1  STEVEN B. ABBOTT (SBN 125270)
2  sabbott@redwineandsherrill.com
   GERALD D. SHOAF (SBN 41084)
3  gshoaf@redwineandhserrill.com
   JULIANNA K. TILLQUIST (SBN 180552)
4  jtillquist@redwineandsherrill.com
5  REDWINE AND SHERRILL
   ATTORNEYS AT LAW
6  1950 MARKET STREET
7  RIVERSIDE, CA 92501
   PHONE (951) 684-2520
8  FACSIMILE (951) 684-9583
9
10 Attorneys for Defendants,
   COACHELLA VALLEY WATER
11 DISTRICT, FRANZ DE KLOTZ, ED PACK,
12 JOHN POWELL, JR., PETER NELSON,
   and DEBI LIVESAY, in their official
13 capacities as members of the Board of
14 Directors of the COACHELLA VALLEY
   WATER DISTRICT
15

16              UNITED STATES DISTRICT COURT

17     CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

18

19 AGUA CALIENTE BAND OF          )  ED CV 13-00883 JGB-(SPx)
20 CAHUILLA INDIANS,              )
                                  )  Action Filed May 14, 2013
21              Plaintiff,        )
                                  )
22     vs.                        )  DECLARATION OF GERALD D.
                                  )  SHOAF IN SUPPORT OF CVWD'S
23 COACHELLA VALLEY WATER         )  MOTION FOR SUMMARY
24 DISTRICT, et al.               )  JUDGMENT
                                  )
25              Defendants.       )  Hearing:  February 9, 2015
26                                )  Time:     9:00 a.m.
   UNITED STATES OF AMERICA       )         Courtroom 1
27                                )
         Plaintiff-in-Intervention )
28                                )

                            1

I, Gerald D. Shoaf, declare as follows:

1.      I am a member of the State Bar of California and am admitted to practice before this court.  I am a partner in Redwine and Sherrill, counsel of record for defendants COACHELLA VALLEY WATER DISTRICT and FRANZ DE KLOTZ, ED PACK, JOHN POWELL, JR., PETER NELSON and DEBI LIVESAY, in their Official Capacities as Members of the Board of Directors of the Coachella Valley Water District, (hereafter collectively "CVWD").  I make this declaration in support of CVWD's Motion for Summary Judgment, or in the alternative, for Partial Summary Judgment.  I have personally worked on this case and am familiar with all matters related to Phase 1 discovery.  I have personal knowledge of all matters stated herein.

2.      Attached as Exhibit 1 is a true and correct copy of the RESPONSES TO REQUEST FOR ADMISSION OF DEFENDANT CVWD TO PLAINTIFF AGUA CALIENTE BAND OF CAHUILLA INDIANS (SET NO. 2), Request No. 23.

3.      Attached as Exhibit 2 is a true and correct copy of the RESPONSES TO REQUESTS FOR ADMISSION OF DEFENDANT CVWD TO PLAINTIFF AGUA CALIENTE BAND OF CAHUILLA INDIANS (SET NO.1), Request No. 11.

4.      Pursuant to stipulation of the parties, the Court on August 15, 2014 entered an Order Regarding Page Limits and Authentication of Documents for Summary Judgment Briefing. (Doc. 78)  Paragraph 3 of that Order provides: "Pursuant to

stipulation of the parties, any document that has been disclosed or produced by any party in discovery shall be presumed to be authentic if offered as evidence in connection with Phase 1 summary judgment briefing."

5.     I have reviewed all documents disclosed by the parties during discovery, including those disclosed in connection with initial and supplemental disclosures, expert disclosures, and in response to discovery requests.  The following documents, which are attached hereto as Exhibits 3-50, were produced by one or more parties during discovery and are therefore presumed to be authentic under the provisions of paragraph 3 of the Order:

| Exhibit # | Document |
| --- | --- |
| 3. | 1862 Annual Commissioner of Indian Affairs Report to Congress, pages 191-92; |
| 4. | 1865 Annual Commissioner of Indian Affairs Report to Congress, page 13; |
| 5. | 1867 Annual Acting Commissioner of Indian Affairs Report to Congress, page 17; |
| 6. | 1871 Annual Commissioner of Indian Affairs Report to Congress, page 19; |
| 7. | 1873 Annual Commissioner of Indian Affairs Report to Congress, pages 29-31; |

8.          1877 Annual Commissioner of Indian Affairs Report to
            Congress, pages 35 through 38;

9.          1888 Senate Committee on Indian Affairs Report;

10.         1889 Annual Commissioner of Indian Affairs Report to
            Congress, page 59;

11.         Letter from Commissioner of Indian Affairs T.J. Morgan
            to Messrs. Smiley, Morse and Painter, dated January 31,
            1891;

12.         Smiley Commission Report of December 1891;

13.         Message from the President of the United States, dated
            January 25, 1892, with attached letter to the President
            from the Secretary of the Interior dated January 23, 1892;

14.         Trust Patent, May 14, 1896;

15.         Trust Patent, October 29, 1906;

16.         Trust Patent, January 5, 1911;

17.         Trust Patent, March 29, 1923;

18.         1855-56 US Government Land Survey Map;

19.         "Aboriginal occupation at Tahquitz Canyon," page 51;

20.         1888 Proposed Agreement between Indian Agent Preston
            and the Palm Valley Water Company for surface water
            supply for Tribe;

21.     1888 Agreement between Indian Agent Preston and BB Barney for surface water supply for tribe in exchange for right-of-way;

22.     Henry Ryan Report to Indian Agent Estudillo, dated January 16, 1894;

23.     1894 Letter from Henderson to Painter regarding Tribe's dire situation involving domestic water supply from Tahquitz Ditch;

24.     1898 Inspector Nesler's report to the Secretary of the Interior;

25.     Supervisor Holland's 1900 Report to the Commissioner; regarding water supply for the Agua Caliente Tribe;

26.     1903 Commissioner of Indian Affairs Annual Report;

27.     Report by Superintendent of Irrigation Butler to Commission of Indian Affairs, dated August 22, 1903;

28.     Report by Special Inspector Levi Chubbuck to Commission of Indian Affairs, dated February 2, 1906;

29.     1906 Inspector Chubbuck's report to Secretary, dated February 24, 1906;

30.     1906, Chief Engineer Code to Secretary;

| | |
|---|---|
| 31. | Kelsey Report to Commissioner dated August 8, 1906 re: "Condition of the California Indians"; |
| 32. | 1907 Kelsey Report to Commissioner; |
| 33. | 1907 Commissioner's Annual report; |
| 34. | 1907, Superintendent of Irrigation Ollny to Code; |
| 35. | 1908, Kelsey to Code, Chief Engineer; |
| 36. | 1909 Lebacho letter re: purpose of construction of Tahquitz Ditch; |
| 37. | 1911 Agreement between United States and Non-Indians concerning Tahquitz Creek water allocation; |
| 38. | 1911 Administrative Farmer's letter to Olberg; |
| 39. | 1918 "History of Irrigation-Agua Caliente Reservation"; |
| 40. | 1924 Indian Defense Association of Santa Barbara report regarding Agua Caliente Tribe; |
| 41. | 1924 Palmer Report to Dr. Blair; |
| 42. | 1924 Clotts Report to Commissioner; |
| 43. | May 8, 1925 Ellis letter to Commissioner; |
| 44. | August 13, 1925 Ellis letter to Commissioner; |
| 45. | 1931 Supervising Engineer Wathen to Director of Irrigation; |
| 46. | 1936 Agua Caliente Tribal Committee letter to Secretary; |

47.     1936 Supervising Engineer Engle to Commissioner with Memo regarding Agua Caliente Water Rights;

48.     1939 District Counsel Humphrys' letter to Director of Irrigation Wathen;

49.     1940 Draft Agreement to replace 1911 Agreement regarding Tahquitz Creek Water allocation;

50.     Report by Special Attorney of the Mission Indians, William Collier, to Commission of Indian Affairs, dated August 8, 1906.

6.     The following documents which are attached as Exhibits H, I, and J to CVWD's Request for Judicial Notice were produced by one or more parties during discovery and are therefore presumed to be authentic under the provisions of paragraph 3 of the Order:

H.     Executive Order of May 15, 1876;

I.     Executive Order September 29, 1877;

J.     Executive Order December 29, 1891.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed on October 21, 2014 at Riverside, California.

_____
Gerald D. Shoaf

**EXHIBIT 1**

1    DAVID J. MASUTANI (SBN 172305)
2    **ALVARADO SMITH, APC**
     633 W. Fifth Street, Suite 1100
3    Los Angeles, CA 90071
     Telephone: (213) 229-2400
4    Facsimile: (213) 229-2499
     dmatsutani@kmwlaw.com
5    Attorneys for Plaintiff
6    AGUA CALIENTE BAND OF
7    CAHUILLA INDIANS

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   AGUA CALIENTE BAND OF              Case No. 5:13-cv-00883-JGB (SPx)
12   CAHUILLA INDIANS,                  Judge: Hon. Jesus G. Bernal
               Plaintiff,
13                                      RESPONSES TO REQUESTS FOR
         v.                             ADMISSION OF DEFENDANT CVWD
14   COACHELLA VALLEY WATER             TO PLAINTIFF AGUA CALIENTE
     DISTRICT, et al.,                  BAND OF CAHUILLA INDIANS (SET
15             Defendants.              NO. 2)
16
17                                      Action filed: May 14, 2013

18

19   PROPOUNDING PARTY:           DEFENDANT CVWD
20   RESPONDING PARTY:            PLAINTIFF AGUA CALIENTE BAND OF
21                                CAHUILLA INDIANS
22   SET NO.:                     TWO
23
24
25
26
27
28

US2008 5686760 1

Pursuant to the Federal Rule of Civil Procedure Rule 36 and Local Rule 36 of the United States District Court for the Central District of California, Plaintiff Agua Caliente Band of Cahuilla Indians (the Tribe) responds to Defendant Coachella Valley Water District (CVWD) Requests for Admission (Requests) as follows:

## I.      GENERAL OBJECTIONS

1. The Tribe objects to the Requests to the extent that they purport to limit the time available for the Tribe to respond to 30 days, when the applicable Federal Rules provide for 33 days.

2.      The Tribe objects to the Requests to the extent that they purport to require that the Tribe answer them under oath, as there is no such requirement in the applicable Federal or Local Rules.

The Tribe incorporates these General Objections into each response set forth below.

## REQUESTS FOR ADMISSION

REQUEST NO. 23:

Please admit that no petition for recognition of the Plaintiff's aboriginal title/permanent rights of occupancy to any lands in California was presented by Plaintiff or in Plaintiff's behalf to the California Land Claims Commission established by Congress pursuant to the "Act to Ascertain and Settle the Land Claims in the State of California" dated March 3, 1851.

RESPONSE:

Admitted.

REQUEST NO. 24:

Please admit that the Tribe was a participant in the case of Thompson v. United States before the Indian Claims Commission, 8 Ind. Cls. Com 1, 13 Ind. Cls. Com 543.

US2008 5686760 1

5:13-cv-00883-JGB (SPx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE:

Denied.

Dated: June 19, 2014

KILPATRICK TOWNSEND
& STOCKTON LLP

By: _____
CATHERINE F. MUNSON
Attorneys for Plaintiff Agua
Caliente Band of Cahuilla
Indians

US2008 5686760 1

3

5:13-cv-00883-JGB (SPx)

1–11

# PROOF OF SERVICE

## United States District Court of the Central District of California
### Case No.:  ED CV 13-00883-JGB-SPX

Pursuant to Local Rule 5-3.1.2, I, Belinda Slack, say:

I am over the age of 18 years, am not a party to this suit, am employed in Los Angeles County, California, and my business address is 633 W. Fifth Street, Suite 1100, Los Angeles, California.

On June 19, 2014, I served a copy of the attached document on the interested parties in this lawsuit by placing it in a sealed, pre-paid envelope in the United States mail addressed:

**RESPONSES TO REQUESTS FOR ADMISSION OF DEFENDANT CVWD TO PLAINTIFF AGUA CALIENTE BAND OF CAHUILLA INDIANS (SET NO. 2)**

### SEE ATTACHED SERVICE LIST

EXECUTED on June 19, 2014 at Los Angeles, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States that that the above is true and correct.

_____
Belinda Slack

3790842.1 -- N1431.1

1–12

## SERVICE LIST

### Agua Caliente Band of Cahuilla Indians v. CVWD, et al.

### Case No. ED CV 13-00883-JGB-SPX

**Defendants:  Desert Water Agency; Patricia G. Oygar, Thomas Kieley, III, James Cioffi, Craig A. Ewing, Joseph K. Stuart, in their Official Capacity as Members of the Board of Directors of the Desert Water Agency**

Roderick E. Walston, Esq.
Arthur L. Littleworth, Esq.
Piero C. Dallarda, Esq.
Best Best and Krieger LLP
2001 North Main Street, Suite 390
Walnut Creek, CA  94596
Telephone:  (925) 977-3300
Facsimile:  (925) 977-1870
Roderick.Walston@bbklaw.com

Steven G. Martin, Esq.
Best Best & Krieger
655 Broadway
15th Floor
San Diego, CA  92101

**Defendants:  Coachella Valley Water District, Franz de Klotz, Ed Pack, John Powell, Jr., Peter Nelson, and Debi Livesay, in their official capacities as members of the Board of Directors of the Coachella Valley Water District**

Steven B. Abbott, Esq.
Gerald D. Shoaf, Esq.
Redwine and Sherrill
1950 Market Street
Riverside, CA  92501
Telephone:  (951) 684-2520
Facsimile:  (951) 684-9583

# EXHIBIT 2

1   DAVID J. MASUTANI (SBN 172305)
2   **ALVARADOSMITH, APC**
    633 W. Fifth Street, Suite 1100
3   Los Angeles, CA 90071
    Telephone: (213) 229-2400
4   Facsimile: (213) 229-2499
5   dmatsutani@kmwlaw.com
    Attorneys for Plaintiff
6   AGUA CALIENTE BAND OF
7   CAHUILLA INDIANS

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  AGUA CALIENTE BAND OF           Case No. 5:13-cv-00883-JGB (SPx)
12  CAHUILLA INDIANS,               Judge: Hon. Jesus G. Bernal
                Plaintiff,
13         v.                       RESPONSES TO REQUESTS FOR
                                    ADMISSION OF DEFENDANT CVWD
14  COACHELLA VALLEY WATER          TO PLAINTIFF AGUA CALIENTE
    DISTRICT, et al.,               BAND OF CAHUILLA INDIANS (SET
15              Defendants.         NO.1)

16

17                                  Action filed: May 14, 2013

18

19  PROPOUNDING PARTY:       DEFENDANT CVWD

20  RESPONDING PARTY:        PLAINTIFF AGUA CALIENTE BAND OF

21                           CAHUILLA INDIANS

22  SET NO.:                 ONE

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP        US2008 5510433 2

Pursuant to the Federal Rule of Civil Procedure Rule 36 and Local Rule 36 of the United States District Court for the Central District of California, Plaintiff Agua Caliente Band of Cahuilla Indians (the Tribe) responds to Defendant Coachella Valley Water District (CVWD) Requests for Admission (Requests) as follows:

## I.    GENERAL OBJECTIONS

1. The Tribe objects to the Requests because they exceed the scope of discovery for Phase I of this case by seeking information that is relevant, if at all, to the quantification of the Tribe's federally reserved and aboriginal rights rather than the existence of those rights. The parties stipulated that Phase I of the case would be limited to "the threshold issue of whether the Tribe has rights to groundwater pursuant to the federal *Winters* doctrine and/or aboriginal rights to groundwater." (Doc. 49 ¶ 4.) The parties further agreed, in their Revised Joint Rule 26(f) Conference Report (Doc. 54), that Phase I discovery would be limited to the issues of "(1) the Tribe's historic and possibly current use of groundwater; and (2) the purposes for which the Reservation was established." (*Id.* § X, ¶ A.4.) All issues pertaining to quantification of the Tribe's groundwater rights are reserved for Phase III, in large part to delay the resolution of complicated factual issues until after the court resolves threshold legal questions regarding the existence of the Tribe's rights.

2. The Tribe objects to the Requests on relevance grounds because they seek information regarding current use of water on the Reservation when it is well-established that federally reserved water rights are not lost by non-use.

3. The Tribe objects to the Requests' definition of the term "Tribe" on the grounds that it is vague and ambiguous as to whether it includes tribal members.

4. The Tribe objects to the Requests to the extent that they purport to limit the time available for the Tribe to respond to 30 days, when the applicable Federal Rules provide for 33 days.

Gibson, Dunn & Crutcher LLP

US2008 5510433 2

OYGAR'S INTERROGATORIES
5:13-cv-00883-JGB (SPx)

2

5.      The Tribe objects to the Requests to the extent that they purport to require that the Tribe answer them under oath, as there is no such requirement in the applicable Federal or Local Rules.

The Tribe incorporates these General Objections into each response set forth below.

## **REQUESTS FOR ADMISSION**

REQUEST NO. 1:

Please admit that the TRIBE did not receive any Spanish or Mexican grant prior to 1850.

RESPONSE:

Admitted.

REQUEST NO. 2:

Please admit that Presidential Executive orders between 1864 and 1891 set aside more than four tracts of land for Indians in California.

RESPONSE:

The Tribe objects to this Request on the ground that it is vague and ambiguous in its use of the undefined term "tracts."

Subject to and without waving the foregoing objection, the Tribe admits that Presidential Executive orders issued between 1864 and 1891 set aside more than four contiguous parcels of land for Indians. The Tribe affirmatively denies that the setting aside of any of these lands in general, or the lands constituting the Tribe's Reservation in particular, constituted or resulted in a violation of the so-called Four Reservations Act, 13 Stat. 39 (1864).

REQUEST NO. 3:

Please admit that any Agua Caliente reservation created prior to 1891 was

or aboriginal rights to groundwater. The Tribe further objects to this Request because it is vague and ambiguous regarding the time period that it is intended to address and in its use of the term "developing."

Subject to and without waiving the foregoing objections, the Tribe states that it has made reasonable inquiries and is unable to admit or deny whether any person or entity has prevented the Tribe from developing groundwater at any time during the 123 years that have elapsed since 1891.

REQUEST NO. 11:

Please admit that the wells alleged to exist in Paragraph 16 of the COMPLAINT are not located within the RESERVATION.

RESPONSE:

The Tribe states that it has made reasonable inquiries and is unable to admit or deny at this time whether any hand dug walk-in wells of the type referenced in paragraph 16 of the Complaint existed within the current boundaries of the Tribe's Reservation.

REQUEST NO. 12:

Please admit that the TRIBE has not developed groundwater for commercial purposes since 1891.

RESPONSE:

The Tribe objects to this Request on the grounds that it exceeds the scope of Phase I discovery and is irrelevant to the existence of the Tribe's federally reserved or aboriginal rights to groundwater. The Tribe further objects to this Request on the ground that it is vague and ambiguous in its use of the undefined term "developed."

Subject to and without waiving the foregoing objections, this Request is denied.

1    Please admit that groundwater where YOU claim groundwater rights does not

2 contribute to the surface flows of Chino Creek.

3   RESPONSE:

4    The Tribe objects to this Request on the grounds that it exceeds the scope of

5 Phase I discovery and is irrelevant to the existence of the Tribe's federally reserved

6 or aboriginal rights to groundwater.

7    Subject to and without waiving the foregoing objections, this Request is

8 admitted.

9

10  ADMISSION NO. 22:

11    Please admit that the TRIBE approved the settlement of its claim for loss of

12 aboriginal rights and received compensation in the Indian Claims Commission

13 proceeding captioned *Thompson v. United States*, 8 Ind.Cls.Com. 1; 13 Ind.Cls.Com.

14 543.

15   RESPONSE:

16   Denied.

17

18

19

20  Dated: April 28, 2014     KILPATRICK TOWNSEND
                & STOCKTON LLP

21

22             By: _Catherine F Munson_

23             CATHERINE F. MUNSON

24             Attorneys for Plaintiff Agua

25             Caliente Band of Cahuilla
             Indians

26

27

28

Gibson, Dunn &
Crutcher LLP

US2008 5510433 2

11

# PROOF OF SERVICE

## United States District Court of the Central District of California
### Case No.: ED CV 13-00883-JGB-SPX

Pursuant to Local Rule 5-3.1.2, I, Belinda Slack, say:

I am over the age of 18 years, am not a party to this suit, am employed in Los Angeles County, California, and my business address is 633 W. Fifth Street, Suite 1100, Los Angeles, California.

On April 28, 2014, I served a copy of the attached document on the interested parties in this lawsuit by placing it in a sealed, pre-paid envelope in the United States mail addressed:

**RESPONSES TO REQUESTS FOR ADMISSION OF DEFENDANT CVWD TO PLAINTIFF AGUA CALIENTE BAND OF CAHUILLA INDIANS (SET NO. 1)**

### SEE ATTACHED SERVICE LIST

EXECUTED on April 28, 2014 at Los Angeles, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States that that the above is true and correct.

_____
Belinda Slack

## SERVICE LIST

### Agua Caliente Band of Cahuilla Indians v. CVWD, et al.

### Case No. ED CV 13-00883-JGB-SPX

**Defendants:  Desert Water Agency; Patricia G. Oygar, Thomas Kieley, III, James Cioffi, Craig A. Ewing, Joseph K. Stuart, in their Official Capacity as Members of the Board of Directors of the Desert Water Agency**

Roderick E. Walston, Esq.
Arthur L. Littleworth, Esq.
Piero C. Dallarda, Esq.
Best Best and Krieger LLP
2001 North Main Street, Suite 390
Walnut Creek, CA  94596
Telephone:  (925) 977-3300
Facsimile:  (925) 977-1870
Roderick.Walston@bbklaw.com

Steven G. Martin, Esq.
Best Best & Krieger
655 Broadway
15th Floor
San Diego, CA  92101

**Defendants:  Coachella Valley Water District, Franz de Klotz, Ed Pack, John Powell, Jr., Peter Nelson, and Debi Livesay, in their official capacities as members of the Board of Directors of the Coachella Valley Water District**

Steven B. Abbott, Esq.
Gerald D. Shoaf, Esq.
Redwine and Sherrill
1950 Market Street
Riverside, CA  92501
Telephone:  (951) 684-2520
Facsimile:  (951) 684-9583

3790842.1 -- N1431.1

# EXHIBIT 3

# REPORT

### OF

# THE COMMISSIONER OF INDIAN AFFAIRS.

---

DEPARTMENT OF THE INTERIOR,
*Office of Indian Affairs, November 26, 1862.*

SIR: I have the honor to submit my annual report for the current year. The details of the present condition of most of the Indian nations and tribes within our borders, their wants, prospects, and the advancement made by them in civilization, as also of the operations of the various superintendents, agents, and employés located among them, may be learned from the accompanying papers.

Having in my last annual report treated, at considerable length, of the location, condition, and wants of the various superintendencies, I shall, upon this occasion, confine myself chiefly to those which, in my judgment, demand special consideration.

Another year has but served to strengthen my conviction that the policy, recently adopted, of confining the Indians to reservations, and, from time to time, as they are gradually taught and become accustomed to the idea of individual property, allotting to them lands to be held in severalty, is the best method yet devised for their reclamation and advancement in civilization. The successful working of this policy is not, however, unattended with difficulties and embarrassments, arising chiefly from the contact of the red and white races. This is especially the case in relation to Indians whose reservations are located within the limits of States.

In very many instances the reservation is entirely surrounded by white settlements, and however much the fact is to be regretted, it is, nevertheless, almost invariably true that the tracts of land still remaining in the possession of the Indians, small and insignificant as they are when compared with the broad domain of which they were once the undisputed masters, are the objects of the cupidity of their white neighbors; they are regarded as intruders, and are subject to wrongs, insults, and petty annoyances, which, though they may be trifling in detail, are, in the aggregate, exceedingly onerous and hard to be borne.

They find themselves in the pathway of a race they are wholly unable to stay, and on whose sense of justice they can alone rely for a redress of their real or imaginary grievances. Surrounded by this race, compelled by inevitable necessity to abandon all their former modes of gaining a livelihood, and starting out in pursuits which to them are new and untried experiments, they are brought in active competition with their superiors in intelligence and those acquirements which we consider so essential to success. In addition to these disadvantages, they find themselves amenable to a system of local and federal laws, as well as their treaty stipulations, all of which are to the vast majority of them wholly unintelligible. If a white man does them an injury, redress is often beyond their reach; or, if obtained, is only had after delays and vexations which are them-

Many vouchers were and are transmitted to this office in advance of the agent's accounts for the quarter in which they were issued.

The delay on the part of some and the neglect of other agents to render and forward their final accounts, together with the fact that much of this indebtedness has been incurred in disregard of the instructions of this office, and with a knowledge on the part of the agents that the funds under many of the heads of appropriation were already exhausted, has been and still is an element of delay.

The outstanding liabilities of the Indian service for Oregon and Washington created during the present administration have been, in a great measure, unavoidable. The necessary changes in the superintendency of Washington Territory, and amongst the agents in Oregon and Washington, have contributed largely to this result.

The appointment of a superintendent, and the filing of his bond, consumes from sixty to ninety days. Until the bond is filed the office cannot place any funds to the credit of the superintendent. Pending the filing of the bond a removal and consequent appointment of another superintendent, as was the case in Washington, involves a repetition of the delay. The funds being thus withheld, the agents are obliged to create an indebtedness in order to carry on the business of their agencies.

To obviate this difficulty it is suggested that legislation be had by Congress, creating depositories in those Territories, so that moneys intended for disbursement there can be paid upon the presentation of the bond of the proper officer

CALIFORNIA SUPERINTENDENCY.

The condition of the Indians in California is one of peculiar hardship, and I know of no people who have more righteous claims upon the justice and liberality of the American people. Owing to the discovery of its mines, the fertility of its soil, and the salubrity of its climate, that State within a few years past became the recipient of a tide of emigration almost unexampled in history. Down to the time of the commencement of this emigration nature supplied all the wants of the Indians in profusion. They lived in the midst of the greatest abundance, and were free, contented, and happy. The emigration began, and every part of the State was overrun, as it were, in a day. All, or nearly so, of the fertile valleys were seized; the mountain gulches and ravines were filled with miners; and without the slightest recognition of the Indians' rights, they were dispossessed of their homes, their hunting grounds, their fisheries, and, to a great extent, of the productions of the earth. From a position of independence they were at once reduced to the most abject dependence. With no one of the many tribes of the State is there an existing treaty. Despoiled by irresistible force of the land of their fathers; with no country on earth to which they can migrate; in the midst of a people with whom they cannot assimilate, they have no recognized claims upon the government, and are almost compelled to become vagabonds—*to steal or to starve.* They are not even unmolested upon the scanty reservations we set apart for their use. Upon one pretext or another, even these are invaded by the whites, and it is literally true that there is no place where the Indian can experience that feeling of security which is the effect of just and wholesome laws, or where he can plant with any assurance that he shall reap the fruits of his labor. The great error in our relations with the California Indians consists, as I conceive, in our refusal to recognize their usufructuary right in the soil, and treat with them for its extinguishment; thereby providing for them means of subsistence until such time as they shall be educated to conform to the widely altered circumstances by which they are surrounded. It is now perhaps too late to correct this error by making treaties, and it only remains for us to do voluntarily that justice which we have refused to acknowledge in the form of treaty obligations.

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 25 of 206   Page ID #:550

When the incalculable value of California, with its seven or eight hundred miles of sea-coast and its untold millions of wealth, is considered, how small, in comparison, is the value of such appropriations as would be sufficient to afford the Indians every aid and facility for the attainment of comfortable homes and the simple arts of civilization necessary to their subsistence!  And when it is also considered that these people were in the almost undisputed possession of this beautiful domain, surely we, who have deprived them of their possessions, ought not to withhold the little which, by every consideration of humanity and justice, they may so imperatively and rightfully demand.

A proviso was added to the appropriation made by Congress at its last session for the Indian service in this State, authorizing and directing the Secretary of the Interior " to inquire into the expediency of reducing the Indian reservations in California to two in number; the proper places for the same; the probable expense thereof; the propriety of disposing of any of the reservations, and the value thereof, and of the property thereon; of the manner and terms of such disposal; and in what manner, in his judgment, the expense of the Indian department in that State can be reduced and its system simplified, without injury to the same, and report thereon to the next regular session of Congress."  That the information sought by this proviso might be obtained, I directed the superintending agents for the northern and southern districts, shortly after the adjournment of the last Congress, to inquire into and report upon the various subjects embraced therein.  The report of Superintending Agent Hanson will be found among the accompanying papers; that of Superintending Agent Wentworth is not yet received.

I entirely concur in the views expressed in the report of Mr. Hanson as to the wants of the northern district.  It will be seen that there is no one location, within his knowledge, sufficient in extent to accommodate the Indians of this district.  Two reservations are therefore imperatively demanded.  Were it otherwise, I should deem the statements made by Mr. Hanson as to the disparity in the tastes, habits, and pursuits of the Indians of the coast and those of the interior, conclusive as to the propriety of two reservations.  I also feel well assured that his recommendations as to the sale of the Klamath, the Mendocino, and Nome Lacke reservations; the purchase of such settlers' claims, within the Smith River and Round Valley reservations, as may be found just; the removal of all whites therefrom, and the enlargement of their limits, should be adopted at once.  If these suggestions shall receive the early and favorable consideration of Congress, I have the utmost confidence that they will be attended with the most gratifying results, as all our accounts agree that the Indians of this district, and, indeed, of the State at large, possess, in an unusual degree, the capacity of speedily acquiring the arts of civilization and becoming self-supporting.

Whether it shall be found expedient to establish one or more reservations within the limits of the southern district, there should be no delay in securing the titles to such as may be found necessary, as delay not only increases the difficulties of procuring suitable locations, but also serves to enhance the value of such desirable lands as may be found to belong to white settlers.  Very many of the Indians of the southern district are already well advanced in civilization. This is especially the case with those in that portion of the district extending east and west from the Mojave to the Colorado river, and to the Pacific coast, and southwardly to the boundary of the State.  I see no reason why the system for the management of our Indian relations with California should differ from that of other States and of the Territories.  We have now *two superintending agents,* both residing in San Francisco, and both necessarily requiring offices and clerks.  Their duties, I have no doubt, may be as efficiently discharged by a superintendent, with but little, if any, additional expense to that incurred by each of the superintending agents; and I have no doubt that, in case two reserva-

**EXHIBIT 4**

# REPORT

OF THE

# COMMISSIONER OF INDIAN AFFAIRS.

---

DEPARTMENT OF THE INTERIOR,
*Office Indian Affairs, Washington, D. C., October* 31, 1865.

SIR: Having assumed the duties of Commissioner of Indian Affairs after the beginning of the third quarter of the year over which this annual report extends, and having been necessarily absent a great portion of the time since, upon public business in the southwest, I have been unable to obtain that familiarity with the details of business, or to gain that acquaintance with the condition of Indian affairs generally, which a longer time would have allowed. I present herewith a summary of such information in regard to the interesting people who are by law placed under the charge of this office as I have been able to obtain from the current correspondence and annual reports of superintendents and agents, and other employés.

Before proceeding to refer to the various superintendencies and agencies in detail, and to make such suggestions as seem to be called for in reference to each, there are sundry matters of common interest to the whole Indian service, or relating to several agencies combined, which I deem worthy of special notice.

First among these is the neglect on the part of many of the officers responsible to this office to forward their monthly, quarterly, and annual reports at the proper time, in disregard of repeated directions from the office. Some of them appear to have imagined that circulars of instructions were mere matters of form, with which a compliance was not expected, or as applying to everybody but themselves. Nor are they sufficiently careful to make these reports complete in detail, as required, where they *are* made. The consequence is that each year, notwithstanding every endeavor on the part of this office, its annual report fails of completeness somewhere, by the neglect of its subordinates; and its statistical tables do not give that fulness of information for which they are designed. I confess that I do not know of any way to remedy this difficulty except by reporting to the department each case of delinquency, and relying upon it to seek a remedy by a change of officers. It is an injustice to those who are prompt and thorough in their reports to allow them to fail of usefulness because the reports of others, necessary to completeness, are not sent, or are deficient in essential particulars.

It has been customary, I have learned, for agents who are superseded by others to take away from the agency the papers and books properly belonging there, thus removing the history of the past transactions, and preventing their successors from explaining matters which must be, and often are, necessarily referred to them. I have endeavored to correct this evil by a circular requiring all agents to preserve and leave as public property duplicate copies of all important papers and vouchers, &c., as well as a complete daily record of all agency transactions; and shall observe as a rule of action by this office the suspension of the accounts of all retiring agents who, after knowledge of the circular above referred to, shall fail to show that they have passed over to their successors the books and papers of the agency.

Original from
UNIVERSITY OF MINNESOTA

thinks that sufficient land can be had at fair rates in the vicinity for other southern bands who will soon have to be brought upon reservations.

With Superintendent Maltby's report he has forwarded the statements of two special agents sent by his predecessor last spring, with instructions to visit and inquire into the condition of, and furnish seeds and a supply of implements to, the Mission Indians, located in small settlements near the southern line of the State, from Los Angelos to San Diego.   These reports are full of interest, and the visit appears to have been of benefit to the Indians.   Unscrupulous white men seem to be interfering with their rights in a very unjustifiable manner, and it was time that protection was extended to them.

The total number of Indians upon the reservations named above is, by the superintendent's report, 3,860; while he estimates the whole number in the State not on reservations, and including the Mission Indians, (who live upon and cultivate their own lands,) at 30,000, which is much beyond any other late estimates of the population of the California tribes.

### ARIZONA.

After the resignation of Superintendent Poston, on the occasion of his election as a delegate to Congress last year, he left Mr. G. W. Leihy, whom he had designated as assistant superintendent, in charge of Indian affairs in Arizona, and Mr. Leihy was subsequently appointed superintendent.   His annual report did not reach this office in time for notice in this report, but will be found in the appendix ; but by a letter received, under date of September 27, he gives some important information in regard to the tribes on and near the Colorado river. The letter, which came too late for further notice, is among the papers submitted herewith.

From Mr. J. C. Dunn, who was among the persons appointed by Mr. Poston as agents, as referred to in the last annual report from this office, advices were received during the last summer of hostilities having broken out among the Indians along the Colorado river, but no details have been forwarded.   Mr. Davidson, who was designated by late Superintendent Poston as agent for the Papagos Indians, in the southwest part of the Territory, has furnished much valuable information in regard to that interesting and thoroughly loyal people. In order to place in permanent form such information as to the character, history, and traditions of the Indian tribes as can be obtained, I have included Mr. Davidson's report among the papers to be published with this report.   The Papagos occupy villages and the adjacent country, in the southwest portion of Arizona, having for their centre and most important point the old mission church of San Xavier del Bac, and number some 5,000 souls.   The Pimos and Maricopas (confederated) are an independent and industrious people, living further to the north and west, and number, according to late Superintendent Poston, some 7,500.   Over these two tribes Mr. Davidson was, on the occasion of his late visit to the east, and after your conference with him, appointed by the department as a special agent, and furnished with such portion of funds from the appropriation for Arizona as was deemed applicable to the Indians assigned to his agency, which also includes the Tame Apaches, a small number of well-disposed persons of the extensive tribe which causes so much trouble in that region.

The Papagos have from time to time furnished soldiers to aid the whites against the inroads of the Apaches, and have been very efficient.

Their friendship has been fully recognized, and it is hoped that, under the teacher to be provided, and by means of the agricultural implements and other really valuable articles to be furnished them, they will make rapid improvement in civilization.   Indeed, from the accounts received from Agent Davidson they

Digitized by Google      Original from
UNIVERSITY OF MINNESOTA

# EXHIBIT 5

# ANNUAL REPORT

### ON

# INDIAN AFFAIRS,

#### BY THE

## ACTING COMMISSIONER.

DEPARTMENT OF THE INTERIOR,
OFFICE INDIAN AFFAIRS,
*November* 15, 1867.

SIR: I have the honor, in the absence of the Commissioner of Indian Affairs, who is now and has been for some time past engaged in the discharge of duties devolved upon him, under the act of Congress of 20th July ultimo, creating a commission to establish peace with certain hostile Indian tribes, to submit the usual annual report of the Indian Bureau.

Most of the tribes, particularly those settled upon reservations, who are friendly and peaceable, have, to a considerable degree, made advances in the attainment of many of the benefits of that condition of civilization to which the government, by treaty stipulations, and under a sense of its obligations as their guardian and protector, has sought to raise them. Although their progress has been slow, hardly answering the expectations of those who have looked for more general and marked results, yet the instances are frequent, as the facts in their history develop, of a decided change, indicating the practicability of their being brought from a state of barbarism and ignorance to the possession of a nobler and higher style of life. The reports of the various Indian agents, not only for this year but of preceding years, show the good spirit that prevails with many in regard to their moral, intellectual, and social elevation, and their willingness to engage in industrial pursuits. But so long as the red man remains in a position where he is subject to influences more numerous and potent for evil than those put in motion for his good are capable of counteracting and overcoming, no great progress in these respects may be realized or even expected. No doubt the greatest obstacle to the consummation of ends so much desired is to be found mainly in his almost constant contact with the vicious, unscrupulous whites, who not only teach him their base ways, but defraud and rob him, and, often without cause, with as little compunction as they would experience in killing a dog, take even his life. Another cause or hindrance is the fact that the Indian has no certainty as to the permanent possession of the land he occupies and which he is urged to improve, for he knows not how long he may be permitted to enjoy it. Should it be in a region of remarkable fertility, or in a country abounding in rich mineral ores, it may be wanted for the white man's occupancy or use. The plea of "manifest destiny" is paramount and the Indian must give way, though it be at the sacrifice of what may be as dear as life. If the incentives to build up for himself and family a pleasant home are not provided by his condition and prospects, he becomes discontented or indifferent as to his future welfare, and if he does not really retrograde

Google

Original from
HARVARD UNIVERSITY

II                    REPORT ON INDIAN AFFAIRS.

life affords a better and surer subsistence than a precarious dependence upon the chase. A desire for the acquisition of individual property will soon spring up, and should be gratified by appropriating to each adult a limited quantity of land for his exclusive use. A title thereto should be assured to him, and farming utensils furnished. He will then learn to cultivate the soil. The mechanic arts will follow. The schoolmaster, and above all the missionary, with the blessings and hopes of religion, will crown and perpetuate the work.

The unoccupied country west of the Missouri is of such vast extent that large regions, if properly selected, at points remote from the great lines of travel, may be reserved without detriment to any public interest. Long before the tide of emigration will reach them, they can, by an equitable arrangement with the Indians, be reduced to the dimensions required by the actual wants of an agricultural population.

The selection of suitable sites, and the removal of the Indians to them, cannot be accomplished in the short time allotted to the commissioners appointed by the act of Congress of July last. Two commissions, each consisting of not less than three persons, should be appointed, and adequate means placed at the disposal of the Secretary of the Interior for the efficient completion of the work. No consideration of the time or expenditure likely to be required should be suffered to defeat an object of such surpassing importance. A guarantee against the useless consumption of time or money should be found in the character of the persons selected. The cost will be very inconsiderable compared with that of a war. Had a tithe of our outlay in military operations against the Indians during the present year been honestly and judiciously applied to purposes of peace, the necessity of a resort to force would have been avoided. It is more humane and economical to subsist Indians than to fight them. A wise and just policy will soon relieve us from either necessity.

The salaries of the superintendents of Indian affairs and Indian agents are inadequate. Increased compensation would enable the department to secure the services of men of undoubted capacity and integrity, and tend to remove the temptation to commit those frauds which, before and since the transfer of the Indian Bureau to this department, were and still are imputed to officers performing duties and sustaining relations to the Indians such as devolve upon this class of public servants. I take pleasure, however, in bearing testimony to the ability and fidelity of many now in the Indian service. Some of those of the greatest merit have announced their intention to resign on account of the insufficiency of their pay. Loss to the government and serious wrong to the Indians would be prevented by an appropriation for the employment of special agents, to investigate and correct, at remote posts, frauds and abuses which cannot be properly dealt with by the instrumentalities now subject to the order of the department.

Original from
HARVARD UNIVERSITY

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 32 of 206   Page ID #:557

affairs among them by the department, that these claims be extinguished and the whites retire from the reserve. I recommend that steps be taken to accomplish these objects at an early day. A precedent will be found in the action taken by Congress, March 3d, 1865, in regard to settlers upon Hoopa Valley reserve. As to this latter reservation, the title being secured, no outside interference will likely occur, and with an appropriation sufficient to supply it with good agricultural implements, the probability is that it can be made as productive and successful as that of Round valley.

The claims of the Mission Indians to the consideration and protection of the government have been noticed in former annual reports. Little has been done for their good of a permanent character. In point of intelligence and industry they are regarded as being much in advance of any of the Indians of California, but they greatly need a home they can call their own, where they will not be overrun by the whites and subject to pernicious influences of the evil-disposed. I strongly urge that they be located upon some suitable reservation.

The melancholy intelligence was communicated to this office last spring that agent Stockton, in charge of the Indians at Hoopa valley, suffered a violent death at the hands of a desperate Indian named Frank, while making an attempt to arrest him for horse-stealing. The murderer fled to the mountains. Efforts, it was stated, would be made to secure and bring him to trial. What success has attended such efforts this office has not been informed.

The Chemihuevis, living in California on the right bank of the Colorado river, so often engaged in conflict with the Mohave Indians, residing in Arizona on the opposite bank, have entered into a treaty of amity with the latter, thus removing one of the hindrances to the success of the measures adopted to colonize and sustain the Indians of that section upon the Colorado River reservation.

The management of Indian affairs in California had been so unsatisfactory for years past that it determined the department in August, 1866, to despatch a special agent to investigate the condition of things as relating to the Indian service in that State. Accordingly R. J. Stevens, esq., secretary of Committee on Appropriations of the House of Representatives, was selected for that purpose. His report, dated 1st January last, which will be found among the documents herewith, is very interesting, containing sound views and wise suggestions, with valuable information respecting the Indians, the geographical position of the several reservations, the nature of the soil and climate.

## NEVADA SUPERINTENDENCY.

There are over 10,000 Indians in this superintendency, all of whom, with the exception of the Bannocks in the north part of the State, are reported as peaceably disposed, but whether they will continue so long is doubtful. The gradual advance and increasing number of the whites has much to do with diminishing their means of subsistence, and unless a more liberal appropriation is made for the service in this State than heretofore, stern necessity may force them to acts of depredation and hostility.

The amount ($20,000) appropriated for this fiscal year is entirely insufficient to accomplish to any considerable degree the objects intended, such as the purchase of agricultural implements, presents, and assisting the Indians to locate in permanent abodes, and to sustain themselves by the pursuits of civilized life. It must also be considered that the various tribes have no treaty relations with the government, unless it be that the Shoshones are to be taken as a part of the people of that name with whom treaties were made by Governor Doty in 1863, and who principally live in Utah and Montana.

Treaties should be negotiated with the several bands of Pah-Utes, numbering about 4,000, and they be colonized on a reservation permanently secured to them, with inducements to keep them there under the charge of an agent of the


Original from
HARVARD UNIVERSITY

# EXHIBIT 6

# REPORT

OF THE

# COMMISSIONER OF INDIAN AFFAIRS

TO THE

## SECRETARY OF THE INTERIOR

FOR

## THE YEAR 1871.

———

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1872.

18    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

On arriving at San Francisco, notice was given for over two weeks in the principal daily papers for the claimants to present and substantiate their claims before the committee. Only two claimants for small amounts were present in response to the notice. Subsequently, diligent inquiry was made by Commissioner Farwell in the localities where the principal claims were alleged to have originated. With the exception of some small claims, his convictions are very strong that nearly all of them are either fraudulent or have been already paid. (See report of Commissioner John V. Farwell, investigation of alleged claims in California, Appendix A e.)

Commissioner Farwell visited Hoopa Valley and Round Valley reservations. He found the Indians in Hoopa Valley using McCormick's reapers in harvesting on the agency farm, and giving abundant evidence of capacity for advancement, and, at the same time, showing in almost every other respect the most striking proofs of abuse and mismanagement on the part of those to whom their care has been heretofore intrusted. The too near vicinity of soldiers is deemed injurious both to themselves and the Indians, and, as in the case of the Washington and Oregon reservations, it is imperatively necessary that the lines of the reservations should be defined, and trespassers ejected. (See Appendix A e.)

### MISSION INDIANS IN SOUTHERN CALIFORNIA.

The condition of the Mission Indians in Southern California demands the serious attention of the Government. In the year 1802, according to the records of the missions, they harvested 33,576 bushels of wheat, and owned 67,782 horned cattle, 107,172 sheep, 3,064 horses and mules, and 1,040 hogs. The choice spots from San Francisco on the north to San Diego on the south were owned and occupied by them. Thirty-eight years ago, by a Mexican law, their lands and stock, before held in common, were divided among them. Since they have come under the control of the United States those lands have been taken from them, and they are now poor. They are scattered through the counties of Los Angeles, San Barnardino, San Diego, and Santa Barbara, and number perhaps 3,000 souls. They have a good knowledge of the manual-labor occupations of the country, and perform the most of it themselves, as herders, farm-hands, grape-gatherers, &c., and are in fact in a state of vassalage to the whites, and their women furnish most of the domestic labor of the country. The meaner class of whites either cheat the Indians out of the pay for their labor, or pay them in that which increases their demoralization.

Many of them speak both Spanish and English. Many are industrious and well-behaved, while many others are drunkards and debased in the extreme. Their character is the natural result of the temptations and abuse to which they have been subjected, together with their deprivation of all incentives to manly exertion.

To the rich rancheros they are slaves in all but the name. A few of these are gentlemen, who seem to have a kindly feeling toward them, and a desire that "something be done for them." The valley of San Pasquale was, by the order of the President, withdrawn from settlement with a view to create a reservation, upon which it was proposed to collect and care for them, but the remonstrances of the whites led to the revocation of the order, and the project is abandoned. It is believed that the opposition to the reservation plan really originated from an unwillingness to lose the labor of the Indians in the settled

6–35

Pasquale. The difficulties of last summer, it is believed, had their origin, not with the Indians, but with the whites instigating them, and the contest was as to which of the districts should have the Chief resident with them, to attract and the better to control the labor which they are unwilling to dispense with. Taking the situation as it is, we believe the only just, and best solution of the difficult question of the Mission Indians, is for Congress to pass a law, giving to Indian families the same amount of land allowed to whites under the homestead law, securing to those who now occupy them the little homes and patches on which they or their forefathers have lived for so many years, and allowing those who have none to select them upon any unoccupied land. They should receive a title inalienable for twenty years, not subject to execution, &c., and *each Indian farm should be subject to the law which protects reservations from white intrusion*, and its occupants to the intercourse laws. They should be subject in all other respects to the existing laws, and each Indian settler upon land, and of proper age, should be entitled to all the rights of citizenship. An able and humane agent should be appointed to protect, advise, and instruct them, and see to the proper registration of their lands.

If these Indians, as has been reported, owned their lands under the Mexican rule, and the United States failed to have their rights represented before the claims commission, the measure proposed is but an insignificant reparation of a great wrong. It should not be delayed, and least of all should it be prevented by the objections of white men of adverse interests, should they be made.

### CIVILIZED INDIANS IN INDIAN TERRITORY.

The civilized tribes in the Indian Territory have held the second session of their annual congress, and clearly demonstrated their ability to legislate wisely for their own welfare and that of their neighboring tribes. Delegates were present from the Cherokees, Creeks, Chickasaws and Choctaws, Seminoles, Cheyennes, Arapahoes, Wichitas, and affiliated bands; and though it was the first time that several members had ever attended such a meeting, yet their conduct was good, and the proceedings altogether animated and harmonious. The marked ability of some of the speakers, and the general talent displayed at this council will compare favorably with that found in older legislative bodies. A copy in brief of the report of their proceedings is appended, (Appendix A c.)

Commissioner John D. Lang assisted in the removal of a portion of the Cherokees from North Carolina to their new home in the Indian Territory; his report will be found herewith, marked A i.

### THE ONEIDAS.

The Oneida Indian reservation in Northern Wisconsin remains as reported last year. The difference of opinion among the members of the tribe as to the wisdom of dividing the lands in severalty, and disposing of such as they do not need, not being reconciled, the board recommend that no action be taken until the Indians agree.

### INDIANS BECOMING CITIZENS.

Lastly, we may refer to the Winnebagoes and Pottawatomies, who, having been for many years under the care of the missionaries and in

# EXHIBIT 7

# ANNUAL REPORT

OF THE

# COMMISSIONER OF INDIAN AFFAIRS

TO THE

# SECRETARY OF THE INTERIOR

FOR

# THE YEAR 1873.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1874.

# PAPERS ACCOMPANYING THE REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS, 1873.

### A.

## REPORT OF SPECIAL AGENT JOHN G. AMES IN REGARD TO THE CONDITION OF THE MISSION INDIANS OF CALIFORNIA, WITH RECOMENDATIONS.

WASHINGTON, D. C., *October 28*, 1873.

SIR: I have the honor to submit the following report touching the "number, location, and condition of the so-called Mission Indians of Southern California," with such recommendations in their behalf as seem best adapted to meet the exigencies of their situation.

In accordance with your instructions, I proceeded in May last to Southern California, where, on the 1st of June, I fixed the headquarters of the agency at Los Angeles. At this point I was detained several weeks, in consequence of the severe illness of a member of my family. This detention, however, was rather favorable than otherwise to the investigation upon which I was about to enter. It gave me the opportunity of learning the views of many of the citizens of Los Angeles and vicinity concerning the Mission Indian question, of acquainting myself with many facts in regard to the past history and management of these Indians, tending to throw light upon their present condition, and of advising with those whom I found best informed upon the subject as to what was best to be done with and for them. It gave me, also, the opportunity of learning, from the officers of the land-office at Los Angeles, so far as the records of that office indicate, the status of land in Southern California, which will aid materially in the solution of this question. I will say in this connection that I found the sentiment of the people of Los Angeles for the most part friendly to the Indians, and in favor of the Government doing something without delay in their behalf. There is a general feeling among those who give any attention to the subject that action in the premises has already been too long neglected, increasing the grievances of which the Indians complain, and making it ever more difficult to remedy the evils to which they are subject.

During my stay at Los Angeles I had several conferences with Indians of the San Luis Rey tribe; the first on June 12, with certain Indians living in Los Angeles, who expressed their gratification that the attention of the Government was at length directed to them, and their hope that they might soon be secure in the enjoyment of their rights. They desired especially that their title to lands now occupied by them should be so confirmed that they could not be driven from them by white men, and thought if this were done the Indians could easily take care of themselves.

Information having been communicated to the Indians living at Pala and vicinity that an agent of the Government had reached Los Angeles, I was in a few days visited by Olegario, actual chief of the large majority of the San Luis Rey tribe, though not recognized as such by the late superintendent of Indian affairs for California. Olegario was accompanied by ten of his captains. With these Indians I had protracted interviews on the 23d of June and on the 3d and 5th of July. They had come to lay their grievances before me and to ask the speedy interposition of the Government in their behalf.

The burden of their complaint was to the effect that they had been gradually driven from the lands which they or their fathers once occupied, the title to which they thought justly belonged to them, until at the present time but little available land remained to them; that white men were in many cases endeavoring to take from them the lands upon which they are living, and by the cultivation of which they gain a partial support; that they were frequently annoyed by the settlers interfering with water upon which they depended for irrigation, corraling their stock, and subjecting them to fine for the same, or taking it from them altogether, threatening them with violence, and in other ways invading what they believe to be their rights; that in disposing of lands the agents of the Government have never recognized the possessory rights of the Indians, and that in consequence they have been, and are still, obliged to abandon lands which they have held in immemorial possession, and to remove from

places to which they are specially attached, as the home and the burial-ground of their ancestors, and this without any provision being made for them elsewhere.

They desired the Government to interfere to prevent this being done hereafter, and to secure them in the possession of the lands now occupied by them. If this was done they could readily support themselves, and were willing to do so, without aid from the Government, except in the matter of farming implements and seed and clothing for the supply of their immediate wants.

They urged, furthermore, as a special grievance, that their right to elect their own chief had been interfered with by the late superintendent, and that the Government recognizes as chief an Indian who was repudiated by nearly all the tribe, against whom they protested at the time of his appointment, two years ago, and whose authority they had since disregarded. They wished a new election ordered, that the tribe might choose its own chief and be no longer even nominally subject to one to whom so few owed allegiance.

In reply I assured them of the sincere desire of the Government to secure their rights and promote their interests, and of its intention to do whatever might be found practicable in this direction; that I had been sent out by the Government to hear their story, to examine carefully into their condition and recommend such measures as seemed under the circumstances most desirable; that I should, as soon as possible, visit them in their homes and see with my own eyes how they were situated, so that I might be better able to advise in their behalf.

It was a matter of special gratification to me that at the conference with Olegario and his captains, held July 3, General B. R. Cowen, the Assistant Secretary of the Interior, was present to listen to their story and to give them wise counsel. General Cowen expressed himself as particularly pleased with their appearance, and hopeful of their future if they were to be regarded as specimens of the Mission Indians.

### TOUR OF INVESTIGATION.

On July 7 I started on a tour of investigation among the Indian settlements of the San Luis Rey tribe, accompanied by Mr. L. E. Sleigh, who, with the approval of the Indian Office, had been appointed clerk of this agency, and by Mr. Louis Wartenberg as interpreter.

We reached San Juan Capistrano the next day, where we called upon Rev. Jos. Mutt of the Roman Catholic Church, whom we found much interested in the Indians of that locality and in possession of information of interest in regard to the pueblo lands adjacent to the mission property. He showed us copies of record matter obtained at great trouble and expense from the archives at San Francisco, from which it appears that the pueblo of San Juan Capistrano was in the year 1841 actually subdivided by the Mexican authorities among the inhabitants, the Indians sharing with the Mexicans in this distribution.

If the claim of the Indians residing there, of whom there are about forty souls, can be established, as Rev. Mr. Mutt believes, the problem as far as they are concerned will be easily solved.

On the 11th we proceeded to San Luis Rey, where are to be found half a dozen families of Indians living upon land in dispute between them and one John Somers. The condition of these Indians, as well as the facts in the case of this dispute, are ably set before the Department by the late superintendent, C. B. Whiting, in a special report under date of May 19, 1873, to which reference is respectfully made.

On the 12th we proceeded thence to the city of San Diego, remaining there until the following Monday evening for the purpose of conferring with some of the citizens of the place as to the condition of the Indians of the country and the course best to be pursued by the Government to better their condition. A diversity of opinion prevails, but all agree that the disputes between the Indians and Americans involving titles to land should be speedily settled.

Reaching Pawai on Monday evening, I was there detained by illness two days, but sent Mr. Sleigh and the interpreter forward to visit certain Indian villages with the understanding that we should meet at Pala, the headquarters of the San Luis Rey tribe. Mr. Sleigh's report of his detour is here inserted:

"Los Angeles, Cal., July 31, 1873.

"Dear Sir: I have the honor to submit the following report of my visit to the Indian villages of San Pasqual, Santa Ysabel, and Agua Caliente, in the county of San Diego, State of California.

"I reached San Pasqual on the 15th instant, from Pawai, where you were yourself detained. I proceeded at once to the house of Panto Lion, captain of the village, and requested him to summon his people together on the following morning for a conference, at the same time explaining to him that we had been sent by the Government at Washington to inquire into their condition and to ascertain if anything could be done by the Government to aid them.

REPORT OF COMMISSIONER OF INDIAN AFFAIRS.   31

"The villagers began to assemble early. At the appointed hour the captain rose, and in a short speech in the Indian language, which seemed to be both eloquent and well appreciated, gave his hearers to understand the errand upon which I visited them. A lively interest was manifested by every one. They complained of the encroachments of their American neighbors upon their land, and pointed to a house near by, built by one of the more adventurous of his class, who claimed to have pre-empted the land upon which the larger part of the village lies. On calling upon the man afterward, I found that such was really the case, and that he had actually paid the price of the land to the register of the land-office of this district, and was daily expecting the patent from Washington. He owned it was hard to wrest from these well-disposed and industrious creatures the homes they had built up. 'But,' said he, 'if I had not done it somebody else would, for all agree that the Indian has no right to public lands.' These Indians further complain that settlers take advantage of them in every way possible; employ them to work and insist on paying them in trifles that are of no account to them; 'dock' them for imaginary neglect, or fail entirely to pay them; take up their stock on the slightest pretext and make exorbitant charges for damages and detention of the stock seized. They are in many cases unable to redeem it. They have therefore little encouragement to work or to raise stock, nor do they care to plant fruit-trees or grape-vines as long as land thus improved may be taken from them, as has been the case in very many instances. Among the little homes included in the pre-emption claim above referred to are those adorned with trees and vines. Instead of feeling secure and happy in the possession of what little is left to them, they are continually filled with anxiety. They claim that they ought to be allowed to remain where their forefathers have lived for so long, and that they should be protected by law in the peaceful possession of the homes that have been handed down to them.

"I asked how they would like for their children to go to school, learn to speak the English language, and to live more like white people. It would be very nice, they replied, but it would do them little good if they could not have their homes protected.

"I asked them how they would like to be moved to some place where they could be better protected, have ground of their own secured to them, and more comfortable homes. The answer was, 'Our fathers lived and died here, and we would rather live here than at any other place.'

"In conclusion I assured them that I should report what I had learned about them, and that I had little doubt but that the Government at Washington would be able to do something to better their condition, charging them at the same time to strive, as I felt they had been doing, to keep the peace among themselves and with the whites.

"I proceeded thence by the most direct route to Santa Ysabel rancheria. On reaching that place, I found the captain, Augustine, absent; sent a messenger for him, and also one for the chief of the Diegeno, Pablo Pene, who lives in a neighboring rancheria. There are about one hundred and twenty-five souls at Santa Ysabel. They occupy the finest valley of the ranch of the same name, on one side of which are about twenty adobe houses for winter-quarters, while on the other side, near their fields of grain, are as many brush-houses, now occupied. At the time that I reached the village, men, women, and children were scattered over the fields harvesting their grain. Some were reaping, some thrashing, some grinding, while near the houses women were making it into bread for immediate use. It was altogether an interesting picture to look upon.

"The chief and captain arrived during the night, and as soon as possible in the morning I sought a conference with them in relation to the condition and wants of their people. I was glad to find them exempt from many of the annoyances of which the Indians of San Pasqual complain. The land which they occupy is claimed under a grant from the Mexican government by private parties, who have hesitated to undertake to eject the Indians for fear of violence on their part in resisting, as they (the Indians) dispute any ownership more sacred than their own, and insist that they should not be disturbed in their possession.

"I reached Agua Caliente on the 17th instant. From a notched stick given me by the captain of the village, José Maria Moro, it appears that there are one hundred and sixty-eight Indians at that place. The land upon which they live has been understood to be of the public domain, until a recent survey of Wagner's ranch betrayed the fact that it was included within the boundary of said ranch. The owners of the ranch threaten to drive them away, and settlers have interfered with their water-privileges, and annoy them in many ways. On the whole they have little to encourage them, and begin to feel that the white man is their enemy.

"My talk with the Indians of Santa Ysabel and Agua Caliente was substantially the same as at San Pasqual. They look to the Government to relieve them of the difficulties under which they now labor. They are peaceably disposed, and for the most part industrious, and deserve better treatment than they get.

"At San Pasqual and Agua Caliente I was called upon by white settlers, the majority of whom had no good word for their dusky neighbors. 'They are thieves; they are treacherous; they are vagabonds.' It was urged that they should be taken to some one of the Territories and surrounded by soldiers to keep them at home, or to some

island in the sea.  I found, however, little in my journey to confirm such opinions, but was glad to note many indications of thrift.  I could but wonder, indeed, that they are as reliable, honest, and peaceable as I found them to be.  The sentiments entertained by very many white men in Southern California toward the Indians are well illustrated in the conclusion to which the proprietor of a small ranch near Temecula came in presenting the subject to me from his stand-point.  It is well to mention that a family of Indians has occupied one corner of his ranch 'from time immemorial.'  His wise and humane (†) conclusion was that the owners of large ranches should not drive 'their Indians' away, but should keep them to work for them, and set apart certain portions of the ranch for them.  'There is worthless land enough upon every ranch,' he said, 'for Indians to live on.'

"The Indians of San Pasqual and Santa Ysabel belong to the Diegenes tribe, with Pable Pene chief, while those of Agua Caliente are Coahuila Indians, under the chiefship of Manuel Largo.  The two tribes speak different dialects; a few in either tribe can speak the Spanish language, but I found none able to converse in English.  The aggregate number of the Diegenes is estimated at one thousand, distributed in about fifteen rancherias, which are situated in the central and southern portions of the county of San Diego.

"All of which I have the honor to submit.

"LUTHER E. SLEIGH.

"Rev. JOHN G. AMES,
     "Special Agent Mission Indians."

Proceeding by way of San Pasqual and Bear Valley, for the purpose of examining the country with reference to a reservation, I reached Pala on the 18th, where, on the next day, I had interviews with José Antonio Sal, chief, and with Manuelita Cota, ex-chief of the tribe; also visited the flourishing Palma rancheria on the Palma grant, reaching Rincon, the residence of Olegario, whom most of the tribe acknowledge as chief, the same evening.  Here I was rejoined by Mr. Sleigh on the 20th.

It being Sunday, we held in the evening a religious service, which was attended by most of the Indians of the rancheria, who gave respectful attention to the words addressed to them.  At their special request this service was concluded with the recital of a portion of the liturgy of the Catholic Church, one of their own number leading and the rest responding.

Visiting the potrero, near by, on the next day, I found an Indian family of unusual interest, because of their greater intelligence and generally recognized superiority among the tribe.  The head of the family was absent, but his wife, "Margarita," known far and wide among the Indians, seemed quite competent to take the management of affairs in his absence.  This Indian woman claims a half league of land which was granted by the Mexican government to her grandmother, and which she now holds by her mother's will in trust for the heirs of the same.  The rancheria upon this land is composed chiefly of these heirs, who derive from the land a comfortable subsistence.

Returning to Rincon, I had the good fortune to witness in the evening one of the traditional dances in which the Indians take so much delight.  It was conducted in an orderly manner, nor was it carried to excess, and could hardly be regarded by any as other than a safe and commendable amusement for them.

On the 21st, at this place, a conference was held with the San Luis Rey Indians.  Runners had been sent out to inform those living in the different rancherias, and a large number had come together eager to hear the news from Washington.  This tribe takes its title from the Mission of that name.  It is farther advanced in civilization than any other tribe of the so-called Mission Indians.  They have the reputation of being industrious, and for the most part peaceable, and but for the difficulties they labor under, in consequence of the unsettled condition of land matters and the disregard of their rights by the settlers, would be self-sustaining and make reliable citizens.

At present they are in trouble about their chief, as indicated at the conference at Los Angeles.  A large majority prefer Olegario, and if an election were held now he would doubtless be chosen.  He is intelligent above the average, peaceably disposed toward the whites, capable of controlling his Indians—for he is virtually their chief, notwithstanding the action of the late superintendent—and is at the same time an enthusiastic defender of his people and disposed to take advanced grounds on questions of their rights.  A more competent man altogether cannot be found in the tribe.

Manuelita Cota and Francisco Magia, ex-chiefs, and José Antonio Sal, chief, were also present at the conference.  We were obliged to employ two interpreters, in order that all could be made to understand what we had to say.  I began by reading my letter of instruction, and explained the same to them.  Much satisfaction was expressed at the prospect of relief from the Government at Washington.

They complained that they were subjected to many indignities from white neighbors who covet the lands occupied by them; that the water they had long depended upon for irrigation had been turned out of its course, rendering their lands useless.  Lands that they have supposed to belong to them have, on various pretexts, been wrested from

# EXHIBIT 8

# ANNUAL REPORT

Public Library
Kansas City, Mo.

OF THE

# COMMISSIONER OF INDIAN AFFAIRS

TO THE

# SECRETARY OF THE INTERIOR

FOR THE

# YEAR 1877.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.

REPORTS OF AGENTS IN CALIFORNIA. 35

ance, and much of success and satisfaction. I have met with firm support and bitter opposition. I have found just and true friends, and malicious enemies. My course and system at San Carlos have been both praised and blamed, lauded and censured. I have neither sought the one nor avoided the other, and when my worthy successor shall have relieved me from the last responsibility connected with that agency, I shall rest content. As agent for the San Carlos Indians I have sought to do my duty well. I claim nothing more than *duty well done.* Had I done less. I would have been unworthy of my position and trust. Whatever may be the feelings of others, I am to-day proud of my work and record at San Carlos, and with extreme satisfaction I shall transfer to my trusty successor one of the most important positions on the Pacific slope.

I shall ever feel indebted to Mr. M. A. Sweeney for his faithful services throughout my administration.

Very respectfully, your obedient servant,

JOHN P. CLUM,
*Late United States Indian Agent.*

The COMMISSIONER OF INDIAN AFFAIRS.

---

HOOPA VALLEY INDIAN AGENCY, CALIFORNIA,
*August 24, 1877.*

SIR: In compliance with circular-letter dated Office of Indian Affairs, Washington, D. C., July 10, 1877, I have the honor to report that the late agent, J. L. Broaddus, was relieved May 9, 1877. and the reservation turned over to me in compliance with letter of instructions from E. C. Watkins, United States Indian inspector.

The reservation was and is now in a most dilapidated condition. The grist-mill has been allowed to fall to pieces, and is useless. The saw-mill is much out of order. The fences are greatly out of repair. Houses have fallen down for want of attention and repair. The stock, consisting of horses, mules, and cattle, have been taken to Round Valley; such farming implements and tools as were not taken there were sold to citizens at a mere nominal sum, viz, hay from 50 cents to $1.50 per ton, while the contract for the military post is $44 per ton; wagons, thrashing-machines, reapers, mowers, &c., in like proportion.

There are on the reservation about 427 Indians, as follows: men, 131; women, 167; children, 129. The Redwood Indians. numbering about 40, left the reservation some time ago, in consequence of the report that they were to be taken to Round Valley. The captain of the band informed me, a few days since, that they intended returning this fall.

There are about 800 or 900 acres of good wheat-land, yet not an acre under cultivation; also a large amount of fine grazing-land. I have no doubt but that this reservation could be made self-sustaining in a very few years; it would be now, had it been properly managed. The Indians are peaceable and well-disposed, and many of them are industrious and willing to work. They complain bitterly about their stock and farming-implements being taken away and sold to white men. I think if the stock is returned, and farming-implements and grain supplied, we will be able to get in a good fall crop; this will have to be done at once to insure success.

I recommend that Congress be asked for a liberal appropriation, that the reservation be improved and placed in a good state of cultivation, farming-implements be supplied, the buildings, mills, &c., be put in proper condition, and then with proper management I have no doubt of its being a success.

I regret exceedingly that I cannot give a more favorable report; but can attribute its dismantled and dilapidated condition to no other cause than misrepresentation, mismanagement, and inefficiency of the agents who have been in charge for the past six years.

Very respectfully, your obedient servant,

RICH. C. PARKER,
*Captain Twelfth Infantry, Acting Indian Agent.*

The COMMISSIONER OF INDIAN AFFAIRS.

---

SAN BERNARDINO, CAL., *August 15, 1877.*

SIR: In submitting to you a report upon the condition and wants of the *Mission* Indians of California, and in making some suggestions with respect to the manner in which the Government may best fulfill what I understand to be its intention of placing them permanently in possession of lands which they may cultivate as their own, I desire to say that the time I have spent among them since my appointment as agent is so short that I can give the Department but few facts concerning these Indians not already to be found in reports and communications on file in your office. For the most part, the information contained in such reports are verified by my observation.

REPORTS OF AGENTS IN CALIFORNIA.

The Mission Indians now number at most but a few thousand.  I judge, from what I can
learn, that the estimate of 4,000 or 5,000 is fully up to their real numbers.  Not much more
than a quarter of a century ago they are reported to have been five or six times as numerous.
The diseases introduced among them with the white settlement of California, particularly
small-pox, which has sometimes swept away entire communities at one visitation, have been the
most effective agencies of their destruction.  The restrictions upon their customary methods
of living, and the limitation of the territory from which they drew their support, have done
the rest.  The present greatest curse to the race is bad whisky and the unscrupulous venders
of it.  A continuation for twenty-five years longer of the treatment which they have re-
ceived in the twenty-five years that are past will so far complete the extermination of the
Mission Indians that the only remnant will be found in strolling bands of vagrants and
beggars, which will become a pest and nuisance to the white population.  On the other
hand, it is possible for the Government to preserve from destruction those who yet remain,
to train them to habits of complete self-support, and ultimately, perhaps, to fit them for in-
corporation into the body of American citizenship, well prepared to discharge the duties and
bear the burdens of citizens.

The Mission Indians have thus far always supported themselves without aid from the
Government, and would not now need much care or attention but for one great and impor-
tant fact upon which the duty of the Government arises and is established.  That fact is,
that the lands they have been accustomed to cultivate are nearly all taken from them for
white settlements, so that they all become subject to the whims and interests of their suc-
cessors in possession.  The Government has formerly made and relinquished some excellent
reservations of public lands on which they might have been located, and it still retains some
small and inadequate reservations of comparatively little use and value.  The Government
still retains plenty of land which might be set apart for them, but none not occupied or dis-
posed of has water upon it, or it is, in other words, mere desert, whose ultimate reclamation,
if at all possible, is at least doubtful, and will be very expensive.  In none of the rich val-
leys which they formerly occupied and cultivated do these Indians now own any land or
possess the right to any water.  They were long ago driven from the best places, and their
last and present places of resort are now threatened, and, it is to be feared, cannot be pre-
served to them except in a few instances.

The Mission Indians may be divided, with respect to their condition and manner of liv-
ing, into three classes.  The first division may be defined as those who stay on or about the
ranches or farms of white men, living by daily labor upon the farms, receiving, when they
work, about one dollar per day.  Most of the larger ranchmen have about them one or
several families, whom they permit to build their slight houses on the corners of the ranch,
or on grounds adjoining, and in addition allow the use of water sufficient to irrigate a
garden, which such Indians often cultivate.  These Indians do most of the ordinary work
of the ranches, except when harvest-time, sheep-shearing, or some special season requires
the employment of other help.  They live more or less comfortably, as the proprietor of the
ranch to which they are attached is a humane and just man, or hard-hearted and a cheat.
They are not legal tenants; they cannot make legal contracts, or collect their wages by a
suit at law, if for no other reason, because they have not the means to prosecute suits.
The interests of the ranchman generally dictate treatment at least fair enough to prevent
his Indians from moving away from him.  This class of Indians is pretty large.  They have
no difficulty in securing enough food and comfortable clothing, and some of them have
learned to be thrifty and prudent.

The second class is made of those who live in small communities, cultivating lands they
have held for a long time and have been accustomed to call their own.  At each village are
gathered as many families as the natural supply of water will make comfortable.  They
desire above all else to be left in possession of these little villages, which are situated where-
ever a spring or small stream of water exists, scattered through a large tract of otherwise
desert country.  Thus they have a village at Potrero, twenty-five miles from here.  Twenty
miles in another direction is another village; fifteen miles farther another village, and so on.
Till recently all these places were on unsurveyed public lands, and unclaimed.  Now white
men have set up claims of more or less valid character upon almost every acre of these
lands, and they are liable to be taken away unless there is prompt and energetic action by
the Government.  Each Indian family at these villages has a house and cultivates a patch
of ground, varying from one acre to four or five.  A field of five acres cultivated by one
family is rarely found.  Fruit-trees and well-kept vines are not unusual.  The Indian men
plant their fields in the spring, give them a more or less thrifty cultivation till a season
comes when they can get temporary employment on ranches, and then they leave their
homes in charge of the squaws and old men, and go out to labor, very much as the young
men in Canada flock over into " the States " in haying-time to work for the New England
and New York farmers.  A much greater number of the Mission Indians were formerly in-
cluded in this class, and oftentimes the Indians described in the first class owned and culti-
vated the very lands where they are now only tolerated as day-laborers.  They are very
much attached to their homes.  One Indian that I know has maintained a home in the
Potrero, and for many years worked most of the time twenty miles away.  He is as little
willing to give up his Potrero house and field as any of his neighbors who live there con-

stantly.  But now his home is threatened by a land-grabber who wants it for nothing.  This second class of Indians are the ones now most especially needing the energetic care of the Government.  The land-grabbers are after them, and an agent with seven-leagued boots could scarcely travel from village to village so fast as those Americans who are seeking a few acres of ground with a spring upon it, or moist lands where wheat and potatoes grow without irrigation, that may be pre-empted or taken up under the desert-land act.  That such lands have been held by Indians and cultivated by Indians counts for nothing more than if they had been only homes for grasshoppers and cayotes.  This seems to me a great and unpardonable vice in the law, that it treats as unoccupied, and subject to pre-emption, lands which have been in fact occupied and cultivated precisely as white men occupy and cultivate, and that, too, for more than one generation of living men.  But for that vice of the law the Mission Indians would now be secure in their old possessions, and where their improvements and water-rights were wanted they would be bought and paid for instead of taken for nothing in the name of law.  I cannot learn at all accurately the number of this class of Indians, but do not suppose they can be more than one-third of all.

The third class is rather small, and includes those that hang upon the outskirts of towns, pass wistfully through the streets, seldom asking for anything, but silently begging with their longing, pathetic eyes.  At times, when they can get whisky, the men are besotted brutes, and the women are generally prostitutes, though the family tie is still strong enough to keep squaw and papoose with the husband.  With this class are some unmarried women who are prostitutes.  This, which I will call the vagrant class, is not so large as I was prepared to find it; and I believe, from observation and from general report, that vagrancy is not a state into which the Mission Indians naturally or willingly fall.  Except in the third class, I believe prostitution is almost or quite unknown, and that the virtue of women is quite as highly esteemed and as much practiced as among the most enlightened peoples. The Government, in treating practically the questions presented by the condition of the Mission Indians, will at first take little account of this third class, since nothing can be done for them till reservations have been provided on which they can be placed, by compulsion, if necessary.  In making a permanent arrangement of reservations, however, the number of this class must be taken into consideration.

The desire of all these Indians in the second class is to be let alone in possession of what they now occupy, and without action by Congress the power of the Commissioner of Indian Affairs and the President can go no further in their behalf than to secure them in the holding of these lands in all cases where the law will permit.  Each case must be considered and acted upon by itself, and when found necessary they will be so reported for action.  A few years ago the claims of white men to Indian lands were so few that wise and firm executive action might have secured homes for all the Indians without aid of Congress; but it is useless in this case to take a gloomy survey of lost opportunities.

The first purpose of the Department is now to secure the Mission Indians permanent homes, with land and water enough, that each one who will go upon a reservation may have to cultivate a piece of ground as large as he may desire.  This is nearly all the Government aid that will ever be asked or needed for these Indians; though, this purpose being accomplished, a small annual expenditure will be desirable to instruct rather than aid them in the way of self-support; and the question of assisting in the maintenance of schools may very likely arise.  Assuming that the Government is to make the needed reservations, the question of how it shall be done becomes simply a practical business problem to be met in a practical business-like way, just as business men solve the problems and perplexities of their private affairs.  How much land do the Indians require?  Should they be placed upon one large reservation, or several small ones?  Should lands, unoccupied by them at present, be purchased, or should attempts be made to keep them on the lands they now occupy?  These and a multitude of similar questions will arise in the practical administration of any law or instructions of the Department looking to the accomplishment of the object in view, and they must all be decided in accord with the general rule that the business must be done so as to secure the best results with the least money.  Nearly all these questions will be practical, arising as the business proceeds, and they cannot be raised or answered in advance.  Therefore no law of Congress and no instructions from the Indian Office can provide against them, and it thus happens that it is impossible to make explicit and detailed recommendations as the basis of action.

For example, I think it may be practical and most advantageous for the Government to insist on retaining for the Indians the Potrero, Henia and Agua Caliente, and attempt to gather a large number of Indians upon them.  This being under consideration, the practical questions come up as to the extent of rights that white squatters have acquired, the cost of extinguishing those rights, the capacity of the Potrero for an increased development of water, the feasibility of carrying the White Water River upon the Caliente reservation, and, after all, the cost and prospective success in comparison with a new purchase or some other different proposition.  But an agent does not dare to make a specific recommendation, nor can he decide what would be best, for he is dealing with nothing but contingencies and hypotheses, and, having the responsibility of dealing with absolute facts, he might discover obstacles to carrying out his theoretical plan that he had never dreamed of.

The economical and satisfactory completion of the work desired by the Department requires,

it seems to me, that the plan of operation should be generally outlined, and then the execution of this general scheme and the determination of its details should proceed together. When the Government begins the actual work of securing homes for these Indians, its purpose must be executed through some agency having a wide discretion and considerable power for action directly intrusted to it. For every reason I am led to the conclusion that the object of the Government can best be attained in the following manner, which I respectfully submit to your consideration:

Congress to appropriate a sufficient sum, say not less than one hundred and fifty thousand dollars, for securing permanent reservations for the Mission Indians of California, and assisting them to settle thereon. This amount to be expended by a commission of five persons, of whom four shall be residents of California, the commission to serve without pay except traveling and other expenses. The commission would, no doubt, be appointed by the President, and their power could be as much restricted as Congress and the Department might deem necessary.

The general outline of their work should be defined, but in all matters of detail and actual business they should be left free, and given discretion and power to decide promptly and act finally. If the commission were chosen so as to include four men of wealth and good repute, residents of Southern California, and a fifth member were added, being selected perhaps from among the trusted officers of the Indian Office, having the entire confidence of the Government, the expenditure would no doubt be wisely made, and would be kept free from the taint of jobbery; and I do not believe that large transactions in this business, by or upon the recommendation of ever so honest and conscientious an agent, would be allowed to escape charges of fraud. The commission would visit the different Indian settlements, learn the Indians' desires and wants, examine reservations already made, settle questions of disputed rights or provide for their settlement, take measures for increasing and economizing water at such places as they might think judicious; and, by showing the possession of power to do something besides "writing to Washington," they would immediately command confidence and respect, which are now sadly diminished for Government commissions and agents from whose visitations the Indians cannot see that they have derived any benefit.

Martinez lives on lands not yet reserved, which white men are endeavoring to claim. He thinks if I am a "strong" and "true" agent I will give him a "paper" to show those white men and warn them off. If I decline to deceive him with a useless order, or if I give him an order which he finds the white men do not respect, he thinks I am not "strong" and "true," but he will always believe me a mere pretender unless I should be fortunate enough to secure the reservation of the Rincon before white settlers gain legal title to it. The "strength," as the Indian terms it, which no agent has, the commission would possess and use, and would, therefore, accomplish in a short time what I really believe can never be done if every proposition must be referred to Washington before action can be taken upon it. I will add that I am assured there are many men who would be willing to accept service on the commission, men just, honest, and, if not sentimental, at least practical, friends of the Indians.

The most northerly bands of the Mission Indians, I have reason to hope, may be provided for without great expense by a readjustment of reservation limits and some outlay in developing the water supply. What disposition may be made of the more southerly bands I am not yet able to suggest, but as soon as I can obtain the necessary information, by personal visits and otherwise, I shall report as fully as possible what facts I obtain and such conclusions as I may have reached. I have not a doubt but such a commission as I have suggested would find a practical and satisfactory method of dealing with them all, and, by an expenditure not greater than I have indicated, secure homes for all.

For the use of the more southerly of the Indians, propositions have been made to sell certain ranches to the Government. Should such a purchase become necessary, I have no doubt the commission, with cash in hand, would save many thousands of dollars over what the same lands could be obtained for by a contingent bargain this year to be executed next. There are many considerations, however, which I think would determine the Government to make several small reservations in place of one large one. The opportunity of securing land enough in one body with sufficient water for all may not arise, and the need of the white settlers to employ Indians, and the benefit of such labor to the Indians, admonishes that the reservations be located with a view to rendering communication between the Indians and those who would employ them not too difficult, for they will not, probably, be able to gain a livelihood entirely upon any reservations that can be made, but must depend to some extent, as heretofore, upon daily labor for a part of each year on the ranches of white farmers, who would also get on badly if deprived of the privilege of employing laborers from among the Indians.

Very respectfully, your obedient servant,

J. E. COLBURN,
*United States Indian Agent.*

The COMMISSIONER OF INDIAN AFFAIRS.

**EXHIBIT 9**

| 50TH CONGRESS, 1st Session. | SENATE. | REPORT No. 74. |
| --- | --- | --- |

# IN THE SENATE OF THE UNITED STATES.

JANUARY 23, 1888.—Ordered to be printed.

Mr. PLATT, from the Committee on Indian Affairs, submitted the following

# REPORT:

[To accompany bill S. 2.]

*The Committee on Indian Affairs, to which was referred the bill (S. 2) for the relief of the Mission Indians in the State of California, having considered the same, make the following report:*

The history of the Mission Indians for a century may be written in four words: conversion, civilization, neglect, outrage. The conversion and civilization were the work of the mission fathers previous to our acquisition of California; the neglect and outrage have been mainly our own. Justice and humanity alike demand the immediate action of Government to preserve for their occupation the fragments of land not already taken from them. Accompanying this report is a letter from the Commissioner of Indian Affairs, giving information of their present condition; also, the report of Mrs. Helen Jackson and Mr. Abbot Kinney, giving the results of an investigation into the condition of these Indians and making recommendations of measures to be adopted for their protection and relief.

The bill referred to the committee is substantially the bill passed by the Senate in the Forty-ninth Congress, and, with certain amendments, indicated in the text, is recommended for passage.

DEPARTMENT OF THE INTERIOR,
OFFICE OF INDIAN AFFAIRS,
*Washington, January 16, 1888.*

DEAR MR. SENATOR: Referring to your verbal inquiry relative to the number and extent of the Mission Indian reservations in the State of California, and the numbers of the different bands occupying the same, etc., I have to state that there are 19 existing reservations set apart for the use of the Mission Indians, the smallest of which contains 80 acres and the largest 88,475 acres, the total area being some 160,762 acres.

The area of each of these reserves is shown on the "diagram of the Mission Indian reservations in California," prepared in this office, and is also given below.

**2**        MISSION INDIANS IN CALIFORNIA.

The Indians occupying these reservations, according to the last annual report of this office, number 3,096, divided into four tribes or bands as follows:

| | |
|---|---:|
| Serranos | 481 |
| Dieguenos | 855 |
| Coahuila | 667 |
| San Luis Rey or San Luisenos | 1,093 |
| Total | 3,096 |

They are divided among the several reservations (as near as can be ascertained from the census reports) as follows:

| | Acres. | No. | Band. |
|---|---:|---:|---|
| Agua Caliente, or Warner's Ranch | ...... | 179 | San Luis Rey. |
| Agua Caliente | 60,870.85 | 38 | Coahuila. |
| Cabezone | 622.22 | 186 | Do. |
| Capitan Grande | 17,340.51 | 57 | Dieguenos. |
| Coahuila | 16,660.62 | 226 | Coahuila. |
| Cosmit | 80.00 | ...... | |
| Inaja | 160.00 | 59 | Dieguenos. |
| Maronga, or San Gorgonio | 88,475.33 | ...... | |
| Mesa Grande | 120.00 | 111 | Do. |
| Mission | 1,920.00 | ...... | |
| Pala | 160.00 | 66 | San Luis Rey. |
| Portrero | 12,164.98 | 102 | Serranos. |
| San Jacinto | 3,176.06 | 176 | Do. |
| San Luis Rey | 2,072.81 | 45 | San Luis Rey. |
| Santa Ysabel | 14,705.53 | 144 | Dieguenos. |
| Sycuan | 640.00 | 51 | Do. |
| Temecula | 3,200.00 | 157 | San Luis Rey. |
| Torras | 639.00 | ...... | |
| Village | 640.00 | ...... | |
| Village | 642.40 | ...... | |

Where the tribe is left blank in the above table (six reservations) it has been impossible, from the data at hand, to identify the band or tribe occupying the reservation.

The census reports for 1886 show the following villages of Indians not included within reservations, so far as appears from the records:

| | No. | Tribe. |
|---|---:|---|
| La Jolla | 136 | San Luis Rey. |
| Rincon | 164 | Do. |
| San Ysadro | 60 | Do. |
| La Puerta | 97 | Do. |
| Pauma | 75 | Do. |
| El Monte | 60 | Coahuila. |
| San Dieguito | 21 | Dieguenos. |
| San Felipe | 73 | Do. |
| La Peacha | 42 | San Luis Rey. |
| Mesa | 23 | Dieguenos. |
| Coyote | 87 | San Luis Rey. |
| Ahsanga | 18 | Do. |
| La Puerta de la Cruz | 26 | Do. |
| San Marguerita | 10 | Do. |
| San Jose | 27 | Dieguenos. |
| San Pasqual | 48 | Do. |
| Matajuay | 35 | Do. |
| Los Cornelos | 80 | Do. |
| Indians living at and near Pomona | 29 | Do. |
| Riverside | 88 | Coahuila. |
| San Diego | 99 | Dieguenos. |
| San Bernardino | 203 | Serranos. |

Mrs. Jackson, in her report dated July 13, 1883 (S. Ex. Doc. No. 49, Forty-eighth Congress, first session), says:

These Indians are living for the most part in small and isolated villages; some on reservations set apart for them by Executive order, some on Government land, and some upon lands included within the boundaries of confirmed Mexican grants.

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 52 of 206   Page ID #:577

While the reservations, as at present existing, contain an area of some 100,000 acres, the agent reports that after a careful examination of the land he does not think there is over 5,000 acres of tillable land.

Much of the best land is included within the limits of private grants. In one case (San Jacinto) suit in ejectment has been brought against the Indians by the owner of the grant, who has obtained judgment in his favor in the lower court, the case being now pending in the suprem court of California on appeal.

In one or more of the larger reservations the odd sections, now included in the reserves, will inure to railroad companies as granted lands when the surveys are extended over the townships.

Much of the land is valueless without irrigation, and the Indians are being deprived of their water rights wherever and whenever the interests of the whites demand the appropriation of such rights.

In establishing the reservations, mistakes, either from design or ignorance, were made, so that in many cases the Indian villages were left outside and the mountains included in the lands reserved.

Trespassers have held possession of some of the best portions of the reservations. After years of effort this office succeeded during last year in securing the removal of most of these parties.

Some of them have equitable claims, and suits have been brought by them for the recovery of the lands from which they were ejected.

For many years this office has urged upon Congress the necessity of having the rights of Indians and settlers determined by a commission of competent and disinterested persons, who could go upon the ground and carefully investigate the whole matter, the Indians to be given valid titles to such lands as of right belonged to them, or upon which they might be located by the commission, and all parties to be compensated for improvements taken from them.

Until this is done permanent provision can not be made for these Indians, nor can the disputes continually arising between the Government and intruders be finally and equitably settled.

Very truly, yours,

J. D. C. ATKINS,
*Commissioner.*

Hon. O. H. PLATT,
*United States Senate.*

------

*Report on the condition and needs of the Mission Indians.*

COLORADO SPRINGS, COLO., *July 13, 1883.*

SIR: In compliance with our instructions bearing dates November 28, 1882, and January 12, 1883, we have the honor to submit to you the following report on the subject of the Mission Indians in southern California.

The term "Mission Indians" dates back over one hundred years, to the time of the Franciscan missions in California. It then included all Indians who lived in the mission establishments, or were under the care of the Franciscan fathers. Very naturally the term has continued to be applied to the descendants of those Indians. In the classification of the Indian Bureau, however, it is now used in a somewhat restricted sense, embracing only those Indians living in the three southernmost counties of California, and known as Serranos, Cahuillas, San Luisenos, and Dieguinos; the last two names having evidently come from the names of the southernmost two missions, San Luis Rey and San Diego. A census taken in 1880 of these bands gives their number as follows:

| | |
|---|---|
| Serranos | 381 |
| Cahuillas | 675 |
| San Luisenos | 1,190 |
| Dieguinos | 731 |
| Total | 2,907 |

**4**                    MISSION INDIANS IN CALIFORNIA.

This estimate probably falls considerably short of the real numbers, as there are no doubt in hiding, so to speak, in remote and inaccessible spots, many individuals, families, or even villages, that have never been counted. These Indians are living for the most part in small and isolated villages, some on reservations set apart for them by Executive order, some on Government land not reserved, and some upon lands included within the boundaries of confirmed Mexican grants.

Considerable numbers of these Indians are also to be found on the outskirts of white settlements, as at Riverside, San Bernardino, or in the colonies in the San Gabriel Valley, where they live like gypsies in brush huts, here to-day, gone to-morrow, eking out a miserable existence by days' works, the wages of which are too often spent for whisky in the village saloons. Travelers in southern California, who have formed their impressions of the Mission Indians from these wretched wayside creatures, would be greatly surprised at the sight of some of the Indian villages in the mountain valleys, where, freer from the contaminating influence of the white race, are industrious, peaceable communities, cultivating ground, keeping stock, carrying on their own simple manufactures of pottery, mats, baskets, etc., and making their living—a very poor living, it is true, but they are independent and self-respecting in it, and ask nothing at the hands of the United States Government now, except that it will protect them in the ownership of their lands—lands which, in many instances, have been in continuous occupation and cultivation by their ancestors for over one hundred years.

From tract after tract of such lands they have been driven out, year by year, by the white settlers of the country, until they can retreat no farther; some of their villages being literally in the last tillable spot on the desert's edge or in mountain fastnesses. Yet there are in southern California to-day many fertile valleys, which only thirty years ago were like garden spots with these same Indians' wheat fields, orchards, and vineyards. Now there is left in these valleys no trace of the Indians' occupation, except the ruins of their adobe houses; in some instances these houses, still standing, are occupied by the robber whites who drove them out. The responsibility for this wrong rests perhaps equally divided between the United States Government, which permitted lands thus occupied by peaceful agricultural communities to be put "in market," and the white men, who were not restrained, either by humanity or by a sense of justice, from "filing" homestead claims on lands which had been fenced, irrigated, tilled, and lived on by Indians for many generations. The Government can not justify this neglect on the plea of ignorance. Repeatedly, in the course of the last thirty years, both the regular agents in charge of the Mission Indians and special agents sent out to investigate their condition have made to the Indian Bureau full reports setting forth these facts.

In 1873 one of these special agents, giving an account of the San Pasquale Indians, mentioned the fact that a white man had just pre-empted the land on which the greater part of the village was situated. He had paid the price of the land to the register of the district land office, and was daily expecting his patent from Washington. "He owned," the agent says, "that it was hard to wrest from these well-disposed and industrious creatures the homes they had built up; but," said he, "if I had not done it somebody else would, for all agree that the Indian has no right to public lands." This San Pasquale village was a regularly organized Indian pueblo, formed by about one hundred neophytes of the San Luis Rey Mission, under and in accordance with the provisions of the secularization act in 1834. The record of its founding is preserved in the Mexican archives at San Francisco. These Indians had herds of cattle, horses, and sheep. They raised grains, and had orchards and vineyards. The whole valley in which this village lay was at one time set off by Executive order as a reservation, but by the efforts of designing men the order was speedily revoked, and no sooner had this been done than the process of dispossessing the Indians began. There is now, on the site of that old Indian pueblo, a white settlement numbering 35 voters. The Indians are all gone; some to other villages, some living near by in cañons and nooks in the hills, from which, on the occasional visits of the priest, they gather and hold services in the half-ruined adobe chapel built by them in the days of their prosperity.

This story of the San Pasquale Indians is only a fair showing of the experiences f the Mission Indians during the past fifty years. Almost without exception they have been submissive and peaceable through it all, and have retreated again and again to new refuges. In a few instances there have been slight insurrections among them, and threatenings of retaliation, but in the main their history has been one of almost incredible long-suffering and patience under wrongs.

In 1851 one of the San Luiseno bands, the Aqua Caliente Indians, in the north part of San Diego County, made an attack on the house of a white settler, and there was for a time great fear of a general uprising of all the Indians in the country. It is probable that this was instigated by the Mexicans, and that there was a concerted plan for driving the Americans out of the country. The outbreak was easily quelled, however, four of the chiefs were tried by court-martial, and shot by order of General

Heintzelman, and in January of the following year a treaty was made with the San Luiseno and Dieguino Indians, setting off for them large tracts of land. This treaty was made by a United States commissioner, Dr. Wozencraft, and Lieutenant Hamilton, representing the Army, and Col. J. J. Warner, the settler whose house had been attacked. The greater part of the lands which were by this treaty assigned to the Indians are now within the boundaries of grants confirmed and patented since that time; but there are many Indian villages still remaining on them, and all Indians living on such lands are supposed to be there solely on the tolerance and at the mercy of the owners of said ranches, and to be liable to ejectment by law. Whether this be so or not is a point which it would seem to be wise to test before the courts. It is certain that in the case of all these Mission Indians the rights involved are quite different from and superior to the mere "occupancy" right of the wild and uncivilized Indian.

At the time of the surrender of California to the United States these Mission Indians had been for over seventy years the subjects, first of the Spanish Government, secondly of the Mexican. They came under the jurisdiction of the United States by treaty provisions, the treaty of Guadalupe Hidalgo, between the United States and Mexico, in 1848. At this time they were so far civilized that they had become the chief dependence of the Mexican and white settlers for all service indoors and out. In the admirable report upon these Indians made to the Interior Department in 1853 by the Hon. B. D. Wilson, of Los Angeles, are the following statements:

"These same Indians had built all the houses in the country, planted all the fields and vineyards. Under the Missions there were masons, carpenters, plasterers, soapmakers, tanners, shoemakers, blacksmiths, millers, bakers, cooks, brick-makers, carters and cart-makers, weavers and spinners, saddlers, shepherds, agriculturists, horticulturists, vineros, vaqueros—in a word, they filled all the laborious occupations known to civilized society."

The intentions of the Mexican Government towards these Indians were wise and humane. At this distance of time, and in face of the melancholy facts of the Indians' subsequent history, it is painful to go over the details of the plans devised one short half century ago for their benefit. In 1830, there were in the twenty-one missions in California some 20,000 or 30,000 Indians living comfortable and industrious lives under the control of the Franciscan fathers. The Spanish colonization plan had, from the outset, contemplated the turning of these mission establishments into pueblos as soon as the Indians should have become sufficiently civilized to make this feasible. The Mexican Government, carrying out the same general plan, issued in 1833 an act, called the secularization act, decreeing that this change should be made. This act provided that the Indians should have assigned to them cattle, horses, and sheep from the mission herds; also lands for cultivation. One article of Governor Figueroa's regulations for the carrying out of the secularization act provided that there should be given to every head of a family, and to all above twenty-one years of age, though they had no family, a lot of land not exceeding 400 varas square, nor less than 100. There was also to be given to them, in common, enough land for pasturing and watering their cattle. Another article provided that one-half the cattle of each mission school should be divided among the Indians of that mission in a proportionable and equitable manner; also one-half of the chattels, instruments, seeds, etc. Restrictions were to be placed on the disposition of this property. The Indians were forbidden "to sell, burden, or alienate under any pretext the lands given them. Neither can they sell the cattle." The commissioners charged with the carrying out of these provisions were ordered to "explain all the arrangements to the Indians with suavity and patience;" to tell them that the lands and property will be divided among them so that each one may "work, maintain, and govern himself without dependence on any one." It was also provided that the rancherias (villages) situated at a distance from the missions, and containing over twenty-five families, might, if they chose, form separate pueblos, and the distribution of lands and property to them should take place in the same manner provided for those living near the missions.

These provisions were in no case faithfully carried out. The administration of the Missions' vast estates and property was too great a temptation for human nature, especially in a time of revolution and misrule. The history of the thirteen years between the passing of the secularization act and the conquest of California is a record of shameful fraud and pillage, of which the Indians were the most hapless victims. Instead of being permitted each one to work, maintain, and govern himself without dependence on any one, as they had been promised, their rights to their plots of land were in the majority of cases ignored; they were forced to labor on the mission lands like slaves; in many instances they were hired out in gangs to cruel masters. From these cruelties and oppressions they fled by hundreds, returning to their old wilderness homes. Those who remained in the neighborhood of the pueblos became constantly more and more demoralized, and were subjected to every form of outrage. By a decree of the Los Angeles aquemiento, about the time of our taking possession of California, all Indians found without passes, either from the alcalde of the pueblos in

which they lived or from their "masters [significant phrase], were to be treated as horse-thieves and enemies." At this time there were, according to Mr. Wilson's report, whole streets in Los Angeles where every other house was a grog-shop for Indians; and every Saturday night the town was filled with Indians in every stage of intoxication. Those who were helpless and insensible were carried to the jail, locked up, and on Monday morning bound out to the highest bidders at the jail gates. "The Indian has a quick sense of justice," says Mr. Wilson; "he can never see why he is sold out to service for an indefinite period for intemperance, while the white man goes unpunished for the same thing, and the very richest and best men, to his eye, are such as tempt him to drink, and sometimes will pay him for his labor in no other way." Even the sober and industrious and best skilled among them could earn but little, it having become a custom to pay an Indian only half the wages of a white man.

From this brief and necessarily fragmentary sketch of the position and state of the Mission Indians under the Mexican Government at the time of the surrender of California to the United States, it will be seen that our Government received by the treaty of Guadalupe Hidalgo a legacy of a singularly helpless race in a singularly anomalous position. It would have been very difficult, even at the outset, to devise practicable methods of dealing justly with these people, and preserving to them their rights. But with every year of our neglect the difficulties have increased and the wrongs have been multiplied, until now it is, humanly speaking, impossible to render to them full measure of justice. All that is left in our power is to make them some atonement. Fortunately for them, their numbers have greatly diminished. Suffering, hunger, disease, and vice have cut down more than half of their numbers in the last thirty years; but the remnant is worth saving. Setting aside all question of their claim as a matter of atonement for injustice done, they are deserving of help on their own merits. No one can visit their settlements, such as Agua Caliente, Saboba, Cahuilla Valley, Santa Ysabel, without having a sentiment of respect and profound sympathy for men who, friendless, poor, without protection from the law, have still continued to work, planting, fencing, irrigating, building houses on lands from which long experience has taught them that the white man can drive them off any day he chooses. That drunkenness, gambling, and other immoralities are sadly prevalent among them, can not be denied; but the only wonder is that so many remain honest and virtuous under conditions which make practically null and void for them most of the motives which keep white men honest and virtuous.

Having thus given as brief a presentation as possible of the general situation and nature of these Indians, we will proceed to state what, to the best of our judgment, are the steps which ought to be taken by the United States Government in their behalf. The descriptions of the most important villages we visited, and the detailed accounts of circumstances and situations on which our suggestions are based, are given for convenience of reference in separate exhibits.

(1) The first and most essential step, without which there is no possibility of protecting these Indians or doing anything intelligently for them, is the determining, resurveying, rounding out, and distinctly marking their reservations already existing. The only way of having this done accurately and honestly is to have it done by a surveyor who is under the orders and constant supervision of an intelligent and honest commissioner; not by an independent surveyor who runs or "floats" reservation lines where he and his friends or interested parties chose, instead of where the purpose of the United States Government, looking to the Indians' interests, had intended. There have been too many surveys of Indian reservations in southern California of this sort. (See Exhibits C, H, I, J, L.) All the reservations made in 1870, and that comprises nearly all now existing, were laid off by guess, by the surveyor in San Diego, on an imperfect county map. These sections, thus guessed at by the surveyor, were reported by the Commissioner to the Interior Department, set aside by Executive order, and ordered to be surveyed. When the actual survey came to be made it was discovered that in the majority of cases the Indian villages intended to be provided for were outside the reservation lines, and that the greater part of the lands set apart were wholly worthless. The plats of these reservations are in the surveyor-general's office at San Francisco. On each of them was marked by the surveyor an additional line in color, showing what tracts ought to be added to take in the Indian villages and fields. So far as we could learn no action was taken in regard to these proposed additions.

The reservation lines, when thus defined, should be marked plainly and conspicuously by monuments and stakes, leaving no room for doubt. A plat of each reservation should then be given to the Indians living on it. It was pathetic, in our visits to village after village, to hear the Indians' request reiterated for this thing—"a paper to show to the white men where their lands were." Every fragment of writing they had ever received, which could by any possibility bear on their title to their lands, they had carefully preserved; old tattered orders from Army officers thirty years back, orders from justices of the peace, etc., all worthless of course, but brought for-

MISSION INDIANS IN CALIFORNIA. 7

ward with touching earnestness to show us.  In no single instance had the reservation lines ever been pointed out to them.  One band, the Sequan Indians, who had never seen any agent, said they had been told that they were on a reservation, but they did not know if it were true or not.  They had been obliged to give up keeping stock, because they could not find any place where the whites would let them pasture cattle. (See Exhibit J.)

There are some settlements of Indians on Government lands not set off as reservations, in some instances not surveyed.  These tracts should all be surveyed, their boundaries marked, and the lands withdrawn from market to be permanently set aside for the Indians' use.  We use the term "rounding out" in regard to these reservations chiefly on account of the complication which results from their being in some cases within the limit of railroad grants, and made subsequent to those grants. Some are actually within the limits of the Southern Pacific Railroad grant; others will be within the limits of the Texas Pacific grant, should that be confirmed.  The odd sections thus belonging to the railroads should be secured to the Indians.  There are also a few claims to lands within reservation boundaries, which are legal on account of their having been made before the reservations were set off.  These should be extinguished.  (See Exhibit O.)

(2) All white settlers now on reservations should be removed.  For the last four years stray settlers have been going in upon reservation tracts.  This is owing to the lack of boundary definitions and marks as aforesaid, also to the failure of the surveys to locate the reservations so as to take in all the ground actually occupied by Indian villages.  Thus, in many instances, the Indians' fields and settlements have been wrested from them, and they in their turn have not known where they could or could not go.  There is not a single reservation of any size which is free from white settlers. It would seem that agents in charge of these Indians should have been authoritatively instructed in no case to allow squatters to settle on lands known to be within reservation lines, whether they were occupied by Indians or not.  (See Exhibits H, I, O.)

The amount of land set off in Indian reservations in southern California appears by the record to be very large, but the proportion of it which is really available is very small.  San Diego County itself is four-fifths desert and mountain, and it is no exaggeration to say that the proportion of desert and mountain in the reservation is even larger than this.  By thus resurveying, rounding out, and freeing from white settlers the present reservations, adding to them all Government lands now actually in occupation by Indians, there will be, according to the best of our judgment, nearly land enough for the accommodation of all the Mission Indians except those whose settlements are on grants.

(3) In regard to this latter class, i. e., those whose villages are now within the boundaries of confirmed grants, the Government has to choose between two courses of action: either to remove them and make other provision for them, or to uphold and defend their right to remain where they are.  In support of the latter course we believe a strong case could be made out, and we have secured from one of the ablest firms in southern California a written legal opinion on this point.  (See Exhibit A.)  It seems clear that this contest should be made by the Government itself.  It is impossible for these poverty stricken and ignorant people to undertake on their own account and at their own expense the legal settlement of this matter.  It would be foolish to advise it, inhuman to expect it.  A test case could be made which would settle the question for all.  (See Exhibit B.)  In case the decision be favorable to the Indians remaining, the ranch owners should then be called on to mark off the boundaries of the Indians' lands according to the California State law covering such cases.  (See Exhibit R.)  Whether the lands thus reverting to the Indians could properly be considered as Government lands or not would be a question to be determined.  Probably the surest way of securing them for the Indians' permanent use would be to consider them as such and have them defined as reservations by act of Congress.

(4) And this brings us to our fourth recommendation, which is, that all these Indians' reservations; those already set off by Executive order, and all new ones made for them, whether of Government lands now in their occupation or of lands which may be hereafter by legal process reclaimed for them from the grant lands on which they are now living, be patented to the several bands occupying them; the United States to hold the patent in trust for the period of twenty-five years; at the expiration of that time the United States to convey the same by patent to said Indians, as has been done for the Omaha Indians.  The insecurity of reservations made merely by Executive order is apparent, and is already sadly illustrated in southern California by the history of the San Pasquale Reservation, that of Agua Caliente, and others. The insecurity of reservations set apart by Congress is scarcely a degree less.  The moment it becomes the interest and purpose of white men in any section of the country to have such reservation tracts restored to the public domain, the question of its being done is only a question of influence and time.  It is sure to be done.  The future of these industrious, peaceable, agricultural communities ought not to be left a single day longer than is necessary dependent on such chances; chances which are

always against and never for Indians' interests in the matter of holding lands. The best way and time of allotting these Indians' lands to them in severalty must be left to the decision of the Government, a provision being incorporated in their patent to provide for such allotments from time to time as may seem desirable, and agents and commissioners being instructed to keep the advantages of this system constantly before the Indians' minds. Some of them are fit for it now and earnestly desire it; but the majority are not ready for it. The communal system, on which those now living in villages use their lands, satisfies them, and is apparently administered without difficulty. It is precisely the same system as that on which the pueblo lands were cultivated by the early Spanish settlers in southern California. They agree among themselves to respect each other's right of occupancy; a man's right to a field this year depending on his having cultivated it last year, and so on. It seems not to occur to these Indians that land is a thing to be quarreled over.

In the village of Agua Caliente, one of the most intelligent of the young men was so anxious to show us his fields, that we went with him a little distance outside the village limits to see them. He had some eight acres in grain, vine, and fruit trees. Pointing first in one direction, then in another, he indicated the places where his ground joined other men's ground. There was no line of demarkation whatever, except it chanced to be a difference of crops. We said to him, "Alessandro, how do you know which is your land and which is theirs?" He seemed perplexed, and replied, "This was my mother's land. We have always had it." "But," we persisted, "suppose one of these other men should want more land and should take a piece of yours?" "He couldn't," was all the reply we could get from Alessandro, and it was plain that he was greatly puzzled by the suggestion of the possibility of neighbors trespassing on each other's cultivated fields.

(5). We recommend the establishment of more schools. At least two more are immediately needed, one at the Rincon, and one at Santa Ysabel. (See Exhibits O, L.) As the reservations are gradually cleared, defined, and assured for the Indian's occupancy, hundreds of Indians who are now roving from place to place, without fixed homes, will undoubtedly settle down in the villages, and more schools will be needed. It is to be hoped, also, that some of the smaller bands will unite with the larger ones for the sake of the advantages of the school, and other advantages of a larger community. The isolated situation of many of the smaller settlements is now an insuperable difficulty in the way of providing education for all the children. These Indians are all keenly alive to the value of education. In every village that we visited we were urged to ask the Government to give them a school. In one they insisted upon ranging the children all in rows, that we might see for ourselves that there were children enough to justify the establishing of a school.

In this connection we would suggest that if a boarding and industrial school, similar to those at Hampton and Carlisle, could be established in southern California, it would be of inestimable value, and would provide opportunities for many children who, owing to the isolation of their homes, could not be reached in any other way.

We would further suggest that, in our judgment, only women teachers should be employed in these isolated Indian villages. There is a great laxity of morals among these Indians, and in the wild regions where these villages lie, the unwritten law of public sentiment, which in more civilized communities does so much to keep men virtuous, hardly exists. Therefore the post of teacher in these schools is one full of temptations and dangers to a man. (See Exhibit M.) Moreover, women have more courage and self-denying missionary spirit sufficient to undertake such a life, and have an invaluable influence outside their school-rooms. They go familiarly into the homes, and are really educating the parents as well as the children in a way which is not within the power of any man, however earnest and devoted he may be.

We would also suggest that great good might be accomplished among these Indians by some form of itinerary, religious and educational labor among them. In the list of assignments of Indian agencies to different religious denominations, as given in the report of the Indian Bureau for 1882, the Mission Agency is assigned to the Evangelical Lutheran; but we could not learn that this denomination had done any work among them. So far as the Mission Indians have any religion at all they are Catholics. In many of the villages are adobe chapels, built in the time of the missions, where are still preserved many relics of the mission days, such as saints' images, holy-water kettles, etc. In these chapels, on the occasions of the priests' visits, etc. Indians gather in great numbers, women sometimes walking two days' journey, bringing their babies on their backs to have them baptized. There are also in several of the villages old Indians, formerly trained at the missions, who officiate with Catholic rites at funerals, and on Sundays repeat part of the mass. As these Indians are now situated in isolated settlements so far apart, and so remote from civilized centers, the only practicable method of reaching them all would be by some form of itinerary labor. A fervent, religious, and practical teacher who should spend his time in going from village to village, remaining in each a few days or weeks, as the case might be, would sow seeds which would not cease to grow during the intervals of his absence.

If he were a man of sound common sense and knowledge of laws of life, fitted to instruct the Indians in matters of hygiene, cleanliness, ventilation, etc., and in a few of the simple mechanical arts, as well as in the doctrines of religion and morality, he would do more for the real good of these people at present than can be accomplished by schools.

(6) The suggestion of the value of itinerary labor among the Indians leads to our next recommendation, which we consider of great importance, viz, that it should be made the duty of any Government agent in charge of the Mission Indians to make a round of inspection at least twice a year, visiting each village or settlement, however small. In no other way can any thing like a proper supervision of these Indians' interests be attained. This proof of the Government's intention to keep a sharp eye on all that might occur in relation to the Indians would have a salutary moral effect not only on the Indians, but on the white settlers in their neighborhood. It would also afford the means of dealing with comparative promptitude with the difficulties and troubles continually arising. As it is now, it is not to be wondered at that the Indians feel themselves unprotected and neglected, and the white settlers feel themselves safe in trespassing on Indians' property or persons. In some of the villages where pre-emption claims have been located with the last four years, no agent has ever been. It is safe to say that had an agent been on the ground each year, with the proper authority to take efficient measures, much of the present suffering and confusion would have been prevented. In the case, for instance, of the Los Coyotes village, filed on a few months ago (see Exhibit F), there was no reason why those lands should not have been set apart for the Indians long ago, had their situation been understood; so in the San Ysidro case, and others. The whole situation of an agent in regard to the Mission Indians is totally different from that of ordinary agency on a reservation. The duties of an Indian agent on a reservation may be onerous, but they are in a sense simple. His Indians are all together, within comparatively narrow limits, and, so to speak, under his hand, and dependent largely on the Government. The Mission Indians, on the contrary, are scattered in isolated settlements, thirty, forty, a hundred miles away from the agency headquarters, many of them in regions difficult of access. Moreover, the Indians are in the main self-supporting and independent. Protection or oversight worth anything to them can only be given by a systematic method of frequent visitation.

What is true in this respect of the agent's work is, if possible, still truer of the physician's. If there is to be an agency physician for the Mission Indians at all, he should be a young, strong, energetic man, who is both able and willing to make at least four circuits a year through the villages, and who will hold himself bound to go when called in all cases of epidemics, serious illness, or accidents occurring among Indians within one day's journey of the agency headquarters. Whatever salary it is necessary to pay to secure such service as this should be paid, or else the office of agency physician to the Mission Indians should be abolished. Anything less than this is a farce and a fraud.

(7) We recommend that there be secured the appointment of a lawyer or a law firm in Los Angeles, to act as special United States attorney in all cases affecting the interests of these Indians. They have been so long without any protection from the law that outrages and depredations upon them have become the practice in all white communities near which they live. Indians' stock is seized, corraled, and held for fines, sometimes shot, even on the Indian's own reservation, or in the pueblo domain. In seasons of dearth roving stockmen and shepherds drive their herds and flocks into Indians' grain fields, destroying their subsistence for a whole year. Lands occupied by Indians or by Indian villages are filed on for homestead entry precisely as if they were vacant lands. This has been more than once done without the Indians receiving any warning until the sheriff arrived with the writ for their ejectment. The Indians' own lives are in continual danger, it being a safe thing to shoot an Indian at any time when only Indian witnesses are present. (See Exhibits C, E.) It is plain that all such cases as these should be promptly dealt with by equal means. One of the greatest difficulties in the position of the Mission Indians' agent is, that in all such cases he is powerless to act except through the, at best, slow and hitherto unsatisfactory channel of reporting to the Interior Department. He is in the embarrassing position of a guardian of wards with property and property rights, for the defense of which he is unable to call in prompt legal assistance. In instances in which the Indians themselves have endeavored to get redress through the courts, they have in the majority of cases, to the shame of the Southern California bar be it spoken, been egregiously cheated. They are as helpless as children in the hands of dishonest, unscrupulous men. We believe that the mere fact of there being such a United States legal authority near at hand to act for the Indians, would in a short time, after a few effective illustrations of its power, do away with the greater portion of the troubles demanding legal interference.

The question of the rights of Indians living on grant lands to remain there, will, if the Department decides to test it by law, involve some litigation, as it will no doubt

**10**               MISSION INDIANS IN CALIFORNIA.

be contested by the ranch owners; but this point once settled and the Indians secured in the ownership of their lands, a very few years will see the end of any special need of litigation in their behalf. We recommend in this connection and for this office the firm of Brunson & Wells, of Los Angeles. We have obtained from this firm a clear and admirable opinion on these Indians' right to their present homes (see Exhibit A), and we know them to be of high standing at the bar and to have a humane sympathy for Indians.

(8) We recommend that there should be a judicious distribution of agricultural implements among these Indians. No village should be omitted. Wagons, harness, plows, spades, and hoes are greatly needed. It is surprising to see what some of these villages have accomplished with next to no implements. In the Santa Ysabel village the Indians had three hundred acres in wheat; there were but three old broken plows in the village, no harness, and no wagon. (See Exhibit G.) There is at present much, and not unfounded, sore feeling in some of the villages which have thus far received no help of this kind, while others of the villages have been supplied with all that was needed.

(9) There should always be provided for the Mission Indians' agency a small fund for the purchase of food and clothing for the very old and sick in times of especial destitution. The Mission Indians as a class do not beg. They are proud spirited, and choose to earn their living. They will endure a great deal before they will ask for help. But in seasons of drought or when their little crops have, for any cause, failed, there is sometimes great distress in the villages. Last winter the Cahuillas, in the Cahuilla Valley (see Exhibit C), were for many weeks without sufficient food. The teacher of their schools repeatedly begged them to let her write to the agent for help, but they refused. At last one night the captain and two of the head-men came to her room and said she might write. They could no longer subdue the hunger. She wrote the letter; the next morning at daylight the Indians were at her door again. They had reconsidered it, they said, and they would not beg. They would rather starve, and they would not permit her to send the letter.

(1 ) The second and third special points on which we were instructed to report to the Department were, whether there still remains in Southern California any Government land suitable for an Indian reservation, and if not, in case lands must be bought for that purpose, what lands can be most advantageously purchased. There is no Government land remaining in Southern California in blocks of any size suitable for either white or Indian occupancy. The reason that the isolated little settlements of Indians are being now so infringed upon and seized, even at the desert's edge and in stony fastnesses of mountains, is that all the good lands, i. e., lands with water or upon which water can be developed, are taken up.

We recommend two purchases of land: one positively, the other contingently. The first is the Pauma ranch, now owned by Bishop Mora, of Los Angeles. (See Exhibit P.) This ranch, lying as it does between the Rincon and Pala Reservations on the north and south, and adjoining the La Jolla Reservation, affords an admirable opportunity to consolidate a large block of land for Indian occupancy. It is now, in our opinion, a desirable tract. While it is largely hilly and mountainous, there is considerable good sheep and cattle pasturing on it, and a fair amount of bottom land for cultivation along the river. The price asked for it is, as lands are now selling in Southern California, low. If the already existing reservations are cleared of whites, unified, and made ready for Indian occupancy, and the Government lands now in actual occupation by Indians be assured to them, the addition of this Pauma ranch will be, in our opinion, all that will be required to make comfortable provision for all the Indians except those living within the boundaries of confirmed grants.

Should the Department decide to remove all these and provide them with new homes, we recommend the purchase of the Santa Ysabel ranch. (See Exhibit Q.) The purchase of this ranch for an Indian reservation was recommended to the Government some years ago, but it was rejected on account of the excessive price asked for it. It is now offered to the Government for $95,000. During the past ten years the value of lands in southern California has in many places quadrupled; in some it is worth more than twenty times what it was then. We have no hesitation in saying that it is not now possible to buy an equally suitable tract for any less money. The ranch contains 17,719.40 acres; is within the rain belt of San Diego County; is well watered, and, although it is largely mountainous, has good pasture, some meadow land, and some oak timber. It is, moreover, in the region to which the greater proportion of these Indians are warmly attached, and in the vicinity of which most of them are now living. One large Indian village is on the ranch. (See Exhibit G.) Father Ubach, the Catholic priest of San Diego, who has known these Indians for seventeen years, says of it, "it is the only tract to which human power can force these Indians to remove." We recommend this purchase only as a last resort in the event of the Department's being compelled to provide new homes for all the Indians now living within the boundaries of confirmed grants.

## MISSION INDIANS IN CALIFORNIA.

In conclusion, we would make the suggestion that there are several small bands of Mission Indians north of the boundaries of the so-called Mission Agency, for whom it would seem to be the duty of the Government to care as well as for those already enumerated. One of these is the San Carlos Indians, living near the old San Carlos Mission at Monterey. There are nearly one hundred of these, and they are living on lands which were given to them before the secularization act in 1834. These lands are close to the boundaries of the ranch San Francisquito of Monterey. These boundaries have been three times extended, each time taking in a few more acres of the Indian lands, until now they have only ten or twelve acres left. There are also some very destitute Indians living in the neighborhood of the San Antonio Mission; some 60 miles south of Monterey, and of San Miguel, 40 miles farther south, and of Santa Inez near Santa Barbara. These Indians should not be overlooked in arrangements made for the final establishing of the Mission Indians in southern California.

Hoping that these recommendations may be approved by the Department, we are, Very respectfully, yours,

HELEN JACKSON.
ABBOT KINNEY.

Hon. H. PRICE,
*Commissioner of Indian Affairs.*

## EXHIBIT A.

LOS ANGELES, CAL., *May* 12, 1883.

SIR: In response to your verbal request asking our opinion as to the following questions, viz:

1st. Have civilized Indians and those who are engaged in agriculture or labor of any kind, and also those who are known as Pueblos or Rancheros Indians in California, a right to occupy and possess lands which they and their predecessors had continuously occupied, possessed, and enjoyed while said lands were under the jurisdiction of the Mexican Government, up to and at the date of the ratification of the treaty of Guadalupe Hidalgo between the United States and the Mexican Republic, March, 1848, notwithstanding that said lands so occupied and enjoyed by the Indians aforesaid had been, while they were so occupying and possessing the same, by the proper Spanish and Mexican authorities, before the ratification of said treaty, granted to certain Spanish and Mexican citizens, and since the acquisition by the United States of the territory embracing said lands so granted been by the United States confirmed, surveyed, and patented to the grantees or their legal representatives?

2d. Has the United States Government the right to condemn lands within the State of California for the purpose of giving Indians homes thereon?

We have the honor to submit the following as our reply and answer to the above interrogatories. Before and at the date of the treaty of Guadalupe Hidalgo, all the territory now known as California was a part of and under the jurisdiction of the Mexican Republic. We do not regard it as necessary in order to answer the questions propounded to give a history of the land laws of Spain and Mexico, nor the method of acquiring land prior to August 18, 1824.

On August 18, 1824, the Mexican Congress enacted a general colonization law, proscribing the mode of granting lands throughout the Mexican territory. This law was limited and defined by a series of regulations ordained by the Mexican Government November 21, 1828. By these laws and regulations, which have ever since continued in force, the governors of Territories were authorized to grant, with certain specified exceptions, vacant land. By the fundamental laws of 1824, the regulations of 1824, and the regulations of the departmental legislature consistent therewith, all Mexican grants in California have been determined, and by this have been determined the validity of every grant of land in California. (Leese and Vallejo *vs.* Clark, 3 Cal., 17.) The limitations, as well as the fundamental laws mentioned, provided that in making grants or distribution of land (such as are now known as Mexican grants)—

1st. It must be vacant land; and if occupied by Indians, then without prejudice to them.

2d. That such land as would be granted to the damage and injury of the Indians should be returned to the rightful owners.

The Mexican Government reserved from private grant all lands occupied and possessed by the Indians. Great care was taken to make strict reservation of such land; and by law no valid grant of land occupied or possessed by Indians could be made so as to dispossess them. When California was ceded to the United States the rights of property of its citizens remained unchanged. By the law of nations those rights were sacred and inviolable, and the obligations passed to the new Government to protect and

been nearly told by the United States commissioners and agents, both special and general, as well as by their legal counsel, that they could remain on these lands. Now, without any previous knowledge by them of any proceedings in court, they are ordered to leave their lands and homes. The order of ejectment has been served on them by the sheriff of San Diego County. He is not only commanded to remove these Indians, but to take of their property whatever may be required to pay the costs incurred in the suit."

Comment on the extracts would be superfluous. There is not often so much of history condensed in the same number of newspaper paragraphs. A portion of these Temecula Indians, wishing to remain as near their old homes and the graves of their dead as possible, went over in the Pachanga cañon, only 3 miles distant. It was a barren, dry spot; but the Indians sunk a well, built new houses, and went to work again. In the spring of 1882, when we first visited the place, there was a considerable amount of land in wheat and barley; and a little fencing had been done. In July, 1882, the tract was set off by Executive order as a reservation for these Indians. In the following May we visited the valley again. Our first thought on entering it was, would that all persons who still hold to the belief that Indians will not work could see this valley. It would be hardly an extreme statement to say that the valley was one continuous field of grain. At least four times the amount of the previous year had been planted. Corrals had been built, fruit orchards started; one man had even so far followed white men's example as to fence in his orchard a piece of the road which passed his place. The whole expression of the place had changed; so great a stimulus had there been to the Indians in even the slight additional sense of security given by the Executive order setting off their valley as a reservation. And, strangely enough, as if nature herself had conspired at once to help and to avenge these Indians in the Temecula Valley from which they had been driven out, the white men's grain crops were thin, poor, hardly worth cutting; while the Indians' fields were waving high and green—altogether the best wheat and barley we had seen in the county. It is fortunate that this little nook of cultivable land was set aside as a reservation. Had it not been it would have been "filed on" before now by the whites in the region, who already look with envy and chagrin on the crops the Indian exiles have wrested from land nobody thought worth taking up.

A Government school has been opened here within the past year, and the scholars have made good progress. We found, however, much unpleasant feeling among the Indians in regard to the teacher of this school, owing to his having a few years before driven off four Indian families from their lands at Pala, and patented the lands to himself. There were also other rumors seriously affecting his moral character, which led us to make the suggestion in regard to the employment of female teachers in these Indian schools. (See report recommendation.) As one of the Indians forcibly said, to set such men as this over schools was like setting the wolf to take care of the lambs.

These Pachanga Indians had, before the setting aside of their tract as a reservation, taken steps towards the securing of their cañon and the dividing it among themselves under the provisions of the Indian homestead act. They were counseled to this, and assisted in it by Richard Eagan, of San Juan Capistrano, well known as a good friend of the Indians. They have expressed themselves as deeply regretting that they were persuaded to abandon this plan and have the tract set off as a reservation. They were told that they could in this way get their individual titles just as securely and without cost. Finding that they have no individual titles, and can not get them, they are greatly disappointed. It would seem wise to allow them as soon as possible to carry out their original intention. They are quite ready and fit for it.


### EXHIBIT N.

#### THE DESERT INDIANS.

The Indians known as the Desert Indians are chiefly of the Cahuilla tribe, and are all under the control of an aged chief named Cabezon, who is said to have more power and influence than any Indian now living in California. These Indians' settlements are literally in the desert; some of them being in that depressed basin, many feet below sea level, which all travelers over the Southern Pacific Railroad will recollect. There is in this desert one reservation, called Agua Caliente, of about 60,000 acres. From the best information that we can get this is all barren, desert land, with only one spring in it. These Desert Indians are wretchedly poor, and need help perhaps more than any others in southern California. We were unable to visit these Indians personally, but were so fortunate as to induce Capt. J. G. Stanley, a former Indian agent for the

Mission Indians, and a warm friend of theirs, to go out in our stead and report to us on their condition. His report is herewith given:

"Mrs. H. H. Jackson:

"Madam: In compliance with your request, I proceeded to the Cabezon Valley and have endeavored, as far as possible with the limited time at my command, to ascertain the present condition and actual necessities of these Indians that still inhabit that portion of the Colorado Basin known as the Cabezon Valley, that being also the name of the head chief, who, from the best information that can be obtained, is not less than ninety and probably one hundred years old, and who still has great influence with all the Indians in that region. I found it impracticable to visit all the rancherias, and accordingly sent out runners and called a council of all the Indians of all the villages to be held at a point on the railroad known as Walter's Station, that being the most central point. The next day there were present in council about one hundred Indians, including the captains of all the rancherias and the old chief Cabezon. Having been special agent under the old superintendent system, and well acquainted with the Indians, I was received by them with the greatest cordiality. I read and interpreted your letter to Cabezon, and also explained that you were not able to visit them in person on account of ill health. The Indians, through their spokesman or interpreter, then stated their cause of complaint. First, that Mr. Lawson had never visited their villages nor taken any interest in their welfare; that he had allowed his interpreter, Juan Morengo, to take the advantage of them; that Juan Morengo had made a contract for them with a man in San Bernardino to cut wood on land claimed by the Indians for the railroad company, he taking the lion's share on the profits, and agreeing to pay them every Saturday in money; that Juan Morengo took some $200 belonging to the Indians and appropriated it to his own use; that the contractor did not pay as agreed, but wished the Indians to take poor flour and other articles at a great price. There may be some exaggeration of the causes of complaint, but it is evident that no one has looked after the rights of these Indians. The Indians have stopped cutting the wood, and they say the contractor tells them he will send others to cut wood if they will not do it. If I understand rightly this is Government land, and no one has a right to cut the timber. It is true, it is mesquito timber, and they profess to cut only the dry trees, but the mesquito is invaluable to the Indians. It not only makes their fires, but its fruit supplies them with a large amount of subsistence. The mesquito bean is used green and dry, and at the present time is their principal article of food. Moreover, without the mesquito tree the valley would be an absolute desert. The wood (the dead trees) could be made a source of employment and profitable revenue to the Indians if cut with proper regulations, but the present mode is destruction to the timber and benefits but few of the Indians. I have extended my remarks on this subject, as I think it very important. If the wood is to be cut the Indians should be supplied with wagons and harness that they may do all the work of delivering the wood and get the profit of their labor. I would suggest that it is very important that a tract of country be segregated and set apart for these Indians. There is a vast amount of desert land in their country, but there are spots in it that have been occupied by them for hundreds of years where wheat, corn, melons, and other farm products can be grown. There is very little running water, but water is so near the surface that it can be easily developed. The Indians appear to know nothing of any lands being set apart for them, but claim the whole territory they have always occupied. I think that to avoid complications something should be done for these Indians immediately to protect their interests. At present there are eight villages or rancherias, each with its own captain, but all recognizing old Cabezon as head chief. I ascertained from each captain the number belonging to his village, and I found the aggregate to be 560 souls. These Indians are not what are called Christianized Indians. They never belonged to the missions and have never been received into any church. They believe in spirits and witchcraft. While I was among them I was told by a white man that the Indians intended to kill one of their number because he had bewitched a man and made him sick. I asked the interpreter about it. He acknowledged it to be true, but said they only intended to frighten him so that he would let the man alone. I told him it would be wrong to kill the Indian, and he said they would not do it. They are very anxious to have schools established amongst them, and are willing to all live in one village if a suitable place can be selected. I shall offer as my opinion that immediate steps should be taken to set apart lands for them, that they be permitted to cut wood for sale only on the public lands in Cabezon Valley, that no one be permitted to cut any green timber in the valley, that two strong wagons and harness for twelve horses be furnished (or loaned) to the Indians for the purpose of hauling wood only, that lumber be furnished to make sheds for said wagons and harness. The Indians have horses of their own.

"All of which is respectfully submitted.

"J. G. Stanley."

# EXHIBIT 10

# FIFTY-EIGHTH ANNUAL REPORT

OF THE

# COMMISSIONER OF INDIAN AFFAIRS

TO THE

## SECRETARY OF THE INTERIOR.

## 1889.



WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1889.

Original from
UNIVERSITY OF CALIFORNIA

# REPORT

## OF THE

# COMMISSIONER OF INDIAN AFFAIRS.

DEPARTMENT OF THE INTERIOR,
OFFICE OF INDIAN AFFAIRS,
*Washington, October* 1, 1889.

SIR: The fifty-eighth annual report of the Commissioner of Indian Affairs is respectfully submitted.

I entered upon the discharge of the duties of this office July 1, 1889. I have had no time as yet to familiarize myself fully with the details of office administration nor to make myself acquainted by personal observation with the practical workings of the Indian field-service. As soon as practicable, I hope to do both.

Unexpectedly called to this responsible position, I entered upon the discharge of its duties with a few simple, well-defined, and strongly-cherished convictions:

*First.*—The anomalous position heretofore occupied by the Indians in this country can not much longer be maintained. The reservation system belongs to a " vanishing state of things " and must soon cease to exist.

*Second.*—The logic of events demands the absorption of the Indians into our national life, not as Indians, but as American citizens.

*Third.*—As soon as a wise conservatism will warrant it, the relations of the Indians to the Government must rest solely upon the full recognition of their individuality. Each Indian must be treated as a man, be allowed a man's rights and privileges, and be held to the performance of a man's obligations. Each Indian is entitled to his proper share of the inherited wealth of the tribe, and to the protection of the courts in his " life, liberty, and pursuit of happiness." He is not entitled to be supported in idleness.

*Fourth.*—The Indians must conform to " the white man's ways," peaceably if they will, forcibly if they must. They must adjust themselves to their environment, and conform their mode of living substantially to our civilization. This civilization may not be the best possible, but it is the best the Indians can get. They can not escape it, and must either conform to it or be crushed by it.

3

Original from
UNIVERSITY OF CALIFORNIA

Digitized by Google

4      REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Fifth.*—The paramount duty of the hour is to prepare the rising generation of Indians for the new order of things thus forced upon them. A comprehensive system of education modeled after the American public-school system, but adapted to the special exigencies of the Indian youth, embracing all persons of school age, compulsory in its demands and uniformly administered, should be developed as rapidly as possible.

*Sixth.*—The tribal relations should be broken up, socialism destroyed, and the family and the autonomy of the individual substituted. The allotment of lands in severalty, the establishment of local courts and police, the development of a personal sense of independence, and the universal adoption of the English language are means to this end.

*Seventh.*—In the administration of Indian affairs there is need and opportunity for the exercise of the same qualities demanded in any other great administration—integrity, justice, patience, and good sense. Dishonesty, injustice, favoritism, and incompetency have no place here any more than elsewhere in the Government.

*Eighth.*—The chief thing to be considered in the administration of this office is the character of the men and women employed to carry out the designs of the Government. The best system may be perverted to bad ends by incompetent or dishonest persons employed to carry it into execution, while a very bad system may yield good results if wisely and honestly administered.

## INDIAN EDUCATION.[*]

The Superintendent of Indian Schools, Daniel Dorchester, D. D., entered upon his duties on the 1st day of May, 1889, and is now engaged in a thorough inspection of the whole school service. By appointment of the Secretary of the Interior, Mrs. Dorchester has been engaged in special inspection of schools.

### SCHOOL EMPLOYÉS.

Recognizing the truth of the adage that "as the teacher, so is the school," special pains have been taken to secure the best available talent in the school service. Believing that what is good enough for a white man is good enough for an Indian, the effort is being made to develop for the Indians a non-partisan, non-sectarian public-school system.

As indicative of the efforts put forth to secure good teachers, I submit a copy of a letter that is mailed to those who apply for positions in the school service:

Your application for appointment as teacher has been received. Inclosed please find blanks to be filled out and returned.

It is the purpose of the office to appoint no person as a teacher in the Indian school service who would not be able to secure a similar position in the best schools for white children in the community in which he resides. Indeed, the exigencies of Indian schools are such as to require a higher order of talent to secure success than is required in ordinary teaching.

---

[*] See also page 93 of this report.

Digitized by Google          Original from
UNIVERSITY OF CALIFORNIA

*Provided further,* That the Secretary of the Interior may at his discretion, by written order, approve issues of subsistence which have been made to heads of tribes or bands of Indians, instead of to heads of families, and that he may in future in like manner except any tribe or portion of a tribe from the operation of section four, act of March third, eighteen hundred and seventy-five, as amended by section two, of the act of March third, eighteen hundred and seventy-seven, when in his judgment the farming and other interests of the Indians and of the service demand it.

### A CENSUS OF INDIANS.

In previous reports of this Bureau attention has been called to the difficulty which the office has experienced in obtaining a reliable enumeration of Indians, except at agencies where the Indians receive regular issues of rations. With no provision for defraying the expense of taking a census, the returns can not be accurate as to a large number of the Indians upon reservations, and as to the number of Indians off reservations and not under the jurisdiction of agents, the office has no reliable data and can furnish only estimates made up from chance information.

It is extremely desirable that the census of 1890 should make a special enumeration of the Indians in the United States, both on and off reservations, and the officers and employés of the Indian Bureau will be ready to co-operate in this work so far as possible.

### MISCELLANEOUS MATTERS RELATING TO SPECIAL RESERVATIONS AND TRIBES.

#### THE MISSION INDIANS IN CALIFORNIA.

For the last sixteen years the difficulties which surround these Indians, the uncertain tenure by which they hold their lands, and the unjust treatment to which they have been subjected, have received the careful consideration of this Office, and have been frequently alluded to in its annual reports. Various measures of relief have been devised and submitted to Congress without avail.

As far as practicable, under existing laws, intruders have been removed from their reservations, and their right to occupy lands in private grants has been maintained through the courts.

January 10, 1884, a draft of a bill for their relief was transmitted to the Department for submission to Congress, which bill (in its main features) was continuously before that body up to the close of the last Congress. It has been passed by the Senate three times, and as many times has failed to become a law by the non-action of the House of Representatives.

The principal feature of this bill was the authorization of the appointment of a commission of three disinterested persons, to arrange a just and satisfactory settlement of these Indians on reservations to be se-

Digitized by Google          Original from
UNIVERSITY OF CALIFORNIA

cured to them by patent.   Without such a commission it is impossible to make any satisfactory adjustment of their difficulties, or to determine the just rights of white settlers.

This bill, with such amendments as may be considered necessary in the light of later information, will be prepared for submission to Congress at the beginning of its next session.

## ROUND VALLEY RESERVATION IN CALIFORNIA.

The state of affairs existing upon this reservation has been the subject of repeated comment in the annual reports of this Office for many years.   The matter is of such grave importance, and the necessity for legislation is so great, that a complete history of the reservation and the efforts made to maintain the rights of the Government and the Indians is deemed essential.

Round Valley was first selected for Indian purposes by Superintendent Henley in 1856.   In a letter addressed to him from this office, dated November 18, 1858, he was, by order of the Secretary of the Interior, directed to give public notice that the entire valley was set apart and reserved for Indian purposes.   It has been claimed that Superintendent Henley did not make this order public, and that it was not proclaimed until 1860.   On the 28th of January, 1859, however, Superintendent Henley transmitted to this office a remonstrance against the occupation of Round Valley for Indian purposes, signed by a number of settlers, dated January 18, 1859, in which they said :

Now we learn that a proclamation has been made by the Superintendent of Indian Affairs, by order of the Department, claiming the entire valley as an Indian reservation.

In a letter dated January 6, 1860, from this office to the General Land Office, reciting the facts in regard to the establishment of this reservation, it was stated that they were deemed sufficient to show that Round Valley had been duly set apart and recognized by the Department as an Indian reservation, and the Commissioner of the General Land Office was therefore requested to respect the same upon the books of that office, and to notify the local officers accordingly.

May 3, 1860, the surveyor-general of California, acting under instructions from the General Land Office, reported a survey of the boundaries of said reservation.   In a communication dated June 21, 1860, the General Land Office inclosed to this office a plat of said survey, certified by the surveyor-general of California, May 4, 1860, showing the reservation to be situated partly in townships 22 and 23 north of ranges 12 and 13 west of the Mount Diablo meridian, and to comprise 25,030.8 acres.

On the 27th of October, 1863, an appraisement of the claims and improvements of settlers in the valley was reported by Superintendent Steele, the value of the same, including growing crops, being placed at $50,000, and of their stock at $25,000 additional.

Digitized by Google                    Original from UNIVERSITY OF CALIFORNIA

Four houses have been built for the Indians during the year, and I hope to have ten or twelve built for them during the coming year. The work has been systematically laid out, the Indians are interested and ready to build with a little assistance, and I hope a good showing will be made at the end of the season.

The Indians have been generally well behaved during the year, are industrious, and appear to be contented.

I understand that this valley is very rich in gold deposits which can be worked at very little expense. In this case it seems to me that it will be necessary to afford the Indians military protection until their lands are fully secured to them and they can have full protection of the courts. Otherwise the valley would soon be overrun by white miners, who would soon dispossess the Indians or have serious trouble with them. I am informed that the allotments of land have been made temporarily pending the action of the Land Office on the surveys made last year. When these allotments are made permanent and the Indian is furnished with an indisputable title to his lands, the first step will be taken to make him independent of military support.

I am, very respectfully, your obedient servant,

FRANK H. EDMUNDS,
*Captain First Infantry, Acting U. S. Indian Agent.*

The COMMISSIONER OF INDIAN AFFAIRS.

---

### REPORT OF MISSION AGENCY.

MISSION AGENCY,
*Colton, Cal., August 8, 1890.*

SIR: I have the honor to submit herewith my second annual report of the affairs of the "Mission Tule River (consolidated) Agency."

The agency is located at Colton, San Bernardino County, Cal., at the junction of the Santa Fé and Southern Pacific Railroads, it being the most convenient point from which the agent can reach by rail or mail all the Indians, the school-teachers, and employés of the agency.

The general affairs of this agency are not at all satisfactory to the agent. Many land titles are in litigation; few surveys well defined, and this leads to daily disputes and differences, which I find difficult to adjust. When I took this position Mr. Frank D. Lewis and Attorney Shirly C. Ward were each employed to look up testimony and make the legal defense. Since both of these gentlemen have been removed, and none appointed to assist me, I feel that important trusts are being neglected, and I am powerless to prevent. I earnestly ask for such legal assistance as will enable me to protect the interests intrusted to my care.

Of the twenty-two reservations in this charge the *Hoopa Valley* reservation is 900 miles northwest of Colton, and being under the immediate charge of Capt. William E. Dougherty, U. S. Army, he will report directly to the Department.

The *Tule River* reservation is in Tulare County, Cal., 150 miles north of Colton. These Indians, 150 in number, remnants of a powerful tribe, have been removed from good lands twice during the past thirty years, and are now living in a narrow cañon on less than 200 acres of good tillable land. They have a good cattle range, which much needs a wire fence to protect them from white intruders and save trouble. They have some valuable timber lands, which they are likely to lose by overreaching white men unless steps are immediately taken to prevent. These people are self-sustaining in a poor Indian way, wearing citizens' dress, cultivating what land they have, keeping a few horses, cattle, sheep, and hogs, raising a few good mules, which are a great improvement upon their little Indian ponies. They live in houses built of boards. This tribe was much reduced some years ago by small-pox, but are now increasing more rapidly than the Mission Indians.

School was discontinued some years ago. Although we could secure only 15 of school age, we re-opened the school in June last, but unfortunately the house was soon burned. I can not recommend its rebuilding now, since we hope to establish a training school this year, which may accommodate the older pupils. Luther Anderson remains in charge as farmer, doing all that can be done, until we can have a survey and divide the land in severalty.

The *Yuma* Reservation (not Mission Indians) is located upon the west side of the Colorado River, opposite Yuma and 200 miles southeast from Colton. Here are about 1,000 Indians, who have made less progress toward civilization than any in California. They subsist principally upon the wild seed pods of the mesquite, a species of locust, and such irregular employment as they can get from the Southern Pacific Railroad Company and river boats.

Digitized by Google            Original from
UNIVERSITY OF MICHIGAN

REPORTS OF AGENTS IN CALIFORNIA.

The railroad officers speak of them as good laborers, and could they be regularly employed they would soon show improvement. Six years ago they were accustomed to go about the depot and streets of Yuma clad only in a shirt and gee string; now they all wear citizens' dress, and are as cleanly as any class of laborers. This has come to them by example, and very little teaching, if any.

They have a large reservation of good land, but no water save what they get from the Colorado River. This overflows generally in June, after which they plant and raise very small crops of corn, beans, and melons. This land is almost worthless without irrigation, and wonderfully productive with it. In April last, under orders, I visited the Pima Agency on Gila River, Arizona, to investigate their manner of irrigation, as they are successful cultivators. On a similar soil, from my observation (reported from there), I am certain that the Yumas may be made self-supporting and started upon the road to civilization immediately by land in severalty, water upon that land to make it available, a farmer to instruct them, and compelling attendance in school.

The Catholic school at Yuma under the very efficient management of Mary O'Neil, superintendent, is a notable example of what an education, without an occupation, will do. When I was last in Yuma I learned that four grown girls just out of school were tramping the streets of Yuma, as prostitutes, simply because they had nothing to do to secure them a living, and as their captain said, they must have something to eat. Will some one explain what good education is doing them.

This is my remedy: I would survey a part of that reservation, lay out a colony, in 10-acre blocks, put water on it, making it possible for a family to be self-supporting. Then I would induce as many in families as possible to take land in severalty, build homes on these 10-acre lots, teach them what and how to plant, cultivate, and harvest, show them how easy to raise enough to support a family, compel a regular attendance in school, then teach them the English language, housekeeping, the care of domestic animals, cultivation of crops, and when about to leave school, I would induce them to marry, build homes on these lands, be self-supporting and respectable. In this way utilize their education, which in idleness is only wasted. If the Government can not furnish money to conduct the school and furnish water that these people may earn a living at the same time, better close the school until we can teach them and help them to necessary food. They are now liable to famine any season. In the winter of 1888–'89 by reason of the non-overflow of the river they made no crops and the Government, sent them $3,000 in provisions. An outlay now of $5,000 to $6,000 would put them beyond want, and do much toward their advancement by giving employment. Let us at one and the same time give them employment and education in place of idleness and ignorance.

I can not submit the census of the Yumas before September, as they are much scattered. In September they have an annual feast, when I will enumerate them.

The remaining twenty reservations lie on and south of the Southern Pacific Railroad at distances from the agency at Colton varying from 30 to 200 miles, extending south to the Mexican line, the extremes being 1,100 miles apart. I have visited them all once and the less remote ones several times.

The *Mission Indians* proper are now scattered over the southern part of California, principally upon nineteen reservations. Many families and groups of families are living isolated in the mountains, where they have been driven by violent white men. Poor and homeless, they subsist principally upon acorns. Others are living near the white settlement, where they secure a better living by their labor, which our best citizens are glad to get, generally at $1.50 per day. Most of the last-named class are the most advanced in civilization. A few of the younger ones have been in school, and by association in labor with the whites are much ahead of those who remain on the reservations.

The Mission Indians have arrived at that period in human progress where they should no longer be classed as Indians, but as citizens. They only need land in severalty, with a set of agricultural implements and a general supervision, to make them all self-supporting; then the school will fit them for the duties before them. They are a very quiet, peaceable, confiding people, and as industrious as any people who have so few wants. Just in proportion as their wants increase their habits of industry will increase, if we properly lead them. They are as simple and confiding as children, and need the same kind, positive, truthful, simple teaching.

The teachings of the padres saved them from savagism. Neglect and white man's greed have robbed them of land, and his vices have reduced their numbers from 15,000 in 1834 to 7,000 in 1852, to 3,000 in 1890. No man with a particle of humanity left can meet these people as an agent does without feeling ashamed that as the agent of this good Government, which has forcibly taken possession of this country and assumed the care for this weak people, we should have by neglect and dishonesty of its paid agents reduced them to such abject poverty and helplessness. Our own records of the past are humiliating. Cortez robbed the Aztecs of gold, but left them their land and water. Americans posing as Christians have robbed these poor children of nature, by legal trick-

Digitized by Google
Original from UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP Document 82-3 Filed 10/21/14 Page 71 of 206 Page ID #:596

ery, of their land made sacred by the graves of their ancestors. As agent for this Government, that I know desires to deal fairly with this people, now I ask and urge that a commissioner may be appointed to come here and settle all land titles, give these people from 10 to 20 acres of available land with water for homes, tools to work with, and enforce attendance in school until every child has secured a common English education. In this way we can soon make some return for the lands we have driven them from, and make them self-supporting, intelligent local citizens. Oft-repeated promises and disappointments cause them to distrust any statement made by civil officers, with reason.

They are to-day nearly self-supporting. We issue no rations except to the sick and infirm, and $900 will cover that entire expense for the past year. We much need more agricultural implements, as they must gain their living by their crops. It is important they have more plows and small tools to enable them to get crops in season. They do not cultivate the ground well, and need instruction in that direction. They are inclined to keep more ponies than is well, as they prefer to ride rather than work. They have some cattle and sheep, and I can see are inclined to increase their stock by taking cows to keep on shares. I think on the whole they have raised more crops than usual, and have worked for the whites more regularly than ever before. This improvement comes by the white cultivator who needs continuous labor and demands more regularity than formerly, when he did not have fruits to care for. Now he must have labor he can depend upon, and the Indian is conforming to the demand.

In nearly every village I find more or less good, intelligent, industrious men, fitted for citizenship. They are a great help to the agent and teachers by their quiet, positive influence, encouraging all to send their children to school, discouraging the use of liquors, always on the side of law and order, anxious to better the condition of their families, unable to do much, because they have no title to land. Patiently they wait and watch, hoping each year Congress may spare a few moments for their relief. Bear in mind they have waited in hope deferred full forty years, and no relief comes to the poor Mission Indian, who has always been loyal to the Government which promised to protect him. He has never been a burden.

We have just taken the census as fully as possible, with the following results:

| | |
|---|---:|
| Mission Indians | 2,895 |
| Tule River Indians | 161 |
| Yuma Indians (estimated) | 100 |
| Total | 4,056 |

Whisky continues the curse of the Indian, and I am glad to be able to say that I think there is an improved public sentiment in regard to selling liquor to Indians. Several white men have been arrested and punished, one man the third time.

I need very much several small prisons, located near our school-houses, to enable me to punish offenders, both Indian and white intruders. The Indians will punish their own offenders if they can confine them, but when they can only tie them to a tree they are not secured. The sight of a jail will do much to deter wrong-doers and save me much trouble. As I do not issue rations I can not punish offenders by withholding them. As I can not use a police force in the scattered reservations I very much need the prison.

But most of all I need a survey that I may know where the reservation lines are. Crimes committed on the reservation escape punishment because I can not prove the line. Trespassers are defiant. For same reason the Indians lose confidence because of the agent's ignorance of the line. Indians on grants are constantly menaced by the grant owners, who are determined to drive them off, and I am powerless to protect.

The prospect of a manual training school is the one great encouragement of the year. This, well conducted, will enable the Indian graduates to step into the labor market, and being able to say I can do this or that well, having a practical knowledge of it, he can compete with all the world for the value of his labor. His success will encourage him and stimulate the older ones at home, when they see their children making better crops than they ever made.

Wherever the agency and training-school shall be located I am very anxious that a small, suitable building be located for a hospital, which is very much needed. I am sure no other outlay can bring better returns than by caring for the sick, educating and winning the confidence of the strong. This has been requested and I hope may soon be reached. My clerk is also agency physician, and does as much as a man can do, but far from what he wants to do. It is a pitiable sight to see these confiding people bring their invalids 30 to 125 miles in a wagon to be treated. We need to be able to do our best for these invalids to enable us to overcome the influence of the old medicine men, who are always doing all they can to keep the people in ignorance and superstition. A few days ago we had a boy at the agency; the doctor cared for him, sent him home doing well; the school

13059 I A——2

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# EXHIBIT 11



NARA DC
RG 75
PI·163/E 102
Special Cases 1821-1907
Bx 19

30)





Reproduced at the National Archives

6

the grant as far as possible. It is not apprehended, however, that there will be any difficulty in dealing with the company, as it has always manifested a desire to treat the Indians fairly, and can no doubt select other lands equally valuable.

You will observe that the eighth section of the act confers upon the Secretary of the Interior power to authorize the construction of ditches and other appliances for irrigating purposes through the reservations.

You will report whether any such appliances have been constructed through or across any of the reservations selected, and make such suggestions and recommendations regarding the subject of irrigation in any of the selected reservations as your observations may seem to require.

It is desired that you give as full a description as possible of the character of the land in each reservation, with the respective quantities of arable, grazing, and other lands. Your opinion as to the willingness of the Indians to take allotments as provided in the act, and the advisability of making such allotments based upon your observation during the progress of your work is requested.

The object of the act of January 12, 1891, is to secure the determination and adjustment of the rights of the Mission Indians as regards their lands, and also of the rights and claims of settlers in conflict therewith. I need not remind you that the accomplishment of that result depends in great measure upon your efforts, and I am confident that you will exercise all possible care and patience in the investigation in order that a satisfactory and final settlement of the troubles which have so long beset these Indians may be had.

You will each be allowed as compensation at the rate of $8 per diem while actually engaged in the work required of you, in addition to your actual and necessary traveling expenses—your salaries to commence on the day you take the oath of office and enter upon your duties.

Mr. Painter has been designated as disbursing officer of the commission and will be required to give bond in the penal sum of $5,000. When he shall have filed his bond as disbursing officer, special instructions will be given him for his guidance in preparing and rendering his accounts in order that they may conform strictly to the regulations of the Department governing such matters. You are authorized to visit the Land office and the office of the Surveyor-General of the State of California, if found necessary, in order to obtain information as to the status of lands, etc.

Upon the completion of your labors you will submit a full and detailed report thereof to this office.

Very respectfully,

T. J. MORGAN,
*Commissioner.*

Approved February 4, 1891.
JOHN W. NOBLE,
*Secretary.*

# EXHIBIT 12

Smiley Commission Report
and
Executive Order of December 29, 1891.

Box 42

## I N D E X

--o--

| Reservation | Page | | Reservation | Page |
|---|---|---|---|---|
| San Manuel | 3 | | Tule River | 23 |
| Ramona | 4 | | San Pasqual | 24 |
| Pala | 5 | | Santa Ynez | 26 |
| Rincon | 6 | | San Jacinto | 28 |
| Cahuilla | 7 | | Agua Caliente | 30 |
| Potrero | 8 | | Los Coyotes | 36 |
| Inaja | 10 | | Torros | 40 |
| Cosmit | 10 | | Pauma | 44 |
| Mesa Grande | 10 | | Augustine | 43 |
| La Posta | 12 | | Santa Rosa | 48 |
| Manzanita | 13 | | Morongo | 51 |
| La Cuna | 13 | | Santa Ysabel | 64 |
| Campo | 14 | | Mission Creek | 66 |
| Temecula | 15 | | Cabazon | 67 |
| Cuyapipe | 16 | | San Louis Rey | 70 |
| Sycuan | 18 | | Private Grants | 71 |
| Capitan Grande | 18 | | | |
| San Felipe | 21 | | | |

HERITAGE ROOM ARCHIVES
IN SMILEY LIBRARY
125 W. VINE
REDLANDS, CA 92373

# REPORT OF MISSION INDIAN COMMISSIONERS.

34993

To the Honorable,

The Secretary of the Interior,

Through the Commissioner of Indian Affairs:--

The undersigned Mission Indian Commissioners most respectfully report as follows:

As soon after their appointment as possible, all the members of the Commission went to California and proceeded to make themselves as familiar with the condition of the Indians and their reservations as possible. To do this they were compelled to travel over many miles of mountain roads and to have many surveys made. We have found a good many difficulties in the way of a satisfactory solution of the questions submitted to us: white men, in many instances, had encroached upon the Indian lands-- especially upon those within the lines of Spanish grants, the Southern Pacific Railroad Company claimed to own the odd sections of land within the reservations near the line of its railroad, settlers had moved on to bona railroad lands and made improvements and developed water rights. of them had been ejected by the military and had against the government or against the officers We have attempted to adjust

differences, and in some cases have succeeded, as will appear more in detail in our recommendations in regard to individual reservations.

It is our judgment that if our recommendations are adopted it will result in a reasonably comfortable and adequate home for every Mission Indian who cares to avail himself of the provisions made for him on these reservations.

At those reservations where we think it wise to allot the lands at an early date in severalty, we have so recommended.   As to the reservations where we do not so recommend, we did not think it best as yet to allot the lands to individuals.

In Southern California the water supply is an important matter.   Its use can be greatly economized by the adoption of method and system in the laying out and the construction of the reservoirs and irrigating ditches.

The Indians are good ditchers and have great skill in the building of irrigating ditches, but they do not possess the technical knowledge that will enable them to plan a system of irrigation that shall provide for an economical use of water by so many families as will need it on some of the reservations proposed by us, and so we recommend that there be employed a competent water engineer to plan systems of irrigation for them in such localities as will be stated more in detail hereafter.

12-81

After pursuing the work of the Commission for about eight weeks, Messrs. Smiley and Moore were compelled to go East and were granted leave of absence for that purpose.   Mr. Painter has remained in California continuously causing surveys to be made and getting such information in detail as he could get.   Mr. Moore returned in October and Mr. Smiley early in November, and all the members of the Commission since their return have spent all their time in the work of the Commission.   We recommend that there be set apart for the Mission Indians of California, the following reservations:

## SAN MANUEL.

We recommend that there be set aside for the Indians living on the land March 12th, 1891, the following lands for a reservation to be called San Manuel, viz:

Section twenty (20); also that part of Section thirty (30) bounded on the North and on the East by the section line and on the South-west by the flume; it being a triangular shaped piece of land containing about fifteen acres: All in Township one (1) North, Range three (3) West, S. B. M.

(For a more detailed statement of this proposed reservation, see our report of March 12th, 1891).

3.

in township four (4) South, Range one (1) East, S. B. M. This water fails during the latter part of the summer, but it is believed that a permanent flow could be secured by development, and easily conducted into Section thirty-two (32), on which, chiefly, in the future, these Indians must depend.

The San Jacinto River, during the past spring, washed away some fifty to seventy-five acres of the land on the grant, and the prospect is that a very large share of the seven hundred and forty-five (745) acres on this grant will disappear.

These Indians, of whom there are nearly two hundred, are quite advanced, and if the government will aid them in the development of their water, as this Commission respectfully recommends it shall due, it is believed that will utilise for pasturage and cultivation the valuable part of their Reservation.

## AGUA CALIENTE.

As now established, this Reservation embraces nearly sixty-one thousand (61,000) acres of land, upon which are settled about seventy Indians.   It is such disproportions between Indians and acres that has given rise to much of the adverse criticism of California newspapers against the Reservation system.

The odd sections are claimed by the railroad company, many of the even sections are dreary wastes of Colorado Desert Lands, and many others are rocky, pathless mountain lands. Nearly all of the Indians are settled on Section fourteen (14) in Township four (4) South, Range four (4) East, S. B. M. This is excellent land, and if it had an abundant permanent water supply, no better land could be found in Southern California, for a home. The hot spring is near the west line of this Section, and is used not only for bathing purposes, but the overflow is used for irrigation. The quantity of water, however, is small, and the Indians have depended largely upon water coming from Toquitch Canyon. Fifty years ago, they built a ditch to bring water from the source for their lands. This supply fails for two or three months, nearly every year, and cannot be depended upon. The Indians, too, have had much trouble with white men, who have a settlement on Section fifteen (15).

There are some Indians on Section thirty-four (34), who are on good land. They had a supply of water, coming from Andreas Cañon, but some of it has been diverted by white men, of whom the Indians bitterly complain. We have recently made an arrangement, subject to the approval of the Secretary of the Interior,

with the Bear Valley Irrigation Company, a very responsible company by which, for the right of way over the Reservation, and for the rights of these Indians to water in Andreas Cañon, they agree to provide for the Indians on Section two (2), Township five (5) South, Range four (4) East, and on Section thirty-four (34), Township four (4) South, Range four (4) East, S. B. M., sufficient water to irrigate one hundred acres upon the basis of one inch to six acres, and water for domestic use.   They also agree, for the right of way across the Reservation, and for the surplus waters in Toquitch Canyon, to furnish, on the North line of Section fourteen (14), Township four (4) South, Range four (4) east, S. B. M., sufficient water for the domestic use of all the Indians now, or that may hereafter be, upon the Reservation.   They also agree to furnish sufficient water to irrigate one hundred and sixty acres of land, upon the basis of one inch to six acres, and that when one hundred and sixty acres is under irrigation by the Indians, to furnish them sufficient water for another one hundred and sixty acres, upon the basis of one inch to six acres. This will be a permanent supply and a better supply than the Indians have ever had or could have if left to themselves.

The proposition of this Company is transmitted herewith and marked Exhibit C; and we recommend its approval.

33.

There is much more arable land in this Reservation than the Indians need,,and more than they can supply with water, without which it has little value.   Dr. W. Murray and wife have a piece of land,-- nearly all the North half (1/2) of Section one (1), Township three (3) South, Range one (1) East, S. B. M.-- that we want to make part of the Morongo Reservation/   They are willing to exchange it for the East half (1/2) of Section ten (10), Township four (4) South, Range four (4) East, S. B. M., in this Reservation, and we recommend this exchange.   His proposition will be found accompaning this report and marked Exhibit D.   We most earnestly recommend this exchange, but would have the right of way across section ten (10), now in use by the water company, reserved or secured.

We recommend that the following lands be set aside as a Reservation, to be called Agua Caliente, viz: Section twelve (12), fourteen (14), twenty-two (22), twenty-four (24), twenty-six (26) and thirty-four (34), all in Township four (4) South, Range four (4) East, S. B. M.   Also, Section two (2), in Township five (5) South, Range four (4) East, S. B. M.

We also recommend that all the other lands now in this Reservation as formerly set apart by executive order (except the East half (1/2) of ten (10) which recommend be exchanged with Dr. Murra

34.

and wife) be restored to the public domain.

As we have before suggested, there is a valuable hot spring on Section fourteen (14), in Township four (4) South, Range four (4) East.   Just across the street, Dr. Murray and wife have a small hotel that is used as a health resort.   This is seven miles across the dreary desert from a small station on the Southern Pacific Railroad, called Seven Palms.   There are no people living there but the station employees; it is about twenty or twenty-five miles to Banning, the first village of any importance.   Dr. Murray and wife have had a three years lease of this spring, for which they have paid $500.   The Indians are allowed to bathe at reasonable hours.   We do not believe the Murrays have realized one-half the rent they have paid from the baths.   They desire to renew their lease at one hundred dollars a year, when it expires. Their proposition is transmitted herewith and marked Exhibit E. The whites, as well as the Indians, ought to have such benefit as may come to them from the use of these waters.   We recommend that the proposition of the Murrays be accepted, under suitable rules and regulations, that will secure to the Indians, as well as the whites, bathing facilities.

The reservation, as recommended by us, will accomodate at least one hundred Indians more than are now there.   Some of the

35.

desert Indians must, and all may be compelled to move, if the Salto
Sea should rise.    In this contingency, this is the place for them
and we recommend that it be set apart, not only for those on the
Reservation, but for those hereafter to come.    Many of the Indian
on the Reservation are ready for allotment.    We are inclined
to think, however, that the allotment ought to be delayed until
question of possible removal may have been determined.    As we
have before suggested the allotments ought to respect the improve-
ments and the occupancy of Indians, as now made, as far as possi-
ble.

The water plan as we have arranged it, is simple; but some
plan ought to be adopted at once, as it will make the future
work much easier.

## LOS COYOTES.

The Reservation of Los Coyotes was set apart by Executive
Order.

It consists of Section three (3) and fractional Section four
(4), in Township eleven (11) South, Range four (4) East, S. B. M.;
and all of township ten (10) South, Range four (4) East, S. B. M.,

36

# EXHIBIT 13

| 52D CONGRESS, | HOUSE OF REPRESENTATIVES. | Ex. Doc. |
|---|---|---|
| 1st Session. | | No. 96. |

## MISSION INDIANS IN CALIFORNIA.

## MESSAGE

### FROM THE

## PRESIDENT OF THE UNITED STATES,

#### TRANSMITTING

*A communication from the Secretary of the Interior submitting an extract
from the report of the Commission for the relief of the Mission Indians
in California, and other papers relating to the exchange of lands, etc.,
with a draft of a bill to carry into effect the recommendation of said
Commission.*

JANUARY 26, 1892.—Referred to the Committee on Indian Affairs and ordered to
be printed.

*To the Senate and House of Representatives:*

I transmit herewith, for the consideration of Congress, a communica-
tion of 23d instant, from the Secretary of the Interior, submitting an
extract from the report of the Commission appointed under the act of
January 12, 1891, entitled "An act for the relief of the Mission Indians
in the State of California," and other papers relating to the exchange
of lands with private individuals and the purchase of certain lands and
improvements for the use and benefit of the Mission Indians, with draft
of a bill to carry into effect the recommendations of said Mission Commis-
sion.

I have approved the report of the Mission Commission, except so
much as relates to the purchase of lands from and exchange of lands
with private individuals, which is also approved subject to the condi-
tion that Congress shall authorize the same.

The matter is presented with recommendation for the early and
favorable action of Congress.

BENJ. HARRISON.

EXECUTIVE MANSION, *January 25, 1892.*

DEPARTMENT OF THE INTERIOR,
*Washington, January 23, 1892.*

The PRESIDENT:

I have the honor to submit herewith a communication from the Com-
missioner of Indian Affairs, transmitting an extract from the report of
the Mission Indian Commission, appointed under the provisions of the

13–90

act of January 12, 1891, entitled "An act for the relief of the Mission Indians in the State of California," and other papers relating to the purchase of lands from and exchange of lands with private individuals, in order that the requirements of the laws as to the reservations for each band or village of the Mission Indians may be complied with.

I also submit a draft of a bill prepared by my direction authorizing the Secretary of the Interior to purchase or exchange certain lands as recommended by the Commission, and which purchase or exchange has received executive approval, subject to the condition that Congress shall authorize the same.

This matter is presented with the recommendation that it receive the early and favorable action of Congress.

I have the honor to be, very respectfully, your obedient servant,

JOHN W. NOBLE,
*Secretary.*

---

DEPARTMENT OF THE INTERIOR,
OFFICE OF INDIAN AFFAIRS,
*Washington, January 13, 1892.*

SIR: Referring to your communication dated December 30, 1891, in which you return the report of the Mission Indian Commission and accompanying papers, and direct that the draft of a bill be prepared authorizing the Secretary of the Interior to purchase or exchange certain lands, as recommended by the Commission, I have the honor to transmit herewith draft of a bill authorizing the purchase and exchange of lands as suggested.

It is thought proper in this report to refer at length to the facts upon which the request for this legislation is based.

The reservation near Banning, called "Morongo," was established by the executive orders of May 15, 1876, May 3, 1877, August 25, 1877, and March 9, 1881. It embraces all of township 2 south, range 1 east, all of township 2 south, range 2 east, and township 3 south, ranges 1 and 2 east, except sections 16 and 36 in each of said townships. The commissioners report that this reservation, as now constituted, embraces considerable worthless mountain-land and also much worthless wash and desert land; that it also contains more agricultural land suitable for dry farming, such as growing barley, than is needed by the Indians; that the Southern Pacific Railroad runs through the reservation, its officers claiming that by virtue of law it is entitled to the odd sections of land therein. Although these townships have not been surveyed, the odd sections have been determined by private survey.

W. S. Hatheway settled upon what was determined to be section 27, township 2 south, range 1 east, and developed considerable water on that section and in the cañon further up. He was ejected from this land by the Government after he had spent, as he claims, some $1,500. He insists that his ejectment was unlawful, as he was on railroad lands, and that he has a claim against the Government.

C. F. Jost and Margaret Jost, his wife, settled on section 25 some years ago, and made very valuable improvements, having good buildings, a good orchard, and having developed by means of ditches a large supply of water. They were also ejected, as they claim, unlawfully, and bring large claims against the Government for damages. The land occupied by them is right in the heart of what the Commission thinks

ought to be the Indian reservation, and is especially valuable because of the water developed upon it.

Richard Gird and John G. North, appreciating the great value of the water upon Hatheway's cañon and the cañon above the Protrero, procured an interest some years ago on sections 15 and 23, which are toward the upper end of the cañon, upon which there are valuable cienegas, and which were railroad lands. They also obtained rights to surplus water from Hatheway and from the Josts. They also took steps which resulted in their getting title to the east half of section 36, which they claimed to be a school section to which they could acquire title. Nearly all the houses, irrigating ditches, and very considerable orchards and vineyards of the Indians are on this section. The commissioners state that to lose this section would be an irreparable loss to the village. Gird and North also built irrigating ditches in the upper end of the cañon, established a field of alfalfa, put out an orchard, and spent considerable sums of money. They too were evicted. Claiming their eviction was unlawful and their losses great, they have commenced suit to recover damages and to determine their right to water and land.

The Commissioners say that, to state the situation briefly, they found that the Indians were the acknowledged holders of lands they did not want or work, and that the whites insisted upon rights to lands that are absolutely essential to the Indians if a reservation is to be established there. The problem, therefore, was how, by means of the lands not wanted, to obtain the title to lands that were wanted, freed from all claims, and at the same time relieve the Government from threatened and actual litigation by the evicted parties.

They succeeded in making satisfactory arrangements with the railroad company, by which it was to relinquish all the lands needed by the Indians for other lands within the reservation not needed for the Indians. They also entered into an arrangement with Mr. O. O. Barker, who held powers of attorney from the several parties in interest, by which the parties referred to agree to relinquish all claims they may have in right or in equity to the lands needed, and to release and abandon all suits against the Government on account of damages claimed, and to accept other lands within the present reservation, they to have said lands conveyed to them by patent.

W. S. Hatheway is to relinquish all his claim to lands in township 2 south, range 1 east, and in township 2 south, range 2 east, all water rights of every kind, and all claims for damages by reason of eviction or otherwise, for which he is to receive a patent to the north half of section 14, township 3 south, range 1 east.

C. F. Jost and Margaret Jost are to exchange all their interest in and to lands and water rights of every sort and nature in township 2 south, ranges 1 and 2 east, and all claims for damages because of eviction and otherwise, they to receive in exchange therefor a patent to the west half of section 6, township 3 south, range 1 east.

Richard Gird and John G. North are to relinquish all their right in and to sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35, and 36, in township 2 south, range 1 east, and sections 6, 7, 18, 19, 30, and 31, in township 2 south, range 2 east, and to any and all damages growing out of eviction or otherwise. Said Gird and North to receive in exchange therefor patents for the south half of section 8, the northwest quarter of section 8, the east half of the northeast quarter of section 8, the northeast quarter of section 10, the southeast quarter of the northwest quarter of section 10, the east half of the southeast quarter of section 10, the northeast quarter of the southeast quarter of section 10,

section 18, and the north half of section 20, all in township 3 south, range 1 east. The land to be given Hatheway is 320 acres; to the Josts, 320 acres; and to Gird and North, 1,840 acres.

Wellwood Murray and Eliza E. Murray, the Commissioners report, are the owners of the north half of section 1, township 3 south, range 1 east, less 10 acres owned by Mrs. Toutain. They report that this land is also needed in the proposed reservation, as it is near the present Indian village and can be readily placed under water. They are willing to exchange it for the east half of section 10 in township 4 south, range 4 east, now under reservation, which land is not needed. As to the proposed exchange, the Commissioners say that to bring it about requires a larger area of land surrendered than they get for the Indians in return, but that in making the exchange the delays and hazards of litigation are avoided. They secure the release of large claims for damages growing out of what are claimed to be unlawful evictions, and secure to the reservation exceedingly valuable water rights. They state that if they were dealing with reference to their own property as individuals they would not hesitate for a moment in making the exchanges.

The right of the Southern Pacific Railroad Company is derived from the twenty-third section of the act of Congress approved March 3, 1871 (16 Stat., 573–579). While it is doubtful whether the right of the railroad company has already attached to the unsurveyed sections, and while the rights of the Indians might possibly be maintained, it may result that the right of the railroad would eventually attach, and that the issue of legal proceedings to establish the rights of the Indians would be doubtful and the contest long and expensive.

It is to be observed that as to some tracts at least there are separate and distinct interests involved. The railroad company has a claim for the land, and the individuals' claims for the value of improvements made and water rights developed on these lands, to which they hope to obtain title by purchase from the railroad company.

The Commissioners report that the former agency clerk and physician, Dr. Ferrabee, purchased from the State the N. ½ of the NW. ¼, the SE. ¼ of the NW. ¼, and the SW. ¼ of the NE. ¼ of Sec. 36, T. 8 S., R. 2 W., San Bernardino meridian, on which section the little water which the Indians in the Temecula Reservation have takes its rise. The purchase was made that the lands might be held for the use of the Indians. Dr. Ferrabee is willing to sell it to the Government for what it cost him, including taxes and interest. The Commission does not state the price, but expresses the opinion that the purchase can be made for not exceeding $500.

In the Los Coyotes Reservation certain entries were made before the reservation was established, May 6, 1889. Among others Chatham Helm has received a patent for the SW. ¼ of the NW. ¼ of Sec. 35, the SE. ¼ of the NE. ¼ and the N. ½ of the SE. ¼ of Sec. 34, T. 10 S., R. 4 E., San Bernardino meridian, and James Talley for the E. ½ of SW. ¼, and the SW. ¼ of the SW. ¼ of Sec. 26, and the NW. ¼ of the NW. ¼ of Sec. 35, T. 10 S., R. 4 E. San Bernardino meridian.

The Commissioners report that Helm's house stands in the narrowest part of the cañon; that his claim separates the Indians below him at San Ysidro from their pasturage lands above, as also from the village of San Ignatio; and that it is impossible for the Indians of San Ysidro to get their stock on to their pastures without passing through a gate, within a few feet of Helm's house, kept closed.

The Commission believes that if the claims of Helm and Talley could be extinguished, by purchase or otherwise, it would be a great advan-

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 94 of 206   Page ID #:619

tage to the Indians, removing an obstacle to the best use of their land and a serious obstacle in the way of their progress.

To do this will require about $2,500 for Helm's place and $2,000 for Talley's.

The purchases recommended by the Commission will require an appropriation not to exceed $5,000.

As the proposed exchange and purchases have been approved by you and by the President, subject to the necessary authorization by Congress, I trust that speedy action may be taken by that body in order that the matter may be fully adjusted and the question of the proper disposition to be made of the Mission Indians be at length finally and forever determined.

I inclose copies in duplicate of so much of the report of the Commission as relates to the proposed purchase and exchange of lands, and of the opinion of Assistant Attorney-General Shields in relation to the matter.

Very respectfully, your obedient servant,

T. J. MORGAN,
*Commissioner.*

The SECRETARY OF THE INTERIOR.

---

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE ASSISTANT ATTORNEY-GENERAL,
*Washington, December 29, 1891.*

SIR: I have the honor to acknowledge the receipt, by your verbal reference, of a communication from the Acting Commissioner of Indian Affairs, submitting the report of the Mission Indian Commission, duly appointed under the provisions of the act of Congress approved January 15, 1891 (26 Stat., 712), entitled "An act for the relief of the Mission Indians in California." By the first section of said act the Secretary of the Interior is required to appoint three Commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the State of California "upon reservations which shall be secured to them as hereinafter provided."

Section 2 provides:

That it shall be the duty of said Commission to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the President and Secretary of the Interior. They shall also appraise the value of the improvements belonging to any person to whom valid existing rights have attached under the public-land laws of the United States, or to the assignee of such person, where such improvements are situated within the limits of any reservation selected and defined by said commissioners, subject in each case to the approval of the Secretary of the Interior. In cases where the Indians are in occupation of lands within the limits of confirmed private grants, the Commissioners shall determine and define the boundaries of such lands, and shall ascertain whether there are vacant public lands in the vicinity to which they may be removed. And the said Commission is hereby authorized to employ a competent surveyor and the necessary assistants.

It is provided by section 3 that said commission, when it has completed its labors, shall make report thereof to the Secretary of the Interior, and if there be no objection he shall cause a patent to issue for each of the reservations approved by him, in favor of each band or village of Indians occupying such reservation, with a proviso, however—

That no patent shall embrace any tract or tracts to which *existing* valid rights have attached in favor of any person under any of the United States laws providing for

Case 5:13-cv-00883-JGB-SP    Document 82-3    Filed 10/21/14    Page 95 of 206    Page ID #:620

the disposition of the public domain, unless such persons shall acquiesce in and accept the appraisal provided for in the preceding section in all respects, and shall thereafter, upon demand and payment of said appraised value, execute a release of all title and claim thereto; and a separate patent, in similar form, may be issued for any such tract or tracts at any time thereafter. Any such person shall be permitted to exercise the same right to take land under the public land laws of the United States as though he had not made settlement on the lands embraced in said reservation. (2) That in case any land shall be selected under this act to which any railroad company is or shall hereafter be entitled to receive a patent, such railroad company shall, upon releasing all claim and title thereto, and on the approval of the President and Secretary of the Interior, be allowed to select an equal quantity of other land of like value in lieu thereof at such place as the Secretary of the Interior may determine; and (3) that the trust patents shall be placed in the custody of the Interior Department and copies thereof shall be filed with the proper Indian agent and be open to public inspection.

Sections 4 and 5 make provision for allotments of land in severalty to the Indians residing upon any of said reservations, and the issuance of trust patents therefor.

Section 6 provides—

That in cases where the lands occupied by any band or village of Indians are wholly or in part within the limits of any confirmed private grant or grants, it shall be the duty of the Attorney-General of the United States, upon request of the Secretary of the Interior, through special counsel or otherwise, to defend such Indians in the rights secured to them in the original grants from the Mexican Government, and in an act for the government and protection of the Indians passed by the legislature of the State of California, April twenty-second, eighteen hundred and fifty, or to bring any suit, in the name of the United States, in the circuit court of the United States for California, that may be found necessary for the full protection of the legal or equitable rights of any Indian or tribe of Indians in any of such lands.

The California act above referred to makes it the duty of justices of the peace in said State to set off a sufficient amount of land for the necessary wants of the Indians residing upon lands owned by white persons upon the application of such owners.

The Senate Committee on Indian Affairs, in 1885, reported that "This act has never been repealed nor, so far as we could learn, complied with in a single instance. To-day, it would be held of no value in the California courts." (See Senate Report No. 1522, Forty-eighth Congress, second session, p. 150.)

The Commission, in said report, recommends that twenty-six reservations, particularly describing each by name, be set apart in said State for the use of said Mission Indians. The Acting Commissioner of Indian Affairs recommends generally the approval of the selections of reservations as made by said Commission and, in addition thereto, that "lot 1 of section 30" selected as school land in lieu of deficiency in fractional town 18 south, range 7 east, embracing 11.58 acres, be set apart if the claim of the State can be satisfied with other land, the list containing said lot not yet having been approved to the State.

The fourteenth reservation, named "Temecula," the Commission recommends should be set apart by executive order, and that a part of section 36, in town 8 south, range 2 west, should be purchased from the State's vendee at a price not to exceed $400. The Acting Commissioner approves of the selection of the reservation by the Commission, but says that the question of the purchase of section 36 "will require Congressional action."

The Commission states that the eighteenth reservation, named "San Jacinto," contains some odd-numbered sections within the granted limits of the Southern Pacific Railroad Company, and it recommends that the company be allowed to select other lands in lieu thereof, subject to the approval of the Secretary of the Interior. This recommendation receives the approval of the Acting Commissioner.

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 96 of 206   Page ID #:621

The Commission also recommends that the reservation named "Agua Caliente" be diminished to include certain sections named, and that the surplus land be restored to the public domain, "except the east half of section 10, which they recommend be exchanged with Dr. Murray and wife." The proposed selection is approved by the Acting Commissioner.

It appears that within the limits of the reservation named "Los Coyotes" there are several patented claims, and among them the claims of J. J. Warren and Harmon T. Helm, which the Commission recommends be "extinguished by purchase or otherwise, because it would be of great benefit to the Indians." The Commission states that said claims were entered and patented before the reservation was set apart by executive order, but long subsequently to the time when the lands were in the possession of the Indians. The Acting Commissioner states that under the provision of said section 3, which prohibits the patenting of any tract as a reservation to which existing valid rights have attached, it will require an appropriation by Congress to pay the appraised value, should the owners be willing to dispose of their claims.

For the reservation named "Torres" the Commission selected among other tracts section 36, town 7 south, range 8 east, San Bernardino meridian, and certain odd-numbered sections within the grant to said railroad company. The company has signified its willingness to select other lands in lieu of those within the reservation, and the Acting Commissioner expresses the opinion that the State should be allowed to select land in lieu of said section 36, but expresses a doubt whether this can be done without additional legislation.

It is stated by the Commission that on the private grant called "Pauma Ranch" there are three rancherias which have been occupied by Indians since prior to the treaty with Guadaloupe Hidalgo, and that the original grant excepted these Indian holdings. The present owner has commenced suit to determine his rights, and the Commission caused the Indian holdings to be surveyed, and entered into negotiations with the present owner, Bishop Mora, who made a quitclaim deed of 250 acres of land, also an interest in certain lands during the lifetime of one Maja and his wife, "and water rights of all of the Indians." The Acting Commissioner recommends the acceptance of the deed and the approval of the selection.

The Commission reports that the "Morongo" Reservation, as at present established, contains much waste land and more agricultural land than is necessary for the Indians; that the Southern Pacific Railroad runs through the reservation, and the company claims the odd-numbered sections; that white men have settled upon some of the railroad lands and have filed on the water in the cañon, one of whom, W. S. Hatheway, settled upon a tract shown by private survey to be in section 27, town 2 south, range 1 east, and was ejected therefrom after having expended, as he alleges, about $1,500; that two others, C. F. Jost and Margaret Jost, settled upon section 25 some years ago and made valuable improvements, and they were also ejected; that Richard Gird and John G. North acquired an interest several years ago on sections 15 and 23, near the upper end of the cañon, and obtained rights of surplus water from said Hatheway and Josts; that, in addition, said Gird and North procured title to the east half of section 36, upon which are nearly all of the houses, irrigating ditches, and a considerable portion of the orchards and vineyards belonging to the Indians; that they also raised a field of alfalfa, and spent considerable money in making irrigating ditches in the upper end of the cañon, and in setting out an orchard; that these parties have also been ejected from their claims and have

commenced suit to recover damages and to determine their right to the lands and the water. The Commission reports that, finding the Indians in possession of lands they did not want, and the whites claiming lands that were essential to the well-being of the Indians if the reservation was to be established, and also desiring to relieve the Government of litigation and secure title to the lands claimed by the whites for the reservation, they wrote to the Commissioner of Indian Affairs on March 16, 1891, for instructions, and on April 1, same year, received a telegram to "go ahead;" that subsequently they were advised by letter from the Indian Office that they had ample authority " to give up lands within the reservation not occupied or needed by the Indians in order to secure within the reservation, free from incumbrance, lands which are needed for the Indians." Thereupon the Commission secured a proposition in writing from the alleged attorney in fact of said Hatheway, Josts, Gird, and North to release their several interests in and to the lands claimed by them and the water rights and all claims for damages on account of said evictions upon condition that they receive patents from the United States for other lands in lieu thereof as follows: Hatheway one-half section, the Josts one-half section, and Gird and North patents for 1,840 acres, which proposition the United States is authorized to accept " at any time prior to the 1st day of January, 1892."

The Commission further reports that in order to secure these various exchanges it will be necessary to surrender a larger area than will be secured for the Indians.

The Acting Commissioner expresses the opinion that there is ample authority in said act for the exchange of railroad lands, but the act does not contain any authority for the exchange of lands claimed by private parties, nor does he know of any law authorizing the issuance of patents to said parties as proposed by the Commission. He also says that the written instructions of April 1, 1891, to the Commission did not contemplate the issuance of patents for lands released from the reservation " except such as they might be entitled to under existing laws;" that " the act does not contain any authority for the exchange of school sections, but it is possible that this authority may exist under general laws," and he suggests that said proposition of said attorney in fact and the railroad company might be formally accepted, and afterwards Congress could be asked to authorize the exchange of the private and school lands.

By your said reference I infer that you wish my opinion whether the Executive Department is authorized to accept said propositions for the exchange of lands and issue patents therefor, and also whether any of the lands selected for reservation purposes are subject to settlement and entry prior to the issuance of patents for the same.

There can be no question, in my judgment, but that there is ample authority under the provisions of the third section of said act for the exchange of lands with the railroad company within the limits of said reservations, provided such company is or may be entitled to a patent for the lands claimed and releases its claim and title thereto. But I am unable to find any authority of law for an exchange of lands with or purchase of lands from private parties and the issuance of patents therefor. The duties of said Commission are expressly stated in the second section of said act.

Besides selecting the necessary reservations for said Indians, the Commission is specifically directed to appraise the improvements within the same belonging to any person, or his assignee who has acquired " valid existing rights   *   *   *   under the public land laws of the United States,   *   *   *   subject to the approval of the Secretary of the In-

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 98 of 206   Page ID
#:623

terior," and also to define the boundaries of the lands occupied by
Indians within the limits of confirmed private grants, and also to de-
termine whether there are vacant public lands near, to which the
Indians can be removed.

It thus appears not only that there is no express statutory authority
for the exchange of lands claimed by private parties within the limits
of the reservations selected by said Commission, but explicit instruc-
tions are given in said act for the appraisal by said Commission of the
improvements of persons having "valid existing rights" therein, sub-
ject, however, to the approval of the Secretary of the Interior.

It is well settled, I think, that Congress alone has the power of the
disposal of the property of the United States, and that the title to pub-
lic land can pass only by virtue of some law of Congress. (Constitu-
tion of the United States, Art. IV, Sec. 3, clause 2; United States *v.*
Gratiot, 14 Peters, 526; United States *v.* Fitzgerald, 15 Peters, 128.)

While the Executive Department can not patent lands from the pub-
lic domain in exchange for those claimed by private parties, unless ex-
pressly authorized so to do by law, yet the President may reserve from
sale and set apart for public uses tracts of land belonging to the United
States.  In Grisar *v.* McDowell (16 Wall., 364–381), the Supreme Court
said:

> From an early period in the history of the Government, it has been the practice of
> the President to order from time to time, as the exigencies of the public service re-
> quired, parcels of land belonging to the United States to be reserved from sale and
> set apart for public uses.

And, in like manner, very many of the Indian reservations have been
set apart by executive order, sometimes by the President, under his
own hand, and occasionally by the Secretary of the Interior, whose acts
are presumed to be by the direction of the President.  (Wilson *v.* Jack-
son, 13 Peters, 498.)

From the papers referred, it is quite impossible to determine what
rights the parties represented by said attorney in fact have to the lands
proposed to be exchanged.  It is true that the Commission reports that
Gird and North procured "an interest some years ago on sections 15
and 23, * * * which were railroad lands," but it does not appear when
or to what extent said interest was obtained.  Besides, their proposi-
tion of relinquishment of their interest in the sections decribed does not
state the extent of their interest therein or how they acquired any
"valid existing rights" to the same.  Moreover, an examination of the
lands proposed for exchange by the railroad company shows that at
least one section is the same as said attorney in fact proposes to ex-
change, namely, section 31, township 2 south, range 2 east, San Bernardino
meridian.

The special counsel for the Indians, Mr. Lewis, in a letter dated
December 7, 1891, concedes the right of the company to the lands
claimed by it and urges the acceptance of its proposition before Jan-
uary 1, 1892, so that the basis for the several actions pending against
"Preston and Morongo," and others expected, may be destroyed.

The right of said company is derived from the twenty-third section
of the act of Congress approved March 3, 1871 (16 Stat., 573–579), which
provides:

> That for the *purpose* of connecting the Texas Pacific Railroad with the city of San
> Francisco, the Southern Pacific Railroad Company of California is hereby authorized
> (subject to the laws of California) to construct a line of railroad from a point at or
> near Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near
> the Colorado River, with the same rights, grants, and privileges, and subject to the

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 99 of 206   Page ID #:624

same limitations, restrictions, and conditions as were granted to said Southern Pacific Railroad Company of California, by the act of July twenty-seven, eighteen hundred and sixty-six: *Provided, however,* That this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or any other railroad company.

Section 18 of the act of July 27, 1866 (14 Stat., 292–299), authorizes the Southern Pacific Railroad Company to connect with the Atlantic and Pacific Railroad and to have "similar grants of land, subject to all the conditions and limitations herein provided." By section 2 of the granting act it was agreed (*inter alia*) that "the United States shall extinguish as rapidly as may be consistent with the public welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act and acquired in the donation to the road named in the act." Section 3 grants to said company

every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption or other claim or rights at the time the line of said road is designated by a plat thereof filed in the office of the Commissioner of the General Land Office.

If the Mission Indians were in actual occupancy of lands at the date of the definite location of said road, it is very doubtful if the company acquired any right of possession to the land so long as it is so occupied. And if there were any other claims under the land laws of the United States which could be perfected, they would serve to except the land from the operation of the grant. So, also, under the rulings of this Department, no person can acquire a settlement right by entering upon lands in the actual use or occupancy of Indians.

This was expressly ruled in the case of the Mission Indians *v.* Walsh (12 L. D., 576), on review, 13 L. D., 269.

Hence, in order to determine whether the company has a legal right to the odd sections within the limits of its grant and also within the limits of the reservation proposed to be selected, it should clearly appear that they were, in the language of the granting act, "free from pre-emption or other claims or rights" at the date of the act. This is not shown by the report of the Commissioner; but as the special counsel of the Indians concedes the claim of the railroad to these lands, presumably he and the Commissioner are *satisfied* on that point. I am, however, clearly of the opinion, and so advise you, that there is no warrant of law authorizing the approval of said propositions for the exchange or purchase of lands, and issuing patents to private individuals as recommended; that under the provisions of the act of February 28, 1891 (26 Stat., 796), the State, if it has not disposed of the school sections, may select other lands in lieu thereof, and that the President may, if deemed necessary, withdraw the lands involved herein from settlement and entry until Congress shall grant the authority to purchase, exchange, and issue the patents as proposed.

I see no objection to the approval of those reservations selected that are free from adverse claims.

Inasmuch, however, as additional legislation is necessary to authorize the Executive Department to purchase and exchange lands as recommended by said Commission, the Commissioner of Indian Affairs should be directed to prepare the draft of a bill to be submitted by the

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 100 of 206   Page ID
#:625

President to Congress, authorizing the Secretary of the Interior to purchase or exchange the lands as r commended.

The papers submitted are herewith returned.

Very respectfully,

GEO. H. SHIELDS,
*Assistant Attorney-General.*

The SECRETARY OF THE INTERIOR.

---

## EXTRACT FROM REPORT OF MISSION INDIAN COMMISSIONERS.

The SECRETARY OF THE INTERIOR
(Through the Commissioner of Indian Affairs:)

The undersigned Mission Indian commissioners most respectfully report as follows:

As soon after their appointment as possible, all the members of the Commission went to California and proceeded to make themselves as familiar with the condition of the Indians and their reservations as possible. To do this they were compelled to travel over many miles of mountain roads and to have many surveys made. We have found a good many difficulties in the way of a satisfactory solution of the questions submitted to us. White men, in many instances, had encroached upon the Indian lands, especially upon those within the lines of Spanish grants. The Southern Pacific Railroad Company claimed to own the odd sections of land within the reservations near the line of its railroad. Settlers had moved on to these railroad lands and made improvements and developed water rights, and some of them had been ejected by the military and had brought suits against the Government or against the officers instrumental in the removal. We have attempted to adjust all these differences, and in some cases have succeeded, as will appear more in detail in our recommendations in regard to individual reservations.

It is our judgment that if our recommendations are adopted it will result in a reasonably comfortable adequate home for every Mission Indian who cares to avail himself of the provisions made for him on these reservations.

\*            \*            \*            \*            \*            \*            \*

### MORONGO.

The reservation near Banning, called Morongo, has given the Commission much trouble.

The reservation, as now constituted, embraces considerable worthless mountain land, and also much worthless wash and desert land. It also has in its borders now more agricultural land suitable for dry farming, such as growing barley, than is needed by the Indians. Indeed, because the Indians neither occupied nor worked some of these agricultural lands the Indian agent has thought it wise to lease a portion thereof. The proceeds have been devoted by him, as we understand it, for the benefit of the Indians.

The Southern Pacific Railroad runs through this reservation. Its officers claim that by virtue of law it is entitled to the odd sections of land within this reservation. There are about 100 Indians on the reservation, nearly all at their village called Potrero. This is at the mouth of a cañon about 5 miles long and of considerable breadth. There is a nice stream of water flowing from two cienegas, one of which is a little ways up the cañon and the other at nearly its head. If all the land of and near this cañon, and the small one adjacent called Hatheway's cañon, could be secured to the Indians, it would make as desirable location for them as their most earnest friend could wish.

Unfortunately for the Indians, whites have seen how valuable the land with the water is, and have settled upon some of the railroad lands in the cañon and have filed on the water. W. S. Hatheway settled on what, by private survey, is determined to be section 27 in township 2 south, range 1 east, San Bernardino meridian, and developed considerable water on that section and in the cañon farther up. He was ejected from these lands after he had spent, as he claims, $1,500. He also insists that his ejectment was unlawful, as he was on railroad lands, and that he has a claim against the Government. C. F. Jost and Margaret Jost, his wife, settled on section 25 some years ago and made very valuable improvements, having good buildings, a good orchard, and having developed by means of ditches a large supply of water. They were also ejected, they claim, unlawfully, and bring a larger claim

MISSION INDIANS IN CALIFORNIA.

against the Government for damages. The land occupied by them is right in the heart of what we think ought to be Indian reservation, and is especially valuable because of the water that can be developed upon it. Richard Gird and John G. North, appreciating the great value of the water in Hatheway's cañon and the cañon above the Potrero, procured an interest some years ago on sections 15 and 23, which are toward the upper end of the cañon, upon which there are valuable cienegas and which were railroad lands. They also obtained rights to surplus water from Hatheway and from the Josts. They also took steps which resulted in their getting title to east half of section 36, they claiming it was a school section to which they could get title. Nearly all of the houses, irrigating ditches, and very considerable vineyards and orchards of the Indians are on this section. To lose section 36 would be an irreparable loss to this village.

Gird and North also built irrigating ditches in the upper end of the cañon, established a field of alfalfa and put out an orchard, and spent considerable sums of money. They, too, were evicted; claiming their eviction was unlawfully, and their losses great, they have commenced suit to recover damages, and also to determine their right to the water and the lands. We fear if the claims of these various parties are pressed to a hearing in the various courts the result will be very disastrous to the Indians as affecting their rights to both water and land. We, then, were confronted by all these conflicting interests which left the Indians and the whites in that neighborhood all in a state of great uncertainty. To state the situation briefly, we found the Indians the acknowledged holders of lands they did not want or work, and the whites insisted upon rights to lands that are absolutely essential to the Indians, if a reservation is to be established there. The problem was, how, by means of the lands not wanted to obtain the title to lands that were wanted freed from all claims, and at the same time relieve the Government of threatened and actual litigation by the evicted parties. Believing that we could make such an arrangement, but having some doubt of our authority, we, on the 16th of March, asked for instructions. Upon the receipt of your telegram and letter of instructions of April 1, 1891, "to go ahead" we have spent much time and anxiety to bring about a settlement of all these conflicting interests. The result is, that we have a written offer from C. O. Barker who holds a power of attorney from W. S. Hatheway, C. F. Jost and Margaret Jost, Richard Gird and John G. North, authorizing him to so do, of a release of their several interests, and an exchange of their lands on the following basis:

The said Hatheway to relinquish all his claim to lands in township 2 south, range 1 east, and in township 2 south, range 2 east, San Bernardino meridian, and all water rights of every kind, and all claims for damages by reason of eviction or otherwise; said Hatheway to receive a patent therefor to the north half of section 14, in township 3 south, range 1 east, San Bernardino meridian.

Said C. F. Jost and Margaret Jost offer to exchange all their interest in and to lands and water rights of every sort and nature in townships 2 south, range 1 and 2 east, San Bernardino meridian, and all claims for damages, because of eviction or otherwise, the said Jost and Jost to receive in exchange therefor a patent to the west half of section 6, township 3 south, range 1 east, San Bernardino meridian.

Said Richard Gird and John G. North offer to relinquish all their right in and to sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35, and 36, in township 2 south, range 1 east, San Bernardino meridian, and sections 6, 7, 18, 19, 30, and 31, in township 2 south, range 2 east, San Bernardino meridian, and to any and all damages growing out of eviction or otherwise. Said Gird and North to receive in exchange therefor patents to and for the south half of section 8, northwest quarter of section 8, east half of northeast quarter of section 8, the northeast quarter of section 10, the southeast quarter of the northwest quarter of section 10, east half of the southeast quarter of section 10, the northwest quarter of the southeast quarter of section 10, section 18, and the north half of section 20, all in township 3 south, range 1 east, San Bernardino meridian, as will appear more in detail in a written proposition signed by the said Barker, and acknowledged November 11, 1891, transmitted herewith and marked Exhibit L. Said proposition will hold good only until the 1st day of January, 1892.

We also, at an early date, opened negotiations with the officers of the Southern Pacific Railway Company, with a view of effecting an exchange with them. The outlook at first was very forbidding, and legal difficulties presented themselves to the officers of the railroad company. We were obliged to make several visits to San Francisco in the course of the negotiations. We finally have a proposition from them to release their right in and to the following lands, viz:

Section 13, east half of section 15, sections 23 and 25, east half of section 27, and section 35, all in township 2 south, range 1 east, San Bernardino meridian. Also, all of section 31 in township 2 south, range 2 east, San Bernardino meridian; they to receive in exchange therefor patents to the following lands:

All of section 18, except northwest quarter of northwest quarter; sections 20 and

## MISSION INDIANS IN CALIFORNIA.

**13**

32 in township 2 south, range 1 east, San Bernardino meridian; southeast quarter of section 20, section 32 in township 2 south, range 2 east, San Bernardino meridian. Also, northeast quarter and south half of southwest quarter of section 4; the northwest quarter of southeast quarter and south half of southeast quarter of section 6, in township 3 south, range 1 east, San Bernardino meridian; southwest quarter section 18, northwest quarter section 20, northwest quarter section 22, south half of section 28, in township 3 south, range 2 east, San Bernardino meridian. A copy of the said agreement is transmitted herewith, marked Exhibit G.

Wellwood Murray and Eliza E. Murray are the owners of the north half of section 1, township 3 south, range 1 east, San Bernardino meridian (less 10 acres near the northwest corner thereof, which is owned by Mrs. Tontain). This land is needed in the proposed reservation; it is near the present Indian village, and could readily be placed under water. The Murrays are willing to exchange it for the east half of section 10 in township 4 south, range 4 east, San Bernardino meridian, (Agua Caliente), as will be seen by their proposition transmitted herewith, marked Exhibit H. The land on section 10 is not needed. The Murrays supposed they had made an arrangement with Mrs. Tontain, by which she would deed to them her 10 acres, so that they could offer to exchange half section for half section; but, as she, though consenting orally, has declined to sign any papers, they propose to pay over $100 to the Indian Department, to enable it to obtain Mrs. Tontain's claim to the 10 acres, which she will probably be glad to sell when she finds that the reservation will be established anyway. She will have no water and no way of getting any on her 10 acres. She is a woman who has given the Indians and the Indian agent much trouble; but we think it exceedingly desirable that the exchange be made with the Murrays.

The right of way for the irrigating ditch on section 10, township 4 south, range 4 east, San Bernardino meridian, should be reserved in the patent.

As will be observed, to bring about these various exchanges requires a larger area of land surrendered than we get for the Indians in return, but in making the exchange we avoid the delays and hazards of litigation, we secure the release of large claims for damages growing out of unlawful evictions, and secure to the reservation exceedingly valuable water rights. This commission, if it was dealing with reference to property owned by its members as individuals, would not hesitate for a moment in making these exchanges, and we urge that the exchanges be made as herein indicated and that they be made at once; for it will be observed that Mr. Barker's proposition holds good only until January 1, 1892, and we have reason to think that some of the parties who have given him a power of attorney would not be sorry if the settlement, on the basis herein named, was not effected.

\* \* \* \* \* \*

We therefore recommend that the following described lands be set aside for the use of the Mission Indians now on the lands and for those to be hereafter placed thereon, which we estimate at about two hundred altogether. Said reservation should be called Morongo, viz:

Sections 10, 12, 13, 14, east half of sections 15, 22, sections 23, 24, 25, 26, east half of section 27, northwest quarter and east half of section 34, sections 35 and 36, all in township 2 south, range 1 east, San Bernardino meridian: also, the north half of section 1, except 10 acres in the northwest corner thereof, and the north half of section 2, all in township 3 south, range 1 east, San Bernardino meridian; also, sections 18, 30, and 31 in township 2 south, range 2 east, San Bernardino meridian; also, section 6 in township 3 south, range 2 east, San Bernardino meridian.

We also recommend that all the lands not herein mentioned as retained for a reservation or for the purposes of making the exchanges herein indicated, which are in the reservation as now established called Morongo, be restored to the public domain.

\* \* \* \* \* \*

The lands selected by this commission will not exceed in area the amount prescribed by the act of Congress creating this commission. The aggregate of the lands retained is much smaller than in the reservations as now established. We have proceeded on the theory that the Southern Pacific Company would soon be, if not already, entitled to the odd sections within the railroad limit. This would reduce the acreage very largely. We also have thrown out worthless desert and mountain lands, thinking it unwise to give the Indians the appearance of holding a disproportionate quantity of lands. We have, however, retained sufficient lands for their reasonable needs. With their rights permanently settled, we hope the condition of the Mission Indians will materially improve.

\* \* \* \* \* \*

All of which is respectfully submitted.

ALBERT K. SMILEY.
JOSEPH B. MOORE.
CHARLES C. PAINTER.

A BILL to authorize the Secretary of the Interior to carry into effect certain recommendations of the Mission Indian commission, and to issue patents for certain lands.

Whereas the act approved January twelfth, eighteen hundred and ninety-one, entitled "An act for the relief of the Mission Indians in the State of California," made it the duty of the commissioners therein authorized to be appointed "to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements;"

And whereas said commissioners were authorized to appraise the value of the improvements belonging to any person to whom valid existing rights had attached under the public-land laws of the United States, where such improvements were situated within the limits of any reservation selected by the commissioners, subject to the approval of the Secretary of the Interior;

And whereas it was further provided in said act that, in case any land should be selected to which any railroad company should be entitled to receive a patent, such railroad company should, upon releasing all claim and title thereto and on the approval of the President and Secretary of the Interior, be allowed to select an equal quantity of other land in lieu thereof;

And whereas no provision was made whereby lands claimed by private persons through titles derived or sought to be derived from railroad companies or other sources than the public-land laws could be so released and exchanged;

And whereas the commissioners appointed under said act have reported, among other things, that certain lands are in the occupation of Indians and are needed for their use, which certain persons have improved, and on which they have developed valuable water rights, expecting to obtain title from the railroad companies or to which they had obtained title from the State of California, and that said persons are willing to exchange said lands for other lands heretofore reserved for the use of the Mission Indians, but which lands are no longer needed for such purpose; and

And whereas the report and recommendations of said commissioners have been approved by the Secretary of the Interior and the President, "except so much thereof as relates to the purchase of lands from and exchange of lands with private individuals, which is also approved subject to the condition that Congress shall authorize the same:" Therefore,

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior be, and he hereby is, authorized and empowered to carry into effect the recommendations of the said Mission Indian commissioners relating to the exchange of lands with private individuals, and to cause patents in the usual form to issue for the lands recommended to be given to such individuals in exchange for lands and improvements released and relinquished for the use of the Indians.

SEC. 2. That the sum of five thousand dollars, or so much thereof as may be necessary, is hereby appropriated out of any moneys in the Treasury not otherwise appropriated, to enable the Secretary of the Interior to purchase certain lands and improvements, for the use and benefit of said Mission Indians, as approved by said Secretary and the President.

------------------

REDLANDS, CAL., *November 30, 1891.*

DEAR SIRS: Understanding that it is desired by you that in the formation of the reservation about to be made at Banning the north half of section 1 in township 3 south and range 1 east, in San Bernardino meridian is required, we offer to exchange this parcel of land (less 10 acres already deeded near the northwest corner), being 310 acres, for the east half of section 10, in township 4 south and 4 east in San Bernardino meridian, and situate near Agua Caliente No. 2, reservation in San Diego County, Cal., and to enable the Commissioners to make this exchange, and to possibly secure the remaining 10 acres, we agree to pay the sum of $100 to the Commissioners on demand, or to the Secretary of the Interior.

For T. M. PARSONS.

Being duly authorized.

WELWOOD MURRAY.
ELIZ. E. MURRAY.

The UNITED STATES INDIAN COMMISSIONERS.

EXECUTIVE MANSION,
*December 29, 1891.*

The report of the Mission Indian Commission appointed under the act of January 15, 1891 (26 Stat., 712), is hereby approved, except so much thereof as relates to the purchase of lands from and exchange of lands with private individuals, which is also approved subject to the condition that Congress shall authorize the same.

All of the lands mentioned in said report are hereby withdrawn from settlement and entry until patents shall have issued for said selected reservations, and until the recommendations of said Commission shall be fully executed, and by the proclamation of the President of the United States, the lands or any part thereof shall be restored to the public domain.

BENJ. HARRISON.

---

DEPARTMENT OF THE INTERIOR,
*Washington, D. C., December 29, 1891.*

Under the act of Congress and as above provided.
Approved,

JOHN W. NOBLE,
*Secretary.*

---

DEPARTMENT OF THE INTERIOR,
*Washington, December 30, 1891.*

SIR: I return herewith the report of the Mission Commission and accompanying papers received with your communication of 19th instant.

By the order of the President of the 29th instant, attached to said report, you will see that the same is approved, except so much thereof as relates to the purchase of lands from and exchange of lands with private individuals, which is also approved subject to the condition that Congress shall authorize the same and that all the lands mentioned in said report are withdrawn from settlement and entry until patents shall have issued for said selected reservations, and until the recommendations of said Commission shall be fully executed, and by the proclamation of the President the lands or any part thereof shall be restored to the public domain.

The above action has this day been communicated to Mr. Painter by telegraph, with directions to advise the Commission and parties interested.

I also inclose herewith a communication of 29th instant from the Assistant Attorney-General for this Department to whom the report was referred, and have to direct that a draft of a bill be prepared authorizing the Secretary of the Interior to purchase or exchange the lands as recommended.

You will also please prepare a list of the lands mentioned in said report of the Commission which are to be withdrawn by the order of the President for file in the General Land Office.

This list should be sent without delay.

Very respectfully,

JOHN W. NOBLE,
*Secretary.*

The COMMISSIONER OF INDIAN AFFAIRS.

## TEMECULA.

This reservation, as created by executive order, comprised sections 26, 27, 28, 34, and 35, in township 8 south, range 2 west, San Bernardino meridian. Owing to an almost entire lack of water, the land is suitable only for dry farming, and can be utilized alone for such grains as barley and wheat, which are made by the winter rains.

The Indians being unwilling to remove, the Commission recommends the setting apart of these sections as a permanent reservation for them, believing that with such crops as they will be able to raise, and the wages they can earn as laborers on the adjoining ranches, they can make a comfortable living. The little water they have has its rise on section 36, 160 acres of which ought to be added to the selections the Commission has made. The former agency clerk and physician, Dr. Ferrabee, purchased this land from the State that it might be held for this purpose, and is willing to sell it to the Government for what it cost him, including taxes and interest, and the Commission recommends that it be purchased and added to the reservation.

This land is described as follows:

The north half of the northwest quarter, the southeast quarter of the northwest quarter, and the southwest quarter of the northeast quarter of section 36, township 8 south, range 2 west, San Bernardino meridian. This purchase can be made, we believe, for a sum not exceeding $500.

There are at this place about 160 Indians, being a remnant of those who were ejected from the Temecula Valley some years ago.

The Commission recommends that the Government pipe the water from the above mentioned quarter sections to the schoolhouse, and to a central point of the village, under the supervision of the Indian agent, at an estimated cost of $2,000.

## LOS COYOTES.

The reservation of Los Coyotes was set apart by executive order.

It consists of section 3 and fractional section 4, in township 11 south, range 4 east, San Bernardino meridian, and all of township 10 south, range 4 east, San Bernardino meridian, except the following described lands: The south half of the northwest quarter and the southwest quarter of the northeast quarter and the northeast quarter of the southwest quarter of section 20; which has been patented to Hiram Keyes. Also, the west half of the southwest quarter of section 20, and the southeast quarter of the southeast quarter of section 19, and the northeast quarter of the northeast quarter section 30, patented to Eugene Pannemberg.

Also the northwest quarter of southeast quarter and the fractional southwest quarter, section 30, which is patented to one Helm. Also the north half of northeast quarter, section 31, and the north half of northwest quarter, section 32, to Jacob Jorn. Also the east half of the northeast quarter and the southwest quarter of the northeast quarter and the northwest quarter of the southeast quarter, section 26, patented to Robert Fain. Also the east half of southwest quarter and the southwest quarter of southwest quarter, section 26, and the northwest quarter of northwest quarter, section 35, patented to James Tally. Also the southwest quarter of the northwest quarter, section 35, and the southeast quarter of northeast quarter and the north half of southeast quarter, section 34, patented to Chat. Helm. Also parts of sections 31, 32, 33, south of the boundary line of the Rancho San José del Valle.

These entries were made before the reservation was set apart, but long subsequent to the time when the lands were in possession of the Indians, and the injustice and cruel wrongs inflicted upon them and the annoyances to which they are still subjected by one, especially of the settlers, give good cause to the Indians for bitter complaint. Chatham Helm was the first white settler in this cañon, and, unfortunately, his filings were allowed and his claim perfected.

His house stands in the narrowest part of the cañon, and his claim separates the Indians below him at San Ysidro from their pasturage lands above, as also from the Indian village of San Ignatio, on the eastern boundary of the township. It is impossible for the Indians of San Ysidro to get their stock on to their pastures without passing through a gate placed within a few feet of Helm's house, and kept closed. This he will not suffer them to do. He has been a great annoyance to the Indians also in regard to their use of water. The survey the Commission caused to be made discovered the fact that he was claiming a 40-acre piece belonging to the Indians, recovering which they are enabled to put the entrance to their ditch some distance farther up, giving them some relief in the matter of irrigation.

The Commission believes that if the claims of Helm and Tally could be extinguished by purchase or otherwise, it would be a great advantage to these Indians, removing an obstacle to the best use of their land, and a serious obstacle in the way of their progress. To do this would require about $2,500 for Helm's place and $2,000 for Tally's.

There are in all about 150 Indians in the two villages, which are 5 or 6 miles apart. They have sufficient good arable land for their agricultural needs, which, with their grazing lands, if made accessible would give them ample support.

There is no school at either village, and few of the children go from home to school.

The Commission recommends the setting apart permanently for them the above described land, and deems the extinguishment of Helm's and Tally's claim as of great importance to the Indians. The holdings of the other settlers do not block up the cañon as do those of these two men, more especially that of Helm.

I, C. O. Barker, acting under and in pursuance of a power of attorney duly executed by Walter S. Hathaway on the 3d day of March, 1891, do hereby agree to deliver to the United States or its authorized representatives a full and complete relinquishment to all the rights, title, and interest of said W. S. Hathaway to any and all land or lands lying within the townships known and described as townships 2 south, ranges 1 and 2 east, San Bernardino meridian, and more especially to that portion locally known as the Hathaway Cañon, and I further agree to furnish to the United States or its authorized representatives a full and complete relinquishment of all the rights, title, and interest in and to any and all of the water in said Hathaway Cañon and any and all water, either from creek, stream, spring, or cieniga rising upon or flowing through or over any of the above-described land; and I further agree to furnish a full and complete relinquishment of any and all claims that the said W. S. Hathaway may have either in law or equity against the United States or any agent thereof for having been evicted from certain unsurveyed lands, to wit, the unsurveyed portion of township 2 south, range 1 east, San Bernardino meridian, ascertained by private survey to be section 27, or for any damage that the said Hathaway may have suffered by reason of the destruction of his improvements and the loss of the use of the land, for and in consideration of a good and sufficient patent, without cost to said Hathaway, for the land known and described as the north half of section 34, township 3 south, range 1 east, San Bernardino meridian, and acting in pursuance of an agreement entered into on the 6th day of August, 1889, between C. F. Jost and Margrett Jost, his wife, parties of the first part, and C. O. Barker, party of the second part. I further agree to deliver to the United States a full and complete relinquishment of all right, title, interest, or claim of the said C. F. Jost and Margrett Jost, his wife, to any and all lands lying within townships 2 south, ranges 1 and 2 east, San Bernardino meridian, and to any right, title, or interest to any and all of the water, either from creek, stream, spring, or other water source, rising on or flowing through or over any of the land in the above-described township; and of any and all claims for damages that the said C. F. Jost and Margrett Jost may have either in law or in equity against the United States or any of its agents for eviction from any portion of the above-described lands, or for any loss by reason of the destruction of their improvements, or the loss of the use of any portion of the above-described lands. For and in consideration of a patent for the west one-half of section 6, township 3 south, range 1 east, San Bernardino meridian, to be issued by the United States to said C. F. Jost and Margrett Jost.

And acting under and in pursuance of a power of attorney, executed on the 5th day of September, 1889, by Richard Gird and John G. North, I do hereby further agree to furnish a full and complete relinquishment to all the right, title, and interest of the said Richard Gird and John G. North to any and all lands lying in what is locally known as the Hathaway Cañon in township 2 south, ranges 1 and 2 east, San Bernardino meridian, including sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35, and 36, in township 2 south, range 1 east, and sections 6, 7, 18, 19, 30, and 31, in township 2 south, range 2 east, San Bernardino meridian, and to all the right, title, and interest of said Richard Gird and John G. North to any and all water from any creek, stream, spring, cieniga, or other water source whatsoever, rising on or flowing through or over any of the above-mentioned lands, and of any and all claims against the United States or any of its agents for damages for eviction from any portion of the hereinbefore-described lands, or for the damage to or destruction of improvements and loss of use of land.

For and in consideration of a patent or patents to be issued to the said Richard Gird and John G. North, for the south half of section 8, the northwest quarter of section 8, the east half of northeast quarter of section 8, the northeast quarter of section 10, the southeast quarter of northwest quarter of section 10, the east half of southeast quarter of section 10, the northwest quarter of the southeast quarter of section 10, all of section 18, and the north half of section 20, all in township 3 south, range 1 east, San Bernardino meridian. And for the further consideration that the Morongo Reservation shall be confined to sections 13, 14, 23, 24, 25, 26, 35, and 36, and the east half of sections 15, 22, 27, and 34, in township 2 south, range 1 east, San Bernardino meridian, and section 31 in township 2 south, range 2 east, section 6, in township 3 south, range 2 east, and the north half of sections 1 and 2 in township 3 south, range 1 east, San Bernardino meridian. And I do further agree that the United States or its authorized representatives shall have the option of accepting this offer at any time prior to the 1st day of January, 1892.

C. O. BARKER.

For a valuable consideration I hereby consent that sections 10, 12, west half 22, west half section 34, all in town 2 south, range 1 east, San Bernardino meridian, and sections 18 and 30 in town 2 south, range 2 east, San Bernardino meridian, may be included in the Morongo Reservation.

December 3, 1891.

C. O. BARKER.

H. Ex. 96——2

**18**                    MISSION INDIANS IN CALIFORNIA.

STATE OF CALIFORNIA, *County of San Bernardino, ss:*

On this 11th day of November, in the year 1891, before me, D. W. Herlihy, a notary public in and for said county, residing therein, duly commissioned and sworn, personally appeared C. O. Barker, known to me to be the person described in, whose name is subscribed to, and who executed the within instrument, and he acknowledged to me that he executed the same.

In witness whereof I have hereunto set my hand and affixed my official seal, the day and year in this certificate first above written.

[SEAL.]                                            D. W. HERLIHY,
                                                        *Notary Public.*

This acknowledgment covers changes in contract in five different instances in regard to boundaries of said land.

O

# EXHIBIT 14

*1896 [illegible]*

The United States of America

To all to whom These Presents shall come, Greeting:

Whereas it is provided by an act of Congress entitled "An Act for the relief of the Mission Indians in the State of California approved January Twelfth Anno Domini one thousand eight hundred and ninety one (26. Stat. 712) that the Secretary of the Interior shall appoint three disinterested persons as Commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the the State of California upon reservations which shall be secured to them.

"Section 2". That it shall be the duty of said Commissioners to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include as far as practicable the land and villages which have been in the actual occupation and possession of said Indians and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the Secretary of the Interior."

"Section 3". That the Commissioners upon the completion of their duties shall report the result to the Secretary of the Interior who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the Commissioners and approved by him in favor of each band or village of Indians occupying any such reservation, which patent shall be of the legal effect and declare that the United States does and will hold the land thus patented subject to the provisions of Section 4 of this Act, for the period of Twenty five years in Trust for the sole use and benefit of the band or village to which it is issued, and that at the expiration of said period the United States will convey the same

ACC0022719

ACC-HRA000760

14—109



_____ patented in severalty, by
patent to said band or village discharged of said trust and
free of all charges or incumbrances whatever.

And Whereas it appears by a letter dated October twenty
six eighteen hundred and ninety five from the Commiss-
ioner of Indian Affairs, and an Order dated October
twenty-eight, eighteen hundred and ninety five from
the Secretary, that a selection has been made by the Com-
missioners appointed and acting under said Act of Con-
gress of January twelfth, eighteen hundred and ninety one
for the Agua Caliente Band or Village of Mission Indians
covering sections nine fourteen, twenty-two, twenty-four,
twenty-six and thirty four of Township four South of Range
four East of the San Bernardino Meridian in the State of
California, containing three thousand eight hundred
and forty four acres and eighty hundredths of an acre

Now Know Ye, That the United States of America
in consideration of the premises and in accordance with
the provisions of the third section of the said Act of Congress
approved January twelfth, eighteen hundred and ninety
one, hereby declares that it does and will hold the said
tracts of land selected as aforesaid ( subject to all the restrictions
and conditions contained in the said Act of Congress of
January 12, 1891 ) for the period of ninety-five years in trust
for the sole use and benefit of the said Agua Caliente Band
or Village of Mission Indians according to the laws of Cali-
fornia and at the expiration of said period the United
States will convey the same, or the remaining portion not
patented to individuals, by patent to said Agua Caliente
Band or Village of Mission Indians as aforesaid, in fee
simple discharged of said trust and free of all charges
or incumbrance whatsoever — Provided that when patents
are issued under the fifth section of said act of January
Twelfth, eighteen hundred and ninety-one in favor of
individual Indians for lands covered by this patent, they

ACC0022720

ACC-HRA000761



-13-

ACC0022721

ACC-HRA000762

14–111

# EXHIBIT 15

4-207o
(May 1954)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**WASHINGTON 25, D. C.**

MAR 1 2 1958

I hereby certify that _____ed copy of
patent is a true and lite_____ification from
the record which is in _____y in this office.

IN TEST_____OF I have hereunto sub-
_____cribed my name and caused
the seal of this office to
be affixed, at the city of
Washington, on the day and
year above written.

_____
**Certifying Officer**

INT.-DUP. SEC., WASH., D.C.               61358

–14–

ACC0022722

ACC-HRA000869

15–113

# The United States of America

To all to whom these presents shall come Greeting:

Whereas, It is provided by an Act of Congress entitled "An Act for the relief of the Mission Indians in the State of California approved, January twelfth, Anno Domine one thousand eight hundred and ninety one, (26 Stats, 712) that the Secretary of the Interior shall appoint, three disinterested persons as Commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the State of California upon reservations which shall be secured to them,

Section 2. That it shall be the duty of said Commissioners to select a reservation, for each band or village of the Mission Indians residing within said State, which reservation shall include as far as practicable the lands and villages which have been in the actual occupation and possession of said Indians and which shall be sufficient in extent to meet their just requirements which selection shall be valid when approved by the Secretary of the Interior:

Section 3. That the Commissioners upon the completion of their duties shall report the result to the Secretary of the Interior who if no valid objection exists shall cause a patent to issue for each of the reservations selected by the Commissioners and approved by him in favor of each band or Village of

—1—

ACC0022723

ACC-HRA000870

Indians occupying any such reservation which patent shall be of the legal effect and declare that the United States does and will hold the land thus patented subject to the provisions of Section 4 of this act, for the period of twenty-five years in trust for the sole use and benefit of the band or village to which it is issued and that at the expiration of said period the United States will convey the same or the remaining portion not previously patented in severalty by patent to said band or village discharged of said trust and free of all charges or incumbrances whatsoever"

And whereas it appears by a letter dated May eighth, nineteen hundred and six, from the Commissioner of Indian affairs and an order dated May fourteenth, nineteen hundred and six from the Secretary of the Interior that a selection has been made by the Commissioners appointed and acting under said Act of Congress of January twelfth, eighteen hundred and ninety-one for the Agua Caliente Band or Village of Mission Indians covering Section two in Township five South of Range four East of San Bernardino Meridian in California containing six hundred and thirty-eight acres and fifty-six hundredths of an acre.

Now Know Ye, That the United States of America in consideration of the premises and in accordance with the provisions of the third section of the said act of Congress approved January twelfth eighteen hundred and ninety-one hereby de-

ACC0022724

ACC-HRA000871



dance which is over, and will hold the said
tract of land selected as aforesaid sub-
ject to all the restrictions and conditions
contained in the said Act of Congress of
January 12, 1891) for the period of twenty
five years in trust for the sole use and
benefit of the said Agua Caliente Band or
Village of Mission Indians according to the
laws of California and at the expiration
of said period the United States will convey
the same or the remaining portion not pat-
ented to individuals by patent to said Agua
Caliente Band or Village of Mission Indians
as aforesaid in fee simple, discharged of
said trust and free of all charge or in-
cumbrance whatsoever — Provided that
when patents are issued under the fifth
section of said act of January twelfth
eighteen hundred and ninety-one in
favor of individual Indians for lands
covered by this patent they will over
ride (to the extent of the land covered
thereby) this patent and will separate
the individual allotment from the lands
left in common, and there is reserved
from the lands hereby granted held in trust
for said Agua Caliente Band or
Village of Mission Indians, a right
of way therein for ditches or canals
constructed by the authority of the
United States.
                In testimony whereof
I, Theodore Roosevelt President
of the United States of America
have caused these letters to be made
patent, and the Seal of the General
Land Office to be hereunto affixed.

ACC0022725

ACC-HRA000872



Given under my hand
at the city of Washington
the twenty-ninth day of
October, in the year of
our Lord one thousand
nine hundred and six
and of the Independence
of the United States the
One hundred and thirty
first.

By the President, T. Roosevelt

By F. M. McLean Secretary

C. H. Brush
Recorder of the General Land Office.

ACC-HRA000873

15—117

**EXHIBIT 16**

90494-10 I.O.
94001-10

4—1040-R.

# The United States of America,

## To all to whom these presents shall come, Greeting:

WHEREAS, THERE HAS BEEN DEPOSITED IN THE GENERAL LAND OFFICE AN ORDER OF THE SECRETARY OF THE INTERIOR DIRECTING THAT A PATENT ISSUE TO THE AGUA CALIENTE BAND OR VILLAGE OF INDIANS, UNDER THE PROVISIONS OF THE ACT OF CONGRESS OF JANUARY 12, 1891 —26 STATUTE, 712—, AS AMENDED BY THE ACT OF MARCH 1, 1907 —34 STAT., 1015—, FOR THE SECTIONS TWO, FOUR, SIX, EIGHT, EIGHTEEN, TWENTY, TWENTY-EIGHT, THIRTY, AND THIRTY-TWO AND THE WEST HALF OF SECTION TEN IN TOWNSHIP FOUR SOUTH AND THE SECTIONS FOUR, SIX, EIGHT, TWELVE, FOURTEEN, EIGHTEEN, TWENTY, TWENTY-TWO, TWENTY-FOUR, TWENTY-SIX, TWENTY-EIGHT, THIRTY, THIRTY-TWO, AND THIRTY-FOUR IN TOWNSHIP FIVE SOUTH ALL IN RANGE FOUR EAST AND THE SECTIONS TWO, FOUR, SIX, EIGHT, TEN, TWELVE, FOURTEEN, EIGHTEEN, TWENTY, TWENTY-TWO, TWENTY-FOUR, TWENTY-SIX, TWENTY-EIGHT, THIRTY, THIRTY-TWO, AND THIRTY-FOUR IN TOWNSHIP FOUR SOUTH OF RANGE FIVE EAST OF THE SAN BERNARDINO MERIDIAN, CALIFORNIA, CONTAINING TWENTY-FIVE THOUSAND TWENTY AND THIRTY-FOUR HUNDREDTHS ACRES.

NOW KNOW YE, THAT THE UNITED STATES OF AMERICA, IN CONSIDERATION OF THE PREMISES, AND IN ACCORDANCE WITH THE PROVISIONS OF THE THIRD SECTION OF THE SAID ACT OF CONGRESS, APPROVED JANUARY TWELFTH, EIGHTEEN HUNDRED AND NINETY-ONE, HEREBY DECLARES, THAT IT DOES AND WILL HOLD THE SAID TRACTS OF LAND SELECTED AS AFORESAID —SUBJECT TO ALL THE RESTRICTIONS AND CONDITIONS CONTAINED IN THE SAID ACT OF CONGRESS OF JANUARY 12, 1891—, FOR THE PERIOD OF TWENTY-FIVE YEARS IN TRUST FOR THE SOLE USE AND BENEFIT OF THE SAID AGUA CALIENTE BAND OR VILLAGE OF INDIANS, ACCORDING TO THE LAWS OF CALIFORNIA, AND AT THE EXPIRATION OF THE SAID PERIOD THE UNITED STATES WILL CONVEY THE SAME OR THE REMAINING PORTION NOT PATENTED TO INDIVIDUALS, BY PATENT TO THE SAID AGUA CALIENTE BAND OR VILLAGE OF INDIANS, AS AFORESAID, IN FEE, DISCHARGED OF SAID TRUST AND FREE OF ALL CHARGE OR INCUMBRANCE WHATSOEVER; PROVIDED, THAT WHEN PATENTS ARE ISSUED UNDER THE FIFTH SECTION OF SAID ACT OF JANUARY TWELFTH, EIGHTEEN HUNDRED AND NINETY-ONE IN FAVOR OF INDIVIDUAL INDIANS FOR LANDS COVERED BY THIS PATENT THEY WILL OVERRIDE —TO THE EXTENT OF THE LANDS COVERED THEREBY— THIS PATENT AND WILL SEPARATE THE INDIVIDUAL ALLOTMENT FROM THE LANDS HELD IN COMMON; AND THERE IS RESERVED FROM THE LANDS HEREBY HELD IN TRUST FOR SAID AGUA CALIENTE BAND OR VILLAGE OF INDIANS, A RIGHT OF WAY THEREON FOR DITCHES OR CANALS CONSTRUCTED BY THE AUTHORITY OF THE UNITED STATES.

IN TESTIMONY WHEREOF, I, WILLIAM H. TAFT,

President of the United States of America, have caused these letters to be made Patent, and the seal of the General Land Office to be hereunto affixed.

GIVEN under my hand, at the City of Washington, the FIFTH day of JANUARY in the year of our Lord one thousand nine hundred and ELEVEN and of the Independence of the United States the one hundred and THIRTY-FIFTH.

(SEAL)

803 D

By the President:

By      Secretary.

Recorder of the General Land Office.

RECORD OF PATENTS: Patent Number **168071**

4—3244

# EXHIBIT 17

795378
98375—22. I.O.

4—1040-B

# The United States of America,

## To all to whom these presents shall come, Greeting:

WHEREAS, There has been deposited in the General Land Office an Order of the Secretary of the Interior directing that a patent issue to the Agua Caliente or Palm Springs Band of Mission Indians, under the provisions of the Act of Congress of January 12, 1891 (26 Stat. 712), as amended by the Act of March 1, 1907 (34 Stat. 1015), for the north half of Section eleven in Township five south of Range four east of the San Bernardino Meridian, California, containing three hundred twenty acres:

NOW KNOW YE, That the UNITED STATES OF AMERICA, in consideration of the premises, and in accordance with the provisions of the third Section of the said Act of Congress, approved January twelfth, eighteen hundred and ninety-one, hereby declares, that it does and will hold the said Tract of land selected as aforesaid (subject to all the restrictions and conditions contained in the said Act of Congress of January 12, 1891), for the period of twenty-five years in trust for the sole use and benefit of the said Agua Caliente or Palm Springs Band of Mission Indians, according to the laws of California, and at the expiration of the said period the United States will convey the same or the remaining portion not patented to individuals, by patent to the said Agua Caliente or Palm Springs Band of Mission Indians, as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever; provided, that when patents are issued under the fifth Section of said Act of January twelfth, eighteen hundred and ninety-one, in favor of individual Indians for lands covered by this patent, they will override (to the extent of the lands covered thereby) this patent and will separate the individual allotment from the lands held in common; and there is reserved from the lands hereby held in trust for said Agua Caliente or Palm Springs Band of Mission Indians, a right of way thereon for ditches or canals constructed by the authority of the United States.

IN TESTIMONY WHEREOF, I, **Warren G. Harding,**

President of the United States of America, have caused these letters to be made Patent, and the Seal of the General Land Office to be hereunto affixed.

GIVEN under my hand, at the City of Washington, the **TWENTY-NINTH**

day of **MARCH** in the year of our Lord one thousand

nine hundred and **TWENTY-THREE** and of the Independence of the

United States the one hundred and **FORTY-SEVENTH.**

(SEAL)

By the President: *Warren G Harding.*

By *Viola G Pugh* , Secretary.

*M. P. LeRoy*

ACC0017375

ACC-HRA001031

**EXHIBIT 18**



Figure 6.  Cahuilla villages, fields, and wells in San Gorgonio Pass and Coachella Valley,
1855-1856.  (Compiled from U.S. Government Survey maps and notes).

# EXHIBIT 19

# Aboriginal Occupation at Tahquitz Canyon:
## Ethnohistory and Archaeology

by

## Philip J. Wilke, Thomas F. King,
## and Stephen Hammond

### INTRODUCTION

Tahquitz Creek drains a portion of the eastern slope of the San
Jacinto Mountains of southern California. Its deeply incised canyon
emerges from the mountains into Coachella Valley at the city of Palm
Springs. The eastern slope of the San Jacinto Mountains is a rain
shadow, and overlooks the arid Salton Basin, which is one of the driest
regions in North America. Consequently, Tahquitz Creek derives most
of its water from snow melt and from rains which fall high on the San
Jacinto Mountains. During most years the flow of the creek is sufficient
to reach and often cross the alluvial fan at the mouth of Tahquitz Canyon
in the winter, spring, and early summer. From late summer through autumn
the flow is much reduced, and only rarely does it proceed much past the
mouth of the canyon.

For a number of years the United States Army Corps of Engineers has
speculated on potential disasters which might occur as a result of massive
floods and debris transport from the San Jacinto Mountains into the city
of Palm Springs. Accordingly, the Corps of Engineers drew up plans for
construction of Tahquitz Dam and Debris Basin, to be located at the head
of the Tahquitz Canyon alluvial fan. These structures would impound
debris flows that might emerge from the mouth of Tahquitz Canyon, and a
concrete-lined channel would carry overflow through the city of Palm
Springs. The projected capacity of the dam and debris basin was based
on a standard project flood of 17,500 cubic feet per second, somewhat
larger than the mean annual flow of the unharnessed Colorado River between

45

51

the Palm Springs region and its native inhabitants is quoted in the preceding paper.

Since Blake's account is the first description of the native inhabitants of the Palm Springs region, and it seems probable that a failure of the earlier diarists to report the presence of Indians at Agua Caliente may indicate that the site of the village was at the times of their visits in the mouth of Tahquitz Canyon.

The initial U.S. Government land survey (1855-56) of Coachella Valley three years later reported Indian rancherias near Agua Caliente, and also at Rincon and at Andreas Canyon several miles to the south (Fig. 2) (Wilke and Lawton, this volume). The survey also recorded the presence of fields under cultivation near Andreas Canyon and near the mouth of Tahquitz Canyon. The latter of these is of particular significance. In company with Harry Lawton the senior author has visited the site (now a mobile home park) and concluded that it would have been an ideal locality for either runoff farming, utilizing water from the surrounding slopes of the mountains and the south slope of the Tahquitz Canyon alluvial cone (see Lawton and Bean 1968), or for irrigation from Tahquitz Canyon.[2] Other documents recently obtained from the National Archives (Johnson to Commissioner on Indian Affairs 1909) indicate that irrigation from Tahquitz Creek may have begun as early as 1830.

Johnson's letter is an extremely important document because it deals with Indian occupation at Tahquitz Canyon, dwells at some length on irrigation agriculture in the Palm Springs area, and is supported by the signed testimony of six aged Cahuilla men. A portion of the letter states as follows:

> Many years ago a witch doctor of the Cohuilla Indians left his people and went up into this cañon to live. He acquired miraculous powers, and many stories are current among the Cohuilla Indians of the exploits of this evil spirit, from which Tahquitz Cañon got its name. The cañon is deep and accessible only with the greatest difficulty.

---

[2] Irrigation of these fields via ditch from Tahquitz Canyon is described by Patencio (1943:57-58).

**EXHIBIT 20**



State of California.
County of San Diego.

Whereas, by instructions from the Department of the Interior of the United States bearing date on the 22nd day of August and on the 19th day of November, 1887, respectively, each marked 'L', the former numbered 19614, case 31, and the latter 30324, Joseph W. Preston, Indian Agent for the Mission Indians, California, was instructed to investigate the subject of fraud, trespass or other interference with the lands and rights of the Mission Indians on what is known as the Agua Caliente and the Rincon reservations, and technically designated as Township Four South, Range Four and Five East, in San Diego County, California, and so reserved and set apart for the use of said Indians, and whereas, the said Joseph W. Preston, under and in pursuant to said instructions, discovered and ascertained among other things, that a certain land company operating in said County, known and organized under the corporate name and style of the Palm Valley Land Company, by its authorized officers, agents and employees, had located, surveyed, designated and partly constructed a water ditch or canal on and through Township Four S., Range Four East, Sections 3, 10, 15, 23, 26 and 27, San Bernardino Meridian, having for its purpose to convey and conduct water from a point North of said reservation through the same to a point South and beyond said sections, to be used for irrigating their lands, and in supplying a town which said Company had located at said point, and on lands claimed by them,

And whereas, it is represented that there is no other practicable route or way by which said Company can conduct the said water as thus desired and intended, and without this way, they will be wholly without the indispensible means of irrigating their said lands and of supplying with water the town to be settled as aforesaid,

And whereas, the value of the land through which the said ditch is located is inconsiderable and without water is worthless, but with water may be of more value.

And it appearing to the said Joseph W. Preston, U. S. Agent, that no consequential injury to the Indians will be likely to accrue from the construction and legitimate operation of such a water ditch, but that the same will be of great use and benefit to said Indians,

Now Therefore, for the consideration hereinafter stated, and by the consent and approval of the Honorable Commissioner of Indian Affairs, I, Joseph W. Preston, Agent as aforesaid, do hereby consent and agree, as follows:

First.  That the said Palm Valley Land Company shall have the full, free and exclusive right of way through said reservation for the construction of a water ditch now located and designed through the sections aforesaid owned by the said Government, and designated on the plat or map hereto annexed as a part of this agreement, and for a distance on either side of twenty-five (25) feet, together with all the rights and privileges of ingress, egress and regress, and other rights necessary for the full and successful construction, occupation, use, enjoyment and operation of the same.

REPRODUCED AT THE NATIONAL ARCHIVES

-2-

**Second.** That said Company and successors and assigns shall have, as incidents thereto, the use and occupation and the further development of all waters in what are known as Torquitz or West Canyon situated on section Twenty Two (22) Township 4 S., R. 4 E.,- and Chino Canyon situated in Tp. 4 S., R. 4 E., section Five,- to which the said Government may have reserved rights for said Indians. The said Company may convey the water from said West Canyon across said sections 22, 23 and such other sections as may be necessary to reach their said lands, for the purposes aforesaid and with the same conditions and restrictions.

**First.** In consideration and for such right use and occupation and enjoyment of said easement, the said Palm Valley Land Company for themselves, their assigns and successors, do hereby grant to said Indians a permanent water right on one hundred and sixty (160) acres of land of section Fourteen (14) Township Four (4) South, Range Four (4) East, San Bernardino meridian, of said reservation,- which is to be irrigated upon the basis of one inch of water under a four-inch pressure to six acres of said land, and to be securely preserved and conducted and delivered on the North-West corner of said section (14) under the rules of said Company except and provided, that said Indians shall have the first right to water, and the water shall be delivered to them free of costs.

**Second.** That the said Palm Valley Company and their successors and assigns shall furnish to said Indians a like quantity of water upon like conditions, for an additional one hundred and sixty acres of land on said section, whenever the same is needed by extension or cultivation, increase of the number of the Indians, or when the same is required of the Company, and from any water, whether that which may be delivered on the land or from the body of the stream brought upon said reservation by said ditch or otherwise, or in lieu and stead thereof pay the sum of Eight Thousand Dollars ($8,000.) to the Government for the use of said Indians, upon demand by the Agent.

**Third.** That no mineral, rock, wood or other material shall be removed or taken from said reservation, or any part thereof, except such as may be necessary for the construction and repairing said ditch, and nothing therein shall be taken, used or appropriated for any other purpose, nor shall said right of way be used for any other than the purposes herein stated and set forth.

**Fourth.** That in the event said Company, their successors or assigns shall fail, neglect or refuse to comply with all or any of the terms, conditions and stipulations in these articles of consent for right of way and agreement, reasonably construed and providential exceptions,- such failure or refusing shall be construed and treated as a forfeiture of all further and longer right to the said easement, and upon due notice by the said Indian Agent or other agent or person authorized by the said Government, and failure to perform thereof, the said Company, their successors, assigns and all their agents and employes shall remove or be removed, together with all their property and movable effects.

REPRODUCED AT THE NATIONAL ARCHIVES

-3-

It is hereby stipulated that in the event that said
Indians shall cease to occupy said lands, or for any cause
be removed therefrom and the land thereafter or theretofore
be restored to the Government, such removal or xxxxxxxxx
restoration or other disposition of said land shall not af-
fect the right of the Company to use said ditch, but that
they shall continue to have the full and exclusive use of
the same, together with the water, and that the water
rights granted for the use of the Indians shall revert to
the Company.

It is hereby stipulated that the water to be delivered
on section Fourteen shall be water from the White River
ditch, or from any water developed in Chino or other Can-
yons.- But in the event that the Government fails to convey
the easement on the waters of said Canyons, that then and
in that event the said Company shall pay, in lieu of said
water herein granted, the sum of one hundred dollars
($100.) per mile for the distance of five miles, towit,
the sum of five hundred dollars ($500.) for the right of
way for said ditch.

This 7th day of February, 1888.

(Signed)            "J O S E P H   W.   P R E S T O N."

U. S. Indian Agent.

NOTE: Above instrument acknowledged before W. L. Burton,
Notary Public in and for the County of San Bernar-
dino, State of California, May 10th, 1888,

REPRODUCED AT THE NATIONAL ARCHIVES

**EXHIBIT 21**

..., by instructions from the Department of the Interior
of the United States Government, contained in letters ..., dated
August 22nd, and November the 19th, 1907, respectively,— the
former numbered ..., Case 54, and the latter number 1,
Joseph R. Preston United States Indian Agent for the Mission
Indians of said state, was required to investigate the subject
of fraud, trespass and any other unlawful interference with
the lands and the rights of the said Indians on what is known
as the Agua Caliente, and Rincon Reservations, and Technic-
ally designated as, Townships Four and Five South, and Four
... East, in San Diego County California, and so recov-
ved and set apart for the use of said Indians. And whereas,
the said Joseph R. Preston, pursuant to said instructions and
such investigation, discovered, amongst other things, that
certain water, from what is known as the Andre. Creek, on Sec-
tions 2,3 and 6, of Township Five South Range Four, East of
... Indian Reservation, and which had been appropriated, used
and enjoyed, for many years by said Indians,—had been taken,
appropriated and diverted from the original bed or, channel,
in which it naturally flowed, and by the use of which it had
... for domestic purposes and uses, and had done, by
... flume conducted across said sections 2and 3, of
... land, and to ,and upon, section Thirty-five and
... now claimed and occupied of, that may be claim-
... by the Custon or Mine Company in part, and

R. R. Barney in part individually, for the purpose ......

.... and domestic uses, thus leaving the lands of said Indians

.. as aforesaid watered by said original channel, wholy and

entirely without any water. And, whereas, the said Company and

the said R. R. Barney were not the original trespassers or pre-

tended claimants to said land and water but claimed to have

been, bona fide and innocent purchasers without notice, and

for valuable consideration, of, and for the same, and, the

facts so appearing. And whereas, - the land through which said

flume runs is of no value, and could never be used, and was

never used, or cultivated, for want of water, when the water

ran through and alongthe original channel. And, in as much as

the distance traversed by the said flume, is only about three

fourths of one mile, and, as now constructed, serves to pre-

serve the water, and renders it more useful and accessable to

the lands of the Indians affected by said deversion, and it fur-

ther appearing that the said lands of said Company and of the
                               of
said R. R. Barney, would be little or no value without water, and

that, by the said flume, water may be had and used there-on,

and, at the same time more water thereby, can and will be

supplied, to said Indians, on said lands, than they were ever

able to use or obtain before, or that they could supply from

the said original channel, -with out such costs and expenditure

.... have not been able, and will not likely be able to

make, in the construction of a flume, or other means to preve..

the absorbtion and waste of water. And it further appearing to

the said Joseph W. Preston, Agent aforesaid, that the said

Indians, known as the Rincon occupants, - have, upon the terms

.. considerations hereinafter stated, volkntarialy agreed ..

... of the said Company and the said R.R. Barney as now

... And it further appearing that the Rights of the

... States and the interests of the Indians, will not be

disturbed or injuriously affected thereby. Now, by these

presents, with, and by, the approval of the Honorable commis-

sioner of the Indian affairs, --consent and agree to the contin

ued use and occupation and appropreation of said flume and

water, upon terms and conditions following,

to wit:

First:-That the Garden of Eden Company, their successors and

assigns and the said R.R. Barney his heirs, executors, admin-

istrator and assigns shall tap their said flume, at or near

the house now occupied by Indian Captain Ramon, or at such

other place or places as said Company may be requested to

do and to convey such part of the water flowing through

said flume and during such times, and periods of time, as the

Indians there, or their then Government agent, may request,

not more as any time than one inch of water under the usual

rule for the measurement of water, that is to say upon the

side of an inch under a four inch pressure, And that in

addition thereto, shall pay the United States Government,

upon demand by the Indian Agent,- for the use of said Indians-

... that the said Company, and

... of this provision, and he

......... obstruct, or prevent in any manner,  the

......... from the full and free use, occupancy and enjoy-

......... their right  to their said reservation,

Third:- It is hereby further stipulated that in the event the
said Company or the said R.R.Barney shall cease to use or
abandon said flume or pipe,- either they or their successors
and assigns, and in the event that they shall fail neglect or
refuse to comply faithfully with any and all the conditions,
terms and requirements of this agreement to the said right of
way,-providential and unavoidable hindrances, excepted,- then
and in that event, this said consent  shall be deemed and con-
sidered  withdrawn, and all their said right, in the premises
forfeited and they shall cease to use the same, and shall
remove or be removed from said land, and the same shall be re-
stored to the Government, as if this consent had not been
given.-Provided such failure,neglect or refusal shall be after
notice to perform, by the Indian Agent or  other authorized
person.

Subject to the foregoing provisions the said Garden of Eden
....... their successors and assigns, and the said R.R.Barney
his executors, administrators and assigns or either of them,
....................... and the full and exclusive use

............................ to the said water right, inclu-

....................... right to the development and use and  un-

................. conveying across said reservation to their said

................. water which they may develope in the said Andrea's

................. which are known as the Palm and Middle Cañons



... or deemed to be withdrawn, by reason of the ...
Indians from said Reservation, by the restoration of said
Reservation to the public domain, or otherwise, but the said
Garden of Eden Company their successors and assigns, and the
said R.B. Barney his heirs, executors and administrators, shall
continue to have the permanent and exclusive use, possession
and enjoyment and the right to the same.

Signed and executed in presence of,

On this 16th day of February in the year one thousand eight hundred and eighty eight before me, A.K. HOLT, a Notary Public, in and for said County of San Bernardino, personally appeared

Burleigh B. Barney

personally known to me to be the same person described in and whose name is

In Witness Whereof, I have hereunto set my hand and affixed my Official Seal, the day and year in this Certificate first above written.

Notary Public



or leased to be withdrawn, by reason of the removal of Indians from said reservation, by the restoration of said reservation to the public domain, or otherwise, but the said Cahulla of Eden Company their successors and assigns, and the said R.R. Barney his heirs, executors and administrators, shall continue to have the permanent and exclusive use, possession and enjoyment and the right to the same.

Signed and executed in presence of,

.......................................... (L.S.

U.S. Indian Agent for the

Mission Indians, California

The Indian of Eden

per..........................................

21-137

# EXHIBIT 22

Los Angeles, Jany. 16th, 1894.

To the Hon. Francisco Estudillo,

    U. S. Indian Agent,

        Colton, Cal.

    Dear Sir:-

        I herewith submit my report on the Agua Caliente or Palm Springs Reservation:

    The Indians at this place have for many years, even from a time prior to the American occupation of this State, used the waters of Chino, Taquitch, and Andreas Canons, three streams having their sources on the eastern slope of the San Jacinto Mts., to irrigate their lands.  After the coming of the white people into this section, disputes arose over the ownership of the waters of these streams, and in order to settle these disputes one of your predecessors entered into two contracts, one with the Palm Valley Co., or its successor the Bear Valley Irrigation Co., and the other with R. B. Barney.  The contract with the Bear Valley Irrigation Co., the successor of the Palm Valley Co. (as I am informed, not having seen the contract, nor anyone who has) provides in substance that in lieu of the surrender of the Indians' rights to the waters of the Taquitch Creek, the Company would deliver from the White Water River ditch to the Indians at the N. W. corner of Sec. 14, 27 miners inches of water, perpetual flow, until the Indians have under cultivation 160 acres of land, and thereafter an additional 27 inches, or 54 inches in all.  Whether this agreement is written or verbal, it is nevertheless being carried out to the letter by the Co.  Some complaints are made by the Indians that the Co. during the last summer failed to deliver to them on certain days any water whatever; but upon investigation I learned that owing to the scarcity of water in the White Water River, that all parties, both Indians and whites, were cut

12

NARA DC
RG75
PI·163/E.653
Irrigation Div. Gen
  Correspondence
Box 172

short of their full amount.  In order to avoid this in the future, I respectfully recommend the construction of a reservoir 150 x 150 ft., and 8 ft. in depth in the north-west corner of Section 14, as shown on the accompanying map.  This reservoir is to be constructed of earth, and to be supplied by an 8 inch steel pipe 575 ft. in length from the point of delivery. The reservoir will also hold sufficient water to tide over any such difficulties in the future, and can be filled during such times as the Indians do not need the water.  The contract with B. B. Barney, of which I believe you have a copy, only provides for the delivery from Andreas Canon of some 16-2/3 miners inches of water at a certain point on the line of Section 2, and even this amount is waived when the supply in the creek is less than 33-1/3 inches, and then in lieu of 16-2/3 inches, the Indians are to receive only 1/2 of the flow of the stream. Such being the condition of affairs, the government having surrendered all the rights of the Indians to the only water not already appropriated that could be used upon the Reservation, the question of water development had to be abandoned, and I had therefore to make the best use of the water contracted for.  In order to utilize the water delivered at the north-west corner of Section 14, I located the reservoir above referred to; a main ditch commencing at the point of delivery, and thence following the west line of the section for about 2/3 of its length, thence east through the section to near the 1/2 section line; thence south to near the south line; also two lateral ditches, one running east and the other south from the main ditch (see map).  The main ditch is to be 7253 ft. long, 1 ft. wide on the bottom, 2 ft. wide on top and 1-1/2 ft. deep (inside dimensions), the sides and bottom to be lined with rock; lateral ditch No. 1 is to be 2,600 ft. long, 10 inches wide on the bottom, 1-1/2 ft. wide on top, and 1 ft. deep (inside dimensions); and No. 2, 1,500 ft. long, and of the same

2.

Reproduced at the National Archives

cross sectional area; both to be lined the same as the main ditch.  As the grade is light, and as the water carries considerable silt which will settle into and fill up the joints between the rocks, it will not be necessary to lay the rocks in cement.  After a close examination of the situation at Section 2 where the 16-2/3 inches are to be delivered according to the Barney contract, I find that the Indians are living on Section 3, which is R.R. land, and are using the water delivered to them almost entirely upon the said Sec. 3; also the point of delivery mentioned in the contract is not a favorable one to the Indians, being too far from the lands suitable for cultivation.  The water as now delivered follows an old ditch constructed by the Indians on Sec. 3, and is turned towards the hills in a westerly direction directly away from the lands within the Reservation.  As Mr. Barney's flume runs across Section 2, the most available land within the Reservation for the Indians to use the water upon, I respectfully recommend that the point of delivery be changed to a place near where Pedro Chino attempted to make some improvements on the said Section 2.  If the point of delivery is changed to the point mentioned, it will require 4,000 ft. of the kind of ditch hereinbefore mentioned.  In event of a failure to change the point of delivery, I recommend that nothing be done until the Indians' rights to the said Section 3 are properly settled.

The following is the estimate:

| | | |
|---|---|---|
| Construction of reservoir & pipe line, | | $900.00 |
| "              "    main ditch, | | 1,300.00 |
| "              "    Lateral No. 1, | | 400.00 |
| "              "          "      2, | | 275.00 |
| "              "    Section 2 ditch, | | 725.00 |
| | Total, | $3,600.00 |

Respectfully submitted,

Henry L. Ryan.

3.

# EXHIBIT 23

27975-1891

COPY

Beaumont, Calif.  July 10, 1894.

The Hon. Chas. C. Painter,

Washington, D. C.,

Dear Sir:

In addition to the letter which I wrote you from Palm Springs I desire to say that up to the time of my leaving there on the 4th, inst, the situation of the Indians was growing worse. They have been under the necessity of going to the ditch near the Palm Springs Hotel & carrying the water in pails to their homes. It is the grossest, most unmitigated outrage within my knowledge.

In my letter to the Commissioner of Indian affairs I suggested that even drastic measures should be employed by the Government to redress this wrong & to secure to these Indians their rights.  It seems to me that the safest and most effective course for the Government to pursue is to apply to the Federal Court at Los Angeles for a permanent injunction against the use or diversion of Toquich water upon the part of the Palm Valley Water Co. & J. S. McCallum & others, meanwhile asking for a restraining order to that effect.  Mr. McCallum's object in his present course is understood to mean an attempt upon his part to compel the Government to make a contract with him.  If the course I suggest should be taken Mr. McCallum will be forced to make a contract with the Government, if he wants Toquich water.  Injunction proceedings, if successfully consummated, will place him at a disadvantage and thus he will not be in a position to virtually

-2-

dictate terms to the Government.

Mr. McCallum claims, so I am informed, that he has a legal right to the water. His claim is based, I understand, upon the water rights which he bought from W. E. Van Slyke & others some years ago. These rights are based upon the following entries, which I obtained from copies which Dr. Welwood Murray made in his note book.

First entry, - W. E. Van Slyke, W. W. McCoy, April 26, 1884, 2,000 inches of water passing through Sections 21, 22 & 23 in Township 4 South Range 4 East, (Section 22 is on the Reservation). All this within exterior limits of Reservation.

Second entry, - Van Slyke, Porter & McCoy, June 26, 1884, 3,000 inches Agua Caliente Creek, the place of diversion being 200 yards above mouth on Sections 21 & 22, & for use upon Sections 13, 15, 23 & 25 in that & neighboring townships, with a ditch of sufficient capacity to carry 3,000 inches.

This claim of Mr. McCallum's as you are doubtless aware, has no merit moral or legal to support it. Section 22 constitutes a part of the Indian Reservation & is, therefore, Government property. Van Slyke & others were compelled to go upon this section in order to obtain the water rights which they claimed, & which McCallum says he bought. It is a fundamental principle of law that a man cannot take advantage of his own wrong. These men in going upon the Reservation to secure water rights were trespassing & hence no rights can accrue to them or their assigns.

Toquich water by immemorial usage & by every consideration of justice belongs to the Indians. Captain "Joe" Rafael in talking

23-144

-3-

with me a night or two before I left Palm Springs, said that the Indians dug the ditch & had the use of this water before white men came to the desert.  Referring to a very old Indian living on the Reservation, he quoted him as saying that the ditch had been there all his life. It seems to me there can be no sort of question upon this point.  The Indians have a clear & indefeasible right to this water, & their enjoyment of it ought to be promptly & fully & forever secured to them against the expedients & machinations of men like McCallum & others.

In the aforementioned conversation with Captain "Joe" he said referring to the Indians' lack of water:- "Indian will suffer; Indian will be hungry; Indian will be sick; Indian Will die". The pathos with which he said this was exceedingly touching.  The heat on the desert is fearful, & by this time the sufferings of these poor people must be great.  I sincerely trust that most vigorous & effective measures will at once be inaugurated by the Government to secure & protect these Indians in the enjoyment of their just & lawful rights.

If you wish to address me you might write me in care of the Rev. Dr. W. J. Chichester, Los Angeles, Califo.

Very respectfully yrs.,

Wm. R. Henderson.

P. S. The Indians near the Garden of Eden need similar protection, as I indicated either in my letter to you or to the Commissioner of Indian Affairs.

**EXHIBIT 24**

OFFICE OF
Indian Affairs
Rec'd AUL 2[1]

1808

3S673

San Jacinto Cal
July 30 08

F. NESLER,
U. S. Indian Inspector.

Report as to the condition of
the **Mission**
**Tule River**
¹DIAN **Agency.**

Aug. 22   8

Tho Ryan
Acting

Office Indian Off

Report as to the condition of ...

To Agent in a' Sept 1/98



Dep't of the Interior,
Dec. 8, 1898.

Respectfully referred to
the Commissioner of Indian
Affairs, in accordance with
the provisions of law in
such cases made and pro-
vided, and the filing of
this certification...

Edward M. Dawson
Chief Clerk

Dept. of the Interior,
Office of Indian Affairs,
Dec. 9, 1898.

Respectfully re-
turned to the Honorable
Secretary of the Interior.

A. C. Tonner
Ass't Commissioner.

24—148

The Honorable

San Jacinto Cal
July 30 - 98

The Secretary of the Interior
Washington D.C.

Sir

I have the honor to make the following report of my inspection of Mission Agency. Cal

This Agency, located at San Jacinto, is about as central to the several reservations, as could be selected for the purpose. The Office, Warehouse and Physicians quarters, is situated on one of the main streets and convenient to Railroad and Telegraph.

I inspected the books and papers of the Agency, and while the books were neat and well kept, the papers, owing to their incompleteness were unsatisfactory. No bills or authority was attached and they were not properly filed.

There are many valuable and important papers here, such as Patents, agreements &c, and I would recommend that a safe be furnished for protection against fire. The goods in the warehouse

## 2

good order.

At present, only a portion of the building is used for Agency purposes. The County Hospital being destroyed by fire some time ago, permission was given to locate in a portion of this building. The new Hospital is now almost completed and the Agency building will shortly be vacated and available for Agency purposes.

In inspecting the various schools 300 miles of territory was covered, and many of the reservations were visited, of which reference will be made under seperate headings.

### Agua Caliente #2.

This reservation is located on the Desert and is a barren waste. The land has been patented but not allotted. There are several camps here, and how these people gain a livelihood is a mystery. The Mesquite tree, the bean from which forms the principal part of their

3

The more enterprising Indians cutting it for sale. With their means of subsistence gone, there is a likelihood of there people requiring assistance from the Government, in the near future Two or three years ago, a contract was made for drilling an Artesian well here, the contract called for a depth of 500 ft, which when completed was found unsatisfactory, inasmuch as it did not furnish the amount of water expected. Subsequently another contract was made to increase the depth 100 ft. The contractors in going this extra 100 ft, were so unfortunate as to break their tools in the well, consequently this well, which cost the Government a large sum is almost worthless, only furnishing about a half inch of water. It would seem to me, that the contractors, who are responsible parties, should either be obliged to remove these tools from the well, or furnish a new well 600 ft in depth I cannot see

Contractor has not paid for last 100 feet

4

why they should be favored, any more than if they were dealing with private individuals.

## Morongo.

This reservation is near the town of Banning, and at one time, previous to the visit of the Mission Commission formed part of the town. It was at that time a valuable piece of property, but the white men gradually moved the Indians out. While the reservation at present is the most valuable of any connected with this Agency, I think it was an injustice to move the Indians, and think the Mission Commission were imposed upon by designing persons there. It is reported to me that there are three or four intruders at present occupying the lands here, among them, one Sam Black. This man is an old offender and was at one time removed by the military. It is reported that he has been an occupant of these lands for four or five years unmolested by the agents. I think this matter

## 26

Agent and believe the work of the Office would be greatly facilitated by a younger person. For this reason, I recommend the transfer of Mr Davenport. The Indian Office a short time since proposed to transfer Mr Davenport, and the Agent would have recommended it, but he believed in case he did so, he would be obliged to prefer charges, which he did not care to do.

Very Respectfully

C. F. Nesler.

Recommendations

F Page   1 Safe for Office be send here.
E  "    13 Proposition of Mrs Sickler be accepted.
A  "    19 Additional farmers to assist Agent.
A  "    26 Transfer of Clerk.

Exhibits

A   Descriptive Statement of Buildings.
B   Letter of Mendenhall in regard to road.
C   Letter of R. McNail County Surveyor.
D   Letter of Chat Helm.
E   Complaints of 32 Indians against Helm.
F   List of Reservations, showing those Patented

# EXHIBIT 25

Reproduced at the National Archives

43034

Los Angeles,Cal.,Aug.23rd,1900.

Hon.Commissioner of Indian Affairs,

Washington,D.C.

Sir:-

In compliance with Office directions of June 30th last(Land),I pro-
ceeded to the Palm Springs Indian reservation for the purpose of trying
to secure water for the Indians,and have the honor to submit the follow-
ing report on my findings:

All of the Palm Springs band,numbering 11 families,40 persons in all,
now live on the west half of section 14,township 4,south,range 4,east.
They have a few fruit trees,grape vines and small corn and melon patch-
es,and evidently work them to the best advantage. The scattered patches
of land under cultivation do not exceed 20 acres altogether.The labors
of the Indians are greatly handicapped by lack of water.The principal
supply at present is the overflow from the hot spring,which is leased to
Dr.Murray and located near the west line of section 14,as shown by accom-
panying plat. The other source of supply is a lateral ditch which taps
the Whitewater ditch at a point about 400 yards west of the hotel in
section 15. This supply is very meagre and uncertain. Getting out at
4.30 in the morning I saw about 3 or 4 inches of water in this ditch
running to the Indians,and,seeing the ditch at the same point about two
hours later,found even that small quantity had been shut off.
The same quantity apparently was turned in to them late in the evening.

2.

Upon inquiry I was informed that the Indians do not always get this much as the Palm Valley Water Company's Canjero(ditch operator) understands his business well enough to turn in somewater to them when official visitors appear. Dec 1981 - 1901

The Whitewater ditch, at the point where it enters section 15,was carrying,during my visit,about 20 inches of water ,and is intended to supply the wants of settlers in sections 10,15,23 and 25. There were,until this summer,15 families living on these sections,all of whom but    3 or 4 lived on section 15,and the undertaking of the Water Company was to furnish water for about 600 acres for them. There are now 5 families living on their ranches,the others having apparently abandoned theirs after seeing their orchards die for want of water. One fine orchard that I saw drying was Mr.McCallum's,the President of the Water Company,and his house apparently abandoned.No water is allowed to anyone for alfalfa,and only a little for orchards,the balance being required for domestic use. McCallum's ranch,it should be noted,is on the SW quarter of the SE quarter of 15,and has been kept alive by the water that McCallum senior,who has recently died,had stolen from Toquitch Canon and conveyed by a flume paralleling the old Indian ditch.

The next point visited was the Toquitch Canon,which I found to be as dry as anything can be,at and above the point of diversion of the ancient Indian ditch,which is shown by red line running from the centre of Section 22 to 14. About one mile up this very rough and rocky canon a little

Reproduced at the National Archives

3.

Water now trickles over a precipice and sinks into a small sand patch
where it is lost. At seasons of the year when water is least needed,the
Toquitch Canon is said to be a torrent,and supplies more water than the
Indian ditch and McCallum's abandoned flume can carry.   1988 5 - 1901

One proposition suggested was to pipe this water to the Indians,a dis-
tance of about 3 miles. The water from this canon is clear and pure and
much superior for domestic use to the dirty looking fluid of Whitewater
ditch. It was the Toquitch water that the office ordered shut off from
McCallum in 1894-95.This water furnished the domestic supply for the whites
and had the office orders been enforced Mc Callum could have been brought
to terms as contemplated by office letters of July 20,1894 fo Agent Estu-
dillo and Frank D.Lewis,and of February 23,1895 to Lewis.Another letter
of which I have some recollection but which cannot be found in the Agency
files,directed the Agent to give McCallum 10 days notice and then proceed
to break up his headgate and flume.

It is estimated that the cost of piping from this canon to section 14 would
be,for 5 inch Asphalt Paper pipe,in Los Angeles,$2,534.Freight to Palm
Springs,carload rates,$181;total,$2,715-plus the cost of a Superinten-
dent and Indian labor in laying pipe,upon which I can give no reliable
figures. From what I have seen and heard of the Asphalt pipe it is very
durable and much cheaper than iron.The price list enclosed (Enclos.2),is for small lots;
on 3 to 5 mile propositions there is 25 per cent off. It comes in seven
foot lengths and 5 inch pipe weighs 4 2-3 pounds per foot.A 5 inch pipe
with about 3 per cent fall will carry about 50 inches of water,and as the
fall from from Toquitch to section 14 will not average over 3 per cent,a

Reproduced at the National Archives

43034

4.

45 inch pipe would be necessary to give an adequate supply. For the purpose of comparison I give the price on wrought iron screw pipe, quoted in Los Angeles today:

    4 inch, 40 cents per foot. Weight .10 1-2 lbs. per foot.

    5 " 52 " " " " 14 1-2 " " "

              Iron riveted pipe.

    4 inch, No.16,21 cents per foot. Weight, 3 1-4 lbs.

    4 " " 14,24 " " " " 4 1-4 "

    5 " " 16,27 " " " " 4 "

    5 " " 14,29 " " " " 5 ".

This pipe would be too frail for use in the rocky canon where heavy washes occur.

The next point examined was Andreas Canon in section 3, township 5 south, range 4, E, where B.B. Barney takes the water into his pipe line under a contract supposed to have been made in December 1893. Here an excellent stream of water was found flowing at least 100 inches and all going to waste. Barney's 8 or 10 inch pipe line runs less than half this water to a place called " The Garden of Eden", in the north half of section 35-4 S. 4 E., where it is soon lost in the sand. The Garden of Eden, which was abandoned about as soon as the building was erected and a fence built around it, is a desert ranch, covering hardly 10 acres, with town lots staked out all around it, and is about the most foolish scheme that a man could embark in. The place shows no evidence of having been occupied for several years, and

Reproduced at the National Archives

5.

probably never will be again.

Barney's contract is a sweeping one, under which he gets everything for nothing-that is if the enclosed draft purporting to be a copy of the contract is, in fact, a true copy. The contract as executed I have not been able to to see. In the draft I can find no valid consideration. It says, in substance, " You give me all your water and I will give you back, either from my pipe or at the banks of the stream where you are now taking it out into the ditch that you made many years ago, as I see fit, one inch of water to every six acres of land that you cultivate." One inch of water to that sandy soil would do about as much good as a tub full, so far as I can learn, Barney never and, did furnish any water to the old Indian, Andreas, who had a ranche in section 34 and abandoned it after Barney began operations. Mr. Barney is now bankrupt. Though this contract could, it is believed, be abrogated for wantof consideration, such action is not necessary for two reasons: First, Barney has forfeited his right to the water under the California laws by five years non user. Second, even were he using the water, he could claim and continue to use only such quantity as is necessary for the proper cultivation of his land, and no more. As stated above, his pipe will carry probably half of the water that is now flowing in Andreas Canon and there is certainly enough left for the Indians. To make this water available however, the Indians must either move down to section 34 , township 4, south, and section 2,5 south, or have it piped to them on section 14 at a cost for the pipe alone of $3,801. Freight, $271.46; total, $4,072.46, plus labor. To do this with wrought iron

Reproduced at the National Archives

43034

6.

pipe the cost would be for pipe-23,760 feet at 52 cents ,$12,355.20; freight,244,520 lbs at 24 1-2 cents,$499. Total $12,854 plus labor.

Adverting to Barney's contract,it would appear from its terms that the Indians were to get water from his pipe that would otherwise be in accessible to them-that is,if Mr.Barney chose to let them have it from his pipe rather than from the banks of the stream where they had been getting it. This would of course be a valuable consideration and the office probably took that view of it.After being on the ground however I can state without fear of contradiction that it would have been no advantage or benefit whatever to the Indians to have had water  delivered to them at the point where the pipe line crosses the west line of section 2,and,by such delivery have the supply to their ditch stopped.

Furthermore,Barney,according to the statements of the Indians,never gave them a drop of water from his pipe,and when they began taking it into their old ditch again,directly from the stream,he posted a notice prohibiting such taking,and the notice was taken down by Agent Wright.

The next and last point examined was the Cienaga,located in China Canon-NE quarter of section 7. Here was found a small stream of water that flows through Chino Canonfrom a westerly direction into the Cienaga and there sinks,together with the water of two or three other little springs. To get to this water the interests of the Southern Pacific railroad company would have to be acquired,and the water piped to the Indians  at a cost for the pipe and freight of about $2700. In addition,a great amount of

Reproduced at the National Archives

7.

ditching would have to be done in and about the Cienaga to get the water collected at one point from which to pipe.

This Cienaga is a green spot of probably seven acres that was long the abode of an Indian named Chino,who was the father of my guide on this expedition. There was plenty of evidence to be seen of Indian occupancy, but the poor Indian was evicted by a white man as soon as section 7 passed to the railroad company. The interests of said white man,whose name I have not been able to learn,were acquired by one H.F.Wheaton who has fenced the trail at the entrance to the Cienaga for the exclusion of Indian ponies that had been grazing there.

Wheaton does not reside on or cultivate this tract nor does he use the water in any way. To get at the water one must go upon the said tract of land. If it can be acquired by exchange,or purchase at a reasonable fig- ure,it would give the Indians some good land and an uncertain supply of water for other portions of their reservation.I say an uncertain supply because I was in formed by the Captain of the Morongo village who said he once lived there, that it sometimes goes dry in summer. By rounding up and piping the water to the nearest point on the Whitewater ditch,about three mile distant,arrangment could be made with McCallum for its conveyance to section 14 by his ditch.

The enclosed letter,just received from Jerome Madden,Land Agent of the Southern Pacific Co.,*(Enclos)* shows that all of said section 7 is railroad land, and that Wheaton is holding it under his application to purchase,filed February 13,1892. Just what rights he has acquired thereunder I will

Reproduced at the National Archives

8.

learn from a personal interview with Mr.Madden when I reach San Francisco, and advise the office further.

I have shown the difficulty and probable cost of getting water from To-quitch,Andreas Canon and the Cienaga,and this leaves the Whitewater ditch as the last for discussion. To this ditch and water the Indians can establish no legal right. An idea that was predominant with me during the whole investigation was to bring McCallum to terms and get water from him without cost to the Government. To do this I thought of shutting off his ditch where it enters government land and found myself against an obstacle. By reference to the plat it will be seen that the ditch enters township 4 south,4 east at section 3,which is railroad land;it then passes through the east 1-2 of 10 which was deeded to Dr.Murray;thence through the east 1-2 of 15 which was acquired by whites from the railroad ;thence between 14 and 22,keeping exactly in the middle of the road as I saw by personal examination,to section 23 which is railroad land partly settled by whites;it then strikes Indian land at the NE corner of the SE 1-4 of 22,below which point only one ranch,in section 25,is supplied. To shut McCallum off at the point where he enters Indian land would not hurt him any, and,furthermore,he could easily straighten his ditch so as to avoid going into Indian land at all. I then looked up in the Land Office here the status of section 34,township 3,south,4 east,with the view to stopping him there. It was found that this tract is public domain,and that he could not be stopped there because of the provisions of Section 2339 U.S.Revised Statutes.

reproduced at the National Archives

9.

There is not enough water now in McCallum's ditch to divide equally be-
tween the whites and the Indians as the quantity of each would be too
small to do either much good. My plan was, therefore, to get a division of
timefor all of the water, giving it to Indians and whites every alternate
24 hours.

Mr. William Collier, the Special Attorney for the Mission Indians, whom I
saw at Riverside, joined me in a conference with U.S. Attorney Flint at
the latter's office in Los Angeles on the 14th inst., and after fully sat-
isfying ourselves that the Indians had no legal right in the Whitewater
ditch we concluded to call in McCallum and by pretending that we were un-
der orders to do something to his material damage, get him to agree to a
division of time on the water. We found that McCallum knew as much about
his rights and our powers in the premises as we did, and he calmly told
us that the only way we could get water from him, in addition to what he
was giving gratuitously, was by purchase, and that he had not a drop to sell.
As we had given him no intimation as to what we proposed to do in the
event of his failure to agree to our proposition, further than the direct
statement to him that he was a trespasser on Indian land, he informrd us
that we could take any action we thought best. As the only action we could
take would be to shut off his ditch where it enters section 22, as above
stated, we did not deem it wise to tell him so. He very graciously in-
formed us that he would quitclaim the Company's right's in the Cienaga
to us and permit us to run a pipe from the Cienaga to the Company's ditch.

10.

The Company has no rights in the Cienaga worth anything, else they would not be ceded; but the permission to connect a pipe line with the ditch would be of material value to the Government in the event of taking water from the Cienaga. All the property of the Company is mortgaged and it is in a bad way. The white users are all stockholders and not purchasers at so much per inch.

I have given pretty fully the conditions existing on and about the reservation at this time. It should be added that while the Indians and whites alike are suffering for water and fighting for every drop, they have more this summer than either the last or the one before. This is admitted by all and the fact is verified by the records of the Weather Bureau. I did not then see the several water sources referred to above at their worst, and hopes are entertained by all that next summer will see them with even more water.

Coming down to what is best to be done to secure more water for the Indians, involves consideration of a difficult problem. The Palm Valley Water Company (McCallum) must be eliminated as a source upon which we can enforce demands. The time to have done this was in 1894 and '95, when they were unlawfully appropriating the Toquitch water for domestic purposes, and when the Company, had the office orders been enforced, could have been dealt with to advantage. With the Company's ditch eliminated, we are left with three propositions:-

(1). Moving one half the Indians to the two lower sections of their reservation where there is ample good land and letting them use their old ditch

Reproduced at the National Archives

11.

from Andreas Canon, regardless of Barney's contractor, piping the water from said Canon to the east half of section 14, a distance of 4 1-2 miles, at a cost of about $4,500.

(2). Piping the water from an uncertain flow up the Toquitch Canon from a point about 1-2 miles west of the point from which the old ditch runs, the last named point being about the centre of section 22. This would require about 3 miles of 5 inch pipe at a cost of about $2700. It should be stated here that the reason why the Indians do not live on section 22, near the water, is because it is a rocky waste without an acre of arable land.

(3). Piping from the Cienaga, the uncertainties and difficulties of which I have shown above.

A fact that should also be borne in mind in considering any proposition involving any considerable cost , is the rapidly decreasing number of Indians. Nine years ago they were said to be 70. They are now reduced to 40-young and old. That they have been much neglected by the Government and abused by white neighbors is a fact that cannot be refuted. A statement that one old fellow made to me in council was, as true as it was touching. He said: Washington sent people here lots of times for many years gone to get water for us. They come and we show them all around and we tell them all we know and they go away and we get less water all the time".

In view of all the facts and conditions as I have seen them, the submission of a recommendation , as I am directed to do, is a difficult matter. The best that I can do is to recommend either the removal of the Indians-or a part

Reproduced at the National Archives

43034

12.

of them–to section 34 township 4 S,4 E,and section 2,township 5 S,4 E;or,

pipe the water to them on section 14 from Andreas Canon. It could never

reach that point by ditch because of rapid evaporation and percolation.

If money is to be spent in piping it had better be done from the source

that promises the most lasting supply,even though it should be a little

more distant and cost more.

I have endeavored to give as full information as possible respecting

the other sources of supply,for the use of the office in the event of my

recommendation not being approved.

Very respectfully,

M. E. Holland

Supervisor.

# EXHIBIT 26

# ANNUAL REPORT

OF THE

# COMMISSIONER OF INDIAN AFFAIRS

TO THE

## SECRETARY OF THE INTERIOR

FOR THE

## FISCAL YEAR ENDED JUNE 30, 1903.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1903.

Original from
UNIVERSITY OF MICHIGAN

the exercise of tact he might be able to terminate the contests initiated, adjust satisfactorily all the issues involved, and thus save useless and expensive litigation. These contests have not as yet been finally settled.

## IRRIGATION.

The Indian appropriation act for the last fiscal year (1903) contained an appropriation of $150,000 for construction of ditches and reservations, purchase and use of irrigating tools and appliances, and purchase of water rights on Indian reservations, and authorized the employment of not exceeding two superintendents of irrigation.

Two irrigation engineers were employed under this appropriation, George Butler at large and John B. Harper on the Pueblo and Jicarilla reservations in New Mexico; and one, Walter B. Hill, in charge of construction on the Crow Reservation, in Montana, was paid from funds belonging to the Crow Indians.

Of the above appropriation $120,950 has been expended, as follows:

| | |
|---|---:|
| For the Pueblos of New Mexico | $11,200 |
| Crow Reservation, Mont | 39,000 |
| Southern Ute Reservation, Colo | 11,100 |
| Walker River Reservation, Nev | 2,350 |
| Western Shoshoni Reservation, Nev | 3,000 |
| San Carlos Reservation, Ariz | 9,300 |
| Pima Reservation, Ariz | 15,000 |
| Navaho Reservation, Ariz | 13,000 |
| Klamath Reservation, Oreg | 7,000 |
| Mission reservations, California | 10,000 |
| Total | 120,950 |

Some $4,000 more has been expended on other reservations in small amounts, leaving a balance of about $25,000 at the present time, which will probably be reduced to $12,000 or $15,000 by the payment of outstanding liabilities.

The Crow Indians having expended nearly $600,000 of their own funds in the construction of systems of irrigation, it was found necessary to use the appropriation for irrigation to complete their largest system. When completed, this system will be one of the finest and best constructed in the country. Some $35,000 more will be required besides the cost of the necessary laterals, amounting, according to the estimate of Inspector Code, to about $250,000.

The appropriation for the current fiscal year is $150,000, the employment of four skilled irrigation engineers being allowed. In addition to Messrs. Butler and Harper, Messrs. Walter B. Hill and James R. Meskimons have been appointed superintendents of irrigation.

Original from
UNIVERSITY OF CALIFORNIA

**44**     REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

The expenditure of $142,265 has already been authorized, as follows:

| | |
|---|---:|
| Yakima Reservation, Wash | $45,434 |
| Zuñi Reservation, N. Mex | 40,000 |
| Pueblos, N. Mex | 5,800 |
| Pala Reservation, Cal | 13,880 |
| Crow Reservation, Mont | 15,000 |
| Western Shoshoni Reservation, Nev | 5,000 |
| Navaho Reservation, Ariz | 3,885 |
| Salaries of superintendents and small amounts on other reservations | 13,266 |
| Total | 142,265 |

It has been found necessary to deny applications for funds greatly needed for work on other reservations, including $20,000 to complete the Big Horn Canal on the Crow Reservation.

**Mission Indians.**—It is particularly gratifying to note the excellent results obtained during the past year through the effort made to secure water for irrigation, by means of artesian wells, for the Mission Indians of California, residing on the Torros and Cabezon reservations. Twenty-two wells were bored under a contract with the Coahuila Development Company, of Los Angeles, Cal., and an aggregate flow of 209.20 miner's inches of water was obtained. In addition, three wells were bored by the company, outside of its contract, on section 16, Torros Reservation, developing a total flow of 26.25 miner's inches. The water so obtained will beyond question prove a great boon to the Indians. With plenty of water they will now be able to raise various crops on lands that heretofore have been regarded as mere wastes of sand and sagebrush.

**Navaho Reservation.**—July 14, 1902, this office laid before the Department plans for beginning the construction on the Navaho Reservation of irrigation ditches leading from the San Juan River, and recommended that George Butler, superintendent of irrigation, be sent there for the purpose of surveying and staking off lines for three or four small ditches leading from the river at the most practicable points and where the largest quantities of good lands might be irrigated.

Superintendent Butler submitted his report to the office May 15, 1903. He surveyed and staked off two ditches, viz., the Sandeval ditch and the upper San Juan ditch. The former heads on the left bank of the river about 30 miles west of the eastern boundary of the reservation. He reported that there was nothing difficult of construction, the line running mostly in earth for its entire length of about 4½ miles, and estimated the cost to be $10,644.63. The acreage reclaimable under the line is 822.4 acres, at a cost of $12.94 per acre. This ditch has been constructed by Supervisor Shoemaker, under authority from the Department, at a cost of about $10,000. It is known as Ditch No. 2.

The San Juan ditch was estimated by Superintendent Butler to cost


Digitized by Google                    Original from
UNIVERSITY OF CALIFORNIA

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 171 of 206   Page ID #:696

water upon the land have been put in very rapidly, and a large area is now under cultivation. The agricultural progress in the last year has been most marked, and returns are now coming in to the Indians in the way of crops. Tribal funds to the amount of $20,000 have been used here.

*Klamath.*—Results on the Klamath Reservation in Oregon have hardly been satisfactory. It is hoped that an intelligent system will be planned in the near future, as the Indians now have ample funds of their own available for irrigation.

*Mission Indians.*—Almost all the reservations of the Mission Indians of California were visited by Special Inspector Chubbuck during the early part of 1906, and his several reports indicate that their greatest need is water for irrigation. On several of their reservations there is ample agricultural land for their support if it could be properly irrigated.

On the Agua Caliente Reservation No. 2, for instance, the inspector found that B. B. Barney claimed the water right in Andreas Canyon. In 1893 he had entered into a contract with the Government which provided that, in consideration of the grant of a 20-foot right of way for a pipe line, flume, or canal across section 2 of the reservation, the Indians were to be allowed sufficient water from the pipe line to irrigate 100 acres, or such part of it as they might have in cultivation, on the basis of 1 inch continuous flow for each 6 acres of land. This was simply in consideration of the right of way across Indian lands. No recognition was given to the Indians' right by long use of the water. Under the conditions of climate and soil 1 inch of water to each 6 acres was of little or no value, and as a result the Indians soon vacated the land and left Mr. Barney in full possession of all the water. The inspector noticed that Mr. Barney was not using the water in accordance with the letter and intent of the law, but was trying to perpetuate his water right by posting and recording notices of the appropriation of water. Finding that the latest posted notice had run the limit of sixty days with no development work, the inspector immediately posted a notice of the appropriation of 500 inches of water for use on Indian lands and put the Indians to work on an irrigation ditch. This action brought Mr. Barney to the necessity of defending his right to the water. The inspector found that the pipe line had been constructed at a cost of about $6,000, and had a carrying capacity of 150 inches, and that Mr. Barney had a vested right which should be respected; so he arranged a compromise by which the agreement of 1893 was abrogated and a new one made, giving the Indians one-half of the pipe-line flow and one-half of all the water flowing in the canyon other than that entering the pipe line, which ranged from 50 to 150 inches during a part of the season. The agreement was approved

Digitized by Google    Original from UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 82-3   Filed 10/21/14   Page 172 of 206   Page ID #:697

by the Department. The inspector thinks that this will be sufficient to irrigate much more land than will be required to support the Indians now on the reservation.

An extraordinarily heavy flood in the San Luis Rey River during the latter part of March, 1906, destroyed the most expensive part of the irrigation ditch on the Pala Reservation, constructed at a cost of about $18,000. The damage is estimated at $10,000. By putting in a temporary heading and making considerable repairs, which they did without compensation, the Indians were able to obtain a reasonably good supply of water for this season's crop. Chief Engineer Code estimates that for about $12,000 a ditch could be constructed on the Pala Reservation which would not be damaged by any floods likely to occur in the future, and he suggests that that amount be set aside from funds available during the fiscal year 1907. His report of May 22 says that the Indians are making fair progress in farming, and seem to be reconciled to their removal and quite satisfied with their present environment. A walk down the street along which their portable houses are located with military regularity surprizes one accustomed to the appearance of the average Indian village. The places are neatly kept, with good gardens in the rear and flourishing flower beds in front.

The same flood also greatly damaged the ditch recently constructed on the Rincon Reservation, but the Indians were able to repair an old ditch so as to save their crops.

From his observations on the Pala and Rincon reservations and his investigation as to what was being accomplished on the Monserrate ranch in the matter of underground-water development, Mr. Code is confident that an abundant supply of water could be obtained, either on the Rincon or on the Pala Reservation, by pumping. The pumping station recently installed on the Monserrate ranch consists of four bored wells, 10 inches in diameter, from 70 to 100 feet apart and about 60 feet deep, situated on land immediately adjoining the channel of the San Luis Rey River. From these wells a volume of 210 California inches is obtained in the summer season, when absolutely no surface water is flowing in the river at this point. The pumping station is 7 miles below the Pala Reservation, and in his opinion the fact that such a supply is available on that ranch warrants expectations of similar results on the Pala Reservation, since the underground formation at the two points is very similar.

*Navaho.*—On the Navaho Reservation, in New Mexico and Arizona, the repair and construction of ditches and the development of a water supply are under the immediate charge of George Butler, superintendent of irrigation. His estimate of the expenditures required during the current fiscal year were $10,482 for Fort Defiance, $10,800 for San Juan, $1,550 for Navaho extension, and $6,620 for Western Navaho;

Original from
UNIVERSITY OF MICHIGAN

**EXHIBIT 27**

ay -1903

In reply to
Land,
32460-1903.

# DEPARTMENT OF THE INTERIOR,

### UNITED STATES INDIAN SERVICE,

Pala, California,
August 22, 1903.

ay- potential

The Honorable,
The Commissioner of Indian Affairs,
Washington, D. C.

Sir:

I would respectfully submit the following statements and facts concerning irrigation matters and possibilities relative to the lands of the Mission Indians of the Agua Caliente, or Palm Springs Reservation in California. There are also submitted with this report, under separate cover, some maps that it is hoped will tend to a clearer understanding of the physical characteristics; and one or two pictures that may be of a little aid.

There are seven alternate sections, containing some 4500 acres, embraced in this reservation that lays at the base of the east slope of the San Jacinto mountains, and within the western border of the California Desert. Frost is seldom, if ever, known in Winter, and the Summers are excessively hot and arid. There is almost no rainfall the year round, and nothing grows without irrigation.

With water, crops of all kinds can be grown here and yield prolifically when properly tended. Date palms are found growing luxuriantly in some of the canons and, owing to the almost tropical climate, figs, grapes and melons mature and are marketed a month or six weeks earlier than from other regions of southern California, and top prices are secured.

Of the lands of the reservation, nearly all of sections 14 and 22, the larger part of sections 24 and 2, and a very little of the western edge of section 34 are excellent, susceptible of cultivation, and under irrigation could be made to produce abundantly.

The ten or eleven families that comprise this band of Mission Indians all have their houses and small individual farms in the western half of section 14. About 80 acres is estimated as the aggregate of the lands planted by these people to figs, grapes, melons, beans, corn, and a little alfalfa. It is possible that this small acreage is to be accounted for by the uncertainty of the water supply; for

REPRODUCED AT THE NATIONAL ARCHIVES.

-2-

they could otherwise easily cultivate much more than this and secure large returns for labor expended.   As it is, they seem to expect but little from their efforts at farming, and to depend largely on the demand for their labor in the grain and fruit ranches of the surrounding country.

*labor income*

There is evidence today that in times past the Indians have built ditches for the conduct and distribution of the waters of the canons  of Chino, Tahquitz, and Andreas; and have irrigated lands therefrom in sections 2, 10, and 11 of T. 5, S. R. 4, E., and sections 7, 10, 14, 15, 34, and 35 of T. 4, S. R. 4, E.

*Chino Creek*

When I was there in July last, Chino Creek was flowing a nice stream of some 30 or 40 inches, but about the middle of the west half of Sec. 7 it sank in the loose sand and gravel.   In the canon, in *Cienega* the N. E. 1/4 of this same section, is quite a cienega which used to be owned and cultivated by Indians; and where considerable water, that seems independent of the stream above, could be developed.  A good flow is discovered in the creek north of this marsh land, which runs for about half a mile and then disappears, as does the stream above.

I understand this water is perennial; and it is thought that a minimum flow of 50 or 60 inches could be made available to the reserve by collecting it at two or three points and piping it for about four miles to the N. W. corner of Sec. 14.   The pipe might be a redwood stave banded, or light iron; run along the side of the canon out of the way of floods, and placed on the ground surface for nearly its entire distance.  The excessive fall of some 2,000 feet would permit of using pipe of small diameter, but the discharge or lower end would have to be kept free and open, as the light iron or wood pipe contemplated is not calculated to withstand a static pressure of 860 pounds.

*Wheaton*

A man by the name of H. F. Wheaton has fenced, and claims land in Chino Canon; to which I understand he has no title.  He has also built a ditch from the creek for the diversion of its waters, but has not made beneficial use of these and so has no valid claim to them. He has excluded some of the Indians from these old holdings, which are not on the present reservation however, and threatened them.

Dr. Welwood Murray also claims these waters, says he filed on them in 1887 and again in 1900; and claims to hold them for land in Sec. 10, in which, I think, a Mrs. Parsons of San Bernardino is interested with him.  This appropriation is also void by reason of failure

*Indians excluded from Chino  1903 ?*

*W. Murray — filed on 1887*

REPRODUCED AT THE NATIONAL ARCHIVES

*was 1903 - a "boom" year - passed for filing claims*

-3-

to use.

A man by the name of N. A. Mathews whose identity I am unable to learn, on April 4, 1903, posted notice of aopropriation of the waters of this creek and cienega for mining, milling, agricultural and domestic purposes; but the time of beginning actual construction has lapsed, and I regard it as only another of the many speculative schemes.

The Palm Valley Land Company may have a claim to these waters, but I think not; of this I will speak later.

*Andreas*

The creek in Andreas Canon is perrennial, was flowing July 21st of last year, the end of a series of dry years, about 48 inches; and this year about the same time showed about 125 to 150 inches by estimate. Water can be diverted high enough to command all the arable land embraced within the sections comprising the reservation; but would have to be conveyed thereto in pipe or concrete channel. From a favorable point of diversion to the N. W. Corner of Sec. 14 would require about 5 1/2 or 6 miles of conduit; to Sec. 26, about half as much; and to Sec. 2 about half a mile. The character of the land is such as to require much of the main distributaries to be also impervious to water.

*Sec. 2*

Until recent time the Indians used to live on and farm lands in this vicinity, principally in Sec. 2; but lately sufficient water has been denied them.  I am told that B. B. Barney has 860 acres in *Barney* Sec. 35 and sections adjacent thereto; and that he secured from the Government relinquishment of the vested rights of these Indians in the waters of Andreas Creek: the consideration being the delivery to them of one inch of water for each six acres actually cultivated; an amount that is inadequate, absurd, and prohibitive of their doing anything in the way of farming.

Mr. Barney is holding this land and water only as a speculative venture, has about a mile and a quarter of pipe line from point of diversion to the south line of Sec. 35 that is capable of carrying most of the normal flow to the land; but as he has not made beneficial use of the water for the past five years, if ever, it is subject to appropriation an use by whomsoever wishes it.

*Tahquitz?* *forward*

The only other available stream in the immediate vicinity is Tahquitz, the one referred to by DR. Murray.  This creek emerges from canon about the centre of Sec. 22; but at low or normal stage the waters never reach the plains, sinking in the loose rocky detritus just below the canon's mouth.  In times past the Indians deflected

REPRODUCED AT THE NATIONAL ARCHIVES.

27-176

REPRODUCED AT THE NATIONAL ARCHIVES

-4-

the waters to an old channel north of the present one; and built a little ditch from near the end of this old channel to convey water across the S. E. 1/4 of Sec. 15 and the W. 1/2 of Sec. 14. This is the ditch they are now using, and which serves, and can be made to cover, most of the lands in Sec. 14.

I understand that Mr. Mc Callum, who was Indian Agent here 15 or 18 years ago, was interested in the Palm Valley Land Co.; secured, or claimed interest in, this ditch by enlargement, and filed on the "unappropriated" water of the stream: the Indians being conceded some rights: (40 inches according to Dr. Murray). After Mr. McCallum died his son, H. F. Mc Callum, became interested in the matter; and water from the creek has been for a few years past diverted to and used on three or four small tracts in sections 15 and 23.

By reference ot your letter of instructions to me it appears that under date of May 19, 1903, Dr. Murray informed the Office that Tahquitz or West Canon Creek had been practically dry for some years: was then flowing a large stream of water that was wasted in great part as there were no storage reservoirs. That the Indians have a right to the stream, with possible limitations; but that they can unquestionably claim 40 inches. He also believes that a large and sufficient storage dam (reservoir?) can be built near the falls in the canon, thus securing three sides of solid granite wall; and states that the channel from this reservoir would serve, for the greater part of the distance, as a conduit: that no debris is brought down the canon in time of flood, and he does not think evaporation or per-colation would materially affect the result.

Reviewing these statements, it would seem unwise to attempt to secure irrigation water from a creek that has been practically dry for some years, and is only now flowing a large stream of water after an unusually wet Winter. If the Indians are only entitled to 40 inches of the flow, a small irrigating head, and their right to the balance is questionable, the wisdom of the Government constructing an impounding reservoir to stand dry and empty is also questionable. The reservoir site is discovered just below the falls mentioned, but the basin would be small, and the three sides of solid granite is wanting. The rock is so seamed and shattered by upheaval and earth-quakes that I believe it would prove a veritable sieve. To prevent undercutting by water falling the 60 feet mentioned would necessitate carrying the impounding wall to a solid bedrock, and it is impossible to determine how deep this is without excavating: test holes would

REPRODUCED AT THE NATIONAL ARCHIVES

-5-

avail nothing.  There are indications of debris of all kinds being
brought down at time of floods that would fill the reservoir unless
ample sluice ways were provided; and, judging from the markings, the
floods at times must be terrific.  As for using the channel from the
reservoir site as a conduit for the greater part of the distance, the
measured loss due to percolation is prohibitive of such a scheme.

It is also noted in your letter that Dr. Murray states there
are other streams to which the Indians could claim legal rights, but
he doubts the advisability of using these streams for the purpose
desired.  Dr. Murray was particularly anxious that I examine thoroughly
Tahquitz Creek and Canon.  The Indian ditch runs through his little
holding of three or four acres in Palm Springs, he can, and does
secure a little water from it to irrigate a small portion of the land
when his share in the Whitewater Ditch fails him; and his supply of
domestic water for his hotel or sanitarium is drawn from this ditch.
When this source of domestic water fails him he is compelled to rely
on a trickle from a hot sulphur spring, or haul water for about five
miles from Palm Springs Station, or the end of the pipe line at Barney's
ranch.  He was perfectly willing for me to visit Andreas Canon, but
did not think it would offer a feasible project; but when I mentioned,
and finally insisted, that I was going to examine Chino Canon there
was strenuous objection, and was told I must not interfere with that
as he had twice filed on and held that water.  What little information
he had previously given me concerning Chino Creek was misleading;
and he was averse to my meeting or talking with the two or three
other white men in the place.  I think the inference is natural and
clear.

Now for my own views on Tahquitz Creek.  It drains some 8 square
miles, is torrential at times during the rainy season in Winter and
carries considerable sand and trash; in ordinary years a nice little
irrigating head is flowing until the first or middle of July, that
could ordinarily be made to irrigate 100 to 150 acres.  Only in time
of flood does the water reach th  valley, the normal flow sinking
and disappearing just out of the canon in the rocky sandy mass that
has in times past been washed from the hills and out of the gorge.

Referring to the tracing, which is but a rough sketch and not
accurate in detail, I would remark the following as relates to the
present Indian ditch.  The heading is about a quarter of a mile below
the falls, on the north side of the canon and creek; a little channel

REPRODUCED AT THE NATIONAL ARCHIVES

-6-

has been dug through loose rock for four or five hundred feet to connect with an old creek channel. This old channel is used as a conduit for three quarters of a mile, and then 4,700 feet of ditch carries the water to the west line of Sec. 14. The channel from the dam to Sta. 47 is in coarse sand and heavy rock and the fall is excessive; from Sta. 47 to 34+70 the ground traversed is rock and sand and the fall is ample; from Sta. 34 + 70 to 13 + 80 the ditch runs through coarse sand on a very light grade and the flow is sluggish. From here to Sec. 14 the fall is better and the ground not so porous.

Weir measurements taken July 13th last gave a flow of 2.148 second feet or 107.5 inches at the falls; 1.878 feet or 93.9 inches at a waste box at Sta. 90 + 75 near the head of the ditch; and 0.386 feet or 19.3 inches at the head of a flume at Sta. 34 + 70; There was no water to gauge below this point; but for the next half mile loss by percolation would be heavy.

It was impracticable to confine all the water below the falls to the weir, and probably 12 or 15 inches passed unmeasured. Yet, taking the quantities as given, it is seen that from the falls to the ditch heading, about 1300 feet below, over 13 inches is lost by seepage; that from the head of the ditch to Sta. 34 + 70, just below the old creek channel, some 74.6 inches sink into the ground; and from the falls to this point 88 inches are lost. From Sta. 34 + 70 to Sec. 14 it is thought that considerably more than 12 inches would be lost, so that from the falls to the west line of the land to be irrigated more than 100 inches, or 2 cubic feet per second, is lost. In other words, it will take 2 1/2 times the amount of water the Indians are entitled to at the head of their ditch, according to Dr. Murray, to wet the bottom of the ditch from the head to their lands. Anything available for irrigation being in excess of this amount.

A light iron or wood stave pipe could be laid from the creek at the top or bottom of the falls, as might be deemed best, and water carried to the N. W. corner of Sec. 14; thus covering the whole section. Or an open ditch, lined with boulders and the interstices pointed with cement mortar, could be used; or a concrete channel built. That such change of intake and extension of the line is warranted there can be no question. The heading is within the reservation, and even if under State jurisdiction this change, as well as the departure from the old line in Sec. 15 is fully covered and warranted by Section 1412 of the Civil Code of California, which says:-"The person entitled "to the use (of water) may change the place of diversion, if others

-7-

"are not injured by such change, and may extend the ditch, flume, "pipe, or aqueduct by which the diversion is made to places beyond "that where the first use was made."

There is a good chance to build one or more small reservoirs in the eastern part of the N. W. 1/4 of Sec. 22, where surplus water could be stored to augment the diminished and inadequate flow of late Summer. These reservoirs would have to be built with the walls and bottom of rock bedded in cement; or of concrete; as there are no basins or depressions that can be used.

I find that the First National Bank of Los Angeles, Calif. now holds a controlling interest in the stock of the Palm Valley Land Co., taken in satisfaction of indebtedness to the bank of some of the incorporators. Among the papers which the Bank has is an agreement with the Palm Valley Land Co. signed by Joseph W. Preston as U. S. Indian Agent on February 7, 1888; and acknowledged by him before W. L. Burton, Notary Public in and for San Bernardino County, Cal. May 10, 1888.

By reference to this document, copy of which is herewith enclosed, it would seem that Agent Preston was acting under instructions of some sort from the Interior Department as indicated in the preamble. He then grants, with the consent and approval of the Commissioner of Indian Affairs, First:- Right of way through the reservation for what is now known as the Whitewater Ditch, property of the Palm Valley Land Co. Second:- The use, occupation and further development of all waters in Tahquitz and Chino canons- to which the Government may have reserved rights for the Indians.

For and in consideration of these grants and concessions the Company is to, First:- Grant a permanent water right to 160 acres in Sec. 14 which is to be irrigated upon the basis of one inch to six acres; the Indians to have first right to the water which is to be delivered free of cost. Second:- That a like quantity of water shall be furnished upon like conditions for an additional 160 acres in the same section, when the same is needed by extension or cultivation, increase of the number of Indians, or when the same is required of the Company.

The instrument is weak and very poorly drawn; and the original in the possession of the Bank is signed and acknowledged only by Mr. Preston as Agent. The Indians are conceded right to, and I believe they get, water from the Whitewater Ditch; but if they are restricted

REPRODUCED AT THE NATIONAL ARCHIVES.

-8-

to the specified inch to six acres the amount is inadequate for any purpose.

You say that some years ago these Indians had a difficulty with this Company, that Special Attorney Collier, acting under instructions, unsuccessfully attempted to adjust the matter owing to the many obstacles placed in the way. I do not know the present legal status of the waters of the canons of Chino, Tahquitz, and Andreas, although I could by exhaustive search here determine such. It would seem, however, that all papers and records necessary to determine this should be in the files at Washington, and that the question could be more easily and quickly answered there. Until the legal rights of the Government and the Indians is known I do not care to recommend and advise the building of any specific system of irrigation for these lands, thereby possibly incurring to the Office loss, and difficulty by conflict with other rights.

I believe, however, that the waters of all these three canons are available and subject to appropriation and use on the lands of the reservation; and I can, from the information I have, prepare tentative plan and estimate for a system as soon as the right to the water is determined. Tahquitz offers the cheapest proposition; but Chino may afford a little longer flow in the Summer. Both creeks cover section 14.

I note that you say the Office is not disposed to expend any considerable sum for this purpose, as it is only desired to provide for the actual needs of the Indians. The building of a proper, economic, and permanent irrigating system, no matter how small, is expensive; and this is especially true in this region where the conditions are almost always such as to require conduits of wood, iron, or cement. A system to provide adequate water to the cultivated lands of this handful of Indians will cost several thousand dollars, while one slightly larger would serve three times as much land and cost but little more. Where small tracts are considered, the cost per acre of a system of irrigation diminishes rapidly as the acreage is increased.

Another matter for consideration is the care and operation of any system that may be devised and built. The drunken Captain of the band and most of the men were absent from the reservation when I was there. The reserve is remote, and not easily accessible from the Agency; and the Agent's territory and duties are such that he cannot devote much time to, or often visit, this place. There are only ten

REPRODUCED AT THE NATIONAL ARCHIVES.

REPRODUCED AT THE NATIONAL ARCHIVES

-9-

or a dozen families here, but there is good land enough to supply ten times as many with 15 or 20 acres each.

While in Los Angeles to obtain information relative to this matter I learned, as has been mentioned, that the First National Bank there holds controlling interest in the stock of the Palm Valley Land Co. and their Whitewater Ditch. Whitewater River drains 70 square miles of the south and west slope of the San Bernardino mountains, is a perrennial stream, and was flowing in July of last year about 280 inches. The only other claimant to this water is the Smith ranch in Secs.10 and 16, T. 3, S. R. 3, E. By Court decree, when there is flowing 180 inches or less, the water is divided equally; between 180 and 350 inches, Smith ranch gets 90 : and when the flow is in excess of 350 inches the Smith ranch is entitled to 150.

This ditch heads to the north-west of the reservation, the channel, about 8 miles long, is in sand and loose rock; and it would cost considerable to properly rebuild it. The heading could profitably be moved up stream about two miles to secure more water. If the Department should wish to make use of the couple of thousand acres of good agricultural land within the Palm Springs Reservation by placing other Indians thereon, and the waters from the three canons are insufficient or not available, this ditch and its water rights are in the market. It was priced at $10,000, but if a straight proposition to buy were made I think it could be secured for less.

In considering irrigation here one important fact must not be lost sight of. For a number of years the flow in all the streams on the western slope of these mountains has been slowly but steadily diminishing, and will, in all probability, continue to do so until all water courses are dry, barren gulches. I saw these streams after an unusually wet season preceeded by a series of four or five years of exceptionally light precipitation, and I have but the most meagre information on which to base an opinion as to the amount of available water for irrigation of the Indian lands. For this reason I have been led to consider Whitewater, the largest permanent stream in the vicinity.

Awaiting such further instructions as you may be pleased to give me in the matter,

I am, Sir,

Very respectfully,

*George Butler.*

Supt. Irrigation.

# EXHIBIT 28

February 9, 1906



13133

OFFICE OF
Indian Affairs
REC. FEB 9

1906

INTERIOR DEPARTMENT

Feb. 9, 1906

---oOo---

Refers letter of Inspector
Chubbuck relative to status of
water rights at Agua Caliente.

- --oOo---

Wrapper.

File

L

S-2
S.

REPRODUCED AT THE NATIONAL ARCHIVES

RG 75, LR/OIA
1906-13133

1243

13133

Office 1906

Porterville, Calif.
Feb. 2/06

Levi Chubbuck
US Indian Inspr.

Status of water rights
at Agua Caliente

Rec 2/8/06

DEPARTMENT OF THE INTERIOR

February 9, 1906.

Respectfully referred to the
Commissioner of Indian Affairs,
for his information, inviting
attention to copy of telegram to
Inspector Chubbuck, copy of
which accompanied reference of
the 8th instant, on this subject.

*Thos Ryan*
Secretary.

# Department of the Interior,

## U. S. INDIAN SERVICE,

Porterville, Calif.

Feby. 2 , 1906.

The Honorable

The Secretary of the Interior.

Washington. D. C.

Sir:

After making an inspection of the Indian reservations and schools under the Pala. Cal. agency. I proceeded to the San Jacinto agency in accord with your instructions of Feby. 21. 1905. But before completing the San Jacinto inspection I proceeded to Yuma. Ariz. for two reasons: First because Superintendent Wright was ill and unable to assist me in making my inspection. and, second, learning that Superintendent Spear was soon to leave the Yuma agency. I deemed it important to visit that agency while he, being familiar with conditions, was on the ground.

Having completed my inspection at Yuma. a report of which has been forwarded to you. I returned and resumed the inspection of matters under the San Jacinto agency.

Among the reservations visited under that agency

REPRODUCED AT THE NATIONAL ARCHIVES.

ACC00

ACC00000220

REPRODUCED AT THE NATIONAL ARCHIVES

2.

in Agua Caliente at Palm Springs, Calif.
While there – Jan 27-28 – my attention was
directed to a matter of grave importance to the
Indians living on their reservation.

It appears that many years ago these In-
dians under the leadership of their then chief,
Andreas, were making quite large use of water
flowing in Andreas canyon, for irrigating land
now included in the reservation, and for stock and
domestic purposes. Later a certain white man
named Barney acquired title to a section of
land adjoining the reservation and near the mouth
of Andreas canyon, and appropriated all the water
in the canyon, under the state law and got his title
strengthened by congressional approval of an a-
greement to furnish the Indians a meagre a-
mount of water from the pipe line he had built
at considerable cost. I was informed that this water
had never been furnished, that Barney had ceased
using the water, that other parties were trying to
perpetuate his title by posting notices of appro-

Andreas

Barn

ACC0000023

3.

priation of the water, under the state law, and that the validity of the latest posted notice — Nov. 29. 1905, expired Jan. 29. 1906. by the failure of the claimant beginning work on a distributing system within the 60 days, as required by law. Being on the ground and noting the importance of this water to the Indians, I immediately posted a notice of appropriation of 500 inches of water in Andreas canyon, for use on Indian lands, and a similar notice in Chino canyon where there is water available, then proceeded to Riverside to confer with Superintendent Wright and Mr. Collier, attorney for the Mission Indians, as to the validity of my action and the further steps to be taken.

Chino

Both Superintendent Wright and Mr. Collier were in Los Angeles, so I proceeded there, conferred with them and also with the U. S. Attorney, Mr. Lawler, regarding the matter. Mr. Lawler expressed the opinion that my action had temporarily safe-guarded the Indians' right to the water, and now

4.

sure me that he would look up the law in detail
pending my return from my visit to the Tule
River reservation.

The foregoing statement is respectfully sub-
mitted in explanation of my apparently somewhat
erratic movement and to apprise you briefly of the
status of the water rights on the Agua Caliente res-
ervation.

Respectfully

Levi Chubbuck

Special Inspector.

REPRODUCED AT THE NATIONAL ARCHIVE.

ACC00000

# EXHIBIT 29

Riverside, Calif.,

Feb. 24, 1906.

.The Honorable

The Secretary of the Interior,

Washington, D.C.

.Sir:-

Referring to my letter of Feb.2 relative to filing on water in Andreas and Chino canyons for the benefit of the Indians of the Agua Caliente Reservation No.2, and my telegram of the 7th inst. suggesting the importance of putting the Indians at work on an irrigation ditch as a means of securing the water right, I have the honor to make the following report:

On receipt of your telegram of the 6th inst. directing that the Indians be put to work on a ditch without delay, I proceeded at once to Palm Springs, Calif., and got a force of four men at the work on the old Indian ditch line.

This work was continued under my direction until Feb.14, when Super-intendent Wright arrived and assumed charge to enable me to return to Riverside for further consultation with Mr. Wm. Collier, attorney for

NARA DC
RG 75
CENTRAL CLASSIFIED FILES, 1907-39
CALIFORNIA SPECIAL
BOX 9
F: CALIF. SPECIAL 70953-1907-311

2

the Mission Indians. While in Riverside on that mission, Mr.B.B.Barney, claimant of the Andreas canyon water right, sought an interview with me and offered to make greater concessions to the Indians than had been made in the agreement entered into by him and the Government in 1883.

By the terms of that agreement, in consideration of the grant of a 80-foot right of way for a pipe line, flume or canal across Section 2 of the Agua Caliente Indian reservation to said B.B.Barney, the Indians were to be allowed sufficient water from the pipe line to irrigate 100 acres of land, or such portion thereof as the Indians might have in cultivation, on the basis of one inch continuous flow for each six acres of land. This was simply in consideration of the right of way across Indian land, no recognition being given to the Indians' right by long use to water in Andreas canyon.

The amount of water --one inch to each six acres-- under the conditions of climate and soil made it of little or no value, and as a result the Indians soon vacated the land, and left Barney in full possession of all the water.

On going to the locality, on the occasion of my first visit, I observed that Barney was not using the water in accord with the letter

3

and intent of the law on water rights, and that there was evidently realization of this for, through another party, a son-in-law, Barney was trying to perpetuate his water right by posting and recording notices of appropriation of water. Finding that the latest posted notice had run the limit of 90 days with no development work, as required by law, I immediately posted a notice of the appropriation of 500 inches of water for use on Indian land.

This action, together with that of putting the Indians at work on an irrigation ditch, brought Mr. Barney to the necessity of defending his right to the water, if he still claimed it, or of proposing a compromise. The right is a very valuable one, it being the only perennial flow of water in that region. I learned, that while Mr. Barney was not financially able to defend his claim in the courts, his creditors who held mortgages on property under his pipe line would feel called upon to contest the matter; and, acting under the advice of Attorney Collier, I felt justified in listening to whatever propositions Mr. Barney had to submit. After three days of discussion, Mr. Barney made the proposition that is embodied in the accompanying agreement, which was drawn by Mr. Collier, who strongly approves of the terms. On Feb. 22. I took the agreement to Palm Springs and got a majority of the adult Indians to sign it, and it has also been signed by Superintendent Wright.

reduced at the National Archives

4

As will be noted, by the terms of the agreement, Barney concedes to the Indians one-half of all the water that flows in Andreas canyon. If desired, the Indians may have the free use of Barney's flume and pipe line (built at a cost of $6000) for the conveyance of the Indians' water to a selected point in the line on Indian land from which the water can be advantageously distributed, provided the Government will meet the cost of putting in suitable shut offs and turn out, and keep in repair about 200 feet of wooden flume that connects the intake with the pipe line. The pipe line is to be kept in repair by Barney, but the Indians are to keep the line covered with earth where the line is on Indian land.

The pipe line has a carrying capacity of 180 inches of water, much of the time there is more than that amount of water in the canyon-- sometimes 500 inches. The minimum flow is said to be 40 inches. Of the surplus the Indians will have the right to take out one-half at any point in the canyon and conduct it to their land by a separate ditch, flume or pipe line; or they may use their own line for their entire flow, in which case they or the Government would have nothing to do with keeping the Barney pipe line or flume covered and in repair. But the value of the pipe line for conveying water to Indian land will be so great that advantage should be taken of this privilege.

8

up to the full carrying capacity of the 6-inch pipe having a fall of more than 200 feet.

The water need not be divided into two equal portions of continuous flow, but, which is preferable, it can be divided by each party taking the full flow for alternating periods of one or more days in each calendar month.

To recapitulate, the old agreement which gave to the Indians one-tenth continuous flow of water to each six acres of land in cultivation in Sections 2 and 34 up to 100 acres --a maximum of 16 and two-third inches-- is abrogated and a new one adopted by which the Indians get one-half of the pipe line flow --ranging from 20 to 75 inches-- and one-half of all the water flowing in the canyon other than that entering the pipe line, which will be from 50 up to 150 inches during portions of the season. Barney is to keep his pipe line in good repair at his own expense, and if it is used to convey water to Indian land the Indians are to keep that portion which crosses their land covered with earth.  The Government is to put cut offs and turn outs in the pipe line and keep the flume connecting intake and pipe line in repair, if these are used for conveying Indian water. The water may be divided by periods of time instead of by continuous flow. The Indians' right to use the water is not restricted to designated sections of land,

6

In Section 2, Township 5 South, Range 4 East, across which the pipe line extends, there are at least 100 acres of good, though rather sandy land. In Section 34, Township 4 South, Range 4 East there are a few acres, not more than six, of excellent land, and in Section 36 there are 100 to 200 acres of choice land, all of which can be served with Andreas Canyon water. While there probably will not be enough water to meet the need of all this land if planted to orchards or alfalfa, there will be enough to permit of the cultivation of most of it in short season crops like grain hay, melons, beans, onions, and so forth. The water thus secured will more than double the area of irrigable land on the reservation, and give to the Indians of this Band who have been forced to seek a livelihood elsewhere opportunities for farm homes.

If the agreement meets with your approval please return the copy to Mr. Wm. Collier, Attorney for the Mission Indians, Riverside, Calif., for delivery to Mr. B. E. Barney.

Mr. Collier requests that the date of former agreement be supplied from the copy on file in the Department.

On approval of the agreement, authority for putting the necessary cut offs and turn out in the pipe line should be granted so that water can be turned onto the Indian land at an early a date as possible. Prompt action will permit the using of the water this season.

The flume connecting intake and pipe line needs some minor repairs, but these are not of a pressing importance.

In this connection, I will state that in putting the Indians at work on the ditch, as directed in your telegram of Feb. 8, I made no promise to them that they would be paid for their work. I told them that as the work was entirely for their own benefit the Government might decline to pay them for it, but that I thought they would be paid. I recommend that they be allowed $1 per day each for the work that was done. Two to four men were employed nine days, when work was suspended pending the approval of the accompanying agreement.

Superintendent Wright informed me that there were no funds from which his traveling expenses could be paid, and that when he came to Palm Springs at my request, he did so at his personal expense. This is an unfortunate condition, for the Superintendent's presence will be frequently needed at Palm Springs in connection with Andreas Canyon water and other matters regarding which I will write in another communication.

Referring to the sketch map of the Agua Caliente reservation submitted herewith, permit me to call attention to Section 3, T.5 S., R.4 E. This is a railroad section, a portion of which Barney claims to have bought. But my information is that he has little or no right on the land.

2

Andreas canyon, as will be seen, runs through the south half of the section, and the Barney intake, flume and a portion of the pipe line are on that part of the section. It is important to the Indians' interests that this section be acquired, if it can be done, as a means of better securing the water right. There are a few acres of very fertile land along the stream within the section.

Respectfully submitted,

Special Inspector.

# EXHIBIT 30

In the Field.

Nov. 17th. 1906.

The Secretary of the Interior,

Washington, D. C.

Sir:-

In compliance with Department orders of June 5, 1906, and Aug. 31, 1906, I have made an investigation of the water problems on the Agua Caliente Reservation, so well set forth in the report of Inspector Chubbuck.

For reasons hereafter stated I shall confine this report to the consideration of the B. B. Barney property, pipe-line etc., which it was the desire of the Department that I should appraise.    Inspector Chubbuck, in his report of May 18, 1906, states as follows:-

"Barney's Proposition.- It would be quite advantageous to the Indians if they had full control of the Andreas Canyon flow, and Mr. B. B. Barney is desirous of selling his holdings, including Section 35, T. 4 S., R. 4 E., and the southeast quarter of Section 3, T. 5 S., R. 4 E., his pipe line and half interest in the water of the canyon.
The entire interest can be bought for $10,000, possibly less.
The eight inch steel pipe-line 7000 feet long would cost that sum to install, and the half interest in the water right is worth as much more, to say nothing of the value of the 800 acres of land.    All of Section 35 is arable and much of it is good.    The value in the south-east quarter of section 3 is in its command of the canyon; but there is enough land of most excellent quality near the intake of the pipe line for the support of a family.    It is a beautiful spot and favorably located for a home.    It is in fact where old Chief Andreas lived many years in an adobe house, and where he had a vineyard, palms, fig and peach trees, some of which are still growing there.
On the south side of section 35, at the end of the pipe line, these is a group of frame cottages that could be utilized at once as Indian homes.    These, with another home re-established in the canyon, and others in the southeast corner of section 34, would permit the restor-ation of a former Indian community under quite favorable conditions."

I have inspected this property on two occasions during the past month, in company with Supt. Wright and Mr. Barney.    On the 15th. inst. we made a careful test of Mr. Barney's pipe-line, in his presence, turning

NARA DC
RG 75
Central Classified Files 1907-39
California Special
Box 9
F: Calif. Special 70953-1907-311

-2-

in a head of approximately 50 inches of water, there being a total volume of at least 60 Cal. inches in the Andreas Canyon at the head of pipe-line on the date specified.   We put the pipe under pressure by closing down the main valve at the lower end of the pipe-line, and the leaks which I felt confident must exist in a line approximately 12 years old, became immediately apparent.   The upper 4,000 feet of the line, in certain sections, resembled to a marked degree an elongated lawn sprinkler, and by submitting to a series of shower baths en route I was enabled to count one hundred leaks in this distance.   Some of the holes found were quite large, one especially being one inch by two inches.   This pipe-line is supposed to be well covered with earth, but in the upper section, which traverses the steep slope of the mass of boulders projected from the mouth of the Andreas Canyon, it was difficult to obtain sufficient earth to properly cover the pipe line, hence the exposure to the elements, and consequent deterioration of the iron.

Supt. Wright, in conformity with the recent contract with Mr. Barney, will have to keep the pipe covered to a depth of two feet where it crosses Indian lands.   At the time of our test the upper section of the pipe-line was covered to an average depth of probably one foot, and many small leaks were thus hidden, but the number observable was sufficiently great to demonstrate that this section of the pipe-line was of little value.

The remaining pipe, which traverses through sandy soil to its terminus on the Garden of Eden Tract, was free from leaks of any

-3-

importance, and would in all probability last the Indians for many years, since it would be unnecessary to use the pipe under any considerable pressure, such as was considered by Mr. Barney in his Utopian ideas for transforming this section of desert land into a health resort of international fame as a place for curable consumptives. His ideas contemplated fire pressure, lawn sprinkling, domestic supply fountains, etc. and he claims that he has a pressure of 125 pounds at the lower end of the pipe line.

For irrigation purposes by the Indians the water would flow freely from the pipe, and for such use the lower portion of the pipe-line would last for a long period, and the upper portion for several years with some few repairs annually.   When the leakage in the future became so great as to cause considerable waste of water the entire pipe would be covered with a ring of concrete four inches thick, after which it would last indefinitely.

A new iron pipe line of eight inch diameter, and # 16 gauge, could be laid in the trench of the present line at an expense of approximately 35 cents per lineal foot, exclusive of cost of taking out old pipe, cleaning trench, and subsequent backfilling over new pipe. These last items would run the total cost to about fifty cents per lineal foot, or $3500. for the estimated total length of the line..

Mr. Barney claims that this pipe line cost him about ten thousand dollars.   I should estimate that the initial expenditure was at least $7500., including the service pipes, hydrants etc., since the excavation of a trench through a bed of large boulders throughout the

-4-

upper 4000 feet of the line occasioned much drilling and blasting.

### Appraisment of Barney holdings.

A list of Mr. Barney's property consists of:-

(a)   A one-half interest in the waters of Andreas Canyon.

(b)   One pipe-line of 8 in. diameter, approximately 6600 feet in length.

(c)   Contract with the Southern Pacific R. R. Co. for S. E. Qr. Sec 3, T. 5S. R. 4E. valuable for protection of water supply in canyon.

(d)   Sec. 35, T. 4S. R. 4E. 640 acres of land. The greater portion of this section is of sandy and porous soil formation, the best land being contained in the W. half of the W. half of the section.

(e)   Improvements on Sec. 35, consisting of four small frame cottages and one barn, some little fencing, outhouses etc., the total value of which would not exceed $1000.00.

(f)   Several hundred feet of service pipe, with six hydrants for supplying cottages and garden with water.

The chief value of the above holdings consists in the water supply.   It should belong wholly to the Indians.   If they can be given undisputed possession of the Barney holdings there will be no future bickerings and troubles such as would otherwise ensue where the Indian and white man are jointly interested in the water supply.

Mr. Barney has held on to this property some twenty or more years hoping to ultimately interest some man of great wealth in his project. He has spent a small fortune on it in trying to carry out his plans, and in his eyes his so-called "Garden of Eden" tract has great

-5-

possibilities and large value.

With reference to the low water supply of Andreas Canyon, it is claimed by Dr. Murray, (A disinterested resident of Palm Springs, who has lived there over twenty years) that it is never less than forty inches.   Barney also makes similar claims, and Agent Wright, who has had occasion to visit this point many times during the dry years, informs me that he never saw Andreas Canyon without a fair head of irrigation water.   For many months of each year it runs a large amount of water, and the Indians could utilize it liberally during such periods for the growth of short season crops.

It is my belief that in years of exceptional drought, such as prevailed a few years ago, there might be periods in the summer when Andreas Canyon would not furnish forty inches of water as claimed, but no records of flow are available, other than the observations of the few whites who have had occasion to visit this unfrequented point in the past.   Even though the minimum summer flow in dry years might be only half what is estimated, the yearly flow of the waters of Andreas Canyon should be a valuable asset for the Indians, hence I would recommend that the Department acquire the Barney holdings specified, and would suggest that this purchase be made for no particular tribe of Sou. California Indians.   If the holdings can be simply purchased for the use of any Indians whom the Department should subsequently deem it proper to locate on the Barney lands, it will in my opinion result in a more satisfactory cultivation of the land and utilization of the water.

Supt. Wright and I both sounded Mr. Barney as to the lowest

-6-

figure he would accept from the Government for his property.   He
talked some very large figures at first, but finally came down to the
amount which it is my opinion the Government can well afford to pay,
viz:- six thousand dollars for his entire holdings, specified above.
He did not say positively he would accept such a figure, having some
hopes of yet selling his interests for a much larger sum.   In my
opinion, however, he will accept this sum if the Department Authorize
Supt. Wright to close with him.

Mr. Barney stated that he still had one more payment to make on
the quarter section of R. R. lands, and Supt. Wright would need the
services of the U. S. District Attorney at Riverside, Cala. to assist
him in carrying through the transaction.

It is my understanding that the sum of five thousand dollars was
set aside from the Irrigation Fund of 1907 for the Agua Caliente
Reservation.

I recommend that the additional amount of one thousand dollars
be added to it, and that it be used for the acquirement of the Barney
holdings, at as early a date as possible.   Mr. Barney is an old man,
eighty years of age.   He is erratic in many ways, and likely to
change his mind at any time.   He was a business man of large affairs
for many years, a "forty-niner", and life-long friend of D. O. Mills,
who, however, to-date has resisted Mr. Barney's appeals to furnish
the funds which would enable him to beautify the place, advertize to
the world its wonderful climate, and in short make it in a degree
worthy of the name he has been pleased to bestow upon it, viz:- "The
Garden of Eden."

30-205

-7-

I have made this matter the subject of a special report, in view of Mr. Barney's desire for an early decision as to whether or not the Department would care to purchase his property.

Will submit another report relative to the Whitewater and Chino Canyon matters as soon as I have started the canal work on the Pala Reservation.

Very Respectfully,

*W. H. Code*

Chief Engr.

*P. S. I attach here to Inspector Chatfield's little map which will show the location of Mr. Barney's "Garden of Eden Tract" + the line. Upon submitting my report relative to the value of the Palm Valley Water Company's holdings I shall forward a comprehensive map showing the country under consideration in greater detail.*

*W. H. C.*