# EXHIBIT 31

31−207



**OFFICE OF
DIRECTOR OF REFERENCE SERVICE**

The National Archives

Washington, D. C.

August 16, 1943.



Mr. John G. Rockwell, Superintendent
Sacramento Indian Agency
Sacramento 2, California

My dear Mr. Rockwell:

     The National Archives has received by reference from the Office of Indian Affairs your letter of July 22, 1943, requesting a copy of the report submitted in 1906 by Special Agent C. E. Kelsey on the condition of the California Indians.

     Inasmuch as there is only one copy of this report in the file (Indian Division 5017-1906), it was necessary to have another copy typewritten. This copy, together with a photostatic copy of the Commissioner of Indian Affairs' letter submitting the report to the Secretary of the Interior, is herewith transmitted for your information. It will not be necessary for you to return these copies.

                 Very truly yours,

                 P. M. Hamer
                 Director of Reference Service

Enclosures



14



C. E. Kelsey Report, 1906

Aug 8, 1905 - 05-8

Hon. Commissioner of Indian Affairs,
    Washington, D. C.

Sir:

        In the matter of the condition of the California Indians, I have
the honor to report as follows: The Act of Congress approved June 30, 1905,
contained the following provision:

        That the Secretary of the Interior is hereby authorized to
    investigate, through an inspector, or otherwise, existing conditions
    of the California Indians, and to report to Congress at the next
    session some plan to improve the same.

        Pursuant to the said provision the undersigned was duly appointed
to make the investigation. The letter of instructions was received on the
6th day of August, 1905. Two days later the actual work in the field began
and has been prosecuted uninterruptedly /sic/ to the 8th of March.

        The work necessary to secure complete and accurate data has proved
to be much greater than was anticipated, and has required the services of
your special agent practically day and night during the whole time. About
December 25, 1905, your special agent received further instructions to in-
vestigate conditions pertaining to the Southern California reservations, a
duty which was duly performed. As there are marked differences in the
situation there and in Northern California, the Northern and Southern fields
will be taken up separately in the order of official instructions.

        Your special agent has visited and personally inspected almost
every Indian settlement between the Oregon line and the Mexican Border, and
has used every effort to make his inquiry complete and exhaustive.

        California has sixty counties, fifty-five of which have Indian
settlements. It has required a little less than 12,000 miles travel to
visit these settlements, and as most of them are not near railroad lines,
it proved impossible to hurry the inquiry beyond the speed of a horse.

        The Act of Congress which provides for this investigation requires
a report at the present session. This allows less than three days per
county, and some of the counties have hundreds of Indians. It is therefore
to be regretted that time was not available to make a hut to hut canvass, as
that seems the best way to insure complete accuracy.

Your special agent has made a family census of the Indians north of Tehachapi, which he believes to be as complete as possible under the circumstances. Working under a great pressure as to time and being of necessity dependent upon third persons in a large measure for information, it is not expected that every Indian in the State has been enumerated.

Your special agent finds an Indian population in California of a little more than 16,500, of which 5,200 are reported as living upon reservations. Thirty-five hundred of these are in Southern California. There is thus a non-reservation population of about 11,300. Your special agent has examined their situation and cannot see that their condition is such as to be a matter of satisfaction either to the Government of the United States, or to the people of California. The Indian population of California a century ago cannot be stated accurately, as data for an accurate estimate are wanting. The census estimate of 1850 was 100,000. The estimates for 1800 vary all the way from 100,000 to 750,000. No well informed person estimates less than 150,000.

( Dr. C. Hart Merriam )

Dr. Hart Merriam of the Biological Survey, whose opportunities for examination have been exceptional, estimates 260,000. Every locality has its tale of hundreds of Indians fifty or even thirty years ago, where there is one now, and making due allowance for exaggeration, your special agent is inclined to believe Dr. Merriam's estimate well founded. A decrease in the Indian population of 94 per cent in a single century, and mostly within 40 or 50 years, is certainly exceptional and would seem to be a fact in which we can neither take pride nor escape responsibility.

In order to understand the present state of affairs, it is therefore necessary to go somewhat briefly into the history of Indian matters in this State. California is a very attractive land to us today, and it was equally attractive to our aboriginal predecessors. The food supply was abundant and the population probably larger than all of the rest of the United States. There was also a conglomeration of Indian races. More than 200 more or less distinct dialects were spoken, classified by ethnologists into 22 or 23 distinct linguistic stocks, as distinct from each other as the Chippewas are from the Sioux, or the Iroquois from the Narragansetts. Two of these distinct stocks disappeared prior to the American occupation, and one other is now confined to Oregon. Representatives of all of the remaining stocks survive to this day, as shown in the census schedule accompanying this report. The different stocks are almost without exception antagonistic and were formerly in a state of perpetual warfare. The California Indians were not very warlike, and their wars were very small affairs in comparison with those of the Indians of the plains. Indians speaking dialects of the same stock were usually friendly. Each California village was independent of all others, and there seems to have been but little idea of tribal organization.

The Mission period began in 1769, and ended with the secularization of the missions by the Mexican Government in 1834. The region covered by the missions extended from the Mexican line to Santa Rosa, and from the Pacific Ocean to the San Joaquin Valley. The completion of the great work done by the Franciscan Fathers in civilizing the Indians was not allowed by the Mexican Government. The Indians had complained bitterly of their state of dependence,

and yet when the dependence ceased they proved utterly unable to maintain themselves. Upon the spoliation of the missions a scramble took place for lands, and a feeble attempt was made to reserve some land for the Indians, which proved ineffective.

In the year before the secularization, 1834, the mission records showed some 34,000 converts in the mission strip. There were probably some unconverted Indians termed gentiles. Only about 3,000 descendants of these Mission Indians are alive today. Most of the decrease is understood to have taken place between 1834 and 1849. A few of the Indians who had come from the San Joaquin Valley returned there. In Southern California those who were able to return to the mountains thus saved themselves from extinction, but the great body of the Mission Indians undoubtedly perished where they had lived. Most of them died during the Mexican period, and not under that of the United States.

The Treaty of Guadalupe Hidalgo, which ceded California to the United States, guaranteed Mexican land titles in the ceded territory as they stood at the time of the transfer. Under Spanish and Mexican law Indians had certain rights to the lands they occupied and could not legally be evicted from them. It would (sic) seem that this right was an interest in land and one entitled to protection under the provisions of the Treaty of Guadalupe Hidalgo.

The Act of Congress which provided for the settlement of the titles to Spanish and Mexican grants imposed upon the commission appointed to make the settlement the duty of first setting apart for Indian use all lands occupied by them. It may therefore be assumed that Congress considered that the Indians had substantial rights. It was the duty of the commission to investigate and confirm the Indian title wherever Indians occupied lands included within the limits of a Spanish or Mexican grant.

Your special agent has found but two cases out of several hundred grants where this was done, Pauma and Santa Ynez, and in the latter case the terms of the settlement were so uncertain that an action is now pending in the state courts in regard to it. The new owners of the Spanish grants had to rely upon the Spanish law to sustain the validity of their titles, but were prompt to appeal to the American law to evict the Indians,—something they could not legally do under the terms of their grants. It is needless to say that the Indians were evicted, the most recent instance being Warner's Ranch.

Four-fifths of the California Indians, however, were not affected by Spanish grants, nor did they come under Spanish or Mexican influence, and their undoing began with the great gold excitement of 1849. When the United States came into full legal ownership of California in 1848, the Spanish or Mexican laws relating to Indians were not adopted, as has been erroneously stated. The policy of the United States adopted toward its new Indian wards

in all the ceded territory was exactly the same as everywhere else.  The
Indian ideas of land ownership are radically different from ours.  Our Govern-
ment has never acknowledged that the Indians owned their lands in fee simple,
and in view of the Indian idea of land ownership, this is correct.  But the
United States has always recognized, and the Supreme Court has held, that the
Indians have a right to occupy the land, which right is termed the Indian
right of occupancy, a right which can be cancelled only by mutual agreement.
All Indian lands in the United States, except in a portion of California, have
been acquired by the Government of the United States, and acquired only by
payment therefor.  Even the land ceded by the Sioux after the great outbreak
were paid for.  The Indian right of occupancy was in the beginning recognized
in California.  The Government sent out a commission which made treaties with
nearly all the Indian tribes in the State.  Sixteen treaties were negotiated
in Northern California and two in Southern California.  These treaties were
all very similar in text.  The Indians agreed to cede their lands to the
United States and to keep the peace, and to accept certain reservations de-
scribed by metes and bounds in the treaties.  The Government agreed to reserve
forever for Indian use the lands described in the treaties, and to pay a
certain specified price, payable in a great variety of things, such as
provisions, live stock, and miscellaneous goods.  The value of the goods thus
promised the Indians in Northern California was about $1,500,000, and the
land reserved was about 5,500,000 acres, worth at the Government price of
$1.25 per acre, about $7,000,000.  In Southern California the goods promised
were worth about $300,000, and about 2,000,000 acres of land was reserved,
worth at $1.25 per acre, about $2,500,000.  Some of these reservations were
laid out in the mining districts, and were strongly opposed by the miners.
At that time, in 1851, Indian treaties were submitted to the Senate for ratifi-
cation.  As California had gathered men of influence from all over the land,
the miner's protest carried such weight that the Senate rejected not only
those treaties that affected the mining districts, but all the treaties.  No
effort seems ever to have been made to make new treaties, or in any way to
acquire the Indian title from that day to this, nor have the California Indians
ever received one cent for their rights in the lands which they have lost.
The Osages, Cherokees, and other eastern tribes have received millions for
precisely the same rights in land, not nearly so valuable, and no reason has
been advanced why the California Indians alone, of all the Indians of America,
should receive no compensation for their lands, except that as Spain did not
acknowledge the land rights of any Indians who had not accepted the sovereignty
of the King of Spain, and as we have come into the Spanish title through
Mexico, therefore the United States is not bound to acknowledge the land rights.
Though why the Indians should be bound by the laws of Spain now when they never
were during the period of Spanish dominion is inexplicable to your special
agent.  The United States has, however, already acknowledged the Indian right
of occupancy of nine-tenths of the Indians of the territory ceded by Mexico,
and the Supreme Court seems to have settled the status for all Indians in the
said territory in Pueblo cases.  Moreover, the laws of Spain as to Indian
land rights in the territory acquired via Mexico were precisely the same as
in the territory of Louisiana in the lands acquired from Spain via France.
The laws of France as to Indian lands in American did not differ essentially

from those of Spain, or for that matter of England though the English Colonists early discovered the practical advantages of buying the Indian rights. Just why this comparatively small band of Indians in California should be selected as the only one in the United States to be deprived of their land rights is still unexplained. The Indians did not understand the intricacies of our Governmental system, or the meaning of Senatorial ratification of a treaty. The Indians certainly understood that they had made a solemn agreement with the United States; and that they had sold their lands for a price. The Government has taken their lands and their reservations and paid nothing, and from an Indian standpoint, this constitutes a deliberate breach of faith, without palliation or excuse.

The consequences of this violation of faith have been disastrous to the Indians. The reservation system of today is an evil which we trust will be eliminated in time, but which had the merit of protecting the Indians from the first fierce on-rush of a frontier population. Deprived of such protection in California, the Indians were at a serious disadvantage, greatly increased by the fact that there was no legal way in which an Indian could acquire title to the land he occupied. For nearly forty years after the American conquest of California, that is from 1846 to 1884, an Indian could not acquire land under the Federal land laws. He was not a citizen and therefore could not take up land. He was not an alien and therefore he could not be naturalized and become a citizen. Hence the settlers had what might be termed a "cinch" on the Indian, and by the time the Indian allotment act was passed in 1887, there was no land left to allot, except in the extreme northern and eastern parts of the State. Something concerning Indian allotments will be said hereafter in this report.

In 1849, the great gold rush began. Within a year or two a considerable portion of the State was overrun by probably two hundred thousand miners. They were mostly men of the strongest and most vigorous type, well armed and masterful. A majority of them had inherited the prejudices and the stories of two hundred years of border warfare with the Indians. A large number of the Argonauts had come over land and had had desperate conflicts with the warlike Indians of the plains. They were, therefore, in no mood to acknowledge that Indians had any rights whatever, and as a rule acted consistently upon this theory. Opposed to the miners was a practically defenseless people (they had no fire-arms), and the entire Indian population of the mining regions could not have mustered 30,000 warriors. Under the circumstances, it is not strange that one of the most shameful chapters of American History ensued. Among the Argonauts there were some desperate characters, who were as willing to commit an outrage upon an Indian as upon any one else. The Indians would retaliate in the aboriginal fashion by killing the first white man they met, then followed swift and sure retribution. The miners would organize and the offending village would be "wiped out." Sometimes, especially east of the Sierras, conflict would arise from attacks upon caravans. The most frequent cause of these conflicts was the accusation that the Indians had stolen stock. The accusation was not always proved, but the nearest band of Indians usually suffered for it. Sometimes the charge was well founded and the Indians had made away with the stock. The Indians had no conception of private ownership of domestic animals or of private ownership of food and did not realize at first that different rules prevailed among the whites. In time the Indians learned to let the white man's effects alone, and the miners began to understand the comparatively harmless character of the California Indian.

The modus operandi of these affairs was very much the same. The Indian camp would be surrounded and rushed, usually at dawn, and men in ambush would shoot every Indian that appeared. At first few were spared, but as no one wished to kill the children, they were usually sold into slavery. Quite a number of raids are reported, especially into the Coast Range, their sole object, it seems, having been to secure slaves. Some Indians are reported to have been so held even after the legal extinction of slavery in the United States. More than 100 of these affairs between whites and Indians have been reported, and there is scarcely a locality from Yuma to Yontocket that has not its story of an Indian "battle." If all the stories told could be believed, they would indicate that more than 15,000 Indians were killed in these affairs, but the suspicion is strong that the white participants in telling the tale afterwards may have exaggerated the number of Indians involved as they did the dangerous character of the clubs and bows and arrows which constituted about the only weapons the Indians at that time possessed.

This state of affairs was not wholly unknown to the National Government. At first there were Government agents who made due reports to head-quarters, and one of them issued a strong appeal to the people of California, but the agents were soon legislated out of office, and thereafter the Federal Government had little knowledge of the California Indians. The State Government also disclaimed any responsibility for them. An Indian could not sue in the state courts and his evidence was not admissible in a court of justice until 1872. As might be expected, the Indian spirit was soon crushed, and no Indian now dreams of attempting to protect his own rights in any way. There are no legal discriminations today against the Indians in California, but the temper of white juries in many counties is such that an Indian can seldom obtain justice.

One noticeable effect of the white settlement of California has been the introduction of many diseases theretofore unknown to Indians, and from the effects of which they are not free to this day. Smallpox has been very destructive to them in the past, and tuberculosis is prevalent among them now. Thousands of Indians have died of all sorts of these imported diseases, and the sanitary and other conditions under which Indians live, and which will be referred to hereafter, are such that death usually follows closely upon the attack of disease.

Another feature of civilization unknown among Indians prior to their acquaintance with the white race is the use of intoxicating liquors, and as the thirst for liquor seems innate among Indians, the problem of handling the liquor traffic among them is difficult.

The State of California has an excellent law against selling liquor to Indians, which law was enforced in some counties and disregarded in others. It is to be regretted that the recent decision of the Supreme Court of the United States has removed practically all the Indians in Northern California from the scope of the Federal laws. A large increase in open liquor selling is noticed, and the remnants of some bands seem to be trying to drink themselves to death before the law is changed. It is a pleasure to find that a majority of the California Indians are sober. The Indians who are addicted to liquor are apt

to hang around the towns, and thus fill a much larger place in the public eye than
the sober Indians, who usually stay at home and are seldom seen.  If a recommenda-
tion upon this subject is allowable, your special agent would earnestly recommend
that the act be amended so as to meet the suggestions raised by the Supreme Court.
It may also be feasible to provide for the summary cancellation of the Federal
liquor license when the holder thereof shall be convicted of the offence of
selling liquor to Indians, in any court of the United States, or of any state or
territory.  It is not expected that this would put an end to illicit liquor sell-
ing, but it would tend to throw the traffic out of the hands of the saloon-keepers
who have friends on juries and political influence, into the hands of go-betweens
who are not usually so circumstanced.  It is not fair to say that a majority of
the California saloon-keepers obey the law, but there are usually one or two in
each locality who are willing to take the risk.

But neither the open slaughter of the California Indians in the period
of "war," nor the ravages of disease, nor the effects of drunkenness, considerable
as they all are, can explain the tremendous decrease of 94 per cent in the
number of California Indians in but a little over one generation.  We are so
familiar with the idea that the Indian race is fading away before our own that
inquiry is seldom made into the details of the process by which we fade them.
In the case of the California Indians, the most potent factor has been, in the
opinion of your special agent, the gradual and sure aggression on the part of
the whites, the progressive absorption of the Indian's every means of existence.
Perhaps this requires some explanation.  In aboriginal days the California
Indians were more nearly sedentary than any other Indians of the United States,
other than the Pueblo Indians.  Each tribe was restricted within narrow limits.
Usually each band had a strip of territory reaching from the mountain tops down
to some fish-bearing stream, or the ocean, and they seldom or never went beyond
these limits.  Game was abundant, but did not hold a very great part in their
bill of fare, as they had no fire arms, and were restricted to what they could
kill by means of bows and arrows and pit-falls.  Fish formed a much greater share
of their diet, and all the California tribes were large fish eaters.  Hardly
a band was without its source of fish supply.  The Indians also made a large use
of edible roots.  Grass seeds and larvae and pupae of some insects, and also
grasshoppers were often on the bill of fare, and angle worms were resorted to in
times of scarcety /sic/, as they are occasionally today.  The largest single item
in their menu was composed of acorns and other nuts.  The Indians grind the acorns,
leach out the bitter principle and make various forms of mush and bread, both
nutritious and palatable.  These sources of food supply may be averaged about as
follows:  Acorns and other nuts 35 per cent; fish 25 per cent; game 15 per cent;
roots, etc., 20 per cent; and grass seed and miscellaneous 5 per cent.  Of course,
the proportion varies in different parts of the State, and the figures given are
only approximate.

The first effect of the occupation of the land by the miners was the
muddying of the streams by the mining operations and the killing or frightening
away of the game, thus cutting off the Indians' fish and game supply.  The mining
population soon needed gardens, and about the only land suitable was that where
the edible roots grew.  The stock industry followed very soon,  and even the
oak trees were fenced in and forbidden to the Indians,  as the acorns were
needed for hogs.  Later the era of wheat came and  arable lands passed into

private ownership.  The Indians were thus reduced from a state of comparative
comfort to one of destitution.  Very few white families would not feel the pinch
of poverty if they lost one-half or three-quarters of their subsistence, and it
is not strange that the Indians suffered.  This absorption of the Indian's
means of making his living did not take place simultaneously all over the State,
but everywhere there has been the same steady, sure occupation by whites of
everything that will yield a living to a human being.  It is not to be expected
that a savage people could at once adapt themselves to such changed conditions,
or that they should at once see the necessity or reason for any change at all.
There was little or nothing available to take the place of what the Indian has
lost.  Very few people in those days wanted Indian labor on any terms, and there
was very little work to be done at that time which an Indian fresh from barbarism
was competent to do.  Generally speaking, the California Indians have been not
far from the line of destitution ever since, and few have been able to rise above
their environment.

        All this could not have occurred had the promises made by the Government
in rejected treaties been given effect in any form, however modified.  Why the
Government never made any further attempt to require the Indian right of occupancy
has not been stated.  It is suspected that interested parties had more influence
at Washington than the Indians did.  The Indian Bureau did, it is true, attempt
for a time to protect the Indians and several small reservations were set aside
by Executive Order.  Some of these were decided to be within the limits of Spanish
grants and thus not available for reservations.  Others were occupied by settlers
who had political influence enough to have the reservations cancelled.  One or two
were abolished by Act of Congress, apparently because they contained timber which
was desired by some lumber concerns.  Only three reservations in Northern
California were finally saved to the Indians.  The Hupa Reservation and the
Klamath strip became Indian land as a result of an expensive Indian war brought
on by encroachments on their lands.  The Round Valley Reserve was confirmed to
the Indians as a result of similar trouble hardly important enough to be called a
war.  These three reservations have a total population of about 1,550 Indians.
The Tule River Reserve and the reserve near Jackson, formed subsequently, have
about 170 Indians.  The rest of the Northern California Indians who have kept
the peace and killed nobody have received nothing but writs of eviction.

        At first, and before the country was thickly settled, if a land-owner
objected to the presence of Indians he could move to some adjacent tract, but very
soon the land in the greater part of the State was practically all taken up.
Then as the lands became more valuable there was less tolerance of Indian occupancy
Had it been possible for Indians to take up Government land, much misery would
have been saved them.  In many instances the Indian arranged with some white
friend to take up the land, upon the promise that the Indian should remain there
as long as he desired.  This promise was usually kept by the white man as long
as he lived.  When he died his successors were very apt to evict the Indian.
Some of the evictions were from Spanish grants, and some distressing occurrences
of this kind in Southern California attracted the attention of Helen Hunt Jackson
and others, and as a result of their agitation reservations were assigned to the
Indians of Southern California.  Since that time the situation in Southern
California and the problems arising there have been different from those arising
in Northern California, and will be discussed hereafter in this report.

-9-

At first the Indians occupied pretty fair land and had usually neat
little gardens and orchards, especially of peach trees. These tiny little places
would attract the attention of some frontiersman who would then file on the place
and summarily kick the Indian out. Several hundreds of these cases have been
reported. One man still in middle life has been evicted seven times in this
matter. It is not strange that the Northern California Indians have ceased to
try to have gardens, when any appearance of thrift is warrant for their ejection
from the premises. Indeed, most of them at the present time are living on land
where, for lack of water or worthlessness of the soil, gardens are impossible.
Most of the Indians have now been crowded out of anything like good soil and
are found in waste places not having value enough to attract anyone else. It
is now a matter of difficulty for an evicted Indian to find any place of refuge,
except in other Indian settlements already overcrowded.

The Indian Allotment Act did not come in time to be of much use to
the greater number of California Indians, though its value has been great in
the Northern and eastern part of the State, notwithstanding some defects in the
application. There have been issued in California 2,058 Indian allotments, of
which 261 have been cancelled for one cause or another, leaving 1,797 now valid
and outstanding.' Of these 1,797 allotments now outstanding, 1,439 are in the
counties of Modoc, Lassen, Plumas, Shasta, and Siskiyou in the northeastern
corner of the State, leaving but 358 for the rest of the State. Every allotting
agent sent out by the Department seems to have visited this corner of the State
and hardly any other. Two or three visited Humboldt County, and one is reported
in the Southern Sierras, but almost their entire attention seems to have been
concentrated on this one section of the State.

The allotting agents first sent out were from the east, and to them
California conditions were an insolvable enigma. Some seem to have come expect-
ing a soft snap. When it became evident that allotting the lands to Indians
required arduous labor in the mountains in all sorts of weather (there was sus-
picion that some of them did not know how to run a section line), they preferred
the much easier plan of making the allotments from the map.

The Golden State is widely known as a land of fruit and flowers and
mild climate. It does not seem to be well understood that a considerable portion
of the State of California, larger than most eastern states, has a severe winter
climate with heavy snow-falls, and that there are also extensive deserts. The
allotments referred to are in this portion of the State. Over 300 allotments
are absolute desert, being sage brush plains without water or the hope of water. Six
hundred more allotments are located in the Sierra Nevada Mountains where the
land, or rather rocks, incline up at an angle of 45 degrees or more, and the
snow falls often 30 or 40 feet deep, and lies from October to June. It would
seem that even a special agent from the Atlantic Littoral ought to have known
better than to allot either kind of land to anyone for a home, and yet that is
just what was done. More than three-fourths of the allotments in that section
are absolutely unfit for human habitation, and it is not strange that the Indians
have been unable to do anything with them. The small number of allotments which
are fit to live upon have been the salvation of the Indians there, and the distress,
disease and death which follows in the wake of eviction has been unknown among them.
If the Allotment Act had nothing more to its credit than the saving of these
Indians, its enactment would be justified. This, however, does not help those
Indians who have received the worthless allotments. The present allotting agents

-10-

in the field are competent, but they cannot create land or undo the mistakes of
their predecessors. The desert allotments have some scanty pasturage and could
probably be sold to sheep or goat men. Five acres of good land with water (land
without water is worth very little), is worth more than an entire quarter section
of desert land. I would recommend that the Government buy enough land with adequate
water supply to give each family five acres of land, and exchange these five-acre
tracts for the quarter section allotments of desert land. This would require a
nominal appropriation of from $25,000 to $30,000, but it would be only nominal,
as the value of the land received in return at the Government price of $1.25 per
acre would probably exceed the value of the land purchased.

The mountain allotments referred to, some 500 in number, are in much
the same situation as the desert allotments, except that most of them have more
or less timber, and some of them very good timber, indeed. This fact has kept
the Indian allottees in hot water most of the time. There is a constant succession
of squabbles over the efforts of claim-jumpers and timber syndicates to get hold of
the timber. All sorts of schemes have been devised, with as yet no very great
success. The allotment Act specifically provides than an Indian may select his
allotment "upon any surveyed or unsurveyed lands of the United States, not other-
wise appropriated." Hence there seems little doubt but that the Indians are
entitled to hold the land. If these allotments were fit for human habitation,
your special agent would be inclined to stand by the Indians at all cost as
against the timber speculators, who are usually eastern gentlemen with large
experience in absorbing timber land, or their California agents who sometimes
seem to be selected for their supposed unfamiliarity with the ten commandments. ✓

The time has gone by when either the desert allottees or the mountain
allottees can secure other allotments from the public domain. Hence, your special
agent would recommend action in favor of the mountain allottees similar to that
proposed for those on desert lands. The Government has held these lands at
$2.50 per acre. Those with timber on are worth much more. The Government would
be a large gainer in exchanging the allotments in question for the small allotment
Land can be had in the mountain valleys much cheaper than in most of California.
It would also require a nominal appropriation of an amount which cannot be stated
exactly without further examination, though probably not to exceed $40,000. Of
the mountain allotments referred to, about one-third are within the limits of
the forest reserves, and none of the others are more than three or four miles
from the reserve boundaries. Most of these lie in the territory between the
Diamond Mountain and the Plumas Forest Reserve, which should, apparently, be
included in these reserves. There would therefore seem to be no good reason
why all the allotments over which so much controversy has arisen should not be
put into the forest reserves and the Indians given something in exchange which
they can use, or at least live upon more than three months in the year.

There is a defect, apparently, in the allotment system as developed
in California in that no provision seems to be made for protecting an allottee
after he has received the allotment either in the use of the land itself, or
what is more important, the water supply when there is one. As it stands now,
anyone can jump an Indian's allotment, and there seems no practical remedy, or
anyone can move the fence over onto the Indian's land, or divert his water, and
it is not even a misdemeanor. Theoretically, the Indian can appeal to the State
Courts. Practically, such remedy is illusory. The Indian would have to pay
court and attorney fees, often jury fees, and would have to put up a bond for
costs, all beyond the power of most Indians. The same is true of encroachments

31-219

upon an Indian's water supply. Many cases have been reported to your special
agent where white men have deliberately diverted a stream of water from the
Indian with full knowledge of the Indian's priority of right, but secure in the
knowledge that the Indian was helpless, and that the offence could be committed
with impunity. The Indian could do nothing but watch his trees die and his
garden dry up, and be forced to abandon his holding.

There is very little use in giving an Indian an allotment if anyone
who is a little loose in morals can deprive him of the use of it. The Indian
has no confidence in the white man's courts, and it must be confessed that in
times past he has had little reason to have any. The title to the land in these
allotments is still in the United States, and it is the United States that is
technically the party interested. It therefore seems entirely within the
province of the Federal Government to interfere and to see that its interests
are not wantonly injured.

Your special agent would therefore recommend additional legislation for
the protection of Indian allottees; that trespassing or encroaching upon an Indian
allotment be made a misdemeanor; and that it shall be made the duty of the United
States Attorney for the district to appear whenever the boundaries, title, or
possession of the land or water appertaining to an Indian allotment is in question.

Very few Indians have been able to rise above the distressing conditions
they live under and to acquire land by purchase. Still there are a number of Indian
communities owning land in common. Indianola, Humboldt County, Upper Lake, Lake
County, Potter Valley, Coyote Valley, Pinoleville, Guidiville, Carroll, in
Mendocino County are all inhabited by Indians who own their own land, though
it was purchased by white friends in most cases. The conditions in these settle-
ments are far from satisfactory. They are sadly overcrowded, and are becoming
more so as the Indians evicted elsewhere join the communities. At Potter Valley,
52 Indians are living upon 14 acres of land that would not support a single white
family. At Coyote Valley 36 live upon seven acres, and at Guidiville 59 live
upon five acres. At Upper Lake they have 160 acres of land, of which but 25
is level enough to build a house on. The hill land is good grazing land, but
the whole place would not be large enough for more than one white family. One
hundred and seventy-seven Indians live there, and there are more than 250 in the
band. There are also three communities living upon land owned by religious or
private associations; one near Chico owned by the Presbyterian Board of Missions;
one near Kelseyville owned by the Roman Catholic Church; and one near Manchester
owned by the Northern California Indian Association. In these three settlements
conditions are much better, as they are not so overcrowded, and there is some
attention paid to the welfare of the Indians themselves.

An interesting experiment has been under way at Fort Independence, Inyo
County, which seems to be giving much better satisfaction than the allotments
under the General Allotment Act. The old military reservation at Fort Independence
has been turned over to the Indian Bureau, and has been allotted, or rather
apportioned among the Indians of that settlement. There are 20 tracts, of
from 2-1/2 to 5 acres per family, and 43 families, or 122 souls, have homes on
the tract. The land is of good quality and the water supply ample. The Indians
are making good use of the land and the conditions among them seem excellent.
In fact, the experiment is so successful that your special agent suggests it
for consideration as a model in the proposed relief of the Northern California
Indians.

