Exhibit 4

EXECUTIVE MANSION.

*December 29ᵗʰ 1891*

The report of the Mission Indian Commission, appoint-

ed under the act of January 12,1891 (26 Stat. 712),is hereby

approved,except so much thereof as relates to the purchase of

lands from and exchange of lands with private individuals,

which is also approved subject to the condition that Congress

shall authorize the same.

All of the lands mentioned in said report,

are hereby withdrawn from settlement and entry until

patents shall have issued for said selected reservations,and

EXHIBIT 4

- 174 -

30                          -2-

until the recommendations of said Commission shall be fully

executed, and, by the proclamation of the President of the

United States, the lands or any part thereof shall be restored

to the public domain.

*[signature]*

Department of the Interior
Washington, D.C.
December 29ᵗʰ

Under the act of Congress and as
above provided; approved

John W. Noble
Secretary

16

100

EXHIBIT 4

- 175 -

Exhibit 5

Case 5:12-cv-00882-JGB-SP Document 81-2 Filed 11/21/13 Page 6 of 86 Page ID #:1394



State of California.
County of San Diego.

Whereas, by instructions from the Department of the Interior of the United States bearing date on the 22nd day of August and on the 19th day of November, 1887, respectively, each marked "L", the former numbered 19614, case 31, and the latter 30324, Joseph W. Preston, Indian Agent for the Mission Indians, California, was instructed to investigate the subject of fraud, trespass or other interference with the lands and rights of the Mission Indians on what is known as the Agua Caliente and the Rincon reservations, and technically designated as Township Four South, Range Four and Five East, in San Diego County, California, and so reserved and set apart for the use of said Indians, and whereas, the said Joseph W. Preston, under and in pursuant to said instructions, discovered and ascertained among other things, that a certain land company operating in said County, known and organized under the corporate name and style of the Palm Valley Land Company, by its authorized officers, agents and employees, had located, surveyed, designated and partly constructed a water ditch or canal on and through Township Four S., Range Four East, Sections 3, 10, 15, 23, 26 and 27, San Bernardino Meridian, having for its purpose to convey and conduct water from a point North of said reservation through the same to a point South and beyond said sections, to be used for irrigating their lands, and in supplying a town which said Company had located at said point, and on lands claimed by them,

And whereas, it is represented that there is no other practicable route or way by which said Company can conduct the said water as thus desired and intended, and without this way, they will be wholly without the indespensible means of irrigating their said lands and of supplying with water the town to be settled as aforesaid,

And whereas, the value of the land through which the said ditch is located is inconsiderable and without water is worthless, but with water may be of more value.

And it appearing to the said Joseph W. Preston, U. S. Agent, that no consequential injury to the Indians will be likely to accrue from the construction and legitimate operation of such a water ditch, but that the same will be of great use and benefit to said Indians,

Now Therefore, for the consideration hereinafter stated, and by the consent and approval of the Honorable Commissioner of Indian Affairs, I, Joseph W. Preston, Agent as aforesaid, do hereby consent and agree, as follows;

First. That the said Palm Valley Land Company shall have the full, free and exclusive right of way through said reservation for the construction of a water ditch now located and designed through the sections aforesaid owned by the said Government, and designated on the plat or map hereto annexed as a part of this agreement, and for a distance on either side of twenty-five (25) feet, together with all the rights and privileges of ingress, egress and regress, and other rights necessary for the full and successful construction, occupation, use, enjoyment and operation of the same,

EXHIBIT 5
- 176 -

ACC0000016

-2-

Second. That said Company and successors and assigns shall have, as incidents thereto, the use and occupation and the further development of all waters in what are known as Torquits or West Canyon situated on section Twenty Two (22) Township 4 S., R. 4 E.,- and Chino Canyon situated in Tp. 4 S., R. 4 E., section Five,- to which the said Government may have reserved rights for said Indians. The said Company may convey the water from said West Canyon across said sections 22, 23 and such other sections as may be necessary to reach their said lands, for the purposes aforesaid and with the same conditions and restrictions.

First. In consideration and for such right use and occupation and enjoyment of said easement, the said Palm Valley Land Company for themselves, their assigns and successors, do hereby grant to said Indians a permanent water right on one hundred and sixty (160) acres of land of section Fourteen (14) Township Four (4) South, Range Four (4) East, San Barnardino meridian, of said reservation,- which is to be irrigated upon the basis of one inch of water under a four-inch pressure to six acres of said land, and to be securely preserved and conducted and delivered on the North-West corner of said section (14) under the rules of said Company except and provided, that said Indians shall have the first right to water, and the water shall be delivered to them free of costs.

Second. That the said Palm Valley Company and their successors and assigns shall furnish to said Indians a like quantity of water upon like conditions, for an additional one hundred and sixty acres of land on said section, whenever the same is needed by extension or cultivation, increase of the number of the Indians, or when the same is required of the Company, and from any water, whether that which may be delivered on the land or from the body of the stream brought upon said reservation by said ditch or otherwise, or in lieu and stead thereof pay the sum of Eight Thousand Dollars ($8,000.) to the Government for the use of said Indians, upon demand by the Agent,

Third. That no mineral, rock, wood or other material shall be removed or taken from said reservation, or any part thereof, except such as may be necessary for the construction and repairing said ditch, and nothing therein shall be taken, used or appropriated for any other purpose, nor shall said right of way be used for any other than the purposes herein stated and set forth.

Fourth. That in the event said Company, their successors or assigns shall fail, neglect or refuse to comply with all or any of the terms, conditions and stipulations in these articles of consent for right of way and agreement, reasonably construed and providential exceptions,- such failure or refusing shall be construed and treated as a forfeiture of all further and longer right to the said easement, and upon due notice by the said Indian Agent or other agent or person authorized by the said Government, and failure to perform thereof, the said Company, their successors, assigns and all their agents and employes shall remove or be removed, together with all their property and movable effects.

REPRODUCED AT THE NATIONAL ARCHIVES

EXHIBIT 5
- 177 -

-3-

It is hereby stipulated that in the event that said Indians shall cease to occupy said lands, or for any cause be removed therefrom and the land thereafter or theretofore be restored to the Government, such removal or restoration or other disposition of said land shall not affect the right of the Company to use said ditch, but that they shall continue to have the full and exclusive use of the same, together with the water, and that the water rights granted for the use of the Indians shall revert to the Company.

It is hereby stipulated that the water to be delivered on section Fourteen shall be water from the White River ditch, or from any water developed in Chino or other Canyons,- But in the event that the Government fails to convey the easement on the waters of said Canyons, that then and in that event the said Company shall pay, in lieu of said water herein granted, the sum of one hundred dollars ($100.) per mile for the distance of five miles, towit, the sum of five hundred dollars ($500.) for the right of way for said ditch.

This 7th day of February, 1888.

(Signed)          "JOSEPH  W.  PRESTON."

U. S. Indian Agent.

NOTE: Above instrument acknowledged before W. L. Burton, Notary Public in and for the County of San Bernardino, State of California, May 10th, 1888,

REPRODUCED AT THE NATIONAL ARCHIVES

EXHIBIT 5
- 178 -

ACC0000018

Exhibit 6

REPRODUCED AT THE NATIONAL ARCHIVES.

ag -1903

In reply to
Land,
32460-1903.

# DEPARTMENT OF THE INTERIOR,

## UNITED STATES INDIAN SERVICE,

Pala, California,
August 22, 1903.

ag - potential

The Honorable,
The Commissioner of Indian Affairs,
Washington, D. C.

Sir:

I would respectfully submit the following statements and facts concerning irrigation matters and possibilities relative to the lands of the Mission Indians of the Agua Caliente, or Palm Springs Reservation in California.   There are also submitted with this report, under separate cover, some maps that it is hoped will tend to a clearer understanding of the physical characteristics; and one or two pictures that may be of a little aid.

There are seven alternate sections, containing some 4500 acres, embraced in this reservation that lays at the base of the east slope of the San Jacinto mountains, and within the western border of the California Desert.  Frost is seldom, if ever, known in Winter, and the Summers are excessively hot and arid.  There is almost no rainfall the year round, and nothing grows without irrigation.

With water, crops of all kinds can be grown here and yield prolifically when properly tended.  Date palms are found growing luxuriously in some of the canons; and, owing to the almost tropical climate, figs, grapes and melons mature and are marketed a month or six weeks earlier than from other regions of southern California, and top prices are secured.

Of the lands of the reservation, nearly all of sections 14 and 28; the larger part of sections 24 and 2; and a very little of the western edge of section 34 are excellent, susceptible of cultivation, and under irrigation could be made to produce abundantly.

The ten or eleven families that comprise this band of Mission Indians all have their houses and small individual farms in the western half of section 14.  About 50 acres is estimated as the aggregate of the lands planted by these people to figs, grapes, melons, beans, corn, and a little alfalfa.  It is possible that this small acreage is to be accounted for by the uncertainty of the water supply; for

EXHIBIT 6
- 179 -

ACC0000007

-2-

they could otherwise easily cultivate much more than this and secure
large returns for labor expended.    As it is, they seem to expect
but little from their efforts at farming, and to depend largely on
the demand for their labor in the grain and fruit ranches of the sur-
rounding country.

*labor income*

  There is evidence today that in times past the Indians have
built ditches for the conduct and  distribution of the waters of the
canons  of Chino, Tahquitz, and Andreas; and have irrigated lands
therefrom in sections 2, 10, and 11 of T. 5, S. R. 4, E., and  sections
7, 10, 14, 15, 34, and 35 of T. 4, S. R. 4, E.

  When I was there in July last, Chino Creek was flowing a nice
stream of some 30 or 40 inches, but about the middle of the west half
of Sec. 7 it sank in the loose sand and gravel.   In the canon, in
the N. E. 1/4 of this same section, is quite a cienega which used to
be owned and cultivated by Indians; and where considerable water,
that seems independent of the stream above, could be developed.  A
good flow is discovered in the creek north of this marsh land, which
runs for about half a mile and then disappears, as does the stream
above.

*Chino creek*

*Cienega*

  I understand this water is perrennial; and it is thought that a
minimum flow of 50 or 60 inches could be made available to the reserve
by collecting it at two or three points and piping it for about four
miles to the N. W. corner of Sec. 14.   The pipe might be a  red-
wood stave banded, or light iron; run along the side of the canon
out of the way of floods, and placed on the ground surface for nearly
its entire distance.  The excessive fall of some 2,000 feet would
permit of using pipe of small diameter, but the discharge or lower
end would have to be kept free and open, as the light iron or wood
pipe contemplated is not calculated to withstand a static pressure
of 860 pounds.

*Wheaton*

  A man by the name of H. F. Wheaton has fenced, and claims land
in Chino Canon; to which I understand he has no title.  He has also
built a ditch from the creek for the diversion of its waters, but has
not made beneficial use of these and so has no valid claim to them.
He has excluded some of the Indians from these old holdings, which
are not on the present reservation however, and threatened them.

  Dr. Welwood Murray also claims these waters, says he filed on
them in 1887 and again in 1900; and claims to hold them for land in
Sec. 10, in which, I think, a Mrs. Parsons of San Bernardino is inter-
ested with him.  This appropriation is also void by reason of failure

*Indians excluded from Chino  1903 ?*

*W. Murray — Filed on 1887*

EXHIBIT 6
- 180 -

REPRODUCED AT THE NATIONAL ARCHIVES

ACC0000008

*was 1903 - a "boom" year - period for filing claims*

-3-

to use.

A man by the name of N. A. Mathews whose identity I am unable to learn, on April 4, 1903, posted notice of appropriation of the waters of this creek and cienega for mining, milling, agricultural and domestic purposes; but the time of beginning actual construction has lapsed, and I regard it as only another of the many speculative schemes.

The Palm Valley Land Company may have a claim to these waters, but I think not: of this I will speak later.

*Andreas*

The creek in Andreas Canon is perrennial, was flowing July 21st of last year, the end of a series of dry years, about 48 inches; and this year about the same time showed about 125 to 150 inches by estimate. Water can be diverted high enough to command all the arable land embraced within the sections comprising the reservation; but would have to be conveyed thereto in pipe or concrete channel. From a favorable point of diversion to the N. W. Corner of Sec. 14 would require about 5 1/2 or 6 miles of conduit; to Sec. 26, about half as much; and to Sec. 2 about half a mile. The character of the land is such as to require much of the main distributaries to be also impervious to water.

*Sec. 2*

Until recent time the Indians used to live on and farm lands in this vicinity, principally in Sec. 2; but lately sufficient water has been denied them. I am told that B. B. Barney has 850 acres in

*Barney* Sec. 35 and sections adjacent thereto; and that he secured from the Government relinquishment of the vested rights of these Indians in the waters of Andreas Creek: the consideration being the delivery to them of one inch of water for each six acres actually cultivated; an amount that is inadequate, absurd, and prohibitive of their doing anything in the way of farming.

Mr. Barney is holding this land and water only as a speculative venture, has about a mile and a quarter of pipe line from point of diversion to the south line of Sec. 35 that is capable of carrying most of the normal flow to the land; but as he has not made beneficial use of the water for the past five years, if ever, it is subject to appropriation an use by whomsoever wishes it.

*[illegible handwriting]*

The only other available stream in the immediate vicinity is Tahquitz, the one referred to by DR. Murray. This creek emerges from canon about the centre of Sec. 22; but at low or normal stage the waters never reach the plains, sinking in the loose rocky detritus just below the canon's mouth. In times past the Indians deflected

REPRODUCED AT THE NATIONAL ARCHIVES

EXHIBIT 6
- 181 -

ACC0000009

-4-

the waters to an old channel north of the present one; and built a little ditch from near the end of this old channel to convey water across the S. E. 1/4 of Sec. 15 and the W. 1/2 of Sec. 14. This is the ditch they are now using, and which serves, and can be made to cover, most of the lands in Sec. 14.

I understand that Mr. Mc Callum, who was Indian Agent here 15 or 18 years ago, was interested in the Palm Valley Land Co.; secured, or claimed interest in, this ditch by enlargement, and filed on the "unappropriated" water of the stream: the Indians being conceded some rights: (40 inches according to Dr. Murray).   After Mr. McCallum died his son, H. F. Mc Callum, became interested in the matter; and water from the creek has been for a few years past diverted to and used on three or four small tracts in sections 15 and 23.

By reference ot your letter of instructions to me it appears that under date of May 19, 1903, Dr. Murray informed the Office that Tahquitz or West Canon Creek had been practically dry for some years: was then flowing a large stream of water that was wasted in great part as there were no storage reservoirs. That the Indians have a right to the stream, with possible limitations; but that they can unquestionably claim 40 inches. He also believes that a large and sufficient storage dam (reservoir?) can be built near the falls in the canon, thus securing three sides of solid granite wall; and states that the channel from this reservoir would serve, for the greater part of the distance, as a conduit: that no debris is brought down the canon in time of flood, and he does not think evaporation or per-polation would materially affect the result.

Reviewing these statements, it would seem unwise to attempt to secure irrigation water from a creek that has been practically dry for some years, and is only now flowing a large stream of water after an unusually wet Winter.  If the Indians are only entitled to 40 inches of the flow, a small irrigating head, and their right to the balance is questionable, the wisdom of the Government constructing an impounding reservoir to stand dry and empty is also questionable. The reservoir site is discovered just below the falls mentioned, but the basin would be small, and the three sides of solid granite is wanting. The rock is so seamed and shattered by upheaval and earth-quakes that I believe it would prove a veritable sieve. To prevent undermining by water falling the 60 feet mentioned would necessitate carrying the impounding wall to a solid bedrock, and it is impossible to determine how deep this is without excavating: test holes would

REPRODUCED AT THE NATIONAL ARCHIVES

EXHIBIT 6
- 182 -

ACC0000010

-5-

avail nothing.  There are indications of debris of all kinds being
brought down at time of floods that would fill the reservoir unless
ample sluice ways were provided; and, judging from the markings, the
floods at times must be terrific.  As for using the channel from the
reservoir site as a conduit for the greater part of the distance, the
measured loss due to percolation is prohibitive of such a scheme.

It is also noted in your letter that Dr. Murray states there
are other streams to which the Indians could claim legal rights, but
he doubts the advisability of using these streams for the purpose
desired.  Dr. Murray was particularly anxious that I examine thoroughly
Tahquitz Creek and Canon.  The Indian ditch runs through his little
holding of three or four acres in Palm Springs, he can, and does
secure a little water from it to irrigate a small portion of the land
when his share in the Whitewater Ditch fails him; and his supply of
domestic water for his hotel or sanitarium is drawn from this ditch.
When this source of domestic water fails him he is compelled to rely
on a trickle from a hot sulphur spring, or haul water for about five
miles from Palm Springs Station, or the end of the pipe line at Barney's
ranch.  He was perfectly willing for me to visit Andreas Canon, but
did not think it would offer a feasible project: but when I mentioned,
and finally insisted, that I was going to examine Chino Canon there
was strenuous objection, and was told I must not interfere with that
as he had twice filed on and held that water.  What little information
he had previously given me concerning Chino Creek was misleading;
and he was averse to my meeting or talking with the two or three
other white men in the place.  I think the inference is natural and
clear.

Now for my own views on Tahquitz Creek.  It drains some 8 square
miles, is torrential at times during the rainy season in Winter and
carries considerable sand and trash; in ordinary years a nice little
irrigating head is flowing until the first or middle of July, that
could ordinarily be made to irrigate 100 to 150 acres.  Only in time
of flood does the water reach th valley, the normal flow sinking
and disappearing just out of the canon in the rocky sandy mass that
has in times past been washed from the hills and out of the gorge.

Referring to the tracing, which is but a rough sketch and not
accurate in detail, I would remark the following as relates to the
present Indian ditch.  The heading is about a quarter of a mile below
the falls, on the north side of the canon and creek; a little channel

EXHIBIT 6
- 183 -

REPRODUCED AT THE NATIONAL ARCHIVES

ACC0000011

REPRODUCED AT THE NATIONAL ARCHIVES

-6-

has been dug through loose rock for four or five hundred feet to connect
with an old creek channel.  This old channel is used as a conduit for
three quarters of a mile, and then 4,700 feet of ditch carries the
water to the west line of Sec. 14.  The channel from the dam to Sta.
47 is in coarse sand and heavy rock and the fall is excessive; from
Sta. 47 to 34+70 the ground traversed is rock and sand and the fall
is ample; from Sta. 34 + 70 to 13 + 80 the ditch runs through coarse
sand on a very light grade and the flow is sluggish.  From here to
Sec. 14 the fall is better and the ground not so porous.

Weir measurements taken July 13th last gave a flow of 2.148
second feet or 107.3 inches at the falls; 1.878 feet or 93.9 inches
at a waste box at Sta. 90 + 75 near the head of the ditch; and 0.386
feet or 19.3 inches at the head of a flume at Sta. 34 + 70.  There
was no water to gauge below this point; but for the next half mile
loss by percolation would be heavy.

It was impracticable to confine all the water below the falls
to the weir, and probably 12 or 15 inches passed unmeasured. Yet,
taking the quantities an given, it is seen that from the falls to the
ditch heading, about 1300 feet below, over 13 inches is lost by seepage;
that from the head of the ditch to Sta. 34 + 70, just below the old
creek channel, some 74.6 inches sink into the ground: and from the
falls to this point 86 inches are lost.  From Sta. 34 + 70 to Sec. 14
it is thought that considerably more than 12 inches would be lost,
so that from the falls to the west line of the land to be irrigated
more than 100 inches, or 2 cubic feet per second, is lost.  In other
words, it will take 2 1/2 times the amount of water the Indians are
entitled to at the head of their ditch, according to Dr. Murray, to
wet the bottom of the ditch from the head to their lands.  Anything
available for irrigation being in excess of this amount.

A light iron or wood stave pipe could be laid from the creek
at the top or bottom of the falls, as might be deemed best, and water
carried to the N. W. corner of Sec. 14; thus covering the whole section.
Or an open ditch, lined with boulders and the interstices pointed
with cement mortar, could be used; or a concrete channel built.  That
such change of intake and extension of the line is warranted there
can be no question.  The heading is within the reservation, and even
if under State jurisdiction this change, as well as the departure
from the old line in Sec. 15 is fully covered and warranted by Section
1412 of the Civil Code of California, which says:-"The person entitled
"to the use (of water) may change the place of diversion, if others

EXHIBIT 6
- 184 -

ACC0000012

REPRODUCED AT THE NATIONAL ARCHIVES

-7-

"are not injured by such change, and may extend the ditch, flume,
"pipe, or aqueduct by which the diversion is made to places beyond
"that where the first use was made."

There is a good chance to build one or more small reservoirs
in the eastern part of the N. W. 1/4 of Sec. 22, where surplus water
could be stored to augment the diminished and inadequate flow of late
Summer.  These reservoirs would have to be built with the walls and
bottom of rock bedded in cement; or of concrete: as there are no
basins or depressions that can be used.

I find that the First National Bank of Los Angeles, Calif. now
holds a controlling interest in the stock of the Palm Valley Land Co.,
taken in satisfication of indebtedness to the bank of some of the
incorporators.  Among the papers which the Bank has is an agreement
with the Palm Valley Land Co. signed by Joseph W. Preston as U. S.
Indian Agent on February 7, 1888; and acknowledged by him before
W. L. Burton, Notary Public in and for San Bernardino County, Cal.
May 10, 1888.

By reference to this document, copy of which is herewith enclosed,
it would seem that Agent Preston was acting under instructions of
some sort from the Interior Department as indicated in the preamble.
He then grants, with the consent and approval of the Commissioner of
Indian Affairs, First:- Right of way through the reservation for what
is now known as the Whitewater Ditch, property of the Palm Valley
Land Co.   Second:- The use, occupation and further development of
all waters in Tahquitz and Chino canons- to which the Government may
have reserved rights for the Indians.

