1  CATHERINE F. MUNSON (D.C. Bar No. 985717, admitted *pro hac vice*)
   CMunson@kilpatricktownsend.com
2  MARK REEVES (GA Bar No. 141847, admitted *pro hac vice*)
   MReeves@kilpatricktownsend.com
3  KILPATRICK TOWNSEND & STOCKTON, LLP
   607 14th Street, N.W.
4  Washington, D.C. 20005
   Tel:  (202) 508-5800; Fax:  (202) 508-5858
5
   STEVEN C. MOORE (CO Bar No. 9863, admitted *pro hac vice*)
6  Smoore@narf.org
   HEATHER WHITEMAN RUNS HIM (NM Bar No. 15671, admitted *pro hac vice*)
7  HeatherW@narf.org
   NATIVE AMERICAN RIGHTS FUND
8  1506 Broadway
   Boulder, CO 80302
9  Tel:  (303) 447-8760; Fax:  (303) 443-7776

10 DAVID J. MASUTANI (CA Bar No. 172305)
   DMasutani@alvaradosmith.com
11 ALVARADOSMITH, APC
   633 W. Fifth Street, Suite 1100
12 Los Angeles, CA 90071
   Tel:  (213) 229-2400; Fax:  (213) 229-2499
13

14 Attorneys for Plaintiff
   Agua Caliente Band of Cahuilla Indians
15
                    **UNITED STATES DISTRICT COURT**
16
          **CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**
17

| | |
|---|---|
| 18  AGUA CALIENTE BAND OF CAHUILLA INDIANS, | Case No.:   ED CV 13-00883-JGB-SPX |
| 19 | Judge:      Jesus G. Bernal |
| 20          Plaintiffs, | |
| 21  v. | **AGUA CALIENTE BAND OF CAHUILLA INDIANS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE I ISSUES** |
| 22  COACHELLA VALLEY WATER DISTRICT, et al. | |
| 23          Defendants. | |
| 24 | Hearing Date:   February 9, 2015 |
| 25 | Time:           9:00 A.M. |
|    | Courtroom:      1 |
| 26 | |
| 27 | Action Filed:   May 14, 2013 |
| 28 | |

# TABLE OF CONTENTS

Page

FACTUAL BACKGROUND...................................................................................1

I.      The Agua Caliente Reservation was carved out of land that Agua
        Caliente has continuously and exclusively occupied. .....................................1

II.     The United States established the Reservation to provide a homeland. .........2

III.    The aquifer has been and continues to be in overdraft....................................4

ARGUMENT & ANALYSIS..................................................................................5

I.      Agua Caliente has a federally reserved right to groundwater. ........................5

        A.      Under *Winters* and its progeny, Agua Caliente acquired reserved
                water rights at the time of the Reservation's establishment. ...............6

                1.      Winters and Arizona lay the foundation of the Winters
                        doctrine. ....................................................................................6

                2.      Subsequent case law affirms and clarifies the Winters
                        doctrine. ....................................................................................9

                        a.      Winters rights are federal rights not subject to state
                                law. .................................................................................9

                        b.      Winters rights are permanently established and fully
                                vested as of the date of a reservation's establishment....12

                        c.      Winters rights allow for changing and expanding
                                tribal uses, cannot be lost through nonuse, and
                                necessarily apply to water beyond what was being
                                used at the reservation's creation. ...............................13

                        d.      Winters rights apply to all sources of water, including
                                groundwater....................................................................14

        B.      The Agua Caliente Reservation was intended as a permanent
                homeland for the Agua Caliente. ......................................................16

II.     Agua Caliente also has aboriginal rights to groundwater. ............................18

        A.      Federal law recognizes a preexisting right of tribal aboriginal title
                that includes groundwater. ...............................................................18

        B.      The undisputed facts show that the Agua Caliente possess
                aboriginal title to groundwater in the Coachella Valley. ...................19

        C.      Agua Caliente's aboriginal rights to groundwater exist today. ..........20

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

i

1

2

1.  The 1851 Act did not extinguish Agua Caliente's aboriginal
    rights to groundwater. ............................................................20

2.  Assuming, arguendo, that Agua Caliente's aboriginal rights
    to groundwater were extinguished by the 1851 Act, it
    subsequently re-established aboriginal title. ............................23

CONCLUSION ....................................................................................23

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

# TABLE OF AUTHORITIES

Page

**Cases**

*Alabama-Coushatta Tribe of Tex. v. United States*
2000 WL 1013532 (Fed. Cl. June 19, 2000)..................................................19

*Arizona v. California*
373 U.S. 546 (1963) ................................................................................passim

*Barker v. Harvey*
181 U.S. 481 (1901) ........................................................................................21

*Cappaert v. United States*
426 U.S. 128 (1976) ...........................................................................5, 12, 14

*Chunie v. Ringrose*
788 F.2d 638 (9th Cir. 1986) ..........................................................................22

*Colville Confederated Tribes v. Walton*
647 F.2d 42 (9th Cir. 1981)......................................................................passim

*Colville Confederated Tribes v. Walton*
752 F.2d 397 (9th Cir. 1985)...................................................................5, 9, 13

*Confederated Salish & Kootenai Tribes of the Flathead Reservation v. Stults*
59 P.3d 1093 (Mont. 2002) ........................................................................6, 16

*Confederated Tribes of Warm Springs Reservation v. United States*
177 Ct. Cl. 184 (1966) ....................................................................................20

*Cramer v. United States*
261 U.S. 219 (1923) ..........................................................................19, 22, 23

*In re Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*
989 P.2d 739 (Ariz. 1999)........................................................................passim

*In re the Gen. Adjudication of All Rights to Use Water in the Big Horn River Sys.*
753 P.2d 76 (Wyo. 1988) ...............................................................................16

*Mandel v. Bradley*
432 U.S. 173 (1977) ........................................................................................22

*Mitchel v. U.S.*
34 U.S. 711 (1835) ..........................................................................................19

*Monell v. Dep't of Soc. Servs.*
436 U.S. 658 (1978) ........................................................................................22

*Montana v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*
712 P.2d 754 (Mont. 1985) ..............................................................11, 12, 19

*Native Village of Eyak v. Blank*
688 F.3d 619 (9th Cir. 2012)...........................................................................19

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

i

*New Mexico v. Aamodt*
    618 F. Supp. 993 (1985).................................................................................19

*Preckwinkle v. CVWD*
    No. 05-cv-626 (C.D. Cal. Aug. 30, 2011)......................................................15

*Sac and Fox Tribe of Indians of Okla. v. United States*
    383 F.2d 991 (Ct. Cl. 1967) ..........................................................................19

*Soboba Band of Mission Indians v. United States*
    37 Ind. Cl. Comm. 326 (1976).................................................................10, 15

*Super v. Work*
    3 F.2d 90 (D.C. Cir. 1925) .............................................................................22

*Tweedy v. Tex. Co.*
    286 F. Supp. 383 (D. Mont. 1968)...............................................................9, 14

