O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BOBBIE RAY PRECKWINKLE,    )    Case No. EDCV 05-626-
an individual; STEPHEN     )    VAP(SGLx)
RICE, an individual;       )
CHAD SIVA, an              )    **ORDER (1) GRANTING**
individual,               )    **DEFENDANT'S MOTION FOR**
                          )    **SUMMARY JUDGMENT (Doc. Nos.**
            Plaintiffs,    )    **63, 156); (2) DENYING**
                          )    **PLAINTIFFS' MOTION FOR**
    v.                     )    **SUMMARY JUDGMENT (Doc. Nos.**
                          )    **62, 200); (3) GRANTING IN**
COACHELLA VALLEY WATER      )    **PART AND DENYING IN PART**
DISTRICT, a public         )    **DEFENDANT'S MOTION FOR**
agency,                   )    **SUMMARY JUDGMENT AS TO THE**
                          )    **COMPLAINT-IN-INTERVENTION**
            Defendant.     )    **(Doc. No. 196);and (4)**
                          )    **DENYING PLAINTIFFS' MOTION**
                          )    **TO AMEND (Doc. No. 98)**
_____ )

    On July 25, 2011, the Court conducted a hearing on
Defendant Coachella Water District's and Plaintiffs Bobby
Ray Preckwinkle's and Stephen Rice's cross-motions for
summary judgment or partial summary judgment ("Cross-
Motions"). The Court also heard argument on Coachella
Water District's motion for summary judgment as to the
complaint-in-intervention and Plaintiffs' motion to
amend. After considering the papers filed in support of,

and in opposition to, the Cross-Motions, as well as the arguments advanced by counsel at the hearing, the Court issues the following orders for the reasons set forth below.

## I. PROCEDURAL HISTORY

### A. Background

Plaintiffs Bobbie Ray Preckwinkle ("Preckwinkle"), Stephen Rice[1] ("Rice"), and Chad Siva[2] ("Siva") filed a complaint ("Complaint") against Defendant Coachella Valley Water District ("Defendant" or the "Water District") on July 11, 2005. (Doc. No. 1.) Plaintiffs filed an amended complaint on February 15, 2006 (Doc. No. 12), and a second amended complaint ("SAC") on April 4, 2006 (Doc. No. 22). The SAC alleges the following claims against the Water District: (1) interference with a federal right; (2) trespass; (3) inverse condemnation; (4) conversion; (5) violation of 42 U.S.C. § 1983; (6)

---

[1] On April 1, 2011, Plaintiffs' counsel notified the Court that Plaintiff Rice died on or about February 7, 2011. (Doc. No. 171 (Ex Parte Application to Stay Case).) At the time of the hearing, Plaintiffs' counsel had not identified the party who would represent Rice's interests in this action. (See Doc. No. 204.) On August 18, 2011, Plaintiffs filed a stipulation to dismiss Plaintiff Rice from the action, and the Court terminated Rice as a party. (See Doc. No. 208.)

[2] On June 27, 2008, Plaintiffs' counsel notified the Court that Plaintiff Siva died on January 7, 2008. (See Doc. Nos. 121 (Stipulation), 122-23 (Declarations re: Stipulation).) The same day, the Court ordered that Clarissa Siva, as the administrator of the Estate of Edmund C. Siva, also known as Chad Siva, be substituted as a plaintiff in place of Chad Siva. (See Doc. No. 124.)

unlawful taxation; and (7) declaratory relief.  (See generally SAC.)  The Water District filed a motion to dismiss on April 24, 2006 (Doc. Nos. 23, 24), and by Order dated June 7, 2006, the Court dismissed Plaintiffs' third claim for inverse condemnation without leave to amend (Doc. No. 32).

## B.  Cross-Motions for Summary Judgment

On March 31, 2008, Defendant Water District and Plaintiffs Preckwinkle and Rice filed cross-motions for summary judgment or partial summary judgment ("Cross-Motions") (see Doc. Nos. 62 ("Pls.' Mot."), 63 ("Def.'s Mot."), along with a "Stipulated Statement of Uncontroverted Facts in Support of Cross Motions for Summary Judgment" ("Stip. Facts") (Doc. Nos. 62-2, 63-5).

In support of Plaintiffs' Motion, Plaintiffs[3] filed a memorandum of points and authorities ("Pls.' Mem. P. & A.") (Doc. No. 62-1); a separate statement of uncontroverted facts and conclusions of law ("Pls.' SUF") (Doc. No. 62-3); a request for judicial notice ("Pls.' RJN") (Doc. No. 62-5); and the declarations of Charles Feddersen (Doc. No. 62-16), Richard M. Freeman (Doc. No. 62-10), Thomas T. Henslee (Doc. No. 62-14), Bobbie Ray

---

[3] "Plaintiffs" here refers the moving Plaintiffs, Preckwinkle and Rice.  Plaintiff Siva did not join this motion.  Moreover, Plaintiff Rice has since been terminated as a party.  For simplicity, however, the Court adopts the term "Plaintiffs" throughout this Order.

1 | Preckwinkle (Doc. Nos. 62-12, 62-13), Steven Rice (Doc.
2 | No. 62-11), Carole M. Ross (Doc. Nos. 62-7, 62-8, 62-9),
3 | and Kim Snyder[4] (Doc. No. 66).  Defendant filed an
4 | opposition ("Def.'s Opp'n") (Doc. No. 69) on April 21,
5 | 2008, along with a statement of genuine issues ("Def.'s
6 | SGI") (Doc. No. 72); objections to evidence ("Def.'s
7 | Objections") (Doc. No. 70); a request for judicial notice
8 | (Doc. No. 73); and the declarations of Steven B. Bigley
9 | (Doc. No. 75), Joseph M. Lord, Jr. (Doc. No. 76), Jubin
10 | Merati (Doc. No. 77), Dan Parks (Doc. No. 78), and Steven
11 | B. Robbins (Doc. No. 74).  Plaintiffs filed a reply
12 | ("Pls.' Reply) on May 12, 2008 (Doc. No. 93), along with
13 | objections to evidence submitted by defendant ("Pls.'
14 | Objections") (Doc. No. 95), a response to Defendant's SGI
15 | (Doc. No. 96), and a reply declaration of Richard M.
16 | Freeman (Doc. No. 94).

18 |     In support of its Motion for Summary Judgment or
19 | Partial Summary Judgment ("Def.'s Mot."), Defendant filed
20 | a memorandum of points and authorities ("Def.'s Mem. P. &
21 | A.") (Doc. No. 63-1), a request for judicial notice (Doc.
22 | No. 63-4), the declarations of Julia Hernandez (Doc. No.
23 | 63-3) and Steven B. Robbins (Doc. No. 63-2), and a
24 | proposed statement of uncontroverted facts and
25 | conclusions of law ("Def.'s SUF") (Doc. No. 63-6).

---

[4] Pursuant to the Court's April 10, 2008, Order, the Declaration of Kim Snyder was filed under seal.

4

1  Plaintiffs filed an opposition ("Pls.' Opp'n") (Doc. No.
2  79) on April 21, 2008, along with a "Response to
3  Defendant's Proposed Statement of Uncontroverted Facts
4  and Conclusions of Law" ("Pls.' Response") (Doc. No. 80),
5  a request for judicial notice (Doc. No. 81), and the
6  declarations of Charles Feddersen (Doc. No. 87), Richard
7  M. Freeman (Doc. No. 86), Thomas T. Henslee (Doc. No.
8  88), Bobbie Ray Preckwinkle (Doc. No. 85), Steven Rice
9  (Doc. No. 84), and Carole M. Ross (Doc. No. 83).
10 Defendant filed a reply ("Def.'s Reply") on May 12, 2008
11 (Doc. No. 90), along with Objections to Evidence in
12 support of Plaintiffs' Opposition ("Def.'s Objections")
13 (Doc. No. 91).

14

15     On June 2, 2008, the Court heard oral argument and
16 issued a tentative ruling.  (See Doc. No. 103.)  On June
17 5, 2008, the Court requested the parties submit
18 supplemental briefing regarding two issues: (1) "whether
19 Plaintiffs' Master lease to their tenant legally included
20 their reserved water rights, in the absence of an express
21 statement to that effect"; and (2) "what effect, if any,
22 their position on the inclusion of water rights in the
23 Master Lease has on the preemption analysis under White
24 Mountain Apache Tribe v. Backer, 448 U.S. 136 (1980), and
25 Segundo v. City of Ranch Mirage, 813 F.2d 1387 (9th Cir.
26 1987)."  (See Doc. No. 101.)

27

28

**C.    Motion to Amend**

On June 9, 2008, Plaintiffs filed a motion to amend the complaint ("Motion to Amend") (Doc. No. 98), and the declaration of Carole Ross in support of the Motion to Amend (Doc. No. 99).  On June 16, 2008, the Water District filed an opposition ("Mot. to Amend Opp'n") (Doc. No. 106) and the declaration of Harry C. Carpelan in support of the Opposition (Doc. No. 107).  On June 23, 2009, Plaintiffs filed a reply ("Mot. to Amend Reply") in support of the Motion to Amend (Doc. No. 110), the declaration of Carole M. Ross (Doc. No. 111), and the declaration of Jodi Thomas (Doc. No. 112).

**D.    Settlement Agreements**

On December 7, 2006, Plaintiff Siva and the Water District reached a tentative settlement agreement (see Doc. No. 44), which involved the conveyance of land by Siva to the Water District (Doc. No. 46).  As any conveyance of allotted land must be approved by the U.S. Department of Interior, Bureau of Indian Affairs ("BIA"), Siva and the Water District submitted the settlement to the BIA for approval.  (See Doc. No 46.)  Thereafter, Plaintiffs and ClubCorp Mission Hills Country Club Inc. ("MHCC"), Plaintiffs' tenant under the Master Lease, submitted a signed settlement agreement to the BIA. (Doc. No. 148 (Status Report of Status of Partial Settlement).)  The BIA reviewed the settlement and

6

eventually suggested certain amendments.  (Id. at 2.)
Plaintiffs and MHCC accordingly revised the agreement and
resubmitted it to the BIA for approval.  (Id.)  While the
parties awaited the BIA's approval, the Court repeatedly
granted the parties' requests for continuances.  (See
Doc. No. 174 (Minute Order Granting Plaintiffs' Ex Parte
Application to Stay in Part) (noting that over the course
of case, the parties had requested the Court grant stays,
vacate hearings, or continue scheduling order dates on at
least twenty-five occasions).)  The parties ultimately
informed the Court that the BIA rejected the settlement
agreements.

**E.   Intervention by Mission Hills Country Club**

On June 23, 2008, MHCC filed a motion to intervene
and to file the proposed complaint-in-intervention
("Motion to Intervene").  (Doc. Nos. 113, 114.)  On April
18, 2011, MHCC filed a first amended complaint-in-
intervention.  (Doc. No. 175).  On May 3, 2011, the Court
granted MHCC's Motion to Intervene (Doc. No. 178), and
MHCC filed a second amended complaint-in-intervention
("Am. Compl.-in-Intervention") on May 23, 2011 (Doc. No.
188).  MHCC seeks: (1) a declaration that the Master
Lease legally includes Plaintiffs' reserved water rights
and the ability to exercise those rights and a
declaration that MHCC "stands in Plaintiffs' shoes
regarding all rights, privileges and obligations

associated therewith for the term of the Master Lease";
(2) an injunction prohibiting the Water District from
regulating or interfering with MHCC's exercise of
Plaintiffs' reserved water rights, including the
imposition of a replenishment fee associated with
Plaintiffs' federally reserved water right; and (3)
disgorgement of all fees unlawfully collected by the
Water District. (Am. Compl.-in-Intervention ¶¶ 41, 51,
59.)

