## Water and the Townspeople

Non-Indian members of the community, perhaps recognizing that there was now an Indian agent who defended the Indians, encouraged them to pursue their economic and political rights, took an interest in Indian water rights, had begun to panic early in 1909. They wrote True, saying they did not wish to infringe on the Indians' right to the first 40 inches of water in Tahquitz ditch, but wanted to be assured of the unmolested use of the water in excess of 40 inches. This document was signed by A. E. Davis, Welwood Murray, Lavinia Crocker, Marcy C. McKenly, Pearl McCallum, and Emily McCallum (Davis et al. 3/12/1909). Indian Agent True, correctly fearing that the non-Indians were apt to disagree with each other over the distribution of any water allowed them, suggested that the government set up a system for controlling the water (True 3/26/1909). The McCallums at this point were at odds with Rogers, and claimed that they could prove that the Palm Valley Water Company had forfeited all rights to Tahquitz water by not using it for over five years. The McCallums retained their own personal riparian rights gained by use.

Johnson, in response to the letter from Davis et al, and to the Rogers situation, put together a review of the documentary evidence in the files of the OIA from the 1880s, 1890s, and 1900s. In the review, he included a statement from H. C. Miller, who asserted that the soil of Palm Springs and vicinity was first class agricultural soil. Citrus and deciduous fruits, figs, grapes, and alfalfa all could grow there and possibly produce $200 to $300 per annum. Land available for agriculture was estimated at 6,000 acres. Water for irrigation and domestic use came from Tahquitz and Andreas canyons, and amounted to 450 to 500 M.I. during the irrigation season, increasing to 1000 M.I. in the spring. Johnson likewise included in his report statements signed by a number of the adult male members of the Tribe with respect to the Tahquitz ditch. There weren't many people living at Palm Springs at this time. About half the Agua Caliente found it necessary to live elsewhere in order to make a living (Miller 1909).

Francisco Patencio and José Rafael signed a statement to the effect that:

> About 1884, Dunford, a white man, who married an Indian woman, had a contract to build a concrete house and enlarged Tahquitz ditch by blasting to get more water. They worked three days. No other white man ever blasted rocks in Tahquitz ditch or otherwise enlarged it. McCallum once started to clean out the ditch but we, the Indians, stopped him (Patencio and Rafael 1909).

Rafael, who had been captain in the 1890s, submitted a statement saying he was 85 years old, and remembered when the Tahquitz ditch was built. He had been too small to help. The Indians built fires around the rock and then poured water over them in order to blast them. "Victorita plowed the furrow and let the water in. Juan Tocolota, Joe Chino, Nicholas, Jose Antonio, all of whom are dead, helped. The ruins of houses on Section 22 [Tahquitz Canyon] were those of our ancestors. I can't remember them" (Rafael 8/14/1909).

Pedro Chino, in his statement, said he was 76 years old and remembered when the ditch was built, having been a little boy at the time. "My father was born here and always lived here" (8/14/1909). Marcus Belardo, 83 years old, said he was born in Palm Springs and always lived there, and that the Tahquitz ditch was built by Indians before he could remember (Belardo 8/14/1909). Francisco Patencio wrote that he was 50 years old and could not remember when the ditch was built, though he had always helped keep it in repair (8/14/1909). Francisco Arenas, 78 years old, said the ditch was built before he could remember by the Indians, who had always kept it in repair (8/17/1909). Jose Lebacho, who thought he was a little over 100 years old, said that he and an Indian named Lass had dug the original ditch, and that old man Victorito was the one who broke the rocks with fire and water about the time the stage station was built there (circa 1860). Lebacho was living in San Bernardino in 1909 and came to Palm Springs to go over the ground to make sure that the ditch was in the same place he remembered digging it (8/23/1909).

While all the furor over the threat represented by the Rogers' interests was going on, the Indian Irrigation Service was finally working at improving the water resources of the reservation so that the Agua

ACC0006813

A Decade of Slow Recovery: 1900-1909

Caliente could be self-sufficient as farmers again. In the 1908-1909 fiscal year, surveys were made for a pipeline to carry water from Tahquitz Canyon to Section 14 without the loss from seepage that occurred in the ditch. Fourteen hundred feet of 14 inch and 6000 feet of 10 inch cement pipeline, and 2200 feet of 8 inch cement pipe lateral "were located." The line would carry 200 California M.I. of water when completed. If the Indians got 40 inches, it would irrigate 160 acres of land. If more water were available, even more could be cultivated. The line would cross land belonging to non-Indians, and negotiations for an equitable distribution of water were under way. At the same time, cement pipe was also being laid for the improvement of the Andreas Canyon irrigation system (Olberg 7/20/1909). With this, it was thought, cash crops and subsistence crops would be sufficient so that the Agua Caliente people could be relatively well off, and with the addition of cash seasonal labor, and other labor, which they engaged in for many years, would indeed be self-sufficient. As it turned out, the development of Palm Springs from an isolated desert community to a major tourist resort would finally preclude the need for subsistence or cash farming as a means of making a living.

### Anthropology

Sometime prior to 1908, A. L. Kroeber, the founder of the Department of Anthropology at the University of California, Berkeley, visited the Indian reservations at Highland and those as far east as Indio, becoming one of the first scholars to visit the Coachella Valley. Kroeber was especially interested in describing material culture and collecting artifacts for what is now called the Phoebe Hearst Museum of Anthropology. He described the traditional culture ways of the Cahuilla women. He noted that they were making baskets both for use and for sale. Those made for use were coarsely constructed, and did not hold water, whereas those made for sale to non-Indians were more finely woven and were made of different materials, usually from *Juncus* sp. Baskets made for use were decorated with simple patterns, whereas those made for sale had quite elaborate patterns (1908:27).

By the time of Kroeber's visit, pottery was seldom if ever made. Cahuilla houses were still apt to contain a bow and two or three arrows (1908:55, 57). They continued to be used for hunting well into the 1920s. The carrying net was still being used from time to time, basket caps worn, mesquite ground in wooden mortars, etc. Kroeber didn't think they still possessed shell beads. People were still living in traditional houses—rectangular houses made of brush (1908) in Section 14.

In addition to his paper on Cahuilla ethnography, Kroeber gathered data for a report on the Cahuilla language on this trip. These data were included in his paper on Shosonean languages (1907).

## PALM SPRINGS BEGINS TO TAKE OFF: 1910-1919

### The Village of Palm Springs

The non-Indian population in Palm Springs markedly increased between 1910 and 1920, bringing a new cast of characters to the village. The arrival of the Coffmans in 1909 and the establishment of the Desert Inn set the tone for a new era. Dr. Coffman for a time replaced the aging Dr. Murray as the doctor for the village and the reservation, and was called on from time to time to provide care for the Agua Calientes, but he left when he and his wife parted company in 1914 (Bright 1981:65). From then on, Nellie Coffman ran the Desert Inn, played down Palm Springs' advantages as a place to recover from tuberculosis, and began to emphasize its virtues as a tourist resort. Many of the Agua Calientes worked for Mrs. Coffman over the years.

After Dr. Murray died in 1914, the sisters Cornelia, Isabel, and Dr. Florilla White bought his property, through which the Tahquitz ditch still ran. Isabel White became the wife of Smeaton Chase, author of popular books that glamorized the desert. The Agua Calientes often served as guides for Cornelia White, a notable equestrian (Bogert 1987:84).

ACC0006814

**Reservation Affairs**

About the end of 1909 or early in 1910, Superintendent Clara True, finally having threatened too many powerful people in southern California in her defense of the Indians, was transferred elsewhere. She was replaced as teacher and administrator by William Sullivan, a man less likely to offend.

During the summer of 1911, Adrian Maxwell was hired by the Indian Office as farmer at Agua Caliente. Neither Sullivan nor Maxwell had the concern for the welfare of the Indians that True had had, but Sullivan was perhaps a bit more aware of the political realities. Maxwell was to enforce the terms of the Tahquitz contract, and to teach farming methods to the Indians (who had been farming in their eco-niche for at least 70 years). He was neither compatible with, nor suited for, working with the Agua Caliente people. By the end of the summer, Sullivan found it necessary to tell him that, even though he might prefer the non-Indians to the Indians, it was up to him to win the Agua Calientes' confidence and friendship, and that no show of force was to be used in dealings with them (Sullivan 9/21/1911).

In a related incident, the Indians accused a man named John Deen of damming the Tahquitz ditch when the water was low in order to get the water to flow onto the Welwood Murray property. After Maxwell explained what Deen had been doing, Sullivan reminded him that it was his duty to make sure that such an action not take place again. Sullivan recommended that he teach each adult male Indian how to measure the waterflow in order that the Indians might be able to keep track of the water distribution for themselves (Sullivan 9/25/1911).

Maxwell's wife was later hired as a field matron, a position available on many Indian reservations. Matrons were hired (Sullivan 9/25/1911) to teach the Indian women how to can fruits and prepare vegetables, to practice "healthy" housekeeping techniques, and to improve their methods of personal hygiene and baby care—areas of behavior in which it was assumed they needed instruction.

Like a number of other Indian agents, and others in and out of the Indian Service, Sullivan had small regard for Indian property rights, resenting that the government did not own reservation land, but held it in trust for the Indians, to whom it was patented. For example, he tried to get Pico Manuel to give him a small piece of land near the hot spring on which to build a house for Maxwell, choosing the choicest land in the entire valley, let alone the reservation. Pico avoided him as long as possible, but on October 12, Sullivan wrote Maxwell,

> . . . I had a talk with Pico, Ramon, and Pedro last Sunday, and they refused to give us a bit of land, they were very impertinent about it and when I told them that the government owned the land anyway, they said, "Well, why don't you take it then." I told them I would but you know the land is patented to the band and I am not sure the Office would stand back of me if I did and then it would be suicide to use force on them as you would not be permitted to help them at all. They claimed that you used their grapes and that your barn is on their land and a lot of rot. Bill Pablo said that they were willing to let us have a little land, but Frank [Francisco] Patencio interfered and changed their attitude. It is disgusting to think that the government should be hampered in this way . . . . I want to tell you that they are a very deceitful crowd of Indians and you just have to take care of yourself down there. If any of them commit any offenses against the law you must see that they are punished for it (Sullivan 10/11/1911, 10/12/1911).

Clearly, a significant change in attitude and management style from that of Clara True and some of her predecessors was in effect. But the Agua Calientes, already well aware of their rights and the value of their lands, were not going to be taken advantage of by men who, they must have realized, were only temporary representatives of the government—men who were in fact not keeping to the letter or spirit of the law by their actions.

With respect to his housing, Maxwell did have cause for complaint, but against the government, not the Indians. Sullivan had asked the Indian Office for $1500 to build Maxwell a house for himself and his family, but the money was not forthcoming, and Maxwell in the winter of 1912 was living in a tent that had been lent by Henry Pablo of Morongo Reservation. Sullivan advised him to build himself a

ACC0006815

frame tent house (1/26/1912). In April, 1912, the government accepted a bid from a contractor for building a house for the farmer (Sullivan 5/26/1912).

Education and medical care were now of greater concern than they had been in the past. Sullivan asked Maxwell to tell Moreno Patencio to send his children to school, and noted that he was also sending medicines for the Indians to Dr. Coffman, husband of Nellie Coffman, hoping he would treat any Indians who were ill (11/18/1911).

The social and religious life of the Indians continued to come under the scrutiny of the agents. Social "fiestas" and religious ceremonies (*nukil*), important gathering times for religious and secular purposes, were worrisome to agents, who feared and generally disapproved of Indian group activities that they could not control. The annual fiesta in 1911 was to begin December 4. Sullivan announced that he was sending officers to maintain the peace, and told them they could use Maxwell's barn as a jail if necessary (11/25/1911). As in earlier days, fiestas and *nukil* ceremonies were times when leaders of many Indian groups in the region came together. They provided an opportunity for comparing and discussing their problems with the government representatives and for organizing resistance.

The bathhouse, a source of income to the Tribe as well as a place to bathe, was in poor repair by 1911, and the Indians with Sullivan's assistance began to plan for its repair. They proposed to buy materials with money laid aside from bathhouse fees, and from what the Pacific Telephone and Telegraph Company had paid for a right-of-way across the reservation. As usual, there was a delay before the OIA would agree to release the money. As time went on, there were more and more complaints about the condition of the existing building. Tribal income was threatened, and there were serious safety concerns. In May, 1912, Sullivan urged the CIA to release the money, as the Indians had kept accounts and were well aware that the bathhouse earnings were enough to pay for the new building, but it was probably this awareness that led to their being described by Sullivan as "sullen, ugly, and unmanageable," (5/8/1912) rather than as sensible entrepreneurs. The money was apparently forthcoming.

The venerable leader José Rafael, a captain of the Tribe some 20 years before, died in 1911 (Sullivan 12/13/1911).

Sullivan in mid-1912 was transferred (Sullivan 6/18/1912), and the Agua Calientes soon had a new agent with whom to get acquainted. The lack of continuity resulting from the constant change of agents became increasingly a problem as the years went by.

The population of the Agua Caliente Reservation in the summer of 1917 was 51, a number that suggests that the members of the Band who had moved elsewhere during the drought at the turn of the century had returned, and that there were now a few more opportunities available to them in Palm Springs. Agricultural conditions had improved, as shown by the fact that there were 3206 fruit trees on the Garden of Eden tract, and $3,100 worth of crops had been harvested the previous year (Olberg 8/3/1917).

## Cemetery

A new Roman Catholic church was built on Section 14 in 1912, and an event that eventually led to the establishment of a new graveyard took place the same year. This was a break in the fence surrounding the old graveyard near or on the Coffman property that Coffman neglected to repair. Sullivan sent lumber to repair it, and asked that the fence be repaired at once (Sullivan 5/18/1912).

## Water

The Indian Irrigation Service put a great deal of effort into the Tahquitz water system during 1910 and 1911, apparently deciding that the formula established in the mid-1890s in negotiations between the Indian agent and McCallum was valid. This formula gave the first badly needed 40 M.I. of flow in Tahquitz Creek to the Indians and 5 M.I. to non-Indians who had been using water since the 1890s for domestic purposes. It is not quite clear whether the 5 M.I. was intended to come out of the 40 inches or was to be taken out separately (in practice we can be sure it was taken out first). The second 40 inches went to the non-Indians, and the Indians were to get 2/3 of any flow over 80 inches.

As True had foreseen, it was difficult indeed to get the non-Indians to agree on how their share of the water was to be divided. There were not a great many who qualified for a portion of it, inasmuch

ACC0006816

as a number of those who owned land in Section 15, through which the pipeline would go, had moved away and forfeited their water rights by not using them. When Chief Engineer Code of the Indian Irrigation Service suggested to Dr. Hamilton Forline, brother-in-law of Pearl McCallum, that a meeting be held with all those who still retained water rights, Forline was unenthusiastic, saying that it would probably be a waste of time, the "neighborly feeling" in Palm Springs having a tendency to delay proceedings (Code 8/27/1910; Forline 8/29/1910).

Code took this advice and dealt individually with the McCallums, Dr. Murray and his son George, Lavinia Crocker, Dr. and Mrs. Coffman, and Judge Davis. At one point, Code thought seriously of rerouting the pipeline to run along the southern edge of Section 15, and across the corner of Section 23 into Section 14, but this came to naught and the route of the existing ditch across Section 14 was used.

The first contract specified a two week schedule, with the Indians and each of the non-Indians allotted the water for a specified period of time during the fortnight. Since the water was used for domestic purposes as well as irrigation, the non-Indians were to fence the ditch as it passed through their land and to keep the ditch clean, i.e., unpolluted by animals. The Indians were to keep the ditch in repair (Indian Irrigation Service 3/2/1911) (see Figure V.9).

As often happened then, and in recent years as well, the consent of the Indians regarding the disposition of matters significant to them had not been deemed necessary. In the first week of February, 1911, elders Francisco Patencio and Pedro Chino visited Sullivan's office at Morongo Indian Reservation in Banning, complaining that the non-Indians were using water from the ditch. They said that if the government had laid the ditch completely on Indian land, they would not have had to share (Sullivan 2/3/1911). The next week the Indians held a tribal council meeting and subsequently approached Sullivan saying they owned all the water from Tahquitz Canyon, and that they did not think the non-Indians should get any of its water. Sullivan consulted Olberg, who wrote to his superior asking if he should secure the consent of the Indians to the contract (Olberg 2/13/1911), but his superior was adamant that they not be consulted, lest they present objections that would delay the agreement. He would sign for the government, representing the Indians.[166] After the construction was completed, a meeting would be held and the agreement would be explained to the Indians (Code 2/18/1911).

The contract was recorded with the County of Riverside on March 14, 1911, and work on the irrigation system proceeded. At this same time, the Andreas Canyon irrigation system was also being repaired and improved for both agricultural and domestic uses, thus relieving some of the crisis regarding water for the Tribe.

The Indians were still being urged to begin farming on Section 35, near Andreas Canyon, where the irrigation system had been refurbished, but they were reluctant to leave their homes on Section 14, quite reasonably, since the area at Andreas was *Paniktum* territory, and none of the Band in 1911 was *Panik*. Section 14 was in the traditional *Kauisiktum* territory. Naturally, they feared that settlers would take their Section 14 land away from them if they moved away; and of course they liked living "in town" among their friends and kin, where housing was already available. They also wanted to be near the ceremonial house where much activity took place, and close to the jobs and school that were available in the center of town. A number of people, especially women, worked in the hotels just a few minutes walk from Section 14, rather than the several miles from Andreas Canyon. Sullivan recommended they plant fig orchards (Sullivan 12/6/1911).

By December, the water in Tahquitz Canyon had risen to over 40 M.I., so Sullivan wrote the non-Indian users, urging that the terms of the contract be precisely observed, being especially concerned that the water be kept clean. He asked Murray to see to it that there were gates that permitted Maxwell to get to the ditch on Murray's property (Sullivan 12/30/1911), perhaps an indication that Murray, notorious for helping himself to as much water as he wanted, tried to keep Maxwell out. The 1911 map in Figure V.9 shows the route finally chosen for the pipline and the route of the cement ditch through the non-Indian lots on Section 15. Section 14, not shown on this map, lies to the right.

---

[166]This decision backfired on the agency in the 1930s.

ACC0006817

Palm Springs Begins to Take Off:  1910-1919



**Figure V.9.  Irrigation System Proposed February 10, 1911**

V-241

ACC0006818

By 1912, Amado Miguel and Marcus Belardo were interested in farming on Section 35 near the mouth of Andreas Canyon, but despite recent improvements to the irrigation system there, there were still unresolved problems with it. Nor were those the only irrigation problems. The Tahquitz ditch developed several small leaks that had to be repaired. The entire length of the ditch was relined with cement, and a concrete box was placed in the Indian line to enable them to measure their water themselves (Olberg 7/12/1912). Unfortunately, in order to repair one of the leaks, Maxwell turned off the water on the Indian line and let it run into the Coffmans' field, resulting in a complaint from the wary leader, Pedro Chino, who, suspecting the illegal use of water, had to be shown what happened (Sullivan 2/19/1912).

Flooding was a continuing concern of Palm Springs people. In 1913, a flood washed out part of the Tahquitz ditch. A cement siphon was installed to carry the flow during a storm, while at the Garden of Eden on Section 35, where the soil was not very good, enough cement pipe was manufactured to carry enough Andreas Canyon water to irrigate all of Section 26, which was more suitable for agriculture (Olberg 7/17/1913).

Satisfied that the Indians were making good use of what water they had, the water service worked to provide them with the water they needed. In Section 14, the Agua Calientes were growing food for themselves and non-Indians as well, using water from Tahquitz. An earth reservoir was being constructed on Section 14 to hold the water from the hot spring for irrigation. The main Tahquitz ditch had been surveyed for a 4000 foot extension, as had a number of laterals, for bringing water into these very productive fields.

Agricultural production was further enhanced when the Indians dug several hundred more feet of ditch on the Garden of Eden project, built a small concrete dam, and cleared and planted new fields. So successful was the effort initially that people from other reservations were encouraged to move to the Garden of Eden (Olberg 7/3/1914). We find no evidence that anyone came in response to this encouragement, nor would they have without Agua Caliente tribal permission. It was just as well that no one came—Section 35 land tended to support agriculture for only a few years before the hard pan beneath the surface soil had its effect.

In 1915, the Indians once again found it necessary to protest interference in their water rights by non-Indians, and a lack of storage facilities to store water for the dry months. They were also concerned that the water they used for domestic purposes was polluted by dead animals and other materials before it reached them, thereby presenting a very serious health hazard (Olberg 5/25/1915). They planted several acres of Section 35 with grapefruit and lemons, one orchard being irrigated by a 400 foot extension of the 10' cement pipe that was built that year. On the Tahquitz project, a culvert consisting of 52 feet of 24" cement pipe was installed to carry the water under the road at the "west reservation boundary," probably the boundary of Section 14 (Olberg 7/15/1915).

In 1916, southern California suffered a severe flood. A great deal of damage was done to the Andreas Canyon irrigation system, but, fortunately for the Indian community, most of whom lived and subsisted on Section 14, the Tahquitz system suffered no structural damage, and needed only $200 worth of repairs (Olberg 2/15/1916). In November, the Andreas system was further impacted when an earthquake shattered one of the stand pipes and opened numerous minor leaks in the concrete pipe (Olberg 8/3/1917).

In 1918, a man named Jordan Dixon wanted to use the water from a spring in the northwest corner of Section 22, which was owned by the Tribe, by piping it to his land. His application was denied and Herbert V. Clotts, Acting Superintendent of Irrigation, recommended that the water from the spring be piped to where the Indians could use it in order to retain their rights to it (Clotts 1/7/1918). It was later decided that the cost of such a project was not justified by the amount of water reported from the spring, and the project was dropped (Clotts 6/5/1919).

Although the irrigation systems had been repaired and improved early in the decade, upkeep was sporadic and inadequate, a situation characteristic of all reservation irrigation systems at the time. In the Irrigation Service Annual Report for 1918, for example, Clotts noted that the steel pipe laid in Andreas Canyon in 1888 was badly corroded. It required repair work every year to keep it in condition to carry water. The cement pipe laid between 1909 and 1915 crossed low sandy places. Back-fill had to be raised

ACC0006819

over the pockets to protect it (Clotts 8/2/1918). Figure V.10 shows the lower end of the Tahquitz irrigation system as of 1918, including the part in Section 14.

The wood regulating gate at the mouth of Tahquitz Canyon had rotted out and had been replaced by one of rubble concrete. A heavy earthquake had crushed several turnouts on the line. These had been repaired. The ditch had been cleaned out and a chute was built at the end of a small flume across the ditch (Clotts 8/2/1918).

Still another flash flood in 1918 washed out the dam at the head of Andreas Canyon. Repair of the damage, the replacement of the corroded steel pipe with concrete, and, later, the extension of the pipeline so that more land could be irrigated were authorized (Reed 11/1/1918, 12/16/1918); but, over all, the maintenance of the system was so inadequate that by 1919 the Tahquitz irrigation system was providing only enough water to irrigate 40 acres, in part because the earth ditches were losing the water, and in part because so much water was lost between the creek channel and the intake pipeline laid in 1911. Clotts thought the later loss was due to cracks, possibly caused by yet another earthquake in September, 1919. Improvements that he recommended, he thought, would make it possible to irrigate 80 acres on Section 14.

### The Agricultural Experiment Station

For some time the U. S. Department of Agriculture had used Indian lands in other areas as experimental stations. In 1918, Clotts sent the CIA at his request two maps showing a tract of land in Section 34 and two in Section 35 that the Department of Agriculture wanted to use for the experimental culture of dates. Some land in the corner of Section 34 was indeed later turned over for use as an experimental station for testing date, cotton, and cactus varieties, and was used as such for some twenty years, employing Indians as farmers (CSRI 1991).

### Anthropologists

By this period anthropologists were well into their task of collecting data on the culture of the Indians of California. Lucile Hooper, one of Kroeber's research fellows, spent a short time in the Coachella Valley in 1918. Although she worked mostly with the people at Torres-Martinez, Augustine, and Cabezon reservations, she also consulted with several people at Palm Springs. Her subsequent monograph (1920) includes a version of the Cahuilla creation story, descriptions of Cahuilla religious life, world view, and social life. There are short sections on material culture, games, dogs, the calendar, and astronomical beliefs. A final section deals with tales and beliefs.

Hooper attended two *nukil* ceremonies, one at Torres and one at Palm Springs, incorrectly calling them *fiestas*. These were still week long ceremonies, coming to an end with a burning of the images of those who had died during the year or two that had elapsed since the last *nukil* ceremony. The only divergence from the traditional ceremony that Hooper took note of was that guests were no longer ceremonially met—probably because people no longer walked, but travelled by wagon, train, or even by automobile (1920:328-329).

Hooper noted that Lee Arenas and his wife, "two well educated Indians" resorted to a traditional medicine man, Lee's father, when Dr. Coffman could not cure her stomach ailment (1920:335). She quoted Francisco Patencio's definition of the spirit: "Our breath is our spirit, for it leaves us when we die" (1920:342). Juan Lugo, "of Agua Caliente reservation," gave her an account of *toloache* initiation ceremony (1920:347). Juan Lugo himself was from the Cahuilla Reservation, but he was married to Apolinaria Lugo from Agua Caliente.

Another collector of data on Cahuilla culture in this decade was not an anthropologist, but a collector; that is, a collector of artifacts. This was E. H. Davis, originally a storekeeper in San Diego County, who travelled extensively in the United States and Mexico collecting artifacts that he sold, principally to the Museum of the American Indian, the Heye Foundation, in New York (a collection being incorporated in the 1990s into the Smithsonian Institution). Davis' journals, now in the archives of the San Diego Historical Society, give us a look at the Agua Calientes from a different direction than that presented by papers of the Indian Agency. They tell us more than one might expect about who the

ACC0006820

The Tahquitz Report: Ethnography and Ethnohistory



**Figure V.10**
**Map Showing Lower End of Tahquitz Irrigation System as of 1918, Including Part in Section 14**

ACC0006821

*Kauisik* were in 1917, where they were "coming from," as one might say. The notes also tell us something of the "collector" culture of the time. Davis' visits to Palm Springs took place in the fall of 1917.

On October 20, Davis wrote:

Made the acquaintance of several Indians on the reservation. Found only one had ollas. They (2) belonged to Lee [Arenas]. These I bargained for. I bought an old arrow straightener from Francisco Arenas and was told Pedro Chino had a deerhoof rattle. This he uses when about to undertake a hunting trip. He sings and uses the rattle all night and then in a dream a bird comes to him and tells him where he can find the deer in the mountains. There he goes and gets his venison.

Food of the desert Indians—mesquit[e] beans, screw beans, mescal, fruit of the cholla, china—bisnaqa cacti. Also certain seeds of desert brush and in the mountains a small sort of wild onion and pinon nuts. These are prepared by heating rocks, putting in the nuts and covering them up and roasting them for two or three hours. Then they are ready to eat. . . (1917).

On October 22:

Early saw Francisco [Patencio] and he had already gone and secured the olla that was hidden in the mountain—he wanted $25, but according to my schedule, it was only worth $10.00. I offered $15, but finally I paid $20.00 and also got a gourd, wood mortar, and stone pestle. This was used to grind mesquite beans. Got samples of beans and bean meal. It is the bean pod that makes the meal. The seeds are discarded although by pouring on hot water in a cup they make a very good drink. The meal is boiled and it makes a very sweet mush.

. . . Francisco Arenas [father of Lee] brought the wood mortar and also Lee's two ollas over. In the afternoon I secured 2 arrow straighteners from Pedro Chino, 1 arrow, 2 stone pestles and some desert food seeds. He is to bring an olla mortar of the hills tomorrow.

In the late P.M. secured a good olla from Marcos [Belardo], also a cooking saucer olla.

October 23—Deer hoof rattle according to Francisco [Patencio]. This down here is purely a hunting rattle and is made from the hoofs of the right forelegs of a number of deer. These are fastened together by mescal twine and [it] is taken in the mountains. The hunter sings to the music of the rattle part of the night and ___ up to charm the birds and animals so that in a dream or vision they will tell him where the deer can be found. None of these rattle[s] to be found here now. Two or a few years ago a man by the name of Swinnerton cleaned out this region of Indian stuff. In December 1917 a *fiesta de los monos* takes place here 4 or 5 times to be burned. This ceremony differs slightly from that of Pala and [Cuya]pipe [?]. The figures, as I understand it, are burned singly in the cemetery and the full ceremony takes one week to perform. The girls' puberty ceremony is about the same but the boys have no toloache ceremony, though during certain ceremonies like the fire dance, the men drink a little toloache. It makes them cold so they dance out the fire. No food of any kind must be eaten for 3 days—very dangerous; liable to die. Toloache varies in strength with locality—some is strong some weak. The medicine men told by the odor if it was the proper strength.

This afternoon, took photos of Marcos [Belardes], the large palm fiesta house with Francisco [Patencio] at the door and later Pedro Chino standing with the ollas and also

ACC0006822

making fire by sticks.  This morning he went horseback to Chino Canyon and got 2 ollas.
His father cached [them] many years ago and [he] brought them back perfect (1917).

Davis left Palm Springs the next morning.[167]

## The Mission Indian Federation

The Indian Agency's constant pressure on the Indians of southern California to drop their traditional culture and adapt to that of the dominant society brought Indian leaders to the boiling point in the later years of the decade.  Particular emphasis had been put on stopping fiestas, which came under censure because the agents thought that Indian laborers were taken away from their jobs for a week at a time, and that they were occasions at which Indians gambled and often drank alcoholic drinks.  That the fiestas had serious economic, social, and political functions in traditional society was something the agents did not choose to recognize in their reports, although this may be the reason they were so adamantly opposed to them, being bent on destroying traditional culture.

The Indian agents were not without some sympathy for their charges in this matter, and tried very hard to make the annual county fairs a substitute for fiestas.  Indians were encouraged to enter their garden and agricultural produce for judging, and to enter their babies in the well-baby contests.

The Indians had good reasons for complaints.  In 1917 Congress passed a new law that mandated allotments, a thinly disguised effort to alienate Indians from their lands, and sense of community.  The Indian Irrigation Service's accomplishments in the matter of reservation irrigation systems fell far short of the service's promises.  Indian men were expected to farm their reservation acreages, but did not have sufficient land or water in the desert environments in which they lived to make a good living, and were forced to supplement their incomes with day labor; however, the day labor took them away just when their own fields needed care.  Their crops suffered.  They had become accustomed to the government's providing them with a modicum of medical care, but the available medical care was far from meeting their needs, and there was little possibility of any from other sources.  Population at most reservations held level from the turn of the century to the 1940s.  The Agua Calientes were no exception.  Their population stood at about 50 from 1910 to 1940.

In response to general dissatisfaction with the federal government's management of Indian affairs on the part of southern California reservations, there arose an organization dedicated to fighting for Indian rights—the Mission Indian Federation (MIF).  It was nominally headed by Adam Castillo, a Cahuilla-Luiseño from Soboba Indian Reservation, and numbered among its members many of the leading traditionalist Indians from the area, including the Patencios and others from the Agua Caliente Reservation.  As time went on, two non-Indian leaders were associated with the MIF, Jonathan Tibbets and Purl Willis.  Tibbets was especially important in the MIF's earlier years, and Purl Willis later (1930s to 1950s).

To this day the MIF is controversial, even though it is long defunct.  Many Native Americans of southern California point to its solid accomplishments; others perceive it as an organization that took precious dollars from impoverished Indian families and put it in the pockets of Tibbets and Willis.  In what follows, we shall have much to say about the MIF and the role it played in the 20th century history of the Agua Caliente, and shall try to present a balanced view of its activities.

---

[167]Despite diligent searching we have not been able to locate the Swinnerton collection.

ACC0006823

## TO BE ALLOTED OR NOT TO BE: 1920-1929

By 1920, Palm Springs was on the brink of its expansion into a world level resort, in part because of its remarkable winter climate, in part because of the Desert Inn, and its "pleasant, attractive accomodations, excellent fare, and gracious hospitality," which attracted wealthy industrialists, talented writers, artists, and moviemakers (Bright 1981:70). The fledgling movie industry, moving into high gear in the early 1920s, found the canyons back of Palm Springs a favorite location for filming movies, as they were easy to reach, always sunny, and scenically not only spectacular, but appropriate representations of other spectacular spots where movie action supposedly took place.[168]

Beginning in 1920, Tahquitz Canyon became the setting for a series of annual Indian plays, initiated by producer Garnet Holmes, who chose Indian legends of the region to dramatize. Mary Austin's *Fire*, the first play chosen, was presented again in 1927 and 1929, the latter presentation being after the death of Holmes. Publicity for the Indian theme plays given there stressed the natural setting—the audience sat on cushions or blankets brought to spread on the ground. *Tahquitz*, a play based on the legends about Tahquitz, was presented in 1928. It was a rare Agua Caliente who participated, but the chorus from Sherman Institute was often brought in to sing.

The status of Palm Springs at the national level was evidenced by a bill before Congress, H.R. 7598, to set aside Palm, Andreas, and Murray canyons as a National Monument for the preservation of their stands of *Washingtonia filifera*, but withholding the water and water rights for the Indians. This bill, developed by conservationists, and introduced in 1920, was signed into law August 26, 1922 (Public Law 291), but came to nothing when the Indians twice refused to give their consent to the land set-aside. Opposition to the proposal had been organized by the MIF, of which the traditional leaders of the Agua Caliente were active members.

There had been no particular outcry against the Band's getting back their canyon lands in 1911, when the canyons were perceived principally as places for livestock to graze, but by the 1920s private developers wishing to use the canyons for hotels and resorts were said to be willing to pay up to $500,000 per canyon. No actual offers had been received, nor was it clear whether the developers wanted all the water rights as well as the land, but it clearly went against the grain for Indians to own such matchless scenic places with their lush stands of *Washingtonia filifera*, "probably the only remaining large groves of natural wild Washington palms in the United States," as the bill stated. On the other hand, the Agua Calientes were equally determined to keep the canyons. Aside from whatever other reasons there might be, such as the canyons' value for grazing, as sources of traditional foods and medicines, and as beautiful places with historical and spiritual meanings, the Indians were well aware of the fair market value of the canyons, and the government's offer of $22,000 for all three canyons was clearly too little.

In the meantime, there were as many as 150 visitors a day to the Palm Canyons. A number of them wished to camp, but the Indian Office had set a policy of no camping, lest the beauty of the canyons be marred by litter and vandalism (Ellis 5/24/1923). By May, 1923, it was reported that some 30,000 people had visited the canyons since September, and that some of these visitors dislodged barrel cacti and rocks that rolled down the slopes, endangering hikers, dug up and stole young palms and other trees, and left litter that was a fire hazard (Maloney 5/23/1923). There was indeed a severe fire hazard.[169] In

---

[168]The Agua Calientes kept control of permissions for filming, but after finding that some of the moviemakers vandalized the canyons, the Indian agency laid down rules to prevent a recurrence. Newspapers of the day recorded some of the movies made in the canyons, but apparently Hollywood did not systematically record where movie companies went on location.

[169]Ironically, one of the reasons C. L. Ellis, Superintendent of the Mission Indian Agency, supported placing the canyons in a National Monument was that he considered the management of the fire hazard beyond the skills of the Agua Calientes. In this he betrayed his own shortcomings, for in his Annual Report of 1923 he noted that ". . . as far back as 1893, the attentions of the Forest Commissioners of California was called to these palm groups, which the Indians were accustomed at that time to burn off, and it was suggested to the Commissioners that the land containing the palms be set aside as a park and a curator be

ACC0006824

order to accomodate the many visitors, a new road and parking place were developed. The fact that only a part of the canyons was owned by the reservation was a problem, because the owners of neighboring non-reservation land were apt to impinge on reservation land in the process of gaining access (Maloney 5/23/1923).

Band members not only objected to the possible loss of the canyons to a National Monument, they objected to the fact that the Indian Agency, without consulting them, was allowing a non-Indian, Raymond Cree—formerly Superintendent of Schools in Riverside—to keep a shop in the canyon, a shop that sold Indian objects, some of them baskets made by Cahuilla women. Moreover, a man named Maloney had been sent by C. L. Ellis, Special Supervisor in Charge of the Mission Indian Agency in Riverside, to protect the canyon and keep campers out. He, too, lived in Palm Canyon, making things from the palm wood to sell. If anyone were to protect the canyons, it should be an Indian. They wanted "all people kept out of these canyons all times until we can control them ourselves. The people that go and stay one hour, two hours, all day, they do the most damage and they leave most paper and cans and pollute the water. More than the people that stay [a] long time, but they buy much from Mr. Cree and Mr. Maloney. We want everybody kept out until this is all settled"—so read the petition to the Secretary of the Interior on MIF stationery, and approved by the Grand Council of that organization (Agua Caliente Band 4/8/1923).

Marcus Pete, elsewhere identified as the grandson of Pedro Chino (Ellis 5/21/1923), signed this petition as proprietor of the "Palm Springs Auto Stage Line." The list of those who signed the petition is only partly legible, but the names of twelve Patencios; Lee and Guadalupe Arenas; Simon and Nancy Arenas; Baristo and Nicholasa Sal; Jose, Clemente, and Juan Segundo; Rosinda, Roy and two other Lugos; Carrie Casero; Anna Pierce; Genevieve Pierce; and Lucy Pete can be discerned. One of the illegible names appears to be that of Pedro Chino.

In response to the petition, the Secretary of the Interior advised Jonathan Tibbett of Riverside, advisor to the MIF, that "it was not the purpose or intention of the Department to take any action in the matter of the National Monument contrary to the wishes of the Indians" (Ellis 5/24/1923). Superintendent Ellis assured the CIA that he did not believe the Indians were capable of controlling the crowds that came to see the canyons. The agency had decreed that no one should be allowed to camp overnight in the canyons, and had disallowed three permits to camp issued by the Indians, on the grounds that the fire hazard was too severe for camping. Both Cree and Malone were leaving the canyons as summer approached. Maloney had not used palm wood from the canyons for his crafts, but he had "sold a few canoes made from the middle rib of cast off palm leaves." As the summer got hotter, the Indians would go into the canyons only to search for their stock (Ellis 5/24/1923). A half section of land at the mouth of Andreas Canyon was added to the reservation in 1923 when President Harding issued a trust patent to the north half of Section 11, Twp 5 S, R 4 E, SBM to "Pedro Chino and other members of the Palm Springs Band" on Mar 29, 1923.

T.B. Roberts, Sr., Special Inspector of the Indian Office, visited the reservation in the spring of 1927, and reported that there were sometimes as many as 5,000 visitors a day visiting the canyons. Recent storms had destroyed 200 trees in the canyons, a loss that decreased the beauty of the canyons but also removed a fire hazard (5/9/1927).

**Irrigation**

The Taquitz irrigation system, which had been the subject of so much attention the previous decade, continued to function, but the non-Indian landowners entitled to Tahquitz water under the rules of the agreement of 1911 often took more than their share of the water. The open ditch that carried the water passed through their properties on the way to Section 14, and was still subject to pollution.

---

appointed to protect the palms" (6/30/1923:54). It has now become apparent that the California Indians, as well as indigenous peoples in many other parts of the world, practiced controlled burning as a successful means of fire prevention, a practice brought to an end when people less in touch with their environments came into power and forbade the burning. Only recently are knowledgeable forest managers turning again to the practice of controlled burning as a means of preventing catastrophic fires. In this they are merely following the lead of indigenous people (Lewis 1993).

ACC0006825

To Be Allotted or Not To Be: 1920-1929

For example, on May 25, 1922, Ellis found it necessary to reprimand Pearl McCallum, now Mrs. Austin McManus and again living in Palm Springs, for failing to fence livestock away from the irrigation ditch where it crossed her property. As a result the cattle were contaminating the water, endangering Indian people. Ellis recommended that Raymond Cree be appointed to enforce the contract "at intervals of less than five years," a telling comment on what had been customary. Ellis asked for details on what would be expected of a water master (7/12/1922). Clotts, in reply, clarified the 1911 agreement. He said that if there were 10 M.I. or less, it should be divided half and half between Indians and non-Indians at the domestic turnout. If there were between 10 M.I. and 40 M.I., 5 M.I. should go to non-Indian users at the domestic turnout, and the rest to the Indians. If there were between 40 M.I. and 80 M.I., the first 40 M.I. was to go the Indians, and all the rest to the non-Indians. If there were over 80 M.I., the first 40 M.I. were to go to the Indians, the second to the non-Indians, and all over that divided two-thirds to the Indians and one-third to the non-Indians (Clotts 7/14/1922). In the end, Cree took over the shop that sold Indian goods in Palm Canyon, and Charles Gabriel, a Cahuilla from Morongo Indian Reservation, was appointed water master to monitor the ditch.

The village of Palm Springs was becoming more urban and other non-Indians complained of trespass on streets and lawns by the Indians' cattle. Ellis suggested that rock salt be placed at watering places some distance from the village, and the stock then be driven to the salt. An alternate suggestion was to use wire left over from moving picture production to build a fence. He directed the farmer at Palm Springs to look at the automobile runway and gate placed on the road to Palm Canyon at Amado Miguel's corner to see if it were effective (Ellis 2/28/1923).

The agency farmer, Adrian Maxwell, was in the meantime guaranteed a water supply more reliable than that assured the Agua Calientes when the Mission Indian Agency arranged to contract for domestic water from the Palm Valley Water Company for the "Palm Springs cottage," where the Maxwells lived (Ellis 7/14/1922).

There was trouble with the McManuses again in the summer of 1924, when Austin McManus refused to fence the grounds of the new hotel he was building, and threatened to corral the Indians' horses and cattle that came on his grounds. The concept of the free range from earlier times was coming into conflict with an increasingly urban situation. Arenas wrote to S.L. Hoffman of the American Indian Defense Association (AIDA) for advice, explaining that several of the Agua Caliente men made much of their living from their horses and cattle (Arenas 6/2/1924). Two days later Arenas wrote again. McManus had come with Ellis to ask Arenas to call a meeting of the Band. McManus threatened to go to court, the livestock having allegedly kept him awake for three nights. When Arenas protested that the cattle were drawn to the green feed on McManus' watered grass, McManus told him, "McCallum got this water from the government for me." Arenas refused to call a meeting of the Band on the grounds that it was a busy time. He himself was busy cutting his alfalfa. Searching for a way to avoid going to court, Arenas asked Hoffman to send him the law that showed cattle could graze in open country, since the Indians could not afford to fence all their land. He pointed out that Mr. Talmadge, a non-Indian, had great herds of cattle in the desert, apparently protected by the law. The Indians did not want to go to court to prove that they were similarly protected (Arenas 6/4/1924a).

By the unusually dry summer of 1924 there was again a great deal of complaint by the Indians that the non-Indians were taking more than their share of Tahquitz water. Arenas[170] wrote on May 30 that "We see no change in matters here. The water is all over the roads daily from one of the white

---

[170]Lee Arenas was captain of the Agua Caliente Band in the early 1920s. While holding this office, he developed close relations with several interrelated organizations, to a large extent dominated by John Collier, which had interested themselves in bringing justice to Native Americans. These organizations included the General Federation of Women's Clubs, the Sierra Club, the Santa Barbara branch of the American Indian Defense Association (of which S. L. Hoffman was secretary), and the agricultural department of the Los Angeles Chamber of Commerce. Arenas carried on a considerable correspondence with Hoffman and others, using the services of Elizabeth Blake for typing his letters. Francisco Patencio sometimes cosigned the letters. These organizations first successfully took up the challenge of preventing the original round of allotments. Having won this encounter, they addressed themselves to finding a solution to the Agua Calientes' irrigation problems.

ACC0006826

The Tahquitz Report: Ethnography and Ethnohistory

sources. And Juana [Hatchitt], a tribal member, who declares she does not use it, floods her place whenever water is turned toward Amado Miguel's place. White people and Indians see it all the while" (Arenas 5/30/1924).

It had become apparent to the Indian Irrigation Service that there was so much hard pan under much of the land in the Barney tract, previously considered good land, that it could not be farmed profitably. Nearby, the Department of Agriculture was finding the soil on its experimental date farm at the mouth of Andreas Canyon so deficient in humus that a great deal of fertilizing had to be done before dates could be grown (Palmer 4/24/1924).

The Band's difficulties with the Tahquitz irrigation system reminded the older members of the Band that in the 1890s there had been an agreement that the Agua Calientes would get 27 inches of water from the Palm Valley Water Company in return for a right-of-way across the reservation. Their questions moved the CIA to consult Indian Irrigation Service Supervising Engineer Clotts, who reviewed the history of water on the reservation and rediscovered that the 1888 agreement, and that of 1895, were never ratified by the government, and were at any rate superseded by the agreement of 1911.

As it was now apparent that Palm Springs was on the verge of becoming a much larger community, the Coachella Valley County Water District assessed the water possibilities in the region. The water plane was falling because more water was being pumped out than streams brought in. On June 2, 1924, Arenas, apparently not trusting the advice of Indian Service personnel, wrote Hoffman, a member of the AIDA at Santa Barbara, that the water district had filed on all the water in the Palm Springs canyons. There was to be a hearing and he wondered whether the Indians needed to take any action.

Arenas expressed increasing outrage at the theft of Tahquitz water, noting that the community was endangered by tuberculosis, that the agricultural endeavors of the Agua Calientes were severely impeded by their loss of water, and that all were endangered by the pollution of the water before it reached them.

> There is no stream gage meter to read the flow. No business' handle water without a meter. The truth is we get as little as seventeen inches sometimes when there is plenty of water, and there is never enough. Mr. Hoffman had it measured when he was here, and the White man was getting 65 inches and the Indian 32 inches. The man, supposed to look after it is not one of our own Indians, but a man of the Serranos [actually a Cahuilla]. Twice within ten years the water failed altogether. We will have more facts very soon. At our meetings it is spoken of as town water. There is no town to be exact. Palm Springs is under the County only. The village water is all bought from an individual, I think it goes under his own name, Stevens.[171] There is no public utility supply. This supply is abundant, and these four, of these most prosperous owners here, who make their places only by our water and ditch, are doing it by getting their water without paying for it instead of paying for it when they should be. It is wasted every day, and floods the roads and stands as flood water in vacant lots and on barren wastes. This is a tubercular community, a health center, and yet it is not posted in a single place along its whole two mile course. Rubbish is always there you know from your visit. Campers are all along its way now and then. There is not a fish trap, and fish have come down. It believe there is a law to protect the fish, even if the Indians cannot be protected. Even where it runs in the business section there are no postings (Arenas 6/4/1924b).

Miss Blake, who typed Lee's letter for him, attached a note of her own to this letter,

> The water problem here now is startling. There is less than the Indians' forty inches and yet the white man goes on drawing it all the while. The government officials measured it the other day, and the Indian was getting eighteen inches and the white man

---

[171]The Desert Water Agency, owned by Stevens, and deriving a significant part of its water from Chino Canyon, has provided water to the City of Palm Springs since the 1920s.

ACC0006827

measured it the other day, and the Indian was getting eighteen inches and the white man thirty-eight. To make it worse he actually saw the man open his dams and turn it into the white man's lands . . . . Lee is afraid he will lose his alfalfa and pasture too. Last year he had to sell his thirty hogs because there was no feed . . . Corn failed last year and all will suffer from now on, unless something happens.

By the end of June, the Indians were getting no water, though McManus was still able to water his place with the Indians' water (Arenas 6/26/1924a).

Employing once again the services of Miss Blake, Arenas wrote F.P. Knott of the Indian Defense Association noting that if the Indians were stealing water as McManus was doing, they'd be punished, but the four non-Indian landowners through whose land the ditch went had been caught in the act of stealing water, and nothing was done. What made it worse was that they could afford to buy water, as the other non-Indians in Palm Springs had to do (6/26/1924b).

On July 14, 1924, the water from Tahquitz had failed, and the Indians were dependent on the water at the hot springs. This source was threatened by a non-Indian proposal to dig seven artesian wells near the hot springs (Arenas 7/14/1924).

Arenas continued to seek assistance from Indian advocates, apparently for good reason. They could influence the Indian Service. After Mrs. J.S. Woods of the Southern District, General Federation of Women's Clubs' Indian Welfare division wrote the CIA, including a letter from Arenas, Ellis was asked to investigate. He noted that it had been an exceptionally dry year in California, and said the only feasible way to stop complaints would be to install a pipeline at the head direct to the Indian fields, but that this would be quite expensive. To install a water meter would cost $200, and he thought it better to supervise the water master (Charles Gabriel, whom he characterized as better qualified than any of the other Indians to measure the water, and closely related to several Band members), until a decision with respect to piping was made. He called attention to the fact that Lee Arenas' fields were irrigated from Andreas Canyon water, not from Tahquitz (Ellis 8/28/1924). Clotts was told to submit estimates on the cost of the pipe that Ellis recommended (Burke 9/22/1924).

By mid-decade there was growing pressure from non-Indians interested in cost cutting to have the Indians reimburse the government for money spent on irrigation systems; however, George Vaux, Jr., a member of the Board of Indian Commissioners who investigated the status of southern California reservations, was opposed to the idea, on the grounds that the Indians were too poor. By that time, $10,367.74 had been spent on the Tahquitz system, and $10,844.59 on the Andreas system (Vaux 7/3/1925).

Agua Caliente water problems were somewhat alleviated when, on or before July 1, 1924, arrangements were made by the government to have water from the city's domestic water system made available to the Indians at the bathhouse, where there were three hydrants (Ellis 3/24/1925). Although none of the Indians lived more than 1800 feet from the bathhouse, their access to water even so was far less convenient than that of the Maxwells. Within a year Ellis reminded the Indians to restrict their use of this water to household use, and at the bathhouse. The shortage was sufficiently critical that Pedro Chino, for example, was told by Ellis to use as little water as necessary to keep the lawn alive and for shower baths and household use, and not use it to water gardens. Ellis asked the Palm Valley Water Company to continue supplying water to the whole system: "If you find the Indians won't pay for replacing the leaky cocks, send me bill for same," but the money would have to come from a fund needed elsewhere to help old and needy Indians (Ellis 6/17/1926). Ellis renewed the contract for water to the Indians in 1927. It was to come from the Palm Valley Water Company's surplus (7/29/1927).

The water supply for those not living on the reservation had been augmented by 1926. Private entrepreneurs had bought the City Water Company, which had filed on additional water at Chino Canyon, Snow Creek, and Falls Creek. The owner of the Whitewater system was developing more water in the Whitewater cienegas, and was installing a pipeline from Whitewater Point to Palm Springs. The Palm Valley Water Company had filed for water from Chino Canyon, Falls Creek, and Snow Creek (Clotts 6/30/1926).

ACC0006828

In an effort to resolve some of these problems Collier, acting as advocate for the Indians and the organizations with which he was allied, had proposed to lease all the land and water on the reservation for $35,000 a year, to move the Indians 660 feet back of the section line (presumably of Section 14), to build new houses, a new water system, sewage system, etc. This would have removed valuable "store front" areas from the reservation, and the loss of income from such property by some tribal members. Because the majority of Indians seemed to be opposed to this plan, it was turned down by the U.S. Attorney in May, 1926 (Clotts 6/30/1926).

When Indian Irrigation Service engineers visited the reservation on September 11, 1926, all of the 13 M.I. flow from Tahquitz Creek was being diverted from the reservation.

A severe flood from February 10 to 17, 1927 washed away 40 feet of the Tahquitz ditch, and although Ellis asked the farmer, A.F. Johnson, to make repairs at once, the Indians were forced to drink ditch water, suggesting that the arrangement for the Indians to get city water was either seasonal, or had been terminated (Ellis 3/1/1927). The flood had also damaged allotted lands on the reservation by diverting waters from their regular waterways outside the reservation onto the reservation (probably Section 14) (Ellis 2/23/1927). The break was repaired by the Indians with the assistance of the non-Indians, who paid the Indians and bought the materials. In the same fashion, the small rock dam at the point of diversion of the small channel from which water was secured from Tahquitz Creek was repaired.

It was also found that the south end of the dam at the intake of the 8 inch cement pipe in Andreas Canyon had been washed out, and a channel from 3 to 6 feet deep and 40 feet wide eroded. No repairs had been made, as more damage was expected. The Indians were expected to divert the minimum flow into a pipe line that led to their fields (Clotts 6/30/1927).

From the point of view of the Indian Agency, it was the responsibility of the village of Palm Springs to prevent such flooding from happening again, either by constructing a dike along the south line of Section 15, or the construction of a small rock dam across the old channel in the southwest corner of Section 22, to divert the major flow northeasterly across Section 22, and thence to Section 23 (Ellis 5/9/1927)—one of the earliest suggestions for a flood control measure in a long series that eventually led to the Tahquitz Project.

Legal procedures were also necessary to manage water resources. Whitewater Adjudication Proceedings that would eventually determine the allocation of water rights in the Coachella Valley began in the 1920s, but dragged on into the 1930s. An analysis of Whitewater River Adjudication Proceedings as of 1928 by Ernest L. Martin showed the U.S. of America on behalf of Agua Caliente Indian Reservation, and the non-Indians "originally included in the contract of 1884 or their heirs" were entitled respectively to 4.8 cubic feet and 1.36 feet per second of water carried in the Agua Caliente ditch, whereas the Coachella Valley Water Company was declared to have rights dating to 7/8/1922, to 5000 acre feet per annum, "to be carried in spreading dams and ditches at the rate of 5000 acre feet per annum, the right being contingent upon completion of appropriation prior to July 1, 1932 (Martin 4/23/1928). Fortunately, since whatever contract of 1884 the proceedings referred to were neither just to the Agua Caliente, nor approved by the OIA, Truesdell and Clotts of the U.S. Indian Irrigation Service and the Mission Indian Agency opposed the adjudication by the Division of Water Rights of the Department of Public Works of California (Ellis 5/26/1928).

**Crops**

As the decade began, commercial farming was still an important part of the Agua Caliente economic life. However, the amount of land farmed peaked in 1924, and then decreased during the rest of the 1920s. In 1921 a total of 60.9 acres were under cultivation, 29.5 in alfalfa, 21.4 in orchard, 1.4 in wheat, and 8.6 in garden (Clotts 7/22/1921). By June 1923, 285.9 acres were under cultivation, as follows: 39.4 acres in alfalfa, 53.1 acres in orchard, 19.2 acres in garden, 6.7 acres in vineyard, and 167.5 in pasture (Clotts 1923). In June 1925, 89 acres were under cultivation, 43 acres in alfalfa, 2 in beans, 17 in citrus fruits, 15 in small fruits, and 12 in garden were reported (Clotts 6/30/1925). However, by June 1926, only 50 acres were under cultivation, and Lee Arenas' grapefruit orchard was dead and another orchard dying, despite the fact that 1.02 sec. ft. of water was coming over the weir, and the trees were

ACC0006829

To Be Allotted or Not To Be: 1920-1929

dying of overwatering and undercultivating, perhaps an effect of the hard pan (Clotts 6/30/1926).

In the calendar year 1927, 1 acre of alfalfa, 1 of figs, 2 of grapes, and 2 of pasture were farmed on Section 14, and 9 acres of alfalfa, 3 of apricots, 1.5 of figs, 3 of grapefruit, .5 of garden, 8 of pasture, and 4 of wheat were farmed at the Garden of Eden (Clotts and Wathen 6/30/1928).

A decline of agricultural production at the mouth of Andreas Canyon had resulted in a greater reliance on Section 14 as a place of residence and income (Clotts 7/22/1921, 6/30/1923, 6/30/1925, 6/30/1926, 6/30/1928).

Although irrigation irregularities and several years of drought made farming difficult in the 1920s, the decline in agriculture during the decade was probably a result of the abundance of work for wage laborers in Palm Springs: Agua Calientes could make $3 to $5 a day working on neighboring ranches or in the village itself. The men were in considerable demand as experienced laborers, and the women as household helpers. Many preferred the certainty of regular wages to the uncertain rewards of agriculture. Income also could be obtained from renting and leasing lands on the reservation, especially Section 14, an area that became a residence for many—Indian and non-Indian alike.

**Allotment**

The Agua Caliente Band had long resisted the allotment of their reservation to individuals, using instead a system that assigned land use to individuals within the Tribe, because they feared that allotments might soon be sold to non-Indians by Indians in need of cash, and because they had already established property rights to the tracts on which they made their homes and/or farmed. They quite correctly feared that the allotment boundaries would not be the same, thus changing the system as it then stood.

Nevertheless, in the early 1920s, the government began in earnest to establish allotments at Agua Caliente, thus putting in motion a number of socio-economic problems that would persist for 30 years. Clotts was concerned about the effect of the irrigation facilities on allotments, and pointed out that there was only enough irrigated land to give each of 12 to 15 heads of families ten acres of irrigated land, the irrigated land being in the SW 1/4 of Section 14, part of the SE 1/4 of Section 22, and the W 1/2 of Section 26. The ten acres around the springs in the NW 1/4 of Section 14 should be kept, but not be allotted. The balance of their allotments, he argued, should be in desert land. He didn't think the NW 1/4 of Section 14 should be allotted, as it was valuable for townsite purposes and "should be sold for the benefit of the band," an idea that once again threatened the Tribe with a loss of valuable land (Clotts 2/7/1923).

It is not surprising that many members of the Band who were opposed to allotment were also members of the MIF, which was active in opposing allotment. The AIDA and its allies were also concerned about the issue and took action against allotment at Palm Springs after the AIDA's executive committee had fully discussed the issues. It held that allotments would confiscate and transfer from one Indian to another any improvements that had been made on the land; that the result of allotments would be taxation and alienation after fee-simple patents were issued; and that "the one reason for allotment is to prepare for reducing the reservations" (Collier 7/31/1923).

By late May, 1923, Clotts' suggestion of giving each family irrigated land from the Tahquitz irrigation system had been discarded. It had been decided instead that each member of the Agua Caliente Band, rather than each family, would receive an allotment. Each member would be allotted a two acre allotment irrigated by the Tahquitz irrigation system and a three acre allotment irrigated by the Andreas system. Each would also get 40 acres of the best non-irrigated land. The canyons and the land around the hot springs would not be allotted. This plan would supposedly allot all the irrigated land (Ellis 5/24/1923).

In September 1923, Collier protested the Department of the Interior's stand that allotment was necessary because a minority of the Indians had most of the good land, and the tribal government would not or could not distribute the land properly (9/14/1923). As a result of AIDA protests, the allotment procedures were given a stay of 30 days. Collier and his associates seem to have worked very closely with the Indian agents. Despite AIDA efforts, however, a system of allotments was proposed to the Band some time in late 1923, after a survey had been made by the County Surveyor of Riverside County to

V-253

ACC0006830

show the boundaries of reservation land and the individual farms of Band members.

Many Band members were outraged at the proposal and protested so forcefully that Dr. Samuel Blair, a special inspector representing Dr. Hubert Work, Secretary of the Interior, was sent to meet with them on April 9, 1924. Lee Arenas, the captain of the Band, pointed out that one reason for complaint was that good land was left out of the allotment process. The fact that Section 22, for example, was not allotted on the grounds that it was "too valuable to be allotted to the Indians" was a case in point. Arenas agreed it was valuable, in part because of the water, in part because "a good many rich people are living right next to it," (Arenas et al. 4/9/1924). Once again, Indian Agency officials had been more sensitive to the non-Indian climate of opinion than to the rights of the Indians, and perhaps intended the land to go to others. People who owned land adjacent to Section 22 did not want to be bothered by neighbors with different life styles, and different ideas about the use of land. They had a sense of what would later be thought of in terms of "zoning rights," expressing class and social distinctions. It was all right for there to be Indians and the friends of the Indians in Palm Springs—they were needed as laborers—but, please, "not in our own back yards," but rather on Section 14, where they had long been established.

Since one of the Indian complaints was that they would lose the land they lived on and farmed in the allotment process, Blair and Ellis had carefully examined the map, and had found that individuals had kept the land they used and received more in addition. That is, they claimed that the allotments would not take land away from the Band members who farmed it and give it to others.

In the course of the meeting Blair listed the total lands of the Band, which totalled 31,127.67 acres, about 600 acres per capita. Of this, 29,823 acres were patented to the Band, but the 800 acres of Section 34 and 35 bought from Barney and held by deed to the United States for the use of the Indians, and the Murray Canyon section, 505 acres, withdrawn for the Indians by the Secretary of the Interior on February 2, 1907, were not yet patented. Blair pointed out that when the trust patents expired, all this land, if not patented, would be turned over to the Band as a whole, and the Band as a whole would owe taxes on it. The allotment procedure, he said, might save a great many litigation fees later on (Arenas et al. 4/9/1924:4).

In the discussion that followed, it developed that the Indians could neither sell nor legally lease land on the Reservation without an act of Congress. Hoffman, secretary of the AIDA, asked and received permission to speak for the Indians, who, he said, did not understand the situation in many respects. He pointed out that a double standard of treatment was used for Indian vs. non-Indian needs, noting that one thing they didn't understand was the purpose served by an experimental date farm when the Indians didn't have enough water to grow dates on their farms. The AIDA had been working on an irrigation proposal, but didn't have data on costs. Its members thought the Indians should sell land to finance a more adequate irrigation project. To this end, the AIDA had asked for bids from private parties for Palm Canyon, but none had been received.

Internal disagreements within the Agua Caliente Tribe now surfaced. In the afternoon this meeting focused on a dispute that derived from the question of who should be on the Palm Springs roll and be eligible to be allotted land. It was brought to the fore in part by the fact that two women, Juana Hatchitt and Romalda Lugo Taylor, had married non-Indians and brought them to live on the Reservation. These marriages, the first by Band members to non-Indians, were perceived as problems that would arise again. By traditional law, the couples would have lived on the husband's land, but these husbands had rights to none of the valuable reservation land, and their wives had.

The particular dispute was about land that had belonged to José Rafael, the former captain, who died in 1911. Rafael had raised his sister's children. Agent Sullivan had given Rafael's nephew, Miguel Saturnino, permission to use Rafael's land to feed Rafael's stock, and he had been farming it ever since. Juana, Rafael's niece, had kept house for her brother from 1909 to 1920, when she got married. She and her husband came to the Reservation about 1921 and had been living on some of the improved land that her brother had previously farmed. She and her baby were recognized as having rights on the reservation (although the Band felt she should have requested membership), and had each been allotted two acres of irrigated land on Section 14 by Allotting Agent Wadsworth. They had then fenced this land in and were using it to board horses that belonged to non-Indians. It was claimed that her husband had shot some

ACC0006831

cattle, one belonging to Saturnino, one to Lee Arenas, and one to Francisco Patencio (Arenas et al. 4/9/1924).

On May 30, Lee Arenas wrote Hoffman to ask whether any confidence could be placed in Dr. Blair. "We know from several sources that he and Mr. Ellis turned right around and came back to Palm Springs and went among the white people and argued for allotment, and told them to use their influence in every way upon the Indians to make them take allotments. . . . " The Indians feared that once the land was allotted, they would be declared "incompetent to handle a public bathhouse," and the bathhouse taken away from them without their being able to do anything about it. He thought the Indian Bureau "should accept Indian order of inheritance, or set up a right one of their own, that is, one the government will back to the full extent of the law" (Arenas 5/30/1924).

That Hatchitt was later sued over the cattle shooting is suggested by a 6/12/1924 notarized statement by one of Hatchitt's erstwhile employees to the effect that on October 22, 1923 he and another employee were awakened by two shots, to see Hatchitt with a gun in his hand, saying he had shot to scare the cattle away. The next morning there were two dead cows near the corral (Daily 6/12/1924).

Because of the many complaints from various sources, the allotments made by Wadsworth in 1924 were never approved by the Secretary of the Interior. Some members of the Band nonetheless used and occupied the land that had been tentatively allotted to them. By 1925, there was already the problem that older people in the Band had allotments, but younger people coming of age did not. Commissioner Vaux noted, "There seems to be a tendency for a very few people to secure large amounts comparatively of the most desirable land in their own hands to the exclusion of others" (7/3/1925).

In 1927, Allotting Agent Wadsworth came back to southern California and once more made a schedule for allotment of the Agua Caliente Reservation, dated May 9, 1927 (Ellis 5/7/1928) (Figure V.11). Never approved by the Department of the Interior, it was to lead to a great deal of acrimony and expensive litigation in the years that followed; however, it can be argued that it was the ensuing delay in allotment that enabled the Agua Calientes to hold on to their land for an additional 30 years.

Ellis wrote Sarah E. Gilman of Banning on August 9, 1928 that John Joseph Andreas could not sell his allotment, since the allotment schedule had not been approved. "When the schedule is approved, and trust patents issued, John can either ask for a patent in fee and dispose of the land himself, or he can ask for sale by this office" (8/9/1928).

## Relations with Non-Indians

Indian concerns and rights continued to be ignored by the OIA when decisions about land use of the Reservation were made. For example, permission for rights-of-way for a telephone line (Ellis 3/24/1922), and State Highway 111 across the Reservation (Ellis 6/15/1922) were granted by the Secretary of the Interior, with apparently no consultation with the Band.

In 1922, C.L. Ellis wrote Fathers Purtell and Lapointe, who were associated with the church built on Section 14 in 1912, that ceremonials associated with the church should not be called "fiestas," inasmuch as there was a rule that fiestas could be held only during the first week of September, and were to last no more than two days (Ellis 5/4/1922).

Native Americans were granted citizenship in 1924. A letter from Lee Arenas to F. P. Knott of the AIDA gives an insight into the effect of the new status. The Agua Calientes sought the help of the Indian agent in getting a warrant for the arrest of an alleged swindler, and he told them they could do it themselves—"You are citizens." Arenas did note some improvement. The agent's attitude had improved. "He has truly talked with me about our affairs on two occasions. . . . He has made prompt answer to two of my letter[s], and he gave me information that we have never had before." It appears that Knott had put pressure on Ellis to make the change to citizenship apparent in day-to-day interactions, for he notes that Ellis "when he goes among white people he seems to do all of his things in your name. I mean he must have told them how it is you that is wanting things done right" (7/10/1924).

Still another instance of non-Indian imposition arose in 1926 when the Palm Springs School Board wanted to acquire two acres of land for a school. The Indians objected (Ellis 2/15/1927).

ACC0006832



**Figure V.11.  Schedule for Allotment of the Agua Caliente Reservation, May 9, 1927**

ACC0006833

present time there is an aggregation of wretched shacks of a most uninviting character. A member of the Tribe is assigned as caretaker and a small fee is charged the patrons of the establishment" (Vaux 7/3/1925). The bathhouse, whatever its condition, was a source of considerable income to the Tribe. The income was under the control of the successive captains, who apparently used it as leaders would have in traditional times.

Captains in the 1920s had each used from $400 to $500 for their own purposes. One of them had used $100 to bring home a boy who got into difficulty in Mexicali, another donated $500 to the MIA, and still another paid the funeral expenses for Marcus Belardo and his wife.

Ellis, frustrated because there was no written record of either the bathhouse income or the withdrawals by the various captains, recommended the appointment of "an honest white man, who could keep accurate records, and the installation of a cash register. This, however, would undoubtedly meet with opposition on the part of the Indians" (Ellis 4/12/1928).

In the spring of 1928 the Palm Springs Chamber of Commerce requested a revocable permit to use the northeast quarter of Section 14 for an airport and stables. Ellis submitted the application, along with a petition signed by 22 Indians, of whom one was not an Agua Caliente, and one was only 18, in which they agreed that the tract might be used as requested for a yearly rental of $250 and all profits. He also enclosed a petition against granting the request signed by seven voting members of the Band. The remaining seven voting members refused to sign or had no interest in the matter, according to Ellis. Despite the small majority by which the Band approved, the permit was issued, the commandant at March Field having endorsed it as an asset to commercial aviation and a contribution to national defense (Ellis 5/7/1928, 7/6/1928, 8/24/1928; Flanery 9/24/1928).

## Population

The population of the Agua Caliente Band numbered 50 members as the decade began, and had dwindled to 48 after the deaths of the Belardos near its end. Most California Indian bands suffered the same "population stability." In 1927, it was reported that there were twice as many adults as children in the total of all the Mission Indian Agency's reservations. The author of the report speculated that some enrolled adults, having married non-Indians, did not enroll their children, and pointed out that deaths were reported to the Mission Indian Agency more promptly than births (Anonymous 8/8/1927). The death rate in Palm Springs was undoubtedly increased by the poor sanitation in a village to which tuberculosis patients had for many years been coming for treatment. It was also possible that fewer children were being brought into the world because parents felt that they had lost control of their lives.

Indian children had been attending public school in Palm Springs since the late 19th century, when they outnumbered non-Indian children. In the 1920s, some of them were sent to Sherman Institute in Riverside because their attendance at public school was so minimal. In the 1920s Sherman Institute was the largest Indian school in the nation.

## Ethnography and Ethnohistory

Francisco Patencio, aware and no doubt concerned that Cahuilla young people were no longer learning the sacred songs and ceremonies nor even the Cahuilla language, began in the 1920s to tell a woman named Margaret Boynton, who recorded what he said, the story of his life, Cahuilla history, and the traditional Cahuilla oral literature. Published in 1943 and 1971, his books constitute a unique contribution to Native American literature, providing a great deal of otherwise unavailable information about Cahuilla history, geography, and world view.

The non-Indian scholar who made the most important contribution to Cahuilla ethnography in the 1920s was W.D. Strong, whose *Aboriginal Society in Southern California* (1929) was based on fieldwork conducted among the Takic-speaking peoples of southern California in 1925. His principal consultant in Palm Springs was Alejo Patencio, elder brother of Francisco, and *net* of the *Kauisiktum*. Strong talked to the leading elders on the various Takic-speaking reservations. His *Aboriginal Society* is an outstanding study of these Shoshonean peoples.

ACC0006834

## THE STRUGGLE FOR POWER IN THE GREAT DEPRESSION: 1930-1939

In 1930 Palm Springs was a village. Its telephone directory, "A" through "Z," was printed on one sheet of paper. There were 132 telephones, of which one was listed for Marcus Pete, apparently the only Agua Caliente with the luxury of a phone. Marcus Pete was a considerable entrepreneur, collecting all the income from a store, 18 cabins, a barn, a warehouse, and several tents that had been built on his tracts. Tenants owned the warehouse, a barn, and five cabins. Four other barns were located on his family's tracts (Southwestern Home Telephone Company 1/1930; Johnson 5/12/1930). A number of members of the Band were informally leasing their unapproved allotments, but could not issue valid leases because the Secretary of the Interior had not approved the allotment schedule (Ellis 11/22/1932).

The Tribe collected an estimated $1000 a month from the bathhouse. This income was used by the traditional tribal leaders. Francisco Patencio, in the name of the Tribe, collected and kept the $7.50 monthly rental of a cabin on the allotment of LaVerne Miguel on the grounds that the allotment was tribal land, whereas LaVerne's mother claimed the money for her child (Johnson 5/12/1930).

The traditional leaders of the Agua Caliente maintained their alliance with the MIF, especially with its leaders, Purl Willis and Adam Castillo, who by this time were losing credibility with some southern California Indians and groups (there were accusations that the sums they collected from Indians went not so much to fight for Indian causes as to raise their own standards of living). This loss of credibility represented a victory for the OIA, which had been waging a consistent battle against the MIF, and especially Willis and Castillo.

The Andreas family, which had left the Reservation in the 1890s when the land at the mouth of Andreas Canyon was taken over by non-Indians, returned to Palm Springs in 1931 when John Joseph Andreas presented credentials that demonstrated his rights as a member of the Agua Caliente Band. He was told by Ellis that 40 acres in Section 35, T 4 S, R 4 E, SBM, and the two acre Lot 59 of Section 14 had been reserved for him, and that he also had the right to farm any tribal land not used by other members of the Band (Ellis 11/22/1931). His return met with some resistance from a number of the Band members, who felt that by leaving he had forfeited his right to his family's traditional claims.

The 1930s were to be years of drastic change. In a decade when the rest of the country was plunged into the worst depression of all time, Palm Springs was catapulting into the first of the great desert resorts. The movies were the "cake" of the times, consciously providing cheering entertainment for people who had little else to cheer them. Palm Springs, having begun as a place where movie people worked, continued as a place where they came to rest and play. As more and more people came, the city expanded and the Reservation's land became more valuable. So much attention did the situation draw at the national level, that a Congressional hearing was held in Palm Springs in 1935, and hearings were held in Washington on bills affecting Palm Springs in 1935, 1936, and 1937. In the course of the decade, the village became a city; water rights to the waters of Tahquitz and Chino canyons were adjudicated; and the Tribe was torn by conflict as the issues of allotment and tribal authority were fought out.

At mid-decade the Agua Calientes were still following many traditional ways, as demonstrated by the fact that the most important Cahuilla ceremony, commemorating the dead of one or more years, lasted a full week until 1938, taking place 24 hours a day from Monday through the following Sunday. "Hundreds of Indians from reservations in Southern California" were expected at the ceremonies held in 1935 (Desert Sun[172] 2/15/1935). There was apparently still a full panoply of traditional ceremonial leaders, as there were also numerous Cahuilla-speaking people to make up a group who still understood the purpose of the ceremony and the sacred songs.

At the ceremonies for the dead held in 1937, non-Indians were no longer welcome to observe as they had in the past. Traditional tribal leaders had made this decision after a Los Angeles newspaper theorized that Indian vengeance might have been responsible for the fatal shooting of film writer

---

[172]Hereafter referred to as DS.

ACC0006835

Humphrey Pearson, who was known to have made a study of Indian ceremonies (Limelight[173] 3/5/1937c).[174]   Indian fiestas, which since Spanish-Mexican times had been affairs that provided economic and recreational services to Indians, were now redefined by Special Agent Quackenbush.  In order to draw attention to the tourist potential of Agua Caliente, in April, 1937, he produced an "Indian Fiesta" in Palm Canyon, which was publicized as a tremendous boost for the Indians; however, the money that it earned was paid to the non-Indians who had contributed $3000 as Guarantors.  The Agua Caliente Indians apparently had little to do with planning it.  Darryl Zanuck contributed 24 million candlepower floodlights to illuminate the evening dance performance.  Indian dancers from the Sherman Institute performed, and a Cahuilla shaman, Salvador Lopez, demonstrated the act of fire eating, a traditional ritual of spiritual empowerment often done in Cahuilla Indian communities (DS 4/23/1937a,b, 4/30/1937; LL 4/24/1937).  The city had learned that it could profitably use its Indian history to its benefit.

When Pico Manuel, an important Agua Caliente member, died shortly thereafter—on April 30— he was said to have died of a stroke because he had recently been refusing to take part in tribal dances and rites, a serious breach of traditional behavior.  He was described as having been one of the "chief Medicine Men of the tribe" (LL 5/8/1937).  The implication was that because he did not use his "powers" correctly, they "turned in upon him," causing his death.  His age was estimated at between 60 and 80.

The ceremonies were again a week long, and commemorated the deaths of John Segundo, Sr., John Segundo, Jr., and Helen Segundo, who had passed away since the last ceremony (DS 3/12/1937).  The 1937 ceremonies were marked by the collapse and death of Nancy Jane Brune, the 75 year old mother of Jim and Frank St. Marie of the Agua Caliente Band (LL 3/20/1937).

An elder beloved by many Cahuillas, and a man historically valued, Miguel Saturnino, died at a Tribal Council meeting at the age of 85 to 90 in March, 1938.  As a young man he had worked on the construction of the railroad in the 1870s.  He had come to Palm Springs from near Cabezon (village) and been adopted by the Agua Caliente Tribe.  Juana Hatchitt, Carrie Pierce Casero, and Annie Pierce were his nieces.  He was also survived by the children of his deceased nephew, Amado Miguel.  On the day of his death he had been rounding up cattle on the desert near Edom Hill (DS 3/25/1938a; LL 3/26/1938).

Another Indian Fiesta under the direction of Quackenbush was held in April, 1938.  A prominent feature of it was a doubleheader baseball game between "four famous Mission Indian teams" on Saturday afternoon:  Sherman Institute vs. Soboba reservation, and the Morongo Indians vs. Santa Rosa.  The meet was held at the Field Club.  In the meantime, hundreds of Indians were expected in Palm Canyon to present "ancient tribal songs, dances and games" (DS 4/23/1938).

A gala fiesta was held November 11 and 12, 1939 at the council house on East Tahquitz Drive featuring Indian dances, speeches by Adam Castillo and Purl Willis, and a Mexican dinner Sunday noon (DS 11/10/1939).  On December 17, the Tribe sponsored a turkey shoot near the Palm Canyon toll gate (DS 12/15/1939).

Since the turn of the century, the Agua Caliente Band had never had more than 50 members.  Tribal membership was still small in number.  In the last week of December, 1938, the birth of Anthony Andreas, Jr. marked the beginning of a steady increase in tribal membership.  The birth of Ramona McGill Welmas on December 3, 1938, had brought tribal membership to 50 again, after the death of Miguel Saturnino (DS 12/23/1938a).

The momentous decade of the 1930s ended with the death of the venerable Pedro Chino, a true culture hero, variously described as 108 or 126, in December, 1939 after a paralytic stroke.  He had been "both medicine man and ceremonial chief of the Cahuilla Indians."  This was a great loss to the Agua Caliente and other Cahuillas as well because of his great reputation as a shaman (*pavuul*) and tribal leader. Four hundred Indians from all over southern California attended the funeral ceremonies, participating in

---

[173]Hereafter referred to as LL.

[174]In 1939, the general public were again invited to attend ceremonies (DS 11/10/39).

ACC0006836

the chanting that began Saturday evening and lasted until after noon on Monday in the ceremonial house (DS 12/11/1939).

## Water

As noted above, the water supply from Tahquitz Canyon became inadequate about 1923, after which water piped from Chino Canyon by a private water company was supplied to Agua Caliente households in Section 14 at government expense. In 1931, because some of the Indians used a great deal of water to manage their auto camps and other commercial businesses, more than they would need for family purposes, the water company put meters in all but two or three Agua Caliente homes, and began to charge the Indians for the water they used. "A committee of Indians," objecting to having to pay for domestic water along with that for commercial establishments, asked James R. LeGallez, a San Bernardino attorney with whom the Band had been dealing for about two years, to find out the details of the 1911 agreement for sharing Tahquitz water with non-Indians, and to determine whether the Indians had been represented appropriately when the rights of Chino Canyon water were given to the water company. This inquiry led to a review of events regarding water between 1909 and 1911. The rights to Chino Canyon water, it was found, had never been definitely determined (LeGallez 11/12/1931; Neuffer 11/30/1931; Wathen 12/15/1931; Scattergood 1/8/1932). This finding indicates how unfamiliar the Indian agency people in the 1930s were with respect to events in the first decade of the century, when Chino Canyon water rights were lost as the result of a decision that piping the water from there to Section 14 would be too expensive to undertake.

A request by Pearl McManus in 1933 that the point of diversion of water from the Tahquitz ditch be moved led to a request from the Agua Caliente Band, conveyed by a letter from LeGallez, for more information about the 1911 agreement. LeGallez' involvement was correctly interpreted as a slight by the Indian Irrigation Service, which should have been defending the Indians' water rights without cost to the Indians (Engle 5/11/1933; LeGallez 6/7/1933; Truesdell 6/9/1933). A 30 foot deep well to supply water for a filling station, dug in Section 11 T 4 S, R 5 E, SBM, a section at the mouth of Andreas Canyon, raised the question of whether underground water rights in the area belonged to the Indians (Hall 12/19/1933; Dady 12/22/1933).

In the fall of 1936 the Tribe took a decisive action on water rights. Spokesman Marcus advised the Secretary of the Interior that it had cancelled approval of the March 6, 1911 agreement on water rights on the grounds that the Indians had not been a party to it, and announced their intention of connecting directly to the Tahquitz Creek for drinking water on their own lands. The Indians were by this time getting only a trickle of water, and that was contaminated by animals after passing through the grounds of the Desert Inn, and thus was unfit for use (Marcus 10/6/1936). The Secretary chided them for taking action without "proper counsel," meaning, of course, that of the OIA, and said that a careful study of the issue was being made, and that when it was completed, Collier would be in touch with them (Ickes 10/16/1936).

Supervising Engineer C. A. Engle of the Irrigation Division of the OIA, after a great deal of prodding from his superiors, submitted a report on the history of irrigation on the Agua Caliente Reservation that included copies of the documents signed in 1911. He proposed that the government spend $40,000 to bring water from both Andreas and Tahquitz canyons to the Reservation. The report exposed many inequities in the Indian Service's water policies that by the 1930s were unknown to OIA personnel (Engle 10/29/1936). Following its release, Acting Secretary of the Interior T. A. Walters wrote to Marcus approving the Indians' spending their accumulated funds on improving the pipeline, in direct opposition to Dady's expressed position that the funds were inadequate for the purpose (Walters 11/13/1936).

Water and floods once again became a problem to the area. On March 1 and 2, 1938, 4.4 inches of rain fell in Palm Springs—an even worse flood than that of 1937 ensued. An earthen dam, built in Andreas Canyon against the wishes of the Tribe at the behest of tribal administrator H. H. Quackenbush, washed out, taking with it the Andreas Canyon water system and leaving the Agua Calientes who depended on it without water.

ACC0006837

There was also a great deal of damage on Section 14, and the ditch that Quackenbush had had dug along the northern boundary of Section 14 washed out, damaging the fences of the neighboring non-Indians, who had been complaining (DS 3/11/1938; Williams 3/21/1938). Cremation pits near Tahquitz Creek were thought to have been completely washed away by the flood (Admiral 10/28/1938). Similiarly damaging results affected the city of Palm Springs.

Riverside County officials had, for some time, been discussing measures to ward off the effects of floods that might be as disastrous as the floods of 1927 and 1937 with the United States Army Engineers and Department of Agriculture officials, Congress having made money for flood control available to these agencies (DS 3/5/1938). After the March flood, further surveys were undertaken (DS 3/25/1938b).

The government announced in July, 1938 that $10,000 had been authorized for installing a concrete pipe from the mouth of Tahquitz Canyon to Section 14 and replacement of existing deteriorated pipelines (DS 7/29/1938) (Figure V.12). Palm Springs residents in Section 23, T 4 S, R 4 E, SBM were pressuring OIA officials to develop Tahquitz Canyon flood control measures (Quackenbush 9/29/1938).

In December, 1938, the Superior Court of the State of California rendered a judgment on the matter of the relative rights, based upon prior appropriation, of the various claimants to the waters of the Whitewater River. These important adjudication proceedings had begun on November 27, 1928 and were regularly continued to April 5, 1938. Robert W. Daniels had appeared specially as counsel for the United States of America on behalf of reservation lands. The United States, on behalf of the Agua Caliente Band, was declared entitled to 6 cubic feet per second, year round, of the flow of Andreas Creek, and to 4.8 cubic feet per second, year round, of the flow of Tahquitz Creek, subject to the provisions of the agreement dated February 10, 1911 between the United States of America and George Welwood Murray, et al. (Dehy 12/9/1938). In April, 1939, the U. S. Attorney General received copies of Certificates of Adjudicated Right for both creeks (Harrison 4/4/1939).

By the end of February, 1939, an Indian crew funded by the Civilian Conservation Corps was finishing work on the improvements to the Tahquitz irrigation ditch. For the first time, separate pipes would bring the water to reservation and non-reservation lands, respectively (LL 2/25/1939).

Work on the irrigation project continued throughout 1939. Dady wrote in September that the work of laying the new irrigation pipe had progressed to the point where it was to be laid in Section 14 itself. He suggested that the first two streets east of Indian Avenue be cleared of houses in order that the pipeline be laid in a straight line, and asked that the Tribal Council be consulted (Dady 9/15/1939).

The Irrigation Service of the OIA turned its attention to the development of a new contract that recognized the changes that had occurred in Palm Springs since the 1911 contract for the use of Tahquitz Canyon water was negotiated. Section 15 had become urbanized, and non-Indians were no longer using Tahquitz water for irrigation and domestic purposes. Instead it was used for watering lawns and gardens, and the ditch that brought it was often a valued feature of the landscaped gardens.  It was no longer feasible for the government ditch tender to follow the ditch into people's yards.  On the other hand, landowners wanted to keep the ditch, rather than have it replaced by a pipe, like that being provided for the water going to the Reservation (Dady 9/28/1939).

A new contract was drawn up to supersede that of 1911.  It provided that the government would build a dam somewhat upstream from where the water would be divided, and pipe the water to the point of diversion.  At the point of diversion, the water to which the non-Indians had a right would be carried in a ditch to Section 15, with the non-Indians getting a right-of-way enclosing the ditch through Section 22 for as long as it was in use for carrying water to their lands.  The non-Indians would be responsible for its upkeep.  The water to which the Indians were entitled would be piped to Section 14 and they would get all of the first 40 inches, whereas under the old contract the non-Indians, when the flow was less than 40 inches, got 5 inches.  The proposed contract proved unacceptable to the CIA, the situation being similar to a situation in the state of Washington, where the department had decided that a 1908 contract made by Code regarding the division of water between Indians and non-Indians was invalid and not binding on the Indians, presumably because the Indians had not agreed to the terms (Dady 9/28/1939; Zimmerman 12/11/1939).

ACC0006838

The Tahquitz Report: Ethnography and Ethnohistory



**Figure V.12.**
**Map of Proposed Changes to Irrigation System, U.S. Indian Irrigation Service, 1938**

ACC0006839

## The Airport

In 1930, Attorney Trent Penland of San Bernardino wrote Superintendent Ellis on behalf of the Tribe complaining that the quarter section leased to the Chamber of Commerce for an airport should not also be used for a saddle livery unless $1000 a year were paid directly to the Indians (instead of to the Indian Agency), to compensate for rental fees tribal members had previously received from the livery stables. Tribal members, who felt that they had been misled or swindled, claimed they had been told the land would be used for an airport only, and that a number of them had been unable to read what they were signing (Penland 9/30/1930). Ellis, in defense of his actions, ignored the request for payment direct to the Tribe, and noted that the signed petition had specifically mentioned stables, and that since only five of twenty two Indians had signed with a thumbmark, it followed that most of those signing could read, and could understood what they signed (Ellis 11/14/1930).

In 1933, the airport lease came up for renewal. In calling for a meeting with the Indian Committee to decide whether the lease should be renewed, Ellis pointed out that if the Indians voted against renewal, there would be a problem in relocating the livery stables, which county health authorities would not permit in areas closer to non-Indian residential areas of Palm Springs (Ellis 6/27/1933), thus reducing income to tribal members. Finally, the Tribe approved a revocable lease for the airport to the Chamber of Commerce (Castillo and Willis 4/7/1935).

By this time the city needed a larger airport to which major airlines could fly directly from the eastern part of the country. The Reservation's Section 18 seemed the best choice for such a facility, and the city began lobbying efforts to acquire it. At the end of August, 1937, H. R. 8026, authorizing the Secretary of the Interior to lease or sell all or part of Section 18 to the County of Riverside for the purpose of building an airport,[175] the proceeds to be deposited in the Treasury of the United States for the benefit of the Agua Caliente Band, had passed Congress and had been signed by President Roosevelt. This measure could not take effect, however, until the Agua Caliente Band approved (LL 8/7/1937, 9/4/1937). In mid-January, 1938, the local newspapers joyfully reported that the lease of Section 18 to the county for an airport was unanimously approved by the 22 members of the Agua Caliente Band who voted, recognizing that the airport would benefit all, Indians and non-Indians. The lease, which was to run for 25 years, carried an option for renewal and purchase. The amount of the lease fee was to be negotiated, but called originally for an annual rental of $1.00 per acre (DS 1/14/1938; LL 1/15/1938a). The Band finally agreed to accept $640 per year for the first five years, but wanted $1280 instead of the $1000 they were offered for the next five years. At the end of ten years, they wanted the fee to be set by three appraisers—one chosen by them, one by Palm Springs and a third by the Secretary of the Interior (DS 4/8/1938).

The indenture of lease that was finally issued on December 4, 1939 provided that the lessor should pay the Tribe ten percent of the gross receipts of the airport, but not less than $640 per year. This important agreement was signed by 27 members of the Band (Agua Caliente Band 12/4/1939). The Tribe was now working more actively as a governing body sharing authority with its neighboring government, the city of Palm Springs, but it would be many years before the city was willing to recognize the Band's right to be treated as a partner in decision-making.

## Land, Allotment, and Autonomy

The leaders of the MIF had long been trying to get rid of Ellis as Superintendent of the Mission Indian Agency, and to change various policies with regard to their political and economic autonomy. One of the organization's techniques was to write letters and petitions, have the various bands sign them, and send them not only to the recipients, but also to the newspapers. In 1933, they submitted "original petitions" from a number of southern California reservations asking that Ellis be removed or transferred, and listing various complaints.

---

[175]It was understood that the county would turn the land over to the city once the city was incorporated.

ACC0006840

Among the specific complaints in the petition was neglect of duty to the Agua Calientes. Ellis had not, it was alleged, accounted for the money received as rent for the quarter-section leased to the Palm Springs airport; he had given the privilege of running a store in Palm Canyon to a non-Indian; and he had tried to take away the moneys deriving from the use of the hot springs (Manuel et al. 4/5/1933; Castillo et al. 4/15/1933). (The Tribe had long been struggling against the Indian Agency's custom of placing income from tribal assets in trust accounts in Washington.)

MIF tactics were apparently successful, perhaps because there had been a change in administrations—Franklin Delano Roosevelt had replaced Herbert Hoover as president. Secretary of the Interior Harold Ickes, replying to Castillo with respect to the petition, said that John W. Dady would replace Ellis on July 15 (7/5/1933). The entrance of John Dady on the southern California Indian scene was a significant event. He was an able, dedicated, formidable "Bureau" man, who proved to be very often the focus of conflict between the Indians, the government, and others.

Dady wrote the Treasurer of the United States to find out what had happened to tribal moneys. He talked to Mr. Cregar, who ran the store in Palm Canyon, and encouraged him to add artifacts made by the Agua Calientes, e.g., canes, baskets, and pottery, to his stock. In this way the Indians could derive some income from their crafts. Cahuilla basket makers had long since established an international reputation as skilled artists.

Dady also made an appointment to talk to a representative of the Chamber of Commerce[176] about renewal of the airport lease. On another matter, Dady ran into immediate criticism from the non-Indian community. He sent a crew of 12 men to clean out the brush and growth, other than palms, that had increased the fire hazard in Palm Canyon. In the eyes of some conservation-minded Palm Springs people, the crew was destroying the beauty of the canyon. Dady was ordered to withdraw the crew at once (Woehlke 9/22/1933).

When Roosevelt took office in March, 1933, he appointed John Collier, prominent in the Indian Defense Association of Santa Barbara in the 1920s, and consultant of Lee Arenas when the latter was captain in the 1920s, as Commissioner of Indian Affairs. Collier introduced the Indian Reorganization Act (IRA) into Congress in 1934. As submitted, it was 52 pages long, and was designed to improve conditions of Indians by replacing much of the legislation on Indian affairs that had accumulated during preceding years. Collier's thrust was toward Indian self-government, against allotment, for tribal ownership of resources, and for the study of and preservation of Indian culture (Kelly 1988:72-73).

Many of Collier's proposals were not included in the bill passed by Congress as the Wheeler-Howard bill and signed into law on June 18, 1934. Congress did not authorize the expenditure of all the funds for the assistance of Indians that Collier had requested, but by contracting with such agencies as the Public Works Administration (PWA), the Resettlement Administration, the Farm Security Administration, and other depression-inspired agencies, Collier was able to give considerable assistance to Indian communities, e.g., jobs (Kelly 1988:72-73).

The leaders and most members of the MIF were adamantly opposed to Collier and his policies. Thus, in the winter of 1933-1934, while the IRA was being considered, the MIF was suspected by Indian Office officials of starting a rumor to the effect that John Collier had tried to get possession of Palm Springs Indian land for non-Indian development, and that the Agua Calientes were now in danger of losing some of their most valuable lands.

On January 30, 1934 Pico Manuel, Baristo Sol, Ramon Manuel, and Clemente Segundo, as an "Indian Committee," wrote to Ickes and Collier to register disapproval of plans to remove them from their village lands on Section 14 and to take away the canyons, and to ask for an accounting of moneys not only from the airport, but also from the trading post, their water rights, and other rentals. They

---

[176]The Chamber of Commerce of Palm Springs undertook many of the tasks that would be the responsibility of the Palm Springs City Council had the village been incorporated. Earl Coffman, whose family operated the Desert Inn, was one of its leading members. Francisco Patencio, in his testimony before Congress in a hearing in 1937, asserted that Dady never talked to the Agua Calientes when he came to Palm Springs, but instead conferred with the Chamber of Commerce (Patencio 7/29/1937).

ACC0006841

complained that Superintendent Dady, who was responsible for employing Indians in various capacities, such as policeman or ditch tender on the Reservation, threatened not to give them any work on the Reservation if they worked with other Indians in asking for justice under the Claims bill,[177] and that he gave them no help in getting improvements made on the Reservation (Manuel et al. 1/30/1934). Dady, in turn, assured them that there was not the slightest possibility that the Tribe would lose part of their land and be moved (Barker 2/5/1934, 2/6/1934; Dady 2/8/1934, 3/23/1934).

The Indian Service, which wanted to change the way Indian groups managed their affairs, was anxious for them to organize as IRA bands. When a vote was held on December 18, 1934, the Agua Calientes voted against organizing as an IRA band, as did most of the other so-called "Mission Indian" reservations (DS 12/14/1934a). Marcus Pete was elected spokesman at this meeting, apparently because Dady had put pressure on Band members to vote for him. Many tribal members apparently boycotted the meeting. Fewer than one-fourth of the Indians were said to have voted for him (Anonymous 1935). Although the truth of this assertion cannot be proven, it is undeniably true that Pete was Dady's choice as spokesman. Left to themselves, tribal members would probably have chosen one of the more traditional leaders, probably a *Kauisik*, who would not have been willing to be controlled by the agent. *Kauisik* lineage members tended to boycott meetings where the vote would go against them, believing that "newcomers" should not have full representation. It appears that the Band did not recognize Pete as its captain, and instead operated under the leadership of what Dady called the "unofficial Indian committee" with Albert Patencio as captain (Dady 11/29/1935; Willis 11/15/1935).

The political lines among the Agua Calientes seem to have been drawn at this point between the traditional leading (*Kauisik* lineage) men of the Tribe, traditional owners of Palm Springs, headed by the *net*, Albert Patencio, and those who filled other traditional roles, and an opposing group who were not members of the *Kauisik* lineage. Most of this opposing group either had *Kauisik* wives, or were descended from *Kauisik* women who had married men from other Cahuilla, Luiseño, or Serrano bands, in accord with traditional marriage rules,[178] or had married other Indians or even non-Indians.[179] Others had been adopted by the Band at one time or another. A number of those in this opposing group derived income from businesses located on their allotments in Section 14. *Panik* members, after they returned to the Band, sometimes voted with the traditionalists, and sometimes with the opposing group.

As noted already, the *net* in traditional times was responsible for the welfare of his people, and was accustomed to having sacredly defined control of certain tribal assets and their products. The control of these contributed to his authority, and enabled him to take economic responsibility for group needs. In the Palm Springs of the 1930s it appears that the *net* had at his disposal the funds taken in from people who used the bathhouse or visited the Indian Canyons. If he used it to pay lawyers or cover the expenses of advisors like Willis and Castillo, that was well within his rights, since he saw such advisors as working for the good of his people. Those who opposed the *net* wanted the income divided among individual tribal members.

Dady, a man with little understanding of, or sympathy for, traditional Indian culture, and continuing a policy initiated in the 19th century by the OIA, made a point of dealing with the Tribe only through the spokesman he had chosen, Marcus Pete. For example, he wrote Pete about the use of tribal funds on deposit in the U.S. Treasury, and the granting of a right-of-way across Reservation land for a proposed sewer line. He thanked Pete and his committee for helping with a clean-up campaign on the Reservation on Section 14, a campaign in which the State Health, Sanitation, and Housing departments were using authority granted them by Congress to improve health conditions on reservations (Dady 2/23/1935a; 2/23/1935b; 3/13/1935). The State Health Department had been called in because business

---

[177]See page V.272 for a more complete discussion of the Claims bill.

[178]These marriage rules prescribed moiety exogamy, and thus would not permit them to marry *Kauisik* men, who would be of the same moiety.

[179]The Cahuillas were patrilocal and patrilineal. Cahuilla women would traditionally live with their husband's band.

ACC0006842

people in Palm Springs, many of them in the tourist business, were concerned about the poor sanitation in the auto camps and other facilities that had sprung up on Section 14.[180]

As the village of Palm Springs became a glamour resort area that drew the rich and famous, the relationship between the Tribe and the "town" became strained. By 1934 the Palm Springs Chamber of Commerce was actively studying a plan to have the village of Palm Springs incorporated as a city. One of the big questions was whether an urban area consisting of sections contiguous only at corners would qualify for incorporation. If so, the city as proposed in 1934 would be four miles long and a mile and a half wide, with Sections 15, 23, and 27 within that area touching only at the corners (DS 12/14/1934b).

Such Chamber of Commerce members as Earl Coffman of the Desert Inn, the village's leading resort hotel, had easy access to economic and political centers of power in the United States. The strange anomaly that half of Palm Springs in a checkerboard pattern belonged to the Indians, and that Section 14 with its dilapidated shacks adjoined the elegant premises of the Desert Inn attracted attention even in the U.S. Congress. In the fall of 1935, Senator Thomas of the Senate Indian Affairs Committee and the committee's Special Assistant Attorney A. A. Grorud held hearing on Senate Bills 1424, repealing allotment, and S. 2589, authorizing the sale of part of the Reservation.

In order to acquire funds for the Indian owners of land, Secretary of the Interior Ickes and CIA Collier, renewing the proposals the AIDA had pushed in the 1920s, in 1935 were promoting passage of a bill (H.R. 8600, and its Senate equivalent, S. 2589) that would have permitted the leasing of much of the Reservation to non-Indian interests. The bills provided that the Indians must consent to any such leasing, but the money from the leases was to accrue in the Treasury of the United States and be disbursed only as Congress should direct (Ickes 7/15/1935). The Agua Caliente, although apparently to be consulted about disbursements, would nonetheless be prevented from acquiring capital for development, or personal unencumbered use of income derived from their land. Thus, the law would have literally dispossessed the Indians from much of their lands.

Collier had conferred with I. C. Freud of Detroit, who submitted a proposal to lease the entire Reservation for 99 years except for such lands as were set aside for Indian use, and Palm Canyon—a proposal that would remove Indians and others from Section 14. Freud's company would build 20 houses for the Indians at $1500 each, and was willing to pay, as a minimum, a sum equal to that currently received from all rentals; 20 percent of gross ground rentals, and 10 percent of all other revenues. Collier found the terms "on the whole acceptable," though nothing could be done until Congress passed enabling legislation (Freud 7/19/1935; Collier 7/25/1935), and ignored such recommendations as that of Dr. George P. Clements, Manager of the Agriculture Department of the Los Angeles Chamber of Commerce, who had written Collier in early August, protesting that the bill was dangerous because it would open up the Reservation to competitive bidding, and leave it "open to every buzzard in the field." He urged that the bill permit the land to be leased only to "a group of responsible people fully financially able" to develop it under the direction of the CIA (Clements 8/10/1935).

At the hearing, on October 24, 1935, the subcommittee was represented by Senator Elmer Thomas of Oklahoma, chairman of the Senate Subcommittee on Indian Affairs, Albert A. Grorud, the special assistant to the committee, and the subcommittee's official reporter. "Members of the Chamber of Commerce of Palm Springs, residents, civic leaders, members of the Agua Caliente or Palm Springs Band of Mission Indians, and their representatives" appeared before them. Some members of the community were concerned that passage of the bill would throw more land on the real estate market, and thus depress land values. Some expressed a concern that the Reservation be sold rather than leased so that it would not remain a "tax-free" island. There was resentment that people could trade at the grocery stores on the Reservation and not pay the 3% California state sales tax.

Earl Coffman, chairman of the Indian Committee of the Palm Springs Chamber of Commerce, proposed that if the Reservation were sold, the Agua Calientes be moved to a model village at the Garden of Eden (Section 35), where homes might be built for them with $100,000 held back from the purchase

---

[180]Since the allotments had not been approved, the Agua Calientes and those who leased from them were in a legal and financial limbo, unable to borrow money to build permanent buildings with proper sanitation facilities.

ACC0006843

Indians, Movie Stars and the Great Depression: 1930-1939

price, that "a reservation be set up around the Agua Caliente Springs of 10 to 40 acres" for a public spa, and that the canyons be set aside as national monuments. This proposal had not been discussed with the Indians.

Eugene Ness, a lawyer from San Diego, spoke on behalf of the Agua Calientes. He said that whereas they used to work for and with the people of Palm Springs, now they felt ostracized by them. The unsightly and unsanitary conditions on Section 14 that bothered the non-Indians were brought about by only six or seven people who had no more right than anyone else to the lots they leased. He had gone to Washington at the behest of the Indians, who wanted a bill that would give them the right to lease their lands if they and the Secretary of the Interior approved its terms. Out of this came H.R. 8600, and its counterpart S. 2589, of which the Indians originally approved, but Secretary of the Interior Ickes, at the behest of the Indian Bureau and outside interests, had made some changes of which they did not approve. These changes gave more control to Ickes (and thus the OIA), and provided the monies would go into the U.S. Treasury, without giving the Indians a say in, or even information about how it was spent (Ness 10/24/1935:23-27).

The possibility of this bill's passing in its altered form frightened and angered members of the Band, some of whom turned again to Willis for advice and encouragement. Willis, in keeping with MIF policy of encouraging reservation economic autonomy, wrote a letter to Captain Albert Patencio, the Tribal Committee, and members of the Band. Having described the property of the Tribe, and then the homes of the 15 families in the Band, which he described as "very poor and almost unfit for residence purposes," he said that their worst problem was that Band members were "almost without hope as their future security" and felt abandoned by the Bureau.[181] He then advised them to make their own plan, hire a business manager, establish a more formal governing body, and keep careful track of Band finances. He told them to have leases approved by the majority of the Tribe and by the Superintendent, and consult with the U.S. Attorney as necessary. He advised them to vote, to improve their own housing, and to comply with sound sanitary practice (Willis 11/15/1935).

Several days later, Willis was brought in to confer with Band members and the Palm Springs Chamber of Commerce. Jack Meyers, an Indian policeman (a Cahuilla from the Santa Rosa Reservation) somewhat controversial among southern California Indians, whom Dady had appointed, was present at the conference, and at another meeting the next day demanded that Willis leave the Tribal Office. Patencio and his committee in turn sent a letter demanding that Meyers be removed from office (Patencio et al. 11/20/1935). Dady wrote Collier, giving his version of events, including the fact that Grorud (special assistant attorney to Senator Thomas) had returned to Palm Springs and met with the Indians and Willis, thus lending Willis' presence a certain legitimacy.

Palm Springs was installing its first sewer in the fall of 1935, and might have extended it onto Section 14 except for a problem that didn't get resolved, perhaps because Dady was so unwilling to interact with the Patencios. An 8 ft deep ditch was to be dug along Indian Avenue, and the Indians were afraid that it might contaminate the hot springs, which lay close to Indian Avenue. Failing to get a satisfactory answer to their queries on this question, they refused to give consent for a right-of-way across the Reservation (Albert Patencio 11/23/1935).

The Indians had held their meetings in the house near the bathhouse, originally built about 1911 as a residence and office for the Reservation farmer when William T. Sullivan was Superintendent of the Malki Agency, and had let Willis stay there. Dady asked if government funds had been used for the building (11/29/1935). Informed that they had been, he made the building off limits to tribal members, except that Marcus Pete and his committee had permission to use the porch and the front room for tribal meetings and the meeting of the regular committee (i.e., the committee of which Dady had approved). He suggested to Pete that tribal funds in the U.S. Treasury be used to erect a suitable community house for the Tribe (Dady 12/9/1935).

---

[181] The OIA was usually referred to as "the Bureau."

V-267

ACC0006844

What the Tribe had been trying to do with the money in the treasury was to extend the irrigation pipeline coming from Tahquitz Canyon north across Section 22 and "thus save our water rights," but Dady quoted the Indian Service Engineer to the effect that the $2500 budgeted would not even pay for the pipe, and would not approve the expenditure, perhaps because it was not presented to him by Marcus Pete, but rather by the committee headed by Albert Patencio (12/9/1935). Later he suggest it be used for a domestic water system. If the Tribe would request the use of the funds for such a system, Dady thought he could supplement them with WPA funds (A. Patencio 12/11/1935;[182] Dady 12/17/1935).

Dady tried another tactic in his determined struggle to wrench authority from the traditional leaders of the Tribe. He sent a letter to all tribal members, suggesting that they were not receiving their fair share of the moneys collected from the bathhouse and the Indian Canyons by members of the "unofficial committee," i.e., Patencio and the other members of the traditional leadership group (12/12/1935). In fact, Dady believed that Patencio et al. were using these funds to support Willis, who was at this time in even greater trouble with the OIA and with members of the Indian community throughout southern California than previously. He and his associates had been denounced at a meeting that included the MIF itself, the California Indian Rights Association, the American Indian Federation, and Indians of California, Inc. (Riverside Press-Enterprise 12/11/1935); moreover, it was shown that he had been convicted for forgery in Lawrence County, Ohio (Dady 12/16/1935). Many groups, including the OIA, were trying to destroy his credibility among Indians and others. Ironically, he remained a major influence among many until the 1960s.

In the December, 1935 tribal election, William Marcus was chosen captain, with Baristo Sol, Francisco Patencio, and Alberto Patencio as the Tribal Committee (DS 12/20/1935). These were all members of the "unofficial committee" of *Kauisiktum* leaders that had been opposing Dady and his policies.

Imposing strict management rules regarding tribal monies, Dady wrote William Marcus, upon his accession to office, a letter that was quite different in tone from that addressed to Marcus Pete the previous year. It stressed that Marcus would be held strictly accountable for the funds collected at the bathhouse and Indian Canyons. They were to be banked, and no check was to be written to anyone not a tribal member except by consent of Dady's office. If advice was needed, it was available from Farm Agent H. J. Hess, not from an "outsider" (Dady 12/17/1935). The procedures Dady proposed were designed to meet the criticisms of tribal members who objected to having the fees from the bathhouse used in the traditional manner. He was also taking a stand against having any funds going to Purl Willis, and other MIF members.

Castillo and Willis, whom the Band had sent to Washington in the spring of 1936, asked that the Band be given title to its land, in accord with the Act of January 12, 1891 (26 Stats. 712); requested that the Band be provided with information about the status of its water rights with respect to Chino and Tahquitz canyons; an accounting of tribal funds in the U.S. Treasury; and copies of any agreements, leases, or permits affecting tribal lands or rights, including the revocable permit issued the Chamber of Commerce for the airport in 1933 (Castillo and Willis 4/10/1936). The OIA, which served as records keeper at the time, set about providing these documents, but they had not yet been provided to the Tribe in September, 1936 (Daiker 4/27/1936; Marcus 9/1/1936). The OIA, in effect, legitimized the tribal decision to engage the services of Purl Willis when Collier authorized the payment of Castillo's travel expenses and per diem expenses. When the authorization arrived at the Mission Indian Agency, Dady furiously objected in a six page letter to Collier, arguing that it was wrong for the OIA to pay these expenses for a trip that he, as Superintendent, had not authorized, and of which some of the Agua Caliente did not approve (Dady 7/15/1936).

The pressure for changes on Section 14 continued, in keeping with the decision by the Chamber of Commerce to improve conditions there. As a move in this direction, Marcus Pete, in June, 1936, was

---

[182]Dady claimed, perhaps correctly, that the letters purportedly written by Patencio and others were actually written by Willis; that Willis had no job, but was being paid in cash from canyon receipts. He noted that Willis paid his expenses and had recently been seen driving a new car.

ACC0006845

Indians, Movie Stars and the Great Depression: 1930-1939

arrested by State Housing officers, fined, and jailed for 15 days for maintaining an unsanitary shack camp on the Reservation (DS 6/19/1936).

By September 26, a group of Band members, including Marcus J. Pete, Ramon Manuel, John Segundo, Carrie Pierce, Anna Pierce, John Joseph Andreas, Roy Lugo, Mrs. Lorene Welmas, Mrs. Romalda Taylor, Clemente Segundo, Frank Moro, Pico Manuel, John Anthony Andreas, and Juana S. Hatchitt, protested to Dady that "secret" meetings were held by the Tribal Committee, and that Purl Willis was present at these meetings (Pete et al. 9/26/1936).

On September 28, the same people sent another letter to Dady, this time declaring that "Our present governing Committee, particularly its Chairman, Willie Marcus, is incompetent, and is mismanaging, and misgoverning our affairs." To their previous complaints, they added that the committee failed to render an accounting of tribal finances, and that it repudiated in a "gangster-type manner" the rental agreements made by certain tribal members. They asked that the Tribal Committee be removed from office, and Purl Willis "ejected from our lands and barred from returning" (Pete et al. 9/28/1936).

This was a new, unprecedented rebellion, not just against an elected group, but against the traditional religious leadership, and especially the Patencio (*Kauisiktum*) lineage who, as a corporate group, in traditional times had owned the Palm Springs area, and which their religious, political, and economic leaders had managed. The "dissidents" were largely those who were not members of the *Kauisiktum* lineage. Two women, Lorena Welmas[183] and Juana Hatchitt, were leading members of the group.

On October 26, one of the rebelling group, Ramon Manuel, wrote Dady in order to bring up still other complaints. He claimed that Purl Willis had been after the Tribe for a long time to lease its lands on Section 14 and move out into the desert; that Willis kept constantly asking for more and more money; and that he had Willie Marcus under his control, to the detriment of the Tribe. Of most immediate concern to Manuel was that Marcus, under direction from Purl Willis, had given permission to his father-in-law, Juan Siva, who was not an Agua Caliente, to live on the land just north of the hot spring that Manuel had held since before the allotment (Manuel 10/26/1936).

The whole community of Palm Springs, accustomed to recreational use of Reservation land without cost, or with minimal cost, was aroused by a decision of the Tribal Committee at this time to raise the fee for visiting the Indian Canyons, and to charge a fee to horseback riders for crossing their lands. This unprecedented action incensed the Chamber of Commerce, as its members had come to feel it was they who should initiate such courses of action. They issued an ultimatum that unless the Tribal Committee showed up at the Desert Inn at 6 p.m. on November 6 with a written cancellation of these new charges, the Chamber would not only "attack the legality of your cash collections, but we shall maintain that the funds derived from the use of your land must be collected by a government representative and distributed for your benefit without your supervision."

In the course of the discussion at the ensuing meeting, two Indian women spoke. A rather different issue was raised, one about which the "dissident" faction was more concerned than it was about fees to riders. One of the women was Juana Hatchitt, who said that one group of Indians on the Reservation "wanted the Indian lands parcelled and allotted equally to the members of the tribe, whereas the other group wished to retain the reservation as tribal land", i.e., owned and managed by the group as a whole.[184] It was the latter group, she said, who wanted the "illegal" fees (DS 11/6/1936).

Another speaker was Attorney Thomas L. Sloan, "representing Mrs. Genevieve P. St. Marie and other Indians in a suit against tribal leaders in which the plaintiffs demand the income from the land which they claim has been allotted to them," who stated that a "white trouble maker" was causing all the trouble (DS 11/6/1936).

The Tribe refused to back down; the Chamber of Commerce and its allies carried out its threat. They wrote to Collier requesting that the Department and the U.S. government "assume and exercise

---

[183]Welmas appears elsewhere in this report as Lena or Lorene Martinez and Lena or Lorene McGlamary.

[184]Actually, private ownership of land and resources was a practice already known to the Cahuilla (Bean 1972).

ACC0006846

immediate control of the Indian situation," which they described as "unbearable." The letter was signed by not only the representatives of the Palm Springs Chamber of Commerce, but also the Palm Springs Junior Chamber of Commerce, Property Owners Association, Realty Board, Desert Riders, Sanitary Board, Police Protection District, and Fire Commission (Palm Springs Chamber of Commerce, Indian Affairs Committee et al. 11/5/1936).

Dady reacted by not calling an election in December, thus letting the government-recognized Tribal Committee go out of office without a replacement (Dady 12/5/1936). This in effect left a small but potentially wealthy group without an authorized governing body. Dady also issued and enforced orders that only persons whom he appointed could collect fees from visitors to the canyons and horseback riders (Willis 1937).

At year's end, Dady, in the Annual Report of Extension Workers, estimated that the average annual income of the members of the Agua Caliente Band was $1200, although it varied greatly from person to person (Dady 1/1/1937).

### Quackenbush Takes Over

Dady now called in a special officer to manage the situation in Palm Springs. In January, 1937, it was announced that H. H. Quackenbush, erstwhile law enforcement officer for 50 reservations in California, Arizona, and Nevada, was being brought in to take charge of all the Agua Caliente administrative duties (DS 1/8/1937).

Quackenbush's arrival meant that tribal self-government was placed in abeyance. The extraordinary powers given Quackenbush enabled him to "accomplish" a great deal in a hurry, but it is ironic that at a time when the CIA was promoting Indian self-government and opposing allotment, he permitted the appointment of a virtual dictator for the Agua Caliente. This "dictator," moreover, was to make common cause with the part of the Tribe that wanted allotment and to work hand-in-glove with the non-Indians of the Palm Springs community who were exerting themselves at the highest levels to take much of the Reservation away from the Indians. It was no wonder that Castillo and Willis, at a time when the leadership of some other reservation bands were rejecting them, found the traditional leaders of the Agua Caliente so open to the assistance they proffered.

What was the total Agua Caliente situation by 1937? The small village of Palm Springs had become the winter playground of corporate America and of Hollywood stars at a time when Hollywood was in its glory. The columns of Palm Springs' two small newspapers were larded with social news items detailing who was at which resort. Shirley Temple and her parents came so regularly that they had their own cottage at the Desert Inn. Moviemaking in the Indian-owned canyons nearby was almost commonplace, e.g., *Lost Horizons* was made in Tahquitz Canyon in 1937. There were housing developments where homes were in the $10,000 to $50,000 range—enormously expensive in those Depression years.

All too close to these were the checkerboarded reservation sections, some untouched desert, but some, especially on Section 14 where the hot springs were located, referred to, by the press, as "slums, veritable slums." They were slums for a reason. It was a place where people with low income could live, people who were often the serving class of Palm Springs.

By federal law the land all belonged to the Tribe as a whole and no individual Indian could lease any of it; only the government could do that on behalf of the Tribe. Actually, there were only two legal leases, one, to the Chamber of Commerce for the airport, and the other, to the Cregars for the Trading Post in Palm Canyon.

Many members of the Tribe, in fact, issued leases to tribal land, informally "assigned" to them, collecting the money themselves. Some leased land that had been allotted them on the allotment schedule of 1927; some leased land to which they had individual traditional title from the years before allotment.

In none of these instances did the lessors have much security. If they put too many or too good improvements on the land, there were no legal guarantees they could keep the leases long enough to recoup their investments, nor did the Indians have the capital to make improvements, or the incentive, since legal ownership was so fuzzy. Lessors accordingly put up minimal housing units, "shacks," or

ACC0006847

Indians, Movie Stars and the Great Depression: 1930-1939

brought in trailers; consequently, there was no sewage system, and there were only outdoor toilets. There was little or no protection against fires, and occasionally there were devastating fires.

The thousand homes on Indian land by 1937 nonetheless served a useful function—they were homes for Palm Springs working people. Although nothing in newspaper items or government documents reveals it, they were also a ghetto. Many of the working people who lived there were Indian, black, Mexican, or poorer whites. There was considerable intermarriage between Indians and others. From this time on the percentage of full blood Cahuillas persistently declined. Schools in Palm Springs, as in other parts of the country, were only partially integrated.

Quackenbush's first actions were to rescind the increase in fees charged visitors to the Indian Canyons, to abolish the proposed fee for horseback riders, and to replace the Agua Calientes who had been operating the baths and working in the canyons when they refused to work under the government officers. These actions limited income for the Tribe and clearly signalled the fact that the Palm Springs non-Indian community was "in charge" of the area, that their interests superseded those of the Indians, and that the Indian Service would determine who had access to employment on trust lands.

Frank Segundo was placed in charge of Palm Canyon, and Anthony Joseph Andreas, of the bathhouse. Canyon roads were placed on a strict maintenance schedule, the better to handle the heavy winter traffic. Quackenbush and his wife moved into the small building near the bathhouse that had been the Tribal Office (Geggie 1/9/1937; LL 1/16/1937).

By the third week in January, 1937, Quackenbush had brought in inspectors from the California Division of Immigration and Housing, who ordered the demolishment of a number of structures on the Reservation he thought to be fire traps or unsanitary. He cited Section 458, Title 18 of the Federal Code, which made state law applicable where no federal law covered the item in question, to justify placing the Reservation under the jurisdiction of state housing and sanitary authorities (DS 1/22/1937). The inspectors abolished "backwoods lavatories," and ordered them replaced by modern plumbing. Builders were henceforth to be required to submit plans for any new building to state housing authorities before proceeding (LL 1/23/1937).

All Reservation leases that had been in effect were cancelled, and tenants were required to get permits from Quackenbush. These would have legal status, but could be cancelled on 30 days notice; hence they offered no inducement to tenants who might have erected sturdy structures. Those who wanted to engage in business on the Reservation were required to get traders' licenses from Washington, and post $10,000 bond with the government (LL 1/29/1937, 2/6/1937a). The usefulness of the lands to the owners was now significantly curtailed.

A significant case that would question government policy was being pressed against the government by St. Marie et al. It was pending trial in the Federal Circuit Court in Los Angeles. In preparation for the case, in which it would be contended that the 1927 and 1928 allotments were valid, government surveyors resurveyed much of the Reservation (LL 1/30/1937).

Quackenbush then announced that Section 14 had been surveyed and subdivided into lots of 50 by 100 feet and 50 by 150 feet, which were available for rent at $10 per lot per month. Some of these had buildings already on them—a thousand of them. Renters were responsible for installing utilities, which had to comply with state sanitary, health, and housing regulations. Although he had received OIA approval for five year revocable leases, these could still be revoked upon 30 days notice (LL 2/6/1937b, 3/5/1937b). A semblance of order had been introduced, but this was still a situation not likely to exploit the full potential of reservation lands.

Palm Springs was struck by a severe flood the first week of February, 1937, reminiscent of the flood that struck ten years before, a reminder to the community at large of the need for water control. Four miles of the road to Palm Canyon were washed out. Quackenbush made plans to have the road rebuilt using WPA funds (DS 2/12/1937).

When the non-Indian bookkeeper and manager of Ramon Camp on Section 14 were arrested for drunken behavior on the Reservation, Quackenbush took the opportunity to declare that non-Indian managers of Reservation businesses would be eliminated, enabling the Indians to manage their property themselves, as Superintendent Dady wanted (LL 3/5/1937c). This was a curious statement, considering

V-271

that the Indian agency had been making such efforts to control their business for them.

Monies began to be distributed to tribal members. Each of the Agua Calientes received a check for $10 in early March. Quackenbush had collected $1468.25 that month.[185] Some had been used to pay salaries of tribal members who had worked for the Tribe. Some was being saved for distribution during the summer months, and the rest was represented by the $10 payments (DS 3/5/1937).

**The Hearings of 1937.** In the spring of 1937, Genevieve St. Marie, Marcus Pete, Juana Hatchitt, accompanied by Attorney Thomas L. Sloan,[186] went to Washington, D.C., as did Purl Willis and Francisco Patencio. All made statements at the hearings on the California Jurisdictional Act, which commenced on May 17. This act would amend the 1928 act that allowed the Indians of California to bring suit in the Court of Claims for payment for lands and property taken from them. The original act pertained only to the Indians who had been a party to the treaties negotiated in 1852. What was being considered in 1937 was an amendment to permit all Indians of California to sue. However divided Sloan and his clients, and Willis and Patencio might be on the issue of allotment, they agreed with each other in their testimony in these hearings on the California Indians Jurisdictional Act (U.S. Senate 1937:200, 223, 300, 287-290), hearings that resulted in a bill that initiated the second round of the Claims cases. The Claims cases provided that the money the government had spent in providing services to the Indians over the years would be subtracted from whatever award the Indians got. For this reason, the Agua Calientes, like other California Indians, were much more angry than they might otherwise have been when Indian agents failed to meet their needs, enjoyed luxuries they did not, or went directly against their wishes.

The Indian Affairs Committee of the Palm Springs Chamber of Commerce sent Guy Pinney, now employed to coordinate city and Reservation affairs, to Washington, allegedly to find out what Congress planned for the Agua Calientes. The Chamber, which had been accused of sending Pinney to negotiate the purchase of Indian lands, denied any such intent (LL 4/20/1937).

On May 10, 1937, Lee Arenas, Pedro Chino, Joe Patencio, Willie Marcus, Moreno Patencio, Clemente Segundo, Albert Patencio, Mandy Segundo, Francisco Patencio, and Florida Patencio, the traditional leaders of the *Kauisiktum*, signed a letter as a "Tribal Committee" to John Collier and John W. Dady, saying that a majority of the Tribe had concurred in sending Francisco Patencio to Washington to work in favor of Senate Bill 1424, which would abolish allotment (Arenas et al. 5/10/1937). Senate Bill 2589 was also before Congress. It would have authorized the Secretary of the Interior to sell Agua Caliente tribal lands to the highest bidder at his discretion, and to lease all or part of Section 18, T 4 S, R 4 E, SBM for an airport. The sale or lease would require the approval of a majority of the adult members of the Agua Caliente Band, except that if they voted against it, a Board of Appraisers could declare their reasons unreasonable or capricious, in which case the sale would go through. Alternately, the President of the United States could declare Section 14, and up to 25,000 acres of the Reservation, a national monument once title to the lands was vested in the United States (S-2589). (This bill was ultimately defeated in Congress because members of the Committee of Indian Affairs felt that it left too much discretion in the hands of the Secretary of the Interior.)

In the meantime, the bathhouse at the hot springs, having been cleaned up and refurbished, was attracting such Hollywood notables as Dolores Del Rio, Robert Taylor, Bruce Cabot, Ralph Belamy, and Charles Farrell, and as a result attracted the attention of the editor of the "March of Time" news movies, who sent a photographer to film it (DS 4/9/1937). The citizens of Palm Springs were anxious to exploit these visits.

Tribal members continued to be in disagreement with one another with regard to land

---

[185] The net tribal income did not include income from the land of the Band members involved in the suit against the government, although those band members shared in the $10 distribution. Some Band members were said to be achieving gross incomes of several hundred dollars a month from "their" lands (DS 3/5/1937).

[186] Sloan represented the dissident group who were suing for approval of the allotments.

ACC0006849

Indians, Movie Stars and the Great Depression: 1930-1939

management. Marcus Pete wrote a letter that repudiated the reported dismissal of the allotment case by the Los Angeles Court, and explained that it was dismissed only on a point of misjoinder (DS 5/7/1937) (the plaintiff could not be a group, but had to be an individual; hence the plaintiff thereafter became Genevieve St. Marie). On all other points the court had given the plaintiffs 30 days to amend. Pete then went on to present an argument in favor of allotment, saying that the time when it was safest for Indians to hold their lands in severalty was gone; that in the modern day the Indians needed every incentive they could get to exert themselves individually. He went on to denounce the "Los Angeles interests" that were offering to buy Section 14, saying the offer was for much less than the land was worth, and asking how William Marcus would feel about losing the money he got from leasing.

The manner in which rental fees were distributed was questioned, and Indian efforts to control assets and income were further pursued when, on June 17, 1937, Marcus Pete filed suit to prevent the Secretary of the Interior and his agents from collecting rent on Pete's improved property. It also directed the Secretary to show cause why Pete should not be granted a trust patent for the allotment he claimed. According to Quackenbush the lands claimed by Pete were not those allotted to him in the 1927-28 allotment (LL 7/27/1937, 7/31/1937). On July 26, Dady was instructed not to collect fees from Pete's tenants while the suit was pending (Zimmerman 7/26/1937).

Quackenbush, acting after the fact, called an election by secret ballot in June that resulted in a unanimous approval by the 17 tribal members voting to send Francisco Patencio to Washington, none of them voting for either Bill S. 2589 or H.R. 5297 (similar to S. 1424), and two voting against each bill. Two members were in Washington, and two were ill or away. Of the 28 adult members of the Band, 7 members declined to vote, on advice of Attorney Sloan (Dady 6/18/1937; LL 6/19/1937; DS 10/1/1937). Anthony Joseph Andreas and John Joseph Andreas were among those who voted. The *Limelight* commented on what appears to have been an attempt to sway the Tribe's vote: "[Quackenbush] made something of a gala day of it for the Indians, treating them to lunch and afterward handing out Government checks—the receipts of recent tolls collected from Palm and Andreas Canyons (6/19/1937).

The third set of hearings on S. 1424 and S. 2589, held in Washington, D.C. on July 6, July 29, and August 16, were the scene of an outbreak of bitter conflict between Sloan and Juana Hatchitt, opposing S. 1424, and Willis and Francisco Patencio, supporting it. Attorney Sloan objected to S. 1424 on the grounds that the Mission Indian Allotment Act of March 3, 1917, which it sought to repeal, was a mandatory act, which meant that the 1927 allotments were valid without the approval of the Secretary of the Interior. He objected to S. 2589 on the grounds that it provided for the sale of the Reservation land as though it were unallotted land, whereas it was, he argued, allotted (Sloan 1937:101-102). Willis and Patencio favored S. 1424 for reasons they had reiterated over and over since allotment was first proposed in the late 19th century—it was a strategy backed by non-Indians to take lands away from Indians.

Sloan asserted that in 1935 and 1936, Willis had persuaded the Agua Caliente Tribal Committee to pay monies collected from people visiting the canyons to him instead of dividing it among Band members. Sloan felt that $20,000 to $30,000 had been "stolen" in this way, and that Patencio and others on the committee should be arrested and prosecuted for the crime. Willis and Patencio accused Sloan of having bribed members of the Band to join in the suit for allotments, and Patencio claimed that most of those whom Sloan was representing were not in fact members of the Band, not having been officially voted in. Willis claimed that Sloan and his clients, the Palm Springs Chamber of Commerce, and the Indian agency had entered into a conspiracy in December, 1936 when the Tribal Committee was deposed after refusing to back down with respect to fees for visiting the canyons (Department of the Interior 1937).

Willis and Patencio declined to take a stand on S. 2589 at the time, wishing to settle the question of allotment first (1937).

Robert Ransom, representing "Eastern" financial interests, in July, 1937 expressed interest in buying the Reservation lands should they become available. He and his wife had been guests of honor while in the East at a luncheon given by Senator Joe Robinson, with Mrs. Cordell Hull and Senator Robert Wagner of New York as fellow guests. The Ransoms had also been the house guests of Patrick J. Hurley, former Secretary of War under President Hoover (LL 7/24/1937). Thus, some of the highest political figures in the nation of both parties were involved with Ransom.

ACC0006850

To increase tribal income, Quackenbush kept the Indian Canyons open during the summer of 1937, and kept the canyons and bathhouse open at night until 10 p.m. (LL 5/15/1937. It was announced in July that the federal government would spend $117,000 on paving Reservation roads, including Palm and Andreas Canyon roads, and the regular section line roads on the section lying east of the village of Palm Springs. Twenty-one of the 28 adult Agua Calientes had given written approval of the roads by July 10, and Quackenbush expected all of them to approve. Congress had approved federal funds for the project and the funds had been appropriated, but not yet received (LL 7/10/1937). Paved roads would improve the appearance of Section 14, and the canyon roads would facilitate tourist visits to the canyons.

Agua Caliente traditional leader Francisco Patencio and Purl Willis continued to protest the Quackenbush regime. They left Washington on August 26. On August 14, Patencio wrote to Collier protesting the cancellation of the 1936 annual Agua Caliente election, and Quackenbush's taking control of the Reservation in January. He pleaded for the resumption of tribal control, insisting that the Band could solve its problems if given control and support from agency officials (Patencio 8/14/1937).

Perhaps because of this letter, Collier seems to have had second thoughts about the legality of the agency's actions. He wrote to Dady, saying that although at Palm Springs they had been dealing with an emergency, he believed, nonetheless, that the general principle that no tribe of Indians should be prohibited from electing a council held true. What powers the councils should have was another matter. He thought it would be desirable for Dady to come to Washington and consult with Felix Cohen, the administration's authority on Indian law, when the latter returned from vacation (Collier 9/7/1937).

By mid-October, 1937, the traditional leaders of the Agua Caliente Band, again bypassing local Indian Service personnel, wrote Collier, saying that a majority of the adult members of the Band had by petition appointed Willie Marcus to serve as Tribal Spokesman, and Albert Patencio, Francisco Patencio, and Baristo Sol as members of a Tribal Committee to act for the Tribe in the emergency represented by having no tribal officers at a time when tribal lands were so seriously threatened. They demanded the right to hold a tribal election, the immediate removal of Special Officer Quackenbush, and the cancellation of a permit Quackenbush had issued to the county to bring steam shovels onto Section 14 to dig a large drainage ditch along its northern border (Marcus et al. 10/16/1937).[187]

On October 20, the Tribal Committee sent an eight page letter to Congressman Harry R. Sheppard, Member of the House of Representatives' Indian Affairs Committee, criticizing everything the Indian agency had done in the last year and before that. They said, for example, that Quackenbush was spending tribal money to make more comforts for himself, was giving each tribal member $10 a month out of "our" money, and was refusing to make an accounting. Old people could not live on the $10, and Quackenbush should apply on their behalf for State Pension Aid to which they were entitled. "If the tribe was in charge, we would see to it that all members receive sufficient aid to carry them over properly, as we did in 1936" (Marcus et al. 10/20/1937).

A small building from which dates had been sold at Palm Springs Station—a train stop, where tourists were picked up to go to Palm Springs—had been moved to the triangle where Indian Avenue, Palm Canyon Drive, and Ramon Road meet, a tract leased from Carrie Pierce Casero, to whom it had been allotted. On the grounds that all allotments were in litigation and could not be leased at the time, Quackenbush had the building removed, whereupon a large proportion of the Agua Calientes met with the directors of the Chamber of Commerce. When, after an impassioned defense of the allotment system by Attorney Sloan, Alvah Hicks, manager of the water company and president of the Chamber of Commerce, suggested the issue be referred to a committee, Earl Coffman of the Desert Inn "sprang up and demanded" that since the Indians had been invited to a discussion, the matter be discussed then and there. Marcus Pete suggested the tract be donated to the city until its legal status was settled, Carrie Pierce appealed for her rights, and Alvah Hicks asked for cooperation between Indians and whites for the betterment of Palm Springs (LL 11/6/1937).

---

[187]Collier understood that the steam shovel had been brought in, as a flood control measure, to clear an old drainage ditch that had become filled with debris that ran some 20 feet to the south, a project that neighboring property owners protested (Collier 11/10/1937; Williams 12/7/1937).

ACC0006851

Indians, Movie Stars and the Great Depression: 1930-1939

**Quackenbush Goes Too Far.** This hearing took place just before an outrageous action by Quackenbush—the arrest on November 20, 1937 of Purl Willis, Adam Castillo, and the 1936 Tribal Committee members, Willie Marcus, Francisco Patencio, Albert Patencio, and Baristo Sol, on charges of conspiracy to defraud, misrepresentation in the handling of $11,000 of tribal funds prior to January, 1937, and rebellion against constituted authority. Warrants were served simultaneously in San Diego (on Willis) and Palm Springs, and all but Albert Patencio were apprehended. Demonstrating his alliance with those arrested, the latter was found the next morning by Quackenbush, waiting on the steps of the Riverside County courthouse for someone to arrest him (LL 11/20/1937, 11/27/1937).

Quackenbush's methods were now open to censure. He was taken to task for having carried out this arrest without informing his superiors of his plans, and was asked by Secretary of the Interior Ickes to justify his actions. He explained that during his service as Special Officer of the Indian Service charged with handling law and order matters before his assignment to Palm Springs, he had been instructed not to communicate with the Superintendent or other officials of whatever agency's jurisdiction he was working in until arrests had been made and indictments secured. This behavior was to assure "cases might be completed successfully and the possibility of offenders being warned prior to the arrest through promiscuous rumors and talk be eliminated." In this instance, he had been asked over two and a half years previously by Dady to check on the activities of Purl Willis, and in December, 1936, to cooperate with FBI Agent James Findlay, who had been assigned to investigate Purl Willis by the Department of Justice at the request of Commissioner Collier. He had prepared the case against Willis and the Tribal Committee in secret over a period of over two years; had presented it to the Assistant U. S. Attorney in charge of the federal Grand Jury; and had taken immediate action after the Grand Jury had voted a true bill to indict the defendants, in order to be able to seize important papers before they were destroyed (Quackenbush 11/25/1937).

Quackenbush asserted that upon the return of Francisco Patencio and Willis from Washington in late summer, 1937, they created chaos among the Agua Calientes at a series of meetings where they claimed various promises had been given them in Washington, including a promise from Collier that they would be permitted to hold an election and handle all the affairs of the Reservation. He asserted that, not hearing from Washington, they had taken action to elect themselves back into office, and "instigated acts of treason," including the demand that the county refill the ditch on Section 14 that had been cleared for flood control purposes. He closed his letter with an assertion that he believed that "Francisco and Albert Patencio and Baristo Sol; particularly the latter, are more or less innocent victims under Purl Willis' domination and that they will make good government witnesses and can be dealt with lightly if a conviction is obtained" (11/25/1937). Since Willis was targeted as a serious troublemaker on several reservations, the opportunity to alienate his influence was highly desired by the Indian Service.

The matter was of sufficient alarm that within the week Collier flew out from Washington to confer with Quackenbush and the U.S. Attorney, to meet with officials of the Mission Indian Agency, and to visit the six defendants in jail (DS 12/3/1937). On November 23, 1937, Collier confirmed in a letter the rights of the Indians to pass on all leases and agreements affecting their land (Willis, Castillo, and Segundo 2/1/1938). He apparently gave orders that Quackenbush was to allow the Indians to meet and to vote on all matters pertaining to the Reservation. He was also to allow them to present and vote on petitions and was to forward them to Washington (Collier 2/16/1938).

The individuals who had been arrested were released. Quackenbush then sent a notice to enrolled Indians to come to a meeting on December 17, 1937, at the Palm Springs School House to discuss matters of concern to the Band, including fees and rentals charged for the use of tribal lands and access to scenic areas. After consulting with Attorney Avery Blount, 18 enrolled members of the Tribe (i.e., the traditional group and others) replied that they would not come to a meeting at the school house where outsiders (presumably referring to the members of the Indian Committee of the Palm Springs Chamber of Commerce) might interfere, but advised Quackenbush that they would meet him on December 21, at the tribal house near the church (Willis, Castillo, and Segundo 2/1/1938).

Quackenbush agreed to come on the 21st, but went ahead with his meeting on the 17th, for which only nine members of the Band showed up. The nine included Clemente Segundo, who later stated that

ACC0006852

confusion reigned and nothing was accomplished (Willis, Castillo, and Segundo 2/1/1938). Quackenbush and his wife also attended the December 21st meeting. Those in attendance, he reported to Dady, were primarily the traditional leaders and their wives, Adam Castillo and his wife, six Indians from other reservations who were active in the MIF, and Attorney Avery Blount. Clemente Segundo, who had long acted as interpreter for the traditional leaders, but had begun, Quackenbush thought, to disassociate himself from this group, was present. Quackenbush believed Segundo's attendance had been secured by promising him the opportunity to go to Washington instead of Francisco Patencio. "[They] must have had difficulty in getting Francisco Patencio to agree to that" (Quackenbush 12/22/1937).[188]

Eight petitions were approved, and it was understood that Quackenbush would forward them to Washington. An especially important petition had to do with the fact that the Tribe had not been getting its share of Tahquitz water. About this one, Quackenbush agreed that something should be done (12/22/1937).[189]

When a committee of Indians and Attorney Blount called on Dady on January 3, 1938 to find out when they could expect action on the decisions made on December 21, they were told that that was not considered an official meeting, and the petitions had not been sent to Washington. Dady agreed to call another meeting on January 12. It was held in the same place as the December 21 meeting, and the petitions were presented again. But, according to a letter from Willis, Castillo, and Segundo to Collier, Quackenbush let them vote on only the petitions that he considered reasonable, and "took occasion to browbeat and intimidate them" (2/1/1938). He tried to get them to use paper ballots, but they insisted on a standing vote in order that there be no misunderstanding.[190]

The 22 voting adults present (the six who were suing for allotment rights did not attend these meetings), acting again in what seemed the best tribal interests, unanimously approved the airport bill, but rejected 16 to 7 Quackenbush's proposal to lease their best lots at $100 a year. Dady claimed they voted to put new rates into effect February 1, but the Indians had intended they be put into effect at once. The Indians, moreover, emphasized a previous demand that horseback riders be charged for the privilege of riding on their lands. Riders had cut the Indians' fences so that livestock got out, and without permission had built trails across scenic Indian land. Whereas Quackenbush, ignoring the facts, had reported Indian approval of a charge of five cents per yard for sand, soil, and gravel taken from their lands, they had not agreed on such a rate. They had tried to charge 25 cents a yard (2/1/1938).

Acknowledging the fact that the local Indian Service would not be pleased with Indian leaders going directly to higher authority, the letter writers defended the Indians' right to send representatives to Washington. They argued that the Superintendent and his agent should applaud what they had accomplished there instead of impeding them. The bill prohibiting allotments should be passed. The

---

[188]Quackenbush was apparently amazed that Patencio was willing to give up his role as tribal spokesman on so important a trip.

[189]While these issues between Quackenbush and traditional tribal leaders were being fought out, conflict continued in the Palm Springs community regarding the ditch on Section 14, for which the steam shovel had been brought. It aroused the ire of neighboring property owners as well as the traditional Indian leaders. The property owners complained that the ditch would reroute onto their lands the flood waters from which it saved Section 14. One of them wrote the President of the United States with his complaint, not only about the ditch but also about the "shanty-town" that was being erected on Section 14 about half a mile from where the Indians lived, but directly across the section line from where homes worth $10,000 to $50,000 had been built (Williams 12/9/1937).

The issue was referred to Collier, who referred it to Dady. Dady, upon inspection of the ditch, found it unsatisfactory. He defended the shacks on the ground that the inexpensive housing was needed, and that the clouded legal status of the land was what prevented the building of more substantial structures. Williams wrote to Collier, complaining that there was no excuse for the agency's creation of crowded, unsanitary slums on the reservation for residents who could often afford modern motor cars and trailers. He wrote an even more blisteringly critical letter in January (Williams 12/24/1937; 1/4/1938). From this time on for many years, the issues raised by Williams were sensitive issues between the tribe, the BIA, and the townspeople.

[190]The standing vote was a traditional method of voting.

ACC0006853

Indians, Movie Stars and the Great Depression: 1930-1939

Agua Calientes had not approved the allotments of 1923 and 1927, and it was wrong for Dady and Quackenbush to lend support to those who were suing in favor of the allotments. They should take note that one of the petitions, passed by a vote of 16 to 8, asked that Attorney Tom Sloan be prevented from coming on the Reservation to collect rents he claimed were due from tenants on his clients' claimed allotments, and from trying to get the Indians to sign a revocable power of attorney (2/1/1938).

Quackenbush, Willis et al. claimed, created dissension in the Tribe, which before he came had unanimously petitioned to have Purl Willis take a problem up with the OIA. One of the most important complaints of the Indians was that Quackenbush had issued permits, leases, and agreements without their agreement. This applied to both land he had leased and road rights-of-way he had granted. They demanded that all these unapproved permits, leases, and agreements be cancelled at once.

The writers asserted that Quackenbush had joined forces with non-Indian residents of Palm Springs to defraud the Indians. This alliance had "cheated" the Indians with respect to the old airport lease; had promoted the 1937 Indian fiesta (which, contrary to Quackenbush's publicity, the Agua Calientes had not approved) and claimed all the money that it brought in; and was threatening to unseat Congressman Sheppard if he did not favor the Chamber of Commerce. The Indians had arranged a lease for land on Section 22 with a Mr. Mark Collins, who paid them $1,000 in advance, but the OIA refused to approve and the water company refused service, so the check had been returned. Quackenbush then leased the land to an auto trailer camp (2/1/1938).

The writers claimed that the Tribe had not been provided with an adequate financial report or accounting on monies collected at the Indian Canyons. They claimed Quackenbush maligned anyone who disagreed with him; that he lied when he claimed that meetings held in 1936 when the Tribal Committee was in charge had been kept secret; and that, contrary to his allegations, the Tribal Committee did keep accurate financial records.

The conflicts with regard to "original occupants" of Agua Caliente versus those brought in by them in later years, circa 1890, etc., were reflected again when it was reiterated that there were seven adults and their children on the rolls who had no right to be there, and that a new roll should be made (2/1/1938).

Upon receiving this letter, Collier notified Dady and Quackenbush that Quackenbush had blatantly disregarded Collier's "exhaustive, clear" instructions, derived from the basic Indian policies of this Administration." He accused Quackenbush of insubordination, and Dady of condoning it. He had not yet decided what action to take, he said (Collier 2/16/1938). Collier, it is said, often had such conflicts with OIA personnel who were in office before he became Commissioner.

**Economic Conditions.** Within the larger community there was very little understanding or sympathy for the Cahuilla among the non-Indians of Palm Springs. There was envy because they owned potentially valuable land, and anger with regard to their different life styles. An example of the general lack of knowledge is presented by an incident involving Mr. Cregar, the operator of the trading post in Palm Canyon, whose ignorance was exhibited in a newspaper article that quoted him as telling a Palm Springs seventh grade class who visited the trading post that the Cahuillas made Kachina figures (they are made, not by the Cahuilla, but by the Hopi of the greater Southwest), and that most of them worshipped the figures (DS 12/7/1937). Cregar was well known as a collector of Indian artifacts and should have known better. His statement is even incorrect with respect to the Kachina's role among the Hopi.

The economic conditions in 1937 had been, on the whole, somewhat better for Agua Caliente than for their neighbors. On the 1937 Annual Report of Extension Workers, Dady gave the average Agua Caliente family income as $2000 (1/4/1938), a considerable increase from the $1200 reported for them in 1936. The number of horses owned by the Tribe had increased to 135 from ten the year before because "a motion picture company induced the Indians to roundup horses for picture purposes. No roundup of a thorough sort had been undertaken before and no accurate figures have ever been available before this roundup" (Dady 1/4/1938). Palm and Eagle canyons had been the scene of filming the picture *Jungle Love* during the year (LL 11/13/1937), and Tahquitz Canyon had been the scene of filming *Lost Horizons*. This had provided some tribal income. Figures entered in the Congressional report on the hearings of

ACC0006854

1935, 1936, and 1937 with respect to income from tribal members' leases show that as of March 9, 1937, Albert Moreno, and Francisco Patencio, Pedro Chino, G. Pierce, and Pico Manuel were the only lessors who received less than $100 a month. Juana Hatchitt, Willie Marcus, and Lee Arenas received the largest incomes, with Ramon Manuel, Marcus Pete, and Vyola Hatchitt the next largest. The rental incomes of Miguel Saturnino, C. Casero, Ramalda Taylor, A. J. Pierce, and "The [Tribal] Committee" were just above those of the Patencios. Average monthly income was $280, an excellent income at a time when college graduates might earn $75 to $100 a month. It should be born in mind, of course, that this income was seasonal (U.S. Senate 1937).

The annual income of the Tribe from the bathhouse and canyons had risen from $8000 in 1936 to $17,000 in 1937 under Quackenbush's management. Fees had been raised to allow only two passengers in a car for a 25 cent fee. Additional passengers were charged 10 cents more (LL 1/15/1938b), and there would be a $1 charge for a season ticket for each horseback rider riding over Reservation lands (DS 2/11/1938).

Problems on the Reservation were exacerbated by several disastrous fires. A volunteer fire department was formed. It was made up of Reservation residents, which included both Indian and non-Indian. A fund was raised to purchase appropriate equipment (DS 1/28/1938, 2/4/1938).

Adam Castillo, on March 30, speaking on behalf of the majority of Agua Calientes before the House Committee on Indian Affairs, supported H.R. 7450—S. 7589, which pertained to the sale of Agua Caliente Reservation lands, on the grounds that new amendments gave the Tribe a voice in which lands should be sold, the price to be set, and the ways in which the money would be spent. The Tribe, he said, had faced the fact that sale of tribal lands was a way to get relief from "what they term the despotic rule of the local Bureau" (Castillo 3/30/1938). Attorney Thomas Sloan, Purl Willis, Adam Castillo, Clemente Segundo, and, intermittently, Quackenbush were also in Washington attending the hearings (DS 5/13/1938).

Before he left for Washington, the season being over, Quackenbush incurred concern when he laid off the Indians who worked for the Tribe, leaving them dependent on the $10 a month they were given, an amount that had not been increased, despite the increase in tribal income of which Quackenbush boasted. Captain Albert Patencio and Acting Spokesperson Willie Marcus, complaining of this to Collier, called attention to the fact that Quackenbush had gone off to Washington with no expense to himself: "And always remember that we do not ride in a government car to Los Angeles. We have to hire one. Only when we are to be put in jail we ride in government cars" (Patencio and Marcus 5/20/1938).

By April 1, 1938, Palm Springs' 910 registered voters had voted 442 to 211 in favor of incorporating as a city. Philip L. Boyd became the city's first mayor (Bogert 1987:165). Flood control was one of the first problems considered by the new city council. The city promptly petitioned the United States government to take measures to alleviate the threat of flood posed by the Tachevah Canyon Wash, which passed through Section 10, T 4 S, R 4 E, SBM, then a part of the Agua Caliente Reservation (City Council of Palm Springs 8/9/1938).

On June 8, the tribal members who were in favor of allotment protested to the *Riverside Press-Enterprise* about its story to the effect that the majority of the Agua Calientes had signed a petition asking that Willis be appointed Indian agent in place of Quackenbush. They pointed out that Willis and Castillo and four signers of the petition were still under indictment for conspiracy to defraud and embezzle the government and the enrolled members of the Tribe (DS 6/10/1938b). Willis and the MIF were still opposed to allotments, as were the traditional members of the Band.

**The Quackenbush Era Comes to an End.** Despite Quackenbush's conflicts with Collier, he was reappointed to his position for another year on July 30 (DS 7/1/1938). The traditional Indian leaders acquired a new advisor, J. M. Forline, a grandson of John Guthrie McCallum. Although Forline was helpful in reconciling some of the Agua Calientes to the highway rights-of-way through the Reservation that Quackenbush had approved, Quackenbush thought Forline an ally of Willis. He noted that Francisco Patencio, the traditional leader, had disapproved Forline's appointment as advisor. Quackenbush, writing to Dady, said nothing had been accomplished in the months since November 23, 1937, when control was

ACC0006855

Indians, Movie Stars and the Great Depression: 1930-1939

placed in the hands of the Indians, and strongly recommended a return to the autocratic management he had enjoyed up to that time (Quackenbush 9/26/1938).

Allotments were once again an issue when, on July 23, after so long a time, the court case brought by Genevieve St. Marie et al. against the government to enforce recognition of allotments came before the Los Angeles Federal Court. Federal Judge Leon Yankwich declared all allotments made to the Agua Calientes illegal (DS 12/23/1938b).

The institution that had long had a marked effect on Indian Affairs in Palm Springs—the Indian Affairs Committee of the Chamber of Commerce—was replaced in October, 1938, by the Indian Affairs Committee of the new city of Palm Springs (DS 10/28/1938).

By the fall of 1938, two thousand Palm Springs residents, mostly non-Indian, lived on Section 14, whereas the average year-round population of the city of Palm Springs was 1500. In winter the city's population swelled to 8000, with much of the temporary population housed in 55 hotels (Floyd 10/18/1938). Tourism was now a major factor in Palm Springs' economic life.

In November, 1938, the Indians petitioned Collier. They asked for "a return of their right to administer their own affairs and propose that this shall be done, among other things, by a Tribal Council in which every adult member shall have an equal voice, and that no act of any kind whatsoever shall be undertaken or approved without the knowledge and majority consent of the entire tribe," and that John McCallum Forline be appointed their business manager, to be paid "a commission of ten percent of the gross tribal income," out of which he would pay all administrative expenses incident to the discharge of his duties. Twenty-four of 26 eligible adult tribal members had signed the petition (Forline 11/25/1938).

In late December, H. E. Shipe, the assistant director of the OIA Division of Irrigation, and C. E. Faris, Senior Field Representative, arrived in Palm Springs to decide how to handle Reservation leasing affairs in the light of this request, and the illegal (because not approved by the government) leases on the Reservation, of which there were over a thousand. In order to enhance economic opportunities for the area, the OIA intended to make it possible to grant lessors 25 year leases to promote the construction of better buildings (DS 12/23/1938b). This would have the indirect effect of increasing income.

Shipe, having met with the Agua Calientes, and Faris found that a major drawback to successful negotiations was that Quackenbush, who had so offended the Agua Calientes, was being paid out of tribal funds. Shipe recommended that plans to sell all or part of the Reservation be dropped, and that Faris, whom he thought admirably suited for work with the Agua Calientes, continue to work with them. "Personally, I feel that the way out for these Indians, who by the way are a group of intelligent people ready to advance under acceptable leadership, is not at all impossible" (Shipe 2/8/1939).

At this time gambling was "open" in the valley, Cathedral City and Palm Springs. In February, 1939, Federal Judge Leon Yankwich approved action alleging gambling to be a public nuisance, thereby making it possible to prosecute anyone operating a gambling operation on an Indian reservation. An action had been brought against the owners of the Agua Caliente Club at the corner of Andreas Road and Indian Avenue. After the ruling the owners of the club agreed to vacate the place (DS 2/13/1939).

Improvements on living conditions at Agua Caliente continued. After a survey of the Reservation by Quackenbush and F. J. Rugg of the State Division of Immigration and Housing, Palm Springs police served 17 abatement notices on Reservation property owners and lessors, ordering that unsanitary and dilapidated buildings be repaired or demolished (DS 3/24/1939). The Acting Secretary of the Interior confirmed that the state authorities had the right to inspect reservation lands to check on health and sanitation, and, through the Superintendent of the Mission Indian Agency, bring about the necessary improvements (Slattery 5/9/1939).

Almost hidden by other news at the end of June, 1939, were several short paragraphs in the newspaper noting that Quachenbush was leaving. Noel Wilson was henceforth to represent the Indian Department in Palm Springs (DS 6/30/1939).

**The Petition of April 15, 1939.** Conflicts regarding membership rights were partially settled when on April 15, the Agua Caliente Band submitted to the CIA and the Secretary of the Interior a petition, which the latter approved on June 2, and the Band on June 22. It consisted of a statement of

ACC0006856

purpose and what was essentially a set of by-laws for the Band. Band members, putting aside their differences, agreed to recognize the rights of all Band members then on the roll, disavowed outside interference except for the "protection and guidance of the Federal Government," and requested a continuation of the right of self-management. A list of the members of the Band, as given in the "last official per capita payment list maintained by the Indian Department," was given, and it was agreed that all present members should continue for life, without revocation; that additional members might qualify: (1), by birth if one or both parents were members; (2), by election, requiring a three-quarter vote of all members and the approval of the Secretary of the Interior. Family adoption would not qualify a person for membership (Agua Caliente Band 6/22/1939).

It was agreed that there should be no alienation of Indian lands by the government without Indian consent; that each member of the Tribe over 18 years of age should be assigned a piece of land approximating four acres of tribal land, and each member under 18 should be assigned that amount of land upon reaching 18; that acceptance of such assigned land by parties to the allotment suit that was pending an appeal should not prejudice their right to receive an allotment; that tribal members could secure more land upon payment of a ground rental to the Tribe; and that assignments not pass to outsiders upon the death of members, except that spouses could inherit a life tenure. There was to be an Appraisal Committee that would consist of three Indians and the Tribal Counselor, who were to be paid for their services from Indian funds, and who were to appraise leases and improvements and prepare a schedule of permits and rentals. Not more than half the tribal income was to be paid out to tribal members on a pro rata basis each month, and the rest was to be used for administration, improvements, and "general betterment of tribal property and life." Tribal lands were to be leased for terms of 25 years or less. Forline was to be employed as Tribal Administrator and be paid out of tribal funds (6/22/1939).

Tribal meetings were to be held each month, with two-thirds of adult members constituting a quorum, and issues to be decided by majority vote. A Chief, and an Assistant Chief were to be elected. The Chief and four other adult members were to constitute an Executive Committee. There was also to be an Education Committee to train tribal members in the business management of their affairs, and a Fiesta Committee to conduct and supervise all "tribal fiestas, ceremonials, games, sports, and recreational activities" (6/22/1939).

Finally, an intent to cooperate with the city of Palm Springs was addressed. The Tribe agreed to eliminate from properties within the city all "unsightly and unsanitary structures;" to agree to road and highway rights-of-way when it was in the mutual interest of all parties to grant them; to observe the city's fire and police regulations in the construction of buildings, maintenance of premises, and conduct of affairs insofar as possible; "to invite the class of people and establish the character of businesses" that would be in keeping with those of the city; and that they would keep themselves informed of the affairs of the city, and try to cooperate as much as possible with it (6/22/1939; DS 6/30/1939).

Forline, McCallum's grandson, had grown up in Palm Springs, where as a boy he knew many of the Indians. He had a career as an oil company executive, but returned to Palm Springs when his health broke down. He had fully recovered. A contract between him and the Band, approved by the U.S. Department of the Interior in September, 1939 provided that his salary was not to exceed $3,000 a year, and expenses of not more than $750 a year (DS 6/30/1939, 9/29/1939).

That year Willie Marcus was elected Chief; Marcus Pete, Assistant Chief; Lena Welmas, and her mother Romalda Taylor, Flora Patencio, and Lee Arenas, members of the Executive Committee. Lena Welmas, Joe Patencio, and Anthony Andreas made up the first Appraisal Committee (DS 6/30/1939). Cahuilla women now were formally major actors in tribal affairs, as they would continue to be.

On July 13, 1939, at the first official meeting of the Tribe under the new "self-management" form of government, various resolutions were passed concerning salaries and expenses of tribal employees. A budget for the fiscal year 1939-40 was discussed and passed except for contention on the salary of Forline. A vote was taken in which 12 voted for the salary of $3000 and nine voted against. Those against wanted a 10% commission on the revenues he brought in to be his salary, as was initially proposed. Forline felt that this vote was inadequate proof of approval, and declared that he could no longer work for the Tribe under such conditions. At this point, Marcus resigned as well. Forline

ACC0006857

Indians, Movie Stars and The Great Depression: 1930-1939

suggested that the commission plan be written up and submitted to Washington for approval (Wilson 6/30/1940).

Another official meeting was held July 20, 1939, at which Dady was present and both he and Forline spoke in support of the original self-management petition with Forline's salary being $3000. August Lomas, a Cahuilla from Torres-Martinez Reservation, translated. The vote was taken and stood at 12:9. A few meetings were called. A quorum was not reached at any of them. The sides were so evenly matched that either could easily prevent any action from taking place (6/30/1940).

The stalemate in tribal government continued until Walter V. Woehlke, the Assistant CIA, was called in from Washington to attend a special meeting on October 27. He stressed cooperation and the amount of time and energy that people in Washington had put into investigating Forline's background and the plausibility of the petition. He suggested a combination of salary and percentage of revenues to solve the stalemate.

Although the stalemate continued, Forline continued working. Mr. A.A. Grorud, Secretary of the Senate Indian Affairs Committee, came to the Reservation and discussed the situation with many of the members. Since some of the members of the Executive Committee told Grorud that they wished to revoke the self-management petition, he discussed this with them and made several recommendations. A quorum was not reached at a meeting called for December 1. A "Tribal Committee"[191] was set up and began acting, although technically the self-management petition was still in operation. This began to cause problems for Wilson, the new clerk, since he was under obligation to follow the rules of the Department of the Interior, which still recognized the petition as the official governing document (Wilson 6/30/1940).

The issue of the long unresolved airport lease came up. An arrangement of 10% of gross receipts and a minimum of $640 was reached and all signatures were gathered (Agua Caliente Band 12/4/1939). The lease was entrusted to Grorud, who took it to Washington and had it presented as a bill. The bill was not passed because it was not in accordance with the Department of the Interior's guidelines (Wilson 6/30/1940).

## WORLD WAR II AND THE URGE TO TERMINATE: 1940-1949

### People

By the beginning of the 1940s, the power of the traditional leadership was declining as age and poor health took their toll. Moreno Patencio died of a heart attack at 75 years of age in April, 1940 (DS 4/5/1940). Ramon Manuel died of a heart attack at the age of 58 on July 11, 1942. The son of Manuel Dias, he had lived all his life at Palm Springs, and had been active in tribal affairs (DS 7/17/1942).

The three Patencio brothers had dominated tribal affairs, both sacred and secular, for many years. By the time of Moreno's death, the eyesight and general health of the venerable tribal leader Francisco were failing. After two weeks in a hospital in Los Angeles, friends took him to Pala for care (DS 6/28/1940). He died in mid-August, 1947 at the age of 91 (DS 8/15/1947). By 1949, his brother Albert Patencio, also a ceremonial leader, was ill, and the general opinion was that he had tuberculosis. His family did not want him sent to a sanitarium, fearing that at his advanced age he would not survive the experience (Perdew 5/3/1949).

### Land and Tribal Government

Because the resolution of December, 1939 to revoke the petition program of April 15 had not been approved by the Secretary of the Interior as the new decade began, Indian Office employees were told to continue operating under the provisions of that program. The Tribe felt that the terms of the resolution should take effect, and tended to act as though it had. Tribal meetings were conducted in English, but were interpreted in Cahuilla, for those more comfortable in Cahuilla, by Clemente Segundo. The St.

---

[191] Collier's letter (9/4/40) indicates that the members of the "Executive Commitee" became the "Tribal Committee," which became the "Tribal Council."

ACC0006858

Marie case was still pending, and there were more and more issues arising between the Tribe and the city of Palm Springs.

The Tribal Committee elected in December, 1939 handled what tribal business did get done with the help of Assistant Clerk Wilson. Since Wilson was subordinate to and following the lead of Superintendent Dady, he was often in conflict with tribal members. He handled the collection of money at Palm and Andreas canyons and at the bathhouse, managed the staffs, and kept the books. He collected the rents and saw to maintenance on the estates of Pedro Chino and Miguel Saturnino, depositing the receipts in special funds, pending decisions as to the rightful claimants (Wilson 6/30/1940).

Superintendent Dady, again assuming the management of business affairs of the tribe and individual members of the tribe, called a series of eight tribal meetings, beginning in April, 1940, to decide on a rental schedule for use of tribal lands, but not surprisingly was never able to get a quorum.

Tribal members apparently decided that the time had come to take more positive action. A quorum appeared at tribal meetings on May 27 and 28, and June 7 to approve a tribal budget for the fiscal year 1941, to approve the handling of tribal business by the Tribal Committee, and to discuss the provisions of a new agreement on the distribution of Tahquitz water, the modification of the 1911 agreement for splitting Tahquitz water between Indians and non-Indians. The new irrigation system was almost finished by the summer of 1940, and H. H. Quackenbush had returned to Palm Springs to get the necessary signatures of the landowners on the new agreement (Wilson 6/30/1940).

The tribe, making a fresh start at managing tribal real estate, on June 7 voted to "cancel all approved tribal revocable permits, with the consent of the tenants, and to make unofficial individual leases or permits with interested persons" (Wilson 6/30/1940:20) (Figure V.13). At the same meeting it voted to approve a rent agreement with M. M. Pavny, already a tenant on tribal land. Wilson sent the agreement to Washington for approval, as well as an agreement to let Lawrence Crossley, a local black resident and entrepreneur who was a friend of several tribal members, collect medicinal herbs on tribal land to market as "Indian" medicinal herbs. This met with the disapprobation of the tribal members, who felt no such approval should be necessary. They were of course angry that Wilson, whose salary was being taken from tribal funds, ultimately took his orders from the Department of Indian Affairs, and not from them (6/30/1940).

On June 26 and 27, the Tribal Committee met and adopted a set of by-laws and regulations, and adopted a budget for fiscal year 1942 (6/30/1940).

CIA John Collier wrote the tribe on September 4, 1940, recommending that the terms of the petition of April 15, 1939 not be revoked. He said that while he understood that the provision for hiring John M. Forline as Tribal Counselor had been the main problem leading to the resolution to revoke the petition, in fact the petition only gave the tribe the right to employ Forline, it did not require that he be employed (Collier 9/4/1940).

The tribe in the petition had requested that each member of the tribe over 18 years of age be assigned a piece of land not to exceed four acres, according to a schedule of assignments attached to the petition. No such schedule had been attached to the petition, or had ever reached the Indian Office, but there was nothing to prevent the tribe from delaying in the matter until the courts should decide the allotment issue. On the other hand, they could send in a schedule whenever they wished.

Collier took up each other item in the petition, explaining that it was essentially in accord with what the tribe wanted. For example, the Tribal Committee, having been confirmed at an official meeting in June, 1940, could continue to serve. He ended by saying that he thought the agreement too valuable to be cast aside, and asserted that, having been approved by the Department of the Interior, the Indian Office, and the Agua Caliente Band, it was "analogous to or similar to a binding contract" (9/4/1940). It appears that this letter from Collier confirming the continuing validity of the terms of the petition of April 15, 1939 brought the tribe's efforts to rescind it to an end. They continued to work on a set of by-laws. On October 17, an official meeting of the Tribal Council took place primarily to discuss the newly drawn up by-laws of the Tribal Council (Agua Caliente Band 10/17/1940).

ACC0006859

World War II and the Urge to Terminate: 1940-1949



CONDITIONS ON WESTERLY PORTION
## SECTION FOURTEEN
PALM SPRINGS, CALIFORNIA
1941

Figure V.13.  Map Showing Heavily Populated Section 14, 1941

V-283

ACC0006860

C.H. Perdew, who had worked at the Indian Office in Riverside for 13 years, became Indian agent in Palm Springs in October, 1945. He remained for many years.

In the summer of 1948, the tribe adopted a new set of by-laws (Perdew 8/24/1948).

## The Allotment Issue

On October 14, 1940, a great blow to future reservation development fell when the Supreme Court refused to review the judgment of the lower courts in the St. Marie case in holding that the 1927 allotments were not valid (Collier 12/13/1944). None of those who had participated in this suit could take further legal action, but 11 members of the tribe who had 1927 allotments were not involved with the St. Marie case. Of these, only three were still alive: Lee Arenas (the heir of four of those who were deceased), John Joseph Andreas, and Anthony Joseph Arenas. There may also have been descendants of the other deceased 1927 allottees: Marcelina Razon Patencio, Anita Segundo, Joe Segundo, and John Segundo. It was Lee Arenas who elected to take action.[192] Early in 1941, he sued the United States in the District Court of the Southern District of California seeking trust patents on the land allotted to him, to his wife Guadalupe, his father Francisco who died in 1924, and his brother Simon who died in 1925. The District Court granted a judgment dismissing the complaint; the Circuit Court of Appeals affirmed that judgment; but the Supreme Court, on May 22, 1944, ruled that the government must answer the plaintiff, and the case must proceed to trial. It "ruled that the Secretary of the Interior has no right to refuse to issue patents of land under an act of Congress merely because of change in the departmental policy" (DS 5/26/1944; Collier 12/13/1944:12). Presumably because this decision forced the Department of the Interior to consider its options, Commissioner Collier reviewed the history of Palm Springs allotments in a report to the Secretary of the Interior. Collier concluded that "a just and equitable division of tribal assets would be impossible" if the 1927 schedule of allotments were approved (12/13/1944).

On April 26, 1945, Federal Judge J. F. T. O'Connor ruled that Lee Arenas was "entitled to outright ownership originally allotted to him, his deceased wife, and his deceased brothers." This was especially significant because it was assumed that the finding would apply to the other 25 Indians who had 1927 allotments (DS 4/27/1945). The government appealed the decision to the Federal Court of Appeals, which ruled in favor of Arenas with respect to his own and his deceased wife's allotments (but not those of his father and brother) on December 12, 1946 (DS 12/13/1946). In Palm Springs the *Desert Sun*, always concerned with the development interests of the city, expressed the opinion that the decision would not adversely affect the city, but in fact would be advantageous because it would permit non-Indians to deal directly with the Indians. Francisco Patencio somewhat bitterly agreed, but from a different point of view. Expressing the attitude long held by the traditional leaders of the tribe, he said, "Now I'm afraid the white man will get our lands. We Indians cannot deal with the white man. I went to Washington back in 1938 to fight this thing and most of the Indians were behind me then." On the other hand, some, perhaps most, tribal members hoped to emulate Lee Arenas in making a more than comfortable living from their holdings (Rashall 12/20/1946).

Rejoicing over this verdict proved to be premature, but only slightly. In December, 1946, the Department of the Interior, committed to Collier's opposition to allotment, asked the Department of Justice to take the case to the Supreme Court (DS 12/24/1946), but on June 26, 1947, the Supreme Court upheld the U. S. Court of Appeals decision (DS 6/27/1947a).

This decision, however welcome to a number of members of the tribe, created a great many problems. Some of the members of the tribe who had not accepted allotments had claims to some of the

---

[192]We have found no documentation or other information on the question of why Arenas did not join in the original suit, but the fact that he, while captain of the Agua Calientes in the 1920s, had received a great deal of help from Collier in the course of the tribe's successful effort to resist allotment may have been the determining factor. It may have been difficult, even in the 1930s, to take up the battle for allotment, since Collier remained opposed to it. On the other hand, Arenas had a great deal to gain, since he had been the most successful of the Agua Calientes in his efforts to farm, and otherwise benefit from the land proposed as his and his family's allotments. He was said to derive an income of $3,000 a month, tax free, from the 94 acres he had been allotted (Rashall 12/20/1946).

ACC0006861

World War II and the Urge to Terminate: 1940-1949

allotted lands on a basis of "assignment" by virtue of use. They lived on and/or received rents from lands that were allotted to others. Some tribal members continued to be opposed to the idea of allotment.

The publicity attendant on the Arenas case brought a new set of unscrupulous speculators into the picture. Three men were arrested in November, 1947 on the grounds that they were trying to sell Indian land in Palm Springs that they did not own (DS 11/7/1947).

Yet another serious problem arose for Arenas, who had risked a great deal when he brought his suit to court. His attorneys asked for fees of $141,000, an amount based on the appraised value of the land to which he had been granted ownership, but an amount that might necessitate his selling some of it at below-market prices; moreover, the case was not officially closed, since the allotment had not been ratified as yet by the government, because of claims that the federal ward had not "reached a sufficiently advanced state of civilization," and because individual ownership of the disputed properties had not been confirmed by the Supreme Court (LL 12/5/1947a). On the same day, a news item showed that another legal case had been brought by Lena Welmas, who filed suit in the name of her baby daughter to repossess 165 feet of frontage on Indian Avenue worth $50,000, on the grounds that the lease had not been signed before a federal judge, and had never been approved by the Secretary of the Interior, or the CIA, nor ever filed in federal court (LL 12/5/1947b).

In April, 1948, Representative Norris Paulson of Los Angeles, later mayor of that city, introduced a bill in Congress "to permit the Agua Caliente Band of Mission Indians to manage their own lands" (DS 4/16/1948).

Three months later, demonstrating the severe economic consequences of the suit to tribal members, Los Angeles attorneys claimed $333,000 in fees from members of the Agua Caliente Band, or one-third of the value of the lands won. The attorneys wanted the land sold to raise the money (LL 12/6/1947). At a hearing before Hugh R. Brown, clerk of the Senate Committee on Interior and Insular Affairs, and Grorud, some members of the Agua Caliente Band of Mission Indians who testified seemed to want to "be free of the white man's rule," but not to sell their land holdings in Section 14. Some had refused to recognize allotments and consequently lived in poverty, while others rented their allotments and were affluent. It was concluded, however, that the majority wanted the right to conduct their own affairs, financial and otherwise, and if that was impossible, to obtain from the Indian Affairs division of the Department of the Interior the right to lease their lands for periods ranging from 25 to 50 years. This was thought to be the length of time necessary to accrue any real economic advantage from the land. Present at the hearings were Attorney Eugene L. Graves, attorney for Clemente and Francis Segundo, Lena Welmas and others. Graves had presented a petition to Congress with signatures of 20 members of the Band. Clemente Segundo, whose name was on the petition, objected. He said he did not remember signing it. Graves claimed he acted only for the good of the Indians and had never charged the tribe, but admitted he was the attorney for Lena Welmas and others (DS 3/19/1948).

These new developments led to new efforts by the BIA.[193] Walter V. Woehlke, then director of the California State Office of Indian Affairs, in early November, 1948, undertook to find out the names of everyone on the 1927 allotment schedule, so that a search could be made for the heirs of those who were deceased. Those who were plaintiffs in St. Marie et al. vs. the United States "in which action judgment was entered against the plaintiffs (24 F Supp. 237) and affirmed by the Circuit Court of Appeals" were to be placed on a separate schedule. He had been instructed to issue trust patents to Lee Arenas for lands allotted to himself and Guadalupe Arenas (Woehlke 11/8/1948a, b).

He wrote Romalda Lugo Taylor on December 9, telling her that Attorney Oliver O. Clark, whom She and others had retained as their legal advisor, had filed for an allotment on Section 14 for her that was larger than was allowed. Without directly consulting her, Woehlke suggested that she take "lots 7, 8, 9, and 111 in Section 14 and the forty acres elsewhere" (Woehlke 12/9/1948).

The Bureau sent a "land allotment expert" and a surveyor to work in Palm Springs for three weeks in late November and early December in order to make out a new schedule of allotments. There were

---

[193]The Office of Indian Affairs became the Bureau of Indian Affairs in 1947 (National Archives 1987:14).

ACC0006862

by this time 71 members of the Agua Caliente Band who were entitled to allotments. The status of between 200 and 300 thirty-day revocable land use permits would be changed within the next 90 days—as soon as "land allotments now in the process of being made are passed in trust patent or fee patent from tribal to individual ownership." Considerable consternation quite naturally resulted among residents and landowners (DS 12/10/1948).

Those members of the Agua Caliente Band who opposed allotments over the years were said to be resigned to the allotments' taking place. Those who fought for the allotments "and a right to do with their lands as they see fit" (sometimes called "progressives") had, with the exception of two or three Indians, decided they preferred to get trust patents to their land rather than fee patents, even though trust patents would mean that the government would continue to act as trustee. The problem with fee patents was that land so held would be subject to taxation, as land held under trust patent was not (12/10/1948), so that fee patents would lead very soon to a loss in real property for many whose lands were not producing good income.

Legal costs once again became a burden—a burden thought by some to be exorbitant and unfair because it should not have been necessary to sue the government: the United States District Court handed down a decision that the lawyers handling the case of Della Brown Arenas' land allotment would receive 12.5 per cent of the allotment as attorneys' fees in January, 1949. A lien was placed on the land and the court appointed a receiver to manage the property. Upon the sale of the property the lawyers would then receive their one-eighth share and Mrs. Arenas would receive seven-eighths (DS 1/7/1949).

BIA personnel resented Attorney Clark's influence on the Agua Calientes, feeling that he was impinging on their responsibilities. In January, 1949, Clark, in letters to members of the Band, complained that Perdew wrote letters to James Ring, Asst. State Director of the California Indian Agency, and Paul Angelillo, a Los Angeles attorney, enclosing copies of Clark's most recent letter to the Palm Springs Indians that "incites the Indians against any government supervision and certainly does not help much in our allotting program." Clark stated in the quoted letter that Perdew had been telling the Indians what a "sharp-shooting shyster lawyer from Los Angeles" Clark was. Perdew somewhat ungraciously commented, "Glad to see he admits it." Clark had also accused Mr. Woehlke of "getting up out of bed and going around and canvassing the Indians" with Mr. and Mrs. Perdew (Perdew 1/8/1949a, b).

Some of the non-*Kauisik* members of the Band were persuaded to make allotment selections with Clark, who instructed them to send the "future remittances in payment of rents to a representative appointed by him" (Perdew 1/12/1949). Some of the others made selections at Perdew's office, switched to Clark, and then for the most part switched back to Perdew (Perdew 1/14/1949).

Perdew suggested that Attorney Clark coerced and intimidated the Indians into signing selection forms through him. The forms were filled out by Clark, ready for the Indians to sign and send directly to the Secretary of Interior. These forms also gave Clark power of attorney. From Perdew's point of view, Clark's major objective was to earn fees from the Indians on the grounds that he "got" them the allotments (Perdew 1/28/1949).

Mrs. Lena Welmas, Chairman of the Tribal Committee, and one of the first women in the nation to hold that position, called a special meeting in order to consider the employment of William V. O'Connor as tribal attorney. O'Connor had been giving Mrs. Welmas legal advice. The Tribal Committee did not accept her proposal to employ him as tribal attorney, but Mrs. Welmas later held another Committee meeting at which she persuaded the committee to approve the proposal. Perdew, resenting the idea that the tribe needed an attorney, decided the matter was of sufficient importance that it should be handled by the Tribal Council (all Tribal members) as outlined in Resolution No. 10, June 10, 1940, and proceeded to call for a Tribal Council meeting on February 15, 1949 (Perdew 1/31/1949).

Land allotments were approved for 23 members of the Agua Caliente Indians, and four were approved to heirs of deceased tribal members. The allotment schedules were referred to the Bureau of Land Management for a trust patent to cover the 27 allotments. Other tribal members would wait. The allotments for 48 members of the tribe were to be made when conflicts between the allotment selections submitted by them had been resolved with administrative procedures (DS 2/25/1949).

ACC0006863

Case 5:13-cv-00883-JGB-SP   Document 85-13   Filed 10/21/14   Page 52 of 253   Page ID
#:2626
World War II and the Urge to Terminate: 1940-1949

Clark during this time sent a number of letters to the Indians and to Perdew in which he "ridiculed and abused" Perdew and his wife, advising the Indians not to take action on the various matters Perdew was instructed to take up with them on the grounds that Perdew and his wife were not "acting in good faith." Perdew believed Clark's motive was to make the Indians dependent upon him entirely for advice on all matters pertaining to their property. He claimed that the newly elected Tribal Committee was already under Clark's complete control and was unable to make its own decisions (Perdew 3/25/1949).

Cruz Siva, the husband of Agua Caliente tribal member Flora (also known as Florida) Patencio, daughter of Moreno Patencio and thus a member of the leading family of the area, went to Perdew's office and delivered a notice of an official special meeting of all the enrolled adult members of the Agua Caliente Band of Mission Indians at the agency office to consider the contract for employment of William O'Connor as attorney for the Band. Perdew was not able to be present at the meeting and requested that it not be held in the agency office. He commented on the fact that two tribal meetings had already been held for the same consideration of William O'Connor as tribal attorney. "Perhaps the plan is to continue calling meetings for this purpose until one of them clicks" (Perdew 4/1/1949).

Flora Patencio wrote to Woehlke regarding the condition of the Agua Caliente Indians under Clark's influence. She complained that Clark "has taken the running of the reservation in his own hands by intimidating tribal members and by telling the Tribal Committee members just what to do. . . ." Clark had urged the Tribal Committee to pass a resolution discharging Perdew from his duties as District agent, but Patencio disagreed with that decision, believing that Perdew had "used his best efforts in the performance of his duties." She believed that since Quackenbush had left Palm Springs the affairs of the Indians had grown worse, and "this action of Clark's and the Committee has shown that the Indians are unable to manage their own affairs and the Tribal Committee form of government is working a hardship on the Band as a whole due to this man's [Clark's] influence." She ended by asking for help in the removal of Clark and the abolishment of the Tribal Committee (Patencio 4/4/1949).

Perdew complained to Woehlke that Marian (Mrs. Lee) Arenas was collecting rents in advance on lands that were not allotted to her husband, but to Joe Patencio, another member of the family, and had been attempting to collect these even further. Perdew, who had written a form letter to go out to all permittees and others occupying allotted lands, suggested that this letter would hopefully solve the problem (Perdew 4/5/1949).

On November 10, 1949 the Agua Caliente Band revoked Clark's power of attorney on the grounds that he did not perform under the terms of their agreements to obtain trust patents, but instead concentrated his attention on other tribal affairs, disrupting the Tribal Committee, and was not looking out for the betterment of the Indians (Segundo et al. 11/10/1949). The Tribal Committee was split on their feelings toward Clark, some feeling he had done no good, and others, more appreciative of what he had done, trying to re-affirm their friendships with him (DS 11/22/1949a).

Clark was to present his defense of the Indian bill at the congressional hearing on the Indian lands question (DS 11/22/1949b).

### Water

On August 14, 1940, the OIA in Washington, D.C. received the Articles of Agreement by which the Tahquitz agreement of 1911 was modified to accord with present conditions. A new pipeline, from a point of diversion above the old point of diversion, had been completed across Section 22. It brought Tahquitz Creek water directly across to the northeast corner of the section, and thence into Section 14 to the lands used by the tribal members, who were to get all of the first 40 inches of water. The non-Indian landowners in Section 15 were to get the next 40 inches, the old stone ditch and the old concrete pipeline in Sections 22 and 15, and a right-of-way extending 10 feet on either side of the old concrete pipeline in Section 22 for purposes of maintenance. If there was more than 80 inches of water, the Agua Caliente people were to get two-thirds of it and the non-Indians one-third (Dady 6/26/1940).

In December, 1940, the Tribal Committee (of which Lee Arenas was then chairman) passed a resolution requesting that Superintendent Dady complete the Tahquitz agreement as soon as possible and complete the work on the improvements to the Tahquitz water system. In the same resolution, the

ACC0006864

committee expressed its strenuous opposition to letting the non-Indians have the 20 foot right-of-way along the old ditch (Agua Caliente Band 12/10/1940). Despite their wish to have the project completed, the tribe was unwilling to sign the new agreement, on the grounds that the 1911 agreement had been made without their consent (Shipe 12/3/1940), but on December 13, a telegram was sent to Woehlke to the effect that the Tribal Committee had approved the water contract amendment on December 10, and that by December 17 all conditions as set forth in the Indian Office letter of August 2, 1940 would have been complied with (Spinner 12/13/1940). On February 1, 1941, Superintendent Dady certified that all the conditions set forth in the Indian Office letter of August 2, 1940, had been complied with, including the written consent of the Indians (Dady 2/1/1941).

In the summer of 1941 the work on the new pipeline and Tahquitz irrigation system had not yet been completed, and the Indians were still forced to use the water from the old ditch, sometimes being driven to fairly extreme measures to get water to those who needed it. At one point, for example, an Indian maintenance crew laid pipe along the old ditch to bring water to lands leased by Mr. Pavny for which he had no authorization (Ryder 10/11/1941).

Fear of flooding remained significant in Palm Springs. In April, 1942, the Palm Springs City Council committed itself to assist and cooperate, "within limits," with the federal government in flood control measures, especially for Chino, Tahquitz, Palm, and Tachevah creeks (LL 5/22/1942). It was recognized that water came down all of these creeks during floods, and tribal permission for these projects, which would increase the value of their land, was a necessity.

The Indian Irrigation Service had $5,000 in 1942 that could be used to improve the Andreas Canyon water system, which had deteriorated, and possibly to bring the water to Section 14 (Woehlke 12/31/1942). A soil analysis revealed that enough water from Andreas Canyon was available to irrigate as much as 160 acres in the winter and spring. Unfortunately, the soil near the north quarter of Section 2 and the northwest quarter of Section 35, which were nearest the water, had very poor, sandy soil of low fertility. In all, only 41.5 acres on the reservation were deemed good enough to irrigate by the OIA staff. These included six acres on the Lee Arenas tract that were being irrigated (Harper 3/19/1943). By 1943, the Andreas irrigation system was sufficiently repaired to irrigate some of this land so that winter vegetables, valuable in the Food-for-War program and for maintaining reservation water rights, could be grown. Some of the land was rented out and some of it farmed by the tribe with hired labor (Fortier 3/25/1943; Dady 3/30/1943).

Little activity was reported during the following war years, but in 1946, World War II having been brought to an end, flood control measures were again considered by various agencies. Max Bookman, Chief Engineer of the RCFCWCD (Riverside County Flood Control and Water Conservation District) wrote the Mission Indian Agency in Riverside, requesting that field survey parties be permitted to make preliminary surveys in Chino Creek, Tachevah Creek, Tahquitz Canyon, Palm Canyon, and Cathedral Canyon areas on the Agua Caliente Indian Reservation (Bookman 5/4/1946). The members of the Tribal Committee, themselves concerned about flood damage, agreed that permission should be granted (Agua Caliente Tribal Committee 5/8/1946). Dady forwarded these decisions to Collier, recommending that permission be granted (Dady 5/13/1946).

There was still no solution to the problem of Tahquitz Creek water. Perdew asked Dady if the residents on the Reservation of Palm Springs could use the "gravity" water of Tahquitz, as it would be cheaper than well water. He wanted the Tribal Committee to provide funds to purchase 4 inch pipes that would carry more water than the 2 inch pipes they were digging up (Perdew 10/1/1946).

Perdew was asked to make a sketch, with the help of John S. Ryder, as to where the water flowed in the streets of Section 14, and what use was made of the water. They needed to justify the use of Indian water since a Mr. Holditch had contacted Washington officials about buying Indian water (Dady 10/3/1946).

City Manager William E. Alworth, also concerned about water delivery, noted that the question of "adequate water supply for the residents of Section 14, the Reservation, was still in the process of survey but that little progress was being made because of red tape involved." There was only one two inch line "serving more than 100 families" (DS 11/4/1946).

ACC0006865

World War II and the Urge to Terminate: 1940-1949

One flood control measure met with approval when, on February 27, 1947, the Agua Caliente Tribal Committee passed a resolution approving the granting of a right-of-way easement to the RCFCWCD for the purpose of constructing and maintaining a flood control channel. It would be 200 feet wide extending "from the westerly line of Section 34, Township 4 South, Range 5 East, and beginning approximately 300 feet south of the State Highway U. S. 111 and extending northeasterly thereof a distance of approximately 1400 lineal feet to the channel of the Whitewater River immediately downstream from where Tahquitz Creek and Whitewater River joins." Because the project would protect Indian land, damages to the tribe were waived (Agua Caliente Tribal Committee 2/27/1947).

The budget of $40,000 for the RCFCWCD in 1947-8 was considered pretentious when submitted in June, 1947. Among the projects proposed were a number of minor jobs, including a thorough engineering study of Tahquitz and Tachevah washes for the control of flood waters. U.S. geological water gauge and engineering studies were to be requested (DS 6/27/1947b). The application of the Flood Control District for the right-of-way and the Indian resolution were sent through BIA channels to the CIA, in whose office they were misplaced, causing much consternation, yet negotiations continued (Dady 6/19/1947; Graves 6/24/1947; Critchfield 7/31/1947).

On August 10, 1948, the duly elected official members of the Agua Caliente Band of California Indians approved a right-of-way that included areas in Sections 22 and 24, T 4 S, R 4 E, SBM, through which Tahquitz Creek flowed. Further portions of the right-of-way granted were associated with Baristo and Tachevah washes. The resolution noted that "The above described right of way No. 1 on Tahquitz Creek is in need of flood control improvements to protect valuable land of the Agua Caliente Band in Section 22 which is now subject to flood hazard, and to extend improvements already constructed in Section 23" (Agua Caliente Tribal Committee 8/10/1948).

The RCFCWCD continued to press the California Indian Agency in Sacramento to take action on its September 7 application with regard to Baristo and Tahquitz washes (Bookman 9/7/1948). By January, 1949, a land allotment plan had been adopted on the reservation. It did not conform to the resolution on flood control right-of-way adopted on August 12, 1948. Accordingly, the Tribal Commitee on January 11 considered a second resolution granting a slightly altered right-of-way to the Flood Control District. The resolution had been proposed by the RCFCWCD and slightly decreased the right-of-way pertaining to Tahquitz Creek in certain dimensions, but was otherwise the same. It concluded with a statement to the effect that all claims of damage were waived in consideration of benefits to the lands within the reservation. The Tribal Committee, however, decided not to take further action on this important issue until allotments were made. These two important issues required that two staff members of the Department of the Interior be in Palm Springs at this time, reviewing allotment problems, flood control, and other issues (Warne 3/3/1949).

**The Airport**

Another considerable necessity for the economic development of Palm Springs was a suitable airport to transport the thousands of people who were now interested in coming there every year. Far-sighted non-Indians and Indians had been working in this direction, and in 1941 efforts to develop a new airport on Section 18 of the Reservation continued. In early February, it was announced that President Roosevelt had given his approval to an appropriation of $470,000 for an airport near Palm Springs—a part of a Works Progress Administration program to improve national preparedness for war. Legislation proposing the lease of Section 18 from the Reservation for the airport was pending (DS 2/7/1941).

Philip L. Boyd, mayor of Palm Springs, had been in Washington, D.C. from May 11 to May 16, where he met with various government officials with respect to the proposed Palm Springs airport and the matter of city jurisdiction over non-Indians living on the Reservation. At a discussion with William H. Flannery, Assistant to the Solicitor of the Interior, and Felix S. Cohen, First Assistant Solicitor, it was concluded that state of California and city of Palm Springs authorities could enforce all laws and other regulations on the Reservation, that further study was needed on the subject of the city's jurisdiction over Indian land (it was hoped that the Department of the Interior and the city might agree on a land use plan), and that Reservation land was definitely Tribal land and should be treated as such. Dady, as the

ACC0006866

representative of the OIA, was the person responsible for the collection of all income. Indian ownership of some improvements was, however, recognized (Boyd 5/11/1941, 6/10/1941).

Boyd found that Indian Office officials believed that Palm Springs had lost its appropriation for airport improvement and saw no reason for early action on behalf of a new airport. In short, they opposed the bill to ratify a 25 year lease by the city of a section of Indian land for use as an airport. By the end of his visit to Washington, however, he had been given confidential assurances of War Department support, and had gained assurance of the Indian Office's support of the pending airport if the three qualifications the office made were met. Boyd felt the city could agree to these qualifications, but doubted that the Indians, having just had a change in leadership, would give their consent to any amendments to the bill. Collier was of the opinion that he had authority to approve the amended legislation without consent of the Indians. The amendments would require that the city of Palm Springs get Department of the Interior approval for subleases; that the Superintendent of the Mission Indian Agency receive all rentals from the lessee; and that construction and operation of the new airport be subject to the regulations of the Civil Aeronautics Administration (Boyd 6/10/1941).

Thus, the airport was built and used by the Air Force through World War II, during which U.S. military forces, including those commanded by General Patton, made a great deal of use of the deserts of southeastern California for training. On August 19, 1947, the city of Palm Springs, by then resuming an intensified role as southern California's most famous resort, got the airport back from the Air Force. Its rent was 10% of its income, or a minimum of $640 (LL 8/19/1947).

In September, 1949 the first piece of legislation regarding the Agua Caliente Reservation to become law in 25 years, H.R. 5310, passed both houses of Congress. It provided that the city be given the option to lease for 25 years a portion of Section 14 along Indian Avenue in order to widen that street as a principal artery through town—a measure that benefitted both the Agua Calientes and the other townspeople. A number of provisions of the bill had been deleted in order to secure its passage (DS 7/15/1949, 9/27/1949).

## A WORLD CLASS RESORT AND TROUBLES WITH LAWYERS: 1950-1959

By the 1950s, Palm Springs was nationally known as a resort city, a destination resort that provided a full range of recreation—golf, swimming, night clubs, hiking, natural history, spectacular scenic areas, and the home of such celebrities as Charles Farrell, Bob Hope, Dinah Shore, and many others. The reservation benefited from these developments, but not in proportion to the rest of the city. Because of restrictive federal regulations, significant development of trust lands was prohibited. The Agua Calientes, however, managed as well as they could. A new church, Our Lady of Guadalupe, was built on Section 14, replacing the old church destroyed by an earthquake in 1948, and when it was dedicated, on March 11, 1950, the *Palm Springs News* reported that the dedication was marked by "an old Indian custom of riding on horseback and marching from the Desert Inn grounds to the church."   Father Raymond Ramon Klumbis was given credit for spearheading the effort to rebuild the church (Palm Springs News 3/15/1950).

Significant changes in tribal leadership developed. Five adult members of the Agua Caliente Band, most of whom had played important roles in tribal affairs for some years, died in the 1950s, three of them at unfortunately young ages. These included Albert Patencio in November, 1951; Clemente Segundo, who died in 1951 at the age of 58; Anthony Joseph Andreas, in 1953 at the age of 42; Augusta Patencio Torro, in 1954 at the age of 59; Calistro Lugo, in 1958 at the age of 95; and John Joseph Andreas in 1959, at the age of 87 (DS 7/29/1951, 8/27/1953, 3/25/1954, 8/12/1958, 10/6/1959).

Tribal members tell us that at some time before the death of Albert Patencio, the elders decided that, considering the difficulties of living partly in the traditional society and partly in the modern world, it would be best if Agua Caliente children ceased to be taught the Cahuilla language and the sacred oral literature. The ceremonial house over which he had presided was burned after Albert's death in one last return to the traditional way of doing things. What was not traditional was that it was not rebuilt. But

ACC0006867

A World Class Resort and Troubles with Lawyers: 1950-1959

Cahuilla culture was not thereby wiped out. Traditional world view lived on, if in gradually attenuating form. *Kauisik* religious songs (*nukil*) continued to be sung by Joseph Patencio at other ceremonial houses as requested by other ceremonial leaders. Bird songs, considered a "secular" form of the traditional literature, and songs accompanying the gambling game *peón* continued to be sung. Tribal members continued to attend wakes and funerals in the ceremonial houses on other reservations, and continued to care for their own deceased in a manner different, but equally respectful of the dead as before. There continued for a number of years to be people who spoke and understood the Cahuilla language. What was happening among these indigenous people was not unlike what has happened so often in the second generation of immigrant peoples from Europe, Asia, and Africa—a period of rejection of the traditional culture, with concomitant loss of traditional knowledge and the attempted assumption of somewhat different or new identities.

In part because comparatively few adult men were left, and in part because there were a number of women in the Tribe who by this time had acquired considerable acumen in dealing with the dominant society, more and more women were elected to the Tribal Council until by mid-decade the Tribal Council was composed exclusively of women,[194] the first such council in the United States. This group became nationally known and left a significant legacy of development, one that prepared the Agua Caliente for future successes on both social and economic fronts.

### Land, Allotment, and Leases

As the decade began, the problems caused by federally mandated short-term leases of Indian lands had not been solved, and there was a great deal of debate about lengthening the period for which land on the Reservation could be leased. With the increasing economic development of the desert area, the issue was critical, and conflict over the subject between the Reservation and the city increased. Some members of Congress, at a time when Indian trust lands were thought to be expendable, were reluctant to increase the period to 25 to 99 years, as had been suggested, for fear that this would be used as a reason for continuing the operation of the BIA under the Department of the Interior (DS 2/9/1950). Congressional fervor for the termination of the government's involvement in Indian Affairs was running high (Nash 1988:270-272). For the Agua Calientes, as well as for others, this was extremely threatening. It stimulated the development of Indian organizations in protest of the idea throughout the state.

The Bureau of Land Management (BLM) was still in the process of allotting the reservation and getting patents to members of the Band. Fifty-seven more tribal members received trust patents in early 1950, bringing to the number who had them to 65. Thirteen members of the Band who had been involved with the St. Marie case were not scheduled to receive allotments, because, as they were claiming in a suit, Clemente Segundo et al. vs. the United States, some of the land allotted to them in 1927 had since been allotted to others (DS 3/3/1950).

Meanwhile, the rest of the Agua Calientes had been adjusting to the fact that they now held trust patents for their land, but that, by the terms of the Mission Indian Act of 1891, allottees could hold land given them in trust for only 25 years before being granted patents in fee. The 25 years for them began in 1928, and would expire in May, 1953. They would thereafter be able to sell their land with clear titles, but they would also have to pay considerable taxes. The Tribal Council, rallying to the defense of its members, formally requested an extension of the trust patent status for 25 years (DS 1/19/1953), an adjustment that was subsequently made.

In response to another of the many attempts by developers to acquire Agua Caliente land, almost all the members of the Agua Caliente Band signed a petition opposing a proposal made by E.L. Stancliff of Stancliff and Co. of Los Angeles, to purchase all land now held by individuals in the tribe for $9,100,000. The petitioners asked the BIA not to consider any similar offer (DS 1/15/1953).

---

[194]Its members included Vyola Olinger (Ortner) as chairman, LaVerne Saubel (Milanovich), Eileen Miguel, Elizabeth Monk, and Flora Patencio Siva. Siva was replaced in 1956 by Gloria Gillette.

ACC0006868

Late in the summer of 1954, Congress passed legislation that gave the Agua Calientes the option of keeping their land in trust for 25 years or getting fee patents at once. Following the passage of this legislation, the value of Agua Caliente Reservation land increased significantly. Indian landowners with fee patents would have to pay taxes, but could sell their land with clear titles, insured by title companies, as they had hitherto not been able to do. Some members of the Agua Caliente Band found it necessary and expedient to sell out. As of June 30, 1954, 3,835.75 acres of the 31,480 acres on the reservation had been allotted; 133.47 acres had been sold in government-advertised sales; and there remained 27,233.92 acres of tribal land (DS 8/19/1954).

An especially important legal ruling that affected the Agua Calientes as a whole came about in 1954, when in settlement of the suit against the U.S. by Clemente Segundo, et al., the U.S. District Court ruled that each plaintiff in the case was to be allotted "total lands of as nearly equal value to the lands allotted to each other member of the Agua Caliente Band of Mission Indians, so when the allotment and equalization process is completed each qualified plaintiff will have been allotted land of as nearly equal value as practicable to each other member of the band" (DS 7/1/1954). This was a landmark event, bringing to an end some 20 years of legal maneuvering, and setting the scene for the future of the tribe.

With this new development, many parties interested in Indian affairs came to the fore. In the fall of 1954, Leonard Hill, California Area Director for the BIA, testified before the State Senate's Interim Committee on Indian Affairs meeting in Palm Springs on the subject of termination. He stated that the Agua Caliente Reservation needed "competent planning, flood control experts and other specialists," which the state could not provide.[195] Tribal Chairman Vyola Olinger also testified, saying that many of the Indians did not fully realize the value of their land. "We need business advice and technical and legal aid on water rights, roads, flood control and utilities." Urgently needed longer term leases for Indian lands were advocated by Mrs. Olinger and others at the meeting. The valuation of the 31,128 acres held by the tribe and tribal members, of which more than one-fifth were within the city limits of Palm Springs, was set at $10,000,000 (DS 11/22/1954).

A great deal of planning and maneuvering by local men of prominence led Congress to come up with a solution that was to prove very costly for the Indians in the 1960s. It directed that a committee of eight prominent citizens of the United States, noted for their business ability, be selected to form a Palm Springs Indian Committee to study the local situation and submit recommendations to Secretary of the Interior Douglas McKay. Floyd B. Odlum, husband of the flier, Jacqueline Cochran, was chairman (Klotzbuecher 12/9/1954). These individuals had all been winter residents of the Palm Springs area, but had no business interests there—which is not to say that they were disinterested. They appear to have been far more sympathetic to those who would exploit the Agua Calientes than to the Agua Calientes, and held the interests of the non-Indians above those of the Indians.

The city of Palm Springs was in favor of the legislation to terminate the federal government's involvement with Indians that Congress was considering, since it would inevitably lead to a loss of control by the federal government and the Indians over lands of a very significant economic potential; but the Agua Calientes argued that the Band still needed federal assistance. Lessees of Indian land at Agua Caliente and other reservations, and many advocates of fair play for Indians joined in the effort to defeat the bill. Both Indians and lessees also pressed for longer term leases, and in the end Congress did make an exception of the Agua Calientes. Their reservation was not to be terminated (DS 12/3/1953, 12/14/1953, 1/28/1954, 2/22/1954, 3/1/1954, 3/25/1954, 4/22/1954, 10/18/1954, 11/1/1954; Nash 1988:271-273).

In 1955 the lease period was increased to 25 years (DS 9/22/1955), but the tribe continued to advocate a 99 year lease period (Klotzbuecher 1/14/1956). In 1956 Congress passed a law to the effect that Indian lands could be mortgaged if the owner had a purpose for the money and a means of repayment (DS 5/25/1956), a measure feared by some because it could lead to the loss of Indian land should

---

[195]After a reservation or rancheria was terminated, the state was to provide the services hitherto provided by the federal government.

ACC0006869

A World Class Resort and Troubles with Lawyers: 1950-1959

expectations not be fulfilled.

Continuing efforts led to a study of how to equalize the land holdings of the various Band members, and the BIA and the Agua Caliente Tribal Council in 1957 outlined four different ways to meet the federal court order of equalization. These were:

(1) Dividing the Tribal Lands.
(2) Selling the Tribal Lands and distributing the money.
(3) Using Tribal Land Income as a dividend to Allotees.
(4) Combining two or more of the above mentioned plans (DS 2/13/1957).

By June, 1958, Rex Lee of the BIA announced to the Tribe that all the tribal lands were to be cut up into parcels and used to bring individual Indian holdings up to a value of $350,000, and any Indian who already had this amount or more (the value of individual holdings had been appraised at from $87,500 to $629,000) would not benefit from the change. Tribal Chairman Vyola Olinger was described as being in a "state of utter shock." She believed that it was not in the best benefit of the Tribe (DS 6/25/1958).

Congressman D. S. Saund, who ran against the aforementioned Jacqueline Cochran for Congress, after urgings by Indian peoples and their advocates, the Agua Caliente Band (and especially the Tribal Council members), and the city of Palm Springs, cooperated in getting two bills pertaining to the Agua Calientes through Congress in September, 1959. President Eisenhower signed them on September 21 (DS 9/21/1959). The Equalization Bill (Public Law 86-339) authorized the equalization of allotments, and the Land Lease Act authorized increasing the leasing period to 99 years (DS 9/10/1959), a major economic development of significance to the future of the Agua Caliente, the city of Palm Springs, and, potentially, Indian landowners in many places. The Equalization Bill also provided for the sale of Section 18 by the Tribe to the city, if the Tribe and the city should so agree (DS 9/9/1959). The bill also provided that guardians or "conservators" be appointed for minors and for adults unable to manage their allotments. The guardians were to be appointed by the Superior Court of Riverside County in Indio.

At the end of 1959, when the tribal roll was closed insofar as equalization was concerned, there were 105 members of the Band (DS 10/5/1959). Fourteen of the 26 adults were persuaded to accept conservatorships on the grounds that they were not able to adequately handle the complexities of successful land management (Locke n.d.:21-7). For a group that had managed to hang on to most of their land since the establishment of the Reservation nearly a century before under the circumstances that had prevailed, a judgment that more than half were incompetent to handle their own affairs indicated the use of a considerable amount of unscrupulous pressure on them to accept conservatorships. The BIA, which should have provided the services turned over to the guardians and conservators, had abrogated its responsibilities. The BIA apparently even failed to inform the Indians of their right, under California law, to choose their own guardians or conservators, and allowed a federal judge to appoint these officials.

From a demographic point of view, it is of note that the population increase that had begun in 1940, when the Band's population finally rose above 50, had continued, suggesting that since 1940 the Band members had enjoyed better health and were less weighed down by the lack of economic opportunities than in the first 40 years of the century.

## Planning

Because of the extraordinary value of their lands, and the pressures from local non-Indians to acquire their lands, the Agua Calientes were the focus of special attention with respect to the intended termination of government involvement with Indian affairs, but early in 1950 the federal government stopped paying for police on the reservation, and it was declared that Indians on tribal lands would be subject to the same civil laws as everyone else. County and state health and sanitation laws that had not previously been in effect were to be enforced (DS 3/31/1950).

The Agua Calientes and the city of Palm Springs began joint plans for the improvement of the reservation (DS 4/28/1950), and in 1952 the Agua Calientes voted to accept a master plan for street routes and road plans that combined features of several earlier plans. It had been laid out after the allotments were made, and took cognizance of them. The plan provided for a direct road from downtown to the city

ACC0006870

offices on McCallum Way, and included channels for flood control (DS 1/31/1952). Indian Avenue was widened, and some of the ancient palm trees that had grown along it were taken out and replanted south of the hot springs.

In September, 1953, the Tribal Council approved rights-of-way for the Southern California Gas Company and the Palm Springs Water Company to install and operate their services on approved streets, alleys and other public places on Section 14, as indicated by the master plan (DS 9/28/1953). Buildings on the section were surveyed for repairs and improvements to meet city building and health codes (DS 10/15/1953).

The Tribal Council in 1956 met with the Palm Springs City Council to discuss the request to the city for the destruction of certain buildings on reservation land, and the proposed urban redevelopment plan. The Tribe was in the process of hiring a planning firm to make a master plan for Section 14, and a zoning plan for the 7,000 acres of reservation land within the Palm Springs city limits (DS 11/20/1956, 11/30/1956). In December the fire department destroyed ten substandard buildings that had made up much of the Mineral Trailer Park. The Tribe planned to develop the acreage where the buildings had stood (DS 12/5/1956).

At the request of the operator of the famous Palm Springs bathhouse, his lease was terminated, and the BIA, which had had its office there, moved to a new location. The Springs Trailer Park was served an eviction notice, and lessees of homes and other businesses on Andreas Avenue were placed on month-to-month permits. An eight acre site was cleared in this way so that a "spa" hotel could be developed (DS 5/2/1957).

Because of the special economic situation of the Agua Caliente Reservation and its special management needs, the Palm Springs office of the BIA was removed from the jurisdiction of the Riverside office, and placed under that of the Sacramento office at the end of 1957. This change was made in order to clear the way for staffing the local office with realty and administrative personnel to help develop the Indian land, and administer the equalization of allotments (DS 11/30/1957).

**Flood Control**

Because of persistent fears of dangerous floods, the RCFCWCD was still trying, in early 1950, to secure rights-of-way for the measures it had proposed for the control of flooding from Baristo and Tachevah washes. The Tribe, considering that the measures would benefit its land, had granted right-of-way through tribal land and waived damages. Joseph Patrick Patencio had granted it through his allotment, but Flora Patencio, whose allotment was also on the right-of-way route, refused to consent, saying she disapproved of the project (Bookman 2/24/1950). The Flood Control District finally solved the problem by modifying the proposed right-of-way so that it would not pass through her allotment (Bookman 4/7/1950; J. Patencio 4/5/1950; Stewart 4/27/1950; Segundo 12/13/1949; Stevens 6/7/1950; Critchfield 10/13/1950).

Flood control came to the fore again in 1952, in part because the Band was considering the development of Section 24, which was threatened by the waters of Tahquitz Creek, Palm Canyon Creek, and Whitewater River. The Los Angeles office of the Army Corps of Engineers had reviewed the Flood Control District's plans for controlling these streams and found them generally satisfactory, but only for the level of flooding that could be expected once in ten years, whereas the Army Corps standard was to develop projects that would control floods of much greater magnitude (Shuler 3/14/1952); however, the Flood Control District had only $50,000 to work with, and flooding was occurring sufficiently often to raise public alarm. The Agua Caliente Band granted easements across its lands for the projects then planned, providing the Flood Control District would construct and maintain the improvements without cost to the Tribe. Work was begun on the Tahquitz channel and a Palm Canyon-to-Whitewater River drainage alignment (DS 9/25/1952).

Meanwhile, another agency, the Coachella Valley County Water District, proposed another dam across the Whitewater River channel north of Palm Springs to spread flood water and cause it to sink into the sand and raise the underground water level instead of running into the Salton Sea (DS 3/1/1954).

In 1954, serious consideration was being given to what flood control measure should be the next

ACC0006871

A World Class Resort and Troubles with Lawyers: 1950-1959

situation was urgent because the court had decreed the sale of Indian land to pay legal fees of some $110,000, and land in danger of flood damage would not sell. It was finally decided to begin with a concrete levee across Palm Canyon to the western end of the fan—projected to cost less than $200,000—to control the waters of Palm Canyon Wash, and to protect the part of the city lying on Palm Canyon cone from Palm Canyon Drive to Araby Point (DS 4/15/1954). Some work on Baristo Road and on Tachevah was also budgeted (DS 6/3/1954).

By May, 1955, the levee across Palm Canyon was carried across the mouth of the canyon from east to west to within 1600 feet of Palm Canyon Road, and work at Araby Point was waiting upon the approval of a bridge design (DS 5/2/1955a). The City Engineering Department was planning a survey to evaluate possible routes for a Tachevah Canyon flood control project across Section 14 (DS 5/2/1955b). Plans for Tachevah flood control were changed when the chief engineer of Zone 6 of the RCFCWCD announced that he was in favor of a water recreation basin at the foot of Tachevah Wash, which he had previously opposed (DS 12/22/1955). Engineers then developed a plan that included a dam and underground conduits to take the water under the Frances Stevens School and the luxury homes that had been built in the flood plain, but by 1959 the project was in danger of being dropped because the Federal Bureau of the Budget had refused to allocate funds for it in the Army Corps of Engineers budget (DS 6/4/1959).

## THE AGUA CALIENTE WIN OUT: 1960-1970

### Land, Equalization, and Guardians

Now, almost a century after approximately half of three townships of desert land had been set aside for the Agua Calientes, they were to have the land divided among them to keep, to live on, to develop, or sell, as they chose. It appeared that the long struggle to maintain the land for their benefit and not that of non-Indians was about to end in victory. But some non-Indians had other agendas.

On March 2, 1960, additions to Title 25, Code of Federal Regulations, having to do with the equalization of allotments on the Agua Caliente Reservation, were set forth. The regulations, to be effective immediately, incorporated changes in procedure embodied in the Act of September 21, 1959 (26 Stat. 712), which provided that anyone not living on September 21, 1959, be excluded from equalization. Values used as a basis for equalization were to be those set for the BIA in 1957 and 1958, excluding the value of improvements. There were special rules for lands already sold by an allottee. The Secretary of the Interior (as represented by BIA staff members, rarely themselves sophisticated in land management) was given the task of determining the highest level of equalization feasible. The acreage limitations established before the 1959 act were to be disregarded (Seaton 3/2/1960).

Most of the Reservation was to be allotted, leaving only a small percentage of its lands in the hands of the tribe as a whole. The lands left in tribal status (owned in common by the Tribe) were to include two cemeteries, the Roman Catholic Church on Section 14, the hot springs area on Section 14, and the lands in Andreas, Palm, Murray, and Tahquitz canyons (3/2/1960).

A significant provision of the regulations stated that guardians or conservators should be appointed for the estates of all minor allottees, and for "those adult allottees who, in his [the Secretary of the Interior's] judgment, are in need of assistance in handling their affairs, in accordance with applicable State laws before making any equalization allotments to them" (3/2/1960). This led to the invidious procedure that resulted in the loss of lands, monies, and dignity by several members of the Agua Caliente Tribe.

In choosing allotments, those who had the lowest valuable allotments were to have first choice of lands available. Since tribal administrative expenses were now increased, revenues deriving from the lease of the hot springs site to the Palm Springs Spa (built in 1960) were to be made available to the Band for administrative expenses (3/2/1960).

The Tribe met with BIA Commissioners Rex Lee and Glenn Emmonds to discuss the rules and regulations for the equalization process and the allotment of Indian land. It was decided that each tribal member was to receive property valued at approximately $330,000. Those members already holding land

ACC0006872

valued in excess of this amount were to keep what they had. The airport land, Section 18, was to be allotted and, if sold to the city, its proceeds would be shared among the Indians who drew a share in the allotments (DS 3/26/1960).

National publicity, following the announcement of these developments, focused on the "wealthy" Indians; however, no money reached an allottee's pocket until the land was leased or sold. Allotees had enormous expenses—for example, Attorney Oliver Clark was asking that the Band members pay him 10% of the value of land allotted to them in either land or money for his services over 23 years (Clark 6/5/1963). They were also expected to pay a part of the expenses of maintaining the Palm Springs BIA office, even though they were not in control of the selection of its staff or its work.

Because bids for the Indian land were judged too low by the BIA and the Band when offered for sale, they were not accepted, and many lots took a long time to sell. The guardianship program, administered by Judge Hilton H. McCabe, a friend of Floyd Odlum (chairman of the committee set up by Congress in 1954), turned out to be disastrous. In part because of the large percentage of minors in the Band, but also in part because of pressure exerted on allottees to accept the "help" of "conservators" in managing their land, 80 percent of the Agua Caliente Band members were judged in need of assistance in handling their assets (Prieto 12/12/1967). Most of their guardians or "conservators," were appointed from among the judges, attorneys, and businessmen of the community (many of whom were not above door-to-door calls, promoting themselves as guardians or conservators).

By the time they took their percentages off the deals they arranged, their Agua Caliente clients had very little left. Fees were charged even when an Indian's land was producing no income—the conservators turned out not to be particularly good at land management, and on a number of estates, fees and other expenses were greater than the income, this despite the fact that the BIA appraised and offered for bid any land that was sold (the guardians and conservators took over other BIA functions). When land was leased, conservators often took a percentage immediately off the total income the property would bring in during the course of the lease. Some of the "wealthy" Agua Calientes had difficulty feeding their families.

This continued for most of the decade. Tribal members protested, and the Tribal Council protested to the CIA, who sent Special Trust Resources Officer Robert Cox to the Palm Springs office to make a general survey with respect to the administration of the various estates. His report "sufficiently alarmed and motivated" Secretary of the Interior Udall to order a special investigation and audit of the estates (Prieto 12/12/1967).

Regional news media also investigated the situation, resulting in detailed public exposure of many of the details of questionable behavior on the part of judges and conservators. Concerned members of the Band and their friends persuaded a young reporter on the *Riverside Press-Enterprise*, George Ringwald, to look into what was going on and write it up. The resulting series of articles not only alerted the larger community to the abuses against the Indians, and caused the prosecution of some of the conservators, but also won the author the Pulitzer Prize in 1967.

In the wake of the resulting "national attention and publicity," Congressman John Tunney introduced a bill to amend the Act of September 21, 1959 to correct the abuses and prevent future abuses, which passed on October 17, 1968. Letters were sent to parents and guardians of minors holding allotments on the Reservation, noting that guardians or conservators could be retained for minors and incompetent adults, but were no longer required by law (Prieto 12/12/1967; McDermott 10/10/1968).

Unfortunately, the form that the BIA passed out to the Indians to sign in order to end their wardships was ambiguously worded, denying in one paragraph what it promised in another. It would have allowed the Bureau to tie up the tribal members' liquid assets in a joint bank account instead of giving each of them his or her own account. When tribal members refused to sign, they were urged to do so because others had signed—a "divide and conquer" technique that members Edmund Peter Siva and Eugene Segundo accused the Bureau of constantly using to control the Indians (Ringwald 11/17/1968).

In the end, court hearings were necessary to close out the conservator/guardianship program, and, with 34 of 38 cases terminated, it appeared that the conservators and guardians would be awarded yet

ACC0006873

The Agua Caliente Win Out: 1960-1970

another $100,000 for final services and accountings leading up to termination of their services (Thorne 12/3/1969). In the meantime, a state investigation was underway that sought to determine whether there had been any illegal activity under state law (Salditch 2/5/1969).

Despite these problems, Tunney's bill halted what had been a series of schemes to remove valuable lands from Indian ownership for the past 100 years, resulting in a new era of Indian autonomy, self-assertion, economic development, and individual opportunity. Agua Calientes began to receive a reasonable income from assets, had more equal working relationships with the city of Palm Springs, and a more independent relationship with the BIA.

**Planning**

The city of Palm Springs and the Agua Caliente Band continued to work out ways to cooperate on plans for the Indian lands. In 1961 each party had developed a plan for the development of Section 14. In 1962, the Tribal Council was impatient for the city to complete the zoning of the section, so that development might proceed, and the city council called a public hearing on a tentative map of the section (DS 1962, 5/28/1962). An outline of the jointly devised plan was presented to the tribe in June (DS 6/8/1962). Squatters were evicted from the section and unleased buildings were burned (DS 7/17/1962).

On November 15, 1962, a zoning plan for Section 14 that both the City Planning Commission and the Agua Calientes approved was also approved by the city. The new plan proposed that the section have zones for a large-scale hotel and apartment houses, garden apartments, and a large-scale retail commercial zone, but no zones for single family residences (Canary 11/15/1962). A special Congressional Act had made it possible for the tribe to negotiate the development of the Palm Springs Spa at the intersection of Indian Avenue and Tahquitz-McCallum Way, a tract to which the hot springs had been diverted. The original site, now under Tahquitz-McCallum Way, had been capped (Tostado 11/16/1968).

In 1964, both H. Zinder and Associates, on behalf of the Agua Caliente Band and the BIA, reported on a study of a proposed Palm Springs zoning ordinance. They were in substantial agreement that the plan would be an "incalculable deterrent to the economic development" of the Indian land that made up more than 70% of the land affected by the zoning proposal (Nash 9/11/1964; Hickel 11/16/1970). Tribal attorney Raymond C. Simpson requested a judge's decision on whether the city could zone Indian land that was technically federal land (Thorne 5/1/1965).

The city passed the zoning ordinance in May, 1965, and the Tribal Council proceeded to initiate a suit against the city in federal court (Barger 5/12/1965). As a result, the city adopted an exclusive zoning ordinance applying to Indian land, and the federal government issued a Federal Regulation that denied that states or their political subdivisions had the right to zone Indian lands (F.R. Doc. 65-6028; Filed, June 8, 1965: 8 a.m.). A further result was the establishment of an Advisory Indian Land Planning Commission to serve through the Tribal Council as advisory to the City of Palm Springs on matters relating to the use of Indian land. The commission consisted of two Indians and three non-Indians.

Differences about zoning between the city and the Tribe were most often about setback requirements, percentages of lots that could be built on, building height, zoning changes, and so on, with tribal members generally wishing to allow developers to use the land more intensively in order to produce economic autonomy.

A case that came up at the end of the decade illustrates the differences between the city and the Tribe. The young son of Frank and Dora Prieto had a lot on the corner of Ramon and El Cielo that the Prietos wished to have rezoned from R-4 to C-2 so that a shopping center might be built there. He had received the land in exchange for land nearer the airport that he had been allotted. The city wanted to restrict commercial zoning to the downtown area, and protested the rezoning would constitute "spot zoning" (DS 6/25/1969).

Again the issue was whether the city had the right to determine the zoning of Indian land—the same issue that lay at the back of all planning and zoning disputes between the Tribe and the city since the city was formed. The tribe in this instance appealed to the Secretary of the Interior, who wrote them on November 16, 1970, that the "authority to regulate the use of leased Indian lands lies with the Secretary of the Interior, and is not delegate[d] to agencies outside the Government of the United States"

ACC0006874

(Hickel 11/16/1970). Hickel went on to encourage the City of Palm Springs and the Agua Caliente Tribal Council, along with a representative from the BIA to review Palm Springs zoning problems. The Tribe directed its planning consultant to prepare a "comprehensive master land use plan" for all the Reservation lands, and a zoning ordinance to implement the plan (Olinger 11/16/1970).

So much for the larger planning picture. Let us note in passing that, in 1966, the Tribe took a stand on a smaller, but in some ways equally significant issue. It insisted that "Tahquitz" be included in the name for a "certain street," i.e., the street originally named "McCallum" in honor of a city father whose memory was held in aversion by the Tribe. It overlay the original site of the hot springs near its intersection with Indian Avenue (Simpson 2/11/1966).

For many years after that it was designated "Tahquitz-McCallum." It is now simply "Tahquitz." This step toward recognizing traditional values of the Tribe led, eventually, to other such recognition—such as signs indicating to visitors as they enter the city that they are entering the Agua Caliente Reservation in Palm Springs, and throughout their lands in the area, including Cathedral City, Rancho Mirage, and the I-10 corridor.

### Flood Control

The possibility of flooding had again become an issue to the Tribe and the city. In October, 1962, the Board of Supervisors of the RCFCWCD approved a plan to construct a debris basin and channel in Tahquitz Creek developed in conjunction with the Army Corps of Engineers to control flooding, "working with officials of the City of Palm Springs and the Desert Water Agency." By April, 1967, the plan had been approved by Congress and design studies were initiated for a project that would protect Palm Springs from the kind of flood that it was thought might be expected every three hundred years (Bryant 5/12/1971).

Since the planned debris basin was to be on a historically important portion of Indian land, the omission of the Agua Caliente Band from this statement is surprising. As planning slowly progressed the Desert Water Agency grew concerned about a concrete bottom, and asked that a sand and gravel bottom be considered in order that water could sink into the underground aquifer, whence it could be pumped for later use by Palm Springs people. The chief engineer of the Flood Control District opposed this idea on the grounds that it would cost too much (Baumer 5/20/1969; Daily Enterprise 6/4/1969; Riverside Press-Enterprise 9/19/1970). The House-Senate Conference Committee that in September, 1950 had allocated $500,000 to go toward lining two miles of the creek with concrete apparently agreed with the chief engineer (9/19/1970). Complicated negotiations and decisions were going on regarding the effects of this dam on Tribal lands, e.g., which Tribal lands would be affected by construction.

In the meantime, a flood on January 25, 1969 brought two feet of water from the swollen Whitewater River to the "Dream Homes" development, which was on Indian land. An official of the Coachella Water District blamed the tribe for the flooding because it had refused to grant rights-of-way for dikes, whereupon the Tribe sued the water district for three million dollars for libel and slander. The tribe dropped the suit after the water district released a statement saying the official had not intended to "expressly or by innuendo or implication suggest that the individual Indians of the Tribe were the cause of the flood damage because of their refusal to cooperate in right-of-way acquisition" (Heinemann 1/29/1969, 1/30/1969; Thorne 2/4/1969; DS 6/24/1970).

### Tahquitz Canyon

Tahquitz Canyon had long been a popular place for hikers and climbers, and, in earlier years, by hunters, collectors of artifacts, and artists. By the late 1960s the "Hippies" had found it. Many lived in the canyon, but showed little or no respect for it. This caused considerable concern on the parts of the Tribe and the city. Disgusted by the rubble and the obscene paintings and writing on the rocks, the Palm Springs Chamber of Commerce in November, 1968 organized a clean-up day, and showed up in great numbers with sticks with nails on the end for picking up trash, gunny sacks to carry the trash, and pickup trucks to haul it away (Baumer 11/2/1968).

The canyon was a popular place for Indian and other young people to swim in summer in the

ACC0006875

The Agua Caliente Win Out: 1960-1970

early years of the century. Through the 1930s, 1940s, and 1950s, it was a popular place to hike, climb mountains, or swim. It was featured in the newspapers almost every year because individuals had to be rescued when they fell from dangerous heights above the falls, but not because they vandalized the canyon. It was only in the 1960s that the combination of protest movements by young people, and Palm Springs' popularity as a resort area to which young people were encouraged to come brought vandalism to the canyon to such a degree that it became a less pleasant and even a dangerous place for the nature lover attracted to the canyon as a place for recreation.

### Tribal Affairs

By the middle of the decade several of the young men of the Tribe had come of age and were again serving on the Tribal Council (DS 3/15/1965). By this time, the significant contributions of Cahuilla women to American Indian Affairs at both the national and local level had been recognized. Vyola Ortner and Eileen Miguel, having served as Tribal Chairpersons, had been selected in turn as International Woman of the Year by the Business and Professional Women (Simpson 3/11/1965).

With the Tribe asserting increasing control over its affairs and monies, plans for a new development were soon forthcoming. A new Tribal building to contain Tribal records was announced in the fall of 1960. It was to contain Tribal records, offices, a meeting hall, and an Indian funeral chapel (DS 10/5/1960). The building was dedicated in December, 1963 (DS 12/9/1963). It was made available to other organizations as a public relations gesture. The canyons were also opened not only for day touring, as previously, but also for overnight camping by youth groups (Jennings 1/6/1965, 1/10/1965).

As the Tribe became more independent and insistent on managing their own affairs, relationships between the Tribe and the Palm Springs office of the BIA were often stormy in the 1960s. Early in 1963, for example, the Tribal Council complained to the Personnel Placement Program of the Department of the Interior about the assignment of officers to the Palm Springs office who knew nothing about local land and economic programs—a problem shared by all of the southern California reservations—and the transference elsewhere of officers who understood the local leasing program (Agua Caliente Band 2/5/1963). A dispute arose in 1964 over whether the BIA had illegally added people to the Agua Caliente roll. Leonard Hill, at the BIA office in Sacramento, claimed the Band had not exercised its prerogative to prepare a membership roll (Hill 10/27/1964).

### CONCLUSIONS

A number of project-specific questions about the *Kauisik* Cahuilla were included in the research design for the ethnographic and ethnohistoric parts of this study. These questions included questions about traditional culture—what was the catchment area from which they derived their principal sustenance, their raw materials for living? What was the nature of the trail system over which they travelled to harvest resources or to trade with or visit their neighbors? With whom were they on terms of enmity and amity?

We also asked how many Cahuillas were brought into the Mission System, and when, how, why, and under what circumstances Cahuillas were baptized. Questions that involved changes in cultural patterns in the Ethnohistoric period included: Why did Cahuilla as far away from the missions as the *Kauisik* choose to go to the missions? What other aspects of Cahuilla culture helped them adapt to the Euro-American world? What has been the role of women through time? How have the *Kauisik* Cahuilla managed to persist as an identifiable group for over 200 years, despite devastating disruptions caused by the intrusion of Europeans and Euro-Americans, threats to their cultural integrity, and to their land base? What changes in social structure occurred as the result of diseases and other factors that reduced the population after the Europeans arrived? What were the *Kauisik's* most important adaptations in material culture, and when did they make these adaptations? What changes were the Cahuilla reluctant to adopt? Why do so few Cahuilla material culture items remain?

Some of these questions have been answered directly in what has been presented. The catchment area has been described and explained on pages V-1-19; the various trail systems on pages V-110-118;

ACC0006876

The Tahquitz Report: Ethnography and Ethnohistory

enmity/amity relationships on page V-105; settlement patterns on pages V-93-102; a brief review of *Kauisiktum* trade relations with other groups, focusing on the exchange of materials and the socio-economic and religious implications of these exchanges has also been assembled on pages V-105-110, and on pages V-125-136. Our findings from mission record research and the study of related documents are presented on pages V-142-150, and V-156-159.

The answers to other questions derive from what has been written, but are not immediately obvious, and discussed in what follows:

### Why did Cahuilla as far away from the missions as the *Kauisik* choose to go to the missions?

As we have noted, the *Kauisik* Cahuilla resisted the missions for many years, but once most of their neighbors were Christianized, the traditional system of which they had been a part was no longer there. It was then that they sent some of their members to the missions.

Sending their members to the Spanish missions and accepting the beliefs and rituals of the Catholic Church were actions not entirely inconsistent with Cahuilla religion. This was another pathway to the spiritual world. This acceptance, however, did not require the abandonment of their own ways. It merely added new ways to achieve ends, such as increased energy resources, cures, materials goods, new technologies, and, most importantly, apparent new sources of power. Since all things emanate from power, and the Spanish had extraordinary things (e.g., ships, horses, armor, guns, cattle and agricultural products), the Cahuilla conclusion that what they had was powerful and useful was an obvious one. These things were beneficial; therefore, having them or control of them would help the Cahuilla in everyday life. The Spanish intrusion began as a process that provided opportunities, dangers, and restraints to the Cahuilla and their neighbors. A sometimes unfair and unpredictable world was already a reality to the Cahuilla because of their history and the philosophical assumptions that were developed to cope with it. The Spanish brought new variations to be learned about, managed, and used for one's benefit. The Cahuilla philosophical system, one designed to cope with risk, was, in effect, in place as a tool of adaptation well before European contact. It was developed in reaction to exigencies not unlike those that they faced after the Spanish arrived.

Shortly after European contact, the Cahuilla surely recognized new dangers and opportunities. The presence of horses and guns as early as 1774-76, when Anza's Expedition passed through the Coyote Canyon and San Jacinto Valley areas, and their certain knowledge of the revolts of their neighbors the *Kumeyaay*, the *Gabrieleno* and *Serrano*, identified the Spanish as dangerous and yet useful people. These events posed a challenge to basic Cahuilla values. Their concept of power, *?iva?a*, held that what was useful could also be dangerous if not handled carefully, and that the knowledge of power and of those new resources could be dealt with successfully, albeit with great caution. Their system permitted a few to learn, take risks, and bring new forms of power and knowledge into the system in a controlled manageable manner. The great opportunities that were traditionally the shamans' must have been anticipated by young people who dared to leave for the coast. Surely, this was seen as an opportunity, however hazardous, by the early *Kauisik* Cahuilla pioneers who went into the Mission System and survived, some of whom returned with new advantages (knowledge-power) for their kinfolk.

### What other aspects of Cahuilla culture permitted them to adapt to the Euro-American world?

The traditional Cahuilla multi-lingualism served them well. Before European contact the Cahuilla often spoke two or more Indian languages and dialects. They were able to switch from one to another of several languages with ease. Leaders needed to communicate with other leaders, often those from other language groups. People not only often married into different dialectical groups but also often into other language groups, e.g., *Serrano*, *Luiseño*, *Chemehuevi*, *Kumeyaay*, especially in elite families. Linguistic skills were highly valued in traditional culture and necessary in an area that included speakers of several languages and many dialects. So it is not surprising that some Cahuillas were speaking Spanish in the desert area by 1823. Some of the Cahuilla had gone to San Gabriel or the pueblo of Los Angeles earlier, circa 1790, and learned enough to communicate at least basic information to the Spanish. Similarly, many of the Spanish at that time also spoke other Indian languages, e.g., *Gabrielino*; hence, by the early 1800s,

ACC0006877

Ethnographic and Ethnohistoric Conclusions

and certainly by the end of the Mexican period in the late 1840s, Spanish was a *lingua franca* for Indian peoples in southern California. Cahuillas with Spanish names were noted in Cahuilla land by the 1823-1824 Romero Expedition (Bean and Mason 1962). All of the elderly Cahuilla men who worked with Bean in 1958 were fluent in both English, Spanish and Cahuilla and often *Luiseño* and *Serrano* as well. This was consistent with the traditional custom of multi-lingualism.

**What has been the role of women through time?**

Despite the fact that the Cahuilla were a patrilineal-patrilocal culture, women in the traditional culture maintained proprietorial rights in their communities, and if they were from priestly leadership families (*acha-i* lineages), they might have considerable responsibility and privilege in the management of the important socio-religious affairs, e.g., the construction of "images."

Particularly important was the fact that women never lost their membership in their lineage, despite exogamous marriage rules. Women could return to their natal communities, and despite their living elsewhere, still maintained lineage privileges and obligations; consequently, women fit comfortably into American institutions. Inheritance rules, political rights and other rules and rights were similar to what they were used to. Their ability to acquire extra income from domestic work, and agricultural skills, crafts, e.g., basketmaking, pottery making and the like, enlarged and enhanced their traditional roles.

Many women engaged in work for non-Indians, often as domestics, and consequently learned inter-cultural skills, e.g., social, language, economic and political skills. They earned money that was theirs, individually, as it would have been traditionally. This experience eventually enhanced their vigorous participation in political affairs (Bean 1964; Barker n.d.)

In 1919 the Mission Indian Federation, a protest organization, recruited women to their ranks because of their many skills, especially language skills. These women could translate for those elders who did not have a working command of English. Agua Caliente women were soon engaged in further local political and economic affairs. They began to take leadership roles in reservation affairs in the 1930s, and continued to do so. In the 1930s and 1940s Juana Hatchett, Lena Welmas, and Flora Patencio were among the first to be active in Tribal affairs. During World War II, when many men left the reservation, women were called upon even more than in the past to manage Tribal affairs and family businesses. By the mid-1950s, several women were serving as Tribal council members. Later, Agua Caliente became the first Indian reservation to have a Tribal council composed entirely of women. Subsequently, both men and women have been active in Tribal affairs.

**How have the *Kauisik* Cahuilla managed to persist as an identifiable group for over 200 years, despite devastating disruptions caused by the intrusion of Europeans and Euro-Americans, threats to their cultural integrity and their land base?**

The circumstances of the Agua Calientes have been significantly different from those prevailing on most Indian reservations, even unique. Rather than being isolated from the mainstream of American development for the past 140 years, as were most other Cahuillas,[196] the *Kauisik* and other Agua Calientes were at a center of cultural activity characterized by tourism and property development since the late 1890s. Indian land holdings were constantly the target of development by outsiders who wanted to develop part of them as national parks, or as commerical properties owned or controlled by non-Indians. Despite this they have persisted as landowners, as a discrete cultural entity, and finally, as vigorous and successful managers of those traditional land holdings that were set aside for them.

The maintenance of their strong cultural identity and economic survival is no accident. It is the result of their traditional value system, which prepared them for managing risks and stress, coping rationally with change, loss, and new opportunities. A philosophy that prepared the Cahuilla for "modern times" was developed in an historical process fraught with physical and social stress. Successful decisions developed over hundreds of years were nurtured and recorded in a rich oral tradition (survival techniques).

---

[196]Most other Cahuilla reservations were established in relatively isolated areas, as were most of the neighboring Indian reservations in southern California.

ACC0006878

The rules of behavior were attuned to exigencies, threats and demands of their distant past and later of those due to the actions of Europeans and Euro-Americans.

The traditional system (see Bean 1972) was developed over a long period of time. The Cahuilla developed concepts necessary to survive. One necessity for survival was a keen sense of property. Each clan had exclusive ownership and control of a specific area. This sense of ownership has contributed to preservation of a land base despite assiduous, harsh, sometimes brilliant schemes and pressures from business interests, government officials, sometimes their own advisors, and occasionally their own members, to remove them from their lands. They have never lost control of their lands.

The Cahuilla story is one of the great dramas of American Indian history, the story of a people determined to remain focused upon their best interests and the interests of their descendants. They were buttressed by a past preserved in their oral literature, passed on to them from generation to generation. Despite the outward symbols of cultural integration of the present and the appearance of passing into the mainstream of American culture, Cahuillas remain conscious of the persistent idea of *Mukat's* guiding his creations through time.

The Agua Caliente are descended from peoples who developed what can be described as a diversified economic system. They developed a property system to provide assets from diverse environments. Consequently they managed and subsisted upon a wide variety of resources that were available somewhat differently from season to season, from year to year, and from place to place. Very broad differences in environmental potential occurred over longer ranges of time, e.g., drought periods. Utilizing resources in different ways in different times precluded a focused economic approach, one that would become dependent on a few resources or a limited number of ways to handle the production of them. Thus, they were not completely dependent on the economic fluctuations, e.g., climatic variations, that could seriously impact one or two major subsistence resources in any one year. The efficiency of their economic strategies were reinforced by sociological, psychological and philosophical strategies that provided them with a decision making system accustomed to rapid changes, as well as changes occurring slowly over a long period of time. This is well demonstrated in their history from the time that they were hunters and gatherers, plant and animal managers, wage laborers, agriculturalists, property owners renting, selling and leasing lands, always assessing and using the various resources and opportunities available to them, sometimes engaged in several of the above simultaneously.

A strong sense of kinship and family developed in the Cahuilla past was also an important factor in their successful survival as a group. Members of the *Kauisik* lineage still maintain a strong sense of family and are significantly involved in Tribal affairs. The Agua Caliente people are now composed of people descended from several groups. However, the basic core of the political leadership was for a very long time that of the *Kauisik*, the parental lineage.

Others composing the Agua Caliente population are descended from the *Paniktum* lineage, those Cahuillas originally located in the Andreas Canyon area, itself named after "Captain Andreas," a *Panik* leader of the last century. Still others are descendants of those who were adopted by the Agua Caliente Tribe or who married into the group.

A major imposition placed upon the Cahuilla by the American Government was that of leadership selection. The appointment or recognition of "Captains," "Generals," and "Mayordomos," by the Spanish, as well as the imposition of an election process for the selection of leaders during the American period, led to many conflicts within Indian communities. In the 1890s those who "won" these elections had to be approved of by the agents of the United States Government. After 1891, the Indian Service in southern California vigorously pressed the Cahuillas to dismiss their traditional leaders by electing new ones who were sometimes recommended or sponsored by the Indian agent. Thus those who were still by traditional rules the rightful leaders of the people were forced to limit their formal roles. They therefore had to lead from a "secret" position or be limited to the religious aspects of their leadership responsibilities.

However, despite new leadership selection processes, traditional leadership continued to exist for several generations. Within the Agua Caliente Reservation, for example, traditional religious, political and economic authority continued without significant disruption until the 1940s. Even today, the descendants of the Patencio family maintain a strong position in Tribal affairs. This is an example not only of the

ACC0006879

Ethnographic and Ethnohistoric Conclusions

respect of Tribal members for traditional authority patterns, but also a reflection of the number of votes a traditional leadership family can rally in Tribal elections. Until just recently, the elder member of the Patencio family remained a revered authority and was consulted on most serious Tribal affairs.

One cannot explain the maintenance of this Tribe's strength without mentioning the inculcation of cultural pride that has occurred among members to their children. The elders, Alejo and Francisco Patencio, Pedro Chino, and, later, Joseph Patencio, were religious as well as political leaders. They taught their children, grandchildren, and others, the cultural values fundamental to understanding Cahuilla history so that it would be recorded; consequently, they have knowledge about themselves unparallelled among the Cahuillas and their neighbors. Examples include *Stories and Legends of the Palm Springs*, as told by Francisco Patencio to Margaret Boynton in 1943, and *Aboriginal Society in Southern California*, by Willian Duncan Strong, first published in 1929 and reprinted by Malki Museum Press in 1972, and unpublished materials provided to others, e.g., John P. Harrington and Edward H. Davis.

Much of this rich heritage remains unwritten, held in the minds of the Agua Caliente peoples. Values are not formally expressed, but are present and function to provide a very significant tool for maintaining the group's autonomy and integrity and designing its future.

### When and under what circumstances did changes occur in ritual and ceremonial patterns?

The major ritual events—*nukil*, eagle, rituals of passage for young people, curing, and first fruits rituals—are no longer practiced. Funerals are conducted in a somewhat traditional manner in conjunction with Christian services. The anniversary of a person's death is still honored, and the Catholic holidays in fall and spring, "candle lighting" in November on All Souls' Day, and "flower decorating" in May are times when the deceased are remembered and honored.

These services now provide an opportunity for grieving and paying last respects. The oral literature of the past is no longer sung, although occasionally "Catholic songs" and secular Cahuilla songs may be sung. Until recently, ceremonial singers, when they were available from other tribes or reservations, were asked to sing.

The funerals bring together the extensive kin networks of the group, and the people from many other groups who attend. The events may be held in the Tribal hall or a home, depending on circumstances, and, of course, at the Tribal cemetery.

Most shamanic functions are no longer carried out, as there are no practicing shamans at the present time. Shamans did perform public demonstrations to exhibit their powers as recently as the 1960s when a man who specialized in the control of fire demonstrated his power and performed cures for the sick. He has since passed away, the last of such officials.

The shamanic functions of belaying misfortune or warding off malevolent uses of power are still performed by some at religious occasions or as needed, e.g., predicting or sensing the cause of a problem and enjoining the spiritual world for protection by the use of tobacco for taking or removing an object containing spiritual power that could cause a problem. This is sometimes done in consultation with a shamanic personage or experienced elder of another group who understands the Cahuilla belief. Similarly, rituals to prevent misfortune or illness are sometimes carried out by an outsider.

The remembrance of things past has been impeded among the Agua Caliente peoples since the passing of its ceremonial and political leaders, Alejo Patencio and Francisco Patencio, as is expected among Cahuilla peoples, when necessary knowledge of religious procedures was lost due to death, and/or the certain ritually necessary objects are lost.[197] Since the persons who knew the proper conduct of the rituals are gone, the rituals are no longer performed, despite the deep sorrow of the people. It is understood that the old ways are gone.

The rules of ritual behavior require a thorough knowledge of sacred information in order for the Cahuilla universe to be correctly maintained. It is proper for them to put the older culture to rest. This

---

[197] W.D. Strong pointed out that as early as 1925 when *nukil* ceremonies were still being conducted, the *maiswut* was missing certain ritual impedimenta that it had previously contained, notably a bear bone.

ACC0006880

pattern has been observed and recorded now for nearly 100 years—the last of the ceremonial houses was ritually burned recently when the last ceremonial singer passed away.

In the Agua Caliente *Kauisik* case, the pattern is as with others. When the waning of past knowledge reached a critical point, they felt that the ritual complex should be destroyed. The *kishumnawut*, the ritual regalia, were burned or buried.

Some materials were retained by individuals who had that right, until a proper use of disposal is determined. Such materials are often buried upon the death of the owner as are other personal objects that are saved as reminders of the past, e.g., baskets, ceramic ware, etc. These can be and are often retained by gifting them to relatives or friends.

When ritual materials are burned or buried it is done with explanations to the people, to the deceased ancestors, to *Mukat* and to the spiritual beings of the Cahuilla universe. It is then appropriate to forget the past, no longer dwell upon it, and look toward the future and toward new ways.

While this is a pattern throughout the Cahuilla area, it was particularly difficult for many other Cahuillas to accept because the *Kauisiktum* Cahuilla's connection to the past and their retention of ritually correct ways was so well thought of and honored. The heir apparent to this tradition did, fortunately for other Cahuillas, retain knowledge of *nukil* and other traditional Cahuilla ceremonial matters, as well as the bird songs, etc., that he had learned from his grandparents and other older Cahuillas. He sang at ceremonial houses of other Cahuillas and taught several Cahuilla secular music, which is now sung by many other Cahuillas.

**What were the *Kauisik's* most important adaptations in material culture, and when did they make these adaptations?**

Some European material culture items, such as foods, tools, and clothing were immediately accepted, often, it appears, as soon as there was an opportunity. This was especially true in instances where the Spanish item could replace a more "expensive" item, i.e., one that required more energy to acquire. For example, cattle and horses partially replaced game animals as food when they became plentiful and were easy to capture, and almost completely when reservations were established and hunting and gathering ranges were lost. Glass and metal replaced stone tools that took longer to make, a replacement that took place in part because the new materials were more efficient, and in part because the sources for traditional materials were lost to the Indians.

**Foods**. Because of their diversified and unstable environment, the Cahuilla were accustomed to making changes in dietary patterns as needed. Some 300 plants and nearly as many fauna are known to have been used by the Cahuilla. Many were not used routinely, but were used as resources when the ordinary and favored foods, builidng materials, medicines and the like were not available. Even animals and birds ordinarily considered spiritually dangerous could be used if a shaman-curer so instructed, under certain circumstances such as drought, or by certain persons, such as the aged.

This flexible and adaptable attitude toward food resources was utilized immediately after European contact. It was, in fact, validated in the Cahuilla creation myth itself. This describes the benefits of innovative foods that appeared after the death of the creator, *Mukat*. His last gift to his people was agricultural crop plants of the varieties used by their neighbors on the Colorado River (see Chapter XX). This change in the myth surely occurred very shortly after the Cahuilla learned of the uses of these materials. Thus validation was given to the acceptance of new ideas. The adoption of European goods and ideas was also rapid. Their adoption of wheat, barley, corn, melons, grapes, European domestic animals and the like demonstrate this. Another example of this is seen in the Cahuilla's addition of eucalyptus to their medical inventory; this adoption apparently occurred within a decade of its introduction into the United States from Australia.

**Cattle and horses**. As we have noted in Chapter V, the Cahuilla traditionally had domesticated dogs; the idea of domestication was not new. As with neighboring groups, the horse, at first used for food, quickly became a source of transportation for people and goods. The diarists of the Romero

ACC0006881

Ethnographic and Ethnohistoric Conclusions

Expedition (Bean and Mason 1962) in 1823-24 noted that the Cahuilla used horses to pack mescal. One need only consider how much more horses can carry than humans to appreciate their adoption. Larger quantities of storable and nutritious plants could be transported to a community, thus releasing Cahuilla men and women for other labor activities. The horse could also carry people and goods long distances with less effort. It thus made it more feasible for greater numbers of people to move further from traditional resource supplies and to gain employment, goods and cash in European communities. Horse hide and bones could also be used to manufacture goods. More significant, however, was the development of a new profession, the *vaquero* (cowboy), a profession in which Cahuilla men were employed for many years thereafter. They not only worked for themselves but also for the Spanish missions and *ranchos*.

Cattle were used immediately for food, and their hide and bone for tools. The Cahuilla sometimes referrred to cattle and horses as *sukat* or "big deer." Cattle became an important commodity for the Cahuilla, and when they acquired horses, the horse was used to acquire and manage them. Cattle for some became an economic mainstay. They grazed on reservations and still do, and are marketed by Cahuillas in the same way as by their non-Indian neighbors.

**Glass**. Glass as a resource material was quickly adopted by the Cahuilla for use in decoration and tools. Glass beads were traded to the Cahuilla at an early time in the Spanish period. The substitution of glass for obsidian in arrowheads, apparently also came quickly, perhaps because it was at that time a more easily worked and more durable material than obsidian.

**Metal**. Metal, when it became available, was also adapted by the Cahuilla for purposes for which it was more efficient than stones; i.e., for saws and knives, and eventually for containers.

**What changes were the Cahuilla slow to adopt?**

**Basketry**. Some Cahuilla materials were particularly adaptable and not readily replaced by European goods. Hence they continued to be used until recent times. Basketry was especially useful until recent years because baskets were flexible, sturdy (non-breakable), light weight, easily repaired, and beautiful to view. When baskets ceased to have significant utilitarian use, they remained in the Cahuilla inventory for several more decades, in part because they were sold as commodities to museums and private collectors, but more significantly because they served as important reminders of Cahuilla cosmology, values, aesthetics and ethnicity. They were used in the ceremonial house (to hold tobacco), and were decorated with figures, often representing major personages in Cahuilla religious cosmology such as rattlesnake, eagle, whirlwind.

Cahuilla values of hard work, attention to detail and fine craftsmanship were demonstrated by the basketmakers. Their individuality as artists was clearly demonstrated. They were recognized as such, and often used a "trademark" signature. Ethnicity was enhanced by a comparison of the work of one group with another, groups often demonstrating suitable but recognizable aesthetic differences.

**Mesquite Wooden Mortars**. The mesquite log and mesquite grinding tools were other examples of a traditional way that was irreplaceable. As long as mesquite beans were a staple, these artifacts were used and jealously kept. As late as 1919, E. H. Davis, who collected for George Heye of the Museum of the American Indian, found it very difficult to acquire them. They were still being used. He could purchase almost any other type of Cahuilla equipment—pottery, rabbitskin blankets, bows, arrows, throwing sticks, rattles and the like—but several Cahuilla women adamantly refused to sell him their wooden mesquite mortars. There was no adequate replacement, no other material that could so effectively grind the palatable mesquite to the texture desired.

Cahuillas had a somewhat similar attitude toward parting with their stone grinding implements. These tools ground foods better and finer than European implements.

**Pottery**. Although eventually supplanted by European containers and cooking implements, pottery was made and used in Cahuilla homes until the early 1900s. Some pottery was sold by Cahuilla women

ACC0006882

to tourists in Palm Springs. It continued to be favored for cooking and for water storage, especially in hot weather, because its porosity aided in keeping the water cool. Storage vessels, too, were functional until recently. The same conservatism as in the basketry tradition held for pottery; however, after pottery became popular with tourists, the Cahuilla began to make pots for the tourist industry, and continued until well into the 1940s.

## Why do so few Cahuilla material culture items remain?

For the most part, the material culture of the Cahuilla has over many centuries been destroyed, as was required by their laws. It was mandatory to destroy the possessions of deceased individuals in order that these could accompany them to the afterworld. This was usually done at the time of death when the materials were burned or broken. The tools, baskets, clothing, jewelry, gaming material and religious objects belonging to individuals were destroyed, leaving a serious lacunae of data with which to study Cahuilla material culture.

However, much has survived, especially in recent years, as the Cahuilla have saved heirlooms by gifting them to the living prior to their deaths.[198] A considerable number of these items were also collected by various people who acquired the materials directly from the Cahuillas (i.e., Palmer, Schumacher, Kroeber, and Davis). Most items that survived intact were collected by museums and private collectors, who, for many years, scoured the mountains and deserts of Cahuilla territory as well as the reservations for their souvenirs, relics and valuables. Private collectors acquired most of the materials that had been cached by the Cahuilla for future uses.[199] Some who cached material died, and the cache was not located by their relatives. The massive epidemics and necessary population moves over the years, e.g., onto reservations, removed Cahuillas from their traditional lands, lands where these caches were left and not returned for. The need for traditional tools and goods was reduced when good incomes and European goods became available.

Some of these materials survive today in private and museum collections, but their value is rarely completely realized because the details of the circumstances of these findings were not always recorded. Fortunately, some of these materials, often those that the Cahuilla gifted or sold to collectors or museums, are accompanied with identification. We can tell what lineage, and sometimes what family, but more often which clan or tribe owned and manufactured them; however, since many were traded from other groups, it is not always possible to identify them more exactly.

Because of Cahuilla marriage and exchange patterns, the derivation of style and form provides a special problem. The Cahuilla married outside of their own clans and moieties and they also married peoples from the cultures surrounding them. Hence style, pattern and the like are difficult to trace not only between Cahuilla groups but also between the Cahuilla and their neighbors; as ideas in art, religion, ritual and so forth were exchanged with their neighbors.

A search for items of Cahuilla material culture has fortunately revealed many artifacts from this area, more than we anticipated. These objects are scattered around the world; many can be found locally, more in museum collections on the east coast of the United States, and still others in other countries, such as Germany. The other body of data on Cahuilla material culture that is available to scholars is in the many archaeological reports now available. In the past 30 years, thousands of Cahuilla sites have been recorded; many of them have provided materials that were either collected from the surface or from excavations. Such materials provide data not otherwise available.

The Native American Graves Protection and Repatriaion Act of 1990 (NAGPRA) has made it possible for the Tribe to retrieve many of their objects held in museums elsewhere, especially sacred

---

[198]Among the Cahuilla today very few materials are destroyed upon the death of an individual. Usually those items that are destroyed are very personal goods, certain clothing items, and those heirlooms and memorabilia that the deceased had requested beforehand be destroyed.

[199]At the time when Ed Davis collected such materials in Palm Springs in 1913, Francisco Patencio was able to go directly to caches to find materials, such as pottery, which he then sold to Davis.

ACC0006883

Ethnographic and Ethnohistoric Conclusions

objects. Museums and similar institutions receiving federal funds are required to provide Indian tribes with lists of each tribe's objects in their collections. As of 1995, the Curator of the Agua Caliente Cultural Museum, who was heading up the Tribe's effort to carry out the terms of the legislation, reported that scores of such lists had been received and many more were expected by the end of the year (Jeffrey 1995).

ACC0006884

# VI. SITE DESCRIPTIONS
by Jerry Schaefer

## INTRODUCTION

No less than 21 activity areas, defined as features, were investigated during the course of testing, data recovery, and monitoring at Tahquitz Canyon (Figure VI.1, Table VI.1). Features are arbitrarily grouped into spatially associated loci that were identified by the Archaeological Research Unit of the University of California Riverside, on the basis of the intensive survey by Jefferson and Hammond (1972). These locus designations, however, represent only arbitrary zones of surface artifact distributions and not necessarily culturally coherent occupation areas. The feature designations presented here are the analytically relevant activity areas defined by the results of the testing (Bean et al. 1988) and data recovery phases. For most purposes, each "feature" is analytically equivalent to what would otherwise be considered a "site" if found in isolation. Some of Jefferson and Hammond's features proved to be natural geomorphic phenomena without cultural associations; particularly many of the "house rings," rockshelter localities, and some of the hypothetical irrigation features. Several previously unidentified cultural resources were also added to the inventory as a result of testing and data recovery program. These were given new locus and feature designations (Locus B, Feature 18; Locus C, Feature 5; Locus D, Feature 3; Locus J, Feature 7; Locus L, Locus M, and Locus N).

Each activity area is defined as a spatially discrete archaeological manifestation. They include:

1. Large open air sites with midden deposits and sometimes associated cremation areas (residential habitation sites):
>    Locus A
>    Locus B, Features 6, 13, and 18
>    Locus C, Features 1-2
>    Locus C, Feature 3 ("shaman's house")
>    Locus E
>    Locus F
>    Locus H
>    Locus L, Feature 2
>    Locus M, Features 1-2

2. Midden deposits adjoining boulder or bedrock formations, sometimes associated with rock art (rockshelters):
>    Locus C, Feature 4
>    Locus G, Feature 1
>    Locus I, Feature 2
>    Locus I, Feature 3 (Archaic period)

ACC0006885

| | | | | | Ceramics | | | Flaked Lithics | | | | Manos/ | Metates/ | Stone | Bone | Stone/Shell Beads | | | Glass | China | Animal | Shell | | Fish | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Locus & Feature | Site Type | Excavation Area | Excavation Volume | Percent Dug | Sherds | Disks | Pipes | Debitage | Cores | Points | Tools | Pestles | Mortars | Tools | Tools | Early | Inter. | Late | Beads | Metal | Bone (gm) | Mar. | Fresh | Bone | Cremations | Radiocarbon Dates | Bead Data |
| A, 1-6 | Residence | 34 | 13.5 | 10 | 248 | 1 | 2 | 900 | 1 | 25 | 2 | 7 | 1 | 1 | 6 | 120 | 5 | 0 | 0 | 0 | 864.6 | 0 | 0 | 0.1 | 3 | A.D.1160-1388 | PII-1803 |
| No./Volume | | | | | 18.37 | 0.22 | 0.15 | 66.67 | 0.07 | 1.85 | 0.15 | 0.52 | 0.00 | 0.07 | 0.44 | 9 | 0.37 | 0.00 | 8.89 | | 64.04 | 0.00 | 0.00 | 0.01 | 0.22 | | |
| A, 8 | Hearth | 8 | 1.6 | 100 | 58 | 0 | 3 | 0 | | | | | | | 1 | | | | | | 47.4 | 0 | 0 | 0 | 0 | | |
| B, 5 | Residence | 53 | 16.26 | 60 | 1554 | 14 | 6 | 1238 | 4 | 43 | 10 | 1 | 4 | 3 | 3 | 54 | 6 | 251 | 1 | 4 | 1724.5 | 20 | 3 | 1.4 | 1 | A.D.1532-1541/1637-1665/1783-1789 | PII-1803 |
| No./Volume | | | | | 95.57 | 0.86 | 0.37 | 76.14 | 0.25 | 2.64 | 0.62 | 0.18 | 0.23 | 0.18 | 0.18 | 3.32 | 0.37 | 15.44 | 0.06 | 0.25 | 106.04 | 1.23 | 0.18 | 0.09 | 0.06 | | |
| B, 6 | Residence | 88 | 26.18 | 90 | 1623 | 20 | 7 | 1862 | 0 | 25 | 8 | 4 | 4 | 6 | 6 | 7 | 14 | 3 | 0 | 0 | 833.4 | 0 | 0 | 0.00 | 0 | A.D.1644-1690/1724-1810 A.D.1474-1668/1751-1758/1776-1794 A.D.1528-1556/1634-1681/1735-1806 | PII-1803 |
| No./Volume | | | | | 61.99 | 0.76 | 0.27 | 71.12 | 0.00 | 0.95 | 0.31 | 0.15 | 0.15 | 0.23 | 0.23 | 0.27 | 0.53 | 0.11 | 0.00 | | 31.83 | 0.00 | 0.00 | 0.00 | | | |
| B, 13 | Residence | 143 | 29.68 | 100 | 1125 | 22 | 3 | 705 | 0 | 24 | 1 | 3 | 2 | 3 | 0 | 4 | 2 | 22 | 1 | 1 | 315.5 | 0 | 0 | 0 | 0 | B.C.780-771/1010-790 | PII-1790 |
| No./Volume | | | | | 37.90 | 0.74 | 0.10 | 23.75 | 0.00 | 0.81 | 0.03 | 0.10 | 0.07 | 0.10 | 0.00 | 0.13 | 0.07 | 0.74 | 0.03 | 0.03 | 29.68 | 0.00 | 0.00 | 0.00 | | | |
| B, 18 | Residence | 85 | 24.22 | 100 | 1272 | 8 | 4 | 1540 | 2 | 52 | 7 | 1 | 4 | 4 | 10 | 0 | 4 | 3 | 0 | 0 | 886.1 | 10 | 4 | 0.6 | 0 | | PII-1790 |
| No./Volume | | | | | 52.52 | 0.33 | 0.17 | 63.58 | 0.08 | 2.15 | 0.29 | 0.04 | 0.04 | 0.04 | 0.41 | 0.00 | 0.00 | 0.08 | | | 24.22 | 0.41 | 0.17 | 0.02 | 0.00 | | |
| C, 1-2 | Residence | 154 | 48.92 | 100 | 2474 | 108 | 9 | 399 | 0 | 22 | 5 | 2 | 0 | 6 | 1 | 0 | 111 | 3 | 23 | | 2867.9 | 5 | 22 | 0.1 | 1 | A.D.1706-1719/1814-1828/1879-1916 A.D.1683-1732/1810-1930 A.D.1681-1736/1806-1936 | A.D.1803-1850 |
| No./Volume | | | | | 50.57 | 2.21 | 0.18 | 8.16 | 0.00 | 0.45 | 0.10 | 0.04 | 0.00 | 0.04 | 0.12 | 0.02 | 0.00 | 2.27 | 0.06 | 0.47 | 58.62 | 0.10 | 0.45 | 0.00 | 0.02 | | |
| C, 3 | Temporary Camp | 8 | 1 | 100 | 113 | 3 | 0 | 30 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17.6 | 0 | 0 | 0 | 0 | | |
| No./Volume | | | | | 113.00 | 3.00 | 0.00 | 30.00 | 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17.6 | 0.00 | 0.00 | 0.00 | | | |
| C, 4 | Rockshelter | 3 | 4 | 30 | 121 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 | 1 | 0 | 119.9 | 0 | 0 | 0 | 0 | | A.D.1803-1850 |
| No./Volume | | | | | 0.00 | 0.00 | 0.00 | 30.25 | 0.00 | 1.50 | 0.00 | 0.00 | 0.00 | 0.25 | 0.25 | 0.00 | 0.00 | 0.50 | 0.25 | 0.00 | 29.97 | 0.00 | 0.00 | 0.00 | | | |
| C, 5 | Burnt Kish | 58.5 | 24.69 | 100 | 622 | 6 | 1 | 249 | 1 | 4 | 0 | 4 | 7 | 0 | 2 | 2 | 0 | 7 | 0 | 0 | 434.8 | 1 | 5 | 0.2 | 0 | A.D.1665-1695/1721-1812/1853/1873 A.D.1639-1668/1751-1758/1776-1797 | A.D.1803-1850 |
| No./Volume | | | | | 25.19 | 0.24 | 0.04 | 10.09 | 0.04 | 0.16 | 0.00 | 0.16 | 0.28 | 0.00 | 0.08 | 0.08 | 0.00 | 0.28 | 0.00 | 0.00 | 17.61 | 0.04 | 0.20 | 0.01 | 0.00 | | |
| D, 3 | Temporary Camp | 18 | 3.6 | 20 | 320 | 0 | 0 | 14 | 0 | 0 | 0 | 0 | 5 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 37.5 | 0 | 0 | 0 | 5 | | |
| E, 1-4 | Residence | 402.3 | 120.13 | 100 | 5171 | 119 | 32 | 1725 | 3 | 84 | 13 | 19 | 15 | 10 | 2 | 12 | 1 | 1032 | 359 | 14 | 1569.6 | 26 | 12 | 1.1 | 0 | A.D.1210-1391/1349-1391 | A.D.1803-1850 |
| No./Volume | | | | | 43.05 | 0.99 | 0.27 | 14.36 | 0.02 | 0.70 | 0.11 | 0.16 | 0.12 | 0.08 | 0.02 | 0.10 | 0.01 | 8.59 | 2.99 | 0.12 | 13.06 | 0.22 | 0.10 | 0.01 | 0.07 | | |
| G, 1 | Rockshelter | 6 | 2.3 | 10 | 128 | 2 | 0 | 56 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 226.5 | 0 | 0 | 0.1 | 0 | A.D.1428-1525/1562-1629 A.D.1434-1491 | A.D.1803-1821 |
| No./Volume | | | | | 50.87 | 0.00 | 0.00 | 55.65 | 0.87 | 0.87 | 0.43 | 0.00 | 0.00 | 0.00 | 0.87 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 98.48 | 0.00 | 0.00 | 0.04 | | | |
| H, 1 | Residence and Cremation Area (Test) | | | | 1 | | 0 | 56 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 3 | PII & A.D.1790-1803 | |
| I, 1 | Rockshelter | 88.5 | 25.48 | 75 | 3449 | 15 | 4 | 5726 | 3 | 109 | 13 | 12 | 4 | 6 | 2 | 51 | 1 | 176 | 41 | 3 | 1972.6 | 17 | 3 | 1 | 0 | A.D.1692-1722/1811-1864 | Archaic-A.D.1850 |
| No./Volume | | | | | 135.36 | 0.59 | 0.16 | 224.73 | 0.12 | 4.28 | 0.51 | 0.47 | 0.16 | 0.24 | 0.08 | 2.00 | 0.04 | 6.91 | 1.61 | 0.12 | 77.42 | 0.67 | 0.12 | 0.04 | 0.00 | | |
| I, 2 | Rockshelter (Test) | | | | 44 | 0 | 0 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5.4 | 0 | 0 | 0 | 0 | | |
| I, 3 | Rockshelter | 11.64 | 9.23 | 50 | 130 | 1 | 0 | 107 | 0 | 4 | 3 | 4 | 2 | 0 | 1 | 4 | 0 | 0 | 0 | 0 | 295.3 | 2 | 0 | 0 | 0 | | Archaic |
| No./Volume | | | | | 14.08 | 0.11 | 0.00 | 11.59 | 0.00 | 0.43 | 0.33 | 0.43 | 0.22 | 0.00 | 0.11 | 0.43 | 0.00 | 0.00 | 0.00 | 0.00 | 31.99 | 0.22 | 0.00 | 0.00 | 0.00 | | |
| J, 7 | Temporary Camp | 16 | 3.9 | 100 | 95 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16.7 | 0 | 0 | 0 | 0 | | |
| No./Volume | | | | | 0.00 | 0.00 | 0.00 | 1.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.28 | 0.00 | 0.00 | 0.00 | | | |
| K, 1 | Temporary Camp | 4 | 0.8 | 100 | 15 | 0 | 0 | 15 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0.1 | 3 | 0 | 0 | 0 | | |
| No./Volume | | | | | 67.50 | 0.00 | 0.00 | 18.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.25 | 0.00 | 0.00 | 0.12 | 3.75 | 0.00 | 0.00 | | | |
| L, 2 | Residence | 316 | 79.64 | 90 | 489 | 0 | 6 | 687 | 0 | 18 | 1 | 7 | 1 | 1 | 1 | 0 | 2 | 0 | 3 | 0 | 151.8 | 0 | 1 | 0 | 1 | | |
| No./Volume | | | | | 6.14 | 0.00 | 0.08 | 8.63 | 0.00 | 0.23 | 0.01 | 0.09 | 0.01 | 0.01 | 0.00 | 0.03 | 0.00 | 0.03 | 0.00 | 0.00 | 1.91 | 0.00 | 0.01 | 0.00 | 0.01 | | |
| M, 1-2 | Residence (Test) | | | | 65 | 0 | 0 | 64 | 0 | 1 | 0 | 2 | 1 | 0 | 0 | 2 | 1 | 3 | 2 | 0 | | 0 | 0 | 0 | | | |
| **Totals** | | **1,497** | **435.13** | | **18,870** | **320** | **74** | **15,605** | **16** | **423** | **64** | **75** | **45** | **34** | **36** | **153** | **30** | **1,741** | **420** | **47** | **12,553** | **84** | **51** | **4.4** | **24** | | |

TABLE VI.1. Tahquitz Canyon Site Summary

ACC0006886

3. Small open air sites with limited midden formation and discrete burnt deposits (temporary camps and hearths):

Locus A, Feature 8
Locus C, Feature 3
Locus D, Feature 3
Locus J, Feature 7
Locus K
Locus N

4. Specialized cremation grounds:
Locus D, Features 1-2

The intensity of investigation depended on the proximity of specific features to direct impact zones, projected indirect impacts from the flood control project, religious or culturally sensitive areas, and the potential of the feature to contribute to the research design. Approximately half the features received from 90 to 100 percent data recovery, proving an excellent data base for which sampling biases are not an issue. Data recovery was particularly limited at several rockshelters, because either site integrity was too poor (Locus C, Feature 4), artifact recovery was too small (Locus I, Feature 2), or partial site preservation was the preferred mitigation alternative (Locus G, Feature 1; Locus I, Feature 3; Locus M). Data recovery was also curtailed or restricted at those sites with cremation remains that were preserved, *in situ*, outside direct impact zones. Isolated milling features and some rock art panels not associated with habitation sites were also discovered and these were all systematically recorded and analyzed.

A summary of general field methods is presented below, followed by the results of excavations at each locus or feature. The discussion of excavation results is organized by locus and feature number. This section concludes with a separate interpretation of site stratigraphy and soils by Gary Huckleberry. The reader can make reference to this final section throughout the discussion of each feature.

## FIELD METHODS

The first phase of archaeological field work consisted of a six week testing program that extended from April 18 to May 27, 1988. An interim period followed to allow for preparation of a preliminary test phase report that included recommendations for data recovery (Bean et al. 1988). This report was reviewed by the National Park Service, the Agua Caliente Band of Cahuilla Indians, and RCFCWCD before the beginning of the data recovery phase that extended from October 15 to December 12, 1988. The construction monitoring phase extended from May 28 to August 30, 1990, during which time additional data recovery was undertaken at several previously undiscovered features, and additional material was salvaged from previously examined areas, principally in Locus C and Locus D.

### The Control Grid System

The first step for the archaeological test phase was to develop a system to control archaeological tasks. Spatial control of surface collection units, test excavations, and mapped features was established by overlaying a grid system over the entire site. First a central datum was fixed on an upper terrace on the south side of Tahquitz Creek, just west of Locus D. A concrete and steel primary datum was established at UTM coordinates N598311.407; E1909,153.065, a location that is 15 m east and 3 m south of the U.S. Army Corps of Engineers Datum No. 422 (see Figure VI.1). Serving as the primary base datum for the entire site, this point was assigned the coordinates N000, W000. All other locational coordinates are tied to this point as north or south, or east or west (e.g., N150 E200). Any coordinate assigned to a collection unit or test unit refers to the northwest corner of the defined unit.

From the primary datum, a 50 x 50 m grid was established over each locus or area that required surface collection or testing. One concrete and steel datum or inscribed boulder was permanently set as

VI-3

ACC0006887

a secondary datum point at each locus. The remaining 50 m coordinates were staked with red painted wooden stakes. The 50 m grid was established using a transit and stadia and was "filled" with 10 m units using steel tapes and unpainted wooden stakes.

## Test Phase Excavations

Test phase field methods, described in the research design (CSRI 1986) were devised for an extensive program of surface collection, shovel testing, and unit excavations to reveal the aerial extent, depth, functional variability, and chronological range of archaeological remains. Interrelated studies included recording of ground stone features, documentation of pictographs, geomorphology analysis, and examination of irrigation technology. Variable sized units were dug over previously identified "house depressions" so as to include one quarter or quadrant of the fill within the feature. All such units indicated that the "house depressions" recorded by Jefferson and Hammond (1972) were actually midden-filled remnant stream channels or naturally occurring circular depressions. Other midden areas or zones of alluvial deposition in open-air sites or rockshelters were tested with standard 1 x 1 m test units. Shovel tests and additional 1 x 1 m units were used between surface manifested features to determine the spatial extent of subsurface deposits. These units were all oriented and designated within the overall site grid system. Units were excavated in arbitrary 10 cm levels or natural stratigraphy, whichever was more discrete. All soil was sifted through 1/8 in. mesh screen. Finer 1/16 in. screen was used in areas of cremation burials or to sample midden for small beads and other artifacts. Crew chiefs used standardized unit and level sheets and also maintained a separate diary that included excavation summaries, field interpretations, differences of opinion among the staff, and other information relevant to site interpretation. Field documentation also included maps of each individual unit, contiguous units, black and white and color slide photography, and periodic video recordings. Specific field strategies for the placement and size of different units would differ on the basis of physical characteristics of the site and objectives of the testing and data recovery phases. Individual approaches to each feature are discussed in the site descriptions below.

Artifacts were cleaned, sorted, labelled, and bagged by a full-time laboratory staff in Palm Springs during the course of field work. All diagnostic artifacts and sherds were individually labelled. Lithic debitage and ecofacts were placed in labelled bags only. Catalogue cards were maintained on the artifact inventory of each unit and level. The hierarchical labelling system on artifacts provided a concise reference to site number, locus, feature, unit, level, and (optional) mapped artifact location. For example, the label "45.C.2.8.1.1" would refer to site CA-RIV-45, Locus C, Feature 2, Unit 8, Level 1, Artifact 1. Additional catalogue numbers were also assigned by some specialty analysts, but for most diagnostic artifact categories the field number was sufficient to distinguish all objects within specific artifact classes.

When a larger number of cremations than had been anticipated were found outside the recorded loci, CSRI staff, members of the Agua Caliente Band, and Mr. Kenneth Edwards, Chief Engineer of the RCFCWCD met to discuss the appropriate method for determining the extent of the cremations. Shovel tests were employed to define the boundaries of the cremation areas, with all artifacts returned to shovel test pits after field counts were made. No further excavation took place in such areas if no direct impacts were anticipated. Conventional excavations were also suspended within loci if cremations were encountered and the area was not going to receive direct impacts. Two ethnohistorically documented cremation areas in Locus D were shovel tested to define their boundaries and these zones were capped with over 12 in. of sterile fill and were carefully monitored to protect them from indirect impacts from the flood control project construction. Testing and data recovery phases demonstrated that numerous cremations remain within Tahquitz Canyon and their confidential locations have been transmitted to the Agua Caliente Band of Cahuilla Indians.

Field methods during the data recovery phase followed the same general procedures as testing, although on a much larger scale. Excavations focused on the excavation of contiguous units to reveal discrete hearths, structures, living surfaces, and activity areas. In Locus B, feature numbers that were assigned to individual "house depressions" in the testing phase were consolidated into a single feature when it was determined that they were encompassed by a single occupational horizon. Standard 2 x 2

ACC0006888

m excavation units were preferred in most areas, but dimensions were sometimes adjusted to accommodate the full exposure of a specific activity area. The preferred method of excavation was to first excavate a line of units across the feature to expose a long stratigraphic section. Excavation levels were adjusted to natural stratigraphy whenever possible. Some undifferentiated midden deposits, for example in Locus B, were excavated as one level rather than in arbitrary 10 cm levels.

At the end of the excavation and analysis, all human remains and associated grave goods were returned to the Agua Caliente Band of Cahuilla Indians for reburial, and all other artifacts, field notes, photographs, and other documentation were returned for curation at the Agua Caliente Cultural Museum. The artifact collections are available to scholars and the Cahuilla people for future study and exhibition.

## RESULTS

### Locus A

Approximately 13 "house depressions" and a low density surface artifact scatter were originally identified by Jefferson and Hammond (1972) in this locus (Figure VI.2). The first five quadrant tests and two shovel tests demonstrated that all of the depressions are natural stream channel remnants that were used for a number of functions, including habitation and cremation burial. What appeared to be artificial boulder alignments on the surface were in fact the tops of stream embankments that slope down below the surface to a depth of 20 to 80 cm. (Figure VI.3a). The bottoms of the stream channels always contained a sterile stream-deposited layer of sand, gravel, cobbles, and boulders. These low-lying channels were evidently used as habitation areas that provided some protection from the wind and a relatively flat and sandy occupational surface. The channels gradually filled with a mixture of midden debris and alluvial sands and silts that through human activity and bioturbation became, for the most part, an undifferentiated stratum of artifact-bearing carbonaceous soil. Several deeply buried ash lenses and *in situ* cremations indicated that some deposits were gradually accumulating and remained preserved as the occupation of the depressions proceeded through time. These middens were clearly not a secondary redeposition from stream action. Some depressions, however, contained a completely undifferentiated fill that included widely scattered cremation remains mixed with boulders and cobbles. These areas apparently represent redeposited remains from upslope.

The test results in the first five depressions provided a convincing case that these surface features were not house pits. No evidence of modification of the boulders or of post holes or other structural remains were found. Some of the tests in depressions also produced negative results and in some cases the depressions were only subjective interpretations of ill-defined rock alignments or surface topography. No further quadrant testing was therefore undertaken in the other depressions. We also wanted to limit the exposure of cremation burials in this area. Figure VI.2 does not show the location of remaining cremations, although that information has been passed on to the Cahuilla. Twenty shovel tests were made in the vicinity of the depressions and along the direct impact area to determine the limits of the subsurface midden deposits and to make specific impact assessments for the data recovery phase. The following summary of each tested feature and of the shovel test program provides more details of the recovered artifacts and cultural associations.

**Feature 1**. One of the two largest depressions, a circular 8 m diameter feature, received a 4 x 4 m quadrant test that was excavated to a depth of 40 cm below the surface (Figure VI.3a). Arbitrary 10 cm excavation levels were maintained, following natural surface contours. The uppermost 10 cm was a medium grained carbonaceous sandy loam with a slightly darker organic color than the lower levels. A mix of midden fill, ash lenses, and alluvial sediment was indicated in profile. This stratum continued through the next two levels to a depth of 30 cm. Artifact content dramatically decreased at the 30-40 cm level, at which point a deposit of sterile alluvial sands and gravels was encountered and excavated to a depth of 90 cm.

ACC0006889



**Figure VI.2. Locus A Plan View**

ACC0006890



**Figure VI.3a.  Locus A, Feature 1, Unit 1, Level 3 Completed View East**

The artifact bearing levels produced ten projectile points or fragments, three bone awl fragments, 14 beads, a clay pipe fragment, numerous sherds, pressure flakes from stone tool modification and rejuvenation, a cooking stone, mano, and fire-effected rock.  A large sample of large and small mammal bones was also recovered.  As in other areas of Locus A, projectile point blanks and debitage indicated that lithic manufacturing was an important activity.  The arrows were put to good use, judging by the large quantity and variety of large, medium, and small mammal bones.

Pollen samples revealed one of the few instances, as aggregates, of *Liguliflorae*.  Of this family, Cahuilla exploitation of thistle buds and dandelion stems and leaves are documented (Bean and Saubel 1972:55, 141).  Aggregates also derived from an Archaic period cist in Locus I, Feature 3, and in Ethnohistoric period midden from Locus E.   Neither species is presently recorded on the alluvial fan. One of only two cat-claw pollen observations also occured in Level 2 of Unit 1.  Although a common plant in washes and near the stream channel on the alluvial fan, it probably was introduced to the midden and represents the exploitation of the seed pods or wood. Bean and Saubel (1972:29) infer extensive use of the plant despite the fact that it was not a preferred food source.  Small amounts of *Onagraceae* pollen suggest the exploitation of desert primrose (Bean and Saubel 1972:94), or perhaps the evening primrose that is found on the alluvial fan but not documented as an economic plant among the Cahuilla.

An undisturbed cremation was found at the bottom of the depression, 30 cm below the surface on a fire-effected concave surface of a large granite boulder.  The boulder sat directly on the basal stream channel sands and gravels.  Within the 5-10 cm carbon and ash deposit on the boulder were found highly calcined cranial, rib, and distal radius fragments in association with burnt *olivella* shell beads. Excavation was discontinued as soon as a determination was made of a burial.  Only the top of the burial was uncovered and it remains unexcavated. The surrounding midden deposit at the same level of the cremation contained fire-reddened soil and white ash.  After notification of the tribal chairman and his inspection, all associated material was returned and the area was reburied.

ACC0006891

**Feature 2**.  Similar stratigraphy was found in another depression to the east of Feature 1.  This depression is actually a continuation of the same remnant stream channel, with the boulder strewn south bank continuing through both test quadrants.  A 3 x 3 m unit was excavated in this 6 x 4 m depression.  The uppermost 30 cm of carbonaceous fill contained the bulk of recovered artifacts.  Within this stratum, two weakly defined discontinuous ashy lenses could be defined.  An abundance of sherds, flakes, and animal bones came from the upper levels.  Catalogued artifacts included 12 projectile points, a retouched flake tool, two bone awl fragments, six manos, a worked sherd disk with incised decoration, shell beads, and one glass bead.

A radiocarbon sample from Level 2 of Unit 1 yielded a calibrated date of A.D. 1160-1388.  This Patayan II date is confirmed by the greater abundance of Tumco Buff pottery in Locus A and suggestions of a Patayan II component in the bead analysis.  Quantities of Colorado Buff pottery and later bead types also proved that the area continued to be used in Patayan III times, but not as extensively as other areas of the alluvial fan.

Proceeding below 30 cm, artifact content dropped precipitously with only a few sherd, lithic, bone, and charcoal fragments.  Much of this material may be from stream redeposition.  Darker soils continued to a depth of 40 cm upon reaching sterile sands and gravels overlying large boulders and cobbles.  Removal of all fill revealed a boulder strewn relic stream bank that provided some protection from the elements.  As the narrow channel bottom filled with alluvium and midden deposits, it would have offered a wider area to occupy, possibly explaining why most of the artifacts were found in the upper levels.

**Feature 3**.  What appeared to be a 4 x 4 m unit rock alignment and depression directly north of Feature 1 received a 1 x 1 m test quadrant.  Only 20 cm of artifact-bearing fill was found inside, and excavation revealed a natural boulder alignment and stream channel deposits on the north side of the large channel in which Features 1 and 2 were located.  The upper 20 cm of undifferentiated midden contained a small amount of pottery, flakes, and bone fragments.  Significant finds included several fish vertebrae and a piece of mollusk shell.  One vertebra could be tentatively identified as brown trout, an introduced European species.

**Feature 4**.  This 7 m diameter circular rock alignment and depression received a 3 x 3 m test quadrant.  Excavation of the fill to a depth of 40 cm below the surface revealed another natural boulder and cobble-lined alluvial depression.  The uppermost 30 cm contained dark midden soil with three manos or fragments, three projectile points, a quartz drill, and abundant lithics, sherds, and animal bone.  An *in situ* cremation burial was encountered at only 15 cm below the surface.  A restorable Colorado Buff Ware olla associated with calcined human bone and an ashy deposit provided the first evidence of a cremation, but not before over 100 burnt *olivella* shell beads and two historic glass beads had been recovered.  Comparison of pottery types, beads, and associated radiocarbon dates from Features 1 and 2 indicate that the cremation was a later, possibly terminal component to the Locus A complex.  Also recovered were two (non-specific) avian raptor bones that appear to be associated.  The human and bird bones were returned to the cremation and photographs were taken before covering the site without further excavation.  The remainder of the quadrant was excavated through 10 cm of sterile sands and gravels.

**Feature 5**.  A 7 m diameter depression adjoins Feature 4 on the northeast.  We decided to place a shovel test first before opening a quadrant to limit the exposure of additional cremations.  As expected, the shovel test produced fine ash and burnt, calcined bone suggestive of a cremation.  No additional testing was undertaken in this area.

**Feature 6**.  A 2 x 2 m quadrant was placed in the northeast portion of a large 6 m diameter depression.  It also proved to be a portion of the same filled stream channel in which Features 1 and 2 were located.  An undifferentiated deposit of dark brown, ashy soil mixed with pebbles and cobbles was found to a depth of 40 cm.  No ash lens or evidence of *in situ* habitation was discerned in what appeared to be an unconsolidated mix of stream-transported midden and alluvial soils above sterile sands and

ACC0006892

gravels. Artifact density was low and included a very small number of sherds, lithics, and animal bone. Notable finds included a worked coyote bone, two possible chalcedony flake scrapers, and quartz core. Of particular significance were small fragments of burnt human bone that occurred at every level and were uniformly dispersed through the deposit. Human bones were found under large cobbles and with no artifact associations, ashy lens or burnt soil, suggesting that they were redeposited by stream activity from an upslope location. The burnt bones were retained for reburial.

**Feature 8**. During the monitoring phase, bulldozers exposed a 10 x 10 m area of ash and artifacts at the extreme southeast corner of Locus A, 20 m north of Tahquitz Creek (Figure VI.1). Salvage excavation of a 2 x 2 m area revealed a 15 cm deep deposit of ashy, carbonaceous midden soil. A fire-reddened circular deposit with charcoal lens in the center of the unit remained from an intact hearth feature. Recovered artifacts included one Desert Side-notched projectile point, one shell bead, one ceramic disk fragment, 115 sherds, lithic debitage, and both burnt and unburnt animal bone. Four additional 1 x 1 m units were excavated to the south and west to reveal the full dimensions of the 1.2 m diameter hearth feature. Small amounts of non-diagnostic material were recovered from these units. This feature was interpreted as a small temporary camp. Lack of Colorado Buff in the ceramic assemblage indicated a probable Patayan II date (A.D. 1000-1600).

**Shovel Test Results**. A series of 28 shovel tests were dug in the area closest to Tahquitz Creek and around the main area of known subsurface remains to determine the limits of the cremation zone and presence of cultural remains that would be disturbed within the direct impact zone. An additional five 1 x 1 m test units were also excavated in areas of positive shovel tests around the depressions to more accurately define the main occupation zone.

All but two of the shovel tests in the direct impact zone proved to be negative. The positive results came from a shallow alluvial fill in which the artifacts appeared to be stream deposited. Positive test results around the main concentration of depressions and cremations demonstrated a spatially discrete area of approximately 600 unit m that abruptly stops at a wash to the south of the site, and that separated the artifact concentration from the project right-of-way.

**Conclusions**. Test results in Locus A revealed remains of a spatially discrete, seasonally occupied residential base from one or more family units. The occupation may be one of the earliest occupations that is contemporary with Lake Cahuilla and that continued after the final recession. The earlier dates and unusual faunal assemblage provided important comparisons with later dated loci to the west. Despite the research value of Locus A, the recurrent cremation burials required some restraint to protect the integrity of these sensitive features. These important resources exist outside of the direct impact zone and the Agua Caliente Tribal Council has expressed the wish to avoid cremations wherever possible. No further data recovery was therefore undertaken because of the strong likelihood of exposing more burials if additional areas were excavated.

**Locus B**

This locus contained three distinct concentrations of what Jefferson and Hammond (1972) described as "house depressions," two of which had associated midden deposits. Several rock rings, isolated depressions, and low density sherd scatters were also recorded in this 1.24 ha area. Each depression and midden was tested with excavation units. All surface artifacts were collected within 10 x 10 m units tied to the site grid system, and a shovel test program was carried out in the direct impact zone between Tahquitz Creek and the southern boundary of Locus B. These tests demonstrated that two of the three concentrations were small, spatially discrete residential areas bearing shallow midden deposits and a valuable assemblage of Late Prehistoric-Ethnohistoric period artifacts. Most of the "depressions" were natural features with no evidence of architecture, as in Locus A. One floor level with associated hearth was found in one small depression and there were expectations for some other spatially defined activity areas. The shovel test program also identified two previously unrecorded midden areas near

ACC0006893



**Figure VI.3b.  Locus B, Feature 5, Unit 30, South Profile, Excavation Beginning on
Unit 54 (right) and Unit Unit 31/41 (left)**

Tahquitz Creek, as well as one cremation that had to be removed from a direct impact zone.

Several feature numbers were subsequently consolidated into one number during the data recovery phase. Testing demonstrated that individually delineated "house depressions" were not separate cultural features, so contiguous "features" were all re-assigned to the lowest number within that group. Data recovery proceeded with the excavation of units within a 2 x 2 m grid system to gain large exposures of the underlying midden deposits and of any activity areas.

Features 1 through 4, described in the preliminary report, were determined to be natural, and the testing phase ended their investigation. Feature 5 was expanded to encompass 13 contiguous units. Feature 6 subsumed Features 6 through 9 in a large excavation of 21 units. No data recovery was undertaken at Features 10 and 11 after testing proved negative. Features 13 through 16 were subsumed under the designation of Feature 13, and excavated in 19 units. Feature 18 was expanded to cover 21 units in the data recovery phase. All of the investigated features of the data recovery phase proved to be extremely productive and yielded a large assemblage of material culture from a series of residential bases.

**Feature 5.**  This large depression (Jefferson and Hammond's 4-6) was located at the bottom of a stream channel at the extreme southwest end of the Locus and adjacent to the direct impact zone. This upper terrace of Tahquitz Creek is intermediate between the upper debris cone and the lower terraces of Tahquitz Creek.  A 1 x 1 m test unit revealed a homogeneous deposit of fine dark brown consolidated soil that was excavated in arbitrary 10 cm levels to a depth of 40 cm. Sterile light gray-white alluvial sands were then excavated to a depth of 50 cm before closing the unit. Artifact frequency decreased with depth. Disturbance or a very late date was indicated by gun cartridges in each of the upper 10 cm levels. Indeed, a pile of sherds from modern collectors was found only 10 m from the unit. Finds also included 41 sherds, 7 flakes, a fragment of marine shell, and 60.6 gm of bone. An additional 14.3 gm of bone was also recovered from the sandy 40-50 cm basal level. The only economic pollen was a single instance from the Lily Family, possibly wild onion or mariposa lily (Bean and Saubel 1972:37, 50).

ACC0006894

Data recovery was extended to 13 contiguous units within a larger grid system. All but eleven units were 2 x 2 m in dimension. Two rectangular units were included because of grid layout errors (Figure VI.4). A much greater area of subsurface midden deposits is still preserved here and could not be completely excavated. The entire area within the direct impact zone and approximately 25 percent of the indirect impact zone was fully examined.

A dark grey-brown (10YR 4/1-4/2) midden of fine silts, sands, and gravels was uncovered throughout the entire excavation (Figures VI.5-6). This homogeneous deposit of carbonaceous soils contained large amounts of fire-affected rocks from abandoned and dispersed hearths. Effects of sustained use over an extended time period and natural erosion and deposition on this upper terrace have resulted in an accumulation of predominantly undifferentiated, artifact-bearing midden. Thin, grayish-brown (10YR 5/3) silt lenses attest to alluvial deposition episodes throughout the deeper deposits, particularly in Unit 54, 56, and 31/41 (see Figure VI.3b). Deposits were thinnest at the highest point of the feature where a small alluvial knoll had formed in the vicinity of Units 31/41 and 52. Deposits were deepest in the lower areas around the knoll to the north and west where natural contours allowed for greater soil accumulation. Artifact densities were also greatest around the small knoll and in the northernmost units, while decreasing sharply in the westernmost Unit 53 that appears to mark the western boundary of the site. The southernmost units, Units 56, 57, and 62, all had evidence of recent earth-moving, apparently associated with the grading of a nearby dirt road and construction of a berm that marks the southern site boundary. Buried machine oil and intrusive recent artifacts were in Units 57 and 62, and the deposit ended abruptly on the southern edge, where bulldozers had previously removed an indeterminate amount of aboriginal midden. Other units contained a few intrusive artifacts in the uppermost few centimeters, but were otherwise undisturbed. Deposits extended in depth to 20-50 cm below the surface with the bulk of the artifacts recovered from depths of 0-25 cm. Underlying all the dark midden were light grey (10YR 7/2) coarse sands and gravels that represent sterile stream channel deposits.

Artifacts throughout the midden indicated a broad range of subsistence activities. Large amounts of ceramics were concentrated in those areas previously indicated for high artifact density. Lithic debitage was also found throughout the deposits but in moderate quantities. Lithic tools included projectile points, awls and scrapers. Ground stone was limited and included only a few mano and metate fragments. Bone and shell beads occurred in low frequency throughout the midden. Marine shell fragments were found in small number, as were several *Anodonta* sp. shell fragments from ancient Lake Cahuilla. Ceremonial activities were suggested by a small number of clay pipe fragments. Burnt and unburnt bone from large and small mammals also occurred in varying abundance through the deposits. Pollen samples indicated economic uses of grasses and aggregates in Unit 29, and chenopods or amaranths on a mano in Unit 54. One of the most interesting finds was a carbonized tepary bean (*Paseolus acutifolius*) from Unit 29, 10-20 cm level (see Chapter XVII). This is the only locality with native tepary beans that might potentially predate the Ethnohistoric period, and provides scant but suggestive evidence of prehistoric agriculture. Ten tepary beans were also recovered from Locus C in confirmed Ethnohistoric contexts and in association with domesticated animal bones. Corn, pumpkin, melons, and watermelon cultivation among the Cahuilla is recorded as early as the 1820s by the Romero Expedition (Bean and Mason 1962:46). Bean and Mason (1962:104) mention beans in their footnotes, but the term does not appear in their text. Tepary beans were a staple domesticate on the Colorado River (Castetter and Bell 1951:106-108), and it is reasonable to expect it wherever cultivation was practiced in the Coachella Valley.

Very few features or occupational surfaces could be defined within the midden deposits. Ash and charcoal pockets were encountered in Unit 20, but no *in situ* hearth evidence. A possible living surface remnant appeared in Unit 30 (Figures VI.3b and VI.7). Discontinuous light brownish-gray (10YR 6/2) stains occurred within both Level 1 (0-15 cm) and Level 2 (15-20 cm). Very high artifact counts were recovered just above these lenses within Level 1. These deposits were found to extend into Unit 31/41 (Level 1, 0-10 cm; Level 2, 10-20 cm) and Unit 29 (Level 1, 0-20 cm). This area marked one zone of more intense activity, leaving what appeared in soil profiles as two partially disrupted occupational surfaces.

ACC0006895



**Figure VI.4.  Locus B, Feature 5, Top Plan**

VI-12

Tahquitz Report

ACC0006896

CA-RIV-45
LOCUS B
FEATURE 5
WEST FACE OF
Sq's 52,54,30,29



**Figure VI.5. Locus B, Feature 5, North-South Stratigraphic Profile**

ACC0006897

**Figure VI.6. Locus B, Feature 5, East-West Stratigraphic Profile**

ACC0006898



**Figure VI.7. Locus B, Feature 5, Unit 30 South Profile (compare to Figure VI.3b)**

ACC0006899

One well preserved cremation was uncovered in Unit 55 and excavated at Level 2 (46-56 cm below surface). The cremation was covered by 46 cm of undifferentiated midden within which no evidence of a pit could be discerned (Figure VI.8). It was difficult to determine if the burial was intrusive into the surrounding midden or contemporary with the earliest occupation of the site. The interment was definitely made in a prepared pit that was dug into the lower midden and sterile gray alluvial substratum, both of which show evidence of fire-reddening. Very large chunks of charcoal were found in the vicinity of the pit. When the pit was fully exposed, two large carbonized logs were revealed. They were oriented northwest-southeast and measured 10-15 cm long, 10 cm thick, and 3-4 cm thick. These logs and charcoal from within the pit were covered for radiocarbon dating. Large and small pieces of heavily calcined human bone were found concentrated within a 10 cm lens within the pit. There was no apparent articulation which suggests this was a gathered or secondarily redeposited cremation. The large carbonized log fragments and pit may remain from the original cremation, however. Numerous saddle-type *Olivella* sp. beads were also recovered from the pit. Sagebrush (*Artemesia*) pollen occurred in high frequency and as aggregates in soil around the cremation. It may well have been used as a fuel. A small amount of human bone was also recovered from the adjoining Unit 11, indicating that some alluvial redeposition had occurred to the north of the main deposit or that the cremation had not been entirely gathered into the pit. All of the burnt bone and beads were recovered for subsequent reburial by the Cahuilla. No analysis of the human bone was undertaken, according to their wishes, but they have generously permitted field descriptions and drawings to be published. A radiocarbon sample from one of the logs produced a date of 250±50 years B.P. (Beta No. 29725). Dendro-calibration indicates three possible dates: A.D. 1532-1541, 1637-1665, or 1783-1789. This suggests an interment that spans the end of the Prehistoric sequence through the early Spanish periods. Absence of glass beads in the cremation and throughout the deposit also support an early date, not only for the cremation, but the entire occupation of Feature 5. Given the evidence for a primary cremation at the base of the deposit, it may be safe to assume that at least some of the upper deposits post-date the cremation, although probably not by any great span of time.

**Feature 6.** A cluster of 3-4 depressions and associated midden was recorded in the east central portion of Locus B at the top of a flat alluvial terrace. The absence of large boulders or drainage channels provided an opportune locality for a small residential site. Tested as Features 6-9, the depressions again proved to be natural contours that have become partially filled with cultural debris and alluvium. Buried midden levels that produced important assemblages were identified in several test units. Some occupational surfaces were also indicated, although they generally occurred on very irregular and uneven cobble and boulder substrata. The results of the original test units are described below. These features were subsequently grouped into one designation, Feature 6, for the data recovery phase, in which 21 units were excavated. The results of that investigation follow the description of the test units.

Test Phase. The original Feature 6 was a 5 m diameter ash deposit located at the southeast corner of the complex (Jefferson and Hammond's 6-8). A 1 x 1 m test unit was placed at the center to reveal 30-40 cm of stratified ash and charcoal lenses in a light-dark gray carbonaceous soil. Below the uppermost 2 cm of mixed silts and ash was a 6 cm level of concentrated ash containing much charcoal and five sherds, 3.8 gm of mostly burnt bone, and eight flakes. The next 20 cm produced more charcoal in a more mixed ash and sand deposit that sloped down to the south-southeast. This level contained only four sherds, but 29 flakes whose numbers were increasing with depth, four *Anodonta* shell fragments, two shell and one glass bead, a mano fragment, and 18.0 gm of bone. A radiocarbon sample from this level gave a calibrated date of either A.D. 1644-1601 or A.D. 1724-1810, thus corroborating the glass bead find. *Cereus*-type cactus and evening primrose were the only economic pollens recorded in a soil sample from this level. Pollen counts and variability were exceptionally low so that specific economic plant use was not well indicated. The following 20-30 cm level saw another change to increasing quantities of yellow-brown sand and gravels in what may be a floor level or basal occupation level. Artifact frequency was highest in this level with 18 sherds, 34 flakes, one projectile point tip, quantities of fire-affected rock,

ACC0006900



**Figure VI.8.  Locus B, Feature 5, Unit 55, Top Plan, and Profile of Cremation Burial**

ACC0006901

charcoal, and 14.8 gm of bone. Sterile yellow tan sands, gravels, and cobbles were finally reached in the 30-40 cm level, in which only 1 sherd, 2 flakes, and 1.6 gm of bone were recovered.

Feature 7 was tested as a 1 x 1 m unit in a 3.5 m circular depression (Jefferson and Hammond's 6-7). Only a few artifacts were found in 46 cm of deposits before hitting sterile alluvial gravels and cobbles (Figure VI.9). The uppermost 2-10 cm stratum of brownish gray silts and gravels contained only three sherds, four flakes, and 1.2 gm of bone. This was apparently the recent alluvial fill. Below this was 12-20 cm of dark gray-brown soil containing bits of charcoal and gravel, 14 sherds, 10 flakes, fire-affected rock, and 10.1 gm of bone. Extending down to sterile soil was a final 20-28 cm thick stratum of lighter gray-brown carbonaceous soil and gravel that contained 11 sherds, 14 flakes, and 7.7 gm of bone. High levels of wild buckwheat pollen from Level 2 strongly indicated exploitation of shoots and seeds (Bean and Saubel 1972:72). Also indicated were members of the mustard family, possibly tansy mustard, for which the Cahuilla made good use of the leafy greens and seeds (Bean and Saubel 1972:66). Either winter or spring-summer occupation is suggested by these species.

A 2.5 m diameter depression that was circumscribed by a loosely defined rock alignment was investigated as Feature 8 (Jefferson and Hammond's 6-7 continued). A 1 x 1 test unit revealed three separate strata in 30 cm of gray-brown soils. The uppermost 10 cm was a fine homogeneous organic-laden silt that appeared to represent mixed alluvium and midden fill. A large sample of 45 sherds, six flakes, and 1.7 gm of bone was recovered. The 10-20 cm level contained a looser and darker carbonaceous and ashy deposit that yielded 28 sherds, 15 lithics, a shell bead, and 11.3 gm of bone. Elevated amounts and aggregates of Cheno-Am pollen from this level indicated exploitation of seeds from this important family of plants. The ashy soil graded into lighter colored silts in the 20-30 cm level until sterile alluvial gravels, sands, and cobbles were encountered. Only two sherds, two flakes, and one bone came from this basal level. No well defined floor was found, although the midden deposit was otherwise rich in finds.

Feature 9 was a poorly defined alignment of stones that circumscribed a 2 m diameter area (Jefferson and Hammond's 6-7 continued). Some of the deposits have been disturbed by a small pot-hunter's hole. A 1 x 1 m unit was opened in the east quadrant to reveal a thin 6-10 cm thick deposit of artifact-laden midden on top of a compact gravel and cobble surface. The gray-brown sandy carbonaceous midden contained 45 sherds, one mano at the basal level, and 4.8 gm of bone. Most of the artifacts were lying just above the sterile substratum, suggesting that this was a floor or occupational surface.

Data Recovery Phase. The subsurface midden deposits revealed in the test units were further exposed in a series of 21 contiguous 2 x 2 units (Figure VI.10). They revealed a largely homogenous and undifferentiated dark grayish brown (10YR 4/2) silty sand containing charcoal, fire-affected and unaffected cobbles, several occupational surface fragments and features, and a large array of Late Prehistoric-Ethnohistoric artifacts. These deposits filled a low remnant stream channel on the edge of the debris cone, just north of the drop to the Tahquitz Creek upper terraces. Stratigraphic analysis indicated a mix of cultural midden accumulation and alluvial wash deposition. These natural forces, combined with extended occupation on soft sandy surfaces, explains why features and definable habitation levels were so poorly preserved.

A low berm defined the eastern side of Feature 6. Excavation of Units 7, 12, 17, 22, 27, 28, 33 and 34 on this berm revealed some of the shallower midden deposits to a depth of 25 cm (Figure VI.10). The northern limits of the feature were found in Unit 7, where only 12 cm of soil accumulation and low artifact counts were recorded. Midden depth and artifact density increased steadily throughout Units 12 and 17 to the south. Accumulated midden and ashy lenses indicated a principal area of occupation with varying artifact densities from one unit to another. Much deeper deposits were found in the excavated units in the western half of the exposure, where previously a wash or alluvial basin had been located (Figure VI.11). Here deposits extended to a depth of 30-45 cm below the surface. While the midden on the eastern berm was directly below the surface, the midden in the depression was often found buried under 10 cm or more of sterile or near sterile alluvium. As in other portions of Locus A and B, what

VI-18

ACC0006902

CA-RIV-45
LOCUS B
FEATURE 7
SQUARE 1
5/2/88
WGS

WEST WALL FACE PROFILE



WEST WALL



Light Brownish Gray    10YR 6/6-2  Fine Silt Loam, Some Gravel

Dark Grayish Brown     10YR 5/5-2  Silty Sand Loam (Slight Midden
                                   Soil) Charcoal Bits and Gravel Mix

Lighter Grayish Brown  10YR 5/5-2  Fine Loam Silty Sand
                                   Lighter Charcoal and Gravel Mix

Light Grayish Brown    10YR 5/5-2  Some Gravel

Mottled with Pale      10YR 5/5-2  Larger Gravel and Mixed with some
Brown Loam                         Granitec Alluvium Fill (Deposit)

0    20cm

**Figure VI.9.  Locus B, Feature 7, Test Unit Stratigraphic Profile**

ACC0006903



**Figure VI.10.  Locus B, Feature 6, Top Plan**

ACC0006904



CA-RIV-45
LOCUS B
FEATURE 6
12/10/88
JHT

Sq 31          Sq 26

WEST FACE



Sq 55          Sq 35

NORTH FACE

| | | | | |
|---|---|---|---|---|
| Grayish Brown | 10YR 5/2 | Sandy Silt | | Cobbles |
| Yellowish Brown | 10YR 5/4 | Silt | | Very Abrupt to Abrupt Boundary |
| Dark Grayish Brown | 10YR 4/2 | Sandy Silt | | Abrupt to Clear Boundary |
| Brown | 10YR 5/3 | Silty Sand | | Charcoal |

0    20cm

**Figure VI.11.  Locus B, Feature 6, Representative Stratigraphic Profiles Showing Thin Beds of Silts, Sands, and Charcoal**

ACC0006905

appeared as possible "house pit depressions" on the surface turned out to be a contiguous midden in a remnant stream channel or depression.

Excavated features or unusual stratigraphic features were rarely encountered within the midden. A few remnant hearths and possible fragments of habitation surfaces were recorded, however. A hearth area was found in Unit 33 and extended into Unit 28. Excavated as Level 2 in Unit 33, this intact feature extended from 10-24 cm below the surface. Fine carbonaceous yellow, white, and bright tan ash (10YR 7/2) extended across the north-central portion of the unit (Figure VI.12). Two large charcoal accumulations were noted, with smaller charcoal concentrations appearing at various depths and locations. The ashy soils covered almost the entire unit except for the northeast corner, where a hole appears to have been dug, filled to a depth of 20 cm with sterile sandy gravel. This burnt area was surrounded by a quarter-circle of cobbles. Soil outside of the circle was the more typical dark brown (10YR 6/2) carbonaceous midden within which were found small amounts of debitage, stone tools, beads and a pumice fragment. The level of slightly browner and moisture-retaining soil adjacent to the burnt area appeared to contain higher artifact frequencies, and although difficult to follow, may be a remnant occupational surface. The ash stain was followed into Unit 27 (Level 2) and 28 (Level 2) to the north and northeast where it was found to be much less distinct and to be smeared into an extended lens of charcoal and ashy lenses (Figure VI.13).

Two additional hearths were found in Unit 31 in the form of semi-circular cobble arrangements surrounding and within profuse charcoal concentrations (Figure VI.14). Some of the charcoal and surrounding carbonaceous midden soils were laminated with lenses of sterile sands and silts. These laminations suggest periodic alluvial deposition during the rainy season while the site was being occupied. Unit 31 is located in one of the lowest portions of the feature, and as in surrounding units, an upper level of sterile sands capped much of the lower midden accumulation. Just to the south of Unit 31, one additional hearth was also recorded in Level 2 (26-35 cm below surface). A loosely defined semi-circle of cobbles was found in association with several small deposits of ash and charcoal in the western half of the unit.

Three of four radiocarbon dates firmly place Feature 6 in the 17th and 18th centuries. Uncalibrated dates range from 200±70 to 270±80 years B.P. One charcoal sample from an ash stain in Unit 33, Level 1 was modern and may indicate recent disturbance or contamination. Dendro-calibration of the other three radiocarbon dates broaden the range from A.D. 1494-1806, with the greatest number of intercepts in the 18th century. Clearly Feature 6 was used for an extended period of time that may well encompass the Late Prehistoric and Spanish periods. This site, however, does not appear to have been used in the Mexican or Early American periods. In that regard it appears to be roughly contemporary with Locus A and the other features of Locus B, and to have been abandoned in later periods for more favored localities higher up on the debris cone.

The range of recovered artifacts reflect the activities of a multi-purpose temporary camp that was periodically occupied for a considerable period of time. Ceramics, lithic debitage, stone projectile points and ground stone all indicate the typical range of food collecting and processing equipment. Bone needles, awls, and pumice sharpening tools suggest basket-making or clothing manufacture or repair. A large array of shell beads and marine shell fragments indicate ornamentation or ceremonial function, as do the array of ceramic pipe fragments. As in other loci, ceramic disks were found in many units. Economic plants used at the site and indicated by pollen samples included hedgehog or barrel cactus, cholla cactus, wild buckwheat, mustard family, amaranths and chenopods, cattail, and mesquite.

**Feature 13**. A complex of five depressions and a midden deposit (Features 13-17 of the test phase) were located in the north end of Locus B on a flat alluvial surface surrounded by small drainage channels. Two of the depressions, upon testing, were found to be natural concavities filled with sterile alluvial sands and silts. The remaining depressions provided important evidence of a spatially discrete seasonally occupied habitation site. One of the few well-defined occupational surfaces with an associated hearth was found in one depression, and the surrounding midden deposits contained an abundance of ceramics, small finds, and ecofactual data.

ACC0006906



Figure VI.12.  Locus B, Feature 6, Unit 33, Top Plan of Hearth

VI-23

ACC0006907

CA-RIV-45
LOCUS B
FEATURE 6
SQUARE 28
12/20/88
JHT

PLANVIEW

N



← Sand Well

A#1  Artifact #1

⬔  Cobbles

▦  Ash Flecking

▨  Charcoal Lens

▩  Course Sand

0  20cm

**Figure VI.13.  Locus B, Feature 6, Unit 28, Top Plan of Charcoal and Ash Deposits**

ACC0006908



**Figure VI.14.  Locus B, Feature 6, Unit 31, Top Plan of Two Hearth Areas**

ACC0006909

Results of the testing phase are first presented below.  Positive results in Features 13 and 14 led to the expansion of excavations to 35 units in the data recovery phase.  Two adjacent activity areas were exposed on a flat area of the debris cone.  Virtually the entire deposit was recovered in Feature 13 because of the significance of the finds.  A total of 38 shovel tests were dug around the exposed units to guarantee that no subsurface deposits were overlooked.

Test Phase.  A 7 m diameter circular depression (Jefferson and Hammond's 5-1) was one of the largest recorded at any locus and was given the initial Feature 13 designation.  Excavation of a 1 x 1 m test unit revealed over 50 cm of sterile alluvial silts and sands over an uneven but very compact layer of alluvial gravel, cobbles, and boulders.  Only two small bone fragments were recovered from the uppermost level.

Recorded as Feature 14, this 4.5 m diameter circular depression with circumscribed berm in the center of the complex was originally recorded by Jefferson and Hammond as Feature 5-3.  A 1 x 1 m test unit revealed 20 cm of rich midden over a hearth and occupational surface.  The upper 20 cm of dark brown-grey loose carbonaceous soil contained 48 sherds, a perforated reworked ceramic disk, a reworked ceramic spoon, four projectile points, four flakes, and 37.2 gm of bone.  Among the sherds was a large sooted bowl with repair hole.  Most of the artifacts lay in the upper 12 cm of the deposit.  The midden lay on a flat surface of compact alluvial sands and gravels that contained none of the irregular cobbles and boulders that characterize the sterile basal levels in most other units.  A floor level may therefore be present.  A pollen sample from this possible floor level revealed elevated levels and aggregates of mesquite pollen.  The source of mesquite blossoms in the spring and pods in the summer could be either the sandy alluvial flats to the east of the alluvial cone or the widely distributed mesquite trees on the terraces of Tahquitz Creek.  Exploitation of barrel or hedgehog cactus was also indicated.

A 10 cm depression in the alluvial surface contained a deposit of charcoal and ash, but no artifacts (Level 3).  The entire deposit was collected for pollen and flotation analysis, but not enough charcoal was obtained for radiocarbon analysis.  Although pollen variability was low, a large amount of *Gramineae* pollen, found in aggregates, indicates the collection of wild grasses.  The hearth may have been used to parch seeds, among other uses.

A radiocarbon sample was retrieved from the artifact-bearing Level 1 and produced an unusually early calibrated date of 1010-771 B.C.  This date is much too old to come from a deposit with ceramics and Cottonwood Triangular projectile points and may result from the "Old Wood" effect (Schiffer 1982:324-325).

Feature 15 was originally recorded by Jefferson and Hammond as a 3 m diameter depression at the south end of the complex (their Feature 5-4).  A 1 x 1 m test revealed over 20 cm of stratified remains.  The uppermost 10-15 cm was a loose light gray-brown sand and gravel containing eight sherds, 10 flakes, a shell bead and 0.9 gm of bone.  Below this apparent alluvium-midden mix was a dark gray carbonaceous midden.  This ashy level sloped down to the west and varied in thickness from 2-10 cm.  Recovered artifacts included 13 sherds, 12 flakes, a marine shell, and 9.0 gm of bone from over 50 fragments.  The ash deposit continued in the 20-30 cm level until reaching another sand and gravel deposit similar to the upper level but containing small charcoal particles.  This level produced five sherds, seven flakes and 3.8 gm of bone.  Artifacts were concentrated in the southwest and east corner of the unit and may have been secondarily deposited by downwash from neighboring midden to the southeast.  No floor level or evidence of structural features were observed in this unit.

Feature 16 was a 4.8 m diameter shallow depression at the center of the complex (Jefferson and Hammond's 5-2).  A very sparse artifact content characterized the two 15 cm-thick layers of mixed midden and alluvium.  The uppermost light brown-gray silty sand and gravel layer contained eight sherds, two flakes, and 6.3 cm of bone.  The second light yellow-brown silty sand layer contained greater quantities of ash and charcoal and only seven sherds, and 0.8 gm of bone.  This layer graded into coarser and more compacted sterile alluvial sands, gravels and cobbles.

A depression and adjacent midden area, Feature 17, was rich in artifacts on the surface.  This area was not tested because full data recovery was anticipated for this zone.

ACC0006910

Data Recovery Phase. The testing phase revealed a shallow undisturbed midden deposit with traces of living surfaces and abundant material remains on a flat open area of debris cone. Because this residential site was not situated in a remnant stream channel or active alluvial terrace, it had not undergone the kinds of natural disturbance that was evident in other nearby features and loci. The shallow depth of deposit also suggested that it was used for only a short period, possibly one or two seasons, and therefore offered the opportunity to examine an assemblage that accumulated over a very discrete time period without intrusions from later occupations. Feature 13 also produced one of only three indications of free standing structures at Tahquitz Canyon, preserved because it was dug into hard sterile subsoil. Many other habitation sites were established in soft sandy remnant stream channels where successive floods, rodent activities, and later occupations on unconsolidated surfaces obliterated any post molds or floor levels.

Two areas of contiguous units are described below. The north area included 27 contiguous 2 x 2 m units in the series numbered from Unit 2-47 (Figure VI.15). The south area included seven contiguous units numbered 48-54. One additional isolated unit (not shown), Unit 55, was also excavated to the west. Only seven sherds were found in an otherwise sterile unit of consolidated stream wash sediments.

The focus of the north area deposits was the remains of an oval depressed occupational surface in Units 4, 5, 9, and 10. The interior of this 1.4 x 1.5 m depression lies predominantly within Unit 9, with a small cobble berm extending into neighboring units. From 13-15 cm of heavily burnt midden deposits were removed from within the depression (Figure 16a-b, 17). This heavily carbonaceous fine loam ranged in color from dark grayish brown (10YR 4/2) to grayish brown (10YR 5/2) and light grayish brown (10YR 6/2). The most heavily burnt ashy lenses were a light gray (10YR 7/1) and indicated extensive burning. A more concentrated deposit of ash and charcoal at the bottom of the depression appeared to mark a hearth (Figure VI.16b). One possible post mold was also uncovered at the south edge of the depression. No other post molds or evidence of a superstructure were discerned, however. Large quantities of ceramics, bone and lithic debitage were recovered from the midden fill. Also recovered were a shell bead, and two projectile points. Economic pollens recovered from the midden included Cheno-am, lily family species, cholla, and yucca. It is presumed that much of the midden was deposited within the structure after it had been abandoned. First established as a small dug depression in the cobble-strewn alluvial surface, the structure was associated with such a large interior hearth and numerous exterior hearths and ash deposits that other functions besides habitation may be postulated. A sweathouse would require a depressed floor, considerable burning of fuel, and proximity to water. Known Cahuilla sweathouses tend to be larger structures with more deeply dug floors and substantial earth-covered superstructures (Barrows 1900:77; Bean 1972:73). They would be expected to leave a larger footprint and berm of debris when abandoned or destroyed. However, a smaller and more temporary sweathouse might be simply covered with brush and leave less substantial traces. Whether a residence or special-function structure, clearly the abandoned depression was subsequently used for trash disposal, resulting in the accumulation of midden within it.

Additional midden was found in all the surrounding units, particularly in Units 4 and 5 where midden accumulation reached to 20 or 25 cm below the surface in dark brown (10YR 6/2- 6/3) silty sands (Figure VI.17). Among the finds were worked ceramic disks, a portable metate fragment, abundant ceramics, lithics, and bone. Concentrations of artifacts decreased with distance from the depression on the south side. Midden deposits in these units, however, still produced considerable numbers of artifacts in dark brown midden soils reaching depths of 20-30 cm. No stratigraphic separations were seen in these deposits except for recent loose sandy alluvium in the uppermost 5 cm. All units were therefore excavated as one level until sterile sands, gravels, and cobbles that underlie the entire site were reached.

Units 6, 11, 16, and 21, located directly north of the depression, contained large quantities of ash throughout the midden, and discrete deposits of ash and charcoal flecks (Figure VI.18). Two explanations may be presented for the unusual concentrations of ash. This may have been the preferred dumping area for ash from fires within the structure, either from its use as a sweathouse or habitation. Another explanation is that the structure may have burned and winds blew the ash in this direction. It should be noted that this would not be the prevailing wind direction during most times of the year so that the former

ACC0006911

**Figure VI.15. Locus B, Feature 13, Top Plan**

VI-28

ACC0006912



**Figure VI.16a.  Locus B, Feature 13, Partially Excavated Structure, View Northeast**



**Figure VI.16b.  Locus B, Feature 13, Hearth in Units 4 and 5, View East**

ACC0006913



CA-RIV-45
LOCUS B
FEATURE 13
PLANVIEW AND
PROFILE OF
UNITS 5,4,3
12/8/88
WGS

EAST WALL PROFILE AND WESTERN PLANVIEW OF HOUSE PATTERN

East Wall
Unit 4

West Portion of House Pattern
(covers units 5,4,3)

A   10YR 6/2   Light Brownish Gray
            Some Gravel, Sand

B   10YR 4/2   Dark Grayish Brown Fine Silt
            and Charcoal (ash) Some Fine Sand

C   10YR 6/4   Light Yellowish Brown Course
            Sand, Heavy Gravel, Pebbles, Rocks

D   10YR 6/2   Light Brownish Gray
            Courser Sand and Moderate Gravel,

⟨⟩   Pebbles, Rocks, Cobbles

0   20cm

VI-30

Tahquitz Report

Figure VI.17.   Locus B, Feature 13, Top Plan and Stratigraphic Profile of Structure in Units 3-5.

ACC0006914



**LOCUS B**
**FEATURE 13**
**UNIT 15,16**
**Dec 8,1988**
**D Parodi**

N

Unit 15                                        Unit 16

Depression     Rock Mound     Mano          Rock Alignment Starts

Top Soil-Fine to Course Grain    10YR 8/3    Very Pale Brown Silty Loam, Fine to Course Grained

Wash, Course Pebbles to Cobbles   10YR 6/2    Light Brownish Gray Interdispersed Charcoal Fragments

Ash with Interdispersed Charcoal  10YR 6/6    Brownish Yellow  Med-Course Grained Sand, Pebbles and Cobbles

0     20cm

**Figure VI.18.  Locus B, Feature 13, Stratigraphic Profile Showing Thin Ash Deposits, North of Structure**

ACC0006915

explanations are more probable. In support, several concentrations of ash and charcoal also bear the fire-reddened stains of *in situ* fires, indicating that outdoor cooking or heating (possibly of rocks for a sweathouse) occurred in this area. Much of the ash residue in these units may have resulted from campfires that were lit to the north of the depression. Many economic plant species were identified in pollen samples from these midden deposits. Unit 6 was particularly varied and included pollen from the mustard family, cholla, hedgehog or barrel cactus pollen, prickly pear cactus, lily family, and possibly sedge. Significantly, only traces of sagebrush (*Artemisia*) pollen were detected in any samples from Feature 13. This important medicinal plant would be expected to occur in higher frequencies if a sweathouse was present. An ill-defined rock alignment in Unit 11 may relate to fire-making activities (see Figure VI.15). One well-defined hearth was found in Unit 21. Larger pieces of charcoal and an ashy lens extending down 25 cm below the surface were found under a concentration of fire-affected cobbles. Artifact content was also high in these units, with stone tools being particularly abundant.

Expanding to the northeast and north, Units 26, 31, 32, 34, 36, 38, and 43 all exhibited shallower midden deposits with much lower artifact densities. These midden deposits were mixed with alluvial sand and silt lenses and were covered with 5-10 cm of sterile sandy overburdens that indicate more active wash activity through shallow water-courses. The midden deposits themselves were no more than 5 to 10 cm thick. Several additional ash and charcoal concentrations were found in these units. Three concentrations occurred in Unit 36a, and one in Unit 34. All contained fire-affected rock and heavily burned ashy lens, but no rock rings or depressions to suggest a purposefully constructed hearth. These were all superficial surface fires.

Units to the south of the depression contained mixes of midden and alluvial wash. Artifact content and density of dark midden deposits decreased with distance from the structure. A small portion of the rock berm of the structure was uncovered in Unit 8, but only small wash gullies and mixed midden were found in Units 2, 3, 7, 12, 13, 14, 17 and 22. All of these units were dug as one contiguous level (Level 1) to sterile gravels at depths reaching 30 cm below the surface.

The southern group of contiguous units were situated on and around a small mound of cobbles and boulders (see Figure VI.15). It revealed a well-defined, but heavily burnt, habitation surface covered by rich midden deposits that extended from 20 to 30 cm in depth. The two southernmost units were at the top of a small hillock: Units 48 and 51. Unit 48 was excavated to a depth of 25 cm. The top 2 cm of light yellowish brown (10YR 6/4) loam overlaid a 15-20 cm thick dark gray (10YR 5/1) carbonaceous midden containing large amounts of fire-affected rock, some of which may be concentrated from a hearth in the southern part of the unit (Figure VI.19). The soil became consistently darker and fire-reddened until the fire-affected top of the sterile underlying sands, gravels, and cobbles was reached. Copious amounts of pottery, lithic debitage, burnt and unburnt bone, and a worked sherd disk, shell bead, and carbonized mesquite bean were recovered from the deposit. Pockets of fire-reddened soil and an abundance of ash suggested that a structure may have burned at this location and that the remains were not only deposited trash midden. Underlying most of the darker carbonaceous midden was a 2-5 cm deposit of fine light gray (10YR 7/1) ash and gravel deposit that marked the base of the cultural deposits. Below this deposit were sterile pale brown (10YR 8/3) sands, gravels, and cobbles.

The same stratigraphy was encountered in Unit 51 to the east at the top of the small mound. Here was continued evidence of extensive burning and large quantities of fire-affected rock. Artifact quantities continued to be high and included fragments from a restorable ceramic vessel, a complete mano and two mano fragments, lithic debitage, three projectile point fragments and two biface fragments, and a piece of pumice. Two boulder slicks in proximity to the unit suggested that food processing was undertaken in this area. Among the abundant ceramic finds were many large pieces from a primary pot drop.

Unit 49 provided support for the inferred remains of a structure. A post mold surrounded by cobbles that may have been post stabilizers was found at the base of the heavily burnt midden. The base of the midden was also more compacted, possibly suggestive of a living surface. Artifact categories occurring in abundance included ceramics, lithic debitage, and bone. Among the diagnostic finds were a portable metate fragment, a pumice fragment, and a projectile point. Similar results were obtained from the excavation of Unit 52 to the east that completed the exposure at the top of the mound (Figure VI.21b).

ACC0006916



CA-RIV-45
LOCUS B
FEATURE 13
UNIT 48
Dec 16, 1988
LPM

PROFILE NORTH WALL

N

| | | | | |
|---|---|---|---|---|
| Top Soil | 10YR 6/4 | Light Yellowish Brown | Loam |
| Charcoal Layer | 10YR 5/1 | Gray | Charcoal Ash Fine Gravel |
| Light Ash Layer | 10YR 7/1 | Light Gray | Fine Ash Fine Gravel |
| Sandy Gravel | 10YR 8/3 | Very Pale Brown | Sand Fine Gravel |
| Cobble Layer | 10YR 8/3 | Very Pale Brown | Sand Fine Gravel Cobble Stones |

0        20cm

**Figure VI.19.  Locus B, Feature 13, Unit 48, Stratigraphic Profile**

Site Descriptions

VI-33

ACC0006917

Among the finds were shell beads, two ceramic pipe fragments, and several carbonized seeds. Two slightly worn boulder slicks were also recorded on the surface of this unit.

Unit 53 and 54 demonstrated further evidence of a living surface and considerable burning at the top of the mound. The upper 20 cm of Unit 53 (Level 1) revealed a light tan to dark gray (10YR 4/2-6/2) sandy soil with several features (Figure VI.20). Large amounts of ash and fire-affected rock filled the eastern two-thirds of the unit, with observed fire-reddening of surrounding soils. Of two charcoal-filled depressions in the northern portion of the unit, the central-most contained large and small fire-cracked rocks and extended to a depth of 30 cm. The other large ashy deposit covered a 40 x 45 cm area in the east central portions of the unit. This ash deposit filled a shallow 10 cm deep depression but extended above the depression for an additional 10 cm. The base of the shallow depression was very compacted and fire-reddened, suggestive of a burnt living surface. This burnt soil contained large amounts of ceramics, lithic debitage, burnt bone, and an assortment of small finds. Unique among these finds were several pendant-shaped shell ornaments. Also recovered from the large ash deposit were shell and bone beads, two bone awl tips and one awl body, a polished bone tool, and two projectile points. Pollen samples revealed unusually large amounts of high spine *Compositae*, such as edible pincushion cactus, medicinal California goldenrod, and edible *Dicoria*. The latter is one of the few winter food sources, although the majority of pollen samples indicate spring-summer occupations.

The 20-30 cm depth of Unit 53 was excavated as Level 2. The large central ash stain was better defined, and shown to be bordered by a semi-circular cobble alignment (Figure VI.21a, VI.22). These stones lay above the ashy deposit and appeared to be a secondary feature and not a hearth enclosure. Very few artifacts were recovered from this lower deposit, except for a portable metate, some carbonized seeds, burnt bone, additional pendant-shaped shell ornaments, and some sherds. The smaller pit was also excavated to bottom, revealing four large fire-affected rocks in what may have been either a hearth or post hole (Figure VI.21a, bottom center). These stones appear to have been carefully placed as either a post support or pot support. In any case, this feature relates directly to the surrounding hardpack surface.

The hardpack surface and overlying heavily burned ashy deposits continued north in to Unit 54, where a distinct edge was found. North of this line only wash deposits were encountered, marking the edge of the occupational zone on the small mound (see Figure VI.15). Evidence of *in situ* burning occurred throughout the living surface. One boulder slick was fire-reddened on the edge closest to the pit feature. Ash deposits were found around several large rocks within the unit. Among the finds were large numbers of ceramics, lithics, one small mano, shell and bone beads, marine shell fragments, and one projectile point fragment.

Unit 50 marked the edge of the occupational area on the northwest base of the small mound. A small rock alignment in the southwest corner of the unit may have been a wind deflector. Artifact quantities decreased, with only one complete mano retrieved from the 18 cm thick midden deposit.

**Summary.** Two discrete activity areas with associated living surfaces, hearths, and midden deposits were examined in Locus B, Feature 13. A full range of domestic activities were indicated, including food gathering, processing, and consumption. The northern structure, a large berm-outlined depression with the expected dimensions of a small oval *kish*, was associated with a considerable number of hearths and ash deposits. Although the considerable evidence of pyrotechnic activity suggest its use as a sweathouse during at least one phase of its use, little corroboration was found from other sources of archaeological data. It was subsequently filled with midden deposits that represent residue of daily household activities. The southern structure was also associated with extensive evidence of burning indicative of a structure and living surface that had been consumed by fire. The recovery of a restorable pot and a wide range of tools may suggest the structure was accidentally burned while still being used. Alternatively the structure may have been burned as part of the funeral ceremonies following the death of an occupant. No unusual number of personal belongings or associated cremation burial, however, were found to specifically identify an intentionally burned house.

Despite the large amount of burning that was evident, no large pieces of charcoal were recovered with which to obtain a radiocarbon date and the one radiocarbon date from the testing phase was too early

ACC0006918



```
CA-RIV-45
LOCUS B
FEATURE 13
UNIT 53              PROFILE NORTH WALL              N
Dec 19,1988
Pam Phillips
```

| | | | | |
|---|---|---|---|---|
| Organic Top Soil | 10YR | 6/4 | Light Yellowish Brown | Sandy Loam |
| Very Light | 10YR | 6/2 | Light Brownish Gray | Fine Grained Sand |
| Ash | 10YR | 4/1 | Dark Gray | Ash W/Charcoal |
| Light | 10YR | 6/3 | Pale Brown | Fine Grain Compacted Sand |

0        20cm

**Figure VI.20.  Locus B, Feature 13, Unit 53, Stratigraphic Profile**

ACC0006919



**Figure VI.21a.  Locus B, Feature 13, Unit 53, Hearth (center) and Post Hole (bottom),  View South**



**Figure VI.21b.  Locus B, Feature 13, Unit 52, Milling Feature**

ACC0006920

CA-RIV-45
LOCUS B
FEATURE 13
UNIT 53
Dec 20, 1988
D Pallette

PROFILE HEARTH FEATURE
SOUTH WALL OF NORTH SECTION



A'                                                                              A

"A"                                                                Level I

"B"                                                               Level II

Key:                    Munsell Color        Color           Texture

"A"    Ash area         10YR 6/1             Gray            Fine
                                                             Silty Loam

"B"    Floor            10YR 7/3             Very Pale       Compact
                                             Brown           Sandy Wash

       Rock

0        20cm

**Figure VI.22.  Locus B, Feature 13, Unit 53, Stratigraphic Profile of Hearth**

ACC0006921

to be reliable.  Bead types and ceramics, however, strongly indicate a time spanning the late 17th to mid 18th century A.D., contemporary with the other nearby features of Locus B.

**Feature 18**.  A small midden deposit was discovered during shovel testing in the southwest end of the locus at coordinates N140 E30.  This approximately 10 m diameter artifact scatter lay under a creosote bush on a lower terrace of Tahquitz Creek, just south of an existing dirt road, and approximately 30 m southeast of Feature 6.  A Desert Side-notched projectile point was found directly on the surface of a 1 x 1 test unit (Unit 1).  The dark gray ashy midden extended down 20-25 cm before grading into a mixed coarse sand and gravel alluvium-midden mix for another 7 cm.  Artifact density decreased with depth, and in total included 21 sherds, 28 flakes, an additional Desert Side-notched point, one shell bead, a marine shell fragment, an unusual worked bone tube, and 17.5 gm of bone.

Data recovery expanded the test to 21 contiguous 2 x 2 m units (Figure VI.23).  A dark brown (10YR 4/2), unstratified, and undifferentiated midden was found throughout the feature (Figures VI.24, VI.25).  The mix of fine silts, sands, and gravels contained varying amounts of fire-affected rock and quantities of artifacts, but no discernable features or living surfaces.  The deposits had obviously been turned over by repeated occupation at the same site, and by the natural forces of seasonal rains and rodent activity.  Large rodent burrows and nests were found throughout the excavation.  Only one level—from surface to sterile sands, gravels, and cobbles—was excavated for each unit because of the lack of stratigraphy.  Large quantities of fire-affected rock were obtained from most units, and while varying in density throughout the feature, were almost never found in great concentrations or with associated ash or charcoal lenses to indicate preserved fire-hearths.

The few features that could be distinguished were remnants of fire hearths.  A cluster of fire-affected rocks in Unit 8 surrounded an ashy stain and were in the vicinity of a mortar and a portable metate fragment.  The dispersed distribution of the rocks suggested they had been removed from a cooking pit.  A similar cluster of rocks also occurred in Unit 5, where they were associated with a 5 cm thick, poorly differentiated concentration of ash and charcoal that covered a 40 x 45 cm area.  A charcoal and ash lens also occurred in Unit 15, covering the southern portion of the unit, but barely extending into the neighboring unit.  Several large fire-affected rocks appeared to mark a boundary to this discrete zone of burnt soil.  This unit also contained high artifact frequencies, yielding a bone awl, two stone blade fragments, one fragment of ground stone, much pottery, and moderate amounts of lithic debitage and animal bone.

The units were extended out until artifact densities became greatly diminished.  The bulk of the artifact-bearing deposit was recovered, although stream action has dispersed artifacts over a much larger area.  Recovered from the midden were large amounts of pottery, lithic debitage, and animal bone.  Several pieces of ground stone, some sherd disks, ceramic pipe fragments, shell beads, and a worked abalone shell scraping tool were also recovered.  The deposits were notable for producing a large assemblage of projectile points.

No large pieces of charcoal were recovered with which to obtain a radiocarbon date.  Analysis of beads and ceramics, however, indicate a late 17th to early 18th century A.D. date contemporary with Feature 6, located just to the west on the same terrace.

Feature 18 produced a large artifact assemblage from a repeatedly used temporary camp.  Food collecting, processing, and consumption took place at the site.  The large number of arrowheads and low numbers of ground stone items suggest that hunting may have been more prominent than plant collecting and processing at this camp.  One pollen sample from Unit 15 lacked pollen, although a sample from Unit 1 produced indications of the economic use of *Cereus*-type cactus and primrose (*Onograceae*). Occupation of the loose sandy alluvial terrace resulted in the poor preservation of occupational surfaces or structural remains.  Repeated use of the area, alluvial action, and extensive rodent burrowing reduced most of the site to an undifferentiated 30 cm thick midden deposit in which only three fire-hearth remnants could be distinguished.  The large quantity of fire-affected rock throughout the midden, however, indicated that numerous other cooking and heating facilities were established during the occupation.

ACC0006922



Figure VI.23.  Locus B, Feature 18, Top Plan

VI-39

ACC0006923

Site Descriptions

Tahquitz Report



Figure VI.24.  Locus B, Feature 18, North-South, Stratigraphic Profile

ACC0006924

Site Descriptions

VI-41

```
CA-RIV-45
LOCUS B
FEATURE 18
SQ 6,11,16,21
11/16/88
JHT                    PROFILE OF NORTH FACE
```





| | | | |
|---|---|---|---|
| Dark Grayish Brown | 10YR 4/2 | Silt with Fine to Med Sand | Abrupt Boundary |
| Grayish Brown | 10YR 5/2 | Silty Sand | Very Abrupt Boundary |
| Light Brownish Gray | 10YR 6/2 | Med to Course Sand with Gravel and Cobbles | Cobbles/Boulders |
| | | | Ash/Charcoal Lens |

**Figure VI.25.  Locus B, Feature 18, West-East Stratigraphic Profile**

ACC0006925

**Locus C**

Locus C proved to be one of the most interesting areas because it provided some of the only clearly defined structural remains in association with a large Ethnohistoric period habitation site at which both domestic and ritual activities took place. What had been previously defined as an irrigation ditch during the survey was also redefined and found to be clearly associated with the site. Geomorphic investigations have shown what route the ditch may have taken, with a draw point on a low alluvial terrace at Locus H. Efforts to confirm the existence of a deliberately modified water-flow channel along this route, through a program of test trenches, was largely unsuccessful. Although the confirmation of an irrigation ditch through Locus C remains inconclusive, secondary evidence from pollen and macrobotanical remains at least suggest some local modifications and activities associated with limited cultivation. Features 1 and 2 were one of the few sites with stratigraphically defined and differentiated occupational phases, both dating to the Ethnohistoric period. The small assemblage of historic artifacts mixed with traditional Cahuilla material culture, also provided important insights into the acculturation process. Shovel testing in Locus C also resulted in the discovery of three previously unrecorded features: a small rockshelter near Tahquitz Creek, an isolated midden deposit next to the hypothesized ditch route, and most spectacular of all: the burnt remains of a possible shamans's house complete with ceremonial cache.

**Features 1 and 2.** Features 1 and 2 represent one residential site that was located in a narrow, sediment filled seasonal wash channel located 90 m north of Tahquitz Creek and approximately midway up the debris cone. The site covered approximately 156 m$^2$, the entirety of which was excavated. A total of 54 units were exposed within all of Features 1 and 2, encompassing more than half of the site in the testing phase, and the remainder of the site in the data recovery phase. Large boulder-strewn interfluves border the site on the north and south. Upstream on the west side the wash channel narrows from 8 to only 2 or 3 m. Downstream on the east side, the channel opens to form several shallow seasonal watercourses that spread out over the lower debris cone. Most of the occupational material was located in the flat sandy alluvium, bounded by the two interfluves, where some protection from the wind may be afforded. The site was covered by a sparse creosote-bursage scrub, with cholla cactus growing on the rocky interfluves and seasonal grasses proliferating in the sandy wash bed.

This Ethnohistoric period habitation site and associated ditch was divided into two adjoining excavation areas, each under the supervision of a different crew chief (Figure VI.26). Testing in Feature 1 began at the west end of the site as six 1 x 1 m units that were aligned through a large midden deposit (Figure VI.27a-b). Seven additional 2 x 2 m units were then extended to the east and resulted in the exposure of a rock alignment that was partially exposed through a layer of midden, as well as a rock-outlined cooking area and suspected irrigation ditch.

Feature 1 Results. Excavation of Units 1-8 in Feature 1 during the testing phase exposed approximately half of the large midden at the west end of the site. The remainder of the midden was recovered in Units 14-16, 18, 19, and 24 during the data recovery phase. From 10 to 25 cm of ashy carbonaceous midden deposits were found above a sterile layer of coarse sands and gravels. This midden contained numerous interbedding lenses of ash, silts, and sand (Figure VI.28). The eastern portion of the deposits were densest, with artifact densities dropping in the westernmost units. The midden adjoins a natural wash channel that Jefferson and Hammond interpreted as an irrigation ditch. In the westernmost units, the midden sediments were interbedded with fine sandy wash sediments from this watercourse. Artifact content was high and included large amounts of bone, ceramics, shell beads, numerous worked sherd disks, ceramic pipe fragments, projectile points, and flaked debitage. Of particular significance were several pieces of transfer-printed ironstone ware, a pointed iron tool—possibly an awl tip, and numerous fine pressure flakes of dark green bottle glass. These items, like others found throughout Locus C, demonstrate that this occupation was from the Ethnohistoric period when Euro-American material culture was just beginning to appear in the otherwise traditional Cahuilla assemblage (see Chapter XIV). Despite these changes, arrowheads were still being produced, as evidenced from the lithics analysis, and they were

ACC0006926

Site Descriptions



**Figure VI.26.   Locus C, Feature 1-2, Top Plan**

ACC0006927

Tahquitz Report



**Figure VI.27a. Locus C, Feature 1-2, Overview with Feature 1, Unit 1 Midden Exposed, View East**



**Figure VI.27b. Locus C, Feature 1-2, Showing Rock Alignment and Drainage Channel, View West.**

ACC0006928



Figure VI.28.  Locus C, Feature 1, Stratigraphic Profile of Midden Area in Units 1-6

ACC0006929

used to hunt a wide variety of mammals and birds, as demonstrated by the faunal analysis. Other items recovered from the midden include numerous ceramics sherds, worked sherd disks, shell beads, and burnt and unburnt animal bone. Milling equipment was noticeably infrequent in this large deposit.

Significantly, Locus C was one of the only areas in which domestic animal bones were recovered. Bones of *Bos Taurus* (cow) and *Equus sp.* (horse or donkey) were found throughout, confirming ethnohistoric accounts that wild horses and donkeys were hunted for food and that domestic animals were acquired for the same purpose.

Testing phase Units 9 and 12 revealed a 1.5 x 2.5 m rectangular rock alignment that opened to the north (Figure VI.29a). Most of the rocks appeared on the surface, but beneath 10 cm of midden was a rough natural cobble surface on which were found evidence of hearth and cooking features (Figure VI.29b). At the southeast interior corner of the rock feature was a partially reconstructible Tizon Ware pot with sooted exterior. It was found in an area of exceptionally dense ash and in a midden that produced two Cottonwood Triangular points, numerous shell beads, six sherd disks, and a large array of animal bone, sherds, and lithic debitage. Pollen samples from this midden produced aggregates of cactus and mesquite that typify economic use. Interbedded lenses of artifact-bearing sands and silts extended to a depth of 30 cm in this part of the site, thinning to the north as they reached the top of the interfluve (Figure VI.30).

In the testing phase, Units 10, 11, and 13 and Units 1 through 5 of Feature 2 were opened to examine the sand-filled channel and parallel rock alignments that were observed on the surface (see Figure VI.27b). The results were disappointing at first, but then we were gratified to find evidence indeed suggestive of an irrigation ditch. The first test trench through the surface channel and subsequent soundings showed it to be a shallow surface feature of coarse sands that were only 5 cm thick at the east end of the Locus, but had accumulated to a depth of 24 cm at the west end of the Locus. The deposit lacked the hyperbolic profile of an irrigation ditch and overlaid an artifact-bearing deposit below that sloped down to the west.

The appearance of a water channel was given by the modern hiking trail that cut through a thin surface deposit of dark silt to expose the white sand and the parallel rock alignments. The fact that the underlying deposit sloped in the opposite direction from the natural drainage pattern also indicated that these sands were relatively modern alluvial fills deposited by fast-moving water. This sandy deposit was almost sterile, although a few isolated artifacts were found within, including a clay pipe fragment near the surface.

Exposures only 2 m to the north in Feature 1, Units 10 and 11, did expose a well-defined water channel below 5-10 cm of fine silts and sands. This ditch was traced for a length of 4 m and was from 50-60 cm wide, running in a southwest-northeast direction (Figure VI.31a). The ditch was 10 cm deep, with a well-defined hyperbolic profile, and was filled with clean coarse sands (Figure VI.32). Artifacts recovered from the ditch included 29 sherds, 13.4 gm of bone, and a well preserved bone awl. The unstratified sand was otherwise very clean and, with the artifacts, was probably deposited by flood waters. The ditch passed directly south of the kitchen area in Feature 1, Unit 9, apparently joining the water-course 10 m upslope that was defined in the wash by another trench. On the downstream side in Feature 2, Unit 2, the ditch widened and thinned out in an area of interbedding alluvial deposits and midden that may have been a small garden plot (Figure VI.31b). Pollen from this area (see Chapter XVIII) contained some preliminary suggestion of agriculture or proto-agriculture. A large granite boulder slick lay above the ditch in Feature 1, Unit 8, which, if in place, suggested continued prehistoric use of the area after the ditch had filled with sand (Figure VI.33a-b). The rock alignments also appeared to be surficial and may post-date the ditch, or were used to contain water in the plots during the last phases of its operation.

The deeper soundings of Feature 1, Units 10 and 13, and Feature 2, Units 4 and 5 confirmed that the ethnohistoric occupation of the sites was already well established by the time the ditch was formed. Beneath the sandy upper level were over 20 cm of artifact-bearing deposits extending down to 45 cm below the surface and a sterile layer of alluvial sands, gravels, and cobbles (Figure VI.34a). This deposit contained a number of discrete ash and charcoal lenses within a matrix of interbedded midden and alluvial soils. Recovered artifacts included approximately 330 sherds, 37 worked sherd disks, seven ceramic pipe

ACC0006930

Site Descriptions



**Figure VI. 29a**
**Locus C, Feature 1, Unit 9, Level 1 Excavated to Expose Rock Alignment, View South**



**Figure VI.29b**
**Locus C, Feature 1, Unit 12 (bottom) and Unit 9 (top) Showing Cooking Area, View South**

VI-47

ACC0006931



**Figure VI.30**
**Locus C, Feature 1, Stratigraphic Profile Representative of Midden North of Drainage**

VI-48

ACC0006932

Site Descriptions



**Figure VI.31a. Locus C, Feature 1, Unit 1 (top) and Feature 2, Units 1-3 (bottom) Showing Rock Alignments and Silt Filled Features, View Southwest**



**Figure VI.31b. Locus C, Feature 2, Units 6-11**

ACC0006933



**Figure VI.32.  Locus C, Feature 1, Unit 10, East Stratigraphic Profile Showing Relationship of Ditch to Adjoining Levels**

ACC0006934

Site Descriptions



**Figure VI.33a**
**Locus C, Feature 1 Excavated Ditch in Unit 30 and Granite Milling Stone in Unit 8, View South**



**Figure VI.33b**
**Locus C, Feature 1, Unit 30, Close-up of Ditch and Exposed Surface of Level 2**

ACC0006935

fragments, seven Cottonwood Triangular projectile points, 177 pieces of lithic debitage including flaked bottle glass, a stone bowl fragment, three mano fragments, seven shell beads, a red glass bead, 458.58 gm of burnt and unburnt animal bone, a bone disk and bone spatulate tool, a pumice burnisher, and seven iron objects. The greatest number and density of artifacts came from the midden below a large pile of some 40 rocks, many of which were fire-affected, and were probably the remains of a roasting pit.

Of particular interest was an iron ring and iron knife blade that were recovered from a depth of 21 cm below the surface. Together with the flaked bottle glass, they demonstrate that Euro-American tools were being incorporated into the assemblage at an early stage in the deposition of cultural materials.

Lower Phase Occupation and The Eagle Cremation.  A stratigraphically discrete lower occupational phase was encountered below the upper deposits of midden, stone alignments and the sand-filled ditch. Although still containing historic artifacts and not greatly older than the upper phase, it marked what may be earlier seasonal occupations. One illuminating example of the stratigraphic relationship to upper deposits was found in Feature 1, Unit 8.

Unit 8 contained several unusual aspects. The sand-filled ditch passed through the unit to expose two stratigraphically separate occupational phases. The lower and earlier phase contained a ritually cremated eagle. Unit 8 was first opened in the testing phase. Level 1 (0-10 cm) contained the same light gray brown (10YR 6/2-7/2) loose sandy silt of the larger midden deposit with a limited amount of pottery, bone, three worked ceramic disks, a shell bead, and one rare mano find. The sandy soils continued in Level 2 (10-20 cm), but artifact content diminished to extremely low. A worked sherd disk, a piece of ironstone ware, and two shell beads were recovered with a small amount of lithics, ceramics, and bone. A large boulder with a milling slick rested on the surface of the unit, and upon excavation, the sand-filled ditch was found to pass directly underneath through the southeast corner of the unit into Unit 30.

Data recovery resumed to trace the ditch channel and investigate the concentration of charcoal that also occurred in the surrounding silts that the channel had cut through. Removal of the sand fill directly below the boulder slick revealed a discrete ash lens and amounts of burnt bird bone at a depth of 15-30 cm (Figure VI.35a-b). Surrounding soil was removed as Level 3 (Data Recovery Phase Level 1) and produced an increasing amount of ceramics, bone, some lithics, six sherd disks, a shell and glass bead, two ceramic pipe fragments, and several iron fragments. The lower Level 4 (30-40 cm) (Data Recovery Phase Level 2) was a series of alluvial laminae grading from light brown (10YR 4/3) to pale brown (10YR 6/3).

Artifact content within these deposits increased with depth and was horizontally distributed on one particular compact silty level that was overlain with fine sandy deposits. This distribution suggested compact living surfaces on which flooding or water deposition had periodically recurred. Among the recovered finds were a whole ceramic bowl, half of a ceramic bowl, a bone awl, an *Equid* molar, moderate amounts of ceramics, some lithics, and moderate amounts of bone.

Within this lower layer and deposited directly on the basal sterile stream channel gravels was the bald eagle cremation (Figure VI.34b). The deposit was determined to be stratigraphically below and earlier than the cutting of the early phase laminae by the sand-filled ditch. Most of the laminated deposits and associated artifacts of Levels 3 and 4 also overlay the cremation. It consisted of a 20 cm diameter hearth containing large amounts of charcoal and surrounded by fire-affected stream cobbles. Bone was concentrated in the southeast corner of the unit and may indicate that the cremation was gathered in much the same manner as a human cremation. It was impossible to determine if the large metate on the surface of the unit was actually a marker for the cremation, since they are separated by several stratigraphic layers. The placement appears to be coincidental, although memory of the location may have been preserved after the cremation was covered by alluvium. The only directly associated artifacts within the hearth were burnt eagle bones. The cremation was found to extend into Units 11 (Level 3), 29 and 30 (Level 2), where it extended down to a depth of from 40-50 cm below the surface. Charcoal from the cremation radiocarbon dated to 50±50 B.P. but that dendrocalibrates to alternative dates of A.D. 1706-1719, 1814-1828, or 1879-1916. These dates fall within the same range as those obtained from the upper occupational phase.

ACC0006936



**Figure VI.34a.  Locus C, Feature 1, Unit 10, Level 2, Showing Relationship of Ditch to Buried Occupational Levels, View East**



**Figure IV.34b.  Locus C, Feature 1, Unit 8, Burnt Basal Levels of the Bald Eagle Cremation; Bone Concentration at Center Left by Partially Excavated Corner of Unit 29**

VI-53

ACC0006937



**Figure 35a.  Locus C, Feature 2, Overview Looking North, Rock Alignment at Bottom,
Water Channel in Center**



**Figure VI.35b.  Locus C, Feature 2, Units 10 and 14, View West of Open Area Between Rocks**

ACC0006938

This cremation was a significant discovery for several reasons. In the first place, because bald eagle cremations are extremely rare, it suggests trade for live eagles with coastal groups. It also indicates that very important ceremonies conducted by a *net* or other ceremonial leader were undertaken at a location some distance from the ceremonial house at Agua Caliente.

The lower laminated phase of occupation was followed though several adjoining units. Lower phase deposits in all excavated units are listed in Table VI.2, which follows.

### TABLE VI.2

| Feature | Unit | Level | Depth |
|---------|------|-------|-------|
| 1 | 8 | 3 | 20-30 cm |
| 1 | 8 | 4 | 30-40 cm |
| 1 | 10 | 2 | 10-35 cm |
| 1 | 10 | 3 | 20-45 cm |
| 1 | 11 | 3 | 20-50 cm |
| 1 | 13 | 3 | 25-35 cm |
| 1 | 13 | 4 | 35-45 cm |
| 1 | 26 | 1 | 00-35 cm |
| 1 | 26 | 2 | 35-40 cm |
| 1 | 26 | 3 | 40-50 cm |
| 1 | 29 | 2 | 18-65 cm |
| 1 | 30 | 2 | 18-40 cm |
| 2 | 2 | 4 | 30-40 cm |
| 2 | 3 | 4 | 30-40 cm (no artifacts) |
| 2 | 5 | 3 | 20-30 cm |
| 2 | 5 | 4 | 30-40 cm |

These levels all contained similar lamination of soils and underlay midden accumulations, rock alignment features, and the sand-filled ditch. These lower phase deposits extended into Feature 2, as indicated, but artifact content declined greatly in these easternmost units. Numerous fragments of unpainted and painted Colorado Buff vessels were found scattered directly on the floor level in Unit 10 (Levels 2-3) and Unit 26 (Levels 1-3), and in association with a bent iron nail, six sherd disks, and an array of ceramic, lithic, and animal bone finds. Circular charcoal-filled moulds were found in Unit 13 that when exposed conformed to the shape of burnt creosote bush root systems. This remnant of a brush fire also left some ash deposits on the buried floor surface. This same floor surface was traced through the southern half of Unit 26 where it abutted against the cobble and boulder bank of the interfluve terrace that bounds the north side of the site. The surface slope up was encountered at only 10 cm below the surface here, indicating a basin-shaped profile for the laminated silts. Ceramic finds were extremely high in Level 1 of Unit 26 and appear to relate to the underlying floor. The lowest portion of the floor level was removed as Level 2 (35-40 cm), on which were recovered abundant ceramic finds, a pumice fragment, a carbonized mesquite bean, green bottle glass, and *Anodonta* shell fragments. Ashy deposits and charcoal flecks were also reported on the floor level although no *in situ* burning or hearths were observed. The

ACC0006939

lowest level of Unit 26 was removed as Level 3 (40-50 cm). Darker brown (10Yr 5/3) coarse silty sand extended down to sterile gravels and cobbles and contained a small amount of pottery, burnt bone, flakes, shell beads, and sherd disk fragment. Excavation of Unit 27 to the north revealed only a 6 cm deep light brown (10YR 6/2) silty sand with few artifacts. The northern boundary of the site was thus confirmed to end with the interfluve terrace.

On the south side of Feature 1, concentrations of ceramics, sherd disks, clay pipe fragments, and other artifacts were found in Unit 29 (Level 2), adjoining the bald eagle cremation. These concentrations extended into Unit 30 (Level 2) where large amounts of pottery, nine additional sherd disk fragments, shell and glass beads, and much animal bone were recovered. In Unit 28, under 20 cm of recent wash sand, was a homogenous deposit of light brownish gray (10YR 6/2) silty sand. This unit was excavated as one level (0-48 cm). The uppermost 5 cm contained a charcoal and ash lens mixed with abundant ceramics, lithics, and bone. This trash midden also contained three sherd disks, a shell bead, and a piece of historic transfer printed ironstone ware. Artifacts continued to be found to a depth of 48 cm before sterile sands and gravels were reached. Soil profiles on the south side indicated that the deposits continued for a few centimeters more before abutting on the cobble terrace interfluve that marks the south boundary of the site. The trash deposits were also found to continue in Unit 22 and 23 of Feature 2.

Unit 29 and adjacent Unit 11 also produced 10 carbonized tepary beans (see Chapter XVII), some of the only evidence of cultigens from Tahquitz Canyon. Tepary beans also derive from Locus B, Feature 5 and Locus E, Feature 1.

Feature 2 Results. Testing in Feature 2 began as a 1 x 4 m trench set perpendicularly through the original sandy wash and parallel rock alignment at the east end of the site (Unit 1). Four additional 2 x 2 m units (Units 2-5) were then excavated to the west that abut on the Feature 1 area and expose more of the rock alignment. The data recovery phase added another 17 contiguous 2 x 2 m units (Units 6-23). These units also revealed at least two phases of occupation. The uppermost phase included several rock alignments that may be either outlines for small garden plots or foundations for structures. These cobble features were structurally connected and stratigraphically associated with the rock alignment, living surface, and cooking area in Feature 1, Units 9 and 12. Below the rock alignments was an extensive deposit of laminated sand and silt lenses, interspersed with charcoal and ash lenses. These deposits correspond stratigraphically with the lower phases in Feature 1 but generally lack the definable living surfaces and horizontally distributed artifact concentrations that suggest a living surface. Instead, these lamina indicate pooling of water and settling of sediment that may be an indication of some horticulture. These sediments become more homogenous on the southern side where additional trash midden and specific features, including a human cremation, were uncovered. Each of these site components will be described in detail below.

A single rock alignment through Units 1-5 first drew the attention of Jefferson and Hammond to the site (Figures VI.26, 27b). It paralleled a sandy channel to the immediate south and gave the impression of a rock lined irrigation ditch. Excavation of that channel proved it to be a very shallow alluvial feature from recent seasonal wash activity. Exposure of subsurface rocks and brush clearing revealed a more complex feature. At least three definable spaces were outlined by the rocks: the previously described cooking ware in Feature 1, and two unit spaces measuring 3 x 3 m each. All of these rock alignments rested above underlying laminated strata that contained features and numerous artifacts of the Ethnohistoric period. The rock alignments thus represent the last phase of occupation at the site. No features or definable floor levels were found within the enclosed spaces although the midden deposits to the south in Units 4, 22, and 23, and west in Feature 1 probably relate to this last occupation.

To complicate our understanding of these rock alignments, the sand-filled ditch in Feature 1 was found to flow though the center of each in a southwest-to-northeast direction. The ditch retained its 30 cm width but flattened out to a 2 cm thick lens of coarse white sand in Units 9 and 13. This lens interbedded with five to six thin layers of silts and sands where the velocity of water slowed and allowed alluvial deposits to be laid in what was a shallow basin. Above the sand deposits were found under 15

ACC0006940

cm of brown (10YR 5/3) silts within which, at 5 cm below surface, was an ash and charcoal lens. Artifact content remained low within all of the sediments of the ditch.

Thus the trail of coarse sands marked the path of water through the ditch as the water velocity slowed and dispersed over this area. Water velocity, however, remained strong enough to leave a thin trail of heavier sands that marked the direction of flow. This flow and accompanying deposition of sediment was followed by a last occupational phase that deposited a thin ash lens over the deposits. After that time, as the shallow basin completely filled with sediment, water drainage probably moved to the vicinity of the rock alignment where it was observed at the beginning of these investigations.

North of the drainage pathway in Feature 2, Units 9, 13, and 19, was what first appeared to be a rock alignment, but that upon excavation was determined to be the natural cobble and boulder bank of the drainage channel. Sediment was found to abut this bank. To the north was the top of an interfluve, upon which a thin 10-18 cm accumulation of fine silts and sands continued to show generally low artifact densities (Figure VI.27b). Efforts were made to trace a possible non-flowing arm of the ditch that might connect with a small wash that occurred to the north of the site. Only natural ephemeral water flow could be traced across this area, with an outlet crossing through the area excavated within Unit 16. Unit 16 was also expanded to investigate the possibility of finding small cobble walls or water-control features within this drainage way. The only artifacts to be recovered from this area were several large domestic mammal fragments. No evidence of a deliberate modified water channel was found although sediments to a depth of 50 cm had accumulated in this small basin area.

**The Southern Sector**. A series of buried midden deposits with associated hearths and one possible cremation were recovered in the southern portion of Feature 2, south of the rock alignments. The midden deposits described in Unit 17 were found to continue into Unit 20 were they abutted against the bank of the interfluve in the unexcavated southern half of the unit (Figure VI.36a). These homogenous carbonaceous deposits were under 3 cm of recent alluvial sands, extended down to 30 cm and contained accumulations of ceramics, few flakes, a glass bead and bone (Figure VI.36a). These midden deposits continued west into Unit 21 where they were buried under 10 cm of recent wash fill and extended to a depth of 20 cm. A hearth was found within this unit at a depth of 10 to 20 cm and contained light gray (10 YR 7/3) ash within a fire-reddened (10 YR 4/6) shallow basin. Two projectile points, two beads, a possible stone scraper, and moderate amounts of ceramics were retrieved from Unit 21. These homogenous midden soils continued west into Unit 4 and north, under the stone alignment into Unit 3. High artifact densities were found within the soils of Units 3 and 4 that also exhibited charcoal and ash lenses. These lenses were interbedded with alluvial laminae in Unit 3, suggesting some pooling of water in this area, possibly in relation to the watercourse to the north. These deposits in Unit 3 contained two projectile points, a mano, shell beads, a bone disk, *Anodonta dejecta* shell fragments, an iron knife blade, sherds, and animal bone.

Each of the units in the southern portion were excavated as one single deposit, except for Unit 5 where more defined stratigraphy called for the excavation of four 10 cm deep levels. Level 1 (0-10 cm) contained white alluvial sands mixed with a small amount of redeposited midden and artifacts. Level 2 (10-20 cm) was the typical gray-brown mottled and laminated silt, containing ash and charcoal at the base of the level and moderate amounts of sherds, lithics, and bone. Level 3 (20-30 cm) continued this trend with less lamination but the typical midden soils containing beads, bone, *Anodonta* shell, sherds, ceramic disks, and a projectile point tip. The midden gradually graded into sterile alluvium in Level 4 (30-40 cm).

Units 22 and 23 at the extreme southern portion of the site revealed the accumulation of midden deposits against the southern interfluve that were recorded in Units 20 and 21, and in the outermost units of Feature 1. These midden soils reached depths of 25 cm in Unit 22, and 34 cm in Unit 23 (Figure VI.36b). It was postulated that they may have been dumped over the side of the interfluve by occupation on top of the terrace. No evidence of occupation was found in the higher area, however, so it must be concluded that occupants of the main area of Features 12 and 2 deposited occupational debris in this area. Ash deposits also accumulated in the northeastern half of Unit 23 and extended into the western half of Unit 22. A heavier concentration of ash and charcoal in the extreme northeastern corner of Unit 23

ACC0006941



**Figure VI.36a.  Locus C, Feature 2, Stratigraphic Profile Representative of Midden Buried in Alluvium South of Drainage**



**Figure VI.36b.  Locus C, Feature 1, Units 28-29 and Feature 2, Units 22-23, Stratigraphic Profile Showing Occupational Levels Under Alluvium**

ACC0006942

indicated the presence of a human cremation, the only human interment found in Features 1 and 2. Pieces of heavily calcined bone were found in association, but scattered over a larger area suggestive of some secondary disturbance by alluvial action. Although not directly associated with the cremation, associated finds in the surrounding midden of Unit 23 included a cast iron element, possibly from a gun, a quartz projectile point or preform, a worked chalcedony tool fragment, a possible preserved piece of fabric, three worked ceramic disks, large amounts of pottery, some lithic debitage, and both burnt and unburnt animal bone.

**Chronology and Stratigraphy**. Stratigraphic analysis of deposits and features demonstrated that several phases or sequences of activity took place at the site. Radiocarbon dates, discussed below, suggested an occupation that spanned the Patayan II and III periods, but these occupations may be difficult to separate. Even the lowest layers contained Historic period artifacts, but a calibrated radiocarbon date of A.D. 1430-1650 for a lower deposit sample (Feature 1, Unit 13, Level 3) suggested a date towards the end of the Lake Cahuilla episode. This was also supported by Patayan II ceramic finds and the presence of several *Anodonta dejecta* valves throughout the deposit. At least 20 cm of midden, ash deposits, and alluvial sediments were in place by the time the ditch was established, as it cut through artifact-bearing deposits. Also recovered from the lower phase, however, was the eagle cremation that produced a less restricted date within the 18th through mid-19th centuries. Efforts to date the lower sediments cut by the ditch in Feature 1, Unit 29, were unsuccessful when a modern date was calculated from charcoal in a habitation level (Beta 29723).

Sitting on top of the midden deposits, and sometimes separated by a 10 cm layer of sands and silts, were the rock alignments in Feature 2. These structural or irrigation-related features were probably contemporary with the rectangular rock alignment, cooking features, and adjacent midden in Feature 1. A calibrated radiocarbon date from the cooking area, only 10 cm below the surface, was A.D. 1683-1732 or A.D. 1810-1930 (Beta 26362). This date is corroborated by charcoal from a burnt midden deposit in Feature 2, Unit 17, Level 2 (Beta 29722) that produced a calibrated date of A.D. 1681-1736 or 1806-1936. To better consolidate the period of occupancy, particularly of the upper phase, a mid-19th century date was also indicated by the transfer printed and ironstone pottery from the midden. One transfer print pattern was positively dated to the 1834-1859 production of Podmore, Walker, and Company of Staffordshire, England. Patayan III-Ethnohistoric period dates were also indicated by the predominance of Colorado Buff among the buff ware types.

**Evidence of Irrigation and Agriculture**. Pollen analysis provided suggestive but inconclusive evidence of cultivation. Two samples from the bottom of the ditch yielded only evening primrose and yucca as possible economic species. Only traces of yucca occur on the alluvial fan today and it was probably introduced from higher elevations. Small amounts of sedge were found in the ditch section of Feature 1, Unit 10 to indicate a wet environment often associated with water channels. More cattail was expected to be associated with a ditch and the few pollen grains from the midden in Feature 2, Unit 2 suggest the introduction of this economically important plant, probably from a pool in the upper reaches of Tahquitz Creek.

Elevated frequencies of Cheno-Ams from the suspected agriculture plot in Feature 2, Unit 3 may suggest semi-cultivation of grasses (Castetter and Bell 1951:167-173), but even higher Cheno-Am frequencies were discovered in the rockshelter at Locus I, Feature 1, where no direct evidence of agriculture was indicated. While further comparisons of Cheno-Am frequencies are needed, even more suggestive are the higher occurrences of *Sphaeralcea* or apricot mallow pollen in Locus C contexts than anywhere else. It infrequently occurs on the alluvial fan as a plant with no known economic use. Suzanne Fish (Chapter XVIII) found it to be closely associated, however, with disturbed soils in Hohokam agricultural proveniences. This pollen was particularly noticeable in the suspected garden plot of Feature 2, Unit 3. Other species with high frequencies and aggregates of pollen that indicated economic use at Locus C included mesquite, cholla, *Cereus*-type cactus, and members of the Mustard family.

ACC0006943

**Feature 3.** A previously unrecorded 9-unit m midden was discovered during the shovel test program on a small interfluve, 30 m north of Features 1 and 2, at coordinates N130 W220. It lay directly next to a small drainage that was the hypothesized route of the Locus C irrigation ditch but where testing proved to be inconclusive. The "shamans's house", Feature 5, lies only 20 m north while the rockshelter, Feature 4, is 20 m to the south. All of these features were at the least 70 m west and upslope from Features 1 and 2. A 1 x 1 m test unit initially was dug in 10 cm arbitrary levels until sterile sands and gravels were reached at 20-25 cm below surface. Below a 5 cm mix of top soil and midden was a shallow deposit of intermixed light gray midden and tan alluvial soils. Rodent activity had caused vertical displacement of artifacts and soil, but this is probably not significant in such a shallow deposit. Recovered artifacts included 49 sherds, three flakes, 1.8 gm of unidentifiable bone, one projectile point, and a flake biface scraper. The low artifact density and spatial limits of the midden suggested that it was produced by a short-lived temporary camp of a single residence unit.

Unit 1 was absorbed as the northeast quadrant of Unit 2, a 2 x 2 m unit, in the data recovery phase. Unit 3 was then excavated directly to the north. These units produced one 10 cm level of yellowish brown (10YR 5/3-5/4) silts, sands and gravels above sterile cobble deposits. Artifact frequencies generally decreased from the original test unit, except for a darker midden accumulation around rocks in the southeast quadrant of Unit 3. Some small sandy lens and laminae also occurred that indicate some alluvial action. Units 2 and 1 produced moderate amounts of ceramics, lithic debitage, unburnt animal bone, and two sherd disks. Unit 3 produced only a quartz projectile point and a few sherds. Clearly this spatially discrete midden deposit represents limited activities on top of a small mound, or dumping of household debris from another location.

Association with an agricultural area, possibly adjacent to the ditch, is suggested by elevated levels of apricot mallow, just as in Feature 1-2. The only economic pollen occurring in aggregates was *Cereus*-type cactus, accompanied by small amounts of cholla.

**Feature 4.** A new rockshelter was discovered during the course of the shovel test program at Locus C. It was located at coordinates N 110 W 240 on the edge of a lower terrace of Tahquitz Creek, located less than 60 m to the south. A group of large boulders enclosed a 3 x 3 m area of dark gray-brown midden soil (Figure VI.37). The rockshelter was recently occupied by transients who erected a 2 m high boulder wall on the open south side and a plywood roof over the top. The rockshelter may have been occupied at the time of the Jefferson and Hammond survey, explaining why it went unrecorded. The roof subsequently burned, leaving a thick deposit of wood, charcoal and recent trash in the upper levels. Rodent activity has unfortunately contaminated all levels of the rockshelter with charcoal, textiles, and trash from the recent fire, making radiocarbon dating impossible.

Three contiguous 1 x 1 m units were excavated in 10 cm levels at the back of the rockshelter to expose a profile of undifferentiated dark brown soil, extending down 80 cm to sterile alluvial sands and gravels. The upper 30 cm contained a mix of modern and aboriginal artifacts, the latter including 39 sherds, 28 flakes, one projectile point, a stone bowl fragment, and about 14.6 gm of bone. Among the lithics were several obsidian flakes. Artifact densities got even smaller in the lower levels, with an absence of historic artifacts except for widely scattered burnt plywood that had been dispersed through the numerous rodent burrows. A modern textile fragment was also found in a rodent nest at the bottom of the deposit. The lower levels produced eight sherds, 19 flakes, one projectile point, one marine shell and a small amount of animal bone. A pollen sample from the 30-40 cm level indicated traces of cholla and evening primrose as the only economic species. No artifacts were found in the bottom 20-30 cm of brown soil before encountering the sand and gravel layer.

This small rockshelter thus appeared to have been occupied solely in the late Prehistoric or Ethnohistoric period, with no evidence of earlier habitation despite the relatively deep soil accumulation. The late period Colorado Buff type ceramic was predominant, and, incidentally, pieces of the same olla were found throughout almost every level, verifying the profound disturbance at this site. The low density of artifacts and lack of features indicated sparse use by a small residence unit, predominantly in the upper deposits. The few artifacts in the lower levels may have resulted from rodent disturbance.

ACC0006944



**Figure VI.37.  Locus C, Feature 4, Top Plan of Rockshelter**

ACC0006945

An additional 2 x 2 m square, Unit 4, was placed over the crude cobble and boulder wall at the entrance to the rockshelter in the hope of finding undisturbed deposits under what is obviously a recent rock enclosure. The unit was excavated in four 10 cm thick arbitrary levels to sterile river cobbles. The same stratigraphy was found as within the rockshelter, but to much shallower depths. Disturbed deposits that included plywood and other recent materials, including a modern English penny, were found throughout, with evidence that the wall was constructed after an earlier fire. Among the prehistoric finds were low amounts of ceramics, bone, lithic debitage, four projectile points, a pumice fragment, and animal bone. Feature 4 thus appears to have been a temporary camp that was probably occupied for several seasons. Lack of glass beads may suggest a Late Prehistoric date, but the scarcity of finds, lack of temporal diagnostics, and extreme disturbance makes it difficult to assign a Late Prehistoric or Ethnohistoric period date to any of the deposits. The finds can be treated as a complete assemblage, however, for functional comparison with other features of Tahquitz Canyon.

**Surface Collection and Shovel Test Result**. The entire surface of Locus C was covered with a 10 x 10 m grid of 71 units. A total of 33 units (46 percent) contained surface artifacts ranging from one to nine sherds, one lithic, and an occasional bone fragment. A total of 92 sherds and one flake were recovered. Ten milling feature locations were also recorded around the locus, with a substantial number at the rockshelter, Feature 4.

A total of 27 shovel tests were evenly distributed throughout the locus. Except for the newly discovered Features 3 and 4, the shovel tests demonstrated that the subsurface cultural remains were restricted to the defined features. The tests around Features 1 and 2 in particular showed that all subsurface deposits are restricted to the bottom of the drainage channel.

## Locus D

The testing program at this large locus on the south side of Tahquitz Creek was dedicated to defining the limits of an ethnohistorically documented cremation area so that it could be capped and avoided. A second, previously unrecorded, cremation and habitation zone was also recorded and tested. These cremation loci are probably the ones drawn on an 1856 G.L.O survey plat map of the region. The only other test was at a depression that proved negative. The entire locus was also gridded into 10 x 10 m surface collection units for recovery of a small sample of surface sherds. One of the notable aspects of this feature was the large number of grinding surfaces. These were recorded and mapped within the grid system.

**North Cremation Zone (Feature 2)**. A total of 74 shovel tests were excavated at 5 m intervals along the edge of the wash and to the east, west, and south to define the limits of the cremation zone. Positive test results were obtained for 19 contiguous tests in the general zone of observable surface material. This constituted an approximately 250 square meter area adjacent to the wash that extended 10 m south and 25 m east-west along the bank. No positive tests were obtained beyond this zone. Positive tests usually produced ashy soil, burnt bone, a few beads, and small amounts of pottery and lithics. All of this material was returned to the test holes from which it came during the field evaluation. Also, no surface collecting was undertaken in the cremation area. A confidential map was prepared and submitted to the Tribe and RCFCWCD for planning the cremation site protection program. Prior to construction, up to 1 m of sterile fill was placed over the cremation area and the eroding banks of Tahquitz Creek to protect the site from potential disturbance.

**South Cremation Zone (Feature 1)**. A second cremation area, heavily vandalized, was discovered 120 m due south of the known cremation zone. Located at coordinates S50 E200, this flat terrace lies west of the Magruder Chevrolet dealership and is widely known as an area where beads and other artifacts could be readily obtained. Burnt human bone, ceramics, and charcoal were scattered around at least two large holes. The vandals also left two pieces of screening some time in the past, but there did not appear to be any recent evidence of disturbance.

ACC0006946

This cremation locus may be the southernmost of two that are drawn on an 1856 G.L.O survey plat map. It was probably part of a larger zone of artifacts that have now been obliterated by modern development and the car dealership. The site also lies just east of a large drainage ditch that has been modified in recent years but is the suspected watercourse for an early 19th century Cahuilla irrigation ditch (the Arcuate Ditch) that watered agricultural fields at the southern base of the Tahquitz debris cone.

Thirteen shovel tests were distributed around the disturbed area to define the limits of the cremation ground. Six of these tests were positive, producing human bone in all, and a few artifacts in two. A 30 x 40 m area that contains archaeological remains was thus defined. One 1 x 1 m unit was also excavated 1 m southwest of the S50 E200 coordinate location and 3 m south of one of the three vandal holes. The purpose was to determine the depth of deposit and whether this was a specialized cremation site or if daily activities also took place. Almost 30 cm of artifact-bearing tan-gray sandy soils were excavated in 10 cm arbitrary levels. Only the uppermost 10 cm contained cremated bone, along with 11 sherds, two flakes, and some unburnt animal bone. The remaining 20 cm of soils grade from tan to white sands and silts with specks of charcoal. Only two sherds, one flake, and 2.7 gm of bone were recovered in what appears to be wash deposited material. The cremation area thus appears to be quite superficial and represents remains from both human interment and habitation. Extensive spatial displacement has taken place in some areas, but most of the area has not been disturbed.

The flood control project will not impact this area as long as no access roads are planned for the area. There are long range plans to extend Belardo Road through the site, and the Tribe has been informed of the testing results to plan any future preservation or mitigation measures.

**Feature 3.** A previously unrecorded area of midden was discovered during the monitoring phase on August 6, 1990 at a location 15 m southeast of coordinates N0 E100. The 10 cm thick ashy deposit extended over an area of 13 m east-west by 8 m north-south. Bulldozers first exposed two pot sherd concentrations. Disturbed surface soils and associated artifacts were first removed and sifted to expose the surrounding undisturbed soils. The sherd concentration at the west end emerged as a single large pot drop with associated quartz Desert Side-notched points, a possible polishing stone for ceramics, one mano, and some bird bone. Very few lithics were present. The other concentration at the east end contained charcoal, ash, burnt domestic animal bone, burnt Tizon Brown Ware ceramics, metate fragments, and a burnt ceramic pipe fragment near what may have been a hearth. Three other manos were recovered from the intervening area.

Three units were established to recover the remaining artifacts. Unit 1 was the westernmost 2 x 4 m unit. All the artifacts derived from a 10 cm level, and sherds were from a single large painted Colorado Buff olla (see Chapter XI). Unit 2 (2 x 3 m) and Unit 3 (2 x 2 m) were placed at the east. A small hearth was recorded at the south end of Unit 2 and the center of Unit 3. Most of the darker midden soil derived from these units.

The small size, thin midden accumulation, and limited artifact variability identify this feature as a small temporary camp that may have been occupied for a short time by a small domestic group. As such, it was one of the few temporary camps discovered in the project area. Other notable examples include Locus A, Feature 8; Locus C, Feature 3; Locus J, Feature 7; Locus K; and Locus N.

**Feature 4.** A 7 x 8 m depression marked by a natural-appearing irregular ring of boulders and cobbles was recorded by Jefferson and Hammond as TC-33 at the extreme western end of Locus D. A mano, portable metate, and several sherds were recovered during the testing phase from an area 11 m north and 6 m east of the depression. A 2.5 x 2 m test unit was excavated in the southeast quadrant to a depth of 20 cm below the surface. A gray-brown sandy alluvium contained large amounts of charcoal, but only one sherd in the 0-10 cm level. The loose silts and sands gave way to compacted gravels and cobbles. The area of charcoal was so extensive and artifacts so few that this area was interpreted as the site of a natural brush fire.

ACC0006947

**Surface Collection Program**.  All of Locus D, except the cemetery area, was divided into 222 ten m² surface collection units and all were systematically examined for surface artifacts.  Artifact quantity and density were extremely low.  Only 61 units (26 percent) contained artifacts, ranging from one to 11 sherds per unit, and including a few flakes, manos, and a metate.  Positive surface collection units clustered in three areas of Locus D: the area south of the southern cremation zone, the center of the Locus, and along Tahquitz Creek near Feature 1.  All indications also point to a continuation of the artifact scatter south of Locus D.

The boulder-strewn alluvial fan was found to contain one of the highest densities of milling features (see Chapter XI).  All 49 of these features were very slightly worn with irregular slicks suggestive of ephemeral and widespread plant processing.

## Locus E, Feature 1

One of the largest ethnohistoric habitation and cremation areas in the project area occupied a flat terrace on the south side of Tahquitz Creek (see Figure VI.1).  The site was situated on the very edge of the creek and overlooked Locus C to the north, a habitation area that may be roughly contemporary (Figure VI.38a-b).  Locus E was composed of two halves separated by about 10-12 m of vacant space.  Because almost all of the site was located in the project direct impact zone, the entire 402 m² was excavated within 90 units.  Four dispersed units were originally excavated during the testing phase (Features 1-4).  Data from these have been integrated into the data recovery excavation and analysis.

The following descriptions provide details on the variability and functional interpretation of different features and their spatial associations.  The west half of the site will first be discussed with reference given to the units in which important features and activity areas occur (see Figure VI.39, back cover pocket).  Description of the east half follows.  The discussion of features in this portion of the site is organized by the different quadrants defined by the wash that bisects the area and by natural spatial associations (Figure VI.40).

## Locus E, Feature 1—West

The western half was focused along a deep wash that ran out from a boulder field, forming an east-facing U-shaped enclosure (see Figure VI.38a).  Such flat, low-lying areas seemed to be favored habitation localities because they provided protection from the wind and visual concealment.  In that respect, this area was much like Locus C, Features 1 and 2.  The deep wash that ran from the southwest to the northeast across the site was used for seven cremation burials that eventually became buried by alluvial sands and silts.  Cremation remains were repeatedly found in units downstream as far as 30 m away to the east.  A house floor, two hearths, and two distinct midden deposits were excavated on the north side of the wash.  A flat occupational surface with 15 hearths, two large midden surfaces, and a hardpack occupational surface were uncovered on the south side (see Figure VI.39, back cover pocket).

**Cremations**.  Units 17, 18, and 28.  A cremation and burnt occupational surface was found at a depth of 20 cm below the surface in Units 17 and 18.  The oval, fire-reddened hardpack may be a house floor or possibly a prepared cremation area.  In either case, the cremation occurred at the south end of the hardpack, where it had been gathered after burning and covered with a rock.  Extensive ash stained the center of the floor.  Among the finds in Unit 17 were a polished bird beak, fire-affected rock, lithic debitage, ceramics, small rounded pebbles, and a small piece with embedded vegetal fibers.  The only domestic maize kernal from all of CA-RIV-45 also derived from Unit 17.  Unit 18 produced at least two polished bone tools, a biface, five ceramic disk fragments, sherds, burnt animal bone, a projectile point blank, lithic debitage, two quartz crystals, and several burnt glass beads.  This co-occurrence of both domestic and ritual items on the floor suggests that the house and contents may have been ceremonially burnt in conjunction with the cremation.

Unit 28 produced an 80 cm diameter deposit of burnt sands and silts (10YR 5/3-6/3) on the south side of the cremation at a depth of 25 cm below the surface.  Labelled Level 1 (bottom), this compacted sediment contained abundant ash, charcoal, and small amounts of pottery, lithic debitage, and burnt bone

ACC0006948

Site Descriptions



**Figure VI.38a. Locus E, Excavations in Progress on West Half, View East**



**Figure VI.38b. Locus E, Excavations in Progress on East Half, View West**

ACC0006949



**Figure VI.40.  Locus E, Top Plan of East Half**

ACC0006950

that indicated an extension of the cremation zone mixed with occupational debris. The cremation area overlies a small north-south oriented wash that cut through the domestic debris (Unit 28, Level 2) to a depth of 25-50 cm and contains redeposited occupational material. Finds included burnt and unburnt glass, shell beads, ceramics, two projectile point fragments, and a mano fragment.

Unit 38. A very large area of burned alluvial silts and sands was uncovered at 37 cm below the surface and extending down to 80 cm. This cremation took place near the bottom of a wash. The wash later filled with additional sands that in the process caused additional dispersed cremations from upstream to be redeposited on top. The cremation extends into Unit 39. Small amounts of burnt human bone and melted glass beads were continuously found in the wash downstream to the east.

The primary deposit occurred at 40-80 cm, where the cremation had been gathered into a small round pit (Figure VI.41a). Large pieces of charcoal and burnt human bone filled the pit and fire-reddened soils covered a large area around and above the feature. Artifacts recovered from the burnt deposit indicated that a female had been cremated in the Ethnohistoric period. One complete metate and fragments of another were found in the burnt deposit and adjacent unburnt levels of Unit 27. Carbonized vegetal fiber matting was found in the loose sandy fill at the extreme western end of the burned area, but it was too poorly preserved to be identified or recovered intact. Basket-making tools included a polished bone awl and a hand-wrought iron nail with a sharpened tip. Other Euro-American items included a piece of porcelain pottery and numerous burnt glass beads. Rare pieces of painted Tizon Brown pottery were among the scarce traditional ceramics. Lithics were also scarce, but a fragment of a large side-notched point or knife was recovered.

Unit 40. A similar cremation was uncovered at a depth of 45-60 cm in the same wash. Fuel had been placed on a large flat boulder, just north of a large boulder cluster on the banks of the wash. Midden was found mixed with the cremation—the same midden that filled the bottom of the wash to the west in Unit 38. Artifacts recovered with large amounts of burnt human bone included burnt glass and shell beads, a Cottonwood Triangular projectile point, several worked flakes and pieces of lithic debitage, large amounts of pottery, a possible piece of asphaltum, a sherd disk, two bone awl fragments, and 10 pieces of broken groundstone that included metates, manos, and a pestle. All the artifacts appear to have been burned.

The bottom of the wash in Unit 40 was lined with tightly packed cobbles that appear to have been deliberately placed in an area where the wash passes between several large boulders (Figure VI.41b, 42a). One hypothesis is that this area may have been intentionally modified as a water catchment area. Over 10 pieces of ground stone, including mano and metate fragments, were recovered from the rocks in this small basin, adding to the suspicion of deliberate modification. Additional observations failed to confirm the water-containment hypothesis. No clay or plaster lining was found, nor had mineral deposits accumulated on the rocks. Seepage would have been a major problem in this loose cobble and gravel alluvium, and in any event, only a limited supply could have been kept in such a small basin. An alternative explanation is that the cobble and groundstone exhibited evidence of burning, and cremation remains were found directly above the cobbles level in adjacent Unit 38. Subsequent to the cremation, the entire wash gradually filled with alluvial sands and silts to a depth of 60 cm.

Unit 47. Up to 60 cm of alluvial sand and silts mixed with both occupational and cremation remains were found within a wash. The cremation remains still retained some spatial integrity but had obviously been affected by stream action. Units 48 and 49 similarly contained some of the deepest wash deposits in what was a major cremation area in Locus E.

Burnt human bones were principally concentrated in a 2 x 0.5 m area at a depth of 0-35 cm. No definable pit was observed and a natural rock alignment in the wash appears to have prevented most of the cremation from being dispersed downstream. Artifact content was highest in this area and included a mixture of Euro-American and traditional items. Among them were an iron screw-tipped borer bit, glass beads, a shotgun pellet, a hand-wrought nail, and fragments of dark green bottle glass. Other items

ACC0006951



**Figure VI.41a. Locus E, Unit 28, Level 3 Showing Gathered Cremation (north arrow), Dispersed
Cremation in Wash (black stain at bottom) and Platformed Carbonized Matting**



**Figure VI.41b.  Locus E, Unit 40, Cobble Platform Next to Cremation, View South**

ACC0006952

Site Descriptions



**Figure VI.42a**
**Locus E, Unit 40 (foreground) and 51 Showing Platformed Ground Stone Fragments**

included three ceramic pipe fragments, two obsidian and one quartz point, a ceramic disk, small pieces of red ocher, numerous sherds, and both burnt and unburnt animal bone. Artifacts continued to be found in the wash fill below the cremation to a depth of 60 cm.

Unit 48. Cremation remains dominated Unit 48, in which a deep wash crossed the site from west to east. At least two interment phases were found in the 60 cm of alluvial sands and silts that filled the wash. Five 10 cm arbitrary levels were excavated, with the first artifacts appearing in quantity in Level 2. The lack of extensive burning in this brown (10YR 5/3) silty sand suggested that the artifacts had washed down from Unit 47 where a cremation was found close to the surface. Level 2 produced numerous *olivella* shell beads, ceramics, and burnt human bone mixed with a few lithics. Artifact quantity continued in Level 3 and the first appearance of a burnt yellowish brown (10YR 4/4) soil indicating a second cremation appeared at 34 cm below the surface. Both *in situ* and secondarily deposited cremation remains may be represented in this northwest quadrant of Unit 48, as no distinct gathering of bones could be discerned. Large quantities of burnt shell beads, seven glass beads, and numerous ceramics were found mixed with the burnt human bone. One very unusual artifact was a large handwrought iron knife blade that must have been hafted into a large handle.

A second *in situ* cremation occurred in Level 5 at the very bottom of the wash and in the northeastern quadrant of the unit. A distinct gathered pit cremation could not be well defined, but much of the bone was concentrated in the corner of the quadrant. Burnt sands and silts extended over a much wider area. Large sooted and fire-affected rocks at the bottom of the wash appear to have been arranged in a cairn and show evidence of *in situ* burning with oxidized surrounding sediment. Artifacts associated with the burnt bone included two glass and one chalcedony projectile points, one serrated point, numerous burnt shell beads, and several sherds.

Level 5 must have been the first cremation in the sequence. After it was covered by wash-deposited sediment, the cremation in Unit 47 took place. A third cremation may have then taken place

ACC0006953



**Figure VI.42b.  Locus E, Unit 41, Potter Scatter, View West**

in Unit 48 contemporary with, and prior to, the down wash of the cremation in Unit 47.  Additional secondarily deposited cremations mixed with occupational debris were deposited in Units 49 and 50 to a maximum depth of 84-90 cm below the surface.  Some of the primary cremation in Square 48 (Level 5) also extended into Square 49 (Level 2).

**Pot Drop**.  Several Tizon Brown Ware vessels were found broken within a 1 m diameter concentration in Unit 41 (Figure VI.42b).  The sherds were recovered at a depth of 15-20 cm from alluvial sand and silt deposits.  Diffuse midden soils were mixed with the alluvium and contained a ceramic pipe bowl fragment, lithic and glass debitage, and several burnt beads.  The pots do not appear to be directly associated with a hearth and may have been "sacrificed" for a cremation, the closest of which is 2 m away in Unit 40.

**Hearths**.  A total of 15 bowl-shaped depressions filled with ash and charcoal, and exhibiting fire-reddened rims, were excavated throughout the area.  These could be readily identified as hearths where fuel was burnt for food preparation and/or heat.  Many of the hearths were concentrated in the southwestern area (Units 71, 79-82, 91) and south central area (Units 42, 53, 54) where boulders to the south would have provided the best windbreaks and where hard, flat alluvial surfaces provided stable living areas.  These areas were also not disturbed by wash activity.  Most, like those in Units 80/91, were simple shallow features (Figure VI.43a).  More complex hearths, like that in Units 42/53, contained several charcoal layers that revealed evidence of multiple fires (Figure VI.43b).  Several additional hearths with special associations are described below.

Located in Unit 19 at a depth of 5-10 cm, a small indistinct hearth was found within a larger midden deposit and contained a low frequency of artifacts.  Excavated in Unit 100 as Level 2, two small 35 cm diameter hearths occurred at 5-20 cm below the surface.  A small ashy deposit next to the pit was interpreted as material removed from the hearth during food preparation or re-use.  The ashy deposits contained eight fire-affected rocks, unburnt mammal bone, and a few sherds.

ACC0006954



**Figure VI.43a.  Locus E, Units 80/91, Hearth Profile**



**Figure VI.43b.  Locus E, Unit 53, North Profile Showing Multiple Hearths**

VI-71

ACC0006955

In Unit 102, a small 60 cm diameter rock-lined hearth contained the same light brown to pale brown (10YR 6/2-6/3) fine sands and silts as the surrounding area. No artifacts were found in direct association with this hearth, nor were any found that might indicate a specific function, or suggest that the hearth might be related to the small rock cairn in Unit 103. Like neighboring units (Units 21, 22, 101, 110, 32, 33, 111), the sands were excavated to a depth of 30 cm to produce only low densities of pottery, lithics, and bone. The sediment-filled wash channel that once flowed through these units contained a mix of redeposited artifacts from both habitation and cremation areas.

In Unit 103, just below the surface, a 60 cm diameter cobble ring was found under a creosote bush (Figure VI.44a). Fire-reddened rocks filled the ring to a depth of 25 cm. The rocks were so situated as to either support a pot or conduct heat in a small roasting pit. The top of the hearth occurred at the level of gravel, sand, and silt hardpack (10YR 5/3) occupational surface that extended across the south side of the wash and through Units 43, 44, 53, and 54. Artifact density was comparatively low and included only a small number of sherds, lithics, and ground stone fragments that might be expected on the periphery of the main encampment.

**Midden Deposits.** Several shallow but spatially extensive dark brown carbonaceous deposits marked the distribution of occupational debris and the main zones of activity and many contained the ashy contents of adjacent hearths (see Figure VI.39, back cover pocket). These all contained relatively higher artifact frequencies than non-midden areas. The stratigraphic character and artifact content of different areas of midden are discussed below by reference to the excavation units in which they primarily occur.

Unit 20. A dark brown (10YR 3/2-5/4) carbonaceous deposit measuring 1.2 m in diameter was found at a depth of 3-15 cm below the surface, and extending east to Unit 21. Food preparation was indicated by an abundance of fire-affected rock, groundstone fragments, charcoal stained cobbles, and small amounts of burnt mammal bone. Two sherd disks were also recovered. A mano fragment may also have been related to two metates and two manos in Unit 31, just to the south (Figure VI.44b). Ceramics and flaked stone were notably absent or in low frequency.

Unit 42. Compact ash and burnt fine sandy soil extended over the western and southern portions of Unit 42 at a depth of 10-25 cm and appeared to be contiguous with midden in Units 52, 53, and 54. All appeared as a compact flat silty occupational surface dotted by discrete hearths and artifact concentrations. The recovered assemblage included a projectile point, ceramics, flaked stone and glass debitage, and animal bone.

Unit 43. A shallow hardpack extended across the entirety of Unit 42 at a depth of 5 cm. Two darkened (10YR 4/2) areas might have been either washed out hearth remnants or deflated midden deposits. Midden in adjacent units to the west and south was expressed as sherd concentration in the corner of this unit. Two glass beads were among the usual array of ceramics, lithics, and bone. Some of the midden also extended into the west side of Unit 44, but artifact frequency greatly decreased in this direction.

Unit 100. Charcoal, ceramics, bone, some lithics, burnt shell beads, and other items were found in a dark brown (10YR 5/3) soft silty sand. The midden covered the entire unit at a depth of 0-5 cm (Level 1) but at the depth of 5-20 cm was confined to a small buried wash (Level 3), and in small pockets of slope wash (Level 4) above sterile alluvial gravels and cobbles. The spatial distribution of midden suggested a prior living surface that had been cut and redeposited by wash activity.

**Summary of Locus E Western Habitation Area.** Evidence of domestic activities dominated the archaeology on the southern side of the wash. A compact brown (10YR 5/3) silty sand underlay much of this zone at a depth of 5-15 cm below the surface. The hardpack was overlain by a thin intermittent midden with especially dense concentrations in Units 42-44 and 53-54 on the eastern side and Units 67,

ACC0006956

Site Descriptions



**Figure VI.44a.  Locus E, Unit 103 Cobble Hearth Feature, View North**



**Figure VI.44b.  Locus E, Unit 31 metate and manos on habitation surface, view east.**

ACC0006957

78-80, and 91 on the western side. Additional midden appears to have washed down into a natural channel un Units 50, 58-60, and 69. Other small concentrations of ash and dark brown soil occurred throughout the area and contained relatively higher artifact densities than non-midden soil bearing areas.

Twelve individual hearths were clearly defined on the south side of the wash. Three additional hearths were recorded on the north side. Each consisted of a fire-reddened, basin-shaped pit dug into the sterile silty sand. Most were filled with discrete layers or lenses of ash and charcoal. The hearths appeared to be arranged in an east-west alignment along the base of the boulder-strewn slope that defines this flat habitation area. Most of the midden deposits also occurred here.

Much of the midden probably represented a combination of disturbed hearths and residue from cleaning out or re-using hearths. Food preparation debris was represented by mano and metate fragments, fire-affected rocks, and both burnt and unburnt animal bone. Evidence of daily domestic activities was available for study through the large assemblage of ceramics, lithic debitage, projectile points, bone tools, sherd disks, beads, etc. Ceremonial activities were suggested by an array of ceramic pipe fragments, of which several were found concentrated in Unit 58, adjacent to the deep wash containing the cremations.

### Locus E, Feature 1—East

The eastern half of the site was also found along the north and south sides of the small wash (see Figure VI.40). This area produced two additional cremations, a habitation area with associated cobble feature, at least five hearths, and distinctive concentrations of ground stone and lithic debitage.

**Habitation Area (Northwest Quadrant).** The flat terrace on the north side of the wash provided an ideal habitation area at which artifact-bearing deposits were found to a depth of 25-30 cm. Some of the domestic material from this area probably washed downslope and mixed with cremation remains found adjacent to this small drainage. A cobble platform and alignment was the most prominent feature, exposed at a depth of 15-30 cm in fine-grained brown (10YR 5/3) silty sands. The rectangular arrangement of closely packed cobbles abutted a semi-circular alignment (Figures VI.45a-b). Two midden stains, possibly from a house floor, were defined in a large cleared area to the west. The platform may have been the foundation for a storage platform, while the cleared area could have marked the outline of a *kish*. No post holes were discovered, however, to confirm these interpretations.

Sparce artifact densities in Units 176-178 suggested a mixed use occupational zone. Unit 176 contained a burnt *olivella* shell bead, a projectile point or drill, a biface, lithic debitage, ceramics, and burnt and unburnt animal bone. Lithic reduction and possibly nut processing was undertaken in the area of Unit 146 where two pitted anvil stones were mapped in association with two small pebble hammerstones. Among other finds were a quantity of lithic debitage, two mesquite beans, and a piñon nut. All of this material was found adjacent to the large cremation and the cobble platform at a depth of 0-14 cm, with some material extending to 30 cm.

**Cremations.** Two stratigraphically overlapping cremations were found in Units 136, 145, and 146. Eroded and redeposited portions were originally found in the initial test units (Feature 4, Units 1 and 2). The core of the cremations occurred in Unit 136 at a depth of 33-43 cm (Figure VI.46). At 5 cm, an upper deposit of fire-reddened soil, large pieces of charcoal, calcined bones, burnt shell, glass beads, projectile points, worked bone, bird bone, and a metal thimble appeared. This deposit continued with increasing concentration to 23-28 cm in the southwest quadrant of Unit 136. Cremation remains continued to occur in the light brown (10YR 5/3) silts and gravels below the fire-reddened (7.5 YR 5/6) lens. A second burnt deposit then appeared at 50 cm in which additional calcined bone, charcoal, beads, ceramics, and unidentified carbonized vegetal fibers were recovered. The greatest concentration was in the northeast quadrant of Unit 136.

Fragments of a black granitic metate and lithic debitage were found to be most concentrated in the center of Unit 136. This apparent concentration of broken groundstone suggested a possible cremation marker or sacrificed offerings. Of particular interest were the partly restorable fragments of a portable basalt mortar in the wash that were excavated in the test phase as Feature 4, east of Unit 136. They were

VI-74

ACC0006958

Site Descriptions



**Figure VI.45a.  Locus E, Units 176 and 178, Cobble Platform and Cleared Habitation Area,
View Southwest**



**Figure VI.45b.  Locus E, Unit 176, Cobble Platform, View Southwest**

ACC0006959



Figure VI.46.  Locus E, Unit 136, North Wall Profile Showing Cremations

ACC0006960

adjacent to the cremation at a depth of 40-60 cm. Also found in the upper level of Feature 4 was a mix of occupation and cremation remains that included burnt calcined bone, a partial string of fused glass beads, burnt shell beads, red ocher, over 200 sherds, a small amount of lithic debitage, one projectile point, and one iron ring. Adjacent Unit 139 also produced similar finds as well as two manos.

**Hearths and Habitation in the Northeast**. Four hearths were found in the flat upper terrace in the northeast part of the site. Six ash deposits adjacent to the hearths were defined downslope to the south. Each feature appeared to be cooking and midden residue that had progressively washed downslope. Artifact densities were highest in Units 151 and 155-157 with greater ceramic and lithic frequencies in Units 142, 143, 158, and 159 (Figure VI.47). Of particular note was the extensive concentration of marine shell fragments in the south half of Unit 159 that may have been a workshop area. Depths of artifact-bearing brown (10YR 5/3) silty sands never exceeded 10-15 cm in any of these units.

**Hearths and Chipping Stations to the South**. The alluvial flats on the south side of the wash also revealed evidence of daily habitation. Low to moderate density scatters of ceramics, stone tools, lithic debitage, ground stone, worked bone, and animal bone attested to tool manufacturing, hunting and gathering, food preparation, and consumption. Most deposits of brown (10YR 5/3) sandy silts reached maximum depths of 15-30 cm, with the deepest deposits of 40-53 cm in the wash channel at the western end of the site. Some artifacts were obviously redeposited in the wash because of slope-wash action from south to north. Only redeposited low density scatters were found in Units 152, 166, and 167, and in areas closest to the wash.

Unit 161 contained an unusual association of hearths, middens, and chipping stations that were concentrated around a large boulder at a depth of 15 cm. A dark brown (10YR 5/3) midden contained fire-affected rocks, charcoal, carbonaceous soil, and unburnt animal bone. No hearth profile or outline could be defined although these remains indicate food preparation and consumption.

Concentrations of quartz debitage adjacent to the midden indicated a tool manufacturing area. A clear quartz Desert Side-notched point and abundant chalcedony, rhyolite, and quartzite debitage were also recovered in midden of Unit 161. Similar material extended into Unit 160, from which two projectile points were plotted. Unit 153 produced no midden but abundant debitage, a biface, and two points. This may have been redeposited material from the main concentration. Lithics were found in these units to a depth of 30 cm, but ceramics remained few in number throughout the area.

Lithic and midden associations continued to the southwest in Unit 168 to a depth of 43 cm. They suggest that additional habitation continued in unexamined areas to the south beyond the direct impact zone. Evidence of stone tool production again dominated the assemblage, with two quartzite and rhyolite cores, lithic debitage, and a possible drill. Among the few ceramic finds was a sherd disk. Also recovered were a mano, possible pebble polishing stone, and both burnt and unburnt animal bone. Similar finds came from the silty sands in Units 162-167, 169-171 to a depth of 40 cm. Abundant ceramic finds, cores and flakes, a chalcedony projectile point, burnt and unburnt animal bone, and bits of charcoal were recovered. A large isolated stone slab metate was found set upside down in Unit 163, along with small discrete ash and midden deposits that extended into Unit 165. Isolated modern refuse also was recovered in Units 165-167 indicating recent redeposition due to stream erosion.

**Conclusions**. Locus E represented one of the largest, best preserved, and most complex residential sites in the project area. No other site had so many discrete features of both secular and ritual origin. The many hearths, midden deposits, milling equipment, and some cobble features and rock clearings associated with abundant ceramic, lithic, and faunal remains, as well as lithic and shell manufacturing areas are typical of daily economic pursuits and household maintenance. The multiple cremations, however, suggest recurrent funeral ceremonies in the virtual center of the habitation area. Occupational sites would be expected to be abandoned for a time after a cremation took place and, in the Ethnohistoric period, a cemetery and habitation area would not be expected to overlap. The secular habitation may therefore have been temporally distinct from the cremations. A large number of the

ACC0006961



**Figure VI.47. Locus E, Units 141-142, North Wall Profile Showing Buried Hearths and Midden**

ACC0006962

cremations may be largely contemporary because of increased disease, an expected situation given the late date indicated by the number of iron and glass objects. Much of the secular component may actually predate the cremations. The only radiocarbon date was obtained from a hearth in Feature 3 (east half) during the test phase. It produced a date of 710±120 year B.P. (Beta 26364), dendrocalibrated to A.D. 1210-1391 or 1349-1391. King (Chapter XIII) found some shell beads in the east half of the site that corroborate some early occupation. The bulk of beads, however, from both cremation and habitation contexts date to the Ethnohistoric period.

If accurate, the Late Prehistoric radiocarbon date suggests some of the habitation may actually date to the Patayan II period. This is also suggested by the fact that no domestic horse or cow was recovered in Locus E, while fairly common in Locus C across the wash. The cremations, and most of the iron and glass items that may be in association, may therefore post-date the principal occupation of the site when it was dedicated to ritual purposes, possibly by the occupants of Locus C, where only one human cremation was discovered. Many of the restorable vessels may also be contemporary with the cremations. Locus E is notable for the large amount of the Patayan III Colorado Buff type ware and also for a higher frequency of painted vessels, possibly suggesting a ceremonial context for painted ceramics in this case, and certainly a late date (see Chapter XI). Ceramic pipe fragments also tend to cluster in units adjacent to the cremations in the western half of the site.

A full range of hunting and gathering activities are otherwise indicated from faunal and floral remains. Significantly, the only carbonized maize at CA-RIV-45 came from near the house floor in Unit 17. No cultigens, however, were detected in the pollen record, and it is likely that the corn was a minor food item derived from elsewhere. Pollen analysis did indicate economic exploitation of high spine Compositae, Liguliflorae, Evening Primrose, cholla, chenopods, and amaranths. Macrobotanical remains suggested use of ironwood, acorn, wild barley, apricot mallow, bladderpod, Phacelia, grasses, and possibly datura—the latter presumably for ritual purposes. Faunal remains indicated considerable exploitation of large mammals, including mule deer and bighorn sheep. Unidentified small mammal bone occurred in quantity but none could be speciated. This could attest to the thorough processing of rabbit bone into unidentifiable pieces at the site. Also, Locus E was only one of three to produce desert tortoise bone.

**Locus F**

Locus F, a flat sandy lower terrace abutting Tahquitz Creek, was tested by King (1972a) and reported by Wilke and King (1973) who discovered evidence of habitation (Jefferson and Hammond's TC-27). Living surfaces, hearths, carbonized seeds, beads, and other evidence of habitation, radiocarbon dated to 300-400 years B.P., were documented (see Chapter V). Little additional work was undertaken at this location because it lies outside direct impact zones and no indirect impacts are anticipated. Several large trenches were excavated across the sandy areas of Locus F to determine if irrigation ditches leading to Locus C were present. These trenches were negative and all the sands were found to be virtually sterile of artifacts. Although there has not been sufficient testing to determine the nature of occupation, the scant surface indications and limited area of occupation suggest temporary encampment rather than a large residential site.

**Locus G**

**Field Methods and Results**. The excavation of two 1 x 1 m test units and one 2 x 2 m unit at Locus G, Feature 1 marked the continued examination of the rockshelter/habitation site that was previously tested by King (1972a). Originally recorded by Jefferson and Hammond as TC-37, this substantial residential base was partially destroyed by an Army Corps of Engineers' percolation test trench (Figure VI.48). King estimated that only 20 percent of the original midden deposit remained. This is indeed unfortunate because this locus represents one of the largest and deeply stratified sites in the canyon. The original midden probably covered an area of 320 m$^2$ on the upper debris cone overlooking Tahquitz Creek, located 45 m to the southeast. Jefferson and Hammond's survey suggested a total occupation area of more than 650 m$^2$. It must have been one of the most intensively occupied areas of the western end of the Tahquitz Canyon complex, as evidenced by numerous bedrock milling features and a newly discovered

ACC0006963



**Figure VI.48. Locus G, Feature 1, Top Plan**

pictograph panel of exceptional complexity on the south side of the rockshelter (see Chapter XIX).

Two test units were placed one m apart in the midden area just outside the large boulder overhang that forms the rockshelter, and perpendicular to the percolation trench cut (Figure VI.49a). The southernmost unit was dug into the side of the percolation trench. King's two 1 x 1 m units were directly under the boulder overhang and adjacent to the current test (King 1972a: Map 4) (see Figure VI.48). The results of the two tests will be compared below.

A 3 x 1 m trench was established along a north-south axis, perpendicular to the balk of the Army Corp trench. A 1 x 1 m square was excavated at either end of the test area, leaving a 1 x 1 m balk between the two units. Unit 1 was southernmost and Unit 3 was to the north. Both were excavated in 10 cm arbitrary levels. The upper level of both units was a loose, dark gray carbonaceous sand and silt deposit. There was some broken glass and evidence of disturbance in the upper two levels of Unit 3 but artifact content was high in both units, particularly in Unit 1. Recovered artifacts included 68 sherds, 15 flakes, one flake scraper, two projectile points and one tip, two shell beads, marine shell fragments, egg shell, and 31.1 gm of bone. The 10-20 cm level contained a very dark gray carbonaceous layer that extended through both units and in which there was a thin yellow-brown silt and sand lens. Only two sherds, seven flakes and 7.1 gm of bone were found in Unit 3, along with a piece of tin foil that demonstrated disturbance. Unit 1 contained 34 sherds, over 30 flakes, at least 10 shell fragments, a piece of historic wood, and 25.3 gm of bone. Artifact density decreased drastically in Level 3, and modern glass in Unit 1 was unsettling evidence of disturbance. Total artifact count for both units was four sherds, 11 flakes, some egg shell fragments, 20.7 gm of bone, and two interesting pieces of painted bone.

ACC0006964

Site Descriptions



**Figure VI.49a.  Locus G, Feature 1, Excavation in Progress, View South**



**Figure VI.49b.  Locus G, Feature 1, Unit 1 After Excavation, View Northeast**

ACC0006965

Different excavation methods were employed in the two units for the remaining levels. The 40-60 cm levels of Unit 1 were excavated as a single layer (Level 4). A homogeneous deposit of dark grayish-brown silts and sands were found intermixed with increasing quantities of granite cobbles (Figure VI.49b). Artifact frequency showed an increase in lithics and at the same time a decrease in ceramics. Only three sherds were found, but 26 flakes were recovered. Also found were two seed pods and 23.3 gm of bone. Rodent activity was very evident and may explain the single piece of flaked bottle glass, possibly derived from upper levels. A solid barrier of loose granite boulders, probably deposited during a debris flow, was encountered at the bottom of the deposit.

Unit 3 continued to be excavated in arbitrary 10 cm levels through a homogeneous gray silt and sand deposit. Artifact frequency decreased with each level: two sherds, one flake, and 7 gm of bone in Level 4; one flake and 0.6 gm of bone in Level 5, two flakes and 3.7 gm of bone in Level 6; and 8.2 gm of bone in Level 7. Charcoal flecks were found in every level but were especially concentrated in Level 6, southeast corner. This carbonaceous lens may be either a very old hearth or natural fire debris.

Despite evidence of human disturbance in the upper levels and rodent activity throughout, the number of diagnostic finds indicated a still valuable cultural resource. King (1972a: Map 4) reported the open area in front of the rockshelter as disturbed. Lower levels, however, appeared to be intact except for some downward intrusion of materials due to rodent activity.

Artifacts from the 1972 tests were never analyzed because of the postulated extreme disturbance (Wilke, King and Hammond 1973:15). Only 10 cm and 30 cm of deposits were found in the two respective units. In addition, three boulder milling slicks were exposed in Unit 2. Numerous sherds and animal bone were noted, but never analyzed (King 1972a:2). These collections were given to the Agua Caliente Band of Cahuilla Indians, which has lent them to us for analysis and comparison. Finds included one pumice abrading stone, 14 flakes, 38 sherds, and a sizable collection of animal bone.

One additional 2 x 2 m unit was placed in the south bank of the Army Corps of Engineers' test trench to investigate the buried midden deposits below the overburden (Figure VI.50a). The goal of this test was to examine undisturbed deposits that lay protected under the fill, providing an uncontaminated context for an accurate assessment of the age and artifact content of the midden. Approximately 2 m of overburden were removed by hand to reach the underlying midden. The midden was then removed in three 10 cm levels. Level 1 contained some glass mixed with abundant ash, charcoal, fire-affected rock, and an array of ceramics, lithics, and bone. Artifact frequencies increased in Level 2 with no evidence of recent intrusion. Large amounts of bone, ceramics, and a few lithics were mixed with fire-reddened soil, fire-affected rock. A core area of ash and charcoal was surrounded by a fire-reddened soil to indicate a partially preserved hearth. The entire deposit contained evidence of burning to suggest multiple hearths in this location, of which one still remained partially intact (Figure VI.50b). The hearth was removed in Level 3, reaching sterile soil at 30 cm below the top of the midden. Moderate amounts of lithics and bone were recovered from this level, but no ceramics.

**Chronology and Interpretation**. No evidence was found for a pre-ceramic component to the site, at least in the test areas. All diagnostics, including ceramics and beads (see Chapters XI and XIII) indicate a Late Prehistoric-Ethnohistoric period occupation. A radiocarbon sample obtained from the 20-30 cm level of Unit 1 (Beta-26365) produced a date of 400±80 years B.P., dendrocalibrated to A.D. 1428-1525 or A.D. 1562-1629. A radiocarbon sample from the hearth in Unit 4, Level 3 (Beta-29724) yielded a date of 410±50 years B.P. calibrated to A.D. 1434-1491. These dates between 321 and 522 years B.P. conform well with those obtained by King (Wilke and King and Hammond 1973:66-67) in nearby Locus F (TC-27N). Locus G, located a short distance to the southwest on the opposite site of Tahquitz Creek, also produced diagnostics of Patayan II date. These are some of the earliest dates obtained, and together these sites establish a pattern of intensified occupation in the upper reaches of the Tahquitz Canyon alluvial fan during the Patayan II-early Patayan III periods, before the final recession of Lake Cahuilla and the beginning of historic contact. The presence of Colorado Buff type ceramics also indicates continued occupation into the later period.

ACC0006966

Site Descriptions



**Figure VI.50a.  Locus G, Feature 1, Unit 4 After Excavation, View South**



**Figure VI.50b.  Locus G, Feature 1, Unit 4, Top of Level 3 Showing Burnt Soil and
Fire-Affected Rock, View East**

VI-83

ACC0006967

A portion of the exposed stratigraphy in the Army Corps of Engineers' percolation test was examined by Gary Huckleberry, project geomorphologist. Evidence for a sterile overburden on top of a 1 m deep midden, as described by Jefferson and Hammond (1972) and Brooks and Larson (1973:22), was found to be in reality redeposited back dirt from the percolation test. This finding helped to establish that no deeply buried pre-ceramic horizon exists at Locus G. Sherds of glass were found in the boulder-filled material just above the midden, and the configuration of cobble and boulder inclusions did not conform to natural depositional patterns. The disturbed nature of this overburden was correctly identified by Fenenga and Nissley, however, in their profile of the percolation test (King 1972a: Fig. 3).

Locus G served as a major residential site from which a variety of economic pursuits were carried out. Pollen samples from Units 1 and 2, Levels 2 and 6 yielded some very interesting results. Economic use of cholla, evening primrose, lily, and Cheno-Ams were all well indicated. Also found were the highest levels of cattail of any feature. This may indicate either contemporaneity with Lake Cahuilla for the lower level occupation of the rockshelter, or exploitation of wetlands along Tahquitz Creek. The large lower terrace below Locus G is only a few centimeters above the Tahquitz Creek level, and it may have encouraged more marsh species such as cattail if the hydrological output was greater than currently observed. Both large game (mule deer, bighorn sheep) and small game (cottontail, jackrabbit, rodents) were represented in the faunal remains (see chapters XVI-XVIII). The relatively higher quantity and diversity of resources near the mouth of Tahquitz Canyon may have attracted early occupants. If the surface water flow receded up the alluvial fan in the summer, as it now does, then this area would retain water longer than any area on the alluvial fan before entering the uninhabitable portions beyond the canyon mouth. This is also the area with the only groves of the economically important mesquite tree, along with substantial numbers of willows, cottonwoods, and other desert riparian species.

The rockshelter also provided an environment for the production of rock art, and possibly served in other ritual contexts. The two obscure red pigment pictograph panels on the south side of the large boulder were not detected by previous investigators, but Dan McCarthy was able to discover and partially reconstruct the panels under appropriate lighting conditions. They include at least two anthropomorphic figures and appear to represent two distinct periods of rock art production. A previously undiscovered petroglyph was also recorded on a rock 50 m north of the rockshelter (See Chapter XIX). Two areas of painted rock art panels also occur at or near the rockshelter at Locus I, Feature 1 to the southwest of Locus G. Together, they indicate ceremonial and symbolic behavior in association with rockshelter habitation. It should also be noted that this portion of the Tahquitz Canyon does have mythological connections with the nearby "Aunt Rock," a square white boulder that sits on another boulder on the north side of Tahquitz Creek, opposite the Echo Cliffs (Locus I and J). Patencio (1943:73) related that this general area was the old occupation site of the First People, or the Fox Tribe, that became the *Kauisiktum* lineage. Aunt Rock is the woman *Cow is ic el a* ("fox's dress"), who turned herself into stone to demonstrate her powers. Both the chronology and cultural associations of Locus G substantiate and complement Cahuilla oral tradition of the earliest occupation and spiritual connotations at the mouth of Tahquitz Canyon.

**Locus H**

This 1,500 m$^2$ terrace on the north bank of Tahquitz Creek is situated just 3 m above the stream channel (Jefferson and Hammond's TC-24). The terrace is at most 30 m wide, but afforded sufficient space for a residential site. It is one of the few places where the creek runs next to a habitable zone without an intervening steep escarpment between the terrace and the creek bed. Flooding may have been a problem during wetter winters and spring melts. Large boulders form the transition to the upper debris cone on the west side of the terrace. The largest boulders that extend out on the southern end of the terrace could have afforded some protection like a rockshelter. A large bosque of mesquite trees, an important economic resource, grows against the boulder field in the center of the terrace. Directly across Tahquitz Creek on the south side is the large rockshelter site of Locus I, Feature 1 (Figure VI.51).

Because the site was not expected to receive either direct or indirect impacts, only a surface collection and testing program was initiated to determine the extent and character of subsurface remains.

ACC0006968

Site Descriptions



Figure VI.51.  Locus H, Top Plan

VI-85

ACC0006969

Positive tests in one area produced a large ceramic concentration, and this area was enlarged to a 1 x 1 m test unit. The presence of multiple cremations at the site also discouraged further investigations. Among these was an important Ethnohistoric period high status interment that had been illegally removed some ten years earlier, the contents of which are reported in Chapter VIII.

A total of 21 shovel tests were placed at 10 m intervals throughout the locus. Only two tests proved positive and indicated a small temporary camp with associated cremation, or an extension of the larger rockshelter site across the creek. The cremation was discovered at the base of a large vertical rock face at the south end of the locus. It contained numerous calcined bone fragments, ceramics, an obsidian flake, and shell beads; all of which were immediately returned to the test hole as soon as a positive identification was made. The Agua Caliente Band was notified of the location and it is expected that it will be left in place.

**Feature 1.** The other positive shovel test was at coordinates S170 W560, at the edge of the lower terrace and only 10 m from Tahquitz Creek. Over 75 sherds from a Tizon Brown ware cooking vessel were recovered with a small number of lithics and animal bone. In order to better assess the nature of this deposit the shovel test was expanded to a 1.5 x 1 m test unit (Feature 1, Unit 1). Up to 20 cm of artifact-bearing midden and alluvium were found in two distinct strata. The upper 13 cm level was a gray-brown sandy alluvium and midden mix containing fine charcoal particles. Recovered artifacts included 218 sherds, two sherd disks, 35 flakes, two pieces of worked bottle glass, four beads, and a metal ring. A lighter tan-gray sandy alluvium with mixed midden was found from 13 to 20 cm below the surface. Sherds were recovered from between and below the cobbles that were increasingly found, suggesting some redeposition from flood activity. Artifact density decreased with depth but an additional 142 sherds, 18 lithics, 4 gm of bone, and an *Anodonta* shell fragment were recovered. Large cobbles and boulders in a culturally sterile alluvial deposit were found in a small test area that was dug to 30 cm.

Very few artifacts were found in the surface collection of fifteen 10 x 10 m units. Only five units contained artifacts, ranging from one to four sherds, and a small number of flakes and bone fragments. A total of 12 sherds, two flakes, five bone fragments, a large piece of pumice, a piece of flaked glass, and a historic ceramic were recovered. Two rock alignments were previously recorded by Jefferson and Hammond, but shovel testing in those areas proved to be negative. With all of the underbrush and mesquite burned back in these locales, the rock alignments were not very definitive but may represent superficial structural foundations. These areas lacked any subsurface midden, and no surface artifacts were found nearby.

The small habitation area discovered by testing appears to be an undisturbed cooking and general activity zone that relates spatially to the Locus I, Feature 1, the pictograph rockshelter on the opposite side of Tahquitz Creek. The two sites would have been cut off during major flood stages, however. Occupation here extended into ethnohistoric times, as indicated by bead types and flaked glass. The high status cremation reported in Chapter VIII probably dates to the 1860s or 1870s, and may represent one of the last activities to have taken place at this location.

### Locus I

This locus consists of several rockshelters on the south side of Tahquitz Creek. Many have associated milling features and several also contain pictographs. Feature 1 is the most outstanding, composed of a large boulder on an upper terrace of Tahquitz Creek. Features 2 through 7 are a linear series of small enclosures formed by large boulders or bedrock overhangs at the base of a north-facing ridge known as Echo Cliffs. Apparently, Jefferson and Hammond recorded all potential rockshelters as sites whether or not they contained obvious indications of habitation. Except for Features 1 and 3, all the other features proved to have only superficial evidence of prehistoric use and frequently little soil deposition. Feature 3 was the only rockshelter against the cliffs where deep sediments were found, and that provided some of the only indications of a pre-ceramic, probably Archaic period, occupation in Tahquitz Canyon.

ACC0006970

**Feature 1.** This prominent rockshelter is located on a wide upper terrace of Tahquitz Creek and in a heavily overgrown zone of grasses and underbrush. A large 10 x 14 m boulder towers more than six m above the sandy alluvium and forms a north-facing overhand (Figure VI.52). A disturbed area extended back about 3 m behind the drip line and contained evidence of recent camping, as well as Cahuilla ceramics and a portable boulder mortar. This black alluvium-midden soil fill extended outside the rockshelter for about 1.5 m and was circumscribed by a horseshoe-shaped enclosure of creek cobbles. This 3 m wide feature appears to be an artificial structure that once formed an enclosure wall around the rockshelter. The surrounding terrace surface is about 1 m higher outside the cobble enclosure than the rockshelter interior. Outside of the rockshelter and to the south is another boulder mortar and an adjacent boulder with six or seven small pecked concavities. Ancient pictographs adorn the northern rockshelter wall but these were obscured by recent graffiti. McCarthy (Chapter XIX) describes the program to remove the graffiti and interprets the remaining original rock art.

Initial tests included a 1 x 1 m unit inside the shelter (Unit 1) after removing the recent trash (Figure VI.53a). This unit was excavated 50 cm, within which the upper 20-30 cm contained abundant evidence of Late Prehistoric-Ethnohistoric activities. The number of small finds and diagnostics was very surprising given the obvious disturbance of the site and proximity to a well-trodden hiking trail.

The upper 10 cm of carbonaceous tan-gray alluvial silts, sands, and gravels bore a large array of artifacts: 45 sherds, 100 pieces of lithic debitage, including obsidian, three projectile points, a bone awl tip, five shell beads, two pieces of worked steatite, and 27.4 gm of bone. Also mixed with this material was glass, plastic, and metal from recent disturbance. This mix of alluvium and midden continued unevenly down to a depth of 23 cm before a sandy layer of charcoal-laden soil within which large cobbles and much gravel were found was reached. Fire-affected rocks in the southeast corner of the square appeared to be from an old hearth. Recovered artifacts from the 10-20 cm level included 28 sherds, 24 flakes, a broken projectile point, a quartz core, a ground stone pestle, a shell bead, and a polychrome glass bead. This translucent green bead with four red stripes is reported by King (Chapter XIII) as a Spanish and Mexican period type. Disturbance of this level was indicated by the recovery of a pop-top at 12 cm and the uneven stratigraphic contours. The highest values of Cheno-Ams were found in Level 2 pollen samples, as was evidence for the collection of evening primrose.

The sterile substratum was approached in the 20-30 cm level, in which gray-white alluvial sands and gravels were mixed with increasing quantities of large cobbles. Midden material was found only between some of the larger rocks, and no fire-affected rocks occurred. Artifact quantity was reduced to only two sherds, seven flakes, a projectile point tip, and 0.7 gm of bone. The square was continued another 20 cm to 50 cm below the surface but only a dense and culturally sterile concentration of stream deposited cobbles, sands, and gravels was found.

A second test unit was excavated to the north of the boulder mortar and cupules (Figure VI.53b). The unit was excavated in 10 cm levels to a depth of 50 cm. Large numbers of artifacts including two projectile points, a biface, two beads, a mano fragment, shell beads, ceramics, and lithic debitage were found in the first three levels. Artifact quantity decreased below 30 cm but continued in all levels. The results are discussed below under Unit 61, which represents the expanded unit in the data recovery phase.

Evidence of a rich cultural assemblage and expectations of significantly higher indirect impacts along the major hiking trail that passes through Feature 1 led to the decision to open three large exposures: one inside the shelter, one on the outside to the east adjoining the bedrock milling features, and one partially sheltered area to the west. The entire area around the rockshelter was divided into 71 sequentially numbered 2 x 2 m units, beginning with Unit 3 after the initial test units. A total of 24 of these 2 x 2 m units were excavated to sterile alluvial gravel, cobbles, and boulders at the base of a midden deposit. The midden ranged in depth from 10 to 50 cm below the surface.

First a top plan of the entire rockshelter was prepared (Figure VI.52). This top plan shows the configuration of stone on the surface or exposed by surface clearing. More detailed plans showing the distribution of excavated units, milling features, floors, and artifacts in the units on the north, east, and west sides of the rockshelter were prepared during the course of excavations and appear as Figures VI.54, VI.55, and VI.56.

ACC0006971



Figure VI.52a.  Locus I, Feature 1, West Face Profile

ACC0006972



Figure VI.52b.  Locus I, Feature 1, Top Plan

ACC0006973



**Figure VI.53a.  Locus I, Feature 1, Unit 1 Upon Completion, View South**



**Figure VI.53b.  Locus I, Feature 1, Unit 2 (left) and Unit 20 (right) and
Mortar Upon Completion, View South**

ACC0006974



Figure VI.54. Locus I, Feature 1, Top Plan of North Exposure

CA-RIV-45
LOCUS I
FEATURE 1
CENTRAL EXPOSURE
EXCAVATION TOP PLAN

VI-91

ACC0006975



Figure VI.55. Locus I, Feature 1, Top Plan of East Exposure

VI-92

CA-RIV-45
LOCUS I
FEATURE 1

Tahquitz Report

ACC0006976



Figure VI.56. Locus I, Feature 1, Top Plan of West Exposure

CA-RIV-45
LOCUS I
FEATURE 1

Site Descriptions

VI-93

Each contiguous block of excavation units will be discussed and summarized. Comparison will be made between each block to indicate the differences in stratigraphy and artifact content that characterize different activity areas of the rockshelter.

Ten additional units (Units 4, 5, 9, 10, 16, 17, 26, 67, 71, 72) on the north side of the rockshelter were excavated to determine the nature of the stratigraphy within what appeared to be the main sheltered residential zone (see Figure VI.54). The units closest to the rockshelter wall were found to be the most heavily disturbed (Units 1, 17). Modern artifacts were found to be mixed with Cahuilla materials in the upper levels, but modern intrusions diminished below the 10-20 cm level. In all the other units modern artifacts were restricted to the fill above and between the cobbles in the concentric pile that defines the north side of the rockshelter. This stratum was defined as Level 1 in every square and it signifies the last deposition of artifacts at the site mixed with recent and earlier disturbed deposits. The cobbles were slowly removed in each unit to determine if this concentric cobble pile was the remains of an actual stone wall and if intact masonry could be defined. Some alignments were found to suggest an irregular stone enclosure of filed rocks that may have originally been built to protect the rockshelter (Figure VI.57a). Numerous sherds and other artifacts were also found between and intermixed with the stones to indicate that the occupation continued during the period that the stone enclosure collapsed. Stone may have been periodically thrown back on top of the circular arrangement, but no clear evidence of deliberate coursing was observed. The most suggestive indication of some deliberate stone construction was found in Units 65-67, where tabular granite slabs were partially stacked like fallen dominoes (see Figure VI.57a, VI.58).

One partially preserved occupational surface may have survived in Units 4, 9, and 10 (Figure VI.57b, 59a). This hardpack, removed as Level 2 in each square, was a finely laminated, light brown (10YR 5/3) consolidated silty sand. This 8 cm thick deposit was so compacted that it peeled off of the underlying darker brown midden deposits. The level contained flecks of charcoal but few artifacts. Some of the consolidation and lamination may have resulted from its location directly under the rockshelter dripline. If not a floor level, at least the hardpack represented a seal, because no historic artifacts were found within the deposit or in any underlying levels. The dark grayish brown (10YR 4/2) midden deposits beneath extended to a depth of 20-40 cm below surface and contained abundant ceramic, lithic, bead, and bone remains. This midden is typical of the deposits in Levels 2-3 in all of the units in the north-central portion of the rockshelter. These undifferentiated midden deposits were usually mixed with a tumble of cobbles and boulders from the semi-circular rock enclosure, extending down to a sterile cobble substratum (Figure VI.58, 59b).

Beneath the hardpack in Level 3 of Unit 10 was one of the few features to be found within the midden deposits (center right in Figure VI.59b). This was a concentration of charcoal within a concentration of five fire-blackened cobbles. Several other discolored cobbles were also found in the immediate area. All of the cobbles rested on the sterile alluvial rock and gravel surface that underlay the entire feature and represented part of the upper terrace of Tahquitz Creek. Although the charcoal concentration lacked some of the fire-reddening usually associated with a hearth, it can at least be said that this was a culturally induced prehistoric firing incident. A radiocarbon analysis of this deposit produced a disappointing modern calibrated date, suggesting contamination, although there was no other evidence that this was a recent intrusive feature (Beta 29718). A second charcoal sample from under the hardpack in Unit 9 also produced a recent date (Beta 29717).

A preserved storage cist was found at the back of the rockshelter in Unit 26. A cavity previously existed or was dug in the sterile gravels at the very back of the rockshelter to form a triangular bin. Rocks had been placed along the front margin of the cavity, apparently to keep the loose gravels from falling in. These intentionally placed stones only extend down 8-12 cm from the top of the bin while the lower sides and bottom were formed from the natural cobble and gravel deposits that underlie the entire site. The usual brown midden deposits overlaid the bin and were excavated as Levels 1 and 2 to a depth of 30 cm. Extending down from 30 to 50 cm below the surface, the bin was excavated as Levels 3 and 4. The grayish brown (10YR 4/2-5/2) soil within the bin contained little of the gravel and cobbles found throughout the midden deposits, but several thin granite slabs in the bin may have been intentionally placed to divide the space in two. Three manos were discovered at the bottom of the bin at a depth of

ACC0006978

Site Descriptions



**Figure VI.57a.  Locus I, Feature 1, Unit 67, Level 1 Removed to Expose Cobble Pile, View North**



**Figure VI.57b.  Locus 1, Feature 1, Unit 10, Level 1 Removed to Reveal Hardpack, View South**

ACC0006979



VI-96

Figure VI.58.  Locus I, Feature 1, Unit 5, North Stratigraphic Profile

Tahquitz Report

ACC0006980

Site Descriptions



**Figure VI.59a.  Locus I, Feature 1, Unit 4, Level 2 Hardpack Exposed, View West**



**Figure VI.59b.  Locus I, Feature 1, Unit 10, Level 3 Removed, View South**

VI-97

ACC0006981

48-51 cm (Figure VI.60a, VI.61). Pollen washes were taken from each mano and a flotation/pollen sample was also recovered from the bin. The results suggested milling of grasses, Chenopod or Amaranth, and also cat-tail. Other evidence of grinding activities were found in adjoining Unit 17, where a metate fragment was recovered, and Unit 1, where a pestle was found. Seed and nut processing appears to have been a major activity at Feature 1, given the number of recorded bedrock and portable mortars recorded here and the number of other milling stone fragments from the midden fill. Mesquite processing is usually associated with mortars, and this was verified by pollen traces from midden in Unit 4 and a mano in Unit 31 on the west side of the rockshelter (see Chapter XVIII). Other remains in the soil fill appear to be domestic midden debris, including sherds, lithics, and animal bone. Of the bone, much of it appears to be from a rodent nest established at the back of the bin.

The northeastern side of the rockshelter was sampled by a line of five 2 x 2 m units that extended in a north-south direction to encompass the previously recorded mortars and test Unit 2 (see Figure VI.55). From south to north, these units included Units 28, 20, 61, 63, and 64. The units revealed deposits of water-laid silts and sands over a large boulder field (Figure VI.60b). Artifacts recovered from the deposits reflected a range of activities undertaken just outside of the rockshelter, and probably also reflect trash deposition from within the rockshelter. The boulder field slopes down towards Tahquitz Creek from south to north, and by so doing, the thickest deposits of cultural and alluvial deposits appear to have been washed into the northern units.

Level 1 of these units, as elsewhere, tended to be partially disturbed. The most shallow deposits were in the southernmost unit, Unit 28, where only the northern half was excavated, after removing the upper 10 cm throughout the unit. Only low concentrations of ceramics, bone, and lithics were found in association with a Desert Side-notched point. This unit appears to mark the boundary of archaeologically manifested activities. Unit 20, to the north, was much more productive. A large surface boulder contained a well formed mortar and an adjoining boulder exhibited at least five small depressions (see Figure VI.53b, VI.55). Usually described as cupules, these small mini-mortars were probably nut or seed cracking stations in association with the mortar. They are also discussed as possible ceremonial features in Chapter XIX. A mano was also found in the uppermost level, cached under a rock directly south of the mortar (see Figure VI.55) The original living surface associated with the milling stone was encountered at 8 cm below the surface. This dark gray (10YR 4/1) hardpack was associated with a large number of sherds, flaked stone and glass, a lead bullet, and a shell bead. Remnants of a hearth or burning episode were defined in the southeast corner of Unit 20 as Level 2 was excavated to 20 cm below the surface. Charcoal from the hearth produced a calibrated radiocarbon date of A.D. 1692-1722 or A.D. 1811-1864 (Beta 29719). Artifact content diminished to sterile soil between boulders at this maximum depth.

Unit 61 to the north encompassed the 1 x 1 m Unit 1 that was excavated in the testing phase. Unit 2 was placed just between the boulder mortar and cupule boulder to the south of the rockshelter. This 1 x 1 m square was excavated to a depth of 50 cm, within which a partially disturbed midden deposit was found to a depth of 20 cm, and artifacts continued to occur to the very bottom. Again, bits of recent glass indicated disturbance to a depth of 30 cm. The upper 0-10 cm level was a tan-gray silty and sandy loam that contained 73 sherds, 17 flakes that included two glass flakes, one quartz biface, one projectile point, one mano, two shell beads, and 7.5 gm of bone. Recent historic trash was found throughout. The second layer of similar alluvial sediments and midden mix contained 33 sherds (two were painted), 23 flakes (five of bottle glass), one Dos Cabezas serrated point, and 1.8 gm of bone. Soil color lightened at 12 cm below the surface and continued to do so in the 20-30 cm level where only three sherds, six flakes (one glass), and 5.8 gm of bone were recovered. This lighter, mostly sterile alluvial deposit still produced some finds in the 30-40 cm level in which three sherds, one quartz flake, and 4.3 gm of bone were found. In the lowest level before encountering alluvial cobbles, we found two flakes, 8.7 gm of bone, a marine shell fragment and what King described as a disk or ring shaped ornament, possibly made of *Glycymerous* sp. (Chapter XIII). Pollen remains were inconclusive as to the plants processed in the mortar. No aggregates were found, and only cacti and Evening Primrose were identified as economic plants.

ACC0006982

Site Descriptions



**Figure VI.60a.  Locus I, Feature 1, Unit 26, Mano Cache in Storage Cist, View South**



**Figure VI.60b.  Locus I, Feature 1, Units 20 (top), 28, 61, 63, and 64 (bottom),  View South**

ACC0006983



**Figure VI.61.  Locus I, Feature 1, Unit 17/26, Top Plan of Storage Cist**

An additional assemblage of bone, glass, and shell beads, a bone awl, ceramic, and lithic debitage, was recovered from Unit 61.  Artifact density was highest in Levels 1 and 2, with artifacts occurring in decreasing density to a depth of 40 cm.  A mano found in Level 1 just north of the cupule-covered boulder again attested to the grinding activity focus in this area.  Soil was still recovered from between the boulders in Level 5 from 40-50 cm, but only trace remains were recovered.

Continuing to the north, Unit 63 produced a quite different artifact assemblage, indicative of specialized activity areas.  After a highly disturbed 10 cm-thick surface layer was removed, a fine light yellowish brown (10YR 6/3-6/4) carbonaceous silty loam  with abundant artifact content was encountered.  This deposit appeared to be an occupation midden that had been affected by alluvial wash from the small boulder-strewn channel in which the soils have accumulated.  This deposit extended to a depth of 50 cm, although the 40-50 cm level contained significantly fewer artifacts.  A soil color change to light grayish brown (2.5 YR 5/2) occurred below the depth of 30 cm.  Conspicuously absent from the lower levels were any ceramic finds in similar quantity to those units within the rockshelter or found directly to the south around the boulder mortars.  Lithic debitage, projectile points, and other flaked stone tools occurred in abundance, however.  Several antler fragments that may be pressure flaking tools were also found.  Some shell and glass beads, milling stone fragments, and animal bones completed the assemblage.  Projectile point manufacturing and maintenance thus appears to have been a focused activity in this area, while food preparation and consumption that might involve ceramics were undertaken elsewhere.

Unit 64, the northernmost unit in this series, produced similar remains as Unit 63.  Again the uppermost 10 cm level contained evidence of rodent and recent disturbance.  The second 20 cm level contained rodent disturbance but was otherwise undisturbed.  Throughout the upper three levels was an abundance of flaked lithic debitage, flaked stone points and tools, shell beads, antler fragments, burnt bone, and other midden remains typical of household refuse.  Again, ceramic finds were relatively rare. Two new grinding surfaces were uncovered in Level 3, 20-30 cm below surface, on a boulder in the northwest corner of the square (Figure VI.62a). This irregular shaped slick occurred directly next to a small round cupule, suggesting nut or seed cracking and grinding.  One mano fragment was also recovered

ACC0006984

Site Descriptions



**Figure VI.62a.  Locus I, Feature 1, Unit 64, Boulder Slick, View East**



**Figure VI.62b.  Locus I, Feature 1, Unit 32-33, Exposed Rock Wall, View East**

ACC0006985

from this level. Sterile pale brown (10Yr 6/3) silts and sands began to appear at 25 cm below surface and were fully exposed at the bottom of the rock-strewn Level 4, 30-40 cm below surface.

The southwest portion of the rockshelter was examined by an exposure of nine units, measuring a maximum of 2 x 2 m (Units 14, 23, 24, 25, 30, 31, 32, 39, 46, and 47). Units closest to the rockshelter varied in size in conformity with the perimeter of the boulder (see Figure VI.58). Revealed in this area was a mix of recent intrusions, alluvial fill, and ancient midden deposits. Artifacts indicated a mix of activities, including ceremonialism, food preparation, and food consumption in what may have been a separate living area of the rockshelter. Disturbances were highest in the southernmost units that were closest to the main hiking trail that leads to Tahquitz Falls. Intrusions in the northernmost units consisted of an extensive surface rodent midden and alluvial fill that followed a natural wash contour along this side of the large boulder rockshelter.

Beginning at the northernmost square closest to the main shelter, Unit 14 was dug in one 20 cm thick level. A homogenous dark grayish brown sandy loam (2.5 YR 4/2) contained a mix of abundant ceramics and lithics, four projectile point fragments, glass and shell beads, a mano fragment, and .22 mm shell casings. Intruding into the midden was a recent hearth. Unit 23 produced similar results to a depth of 25 cm, and with worked bone, a hammerstone, and an uncovered slick on one boulder. Units 24 and 25 were dug as one unit and labelled Unit 24. The uppermost 12 cm of rodent midden was removed as Level 1, along with a grayish brown sand and silt (2.5YR 5/2). Some ancient deposits were found mixed in this alluvium. Ceremonial activities were suggested by the large number of beads in association with a clay pipe fragment. Large numbers of ceramics, lithics, and burnt bone attested to daily activities. A less disturbed Level 2 was excavated to a depth of 12-20 cm below surface to reveal a dark brown silty sand (2.5YR 4/2) containing the same assortment of artifacts, but in smaller numbers.

Units 30 and 31 were also excavated as one unit, Unit 30, to reveal some very important finds. The upper 10 cm level contained large amounts of rodent midden and recent alluvium mixed with habitation remains. Despite the disturbances, fragments of a gourd (*Lagenaria siceraria*) were found lodged under a rock in Unit 30. Too fragmentary to reconstruct a shape, this was the only *identifiable cultigen found at the site*. The Cahuilla used gourds for rattles (Bean and Saubel 1972:82-83), and possibly also as bowls and water storage vessels. Level 2 was excavated to a depth of 10-20 cm to reveal a light brownish gray silty sand (10YR 6/2) with ashy carbonaceous lenses. Four mano and two metate fragments were found associated with one such lens. Although beads were not as common in this zone, large amounts of ceramics, lithics, and burnt bone continued to occur. Of particular interest was a poorly preserved rock alignment that ran north-south between Units 31 and 32 and extending into Units 24 and 39 (Figure VI.62b). Room partitions may have been present in this area.

Unit 32 was excavated in three 10 cm levels to reveal similar materials in the same carbonaceous silty sand as the units to the north. Artifact densities decreased in the southernmost units closest to the recent trail (Units 39, 46, and 47). Milling stone fragments still occurred in association with lithics, ceramics, and bone, but deposits were shallower and of lighter color (10YR 4/2). A recent hearth was even found on sterile soil at a depth of 25 cm in Unit 46. The decrease in finds may have resulted from both a decrease in activities and the effects of downslope wash in this area.

In summary, Locus I Feature 1, stands out as one of the most intensively occupied habitation areas of Tahquitz Canyon with evidence of ceremonialism, seed and nut grinding, hunting, food preparation and consumption. Extensive disturbance due to recent camping, rodent activity, and alluviation has probably mixed some deposits and resulted in the contamination of radiocarbon samples. Two of the deepest charcoal deposits, one under a sealed layer, both produced recent dates. A third radiocarbon sample from a hearth near a milling feature (Unit 20, Level 2) produced a date of A.D. 1692-1722 or A.D. 1811-1864. Shell and glass beads support the later date in the Spanish and Mexican periods. Identification of three different Lake Cahuilla fish species, however, extend the date of occupation back to the period between A.D. 1000 and 1600. Ceramic types were also more varied and included more typical types of the Patayan II period. Bead types also reflect a very long and probably continuous occupation span that may extend back to the Archaic period (see Chapter XIII). Seven of 77 pieces (9 percent) of obsidian from Feature 1 derive from the Coso volcanic field, all occurring in lower levels of the midden deposits

ACC0006986

(Chapter X and Appendix C). This source is known to have been more widely used in earlier periods, replaced by Obsidian Butte as the dominant source in the Late Prehistoric period of southern California (Hughes and True 1985). Although no other early diagnostic artifacts were recognized, an early occupation also seems reasonable given the proximity to the Archaic rockshelter at Locus I, Feature 3. As discussed above under Locus G, archaeological evidence of an early and intensive occupation at the mouth of Tahquitz Canyon complements *kauisiktum* oral traditions associated with Echo Cliffs.

Despite evidence of disturbance, an abundance of archaeological remains were recovered with which to reconstruct the range of activities at this important site. Extensive seed processing was found throughout the rockshelter in the form of bedrock mortars, slicks, and associated pollen evidence. Portable mortars and metate fragments were also found within the midden, as were three cached manos in a cist at the back of the rockshelter, and mano fragments throughout the deposits. This emphasis on grinding correlates with the concentration of mesquite trees in this part of Tahquitz Canyon, and the general availability of other wetland and riparian plant species. Hunting activities and tool-kit maintenance are strongly suggested by the high frequency of projectile points, pressure flakes, and antler flakers. Over half the bone by weight and count from the rockshelter derives from large mammal. This is one of the highest proportions of any site in the canyon, comparable only to Locus B, Feature 5. The usual array of lagomorphs and rodents complete the faunal assemblage, but with none of the more exotic birds, carnivores, or other species found at other loci.

Deposits were best preserved in the northernmost part of the site, where they were protected by the mass of stones in the circular rock enclosure and by alluvial deposition. Evidence of a roughly constructed cobble enclosure formed by the modification of an existing stream channel terrace levee was seen in the alignment of stone. This  occupation continued while the circular enclosure became increasingly deflated through time. The site probably flooded periodically, but no evidence of flood episodes was seen in the homogenous midden fill. Emphasis on tool manufacture, food processing and food consumption were evidence in the assemblage.

The northeast area indicated that grinding and food preparation were important activities around the large mortar and cupules. Grinding was also undertaken to the north where a buried slick was discovered. This northern area, however, also saw a concentration of lithic manufacturing, as evidenced by the lack of ceramics and presence of antler flakers. As elsewhere, there was a mix of midden and alluvially deposited soils in this boulder-strewn wash channel. The southwest side of the rockshelter contained an ill-defined rock alignment and a mass of midden to suggest another habitation area, perhaps with a manufactured lean-to or brush shelter.

The remaining three rockshelter locations in Locus I produced small assemblages of Late Prehistoric or Ethnohistoric artifacts within shallow deposits. The six examined locations in Locus J produced few or no artifact-bearing deposits during the testing phase. Most contained little or no soil deposition within which artifacts might be found. Those features with soil deposition were frequently sterile or contained only a few sherds or flakes. These features, originally recorded by Jefferson and Hammond (1972), were almost all noted because they offered a north-facing protection against sun, wind, and rain, and not because they exhibited any obvious evidence of past habitation. Some of these rockshelters have also been extensively disturbed by recent campers, but that would not explain the lack of artifacts because other areas with recent use have abundant evidence of past occupation, however disturbed they may be (see Locus C, Feature 4). We must therefore conclude that most of these sheltered locations at the base of Echo Cliffs were not used to any degree as habitation sites by the Late Prehistoric peoples or the Ethnohistoric Cahuilla. Open air localities or rockshelter localities next to large boulders adjoining Tahquitz Creek appear to have been much preferred.

Several reasons may be offered for this preference for open spaces. One major reason offered by Cahuilla consultants is that the frequency of earthquakes discouraged sustained occupations near unstable cliffs. The observed amount of rock fall in Locus I, Feature 3 and throughout Locus I and J substantiate that claim. Many of the rockshelters also offered little flat habitation space or had uncomfortably low ceilings for daily activity areas. Those features that did produce some limited remains beyond a few

ACC0006987

surface artifacts are described below. Foremost among them is Locus I, Feature 3, where deeply buried stone lined cists may date back to the Archaic period.

**Feature 2.** This rockshelter site is a flat space under a vertical rock face, 20 m south of Feature 1 and about 5 m higher than the creek bed at the base of the cliffs (Figure VI.63a). Two 1 x 1 m test units were placed 1 m apart on the gravely, trash-strewn surface. Both units produced identical results. A small number of artifacts were found within the top 20 cm of light gray-brown sands, silts, and gravels before encountering a compact substratum of cobbles and boulders. The 0-10 cm levels contained 13 sherds (one painted), 122 flakes, six pieces of fire-affected rock, one worked stone pipe fragment, and 6.1 gm of bone, as well as some charcoal. The 10-20 cm levels contained one sherd, nine flakes, and 4.1 gm of bone. The location was evidently a Late Prehistoric period temporary camp with possible associations to Locus I, Feature 1, and the uppermost component of Locus I, Feature 3. The stone pipe fragment and some rock art elements on a nearby cliff face also suggest ceremonial use of the area.



**Figure VI.63a. Locus I, Feature 2, Units 1-2 After Excavation, View South**

**Feature 3.** The only clear evidence of hunter-gatherer activities that extend back to the Archaic period in Tahquitz Canyon was revealed within a north-facing rockshelter at the base of Echo Cliffs. This site was extremely important in extending back the occupational history of the canyon and exhibiting rare features that have been documented at only one other site in southern California—at the eastern base of the Peninsular Range. This site revealed aspects of the hunter-gatherer strategy in the Archaic period that differ from the Late Prehistoric and Ethnohistoric periods. In the testing phase, a 1 x 1 m unit was placed in a large open flat terrace at the base of a north-facing rockshelter. This surface is at the same elevation as Feature 2, a small rockshelter to the west, and is connected to it by a narrow corridor in the boulder field at the base of the cliffs. A very large mesquite tree shields the rockshelter from view and the space remains in the shade for most of the day (Figure VI.64). An enormous 10 x 7 m boulder rests on an overhang and creates a 5 x 4 m space under the drip line. A much larger area outside the drip line also would have provided usable space. The only surface indication of prehistoric use was an early stage boulder mortar located west of the drip line.

ACC0006988



**Figure VI.63b. Locus I, Feature 3, Unit 1 Before Excavation, View Southwest**

The test unit was located 1 m north of the very back of the rockshelter and 5 m south of the mesquite tree (Figure VI.63b). All depth measurements were recorded as below surface at one datum point, that being the southwest corner of Unit 1. All depth readings given below are relative to that datum point but described as "below surface." Unit 1 was excavated to a depth of 80 cm and artifacts were found in every level. The uppermost 10 cm contained a mix of Late Prehistoric and modern material. The light brown alluvial silt had a fire-reddened modern hearth containing much charcoal and associated recent trash. Also found in this layer were 37 flakes, three obsidian flakes, a possible quartz tool, a projectile point, and 10.8 gm of bone. Below this was a 10-20 thick deposit of light brown, loosely compacted alluvial and aeolian silts. The 10-20 cm level contained one sherd, nine lithics, and 9.8 gm of bone. The 20-30 cm level contained one sherd, 14 flakes, one shell bead, and 11.3 gm of bone. The *Olivella biplicata* spire removed bead is a type used during a long time span (see Chapter XIII). Lithics and large mammal bone continued through the lower levels but no ceramics were found, suggesting a pre-ceramic horizon. This interpretation gained support from the observation that most of the flakes were from basalts, ryolites, and other metavolcanics while silicates were absent. Pollen samples from Levels 2 and 3 indicated elevated numbers of mesquite—not unexpected given the proximity to mesquite bushes—but also Yucca and cattail, which suggest importation of vegetal material from upland areas and wetland marshes.

The same soil color and composition were found in the lower levels, although the silts were more compact. An oxidized soil lens was discovered at 36-39 cm below the surface when the profile was scraped for stratigraphic study. This may have been the remains of a deeply buried hearth that just barely protruded into the southwest corner of the test square. Artifacts recovered from the 30-40 cm level included 11 flakes and 5.5 gm of large mammal bone. The 40-50 cm level produced three flakes, and 4.9 gm of bone. The final level extended from 50-77 cm, in which only a few artifacts were found, although extending down to basal deposits. Included were five flakes, one possible large basalt flake

ACC0006989



**Figure VI.64.  Locus I, Feature 3, Top Plan**

ACC0006990

Site Descriptions

scraper, and 6.8 gm of bone. An increasing number of granite cobbles were found until an impenetrable layer of boulders and cobbles was reached at 77 cm below the surface.

Two additional 1 x 1 m units were first added to the initial test in the data recovery phase to increase the low artifact sample size from the lower levels. Similar results were obtained but with some important differences. The uppermost 20 cm of Unit 2 (Levels 1 and 2) again produced Late Prehistoric period materials, including a small hearth. Only flakes and bone fragments occurred in the lowest levels, but also recovered was a leaf-shaped basalt point from Level 5 (30-40 cm below surface) (see Chapter X). A single mano was also found at 30 cm below surface in Unit 3. A few sherds were recovered from rodent burrows at considerable depth, but all other levels produced small samples of lithics and bones to a depth of 75 cm below the surface, mixed with varying amounts of tabular granite roof fall.

The most astounding find was not made until the west balk of Units 1-3 was examined (Figure VI.65). The clear profile of a rock lined cist was apparent. Within the cist was a distinctive fill that partially blended in color and texture with the red-brown carbonaceous soil seen through most of Level 2. This profile was observed and mapped in the top plan as a carbonaceous smear at 20 cm below surface. The actual edge of the rock lined cist, defined at a lower level, was just missed when the rest of the unit was excavated and did not become distinguishable from the roof fall until seen in profile. The only other rockshelter with rock lined cists in association with an Archaic assemblage was at Indian Hill Rockshelter in Anza-Borrego State Park (Wilke, McDonald, and Payan 1986; McDonald 1992). Given the significance of these findings, it was decided to open a larger area to recover a larger artifact inventory and define the rock lined cist.

An additional 2 x 2 m unit (Unit 4) was extended to the west adjacent to Units 1 and 3. The exposure was then extended south to the back of the rockshelter with another unit, Unit 5 (Figure VI. 66). In Unit 4, Level 1 (0-10 cm) consisted of a loose ashy silt mixed with modern trash. A 56 x 50 cm slab-lined modern campfire extended to a depth of 47 cm and was removed as a separate intrusive unit before excavation continued. Artifacts in Level 1 consisted of modern trash mixed with ceramics, a rhyolite Cottonwood Triangular projectile point, a possible flake point or tool, two marine shell fragments, lithic debitage that included Obsidian Butte obsidian, and mammal bones.

The top plan of the upper fill within the slab-lined cist was now apparent and excavated as Level 2 (10-34 cm). A carbonaceous brown (10YR 4/2) loose silt and gravel fill contained two quartz Cottonwood Triangular points, two sherds, lithic debitage, and small mammal bone. These diagnostics indicate a Late Prehistoric or Ethnohistoric date, contemporary with the uppermost deposit throughout the rockshelter. A very similar circumstance was found at Indian Hill Rockshelter where the later artifacts were interpreted to be intrusive materials deposited after the cists were opened, cached material removed, and the features were abandoned (Wilke 1986:32). Indeed, the greater age of a lower deposit of fine silt within the Feature 3 cist produced only large and small mammal bone and a large chalcedony flake, with no later diagnostics. This Level 3 extended from 34-44 cm below the surface. These fine compact light brown silts were heavily mineralized, as were the upper surfaces of all the slabs that lined the cist. A tumble of stone was found at the bottom of the cist (Figures VI.67, VI.68a) and when removed, revealed a haphazardly arranged circular base. A larger stone on the south side apparently formed an edge, while some of the mapped slabs on the east side collapsed from their pedestal before photographs could be taken. Clearly the cist was constructed directly in the fine silts and sands within which no Late Prehistoric artifacts were found, suggesting that it might indeed be early, as later finds would support.

The excavation of the surrounding coarse brown silts from 10-20 cm below the surface resumed with the excavation of Level 4. These uppermost silts below the disturbed surface deposits were about even with the top of the cist but still contained two sherds, an iron clasp, basalt and Obsidian Butte or unknown source obsidian flakes, and an assortment of burnt and unburnt mammal bone. Some intrusion of the latest occupation of the rockshelter was obviously present. Levels 5 through 9 continued the excavation of the fine compact silts and gravels in 10 cm arbitrary levels from 20 to 70 cm below the surface. A few sherds and late style *Olivella* shell beads still occurred, possibly as a result of rodent activity. Artifact densities were low and were dominated by flakes and bone. Notable items included a

ACC0006991



**Figure VI.65.  Locus I, Feature 3, Units 1-3, West Profile**

ACC0006992

Site Descriptions



**Figure VI.66.  Locus I, Feature 3, Levels 3-10, Upper Level, Top Plan**

ACC0006993



**Figure VI.67.  Locus I, Feature 3, Levels 3-10, Lower Level, Top Plan**

ACC0006994

piece of quartz biface and a marine shell in Level 8. Except for a few intrusives, the dominance of larger volcanic flakes continued to suggest an earlier occupation and lithic industry distinct from all other Tahquitz Canyon sites.

A second cist was discovered at 70 cm below surface, at least 20 cm deeper than the first cist (Figure VI.68b). Unlike the first cist, this one was covered by up to 50 cm of fine compact silts and gravels as the interior fill. It was difficult to distinguish from roof fall in the profile, except for one large diagonally placed slab (see Figure VI.65). The interior fill, excavated as Level 10 in Unit 4 and Level 8 where it extends into Unit 5, extended from 70 to 86 cm below the surface. This cist extended into Unit 5, where subsequent excavations revealed a tumble of slabs that probably originally covered the cache and were removed in antiquity when the contents were retrieved (Figure VI.69a). A large boulder metate was incorporated into the west lip of the cist, under which was found a mano at 85 cm. A second mano was also found adjacent to the cist at 70 cm in Unit 5. A core-based uniface was also used as chinking in the cist (Figure VI.69b). The only finds within the fill were a piece of quartz shatter, two quartz flakes, a fire-affected chalcedony flake, and four mammal bones including burnt pieces.

Continuing in Unit 4, the compact light brown silts and roof fall outside of the second cist and below the first continued to be excavated as Level 11 (70-80 cm). Despite some rodent borrows, no apparent intrusives were found. Of particular interest was the base of a stemmed quartz point, three obsidian flakes (of which two could be identified as from the Coso volcanic field), pieces of burnt large mammal bone, and an assortment of small and large volcanic flakes.

The deepest deposits that extended below 80 cm were dug as one level, Level 12, to a depth of 112 cm. At this depth almost the entire surface of the unit was covered with very large boulders that probably represent the basal layer. A small number of flakes, burnt and unburnt large mammal bone, and small rodent bones were recovered from this level.

Unit 5 deposits paralleled those in Unit 4 except that the surface closest to the back of the rockshelter was higher. Levels 1 and 2 included deposits that were from 23 cm above to 10 cm below the surface datum. These upper most levels contained modern trash and burnt soil from recent camping mixed with numerous sherds, a sherd disk, a tip of a bone tool, four Obsidian Butte obsidian flakes, varied lithic debitage, and unburnt rodent bones. No ceramics were found below 20 cm and only small numbers of flakes, core fragments, and mammal bones were recovered from the light brown silts that extended to a depth of 100 cm. These were the lowest artifact frequencies per cubic meter of soil from any site in Tahquitz Canyon. Manos were found at depths of 40 cm, 50 cm, and 70 cm; and a whole metate was found at 70 cm.

**Summary**. It is estimated that about 50 percent of the rockshelter fill was excavated to reveal a two component occupation (Figures VI.70a-b, 71a-b). The uppermost component is a Late Prehistoric or Ethnohistoric campsite that left evidence of at least one hearth and a 10 cm deposit of ashy midden. *Olivella biplicata* rough disk beads from the upper levels are typical of other sites with Ethnohistoric period dates from 1803-1850. Ceramics, Cottonwood Triangular points, Obsidian Butte obsidian, and silica dominated lithic debitage are typical indicators of a late date. This component has been heavily impacted by modern camping, but the artifact assemblage and density of materials in the hearth suggests a small temporary camp. This is the only substantial late period occupation to be found in the rockshelters of Locus I and J along Echo Cliffs, but, at that, it represents a small and short-term occupation. Late Prehistoric artifacts also appear to intrude by means of rodent and root activity into the earlier phases to a depth of 30 cm.

The lower component could not be dated by absolute methods. No charcoal or carbonaceous soils were present and the small amount of mammal bone was of insufficient quantity for a meaningful AMS radiocarbon date. Shell bead types were useful in distinguishing two very distinct chronological phases. Also found were four *Olivella biplicata* spire removed beads from Levels 3 and 5 in Unit 1, and Levels 6 and 7 in Unit 4. These were the only ones of this type recovered from any locus and at least suggest an early occupation (see Chapter XIII). Obsidian from the Coso volcanic field was also obtained from the lower levels, another suggestion of an early date (Hughes and True 1985). Although artifacts were

ACC0006995



**Figure VI.68a. Locus I, Feature 3, Unit 3, Modern Hearth (left) Removed and First Cist (right) Exposed, View West**



**Figure VI.68b. Locus I, Feature 3, Unit 4, Level 10, Second Cist and Metate, View Southwest**

ACC0006996

Site Descriptions



**Figure VI.69a.  Locus I, Feature 3, Unit 4, Level 10 and Unit 5, Level 8, View Southwest**



**Figure VI.69b.  Locus I, Feature 3, Unit 4, Level 10, Cist and Associated Manos, View Northeast**

ACC0006997



**Figure VI.70a.  Locus I, Feature 3, Excavation Completed, View Northwest**



**Figure VI.70b.  Locus I, Feature 3, Excavation Completed, View South**

ACC0006998

Site Descriptions



**Figure VI.71a.  Locus I, Feature 3, Excavation Completed, View East**



**Figure VI.71b.  Locus I, Feature 3, Excavation Completed, View West**

ACC0006999

few in the lower levels, ceramics were absent and the leaf-shaped biface, dominance of volcanic or metavolcanic source material, and lithic debitage morphology were all consistent with a pre-ceramic horizon.

The early phase occupation was for the most part restricted to storage and possibly some food processing, as indicated by the extremely low artifact and ecofact densities, lack of midden, and absence of hearths, fire-affected rock, or charcoal. The differing depths of the two cists may suggest two different occupational phases within the earlier period. Analysis of organic and phosphorous content also suggests an occupational horizon at 50 cm (see stratigraphic analysis below). The area around the mouth of Tahquitz Canyon is still the only area in which mesquite trees grow, including directly in front of the rockshelter. The manos and metates from the lower levels appear to be associated with the cists and may either have been curated at this location or used to process stored seeds, other vegetal items, and meat during periodic visits to the rockshelter. Pollen washes from three milling tools were all contaminated during lab processing so they could not be used to make definitive economic inferences. Cattail appears to have been processed on the metate from Unit 5 and Chenopods or Amaranth pollen aggregates were observed on the metate from the cist in Unit 4. The only certain economic pollen from the upper cist in Unit 4 (Level 2) was cholla. Associated artifacts suggest that this probably represents a Late Prehistoric intrusion. Pollen from the bottom of the lower cist in Level 10 produced aggregates of *Ambrosia*-type and Liguliflorae (possibly *Taraxacum* or dandelion). Neither of these were stable food sources and some of this pollen may have derived from vegetal linings of food caches and not actual food resources. Aggregates of mesquite also derive from Level 3 of Unit 1, not unexpected given the proximity of *Prosopis* to the rockshelter.

Bone, both burnt and unburnt, from the rockshelter was most frequent in the Late Prehistoric/Ethnohistoric period component and for identified species is quite similar to Locus I, Feature 1. Comparison of upper to lower levels in Feature 3 indicate greater frequencies of large mammal, reptiles, and birds in the lower levels.

Locus I, Feature 3 was the only rockshelter at the base of Echo Cliffs that contained any substantial evidence of use. Even so, only short term ephemeral use of the rockshelter is suggested. Late Prehistoric or Ethnohistoric peoples, ancestors of the modern Cahuilla, built several campfires and deposited a small amount of household debris within the uppermost 10-20 cm of the rockshelter. They were preceded by peoples in the Archaic period who principally used the rockshelter to cache food or supplies in rock-lined cists and undertake seasonal hunting and gathering activities on a limited basis, as indicated by an extremely low artifact density and lack of hearths, charcoal, or accumulated midden deposits. The recovery of four manos and two metates in the lower levels emphasizes the seed grinding activities undertaken at the rockshelter or nearby. Some of these items may represent "site furniture," items left at the site for re-use during subsequent visits (Wilke and McDonald 1989:54). Mesquite pollen recovered from the surrounding soils indicates one important resource that continues to be concentrated in this section of Tahquitz Creek.

The two stone-lined cists represent only the second incidence of such features at Archaic sites in the Colorado Desert. In construction and contexts they directly parallel the Indian Hill Rockshelter examples (Wilke et al. 1986; McDonald 1992). The Tahquitz Canyon examples resemble one of the cache types at Indian Hill, where the construction method consisted of a mosaic of granitic slabs and small chinks set in sandy or silty, aceramic deposits. In both cases rock slabs were scattered around the interior and exterior from removal of the coverings when the caches were last retrieved. In both cases some of the resulting concavities were filled with Late Prehistoric midden debris. In both cases millingstone artifacts were incorporated into the construction or were found in direct association.

Despite the Late Prehistoric midden fill within some of the caches, Wilke argued that the Indian Hill Rockshelter features dated before the advent of ceramic production because ceramic ollas would have fulfilled the function of stone-lined cists in later periods. Cists of similar construction are common to rockshelter sites in the Mohave Desert, Great Basin and Southwest (Wilke and McDonald 1989). Locus I, Feature 3 thus appears to have been principally a cache location, like Indian Hill Rockshelter, Lovelock Rockshelter and Humbolt Caves, but on a much more modest level. Most of these sites also date to the

VI-116

ACC0007000

Archaic or Basketmaker Periods and derive from the mobile hunting and gathering strategies of the Desert Culture. Such rockshelters contain remnants of what were food caches, but also caches of material culture such as decoys, hunting nets, and ceremonial paraphernalia that represent a wide range of caching objectives. Caching of food, tools, and raw materials was employed within both the forager and collector-oriented settlement and subsistence strategies (Wilke and McDonald 1989). In the forager strategy, tools and food were stored in critical localities where people would be most likely to return as seasonal resources became available. Stone-lined subterranean caches were well suited to concealment if more than one group might use a shelter within overlapping or undefined territories. Careful placement of the stones suggest food storage to prevent rodent infestation. In addition, heavy or bulky items might be specifically cached and reused on each return to the locality. In the collector oriented strategy the same caching might take place at distant resource extractive localities, but food caching would also be used for the storage of surpluses before they were brought back to the residential base. Any number of subsistence-mobility strategies may therefore have been employed that resulted in the observed archaeological record (Wilke and MacDonald 1989:70).

The presence of what must have been cached food in the cists and the milling stone site furniture at Feature 3, but without substantial evidence of sustained residential activities, suggests a highly mobile strategy in which Tahquitz Canyon was only visited for short periods of hunting and gathering. Proximity to the mesquite groves, if present in the Archaic period, and abundant mesquite pollen in the middle strata may suggest this occupation was timed to the late spring and summer, when the seeds were processed and stored. This would have been a period when water was available at the mouth of the canyon but may have been scarce in the lower desert. Certainly none of the other investigated favorable settlement locations produced any preserved pre-ceramic occupational horizons. Some early shell bead types from Locus I, Feature 1 may represent scant evidence of one occupation at this neighboring rockshelter at the bank of Tahquitz Creek. Any other Archaic sites on the debris cone may not have survived the effects of floods and debris flows. If there was never any Archaic period occupation of the debris cone, then this early settlement pattern would have been different from the Late Prehistoric and Ethnohistoric periods, when many portions of the Tahquitz Canyon debris cone were used as a major temporary camp or residential base.

**Rockshelter Stratigraphic Analysis** (by Gary Huckleberry). Archaeological Loci I and J are located at the base of Tahquitz Canyon's southeast cliff face, an area where mass-wasting processes are favored by steep slopes, highly jointed and dipping bedrock, and, as elsewhere on the Tahquitz fan, earthquakes. The result is a series of rockshelters of variable configuration, orientation, and stratigraphy. Rockshelters generally represent good sediment traps and often contain intact stratified deposits. However, most of the rockshelters at Loci I and J are not sites of considerable deposition. Only Features 1 and 3 at Locus I contain deposits greater than 30 cm depth. Differences in rockshelter stratigraphy at Tahquitz Canyon relate primarily to the variability in rockshelter location, configuration, orientation, and the intensity of human occupation. Why most of the rockshelters at Tahquitz Canyon do not contain deep stratigraphies is likely related to the overall geomorphic stability of the fan. In general, primary modes of deposition at rockshelter sites include rockfall, aeolian influxes, colluviation, alluviation, and human and animal activity (Farrand 1985). All of these processes have operated to a varying degree at the Tahquitz rockshelters.

Features 1 and 3 at Locus I are examples of how two different rockshelter types at Tahquitz Canyon can contain contrasting stratigraphies. Feature 1 is characterized by a large mass-wasted boulder situated near the terrace scarp of old fan deposits. This rockshelter is relatively exposed to outside climate. Sand and silt derived from coarse alluvial soils, slopewash, and aeolian contributions comprise the sedimentary matrix around the boulder. Sandy midden material less than 40 cm in depth extend around the boulder. Cultural contributions include organics and river cobbles, the latter having been placed over the sands and around the rockshelter. In contrast, Feature 3 is recessed into rockfall at the base of the south cliff face. Open only to the north, this rockshelter is protected by a large mesquite tree which further isolates the shelter from outside climate. The deposits here are finer textured and extend almost

ACC0007001

Tahquitz Report

1.0 m below the surface, implying a greater preservation of aeolian silt and fine sand (Figure VI.72-73). Other contributions include the rock spalls from the walls and ceiling, colluvium from the cliff face, and culturally introduced organics. As might be expected with the deeper fill, an older, pre-ceramic component is preserved.

It is common in arid climates for rockshelter stratigraphy to appear sedimentologically homogeneous. Physical and chemical signatures of sediment origin, mode of deposition, and post-depositional processes are subtle and often impossible to distinguish without laboratory data (Stein 1985). Feature 3, for example, contains a relatively homogenous loamy fill with little internal stratigraphy. Aside from low-density debitage, a single, thin, burned horizon was the only signature of cultural activity in the 1 x 1 m test unit excavated during testing (Huckleberry 1988). In an effort to better understand the rockshelter sedimentology of Feature 3 and its cultural implications, particle-size, pH, organic matter, and phosphorus analyses were performed on seven samples collected at 20 cm intervals in the original test unit. The particle-size distribution confirms overall textural homogeneity with the exception of an increase in the sand fraction in the upper 20 cm (Figure VI.74, Table VI.3). An increase of fine sand may reflect greater aeolian activity, although increased cultural activity may also disrupt deposition. Chemical data indicate peaks in organic matter and phosphorus at 10 and 50 cm depth. Since organic matter and phosphorus are good chemical signatures for cultural activity (see Eidt 1985; Farrand 1985; Sjoberg 1976), each peak suggests a depositional hiatus accompanied by cultural activity. The lower level corresponds to the Archaic component, and the upper level corresponds to both Cahuilla (Patayan III) and modern activity. The increase in cultural activity in the upper 20 cm corresponds to the increase in the sand fraction and supports the contention that recent cultural activity has modified the depositional regime.

| TABLE VI.3 Particle-Size and Chemical Data for Locus I, Feature 3 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sample | Depth (cm) | Organic Matter (%) | HC03-P (ppm) | Sand (%) | Silt (%) | Clay (%) | pH |
| 1 | 5-10 | 0.9 | 37 | 61.2 | 29.6 | 9.2 | 8.0 |
| 2 | 15-20 | 0.6 | 29 | 55.2 | 33.6 | 11.2 | 8.1 |
| 3 | 25-30 | 0.6 | 30 | 45.2 | 41.6 | 13.2 | 7.2 |
| 4 | 35-40 | 0.5 | 31 | 47.2 | 43.6 | 9.2 | 8.0 |
| 5 | 45-50 | 0.8 | 34 | 49.2 | 39.6 | 11.2 | 8.0 |
| 6 | 55-60 | 0.6 | 31 | 47.2 | 43.6 | 9.2 | 7.9 |
| 7 | 65-70 | 0.6 | 26 | 51.2 | 39.6 | 9.2 | 7.9 |

**Feature 4.** A 1 x 1 m test unit was placed along the back wall of a small north-facing rockshelter. The unit was taken down through 20 cm of light tan-brown silty soil before reaching consolidated gravels and cobbles. The unit was almost sterile with only two flakes, 0.6 gm of bone, a modern glass marble, and four pieces of recent glass being recovered from the uppermost deposit. This rockshelter was not used for any prolonged prehistoric activities that might leave midden or non-perishable artifacts.

**Feature 5.** A small north-facing rockshelter was formed by several large boulders that have fallen on top of each other, forming a long 3 x 7 m corridor (Figure VI.75a). The innermost (southernmost) two-thirds of the corridor was filled with water deposited cobbles and boulders but the northernmost area was a flat space of about 2 x 1.5 m. This entire area was excavated in four units, two of which measured

ACC0007002



**Figure VI.72.  Locus I, Feature 3, Square 4, South Stratigraphic Profile**

ACC0007003



**Figure VI.73.  Locus I, Feature 3, Squares 4-5, West Stratigraphic Profile**

ACC0007004



Figure VI.74.  Locus I, Feature 3: Particle-Size, pH, Organic Matter, and Phosphorus Distributions of Rockshelter Sediments

ACC0007005



**Figure VI.75a.  Locus I, Feature 5, Ronald Saubel at Rockshelter, View South**

1 x 1 m, and two of which measured 1 x 0.5 m.  The units were excavated to a depth of 20 to 30 cm depending on the depth of rockfall below the light brown, loosely consolidated silts and gravels.  A small assemblage of Late Prehistoric-Ethnohistoric period artifacts indicates this rockshelter was occupied, probably for a short time and by a small group or an individual.  It may also have been used for caching food or supplies.  Recovered artifacts included 40 sherds, many of which were painted sherds from the same olla.  Also found were six flakes, a possible bone spatulate tool, and a small sample of animal bone.

**Locus J**

A series of six potential rockshelter sites were examined in the easternmost end of the Echo Cliffs rock escarpment on the south side of Tahquitz Creek.  This is the same geological formation that formed the rockshelters in Locus I.  These rockshelters all occur on an east-west line along a well-used hiking trail.  Many have been intensively occupied by recent transient visitors, and were still being used during the investigations.  Almost all tested negative or contained only a few traces of Late Prehistoric activity.  Only shallow soil accumulation was found in most, and disturbance from recent uses had obliterated any evidence of aboriginal use.  Low artifact frequencies and lack of accumulated midden indicated that none of these rockshelters were used as residential bases or even temporary camps.  Rather, they were used for short-term specialized activities or possibly as cache locations.  Isolated basalt artifacts at two features may indicate use in the Archaic period.  Many additional rockshelter locations were originally identified by Jefferson and Hammond.  Particularly those on the upper cliffs to the south were examined and were found to be cavities and boulder falls that may have provided some protection from the elements, but there were almost no habitable flat spaces, no soil accumulation, and no surface artifacts.

**Feature 1**.  This large west-facing overhang appeared to be a perfect protected rockshelter location.  Numerous beer bottles, cans, remnants of a recent campfire, and abundant graffiti on the back wall proved that modern occupants made use of the sheltered location.  A linear scatter of boulders and

ACC0007006



**Figure VI.75b. Locus J, Feature 2, Jim Swenson Standing Next to Test Unit, View South**

cobbles at the front of the rockshelter also suggested that a rock wall or windbreak was constructed at one time. A 1 x 1 m test unit was placed in the small open area behind the drip line and in one of the few areas not covered with large rocks. A light-tan grayish brown silt loam was excavated to a depth of 20 cm before encountering consolidated boulders and cobbles. The upper 10 cm contained one sherd, one flake, one basalt projectile point preform, and 0.6 gm of bone. The lower 10 cm contained small charcoal flecks, 0.6 gm of bone, but no artifacts. A second unit was placed 2.5 m north of Unit 1. Similar soil was found to a depth of 20 cm, within which only one sherd was recovered from the lower level. The low artifact density suggested ephemeral use of the rockshelter by task-specific groups.

**Feature 2.** A small, north-facing enclosure formed by fallen boulders is bordered by steep slopes to the east and west (Figure VI.75b). A 1 x 1 m unit was excavated to a depth of 30 cm. A small shovel test in the bottom of the unit indicated continued sterile silts until compacted boulders were reached at a depth of 40 cm. The semi-compacted, light-tan silts and sands were sterile except for the heavily disturbed uppermost level. It contained two fragments of a basalt projectile point, 0.8 gm of bone, and an assortment of recent ceramics, plastic, and gun shells. A few bones from the lower levels may have been naturally introduced.

**Feature 3.** A large granite slab fell over an array of boulders around a concavity and produced a low shelter, actually a 1 m high crawl space. A shovel test in the light yellowish brown silts and gravels under the rock indicated 40 cm of sediment before crushed granite was encountered. The uppermost level contained charcoal, a steel pellet, three sherds, and 0.8 gm of bone. No other artifacts were found. All of this material appears to have washed into the space. The low overhang probably made it impossible to conduct any activities in such a space beyond storage.

ACC0007007

**Feature 4.** Two large granite slabs fell in such a way as to brace against each other and form an A-shaped, north-facing rockshelter. A shovel test was first placed in the center of the dimly lit 2 x 3 m area under the giant rocks. Three sherds (two from the surface) and 2.2 gm of bone were recovered from the 40 cm deep probe, encouraging an expansion into a 1 x 1 m unit. The uppermost 2 cm of the 0-10 cm level of slightly carbonaceous tan silts and sands produced eight sherds, two flakes, and 2.9 gm of bone. The second level contained only 0.1 gm of bone. The remaining 10-20 cm of soil above the rocky substratum was totally sterile. Only ephemeral activities were undertaken in this small rockshelter, as evidenced by the lack of midden and restriction of artifacts to the surface.

**Feature 5.** A large enclosed area was formed when an enormous granite slab fell on a cluster of large boulders. This space is only about 1.5 m high, but extends over an indeterminate space with different ledges and levels. The rockshelter has been intensively occupied by migrants, who have left cardboard, glass, beer cans, carpets, and an interesting assortment of pornographic magazines. Fearless crew members crawled into the cramped space and removed the scraps of bedding to reveal a thin deposit of aeolian silt. Samples of this soil were removed and sifted, revealing a sterile fill. If this rockshelter were used in the past, all evidence has been obliterated by modern inhabitants. A shovel test was also made in an open area on the east side of the shelter. No artifacts were found in the 20 cm of light tan silty soil.

**Feature 6.** A small enclosed area with sloping rocky floor was covered with contemporary trash and some *Neotoma* midden debris. Shovel tests in the 10 cm or less of yellow-brown aeolian soil were negative except for modern trash.

**Feature 7.** Three small campsites were excavated in a newly defined Locus J, Feature 7 during investigations for the proposed Agua Caliente Cultural Center in November, 1989. Two of these sites had tested positive during the testing phase of the project in June 1989. An additional ashy midden area found during the excavation phase also proved to be a small camp. All three areas are within 100 m of each other (see Figure VI.1).

Units 1-3 (Area I). A shovel test had revealed charcoal and ash, eight sherds, four metavolcanic flakes, and burnt and unburnt bone in a small area that butted up in front of several large boulders. A 2 x 2 m unit was placed around the shovel test. An ashy carbonaceous midden deposit was exposed at 5 cm depth and continued to 12 cm, above a sterile layer of coarse sand and gravel. The deposit was elliptical in shape, roughly 1.5 m in length and 1 m wide. Artifact content was high and included 111 sherds (36% Colorado Buff Ware, 64% Tizon Brown Ware), 85 lithic flakes (glass, rhyolite, chert, obsidian and quartz), and several small projectile points (glass and rhyolite). Of particular significance was a small Cottonwood Triangular point made of green glass. In addition, over 300 gm of large mammal bone were recovered. Units 2 and 3 were 1 x 1 m squares dug to establish the northern and southern boundaries of the deposit. Area I appears to have been a small campsite of Late Ethnohistoric occupation.

Units 4-6 (Area II). This area is located approximately 25 m north of Area I. It is also situated around a large boulder. A 2 x 2 m unit (Unit 4) was placed around the original shovel test, and excavation revealed a concentration of ash and charcoal. The dark ashy midden extended from a depth of 5 cm to 20-25 cm before grading into sterile sand and gravel. The deposit was roughly oval in shape and 1 m in diameter. Artifacts in the first level (0-10 cm) included 90 sherds (Colorado Buff Ware), nine flakes (glass, rhyolite, and chert), a small amount of bone and one *Olivella* bead. Level 2 (10-25 cm) revealed a large pot drop (697 sherds) of a Colorado Buff Ware olla, 15 flakes (12 green glass, one rhyolite and two quartz), a small Cottonwood Triangular projectile point and a bone awl. The pot drop was found slightly south and adjacent to the hearth area. The bone awl and point were found in association with the pot drop. Two 1 x 1 m units (Units 5-6) were excavated around two positive shovel

ACC0007008

tests 7 m east of Unit 4. Both had a very shallow deposit (5-10 cm) of sedimentary material superimposed over alluvial rocks and cobbles. A small amount of sherds and some bone were found in both units. The two units were located on the side of a small drainage, which showed a considerable amount of water erosion; thus some of the artifacts may have been redeposited. The presence of artifacts was most likely the result of water dispersal from other areas. Area II also appears to have been a small campsite of the Late Ethnohistoric period. The adjacent boulders and rocks would have provided a convenient wind break and shelter. It also helped to keep the hearth area relatively intact.

Unit 7 (Area III). A dark ashy deposit was found on the surface 25 m south of Area I during the excavation phase. The area is located on an exposed surface which shows considerable water erosion, with a small drainage on the south side of the deposit. A low density surface artifact scatter appears to have been exposed by recently heavy rainfall. A shovel test revealed cultural material to a depth of 5-8 cm. A 1 x 1 m unit was placed around the shovel test and excavated to a depth of 20 cm where sterile alluvial rocks and cobbles were encountered. Artifacts included 42 sherds (37 Colorado Buff Ware, 5 Tizon Brown Ware), one glass flake, and 40 gm of bone. The 1 x 1 unit exhausted the ash and midden deposit with the result that the lateral and horizontal limits of the feature could be defined as very limited in size. Area III also can be considered a limited use Ethnohistoric period campsite.

**Locus K**

The shovel test program conducted in the direct impact zone of the debris basin located an interesting, previously unrecorded deposit. It was located 100 m north of Locus C at coordinate N140 W330, and assigned a new locus designation, Locus K. A surface scatter of sherds and midden soil indicated a 10 m$^2$ area of occupational debris just south of a dirt road. A 1 x 1 m test unit was placed in the center of the midden to reveal a 10 cm thick layer of tan-gray, fine grained sandy loam that contained charcoal and fire-affected earth. The deposit was unusual because with the large sample of ceramics were many marine shell fragments. Many of the fragments appeared to be rounded and water or surf worn. Fragments recovered included a possible *Donax gouldii* fragment, three fragments of burnt *Ostrea* (oyster) shell, and one fragment of *Haliotis cracherodii* (abalone). All of these types are derived from the Pacific Ocean, and may represent debris from shell manufacture. The Cahuilla are known to have enjoyed extensive trade with the Chumash and Gabrielino for beads and other materials from the Pacific Coast, and there is no reason why they could not have manufactured some shell artifacts from imported raw materials (Bean 1972:122-125). Four *Olivella biplicata* shell beads or fragments were also recovered, one of which possessed an extremely rough edge typical of a preform (see Chapter XIII). Other finds included faunal remains and a few lithics. Another unusual find was a cylindrical fired clay fragment that may have been part of a figurine.

This small, Late Prehistoric temporary camp was used not only for daily subsistence activities, but also provides possibly the first known evidence for shell bead or shell tool manufacturing in the Coachella Valley. The thin deposit and limited spatial extent suggests a short-lived, although intensively used, Late Prehistoric-Ethnohistoric camp. Locus I, Feature 1, also produced an *Olivella biplicata* callus that may indicate bead manufacture (see Chapter XIII).

**Locus L, Feature 2**

Locus L was discovered at the end of the data recovery project during testing of a right-of-way for the Agua Caliente Band Interpretive Center access road. Investigations at this site lasted from March 29 to May 5, 1989.

The large Late Prehistoric-Ethnohistoric temporary camp was situated on a lower terrace paralleling the south side of Tahquitz Creek between Loci D and E (Figures VI.76a-b). Tahquitz Creek was still flowing about 3 m below the terrace at the time excavation began, but surface flow receded to the upper debris cone by the end of excavation work. To the south of this narrow 20 m wide terrace, a steep 4 m high escarpment lead to the upper boulder-strewn surface of the debris cone. The intermediate position of this terrace above the Tahquitz Creek made it a likely area for habitation and also for possible

ACC0007009



**Figure VI.76a.  Locus L, Feature 2, View West**



**Figure VI.76b.  Locus L, Feature 2, View Northwest from Top of Embankment**

ACC0007010

Site Descriptions

agriculture. High flood stages of the creek could well inundate the terrace, or water could be artificially diverted through dams and ditches. Heavy surface undergrowth was first removed before testing the site. The extensive ground cover probably explains why the locus was not recorded during the Jefferson and Hammond (1972) survey or subsequent investigations. After brush clearance, a series of ashy midden deposits and rock alignments were immediately revealed in the cobble and boulder-strewn terrace surface. The area was subsequently divided into 323 two by two m units and mapped. Shovel tests were placed in the center of most of the squares to determine the limits of subsurface deposits. An area of 80 contiguous units was opened for full excavation at the western end of the site (see Figure VI.77, back cover pocket). In addition to this large exposure, at least two cremation burials, four hearths, and a large midden deposit were detected by shovel testing in the eastern portion of the site. Limited time and Cahuilla concerns did not permit the examination of these latter features, but they will be preserved by site capping.

Three types of features were found within an artifact scatter of varying density. These included fire hearths, midden deposits, and rock alignments. All occurred as thin deposits no more than 5-15 cm thick, no more than 5-10 cm below the surface or at surface level, and extending no deeper than 30 cm below the surface, where they rested on alluvial silts, gravels and cobbles. Several shallow washes bisected the area and some alluvial displacement of artifacts appeared likely. Each feature will be discussed in detail below, following a brief summary of each type.

Fire hearths were bowl-shaped, fire-reddened pits that contained fire-affected rocks, charcoal and ash. They were found to cluster in the southeast part of the site in an area of dispersed cobbles and boulders where shallow silt and sand deposits had accumulated. This part of the site was close to the base of the upper terrace where several shallow washes flow through the area.

Midden deposits were all shallow deposits of mixed organic and carbonaceous soils that contained a mix of fire-affected rock, animal bone, charcoal, and an array of sherds, lithics, shell beads, and milling equipment fragments. Most midden concentrations were directly associated with hearths and, in part, probably represented hearth debris from food preparation and consumption. Several midden deposits, particularly those on the north side of the site, had no hearth associations, but this was probably due to poor preservation or cultural activities that obliterated the characteristic outlines of *in situ* hearth installations. These areas all contained evidence of fire and food preparation, domestic activities, tool manufacture, and tool maintenance.

Rock alignments were unique to this site. Six of the approximately 12 rock features were included in the excavation zone. These roughly parallel, uncoursed cobble alignments measured from 2-4 m long and 0.5 m wide, and stood only 20 cm high. They were arranged at uneven intervals along a shallow wash at the extreme southern end of the site. If water could be diverted to this wash from Tahquitz Creek, these rock alignments could have been used for horticulture to retain soil and slow water flow for maximum soil saturation.

Other units generally contained shallow deposits of light brown (10 YR 5/3-6/3) silty sands to a depth of no more than 30 cm, over cobble and gravel strewn alluvial fan deposits. Artifact content within these sediments was generally low, and in the active wash areas, also contained recent historic glass and metal artifacts to indicate stream action and redeposition. This phenomenon was particularly acute in the sediments accumulating near the rock alignments. An array of milling stone fragments, sherds, lithics debitage, and other utilitarian artifacts were recovered from these units, usually in small numbers.

**Fire Hearths and Middens**. Three hearths were found within a large midden deposit in Units 34-35, and 43-44. The midden appeared to have been located between two of the rock alignments but no direct association could be made. The hearths had well defined circumferences within which were concentrations of fire-reddened soils, fire-affected rocks, ash and charcoal (Figure VI.78a). All were stratigraphically associated with the midden and rested on gravelly or silty wash deposits at a depth of 5-20 cm below the surface. The midden deposits ranged in thickness from 2-15 cm, thinning out to a 1 cm lens at the edges (Figure VI.78b). The midden consisted of a grayish-brown (10YR 5/2) sandy soil, and

VI-127

ACC0007011



**Figure VI.78a.  Locus L, Feature 2, Unit 43, Hearth Feature, Midden Surface, and Rock Alignment, View North**



**Figure VI.78b.  Locus L, Feature 2, from Left to Right Units 25, 34, 43, 52 After Excavation, Unit 61 at Far Right Not Yet Excavated, View North**

ACC0007012

Site Descriptions

contained two projectile points, milling stone fragments, shell beads, a small amount of lithics, abundant ceramics, and both burnt and unburnt animal bone.

An unusual tortoise shell plastron (ventral shell) fragment was found to the north of the midden deposit in Unit 35. The front half was found *in situ* below 6 cm of alluvial sediment. Also found in the unit were nine sherds, found at a depth of 14-16 cm, a projectile point, and two flakes. All appeared to be redeposited in alluvial sediments trapped by the nearby rock alignment. Although likely, it cannot be determined with certainty that the tortoise shell is a result of cultural activities and not natural.

Unit 44 produced a concentration of charcoal and burnt animal bone at a depth of 5-15 cm. The irregular-shaped deposit was plano-convex in profile and contained a layer of fine gravel through the center. Associated artifacts included a milky quartz crystal, a Desert Side-notched point, and ceramics.

A small hearth lay within a partial rock ring in Unit 53. Ash and charcoal were found from a depth of 0-15 cm below surface, but the lack of associated artifacts made it difficult to date. It may be recent or from the last aboriginal occupation of the site. Artifacts found in the pale brown (10YR 6/3) silty fill of the unit included two projectile points, additional tortoise shell, several flakes, and a possible burnishing stone.

Two oxidized surfaces were found within the midden of Units 62 and 63. The 5-10 cm thick midden in the northwest quadrant also extended into Unit 53 where it formed a compacted silty deposit of ash and charcoal—possibly a small occupation or activity area. The hearth in the southeast quadrant extended into Unit 61 and was likewise ill-defined, and associated with only a few sherds. The amorphous hearths suggested burning episodes on the already established midden. These deposits were all contained within a recent shallow wash in which artifacts were concentrated. Included in the assemblage of Unit 62 were a projectile point, several flakes, ceramics—including some with carbonized residue, and abundant burnt bone.

Unit 55 produced an area of fire-reddened soil at a depth of 9-15 cm within a larger ashy midden deposit. The midden sat on the north side of a small wash that bisected the site. Most of the artifacts came from the 5-10 cm thick midden that rested on compact alluvial sediments at a depth of 20 cm. Among the finds were three projectile point fragments, abundant lithic debitage and ceramics, five shell and one melted glass bead, and burnt and unburnt animal bone.

A series of very thin ashy midden deposits were found in Units 19, 21, and 28. All appeared to be heavily disturbed by alluvial action and were either close to the surface or interbedded with silt laminae. Finds included metate fragments, both carbonized and uncarbonized seeds, a few sherds, a possibly intrusive rim-fire 22 caliber shell (stamped "US"), and only small amounts of pottery and lithic debitage. A small hearth in the northwest quadrant of Unit 72 extended from 8-18 cm below the surface. The ash and charcoal content included paper-thin carbonized material that may have been burnt pine cone. Associated finds included a large boulder slick in Unit 80, metate fragments, abundant ceramics and lithic debitage, a broken projectile point base, and both burnt and unburnt animal bone.

The hearth in Unit 72 was probably associated with the large midden deposit to the north in Unit 73. Large amounts of charcoal, fire-affected rock, and artifacts occurred in the dark brown (10 YR 3/3) sands and silts to a depth of 20 cm. Among the finds were two large ceramic pipe fragments, numerous sherds, a small number of stone flakes, one mano, carbonized seeds, and a small amount of animal bone.

A large hearth and two distinct middens were found in Units 89, 97, 98, and 99 at the northeastern edge of the exposure (Figure VI.79a). They were found within and to the north of a small wash that bisected the site. A dark brown (10YR 3/1-5/3) midden stain marked the 70 x 90 cm hearth in Unit 98. Extending from 0-10 cm below the surface, the deposit contained fire-reddened silty soil, ash, charcoal, burnt and unburnt small mammal bone, quartz lithic debitage and associated core, and ceramics.

A charcoal and ash layer extended over much of Unit 89 at a depth of 15 cm, but no artifacts were found in association. A few sherds, flakes, and animal bone came from the southwest quadrant or below the charcoal lens. Also two ceramic pipe fragments were recovered from the wash, probably associated with a fragment in Unit 80 and three fragments in Unit 81. The carbonaceous deposit continued to the southeast into the wash in Unit 97. Here abundant artifact finds indicated that downwashing may have redeposited all the finds. Occurring at a depth of 5-10 cm below the surface, this

ACC0007013

dark brown (10YR 6/3-4/2) ashy silt contained two projectile points, ceramics, lithic debitage, and small mammal bone. A portion of the midden also extended to the north into Unit 98 (Figure VI.79b). The midden to the north of the hearth, in Unit 99, contained only a 2 cm thick deposit of ash and charcoal intermixed with alluvium. Only a few lithic flakes and burnt bone were recovered, except for a mano and a small cluster of fire-affected rock in the northeast corner.

**Chipping Station**. Abundant chalcedony debitage in Units 82, 83 and 90 indicated the presence of a lithic reduction workshop at the periphery of the site. Unit 90 produced over 50 small flakes but little other cultural material. Numerous flakes also were recovered from the eastern half of Unit 82, along with a projectile point, ceramics, animal bone and charcoal. A more diverse assemblage remained in Unit 83 where the same chalcedony flake variety occurred with ceramics, shell beads, a piece of incised abalone, an obsidian point, charcoal, and burnt and unburnt animal bone. Most of these artifacts came from the uppermost 5 cm, with sediments extending to 18-32 cm.

**Rock Alignments**. Possible evidence of aboriginal water control was suggested by the array of rock alignments that occurred at irregular intervals along the shallow wash on the south side of the site (see Figure VI.77, back cover pocket, Figures VI.80a-b, VI.81a-b). The semi-circular alignment in Unit 91 may have been a small enclosed activity area on a small slope above the wash. A mano and bone awl were found among rocks along with a small sample of ceramic and lithic finds. This feature may indeed have been related to the hearth and middens to the south and east. What appeared to be a semi-circular alignment in Unit 103 was probably two linear rock alignments.

Small pockets of alluvially deposited silts and sands were found between the rock alignments, often containing artifacts that had washed in. Even the deepest deposits "downstream" from each alignment contained intrusive glass and metal artifacts of recent date, suggesting that some of these soils have been eroded away and redeposited several times. This was most evident in the eastern end of the site where the stream gradient is greater and water velocity would be faster. The small alignments only stood a maximum of 20 cm above the underlying cobble base and did not appear to have contained enough material to support deeper soil deposits at any time. There did not appear to be any evidence that they had eroded away to a lower height. Downstream boulder patterns at Locus L did not indicate that the upper portions were sheared off by floods. Rocks in Unit 88 appeared to be imbricated or overlapping due to stream deposition. Some natural stream deposition had contributed to the alignment, although the original rock feature may or may not have been cultural in origin. Natural rock dams are a common occurrence in desert washes, and typically contain an imbricated rock arrangement, rather than deliberate horizontal coursing. If these rock alignments were cultural, then their function cannot be inferred with certainty. As agricultural installations, they appeared to be too low to hold sufficient soil to grow cultigens. The Hohokam trincheras of southern Arizona and northern Sonora often stand over 85 cm high and could contain much more substantial soil deposits. Such systems may also extend back in time to the Late Archaic (Fish et al. 1986; Wilcox and Larson 1979). Other boulder retaining wall systems in the Arizona uplands, e.g. in southern Arizona, were installed in washes as they coursed down steeply sloping hills, not on flat terraces. They occur in groups of from 10 to 50 and on slopes ranging from 5 to 21 degrees (Cordell 1984:192). The extensive fire hearth and midden complex in Units 34 and 43 indicated that some spaces between the rock alignments were used for habitation. They may thus have served to prevent or retard erosion of living surfaces. Alternatively, the shallow soil deposits retained by the rocks may have been used to cultivate shallow-rooted native herbs and grasses.

**Test Trench F, Unit 12**. A test trench was excavated at the far western end of Locus L, 14 m west of Unit 3, to explore for evidence of irrigated agriculture. Natural topographic associations between Tahquitz Creek and the terrace suggested the potential for water to be diverted onto the terrace for agriculture. Lying only 3 m above Tahquitz Creek, water could be diverted through the use of dams and an irrigation ditch to the small washes that bisected the site. The small rock alignments could have been

ACC0007014

Site Descriptions



**Figure VI.79a.  Locus L, Feature 2, Unit 97 (right), Midden and Hearth Emerging at Northwest Corner, View North**



**Figure VI.79b.  Locus L, Feature 2, Units 91 and 98, Midden Deposit, View Southeast**

VI-131

ACC0007015

Tahquitz Report



**Figure VI.80a.  Locus L, Feature 2, Unit 88, Rock Alignment, View North**



**Figure VI.80b.  Locus L, Feature 2, Unit 103, Two Rock Alignments, View North**

ACC0007016

Site Descriptions



**Figure VI.81a.  Locus L, Feature 2, Units 121-122, 131-132, Excavated (left) and Unexcavated (center) Rock Alignments, View North**



**Figure VI.81b.  Locus L, Feature 2, Unit 122, Rock Alignment, View North**

VI-133

ACC0007017

used to control the water flow, although as discussed, little evidence was found to confirm that hypothesis. Water levels would only reach the terrace level in higher flood stages and for short periods. Recent down-cutting has probably lessened the frequency that floodwater reaches the terrace level, and in the past, this may not have been as difficult a task as it would presently seem. The most logical place to divert water from the flooding creek would be at the westernmost end of the terrace where once diverted, gravity would carry any water east across the terrace. A small natural wash that is blocked by a 50 cm berm presently exists at this location. A north-south oriented trench measuring 50 cm by 9 m was excavated to bisect any potentially buried diversionary features. No ditch profiles, rock alignments, soil stains, or other evidence of deliberate cultural modification were found to a maximum depth of 40 cm. An upper deposit of brown (10YR 5/3) silts overlaid a thin interbedded lens of light yellowish brown (10 YR 6/4) intermixed silts and gravels and light gray (10 YR 7/2) concentrated gravels. One natural dark gray organic lens was also found. At 40 cm, a compact deposit of alluvial cobbles, gravels, and boulders was exposed, but no disconformities to suggest that a diversionary ditch had ever been dug through the area. The only artifacts found were a few surface sherds.

The absence of evidence for irrigated agriculture or the presence of cultigens at Locus L does not entirely prove that agriculture was not practiced, only that agriculture cannot be demonstrated with any certainty. Very likely the rock alignments were either natural or were used to control surface runoff to encourage wild vegetation or reduce erosion. Locus L does represent an intermittently used temporary camp where a variety of domestic activities were conducted. Several cremations that were located nearby tend to support the conclusion that this may have been a residential base. Unless erosion has decreased the original sediment depth, the low artifact density and shallow midden accumulation indicate a less intensive occupation than many of the other loci in Tahquitz Canyon.

Locus L represents a Late Prehistoric and/or Ethnohistoric Period residential site located on a lower terrace of Tahquitz Creek. The presence of flaked glass indicates a late 18th-19th century date. This was further corroborated and specified by *Olivella* bead types dating to 1790-1803 (Chapter XIII). No radiocarbon dates were run because by this phase in the project it was found that Late Period calibrated dates were no more accurate than dates based on artifacts. Substantial evidence was found that the site was occupied at least during the spring season. Grass, cattail and globe mallow pollen derived from a hearth in Unit 34 and indicated springtime use. *Plantago* pollen aggregates suggested springtime seed gathering of this winter annual, and potentially winter exploitation of the leafy greens. Cholla and Evening Primrose Family type pollen were recovered from midden deposits in Unit 43. No evidence of cultigens was found in pollen or float samples to support an interpretation of the rock alignments as agricultural features.

## Locus M

A program of intensive surface recording and limited subsurface testing was completed at a newly defined Locus M that was discovered during brush clearing of Locus L. Initial survey and mapping revealed an extensive historic site from the early 1900s that overlay and abutted a Late Prehistoric-Ethnohistoric component. Surface finds included a mix of prehistoric and historic materials. Prehistoric surface remains included a cremation area, ceramics, lithic debitage, beads, a steatite arrowshaft straightener, and animal bones. Historic finds included bottle glass, glazed Euro-American ceramics, Mexican painted pottery, wire and cut nails, a hammer, a metal spoon, roof tile, adobe bricks, concrete, and pink stucco. The most unusual artifact category were large numbers of carbon rods of the type used in arc lamps.

The cremation area was intentionally avoided but the remainder of the site was mapped and subsurface tests were undertaken to identify the function and historical association of the historic house, and to define the depth and limits of the prehistoric occupation. Mapping of the historic remains detailed the configuration of a rectangular cobble foundation, a concrete slab, retaining walls, a small trough, and an unusual circular foundation attached to what appeared to be a well head. Excavation of the well proved this feature to be a buried barrel with plastered bottom. Apparently this was a cistern or "mock well" (Figure VI.82a). Test units on the site also revealed a shallow deposit of decomposing red stucco and

ACC0007018



**Figure VI.82a. Locus M, Feature 2, Interior of Excavated "Barrel", Bottom Diamter is 60 cm, View West**

other building debris. The structure appeared to have been intentionally dismantled leaving no intact superstructure, only scattered building remains and a great quantity of iron nails.

Archival research at the Palm Springs Historical Society and interviews with elder Palm Springs residents helped to identify this enigmatic historical site. No maps, plats, or historical records had previously indicated that a historic homestead or ranch house had ever existed in Tahquitz Canyon. Initial research suggested that this may have been one of the locations for the famous Tahquitz Pageant, a series of melodramas with Indian themes that were produced by local citizens in the 1920s, and promoted to the burgeoning Los Angeles tourist community. A preserved script at the Palm Springs Historical Society called for an adobe set, and one newspaper story contained drawings of an adobe building. Informants, however, all agreed that Locus M was not the location of the pageant and that plays were presented further up the canyon near Locus G. Several local residents referred to the numerous movies that were made in Tahquitz Canyon by the growing Hollywood industry in the late 1910s and 1920s. Many of these movies were made in the silent era, but Tahquitz Canyon continued to be a popular movie setting in later decades (Bogert 1987:128-132). Tahquitz Canyon appears to have been used for both western exotic Arabian, and other settings. For example, Tahquitz Falls was portrayed as Shangri-La in the 1940s version of *Far Horizons*, starring Ronald Coleman. Locus M thus appears to have been a movie set that was probably used for one season or even several years. This would explain the numerous carbon arc lighting rods, the superficial nature of the structure, the "mock-well," the lack of domestic trash, and the absence of historical references to a ranch at this site. Queries to the American Motion Picture Academy Archives to identify the actual movies at this location were not successful. No additional research or analysis of data was undertaken concerning the historic component because the locus was outside the Area of Potential Effect of the project, but was rather within the proposed access road for the Agua Caliente Cultural Center that was specifically excluded from the MOA. The site also did not bear on the current research objectives of the Tahquitz Canyon Project. All recovered artifacts and a detailed map of surface remains, however, are in the possession of the Agua Caliente Band of Cahuilla Indians and are available for future research.

Subsurface testing at Locus M also uncovered evidence of a Late Prehistoric to Ethnohistoric period component. Six 2 x 2 m test units were excavated around and in the center of the small rise on which the historic site rests. Units on top of the mound and adjacent to the "well" produced only historic remains in a shallow deposit that extended no more than 10-20 cm below the surface. Any prehistoric remains may have been obliterated by historic activities. Three units to the north and west did uncover subsurface prehistoric remains that included midden deposits, a hearth, bird and mammal bone, lithics, ceramics, and other typical habitation remains. Ceramics were all of late period Tizon Brown Ware, Colorado Buff, and Topoc Buff. The prehistoric component appeared to cover an area of about 100 m$^2$ adjacent to the historic component. New midden deposits were also found in two of the test trenches towards Locus L that were dug to find evidence of prehistoric agriculture. Evidence of cremations was also found adjoining the historic component. These calcined bone fragments were returned to the units

ACC0007019

from which they were excavated. A temporary camp or residential area was thus defined that may be associated with Locus L. Funding restraints precluded further work at this site and it is anticipated that it will be capped prior to construction of an access road for the Agua Caliente Cultural Museum.

## Locus N

An intensive archeological survey was conducted in May of 1989 for the Desert Water Agency (DWA) proposed construction of a 5 million gallon water tank at the mouth of Fern Canyon, next to the existing 5 MG tank (CSRI 1989). A grinding slick and several chipping stations were found, and several potential rockshelters were recorded as a newly defined Locus N. A sheltered area at the base of three large boulders was also found. From June 16 to 21, 1989, 82 shovel test pits were excavated over the area to test for subsurface deposition. The results of the testing are reported here as ancillary data for interpreting the general settlement pattern at CA-RIV-45. Archaeological tests were also conducted on lined and unlined portions of the Lebacho-McCallum irrigation ditch. Those results are discussed later under evidence for irrigation. Additional rock art was also located at one of the rockshelters and is reported in Chapter XIX.

The Locus N study area, defined by the limits of the planned surface disturbance, was located at the mouth of Fern Canyon, both above and within the stream channel that contains the Lebacho-McCallum Ditch. Fern Canyon is about 350 m long and steeply inclined, rising from 200 to 300 m. Fern Spring lies at the head of the canyon and perennially produces water and supports lush vegetation. Lebacho Wash begins at the apex of the fan building out of the mouth of the Tahquitz Canyon. It flows northerly 2.5 km along the base of the San Jacinto Mountains, intersecting the drainage channel of Fern Canyon about 690 m from its beginning.

The hydrologic history of both Lebacho Wash and Fern Springs may have induced changes in human settlement. The Lebacho Wash channel was probably cut by Tahquitz Creek prior to the time that it shifted into its modern stream course. Well-rounded cobbles, the result of the relatively greater distance of transport than the subangular clast found in the fan, are part of the bedload of Tahquitz Creek. The presence of well-rounded cobbles in Lebacho Wash suggest that Tahquitz Creek once flowed through it. This fact is supported by both ethnohistoric accounts and detailed geomorphological studies. If this is true, then human populations may have been attracted to the area prior to the intensive occupation along the current Tahquitz Creek channel. Fern Canyon was probably formed by accelerated erosion along a fault zone, and the presence of a fault may explain the presence of the spring. Tectonic activity may have affected the reliability of the spring, which in turn may have effected human settlement.

The eastern edge of the study area lies on a remnant floodplain of Lebacho Wash that has been incised by an inset stream channel. The study area extends westward upslope onto the channel banks of the wash onto the toe of the Fern Canyon alluvial fan. A boulder field situated on the toe of this fan consists of 20 large boulders (5-15 m long) among 100-200 smaller boulders. These prograde down the channel slopes onto the relatively boulder-free floodplain.

Vegetation covering the project area is dominated by shrubs and the remains of annual and perennial grasses. Probably because of no precipitation the preceding winter, no annuals were growing in the study area when the site was examined, in late Spring-early Summer. Creosote bush (*Larrea tridentada*) dominated the area in both number and cover. *Encilia* and two other shrubs (c.f. *Krameria parvifolia* and *Labiatae sp.*) Cat-claw (*Acacia greggii*) is rarely found in the study area. Mesquite (*Prosopis glandulosa*) grows in the inset stream channel outside the study area. Mesquite is an important Cahuilla resource found rarely on the Tahquitz alluvial fan. Small groves of mesquite are also found below and above Fern Springs. Grasses grow abundantly in the project area. The most common is cheat-grass (*Bromus tectorum*)—an introduction—followed by several unidentified species.

In addition, the area is in easy access to lush spring vegetation at Fern Springs, 300 m to the west, and the riparian vegetation in Tahquitz Creek, 330 m to the south. Tahquitz Creek is ephemeral in this area at the canyon mouth and today contains trees dominated by wash willow (*Chenolopsis linearis*), cat-claw (*Acacia greggii*), and desert apricot (*Prunus fremontii*). Cottonwoods (*Populus fremontii*) grow

ACC0007020

Site Descriptions

abundantly at the mouth of Tahquitz Canyon. Fern Springs is covered by wild grape vines (*Vitis* sp.) and several small palms (*Washingtonia filifera*) also grow at the spring.

Shovel test pits were excavated in locations judgmentally chosen on the basis of geomorphic and surface texture variables. The boulder-strewn alluvial surface of the Tahquitz fan has been reworked by erosional processes, such as slope wash that move sediment from an area of higher slope to areas of lower slope. In addition, aeolian silts and alluvial sediments have accumulated around the base of the boulders on the banks of Lebacho Wash. Those areas in which Holocene sediments have accumulated were judged the place most likely to have buried cultural material.

The incised floodplain of Lebacho Wash has three such areas measuring 20 x 6 m, 15 x 5 m, and 7 x 5 m. A total of 22 shovel tests were excavated in these areas, all with negative results. The tests revealed a floodplain covered with 26-45 cm of sandy silt alluvium.

The boulder field on the banks of Lebacho Wash is a second area of interest. Not only have Holocene sediments accumulated around the rocks, but seven grinding slicks were found on them, suggesting repeated use of the area. In addition, the granite boulders are large enough to form small overhangs that are potentially rock shelters. Shovel tests were placed at roughly 5 m intervals in the sediments at the base of the boulders. Particular attention was paid to the boulders on which grinding slicks were found. All were negative, despite revealing as much as 87 cm of accumulated sediments.

**Feature 1.** One sheltered area (Feature 1) looked particularly attractive and two potential localities underwent further scrutiny. Feature 1 was enclosed by three large boulders measuring 4-9 m long by as much as 1.5 m high that shelter an area about 6 x 12 m (Figure VI.82b). They form an L-shaped area with the most sheltered area occurring at its base. All three boulders overhang slightly, providing some overhead cover sufficient for protection from sun and wind. Unless enhanced by construction of a roof, they provide poor protection from rain. The ceiling of some of the sheltered area is so low as to make the area of little use except to lie in or cache possessions.



**Figure VI.82b. Locus N, Feature 1, Area 7, Rockshelter, View West**

ACC0007021

Two unnatural-appearing rock alignments were found at the base of the two boulders forming the bottom of the L. The first was beneath the area sheltered by the central boulder. It was a semi-circular alignment built against the base of the rock and was partially protected by the overhang. It consisted of seven 15-120 cm rocks, and the largest of these was found on its western end leaning against the boulder. Fifteen to 20 other rocks had been used to block either end of this overhanging rock, forming a small hollow that contained modern trash. A shovel test was begun within the center of the alignment, but was promptly aborted when a quantity of ash was found with a piece of bailing wire and chicken wire.

The second rock feature consisted of seven 20-50 cm unvarnished rocks laid end to end, roughly forming one-quarter of a circle under the overhang of the eastern rock partially enclosing it. It extended from the north edge of the overhang to a point 190 cm in front of the boulder.

In addition to the potential fire hearth found in the first alignment, two other potential hearth deposits were found at the base of the L. The first was discovered in STP 61, 0-9 cm below the surface. It consisted of small charcoal fragments in a gray soil matrix. The lower contact of this deposit was heavily oxidized (7.5 YR 6/6). The third potential hearth was also found at the base of the L in STP 65. It consisted of small charcoal fragments in a grey (10YR 5/1) soil matrix associated with three small fragments of fire-affected-rock found 20 cm below the surface.

Feature 1 was more thoroughly tested using shovel test pits at approximately 2 m intervals, because of the presence of potential rock alignments, the presence of the slicks on the boulders above the site, and the fact that it is so well sheltered. The surface had numerous modern artifacts including glass, paint cans, beverage cans, food cans and clothing associated with transient use of the area and construction of the existing water tank. Two obsidian flakes were found in shovel test number 53 and together with the seven grinding slicks, comprised the only prehistoric or ethnohistoric cultural material found in the area. A corroded brass wick holder for a kerosene lamp with a glass chimney, and a piece of bailing wire with the old style twisted loop ending were also found in the feature, suggesting that it may have been used in the 19th century.

Testing also established that alluvial sediments have accumulated in the sheltered area. They are pale brown (10YR 7/3) to brownish gray (10YR 6/2) gravelly sandy silt alluvium that contains cobble to boulder sizes clasts. Shovel tests, which were terminated when large rock was encountered, revealed these sediments are at least 45 cm deep. The potential exists that these sediments are even deeper and as yet undiscovered buried cultural deposits may yet be found.

Testing at the mouth of Fern Canyon indicated only short term temporary encampment and localized milling activities. Two obsidian flakes, seven grinding slicks, at least one Prehistoric or Ethnohistoric Period hearth, and two historic artifacts were found in the study area. Subsurface testing located buried cultural deposits in a sheltered area among large boulders (Feature 1). The tests could not determine the full character of these deposits. Archaeological monitors of the pipeline re-location for the project found no additional cultural resources.

## ARCHAEOLOGICAL SITE STRATIGRAPHIES
### By Gary Huckleberry

Each archaeological site at Tahquitz Canyon has its own unique stratigraphy—a stratigraphy that is the product of variable and often complex physical-cultural processes. Although site stratigraphies vary, it is possible to distinguish patterns in physical site formation across the project area. There are two general site types at Tahquitz Canyon: open sites and rockshelters. With the exception of Loci I and J which are located at the base of the mountain, all other archaeological loci are generally open sites located near Tahquitz Creek. With the exception of a few large boulders on the fan that were used as rockshelters, most of the open sites were unprotected from the climatic and geologic elements. As would be expected, geological processes vary between open sites and rockshelters, resulting in contrasting stratigraphies and influencing interpretation of the archaeological record. The following is a brief

ACC0007022

Site Descriptions

overview of site stratigraphies at the open archaeological loci that were partially excavated during testing and data recovery. The stratigraphies of the rockshelter sites were previously discussed under Locus I.

### Open Sites

The open sites at Tahquitz Canyon are situated on drainages and interfluves that are superposed on the debris flows of the fan. Many of the interfluves are composed of linear boulder trains that look suspiciously cultural, but are actually the product of debris flow sorting. Most open habitation sites are situated within relict drainages of the fan. In general, these channels contain thin (e.g. <40 cm deep) alluvial fill. Alluvial stratigraphies within these channels are characterized by gravelly sands derived from channelized flow and finer textured (e.g. silt loam) sheetwash derived from the surrounding interfluves and reworked aeolian materials. Dark, carbonaceous midden is mixed within the natural stratigraphy at habitation areas. The base of the fan channels is comprised of large cobbles and boulders, and given the overall coarse texture of the alluvium, appear to be quite pervious. Although some of these channels represent former alignments of Tahquitz Creek, most have developed independently onto the debris flows through channel erosion.

**Loci A and B**. Locus A is situated on Young fan deposits, whereas Locus B extends across Young, Intermediate, and Old deposits. Despite these differences, both loci are comparable in terms of overall site stratigraphy. Cultural features located in relict stream channels contain loose, noncalcareous, loamy sands stained with ash and charcoal (See Soil Profiles 1 and 3, Appendix B). At Locus B, some of the lower deposits are slightly effervescent when treated with dilute hydrochloric acid, suggesting incipient calcification and supporting the interpretation of older, intermediate deposits at this location. Radiocarbon dates from cultural features within the alluvial fills of the relict channels are younger than 800 B.P.

**Locus C**. Locus C extends along a relict drainage across mostly intermediate deposits. As at Loci A and B, much of the archaeological stratigraphy is comprised of intercolated channel sands, sheetwash silts, and cultural deposits, the latter including strategically placed cobbles. The geoarchaeological focus of this site is the stratigraphy of the channel and how it relates to cultural features. Topographically, only one channel is identified in the western part of Locus C, but this channel divides downstream into south and north channels, both of which are topographically distinct. At the bifurcation of these two channels, a topographically indistinct alluvial channel weaves its way between rock alignments on the interfluve of the south and north channel. The middle channel contains well-sorted alluvial sands that interfinger and overlie cultural midden, much of which appears mixed with silty sheetwash. The sands represent active channel deposits derived upstream in the watershed, whereas the sheetwash is derived from adjacent cultural areas and interfluves. Rock alignments along this channel appear to have been placed after much of the channel had filled. There are strong indications that discharge was artificially maintained in the channel by the Cahuilla. Radiocarbon dates and stratigraphic associations indicate that the alluvial fill at Locus C, most of it within 30 cm of the surface, dates entirely to the Ethnohistoric period.

**Loci D, L, and M**. Loci D, L, and M are combined because of their proximity and geomorphic similarity. These loci are mostly on Young fan deposits although some of Locus D extends onto Old fan deposits to the south. General site stratigraphy at Loci D, L, and M is similar to that at Loci A and B in that well-sorted sands and midden material interfinger with finer textured slopewash within the relict channels that comprise the habitation areas. A relict drainage follows the base of an Old terrace scarp through Locus L and appears to have been utilized for irrigation/domestic purposes. The stratigraphy of this channel is like that of Locus C and of other relict and intermittent channels on the Tahquitz fan. Sandy alluvium interfingered with finer textured slopewash is preserved along segments of decreased gradient, whereas the channel contains little fill along the steeper gradients. At Locus L, sediments are derived via the relict stream channel and slopewash from the terrace scarp and boulder strewn interfluves.

ACC0007023

The channel deposits are primarily light-colored coarse sand, and the slopewash is generally silty and carbonaceous.

**Locus E.** Locus E is situated on Old fan deposits above the south bank of Tahquitz Creek. Older soils prevail on interfluves, whereas recent alluvium and associated soils occur within the relict drainages. Like the other archaeological loci, habitation areas are concentrated within the relict channels. Within some of these channels, cobbles are intricately arranged and overlain by channel, sheetwash, and midden deposits. Although the rocks appear to be culturally placed, their function is unclear. There is no evidence to suggest that these rock arrangements are agricultural in function. A ditch was reportedly identified in the vicinity during earlier surveys (Jefferson and Hammond 1972), but could not be confirmed during testing or data recovery. The alluvial fill of the relict channels, comprised of sandy channel, silty slopewash, and organic cultural deposits, are generally less than 40 cm deep and less than 700 years old on the basis of radiocarbon dates.

**Locus F.** Locus F is located in a flood channel of the modern Tahquitz Creek. Most of the stratigraphic information for this site is derived from trenches placed to trace a hypothetical alignment of the Locus C channel, and from work performed by Wilke et al. (1975). Locus F is slightly different from the other open sites in that it is located in a more geomorphically active position of the fan. The intake for the flood channel is only 1.0 m above the main Tahquitz Creek channel, suggesting the deposits at Locus F are very young and date to historic flooding events. Trenches across the flood channel revealed deep (>1 m), well-sorted, very loose, coarse sands and gravels that appeared to be very young alluvium. Furthermore, residual alluvium situated on top of a boulder approximately 1.5 m above the present flood channel floor suggests recent high-water levels. On the other hand, this scenario of frequent high-magnitude floods has been challenged by radiocarbon dates from archaeological features on a low interfluve within the flood channel. Radiocarbon dates from cultural features indicate that occupation occurred between 300 and 450 B.P. on the interfluve (Wilke et al. 1975:64-67). Given that this interfluve is no more than 1 m above the bottom of the flood channel, the radiocarbon dates suggest that high-magnitude floods have a surprisingly low frequency at Tahquitz Canyon, and that the flood channel at Locus F is geomorphically a fairly stable location for occupation (Wilke et al. 1975:69).

**Locus G.** Locus G is located on a terrace scarp composed of Intermediate deposits above Tahquitz Creek. On the Intermediate deposits, relict channels contain shallow alluvial sands and silty sheetwash that are characteristic of the other open site stratigraphies. In addition, there is some colluvial reworking of material down the terrace scarp. Representative stratigraphy is exposed in a large Army Corps of Engineers percolation test pit (see Appendix B, Soil Profile 7). Also exposed in the percolation test pit is the archaeological stratigraphy of a rockshelter and an open habitation site. Approximately 60 cm of weakly stratified carbonaceous sands and lenses of fine sand and silt comprise the midden at the rockshelter. Rodent activity has reduced much of the midden's stratigraphic integrity. Radiocarbon dates and artifact assemblages suggest that the fill dates to the Patayan II and III periods.

**Locus N.** Locus N is located outside the original project area in an area of fan deposits derived from Fern Canyon (see Figure VI.1). Trenches were placed across a natural drainage that was used as the Lebacho-Tahquitz Ditch. This segment of the ditch was never lined. The stratigraphy is characterized by less than 50 cm of overlapping channel fills of gravelly sands and laminated silts, and is quite typical of natural fan channel stratigraphy except that the finer textured sediments contain orange mottles, the product of reduced and oxidized iron under a water-logged environment. This segment of the ditch was bypassed by a concrete pipe in 1911; accordingly, much of the alluvium was probably derived from ephemeral drainages that intersect the ditch upstream. Deposition in the channel at Locus N is presently impeded by the Fern Canyon Dike (ca. 1952).

ACC0007024

Site Descriptions

**Geomorphology Synopsis**

Excavations at the open sites on the Tahquitz fan indicate that cultural deposits are generally less than 1.0 m deep and date to the Patayan period. Most of the recent deposition on the fan has been confined to small ephemeral drainages. The fact that many of the habitation areas are situated within the relict drainages suggests alluvial processes outside Tahquitz Creek on the fan were slow and infrequent. Alluvial fills are generally less than 40 cm in depth and younger than 800 B.P. As a general estimate, given this maximum age and thickness of the cultural deposits at the open sites, depositional rates are generally less than 0.5 mm/year, a relatively slow rate given a channel context. It is evident that these channels are geomorphically stable and thus favorable locations for habitation.

In general, the rockshelter sites also contain thin cultural deposits. Locus I, Feature 3 is the only rockshelter with sediments exceeding 40 cm in depth. Unlike the other rockshelters, Feature 3 represents a balance between sediment influx and preservation. Because of its configuration and location, Feature 3 is sufficiently exposed to receive low energy sediments but is sufficiently protected to inhibit erosion. The other rockshelter sites that lack deep stratigraphy may be either too protected, thus inhibiting deposition, or too exposed and subject to erosion.

ACC0007025

ACC0007026

# VII. THE FACE OF THE NUKATUM:
# A BURNT SHAMAN'S HOUSE AND CACHE
by Jerry Schaefer

The discovery of what is presumed to be a burnt shaman's house and ceremonial cache at Locus C, Feature 5 offered an unprecedented opportunity to reconstruct aspects of past Cahuilla ritual life that is rarely possible in an archaeological investigation. Lying on and under a fire-reddened house floor were six ceramic figurines and two miniature bowls in association with several hearths, a restorable cooking pot, grinding implements, and other restorable artifacts that all appear to have been intentionally abandoned. The structure was discovered buried in a small wash adjacent to, but spatially separated from, the large early 19th century habitation site, Locus C, Features 1-2.

This site is unique to southern California archaeology for several important reasons. This is the largest assemblage of figurines ever found at one site in southern California and on an undisturbed living surface. A very specific Ethnohistoric date can be confidently assigned. The cultural and lineage affiliation is certain. Associated contextual data, pollen samples, settlement pattern, and ethnographic analogies make it possible to hypothesize the function of these clay figurines, and to infer aspects of shamanistic use of objects that are not well documented in the ethnographic record. A new ceramic figurine type has been defined and shown to be contemporary with previously well known types.

## THE SHAMAN'S HOUSE

The site was designated Locus C, Feature 5 after a test trench dug to investigate potential irrigation features revealed a burnt layer, buried under 20 cm of alluvial sand. Feature 5 is located 80 m north of Tahquitz Creek in a narrow boulder-lined wash. It is about 90 m west of Locus C, Features 1 and 2, which constitute a very large Ethnohistoric period campsite that contained extensive domestic midden deposits, rock alignments from suspected houses, living surfaces, and human and raptor cremations. A fragment from one of the figurines in the shaman's cache was found in the midden deposit of Feature 1, indicating contemporaneity of the two areas. An additional fragment of another figurine similar to those in the shaman's cache, but not mending with any of them, was also recovered from Feature 1.

A 6.6 m x 6.1 m area was excavated in eight units (Figure VII.1). Unit 1 was a 4.1 x 1.1 m trench and marks the location of the original hand-dug test trench that was designed to bisect the wash stratigraphy. The first figurine fragments and an associated hearth were found here, but not before disturbing some of the *in situ* deposits. Once the uncovered material was recorded, four additional 2 x 2 m units (Units 2-5) were extended off the trench to follow the burnt floor. Finally three additional units (Units 6-8) of different dimensions were added to complete the exposure of the entire feature.

ACC0007027



**Figure VII.1.  Locus C, Feature 5, Top Plan of Burned House**

VII-2

Tahquitz Report

ACC0007028

The Face of Nukatum

## The Structure

A roughly semi-circular burnt area measured 4.5 x 3.0 m, with a 0.7 m projection to the east that might be an entrance. The floor of the structure was simply the unprepared sandy wash bottom into which a shallow basin-shaped depression appeared as a distinct fire-reddened horizon (Figure VII.1). This burnt horizon appeared at a depth of 8-20 cm below the surface and extended to a depth of 40 cm below the surface. Patches of ash and charcoal irregularly occurred throughout the floor. These zones, and areas of more intense fire-reddened floor may have been locations of concentrated perishable remains that were consumed in the fire. The perimeter of the basin was more uniformly fire-reddened, while the interior contained the thickest deposits of ash and·carbonaceous sands and silts. All indications are that the structure burned in one catastrophic episode. A total of 20 charcoal-filled post molds were recorded around the inside perimeter of the basin (Figure VII.2a). Profiles of these post molds revealed a pit ranging from 9 to 14 cm in depth and usually slanted at a 45 degree angle towards the center of the house (Figure VII.2b). The lower portions usually contained dark brown silts, while the upper portions contained lenses of charcoal and carbonaceous soil. Often one large piece of charcoal derived from the center of the post mold. One radiocarbon date was obtained from such a sample. The angle of the molds suggested a typical Cahuilla round *kish*, in which bent arrow weed branches were set in the ground to form a framework (Kroeber, 1908:63-64; Bean and Saubel 1972:105).

Three discrete burnt areas were detected inside the structure. These may have been independent of the conflagrations that consumed the building. One was a hearth feature in Unit 2 that was enclosed by a semi-circular rock alignment (Figure VII.3a). One naturally flat rock with a higher surface was situated so as to suggest a platform for cooking or ceremonial activities. A large metate was also found in this area, as were metate fragments in other areas of the floor. Darkened carbonaceous and ashy soil in the center of the rock circle appeared to be hearth fill, and from this location a radiocarbon date was obtained. Oxidized soils also concentrated around this hearth, suggesting that perishable personal possessions were concentrated in this area when the house burned. The second area was in Unit 6 where a large boulder was found fire-cracked into 8 to 10 articulated pieces (Figure VII.3b). This one boulder was found lying over several larger boulders and they also exhibited some signs of fire-reddening, but very little ash or charcoal. If the fire-affected boulder had not cracked in the final conflagration (no other had done so), then it may be suggested that it cracked from repeated heating and cooling of a kind associated with the use of the structure as a sweat house. Such a function would conform with the possible use of the figurines in healing ceremonies. Sufficient utilitarian objects were found within and around the structure, however, to interpret it as a domestic structure.

Adjacent to the hearth in Unit 1 was the shaman's cache, which was also associated with the third heavily burned area that may have resulted from the burning of perishable ritual items (Figure VII.4a-b).

Only a few activity areas were found outside of the house. A single rock covered a hearth that was located just southeast of the structure, opposite a possible entrance. One hardpack surface was followed in Unit 7 on the east side of the structure. A grinding slick also occurred on a large boulder to the south in Unit 8. In general, however, artifact frequencies significantly decreased beyond the burnt house area.

## The Shaman's Cache

A unique assemblage of two miniature vessels, one restorable cooking pot, and six fired clay figurines were found in the center of the structure. All but one figurine were broken, and while most were found in one area, at least two fragments were recovered from different locations and depths near the center of the structure. The haphazard arrangement of the fragments suggests that they were intentionally deposited after use and before the structure was burned. Several fragments were recovered in the screens but the *in situ* location of others are shown in Figure VII.I (see also Figure VII.4a-b).

All of the figurines and the two miniature bowls were made from the same fine micaceous dark gray brown (MUNSELL 10YR 5/1) inclusion-free clay. There are very occasional rounded to sub-angular milky quartz grain inclusions in some of the figurines. The smallest specimen contains a higher quantity of quartz grains and possesses a lighter color than the other examples. This ceramic is defined as a new

ACC0007029



**Figure VII.2a. Locus C, Feature 5, Unit 3, Post Molds on Southeast Side of Structure, View North**



**Figure VII.2b.  Locus C, Feature 5, Unit 3, Cross-Section of Eastern Post Mold**

VII-4

ACC0007030

The Face of Nukatum



**Figure VII.3a.  Locus C, Feature 5, Unit 2, Level 2, Burnt Floor, View East**



**Figure VII.3b.  Locus C, Feature 5, Unit 6, Level 2, Burnt Floor with Exposed Fire Cracked Boulder, View North**

VII-5

ACC0007031



**Figure VII.4a.  Locus C, Feature 5, Unit 1, Ceremonial Cache as First Exposed,
Miniature Vessel in Balk, View Northeast**



**Figure VII.4b.  Locus C, Feature 5, Unit 2, Level 3, Showing Cache,
Crushed Cooking Pot, and Hearth, View Northeast**

ACC0007032

The Face of Nukatum

type, Tahquitz Brown, that is typical of only 3.6 percent of the ceramic assemblage in Tahquitz Canyon. The identical clay source for all the pieces suggest that they were all made locally, at the same time, and probably by the same individual.

Three distinct figurine types were found, only two of which are treated in the professional literature. The types include coffee bean-eyed figurines (Figure VII.5a), paddle-shaped figurines (Figure VII.5d-f), and miniature figurines (Figure VII.5c-d).

## Coffee Bean-Eyed Figurine

Two parts of one well-preserved specimen of a coffee bean-eyed figurine were found in two separate localities (45.C.5.1.1.4, 45.C.5.1.2.8). The spalled back portion was found with the figurine cache concentration (No. 4) at a depth of 26 cm. The front portion was found below the level of the burnt floor in the center of the structure at a depth of 36 cm (No. 8). No explanation could be found for this spatial separation, but possibly one segment of the figurine was intentionally buried before the rest of the cache was deposited.

This typical example of the type exhibits the appliqué horizontal slit eyes and vertical nose. Incised decorations, applied before firing, include a herringbone pattern that may represent hair or a cap, and fine incised lines below the eyes that may be distinctive tattoo marks or face paint (Figure VII.6). A mouth may be represented by a vertical incised line, an atypical trait since most figurines of this type have a hole or pinched clay to represent lips. This is only the upper portion of what was once a larger spatulate type. Often male genitals are indicated on the lower portion. The figurine continued to be used after it broke, as indicated by a worn or polished surface on the broken base.

This specimen appears to be transitional between Types I and III as defined by Hedges (1973: 9-15). It is like his Type I in that the head is differentiated from the body. It lacks the paired holes on either side of Type I that indicate ears or ear ornaments. It is also like Type III in that it lacks ear holes but does have a differentiated head. The incised decoration of the hair and facial markings closely resembles that of the specimen collected in the Coachella Valley and curated at the Malki Museum (Hedges 1973: Figure 4A). A much similar but larger example was also collected from the cove area of La Quinta and published by Graffam (1978: Fig. 16). The similarity of incised decoration between the La Quinta and Tahquitz Canyon examples, and absence of such treatment on San Diego county examples published by Hedges, may suggest a distinct Cahuilla figurine trait. Hedges had only a small sample with which to distinguish types. New classificatory systems may need to be devised as the sample of figurines increases.

## Paddle-Shaped Figurines

Four figurines of similar shape, but varying in size and degree of ornamentation, were recovered from the main cache area at a depth of 26-30 cm. All have a bulbous base and a flat spatulate appendage. The simpler, apparently anthropomorphic, specimen (45.C.5.2.3.4) has appliquéd knobs and a series of V-shaped incisions (Figures VII.5b, VII.7a). The more elaborate one of similar design (45.C.5.1.1.6) has two appliqued knobs that may represent breasts or arms with a punctate pattern between them and incised cross-hatching on the spatulate portion (Figures VII.5b, VII.7b). There is really no way to be certain that it is anthropomorphic, or if it should more properly be inverted for viewing. The third example of this general type (45.C.5.2.3.5) has no ornamentation, but exhibits some abrasion wear along the margin of the spatulate end (Figures VII.5f, VII.8a). The last example (45.C.5.1.1) is a smaller version of the others with a narrower neck between the bulbous and spatulate ends (Figure VII.5e, VII.8b).

## Miniature Figurines

One example of a miniature paddle-shaped figurine (45.C.5.2.3.3) was also found within the cache (Figures VII.5d, VII.8c). It is made from the same micaceous Tahquitz Brown ceramic and appears to have one smooth or abraded surface resulting from handling or rubbing. The bulbous and flattened ends resemble those already described, but the size is comparable to one in an otherwise undocumented

ACC0007033



**Figure VII.5a-h. Figurines and Miniature Vessels from the Cache in Locus C, Feature 5**

ACC0007034

The Face of Nukatum





Figure VII.6.  Anthropomorphic Coffee Bean-Eyed Figurine

ACC0007035



Figure VII.7a-b.  Paddle Shaped Anthropomorphic Figurines

VII-10

ACC0007036

The Face of Nukatum





Figure VII.8a-c.  Paddle Shaped and Miniature Figurines

VII-11

ACC0007037

**Tahquitz Report**



Figure VII.9a-b.  Miniature Vessels

VII-12

ACC0007038

museum collection from Mason Valley in the southern San Diego County eastern Peninsula Range (McKinney and Knight 1973).

This paddle-shaped figurine type was not recorded in Heizer and Beardsley's (1943) early description of known examples, or in Hedges' (1973) more comprehensive survey of known southern California examples in local museums. True (1955) does report seven similar bulbous bottom types with appliquéd breasts and incised designs from the central San Luis Rey River watershed in northern San Diego County. Most occurred at San Luis Rey II period village sites, tentatively dated to the 18th and 19th centuries. Most were surface collected or excavated by non-archaeologists on the Verne Jones Farm in Valley Center. No stratigraphic or contextual data are therefore available, but True inferred they may have been used in Luiseño hexing or nature increase ceremonies.

A large unpublished collection of at least 26 paddle-shaped figurines exists in the Coachella Valley. Drawings by local collector and illustrator Merle Graffam are on file at the San Diego County Museum (Ken Hedges, personal communication). Most are the broken bulbous end of the paddle, but several have appliqué elements similar to the Tahquitz examples. The paddle-shaped figurine type is therefore probably a common Coachella Valley type, although it is under-represented in the literature because of the limited number of archaeological projects at which figurines have been found.

**Miniature Bowls**

Two miniature Tahquitz Brown bowls were found within the central cluster of figurines. Both are roughly made pinch-pots with uneven, wet-smoothed interiors and exteriors. The smallest (45.C.5.1.3.5) was found facedown at a depth of 30 cm (Figures VII.5h, VII.9a). The incised rim contradicts Waters' (1982a:282) conclusion that such decoration is an early trait. The second, larger bowl (45.C.5.2.3.2) was found at a depth of 23 cm in an upright position (Figures VII.5g, VII.9b). Pollen analysis of soil within the vessel produces much higher *Pinus* than three other samples from the house floor, or from most other contexts throughout Tahquitz Canyon (30.5 grains compared to the usual one to ten grains). Such high counts cannot have been produced by natural pollen rain and must reflect cultural behavior.

**Other Artifacts**

One restorable ceramic Tizon Brown Ware cooking pot was recovered from the floor of Unit 2 (Figure VII.10). Proximity to a hearth suggests it remained *in situ* after its last use. A large, 11 cm diameter, Tizon Brown ware sherd disk was found outside the structure in Unit 7. It was fabricated by grinding down the edges of a large sherd, and could have been used as a pot lid, plate, or potter's tournette. Other artifacts from Feature 5 included 622 body sherds, seven rim sherds, seven painted sherds, six sherd disks, one ceramic pipe fragment, 249 pieces of lithic debitage, one core, four projectile points, five metate fragments, one mano, two bone tools, and nine beads. All of these artifacts are discussed in appropriate analytical chapters of the report.

Animal bone remains differed substantially from the contemporary residential area of Locus C, Features 1-2. Two bighorn leg bones with butchering marks were recorded, suggesting a higher status residence. Domestic animal bones were noticeably absent. Principal species included rabbit, large mammal, woodrat, and chuckwalla. Unidentified bird and one fish bone complete the list.

**Radiocarbon Dates and Chronology**

One of the most important aspects of the shaman's house is that it can be given absolute dates. The spatial association on a burnt floor establishes that all the objects are contemporary and date to a specific event. The fact that all the cache objects were made from the same clay source also precludes any possibility of these objects being heirlooms or objects from diverse locations.

Two overlapping dates were obtained from charcoal in distinct contexts. The first sample (Beta-29720) derives from the hearth in the center of the house and adjacent to the cache (45.C.5.1.1). A radiocarbon age of 160±40 B.P. was obtained, from which the following dendro-calibrated age ranges were calculated: A.D. 1665-1695, 1721-1812, and 1853-1873. A second radiocarbon date (Beta-29721)

ACC0007039



0        5 cm

**Figure VII.10.  Restored Tizon Brown Ware Cooking Pot from the Floor in Unit 2**

derives from a charcoal-filled post hole (45.C.5.2.2).  The derived radiocarbon age was 240±50, resulting in a dendro-calibrated age range of A.D. 1639-1668, 1751-1758, or 1776-1797.  Thus the date from the hearth indicates an occupation in the 18th to mid 19th century.  An earlier, mid 17th to late 18th century date is indicated by the post hole sample.  The large date range is not only a result of the multiple intercepts from geomagnetic variation, but also from the "Old Wood" phenomenon in the desert. Long-lived hardwoods retain Carbon 14 isotopes for hundreds of years before finally dying.  In addition, mesquite and ironwood are very durable and can lie on the desert floor for centuries or be recycled from other structures before being used for house construction or firewood.

A firmer date can be obtained by examination of the beads and other associated artifacts.  Chester King's examination of *Olivella* shell beads indicate a date of 1821-1850 (see Chapter XIII).  Sizable quantities of Colorado Buff type ceramics also support a late date.  Additional circumstantial evidence is provided by the spatial association between Feature 5 and Features 1 and 2.  Located only 100 m to the east, Features 1 and 2 represent one large stratified Ethnohistoric period camp containing an abundance of glass beads, glass debitage, metal artifacts, ironstone ceramics, and domestic animal bones that date it to the late 18th to mid 19th centuries.  The shamans's house is probably directly contemporaneous with this habitation site.  Indeed, the spatial separation of the secular activities from spiritual activities is well documented among the Cahuilla and supported by recent Cahuilla consultant interviews.  Noticeably lacking from the shaman's house, however, are any Euro-American items.  They may not have been appropriate in a shamanistic setting.  Such artifacts were infrequent within Features 1 and 2, so the lack of glass, iron, or ironstone items may also be due to the smaller artifact sample size of Feature 5.

ACC0007040

## CULTURAL AND CHRONOLOGICAL IMPLICATIONS OF FIGURINE TYPES

True (1966:154-155, 238-239), distinguished five clay figurine types in his comparison of Shoshonean and Yuman material culture, attempting to correlate artifact attributes with language and ethnicity. He suffered from a small sample size, fragmentary remains, and lack of provenience. His Type 1 conforms to the paddle-shaped type, but he incorrectly assumed that most specimens should have punctate eyes and incised features. None of the Tahquitz Canyon paddle-shaped examples have facial features, but most do have the incised and punctate decorations. His other types are either variants of the paddle form or the flat coffee-bean eye type. Poor preservation and provenience prevented True from deciding how these two basic styles are related. Are they the result of two contemporary traditions existing within a larger area? Do they derive from two traditions that originate at different places? Or are they from two different time periods?

We can now conclusively say that the two figurine types are contemporary and part of the same tradition. The shaman's cache pieces were made from the same clay and used by the same individual. True (1966:239) suggests that despite the overlap in geographical distribution, the coffee-bean eye type has its origins in the desert Yuman area, while the paddle type originates in the coastal area. If that is so, then it may be concluded that the Cahuilla figurine styles include both coastal and desert types, as do so many other aspects of Cahuilla material culture. This contemporaneity of types may relate to the Cahuilla's amicable trading relationships and cultural ties with both desert and coastal peoples, as well as possible intermarriage. Perhaps at this juncture in our knowledge it would be most reasonable to conclude from the current inventory of figurine types and their known distributions that the round profile paddle-shaped type is specific to the Cahuilla, Luiseño, and probably related Shoshonean-speaking groups, while the flat profile coffee bean-eye type was derived from the Yumans and adopted by the Cahuilla, but not the coastal or northern groups.

The shaman's cache, however, is too late in time to address the questions of geographical origins. Hedges (1973:27) and True are probably correct to view the flat coffee bean-eye types as derived from the Hohokam and Patayan traditions, and possibly also connected to the Anasazi and Mogollon figurine types of the greater Southwest (Morss 1954). The rounded paddle shapes share characteristics with northern California and Great Basin varieties (Heizer and Beardsley 1943), but lack some of the three-dimensional modelling and often crude manufacture that typifies that tradition. Examples from the Karlo site (CA-LAS-7) were dated to the late Archaic period from 2000 B.C. to A.D. 1 (Riddell 1960; Joesink-Mandeville 1983:37). More problematic Archaic period figurines derive from coastal Orange County, California, around Newport Bay. The figurines occur with rare examples of ceramic bowls and jars in levels from which shell was radiocarbon dated between 4270 and 5200 B.C. (Drover 1971, 1975).

Questions concerning the stratigraphic association of the scant ceramics and of the validity of shell derived dates led to subsequent thermoluminescent dating of the figurines to 1263±500 to 1717±650 B.C. (Drover et al. 1979). Thermoluminescence dating also has inherent limitations of accuracy and precision, but it is probably safe to say that the ceramic samples are at least "old." Further credence is provided by other early dated ceramic specimens from Catalina Island, Marin County, and the San Joaquin Valley (Drover et al. 1979:293). These data suggest that an independent ceramic tradition of limited use emerged in California prior to the introduction of the Late Prehistoric ceramic tradition from the Colorado River and Arizona. Joesink-Mandeville (1983) goes so far as to argue that the distinctive rocker-stamped and shell-impressed decoration on the fiber-tempered figurines point to diffusion from Nuclear America. The flooded Salton Basin is even proposed as one route for the dissemination of Central American ceramic traditions to the Great Basin and Central Valley. This theory must remain speculative at best as it is not in any way supported by the now well-dated examples from Tahquitz Canyon. The dominance of this type in Locus C, Feature 5, and the more abundant inventory now known from unpublished collections certainly suggest that no matter what the origin, by the Late Prehistoric and Ethnohistoric periods paddle-shaped figurines had become a common type throughout a large part of the interior desert of southern California.

ACC0007041

The function of these figurines remains hypothetical. Alternatives include use in shamanic rites of curing, hexing, or increasing fertility, or as memorial figures. Figurines in shamanistic ritual are concisely reviewed by Langenwalter (1980) in her description of a possible shaman's cache from CA-RIV-102 near Hemet. Fragments of a stone pipe were found with a quartz crystal and a typical northern style round profile anthropomorphic figurine. The objects were obtained from a 10 cm level in a test excavation unit, so she did not have the ideal contextual associations of the Tahquitz Canyon cache. This did not prevent her from reviewing Luiseño, Cahuilla, and Cupeño shamanistic use of such material items. References to clay figurines, however, are noticeably scarce. True (1957:296), however, was able to ascertain that cloth figurines, formerly all made of clay, were used for hexing. Previously, Roberts (1917:33) described a Kumeyaay person from San Pasqual who used a clay image to hex someone. J.P. Harrington also recorded a Gabrieliño account of 12 figurines, made from unspecified materials, that were hung downwards in a hexing ceremony (Hudson 1979:357). Anthropomorphic images also figured in Chumash rituals for either positive or negative purposes (Hudson 1979:359-360).

More broadly, male and female specific figurines from the Greater Southwest have been attributed to fertility increase cults and to curing rituals (Morss 1954; Heizer and Beardsley 1943; Joesink-Mandeville 1983). Figurines rarely occur as grave offerings and do not appear to memorialize the dead as do the well-known perishable constructs. In this regard, only one documented case of a figurine in a cremation burial is reported. Elizabeth Campbell (1932:111) found a group of five cremations in the Twenty-nine Palms area, in one of which was a flat coffee-bean eye figurine, apparently made of unbaked clay.

It is no wonder that ethnographic references are so rare. The archaeological associations at Tahquitz Canyon become all the more significant. But as Bean (1975:26) has stated, it was not the power object that was perceived to be inherently good or evil. That was determined by the shaman's or user's purpose. Saturnino Torres of the Torres-Martinez Reservation suggested that the flat anthropomorphic figurine is a representation of the *nukatem*, the primordial beings created by *Mukat* and *Temayawet*. These beings caused the death of *Mukat* through witchcraft (Bean 1972:163). Some *nukatem* remained as controllers of powerful forces in Cahuilla life, among them *Taqwish*, who was the first *puul* and who remained the sponsor and instructor of subsequent *puvalam* (Bean 1972:166). Could these figurines represent several different *nukatem*, among them the namesake of Tahquitz Canyon, whose powers were elicited to influence the natural world?

These figurines appear to have been the personal property of the former inhabitant of the *kish*, and may have been purposefully destroyed or abandoned, possibly at the death of an inhabitant. They reflect a tradition of figurine manufacture and use that continued from prehistoric times into the middle 19th century; a tradition that juxtaposed both Yuman and Shoshonean figurine styles. A high status individual, possibly a *net* or *puul*, and his family may have occupied the *kish* and lived at a discrete distance from other members of the community. In other aspects of material culture, however, they were no different from anyone else and undertook the same activities required for daily household maintenance.

ACC0007042

# VIII. AN ETHNOHISTORIC HIGH STATUS BURIAL

by Jerry Schaefer

The excavations at Tahquitz Canyon were conducted with the utmost discretion to avoid encouraging illicit excavations by pot-hunters and to keep secret the location of archaeological sites. Some pot-hunting is known to have occurred in the past, and it was actually a surprise to people that so many preserved remains were uncovered by the archaeological team. It has been assumed by many Palm Springs residents that most cultural remains had already been illegally removed. It was with great satisfaction that we found the presence of the scientific team did not provoke additional pot-hunting, but actually resulted in the return of important and sensitive cultural resources to scientific study and to the receivership of the Agua Caliente Band of Cahuilla Indians. One day in October, 1988, Mr. Fred Kalmar, a local Palm Springs landscaper, arrived on site to ask what we were doing. He apparently already knew about the project and wanted to resolve a certain matter. He told us that he used to pot-hunt in Tahquitz Canyon ten years before, and had come across a cremation burial eroding out of an alluvial bank next to a hiking trail. He volunteered to show us the location of the find and to turn over the cremation and associated artifacts to the tribe. This was such an unusual and interesting collection that we considered it important to publish it despite the lack of scientific documentation. We also acknowledge the kind permission of the Agua Caliente Band of Cahuilla Indians to make this information available to the scientific community.

The cremation was located within Locus H and designated Feature 2, on a low alluvial terrace adjacent to Tahquitz Creek and close to the painted rockshelter at Locus I, Feature 1. The exact location has been mapped, but remains confidential tribal information. Additional cremations were located nearby in Locus H during shovel testing, but none of those sites were excavated and all remains were returned to the shovel test holes. The location identified by Kalmar thus appears to be corroborated. His "field methods" consisted of excavation with hand tools and sifting of soil through "fine-mesh" screen. He left all bones in place except for three burnt tooth roots that are scheduled to be reburied.

The assemblage of associated grave goods contains a mix of traditional Cahuilla and Early American period items that graphically reflect the introduction of new material culture and ideas to the area. If we can assume that all the items derive from the same interment, then this cremation differs greatly from all others found at Tahquitz Canyon. It contains a much greater number and variety of Euro-American items than any other yet recorded. Traditional Cahuilla items represent only a small percentage of the assemblage, but these beads, projectile points, and awls are typical of other cremations in Locus E. Whereas well-dated diagnostics are generally lacking from other Ethnohistoric period burials, this cremation was associated with many such diagnostics. It appears to be one of the most recent interments in Tahquitz Canyon, signifying the increased accessibility of Euro-American manufactured goods.

Most of the items were probably personal possessions of the deceased and, for the most part, reflect male-oriented activities. The projectile points, horse tack hardware, knife sharpener, knife hilt, iron tools, U.S. Army officer's buckle and snuff box, all suggest the deceased was a male who enjoyed considerable wealth and prestige. In this regard an unusual number of luxury items were represented. The deer bone awl and metal purse frame, on the other hand, are usually associated with female activities,

ACC0007043

although there is no reason they could not have been used by males. Alternatively, the awl and some other items may have belonged to family members. As is customary at almost every Cahuilla cremation, *olivella* shell beads were also included. Many of the items were probably burned with the deceased, with specific evidence of burning seen with all the beads, the awl, the silver snuff box, and the projectile points. A catalogue and descriptions of each artifact category are provided below.

### Projectile Points

Thirteen Cottonwood Triangular projectile points with concave bases were included (Figure VIII.1). Eight were of dark green bottle glass, heavily patinated, probably as a result of fire. The other five stone points were respectively of red, white, gray (two), and mottled chalcedony, most being long thin points of excellent craftsmanship. See Chapter X for more discussion of these projectile points.

### Shell Beads

A total of 102 whole and 39 fragments of *Olivella biplicata* disk beads were found, all of which have been darkened by burning (Figure VIII.2a). These are the late type from the first half of the 19th century, made from the side of the shell and only roughly shaped (see Chapter XIII).

### Bone Awls

One restorable awl was made from a distal metatarsal of a deer (*Odocoileus hemionus*) (Figure VIII.2b). Fragments of a second awl were also in the collection (Figure VIII.2c).

### Personal and Ornamental Objects

The handle of a folding jack knife or razor blade measures 4.5 x 0.5 in (11 x 1.6 cm). The base of the blade still remains and has rusted in the half-opened position. The cavity inside the handle indicates a blade that could be up to 3 in long (Figure VIII.2d).

A schist whetstone exhibits considerable use wear (Figure VIII.2e). Measuring 4 x 1.5 in (11 x 4 cm), the stone is broken at one end, but has otherwise well-rounded edges. It is slightly thinner in the center as a result of differential wear, and on one side bears two notches and an iron stain. This fine-grained schist has not been found in any other contexts at Tahquitz Canyon, and is probably an Anglo-derived acquisition. Such items were used since colonial times for sharpening swords and cutlery (Noel Hume 1970:32) and, in this case, were probably part of the tool kit that included the jack knife and Bowie knife.

Ten shirt buttons are of obvious Euro-American manufacture (Figure VIII.3a-j). One is a four-hole shell button while the remainder include eight four-hole and one three-hole types made from white glass. One glass button exhibits a fine ornamental chain-like pattern (h) that may either be an impression from material or a decoration applied to the button. These are typical of types first appearing in the 1850s and 1860s and continuing in use through the remainder of the 19th century (South 1964:132; Fontana, Greenleaf and Greenleaf 1962:87).

Four brass coat buttons are all of the three-piece variety, a type introduced in 1835-1840 and extending through the Victorian period (Wyckoff 1984). This type has a thin metal front that is crimped over a separate backing into which the shank is attached (Figure VIII.3k-n). Production of this type was very high between the Mexican and Civil Wars and was a common trade or gift item to Indians (Olsen 1963:552). A fifth stamped brass button is a four-hole variety that was also crimped over some backing, now missing (Figure VIII.3o). It has a fine scalloped decoration around the edge and is similar to an example recovered from the Rancho Punta de Agua Adobe south of Tucson, Arizona (McGuire 1979:73). Similar examples date between 1800 and 1860 (Olsen 1963:553), and the context at Rancho Punta de Agua would put it at the end of that sequence.

A two-pronged copper trouser buckle displays an elaborate floral design around the entire rim (Figure VIII.3p). A small brass clasp may have fit on the end of a lead pencil or other cylindrical object.

A perfectly preserved brass bell still retains traces of gold plating (Figure VIII.3q). The iron or iron ball inside still operates. Decoration consists of a fine floral pattern around the bottom. A small "O"

ACC0007044

An Ethnohistoric High Status Burial



Figure VIII.1.  Locus H, Feature 1, Projectile Points

ACC0007045



**Figure VIII.2a-f.  Locus H, Feature 1, Beads, Awls, Knife, Sharpening Stone, and Nails**

ACC0007046

An Ethnohistoric High Status Burial



**Figure VIII.3a-y.  Locus H, Feature 1, Personal Items**

VIII-5

ACC0007047

stamped on the base adjacent to the slit opening must be a maker's mark. The casting also included two small holes, one on either side of the handle, that enhanced the bell's resonant qualities. Such an item may have been a personal ornament, attached to ceremonial dance clothing or fittings, or it may have decorated some horse trappings. This item may date back to the Mission period. Similar bells were imported from England in the 18th century to colonial America (I. N. Hume 1969:46). An example with almost identical decoration, but with a different maker's mark, was recovered from Five Forks near colonial Williamsburg, Virginia. Function, ascribed by A. N. Hume (1974:86), was for bird-scaring devices and horse bells. Bells of almost identical style continued to be marketed and are illustrated as loose sleigh bells in the 1902 Sears, Roebuck catalogue (Sears, Roebuck 1902:566).

A small rectangular silver box could have been used as a match-safe or snuff box (Figure VIII.3r). The same elaborate hand-tooled floral patterns decorate both sides, and a scroll pattern has been inscribed around the edge. An iron hinge mechanism has rusted beyond recognition, and the bottom is partially melted, probably from the cremation fire. It was possible to partially open the box, but no maker's marks or inscription could be found.

No absolute function could be assigned to a carefully crafted copper cylinder and chain apparatus (Figure VIII.3s). The 3 in (7.7 cm) long and 3/8 in (0.9 cm) diameter tube had a small hole punched in it, 3/8 in from one end. On the same side and opposite end is a soldered-on hook and ring. Attached to the ring is a 22-link chain, at one end of which is a copper clasp that could have fit on a small leather or cloth belt. The other end of the chain is a two-piece copper cap onto which have been attached an additional six links and a sharp hook. The cap precisely fits onto the cylinder, leaving the small chain and hook inside. Some other device would have to fit the other side of the cylinder and would attach the hook for the cap to be secured. One possible function is that of a lighter. The hook may have been attached to a cotton rope that fit inside the cylinder. A small steel wheel or flint may have been used to ignite the cotton that could then be used to light a cigarette or start a fire. Another possible function is that of a chatelaine. These were usually ornamented chains that hung from the belt of a woman's dress and substituted for a purse in the Victorian period. Men sometimes wore a simpler version. Watches, scissors, and other personal items were usually hung from a series of chains. This may have been an atypically simple or fragmentary version of one such chatelaine.

Another personal container was the burnt metal frame of a small purse (Figure VIII.3t). Small holes along the crenelated edge indicate where the leather or cloth bag would have been attached.

An almost completely corroded steel blade was associated with a well-preserved brass hand guard for a knife (Figure VIII.3u). This type of guard was typical for the Yankee Bowie knives that were carried by U.S. Army soldiers (Lord 1965:152).

A .9 cm diameter cylindrical copper fitting of unknown function was probably attached to a bone or wooden utensil (Figure VIII.3x). A rosy-pink glass bezel was found that probably derived from a ring or large button (Figure VIII.3y). The unfaceted convex side faces out while the flattened reverse side was probably set into metal. Two unusual heavy metal objects appear to be of iron or silver and contain thousands of small metallic cubes, fused into naturally rounded pebbles (Figure VIII.3v-w). One appears to be naturally or artificially worn on one side.

Euro-American eating utensils, if used for the purpose for which they were made, may reflect a change in food-ways with exposure to the American diet. In this regard a large copper alloy serving spoon was found still retaining some silver plating (Figure VIII.4a). It is almost identical in shape to an example recovered at Ft. Bowie, Arizona, and dating from 1875 (Herskovitz 1978). This typical design goes back much further in time, however.

Of particular interest are a set of two identical copper waist belt or sword belt buckles (Figure VIII.4c-d). This type was worn by U.S. Army Infantry officers. They display an American eagle with shield, holding the olive branch and arrows, and surrounded by nineteen stars. The outer ring and belt attachments are unembellished. This general type dates back to the American Revolution but on those, only thirteen stars are shown, the eagle neck is shorter, and an elaborate laurel wreath decorates the outer ring and belt attachments (Shier 1972:263). A very similar pattern continued between 1822 and 1836 with the addition of 24 stars. Other examples also show 26 and 28 stars (Campbell and Howell 1963:38). The

VIII-6

ACC0007048

An Ethnohistoric High Status Burial



**Figure VIII.4a-e.  Locus H, Feature 1, Spoon, Awl, Buckles, and Fitting**

VIII-7

ACC0007049

number of stars is no sure indication of date, however, for an example from ca. 1850 displays 13 five-pointed stars (Campbell and Howell 1963:115), as does a Civil War example (Lord 1965:269). The circular format around the eagle presumably ended in 1851 with the prescription for rectangular officer's waist belt buckles (Campbell and Howell 1963:115). This rectangular type with prescribed laurel wreath frame is again described and photographed in the U.S. War Department (1862) Uniform Regulations. The uniform code was not strictly adhered to, probably less so in California than the East Coast. Older styles continued to be in use, so that it is probable that these belt buckles date between 1848 and 1860. The Tahquitz Canyon pair differ from other published examples only in that the outer ring lacks the prescribed laurel wreath. How the Cahuilla, through gift, trade, or other means, came into possession of two such belts can be the subject of some interesting speculation.

A cylindrical copper sheath has one end that is slightly crimped inward and two small opposing holes at the base of the other end. Such a sheath may have protected the end of a wooden tent pole or other device (Figure VIII.4e).

Other iron objects include a 6.5 in long drill bit (Figure VIII.4b) and seven square-cut nails (Figure VIII.2f). The nails included four 1.5 in four pennyweight, two 2 in six pennyweight, and one 3 in 10 pennyweight varieties. Such nails were common between 1830 and 1890 (Fontana and Greenleaf 1962:54).

## Equestrian Equipment

The remaining objects represent remains from a horse bridle, harness, and saddle (Figure VIII.5). A hand-wrought iron bit measures 6 in across with 2 in diameter rings for attaching a bridle. This simple bit is not standard U.S. Army type (Herskovitz 1978), but represents the civilian tradition going back to Spanish times in California. Associated with it are two additional 2 in rings, a 3 in ring, 3.5 in ring, and 4 in ring. All of these were commonly used for securing cinches and other saddle straps. A double ring harness buckle completes the assemblage.

## Interpretation and Conclusions

Assuming this collection accurately represents the non-perishable personal items of a single historic cremation burial at Locus H in Tahquitz Canyon, several conclusions can be drawn concerning the final period of occupation in Tahquitz Canyon and of the identity and status of the individual. In comparison to the other 14 investigated cremations, this is the most lavish group of grave goods, and probably the latest, even in comparison to the Ethnohistoric cemetery at Locus E. The style of objects puts it in the mid-Victorian period around 1850-1870.

The most intriguing aspect of the collection are the two U.S. military style belt buckles (Figure VIII.4c-d). These are identical to one found in association with a Cahuilla inhumation excavated in San Timoteo Canyon at the west end of the San Gorgonio Pass (Smith et al. 1960). Among the finds at that site were a silver spoon, two coins dating to 1854, a needle and thimbles, glass beads, and other personal items. Most significant were the remains of epaulets from a U.S. Army officers uniform. This led the excavators to conclude from historical documentation that they had found the final resting place of Juan Antonio, the famous Cahuilla tribal leader who died in the 1862-1863 smallpox epidemic and was known to have been buried at his last residence of *Sahatapa* in San Timoteo Canyon. Juan Antonio was one of the signers of the 1852 Treaty of Temecula and one of the most important Cahuilla leaders of his time (Phillips 1975). Such military insignia were commensurate with his recognized rank in both Euro-American and Cahuilla society. Could the remains from Locus H in Tahquitz Canyon also have belonged to an important *net* from the desert area who was a contemporary of Juan Antonio? Could he also have been a signer of the Treaty of Temecula where he acquired the belt buckles with other gifts? Unlike Juan Antonio, this individual was afforded a traditional Cahuilla cremation, probably because of the ability of people in the more remote desert areas to resist Euro-American acculturation and the personal religious beliefs and traditions of both the deceased and his survivors. But like Juan Antonio, he departed this world with Euro-American derived symbols of high status that reflect the changing social and political role of Cahuilla leaders in Ethnohistoric times.

ACC0007050

An Ethnohistoric High Status Burial



**Figure VIII.5.  Locus H, Feature 1, Equestrian Equipment**

VIII-9

ACC0007051

# TAB 9



# TEMALPAKH
## Cahuilla Indian knowledge and usage of plants

LOWELL JOHN BEAN AND KATHERINE SIVA SAUBEL

ACC0019197



ACC0019198

# TEMALPAKH

*(from the Earth)*

*Cahuilla Indian knowledge and usage of plants*

## Lowell John Bean and Katherine Siva Saubel

With an Appendix on the Problem of Aboriginal Agriculture Among the Cahuilla by Harry W. Lawton and Lowell John Bean

Photographic Arrangement by Nancy Bercovitz

1972 MALKI MUSEUM PRESS, MORONGO INDIAN RESERVATION

ACC0019199

COPYRIGHT © 1972
Malki Museum, Inc.
Banning, California

Library of Congress Catalogue Card Number 72-85815
ISBN 0-939-046-24-5

First Reprint, February, 1979
Second Reprint, July, 1982
Third Reprint, June, 1987
Fourth Reprint, May 1997


The Appendix, "A Preliminary Reconstruction of Aboriginal Agricultural Techonology Among the Cahuilla," is reprinted from *The Indian Historian*, Winter, 1968, Vol. 1, No. 5. Copyright © 1968 by the American Indian Historical Society. Reprinted by permission of the American Indian Historical Society. All rights reserved.

ACC0019200

## MALKI MUSEUM PRESS EDITORIAL BOARD

Chairman: Harry W. Lawton, University of California, Riverside; Katherine Siva Saubel, President, Malki Museum, Inc.; Lowell John Bean, California State University, Hayward; William Bright, University of California, Los Angeles; Richard F. Logan, University of California, Los Angeles; Margaret Langdon, University of California, San Diego.

ACC0019201

# Contents

INTRODUCTION          1

THE CAHUILLA NATURAL ENVIRONMENT          9

    Botanical Life Zones          11

    Lower Sonoran Life Zone          11

    Upper Sonoran Life Zone          12

    Transitional Life Zone          13

    Canadian-Hudsonian Life Zone          13

PLANTS AND CAHUILLA CULTURE          15

    Cahuilla Folk Taxonomy          16

    Plants and Social Roles          18

    The Seasonal Round          19

    Cahuilla Property and Ownership Concepts          21

    Trading of Plant Products          22

    Cahuilla Basketry          23

    Cahuilla Plant Uses Today          25

AN ANNOTATED LIST OF CAHUILLA PLANTS          27

UNIDENTIFIED PLANTS          187

APPENDIX. A PRELIMINARY RECONSTRUCTION
    OF ABORIGINAL AGRICULTURAL TECHNOLOGY
    AMONG THE CAHUILLA          197

ACC0019202

# Illustrations

The Cahuilla and their neighbors        8
Mushroom (*saqapish*) on cottonwood tree        155
Pygmy weed (*Dudleya lanceolata*)        155
Nolina (*Nolina Bigelovii*)        156
Our Lord's Candle (*Yucca Whipplei*)        157
Fruit of tuna cactus (*Opuntia megacantha*)        158
Barrel cactus (*Echinocactus acanthodes*)        158
Prickley pear (*Opuntia occidentalis*)        159
Beavertail (*Opuntia basilaris*)        159
Mesquite (*Prosopis juliflora*)        160
Cottonwood mortar for mesquite beans        160
Screwbean (*Prosopis pubescens*)        161
Mesquite bean granary        161
Manzanita berries (*Arctostaphylos glauca*)        162
White sage seeds (*Salvia apiana*)        162
Pinyon pine (*Pinus monophylla*)        163
Pinyon cones        163
Fruit of California fan palm        164
California fan palm (*Washingtonia filifera*)        164
Juniper berries (*Juniperus californica*)        165
Chokecherry (*Prunus virginiana*)        165
Grove of oak trees (*Quercus*) on Los Coyotes Reservation        166
Acorns stored in Cahuilla basket        166
Cahuilla acorn granary        167
Cahuilla woman filling granary with acorns        167
Agave (*Agave deserti*)        168
Heart of agave is removed with hardwood pole        168
Preparing the heart of agave        169
Baking agave in the roasting pit        169
Creosote bush (*Larrea divaricata*)        170
Calabazilla (*Cucurbita foetidissima*)        170
Buckwheat (*Eriogonum fasciculatum*)        171
Yerba santa (*Eriodictyon trichocalyx*)        171
Croton (*Croton californicus*)        172

ACC0019203

# Illustrations  (Continued)

White sage (*Salvia apiana*)       172
Deerhorn cactus (*Opuntia acanthocarpa*)       173
Tobacco (*Nicotiana glauca*)       174
Jimsonweed (*Datura meteloides*)       174
Elephant tree (*Bursera microphylla*)       175
Deer-grass (*Muhlenbergia rigens*) bundle       176
Cahuilla woman weaving basket       177
Katherine Saubel gathers rush (*Juncus*)       177
Splitting the reed in three equal parts       177
Coiling reed so that it may be hung to dry       177
Cahuilla baskets at Malki Museum       178
Mohave yucca (*Yucca schidigera*)       179
Mohave yucca fiber was used to make sandals       179
Cahuilla loom used for weaving yucca fiber       179
Cahuilla archers lined up       180
Throwing sticks used to hunt rabbits and birds       180
Ocotillo (*Fourquieria splendens*)       181
Ocotillo structure       181
California fan palm (*Washingtonia filifera*)       182
Cahuilla home on Colorado Desert       182
Cahuilla family and dwelling       183
Francisco Patencio and Palm Springs ceremonial house, 1963       183
Reconstructed aboriginal Cahuilla village       184
Cahuilla ceremonial house at Palm Springs       184
Cahuilla *kish* (family dwelling) made of tules       185
*Kish* of Maria Los Angeles at Cahuilla Reservation       185
Ceremonial house made of arrowweed (*Pluchea*)       186
Cahuilla Indians threshing in the Cahuilla Valley       186

ACC0019204

# Introduction

Southern California's native American Indian populations varied in historical background and in their social adjustments to the multifaceted environments in which they lived. On the coast, large sedentary populations made use of the combined resources of the sea, the coastal fringes, and adjacent inland plains and mountains. In the interior, various groups of the southern California basin skillfully adapted to a variety of ecological niches, developing a diversified hunting and gathering economy with far-ranging reciprocal trade relationships with other cultures. Far to the east along the Colorado River and its fertile shores, Indian cultures arose along more dramatically complex lines than in much of aboriginal California. Almost midway between the extremes of the rich coast and interior basin and the hospitable Colorado River area lay the territory of the Cahuilla Indians. They inhabited an environment beginning west of the mountainous terrain that formed an eastern wall to the interior basin and extending far out into the Colorado Desert, seemingly harsh and barren, yet richer in natural resources than the unknowledgeable might imagine. Here the Cahuilla Indians—whose oral literature reflects a land of sharp contrasts—became singularly adept at mastering and exploiting an environment that was both desert and mountainous woodland.

The Cahuilla are a Shoshonean-speaking people whose historical relationships connect them with the well-known Hopi of Arizona, the powerful Gabrielino on the Pacific Coast, the Luiseño who ex-

1

ACC0019205

tended into the interior basin, the Diegueño to the south, and many desert-oriented groups of southern California, including the Serrano, Kamia, Chemehuevi, and Paiute. Before contact with the Spanish, the Cahuilla population may have been as high as 6,000 persons, spread over 2,400 square miles and divided into seven or more politically autonomous groups. Each group was composed of from four to approximately a dozen village land-holding units (lineages) with villages scattered throughout the area bounded by the San Bernardino Mountains on the north, the middle of the Colorado Desert to the east, the Anza-Borrego Desert and Santa Rosa Mountains to the South, and the San Jacinto Mountains and portions of the San Jacinto and San Bernardino valleys to the west.

Long before arrival of the Spanish in California, the Cahuilla had acquired mastery of a seemingly forbidding and fruitless environment. As with most hunting and gathering peoples, their daily life was influenced to a great extent by the environmental potential which nature afforded them. No one can attempt to understand the Cahuilla without soon becoming aware that they were master ecologists—that in their world view and philosophical system there was an ecological model as keenly geared to empirical reality as any that botanists might teach in today's college classrooms.

The historical and cultural backgrounds of the Cahuilla have been written about by early explorers and by historians, anthropologists, and fascinated laymen for more than a century, beginning with the earliest description of these people by Juan Bautista de Anza on his first trek through their country from Sonora to San Gabriel in 1774. The literature of California abounds in references to the Cahuilla, and a bibliography published by Malki Museum Press (Bean and Lawton 1967) cites more than 500 pertinent sources of material.

The first major publication on the Cahuilla has long been a classic in American anthropology: David Prescott Barrows' *The Ethno-botany of the Coahuilla Indians of Southern California* (Chicago, 1900). Barrows' work, which laid the foundation for all future Cahuilla studies, was primarily concerned with plant uses, although it also touched upon the history, religion, language, and other aspects of Cahuilla culture.

*Temalpakh*, which is the Cahuilla way of saying "from the earth," draws upon Barrows' pioneer research, other more recent sources, and more than ten years of ethnobotanical field work by the authors. Our purpose remains essentially the same as Barrows' original intent—to understand how the Cahuilla adapted to their

2

ACC0019206

Case 5:13-cv-00883-JGB-SP   Document 85-13   Filed 10/21/14   Page 251 of 253   Page ID
#:2825

natural environment. This book approaches the subject in greater depth, however, and is oriented strictly to plants, their multiple uses, and their influence on the culture of the Cahuilla. Barrows gathered information on the use of about 100 plants. This book lists more than twice that number and examines plant species in fuller detail with consideration of their various uses, distribution, dependability as food sources, methods of gathering, and preparation and storage procedures.

The basic pattern of our study is explained in the "Ethnobotanical Report Sheet" (Bean 1961), which was used both in our literature survey and in field interviews as a guide in our preliminary work. Briefly, the report sheet was concerned with what plants were gathered, how they were gathered and prepared, and in what ways they were used. In addition, available data was obtained on the nutritional value of plants, their dependability or seasonal availability as a food source, and whether they could be preserved by storage. Other areas of interest were division of labor and expenditure of time in gathering, effects of plants on settlement patterns, plant associations with religious ceremonies, and trade with other Indian groups.

Data gathering for this work began in 1960 when Lowell Bean, the senior author, was residing with Mr. and Mrs. Elmer Penn on the Morongo Reservation near Banning, California. At that time, he and his co-author, Mrs. Saubel, who has had a lifelong interest in the ethnobotany of her people, commenced collecting data, which they continued to obtain intermittently over the years. The bulk of this material was acquired directly from Cahuilla people, although published sources were also consulted and are cited wherever information from them is used in the text.

Our field technique was to collect plant specimens and offer them to individual Cahuilla for examination and comment. Sometimes plant samples were taken to Cahuilla homes for inspection, but whenever possible Cahuilla people were taken into the field so they could select plant samples for themselves. The latter approach was most productive, since it not only saved considerable time but also often served to refresh the memory of those assisting us concerning gathering techniques or uses of a plant. Once plants were clearly identified, all information was checked whenever feasible with at least several other Cahuilla people so that individual variations in their observations could be noted and errors corrected.

Some peculiarities of our text deserve to be explained. A number of Cahuilla plants are listed which were presented in an ethno-

3

ACC0019207

botany by Romero (1954), but which were not recognized by any of the Cahuilla with whom we worked. In many cases, there were plants for which no Cahuilla name could be obtained, usually because our sources had forgotten the Indian nomenclature after so many years of speaking Spanish or English almost exclusively. About one hundred plants were remembered as having been used by the Cahuilla which we were unable to identify botanically. In the case of plants that were mentioned which we could not locate in the field, we decided to publish the meager information available in the hopes that someone may eventually be able to identify these plants. There are also a number of plants discussed which were remembered by only one person. In such instances, we have recorded the name of the person who provided the information.

Obviously, our book is not definitive, since despite the many years that have passed since it was begun and the many people who have worked with us, it can represent only a shadow of the original knowledge held by Cahuilla scholars of the past. Yet when one considers how much material it has been possible to obtain from a few Indian people so distant in time from their ancestors, there can be few remaining doubts about the highly sophisticated knowledge of the environment possessed by the Cahuilla.

The authors hope that this work will stimulate a better understanding of environmental and cultural relationships which will be at least partly applicable to all other southern California Indian groups. Although the Cahuilla are the only Indian group in southern California who remember so clearly their original subsistence patterns, their plant domain is sufficiently similar to that of neighboring tribes that valuable comparisons can be made. There still exists an enormous body of unpublished information on plants and their uses among such neighboring groups. Two researchers, the senior author and Charles Smith, currently are compiling material for a work that will describe over 500 plants and their uses among twelve southern California tribes extending as far north as the Owens Valley Paiute and as far south as the Mexican border.

This book and such future ethnobotanical work should provide anthropologists and archaeologists interested in exploring the dynamic relationship between culture and environment with a rich body of data which can be used as new theories and hypotheses are developed that take account of botanical variables. In addition, we hope that this work provides the lay reader with a keener appreciation of the ecological dependence of man on his environment and a heightened awareness of the detailed, precise scientific knowledge that the

4

ACC0019208

California Indians had of the world around them. The reader who wishes to know more about the Cahuilla, especially such information as an explanation of the status terms used in this book, is referred to Lowell Bean's recently published *Mukat's People: The Cahuilla Indians of Southern California* (Berkeley, 1972).

The authors have dedicated this book to five Cahuilla friends who provided much information for the work and who had looked forward to its completion: the late Juan Siva, Calistro Tortes, Salvador Lopez, Victoria Wierick, and Cinciona Lubo. Others who contributed from their immense fund of knowledge or assisted us from the beginning of our research were Mrs. Alice Lopez; Mrs. Jane Penn, curator of Malki Museum, Inc.; and Mariano Saubel. We also are very grateful for contributions made by William Holmes, Matthew Pablo, Robert and Esther Levi, Tom Siva, Alex Siva, and Alvino Siva.

Many others close to the Cahuilla helped support our efforts. Initially, the research was inspired by suggestions and the sponsorship of Dr. Wendell Oswalt of the University of California, Los Angeles. Mr. and Mrs. Harry C. James shared their knowledge of Cahuilla culture and the hospitality of their lodge at Lake Fulmore. Mr. and Mrs. Francis Johnston accompanied the authors on many field trips, and we drew constantly upon their intimate knowledge of the desert and Cahuilla Indian sites. Mrs. Edna Badger deserves special mention for help in locating various plants and other efforts on our behalf. Dr. C. E. Smith, who was director of Palm Springs Desert Museum when the senior author was a curator at that instiution, placed museum facilities at our disposal, and was a steady source of encouragement. We are grateful to both Dr. Smith and the Board of Directors of Palm Springs Desert Museum.

Among those to whom we are obligated for professional advice are Dr. William Bright, Dr. Richard Logan, and Dr. Mildred Mathias, all of the University of California, Los Angeles; Dr. Hansjakob Seiler of the University of Cologne, Germany; Dr. Margaret Langdon of the University of California, San Diego; Dr. Philip Munz and the staff of the Santa Ana Botanical Gardens; Florence Shipek of San Diego; and Beecher Crampton, lecturer in agronomy, University of California, Davis. Miss Christine Hays assisted in making plant identifications and collating data. Finally, we wish to express our special indebtedness to Oscar Clarke, herbarium botanist of the University of California, Riverside, who devoted many long hours to helping identify plants, discussing problems we encoun-

5

ACC0019209