# Other Books in Our
# Southwest Regional File

**View from the Saddle,** Characters Who Crossed My Trail
by Frank M. Bogert
The Mayor of Palm Springs for 14 years, Frank Bog[...] ch to
say about the many players he has known since 192[...], the
famous and the just plain "characters."

**Nellie's Boarding House**
by Marjorie B. Bright
The story of Palm Springs pioneer, Nellie Coffman, [...]ie Pile
said was the "founder of the institution of desert vac[...]

**The Man Who Captured Sunshine**
by Katherine Ainsworth
Biography of a remarkable modern day Renaissance man, John
Hilton, the "Dean of Desert Painters"

These and many other books are available on
**www.etcpublications.com**



ISBN 0-88280-159-7



ACC0002308

# TAB 12

UNIVERSITY OF CALIFORNIA PUBLICATIONS

IN

AMERICAN ARCHAEOLOGY AND ETHNOLOGY

Vol. 8, No. 2, pp. 29-68, Pls. 1-15                    June 20, 1908

# ETHNOGRAPHY OF THE CAHUILLA
## INDIANS

BY

A. L. KROEBER

UNIV. OF
CALIFORNIA

BERKELEY
THE UNIVERSITY PRESS

ACC-HRA002239



## UNIVERSITY OF CALIFORNIA PUBLICATIONS
### DEPARTMENT OF ANTHROPOLOGY

The following publications dealing with archaeological and ethnological subjects issued under the direction of the Department of Anthropology are sent in exchange for the publications of anthropological departments and museums, and for journals devoted to general anthropology or to archaeology and ethnology. They are for sale at the prices stated, which include postage or express charges. Exchanges should be directed to The Exchange Department, University Library, Berkeley, California, U. S. A. All orders and remittances should be addressed to the University Press.

**AMERICAN ARCHAEOLOGY AND ETHNOLOGY.** (Octavo).

Cited as Univ. Calif. Publ. Am. Arch. Ethn.

Vol. 1. No. 1. Life and Culture of the Hupa, by Pliny Earle Goddard. Pages 88, Plates 30, September, 1903 . . . Price, $1.25
No. 2. Hupa Texts, by Pliny Earle Goddard. Pages 290, March, 1904. . . . . . . . Price, 3.00

Vol. 2. No. 1. The Exploration of the Potter Creek Cave, by William J. Sinclair. Pages 27, Plates 14, April, 1904 . . Price, .40
No. 2. The Languages of the Coast of California South of San Francisco, by A. L. Kroeber. Pages 52, June, 1904. Price, .60
No. 3. Types of Indian Culture in California, by A. L. Kroeber. Pages 22, June, 1904. . . . . . Price, .25
No. 4. Basket Designs of the Indians of Northwestern California, by A. L. Kroeber. Pages 60, Plates 7, January, 1905. Price, .75
No. 5. The Yokuts Language of South Central California, by A. L. Kroeber. Pages 213, January, 1907 . . Price, 2.25

Vol. 3. The Morphology of the Hupa Language, by Pliny Earle Goddard. Pages 344, June, 1905. . . . . . . Price, 3.50

Vol. 4. No. 1. The Earliest Historical Relations between Mexico and Japan, by Zelia Nuttall. Pages 47, April, 1906. . Price, .50
No. 2. Contributions to the Physical Anthropology of California, by A. Hrdlicka. Pages 16, Tables 5, Plates 10, June, 1906. . . . . . . . . Price, .75
No. 3. Shoshonean Dialects of California, by A. L. Kroeber. Pages 100, February, 1907. . . . . . Price, 1.50
No. 4. Indian Myths of South Central California, by A. L. Kroeber. Pages 84, May 1907. . . . . . Price, .75
No. 5. The Washo Language of East Central California and Nevada, by A. L. Kroeber. Pages 67, September, 1907. Price, .75
No. 6. The Religion of the Indians of California, by A. L. Kroeber. Pages 38, September, 1907. . . . Price, .50

Vol. 5. No. 1. The Phonology of the Hupa Language: Part I, The Individual Sounds, by Pliny Earle Goddard. Pages 20, Plates 8, March, 1907. . . . . . . . Price, .35
No. 2. Navaho Myths, Prayers and Songs with Texts and Translations, by Washington Matthews, edited by Pliny Earle Goddard. Pages 43, September, 1907. . . . Price, .75
No. 3. Kato Texts, by Pliny Earle Goddard (in press).

Vol. 6. No. 1. The Ethno-Geography of the Pomo and Neighboring Indians, by S. A. Barrett. Pages 332, Maps 2, February, 1908. Price, 3.25
No. 2. The Geography and Dialects of the Miwok Indians, by S. A. Barrett. Pages 36, Map 1, February, 1908.
No. 3. On the Evidences of the Occupation of Certain Regions by the Miwok Indians, by A. L. Kroeber. Pages 12, February, 1908.

In one cover. Price, .50

ACC-HRA002240



## UNIVERSITY OF CALIFORNIA PUBLICATIONS

IN

### AMERICAN ARCHAEOLOGY AND ETHNOLOGY

Vol. 8, No. 2, pp. 29-68                                June 20, 1908

# ETHNOGRAPHY OF THE CAHUILLA
# INDIANS

BY

### A. L. KROEBER.

### CONTENTS.

|                                                     | PAGE |
| --------------------------------------------------- | ---- |
| Geography                                           | 29   |
| Culture                                             | 39   |
| Basketry                                            | 41   |
| Stone Implements                                    | 51   |
| Pottery                                             | 54   |
| Implements of Wood and Fibre                        | 57   |
| Ceremonial Objects and Beads                        | 61   |
| Houses                                              | 63   |
| Social and Religious Life                           | 65   |

### GEOGRAPHY.

The following notes are based on a trip to the Indian reservations in the vicinity of Highland, Banning, and Indio in Southern California. The specimens described and illustrated were secured, through the generosity of Mrs. Phoebe A. Hearst, for the Museum of the Department of Anthropology of the University of California. The reservations visited are inhabited by Shoshonean Indians, mainly speaking the Serrano and Cahuilla dialects. Indians speaking Chemehuevi, Gabrielino, and Agua Caliente were also found. The three groups of reservations, while within a stretch of less than a hundred miles, are in totally

323248

ACC-HRA002241

different natural environments. Highland is in the cultivated and thickly populated orange-growing district of Southern California. Banning is near the summit of the pass connecting this region with the desert to the east. Indio is in the heart of this desert, below the level of the sea.

Highland is at the northern edge of the fruitful San Bernardino valley, and the small San Manuel Indian reservation near by is situated on the first foothills overlooking the valley. The character of this region is too well known to need description. It is only necessary to call attention to the difference between the level lands of the San Bernardino valley, which form part of the great highly cultivated plain of Southern California, and the Sierra Madre or San Bernardino range, rising abruptly to a height of ten thousand feet above this plain. While the higher portions of this range are timbered, the lower parts, especially the foothills, preserve the barren, brush-covered appearance which they have always had, and of which the valley must in some measure have partaken before its irrigation.

Banning is in the San Gorgonio pass, which affords the lowest natural entrance into the fruitful portion of either Southern or Northern California. This pass is in many ways remarkable, rising to only 2500 feet as compared with the 4500 over Tehachapi and the 5000 and more in the various Sierra passes. It is directly between the two highest peaks in Southern California, Mt. San Gorgonio, 11,400 feet high and little more than 12 miles away from Banning on the north, and Mt. San Jacinto, 10,600 feet in altitude, only 14 miles distant from Banning to the southeast. The pass is not, however, as might be expected, a wild gorge or canyon cut between these peaks, but a wide gradual slope with scarcely any water courses. At Banning, which is about six miles east of the summit at Beaumont and some 200 feet lower, the pass is several miles wide, flat, and with a perceptible but gentle slope to the east, which the railroad is able to climb without detour or approaches. While the streams from the San Bernardino range quickly lose themselves in the boulders and sand of the pass, the lower parts of these mountains are sufficiently watered and wooded to make them a favorable Indian habitation. The climate is cooler than in the San Bernardino

ACC-HRA002242

valley or in the desert, but all fruits hardier than oranges, and in
some cases even these, are successfully grown. The Indian reser-
vation is a few miles to the northeast of Banning. Its inhabited
portion is at the edge of the foothills, though the reservation
extends some distance back into the mountains.

From Banning eastward the character of the country changes
rapidly. The pass gradually widens out into a broad plain, the
Cabezon valley, which has much the surface character of a wide
wash. The streams from the mountain disappear with almost
miraculous rapidity in the stretches of boulders, gravel, or sand
that constitute the soil. The vegetation is very scanty, the tree
yucca being by far the most conspicuous plant. A strong wind
is generally blowing from the west and is made particularly
noticeable by the sand which the lack of vegetation enables it to
carry. Some twenty miles east of Banning is Palm Springs sta-
tion, some miles to the south of which are Palm Springs and the
Agua Caliente Indian reservation. Palm Springs is at the very
foot of Mt. San Jacinto on its eastern side. Some miles to the
south is the famous Palm canyon, noted for the number and size
of its native palms. This was the territory of a division of the
Cahuilla Indians, some of whom still live at Palm Springs.

Some twenty or twenty-five miles farther on is Indio. Here
one is below the level of the sea, in the supposed heart of the
desert not far from the famous Salton sink. The rainfall is al-
most nil, many years passing without perceptible precipitation,
and the heat of summer is intense, equalling that of the arid
regions of southern Arizona and Sonora. But this region is
really less desert than the district about Palm Springs station.
The vegetation is much heavier and of a different character.
The tree yucca is replaced by the mesquite, which will grow only
where its roots can pierce to water. Throughout the entire low-
lying region which constitutes the center of the Colorado desert
water can be obtained at comparatively slight depths, so slight
in fact that it was reached by the wells dug by the Cahuillas in
aboriginal times. At present the greater part of this desert
is becoming converted into valuable agricultural land through
the sinking of artesian wells and pumps. The soil is not gravelly
or made of the loose detritus from the neighboring mountains,

ACC-HRA002243

but the deposit of an old lake formerly connected with the Colorado river or the Gulf of California. Certain stretches contain much alkali, but others are exceedingly favorable for cultivation. Sand is found only here and there, most of the surface soil being a silt, in some places thickly covered with small shells. The two long ranges of mountains flanking this valley, the San Bernardino range on the northeast and the San Jacinto mountains on the southwest, however, bear an absolutely desert appearance. They are rocky and from a distance show no signs of vegetation except in their higher western portions.

As will be seen, the interesting difference in the environment of these three localities is reflected in the native cultures found there. It accords also with the distribution of tribes or dialectic groups. San Bernardino valley and the San Bernardino mountains were held by the Serrano. In the pass at the edge of the mountains, and at Palm Springs, lived one division of the Cahuilla. In the low-lying streamless region between Indio and Salton were another branch of the Cahuilla.

In a previous publication dealing with the geography of the Shoshoneans of California the territorial relations of the Serrano and Cahuilla in their region of contact have been discussed.[1] The published evidence on this point is conflicting, several authors having included San Bernardino valley in the former habitat of the Cahuilla. The conclusion was however arrived at that this valley was held by the Serrano, and that the westernmost limit of Cahuilla territory was somewhere in the San Gorgonio pass. The San Bernardino mountains appeared to be Serrano, the San Jacinto mountains Cahuilla. Information secured in the course of the present trip substantiates these conclusions.

The home par excellence of the Serrano was the San Bernardino range and the desert tableland extending between this and the Tehachapi range to the north. It is therefore easy to see how their name, which signifies "mountaineers," came to be applied to them. The only region in which they are known to have held any fruitful low-lying plain was in the San Bernardino valley. Redlands, San Bernardino, and Colton were all in Serrano territory. Riverside and Jurupa were near the meeting

[1] Shoshonean Dialects of California, present series, IV, 132, 1907.

ACC-HRA002244

point of Serrano, Gabrielino, and Luiseño. A Serrano informant made these places Luiseño, but claimed for his people all the territory north of the Jurupa mountains. Yucaipa he regarded as Serrano, but gave San Timoteo to the Cahuilla. As Yucaipa valley drains into the lower part of San Timoteo canyon, the boundary between the Serrano and Cahuilla must be sought somewhere in the course of this western approach to the wider San Gorgonio pass.

No information could be obtained regarding the Serrano extension westward in the plain, but there seems no reason to alter the conclusion previously arrived at that it was somewhere in the neighborhood of Cucamonga or the line between Los Angeles and San Bernardino counties. The topographically natural line of division would follow the hills, just west of Pomona, forming a northward extension of the Santa Ana mountains. On the other hand it must always be regarded as doubtful, in the absence of definite information, whether a people otherwise showing so strong a preference for a mountain habitat would have been likely to hold the large stretch of plain between Colton, Pomona, the Santa Ana river, and the San Gabriel mountains.

The eastward extension of the Serrano is less doubtful, at least for some distance. San Gorgonio pass about Banning was Cahuilla territory. This included the lower part of Morongo reservation, called Potrero in Spanish and Malki in Cahuilla. But immediately east, Mission creek, flowing southeastward into the desert from San Gorgonio peak, was held by the Serrano, who call it Marina or Maronga. East of Mission creek are Morongo creek and Morongo valley, the names of which are evidence of occupancy by the same people. Morongo, or some form of the name, is the term by which the Serrano of this region are known to several Indian tribes. The Serrano also lived still farther east, at Twenty-nine Palms, some distance north of the main crest of the San Bernardino range. This place, which they called Mara, is near the one hundred and sixteenth meridian, in the Mohave desert, nearly half way between Indio on the Southern Pacific railroad and Bagdad on the Santa Fe. One of the original inhabitants of this place is still said to live there, but the remainder of the few Indians now on the small reservation there

ACC-HRA002245

are Chemehuevi. As to the desert country still farther east, in which the territory of the Serrano comes to an end and that of the Chemehuevi begins, no information could be obtained.   The languages of Highland and of Mission creek and Morongo valley were found to be identical. The dialect of Twenty-nine Palms is said to have been identical with that of Morongo, and that of Highland with the language spoken about Bear valley in the mountains to the north. It therefore appears that all the Serrano of the San Bernardino mountains spoke only one dialect, which differed somewhat from that of the Serrano of the Mohave desert and the Tehachapi mountains.

Serrano names of places are:

| | |
|---|---|
| Wachavak | San Bernardino. |
| Yukaipat | Yucaipa, east of Redlands. |
| A'ʻhangk | a small hill west of Colton. |
| Hunguvat | hills southeast of Colton, across the river, probably Box Springs mountains and the hills farther north. |
| Hikavanü'tʼ[2] | a large hill west of Colton, probably Jurupa mountain. |
| Mu'kat | mountains south or southwest of Colton, probably the Sierra Santa Ana. |
| Kukamonat | Cucamonga. |
| Wahinut | Cajon canyon. |
| Kwiria-kaich[3] | San Gorgonio mountain. |
| Kayakhpiat | Bear lake. |
| Achavat | a lake to the north of the last. |
| Atanpat | a sierra to the north. |
| Padjüdjüt | (warm water), the stream flowing north from Little Bear valley, the upper Mohave river. |
| Nanamüvyat | six large stones, ''goddesses,'' in or near Little Bear valley. |
| Kotainat[4] | Santa Ana river near Highland. |
| Mara | Twenty-nine Palms. |

[2] Or Yikavanü'tʼ.
[3] Qaite, mountain.
[4] Qotainat.

ACC-HRA002246

| Maronga[5] | Morongo valley or Mission Creek. |
|---|---|
| | The above, except Mu[r]kat, are all in Serrano territory. |
| Savova | San Jacinto reservation. |
| Luvus | place or tribe south, in vicinity of Cahuilla reservation. This does not have the appearance of a Serrano word. |
| Aya-kaich[3] | San Jacinto mountain. |
| Akavat[6] | San Timoteo and Banning, the country of the Wanupiapayum Cahuilla. |
| Kawishmu | a small hill east of White Water, marking the boundary between the Wanupiapay-um and the desert Cahuilla. |

The "Paiuches" and Chemehuevi are called Yoaka-yam, from yoaka, perhaps the term for a high mountain or range. This word was applied by a Vanyume or "Möhineyam" Serrano of Mohave river to the Chemehuevi.[7] It appears to be the Serrano term for the Ute-Chemehuevi in general. The desert Cahuilla are Kitanemun-um, those of San Gorgonio pass Wanupiapay-um. The former word resembles Gitanemuk, the name of the Serrano of Tejon. For themselves, the Serrano perhaps had no name. Kaiviat-am was obtained. This is a derivative from kai-ch (qaite), mountain. It is not certain whether it is an old term denotive of the tribal and linguistic group or a translation of Spanish "Serrano."

As regards the Cahuilla, the tribal affiliations of the Colorado desert people have always been undoubted, whereas Gorgonio pass has been disputed territory. It has been stated that the Indians of Morongo reservation near Banning were mixed Serranos and Cahuillas. This is literally true. Nevertheless the number of true Serrano on this reservation is small. The Indians are predominatingly Cahuilla, and both tribes state that the pass in the vicinity of the reservation was always Cahuilla territory. These Banning Cahuilla however answer indiscriminately to the name of Serrano or Cahuilla, and seem to apply

---

[5] "The largest village" according to the Highland informant.

[6] Aqavat. The frequent -at of these names is perhaps a locative suffix.

[7] Present series, II, 140.

ACC-HRA002247

either name to themselves. Why they should be known as Serrano as well as Cahuilla is not quite clear. A Serrano informant questioned at Banning claimed the name Serrano as proper only to her own people. When they moved from Mission creek and Morongo valley to live on the reservation, they brought the name with them, which then came to be applied to the Cahuilla there. This explanation can of course not be accepted unqualifiedly. As compared with the Cahuilla of the desert, the Banning Cahuilla lived at a much greater altitude and at the foot of the mountains, so that they were literally ''Serranos.'' It is only natural that the distinction between the general meaning of the word, and its exact signification as applied to a tribal or linguistic group, should not always have been observed by Spanish and English-speaking people. Moreover the confusion may have been aided by the distinction existing in the Indians' mind between the Cahuilla of the Colorado desert and those of San Gorgonio pass. As stated, the Serrano call the former Kitanemunum and the latter Wanupiapay-um. Among the Cahuilla themselves corresponding names were not obtained, but it is obvious from their reference to one another that the distinction between the two groups exists. Besides the difference in mode of life enforced in former times by environment, there remains today a difference in dialect.

The Cahuilla of Palm Springs or Agua Caliente form part of the San Gorgonio pass group. San Jacinto mountain is said to have belonged to these Indians. Palm Springs is less than eight miles in a direct line from the summit of this peak.

Nothing new was ascertained as to the territory of the desert Cahuilla. They live in a number of reservations in the flat valley, near its center or towards its western side. These sites appear to have been among their principal habitations in aboriginal times. It is doubtful whether they claimed definite limits to the more barren outlying portions of their territory. To the north there seems every reason for assuming that the limit, if any existed, was the crest of the San Bernardino range, which is here of no great altitude. To the southeast they extended at least to the northern end of the Salton sink. Near the southern end of this ancient lake there were formerly Yuman villages.

ACC-HRA002248

The Cahuilla living in the mountains to the west of their brethren in the desert, were situated in a third environment, different both from that of the San Gorgonio pass and of the desert. They are principally on Cahuilla reservation in the drainage of the Santa Margarita river, and at Santa Rosa and San Ignacio in the lost drainage of Coyote valley. This habitat is on the more favored side of the San Jacinto range. The desert Indians state that the dialect of the mountain Cahuilla is identical with their own.[7a]

Twenty-nine Palms in the Mohave desert north of Indio, formerly in Serrano territory, is now held chiefly by Chemehuevi.  Within the past few years several families of these Chemehuevi have removed from Twenty-nine Palms on account of the difficulty of finding subsistence there, and are now on the Cahuilla reservation of Cabezon, near Coachella, three miles southeast of Indio. The Cahuilla cannot communicate with them except in English or Spanish, though the two languages belong to the same family. The Cahuilla state that these Indians did not formerly live at Twenty-nine Palms, but to the east near the Mohave, and that when they fought that tribe many years ago, they were defeated and fled to this place. This statement corresponds with a quotation made by Dr. Barrows from an Indian Office report, according to which a number of Chemehuevi had in 1867 fled from their enemies, the Mohave, across the desert into Cahuilla territory. Mohave accounts also tell of their war about this time with the tribe with which they had previously maintained friendly relations. For the sake of corroboration the few Chemehuevi at Cabezon were questioned as to their places of birth. All the younger people to about the age of forty were born in Twenty-nine Palms, while all the old people are from the vicinity of what they call the Mohave river, that is the Colorado, the river of the Mohaves. One elderly man was born near Pahrump, in southern Nevada. Their dialect was found to be the same as that of the Chemehuevi questioned some years ago.

The presence of these Chemehuevi at Twenty-nine Palms and

---

[7a] Cahuilla Indians from Cahuilla reservation, seen at the Indian conference in Riverside, April, 1908, stated that there were slight differences between their speech and that of the desert Cahuilla.

ACC-HRA002249

Cabezon is interesting because it adds another distinct tribe and language to the many included under the jurisdiction of the Mission-Tule agency. Besides a few Chumash surviving near Santa Ynez in Santa Barbara county, and the Yokuts at Tule river, among whom three dialects are spoken and among whom a number of Tübatulabal or Kern river Shoshoneans are inter-married, there are the following groups known as Mission Indians: of the Yuman family, the Diegueño, speaking probably two closely similar dialects; of the Shoshonean family, the Serrano at San Manuel and Banning; a few surviving Gabrielino at the former and perhaps other reservations; the Cahuilla that have been enumerated, speaking two slightly different dialects and living in three quite distinct districts; the Luiseño, whose language is also slightly varied between San Luis Rey and San Jacinto rivers; the Agua Caliente or Warner's Ranch Indians; the San Juan Capistrano Indians, of whom a few survive; and finally the Chemehuevi just mentioned. These Shoshoneans belong to five of the eight principal divisions into which the entire sub-family is divisible. The total number of linguistic families under the Mission-Tule agency is thus four, of languages eight, and of dialects fifteen or more.

Among the San Manuel Serrano was found Jose Sevaldeo, the same informant who had been questioned some years previously, though his name was then understood to be Varoxo. He is now a very old man of perhaps ninety years, who was grown up but not yet married at the time that "the stars fell from the sky" in 1833, and whose skin is turning white. Owing to his extreme age and feebleness exact information could no longer be obtained from him. He gave the Indian names of a number of localities. As to some of these there seems no reasonable doubt. As regards others, the form of the name is in some cases Gabrielino, in others Serrano or possibly Luiseño; and in certain cases the localities to which the names are said to refer appear to be incorrectly given.

| | |
|---|---|
| Pimu | Santa Catalina island. |
| Kingki | (evidently San Clemente island.) |
| Chauvi | in vicinity of San Pedro (Reid, Chowi-gna, Palos Verdes). |

ACC-HRA002250

| | |
|---|---|
| Ungövi-pit | Salinas, *i.e.*, Redondo, previously given as Ongoving.[8] |
| Wenot | Los Angeles.[9] |
| Wach-bit | San Bernardino. |
| Yukaipa | Yucaipa. |
| Ashuksha-vit | given as La Puente, but evidently Azuza, Reid's Asuksa-gna. |
| Shua-vit | given as a place on the coast near Palos Verdes or Cerritos: evidently Reid's Sua-ngna, Suanga. |
| Akura-nga | San Gabriel; Akura-gna is given by Reid[10] for La Presa, and San Gabriel is Siba-gna. |
| Apachia-ng | a small lake near San Gabriel. |
| Kukamo-nga | Cucamonga; Reid,[10] Kukomo-gna. |
| Pashina-nga | Chino; Reid Pasino-gna. |
| Khurupa | Jurupa. |
| Toibi | San Jose; Reid Toibi-pet. |
| Sovovo | San Jacinto. |

### CULTURE.

As has already been intimated, the strong differences between the environments of the various divisions of the Cahuilla and other Mission Indians of Southern California are reflected in considerable differences of culture. At the same time there is an underlying general uniformity of civilization. This is clear from the fact that in all matters not under the direct influence of physical environment, such as social and religious life, the differences between the tribes and dialectic groups are very much smaller. As might be expected in a case where the diversifying influence is physical nature, the cultural differences are more marked on the material than on the immaterial side of native life. The implements of the Cahuilla, as they would

[8] Present series, II, 143. Salt is añor in Gabrielino, eñla in Luiseño. The locative ending -bit or -pit is Serrano.

[9] "Because of a large river there." Cahuilla wanic, Serrano wanut-, stream.

[10] As cited, transcribed, in the present series, II, 142.

ACC-HRA002251

be represented in a museum collection, are therefore particularly favorable for illustrating such cultural differences as exist. But even among these there are entire classes of objects which for some reason or other are not dependent upon variations of physical environment within the comparatively narrow limits of Southern California, and are therefore practically identical throughout the region. Preeminent among such objects is basketry. Food and mode of subsistence were of course most directly dependent on environment, and the implements for their gathering and preparation varied accordingly. Thus the Cahuilla of the desert use chiefly a deep wooden mortar with a long pestle. The people at San Gorgonio pass have shallow mortars with basketry rims. The southern Luiseño and Diegueño use stone mortars without the basketry rim but of greater depth. Pottery is perhaps the class of objects in regard to which there is greatest tribal divergence that cannot be connected with natural surroundings. Pottery was made by all the Luiseño-Cahuilla as well as by the Yuman Diegueño farther south; it was not made by the Gabrielino; while the position of the Serrano is doubtful.

As one comes among the Cahuilla of the desert after some acquaintance with such tribes on the coast side of the San Jacinto range as the Luiseño, and with the agricultural Yuman tribes on the Colorado,—in other words, the western and the eastern neighbors of the Cahuilla,—one cannot but be struck by the numerous similarities which they present to the latter, of whom the Mohave may be taken as typical. In both cases there is a similar habitat, a wide semi-desert plain, with mountains in the distance. There are houses of similar brush, more or less covered with sand. The pottery is identical in material and shape and even in ornamentation. Among both tribes the staple food furnished by nature is mesquite, which is pounded in similar mortars with stone pestles. The mesquite is stored in the same large rudely constructed granary baskets. Grain and seeds are ground on the nearly flat metate. The whole appearance of a desert Cahuilla house and its contents at the present day are very similar to that of a Mohave house.

But here also we are dealing only with a partial impression.

ACC-HRA002252

After all the differences between the Cahuilla and the Mohave
or Yuma are greater than the correspondences. The Mohave are
farmers and fishermen. The Cahuilla follow neither pursuit.
The Mohave are practically without basketry, except for such
few pieces as they may trade from their Shoshonean neighbors.
The Cahuilla use baskets as abundantly as all their Shoshonean
kinsmen. The Mohave employed a carrying frame of sticks
and twine, the Cahuilla a carrying net which held a basket. The
Mohave were warlike and had a developed tribal sense. The Ca-
huilla resembled the other Indians of California in lacking these
qualities. They appear also to have been without the totemic
clan system of the Mohave. What is known of their ceremonies,
and of the character of the shaman among them, further points
to practically complete identity with the other Mission Indians.
In other words, they are typical Mission Indians, somewhat
specialized by their desert habitat, and possibly influenced in
some respects by contact with the Yuman tribes of the Colorado.


### BASKETRY.

The basketry of the Mission Indians is well known, and that
of the Cahuilla has been described in detail.[11] Considering its
importance in the life of the people, it is remarkable for the
small number of weaves, forms, and materials to which it is
confined. The ordinary materials are not more than three: a
grass, *Epicampes rigens,* for the warp; and for the woof either
a reed-grass, *Juncus robustus* (or *lesenerii*), or sumac, *Rhus
trilobata.* The fibre of the palm, *Neowashingtonia filamentosa,*
is also sometimes employed today, but its former use is doubt-
ful. There appears to have been only one dye in common use,
a black which is produced either from the elder or from a species
of *Sueda.* Yellow, red, brown, and even greenish shades are
ordinarily all obtained by using different portions of the stem of
the *Juncus,* which between its root and top passes through sev-
eral quite different colors. All the ordinary forms of basketry

11 Barrows, Ethno-botany of the Coahuilla Indians of Southern Cali-
fornia, 1900, 40; Schumacher, in Putnam, Wheeler Survey, VII, 247.

ACC-HRA002253

are coiled on a multiple foundation of the *Epicampes* grass. *Juncus* is occasionally substituted.

Twined weaves are used only in rude openwork baskets, so far as known. The Chemehuevi make conical carrying baskets (Pl. 1) and caps, in the diagonal-twined or double-warp weave so characteristic of the Shoshoneans of the Plateau. A basket made in this way may occasionally be found in the possession of the Cahuilla; but they appear not to have practiced the weave themselves.

The Cahuilla openwork baskets (Pl. 1) may appropriately be described as irregular in technique, rather than as strictly in the simple single-warp twined weave. The simplest form of twining predominates, but in all specimens examined is more or less interspersed with double-warp twining and twining on zigzagging warp. Two warp strands are frequently treated for awhile as a unit; then they may diverge and each be twined around independently; or, one may be bent to the side, be wound with the adjacent warp rod for a course or two, and then return to its former neighbor. Sometimes this alternate zig-zag warp twining is carried out fairly regularly over a considerable part of the basket, but this is unusual. The principal attempt seems to be to get the interstices in the basket about equally far part, and to accomplish this end warp stems are united, separated, and reunited at will. Hence the invariably ragged and rough appearance of these baskets.

Coiled weaving on a definite three-rod foundation of woody stems, and similar coiling on single rods,—the two most important coiled weaves of northern California,—are not used at all by the Cahuilla or other Mission Indians.

Large granaries for storing mesquite are a conspicuous feature of the surroundings of a desert Cahuilla settlement. (Pl. 2.) They are from three to six feet across, without top or bottom, placed on a layer of brush, and covered with the same. They are sometimes set on the ground, but more usually raised on a rude scaffold of poles. These granaries can be called baskets only by courtesy, as they show no distinct weave, slender branches being simply intertwined as in a bird's nest. The material used in them, given by Dr. Barrows as *Artemisia ludovi-*

ACC-HRA002254

*ciana,* is similar to the plant used by the Mohave, *Pluchea sericea,* commonly called arrow-weed. Many Mohave and Cahuilla granaries are identical; but when a number of each have been seen, it becomes apparent that the Cahuilla show more tendency to make baskets of smaller diameter and relatively greater height narrowing toward the top. The more frequent Mohave form has the shape of a cylinder, perhaps twice as great in diameter as altitude. Like the desert Cahuilla, the Mohave set their granaries on a layer of brush on the ground, or on a scaffold. The granaries of the mountain Cahuilla, says Dr. Barrows, are usually on tall bare rocks.

The basket mortar, or rather hopper of the stone mortar, is still used in many households among the San Gorgonio pass Cahuilla, but no specimens were seen in the desert. Stone mortars are rare in the desert, and it is not certain that they were used with the basketry rim. The Banning Cahuilla say that they attach the basketry rim to the stone with gum from a bush. Asphalt is however the most common material, as numerous remains from Southern California attest. The mortar basket calls for no particular description, being identical with a common form of Cahuilla basket except for lacking a bottom. Believing that it might be possible that these baskets were made from such complete baskets by cutting out the center, the Indians were questioned, but stated that this was not the case, the mortar baskes being begun around a hoop. This is obviously the easier as well as the quicker method of manufacture in coiled basketry. Among the Yurok of Northwestern California, whose mortar baskets are twined, the basket is begun as if it were to have a rude bottom, and only when ready for use is the central portion cut out.