There are also quite a number of Indians located within the boundaries of the forest reserves. According to the figures of your special agent, they number 1,194. They have, of course, no title to the land they occupy, and since the establishment of the forest reserves, it is uncertain whether the lands within the boundaries can legally be allotted to them. These lands have mostly been in their present location from time immemorial, and there seems to be no occasion for any action in respect to any of them. The Forest Reserve Officials do not seem to object to the Indians, though some of them desire to extend their hold by means of leases or permits which it is proposed to have the Indians secure to entitle them to reside upon the reserve. This seems hardly necessary, and any rules or regulations for Indians alone are objectionable. There is no apparent reason why the Indians should be upon any different basis from other people, and any attempt to enforce arbitrary rules is sure to result in friction. Your special agent would therefore recommend that no action be taken in respect to Indians on the forest reserves until action seems more necessary than at present.

In the matter of schooling for their children, the Indians in California have not been much favored. For many years all Indian children were refused admission to public schools, and today, in a majority of school districts where Indians live, public sentiment is against their admission. About the only districts in which Indian children are welcome are those small ones which are likely to lapse if the Indians do not attend. It is impossible to give exact figures as to the number of Indian children attending the public schools, as the school registers do not distinguish them and only partial statistics could be obtained. As near as can be estimated, the number is about 500 out of a possible school population of 2,700. The laws of California in regard to school matters make no distinction as to race or color. The trouble has been in local public sentiment. All counties have for years drawn the full quota from the State School Fund for the education of the non-reservation Indian children, but most of the counties have refused the Indian children admission to the schools, seemingly with no conception of the morals involved in drawing money from the State Treasury for one purpose and using it for another. The method of school apportionment has, however, been changed recently, and hereafter no money can be drawn for Indian children unless they actually attend the district school. The National Government has to a limited extent entered the educational field, and is now maintaining reservation boarding schools at Hupa and Round Valley, training schools at Greenville and Fort Bidwell, and day schools at Bishop, Big Pine, Independence, Ukiah, and Manchester. These have a capacity of about 560, and the attendance of non-reservation children has not exceeded 350. Private schools have about 50 more non-reservation children. There are thus at least 1800 Indian children without opportunity of any schooling whatever.

In endeavoring to ascertain the present condition of the Indians of Northern California, your special agent has availed himself of all information offered from any and every source, but he has preferred to rely chiefly upon his own investigations, and for that purpose has visited almost every Indian settlement in Northern California. He feels in a position to speak with some degree of assurance in regard to what he has seen. The most surprising feature of the situation is the absolute ignorance of 99 per cent of the inhabitants of California in regard to the Indians in their own neighborhoods. Very few persons really know much about Indians in their person or in their circumstances, or in their manner of living. Those who are best informed are usually the store-keepers with whom the Indians trade, and whose information is usually accurate.

Your special agent finds considerable diversity in the Indian
condition in different localities, they being usually in better condition
in the Northern part of the section, and worst off in the Central Valleys
and along the southwest flanks of the Sierras. The Indians are for the most
part settled in little villages called in California rancherias. These little
settlements contain all the way from 20 souls up to 250, the usual size being
about 50. A schedule or census accompanying this report gives the location of
each such settlement and the names of each head of a family and the number
dependent upon him. These Indian settlements are for the most part located upon
waste or worthless land as near as possible to their ancestral home. These
remnants of each stock or tribe or band occupy today almost exactly the same
territory their ancestors did a century ago.

In the native religion of the Indians a sort of shamanism, inter-
communion with the spirit of the dead is one of the chief features. The Indians
continually make offerings to the manes of their deceased ancestors and friends,
especially at the annual feast of the dead, and they expect to receive in return
protection from all manner of spiritual and earthly terrors. The desire of the
Indian to remain by the bones of his ancestor is therefore much more than a mere
sentiment, and the feeling is still strong, even among those who have been Chris-
tians for a generation or so. An Indian will endure great extremities rather than
abandon his locality, a trait that has not always been given proper weight in
attempting to handle Indians.

The sanitary condition of the Indian rancherias is bad, but the feeling
of helplessness and despair is worse. Most of the Indians seem to have lost all
hope of escape from their present situation and have become familiar with the
idea that they will all die off soon any way. It is evident that if the Indian
is to keep alive he must have some means of making his living. He must do so
by his own labor, either for himself or for others. Most of the Northern Cali-
fornia Indians being landless, the opportunity to work for themselves is wanting,
and they must of necessity work for others. If the supply of labor for Indians
was sufficient in all localities and well distributed during the year, the problem
would be light, but in many localities the labor is not to be had in sufficient
amounts, and the Indians thus suffer great straits in endeavoring to keep alive.

Your special agent estimates that 1,700 families with nearly 6,000
souls are dangerously near the famine line. This does not mean that they are all
suffering at the same time, or all times, or every year, but each of the landless
bands is liable to suffer a time of famine, and during such a season the old
people and children die. The healthy and ablebodied can survive a period of
starvation, but in the weakened state caused by insufficient nutrition, almost
any disease, even common colds, will carry off most of the children in the settle-
ment. North of Tehachapi there are hardly any of the old people left, and the
proportion of children is small, although births are numerous. The people of
almost any locality who do not know the Indians well are apt to deny that their
Indians ever suffer. Other Indians do, but their's do not, and it is a striking
fact that the less work there is for an Indian in a locality, the more firmly
convinced his white neighbors are that he has all the work that any well regulated
Indian could desire. The store-keepers, however, generally know better, and quite
a number have told me that in employing an Indian it was necessary to feed him up
for two or three days before he was able to work satisfactorily; and that the Indian
scale of living was so low that the Indians were often week /sic/ from lack of
proper food. The Indian is not competent for all kinds of work and usually is

restricted to the roughest labor. The need of industrial instruction is great, and the need of field matrons to teach ordinary household economy and common sanitation is even greater.

Your special agent will take pleasure in recommending 25 or 30 places as proper locations for industrial instructors or field matrons. It can hardly be expected, however, that either can teach very much while the Indians are subject to eviction at any time or are being harrassed /sic/ from place to place. It can hardly be claimed that the non-reservation Indians are advancing very much, or that any very effective steps are being taken to improve their condition or to teach them anything that an Indian must know if he is to take any part in our civilization. There are missions at Fall River, Chico, North Fork, Helseyville, and Carroll. These with the Government work at the schools, altogether do not reach 40 per cent of the non-reservation Indians. The reservation Indians are all fairly well cared for. Your special agent would therefore recommend an increase in the number of day schools in Northern California, and especially an increase in the number of field matrons and industrial instructors. He will, if desires, submit reports hereafter specifying locations and giving more details than seem proper in this report.

The California Indian both north and south has a good reputation as a hard working, trust-worthy, honest laborer. His greatest defect is that he will sometimes leave his work without regard to the position in which it leaves his employer. In some localities the Indians have all the work they can do. In more localities a very curious race prejudice, different from that against Asiatics, militates against their employment. In other places there is very little work of any kind to be had, and the Indian often has to go 50 or 100 miles to work. Then he can work but a short time, picking fruit or hops. This is often all the work they get in the year, and how these bands live is a mystery to their neighbors.

In making the family census of the Indians of Northern California, a very puzzling question was the status of the half-breeds or mixed-bloods. The number recorded by the census is much fewer than had been expected. It has been found impossible to classify them strictly according to blood. With those half-breeds who are brought up, educated and acknowledged by their white fathers, little trouble is experienced, but the majority of the mixed-bloods never knew their white ancestors, and have grown up in the Indian camps. They are more intensely Indian in sentiment than the Indians themselves. They consider themselves Indians, and it is difficult to deal with them upon any other basis. About two-thirds of the half breed men marry full-blood Indian women, and 20 per cent of the half-breed women marry Indian men who are full-bloods. Where the children are thus three-fourths Indian, they are Indians to all intents and purposes, and are so recorded in the census. A considerable number of half-breeds intermarry among themselves. These form a class apart, not being recognized by whites and looked upon with suspicion b, the Indians. The mere statement of mixed-blood therefore, does not indicate whether or not they are to be considered Indians, and a separate list has been made for mixed-bloods, status undetermined. Just what ought to be done with them your special agent is not able to decide, as it will take a more minute examination of each individual case than he has had time to give. People of mixed blood, more than half white, are not usually enumerated at all.

– 15 –

The responsibility of the National Government for the present condition of the non-reservation Indians of California seems clear. Had the Government given these Indians the same treatment as it did other Indians in the United States, their condition today would be very different. Those Indians of California who have received land, if not increasing in numbers, are at least not decreasing very fast. Most of the landed bands are about stationary in numbers. The entire Indian population of Northern California has decreased as closely as your special agent can estimate by about 1,100 in the last three years, most of the decrease being in the landless bands.

It should be remembered that the Government still owes these people considerable sums of money, morally at least, but the Government owes more than money. No amount of money can repay these Indians for the years of misery, despair, and death which the Governmental policy has inflicted upon them. No reason suggests itself to your special agent why these Indians should not be placed in the same situation as all other Indians in the United States; why they should not receive a minute portion of the lands which they have not as yet ceded to the United States. It seems clear to your special agent that the Northern California Indians have not had a "square deal," and that it is not too late to do belated justice. The landless Indians cannot be placed in status quo ante, but they can be given what is sometimes expressed as "a white man's chance," and it ought to be possible to put an end to the periodical wiping out of Indian children. It seems that we are under the necessity of civilizing the Indian whether we like the job or not, or whether the Indian wants to be civilized or not. We are therefore under obligation to make at least a decent effort to accomplish the task without injury to the Indian.

Your special agent is inclined to object strongly to anything in the nature of reservations for these people. The day has gone by in California when it is wise to herd the Indians away from civilization, or to subject them to the stinting influences of reservation life. Some of the past reservation experiences in California have been so harrowing that the Indians fear reservations above all things. Moreover, the expense of establishing reservations, and more especially maintaining them, would be enormous. Reservations, therefore, seem out of the question. It should, however, be feasible and comparatively inexpensive to give these Indians allotments, and there would be no expense connected with the allotments after they are once made. It would, however, be necessary to buy a considerable amount of the land, as there is very little land in the public domain left to allot them. Almost everything relied upon for this purpose has been included in the forest reserves. The expense of buying land to allot these Indians is not so great as would appear at first sight. Your special agent is not in favor of giving them farms. They would be unable to use farms. Small tracts, not exceeding ten or fifteen acres, if the land is good land, will be ample, and in many places five acres per family, or less, will be sufficient. It is not necessary that the Indians should be made rich. All that is proposed is that they shall have mere footholds with fixity of tenure. This will not change their present status as laborers, but will give opportunity to teach them some of the common every-day less which they need so much. I would therefore recommend the appropriation of a sufficient sum for the purchase of land in the immediate localities where the Indians live to be allotted or assigned to them in small tracts under such rules as the Secretar

31–224

of the Interior may prescribe.  It may take several years to complete the work.
Hence it is not necessary that the entire appropriation shall be available the
first year.

The Indian Appropriation Bill for the fiscal year 1906, contained an
item providing for this investigation, and appropriating the sum of $10,000 to
cover the expenses, and for the support and civilization of the Northern Indians
of California, for 1906.  Your special agent would recommend that the unexpended
portion of this appropriation be re-appropriated in such form that it can be
applied to the purchase of land.

It seems to be the belief of many persons that there has existed in
California a considerable body of "Citizen" Indians.  This is an illusion.  Until
allotment times there never were any Citizen Indians in California.  There are
none now except of comparatively recent make.  The Indians who are supposed to
be Citizens, or most of them, were so neither in law nor in fact and were for
all those years unable by reason of legal restrictions to appeal to the courts
of either state of Nation.  Their rights and their citizenship were denied by
both state and nation, and to speak of anyone in such position as a Citizen is
absurd.

There are, however, some really Citizen Indians in California.  At the
present time about 1,250 Indian men are, by virtue of the Allotment Act, entitled
to vote, or would be if they could pass the educational qualifications imposed by
the constitution of California.  Comparatively few of them have ever voted, and
those few are usually educated mixed bloods.  The 1,250 men may be said to repre-
sent an Indian population of about 4,000.  These may fairly be considered citizens.
It should be understood that for these Citizen Indians no relief is asked and in
the opinion of your special agent none is needed other than some re-adjustment of
allotments mentioned heretofore in this report.

## Southern California.

Although the troubles of the Indians of Southern California arise from
the same initial wrong as those of the Northern part of the State, yet, the Govern-
ment has here attempted to repair the wrong, and has assigned more or less barren
reservations to substantially all the Indians in the southern section of the State.
This action came late, as usual, and there was very little land of any value remain-
ing in the public domain which could be given to the Indians.  The unsatisfactory
condition on some of the reservations arises from the character of the reservation,
and therefore requires remedies different from those to be applied in Northern
California.

Your special agent has visited nearly all of the reservations in South-
ern California, and has had a bird's-eye view of some of the others, and has made
a careful investigation of the situation there.  Those reservations which seem
to require attention will be considered in order:

## Campo.

Campo has occupied a considerable place in the public mind for the past
18 months by reason of reports current as to conditions there.  It is to be regrett
that the sensational press has exploited the matter in such shape as to give the

idea that all Indians in Southern California were in the last stages of starvation. The situation at Campo was bad enough without exaggeration. There is no question as to the extremity to which the Indians of the Campo reservation were reduced. Your special agent has no doubt as to the fact that the Indians were in great straits, and that only the timely relief saved them, or most of them from death by starvation.

There are five reservations usually known as the Campo reservations, as follows: Campo Proper, area 240 acres, population 25, elevation about 2,500 feet; Manzanita, area 640 acres, population 59, elevation 3,000 feet; La Posta, area 259 acres, population 19, elevation about 3,200 feet; Cuyapipe, area 880 acres, population 44, elevation about 3,800 feet; and Laguna, area 320 acres, population 5, elevation about 4,500 feet. The areas given are their areas on paper. Most of the land is the most barren description. The actual areas of arable lands are as follows:

| | |
|---|---|
| Campo, | 40 acres |
| Manzanita, | 35 " |
| La Posta, | 30 " |
| Cuyapipe, | 30 " |
| Laguna, | 70 " |

There are about 20 of these Indians not living on any reservation. The rainfall is scanty, and grain and hay are about the only crops that can be raised without irrigation. There is no water for irrigation on any of the reservations, and barely enough water for household use. The entire five reservations would not support more than one or two white families, and yet 40 Indian families are expected to make their living there. The surrounding country for fifty miles in every direction is thinly settled, and mostly a cattle country where there is very little work for Indians outside of the reservations.

Now Indians require some means of making a living the same as anyone else. To place Indians upon a reservation where they cannot make a living, either by working for themselves or for others, is to invite exactly what occurred at Campo, starvation. The immediate cause of the hard times at Campo was a succession of three or four bad years when crops failed.

Your special agent saw no evidences of present suffering at Campo. The relief extended by the people of Southern California was timely and generous. Since the Government has taken charge of the situation there has been no occasion for suffering. Last year was a favorable one, and the present promises to be likewise, but so far no remedial steps have been taken to prevent a recurrence of the trouble which any bad year may bring forth.

In relieving the distress, the people of Southern California have contributed two four-horse wagon loads of supplies, the value of which cannot be less than $2,000. There was also contributed in cash, through the Sequoyah League, which also handled the contribution of goods, the sum of $3,075, and through other persons, $333.17. The Government has itself spent $748.80 in cash, a total of $4,156.97 in cash and at least $2000 in goods. This for 165 Indians. Starving our Indians seems to be quite expensive both for the Government and the surrounding people. The amount of cash alone spent in the last 18 months is the interest on $83,219 at 5 per cent, and at the rates the Government pays, the principal would be much larger.

All humanitarian questions aside, it would seem to be cheaper as a business proposition to put these Indians in a position where they can earn their

own living than to allow present conditions to continue and have a scandal of this kind every few years. Your special agent estimates that a proper place can be secured in a neighborhood with a proper water supply, and would recommend an appropriation to provide more and better land for the Indians of the five Campo reservations. It is not expected that all the Indians will wish to remove from the old reservations, and I therefore recommend that the present reservations be retained and used in connection with the proposed new tracts.

The amount contributed by the people of Southern California and by the United States seems a large one for the purpose, and yet it is not quite as large as it appears at first sight. $4,155.97 is only $1.40 per month per head for the 18 months. A report has gained considerable currency in the public press that the Campo Indians are being supported in idleness and luxury. $1.40 per month per head will not buy many luxuries for anyone, nor will it buy an undue quantity of necessaries. The relief was not all doled out by the month to be sure, but was given in the nick of time when needed. Yet it is still evident that the Campo Indians, notwithstanding the considerable assistance received, have themselves, by their own labor, furnished the major portion of their subsistence.

## Pala.

The new reservation at Pala is undoubtedly the best in Southern California. There is a large area of good land and a fine water supply. Some 450 or 500 acres are now being irrigated. The land under the new ditch, about 400 acres, is sub-irrigated, well drained, free from alkali, and with the surface irrigation from the new ditch ought to be very productive. The situation is certainly much better than that formerly occupied by the Indians on Warner's Ranch. It is not to be expected that the old people will ever be satisfied with any other place than Warner's Ranch, but the able-bodied young men are finding the value of the new location. They probably would not be so willing to return to the old site, if it were possible. Your special agent has no desire to criticise severely those Government officials at Pala who did the best they could in a time of great stress, yet, there are certain things in connection with the making of the Pala reservation that are valuable in showing some things to be avoided in trying to improve the situation at Campo and other places. There seems to have been a considerable waste of Government funds, and, as usual, no one is willing to shoulder the responsibility.

The new irrigation ditch has cost nearly $18,000, or about $45 per acre of land irrigated. It cannot be used to irrigate any other land anywhere. The ditch is well built, with a proper grade and fine curves. About three-quarters of a mile of it is cemented. There are some criticisms that might be made as to money spent in a diverting dam of which very little is to be seen now and to other expenses necessitated by locating the upper end of the ditch parallel to the torrent. The capacity of the ditch is given as 1,700 inches of water, and the land to be irrigated about 400 acres. The duty of water under the San Diego Ditch and Flume Company, the largest irrigation enterprise in that part of San Diego County, is 1 to 6, that is, 67 inches of water would irrigate 400 acres of land. If we take the lower duty of 1 to 4, 100 inches of water would be sufficient. Or to put it another way, the ditch of 1,700 inches capacity would irrigate from 6,800 to 10,200

acres of land. These are minimum figures, however. It would be perfectly proper to make the ditch larger than necessary for the minimum amount of water. Four times the minimum or from 300 to 400 inches would have been ample as the capacity of the ditch.

Your special agent has in former years visited Pala in the summer time, and he has seen the amount of water in the San Luis Rey River at that point. He doubts very much if the said river ever carries one-fourth of the capacity of the ditch in question during the irrigation season. The commission which examined the various sites prior to the purchase of Pala, state in their official report to the Secretary of the Interior that they measured the San Luis Rey River at the point of diversion, and found a flow of 142 inches. Just why it should have been necessary to build the ditch a dozen times larger than there is land to irrigate, or water to irrigate with, is a query which an inspection of the premises does not enable one to answer. This big ditch contrasts strongly with the ditch recently completed on the Rincon reservation under the direction of the agent, planned to irrigate 200 acres of land, and which cost a little less than $800.

The matter of houses for the Indians who removed from Warner's Ranch to Pala was a vexed question of the times immediately after the removal. The suggestion was made that the Indians be at once set to work building adobe houses. This particular band had been making adobe, building adobe houses, and living in adobe houses for more than 100 years, and the adobe house was the one kind of house they knew all about. Adobe as a building material has some defects, but it also has some excellent qualities. It is suited to the climate, being warm in winter and cool in summer. It is wind proof, dust proof, and even when the roof was of thatch, the Indian houses were usually water proof. But for some reason the adobe idea did not meet with favor. It was said to take too much time. This objection was also made against the project of buying rough lumber for the Indians to build into houses, and things were rather at a standstill until the brilliant idea was evolved of getting temporary houses for the Indians to live in permanently. The Indians were inclined to be mutinous and openly threatened to return to Warner's Ranch. There was evident need for haste, so fifty portable houses were ordered by telegraph--from New York. The order seems to have been filled in due course of business, and the delay in coming by freight, more than 4,000 miles, were no greater than usual with transcontinental freight, but as a time-saving device, it was hardly a success. It was nearly six months before the Indians got into the houses. The expense was double what wooden cabins built on the spot would have been, and about four times the cost of adobes. There would be less room to cavil at this purchase if the houses were fairly adapted to the purpose for which they were bought. The houses are well enough constructed for the purpose for which they are advertised and sold, that is for a temporary house, or wooden tent. As a permanent dwelling place for human beings they are far from satisfactory. Being composed of but a single thickness of board three-quarters of an inch thick, they are hot in summer and cold in winter. The California sun has sprung the narrow strips composing the panels and made cracks in about every panel. The sun has also warped the roof panels and injured the tarred paper which constitutes the rain-shedding part. The houses are neither dust-proof, wind-proof, nor water-proof, and are far inferior to the despised adobes.

California has no winds comparable to the eastern cyclones, and yet not long ago a stiff breeze unroofed 14 houses and made kindling wood of another. Nearly every house in the settlement is more or less wracked and twisted.

In moving the Indians to Pala, one mistake was made which, though of small dimensions, is illustrative of a class. The Indians of Agua Caliente Village speak a dialect of Shoshonian stock. The little village at San Filipe, also evicted at the same time and moved to Pala, are of Yuman stock. Not a single word is alike in the two languages. Between these two diverse races of Indians there are generations of warfare and hatred, and though there has been no open war between them for a long time, a great deal of the old animosity still survives. The San Filipes removed to Pala number but 34, a mere hand-full, surrounded by an overwhelming number of their hereditary enemies, and among whom they are unwelcome. The San Filipes are outraged in their feelings, or possibly in their prejudices, and will never be satisfied at Pala. They have said little on the subject for they have all of a child's helplessness of making anyone understand. The Government seems to learn very slowly that Indians are not all alike, and that different stocks or races of Indians ordinarily cannot be put together. We may consider their ideas or antipathies to be childish, yet, if we wish to be successful in dealing with them we must necessarily take some account of the human characteristics of the Indian. I would therefore recommend that the San Filipe Indians be allowed to remove to Santa Yasabel where most of their friends and relatives are. More than half have left Pala already.

### Pachanga.

The Pachanga reservation is one of the poorest in Southern California. On paper it has 3,360 acres, which looks large. Actually, there is less than 300 acres that can be plowed, and this is so dry and sandy that the grain crop, about all that can be raised, is very scanty and often a failure. There is no water supply even for domestic purposes. At the Government school there is a well which furnishes some water for two or three months during the rainy season. The rest of the year all water has to be hauled from three to five miles, and at the school they have not even water enough to wash the children's faces. The contrast is strong between Pachanga and Pala with its good land, abundant supply of water for irrigation, and water for household purposes piped to each Indian house. There is a fine spring two or three miles up the canon from Pachanga which can be brought down in pipes at an expense estimated by the agent as $4,000. The land the spring is on is Government land, and that and the land between it and the reservation should be added to the reservation. The Pachanga Indians really ought to have some land that is good enough for gardens. The expense would not be great, probably less than $5,000. I would therefore recommend the purchase of such land.

### San Pascual.

The maps show an Indian reservation named San Pascual, but actually there is no such reservation. A reservation was selected for these Indians comprising certain descriptions of land in township 12 south, range 1 west, in San Diego County. By some inexcusable error, the land was actually reserved in township 11 south, range 1 west. None of the San Pascual Indians ever lived on the land actually reserved, as that was considered to be Shoshonian territory, and the San Pascual are Yuman. Both pieces of land are barren and of little value. The Indians actually occupied the land in township 12. In the years that have past,

all the land in the intended reservation worth filing on has been taken up
in the usual manner, - it being open to settlement. The result is that the
San Pascual Indians have no reservation, and all through errors not of their
own making. I would therefore recommend an appropriation to buy a small tract
of land for the San Pascual band.

## Los Coyotes.

Los Coyotes is a large reservation on paper, being nearly a township
of land. It is quite elevated, being from 4,500 up to 8,000 feet. The reservatio
is nearly all barren mountain tops, and the agricultural land is confined to
narrow strips in the San Ysidro and San Ygnacio canons, about 275 acres in all.
A large part of this is owned by a white man and was patented before the reservati
was established. There are also two valleys or hallows in the mountains which
have some feed for cattle, and are also patented land. The Indians say that the
Government promised them to buy this patented land. Whether such a promise was
made your special agent does not know. It is a fact that the Government did buy
out one white homesteader in the San Ysidro canon. These Indians are the only
ones I have found in California who are inclined to be belligerent. They have
been frightened by the fate of their neighbors on Warner's Ranch, and have deter-
mined to allow no white man on their reservation. They have occupied the patented
lands, and show a disposition to hold them by force. If the owners insist upon
their rights, a small sized Indian war is likely to result. It seems to your
special agent that the Indians' demand for this land is just. It was a rancheria
site, and as such could not be filed upon without something closely approaching
perjury. The patents are now issued, however, and the title has passed to partie
who acquired it in a legitimate manner--I believe upon a mortgage. I would there
fore recommend an appropriation to buy this land.

## San Manuel.

This reservation of 640 acres is about the most absolutely worthless
that I have seen anywhere in California, being steep, barren dry hills, and yet
it immediately adjoins one of the most fertile pieces of land in Southern
California. The Indians should have a little land fit for gardens.

The little reservation of Pauma has the use of a fine stream of water
from the Pauma Creek, but the stream is apt to be very scanty in summer when it
is mostly needed. Some means of conserving the supply is much needed. The
reservoir site is so gravelly and sandy that cementing is necessary. The Indian
have promised to do all the work if the Government will furnish the cement. I
would recommend that they receive the cement.

## Coahuilla.

On the Coahuilla reservation a storage reservoir and irrigation system
is about half completed. It is estimated that $1,000 will complete it. Without
the irrigation system the Indians can raise very little, as their reservation is
mountains, and contains of very little agricultural land, and that little needs
water to produce anything.

## Morongo.

The Morongo reservation, near Banning, has quite an area of arable
land, but the land is desert and without water will raise nothing.  There is
also a fair water supply if it were developed and brought to the land.  The
water comes from two cienegas, or spring spots, the sources of which are upon
the reservation.  But one of these ciene as is at present used.  It is likely
the flow from these cienegas could be increased.  The water brought from this,
the upper one, has sufficient fall to pump water from the lower cienega into
the ditch for irrigation.  The water supply could thus be largely increased
and the area of land cultivated, it is believed, could be more than doubled.
I recommend an appropriation for this improvement.

## Desert Reservations.

On the Colorado Desert are several small reservations known as Torres,
Martinez, Alamo Bonito, San Augustine, Agna Dulce, 29 Palms, and Cabazon, the
latter being near Indio.

On two or three of these reservations artesian wells have been bored
by the Government, the water from which is used by the Indians for irrigation.
They make good use of the water.  I would recommend the boring of more wells.
The cost is from $300 to $500 per well, and the benefit is great.  With the
water the Indians are self-sustaining, and without it they are perpetually
menaced by famine.  I recommend an appropriation for this purpose.

At the Palms Springs reservation, sometimes called Agnacaliente number 2,
there is a small stream of water, the right to which is claimed by outside parties
It would seem that the Indian rights are prior and should be supported.  If the
white contestants are willing to sell for a reasonable price, it would probably
be cheaper to buy them out.  I would recommend an appropriation to determine the
water rights, or buy out the contestants, as may be found the more advisable.

## Rincon.

The Rincon reservation, 14 miles from Pala, has four or five hundred
acres of arable land, more than there is water to irrigate.  A ditch has recently
been constructed taking its water from the San Louis Ray River and expected to
irrigate about 200 acres.  A syndicate is making preparations to build a large
dam across the San Louis Rey River a few miles above the Rincon for a storage
reservoir and power plant.  Steps should be taken to protect the Indian rights
to their water.  It is believed that if the matter is attended to now the matter
can be amicably arranged without in any manner embarrassing the great enterprise.

## Boundaries.

One of the most troublesome questions in regard to Southern California
reservations arises from the looseness with which the reservation  boundaries are
laid down.  From every reservation comes a complaint as to the boundaries and of
encroachments  upon the boundaries of Indian reservations.  One reservation line
is said to have been moved in over 1,100 feet.  Another is said to have been moved
over onto the reservation three separate times.  It seems as if each successive
owner of land adjoining a reservation is unable to resist the temptation to grab a
little Indian land, and they seem able to work this kind of a graft with impunity.

The farcical character of some of the California surveys plays directly into the hands of this class of landgrabbers.  If a man steals $50, it is a penal offence.  If he steals $5,000 worth of Indian land he gets the land as a reward for his nerve.  Encroachments upon Indian lands are likely to continue until it is made a penal offence for anyone to establish the boundary line of an Indian reservation except in conjunction with a duly appointed officer of the Government.  There is one thing which, in the opinion of your special agent, should be done, and at once: A commission of competent surveyors should establish the boundaries of every California reservation, and mark the boundaries so as to endure for all time.  Fence them if necessary.  Your special agent would earnestly recommend an appropriation to determine and mark the various reservation boundaries.

Two reservations, Inyaha and the Conejos division of Capitan Grande, should, in the opinion of your special agent, be enlarged by the addition of certain adjoining tracts of Government land.  This is advisable chiefly to protect their water rights.  The little reservation called Cosmit I found fenced in and used as part of a cattle ranch.  There is said to be a deed extant from a senile old man belonging to the tribe, purporting to convey the property to a white man.  The deed is worthless, of course, but such attempted transfers are met with in various places in California.  The Indians do not care to live on the Cosmit reservation, as the village of Cosmit was, by one of the usual mistakes, not located upon the description set aside as the reservation.  The Cosmit Indians can be taken care of on the Inyaha reservation.