For and in consideration of these grants and concessions the
Company is to, First:- Grant a permanent water right to 160 acres in
Sec. 14 which is to be irrigated upon the basis of one inch to six
acres: the Indians to have first right to the water which is to be
delivered free of cost.  Second:- That a like quantity of water shall
be furnished upon like conditions for an additional 160 acres in the
same section, when the same is needed by extension or cultivation,
increase of the number of Indians, or when the same is required of
the Company.

The instrument is weak and very poorly drawn; and the original
in the possession of the Bank is signed and acknowledged only by Mr.
Preston as Agent.  The Indians are conceded right to, and I believe
they get, water from the Whitewater Ditch; but if they are restricted

EXHIBIT 6
- 185 -

ACC0000013

REPRODUCED AT THE NATIONAL ARCHIVES

-8-

to the specified inch to six acres the amount is inadequate for any purpose.

You say that some years ago these Indians had a difficulty with this Company, that Special Attorney Collier, acting under instructions, unsuccessfully attempted to adjust the matter owing to the many obstacles placed in the way.  I do not know the present legal status of the waters of the canons of Chino, Tahquitz, and Andreas, although I could by exhaustive search here determine such.  It would seem, however, that all papers and records necessary to determine this should be in the files at Washington, and that the question could be more easily and quickly answered there.   Until the legal rights of the Government and the Indians is known I do not care to recommend and advise the building of any specific system of irrigation for these lands, thereby possibly incurring to the Office loss, and difficulty by conflict with other rights.

I believe, however, that the waters of all these three canons are available and subject to appropriation and use on the lands of the reservation; and I can, from the information I have, prepare tentative plan and estimate for a system as soon as the right to the water is determined.    Tahquitz offers the cheapest proposition; but Chino may afford a little longer flow in the Summer. Both creeks cover section 14.

I note that you say the Office is not disposed to expend any considerable sum for this purpose, as it is only desired to provide for the actual needs of the Indians.   The building of a proper, economic, and permanent irrigating system, no matter how small, is expensive; and this is especially true in this region where the conditions are almost always such as to require conduits of wood, iron, or cement.   A system to provide adequate water to the cultivated lands of this handful of Indians will cost several thousand dollars, while one slightly larger would serve three times as much land and cost but little more.  Where small tracts are considered, the cost per acre of a system of irrigation diminishes rapidly as the acreage is increased.

Another matter for consideration is the care and operation of any system that may be devised and built.  The drunken Captain of the band and most of the men were absent from the reservation when I was there.  The reserve is remote, and not easily accessible from the Agency; and the Agent's territory and duties are such that he cannot devote much time to, or often visit, this place.  There are only ten

EXHIBIT 6
- 186 -

ACC0000014

REPRODUCED AT THE NATIONAL ARCHIVES.

-9-

or a dozen families here, but there is good land enough to supply ten times as many with 15 or 20 acres each.

While in Los Angeles to obtain information relative to this matter I learned, as has been mentioned, that the First National Bank there holds controlling interest in the stock of the Palm Valley Land Co. and their Whitewater Ditch.  Whitewater River drains 70 square miles of the south and west slope of the San Bernardino mountains, is a perrennial stream, and was flowing in July of last year about 280 inches. The only other claimant to this water is the Smith ranch in Secs.10 and 16, T. 3, S. R. 3, E.  By Court decree, when there is flowing 180 inches or less, the water is divided equally between 180 and 350 inches, Smith ranch gets 90 : and when the flow is in excess of 350 inches the Smith ranch is entitled to 150.

This ditch heads to the north-west of the reservation, the channel, about 8 miles long, is in sand and loose rock; and it would cost considerable to properly rebuild it. The heading could profitably be moved up stream about two miles to secure more water.  If the Department should wish to make use of the couple of thousand acres of good agrioultural land within the Palm Springs Reservation by placing other Indians thereon, and the waters from the three canons are insufficient or not available, this ditch and its water rights are in the market. It was priced at $10,000, but if a straight proposition to buy were made I think it could be secured for less.

In considering irrigation here one important fact must not be lost sight of. For a number of years the flow in all the streams on the western slope of these mountains has been slowly but steadily diminishing, and will, in all probability, continue to do so until all water courses are dry, barren gulches. I saw these streams after an unusually wet season preceeded by a series of four or five years of exceptionally light precipitation, and I have but the most meagre information on which to base an opinion as to the amount of available water for irrigation of the Indian lands. For this reason I have been led to consider Whitewater, the largest permanent stream in the vicinity.

Awaiting such further instructions as you may be pleased to give me in the matter,

I am, Sir,

Very respectfully,

George Butler

Supt. Irrigation.

EXHIBIT 6
- 187 -

ACC0000015

Exhibit 7

Post 1507

**DEPARTMENT OF THE INTERIOR,**

**OFFICE OF INDIAN AFFAIRS,**

**WASHINGTON.**

Subject.

Report on use of waters
of Whitewater river in
California.

San Jose, Calif., Oct. 17, 1907.

Hon. Commissioner of Indian Affairs,
Washington, D. C.

Sir:—

I am in receipt of your letter dated Sept 24 last, Field Work
71142, 76168, 76594, 77361-1907 relative to the use of waters of the
Whitewater river, in Southern California, enclosing a letter from F. H.
Gilliam, of Thermal, Calif., to the U. S. Land Office at Los Angeles, a
letter from the Register of the said Land Office, a letter from the Chief
of the Second Field Division of the General Land Office, a copy of a letter
from the last named officer to the Indian Office, and copies of the
Imperial Valley Press and the Coachella Valley News containing marked
articles relative to the main subject. I will return all the enclosed
papers herewith and will also forward you a map which I have drawn to
show the relative situation of the various Indian reservations and the
Coachella Valley to the drainage system of the Whitewater river.

The Whitewater river is the largest of those which flow into
the Salton basin. It rises near the peak of San Gorgonio, 11485 feet
elevation, the highest in Southern California. The Whitewater is fed from
melting snows and runs a large stream until late in the season. At
present but 150 inches of the flow is used, and that upon one or two

NARA DC
RG 75
PI·163/E. 121A
Central Classified Files
California Special
Bx 22
F: Calif Special 71081-1907-3777

EXHIBIT 7

- 188 -

2. Ind. Commr. Whitewater.

ranches near at hand.  Some twenty years ago the water was appropriated
by a boom company which endeavored to establish a settlement in the
desert near Palm Springs, at a place called Palmdale.  This was upon
section 25, T. 4. S. R. 4 E.  The ditch was poorly located and poorly
constructed and was too small for the work.  The whole scheme failed and
the stock in the enterprise mostly became the property of certain money
lenders to which it had been pledged. Some five or six years ago unusual
floods washed our several miles of the ditch.  The money lenders refused
to put any more money into the scheme and the land owners could not. No w,
the rights are about to be lost by reason of non-user.  About 90% pf the
stock was offered to me not long ago at about par, if the government
would agree to sell water to outside land owners.  The same stock had
been offered to Chief Engineer Code for about half the figure offered
me.  As the cost of rebuilding the ditch would be enormous Mr Code did
not think the expenditure justified.  The Indians at Palm Springs, with
the Barney purchase and the cementing of the Tauquitz ditch, have all
they water they can use for some time.  The proposition looked to me like
an attempt to unload a bad bargain upon the government.

    I have noticed several items in the papers to the effect that
parties connected with the Banning colony were organizing a company to
take the water from the Whitewater river to the neighborhood of Banning
and Beaumont.  To take the water to the Allessandro Valley is a much
larger proposition.  Th e Allessandro Valley is not shown on the accom-

EXHIBIT 7

- 189 -

3. Ind. Commr. Whitewater.

panying map, being located about thirty miles west of Banning.  There seem to be no engineering features of difficulty in taking the water to Allessandro Valley, though the expense will necessarily be great.

Beaumont stands nearly at the top of the San Gorgonio Pass, through which runs the main line of the Southern Pacific R. R. from Los Angeles to New Orleans.  The elevation of Beaumont is about 2600 feet above sea level.  The Morongo Indian reservation is located about half way between the Whitewater river and the top of the pass at Beaumont.  The reservation reaches down as far as the 2100 2100 foot line.  In order to give the ditch the necessary grade and still deliver the water at the height of land at Beaumont, the ditch must necessarily cross the Morongo reservation.  Between the Morongo reservation and the Whitewater canyon is a very rough country, the peaks exceeding 6000 feet in elevation.  I think I have heard of a survey for a tunnel from the Whitewater watershed to the headwaters of Potrero creek, on the reservation.  There seems to be no way in which the reservation may be avoided in laying out the line of ditch.  I think Superintendent Wright is correct in stating that the construction of the proposed ditch would not be in any way to the detriment of the Indians of the Morongo reservation.  They need the water very much and it is my belief that in making settlement for the right of way, should it be granted, any payment should be in the form of water rather than the per capita payments often made.  It might also be well to require the company to agree to sell a limited amount of water to the

EXHIBIT 7

- 190 -

4. Ind. Commr. Whitewater.

Indians, in addition to, say, 100 inches as rental for the right of way.

The complaint of Mr Gilliam and the people of the Coachella Valley is an entirely different matter which does not concern the Indians of the Morongo reservation, but refers to the Indians of the desert at Cabason, Torres, Martinez, Alamo Bonito, etc. There has in the last six years been developed in the northwestern end of the Salton basin, a considerable artesian district, known as the Coachella Valley. This artesian district is wholly, I believe, below sea level. The highest flowing well I have observed is at India, fifteen feet below datum. This well does not flow all the year. Water may be obtained by pumping for an undetermined distance up the slope. This discovery of abundant water in what was supposed to be the most absolute desert in America has resulted in the rapid development of several towns and a large shipping district. This country proves to be about six weeks earlier than Los Angeles in the production of all kinds of crops and the earliest in the United States for canteloupes. At first only artesian wells were bored, but it was soon found that the pressure decreased during the heat of summer when the water was most needed, and pumping plants were soon put in, which still further reduced the pressure. Then a much larger supply of water was discovered nearer the surface, which would not rise to the surface, but is available for pumping, and this is being utilized more now that the artesian wells. The known water bearing district embraces more than two hundred square miles and the assessment already

EXHIBIT 7
- 191 -

5. Ind. Commr. Whitewater.

reaches several millions, all derived from and depending upon the water
supply. Down toward the lower levels of the basin the soil is more
impregnated with salt, in some places too much so for ordinary vegetation.
In the lower levels the artesian flows are more copious and are little
influenced by the season. The climate is very hot during the summer
but with plenty of wtaer the range of crops which the land will produce
seems beyond anything found elsewhere in this country.

Where this artesian water originates may never be known. There
would seem to be no other source than the surrounding basin, of which
this artesian belt is the bottom. On the southwestern side of the basin
the mountains are very barren and the number of streams which come from
the mountains is small. The amount of water they carry is also small,
except in winter and spring when the melting snows bring down considerable
floods. A tremendous fan shaped pile of boulders and gravel is found
at the mouth of each canyon, where it opens into the plain. Except in
extreme floods the streams disappear into this pile of boulders and the
course of the stream below is marked by a dry sandy wash or empty stream
bed. In the San Gorgonio pass and in the Coachella Valley there are
innumerable such dry stream beds, only the larger ones being shown on
the map. On the south side of San Gorgonio pass the largest stream is
Snow Creek, heading on Mt. San Jacinto. Next in amount of water is
Tauquitz Creek, from which the Indians at Palm Springs have in the past
received most of their water. Andreas canyon does not carry so much
water as Tauquitz but

EXHIBIT 7
- 192 -

6. Ind. Commr. Whitewater.

it usually runs the whole summer through.  On the north side of the pass
the Whitewater is by far the largest.  It heads far back in the mountains
receives more snow water and has larger floods than any other stream
flowing into the desert.  Its floods often reach to Coachella or Thermal
on the surface.   The next to the Whitewater in amount of water is
Mission Creek.  This stream has considerable floods, but little snow
water and consequently a small summer flow.  There are several small
creeks in the neighborhood, none of which is of great importance.  To
the northeast of the Coachella Valley the mountains are very barren and
arid in appearance and no streams of a permanent character come from
them, only torrents from the scanty storms of that desert region.

The people of the Coachella Valley are trying hard to get nervous about the
proposed diversion of the Whitewater to another watershed.  That it is
one of the sources of their artesian supply is quite likely and if so,
it is necessarily the largest single source.  How much effect taking
the Whitewater to another locality would have upon the Coachella artesian
supply does not admit of easy demonstration.   I know of no way of
estimating it in advance.  It might have no perceptible effect.  It
would seem to be a fact that there is more water being pumped and flowing
from the Coachella wells that the Whitewater carries during most years.
But the water now being taken out may be the storage of years. I doubt
if sufficient data exists for me or anyone to decide whether the diversion
of the Whitewater to another district would have any appreciable effect
upon the Coachella water supply.

EXHIBIT 7
- 193 -

.7. Ind. Commr. Whitewater.

Nevertheless the people of the Coahhella Valley have a perfect right to test the matter in the courts, if it seems to them that their rights are being infringed upon or that their water supply is in danger. The government is invloved, on behalf of the Indians, to this extent. Twenty two sections of land have been reserved to the Indians, in the Coachella district, all even numbered sections scattered along from India to Juanito Razon's, or Figtree John's. The Indians have, roughly speaking, about ten per cent of the water bearing land and the government has made valuable improvements for the Indians. These improvements are as follows:- At Cabezon, section 32, T. 5 S. R. 8 E. two artesian wells and a 15 horse power gasoline pumping plant pumping from the surface or upper stratum of water. Augustin, section 18, T. 6 S. R. 8 E, one artesian well, with 10 H. P. auxilliary pumping plant.  Torrez, on section 2, T. 7 S. R. 7 E., ten artesian wells.  Martinez, on section8, four artesian wells, on section 16, three artesian wells and one new school house.  At Alamo Bonito, on section 26, three artesian wells. Martinez and Alamo Bonito are in T. 7 S. R. 8 E.  In all there are 22 artesian wells, two pumping plants and one school house.  The Indians are making good use of the water and are living in a state of thrift and comfort that few Indians in California have attained.   The Indians living on these 22 sections number about 350.

I do not see that any action is required of the government until some definite proposition is presented.   So far there seems to have been

EXHIBIT 7

- 194 -

2. Ind. Commr. Whitewater.

nothing but talk, and judging from the newspaper articles, there semms to
be some division of opinion among the people of Coachella Valley.    If
there were certainty of injury to the Indian reservations or even great
probablilty, the government could not do otherwise than interfere.  At
present there is no showing of actual injury.   The damages seem to me
to be rather remote and conjectural.   Possibly further data might
justify a different conclusion.   At present I can not find that such
data exists.

Very respectfully,

C. E. Kelsey.

Special Agent for the California Indians.

EXHIBIT 7

- 195 -



EXHIBIT 7

- 197 -

Exhibit 8

BEFORE THE DIVISION OF WATER RIGHTS

DEPARTMENT OF PUBLIC WORKS

STATE OF CALIFORNIA

IN THE MATTER OF THE DETERMINATION )
OF THE RELATIVE RIGHTS, BASED UPON )
PRIOR APPROPRIATION, OF THE VARIOUS )
CLAIMANTS TO THE WATERS OF WHITE WATER ) SUGGESTION
RIVER AND ITS TRIBUTARIES, IN SAN ) OF THE
BERNARDINO AND RIVERSIDE COUNTIES, ) UNITED STATES
CALIFORNIA. )

    Now come Joseph C. Burke, United States Attorney
for the Southern District of California, and Oliver P. Morton,
Special Assistant to the Attorney General of the United States,
appearing for the purpose of this Suggestion only and not sub-
mitting the rights or claims of the United States to the juris-
diction of the Department of Public Works of the State of
California, or to the Division of Water Rights thereof, or at
all, and respectfully suggest as follows:

        -I-

    That the United States of America, by reservation,
withdrawal from entry, or other disposition, has set aside,
and reserved, for the use and benefit of the Indians residing
thereon and their successors and other Indians, certain tracts
of land, and the waters therein and thereon and traversing
the same, situate in the Coachella Valley and water shed of
the Whitewater River and its tributaries, in the State of
California; which said tracts comprise the Morongo,
Mission Creek, Agua Caliente, Cabazon, Augustine and Torros
Indian Reservation.  That the lands in three of said re-
servations are traversed by and riparian to the Whitewater
River and its tributaries, or one or more of said streams,
and contain large areas of land irrigable therefrom, and
need and are dependent on the surface flow thereof for a

EXHIBIT 8
- 197 -
ACC0007698

1  water supply for their irrigation, and for power, domestic

2  and stockwatering uses thereon; that such lands are of

3  little or no value without such a supply, and require irri-

4  gation for the production of paying crops thereon.

5                              -II-

6          That said Morongo reservation is traversed by

7  and riparian to Hathaway Creek and Potrero Creek and other

8  tributaries of Whitewater River, and is comprised of the

9  following described lands in Riverside County, California,

10  which were set aside and included within said reservation

11  in the manner and upon the dates set opposite the descrip-

12  tions thereof, to-wit:

13  Description of Lands:              Dates of Executive and
                                      Departmental Orders, etc.
14

15  Sections 10, 12, 13, 14, 15
    22, 23, 24, 25, 26, 27, 34
16  35 & 36, of T. 2 S., R. 1 E.,
    S.B.M. Sections 18, 30 & 31,
17  of T. 2 S., R. 2 E., S.B.M.        December 29, 1891.

18  Sections 8, 9, E½ of Section 16,
    Section 17, N½ and SW¼ of Section
19  19, N½, SW¼ and N¼ of SE¼ of
    Section 20, E½ and S½ of SW¼ of
20  Section 21, Sections 25, 26, 27,
    & 28, E½ of Section 29, Sections
21  33, 34, & 35, W½ and SE¼ of Section
    36, T. 2 S., R. 2 E., S.B.M., S½
22  Section 2, NE¼ of Section 6,
    Section 12, S½ of S½ of Section
23  14, Sections 22, 24 & 26, N½ of
    SW¼ of NE¼ of NW¼ and N½ of NW¼
24  of NW¼ of Section 34, T. 3 S.,
    R. 1 E., S.B.M, Sections 2, 4, 8,
25  10, 12 & 14; S½ of SW¼ of NE¼,
    S½ of NW¼, SW¼, SW¼ of SE¼ and
26  E½ of SE¼ of Section 20, S½ of
    Section 22, Section 24, N½ of
27  Section 28; N½ of NW¼, SW¼ of
    NW¼ of SW¼, S½ and NE¼ of SW¼
28  of SE¼, NE¼ of SE¼ and S½ of
    SE¼ of Section 32, of T. 3S.,
29  R. 2 E., S.B.M.                    October 9, 1908

30  N½ of Section 1, W½ of Section 2,
    of T. 3 S., R. 1 E., Section 6 of
31  T. 3 S., R. 2 E., S.B.M.          December 29, 1911.

32

                           - 2 -

EXHIBIT 8
- 198 -

ACC0007699

-III-

That said Mission Creek Reservation is traversed
by and riparian to Mission Creek, a tributary of the
Whitewater River, and is comprised of the following des-
cribed lands in Riverside County, California, which were
set aside and included within said reservation in the
manner and upon the dates set opposite the descriptions
thereof, to-wit:

| Description of Lands: | Date of Executive and Departmental Orders, etc. |
|---|---|
| Sections 12, 13 & 14 of T. 2 S., R. 3E., S.B.M. | May 16, 1876. |
| S½ of Section 1 and E½ of Section 2, T. 2 S., R. 3 E., S.B.M. | May  6, 1908. |

-IV-

That said Agua Caliente Reservation is traversed by
and riparian to Andreas Creek and Tahquitz Creek and other
tributaries of Whitewater River, and is comprised of the
following described lands in Riverside County, California,
which were set aside and included within said reservation
in the manner and upon the dates set opposite the descrip-
tions thereof, to-wit:

| Description of Lands: | Dates of Executive and Departmental Orders, etc. |
|---|---|
| Section 14 and E½, NE¼ and E½ of SW¼ Section 22 of T. 4 S., R. 4 E., S.B.M. | May 15, 1876. |
| Sections 2, 4, 6, 8, W½ of Section 10; Sections 12, 18 & 20, SW¼ & NE¼ and W½, SE¼ of Section 22, Sections 24, 26, 28, 30, 32 & 34 of T. 4 S., R. 4 E., S.B.M. Sections 2, 4, 6, 8, 10, 12, 14, 18, 20, 22, 24, 28, 30, 32 & 34 of T. 4 S., R. 5 E., S.B.M. Sections 2, 4, 6, 8, 10, 10, 12, 18, 20, 22, 24, 26, 28, 30, 32 & 34, of T.5 S., R. 4 E., S.B.M. | September 29, 1877. |

- 3 -

EXHIBIT 8
- 199 -

ACC0007700

N½ of Section 11, of T. 5 S., R 4 E., S.B.M., Section 35, of T. 4 S., R. 4 E., S.B.M.

Departmental Order of February 2, 1907

Section 35 of T. 4 S., R. 1 E. and SE¼ of Section 3, T. 5 S., R. 4 E., S.BM.

Purchased by U. S. and included in re-servation July 5, 1907.