*United States v. Adair*
    723 F.2d 1394 (9th Cir. 1984)..............................................................9, 17, 19

*United States v. Cappaert*
    508 F.2d 313 (9th Cir. 1974)..........................................................5, 9, 12, 15

*United States v. Gila Valley Irrigation Dist.*
    31 F.3d 1428 (9th Cir. 1994)..........................................................................19

*United States v. New Mexico*
    438 U.S. 696 (1978) .........................................................................................9

*United States v. Powers*
    305 U.S. 527 (1939) .......................................................................................17

*United States v. Title Insurance & Trust Co.*
    265 U.S. 472 (1924) .......................................................................................22

*United States v. Washington*
    318 F. App'x 462 (9th Cir. 2009) ..............................................................12, 15

*United States v. Washington*
    No. 2:01-cv-00047 (W.D. Wash. Feb. 24, 2003).........................................15

*Winters v. United States*
    207 U.S. 564 (1908) ..............................................................................passim

*Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*
    505 U.S. 214 (1992) .......................................................................................22

*Worcester v. Georgia*
    31 U.S. 515 (1832) .........................................................................................19

**Statutes**

10 Stat. 244 (March 3, 1853) ...............................................................................22

9 Stat. 544 (1850) ................................................................................................21

KILPATRICK TOWNSEND & STOCKTON
607 14ᵗʰ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S NOTICE OF MOTION AND MOTION FOR SUMM. J. ON PHASE I ISSUES**
3855995.1 -- N1431.1

9 Stat. 631 (March 3, 1851) ................................................................20, 21

Cal. Water Code § 10720 ........................................................................11

**Other Authorities**

History and Proposed Settlement, Claims of California Indians, Robert W. Kenny,
(Sacramento, 1944) ........................................................................21, 22

Original Indian Title, Felix S. Cohen
32 Minn. L. Rev. 28 (1947) ..............................................................18

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S NOTICE OF MOTION AND MOTION FOR SUMM. J. ON PHASE I ISSUES**
3855995.1 -- N1431.1

It is settled federal law that when the United States created Indian reservations, it also reserved water rights necessary to fulfill the purposes of those reservations. It is undisputed that the United States established a reservation for the Agua Caliente Band of Cahuilla Indians (Agua Caliente or the Tribe) for the purpose of creating a permanent Agua Caliente homeland. These straightforward facts and legal principles establish, as a matter of law, that Agua Caliente has federally reserved rights to groundwater in an amount to be quantified later in this case. It is also undisputed that Agua Caliente has used and occupied the reserved land for centuries. Agua Caliente therefore is entitled to summary judgment on its claim for aboriginal rights to groundwater as well.

## FACTUAL BACKGROUND

**I.  The Agua Caliente Reservation was carved out of land that Agua Caliente has continuously and exclusively occupied.**

Agua Caliente is a federally recognized Indian tribe with a reservation consisting of approximately 31,396 acres of lands within the exterior geographic boundaries of Riverside County, California – a reservation carved out of Agua Caliente's aboriginal territory. *See* Statement of Undisputed Facts (SF) 1-4. As set forth *infra*, the Agua Caliente and their ancestors have used and occupied the land constituting and surrounding the Reservation continuously and exclusively since time immemorial.

The pre-contact Cahuilla population is estimated at 5,000-6,000 people. SF 5. The Cahuilla ancestors of the present-day Agua Caliente lived in an area of about 600 square miles that was roughly centered on present-day Palm Springs. *Id.* 9. Ancestral Cahuilla villages sited near water sources were occupied year-round to utilize adjacent water and plant resources, with parties occupying other locations seasonally to hunt and to gather resources. *Id.* 12-24.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

1

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

Water was critical to meet a number of the ancestral Cahuilla people's needs.[1] Groundwater in particular was an important source of water for all Cahuilla people, including ancestors of the Agua Caliente. *Id.* 24-26. The pre-contact Cahuilla adapted to drought cycles in the desert environment by developing naturally appearing springs and groundwater wells. *Id.* Ancestral Cahuilla, including the lineages of the Agua Caliente, dug walk-in wells as a water source during times of water scarcity. *Id.* The ancestral Cahuilla used natural indicators of subsurface water to site such wells and used the water that they produced for domestic consumptive use. *Id.* The ancestral Cahuilla survived in the desert environment for millennia by using groundwater to meet the requirements of their life ways. *Id.*

## II.     The United States established the Reservation to provide a homeland.

While Agua Caliente has occupied the lands comprising its Reservation and the surrounding territory since time immemorial, the United States formally set aside the bulk of the present day Agua Caliente Reservation for the Tribe's permanent use and occupancy through two executive orders issued on May 15, 1876 and September 29, 1877. SF 30-36. The issuance of the executive orders creating and expanding the Agua Caliente Reservation marked the culmination of a prolonged effort by the United States and various federal Indian agents to provide for the Indians of Southern California – including the Agua Caliente – in the face of ever increasing encroachment and depredation by white settlers. *Id.* 37-38.

The homeland that the federal government envisioned for Agua Caliente was necessarily dependent upon access to an adequate supply of water. As Special Agent John Ames observed in 1874, when discussing the need for the United States to take

---

[1]  Documented ancestral Cahuilla uses of water include: personal consumption and other uses such as food processing and preparation (SF 15-17); personal hygiene (*id.* 18); medicinal uses (*id.* 19); spiritual and ceremonial uses (*id.* 20); production of household items, including pottery and basketry (*id.* 21); the construction of dwellings (*id.* 22); and agricultural practices (*id.* 23).

action to reserve lands for Agua Caliente and other Mission Indians in Southern California:

> The great difficulty … arises not from any lack of unoccupied land, but from lack of well-watered land. Water is an absolutely indispensable requisite for an Indian settlement, large or small. It would be worse than folly to attempt to locate them on land destitute of water, and that in sufficient quantity for purposes of irrigation ….

SF 34-43. Agent Ames' common sense observations were echoed implicitly by others, including D.A. Dryden, head of the Mission Indian Agency, who lamented in 1875 that "[t]he one pressing want of these people [including Agua Caliente] now is land, on which they can cultivate their gardens …." *Id.* 44-47.

Agent Dryden, in accordance with contemporaneous federal policy, envisioned the Agua Caliente Reservation as serving as a permanent homeland where the Agua Caliente could be self-sustaining. He explained that it would "meet the present and future wants of these Indians, by giving them exclusive and free possession of these lands … [t]hey will be encouraged to build comfortable houses, improve their acres, and surround themselves with home comforts." *Id.*

After years of such reports from Special Agents Ames, Dryden, and others, President Grant issued the 1876 executive order setting aside lands recommended by Agent Dryden "for the permanent use and occupancy" of Agua Caliente and other Southern California tribes. *Id.* 33-34, 48-50. It became immediately apparent, however, that the lands set aside were insufficient to serve as a permanent Agua Caliente homeland. *Id.* 51-55. Thus, in July 1877, newly appointed Mission Indian Agent J.E. Colburn received instructions from Commissioner of Indian Affairs John Smith to make "strenuous efforts … at the earliest possible date" to identify and reserve "every available foot of vacant arable land" for the "permanent occupation" of the Agua Caliente and other Southern California tribes. *Id.* 56-57. Shortly thereafter,

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

1    Agent Colburn issued a report declaring that his "first purpose" was to "secure the

2    Mission Indians permanent homes, with land *and water* enough, that each one who

3    will go upon a reservation may have to cultivate a piece of ground as large as he may

4    desire." *Id.* 58-59.