On June 17, 2011, the Water District filed a motion
for partial summary judgment as to MHCC's second and
third claims for relief ("Complaint-in-Intervention
Motion"). (Doc. No. 196). MHCC filed an opposition
("Complaint-in-Intervention Opposition") on June 27,
2011. (Doc. Nos. 196, 197), along with a statement of
genuine issues ("MHCC's SGI") (Doc. No. 197-1), a request
for judicial notice with exhibits A and B attached (Doc.
No. 197-2), and the declaration of Ulrich R. McNulty
(Doc. No. 197-3). On July 1, 2011, the Water District
filed a reply ("Complaint-in-Intervention Reply") (Doc.
No. 199), a response to MHCC's statement of genuine
issues ("Water District's SGI Resp.") (Doc. No. 199-1), a
request for judicial notice ("Water District's Reply
RJN") (Doc. No. 199-2) with exhibits 1 and 2 attached.

## F.   Supplemental Briefing on Cross-Motions

On October 14, 2010, the Water District filed a supplemental brief related to the Cross-Motions for Summary Judgment ("Def.'s Suppl. Br."). (Doc. No. 156.) On July 5, 2011, Plaintiffs filed a supplemental brief related to the Cross-Motions for Summary Judgment ("Pls.' Suppl. Br."). (Doc. No. 200.) The same day, MHCC filed its supplemental brief related to the Cross-Motions for Summary Judgment ("MHCC's Suppl. Br."), as well as the declaration of Stephanie Osler Hastings and the declaration of Kay Gentile. (Doc. No. 201.)

## G.   Ex Parte Application to Stay

On July 8, 2011, Plaintiffs filed an ex parte application to stay the case. (Doc. No. 202). The Water District filed opposition to the application on July 8, 2011. (Doc. No. 203.) On July 12, 2011, Plaintiffs filed an amended ex parte application to stay (Doc. No. 204), and the Water District filed an opposition to the amended ex parte application on July 13, 2011 (Doc. No. 205). MHCC informed the Court that it does not oppose the motion.


## II. LEGAL STANDARDS

## A.   Motion for Summary Judgment

A court shall grant a motion for summary judgment when there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." <u>Anderson</u>, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. <u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998) (citing <u>Anderson</u>, 477 U.S. at 256-57); <u>Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.</u>, 707 F.2d 1030, 1033 (9th Cir. 1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Where the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. <u>Celotex</u>, 477 U.S. at 325. Instead, the moving party's burden is met by pointing out that there is an absence of evidence supporting the non-moving party's case. <u>Id.</u>

The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. See also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial § 14:144. A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248.

In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

**B.   Motion to Amend**

Federal Rule of Civil Procedure 15(a) ("Rule 15") provides that leave to amend "shall be freely given when justice so requires." Although Rule 15's policy strongly favors allowing amendment, and the Ninth Circuit applies this policy with liberality, the liberality is subject to

several limitations.  See Bowles v. Reade, 198 F.3d 752, 757 (9th Cir. 1999) (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987)); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989).

For example, "[l]eave need not be granted where the amendment of the complaint would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue delay."  Ascon Props., 866 F.2d at 1160 (citing DCD Programs, 833 F.2d at 186); Saul v. United States, 928 F.2d 829, 843 (9th Cir. 1991) (stating that district court may deny leave "where the amendment would be futile . . . or where the amended complaint would be subject to dismissal"); see also Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").

Similarly, "a district court does not abuse its discretion in denying a motion to amend a complaint . . . when the movant presented no new facts but only 'new theories' and provided no satisfactory explanation for his failure to fully develop his contentions originally." Allen v. City of Beverly Hills, 911 F.2d 367, 374 (9th Cir. 1990) (internal quotations omitted) (quoting Vincent v. Trend W. Technical Corp., 828 F.2d 563, 570-71 (9th

1  Cir. 1987)); <u>Acri v. Int'l Assoc. of Machinists &</u>
2  <u>Aerospace Workers</u>, 781 F.2d 1393, 1398 (9th Cir. 1986)
3  ("[L]ate amendments to assert new theories are not
4  reviewed favorably when the facts and the theory have
5  been known to the party seeking amendment since the
6  inception of the cause of action.").

7

8      Finally, "[t]he district court's discretion to deny
9  leave to amend is particularly broad where plaintiff has
10 previously amended the complaint." <u>Ascon Props.</u>, 866
11 F.2d at 1160 (citing <u>DCD Programs</u>, 833 F.2d at 186);
12 <u>Fidelity Fin. Corp. v. Fed. Home Loan Bank</u>, 792 F.2d
13 1432, 1438 (9th Cir. 1986) (denying plaintiff leave to
14 file fourth amended complaint because "the factual bases
15 of the claims were known to [plaintiff] long before" and
16 defendant would suffer prejudice).

17

18                    **III. FACTUAL BACKGROUND**
19      The following material facts are supported adequately
20 by admissible evidence and are uncontroverted.  They are
21 "admitted to exist without controversy" for the purposes
22 of this Motion.  <u>See</u> L.R. 56-3.

23

24 **A.   Facts Related to the Cross-Motions**
25      Plaintiffs Preckwinkle and Rice are enrolled members
26 of the Agua Caliente Band of Cahuilla Indians, which was
27 known formerly as the Agua Caliente Band of Mission
28

                                13

Indians.  (Stip. Fact Nos. 2, 3, 5.)  President Ulysses
S. Grant established a reservation for the Agua Caliente
Band of Mission Indians by executive order in 1875 and
1876.  (Stip. Fact No. 1.)  By executive order dated
September 29, 1877, President Rutherford B. Hayes added
even-numbered sections of land to the reservation,
including Section 26, Township 4 South, Range 5 East, San
Bernardino Meridian ("Section 26").  (Stip. Fact No. 1.)
Odd-numbered sections of land in the area were granted to
a railroad, resulting in a "checkerboard" pattern of
private land and reservation land in alternating
sections.  (Stip. Fact No. 1.)

     By trust patent dated April 5, 1960, Plaintiff Rice
was granted a 40-acre allotment of land in Section 26.
(Stip. Fact No. 4.)  By trust patent dated October 12,
1961, Plaintiff Preckwinkle was granted a 240-acre
allotment of land in Section 26.  (Stip. Fact No. 6.)
Both Plaintiffs' allotments are held by the United States
in trust for their benefit and are administered by the
Bureau of Indian Affairs, pursuant to the Agua Caliente
Equalization Act, enacted in 1959.  (Stip. Fact Nos. 4,

6.)  Plaintiffs' land is located in an arid region.[5]
(Pls.' SUF ¶ 21.)

Plaintiffs' Section 26 allotments are part of a
larger parcel of Indian land leased for use by the
Mission Hills Country Club ("MHCC") in Rancho Mirage,
California.  (Stip. Fact No. 7.)  The land is leased
subject to a long-term Master Lease, which was originally
entered into in 1969 and has been supplemented more
recently.  (Snyder Decl. ¶ 3.)  The current lessee is the
Mission Hills Country Club, Inc., which has operated MHCC
since 1993.  (Stip. Fact No. 16.)  Three wells were
drilled on Plaintiffs' allotments between 1964 and 1978.
(Stip. Fact Nos. 8-12.)  The parties have stipulated that
third parties, _i.e._, neither Plaintiffs nor Defendant,
drilled the wells.  (Stip. Fact Nos. 10-12.)  It is
unclear, however, whether the wells were drilled by those
third parties at the direction of Plaintiffs' tenants or
Defendant.  The wells are used to pump non-potable water
for irrigation of MHCC's landscape and golf course on
Plaintiffs' allotted land.  (Stip. Fact No. 13.)  MHCC
obtains additional non-potable water from other wells not

---

[5] The Court grants Plaintiffs' RJN concerning this
fact and overrules Defendant's objection to the request.
The Court further grants Defendant's RJN, filed in
support of its Motion and in opposition to Plaintiffs'
Motion, though many of the requests are unnecessary to
resolution of the Cross-Motions.  The Court also notes
that it need not take judicial notice of California
statutes.

15

located on Plaintiffs' allotments.  (Stip. Fact No. 14.)
The Club also purchases potable water from Defendant
District.  (Stip. Fact No. 14.)

Defendant is a county water district organized
pursuant to the California Water Code.  (Stip. Fact No.
17.)  Plaintiffs' allotted land is within the Water
District's "Area of Benefit."  (Def.'s SUF ¶ 37.)  The
Water District purchases imported water each year to
replenish the groundwater in its Area of Benefit.
(Def.'s SUF ¶¶ 31, 35.)  To finance this operation, the
Water District levies a replenishment assessment on the
"producers" of groundwater in the area.[6]  (Def.'s SUF ¶
31.)  The amount of the assessment is based on a uniform
rate for the volume of water pumped.  (Id.)

Since 1980, the Water District has mailed invoices
for replenishment assessments to MHCC, based on the
pumping of water from the wells on Plaintiffs' allotted
land.  (Stip. Fact No. 23.)  Representatives of the Water
District have entered Plaintiffs' allotted land on a
regular basis to read the meters on the three wells and
determine the amount of the assessment.  (Stip. Fact No.
21.)  MHCC has paid the amounts due on the Water

---

[6] A "producer" is a person or entity who "extract(s)"
groundwater by pumping or any other method within the
boundaries of the Water District . . . ."  Cal. Water
Code §§ 31360.5 (d), (e).

16

1  District's invoices; Plaintiffs themselves have not paid
2  any of the assessments.  (Stip. Fact Nos. 20, 24.)

3

4      Before 2004, Plaintiffs Preckwinkle and Rice were not
5  aware that there were wells located on their allotted
6  land, nor did they know that water pumped from those
7  wells provided a basis for the Water District to levy
8  assessments on their tenant.[7]  (Pls.' SUF ¶¶ 12-15.)
9  Plaintiffs learned of the wells and the Water District's
10 assessments when they attempted to negotiate the sale of
11 what they believed to be their water to MHCC.
12 (Preckwinkle Decl. ¶ 9; Rice Decl. ¶ 9.)

13

14     Defendant's expert witness, Joseph M. Lord, has
15 provided an opinion concerning the volume of water that
16 would have been necessary either to sustain the golf
17 course on Plaintiffs' land or to produce certain crops.
18 (Lord Decl. ¶¶ 4-5 & Ex. A.)  When those amounts were
19 compared to the actual annual volume of water pumped on

20

21 ───────────────
       [7] Though Defendant disputes these facts, it has not
22 identified evidence creating a genuine issue.  Defendant
   cites to annual public notices printed in a local
23 newspaper of public record announcing the proposed rate
   of assessment for the year and inviting persons to attend
24 a public hearing.  (Def.'s SGI ¶¶ 12-15 (citing Parks
   Decl. & Exs. 5-29 (public notices published from 1980 to
25 2004)).)  Even if the public notices provided
   constructive notice to Plaintiffs that the Water District
26 was making assessments for water pumped on land in the
   area, Plaintiffs still would not have known that their
27 tenants were actually pumping water.  The public notices
   thus do not support the drawing of an inference in
28 Defendant's favor on this issue.