The basketry cap of the Cahuilla (Pl. 7), is like that of the other Mission Indians, and of a type extending at least as far north as the Yokuts of central California. It is rather large, flat-topped, and of coiled weave. Its general appearance is that of the frustum of a cone, horizontally corrugated. It is not worn habitually, as are the basketry caps of northernmost California and Oregon, but only in carrying burdens. The load is contained in the carrying net, the strap of which passes over the forehead.

ACC-HRA002255

It is as a protection against this band that the cap is worn. The caps are made perfectly round, so that they do not fit the head well. Only one specimen in the Museum collections has been flattened, apparently by use, to the oval shape of the head. Most of the caps seem unnecessarily large for the head. The pattern ornamentation is simple, and sometimes wanting. One or two of those obtained show signs of having been used for other purposes, such as parching or holding liquids.[12]

The Chemehuevi cap is of a different type, being twined instead of coiled, somewhat peaked or conical instead of flat-topped, and lighter and more flexible than the thick coiled Cahuilla cap. One of these Chemehuevi hats, which the owner was unable to part with, was ornamented with a red and black design resembling a basketry pattern, but painted on. A similar cap, also in diagonal-twined weave, was obtained from a Cahuilla family at Alamo. (Pl. 7, òn right.) This piece, however, had the design worked into the basketry. This Chemehuevi form of cap is of the type found among the Shoshonean tribes of the Great Basin, and the piece here mentioned could be practically duplicated by Ute specimens.

While the basketry cap is characteristic of many parts of California, it is not found over the whole state. In the region in northernmost California in which twined basketry is exclusively used, caps are habitually worn by the women, whether carrying loads or otherwise engaged, and are apt to be the most highly ornamented and carefully made articles of basketry. In the northeastern corner of the state, as among the Modoc, they have the shape of a truncated cone. In northwestern California, among the Yurok and Hupa, they are lower and somewhat rounded, but all the better made ones are flat-topped. South of this belt across northernmost California, beginning with the region in which coiled basketry first appears, and extending to beyond the latitude of San Francisco, basketry caps are not made. The Pomo, Wintun, and Maidu[13] of the coast and Sacra-

---

[12] Barrows, p. 44.

[13] Professor Dixon, Bull. Am. Mus. Nat. Hist. XVII, 162, 1905, states that the northern Maidu women formerly wore basket hats; but no specimens have been seen by him or by the author and none appear ever to have been collected.

ACC-HRA002256

mento valley, and the Miwok and probably other tribes, do not use caps. With the Yokuts of the southern San Joaquin valley, and among the neighboring Shoshoneans such as the Mono, the Tübatulabal, and those of Inyo county, is found the large flat-topped coiled cap worn only to protect the head in carrying, and this form continues to be met with southward over most the remainder of the state. The peaked diagonal-twined Shoshonean cap characteristic of the Great Basin, is distinct from both the northern and southern of the California forms, and occurs only in the easternmost parts of the state.

A twined water-basket of jug shape, coated with pitch or asphalt, of the type used by the Paiutes and other Shoshoneans, and on Santa Barbara Channel, is said to have been made by the Cahuilla in former times.[14] Such water-baskets have entirely disappeared. In fact there seems some reason to doubt their ever having been made by the Cahuilla, who had pottery which was fully as suitable and much more readily manufactured.

A leaching basket is mentioned by Dr. Barrows, but none was seen, and no definite description could be obtained. Possibly the twined openwork baskets of juncus answered this purpose.

The seed-beater (Pl. 3) may appropriately be included under the consideration of forms of basketry, although the Cahuilla seed-beater, which is nothing but a frame of a few sticks, presents but little appearance of basket work. The specimens obtained have the sticks wound together with strips of cloth. Either strips of bark or string might have been employed for this purpose in former days. In size and shape the Cahuilla seed-beaters resemble those used elsewhere in California, but they are made of an unusually small number of sticks and are peculiar in the parallel arrangement of these along the middle of the encircling hoop. The seed-beater of most California tribes is made in circular openwork twining on radiating ribs.

All the foregoing forms of basketry serve some special or limited purpose, and, as has been said, to several of them the term basketry can be applied by courtesy rather than in fact. If all these special forms are excluded, and consideration is given

[14] Barrows, 41: called kaputil. The stem of this word appears, with the diminutive suffix -mal, in kaput-mal, obtained as the name of ordinary bowl-shaped baskets, as given below.

ACC-HRA002257

to the ordinary types of basketry serving a wider and more general function, it is apparent that the Cahuilla show a limitation in the number and variability of forms that is as striking as is the confinement of materials to three or four plants. In brief, the types of the ordinary baskets of the Cahuilla and other Mission Indians are only four. These may be described as the flat basket, the shallow basket, the large deep basket, and the small globular basket. These are all executed in the same materials, weave, and fineness of technique, with similar patterns. The constricted or bottle-necked basket of the San Joaquin valley, the oval basket found here and there among many tribes, the feather or bead-ornamented basket of the Pomo, the conical carrying basket of California in general, are all absent. That certain of these forms, such as the oval basket, are found at the present day, seems to be due to the stimulus of basket buying by the whites, as no oval baskets have been seen in use among the Indians. The uniformity in size of each of the four classes of baskets that have been enumerated is also quite striking. The smallest pieces have half or more the diameter of the largest specimens of the same class. Among other California tribes baskets of the same shape range from a few inches to nearly as many feet.

The flat basket, or chipatmal (Pl. 4), is most commonly something over a foot in diameter. Its curvature is very slight. It is employed as a plate or tray, and for winnowing, and has also been described as used to gather the seeds struck down on it by the seed-beater.

The shallow basket (Pl. 5) is deeper than the preceding, but flatter than the large deep basket. It is called sewhalal, according to Dr. Barrows; or kaputmal, the same as the deep basket. It has about the same diameter as the flat basket, is some three or four to six or eight inches deep, and has the form of a shallow flaring bowl. The bottom is nearly flat. The sides usually rise in a gradually ascending curve, or more rarely meet the bottom at a distinct angle. The uses of this form of basket naturally shade into those of the flat basket. It is a convenient receptacle for food. It is also used for parching corn or seeds. A specimen may occasionally be found of which the interior is entirely charred.

ACC-HRA002258

The deep basket (Pl. 6) is much like the shallow one except that its sides rise more steeply and to a greater height. Its usual shape is that of an inverted truncated cone, of which the altitude is equal to the smaller diameter and about half that of the greater diameter. Besides being used to hold food and other articles, this flat-bottomed coiled basket is the substitute of the Cahuilla and Mission Indians for the pointed twined carrying-basket found elsewhere in California. It is not so shaped that it can be properly carried on the back merely by means of a strap passing around it and over the forehead. With the Cahuilla form of basket this strap becomes part of a net, in which the basket rests. In reality it is this net and not the basket that is the burden-carrier: the basket is only a secondary receptacle for objects that the meshes of the net will not retain.

The carrying net is not confined to Southern California, but it is only there that the shape of the burden basket makes it a practical necessity. In central California the net is rather a convenience, and the basket is often used without it.

The small globular basket (Pl. 7) is the least common of the four types. It serves to keep small utensils and trinkets. The diameter is usually somewhat greater than the height. The mouth is of the same size as the bottom, or sometimes smaller. No attempt is made to form a neck or constriction that will produce a lip, or an urn-shaped vessel. Occasionally one of these small globular baskets is found with a thong across its mouth by which it can be suspended. All baskets of this type that have been seen are ornamented; but the design is like that of other shapes, except in more frequently presenting a vertical arrangement instead of a disposition of the pattern in a horizontal band.

All the Cahuilla basketry that is made for use is coarsely constructed. The wrapping of the woof is never close, and at times is very far apart. The baskets are not intended to hold water, and it runs through them readily. Upon being thoroughly wetted they are probably more nearly water-tight, but it is apparent that the use of pottery renders attention to this quality unnecessary. The same coarseness which characterizes the woof extends also to the warp. While the warp material is the same as that used by the southern San Joaquin valley tribes,

ACC-HRA002259

the coils are much thicker. This is equally true of the four principal types of baskets and of the caps. Of over fifty pieces of basketry in the Museum collection the finest has only six coils or courses to the inch, the coarsest four. This uniformity is remarkable in being maintained in all classes and sizes of baskets. In baskets made for sale, where attention is given to appearance, finer work is occasionally found. Especially the woof wrapping is brought more closely together, giving the impression of neatness and good work which is so characteristic of most California basketry, although wanting from the typical Cahuilla work. The size of the warp foundation is less often reduced, but occasionally a particularly well made basket is offered for sale, in which the coil is no thicker than in an ordinary good Yokuts basket.

In regard to designs a great difference exists between baskets made by the Cahuilla for their own use, and those made for sale to the whites. The latter are most always made of stems of juncus of varying shades, presenting a mottled appearance. This effect is pleasing, and such baskets bring the readiest sale.    In baskets made by the Cahuilla for their own use, this mottling is much less pronounced, and the shade of the juncus used is much lighter, being whitish rather than olive green over the body of the basket. To bring out definite patterns, as distinct from the more or less mottled surface of the basket as a whole, the Cahuilla use the yellow, red, and brown shades of this juncus as well as its black-dyed form. In baskets made for use the pattern is almost always quite simple. In those made for sale it is in most cases quite elaborate. Figures of men, lizards, snakes, birds, and animals are frequently woven in such baskets, and still more frequent are diversified, branching, or otherwise elaborate figures of non-realistic import. In their own baskets the Cahuilla rarely put more than one or two simple bands or radiating figures. The simple stripe; the short bar, vertical or horizontal; the rectangle, either standing alone as a bar or combined into a series of steps; triangles, usually in series; the diamond or hexagon repeated into a horizontal band; and the simple zigzag, constitute the great majority of patterns. A striking but uncommon design is the fret. (Pl. 6.) Occasionally a design is in two colors, most often black combined with reddish or brownish yellow. At other times the two colors occur on different parts of the same basket.

ACC-HRA002260

The prevailing arrangement of the pattern in typical Cahuilla baskets made for their own use is a horizontal one, in most cases a continuous band encircling the basket. Even where a diagonal, vertical, or zigzag pattern arrangement occurs in flat or shallow baskets, it usually produces the effect of forming a band, which in baskets of this shape is the equivalent of a horizontal arrangement. In deep baskets there is scarcely an exception to the prevalence of the horizontal band, and in caps it is also usual. Only in the small globular basket is the horizontal arrangement lacking. There seems to be a desire to have the pattern on such baskets extend from top to bottom. Consequently vertical designs are most common on them, and zigzag arrangements of next greatest frequency.

In the prevalence of horizontal patterns, especially of the band type, with a secondary tendency towards vertical designs, the Cahuilla agree with the other Mission Indians, and in fact with the tribes of all that part of California south of the latitude of San Francisco.[15]

The small globular baskets are exceptional in another respect than their pattern arrangement. In all flat, shallow, and deep baskets, as well as in caps and mortar baskets, the direction of the coil, as one looks into the basket, is from left to right, or clock-wise; in all globular baskets it is from right to left. A somewhat similar difference has been noticed by Dr. Dixon among the Maidu,[16] except that among these Indians flat baskets run from right to left. Mr. S. A. Barrett has noted that among the Pomo the coil is always clockwise, whatever the shape of the basket. These striking differences, which evidently are typical of tribes, and the reason for which is unknown, have led to an examination of all the coiled basketry from California in the University Museum, with the following results. In all cases, whether the basket is used with bottom down or with bottom up, and whether the pattern is on the inside or on the outside, the direction of the coil is observed as the hollow of the basket is looked into.

The coiled baskets of the Wailaki and of the Yuki all run

[15] Present series, II, 150, 1905.
[16] The Northern Maidu, Bull. Am. Mus. Nat. Hist., XVII, 146, 1905.

ACC-HRA002261

e 5:13-cv-00883-JGB-SP Document 85-15 Filed 10/21/14 Page 26 of 190 Pag #:3257

University of California Publications in Am. Arch. and Ethn. [Vol. 8

anti-clockwise. Those of the Pomo run clockwise. Among the Maidu the direction is clockwise, except that flat baskets run anti-clockwise. Among the Miwok, where a large series of baskets was examined, the same arrangement was found as among the Maidu. Among the Washo, the baskets examined, which were all bowl-shaped, showed a clockwise coil. Among the Yokuts the coil in flat baskets is clockwise; in the so-called "bottle necks," forms showing a distinct shoulder and constricted neck, always anti-clockwise; and in bowl-shaped baskets, variable, though in the majority of cases clockwise. Among the Mono and other Shoshoneans of central California the direction is clockwise, except again in the case of bottle-necks. Among the Mission Indians, Luiseño and Diegueño as well as Cahuilla, the direction is clockwise except in the small globular baskets. Among the Chemehuevi flat and bowl-shaped baskets usually run clockwise, though a number of exceptions have been observed. The Chemehuevi also make urn-shaped baskets approximating bottle-necks, but the direction of the coil in these is not known.[16a]

It thus appears that other than among the Wailaki and Yuki the normal direction of the coil in California basketry is clockwise, except that in three groups of tribes certain classes of baskets, and those only, also run anti-clockwise. Among the Maidu and Miwok it is the flat baskets that are exceptional, among the Yokuts and Mono the bottle-necks, among the Mission Indians the globular baskets. The differences in shape between the baskets that are thus made an exception of, render it difficult to conceive a technological reason for the turning of the coil in the unusual direction. It can be imagined that it might be easier to make a basket with constricted mouth by working in one way than in the other, and that the Maidu and Miwok choice of the unusual direction for their flat baskets was due to their holding such baskets inverted during the process of manufacture; but

[16a] Since this paper was put in type, Dr. C. V. Hartman, Curator of Ethnology and Archaeology in the Carnegie Museum, Pittsburg, writes as follows regarding a collection of Chemehuevi baskets in that museum: "Of the flat baskets, ten have the coils clockwise, ten anti-clockwise. Of the more or less cylindrical baskets, five have the coils clockwise, fifteen anti-clockwise. Mr. C. P. Wilcomb has verified the observation." It thus appears that the Chemehuevi follow no consistent rule, but that the prevailing tendencies among them are the same as the rule of the Yokuts and Mono.

ACC-HRA002262

such guesses are in greater need of verification by observation than of further discussion. It is not unlikely that the selection which governs the direction of the coil among different tribes is dependent primarily on custom or tribal habit.

The prevailing clockwise tendency in California seems to be replaced by the opposite one elsewhere in North America. In the great majority of Southwestern baskets the coil is anti-clockwise. This is true of all the ancient baskets examined and of most of those made by Indians of the present day. Among the tribes of Washington and the Alaskan Eskimo the anti-clockwise direction also prevails.

### STONE IMPLEMENTS.

Of next greatest abundance after basketry, among the Indians of the present day, are articles of stone, especially the metate and the mortar, and the corresponding mano or muller and pestle. These are still in frequent use. The metate is nothing but a flat stone, oval or somewhat rectangular in shape. It is made of granitic or metamorphic rock, not of a sandstone slab. It is very slightly hollowed. Some pieces show hollowing only in that part of their area which is actually rubbed in use. Occasionally a large lava metate on three legs, of the familiar Mexican type, is seen. These are always declared to have been obtained from Mexicans. A considerable number of such pieces must have been brought into California from Mexico. One has been obtained among the Yokuts north of Fresno river, and a fragment from the Emeryville Shellmound near Berkeley is in the University collections. It is curious that these heavy implements of the stone age should have been brought over a thousand miles by a civilized people in colonizing a new territory.

The rubber or mull stone is of much more varied shape than the metate. Sometimes it is oval in outline, thin and flat. Other pieces of the same length are narrower and twice as thick. Still others are much longer, of equal breadth and thickness, and well squared, so that they present the shape of a short length of dressed timber. Still others are natural shaped stones or boulders, the bottom of which has been rubbed flat.

ACC-HRA002263

The mortar shows more variations than the metate. The deep wooden mortar of the desert, and the stone mortar with basketry rim of San Gorgonio pass, have been mentioned. The wooden mortar is specially adapted for the mesquite bean. It is made from a section of tree two feet or more long. The greater part of this log is sunk in the ground. The projecting portion presents the appearance of being a stump cut from a tree in situ. The mortar hole is quite deep, in some cases as much as a foot or more. A correspondingly long pestle is necessitated. This is about two feet in length, fairly well shaped, and quite slender. A similar wooden mesquite mortar is used by the Mohave, though block, cavity, and pestle are shorter than among the Cahuilla.

The stone mortar with basketry rim (Pl. 15) is used in the region where mesquite is unimportant or wanting. The block or boulder of stone is large compared with the size of the rather shallow cavity. The pestle used with this mortar (Pl. 8, left) is naturally much shorter than the pestle accompanying the deep mortar of the desert (Pl. 8, right). It is also much more rudely shaped. In most cases it appears to be only a convenient cobble or boulder, one end of which has been dressed to fit the surface of the mortar cavity.

This rude type of pestle, practically unshaped except at the pounding end, or sometimes flattened on one side, is found also in the Sierra Nevada and perhaps in other parts of the state. Among the Yokuts and Miwok this is the only form of pestle for ordinary purposes. Cylindrically shaped pestles occur only in small sizes, for use with small portable stone mortars for crushing tobacco, medicine, or meat. Associated with the rough pestle among the Yokuts and Miwok, is the bedrock mortar, consisting of a hole in an exposed surface of granite. Most frequently a number of these holes, varying in depth, are found close together. Such assemblages, which have been a number of times described and illustrated,[17] are a conspicuous feature of past and present native life in the Sierra region. The basket mortar is unknown among these tribes, but is used by all the

---

[17] Holmes, Anthropological Studies in California, Rep. U. S. Nat. Mus. for 1900, 178, pl. 29, and Handbook of American Indians, Bull. 30 Bur. Am. Ethn., I, 944.

ACC-HRA002264

Indians of the Coast Range north of San Francisco—both those of the Central type of culture, such as the Pomo, and those of northwestern California. The basket mortar is used also in the northeastern part of the state. It is also found in the Chumash or Santa Barbara region, both mainland and island, as is evidenced by numerous stone mortars and slabs showing remains of asphalt at the rim and by an occasional piece preserved with the basketry still attached. In this region, however, the bowl-shaped mortar without basketry rim appears to have been used side by side with the composite form, for many of the mortars found are of such irregular shape at the top that a basket could never have been fastened to them. The basket set on a slab or shallow mortar, and the bedrock mortar, divide almost the whole of California between them, at least as regards the Indians of historic times and the present. This fact brings up the question of the origin and purpose of the portable stone mortars which are found in all sizes, in and on the ground, in all parts of the state. The Indians not only do not use these, but on being questioned frequently declare that they would not know how to, as the manipulations required in pounding acorns or seeds in these mortars would be quite different from those employed in the basket-rim or bedrock mortar. It can only be concluded that the ordinary bowl-shaped mortar found in such abundance all over California, belongs to a former period, and has in recent generations or centuries been generally replaced by the other forms described. The only region in California where the author has seen round or somewhat deep stone mortars in use is in San Diego county, where they are occasionally met with among the half-civilized Luiseño and Diegueño.

Next to the metate and muller, and mortar and pestle, the stone implement today most frequently encountered among the Cahuilla, though it is but little used, is the arrow-straightener. This consists of a rectangular or oval block of stone somewhat raised toward the middle, where a transverse groove divides its upper surface. It is in this groove that the arrow is placed to be straightened. The inner surface of the groove often shows high polish. Some arrow-straighteners show a low longitudinal ridge extending at right angles from one or both sides of the

ACC-HRA002265

groove. According to the explanation obtained from an old man who still used his straighteners, this ridge serves to bend cane arrows at their joints, the joint being placed directly upon the ridge after the stone has been heated. Other stones show this longitudinal ridge only in rudimentary form, so low that it is doubtful whether it could have served any actual use. In still other pieces the ridge has entirely disappeared except for two narrow grooves or scratches that mark its place and can have had little other purpose than ornamentation or the following of custom. Occasionally also other scratched designs appear in the place of the ridge. The stone from which the arrow straightener is made is soft, usually soapstone or micaceous rock. Granite or similar stone does not appear to be used. The Cahuilla form of arrow-straightener is found among the other Mission Indians and among the Yokuts of central California. Like the rude pestle, the technique of basketry, and the carrying net with its companion the cap, it is therefore another link in the chain of technological similarities of culture between the San Joaquin valley and Southern California.

### POTTERY.

Of next greatest frequency after basketry and stone implements among the Cahuilla of today, are objects of pottery, though they are seldom if ever manufactured now. Native pottery is of interest in California because until a few years ago it was believed not to occur. Its distribution is restricted. It is of greatest importance among the Yuman tribes living on the Colorado, who are without basketry of their own. It is made also by the Diegueño and by the interrelated Luiseño, Agua Caliente, and Cahuilla Indians. The Gabrielino and the tribes beyond, such as the Chumash, did not make pottery. No undoubted pieces have been found in the numerous archaeological explorations of the Santa Barbara islands. Whether the Serrano had pottery, and if so which of their divisions, is unknown. It was made to some extent by the Chemehuevi and probably other closely related Paiute tribes in the part of California bordering on the Mohave habitat and on southernmost Nevada. As compared with the pottery-making Mohave, these Paiute-Chemehuevi tribes

ACC-HRA002266

are basket makers; but under Mohave influence they seem also to have practiced the manufacture of pottery somewhat. Several vessels obtained from the Chemehuevi at Twenty-nine Palms and Cabezon are in the University collections. North of Tehachapi pottery has been found in only one region, the southern Sierra Nevada, where both Yokuts and Mono made it to some extent. This pottery is small, dark gray or brownish, unpainted and unornamented, and quite rude. Whether the art is a recently acquired one among these Indians is not known. No archaeological investigations that might throw evidence on the question have been carried on in this mountain region, nor does the nature of the country offer any great temptations for so doing. This Yokuts and Mono pottery is quite different from that of Southern California in appearance and shapes. It appears to be used for little but cooking. The Yokuts and Mono seem to have lacked the ability of constructing large well-made vessels such as are found in Southern California, or not to have felt the need of making them. Whether the principal pottery-making area in the southern part of the state was connected with the subsidiary one in the Sierra Nevada by an intervening area in which pottery was used, is doubtful. If there was such a territorial connection, it must have been by tribes of Ute-Chemehuevi affiliation or of Serrano affinity.

All the pottery of Southern California is of one type. It is a light, thin, rather brittle red ware. On the Colorado river it is almost always ornamented, among the basket making tribes more often unornamented. The painting is in only one color, a red somewhat darker than the surface. Among the Mohave this color is produced by painting the unfired pot with yellow ochre, which burns red. Among the Cahuilla a red stone, apparently an oxide of iron, was said to be used for the same purpose.

Only three ornamented pieces of pottery were seen among the Cahuilla. One of these was a broken discarded dish, another a jar in the possession of the Chemehuevi at Cabezon, and the third, a black-painted jar which will be described below. The designs on the two red-painted pieces are identical with typical Mohave painting. Mohave pottery designs consist most frequently of patterns of parallel lines, either straight, zigzag, or

ACC-HRA002267

forking; of rhombi or crossed or branching lines with or without adjacent dots; and of angles and triangles with the corners filled in. Realistic drawings, round lines, or separate geometrical figures of any elaborateness, are not attempted. There is very little resemblance to any past or present pottery of the Pueblo region.

The black-painted jar from San Gorgonio pass (Pl. 10) is unique not only in the color of its ornamentation, but in its pattern, which differs thoroughly from designs of the Mohave type. It is more finely executed with narrow lines, the ornamental handling of which is reminiscent of the ancient Pueblo style. The star shape of the pattern suggests the basket ornamentation of the Cahuilla.

Like the pottery of the Mohave, that of the Cahuilla was made by coiling together narrow cylinders or ropes of clay, which were then patted between a smooth rounded stone and a wooden paddle. The degree to which the art is now in abeyance may be judged from the fact that neither of these implements was seen. As Dr. Barrows has noticed, the vessel is not kept away from the fire in burning, so that it is often blackened in spots. The same is true of Mohave and Luiseño pottery. In recent times the Cahuilla have used dung for firing their pottery. Before the introduction of domestic animals they employed the wood of certain shrubs. Among the Mohave the making and baking of pottery, which takes place before an open wood fire, may still be seen.

There are four principal forms of Cahuilla pottery: a small-mouthed jar for water and perhaps for the storage of seeds; a somewhat wider-mouthed jar; a cooking pot, of which the mouth is approximately of the same diameter as the body of the vessel; and an open bowl or dish of perhaps half as great a depth as diameter. (Pl. 9, upper figures and lower left.) These forms are made with comparatively little variation except in size, and are identical with Mohave types, even to the binding of the bowl or dish with a strip of mesquite fibre just below the rim to insure greater strength. The only divergent forms that have been seen are a vessel with incurved mouth (Pl. 9, lower right), thus being intermediate in form between the open dish and the jar; and one or two small roughly-made dishes of a dull dark red

ACC-HRA002268

color with a flat bottom. Of these one was obtained at Banning, the other from one of the Indio reservations. It is not certain that either of these two forms represents anything more than a sporadic aberrance.

To judge from a smaller number of specimens that have been seen, the pottery of the Luiseño and Diegueño is identical with that of the Cahuilla. While the forms of vessels made by all these Mission tribes are found also among the Mohave, the Mohave manufacture other types which do not occur among the Mission Indians, at least at the present day. Such are an asymmetrical small-mouthed jar having the shape of a swimming duck and called "duck jar;" a pottery spoon; and flat round or oval dishes nearly as shallow as one of our plates, though of a gently flaring curvature.

As compared with the practical identity of the Colorado river and the Mission region pottery in all other respects, the almost regular absence of painting from the Mission ware, and its customary presence on Mohave vessels, is of special significance. It is another instance of the want of the symbolic and pictorial tendency that is so strangely undeveloped among all California Indians.

As pottery is more important to the Yuman tribes of the Colorado river than to the Cahuilla and coast Indians, and as these latter are basket makers, it may be presumed that its use was earlier among the former, as their closer proximity to the Southwestern culture-area would also render probable.

#### IMPLEMENTS OF WOOD AND FIBRE.

A bow and two or three arrows will frequently be found in a Cahuilla house. They are used for small game. As Dr. Barrows has said, the bow is apt to be shown with an apology and an explanation of the superior qualities of those made by the forefathers. Both bow and arrow are of the same type as those of the Mohave. The bow is usually of willow. The University collections however contain one made of harder wood, perhaps mesquite, and another made from the stem of a palm leaf. According to Dr. Barrows the bows of former days, at any rate the bet-

ACC-HRA002269

ter ones, were made of mesquite.[18]  At the present day bows are all four to four and a half feet long, an inch and an eighth or an inch and a quarter wide, and three-quarters to seven-eighths of an inch in greatest thickness.  The better made ones are roughly squared in cross section.  Others are more rounded, and some of these are still covered with red willow-bark on the back or outside.  One specimen is nothing but the split half of a willow stick.  No sinew backing has been found.  There is very little taper in either width or thickness from the middle of the bow to the ends.  This comparatively long, narrow, and thick unbacked bow, most frequently made of willow, corresponds exactly with the Mohave bow.  The string is still occasionally made of mescal fibre or sinew, but more modern substitutes, including iron wire, are common.

The arrows are of two types, being made either of a straight shaft of wood sharpened at the end, or of cane with a wooden foreshaft.  The wooden arrow is typical of the Mohave, while the cane arrow is attributed by them to the neighboring Chemehuevi and Paiute of Shoshonean stock.  At the present day the wooden arrow seems more frequent among the Cahuilla.  Being used only for small game, neither form has a stone or metal point.  It is not unlikely that such may have been the custom also in old days, even in the case of arrows intended for war.  The Mohave state that stone arrow-points were not regularly used by them, and that their ordinary war arrow was the simple sharpened shaft of wood.  They appear to regard the stone arrow-point as typical of their Shoshonean neighbors.

The Cahuilla wooden arrow is said by Dr. Barrows to be made from wormwood, *Artemisia ludoviciana.*  This is similar to the plant used by the Mohave, *Pluchea sericea.*  The arrow is about three feet long.  One end is sharpened, the other notched and feathered.  All the arrows seen had only two feathers.  This may be due to their being intended only for small game.  The Mohave used a two-feather arrow for similar inferior purposes, but a three-feathered one for war.  The feathering on the Cahuilla arrows is applied as follows: a feather is split down the quill; each half is then laid against opposite sides of the shaft

18 Barrows, 49.

ACC-HRA002270

and the ends fastened down by a sinew wrapping. Each half-feather is not in line with the shaft but is given a quarter twist around it.

The cane arrow is similarly notched and feathered. It consists of three or four joints of cane three-eighths or half an inch in diameter. At the front end a piece of wood is let into the hollow cane, which is then wrapped about with sinew. This piece of wood, which tapers to a point, projects from the cane some six or eight inches. In a set with two arrows of this type obtained at Banning is a third one, similarly made but with a shaft of unjointed rush replacing the jointed cane. The cane arrow is usually somewhat longer than the wooden one.

The digging stick of the Cahuilla calls for no special comment, being as elsewhere merely a sharpened stick of hard wood. A specimen obtained is four feet long and an inch and a half in diameter.

The Cahuilla flute, like that of all the Indians of California, is of the entirely open variety. It consists of a piece of cane a foot and a half long which can be looked through like a pipe. The mouth end is ground or otherwise brought to an edge at an angle of about forty-five degrees. There are four stops or holes of small size. Whether consciously or unconsciously, these are grouped into two pairs, the distance between the pairs, that is to say, between the two middle holes, being somewhat greater than between the two holes in each pair. Of two flutes in the University collections both show this grouping of the stops. The distance between the stops varies from somewhat less than two to somewhat more than two and a half inches. The distances are not exactly equal, and yet not sufficiently varied to give any appearance of design. It is not probable that they are constructed with any clear idea of the dependence of tone intervals upon the distance between them, but merely by eye or by some convenient rule of thumb. When played, the flute is held against the mouth at somewhat of an angle, not taken between the lips. The sound is produced by the column of air from the mouth striking the sharpened upper edge. The melodies have a peculiarly fascinating character. They are sweet and plaintive, though the tone intervals are likely to be arbitrary.

ACC-HRA002271

So far as is at present known, the straight open flute is the only one known in any part of aboriginal California. Only among the Mohave of the Colorado river does a flageolet appear in addition.

A curved throwing stick used for rabbits and birds, and a war club of potato-masher form, are mentioned by Dr. Barrows as having been used by the Cahuilla.[19] Like the pottery, they are of ethnographical interest in having been made both by the Indians of Southern California and those of the Pueblo region.

The carrying net (Pl. 11) is an important Cahuilla implement, still employed occasionally, and making it possible for the Cahuilla to dispense with the deep conical burden basket found in most other parts of California, as in the carrying net a shallower basket can be conveniently transported. The net is made of string with meshes four to five inches square. Among the Diegueño and Luiseño the carrying net is smaller, the string slenderer, and the meshes finer. The general shape of the net is that of a small broad hammock. At the two ends the net is gathered on a ring or loop of heavier cord or rope. These loops are six or eight inches in diameter. One of these rope rings has a loose end several feet long. This is passed through the other loop to join the net, much like a saddle cinch between its two rings. In this way the size of the net can be increased or diminished. The wide portion of the net, which is behind the back, contains the basket or object carried. The rope passes over the basketry cap worn by the carrier. In the desert the net seems all to be made of mescal-leaf fibre. In San Gorgonio pass a softer glossy material is employed, a string made from ''wish,'' given by Dr. Barrows as the common reed, *Phragmites communis*.[20]

Sandals of mescal fibre are still used, especially on the desert. (Pl. 10.) They are said to be worn principally by men when out-doors at night. These sandals consist of a half-inch pad of mescal fibres held to the foot with strips of the same fibre, or by thongs. They serve as an efficient protection against

---

[19] Barrows, 50.