The Indians on the remaining reservations in Southern California are in fair condition.  At least no facts were observed which require special attention in this report.  No other Southern California Indians have been shown to your special agent as having been in as bad a state as those at Campo, but several other bands must have been very close to the line as a result of the bad years.  The present year is a favorable one, and no Indians are reported to be destitute, other than a few old people who are without relatives to support them and for whose support the Government makes a small contribution.

--------------

The plan of relief for the Indians of California which your special agent ventures to recommend is briefly:

### Southern California.

That those Indians who have been placed by the Government in such position that they cannot earn their own living shall receive such pecuniary aid as to put them in shape so that they can do so; that this aid take the form of land of good quality with ample water supply, the same to be held in the same manner as their present lands; that this land shall be purchased by a commission appointed by the Honorable Secretary of the Interior, and a majority of which shall be experienced in Southern California land conditions; and that provision be made to extend the irrigation facilities of the reservations mentioned in the body of this report.

### Northern California.

That those Indians who are landless through past acts of omissions of the National Government, shall receive land in lieu of any claims they may have against the Government, moral or otherwise; that the land shall be of good quality

with proper water supply, and shall be located in the neighborhoods in which the Indians wish to live; that this land shall be given under some such plan as that pursued at Fort Independence, each family being assigned not exceeding ten acres of land, or such smaller tract as the conditions may warrant; and that this land be purchased and assigned by a commission appointed by the Honorable Secretary of the Interior, a majority of whom are expert in Northern California land conditions.

That these Indians who have received worthless desert allotments shall have the privilege of exchanging them for allotments of the same size and character as proposed for the landless Indians of Northern California, and that the allotments surrendered shall be restored to the public domain; that those Indians who have received mountain or timber allotments shall have the privilege of exchanging them for allotments of the same size and character as those proposed for the landless Indians of Northern California, and that the allotments so surrendered be added to the forest reserves; that the exchange of allotments and the purchase of the land for exchange where necessary be placed in charge of the same commission as that which handles the other proposed Northern California allotments; and that the unexpended portion of the appropriation for the support and civilization of the Northern Indians of California, 1906, be re-appropriated in such form that it may be used in the purchase of land.

Recommendations common to both Northern
and Southern California.

That further legislation be passed for the protection of the land and water rights of Indian allottees; that provision be made for an increase in the number of field matrons and industrial instructors; that the number of day schools be increased; that additional legislation be passed placing Indian allottees within the scope of the laws against selling liquor to Indians; and that the boundaries of the various reservations of California be determined and marked.

The appropriations recommended are as follows:

| | |
|---|---|
| Purchase of land at Campo, | $30,000.00 |
| Purchase of land for Pachanga, | 5,000.00 |
| Water supply for Pachanga, | 4,000.00 |
| Purchase of land for San Pascual, | 5,000.00 |
| Purchase of land for Los Coyotes, | 3,000.00 |
| Purchase of land for San Manuel, | 5,500.00 |
| Water system at Morongo, | 5,000.00 |
| Water system at Coahuilla, | 1,000.00 |
| Water system at Pauma, | 500.00 |
| Artesian wells for Torres, San Augustine, Cabazon, etc., | 3,000.00 |
| For determining rights at Agua-Caliente or purchase of land, | 1,500.00 |
| Determining rights at Rincon, | 3,000.00 |
| For determining and making reservation boundaries, | 10,000.00 |

Respectfully submitted,
(Signed) C. E. Kelsey

March 31, 1906.                          Special Agent for California Indians.

31—233

# EXHIBIT 32

REFER IN REPLY TO THE FOLLOWING:

## DEPARTMENT OF THE INTERIOR,

### OFFICE OF INDIAN AFFAIRS,

### WASHINGTON.

San Jose, Calif., July 10, 1907.

Hon. Commissioner of Indian Affairs,
      Washington,  D.  C.

Sir:-

In compliance with the instructions contained in your letter dated May 17, 1907, Land, I have the honor to make herewith my annual report for the fiscal year ending June 30, 1907.

My service began, under this appointment, on the 23rd day of August, 1906. Since that date I have been almost continuously in service. The time has been divided between Northern and Southern California in accordance to the necessities of the work.

Southern California.

Coachella or Cabazon. Two artesian wells were bored upon the lower side of this section some years ago by the government, which wells irrigate a portion of the reservation. During the summer when water is needed most the extensive pumping of water from wells outside the reservation so reduces the pressure that the Indians have had no water in the time of greatest need. Two strata of water have been developed in this neighborhood, one from which the flowing wells are derived at a depth of about 500 feet and the other at a depth of about 150. The latter rises to within twenty or thirty feet of the surface and is secured for irrigating

NARA DC
RG 75
CENTRAL CLASSIFIED FILES, 1907-39
CALIFORNIA SPECIAL
BOX 9
F: CALIF. SPECIAL 80665-08-310 [1 OF 2]

2. nual Report.

purposes by pumping. The supply is much more abundant than the artesian stratum. It was decided to put in a pumping plant at the highest point of the section at an expense of $1,200.00. This is in the process of installation and it is hoped may be completed in time for some use this season. This pumping plant will more than double the productive area of this section and will insure the Indian crops from the failures which the failure of their water supply in the heat of summer, which has taken caused place hitherto.

San Augustin. This section of fine land has been without any water supply whatever, and nearly all the Indians had removed to those places having water. A real estate man at Coachella told me that this section of land was worth $30,000.00 as it stood, without water. It therefore seemed to me that the water should be developed. It was decided to put in a combination plant, with artesian well and auxilliary pumping plant to use when needed. The elevation is lower than at Cabazon and it is expected that the flow will be larger and more persistant than farther up. Still, the experience in the surrounding tracts showed the advisability of having a pumping plant also and it was duly authorized, at an expense for artesian well and plant complete of $1,150.00. This is also to be complete this season and is, I believe about finished at this writing.

At Torres, Martinez and Alamo Bonita are twenty artesian wells bored by the Indians by the governemnt. The Indians are making good use of the water and the contrast between their former poverty stricken, half famished condition and their present comfort and thrift is striking. In no place

3. Annual Report.

have I found such satisfactory results from such a limited expenditure as in the case of these artesian wells here in the desert. At Martinez where there are only three wells they are already asking for more water. As soon as the Salton Sea menace is removed and there is assurance of entire safety it will be wise to increase the number of wells for the Indians of the Salton basin.

Morongo. A plan has been evolved, based largely upon the plan put in by the Banning Water Company in a neighboring canyon, for increasing the water supply for the Morongo reservation. The plan is to use the power now going to waste from the water in the stone ditch, to pump more water from a cienega half way down the canyon. This seems entirely feasible and would cost about $2,000, to $2,500. It occurred to me that there was possibly a ledge across the canyon bed, or the water would not rise to the surface at the lower cienega, and also that it would be better to make a thorough examination of the place and test of the quantity of water that could be developed before going ahead with the program. An authority was therefore granted to expend $500 in making this test, constructing the well, etc., and other preliminary work. But for reasons unknown to me the test has not been made as yet.

Palm Springs or Agua Caliente, (No.2). I made an inspection of this reservation and its water problem and joined in the recommendation made by Chief Engineer Code, that the conflicting rights of B. B. Barney be bought by the government for $6,000. My understanding is that this has

4. Annual Report.

been done and that the funds have been provided from the Irrigation appropriation.  I also examined into the matter of the Indian title to certain sections of government land adjoining and receomended that certain additions be made to the reservation, for the purpose of protecting the Indians from future controversies with white homesteaders, not only as to the land, but more especially as to the water.  Taking the land now for Indian use, upon which it is possible to use the water, will save a whole succession of water disputes in the future.

I also amde a report upon the condition of the little reservation upon Mission Creek in the San Bernardino Mountains and recommended that it be retained as a reservation for the present.

Twenty nine Palms.  This reservation consists of one section of land forming an oasis in the desert on the north side of the San Bernardino range.  One section was set aside under Congressional sanction.  It was later discovered that the Indians and the water supply were upon another section adjoining.  This was then withdrawn from entry by executive order. At one time the State of California selected this latter section as lieu school alnd, but its selection was rejected, as appears from the records of the U. S. Land Office.  Nevertheless, a year ago or so F. A. Hyde placed on record a deed from the State of California to himself and one Quinte, assuming to convey to them this Indian land.  The place has value as being the only accessible water supply for many miles and we may expect to hear of trouble there almost any time if the claimants

5. Annual Report.

attempt to take possession of the land set apart for these Indians. Chimehuevi Valley. In response to instructions from the Indian Office I made a partial report in respect to the conditions at the Chimehuevi Valley, on the Colorado River, though I have not been able as yet to visit that locality.This valley is a deep low valley by the Colorado River and has been occupied from time immemorial by the Chimehuevi Indians. Some years ago the land was reserved from entry in connection with the reclamation service, for which purpose there seems no immediate need or possibility of use. The Chimehuevi Indians are counted among the Indians of the Colorado River reservation, though they have never lived there. The Chimehuevis are of Shoshonean stock and the Indians of the lower river are of Yuman stock. Past centuries of distrust and hatred make it hardly feasible to put the two tribes together, even is there were room among the Mohaves for the Chimehuevis. It is reported that the Chimehuevi Valley is soon to be restored to entry and there is likely to be a scramble for the Indian lands if not attended to before hand. The Arizona side of the river is already partly occupied by whites. The soil is good and the water supply in the Colorado River is unlimited, though it has to be pumped, ownig to the extreme range between high and low water. I made recommendation that the fractional townships occupied by the Indians be withdrawn from entry temporarily, until it could be ascertained what land and how much should be set aside or allotted to the Indians. I do not know what action was taken. If this matter has not been acted upon I would respectfully renew the recommendations made in my letter upon this

6. Annual Report.

matter in my letter of Dec. 29, 1906 and also in my report upon reservation addtitions dated Jan. 3, 1907.

San Manuel. In my report of March 21, 1906 I recommended that some additional land be bought for gardens for the San Manuel Indians, as their reservation is very barren. This has been accomplished. That is we have bought 5.18 acres adjoining the reservation, below the ditch. This is the land which the Indians cultivated for many years and believed they owned. The land is frostless and in the Highland citrus district, one of the best in Southern California. Hence we have had to pay a rather high price for the land, the highest price we have yet paid in California. It has also been possible to buy the land upon which the Indian graveyard and one or two of the Indian houses are located, about seven and one half acres. The total expense is $2125.00. Both tracts have been deeded to the United States and abstracts furnished. These are before the title insurance company and an opinion will be rendered within a few days.

San Jacinto. While looking over the records in the Land Office in Los Angeles, I discovered that several descriptions of land within the San Jacinto reservation, aggregating over 1,000 acres of land had been patented to the Southern Pacific R. R. Co. as part of its land grant. This was dountless by inadvertance, as the Indians were in possession and I understand the land had been reserved for Indian use before the land grant attached. Some of the land is of little value, but most of is is occupied by Indians. Some action should be taken to re-acquire this land as

32–240

7.   nual Report.

land as there is no land available to make the loss good to the Indians,
and the loss of the land is a matter which could never be explained satis-
factorily ~~explained~~ to the Indians.

Cahuilla. The completion of the reservoir near the Cahuilla day
school was recommended in my report of March 21, 1906.  Authority to
do this has been secured and also to make certain tests for water at two
other places where the surface indications point to water.  The work is
said to be finished asto the reservoir and it is hoped the season may
demonstrate the value of the other two places.  The expanse has been
about $600.00

Santa Rosa.  Considerable correspondence has been carried on with the
Indian Office and with other persons over the location of the Santa Rosa
band of Indians.  They are located within the boundaries of the San Jacinto
Forest Reserve.  The surveys for the township have not yet been filed,
but they are supposed to be upon section 33, T. 7 S. R. 6 E., S. B. M.
This land being agricultural land there is danger that cattle men or
others may attempt to file upon it under the new law and I recommend that
Congress be asked to set aside this land for Indian use.  I have given
due notice to the Land Office officials that the Indians are on this land.

Pachanga.  The land upon which the springs rise and from which
springs it is proposed to pipe water for use of the Indians and for the
day school, has been reserved from entry for Indian use by executive
order.  Authority was granted to put in the pipe line at an expense of
$2,500.00.  Owing to some complications which have not been explained to

NARA DC
RG 75
CENTRAL CLASSIFIED FILES, 1907-39
CALIFORNIA SPECIAL
BOX 9
F: CALIF. SPECIAL 80665-1908-310 [2 OF 2]

21. Annual Report.

It has been possible to economise time in traveling to a much greater extent during the last fiscal year than during the preceeding year.  I have traveled about 12,350 miles during the  fiscal year of 1907, beginning August 23rd, of which a little less than two thirds was by rail or steamer.   Nearly 4,500 miles was by ordinary horse drawn vehicles.

I am unable to make an estimate as to the time in which the work can be finished.  A great many circumstances have in the past interfered with the main work and many collateral matters are necessarily drawn into any scheme covering the whole question.

Respectfully submitted,

C. Kelcey

Special Agent for the California Indians.

# EXHIBIT 33

# REPORT OF THE

# COMMISSIONER OF INDIAN AFFAIRS

TO THE SECRETARY OF THE INTERIOR

1907



WASHINGTON : GOVERNMENT PRINTING OFFICE : 1907

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

*Mission Indians.*—Some $12,000 was expended during the year in the construction of a new ditch on the Pala Reservation, in California, to replace the one destroyed by floods, as mentioned in my last report.

On November 7, 1906, Chief Engineer Code reported that the holdings of B. B. Barney should belong to the Agua Caliente Indians and thus put an end to bickerings and disputes which are inevitable where members of two races are jointly interested in the same water supply. Special Agent Kelsey had recommended the same thing; and on December 17 the Department authorized the purchase of Mr. Barney's property for $6,000, to be taken from the $100,000 appropriated for the purchase of lands and water rights for Indians in California. A deed conveying the water rights, pipe line, lands, and other property was approved by the Attorney-General on July 5, 1907, and the transfer has been made. A further sum of some $7,600 from this appropriation has been expended to increase the water supply on the Pauma, Cahuilla, Cabezon, San Augustin, Mission and Pechanga reservations.

*Pima.*—On January 23, 1907, Chief Engineer Code reported that after the submission of the joint report of Special Agent Granville and himself, dated April 25, 1906—referred to in my last report— he had learned of new developments in the Salt River Valley reclamation project which would insure a large amount of surplus power. A plan was accordingly arranged whereby this Bureau was to sign an agreement with the Water-Users' Association of the Salt River Valley for power for pumping water on 10,000 acres of land on the Pima reservation, in Arizona, the power to be delivered at the north boundary of the reservation; the extension of the line to the various pumping plants on the reservation, and the construction work, were to be done by the engineers of the Reclamation Service and paid for from the funds available for the irrigation of Pima lands; and the Indians were to be required to pay the same construction and maintenance charges for power delivered to the reservation line as were assessed generally against the lands of the Salt River project.

In pursuance thereof, an item was inserted in the current Indian appropriation act (34 Stat. L., 1022), providing—

That the Secretary of the Interior may, in his discretion, use such part of the three hundred thousand dollars heretofore appropriated for an irrigation system for the Pima Indians in the payment of such Indians' proportionate part of the construction of the Salt River project, and such funds may be transferred to the reclamation fund, to be expended by that Service in accordance with its rules and regulations; the Indians to receive a credit upon the reclamation charge assessed against their lands under the Salt River project for the amount so transferred.

An agreement signed by the president and the secretary of the Salt River Valley Water Users' Association, to include the lands of

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# EXHIBIT 34

Reproduced at the National Archives

DEPARTMENT OF THE INTERIOR,

CHIEF ENGINEER, INDIAN SERVICE,

(IRRIGATION,)       522 Bumiller Bldg.
Los Angeles, Cal.

Dec 10, 1907

Mr. W. H. Code,
Chief Engineer U.S.I.S.
Los Angeles, Cal.

Sir:

In compliance with your instructions to measure the low water flow of Tahquitz and Andreas Canyons, near the Agua Caliente Indian Reservation, California, I visited the latter reservation for that purpose, while conducting my investigations on the Morongo Reservation.

Andreas Canyon.

On October 9, 1907 I measured the flow in the canyon, about 300 feet above the intake to the Barney Pipe Line.    I found the water to be 0.53' in depth on a 2.0' Cippoletti weir, equivalent to 130 California inches.

I again measured the water in the box flume, supplying the pipe line, and found 113.5 California inches flowing, placing the amount of water wasting down the canyon at 16.5 California inches.

The pipe line, as you are probably aware, leaks badly when the pipe is under pressure, owing to the fact that it has rusted out in a number of places where exposed to the weather.    Its age and general condition require intelligent supervision, to maintain it even in its present stage of efficiency.

In spite of the leakage fully 100 inches are delivered to the Indian land, known as the Barney Ranch, which was recently purchased by the Government for the benefit of the Palm Springs Indians.

NARA DC
RG75
PI-163/E 653
Irrigation Div. Gen Correspondence
Bx 72
F: Aqua Caliente Palm Springs

Case 5:13-cv-00883-JGB-SP   Document 82-4   Filed 10/21/14   Page 42 of 177   Page ID #:773

I regret to state that the Indians are not making the least use of the water; the small buildings acquired with the land are unoccupied, and the ranch presents an appearance that, to say the least, is discouraging.   Apparently no one exercises any supervision over these Indian lands.   Such supervision is necessary, if for no other reason than to see that the water is put to a beneficial use, otherwise the Indians stand a grave chance of losing the water.   I would respectfully suggest that an additional farmer be employed, to exercise this jurisdiction on this, and other near-by reservations.

Tahquitz Canyon.

The Agua Caliente Reservation obtains its major water supply through a ditch leading from the Tahquitz Canyon.   This ditch heads a short distance above the mouth, in Tahquitz Canyon, and flows in a northeasterly direction for about a mile, over the talus slope at the mouth of the canyon.   From the foot of this slope it skirts the base of the mountain for a distance of half a mile, when it turns to the right and flows almost due east for quarter of a mile, when it crosses the west line of Section 14, entering the reservation.

The flow at the head of the ditch in Tahquitz Canyon on October 9th. was 55.3 California inches.   All the water was entering the ditch.   The flow in the ditch at the foot of the talus slope was 21.5 California inches, showing a loss of 23.8 California inches in the talus slope, or 43%.

Where the ditch crossed the west line of Section 14 no water was flowing, all the water disappearing several hundred feet west of the line.

From these conditions it is evident that to utilize the water of Tahquitz Canyon to the best advantage, it will be necessary to

-3-

construct a pipe line, about one half mile in length, from the head of the ditch to the foot of the talus slope, and a stone ditch, about one mile in length, from that point to the west line of Section 14.

Morongo Reservation.

On October 11, 1907, at the time of conducting investigations regarding the proposed submerged dam across Potrero Canyon, the flow in Potrero Creek, above the lower cienega, was 30.5 California inches.   The flow below the cienega was 153. California inches, giving an increase in flow, due to the cienega, of 122.5 California inches.

Very respectfully,

C. R. Olberg,

Supt. of Irrigation.

L.S.

# EXHIBIT 35

Reproduced at the National Archives

REFER IN REPLY TO THE FOLLOWING:

Office Chief Eng'r.
RECEIVED
NOV   1908
U. S. Indian Service

# DEPARTMENT OF THE INTERIOR,

## OFFICE OF INDIAN AFFAIRS,

xxWASHINGTONxx

San Jose, Calif., Nov. 16, 1908.

W. H. Code, Chief Engineer,
522 Bumiller Building,
Los Angeles, Calif.

Dear Sir: -

Replying to yours of the 14th, Mr Yorke reserved the ownership of the stone ditch and right of way for same.  No water can be bought of the Bear Valley Company.  They have none to sell.  In that district the water is owned by water owning companies and the ditch companies are carriers.  The water is represented by certificates of stock in the water owning companies.  We need five shares for the five acres irrigable at San Manuel.  None have been bought.  The man who was to buy the water shares for me was killed in a railroad accident.  I talked with Miss True when there last, but she has been east.  I shall have to come south again before long and will try and see what can be done.  I think prices will be less after the rains begin, that is, if we have the usual rains.  If you can get the five water shares I think I can find the money.  I do not see any prospect of an adequate supply on the reservation, and we must necessarily buy certificates in some company using the ditch across the reservation.  I believe there are three such water owning companies.

Very truly
C. E. Kelsey.
Special Agent for the California Indians.

NARA DC
RG 75
PI-163/E 653
Irrigation Div. Gen
   Correspondence
Bx 86
F: Mission 1906-21 [1 of 4]

**EXHIBIT 36**

"Exhibit D"

DEPARTMENT OF THE INTERIOR,

Subject: Tahquitz        UNITED STATES INDIAN SERVICE
Ditch at Palm Springs.   Salt Lake City, Utah.

Banning, Cal.
Aug. 23, 1909.

72726

When I was about twelve years old my father took me to San Gabriel. We staid there about a year.  The Mission was built then, we left there and went to Cabozon, or what is now called Indio. We staid there about ten years.  Then I left there and went to Palm Springs.  I married at Palm Springs.  I had three children when I started to build the ditch out of Tahquitz Canyon.  Another Indian by the name of Lass helped me build the ditch.  We had no power to blast the rocks with, so we built around the rocks the best we could, and finally got the water to the Springs.  I did not break the rocks with fire and water. Old man Victorito did it about fifteen or twenty years later, or about the time the Stage Station was built there.  I had built the ditch out of Tahquitz Canyon some years before the U. S. mail was first carried through there on horse back.  The stage station was built about fifteen or twenty years after I had built the Tahquitz ditch.  The ditch was built to get good water to drink and to irrigate with.  All the water we had before we built the Taquitz ditch, was from the hot sulphur spring, to drink or to irrigate with.  I took the water out of Taquitz creek and made a ditch following reasonably close to the foot of the mountain until I reached a point west of the springs, then I left the foot of the mountain and made the ditch so that it passed a little north of the hot springs.  No white man did anything to help me

(COPY)

-2-

build the ditch.    I think I could go down there now and show just where I built the ditch.    I think I am a little over a hundred years old.

his mark

Jose Lebacho

(thumb print)

Witness
B. B. deCrevecoeur,
Banning, Cal.

**EXHIBIT 37**

UNITED STATES OF AMERICA, )
   AND      )
GEORGE WELLWOOD MURRAY ET AL. )

Office of Indian Affairs

Received

Mar. 2, 1911  18318

THIS AGREEMENT, made and entered into this tenth day of February, 1911, by and between the UNITED STATES OF AMERICA, acting in this behalf by W. H. Code, Chief Inspector of Irrigation of the United States Indian Service, party of the first part, and GEORGE WELLWOOD MURRAY, WELLWOOD MURRAY, MRS. NELLIE COFFMAN, MRS. LAVINA CROCKER, ALONZO E. DAVIS and MISS PEARL MC CALLUM, parties of the second part.

WITNESSETH: That whereas the party of the first part has in contemplation the building of a concrete pipe line and stone cement ditch to convey a portion of the water flowing in and from Tahquitz Creek on the Agua Caliente Indian Reservation, in County of Riverside, State of California, which said party of the first part owns and is entitled to use; and

WHEREAS that portion of the waters of said Tahquitz Creek heretofore applied to beneficial use do run and flow out of and from said Tahquitz Creek into and through a channel in a general northeasterly direction across the northerly half of section 22, township 4 south, range 4 east, S. B. M. and

WHEREAS, it is the desire and purpose of the parties hereto that the rights to the waters of said Tahquitz Creek and to the use thereof be defined and agreed upon as between the parties hereto.

261

NOW THEREFORE, it is hereby understood and agreed, in consideration of the covenants herein contained, that the said party of the first part, for the purpose of effecting a saving in the low water flow, will construct a concrete pipe line from a point on the said present channel leading from said Tahquitz Creek (said point being the same point hereinafter called the point of diversion) through and across section 22, township 4 south, range 4 east, S. B. M., to a point about four hundred ninety (490) feet north of the south line of section 15, township 4 south, range 4 east, S. B. M. as the said concrete pipe line is located and indicated on the map attached hereto marked "Exhibit A" which is hereby referred to and made a part of this agreement.

It is further agreed that the party of the first part will also construct a stone cement ditch with a maximum carrying capacity of approximately three hundred fifty (350) California Miners' inches, said ditch to extend from the north end of said concrete pipe line in said section 15, as hereinbefore mentioned and described, through and across said section 15, following the line of the present ditch in which the parties hereto have mutual rights; said pipe line and ditch, when so constructed and completed, to be used to convey the waters of said Tahquitz Creek to the lands whereon the said water is to be used by the parties hereto.

It is further understood and agreed, in consideration of the covenants herein contained, that the said party of the first part is the owner of and is entitled to and shall have the right to use the first forty (40) California Miners' inches of the waters of said Tahquitz Creek, said forty (40) inches to be measured at the aforesaid point of diversion in said section 22, which said point of diversion is marked "point of diversion" on the map hereto attached marked "Exhibit A". And the said party of the first part shall be entitled to, and shall have the right to use the first forty (40) California Miners' inches of water at any and all times flowing at the aforesaid point of diversion.

It is further agreed that when the quantity of water at the said point of diversion exceeds forty (40) California miners inches, and until it reaches eighty (80) California miners inches of water, said parties of the second part shall be entitled all waters in excess of the said first forty inches.

When the waters flowing at said point of diversion exceed eighty (80) California miners inches in quantity, it is hereby agreed that the said party of the first part shall be entitled to the use of two-thirds (2/3) of the excess of water above eighty (80) California miners inches, and the said parties of the second part shall be entitled to the use of the remaining one-third (1/3) of said excess of water above eighty (80) California miners inches, until the carrying capacity of said stone cement ditch is reached.

It is further understood and agreed by and between the parties hereto that the custody and control of said ditch shall at all times be vested in the said party of the first part, its successors or assigns, and that at such time or times when the flow of water at said point of diversion is reduced to forty (40) California miners inches or less, said party of the first part shall turn out of the said stone cement ditch at that certain point indicated on the map hereto attached, marked "Exhibit A", which said point is marked on said map and thereon designated as "domestic turnout", a stream of water not exceeding five (5) inches in quantity, which said five inches of water turned out under the conditions aforesaid may be used by said parties of the second part for domestic purposes only and for no other purpose, provided, however, that whenever the flow of water at said point of diversion shall not exceed ten (10)

262

California miners inches, the party of the first part hereof shall be entitled to one-half (1/2) of such flow of water as may be available at said point of diversion; and the said parties of the second part shall be entitled to the other one-half (1/2) of such flow of water at said point of diversion, for domestic purposes only and for no other purpose.

It is further understood and agreed by and between the parties hereto that the said party of the first part shall turn out from the said stone cement ditch at the six points indicated upon the map hereto attached, marked "Exhibit A", which said six points are marked and designated on said map as "Turn-out No. 1", "Turn-out No. 2", "Turn-out No. 3", "Turn-out No. 4"; "Turn-out No. 5" and "Turn-out No. 6", respectively, such water as the said parties of the second part are entitled to under the terms of this agreement, at all times when there is an excess over and above forty (40) California miners inches of water at said point of diversion hereinbefore mentioned and described. Said water shall be turned out to the said parties of the second part in such rotation, at the times and in the amounts mentioned in a certain written mutual agreement executed by and between the parties of the second part, which said agreement is hereto attached, marked "Exhibit B" provided, however, that in the event that either or any of said parties of the second part desire to exchange the time of service as specified in said "Exhibit B", that the agent of the party of the first part in charge of said ditch be given at least forty-eight (48) hours notice of such requested exchange.

It is further understood and agreed by and between the parties hereto that the said parties of the second part shall clean out all sand, debris or other accumulation which may deposit in the said stone cement ditch in said Section 15, and that any maintenance or repairs necessary upon the said stone cement ditch, except as to the said cleaning out of sand, debris or other accumulations, shall be performed or made by the said party of the first part. In the event that said parties of the second part shall fail or refuse to keep the said stone cement ditch in section 15 free and clear of all sand, debris and other accumulations after forty-eight (48) hours notice given to either or any of said parties of the second part to so clean out said ditch, then the party of the first part may, at its option, cause the said ditch in said section 15 to be so cleaned out, and the said parties of the second part shall jointly and severally be liable to the said party of the first part for the cost and expense of such cleaning, and said party of the first part may withhold from each and all of the parties of the second part any and all waters which they or either of them may be entitled to use under this agreement, until the cost and expense of said cleaning shall have been paid to said party of the first part.

It is further understood and agreed by and between the parties hereto that said parties of the second part shall severally construct and maintain a good and substantial fence upon each side of said stone cement ditch throughout their several abutting properties in and through said section 15 where said ditch is accessible to stock, and said parties of the second part shall also construct and maintain a good and substantial fence across said ditch on each side of the road at all road crossings, with a suitable gate opening for the passage of the ditch tender; and the said party of the first part agrees to cover said ditch in a proper and substantial manner at the said road crossings.

It is further understood and agreed that the provisions of this agreement shall be binding upon the heirs, administrators, executors, successors and assigns of the parties hereto.

263

IN WITNESS WHEREOF, the said parties have hereunto subscribed their names and affixed their seals on the day and year in this certificate first above mentioned.

> William H. Code, Chief Inspector
> of Irrigation.
> Welwood Murray
> Mrs. Nellie Coffman
> Mrs. Lavina Crocker
> Miss Pearl Mc Callum
> Alonzo E. Davis
> Geo. Welwood Murray

Approved March 6, 1911.

R. A. Ballinger, Secretary of the Interior.   C. F. H.   E. C. P.

State of California,  )
                      )  ss.
County of Riverside.  )

On this 10" day of February, in the year of our Lord, one thousand nine hundred and eleven, before me, George P.McBurney, a Notary Public in and for said County of Riverside, residing therein, duly commissioned and sworn, personally appeared Welwood Murray, Mrs. Nellie Coffman, Mrs. Lavina Crocker and Miss Pearl Mc Callum, personally known to me to be the persons described in, and whose names are subscribed to and who executed the within instrument, and acknowledged to me that they executed the same freely and voluntarily.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal, at Palm Springs, in the said county, the day and year in this certificate first above written.