-V-

That to the extent to which water can be supplied from the following named streams, lands in said reservations are susceptible of irrigation, and water is required to be diverted throughout each year for that purpose (including diversions for storage in ground by spreading), and for power, domestic and stock water uses thereon, as follows:

| Reservation | Irrigable Lands in Acres | Stream | Continuous flow required to be diverted for all purposes. |
|---|---|---|---|
| Morongo | More than 200 | Hathaway | 3 cubic feet per second |
|  | More than 1200 | Potrero | 7 cubic feet per second |
| Mission Creek | More than 150 | Mission | 3 cubic feet per second |
| Agua Caliente | More than 360 | Andreas | 6 cubic feet per second |
|  |  | Tahquitz | 4.8 cubic feet per second |

-VI-

That by virtue of the ownership of the legal title to said lands (in which the Indians have certain rights of occupancy and possession and in some instances

- 4 -

EXHIBIT 8
- 200 -

ACC0007701

Trust Patents to the Land), and in the lawful exercise of its supervision and control of said Indians, and in the carrying out of its Indian policy, and furthermore and by virtue of the setting aside and establishment of said reservations as aforesaid, and the occupancy and possession and use of same by the Indians from time immemorial, there has been reserved from appropriation by others and set aside with said reservations, and the United States, for and on behalf of the Indians living thereon and other Indians, and those succeeding them, is entitled to divert and use for the irrigation of said lands (including diversion for storage in the ground by spreading), and for power, domestic and stock water uses thereon during every month of each year, and is the owner of 3 cubic feet per second of the waters flowing in Hathaway Creek, 7 cubic feet per second of the waters flowing in Potrero Creek, 3 cubic feet per second of the waters flowing in Mission Creek, 6 cubic feet per second of the waters flowing in Andreas Creek, and 4.8 cubic feet per second of the waters flowing in Tahquitz Creek, and has a prior and first right thereto as against all persons claiming the use of said waters or otherwise.

-VII-

That under and in pursuance of its above described rights, and as the waters of said streams are needed for the irrigation of said lands, the United States, by virtue of its ownership of the legal title to said lands and in the lawful exercise of its supervision and control

- 5 -

EXHIBIT 8
- 201 -

ACC0007702

1  of said Indians, and in carrying out its Indian policy, has

2  from time to time provided for the application of said waters

3  to beneficial use, and to that end has constructed dams,

4  ditches and other conduits and systems for the irrigation of

5  said lands from said streams, and for the diversion and use

6  of the waters thereof for power, domestic and stock water pur-

7  poses, and in that relation has constructed the following named

8  systems, diversion dams, ditches, pipe lines and other conduits,

9  and has provided for the application of, and has applied, water

10 to beneficial use thereby as follows:

11                        -VIII-

12              HATHAWAY CANON PIPE LINE

13              MORONGO RESERVATION.

14 Name of Stream              Hathaway Creek.

15 Point of Diversion          From left bank of Creek in NW 1/4
                               of NE¼ of Section 34, T. 2 S., R.
16                             1 E., S.B.M.

17 Diversion Works             Earth Dam across Creek Channel.

18 Location of Conduit         Extends from Diversion Dam in
                               southerly direction and then easter-
19                             ly direction, across the E½ of
                               Section 34 and SW¼ of Section
20                             35, of T.2 S., R. 1 E., S.B.M. for
                               a distance of 7630 feet and connecting
21                             with the Potrero Creek irrigation
                               system hereafter described.

22 Character and Dimen-
   sions of Conduit
23                             Cement 10 inch pipe, 1300 Feet
                               Cement 8 inch pipe, 5444 feet
24                             Riveted Steel 8 inch pipe, 220 ft.
                               Riveted steel 6 inch pipe, 266 f.

25 Approximate Cost            $4,000.00

26

27

28

29

30                    - 6 -

31

32

EXHIBIT 8
- 202 -

ACC0007703

| | | |
|---|---|---|
| 1 | Grade and Capacity | Grade varies - total fall 234 feet |
| 2 | | Approximate capacity at Diversion 2 cubic feet per second. |
| 3 | System Provides for | Irrigation of 100 Acres of sandy loam in Sections 34 and 35, T. 2 |
| 4 | | S., R. 1 E., S.B.M. and a maximum of 100 Acres in said Section 35 and |
| 5 | | Sections 1 and 2, T.3 S., R. 1 E. (supplementing supply from Potrero |
| 6 | | Creek System, and delivered to that System through said Hathaway Canon |
| 7 | | Pipe Line), which will require the diversion of 800 acre feet of water |
| 8 | | per annum.  Diversion of 120 acre feet, or 2 cubic feet per second, |
| 9 | | required in each month of maximum use. |
| 10 | | Present irrigation season March 1st to December 1st. |
| 11 | | Fall in pipe line will permit development of power to capacity thereof. |

Present Uses — 13.1 Acres (9.4 acres in Section 34 and 3.7 Acres in Section 35) of said first named 100 acres are being irrigated, a minimum of 3 acre feet per acre per annum measured at land, or total of 39.3 acre feet, required to properly irrigate lands for present crops; fruit, corn and vegetables, in turn requiring a diversion of 53 acre feet to compensate for transmission losses.  A diversion of 17 acre feet required in a month of maximum use.  Diversion required for irrigation, domestic and stock water uses is the available supply in creek up to 2 cubic feet per second; surpluses over the above requirements for said 13.1 acres being utilized to supplement the supply secured from the Potrero Creek Irrigation System for lands thereunder.  The development of these two systems provides, as aforesaid, for the utilization of a continuous flow of 2 cubic feet per second, whenever available, upon 100 acres under Hathaway system, and a maximum of 100 acres under Potrero system.

Whenever available, 1/2 cubic foot per second is diverted for domestic and stock water uses, whenever that amount or more is not being diverted for other purposes aforesaid.

- 7 -

EXHIBIT 8
- 203 -

ACC0007704

| | |
|---|---|
| **Historical** | Present Pipe line begun in April, 1923, completed February 1924. |
| | Earlier works, consisting of dam lower down on stream, and 2000 feet earth ditch, covering large portion of same lands, constructed prior to 1896. |
| | Width on top (at water line) 1½ feet on bottom 1 foot, depth of water 1/5 foot, Grade 10 feet per 1000 feet. |
| | While no records were kept of the very early Indian irrigation from Hathaway Creek, it is known that such occurred, and that in more recent times, to-wit since 1910, approximately 13 acres of land have been irrigated and most of it since 1890 or before. |

-IX-

| | |
|---|---|
| **Name of Stream** | Potrero Creek and head waters. |
| **Points of Diversion and Diversion Works** | 1.  Rook Dam across Woods Canyon (Potrero Creek head waters) in SW ¼ Section 7, T. 2 N., R. 2 E., S.B.M. |
| | 2.  Intake from Potrero Creek in SE ¼ SE¼ Section 14, T. 2 S., R. 1. E., (below Cienega) |
| | 3.  Intake from Potrero Creek (below spring) in NW¼ NWP Section 25, T. 2 S., R. 1 E. |
| | 4.  Infiltration Gallery from Potrero Creek in NE¼ NW¼ of said Section 25. |
| | 5.  Earth dam across Potrero Creek in SE¼ SE¼ of said Section 25. |
| **Location of Conduit.** | Extends from diversion dam in south southwesterly direction by meandering line through Section 7, T. 2 N. R. 2 E., and Sections 13, 14, 23, 24, 25, T. 2 S. R. 1 E. to a point in the SE¼ of the SE¼ of Section 25, whence extends the lateral system covering Sections 35 & 36, T. 2 S., R. 1 E., Section 31, T. 2 S., R. 2 E., Sections 1 & 2, T. 3 S., R. 1 E., and Section 6, T. 3 S., R. 2 E., |
| | The entire system of main conduits and laterals having a total length of 105,981 feet. |

- 8 -

EXHIBIT 8
- 204 -

ACC0007705

| | | |
|---|---|---|
| 1 | Character and dimen-sions of conduits. | 29,700 feet ditch, lined with stone and concrete; width on top (at water line) 1 3/4 feet; width on bottom 3/4 foot. 70,904 feet of cement pipe, diameter 8 to 14 inches. 375 feet of riveted steel pipe, diamter 10 inches. 4,552 feet of wood stave pipe, diameter 10 inches, and 120 feet of steel flume, diameter 23 inches. |
| 7 | Approximate Cost | $100,000.00 |
| 8 | Grade and Capacity | Grade of Ditch and pipe varies, total fall 2400 feet. Capacity at head of Ditch and Pipe Line below all diversions points and above irrigated land is 7 cubic feet per second. |
| 11 | System Provides For | Irrigation of 1200 acres of sandy loam in Sections 1 and 2, T. 3 S., R. 1 E., Section 6, T. 3 S., R. 2 E., Section 31, T. 2 S., R. 2 E., Sections 25, 35 & 36, T. 2 S., R. 1 E., S.B.M. Which will require the diversion of 4000 acre feet of water per annum. Diversion of 420 acre feet or 7 cubic feet per second, required in month of maximum use.  Present irrigation season March 1st to December 1st. Also for spreading of water for storage in ground, which will require, including diversions for direct irrigation and for domestic and stock purposes, a continuous diversion throughout the year, of aforesaid 7 cubic feet per second.  The flow in the pipe line produced by said continuous diversion, to the extent of its fall, is available for the development of power. |
| 23 | Present Uses | 596.3 acres of said 1200 acres are being irrigated as follows: 66.8 acres in Section 1, T. 3 S., R. 1 E., 22. acres in Section 2, T. 3 S. R. 2 E., 116.4 acres in Section 6, T. 3 S., R. 2 E., |

- 9 -

EXHIBIT 8
- 205 -

ACC0007706

130.9 acres in Section 31, T. 2 S.,
        R. 2 E.
10.2 acres in Section 25,
80.4 acres in Section 35,
169.6 acres in Section 36, T. 2 S.,
        R. 1 E., S.B.M.
596.3 acres.

A minimum of 3 acre feet per acre per
annum, measured at the land, or a total
of 1783.9 acre feet, required to irrigate
lands for present crops: fruits, corn,
beans, grapes and vegetables. A diver-
sion of 2000 acre feet is required to
compensate for transmission losses. In
each month of maximum use, a diversion
of 270 acre feet, or 4½ cubic feet per
second is required. Water in the stream
not diverted for direct irrigation,
power, domestic and stock water uses with-
in the aforesaid maximum of 4½ cubic feet
per second, is spread annually in the
gravels in the upper part of the canyon
and serves to build up the stream flow
at later periods, when larger diversions
for irrigation are required. The amount
required and used for all purposes is
constant flow of 4½ cubic feet per
second whenver physically available in
stream.

Power is developed on pipe line
between points 18,500 feet and 23,600
feet from diversion, where fall of 254
feet is utilized to turn a Pelton
wheel developing 40 horsepower, which
is used for pumping of additional water
for irrigation from wells, to-wit an
average of 450 acre feet per annum.
The power plant is operated from June 1st
to November 1st of each year, and requires
the diversion from the stream of 2 cubic
feet per second, which is also utilized
for the irrigation aforesaid. At all
times throughout the year when not
diverted to that or a greater extent
for other purposes, a continuous
diversion of at least 1 cubic foot per
second is required to be maintained for
domestic and stock water uses.

Historical

Present system was constructed, extended
and completed during the period from 1908
to 1922.

-10-

EXHIBIT 8
- 206 -

ACC0007707

Earlier works, consisting of a dam, ditch and pipe in same general location, were surveyed and laid out in 1893, and constructed and completed in 1895 and 1896.

Length of condit 1600 feet, being ditch built of stone and mortar; width on top (at water line) 1 foot on bottom ½ foot, depth of water ⅓ foot; grade varies, with total fall about 1100 feet.

While no records were kept of the early Indian irrigation from Potrero Creek, it is known that such occurred and that in more recent times, to-wit during the last thirty years or more, a large or very considerable portion of the present cultivated area was irrigated.

## MISSION CREEK INDIAN RESERVATION

| | |
|---|---|
| Name of Stream | Mission Creek |
| Point of Diversion | From left bank of creek in NW¼ of NE¼ of Section 2, T. 2 S., R. 3 E., S.B.M. |
| Diversion Works | Intake Headgate of concrete and steel. |
| Location of Conduit | Extends from diversion in southeasterly direction across the E. ½ of Section 2, SW¼ Section 1, and Section 12, of T. 2 S., R. 3 E., S.B.M. For distance of 12,310 feet. |
| Character and Dimensions. | First 800 feet, 18 inch cement pipe  Next 9000 ft. 10 inch cement pipe  Next 2060 feet, 8 inch cement pipe |
| Approximate Cost | $8,700.00. |
| Grade and Capacity | The grade varies. Total fall 350 feet Approximate capacity at Diversion 5 cubic feet per second. |
| System Provides For | Irrigation of 150 acres of sandy loam in S½ Section 1, E½ Section 2 and Section 12, T. 2 S., R. 3 E., S.B.M., which will require the diversion of not less than 750 acre feet per annum. The diversion of 180 acre feet or 3 cubic feet per second, required in month of maximum use. Diversion of water for irrigation required throughout the year. |

- 11 -

EXHIBIT 8
- 207 -

ACC0007708

Domestic and stock water uses will require diversion of at least ½ cubic foot per second whenever that or greater amount is not being diverted for other purposes. Fall in pipe line will permit the development of power to capacity thereof.

35 acres of said 150 acres in Section 12, T. 2 S., R. 3 E., S.B.M. irrigated in recent years and up to and including 1922, when Indian occupant died. Arrangements for the return of the decedents of the earlier Indian inhabitants being consummated.

A minimum of 5 acre feet per acre per annum, measured at the land, or a total of 175 acre feet, required to irrigate the land for present crops: corn, beans, alfalfa and vegetables. For a month of maximum use a diversion of 45 acre feet is required. One cubic foot per second required for irrigation head and is diverted when available and land is being irrigated.

The diversion of this amount throughout the year is required for irrigation, domestic and stock water purposes.

Historical                 The survey for the system was begun in 1913 and construction thereof begun and completed in 1915. While no records were kept of the early Indian irrigation from Mission Creek, it is known that such occurred, and that in more recent times, to-wit since 1902, approximately 35 acres as above described have been irrigated.

## ANDREAS CREEK INDIAN PIPE LINE

## AGUA CALIENTE RESERVATION.

Name of Stream          Andreas Creek

Point of Diversion      From left bank of Creek in SE¼ of SE¼ of Section 3, T. 5 S., R. 4 E., S.B.M.

- 12 -

EXHIBIT 8
- 208 -

ACC0007709

| | |
|---|---|
| Diversion Works | Concrete Dam across creek channel. |
| Location of Conduit | Extends from Diversion Dam in northeasterly direction and then in northwesterly direction across the E½ of Section 2; thence northerly through Section 35 and Section 26, T. 4 S., R 4 E., S.B.M., for a total distance of 21,510 feet. |
| Character and dimensions of Conduits | 4,565 feet of 12 inch cement pipe; 9,643 feet of 10 inch cement pipe; 5,302 feet of 8 inch cement pipe; and 2,000 feet of 8 inch steel pipe. |
| Approximate Cost | $18,500.00 |
| Grade and Capacity | Grade varies:  total fall 300 feet. Capacity at Diversion approximately 6 cubic feet per second. |
| System Provides For | Irrigation of 210 acres of sandy soil in Sections 22, 26, & 34, T. 4 S., R. 4 E., S.B.M., which will require the diversion of 1890 acre feet per annum.  Diversion of 360 acre feet, or six cubic feet per second required in each month of maximum use.  Irrigation season extends throughout the year. The irrigation season extends from January 1st to December 31st of each year.  At all times throughout the year, when not diverted to that or greater extent for irrigation or other purposes, a continuous diversion of at least ½ cubic feet per second required to be maintained for domestic and stock water uses.  The fall in the pipe line permits power development to the capacity thereof. |
| Present Uses | A total of 70.2 acres in Sections 22, 26 and 34, T. 4 S. R. 4 E., S.B.M. has been irrigated, the largest area having been irrigated in 1920.  A minimum of 9 acre feet per acre per annum measured at the land, or a total of 631.2 acre feet required to irrigate said area for present crops:  alfalfa, oranges, grape fruit, apricots, dates, cotton, vegetables and pasture grass. |

- 13 -

EXHIBIT 8
- 209 -

ACC0007710

1
2
3
4
5
6

**Historical**

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

In month of maximum use, a diversion of 120 acre feet, or 2 cubic feet per second, is required. At all times throughout the year, when not diverted to that or greater extent for irrigation or other purposes, a continuous diversion of at least ½ cubic foot per second maintained for domestic and stock water uses.

The dam and pipe line were constructed, extended and completed during the period from 1909 to 1919. Records of early uses are not available, but it is known that the water of Andreas Creek was used upon these lands by the Indians in a very early day. Also the owner of the Barney Ranch, in Section 35 of said Township and Range, made use of the waters of Andreas Creek in 1893 and irrigated at least 10 acres thereby in said Section 35. The Barney Ranch pipe line was constructed and completed in or about the year 1893 and had a capacity of 6 cubic feet per second. Information available indicates that the irrigated area was increased somewhat from year to year. In or about the year 1893 an agreement was made with B.B.Barney, owner of said ranch, whereby ½ of the water carried in the Barney Ditch was made available for the Indians, and in 1907 Section 35, together with said Barney Ranch Water Right and pipe line, was purchased from B. B. Barney and made part of the reservation. An average of more than 49 acres has been irrigated from the combined systems above described during the period from 1915 to the present time, the largest area irrigated during that time being 70.2 acres in 1920.

- 14 -

EXHIBIT 8
- 210 -

ACC0007711

<u>TAHQUITZ CREEK</u>

<u>INDIAN DITCH, AGUA CALIENTE</u>

<u>RESERVATION.</u>

| | |
|---|---|
| <u>Name of Stream</u> | Tahquitz Creek |
| <u>Point of Diversion</u> | From left bank of creek in NE¼ of SW¼ of Section 22, T. 4 S., R. 4 E., S.B.M. |
| <u>Diversion Works</u> | Rock dam across creek channel. |
| <u>Location of Conduit</u> | Extends from diversion dam in north-easterly direction and then in easter-ly direction across the N½ of Section 22, E ½ of Section 15 and W½ of Sec-tion 14, of T. 4 s., R. 4 E., S.B.M. for a distance of 12,734 feet. |
| <u>Character and Dimen-sions of Conduit.</u> | First 1500 feet Earth Ditch, with average dimensions as follows: Width on top at water line 2 feet, Width on bottom 1 foot, Depth of water ½ foot, Next 2834 feet, 10 inch cement pipe, Next 4344 feet, stone and concrete canal. Width on top at water line, 3 feet, Width on bottom, 1½ feet, Depth of water, 1½ feet, Next 4056 feet, 10 inch cement pipe. |
| <u>Approximate Cost</u> | $10,000.00 |
| <u>Grade and Capacity</u> | First 1500 feet, irregular grade, Next 2034 feet, 40 to 63 ft. fall per 1000 feet.   Total fall 127 feet. Next 4344 feet, 4 feet per 1000 feet, Next 4056 feet 5.6 feet per 1000 feet. Total fall 40.2 feet. Capacity at diversion and head of Upper Pipe Line 7.5 cubic feet per second. |
| <u>System Provides For</u> | Irrigation of 150 acres of sandy soil in Section 14, T. 4 S., R. 4 E. S.B.M., which will require the diversion of 1350 acre feet per annum.  The diversion of 288 feet, or 4.8 cubic feet per second, required in month of maximum use. |

- 15 -

EXHIBIT 8
- 211 -

ACC0007712

Irrigation season extends throughout the year. At all times throughout the year when not diverted to that or greater extent for other purposes a continuous diversion of at least 8 cubic feet per second is required to be maintained for domestic and stock water uses.

The fall in the two pipe lines permits the development of power to the extent of their capacity.

## Present Uses

40 acres of said 150 acres were irrigated up to very recent years. In the last 3 or 4 years not more than 34 acres have been irrigated. A minimum of 9 acre feet per acre per annum, measured at the land, or a total of 360 acre feet for the said 40 acres, required to irrigate lands for present crops: alfalfa, vegetables and grapes. In month of maximum use a diversion of 90 acre feet, or 1½ cubic feet per second, is required. At all times throughout the year when not diverted to that or greater extent for other purposes a continuous diversion of at least .8 cubic feet per second maintained for domestic and stock water uses.

An agreement dated February, 1911, provides that the Indian water users shall have first call upon the first .8 cubic feet per second flow in Tahquitz Creek and that white owners shall have next .8 cubic feet per second, after which the remainder in the stream shall be distributed two-thirds to the Indians and one-third to the whites. Supplies for both are carried through first 8600 ft. of above described ditch.

## Historical

A dam, ditch and pipe line were surveyed in 1910 and constructed, extended and completed during the period from 1911 to 1919. No record was kept of the early uses by the Indians, but it is known that these lands were irrigated by them as early as 1835 and practically continuously since that time to the year 1914.

- 16 -

EXHIBIT 8
- 212 -

ACC0007713

Records of uses since that time, in-
cluding 1914, show an average use
of more than 40 acres prior to the
last three or four years, during
which the acreage has been somewhat
reduced, the maximum during that
period being about 34 acres.

-X-

That the undiverted and diverted but returned
waters of Whitewater River and its tributaries flow from
their several sources in the mountains into that portion
of the Coachella Valley lying east and north of San Jacinto
and Santa Rosa Range of Mountains, and there sink into the
earth and become tributary to and form an underground stream
or diffused body of water flowing or percolating in said
valley in a general southeasterly direction, upon which said
body of water the aforesaid Cabazon, Augustine and Torros
Indian Reservations are dependent for their irrigation,
domestic and stock watering supply and to which said reser-
vation and each of them and the lands thereon are riparian.
That said reservations and each of them contain very large
areas of irrigable lands, and the United States, by the
authority and in the pursuance of the policies and purposes
above described, has constructed and has in operation wells,
pumps, canals and conduits for the irrigation of portions
thereof and said lands are now being irrigated by that
means.  That a large additional amount of said waters will
be required for the irrigation of others of said lands as
aforesaid, and it is respectfully shown and submitted for

- 17 -

EXHIBIT 8
- 213 -

ACC0007714

1 the information of the Board, that the United States,
2 for the reasons stated in previous paragraphs hereof,
3 which apply as well to said last named reservations, is
4 entitled to and the owner of such waters, and has a prior
5 right thereto, as against all others claiming same or
6 otherwise, to the extent to which same may be needed for
7 irrigation, domestic and stock watering purposes on said
8 lands, and for the Indians living thereon, and other
9 Indians, and their successors.