5          Acting on his instructions and to accomplish his stated "first purpose," Agent

6    Colburn proceeded to identify and recommend for inclusion in the Agua Caliente

7    Reservation some thirty-five additional sections of land in the vicinity of the lands

8    already reserved for Agua Caliente by President Grant. *Id.* 60-61. While he

9    acknowledged that this was a large tract, Colburn clarified that "none of it is fit for

10   pasturage, and none can be cultivated except the few acres watered at the 'Rincon'

11   and at the Spring." *Id.* 62-63.[2] Agent Colburn nonetheless recommended reservation

12   of the entire tract for Agua Caliente, as he believed that "there are a thousand acres

13   more or less that could be cultivated if water could be brought upon it." *Id.* 65.

14         Approximately one month after receiving Agent Colburn's report, President

15   Hayes issued the 1877 Executive Order setting aside "for Indian purposes" much of

16   the land identified by Agent Colburn. *Id.* 35-36, 67. The Agua Caliente Reservation

17   then consisted of more than 30,000 acres set aside for the Tribe's permanent use and

18   occupancy.[3] *Id.* 35. Patents for the Reservation were subsequently issued to Agua

19   Caliente and its members. *Id.* 68.

20   **III.     The aquifer has been and continues to be in overdraft.**

21         The water that has sustained Agua Caliente since time immemorial is now in

22   peril. The aquifer underlying the Reservation is in an overdraft condition and has been

23   for many years.[4] As of 2010, Defendant CVWD estimated the cumulative overdraft of

24   ───────────────────────

25   [2]  The "Rincon" village referenced in Colburn's letter was an Agua Caliente settlement, and should not be mistaken for a reference to the Rincon Band of Luiseno

26   Indians, whose reservation is located in San Diego County. SF 64.

27   [3] The United States acquired and withdrew additional lands for Agua Caliente in later years. SF 67.

28   [4]  An aquifer is in an "overdraft" condition when "more water is used each year than can be replaced by natural or artificial means." SF 70.

4

the aquifer as more than 5.5 million acre-feet (AF) and the continuing annual overdraft at an average of approximately 239,000 AF. SF 69-72. There is less groundwater available under the Agua Caliente Reservation now than at the time of its creation, and the available groundwater continues to decrease each year.

## ARGUMENT & ANALYSIS

Agua Caliente's survival and well-being depends not just on land, but also on water necessary to make that land productive. For more than a century, federal and state courts have recognized that the establishment of Indian reservations includes the reservation of water rights. The Court should follow the path laid down by those courts and hold that Agua Caliente has a federally reserved right to groundwater as a matter of law. Based on Agua Caliente's historical use and occupancy of its lands and associated water, the Court also should hold that Agua Caliente has aboriginal rights to groundwater.

## I.      Agua Caliente has a federally reserved right to groundwater.

A federal reservation of land includes an implied reservation of water rights.[5] This principle, commonly referred to as the *Winters* doctrine, was first established in the foundational case of *Winters v. United States*, 207 U.S. 564 (1908), and it has been applied and affirmed consistently and repeatedly for more than a century. *See, e.g.*, *Cappaert v. United States*, 426 U.S. 128, 138-143 (1976); *Arizona v. California*, 373 U.S. 546, 598-600 (1963); *Colville Confederated Tribes v. Walton*, 752 F.2d 397 (9th Cir. 1985) (*Walton II*); *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) (*Walton I*); *United States v. Cappaert*, 508 F.2d 313 (9th Cir. 1974), *aff'd by* 426 U.S. 128 (1976); *Confederated Salish & Kootenai Tribes of the Flathead*

---

[5] The amount of water reserved is that necessary and sufficient to accomplish the purposes of the reservation. To be clear, Agua Caliente does not seek summary judgment regarding its entitlement to any particular amount of water. The Court is currently asked only to answer the question of *whether* Agua Caliente has *Winters* rights to groundwater in any amount. The more difficult question of *how much* water Agua Caliente's rights encompass – *i.e.*, the amount of water necessary to accomplish the homeland and agricultural purposes of the reservation – is reserved for Phase 3 of this litigation by stipulation of the parties. *See* Dkt. Nos. 49 & 69.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

*Reservation v. Stults*, 59 P.3d 1093 (Mont. 2002); *In re Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 989 P.2d 739 (Ariz. 1999) (*en banc*). Under *Winters*, Agua Caliente unequivocally has a federally reserved right to groundwater underlying its Reservation.

**A.      Under *Winters* and its progeny, Agua Caliente acquired reserved water rights at the time of the Reservation's establishment.**

The *Winters* doctrine, as clarified and reaffirmed by numerous decisions over more than a century, provides that Agua Caliente has a federal, reserved right to groundwater as a matter of law. The only material facts necessary to establish this right are set forth in the orders establishing the Reservation, and thus are undisputed. Accordingly, Agua Caliente is entitled to summary judgment on the Phase 1 *Winters* issue.

*1.      Winters and Arizona lay the foundation of the Winters doctrine.*

*Winters* involved water rights associated with the Fort Belknap Indian Reservation, which was established by the United States in 1888 as "a permanent home and abiding place" for certain Indians in Montana. *Winters*, 207 U.S. at 565. Portions of the Fort Belknap Reservation – those lying near the Milk River, which served as the Reservation's northern boundary – were suitable for pasturing stock and were used for that purpose from the time of the Reservation's establishment. *Id.* at 566. Other parts of the Reservation were potentially suitable for agriculture, but those lands were "of dry and arid character, and, in order to make them productive, require[d] large quantities of water for the purpose of irrigating them." *Id*. To take make use of that land, Indians living on the Fort Belknap Reservation began in 1898, well after the Reservation's establishment, to divert water from the Milk River to irrigate roughly 30,000 acres. *Id.*

While the Indians of the Fort Belknap Reservation were not diverting the entire flow of the Milk River, both they and the United States contended that "all of the waters of the river [we]re necessary for … the purposes for which the reservation was

created." *Id.* at 567. Accordingly, when upstream parties began diverting water from the river, the United States sued to enjoin their interference with its and the Indians' water rights. *Id.* In response, the defendants argued that (1) they had acquired valid, state law riparian rights to the waters of the Milk River after the creation of the Fort Belknap Reservation by diverting water from the river before the Indians began doing so, (2) their rights were thus senior and superior to any rights held by the Indians, (3) other springs and streams were available within the Reservation to supply the Indians' needs, and (4) a ruling in favor of the United States would render the defendants' lands valueless and destroy communities of "thousands of people," thereby defeating the government's purpose in opening the lands upstream of the Reservation for public settlement. *Id.* at 568-570.