                              17

1  Plaintiffs' land between 1995 and 1999, Lord concluded
2  that the water use on Plaintiffs' land exceeded the
3  amount of water needed.  (Lord Decl. ¶¶ 7-8.)
4
5      Plaintiffs provided notice of their claims against
6  the Water District by letter dated December 23, 2004.
7  (Stip. Fact No. 22.)
8
9  **B.   Facts Related to the Complaint-in-Intervention Motion**
10     The Water District is a public agency governed by an
11 elected board of directors under the County Water
12 District Law (Cal. Water Code § 30000, et. seq.) and the
13 Coachella District Merger Law (Cal. Water Code § 33100,
14 et seq.).  (SUF 1.)  The Water District provides domestic
15 water service to more than 106,000 customers with water
16 drawn from groundwater supplies and conducts groundwater
17 recharge operations using waters appropriated from the
18 Whitewater River and imported from the Colorado River.
19 (SUF 2.)
20
21     In the 1960s, the Water District entered into
22 contracts with the California Department of Water
23 Resources to purchase water developed by the State Water
24 Project ("SWP").  (SUF 3.)  Because the California
25 aqueduct that transports SWP water does not extend to the
26 Coachella Valley, the Water District and California
27 Department of Water Resources arranged to exchange their
28

SWP supply for an equal volume of Colorado River water
delivered from the Metropolitan Water District's Colorado
River aqueduct. (Id.) The water is delivered into the
Whitewater River and then diverted into the Water
District's Whitewater Spreading Facilities, which were
enlarged in 1972, and again in 1984, for this purpose.
(Id.) The recharge water percolates into the groundwater
basin where it migrates down the valley. (Id.)

The Water District levies and collects water
replenishment assessments on the production of
groundwater from areas benefitted by the Water District's
groundwater recharge operations, pursuant to California
Water Code section 31630, et seq. (SUF 4.) The Water
Board's elected Board of Directors determines the
imposition of the water replenishment assessments and the
rate of the assessments. (SUF 5.) The Water District
charges the replenishment assessments uniformly to every
producer[8] of more than 23 acre feet of water from the
groundwater aquifer within the Area of Benefit. (SUF 6.)

The Water District uses the revenue from water
replenishment assessments to pay for imported and
recycled or reclaimed water or to supplement the limited

_____

[8] As stated in note 7 supra, a "producer" is a person
or entity that "extract(s) groundwater by pumping or any
other method within the boundaries of the Water District
. . . ." Cal. Water Code §§ 31360.5 (d), (e).

naturally existing water supplies in the Upper Whitewater
River Subbasin.  (SUF 8.)  This includes the cost of
imported water obtained by exchange for water rights
through the SWP.  (_Id._)  Groundwater recharge into the
Upper Whitewater River Subbasin benefits all water
producers and consumers in the Area of Benefit (SUF 10)
and prevents overdraft conditions (SUF 9).

State Well Numbers 04S05E26A01S, 04S05E26D01S,
04S05E26H01S, 04S05E26K01S (the "Wells") are located
within MHCC's leasehold interest under the Master Lease
of Plaintiffs' allotted lands in Rancho Mirage, located
within the Upper Whitewater River Subbasin Area of
Benefit.  (SUF 12.)  The Water District has levied water
replenishment assessments on the Wells since 1980.  (SUF
13.)

To determine the amount of the water replenishment
assessments, Water District employees read meters on the
Wells on a monthly basis, calculate the amount owed for
the water produced from the Wells, and mail invoices for
the amounts owed.  (SUF 14.)  MHCC has paid all water
replenishment assessments invoiced by the Water District
for the Wells.  (_Id._)  Hence, the Water District has
never sued MHCC to collect the water replenishment
assessments for production from the Wells.  (_Id._)  MHCC

did not present a claim to the Water District before
filing this action.  (SUF 17.)

## IV. RULINGS ON OBJECTIONS TO EVIDENCE

**A.   Cross-Motions**

The Court makes the following rulings on the parties'
respective objections to evidence submitted in connection
with the Cross-Motions.

With respect to Defendant's Objections to Evidence in
Support of Plaintiff's Motion (Doc. No. 70) and
Objections to Evidence in Support of Plaintiff's
Opposition (Doc. No. 91), which make identical
objections:

- The Court sustains the first objection to the
  Declaration of Kim Snyder, on the ground that
  her testimony that the lease did not convey
  water rights lacks foundation.  She bases this
  testimony on her knowledge of the usual practice
  of the Bureau of Indian Affairs since her
  employment began in 2003, but has not
  established that her knowledge extends back to
  1969, the year the parties signed the Master
  Lease.
- The Court overrules the objections to the
  Declaration of Richard Freeman, as his

recounting of out-of-court statements are not
offered for the truth of the matters asserted,
but rather to show the basis for his belief that
MHCC paid assessments to the Water District and
would be willing to pay Plaintiffs for water.

- The Court sustains Defendant's objections to the
  Declaration of Thomas T. Henslee in its
  entirety, as the declaration is not dated as
  required by 28 U.S.C. § 1746.  See Pieszak v.
  Glendale Adventist Med. Ctr., 112 F. Supp. 2d
  970, 999 (C.D. Cal. 2000) (stating that
  declaration must include execution date or
  approximate date to be admissible).  In
  addition, Henslee states only that he currently
  holds the position of general counsel of MHCC,
  and does not lay a proper foundation for his
  position with the Club when he engaged in the
  discussions described in his declaration.
  (Henslee Decl. ¶ 1.)

- The Court overrules the objections to the
  declarations of Plaintiffs Preckwinkle and Rice,
  with the exception of Defendant's Objection No.
  6 to Preckwinkle's opinions about the Water
  District's stickers located on his wells.
  Objection No. 6 is sustained, on the basis of
  improper lay opinion.  The remaining objections
  are overruled, as Plaintiffs are testifying to

the basis for their understanding that wells are
located on their land and that assessments are
paid by MHCC.

- The Court declines to rule on the remaining
objections are overruled, as the evidence to
which the objections are directed is not
necessary for resolution of the Cross-Motions.

With respect to Plaintiff's Objections to Evidence
Submitted by Defendant in Opposition (Doc. No. 95):

- The Court sustains Plaintiff's objections to the
Declaration of Steven B. Robbins. Robbins's
testimony providing hypothetical calculations
showing the use of more groundwater on
Plaintiffs' land than is naturally replenished
exceeds the scope of his disclosed expertise.
Defendant's counsel identified his expertise in
connection with "decipher[ing] the [Water
District's] engineering reports." (Reply
Freeman Decl. ¶ 8 & Ex. D at 59:18-20.) In
addition, Robbins has not laid a foundation for
his personal knowledge concerning the acreage of
Plaintiffs' lands and the basis for his
hypothetical calculations.
- The Court overrules the objections to the
Declaration of Joseph M. Lord. Plaintiffs'

23

1          objection to the use of the word "probably" is

2          not well-taken, as the word is used to modify

3          his understanding of the present uses of water,

4          but not his opinion concerning the past use of

5          water.   In addition, his testimony does not

6          exceed the scope of the topic for which he was

7          retained to provide an opinion – the irrigation

8          requirements for land parcels of certain

9          acreage.  (Lord Decl. ¶ 3.)

10    •    The Court declines to rule on the remaining

11         objections, as the evidence to which the

12         objections are directed is not necessary for

13         resolution of the Cross-Motions.

14

15                    **V. DISCUSSION**

16   **A.   Cross-Motions**

17        Plaintiffs and Defendant Water District each seek

18   entry of judgment in their favor on Plaintiffs' claims

19   that the pumping and use of water from wells on their

20   land cannot be subject to a replenishment assessment

21   charged by a special water district.  More specifically,

22   the parties disagree whether Defendant can levy a

23   replenishment assessment based on water extracted from

24   reserved Indian land, where the water is extracted by a

25   non-Indian lessee.[9]  As set forth below, the Court finds

26   _____

27        [9] The parties disagree about whether the
     replenishment assessment is classified properly as a

28                                        (continued...)

                         24

that Plaintiffs do have the right to use of a certain
amount of water in connection with their land ownership,
and that such use cannot be regulated by Defendant
through its assessment.  Nevertheless, the Court finds it
cannot adjudicate in this action the amount of reserved
water subject to Plaintiffs' reserved water right,
because it involves a determination of the total water
rights on the reservation, which could affect adversely
the rights of parties not before the Court.

### 1.   Plaintiffs' Reserved Water Rights

The Supreme Court has recognized that when the
federal government reserves land for Indians, it also has
the power to reserve accompanying water rights, thereby
"exempt[ing water] from appropriation under the state
laws."  <u>Winters v. United States</u>, 207 U.S. 564, 577
(1908).  Such reservation of water rights is found by
implication when water is necessary to accomplish the

---

[9](...continued)
"tax" or a "fee."  Though the distinction is not relevant
to the Court's analysis, the Court agrees with Plaintiffs
that the assessment is a fee, rather than a tax, as it is
imposed by a non-legislative body and its proceeds are
spent separately from the state's general fund.  <u>See
Hexom v. Or. Dep't of Transp.</u>, 177 F.3d 1134, 1137 (9th
Cir. 1999) (quoting <u>Bidart Bros. v. Cal. Apple Comm'n</u>, 73
F.3d 925, 933 (9th Cir. 1996)).  A final relevant factor,
whether the assessment is spent for general public
purposes, is a closer call.  The assessment's financing
of water replenishment for individual water users in the
Water District, however, makes it more akin to a
regulatory fee benefitting those who pay it.  (<u>Id.</u>)

purposes of the Indian reservation.  <u>Colville</u>
<u>Confederated Tribes v. Walton</u>, 647 F.2d 42, 46 (9th Cir.
1981) (hereafter, "<u>Walton I</u>") (citing cases).  The amount
of water reserved is the amount reasonably necessary to
fulfill the purposes of the reservation, and the right is
measured from the date the reservation was created.  <u>Id.</u>

When Congress allotted parcels of reserved Indian
land to individual Indians, such as Plaintiffs here, the
allotment included "the right to use some portion of
tribal waters essential for cultivation."  <u>Id.</u> at 50
(quoting <u>United States v. Powers</u>, 305 U.S. 527, 532
(1939)).  Commentators agree that reserved water rights
include rights to both surface water and groundwater.
<u>See</u> A. Dan Tarlock, Law of Water Rights and Resources, §
9.41 (Clark Boardman Callaghan 2007 Supp.); Gwendolyn
Griffith, Note, <u>Indian Claims to Groundwater: Reserved</u>
<u>Rights or Beneficial Interest?</u>, 33 Stan. L. Rev. 103,
110-11 (1980); <u>cf.</u> <u>Cappaert v. United States</u>, 426 U.S.
128, 142-143 (1976) (holding, in the context of reserved
federal rights, that "since the implied-reservation-of-
water-rights doctrine is based on the necessity of water
for the purpose of the federal reservation, . . . the
United States can protect its water from subsequent
diversion, whether the diversion is of surface or
groundwater.").