[20] Barrows, 47. According to the late Mr. Sparkman, the Luiseño called Indian hemp, *Apocynum cannabinum*, by the dialectically equivalent name wicha.

ACC-HRA002272

thorns.  The manner of construction is not quite clear.  It would appear that the fibres are bent around a cord which follows the outline of the foot, and are in some way joined or fastened along the middle of the sandal.  There is no distinct weave or textile process.  Among six or eight different forms of sandal in the University collections from cliff dwellings in southern Utah and Colorado (Pl. 12), there is none resembling this Cahuilla form.  All these cliff-dweller sandals are made by some method of basketry or cord weaving.  The strings which hold the Cahuilla sandal to the foot are not tied each time the sandal is worn, but are so arranged that the foot can be slipped into them.     The strings in front pass on the two sides of the second toe, or of the second and third toes.  The general arrangement is shown in the illustration.

A similar sandal, but of rawhide instead of mescal fibre, was obtained from the Chemehuevi at Cabezon.  A loop of string at the back of this sandal serves as a heel strap.  At the front there are two cords.  These are passed on the two sides of the second toe.  They are then crossed, brought backward, and passed under the heel strap, brought forward again, and tied over the instep.

A third form of footwear consists of a high moccasin of soft skin without ornament.  A pair of such moccasins was secured from the Cahuilla at Cabezon.

The familiar California soaproot-fibre brush used for cleaning baskets of meal, and also as a comb, is not a Cahuilla implement.  Dr. Barrows mentions brushes of mescal fibre.[21]  The Serrano at San Manuel use the soaproot brush, but the Luiseño, Diegueño, and Mohave agree with the Cahuilla in making their brushes of other materials than this.[22]  The only other tribes in California known not to use a form of soaproot brush, are the Pomo and southern Wintun, who employ anise-root fibres for this purpose.[23]

#### CEREMONIAL OBJECTS AND BEADS.

The ceremonial implements of the Cahuilla have practically disappeared.  A few simple feather-ornaments worn by the medi-

[21] Barrows, 47, 54.
[22] According to specimens in the University museum.
[23] According to specimens in the University museum.

ACC-HRA002273

cine men in dancing can still be seen. More elaborate objects must have been used in former times. The present-day ornaments consist of owl or hawk feathers. These are usually mounted in bunches or tufts on sticks so as to stand upright. Occasionally, however, they are pendant bunches, hanging from a stick. They come in sets of threes. A bunch is worn on each side of the head, supported by a band passing around the forehead, and the third is carried in the dancer's hand.

The principal dancing regalia of the Luiseño seem to have been a short skirt or apron of eagle or condor feathers hanging from a network of string, and long flat bands of feathers. The latter resemble the familiar forehead-bands of yellowhammer quills sewed side by side, which are so typical of central California. The Luiseño bands are however mostly made of dark or black quills, and are wider and longer. It is not unlikely that the Cahuilla formerly had such ornaments.

A gourd rattle obtained among the desert Cahuilla is identical with Mohave gourd rattles except for being unpainted, like a Chemehuevi rattle in the University Museum, whereas Mohave rattles are usually red. If the Cahuilla of aboriginal times used such rattles they must have obtained them by trade, as they did not practice agriculture or raise gourds. That there was such trade with the region to the east is probable from what Dr. Barrows says of the established trail through the Chemehuevi country, and also from the fact that a Cahuilla declared to the author that the red paint used by his people came from Arizona. The Mohave obtained their red paint, or the best of it, from the Walapai to the east.

It does not seem that any of the Cahuilla still possess shell beads. These were of the thin curved type made from *Olivella* or other univalve shells. Beads of this form are found in great quantities in burials in the Santa Barbara region, where they appear to have been the most common form of currency. They differ from the thick, flat, disk-like, larger beads made from clams or similar shells, which are typical of Central California. A number of the thin *Olivella* beads, calcined black, have been found near the old Cahuilla village site at Indian Wells. They had apparently been burned with the dead or for them. These

ACC-HRA002274

beads were well rounded. A string of similar beads, now in the
University collections, is from the Luiseño of San Jacinto. The
wear on these beads shows them to possess some age, but they
have been rudely chopped into shape and never ground round.
Strung beads were measured in a certain way around the circum-
ference of the hand. This practice is found among the Luiseño,
the Yokuts, probably the Gabrielino, Serrano, and Chumash, and
perhaps among other tribes.

The accompanying plate 13 shows a number of shell disk
beads from various parts of California. In the upper left-hand
corner are the Luiseño beads mentioned. It will be seen that
the outline is much less regular than in any of the other speci-
mens. To the right are similar beads from Santa Catalina
island and from Point Sal in Santa Barbara county. The
second row of figures shows beads from Santa Rosa island. Of
these the first three groups are of the same concave type as
the preceding. The fifth group is made of thin pieces of haliotis.
The third row on the plate shows beads from shellmounds
about San Francisco bay. The first three, which are from bu-
rials in the Emeryville shellmound, are of the concave Southern
California type. The square beads are from the West Berkeley
mound and are unusual. They are not made from univalves,
but apparently from mussel or haliotis. The lowest row on the
plate shows beads of the thick Central California type, appar-
ently all made from clams. The first, to the left, is from the
Pomo Indians. The second has passed through fire and was
excavated in Napa county. The third is from a prehistoric site
near Stockton, and the last, in the lower right-hand corner of the
plate, from the modern Maidu Indians. The difference between
the typical forms of Southern and Central California is obvious,
but it appears that at least some of the prehistoric inhabitants
of the shellmounds on San Francisco bay used the southern form
of bead.

### HOUSES.

The houses of the desert Cahuilla remain very much as de-
scribed by Dr. Barrows.[24] Their appearance and construction

---

[24] Barrows, 35.

ACC-HRA002275

is shown in plate 14. These houses bear some resemblance to the houses of the Colorado river tribes, especially in the upright forked posts supporting the roof beams, and in the character of the thatching. They differ, however, in being but slightly or partially covered with sand or earth. In fact many houses are without any covering other than the brush thatching. In the Mohave house the sides are quite low, and both sides and roof are pretty thoroughly covered with a layer of sticks. The outside layer of brush serves the purpose rather of preventing the thick covering of sand from shifting through the spaces between the wooden framework, than of being a covering in itself. The Cahuilla house is distinctively an airy brush-house, the Mohave structure a heavy close earth-house. The Mohave and Cahuilla resemble each other much more closely in the character and use of their shades or ramadas and wind-breaks, which are usually constructed in front of the entrance to the house.

At the Banning reservation a sweathouse is still in use (Pl. 15). From the outside its appearance is that of a small mound. The ground has been excavated to the depth of a foot or a foot and a half, over a space of about twelve by seven or eight feet. In the center of this area two heavy posts are set up three or four feet apart. These are connected at the top by a log laid in their forks. Upon this log, and in the two forks, are laid some fifty or more logs and sticks of various dimensions, their ends sloping down to the edge of the excavation. It is probable that brush covers these timbers. The whole is thoroughly covered with earth. There is no smoke hole. The entrance is on one of the long sides, directly facing the space between the two center posts and only a few feet from them. The fireplace is between the entrance and the posts. It is just possible to stand upright in the center of the house. This building was said by the old man who owned it to be used only for sweating. Its size, which would prevent any considerable gathering for ceremonial purposes or dances, corroborates his statement. Throughout Southern California, as well as the southern portion of the central region of the state, the use of the sweathouse was confined strictly to this purpose, ceremonies being held either under a simple shade or in a brush enclosure. In most of northern California the so-called

ACC-HRA002276

sweathouse is of larger dimensions and was preëminently a cere-
monial or assembly chamber.

### SOCIAL AND RELIGIOUS LIFE.

Practically no information is available as to the social and
religious life of the Cahuilla, but the information obtained in
answer to a few inquiries goes to show their close affiliation with
the other Mission tribes rather than with the agricultural Yuman
tribes to the east. There is no evidence of any totemic clan
system as among the Mohave. The chief or ''captain'' seems
to be such principally through the possession of property. He
is always regarded as the richest individual in the community.
At ceremonies and gatherings he supplies food for the assem-
blage. This dependence of social rank on wealth is a typically
Californian trait. The Luiseño follow the same practice. The
Mohave chieftainship, so far as not influenced by hereditary
succession, is dependent on valor.

The mythical origin of the Cahuilla is said to have been in
the north, in which account they agree with the Luiseño. The
large low-flying meteor, dakush, is distinguished from ordinary
shooting stars, ngamngam, and is said to live in San Jacinto
mountain, a belief which agrees with those of both Luiseño and
Diegueño. The eagle ''is the general of the Indians,'' volun-
teered a Cahuilla, by which no doubt he meant to express a
mythological and ceremonial importance of the bird parallel to
that which it has among other tribes of Southern California.

The most important ceremony of the Cahuilla seems to have
been the annual tribal mourning gathering, hemnukuwin. This
was in addition to singing immediately after a death. Jimson-
weed or toloache, kiksawal, which plays so important a part in
the initiation ceremonies of the Luiseño, Yokuts, and other tribes,
was customarily used for religious purposes. It was not learned
definitely that it was expected to be drunk by every boy or young
man of the tribe, but such seems to have been the case. It was
thought that the objects or events seen in the visions caused by
the drink would come true. It was especially believed that the
use of the jimson-weed would bring riches, no doubt in connection
with the general idea that it conferred power and the attainment

ACC-HRA002277

of desire. It was also used as a medicine, especially in case of broken bones. The Yokuts also employed it extensively for this purpose. It appears to have been efficacious in such cases by rendering the sufferer unconscious or insensible of pain for a number of days, in which time the healing took place. It is said by the Cahuilla that the amount of extract of the root that is drunk must be judged by a man experienced in its use, and that a number of deaths have resulted from the taking of excessive quantities.

The position of the medicine man or hechicero among the Cahuilla apparently corresponds very nearly to that of the medicine-man among the other Mission tribes and the Yokuts. This is especially brought out by the fact that he is the principal person who dances. The Mohave medicine-man acts as important a part as his colleague in these tribes, but as a causer and curer of disease, and not as the initiator of public ceremonies.

The ceremonial drinking of jimson-weed is known as pem-pa-wvan kiksawal. A girls' puberty ceremony, the "roasting of girls" of the Mission tribes, seems to have been practiced. It was called pem-iwvlu-niwom.

Altogether, as one compares the culture of the Cahuilla with that of other tribes of California, it is seen that the several striking resemblances that they bear to the Mohave and Yuma are due to proximity, or to the similarity of the two natural environments. In so far as these causes are not operative, the Cahuilla partake of the culture common to the tribes of the coast and inland of Southern California, in other words, the Mission Indians. Many resemblances with the Yokuts are also noticeable. These are of course not confined to the Cahuilla, but are common to all the Mission Indians. Such similarities are not restricted to the material side of life, but are conspicuous in the general social and religious organization. On the side of mythology, however, the Yokuts resemble the northern Californians, and the Mission Indians the tribes of the Southwest.[25] The physical type of the Yokuts, or at least their southern tribes, has also been shown to be nearly identical with that of the

[25] Present series, IV, 167, 1907; Journ. Am. Folk-Lore, XIX, 309, 1906.

ACC-HRA002278

Mission Indians,[26] though the possible historical significance of this resemblance is weakened by the similarity of both types to the Mohave-Yuma physical form. All in all, the Yokuts form part of the great Central culture group of California, and the Cahuilla belong to the ethnographic province of Southern California, just as their respective habitats form part of distinct physiographic areas. The instances of resemblances between the two groups are however so numerous, that it is evident that there must have been considerable cultural interinfluence between the whole body of Southern California tribes on one side of the Tehachapi mountains, and the Indians of Central California on the other side.

*May 14, 1907.*

[26] Boas, Proc. Am. Ass. Adv. Science, XLIV, 261, 1896.

ACC-HRA002279

CATALOGUE NUMBERS OF SPECIMENS SHOWN IN PLATES.

In all plates the specimens are given in order from left to right, and then downward. Unless prefixed by 2-, the numerator 1 is understood.

Plate  1:  10956, 11083, 11125.

Plate  3:  11098, 11121, 11093.

Plate  4:  11103, 11113, 11052, 10988, 11051, 11027.

Plate  5:  10976, 11047, 11065, 10975, 11034, 10977.

Plate  6:  11063, 11008, 10986, 11066, 11104, 11089.

Plate  7:  11079, 11111, 11042, 11130, 11105, 11007, 11057, 11067.

Plate  8:  11107, 10979.

Plate  9:  10985, 10990, 10992, 11040, 11091.

Plate 10:  11095, 10991, 11067.

Plate 11:  10997.

Plate 12:  2–3628, 2–3624, 2–3604, 2–3611, 2–3612, 2–3586, 2–3600, 2–3563.

Plate 13:  11129, 8462, 1291, 6708, 6394, 6522, 6314, 6311, 8788, 8773, 8798, 7496, 2689, 6971, 3362f, 7462.

ACC-HRA002280

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL 8                    [KROEBER] PLATE



CHEMEHUEVI CARRYING BASKET.

CAHUILLA OPEN-WORK BASKET.                          LUISEÑO OPEN-WORK BASKET.

ACC-HRA002281

ACC-HRA002282

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8

[KROEBER] PLATE 2






STORAGE BASKETS FOR MESQUITE.

ACC-HRA002283

ACC-HRA002284

[KROEBER] PLATE 3

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8



SEED-BEATERS.

ACC-HRA002285



ACC-HRA002286

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8

[KROEBER] PLATE 4



FLAT BASKETS.

ACC-HRA002287

ACC-HRA002288

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8   [KROEBER] PLATE 5



SHALLOW BASKETS.

ACC-HRA002289

ACC-HRA002290

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8                    [KROEBER] PLATE 6



DEEP BASKETS.

ACC-HRA002291



ACC-HRA002292

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8 [KROEBER] PLATE 7



BASKETRY CAPS AND GLOBULAR BASKETS.

ACC-HRA002293



ACC-HRA002294

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8 [KROEBER] PLATE 8



PESTLES FROM SAN GORGONIO PASS AND THE DESERT.

ACC-HRA002295

ACC-HRA002296

[KROEBER] PLATE 9



POTTERY.

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8

ACC-HRA002297



ACC-HRA002298

UNIV. CAL. PUBL. AM. ARCH. & ETHN.                    [KROEBER] PLATE 10





PAINTED JAR AND FIBRE SANDALS.

ACC-HRA002299



ACC-HRA002300

[KROEBER] PLATE II



CARRYING NET.

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 3

ACC-HRA002301



ACC-HRA002302

[KROEBER] PLATE 12



SANDALS FROM UTAH AND COLORADO CLIFF DWELLINGS.

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8

ACC-HRA002303

ACC-HRA002304

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8 [KROEBER] PLATE 13



DISK-SHAPED SHELL BEADS FROM CALIFORNIA.

ACC-HRA002305

ACC-HRA002306

[KROEBER] PLATE 14

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8







MODERN HOUSES IN THE DESERT.

ACC-HRA002307



ACC-HRA002308

UNIV. CAL. PUBL. AM. ARCH. & ETHN. VOL. 8      [KROEBER] PLATE 15





BASKET MORTAR AND SWEAT-HOUSE.

ACC-HRA002309

ACC-HRA002310

ACC-HRA002311

ACC-HRA002312

**AMERICAN ARCHAEOLOGY AND ETHNOLOGY.—Continued.**

Vol. 7. No. 1. The Emeryville Shellmound, by Max Uhle. Pages 106,
Plates 12, June, 1907. . . . . . . Price, 1.25

No. 2. Recent Investigations bearing on the Question of the
Occurrence of Neocene Man in the Auriferous Gravels of the
Sierra Nevada, by William J. Sinclair. Pages 25, Plates 2,
February, 1908. . . . . . . . . Price, .35

No. 3. Pomo Indian Basketry, by S. A. Barrett (in press).

Vol. 8. No. 1. A Mission Record of the California Indians, from a
Manuscript in the Bancroft Library, by A. L. Kroeber. Pages 27,
May, 1908. . . . . . . . . Price, .25

No. 2. The Ethnography of the Cahuilla Indians, by A. L. Kroeber.
Pages 40, Plates 15, June, 1908. . . . . Price, .75

No. 3. The Religion of the Luiseño Indians of Southern California,
by Constance Goddard DuBois (in press).

No. 4. The Culture of the Luiseño Indians, by Philip Stedman
Sparkman (in press).

Vol. 9. No. 1. Yana Texts, by Edward Sapir (in press).

**GRAECO-ROMAN ARCHAEOLOGY. (Large Octavo).**

(Published by the Oxford University Press.)

Vol. 1. The Tebtunis Papyri, Part 1. 1902. Edited by Bernard P. Grenfell,
Arthur S. Hunt, and J. Gilbart Smyly. xix + 674 pages, with
9 plates. . . . . . . . . Price, $16.00

Vol. 2. The Tebtunis Papyri, Part 2. 1907. Edited by Bernard P. Grenfell,
Arthur S. Hunt, and Edgar J. Goodspeed. xv + 485 pages, with
2 collotype plates and a map. . . . . . 16.00

Vol. 3. The Tebtunis Papyri, Part 3 (in preparation).

**EGYPTIAN ARCHAEOLOGY. (Quarto).**

Vol. 1. The Hearst Medical Papyrus. Edited by G. A. Reisner.
Hieratic text in 17 facsimile plates in collotype, with introduction and
vocabulary, pages 48, 1905. (J. C. Hinrichs, Leipzig, 25 Marks)
. . . . . . . . . . . Price, $8.00

Vol. 2. Early Dynastic Cemeteries of Naga-ed-Dêr, Part I, by George A.
Reisner. xii + 160 pages, with 80 plates and 211 text figures.
1908 (J. C. Hinrichs, Leipzig, 50 marks). . . Price, 16.00

Vol. 3. The Early Dynastic Cemeteries at Naga-ed-Der. Part II. By A.
C. Mace. (in press.)

Vol. 4. The Predynastic Cemetery at Naga-ed-Der. The Anatomical Material,
by Elliott Smith (in preparation).

Vol. 5. The Cemetery of the Second and Third Dynasties at Naga-ed-Der,
by A. C. Mace (in press).

Vol. 6. The Cemetery of the Third and Fourth Dynasties at Naga-ed-Der,
by G. A. Reisner (in preparation).

Vol. 7. The Coptic Cemeteries of Naga-ed-Der, by A. C. Mace (in prep-
aration).

**SPECIAL VOLUMES.**

The Book of the Life of the Ancient Mexicans, containing an account of their
rites and superstitions; an anonymous Hispano-American manuscript
preserved in the Biblioteca Nazionale Centrale, Florence, Italy. Repro-
duced in fac-simile, with introduction, translation, and commentary,
by Zelia Nuttall.

Part I. Preface, Introduction, and 80 Fac-simile plates in
colors. 1903.

Part II. Translation and Commentary. (In press).

Price for the two parts . . . . . . $25.00

Facsimile of a Map of the City and Valley of Mexico, by Alonzo de Santa
Cruz, Cosmographer of Philip II of Spain. Explanatory text by Zelia
Nuttall. Map in 7 sheets, 17×20 inches. (in preparation).

The Department of Anthropology, Its History and Plan, 1905. Sent free
on application to the Department, or to the University Press.

European orders for numbers of the series in American Archaeology and Ethnology
may be addressed to Otto Harrassowitz, Leipzig, or R. Friedlænder & Sohn, Berlin.

ACC-HRA002313

STTY C

UNIVERSITY OF CALIFORNIA PUBLICATIONS—(CONTINUED)

**ASTRONOMY.**—W. W. Campbell, Editor. (Lick Observatory, Mt. Hamilton, Cal.)
Publications of the Lick Observatory.—Volumes I–V completed. Volumes
VII and IX in progress. Volume VIII in press.

**BOTANY.**—W. A. Setchell, Editor. Price per volume $3.50. Volumes I (pp. 418),
II (pp. 354), completed. Volume III (in progress).

**CLASSICAL PHILOLOGY.**—Edward B. Clapp, William A. Merrill, Herbert C.
Nutting, Editors. Price per volume $2.00. Volume I (in
progress).

**ECONOMICS.**—A. C. Miller, Editor.

**EDUCATION.**—Edited by the Department of Education. Price per volume $2.50.

**ENGINEERING.**—Edited under the direction of the Engineering Departments.
This series will contain contributions from the Colleges of
Mechanics, Mining, and Civil Engineering. Volume I in progress.

**GEOLOGY.**—Bulletin of the Department of Geology. Andrew C. Lawson, Editor.
Price per volume $3.50. Volumes I (pp. 428), II (pp. 450),
III (475) and IV (462), completed. Volume V (in progress).

**PATHOLOGY.**—Alonzo Englebert Taylor, Editor. Price per volume, $2.50.
Volume I (pp. 347) completed.

**PHILOSOPHY.**—Volume I, completed. Price, $2.00.

**PHYSIOLOGY.**—Jacques Loeb, Editor. Price per volume $2.00. Volume I
(pp. 217) completed. Volume II (pp. 215) completed.
Volume III (in progress).

**ZOOLOGY.**—W. E. Ritter, Editor. Price per volume $3.50. Volumes I (pp.
317), II (pp. 382) and III (pp. 383) completed. Volume IV
in progress. Commencing with Volume II, this series contains
Contributions from the Laboratory of the Marine Biological
Association of San Diego.

**UNIVERSITY OF CALIFORNIA CHRONICLE.**—An official record of University
life, issued quarterly, edited by a committee of the faculty. Price,
$1.00 per year. Current volume No. X.

**ADMINISTRATIVE BULLETINS OF THE UNIVERSITY OF CALIFORNIA.**—
Edited by the Recorder of the Faculties. Includes the Register, the
President's Report, the Secretary's Report, and other official
announcements.

———

Address all orders, or requests for information concerning the above publications
to **The University Press, Berkeley, California.**

European agent for the series in American Archaeology and Ethnology, Classical
Philology, Education, Philosophy, and Semitic Philology, **Otto Harrassowitz, Leipzig.**
For the series in Botany, Geology, Pathology, Physiology, Zoology and also American
Archaeology and Ethnology, **R. Friedlaender & Sohn, Berlin.**

ACC-HRA002314



ACC-HRA002315

ACC-HRA002316



ACC-HRA002317



ACC-HRA002318

TAB 13

THE UNIVERSITY OF CALIFORNIA, SAN DIEGO

Evolving Ecoscape:

An Environmental and Cultural History

of

Palm Springs, California,

and the

Agua Caliente Indian Reservation,

1877-1939

A dissertation submitted in partial satisfaction of the

requirements for the degree Doctor of Philosophy in

History

by

Rachel Dayton Shaw

Committee in charge:

Professor William Deverell, Chair
Professor Chandra Mukerji, Co-Chair
Professor Michael Bernstein
Professor Ross Frank
Professor David Gutierrez

1999

ACC0003741

UMI Number: 9936845

UMI Microform 9936845
Copyright 1999, by UMI Company. All rights reserved.

This microform edition is protected against unauthorized
copying under Title 17, United States Code.

UMI
300 North Zeeb Road
Ann Arbor, MI 48103

ACC0003742

This is an authorized facsimile, made from the microfilm master copy of the original dissertation or master thesis published by UMI.

The bibliographic information for this thesis is contained in UMI's Dissertation Abstracts database, the only central source for accessing almost every doctoral dissertation accepted in North America since 1861.

 Dissertation Services



300 North Zeeb Road
P.O. Box 1346
Ann Arbor, Michigan 48106-1346 USA

800.521.0600     734.761.4700
web www.il.proquest.com

Printed in 2006 by digital xerographic process on acid-free paper

ACC0003743

ACC0003744

## INFORMATION TO USERS

This manuscript has been reproduced from the microfilm master. UMI films the text directly from the original or copy submitted. Thus, some thesis and dissertation copies are in typewriter face, while others may be from any type of computer printer.

**The quality of this reproduction is dependent upon the quality of the copy submitted.** Broken or indistinct print, colored or poor quality illustrations and photographs, print bleedthrough, substandard margins, and improper alignment can adversely affect reproduction.

In the unlikely event that the author did not send UMI a complete manuscript and there are missing pages, these will be noted. Also, if unauthorized copyright material had to be removed, a note will indicate the deletion.

Oversize materials (e.g., maps, drawings, charts) are reproduced by sectioning the original, beginning at the upper left-hand corner and continuing from left to right in equal sections with small overlaps. Each original is also photographed in one exposure and is included in reduced form at the back of the book.

Photographs included in the original manuscript have been reproduced xerographically in this copy. Higher quality 6" x 9" black and white photographic prints are available for any photographs or illustrations appearing in this copy for an additional charge. Contact UMI directly to order.



Bell & Howell Information and Learning
300 North Zeeb Road, Ann Arbor, MI 48106-1346 USA
800-521-0600

ACC0003745

ACC0003746

The dissertation of Rachel Dayton Shaw is approved, and

it is acceptable in quality and form for publication on

microfilm:

_____

_____

_____

_____

Chair

_____

Co-Chair

University of California, San Diego

1999

iii

ACC0003747

Copyright

Rachel Dayton Shaw, 1999

All rights reserved.

ACC0003748

To My Parents,

who gave me an appreciation of deserts,

and to all my friends and family

who have explored them with me.

iv

ACC0003749

## Table of Contents

Signature Page.................................................................................................................iii

Dedication........................................................................................................................iv

Table of Contents.............................................................................................................v

List of Tables ................................................................................................................viii

Acknowledgments ...........................................................................................................ix

Vita................................................................................................................................xiv

Abstract...........................................................................................................................xv

Chapter 1:   Introduction.................................................................................................1

       Evolution of Nature in Historiographical Debate ...........................................4

       The Trouble with Nature..............................................................................10

       Filling in the Great Divide ...........................................................................13

       The Problems of Ahistoricism and Privilege................................................16

       The Ecoscape Introduced..............................................................................20

       Ramifications for the New Western History.................................................22

       The Existing Historiography of Palm Springs ..............................................27

       The Project Summarized ..............................................................................30

       Notes.............................................................................................................33

Chapter 2: The Palm Valley Ecoscape:  An Overview...................................................40

       Human History..............................................................................................45

       A Closer Look at the Palm Valley Ecoscape ...............................................70

       The Western Ecoscape .................................................................................80

       Notes.............................................................................................................83

Chapter 3: Andreas Canyon ..........................................................................................95

       Cultivating a New Ecoscape.........................................................................96

       Dry Spell....................................................................................................101

       Rethinking Eden .........................................................................................107

       Experimenting with Agriculture ................................................................113

       Making the Desert Bloom...........................................................................115

       "Dying from Overwatering and Under-Cultivation"..................................119

       Assessing the Harvest.................................................................................124

       Moving On .................................................................................................128

       Notes...........................................................................................................129

ACC0003750

Chapter 4: Tahquitz Canyon..........................................................................................140

    Traversing the Terrain of an Evolving Ecoscape...................................................141

    The Rumblings of Tahquitz.....................................................................................151

    Delineating the Palm Valley Ecoscape..................................................................153

    Ditchside Diplomacy...............................................................................................164

    Towards a Domestic Water System.......................................................................171

    Traversing the Terrain of Tahquitz........................................................................177

    Wider Implications..................................................................................................192

    Notes.......................................................................................................................195

Chapter 5: Palm Canyon.............................................................................................208

    The People of the Palms.........................................................................................211

    "Home of the Fire-Flies"..........................................................................................215

    Chaperone to the Palms.........................................................................................219

    Cahuilla versus "Indian" Canyons..........................................................................226

    Notes.......................................................................................................................237

Chapter 6: Agua Caliente............................................................................................243

    A "Most Wonderful, and Most Valuable, Spring"....................................................244

    A "Great Nuisance to the People"?........................................................................250

    Coming to a Boil.....................................................................................................262

    The Steam Clears...................................................................................................273

    Notes.......................................................................................................................278

Chapter 7: Conclusion.................................................................................................289

    Wider Implications..................................................................................................296

    Variations on a Theme............................................................................................303

    Epilogue..................................................................................................................306

    Notes.......................................................................................................................308

Bibliography.................................................................................................................310

    Books.......................................................................................................................310
        Primary Sources...............................................................................................310
        Secondary Sources..........................................................................................312

    Articles.....................................................................................................................319
        Primary Sources...............................................................................................319
        Secondary Sources..........................................................................................322

    Periodicals..............................................................................................................323

    Advertisements and Brochures..............................................................................324

ACC0003751

Government Reports ................................................................................................325

Correspondence ......................................................................................................328

Maps and Other Visual Materials.........................................................................363
    Maps ...................................................................................................................363
    Photographs......................................................................................................367
    Other Visual Media........................................................................................374

Miscellaneous .........................................................................................................374

ACC0003752

## List of Tables

Table 1:     Amount of Land Under Cultivation at the Garden of Eden in Acres ................121

Table 2:     Value of Crops Harvested at the Garden of Eden in Dollars.........................121

ACC0003753

## Acknowledgments

It is difficult to know where to begin thanking those who have made the completion of this history possible. So many friends, family members, colleagues and institutions have helped me during the course of my research and writing and this brief acknowledgement can but barely express the extent of my gratitude to them.

Dr. Jerry Schaefer and Drew Pallette of A.S.M. Affiliates in Encinitas, California, generously let me peruse their library of cultural resource surveys and related materials, and deserve my thanks for their patience when my visit lasted several weeks longer than originally intended. The staff and archivists at the National Archives in Laguna Nigel, California; Seattle, Washington; College Park, Maryland; and the main archives in Washington, D.C. are owed thanks for their assistance in locating and procuring records from the Bureau of Indian Affairs. Special thanks is due to archivist Paul Wormser at the Laguna Nigel branch; he displayed a near-psychic ability to deduce which materials would be of interest to me, and offered one of those rare gifts to the researcher -- someone with whom to share the odd and amusing little tidbits. Much of the chapter on Tahquitz Canyon, based on the field records of government surveyors, would not have been possible had he not brought those materials to my attention. I would also like to thank the staff and archivists at the Huntington Library in San Marino, California. Jennifer Watts, Curator of Photographs, proved especially helpful in navigating the Huntington's collection of photographs and ephemera; I am also grateful for the assistance of Peter J. Blodgett, Curator of Western Historical Manuscripts. Steven Coy and the other archivists at UCSD Special Collections patiently pulled documents for me and helped me navigate the holdings of the Goodman Collection. Sally McManus at the Palm Springs Historical Society helped me locate and copy documents not found elsewhere, and the staff at the Palm Springs Public Library were also generous with their assistance. Tony Andreas,

ix

ACC0003754

former Tribal Historian for the Agua Caliente Band of Cahuilla, offered his his recollections of the Garden of Eden. Jim Mori of the USGS, based at the California Institute of Technology, provided me with information on historic earthquakes. I would also like to acknowledge the patience of the clerks at the county recorder's offices in San Diego and Riverside in putting up with a researcher who spent far too much time hogging the microfilm machines.

This project was made easier by funding from the University of California, San Diego, History Department, and from the Huntington Library, which offered me the Ernestine Richter Avery fellowship in 1997.

Many friends and colleagues travelled the rocky road from proposal to completed work with me -- I cannot thank them enough for their support, confidence, and reassurance. My committee -- William Deverell, Chandra Mukerji, David Gutierrez, Ross Frank, and Michael Bernstein -- have been invaluable resources. Bill's advice and reassurances saw me through the early agonies of research, the confusion of writing an effective proposal, and the frustrations of seemingly endless re-writes. It would have been a much more difficult task without his insight and encouragement. Chandra's ability to untangle the knotty threads of this project's theoretical framework was a tremendous help. Her support of my efforts to combine historical understanding with theoretical competence and her confidence in my ability to do so was a needed anchor when it sometimes seemed as if the complexities of the ecoscape were about to run away with me. Dave encouraged my efforts even when materials seemed scanty, and his measured criticisms have forced me to carefully think through the implications of my research. Ross generously shared his knowledge of Native American history and ethnography. Michael helped keep me on track, and reminded me to keep my work accessible to colleagues working outside my field of expertise.