> George P. Mc Burney, Notary Public
> (NOTARIAL)
> (  SEAL  )        in and for the County of Riverside,
>                   State of California.

My commission expires July 26", 1914.

State of California,   )
                       )  ss.
County of Los Angeles. )

On this 15 day of Feby., in the year one thousand nine hundred and eleven, before me, C. V. Sturdevant, a Notary Public in and for the County of Los Angeles, personally appeared Alonzo E. Davis, known to me to be the same person whose name is subscribed to the within instrument, and he duly acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, at my office in the County of Los Angeles, the day and year in this certificate first above written.

> C. V. Sturdevant, Notary Public
> (NOTARIAL)
> (  SEAL  )        in and for the County of Los Angeles,
>                   State of California.

My commission expires Dec. 27, 1914.

State of New York,  )
                    )  ss.
County of New York. )

On this first day of March, A. D. nineteen hundred and eleven, before me, Lucius A. Wilson, a Notary Public of the State of New York, for Kings County, with certificate duly filed according to law in the County of New York, and duly authorized in accordance with the laws of the State of New York, to act in the said County of New York, duly commissioned and sworn, personally

264

appeared George Welwood Murray, known to me to be the person whose name is subscribed to the within instrument, and duly acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year in this certificate first written.

> (NOTARIAL)
> (  SEAL  )

Lucius A. Wilson, Notary Public of the State of New York, for Kings County, Certificate filed in New York County.

My commission expires March 31, 1911.

District of Columbia, )
                      ) ss.
City of Washington.   )

Subscribed and sworn to by Wm. H. Code, before me, this 3rd March, in the year of our Lord, one thousand nine hundred and eleven.

> (NOTARIAL)
> (  SEAL  )

Laura B. Holderby, Notary Public.

My commission expires Nov. 18, 1912.

## EXHIBIT "B"

WHEREAS, we the undersigned owners of land and entitled to the use of a portion of the water flowing in the ditch from Tahquitz Creek, have entered into, and attested with our several signatures, our agreement to the terms of the agreement with the Government of the United States, a copy of which is hereto attached and made a part hereof.

NOW THEREFORE, we the undersigned do hereby covenant and agree, each for himself, with all the other parties hereto, to the following schedule defining our several rights to the use and service of said water, under said agreement, for irrigation, as follows, to-wit: Our said rights shall be measured and proportioned upon the basis of the proportions of our several acreages and holdings, to-wit:-

George Wellwood Murray, ten (10) acres; Mrs. Nellie Coffman, seven and one-half (7-1/2) acres; Mrs. Levina Crocker, one-half (1/2) acre; Alonzo E. Davis, one (1) acre; Miss Pearl Mc Callum, twenty one (21) acres.

That the said parties shall be entitled to use the said water coming to them under said agreement with the United States of America in irrigating their said lands, according to the following schedule:

| Water User's Name | Acr. | Hrs. Flow | No. Acr. | TURNOUTS Hrs. Flow | From | To |
|---|---|---|---|---|---|---|
| Mc Callum- Davis- | 11 1/2 | 92.4 4.2 | 1 | 11-1/2 | 96.6 | Mon. 6:00 A.M. | Fri. 6:36 A.M. |
| Coffman- | 2 | 16.8 | 5 | 2 | 16.8 | Fri. 6:36 A.M. | Fri. 11:24 P.M. |
| Coffman- | 5 | 42.0 | 2 | 5 | 42.0 | Fri. 11:24 P.M. | Sun. 5:24 P.M. |
| Mc Callum- Coffman- | 10 1/2 | 84.0 4.2 | 3 | 10-1/2 | 88.2 | Sun. 5:24 P.M. | Thurs. 9:36 A.M. |
| Davis- Crocker- | 1/2 1/2 | 4.2 4.2 | 4 | 1 | 8.4 | Thurs. 9:36 A.M. | Thurs. 6:00 P.M. |
| Murray- | 10 | 84.0 | 6 | 10 | 84.0 | Thurs. 6:00 P.M. | Mon. 6:00 A.M. |
| Total | 40 | 336.0 | | 40 | 336.0 | | |

The foregoing schedule is based upon the mutual agreement that our lands shall use the water every two weeks, its proportional time.

And it is further agreed, that in the event any of the parties so entitled to said water shall not care to use the water at the time, nor the amount to which he may be entitled hereunder, he may allow a part or all of his water run to pass on down the ditch; but such act shall in no way change the time when the next user in order shall receive his water.

Provided, however, that nothing herein shall be construed to prevent the several users from exchange of time of service of water runs that shall not interfere with the rotation of service to other irrigators not parties to such exchange, without their consent thereto.

And provided further, that such change of time shall depend upon the concurrence of the water agent in charge of the turning and measuring of the outflow at the turnouts.

And it is further agreed, that the work of cleaning said ditch, as provided in the attached agreement, shall be performed or paid for pro rata, when notified by the said water agent, and in case any of the parties hereto shall fail after reasonable notice (of at least forty-eight (48) hours) to perform his share of such work, it shall be lawful for the said water agent to withhold use of the said water until said work is performed or paid for.

And provided further, that when the water in said ditch shall admit of less than 20 inches flow, it shall be at the option of the users as aforesaid to receive a flow of a greater amount of water for a proportionately less number of hours.

It is further understood and agreed that the provisions of this agreement shall be binding upon the heirs, administrators, executors, successors and assigns of the parties hereto.

WITNESS our hands this tenth day of February, 1911.

> Welwood Murray
>
> Mrs. Nellie Coffman
>
> Mrs. Lavina Crocker
>
> Miss Pearl McCallum
>
> Alonzo E. Davis
>
> Geo. Welwood Murray

State of California, )
                     ) ss.
County of Riverside. )

On this tenth day of February, A. D. 1911, before me, George P. McBurney, a Notary Public in and for the said County and State, residing therein, duly commissioned and sworn, personally appeared Welwood Murray, Mrs. Nellie Coffman, Mrs. Lavina Crocker, and Miss Pearl McCallum, known to me to be the persons whose names are subscribed to the within instrument, and acknowledged to me that they executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year in this certificate first above written.

> George P. McBurney, Notary Public
> in and for said County and State
> of California.

(NOTARIAL)
(  SEAL  )

My commission expires July 26, 1914.

266

State of California,  }
                      (  ss.
County of Los Angeles. )

On this 15 day of Feby., in the year one thousand nine hundred and eleven, before me, C. V. Sturdevant, a Notary Public in and for the County of Los Angeles, personally appeared Alonzo E. Davis, known to me to be the same person whose name is subscribed to the within instrument, and he duly acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, at my office in the County of Los Angeles, the day and year in this certificate first above written.

(NOTARIAL)                          C. V. Sturdevant, Notary Public
( SEAL )                            in and for the County of Los Angeles,
                                    State of California.

My commission expires Dec. 27, 1914.


State of New York,  }
                    (  ss.
County of New York. )

On this first day of March, A. D., nineteen hundred and eleven, before me, Lucius A. Wilson, a Notary Public of the State of New York, for Kings County, with certificate duly filed according to law in the County of New York, and duly authorised in accordance with the laws of the State of New York, to act in said County of New York, duly commissioned and sworn, personally appeared George Welwood Murray, known to me to be the person whose name is subscribed to the within instrument, and duly acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year in this certificate first written.

                                    Lucius A. Wilson, Notary Public
(NOTARIAL)                          of the State of New York, for Kings
( SEAL )                            County, Certificate filed in New
                                    York County.

My commission expires March 31, 1911.

# EXHIBIT 38

8-1142

U. S. INDIAN SERVICE, LOS ANGELES, CAL.
OFFICE OF SUPERINTENDENT OF IRRIGATION
Ansd. SEP 10 1912 F. M. Schrock
9/7/2 H. F. Counts
File

DEPARTMENT OF THE INTERIOR

UNITED STATES INDIAN SERVICE

Palm Springs, Cal. Sept. 7, 1912.

Mr. C.R.Olberg,

Suprintendent of Irrigation,

Los Angeles, California.

Through W.T.Sullivan,

Suprintendent Malki Agency,

Banning, California.

Dear Sir:-

I am enclosing herewith water report for the month of August. The flow has been low in both Tah Quitz and San Andreas Canyon ditches but the Tah Quitz ditch has furnished water for domestic use but it has been necessary for most of them to haul it as the flow has been too low to reach those who live farther back on the reservation. The water has been measured at the diversion dam not at the reservation line therefore the Indians have not had use of all the water as indicated on the record, as some of it evaporates while coming down the ditch but we are gatting a lot more water on the reservation than we did before the ditch was worked on last winter.

I would like very much to know what your plans are in the way of improving the water systems for these Indians the coming winter especially the Andreas Canyon system. Mr. Wakosky made a lot of cement pipe which is on the ground ready to be put in on Sec. 26 but he was short of funds and had to stop work before he got them all in.

Owing to the grade and the condition the lower end of the pipe it is absolutely impossible to irrigate land below the end of the pipe as the lower end is about four or five feet under ground and if we should dig out the dirt and make an open ditch of it the land is so steep for a distance of a quarter mile that the water would wash the land till it would be unfit for farming purposes.

Three Indians are farming on Sec. 26, and only a small amount of land can get the benefeit of the water owing to the way the ditch swings around. I have one Indian who wants to level ten acres on the N.W. corner of the section but I don't believe I can get him started at it until I can promise him the water will be brought at least ten or twelve hundred feet farther north and then after that has been done the land is not so steep and we can carry the water the balance of the way in a dirt ditch. I surveyed this ten acres for Amado Miguel at the time Mr. Makosky was working there but when he saw the ditch was not coming any farther at that time he did not do any thing more on the land. I have succeeded in getting Marcus Belardo to take up another ten acre strip near that of Amado Miguels and he says he will clear it and put it in crops if the water is brought down within reach of him.

I wish you would please arrange it to get this ditch completed so we can go ahead with the work leveling the land as this is the only water these Indians can depend on and Sec. 26 is the best land they have for farming and while I have them in the notion of going up there to farm I would like to have the ditch in shape so they can take water. White people are already complaining about the water going to waste on Sec. 26 and if we don't make use of it soon under the California laws we are liable to lose a part of it as there is lots of splendid land which belong to white people on Sec. 23 and the whites may cause us lots of trouble even if they can't take the water.

The Indian office has decided to promote the Farmers and
Suprintendents according to increase of live stock and acreage
farmed and value of crops raised and you cannot appreciate the
conditions as they exist on Sec. 26 unless you be right on the
ground and see for your self. I wish you could come down soon
and go over the ground with me and I think you would agree with me
that some work should be done for the extention of the water system
on the section mentioned above. This work should be done before the
first of the year or as soon after Jan. 1,as possible as the Indians
want to put the land in Alfalfa and the seed must be sowed by the
latter part of Jan. in this climate or it will do no good.
Please let me hear from you in regard to the extention of the ditch
as soon as convenient so that I will know what to promise the Indians
and if you say you can do anything for us I think I can get them to
go up there to clear and level the land and have it ready when the
water comes but I have to be very careful not to dissappoint them
by promising them something which we cannot deliver. Hoping to hear
from you at your earliest convenience I am Very Truly yours,

*Adrian S. Maurer*

Add. Farmer. U.S.Indian Service.

**EXHIBIT 39**

Reproduced at the National Archives

Original

# HISTORY OF IRRIGATION

## AGUA CALIENTE INDIAN RESERVATION

### CALIFORNIA.

Dist. #4.                    Jan., 1918.

Reproduced at the National Archives



Reproduced at the National Archives

* * *

Department of the Interior

UNITED    STATES    INDIAN    SERVICE

Cato Sells, Commissioner

* * *

HISTORY OF THE INDIANS

and

IRRIGATION ON INDIAN RESERVATIONS

***

Prepared under the direction of
W. M. Reed, Chief Engineer.

***

DISTRICT NO. 4

C. R. Olberg, Supt. of Irrig.  H. V. Clotts, Acting Supt.

HISTORY OF AGUA CALIENTE RESN.

Compiled by O. W. Bauer.

1918.

Reproduced at the National Archives

HISTORY OF IRRIGATION

AGUA CALIENTE INDIAN RESERVATION.

Reproduced at the National Archives

# I n D e X

| | Page No. |
|---|---|
| General description, location, area, etc. - - - | 1 |
| Climate and rainfall - - - - - - - - - - - - - - - | 2 |
| Soil and vegetation - - - - - - - - - - - - - - - | 2 |
| Water Resources - Early history of development- | 5 |
| History of Irrigation Projects - - - - - - - - - | 7 |
|    Palm Springs Project - - - - - - - - - - - | 7 |
|       Disputes over water & their settlement- | 7 |
|       Construction of Project - - - - - - - - - | 9 |
|       Need for additional conduits - - - - - | 10 |
|       Reservoir at Bath House - - - - - - - - | 10 |
|    Garden of Eden Project - - - - - - - - - - | 11 |
|       Acquisition of water right for Indians- | 11 |
|       Extension of original pipe line - - - - | 11 |
|       Need for pipe replacement - - - - - - | 12 |
| Present condition of the Indians - - - - - - - | 12 |
|    Population, crops grown, etc. - - - - - - | 12 |
| Orders of Withdrawal establishing reservation - | 13 |
| Patents and purchases of Land - - - - - - - - - | 14 |
| List of Conduits and Structures - Palm Springs Project - - - | 16 |
| List of Conduits and Structures - Garden of Eden Project- | 17 |

Reproduced at the National Archives

## PHOTOGRAPHS

PAGE NO.

Pomelo Orchard - Garden of Eden - - - - - - - - -   18

Bath House at Palm Springs - - - - - - - - - -   18

Diversion Dam - Garden of Eden Project   - - - -   19

## MAPS

1.   Plat showing Indian Lands in T 4 S, R 4 E, S. B. M.

2.   "    "    "    "    "    "   T 4 S, R 5 E,    "

3.   "    "    "    "    "    "   T 5 S, R 5 E,    "

4.   Map of Palm Springs Project.

5.   "   "   Garden of Eden Project.

Reproduced at the National Archives

History.

## AGUA CALIENTE RESERVATION.

### Location, Area, etc.

Agua Caliente Reservation, which is situated in Riverside County, California, was created by Executive Order of May 15, 1876 and subsequent Orders and purchases. At the present time, the Reservation comprises 31200.01 acres of land of which 30376.04 acres are patented to the Agua Caliente tribe. Originally, the Reservation embraced only the even numbered sections of three townships, the odd numbered sections having been grant lands of the Southern Pacific Railroad. Subsequent Orders and purchases have resulted in the acquisition for the Indians of some lands in the odd sections.

Approximately one half of the Reservation lies on the steep eastern slope of the San Jacinto Mountains, this area being far too precipitous to be of value even for grazing purposes. Several creeks flow in deep canyons down this slope of the mountains and from two of these streams, namely Tahquitz and Andreas Creeks the Indians obtain their water supply. The remaining (i.e. eastern) half of the Reservation lies on the floor of the Colorado Desert at an average elevation of 400 feet. For the most part, this consists of sandy land badly cut up by rocky washes in which flow or disappear the various streams

Reproduced at the National Archives

2

that emerge from the canyons. A limited area of irrig-
able land lies along the base of the mountain and for
the irrigation of this land two Projects, known as the
Palm Springs and the Garden of Eden Projects have been
constructed by the Government.

### Climate and Rainfall

During eight months of the year, the climate of
this region is almost ideal. In consequence of this
fact, quite a settlement of health seekers has grown up
in the vicinity of the warm spring to which the names
Agua Caliente and Palm Springs originally referred. The
springs are said to possess medical properties and a
number of sanatoriums have been established here. This
settlement is known as Palm Springs.

The summer months are very warm but always there
is a wide variation between night and day temperatures.

While no rainfall records from Palm Springs are
available, the record of observations at the railroad
station six miles distant indicate that the average
precipitation is about 4 inches.

### Soil and Vegetation

In the northern portion of the irrigable area men-
tioned above as that served by the Palm Springs Project,
the soil consists of a loose sandy loam. After cropping
for several years, this soil becomes very productive.

Reproduced at the National Archives

3

In the area to the south, or that covered by the Garden of Eden Project, the soil of the higher lands is a red clay while the low lands as a rule are sandy.

The natural vegetation of the region consists of luxuriant growths of mesquite and palo verde trees, greasewood and other desert plants.

## Water Resources. Early History of Development.

Agua Caliente spring forms an oasis on the desert that has been a gathering place for the Indians for many decades. The spring itself which is situated barely inside the boundary of the Reservation, furnishes only three or four miners inches of water, and is not of great importance for irrigation. In 1914, the government erected a small bath house over the spring to replace a dilapidated structure that preceded it.

The only other known sources of water supply available for this reservation are the streams that flow in the mountain canyons. These streams, in their order from north to south, are Whitewater River, Snow, Chino, Tahquitz, Andreas, Murray and Palm Creeks, all of which flow perenially.

Whitewater River, a stream of considerable proportions, has been exploited at sundry times since 1884 by various companies interested in desert land schemes. A stone lined ditch six miles in length furnishes water

Reproduced at the National Archives

4

to various white irrigators near Palm Springs. The greater portion of the water in the river has recently been diverted to another watershed.

Chino Canyon for many years was a rendezvous for Indians. In the days of the early Mission Fathers the Agua Caliente Indians moved their camps close up to the mountains so that they might flee into the canyons upon the approach of the Padres to whose strenuous methods of evangelization and civilization they objected. Finally, hard pressed, a band of these Indians under the leadership of "Old Man Chino" moved up into Chino Canyon, where they lived for some time. A few fruit trees and remains of houses at present mark the location of this camp. The canyon affords excellent pasturage and is still used by the Indians for this purpose, notwithstanding the fact that the land is owned privately.

Although the Indian Office at one time proposed to develop the waters of Chino Canyon, and caused water filings to be made, these plans were finally dropped owing to the great expense involved.

Tahquitz Creek always has been the principal source of water supply for the Palm Springs section. Many years ago a witch doctor of the Cahuilla Indians left his people and went up into Tahquitz Canyon to live. He acquired miraculous powers and many stories are current

Reproduced at the National Archives

5

among the Cahuilla Indians of the exploits of this
evil spirit from which Tahquitz Canyon got its name.
The canyon is deep and accessible only with the great-
est difficulty. This fact and the fact that it is the
habitat of this evil one prevents its being much visited
by the Indians even today.

From the earliest times Indians have lived around
the mouth of Tahquitz Canyon. Some of the oldest In-
dians state that their fathers were born and died there.
At least two "grave-yards" or more correctly, places
where the dead were formerly burned are still visible
but none of the living Indians can remember when the
burnings ceased at these places.

As nearly as can be ascertained, it was about 85
years ago that the Indians first dug an irrigation ditch
from Tahquitz Canyon. This ditch was used continuously
and at frequent intervals was cleaned out or enlarged.
When the first white settlers arrived they evidently
acquired lands near the ditch and appropriated water
therefrom. The Indians at first offered no objection
to this procedure but as more whites arrived the Indians
were soon left without water. For several years such
conditions prevailed and much friction arose between
various interests and factions over the water situation.
The activities of the Government for the relief of the
Agua Caliente Indians will be taken up below under the

Reproduced at the National Archives

6

"History of Irrigation Project".

The early development of one other creek - Andreas - has yet to be mentioned. From the earliest times, Andreas Canyon, which takes its names from one of the early settlers who lived therein, has been inhabited by Indians who made use of the water.

In 1893 one B. B. Barney, acquiring some lands near the mouth of the Canyon, established a ranch that he called the Garden of Eden and which he proposed to irrigate from Andreas Creek. He entered into a contract with the Government which provided that in consideration for a 20-foot right-of-way for a pipe line across Section 2 of the Reservation, the Indians were to be allowed sufficient water from the pipe line to irrigate 100 acres or such part of it as they might have in cultivation on the basis of 1 inch for each 6 acres of land. No recognition was given to the Indians' right by long use of the water. Under the conditions of climate and soil this amount of water was of little or no value for irrigation and as a result the Indians soon vacated, leaving Mr. Barney in full possession of the water. An inspector finding that Mr. Barney was not doing the necessary development work to preserve his water right, filed on 500 inches or all of the ordinary flow of Andreas Creek and put the Indians to work to construct a stone ditch. This

Reproduced at the National Archives

ditch never proved of practical value to the Indians. The inspector found that the pipe line had been constructed at a cost of about $6000 and that it had a capacity of 150 miners' inches and that Mr. Barmy had a vested right which should be respected. He therefore arranged a compromise by which the agreement of 1893 was abrogated and a new one made giving the Indians one-half of the flow in the creek and in the pipe line.

This contract remained in effect until 1907 when Barney sold to the Government all his interests in the water and 800 acres of land for the sum of $6000. The later development of the Creek by the Government is described below.

In 1912, an investigation of the power and reservoir possibilities of this region was made. This is covered in a report dated March 18, 1912.

History of Irrigation Project.
Palm Springs Project

The first irrigation work undertaken by the Government at Palm Springs is believed to have been the construction of cobble-stone ditches at Tahquitz and Andreas Canyons in 1906. These ditches were poorly constructed and were soon abandoned.

The first active steps were taken by the Government to settle the dispute over the division of the water of Tahquitz Creek in 1909 and 1910. It was generally con-

8

-ceded that the Indians were entitled to 40 miner's inches of the low water flow of Tahquitz Creek but owing to seepage and evaporation losses it was seldom that any water reached the irrigable land of the Reservation during the low water season.

Before anything could be accomplished, to improve the water supply for the Indians, it was necessary to establish the respective rights of the several water users. Accordingly a contract was drawn up setting forth the respective rights of the Indians and whites and the division of the water belonging to the whites among its several owners. Under the terms of this contract, the whites agreed to the division as set forth in consideration of the improvements to be made in the ditch from which they would receive benefits as well as the Indians.

As stated in the contract, the first 40 California miner's inches of the low water flow of Tahquitz Creek belonged to the Indians, the second 40 inches to the whites, and the balance of the flow was divided on the basis of two-thirds to the Indians and one third to the whites.

Although this contract was eminently fair, considerable difficulty was encountered in obtaining the signatures of the parties at interest. All opposition, however, was finally overcome and the document was approved

Reproduced at the National Archives

9

by the Secretary of the Interior on March 6, 1911.

Work was immediately begun on the Palm Springs Project. A small diversion dam was constructed in Tahquitz Canyon, not in the creek itself but in the old irrigation channel, thus effecting quite a saving in the length of conduit. This diversion dam is provided with a cippoletti weir, leaf trap, and head-gate.

From the head-gate, a pipe line 2870 feet in length leads northward across the rough talus slope to the head of the stone lined ditch. This line consists of concrete pipe of 14", 12" and 10" diameter having a capacity of five second feet. The stone lined ditch is 4344 feet in length and has a trapezoidal section, with 1.5 feet bottom width and depth of 1.5 to 2.0 feet. Its capacity is ten second feet; this excess of capacity of the ditch over that of the pipe line permits the turning of water from the old irrigation channel directly into the head of the ditch during periods of high water. Several checks and turnouts were provided along the line of the ditch, each with an individual weir so that an accurate check may be kept on the quantity of water supplied to irrigators.

The present terminus of this conduit is at the warm spring just inside the boundary of section 14 which is the section on which most of the Indians live. One short lateral, 568 feet in length of 12" concrete pipe was installed in 1915 to carry the water past the bath house.

Reproduced at the National Archives

10

Because of the lack of a suitable distribution system, a large portion of the water is lost in the open ditches before it reaches the various irrigators. Owing to the unusually warm climate and the sandy nature of the soil, the evaporation and seepage losses are very great.

A few minor changes have been made in this conduit since it was installed. In the village, the ditch was carried across two streets in culverts consisting of two lines of 14" concrete pipe. These culverts were soon cut out by the sand and therefore have been replaced, one in 1915 by a 24" concrete pipe 52 feet in length, the other which passes under the newly paved County highway was replaced in 1916 by a reinforced concrete box culvert 86 feet long.

One syphon 45 feet in length was also installed in 1913 to permit the flood water to flow across the conduit. This consists of 24" concrete pipe.

Near the bath house, a reservoir has been excavated to collect the water from the spring. This reservoir is 130 x 50 x 5 feet and has a capacity of 240,000 gallons. It is unlined. The water thus collected is used for irrigation, while the reservoir also serves the Indians for a swimming pool.

Reproduced at the National Archives

11

### Garden of Eden Project.

As already stated, the so-called Barney Ranch con-
sisting of Section 35, together with the low water flow
of Andreas Creek, was purchased in 1907 for the benefit
of the Agua Caliente Indians.  An eight inch pipe of riv-
eted sheet steel about one mile in length was included
in the purchase.  This pipe was installed in 1893 to con-
duct the water from the canyon down the steep talus slope
to Section 35.

Because of the worthlessness of the land covered by
the pipe line, it was decided to construct an extension
of concrete pipe to irrigate a tract of fairly good land
in Section 26.  During the fiscal year 1909, 1720 feet of
10" pipe was laid.

During 1911, a small concrete diversion dam was con-
structed in Andreas Canyon at the head of the steel pipe,
and during that and subsequent years the pipe line has
been extended 13040 feet further, using 12" and 10" con-
crete pipe with one short 8" lateral.  This pipe line now
extends a short distance into Section 22.

During January 1916, a flood of considerable propor-
tions swept down Andreas Canyon overtopping both abutments
of the dam.  These were of earth and were quickly carried
away leaving the concrete dam in place.  Several breaks
occurred also on the pipe line.  This damage was immediately
repaired.

Reproduced at the National Archives

12

At the present time, the old steel pipe line still remains in service but it should be replaced at a very early date.

Topography of all the irrigable lands of this reservation was taken during the years 1910, 1911 and 1913.

## Present Condition of the Indians

The population of Agua Caliente Reservation consists of 52 Indians of the Cahuilla tribe. Although these people have irrigated lands under the Palm Springs ditch for many years, it has been only recently that they have begun to make extensive use of the irrigation facilities provided by the Garden of Eden Project.

The chief crops grown at Palm Springs are melons, alfalfa, potatoes, figs and citrus fruits.

None of the Indian lands are allotted.

The settlement at Palm Springs is reached from Whitewater Station on the Southern Pacific Railroad over a paved highway. The distance from the station is about 9 miles and all produce and supplies are transported by this route.

Reproduced at the National Archives

13

## ORDERS OF WITHDRAWAL - AGUA CALIENTE RESERVATION.

### T 4 S R 4 E  SBM

Sec. 14 and E 1/2 of S E 1/4 and N E 1/4 Sec. 22 withdrawn from entry for Indians (Exec. Order 5/15/1876)

All even numbered sections and unsurveyed portions of township withdrawn from entry for Indians (Exec. Order 9/29/1877.

Secs. 12, 14, 22, 24, 26, and 34 reserved for Indians (Exec. Order 12/29/1891).

Secs. 6, 7 if same be exchanged with Southern Pacific Railroad and Sec. 10 withdrawn from entry for Indians (Exec. Order 2/2/1907).

Sec. 35 purchased for Indians (1907).

### T 4 S R 5 E  SBM

All even numbered sections and unsurveyed portions of township withdrawn from entry for Indians (Exec. Order 9/29/1877).

### T 5 S R 4 E  SBM

All even numbered sections and unsurveyed portions of township withdrawn from entry for Indians (Exec. Order 9/29/1877).

Secs. 2, 10 & 11 withdrawn from entry for Indians (Exec. Order 2/2/1891).

S E 1/4 Sec. 3 purchased for Indians (1907).

14

Patented to Agua Caliente Band, May 14, 1896 (File Refs.
I.O. Oct. 26, 1895, Rec. Gen. L. O.  In Vol. 21, pp.
231 to 233.  Interior letter Oct. 28, 1893).

|  Description | | | | Area |
|---|---|---|---|---|
| Secs. | Ts. S. | Rs. E. | | |
| 12 | 4 | 4 ) | | |
| 14 | 4 | 4 ) | E. San Bernardino M. | |
| 22 | 4 | 4 ) | 3844.80 acs. | 3844.80 acres. |
| 24 | 4 | 4 ) | | |
| 26 | 4 | 4 ) | | |
| 34 | 4 | 4 ) | | |

Patented to Agua Caliente Band, October 9, 1906 (File
Refs. I. O. May 8, 1906.  Interior May 14, 1906,
Recorded G. L. O., Misc. Vol. 577, pp. 476
to 479.

| Description | Area |
|---|---|
| Sec. 2. T. 5 S., R. 4 E., San Bernardino M. | 638.56 acres. |

Reproduced at the National Archives

15

Description of land patented January 5, 1911, to the

AGUA CALIENTE BAND OF MISSION INDIANS

under the provisions of the Acts dated January 12, 1891,

(26 Stat. L. 712), and March 1, 1907, (34 Stat. L. 1015).

Patent No. 168071.  Recorded in the Indian Office, Volume

36; file No. 94001-1910.  Patent filed in drawer 431;

> Sections 2, 4, 6, 8, 18, 20, 28, 30 and 32, and
> the W 1/2, Sec. 10, Twp. 4 South; and Sections
> 4, 6, 8, 12, 14, 18, 20, 22, 24, 26, 28, 30, 32,
> and 34, Twp. 5 South, Range 4 E; and Sections 2,
> 4, 6, 8, 10, 12, 14, 18, 20, 22, 24, 26, 28, 30,
> 32, and 34, Twp. 4 South, Range 5 East of the
> San Bernardino Meridian, containing 25,020.34
> acres.

————————— o —————————

Description of land purchased in 1907 for

AGUA CALIENTE BAND OF INDIANS

from B. B. Barney.  Recorded in Indian Office, Volume

6.  File No. 70953-07  page 165.

| | Section | Twp. | Rg. | Area  acres |
|---|---|---|---|---|
| All | 35 | 4 S | 4 E | 640 |
| S E 1/4 | 3 | 5 S | 4 E | 160 |

San Bernardino Meridian.  Total area  400 acres.