10        WHEREFORE, without submitting the rights
11 of the United States hereinabove described or otherwise
12 to the jurisdiction of the Department of Public Works
13 of the State of California, or to the Division of Water
14 Rights thereof, or at all, but respectfully insisting that
15 neither said Department or Division has jurisdiction of the
16 water rights of the United States, and is without jurisdic-
17 tion to enter any order or make any determination affect-
18 ing, or to in any way affect, the said rights of the
19 United States in or to the waters of Whitewater River, its
20 sources or tributaries, it is respectfully suggested that
21 said Division of Water Rights of the Department of Public
22 Works adjust its determination and judgment in this pro-
23 ceeding according to the rights herein disclosed upon the
24 part of the United States, and take account of such rights
25 in its said determination or judgment and cause the same
26 to be made subject thereto.

        Respectfully submitted.

27        (Sd)    Joseph C. Burke,
28                United States Attorney for the
                  Southern District of California.

29        (Sd)    Oliver P. Morton,
30                Special Assistant to the Attorney
                  General.

31

32 Dated:
   Los Angeles, California.
   June 26, 1924.

- 18 -

EXHIBIT 8
- 214 -

ACC0007715

Exhibit 9

Case 5:13-cv-00883-JGB-SP   Document 84-7   Filed 10/21/14   Page 48 of 86   Page ID #:1437

Sec. 2. *And be it further enacted,* That the thirty-fifth section of the act entitled "An act for enrolling and calling out the national forces, and for other purposes," approved March three, eighteen hundred and *and* sixty-three, shall not be deemed hereafter to prohibit the payment to enlisted men employed at the military academy of the extra-duty pay heretofore allowed by law to enlisted men when employed at constant labor for not less than ten days continuously.

Sec. 3. *And be it further enacted,* That from and after the first day of July, eighteen hundred and sixty-three, the annual pay of cadets at the military academy at West Point shall be the same as that allowed to midshipmen at the naval academy, and the amount necessary for that purpose is hereby appropriated.

Sec. 4. *And be it further enacted,* That cadets found deficient at any examination shall not be continued at the military academy, or be re-appointed except upon the recommendation of the academic board.

Sec. 5. *And be it further enacted,* That no part of the money hereby appropriated shall be applied to the support or pay of any cadets hereafter appointed not in conformity with the express provisions of law regulating appointments of cadets at that academy.

APPROVED, April 1, 1864.

*Construction of act of 1863, ch. 75, § 35.*
*Vol. xii. p. 736.*

*Pay of cadets, and appropriation.*

*Cadets found deficient at examination. [Repealed. Post, p. 467.]*

*Appropriation to apply only to cadets regularly appointed.*

———

CHAP. XLVI. — *An Act to increase the Pension of the Revolutionary Pensioners now on the Rolls of the Pension Office.*

*April 1, 1864.*

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That there shall be paid, out of any money in the treasury not otherwise appropriated, the sum of one hundred dollars per annum to each of the surviving soldiers of the Revolution, now on the pension rolls, during their natural lives, in addition to the pensions to which they are now entitled under former acts of Congress ; said payment to date from, and commence on, the first day of January, eighteen hundred and sixty-four, and to cease at their death.

APPROVED, April 1, 1864.

*Pension to surviving soldiers of the Revolution.*

———

CHAP. XLVII. — *An Act relating to Acting Assistant Paymasters in the Navy, and regulating the Appointment of Cadets in the Naval Academy.*

*April 1, 1864.*

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That whenever the President of the United States shall nominate any acting assistant paymaster in the volunteer naval service, on account of his faithful, diligent, and efficient discharge of duty in the volunteer service, to be an assistant paymaster in the navy, it shall be no objection to his appointment and confirmation that he is over twenty-six years of age : *Provided,* That he be not over thirty years of age : *And provided, further,* That the number of paymasters and assistant paymasters, as authorized by law, be not increased thereby.

Sec. 2. *And be it further enacted,* That the students of the naval academy, when examined for admission thereto, shall be between the ages of fourteen and eighteen years.

APPROVED, April 1, 1864.

*Appointment of acting assistant paymasters in the navy.*

*Age.*
*Number.*

*Age of students at naval academy.*

———

CHAP. XLVIII. — *An Act to provide for the better Organization of Indian Affairs in California.*

*April 8, 1864.*

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, from and after the first day of April, anno Domini eighteen hundred and sixty-four, the state of California shall, for Indian purposes, constitute one superintendency, for which there shall be appointed by the President of the United States, by and with the advice and consent of the Senate, a superintendent of Indian

*1865, ch. 122.*
*Post, p. 533.*
*California to constitute one Indian superintendency.*

EXHIBIT 9
- 215 -

40    THIRTY-EIGHTH CONGRESS. Sess. I. Ch. 48. 1864.

Superintendent, salary, bond, oath of office. affairs for said superintendency, at a salary of three thousand six hundred dollars per annum, who shall reside at a point within said state, to be selected by the Secretary of the Interior, and who, upon executing a bond, upon such terms and such sum as may be prescribed by the Secretary of the Interior, and taking the usual oath of office, shall have under his control and management, in like manner and subject to like rules and regulations as are prescribed for superintendents of other superintendencies, the Indians and Indian reservations that are or may hereafter be established in said state: *Provided*, That the superintendent shall be authorized to appoint a clerk, at a compensation not to exceed eighteen hundred dollars per annum.

Clerk, salary.

Indian reservations in California. SEC. 2. *And be it further enacted*, That there shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the Location. accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable, having due regard to Proviso. their adaptation to the purposes for which they are intended: *Provided*, That at least one of said tracts shall be located in what has heretofore been known as the northern district: *And provided, further*, That if it shall be found impracticable to establish the reservations herein contemplated without embracing improvements made within their limits by white Improvements in such locations to be purchased, after report to Congress. persons lawfully there, the Secretary of the Interior is hereby authorized and empowered to contract for the purchase of such improvements, at a price not exceeding a fair valuation thereof, to be made under his direction. But no such contract shall be valid, nor any money paid thereon, until, upon a report of said contract and of said valuation to Congress, the same shall be approved and the money appropriated by law for that pur- Tracts may or may not include present reservations. pose: *And provided, further*, That said tracts to be set apart as aforesaid may, or may not, as in the discretion of the President may be deemed for the best interests of the Indians to be provided for, include any of the Indian reservations heretofore set apart in said state, and that in case any such reservation is so included, the same may be enlarged to such an extent as in the opinion of the President may be necessary, in order to its complete adaptation to the purposes for which it is intended.

SEC. 3. *And be it further enacted*, That the several Indian reservations Reservations not retained to be surveyed and offered for sale. in California which shall not be retained for the purposes of Indian reservations under the provisions of the preceding section of this act, shall, by the commissioner of the general land-office, under the direction of the Secretary of the Interior, be surveyed into lots or parcels of suitable size, and as far as practicable in conformity to the surveys of the public lands, which said lots shall, under his direction, be appraised by disinterested persons at their cash value, and shall thereupon, after due advertisement, as now provided by law in case of other public lands, be offered for sale at public outcry, and thence afterward shall be held subject to sale at private entry, according to such regulations as the Secretary of the Interior Minimum price. may prescribe: *Provided*, That no lot shall be disposed of at less than the appraised value, nor at less than one dollar and twenty-five cents per Sale, how conducted. acre: *And provided, further*, That said sale shall be conducted by the register and receiver of the land-office in the district in which such reservation or reservations may be situated, in accordance with the instructions of the department regulating the sale of public lands.

SEC. 4. *And be it further enacted*, That the President of the United Agent for each reservation. States be, and he is hereby, authorized, by and with the advice and consent of the Senate, to appoint an Indian agent for each of the reservations which shall be established under the provisions of this act, which said agent shall reside upon the reservation for which he shall be appointed, Residence, duties. and shall discharge all the duties now or hereafter to be required of Indian agents by law, or by rules and regulations adopted, or to be

EXHIBIT 9
- 216 -

adopted, for the regulation of the Indian service, so far as the same may be applicable.  Each of the agents appointed as aforesaid shall, before entering upon the duties of his office, give bond in such penalties and with such conditions and such security as the President or Secretary of the Interior may require, and shall hold his office for the term of four years, unless sooner removed by the President, and shall receive an annual salary at the rate of eighteen hundred dollars. *Bond of agents.*

*Term of office, salary.*

Sec. 5. *And be it further enacted,* That there may be appointed, in the manner prescribed by law, for each of said reservations, if in the opinion of the Secretary of the Interior the welfare of said Indians shall require it, one physician, one blacksmith, one assistant blacksmith, one farmer, and one carpenter, who shall each receive compensation at rates to be determined by the Secretary of the Interior, not exceeding fifty dollars per month. *Physician, blacksmith, farmer, carpenter, &c.*

*Pay.*

Sec. 6. *And be it further enacted,* That hereafter, when it shall become necessary to survey any Indian or other reservations, or any lands, the same shall be surveyed under the direction and control of the general land-office, and as nearly as may be in conformity to the rules and regulations under which other public lands are surveyed. *Reservations, how to be surveyed.*

Sec. 7. *And be it further enacted,* That all Indian agents shall reside at their respective agencies, and shall in no case be permitted to visit the city of Washington except when ordered to do so by the commissioner of Indian affairs.   And it is hereby made the duty of the said commissioner to report all cases of the violation of this section to the President, with the request that the agents disregarding the provisions herein contained be at once removed from office. *Indian agents to reside where; not to visit Washington except, &c.*

Sec. 8. *And be it further enacted,* That all acts or parts of acts in conflict with the provisions of this act, be, and the same are hereby, repealed ; and all offices and employments connected with Indian affairs in California not provided for in this act be, and the same are hereby, abolished. *Repealing clause.*

*Offices, &c., abolished.*

APPROVED, April 8, 1864.

CHAP. XLIX. — *An Act to incorporate the Union Gaslight Company of the District of Columbia.* *April 8, 1864.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Sayles J. Bowen, William Elmer, William Bates, Robert W. Milbank, Andrew M. Kinney, William H. Baldwin, Z. D. Gilman, D. C. Forney, S. P. Brown, John Green, and Gamaliel Gay, and their associates and assigns, be, and they are hereby, created a body corporate, under the name of "The Union Gas-light Company of the District of Columbia," with authority to manufacture and sell gas, to be made of coal, zinc, oil, tar, pitch, peat, turpentine, or other material, and to be used in lighting the city of Washington and the streets thereof, and any buildings, manufactories, or houses therein situated, and to lay mains and pipes for the purpose of conducting gas in any of the avenues, streets, lanes, or alleys of the said city : *Provided, however,* That the said company shall so conduct the manufacture, and lay said mains and pipes, as not to create a nuisance or injure either private or public property : *And provided, further,* That the said mains and pipes shall be laid subject to such conditions and in compliance with such regulations as may be prescribed by the municipal authorities of the city of Washington ; and the right to erect and establish any buildings, apparatus, or machinery for the manufacture of gas, shall be subject to such regulations and restrictions as may be from time to time prescribed by the said municipal authorities of Washington. . *Union Gas-light Company incorporated.*

*Name; authority.*

*Not to create a nuisance.*

*To be under direction of city authorities.*

Sec. 2. *And be it further enacted,* That the capital stock of the said company shall not be less than five hundred thousand, nor more than one million dollars, and that the said stock shall be divided into shares of one hundred dollars each, and shall be deemed personal property and *Capital stock. Number of shares.*

4 *

EXHIBIT 9
- 217 -

Exhibit 10

Case 5:13-cv-00883-JGB-SP   Document 84-7   Filed 10/21/14   Page 52 of 86   Page ID
#:1441

at rates fixed by the Administrator, but not exceeding $25 per day, and shall also be entitled to receive an allowance for actual and necessary travel and subsistence expenses while so serving away from their places of residence.   The Council shall meet as frequently as the Surgeon General deems necessary, but not less than once each year. Upon request by three or more members, it shall be the duty of the Surgeon General to call a meeting of the Council. *[margin: Meetings.]*

"(c) In administering the provisions of this title, the Surgeon General, with the approval of the Administrator, is authorized to utilize the services and facilities of any executive department in accordance with an agreement with the head thereof.   Payment for such services and facilities shall be made in advance or by way of reimbursement, as may be agreed upon between the Administrator and the head of the executive department furnishing them. *[margin: Services, etc., of executive departments.]*

### "CONFERENCES OF STATE AGENCIES

"SEC. 634. Whenever in his opinion the purposes of this title would be promoted by a conference, the Surgeon General may invite representatives of as many State agencies, designated in accordance with section 612 (a) (1) or section 623 (a) (1), to confer as he deems necessary or proper.   Upon the application of five or more of such State agencies, it shall be the duty of the Surgeon General to call a conference of representatives of all State agencies joining in the request.   A conference of the representatives of all such State agencies shall be called annually by the Surgeon General.

### "STATE CONTROL OF OPERATIONS

"SEC. 635. Except as otherwise specifically provided, nothing in this title shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any hospital with respect to which any funds have been or may be expended under this title."

SEC. 3. Paragraph (2) of section 208 (b) of the Public Health Service Act, as amended, is amended by inserting "(A)" before the words "to assist"; by striking out the word "paragraph" and inserting in lieu thereof the word "clause"; and by striking out the period at the end of such paragraph and inserting in lieu thereof a comma and the following: "and (B) to assist in carrying out the purposes of title VI of this Act, but not more than twenty such officers appointed pursuant to this clause shall hold office at the same time." *[margin: Ante, p. 422.]*

SEC. 4. Section 1 of the Public Health Service Act is amended to read? *[margin: 58 Stat. 682. 42 U. S. C., Supp. V, § 201 note.]*

"SECTION 1. Titles I to VI, inclusive, of this Act may be cited as the 'Public Health Service Act'."

SEC. 5. The Act of July 1, 1944 (58 Stat. 682), is hereby further amended by changing the number of title VI to title VII and by changing the numbers of sections 601 to 612, inclusive, and references thereto, to sections 701 to 712, respectively. *[margin: 58 Stat. 711. U. S. C., Supp. V, p. 1323.]*

Approved August 13, 1946.

---

[CHAPTER 959]

### AN ACT

To create an Indian Claims Commission, to provide for the powers, duties, and functions thereof, and for other purposes. *[margin: August 13, 1946 [H. R. 4497] [Public Law 726]]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there is hereby created and established an Indian Claims Commission, hereafter referred to as the Commission. *[margin: Indian Claims Commission.]*

EXHIBIT 10
- 218 -

Case 5:13-cv-00883-JGB-SP   Document 84-7   Filed 10/21/14   Page 53 of 86   Page ID #:1442

JURISDICTION

SEC. 2. The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.  No claim accruing after the date of the approval of this Act shall be considered by the Commission.

*Classes of claims.*

All claims hereunder may be heard and determined by the Commission notwithstanding any statute of limitations or laches, but all other defenses shall be available to the United States.

*Deductions for payments, etc.*

In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim, and for all other offsets, counterclaims, and demands that would be allowable in a suit brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136; 28 U. S. C. sec. 250), as amended; the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, except that it is hereby declared to be the policy of Congress that monies spent for the removal of the claimant from one place to another at the request of the United States, or for agency or other administrative, educational, health or highway purposes, or for expenditures made prior to the date of the law, treaty or Executive Order under which the claim arose, or for expenditures made pursuant to the Act of June 18, 1934 (48 Stat. 984), save expenditures made under section 5 of that Act, or for expenditures under any emergency appropriation or allotment made subsequent to March 4, 1933, and generally applicable throughout the United States for relief in stricken agricultural areas, relief from distress caused by unemployment and conditions resulting therefrom, the prosecution of public work and public projects for the relief of unemployment or to increase employment, and for work relief (including the Civil Works Program) shall not be a proper offset against any award.

*25 U. S. C. § 461 et seq.*
*25 U. S. C. § 465.*

MEMBERSHIP APPOINTMENT; OATH; SALARY

SEC. 3. (a)  The Commission shall consist of a Chief Commissioner and two Associate Commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate, and each of whom shall receive a salary of $10,000 per year.  At all times at least two members of the Commission shall be members of the bar of the

EXHIBIT 10
- 219 -

Supreme Court of the United States in good standing: *Provided further*, That not more than two of the members shall be of the same political party.   Each of them shall take an oath to support the Constitution of the United States and to discharge faithfully the duties of his office.

### TERM OF OFFICE; VACANCIES; REMOVAL

(b)  The Commissioners shall hold office during their good behavior until the dissolution of the Commission as hereinafter provided. Vacancies shall be filled in the same manner as the original appointments.   Members of the Commission may be removed by the President for cause after notice and opportunity to be heard.

### NOT TO ENGAGE IN OTHER VOCATIONS OR REPRESENT TRIBES

(c)  No Commissioner shall engage in any other business, vocation, or employment during his term of office nor shall he, during his term of office or for a period of two years thereafter, represent any Indian tribe, band, or group in any matter whatsoever, or have any financial interest in the outcome of any tribal claim.   Any person violating the provisions of this subdivision shall be fined not more than $10,000 or imprisoned not more than two years, or both.

### QUORUM

(d)  Two members shall constitute a quorum, and the agreement of two members shall be necessary to any and all determinations for the transaction of the business of the Commission, and, if there be a quorum, no vacancy shall impair or affect the business of the Commission, or its determinations.

### STAFF OF COMMISSION

SEC. 4. The Commission shall appoint a clerk and such other employees as shall be requisite to conduct the business of the Commission.   All such employees shall take oath for the faithful discharge of their duties and shall be under the direction of the Commission in the performance thereof.

### OFFICES

SEC. 5. The principal office of the Commission shall be in the District of Columbia.

### EXPENSES OF COMMISSION

SEC. 6. All necessary expenses of the Commission shall be paid on the presentation of itemized vouchers therefor approved by the Chief Commissioner or other member or officer designated by the Commission.

### TIME OF MEETINGS

SEC. 7. The time of the meetings of the Commission shall be prescribed by the Commission.

### RECORD

SEC. 8. A full written record shall be kept of all hearings and proceedings of the Commission and shall be open to public inspection.

### CONTROL OF PROCEDURE

SEC. 9. The Commission shall have power to establish its own rules of procedure.

EXHIBIT 10
- 220 -

### PRESENTATION OF CLAIM

Sec. 10. Any claim within the provisions of this Act may be presented to the Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all its members; but wherever any tribal organization exists, recognized by the Secretary of the Interior as having authority to represent such tribe, band, or group, such organization shall be accorded the exclusive privilege of representing such Indians, unless fraud, collusion, or laches on the part of such organization be shown to the satisfaction of the Commission.

### TRANSFER OF SUITS FROM COURT OF CLAIMS

Sec. 11. Any suit pending in the Court of Claims or the Supreme Court of the United States or which shall be filed in the Court of Claims under existing legislation, shall not be transferred to the Commission: *Provided*, That the provisions of section 2 of this Act, with respect to the deduction of payments, offsets, counterclaims and demands, shall supersede the provisions of the particular jurisdictional Act under which any pending or authorized suit in the Court of Claims has been or will be authorized: *Provided further*, That the Court of Claims in any suit pending before it at the time of the approval of this Act shall have exclusive jurisdiction to hear and determine any claim based upon fair and honorable dealings arising out of the subject matter of any such suit.

### LIMITATIONS

Presentation of claims.

Sec. 12. The Commission shall receive claims for a period of five years after the date of the approval of this Act and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress.

### NOTICE AND INVESTIGATION

Sec. 13. (a) As soon as practicable the Commission shall send a written explanation of the provisions of this Act to the recognized head of each Indian tribe and band, and to any other identifiable groups of American Indians existing as distinct entities, residing within the territorial limits of the United States and Alaska, and to the superintendents of all Indian agencies, who shall promulgate the same, and shall request that a detailed statement of all claims be sent to the Commission, together with the names of aged or invalid Indians from whom depositions should be taken immediately and a summary of their proposed testimonies.

Investigation Division.

(b) The Commission shall establish an Investigation Division to investigate all claims referred to it by the Commission for the purpose of discovering the facts relating thereto. The Division shall make a complete and thorough search for all evidence affecting each claim, utilizing all documents and records in the possession of the Court of Claims and the several Government departments, and shall submit such evidence to the Commission. The Division shall make available to the Indians concerned and to any interested Federal agency any data in its possession relating to the rights and claims of any Indian.

### CALLS UPON DEPARTMENTS FOR INFORMATION

Sec. 14. The Commission shall have the power to call upon any of the departments of the Government for any information it may deem necessary, and shall have the use of all records, hearings, and

EXHIBIT 10
- 221 -

Case 5:13-cv-00883-JGB-SP   Document 84-7   Filed 10/21/14   Page 56 of 86   Page ID #:1445

reports made by the committees of each House of Congress, when deemed necessary in the prosecution of its business.

At any hearing held hereunder, any official letter, paper, document, map, or record in the possession of any officer or department, or court of the United States or committee of Congress (or a certified copy thereof), may be used in evidence insofar as relevant and material, including any deposition or other testimony of record in any suit or proceeding in any court of the United States to which an Indian or Indian tribe or group was a party, and the appropriate department of the Government of the United States shall give to the attorneys for all tribes or groups full and free access to such letters, papers, documents, maps, or records as may be useful to said attorneys in the preparation of any claim instituted hereunder, and shall afford facilities for the examination of the same and, upon written request by said attorneys, shall furnish certified copies thereof.