The *Winters* Court rejected all of the defendants' arguments. It observed that the Reservation was but a small part of a much larger area previously occupied by the "nomadic and uncivilized" Indians, and that "it was the policy of the government … to change those habits and [for the Indians] to become a pastoral and civilized people." *Id.* at 576. The Court further recognized that, in order to become a "pastoral … people" on a small fraction of their traditional lands, the Indians would need to take up agriculture on lands that "were arid, and, without irrigation, were practically valueless." *Id.* Finally, with respect to the defendants' argument that the Indians had lost any rights to Milk River water through nonuse and should have to rely on other springs and streams within their Reservation for water, the Court squarely rejected the notion that the defendants' state law riparian rights could ever trump the federal reservation of rights. *Id.* at 577 ("The power of the government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be." (citations omitted)).

In light of these facts and legal tenets, the Court held that the Indians of the Fort Belknap Reservation retained rights to the Milk River water necessary to irrigate their reservation and that those rights were reserved and held by the United States as of the

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

1   date of the Reservation's establishment "for a use which would be necessarily

2   continued through years." *Id.* at 576-577. This principle – that a federal reservation of

3   lands impliedly includes the immediate and permanent reservation of water rights in

4   an amount necessary to accomplish the reservation's purpose – is now known as the

5   *Winters* doctrine, and it serves as the basis for the Agua Caliente Tribe's federally

6   reserved rights.

7        The Supreme Court reaffirmed the *Winters* doctrine in the landmark case of

8   *Arizona v. California.* There, the Court considered various parties' rights to the water

9   of the Colorado River, including the United States' assertion of *Winters* rights on

10  behalf of five executive order Indian reservations in Arizona, California, and Nevada.[6]

11  *Arizona*, 373 U.S. at 595-596. Over numerous objections by the State of Arizona, the

12  Supreme Court affirmed a Special Master's determination "as a matter of fact and law

13  that when the United States created these reservations or added to them, it reserved

14  not only land but also the use of enough water from the Colorado to irrigate the

15  irrigable portions of the reserved lands." *Id.* at 596.

16       The *Arizona* Court found it "impossible to believe" that the President would

17  have created Indian reservations "unaware that most of the lands were of the desert

18  kind – hot, scorching sands – and that water from the river would be essential to the

19  life of the Indian people … and the crops they raised." *Id.* at 599. Accordingly, the

20  Court held that "the United States did reserve the water rights for the Indians effective

21  as of the time the Indian Reservations were created" and that "the water was intended

22  to satisfy the future as well as the present needs of the Indian Reservations." *Id.* at

23  600. Emphasizing that the reserved rights must take into account both the

24  contemporaneous and future needs of the reservations, the Court finally concluded

25

26

---

27  [6] *Arizona* established that the *Winters* doctrine applies to Indian reservations created
    by executive orders in the same manner that it applies to statutory or treaty
28  reservations. *See* 373 U.S. at 597-599 (explicitly rejecting the argument that executive
    order reservations do not enjoy *Winters* rights).

that water was reserved in an amount sufficient "to irrigate all of the practically irrigable acreage on the reservations." *Id. Arizona* thus clarified and reinforced both the applicability and the application of the *Winters* doctrine as a means of ensuring that Indian reservations include a permanent right to adequate water supplies for all of their present and future needs.

### 2. Subsequent case law affirms and clarifies the Winters doctrine.

Subsequent judicial decisions have clarified and reaffirmed key legal principles of the *Winters* doctrine and *Winters* rights. The doctrine's central tenets include: (a) it is a doctrine of federal law, and neither it nor associated water rights are subject to or preempted by state law; (b) it creates immediately vested, permanent rights in water sufficient to supply a reservation's current and future needs; (c) the rights that it creates are not dependent upon whether or how a tribe was using water at the time of the reservation and cannot be lost by nonuse; and (d) it applies to all available sources of water, including groundwater. All of these principles are relevant in this case, and all support summary judgment in favor of Agua Caliente with respect to the existence of its *Winters* right to groundwater.

### a. Winters rights are federal rights not subject to state law.

Because they are reserved by the United States pursuant to federal law, *Winters* rights are federal rights, as *Winters* itself held. They are not subject to restriction, limitation, or diminishment by state law doctrines and concepts. Numerous federal courts, including the Ninth Circuit, have so held. *See, e.g.*, *United States v. New Mexico*, 438 U.S. 696, 715 (1978) ("[T]he 'reserved rights doctrine' is … an exception to Congress' explicit deference to state water law in other areas."); *Walton II*, 752 F.2d at 400 ("Reserved rights are 'federal water rights' and 'are not dependent upon state law or state procedures.'" (quoting *Cappaert*, 426 U.S. at 145)); *United States v. Adair*, 723 F.2d 1394, 1410 (9th Cir. 1984); *Cappaert*, 508 F.2d at 320; *see also Tweedy v. Tex. Co.*, 286 F. Supp. 383, 385 (D. Mont. 1968) ("The waters being reserved are governed by federal rather than state law."); *Soboba Band of Mission*

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

1  *Indians v. United States*, 37 Ind. Cl. Comm. 326, 487 (1976) ("The Winters Doctrine

2  … is paramount to the California law, including the California doctrines of riparian

3  rights, appropriation, and percolating ground waters ….").

4      As the Ninth Circuit explained in *Walton I*, one of the basic premises of the

5  *Winters* doctrine is that the United States, in creating Indian reservations, set aside

6  water rights for Indians that would be protected from subsequent appropriation.

7  *Walton I*, 647 F.2d at 46. This was necessary because the Indians being placed on

8  reservations frequently "were not in a position, either economically or in terms of their

9  development of farming skills, to compete with non-Indians for water rights." *Id.* Only

10  by establishing a federal right that was superior to any subsequently acquired state law

11  rights could the federal government realize its goal of ensuring that water would

12  remain available and accessible to Indians until such time as they had the desire and

13  ability to use it.[7]

14      *Winters* rights' settled superiority over state rights is perhaps best illustrated by

15  state courts' deference to federal law over their own law when addressing Indian

16  water rights. For example, the Supreme Court of Montana has held that:

17          The doctrine of reserved water rights conflicts with prior

18          appropriation principles in several respects. … Appropriative rights

19          are based on actual use [and] governed by state law. Reserved water

20          rights are established by reference to the purposes of the reservation

21          rather than to actual, present use of the water. … We hold that state

22          courts are required to follow federal law with regard to those water

23          rights.