Here, Plaintiffs' parcels of land were reserved by executive order in 1877 (Stip. Fact No. 1), at which time the water rights necessary to fulfill the purposes of the reservation were also set aside. <u>Winters</u>, 207 U.S. at 577. Such water rights were implied in the reservation of land in the area now known as Rancho Mirage, as it is a dry region where water would be necessary to use the land productively. <u>See</u> <u>Walton I</u>, 647 F.2d at 46. Plaintiffs later received allotments of reserved land, which are held in trust by the federal government for their benefit and overseen by the Bureau of Indian Affairs. (Stip. Fact Nos. 4, 6.) Plaintiffs' allotted land thus includes the reserved water rights necessary to cultivate their particular parcels.[10] <u>Walton I</u>, 647 F.2d

---

[10] In <u>Walton I</u>, the Ninth Circuit held the "general purpose" of the reservation there was to provide the tribes with a homeland, and that within that general purpose were two primary purposes: (1) the creation of an agrarian society and (2) the preservation of the tribes' historic access to their fishing grounds. 647 F.2d at 47-49. <u>See also</u> <u>United States v. Adair</u>, 723 F.2d 1394, 1408-09, 1410 (9th Cir. 1983) (holding that water rights may be implied only "where necessary to fulfill the very purposes for which a federal reservation was created, and not where it is merely valuable for a secondary use of the reservation" and finding that the Klamath Tribe was entitled to reserve a quantity of water "not only for the purpose of supporting Klamath agriculture, but also for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands.") (quotation and citation omitted); <u>United States v. Orr Water Ditch Co.</u>, 309 F. Supp. 2d 1245, 1252-53 (D. Nev. 2004) (holding irrigated agriculture and fishery were primary purposes of the Pyramid Lake Paiute Reservation); <u>Dep't of Ecology v. Yakima Reservation Irrigation Dist.</u>, 121 Wash. 2d 257, 276-77 (1993) (finding the Yakima Nation enjoyed reserved water rights for irrigation and fishery). "The approach of the majority of courts [in defining the purposes of

(continued...)

27

at 50. Plaintiffs' reserved water rights give them a federally recognized right to use a certain amount of the groundwater in the Water District's Area of Benefit.

---

[10](...continued)
the reservation] is . . . consistent with the Indian canons of construction that call for the documents establishing reservations to be construed liberally in favor of Indians." F. Cohen, Cohen's Handbook of Federal Indian Law 1183 (2005 ed.). In United States v. Powers, the Supreme Court first recognized the reserved water rights of allotments. 305 U.S. at 533. Since then, federal courts have interpreted Powers to accord a right to use a "just share" of a tribe's agricultural water rights to allottees. See Scholder v. United States, 428 F.2d 1123, 1126 (9th Cir. 1970); Segundo v. United States, 123 F. Supp. 554, 558 (S.D. Cal. 1954) (citing the "just and equal distribution" language from the General Allotment Act of 1887). See also Powers, 305 U.S. at 532 (presuming that an allottee acquires a right of use only, so that allotment does not sever water rights from tribal ownership); Scholder, 428 F.2d at 1126 (same); Gila River Pima-Maricopa Indian Cmty. v. United States, 29 Indian Cl. Comm'n 144, 150 (1972) (presuming, in dictum, that a portion of a tribe's aboriginal irrigation rights would also pass to allottees). The Ninth Circuit has quantified an allottee's share as a ratable share of the tribe's practicably irrigable acreage ("PIA") rights, based on the percentage of total irrigable acres included within the allotment. Colville Confederated Tribes v. Walton, 752 F.2d 397, 401 (9th Cir. 1985) (hereafter, "Walton II"); Walton I, 647 F.2d at 51; United States v. Ahtanum Irrigation Dist., 236 F.2d 321, 342 (9th Cir. 1956).

By their Motion, Plaintiffs only seek a declaration that the Water District may not assess fees on Plaintiffs or MHCC for the pumping of Plaintiffs' reserved water; Plaintiffs state the amount of reserved water subject to such a right is a matter to be determined at trial. (See Doc. No. 62-16 (Proposed Order Granting Plaintiffs' Motion for Partial Summary Judgment) at 5, n.2.). As discussed below in Section V(A)(4) infra, however, the Court finds it cannot adjudicate in this action the amount of reserved water subject to Plaintiffs' reserved water right.

28

Congress further has provided that lands held by the United States in trust for Indians, such as Plaintiffs' allotted lands, may be leased subject to approval by the Secretary of the Interior. 25 U.S.C. § 415(a) (providing that Indian lands "may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, or business purposes, including <u>the development or utilization of natural resources in connection with operations under such leases</u>.") (emphasis added); <u>see also</u> <u>Segundo v. City of Rancho Mirage</u>, 813 F.2d 1387, 1391 (9th Cir. 1987) (describing the statutory scheme regulating leasing of Indian land). The regulations implementing 25 U.S.C. § 415 provide that

> none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, <u>including water rights</u>, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States.

29

25 C.F.R. § 1.4(a) (emphasis added).[11]  Federal law thus allows Plaintiffs to lease their reserved water rights.[12]

### 2.  Plaintiffs' Reserved Water Rights Preempt the Water District's Replenishment Assessment

Defendant asserts that its replenishment assessment does not infringe on Plaintiffs' federal water rights, because the assessment is levied against, and paid by, a non-Indian lessee.  As a result, Defendant argues, the assessment does not regulate Plaintiffs' right to use groundwater or their ability to convey their water rights.  (Def.'s Mem. P. & A. at 7-13.)  Neither contention is persuasive.

The Supreme Court applies a balancing test to determine when "the State asserts authority over the conduct of non-Indians engaging in activity on the

---

[11] The regulation further provides that such state or local laws may be made applicable to Indian lands by the Secretary of the Interior.  25 C.F.R. § 1.4(b). Defendant has not cited authority suggesting that the Secretary of the Interior has made Plaintiffs' land subject to regulation by a county water district.

[12] Defendant argues that Indian reservations may enjoy water rights under state law.  (Def.'s Suppl. Br. at 5-6.)  That is, in addition to their reserved water rights, Plaintiffs also may obtain water rights in accordance with state law.  This issue has no bearing on the Cross-Motions, however, because Plaintiffs merely seek a determination that Defendant infringed Plaintiffs' reserved water rights by charging assessments. Plaintiffs do not dispute that Defendant may levy assessments for water use that exceeds their reserved water rights.  See note 10 supra.

reservation." <u>Segundo</u>, 813 F.2d at 1391 (citing <u>White Mountain Apache Tribe v. Bracker</u>, 448 U.S. 136, 145 (1980) (hereafter, "<u>Bracker</u>")).  In <u>Bracker</u>, the Court determined that analysis requires:

> a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

448 U.S. at 145.  The Ninth Circuit applied the <u>Bracker</u> balancing test to a case challenging the application of local rent control ordinances to non-Indian lessees operating a mobile-home park on Indian land, finding the federal statutes and regulations governing the lease of Indian land preempted local rent control ordinances. <u>Segundo</u>, 813 F.2d at 1388, 1391, 1392-93.

The analysis in <u>Segundo</u> is particularly relevant here, because the Ninth Circuit there considered the same federal statutes and regulations governing the lease of Plaintiffs' land to MHCC.  Specifically, the Ninth Circuit noted that federal oversight of Indian leases – including a requirement that the leases be approved by the Secretary of the Interior – promoted the interest of "obtain[ing] the 'highest economic return to the owner consistent with prudent management and conservation practices.'"  <u>Id.</u> at 1393 (quoting 25 C.F.R. § 162.8). The Ninth Circuit also found significant the express

provision in federal law that local regulations affecting
the use or development of land may not be applied to
Indian lands.  Id. (citing 25 C.F.R. § 1.4).

Like the rent control ordinances at issue in Segundo,
the Water District's replenishment assessments "not only
would threaten to disrupt the federal and tribal
regulatory scheme, but would also threaten Congress'
overriding objective of encouraging tribal self-
government and economic development."  Id. (quoting New
Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 341
(1983)).  Plaintiffs' ability to include their water
rights in a lease to a tenant, or otherwise to profit
from them, is diminished where the Water District
concurrently charges a fee for water extracted subject to
those rights.  Cf. Walton I, 647 F.2d at 50 (finding that
a restriction on transfer of water rights is a
"diminution of Indian rights").  The Water District's
efforts to characterize the assessments as merely a
mechanism for financing the purchase of additional
groundwater does not alter this result.

The Water District urges the Court to adopt the
reasoning set forth by the Ninth Circuit in cases
involving the imposition of sales taxes on reservation
businesses, such as Gila River Indian Community v.
Waddell, 91 F.3d 1232 (9th Cir. 1999), Salt River Pima-

32

<u>Maricopa Indian Community v. State of Arizona</u>, 50 F.3d 734 (9th Cir. 1995), and <u>Barona Band of Mission Indians v. Yee</u>, 528 F.3d 1194 (9th Cir. 2008). (<u>See</u> Def.'s Suppl. Br. at 9-14.) Defendant's reliance on these cases is misplaced. In each of them, the Ninth Circuit held that sales taxes on non-Indian goods and entertainment sold on a reservation were not preempted by federal law. As noted above, however, the Court construes the replenishment assessment as fee, not a tax. Moreover, reserved water rights are distinguishable from non-Indian goods and entertainment, as the former are tied to the enjoyment of reservation land and accordingly granted greater protection.

The tribal and federal interests, including the interests in the reserved water and in promoting the Tribe's economic development, outweigh the state's interest in taxing reserved water. <u>See, e.g.</u>, <u>Bracker</u>, 448 U.S. at 137-38 (preempting Arizona's motor carrier license and use fuel taxes on non-Indian timber company entering Indian territory to fell trees planted on Indian territory); <u>Crow Tribe of Indians v. Montana</u>, 819 F.2d 895, 904 (9th Cir. 1987) (preempting Montana's coal taxes against non-Indians mining goal beneath a reservation). The Court therefore finds that federal law reserving Plaintiffs' water rights, whether exercised by Plaintiffs

1  or their tenant, preempts the Water District's levy of
2  replenishment assessments.

3

4      **3.    Whether the Master Lease Legally Includes**
5          **Plaintiffs' Reserved Water Rights**

6      Plaintiffs contend the Master Lease does not include
7  Plaintiffs' reserved water rights, while Defendant and
8  MHCC argue it does.  (SUF 22; Def.'s SGI ¶ 22; MHCC's
9  Suppl. Br. at 3-9.)

10

11     As an initial matter, the Court rejects Plaintiffs'
12  assertion that a federal regulation provides that "Indian
13  leases do not convey water rights unless the lease
14  expressly incorporates such rights."  (Pls.' Mem. P. & A.
15  at 6:16-17 (citing 25 C.F.R. § 162.103).)  The authority
16  Plaintiffs cite addresses the application of federal
17  regulations to Indian leases and actually states:

18

19          These regulations cover leases that authorize the
20          possession of Indian land.  These regulations do
            not apply to . . . [l]eases of water rights
21          associated with Indian land, except to the extent
            the use of such water rights is incorporated in a
22          lease of the land itself.
    25 C.F.R. § 162.103.

23

24     Though no case law interprets the meaning of this
25  regulation, its plain language indicates that Indians may
26  lease water rights associated with their land without
27  complying with all of the federal regulations governing

28

Indian leases.  If water rights are incorporated into a
lease of the land itself, however, those water rights
also are subject to the federal regulations, including
such requirements as written approval by the Secretary of
the Interior and a surety bond to assure the lessee's
performance.  <u>See</u> 25 C.F.R. § 162.604 (describing
requirements for non-agricultural leases).  Plaintiffs
thus have not established that the Master Lease did not
convey water rights as a matter of law.

     The only fact Plaintiffs have established is that the
Master Lease is silent on the issue of water rights.
(Snyder Decl. ¶ 6.)  Thus, the Master Lease does not
contain language either reserving Plaintiffs' water
rights or limiting MHCC's use of water within the
allotments.  On the other hand, the Master Lease does not
expressly grant MHCC Plaintiffs' water rights.
Plaintiffs also offer testimony from the current district
supervisor of the Bureau of Indian Affairs, who
interprets the silence to mean that no water rights were
conveyed.  (<u>Id.</u>)  The current district supervisor has
only held her position since January 2003, however.
(Snyder Decl. ¶ 1.)  Though she may confirm that the
Master Lease is silent on the issue of water rights, that
testimony is not probative of the respective parties'
intent, or the BIA's practice concerning the lease of

water rights, when the original lease was negotiated in
1969.