My colleagues -- and friends! -- in the department of history here at UCSD are owed my deepest gratitude for keeping me sane during the whole process. Special thanks

x

ACC0003755

and a glass of good microbrew are owed to the lunch crowd and core of the Association of Scholarly Students (ASSes): Dan Berenberg, Barney Hartston, Phoebe Kropp and her husband Will, Henry Sanabria and his wife Ann, and Theresa Smith. All of them offered advice, their insight, ears to pour my complaints into, and pleasant company. Good cheer and commiseration were also shared with Charles Bethel, Carolyn Bissonnette, Chuck Bodie, Eric Boime, Julie Broadwin, Krista Camenzind, Margaret Garber, Katrina Pearson Johnston, Erik Maiershofer, Cecelia Miranda, Marghi Merzenich, Matt O'Hara, Greg Rodriguez, Sarah Schrank, Mark Wild, Andrew Zimmerman, and Jackie Zucconi. It would have been much harder without everyone's support and encouragement. Many others have offered help along the way; it would be impossible to list them all, and I apologize if I have missed someone!

For helping me formulate and articulate my ideas, I must acknowledge the support and advice offered by the shifting membership of Chandra's "salon," my fellow researchers at the Huntington Library and to Mark Hineline, Denise Spooner, and Steve Elster, all of whom served as sounding boards at some point along the way. Thanks are also owed to my friend Sue Halebsky, my colleagues at the Warren College Writing Program and in the Center for Teaching Development's Preparing Professional Faculty course, and my students, all of whom have allowed me on various occasions to vent my complaints, share my materials, and bounce ideas off them. I must also thank the able and friendly staff serving the department of history at UCSD, especially Mary Allen, Lorel Wirkus, and Amy Chiang, who provided shoulders to cry on, supplied the necessary forms, and helped me navigate the complexities of requirements and fax machines.

Thanks are also owed to a number of people outside academe. A welcome break was provided last year by a four-month trip to Australia; my NOLS expedition-mates, including Sarah Garlick and Anna Kirby and instructors Scott Laroux, Sparky Donahue, and Julie Anderson, were my companions for the first two and a half months; later

xi

ACC0003756

accommodation and good cheer were supplied by John, Betty, Suzanne, and Catherine Kneen of Melbourne, and Peter, Deborah, and Brandon Kneen of Sydney. Without them, the trip would have been less fun; without the trip, it is possible I would have burned out before completing my degree, so I am very grateful to them all. Thanks is also owed to Myrna Roberts of Acacia Books in Solana Beach, the San Dieguito Fellowship of Unitarian Universalists and the members of the UCSD Chorus, for reminding me that there is life beyond grad school.

My friends from Reed College, especially Paul Anderson, Heather Cleary, Julie Landweber, Matt Pearson, Chris Reyes, Joel Roberts, and Sarah Shih Snapp; my high school friend Robin Lisé-Neilson; Annah Pitt; Paul Eykamp and Laura Kaelke all deserve my sincere appreciation for their support and encouragement throughout this long process. During visits, and through cards, letters, and more e-mail than I can count, they all were generous with advice, sympathy, and an open-hearted willingness to share joys and difficulties.

My long-time friends Abby and Scott Anders graciously put me up at their place during my visits to Washington, D.C.; they and the rest of the Anders -- Becky, Bron and Eric -- are family in spirit if not by blood, and have offered me support and encouragement throughout. The same can be said of my godparents, Jim and Priscilla McLeod, who have shared their time, attention, and love of deserts with me since I was a baby. My aunts, uncles and cousins -- the Hickmans and the Shaws -- have followed my progress with interest and support. My grandparents, Marge and Zack Hickman, were always supportive of my endeavors, and I wish they were still alive to see the completion of this long process. My brother Jeremy provided a sympathetic ear, sage advice, and shared many an adventure with me. About my parents, Ken and Judy Shaw, I cannot say enough; it is not possible to express in words the debt I owe them for all their years of patient encouragement, love and support. Dedicating this history to them seems small thanks for

xii

ACC0003757

all that they have given me. I would also like to offer special thanks to Dan, who this year brought unexpected happiness into my life, for putting up with my complaints while struggling himself with minor field exams and orals prep. This year would have been a lot harder without his encouragement and good humor, and much less fun.

xiii

ACC0003758

## Vita

| | |
|---|---|
| March 7, 1970 | Born Phoenix, Arizona |
| 1992 | B.A. in History,<br>Reed College, Portland, Oregon |
| 1992-1993 | Reader,<br>Department of History,<br>University of California, San Diego |
| 1993-1999 | Teaching Assistant,<br>Department of History,<br>University of California, San Diego |
| 1995-1998 | Writing Instructor,<br>Warren College Writing Program,<br>University of California, San Diego |
| 1996 | M.A. in History,<br>University of California, San Diego |
| 1997 | Ernestine Richter Avery Fellow,<br>Huntington Library, San Marino, California |
| 1999 | Ph.D. in History,<br>University of California, San Diego |

### Fields of Study

Major Field: United States since 1877

Studies in Communications and Cultural Studies
Professor Chandra Mukerji

Studies in the History of the American West
Professor William Deverell

xiv

ACC0003759

## Abstract of the Dissertation

Evolving Ecoscape:

An Environmental and Cultural History of

Palm Springs, California, and the

Agua Caliente Indian Reservation,

1877-1939

by

Rachel Dayton Shaw

Doctor of Philosophy in History

University of California, San Diego, 1999

Professor William Deverell, Chair

This cultural and environmental history of the Agua Caliente Indian Reservation and Palm Springs, California, considers the formation of a new "ecoscape." (Ecoscape refers to the local ecosystem, inhabitants, beliefs and practices, and the network of relationships connecting them all). Diverse sources are employed to analyze the evolution of this region's local ecoscape and thereby better understand the formation of the turn-of-the-century American West. (These sources include travel literature, surveyors' journals, engineering reports, government correspondence, newspapers, photographs and maps.) The ecoscape concept challenges the historiographical use of the concept "nature"; revealing the complexities of an encounter between a "nature-less" society and a "natured" one with greater clarity. This framework represents the logical outcome of the current trajectory in the theoretical development of environmental history.

xv

ACC0003760

This examination focuses on the on-going encounter between indigenous Cahuilla Indians, white settlers, and agents of the Bureau of Indian Affairs. Cahuilla mastery of the local, pre-contact ecoscape, abetted by a conception of that ecosystem as a unified whole, was challenged when white newcomers began to alter its physical and cultural terrain. Initially these newcomers failed to recognize the limits of the local ecosystem, perceiving "nature" as something separate from, inferior to, and essentially yielding to human manipulation. Rather than promoting adaption, this perception encouraged settlers to recreate familiar ecoscapes in an unfamiliar environment, with often disappointing results. Accommodation was further hampered by complex spatial arrangements resulting from the checkerboard distribution of federal lands in the 1860s and 1870s. During the early years of settlement, the agents of the federal government played an important role, negotiating between the settlers and Cahuilla and collecting needed data on the evolving ecoscape. By the 1930s, both Cahuilla and their white neighbors had developed an effective understanding of their shared ecoscape; they no longer needed the guiding hand of the government to navigate it successfully. BIA officials, at first unwilling to admit to their own growing superfluity, were at last convinced through a series of events in the 1930s that local knowledge, gained through daily experience, was ultimately superior to that of a distant government.

xvi

ACC0003761

# Chapter 1

## Introduction

Research projects can begin in any number of ways. A passing comment, an intriguing omission in a secondary source, a quirky original document -- all can be the first step in a process that can be both laborious and thrilling. This one started during a period in my graduate studies when I was preoccupied with the idea of things that appear natural, yet are highly manipulated. Lawns in particular captivated me, and thus it is not surprising that my advisor Bill Deverell pointed me in the direction of Palm Springs, renowed for its golf courses. (Ironically, Palm Springs is currently losing the golfing trade to its neighbors in the area; communities such as Palm Desert, Rancho Mirage, and Cathedral City actually have the bulk of the greater region's golfing facilities. This would turn out to be one of many ironies in its history.) I first started with an examination of the failed settlement known as the Garden of Eden, both because it offered an intriguing counter-example to the apparent success of Palm Springs, and because I wanted to prove that it could be done (sources initially were not promising).

When I emerged much later, blinking, from the fluorescent-lit cocoon of the archives, it was clear that there was more to the history of Palm Springs and the Agua Caliente Indian Reservation than initially met the eye. Subsequent visits to Palm Valley itself, where I soaked up the sunshine and the atmosphere, confirmed this belief, and encouraged me to persevere, despite occasional encounters with sceptics. In the wake of a number of conversations I've had since I began working on this project, I have come to anticipate a certain bemused expression spreading over the face of my listeners when I tell them I'm "doing Palm Springs." This bemusement, I have come to believe, stems from a mixture of curiosity about the topic and scepticism about its research value. Palm Springs, after all, is more known for spring break madness and celebrity antics than serious study. I

1

ACC0003762

hope to assure my audience, then, that the history of the Agua Caliente Indian Reservation and Palm Springs is not merely an amusing conversation piece, but that it provides an ideal case study for exploring both new theoretical approaches and larger historical trends that occurred throughout the American West.

The Palm Springs region derives its value as a historical subject from its small scale, ecological conditions and intensity of engagement of the participants in its evolution. The sparse population of the region (at least during its early years as far as the white population goes) makes it relatively easy to track the actions of the participants, while its constrained geography limits the number of significant sites. The ecology of this region, in which extremes of temperature and aridity exist alongside lush palm oases, encapsulates a number of wider western environments. The checkerboard arrangement of Indian and privately owned sections (resulting from a government subsidy of railroads in the 1860s) made it impossible for the Cahuilla Indians and white settlers to ignore each other. Their close proximity exaggerated a number of typically western concerns: water and land rights in an arid environment; Indian allotment; troubled relationships between white settlers and native peoples; use of public lands; scenic resource managment; conflicts and collaboration between local, state, and federal government, and so on. These larger connections, visible to contemporaries as well as current observers, resulted in Palm Springs being the focus of national debate several times throughout its first six decades. In the miniature hothouse environment of the Palm Springs region, these issues are strikingly visible, relevant to a far wider region, and of a manageable scope for an in-depth study.

By studying the intensified interactions between government, local whites, and the native Cahuilla Indians in the Palm Springs region, we gain insight into the larger, more diffuse processes occurring in the wider American West. At the same time, the small scale of this case study makes it possible to pursue a line of inquiry into alterative theoretical frameworks for both environmental history, and the historical field more generally.

ACC0003763

This study will examine the events during a formative period in the history of Palm Springs and the Agua Caliente Indian Reservation. The matrix of tangible and intangible relationships — the *ecoscape* — in which these events occurred forms the core of this examination. The ecoscape was perceived differently by each of the three groups — Cahuilla, white settlers, and the federal government — and these perceptions had profound effects on these groups' abilities to cope with socio-environmental change. In particular, the abstraction of "nature" as something separate or separable from intra-human relationships played a crucial role.

It is necessary to break away from analytical paradigms that construct human beings and human society as separate from the ecosystems to which they belong. There are philosophical, theoretical and practical reasons for doing this. Past efforts in the field of environmental history have focused on bridging the gap between "Humanity" and "Nature." But what if that gap did not actually exist? This is the premise upon which this history is based: "nature" is an artificial construct that may have governed the actions of historical subjects, but which need not (and should not) limit the thinking of present-day historians or their audiences. Yet even if one cannot accept this philosophical position, there are valid historiographical reasons to devise "nature-less" methods of analysis. (This does *not* mean a return to humans-only histories, in which ecosystems may be cavelierly ignored. Rather, I am concerned here with the (mis)use of particular categories.)

When one uses poorly defined "universal" concepts like "nature" without an awareness of their historical and cultural origins, one runs the risk of imposing these concepts on peoples who did not use them, or of misunderstanding *how* those who employed such concepts did so. Another risk is that one may unwittingly reinscribe the normative values of peoples who did use such concepts, or fail to recognize the historical specificity of what at first glance appear to be familiar concepts. When one wishes to analyze

ACC0003764

4

interactions between a group which employed a concept like "nature" and one that did not, the problem is further compounded. Given these dangers, it is appropriate to ask if "nature" is a necessary (or even valid) concept in historical analysis, environmental or otherwise.

**Evolution of Nature in Historiographical Debate**

At first blush, such a claim seems an audacious, even heretical, one for an environmental historian to voice. Yet it is the logical extension of the past and present evolution of environmental theory. It also has implications for western history, inasmuch as a number of its prominent scholars incorporate an environmental component in their studies of the American West, albeit an often unsophisticated one.[1] The field of environmental history, even in its earliest incarnations, rests on the premise that one cannot have a history of human beings without an awareness of the physical environment in which that history took place. In the earliest versions, that environment was represented as a stage upon which human drama was enacted. Frederick Jackson Turner's frontier thesis and Walter Prescott Webb's *Great Plains* are notable examples of this. The continual reinvention of society and creation of American character was dependent, asserted Turner in his 1893 address, upon the need to solve each new set of environmental challenges as trappers, pioneers, and businessmen and women moved toward the setting sun. Webb refined this process of social reinvention when he focused more narrowly on the Great Plains, and the transformations wrought in Amerindian and later societies by the experience of life in the arid, treeless midlands of the North American continent. The problem with such constructions of the non-human world is they make it too easy to treat that world as a background to human endeavors, rather than as a dynamic system populated by other organisms and governed by its own rhythms.[2]

Other scholars discarded such stage-like constructions in favor of personifying Nature. This approach constructs Nature as an independent actor with whom human actors

ACC0003765

5

contend. This approach does reconcile the desire to include active, non-human subjects with the awareness that history is not history without at least the peripheral involvement of human beings. A fairly recent example of "Nature as person" history is seen in Patricia Nelson Limerick's *Legacy of Conquest*, where Nature, along with women and people of color, is abused but in the end gains revenge on its persecutors. However, such personifications ultimately do not get us very far. Among other things, they cast the non-human in a human mold -- which ultimately tells us more about the human beings who do the casting (particularly historians) than about the intricate relationships that connect humans to other species and physical spaces.[3]

A more complex approach recognizes that "nature" encompasses physical space, dynamic phenomena (like weather) and living organisms. Donald Worster provides the most compelling examples of this. One of the key scholars in both environmental history and the New Western History, Worster sets a compelling and often inspiring example for environmental historians who are also environmentalists. His admonition that we cannot ignore "nature" resonates deeply, reinforcing our awareness of the interconnectedness of human beings with the environment and other organisms.[4] In all of his works he insists that one cannot examine human history without taking into account both the arena within which that history takes place and the non-human organisms which share that arena with humans. It is somewhat ironic, then, that Worster's language and the frameworks he uses to explore these relationships deeply reinscribe the line between "nature" and "culture." He speaks of a "dialectic" or a "dialogue" between "nature" and "culture," emphasizing the separation that lies between them. These concepts are poorly defined and rarely are questioned as to their empirical validity.[5] For Worster, the pristine, non-human world offers a model that humans would be well-advised to follow. The problem with such as view is that, being by definition separated from that world, human beings can never reach it. The image of a hopelessly yearning humanity stretching towards a purity it

ACC0003766

6

cannot have is not comforting and may even promote resentment and rebellion; it is not surprising, then, that some environmental historians, such as William Cronon, endeavor to at least lessen the distance between imperfect humanity and a natural ideal.

Other scholars have turned attention away from the influences "out there" toward settings closer to home, like cities, buildings, even our own bodies. Studies of such settings, in other fields, have tended to emphasize not the "naturalness" of humanity, but the "artificiality" of nature. Examples of this type can be found in "post-modern" critiques such as those offered by Donna Haraway and Neil Evernden. Such arguments are useful in that they point out the ways in which ostensibly "objective" fields -- such as science in general or subfields like ecology -- are in fact riddled with assumptions, value judgements, and selective blind spots. Unfortunately, such arguments, unless carefully controlled, can also lead to dangerous essentialisms. Under such paradigms, the destruction of species or oppression of human groups can be justified by the argument that since all human beings are "natural" *none* of their actions are vulnerable to critical evaluation. The equally destructive flip side to this is that if instead everything is constructed -- that is, human-made -- the replacement of an ecosystem with myriad species and its own internal rhythms by one with a limited number of organisms oriented towards filling a single species' need (i.e. mono-crop agriculture) is not a significant transformation. One has merely replaced one artificial system with another. Both constructions are marked by a hubris that is highly destructive in this era of large-scale environmental degradation; moreover, both encourage reductionist histories in which models become more important than the historically specific subjects to which they refer.

This is not to argue that either Haraway or Evernden consciously advocates such views. Indeed, the intent of their respective works is to de-essentialize "nature" and to deny it explanatory power in the context of human social interactions. The problem arises when such ideas filter down to the popular discourse, and the message becomes distorted to

ACC0003767

justify the exploitation of non-human species. Since human relationships are their foci, non-human species are obscured and rendered conceptually insignificant. For environmentalists and environmental historians, such a position is untenable.[6]

Environmental historians in general demonstrate a reluctance to espouse views that promote (or fail to condemn) planetary degradation. More thoughtful attempts to bring nature home, such as those offered by Carolyn Merchant, Anne Whiston Spirn, and William Cronon deserve closer attention. Merchant emphasizes the relationships between human beliefs and behavior (particularly concerning production and reproduction), people, non-human organisms, and their shared environment. The framework she offers in *Ecological Revolutions* explores the relationship between contested changes in human belief systems and related behaviors and environmental change. Merchant's approach links learned, social behaviors with biological processes; an example is women as (re)producers both of offspring and of the social context in which those offspring are raised. Her approach implicitly blurs the line between "nature" and "culture" by challenging the notion of a universal understanding of the non-human world and emphasizing the human connections to that world. As such it offers valuable insight into the historically and culturally constructed meanings of both "nature" and gender, and reveals the ways in which the two have intersected at several key moments in the development of American society.

However, her model is ill-suited for examining the effects of slow change over time; its explanatory power is best suited for ecoscapes marked by steady states convulsively changed by brief transformative "revolutions." While the Palm Springs ecoscape in the 19th and 20th centuries -- like those of many other regions -- had its roots in encounters between different world views (like those that inform Merchant's argument) those encounters were and are part of an on-going evolution, not a revolution.[7] Tensions and conflict still exist between whites and Cahuilla, unlike in Merchant's account, where the "losers" soon fade from view. Her model glosses over the possibility of the persistence of

ideas and relationships (and peoples) that existed prior to a revolution. (As Patricia Nelson Limerick notes in *The Legacy of Conquest* and elsewhere, landscapes may be built up out of multiple "layers" of historical development.) Merchant's model is also ill-suited for addressing the possibility of gradual change from within, as it emphasizes instead change imposed from without. Palm Springs and the Agua Caliente Indian Reservation were and are experiencing evolution, not revolution. The effects, of course, can be just as profound.[8]

The dynamics of such subtle ecological processes are examined from a different perspective in Anne Whiston Spirn's *The Granite Garden* and William Cronon's *Nature's Metropolis*. Both Spirn and Cronon assay to "bring nature home" in their respective works, and focus on gradual change over time. In both books, the assumed isolation of the human community -- embodied here as the cities of Boston and Chicago -- from its larger environment is clearly identified as fallacious. So too is the belief that non-human organisms and environmental processes cannot exist within and around "human" urban spaces. Spirn reveals the influence of climatic phenomena, such as floods and wind; non-human organisms such as street trees, park lawns, rats, city birds, feral dogs and alley cats; resources such as water and soil; and human beings as biological as well as cultural entities in ostensibly sterile, "unnatural" cities. In brief, she argues that the distinction between "city" and "nature" is a false and misleading one -- a point also made by Cronon in *Nature's Metropolis*, when he explores the connections between the city and its rural hinterland. His analysis of the ways in which urban consumption and production are inescapably linked to rural cultivation and harvest of raw materials through capitalism is compelling and insightful. Unfortunately, perspectives such as Spirn's and Cronon's are rare in the historical field; cities are typically treated as networks of human activities occurring in a built and wholly "unnatural" environment. Erstwhile "natural" concerns, such as sanitation and flood control, are reassigned to the category of "city" for the duration of study; they are not dealt with as "natural" phenomena per se. The reverse of this pro-city slant can be seen

ACC0003769

in *Nature's Metropolis*, with equally unfortunate results; Cronon has been criticized, with justification, for paying insufficient attention to the complexities of Chicago's human society beyond their role as agents of capital. Analyses like these made by Spirn and Cronon demonstrate that attempting to eliminate the polarized construction of "nature" and "culture" by treating everything as "cultural" or "natural" does not eliminate the polarity. Indeed, it makes it even more difficult to consider the subtle distinctions and interactions in the middle ground of actual experience, as it is no longer necessary to consider what separates one pole from the other. (Much that occurs in the "invisible" middle is highly interesting, as will become apparent when Bruno Latour's arguments are discussed later.)[9]

Yet we environmental historians seem hesitant to develop our more revolutionary and valuable lessons; that is, to assert not the fineness of the gap between "the natural" and "the human," but rather to refute the existence of that gap without forcing all of complex reality into one of those limited concepts. Some scholars have come close, but seem to pause in mid-stride, as though anxious about what might be found if they step off the "nature" trail. Is it a black mire of sticky post-modern confusion, or is it the firm footing of theoretical granite? William Cronon and Richard White have attempted to construct map and compass for this new terrain, although they haven't completely left familiar trails behind. Perhaps like the practicioners of the New Western History – a school to which Cronon and White also belong – environmental historians fear that to consider alternative paths is to risk the loss of the authority that comes from being on the "right" path.

In his thought-provoking essay, "The Trouble with Wilderness," Cronon quite correctly shows that the concept of "wilderness" is a construct, not a reality; he argues, moreover, that constructing wilderness as "pristine" (that is, untouched by humans) encourages a dangerous polarization of nature and humanity. If one sees wilderness as salvation for the sins of humanity, one is left with the ultimate realization that, as defined, such salvation can never be reached (recall my discussion of Worster's approach

ACC0003770

earlier in this introduction). If one rejects this position, then an important rationale for the preservation of "wild nature" is lost. Cronon therefore proposes that, instead of focusing exclusively on the preservation of "wilderness," we should direct our attention to the "non-wild nature" that exists all around us. Here Cronon takes an important step – he attempts to narrow the distance between "nature" and human society by bringing "nature" closer to home. By so doing, he hopes, we will be able to develop a position in which we treat "nature" with respect. Such a position would come out of our recognition of "nature's impact on our lives, and out of a respect for its right to exist unto itself," rather than from a misguided attempt to preserve the "pristine" from humanity's taint.[10]

### The Trouble with Nature

So far, so good. Any argument that aims to move us into a more respectful position vis-á-vis the environment and nonhuman organisms is a step in the right direction, and Cronon's is more adroit and coherent than most. However, there is the danger that even Cronon's skillful exposition merely renders more subtle the polarized construction of "nature" and humanity that he endeavors to critique. For example, as a substitute for the clearly flawed category "wilderness," he offers "wild nature" (distinguished from "non-wild nature" and humans). Wherein lies the distinction? True, "wilderness" is a term weighted down with considerable cultural baggage, but is "wild nature" much better? At one moment he refers to "humanity in all its diversity and... all the rest of nature too," which seems to imply humans are part of nature. This is confirmed by later statements that wildness can be found "even in the cells of our own bodies," and that

> Our challenge is to stop thinking of such things according to [a] set of bipolar moral scales in which the human and the nonhuman, the unnatural and the natural, the fallen and the unfallen, serve as our conceptual map for understanding and valuing the world.[11]

ACC0003771

We might thus be forgiven for assuming that Cronon is arguing that there is no such separation, that we have "humanature" rather than humans and "nature." How, then, should we interpret his references to "the otherness of the tree" and "nonhuman nature"? "Nonhuman nature" is conceptually redundant: if human beings are a part of "nature," the reference to "nature" is unnecessary; if they are not, it is the reference to "nonhuman" that is unnecessary. Cronon apparently wants to keep his natural cake and eat it too. This paradoxical agenda can be seen particularly in his following statement:

> Any way of looking at nature that encourages us to believe we are separate from nature -- as wilderness tends to do -- is likely to reinforce environmentally irresponsible behavior. On the other hand, I also think it no less crucial for us to recognize and honor nonhuman nature as a world we did not create, a world with its own independent, nonhuman reasons for beings as it is.[12]

Upon closer examination of this essay and of Cronon's response in the same issue to comments made about it, it appears that a large part of the problem is linguistic as well as conceptual. In his response, particularly, Cronon's language when dealing with these issues seems both forced and imprecise. He refers repeatedly to the concept of "wild nature" without explaining what that means, although it can apparently be distinguished in some way from "non-wild nature," "the rest of the environment," and the problematic "wilderness."[13] He himself notes that "The trouble is that our cultural traditions and our very language encourage us to think that wilderness and nature are, well, *natural*. And the trouble with 'nature' as a linguistic category is that it tends to shut down conversations rather than open them up." One hopes therefore, that he is writing somewhat tongue-in-cheek when he argues later on about the "need to recognize that 'wilderness' and 'nature' *are ideas* susceptible to this kind of cultural analysis, not just facts of nature that we are entitled to take for granted as standing outside the realm of human perceptions and values. This is not a perspective that comes naturally to most of us."[14] One begins to wonder, if "nature" is so problematic, why Cronon insists on using it at all.

ACC0003772

12

A likely possibility is that "nature" is a concept which generally carries positive connotations for both environmentalists and environmental historians. It is also initially easier to employ a vocabulary with which the general public will be familiar than to teach them new ways to examine human interactions within ecosystems. If we are to escape the limitations of nature-based thought, however, eventually such re-education will have to take place. This point is made succinctly by James Sherow in his review of Cronon's anthology *Uncommon Ground*, which includes "The Trouble with Wilderness"; his criticism is very similar to my own, although I would place more emphasis on examining the ways in which human beings understand their place in their ecosystems. Sherow writes,

> Why question the actual existence of wilderness and not nature? Cronon especially, but many of the other contributors, too, dance around this question, but fail to confront it head on. All seem to want to believe in some kind of nature, and in one that is other than human.
>
> But as homo sapiens, has it ever been possible for this species to be both a part of nature, yet removed from it? The species evolved out of the earth, not the other way around.... If, as Cronon posits, the other-than-human nature, or the wild in nature, can be found even in the cells of our own bodies, then where does human nature begin?
>
> We need to resolve how humans are of the Earth; begin with the Earth and place humans within its context because all of what we are is also of this planet.... Homo sapiens, as beings of the Earth, possess tangible existence tied to the chaotic workings of an infinitesimal planet in a universe of unimaginable vastness. Reinventing nature will not move us closer to understanding the constraints and latitude of life on this planet.[15]

Cronon's arguments, thoughtful though they may be, still reinscribe a division between a natural world and a human world; in these essays, he delays at the edge of unmapped territory, unwilling to rely on old cartographies, but equally reluctant to leave familiar terrain. Cronon's call for a perspective that simultaneously respects the environment and non-human organisms and which does not define humans as separate from

ACC0003773

them is admirable, as are his efforts to outline such a perspective. However, further manipulation of the compromised and limited concept "nature" will not get us there. The paradigm employed in the history that follows offers an alternative; it permits us to be conscious of differences between the elements of an ecoscape, while at the same time reinforcing an awareness of the connections between them. Instead of debating whether we are "getting back to the wrong nature" or the right one, we need, instead, to ask: why should we get back to "nature" at all?[16]

### Filling in the Great Divide

The question of whether we should (or can) get back to "nature" or not lies near the heart of *We Have Never Been Modern*. The argument laid out by French scholar Bruno Latour clearly articulates the inadequacy of the categories "nature" and "culture," and offers suggestions for moving beyond them. Yet while Latour's framework has influenced the approach used in this examination, it differs from mine in some important ways. Latour argues that the defining characteristic of the modern era is the rigid conceptual separation of all objects and experience into the categories of Nature and Society; the Enlightenment introduced not only the idea of Man, but also, if less explicitly articulated, the idea of not-Man. Hybrids, Latour claims, have proliferated in the gap between the artificially constructed poles -- Nature and Society -- of the modern "Constitution" (interpretive framework). The creation of these abstract, polarized categories, he argues, has facilitated the formation of hybrids -- things such as AIDS, the hole in the ozone, and gene mapping -- which are not easily contained within the tidy boundaries of either Nature or Society. By crossing boundaries, and partaking of both realms, hybrids demonstrate that flaws exist in the boundaries keeping Nature and Society apart. Ironically, the imposition itself of these rigid categories on a fluid reality creates an unseen space between categories in which hybrids can proliferate. Also ironically, this growth in turn reveals the inadequacy of the modern Constitution to explain the presence of such "quasi-objects."

ACC0003774

14

Latour seeks to resolve these apparent contradictions and answer the critiques of postmodernists. He does this by both suggesting that we never really were modern (that is, the categories of Nature and Society never really were fixed and separate), and proposing that a new Constitution for understanding these phenomena must now include a study of networks as well as of poles. Ideally this new framework would be capable of explaining the new developments in our society without either privileging either Nature or Society at the expense of another or losing the creative dynamic tension between these poles. Though he argues that the pure poles are largely abstract, rather than real, Latour acknowledges that their existence is what facilitated the creation of hybrids, and so does not advocate their negation; rather, their abstract quality and permeable boundaries should be recognized.[17]

Latour's argument thus offers a thoughtful analysis of the ways "modern" society has been constructed, and the developments that that construction has enabled. He is sensitive to the fact that our too-facile division of experience into Nature and Society has created problems, while recognizing that some value has also come of it. The solution Latour suggests is somewhat similar to mine in that it is relational and emphasizes the abstract character of categories like "nature" and "culture." However, the purposes to which he would put his new "Constitution" and those which my ecoscape concept is intended to address are different; his framework, while providing a useful background, is not adequate to the task now before us. His model is ill-equipped to explain relationships between objects aligned on his spectrum between Nature and Society. Objects (including human beings) are instead defined by their relationship to those abstract poles, although one might be able to infer relationships between them by arranging them sequentially on that continuum. (That is, one could deduce the location of Object B relative to Objects A and C by comparing their particular distances from either of the two poles.) If one wishes to study relationships between objects rather than relationships between objects and

ACC0003775

ahistorical abstract categories, then Latour's model is inadequate. And it is wholly
inappropriate for a study that considers the historically specific interaction of different
"constitutions" with each other and the phenomena that they describe.

Latour's placing of phenomena along a spectrum between Nature and Society also
implies that some may be more "natural" or more "social" than others. Whether or not we
can decide the truth of such an allegation (for by whose standards shall we judge such
claims?) is somewhat beside the point. Rather, we should ask how different peoples in
different places and different times have created their own "constitutions" — or
cartographies (my variation, explained later). We should consider how objects and ideas
were organized and related within cartographies and examine how these cartographies, or
the placement of things within them, have been contested. We should examine the effects
of such placement and contestation on people and on objects. In other words, our primary
concern should not be how we as historians choose to place objects (except as they affect our
analysis), but how our subjects did, and what the implications of that placement were.
This both prevents us from reifying our own perspectives and allows us to reap the full
benefits of exploring alternative viewpoints.