Reproduced at the National Archives

(16)

**AGUA CALIENTE RESERVATION.**

Palm Springs Project.

List of Conduits and Structures.

Conduit P.  (3438' cement pipe & 4344' stone ditch.)

Stone ditch 2200 ft. 1 1/2' bottom 1 1/2' deep installed 1911.

50 ft. replaced by 24" syphon 1913.

Stone ditch 2006 feet 1 1/2 bottom 2' deep installed 1911.

In addition 1 80' road culvert installed 1911 and

replaced 1916 by 86' box culvert 14" x 30" in clear.

Also 1 52' road culvert installed 1911 and replaced

1915 by 24" concrete pipe syphon.

Pipe Line

| | | | | |
|---|---|---|---|---|
| 14" | cement | 146' | installed | 1911 |
| 12" | " | 334' | " | " |
| 10" | " | 2390' | " | " |
| | | 2870' | | |

Pipe Line Lateral P 2

| | | | | |
|---|---|---|---|---|
| 12" | cement | 568' | installed | 1916 |

Structures

| | | | |
|---|---|---|---|
| 1 | concrete dam | installed | 1911 |
| 1 | concrete regulating gate | " | 1917 |
| 1 | concrete sand trap | " | 1911 |
| 1 | concrete water bridge | " | 1911 |
| 2 | concrete weir boxes | " | 1911 |

Reservoir Earth 130 x 50 ft.  5 ft. deep.  Capacity 240,000

gallons.  Installed 1914.

39—289

Reproduced at the National Archives

(17)


AGUA CALIENTE RESERVATION.

Garden of Eden Project.

    List of Conduits and Structures.

Steel Pipe Line A.

    3392 feet 8" riveted steel pipe purchased with land

Pipe Line B.   14030 feet long                    Cost $10284.80

| | | | | |
|---|---|---|---|---|
| 10" | Concrete | installed | 1909 | 1720 ft. |
| 12" | " | " | 1911 | 1995 " |
| 10" | " | " | 1911 | 5515 " |
| 12" | " | " | 1912 | 1481 " |
| 12" | " | " | 1913 | 1089 " |
| 10" | " | " | 1913 | 1800 " |
| 10" | " | " | 1915 | 430 " |

Lateral B 1     760 feet long                    Cost     281.61

    8" Concrete installed 1911     760 ft.

Structures.

    1 reinforced concrete diversion dam     Cost $1692.35

       constructed in 1911 including 30 ft. of

       14" concrete pipe and 178 ft. of 10" pipe

       to connect dam with steel pipe line.  This

       concrete pipe and both earth abutments of dam

       washed out in 1916.  Reconstructed.

    1 reinforced concrete flush out structure.

       Cost included in pipe line B.

Reclassification of Pipe Lines.

| | 8" | 10" | 12" | Total |
|---|---|---|---|---|
| Concrete | 760 ft. | 9643 ft. | 4565 ft. | 14968 |
| Steel | 3392 " | | | 3392 |
| | | | | 18360 ft. |

Reproduced at the National Archives

-18-



Pomelo Orchard Garden of Eden.  1 -A -4



Bath house at Palm Springs.  1 -B -10

39-291

Reproduced at the National Archives

-19-



Diversion Dam - Garden of Eden Project.





# EXHIBIT 40

Reproduced at the National Archives

REPORT ON THE

AGUA CALIENTE INDIAN RESERVATION,

To the

    INDIAN DEFENSE ASSOCIATION OF SANTA BARBARA.

- - - - - - - -

    The object of this report is to present an outline of the present status of the lands and water rights of the Indians now living within the Agua Caliente Indian Reservation, Palm Springs, Riverside County, California.

    This report is compiled from data and information obtained from an inspection of the lands, ditches, pipe lines and distributing systems now belonging to the reservation, measurements of flow of streams from which the Indians obtain water for irrigation or domestic use; from talks with a number of the Indians and with the Indian Agent, Mr. Ellis, at Riverside. Also from data obtained from records in the office of the Indian Agency at Riverside and from other official sources.

    A Map, Exhibit "A", accompanying this report shows the land ceded to the Indians or purchased by the U. S. for their use.

    A Map, Exhibit "B", on a larger scale, shows the Townsite of Palm Springs with reference to the present Indian Farms and the irrigating ditches carrying water thereto.

    Photographs taken on the reservation and on the streams, the source of water for the ditches, show the topography and general character of the land and water shed.

Reproduced at the National Archives

-2-

HISTORICAL:    Since long before the white men came among these Indians, the ancestors of the Indians owned, lived upon and farmed the land now occupied as the present townsite of Palm Springs. In 1884 the Indians were dispossessed from the lands of their forefathers and moved to the lands they are now farming. Remnants of their old ditches and their cemetary are still to be seen within the limits of Palm Springs townsite.

The present irrigating ditch, carrying water from Tahquit Canyon, see photos 1, 8 & 10, to Palm Springs, was built by the Indians very many years ago to water their farms on the East half of Section 15, now the townsite of Palm Springs. In order to irrigate their new farms on the West half of Section 14 an extension of the old ditch was necessary and was made by the Indians. The white owners of the townsite of Palm Springs appropriated the Indians' ditch, constructing five diversion headgates thereon, see Exhibit "E", diverting water at these points to their own laterals. Under this arrangement the Indians were forced to receive their irrigating water at the tail end of the ditch and at the pleasure of the white owners or water users. The ditch water was used by the Indians for domestic purposes as well as irrigation. As the water is carried through the townsite of Palm Springs in open ditches it becomes contaminated by drainage from the townsite as well as by dirt and rubbish finding its way into the ditch due to people and livestock crossing it.  In 1885 the Palm Valley Water Co., brought water to Palm Springs in a stone ditch, crossing the Indian Reservation for about five miles. For this right of way, under an agreement,

40-297

Reproduced at the National Archives

-3-

the Northwest quarter of Section 14. The Indians built a stone ditch to carry 27 inches of water. Water was turned into their ditch for a short time when for some reason the Indian's stone ditch was destroyed. Remnants of it can still be seen in several places.   In the latter part of the Eighties an effort was made on behalf of the Indians to obtain authority to construct a new ditch to deliver water to their farms without passing it through the townsite of Palm Springs, the sanatariums or dwellings of the health seekers living on the East half of Section 15. This movement was defeated by the white people by means of a petition sent to Washington about that time.

The white water users along the Tahquit ditch use water every day for irrigation or domestic purposes passing on to the Indians whatever water may be left and which has been found to be inadequate for proper irrigation of their farms. LAND:  Some 31127 acres of land have been ceeded by the U. S. Government to the Indians or purchased for their use, see Map Exhibit "A". The lands are located in Township 4 and 5 South of Range 4 East and Township 4 South of Range 5 East. Over two thirds of the entire acreage is non-agricultural and is located in a rough, rocky, mountainous country to the West and South of Palm Springs. Of the total acreage about 10000 acres may be classed as agricultural extending from Palm Springs Easterly about 8 miles on the large flat sloping gently towards the Salton Sea basin. Floodwater washfrom Whitewater River drainage cuts through a portion of this acreage from the Northwest. Floodwater from Palm Canyon flowing in a Northeasterly and Easterly direction joins the wash from Whitewater River crossing part of the Indian lands.

Reproduced at the National Archives

-4-

A careful survey of the agricultural lands of the Reservation would be necessary for accurate determination of the irrigable acreage, soil classification and valuation.

In general the lands below the 500' contour, see Map Exhibit "A" may be classed as agricultural, the irrigable portion of which is well adapted to raising alfalfa, corn, beans, water-melons, cantaloupe, garden truck and other crops provided adequate water can be obtained for irrigation.

WATER: The principal source of water supply for irrigating the Indian farms in the vicinity of Palm Springs is Tahquit canyon. Water for irrigation of Indian farms on Section 26 is brought through a Government built concrete pipe line from Andreas canyon. See photos 7,8,9 & 10. According to the stream gauging records in the files of the Indian Agency at Riverside, covering the period from August 1, 1922 to March 1, 1924, the maximun recorded flow of Tahquit Creek was 216 miners inches in November 1922 with 5 miners inches in August 1923. The record of stream flow of Andreas Creek is limited to 10 days in January 1924 during which period the flow ranged from 117 to 135 miners inches. It is probable that the stream flow of Murray and Palm Canyons is equal to that of Tahquit and Andreas Creeks. The water from these streams, Murray and Palm Canyons, appears not to have been appropriated and is permitted to sink into the underflow of the Palm canyon wash. The total normal flow of the four canyons mentioned would afford adequate water for direct irrigation of perhaps 400 or 500 acres of land if properly conserved and conveyed. The Indians are now partially irrigating 40 or 50 acres of land raising small crops of alfalfa, vegetables and

Reproduced at the National Archives

-5-

fruit for their own consumption. See photos 6, 14 & 17.

By conserving the flood water discharged at times by these four canyons it is probable that perhaps 1000 acres of Indian lands could be brought under irrigation. A careful study and survey would have to be made before an accurate estimate could be made as to selection of suitable reservoir sites and construction costs.

The U. S. Geological Survey records an average annual rain fall of 3.9 inches at Palm Springs covering a period of 16 years. The reported annual rain fall at Banning is 15 inches and the higher elevations of the San Jacinto mountains are estimated to have an annual precipitation of 25 inches or more. According to the U. S. G. S. Topographic map of the vicinity of Palm Springs the water shed of Palm and tributary canyons is approximately 250 square miles. This area should afford a flood water run-off, see photo 18, that if conserved by the construction of suitable storage reservoirs, would bring under irrigation a large acreage of the Indian lands in the valley East of Palm Springs.

We are advised by Mr. Ellis, Indian Agent at Riverside, that the water now being used by the Indians on the Reservation at Palm Springs is all that they are entitled to receive unless further appropriations are made for their benefit in accordance with the U. S. laws covering the use of unappropriated water on the Government domain.

Reproduced at the National Archives

-6-

CONCLUSIONS:     The Mission Indians now living on the Reservation at Palm Springs are being unfairly deprived of irrigation water to which they are entitled for the irrigation of their farms. The owners of lands adjoining the Indian lands at Palm Springs have other adequate sources of water supply, viz; Chino canyon and the Whitewater ditch in addition to which wells may be put down to underground water. The Indian land in Section 10 and 22, T. 4 S. R. 4 E., see photos 1 and 13, has but little if any value as agricultural land. This land, however, is well adapted for subdivision into acre lots for winter homes of health seekers and could be sold at good prices, the proceeds used for the benefit of the Indians in constructing a new ditch , see Exhibit "B" from a point where the present ditch crosses the South line of Section 15 to a point as indicated on the map. The ditch to be built on Indian land and at the point of diversion from the old ditch to have a measuring weir constructed with a locking device to prevent tampering with the Indians water by other water users.  Proceeds from the sale of acre lots could also be used for the construction of a more commodious bath house at the hot springs now owned and operated by the Indians in a small way on the Northwest quarter of Section 14, see Map Exhibit "B". It is reported that Townsite lands are now being sold at prices around $3000 per acre.

Respectfully submitted.

Dated April 7 1924

Wm. M. Strong.

40-301

Reproduced at the National Archives



1. Looking up Tahquitz Canyon, S.W. over Sec 22.



2. Looking W. over S. side Palm Springs Townsite.



3. Agua Caliente Bath House.



4. Agua Caliente Reservoir.



5. Looking S.E. over Palm Springs Townsite.



6. Looking East over Agua Caliente Gardens.

40—302

Reproduced at the National Archives



7. Andreas Cr. Looking S.W. from Weir.



8. Tahquit Falls.  March 25, 1924



9. Andreas Weir.  March 25. 1924



10. Tahquit Diversion Point  Mar. 25, 1924



11. Palm Canyon.  March 26, 1924.



12. Murray Canyon.  Mar. 25, 1924.

40–303

Reproduced at the National Archives



13. Chino Canyon. N.W. from N.W.cor. Sec.10



14. Looking N.E. over Sec 14. INDIAN FARMS.



15. Indian Land N & S. of Palm Springs.



16. Looking N.E. over Sec 11. Japanese Garden.



17. Looking N.E. over Sec. 26. INDIAN FARMS.



18. Flood drift in Tahquit Canyon. 6' high.

40–304

Reproduced at the National Archives

Exhibit "A"





Map of the

AGUA CALIENTE INDIAN

RESERVATION.

Showing the lands ceded to
the Indians.

Riverside County, California.

Patent Nº 168071   Jany 5. 1911

Patented to Band May 14. 1896

Purchased for use of Indians 1906-7

Patent Nº 301282 – March 29. 1923

31127 67/100 Acres.

= TOWNSITE      = ACRE LOTS      = AGRICULTURAL

Reproduced at the National Archives



# EXHIBIT 41

April 24, 1924

April 24, 1924.

Dr. Samuel Blair
Inspector
Department of the Interior.

Dear Dr. Blair:

    Agua Caliente, Cabezon, Augustine, Torres, and Martinez Indian Reservations are all located in that portion of the Colorado Desert known as the Coachella Valley, and while Agua Caliente is situated at the foot of Mt. San Ja____ 25 miles from the other four, it has some points in co_____ them, and in studying its water resources the demands of reservations below must also be considered.

    The lower Coachella Valley fro_____ entirely dependent upon artesian water for_____ only source of this artesian water is from t_____ and its tributaries which rise on the sides _____ nardino and San Jacinto.   No underground _____ from the south because all of that section o_____ been filled in with fine silt brought down by _____ River, making a formation that is impervious _____ of water.   The Coachella Valley has been de_____ past 25 years, since the time that the first _____ were sunk.   At that time, all wells yielde_____ of water by artesian flow, and pumping wa_____ the development of the valley has progress_____ water has increased to such an extent that _____ more water is being pumped out from the unde_____ than is received from the streams above.

    In order to protect its intere____ the Coachella Valley has been organized as the Coachella_____ District, and has been making investig_tions for _____ years to see what should be done to insu_____ for the farmers, and the Indian Service _____ with them, as we have felt that the intere_____ in that section are identical with those of_____

RG 75, Mission
Envelope with 45742-24-150

41-308

Dr. Samuel Blair                                          Page 2.

As far as can be learned from the data at hand, it appears that the average annual flow into these underground reservoirs, after deducting the amount of water lost by evaporation and transpiration in irrigating the lands around Banning, on the Morongo Indian Reservation, and other places in the upper part of the valley, is approximately 54,000 acre feet. At the present time, there are approximately 12,900 acres of land under cultivation in the lower valley, requiring at least 5 acre feet per annum, or 64,000 acre feet in all, which is at least 10,000 more than is being received. This is further evidenced by the fact that the water plane is falling a little bit every year, and wells, in which formerly flowed an abundance of water, have either ceased entirely to flow, or must be pumped to furnish enough water for irrigation. Fourteen years ago, the Indian Service maintained two pumping plants in this region, one on the Cabezon Reservation, and the other on the Augustine. At the present time, there is a second pumping plant on the Cabezon, two at Torres, and one at Martines, in addition to the two original ones, and the Indians are asking for more.

Two years ago, these Indian lands were allotted into approximately 250 40-acre tracts, but most of the Indians have refused to accept their allotments until the government puts down wells and operates pumping plants on each of these tracts. Since it would cost approximately $5,000 to sink a well and build a pumping plant, the total cost of irrigating this land would be in the neighborhood of three-quarters of a million dollars, and the cost of clearing it to put it in good condition for irrigation would be another half million. The water requirements would be 50,000 acre feet per annum, so the valley would be using more than twice the water which it is now receiving or can expect to receive at any time until the All-American Canal is built. Therefore, unless there is immediate prospect of the building of this canal, it is useless to consider the development of any of these large allotments, and the only program which the Irrigation Office of the Indian Service has in mind is the development of the present wells as far as it appears to be feasible to do so.

In order to protect the present cultivated lands, the Coachella Valley County Water District has placed a blanket filing on the surplus water of all the creeks tributary to the Whitewater River, and an adjudication of the water rights of this valley is being made by the State Division of Water Rights, and final proofs of all waters claimed are to be filed by July 1, 1924.

Dr. Samuel Blair                                                      Page 3.

**AGUA CALIENTE**   The Agua Caliente Reservation contains 31,200
acres, nearly all of which is unsuitable for
agricultural purposes, either because it is located on the
rocky slopes of the mountains or because the soil is almost
pure sand.   It is located east of Mt. San Jacinto, which is
10,000 feet high, and is protected by it from the prevailing
westerly winds, which makes it an ideal location as a winter
and health resort.   It is, therefore, likely that the region
around Palm Springs will never be devoted to agriculture, but
will become one of the principal resorts in Southern Calif-
ornia.

**TAHQUITZ CREEK**   A small band of Agua Caliente Indians have
lived in this neighborhood since time immemor-
ial, and the records of the Indian Office show that about 1855,
they constructed the ditch from Tahquitz Canon to their lands-
lying on the present location of the town of Palm Springs, and
also to what is now Section 14, a part of the reservation, and
that, when the white people first came to this ditch, the
Indians allowed them to use the water from this ditch, until
finally the early settlers attempted to appropriate all of the
water for their own use.   About 1895, the Palm Valley Land
and Water Company diverted water from the Whitewater River,
about five miles to the northwest, and proposed to the Indian
Service that if the Indians would relinquish all rights to
water in Tahquitz Canon, the Company would grant them 27 inches
of water, 24 of which was to come from Whitewater River, and 3
inches from Tahquitz Creek.   This contract was recommended, but
never was signed; but, on the supposition that it would be ap-
proved by the Department, the Indians built a ditch about a quar-
ter mile in length, to connect with the Whitewater Ditch, and ev-
idently used water at times for about two years, when the presi-
dent of the Company, Mr. McCallum, died, and the company all but
went out of existence, and failing to deliver water, the Indians
resumed the care of the ditch and the use of water from Tahquitz
Creek.

In 1910, when the Irrigation Service was starting
the project on this reservation, the old water rights of both
the Indians and the whites were investigated, and a contract was
drawn up and signed by the Secretary of the Interior, which gave
to the Indians the first 40 inches of water in Tahquitz Creek,
the whites the next 40, and all above 80 inches was to be divided,
two-thirds to the Indians, and one-third to the white people.
The ditch was rebuilt, and lined with stone and concrete to pre-
vent seepage losses, and now has a capacity of approximately 375
inches, or 7½ second feet, and the water has been divided between

Dr. Samuel Blair                                        Page 4.

the Indians and the whites on the basis of this contract ever
since, although it is possible that at times the measurements
have not been made with the greatest degree of accuracy, and
some have questioned for this reason whether or not the Indians
have received all the water to which they are entitled.

During the last few months, some of the Indians have
been referring frequently to the old contract, which grants
them 27 inches from the Whitewater Ditch, but they were ig-
norant of the fact that this contract never was approved, and
that since it was based entirely upon the relinquishment of all
right to water in Tahquits Creek, the signing of the above con-
tract, in February, 1911, dividing the waters of Tahquits Creek,
would have rendered the earlier contract null and void.

Tahquits Creek, like all other desert streams, is sub-
ject to extreme fluctuation, and while there is more than enough
water for all parties during the spring, the flow is so small
during the summer and fall that the Indians, who are not the
best of farmers, have not found it advisable to attempt to cul-
tivate more than 150 acres, and a large part of this is devoted
to pasture for their horses.

**ANDREAS CREEK**   A second source of water supply for the In-
dians is in Andreas Canon, four miles to the
south of Tahquits, which the Indians used to a large extent
before the advent of the white people. During the latter
part of the '90's, some of the railroad land in the mouth
of Andreas Canon was purchased by the Barney Ranch, and a con-
tract was made with the Indian Agent, allowing the desert
a small amount of water from the creek. After a few years
it was found that the ranch had practically deprived the In-
dians of all water from this source, and had established enough
rights so that it was practically impossible to recover the
water which the Indians had formerly used.

However, upon finding a flaw in the title to the
land, the Indian Agent was able to force the owner of the
ranch to sign a compromise contract, and later, in 1907, the
Indian Service purchased the ranch with all its water rights,
thus giving to the Indians without question the entire flow
of this creek.   Since that time, a distributing system has
been built to carry this water two and a half miles to the
north, for the purpose of irrigating about 300 acres of land,
which might be classed as agricultural.   However, on account
of its distance from the town of Palm Springs, the Indians
have been very slow about putting it under cultivation, and
they have also found that what was considered some of the
better land contains so much hardpan that the crops have been
failures after the first two or three years.

41—311

Dr. Samuel Blair                                                   Page 5.

The Department of Agriculture has established an experimental station on 10 acres of land in Section 24, and their experience has been that the soil is too deficient in humus to make it of value for dates until several years have been spent in fertilising it.   It is, therefore, hardly likely that the Indians will ever make a great amount of use of the water from this creek.

WATER DEVELOPMENT    There has been considerable agitation about developing more water for these Indians, which can be done in three different ways.

1st.   Water can be filed upon in Murray and Palm Canons, and carried to the Indian lands at considerable expense.   Neither one of these canons furnishes very much water, and at the time that the water would be most needed, which would be during the summer and early fall, the increased flow would be so small that it would not warrant the expense of the pipe line to carry it to the Indian lands.
Considering the scarcity of water in the lower Coachella Valley, it would be far better to allow these creeks to remain unappropriated so that they may add their quota to the underground waters below.
Chino Creek cannot be considered, as its water is all filed upon, and is used for municipal purposes in Palm Springs.

2nd.   Reservoirs.

Tahquitz Canon, being close to Palm Springs, and being cut from solid rock, is the one that appeals to the most people as being the ideal location for a dam.   The dam sites on this creek are almost ideal, since there is everywhere solid rock for the walls, and practically no excavation for the foundation would be necessary, and there are probably few streams in the United States which have more dam sites per mile than Tahquitz Canon.   The canon falls 7,000 feet in seven miles, giving it an average grade of 1 foot in 5, and an average dam 100 feet high would back the water only 500 feet, and the canon is so narrow that such a reservoir would contain approximately only 40 acre feet, and a flow of one second foot would fill it in 20 days.   Many small dams could be built throughout the length of the canon, but the expense, in proportion to the amount of water conserved, would be so large as to make it prohibitive.
Andreas Canon is not nearly as steep, so that a dam of corresponding height would conserve much more water.   At the same time, the dam sites are not so favorable, and the dam itself would cost more.   Therefore, neither of these canons, or in fact, any of the canons in this neighborhood can be considered as feasible types for storage reservoirs.

Dr. Samuel Blair                                            Page 4.

### 3rd.   Wells.

There always has been more or less talk of sinking
wells in this valley, due to the fact that many of the promoters
have seen the results obtained from wells on the other side of
the mountains, and also in the Coachella Valley, but they have
not taken into account the fact that the lands close to the
foot of the mountains lie on a much steeper slope, and have a
much smaller underground reservoir above them than the lands
below.

Wells sunk in this neighborhood might yield sufficient
water for a short time each year, but would go dry about the
time that the water would be most needed.   One well has been
sunk about three miles to the east and water has been found at
a depth of 110 feet.   This has led other enthusiasts to put
down wells in this neighborhood, but we have yet to learn that
enough water can be developed from them to make the agricul-
tural development of this land possible.   It must always be
borne in mind that as we leave the protection of Mt. San Jac-
into, going eastward, the chances of finding well water in-
crease, as the prevailing desert winds also increase, so that
the land becomes less and less adaptable to irrigation.

In the lower Coachella Valley the wells penetrate
what is now an underground reservoir, where the depth of water
sand penetrated is very large, amounting often to 100 to 300
feet.   In the neighborhood of Palm Springs the wells will
penetrate the underground stream which is feeding this reser-
voir below, and the depth of sand would be very much less,
though the Indian Service has no record of the strata pene-
trated by any of the existing wells.   It therefore stands
to reason that no well in this neighborhood would yield very
much water, and the first well which was completed in 1921
and evidently has been used as an inducement to others to
sink wells—is not surrounded by any amount of cultivated land.
Considering the large amount of promotion going on in this part
of the state at the present time, in connection with the usual
tactics of land promoters, this lack of cultivated land around
this pioneer well should be kept in mind before proceeding with
any program for developing the wells to irrigate lands which
are scarcely suitable for cultivation, always bearing in mind
that the water is needed and can be put to better use on the
land below.

__ALLOTMENTS__   It is well to bear in mind that these Indians are
not farmers by nature, and that since Palm Springs
has been growing so rapidly during the past few years they have
been slowly abandoning their farms, to work in the village, and
as the village grows in population and work becomes more and
more abundant, it is inevitable that they will farm even less
land than they do at the present time.

Dr. Samuel Blair                                              Page 7.

It is said that the W½ of Sec. 10 and a portion of Sec.
22, (T4S, R4E) could both be sold at high prices for subdivision
into town lots.   Sec. 10 is so situated on the debris cone of
Tahchevah Canon, that it is useless to the Indians, and Sec. 22,
lying at the mouth of Tahquitz Canon, is so thickly covered with
granite boulders that only about two acres in the SW corner, and
perhaps a small tract in the NE corner, could be considered of
any value.   If this section, or a portion of it, could be sold
at the high price, which its nearness to Palm Springs would war-
rant, without sacrificing in any way the water rights to Tahquitz
Canon, the sale should by all means be made.   The proceeds of
the sale could be devoted very profitably to building a new
pipe line along the north boundary to Sec. 22, so that the In-
dians could obtain their water for irrigation without having it
pass through the town, where it would be subject to theft and
contamination.   The water could be divided at the beginning of
this new pipe line, so that the whites' share would flow auto-
matically to them through the old ditch, and the Indians would
get theirs through the new.   At the same time, a domestic pipe
line could be built, which would take water from the creek above
all sources of contamination, and carry it direct to the Indians'
homes.

The land in Sec. 14 has been divided into tracts of
about two acres each, but the Indians have refused to accept
them, since they are reluctant to change the present land lines
with no apparent improvement.   Since the main use of this sec-
tion is going to be to form a home for these Indians and to
give them small tracts of land for gardens, it might be that the
Indians would prefer that a small part of the section adjacent
to the western boundary be divided into village lots, of which
not more than fifteen or twenty would be required, and the re-
mainder of the section, or of the SW¼ of the section, be sub-
divided into new allotments for farming purposes only.

With such an arrangement, it would be feasible to
give the Indians an ideal domestic water supply, and there would
be sufficient money left to build them modern homes, or at least
homes which would embody modern sanitary principles, and yet be
simple enough in style and construction to be suitable to the
Indian needs in a region that is subject to such high tempera-
tures as Palm Springs.

For the present, the land under the pipe line from
Andreas Canon should be considered as agricultural land, and the
Indians should be given an opportunity to cultivate it if they
so choose.  But, at the present time, it looks as though the
ultimate destiny of the Andreas Creek water would be for munic-
ipal purposes in and around the town of Palm Springs, and the
Indians will be much better off if allowed to sell or lease
this land which is so poorly adapted to agriculture, and so very

Dr. Samuel Blair                                          Page 8.

desirable for resort purposes.    The disposition of this land
might be postponed for some time, not only to give the Indians
an opportunity to better adjust themselves to changing condi-
tions, but to obtain a better price than could be done if so
much land were placed on the market at once.

        While such a change from the old scheme of allotment
is extremely radical, it probably would work out ultimately to
the better advantage of the Indians, and would give them a bet-
ter opportunity to become an essential part of the community
than could be done if they lived in primitive style on little
used allotments, so situated as to hinder the growth of the
community; and, if given better homes and the opportunity to
decide on the general principles along which the lands are di-
vided, the foundation would be taken out from under much of
the criticism of the Department.

                                    Very respectfully,


                                    Supervising Engineer


                                    by
                                        H. K. PALMER
                                        Engineer.

HKP/mvb.

41-315

# EXHIBIT 42

Reproduced at the National Archives

5—1142

# DEPARTMENT OF THE INTERIOR

## UNITED STATES INDIAN FIELD SERVICE

SACATON DIVERSION DAM



PO. Box 26, Chandler, Arizona.

October 3, 1924.

Hon. Commissioner of Indian Affairs,

Washington, D. C.

Sir:

Your letter of September 22 (66420-24) regarding pipe line at Tahquitz Creek Agua Caliente Reservation received.

The matter has been discussed several times heretofore with Supt. Ellis but no definite proposition has been agreed upon owing to the considerable expense involved. I am not aware just what Mr. Ellis now desires and as I am tied up here for some time in taking over charge of construction of the Sacaton Dam and Engineer Palmer of the California Section is at Hoopa starting work on that project it is difficult to make the detailed survey and estimate necessary to determine the cost of the work.

The situation is that the Indian Service constructed an intake, pipe lines and distribution system under which the water is being distributed fairly satisfactorily in ordinary seasons. The town of Palmsprings has built up considerably since and would like to get additional water. Our heading does not go high enough up stream to get all of the water although it was built as far as thought practicable at the time. If a pipe line extension was made up to a small fall, very difficult construction, some water could be secured which now seeps into the gravel above our intake and during very dry seasons comprises nearly all the flow. It is probable that only a few inches, perhaps 10 M I, could be secured at low water seasons and the cost of the pipe would probably be in the neighborhood of $2,000.00. This would only put it into the upper end of the present system.

Reproduced at the National Archives

-2-

Requests have been made by the white people to have a new steel pipe brought down from the upper point near the falls to the village so as to provide better water for the Indians who they say are endangered by contamination of the water in the open ditch. The Indians use this water for domestic purposes while the Whites secure theirs from China Canyon. The latter scheme would be very expensive but would avoid contamination.

It is probable that conditions are at the worst now since there have been two very dry seasons. However it would be impossible to effect a remedy before rains are expected this fall and winter.

Unless special efforts are deemed necessary I will arrange to have this investigated and a full report and estimate prepared during the winter after the Hoopa work is closed down by bad weather.

Very respectfully,

Herbert V. Clotts

Supervising Engineer.

HVC/Jag.

42-318

# EXHIBIT 43

Reproduced at the National Archives



5—1142

# DEPARTMENT OF THE INTERIOR

Request for
Authority

### UNITED STATES INDIAN FIELD SERVICE

Mission Indian Agency
Federal Building
Riverside, – California
May 8, 1925.