<div align="right"><em>Use of documents, etc., in evidence.</em></div>

## REPRESENTATION BY ATTORNEYS

SEC. 15. Each such tribe, band, or other identifiable group of Indians may retain to represent its interests in the presentation of claims before the Commission an attorney or attorneys at law, of its own selection, whose practice before the Commission shall be regulated by its adopted procedure. The fees of such attorney or attorneys for all services rendered in prosecuting the claim in question, whether before the Commission or otherwise, shall, unless the amount of such fees is stipulated in the approved contract between the attorney or attorneys and the claimant, be fixed by the Commission at such amount as the Commission, in accordance with standards obtaining for prosecuting similar contingent claims in courts of law, finds to be adequate compensation for services rendered and results obtained, considering the contingent nature of the case, plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the amount recovered in any case. The attorney or attorneys for any such tribe, band, or group as shall have been organized pursuant to section 16 of the Act of June 18, 1934 (48 Stat. 987; 25 U. S. C., sec. 476), shall be selected pursuant to the constitution and bylaws of such tribe, band, or group. The employment of attorneys for all other claimants shall be subject to the provisions of sections 2103 to 2106, inclusive, of the Revised Statutes (25 U. S. C., secs. 81, 82–84).

<div align="right"><em>Fees.</em></div>

The Attorney General or his assistants shall represent the United States in all claims presented to the Commission, and shall have authority, with the approval of the Commission, to compromise any claim presented to the Commission. Any such compromise shall be submitted by the Commission to the Congress as a part of its report as provided in section 21 hereof in the same manner as final determinations of the Commission, and shall be subject to the provisions of section 22 hereof.

<div align="right"><em>Authority of Attorney General.</em></div>

## NO MEMBER OF CONGRESS TO PRACTICE BEFORE COMMISSION

SEC. 16. No Senator or Member of or Delegate to Congress shall, during his continuance in office, practice before the Commission.

## HEARING

SEC. 17. The Commission shall give reasonable notice to the interested parties and an opportunity for them to be heard and to present evidence before making any final determination upon any claim. Hearings may be held in any part of the United States or in the Territory of Alaska.

EXHIBIT 10
- 222 -

## TESTIMONY

SEC. 18. Any member of the Commission or any employee of the Commission, designated in writing for the purpose by the Chief Commissioner, may administer oaths and examine witnesses. Any member of the Commission may require by subpena (1) the attendance and testimony of witnesses, and the production of all necessary books, papers, documents, correspondence, and other evidence, from any place in the United States or Alaska at any designated place of hearing; or (2) the taking of depositions before any designated individual competent to administer oaths under the laws of the United States or of any State or Territory. In the case of a deposition, the testimony shall be reduced to writing by the individual taking the deposition or under his direction and shall be subscribed by the deponent. In taking testimony, opportunity shall be given for cross-examination, under such regulations as the Commission may prescribe. Witnesses subpenaed to testify or whose depositions are taken pursuant to this Act, and the officers or persons taking the same, shall severally be entitled to the same fees and mileage as are paid for like services in the courts of the United States.

*Fees and mileage.*

## FINAL DETERMINATION

SEC. 19. The final determination of the Commission shall be in writing, shall be filed with its clerk, and shall include (1) its findings of the facts upon which its conclusions are based; (2) a statement (a) whether there are any just grounds for relief of the claimant and, if so, the amount thereof; (b) whether there are any allowable offsets, counterclaims, or other deductions, and, if so, the amount thereof; and (3) a statement of its reasons for its findings and conclusions.

## REVIEW BY COURT OF CLAIMS

*Certification of questions of law.*

SEC. 20. (a) In considering any claim the Commission at any time may certify to the Court of Claims any definite and distinct questions of law concerning which instructions are desired for the proper disposition of the claim; and thereupon the Court of Claims may give appropriate instructions on the questions certified and transmit the same to the Commission for its guidance in the further consideration of the claim.

*Notice of filing of final determination.*

*Appeal.*

(b) When the final determination of the Commission has been filed with the clerk of said Commission the clerk shall give notice of the filing of such determination to the parties to the proceeding in manner and form as directed by the Commission. At any time within three months from the date of the filing of the determination of the Commission with the clerk either party may appeal from the determination of the Commission to the Court of Claims, which Court shall have exclusive jurisdiction to affirm, modify, or set aside such final determination. On said appeal the Court shall determine whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting "fair and honorable dealings", where applicable, stated by the Commission as a basis for its final determination, are valid and supported by the Commission's findings of fact. In making the foregoing determinations, the Court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error. The Court may at any time remand the cause to the Commission for such further proceedings as it may direct, not inconsistent with the foregoing provisions of this section. The Court

*Remand of cause to Commission.*

EXHIBIT 10
- 223 -

shall promulgate such rules of practice as it may find necessary to carry out the foregoing provisions of this section.

(c) Determinations of questions of law by the Court of Claims under this section shall be subject to review by the Supreme Court of the United States in the manner prescribed by section 3 of the Act of February 13, 1925 (43 Stat. 939; 28 U. S. C., sec. 288), as amended.

*Review by Supreme Court of U. S.*

### REPORT OF COMMISSION TO CONGRESS

SEC. 21. In each claim, after the proceedings have been finally concluded, the Commission shall promptly submit its report to Congress.

The report to Congress shall contain (1) the final determination of the Commission; (2) a transcript of the proceedings or judgment upon review, if any, with the instructions of the Court of Claims; and (3) a statement of how each Commissioner voted upon the final determination of the claim.

### EFFECT OF FINAL DETERMINATION OF COMMISSION

SEC. 22. (a) When the report of the Commission determining any claimant to be entitled to recover has been filed with Congress, such report shall have the effect of a final judgment of the Court of Claims, and there is hereby authorized to be appropriated such sums as are necessary to pay the final determination of the Commission.

*Report.*

*Appropriation authorized.*

The payment of any claim, after its determination in accordance with this Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy.

(b) A final determination against a claimant made and reported in accordance with this Act shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy.

*Further claim barred.*

### DISSOLUTION OF THE COMMISSION

SEC. 23. The existence of the Commission shall terminate at the end of ten years after the first meeting of the Commission or at such earlier time after the expiration of the five-year period of limitation set forth in section 12 hereof as the Commission shall have made its final report to Congress on all claims filed with it. Upon its dissolution the records of the Commission shall be delivered to the Archivist of the United States.

*Records.*

### FUTURE INDIAN CLAIMS

SEC. 24. The jurisdiction of the Court of Claims is hereby extended to any claim against the United States accruing after the date of the approval of this Act in favor of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws, treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band, or group. In any suit brought under the jurisdiction conferred by this section the claimant shall be entitled to recover in the same manner, to the same extent, and subject to the same conditions and limitations, and the United States shall be entitled to the same defenses, both at law and in equity, and to the same offsets, counterclaims, and demands, as in cases brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136; 28 U. S. C., sec. 250), as amended: *Provided, however,* That nothing contained in this section shall be construed as altering the

*Extension of jurisdiction of Court of Claims.*

EXHIBIT 10
- 224 -

**1056**  PUBLIC LAWS—CHS. 959, 960—AUG. 13, 1946  [60 Stat.

fiduciary or other relations between the United States and the several Indian tribes, bands, or groups.

**EFFECT ON EXISTING LAWS**

Sec. 25. All provisions of law inconsistent with this Act are hereby repealed to the extent of such inconsistency, except that existing provisions of law authorizing suits in the Court of Claims by particular tribes, bands, or groups of Indians and governing the conduct or determination of such suits shall continue to apply to any case heretofore or hereafter instituted thereunder save as provided by section 11 hereof as to the deduction of payments, offsets, counterclaims, and demands.

Separability of provisions.

Sec. 26. If any provision of this Act, or the application thereof, is held invalid, the remainder of the Act, or other applications of such provisions, shall not be affected.

Approved August 13, 1946.

---

[CHAPTER 960]

August 13, 1946
[H. R. 2633]
[Public Law 727]

AN ACT

Authorizing Federal participation in the cost of protecting the shores of publicly owned property.

Protection of shores owned by States, etc.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That with the purpose of preventing damage to public property and promoting and encouraging the healthful recreation of the people, it is hereby declared to be the policy of the United States to assist in the construction, but not the maintenance, of works for the improvement and protection against erosion by waves and currents of the shores of the United States that are owned by States, municipalities, or other political sub-

Federal contribution.

divisions: *Provided,* That the Federal contribution toward the construction of protective works shall not in any case exceed one-third of the total cost: *Provided further,* That where a political subdivision

Repair, etc., of sea wall.

has heretofore erected a sea wall to prevent erosion, by waves and currents, to a public highway considered by the Chief of Engineers sufficiently important to justify protection, Federal contribution toward the repair of such wall and the protection thereof by the building of an artificial beach is authorized at not to exceed one-third of the original cost of such wall, and that investigations and studies hereinafter provided for are hereby authorized for such localities:

Plan of protection.

*Provided further,* That the plan of protection shall have been specifically adopted and authorized by Congress after investigation and study by the Beach Erosion Board under the provisions of section 2

46 Stat. 945.
33 U. S. C. § 426.

of the River and Harbor Act approved July 3, 1930, as amended and supplemented.

Payment to States, etc.

Sec. 2. When the Chief of Engineers shall find that any such project has been constructed in accordance with the authorized plans and specifications he shall cause to be paid to the State, municipality, or political subdivision the amount authorized by Congress.

Payments on construction.

Sec. 3. The Chief of Engineers may, in his discretion, from time to time, make payments on such construction as the work progresses, but these payments, including previous payments, if any, shall not be more than the United States pro rata part of the value of the labor and materials which have been actually put into such construction in conformity to said plans and specifications: *Provided,* That the con-

Works undertaken by Chief of Engineers.

struction of improvement and protective works may be undertaken by the Chief of Engineers upon the request of, and contribution of

EXHIBIT 10
- 225 -

Exhibit 11

Case 5:13-cv-00883-JGB-SP    Document 84-7    Filed 10/21/14    Page 61 of 86    Page ID #:1450

each year shall hereafter commence on the third Tuesday of April in each year, and all provisions of law now applicable to the holding of said May term shall apply to the said April term.

APPROVED, March 3, 1851.

---

CHAP. XL.—*An Act to change the Terms of the Circuit Courts for the Eastern and Western Districts of Pennsylvania.* (a)

*March 3, 1851.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the terms of the Circuit Courts of the United States for the eastern and western districts of Pennsylvania shall hereafter commence as follows, to wit : The April and October terms of the eastern district shall commence on the first Mondays of April and October, and the May and November terms of the western district shall commence on the second Mondays of May and November.

*Terms of Circuit Courts in Pennsylvania.*

APPROVED, March 3, 1851.

---

CHAP. XLI.—*An Act to ascertain and settle the private Land Claims in the State of California.*

*March 3, 1851.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purpose of ascertaining and settling private land claims in the State of California, a commission shall be, and is hereby, constituted, which shall consist of three commissioners, to be appointed by the President of the United States, by and with the advice and consent of the Senate, which commission shall continue for three years from the date of this act, unless sooner discontinued by the President of the United States.

*Commission constituted.*

SEC. 2. *And be it further enacted,* That a secretary, skilled in the Spanish and English languages, shall be appointed by the said commissioners, whose duty it shall be to act as interpreter, and to keep a record of the proceedings of the board in a bound book, to be filed in the office of the Secretary of the Interior on the termination of the commission.

*Secretary. Duties.*

SEC. 3. *And be it further enacted,* That such clerks, not to exceed five in number, as may be necessary, shall be appointed by the said commissioners.

*Clerks.*

SEC. 4. *And be it further enacted,* That it shall be lawful for the President of the United States to appoint an agent learned in the law, and skilled in the Spanish and English languages, whose special duty it shall be to superintend the interests of the United States in the premises, to continue him in such agency as long as the public interest may, in the judgment of the President, require his continuance, and to allow him such compensation as the President shall deem reasonable. It shall be the duty of the said agent to attend the meetings of the board, to collect testimony in behalf of the United States, and to attend on all occasions when the claimant, in any case before the board, shall take depositions ; and no deposition taken by or in behalf of any such claimant shall be read in evidence in any case, whether before the commissioners, or before the District or Supreme Court of the United States, unless notice of the time and place of taking the same shall have been given in writing to said agent, or to the district attorney of the proper district, so long before the time of taking the deposition as to enable him to be present at the time and place of taking the same,

*Agent for United States. Duties.*

*Ante, p. 616. Compensation. Duties.*

*Notice of taking of depositions to be given to such agent.*

(a) See vol. i. pp. 75, 463, 517 ; vol. ii. pp. 1, 157 ; vol. iii. p. 462 ; vol. v. pp. 177, 628.

EXHIBIT 11
- 226 -

and like notice shall be given of the time and place of taking any deposition on the part of the United States.

**Sessions of commissioners.**    SEC. 5. *And be it further enacted,* That the said commissioners shall hold their sessions at such times and places as the President of the United States shall direct, of which they shall give due and public notice; and the marshal of the district in which the board is sitting shall appoint a deputy, whose duty it shall be to attend upon the said board, and who shall receive the same compensation as is allowed to the marshal for his attendance upon the District Court.

**Deputy marshal.**

**Pay.**

**Oaths to be administered, and testimony taken in writing and recorded.**    SEC. 6. *And be it further enacted,* That the said commissioners, when sitting as a board, and each commissioner at his chambers, shall be, and are, and is hereby, authorized to administer oaths, and to examine witnesses in any case pending before the commissioners, that all such testimony shall be taken in writing, and shall be recorded and preserved in bound books to be provided for that purpose.

**Subpœnas.**    SEC. 7. *And be it further enacted,* That the secretary of the board shall be, and he is hereby, authorized and required, on the application of the law agent or district attorney of the United States, or of any claimant or his counsel, to issue writs of subpœna commanding the attendance of a witness or witnesses before the said board or any commissioner.

**Claimants of land to present their claims.**    SEC. 8. *And be it further enacted,* That each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government, shall present the same to the said commissioners when sitting as a board, together with such documentary evidence and testimony of witnesses as the said claimant relies upon in support of such claims; and it shall be the duty of the commissioners, when the case is ready for hearing, to proceed promptly to examine the same upon such evidence, and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim, and, within thirty days after such decision is rendered, to certify the same, with the reasons on which it is founded, to the district attorney of the United States in and for the district in which such decision shall be rendered.

**Proceedings thereon.**

**Petitions to District Court. Proceedings therein.**    SEC. 9. *And be it further enacted,* That in all cases of the rejection or confirmation of any claim by the board of commissioners, it shall and may be lawful for the claimant or the district attorney, in behalf of the United States, to present a petition to the District Court of the district in which the land claimed is situated, praying the said court to review the decision of the said commissioners, and to decide on the validity of such claim; and such petition, if presented by the claimant, shall set forth fully the nature of the claim and the names of the original and present claimants, and shall contain a deraignment of the claimant's title, together with a transcript of the report of the board of commissioners, and of the documentary evidence and testimony of the witnesses on which it was founded; and such petition, if presented by the district attorney in behalf of the United States, shall be accompanied by a transcript of the report of the board of commissioners, and of the papers and evidence on which it was founded, and shall fully and distinctly set forth the grounds on which the said claim is alleged to be invalid, a copy of which petition, if the same shall be presented by a claimant, shall be served on the district attorney of the United States, and, if presented in behalf of the United States, shall be served on the claimant or his attorney; and the party upon whom such service shall be made shall be bound to answer the same within a time to be prescribed by the judge of the District Court; and the answer of the claimant to such petition shall set forth fully the nature of the claim, and the names of the original and present claimants, and shall contain a deraignment of the claimant's title; and the answer of the

**Form of petition.**

**Answers to petitions.**

EXHIBIT 11
- 227 -

Case 5:13-cv-00883-JGB-SP   Document 84-7   Filed 10/21/14   Page 63 of 86   Page ID #:1452

district attorney in behalf of the United States shall fully and distinctly set forth the grounds on which the said claim is alleged to be invalid, copies of which answers shall be served upon the adverse party thirty days before the meeting of the court, and thereupon, at the first term of the court thereafter, the said case shall stand for trial, unless, on cause shown, the same shall be continued by the court.

Sec. 10. *And be it further enacted*, That the District Court shall proceed to render judgment upon the pleadings and evidence in the case, and upon such further evidence as may be taken by order of the said court, and shall, on application of the party against whom judgment is rendered, grant an appeal to the Supreme Court of the United States, on such security for costs in the District and Supreme Court, in case the judgment of the District Court shall be affirmed, as the said court shall prescribe; and if the court shall be satisfied that the party desiring to appeal is unable to give such security, the appeal may be allowed without security.  *[margin: Proceedings thereon. Appeal to Supreme Court. Security for costs.]*

Sec. 11. *And be it further enacted*, That the commissioners herein-provided for, and the District and Supreme Courts, in deciding on the validity of any claim brought before them under the provisions of this act, shall be governed by the treaty of Guadaloupe Hidalgo, the law of nations, the laws, usages, and customs of the government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court of the United States, so far as they are applicable.  *[margin: On what principles commissioners are to act.]*

Sec. 12. *And be it further enacted*, That to entitle either party to a review of the proceedings and decision of the commissioners hereinbefore provided for, notice of the intention of such party to file a petition to the District Court shall be entered on the journal or record of proceedings of the commissioners within sixty days after their decision on the claim has been made and notified to the parties, and such petition shall be filed in the District Court within six months after such decision has been rendered.  *[margin: Proceedings to authorise petition to District Court.]*

Sec. 13. *And be it further enacted*, That all lands, the claims to which have been finally rejected by the commissioners in manner herein provided, or which shall be finally decided to be invalid by the District or Supreme Court, and all lands the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held, and considered as part of the public domain of the United States; and for all claims finally confirmed by the said commissioners, or by the said District or Supreme Court, a patent shall issue to the claimant upon his presenting to the general land office an authentic certificate of such confirmation, and a plat or survey of the said land, duly certified and approved by the surveyor-general of California, whose duty it shall be to cause all private claims which shall be finally confirmed to be accurately surveyed, and to furnish plats of the same; and in the location of the said claims, the said surveyor-general shall have the same power and authority as are conferred on the register of the land office and receiver of the public moneys of Louisiana, by the sixth section of the act "to create the office of surveyor of the public lands for the State of Louisiana," approved third March, one thousand eight hundred and thirty-one: *Provided, always*, That if the title of the claimant to such lands shall be contested by any other person, it shall and may be lawful for such person to present a petition to the district judge of the United States for the district in which the lands are situated, plainly and distinctly setting forth his title thereto, and praying the said judge to hear and determine the same, a copy of which petition shall be served upon the adverse party thirty days before the time appointed for hearing the same. *And provided, further*, That it shall and may be lawful for the district judge of the United States, upon the hearing of such petition,  *[margin: All lands in California to which claims are not established to be taken as public lands. Patent to issue for lands, claims to which are confirmed. Location and survey of claims. 1831, ch. 116. Provision where a claim is contested by some other person. Injunction in such case.]*

Vol. IX. Pub. — 80

EXHIBIT 11
- 228 -

to grant an injunction to restrain the party at whose instance the claim to the said lands has been confirmed, from suing out a patent for the same, until the title thereto shall have been finally decided, a copy of which order shall be transmitted to the commissioner of the general land office, and thereupon no patent shall issue until such decision shall be made, or until sufficient time shall, in the opinion of the said judge, have been allowed for obtaining the same; and thereafter the said injunction shall be dissolved.

**This act not to extend to certain lots.**

**Provision for the case of such lots.**

Sec. 14. *And be it further enacted,* That the provisions of this act shall not extend to any town lot, farm lot, or pasture lot, held under a grant from any corporation or town to which lands may have been granted for the establishment of a town by the Spanish or Mexican government, or the lawful authorities thereof, nor to any city, or town, or village lot, which city, town, or village existed on the seventh day of July, eighteen hundred and forty-six; but the claim for the same shall be presented by the corporate authorities of the said town, or where the land on which the said city, town, or village was originally granted to an individual, the claim shall be presented by or in the name of such individual, and the fact of the existence of the said city, town, or village on the said seventh July, eighteen hundred and forty-six, being duly proved, shall be prima facie evidence of a grant to such corporation, or to the individual under whom the said lot-holders claim; and where any city, town, or village shall be in existence at the time of passing this act, the claim for the land embraced within the limits of the same may be made by the corporate authority of the said city, town, or village.

**Proceedings to be conclusive only as between U. S. and the claimants.**

Sec. 15. *And be it further enacted,* That the final decrees rendered by the said commissioners, or by the District or Supreme Court of the United States, or any patent to be issued under this act, shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons.

**Report on tenure of mission lands and those held by certain Indians.**

Sec. 16. *And be it further enacted,* That it shall be the duty of the commissioners herein provided for to ascertain and report to the Secretary of the Interior the tenure by which the mission lands are held, and those held by civilized Indians, and those who are engaged in agriculture or labor of any kind, and also those which are occupied and cultivated by Pueblos or Rancheros Indians.

**Compensation. Commissioners. Secretary. Clerks.**

Sec. 17. *And be it further enacted,* That each commissioner appointed under this act shall be allowed and paid at the rate of six thousand dollars per annum; that the secretary of the commissioners shall be allowed and paid at the rate of four thousand dollars per annum; and the clerks herein provided for shall be allowed and paid at the rate of one thousand five hundred dollars per annum; the aforesaid salaries to commence from the day of the notification by the commissioners of the first meeting of the board.

**Secretary to receive no fees except in certain cases.**

Sec. 18. *And be it further enacted,* That the secretary of the board shall receive no fee except for furnishing certified copies of any paper or record, and for issuing writs of subpœna. For furnishing certified copies of any paper or record, he shall receive twenty cents for every hundred words, and for issuing writs of subpœna, fifty cents for each witness; which fees shall be equally divided between the said secretary and the assistant clerk.