24

25

26  ―――――――――――

[7] The Ninth Circuit "recognize[d] that open-ended water rights are a growing source
27  of conflict and uncertainty in the West. Until their extent is determined, state-created
water rights cannot be relied on by property owners." *Walton I*, 647 F.2d at 48. It
28  correctly held, however, that "[r]esolution of the problem is found in quantifying
reserved water rights, not in limiting" them. *Id.*

*Montana v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 712 P.2d 754, 762, 765-766 (Mont. 1985). Similarly, the Supreme Court of Arizona recognized that its state's groundwater pumping laws, which provided all overlying landowners with an equal right to access groundwater for beneficial use, were inconsistent with *Winters* rights because "[a] theoretically equal right to pump groundwater, in contrast to a *reserved* right, would not protect a federal [Indian] reservation from a total future depletion of its underlying aquifer by off-reservation pumpers." *Gila River*, 989 P.2d at 748 (emphasis in original). Accordingly, the Court held that the state's laws must yield to *Winters* rights, thereby "affirm[ing] the trial court's conclusion that federal reserved rights holders enjoy greater protection from groundwater pumping than do holders of state law rights." *Id.* at 750.

In fact, California recently codified the superiority of federal law over state law in the context of reserved water rights. State law now explicitly provides that "federally reserved rights to groundwater shall be respected in full" in groundwater rights adjudications and that "[i]n case of conflict between federal and state law in that adjudication … federal law shall prevail. … This subdivision is declaratory of existing law." Cal. SB 1168 (approved by Governor Sept. 16, 2014), codified at Cal. Water Code § 10720.3(d) (2014). Clearly then, this principle is beyond dispute.

That *Winters* rights are not subject to state law is as important as it is well settled. As discussed below, *Winters* rights are created and fully vested at the time of a reservation's establishment, often well before they are fully utilized by the Indian rights holders. They are not subject to diminishment or loss regardless of whether they are fully used or used in different ways over time, nor may they be reduced or diminished by the actions of subsequent appropriators or other water users. By their very nature, then, *Winters* rights often prove inconsistent with state law doctrines concerning the acquisition, use, and loss of water rights, making the superiority of the federal right critically important. State water law rules and doctrines necessarily are

preempted to the extent that they are inconsistent with or might result in infringement of federally reserved *Winters* rights.

> b.  *Winters rights are permanently established and fully vested as of the date of a reservation's establishment.*

*Winters* rights constitute a permanent property right that is established and fully vested, once and for all, at the time of an Indian reservation's establishment. *See, e.g.*, *Cappaert*, 426 U.S. at 138 (holding that the United States, in creating a federal reservation, "acquires a reserved right in unappropriated water *which vests on the date of the reservation*" (emphasis added)); *Arizona*, 373 U.S. at 600 ("[T]he United States did reserve the water rights for the Indians effective as of the time the Indian Reservations were created."); *id.* (holding that *Winters* rights, in their entirety, are "present perfected rights" as of the date of the reservation's creation); *Walton I*, 647 F.2d at 48 ("[T]he Tribe has a vested property right in reserved water …."); *Cappaert*, 508 F.2d at 320; *United States v. Washington*, 2005 WL 1244797, at *8 (W.D. Wash. May 20, 2005) ("The water right vests on the date the reservation is created, not when the water is put to use or at some later time." (citing *Arizona*, 373 U.S. at 600)), *vacated pursuant to settlement agreement by*  2007 WL 4190400 (Nov. 20, 2007), *aff'd*, 318 F. App'x 462 (9th Cir. 2009). While a right holder's use of water may expand or change over time, the right itself remains unchanged – all of the water rights necessary "to satisfy the future as well as the present needs" of the reservation is reserved from the date of its creation. *Arizona*, 373 U.S. at 600; *Gila River*, 989 P.2d at 748 ("[F]ederal reserved water rights are by nature a preserve intended to continue through years." (internal punctuation and quotation omitted)); *Confederated Salish*, 712 P.2d at 765 ("[R]eserved rights may reflect future need as well as present use.").

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

1
2
3

    *c.*    *Winters rights allow for changing and expanding tribal uses, cannot be lost through nonuse, and necessarily apply to water beyond what was being used at the reservation's creation.*

4
5
6
7
8
9
10
11

Given that *Winters* rights necessary to provide for the present and future needs are fully reserved and vested on the date of a reservation's establishment, it naturally follows that *Winters* rights are not limited to the particular sources or amount of water in use prior to or at the time of the reservation's creation and cannot be lost through nonuse. It is a basic tenet of the *Winters* doctrine that reserved rights allow for changes in tribal water usage in response to changing tribal needs. Accordingly, a *Winters* rights holder may expand or change its use of water and/or access previously unused sources of water over time in order to fully utilize its vested, reserved rights.

12
13
14
15
16
17
18
19

These aspects of the *Winters* doctrine have been apparent from the doctrine's inception. In *Winters* itself, substantial tribal diversion and use of water from the Milk River for irrigation did not begin until years after the creation of the Fort Belknap Reservation. *Winters*, 207 U.S. at 565-566. More recently, the Supreme Court reaffirmed that reserved "water was intended to satisfy the future as well as the present needs of the Indian Reservations and … enough water was reserved to irrigate all the practicably irrigable acreage on the reservations" even though all such land was not irrigated. *Arizona*, 373 U.S. at 600.

20
21
22
23
24
25
26
27
28

Numerous other courts have followed *Winters* and *Arizona* by recognizing that (1) tribes may not and need not make full use of their *Winters* rights immediately, or at any particular time, (2) *Winters* rights are not lost through nonuse, and (3) a rights holder's use of its reserved rights may grow, diminish, or change over time without the right itself being affected. *See, e.g.*, *Walton I*, 647 F.2d at 47-48 (Developments "making the historically intended use of the water unnecessary do not divest the Tribe of the right to the water."); *Walton II*, 752 F.2d at 404 (rejecting the notion that *Winters* rights could be lost due to nonuse); *Confederated Salish*, 712 P.2d at 762, 765 ("Reserved water rights are established by reference to the purposes of the reservation

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

1   rather than to actual, present use of the water. … Most reservations have used only a

2   fraction of their reserved water."). Because *Winters* rights are reserved once and for

3   all upon the establishment of the reservation but are intended to provide for the

4   reservation's current *and* future needs, they necessarily allow for tribal water uses to

5   change and grow over time and are not lost through nonuse.

6             d.      *Winters rights apply to all sources of water, including
7                     groundwater.*

8       The *Winters* doctrine is equally applicable to surface water and groundwater.

9   Nearly every court to consider the issue has so held, and consideration of the rationale

10  underlying the *Winters* doctrine and all of the doctrine's other characteristics leads

11  inescapably to this conclusion.

12      The Supreme Court has explained that the *Winters* doctrine is based on the

13  assumption that the United States "intended to deal fairly with the Indians by

14  reserving for them the waters without which their lands would have been useless."