On the other hand, Defendant points to language in
the Master Lease stating that the lessee shall pay all
charges for water.  (Def.'s SGI ¶ 22.)  The cited
language does not identify the source of the water,
however, and is insufficient evidentiary support for a
factual finding that the Master Lease allowed the lessee
to use Plaintiffs' reserved water rights.

MHCC argues that because reserved water rights are
appurtenant[13] to Indian lands, water rights are impliedly
leased together with possessory leases of allotted lands.
(MHCC Suppl. Br. at 6.)  The cases, statutes, and
commentaries MHCC cites, however, merely stand for the
proposition that Indian water rights may be included in a
lease, not that they necessarily are by implication.
(Id. at 6-7.)  MHCC also argues the parties intended that
the Master Lease include the right to produce groundwater

_____

[13] Appurtenant is defined as: "Belonging to;
accessory or incident to; adjunct; appended, or annexed
to . . . [e]mployed in leases for the purpose of
including any easements or servitudes used or enjoyed
with the demises premises.  A thing is 'appurtenant' to
something else when it stands in relation of an incident
to a principal and is necessarily connected with the use
and enjoyment of the latter.  A thing is deemed to be
incidental or appurtenant to land when is by right used
with the land for its benefits, as in the case of a way,
or water-course, or of a passage or light, air or heat
from or across the land of another."  Black's Law
Dictionary 103 (6th ed. 1990) (emphasis added).

1  from beneath the leased property.  To support this

2  argument, MHCC notes one of the Master Lease's stated

3  purposes was to provide for the construction and

4  operation of golf courses, which the parties intended to

5  be profitable, the latter evinced by the fact that

6  Plaintiffs earned income from MHCC's gross revenue.[14]

7  (MHCC Suppl. Br. at 9.)  At the time the parties signed

8  the Master Lease, no public water service existed in the

9  area.  (Genet Decl. ¶ 5.)  The Master Lease provided that

10 Plaintiffs must complete construction of the golf courses

11 within two years.  (Id. ¶ 6(b).)  The cost of extending a

12 water line to the Lease Property, arid desert land (Pls.'

13 SUF ¶ 21), for the provision of domestic water was

14 prohibitive at the time and could not have been achieved

15 in the period of time available to construct the golf

16 courses (see Genet Decl. ¶ 6(a)).  MHCC accordingly

17 argues, "During the entire negotiation process and the

18 signing of the [Master Lease] it was clearly implied that

19 the [Master Lease] included the right to set wells and

20 pump water to irrigate the golf course(s) and common

21 areas of any later development.  There was no other

22 option."  (Genet Decl. ¶ 10.)  In other words. "[w]ithout

23 water, the land was useless."  (Id. ¶ 11.)

24 _____

25     [14] Specifically, the Master Lease entitles the
   lessors to a percentage of the lessees' gross receipts as
26 follows: (1) golf courses - 10%; (2) golf cart rentals -
   5%; (3) pro shop - 4%; (4) apartment houses - 5%; (5)
27 restaurant and coffee shop (sales of food) - 2%; (6)
   cocktail lounge (bar) - 2 1/3%; and (7) residential lot
28 rentals - 30%.  (Master Lease at 5.)

1    Moreover, while MHCC argues, as do Plaintiffs, that

2    the Master Lease is silent on the issue of water rights,

3    it construes this silence differently.  Whereas

4    Plaintiffs construe the silence to mean the absence of a

5    right, MHCC argues it should be interpreted as evidence

6    that Plaintiffs did not reserve their water rights

7    expressly.  (MHCC Suppl. Br. at 8-9.)

8

9    Neither party has carried its burden of establishing

10   whether the Master Lease included – either legally or

11   factually – Plaintiffs' water rights.

12

13       **4.   Application to Plaintiffs' Claims**

14            **i.   Interference with a Federal Right**

15   Both parties seek entry of judgment on Plaintiffs'

16   first claim that the Water District's replenishment

17   assessment has interfered with Plaintiffs' federally

18   protected water rights.

19

20   In the usual case, federal law would not provide a

21   claim for "interference with a federal right" independent

22   of a § 1983 claim or a private right of action under a

23   particular statute.  See Keaukaha-Panaewa Cmty. Ass'n v.

24   Hawaiian Homes Comm'n, 739 F.2d 1467, 1471-72 (9th Cir.

25   1984) (analyzing only whether the plaintiff could enforce

26   a statute by private right of action or through a § 1983

27   claim).  Plaintiffs cannot obtain relief under § 1983 as

28

                                38

set forth below in Section V(A)(4)(i) _infra_, and they
have not set forth any other basis for bringing a naked
claim that Defendant interfered with their federal
rights.

 

   The Supreme Court has recognized, however, that
Indian landowners may maintain an "action for violation
of their possessory rights based on federal common law."
_Cnty. of Oneida v. Oneida Indian Nation of N.Y._, 470 U.S.
226, 236 (1985) (holding federal common law claim existed
where Indian tribe alleged its ancestors had illegally
transferred land to New York State and sought recovery of
fair rental value).  Resolution of this claim requires
the Court to determine whether the Master Lease conveyed
Plaintiffs' water rights to MHCC, either as a matter of
fact or as a matter of law.

 

   As noted above, federal courts have interpreted
_Powers_ to accord a right to use a "just share" of a
tribe's agricultural water rights to allottees.  _See_
_Scholder_, 428 F.2d at 1126; _Segundo_, 123 F. Supp. at 558
(citing the "just and equal distribution" language from
the General Allotment Act of 1887).  _See also_ _Powers_, 305
U.S. at 532 (presuming that an allottee acquires a right
of use only, so that allotment does not sever water
rights from tribal ownership); _Scholder_, 428 F.2d at 1126
(same); _Gila River Pima-Maricopa Indian Cmty._, 29 Indian

1  Cl. Comm'n at 150 (presuming, in dictum, that a portion
2  of a tribe's aboriginal irrigation rights would also pass
3  to allottees).  The Ninth Circuit has quantified an
4  allottee's share as a ratable share of the tribe's
5  practicably irrigable acreage rights, based on the
6  percentage of total irrigable acres included within the
7  allotment.  Walton II, 752 F.2d at 401; Walton I, 647
8  F.2d at 51; Ahtanum Irrigation Dist., 236 F.2d at 342.
9
10     Although Plaintiffs state that the amount of water
11 subject to their reserved water rights is a matter to be
12 determined by the Court at trial (see Doc. No. 62-16 at
13 5, n.2), the Court cannot make such a determination in
14 this action.  As the Ninth Circuit held in United States
15 v. Powers, what right, if any, an allottee may have to
16 water rights cannot be determined in a piecemeal fashion
17 because all owners or allottees of lands within a
18 reservation are "necessary parties."  94 F.2d 783, 786
19 (9th Cir. 1938).  Moreover, the landowners and allottees
20 are indispensable because a determination of one
21 allottee's rights "would directly and materially affect
22 all owners of lands within the reservation, many of whom
23 are not parties to this suit."  Id.
24
25
26
27
28

40

1   Federal Rule of Civil Procedure 19(a) provides:

2

3   A person who is subject to service of process and
    whose joinder will not deprive the court of
    subject-matter jurisdiction must be joined as a
4   party if: (A) in that person's absence, the court
    cannot accord complete relief among existing
5   parties; or (B) that person claims an interest
    relating to the subject of the action and is so
6   situated that disposing of the action in the
    person's absence may: (i) as a practical matter
7   impair or impede the person's ability to protect
    the interest; or (ii) leave an existing party
8   subject to a substantial risk of incurring double,
    multiple, or otherwise inconsistent obligations
9   because of the interest.

10  Fed. R. Civ. P. 19(a). Here, as in <u>Powers</u>, an

11  adjudication of Plaintiffs' water rights necessarily

12  involves a determination of the entire reservation's

13  water rights, <u>i.e.</u>, because Plaintiffs are entitled to a

14  ratable share of the tribe's total practicably irrigable

15  acreage rights, the Court would have to quantify the

16  tribe's PIA to determine Plaintiffs' ratable share.

17  Making such a determination in this action would as a

18  practical matter impair the unjoined landowners' and

19  allotees' ability to protect their interests. Likewise,

20  the United States, as trustee of the allotments, has

21  legal title to the property. <u>See</u> <u>Puyallup Indian Tribe</u>

22  <u>v. Port of Tacoma</u>, 717 F.2d 1251, 1254 (9th Cir. 1983);[15]

23  _____

24  [15] The Ninth Circuit found in <u>Puyallup</u> that the
    United States was not an indispensable party where an
    Indian tribe brought an action to quiet title to a
25  portion of riverbed. 717 F.2d at 1254. <u>Payallup</u> is
    distinguishable from the facts here, however, because the
26  Ninth Circuit found the tribe's interest in bringing the
    action was aligned with the United States' interests, and
27  the United States simply held the title to the disputed
    land in trust for the benefit of the tribe. In other
28  (continued...)

41

<u>Paiute-Shoshone Indians of Bishop Cmty. v. City of Los Angeles</u>, 637 F.3d 933, 997-98 (9th Cir. 2011) (holding the United States was a required party where Indian tribe brought action against city to restore possession of land). The United States cannot be joined in this action, however, and has declined to be joined as a party, because Plaintiffs only seek a determination of their reserved water rights, which is not the type of water rights adjudication for which Congress expressly has permitted joinder of the United States. <u>See</u> 43 U.S.C. § 666 ("McCarren Amendment"). It also is not feasible to join all reservation landowners and allottees in this action because Plaintiffs did not bring this action as a general groundwater adjudication.

Having determined the absent parties are necessary and cannot be joined, the Court next examines "whether, in equity and good conscience, the action should proceed among the existing parties, or should be dismissed." Fed. R. Civ. P. 19(b); <u>Am. Greyhound Racing, Inc. v. Hull</u>, 305 F.3d 1015, 1018 (9th Cir. 2002) ("[T]he

---

[15](...continued)
words, the tribe's position was not adverse to the United States. Here, only three allottees, rather than the entire tribe, seek adjudication of their water rights; the United States' interests, as trustee, accordingly may not be aligned with these three Plaintiffs' interests. Furthermore, even if the Court found that the United States was not a necessary party under <u>Puyallup</u>, the other landowners and allottees on the reservation are necessary parties under the holding in <u>Powers</u>.

question whether a party is indispensable 'can only be determined in the context of particular litigation.'") (quoting <u>Provident Tradesmens Bank & Trust Co. v. Patterson</u>, 390 U.S. 102, 118 (1968)). Rule 19(b) sets forth four factors to consider in determining indispensability:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

"The list is by no means exhaustive, nor does the rule state how much weight is to be given to each of the factors." <u>Fletcher Aircraft Co. v. Bond</u>, 77 F.R.D. 47, 53 (C.D. Cal. 1977); Rule 19(b) advisory committee notes to 1966 Amendment (stating the Rule 19(b) factors "are not intended to exclude other considerations which may be applicable in particular situations"). Thus, "Rule 19(b) gives a trial court considerable discretion and requires that several conflicting interests be balanced on a case-by-case basis." <u>Bakia v. Los Angeles Cnty.</u>, 687 F.2d 299, 301 (9th Cir. 1982).