We can see some of the practical benefits of such an approach in Richard White's
recent work, *The Organic Machine*. Oriented around the idea that human beings and
"nature" (represented by the Columbia River and its salmon) are intimately linked to each
other through the expenditure, consumption, and exchange of energy, White's approach
goes far in tying people, rivers, and fish together, and in demonstrating the complexity of
those links. The concept of energy as the thing that links the focal points of an ecoscape
together is promising and deserves further scrutiny. However, I will not use White's
approach here, since I am more of a culturalist than a materialist in my approach to
environmental history, and his histories, though excellent, have tended to move away
from such analysis (for more on this, see my discussion relative to the New Western History

ACC0003776

later in this introduction).  My focus instead is on the interaction of different organizing systems (cartographies) used by different groups of people (being informal versions not unlike the one White himself uses to explain the relationships between fish, people, and rivers) and the effects of that interaction on those systems and the local ecology of the Palm Springs ecoscape.  This examination will be inspired by White's methodologies, but distinct from and not dependent upon them.[18]

### The Problems of Ahistoricism and Privilege

There are immediately practical reasons for reconsidering the use of "nature" beyond the philosophical and theoretical ones suggested above.  As scholars in the field of race and ethnic studies have learned, the utility of concepts such as race -- or nature -- lies in their assumed ability to cross boundaries of culture and time.   This presumed universality, however, is a two-edged sword; when such a concept proves *not* to be truly universal, it makes historical analysis more difficult, not less.  If one attempts, using "nature," to examine groups whose store of cultural categories did not include this concept, one is likely to impose "nature" upon them, seeing its presence where it did not exist.  On the other hand, if one's subjects are a group that included "nature" in their conceptual kit, the risk is that of assuming that their "nature" and one's own concept, also labeled "nature," are one and the same; the historical specificity of their articulation and use of that concept is thereby obscured, and any analysis thus produced will be more about how historians think than do their subjects.

If one examines evolving relationships between a "natural" group and an "a-natural" group (that is, groups that do and do not utilize a concept called "nature") the picture becomes even murkier.  The imposition of "nature" onto the "a-natural" group conceals any change in their conceptual framework either toward or away from the framework of the "natural" group.  At the same time, the use of "nature" by the historian bolsters the position of the "natural" group by connecting it to a universal norm.  The result

ACC0003777

is that the "a-natural" group becomes an aberration that must conform to the "natural" group's norm and, by extension, with the norm of the historian. Again, history becomes a story about the historian, and subjects who "measure up" to the historian's expectations are privileged at the expense of those who do not.

While this examination is not meant to be an "ethnohistory," it has been influenced by and has significance for that field. Aside from the obvious topical connection -- the examination of Anglo-Cahuilla interaction -- the question of how one balances one's own perspective with those of one's subjects is one which is invested with special significance for ethnohistorians. Debate in this field has centered on the study of peoples with oral rather than written cultures, and whether, by "translating" their histories into text, these peoples' "authentic" voice becomes lost. When study turns to encounters between text-based and non-textual groups, the risks compound, with the textual character of historical research and writing working to privilege the text-based culture over the non-textual. (The parallels between textual/oral and natural/a-natural should be clear.)

A brief look at some of the ways in which ethnohistorians have addressed these problems will provide insight into the ways environmental historians can cope with the parallel problems of studying relationships between "natural" and "a-natural" cultures. One of the problems facing ethnohistorians is the difficulty involved in identifying events in the historical record and making sense of them, given the imbalance between events recorded by literate peoples (who dominate the available sources) and those that were not. The parallel for environmental historians is the difficulty in reconstructing the significance of environmental events, given that much of our knowledge of historical ecoscapes in the United States comes from literate, often highly educated, "Western" observers. Raymond D. Fogelson, in "The Ethnohistory of Events and Nonevents," argues that historians can partially address such problems by considering "nonevents" -- occurrences not identified in the dominant sources as significant -- as well as "events" --

ACC0003778

occurrences given significance by contemporary observers. In other words, he suggests that historians should be guided by their own sense of what is significant as much as (or more than) by what their subjects deemed important. Given that the history of ecoscapes can best be recreated by comparing and contrasting multiple perspectives, historians' awareness of their own agendas provides a necessary anchor in what could otherwise become a sea of competing realities.[19]

It is also important to maintain an awareness of one's own analytical categories -- such as "nature" -- to avoid imposing them upon one's subjects or privileging those subjects who seem to already possess them. Given that most of our sources come from people who use "nature" as an essential category for organizing experience, such awareness is especially important for environmental historians interested in cross-cultural interaction. Here, too, ethnohistorians can offer some solutions, arising out of their own struggles to balance accurate representations of non-literate peoples with their own reliance on textual sources. In "'These Have No Ears':  Narrative and the Ethnohistorical Method" Raymond DeMallie suggests that one way to represent the narratives of such cultures without distorting them to fit alien historiographical norms is to let such material speak for itself, having been sensitively introduced by scholars conversant (as far as possible) in the ways and beliefs of those who produced the material and whose needs it served.[20]  Similarly, in "(Re)Collecting the Past:  Writing Native American Speech," Michael E. Staub shows through an examination of three ethnographic accounts of Indian life from the 1930s that it is possible to delegitimate some of the power of the written text by deliberately foregrounding and privileging oral speech within that text.  This can be accomplished by praising oral speech and denigrating written, pointing out the limitations of written text explicitly and implicitly; by disregarding the structural conventions of text and imposing the patterns and rhythms of speech on the written word; and by preserving the quality of

ACC0003779

oral remembrances -- shifting (re)interpretations, repetition, contradiction, the
interrogation of or engagement with the audience -- within the text.[21]

For this examination, the parallel compensations will be:  pointing out the
problems with "nature-based" perspectives; drawing attention to the historically and
culturally specific character of "nature" through explicit discussion and use of quotation
marks around "nature"; and through the use of analyses rendered independent of the concept
by designing new ones — such as the ecoscape.  Also, given that a significant portion of this
examination rests on textual analysis (in order to illuminate the parameters of the various
groups' cartographies), the unmediated text will be made visible, as well as the
interpretation of it, as often as stylistically possible.

However, though useful, the ethnohistorical perspective rests on a problematic
base.  The question of privilege as posed by the ethnohistorians is framed in a biased
manner by assumptions of familiarity and unfamiliarity with historical subjects.  Put
simply, the problem of representation is deemed more critical for scholars of Native
Americans than for those studying subjects with more "familiar" modes of expression.  This
perspective is not limited to ethnohistorians; it is often taken for granted more generally
that the study and representation of Indian beliefs in historical work requires a special
sensitivity and an awareness of differences between the perceptions of the historian and
those of his or her subjects.  Much less apparent is an awareness that the same must be done
when considering the perceived realities of non-indigenous, supposedly "modern," subjects,
particularly when the distance between them and the historian is less than three or four
generations.  These subjects leave written records, many of which are still part of our
experience today (such as the writings of Frederick Jackson Turner).  It is easy to assume,
despite the difference in context, that we and our "modern" subjects think alike.[22]

This is a false assumption, particularly if we return to the question of "nature."  The
rationale for having a theoretical framework which denies the universality of concepts

ACC0003780

like "nature" becomes clear. Using such a framework not only makes a statement about the lack of such categories' empirical validity; it offers an alternative. Unless we begin to employ new perspectives, we are destined to reinscribe and take for granted the belief systems of people who perceived human beings as separate and separable from the ecosystems in which they lived. Our awareness of environmental degradation on a global scale suggests that we can no longer take for granted the feasibility -- or familiarity -- of an "American" mental terrain any more than we can Amerindian ones. By de-privileging "nature," much as the ethnohistorians advocate de-privileging text, the strangeness of the supposedly familiar becomes easier to perceive.

There are wider ramifications as well. Reinscription does more than encourage the conflation of present attitudes with those of past peoples, indigenous or not. In this case it permits the perpetuation of categories which have clearly contributed to the unfortunate state of our global ecoscape today, since by definition they deny the connections between humans, other organisms, and their shared environments. While changes in perception alone are not enough to take us off this destructive path, they at least facilitate actions which can.

### The Ecoscape Introduced

What we need, then, is an approach which discourages the facile assumption that human beings are separable from their ecology, and which encourages closer examination of the complex web of tangible and intangible relationships between human beings, other species, physical space and physical phenomena (such as weather). Instead of remaining frustrated by the limitations of language, it is both necessary and more fruitful to develop both alternative concepts and words with which to describe them.

The heart of this study's conceptual approach is the idea of the "ecoscape"; the term was deliberately chosen to evoke the tangible and intangible relationships between humans and their ecosystems which geographers categorize as "landscape," but without

ACC0003781

21

landscape's connotations of distance and stasis. An ecoscape is the network of relationships and physical objects affecting the lives of organisms, human and otherwise, as they inhabit a particular place. The ecoscape can be described as a dynamic system of interactions between and within cartographies and ecosystems. In this study, the ecosystem is the network of physical objects and the concrete relationships that link them to each other and to a given space. Cartographies are both the schemata organisms use to make sense of their ecoscapes, and the systems by which they generate and modify these schemata. Cartographies also offer models for the transformation of existing ecoscapes into more desirable ones.

The alert reader will no doubt have noticed some similarities between the concept of "cartographies" and the Constitutions of Latour. However, the key difference lies in their degrees of specificity -- where Latour speaks of Nature, or Society, or even hybrids in the abstract, the focus here is on how such abstractions were linked to specific ideas, people, places, and so on. The evoking of images of maps and charts is also intentional; where Latour's "constitution" suggests an ideal plan or universal model, "cartography" suggests instead an awareness of deviations from abstract ideals and an emphasis on locally specific features. (Of course, representations of the local terrain are often colored by wishful thinking and other manifestations of the ideal, but specific regional features remain the focus.) "Cartography" further suggests the processes which produce maps and charts, as well as the products of those processes. In a sense, the relational qualities inherent in the concept of the ecoscape combine with the focus on specific local features to make this more an "ecological" history than an "environmental" one.

Many benefits result from replacing "nature" with ecoscape. The complexity of the ecoscape and its components discourages simple claims about "nature" versus "culture." By placing humans within ecosystems, rather than external to them, the ecoscape encourages us to consider the many ways humans both shape and are shaped by changes in them; yet

ACC0003782

the inclusion of cartographies allows us to acknowledge the influence of belief, knowledge, and practice, thus avoiding environmental determinism. Finally, the possibility of combining analyses of local ecoscapes with an awareness of their connection to other local ecoscapes -- forming, perhaps, a super-scape? -- may offer a way to resolve the current tension in the field between calls for grand syntheses and the proliferation of focused local studies that are especially common in the New Western History. Looking at the ecoscape in Palm Valley will not only demonstrate the validity of this approach, but also lay part of the groundwork for a larger understanding of the ecoscapes of Southern California and the American West. The ecoscape more broadly holds potential for resolving some of the central dilemmas of the New Western History, although not exclusively.[23]

### Ramifications for the New Western History

The New Western History has by this time proved its viability as an area of historical inquiry. The longevity of the field -- as well as its projected future -- depends on it retaining a flexibility of approach while maintaining a sense of its own cohesiveness. The history of the Palm Springs ecoscape, I argue, demonstrates that one can introduce fresh approaches while extending the existing narrative themes that characterize the New Western History. Three areas in particular seem well suited for an integration of a history of ecoscapes with Western history. These are first, the issue of culture and myth; second, the inclusion of multiple perspectives; and third, the question of integration and synthesis. Inasmuch as the New Western History itself continues to struggle with these areas of inquiry, this study may offer some keys to their eventual resolution.

One of the issues that continues to dog the New Western History (and environmental history) is the question of culture and myth; specifically, how does one incorporate the history of the imagined West into the history of the region more generally? To date, the answer has generally been poorly, awkwardly, or not at all. The underlying problem can be best examined in two parts, one dealing with the question of how historians

ACC0003783

incorporate fictional narratives, the other considering the integration of imagined accounts with recorded events.

In *The New Western History: The Territory Ahead*, contributors Jerome Frisk, Forrest G. Robinson, Krista Comer and Stephen Tatum all note the difficulty the primary practioners of the New Western History have with the literature and films of the American West. Donald Worster and Patricia Nelson Limerick in particular are shown to exhibit a dismissive or even suspicious attitude toward material that lies outside the historical genre. Part of this, Frisk and Robinson argue, lies in the field's near obsession with originality. If the New Western historians acknowledge that others have told stories of a tormented, violent West, then on what basis can they claim to be writing a "new" history? Since this question raises the larger issue of whether we should privilege "newness" in historical writing, one which is beyond the scope of the examination at hand, let us set it aside for now, and turn to the other reasons why the New Western History is suspicious of external narratives.

The other source of the New Western History's suspicion of narratives originating outside the field of history, argue Robinson and Tatum, is an unease with the messages of postmodern theory and cultural studies. (Which is somewhat understandable; we have already seen some of the dangers associated with postmodern critiques of science and "nature.") If all narratives potentially possess equal validity, as postmodernism claims, then how are we to privilege historical narratives? This question, along with the related one of why (or whether) we should engage in such privileging, challenges the New Western History's claims to particular political pertinence. In a similar way so do the arguments made by cultural studies, in which audience reaction and interpretation play as important a role as author production and dissemination; if the audience possesses such power, how can the author (or historian) claim a stance of higher authority? The New Western historians, claim Tatum and Robinson, have been reluctant to address these theoretical

ACC0003784

questions, perhaps because, like the question of originality, they challenge the authority of the New Western History.

Thus an anxiety about the field's legitimacy and authority hampers the adoption or incorporation of fictionalized narratives into the New Western History. As I do not consider myself a practitioner of New Western History *per se* (although I do engage with western topics), I am not concerned here with establishing or defending the legitimacy of the field. What I do hope to demonstrate is that through an engagement with the intangible West of perception, aspiration, literature and myth, we can learn more about the region -- and its subregions -- than an examination of the "real" West alone permits. I would also argue that doing so makes it possible to better address some of the interesting issues raised by the New Western History, but whose consideration has been hindered by this strategy of reducing or ignoring other narratives.

In particular I want to consider the question of multiple perspectives in historical narratives, which I find is one of the more significant contributions made by the New Western History. The field's practitioners' insistence that a variety of different voices be heard, particularly those of groups previously silenced or excluded, has encouraged the production of many valuable pieces of scholarship. It is thus somewhat ironic that suspicion of "imaginary" Wests is allowed to impede this development. Some voices speak more loudly in a fictional vein; as Krista Comer points out in "Literature, Gender Studies and the New Western History," women's literature functions not only historiographically but also historically as a source of critique and comment on society's status quo. Moreover, if we construe the "imaginary" West to include not only works of literature and fiction, but also perception and interpretation, it becomes more and more difficult to justify limiting our examinations to the history of the "real" West alone. We must ask, what *is* the "real" West, and how can we study it in isolation from the perceptions and beliefs of the people who inhabited it?

ACC0003785

I would argue that we cannot, just as we cannot understand such perceptions in isolation from the ecosystems in which they developed.  To attempt to do so is to severely truncate our understanding of what the history of a region means.  In effect, to leave out the intangible West is to downgrade historical analysis to either the antiquarian collation of facts in chronological order, or a form of environmental determinism in which human beings are merely the sum of their composite biological parts.  When scholars as thoughtful and adroit as Richard White justify the isolation of the history of the imagined West from that of the "real" West on the grounds that it would be "potentially confusing" to integrate them, something besides mere complexity must be operating.  Some of it can be attributed to the suspicion of the fictional described above; White's *"It's Your Misfortune"* is cited in Robinson's critique of the New Western History as an example of a book which "bristles with the conviction that the real West, the place, like much of what has really happened there, is obscured in fanciful human constructions, in myths."[24]

Yet I suspect that more is going on than simple hostility, especially since Richard White has recently altered his position to allow for greater consideration of the fictional West.[25]  I think part of the problem lies in how we define "myth."  If we are talking about fictional recreations of a past that depart from what historical research tells us yet are taken as wholly truthful accounts, I think Worster, Limerick, and White have a point about the dangers of losing sight of the "real" West in our pursuit of mythical ones.  Yet there is more to it than that, even within such a narrow definition; myths tell us something about how people made sense of their experiences, and can function as historical forces worthy of study in their own right.  I would, however, rephrase the debate.  Instead of a "mythic" and a "real" West, I propose we think of the problem in terms of intangible and tangible Wests, or in terms of cartographies and ecosystems, comprising a larger regional ecoscape.

ACC0003786

What this does, when we employ the larger encompassing concept of the ecoscape, is more than simply reintegrate these arenas, although that is important. Instead of seeing myths as an isolated aspect of history, somehow divorced from the day to day lives of people, we can see them as one part of a larger experience. By thinking in terms of cartographies, we are not only able to bring myths into our purview, but to bring accepted interpretive frameworks such as politics or economics into question. When White and other promulgators of the New Western History claim that myths are "confusing" and "difficult" to integrate on the grounds that this would introduce a dizzying multitude of voices into the narrative, they are undermining their own project in two significant ways.

First, as we have seen, this would pose a critical challenge to the field's stated desire to incorporate multiple perspectives and alternative voices. Second -- and this relates back to Robinson's and Tatum's comments about the field's reluctance to engage with postmodernism -- if we accept the presence of different cartographies, then we must also accept that there are variants of categories about which historians may have become too complacent. "Nature" is one such that I have identified, and on which I am focusing primarily. But a similar critique could be performed on categories such as economics, politics, social structure, and the like. All are accepted lenses for historical analysis, yet all contain elements of perception, interpretation, and re-creation -- much like myth and literature do. Clearly, this adds significantly greater complexity to the field of analysis. Yet I would not advocate treating each of these elements in isolation -- as by adding a political chapter and an economic chapter to the mythic, for example. In effect, we are already doing this. Rather, I would like to see historians (and others) try to embrace this complexity, and work on exploring the interconnections between multiple groups' shifting categories and the ecosystems in which they are deployed.

A final note, concerning the field's concern with synthesis, and defining region: is it not true that, in the final analysis, "the West" is a place defined by perception and

ACC0003787

imagination -- and that no other yardstick, be it environmental, social, economic, federal or the like -- evokes the sense of the region in its entirety so well as the *perceived* unity of those who call themselves "Westerners"?

### The Existing Historiography of Palm Springs

Finally, this examination will make a positive contribution to the existing historiography of the Palm Valley region. The historical writing on the area, while not completely dismal, is not stellar. Popular local histories, promotional booklets, and collections of antiquarian tidbits typify Palm Springs historiography; the genre is generally long on quaint folklore and celebrities, and woefully short when it comes to careful scrutiny or interpretive frameworks. The history of the Cahuilla, on the other hand, is in almost the reverse state; here the field is dominated by surveys, studies, and reports produced by anthropologists, ethnologists and archaeologists. Here the problem lies not in a lack of attention to detail or of analysis -- indeed, the level of scholarship in this arena is excellent -- but rather in the difference in project between history and these social sciences. The historical sections of these works tend towards straightforward chronologies, rather than analytical narratives; the social scientific sections reflect their presentist and universalist leanings.

Finally, the twain rarely meet. The Cahuilla enter the history of Palm Springs as quaint figures, sources of curious (and often invented) folk tales, and occasional obstacles to progress, but generally remain on the periphery. The villagers of Palm Springs, and the agents of the federal government, on the other hand, fall largely outside the purview of the Cahuilla-focused scholarship; when they do appear, they are presented as largely homogeneous sources of policy, conflict, and competition. A history that not only accurately tells what happened in this place, but also explains why and how it happened, and which reunites the *shared* history of these groups, is long overdue. This examination will fill in this gap by being a history in which the whole is greater than the sum of the parts.

ACC0003788

Examples of the local history genre abound, but with two notable exceptions, they
relate essentially the same story -- or, more accurately, the same collection of anecdotes.
Most texts begin with the exploration of the Colorado Desert by Spanish, Mexican and
American explorers; they note the arrival of the Butterfield Stage Line and its supercession
by the Southern Pacific Railroad; next they briefly describe the sanitarium era before
jumping headlong into a celebration of the celebrities who made Palm Springs their
playground in the 1920s and 1930s. The exceptions are librarian Katherine Ainsworth's
*The McCallum Saga* and journalist Edward "Ed" Ainsworth's *Golden Checkerboard*. The
former is a detailed biography of one of the white founding families of Palm Springs;
while generally well-researched, it suffers from a tendency towards purple prose and
romanticization of the subject. In the area of white-Cahuilla relations, in particular, the
book begs the question of whether John Guthrie McCallum was really the far-sighted
pioneer saint and friend to the Indians that Katherine Ainsworth makes him out to be.
(The bulk of the primary documents paints a far more ambiguous picture.) Edward
Ainsworth's piece examines the process by which Judge Hilton H. McCabe apparently
single-handedly lifted the Agua Caliente Cahuilla up from poverty in the 1960s by
helping them gain control of their lands. This book, which lacks much of the research
depth of his wife's book, is memorable not for its scholarship, but for its pervasive and
paternalistic racism. The rumor that the Agua Caliente Cahuilla have endeavored to
seize and burn all copies of this book is not unreasonable, given the insultingly patronizing
picture it paints of the Cahuilla.[26]

Such attitudes are not found in the anthropological and archaeological literature.
Instead, here the Cahuilla are the undisputed and sympathetic focus; in some cases, this
emphasis shades into romantic celebration of the Cahuilla, and condemnation of virtually
all whites involved in the development of Palm Springs. Lowell John Bean's *Mukat's
People* is the classic text on the society and lifeways of the desert Cahuilla, and he is the

ACC0003789

undisputed scholarly expert on affairs Cahuillan. He has collaborated on most of the notable texts dealing with the Cahuilla, including the ethnobotanical work *Temalpakh*, and several cultural resource surveys. His works are important for their depth of knowledge and clear respect for the Cahuilla people; they do not, however, deal significantly with the white presence in the area. Another critical scholar, who has worked extensively with Bean and other researchers in the area, is Sylvia Brakke Vane; her chronologies of recent Cahuilla history reflect long hours spent in the archives, and provide a wealth of material about extant sources. Like Bean, her respect for the Cahuilla is obvious in her scholarship; unfortunately this is coupled with an often vehement advocacy and a tendency to paint their competitors with a broad, occasionally tar-coated brush. Others at work in the field, while providing excellent material that augments and reinforces the textual resources -- such as archaeological surveys and inventories of cultural resources -- fail to provide coherent analyses of the region's historical events. (These researchers, of course, should not be faulted for not doing "proper" history -- it is not the primary purpose of the studies, after all.) In summary, the anthropological and archaeological scholarship is of excellent quality and provides much data on the region's Cahuilla; however, historical analysis is not its primary aim, and the heavy emphasis on the Cahuilla encourages largely monolithic renditions of non-Cahuilla.[27]

There are three pieces of scholarship that approach the ideal of a unified scholarly history, but even they fall short. One, a geography dissertation that endeavors to answer the question "why Palm Springs?," is old enough to be virtually a primary source itself, having been completed in 1954. Moreover, being written for the field of geography, not history, analysis of past events takes a back seat to the examination of contemporaneous development and future trends. The second is Harry C. James' *The Cahuilla Indians.* Originally published in 1960, it too bears the burdens of its age. It focuses primarily on the "Mountain" and "Desert" Cahuilla (and not the "Western" group which includes the Palm

ACC0003790

Springs Cahuilla), especially as embodied by the colorful figures of Ramona and Fig Tree John.   Although James acknowledges the effects of white expansion into Cahuilla territories, he mostly glosses the worst cases and fails to provide an in-depth analysis of the overall process.   Generally speaking, James is uninterested in white-Cahuilla relationships *per se*, and largely ignores the decades between the 1880s and the 1950s which form the focus of this examination.   The last, George Harwood Phillips' *Chiefs and Challengers*, is an excellent analysis of the ways in which desert Cahuilla developed strategies for challenging and cooperating with Californios and Americans.   It deserves its reputation as a thoughtful, well-researched book.   However, because Phillips' timeframe is focused on the period from the 1840s to 1863, it concludes before both Palm Springs and the Agua Caliente Indian Reservation were established.[28]

The need for a history that looks at all involved groups is clear.   Moreover, such a history must provide a clear sense of the complexities and nuances of all parties.   Not only will this examination enhance the existing (and divided) scholarship, it will provide an analysis that demonstrates that the whole is greater than the sum of its parts.   In order to understand the Cahuilla, we must know of their competitors and their collaborators, their enemies and their friends.   The same holds true for the Palm Springs villagers, for the agents of the Bureau of Indian Affairs, and for other interested participants, such as tourists.   This examination will provide such a complex, multi-sided, and nuanced perspective while serving as a test case of the interpretive framework described above.

### The Project Summarized

This history encompasses the formative years of the Agua Caliente Indian Reservation -- Palm Springs ecoscape.   It begins in 1876 and 1877 with the arrival of the Southern Pacific Railroad and the establishment of the Agua Caliente Indian Reservation by the Executive Orders of Presidents Ulysses S. Grant and Rutherford B. Hayes.   From there it moves into the 1880s and 1890s, when the settler community of Palm City slowly

ACC0003791

developed into Palm Springs and the local Cahuilla lineages were shaped into the Agua Caliente Band of Mission Indians. The agricultural character of both communities, coupled with a prolonged drought in the 1890s and 1900s, made struggles over water and land the formative influences on the ecoscape's development. The 1910s and 1920s saw increased intervention by the federal government in the form of the Mission Indian Agency, the local branch of the Bureau of Indian Affairs. As Palm Springs evolved from an agricultural community into a sanitarium, and then into a winter tourist resort, the relationships between villagers and Cahuilla likewise underwent alteration. In particular, the close proximity of the reservation and the increasingly popular resort brought both turmoil and benefit to the Agua Caliente band and the Palm Springs villagers. The Mission Indian Agency was increasingly called in to mediate between competing interests, while itself subject to the dictates of the Bureau of Indian Affairs back in Washington, D. C. In the 1930s matters came to a head and the Mission Indian Agency assumed direct control over the affairs of the Agua Caliente Indians. This history concludes in 1939, by which time the Agua Caliente band had organized under the Indian Reorganization Act and resumed partial control of their affairs, and Palm Springs had incorporated as a city.

Separate chapters analyze the events, cartographies, and ecosystems of Palm Springs and the Agua Caliente Indian Reservation, each exploring locally significant sites in the Palm Valley ecoscape. Chapter Two introduces the Palm Valley ecosystem as a whole and locates it within the larger ecoscapes of California and the American West. Subsequent chapters focus more narrowly on specific events and places: Chapters Three through Five look at the "Indian Canyons" -- Andreas, Tahquitz, and Palm; Chapter Six focuses on the Agua Caliente hot spring. The Conclusion considers the Palm Valley ecoscape as a whole, outlines the further elaboration of the patterns which evolved during the past six decades, and reprises the argument laid out here and developed in the rest of the work.

ACC0003792

Although this chronology is not absolute -- Chapter Two provides background and thus includes earlier events, while Chapter Four, focused on Tahquitz Canyon, incorporates data on a crucial project begun in 1939, but not completed until the spring of 1940 (the Tahquitz water system) -- this examination covers the critical developmental period for this particular ecoscape. This chronology also links up with a particular stage in the development of tourism in the United States -- not unexpectedly, given the region's eventual success as a resort community -- and in that of the American West. Finally, there is the interesting coincidence that, according to some scholars, Palm Springs' history begins with the supposed sale of some land by Cahuilla Indian Pedro Chino in the 1880s, and it is in 1939 that Chino dies. Thus, the chronology of the Palm Valley ecoscape -- as do many of its other features -- resonates on more than one level. It is time, then, to begin our journey through this multi-layered ecoscape.

ACC0003793

## Notes

1       Sally K. Fairfax and Lynn Huntsinger, "The New Western History: An Essay from
the Woods (and Rangelands)," in *The New Western History: The Territory Ahead.* Forrest
G. Robinson, ed. (Tucson: University of Arizona Press, 1997), 191-210.

2       Frederick Jackson Turner, "The Significance of the Frontier in American History," in
*Major Problems in the History of the American West: Documents and Essays.* Clyde A.
Milner II, ed. (Lexington, MA: D. C. Heath and Company, 1989), 2-21. Walter Prescott
Webb, *The Great Plains.* (New York: Ginn, 1931).

Those scholars who wrote about what we would now label "environmental" topics
in their history were not, however, as yet "environmental historians." At issue (as
environmental historians such as Donald Worster tend to see it) is not that historians have
not dealt with topics such as climatic phenomena and the use and activities of non-human
organisms, but that they have not dealt with them systematically under the category of
"nature." (Indeed, by this limited definition, the sort of history that I practice is not
"environmental" history either, but rather ecological.) That is, non-environmental
histories treat "natural" phenomena, such as floods or soil erosion, solely in the context of
human needs, desires, and actions. Alternatively, "nature" may be seen as totally removed
from human experience, and therefore the purview of scientists, not historians.
Environmental historians, however, emphasize the connections between human beings,
their environment, and the organisms with whom they share it — hence the irony of
environmental historians relying on conceptual categories that explicitly deny such
connections.

In that traditional history encourages static interpretations of the non-human
world, there may be another reason to contemplate doing an "ecological" history rather
than an "environmental" one; the ecoscape emphasizes connections and interdependence
within dynamic systems, rather than focusing on human action amid passive surroundings.

3       Patricia Nelson Limerick, *The Legacy of Conquest: The Unbroken Past of the
American West.* (New York: W. W. Norton and Co., 1987).

4       All environments are "built" to some degree. As Stephen J. Pyne has shown in *Fire
in America: A Cultural History of Wildland and Rural Fire.* (Princeton: Princeton
University Press, 1982) and elsewhere, environments can be altered through the seemingly
"natural" use of fire, or through the withholding of such forces. Thus, even to do nothing is,
potentially, to have a shaping effect on one's environment. See Donald Worster, "History
as Natural History: An Essay on Theory and Method" in *Pacific Historical Review* 53:1

ACC0003794

(February 1984): 1-19; Worster, "New West, True West: Interpreting the Region's History," *Western Historical Quarterly* 18 (April 1987): 141-56; Worster, *An Unsettled Country: Changing Landscapes of the American West.* (Albuquerque: University of New Mexico Press, 1994); Worster, *Rivers of Empire: Water, Aridity, and the Growth of the American West.* (New York: Oxford University Press, 1985).

5      Moreover, Worster emphasizes rural environments at the expense of urban, an attitude decidedly at odds with my interest in community formation and the relations "between" (within) what he would characterize as built and "natural" environments. However, his work on the interactions between competing human groups and institutions over the "proper" use of water will at least partly inform my own research, given the saliency of this particular resource in arid Palm Springs.

6      Neil Evernden, *The Social Creation of Nature.* (Baltimore: Johns Hopkins University Press, 1992); Donna Haraway, *Simians, Cyborgs, and Women: The Reinvention of Nature.* (New York: Routledge, 1991).

7      An instructive example is the phenomenon of Cahuilla in Palm Valley adopting Spanish or Anglo names, receiving baptism, planting oranges and alfalfa, and sending representatives to Congress -- while at the same time continuing to hold traditional ceremonies, relying on the skills of native healers, harvesting indigenous plants, and hunting with handmade weaponry. This resembles evolution far more than revolution. For similar examples, see the concluding section of Lowell John Bean and Sylvia Brakke Vane's "*Knuisik* History", being Section V of *Archaeological, Ethnographic, and Ethnohistoric Investigations at Tahquitz Canyon, Palm Springs, California* (Menlo Park, Calif.: Cultural Systems Research, Inc., 1995), hereafter "The Tahquitz Report."

8      Carolyn Merchant, *Ecological Revolutions: Nature, Gender, and Science in New England.* (Chapel Hill: University of North Carolina Press, 1989); Merchant, *The Death of Nature: Women, Ecology, and the Scientific Revolution.* (San Francisco: Harper and Row, 1980). See also Patricia Nelson Limerick, "Disorientation and Reorientation: The American Landscape Discovered from the West," *Journal of American History* 79:3 (December 1992): 1021-49.