Commissioner of Indian Affairs,

Washington, D. C.

Sir:-

RECEIVED
Purchase - Supplies

MAY 26 1925

10 11 12 1 2 3 4 5 6

Authority is requested to expend the sum of
$1000.00 from Support and Civilization of Indians in
California, 1925 - there is a sufficient balance available,
for the purpose of purchasing pipe and employment of labor
in laying same, and other expenses of installation, to
provide water for the Indians at Palm Springs Reservation.

At the present the Indians at Palm Springs get their
domestic water from the Tahquitz ditch and from a tap at the
bath house at Palm Springs.   The ditch water is subject to
contamination, inasmuch as the ditch is open, and it runs
through the town of Palm Springs.   Last July the ditch went
dry and did not flow for five or six months, so that the
supply from this source is not dependable for domestic
purposes.   At the bath house, water is furnished by the
Palm Valley Water Company, at a set rate, payment for which
is made by this office.   Many of the Indians live some
distance from the bath house and it is necessary for them
to carry the water from the bath house to their homes, the
farthest of which is about 2000 to 2500 feet.

The water condition at Palm Springs has been under
discussion for some time past.   Recently a physician from the
State Board of Health protested against the Indians using the
ditchwater, and there have been several complaints against re-
quiring the Indians to go nearly one half mile for domestic
water to the bath house tap.   Many of the local people insist
that the Indians are entitled to domestic water at their homes,
and that the Government should furnish the same.   To do this
will necessitate the purchase of pipe, stands, taps, etc., and
the digging of a shallow ditch for laying the pipe.   The
approximate expense, as obtained from water companies, is $1000.00.

It is to the interest of the Government to do this
work.   Palm Springs offers a fertile field for agitators and
the water question has recently risen almost to an issue.   By
furnishing the water to the Indians the objection will have been

Reproduced at the National Archives

overcome and the Indians provided with the domestic water
at their homes from the same source that white people in
the town of Palm Springs receive theirs.   The Indians
are insisting that they receive water at their homes and
only recently brought the matter to the attention of
Secretary Work on his recent visit to Palm Springs.

Very respectfully,

C. L. Ellis

Superintendent.

DEM

Ed-Law & Order
FAR Approved as requested
5/18/25 A----------------
Chief of Education Division

Reproduced at the National Archives

Ed.-L&O
35220-25
F  A  R

## J U S T I F I C A T I O N

The Superintendent of the Mission Agency requests
authority to expend $1,000 for the employment of labor
and the purchase of material in order to provide water
for the Indians at Palm Springs.

At the present time these Indians get their water
from the Tahquitz ditch and from a tap at the bath
house at Palm Springs.  The ditch water is unsanitary
and should not be used for drinking purposes.  Many of
the Indians live a half a mile from the bath house and
find it very inconvenient to have to carry water from
there to their homes.  In the interest of the Indians'
health, water should be installed in the homes of the
Indians at Warm Springs.

Payment is to be made from the fund "Support and
Civilization of Indians in California, 1925," heretofore
allotted.

5 tjb 20

Pur-Sup.        *Justification (as to award)*
  H P
All purchases are to be made after advertising as the
law requires.  The labor is to be paid at daily rates not in
excess of the lowest in that locality where the improvements
are made.

6-LM-1

43-322

# EXHIBIT 44

Case 5:13-cv-00883-JGB-SP Document 82-4 Filed 10/21/14 Page 118 of 177   Page ID #:849

Aug. 13, 1925.

Commissioner of Indian Affairs,

    Washington, D.C.

Sir:-

       There is enclosed an agreement submitted to me by the Palm Valley Water Company with the request that I sign the same.   This agreement covers the delivery of water for domestic purposes at Palm Springs, California, for the use of the Palm Springs, or Agua Caliente, Indians. This agreement is submitted: the Office with request for advice as to the propriety of my signing.

       For several years the Government has purchased water from this company for use of the Palm Springs Indians, the water being delivered at the Indian bath house, and from there carried by the Indians to their homes, a distance of from 100 to 2000 feet.   Last June sufficient pipe was placed to carry the water from the stand at the bath house to Indian homes.

       The water furnished by this company is the only supply available at all times for the Indians.   The Indians have been able to get water from the Tahquitz ditch, but during the summer this dries up.   Also, considerable complaint has been made against the Indians using this ditch water, on account of sanitation - the ditch is an open one.

       The Company requests that this agreement be signed.

       Very respectfully,

         Superintendent.

Encl.

44-324

# EXHIBIT 45

December 15, '31

L D I.

02945-31
Irrigation 69

6-1149

## UNITED STATES

### DEPARTMENT OF THE INTERIOR

#### INDIAN IRRIGATION SERVICE

##### SUPERVISING ENGINEER

Irrigation
63942-31

December 15, 1931

The Director of Irrigation
Office of Indian Affairs
Washington, D.C.

Subject: <u>Water Rights, Palm Springs</u>

Dear Sir:

Reference is made to your letter of November 30, 1931, requesting a report on the water rights pertaining to the Agua Caliente Reservation.

There is no evidence in the files of this office to indicate that there was ever any exchange of Indian water rights in Chino Canyon for rights in the Tahquitz Canyon water.

Tahquitz Creek always has been the principal source of water supply for the Palm Springs section. From the earliest times, Indians have lived around the mouth of Tahquitz Canyon. As nearly as can be ascertained, the Indians first dug an irrigation ditch from this canyon at least as early as 1859. Indian rights to the use of this water, acquired under Mexican law, and maintained continuously from that time, are unquestioned. At the same time, white settlers, from long use of this water, have acquired certain vested rights. In order to settle the division of waters between the Indians and the group of white settlers, an agreement, dated February 10, 1911, was drawn up between the United States of America, acting in its behalf by W. H. Code, Chief Inspector of Irrigation of the United States Indian Service, party of the first part, and George Wellwood Murray, Wellwood Murray, Mrs. Nellie Coffman, Mrs. Lavina Crocker, Alonzo E. Davis and Miss Pearl McCallum, parties of the second part. This contract was approved by the legal officers of the Department of the Interior, and was carefully scrutinized and partially rewritten by Mr. McCormack, then U.S. District Attorney. This contract was received for record on March 15, 1911; Copies in Book No. 325, et. seq., Records of Riverside County, Calif.

*1911*
*agreement re water*

According to this contract, the Indians received the first 40 inches (0.8 cubic feet per second), the whites the next 40 inches, and of the remainder, two-thirds goes to the Indians and one-third to the whites. There is also provision for a limited supply of domestic water to the whites during low flow. As far as is known, this is the only contract or agreement in existence pertaining to the water rights of Tahquitz Canyon water.

Carbon for Indian Office.

RG 75, Mission
63942-31-341

45-326

- 2 -

The Indian right to use of water from Chino Canyon was never definitely determined. In the early days this canyon became a sort of haven of refuge for the Indians who fled from the padres, who wanted to civilize them. This canyon affords excellent pasturage and was long used by the Indians for this purpose. The Indians who were pasturing cattle in this valley believed that this land was in Section 8, which is part of the reservation. As a matter of fact, however, the mouth of Chino Canyon, and the source of supply, lies in Section 7, Township 4 South, Range 4 East, S.B.M., which was originally a Southern Pacific Railroad section. For several years prior to 1909 the Indian Office caused water notices to be posted in Chino Canyon giving notice of appropriation of this water. These water notices were properly recorded. Various reports as to the availability of this water were made, until finally Chief Engineer Code, after investigation, decided that the cost of bringing this water out to land suitable for irrigation would be greater than the water was worth. The filing of notices was therefore discontinued, as filing had to be made every sixty days and involved considerable time and expense. Negotiations were started by Special Inspector Chubbuck in 1906 by which he endeavored to obtain an agreement from the Southern Pacific Railroad relative to an exchange of lands where-by the Indians would be put in possession of Section 7. Our records do not show the final outcome of these negotiations, which were ap-parently unsuccessful, however, as this section is still without the reservation.

The only other source of water supply of any consequence is from Andreas Canyon. The lands near the mouth of Andreas Creek have been inhabited by the Indians from the earliest times, the Indians making more or less use of all available water.

In 1893, B. B. Barney acquired Section 35, Township 4 South, Range 4 East, and the southeast 1/4 of Section 3, Township 5 South, Range 4 East, and established a ranch that he called "The Garden of Eden," which he proposed to irrigate from Andreas Creek. He entered into a contract with the Government which provided that, in considera-tion of a 20 ft. right-of-way for a pipe line across Section 2 of the reservation, the Indians were to be allowed sufficient water from the pipe line to irrigate 100 acres, or such part of it as they might have in cultivation, on a basis of one inch to each six acres of land. This agreement was later abrogated and a new one made giving the Indians half of the pipe-line flow and half of all the water flowing in the canyon, other than that entering the pipe line. This contract remained in effect until 1907, when Barney sold to the Government all his interest in the water and 800 acres of land, being all of Section 35, in Township 4 South, Range 4 East, and the Southeast 1/4 of Section 3, Township 5 South, Range 4 East, for the sum of $6,000. By this sale the Indians acquired the water rights to the entire flow of Andreas Canyon.

By "water company," referred to in Mr. LeGallez' letter, is appar-ently meant the Palm Valley Water Company, which was organized in 1887 for the sole purpose of bringing into Palm Springs Valley water from

Carbon for Indian Office.

- 3 -

the Whitewater River, a distance of about six miles.  The ditches were built and, until 1909 at least, no other water than Whitewater was ever used in these ditches, except for a short period in 1891, when a project was on foot to use water from Tahquitz belonging to the Indians, in return for water from Whitewater to be delivered to the Indians. Arrangements for carrying out this deal were never completed, though the water was so used for a short time but afterwards abandoned.

Very truly yours,

A. L. Wathen.

A. L. Wathen,
Supervising Engineer.

c.c. to Field Office

ac

REPRODUCED AT THE NATIONAL ARCHIVES

Carbon for Indian Office.

# EXHIBIT 46

29149

# Agua Caliente Indian Reservation
## ⮞ Tribal Committee ⮜

Palm Springs, California _____ October 29, 1936_____ 19

Honorable Harold L. Ickes, Secretary of the Interior,
Washington, D. C.

Dear sir:-

### Attention Mr. Walters.

    We acknowledge receipt of your letter on 23, inst, relative
to our appeal for cancellation of the OLD TAHQUITZ CREEK WATER AGREE-
MENT made in 1911 by an employe of the Indian Irrigation Service,and
against the desire, wish or consent of the Indians of this reservation.

    We have taken the action we have---in advising you to cancel the
old agreement, as per our letter, because for more than a year we have
been trying to get the Superintendent,  r. Dady to allow us the use of
some of the tribal funds which he has, in our own plans for the extension
of a water line now on our lands, so that the Indians who live in the
village near the Bath House, can get the use of our own water.  We have
been forced to pay the local Water Company for every drop of water we
use in the village, and, mind you, some of this water comes from Chino
Canyon on our reservation.   THE AGENT OR THE COMMISSIONER HAS SO FAR
REFUSED TO EVEN ANSWER OUR LETTERS CONCERNING OUR WATER.  We have writ-
ten many times concerning this vital matter, but we can get no assistance.
The water from Tahquitz canyon on our lands has been diverted into the
property of some five white persons.  The expense for running this ditch
on our own lands was taken out of our funds,---we are to pay it---  Why
should these white people be given our water?  We have not been able to
get a gallon of this water for domestic use--what little is allowed to
run onto our lands--the village---come in an open ditch, after it has
run through the private grounds of the Desert Inn Hotel and other similar
uses.  The overflow from their land, etc, with the fertilizer has come in
to the ditch--the children wade in it--their dogs, etc, have free use of
the water as it comes through their properties.  And then  what they
cannot use, is allowed to run into an open ditch onto our lands--just as
waste water.  In fact other waters from the regular system is turned in
and the whole is a mess of filthy water.  We do not attempt to use it for
domestic purposes.  You can see that we are in desperate need for
water---We demand the complete cancellation of this agreement--it has
never been for our interest and we plan to immediately run a pipe line
from Tahquitz creek to our village, if we can get the funds to do the work.

    We want to be fair--but we can get no honest effort from the Supt.
to assist us or even defend our rights--he is so prejudiced and has prac-
tocally abandoned us to shift for ourselves and we have decided to pro-
tect our rights and develop our property for the tribe as a whole.

                    Respectfully,

                      Willie Marcus
                      Willie Marcus, Spokesman.

_paying for water from Chino_

REPRODUCED AT THE NATIONAL ARCHIVES

# EXHIBIT 47

*October 29, 1936*

*1936 Water right*

*Chino*
*Andreas*
*tahquitz*

REPRODUCED AT THE NATIONAL ARCHIVE.

Report in
Answer to
Office
Letter of
5/18/1936
Irrigation
9068 – Agua Caliente
(Palm Springs) and
same of 9/17/1936

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
OFFICE OF INDIAN AFFAIRS
**FIELD SERVICE**

OFFICE OF INDIAN AFFAIRS
RECEIVED
NOV 2 1936

751 S. Figueroa St., Los Angeles, Calif.     October 29, 1936

Mr. John Collier
Commissioner of Indian Affairs
Washington, D.C.

90968

<u>Agua Caliente Water Rights</u>

Dear Mr. Collier:

 The enclosed report, prepared by Engineer M. R. Trenam of
this office, we believe contains all the data requested in the
two letters mentioned above.

 We regret the delay in submitting this report, which was
caused partly by the urgency of other important matters and
partly by the necessity of considerable research in accumulating
the facts in the case and in conferring with Superintendent Dady's
office.

     Yours very respectfully,

     C. A. Engle,
     Supervising Engineer

Enclosure:
 Report – Agua Caliente Water Rights

*RG 75, Mission*
*9068-36-341*
*Agua Cal.*

9068-36-341

Report in answer to Office
Letter of 5-18-1936
Irrigation
9068 - Agua Caliente
(Palm Springs)
and same of 9-17-1936

## AGUA CALIENTE INDIAN RESERVATION,
### RIVERSIDE COUNTY, CALIFORNIA

This reservation was created by Executive Order of May 15, 1876, and subsequent orders and purchases. At the present time the reservation comprises approximately 47 square miles located in T. 4 S., R. 4 E.; T. 4 S., R. 5 E.; and T. 5 S., R. 4 E., S.B.B. & M. Originally the reservation comprised approximately all of the even-numbered sections in these three townships, the odd-numbered sections having been grant lands to the Southern Pacific Railroad. Subsequent Orders and purchases have resulted in the acquisition for the Indians of some lands in the odd sections.

Approximately one-half of the reservation lies on the steep eastern slope of the San Jacinto Mountains, this area being far too precipitous to be of value even for grazing purposes. Several creeks flow in deep canyons down this slope of the mountains and from two of these streams, Tahquitz and Andreas, the Indians obtain their water supply. The remaining (i.e., eastern) half of the reservation lies on the floor of the Colorado Desert at an average elevation of 400 feet. For the most part, this consists of sandy land badly cut up by rocky washes in which flow or disappear the various streams that emerge from the canyons. A limited area of irrigable land lies along the base of the mountains and for the irrigation of this land two projects, known as the Palm Springs and the Garden of Eden Projects, were constructed by the Government in the year 1911.

In this report will be found, not only the data requested in Office letter of May 18, 1936, but also some additional information concerning the problems of water supply and rights.

From the time this reservation was established until the year 1911, and to a lesser extent since, there has always been difficulty and more or less dissatisfaction in the division and distribution of water between the Indians and their white neighbors.

The only water rights that now exist, by appropriation or diversion from streams, are confined to Tahquitz and Andreas Creeks. The rights to the waters of Andreas Creek were acquired by purchase. While it is the only source of continuous supply on the reservation it does not,

REPRODUCED AT THE NATIONAL ARCHIVES

under the existing distribution system, benefit the majority of the
Indians, who live some three miles from the mouth of Andreas Canyon.

Andreas Canyon:

From the earliest times, Andreas Canyon, which takes its name
from one of the early settlers who lived therein, has been inhabited
by the Indians who made use of the water.

In 1893 one B. B. Barney, acquiring some lands near the mouth of
the canyon, established a ranch that he called the Garden of Eden and
which he proposed to irrigate from Andreas Creek. He entered into a
contract with the Government which provided that in consideration for
a 20-foot right-of-way for a pipe line across Section 2 of the reser-
vation, the Indians were to be allowed sufficient water from the pipe
line to irrigate 100 acres or such part of it as they might have in
cultivation on the basis of 1 inch for each 6 acres of land.  No recog-
nition was given to the Indians' right by long use of the water.  Under
the conditions of climate and soil this amount of water was of little
or no value for irrigation, and as a result the Indians soon vacated,
leaving Mr. Barney in full possession of the water.  An inspector find-
ing that Mr. Barney was not doing the necessary development work to
preserve his water right, filed on 500 inches, or all of the ordinary
flow of Andreas Creek, and put the Indians to work to construct a stone
ditch.  This ditch never proved of practical value to the Indians.  The
inspector found that the pipe line had been constructed at a cost of
about $6000 and that it had a capacity of 150 miners' inches and that
Mr. Barney had a vested right which should be respected.  He therefore
arranged a compromise by which the agreement of 1893 was abrogated and
a new one made giving the Indians one-half of the flow in the creek
and in the pipe line.

This contract remained in effect until 1907, when Barney sold to
the Government all his interests in the water and 800 acres of land
for the sum of $6000.  The later development of the creek by the Govern-
ment is described below.

As already stated, the so-called Barney Ranch, consisting of Section
35, together with the low water flow of Andreas Creek, was purchased in
1907 for the benefit of the Agua Caliente Indians.  An eight-inch pipe
of riveted sheet steel about one mile in length was included in the pur-
chase.  This pipe was installed in 1893 to conduct the water from the
canyon down the steep talus slope to Section 35.

Because of the poor grade of the land covered by the pipe line, it
was decided to construct an extension of concrete pipe to irrigate a
tract of fairly good land in Section 26.  During the fiscal year 1909,
1720 feet of ten-inch pipe was laid.

- 2 -

During 1911, a small concrete diversion dam was constructed in
Andreas Canyon at the head of the steel pipe, and during that and
subsequent years the pipe line has been extended 13,040 feet farther,
using 12-inch and 10-inch concrete pipe with one short 8-inch lateral.
This pipe line now extends a short distance into Section 22.

During January, 1916, a flood of considerable proportions swept
down Andreas Canyon, overtopping both abutments of the dam. These
were of earth and were quickly carried away, leaving the concrete dam
in place. Several breaks occurred also on the pipe line. This damage
was immediately repaired.

At the present time the old steel pipe line still remains in
service, but it should be replaced at a very early date.

In the same adjudication (Whitewater River Adjudication), on
page 30, paragraph 55 states:

"55.  THE UNITED STATES OF AMERICA

is entitled to divert from the natural flow of Andreas
Creek, through the Andreas Creek Pipe Line,

6.00 cubic feet per second—priority January 1, 1893,

or as much thereof as it applies to beneficial use for the pur-
poses hereinafter set forth, throughout the entire year; said
water to be diverted from said Andreas Creek at a point (desig-
nated on Division of Water Rights Map as Diversion 62) which
bears approximately S. 31° 00' W., approximately 1900 feet dis-
tant from the east quarter corner of Sec. 3, T. 5 S., R. 4 E.,
S.B.B. and M., being within the SE¼ SE¼ of said Sec. 3, and said
water to be used for domestic, stock watering, power development
and irrigation purposes within the Agua Caliente Indian Reserva-
tion, comprising some 30,240 acres of land described as follows:

"All of Secs. 2, 4, 6, 8, 12, 14, 18, 20, 22, 24, 26,
28, 30, 32, 34 and 35, T. 4 S., R. 4 E., S.B.B. and M.
W½ Sec. 10, T. 4 S., R. 4 E., S.B.B. and M.
All of Secs. 2, 4, 6, 8, 10, 12, 14, 18, 20, 22, 24,
28, 30, 32 and 34, T. 4 S., R. 5 E., S.B.B. and M.
All of Secs. 2, 4, 6, 8, 10, 12, 14, 18, 20, 22, 24,
26, 28, 30, 32 and 34, T. 5 S., R. 4 E., S.B.B. and M.
SE¼ Sec. 3, T. 5 S., R. 4 E., S.B.B. and M.
N½ Sec. 11, T. 5 S., R. 4 E., S.B.B. and M.

Chino Canyon.  Status of Water Rights of the Indians:

The Indians have no rights in the water of this stream other than
riparian, as shown by the following reports and letters, copies of
which are in the Irrigation District Office files.

- 3 -

REPRODUCED AT THE NATIONAL ARCHIVE.

In a report (subject, Report on Palm Springs Complications) dated September 2, 1909, to the Commissioner of Indian Affairs from Chief Special Officer Johnson, he states:

"Chino Canyon . . . . . . . is accessible with difficulty. In the days of the early Mission Fathers the Palm Springs Indians moved their camps close up to the mountains so that they could flee into the mountains upon the approach of the Padres, to whose strenuous methods of evangelization the Indians objected. Finally, hard pressed, a band of these Indians moved up into Chino Canyon, above the cienaga. The leader of this band was "Old Man Chino," who is now dead. . . . . . . It was from "Old Man Chino" that the canyon received its name. This canyon became a sort of a haven of refuge for the Indians who fled from the Padres, who wanted to civilize them. A few fruit trees and remains of houses are still there. The Indians have believed that this cienaga was largely on Section Eight, which is Indian land. To determine this point I had lines run through, showing that this cienaga is entirely on Section Seven, which belongs to the Southern Pacific Railway. This canyon affords excellent pasturage. It has always been used as pasturage for the Indians, and is so used now. It will pasture forty or fifty head of cattle during the driest season. If the Indians were deprived of this pasturage it would compel them to dispose of a considerable number of their cattle. . . . . . . For these reasons I strongly urged Charles E. Kelsey, Special Agent for the California Indians, to exchange, if possible, some other unused Indian lands for Section Seven. Mr. Kelsey is now negotiating with this end in view.

"For several years the Indian Office caused water notices to be posted in Chino Canyon, giving notice of appropriation of this water. These water notices were properly recorded. Various reports as to the availability of this water were made, until finally last year Chief Engineer Code, after an investigation, decided that the cost of bringing this water out to the land suitable for irrigation would be greater than the water was worth. The filing of these notices therefore was discontinued. . . . . . . "

The recommendation to discontinue these notices and reasons for so doing were included in a letter to the Secretary of the Interior from Chief Engineer Code, dated December 30, 1907, excerpts from which follow:

"At the time of Inspector Chubbock's visit to Agua Caliente Reservation, in the spring of 1906, he made a filing on the water of Chino Canyon for use of the Indians. In order

- 4 -

REPRODUCED AT THE NATIONAL ARCHIVES

to maintain such rights it is necessary to renew the filing every 60 days, and former Agent Wright, upon my recommendation, did this during his incumbency, and it has since been attended to by Miss Anna C. Egan, whose jurisdiction covers the Agua Caliente Reservation. The low flow of Chino Canyon cannot be applied to Indian lands at any reasonable expense, and the only hope of its being advantageously used rests upon the completion of negotiations started by Inspector Chubbock in 1905, in which he endeavored to obtain an agreement from the Southern Pacific Company, relative to an exchange of lands whereby the Indians would be put in possession of Section 7, T. 4 S., R. 4 E.

"Mr. Chubbock is now in California, and I would respectfully suggest that he be directed to ascertain whether an exchange of lands can be effected, such as recommended.

"It is a source of expense to the Government, and an additional responsibility upon the Superintendent in charge of the Agua Caliente Reservation, to be forced to make this filing on water in Chino Canyon every 60 days; and, unless some action such as herein recommended can be undertaken, I would respectfully recommend that Superintendent Egan be directed to discontinue further filings."

Our records do not show the final outcome of the negotiations with the Southern Pacific Company, which presumably were unsuccessful, as this section never was included in the reservation.

In pamphlet entitled "Whitewater River Adjudication Proceedings, Order Determining and Establishing the Several Rights by Appropriation to the Use of the Waters of the Whitewater River Stream System, San Bernardino and Riverside Counties, California, Order entered April 23, 1925, in Book 1 of Orders of Determination," on page 22, paragraph 56 states:

"The Palm Valley Water Company is entitled to divert from the natural flow of Chino Creek, through Chino Pipe Line,

2.00 cubic feet per second--priority October 2, 1897,

or as much thereof as said company applies to beneficial use for the purpose hereinafter set forth, throughout the entire year: said water to be diverted from said Chino Creek at a point (designated on Division of Water Rights Map as Diversion 59) which bears approximately S. 60° 30' W., approximately 725 feet distant from the northeast corner of Sec. 7, T. 4 S., R. 4 E., S.B.B. and M., being within the NE$\frac{1}{4}$ NE$\frac{1}{4}$ of said Sec. 7, and said water to be used by said company for the purpose of supplying water for domestic and municipal

- 5 -

REPRODUCED AT THE NATIONAL ARCHIVES

uses in the territory within and adjacent to the town of Palm
Springs, Riverside County, California."

Since the discontinuance of filings on the water of Chino Creek,
the Indian Service has made no attempt to utilize this water, and
their reason for not doing so seems to be justified, for, while the
actual cost to the Palm Valley Water Company in constructing their
pipe line is not known, it consists of 17,286 feet of pipe from 4 to
10 inches in diameter, and a very conservative estimate of the cost
would be $15,000.  This line extends to a point in the NW¼, SE¼, NE¼
of Section 10, T. 4 S., R. 4 E., more than a mile north of the Indian
lands near Palm Springs and has a capacity of approximately 0.77
cubic feet per second.  The cost to the Government of delivering
this small amount of water to the Indians would have been, at the
very least, some $20,000, or a sum amounting to two-thirds of the
total amount the Indian Irrigation Service has spent to date on
this reservation, both for construction and operation and maintenance
for all irrigation purposes.

Even this seemingly large amount would have been justified had
it provided a continuous supply of domestic water for the Indians,
but this stream, like Tahquitz, ceases to flow during the summer
months.  Most of the white inhabitants leave during the extremely
hot summer months, but the Indians are forced to remain, and their
only hope of a continuous water supply during these months is from
Andreas Canyon.

The town of Palm Springs has, in the last few years, become a
popular winter resort, and the Palm Valley Water Company found a
ready market for this water for domestic purposes, but it certainly
could never be used economically for irrigation.

It is reported to this office that at the present time Chino
Creek is entirely dry at all seasons of the year and the Water
Company has been forced to extend its pipe line to Snow Canyon.

The Indians' claim to the rights of the water of Chino Creek
seemed to be based entirely on their belief that the cienaga and
meadows in Section 7 (not Indian owned) were in reality in Section
8, which is Indian land.  Sections 4, 6 and 8 in T. 4 S., R. 4 E.,
are the only Indian lands which can in any way be connected with
Chino Creek, and any rights that they have in these sections would
be strictly riparian.

Tahquitz Canyon.  Status of Water Rights of the Indians:

The only known diversion from Tahquitz Creek is the following,
which is designated in paragraph 56, page 31, of the pamphlet men-
tioned under Chino Creek:

- 6 -

REPRODUCED AT THE NATIONAL ARCHIVES

"58. THE UNITED STATES OF AMERICA

is entitled to divert from the natural flow of Tahquitz Creek, through Agua Caliente Ditch,

4.80 cubic feet per second—priority April 26, 1884,

or as much thereof as it applies to beneficial use for the purposes hereinafter set forth, throughout the entire year: said water to be diverted from said Tahquitz Creek at a point (designated on Division of Water Rights Map as Diversion 61) which bears approximately S. 49° 30' W., approximately 5400 feet distant from the northeast corner of Sec. 22, T. 4 S., R. 4 E., S.B.B. and M., being within the NW¼ SW¼ of said Sec. 22, and said water to be used for domestic, stock watering, power development and irrigation purposes within the Agua Caliente Indian Reservation, comprising some 30,240 acres of land as hereinabove described in the preceding paragraph. The use of water under this right by said United States of America is subject to the provisions of that certain agreement dated February 10, 1911, between the United States of America (Indian Service) and George Wellwood Murray et al.— recorded March 11, 1911, in Book 325 of Deeds, page 260 et seq., records of Riverside County, California."

According to this agreement the Indians receive the first 40 miners' inches (0.8 cubic feet per second), the whites the next 40 inches, and of the remainder, two-thirds goes to the Indians and one-third to the whites. There is also provision for a limited supply of domestic water to the whites during low flow, the agreement stating that, when the flow of water at said point of diversion is reduced to forty (40) California miners' inches or less, the white property owners shall receive, at point marked on map (Exhibit A) as domestic turnout, five (5) miners' inches in quantity, to be used exclusively for domestic purposes, and provided, however, that when the flow of water at said point of diversion shall not exceed ten (10) miners' inches, the white owners shall be entitled to one-half (1/2) of such flow of water and the Indians the other one-half (1/2) for domestic purposes exclusively. As far as is known, this is the only contract or agreement in existence pertaining to the water rights of Tahquitz Canyon water.

In this contract the U.S. Government, through the Indian Service, is obligated to make this division of the water and to turn out to the individual white water users the amounts due them at the specified times as stated in the contract. This matter was handled satisfactorily for some time after the contract was signed, that is during the time the Indian Service had a representative located on this reservation. Since that time there has been complaint concerning this matter, and for a time an Indian policeman was in charge of this distribution.

- 7 -

REPRODUCED AT THE NATIONAL ARCHIVE.

It seems advisable that the Indian Service, through the District office or the Mission Agency, as long as this agreement is in effect, should employ a man qualified to make these divisions in strict accordance with the agreement of February 10, 1911.