Approved, March 3, 1851.

EXHIBIT 11
- 229 -

Case 5:13-cv-00883-JGB-SP   Document 84-7   Filed 10/21/14   Page 65 of 86   Page ID #:1454

Chap. XLII. — *An Act to amend an Act entitled " An Act allowing Compensation to the Members of the Senate, Members of the House of Representatives of the United States, and to the Delegates of the Territories, and repealing all other Laws on that Subject." (a)*

March 3, 1851.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the passage of this act, no member of the Senate shall be entitled to receive compensation for his attendance at the Senate, in the recess of Congress, during such meeting of the Senate as may be called on the fourth day of March, eighteen hundred and fifty-three, and on the fourth day of March in every fourth year thereafter, other than the eight dollars per diem for attendance, now allowed by law : *Provided,* That this act shall not apply to a senator, not a member of either house of Congress at the expiration of the Congress preceding such called session of the Senate.

No senator to receive mileage for the session commencing March 4, 1853, and every four years thereafter, if he was a member of Congress in the preceding session.

Approved, March 3, 1851.

———

Chap. XLIII. — *An Act to limit the Liability of Ship-Owners, and for other Purposes. (b)*

March 3, 1851.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That no owner or owners of any ship or vessel shall be subject or liable to answer for or make good to any one or more person or persons any loss or damage which may happen to any goods or merchandize whatsoever, which shall be shipped, taken in, or put on board any such ship or vessel, by reason or by means of any fire happening to or on board the said ship or vessel, unless such fire is caused by the design or neglect of such owner or owners : *Provided,* That nothing in this act contained shall prevent the parties from making such contract as they please, extending or limiting the liability of ship-owners.

Owners not liable for damage by fire not caused by their neglect.

Parties may vary their liabilities by contract.

Sec. 2. *And be it further enacted,* That if any shipper or shippers of platina, gold, gold dust, silver, bullion, or other precious metals, coins, jewelry, bills of any bank or public body, diamonds or other precious stones, shall lade the same on board of any ship or vessel, without, at the time of such lading, giving to the master, agent, owner or owners of the ship or vessel receiving the same, a note in writing of the true character and value thereof, and have the same entered on the bill of lading therefor, the master and owner or owners of the said vessel shall not be liable, as carriers thereof, in any form or manner. Nor shall any such master or owners be liable for any such valuable goods beyond the value and according to the character thereof so notified and entered.

Owners not liable for certain valuable articles, unless notice is given, &c.

Limit of liability in case of such notice.

Sec. 3. *And be it further enacted,* That the liability of the owner or owners of any ship or vessel, for any embezzlement, loss, or destruction, by the master, officers, mariners, passengers, or any other person or persons, of any property, goods, or merchandize, shipped or put on board of such ship or vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner or owners respectively, in such ship or vessel, and her freight then pending.

Liability of owners for certain losses not to exceed the value of their interest in the vessel.

Sec. 4. *And be it further enacted,* That if any such embezzlement,

(a) For previous acts on the subject, see note in vol. i. p. 70, and Stat. 1850, ch. 90.
(b) See the case of New Jersey Steam Navigation Co. *v.* Merchants Bank, 6 Howard, R. 344.

EXHIBIT 11
- 230 -

Exhibit 12

Case 5:13-cv-00883-JGB-SP   Document 84-7   Filed 10/21/14   Page 67 of 86   Page ID #:1456

the administration of the criminal laws of said State and the service of civil process therein.

Open space.    The building shall be unexposed to danger from fire by an open space of at least forty feet on each side, including streets and alleys.

Approved, January 12, 1891.

---

January 12, 1891.

**CHAP. 65.—An act for the relief of the Mission Indians in the State of California.**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That immediately after the passage of this act the Secretary of the Interior shall appoint three disinterested persons as commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the State of California, upon reservations which shall be secured to them as hereinafter provided.

Mission Indians, Cal. Settlement upon reservations.
Appointment of commission.

Duties of commissioners.
Selection of reservations.

SEC. 2. That it shall be the duty of said commissioners to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the President and Secretary of the Interior. They shall also appraise the value of the improvements belonging to any person to whom valid existing rights have attached under the public-land laws of the United States, or to the assignee of such person, where such improvements are situated within the limits of any reservation selected and defined by said commissioners subject in each case to the approval of the Secretary of the Interior. In cases where the Indians are in occupation of lands within the limits of confirmed private grants, the commissioners shall determine and define the boundaries of such lands, and shall ascertain whether there are vacant public lands in the vicinity to which they may be removed. And the said commission is hereby authorized to employ a competent surveyor and the necessary assistants.

Appraisal of improvements.

Removals from confirmed private grants.

Surveyor and assistants.

Report.

SEC. 3. That the commissioners, upon the completion of their duties, shall report the result to the Secretary of the Interior, who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the commission and approved by him in favor of each band or village of Indians occupying any such reservation, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus patented, subject to the provisions of section four of this act, for the period of twenty-five years, in trust, for the sole use and benefit of the band or village to which it is issued, and that at the expiration of said period the United States will convey the same or the remaining portion not previously patented in severalty by patent to said band or village, discharged of said trust, and free of all charge or incumbrance whatsoever: *Provided,* That no patent shall embrace any tract or tracts to which existing valid rights have attached in favor of any person under any of the United States laws providing for the disposition of the public domain, unless such person shall acquiesce in and accept the appraisal provided for in the preceding section in all respects and shall thereafter, upon demand and payment of said appraised value, execute a release of all title and claim thereto; and a separate patent, in similar form, may be issued for any such tract or tracts, at any time thereafter. Any such person shall be permitted to exercise the same right to take land under the public-land laws of the United States as though he had not made settlement on the lands embraced in said reservation; and a separate patent, in similar form, may be issued for

Issue of reservation trust-patents in common.

Terms of trust.

*Post,* p. 713.

Provisos.
Existing valid rights.

Lieu-lands to accepting settlers.

Settlers' rights.

EXHIBIT 12

- 231 -

Case 5:13-cv-00883-JGB-SP Document 84-7 Filed 10/21/14 Page 68 of 86 Page ID #:1457

any tract or tracts at any time after the appraised value of the improvements thereon shall have been paid: *And provided further,* That in case any land shall be selected under this act to which any railroad company is or shall hereafter be entitled to receive a patent, such railroad company shall, upon releasing all claim and title thereto, and on the approval of the President and Secretary of the Interior, be allowed to select an equal quantity of other land of like value in lieu thereof, at such place as the Secretary of the Interior shall determine: *And provided further,* That said patents declaring such lands to be held in trust as aforesaid shall be retained and kept in the Interior Department, and certified copies of the same shall be forwarded to and kept at the agency by the agent having charge of the Indians for whom such lands are to be held in trust, and said copies shall be open to inspection at such agency. *{Lieu-lands to accepting railroads.}* *{Custody of trust-patents. Copies.}*

Sec. 4. That whenever any of the Indians residing upon any reservation patented under the provisions of this act shall, in the opinion of the Secretary of the Interior, be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the Interior may cause allotments to be made to such Indians, out of the land of such reservation, in quantity as follows: To each head of a family not more than six hundred and forty acres nor less than one hundred and sixty acres of pasture or grazing land, and in addition thereto not exceeding twenty acres, as he shall deem for the best interest of the allottee, of arable land in some suitable locality; to each single person over twenty-one years of age not less than eighty nor more than six hundred and forty acres of pasture or grazing land and not exceeding ten acres of such arable land. *{Allotments in severalty.}* *{Head of family.}* *{Single person.}*

Sec. 5. That upon the approval of the allotments provided for in the preceding section by the Secretary of the Interior he shall cause patents to issue therefor in the name of the allottees, which shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State of California, and that at the expiration of said period the United States will convey the same by patent to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: *Provided,* That these patents, when issued, shall override the patent authorized to be issued to the band or village as aforesaid, and shall separate the individual allotment from the lands held in common, which proviso shall be incorporated in each of the village patents. *{Patents to allottees.}* *{In trust.}* *{In fee.}* *{Prior conveyances, etc., void.}* *{Proviso.}* *{Power of severalty patents.}*

Sec. 6. That in cases where the lands occupied by any band or village of Indians are wholly or in part within the limits of any confirmed private grant or grants, it shall be the duty of the Attorney-General of the United States, upon request of the Secretary of the Interior, through special counsel or otherwise, to defend such Indians in the rights secured to them in the original grants from the Mexican Government, and in an act for the government and protection of Indians passed by the legislature of the State of California April twenty-second, eighteen hundred and fifty, or to bring any suit, in the name of the United States, in the Circuit Court of the United States for California, that may be found necessary to the full protection of the legal or equitable rights of any Indian or tribe of Indians in any of such lands. *{Rights of Indians on Mexican land grants.}* *{Attorney-General to defend, etc.}*

Sec. 7. That each of the commissioners authorized to be appointed by the first section of this act shall be paid at the rate of eight dollars per day for the time he is actually and necessarily employed in *{Compensation of commissioners.}*

EXHIBIT 12
- 232 -

**714**          FIFTY-FIRST CONGRESS. Sess. II. Chs. 65, 66. 1891.

Appropriation.

the discharge of his duties, and necessary traveling expenses; and for the payment of the same, and of the expenses of surveying, the sum of ten thousand dollars, or so much thereof as may be necessary, is hereby appropriated out of any money in the Treasury not otherwise appropriated.

Rights of way across reservations, prior to patent.
Secretary of Interior may grant.

For water pipes, etc.

Conditions.

SEC. 8. That previous to the issuance of a patent for any reservation as provided in section three of this act the Secretary of the Interior may authorize any citizen of the United States, firm, or corporation to construct a flume, ditch, canal, pipe, or other appliances for the conveyance of water over, across, or through such reservation for agricultural, manufacturing, or other purposes, upon condition that the Indians owning or occupying such reservation or reservations shall, at all times during such ownership or occupation, be supplied with sufficient quantity of water for irrigating and domestic purposes upon such terms as shall be prescribed in writing by the Secretary of the Interior, and upon such other terms as he may prescribe, and may grant a right of way for rail or other roads through such reservation: *Provided*, That any individual, firm, or corporation desiring such privilege shall first give bond to the United States, in such sum as may be required by the Secretary of the Interior, with good and sufficient sureties, for the performance of such conditions and stipulations as said Secretary may require as a condition precedent to the granting of such authority: *And provided further*, That this act shall not authorize the Secretary of the Interior to grant a right of way to any railroad company through any reservation for a longer distance than ten miles. And any patent issued for any reservation upon which such privilege has been granted, or for any allotment therein, shall be subject to such privilege, right of way, or easement. Subsequent to the issuance of any tribal patent, or of any individual trust patent as provided in section five of this act, any citizen of the United States, firm, or corporation may contract with the tribe, band, or individual for whose use and benefit any lands are held in trust by the United States, for the right to construct a flume, ditch, canal, pipe, or other appliances for the conveyance of water over, across, or through such lands, which contract shall not be valid unless approved by the Secretary of the Interior under such conditions as he may see fit to impose.

For railroads, etc.
*Provisos.*
Conditional bond, etc.

Limit of distance.

Rights of way, after issue of patents.

Subject to approval of Secretary of Interior.

Approved, January 12, 1891.

---

January 12, 1891.

**CHAP. 66.—An act for the erection of a public building at Newburgh, New York.**

Newburgh, N. Y.
Public building, etc.

Site.

Building.

Cost.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to acquire, by purchase, condemnation, or otherwise, a site and cause to be erected thereon a suitable building, including fire-proof vaults, heating and ventilating apparatus, elevators, and approaches, for the use and accommodation of the United States post-office and other Government offices, in the city of Newburgh and State of New York, the cost of said site and building, including said vaults, heating and ventilating apparatus, elevators, and approaches, complete, not to exceed the sum of one hundred thousand dollars.

Proposals to be advertised for.

Proposals for the sale of land suitable for said site shall be invited by public advertisement in one or more of the newspapers of said city of largest circulation for at least twenty days prior to the date specified in said advertisement for the opening of said proposals.

Responses.

Proposals made in response to said advertisements shall be addressed and mailed to the Secretary of the Treasury, who shall then cause the said proposed sites, and such others as he may think proper to designate, to be examined in person by an agent of the Treasury

Examination, etc., by Treasury agent.

EXHIBIT 12
- 233 -

Exhibit 13

52d CONGRESS, } HOUSE OF REPRESENTATIVES. { Ex. Doc.
1st Session.  }                                { No. 96.

## MISSION INDIANS IN CALIFORNIA.

# MESSAGE

#### FROM THE

# PRESIDENT OF THE UNITED STATES,

#### TRANSMITTING

*A communication from the Secretary of the Interior submitting an extract from the report of the Commission for the relief of the Mission Indians in California, and other papers relating to the exchange of lands, etc., with a draft of a bill to carry into effect the recommendation of said Commission.*

JANUARY 26, 1892.—Referred to the Committee on Indian Affairs and ordered to be printed.

*To the Senate and House of Representatives:*

I transmit herewith, for the consideration of Congress, a communication of 23d instant, from the Secretary of the Interior, submitting an extract from the report of the Commission appointed under the act of January 12, 1891, entitled "An act for the relief of the Mission Indians in the State of California," and other papers relating to the exchange of lands with private individuals and the purchase of certain lands and improvements for the use and benefit of the Mission Indians, with draft of a bill to carry into effect the recommendations of said Mission Commission.

I have approved the report of the Mission Commission, except so much as relates to the purchase of lands from and exchange of lands with private individuals, which is also approved subject to the condition that Congress shall authorize the same.

The matter is presented with recommendation for the early and favorable action of Congress.

BENJ. HARRISON.

EXECUTIVE MANSION, *January 25, 1892.*

---

DEPARTMENT OF THE INTERIOR,
*Washington, January 23, 1892.*

The PRESIDENT:

I have the honor to submit herewith a communication from the Commissioner of Indian Affairs, transmitting an extract from the report of the Mission Indian Commission, appointed under the provisions of the

---

30                    CLAIM OF HON. JAMES CROOKS.

ninth Congress, first session, nor does it appear that any claim for relief has ever been presented to this Department by the owners of *The Lydia.*

I have the honor to be, sir, your obedient servant,

T. F. BAYARD.

JAMES S. COCHRAN,
*House of Representatives.*

---

LONDON, *September 29, 1819.*

[Rec'd Nov 24. Duplicate No. 83]

SIR: On the 23d instant I received a representation from Messieurs W. and E. Lawrence, of this city, respecting the case of the ship *Lydia*, of New York, an American vessel belonging to Stephen Hathaway, George Hathaway, and Isaac Waite, citizens of the United States. The vessel was captured by an English cruiser during the late war, and condemned in the court of vice-admiralty at Bermuda. The sentence was reversed in London and restitution ordered to the claimants. The ship being sold at Bermuda the proceeds were paid into court to abide the result of the appeal; but since by the reversal of the sentence it appears that through the default of the proper officers of the court this part of the proceeds is not now forthcoming, this Government will interpose and protect them against the misconduct or other inability of its own officers. It is to procure this interposition that my official aid is invoked by Messieurs Lawrence on the part of the owners. I do not think it necessary to trouble the Department with a copy of the correspondence that has passed between us. It will be sufficient for the present to state that, perceiving that the ship when captured was sailing under the protection of a British license, I have deemed it my duty to suspend proceeding in ballast from New York to Charleston, thence to carry a cargo of provisions to Cadiz. The license which she had on board would have rendered her a prize of war had she fallen into the hands of a cruiser of our country. I have deemed it proper to state thus much of the case, to anticipate whatever representations may be made by the parties themselves. I have said to them that, if I have misjudged the merits of their application in withholding my assistance, an appeal to the Department of State will be open to them.

I reach Carlsbad lately I got back again to this place from Paris. I learn from him that affairs between Portugal and Spain still remain wholly unsettled. The Count proceeds to Rio Janeiro before long to take upon himself the office of foreign affairs.

It incloses the *Times* of the 4th of the present month. It contains a publication reporting to hold the proceedings of the general assembly of Nova Scotia in the month of March. The subject of the present communication was conducted with the Government last autumn. I have no other knowledge of these proceedings than is afforded by this newspaper publication; and would incline the hope, from its nature, of some of the sentiments and language towards the United States, that it must be spurious.

I have the honor, etc.,

(Signed)            RICHARD RUSH.

Hon. JOHN QUINCY ADAMS,
*Secretary of State.*

EXHIBIT 13
- 234 -

## 2. MISSION INDIANS IN CALIFORNIA.

act of January 12, 1891, entitled "An act for the relief of the Mission Indians in the State of California," and other papers relating to the purchase of lands from and exchange of lands with private individuals, in order that the requirements of the laws as to the reservations for each band or village of the Mission Indians may be complied with.

I also submit a draft of a bill proposing by my direction authorizing the Secretary of the Interior to purchase or exchange certain lands as recommended by the Commission, and which purchase or exchange has received executive approval, subject to the condition that Congress shall authorize the execution.

This matter is presented with the recommendation that it receive the early and favorable action of Congress.

I have the honor to be, very respectfully, your obedient servant,

JOHN W. NOBLE,
Secretary.

---

DEPARTMENT OF THE INTERIOR,
OFFICE OF INDIAN AFFAIRS,
Washington, January 13, 1892.

SIR: Referring to your communication dated December 30, 1891, in which you return the report of the Mission Indian Commission and accompanying papers, and direct that the draft of a bill be prepared authorizing the Secretary of the Interior to purchase or exchange certain lands, as recommended by the Commission, I have the honor to transmit herewith draft of a bill authorizing the purchase and exchange of lands as suggested.

It is thought proper in this report to refer at length to the facts upon which the request for this legislation is based.

The reservation near Banning, called "Morongo," was established by the executive orders of May 15, 1876, May 3, 1877, August 25, 1877, and March 9, 1881. It embraces all of township 2 north, range 1 east, all of township 2 south, range 2 east, and sections of said township, the commissioners report that this reservation, as a whole, embraces considerable worthless mountain land and adjoining land suitable for dry farming, such as grain, barley, etc., but the reservation Indians, that the Southern Pacific Railroad runs through the reservation, its officers claiming that by virtue of law it is entitled to the odd sections. Although these townships have not been surveyed, the odd sections have been determined by private survey.

W. L. Hathaway settled upon what was determined to be section 27, township 2 south, range 1 east, and developed considerable water on that section and in the cañon further up. He was ejected from this land by the Government after he had spent, as he claims, some $1,500. He insists that his ejectment was unlawful, as he was on railroad lands, and that he has a claim against the Government.

C. F. Jost and Margaret Jost, his wife, settled on section 25 some years ago, and made very valuable improvements, having good buildings, a good orchard, and having developed by means of ditches a large supply of water. They were also ejected, as they claim, unlawfully, and bring large claims against the Government for damages. The land occupied by them is right in the heart of what the Commission thinks

## MISSION INDIANS IN CALIFORNIA. 3

ought to be the Indian reservation, and is especially valuable because of the water developed upon it.

Richard Gird and John G. North, appreciating the great value of the water upon Hathaway's cañon and the cañon above the Protrero, procured an interest some years ago on sections 15 and 23, which are toward the upper end of the cañon, upon which there are valuable cienagas, and which were railroad lands. They also obtained rights to surplus water from Hathaway and from the Josts. They also took steps which resulted in their getting title to the east half of section 36, which they claimed to be a school section to which they could acquire title. Nearly all the houses, irrigating ditches, and very considerable orchards and vineyards of the Indians are on this section. The commissioners state that to lose this section would be an irreparable loss to the village. Gird and North also built irrigating ditches in the upper end of the cañon, established a field of alfalfa, put out an orchard, and spent considerable sums of money. They too were evicted, and commenced suit to recover damages and to determine the status of the lands. Their eviction was unlawful and their losses great, have now to wreak and actual litigation by the evicted parties.

The Commissioners say that, to state the situation briefly, they found the Indians as they are, acknowledged holders of lands they did not want or work, and that the whites insisted upon rights to lands that are absolutely essential to the Indians if a reservation is to be established there. The problem, therefore, was how, by means of the lands not wanted, to obtain the title to lands that were wanted, freed from all claims, and at the same time relieve the Government from threatened and actual litigation by the evicted parties.

They succeeded in making satisfactory arrangements with the railroad company, by which it was to relinquish all the lands needed by the Indians for other lands within the reservation not needed by the Indians. They also entered into an arrangement with Mr. M. C. O. Barker, who held powers of attorney from the several parties in interest, by which the parties referred to agree to relinquish all claims they may have in right or in equity to the lands needed, and to release and abandon all suits against the Government on account of damages claimed, and to accept other lands within the present reservation, they to have said lands conveyed to them by patent.

W. S. Hathaway is to relinquish all his claim to lands in township 2 south, range 1 east, and in township 2 south, range 2 east, all water rights of every kind, and all claims for damages by reason of the half or odd sections, and to receive a patent to the north half of section 27, township 3 south, range 1 east.

C. F. Jost and Margaret Jost are to exchange all their interest in and to lands and water rights of every sort and nature in township 2 south, ranges 1 and 2 east, and all claims for damages because of eviction and otherwise, they to receive in exchange therefor a patent to the west half of section 6, township 3 south, range 1 east.

Richard Gird and John G. North are to relinquish all their right in and to sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35, and 36 in township 2 south, range 1 east, and sections 6, 7, 18, 19, 30, and 31, in township 2 south, range 2 east, and to any and all damages growing out of eviction or otherwise. Said Gird and North to receive in exchange therefor patents for the south half of section 8, the northwest quarter of section 8, the east half of the northeast quarter of section 3, the northeast quarter of section 10, the southeast quarter of the northwest quarter of section 10, the east half of the southeast quarter of section 10, the northeast quarter of the southeast quarter of section 10,

EXHIBIT 13
-235-

section 18, and the north half of section 20, all in township 3 south, range 1 east. The land to be given Hatheway is 320 acres; to the Josts, 320 acres; and to Gird and North, 1,840 acres.