15  *Arizona*, 373 U.S. at 600. This rationale applies with equal force to both surface and

16  groundwater; both types of water can be the subject of reserved rights to the extent

17  necessary to satisfy the purposes of a reservation and prevent Indian reservation lands

18  from becoming "useless." *See Tweedy*, 286 F. Supp. at 385 ("[T]he same implications

19  which led the Supreme Court to hold that surface waters had been reserved would

20  apply to underground waters as well."). Indeed, in many cases, groundwater may be

21  the only consistently available source of water that can make reserved lands habitable

22  or suitable for their intended purpose. *See Gila River*, 989 P.2d at 746.

23      Given the rationale underlying the *Winters* doctrine, it is unsurprising that the

24  courts addressing the issue have almost unanimously held that *Winters* rights

25  encompass groundwater as well as surface water. The Ninth Circuit addressed the

26  applicability of *Winters* rights to groundwater in its *Cappaert* decision, which was

27  subsequently affirmed by the Supreme Court. *See Cappaert*, 426 U.S. at 138. The

28  issue in *Cappaert* was whether the United States could invoke reserved water rights

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

associated with Devil's Hole, a subterranean pool within the Death Valley National Monument that served as home for the endangered pupfish, to prevent surrounding landowners from pumping groundwater from their wells. *Cappaert*, 508 F.2d at 315-318. The United States argued that pumping of groundwater by nearby landowners lowered the level of Devil's Hole, threatening its pupfish population. The Ninth Circuit, finding that the purpose for the reservation of Devil's Hole was to protect pupfish, held that the United States "implicitly reserved enough groundwater to assure [their] preservation" and that it could invoke its reserved rights to enjoin other landowners from pumping groundwater in amounts that adversely affected the pupfish. *Id.* at 318-322.

While *Cappaert* was one of the first decisions recognizing that *Winters* rights apply equally to both ground and surface water, it by no means stands alone. The Western District of Washington has held that "reserved *Winters* rights … extend to groundwater," *Washington*, 2005 WL 1244797 at *3, and the Indian Claims Commission, in discussing the water rights of another Indian tribe within Riverside County, held that "the *Winters* Doctrine applies to all unappropriated waters … including … percolating and channelized ground water." *Soboba Band*, 37 Ind. Cl. Comm. at 487. *See also* Order, *Preckwinkle v. CVWD*, No. 05-cv-626 at **27-28 (C.D. Cal. Aug. 30, 2011) (holding, in a case involving Defendant CVWD, that Agua Caliente members have federally reserved rights to groundwater) (Ex. A, attached); Order, *United States v. Washington*, No. 2:01-cv-00047 at *16 (W.D. Wash. Feb. 24, 2003) (Ex. B, attached). The Arizona Supreme Court's discussion of *Winters* rights to groundwater is particularly instructive. After an exhaustive examination of relevant case law, the *en banc* Court held that:

> [I]f the United States implicitly intended, when it established reservations, to reserve sufficient unappropriated water to meet the reservations' needs, it must have intended that reservation of water to come from whatever particular sources each reservation had at hand.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

> The significant question … is not whether water runs above or below the ground but whether it is necessary to accomplish the purpose of the reservation.

*Gila River*, 989 P.2d at 747. *See also id.* at 743 & 747 (explaining that the differing treatment of ground and surface water rights is a common feature of state law, but noting that *Winters* rights are federal rights not limited by such state law concepts); *Stults*, 59 P.3d at 1098 ("[T]here is no distinction between surface water and groundwater for purposes of determining what water rights are reserved …."). The Arizona Court's logic is unassailable: the *Winters* doctrine is concerned with securing the water necessary to fulfill the essential purposes of a federal reservation, not with state law doctrines providing for disparate treatment of ground and surface water. Any contrary holding would defeat the doctrine's purpose and, in effect, impermissibly render *Winters* rights subject to state law.[8]

## B.   The Agua Caliente Reservation was intended as a permanent homeland for the Agua Caliente.[9]

The United States intended for the Agua Caliente Reservation to serve as a permanent homeland for the Agua Caliente and to support their self-sufficiency. This is indisputable both as a matter of law and under the specific facts of this case.

The Supreme Court has repeatedly held that "the Government, when it created [] Indian Reservation[s], intended to deal fairly with the Indians by reserving for them the waters without which their lands would be useless." *Arizona*, 373 U.S. at 600

---

[8] Tellingly, even the one reported decision declining to recognize *Winters* rights to groundwater conceded that the "logic which supports a reservation of surface water … also supports reservation of groundwater." *In re the Gen. Adjudication of All Rights to Use Water in the Big Horn River Sys.*, 753 P.2d 76, 99 (Wyo. 1988).

[9] As explained *supra*, a federal reservation impliedly includes the reservation of water rights in an amount necessary to accomplish the purposes of reservation. While the purposes of the Agua Caliente Reservation ultimately speak more to the quantification of Agua Caliente's reserved water rights than to the existence of those rights, it is relevant for Phase 1 to establish as a matter of law that some water is necessary to accomplish the Reservation's purposes.

1    (citing *Winters*). Reservation of lands for Indians therefore necessarily includes

2    reservation of water rights.

3        It is also well settled that Indian reservations were intended to serve as

4    permanent homelands for tribes. *See, e.g.*, *Arizona*, 373 U.S. at 599-600. As the Ninth

5    Circuit has explained: "The specific purposes of an Indian reservation … were often

6    unarticulated. The general purpose, to provide a home for the Indians, is a broad one

7    and must be liberally construed." *Colville Confederated Tribes v. Walton*, 647 F.2d

8    42, 47 (9th Cir. 1981) (*Walton I*). As a result, Ninth Circuit courts refuse to restrict the

9    purposes for setting aside land for Indian homelands to "a single essential purpose."

10   *Adair*, 723 F.2d at 1410. Furthermore, during the era when federal policy favored the

11   establishment of reservations, the United States often equated its desire for Indians to

12   achieve economic self-sufficiency with their adoption of agriculture. *See United States*

13   *v. Powers*, 305 U.S. 527, 528, 533 (1939); *Adair*, 723 F.2d at 1410 (indicating that

14   one "essential purpose in setting aside [a reservation] … was to encourage the Indians

15   to take up farming"). These precedents establish that the United States established

16   Indian reservations with the intent of providing a permanent homeland on which

17   Indians would become self-sufficient. This case law, standing alone establishes Agua

18   Caliente's entitlement to summary judgment on the Phase 1 *Winters* issue.

19       Moreover, extensive evidence in the historical record shows that the creation of

20   a permanent homeland, in addition to being the general purpose of Indian reservations,

21   was the specific purpose for the creation of the Agua Caliente Reservation. *See*

22   *generally* Factual Background, Part II, *supra*. The correspondence surrounding and

23   directly resulting in the creation of the Reservation is replete with references to

24   preserving the existing homes of Indians, providing for their future by placing them in

25   permanent possession of lands, and ensuring that they were provided sufficient land

26   and water necessary to self-sustaining into the future. *See* SF 59 (noting federal intent

27   to put Indians "permanently in possession of lands which they may cultivate as their

28   own"); *id.* 42 (stating that "water is absolutely indispensable to any Indian

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

settlement"); *id.* 47 (proposing a reservation that would "meet the present and future needs of these Indians" and on which they would "be encouraged to build comfortable houses [and] improve their acres"). In particular, Agent Colburn's instruction to identify and secure "every available foot of vacant arable land" for the "permanent occupation" of Southern California Indians affirms that these issues were at the forefront of the United States' considerations in creating the Agua Caliente Reservation. *Id.* 57-58.