1    "[I]n general[,] the United States is an
2  indispensable party in actions involving Indian lands
3  because of its governmental interest . . . ."  3A J.
4  Moore & J. Lucas, <u>Moore's Federal Practice</u> ¶ 19-196 (2d
5  ed. 1986); <u>see</u> <u>Paiute-Shoshone</u>, 637 F.3d at 998.  In
6  <u>Puyallup</u>, the Ninth Circuit found that if the United
7  States was not joined formally as a party in an action to
8  quiet title to a portion of a riverbed, it would "not be
9  bound by any degree in the ensuing litigation."  717 F.2d
10 at 1254-55.  The same could be said here both of the
11 United States and the absent landowners and allottees.
12 Thus, without joinder of the absent landowners and
13 allottees, "a judgment entered . . . in favor [of one
14 party] would not necessarily render complete relief to
15 [that party] or protect the [parties] from inconsistent
16 judgments."  <u>Id.</u>; <u>Fort Mojave Tribe v. Lafollette</u>, 478
17 F.2d 1016, 1018 (9th Cir. 1973).

18

19    Moreover, the Court here cannot quantify Plaintiffs'
20 water rights without materially affecting the rights of
21 other landowners on the reservation.  <u>See</u> <u>Powers</u>, 94 F.2d
22 at 786; <u>Puyallup</u>, 717 F.2d at 1254-55.  Any judgment
23 entered in this action could be highly prejudicial to the
24 absent landowners and allottees.  <u>See</u> <u>Navajo Tribe of</u>
25 <u>Indians v. New Mexico</u>, 809 F.2d 1455, 1472 (10th Cir.
26 1987).  "[S]uch prejudice could not be lessened or
27 avoided either through protective provisions in the
28

judgment or through the shaping of relief" because rights
related to reservation lands "must be decided entirely or
not at all."  Id.  Finally, even if the Court were to
proceed without the necessary parties, any judgment
entered would not necessarily render complete relief or
protect the parties from inconsistent judgments.  Fed. R.
Civ. P. 19(b).

On the other hand, the Court also must consider the
fourth Rule 19(b) factor – whether Plaintiffs will have
an adequate remedy if the action is dismissed for
nonjoinder.  Fed. R. Civ. P. 19(b).  The Court
acknowledges Plaintiffs have no such remedy here.  "Yet,
this lack does not preclude a finding of
indispensability."  Navajo, 809 F.2d at 1473 ("'Rule
19(b) does not state what weight is to be given each
factor, and thus we must determine the importance of each
factor on the facts of each particular case and in light
of equitable considerations.'" (quoting Glenny v. Am.
Mental Climax, Inc., 494 F.2d 651, 653 (10th Cir. 1974));
Dainippon Screen Mfg. Co. v. CFMT, Inc., 142 F,3d 1266,
1273 (Fed. Cir. 1998) (noting a single Rule 19(b) factor
is not determinative, given "Rule 19(b)'s mandate to
consider all of the relevant factors and the equities of
the situation.").

As this action likely would prejudice the rights of parties not before the Court, and any relief rendered would be unlikely to protect either the interests of the absent parties or the parties before the Court, "in equity and good conscience," the action should not proceed. The Court accordingly DISMISSES Plaintiffs' second claim for interference with a federal right on the basis of nonjoinder.

### ii. Trespass

Defendant requests entry of judgment in its favor on Plaintiffs' second claim for trespass, arguing that owners who are not in possession of their property cannot state a claim for trespass. (Def.'s Mem. P. & A. at 14:12-19.) Under California law, "an out-of-possession property owner may recover for an injury to the land by a trespasser which damages the ownership interest." Hassoldt v. Patrick Media Grp., Inc., 84 Cal. App. 4th 153, 171 (2000) (quoting Smith v. Cap Concrete, Inc., 133 Cal. App. 3d 769, 774-75 (1983)). Hence, Plaintiffs may maintain an action for trespass despite lease of the land they allege has been trespassed upon. Id.

Defendant makes no other argument for entry of judgment in its favor on the trespass claim, and the Court declines to grant summary judgment on those grounds.

46

As set forth above, however, the Court cannot
adjudicate a dispute involving the determination of water
rights as to only a few allotments of land on a
reservation.   Though Defendant did not raise this
argument as to Plaintiffs' trespass claim, courts may
raise issues related to joinder sua sponte.   See McCowen
v. Jamieson, 724 F.2d 1421, 1424 (9th Cir. 1984) (holding
the issue of joinder "is sufficiently important that it
can be raised at any stage of the proceedings – even sua
sponte."); CP Nat'l Corp. v. Bonneville Power Admin., 928
F.2d 905, 911 (9th Cir. 1991) ("The absence of
'necessary' parties may be raised by reviewing courts sua
sponte.   The issue can be properly raised at any stage in
the proceeding."); see also Provident, 390 U.S. at 111
(1968) ("[W]hen necessary . . . a court . . . should, on
its own initiative, take steps to protect the absent
party, who . . . had no opportunity to plead and prove
his interest . . . ."). For the reasons set forth above,
the Court accordingly DISMISSES Plaintiffs' second claim
for trespass.


                **iii. Conversion**

     Defendant seeks summary adjudication on Plaintiffs'
fourth claim for conversion.   As to that claim,
Plaintiffs allege:


          Plaintiffs, and not [the Water District], have the
          right to possession of fees for the removal and

> replenishment of water from wells on the Allotted Lands. By charging and collecting fees from the master tenant for the removal and replenishment of water, [the Water District] has converted Plaintiffs' property for its own use.

(SAC ¶ 39.) Defendant argues Plaintiffs "do not have any personal ownership interest in the funds used by their tenant to make payments to the Water District." (Def.'s Mem. P. & A. at 15.) Defendant's contention requires a finding that Plaintiffs did not convey water rights to their tenant when the tenant extracted groundwater and paid the Water District's assessments. Such a factual finding would lead to the conclusion that Plaintiffs had no property right in the assessments paid to the Water District. As set forth above, there remains a triable issue whether Plaintiffs conveyed water rights to MHCC in the Master Lease. Also as set forth above, however, the Court cannot adjudicate the issue of Plaintiffs' reserved water rights in this action because it necessarily requires the Court to quantify those rights. The Court cannot quantify Plaintiffs' water rights without materially affecting the rights of other landowners on the reservation and accordingly DISMISSES Plaintiffs' fourth claim for conversion.

### iv. Violation of 42 U.S.C. § 1983

Both Plaintiffs and Defendant seek entry of judgment on Plaintiffs' fifth claim that the Water District's

1   assessments deprived Plaintiffs of rights secured by

2   federal law, in violation of 42 U.S.C. § 1983.

3

4       Plaintiffs' § 1983 claim fails as a matter of law.

5   The Ninth Circuit has held that a § 1983 claim cannot be

6   premised on a state action made unlawful by federal

7   preemption.  <u>White Mountain Apache Tribe v. Williams</u>, 810

8   F.2d 844, 852 (9th Cir. 1987); <u>see also</u> <u>Segundo</u>, 813 F.2d

9   at 1394 ("preemption of state law under the Supremacy

10  Clause - being grounded not on individual rights but

11  instead on considerations of power - will not support an

12  action under section 1983.").

13

14      As set forth above in Section V(A)(2) <u>supra</u>, the

15  Court finds that federal law reserving Plaintiffs' water

16  rights preempts the Water District's levy of

17  replenishment assessments; Plaintiffs thus cannot obtain

18  concurrent relief under § 1983.  The Court accordingly

19  enters judgment in Defendant's favor on Plaintiffs' claim

20  for violation of 42 U.S.C. § 1983.

21

22          **v.   Unlawful Taxation**

23      Defendant moves for summary adjudication on

24  Plaintiffs' sixth claim for unlawful taxation.

25  Plaintiffs argue that Defendant's assessments violate

26  federal statutes prohibiting taxation of Indian land.

27  (SAC ¶ 51 (citing 25 U.S.C. § 956; 28 U.S.C. § 1360).)

28

Though Plaintiffs cite 25 U.S.C. § 956 as a basis for their claim for unlawful taxation, that statute provides that allotted lands "shall not be subject to assignment, sale, or hypothecation or to any attachment or levy for claims or debts created before or after September 21, 1959, without the written approval of the Secretary."  25 U.S.C. § 956(a).  The statute is inapplicable here; it simply prohibits the use of allotted lands to satisfy claims or debts.

The other basis for Plaintiffs' claim, 28 U.S.C. § 1360, is a statute providing for state court jurisdiction over civil claims arising between Indians, or to which Indians are a party.  28 U.S.C. § 1360(a).  The statute further provides:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

28 U.S.C. § 1360(b).

1    Plaintiffs apparently base their claim on the
2  language in § 1360(b) prohibiting the encumbrance or
3  taxation of Indian property, including water rights.
4  Reading the statute in its entirety, however, § 1360(b)
5  is better understood as "prohibiting state courts,
6  acquiring jurisdiction over civil controversies involving
7  reservation Indians pursuant to [§ 1360(a)] from applying
8  state laws or enforcing judgments in ways that would
9  effectively result in the 'alienation, encumbrance, or
10 taxation' of trust property."  <u>Bryan v. Itasca Cnty.,</u>
11 <u>Minn.</u>, 426 U.S. 373, 391 (1976).

12

13    As the challenged replenishment assessment does not
14 fall under either statute on which Plaintiffs predicate
15 their claim, the Court GRANTS Defendant's Motion as to
16 Plaintiffs' unlawful taxation claim.

17

18          **vi. Request for Entry of Declaratory Judgment**
19    Both parties request judgment in their favor on
20 Plaintiffs' seventh claim for declaratory judgment.  The
21 SAC requests a declaration that Plaintiffs "may sell
22 their reserved water to their tenant(s) and that [the
23 Water District] may not assess or charge any fees or
24 taxes upon plaintiffs or their tenants, for the drilling
25 and/or consumption of such water."  (SAC ¶ 56.)

26
27
28

Pursuant to the analysis set forth above, Plaintiffs are entitled to reserved water rights that provide them with access to a specific – but unknown at this time – amount of groundwater and may convey the use of such rights to their tenants.  The Court cannot enter judgment in Plaintiffs' favor, however, because it is unable to adjudicate the amount of Plaintiffs' reserved water rights, i.e., the "just and equal distribution" afforded to Plaintiffs as allottees.  The Court accordingly enters judgment in Defendant's favor as to Plaintiffs' declaratory relief claim.

### 4.   Statute of Limitations and Limitation on Damages

Finally, Defendant argues in the alternative that it is entitled to partial summary judgment, or summary adjudication on the basis that the availability of damages in this action should be limited by the California statutes of limitation and California's claim presentation requirement.  (Def.'s Mem. P. & A. at 18.) In response, Plaintiffs cite to various federal statutes of limitation.  (Pls.' Opp'n at 23.)  The Court has dismissed Plaintiffs' claims on other grounds as set forth above, and accordingly need not reach Defendant's alternative argument regarding the statute of limitations.

**5.   Application of the Court's Analysis to Plaintiff Siva's Claims**

Here, Plaintiff Siva did not move for summary judgment.  In <u>Bird v. Glacier Electric Coop, Inc.</u>, the Ninth Circuit held that a "court has power <u>sua sponte</u> to grant summary judgment to a non-movant."  255 F.3d 1136, 1152 (9th Cir. 2001); <u>see also</u> <u>Cool Fuel, Inc. v. Connett</u>, 685 F.2d 309, 311 (9th Cir. 1982) (stating that if it is apparent "that the case cannot be proved if a trial should be held, the court may <u>sua sponte</u> grant summary judgment to the non-moving party.").