9      Anne Whiston Spirn, *The Granite Garden: Urban Nature and Human Design.* (New York: Basic Books, Inc., 1984). (Although formally an urban planner, Spirn has been adopted by environmental historians as one of their own -- or at least as a kindred spirit.) William Cronon, *Nature's Metropolis: Chicago and the Great West* (New York: W. W. Norton & Co., 1991). For a critique of the treatment of human beings in *Nature's Metropolis*,

\

ACC0003795

see Peter A. Coclanis, "Nature's Metropolis - Chicago and the Great West" in *Reviews In American History*, 20:1 (March 1992): 14-20.

10      Cronon, "The Trouble with Wilderness: or, Getting Back to the Wrong Nature." *Environmental History* 1:1 (January 1996): 7-28. It is an indication of the growing relevance of environmental theory to the environmental movement that Cronon's arguments against "wilderness" have come under scathing attack by activists such as David Foreman. They hold a not unreasonable fear that if "wilderness" (or "nature") is lost there will be no equally powerful symbol to offer in its place. It is my hope that this critique of "nature" is sensitive to those fears, and that the concept of the ecoscape may offer a more lasting and useful alternative.

11      Cronon, "The Trouble with Wilderness," p. 24.

12      Cronon, "The Trouble with Wilderness," p. 22.

13      The concept of "non-wild nature" becomes problematic itself when Cronon writes, "*wild*ness (as opposed to wilderness) can be found anywhere: in the seemingly tame woodlots of Massachusetts, in the cracks of a Manhattan sidewalk, even in the cells of our own bodies." Again, wherein lies the distinction? Of course, Cronon is not the only environmental historian guilty of linguistic ambiguity. He is, however, one of the few to systematically engage with the theoretical underpinnings of the field, and thus must anticipate closer scrutiny of his text.

14      Cronon, "Response," *Environmental History* 1:1 (January 1996): 47-55. Italicized in the original. Bold type added for emphasis is mine.

15      James Sherow, "*Uncommon Ground: Toward Reinventing Nature,* edited by William Cronon." [book review] *Western Historical Quarterly* 27:3 (Autumn 1996): 373-74.

16      Again, a necessary caveat. This question refers to analytical categories, not the real organisms and objects supposedly denoted by such categories. "Getting back" to "nature" as a theoretical project in the final count impedes the study of the non-human world and its relationship to human beings.

17      Bruno Latour, *We Have Never Been Modern.* trans. Catherine Porter. (Cambridge: Harvard University Press, 1993).

18      Richard White, "American Environmental History: The Development of a New Historical Field," *Pacific Historical Review* 54 (August 1985): 297-335; White, "*It's Your Misfortune and None of My Own*": A History of the American West. (Norman: University of Oklahoma Press, 1991); White, *The Roots of Dependency: Subsistence, Environment, and Social Change among the Choctaws, Pawnees, and Navajos.* (Lincoln: University of

Nebraska Press, 1983); White, *The Middle Ground: Indians, Empires, and Republics in the Great Lakes Region, 1650-1815.* (New York: Cambridge University Press, 1991); and White, *The Organic Machine.* (New York: Hill and Wang, 1995).

Elsewhere White examines, quite fruitfully, the relationships between changing beliefs and practices and environmental change (in *The Roots of Dependency*) and the complicated negotiations that occur when different groups with different perspectives and practices encounter each other (in *The Middle Ground*). However, he has yet to combine all these approaches into a single treatment. Just such an integration will be attempted here, though probably not of White's various approaches *per se*; given his own apparent failure to achieve such integration, it seems better to be informed by his insights rather than to use and accept his approaches *in toto*. The risk of making a bad misstep is a hazard of the trade; it seems more risky, however, to navigate unfamiliar terrain using a map designed for other purposes instead of one you have painstakingly drawn yourself. Finally, it is not clear whether White has indeed produced an environmental history that is free from "nature"; he himself does not present his work in those terms.

[19]   Raymond D. Fogelson, "The Ethnohistory of Events and Nonevents." *Ethnohistory* 36:2 (Spring 1989): 133-47. See also the anthology edited by Calvin Martin, *Time and the American Indian.* (New York: Oxford University Press, 1987). A list of nonevents forms the core of Fogelson's presentation, including: the activities of people who avoided events that were likely to be documented; events which may not have been seen as "eventful" by some of the participants; events where there is disagreement as to their meaning and significance; events that *could* have happened (and thus influenced people's actions) but didn't; "epitomizing events," or narrative events which condense long historical patterns and processes into a single "moment"; "latent events," or events not perceived as events because we have not yet conceived or defined them as "eventful"; documentable events whose occurrence can be confirmed, but which are denied by participants (as a response to great trauma, i.e.).

His intention here is to prompt historians to look beyond the usual categories of events that form historical frameworks, history being defined as being about events (that is, recorded happenings that have been granted significance). He is particularly interested in occurrences that were not recorded; implicit in his argument is that significance lies in the eyes of the historian, and that, therefore, we should be willing to seek out "nonevents" that fail to appear in the usual historical sources (usually text-based). They can, he argues, tell us as much as do "events" about the periods in which they occurred, and may

ACC0003797

even reveal more than more "official" recorded accounts. Although his category is problematic -- Does a "nonevent" become an "event" when it becomes the object of historical study? Does bringing "nonevents" to the historical record destroy the narrative power of being "outside" history? -- the benefit of Fogelson's analysis lies in his insistence that we need not be restricted by existing definitions of events. Broadly put, historians need not be limited by how their subjects defined significance; nor must they remain bound to the historiographical categories currently in vogue -- including "nature."

20      Raymond J. DeMallie, "'These Have No Ears': Narrative and the Ethnohistorical Method." *Ethnohistory* 40:4 (Fall 1993): 515-38.

21      Michael E. Staub, "(Re)Collecting the Past: Writing Native American Speech." *American Quarterly* 43:3 (September 1991): 425-56.

22      As Carolyn Merchant has shown in both *The Death of Nature* and *Ecological Revolutions*, earlier variants of "modern," "Western" thinking, though superficially familiar, can be quite alien upon closer scrutiny.

23      I also intend to argue, in later research, that the ecoscape approach is applicable elsewhere; in particular I am interested in exploring whether it can illuminate settler-indigenous relationships in a comparative study of the arid-land ecoscapes of Australia and the United States. I am also contemplating a similar examination of a less ecologically extreme ecoscape in the United States sometime in the future.

24      Forrest G. Robinson, "Clio Bereft of Calliope: Literature and the New Western History" in *The New Western History: The Territory Ahead*, p. 71. Although Robinson is specifically concerned here with the exclusion of Western literature from the New Western History, his comments about the suspicion with which the New Western historians view the intangible West have wider validity.

25      See Richard White, "Richard White's Opening Statement," *Forum on the American West*, http:// ashp.listserv.cuny.edu / scriptsashp / wa-ashp.exe?LIST = AMERICANWEST (April 5, 1999, 11:01:41). Here he writes, " I dislike myth versus reality approaches to the West because, in my view, the myth is essential to understanding the reality since many people tried to act out the myth itself and this becomes a part of the history. I know others differ about this, and this is worth some discussion."

26      Katherine Ainsworth, *The McCallum Saga: The Story of the Founding of Palm Springs.* (Palm Springs, Calif.: Palm Springs Desert Museum, 1973); Ed Ainsworth, *Golden Checkerboard.* (Palm Desert, Calif.: Desert-Southwest, Inc., 1965); The Board of Directors, Coachella Valley County Water District, *History of the Coachella Valley County Water*

ACC0003798

*District*, (Indio, Calif.: Desert Printing Co., Inc., 1978); Sally Presley, *Facts and Legends: The Village of Palm Springs*, (Palm Springs, Calif.: Celebrity Publishers, 1996); Frank M. Bogert, *Palm Springs: A Photographic History*. (Palm Springs: Palm Springs Heritage Associates, 1987); R. E. Harrington, *Souvenirs of the Palm Springs Area*. (R. E. Harrington, 1962); Elizabeth W. Richards, *A Look into Palm Springs' Past*. (Palm Springs: Santa Fe Federal Savings and Loan Association, 196?). Several of these books -- Bogert's in particular -- have sections that devolve into photograph albums of celebrities at pools; such photographs could have been taken in Los Angeles or Phoenix, or any other city with a warm climate, and offer little insight into Palm Springs itself. (The fact that the Ainsworths were husband and wife and closely tied to Palm Springs gives some indication of both the smallness of the field and its local character.)

27      Such works include the following: Lowell John Bean, and Katherine Siva Saubel. *Temalpakh (From the Earth): Cahuilla Indian Knowledge and Usage of Plants*. (Banning, Calif.: Malki Museum Press, 1972); Bean, with Sylvia Brakke Vane, and Jackson Young. *The Cahuilla and the Santa Rosa Mountain Region: Places and their Native American Association*. (Riverside, California: Bureau of Land Management, 1981) and *The Cahuilla Landscape: The Santa Rosa and San Jacinto Mountains*. (Menlo Park, Calif.: Ballena Press, 1991); *Paniktum Hemki: A Study of Cahuilla Cultural Resources in Andreas and Murray Canyons*, (Cultural Systems Research, Inc., 1983); *Archaeological, Ethnographic, and Ethnohistoric Investigations at Tahquitz Canyon, Palm Springs, California*, (Menlo Park, Calif.: Cultural Systems Research, Inc., 1995); *Cultural Resource Study: Archaeology/Ethnography Canyon Development Project, Palm Springs, California, Central Riverside County, California May 22, 1991*, prepared for Smith, Peroni & Fox Planning Consultants, by Cultural Systems Research, Inc. Contributing Scholars: Lowell John Bean, Jerry Schaefer, Sylvia Brakke Vane, Bern Schwenn, Drew Pallette, Jackson Young, and Ernest Quinones, B.S. (Menlo Park, Calif: Cultural Resource Systems, Inc., May 22, 1991); *A Cultural Resource Survey and Assessment of the Shadowrock Project Area, Chino Canyon, Palm Springs, California*, Prepared for Shadowrock Ventures by Cultural Systems Research, Inc. and Brian F. Mooney Associates, Jerry Schaefer. Drew Pallette, Lowell Bean, and Sylvia Brakke Vane, (Menlo Park and Palm Springs, Calif.: Cultural Resource Systems and Brian F. Mooney Associates, January 1992); *Cahuilla Ethnohistory and Land Use in Section 14: A Cultural Resources Survey for the Agua Caliente Gaming Facility, Palm Springs, California*. prepared for The City of Palm Springs, Department of Community Development and the Agua Caliente Band of Cahuilla Indians, by Brian F.

ACC0003799

Mooney Associates, Jerry Schaefer, Senior Archaelogist, (San Diego and Palm Springs, Calif: Brian F. Mooney Associates, 1994).

28      Thomas A. Jensen, *Palm Springs, California:  Its Evolution and Functions.* (Dissertation:  University of California, Los Angeles, 1954); Harry C. James, *The Cahuilla Indians,* (Banning, Calif.:  Malki Museum Press, 1985; 1969; 1960); George Harwood Phillips, *Chiefs and Challengers:  Indian Resistance and Cooperation in Southern California* (Berkeley; Los Angeles:  University of California Press, 1975).

ACC0003800

## Chapter 2

## The Palm Valley Ecoscape: An Overview

Imagine a red-tailed hawk, circling gently on twisting eddies of warm air, high over the Colorado Desert of southeastern California. As it slowly spirals clockwise, the San Bernardino Mountains appear before it to the northwest, then the Little San Bernardinos to the east, followed in turn by the Santa Rosas in the southwest, and then the San Jacinto range to the west before returning to the beginning. The San Gorgonio Pass in the northwest forms one access point between the San Bernardinos and the San Jacintos; to the south the region may be reached by heading north along the edge of the Salton basin. Conical foothills and sand dunes form an intermediate zone between dry flood plains and high, conifer-carpeted peaks. Beneath the hawk's wings lies the small desert basin known as Palm Valley in the 1800s, and later as Palm Springs.[1]

Suddenly, the hawk drops through the dry air, narrowly missing a ground squirrel that darted through an open space in the brush below. As we join the squirrel in its thorny shelter, we get a closer look at the valley floor. The basin owes much of its geological character to a combination of sedimentation and seismic activity. Thus the valley floor is largely comprised of gravel and a fine limestone sand; the sides of the surrounding fault-riven mountains are marked by a bathtub ring of darker sediment left by the Salton Sea's earlier incarnation, the ancient Lake Cahuilla. These "immense quantities of rich 'black sediment' contributed to the early lure of the valley," even as the blowing sands made access by wheeled vehicles difficult.[2] Rounding out this picture of a decidedly more aquatic past, fossilized remnants of prehistoric marine mammals can still be found in the region.[3]

The ground squirrel starts as a roadrunner comes jogging by. Following the sprightly bird, we find ourselves in a cul-de-sac at the base of Mount San Jacinto, which rises to an

ACC0003801

elevation of over 10,000 feet above sea level. Its steep sides, which discourage all but the hardiest of vegetation, are riven by canyons and creeks. The water of these streams, the outpouring of springs augmented by snow melt and occasional rainfall, enables life -- including the famed *Washingtonia filifera* palms from which the region and later resort city take their names -- to flourish with greater vibrancy in the sheltering coves of such canyons. Life is difficult on the basin's central floor, where water is only sporadically provided by the erratic waters of the Whitewater River, tumbling down from the San Bernardinos northeast of Banning before succumbing to the thirsty pull of the desert sands. Areas supporting year-round vegetation, like the palm oases at Palm Springs or Seven Palms to the east depend on perennial water sources, which are scarce. The denizens of the canyons, supported by the water of canyon springs and streams, generally know a more fertile, comfortable existence than those of the basin floor.[4]

Even then, predictability and stability are not guaranteed. The palm canyons are located atop several active fault lines, notably the San Andreas along the eastern edge of Palm Valley, and the San Jacinto on the western, not infrequently they undergo the unsettling rumblings of seismic activity.[5] Such activity not only shuffles rocks around; it can result in significant alterations to water sources in the canyons and mountains. Francisco Patencio, one of Palm Springs' more notable Cahuilla spokesmen, recalled in 1943 the dramatic effects of a series of earthquakes in the area:

> But one time (I was very small, I could not remember yet), there came such earthquakes as had not been known to any of the people. Whole mountains split -- some rose up where there had been none before. Other peaks went down, and never came up again. It was a terrible time. The mountains that the people knew well were strange places that they had never seen before.
>
> Then it was that Tahquitz Creek went dry, and only ran water in the winter time, and other streams that ran good water all year around have only been winter streams since. And so the Indians could not raise crops on that Mesquite land any more. The climate seemed to change. The Andreas Canyon Creek that only ran in

ACC0003802

the winter became an all year stream, as it has been since. Before the earthquakes, the only water to be had there in the summer months was from a small spring which ran always in the creek beneath the caves. There were many springs on the mountain sides and on the level land. When the rains came less, they dried out and went away. No one knows where they used to be any more.[6]

The United States Geological Survey has records of southern Californian earthquakes dating back to the 1560s, and they confirm that there was considerable earthquake activity at this time. The earthquakes Patencio remembered, given his birth in the mid-1850s, are probably the earthquakes which struck near San Bernardino at 34° North latitude, 117° West longitude with a magnitude of about VI and VIII on the Richter scale on December 16, 1858. Although the reported epicenter is about thirty to forty miles away from Palm Valley and the surrounding Coachella Valley, it was felt as far away as Los Angeles; it is not improbable that seismic activity in the desert areas, particularly along the fault lines, was as strong or stronger, but due to the sparsity of the (white) population was not reported. In any case, even the peripheral effects of an earthquake of that size at that distance would still have been upsetting and memorable.

Earthquakes are not the only unsettling aspect of the local ecosystem. The canyons are vulnerable to the effects of fire, and of weather and the seasons; flood and drought can wreak dramatic changes in patterns of activity that seem routine in less extreme years.[7] The dominant characteristic of Palm Valley was its aridity, as is true for other regions in the American Southwest.[8] Occasional summer storms arrive suddenly and with great force, causing flash floods in canyons and in dry streambeds miles from the storm.[9] Most of the rainfall occurs in late autumn, winter, and early spring, in a pattern typical of Southern California more generally; much of such rain that does make it farther inland is stopped by the lofty bulk of the San Jacintos and Santa Rosas. Rainfall data from 1889 to 1900 for Palm Springs, which lies on the western edge of Palm Valley, indicates a mean annual rainfall of 3.53 inches (though we must take these figures with a grain of salt, as they were taken

ACC0003803

during a period of drought).[10]  This aridity was often used as a selling point by boosters in the 1880s and 1890s such as the Palm Valley Land Company, hotelier Dr. Welwood Murray, and writer George Wharton James in advertisements aimed at tourists and prospective investors; in addition to an early growing season (due to the warm climate), they claimed, there were no incidents of fog.[11]

This lack of humidity accounted both for the intense daytime heat of summer, and the contrasting chilliness of winter nights.  Mean annual temperatures for 1903, 1904, and 1905 were 70.4, 75.6, and 70.4°F.  This apparent mildness is deceptive; yearly maximums and minimums for those years were 117 and 32°F, 113 and 32°F, and 122 and 28°F, respectively.[12]  Such temperature extremes encouraged the development of seasonal migration patterns by the region's human populations.  Before the arrival of whites, Cahuilla villages in hotter areas would relocate for the summer, perhaps to a nearby canyon or to a mountain campground.[13]  Similarly, white settlers in subsequent decades would go to places like Los Angeles in July and August, leaving the baking desert to the local animals and those people unable to leave due to poverty, lack of options, or duty to their employers.[14]

Temperature was not the only climatic phenomenon that adversely affected human populations in the area.  Winds proved a notable feature of the ecoscape then and still do.  The uphill winds of the morning (caused by the heating of the desert floor by the rising sun) and the downhill winds of the evening (when the process reverses) ensure a constant flow of air.  Fall, winter, and spring winds, all of which are strong, resound around the surrounding desert in eerie, roaring tones.  Santa Ana winds, known for their warm, dry air, and association with increased tension in human populations, occasionally blow in from the eastern deserts.  These various winds have been harnessed in recent years by wind-farm generators, but in earlier periods they were considered a nuisance, as they blew sand over roadways, desiccated crops, sand-blasted signs into illegibility, and posed a real danger to

the inexperienced and unprepared traveler.  It is not surprising that both Cahuilla and non-Indians associated winds in the area with evil or destructive spirits.[15]

Despite -- or perhaps because of -- such unsettling influences, Palm Valley and the surrounding mountains possess a rich variety of plant and animal life.  From the hardy creosote and burro bush of the arid basin zone to the fan palm of the canyons, and the oaks and pinyon pine of the upper mountains, the plant kingdom is well-represented in the region.  Other plants include verbena, chuparosa, desert agave, Mojave yucca, cholla, beavertail, barrel cactus, mesquite, screwbean, and datura.  Many of these plants provided food and other materials to the region's Cahuilla Indians and later American settlers, as well as to various other species.[16]

Numerous insects, reptiles, birds and mammals populate the area (although they are scarcer today as a result of intensive development and habitat alteration), forming an important part of the web of eaters and eaten.  Insects include ants, grasshoppers, scorpions, and a wide variety of butterflies.  Spiders, such as the well-known tarantula, are widespread.  Reptiles are represented by geckos, chuckwallas, spiny lizards, whiptails, rosy boas, blind snakes, coachwhips, kingsnakes, rattlesnakes, gopher snakes, and nightsnakes.  Numerous bird species inhabit the region:  turkey vultures, the California quail, mourning doves, owls, hummingbirds, flickers, flycatchers, phoebes, larks, ravens, wrens, mockingbirds, shrikes, European starlings, sparrows, juncos, cowbirds, and finches, and, as we have seen, hawks and roadrunners.  Our ground squirrel's compatriots are amply represented in the region.  Many varieties of mammals, such as bats, pocket mice, kangaroo rats, various species of mice (including the insectivorous, howling grasshopper mouse), rabbits, "jackrabbit" hares, ringtails, badgers, bobcats, foxes, coyotes, bighorn sheep, and pronghorns share the desert with the ground squirrels, and with that ever-adaptable primate, *Homo sapiens sapiens*.[17]

ACC0003805

## Human History

While human beings as a species did not evolve out of the tumultuous oscillations between extremes that characterize the Colorado Desert, neither are they recent arrivals. Although the history of pre-contact Cahuilla society is largely lost, the evidence indicates that the ancestors of the present-day lineages were present in the area a thousand or more years before the more recent arrival of European peoples. Ancient artifacts and structures, including building foundations, wells, and rock paintings, date back at least that far. So do Cahuilla oral histories describing the arrival and disappearance of a great flood of water, a flood confirmed by geologic evidence of a great "Lake Cahuilla" which covered an area greater than the present-day Salton Sink. As a result of this long occupancy, the Coachella Valley ecoscape is deeply layered with meanings of personal, tribal, and mythical character for the Cahuilla. No rock, stream, or grove of mesquite went unnamed.[18]

Any given place in the region was more than a simple collection of rocks, vegetation, and animals; it was part of both the individual and collective identities of the local Cahuilla. Before contact with Europeans, and well into the 1800s, the Cahuilla organized their territories according to long-established patterns. Large territorial groups, known as sibs, dominated a given region; typically such sib areas included a variety of biological life zones -- mountain, canyon, basin. This diversity enabled the sib's members to harvest a variety of plant and animal resources, travelling seasonally within the sib territory to take advanatage of ripening crops and seasonal fluxes in game populations. Within the sib, access to and ownership of ecological resources such as springs, oak groves, and hunting grounds were divided among lineages, which were smaller groups of persons related by blood or marriage. Lineages in Cahuilla society were divided into one of two moieties -- the wildcat people and the coyote people -- and exogamous marriages between the two was the norm, with women traditionally moving to live with their husbands. Lineages organized themselves into villages within sib territories, and the village

ACC0003806

provided the primary basis for resource allocation within the sib. Certain bio-niches, such as canyons, came to be identified with particular villages, either as village sites or as grounds for resource collection. Individual families within a village might lay claim to a particularly fertile oak or pinyon pine, or to a campground at a harvest site, as well as to their home site within the village. Additionally, certain areas within the territories were considered the domain of specific individuals, such as *púulem* and *púvalem* (shamans), *tíng'ayvachem* (doctors), and basket makers, who had special need of the specific resources there (such as ceremonial and medicinal plants, or reeds used in basketry). Other individuals might lay claim to caches of seeds stored by rodents or similar resources. All Cahuilla owned property of some kind, even if it was in the form of tools and cultural resources (such as songs) rather than specific ecological resources. Their sense of their place in the world -- and their relationship to it as individuals and as a people -- was very strong.

That world was unpredictable and thus demanded caution. The ecosystems of the Colorado Desert and surrounding mountains, as should be evident from earlier discussion, were "predictable" only in the sense that one could take change as a given. Droughts, floods, earthquakes, crop failure, animal plagues, disease, and the like could easily result in significant hardship to individuals, families, lineages, and even whole sibs. As anthropologist Lowell John Bean and others have argued, most Cahuilla cultural practices functioned to ensure survival under such conditions. Rituals and oral tradition reinforced adaptive behaviors -- such as the redistribution of food during times of scarcity -- and discouraged those that were destructive or dangerous -- such as carelessness and lack of foresight. Many stories emphasized the virtues of care, deliberate action, skill, and caution. Others reminded listeners that the world was an unpredictable, unstable place and to prepare for the unexpected. Still other practices provided outlets for the anxiety and frustration produced by this insistence on self-control and by the unsettled ecoscape

ACC0003807

itself. Above all, Cahuilla cultural practices and values reinforced the idea that the Cahuilla were but one part of a larger network, and that changes to it should be made carefully and deliberately, if at all. In the Cahuilla ecoscape, people, animals, objects, and places played different roles, but all belonged to the same world, and incautious change could produce dangerous imbalances. It is important to bear this in mind when we examine white-Cahuilla relationships after the 1870s, for it helps us understand the form assumed by the new Anglo-Cahuilla ecoscape that emerged in Palm Valley at that time.[19]

The origins of the Anglo-Cahuilla ecoscape that developed in Palm Valley can be traced back to nearly the beginning of the United States itself. Although in the 1770s and 1780s the western half of the continent was little more than a vague idea in the minds of most Americans, curiosity about the region did lead the more knowledgeable and the more imaginative to speculate about what it might hold. From the beginning it seemed likely that Americans would continue to expand beyond the edges of existing settlements -- indeed, thinkers like Thomas Jefferson argued that the success of the new republic depended on it, claiming that the independent virtue of yeoman farmers was what made a true republic possible -- and so early on Americans encoded provisions for this expansion. The Territorial Ordinance of 1784, and the Northwest Ordinance, signed July 13, 1787, laid out the framework for the transformation of remote regions into American territories and territories into states. The Northwest Ordinance, reenacted under the new constitution on August 7, 1789, would have particularly far-reaching effects on the settlement of the continent. Yet California poses a notable exception in that it leapt straight into statehood in 1850 with nary a pause in the territorial stage.[20]

Instead it was a lesser-known framework established by the Land Ordinance of 1785 which would prove to have a deeper effect on the development of the ecoscapes of Palm Springs and California more generally. Indeed, it has arguably made a greater impression than the Northwest Ordinance on western development in the post-territorial

ACC0003808

era.[21]  Starting in 1785, frustrated with the haphazard settlement of the Atlantic coast
and the American South, the national government undertook to systematically map all
U.S. territory not yet charted.  To do this, a national grid system, based on north-south
township lines (also called bases or baselines) and east-west range lines (also called
meridians or meridian lines), was created and mapping expeditions delegated to survey
teams.  The problem of placing a square grid on a curved surface was solved through
periodic recalibrations and the setting of a new baseline every twenty-fourth township,
eventually resulting in some eighteen base and meridian pairs in the trans-Mississippi
West.  In Southern California, the primary base and meridian are the San Bernardino Base
Line (roughly 34° north latitude) and the San Bernardino Meridian (roughly 117° west
longitude).  Grid squares, or townships, measuring 36 square miles (six miles long and six
miles wide), were described in terms of their position relative to the base and meridian
lines.  Thus, Township 4, in which Palm Springs, part of the Cahuilla village of Rincon,
and most of a failed settlement known as the Garden of Eden were located, can be described
as the fourth township square south (T4S) of the San Bernardino Base Line, and the fourth
range square east (R4E) of the San Bernardino Meridian.  These townships were further
divided into thirty-six sections measuring one mile square.  These sections were numbered
one through thirty-six in a serpentine manner beginning in the northeast corner, moving
west to section 6, south one square to section 7, east to section 12, south one square, west
again, south one square, east again, and so on, finishing up with section 36 in the southeast
corner.  Thus a specific part of a township could be represented in the following manner:  the
$SW^1/_4$ of the $NW^1/_4$ of Section 14, T4S, R4E, SBBM (San Bernardino Base and Meridian),
being in this case the part of the Palm Springs Indian reservation in which the famous hot
springs are located.  The grid system makes precise representations (though not necessarily
descriptions) of land possible without having to resort to maps; at the same time it makes
the abstraction of real estate from specific ecoscapes much easier.  The imposition of this

ACC0003809

federal grid on the indigenous ecoscape of the Cahuilla would have a profound effect on the ecoscape of Palm Springs which succeeded it.[22]

Such transformations were far in the future in the 1770s and 1780s. Alta California, as the lower Pacific coast above the northern end of the Gulf of California was then called, was only just becoming known to the Spanish empire. It was nearly a complete cipher to the Americans of the eastern shores, except for those who traversed the coast on trading runs. Coastal exploration by men such as Juan Rodríguez Cabrillo had occurred as early as 1542, and the expedition of Juan de Oñate passed through the vicinity of the lower Colorado River in 1604-1605, but these visits were cursory at best. It would take another one and a half centuries before serious exploration of the Californian interior would occur. In 1771-1772, Fray Francisco Garcés charted one of the first overland routes into California, but even then he skirted the arid desert region inhabited by the Cahuilla of Palm Valley.[23] It was not until 1774-1776 that Captain Juan Bautista de Anza passed through the area on his way from the region around present-day Tucson to the California coast; even then he did not linger. Nor did Captain Pedro Fages, who passed nearby in 1772 and 1782. They left a few names on the terrain -- such as Mount San Jacinto (Saint Hyacinth) and Mount San Bernardino (Saint Bernard) -- and took away a vague sense of the region's character, but that was about it.[24]

The brief, sporadic, and tenuous character of the Spanish presence in the area meant that the Cahuilla of the inland deserts generally escaped the fates that befell their coastal trading partners.[25] The desert Cahuilla who adopted elements of the nascent Spanish ecoscape or who allowed themselves to be incorporated into it did so voluntarily for the most part. Interactions with the Spanish generally paralleled the trading patterns previously established with the coastal Gabrielinos and the eastern Yumas, with whom the Cahuilla traded local goods for shell beads, asphaltum, pottery and seeds.[26] Some of the Cahuilla took up ranching and planted imported crops, learned new methods of

ACC0003810

irrigation, and included spells of labor in Los Angeles, San Diego, and neighboring holdings in their seasonal rounds.[27] Some assumed Spanish names, some accepted baptism -- though typically retaining elements of their indigenous spiritual practices -- and others adopted Spanish clothing and learned to make use of animals such as the horse in ways other than for food.[28] Spanish attempts to bring the desert Cahuilla under colonial rule were rare and typically ill-fated; not only were the Cahuilla far more comfortable and experienced with the ecoscape of the arid interior, but they were also formidable warriors capable of uniting diverse groups in order to fend off Spanish (and later Mexican and American) incursions into their territory.[29] For the most part then, such imported elements remained subordinate to traditional patterns and were insufficient on their own to substantially alter the inland ecoscape established by the Cahuilla. This state of affairs would remain unchanged throughout both the duration of the Spanish colonial era and the brief tenure of Mexican rule between 1821 and 1848.

Back on the American side of the continent, the first half of the nineteenth century was a lively and energetic time. On April 11, 1803, for \$15 million, the United States acquired a vast new territory through the Louisiana Purchase, the first such in the lands beyond the Mississippi. President Jefferson, the primary force behind this purchase, wasted little time in sending Meriwether Lewis and William Clark to explore it in 1804; their expedition, after returning two years later, excited American interest in the trans-Mississippi West. It was an enthusiasm that would grow in subsequent decades.[30] What we can see here is the extension of the first tendrils of the American ecoscape -- an ecoscape that was itself only few generations old -- beyond the coastal ranges and lowlands that initially gave it shape. As national ideas, practices, and frameworks were extended beyond the realm of known peoples and ecosystems, the national ecoscape as a whole would undergo modification, even as its inhabitants sought to impose their familiar patterns on the indigenous ecoscapes already in place on the continent. New bureaucracies were created

to rationalize the process of expansion, such as the General Land Office (1812), the Bureau of Indian Affairs (1824) and the Corps of Topographical Engineers (1838).[31]  It is not surprising that these three were among the earliest national bureaucracies designed to address western concerns.  They explored and inventoried the ecosystems west of the Mississippi, arranged for the removal or relocation of indigenous populations in the new territories, and made this region's lands available for settlement by white Americans.  In other words, they laid the groundwork for expansion of the national ecoscape, sought to eliminate competing frameworks, and encouraged participation at the individual level, hastening the process of expansion.