In report by H. K. Palmer of February 19, 1925, which is incorporated in report by C. A. Engle of February 1, 1936, the matter of enlarging and revamping the irrigation systems, using water from both Andreas and Tahquitz Creeks is discussed, and this same subject is made a part of the Advance Estimates for 1937 and 1938, which were mailed to the Commissioner on August 10, 1936. A plan for the solution of the rather complicated water problem on this reservation is stated briefly on page 23 of the Advance Estimates, as follows:

"Palm Springs

"The present source of supply for the Palm Springs Indians is from Tahquitz Canyon. The water taken from this canyon is delivered to the reservation by means of a canal through adjoining white lands. It is difficult to control the flow of water through this territory, and, in addition, there is some evidence that there are unwarranted losses of water. Another possible source of water for the Palm Springs Indians is Andreas Canyon. This will furnish a more plentiful and reliable supply than Tahquitz Canyon, and every effort should be made to use the water from Andreas Canyon in order to definitely establish the water rights of the Indians thereto.

"The work proposed in the above program will consist of running pipe line from diversion points in the two canyons (Andreas and Tahquitz) so that water delivery to the Indians is not complicated by any turnouts necessary for other purposes."

The estimated cost of this plan is $40,000.

This method will, of course, necessitate making a new agreement with the white owners and voiding the present one, but there seems to be no reason to contemplate any difficulties in this matter.

In this same adjudication (Whitewater River Adjudication), on page 12, paragraph 18, is the following item, which applies to the same diversion point as that mentioned in paragraph 58 of the adjudication:

"18. Nellie N. Coffman, Cornelia B. White, Florilla M. White, Lavina F. Crocker, Helen Coffman, Pearl McCallum McManus, Isabel White Chase, George Wellwood Murray, Ruth J. Orr, T. L. Douglas, C. A. Abbott, and Charles Powers, jointly, are entitled to divert from the natural flow of Tahquitz Creek, through the Agua Caliente Ditch,

1.36 cubic feet per second--priority April 26, 1884,

- 8 -

REPRODUCED AT THE NATIONAL ARCHIVES

or as much thereof as they directly apply to beneficial use for the purpose hereinafter set forth, throughout the entire year; said water to be diverted from said Tahquitz Creek at a point (designated on Division of Water Rights Map as Diversion 61) which bears approximately S. 49° 50' W., approximately 5400 feet distant from the northeast corner of Sec. 22, T. 4 S., R. 4 E., S.B.B. and M., being within the NW¼ SW¼ of said Sec. 22, and said water to be used for the irrigation of the respective lands of said parties as follows:

"Nellie N. Coffman:
2.6 acres in a parcel bounded as follows:  Beginning at the northwesterly corner of Spring Street and Main Avenue in the town of Palm Springs, Riverside County, California; thence west along the northerly line of Spring Street 290.40 feet; thence at right angles northerly 355.0 feet; thence at right angles easterly 290.4 feet to westerly boundary line of Main Avenue; thence southerly along said westerly boundary of Main Avenue 355.0 feet to point of beginning.
0.6 acre in lots 22, 23 and 24 of block 8 of said town of Palm Springs.
6.9 acres in blocks 1, 6 and 8 of said town of Palm Springs bounded as follows:  Beginning at a point in block 8 where the westerly side of the Whitewater or Palm Valley Water Company's Ditch intersects a line 150.0 feet north of and parallel with the north line of Park Street; thence N. 30° 58' W., 327.0 feet; thence N. 0° 23' W., 174.0 feet; thence west 40.0 feet; thence N. 0° 08' W., 103.0 feet; thence S. 79° 10' W., 335.7 feet; thence S. 84° 08' W., 217.0 feet; thence S. 3° 40' E., 264.25 feet; thence N. 89° 50' E., 80.0 feet; thence S. 0° 08' E., 210.0 feet; thence N. 89° 50' E., 678.3 feet to point of beginning.
1.2 acres in lots 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 32 and 33, all in Block 20 of said town of Palm Springs.
0.4 acre in block 27 of said town of Palm Springs bounded as follows:  Beginning at the southwest corner of said block, thence northerly on the easterly line of Main Avenue 100.0 feet; thence at right angles easterly and parallel with Park Street 145.0 feet; thence at right angles southerly 100.0 feet to northerly line of Park Street; thence westerly 145.0 feet to point of beginning.
11.7 acres—Total.

"Cornelia B. White:
4.0 acres constituting all of block 27 of said town of Palm Springs, except the parcel last above described under Nellie N. Coffman, and except a parcel 80.0 feet square situate in the northwest corner of said block.
4.0 acres—Total.

- 9 -

REPRODUCED AT THE NATIONAL ARCHIVES

"Cornelia B. White and Florilla M. White:
4.1 acres constituting all of block 26 of said town of Palm Springs, except lots 1, 2, 3 and 4 thereof, and except a rectangular parcel having a frontage of 50.0 feet on Main Avenue, a depth of 100.0 feet, and situate south and contiguous to lot 4 of said block.
4.1 acres--Total.

"Lavina F. Crocker:
1.6 acres in a parcel bounded as follows:  Beginning at a point on the northerly line of Spring Street in said town of Palm Springs, 290.4 feet westerly from the northwest corner of Spring Street and Main Avenue; thence westerly along the said line of Spring Street 323.5 feet; thence N. 0° 08' W., 204.0 feet; thence N. 89° 50' E., 323.5 feet; thence S. 0° 08' E., 204.0 feet to point of beginning; said description containing within its boundaries lots 9 to 20, both inclusive, of block 14 of said town of Palm Springs.
1.6 acres--Total.

"Helen Coffman:
0.3 acre in lots 1, 2 and 3 of block 8 of said town of Palm Springs.
0.3 acre--Total.

"Pearl McCallum McManus:
3.7 acres in lots 1, 2, 3 and 4 of block 1,
10.4 acres in lots 1, 2, 3 and 4 of block 2,
0.6 acre in lots 22, 23 and 24 of block 7,
2.2 acres in lots 4 to 9, both inclusive, and lots 14 to 21, both inclusive, of block 8,
2.6 acres in lots 1 to 16, both inclusive, and lots 26 to 28, both inclusive, of block 15,
0.3 acre in lots 11 and 12 of block 16,
0.6 acre in lots 9 to 12, both inclusive, of block 19,
1.5 acres in lots 1 to 12, both inclusive, of block 20, all in said town of Palm Springs.
21.9 acres--Total.

"Isabel White Chase:
1.1 acres constituting the west 250 feet of lot 4 of block 1 of said town of Palm Springs.
1.1 acres--Total.

"George Wellwood Murray:
0.2 acre constituting a parcel of land 80.0 feet square situate in the northwest corner of block 27 of said town of Palm Springs.
0.2 acre--Total.

- 10 -

REPRODUCED AT THE NATIONAL ARCHIVE.

"Ruth J. Orr:
   0.5 acre in lots 34, 35 and 36 of block 20 of said town of Palm Springs.
   0.5 acre—Total.

"T. L. Douglas:
   0.6 acre constituting the east 150 feet of lot 1 of block 2 of said town of Palm Springs.
   0.6 acre—Total.

"C. A. Abbott:
   1.9 acres constituting the east 250 feet of lots 3 and 4 of block 2 of said town of Palm Springs.
   1.9 acres—Total.

"Charles Powers:
   1.0 acre in lots 1, 2, 3, 4 and 5 of block 5 of said town of Palm Springs.
   1.0 acre—Total.

The joint diversion and use of water under this right by the parties hereinabove enumerated is subject to the provisions of that certain agreement dated February 10, 1911, between the United States of America (Indian Service) and George Wellwood Murray et al., recorded March 11, 1911, in Book No. 325 of Deeds, page 260 et seq., records of Riverside County, California."

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Attached to this report will be found a copy of the agreement of February 10, 1911, and a copy of the map referred to in this agreement as "Exhibit A."

<u>Whitewater River</u>

Another matter that has caused considerable discussion in the past is the Indians' claim of rights to water from Whitewater River. This claim is based on a supposed contract between the United States and the Palm Valley Water Company, granting the Indians 27 inches of water.

It seems that about 1895, McCallum, President of the Company, proposed a contract whereby, if the Company were given all the right-of-way across the reservation, and all water rights, and if the United States would relinquish all rights to Tahquitz Creek, the Company would grant the Indians 27 inches of water, 24 inches from Whitewater and 5 inches from Tahquitz.

- 11 -

REPRODUCED AT THE NATIONAL ARCHIVE.

The matter seems to have dragged along for some years and the Company put the plan into operation, supposing that the contract would be signed, and the Indians even went so far as to build a half mile of ditch from the Whitewater Ditch.

After McCallum died the Palm Valley Water Company practically went to pieces until it was sold some years later, and the Indians resumed the care of the old Tahquitz Ditch, which, it seems, they constructed about 1835.

The contract never was signed, and had it been, it would have been rendered void by the contract of 1911, which gave the Indians more than half of the Tahquitz Creek. But the fact that the Palm Valley Water Company did deliver water a few times impressed the Indians, who still think they have these rights.

See letter to the Commissioner, dated December 19, 1895, signed by Francisco Estudillo, U.S. Indian Agent; also, this matter is discussed on page 4 of Chief Special Officer Johnson's report of September 2, 1909, subject, "Report on Palm Springs Complications."

--------------

Enclosures:
Agreement of February 10, 1911
Copy of Map ("Exhibit A")

REPRODUCED AT THE NATIONAL ARCHIVE.

# EXHIBIT 48

Reproduced from the holdings of the *National Archives at Riverside*

C O P Y

Irrigation
9068-
Agua Caliente

Room 1358-A
U.S. Post Office & Court House
Los Angeles, California

August 28, 1939.

Mr. A. L. Wathen,
Director of Irrigation,
Washington, D. C.

Dear Mr. Wathen:

It will be recalled that the Agua Caliente Indian Reservation was established by Executive Order in 1876, and that it was enlarged by subsequent Orders and purchases of land. It has been said that the Indians first used water from Tahquitz Creek, to some extent, possibly as early as 1823. Subsequent to that time, however, Mexican and other non-Indian landowners used water from Tahquitz Creek, either with the consent of the Indians or by encroachment on their rights. In any event, the Department conceded, in a contract dated February 10, 1911, approved March 6, 1911, that other landowners owned an interest in the ditch diverting water from Tahquitz Creek.

As a result of the increased uses, controversies have arisen between the Indians and their neighbors about the use of water, and it was for the purpose, in part, of settling these controversies and fixing the rights of the respective parties to the use of Tahquitz Creek water that the contract above referred to was executed. Briefly, that contract provided that the Indians should have the first 40 miners inches of water, subject to the exceptions hereinafter noted, and the private landowners the next 40 miners inches, and that all water in excess of 80 miners inches should be divided between them on the basis of two-thirds to the Indians and one-third to the private landowners.

The right of the Indians to use the first 40 miners inches was subject to the provision that when there were 40 miners inches only, or less, the private landowners should be entitled to receive 5 miners inches for domestic use only, and that in the event the flow were 10 inches or less it would be divided one-half to each group.

Reproduced from the holdings of the *National Archives at Riverside*

C O P Y

Irrigation
9068-
Agua Caliente

Room 1358-A
U.S. Post Office & Court House
Los Angeles, California

August 28, 1939.

Mr. A. L. Wathen,
Director of Irrigation,
Washington, D. C.

Dear Mr. Wathen:

It will be recalled that the Agua Caliente Indian
Reservation was established by Executive Order in 1876, and
that it was enlarged by subsequent Orders and purchases of
land. It has been said that the Indians first used water
from Tahquitz Creek, to some extent, possibly as early as
1823. Subsequent to that time, however, Mexican and other
non-Indian landowners used water from Tahquitz Creek, either
with the consent of the Indians or by encroachment on their
rights. In any event, the Department conceded, in a contract
dated February 10, 1911, approved March 6, 1911, that other
landowners owned an interest in the ditch diverting water
from Tahquitz Creek.

As a result of the increased uses, controversies have
arisen between the Indians and their neighbors about the use
of water, and it was for the purpose, in part, of settling
these controversies and fixing the rights of the respective
parties to the use of Tahquitz Creek water that the contract
above referred to was executed. Briefly, that contract
provided that the Indians should have the first 40 miners
inches of water, subject to the exceptions hereinafter noted,
and the private landowners the next 40 miners inches, and
that all water in excess of 80 miners inches should be divided
between them on the basis of two-thirds to the Indians and
one-third to the private landowners.

The right of the Indians to use the first 40 miners
inches was subject to the provision that when there were 40
miners inches only, or less, the private landowners should
be entitled to receive 5 miners inches for domestic use only,
and that in the event the flow were 10 inches or less it
would be divided one-half to each group.

48-347

Reproduced from the holdings of the *National Archives at Riverside*

The contract also provided that the non-Indian users should receive their water at six points of delivery, all provided for in the contract, together with the schedule for the delivery of their water.

The obligations of the Government under that agreement, briefly, were these:

(1)  To rehabilitate the ditch which it was conceded both parties owned, including the installation of a pipe-line for one section of it with a capacity of 350 miners inches.  The ditch was to be built on the line of the old one across Section 15.

(2)  The Government was to operate and maintain the ditch and deliver the water to the non-Indians as well as to the Indians, except that the non-Indians were to keep sand and other debris cleared out of the open ditch through Section 15.

(3)  The expense of the foregoing items.

Six landowners were recognized at that time as being entitled to use water, and all of them owned farms in Section 15.  ( The various features of pipe-lines and the Section 15 referred to herein were all shown on a map attached to that Agreement as Exhibit "a.")  It was a farming community and, as evidenced by the contract, the domestic use was small.  Since the time that contract was made the resort city of Palm Springs has come into existence, and most of the land for which the parties to that contract were entitled to use water has been included within the City of Palm Springs, and has been subdivided for residential and business purposes.  The landowners no longer use Tahquitz Creek water for domestic purposes, and have not done so for a long time.  The present use of that water so far as the non-Indians are concerned is principally for the irrigation of lawns and shrubs.  As the Palm Springs City development occurred, it became increasingly more difficult for the Indian Service to deliver the water as provided for in the 1911 Agreement, and it, of course, became more expensive to operate and maintain the ditch.  For many years now the Indians have had greater trouble in getting water through the ditch to their lands and have complained that it has been polluted as it passed through the City of Palm Springs.  Undoubtedly that was true to a great extent since an open ditch passing through a city would naturally

-2-

Reproduced from the holdings of the *National Archives at Riverside*

collect paper and other rubbish discarded by children.
The arrangement provided for in 1911 has become unsatisfactory,
both to the Indians and the private landowners, and for
the past several years both parties have been trying to
work out a satisfactory arrangement to meet the new situa-
tion. Supervising Engineer Fortier and Superintendent
Dady have worked out, informally, with the landowners a
program which seems satisfactory to everybody concerned.
It calls for the construction of a new pipeline across
Section 22 directly to the Indian Reservation.

It will also mean the abandonment, so far as the
Government is concerned, of the old ditch and pipeline.
I am advised that the pipeline is already in a bad state
of repair, and would require a great deal of work to be
rehabilitated before it would carry the full amount of
water provided for in the old Agreement.

It has been proposed that the old Agreement be modified
in part and abrogated in part. We have prepared a draft
which is enclosed herewith for approval as to form, which
we think will meet the new situation. It has been examined
by Mr. Fortier and Superintendent Dady, and is in accordance
with their understanding of the informal arrangements
they have made with the private landowners. I am authorized
to say that the draft meets with their approval.

The proposed Agreement sets forth rather fully the
historical background leading up to the present situation.
It is believed that that method of approach should be
used in view of the fact that there may be some question
about the validity of the original contract.

If the new contract is approved, it is felt that the
Government and the Indians will receive at least the follow-
ing advantages as compared with the 1911 Agreement:

(1) The first 40 miners inches will go unconditionally
to the Indians.

(2) The Government will be relieved of evaporation
and see page losses occuring between the intake for the old
pipeline and the reservation boundary, which under the old
arrangement were charged almost wholly to the Indians.

(3) The Government will be relieved of operating
and maintaining the old concrete pipeline and the open
ditch through Section 15.

(4) The Government will be relieved of measuring
and delivering to the landowners their respective amounts
of water.

-3-

Reproduced from the holdings of the *National Archives at Riverside*

(5)  The water for the Indian lands will be diverted directly into a pipeline before it passes through the city, thus protecting it from pollution.

(6)  Since the Indian Service will be able to divert the Indians' water directly into a pipeline and carry it in a pipeline to the reservation boundary, it is expected that the total amount of water to reach the reservation boundary will be increased materially under the new arrangement.

(7)  There will be but one point of division, as compared with six under the old contract.

Attached to the draft is a map, marked "Exhibit #," which shows the location of the old ditch, the old pipeline, the proposed new pipeline, the proposed new point of diversion, the proposed new point of division, and the proposed new point of diversion from Tahquitz Creek.

It is true that the contract provides that the Government will construct the new diversion dam and will install about 110 feet of 12" pipe near Tahquitz Creek, to improve facilities for diverting water into the ditch leading to the new pipeline. That, however, is not altogether an obligation created by the proposed new Agreement. That work would be necessary even though the new Agreement were not made, if the Indians are to get the water to which they are entitled. It is true that the non-Indians will receive benefit from it. It is also true that the new contract provides that the Government shall provide an adequate measuring device at the new point of division which is, of course, identical with the intake for the new pipeline. While at first blush that may appear to be a cost which the others should help pay, it is a structure which the Government would want in any event. The contract also provides that the Government shall be responsible for operating and maintaining that division box. Here again the Government wishes to have control of these head-works, and it appears to be to the advantage of both the Indians and the Government that such control be retained.

It appears that the new arrangement will be well worth the additional outlay for structures, and that over a long period of time it will be less expensive than to continue operating under the old inefficient system which the Government was obliged to operate and maintain at its own expense.

For your information, a copy of the 1911 Agreement is enclosed herewith. It will be observed that whereas there were only six parties to that Agreement besides the Government,

-4-

Reproduced from the holdings of the *National Archives at Riverside*

there are many more than that number in the proposed Agreement. The explanation for that is that the holdings of the original contractors have been subdivided. The question undoubtedly will arise as to whether all of the parties who are entitled to the use of water from Tahquitz Creek under the terms of the old Agreement, either as original parties or successors in interest, have been included in the present proposed Agreement. Superintendent Dady and his men have carefully studied that situation, and he has advised us that the parties who are listed in the draft of Agreement own all of the land to which water was ever delivered under the old Agreement, or to which water could have been delivered from the works as constructed.

I assume, also, that the question will arise as to whether the Secretary has authority to enter into the proposed Agreement. If the Secretary had authority to make the Agreement in 1911, he undoubtedly has authority to make the present contract.

I think there is some question as to whether the Agreement of 1911 was valid as to (a) the division of water, (b) the recognition of rights to the use of water in others, (c) the agreement to reconstruct a ditch at government expense, and (d) operate and maintain it at government expense. It appears, however, that by that Agreement the Indian Service was successful in securing for the Indians as great, and perhaps greater, rights to the use of Tahquitz water as could have been accomplished in any other manner. Presumably, it was in consideration of the amount of water which the landowners were recognizing as belonging to the Indian lands that the Department agreed to reconstruct the ditch which presumably belonged jointly to the Indians and non-Indians. Since that time there has been a general disposition on the part of all parties concerned to abide by the provisions of that Agreement. In 1928 the Department of Public Works, Division of Water Resources, for the State of California, made an Order of Determination, adjudicating the waters of White River and its tributaries, one of which is Tahquitz Creek. The record discloses that at that time the Indian Service suggested to the Division of Water Resources that it recognize the rights of the Indians to 4.8 sec. ft. of water. The non-Indian landowners, as I understand it, did not oppose that suggestion. The right was recognized with a priority of April 26, 1884. On December 9, 1938, the Superior Court of the State of California, in and for the County of Riverside, in an action brought for the purpose of approving the Order of Determination made in 1928, again recognized the Indians' right to 4.8 sec. ft. of water from Tahquitz Creek. At that time suggestions were again made on behalf of the Government by the United States Attorney, which had the approval of both the Interior and Justice Departments.

-5-

Reproduced from the holdings of the *National Archives at Riverside*

Conceding arguendo, but without so deciding, that the Agreement of 1911 was made without authority, it would seem to follow that the same lack of authority in general exists with reference to a modification of the agreement. Since there seems to be no reason why the Government should attempt to claim more than 4.8 sec. ft. of water from Tahquitz Creek, or for believing that it would be successful if it made such a claim, it would appear that the Commissioner of Indian Affairs and the Secretary of the Interior, under the broad powers to manage the affairs of the Indians granted to them in Section II of Chapter I, Title 25, United States Code, can modify the 1911 Agreement in the manner proposed, particularly in view of the fact that it will release the Indian Service from all the obligations of that old Agreement except the one for diverting, measuring, and dividing the water. The latter obligation the Indian Service would want in any event, and I assume would be justified in insisting upon if anyone undertook to deprive it of that power.

While the Government probably is not estopped from claiming greater water rights than those recognized in the old contract and recently recognized in the State decree, it occurs to us that if it had intended to assert a greater right, it should have been done before those proceedings were concluded, and certainly if it ever intends to assert a right to more than 4.8 sec. ft. of water from Tahquitz Creek, the proposed contract should not be executed.

The land descriptions and right of way descriptions have been checked by Supervising Engineer Fortier and his staff, and he advises us that they are correct.

It is recommended that the enclosed draft be approved as to form, subject to the right of correcting the descriptions if any errors should be found, with the further understanding that Superintendent Dady will make a formal certificate to the effect that the parties to the proposed Agreement constitute all of those who have succeeded to any part of the water rights covered by the 1911 Agreement.

Sincerely yours,


Geraint Humpherys,
District Counsel.

GH:ehs
cc-Solicitor,
  Mr. Clotts,
  Mr. Fortier,
  Mr. Dady.

-6-

# EXHIBIT 49

<u>ARTICLES OF AGREEMENT</u>

THIS AGREEMENT, made and entered into this _____ day of _____, 1940, by and between the United States of America, acting herein by John W. Dady, Superintendent of the Agua Caliente Indian Reservation, thereunto duly authorized by the Secretary of the Interior, hereinafter for brevity referred to as the United States, and Nellie N. Coffman, a widow; George B. Roberson and Elta Harrison Roberson, his wife; Earl O. Coffman and Helen Bayless Coffman, his wife; Desert Inn, Inc., a California corporation; Cornelia B. White, unmarried; Florilla M. White, unmarried; Pearl McCallum McManus and Austin G. McManus, her husband; Ralph E. Mattoson and Lottie Mattoson, his wife; Hobart Garlick, a widower; Garlick Holding Company, Inc., a California corporation; The Estate of Willitts J. Hole, deceased, and The Estate of Mary B. Hole (his wife), deceased, both by Samuel K. Rindge, Administrator; Pauline S. Abbott, a widow; Stewart A. Abbott, a bachelor; Isabel White Chase, a widow; Nora Judd Powers, a widow; and the City of Palm Springs, California, jointly and severally hereinafter for brevity referred to as "the Landowners," and

WHEREAS, the United States owns on account of its Indian wards of the Agua Caliente Indian Reservation, Riverside County, California, together with the right to the use thereof, certain water from Tahquitz Creek which flows on to and across said Indian Reservation, all as more particularly set forth hereinafter; and

WHEREAS, the Indians of said Reservation had for many years prior to 1911 diverted water from said Tahquitz Creek and used the same for irrigation of lands on said Agua Caliente Reservation and for domestic and other uses; and

WHEREAS, certain other parties claimed the right to use water from said Tahquitz Creek; and

WHEREAS, both the Indians and the said other persons had been using and claimed joint rights in the ditch used to divert and carry water from said Tahquitz Creek to the Indian lands on said Reservation; and

WHEREAS, in order to save and conserve the low water flow of said Tahquitz Creek and to provide for the use of said waters, as against any other non-Indian persons, the United States, acting therein by W. H. Code, Chief Inspector of Irrigation, United States Indian Service, made a written agreement with Wellwood Murray, Mrs. Nellie Coffman, Mrs. Lavina Crooker, Miss Pearl McCallum, Alonzo E. Davies, and George Wellwood Murray, on the 10th day of February,

1911, which said contract was approved by the Secretary of the Interior March 6, 1911, and placed of record March 15, 1911, in Book No. 325 of Deeds, Page 260, Records of Riverside County, California; and

WHEREAS, in said agreement it was provided among other things:

(a)  That the United States would construct a "stone cement" ditch along the course of the then existing ditch to a point in Section 15, T. 4 S., R. 4 E., S.B.B. & M., and connect it with a concrete pipeline also to be built by the United States to a diversion point on a channel leading from Tahquitz Creek through and across Section 22, T. 4 S., R. 4 E., S. B. B. and M.;

(b)  That the custody and control of said ditch and pipeline should at all times be vested in the United States and its assigns;

(c)  That the said non-Indian parties to the agreement were to clean out all sand, debris, and other accumulations from said stone cement ditch through its entire course within said Section 15;

(d)  That any maintenance and repairs necessary upon the said stone cement ditch were to be made by the United States;

(e)  That the United States was to be responsible for the diversion of the water and operation of said pipeline and canal, including the delivery of water to said other parties;

(f)  That each of the said other parties was to "construct and maintain a good and substantial fence upon each side of said stone cement ditch through their several abutting properties in and through said Section 15." Said parties were also to construct and maintain a good substantial fence across the said ditch on each side of the road at all road crossings, and provide a suitable gate opening for the passage of the "ditch tender"; and

WHEREAS, at the time of the making of said agreement aforesaid the lands to be irrigated from said ditch were farm lands and the surrounding country open except for such of said irrigated farms or neighboring farms as may have been fenced for the purpose of keeping stock out of the fields and vineyards; and

- 2 -

49—355

WHEREAS, since the making of said agreement as aforesaid and the construction of said pipeline and ditch by the United States the lands belonging to said other parties have been included within the boundaries of the resort city of Palm Springs, California, a municipal corporation, which city has grown and developed and the lands entitled to the use of water from Tahquitz Creek, as provided in said agreement of February 10, 1911, have been divided and subdivided and are no longer used for farming purposes but only for residential or commercial purposes; and

WHEREAS, because of the developments aforesaid, it is no longer practicable to regulate the use of water as provided for in said agreement of February 10, 1911, and due thereto the Indians have had great difficulty in securing the amount of water to which they are entitled from Tahquitz Creek, and disputes have arisen over the past several years between the parties to the agreement as to who was responsible for the non-delivery of water to the Indians; and

WHEREAS, the United States in order to avoid further controversies and to eliminate all possible waste of water contemplates constructing a new pipeline heading in a concrete lined section of said channel at a point (as hereinafter defined) above the intake or place of diversion for said existing and jointly used pipeline, which said new pipeline would carry the water for the Indians in a northeasterly direction across said Section 22 to the southwest corner of Section 14, T. 4 S.,R. 4 E., S.B.B. & M., for delivery at the latter point on the Agua Caliente reservation; and

WHEREAS, it is proposed to provide for the diversion of the water to be used by the Indians at the point of intake for said new pipeline and deliver the same to the said Agua Caliente Indian Reservation at the southwest corner of said Section 14; and

WHEREAS, it will be to the mutual advantage of the surviving land owners, parties to the agreement of February 10, 1911, and their successors in interest, parties hereto, if said original agreement is modified so as to provide that the water from Tahquitz Creek to which the parties hereto are entitled shall be divided at a point of intake for said new or Reservation pipeline and the United States be relieved of all obligations in connection with the existing pipeline, stone cement ditch and the concrete lined section of said channel below the new point of division;

- 3 -

NOW, THEREFORE, in consideration of the mutual advantages, the saving of water, the avoidance of controversies as to the use of said stone cement ditch, past and future, and the covenants and promises hereinafter contained, it is mutually understood and agreed as follows:

1. The United States, at its own expense, will construct a new diversion dam and 110 feet of 12-inch steel pipeline appurtenant thereto on Tahquitz Creek at a point in the Northwest Quarter of the Southwest Quarter of Sec. 22, T. 4 S., R. 4 E., S. B. B. and M., described as bearing approximately S. 49° 32' West, 5,510 feet from the Northeast corner of said Section 22, as shown on the map marked "Exhibit A" attached hereto, and made a part hereof. That title thereto, together with the full power of operation and maintenance, shall at all times be vested in the United States.

2. The United States will construct a division box in the Channel running from Tahquitz Creek to the point of intake for the present jointly used concrete pipeline at a point which bears approximately S. 22° 35' West approximately 2,428.4 feet distant from the quarter corner common to section 22 and 15, T. 4 S., R. 4 E., designated as "point of division" on the map marked "Exhibit A" attached hereto and made a part hereof.

3. That the United States will construct a new pipeline beginning at said division box with sufficient capacity to carry 4.80 second foot of water, which said pipeline will from that point bear diagonally in a northeasterly direction across Section 22 to the Southwest corner of Section 14, T. 4 S., R. 4 E., S. B. B. & M., and which said pipeline shall be used for the delivery of all water which the Agua Caliente Indian Reservation is entitled, as aforesaid, to take from Tahquitz Creek.

4. That the provision of the agreement of February 10, 1911, recorded in Book 325 of Deeds, page 260, Records of Riverside County, California, reading as follows:

"It is further understood and agreed, in consideration of the covenants herein contained, that the said party of the first part is the owner of and is entitled to and shall have the right to use the first forty (40) California miner's inches of the waters of said Tahquitz Creek, said forty (40) inches to be measured at the aforesaid point of diversion in said Section 22, which said point of diversion is marked "point of diversion" on the map hereto attached marked 'Exhibit A'. And the said party of the first part shall be entitled to, and shall have the right to use the first forty (40) California miners' inches of water at any and all times flowing at the aforesaid point of diversion.

- 4 -

"It is further agreed that when the quantity of water at the said point of diversion exceeds forty (40) California miners' inches, and until it reaches eighty (80) California miners' inches of water, said parties of the second part shall be entitled to all waters in excess of the said first forty inches.