Wellwood Murray and Eliza E. Murray, the Commissioners report, are the owners of the north half of section 1, township 3 south, range 1 east, less 10 acres owned by Mrs. Toutain. They report that this land is also needed in the proposed reservation, as it is near the present Indian village and can be readily placed under water. They are willing to exchange it for the east half of section 10 in township 4 south, range 4 east, now under reservation, which land is not needed. As to the proposed exchange, the Commissioners say that to bring it about requires a larger area of land surrendered than they get for the Indians in return, but that in making the exchange the delays and hazards of litigation are avoided. They secure the release of large claims for damages growing out of what are claimed to be unlawful evictions, and secure to the reservation exceedingly valuable water rights. They state that if they were dealing with reference to their own property as individuals they would not hesitate for a moment in making the exchanges.

The right of the Southern Pacific Railroad Company is derived from the twenty-third section of the act of Congress approved March 3, 1871 (16 Stat., 573–579). While it is doubtful whether the right of the railroad company has already attached to the unsurveyed sections, and while the rights of the Indians might possibly be maintained, it may result that the right of the railroad would eventually attach, and that the issue of legal proceedings to establish the rights of the Indians would be doubtful and the contest long and expensive.

It is to be observed that as to some tracts at least there are separate and distinct interests involved. The railroad company has a claim for the land, and the individuals' claims for the value of improvements made and water rights developed on these lands, to which they hope to obtain title by purchase from the railroad company.

The Commissioners report that the former agency clerk and physician, Dr. Ferrabee, purchased from the State the N. ½ of the NW. ¼, the SE. ¼ of the NW. ¼, and the SW. ¼ of the NE. ¼ of Sec. 36, T. 8 S., R. 2 W., San Bernardino meridian, on which section the little water which the Indians in the Temecula Reservation have takes its rise. The purchase was made that the lands might be held for the use of the Indians. Dr. Ferrabee is willing to sell it to the Government for what it cost him, including taxes and interest. The Commission does not state the price, but expresses the opinion that the purchase can be made for not exceeding $500.

In the Los Coyotes Reservation certain entries were made before the reservation was established, May 6, 1889. Among others Chatham Helm has received a patent for the SW. ¼ of the NW. ¼ of Sec. 35, the SE. ¼ of the NE. ¼ and the N. ½ of the SE. ¼ of Sec. 34, T. 10 S., R. 4 E., San Bernardino meridian, and James Talley for the E. ½ of SW. ¼, and the SW. ¼ of the SW. ¼ of Sec. 26, and the NW. ¼ of the NW. ¼ of Sec. 35, T. 10 S., R. 4 E. San Bernardino meridian.

The Commissioners report that Helm's house stands in the narrowest part of the cañon; that his claim separates the Indians below him at San Ysidro from their pasturage lands above, as also from the village of San Ignatio; and that it is impossible for the Indians of San Ysidro to get their stock on to their pastures without passing through a gate, within a few feet of Helm's house, kept closed.

The Commission believes that if the claims of Helm and Talley could be extinguished, by purchase or otherwise, it would be a great advan-

tage to the Indians, removing an obstacle to the best use of their land and a serious obstacle in the way of their progress.

To do this will require about $2,500 for Helm's place and $2,000 for Talley's.

The purchases recommended by the Commission will require an appropriation not to exceed $5,000.

As the proposed exchange and purchases have been approved by you and by the President, subject to the necessary authorization by Congress, I trust that speedy action may be taken by that body in order that the matter may be fully adjusted and the question of the proper disposition to be made of the Mission Indians be at length finally and forever determined.

I inclose copies in duplicate of so much of the report of the Commission as relates to the proposed purchase and exchange of lands, and of the opinion of Assistant Attorney-General Shields in relation to the matter.

Very respectfully, your obedient servant,

T. J. MORGAN,
*Commissioner.*

The SECRETARY OF THE INTERIOR.

---

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE ASSISTANT ATTORNEY-GENERAL,
*Washington, December 29, 1891.*

SIR: I have the honor to acknowledge the receipt, by your verbal reference, of a communication from the Acting Commissioner of Indian Affairs, submitting the report of the Mission Indian Commission, duly appointed under the provisions of the act of Congress approved January 15, 1891 (26 Stat., 712), entitled "An act for the relief of the Mission Indians in California." By the first section of said act the Secretary of the Interior is required to appoint three Commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the State of California "upon reservations which shall be secured to them as hereinafter provided."

Section 2 provides:

That it shall be the duty of said Commission to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the President and Secretary of the Interior. They shall also appraise the value of the improvements belonging to any person to whom valid existing rights have attached under the public-land laws of the United States, or to the assignee of such person, where such improvements are situated within the limits of any reservation selected and defined by said commissioners, subject in each case to the approval of the Secretary of the Interior. In cases where the Indians are in occupation of lands within the limits of confirmed private grants, the Commissioners shall determine and define the boundaries of such lands, and shall ascertain whether there are vacant public lands in the vicinity to which they may be removed. And the said Commission is hereby authorized to employ a competent surveyor and the necessary assistants.

It is provided by section 3 that said commission, when it has completed its labors, shall make report thereof to the Secretary of the Interior, and if there be no objection he shall cause a patent to issue for each of the reservations approved by him, in favor of each band or village of Indians occupying such reservation, with a proviso, however—

That no patent shall embrace any tract or tracts to which *existing* valid rights have attached in favor of any person under any of the United States laws providing for

1891 Mission Indian Relief Act: Indians weren't nomadic so there was no intent to bring them in and provide land (and wtr) for agriculture; they were already there & intent was to secure the land they already occupying — to protect them from settlers - already had a [illegible] ...

6                    MISSION INDIANS IN CALIFORNIA.

the disposition of the public domain, unless such persons shall acquiesce in and accept the appraisal provided for in the preceding section in all respects, and shall thereafter, upon demand and payment of said appraised value, execute a release of all his and all their claim or claims to such land; in form, it may be, as provided for by such tract or tracts at any time thereafter. Any such person shall be permitted to exercise the same right to take land under the public land laws of the United States as though he had not made settlement on the lands embraced in said reservation.

(2) That in case any land shall be selected under the act to which any railroad company is or shall hereafter be entitled to receive a patent, such railroad company shall, upon releasing all claim and title thereto, and on the approval of the President and Secretary of the Interior, be allowed to select an equal quantity of other land of like value in lieu thereof at such place as the Secretary of the Interior may designate, and other land may be selected in lieu thereof, the selection of the same prior thereto by the Interior Department and copies thereof shall be filed with the proper Indian agent and be open to public inspection.

Sections 4 and 5 make provision for allotments of land in severalty to the Indians residing upon any of said reservations, and the issuance of trust patents therefor.

Section 6 provides—

That in cases where the lands occupied by any band or village of Indians are wholly or in part within the limits of any confirmed private grant or grants, it shall be the duty of the Attorney-General of the United States, upon request of the Secretary of the Interior, to defend the Indians in their right to possession of the same in the rights secured to them in the original grants from the Mexican Government, and in an act for the government and protection of the Indian passed by the legislature of the State of California, April twenty-second, eighteen hundred and fifty, and amending act for the same, of the United States Statutes, it shall be the duty of the United States district attorneys of the United States to take such measures, before the proper United States court of the district within which said reservation is situated, to protect and enforce the legal or equitable rights of any Indian or tribe of Indians in any of such lands.

The California act above referred to makes it the duty of justices of the peace in said State to set off a sufficient amount of land for the necessary wants of the Indians residing upon lands owned by white persons upon the application of such owners.

The Senate Committee on Indian Affairs, in 1885, reported that "This act has never been repealed nor, so far as we could learn, complied with in a single instance. To-day, it would be held of no value in the California courts." (See Senate Report No. 1522, Forty-eighth Congress, second session, p. 150.)

The Commission, in said report, recommends that twenty-six reservations, particularly describing each by name, be set apart in said State for the use of said Mission Indians. The Acting Commissioner of Indian Affairs recommends generally the approval of the selections of reservations as made by said Commission and, in addition thereto, that "lot 1 of section 30" selected as school land in lieu of deficiency in fractional down 18 south, range 7 east, embracing 31.85 acres, be set apart if the case may be, that can be satisfied with other land, the list containing said lot in township 18 south, range 7 west.

The fourteenth reservation, named "Temecula," the Commission recommends should be set apart, by executive order, and that a part of section 36, in town 8 south, range 2 west, should be purchased from the State's vendee at a price not to exceed $400. The Acting Commissioner approves of the selections of the reservation by the Commission, but says that the question of the purchase of section 36 "will require Congressional action."

The Commission states that the eighteenth reservation, named "San Jacinto," contains some odd-numbered sections within the granted limits of the Southern Pacific Railroad Company, and it recommends that the company be allowed to select other lands in lieu thereof, subject to this approval of the Secretary of the Interior. This recommendation receives the approval of the Acting Commissioner.

7                    MISSION INDIANS IN CALIFORNIA.

The Commission also recommends that the reservation named "Agua Caliente" be diminished to include certain sections named, and that the surplus land be restored to the public domain, "except the east half of section 10, which they recommend be exchanged with Dr. Murray and wife." The proposed selection is approved by the Acting Commissioner.

It appears that within the limits of the reservation named "Los Coyotes" there are several patented claims, and among them the claims of J. J. Warren and Harmon T. Helm, which the Commission recommends be "extinguished by purchase or otherwise, because it would be of great benefit to the Indians." The Commission states that said claims were acquired and patented before the reservation was set apart by executive order, but long subsequently to the time when these lands were in the possession of the Indians. The Acting Commissioner states that under the provision of said section 3, which prohibits the patenting of any tract as a reservation to which existing valid rights have attached, it will require an appropriation by Congress to pay the appraised value, should the owners be willing to dispose of their claims.

For the reservation named "Torres" the Commission selected among other tracts section 6, town 7 south, range 8 east, San Bernardino meridian, and certain odd-numbered sections within the grant to said railroad company. They recommend that in the reservation, and the Acting Commissioner expresses the opinion that, if the State should be allowed to select other lands in lieu of those within the reservation, and the Acting Commissioner expresses the opinion that, if the State should be allowed to select land in lieu of said section 36, but expresses a doubt whether this can be done without additional legislation by Congress.

It is stated by the Commission that on the private grant called "Pauma Ranch" there are three rancheries which have been occupied by Indians since prior to the treaty with Guadalupe Hidalgo, and that the original grant excepted these Indian holdings. The present owner has commenced suit to determine his rights, and the Commission caused the Indian holdings to be surveyed, and entered into negotiations with the present owner, Bishop Mora, who made a quitclaim deed of 250 acres of land, also an interest in certain lands during the lifetime of one Maja and his wife, "and water rights of all of the Indians." The Acting Commissioner recommends the acceptance of the deed and the approval of the selection.

The Commission reports that the "Morongo" Reservation, as at present established, contains much waste land and more agricultural land than is necessary for the Indians; that the Southern Pacific Railroad runs through the reservation, and the company claims the odd-numbered sections; that the company have settled upon some of the railroad lands, and have filed on the canon, in the canon, one of whom, W. S. Hathaway, settled upon a tract upon which private survey to be in section 27, town 2 south, range 1 east, and was ejected therefrom after having expended, as he alleges, about $1,500; that two others, O. F. Jost and Margaret Jost, settled upon section 26 some years ago and made valuable improvements, and they were also ejected; that Richard Gird and John G. North acquired an interest several years ago on section 15 and 23, near the upper end of the canon, and obtained rights of surplus water from said Hathaway and Josts; that, in addition, said Gird and North procured title to the east half of section 36, upon which are nearly all of the houses, irrigating ditches, and a considerable portion of the orchards and vineyards belonging to the Indians; that they also raised a field of alfalfa, and spent considerable money in making irrigating ditches in the upper end of the canon, and in setting out an orchard; that these parties have also been ejected from their claims and have

H. E. 84——50

## MISSION INDIANS IN CALIFORNIA. 8

commenced suit to recover damages and to determine their right to the lands and the water. The Commission reports that, finding the Indians in possession of lands they did not want, and the whites claiming lands that by no official to the well-being of the Indians if the reservation was to be established, and also desiring to relieve the Government of litigation and secure title to the lands claimed by the whites for the reservation, they wrote to the Commissioner of Indian Affairs on March 16, 1891, for instructions, and on April 1, same year, received a telegram to "go ahead," that subsequently they were advised by letter from the Indian Office that they had ample authority "to give up lands within the reservation not occupied or needed by the Indians in order to secure within the reservation, free from incumbrance, lands which are needed for the Indians." Thereupon the Commission secured a proposition in writing from the alleged attorney in fact of said Hathaway, Josts, Gird, and North to release their several interests in and to the lands claimed by them and the water rights and all claims for damages on account of said evictions upon condition that they receive patents from the United States for other lands in lieu thereof as follows: Hathaway one-half section, the Josts one-half section, and Gird and North patents for 1,840 acres, which proposition the United States is authorized to accept "at any time prior to the last day of January, 1892?"

The Commission further reports that in order to secure these various exchanges it is necessary to surrender a larger area than will be secured to the Indians.

The Acting Commissioner expresses the opinion that this ample authority in said act for the exchange of railroad lands, but the act does not contain any authority for the exchange of lands claimed by private parties, nor does he know of any law authorizing the issuance of patents to said parties as proposed by the Commission. He also says that the written instructions of April 1, 1891, to the Commission did not contemplate the issuance of patents for lands released from the reservation "except such as they might be entitled to under existing laws;" that "the act does not contain any authority for the exchange of school sections, but it is possible that this authority may exist under general laws," and he suggests that said proposition of said attorney in fact and the railroad company might be formally accepted, and afterwards Congress could be asked to authorize the exchange of the private and school lands.

By your said reference I infer that you wish my opinion whether the Executive Department is authorized to accept said propositions for the exchange of lands and issue patents therefor, and also whether any of the lands claimed by private parties are subject to settlement and entry prior to the issuance of patents for the same.

There can be no question, in my judgment, but that there is ample authority under the provisions of the third section of said act for the exchange of lands with the railroad company within the limits of said reservations, provided such company is or may be entitled to a patent for the lands claimed and releases its claim and title thereto. But I am unable to find any authority of law for an exchange of lands with or purchase of lands from private parties and the issuance of patents therefor. The duties of said Commission are expressly stated in the second section of said act.

Besides selecting the necessary reservations for said Indians, the Commission is specifically directed to appraise the improvements within the same belonging to any person, or his assignee who has acquired "valid existing rights * * * under the public land laws of the United States, * * * subject to the approval of the Secretary of the In-

## MISSION INDIANS IN CALIFORNIA. 9

terior," and "also to define the boundaries of the lands occupied by Indians within the limits of confirmed private grants, and also to determine whether there are vacant public lands near, to which the Indians can be removed.

It thus appears not only that there is no express statutory authority for the exchange of lands claimed by private parties within the limits of the reservations selected by said Commission, but explicit instructions are given in said act for the appraisal by said Commission of the improvements of persons having "valid existing rights" therein, subject, however, to the approval of the Secretary of the Interior.

It is well settled, I think, that Congress alone has the power of the disposal of the property of the United States, and that the title to public land can pass only by virtue of some law of Congress. (Constitution of the United States, Art. IV, Sec. 3, clause 2; United States v. Grafiot, 14 Peters, 526; United States v. Fitzgerald, 15 Peters, 128.)

While the Executive Department can not patent lands from the public domain in exchange for those claimed by private parties, unless expressly authorized so to do by law, yet the President may reserve from sale and set apart for public uses tracts of land belonging to the United States. In Grisar v. McDowell (16 Wall., 364–381), the Supreme Court said:

From an early period in the history of the Government, it has been the practice of the President to order from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses.

And, in like manner, very many of the Indian reservations have been set apart, by executive order, sometimes by the President, under his own hand, and occasionally by the Secretary of the Interior, whose acts are presumed to be by the direction of the President. (Wilson v. Jackson, 18 Peters, 498.)

From the papers referred to, it is quite impossible to determine what rights the parties represented by said attorney in fact have to the lands proposed to be exchanged. It is true that said the Commission reports that Gird and North procured "an interest some years ago on sections 15 and 23, * * * which were railroad lands," but it does not appear when or to what extant said interest was obtained. Besides, their proposition of relinquishment of their interest in the sections described does not state the extent of their interest therein or how they acquired any "valid existing rights" to the same. Moreover, an examination of the lands proposed for exchange by the railroad company shows that at no place in said section is the same as said attorney in fact proposes to exchange, namely, section Ej, township 2 south, range 2 east, San Bernardino meridian.

The special counsel for the Indians, Mr. Lewis, in a letter dated December 7, 1891, concedes the right of the company to the lands claimed by it and urges the acceptance of its proposition before January 1, 1892, so that the basis for the several actions pending against "Preston and Moronga," and others affected, may be destroyed.

The right of said company is derived from the twenty-third section of the act of Congress approved March 3, 1871 (16 Stat., 573–579), which provides:

That for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near the Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado River, with the same rights, grants, and privileges, and subject to the

EXHIBIT 13
- 238 -

10

## MISSION INDIANS IN CALIFORNIA.

same limitations, restrictions, and conditions as were granted to said Southern Pacific Railroad Company of California, by the act of July twenty-seven, eighteen hundred and sixty-six: *Provided*, That this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or any railroad company.

Section 18 of the act of July 27, 1866 (14 Stat., 292–299), authorizes the Southern Pacific Railroad Company to connect with the Atlantic and Pacific Railroad and to have "similar grants of land, subject to all the conditions and limitations herein provided." By section 3 of the same act it was agreed (*inter alia*) that "the United States shall extinguish as rapidly as may be consistent with the public welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act and acquired in the donation to the road named in the act." Section 3 grants to said company every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, on the line of said road, and in case it shall appear that the United States have, when the line or route of said railroad whenever it, passes as said company may adopt, through the public lands, that any of said alternate sections or any part thereof shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands, designated by odd numbers, shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections; and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is designated by a plot thereof filed in the office of the Commissioner of the General Land Office.

If the Mission Indians were in actual occupancy of lands at the date of the definite location of said road, it is very doubtful if the company acquired any right of possession to the land so long as it is so occupied. And if there were any other claims under the land laws of the United States which could be perfected, they would serve to except the land from the operation of the grant to acquire a settlement right by entering upon lands ment, no person can acquire title to lands in the actual use and occupancy of Indians.

This was very expressly ruled in the case of the Mission Indians v. Walsh (12 L. D., 670), on review, 13 L. D., 269.

Hence in order to determine whether the company has a legal right to the odd sections within the limits of its grant and also within the limits of the reservation proposed to be selected, it should clearly appear that they were, in the language of the granting act, "free from pre-emption or other claims or rights" at the date of the special commission not shown by the report of the Commissioner. I am, presumably, he and the Commissioner are satisfied on that point. I am, however, clearly of the opinion, and approval of said propositions for the warrant of law authorizing the issuing patents to private individuals, exchange or purchase of lands, under the provisions of the act of February 28, 1891 (26 Stat., 796), the State, if it has not disposed of the school sections, may select other lands in lieu thereof, and that the President may, if he deemed necessary, withdraw the lands involved herein from settlement and entry until Congress shall grant the authority to purchase, exchange, and issue to the approval of those reservations selected that I see no objectionable claims.

Inasmuch, however, as additional legislation is necessary to authorize the Executive Department to purchase and exchange lands as recommended by said Commission, the Commissioner of Indian Affairs should be directed to prepare the draft of a bill to be submitted by the

President to Congress, authorizing the Secretary of the Interior to purchase or exchange of the lands as I recommend.

The papers submitted are herewith returned.

Very respectfully,

GEO. H. SHIELDS,
*Assistant Attorney-General.*

The SECRETARY OF THE INTERIOR.

## EXTRACT FROM REPORT OF MISSION INDIAN COMMISSIONERS.

The SECRETARY OF THE INTERIOR.

(Through the Commissioner of Indian Affairs.)

The undersigned Mission Indian commissioners most respectfully report as follows:

As soon after their appointment as possible, all the members of the Commission went to California and proceeded to make themselves as familiar with the condition of the Indians and their reservations as possible and to have many surveys made. We have found a good many difficulties in the way of a satisfactory solution of the questions submitted to us. White man, in many instances, had encroached upon the Indian lands, especially upon those within the lines of the railroad grant, within the reservations near the line of its railroad. Settlers had moved on to these railroad lands and made improvements and developed water rights, and some of them had been ejected by the military and had brought suit against the Government or against the railroad and the Indians attempting to adjust all these differences, and in some cases have succeeded, as will appear more in detail in our recommendations in regard to individual reservation.

It is our judgment that if our recommendations are adopted it will result in a reasonably comfortable adequate home for every Mission Indian who cares to avail himself of the provision made for him on these reservations.

### MORONGO.

The reservation near Banning, called Morongo, has given the Commission much trouble.

The reservation, as now constituted, embraces considerable worthless mountain land, and considerable worthless small and desert land. It also has in its borders now more agricultural land suitable for dry farming, such as growing barley, than is needed by the Indians. Indeed, because the Indians neither occupied nor worked some of the best agricultural land has been devoted to their use by some of the Indians, and some should have been devoted by him, as we understand it, for the benefit of the Indians.

The Southern Pacific Railroad runs through this reservation. Its officers claim that by virtue of its grant it is entitled to all the odd sections of land within this reservation, nearly all at their value, however, of the railroad's odd sections of land within this reservation, nearly all at their value, on about 5 miles long and of considerable breadth. There is a nice stream of water flowing from two general springs, Potrero. This is the mouth of a canon about 5 miles long and of considerable breadth. There is a nice stream of water flowing from two general springs, and through considerable breadth. There is a nice stream of water flowing from two general springs, one of which is a little ways up the canon, and the other at the canon farther up. We had of land near the canon, but the small and only canon called Hathaway's canon, could be secured to the Indians, it would, make as desirable location for them as their most earnest friend could wish.