Additionally, the executive orders creating the vast majority of the Agua Caliente Reservation explicitly refer to setting land aside for the Agua Caliente's "permanent use and occupancy" and "for Indian purposes." *Id.* 34 & 36. The plain language of the Executive Orders as well as the correspondence that led to their issuance confirms that the United States intended for the Agua Caliente Reservation to serve as a permanent homeland for the Tribe. Clearly water is necessary to accomplish this purpose.

## II. Agua Caliente also has aboriginal rights to groundwater.

Because there is no genuine issue of material fact as to the existence of the Tribe's aboriginal use of and rights to groundwater underlying its Reservation. Agua Caliente is entitled to summary judgment as a matter of law on this claim as well.

### A. Federal law recognizes a preexisting right of tribal aboriginal title that includes groundwater.

From the beginning of European "discovery," respect for aboriginal title and occupancy was part of international law and became part of United States law.[10] The doctrine of discovery "shut out the right of competition among those [European powers] who had agreed to it; ... but could not affect the rights of those already in possession ... as aboriginal occupants ...." *Worcester v. Georgia*, 31 U.S. 515, 543-

---

[10] Felix S. Cohen, *Original Indian Title*, 32 Minn. L. Rev. 28, 45 (1947) (cited favorably in *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 233-34 (1985)).

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

544 (1832); *Mitchel v. U.S.*, 34 U.S. 711, 746 (1835) (recognizing that the Indian "right of occupancy is considered as sacred as the fee simple of the whites.").[11] Lands within the Treaty of Guadalupe Hidalgo's Mexican Cession were encompassed within this policy. *Santa Fe*, 314 U.S. at 345; *Mitchel*, 34 U.S. at 746 (*citing Cramer v. United States*, 261 U.S. 219 (1923)).

These aboriginal rights include the "aboriginal-Indian reserved water rights which exist from time immemorial and are merely recognized by the document that reserves the Indian land …." *Confederated Salish*, 712 P.2d at 767. The leading Ninth Circuit authority is *Adair*, 723 F. 2d. 1394, where the court held that the Klamath Tribes possessed aboriginal title to certain lands and, "by the same reasoning, an aboriginal right to the water used by the Tribe as it flowed through its homeland." *Id*. at 1413. *See also Cramer*, 261 U.S. at 226; *United States v. Gila Valley Irrigation Dist*., 31 F.3d 1428 (9th Cir. 1994) (recognizing Gila River Tribes' water right with "immemorial" priority date); *New Mexico v. Aamodt*, 618 F. Supp. 993, 1009 (1985).

**B.    The undisputed facts show that the Agua Caliente possess aboriginal title to groundwater in the Coachella Valley.**

As stated, native peoples have aboriginal rights to land and resources in areas of long–term exclusive use and occupancy. *See, e.g*., *Alabama-Coushatta Tribe of Tex. v. United States*, 2000 WL 1013532 at *10 (Fed. Cl. June 19, 2000) (collecting authorities). "Use and occupancy" means "use and occupancy in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers." *Sac and Fox Tribe of Indians of Okla. v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967). Exclusivity of use is demonstrated by a tribe "behav[ing] as an owner of the land by exercising dominion and control." *Alabama-Coushatta Tribe*, 2000 WL 1013532 at *12; *Native Village of Eyak v. Blank*, 688 F.3d 619 (9th Cir. 2012)

---

[11] Article 26 of the United Nations Declaration on the Rights of Indigenous Peoples requires states to recognize indigenous peoples' "right to the lands, territories and resources which they have traditionally owned, occupied or otherwise used or acquired." *See* www.un.org/esa/sodcev/unpfii/documents/DRIPS_en.pdf

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

1  (exclusivity of aboriginal use rights such as water, and hunting and fishing rights.),

2  *cert denied* 134 S. Ct. 51 (2013). The time requirement for establishing aboriginal title

3  generally cannot be fixed at a specific number of years; it must be long enough to

4  have allowed the Indians "to transform the area into domestic territory." *Confederated*

5  *Tribes of Warm Springs Reservation v. United States*, 177 Ct. Cl. 184, 194 (1966).

6      Agua Caliente meets each of these elements of proving aboriginal title to both

7  the land and associated water resources of the Upper Coachella Valley.  Ancestors of

8  today's Agua Caliente Tribe have lived and sustained themselves in the area of the

9  Agua Caliente Reservation for centuries, prior to European contact up to the present

10  day. *See* SF 24 & 27-29. The historical record shows extensive Cahuilla use and

11  control of the Coachella Valley. *Id.* 29. There is no ethnographic or archaeological

12  evidence of indigenous groups other than Cahuilla living in the Coachella Valley. *Id.*

13  28.

14      **C.    Agua Caliente's aboriginal rights to groundwater exist today.**

15      *1.    The 1851 Act did not extinguish Agua Caliente's aboriginal rights to*
16          *groundwater.*

17      In an attempt to resolve questions relating to land title under Mexican and

18  Spanish law in California, and to clear title to the public domain to be passed on to

19  incoming settlers who were hungry for the resource-rich lands of California, Congress

20  initiated two distinct processes.  First, it passed *An Act to Ascertain and Settle the*

21  *Private Land Claims in the State of California*. 9 Stat. 631 (March 3, 1851) (the 1851

22  Act). The 1851 Act required "each and every person claiming lands in California by

23  virtue of any right or title derived from the Spanish or Mexican government" to

24  present a claim to validate and confirm that title before a Board of Land

25  Commissioners (the Land Commission) in San Francisco by March 3, 1853, or the

26  land would revert to the public domain. *See* §§ 8 & 13 of 1851 Act, 9 Stat. at 632-

27

28

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

633.[12] Agua Caliente's aboriginal rights and title are based on use and occupation since time immemorial and are not derived from the Spanish or Mexican government, so they fall outside the ambit of § 8 of the 1851 Act.

Section 16 of the 1851 Act directed the commissioners to "ascertain and report to the Secretary of the Interior the tenure by which the mission lands are held, and those held by civilized Indians, and those who are engaged in agriculture or labor of any kind, and also those which are occupied and cultivated by Pueblos or Rancheros Indians." § 16 of 1851 Act, 9 Stat. at 634. This section applied to Indians who "had come under the influence and instruction of the Catholic Padres," as their landholdings corresponded with those relationships, and the secularization of the Missions under Mexican law was intended to return and preserve lands for Indian use and occupancy. Robert W. Kenny, *History and Proposed Settlement, Claims of California Indians* at 20 (Sacramento, 1944). The Agua Caliente Cahuilla, though often characterized as part of the Southern California "Mission Indians," were not "missionized," and their aboriginal rights are not based on or derived from any dealings with Catholic missions. SF at 73-75. Agua Caliente therefore also fell outside the scope of § 16 of the 1851 Act.