At the July 25, 2011, hearing, Plaintiffs' counsel stated that Plaintiff Siva's trespass claim has a different factual basis than Preckwinkle's and Rice's trespass claims.  (<u>See</u> Rep. Tr. 7:1-2 ("[Siva's] trespass claim is different than the trespass claims of the other plaintiffs."), 7:9-15 ("The trespass claim for Mr. Siva includes more of a traditional trespass of coming onto land that belonged to Mr. Siva and interfering with that land . . . . [I]t is not dependent upon water rights."), 10:20-25-12:4 (discussion of the Court, Plaintiffs' counsel, and Defendant's counsel regarding Siva's trespass claim).)

The Court's conclusion that it cannot adjudicate Plaintiffs' water rights claims in this action, however, also applies to Plaintiff Siva's water rights claims, which are identical to the moving Plaintiffs' claims. The Court accordingly GRANTS Defendant's Motion as to Plaintiff Siva on the same grounds and as to the same claims as set forth above, with the exception of Siva's trespass claim.

**B.  Complaint-in-Intervention Motion**

The Water District moves for partial summary judgment as to MHCC's second claim for injunctive relief to prevent the Water District from levying or collecting water replenishment assessments and third claim for disgorgement of money previously paid to the Water District under an unjust enrichment theory.  (Compl.-in-Intervention Mot. at 1.)

The Water District argues MHCC's second and third claims are jurisdictionally barred under the Tax Injunction Act.  (Compl.-in-Intervention Mot. at 2-9.) MHCC responds that the replenishment assessment is a fee, not a tax, and accordingly the Tax Injunction Act is inapplicable.  (Compl.-in-Intervention Opp'n at 3-9.) The Water District also argues MHCC cannot maintain its third claim because it did not present its claim to the Water District's governing board, as required under the

California Government Claims Act. (Compl.-in-Intervention Mot. at 10-17.) MHCC responds that its third claim is not subject to the California Government Claims Act, and accordingly is not barred. (Comp.-in-Intervention Opp'n at 9-15.)

### 1. Whether the Water Replenishment a Fee or a Tax

As discussed in note 9 <u>supra</u>, the parties disagree about whether the replenishment assessment is classified properly as a "tax" or a "fee."

The Tax Injunction Act provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Act "prohibits both declaratory and injunctive relief in state tax disputes as long as the taxpayer has an adequate remedy in state court." <u>Patel v. City of San Bernardino</u>, 310 F.3d 1138 (9th Cir. 2002); <u>see also Amarok Corp. v. State of Nevada</u>, 935 F.2d 1068, 1069 (9th Cir. 1991) ("the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground to invoke the equitable jurisdiction of federal courts." (internal quotation marks and citation omitted)). Under Ninth Circuit case law, the Act also prohibits monetary relief such as a tax refund. <u>See Dillon v. State of</u>

<u>Montana</u>, 634 F.2d 463, 466 (9th Cir. 1980) ("§ 1341 bars refund actions in federal court when adequate state remedies are available").

The Ninth Circuit applies a three-part test to determine whether a certain charge is a fee or a tax. <u>Qwest Corp. v. City of Surprise</u>, 434 F.3d 1176, 1183 (9th Cir. 2006) (citing <u>Bidart</u>, 73 F.3d at 931). The test instructs courts to focus on three primary factors: (1) the entity that imposes the charge; (2) the parties upon whom the charge is imposed; and (3) whether the charge is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed. <u>Id.</u> "When the first two . . . factors are not dispositive, courts emphasize the third factor - the way in which the revenue is ultimately spent." <u>Qwest</u>, 434 F.3d at 1183 (citing <u>Bidart</u>, 73 F.3d at 932).

The Court agrees with MHCC that the assessment is a fee, rather than a tax. First, the assessments are imposed by the Water District's Board of Directors, which is a non-legislative body. (SUF 5.) Second, the Water District charges the replenishment assessment uniformly to producers of more than 23 acre feet of water from the groundwater aquifer within the Area of Benefit. (SUF 6.) Here, California Water Code section 31639 states:

56

> 1       This chapter, applicable only to the Coachella
>       Valley Water District, is necessary because of
> 2       the special and unique problems . . . within
>       such district . . . This problem is not common
> 3       to all districts formed under this division.  It
>       is therefore hereby declared . . . that the
> 4       enactment of this chapter as a special law is
>       necessary for the solution of problems existing
> 5       in the Coachella Valley Water District.

6 Thus, those in the Area of Benefit could be said to be a

7 limited class – namely, those who reside within the Area

8 of Benefit and use more than 23 acre fee of water.

9

10     Even assuming this factor weighs in favor of

11 construing the assessment a tax, the third factor – how

12 the assessments are spent – weighs in favor of construing

13 the assessment as a fee.  Here, the proceeds are spent

14 separately from the state's general fund.  <u>See</u> <u>Hexom</u>, 177

15 F.3d at 1137 (quoting <u>Bidart</u>, 73 F.3d at 933).

16 Specifically, the revenue from the water replenishment

17 assessments is used to pay for imported and recycled or

18 reclaimed water to supplement naturally occurring water

19 (SUF 8) and accordingly prevent overdraft conditions (SUF

20 9.)  <u>See</u> <u>Bidart</u>, 73 F.2d at 931 (holding where an

21 assessment is designed to defray costs of an applicable

22 program it is more likely a fee than a tax).  The

23 assessment's financing of water replenishment for

24 individual water users in the Water District makes it

25 akin to a regulatory fee benefitting those who pay it,

26 rather than a tax.  (<u>Id.</u>)  Thus, the Water District has

27

28

1  not carried its burden of establishing that MHCC's claims
2  are jurisdictionally barred under the Tax Injunction Act.
3
4      As set forth above in its analysis of the Cross-
5  Motions, however, the Court finds it cannot adjudicate
6  the amount of Plaintiffs' reserved water rights in this
7  action.  The Court accordingly DISMISSES MHCC's second
8  claim, as it necessarily depends on this determination.
9
10     **2.   Whether Plaintiffs' Third Claim Is Subject to**
11          **the California Government Claims Act**
12     MHCC's third claim, unjust enrichment, seeks
13  disgorgement of money from the Water District for MHCC's
14  payment of illegally imposed fees.  The Water District
15  argues this claim is barred because it is subject to the
16  California Government Tort Claims Act, with which MHCC
17  admits it has not complied.  (Compl.-in-Intervention Mot.
18  at 10.)
19
20     Under the California Tort Claims Act, a plaintiff may
21  not maintain an action for damages against a public
22  entity unless a written claim has first been presented to
23  the appropriate entity and acted upon by that entity
24  before filing a suit in court.  Cal. Gov't Code § 945.4.
25  A plaintiff must demonstrate compliance with or an
26  applicable excuse to the claim presentation requirement.
27
28

58

1  See State of California v. Super. Ct. (Bodde), 32 Cal.
2  4th 1234, 1243 (2004).

3

4       In the Amended Complaint-in-Intervention, MHCC
5  alleges it "is not subject to the California Tort Claims
6  Act because Mission Hills is seeking a return of
7  property, in the form of illegal fees" from the Water
8  District.  (Am. Compl.-in-Intervention ¶ 53.)  In this
9  motion, MHCC claims exemption from the Government Claims
10 Act on several bases:  (1) its claims arise under 42
11 U.S.C. § 1983, the General Allotment Act, and the Winters
12 Doctrine because they are predicated upon Plaintiffs'
13 claims, and accordingly do not arise under state law; (2)
14 MHCC "stands in the shoes" of Plaintiffs because
15 Plaintiffs conveyed their reserved water rights to MHCC
16 in the Master Lease; (3) MHCC is seeking return of
17 specific property, which is a nonpecuniary action; and
18 (4) to the extent MHCC is subject to the Government
19 Claims Act, it is seeking a "refund" of the water
20 replenishment assessment, pursuant to an exception in the
21 Act.  The Court finds MHCC's arguments unavailing for the
22 reasons set forth below.

23

24            **i. Claims Arise Under Federal Law**
25      MHCC's first argument – that its claims arise under
26 federal law – is unpersuasive.  MHCC does not allege a
27 federal claim in the Amended Complaint-in-Intervention.
28

Instead, it brings claims for an injunction, declaratory relief, and unjust enrichment.  None of these claims arise under federal law.  Moreover, MHCC cannot rely on the claims in Plaintiffs' pleadings as a basis for an exception here.

### ii. MHCC Stands in Plaintiffs' Shoes

MHCC next argues it is not subject to the claim presentation requirement because Plaintiffs conveyed their reserved water rights to MHCC in the Master Lease. Plaintiffs, as Indians bringing federal claims related to their land, need not satisfy the claim presentation requirement.  MHCC seeks to rely on Plaintiffs' exemption, arguing Plaintiffs' conveyance of water rights allows MHCC to stand in Plaintiffs' shoes.

As the Water District correctly points out, however, every litigant must present its own claim to the state agency, and cannot rely on a claim submitted by another. See Nguyen v. L.A. Cnty. Harbor/UCLA Med. Ctr., 8 Cal. App. 729, 734 (1992) (dismissing parents' action, which relied on their child's claim for medical malpractice); Bozaich v. State of California, 32 Cal. App. 3d 688, 696-97 (1973) (finding, in a class action, that the claim presentation requirement was not met where named plaintiffs had fulfilled the requirement but some class members had not).  In Montana v. Crow Tribe of Indians,

the Supreme Court noted that a non-Indian lessee did not qualify for a refund of an allegedly illegally assessed tax because the lessee failed to pursue protest and claim procedures prescribed by state law.[16]  523 U.S. 696, 698, 713-14 (1998) (hereafter, "Crow II").  "As a rule, a nontaxpayer may not sue for a refund of taxes paid by another."  Crow II, 523 U.S. at 714 (citing cases).  It follows logically that Plaintiffs cannot sue for a refund of fees paid by another, i.e., MHCC.  See, e.g., Crow II, 523 U.S. at 698, 713-14; Crow Tribe v. Montana, 650 F.2d 1104, 1113, n.13 (9th Cir. 1981) (hereafter, "Crow I") ("As to the taxes already paid by [the non-Indian lessee], however, . . . the Tribe has not paid any of the taxes and is apparently not entitled to any refund if the tax statutes are declared invalid.").

The facts here are analogous to those in Crow.  As there, MHCC was required to, but did not, comply with state claim presentation requirements.  Moreover, MHCC cannot rely on Plaintiffs' exemption to avoid compliance.

### iii. Specific Property Exception

MHCC next argues that it is exempt from the claim presentation requirement because it merely seeks return

---

[16] The Supreme Court also found persuasive that the non-Indian lessee had entered into a settlement with the State and the county relinquishing any claim it might have had for return of the tax payments in question. Crow II, 523 U.S. at 713.

61

1  of property in the form of "illegal fees" that were

2  "wrongfully detained" by the Water District.  (Compl.-in-

3  Intervention Opp'n at 11-14.)

4

5      A claim for specific property in which the property

6  is held by the government as a "bailee" is exempt from

7  the claims presentation requirement because it does not

8  constitute a claim for money or damages.  See Minsky v.

9  City of L.A., 11 Cal.3d 113, 121 (1974).  In Minsky, the

10 Los Angeles police department seized money from a

11 defendant's person while arresting him.  Id. at 117-18.

12 The defendant assigned his interest in the money to his

13 attorney, who later assigned it to another party, who in

14 turn sought to recover it from the police department.