By the 1840s, the national government was playing catch-up with its citizens, who travelled rapidly westward in ever-growing numbers.  It was of little concern to most of them that large sections of the continent were not formally possessions of the United States -- notably California and Texas, which were held by Mexico, and the Pacific Northwest, jointly occupied with Great Britain until 1846.  Men like John Sutter and John Trumbull Warner (owner of the Warner's Ranch trading post and way station that figured in Helen Hunt Jackson's novel *Ramona*) moved into Mexican-held territories and nominally took on Mexican citizenship, but they remained Americans in their own minds and in the minds of their countrymen and -women. It was attitudes like this -- combined with the presence of sizeable American populations in the regions in question -- which led to the creation of the Republic of Texas between 1836 and 1845, and to the Bear Flag Rebellion led by John C. Frémont in 1846.  This latter event, an attempted coup in northern California, helped precipitate the Mexican-American War, ultimately leading to the cession in 1848 of most of Mexico's holdings north of the Gulf of California.[32]

American acquisition of California and the greater Southwest paved the way for the intensified extension of the national ecoscape into the trans-Mississippi West.  This process of expansion would have profound effects not only on the nation and the West, but

ACC0003812

also on a number of local ecoscapes, including that of Palm Valley. When the Treaty of
Guadalupe Hidalgo was signed on February 2, 1848, none of the signatories were aware that
gold had been discovered at John Sutter's fort on January 24. The mad rush that followed
the announcement of this discovery is but one of many that helped transform the West in
the nineteenth century, but its significance is not the less for that. Indeed, as the first of
these mineral rushes, the California gold rush established patterns that would inform
subsequent influxes of prospectors into other areas.[33] It is difficult to overestimate the
impact of this event. For one thing, in the northern sections of California it resulted in a
near-total erasure of the indigenous ecoscapes that had managed to survive Spanish and
Mexican incursions. Entire peoples and cultures literally disappeared from the map as a
result of disease, genocide, and psychic trauma. Those that survived found themselves
caught in the web of an emerging ecoscape which they were poorly equipped to
understand.[34]

The American ecoscape in California, constructed around a framework of gold,
would inform subsequent development in the region and in the wider West. Gold fever and
the related idea of California as a golden land (which predated the gold rush itself)
became a national trope, an essential thread of the new western ecoscape. Gold summoned
greater numbers of Americans westward in a shorter amount of time than might have
otherwise occurred. Among these were Burleigh B. Barney, a dreamer who would try to
recreate the Garden of Eden in Palm Valley in the 1880s and 1890s, and the brothers of Palm
Springs speculator and settler John Guthrie McCallum.[35] Such men (and some women) came
seeking gold and quick riches; many were disappointed, and returned home footsore, worn,
and embittered. Others, both the successful and the unfortunate, decided to stay in
California and turn their hands to other things. So great was the multitude which
remained that California leapt straight into statehood a scant two years after the United

ACC0003813

States had acquired it; it never went through the territorial period experienced by other western states under the framework laid out by the Northwest Ordinance of 1789.

California's entry into the Union as a free state, as part of the Compromise of 1850, reminded observers that the sectional crisis then developing between the North and the South was not going to be assuaged by the acquisition of Mexico's northwestern territories. Indeed, the opposite was much more likely. As the United States began extending the framework of the national ecoscape into its new lands, the question of which set of national patterns would predominate – slave or free, southern or northern – gained a new urgency.[36] We can see this in the debate that ensued over which route the new transcontinental railroad would take. In 1853, government survey teams were sent to map and assess several possible routes along the 32nd, 35th, and 38th parallels, and between the 47th and 49th parallels. (One such survey team, led by Lieutenant R. S. Williamson, performed its route assessment in the Colorado Desert in 1853 as part of this national project; the subsequent extension of the Southern Pacific Railroad into Palm Valley would follow their recommendations.[37]) The South, understandably, favored the southern routes, while their Northern opponents felt that the northern routes were more desirable. Thus the surveyors who participated in these surveys traversed not only the unfamiliar terrain of the western territories, but also that of sectional crisis. At the time of the surveys, the hope was that the scientific data thus garnered would allow an objective selection of the ideal route; the possibility that such easy decisions might not be possible was kept in the background. Before a decision had to be made, though, the federal government found that the situation had resolved itself on this matter, if not others. The secession of the Confederacy in 1861 obviated the need to make a national decision based on sectional interests; on July 1, 1862, President Abraham Lincoln signed the Pacific Railroad Act, authorizing the construction of the transcontinental railroad along the 41st parallel (not included in the 1853 surveys because the route, also known as the Oregon Trail, was already well-traveled and

familiar).  The federal grants of public land to the railroads to fund such expansion – and the manner in which such grants were arranged and distributed – would have a profound effect on the spatial framework of the Palm Valley ecoscape.[38]

As noted earlier, the grid system established in 1785 arranged for the division of the continent into townships and sections.  The collection of adjoining squares that resulted proved, in their abstraction, a splendid foundation for the construction of federal projects.  These geometric chits of real estate were easily distributed – especially since knowledge of the terrain they actually represented was sketchy at best – to fund and reward those who acted so as to extend the national ecoscape into the trans-Mississippi West.  The Homestead Act of 1862, for example, based the distribution of the public lands to would-be settlers on the tidy division of such lands into easily bartered squares of 160 acres each.  More importantly for the story at hand, the federal government decided to encourage the construction of a national railroad system by offering land as an incentive.  For each mile of track constructed, the railroad company responsible would receive title to all the odd-numbered sections in the townships within ten to twenty miles of the tracks, plus an additional amount of real money at a rate predicated on the type of terrain traversed.  These lands, it was assumed, could be sold by the railroads so as to subsidize their contributions to the national interest.  (The federal government retained hold of the even-numbered sections with the idea of eventually selling them after the presence of the railroad increased their value.)[39]

The 1860s brought more than the transcontinental railroad to the West.  As suggested earlier, the sectional crisis and resulting Civil War had a significant effect on the region – though not in the same way experienced by the more directly involved North and South.  Indeed, when the Civil War ended in 1865, the development of the western ecoscape in the now-unified national image was ready to enter its next stage.  As noted, the Homestead Act was passed in 1862, and was intended to induce settlers to take up residence

in the western territories. Although the Act proved vulnerable to abuse -- as by corporations acquiring large tracts through the use of dummy entrymen -- it did encourage Americans to think of the West as a region in which people could live.[40] The transcontinental railroad, completed in 1869, provided a way for these new settlers to get to their new properties -- and even to view them before purchasing them. Indeed, migrant and tourist traffic was actively solicited by the railroads, which both needed to sell their lands as soon as possible and sought to increase their clientele.[41] The nascent idea that the West might have an aesthetic value for travellers and tourists was given encouragement with the creation of Yellowstone National Park in 1872 "as a public park or pleasuring ground"; the railroads enabled sightseers to visit the West with less difficulty than before.[42] But we should not be too sanguine about this growing expansion of the national ecoscape -- or rather, perhaps we should, for some of its effects were bloody indeed.

The land to which Americans -- tourists, settlers, prospectors, entrepreneurs -- flocked was already inhabited by a great variety of indigenous peoples, already enmeshed in ecoscapes of their own making. For the national ecoscape to be extended into the West, these indigenous ecoscapes would have to be either incorporated into the national fabric -- thus requiring a reweaving of its patterns -- or eliminated. It is an unfortunate aspect of our nation's history that generally the latter strategy prevailed. What we can see occurring between the 1860s and the 1920s is what one scholar, William T. Hagan, has described as the "imposition of another culture" -- or the imposition of another ecoscape, if you take the wider view and include environmental as well as cultural change -- upon preexisting ones. According to Hagan, between 1860 and 1886 "not a year passed without some clash between Indians and the U.S. Army." Apache, Sioux, Navajo, Cheyenne, Arapaho, Commanche, Kiowa... all these tribes and other nomadic "warrior cultures" were slowly but surely subdued and herded onto reservations, where either they conformed to the places in the American ecoscape set aside for them, or they fled and were subsequently captured and

ACC0003816

returned or killed.[43]   It was with this bloody, brutal background in mind that President

Ulysses S. Grant optimistically adopted an Indian "peace policy" as part of his

administration from 1869-1876;[44] no doubt this also partially explains President Grant's

initial reservation of land in the Colorado Desert for the use of the Cahuilla in 1876.

Although the desert Cahuilla were suffering at the time Grant's Executive Order

transformed some of the region's even-numbered sections into "Indian" territory, it was not

so much due to violence outright as the more subtle workings by which ecoscapes are

reconfigured.   In this case, disease -- specifically smallpox -- worked greater

transformations in the local ecoscape than the decades of being neighbors to Spanish,

Mexican and more recently, American, societies ever had.  (It should be noted, however,

that the experience of the desert Cahuilla is atypical for the region; genocide and psychic

trauma were the norm for most indigenous groups in California during the 1800s.)  In 1863, a

smallpox epidemic began in Los Angeles and spread eastward, killing significant numbers of

the indigenous populations as it propagated throughout southern California.  Among the

victims was Juan Antonio, a Cahuilla leader who had played a significant role in unifying

the Cahuilla, enabling them to withstand the more violent incursions of their white

neighbors.[45]  In 1865, the death toll of the 1863 epidemic combined with a drought to

further weaken and impoverish the Cahuilla; four years later, in 1869, a second epidemic

passed through the region, killing Mexicans as well as Indians.  Terrified of yet another

plague, Cahuilla workers shunned Los Angeles -- as did neighboring Indian groups -- forcing

city employers to hire Chinese labor in their stead.  Meanwhile, the grieving remnants of

decimated lineages reformed into mixed bands, built new communities, and wondered what

had gone wrong.  They were right to wonder, for the effects were both traumatic and

unprecedented, even for a culture trained to expect the worst and anticipate the

unpredictable.  Anthropologist Lowell Bean estimates that the pre-contact Cahuilla

population numbered between 5,000 and 6,000 persons. (This estimate was derived through

ACC0003817

an analysis of the likely number of villages and probable village size, and represents a median between the low of 2,500 suggested by anthropologist Alfred L. Kroeber, and Bean's own belief that the region was capable of sustaining a population of up to 10,000.) This number had dwindled to about 3,000 in 1850, according to the Los Angeles County Census; following the epidemics of the 1860s, the population had decreased to a little over a thousand persons by 1883. Thus, even if we take Kroeber's conservative estimate, we are looking at about a 50% decline over a hundred year period; if we take Bean's highest figure as accurate, we could be looking at a reduction of as much as $9/10$ths of the population originally present in the 1770s. The failure of traditional medicine and curing rituals to halt the decline -- particularly during the rapid decimation caused by the 1860s epidemics -- must have been unsettling indeed.[46]

Given this context, both nationally and locally, the arrival of white settlers and speculators following the extension of the Southern Pacific Railroad into the Palm Springs area in 1876 seems less the beginnings of a bold pioneer tale (the standard genre for the local histories of the area) than the middle passages of a long and cranky tragi-comedy full of hubris, whining and mayhem (a genre given renewed currency by New Western Historians like Patricia Nelson Limerick[47]). Nationally, the Civil War had ended, but struggles between indigenous peoples and Americans continued in an almost unbroken stream.[48]  Indeed, the strong military involvement in national Indian policy encouraged the War Department to try to reclaim the Bureau of Indian Affairs from the Department of the Interior; its efforts were fortunately staved off by Secretary of the Interior Carl Schurz during his tenure from 1877 to 1881.[49]  Why were Indian wars such a prevalent and vicious part of the national expansion into the West?  In part the answer lies in the character of that expansion; nothing less was involved than the wholesale attempt to recreate in the West the American patterns developed in the eastern states.  The answer also lies in the reasons behind such expansion and the people involved in it; the western "frontier" was

ACC0003818

believed to serve as a necessary safety valve and nursery for democratic virtue. For the West to serve such purposes, it had to be an "empty" land, not a populated one.

Yet those who came to the emptied West found that Eastern patterns were difficult to establishment in the region; they shifted, fluttering in the dry winds like so many lines of tiny survey flags. Despite the optimistic claims made by boosters and starry-eyed dreamers like William Gilpin who insisted that "rain follows the plow," westerners were slowly and reluctantly forced to recognize that Western aridity could not be so easily ignored. The Desert Land Act of 1877 gave legislative recognition to western aridity by increasing the size of desert tracts available for purchase to 640 acres; the following year John Wesley Powell published his *Report on the Lands of the Arid Region of the United States,* advising against further western settlement until more research and careful planning could be done.[50] Throughout the West, it was slowly becoming apparent -- if not willingly accepted or believed -- that imposing the national ecoscape on the local terrain would not be as easy as first thought. Myriad related worries -- labor unrest, concern over corporate monopoly, unease about the human costs of clearing the West, concern about the destruction or misuse of western resources -- found an outlet in the Progressive reforms of the succeeding decades.

The great railroad companies that had come to dominate the western ecoscape -- including the Southern Pacific Railroad which sent its locomotives through Palm Valley -- came under increasing scrutiny and greater regulation by critics and reformers who did not like what they saw. In California the railroad question had long been a divisive one, splintering California politics between supporters of the Workingman's Party, who clamored for extensive state and federal regulation of the railroads, and their conservative opponents in the Democratic and Republican parties, who feared that too firm a grip would have adverse effects on California's prosperity. Among the latter was John Guthrie McCallum of Indiana, who had stayed in northern California after coming west to

ACC0003819

determine the fate of his forty-niner brothers. Initially a staunch supporter of the railroad, his enthusiasm waned as the reach of the Central Pacific Railroad's "Big Four" -- Charles Crocker, Mark Hopkins, Collis P. Huntington, and Leland Stanford -- expanded and their grip on the state tightened. In 1879, McCallum was nominated for -- but did not win -- the position of Railroad Commissioner, vowing to work for the reduction of railroad rates. Effective railroad reform would not be achieved until the 1900s, and it would be accomplished by other hands. Losing the election and the illness of his favorite son John had induced McCallum to move his family to Palm Valley in the 1880s.[51]

Despite such agitation, the 1870s and 1880s were also a peak period for railroad travel, fueled by the construction of additional transcontinental lines and the numerous feeders branching off of them. Railroad tourism blossomed in the aftermath of the Civil War; railroad companies, travel agencies, and tourists tired of the established circuit of Eastern sights took advantage of the new transcontinental lines. Travelling westward in their plush Pullman cocoons, elite travelers came seeking inspiring scenery, distinguished company and the occasional amusing curiosity. As Earl Pomeroy and Anne Farrar Hyde have suggested, it can be argued that these tourists were not truly interested in the western ecoscapes which they encountered; they were seeking a blank -- or at least compliant -- slate upon which to write their musings and to sketch picturesque and sublime European landscapes. That they came to the West is significant, but whether they came to the West because it was the West is arguable. Many came instead looking for American Italys, Greeces, Switzerlands, and the like. Western ecoscapes of course typically fell short of these alien standards, with the unsurprising result that many "Western" tourists mentally barricaded themselves in European-style pleasure grounds like the Del Monte and the Raymond and the Del Coronado where they could complain genteely with their peers about western shortcomings. A handful of less primped but no less elitist travelers -- generally male, as opposed to the more feminine crowd found at the resorts -- came to the West to

ACC0003820

"rough" it, seeking challenging and exotic game animals and a sort of rugged outdoor masculine virtue. (Pomeroy offers Theodore Roosevelt as the quintessence of this sort of traveler.) Again, though, the West was viewed through an Eastern — even a foreign, in the case of European visitors — lens; the West did not tend to produce its own tourists in this period. Over time this would shift, as tourism became less the province of elites, western populations increased, and alternative forms of transportation, such as the private motorcar, became available.[52]

The national transportation grid had, by the end of the nineteenth century, been fully extended into the western ecoscape, forming an important framework for its further development. Transcontinental railroad lines connected the West to the rest of the nation, and feeder lines filled in the interstices. Beyond those, moreover, a web of highways and roads linked local regions to each other and gave shape to the western ecoscape as a whole. During this period a subtle but important shift was beginning — one which would prove to be the basis of one of the more significant aspects of the western ecoscape. This was the shift from trains to automobiles. The development of the private automobile, and its dissemination into the ranks of non-elite Americans, coincided handily with the development of Progressive-Era good roads programs. As more cars were built and sold, more roads were available on which to drive them; as more roads were paved or constructed, more drivers were encouraged to use them. Western cities as we know them today — Los Angeles and Phoenix being particular examples — with their vast sprawling suburbs and intricate networks of freeways, highways and surface streets, could not function without the automobile; they developed along with it.[53]

Changes in tourism reflect these larger trends; the type of tourists, the mode of transportation they used, and the expectations they brought with them shifted away from the Euro-centric mode of the elite Pullman tourist. By the end of the 1900s, that form of tourism and tourist had virtually disappeared, replaced by a new generation of

independent-minded automobile tourists bent on exploring the "real" West. As historians of tourism have pointed out, we can see the shift materially represented by the changing types of tourist accommodations. The 1880s saw the construction of grand edifices, like the Del Monte and the Del Coronado in northern and southern California, which sought to provide European-style elegance to a refined resort crowd. Less affluent tourists turned to smaller scale resorts such as Pacific Grove and Long Beach in California, or tent camps in places like Santa Cruz, California, and Newport, Oregon. Health seekers sought out places with thin or dry air (Denver), hot springs (Yellowstone), and warm climates (southern California more generally) to assuage their tuberculosis, consumption, and general malaise. Palm Springs combined all three of these healthful virtues with stunning scenery, but its remoteness from established routes delayed its eventual renown as a winter-time resort; as Pomeroy has remarked, in the 1880s the desert "had not yet, for the most part, learned to be fashionable."[54] Gradually, over the course of the 1890s, tourists became more enthusiastic about obviously western scenery. The fanciful "log palaces" constructed in or near national parks (such as the Old Faithful Inn in Yellowstone (1904) or El Tovar at the Grand Canyon (1905)) reflect this change, with their ostentatious use of native materials and indigenous motifs in their decor.[55]

We can see this change in tourism modes manifesting locally in the closure in 1909 of Palm Springs' first hotel -- built by Dr. Welwood Murray and his wife Elizabeth in 1886 -- and the opening of the Desert Inn (note the name itself, which implies that "desert" is desirable) that same year. The Murrays' hotel had served as a sanitarium and resort for health-seekers since its inception, depended on the railroad for its patronage, and emphasized the region's dry air and healthful spring over fun and play. Although it survived even the barren years of drought between 1894 and 1905, it proved unable to meet the challenge of the new tourism and the declining health of its proprieters. Its successor, the Desert Inn, opened by Dr. and Nellie Coffman at the start of the 1909-1910 winter

season, was initially intended to serve invalids, but subsequent additions were made with the new tourist firmly in mind. It combined informality with cabin-style accommodations, offered childcare and schooling, touted Indian fiestas and horseback riding as possible entertainments, and possessed a swimming pool and parking lots. The stucco-faced, mission-style building graced with red-tile roofs and palm trees was the face of the future, even as the decaying Murray hotel, its long porches shrouded by mysterious overgrown vines, represented that of the past.[56]

The enthusiasm for things western spilled over into the arenas of conservation and federal involvement with the sudden growth of the national park system. (Prior to this, it would not have been possible to refer to the scattered handful of parks as a "system.") Starting in the early 1900s, we see a boom in the establishment of national parks and monuments in the West. This rapid expansion of the parks system continued unabated through the 1930s with a rapidity of growth that prompted the establishment of the National Park Service in 1916. The majority of these parks and monuments preserve or commemorate distinctive aspects of the western ecoscape: rock formations; caves; Indian ruins, petroglyphs and cliff dwellings; battle sites; unique ecosystems and species (such as redwoods, Joshua trees and saguaro cacti); volcanoes; fossils; sand dunes; historic sites -- to name the major categories.[57] In Palm Springs, too, efforts to protect indigenous fan palms resulted in legislation (H.R. 7598) for the creation of Palm Canyon National Monument in 1922.[58] The growing numbers of parks reflected the numbers of tourists -- most in automobiles, especially after the parks were opened to auto traffic in 1913, who were willing -- eager! -- to visit them. In 1910 about 199,000 tourists visited the national parks; in 1920 approximately 920,000; in 1930, 2,775,000 or so.[59] In the 1920s, it was not unusual for Palm Canyon itself to see 30,000 visitors in a single season. To say that western scenery was popular with tourists would be an understatement.[60] Such attitudes would continue to develop and expand throughout the interwar period, and tourism would be firmly

ACC0003823

established as an important part of the economy and self-image of the West and of Palm Valley.

In the area of Indian policy, reforms were enacted to improve the conditions of the nation's indigenous peoples, albeit with an eye to assimilation rather than legitimating or supporting cultural autonomy. Nationally, the plight of America's indigenous peoples had inspired reformers to agitate for programs and policies to "help" the Indian. Groups such as the Indian Rights Association (1882) and the National Indian Defense Association (1885) were formed in order to promote the integration of Native Americans into white society.[61] Although their concern for the sick and destitute Indian was admirable, their emphasis was on assimilation, a "cure" that was actually part of the epidemic of cultural trauma that underlay the unhappy circumstances of many native populations. Reformers' failure to understand this led them to champion the establishment of Indian schools and the Dawes Severalty Act of February 8, 1887, which promoted the allotment of tribally held lands to individuals. Intended to aid the transformation of previously nomadic tribes into communities of permanently rooted and independent farmers, the Dawes Act in practice resulted in the gradual erosion of Indian land as inexperienced allottees fell victim to white swindles and land grabs. According to historian Richard White, Indian-held land was reduced in the wake of the Dawes Act from 155,632,312 acres in 1881 to 104,314,349 acres in 1890, and 77,865,373 acres a decade later.[62] Between 1887 and 1934, partly as a result of such legislation, Indian landholdings declined from 138 million acres to about 47 million, a reduction of nearly two-thirds. This resulted, among other things, in an eventual rethinking in the 1900s of the validity of the allot-and-assimilate approach to Indian policy.[63] It is therefore worth noting that the Cahuilla of the Palm Springs area managed to retain control of their tribal assets well into the twentieth century despite such pressures -- the result of a combination of luck, government support, and their own political savvy. They thus remained an active presence in the Palm Springs ecoscape from its inception

ACC0003824

onward, unlike many other indigenous populations in the wider West. The proximity of the reservation to white Palm Springs introduced complications not seen elsewhere, or only seen in attenuated form.

This proximity helps account for the somewhat anomalous involvement of the federal government in promoting the urbanization of the region; Cahuilla acculturation and self-sufficiency slowly came to be seen as linked to the growth of the region. Both wage labor opportunities and the proximity of "beneficial" white influences increased with the growth of white Palm Springs, and so according to the BIA's own rubric, boosting the white community would improve the Cahuilla situation. Generally speaking, they were not wrong in this assessment. While often a source of stress and conflict, proximity to Palm Springs enabled the Cahuilla to escape the worst effects of American Indian policy during this period.[64]

The question of displacement and marginalization of native peoples, especially, was answered differently in the Palm Springs ecoscape than elsewhere. Like the harnessing of water in Palm Valley (about which more will be said later), the management of the Agua Caliente Indian Reservation was constricted by the checkerboard matrix of white and Cahuilla land. The usual reasons for Indian removal in the late 1890s -- the value of Indian lands and the desire to "help" Indians by facilitating their assimilation -- were not operating in Palm Springs at this time. In some respects, these two justifications cancelled themselves out; the value of Palm Valley land was tied to the region's urbanization, which was correctly perceived as a significant force in the acculturation of the Agua Caliente Cahuilla. Removal would have actually impeded assimilation under these conditions, and made the self-supporting Cahuilla into dependent wards of the state in fact as well as name.

The origins of these somewhat atypical circumstances can be traced to developments that came about in the late 1870s and 1880s. In the fall of 1875, the Mission

ACC0003825

Indian Agency, destined to play a major role in the region's development, was established.[65] The Southern Pacific Railroad was one of the recipients of federal largesse, as noted earlier, not only for its work on the transcontinental line, but also for its construction of smaller feeder lines. Among these was the line that passed through Palm Valley, and it too was accompanied by this checkerboard distribution of federal land. The Southern Pacific Railroad was extended slowly into the Coachella Valley in the 1870s, reaching San Gorgonio Pass in 1875, the Whitewater River in February of 1876, and finally passing through Seven Palms in May of 1876. In May of 1876, President Ulysses S. Grant set aside Section 14 and part of Section 22 (T4S R4E, SBBM) for an Indian reservation.[66] Soon after, the Palm Valley Land and Water Company -- a cadre of speculators who set the initial development of white Palm Springs in motion -- began buying land from the railroad. In 1877 they hired surveyor H. J. Stevenson to lay out a townsite on Section 15 adjacent to the part of the new reservation which contained the famous hot spring (Section 14).[67] On September 29 of that same year, President Rutherford B. Hayes expanded the reservation by including within its boundaries all the even-numbered and unsurveyed sections of T4S R4E, T4S R5E, and T5S R4E except Sections 16 and 36 within each township (reserved for school purposes) and any property that had already "passed out of the United States Government."[68] In 1879, perhaps in response to the development of such reservations in the inland areas, the Mission Indian Agency moved from Los Angeles to San Bernardino.[69] Thus by the end of the 1870s, the essential frameworks for the new ecoscape had been established.

When the Southern Pacific began local operation, it brought not only new settlers, but a new spatial arrangement to the region. The establishment of the Agua Caliente Indian Reservation in 1876 and 1877 by Presidents Grant and Hayes from the even-numbered and unsurveyed lands in Palm Valley, in conjunction with the railroad's being given the title to odd-numbered local sections, produced spatial configurations that would have a

ACC0003826

profound effect on the local ecoscape. In brief, these two actions – both concerned with the meaning and use of federal lands -- divided local space into Indian and white land in a way that had not existed before. The result was a checkerboard, half federal, half private, and wholly contested.[70]

In 1881 a typhoid epidemic in San Francisco severely weakened the health of John McCallum, Junior, son of lawyer John Guthrie McCallum. This family tragedy would lead the McCallums to Palm Valley in search of dry healing air (as well as investment possibilities). Here John Senior would play an influential role in the new ecoscape as early settler, self-interested Indian Agent, and member of the Palm Valley Water Company. On June 19, 1883, John Guthrie McCallum became an interim Indian Agent for the Mission Indian Agency. A year and a half later, on December 29, 1884, he began what was to be a four-year tenure as Indian Agent in fact, serving the Cahuilla of the newly formed Agua Caliente Indian Reservation and Indians on other nearby reservations. During this time he became increasingly involved in the activities of the Palm Valley Land and Water Company, so much so that his ability to serve as an effective Indian Agent was compromised; he was forced to resign in the fall of 1885 because his actions had rewarded himself and his cronies at Indian expense. He was replaced by John S. Ward on October 1, 1885; Ward would serve for two years before being replaced by Joseph W. Preston in the summer of 1887. Preston in turn was followed by Horatio Nelson Rust (1889-1893), Francisco Estudillo (1893-1897), L. A. Wright (1897-1907), Anna C. Eagan (1907), and Clara True (1907-1909); it was not until the 1910s that the rapid replacement of Indian Agents and Mission Indian Agency Superintendents (who assumed the duties of the Indian Agent in the 1900s) finally slowed.[71] The briefness of these agents' tenures clearly indicates the instability of the ecoscape; although the presence of the Mission Indian Agency was a perennial one from the time the reservation was established, the relationship between the local whites and

ACC0003827

Cahuilla and the Indian Agents or Superintendents remained tenuous at best, and openly hostile at worst.

Generally speaking, the Cahuilla of Palm Valley suffered more harm from their white neighbors than from government agents; the Indian Agents assigned to the Agua Caliente Reservation, while often ill-informed, and on occasionally insultingly paternalistic, generally tried to reach what they believed were equitable arrangements for the Cahuilla's well-being. The primary accusation that can be leveled against these men and women as a group is that despite their sympathy for the Cahuilla and concern for their rights (if not *per se*, then as emblems of government authority), they were part of a larger system that exerted a profound influence on the development of the local ecoscape. Though they were well-schooled in the logic of that system, the complex dynamics of the local ecoscape often confounded their attempts to apply it consistently. This complexity made it difficult for them to respond effectively to changes in the ecoscape, even as they played a not inconsiderable role in shaping the framework in which those changes occurred.

For the most part, the poorly informed, inexperienced, and usually physically remote Agents and Superintendents of the Mission Indian Agency were ill-equipped for the task of mediating the often acrimonious relationships between Palm Valley whites and the "Agua Caliente" Cahuilla (so named for their proximity to the local hot spring, Agua Caliente).[72] The first decades of Palm Springs' development were marked by a series of misunderstandings about where and how whites and Cahuilla would fit into the new ecoscape. The Cahuilla, not unsurprisingly, proved reluctant to accept the newcomers' claims to land and water in the area; such acceptance challenged their long-standing property rights and sense of the proper order of things. Whites, meanwhile, felt that the Cahuilla were but superstitious, childlike Indians, unable to properly harness the region's few resources (at least they seemed few to white eyes) or to comprehend the difference between reservation and private land. Despite the halcyon picture painted by most

ACC0003828

histories of the "pioneer" period, squabbles and subterfuge and sabotage were all common at this time.[73] The Indian Agents often found themselves caught in the midst of these wranglings; it was only when they were able to combine aloofness from the fray with adequate knowledge of what the fighting was about that they were able to successfully mediate between the quarreling parties. Despite their intermittant success -- and some tremendous errors (as when Agent Horatio Nelson Rust was tricked into destroying an "Indian" irrigation ditch and wiped out a large section of the Cahuillas' crops) -- the need for such mediation was so strong that it affected the emerging ecoscape's pattern.[74] Eventually efforts to increase Indian autonomy resulted in efforts to educate indigenous peoples in the handling of their allotted lands, the granting of citizenship to all non-citizen Indians in 1924, and the establishment of a new policy of Indian "reorganization" under Commissioner of Indian Affairs John Collier in the 1930s.[75] Yet these new policies did not immediately result in a transformation of the Palm Valley ecoscape (or that of the larger West). The habit of looking resentfully to the federal government for assistance in local affairs -- a habit common to westerners more generally, according to New Western Historians -- persisted well into the 1930s in Palm Valley, at which time the community, white and Cahuilla, finally decided the costs of outside intervention outweighed the benefits.[76]

Much of the trouble in Palm Springs stemmed from white settlers' naive (or stubborn) optimism about what the local ecoscape was capable of supporting (as illustrated by their insistence on growing exotic crops like grapes and oranges), and their refusal to limit or change their plans until forced to do so by circumstance or federal authority. Wrangling over water resources such as the Andreas Canyon creek or the Tahquitz Ditch was common, requiring the repeated intervention by groups like the Indian Irrigation Service and the Mission Indian Agency on the behalf of their Cahuilla wards. Such attitudes, particularly relative to aridity, were not limited to Palm Valley. They were

ACC0003829

common, in the 1800s (and one could argue, still are), to westerners and Americans in general.  We can see this in the way reclamation and irrigation played out in the West.  In 1881 John Wesley Powell was appointed director of the United States Geological Survey by President James A. Garfield, where he would serve thirteen years as an increasingly unpopular prophet of western aridity and its limitations.  His prophecies were realized in 1889, with the onset of a ten-year drought that devastated the Great Plains, killing the belief that "rain would follow the plow" (this was a piece of optimistic pseudo-science which held that agriculture, being both favored by God and productive of rain-inducing dust particles, would be rewarded with increased percipitation, making the farming of the western territories possible without irrigation).[77]  In Palm Springs, about five years later, an eleven-year drought wrought havoc on the dreams of the white settlers and speculators who had come there to erect their fantasies of oases and gardens in the desert.