"When the waters flowing at said point of diversion exceed eighty (80) California miners' inches in quantity, it is hereby agreed that the said party of the first part shall be entitled to the use of two-thirds (2/3) of the excess of water above eighty (80) California miners' inches, and the said parties of the second part shall be entitled to the use of the remaining one-third (1/3) of said excess of water above eighty (80) California miners' inches, until the carrying capacity of said stone cement ditch is reached."

shall be and hereby is amended and modified to read as follows:

It is hereby understood and agreed that the United States is the owner of and is entitled to and shall have the right to use the first forty (40) California miners' inches of water of Tahquitz Creek, said water to be measured at the aforesaid division box to be constructed at the point of intake for the new Agua Caliente Indian Reservation pipeline, all as shown on the map attached hereto and made a part hereof and marked "Exhibit A"; at all times when there is sufficient water in Tahquitz Creek which can be diverted so as to provide at said division box an amount of water in excess of 40 California miners' inches the landowners shall be entitled to receive at said division point the next forty (40) California miners' inches. When there is sufficient water in Tahquitz Creek susceptible of diversion by the facilities available to the parties hereto in accordance with the terms of this agreement so as to yield at said division point an amount of water in excess of eighty (80) California miners' inches, all such water in excess of said 80 miners' inches shall be divided at said division box between the parties hereto as follows: Two-thirds to the United States and One-third to the landowners.

It is further understood and agreed that the ownership, care, custody, control and operation of said division box belong to the United States and that it will operate said division box so as to divide the available water from Tahquitz Creek as between the parties hereto on the foregoing basis in accordance with such standards of accuracy

- 5 -

as may be established by the Secretary of the Interior
for the operation of said division box, whose decision
in that regard shall be final.

5. That the United States will at all times in its operation
of said diversion dam and appurtenant structures divert from Tahquitz
Creek as much of the water flowing there as can reasonably be ac-
complished with said facilities up to but not exceeding the capacity
of said 12-inch steel pipe. Provided that the United States after
it has constructed said dam and installed said 12-inch steel pipe-
line, shall not be obligated to make further improvements in the
diversion facilities and its obligation to divert water for the
landowners hereafter shall be limited to that which can be diverted
with said facilities when so constructed.

6. The United States is hereby released from all its obliga-
tions under the said contract of February 10, 1911, except as provided
in Article 4 hereof. In consideration of being released from said
obligations it is further agreed that the United States will not claim
hereafter any right to the use of said stone cement ditch in Section
15, T. 4 S., R. 4 E., S. B. B. & M., the concrete pipeline heretofore
constructed under the terms and provisions of the 1911 agreement or
that part of the concrete lined channel between the new division box
and the point of intake for the old pipeline, and it hereby assigns
its interest therein and right of way therefor to the Landowners.
The United States recognizes the right of the Landowners to continue
using:

(a) The approximate 2,342 feet of the old pipeline located in
Section 22, together with a right of way therefor, described as fol-
lows:

A strip of land extending ten (10 feet on each side of
the center line of a concrete pipeline located and des-
cribed as follows: Beginning at a point which bears ap-
proximately S 59° 15' W., approximately 4,049.4 feet distant
from the southwest Section Corner, Sec. 14, T. 4 S., R.
4 E., designated as "Point of Diversion" on the map attached
hereto and made a part hereof, marked "Exhibit A"; thence
N. 80° 23' E. a distance of 25 feet to a point; thence on
a curve to the left whose radius is 60 feet through a cen-
tral angle of 45° 20', a distance of 47.5 feet; thence on
a tangent which bears N. 35° 03' E. a distance of 156.2
feet to a point; thence on a curve to the left whose radius
is 100 feet through a central angle of 10° 30' a distance

- 6 -

of 18.2 feet; thence on a tangent which bears N. 24° 33' E. a distance of 121.5 feet to a point; thence on a curve to the right whose radius is 100 feet through a central angle of 23° 45' a distance of 41.4 feet; thence on a tangent which bears N. 48° 18' E. a distance of 69.2 feet to a point; thence on a curve to the left whose radius is 100 feet through a central angle of 8° 57' a distance of 15.6 feet; thence on a tangent which bears N. 39° 21' E. a distance of 530.9 feet to a point; thence on a curve to the left whose radius is 100 feet through a central angle of 14° 45' a distance of 25.8 feet; thence on a tangent which bears N. 24° 36' E a distance of 25.8 feet; thence on a tangent which bears N. 24° 36' E. a distance of 1,230.1 feet to a point; thence on a curve to the left whose radius is 100 feet through a central angle of 42° 30' a distance of 61.3 feet to a point on the North line of Sec. 22, T. 4 S., R. 4 E., which point bears North 89° 53' E. a distance of 414 feet distant from the quarter corner common to Secs. 22 and 15, T. 4 S., R. 4 E., designated as Station 23 + 42.7 on the map attached hereto and made a part hereof, marked "Exhibit A", and

(b)  That portion of the concrete lined ditch designated as "channel" on the attached map, including a right of way twenty (20) feet in width, or ten (10) feet on either side of the center line of said ditch, located and described as follows:

Beginning at a point which bears approximately S. 22° 35' W., approximately 2,428.4 feet distant from the quarter corner common to Secs. 22 and 15, T. 4 S., R. 4 E., designated as "Point of Division" on map attached hereto and made a part hereof, marked "Exhibit A"; thence N. 4° 10' W., a distance of 122 feet to a point; thence N. 23° 52' E., a distance of 21 feet to a point; thence N. 36° 50' E., a distance of 27 feet to a point; thence N. 72° 20' E., a distance of 48 feet to a point; thence N. 49° 15' E., a distance of 41 feet to a point which bears approximately S. 59° 15' W., approximately 4,049.4 feet distant from the southwest Section Corner of Section 14, T. 4 S., R. 4 E., designated as "Point of Diversion" on said "Exhibit A",

containing in all approximately 1.19 acres of land.

- 7 -

The use of said right of way shall be limited to the doing of those things thereon which may be necessary in operating, maintaining and repairing said sections of ditch and the old pipeline. It is mutually understood and agreed that the assignment of said right of way shall remain in effect only so long as the said ditch, concrete pipeline, and stone cement ditch shall be used for the purpose of conveying water to the lands of the contractors or their successors in interest.

7.  It is mutually understood and agreed that the Landowners will assume full responsibility from and after the execution and approval of this agreement for the operation, maintenance and repair of said concrete pipeline and sections of ditch hereinabove described.

8.  The Landowners hereby represent to the United States that they hold and own all rights to the use of water provided for in said agreement of February 10, 1911, and that in consideration of the United States agreeing not to use said old pipeline and the open ditch and that section of channel or cement lined ditch in Section 22 below the new point of division provided for herein, they will hereafter assume full responsibility of furnishing water to any Landowner or Landowners not parties hereto if at any time it shall be found that they own a right to use water under the terms of said agreement.

9.  No member of, or delegate to Congress, or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

10.  It is intended that the terms and provisions of this contract shall be binding upon and shall inure to the benefit of the United States and its assigns and the heirs, executors, administrators, successors and assigns of the Landowners, the parties hereto.

11.  It is understood that this agreement shall not become effective until approved in writing by the Secretary of the Interior of the United States.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

UNITED STATES OF AMERICA

By _____
     John W. Dady, Superintendent,
     Agua Caliente Indian Reservation.

- 8 -

WITNESSES:

_____   Nellie N. Coffman

_____   George B. Roberson

_____   Elta Harrison Roberson

_____   Earl O. Coffman

_____   Helen Bayless Coffman

_____   Cornelia B. White

_____   Florilla M. White

_____   Pearl McCallum McManus

_____   Austin G. McManus

_____   Ralph E. Matteson

_____   Lottie Matteson

_____   Pauline S. Abbott

_____   Stewart A. Abbott

_____   Isabel White Chase

_____   Nora Judd Powers

_____   Hobart Garlick

- 9 -

Estate of Willitts J. Hole, deceased, and Estate of Mary B. Hole, deceased, by Samuel K. Rindge, Administrator

Attest:

_____
              Secretary

Desert Inn, Inc.,

By_____
              President.

Attest:

_____
              Secretary

Garlick Holding Company, Inc.,

By _____
              President

Attest:

_____
              CITY CLERK

City of Palm Springs, California

By _____
              Mayor

- 10 -

49—363

STATE OF CALIFORNIA )
                      )     ss.
COUNTY OF RIVERSIDE )

       On this _____ day of _____, 1940, before me

_____, a Notary Public in and for the

said County of Riverside, personally appeared

_____

_____

_____

known to me to be the persons whose names are subscribed to the
within instrument, and they acknowledged to me that they executed
the same.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed
my official seal, at my office in the said County of Riverside the
day and year in this certificate first above written.

                                      _____
                                      Notary Public in and for the said
                                      County of Riverside, State of California.

My commission expires:

_____

# EXHIBIT 50

COLLIER & CARNAHAN
ATTORNEYS AT LAW
LRIGHTS BUILDING

WM. COLLIER
H. L. CARNAHAN

RIVERSIDE, CALIFORNIA, August 3, 1906.

Hon. Francis E. Leup,

Commissioner of Indian Affairs,

Washington, D. C.

Dear Sir:

Pursuant to the suggestions of my letter of June 30, 1906, I submit the following report as to matters which have been under my consideration as Special Attorney of the Mission Indians up to the 30th of June, 1906, the date at which my resignation takes effect. I think these matters may be of interest to the Department and may be to some extent a guide to my successor or such other officer of the Department of Justice who may have charge of the interests of the Mission Indians of Southern California.

1st. Difficulties which have heretofore prevailed and conditions existing at Palm Springs or the Agua Caliente Reservation, relative to their water and water rights:

My appointment as attorney of the Mission Indians was made on the 24th day of May, 1899, and this appointment came at the end of a succession of several years, the average rainfall of which was very much below the general average. According to the tables kept at San Bernardino, which will be suggestive, the rainfall of the year 1893, being from July, 1893, to the end of June, 1894, was 8.13 inches; 1895-96,8.11 inches; 1897-98,8.24 inches; 1898-99,7.49 inches; 1899-00, 8.64 inches. Intervening however were two seasons, 1894-95,20.98 inches, and 1896-97,16.74 inches. The average rainfall at San Bernardino, which I may say is at the foot of the mountain range on the coast side, along which these Indians reside, but on the east side of the range however, from 1901-02, to and including 1903-04, 15.06

NARA DC
RG 75
Central Classified Files, 1907-39
California Special
Box 3
F. Calif. Special 35552-1908-200 Part 1

-2-

You will discover from this that the year 1894-95 the rainfall was not quite six inches above the average for that period, and the year 1896-97 it was only about an inch and a half above the average, all the other years greatly below.

As a result of this condition of things with reference to the water supply, one of the first matters which was brought to my attention was the difficulty between the Indians and a few settlers improving lands on the section adjoining the Indian Reservation, with reference to water rights.

The Indians it appeared had been for a long time, and long prior to any white settlement in the neighborhood, using water through an old ditch constructed by their ancestors from what was known as the West or Tauquitz Canon across a part of Section 22 and a part of Section 15 to Section 14, of which section the land cultivated and occupied by the Indians formed a part. The white settlers on Section 15 were making claim to this water so taken from West Canon and used by the Indians. I investigated the situation as carefully as I could from the records of your Department and from facts I was able to ascertain on the ground, and I became satisfied that aside from such flood water as the Indian ditch would not carry in the spring time when such flood waters came down, the Indians were entitled to all the minimum and ordinary flow of that canon, which varied, owing to the seasons, from nothing to forty or fifty inches. The amount to which the Indians were entitled of the permanent waters of the canon could not very well exceed the capacity of their ditch which indicated the amount of water formerly used by them, and as nearly as I

-3-

could estimate, and according to the information I could get on the ground, their ditch as constructed and used by them had carried and was capable of carrying about forty or fifty inches of water.

This controversy, developed by the scarcity of water, continued for sometime and there were various phases of it, but for a number of years during and following this series of dry years there was so little water in the canon that there was really almost nothing to litigate over. I visited the canon on two different occasions during those years in the summer time, being always called there when water was scarce, and on both of those visits there was no water at all flowing from the canon into the ditch. There was on both occasions a small amount of water dropping over a rocky ledge or fall into the canon some distance above the intake of the Indian canal, but none whatever flowing beyond a little pool which was created at this fall, which, if all saved, would probably have afforded the Indians drinking water or domestic water who resided at Palm Springs, but there was no method of getting it to them unless the same were inclosed in an iron pipe, as in any open conduit it would all have evaporated before reaching them. From time to time I advised the Indians of what I considered their rights, and L. A. Wright, the Agent, and myself cooperating together, urged the Indians to hold and use the water they were entitled to from that ditch and to insist that it should not be interfered with by others. I continued on this line, the Indians acting with reasonable firmness in their own behalf, until the white people in the neighborhood finally conceded that the Indians were entitled to the first forty inches of water and all below that that

-4-

that would flow in the ditch from that canon, and so far as I know this right is now conceded by all the settlers residing in the neighborhood, there being but very few of them.

If any controversy should arise in the future with reference to West Canon, by an examination of my reports and such other information as I can give personally to my successor, I may be of assistance to him in furnishing a more detailed statement of the facts, together with names of parties with whom I have conferred in the past and such evidence as I was able to unearth for the purpose of establishing this right which seems now to be conceded by the few settlers who are there.

During all these years until within the last two years, 1905 and the summer season of 1906, the present year, that canon has afforded very little water for irrigation except during the early spring while the snow, if any happened to fall in the mountains, was melting. It has been dry below this fall which I have mentioned, and which is on the line of the ditch probably more than a mile from the Indian settlement, during a good part of every summer and irrigating season. In 1904-5 we had quite an abundant rainfall. I have no record before me of the number of inches during that season, and in 1905-6 if anything a still more abundant rainfall, and especially so on the mountains where the fall of snow was very heavy, and from information which I have from the Indians I have no doubt this canon is running quite a large and promising looking stream and has been during the winter and spring and up to this time, the summer of 1906. But as I have suggested, it is a very unsafe, unreliable and uncertain proposition, and I have never felt like advising the Government to expend

-5-

money on the uncertainty which seemed to attend the flow of water in that canon for the purpose of saving for the Indians the small amount which might be saved, as I have always considered the expense attending any effort of this kind to be out of proportion to the benefits which would be derived from the expenditure.

There is another canon to the north of West Canon along the mountain range which is known in the vicinity as Chino Canon. There has been a small amount of water in this canon at different times since I have been connected with the service. There is a section of land, I think Section 6, according to reports brought to me from surveys, which extends across this canon, and upon investigation of the status of that land some two years ago, I advised the agent, under suggestion from your Department, to furnish the Indians wire to fence across the canon for the purpose of pasturing their stock upon a portion of Section 6, which, while it was not patented by Village Patent to these Indians, was a part of the reservation as originally set apart by executive order, and after the report of the Commissioner in 1891 as to lands necessary for these Indians, while it was not included in this report by the Commissioner, it was recommended that this land be restored to the public domain, no executive order has ever been made, as I have been advised, restoring the land to the public domain, and it therefore stands withdrawn on the records in the Land Office at Los Angeles and is not therefore open to entry. The Indians are using a portion of this Section 6 to pasture their stock, there being sufficient water for them in the canon. As a water

-6-

proposition however, for the purposes of piping or fluming water, it is absolutely useless in my judgment for the purposes of the Indians. While during the last year there has been I presume, and I have no doubt from information received from Mr. Chubbuck, one of the Special Agents of the Department, who visited the canon since I have, quite a large flow of water during the rainy season in the canon, but in view of the fact that in the summer time this canon runs down to a very small amount, scarcely more than water for a few head of stock, and the further fact that pipe lines and conduits of some kind would have to be constructed between three and four miles, as I now recollect, to reach the Indian settlement, and for the further reason, as will appear hereafter, that there are but thirty or thirty-five Indians who really belong to that band or village at Palm Springs, I think any expenditure upon that canon for the purpose of diverting or carrying water to Section 14, where the Indians reside, or to any other section which constitutes a part of the reservation, would be a useless and unprofitable expenditure of money.

In conference with Mr. Chubbuck when here I did suggest to him that if it was practicable as an engineering proposition that a ditch might be taken from West Canon across Section 22 over a road which might carry the water to Section 14, and when the canon afforded flood water in the spring more than would be carried by their present ditch, they might get some benefit from it during the flow of the flood water and to some extent they might be benefitted. The greatest difficulty with a proposition of this kind is with the Indians

-7-

themselves.  They are as a rule very much more stupid in the management of their agricultural affairs than white men and very much less inclined to take chances than white men.  The uncertainties attending the flow of this flood water or the continuation of it in the spring time are so many from their past experience that they are not much inclined as a rule to go on and make preparations and do the work necessary to the use of such water, when there are so many chances that the work will all come to naught, for the reason that the flood water does not come or continue long enough to be of any substantial benefit.  Our own people in carrying on their irrigation work rarely or ever rely on water of that kind unless by expensive means they are able to store it, and in such quantity as will enable them to carry it through the irrigating season, which is a very expensive proposition.

Sometime ago, and since my last report, Mr. Chubbuck called on me for suggestions in regard to a water right in a canon in that vicinity known locally as Andreas Canon.  By an old contract with the Department Mr. B. B. Barney had incured considerable expense in laying a pipe line from this canon to a section of land lying out in the valley opposite the mouth of the canon, and in the contract a reservation had been made in behalf of the Indians of water from this canon, being one inch to every six acres of land actually used and cultivated by the Indians.  In the first place the reservation was one which was absolutely worthless as one inch of water for six acres of land in that desert country is entirely inadequate for any purpose whatever, and there being no provision in the contract for the accumulation of

-8-

water, a single inch of water in constant flow would probably sink away in the sand before it had run three or four rods over a six acre tract.

Long before my appointment as Special Attorney of the Mission Indians Mr. Barney had been a client of mine and had consulted with me as his attorney with reference to this water right which he had after making this contract with the Department, and I had as his counsel given him advice a number of times in regard to it, there being at the time and since then no controversy between himself and the Indians until recently, as hereinafter stated.

During last winter Mr. Chubbuck called on me, after having made a visit to Palm Springs, and advised me that in behalf of the Department for the Indians he had made a filing upon this water, or some of the water which had hitherto been claimed by Mr. Barney under our statute, and desired to confer with me in regard to the rights secured by him through a water notice as posted pursuant to our law. Having in times past advised Mr. Barney in regard to the water, and knowing there was a controversy between himself and the Indians, I did not feel that professionally I ought to take the matter up for either party. I therefore notified Mr. Chubbuck that I was perfectly willing to do everything in co-operation with him that I could consistently with my former and present relations with Mr. Barney as attorney, and anything I could do toward bringing about an adjustment and settlement of the matter between them satisfactory to himself and Mr. Chubbuck I was willing to do, and after negotiations between Mr. Chubbuck and Mr. Barney, and with this understanding on the part of both of them,

-9-

they came to an agreement in regard to the division of the water, which I put in writing for them, and which I was advised by Mr. Chubbuck was approved by the Department, and further, which secured to the Indians from that canon a valuable water right, and the only water right in that neighborhood that is worth anything, in view of the expense attending the development and improvement of any other, and the few Indians to be supplied after the expense is incurred.

I have visited Andreas Canon a number of times in going back and forth to Palm Springs. I think I visited the canon at three or four different times on my visits to the reservation, and all of them, as I now remember, were in mid summer or when the minimum flow of water prevailed, and on each visit I found a good flow even in dry years. I could not say positively, as it is very difficult to estimate water flowing in a strong current among the rocks as it flowed in that canon, but I do not believe that I have ever seen it flowing less than thirty or forty inches, and this at a time when the flow would be down to probably the minimum. In my judgment the available and practicable water supply for the Indians at Palm Springs and the economical method for supplying it is to take it out under the contract just below the intake of Mr. Narney's pipe so as to get all he allowed to go to waste and that he is not entitled to under the contract, as well as all the Department is entitled to under the agreement, and enclose it in a substantial pipe under pressure to Section 14 near the Springs. The Indians, most of them, have always been accustomed to reside on this section and about these springs, the soil of that section and the sub-soil is of such a character that it will carry water for the

-10-

purposes of irrigation and so conserve it as to make it useful to the Indians.  I would advise spending in this manner all the money the Department sees proper to spend to accomodate these Indians.  Aside from what the Indians might do themselves in the way of ditching from West Canon, I believe it to be the only safe, permanent and economical supply for them.

I am well aware from my conversation with Mr. Chubbuck that he had in his mind a great many ideas in regard to procuring water for these Indians with which I could not agree, and while I do not question his sincerity, and while I am fully aware that he desired to do for the Indians what he thought entirely in their interest, yet visiting this section at the time he did with water flowing in abundance out of the canons as it was at that time, it appeared to me he could hardly appreciate and almost seemed to question my veracity when I told him of the conditions I had personally found in those canons during the summer time when the water was really needed and required. It is very difficult for a man from east of the Rocky Mountains, or from the Missouri or Mississippi Valleys, where I grew up myself, to understand the changes that will occur in a country like this from the winter season when our rains and snows fall on the mountains, after we have existed as we do many seasons from early in March until December without any rain.  This is not always true.  We sometimes have rains through the month of April, and occasionally have showers as early as in the month of October, and while at times the rains in April are quite heavy, they are generally, if we have any at all, light in the month of October.

-11-

If it is desired, for a better understanding of the rainfall in the country, I would refer my successor to the Water-Supply and Irrigation Paper No. 142, of the Department of the Interior, made by Mr. Walter C. Mendenhall, on the Hydrology of San Bernardino Valley, California, and published in 1905, and for the rainfall of San Bernardino, to page 18.

I have no doubt if Mr. Chubbuck would visit this section in the month of October of this year and look over the conditions as he would find them at Palm Springs at that time, he would have some very different recommendations to make from what he may have probably urged after his visit in the winter and early springtime, and his visit too being at a time following an unusually heavy rainfall and snow in the mountains above that locality.

In this country people never make plans for their irrigating projects based on anything but the possible minimum flow of these canons, and experience has taught us that when we undertake to work on an average flow or any increase over the minimum during the ordinary irrigating season we are liable to get into very serious trouble, with the single exception however in building large storage reservoirs to impound flood waters as well as the ordinary flow of canons this rule may be and is safely departed from, but I do not believe at Palm Springs there would be land enough cultivated by those who belong there to justify any great expenditure for the purpose of impounding flood waters of the winter time.

-12-

## MATTERS IN LITIGATION.

--------

| | | |
|---|---|---|
| Roman Catholic Bishop of Monterey, | ) | |
| Plaintiff, | ) | Formerly Pending in the |
| | ) | Superior Court of the |
| vs. | ) | County of Santa Barbara. |
| | ) | |
| Samuel Cota, et al., | ) | |
| Defendants. | ) | |

---------------

    At the date of my last report an action entitled as above was
pending in the Superior Court of the County of Santa Barbara, and
had been brought by the Bishop for the purpose of determining the
boundaries of the land occupied by a certain band of Mission Indians
residing at Santa Ynez in Santa Barbara County.

    The action has been long pending awaiting the disposition of the
cause as between an individual Indian who answered separately, and the
Bishop, practically all others having acquiesced in an agreement with
the Bishop settling the lines of the land to which the Indians claimed
the possessory right.  Aside from the issues presented by the answer
of this individual Indian, all that has been necessary to be accom-
plished was an adjustment of the terms of the decree of the court
according to the agreement of the parties.  Prior to the trial of
the cause however I visited the City of Santa Barbara, had a consul-
tation with counsel for the Bishop, and we settled as between us the
terms of the decree such as in my opinion fairly complied with the
agreement between the Bishop and the Indians, which had been made
prior to my appointment, which form of decree was substantially re

-13-

duced to writing and criticized, and after being made to conform to our understanding, was forwarded to your office and was approved, and during the month of December, 1905, the case was tried as between the contesting Indian and the Bishop, and also such matters as in this contest pertained to the rights of the Indians who were not contesting but desired a settlement according to the agreement formerly made.

In the early part of 1906 a decision was made by the court and a decree prepared and submitted in accordance with the judge's decision, substantially in the same form as I had previously submitted to the Department, and which by the Honorable Commissioner has been approved.  This decree was entered and a deed made by the Bishop, in accordance with the agreement, to the Honorable Secretary of the Interior, transferring the interest conferred to the Indians by the decree, all of which papers have been duly reported to your office, have been approved and the deed by the Department forwarded to Mr. L. A. Wright, General Superintendent and Disbursing Agent, and by him recorded in Santa Barbara County.  This matter has therefore been finally closed and the rights of the Indians fully determined with practically entire satisfaction to the band or village and to the agent who conducted the negotiations for the original settlement, as well as the approval of the Department.

Reproduced at the National Archives

-14-

Santa Ysabel Reservation.

An action in the Superior Court of the County of San Diego, entitled:

Charles Martin, et al.,
     Plaintiffs,  )
           )
           )
   vs.       )
           )
Jose Maria Guacheno, sued as )
 Jose Maria Quackegro, et al., )
       Defendants. )

--------------------

This action was commenced on July 27, 1904, for the purpose of ejecting two families of Indians from two several small pieces of land which it was claimed by the plaintiffs constituted a part of the Santa Ysabel Grant in San Diego County. The land had been occupied for a long time by these Indians and it was supposed was a part of the Santa Ysabel Reservation. In January, 1905, under instructions of the Department, I procured the services of a capable surveyor, accompanied him overland to the Santa Ysabel Reservation, and spent about six days in a re-survey of the grant line of the Santa Ysabel Grant, extending along the westerly line of the Santa Ysabel Reservation, for the purpose of ascertaining whether or not the lands occupied by these Indian families constituted any part of the grant. While there are other questions as to the prescriptive rights of the Indians to the entire acreage occupied by them, our survey of the grant line, following the patent issued by our Government pursuant to the order of the Commission on Private Land Claims for California, showed that part of the land occupied by these Indians is inside the

-15-

grant and part of it upon the reservation.  The acreage however is
small, the land is not of any great value except as the Indians are
attached to it by reason of their long residence there, and the fur-
ther fact that it lies just at the foot of a mountain which rises
six or eight hundred feet above their houses and therefore their hol-
dings cannot very well be enlarged.  The families who are occupying
these pieces are among the most worthy of the old Indians of the
village, and I was very anxious to maintain for them a right to occupy
their old homes so long as they like, if the same could be done
legally.

A short time ago, and before tendering my resignation, I visited
San Diego and had an interview with the attorney of the plaintiffs
in the case, and following the conversations which we have had in
times past I suggested that we get together and endeavor to arrive at
some kind of a settlement.  He preferred to take the matter up on
the ground with the representative of the owners of the ranch, and
thought in view of the character of the controversy that we ought to
be able to come to some adjustment of the matter which would be sat-
isfactory and at the same time might result in the Indians being
undisturbed.  The owners of this grant have as a rule treated the
Indians with considerable justness and they do not seem to have a
desire to be at all unfair to them.  Their help on the ranch is
largely from among the Indians and the worthy ones are treated by
them with respect so far as I know.  I therefore made an arrangement
with counsel for the plaintiffs to meet him at the ranch at sometime
when it will be convenient for us both and endeavor to adjust this

-16-

matter, and in my letter of resignation suggested that I was willing to make this attempt at settlement and disposition of this matter without further expense to the government, since I had the matter in hand, had personal knowledge of the situation and had personally supervised the survey of the line. My proposition so made at the time of my resignation was approved by your office, and I will proceed to carry it out and make further report in regard to this matter, being the only matter pending in court at this time within this jurisdiction.

Santa Rosa Band or Village of Indians.

During the last year I have had a number of calls from an old Indian who appears to be a very well behaved and worthy old man, residing in a locality known as Santa Rosa, easterly from the Cahuilla Indian Reservation in this county. This band or village is mentioned in the report of the Commissioners to set apart lands, made in 1891, as "occupying unsurveyed land in a remote and uninhabited region where they were not likely to be disturbed".

About two years ago I learned that contracts had been made for the survey of the township occupied by these Indians. It is impossible for me to locate the land as actually occupied by these people, but it is either in Townships 7 or 8 South, Ranges 4 or 5 West of S. B. M.

I engaged with these Indians to watch the record in the local land office, and upon filing the plat to take such steps as would bring to the attention of your Department the exact lands occupied and necessary for the use of the Indians, and endeavor to see that their

-17-

rights were protected by a proper order withdrawing the lands from
entry.   With regard to this locality however it is proper to say from
my information gathered from persons who have been on the ground,
that there is very little land of any practical avail to these In-
dians in the locality where they reside, and as they have grown up
most of them have scattered by reason of the fact that they have no
suitable tillable land for use in the locality for any great number,
possibly not for more than one or two families.  The last time this
so-called Captain came to me I took a list of the names of the dif-
ferent ones who had gone out from there and were scattered here and
there throughout the county, having no interest in any other reser-
vation and forming no part of any other band, and they numbered some
twenty-eight or twenty-nine persons, if my information was correct.

     I am of the opinion that if funds were appropriated at the last
session for the purchase of lands for the Indians having no homes, or
not suitably provided with tillable land and water, that a small
amount of money could be very profitably invested to furnish these
Indians with land, and that their condition and their necessities
should be investigated by any representative of the Department to
whom is committed the responsibility of selecting lands for such
persons.  As I understand it the valley or canon which they occupy,
those who still remain, is so high that it is too cold in winter
time for them, or so much snow that during the two or three months of
cold weather they have to repair to the valley below and only return
to their mountain home when the snows are gone in the spring.  The
only advantage I can see accruing to the Indians in that remote and

50-382

Reproduced at the National Archives

-18-

apparently desolate locality is the fact that they are isolated and therefore not subjected to many of the baneful influences of white men.

While I have had the honor to represent the Department in the interest of these Indians I have given very considerable attention to them, have made long journeys in many instances overland to visit their reservations, and have become somewhat familiar with many of the bands of Indians in this jurisdiction, and if at any time such information as I have obtained will be of any avail or can be used by my successor for the Department I will very cheerfully furnish all such information, desiring at all times to be helpful to the Indians, for while I have never been an enthusiast on the subject, I have through my official duty become interested to the extent that I have a very large sympathy for many of them.

Respectfully submitted,

Wm Collins

Special Attorney
of the Mission Indians.