Unfortunately for the Indians, whites have seen how valuable the land with the water is, and have settled upon some of the railroad lands in the canon and have mined to-be section 27 in township 2 south, range 1 east, San Bernardino meridian, and developed considerable water on what, by private survey, is determined to-be section 27 in township 2 south, range 1 east, San Bernardino meridian, which especially needs relief, as his land open, as he claims, in July, 1886, inside that his ejectment was unlawful, so he was on railroad lands, and that he has a claim against the Government. C. F. Jost and Margaret Jost, his wife, settled on section 26 some years ago and made very valuable improvements, having good buildings, a good orchard, and having developed by private survey, which is a lower survey, they were also special, they claim, unlawfully, and bring a larger claim

EXHIBIT 13

- 239 -

## 12

## MISSION INDIANS IN CALIFORNIA.

## 13

## MISSION INDIANS IN CALIFORNIA.

ALBERT K. SMILEY,
JOSEPH B. MOORE,
CHARLES C. PAINTER.

EXHIBIT 13
- 240 -

## 14    MISSION INDIANS IN CALIFORNIA.

A BILL to authorize the Secretary of the Interior to carry into effect certain recommendations of the Mission Indian commission, and to issue patents for certain lands.

Whereas the act approved January twelfth, eighteen hundred and ninety-one, entitled "An act for the relief of the Mission Indians in the State of California," made it the duty of the commissioners therein authorized to be appointed to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements;

And whereas said commissioners were authorized to appraise the value of the improvements belonging to any person to whom valid existing rights had attached under the public-land laws of the United States, where such improvements were situated within the limits of any reservation selected by the commissioners, subject to the approval of the Secretary of the Interior:

And whereas it was further provided in said act that, in case any land should be selected to which any railroad company should be entitled to receive a patent, such railroad company should, upon releasing all claim and title thereto and on the approval of the Secretary of the Interior, be allowed to select an equal quantity of other land in lieu thereof:

And whereas no provision was made whereby lands claimed by private persons through titles derived or sought to be derived from railroad companies or other sources than the United States could be so released and exchanged:

And whereas the commissioners appointed under said act have reported, among other things, that certain lands are in the occupation of Indians and are needed for their use, which certain persons have improved, and on which they have developed valuable water rights, claiming title under the railroad company, and that such persons are willing to exchange said lands for other lands heretofore reserved for the use of the Mission Indian, but which lands are no longer needed for such purpose;

And whereas the recommendation of said commissioners have been approved by the President of the United States, and thereupon it may become necessary to purchase, in some instances, certain lands and improvements thereof as relates to the purchase of lands from and exchange of lands with private individuals, which is also approved subject to the condition that Congress shall authorize the same: Therefore,

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Interior be, and he hereby is, authorized and empowered to carry into effect the recommendations of the said Mission Indian commissioners relating to the exchange of lands with private individuals, and to such individuals in exchange for lands and improvements released and relinquished for the use of the Indian.

Sec. 2. That the sum of five thousand dollars, or so much thereof as may be necessary, is hereby appropriated, out of any money in the Treasury not otherwise appropriated, to enable the Secretary of the Interior to purchase certain lands and improvements, for the use and benefit of said Mission Indians, as approved by said Secretary and the President.

REDLANDS, CAL., November 20, 1891.

DEAR SIRS: Understanding that it is desired by you that in the formation of the reservation about to be made at Banning the north half of section 11 in township 3 south, range 1 west, San Bernardino meridian, as well as the whole, exchange this parcel of land (less 10 acres already deeded near the northwest corner) being 310 acres, for the east half of section 10, in township 4 south and 4 east in San Bernardino meridian, and situate near Agua Caliente No. 2, reservation in San Diego county, Cal., and to enable the Commissioners to make such exchange, and to possibly secure the remaining 10 acres, we agree to pay the sum of $100 to the Commissioners on demand, or to the Secretary of the Interior.

For T. M. PARSONS.

WELWOOD MURRAY,
ELZA. E. MURRAY.

Being duly authorized.

THE UNITED STATES INDIAN COMMISSIONERS.

---

## MISSION INDIANS IN CALIFORNIA.    15

EXECUTIVE MANSION,
December 29, 1891.

The report of the Mission Indian Commission appointed under the act of January 12, 1891 (26 Stat., 712), is hereby approved, except so much thereof as relates to the purchase of lands from and exchange of lands with private individuals, which is also approved if authorized by Congress shall authorize the same.

All of the lands recommended in said report are hereby withdrawn from settlement and entry until patents shall have issued for said selected reservations, and until the recommendation of said Commission shall be fully executed, and by the proclamation of the President of the United States, the lands or any part thereof shall be restored to the public domain.

BENJ. HARRISON.

DEPARTMENT OF THE INTERIOR,
Washington, D. C., December 29, 1891.

Under the act of Congress and as above provided.
Approved.

JOHN W. NOBLE,
Secretary.

DEPARTMENT OF THE INTERIOR,
Washington, December 30, 1891.

SIR: I return herewith the report of the Mission Commission and accompanying papers received with your communication of the 19th instant.

By the order of the President of the 28th instant, you will see that the same is approved, except so much thereof as relates to the purchase or exchange of lands with private individuals, which is also approved subject to the condition that Congress shall authorize the same, and that all the lands mentioned in said report are withdrawn from settlement and entry until patents shall have issued for said selected reservations, and until the recommendations of said Commission shall be fully executed, and by the proclamation of the President the lands or any part thereof shall be restored to the public domain.

The above action has this day been communicated to Mr. Painter by telegraph, with directions to advise the Commission and parties interested.

I also inclose herewith a communication of 29th instant from the Assistant Attorney-General for this Department to which the report was referred, and have to direct that a draft of a bill be prepared authorizing the Secretary of the Interior to purchase or exchange the lands as recommended.

You will also please prepare a list of the lands mentioned in said report of the Commission, which is to be withdrawn by the order of the President for file in the General Land Office.

This list should be sent without delay.

Very respectfully,

JOHN W. NOBLE,
Secretary.

THE COMMISSIONER OF INDIAN AFFAIRS.

TEMECULA.

This reservation, as created by executive order, comprised sections 26, 27, 28, 34, and 35, in township 8 south, range 2 west, San Bernardino meridian. Owing to an almost entire lack of water, the land was utterly unfit to be set apart as a reservation. The former agency, Dr. Francisco, who lives alone and is willing to sell it to the Government for what it cost him, which was made by this wrinkle.

The Indians being unwilling to remove, the Commission recommends the setting apart of these sections as a permanent reservation for them, believing that with such crops as they will be able to raise, and the wages they can earn as laborers, they can make a comfortable living. The little water they have has the side of the hills in section 36, 160 acres of which ought to be added to the selections the Commission has made.

Dr. Francisco, the former agent, owns a small tract, and Physician, Dr. Francisco, is willing to sell it to the Government for what it cost him, including the land added to the reservation, and the Commission recommends that it be purchased and added to the reservation.

16 MISSION INDIANS IN CALIFORNIA.

This land is described as follows:

The north half of the northwest quarter, the southeast quarter of the northwest quarter, and the southwest quarter of the northeast quarter of section 36, township 8 south, range 2 west, San Bernardino meridian. This purchase can be made, we believe, for a sum not exceeding $500.

There are at this place about 160 Indians, being a remnant of those who were ejected from the Temecula Valley some years ago.

The Commission recommends that the Government pipe the water from the above mentioned quarter sections to the schoolhouse, and to a central point of the village, under the supervision of the Indian agent, at an estimated cost of $2,000.

## LOS COYOTES.

The reservation of Los Coyotes was set apart by executive order.

It consists of section 3 and fractional section 4, in township 11 south, range 4 east, San Bernardino meridian, and all of township 10 south, range 4 east, San Bernardino meridian, except the following described lands: The south half of the northwest quarter and the southwest quarter of the northeast quarter and the northeast quarter of the southwest quarter of section 20; which has been patented to Hiram Keyes. Also, the west half of the southwest quarter of section 20, and the southeast quarter of the southeast quarter of section 19, and the northeast quarter of the northeast quarter section 30, patented to Eugene Paumenberg.

Also the northwest quarter of southeast quarter and the fractional southwest quarter, section 30, which is patented to one Helm. Also the north half of northeast quarter, section 31, and the north half of northwest quarter, section 32, to Jacob Jora. Also the east half of the northeast quarter and the southwest quarter of the northeast quarter and the northwest quarter of the southeast quarter, section 26, patented to Robert Fain. Also the east half of southwest quarter and the southwest quarter of southwest quarter, section 26, and the northwest quarter of northwest quarter, section 35, patented to James Tally. Also the southwest quarter of the northwest quarter, section 35, and the southeast quarter of northeast quarter and the north half of southeast quarter, section 34, patented to Chat. Helm. Also parts of sections 31, 32, 33, south of the boundary line of the Rancho San José del Valle.

These entries were made before the reservation was set apart, but long subsequent to the time when the lands were in possession of the Indians, and the injustice and cruel wrongs inflicted upon them and the annoyances to which they are still subjected by one, especially of the settlers, give good cause to the Indians for bitter complaint. Chatham Helm was the first white settler in this cañon, and, unfortunately, his filings were allowed and his claim perfected.

His house stands in the narrowest part of the cañon, and his claim separates the Indians below him at San Ysidro from their pasturage lands above, as also from the Indian village of San Ignatio, on the eastern boundary of the township. It is impossible for the Indians of San Ysidro to get their stock on to their pastures without passing through a gate placed within a few feet of Helm's house, and kept closed. This he will not suffer them to do. He has been a great annoyance to the Indians also in regard to their use of water. The survey the Commission caused to be made discovered the fact that he was claiming a 40-acre piece belonging to the Indians, recovering which they are enabled to put the entrance to their ditch some distance farther up, giving them some relief in the matter of irrigation.

The Commission believes that if the claims of Helm and Tally could be extinguished by purchase or otherwise, it would be a great advantage to these Indians, removing an obstacle to the best use of their land, and a serious obstacle in the way of their progress. To do this would require about $2,500 for Helm's place and $2,000 for Tally's.

There are in all about 150 Indians in the two villages, which are 5 or 6 miles apart. They have sufficient good arable land for their agricultural needs, which, with their grazing lands, if made accessible would give them ample support.

There is no school at either village, and few of the children go from home to school.

The Commission recommends the setting apart permanently for them the above described land, and deems the extinguishment of Helm's and Tally's claim as of great importance to the Indians. The holdings of the other settlers do not block up the cañon as do those of these two men, more especially that of Helm.

MISSION INDIANS IN CALIFORNIA. 17

I, C. O. Barker, acting under and in pursuance of a power of attorney duly executed by Walter S. Hathaway on the 3d day of March, 1891, do hereby agree to deliver to the United States or its authorized representatives a full and complete relinquishment to all the rights, title, and interest of said W. S. Hathaway to any and all land or lands lying within the townships known and described as townships 2 south, ranges 1 and 2 east, San Bernardino meridian, and more especially to that portion locally known as the Hathaway Cañon, and I further agree to furnish to the United States or its authorized representatives a full and complete relinquishment of all the rights, title, and interest in and to any and all of the water in said Hathaway Cañon and any and all water, either from creek, stream, spring, or cieniga rising upon or flowing through or over any of the above-described land; and I further agree to furnish a full and complete relinquishment of any and all claims that the said W. S. Hathaway may have either in law or equity against the United States or any agent thereof for having been evicted from certain unsurveyed lands, to wit, the unsurveyed portion of township 2 south, range 1 east, San Bernardino meridian, ascertained by private survey to be section 27, or for any damage that the said Hathaway may have suffered by reason of the destruction of his improvements and the loss of the use of the land, for and in consideration of a good and sufficient patent, without cost to said Hathaway, for the land known and described as the north half of section 14, township 3 south, range 1 east, San Bernardino meridian, and acting in pursuance of an agreement entered into on the 6th day of August, 1889, between C. F. Jost and Margrett Jost, his wife, parties of the first part, and C. O. Barker, party of the second part. I further agree to deliver to the United States a full and complete relinquishment of all right, title, interest, or claim of the said C. F. Jost and Margrett Jost, his wife, to any and all lands lying within townships 2 south, ranges 1 and 2 east, San Bernardino meridian, and to any right, title, or interest to any and all of the water, either from creek, stream, spring, or other water source, rising on or flowing through or over any of the land in the above-described township; and of any and all claims for damages that the said C. F. Jost and Margrett Jost may have either in law or in equity against the United States or any of its agents for eviction from any portion of the above-described lands, or for any loss by reason of the destruction of their improvements, or the loss of the use of any portion of the above-described lands. For and in consideration of a patent for the west one-half of section 6, township 3 south, range 1 east, San Bernardino meridian, to be issued by the United States to said C. F. Jost and Margrett Jost.

And acting under and in pursuance of a power of attorney, executed on the 5th day of September, 1889, by Richard Gird and John G. North, I do hereby further agree to furnish a full and complete relinquishment to all the right, title, and interest of the said Richard Gird and John G. North to any and all lands lying in what is locally known as the Hathaway Cañon in township 2 south, ranges 1 and 2 east, San Bernardino meridian, including sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35, and 36, in township 2 south, range 1 east, and sections 6, 7, 18, 19, 30, and 31, in township 2 south, range 2 east, San Bernardino meridian, and to all the right, title, and interest of said Richard Gird and John G. North to any and all water from any creek, stream, spring, cienega, or other water source whatsoever, rising on or flowing through or over any of the above-mentioned lands, and of any and all claims against the United States or any of its agents for damages for eviction from any portion of the hereinbefore-described lands, or for the damage to or destruction of improvements and loss of use of land.

For and in consideration of a patent or patents to be issued to the said Richard Gird and John G. North, for the south half of section 8, the northwest quarter of section 8, the east half of northeast quarter of section 8, the northeast quarter of section 10, the southeast quarter of northwest quarter of section 10, the east half of southeast quarter of section 10, the northwest quarter of the southeast quarter of section 10, all of section 18, and the north half of section 20, all in township 3 south, range 1 east, San Bernardino meridian. And for the further consideration that the Morongo Reservation shall be confined to sections 13, 14, 23, 24, 25, 26, 35, and 36, and the east half of sections 15, 22, 27, and 34, in township 2 south, range 1 east, San Bernardino meridian, and section 31 in township 2 south, range 2 east, section 6, in township 3 south, range 2 east, and the north half of sections 1 and 2 in township 3 south, range 1 east, San Bernardino meridian. And I do further agree that the United States or its authorized representatives shall have the option of accepting this offer at any time prior to the 1st day of January, 1892.

C. O. Barker.

For a valuable consideration I hereby consent that sections 10, 12, west half 22, west half section 34, all in town 2 south, range 1 east, San Bernardino meridian, and sections, 18 and 30 in town 2 south, range 2 east, San Bernardino meridian, may be included in the Morongo Reservation.

December 3, 1891.

C. O. Barker.

H. Ex. 96——2

EXHIBIT 13
242

52D CONGRESS, } HOUSE OF REPRESENTATIVES. { EX. DOC.
1st Session.   }                              { No. 97.

# ATTORNEY FOR THE MISSION INDIANS.

## LETTER

FROM

## THE ACTING SECRETARY OF THE TREASURY,

TRANSMITTING

*A copy of a letter from the Attorney-General, and its inclosures, submitting an estimate for an appropriation to continue the employment of a special attorney for the Mission Indians of southern California.*

JANUARY 26, 1892.—Referred to the Committee on Indian Affairs and ordered to be printed.

TREASURY DEPARTMENT,
*January 25, 1892.*
SIR: I have the honor to transmit herewith, for the consideration of Congress, copy of a communication from the Attorney-General, of the 21st instant, and of its inclosures, submitting an estimate for an appropriation of $2,500 to enable the Attorney-General to continue the employment of a special attorney for the Mission Indians of southern California, upon the recommendation of the Secretary of the Interior.
Respectfully yours,
O. L. SPAULDING,
*Acting Secretary.*
The SPEAKER OF THE HOUSE OF REPRESENTATIVES.

DEPARTMENT OF JUSTICE,
*Washington, D. C., January 21, 1892.*
SIR: Inclosed is a copy of a letter of January 19, 1892, from the Secretary of the Interior, transmitting a copy of a letter of January 14, 1892, from the Commissioner of Indian Affairs, and of its inclosures. They relate to an estimate of an appropriation for employing a special attorney for the Mission Indians of Southern California.
In the Indian act, August 19, 1890, an appropriation of $2,500 was made for this purpose. Of this appropriation there is available $620.15, the Commissioner of Indian Affairs asks that steps be taken with a view of obtaining from Congress an additional appropriation of $2,500 $3,000 to continue the service,

---

18      MISSION INDIANS IN CALIFORNIA.

STATE OF CALIFORNIA, *County of San Bernardino, ss:*
On this 11th day of November, in the year 1891, before me, D. W. Herlihy, a notary public in and for said county, residing therein, duly commissioned and sworn, personally appeared C. O. Barker, known to me to be the person described in, whose name is subscribed to, and who executed the within instrument, and he acknowledged to me that he executed the same.
In witness whereof I have hereunto set my hand and affixed my official seal, the day and year in this certificate first above written.
[SEAL.]
D. W. HERLIHY,
*Notary Public.*

This acknowledgment covers changes in contract in five different instances in regard to boundaries of said land.

EXHIBIT 13
- 243 -

Exhibit 14



PCT001 | TOTAL POPULATION [1]

Universe: Total population
Census 2000 American Indian and Alaska Native Summary File (AIANSF) - Sample Data

NOTE: Data based on a sample. For information on confidentiality protection, sampling error, nonsampling error, definitions, and count corrections see
http://www.census.gov/prod/cen2000/doc/aiansf.pdf

**Population Group: Total population**

|  | Agua Caliente Reservation, CA |
|---|---|
| Total | 21,357 |

EXHIBIT 14
- 244 -

Exhibit 15

U.S. Census Bureau



PCT1 | TOTAL POPULATION

Universe: Total population
2010 Census American Indian and Alaska Native Summary File

NOTE: For information on confidentiality protection, nonsampling error, and definitions, see http://www.census.gov/prod/cen2010/doc/aiansf.pdf. The American Indian and Alaska Native Summary File has a population threshold of 100. Data are available only for the population groups having a population of 100 or more of that specific group within a particular geographic area.

**Population Group: Total population**

| | Agua Caliente Indian Reservation and Off-Reservation Trust Land, CA |
|---|---|
| Total | 24,781 |

Source: U.S. Census Bureau, 2010 Census.

EXHIBIT 15
- 245 -

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

1

# PROOF OF SERVICE

2     At the time of service I was over 18 years of age and not a party to this

3  action.  My business address is Best Best & Krieger LLP, 2001 N. Main Street,

4  Suite 390, Walnut Creek, California 94596.  On October 21, 2014, I served the

5  following document(s):

6

7  **DEFENDANT  DESERT  WATER  AGENCY'S
   REQUEST FOR JUDICIAL NOTICE**

8

9  by transmitting via electronic transmission to the person(s) at the e-mail address(es)

10  set forth below by way of filing the document(s) with the U.S. District Court,

11  Central District of California. Federal Rule of Civil Procedure § 5(b)(2)(E)

12

13  Catherine F. Munson, Esq.          Pro Hac Vice Attorneys for Plaintiff
    Kilpatrick Townsend & Stockton LLP   Agua Caliente Band of Cahuilla
14  607 Fourteenth Street NW, Suite 900  Indians
    Washington, DC 20005
15

16
    Tel:  (202)-508-5844
17  Fax: (202) 585-0007
    cmunson@kilpatricktownsend.com
18  kharper@kilpatricktownsend.com
19

20  Thierry R. Montoya                 Attorneys for Plaintiff Agua
    David J. Masutani                  Caliente Band of Cahuilla Indians
21  AlvaradoSmith, APC
    633 W. Fifth Street
22  Suite 1100
    Los Angeles, CA 90071
23

24
    Tel: (213) 229-2400
25  Fax: (213) 229-2499
    dmasutani@alvaradosmith.com
26

27

28

01358.00008\9366804.1                    - 1 -                      PROOF OF SERVICE

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

Heather Whiteman Runs Him, Esq.            Pro Hac Vice Attorneys for Plaintiff
Steven C. Moore, Esq.                       Agua Caliente Band of Cahuilla
Native American Rights Fund                 Indians
1506 Broadway
Boulder, CO 80302

Tel:  (303) 447-8760
Fax: (303) 442-7776
heatherw@narf.org
smoore@narf.org

Mark H. Reeves, Esq.                        Pro Hac Vice Attorneys for Plaintiff
Kilpatrick Townsend & Stockton LLP          Agua Caliente Band of Cahuilla
Enterprise Mill                             Indians
1450 Greene St., Suite 230,
Augusta, GA  30901

Tel:  (706) 823-4206
Fax: (706) 828-4488
mreeves@kilpatricktownsend.com

Gerald D. Shoaf, Esq.                       Attorney for Defendants
Steven B Abbott, Esq.                       Coachella Valley Water District,
Redwine & Sherrill                          Franz De Klotz, Ed Pack, John
1950 Market Street                          Powell, Jr., Peter Nelson, Debi
Riverside, CA 92501-1704                    Livesay

Tel:  951-684-2520
Fax: 951-684-9583
sabbott@redwineandsherrill.com
gshoaf@redwineandsherrill.com


          Executed on October 21, 2014, at Walnut Creek, California.


                    /s/ Monica Brozowski
                    Monica Brozowski