Second, Congress in 1850 established a treaty commission pursuant to which the aboriginal title claims of the non-missionized Indians would be cleared and appropriated $25,000 to fund the treaty commission's work. 9 Stat. 544, 558 (1850).[13]

---

[12] *See generally Barker v. Harvey*, 181 U.S. 481 (1901), (affirming state court decision upholding Land Commission's issuance of a patent to the successors of private Mexican land grants.) The *Barker* Court characterized a Mexican grant that lacked any specific protection for Indian occupancy rights as extinguishing those rights. It also held that the Indians fell within the scope of the 1851 Act and should have brought their land claims before the Land Commission. *Barker* did not address ownership of lands by Indians who were not within the scope of § 16 of the 1851 Act.

[13] By early 1852, eighteen treaties were negotiated between the United States and various tribes in California, including the Agua Caliente Cahuilla, signatories of the Treaty of Temecula, which set aside a reservation that encompassed most of the lands that are part of today's Agua Caliente Reservation. SF 76-79. The United States Senate failed to ratify any of the eighteen treaties, although this fact was not disclosed to the Indians for some time. SF 80-81.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

The 1851 Act did not reference the "uncivilized Indians outside the zone of missionization" because "it was understood that their rights would be taken care of by the treaty commissioners appointed under the Act of September 30, 1850. Both acts were in operation at the same time." Kenny, *supra* at 20.[14] Case law interpreting the 1851 Act is therefore irrelevant to Agua Caliente.[15]

In 1853, Congress passed an act to transfer California lands in which the United States retained a proprietary interest to the public domain of the United States. *See* Act of March 3, 1853 (10 Stat. 244, 246). Section 6 of the 1853 Act excepted from transfer lands burdened with Indian aboriginal title: "That this act shall not be construed to authorize any settlement to be made on any tract of land *in the occupation or possession of any Indian tribe*, or to grant any preemption right to the same." 1853 Act, ch. 145, § 6, 10 Stat. 244 (emphasis added).  For § 6 of the 1853 Act to have any meaning, then, Indian aboriginal title rights of the kind asserted by Agua Caliente were not extinguished by failing to bring a claim before the Land Commission.

---

[14]  In *Cramer v. United States*, 261 U.S. 219 (1923) the Court noted the factual distinction between Indian claims recognized under Mexican law, and those that fell outside of the provisions of § 16 of the 1851 Act, stating that the 1851 Act "plainly ha[d] no application" because the individual Indians at issue in the case did "not belong to any of the classes described therein and their claims were in no way derived from the Spanish or Mexican governments." *Id*. at 231.

[15]  The year following *Cramer*, the Court decided *United States v. Title Insurance & Trust Co.* 265 U.S. 472 (1924), which, like *Barker v. Harvey*, is distinguishable because it addresses Indian land rights that fell within the purview of the 1851 Act. *Chunie v. Ringrose*, 788 F.2d 638 (9th Cir. 1986), is distinguishable on the same basis. *Super v. Work*, 3 F.2d 90 (D.C. Cir. 1925), *aff'd per curiam*, 271 U.S. 643 (1926), relied on the *Barker* and *Title Insurance* decisions, although the plaintiffs there were not Mission Indians but rather "roving bands." 3 F.2d at 91. The *Super* Court lacked an adequate record and its decision is not binding on and should not be followed by this Court. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 695-6 (1978) ("[W]e have never applied *stare decisis* mechanically to prohibit overruling our earlier decisions determining the meaning of statutes."); *see also Mandel v. Bradley*, 432 U.S. 173, 176 (1977) ("Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below."); *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 224 n.2 (1992) (holding that summary affirmance "cannot be taken as adopting the reasoning of the lower court").

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

2.    *Assuming, arguendo, that Agua Caliente's aboriginal rights to groundwater were extinguished by the 1851 Act, it subsequently re-established aboriginal title.*

The 1851 Act did not extinguish Agua Caliente's aboriginal title. But assuming, *arguendo*, that it did, Agua Caliente clearly re-established its title after 1853. Agua Caliente continued its exclusive use and occupancy of the land and water resources immediately following the running of the two year limitations period for filing claims under the 1851 Act.

The Supreme Court addressed a similar fact pattern in *Cramer*, 261 U.S. 219. There, the United States sued the grantee of the holder of a railroad patent on behalf of individual Indians who had commenced occupation of lands *after* the 1851 Act was enacted and its two year limitations period had lapsed. *Id*. at 225.  In light of these facts, the Court validated the aboriginal claims, holding that they were "not shown to be within the terms of the Act of 1851 in any respect." *Id*. at 231-32. Thus, even if the 1851 Act had extinguished the Tribe's aboriginal water rights, the Tribe re-established aboriginal title post-1853.[16]

## CONCLUSION

Agua Caliente has a reserved right to groundwater. A federal reservation of land impliedly includes a reservation of water. The critical – indeed, the only – questions in assessing *whether* a *Winters* right exists is whether a reservation exists and needs water. Here, there can be no doubt that water was required for Agua Caliente to build a permanent home on the arid, desert lands set aside for it. So, by operation of law, water was impliedly reserved for Agua Caliente as its Reservation was established. Agua Caliente's reserved rights are fully vested, federal property rights. They are not

---

[16] The Tribe's aboriginal rights were not terminated by actions brought under the 1928 Jurisdictional Act, 45 Stat. 602 (1928), or the Indian Claims Commission Act, 60 Stat. 1049 (1946), codified at 25 U.S.C. §§ 70(a), *et seq.*, because neither Act included compensation for lands retained in existing reservations.

1  subject to state law, including state law distinctions between the treatment of ground
2  and surface water. They cannot be lost or diminished through nonuse, changed use,
3  subsequent appropriation, or other water use by third parties. Agua Caliente is thus
4  entitled to summary judgment on the Phase 1 question of the existence of its *Winters*
5  right to groundwater.

6      Agua Caliente, by virtue of its occupation and use of its Reservation lands and
7  water since time immemorial, also has aboriginal rights to groundwater. Those rights
8  have never been extinguished and continue to exist today, as they have since time
9  immemorial. The Court should grant summary judgment declaring the existence of
10 that right in an amount to be quantified in Phase 3.

11 DATED:  October 21, 2014.          KILPATRICK TOWNSEND & STOCKTON LLP

12

13                                      By:_____/s/ Catherine Munson
14                                         CATHERINE MUNSON
                                          (D.C. Bar No. 985717, admitted *pro hac*
15                                         *vice*)
                                          MARK H. REEVES
16                                         (GA Bar No. 141847, admitted *pro hac*
17                                         *vice*)

18

19                                         *Attorneys for Plaintiff*
                                          *Agua Caliente Band of Cahuilla Indians*
20

21

22

23

24

25

26

27

28

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018