15 Id. at 118.  The California Supreme Court held the claims

16 presentation requirement did not apply to the assignee's

17 claim because the money was specific, personal property.

18 Id. at 120-21.  See also Hold v. Kelly, 20 Cal. 3d 560,

19 563-65 (1978) (holding the claims presentation

20 requirement does not apply to a claim for personal

21 property by an arrestee).  Courts also have applied the

22 Minsky rule to actions to recover property seized under a

23 search warrant, or compensation for its value.  See Long

24 v. City of L.A., 68 Cal. App. 4th 782, 786-787 (1998);

25 Hibbard v. City of Anaheim, 162 Cal. App. 3d 270, 277-278

26 (1984).

27

28

1    MHCC points to no case in which a court has applied

2 the specific property exception to a case involving the

3 assessment of a tax or fee.  The Water District, on the

4 other hand, cites persuasive authority that the Minsky

5 exception should be construed narrowly.  See City of

6 Stockton v. Super. Ct., 42 Cal. 4th 730, 743 (2007)

7 (declining to extend the Minsky exception to a breach of

8 contract case); Sparks v. Kern Cnty. Bd. of Supervisors,

9 173 Cal. App. 4th 794, 799 (2009) (holding the bailee

10 exception does not apply to actions for restitution or

11 reimbursement); City of L.A. v. Super. Ct., 168 Cal. App.

12 4th 422, 426 (2008) (declining to extend the Minsky

13 exception where drunk-driving arrestees sought partial

14 refunds of amounts assessed by the city to defray its

15 emergency response costs associated with their incidents,

16 and holding, "Because plaintiffs' claim for monetary

17 relief is not based on an obligation to return specific

18 property held by the city as a bailee, we conclude that

19 the claim is a claim for 'money or damages'").  The Court

20 accordingly declines to extend the Minsky rule to the

21 facts here.

22

23          **iv.  Refund Exception**

24    Finally, MHCC contends to the extent it is subject to

25 the Government Claims Act, it is seeking a "refund" of

26 the water replenishment assessment, for which the Act

27 provides an exception.  (Compl.-in-Intervention Opp'n at

28

63

13-15.)  Specifically, MHCC relies on the following
exception to the claims presentation requirement:  "There
shall be presented . . . all claims for money or damages
against local public entities except . . . (a) Claims
under the Revenue and Taxation Code or other statute
prescribing procedures for the refund, rebate, exemption,
cancellation, amendment, modification, or adjustment of
any tax, assessment, fee, or charge or any portion
thereof, or of any penalties, costs, or charges related
thereto."  Cal. Gov't Code §§ 905, 905(a).

    In determining whether section 905(a) provides an
exemption from compliance with the general claims
presentation statutes, courts "are guided by established
rules of statutory construction" and accordingly "begin
with the fundamental rule that a court should ascertain
the intent of the Legislature so as to effectuate the
purpose of the law." Dalton v. East Bay Mun. Util.
Dist., 18 Cal. App. 4th 1556, 1571 (1993) (citation
omitted).  In determining such intent "[t]he court turns
first to the words themselves" and is "required to give
effect to statutes according to the usual, ordinary
import of the language employed in framing them." Id.
Moreover, "[w]hen used in a statute words must be
construed in context, keeping in mind the nature and
obvious purpose of the statute where they appear." Id.
(citation omitted).

As the court explained in <u>Dilts v. Cantua Elementary School District</u>, 189 Cal. App. 3d 27 (1987), "[t]he primary function of the Tort Claims Act is to apprise the governmental body of imminent legal action so that it may investigate and evaluate the claim and where appropriate avoid litigation by settling meritorious claims." <u>Id.</u> at 32 (citation omitted). The legislature has specifically exempted from the claims requirement certain categories of claims that have been characterized as "essentially nontortious claims for which some other adequate claims procedure has already been devised or for which the procedural protection of the Tort Claims Act [Government Code section 905] is believed to be unnecessary." <u>Dalton</u>, 18 Cal. App. 4th at 1571 (citation omitted).

In accordance with the statutory framework, and the legislative history of Government Code section 905, which "indicates the scope of the enumerated exceptions to filing claims was intended to be extremely limited," the statutory exceptions specified in Government Code section 905 are given a "strict" and narrow construction. <u>Dalton</u>, 18 Cal. App. 4th at 1573 ("[T]he statutory exceptions specified in section 905 are given a strict construction."); <u>Hanson v. Garden Grove Unified Sch. Dist.</u>, 129 Cal. App. 3d 942, 946-48 (1982) (recognizing the "statutory loopholes" to the claim filing requirements "have been narrowly construed"); <u>Hart v.</u>

Cnty. of Alameda, 76 Cal. App. 4th 766, 779 (1999) ("[T]he Legislature intended the claims presentation statutes to broadly apply to 'all forms of monetary demands.'") (citation omitted).

MHCC argues California Water Code section 60328 provides a procedure to obtain a refund of a water replenishment assessment. MHCC's reliance on section 60328 is misguided, however, because the statute, on its face, does not apply to the situation presented here. Section 60328 provides for refund of a replenishment assessment for "any producer who has erroneously overstated his production of ground water in any sworn statement for a quarterly period . . ., and who has overpaid his replenishment assessment for that quarter." Cal. Water Code § 60328. Even if MHCC were to establish that the Water District erroneously charged the assessments, MHCC has not provided any authority suggesting section 60328 provides a procedure for remedying that harm. The Court accordingly GRANTS the Complaint-in-Intervention Motion as to MHCC's third claim.[17]

_____

[17] A party need not comply with the claims presentation requirement when bringing an action for injunctive or declaratory relief where monetary relief is incidental to the primary relief sought generally. Lozada v. City & Cnty. of San Francisco, 145 Cal. App. 4th 1139, 1164-65 (2006). Plaintiffs' first and second claims accordingly are not subject to the claims presentation requirement. It cannot be said, however,
(continued...)

Finally, as set forth above, the Court finds it cannot adjudicate the claims in the Amended Complaint-in-Intervention without determining the quantify of water included in Plaintiffs' reserved water rights. Such a determination requires joinder of all landowners on the reservation and the United States, as trustee. The Court accordingly DISMISSES the Amended Complaint-in-Intervention in its entirety.

## C. Motion to Amend

Plaintiffs seek to amend the SAC to include a claim for unjust enrichment and a remedy of restitution. (Mot. to Amend at 2.) Plaintiffs argue amendment is appropriate because the facts that comprise the proposed third amended complaint ("TAC") already are alleged or stipulated to in earlier pleadings, and the theory of the new claim also is similar. (Id.)

Defendant argues amendment is not appropriate because the proposed TAC: (1) contains a claim the Court dismissed previously, Plaintiffs' third claim for inverse condemnation; (2) repeats a claim for which the Water District has moved for summary judgment; and (3) includes allegations that the summary judgment motions "have

---

[17](...continued)
that Plaintiffs' third claim, which seeks disgorgement of the money MHCC paid to the Water District, is incidental to the primary relief sought generally.

1  indisputably revealed are factually untrue as to
2  Plaintiffs Preckwinkle and Rice (Paragraphs 11, 21, 22,
3  27, and 31)."  (Mot. to Amend Opp'n at 1.)  As to
4  Plaintiffs' proposed unjust enrichment claim, Defendant
5  argues leave to amend should be denied because amendment
6  would be futile, in that a claim for unjust enrichment
7  does not arise at common law when taxes or fees
8  voluntarily paid are later determined to be void.  (<u>Id.</u>)
9  Finally, Defendant argues the Court should not grant
10  leave to amend because Plaintiffs' proposed amendment
11  "comes too late in the process, after discovery has
12  closed and after the deadline for making motions for
13  summary judgment as to [P]laintiffs Preckwinkle and Rice
14  has passed."  (<u>Id.</u>)

15

16      As noted above, under Rule 15(a), courts should grant
17  leave to amend liberally, except in narrow circumstances.
18  For example, "[l]eave need not be granted where the
19  amendment of the complaint would cause the opposing party
20  undue prejudice, is sought in bad faith, constitutes an
21  exercise in futility, or creates undue delay."  <u>Ascon</u>
22  <u>Props.</u>, 866 F.2d at 1160 (citing <u>DCD Programs</u>, 833 F.2d
23  at 186); <u>Saul</u>, 928 F.2d at 843; see also <u>Bonin</u>, 59 F.3d
24  at 845.

25

26

27

28

1    Here, Plaintiffs previously have amended their
2    complaint twice.  Plaintiffs seek to amend their
3    complaint again, more than six years after they filed
4    this action.  While the delay was due, in large part, to
5    the parties' joint stipulations to continue the case,
6    Plaintiffs voluntarily agreed to repeated continuances of
7    this action.  While there is no evidence that Plaintiffs,
8    in seeking leave to amend, are acting in bad faith or in
9    an effort to delay the proceedings further, the stage in
10   the proceedings disfavors granting leave to amend.

11

12   Plaintiffs argue the proposed amendments would not
13   prejudice Defendant because they merely add an additional
14   remedy and arise from the same facts contained in
15   Plaintiffs' previous pleadings, or from facts to which
16   the parties previously stipulated.  This argument is
17   unavailing, however.  "[L]ate amendments to assert new
18   theories are not reviewed favorably when the facts and
19   the theory have been known to the party seeking amendment
20   since the inception of the cause of action."  <u>Acri</u>, 781
21   F.2d at 1398.  Moreover, the Ninth Circuit has held that
22   "a district court does not abuse its discretion in
23   denying a motion to amend a complaint . . . when the
24   movant presented no new facts but only 'new theories' and
25   provided no satisfactory explanation for his failure to
26   fully develop his contentions originally."  <u>Allen</u>, 911
27   F.2d at 374 (quotations omitted).  Plaintiffs have

28

69

1  provided no satisfactory explanation for their failure to
2  develop their contentions related to the proposed
3  amendment at an earlier date.   Indeed by their own
4  argument, Plaintiffs admit the facts upon which they rely
5  were known to them for some time.   The Court accordingly
6  DENIES Plaintiffs' Motion to Amend.

7

8                      **VI. CONCLUSION**

9      For the foregoing reasons, the Court:

10

11     (1) GRANTS Defendants' Motion as to Plaintiffs' claim
12  for interference with a federal right;
13     (2) GRANTS Defendant's MOTION as to Plaintiffs'
14  trespass claim;
15     (3) GRANTS Defendant's Motion as to Plaintiffs'
16  conversion claim;
17     (4) GRANTS Defendant's Motion as to Plaintiffs' claim
18  for violation of 42 U.S.C. § 1983;
19     (5) GRANTS Defendant's Motion as to Plaintiffs'
20  unlawful taxation claim;
21     (6) GRANTS Defendants' Motion as to Plaintiffs'
22  declaratory judgment claim;
23     (7) GRANTS Defendants' Motion as to Plaintiff Siva's
24  claims, with the exception of the trespass claim;
25     (8) DENIES Defendant's Complaint-in-Intervention
26  Motion on the basis of the Tax Injunction Act;

27

28

        (9) GRANTS Defendant's Complaint-in-Intervention
Motion as to MHCC's third claim for unjust enrichment;

        (10) DISMISSES the Complaint-in-Intervention; and

        (11) DENIES Plaintiffs' Motion to Amend.


        The Court VACATES all pending deadlines and schedules
a status conference on September 26, 2011, at 3:00 p.m.



Dated: _August 30, 2011_____

                                VIRGINIA A. PHILLIPS
                            United States District Judge