Powell's warnings were thus vindicated, here as elsewhere in the West, but public unwillingness to concede the limitations of the western ecoscape led them to shoot the messenger.  Funding for the United States Geological Survey suffered a decline over the duration of Powell's tenure as director, and instead of cutting back on western settlement as Powell had advocated, the federal government turned instead to the promotion of reclamation projects.[78]  The most notable piece of legislation related to this policy -- the Newlands Reclamation Act of 1902 -- authorized the development of vast reservoirs throughout the west, to be funded through the sale of the public lands they were intended to serve.[79]  Under this Act, massive federal projects like the construction of Boulder (later Hoover) Dam on the Colorado River, the Grand Coulee Dam on the Columbia, and the Central Valley Project in California in the 1930s undertook to harness the power of wild western rivers and control their water for the purposes of irrigation and urban development.  Federal reclamation was paralleled by actions at the state level and corporate level, such as those affecting Hetch Hetchy in northern California, and the Owens River and Imperial

ACC0003830

Valley in southern California.[80]  In Palm Valley, reclamation and the expansion of existing irrigation systems occurred under the auspices of the Indian Irrigation Service, a branch of the Bureau of Indian Affairs responsible for irrigation projects on the reservations.

Though the reclamation approach to the problem of western aridity owed homage to Powell's insistence that the solution must be a scientific, reasoned and orderly one, it also refuted his calls for a moratorium on western settlement until the region's watersheds had been mapped in detail, and his insistence that land allocation be based on knowledge of the local terrain rather than the too-abstract grid system.  Americans attitudes toward western aridity reflected their attitude toward the West more generally around the turn of the century, which boiled down (more or less) to:  if it doesn't fit our expectations, we (or the government) are not trying hard enough to make it fit, and more effort or money or technology or a combination thereof will make things right.  The very word "reclamation" implies the act of returning a lost or damaged ecosystem to its proper configuration and to its rightful owners, rather than the drastic transformation of an indigenous ecosystem into a hybrid of technology, sheer will and natural resources.  We will see this attitude echoed in the ecoscape of Palm Springs, particularly concerning the management and proper use of water resources such as Andreas Canyon and the Tahquitz Ditch (see Chapters 3 and 4).  Ultimately, however, the Western ecoscape, and smaller western ecoscapes like that of Palm Valley, changed expectations as much as they were shaped by them.

### A Closer Look at the Palm Valley Ecoscape

The ecoscapes of Palm Valley and the wider West were comprised of not only the physical relationships that defined their ecosystems; an intangible matrix of competing beliefs, understandings, behaviors and anticipations was employed to make sense of such relationships by the people who lived and worked within these ecosystems.  This intangible matrix intersected ecosystems at the level of practice, of attempts to alter

ACC0003831

ecosystems to fit the parameters of that matrix and to adapt the matrix to changing ecosystems. Only by examining ecosystems, cartographies, and practice together can we gain a clear understanding of what transpired during the region's development.

Local ecoscapes like that of Palm Valley were additionally comprised of localized networks centered on specific groups (even individuals) and particular locations. While at this time it is not possible to delve into the infinitely small localities that make up the larger Palm Valley ecoscape, it is apropos to consider the intersection and interaction of the beliefs and practices associated with each of three main groups: the Cahuilla, white residents, and the federal government (although it should be understood that none of these cartographies are necessarily limited to any one of these groups). A fourth group, tourists, can be considered as a subset of the category to which the white settlers belong.

The essence of the Cahuilla world view was a combination of flexibility, caution, holistic thinking and precise knowledge of the ecosystem. New species and new experiences (including encounters with unfamiliar human societies) were carefully fitted into patterns based on long familiarity with a specific ecoscape. Their social relationships were intimately bound up with the ecosystems they inhabited; lineages were identified with animals and local phenomena; the *Paniktum* lineage based in Andreas Canyon belonged to the Wildcat moiety, for example, and their name meant "daylight."[81] Their stories and histories emphasize the connections between people, places, animals, plants and climatological and geological phenomena.

In the creation myth told by the Cahuilla around Palm Springs, tobacco came from the first children, Mukat and Temaiyauit, who themselves were created out of the twisting of red, white, blue, and brown colors together. Web-spinning spiders were created from the hearts of these children, and snakes, and the earth, and whirlwinds. Oceans and ocean creatures too came from their hearts. Coyote and the horned owl were made by them, and the palm and the wood duck. Diseases issued from their afterbirth. Their saliva made the

ACC0003832

stars. Only afterwards were humans made, and given their roles as men and women by the female moon Menyil, who taught them ceremonies and proper behavior. Other roles were played by numerous species: rattlesnake, hummingbird, kingbird, butterfly, vulture, cony, lizard, flicker, frog and water skipper, among others. When Mukat was poisoned by creatures tired of his trickery, he was cared for by Coyote, Horsefly, Water Snake, Gopher Snake, Red Racer Snake, and King Snake and by sow bugs and dragonflies. Fire was created in the body of Ninmaiwaut, the palm woman. Human beings, on the other hand, played only a small role in the story, being but one species within a community of beings.[82] In such a cartography, the concept of "nature" is empty; there are no sure demarcations setting human experience apart from the rest of the ecoscape.

In addition to teaching that human beings are but one of many species, the creation story provides a catalog of those species, and of other notable features of existence in southern California, such as oceans, winds, rocks, prickly cactus and thorny vines, mountains, the moon and the sun. As noted earlier, each lineage was associated with a specific locality; regions were identified precisely by their characteristics, forming an appelatory cartograph that guided the Cahuilla through daily interactions with their surroundings. For example, an area near the Garden of Eden, a failed white development, was named *Gash mo*, "the sound of the crunching of sand as one walks." The hot springs in Section 14 were called *Sec he*, "the sound of boiling water," and a place in nearby Palm Canyon was known as *Fat mel mo*, "a place among many hills." Other sites recorded the actions of figures such as the evil spirit Tahquitz, the hero Evonganet, and incidents in recent history.[83] These cartographies arose out of indigenous experience with a particular ecoscape; they explained what was there, how it came to be there, and what happened after that.

The Cahuilla were both determined and flexible in their beliefs and practices. They had to be. Both flexibility and determination are needed to survive and succeed in an

ACC0003833

ecoscape marked by seasonal shifts, seismic upheaval, and cycles of drought and flood, scarcity and abundance. These traits, combined with the holistic awareness of the local ecosystem, enabled the Cahuilla to adapt to, and eventually thrive in, the Palm Valley ecoscape after white immigration altered it. The period of transition, however, was not easy. While the Cahuilla were practiced in fitting new ideas, species, people, and practices into their familiar cartographies, they had not been previously required to do so on such a massive scale; the extent of the transformation in the ecoscape following the American arrival additionally required the Cahuilla to alter significantly those cartographies in order to acknowledge such changes.[84]

The core of the settler understanding was different; it rested on dualist (and often antagonistic or hierarchical) thinking -- "nature" versus human in particular. The short duration of white experience with the Palm Valley ecoscape made it difficult for recent arrivals to create cartographies of understanding as elaborate and detailed as those of the local Cahuilla; coupled with hierarchical, dualist thinking, this inexperience encouraged settlers to impose their own familiar patterns on the existing ecoscape, rather than adapting those patterns to it.[85] Where such ecoscapes proved yielding and malleable, this was an effective strategy. Where they were not -- as in the Coachella Valley or the arid West more generally -- the shortcomings of such doctrinal cartographies were soon made evident.

Where the Cahuilla creation myth promoted an awareness of integration and connection concerning human beings and their ecosystems, the creation myth associated with the Garden of Eden -- a name given to one of the early settlements in Palm Valley -- taught different lessons. The creation of the god of the Garden is an orderly, rather aseptic process, arising from his words rather than from bodily fluids, organs, semen, teeth, or ashes.[86] The male human first created by the god is given "dominion over the fish of the sea, and over the birds of the air, and over the cattle, and over all the earth, and over

ACC0003834

every creeping thing that creeps upon the earth."[87] Later, we are told, this first man gave names to "every living creature," but we are not told what those names might be. Later, when the man and the woman who is created from his rib follow the advice of a snake and seek to increase their knowledge, the god becomes angry, and casts them out of his garden, telling these three what their new lives will entail — enmity, pain, toil, and domination. The story told here is rather different than that of the Cahuilla creation. With the possible exception of the snake (an evil creature of unspecified species, quite unlike the snakes of the Cahuilla creation story), and the first man and woman, the story is general, lacking details. It offers no guidance for someone wishing to navigate through the Coachella Valley ecosystem — or indeed any other — except in a highly abstract way.

The story presents a hierarchical division between the man (and gender is important here) and the creatures he has named. Unlike the case in the Cahuilla creation story, where Mukat and Temaiyauit are assisted by Coyote and Horned Owl in the further creation of other creatures — including humans — the god of the Garden does it all alone, with the exception of the naming of non-human creatures, in which case man, god's image, acts as his surrogate. The lesson taught here is that human beings — or, more specifically, male human beings — are closer to the deity than other creatures. Aside from the clear hubris of this message, an important element is the division of ecoscapes into "human" and "natural" categories, with the latter subordinate to the needs of the former.[88]

In practice, we can find numerous examples of the facile division of the ecoscape into "nature" and "civilization," and the desire to impose foreign patterns on the indigenous ecoscape. A look at the documents produced by developers, settlers, and their boosters reveals the essence of their cartographies. Indigenous species — including humans — were rarely examined on their own terms. Instead, they were judged according to imported standards and imperfect analogies. Thus Palm Valley was likened to "Araby," Egypt, and the Orient; plants like ocotillos and Joshua trees were described as fantastic, exotic, or

ACC0003835

bizarre; other species, like chollas and rattlesnakes, were viewed with distaste and repugnance; and Cahuilla men, women, and children (as well as other Amerindian peoples) were regarded with a mixture of condescension, paternalism, and curiosity about their quaint cartography and primitive practices. All these images -- and they are indeed largely visual, even when related via the written word -- betray an ignorance about the ecoscapes they claimed to represent, and an effort to fit these new elements into familiar cartographies.[89]

Of course, the desire to fit unfamiliar elements into existing cartographies is by no means limited to these white writers. As we have seen, the Cahuilla also performed such integration. However, there are two key distinctions that need to be made. The first is that the Cahuilla knowledge of the indigenous ecoscape greatly exceeded that of these writers; thus, when they proposed to integrate imported species or ideas (such as grape vines or Catholicism), they had a clearer understanding of what was and was not feasible. Second, there were the relative scales to consider. It is one thing to introduce new elements (be they species, beliefs, or practices) into an existing network of relationships; it is a much different enterprise to impose one network upon another one. To attempt that latter enterprise with limited knowledge of an unfamiliar network -- and, in the case of many developers, of their own! -- is a difficult undertaking indeed.

Developers' plat maps such as that developed for Barney's Garden of Eden and boosters' advertisements such as those put out by the Palm Valley Land Company emphasized future or imagined potential over existing conditions. Many of the images -- gushing flumes, broad lawns, fancy hotels -- depicted on these maps never became more than fanciful chimeras. Their images and words depicted not an indigenous ecosystem, nor even an ecosystem in which imported species are inserted gracefully into local (and time-tested) patterns. Rather, fantastic amalgams of species were imposed upon the ecosystem, bound together by technology and human will -- and highly dependent upon them. Such

ACC0003836

maps rest upon the twin assumptions that the ecoscape upon which their patterns will be imposed is malleable, and that human vision is not constrained by the whims of an exterior, subordinate "nature." An awareness of the limitations of the indigenous ecosystem -- or even a desire to become so aware -- was missing.

The cartographies that informed the actions of the federal government share certain characteristics with those of both the Cahuilla and the settlers. Like the cartographies of the latter, those employed by the government emphasized hierarchical dualism. Like those of the former, they promoted the compilation and codification of precise knowledge about specific ecoscapes. Where they differed most significantly from the others was in their emphasis upon universal, abstract categories and principles -- which served to unite both hierarchical dualism and the pursuit of specific knowledge. As a result, the cartographies of the federal government were more flexible than those of the settlers when interpreting new ecoscapes, but at the same time shared their tendency to impose imported categories upon those ecoscapes, and to conceptually isolate non-human subjects from human experience.

The cartographies of the federal government are, appropriately enough, best illustrated by the maps representing Palm Valley townships. These maps reveal the combination of precision and abstraction that governed government actions there and elsewhere. Like the Cahuilla cartographies, government survey maps can be used to precisely locate specific areas within larger territories. Through designations such as "the southeast quarter of the southeast quarter of Section 34, Township 4 South, Range 4 East, San Bernardino Meridian" particular tracts of land can be clearly identified. Moreover, the grid lines upon which these designations rest are not vulnerable in the way that Cahuilla landmarks were to the alterations wrought by flood, earthquake, or the scarring abrasions of wind -- or even the slower erosions of nibbling rabbits and burrowing rodents. Recall Francisco Patencio's recollection that following a series of major earthquakes, "The

ACC0003837

mountains that the people knew well were strange places that they had never seen before."[90]

These characteristics of the federal cartographies followed from a highly abstract framework of theoretical categories. The grid system, while precise on an conceptual level, was in practice often too abstract to adequately describe the character of a given place. Where Cahuilla landmarks recalled the tactile, visual, and auditory qualities of a given space -- and even tastes and smells -- or reminded the user of historical and mythical events that occurred there, the grid system was imposed upon local features without much regard to their position within indigenous ecoscapes. Thus only a single digit separated the arid basin floor of creosote and burro brush from the snowy lodgepole pine forests on the top of Mount San Jacinto.

Given the degree of abstraction inherent in this aspect of the federal cartography, it is not surprising that federal knowledge of local regions had to be augmented by the more specific findings of surveyors, who "ran the lines" of the townships and sections, measuring and describing what they encountered. Thus some maps, in addition to their ubiquitous grids, bear stylized representations of creeks, structures, and mountains, and notations like "Bowlders," "Fair Land -- No Timber," "Approximate Area of Best Soil," and "B. B. Barney's Pipe Line." Such maps sometimes described future hopes for the ecoscape, with planned pipelines, highways, and buildings neatly laid out on plots parallel and perpendicular to the grid lines (contrasting with the representations of the land distribution patterns of the Cahuilla, whose irregular plots followed the shifting contours of the local ecoscape's tangible and intangible terrain).[91]

The imposition of abstract categories upon specific subjects within particular ecoscapes, later modified to account for any significant differences, can be perceived elsewhere in the federal cartographies as well. Federal policies, such as allotment, arose in contexts removed from the daily experience of the peoples upon which they were

ACC0003838

ultimately imposed. Less coercive, perhaps, but more immediately relevant at this point, were the systems of scientific taxonomy that informed the government's cartographers. Like the Cahuilla, the local representatives of the federal government were interested in how best to fit new (or old, depending upon one's perspective) species and practices into the indigenous ecoscape. Like the settlers and the boosters, these agents were highly interested in introducing their cartographies to new ecoscapes and transforming those ecoscapes into more familiar ones. They had greater resources at their disposal, and greater expertise than the settlers, but their project was much the same.[92]

An ability to understand and direct the evolution of the Palm Valley ecoscape from a Hispano-Cahuilla matrix to one that partook of both Cahuilla and American contributions was crucial during periods when such change was not proceeding smoothly, as when disputes arose over the "proper" distribution of water from Tahquitz and Andreas Creeks. The federal government, instigator of many of the region's new patterns, was an appropriate intermediary in such circumstances. Government remoteness combined with an understanding of the larger framework of the new ecoscape enabled it to act as an objective authority in local disputes. However, the width of the government's expertise and the depth of its authority did not guarantee that its solutions were ideal. An incompletely refined mixture of familiar abstract categories and a partial understanding of the local ecoscape tended to produce solutions that looked good on paper but in practice accomplished little. They isolated "natural" problems from "human" ones, and divided the solutions accordingly.[93]

Belief in the human ability to control and reform a recalcitrant "nature" made it possible to ignore or diminish the larger significance of earthquakes, floods, aridity and the difficulties of adapting exotic species to the local ecosystem. Instead, technology was used to overcome such problems by rebuilding damaged irrigation systems, breeding plants, researching techniques for the eradication or control of organisms that fed on preferred

ACC0003839

species, and so on. The scientific and technological cartographies of the government encouraged government employees to think in terms of adapting the existing ecoscape to their goals, rather than taking up a position of adaptation or accommodation themselves.

All of these cartographies were employed primarily at the local level, but they also influenced, and were in turn influenced by, the larger matrices associated with the Coachella Valley, with southeastern California, with the larger American West, and so on. (A fractal might prove a useful analogy, with the caveat that, while each smaller part of a larger such fractal is identical in form if not scale to the whole, these smaller ecoscapes vary from as well as resemble the larger ecoscapes of which they are a part). Thus small localized studies, while probably inappropriate models for equally localized studies elsewhere, can illumine and be illumined by the larger patterns that interact with dissimilar subregions.

What links the three groups together was their shared participation in the Palm Valley ecoscape and their contributions to its evolution. If one looks solely at the cartographies of the three groups, it is tempting to see a progression from localized, idiosyncratic beliefs and practices to a rational system of hierarchy and universal categories. If one looks only at the ecosystem -- or, more narrowly, at "nature" -- one perceives a process combining the eradication or reduction of indigenous species with the introduction of new ones, be they diseases, stock animals, crops, or people. Yet the dynamics driving the process are invisible. One must look at the whole complex network that weaves the tangible and intangible terrains of the ecoscape together in order to understand changes in either terrain. The use of "nature" -- which sets humans apart from their ecosystems and conceptually isolates the remainder from the intangible relations of human communities -- is but one approach to studying history. As it may hide relationships within the ecoscape, or essentialize those of the settlers, developers, and federal agents who depended so heavily upon it to make sense of their ecoscapes, it is time to consider alternatives. As we

ACC0003840

shall see in the next four chapters, treating ecoscapes as collections of independent variables rather than as cohesive networks not only impedes understanding. It can also mean the ultimate irrelevance of projects based on that misapprehension.

## The Western Ecoscape

Now, if we allow our imaginations to soar aloft once more like a red-tailed hawk, we can begin to circle over not just Palm Valley, but over the whole of the trans-Mississippi West. Beneath our circling pinions we can see great activity throughout the region, especially if we are able to observe the evolution of the resulting patterns over the course of a century. We see railroads expanding along lines mapped by government surveyors, extending out to meet distant cities and creating new towns along their routes. We see the steady expansion of white settlement -- punctuated by the sudden thrusts of gold and silver rushes -- fitting tidily into the grid system laid by other surveyors at the government's behest. Water projects, so necessary to counter the aridity of most western ecosystems, effluoresce throughout the region; some are small-scale private affairs, but increasingly we see the appearance of great systems like Hoover and Grand Coulee Dams for the containment and distribution of water resources. Native peoples become isolated into pockets throughout the West -- rather than pushed along the front of an encroaching and uniform wave -- where they are eventually contained, relocated to reservations in other pockets, or eliminated. Eastern tourists begin exploring the region, travelling the rails after the Civil War, and bring with them increasing interest in the distinctive physical and cultural features of the developing western ecoscape. National parks and monuments preserving a variety of desert ecosystems and indigenous cultural artifacts are created throughout the region, both responding to and providing a magnet for further tourism. As American aesthetic appreciation of the region grows, so does tourism. After the turn of the century the development of the motorcar and the construction and expansion of the national highway system brings further transformations to the region, as a new framework within

ACC0003841

which transportation, urban growth and commerce develop is solidified. On the eve of World War II, the basic patterns of the Western ecoscape have been established, awaiting only further expansion and elaboration as subsequent decades bring more funding and interest to the region.

The evolution of the Palm Springs ecoscape, as one of many knots in the fabric of the larger western ecoscape, both repeats these larger regional patterns and adds small snarls to them. Circling over Palm Springs, our metaphoric hawk sees the gradual imposition of American patterns on the local ecoscape. The subtle alterations first wrought by the presence of Spanish and later Mexican colonists on the indigenous ecoscape are little compared to the transformations to come. In the 1850s, government surveyors pass through the area, looking for railroad routes; in the 1870s, the railroad itself follows along the tracks they made. Branching out on either side of the railroad line comes a grid of federal and private space, the former transformed into a reservation, the latter into white settlements. The local Cahuilla population is compressed into their even-numbered squares, looking across a slowly growing network of fences and roads at their new white neighbors. Initial government neglect gives way to a steadily increasing involvement in the region, bringing changes to the spatial layout of the local ecoscape. Water systems are developed and expanded; settlement patterns are rationalized; and tourism is harnessed. The importance of the railroad wanes in the 1910s with the rise of automobile tourism and the extension of a local highway system. The pace of urban growth picks up and the community blossoms with the winter tourist rains. Proposals for a national monument to protect the local palms reflect a growing national interest in indigenous western ecoscapes. The Cahuilla develop the skills necessary to succeed in the new ecoscape and force the federal government and the local whites to acknowledge this; elsewhere Indians gain American citizenship and a greater degree of autonomy under the administration of John Collier in the 1930s. In Palm Springs, the local community develops a stronger sense of

ACC0003842

purpose and self-understanding; the federal government, although it tries to expand its influence in the region, is forced to withdraw by the end of the 1930s, unlike elsewhere in the West. This, then, in broad overview, is the history of the local ecoscape, and of its relationship to the evolution of the larger ecoscape of the modern American West. Let us move in closer and look at these developments in greater detail.

ACC0003843

## Notes

1      The term "Colorado Desert" was coined by William P. Blake in 1853.  Edmund C. Jaeger, *The California Deserts:  A Visitor's Handbook.* (Stanford, California:  Stanford University Press, 1948); Thomas A. Jensen, *Palm Springs, California:  Its Evolution and Functions,* (Los Angeles:  University of California, 1954); James A. MacMahon, *Deserts: The Audubon Society Nature Guides Series.* (New York:  Alfred A. Knopf, Inc., 1985); Walter C. Mendenhall, *Some Desert Watering Places in Southeastern California and Southwestern Nevada.*  For the United States Geological Survey, Department of the Interior, Water Supply Paper 224. (Washington:  Government Printing Office, 1909); Robert P. Sharp, *Southern California:  K/H Geology Field Guide Series.* (Dubuque, Iowa:  Kendall/Hunt Publishing Co., 1976).

2      "Map of Palm Springs and Palm Valley Colony Lands" with attached advertisement (1887), pg. 9.  Bancroft Library Map Collection.

3      Such fossils supposedly provided the basis for the valley's name of "Coachella": according to one story, it received that appellation when a telegraph operator mis-keyed the word "Conchella," in reference to these fossilized shells. R. E. Harrington, *Souvenirs of the Palm Springs Area.* (R. E. Harrington, 1962) offers one variant of this story.  Although the existence of these shells is easily confirmed, the accuracy of the story is not.  Jane Davies Gunther notes in *Riverside County, California, Place Names: Their Origins and Their Stories.* (Riverside, California: J. D. Gunther, 1984) that several variations and other names that had been applied to the area -- Coahuilla (the Spanish spelling of Cahuilla), Couvilla, Cabazon, Chabezon, Coahuila, Conchilla -- and suggests that the name, rather than being a mistake or misreading, was actually a deliberate attempt to create a compromise between the competing claims for "Conchilla" and "Coahuilla." *Place Names,* pp. 120-23.

4      Lowell John Bean, *Mukat's People:  The Cahuilla Indians of Southern California.* (Berkeley:  University of California Press, 1972), pp. 23-28, 32-34; Mendenhall, Sharp.

5      Bean, *Mukat's People,* pp. 23-28, 32-34; Mendenhall, Sharp. *Paniktum Hemki: A Study of Cahuilla Cultural Resources in Andreas and Murray Canyons,* (Cultural Systems Research, Inc., 1983); *Archaeological, Ethnographic, and Ethnohistoric Investigations at Tahquitz Canyon, Palm Springs, California,* ( Menlo Park, Calif.:  Cultural Systems Research, Inc., 1995) (hereafter the Tahquitz Report).  Seismic activity continues to loom large in the Palm Springs ecoscape today; a trip to the Palm Springs Public Library, for

ACC0003844

example, reveals the pervasiveness of earthquake dangers in the warning signs displayed prominently on all the stacks.

6          Francisco Patencio, *Stories and Legends of the Palm Springs Indians*. (Los Angeles: Times-Mirror, 1943), p. 58. The US Geological Survey has records of earthquakes back to the 1560s, and they confirm that there was sizable earthquake activity at this time. A probable date for the earthquakes Patencio remembered, given his birth in the mid-1850s, are the December 16, 1858 earthquakes that struck near San Bernardino at 34° North latitude, 117° West longitude with a magnitude of about VI and VIII on the Richter scale. Although the reported epicenter is about 30-40 miles away from the Coachella Valley, it was felt in Los Angeles, and it is not improbable that fault activity in the desert areas, particularly along the fault line, was as strong or stronger, but, due to the sparsity of (white) populations there, was not reported; in any case, an earthquake of that size at that distance would still have been unsettling and memorable. *Seismicity of the United States, 1568-1989 (Revised)*. U. S. Geological Survey Professional Paper 1527, pg. 72, 102.

7          For a discussion of the dangers -- and benefits -- of wildfire, see Bean, *Mukat's People*, pp. 34-35.

8          I use the past tense, since, with the increased development of irrigation and golf-courses, the region has experienced a rise in atmospheric moisture: while photographs from the turn of the century depict views encompassing the entire basin, presently the view is often hidden behind layers of haze.

9          "Rain seldom falls on this desert in a natural manner," wrote ethnobotanist David Prescott Barrows in 1888, "When it comes it is in terrific water-spouts or cloud-bursts that flood the country like a lake and cut great gullies, twenty-five feet deep, in the sand." David Prescott Barrows, *Ethno-Botany of the Coahuilla Indians*. (Banning, California: Malki Museum Press, 1977), p. 31.

10         Compare this with the annual rainfall for Los Angeles in the same period, 1889-1900:  34.83, 13.36, 11.85, 26.28, 6.73, 16.11, 8.51, 16.86, 7.06, 5.59, 7.91, 16.29 inches, respectively, for an average of 14.28 inches over the whole period, and of 11.19 inches during the years in this range affected by the drought. Alexander McAdie, United States Weather Bureau. "The Los Angeles Rain-Making," *Sunset Magazine*, October 1905, pp. 575-77. The figures for Palm Springs in Mendenhall's report reflect an amount of 0.70 and below for the last two years of the drought, followed by a total of 9.36 inches in the year that ended it. Mendenhall, pg. 13.

ACC0003845

11    See the following: advertising postcard put out by the Palm Valley Land Company, describing Palm Valley as a place "Where Frost, Fog or Windstorms Are Never Known," Huntington Library Rare Books Stacks, Photograph #435825 (c. 1888); Welwood Murray, "Palm Springs," advertisement in *Sunset Magazine*, October 1898, p. 107; and George Wharton James, *Travelers' Hand Book to Southern California* (Pasadena, Calif.: 1904), p. 294.

12    Mendenhall, pp. 11-12.

13    Bean, in *Mukat's People*, p. 71, notes that one Cahuilla village in Palm Valley was known to move seasonally between Palm Canyon (summer) and Chino Canyon (winter) to escape the harsher effects of the local microclimates.

14    For comments on hiring summertime staff, see Charles L. Ellis, Superintendent, to Commissioner of Indian Affairs, May 24, 1923 (RG 75, Mission 124, #34908 1922, National Archives, D.C.), Ellis to Commissioner of Indian Affairs, December 13, 1926 and December 23, 1926 (RG 75, Letters to the CIA, May 1925-June 1944, Box 137, National Archives, Laguna Nigel). On whites leaving the area for the summer see Ellis to Commissioner of Indian Affairs, June 30, 1927 (RG 75, Letters to the CIA, May 1925-June 1944, Box 137, National Archives, Laguna Nigel) and R. E. Harrington, *Souvenirs of the Palm Springs Area*, (Simi, Calif.: Peg Wilson, 1962), p. 3.

15    Bean, *Mukat's People*, pg. 29; Raymond B. Cowles, in collaboration with Elna S. Bakker. *Desert Journal: Reflections of a Naturalist.* (Berkeley: University of California Press, 1977); Jaeger; MacMahon; Mendenhall; William E. Reifsnyder, *Weathering the Wilderness: The Sierra Club Guide to Practical Meteorology.* (San Francisco: Sierra Club Books, 1980). The name of the Santa Ana winds mirrors this shift in perspective; they were originally called Santanas -- devil winds -- before acquiring the less demonic appellation by which they are known today. Barrows, in *Ethno-Botany of the Coahuilla Indians*, pg. 31, notes the abrasive effects of the combination of sand and high winds. In *Mukat's People*, Bean discusses the *nukatem*, or wind spirits; Bean, Sylvia Brakke Vane, and Jackson Young, in *The Cahuilla Landscape: The Santa Rosa and San Jacinto Mountains.* (Menlo Park, California: Ballena Press, 1991), pg. 49, note one location called *E va we*, meaning "the wind blows all the time" near Snow Creek.

16    Barrows, *Ethno-Botany*; Bean, *Mukat's People*, pp. 36-55; Bean and Katherine Siva Saubel. *Temalpakh (From the Earth): Cahuilla Indian Knowledge and Usage of Plants.* (Banning, California: Malki Museum Press, 1972); Cowles, *Desert Journal*; Jaeger, *The*

ACC0003846

*California Deserts*; Jaeger, *Desert Wild Flowers*. (Stanford, California:   Stanford University Press, 1950); MacMahon.

[17]   Bean, *Mukat's People*, pp. 56-67; Cowles; Jaeger, *The California Deserts*: Jaeger, *Desert Wild Flowers*; Jaeger, *Desert Wildlife*. (Stanford, California:  Stanford University Press, 1961); MacMahon.

[18]   Bean, *Mukat's People*; Bean, Vane, and Young, *Cahuilla Landscape*, (for discussion on naming see, pp. 9-10, regarding the ancient lake, see pg. 59); Gunther, pp. 17-21; Mendenhall, pg. 10; Francisco Patencio, *Desert Hours with Chief Patencio*. (Palm Springs Desert Museum, 1971); Patencio, *Stories and Legends*, especially pp. 83-85; Sharp, pp. 37-39.

[19]   Bean, *Mukat's People*; Bean, Vane, and Young, *Cahuilla Landscape*, pg. 5; Bean, Vane, and Young. *The Cahuilla and the Santa Rosa Mountain Region:  Places and their Native American Association*. (Riverside, California:  Bureau of Land Management, 1981); Barrows; Bean and Saubel, pp. 15-26; Ruby Modesto and Guy Mount. *Not for Innocent Ears: Spiritual Traditions of a Desert Cahuilla Medicine Woman*.  (Riverside, California: Rubidoux Printing Company, 1980); Katherine Siva Saubel, with Anne Galloway. *I'isniyatam (Designs):  A Cahuilla Word Book*. (Banning, California:  Malki Museum Press, 1977); Saubel, with Pamela Munro.  *Chem'ivillu' (Let's Speak Cahuilla)*.  (Los Angeles:  American Indian Studies Center, UCLA, 1981); William Duncan Strong, *Aboriginal Society in Southern California*. (Banning, CA:  Malki Museum Press, 1972).

[20]   See Richard White, *"It's Your Misfortune and None of My Own": A History of the American West*. (Norman, OK:  University of Oklahoma Press, 1991), pp. 155-78 for a discussion of the territorial system in the West and its failures.

[21]   See Donald Worster, *An Unsettled Country:  Changing Landscapes of the American West*, (Albuquerque:  University of New Mexico Press, 1994), p. 12, on John Wesley Powell and the grid system in the West.

[22]   Hildegard Binder Johnson, "Towards a National Landscape," in *The Making of the American Landscape*, ed. Michael P. Conzen. (Boston:  Unwin Hyman, 1990), pp. 127-145 for a more detailed account, and John R. Stilgoe, *Common Landscapes*,  for a broader overview. *The New Universal Family Encyclopedia*, eds. Stephen P. Elliot and Alan Isaacs. (Random House, 1985), pg. 744, provided the information on Palm Springs' location; Palm Springs is located at 33°, 49' N, 116° 34' W. See also "Principal Meridians and Base Lines Governing Public Land Surveys" in Warren A. Beck and Ynez D. Haase, *Historical Atlas of the*

ACC0003847