*American West*, (Norman, Okla.: University of Oklahoma Press, 1989), being map number 53.

23 Beck and Haase, map 15, "Explorations, 1500-1599," map 16, "Explorations, 1600-1699," and map 19, "Explorations, 1772-1799."

24 De Anza is credited by Katherine Ainsworth, *The McCallum Saga: The Story of the Founding of Palm Springs*, (Palm Springs Desert Museum, 1973), with having named Mount San Jacinto during his expedition through the desert in 1774; however, Gunther claims instead that the name had been bestowed on the peak in question about 80 years after de Anza "discovered" it. Ainsworth, p. 61; Bean, Vane and Young, *Cahuilla Landscape*, pg. *5, 77;* J[ames] Smeaton Chase, *Our Araby: Palm Springs and the Garden of the Sun, Illustrated from Photographs by the Author: with a Descriptive List of Desert Plants, etc., and Hints to Desert Motorists: Also a New Map of the Region by the U. S. Geological Survey*. (Pasadena, Calif., Printed for J. S. Chase by Star-news Publishing Company, 1920) pp. 33-34; *Palm Springs History Handbook*, ed. Nancy Robinson. (Palm Springs: Palm Springs Public Library, 1992), Section 14: "1823 Romero Expedition passes through Agua Caliente; first Indian contact with Europeans" no page number; Jensen, pgs. 39, 41; Jane Davies Gunther, *Riverside County, California, Place Names : Their Origins and Their Stories*. (Riverside, California: J. D. Gunther, 1984), pgs. 3, 466.

Francisco Patencio also notes the succession of names, noting those applied to the hot springs in Section 14. *Stories and Legends*, p. 101.

25 Bean, Vane, and Young, *Cahuilla Landscape*, pp. 5-6.

26 Bean, *Mukat's People*, pp. 69-70.

27 Barrows, pp. 70-71. Tahquitz Report, throughout. See also *Paniktum Hemki.*

28 Bean, Vane, and Young, *Cahuilla Landscape*, pp. 5-6.

29 See George Harwood Phillips, *Chiefs and Challengers*, for a thorough discussion of Cahuilla agency and military alliances in the first half of the 1800s.

30 For a brief overview, see Doren Ben-Atar, "Louisiana Purchase," in *The American Heritage Encyclopedia of American History*, John Mack Faragher, ed., (New York: Henry Holt and Company, 1998), pp. 541-43. For a more extensive discussion of the Louisiana Purchase and its significance, see White, *"It's Your Misfortune,"* pp. 61-64.

31 See Paul Wallace Gates, "Land Office, General," p. 611; P. Richard Metcalf and Kathryn A. Abbott, "Indian Affairs, Bureau of," p. 520; and Richard A. Bartlett,

"Exploration, United States," p. 357, all in *New Encyclopedia of the American West*. ed. Howard R. Lamar, (New Haven: Yale University Press, 1998).

32 See White, *"It's Your Misfortune,"* pp. 61-84; see also J. F., "Warner's Ranch," p. 1177, *New Encyclopedia of the American West*.

33 See White, *"It's Your Misfortune,"* pp. 191-92.

34 See Jack D. Forbes, *Native Americans of California and Nevada*, (Healdsburg, Calif.: Naturegraph Publishers, 1969), Albert L. Hurtado, *Indian Survival on the California Frontier*, (New Haven: Yale University Press, 1988) and George Harwood Phillips, *Indians and Intruders in Central California, 1769-1849*, (Norman, Okla.: University of Oklahoma Press, 1993).

35 On Barney, see W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. November 17, 1906. 1911 folder, Box 73, Entry 653, Irrigation Division, Record Group 75, National Archives, Washington, D. C. For a discussion of the McCallum brothers, their deaths, and the subsequent arrival of John Guthrie McCallum in San Francisco, see Ainsworth, *The McCallum Saga*, pp. 709. It should be noted that, while I mention McCallum several times in this overview, one must be careful to not overstate his importance. Granted, he did play several important -- but not crucial -- roles in the formation of the Palm Valley ecoscape. His significance, however, lies primarily in the fact that he and his family have been more extensively researched than other individuals in the area, and in that he can be used to demonstrate the connections between Palm Valley and the wider Western ecoscape.

36 For a brief discussion of Northern versus Southern patterns vis-á-vis the West, see Donald Worster, *An Unsettled Country*, pp. 4-5.

37 William P. Blake, *Report of a Geological Reconnaissance in California: Made in Connection with the Expedition to Survey Routes in California, to Connect with the Surveys of Routes for a Railroad from the Mississippi River to the Pacific Ocean, under the Command of Lieut. R. S. Williamson, Corps Top. Eng'rs, in 1853*. (New York: H. Baillière, 1858).

38 See White, *"It's Your Misfortune,"* pp. 125-26; also William Deverell, *Railroad Crossing: Californians and the Railroad, 1850-1910*, (Los Angeles: University of California Press, 1994), pp. 9-33, for a more focused discussion relative to California.

39 See White, *"It's Your Misfortune,"* pp. 145-47, 246-52. "Under act of March 3, 1871 (16 Stats., 573), the Southern Pacific Railroad Company was granted the odd sections

within twenty miles on each side of its road." T[homas] J[efferson] Morgan, Commissioner of Indian Affairs, to A[lbert] K. Smiley, Joseph B. Morse, and Professor C[harles] C. Painter. January 31, 1891. File #1891-46165. Box 19, Special Case 31, Record Group 75, National Archives, Washington, D.C.

40 White, *"It's Your Misfortune,"* pp. 142-45.

41 White, *"It's Your Misfortune,"* pp. 195-97.

42 William Cronon, "Landscapes of Abundance and Scarcity," p. 630, in *The Oxford History of the American West,* eds. Clyde A. Milner II, Carol A. O'Connor and Martha A. Sandweiss. (New York: Oxford University Press, 1994).

43 William T. Hagan, "United States Indian Policy, 1860-present," pp. 1141-42, in *New Encyclopedia of the American West.*

44 P. Richard Metcalf, "Peace Policy," p. 845, in *New Encyclopedia of the American West.*

45 For more on Juan Antonio, see Phillips, *Chiefs and Challengers.* His death is discussed on page 159.

46 Lowell John Bean, "Cahuilla," pp. 583-84, in *Handbook of North American Indians, Volume 8: California.* Robert F. Heizer, ed., (Washington, D.C.: Smithsonian Institution, 1978), pp. 575-587. See also Bean, *Mukat's People,* pp. 75-77. For an overview of the epidemics and Cahuilla responses to them, see the Tahquitz Report, pp. V-164, V-177-88.

47 See, for example, Limerick's seminal work, *The Legacy of Conquest: The Unbroken Past of the American West.* (New York: W. W. Norton and Co., 1987).

48 The author of the entry "Indian Wars: 1865-1891" notes the Modoc War in southern Oregon (1872-1873), the Red River War (1874-1875), the Sioux and Cheyenne war (1876-1877), and the Nez Percé War (1877) as some of the major battles of this period. O. K. "Indian Wars: 1865-1891," in *New Encyclopedia of the American West,* pp. 543-45. See also White, *The Roots of Dependency: Subsistence, Environment, and Social Change among the Choctaws, Pawnees, and Navajos.* (Lincoln: University of Nebraska Press, 1983), and White, *"It's Your Misfortune."*

49 Donald C. Swain and Harry N. Scheiber, "Interior, Department of," p. 548, in *New Encyclopedia of the American West,* pp. 547-48.

50 Wallace Stegner, *Beyond the Hundredth Meridian: John Wesley Powell and the Second Opening of the West.* (New York: Penguin Books, 1992; originally published 1953, 1954).

---

51 Deverell, *Railroad Crossing;* Ainsworth, *The McCallum Saga.*

52 Anne Farrar Hyde, *An American Vision: Far Western Landscape and National Culture, 1820-1920.* (New York: New York University Press, 1990); Earl Pomeroy, *In Search of the Golden West: The Tourist in Western America.* (New York: Alfred A. Knopf, 1957). See also Warren James Belasco, *Americans on the Road.* (Cambridge, Mass.: The MIT Press, 1979).

53 Belasco, *Americans on the Road;* see also Hyde, *An America Vision*, Pomeroy, *In Search of the Golden West*, and Kenneth T. Jackson, *Crabgrass Frontier: The Suburbanization of the United States*, (New York: Oxford University Press, 1985), pp. 157-89.

54 Pomeroy, *In Search of the Golden West*, p. 120.

55 Belasco, *Americans on the Road;* Hyde, *An American Vision;* Pomeroy, *In Search of the Golden West.*

56 For descriptions and history of the Murray's hotel, see Tahquitz Report, p. V-206; John E. Baur, *The Health Seekers of Southern California, 1870-1900.* (San Marino, Calif.: The Huntington Library, 1959), p. 78; C. C. Pierce, "760. Palm Springs Hotel with Mt. San Jacinto," "759. Palm Springs. Dr. Murray's Hotel. 1901," "9622. Front of original Palm Springs Hotel. owned by Dr. Murray," and "9623. South side. Dr. Murray's Palm Springs Hotel"; "What Ails Mount Tauquish? Major Rust Investigates the Reports as to Volcanic Action"; "Major Rust on San Jacinto Mt. Interesting Description of a Trip Through Strawberry Valley. Nature in Its Wildest Mood. The News Correspondent Stands on High Before the Creator Has the Spot Prepared for Man -- The Romance of Ramona -- Footprints of the Red Man," *The Pasadena Daily News*, (July 19, 1898); Dr. Welwood Murray, "Palm Springs," *Sunset Magazine* (October 1898), p. 107; George Wharton James, *Traveler's Hand Book*, pp. 291-92; James, *The Wonders of the Colorado Desert (Southern California): Its Rivers and its Mountains, its Canyons and its Springs, its Life and its History, Pictured and Described. Including an Account of a Recent Journey made down the Overflow of the Colorado River to the Mysterious Salton Sea. With upwards of Three Hundred Pen-and-Ink Sketches from Nature, by Carl Eytel.* (Boston: Little, Brown, and Company, 1907), pp. 278-80; and R. E. Harrington, *Souvenirs of the Palm Springs Area*, pp. 2, 5.

For the Desert Inn see Tahquitz Report, p. V-227; *Palm Springs California: Californias Most Picturesque Oasis.* [January, 1929]; *Palm Springs: The Oasis of Delight.* Compliments of Hugh Evans & Company (Incorporated); *Riverside County: It's [sic] Hotels*

*and Resorts*. Riverside County Chamber of Commerce. Court House, Riverside, California; Uncatalogued Postcards, Huntington Library Ephemera; *Palm Springs, California*. (1929: Distributed by Desert Inn, Oasis and El Mirador hotels, Deep Well Guest Ranch); *Rider's California: A Guide-Book for Travelers with 28 maps and plans*. (New York: The Macmillan Company, 1925; London: George Allen & Unwin, Ltd., 1925); *Sands of Time*. (Palm Springs, Calif: The Desert Inn, 1935); Harrington, *Souvenirs of the Palm Springs Area*.

57 Robert B. Westbrook and Alfred Runte, "National Parks and Monuments," pp. 761-69, in *The New Encyclopedia of the American West*.

58 See C[harles] L. Ellis to Commissioner of Indian Affairs, August 14, 1922, RG 75, BIA Classified Files, Mission 124, National Archives, D.C.; C[harles] L. Ellis to Commissioner of Indian Affairs, July 23, 1929, Box 138, and C[harles] L. Ellis to Commissioner of Indian Affairs, June 12, 1930, Box 139, from Letters to the CIA, May 1925-June 1944, National Archives, Laguna Nigel.

59 Anne Farrar Hyde, "Tourist Travel," p. 1119, in *The New Encyclopedia of the American West*.

60 Tahquitz Report, p. V-247. This was for the winter season between September 1922 and May 1923.

61 E. Arthur Gilcrest, "Indian Rights Association," p. 530, and William T. Hagan, "United States Indian Policy, 1860-present," p. 1143, both in *The New Encyclopedia of the American West*.

62 White, *"It's Your Misfortune,"* p. 115, pp. 109-17.

63 Fred H. Nicklason, "Dawes Severalty Act," p. 288, in *The New Encyclopedia of the American West*.

64 For an excellent discussion of the Navajo experience with the Bureau of Indian Affairs, another tribe affected by a checkerboarded reservation, see White, *Roots of Dependency*. In the 1890s the issue of allotment had first appeared, and would continue to trouble the Agua Caliente Cahuilla intermittently through the 1920s and 1930s; see *Paniktum Hemki* and Tahquitz Report for details on the Cahuilla situation.

65 Tahquitz Report, p. V-193.

66 Ulysses S. Grant, President, Executive Order, May 15, 1876. Record Group 75, National Archives.

67 Ainsworth, *The McCallum Saga*, pp. 105-06.

---

68 Rutherford B. Hayes. Executive Order, September 29, 1877. Record Group 75, National Archives.

69 Tahquitz Report, p. V-203.

70 Ulysses S. Grant, President, Executive Order, May 15, 1876; Rutherford B. Hayes, Executive Order, September 29, 1877. Record Group 75, National Archives. See also Tahquitz Report, pp. V-196-203. On the extension of the railroad into the region, see the Tahquitz Report, p. V-194. T[homas] J[efferson] Morgan, Commissioner of Indian Affairs, to A[lbert] K. Smiley, Joseph B. Morse, and Professor C[harles] C. Painter. January 31, 1891. File #1891-46165. Box 19, Special Case 31, Record Group 75, National Archives, Washington, D.C.

71 Ainsworth, *The McCallum Saga*, pp. 45-51; Tahquitz Report, V-205-09, and more generally regarding the various Indian Agents.

72 The "Agua Caliente" of Palm Valley is not to be confused with the Agua Caliente located near Warner's Ranch southwest of San Jacinto.

73 One example of this is the placing of cactus in the bed of settler Burleigh B. Barney (see Chapter 3, Andreas Canyon); other acts of sabotage involved cutting down prized trees (Chapter 6, Agua Caliente) and damaging or destroying irrigation systems (Chapters 3, 4 and 6).

74 For further discussion of Rust's intervention, see Chapter 4, "Tahquitz Canyon."

75 Stephen Cornell, *The Return of the Native: American Indian Political Resurgence.* (New York: Oxford University Press, 1988), pp. 59, 87-105.

76 Richard White, for example, likens federal assistance in the West to a "particularly scratchy wool shirt in winter. It was all that was keeping [westerners] warm, but it still irritated them." *"It's Your Misfortune,"* p. 57.

77 See Stegner, *Beyond the Hundredth Meridian*, for a discussion of both Powell and the belief that "rain follows the plow." See also Donald Worster, *Rivers of Empire*, and *Unsettled Country*.

78 See Stegner, *Beyond the Hundredth Meridian*.

79 Lawrence B. Lee, "Newlands Reclamation Act," p. 784, in *The New Encyclopedia of the American West*. See also Worster, *Rivers of Empire*, and Stegner, *Beyond the Hundredth Meridian*.

80 See Worster, *Rivers of Empire*; Marc Reisner, *Cadillac Desert: The American West and Its Disappearing Water*. (New York: Viking, 1986); Norris Hundley, Jr. *The Great*

---

*Thirst: Californians and Water, 1770s-1990s.* (Los Angeles: University of California Press, 1992); Donald J. Pisani, *From the Family Farm to Agribusiness: The Irrigation Crusade in California and the West, 1850-1931.* (Berkeley; Los Angeles: University of California Press, 1984); John Walton, *Western Times and Water Wars: State, Culture and Rebellion in California.* (Los Angeles: University of California Press, 1992).

81 Strong, *Aboriginal Society*, pg. 91.

82 See Bean, *Mukat's People*, pp. 160-182; Strong, *Aboriginal Society*, pp. 130-43 and Patencio, *Stories and Legends*, pp. 1-59, for details of the creation story of the Cahuilla of Palm Springs.

83 Bean, Vane, and Young, *Cahuilla Landscape*, pgs. 50, 81, and 49; see also Patencio, *Stories and Legends*.

84 See Bean and Vane, "*Kauisik* History", in the Tahquitz Report, particularly the concluding section, for a discussion of Cahuilla adaptability.

85 See Hyde, *An American Vision* and also Annette Kolodny, *The Lay of the Land: Metaphor as Experience and History in American Life and Letters.* (Chapel Hill: University of North Carolina Press, 1975), and Kolodny, *The Land Before Her: Fantasy and Experience of the American Frontiers, 1630-1860.* (Chapel Hill: The University of North Carolina Press, 1984), for a more detailed discussion of the indescribable West and of the imposition of familiar patterns upon it by settlers and explorers.

86 Strong's presentation of the Cahuilla creation story in *Aboriginal Society*, pg. 142, adds that, in addition to the creations described earlier, a number of useful plants came from various parts of Mukat's body. From his heart came tobacco; his stomach, yellow squashes; his pupil, watermelon; his teeth, corn; the lice eggs in his hair, wheat; and from his semen, beans.

87 *The Holy Bible, Revised Standard Version, Containing the Old and New Testaments.* (1962; New York: Meridian, 1974), pg. 1.

88 See Merchant, *Ecological Revolutions*, and *The Death of Nature*, especially the latter, for a discussion of the connections between the construction of the non-human world as either female or "dead"; see also Kolodny, *The Lay of the Land* and *The Land Before Her*, and Haraway, *Simians, Cyborgs, and Women.*

89 See Hyde, *An American Vision*, for a discussion of the American encounter with the exotic West. For examples of travel writers, see the writings of George Wharton James,

most notably his *Wonders of the Colorado Desert*, and J[ames] Smeaton Chase's *Our Araby* and *California Desert Trails.*

90 Francisco Patencio, *Stories and Legends*, p. 58.

91 For examples of the federal mapping system, see "Official U. S. Government land survey map of 1885 showing hot springs in Section 14," being Figure 5, pg. 15 in *Cahuilla Ethnography and Land Use in Section 14, A Cultural Resources Survey for the Agua Caliente Gaming Facility, Palm Springs, California* (Palm Springs, Calif.: Brian F. Mooney Associates, 1994), Jerry Schaefer, Senior Archaeologist (hereafter Section 14 Report); "U. S. Government Map of 1891 showing existing land use and proposed allotments in Section 14," being Figure 7, pg. 18, in the Section 14 Report; "1925 U. S. Indian Service Irrigation Map showing sections 34 & 35", being Figure 3, pg. 27, in the Canyon Development Project Study; and the 1908 "Sketch of a Portion of the Agua Caliente Indian Reservation Showing approximate Contours and Area of Best Soil", by H. W. Hincks for the U. S. Indian Service (Irrigation), being Figure V.8, pg. V-234, of the Tahquitz Report.

A map by Civil Engineer T. M. Topp from 1891 exemplifies the combination of grids augmented by stylistic renderings of the local terrain. See Figure 2, pg. 26 in the Canyon Development Project Study, and Figure 6, pg. 16, in the Section 14 Report.

92 For a discussion of the importance of monetary capital and expertise in the transformation of the arid west, refer to Worster, *Rivers of Empire.*

93 Arthur F. McEvoy, in *The Fisherman's Problem: Ecology and Law in the California Fisheries, 1850-1980.* (New York: Cambridge University Press, 1986), discusses this phenomenon of considering parts of the ecosystem to be literally "outside" the realm of human activities -- so much so that in the California fisheries overfishing was seen as the result of human competition alone; the breeding patterns of fish or the state of the fisheries themselves were simply absent from the equation.

# Chapter 3

## Andreas Canyon

To a visitor setting out to explore more of Palm Valley, the lure of the canyons to the south of Palm Springs proves compelling. Distances often seem short in the desert due to the clarity of the air, and so it seems reasonable to make a quick hike to visit them. Walking towards a cleft in the bulk of the San Jacintos, one discovers that it is both larger and farther away than initially believed. The heat of the sun, at first pleasant, grows uncomfortably warm. Delicate particles are thrown up by the movement of walking, and settle gently upon one's sweating body. The only sounds are the crunching of gravel, and the thin cries of birds.

Yet eventually the welcome sound of running water and the smell of moisture greet the hot and dusty traveler who makes the long trek. On the right a small canyon is revealed. Its walls are steep and winding; piles of reddish rock slabs are piled up like a child's building blocks. Andreas Creek bubbles and gurgles as it flows over the rocks that have fallen to the narrow canyon floor. The brush is thick and dense, a tangle of cottonwoods, palms and other vegetation. At the mouth there is a wide spot where the air is cool -- the perfect spot for a picnic, or for a home. It is also a good location from which to contemplate the early development of the Palm Valley ecoscape.

It was here, at the mouth of Andreas Canyon, that the *Paniktum* Cahuilla established the village Panyik. This community, later given the Spanish name Rincon, relied on the waters of Andreas Creek for its survival. In the 1880s and 1890s, white settler Burleigh B. Barney planned out a development just north of Andreas Canyon which he called the Garden of Eden, and he and his family too came to depend on these waters. The Barney ranch, as the Garden came to be known, was destined for an acrimonious existence. The struggles of Barney and the Cahuilla during a decade of drought came to no avail,

despite intervention by the federal Bureau of Indian Affairs (BIA). After the Garden of Eden was sold to the government in 1907, the BIA, working through the Indian Irrigation Service (IIS), sought to succeed where Barney had failed. An agricultural experiment station operating in Andreas Canyon in the 1910s-1930s under the aegis of the BIA and the Department of Agriculture's Bureau of Plant Industry (BPI) failed to live up to expectations, as did efforts to promote market agriculture among the local Cahuilla. Analysis of these frustrated attempts will illumine the evolution of the larger Palm Valley ecoscape from a local Cahuilla network prior to 1876 to a federally mediated intersection of white and Cahuilla networks in the 1880s-1920s to a more-or-less autonomous local network (1930s-present).

**Cultivating a New Ecoscape**

Prior to the imposition of the reservation system in 1876, the Cahuilla traveled freely in and around the Coachella Valley; seasonal cycles of fruition and decline intersected with the pull of employment and possibility of acquiring new skills to guide them on their yearly rounds. Complementing this apparently footloose nomadicism, the Cahuilla also established and maintained permanent villages in locations favorable to year-round occupation. Several such villages were clustered in the canyons of Mount San Jacinto, including what would become known as Andreas Canyon. One of these was a village the Cahuilla first called Panyik, then Rincon.

In the 1850s and 1860s Captain Andreas, after whom the canyon would be named, lived in a village south of Rincon with his relatives. The Captain, at this time still the political leader of the *Paniktum* lineage based there, had a small adobe house about which he planted figs, peaches, a garden, and grapes.[1] One observer opined in 1892 that

> The site on which he built his house is picturesque in the extreme. The wild vines make fantastic curtains of greenery, and so closely are their limbs matted together

that in summer there seems to be a broad, thick swaying wall of dense leafage encircling the many cup-like pools in the glistening white rocks.[2]

Rincon, a newer settlement, was governed in the 1880s by Captain Andreas' son, Juan Andreas, who lived in an adobe in Section 34. (In 1885, Rincon straddled the boundaries between Section 2, Township 5 South, Range 4 East, San Bernardino Meridian, and Sections 34 and 35, T4S, R4E, SBBM. Palm City, as Palm Springs was initially known, was located in Section 15, T4S, R4E, to the north.) Both northern and southern groups drew upon the waters of Andreas Creek for irrigation as well as domestic uses; the imported crops that they cultivated supplemented the indigenous *maul* (fan palm) that grew in Andreas Canyon and other native trees such as *tevat* (pinyon pine), *qwinyily*, *wi'asily*, *pawish*, *wi'at* (black, live, scrub, and canyon oak), *ily* (Western mesquite), *chakwal*, *atut*, and *chamish* (assorted stone fruits).[3]

The Cahuilla supplemented their agricultural harvest with wages earned working at white ranches and orchards in the mountain areas around Banning to the northwest and Warner's Ranch to the south. Although they thus benefited from the increased opportunities that accompanied influxes of white settlers into Southern California, they did not expect to find ripples from that flood lapping at their front doors. With the arrival of the railroad in the 1870s, Cahuilla access to the outside world improved, but it also improved white settlers' access to Palm Valley.

In this way Burleigh B. Barney came to Palm Valley with his wife Elizabeth W. Barney in 1887. A former forty-niner, Barney was used to chasing golden futures, and this time he hoped to construct a Garden of Eden in the desert.[4] Between July 7th and September 22nd, 1887, he purchased the greater part of the land that would provide the foundation for his dreams.

In the heat of summer, water in Palm Valley is immediately perceived as precious, so it is not surprising that the various transactions Barney completed to piece his Garden together carefully specified the accompanying water rights. On July 7th, Barney paid

speculators Mathew Byrne, William E. Van Slyke and John E. Jackson $1 for their interest in the "East one half and the East one half of the West one half of Section Thirty five Township Four," assuming responsibility for paying out their contract with the Southern Pacific Railroad at $2 per acre at 7% interest. Almost two months later, on August 30th, he added the "South West quarter (S.W. $^{1}/_{4}$) of the South West one quarter (S.W. $^{1}/_{4}$) of Section Thirty five (35)" to his holdings; this was purchased from neighboring settlers Maria and Samuel F. Chapin for $800, with Barney again taking over their unfulfilled contract with the Southern Pacific. The next day the "west half of the north west quarter of section thirty-five" was purchased from former Indian Agent John Guthrie McCallum for $2400 under a similar arrangement. By the fall of 1887 Barney had purchased most of the land needed for his Garden of Eden.[5]

Each of these transactions was accompanied by a transferral of water rights and related improvements. Barney received a three-quarter interest in the waters of "Andrace [sic], Middle, and Palm canons and all flumes and ditches" from Byrne, Van Slyke and Johnson, one-eighth interest from McCallum, and an unspecified interest and irrigation improvements from the Chapins.[6] What Barney did not know was that the original water rights claimed by Byrne and Van Slyke (and from whom McCallum and the Chapins had received their water rights) had been obtained under questionable circumstances.

Van Slyke claimed to have obtained these water rights by promising the *Panikium* Cahuilla that he would build a flume to improve the flow of water brought to their crops and by paying Captain Andreas $150. Reassured by the assurances of John Guthrie McCallum, then Indian Agent (1883-1885), the Cahuilla consented. This arrangement, if it was genuine and not coerced as later observers claimed, did not in any case last long. Barely after the ink had dried on the first of Barney's deeds, the Cahuilla lodged a complaint in July of 1887 with former Indian Agent S. S. Lawson (1878-1881) that their crops were dying from lack of water due to interference by whites. Although Indian Agent John S. Ward

(1885-1887) dismissed their protest, passed on by Lawson (Ward felt the Cahuilla were getting more than their share), his successor Joseph W. Preston (1887-1888) felt the matter was worth serious consideration. (If one feels some confusion at this plethora of Indian Agents, so too did their contemporaries; between 1878 and 1888, four Agents -- Lawson, McCallum, Ward and Preston -- quickly cycled through, none of them serving for more than three years.)[7]

Subsequent investigation by Preston confirmed the Cahuilla allegations of wrong-doing. Even as he berated the "two snakes" involved -- McCallum and Van Slyke -- Preston withheld condemnation from the "subsequent purchasers -- 'The Garden of Eden Company' -- whose rights stand upon a different footing, and, who are, I have no doubt, innocent purchasers of section 35."[8] Although the snakes had slithered on, something would have to be worked out with Barney if the Cahuilla situation was to be corrected.[9]

Operating under the assumption of Barney's innocence Preston devised an agreement with Barney for the management of the waters of Andreas Canyon. He justified his decision based on the following four points. First, Barney was a *bona fide* and innocent purchaser of Section 35 and the water rights in question; second, the lands on Section 35 and through which the flume ran were "of no value, and could never be used, and was never used, or cultivated, for want of water, -- when the water ran through, and along, the original channel";[10] third, the Cahuilla lacked the means and/or will to construct such a flume on their own; and fourth, by preventing the absorption of water into the sand at the canyon's mouth, the flume made sufficient amounts of water available that would have otherwise been lost, thereby making a sharing arrangement feasible.

By the terms of Preston's agreement Barney and his "company" (which, like the development itself, seems to have been primarily a paper one) were to receive at minimum one inch of water under a four inch pressure; were granted rights to the easement, the irrigation system, and "any water which they may develop in the said Andreas canon and

also what are known as the Palm and Middle canons on said reservation"; and were required to pay $75 to the federal government for right-of-way privileges (this fee being held for the benefit of the Cahuilla). The agreement further enjoined that they

> shall not appropriate any mineral, wood, ore, or other substance of said land except that which may be necessary to keep said flume in repair. Nor, shall they hinder, obstruct, or prevent in any manner, the said Indians from the full and free use, occupancy and enjoyment of their rights to their said reservation.[11]

Given the presence of Cahuilla dwellings in Section 35 in 1885, it is clear that it would likely prove difficult to keep to the terms of this agreement, even under the best of circumstances and with the best of intentions.

In any case, Barney soon settled in, building several buildings and planting a variety of fruit crops. A couple of pictures dated 1888, and reportedly of the Garden of Eden, show two small frame houses surrounded by a number of small fruit trees, with a garden out front. Three men, a woman, and a child are shown in one of the photographs.[12] A third photograph, also labeled as being of the Garden of Eden, shows several houses of similar construction. Southwestern writer George Wharton James' *Wonders of the Colorado Desert* (1906) includes a sketch by famed desert artist Carl Eytel, labeled "Garden of Eden," which shows two small frame houses, similar to those shown in the photographs, surrounded by a number of good-sized palms and deciduous trees.

Other than the construction of these buildings, the planting of the trees, and development of an irrigation system, it appears that Barney did little to develop the grandiose vision indicated by the Garden's plat map. Indeed, when Indian Agent Joseph W. Preston visited Barney's settlement in 1888, he was struck by the degree to which Barney's cartography of the Garden of Eden failed to align with the physical environment. Preston wrote,

> ...[T]he "Garden of Eden Company." (What a name!) It deserves a remark or two... This Garden is located in the Rincon (corner) of the Agua Caliente spring valley, in

> the cove of the mountains that come conically -- in a geographical sense -- together; it is located on that celebrated section 35, a garden with two snakes, -- gone -- McCallum and Van Slack [sic]. It is a grand circle, with streets radiating therefrom, northwest, north, and northeast. These streets bear the names of Bible characters, -- (not Eve), but Ruth, Naomi, Martha, on the one side of the grand approach, -- and, on the other, Abraham, (not Adam), Joshua, et al. A grand hotel is to be located in the center; and, a separate sanitarium. The streets are to be ornamented with palm trees, and other subtropical growth, and, the whole is intended for a winter resort, and for the healing of the natrous. The company [Barney] have the plan photographed. *It is beautiful on paper, and, is, as yet, only on paper, and in the imagination,* -- except, that section 35 is there, and, that flume is spouting into the little cabin, pure mountain water from the Andreas canon, through that flume.[13]

The Garden seems to have remained largely a paper development; Barney did little to effectively boost his property. Despite the claims of some scholars that Barney "started selling five to twenty acre tracts there in early 1888," the records in the San Diego and Riverside County Recorder's Offices show no evidence of this.[14]

**Dry Spell**

While Barney was settling into his new paradise, the Cahuilla were increasingly disturbed by the changes being made to their once familiar ecoscape. Adaptation to the reservation system and the influx of white settlers had proved difficult, but possible. In the 1890s stresses on the Cahuilla multiplied, and threatened to overwhelm them. In 1891, the Cahuilla were appalled by the recommendations released by the Mission Indian Commission (a.k.a. the Smiley Commission, after its chair, Albert K. Smiley), which reduced the lands granted in President Rutherford B. Hayes' Executive Order of 1877 to little more than the area around the Agua Caliente village adjacent to the white settlement of "Palm City," some sections in the surrounding desert, and Rincon, a reduction of 56,520 acres.[15]

The issue of allotment was raised for the first time when Indian Inspector Arthur M. Tinker came in July of 1892 to vet the idea before the Agua Caliente Cahuilla. Part of a larger national program intended to promote Indian assimilation, allotment -- put into policy with the Dawes Severalty Act of 1887 -- divided reservation and tribal lands among individual tribal members. Often this resulted not in assimilation as Indians learned to farm their individual allotments, but rather displacement as the new inexperienced owners fell prey to the deceptions of speculators. The Agua Caliente Cahuilla managed to forestall allotment at this time, but the fact that it was being considered both suggested the extent to which the familiar ecoscape had been disturbed and presaged further change.[16]

In the Coachella Valley more generally the Cahuilla were additionally disturbed by the rising of the Salton Sea and earthquakes. Not unsurprisingly, many Cahuilla felt beleaguered and besieged on several levels of their ecoscape. Some viewed these events as foreshadowing an apocalypse. These changes in the ecosystem and the ecoscape as a whole help explain why the Ghost Dance movement of the 1890s found a number of followers in the Coachella Valley.[17] Those Cahuilla who were unwilling to abandon familiar cartographies by clutching at more favorable new ones (as the Ghost Dancers were doing) struggled to find other ways to reverse or slow the pace of change. In 1892 the Cahuilla of Rincon presented a petition asserting their rights of sovereignty in the area, suggesting that they felt such was under threat at this time. In this petition, published in the *San Francisco Chronicle* by sympathetic journalist John Hamilton Gilmour, Juan Andreas and four other Cahuilla promised punishment or removal of interlopers who visited the canyons without leave, set fire to the palm groves or other timber, or who brought liquor to the village; they also referred to their long residency in the area and asserted their rights to collect palms, berries, and other plants in the region, and to graze their stock unhindered.[18]

Meanwhile Barney had his own worries. The Andreas flume built in 1887 had fallen into disrepair by 1892. In 1891 Barney had built a millhouse for water diversion and added a pipeline to the flume system, but his access to the water was threatened in December of that same year by proposals submitted by the Palm Valley Water Company of Palm Springs and the Bear Valley Irrigation Company of Banning. Both companies proposed to the Bureau of Indian Affairs an exchange in which access to the waters of Andreas Canyon would be traded for permission for the Cahuilla to use their irrigation system.[19] Although the proposals were withdrawn a year later when the Bureau of Indian Affairs failed to respond, all these factors prompted Barney to approach the government with a proposal of his own in 1893.

Barney had been out of state when the water companies' proposals were presented to the Mission Indian Commission (who were in the area to investigate the condition of the Mission Indians) due to his wife's "dangerous" and "severe" illness; when he returned he was anxious that his side be heard. Perhaps cognizant of the protest made by the Cahuilla in the *Chronicle* the year before, and certainly aware that his use of Andreas Canyon water depended on the good will of the Bureau of Indian Affairs, Barney referred to the needs of the Cahuilla as well as his own. The flume, he explained, in a series of increasingly anxious letters addressed to the Commissioner of Indian Affairs, was in a state of "absolute rottenness."[20]

> "...I am in constant danger of loosing [sic] the flume & destruction of my plants & also the Indians.... I have owned & kept up the flume & supplied the two families of Indians there water for 7 years past.... It will ruin me & destroy the Indians' crops unless prompt action can be had."[21]

As the flume crossed reservation land on its way to the Garden of Eden, Barney needed a right of way in order to repair it without trespassing. In exchange for this right of way, he offered to supply water to the Cahuilla on the same terms offered by the Bear Valley Irrigation Company in 1891.[22]

Frank D. Lewis, Special Assistant U. S. Attorney for the Mission Indians, looked over Barney's proposal and found it acceptable. By the end of the summer of 1893, the Acting Secretary of the Interior gave the Commissioner of Indian Affairs Daniel M. Browning permission to grant Barney the right of way, and the contract was drawn up on October 27, 1893. According to its terms, Barney was to deliver to the Cahuilla on Sections 2 (T5S, R4E) and 34 (T4S, R4E) enough water from Andreas Creek to irrigate 100 acres (or as much land under that amount as the Cahuilla actually had under cultivation) on the basis of one inch of water per six acres under a four inch pressure. In the event that the flow in the creek fell below 33 $^{1}/_{3}$ inches, it was to be divided in half between Barney and the Cahuilla. In exchange Barney received a 20-foot right of way through Section 2 for a water delivery system, whether it was a pipe, flume or canal. The terms of the contract were to hold until such time as when either property was abandoned by the Cahuilla, Barney, or his heirs and assigns. This last clause would prove prophetic in a way that was not anticipated.[23]

When Indian Agent Francisco Estudillo (1893-1897) visited Andreas Canyon at the end of October, he found that the Cahuilla were deriving little benefit from their arrangement with Barney:

> at the point upon the Andreas Ditch...where the water was diverted by the Garden of Eden Co. that the Co. take all the water at this point out of the ditch by flume, returning a portion to the old creek bed below the Andreas ditch, where it is of little practical use to the Indians, and of no value whatsoever to the Co. That this Garden of Eden Co. have not farmed to exceed 5 acres of land at the Garden of Eden or elsewhere, though they are monopolising [sic] all of the water, to the great harm and damage of the Indians who during the spring and summer have not sufficient water to save their crops.[24]

It is not clear whether this "monopoly" was deliberate or whether the result of a poor understanding of where to direct the water so that it would not be wasted. As investigator Henry L. Ryan explained to Estudillo in January 1894,

> I find that the Indians are living on Section 3, *which is R. R. land*, and are using the water delivered to them almost entirely upon the said Sec. 3; also the point of delivery mentioned in the contract is not a favorable one to the Indians, being too far from the lands suitable for cultivation. The water as now delivered follows an old ditch constructed by the Indians on Sec. 3, and is turned towards the hills in a westerly direction directly away from the lands within the Reservation. As Mr. Barney's flume runs across Section 2, the most available land within the Reservation for the Indians to use the water upon, I respectfully recommend that the point of delivery be changed to a place near where Pedro Chino attempted to make some improvements on the said Section 2.[25]

Ryan's proposal to improve the water system at Andreas Canyon, which he estimated would cost $3600 to complete, was not acted upon. Without these improvements, necessary to reduce waste and direct the water to where it could be used by the Cahuilla, the distance between the amount of water specified by the contract and that which was actually put to use was dangerously wide. The eleven year drought that began the following year would increase the gap to an untenable degree.

William R. Henderson, a Presbyterian minister visiting the area with his ailing wife in 1894, reported that "Their water has been diverted, and unless the government promptly interposes and does justice to these Indians, they will be ultimately forced to abandon their present settlement, for the residuum of water allowed will be of no benefit to them." Barney, in his own defense, referred to the contract he had made with the government as the rationale for his actions.[26]

When drought came to the region in 1894, Barney's grand dreams became even further removed from the capacities of the local ecoscape to sustain them. Data is sparse on the Garden of Eden and Rincon after 1894. It is known that the Cahuilla of Rincon, unable to keep their crops alive, were "'dried out' and compelled to move elsewhere," leaving behind a pitiful collection of abandoned *ollas*, mortars, tools, and dwellings.[27] Explained Special Inspector Levi Chubbuck of the Indian Irrigation Service (IIS) in 1906, "The amount of water -- one inch to each six acres -- under the conditions of climate and soil made it of

little or no value, and as a result the Indians soon vacated the land, and left Barney in full possession of all the water."[28] This probably occurred sometime in 1900, as on December 11, 1900, at 6:25 am, Barney (in the presence of two witnesses Jay J. and W. F. Johnson) posted a notice in Andreas Canyon. In it he laid claim to "all the water here flowing in said canyon and not already owned, used, claimed or appropriated by the undersigned," and stated that he intended to divert it to his land in Section 35 for "domestic and irrigation purposes and power." Unless he was breaking the 1893 contract, this would indicate that the Cahuilla had nullified it by abandoning their land; the last clause in that contract stated that "Said water delivery to continue so long as the Indians reside on the reservation, or land is allotted to or held in trust for the Indians, unless flume or canal is abandoned first by Barney, heirs, assigns."[29]

Full possession did not amount to much. Given the findings of a recent archaeological survey in the Andreas Canyon area, it seems likely that Barney was faring almost as poorly as the Rincon Cahuilla. This survey uncovered the remains of a trash dump in the general vicinity of the Garden of Eden, and dated it to the period between 1895 and 1905:

> Lack of beverage bottles suggest the specialized dump is not the product of a hotel, store, or restaurant. Also missing are animals bones and fruit pits from fresh food consumption. Paper and wood finds indicate that this is not the result of poor preservation. Two explanations are possible. The first is that bones and organics were recycled as fertilizer or animal feed. The second is that fresh meat, vegetables, and fruit were unavailable. Clearly canned meat or fish was consumed in large quantities. In this regard, the dump resembles those found at isolated mining camps where local environmental and economic conditions preclude domestic food production.... In this period [of drought], the local population would be dependent on outside food and transportation sources just like miners or lumbermen in other parts of the American West.[30]

These findings suggest that when *Sunset Magazine* wrote breathlessly in 1900 that Barney was growing "oranges and lemons and apricots and figs and grapes [of] gigantic

proportions" the author was either greatly exaggerating or basing his account on an earlier visit to the region. As with other descriptions of Barney's Garden of Eden, words and pictures leaped far beyond the physical reality of the place. This "Garden" was revealed for what it was during the drought: a dream tenuously erected in a desert ecoscape into which imported, water-thirsty species such as dates and grapefruit fit poorly, if at all.[31]

**Rethinking Eden**

When the drought came to an end in 1906, interest in the area revived from its period of dormancy like desert flowers blooming after a late winter's rain. Barney had been filing on the waters of Andreas Canyon, as we have seen, but had grown lax in maintaining his water right as the drought persisted. In February, IIS Special Inspector Chubbuck discovered that Barney's latest filing "had run the limit of 60 days with no development work, as required by law" and promptly erected his own notice on behalf of the Cahuilla, claiming "500 inches of water for use on Indian land." He also put the Cahuilla to work on the Andreas Canyon irrigation ditch, thus bolstering their claim to the water.[32]

These actions caught Barney unawares, and the Bureau of Indian Affairs was thus able to work out a new irrigation agreement with Barney that its agents hoped would be of greater benefit to the Cahuilla than the ill-fated one of 1893. The new agreement reaffirmed Barney's right of way through Section 2, but the terms of water use were significantly modified. Instead of being apportioned on the inadequate one inch per acre basis of the previous contract, this time the waters of Andreas Creek were divided exactly in half, based on duration rather than amount of flow:

> [T]he said B. B. Barney shall have the right to the full flow of said cañon for one-half the time of and during each calendar month, and ...the Indians of said village or band shall have the right to the use of the flow of said cañon for the other one-half of each calendar month, it being understood and agreed that at all times there shall be allowed to flow through said pipe line to and upon the lands of the said B. B. Barney sufficient water for domestic and household uses upon his tract of land,

> and in like manner there shall be at all times be allowed to flow through said pipe line sufficient water for domestic purposes for Indians residing on Indian lands and within reach of said pipe line.[33]

Recalling also that the inflexibility of the previous agreement had contributed to the demise of Rincon's crops and subsequent departure of the Andreas Canyon Cahuilla, the 1906 contract included a provision for altering the distribution schedule. Each party could choose one representative, and the representatives then would meet and work out the details; if they failed to agree, a neutral third party would be chosen to break the tie. The altered schedule would last for three months, at which time the schedule would lapse back to that specified in the contract unless other arrangements were worked out anew.[34]

In exchange for the right of way and recognition of his lapsed water right, Barney accepted responsibility for the upkeep of the pipe line; the government meanwhile agreed to construct a turn-out and shut-off and appliances at points of diversion for the Cahuilla (retaining the passage of flow to Barney), and to keep these in repair. The government also retained the option to divert the water above or below the intake of Barney's flume.[35]

The changes made in the contract reflect the changes that had been occurring in the cartographies of the Cahuilla, of Barney, and of the government during the past few years. Earlier assumptions about the amount of water needed to irrigate crops grown in sandy desert soil had withered during the dry drought years. The Cahuilla had learned that their traditional claims on the water, once taken for granted, had to be bolstered by contracts and registered within the white legal system. These were important lessons to learn.

In a sense these lessons were learned too late to be of much benefit to either Barney or the Rincon Cahuilla. The latter had already left for more hospitable locales, and the drought had taken its toll on Barney as well as on his Garden. Yet the value of these lessons was not entirely lost, for the water contract of 1906 did more than confirm the water

rights of the Cahuilla and of Barney. It also signaled the beginning of increasing government involvement in the development of the Andreas Canyon water system.

Government observers had noted the region's potential before this, but had been in a poor position to do much beyond musing about possible projects. The 1888 and 1893 contracts with Barney had been a tacit recognition of the fact that Barney could provide virtually free of cost to the Cahuilla and the government the use of an irrigation system that would have otherwise been expensive to construct. In 1894 investigator Henry L. Ryan had recommended adding a reservoir, pipeline and 4,000 feet of rock-lined ditch to improve delivery, but the estimated cost of construction -- $3,600 -- proved too rich for government blood at that time. Eleven years later, in 1905, Physiologist Walter T. Swingle of the USDA's Bureau of Plant Industry (BPI) proposed creating a "desert garden" but nothing immediately came of this.[36] When Barney's inattention allowed Chubbuck to stake a claim on the waters of Andreas Canyon a year later, ostensibly for the Cahuilla, it suddenly seemed possible to turn government dreams into reality.

Visiting Palm Valley in 1906, Special Inspector Levi Chubbuck expressed considerable interest in the water resources and agricultural potential of the area. The water from the canyons, properly directed to the thirsty but fertile desert soil, could be the means for creating a sturdy, independent colony of Cahuilla. When he learned that Burleigh B. Barney was considering selling his Garden, Chubbuck's optimism rose. For the asking price of $10,000 (or "possibly less"), Barney's pipe system, and his lands in Andreas Canyon ("a beautiful spot and favorably located for a home") and in Section 35 could be secured for the Cahuilla. The presence of "a group of frame cottages" only increased the Garden's potential value; these "could be utilized as Indian homes" and "with another home reestablished in the canyon and others in the southeast corner of section 34 would permit the restoration of a former Indian community under quite favorable conditions."[37]

Chubbuck's report succeeded in stimulating government interest in purchasing the Garden of Eden. Chubbuck's superiors deliberated whether the benefits to the Cahuilla would justify the expense, and Barney was approached to find out if he was still willing to sell, and for how much. Their meetings and correspondence with Barney on the matter demonstrate again the tensions within Barney's local cartography. Part of it focused on the Garden of Eden as Barney wished it would be:

> a health resort of international fame as a place for curable consumptives. His ideas contemplated fire pressure, lawn sprinkling, domestic supply fountains, etc.[38]

This section of Barney's cartography was more of a map of the intangible terrain of the ecoscape than of the tangible. As IIS Chief Engineer William H. Code explained,

> Mr. Barney has held on to this property some twenty or more years hoping to ultimately interest some man of great wealth in his project. He has spent a small fortune on it in trying to carry out his plans, and *in his eyes* his so-called "Garden of Eden" tract has great possibilities and large value.[39]

Yet over the years, this cartography of dreams had been overlaid by one compiled through daily experience with a desert ecosystem experiencing drought, in which Barney acknowledged that his Garden was actually little more than an irrigation system and "improvements on Sec. 35, consisting of four small frame cottages and one barn, some little fencing, outhouses, etc., the total value of which would not exceed $1000.00"; and "several hundred feet of service pipe, with six hydrants for supplying cottages and garden with water."[40] The "$15,000.00 and $30,000.00 and a quarter of a million" Barney initially presented as possible asking prices and the "strictly confidential price of $7,000.00" he later offered suggest the vast difference between Barney's imagined Garden of Eden and the Barney ranch as perceived by others.[41] This dissonance is not only visible to us, but was apparent to Barney's contemporaries; Code considered Barney's ideas "Utopian" and Barney himself "erratic in many ways, and likely to change his mind at any time."[42]

Although government agents lacked the daily experience with the Palm Valley ecoscape shared by Barney and the Cahuilla, they were still able to construct an understanding of the region that enabled them to navigate with fair success through the ecoscape. Informed by a systematic approach to gaining local knowledge, their understanding of the physical terrain was more accurate than Barney's. Looking at his Garden, they did not see a health resort filled with jetting fountains. Instead they saw a system of leaky pipes that, when a full flow of water was turned through them, "resembled to a marked degree an elongated lawn sprinkler."[43] They carefully drew up maps that showed where "good land," "fair land" and "Broken and Barren Mountains" were located. They measured the flow of the waters at Andreas Canyon and elsewhere and calculated the costs of improving and expanding the irrigation system. Yet their cartographies were less effective when it came to mapping the intangible terrain that permeated the ecosystem.[44]

Although government agents showed fair to excellent knowledge of the intangible features introduced by the government itself – such as the grid system that organized spatial relationships, or the legal system that informed social relationships – they were less adept at perceiving the intangible terrain constructed through daily interaction with the local ecoscape and the people who lived within it. Instead they relied on cartographies constructed elsewhere; thus engineers, Indian Agents, government attorneys, and USDA scientists all believed that the Garden of Eden should be acquired in order to permit the Cahuilla to return to an agricultural way of life, in line with their ideas about "civilized" Indians. These government employees did not ask the Cahuilla if this was what they themselves desired. When Superintendent L. A. Wright of the Mission-Tule River Consolidated Indian Agency[45] (1897-1907) visited Barney in November, 1906, there were indications of discrepancies between the ecoscape and the government's comprehension of it. Barney, according to Wright,

seemed to be in rather a fault finding mood and wanted to insist that there had been some vandalism in connection with the pipe, especially the joint that had been riddled with holes. He could not get over the fact that someone had put cactus in his bed and stolen his blankets and he wanted to ascribe all of these matters to the Indians. He stated that *the Indians took that way of protesting against our getting the water from him and delivering it to the land, as we propose doing*, and lots of other things which are unworthy of mention.[46]

As this passage suggests, Wright felt that Barney's complaints were somewhat specious, and he dismissed Barney's claim about Cahuilla motives. While we should take Barney's assertions with a grain of salt, his allegations -- and the lack of interest in them expressed by Wright or any of his superiors -- suggest that the government's cartography of the intangible terrain of the ecoscape had flaws of its own. The agents' reading of Cahuilla needs and desires were colored by their own expectations of what indigenous peoples needed and wanted.

Believing itself capable of addressing what its cartography defined as the most pressing problem -- the aging and leaking irrigation system -- and unaware or dismissive of others, the government moved ahead with its plans. The Garden of Eden was purchased from Barney and his second wife Caroline M. Barney on March 22, 1907.[47] For the sum of $6,000, the Bureau of Indian Affairs found itself the proud owner of:

First: A half interest in the waters of Andreas Canyon; second: One pipe line eight inches in diameter made of steel, approximately 6500 feet in length No. 14 Birmingham Gauge; Third: S. E. $^{1}/_{4}$ of section 3, township 5 S. Range 4 east, S. B. Meridian [presumably where Barney tapped the waters of Andreas Canyon]; Fourth: Section 35, township 4 south, range 4 east, 640 acres of land S. B. Meridian; Fifth: Improvements on section 35, consisting of 4 small cottages (frame) and one barn, some little fencing, outhouses, etc.; Sixth: Several hundred feet of service pipe with 6 hydrants for supplying cottages and garden with water.[48]

Barney's Garden was at an end, and it was time to see if the federal government would have a better time harvesting the fruits of its own expectations.

**Experimenting with Agriculture**

Despite the lack of Cahuilla enthusiasm, the federal government busied itself with improvement projects and established an experimental agricultural station on tracts in the abandoned sections. Physiologist in Charge Walter T. Swingle of the Plant Life History Investigations division of the Bureau of Plant Industry (BPI) of the USDA had expressed interest in the area around Palm Springs -- a "desert garden" -- as early as January 1905, when he had visited that settlement. His eagerness to experiment in that garden was shared by Commissioner of Indian Affairs Francis Ellington Leupp, a plant cultivation enthusiast. Was it possible, they wondered, for the Bureau of Indian Affairs and the Department of Agriculture to collaborate on an agricultural project on the Agua Caliente Reservation? An experimental station, it was hoped, would provide both employment for the Cahuilla and new knowledge about dates and other desert crops.[49]

Professor S. C. Mason of the Department of Agriculture had visited the area in the spring of 1907, and according to Special Inspector Levi Chubbuck, Mason came away "much impressed with the unique and favorable climatic conditions of Palm Springs, and also of Chino Canyon," and believing "that a propagating garden at one or both places would result in much good to science and to the Indians."[50]

The California Date Growers' Association, a local consortium of date farmers in the Coachella Valley, was already working with the U.S. Experimental Station in Indio and likewise looked with favor upon the enterprise.[51] Heartened by these expressions of support Swingle met with Chief Engineer William M. Code of the IIS in April to assess the potential of the newly acquired Barney holdings, and began requesting funding for this project by August 12, 1907, less than five months after the government had gained title to Barney's lands.[52]

Although the general tenor of government correspondence about possible plans for the Garden of Eden was positive, there were growing intimations that these plans could

prove as ill-fated as Barney's efforts. In December of 1907, IIS Superintendent of Irrigation Charles R. Olberg reported with disappointment that

> the Indians are not making the least use of the water; the small buildings acquired with the land are unoccupied, and the ranch presents an appearance that, to say the least, is discouraging. Apparently no one exercises any supervision over these Indian lands.[53]

Other voices chimed in, adding notes of caution to the enthusiastic paean. Special Agent R. S. Connell of the Indian Service reminded Commissioner Leupp that "The drought years have broken every American that ever tried to make a living out of the soil at Palm Springs. The Indians cannot succeed where whites fail." However, he added, Palm Valley was "a fine locality owing to the heat, for an agricultural experiment station for hot country desert plants," and suggested that responsibility for such a project be turned over to the USDA, as it had greater funding than the Bureau of Indian Affairs.[54] Supervisor Charles L. Davis similarly observed that

> A glance at the map... shows abandoned vineyards, abandoned fields, abandoned townsites; while a visit shows dead orchards, old fields grown up, abandoned ditches, and failures and abandoned hopes on all sides. These come from enterpirses [sic] of whites much more than Indians. On the grounds awhile this is easily understood, but the reader asks why? The answer is, water -- plentiful at planting time, but before the harvest all is gone, or the Indian right covers what little there is, hence what was planted in great hopes dies of thirst.[55]
>
> ...This ranch [the Garden of Eden] is one of the abandoned enterpirses [sic], doubtless by reason of the lack of market and the difficulty of a white man attempting to live there during the summer heat. The land is of little moment, as it is too sandy to make use of if better lands can be had -- it requires too much water. It is now being arranged to restore the water system, diverting it northwest along near the mountain, where firmer soil now belonging to the Indians is to be had. This will merely increase the water supply for the Indians, and thus increase the lands available to them. The water is not now in use, and it can not now be determined just what attitude the Indians will manifest toward going on these lands. It is probable

> some of them will take it for alloment, but whether they will actual [sic] reside there is yet doubtful.[56]

Despite these warnings, the Bureau of Indian Affairs, Department of Agriculture, and the Indian Irrigation Service proceeded with their plans. Their cartographies encouraged them to believe that water was the only problem standing in their way; when solved, their plans would literally come to fruition. Yet more than water was involved in these white failures; their hopes for and perceptions of the region's potential played a crucial role. (After all, whether a given amount of water is "sufficient" for one's plans depends on what those plans are.)

**Making the Desert Bloom**

The Indian Irrigation Service went to work repairing leaky pipes, digging and lining ditches, and U.S. Indian Service Farmer Adrian I. Maxwell was hired to increase cultivation on reservation lands. The BIA's justification for this, as for the purchase of Barney's holdings, was that their efforts would encourage the Cahuilla to return to a life on the land (instead of engaging in wage labor), and thus "render this little band of Indians independent of further aid from the Government."[57] At the same time, the U.S. Department of Agriculture began its experimental work, hoping to improve its knowledge of hot climate crops such as dates and cacti.

Maintaining and improving the Andreas Canyon irrigation system proved to be a full-time job. The leaky main pipe was riddled with holes from exposure to the weather and vandals, and it did not reach the lands the government was eying for its agricultural project. So, in 1909, crews from the Indian Irrigation Service set about repairing and improving the system. They measured the flow of Andreas Creek in several places to calculate how much water was being lost. They installed a concrete diversion dam and a new cement pipe. More cement pipe was laid in 1913, enabling the Cahuilla "to irrigate all of the irrigable land on Section 26." The existing metal pipe was repaired and extended,

with a lateral built to "an Indian farm."[58] When it finally became irreparable, due to age and wear, a new pipe was installed. By 1915, most of the needed improvements had been made.[59]

Yet the Indian Irrigation Service was not allowed to rest on its laurels. In January of 1916 winter floods damaged the system, breaking pipes, eroding the dam, and clogging the intake, necessitating repairs. In November, earthquakes shattered some of the carefully repaired pipes, requiring further reconstruction. The summer of 1917 saw further flood damage from a "cloud burst in the San Jacinto Mountains"; again repairs were made.[60] In 1918, another such flood -- one in which writer James Smeaton Chase, camping overnight in Andreas Canyon, almost drowned -- washed out the dam at the head of the canyon.[61] The area in 1918 and 1919 was again shaken by a series of strong earthquakes, making it necessary to make repairs to the line carrying water to the Experimental Station in Section 35.[62]

This Station, installed in Andreas Canyon, was part of a larger project undertaken by the U. S. Department of Agriculture throughout the United States. In the 1910s and 1920s, Bureau of Plant Industry field stations in Wisconsin, Florida, California, the Carolinas, and many other states explored the numerous variables involved in plant cultivation. Some explored the realms of plant pathology, investigating the causes and cures of pear blight, powdery mildew, black rot and tomato wilt, among others. Other stations experimented with new varieties of apple, pear, avocado, wheat, alfalfa, and other species; in California they tested citrus, grapes, dates, and cotton, and even considered the possibilities of cacti cultivation. Some analyzed soils and experimented with fertilizers; others catalogued insect pests and devised ways to combat and destroy them. The stations distributed seeds and information to local agriculturists, and collaborated with the State Experimental Stations. The stations at Palm Springs, Indio, and elsewhere in the Coachella and Imperial Valleys followed this pattern.[63]

The Palm Springs Station was located on three tracts in Sections 34 and 35. The Department of Agriculture and the Bureau of Indian Affairs had set aside those tracts for the station by late May of 1918; already part of the reservation, no special arrangements were necessary, unless Section 34 later became open to allotment.[64] Tract 1 was a 22-acre parcel, only 4.9 acres of which were deemed cultivable. Tract 2 was "a ten acre tract, level and sandy." Tract 3, "a five acre tract, level and sandy," had fan palms still growing on it.[65] (These may have been the "row of hard-bitten palms" described by writer James Smeaton Chase in his famous book on Palm Springs, *Our Araby* (1921).[66] )

James E. Jenkins, the Superintendent of Malki School, the local Indian school in Banning, called a meeting of the Cahuilla on June 3, 1918 to get their consent to use these lands for the Station. (In the 1910s, the Superintendent served as the local BIA supervisor for reservations in the Riverside area.) No one came, and of the seventeen tribal members he was able to track down subsequently, three claimed to have no say in the matter, nine refused to give their permission, and eight agreed. The reasons for their choices were not given. Jenkins claimed that the other members of the tribe were working elsewhere at ranches and orchards, but that he was sure a majority would consent.[67] Practically speaking, Cahuilla interest in the project was of little moment, despite earlier efforts to justify the Station by claiming that the work done there "would result in much good to science and to the Indians."[68] As was the case elsewhere in the United States, the BIA had already formed its own opinion about what its Indian wards needed, and generally ignored what the recipients of its largesse actually wanted. Thus the project went ahead as planned, despite its ambiguous reception by the Cahuilla. Will England, a representative of the USDA, had already hired some local Cahuilla to fix the irrigation system, and four acres on Tract 1 were improved and planted with 54 date off-shoots at the time of Jenkins' report.[69] By July 1918, the Palm Springs Experiment Station was up and running, managed by Cahuilla Amado Miguel with a budget of $2000 per year.

In terms of actual benefit to the Cahuilla, the efforts of U.S. Indian Service Farmer Adrian I. Maxwell were probably of greater value than the Experimental Station. While the Indian Irrigation Service busied itself with the irrigation system, Maxwell began looking for ways to put the water to use. His motivation was monetary as well as altruistic; in 1912 the Bureau of Indian Affairs linked the promotion of its Farmers and Superintendents to the increase in agricultural activity within their jurisdictions. The more acres farmed, the more livestock raised, and the greater the value of the crops harvested, the more likely it was that the supervising Farmer would be promoted. This system, of course, failed to take into account the limits of the particular ecosystems to which these Farmers might be assigned.[70]

Under this pressure Maxwell lobbied for an extension of the irrigation system to Section 26 in 1912. Cahuilla Amado Miguel and Marcus Belardo and a third unnamed Cahuilla were farming there, but both they and Maxwell were reluctant to make further improvements unless they were assured that sufficient water would be available. Pipe for this purpose was laid by 1913. In 1914, 705 grapefruit trees and some apricots were planted by the Cahuilla, under a program in which they could purchase the trees from the Superintendent and make payment at cost, without interest, in one to five years. Maxwell optimistically observed that "The trees they have are a very fine lot of trees and I hope they will have good luck with them."[71] The less than 30 acres originally cultivated at Palm Springs had been increased to 88. By the summer of 1914, 600 of the grapefruits were still alive, along with about 200 apricots, "some olives" and 11 acres of alfalfa, and plans were made to add another 100 grapefruits, 200 apricots and 1080 grapevines. By 1915 "nearly 2,000 fruit trees" were under irrigation from Andreas Creek. In 1917 Supervising Engineer Charles R. Olberg reported that IIS work on the Andreas Canyon and Tahquitz ditch irrigation systems had enabled the Cahuilla to plant a total of 3,206 fruit trees.[72]

Despite these successes, and the pressure on Maxwell to increase cultivation, both he and the Cahuilla were cautious in their expansion. Maxwell opined that "the red man is the easiest man to get discouraged in the world" and often noted Cahuilla discouragement whenever repairs were delayed or a new addition to the system was desired.[73] Maxwell and the Cahuilla worried continually about putting in additional trees and being unable to irrigate them effectively. Storm damage to the irrigation system in 1916 discouraged the Cahuilla from buying more trees. The leaky metal pipe threatened to "prove disastrous to the Indian orchardists who are department on this project" if it failed.[74] Cahuilla pessimism and caution can doubtless be attributed in part to their experience with farming prior to the improvements constructed by the Indian Irrigation Service. Awareness of the searing heat of the summers and memories of drought were still retained in the Cahuilla cartography, although it had since been modified so that the planting of vast numbers of non-indigenous plants could be contemplated. Further changes in the ecoscape overall would promote further modification in subsequent decades, spelling the eventual end of commercial agriculture in Palm Valley.[75]

"Dying from Overwatering and Under-Cultivation"

As early as 1907 there was some awareness that the Andreas Canyon Cahuilla supposedly "forced to seek a livelihood elsewhere" might actually have gone willingly in search of other opportunities.[76] (Although circumstances probably did initially leave the Cahuilla at Rincon with little alternative, the same cannot be said in later years, after the drought had ended and Barney had left.) Yet the government's investment in the idea of restoring a Cahuilla agricultural community discouraged extensive consideration of the possibility. Periodically an observer would note, as did Agency Superintendent Sullivan in 1910, that "it is going to be hard to get them to go to the Garden of Eden to farm although I think it would be the best place for them, but they like to live in town like the rest of us."[77] As this flew in the face of the logic that had driven the development of the Andreas

Canyon irrigation system -- that an abundance of water was all that was necessary to turn the Cahuilla (back) into farmers -- such observations had little impact on the Indian Irrigation Service's actions.

Yet these caveats could not be entirely dismissed. Nine years later IIS Supervising Engineer Herbert V. Clotts lamented that

> Most of the Indians live at Palm Springs and have been very reluctant to move to the Garden of Eden, although water in the latter line from Andreas Canyon is much more abundant than at Palm Springs.[78]

It was not until the 1920s that a number of factors finally combined to drive the lesson home. Declining Cahuilla interest in agriculture and increasing opportunities due to growth spurred by tourism forced the government to reassess its understanding of the region. The ecoscape had changed in ways that discouraged agriculture, and all participants -- Cahuilla, white settlers, the government -- had to alter their cartographies in order to move surely through this altered terrain.

As prices dropped and interest waned, agriculture on the Garden of Eden tracts declined. Farmer Maxwell had been transferred to Nevada in 1916, and there was little effort after he left to bolster flagging local interest in the project. Drought in 1925 dealt a blow to the crops planted there, and they never fully recovered. Between 1925 and 1931 only figs, alfalfa, and garden produce showed an increase in acreage; other crops either lost acreage or stayed at the same level. Looking at the market value of the crops harvested from the lands irrigated by Andreas Creek the decline becomes sharper still. All crops showed a steady decline in value, except for pasturage, which remained steady, and garden produce, which showed an increase due to the greater amount of acreage cultivated.[79] (See Tables 1 and 2.)

Table 1

Amount of Land Under Cultivation at the Garden of Eden in Acres[80]

| | Alfalfa | Citrus | Dates | Small Fruits | Apricots | Figs | Grape-fruit | Garden | Wheat | Pasture |
|---|---|---|---|---|---|---|---|---|---|---|
| 1925 | 38 | 11 | 3 | 9 | -- | -- | -- | -- | -- | -- |
| 1926 | 9 | -- | -- | -- | 3 | 1.5 | 3 | 0.5 | 4 | 8 |
| 1927 | 5 | -- | -- | -- | 3 | 1.5 | 3 | 0.5 | 4 | 8 |
| 1928 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1929 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1930 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1931 | 11 | -- | -- | -- | 3 | 7 | -- | 6.75 | -- | -- |

Table 2

Value of Crops Harvested at the Garden of Eden in Dollars[81]

| | Alfalfa | Citrus | Dates | Small Fruits | Apricots | Figs | Grape-fruit | Garden | Wheat | Pasture |
|---|---|---|---|---|---|---|---|---|---|---|
| 1925 | 2280 | dying | nb | nb | -- | -- | -- | -- | -- | -- |
| 1926 | 1125 | -- | -- | -- | 120 | 150 | 75 | 25 | 264 | 96 |
| 1927 | 550 | -- | -- | -- | 108 | 135 | 67.50 | 25 | 240 | 96 |
| 1928 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1929 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1930 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1931 | 486 | -- | -- | -- | 80 | 131 | -- | 337.50 | -- | |

nb = not bearing
-- = no data

In 1936, F. D. Richey, Acting Chief of the Bureau of Plant Industry, suggested relocating the research in dates and other fruit trees southward to the Torres-Martinez Experiment Station near Indio -- where the local ecoscape was believed to be more accommodating (the whites and Cahuilla there being supposedly less contentious than in Palm Valley) -- and placing emphasis upon cotton cultivation instead of dates and citrus. The following year a distinctive variety of date palm was still under cultivation at the Garden of Eden, but the date project in Andreas Canyon had been otherwise abandoned. By

ACC0003882

1938, the station itself had been discontinued, with remaining projects and stock relocated to the station at Martinez.[82]

The factors pulling the Cahuilla away from Andreas Canyon and agricultural work grew more powerful in the 1920s due to a fast-rising boom in tourism. As we will see in the chapter on Palm Canyon, the enormous crowds that descended upon Palm Springs every winter season invigorated the Palm Springs economy. Hungry for entertainment, they demanded Indian fiestas. Seeking to be awed, they sought out the palm canyons (including Andreas) to such an extent that a bill to turn the canyons into a National Monument was passed in 1922. They descended on the hot spring in Section 14, flocked to local hotels if they could afford them, and stayed in cheap camps on the reservation if they could not. Opportunities for the Cahuilla to earn a non-agricultural livelihood multiplied. The Cahuilla became toll collectors, fire guards, campground operators, store owners, hotel workers, policemen, and so forth. By 1924, IIS Supervising Engineer Clotts had to admit that

> It is becoming more and more apparent that these Indians will secure their livelihood through working for the White settlers rather than through their efforts at farming, so that anything the Government may do which will result in the settling up of this section will give the Indians a greater market for their labor.[83]

Underlying structural conditions and general changes in the Palm Valley ecoscape had slowly eroded the network that supported the Station. The existing ecosystem of Andreas Canyon was, like the rest of the region, vulnerable to the forces of flood, aridity, and seismic activity. Successful cultivation of the tracts in Sections 34 and 35 depended on a reliable system of irrigation and a steady flow of water through it. An intimation of future troubles had been given in 1916, when the aging system of pipes, dams and flumes was damaged first by flood, then by earthquake.[84]

The soil that the government's agents worked to hard to cultivate and irrigate proved less ideal than originally believed. While portions of the tracts near Andreas Canyon possessed fertile soil, the remainder was either too sandy, or too "rough" to encourage cultivation; the soil near the Andreas Canyon mouth was so deficient in humus that dates required heavy fertilization to prosper. By 1926, it had also become evident that even the "good" land was located over a layer of hardpan; trees planted in such soil failed to thrive, as they suffered from compacted roots and, ironically, from overwatering.[85]

The ecoscape of Palm Valley and of the Coachella Valley more broadly proved less than accommodating to the government's plans. The California Date Growers' Association began complaining in the 1920s about the inadequate dissemination of information by the station and alleged corruption and incompetence on the part of the station staff. Although a few individuals had assayed the cultivation of experimental dates and grapefruit the Cahuilla as a group had never been greatly enthusiastic about the project. In Palm Valley the ecoscape was in the process of shifting from an agricultural community to one based on tourism and wage labor. Under such conditions, the perceived social need for Indian agriculture which had informed the station project in the early years of its formation was no longer compelling. Wage labor was more reliable than farming, and allotment plans developed in the 1920s and 1930s held out the possibility that individual Cahuilla could profitably rent their lands in nearby Section 14, located just across the street from Palm Springs' prosperous Section 15.

While the government was pulling out, the *Paniktum* Cahuilla were beginning to return to the area. In 1927, *Paniktum* John Joseph Andreas and his son Anthony Joseph Andreas applied for enrollment at Agua Caliente Reservation, which they were granted in 1929. In 1931 the elder Andreas asked for and got permission to farm at Rincon; 40 acres were reserved for him in 1935, and he was promised Lot H59 in Section 14 per the as-yet-

unfulfilled allotment schedules of 1927. In 1937, John Joseph Andreas and his wife Margaret Augustine Andreas moved into the Experimental Station's buildings, where they lived with their son and his new bride Virginia De Soto Andreas until 1939. By February of 1938, the Station had officially closed, and Andreas Canyon was in the hands of the *Paniktum* once more.[86]

**Assessing the Harvest**

At Rincon, it is clear that prior to Barney's arrival the *Paniktum* had already begun the process of adapting foreign elements to the local ecoscape. They cautiously experimented with new crops -- apricots, grapes, peaches, figs -- and new technologies. Captain Andreas -- his very name an indicator of evolving Cahuilla cartographies -- made brandy and was familiar with the Christian holiday Christmas, while at the same time continuing to believe in the malicious *nukat* (spirit being) Tahquitz, who dwelt in the nearby mountains.[87] His son was given a Spanish name -- Juan -- and his grandson an Anglic "John." We can see similar integration in the use of the Cahuilla word *páksukat* (elk) to refer to the horse. Horses and cattle became important stock animals, first solely as food, following patterns shaped around game animals like *páksukat*, *pá'at* (mountain sheep) and *ténal* (antelope); later these new animals were used as transportation and marketable goods.[88] These adaptations suggest that, left to their own devices, the Cahuilla would have gradually and successfully integrated the new elements introduced by the Spanish, Mexicans, and Americans with traditional beliefs, practices, and ecosystems.

However, as we have seen, the Cahuilla were not given such leeway. At Rincon, the pressures of drought and competition were added to increasing demands for change. In the absence of the competition from Barney's Eden, it is not unlikely that the *Paniktum* could have endured the drought. In the absence of the drought, they probably could have negotiated a truce -- however uneasy -- with Barney and his family over the use of Andreas Creek, as they had done earlier with other tribes and as was done at Palm Springs proper.

Unfortunately, they were called to do both at once, and the picture was complicated by their and Barney's investment in non-indigenous crops.

There was not enough water, by 1900, for Barney, the Cahuilla, and their fruit trees. The Cahuilla cartography enabled the Cahuilla to perceive this and offered them alternatives to a dried-out future. Prior to the drought, the Cahuilla were not fully dependent on these crops. Noted journalist John Hamilton Gilmour in 1892,

> At present the Indians maintain themselves for the most part by working for white people, largely for those living in the village on Section 15, in the Banning orchards, and other nearby places. This means of support is supplemented by what little vegetables they can grow in the early season, their figs, and *some of their native subsistence gathered from the desert.* [89]

As Gilmour's account suggests, the Cahuilla were not wholly supported by agriculture per se. When conditions finally became too difficult in Andreas Canyon, the *Pankitum* were guided by the last applicable pattern in their cartography: they migrated, looking for places where water and work were more plentiful, much as earlier generations had established new camps in pursuit of game and in response to the seasonal appearance of fruits and plants. Also like those earlier generations, the *Paniktum* eventually returned to familiar territory after the time of hardship had passed.

We should not assume that their decision to leave was either easy or their preferred choice. At the time, it probably seemed the most feasible, if not the most desirable, and it was their knowledge of the local ecoscape that enabled them to make this assessment. This understanding, developed out of daily experience, offered them a set of options from which to choose; as circumstances worsened, the number of choices dwindled. Either the circumstances or the ecoscape itself would have to change before the *Paniktum* could return; as we have seen, both did.

Burleigh B. Barney's cartography, on the other hand, proved a less than ideal guide for navigating the difficulties involved in creating an Eden in the arid Colorado

Desert. We can see this in the map of Barney's Eden, a literal cartograph of the ecoscape he wished to create. This map describes a host of things that did not exist at the time it was drawn -- hotels, lawns, orchards and fountains -- and many never became more than fanciful chimeras. Such a map rests upon the twin assumptions that the ecoscape upon which its patterns will be imposed is completely malleable, and that human vision is superior to the whims of an exterior, subordinate "nature." An awareness of the limitations of the indigenous ecosystem -- or even a desire to become so aware -- are missing from this cartographic artifact.

Photographs of Barney's development, in sharp contrast to Carl Eytel's sketch and the map described earlier, reveal a typical desert basin sparsely covered with native vegetation; small, board-sided buildings rest lightly and impermanently upon its surface. Of the famed fruit trees, there is little to be seen, save some spindly infant trees held up by frames larger than themselves. A sparse garden, several tired-looking men, a woman and child, and a knobby-plow-horse round out the scene. If the map's glories were fattened by the cornucopia of a *Sunset Magazine* article, the uninspiring reality suggested by those photographs partook of the dismal diet of imported canned goods that the Garden's residents were actually consuming at the time that *Sunset's* glowing reports were published.

Rather than learning how to eat *menyakish* (mesquite beans) -- a valuable indigenous source of nutrients -- Barney remained focused on adapting the ecoscape to fit his exotic expectations. (A typical reaction of whites to familiar Cahuilla foods is embodied in the title photographer C. C. Pierce gave one of his photographs: "Mesquite Bean - Food for Indians and Cattle, Hogs, Horses, & Sheep."[90]) Barney did not interpret his difficulties during the drought years as the result of his unwillingness to adapt to the indigenous ecoscape; this would have required recognition of his being a part of its ecosystem. Instead, he saw his troubles as arising from competition with the *Paniktum* of Rincon over the waters of Andreas Creek, a leaky water system, and government delays.

His solutions to the slow decay of the Garden did not address the impracticality of trying to grow water-hungry imported crops in an arid desert valley; they focused on negotiating with the Cahuilla and the government and employing technology (in the form of flumes and pipes) to reduce the amount of "wasted" water. Barney eventually succeeded in both projects, but not in solving the underlying problem. The Garden of Eden had become impossible to sustain with his dwindling resources, and Barney moved back to Riverside, leaving behind the last remnants of the new ecoscape he had tried so hard to construct.

Like Barney, the government brought its cartography to Palm Valley and attempted to impose its expectations upon the ecoscape. The grid system that enabled Presidents Grant and Hayes to transform half of the former territory of the Cahuilla into the Agua Caliente Indian Reservation was perhaps the most profound imposition. Less coercive, perhaps, but more immediately relevant to the Andreas Canyon area, were the systems of scientific taxonomy that informed the projects undertaken at the Palm Springs Experimental Station. Like the Cahuilla, the local representatives of the Bureau of Plant Industry wanted to learn how best to fit exotic species into the indigenous ecosystem. However, like the settlers and the boosters, the agents of the government also wanted to fit exotic ecoscapes into existing understandings and transform them into something more familiar. They had greater resources at their disposal than individual settlers, and greater expertise, but the project was much the same.[91] And as for the settlers, federal agents' cartographies encouraged them to divide problems into "natural" and "cultural" ones, with correspondingly divided solutions. Thus the government drafted water rights agreements that assured both parties an equal quantity of the Andreas Creek waters -- but did not address the real effects of reduced flow or the uses to which this water was to be put.

When the government later stepped in to try its own hand at farming the soil at the mouth of Andreas Canyon, it fell into similar pitfalls. Belief in the human ability to

control and refine a recalcitrant "nature" made it possible to ignore or diminish the significance of earthquakes, floods, and the difficulties of adapting exotic species to the local ecosystem. Instead the experience of its agents suggested that technology could overcome the difficulties, rebuilding damaged irrigation systems, breeding plants, and researching techniques for the eradication or control of organisms that fed on preferred species. In short, the cartography of government agents advocated adapting the existing ecosystem to their goals, rather than themselves adopting a position of adaptation or accommodation. When the local ecosystem -- indeed, the whole ecoscape --proved less accommodating to the goals of the Bureau of Plant Industry and the Bureau of Indian Affairs than expected -- the local station was abandoned, and its projects transferred to more cooperative ecoscapes.

**Moving On**

Similar dramas played out on many stages within the evolving ecoscape. At Tahquitz Canyon, Palm Canyon and Agua Caliente, white settlers, Cahuilla and the federal government contributed to the changing shape of the Palm Valley ecoscape. The Cahuilla ecoscape of the mid-1800s gave way under the pressure of white settlement between 1876-1920s, being replaced by a mixed ecoscape comprising white and Cahuilla patterns mediated by the federal government. This composite ecoscape in turn was developed into a largely autonomous network by the end of the 1930s, spelling the end of extensive government involvement in the region. The evolution of this ecoscape occurred as a result of these groups' various attempts to meet their diverse needs and expectations. It was also fueled by their simultaneous efforts to alter their cartographies to reflect the changes in the ecoscape. In a highly dynamic and interactive process, these three groups assessed, adapted to, and altered their shared ecosystem, others' and their own cartographies, and the ecoscape as a whole.

## Notes

1 Captain Andreas' grape-growing, and related viticultural activities, have drawn the attention of many a non-Indian author; apparently the liquid fruit of the vine was responsible for Indian drunkenness on more than one occasion before Dr. Welwood Murray of neighboring Palm Springs halted production by either kindly dissuading the errant distiller or taking an axe to his still. (The details vary from story to story.) See, for example, John Hamilton Gilmour, "The Coahuilla Indians," San Francisco *Chronicle*, February 21, 1892, in *Some Last Century Accounts of the Indians of Southern California*, ed. Robert F. Heizer, (Ramona, Calif.: Ballena Press, 1976), pp. 2-3; George Wharton James, *The Wonders of the Colorado Desert*. 2 vols. (Little, Brown, and Co., 1907), pg. 295; J[ames] Smeaton Chase, *California Desert Trails*. (Boston: Houghton Mifflin Company, 1919), pp. 20-21.

2 Gilmour, "The Coahuilla Indians."

3 Bean and Saubel, *Temalpakh*, on the uses of tree species, pp. 145-49, 102-105, 121-31, 107-117, 119-121.

4 The "B. B. Barney" uniformly referred to in the extant literature on the Garden of Eden is not to be confused with Bruce B. Barney, of Chicago, Illinois, with whom Burleigh B. Barney entered into contracts regarding another piece of property in Riverside. Riverside County Deed Book 164, pp. 168-72, Deed Book 196, pp. 193-96. For a description of Barney nineteen years later, see W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. November 17, 1906.

5 San Diego County Deed Book pgs. 92, 99, 103, 158, 347-48, 358-59. There is, however, one $^1/_{16}$th of Section 35 for which I am unable to account.

6 San Diego County Deed Book pgs. 92, 99, 103, 158, 347-48, 358-59. Underlined in the original to indicate a misspelling.

7 S. S. Lawson, to Secretary of the Interior. July 18, 1887; John S. Ward, U. S. Indian Agent, to J[ohn] D[eWitt] C[linton] Atkins, Commissioner of Indian Affairs. September 2, 1887; Contract signed by Burleigh B. Barney, President of the Garden of Eden, and witnessed by Joseph W. Preston, U. S. Indian Agent for the Mission Indians, California. February 16, 1888; Right of way contract signed by Burleigh B. Barney, President, and W[illia]m Igleheart, Secretary, for the Garden of Eden Company, Burleigh B. Barney for himself, and Joseph W. Preston, U. S. Indian Agent, for the Mission Indians, California. February 16, 1888; Joseph W. Preston, U. S. Indian Agent, to J[ohn] D[eWitt] C[linton] Atkins, Commissioner of Indian Affairs. February 20, 1888. See *Pankitum Hemki*, pp. vi-45-vi-46

on the water deal and complaint to Lawson; pg. vi-49 on the date of acquisition and dubious circumstances that accompanied the sale.

8 Joseph W. Preston, U. S. Indian Agent, to John D[eWitt] C[linton] Atkins, Commissioner of Indian Affairs. February 20, 1888. See also Map of the Garden of Eden, Palm Springs Historical Society. A cropped copy of this map appears in Frank M. Bogert, *Palm Springs: First Hundred Years*, (Palm Springs, Calif.: Palm Springs Heritage Associates, 1987), pg. 68. Preston's statements to the contrary, the map itself indicates that streets named after Adam and Eve *were* planned.

9 *Paniktum Hemki*, pp. vi-53-vi-54. The rationale Preston offered was two-fold: first, Barney had purchased those water rights under the assumption that they were legitimate, and should not therefore be punished for the wrongdoings of the sellers, especially since his land would be worthless without those waters. Preston also claimed that the flume, by saving water that would have otherwise been wasted, made more than enough available to the Indians to make up the difference.

10 Preston, Report to the Commissioner of Indian Affairs, February 1888. Excerpted in *Paniktum Hemki*, pp. vi-54-vi-55.

11 Ibid.

12 Two of the men resemble each other (and therefore may be Burleigh and Bruce Barney). The third, a weathered bearded fellow, is shown holding a horse in harness. He may be the infamous Adam Weed about whom James Smeaton Chase wrote in his book boosting Palm Springs, *Our Araby*, or possibly one "Leah Murray." The woman, if the date is correct, could be either Leah Murray (the gender of the name is unclear) or Burleigh's wife Elizabeth W. Barney. The child is unidentified. The identity of the people remains, however, a matter of speculation, as does the date; the labels on the back of the photos at the Historical Society, including the one which claims that one of the individuals was named "Leah Murray," are not contemporary to the photos.

13 Joseph W. Preston, U. S. Indian Agent, to John D[eWitt] C[linton] Atkins, Commissioner of Indian Affairs. February 20, 1888; Map of the Garden of Eden, Palm Springs Historical Society. Italics mine.

14 Bean, Vane, Young, *Cahuilla Landscape*, pg. 50. See also*Paniktum Hemki*, pg. vi-69. In 1893 Barney also apparently added some land in Section 3, T 5 S, R 4 E, SBM to the Garden. I say apparently, for, while the author of *Paniktum Hemki* claims that he did so, there is no record of such a transaction on the books in either Riverside or San Diego county. Researchers should note that Palm Valley was originally under the jurisdiction of San

Diego County prior to the creation of Riverside County in 1893; some documents from the 1890s were still filed in San Diego.

15 *Paniktum Hemki*, pp. vi-58-vi-60. Luckily for the Cahuilla, these recommendations were never fully implemented.

16 *Paniktum Hemki*, pp. vi-61-vi-62.

17 *Pankitum Hemki*, pp. vi-67-vi-68; Tahquitz Report, pg. v-212.

18 Gilmour, "Indian Politicians," San Francisco *Chronicle*, May 15, 1892; pg. 10 in *Las Century Accounts*; also in *Paniktum Hemki*, pp. vi-63-vi-64.

19 *Paniktum Hemki*, pg. vi-69; Henry L. Williams, Vice-President, and Fred E. Hotchkiss, Secretary, for the Bear Valley Irrigation Company, to Albert K. Smiley, J[oseph] B. Moore, and C[harles] C. Painter. December 1, 1891; [Bear Valley Water Company] to [Office of Indian Affairs]. December 28, 1892; E[dward] L. Dorn to Commissioner of Indian Affairs. December 17, 1892; Frank D. Lewis, Special Assistant U. S. Attorney for Mission Indians, to Commissioner of Indian Affairs. January 13, 1893.

20 B[urleigh] B. Barney to Commissioner of Indian Affairs. March 18, 1893; Frank D. Lewis, Special Assistant United States Attorney for Mission Indians, to Commissioner of Indian Affairs. March 21, 1893; B[urleigh] B. Barney to Hoke Smith, Secretary of the Interior. August 21, 1893.

21 B[urleigh] B. Barney, to [W. W.] Bowers. August 24, 1893.

22 B[urleigh] B. Barney to Commissioner of Indian Affairs. March 18, 1893; Frank D. Lewis, Special Assistant United States Attorney for Mission Indians, to Commissioner of Indian Affairs. March 21, 1893; B[urleigh] B. Barney to Hoke Smith, Secretary of the Interior. August 21, 1893; B[urleigh] B. Barney, to [W. W.] Bowers. August 24, 1893.

23 Draft right of way contract, unsigned. 1893; "Plat Showing Line of Flume across Sec. 2, T 5 S, R4E, SBM, California"; Frank D. Lewis, Special Assistant United States Attorney for Mission Indians, to Commissioner of Indian Affairs. March 21, 1893; Acting Secretary, to Commissioner of Indian Affairs. September 21, 1893; agreement between B[urleigh] B. Barney and L. A. Wright, Superintendent and General Disbursing Agent of the Government, and village members Miguel Saturnino, Amado Miguel, Baristo Sal, Ramon Manuel, Albert S. Patencio, Simon Arenas, Marcus Belardo, Pedro Chino, and Alijo Patencio. February 19, 1906; Riverside County Deed Book 226, pg. 253.

24 Francisco Estudillo, U. S. Indian Agent, to Commissioner of Indian Affairs. October 31, 1893.

---

25 Henry L. Ryan, to Francisco Estudillo, U. S. Indian Agent. January 16, 1894. Italics mine.

26 William R. Henderson, to Cha[rle]s C. Painter, Secretary, Indian Rights Association. June 30, 1894.

27 James, pp. 292-93. An accompanying sketch by Carl Eytel shows a group of withered trees next to a dry ditch, where a shovel has been left as it stood. *Ollas* are fired pottery jugs made by the Cahuilla.

28 Levi Chubbuck, Special Inspector, to Secretary of the Interior. February 24, 1906.

29 Riverside County Water Claims Book. 1 pg. 335. Draft right of way contract, unsigned. (1893.) (Gunther claims that other claims were filed by Barney earlier; I have been unable to find the records of them, primarily because the index to the Water Claims Book is presently missing.)

30 *Phase II: Cultural Resource Study: Archaeology/Ethnography Canyon Development Project, Palm Springs, California, Central Riverside County, California, May 22, 1991.* (Menlo Park, Calif.: Cultural Systems Research, Inc., 1991) (hereafter the Canyon Development Project Study), pp. 21-22.

31 *Sunset Magazine,* August 1900, p. 171.

32 Levi Chubbuck, Special Inspector, to Secretary of the Interior. February 24, 1906.

33 Agreement between B[urleigh] B. Barney and L. A. Wright, Superintendent and General Disbursing Agent of the Government, and village members Miguel Saturnino, Amado Miguel, Baristo Sal, Ramon Manuel, Albert S. Patencio, Simon Arenas, Marcus Belardo, Pedro Chino, and Alijo Patencio. February 19, 1906. pp. 5-6. The contract specified that each group would have the water for half the month in succession, rather than on an alternating day-to-day basis, although that was also an option.

34 Agreement between B[urleigh] B. Barney and L. A. Wright, Superintendent and General Disbursing Agent of the Government, and village members Miguel Saturnino, Amado Miguel, Baristo Sal, Ramon Manuel, Albert S. Patencio, Simon Arenas, Marcus Belardo, Pedro Chino, and Alijo Patencio. February 19, 1906. p. 9.

35 Agreement between B[urleigh] B. Barney and L. A. Wright, Superintendent and General Disbursing Agent of the Government, and village members Miguel Saturnino, Amado Miguel, Baristo Sal, Ramon Manuel, Albert S. Patencio, Simon Arenas, Marcus Belardo, Pedro Chino, and Alijo Patencio. February 19, 1906. It should be noted that most of the Cahuilla signatories -- if not all -- were from the group associated with Agua Caliente in Section 14 of the reservation, and not with Rincon.

---

In March, a "supplemental stipulation" was added to this contract. The original wording implied that the government gave up all right to the waters of Andreas Creek in exchange for Barney's cooperation, when it in fact only ceded half of the water to Barney, retaining the right to the other half for the Cahuilla. This was clarified in the stipulation. Supplemental Stipulation.

36 Canyon Development Project Study, pp. 64-79.

37 Levi Chubbuck, Special Inspector, to Secretary of the Interior. May 18, 1906.

38 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. November 17, 1906.

39 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. November 17, 1906. Italics mine.

40 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. November 17, 1906.

41 L. A. Wright, Superintendent and Special Disbursing Agent, to W[illiam] H. Code, Chief Engineer. November 6, 1906.

42 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. November 17, 1906.

43 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. November 17, 1906.

44 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. November 17, 1906; "Map Showing Agua Caliente Reservations [sic] California. Also Properties of Palm Valley Water Co. and B. B. Barney"; W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. December 14, 1906.

45 This would become the Mission Indian Agency in later years.

46 L. A. Wright, Superintendent and Special Disbursing Agent, to W[illiam] H. Code, Chief Engineer. November 6, 1906. Italics mine. For information on the harassment of Barney, I am also indebted to Anthony Andreas, Jr.. Telephone interview, March 12, 1994. It is possible that the saboteur(s) might have been *Paniktum;* Anthony Andreas, Jr., cited in *Paniktum Hemki*, recalls that in the interim period his family visited the area frequently and never forgot that it had been theirs. See *Paniktum Hemki*, pg. vi-83, vi-95.

47 Riverside County Deed Book 276, pg. 96. C. E. Kelsey, Special Agent for the California Indians, to W[illiam] H. Code, Chief Engineer. January 11, 1907; Deed signed by Burleigh B. Barney and Caroline M. Barney. March 22, 1907; L. A. Wright, Superintendent and Special Disbursing Agent, to Commissioner of Indian Affairs. March 25, 1907;

---

B[urleigh] B. Barney to W[illiam] H. Code, Chief Engineer. June 14, 1907; W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. June 15, 1907; L. A. Wright, Superintendent and Special Disbursing Agent, to W[illiam] H. Code, Chief Engineer. January 2, 1907. Although the deed was signed on March 22, 1907, it was not completed until January the following year, due to the slowness of the government in transferring the monies to the appropriate fund for payment. This caused Barney no end of frustration, especially since he had taken out a thirty-day loan in order to complete payment on the $^1/_4$ section of Section 3 included in the transaction, and had anticipated receiving payment from the government in time to cover this loan.

48 Riverside County Deed Book 276, pg. 96.

49 Canyon Development Project Study, pp. 64-79.

50 Levi Chubbuck, Special Inspector, to W[illiam] H. Code, Indian Inspector. April 4, 1907.

51 Plant Life History Investigations, Arboriculturalist S. C. Mason, Report to Walter T. Swingle, 1908; W. E. Paul, Untitled Manuscript, 1914; Superintendent of Malki School C. T. Coggeshall, Letter to Commissioner of Indian Affairs, March 5, 1914; Superintendent of Malki School C. T. Coggeshall, Report to the Commissioner of Indian Affairs, April 28, 1914; Farmer Adriane Maxwell, to C[harles] R. Olberg, July 7, 1914; Farmer Adriane Maxwell, to C[harles] R. Olberg, August 7, 1914; Walter T. Swingle, to Charles L. Davis, February 4, 1914; Walter T. Swingle, to Cato Sells, Commissioner of Indian Affairs, March 2, 1914. See also Tahquitz Report, p. v-239, on fruit trees.

52 Walter T. Swingle, Physiologist in Charge, to W[illia]m M. Code, Chief Irrigation Engineer. April 18, 1907. See also overview in Canyon Development Project Study, pp. 64-79.

53 C[harles] R. Olberg, Superintendent of Irrigation, to W[illiam] H. Code, Chief Engineer. December 10, 1907.

54 R. S. Connell, Special Agent, to Commissioner of Indian Affairs. March 12, 1908. Connell's assessment of Cahuilla capacities is intriguing. Read one way -- Cahuilla agriculturalists were less competent than whites -- the statement is clearly fallacious. Read another -- the Cahuilla could not succeed when their white neighbors failed -- the statement becomes an acknowledgement that both Cahuilla and whites were bound up in a shared ecoscape, in some ways dependent on each other for their shared success.

55 Cha[rle]s L. Davis, Supervisor, to Office of the Chief Engineer. March 18, 1909.

56 Cha[rle]s L. Davis, Supervisor, to Office of the Chief Engineer. March 18, 1909.

---

57 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. December 14, 1906.

58 C[harles] R. Olberg, to W[illiam] H. Code, Chief Engineer. Annual Report, 1911. July 22, 1911; "Pipe Line Garden of Eden, Agua Caliente Indian Reservation, California"; "Plat of Palm Springs, California, Showing Location of Concrete Pipe Line and Stone Cement Ditch."

59 Cha[rle]s L. Davis, Supervisor, to Office of the Chief Engineer. March 18, 1909; C[lara D.] True to [William H.] Code. April 14, 1909; C[harles] R. Olberg, to W[illiam] H. Code, Chief Engineer. Annual Report, 1909. July 20, 1909; William T. Sullivan, Superintendent and S[pecial] D[isbursing] A[gent]. Request for Funds. August 11, 1910; W[illiam] H. Code, Chief Engineer, to C. R. Cawthon. September 14, 1910; C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer. December 17, 1910; C[harles] R. Olberg, to W[illiam] H. Code, Chief Engineer. Annual Report, 1911. July 22, 1911; "Pipe Line Garden of Eden, Agua Caliente Indian Reservation, California"; "Plat of Palm Springs, California, Showing Location of Concrete Pipe Line and Stone Cement Ditch"; C[harles] R. Olberg, Superintendent of Irrigation. Annual Report, Southern California Reservations, 1912; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. September 7, 1912; C[harles] R. Olberg, Superintendent of Irrigation. Annual Report, Southern California Reservations, 1913; C[harles] R. Olberg, Supervising Engineer. Annual Report. June 1914; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. April 3, 1914.; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1915; A[drian] I. Maxwell, Farmer, to Owen W. Bower [Bauer], Instrumentman. February 25, 1915.

60 Herbert V. Clotts, Superintendent of Irrigation, to W[illiam] M. Reed, Chief Engineer. October 15, 1918.

61 Chase, *California Desert Trails*, pp. 22-27.

62 *Seismicity of the United States*, pp. 76, 122-23; *Paniktum Hemki*, p. vi-88-89; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1916; A[drian] I. Maxwell, Farmer, to Owen W. Bauer, Instrumentman. January 22, 1916; A[drian] I. Maxwell, Farmer, to Superintendent of Irrigation. January 27, 1916; A[drian] I. Maxwell, Farmer, to [O. W.] Bauer. February 3, 1916; A[drian] I. Maxwell, Farmer, to Superintendent of Irrigation. February 4, 1916; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg. February 15, 1916; O[wen] W. B[auer], Instrumentman, to Chris Botticher, Foreman. February 26, 1916; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1916; O[wen] W. Bauer, Instrumentman, to Adrian I. Maxwell, Farmer. March 1, 1916; C[harles] R. Olberg,

---

Supervising Engineer. Annual Report. 1917; A[drian] I. Maxwell, Farmer, to Owen W. Bauer, Instrumentman. November 6, 1916; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1917; J[ames] E. Jenkins, Superintendent, to U. S. Indian Service. July 9, 1917; Herbert V. Clotts, Superintendent of Irrigation, to W[illiam] M. Reed, Chief Engineer. October 15, 1918; Herbert V. Clotts, Superintendent of Irrigation, to J[ames] E. Jenkins, Superintendent Malki Indian Agency. April 16, 1918; Superintendent of Malki School, J[ames] E. Jenkins, Notice to the Indian [sic] of Agua Caliente, May 27, 1918; Superintendent of Malki School, J[ames] E. Jenkins, to Commissioner of Indian Affairs, June 28, 1918; Assistant Commissioner of Indian Affairs, E. B. Meritt, Letter to C. T. Coggeshall, Superintendent of Malki School, February 14, 1914; Superintendent of Malki School, J[ames] E. Jenkins, Notice to the Indian [sic] of Agua Caliente, May 27, 1918; Superintendent of Malki School, J[ames] E. Jenkins, to Commissioner of Indian Affairs, June 28, 1918; Canyon Development Project Study, pp. 72-73; Herbert V. Clotts, Superintendent of Irrigation, to W[illiam] M. Reed, Chief Engineer. October 15, 1918; Herbert V. Clotts, Supervising Engineer, to W[illiam] M. Reed, Chief Engineer. December 9, 1918; Herbert V. Clotts, Supervising Engineer, to W[illiam] H. Reed, Chief Engineer. December 23, 1918; Herbert V. Clotts, Supervising Engineer, to J[ames] E. Jenkins, Superintendent. December 23, 1918; H. K. Palmer, Assistant Engineer, to Herbert V. Clotts, Supervising Engineer. November 25, 1919; Herbert V. Clotts, to W[illiam] M. Reed, Chief Engineer. November 3, 1919; H. K. Palmer, Assistant Engineer, to Herbert V. Clotts, Supervising Engineer. November 25, 1919.

63 Canyon Development Project Study, pg. 76, on proposal to experiment with edible cacti; Alfred Charles True, *A History of Agricultural Experimentation and Research in the United States 1607-1925, Including a History of the United States Department of Agriculture*. Misc. Publications No. 251, USDA. (Washington, D. C.: U. S. Government Printing Office, 1937).

64 Assistant Commissioner of Indian Affairs, E. B. Meritt, to C. T. Coggeshall, Superintendent of Malki School, February 14, 1914.

65 Tract 1 was the South 1/2 of the North 1/2 of the Southeast 1/4 of the Southeast 1/4 (S/2 of N/2 of SE/4 of SE/4), the N/2 of S/2 of SE/4 of SE/4 and the South 66 feet of N/2 of N/2 of SE/4 of SE/4 of Section 34; Tract 2 was the S/4 of SE/4 of SW/4 of Section 35; and Tract 3 was the S/2 of SW/4 of SE/4 of Section35.

66 Chase, *Our Araby*, pg. 40.

---

67 Superintendent of Malki School, J[ames] E. Jenkins, Notice to the Indian [sic] of Agua Caliente, May 27, 1918; Superintendent of Malki School, J[ames] E. Jenkins, to Commissioner of Indian Affairs, June 28, 1918.

68 Levi Chubbuck, Special Inspector, to W[illiam] H. Code, Indian Inspector. April 4, 1907.

69 Canyon Development Project Study, pp. 72-73.

70 Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. September 7, 1912.

71 Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. April 3, 1914. Folder 9068, Agua Caliente (Palm Springs), Box 867, Project Case Files, 1938-46, Mission Jurisdiction, Irrigation District #5, 6, and 7, San Francisco, California, Record Group 75, Portland Area Office of the Bureau of Indian Affairs, National Archives - Pacific Northwest Region, Seattle, Washington.

72 Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. September 7, 1912; Plant Life History Investigations, Arboriculturalist S. C. Mason, to Walter T. Swingle, 1908; W. E. Paul, Untitled Manuscript, 1914; Superintendent of Malki School C. T. Coggeshall, to Commissioner of Indian Affairs, March 5, 1914; Superintendent of Malki School C. T. Coggeshall, to Commissioner of Indian Affairs, April 28, 1914; U. S. Indian Service, Farmer Adriane Maxwell, to C[harles] R. Olberg, July 7, 1914; U. S. Indian Service, Farmer Adriane Maxwell, to C[harles] R. Olberg, August 7, 1914; Walter T. Swingle, to Charles L. Davis, February 4, 1914; Walter T. Swingle, to Cato Sells, Commissioner of Indian Affairs, March 2, 1914; See also Tahquitz Report, pg. v-239, on fruit trees; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. April 3, 1914; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. July 28, 1914; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Supervising Engineer. August 7, 1914; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1915; A[drian] I. Maxwell, Farmer, to Owen W. Bower [Bauer], Instrumentman. February 25, 1915; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1916; A[drian] I. Maxwell, Farmer, to [O. W.] Bauer. February 3, 1916; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg. February 15, 1916; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1917.

A[drian] I. Maxwell, Farmer, to [O. W.] Bauer. February 3, 1916. Folder 9068, Agua Caliente (Palm Springs), Box 867, Project Case Files, 1938-46, Mission Jurisdiction, Irrigation District #5, 6, and 7, San Francisco, California, Record Group 75, Portland Area

---

Office of the Bureau of Indian Affairs, National Archives - Pacific Northwest Region, Seattle, Washington.

74 C[harles] R. Olberg, Supervising Engineer. Annual Report. 1917. Box 33, District 4, Entry 655, Irrigation Division, Record Group 75, National Archives, Washington, D. C.

75 Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. September 7, 1912; U. S. Indian Service, Farmer Adriane Maxwell, to C[harles] R. Olberg, July 7, 1914; U. S. Indian Service, Farmer Adriane Maxwell, to C[harles] R. Olberg, August 7, 1914; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. April 3, 1914; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. July 28, 1914; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Supervising Engineer. August 7, 1914; A[drian] I. Maxwell, Farmer, to Owen W. Bower [Bauer], Instrumentman. February 25, 1915; A[drian] I. Maxwell, Farmer, to [O. W.] Bauer. February 3, 1916; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg. February 15, 1916.

76 Box 23, Special Case 31, Record Group 75, National Archives, Washington, D.C.

77 William T. Sullivan, Superintendent, to W[illiam] H. Code, Chief Engineer. November 14, 1910. 1910 folder, Box 73, Entry 653, Irrigation Division, Record Group 75, National Archives, Washington, D. C.

78 Herbert V. Clotts, to W[illiam] M. Reed, Chief Engineer. November 3, 1919. 1918 folder, Box 73, Entry 653, Irrigation Division, Record Group 75, National Archives, Washington, D.C.

79 A[drian] I. Maxwell, Farmer, to Owen W. Bauer, Instrumentman. November 6, 1916; H. K. Palmer, Engineer. Memorandum and Estimate of Development of Tahquitz and Andreas Creeks. February 20, 1925; Herbert V. Clotts, Supervising Engineer, and H. W. Palmer, Special Disbursing Agent. Annual Report. 1926; Anonymous, Annual Report of Bureau of Plant Industry, February 12, 1938.

80 Herbert V. Clotts, Supervising Engineer, and H. W. Palmer, Special Disbursing Agent. Annual Report. 1926; Herbert V. Clotts, Supervising Engineer, and H. W. Palmer, Special Disbursing Agent. Annual Report. 1927; Herbert V. Clotts, Supervising Engineer, and H. W. Palmer, Special Disbursing Agent. Annual Report. 1928; A. L. Wathen, Supervising Engineer. Annual Report. 1932.

81 Herbert V. Clotts, Supervising Engineer, and H. W. Palmer, Special Disbursing Agent. Annual Report. 1926; Herbert V. Clotts, Supervising Engineer, and H. W. Palmer, Special Disbursing Agent. Annual Report. 1927; Herbert V. Clotts, Supervising Engineer,

---

and H. W. Palmer, Special Disbursing Agent. Annual Report. 1928; A. L. Wathen, Supervising Engineer. Annual Report. 1932.

82 Anonymous, Annual Report of Bureau of Plant Industry, February 12, 1938.

83 Herbert V. Clotts, Supervising Engineer, to C[harles] L. Ellis. October 11, 1923.

84 *Paniktum Hemki*, p. vi-88; *Seismicity of the United States*, p. 76.

85 Tahquitz Report, pg. v-250, on the discovery of hard pan under the Eden tract and soil deficiencies; pp v-252-v-253, on trees dying from overwatering and undercultivation.

86 See *Paniktum Hemki*, on declining interest in agriculture by Cahuilla, pgs. vi-101, vi-102; on return of Andreas family, and activities in the interim, pp. vi-106- 107. For a brief discussion of the California Date Growers' Association, see Canyon Development Project Study, pgs. 68, 74-75.

87 Gilmour, "Coahuilla Indians," San Francisco *Chronicle*, February 21, 1892, in *Some Last Century Accounts*, pp. 2-3.

88 See *Paniktum Hemki* and the Tahquitz Report for a chronology of the Cahuilla experience in Palm Valley; see Katherine Siva Saubel and Anne Galloway, *I'isniyatam (Designs): A Cahuilla Word Book* (Banning, Calif.: Malki Museum Press, 1977), on the names of animals.

89 Cha[rle]s L. Davis, Supervisor, to Office of the Chief Engineer. March 18, 1909. Italics mine.

90 C. C. Pierce, "Mesquite Bean - Food for Indians and Cattle, Hogs, Horses, & Sheep." Huntington Library, Pierce #4721.

91 For a discussion of the importance of monetary capital and expertise in the transformation of the arid west, refer to Worster, *Rivers of Empire*.

## Chapter 4

## Tahquitz Canyon

On the western edge of the Palm Valley basin, Mount San Jacinto towers over the desert floor. Its steep rocky slopes, as we have seen, are riven with deep, twisting canyons -- the result of seismic activity and the slower workings of erosion by winter run-off and mountain streams. Beginning far up near Tahquitz Peak, a subsidiary peak of Mount San Jacinto, Tahquitz Creek passes through a high mountain valley above the canyon proper. The water cascades over rocks, producing rumblings that in the past were believed to emanate from deep within the mountain. Entering an area of steep rock walls and thick desert brush, the water continues tumbling roughly eastward to the desert below. Just before the desert floor comes into sight, it suddenly plummets down a steep precipice, forming Tahquitz Falls. The thunder of the falls, especially loud when recent precipitation swells the creek, resounds off Echo Cliffs just southeast of the falls. Its vigor then spent, the creek emerges quietly between the tall rock gates of the canyon mouth. Crossing a rocky mound beyond, the creek is soon absorbed into the sandy desert soil unless quickly captured by water pipe or irrigation ditch.

Tahquitz Canyon, like many of the canyons on the eastern slopes of the San Jacinto Mountains, was a vital source for life seeking refuge from the aridity of the desert floor. The famed fan palms grew in its rocky womb, animals drank from its waters, desperate people hid from their enemies behind its high rock walls. Following the arrival of white settlers in the 1880s, it also became a region of contestation.

At the center of dispute was the Tahquitz ditch, which existed in various incarnations since the 1830s, when it was constructed by the Cahuilla to water their lands around *Sec He*, the hot spring. The cyclic flow of Tahquitz Creek, which ran through this ditch, varied from powerful winter floods to dry summer dust. Both conditions strained the

increasingly tense relations between the Cahuilla and the white settlers who came to share the ditch with them in the 1880s. From the 1880s into the early 1930s, their disputes, mediated by the agents of the federal government, especially those of the Indian Irrigation Service, interacted with the ways in which whites and Cahuilla understood the local ecoscape. By the end of the 1930s, local understanding had developed to the point that such government intervention had become largely superfluous. By looking at a series of conflicts focused around the control of Tahquitz water, we gain insight into both Palm Springs and other western arenas where government, native peoples, and white settlers addressed issues of water, land, and autonomy.

**Traversing the Terrain of an Evolving Ecoscape**

Following in the footsteps of their culture hero Evonganet, "The Fox," the Cahuilla came to the Coachella Valley many generations ago. Evonganet established guidelines as a result of his travels and named many features of their new home; it became the duty of tribal leaders to further expand their knowledge and to identify the regions set out for them by Evonganet. After the Fox Tribe settled at Panyik, their *net* (headman) Kauiskiauka, "The Fox's Horns," set out on a journey. He sought traces of Evonganet's passage, as well as game, seeds, acorns, mescal, and other food.

As he traveled Kauiskiauka too noted distinctive formations and gave them names so that others could follow in his tracks; where the terrain was undistinguished he placed rocks to mark his route. He went by the stream Milyillikalet and the painted rocks of Tekic and he named a hill Kauissimtcem Hempki at the mouth of a nearby canyon along the eastern edge of the mountains. At a low hill on the desert's edge he paused to hunt rabbits, using brush traps that he placed along their runs. This place he named Temukvaal. Passing through the mesquite grove Tekelkukuaka, he came to Kakwawit, the broad mouth of another canyon guarded by the two rocks Kauiski (from which the Kauiskistum clan at the hot spring Sec He would take their name) and Miaskalet. Entering the canyon,

Kauiskiauka followed its contours inward, eventually arriving at Palhanikalet, meaning "water falling down."

At another time Kauiskiauka again explored this canyon of the waterfall, which he named Cheemokewene due to its deepness and narrowness. This time he began in the high valleys of the mountain, and came down the canyon to the foothills, Tongwenneval, "the place of wasted mescal." Passing through a wash he named Temmavesel (sediment), he came again to the mesquite grove, and thence to Sec He. This place he identified as the home set aside for the Foxes by Evonganet, to the dismay of those people already living there. These people, the Munalem, refused to leave when the Foxes arrived and began a war. Their efforts came to naught; the Foxes defeated these squatters and claimed their rightful territory.[1]

Such travel narratives served several purposes. They provided a guide to the contents and arrangements of the local ecoscape. They identified and named distinctive geological features. They described areas of useful food resources, such as mesquite, mescal, and rabbits. With this knowledge, travelers could find their way from place to place, and anticipate their probable success at finding food and water. These narratives also legitimized the presence of the Fox Tribe's descendants within this ecoscape. Their right to use its resources and travel its rocky heights and desert flats was established by the actions of their ancestors. The area resonated with history; each time the story was told, or a traveler found his or her way from pines to palms using Kauiskiauka's landmarks, the Cahuilla reinscribed their sense of belonging.

The familiarity of the Agua Caliente Cahuilla with these places would be eroded and their claims to their ancestral territory challenged as new people entered the region. Kauiskiauka and his people could not have anticipated that the canyon at Kauissimtcem hempki would later be renamed Andreas Canyon, the canyon guarded by the sentinel rocks would be called Tahquitz Canyon, and that Palhanikalet would become Tahquitz Falls.

Like Kauiskiauka and his people, later travelers would create their own maps of the territory and place claims upon it.

Kauiskiauka's narrative journeys offered little to those seeking to navigate a new terrain of railroads, abstract grids, and imported people, ideas, and species. In 1876 and 1877 Executive Orders sliced through the winding trails of Evonganet and Kauiskiauka with straight grid lines and railroad tracks. New travelers, belonging to a professional class of government surveyors, would produce the new maps, name new features and rename older ones, enabling the inhabitants of the changing ecoscape to navigate its shifting terrain.

The railroad, the reservation, and the new settlements were literally delineated not by the journeys of leaders like Evonganet and Kauiskiauka, but by those of men in charge of linking abstract Township grids to the physical terrain. The field notes of surveyors such as William Minto, George W. Pearson, A. W. Brown, Theodore VanderMeer, Francis E. Joy and John L. Warboys established claims to the territory of Palm Valley, charted unfamiliar terrain, and described the changes occurring in the local ecoscape. Early surveys were cursory and covered only habitable terrain. Subsequent exploration retraced old lines and tidied old monuments; and, filling a hunger for increased knowledge, later surveyors explored areas that no one -- Cahuilla or white -- would have considered suitable for settlement, leaving marker posts, mounds, and pits in their wake.

In July of 1885, William Minto, Deputy Surveyor and his crew (chainmen Harvey H. Miller and E. D. Palmer, axemen Fred Waite and Herman K. Bartsch, compassman D. J. Miller and flagman J. H. Martin) set out to establish the subdivision lines of the township that contained Palm Springs and part of the Agua Caliente Indian Reservation, Township 4 South, Range 4 East, San Bernardino Base and Meridian (T4S R4E SBBM). Starting at the corner of the township Sections 22, 23, 26, and 27, they moved north along an invisible line, established by compass, between the first two sections towards the southeastern edge of the

recently established village of Palm Springs. They descended from their starting point on the edge of the mountain, and crossed a wash 20 links wide, flowing south and 40° east. About 8 chains further north they paused to sink a redwood post in the ground, cut markings into it, and raise a mound of earth to mark the point half-way between the north and south boundaries of Sections 22 and 23. (This was called setting the $^1/_4$ section corner.) They entered and left a rocky wash and eventually came to the corner of Sections 14, 15, 22, and 23, where they found an old mound left by a previous survey party. They refurbished it with a new post, repaired the mound, and dug marker pits alongside.[2]

After a brief digression to survey the line between Sections 14 and 23, they headed west, south of Palm Springs, towards the abstract point where Sections 15, 16, 21 and 22 met. Along the way they crossed an "Indian trail" bearing north and south and traversed a water ditch 5 links wide flowing north. Eventually they came to the eastern foot of the San Jacinto mountains. At this point Minto decided to abandon the line, as "the country in advance [was] so mountainous and broken" that it wasn't feasible to continue, and ordered that a mound of stone be erected. The land they had crossed was rolling and level up to that point, with "2nd and 3rd rate" soil suitable for agriculture and mining. Like Kauiskiauka, they noted "mesquite and greasebrush" along the route.[3]

Although they grew more precise as equipment and techniques improved, field survey narratives in later years were more or less identical in form to that of William Minto in 1885. George W. Pearson, Deputy Surveyor, and his crew in the winter of 1893 retraced Minto's footsteps, then went on into the areas earlier deemed impassable. Heading westward, they "ascend[ed] abruptly over very large slabs of rocks," moved over "rough mountains" and through "dense cacti."[4] The survey party then turned north, "descending abruptly over rough broken ground" to a stream flowing northeast at the bottom of a steep canyon. Ascending thereafter over "very rough ground" they made for the corner to Sections 15, 16, 21 and 22, establishing corner markers as they went. The difficulty of the

trip seems to have discouraged them from retracing their steps (a standard practice on more level ground), for they then turned eastward along the boundary between Sections 15 and 22.[5]

Pearson and his crew also surveyed the upper reaches of the canyon that Minto had deemed too difficult to reach, but which Kauiskiauka had traversed on his way to the hot springs. On the way to the corner of Sections 20, 21, 28 and 29 they came to a part of the canyon that was so deep they had to run an offset line to the south so that they could cross safely. (An offset line is one run to the side of an obstacle such as a boulder or cliff that could not be otherwise traversed; the original line is rejoined on the other side.) The canyon twisted such that they had to cross it twice on their way to the corner.[6] The land of these upper stretches was generally described as "mountainous," with "4th rate" soil and covered with cacti. In his concluding description Pearson wrote, "The mountain land may be classed as 4th rate is [sic] rocky and covered in many places with huge slabs of iron ore and is unfit for cultivation."[7]

Substantial changes had occurred since Minto's journey in 1885; the only "land objects" appearing in both sets of field notes were the base of the mountain and a water ditch flowing northward. Pearson's group discovered a road where an "Indian trail" had been in 1885, a new trail further west, and two dry washes that had not been there before. They crossed two new water ditches flowing southeast and southwest, traversed cultivated land, made their way through fences, and crossed the washes that Minto and crew had noted (though the washes' courses had shifted somewhat). Pearson found the land more congenial than Minto; the canyon mouth had become a "valley" with "1st rate" soil. Vegetation shifts were also noted; the mesquite and greasewood described by Minto had given way to cacti.[8]

Considering how rapidly the ecoscape had changed in only eight years, it is not surprising that both Cahuilla and settlers found it difficult to adapt at an equally swift

pace. Nor is it surprising that the surveyors' efforts to chart these changes were generally looked on with favor by the local white population. Yet it would be twelve years until the region was traversed again by Francis E. Joy in 1905, and twelve more after that when A. W. Brown and Theodore VanderMeer would set out to update the survey and correct the errors made by Joy.

A. W. Brown, U.S. Surveyor, and Theodore VanderMeer, U.S. Transitman, began a resurvey of portions of the township in April of 1917, a survey that would take twelve years to complete. Like Pearson and his team, Brown and VanderMeer were not daunted by the rough terrain of the upper reaches of Tahquitz Canyon. Unlike the earlier survey team, who noted only the canyon itself and "a high ridge," Brown and VanderMeer provided a highly detailed picture of the terrain along the western edge of Section 30. On their southward journey they crossed a small creek, climbed over a series of spurs and drains, and traversed "sloping bedrock"; they crossed Tahquitz Creek and were able to identify it by name. The "brush" described by Pearson was carefully identified as "scrub cedar, oak, pinon, manzanita, mahogany, catclaw, cherry, bluebrush, [and] sotol." They replaced the unofficial corners set by Francis E. Joy in 1905, and set several of their own.[9]

This quest for increasingly precise knowledge of the rapidly changing region encouraged additional surveys and resurveys. In the mid-twenties U.S. Cadastral Engineer Francis E. Joy (he whose earlier survey had to be corrected by Brown and VanderMeer) and U.S. Surveyor John L. Warboys joined the growing numbers of travelers moving around Township 4 South, Range 4 East.

Section 22, due to its proximity to Palm Springs, continued to receive the closest scrutiny. In May of 1923, the survey team traced the boundaries of this section and the subdivisions in its southeastern quarter. Their journey south on the western edge of Section 22 ran "along a steep E[astern] slope over nearly solid rock" that had been noted earlier by George W. Pearson. Joy and Warboys then descended "about 600 f[ee]t over rough and broken

land" and passed to the west of a warm spring, which Pearson had missed, on their way to the $^{1}/_{4}$ section corner marker. Ascending another ten chains along a "broken N[orth] E[astern] slope over rocky land, they came a point where the ground ahead was "very rough and rugged." Francis E. Joy decided that, given that no subdivisions were planned for the southwestern quarter of the Section, it would be of "no benefit" and entail considerable hardship to continue along the line. The team established a witness point and went no further south.[10]

By the time Joy and Warboys' survey was made the road Pearson had noted in 1893 had evolved into a highway, and another road to Tahquitz Canyon had been added. The dry washes had shifted further west -- if they were even the same washes -- and the water ditch had been superseded by a "Pipe line, Tahquitz Creek to Palm Springs." A road had been constructed right along the eastern boundary of Section 22, and a house to the east of it in Section 23. A new fence and a cement pipe had been constructed, probably the Andreas Canyon irrigation system. The cultivated land in the southeastern quarter noted by Pearson was still being used for agricultural purposes, surrounded at this time by fences. Of the water ditch mentioned by Pearson, no note was made.[11]

Along the northern and eastern borders of Section 22 greasewood remained the dominant vegetation, along with a new prevalence of creosote. No note was made of the "dense cacti" Pearson found on the southern boundary, however, and the mesquite mentioned by Minto and Kauiskiauka had long disappeared.[12] About the only things unchanged was the steep foot of the mountain, which Joy and Warboys' notes described as a "barren and rocky E[astern] slope," rising 1040 feet to the corner of Sections 15, 16, 21 and 22.[13]

The types of mapping narratives used by government surveyors and Cahuilla travellers differ in other significant ways besides disagreement over vegetation of the region. The field notes of the surveyors were based on a ritualized system of measuring distance and constructing monuments to mark the lines of a vast, intangible grid

superimposed from distant Washington, D.C. While these narratives could include local quirks and awareness of particular relationships, depending on the experience of individual surveyors, they were driven by the logic of the disinterested, rational outsider. The Cahuilla culture heroes, and those who related their stories, by contrast, emphasized local specificity and the intangible personal, social, and physical relationships that made up the local ecoscape.

Yet the surveyors' field notes served similar purposes as the narratives of Evonganet and Kauiskiauka. Distinctive geological features were noted and resources described and catalogued. The presence of other people in the ecoscape were revealed through the trails, ditches, roads and structures they built. While some of these constructed landmarks were identified by size, location, and direction, others were further identified by their relationships to the surrounding community and by name. As surveys and resurveys increased the federal government's knowledge of the region, awareness of these intangible relationships increased. Even when highly abstract, field notes and the monuments surveyors built bolstered local claims to the use of local resources.

Such notes and monuments served more than the surveyors, particularly when translated into maps. Boosters, adventurers, and part-time residents of Palm Springs also explored the intriguing spaces of Tahquitz Canyon and nearby environs. As they did so, they drew upon government surveys to guide their feet and Cahuilla oral tradition to bring drama to their journeys. Accounts of such explorations, and of how the explorers combined these two cartographies to construct their own, helped white readers to develop their own sense of place within the emerging ecoscape.

In the summer of 1893, when visitor J. R. Pierson visited Tahquitz Valley and Peak, he had to turn to local guide John Blodgett for information about the phenomena he encountered there. "While in camp," he later wrote in the *Riverside Press and Horticulturist*, a local newspaper,

> I asked many questions of Mr. Blodgett concerning the mountains, and particularly of the strange noises that are said to be heard on Taukwitch. While it is true a rumbling noise, accompanied by a trembling of the earth is frequently heard and felt, it is not nearly so great as some writers have led us to believe.... No one has ever been able to locate the spot where these sounds come from -- it is always a little further on.... The word Taukwitch means "Devil" in the Indian tongue, and they believe the evil spirit dwells in this mountain, and that when the rumblings are heard they say he is angry.[14]

Such curiosity -- and the interest in mysterious and otherworldly phenomena -- was typical of white adventurers in this period. In Pierson's account we can see both the desire to know more about an unfamiliar ecoscape, and the tendency of white visitors to rely on local whites as informants rather than the more knowledgeable Cahuilla -- even when they sought information about Cahuilla cartographies.

We can see these same preoccupations thirty years later in an account of another excursion to Mount San Jacinto that appeared in the *Sierra Club Bulletin* of 1923. During their trip, club members gleefully spooked themselves with stories about the evil *nukat* (spirit being) Tahquitz. Perhaps reassuring themselves that their lack of local knowledge was not a handicap, they also recalled the tale of two bold mountaineers "who, *disdaining any trails*, attempted the fantastic rocks and tree-covered ledges down the seventy-six hundred feet of difference between Hidden Lake and the mouth of Tahquitz Creek."[15]

Even writers who tried to offer more practical guidance to would-be travelers found themselves running up against not only their readers' unfamiliarity with the region, but with their own inability to describe it without resorting to allusion, metaphor and simile.[16] The description of Tahquitz Canyon provided by James Smeaton Chase, one of Palm Springs' residents, in his guidebook *California Desert Trails* is typical of the Western travel genre of the period. It is full of flowery phrases and romantic allusions to ancient civilizations. Approaching the "imposing gash in the mountain," he related in 1919, the

traveler would remark upon the "magnificent cliffs, forming at the mouth a cirque with walls rising sheer for hundreds of feet." According to Chase,

> This titanic Colosseum makes a superb effect by morning light, when the vast, crater-like shadow is outlined by grim though sunlit rock-bolts that guard the towering gateway. It would be a worthy portal to Avernus, and when Tahquitz has his waterfall in full blast a quite infernal uproar reigns in the confined place, while the great southern cliff, acting as sounding-board, projects a full-mouthed roar upon the ears of the villagers of Palm Springs.[17]

Over time, Chase, like his audience, would become better able to appreciate and describe the region on its own terms. The description he offered in *Our Araby* the following year reflected his greater experience with the region:

> Tahquitz Cañon, (named for the evil spirit of the Cahuillas) is marked by a striking break in the mountain wall just to the south of Palm Springs. It is the favorite resort in the neighborhood of the village, the popular route being the foot-path along the bank of the Tahquitz ditch, which follows the base of the mountain. The main feature of interest for most people is the waterfall, which after heavy rains is quite impressive; but the rock scenery, the cacti, and the outlook from the cañon portals are all well worth notice. There are two trails worth exploring, an upper and a lower. Automobiles can take a road (fair) just south of the village going to the mouth of the cañon. Only the lower part, as far as the fall, is accessible without hard and even dangerous climbing: a fatal fall occurred recently.[18]

This account may have lost some of the hyperbolic grandeur of his earlier one, but made up for it in improved accuracy. It suggests a greater familiarity with the region; references to the Colosseum have given way to descriptions of roads, trails, and awareness of local events. Although it still lacks the accuracy of the accounts of either the Cahuilla or the surveyors, Chase's second description does tell us something about the local ecoscape. It also demonstrates that white settlers could adapt their cartographies to the local ecoscape, given sufficient time and personal experience within it.

The rugged character of Tahquitz Canyon's upper reaches, its mysterious rumblings, and the steepness of the walls at its mouth evoked different reactions depending on the visitor's intentions and expectations. The cheerful campers and travel writers valued such precipitous territory for its challenges, sublimity, and colorful legends. The surveyors perceived it as a hindrance to the careful delineation of Section lines and Township boundaries. The Cahuilla understood these upper reaches as hazardous, yet familiar as a result of their long occupancy of the region.

The Cahuilla travel narratives and the survey field notes were practical catalogues of resources and landmarks. The descriptions and stories of Tahquitz Canyon told by the white setters and tourists emphasized the picturesque and the quaint, but they also made brief reference to distinctive features and local events. Survey field notes tended to emphasize the physical terrain, travelogues the social, and Cahuilla cartography the relation between the two. Yet all three systems told the user who was guided by them something about how to navigate the terrain of this ecoscape. As the ecoscape grew increasingly complex, no single system would prove sufficient to guide the traveler through its labyrinth; nor, by focusing on one narrative perspective alone, can we fully understand the history of the region.

**The Rumblings of Tahquitz**

In the early years of the new ecoscape's formation, there were no clear roles or guidelines for either the Cahuilla or their new white neighbors. The traditional Cahuilla cartography did not equip them for the task of sharing their precious water with whites intent on creating oases in the desert, particularly within a system of water laws that were confusing to both Cahuilla and whites. Their white neighbors were similarly ill-prepared to deal with the realities of agriculture in a desert ecosystem, and often unwilling to negotiate with people they considered superstitious and inferior to themselves.

The drought of 1894-1905 discussed in the previous chapter raised the stakes and brought the conflicts between and within the settler and Cahuilla communities into sharp relief. Visiting observers, through their pleas on behalf of what they saw as hapless Indians at the mercy of unscrupulous whites, convinced the government to intervene. Initially entering the fray intending to protect their wards' interests, Indian Agents slowly learned that, even at this early date, neither the white settlers nor the Cahuilla could be easily disentangled from the web of the developing ecoscape. Forced to act as intermediaries between the two groups, government agents helped shape the framework for future negotiation and dispute.

The Bureau of Indian Affairs (BIA), particularly its Indian Irrigation Service branch (IIS), contributed greatly to the physical structure of the emerging ecoscape. Through its continued efforts to improve, protect and maintain the Tahquitz ditch irrigation system, the IIS left its imprint on a growing network of spatial relations. Under the government's aegis patterns of interaction on several levels stabilized in the 1900s and 1910s, but continued to evolve.

The 1920s and 1930s saw the community beginning to outgrow the government's carefully constructed plans for the ecoscape's development. Both physical and relational infrastructures were aging, and proved inadequate for the rapidly urbanizing ecoscape. Despite continued efforts by the government to stretch its cartography over the burgeoning problems of the Tahquitz water system, leaks and tears almost ineluctably began to appear.

At the end of the 1930s the Cahuilla and the City of Palm Springs had accepted the responsibility for constructing their own cartographies for their shared ecoscape. In earlier decades they had asserted their desire to manage their own affairs -- in this little had changed over the years -- but what was new was that they were now actually capable of doing so together. As their jointly created infrastructure stabilized, they had less and less need for the government's intervention. While the imprints of the government

framework remained, they had become incorporated into the larger patterns created by the interactions of Cahuilla and white residents of Palm Springs.

**Delineating the Palm Valley Ecoscape**

Prior to the creation of the reservation, the evolution of the Cahuilla ecoscape proceeded at a pace governed by ecological change and the ability and desire of the Cahuilla to integrate outside elements with local ecosystems and local cartographies. The Cahuilla had developed a comprehensive understanding of their ecosystem and their place within it; aware that this ecosystem had little tolerance for sudden change, they were understandably wary of change. Yet the Cahuilla ecoscape was not static. Events in the ecosystem such as fires, floods, earthquake and droughts could require a dramatic reshaping of existing cartographies.

When visiting travelers brought new elements to the region, the Cahuilla, after careful consideration, often chose to integrate them into their ecoscape. The possibility of adding new food sources to an ecosystem comprised of species that evolved to horde scarce nutrients received particular attention. Being alien to the desert environment, the beans, melons, and grains that the Cahuilla decided to cultivate required water in greater amounts than native species. While the Cahuilla often located their farm plots near water sources, they began in the 1830s to bring the water to the crops. Using fire to heat large boulders and cold water to crack them, Cahuilla men such as Juan Tocolota, Joe Chino, Nicholas, Joe Antonio, Lass and Jose Lebacho carefully built a ditch "to get good water to drink and to irrigate with."[19] The ditch brought water from what would become known as Tahquitz Canyon to Cahuilla fields in the area later surveyed as Sections 14 and 15 of Township 4 South, Range 4 East, SBBM.

The creation of the reservation by Executive Orders in 1876 and 1877 imposed a radical restructuring of the ecoscape's terrain. The land was divided into sections not according to existing social or physical features, but by mathematical formulae and

compass directions. The Cahuilla irrigation system, once stretching unbroken from the mouth of the canyon to their fields near the hot springs, was sliced up by section lines. The physical terrain was initially unchanged, but the network of relationships the Cahuilla used to arrange themselves within habitable areas was dramatically altered. A grid of invisible walls divided once unified regions into alternating squares of reservation and railroad lands.

This grid *per se* did not initially have much effect on the Cahuilla, as it bore little relation to the local ecoscape. It neither explained how the ecosystem functioned, nor provided guidance as to where and how people should live within it. Had the Cahuilla remained the sole inhabitants of the region, this abstract, externally imposed framework would have had little impact on their daily lives. It was when others came to live on the newly delineated sections of non-reservation land that the grid became significant.

Unlike the Cahuilla, the white settlers who came to the region in 1884 placed great credence in the abstract grid system. It defined for them which lands they could buy and which they could not, and enabled them to identify and claim territories within the eligible sections. Unfamiliar with the existing patterns of the Cahuilla ecoscape, they arranged themselves in grid-defined squares, acknowledging the presence of the Cahuilla and the local ecosystem only when that presence impeded or enhanced this process. Mountains proved difficult to move, but the Cahuilla who found themselves on the wrong side of section lines soon learned that they were now literally out of place. Old Man Chino, a Cahuilla living on what had become Section 15, was given $130 in 1884 to leave by Mathew Byrne and William E. Van Slyke, members of the Palm City Land and Water Company, newly formed to administer the sale of railroad lands in the region. The money only partially compensated him for his fields and home, and was considered "a simple gift" by John Guthrie McCallum, the local Indian Agent (1883-1885) and friend of the Company. From the perspective of McCallum and the Company, this land was not really

Chino's; the Company had bought it from the railroad, not him.[20] The Cahuilla cartography held no relevance for them and Chino's presence on Section 15 was not accounted for in their own apprehension of the region. As Indian Agent John S. Ward (1885-1887) would later comment, "These purchasers from the S.P.R.R. paid the Indians full cash value of all improvements and growing trees *that were upon the Rail Road lands*."[21] The Tahquitz ditch, by contrast, could not be so easily alienated from the Cahuilla. It would become a distinctive feature in the emerging ecoscape as well as the old, and hold a significant place in the cartographies of both groups.

The Cahuilla claim on the water of Tahquitz Creek was established, whether one looks to Mexican law, the California doctrine, or simple common sense to define it, when they built the Tahquitz ditch in the 1830s. But a claim on water is not necessarily the same as a right to water; the latter requires that the claim be granted legitimacy by those involved. The Cahuilla held that they had a right to the water, and the laws of both Cahuilla and American society agreed. Local white settlers were less willing to concede Cahuilla rights (or even Cahuilla claims). At the minimum they challenged any assertion that the Cahuilla right to the water was an exclusive one.

As the settlers' plans for the region depended on a reliable source of water for crops, stock and domestic use, they were understandably interested in establishing their own claim on the water of Tahquitz Creek. The Palm City Land and Water Company filed on its waters in 1884, and constructed a diversion box in the Tahquitz ditch. It filed on Tahquitz Creek again in 1885 and 1886.[22]

Legally, this action was questionable, but the letter of the law formed but one part of the new settlers' cartography. White settlers generally were less concerned with legal rights than with what could be termed the right of proper use. If the Cahuilla were not using the water (or land) properly, they were less entitled to it than those who were or who intended to do so. Even if they were using it properly, the rights of other proper users could

not be denied. This, local whites felt, was "justice." The Indian Office and its Agents would come to agree.[23]

On February 1, 1887, the Palm Valley Water Company was formed under the aegis of John G. McCallum and his friends and soon replaced the Palm City Land and Water Company as the key player in Palm Valley water development. Its main function was to bring water from the Whitewater River, several miles away, to the "Colony Lands" belonging to the Company.[24] In preparation for their land sale auction on November 1, 1887, they began constructing stone-lined irrigation ditches, using hired Cahuilla labor. As BIA Chief Special Officer William E. Johnson was later to report, the Company ditches

> ran across Indian land in various directions without a right-of-way of any sort whatsoever. McCallum simply dug and allowed to be dug, ditches, by his friends wherever they chose to dig them without any regard whatever for the interests of the Indians under his charge.[25]

Although these ditches, built to tap into the Whitewater River, did not directly affect Cahuilla use of Tahquitz water, they did illegally cross the reservation lands. When Indian Agent Joseph W. Preston (1887-1888) found out that the ditches had been constructed without securing any rights of way, he found himself torn between his duty to his Cahuilla wards and concern for the white settlers who benefited from this *fait accompli*. In a move that would set a precedent for all future negotiations, he decided that the Cahuilla would benefit more from the improvements offered by white settlement than from retaining exclusive right to their land and waters.

On February 7, 1888, Preston signed a right of way contract with Henry C. Campbell and Henry Clay Miller, president and secretary of the Palm Valley Land Company (as the Company was alternatively known). In exchange for right of way across reservation land that "without water is worthless, -- but with water may be of more value" and the right to use and develop the waters of "Torquito or West Canyon" (Tahquitz Canyon) and Chino Canyon the Company was to pay $100 per mile ($500 total) and to deliver water free of

charge to the Cahuilla. The contract recognized Cahuilla first right to the water -- at least to the amount needed to irrigate up to 160 acres. At a later date, if warranted by increased cultivation by the Cahuilla, the government could demand that this amount be increased to cover an additional 160 acres; if unable or unwilling to supply the additional water, the Company would have to pay an extra $1000 to get out of this obligation. No rocks, minerals, wood, or similar materials could be removed from the rights of way except for the purposes of constructing or repairing the ditch.[26]

Several precedents were set by this arrangement. The contract legitimized the right of white settlers to share the waters of Tahquitz Creek with the Cahuilla and transformed the latter's water right from an exclusive to a limited one contingent on their "proper" use of the water. It introduced the practice of using local whites as the government's proxy in providing for the welfare of the Cahuilla and thus linked that welfare to the development of the white settlement. Finally, it set the unfortunate precedent of excluding the Cahuilla from such negotiations. Similar dynamics can be seen in 1891, when the Bear Valley Irrigation Company approached the Mission Indian Commission (also known as the Smiley Commission after its chairman) with a proposal to provide the Agua Caliente Cahuilla with irrigation water in exchange for rights of way across reservation lands at Banning and in Palm Valley; its terms were strikingly similar to those of the Palm Valley Water Company contract negotiated by Preston. The Bureau of Indian Affairs found it acceptable, and was about to approve it when the Company, impatient with the slowness of the government's response, withdrew its offer. As was the case with the Palm Valley Water Company, these negotiations were strictly between the government and the company involved; the Cahuilla were not consulted.[27]

It was also unfortunate that the agreement with the Palm Valley Water Company and other subsequent agreements depended heavily on white goodwill and the government's ability to enforce it. As has been suggested, whites' charity towards the

Cahuilla (and other indigenous peoples) was an often scarce commodity, particularly when it came at cost to themselves; even when present, it was often more informed by white assumptions about Cahuilla needs than the actual desires of the Cahuilla themselves. Some whites were not above playing on such assumptions in order to improve their own positions.

In April of 1892, for example, Indian Agent Horatio Nelson Rust (1889-1893) found himself in the middle of a local dispute; his intervention "without thinking" resulted in the destruction of one of the Palm Valley Water Company's headgates and some of the Cahuilla fields. Acting on the complaint of the local roadmaster that water from an "Indian" ditch was destroying one of the settlement's streets, he broke the headgate on the ditch and diverted the water into another ditch leading to the reservation on Section 14. The combined flow of the two ditches swept onto the reservation with such force "that it broke the banks, washed out newly sown alfalfa, fence posts, and a large planted area, to the great annoyance of the Indians."[28] Rust later discovered, to his chagrin, that the supposed "Indian" ditch actually belonged to the Company and explained to his superiors "that the village was quarelling [sic] and I was made to take a hand unwittingly."[29] Rust's actions reveal both the BIA's assumptions about Cahuilla competence (Rust saw no need to question the faulty ditch's identification as "Indian") and unfamiliarity with the dynamics of the local ecoscape. Similar scenes would be all too common in the drought years to come.

The porous character of local soil allowed little forgiveness of such shenanigans, particularly on the Cahuilla end of the ditch. Surveyor Edward L. Dorn noted later in 1892 that "The agreement with the water company allows them [the Cahuilla] one inch for six acres of land. That is barely sufficient if used to the best advantage. When conducted in the loose sand ditches which the indians make the loss from percolation and evaporation

especially in the summer is fully one half." He recommended appropriating $200-$300 for improving the system, but there is no evidence to confirm if this was ever done.[30]

Percolation and evaporation aside, both Tahquitz Creek and the Whitewater River, even in wet years, decline markedly in the summer. In the summer of 1893 the Cahuilla complained that the Company failed to deliver regularly the water due them; investigator Henry L. Ryan found the problem this time was more one of supply than of distribution; "owing to the scarcity of water in the White Water River, ...all parties, both Indians and whites, were cut short of their full amount." This observation led him to recommend building an earthen reservoir in Section 14 to alleviate the problem. His suggestion, estimated to cost $3,600, was not acted upon.[31] Whether these improvements would have mitigated the stresses of the next decade's prolonged drought is unclear. What is clear is that, starting in 1894, a desperate battle for the water of Tahquitz began.

In the spring of 1894 Presbyterian minister William R. Henderson and his wife came to Palm Springs, seeking the warm dry air to improve her health. What they found were dying crops, angry Cahuilla, and desperate whites. According to Henderson, writing in June of that year, the supply of water reaching the Cahuilla was "so inadequate that the crops of the Indians are surely suffering, & in many cases dying." This water was "a sickening, disagreeable water... not fit for drinking purposes." Understandably, Henderson explained,

> There is, moreover, anger on account of the unwholesome nature of this water of sickness being provided among the Indians. Up to the time that they were unjustly deprived of their water the Indians were doing well & their crops were in excellent shape. They are naturally very seriously disturbed by this situation of affairs & considerably wrought up on account. Under all the circumstances they have behaved with remarkable moderation.

Henderson claimed that when McCallum turned the waters of Tahquitz to his own ranch, depriving the Cahuilla, he had "as much right to do this as he has to steal your

watch. It is a pure, simple case of robbery."[32] Henderson was not completely correct in his assessment; according to the 1888 contract made with the Palm Valley Water Company, of which McCallum was president, the Company was both obliged to supply the Cahuilla with water from the Whitewater River and granted the right to use the waters of Tahquitz Creek for its own use; the contract said nothing about quality, only amount. Henderson was correct, however, in that the water supplied was poor compensation for the water taken.

As the season dragged on, growing hotter and hotter, the situation worsened. McCallum ceased entirely to abide by the terms of the agreement; the water of Tahquitz was directed to McCallum's crops (except for one 2-hour period when some was sent down the Cahuilla ditch) while some of the Cahuilla were receiving no water at all. Captain Jose Rafael, Francisco Arenas, Pedro Chino, Francisco Patencio and Elihu Patencio all watched in frustration as their alfalfa died and their other crops withered in the 110° heat. Captain Rafael attempted to discuss the matter with the superintendent of the Palm Valley Water Company, but was told that he was only doing what McCallum (conveniently absent in Los Angeles) had ordered.[33]

Although both Henderson and Dr. Welwood Murray, owner of the local hotel, wrote condemning the Company's actions (Henderson forcefully suggested that "the government should 'jump on them with both feet'"[34]), things had not improved by the second week of July. The Cahuilla were by this time carrying water in pails from a ditch in front of Dr. Murray's hotel to their homes.[35] Despairing, Captain Rafael told Henderson that unless things improved soon, "Indian will suffer; Indian will be hungry; Indian will be sick; Indian will die."[36] At the end of August, Henderson wrote indignantly that the entire Cahuilla crop had been lost, and that there was still no improvement in sight. He was especially perturbed by the thought that the government might actually attempt to negotiate anew with McCallum; he felt that stronger measures were called for, such as an injunction barring further abuses.[37]

The Bureau of Indian Affairs concurred. The complaints and reports slowly worked their way up the chain of command over the next year. Commissioner of Indian Affairs Daniel M. Browning and Secretary of the Interior Hoke Smith mulled over Henderson's and Dr. Murray's earlier letters and the reports of government agents Charles C. Painter, Special Agent M. D. Shelby and Frank D. Lewis, U.S. Attorney for the Mission Indians. The picture and consensus that emerged was that given the suffering of the Cahuilla as a result of McCallum's actions, actions which involved the trespass on reservation land, the government should act to prevent further abuse by serving notice on McCallum to quit. Commissioner Browning explained, "The Mission Indians are meek, inoffensive people, and they should not be imposed upon."[38] There was general agreement that constructing a reservoir to store waters collected in the winter would ease the problem. Although they did not know it at the time, these collective decisions would contribute significantly to the evolving shape of the Palm Valley ecoscape.[39]

For three months Indian Agent Francisco Estudillo (1893-1897) attempted to serve McCallum with a notice to quit, finally achieving success on December 2, 1895.[40] He was almost immediately contacted by McCallum's attorney Shirley C. Ward. In a letter written to Estudillo, Ward politely informed the Bureau of Indian Affairs that the Palm Valley Water Company had it over a barrel filled with Tahquitz water. Once again the grid system played a fundamental role in shaping the terrain of the emerging ecoscape; as a network of invisible walls slicing through Palm Valley it greatly complicated negotiations. Even if McCallum was removed, Ward pointed out, the ditch still passed through non-reservation land. The Bureau of Indian Affairs had no jurisdiction over this land, and would have to acquire a right of way across it if it wished to manage the ditch itself. Since it was unlikely that McCallum would grant this permission, and could influence his friends to withhold consent as well, Ward concluded, if the Bureau was really

concerned with the welfare of the Cahuilla, it should consider McCallum's proposal for a renegotiation of the 1888 agreement.[41]

Indian Agent Francisco Estudillo, passing on the letter, recalled the reservoir idea, which he claimed "has many features to recommend it to the True Friends of the Indians." It would, he felt, be a possible alternative to the otherwise necessary negotiations with the white settlers. (He did not explain exactly how this would work.) Attorney Lewis reached a similar conclusion about the need to seriously consider the McCallum proposal, though he was dubious about the feasibility of a Tahquitz Canyon reservoir.[42] In 1901 the Bureau of Indian Affairs finally drew up a blank agreement covering rights of way and distribution of Tahquitz and Whitewater waters, although some observers remained dubious about the idea of collaborating with a person who had proven untrustworthy in matters concerning the Cahuilla.[43] The question proved moot; when BIA agents went to get the document signed and approved they found that many of the principal parties had died or left the area.[44]

Pedro Chino, listed on the agreement, had left the area in 1896.[45] The McCallums were gone too, although they retained control of property in Palm Springs. For the McCallums, the 1890s had been a period of despair and grief. In 1891, John Guthrie McCallum's favorite son, John McCallum Jr., died, followed by his brother Wallace in 1896. John McCallum Sr. himself died on February 5, 1897 -- of a broken heart, according to his daughter Pearl. His remaining son, Harry F. McCallum, managed the Palm Valley Water Company afterwards, but death came to him as well on September 1, 1901. The remaining McCallums -- Mrs. Emily Freeman McCallum and her daughters Pearl and May -- were forced by their worsening financial situation to transfer the Palm Valley Water Company over to the First National Bank of Los Angeles shortly after Harry's death.[46]

The Cahuilla situation remained grim, and BIA officials racked their brains on how best to assist them. As Cahuilla Pedro Chino noted, "The uncertainty regarding the

flow of water should be removed, [so] that [the Cahuilla] may feel secure as to the place to plant..."[47] With the Palm Valley Water Company effectively out of the picture the Indian Office lacked a suitable (or unsuitable, for that matter) local administrator to manage the Tahquitz ditch system.[48] Although they briefly contemplated BIA acquisition of the Company, the cost was eventually deemed too high.[49] Turning the management of the ditch back to the Cahuilla was not considered; in the event of problems, the Cahuilla were instructed instead to report to their Agent for assistance.[50] William Collier, Special Attorney for the Mission Indians, even went so far as to suggest that the Cahuilla be removed to a more habitable location using monies from the fund for the relocation of Mission Indians at Warner's Ranch:

> I beg leave to suggest that the Indians still remaining at Palm Springs, some four or five families only, are very sure to be in continuous difficulty for want of water to irrigate, so longas [sic] these seasons which have prevailed for the last four or five years continue. This reservation is on the desert where they are totally without rainfall, and all their agriculture and horticulture depends entirely on irrigation. Not only so but they are remote from opportunities of labor and have to find employment a long way from their homes.
>
> ...a few thousand dollars of this fund appropriated under the direction of the commissioners would be money well spent, and put these unfortunate people in position which they never can occupy while attempting to live on this deserted and forsaken desert.[51]

Eventually the Bureau of Indian Affairs decided that the primary problem was a lack of water, rather than a flawed understanding of the limits of the local ecoscape. If the amount of water available was used more efficiently it would not only benefit Cahuilla crops, but it could ease some of the strain between the Cahuilla and their white neighbors.[52] In 1906 the Indian Irrigation Service (IIS) was first brought in to assess the region's problems and potential. From this point forward, the involvement of the IIS in developing the Tahquitz water system would become considerable.

**Ditchside Diplomacy**

During its tenure in Palm Valley the Indian Irrigation Service devoted much attention to learning about the ecoscape from an irrigation perspective. Although its emphasis was understandably on water systems and how to develop them, the body of knowledge that its engineers and surveyors collected included commentary on the relationships between the Cahuilla and their white neighbors, and on the tensions within these groups as well. The drought years had made it clear to the BIA that the physical terrain could not be considered in isolation from more intangible networks of belief and practice. The IIS would soon discover what its parent agency already knew: something that began as a straightforward engineering project could easily transform into a diplomatic mission requiring considerable perseverance and tact.

The IIS was constrained by the fact that any irrigation system serving more than one section of the reservation would have to cross or run along the edge of non-reservation sections. The steadfast refusal of the Cahuilla to consider moving from their homes on Section 14 brought its own special problems. Tahquitz Creek was the water source closest to Section 14, but its summertime flow was paltry; some years it dried up completely. As a result, any water obtained from Tahquitz had to be carefully protected from seepage, evaporation and waste. The Tahquitz ditch at this time followed the best line through the rocks and other obstacles at the mouth of Tahquitz Canyon, but that line ran through the white-owned Section 15 on its way to the reservation. Each factor -- poor flow and a complicated socio-spatial terrain -- demanded considerable investment of time, money and personal energy to mitigate. The combination would prove even more formidable.

When the Indian Irrigation Service entered the field in 1906 the full complexity of these issues was not entirely appreciated. Although the IIS was aware of the past problems the Bureau of Indian Affairs had experienced with the Palm Valley Water Company, the virtual demise of that corporation encouraged it to believe that the company

was a minor player at best. Service officials did briefly consider the offer made by the First National Bank to sell the Company and its ditch system to the BIA, but correctly ascertained that the years of neglect and drought had rendered many of the ditches unusable. The asking price of $10,000 further dissuaded them; as IIS Chief Engineer William H. Code noted, "in view of the small number of Indians to be cared for I would not advocate such an expenditure."[53]

Similarly the arrival of a series of rainy years, ending the drought, made it feasible to improve the existing irrigation system. Various inspectors, engineers, and foremen busily generated project descriptions, cost schedules, and blue line maps showing how the Tahquitz ditch could be made to increase the flow of water reaching Section 14. The flow of Tahquitz Creek and losses due to seepage were carefully measured. Considerable optimism was expressed about their ability to enhance the system. Special Inspector Levi Chubbuck of the IIS averred that "It will be a simple matter -- only a little intelligently directed labor required -- to spread this water over this land and make it produce good crops of barley hay or at least good grazing."[54] Chief Engineer Code similarly believed that "it will be a simple matter to construct a small cobble stone ditch laid up in mortar to convey the low water flow without appreciable loss to section 14, and the Indians will be greatly benefited." If the Garden of Eden was also obtained, an expenditure of $2000 on the Tahquitz system, he claimed, "should render this little band of Indians independent of further aid from the Government."[55] Neither Code nor Chubbuck included the white settlers on Section 15 in their calculations.

Nor did they anticipate the revival of the Palm Valley Water Company in 1908 under the control of a man named Ralph Rogers. A schemer who had acquired the virtually derelict Company with hopes of fobbing it off on an unwary buyer, Rogers made his debut in Palm Springs by turning off the water in the Tahquitz ditch.[56] As Cahuilla Francisco and

Moreno Patencio, Segundo and Pedro Chino, Marcus Belardo, Francisco Arenas, Joe Rafael, Pico Manuel and Baristo Sal explained,

> just before the melons and figs were getting ripe, Mr. Rogers turned the water out of Tahquitz ditch allowing it to go to waste for four days until Segundo Chino turned it back in the ditch. Our crops consisting of melons, corn, beans, and pumpkins were practically destroyed. Our figs and alfalfa were badly damaged. Our loss was about fourteen hundred dollars.[57]

What Rogers hoped to accomplish was to force right of way concessions in Chino Canyon from the BIA. By claiming he held the water right on Tahquitz Creek through his acquisition of the Palm Valley Water Company, he endangered IIS plans for the Tahquitz water system. His claim was early recognized as specious, but his actions on the reservation proved annoying and damaging to Cahuilla property while the Bureau decided what to do. The problem was finally solved through what Chief Engineer Code likened to

> a "swap of poor jackknives." The Government is to allow Rogers a right of way over Indian land of no value, in consideration of his surrendering claims of an exceedingly doubtful character to certain waters from Tahquitz Creek.[58]

The Rogers affair had little direct impact on the management of the Tahquitz ditch in the long run. What it did do was to remind the Indian Irrigation Service of the presence of the other white settlers who had more legitimate claims on the water of Tahquitz Creek.[59]

The increased activity around the Tahquitz ditch reminded those settlers as well. Rogers' encroachments had prompted Mission Indian Agency Superintendent Clara D. True to pursue a policy of exclusive Cahuilla water rights, denying the claims of local whites as well as those of Rogers. Understandably, her actions provoked much anxiety and resentment among those involved. In 1909 Judge Alonzo E. Davis, a local resident, approached Superintendent True with a proposal. Speaking for his neighbors Welwood Murray, Mrs. Lavina F. Crocker, Mary C. McKenzie, John W. Ross, Pearl and Emily

McCallum as well as himself, Davis wrote that they were willing to guarantee the Cahuilla the first 40 inches of flow and to maintain and clean the ditches in exchange for a right to use any surplus water. Enclosed with his petition was an agreement to these terms that all had signed.[60]

Superintendent True was sceptical about their proposal, but conceded to Chief Engineer Code that the current state of affairs made some sort of formal arrangement desirable. "The building up of the community," she observed, "generally means the welfare of the Indians." However, an informal agreement among neighbors was not enough; she was adamant that the would-be white users organize themselves into a corporate body with the power to discipline its members and to negotiate on their behalf. Otherwise things would continue as they had in the past; she explained that "The white people have tried to manage water in a 'neighborhood' arrangement and have almost murdered each other and had the Indians at sword point."[61]

She argued the same point to Davis, reminding him that

> We are too old in tresspasses [sic] an [sic] in sin to have faith that water relinquished unconditionally to the settlement would be distributed with Arcadian sweetness. Palm Springs is, as you aptly describe it, the "tragedy of the desert." The abandoned and desolate homes all tell of the bitterness among the whites which has been the most powerful factor in the ruin of the place.[62]

Superintendent True's forceful, perhaps even zealous defense of her wards' interests resulted in her transferral by 1910. The "misnomer True" -- as Welwood Murray later described her -- had offended local whites with her actions vis-á-vis the Tahquitz water supply and with her often blunt comments on the white-Cahuilla relationship at Palm Springs.[63] Possibly, too, they resented the perspicacity of an outsider in comprehending the dynamics of the local ecoscape. In any case, her assessment of the situation proved accurate, to the frustrated dismay of the employees of the IIS who had to negotiate with local residents.

Beginning in August of 1910, after True had been replaced by William T. Sullivan, the Indian Irrigation Service collected information on the question of Tahquitz water rights. Chief Engineer Code approached Welwood Murray for a list of persons with claims on Tahquitz Creek. He also asked Dr. Hamilton Forline, May McCallum's husband, for advice on meeting with these people. He was discouragingly informed by Forline that

> it has been abundantly proven in the past that such meetings only delay the solution of the problem and are sources of the further development of that peculiar type of Palm Springs neighborly feeling which has been so disastrous to settlement of the difficulties in times gone by ...it is my judgement that you will conserve time, temper and tender by settling this matter, with these people as far apart as possible.[64]

Undaunted, the Indian Irrigation Service pursued the question of how best to compel cooperation with (and among) the white users of Tahquitz water. While on-site engineers struggled to repair flood damage caused by heavy rains in September of 1910, and pondered the costs and benefits of lining the ditch and installing a reservoir, their superiors debated how to apportion the water that the improved system would carry.[65]

The arrangement that Chief Engineer Code drew up, in consultation with Superintendent of Irrigation Charles R. Olberg, gave "the cream of the low water supply" to the Cahuilla and set down the manner in which the surplus would be distributed. When the water was flowing in an amount of 40 miner's inches or less, it would all go to the Cahuilla, except for about 5 inches set aside for domestic use by the white settlers. When the ditch carried between 40 and 80 inches, the Cahuilla would get forty inches and the settlers would get the remainder. When the flow was over 80 inches, the Cahuilla would get two-thirds of the water in excess of 80 inches, with the remaining third being divided among the white users. In exchange for being allowed to use what the Indian Irrigation Service considered Cahuilla water, the settlers would be responsible for maintaining the

ditch and keeping it clean. A *zanjero* (watermaster), would be responsible for measuring and distributing the water according to the agreement.[66]

Getting the white users to accept this contract proved more difficult than crafting it. Superintendent Olberg called it "the hardest little job that I ever got up against" and averred that he "would not have that kind of work as a steady job for $40 -- or any other price." Unused to such negotiations, and concerned that his crew under Foreman H. F. Makosky be allowed to move onto Section 15 before lack of work made their transfer monetarily necessary, Olberg sweated through his efforts to remain "decent and agreeable under most trying circumstances." Pearl McCallum, Welwood Murray, and Mrs. Nellie Coffman gave him the most trouble, each carefully scrutinizing his or her share relative to that of the others.[67]

For their part, such caution was understandable. The Coffmans had built the Desert Inn hotel only two years before, not enough time to realize their investment. Pearl McCallum and Welwood Murray had been in the area since its foundation and had developed a certain proprietary feeling towards the water of Tahquitz. Murray was under great stress at the time due to the declining health of his wife. McCallum, meanwhile, was undoubtedly still vexed by the damages done by the September floods to her property (she blamed Makosky and his crew) and her family had long had a troubled relationship with the Indian Service since their arrival in the area. Suspicion and outright hostility within the Palm Springs community affected their willingness to concede perceived advantages to other white users.[68]

After a few more amendments to the agreement, it was sent back for final approval by the white users on February 10, 1911. For the most part it went smoothly. There was a bit of a delay when it was realized that Murray's interest had been transferred to his son George Welwood Murray, an attorney in Chicago, but George Murray proved pleasantly willing to sign the 12 notarized copies that the Bureau had sent to him. Pearl McCallum

signed the document without complaint, though immediately afterwards she took some issue with the clause that gave the Cahuilla two-thirds of the water. Davis was out of town, but was expected to sign when he returned (which he did). Mrs. Coffman and Davis complicated things a bit when he sold her 5 1/2 acres, necessitating an amendment to the contract.[69]

Yet by the end of the day Indian Irrigation Service felt satisfied with the results. Makosky's crew was given permission to continue their work onto Section 15. The Bureau of Indian Affairs looked to hire a farmer to act as zanjero and educate the Cahuilla about farming. The contract was sent back to the main office and was approved on March 14, 1911. Superintendent Sullivan was pleased that it gave the Cahuilla two-thirds of the surplus. Everyone seemed satisfied -- everyone, that is, except the Cahuilla.

During his soul-trying negotiations with Palm Springs whites, Olberg had avoided discussing the matter with the other users of the ditch, the Cahuilla. When they learned of the agreement, they "held a council and sent two of their number to Mr. Sullivan to protest against giving the whites any water, as they claimed that they owned it all."[70] Upon learning of this from Olberg, Code concurred with Olberg's assessment that it would have been "foolish" to have included the Cahuilla in the negotiations. As the Cahuilla had once been the sole users of Tahquitz Creek, and had tasted the possibility of reclaiming that status through True's actions in 1909, their dismay with these machinations is understandable. Indeed, given their past experiences with white users' ideas about what "sharing" these waters entailed, one feels a definite sympathy for their protests.

The complaints of the Cahuilla did not receive any substantive response at this time; Code merely advised Olberg to meet with Superintendent Sullivan and the Cahuilla in order to "give them as plain an understanding as they will be capable of getting regarding this somewhat perplexing contract."[71] The general tendency of the government

employees involved in the negotiations was to praise the agreement, particularly the way the division of Tahquitz waters "favored" the Cahuilla.

Over the next two decades the Indian Irrigation Service continued to hold this view, justifying its expense of time, money and labor with perceived benefits brought to the Cahuilla. Looking back on the work accomplished by the Service, the Superintendent of Irrigation reflected contentedly that their efforts had literally borne fruit, despite the fact that

> a few members of the Indian Colony at Palm Springs have for years resisted all efforts of the Indian Superintendents and irrigation officials to better their condition... considerably hampering a project which was already beset by a great many difficulties.

"Happily," he wrote in 1915, "many of the Palm Springs Indians are more in sympathy with efforts made in their behalf," using the irrigation system with "gratifying results."[72] Although the IIS did not know it at the time, this supposedly halcyon period would not last. As the twentieth century entered its second decade, the system and the agreement of 1911 proved an inadequate arrangement for meeting the needs of the rapidly booming resort.

Towards a Domestic Water System

In the 1910s and 1920s Indian Irrigation Service engineers expanded their work on the Tahquitz ditch system. They repaired flood damage caused by heavy rains in 1913, 1916, 1917 and 1927. They built retaining walls, repaired dams, leaf traps and pipes, and cleared out brush, sand and other debris. They added a few more turnouts for the white users. They surveyed an extension of the system onto Section 14. They excavated a reservoir around the hot spring to store water from Tahquitz Creek overnight. Culverts were installed to carry the water under the roads the ditch crossed on its way to the reservation. They relined the ditch in order to minimize leakage. They lined the area near the intake

in Tahquitz Canyon after an earthquake in 1919 shattered the hard pan below and allowed the water to drain away before reaching the ditch. They extended the ditch system, worked on the syphon at the mouth of the canyon, and shored up various sections of the ditch in order to protect it from future floods.[73]

Meanwhile U.S. Indian Service Farmer Adrian I. Maxwell was hired to serve as zanjero and to work with the Cahuilla to increase the cultivation of marketable crops (as we have already seen in our discussion of Andreas Canyon). His former role affirmed the government's commitment to the 1911 water agreement; his latter one justified the expansion and maintenance of the irrigation system. During his 5-year tenure Farmer Maxwell worked enthusiastically with the Cahuilla at Palm Springs and the Garden of Eden, although the Cahuilla considered his presence superfluous. "The Indian is by nature a farmer," wrote the members of the self-named "Original Council" of the Cahuilla, "Give us water and we can spare the Government the expense of a Farmer on our reservation."[74] The matter was not that simple in practice.

The Cahuilla were understandably sceptical about Maxwell's abilities as zanjero, noting that they were still finding "dead chickens, cats, and other refuse in the ditch" in 1914.[75] Maxwell himself was cognizant of the problems of sanitation and sympathetic to Cahuilla complaints about not getting their full share of the water. However, it is difficult to see how removing him -- as the Cahuilla proposed -- would have remedied the situation. One lengthy passage in which he vented his frustration with the ditch situation is worth quoting in its entirety, as it summarizes all the difficulties he confronted on a daily basis:

> One Indian will come along and tell me to turn the water down his way an hour so his horses and poultry can have water and I turn the water down his way, about an hour and as soon as I shut it off back he comes and says turn the water down my way about two hours for the water did not reach me NOW BEAR IN MIND when I turn the water down his way two more hours that makes three hours in all and a head

of 75" will not more than reach him during this run so he can fill up his barrels for domestic use. About this time I have turned the water down for the man who is waiting for the water to irrigate his crop which is withering in the sun shining 150 degrees and along comes another fellow in trouble who says he has not had water for his horses and poultry and for his own water jar and he wants water in his ditch for an hour which is constructed of pure granite sand and the water sinks in it like it was a strainer. Now what does the man do who has been standing in the hot sun waiting for water to irrigate his crop. He goes home disgusted with the whole thing and either lays down in the shade or gets a job of work from his white neighbor where he knows he will get $2. at five o'clock in the evening and you can well guess what become [sic] of his crop.

...Another thing, this ditch water runs through sanitorium [sic] grounds where they [sic] are careless consumptives and they have the deadly poison oleander hanging over the open ditch and the flowers and leaves continually falling in the water and when the water is low it makes it very dangerous for drinking water. The Indians are continually kicking about dirty water and I don't blame them much for before the white man moved in between them and the mountains they had clean water.[76]

Superintendent Olberg -- the recipient of this outburst -- conceded that the position of zanjero was inherently "full of vexatious problems" but believed that "it is possible that Mr. Maxwell has been unduly irritated by acts that would not in themselves be particularly heinous." In fairness to Maxwell, it must be noted that the dumping of manure and other waste into the ditches, and the persistent efforts of some white users, such as Dr. Coffman, to bypass Maxwell by taking their water out of turn or in excess of the amounts allowed, would make most people "irritated."[77] Moreover, more was involved than one man's difficulty in coping with the demands of his job.

The highly visible problems of sanitation, distribution and conflict between white and Cahuilla water users obscured a larger challenge to the carefully constructed irrigation system. As Maxwell's comments suggest, wage labor offered a viable -- in some respects preferable -- alternative to agriculture as a way for the Cahuilla to make a living.[78] The problems of sanitation had increased since 1911, leading Maxwell to suggest in 1914 that

the ditch be replaced or augmented with a pipeline for domestic use. The decline of agriculture and the increase in pollution stemmed from the same source: the increasingly rapid growth of urban Palm Springs.

The changes this growth brought would render the Indian Irrigation Service ever more superfluous. The IIS was reluctant to construct the domestic water line, even with outside funding, on the grounds that the water would not be used for irrigation and that the project was therefore outside its purview. This reluctance suggests a tacit acknowledgement that the Service -- and its parent agency -- would play a minor role (if any) in the subsequent development of the growing resort community.[79] Beginning in 1923, the idea that the Cahuilla could best be served by boosting Palm Springs became more acceptable to the Bureau of Indian Affairs. This suggests that the Service was already looking ahead to a day when Palm Springs would take over its role in improving the livelihood of the Cahuilla.[80]

Subsequent events chanted a litany of increasing irrelevance. Farmer Adrian Maxwell was transferred to the Nevada Indian School in Nixon, Nevada, in November 1916.[81] The domestic water system was installed, after much cajoling by MIA Superintendent Charles L. Ellis, in 1925.[82] As IIS Engineer H. K. Palmer (who began work in Palm Springs as a Junior Engineer in 1910), explained earlier that year,

> With the construction of good roads and the general use of autos, the town has ceased to be a third rate health resort and has become a prosperous winter resort, and has experienced quite a boom. This means that there is now plenty of work for the Indians who prefer to work by the day or week when they need money, to farming, with its returns only in the distant future. The result is that the agriculture on this reservation is doomed to become a negative quantity, if it has not already done so.[83]

Cracks in the 1911 agreement continued to widen after 1925. In 1928 the Division of Water Rights of the California Department of Public Works held hearings to ascertain the "rights by appropriation" in the Coachella Valley. Although the hearing ostensibly was

focused on the Whitewater River, it included findings on the waters of Tahquitz, Palm, Andreas, Murray and Chino Canyons as well. These findings, published in April, confirmed the right of white users to the waters of Tahquitz Creek, and dated that right back to April 26, 1884.[84] By affirming this right, and finding that it antedated the 1911 agreement -- indeed all of the earlier agreements -- the 1928 Adjudication Hearings challenged the basis on which those agreements had been made. These agreements had been originally established to allow the white settlers to use the waters of Tahquitz in exchange for certain concessions; the main implication of the Hearings was that when these users signed their contracts with the Bureau of Indian Affairs they were in effect agreeing to the government's terms in order to secure a right which they already possessed.

By this interpretation, the white users of Tahquitz -- listed as Nellie and Helen Coffman, Cornelia B. and Florilla M. White, Isabel White Chase, Lavina F. Crocker, Pearl McCallum McManus, George Welwood Murray, Ruth J. Orr, T. L. Douglas, C. A. Abbott, and Charles Powers in the 1928 findings -- would have been justified in rejecting their responsibilities vis-á-vis the maintenance of the Tahquitz ditch.[85] That they did not indicates that they did still benefit from the presence of a government-supplied zanjero (and -- if cynicism is allowed -- it also reflects the fact that some of them had not met their responsibilities even before the validity of the 1911 agreement was called into question). The Indian Irrigation Service, if nothing else, functioned as an ostensibly objective authority in local disputes between the various users of the ditch system. Thus in 1932, when Pearl McManus wanted to sell some of her "points" -- her water allocation based on the acreage under irrigation in 1911 -- and construct a new point of diversion on the ditch itself, she was able to turn to the IIS for help in getting it approved by her neighbors.[86]

The perspective of the Cahuilla was different. As they saw it, they had given up much and gained little. Once the sole users of Tahquitz Creek, they had found their rights increasingly constrained after the arrival of the whites in 1884. Although the 1928

hearing confirmed the right of the government to the water of Tahquitz on behalf of the Cahuilla, the Cahuilla themselves were not mentioned in the findings. The hearing offered little to them except perhaps a stronger legal basis on which to challenge white users who used more than their allotted share. The 1911 agreement, though it protected their rights on paper, lacked teeth in practice. The Cahuilla initially had no basis on which to judge whether it was being enforced or not; they did not receive a copy of the agreement until 1921, and even then it was only an excerpt relating to the whites' obligation to keep the ditch clear.[87]

Rejecting the belief of government officials that the community of Palm Springs would eventually replace them as the guardians of the Cahuilla, the Cahuilla asserted their right to manage their own affairs. They had said as much in 1914, when they argued that they didn't need the services of Farmer Maxwell. At the Garden of Eden, at Palm Canyon, at Agua Caliente, the Cahuilla endeavored to reclaim their right to administer tribal business themselves. They did the same at Tahquitz Canyon.

In 1936, Willie Marcus, acting as the spokesman for the Tribal Committee, informed Secretary of the Interior Harold L. Ickes that the Cahuilla were cancelling the 1911 agreement. Frustrated by years of being handed *fait accompli* agreements -- agreements which were rarely lived up to by their white neighbors -- and by their current struggles with white Palm Springs and Superintendent John W. Dady, they announced their intention to use tribal funds to tap into Tahquitz Creek at the source, bypassing their troublesome neighbors entirely.[88]

The new water system was completed in 1939, and for the first time the two groups -- white settlers and Cahuilla -- received their water by way of separate systems.[89] The same year District Council Geraint Humphreys recommended to IIS Director of Irrigation A. L. Wathen that the 1911 agreement be abrogated, as the conditions under which it -- and the ditch -- had been constructed were no longer in force.[90] By the end of the 1930s the

authority of the Indian Irrigation Service, like the 1911 agreement and water system it had laboriously constructed, had become superfluous to needs and interests of urban Palm Springs.

Although an air of resignation tinges the correspondence of the IIS after 1936, there is also a sense of relief that the Service would no longer have to take a majority responsibility for water projects in the area. In 1938 and 1939, for example, flooding from nearby Tachevah Canyon prompted both the Cahuilla and the white residents of Section 10 to complain about the damage. The Indian Irrigation Service, after analyzing the situation, found that responsibility both for the damage and for making the necessary measures to control future floods could be laid at the feet of the city and county. Beyond ascertaining that the proposed flood control plans would not increase damage on the reservation, and contributing some funds and labor for the protection of reservation lands, Service officials seem to have been content to leave matters in local hands.[91]

Although the Tahquitz system constructed by the Indian Irrigation Service had survived the floods pouring down Tahquitz Canyon, it could not withstand the flood of white newcomers to Palm Springs. It had been repaired after earthquakes ruptured pipelines and cracked the ground beneath them, but no one could undo the alterations wrought by the urbanization of Palm Springs. Although reservoirs, pipes and lining could mitigate the loss of water when Tahquitz Creek ran low, the Indian Irrigation Service proved unable to staunch the flow of Cahuilla into wage labor when agricultural opportunities dried up. Both physically and metaphorically, the Tahquitz irrigation system had declined from a central feature of the ecoscape to little more than a pretty way to water flowers and lawns.

**Traversing the Terrain of Tahquitz**

The significance of the overlapping and competing cartographies discussed earlier lies in what they can tell us about the ecoscape of Tahquitz Canyon. They describe not only

its physical features, but its social relationships and the perceptions and practices of those who gave shape to its development -- the IIS, the Cahuilla, white settlers, surveyors, and others. The construction of the Tahquitz ditch system occurred in a context of competing and complementary cartographies and practices and on a shared physical terrain. Travel narratives, with their suggestions for navigating the Palm Valley ecoscape, offer guidelines for charting the path that the Tahquitz ditch carved through the shifting terrain of enmeshed white, government, and Cahuilla ecoscapes.

The Cahuilla of the northern Coachella Valley had many years in which to make sense of their ecoscape. Their understanding of its ecosystems in particular was both specific and vast. Ethnobotanists have spilled much ink in their efforts to capture or recreate the depth and detail of Cahuilla plant lore; cultural resource specialists have labored to compile maps of the spatial geography of pre-contact Cahuilla; anthropologists have amassed reams of notes about marriage structures, death rituals, and puberty rites. Yet Cahuilla knowledge encompassed more than an understanding of local communities' social norms and of local ecosystems. Cahuilla oral tradition specifically located human history in the ecosystem and argued that the ecosystem could not be understood apart from human relationships. As increasing numbers of white settlers and government agents flowed into the Cahuilla homeland after 1877, that familiar ecoscape was slowly but surely transformed into something new. The Cahuilla would have to adapt their cartography to reflect these changes if they wished to retain mastery of the local ecoscape.

Were it not for the resilience and creativity of the Cahuilla, such a task would have been difficult. Their understanding of the local ecoscape had been developed over many generations, reinscribed by traditional stories. The daily presence of geo-social markers and individuals' own experiences in the region further reinforced the reproduction and transmission of Cahuilla knowledge and practices.

Central to the spatial cartography of the Cahuilla were the trails that crossed and recrossed the local terrain, and the stories and practices associated with them. These trails served to connect distant trading partners, and led to gathering grounds, sacred sites, seasonal villages, and hunting areas. Such trails enabled the Cahuilla to get from place to place and simultaneously articulated complex relations between social groups, specific locales, and the Cahuilla past. Some trails, for example, were for use only by certain lineages or for particular purposes. Others were mentioned in stories about earlier trail-makers, such as Evonganet and Kauiskiauka. According to anthropologist Lowell John Bean, "it was essential for everyone to know not only the differences between the trails, but also all the identifying trail markers in order not to trespass onto land belonging to other groups."[92]

Knowledge of such markers was passed on and reinforced through traditional stories, the experiential quality of many markers' names and descriptions (that is, they evoked effects specific markers had on the traveller's senses, such as hearing or smell), and practices specifically concerned with trail maintenance. Keeping the trails clear was an on-going and vital task. As is apparent from the narratives of the government survey parties, the mountain slopes, left untended, supported a thick growth of tough and thorny plants. One way to clear the trails was by fire, which required not only expert knowledge (else the fire could rage out of control and destroy vital food crops) but cooperation. In 1943 Cahuilla elder Francisco Patencio explained that "If the Indians need to set a fire to clear a brushy trail, they notify all the tribes around so that they will understand." Also important, particularly given the physical hazards associated with travel, trail or no trail, was the regular construction of trail shrines or offerings. According to Patencio, "When the hunters were having trouble about things, they gathered up rocks from the trail, and put them in piles on the side. This pleased the spirits, and caused goodwill." By this single action, the makers of such piles both cleared the trail and appeased potentially

threatening neighbors (such as Tahquitz, about whom more will be said later). The physicality of Cahuilla trails, then, could not be understood apart from the intangible web in which they existed. Indeed, they were one of the strands that bound the Cahuilla ecoscape together.[93]

When white settlers came into Palm Valley, both the tangible and intangible aspects of the Cahuilla ecoscape were irreparably altered. The cartographies of the Cahuilla, if they were to remain functional, needed to be updated to account for the changes. Such updating had been done on occasion in the past. Francisco Patencio mentioned several instances of significant geological change as well as the socio-cultural changes that resulted as new peoples passed through the region. The rise and fall of Ancient Lake Cahuilla, the current Salton Sea's elder, greater incarnation, transformed the region greatly. Earthquakes as well as flood could alter familiar places. When Patencio was a child, as we have seen,

> [T]here came such earthquakes as had not been known to any of the people. Whole mountains split -- some rose up where there had been none before. Other peaks went down, and never came up again. It was a terrible time. The mountains that the people knew well were strange places that they had never seen before.... There were many springs on the mountain sides and on the level land. When the rains came less, they dried out and went away. No one knows where they used to be any more.[94]

The changes brought by the white settlers were both more subtle and more profound. The ecosystem was gradually transformed as landmark mesquite groves were killed, new species were introduced, roads were built, irrigation ditches laid and altered, homes constructed, and so on. More intangible transformations occurred alongside. Familiar territories were declared off-limits and claimed by unfamiliar peoples. Invisible grids literally delineated space that had previously been organized around the physical contours of the ecosystem. New names were imposed on top of old ones, and some of the latter forgotten entirely. The complex network of places that made up the steep canyon

whose mouth opened near the hot springs was transformed into a simplified system contained by the designation "Tahquitz Canyon."

The Cahuilla made the necessary alterations to their cartographies to account for the changes. Alejo Patencio, Francisco's brother, combined both Anglo and Cahuilla appellations in the version of Kauiskiauka's journey he related to anthropologist William Duncan Strong in the 1920s. Where appropriate he glossed familiar Cahuilla place names with an explanation of their location relative to those more familiar to Strong. Thus "kauissimtcem hempkı" became a "hill four miles south of Palm Springs," "kakwawit" became "mouth of Tahquitz canyon," and "palhanikalet" became "water falling down" and "name of Tahquitz falls." Francisco performed similar translation in his 1943 account of the journeys of Evonganet and Kauiskiauka. In it he combined Anglo and Cahuilla place names and Anglo translations of the literal meaning of Cahuilla names. Such alterations became increasingly common as the numbers of non-Cahuilla in the region grew, reflecting the growing irrelevance of large portions of traditional Cahuilla cartographies; by the 1930s the Tribal Council of the Agua Caliente Band of Mission Indians (as Palm Valley's Cahuilla came to be known) had to request maps from the federal government in order to defend their land and water rights against their white neighbors in Palm Springs.[95]

Among the changes to which the Cahuilla had to adapt were those relating to their relationship with Tahquitz Creek. Its waters, brought to their fields near the hot spring, irrigated imported food crops such as corn and barley, even as the overflow watered indigenous mesquite groves near the canyon mouth. Their imported crops, so dependent on irrigation, would bear the brunt not only of changes in the ecosystem -- such as drought or flood -- but in the intangible terrain on which Cahuilla and white settlers encountered each other. When the Cahuilla struggled with their white neighbors, they fought not only over water, but over the right to define what was significant, desirable, and proper in the local ecoscape. Much as the earthen irrigation ditch of the early Cahuilla was

transformed into a complex system of pipes, weirs, dams and cement-lined ditch, the ecoscape through which it ran was transformed from a world where culture heroes like Evonganet laid trails through mountains and canyons to one in which journeys proceeded along roadways, ditches and section lines.

In contrast to the Cahuilla, the white settlers who came to Palm Valley in the 1880s and afterward were initially handicapped by their lack of specific knowledge about the region. This ignorance was further compounded by a lack of systematic ways for obtaining such knowledge; in some ways their preconceptions about western ecoscapes actually discouraged the development of effective systems for its acquisition. Instead, the settlers relied on allusions to distant lands and ancient civilizations to describe their new surroundings. Their division of the ecoscape into "nature" and "culture" made it difficult for them to perceive -- let alone comprehend -- the ways that human beliefs, practices, and the local ecosystem were all intimately and intricately linked. These qualities of the settler cartographies predisposed the white villagers of Palm Springs to lean heavily on outside expertise for specific local knowledge. At the same time they discouraged the villagers from learning such knowledge from the Cahuilla.

The difficulty Americans once had describing and comprehending the western deserts has been well-documented by Anne Farrar Hyde in *An American Vision*. According to Hyde, American explorers, settlers, and tourists found themselves literally speechless before the unique landscapes of the American West, particularly its deserts. She argues that through the process of forging new ways to describe unique landscapes, Americans developed an identity for themselves that was not dependent on comparisons to Old World aesthetics. In the literature of men like George Wharton James and James Smeaton Chase, both of whom maintained residences in Palm Valley, we can see the struggle to describe a region only slightly more familiar to these relative newcomers than to their distant audiences.[96]

The narratives of both these men emphasize the weird, the exotic, the folksy, and things evocative of ancient civilizations and distant lands. The titles of two of their books -- *The Wonders of the Colorado Desert* (James) and *Our Araby* (Chase) -- embody these tendencies. The genre of desert writing represented by James and Chase focuses on a limited and expected range of subjects, thus easing some of the difficulties such writers faced in describing the Colorado Desert to people who had never even seen a desert, let alone this particular one. Aridity, weather, strange vegetation (particularly ocotillos, Joshua Trees, cacti, and the statuesque desert palms), weird animals (particularly the dangerous or physically distinctive), stark rock forms, the colors of desert light, and exotic peoples were all essential players in these desert dramas.[97]

"Indians" (writers in this genre rarely made much effort to distinguish between specific native peoples) and aspects of their culture were a favorite topic. Their "legends" and "myths" received particular attention. The "demon Tahquitz" captured the imagination of many such writers. All agreed that the Indians believed the following: Tahquitz would punish them if they trespassed in his domain atop Tahquitz Peak (a subsidiary peak of Mount San Jacinto); Tahquitz could appear as a ball of lightning; Tahquitz was responsible for the rumblings of the earth heard in the upper canyons; and Tahquitz was malicious and the cause of many accidents and ill-fortune. The Cahuilla seem to have agreed with most of these assertions, or at least did not openly challenge them. However, the presence of Cahuilla trails on and around the mountain (which brings the first belief into question) suggest that in general such assertions about Cahuilla beliefs should be taken with a grain of salt.[98]

Taken as a whole, the collection of Tahquitz stories found in travel literature is more the product of white authors looking for "ancient legends" and "native superstitions" with which to titillate the reader than an accurate transcription of Cahuilla cosmology. Journalist John Hamilton Gilmour's 1892 account in the *San Francisco Chronicle* described

Tahquitz as "a chief of gigantic proportions" who abducted a girl from a neighboring "tribe"; however, Gilmour heard this story not from the Cahuilla, but from Welwood Murray.[99] Chase likened Tahquitz to "'the fellow in the cellarage,' old Truepenny himself" and conflated him with another one of the *nukatem* (spirit beings) known to the Diegueño Indians to the south as Chowk. For the members of a Sierra Club outing in 1918, Tahquitz was the subject for campfire tales and laughter, though the laughter was rueful the next day when the group was plagued by a streak of bad luck.[100] While the *nukat* Tahquitz was one of many significant powers in Cahuilla cosmology, the demon Tahquitz was more the "evil spirit" of whites, deriving his significance in their cartographies from being a fit subject for humor, quaint tales, and evidence of native superstition.

The Cahuillas' expert knowledge of the Palm Valley ecoscape, meanwhile, was rarely acknowledged, although it was accepted that the Cahuilla were useful sources of information about the location of springs and water holes. As George Wharton James pointed out in his guidebook,

> The Indians of the Colorado Desert ...discovered and located all the hot and cold springs... Early day travelers and prospectors on the desert were entirely dependent upon the favor of Indians or their own skill to discover water-holes, "seeps," or springs.[101]

On occasion the grudging admission was made that their knowledge of indigenous plants was extensive, though generally it was tempered by an assertion that the accuracy of Cahuilla lore had to be confirmed by scientists before would-be experimenters acted on it. Chase claimed in his chapter on "Some Desert Indian Lore," that

> much of what follows cannot be taken as trustworthy. Every one who has attempted to delve into affairs ethnological, even if he be fitted for the task by study and training, knows the hopelessness of efforts to clear up the doubts and contradictions that arise at every step. Hence these scraps of supposed fact or belief are offered more for the passing interest or amusement of the reader than as reliable fragments of knowledge. The only items not subject to this qualification are

those referring to the medical qualities of plants, in so far as they may have been proved and accepted by authorities.[102]

Generally speaking, the vast stores of local knowledge held by the Cahuilla went untapped by (or was withheld from) their neighbors. The only non-indigenous people who showed much interest were the anthropologists who came and went, but did not stay.

The cartographies constructed about the Palm Valley ecoscape by white settlers were not focused on understanding that ecoscape *per se*, as a complex network of locally specific peoples, practices, and places. Nor were they geared towards improving the settlers' "fit" into the web of existing relations. Rather, aspects of that ecoscape were singled out and integrated into their own imported patterns as much as possible, especially by recent arrivals. Thus Tahquitz Canyon was likened to the Colosseum, the Cahuilla were fit into the stereotype of the childlike, superstitious Indian, and Tahquitz became a quaint local version of the folkloric devil.[103] Settlers who had been in the region for a while did slowly begin to develop an awareness of the ebbs and flows of desert life. They learned how to deal with the heat, the cold, the winds, and the unfamiliar plants; they came to know the character and locations of their neighbors. They learned that Tahquitz Creek ran dry in summer, and that heavy rains could cause damaging floods.

Some never managed to develop this sense of the ecoscape; the rigidity of their cartographies precluded their appreciation of new experiences. As George Wharton James, a resident of both Pasadena and Palm Valley's Chino Canyon, noted: "Some white men are naturally antagonistic to the desert. They fear, dread, and shun it. Its hardships and dangers, its perils and deaths, daunt and restrain them, and comparatively few ever venture into its secret and hidden places."[104] Most white newcomers lacked a systematic way to accrue the knowledge needed to survive and thrive in the desert, and relied primarily on the hard lessons of experience and the dubious expertise of residents and travelers who might be scarcely more knowledgeable than themselves. As a result, guide books and travelogues by self-acclaimed experts such as James and Chase became the objects

of careful scrutiny by both locals and visitors. For example, one reviewer for the *Sierra Club Bulletin* found Chase's book *California Desert Trails* fairly interesting and useful, but complained that "There is too much of the unessential, carefully written down at length. The effect is somewhat that of another traveler who was unable to see the forest because of the trees."[105] Similarly, it is not surprising that such settlers and travelers used the number of years resident in the area as a marker of a person's ability to speak with authority on local matters.[106]

Many whites relied heavily on the efforts of the federal government and its agents to compile data about the region for them. Errant travelers could and did become lost as they rambled about the desert looking for gold, adventure, romance, and scientific curiosities. Visitor William Wightman Price discovered this in 1892 when a planned cross-mountain "tour" turned into an anxious ordeal after he mistook game trails for human trails on his first day out. Though he managed to find his way back to Palm Springs the following morning, he was not incorrect in assuming that his mistake could easily have become a fatal one.[107] Thus government surveys, the establishment of boundary lines, the setting of signposts, and the mapping of the region were viewed with great interest by settlers and travelers unwilling or unable to compile accurate and locally specific data themselves. Local whites relied on the expertise of the engineers of the Indian Irrigation Service, who knew how to measure the flow of water accurately, lay ditches most effectively, and construct lasting irrigation structures. When this expertise was undermined (sometimes literally) by changes in the ecosystem, such as those caused by flood, earthquake and drought, white settlers were forced back on their own recognizance, often with harmful results. We can see this in the repeated attempts by white users of the Tahquitz ditch to circumvent the restrictions imposed by agreements and government zanjeros, and in the harm done to the Cahuilla as a result.

The approach used by the settlers -- using outside expertise when it could aid their efforts to further their own ends and rejecting it when it did not -- proved effective if at times crude. They were able to combine the specific knowledge borrowed from the federal government with their own strong sense of how things should be. At times, they were even able to use that borrowed knowledge to force the government to assist them, as when McCallum forced the Bureau of Indian Affairs to acknowledge that the grid system that granted it authority in the region (through the reservation) also placed limits on that authority.

As time passed, daily experience improved settlers' own knowledge of the ecoscape, which helped them directly in navigating the ecoscape themselves, and indirectly when they needed to decide which outside data to use. Extrapolating from the survey data in 1936 to draw their own conclusions, the Chamber of Commerce wrote regarding Section 22, located at the mouth of Tahquitz Canyon,

> This land is composed of the fan from the erosion in Tahquitz Canyon. It is high, rocky, and uneven. The soil is not fertile and it is impossible to irrigate it for crop raising, but it is well situated for high-class residential sites.[108]

This assertion not only supported their claim that this reservation land should be given to the Chamber to ensure it would be put to "proper" use. It also demonstrated that the villagers believed their (borrowed) knowledge of the region provided a strong enough base on which to make such pronouncements. Yet those agencies which had been essential in gathering such data did not always accept the conclusions the villagers drew from them.

Government understanding of the region, like that of the settlers, was based in part on the assumption that "nature" and "culture" were separate and separable; it was similarly marked by an early ignorance of the local ecoscape. Unlike the villagers, the government possessed an array of systems and methods for the collection, interpretation and transmission of data. Developed out of an amalgam of experiences in diverse situations, such systems enabled the agents of the government to accrue knowledge about the specifics

of the Palm Valley ecoscape. However these systems were better suited for analyzing discrete aspects of the ecoscape than comprehending the whole. Research labor was divided between specialists of "culture" (such as anthropologists) and specialists of "nature" (such as biologists). Further divisions separated men into farmers, surveyors, engineers, geologists, and so on. The wealth of systematically ordered data garnered by these specialists gave the impression of solid knowledge about the region in entirety, particularly to agencies located far away. Yet federal comprehension of the relationships between these segregated data was much less thorough. Locally, the government's agents repeatedly had to reconcile their desire (and need) for segregated data with the awareness gained through their own experience that no one element could be completely isolated from the whole. As Indian Irrigation Service engineers learned, constructing the Tahquitz ditch system occurred on the levels of practice and perception as well as on more tangible terrain. A clean line between "nature" and "culture" did not exist in the daily life of the Palm Valley ecoscape. As a result data collected according to that assumption provided an often inadequate base on which to construct an understanding of the relationships that crossed and refuted that line.

The diverse array of maps, survey field notes, and written descriptions of the region reveal the geography of Tahquitz Canyon. They also, if read carefully, illumine the framework employed by the often remote government agencies to make sense both of that geography and the relations by which it was informed and which it shaped. The most illustrative examples of the government's cartographies are its literal "cartographs" -- the maps and surveys produced for the Palm Valley area. These materials typify the essence of the government's approach in their placement of locally specific elements into a familiar, abstract framework. Pipelines, property lines, and section lines were carefully inked in, labeled, and scrutinized. Yet these textual and visual representations of the

region's valleys, mountains, vegetation and human-made structure did not simply describe the ecoscape and chart its changes. They also reinscribed and altered various aspects of it.

As we have seen, as the surveyors and their small parties of chainmen, compassmen, flagmen and axemen traversed and retraversed the physical terrain of Palm Valley they encountered rocky slopes, gulches, washes, and areas of dense brush, all of which was duly recorded. They discovered roads, cabins, fences and cultivated fields; on resurvey expeditions they actively sought for the signs of their earlier colleagues' passage in the form of posts, stones, mounds and pits. Even as they sought and recorded physical objects along the lines, these men demonstrated an awareness of intangible relationships. Trails were identified as "Indian," canyons and streams could sometimes be identified by their local names; the age of roadways could be confirmed by asking bystanders; ownership as well as physical location and appearance could be used to identify structures; and the inaccuracy of existing monuments was blamed on earlier, less adept surveyors.

At the same time the survey parties made their own contributions to the ecoscape. They erected new posts, carved notches into trees, dug pits and raised mounds, all according to specific (indeed, even ritualistic) guidelines. They imposed (or reconfirmed) the abstract system of Township and Section, in which physical space was located relative to invisible lines determined not by local geography or even by the monuments erected by the surveyors in such proliferation. Instead they were established through the arcana of specialized instruments, mathematical calculations, the position of celestial bodies and the movement of compass needles. This abstractness was reinforced by the verbal descriptions the surveyors wrote about the territory they encountered. Regardless of the specific locality in which their surveys occurred, their notations fell into rubrics that emphasized the typical over the unique.

A set and fairly limited vocabulary was used to describe the ecosystem encountered by the survey team -- or, more accurately, the narrow strip, a couple of chains wide, on

either side of the grid line that they traversed.[109] The surveyors were enjoined to note the following in their field notes by the Commissioner of the General Land Office in 1881, and to specify their dimensions, location, and composition:

> 1) The precise length of every line run… 2) *"bearing trees"* and WITNESS CORNERS… 3) The kinds of materials of which corners are constructed. 4) *Trees on line*… 5) *land objects*… 6) *water objects*… 7) The land's *surface*, whether level, rolling, broken, or hilly. 8) The *soil* – whether first, second, third, or fourth rate. 9) *Timber*… 10) *Bottom lands*… 11) *Springs of water*… 12) *Lakes and ponds*… 13) *Improvements*… 14) *Coal*,… *peat*,… *minerals*,… *diggings*,… also *salt* springs and licks… 15) *Roads and trails*… 16) Rapids, cataracts, cascades, or falls of water… 17) Precipices, caves, sink holes, ravines, stone quarries, ledges of rocks… 18) *Natural curiosities*… also all ancient works of art… 19) The *variation* of the needle [from true north]…[110]

Within these specific parameters, which became increasingly precise and complex over time, there was some room for elaboration on the part of the individual surveyor, depending on his knowledge of the local terrain and vegetation. While some surveyors were knowledgeable enough to specify species such as sotol or manzanita, others were unable (or unwilling) to identify species more precisely than as "greasewood," "cactus," or "brush." The same can be said for descriptions of other objects that lie in the surveyor's path; after reading innumerable notations about "washes, course SE," "roads, bearing SW and NE," and the like, it is very easy to become confused by the repetitive character of these descriptions. One cannot tell at a glance "where" one is while reading the survey logs; it is often necessary to sketch a map to keep track of whether the wash, 10 links wide, 2 inches deep described on one page of the report is the same as that mentioned on another.

Given these uncertainties, the need for clearly recognizable markers for Township, Section, and 1/4 section corners (to name only the three most basic types) was obvious. The descriptions and requirements for "the corners" (as the markers came to be known, having been conflated with the abstract intersections they represent) grew in complexity during

the period here discussed. The 1881 "Instructions of the Commissioner of the General Land Office" devoted 12 pages to sample text descriptions of all the possible corner types and three plates showing the nine most basic types. By 1902, the General Land Office's "Manual of Surveying Instructions" had expanded the descriptive section to 32 pages and included diagrams of forty-six different corner types. The Cahuilla spirits of the mountains as well as the government and settlers must have been quite pleased with this plethora of pits, posts and mounds, though perhaps the survey teams who had to build them were less appreciative.[111]

Similarly, the Indian Irrigation Service referred to parts of the Tahquitz ditch system by number (such as Station 8+60), by location on a specified map, or by their position relative to section lines.[112] As they grew more familiar with the local ecoscape, IIS employees sometimes described various areas in a less formal manner among themselves -- noting, for example, that the damage caused by an earthquake could be deduced from the presence of dying alder trees -- but they typically were more formal in their communiques with distant superiors.[113] Maps enabled additional precision and were often considered essential; the approval of the 1911 agreement was delayed when humidity precluded the printing of the accompanying blue line maps, and Pearl McCallum McManus's request for a new point of diversion was denied until she provided an accurate description of the land involved, accompanied by six copies of a map of the area.[114]

Yet despite the Indian Irrigation Service' increasingly accurate knowledge of the physical terrain of the local ecoscape, its understanding of the relationships between its inhabitants was much weaker. As both the Cahuilla and their white neighbors had learned, it was necessary to live inside the ecoscape, interacting daily with its people and places, in order to accrue such knowledge. The Bureau of Indian Affairs had acknowledged as much when it had negotiated with McCallum to provide the Cahuilla with water. Eventually the relative distance of government officials from local events -- which had

once given them the objectivity needed to maintain their authority in local disputes -- would prove to be a two-edged sword. The cartography of the IIS, geared towards providing water to an agricultural community in the most efficient manner, proved ill-suited for the task of managing a domestic water system in the heart of a growing resort town.

**Wider Implications**

Events at Palm Springs and the Agua Caliente Indian Reservation suggest larger trends elsewhere in the American West. The transformation of the Cahuilla ecoscape of the mid-1800s to the more-or-less independent local ecoscape of the late 1930s cannot be understood without examining the transitional period from the 1880s to the early 1930s, when water and federal involvement played such a significant role in the development of future patterns. In this Palm Valley parallels much of the larger Western experience. Aridity is often cited as the defining characteristic of the ecological West, with the result that water sources are highly prized and highly contested. Donald Worster has argued that large-scale development of water in the West demanded the presence of an authority capable of compelling obedience among water users, as was the case in the Mormon communities in Utah. Palm Springs both confirms and complicates this argument. It is certainly true that water distribution was haphazard, rarely fair, and fraught with contentious argument in Palm Springs, and that the government's presence in the region served to impose a degree of rationality on the situation. It is also true that the government sought -- and found -- alliances with white business owners at the (unintended?) expense of indigenous people.[115]

Yet the structure of the Palm Valley ecoscape made it difficult for the government to operate with the free and unencumbered authority Worster's account implies. The authority of the Indian Irrigation Service literally ended at the edge of the reservation, making it difficult to compel white water users to act according to its wishes; at the same

time, the spatial arrangement of the reservation and white sections made it imperative that the Service secure their cooperation. Since the white users often had as much to lose as to gain from such cooperation, the relationship between government and business remained tenuous. Furthermore, irrigation officials found that their plans were often at odds with those of white Palm Springs; their obligation to provide irrigation services to indigenous peoples -- as spelled out in the agency's name -- hampered their efforts to find common ground with a rapidly urbanizing community whose interests were often opposed to those of the Cahuilla.

Also different from Worster's account is the way in which the Cahuilla managed to maintain a presence, albeit an often marginalized one, in these negotiations. Their strong sense of place and identity, combined with the spatial intermingling of reservation and white land, meant that they could not be easily ignored so long as they were present. Timing also worked in their favor. The threat of removal, raised periodically, was countered in earlier years by the expense involved and the relative lack of white interest in the remote desert community; in later years, when the reservation lands had become more desirable, the Cahuilla had grown sufficiently adept at navigating the ecoscape that they were able to successfully fend off further attempts. Their proximity to Palm Springs, moreover, discouraged removing them for the purposes of enhancing assimilation to white society, which often as not was offered as the justification for relocating indigenous peoples living on remote reservations. (Indeed, the officials who worked with the Cahuilla in the 1920s and 1930s often found to their dismay that the Cahuilla had been all too successful in their adaptation to white society.)

What all this suggests is that we should not take for granted the inevitability of how water development proceeded in the West. The particulars of place need to be taken into account. (Worster himself notes other paths not taken, such as John Wesley Powell's recommendation that water districts be organized along watersheds rather than according

to other less ecologically cognizant frameworks.) What the history of the Palm Springs ecoscape also implies is that looking at the history of water development in the West from a predominantly agricultural perspective -- or a largely urban one -- may cause one to miss the interesting things that happen when agricultural areas urbanize. Finally, it reminds us that histories of how large scale change is imposed from without should be balanced with histories that look at such change from the inside.

In the next chapter, focused on Palm Canyon, we will see vividly how the boom in tourism that swept the nation in the early decades of the twentieth century looked from the inside of Palm Valley.

Notes

1 Story compiled from Alejo Patencio's account in William Duncan Strong, *Aboriginal Society in Southern California* (Berkeley: UC Press, 1929; Morongo Indian Reservation, Banning, Calif.: Malki Museum Press, 1972), pp. 100-101; and from Francisco Patencio's account in *Stories and Legends of the Palm Springs Indians*, (Los Angeles: Times-Mirror, 1943), pp. 85-87, 96-99.

2 William Minto, *Field Notes of the Subdivision Lines of Township 4 South Range 4 East San Bernardino Meridian*, (1885; National Archives, Laguna Nigel, R G 75, Mission Indian Agency file, Field Notes Packet), pp. 12-14. A chain, according to Francois D. Uzes, *Chaining the Land: A History of Surveying in California*, (Sacramento, Calif.: Landmark Enterprises, 1977), pp. 1-2, "is made of iron or steel wire, the usual standard length for land surveying being 66 feet (4 poles). It is composed of 100 links, each connected by 2 or 3 small rings, and provided at every 10 links with a brass tally mark or tag notched to designate its number from the end.... A full length of the 66-foot or 4-pole chain [there were also shorter chains for use in rugged country] is also a unit of length known by the term 'chain.' One link, when spoken of as a unit of measure, is 7.92 inches long... a distance of 50 links equals 33 feet... The 66-foot chain as a unit of measure is useful in calculating acreage. The number of square chains in a tract, divided by 10, gives directly the number of acres."

3 Minto, pp. 14-15.

4 George W. Pearson, *Field Notes of the Subdivision Lines of Township 4 South Range 4 East San Bernardino Base and Meridian, California* 1893, pp. 22-23.

5 Pearson, *Field Notes of the Subdivision Lines*, pp. 25-26.

6 Pearson, *Field Notes of the Subdivision Lines*, pp. 35-37; George W. Pearson, *Field Notes of the Exterior Lines of Township 4 South Range 4 East San Bernardino Base and Meridian*, 1893, p. 12.

7 Pearson, *Field Notes of the Subdivision Lines*, pp. 35-37; 48-50; 62.

8 Pearson, *Field Notes of the Subdivision Lines*, pp. 12-14, 25-26.

9 A. W. Brown and Theodore VanderMeer, *Book "C": Field Notes of the Re-Survey of a Portion of the East Boundaries of Ts. 3 and 4 S., R. 2E., the South Boundary of T. 3 S., R. 3 E., the West Boundary of T. 4 S., R 4 E., and Survey and Resurvey of a Portion of the Subdivisions of T. 4 S., R. 3 E., of the San Bernardino Meridian, in the State of California*, 1917-1929, pp. 29-30. Unfortunately this record is incomplete; several large sections dealing with the settled areas of the township are missing.

---

10 Francis E. Joy and John L. Warboys, *Book A: Field Notes of the Resurvey of a Portion of the S. and E. Boundaries, Resurvey of a Portion of the Subdivisions, Survey of Subdivision-of-Section Lines in Secs. 10, 12, 22, 24, 26 and 35, Survey of Tracts 37 to 43, Inclusive, and Survey of Lots 1s to 6a and 7 to 62, Inclusive, in Sec. 14, T. 4 S., R. 4 E. (Agua Caliente Indian Reservation) of the San Bernardino Meridian, in the State of California*, 1923-1926, pp. 96-98.

11 Joy and Warboys, pp. 93-95.

12 Joy and Warboys, pp. 90-92.

13 Joy and Warboys, pp. 95-96.

14 Jane Davies Gunther, citing J. H. Pierson in the July 29, 1893, *Riverside Press and Horticulturalist*, in*Riverside County, California, Place Names: Their Origins and Their Stories*, (Riverside, California: J. D. Gunther, 1984), p. 521.

15 Ralph Arthur Chase, "San Jacinto, Southern California's Noblest Mountain," *Sierra Club Bulletin*, 11:4 (1923): 348-56, p. 352. Italics mine.

16 The problem of Americans being inarticulate in the face of unfamiliar Western ecoscapes is discussed by Anne Farrar Hyde in *An American Vision: Far Western Landscape and National Culture, 1820-1920*, (New York: New York University Press, 1990).

17 J[ames] Smeaton Chase, *California Desert Trails, with Illustrations from Photographs by the Author and an Appendix of Plants. Also Hints on Desert Traveling*. (Boston and New York: Houghton Mifflin Company, 1919), p. 27.

18 James Smeaton Chase, *Our Araby: Palm Springs & the Garden of the Sun. New Edition, Revised and Enlarged. Illustrated from Photographs by the Author: w/ a Descriptive List of Desert Plants, etc., & Hints to Desert Motorists: Also a New Map of the Region by the U.S. Geological Survey*. (1920; New York: J. J. Little & Ives Company, 1923), p. 75.

19 See statements of Francisco Arrennas [Arenas], August 17, 1909; Marcus Belardo, August 14, 1909; Pedro Chino, August 14, 1909; Jose Lebacho, August 23, 1909; Francisco Patencio, August 14, 1909; and Joe Rafael, August 14, 1909. The quotation is from Lebacho's account.

20 J[ohn] G[uthrie] McCallum, to General H. Heath. November 2, 1885.

21 John S. Ward, U. S. Indian Agent, to J[ohn] D[eWitt] C[linton] Atkins, Commissioner of Indian Affairs. September 2, 1887. Italics mine. Some observers held the opposite view -- Indian Agent S. S. Lawson labeled the payment a "mere trifle," a "mere pittance" by

---

which "they secured a valuable water-right by a trick played by the Agent and his physician" – but the fact that this Agent, John Guthrie McCallum, failed to defend the rights of his wards suggests that Lawson's reading was out of sync with local white opinion. See S. S. Lawson, to Secretary of the Interior. July 18, 1887. It should also be noted that the replacement of McCallum in 1885 as Agent on account of his involvement in these affairs does not contradict this interpretation; as Agent Preston noted, even "an *honest* agent will, frequently, stand in need of government protection" because his duty to his wards doesn't sit well with local opinion. See Joseph W. Preston, U. S. Indian Agent, to J[ohn] D[eWitt] C[linton] Atkins, Commissioner of Indian Affairs. November 28, 1887. Italics in original.

22 Their efforts would bear out in the long run; in the Whitewater Adjudication Hearing of 1928, the right of the settlers to use the waters of Tahquitz Creek were confirmed to have been established on April 26, 1884. See State of California, Department of Public Works, Division of Water Rights. *Whitewater River Adjudication Proceedings: Order Determining and Establishing the Several Rights by Appropriation to the Use of the Waters of the Whitewater River Stream System, San Bernardino and Riverside Counties, California.* (April 23, 1928.)

23 Justice, or injustice, was a theme that would continue to reappear in the ecoscape's discourses. It was not exclusively deployed on the whites' behalf, however; supporters of the Cahuilla as well as the Cahuilla themselves often found it a useful tool in negotiations.

24 *The McCallum Saga*, pp. 78-79. See also *Palm Springs Area Yearbook* 1953 and [William E. Johnson], Chief Special Officer to Commissioner of Indian Affairs. September 2, 1909.

25 [William E. Johnson], Chief Special Officer to Commissioner of Indian Affairs. September 2, 1909. pp. 6-7.

26 Contract signed by Henry C. Campbell, President, and Henry Clay Miller, Secretary, of the Palm Valley Land Company, and Joseph W. Preston, U. S. Indian Agent for the Mission Indians of California. February 7, 1888.

27 [Bear Valley Water Company] to [Office of Indian Affairs], December 28, 1892; E[dward] L. Dorn to Commissioner of Indian Affairs, December 17, 1892; Frank D. Lewis, Special Assistant U. S. Attorney for Mission Indians, to Commissioner of Indian Affairs, January 13, 1893.

---

28 R. O. Beel, Acting Commissioner, to Horatio N[elson] Rust, U. S. Indian Agent. May 2, 1892.

29 [Horatio Nelson Rust] 189? "The Indian Box," Palm Springs Historical Society.

30 E[dward] L. Dorn to Commissioner of Indian Affairs. December 17, 1892.

31 Henry L. Ryan, to Francisco Estudillo, U. S. Indian Agent. January 16, 1894. Later, in the 1900s and 1910s, the idea of constructing some sort of reservoir facility for the storage of Tahquitz Creek waters would be given much more serious consideration.

32 W[illia]m R. Henderson, to Commissioner of Indian Affairs. June 27, 1894.

33 W[illia]m R. Henderson, to Cha[rle]s C. Painter, Secretary, Indian Rights Association. June 30, 1894; Welwood Murray, to Cha[rle]s C. Painter. June 30, 1894.

34 W[illia]m R. Henderson, to Cha[rle]s C. Painter, Secretary, Indian Rights Association. June 30, 1894.

35 Welwood Murray, to Cha[rle]s C. Painter. June 30, 1894.

36 W[illia]m R. Henderson, to Cha[rle]s C. Painter. July 10, 1894.

37 W[illia]m R. Henderson, to Cha[rle]s C. Painter. August 29, 1894.

38 D[aniel] M. Browning, Commissioner of Indian Affairs, to Secretary of the Interior. July 3, 1895, p. 13.

39 C[harles] C. Painter, to D. M. Browning, Commissioner of Indian Affairs. July 16, 1894; W[illia]m R. Henderson, to Cha[rle]s C. Painter. August 29, 1894; M. D. Shelby, Special Indian Agent, to Commissioner of Indian Affairs; Frank D. Lewis, Special U. S. Attorney for Mission Indians, to Commissioner of Indian Affairs. June 18, 1895; Hoke Smith, Secretary of the Interior, to Commissioner of Indian Affairs. July 8, 1895.

40 C. F. Larrabee, Acting Commissioner of Indian Affairs, to W[illiam] H. Code,Chief Engineer. August 7, 1908; Frank D. Lewis, Special United States Attorney for Mission Indians, to Commissioner of Indian Affairs. December 31, 1895. McCallum was out of the state and thus impossible for Estudillo to serve.

41 Shirley C. Ward to Francisco Estudillo, U. S. Indian Agent. December 12, 1895.

42 Francisco Estudillo, U. S. Indian Agent, to Commissioner of Indian Affairs. December 19, 1895; Frank D. Lewis, Special United States Attorney for Mission Indians, to Commissioner of Indian Affairs. December 31, 1895; D[aniel] M. Browning, Commissioner of Indian Affairs, to Francisco Estudillo, U. S. Indian Agent. February 1, 1896.

43 C. F. Larrabee, Acting Commissioner of Indian Affairs, to W[illiam] H. Code, Chief Engineer. August 7, 1908. According to Larrabee, Supervisor Holland (somewhat naively)

recommended instead that Agent Wright be given orders "to proceed at once with a number of Indians 'and smash McCallum's head gate and so much of his flume as runs through Indian lands, and see that they stay smashed.'"

44 Blank agreement between the Palm Valley Water Company and Pedro Chino, Captain, L. A. Wright, Agent, et al. 1901.

45 Letter of Captain Pedero [Pedro] Chino, interpreted by Lee Arenas, and witnessed by Miguel Saturnino. June 10, 1902.

46 Katherine Ainsworth, *The McCallum Saga*, pp. 133-149, 155-160; [William E. Johnson], Chief Special Officer to Commissioner of Indian Affairs. September 2, 1909.

47 Letter of Captain Pedero [Pedro] Chino, interpreted by Lee Arenas, and witnessed by Miguel Saturnino. June 10, 1902.

48 The new Board of Directors of the Company was trying at this time to inventory and improve their assets, but lacked the capital to be of much immediate assistance. See W. N. Hamaker to Board of Directors, Palm Valley Water Company. July 31, 1902; W[illia]m Collier, Special Attorney of the Mission Indians of Southern California, to Henry M. Hoyt, Acting Attorney General. August 12, 1902. p. 7.

49 W. N. Hamaker, Confidential Clerk, to Levi Chubbuck, Special Inspector. May 8, 1906; Levi Chubbuck, Special Inspector, to Secretary of the Interior. May 18, 1906.

49 C. F. Larrabee, Acting Commissioner, to Secretary of the Interior. June 2, 1906.

49 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. June 13, 1906; W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. December 14, 1906.

50 W[illia]m Collier, Special Attorney for Mission Indians, to Captain Marcos Belaro [Marcus Belardo]. April 7, 1904.

51 W[illia]m Collier, Special Attorney of the Mission Indians of Southern California, to Henry M. Hoyt, Acting Attorney General. August 12, 1902. p. 7.

52 Welwood Murray to A. C. Tonner, Acting Commissioner. May 19, 1903. It is unclear whether they were reminded of this possibility by this letter from Welwood Murray suggesting that a reservoir could solve problems like those experienced in 1903, when the winter rains had been lost, or whether they simply recalled the earlier correspondence about constructing one.

53 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. December 14, 1906.

54 Levi Chubbuck, Special Inspector, to Secretary of the Interior. May 18, 1906, p. 10. File #1906-112753.

---

55 W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. December 14, 1906, p. 5.

56 [William E. Johnson], Chief Special Officer to Commissioner of Indian Affairs. September 2, 1909.

57 Francisco Patencio, Marcus Belardo, Pedro Chino, Francisco Arrennas [Arenas], Jose Rafael, Marcus Patencio, Pico Manuel, and Baristo Sal. August 14, 1909; Francisco Patencio, Segundo Chino, Marcus Belardo, Pedro Chino, and Marino [Moreno] Patencio. August 14, 1909.

58 W[illiam] H. Code, Chief Engineer, to A. I. McCormick, U. S. Attorney. November 11, 1909.

59 W[illiam] H. Code, Chief Engineer, to A. I. McCormick, U. S. Attorney. November 11, 1909.

60 A[lonzo] E. Davis, Welwood Murray, Lavinia F. Crocker, Mary C. McKenzie, Pearl Mac Callum [McCallum] and Emily Mac Callum [McCallum], to Clara D. True, Agent for the Palm Springs Indians. March 18, 1909; A[lonzo] E. Davis, Welwood Murray, Lavinia F. Crocker, Mary C. McKenzie, Pearl Mac Callum [McCallum], Emily Mac Callum [McCallum], and John W. Ross. n. d. [c. 1909]

61 Clara D. True to W[illiam] H. Code, Chief Engineer. March 26, 1909.

62 Clara D. True, Superintendent and Special Disbursing Agent, to A[lonzo] E. Davis. March 26, 1909.

63 Welwood Murray to W[illiam] H. Code, Chief Engineer. August 31, 1910. A particularly outspoken critic was Edmund Mitchell, author of the article "Palms of the Colorado Desert." Mitchell resented not only what he considered "a cruel injustice" against his white friends, but also the inefficient use of the protected waters by the Cahuilla. It is worth noting, however, that he included Rogers among those he considered victimized by True's policy. See E[dmund] M[itchell] to Charles L. Davis, Supervisor of Indian Service. March 9, 1910; E[dmund] M[itchell] to Mr. Blanchard. March 9, 1910; E[dmund] M[itchell] to Dr. [Earl] Coffman. March 9, 1910; E[dmund] M[itchell] to Mr. Rogers. March 9, 1910; E[dmund] M[itchell] to [Carl] Eytel. March 9, 1910. "The Indian Box," Palm Springs Historical Society. E[dmund] M[itchell] to Mrs. [Emily Freeman] McCallum. March 9, 1910; E[dmund] M[itchell] to Welwood Murray. March 9, 1910.

64 Hamilton Forline to W[illiam] H. Code. August 29, 1910.

---

65 W[illiam] H. Code, Chief Engineer, to Welwood Murray. August 27, 1910; W[illiam] H. Code, Chief Engineer, to Dr. Hamilton Forline. August 27, 1910; Hamilton Forline to W[illiam] H. Code. August 29, 1910. Welwood Murray to W[illiam] H. Code, Chief Engineer. August 31, 1910; W[illiam] H. Code, Chief Engineer, to C. R. Cawthon. September 14, 1910; W[illiam] H. Code, Chief Engineer, to C[harles] R. Olberg, Superintendent of Irrigation. October 27, 1910; William T. Sullivan, Superintendent, to W[illiam] H. Code, Chief Engineer. November 14, 1910; H. K. Palmer, Junior Engineer, to C[harles] R. Olberg, Superintendent of Irrigation. December 8, 1910; C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer. December 13, 1910. See also *The McCallum Saga*, pp. 165-67.

66 Blank agreement between W[illiam] H. Code, Chief Inspector of Irrigation, and unnamed party of the second part. c. 191?; W[illiam] H. Code, Chief Engineer, to C[harles] R. Olberg, Acting Chief Engineer. January 4, 1911; C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer. January 7, 1911; C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer. January 18, 1911.

67 C[harles] R. Olberg, Superintendent of Irrigation, to W[illiam] H. Code, Chief Engineer. January 26, 1911; W[illiam] H. Code, Chief Engineer, to George Elwood [Welwood] Murray. February 4, 1911; W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. February 2, 1911. Undoubtedly adding to Olberg's distress, influenza (or "grippe") was making the rounds. When he visited, Davis was laid up with it, compounded by his asthma; a few days later Olberg himself fell ill. He was still "kind of shaky" when he returned to work on February 1st.

68 C[harles] R. Olberg, Superintendent of Irrigation, to W[illiam] H. Code, Chief Engineer. January 26, 1911; *The McCallum Saga*, 165-66.

69 C[harles] R. Olberg, Superintendent of Irrigation, to W[illiam] H. Code, Chief Engineer. January 26, 1911; C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer. February 1, 1911; W[illiam] H. Code, Chief Engineer, to Secretary of the Interior. February 2, 1911; W[illiam] H. Code, Chief Engineer, to George Elwood [Welwood] Murray. February 4, 1911; R. A. Ballinger, Secretary of the Interior, to W[illiam] H. Code, Chief Inspector of Irrigation. February 6, 1911; W[illiam] H. Code, Chief Engineer, to C[harles] R. Olberg, Acting Chief Engineer. February 8, 1911; C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer. February 13, 1911; C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer.

---

February 16, 1911; W[illiam] H. Code, Chief Engineer, to C[harles] R. Olberg, Acting Chief Engineer. February 18, 1911; W[illiam] H. Code, Chief Engineer, to C[harles] R. Olberg, Superintendent of Irrigation. February 4, 1911; M. R. Trenam, Assistant Engineer, to C. A. Engle, Supervising Engineer. March 12, 1933.

70 C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer. February 13, 1911.

71 W[illiam] H. Code, Chief Engineer, to C[harles] R. Olberg, Acting Chief Engineer. February 18, 1911.

72 Superintendent of Irrigation to Commissioner of Indian Affairs. May 25, 1915.

73 C[harles] R. Olberg, to W[illiam] H. Code, Chief Engineer. Annual Report,. July 22, 1911; C[harles] R. Olberg, Superintendent of Irrigation. Annual Report, Southern California Reservations, 1912; C[harles] R. Olberg, Superintendent of Irrigation. Annual Report, Southern California Reservations, 1913; C[harles] R. Olberg, Supervising Engineer. Annual Report. June 1914; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1915; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1916; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1917; C[harles] R. Olberg, Supervising Engineer. Annual Report. 1917.

Herbert V. Clotts, to W[illiam] M. Reed, Chief Engineer. November 3, 1919; H. K. Palmer, Assistant Engineer, to Herbert V. Clotts, Supervising Engineer. November 25, 1919; Herbert V. Clotts, to W[illiam] M. Reed, Chief Engineer. November 26, 1919. (On the same sheet is a letter by Pearl MacCallum [McCallum] to [Charles R.] Olberg. March 21, 1913.)

A[lonzo] E. Davis to C[harles] R. Olberg, Superintendent of Irrigation; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. April 3, 1914; O[wen] W. B[auer], Instrumentman, to Chris Botticher, Foreman. February 26, 1916; A[drian] I. Maxwell, Farmer, to Owen W. Bauer, Instrumentman. November 6, 1916.

A[drian] I. Maxwell, Farmer, to Owen W. Bauer, Instrumentman. January 22, 1916; A[drian] I. Maxwell, Farmer, to Superintendent of Irrigation. January 27, 1916; O[wen] W. Bauer, Instrumentman, to Adrian I. Maxwell, Farmer. March 1, 1916; Adrian I. Maxwell, Farmer, to C[harles] R. Olberg. February 15, 1916. O[wen] W. Bauer, Instrumentman, to Adrian I. Maxwell, Farmer. March 1, 1916; Adrian I. Maxwell, Farmer, to Owen W. Bauer, Instrumentman. July 31, 1916; J[ames] E. Jenkins, Superintendent, to U. S. Indian Service. July 9, 1917; O[wen] W. Bauer, Assistant Engineer, to H. F. Makosky, Foreman; H. K. Palmer, Engineer, to P. T. Hoffman, Superintendent. December 16, 1920.

---

74 Francisco Patencio, Pedro Chino, Francisco Arenas, Alejo Patencio, Moreno Patencio, Albert Patencio, Pico Manuel, Simon Arenas, Baristo Sal and Thomas Segundo, to the President of the United States. May 27, 1914.

75 Francisco Patencio, Pedro Chino, Francisco Arenas, Alejo Patencio, Moreno Patencio, Albert Patencio, Pico Manuel, Simon Arenas, Baristo Sal and Thomas Segundo, to the President of the United States. May 27, 1914.

76 Adrian I. Maxwell, Farmer, to C[harles] R. Olberg, Superintendent of Irrigation. July 7, 1914.

77 C[harles] R. Olberg, Superintendent of Irrigation, to J[ames] E. Jenkins, Superintendent, Malki Agency. June 2, 1916.

78 This became ever more the case as time went on. As Supervising Engineer Wathen tersely noted in 1932, "Project not fully used. Work available close by which is preferred to farming. General conditions good." See A. L. Wathen, Supervising Engineer. Annual Report. 1932.

79 H. K. Palmer, Engineer, to C[harles] L. Ellis, Superintendent. June 9, 1924; Herbert V. Clotts?], Supervising Engineer, to Commissioner of Indian Affairs. October 3, 1924; H. K. Palmer, Engineer, to C[harles] L. Ellis, Superintendent. January 13, 1925; [Herbert V. Clotts?], Supervising Engineer, to Commissioner of Indian Affairs. February 19, 1925; H. K. Palmer, Engineer. Memorandum and Estimate of Development of Tahquitz and Andreas Creeks. February 20, 1925.

80 Herbert V. Clotts, Supervising Engineer, to C[harles] L. Ellis. October 11, 1923.

81 A[drian] I. Maxwell, Farmer, to Owen W. Bauer, Instrumentman. November 6, 1916.

82 C[harles] L. Ellis, Superintendent, to Commissioner of Indian Affairs. May 3, 1925; C[harles] L. Ellis, Superintendent, to Commissioner of Indian Affairs. June 2, 1925; C[harles] L. Ellis, Superintendent, to Commissioner of Indian Affairs. August 13, 1925.

83 H. K. Palmer, Engineer. Memorandum and Estimate of Development of Tahquitz and Andreas Creeks. February 20, 1925.

84 State of California, Department of Public Works, Division of Water Rights. *Whitewater River Adjudication Proceedings: Order Determining and Establishing the Several Rights by Appropriation to the Use of the Waters of the Whitewater River Stream System, San Bernardino and Riverside Counties, California*. (April 23, 1928).

85 State of California, *Whitewater River Adjudication Proceedings*.

---

86 M. R. Trenam, Assistant Engineer, to C. A. Engle, Supervising Engineer. March 12, 1933; Pearl M[cCallum] McManus, to C. A. Engle, Supervising Engineer. March 20, 1933; Pearl McCallum McManus, to C. A. Engle, Supervising Engineer. April 3, 1933; C. A. Engle, Supervising Engineer, to A. Heber Winder, Attorney at Law. April 25, 1933; Supervising Engineer [Engle]. Notice of Petition to Change Point of Diversion and Place of Use of Water. April 25, 1933; Pearl M[cCallum] McManus, to [C. A.] Engle. May 6, 1933; C. A.Engle, Supervising Engineer, to Whom It May Concern [Nellie N. Coffman, Cornelia B. White, Lavina F. Crocker, Pearl McCallum McManus, Isabel White Chase, Charlie [Charles] Gabriel] May 11, 1933; John F. Truesdell, Chief Field Council, to Commissioner of Indian Affairs. June 9, 1933; John F. Truesdell, Chief Field Council. Memorandum for Mrs. Pearl McC[allum] McManus. June 14, 1933.

87 P. [T.] Hoffman, Superintendent, to H[erbert] V. Clotts. December 29, 1921.

88 Willie Marcus, Spokesman for Tribal Committee, to Harold L. Ickes, Secretary of the Interior. October 6, 1936; Willie Marcus, Spokesman, to Harold L. Ickes, Secretary of the Interior. October 29, 1936.

89 W. L. Miller, Assistant Engineer, to John W. Dady, Superintendent. September 14, 1939; John W. Dady, Superintendent, to J[ohn] M[cCallum] Forline. September 15, 1939; John W. Dady, Superintendent, to Geraint Humphreys, District Counsel, November 28, 1939. See also Cultural Systems Research, Inc., Lowell John Bean, Jerry Schaefer, and Sylvia Brakke Vane. *Archaeological, Ethnographic, and Ethnohistoric Investigations at Tahquitz Canyon, Palm Springs, California.* [The Tahquitz Report]. Prepared for Riverside County Flood Control and Water Conservation District. (Menlo Park, Calif.: Cultural Systems Research, Inc., November 1995), p. v-260.

90 Geraint Humphreys, District Counsel, to A. L. Wathen, Director of Irrigation. August 28, 1939.

91 R. A. Floyd, Project Manager, to Charles W. Petit, Assistant Regional Conservator. October 18, 1938; Guy Pinney, City Clerk of the City of Palm Springs, California. Copy of Resolution of August 9, 1938. August 10, 1938; John W. Dady, Superintendent, to Commissioner of Indian Affairs. January 13, 1939; E. C. Fortier, Supervising Engineer, to A. L. Wathen, Director of Irrigation. March 11, 1939.

92 Lowell John Bean, *Mukat's People: The Cahuilla Indians of Southern California.* (1972; Berkeley and Los Angeles: University of California Press, 1974), p. 75.

93 Patencio, *Stories and Legends,* pgs. 73, 96.

---

94 Francisco Patencio, *Stories and Legends*, p. 58. See also *Seismicity of the United States, 1568-1989 (Revised)*. U. S. Geological Survey Professional Paper 1527, pgs. 72, 102.

95 Letter from Albert Patencio on behalf of the Agua Caliente (Palm Springs) Band of Mission Indians, Palm Springs, Calif. to John W. Dady, Superintendent, Mission Indian Agency, Riverside, Calif. dated November 23, 1935, and letter from William Marcus, Tribal Spokesman, Palm Springs, Calif. to John W. Dady, Superintendent, Mission Indian Agency, Riverside, Calif., dated January 8, 1936; Reproduced in *Palm Springs Band of Mission Indians Hearing before the Committee on Indian Affairs, 1936-1937, Seventy-Fifth Congress, First Session, on S. 1424, a Bill to Repeal that Provision in the Act of March 2, 1927 (39 Stat. L. 976), Directing the Making of Allotments to Indians of the Mission Indian Reservations, Calif., and S. 2589, a Bill to Authorize the Sale of Part of the Lands Belonging to the Palm Springs or Agua Caliente Band of Mission Indians, and for Other Purposes*, (Washington, D. C.: Government Printing Office, 1937), pgs. 82, 87. (Hereafter designated as Senate Allotment Hearing).

96 Anne Farrar Hyde, *An American Vision: Far Western Landscape and National Culture, 1820-1920*. (New York: New York University Press, 1990). Hyde's book is thoughtful and informative and offers an interesting perspective on the westering experience. It should however be noted that while Hyde's account is useful for its insight into the cartographies of white Americans, her narrative emphasizes white perception, and its rendition of Indians as objects. Whatever the various native peoples thought about their own territories and the American newcomers is not considered.

97 James, *Wonders of the Colorado Desert*, Chase, *California Desert Trails*, and Chase, *Our Araby*. See also the numerous examples of poetry about the desert to be found in *The Overland Monthly*, 2nd series, at this time; all incorporate in one form or another most of the standard desert tropes of sage-brush, coyotes, reptiles, silence, waiting, aridity, beauty after rain, harshness of climate, and delicacy of color.

98 On the legends of Tahquitz see: John Hamilton Gilmour, "Coahuilla Indians: Their Artistic Sense Well Developed: Peculiarities of the Desert Dwellers," San Francisco *Chronicle*, February 21, 1892, excerpted in *Some Last Century Accounts of the Indians of Southern California*, ed. Robert F. Heizer, (Ramona, Calif.: Ballena Press, 1976), pp. 1-4; James, *California Desert Trails*; "Southern Section Notes: From Pine Trees to Palm Groves," in "Notes and Correspondence," ed. William E. Colby, *Sierra Club Bulletin*, 10:1 (January 1918): 332-34; Patencio, *Stories and Legends*; Gunther, *Riverside County, California, Place*

---

*Names*, pp. 521-24; Bean, *Mukat's People*. Again, such accounts of "Indians legends" were a stock item in the literary magazines of the period; *The Overland Monthly* is full of them.

99 Gilmour, "Coahuilla Indians," in *Some Last Century Accounts*, pp. 3-4.

100 Ralph Arthur Chase, "San Jacinto, Southern California's Noblest Mountain," *Sierra Club Bulletin*, 11:4 (1923): 348-56, p. 352.

101 James, *Wonders of the Colorado Desert*, pgs. 263, 264, 265.

102 Chase, *California Desert Trails*, p. 69.

103 Chase, *California Desert Trails*, p. 27.

104 James, *Wonders of the Colorado Desert*, p. 233.

105 A. H. A., "California Desert Trails," [book review], *Sierra Club Bulletin*, (January 1920): 110-11. A. H. A. also wished for a map, a lack that was later remedied somewhat in Chase's next work on the area, *Our Araby*.

106 Gunther notes, for example, in *Riverside County, California, Place Names*, p. 521, that J. H. Pierson, when he visited Tahquitz Valley, relied on the expertise of John Blodgett that came from 18 years' familiarity with the region. In the Indian Affairs Committee hearings of 1936 and 1937, pp. 8-9, 11-12, 14-15, 17-18, 28-29, the duration of residence was carefully listed among the bona fides of those who gave statements to the committee's representatives; such durations range from a scant 3 years (Francis Crocker) to the 27 years of Nellie M. Coffman, and a corresponding weight of authority was attached. For events that occurred prior to even the experiences of the most senior white resident, Cahuilla, usually aged, were typically consulted.

107 Price, "A Glimpse of the Desert," *The Overland Monthly*, 19:109, 2nd series, (January 1892): 73-77. Given the risks involved in desert travel for those unfamiliar with their routes, it is not surprising, then, that George Wharton James chose to devote a chapter of his *Wonders of the Colorado Desert*, to the description of local signposts and a plan to establish them systematically throughout the region. ("Sign-boards on the Desert," pp. 331-35).

108 See "Palm Springs and the Agua Caliente Reservation" in Senate Allotment Hearing, pp. 35-54, particularly p. 52.

109 We can see parallels to this literally narrow vision in the perspective of the Western ecoscape as viewed from the railroad lines, which focused passengers' attention on the routes traversed by the trains and discouraged looking beyond them. For a discussion of

---

the spatial aspects of railroad travel, see Hyde, *An American Vision*, and Warren James Belasco, *Americans on the Road*. (Cambridge, Mass.: The MIT Press, 1979).

110 C. Albert White, *A History of the Rectangular Survey System*, (1983; Washington, D. C.: U. S. Government Printing Office, 1991), p. 529. Italics in original.

111 White, *A History of the Rectangular Survey System*. pp. 516-523; 542-44; 697-713; 741-44.

112 C[harles] R. Olberg, Superintendent of Irrigation. Annual Report, Southern California Reservations, 1913.

113 H. K. Palmer, Assistant Engineer, to Herbert V. Clotts, Supervising Engineer. November 25, 1919.

114 C[harles] R. Olberg, Acting Chief Engineer, to W[illiam] H. Code, Chief Engineer. February 16, 1911; C. A. Engle, Supervising Engineer, to A. Heber Winder, Attorney at Law. April 25, 1933.

115 Donald Worster. *Rivers of Empire: Water, Aridity, and the Growth of the American West*. (New York: Oxford University Press, 1985).

## Chapter 5

## Palm Canyon

Heading south past Andreas Canyon on another expedition into the Palm Valley canyons, one passes through narrow gaps between boulders, keeping a watchful eye out for loose and falling rocks. The way grows steeper and more winding. Desert vegetation grows in clumps on the steep rocky hillsides. Climbing upward, one comes to a small plateau, familiarly known as "Hermit's Bench." Pausing to recover from the climb, one catches sight of something green. Ranks on ranks of palms stretch into the distance on the other side of the bench.

A brief scramble places one in the thick of the palms. Towering overhead, they block out the heat of the sun. Some palms are marked with the scars of fire, their trunks blackened and sooty. Others retain magnificent "beards" of dead fronds; birds, lizards, and other small animals can be heard rustling inside. Along the ground there are many palmlets, competing with other vegetation for water and sunlight. The canyon stretches for miles; an adventurous traveler could hike or ride a horse up its entire length and emerge at Pinyon Flat high in the Santa Rosa mountains. Most would be content to rest in the shade, eat picnic lunches, and splash in the cool waters of Palm Canyon Creek.

The Cahuilla were enjoying such activities long before contact with the Spanish and Americans was made. Subsequent visitors to Palm Canyon did likewise. (Indeed, they continue to do so today.) Yet the meaning attached to these activities by local groups varied considerably. So did assessments of the character of the canyon's value, though all agreed it was considerable. One particular example, the proposal to establish a Palm Canyon National Monument in the 1920s, both influenced and was shaped by the needs and desires of the Cahuilla, white residents of Palm Springs, wintertime tourists, and agents of the federal government. The efforts of these groups to determine the meaning and control



ACC0003969

the use of Palm Canyon echoed and influenced the emerging patterns of the region's evolving ecoscape.

By the 1920s and 1930s, all three groups had developed sufficient understanding of their jointly created ecoscape to survive and succeed in it; their cartographies adequately mapped their shared ecoscape's terrain. At the beginning of the second decade of the twentieth century the roles of the three groups were still under often acrimonious negotiation. Meanwhile, new outsiders -- a seasonal population of pleasure-seekers -- fueled an explosive growth of the region, bringing new transformations.

The village of Palm Springs and the Agua Caliente Indian Reservation were significantly altered by this period of rapid growth and urbanization, as were many Western cities and towns. As the number of players swelled and the stakes grew higher, so too the amount of tension in the air increased. Who would control the direction of the region's future evolution? The Cahuilla, the agents of the federal Bureau of Indian Affairs (BIA), and the local residents and business interests of Palm Springs, influenced by the multitudes of winter season visitors, negotiated over how best to use and develop the resources of the Palm Springs ecosystem; the reservation lay at the center of debate. Each group laid claim to its use, but these claims were continually challenged and tested.

Considerable controversy developed over who was to control and protect the palm canyons five miles south of Palm Springs, and what forms such control and protection would take. Palm Canyon, the largest, was the focus of particularly intense concern. The 1920s saw a boom in tourist interest in the canyons, and a corresponding rise in conflict between the BIA, its Cahuilla wards, and the white business interests of Palm Springs over the management of this environmental resource.

These canyons are one of the key habitats of the indigenous fan palm, *Washingtonia filifera*. These trees grow in large groves in these canyons, watered by streams fed by springs and snowmelt from Mount San Jacinto. The combination of palms,

water, and desert surroundings proved irresistable to white travelers from the 1850s onward; they likened them to the oases of Egypt and the Middle East. (Even today the evocation of "Araby" and the exotic desert has far from run its course.) In the 1920s and 1930s, this alluring combination, described in tantalizing and flowery prose by a multitude of writers and captured in photographs and motion pictures, brought many pleasure-seekers to Palm Springs. As the tourist hordes poured in, it fell to the local branch of the BIA, the Mission Indian Agency (MIA), to handle the crush; Palm Canyon and the other canyons were on reservation land.

This task was met with inadequate resources and increasing frustration and complaint on the part of Agency Superintendents Charles L. Ellis (1923-1933) and John W. Dady (1933-?). The Cahuilla and the business interests of Palm Springs strove meanwhile to derive a profit from these swarms of palm-lovers. The Cahuilla constructed a toll gate on the road to Palm, Andreas, and Murray Canyons, while local hoteliers extolled the beauty, mystery and romance of the canyons and their ancient palms in advertisements. Travel writers such as George Wharton James, Charles Francis Saunders, and James Smeaton Chase contributed to the frenzy with vivid descriptions of this "scenic wonderland" and its Indian mysteries.

The contradictory burdens of protecting the palms and catering to the tourists, coupled with a desire to preserve the canyons for both aesthetic and economic reasons, provoked calls for their protection from business owners, residents, visitors, and the Indian Service. These calls resulted twice in legislation authorizing the formation of a Palm National Monument; both times the Cahuilla refused to give their consent and thus relinquish their canyons. Though the canyons remain today in the hands of the Cahuilla, the National Monument's advocates can still be heard. While the question of control has been settled for the time being, the debate is far from over.

In these struggles to define and control the canyons, we can see how the alterations participants made to their cartographies mirrored the changes occurring in the ecoscape as a whole. Splits within the Cahuilla imply the growing gap between the evolving ecoscape and older understandings, especially after the 1910s; they also suggest the development of new or altered perspectives among less "traditional" band members. The actions of government agents speak both of a desire to maintain their position of authority prevalent from the 1910s to the early 1930s and of their gradual realization that keeping their knowledge of the local ecoscape up to date required a greater investment of time and money than they could easily justify. In the 1920s and 1930s, the arguments put forth by the Palm Springs business community reflect both their growing confidence in their ability to navigate the local ecoscape and lingering anxiety informed by the memory of past misunderstandings. An analysis of the perspective of white outsiders, meanwhile, serves to highlight the extent to which white residents had integrated themselves into the local ecoscape in this same period.

The increasing intricacy of the network centered on the palm canyons reflected that of the larger Palm Valley ecoscape. This ecoscape was evolving into a system of such complexity that it was becoming more and more difficult for those who did not experience it on a daily basis to achieve a working understanding of its dynamics. In Palm Canyon, as elsewhere in the region, we can trace a shift from the pre-reservation Cahuilla ecoscape to one in which white and Cahuilla patterns were uneasily enmeshed under the aegis of the federal government, and we can also see the transition from this mixed ecoscape of the 1880s-1920s to the full-fledged and integrated one that came to maturity by the end of the 1930s.

**The People of the Palms**

Before their contact with Europeans, Cahuilla use of Palm Canyon largely went unchallenged. Cahuilla villages were often established in canyons, clustered around

springs found along their length. Palm Canyon, being large, had a notable number of such springs, and portions of the canyon were apparently claimed by several different lineages, such as the *Qawi'siktem*, the *Wa-ke-chi'm-kut*, and some Serrano groups (largely at the southern-most upper end, near Pinyon Flat in the Santa Rosa Mountains). One lineage, the *Atcitem*, derived their claims from the *Kauisiktum* of Palm Springs, "to whom they were related by marriage."[1]

The relationships between the Cahuilla and the canyons were both practical and spiritual. The water from canyon creeks supported the growth of extensive palm groves and other valued vegetation, such as screwbean and mesquite, which provided the Cahuilla with food and material for handicrafts, tools, and housing. The presence of sheltering brush, water, and food made the canyons attractive to a variety of animal species; some, like rabbits and lizards, were valued as sources of food and materials by the Cahuilla. Reflecting and informing these interactions, Cahuilla cartographies mapped out the connections between the Cahuilla and the canyons, and especially those linking Cahuilla and palms.

Palms provided the Cahuilla with a considerable number of materials for their daily welfare. The palm fronds were used as thatching in the construction of houses, called *kish* (Cahuilla) or *jacale* (Spanish). According to David Prescott Barrows, an anthropologist who observed them in the 1880s,

> In Palm Valley are perhaps the most beautiful jacales to be seen anywhere, for here are utilized the large palm leaves of the Washingtonia filifera. The pole framework is made as usual, but the thatching and sides are made of these beautiful fronds.[2]

The central stems of palm leaves could be carved into flails, stirring implements, walking sticks, and other utensils. Palm fiber was used to make twine, sandals, and cloth. Palm fruits were a valued addition to the diet, which the Cahuilla ate fresh when in

season, and stored dried in ollas for other times.[3] When the palm fruits riped, Barrows explained,

> the Coahuillas lasso[ed] the clusters and [drew] them down for food. Swarms of bees surround the fruit as it ripens, and in the fronds of the palms are multitudes of "yellow jacket's" nests.[4]

If bees, wasps, hornets, or other insects became a problem, the Cahuilla applied fire. Fire was applied to the living palm groves not only to control insects, but to drive out vermin, and reduce flammable debris.[5] Tribal elder Francisco Patencio recounted in 1943 how

> It was the medicine men who burned the palm trees so that they could get good fruit. The bugs that hatched in the top of the palm trees, they made the tree sick, and no fruit came. After the trees were set afire and burned, the bugs were killed and the trees gave good fruit. Now that the medicine men are gone, the worms are taking the flower, the green fruit, and the ripe fruit.[6]

Cahuilla use of fire reflected their experience with the canyon ecosystem; the palm groves were vulnerable to decimation by both flood and fire, and controlled burning was a way to reduce the latter risk. It was informed and reinforced by their cartographies, which emphasized the connections between palms, people, and fire. Cahuilla oral tradition recounted how the sacrifice of the palm-woman Ninmaiwaut was essential for the creation of the first fire.[7]

In the Cahuilla origin story, the dying creator Mukat explained to the people that after his death, they should use the palm to make fire and then cremate him. "When the palm, who was a woman, heard this, she began to cry and complain that it was unfair to select her from among all other creatures," Francisco Patencio's brother Alejo explained in 1925.[8] Despite the palm's piteous cries, Mukat had Fly drill into her body with a stick to produce the fire. Then, Francisco Patencio related later in 1943, "Mo-Cot told the people,

no matter how much she screamed or cried, or blood ran out of it, to keep on twisting the stick in the hole until they made the fire."[9]

The story thereby explains why flies "drill" with their forelegs, and describes the process by which humans may produce fire from a palm rib. Although the ability to produce fire by "drilling" into a palm stem to produce heat through friction had become by the 1910s "an art not often practised in these days," local writer James Smeaton Chase was still able to find at least two men who remembered this technique.[10]

The story suggests that individual sacrifice (of either palms or people) may be necessary for the greater good. This theme of self-sacrifice by a palm-person appears again in the story of Sungrey's migration (one of many travel stories explaining the arrival of the Cahuilla in Palm Valley). One of Sungrey's head men, being tired of his labors, chose to become the man-palm Moul. According to Francisco Patencio,

> This man wanted to be a benefit to his people, so he said: "I am going to be a palm tree. There are no palm trees in the world. My name shall always be *Moul* (palm tree). From the top of the earth to the end of the earth my name shall be *Moul*."
>
> So he stood up very straight and very strong and very powerful, and soon the bark of the tree began to grow around him, and the green leaves grew from the top of his head. And so he passed from the sight of his people.[11]

The story continues with a description of the wondrous sweetness of his fruit, "much enjoyed by everybody -- animals and birds too," and how people planted his seeds far and wide. Thus, palm trees everywhere, "all, everyone of them, came from this first palm tree, the man who wanted to be a benefit to his people."[12] Again, the story describes a Cahuilla practice -- the dispersal and planting of valued food plants -- and reinforces the idea of interconnection between Cahuilla and the rest of their ecosystem.

On many levels, the Cahuilla recognized the depth and breadth of their links to these valued trees and the canyons in which they grew. As the white development of Palm Springs increased, new pressures were placed on these connections, and new roles developed

for the palms. The Cahuilla faced these challenges by defending what they could of existing beliefs and practices, and learning to make the most of new opportunities.

**"Home of the Fire-Flies"**

On November 15th, 1853, geographer William P. Blake introduced what was later to become one of the most over-invoked allusions in the history of the region: Palm Springs as Arabian oasis. Passing through the Colorado Desert of southern California on a railroad survey mission led by Lieutenant R. S. Williamson of the Army Corps of Engineers, Blake with the rest of the expedition halted at the hot springs known as Agua Caliente for water and rest. They shared the springs with a group of Cahuilla, who were bathing in the waters and preparing food when the survey party came upon them. The scene, occurring beneath the shade of some palms, wrote Blake, had "an Oriental aspect; and the similarity was made still more striking by the groups of Arab-like Indians."[13]

This image of an Oriental oasis would come later to dominate the literary imagery produced about the palm canyons (which the Williamson party missed entirely). In the 1900s, an advertisement for the hotel established by pioneer residents Welwood and Elizabeth Murray suggested that being in the presence of the "ancient palms" would result in the transportation of the observer "to lands of the Orient."[14] The Murrays even went so far as to dress up Cahuilla employee Willie Marcus as an Arab, and had him greet visitors at the Seven Palms railroad station astride a camel.[15] A decade later, writer and local resident James Smeaton Chase captured the essence of the image with his book, *Our Araby: Palm Springs and the Garden of the Sun*.[16] Similarly writer Charles Francis Saunders felt that the view of the palm canyons was "a sight more suggestive of the Orient than the United States." Oasis imagery continues to be used even today.

Blake's account also presaged the use of the prehistoric past, both of the palms and of the Cahuilla themselves, to lend weight and mystery to the phenomenon of the canyons. This trope of antiquity, in fact, proved more lasting than that of the Oriental oasis.

Originally serving to lend additional power to the lure of an American version of Egypt and Arabia, the evocation of antiquity served equally well the image of a wonderland unique in all the world -- an image that came to dominate the scene in the 1920s and 1930s. Advertisements from the 1900s and 1910s invented fanciful Cahuilla names for the canyons, such as "Toquich-hecke," translated as the "Home of the fire-flies," and spoke reverently of "ancient palms." (Fireflies, it should be noted, are not found in the arid Southwest, including southern California.) Later maps and brochures noted "Ancient Indian caves," and "prehistoric" and "centuries-old" palms, "appealing in their age." Another travel writer asserted confidently in 1939 that "certain individual palms of the species are known to be over two hundred years old."[17]

Not being content with the existing ruins and relics, visitors clamored for -- and got -- live "Indian" entertainment in the 1920s and 1930s. Authenticity proved not to be a great concern, a fact which is true in Palm Springs even today.[18] In 1920, Garnet Holmes of Palm Springs instigated the yearly "Desert Play," in which white actors in "Indian" dress dramatized stories that combined Southwestern Indian legends with white expectations.[19] In the 1930s, the Desert Inn, one of the major hotels, put out a brochure that included a photograph of a man wearing jeans, sneakers, a long fringed shirt, and a huge plumed bonnet viewing Palm Canyon from the Bench captioned, "So might the Indian of yore have surveyed his domain." The jeans and sneakers were more authentic as items of Cahuilla dress than the headdress and fringed shirt; while contemporary Cahuilla generally dressed in the same fashion as their white neighbors, the Cahuilla had never worn anything resembling the latter items, which harked more to Indian stereotypes derived from the native cultures of the Great Plains.[20] In 1938, guidebook author Don Admiral focused heavily on the Cahuilla association with the canyons. He noted not only the "ancient cave homes" and plentiful game which existed "before the advent of the white man," but also described the yearly fiesta and evening dances "held under the moonlight

and under special lighting effects" for the enjoyment of the public, which he judged were "among the most colorful in the West."[21] This fiesta was the brainchild of government agent Harold H. Quackenbush, not the Cahuilla; Cahuilla participants were outnumbered by performers representing other Western tribes.[22]

A third minor accompaniment to these evocations of the exotic was an even more ancient trope - that of the Garden of Eden. Not content with the splendor of the Orient, the mysteries of Cahuilla lore, or even the antiquity of the palms themselves, these observers reached back to the very beginning of Biblical creation in their efforts to exalt the canyons. Some did so directly, like settler Burleigh B. Barney, who called his ill-fated development "The Garden of Eden," or like famed travel writer George Wharton James, who wrote of the palms, "in their solemn grandeur they attest the dignity, beauty and fruitfulness of the Eden over the range."[23] Others were more subtle in their allusion, though no less florid, writing of how

> in the prehistoric times - no one knows how many years ago - Nature started to beautify this spot in her own way - with trees and verdure. ...How the seeds [of the palms] were brought, and by whom - if anyone - and from whence, is one of the unsolved riddles of Time.[24]

(The Cahuilla cartography, by way of contrast, explained exactly how the palms had come to be, and how their seeds had been dispersed.)

In the earlier images, we can sense some of what Anne Farrar Hyde has called the fear and embarassment of "a world of terrifying distance, strange scenery, and useless space." Initially, she argues, explorers of the far West lacked even the vocabulary to accurately describe -- let alone appreciate -- the unique aesthetic offered by the features of Western (particularly desert and mountain) ecosystems. They had no parallels in their experiences with either the Old World or the American East from which to draw. Eventually, with greater experience, Westerners grew able to describe and appreciate their regional ecosystems, but it was not until the 1920s that Americans were able to fully

appreciate and take pride in their unique national ecoscapes. Until that time, it was felt, America came up poorly against the standards of Europe.[25]

It is therefore not surprising that, with the exception of the Cahuilla relics, all of the exotic imagery applied to the canyons was not indigenous, but rather that of the Old World and hence -- ironically -- more familiar. In other words, what the swarms of visitors initially sought in the canyons was the familiar exotic of foreign lands, not the indigenous exotic of their own country. While Hyde's chronology for the nation's slow acclimation to Western ecoscapes parallels the gradual abandonment of the allusions to "Araby" in Palm Springs by the mid-1920s, even then indigenous ecoscapes were not always fully appreciated. Off-setting the proud assertions of the uniqueness and world-wide fame of the canyons, the representations of the Cahuilla past were molded to the tourists' (and locals') expectations, which were more informed by Western images and stereotypes than knowledge of local indigenous culture. We can see this clearly in the evolution of tourism's image of Cahuilla "Indian-ness" from quasi-Arab to quasi-noble savage or quasi-Sioux. Such discrepancies complicate the story Hyde tells about American accommodation to and acceptance of its indigenous ecoscapes.[26]

Regardless of the larger impulses that impelled winter visitors to the region, a desire to experience the canyons in the flesh shaped visitors' actions once they arrived. As writer George Wharton James wrote in 1904, they itched to "enter and take full possession" of the canyons. Such yearnings ran up against the practical problems resulting from thousands of such visitors all wanting to "take full possession" at the same time.[27] The damages caused by the swarms of tourists visiting the canyons led to cries for the protection of the palms and canyons. Who would take up this weighty responsibility? In the end, it fell on the reluctant shoulders of the Mission Indian Agency.

**Chaperone to the Palms**

On January 15, 1920, Congressional Representative William Kettner (D-Calif.) introduced H. R. 11733 for the establishment of a national monument for the preservation of the palms. This legislation successfully passed through Congress and on August 26, 1922, President Warren G. Harding signed Public No. 291, the Act that authorized the creation of Palms National Monument. This Act placed 1600 acres in Palm, Murray, and Andreas Canyons under the control of the Secretary of the Interior. However, in an unusual recognition of native rights, the establishment of the monument was "conditional upon securing the consent and relinquishment of a majority of the Cahuillas."[28] After the Cahuilla refused on November 11, 1922, to give this consent, MIA employees were directed by the Bureau of Indian Affairs to arrange protection for the canyons themselves. Although they hoped to change Cahuilla minds on the matter, they were unsuccessful. Three months later, on February 10, 1923, the Cahuilla refused again to grant consent and the Agency reluctantly settled into its unwanted role as chaperone to the palms.[29]

The Superintendent of the MIA and his employees struggled against a tide of palm-lovers seeking to camp, play, and film in the canyons. During the spring of 1923, for example, each week Superintendent Charles L. Ellis received and responded to at least one request -- and sometimes more -- to camp in the canyons. In February and March alone, Ellis noted in one letter, he had received requests covering approximately 150 would-be campers.[30] One of the first decisions Agency emloyees therefore made was to ban camping in the canyons on the grounds that it posed too great a risk to the palms, and required an unfeasible degree of supervision. The policy had been enacted partly out of concern for the fire risk from camp fires, and partly as a result of experience with actual abuses by visitors. A fire the previous year had damaged a number of palms. Vandals had uprooted cacti and rolled them down the slopes, actors had washed grease paint into the streams during film

shoots in the canyons, and one infamous party of 150 from New York set the standard for pollution and littering.[31] According to MIA Superintendent Charles L. Ellis,

> This, and other minor incidents aroused the Indians and nature lovers to such an extent that it was finally decided to stop all further camping in the canyons, although visitors [were] permitted to freely enter the canyons and remain as long as they like[d], so long as they [did] not destroy any of the flora.[32]

Most would-be campers agreed that the protection of the palms was a higher priority than their desire to camp in the canyons, and settled for a campground on the outskirts of the village. The motion picture companies likewise agreed to limit their activities in the canyons to filming, and to pay the Cahuilla for the privilege. Campgrounds and hotels outside the canyons, both those run by the Cahuilla and those operated by white businesses in Palm Springs, benefitted greatly from this policy. Management of the canyons and their profit-bearing visitors therefore became a significant local issue.

The Cahuilla were somewhat divided over the management of the canyons. While the Cahuilla disapproved of the litter and pollution left by careless campers, the shift towards protection of the canyons was not an entirely smooth one. The band was not united on the question of how best to manage the increasing swarms of visitors. Not only did the Cahuilla have a long personal association with the canyons, but in the 1920s the income from reservation campgrounds and from filming permits was not inconsiderable. Such permits went for a lucrative $50 per film during a time when the average wage available to an Indian laborer was about $3 per day. Split among the tribe members, then, a single day's film shoot would be roughly equivalent to providing employment to every member of the tribe; in addition, sometimes the film companies would also hire Cahuilla labor.[34] The tribal committee, however, generally opposed the presence of campers, seeing in their numbers a threat to the canyons and tribal land rights. Some individual Cahuilla were entirely opposed to camping, while others, such as Pedro Chino, granted camping permits to

a few small parties.[35] Other band members created alternative campgrounds on reservation land and pocketed the fees on an individual basis, irritating those who felt that all income from tribal sources (including reservation land, which was not as yet allotted to individuals) should be distributed equally among the band's members.

Yet disagreement within the tribe was secondary to the tension that existed between the Cahuilla and the Mission Indian Agency. Partly this was due to an overall difference of opinion on what protection of the canyons entailed. Central to the disagreement was how the two groups understood the role of fire in the canyon ecosystems. As Stephen J. Pyne has explained in *Fire in America*, government policy in this period was against wildfires and dubious about controlled, preventative burns.[36] The Cahuilla, meanwhile, had long recognized the beneficial role played by fire in the canyon ecosystem. Through the use of traditional fire technologies they reduced the vermin population in the canyons and encouraged new growth. Their practices had roots in Cahuilla mythology, as seen in the story of Ninmaiwit, and in extended Cahuilla participation in the local ecosystem. They reflected Cahuilla understanding of *Washingtonia filifera* and its role in an ecosystem often decimated by flood and non-human fire.

Most white observers failed to understand this relationship between palms and fires as the Cahuilla did. Most attributed the practice of burning the palms to Indian superstition; the burning of the fronds was supposed to be comforting to deceased spirits. Others attributed it to Indian short-sightedness; burning was seen as an effort to make the palm fruit sooner, but at the cost of fatally weakening it. The remainder of the critics put it down to carelessness and apathy.[37]

White attitudes toward Indians were not the only factor in their disapproval of Cahuilla methods; white ideas about the palms themselves discouraged the perception of burning as a feasible option. In a telegram in 1940, for example, MIA Superintendent John W. Dady justified the purchase of a water-sprayer as not only necessary fire-fighting

equipment, but also as a tool "for immediate use in washing down trunks of burned palms, which will stimulate growth and *help restore their natural appearance.*"[38]

Fire, as white observers saw it, was not "natural" for palms. The palm trees were more national treasures than living plants, described as beautiful, majestic, and even noble sentinels from an ancient age. From such a perspective, allowing the burning of palms to go unchecked was on a par with letting a fire burn freely through the Louvre; the deliberate firing of their fronds was akin to torching the Mona Lisa. Even if the local business people did not personally hold such attitudes (although many of them did) they were well aware that the scenic value of the canyons was an important enticement for the visitors who patronized their stores and hotels in the winter season. The canyons were worth protecting on economic as well as aesthetic grounds.[39]

To the Cahuilla, the canyons were more than a tourist attraction, but they began slowly to take advantage of their scenic potential. We have already seen that the Cahuilla benefitted from fees charged to campers and movie companies. They continued this trend in the 1930s with the installation of a toll gate. They capitalized not only on the reverence and curiosity tourists expressed towards the palms, but also on the popularity of Indian imagery in the West. However, this latter development was not without complications.

Many guidebooks carefully noted that Cahuilla relics and ruins were to be found in the canyons; yet while the guidebooks presented them as scenic attractions, they failed to explain that they were also indications of the long association the Cahuilla had -- and still have -- with the canyons. The Cahuilla have long been a territorial people, protective of the property claims of individuals, groups, and communities.[40] Their earliest histories recounted the activities of culture-heroes such as Evonganet in the canyons, and latter ones spoke of battles, councils and other more current events. Until the arrival of whites in the 1880s, they had the canyons largely to themselves.

By the 1930s the majority of Cahuilla tribal territories had been claimed by white settlers, and much of their water as well. Therefore it is not difficult to understand the reluctance of the Cahuilla to permit free access to their remaining territory by outsiders, and their resentment of interference with their management of the canyons. For example, one of the post-contact uses to which the Cahuilla put the canyons was as grazing areas for their cattle. While the Cahuilla looked for ways to keep their cattle in the canyons, government agents sought for the means to keep these cattle out. The Cahuilla felt that fencing could be used to keep cattle from escaping; white observers advocated instead the use of fencing to protect juvenile palms from the browsing and trampling of these herds.[41] Cahuilla reluctance to share their canyons was offset by growing awareness of the economic fruits of the canyons; the valuable tourist traffic benefitted Cahuilla businesses, film companies were willing to pay for the scenery, and in the 1930s, toll monies contributed to tribal income.

Yet the Cahuilla management of the canyons was contested. The Mission Indian Agency also recognized the canyons' scenic and economic value, but its approach to the exploitation of this value was different. The Agency was reluctant to permit the Cahuilla to manage their own affairs. In part this reluctance stemmed from an awareness that, given the legal status of the Cahuilla as wards of the Agency at this time, responsibility still ultimately devolved upon the head of the Superintendent and his superiors if problems arose. It also stemmed from the belief that the Cahuilla were not competent to manage the canyons without supervision. The Cahuilla, claimed MIA Superintendent Charles L. Ellis in 1932,

> do not realize the necessity of keeping someone constantly on the job and will not assume the responsibility to that extent. Some of them want to lock it [Palm Canyon] up during their absence, which would leave the place exposed to miscreants, who might through carelessness start a fire which would destroy the attractiveness of the canyon.[42]

The Cahuilla saw the canyons as providing not only an opportunity for income but also the autonomy such income brought; the Mission Indian Agency refused to support the rights of individual Cahuilla, regardless of their status in the tribe, in opposition to what it perceived as the collective interest of the band. Thus Agency employees denied the legitimacy of permits issued by individuals.[43] Ideally, the job of supervising the canyons could be taken up by a qualified government agency, such as the National Park Service. Cahuilla defiance, as we have seen, made this impossible. The end result was that the MIA found itself responsible for the management of the canyons.

Taking care of the canyons proved a headache for the inexperienced Agency employees. The Agency was well aware of its lack of expertise in park management. In 1923, Superintendent Ellis received advice (and sympathy) from the Assistant Director of the National Park Service, Arno B. Camerer, but the burden of the canyon's protection remained on Agency shoulders.[44] Thus the Agency confronted the onslaught of winter visitors eager to see the "scenic wonderland" of the canyons (comprising as many as 3000 cars in a single day) operating on a shoestring budget; it was thus able to employ only a fire guard, who patroled the canyons aided only by his horse, a scant handful of laborers hired to help out on the weekends, and a few sympathetic volunteers.[45] This small company endeavored to protect the canyons from rubbish-strewing tourists, the streams from pollution, and the palms from fire, theft and vandalism. They also dealt with the occasional unforeseen ecological event, such as the floods that ripped through the canyons in the winter of 1928, felling palms and piling up debris.[46] That they managed to do this successfully, for the most part, received commendation from park officials who appreciated the magnitude of the task. Others were less appreciative.

Although the problem of would-be campers gradually eased as the no-camping policy became more established, the Cahuilla remained sceptical about the value of Agency intervention in what they felt was their own private affair. The earlier issuance of

camping permits by Pedro Chino probably reflects this belief, as did the tribal collection of trespass fees from the motion picture companies. The desire of the Cahuilla to manage their own economic affairs relative to the canyons was most clearly expressed in June of 1930, when Ellis reported to the Commissioner of Indian Affairs in Washington, D.C., that the band had decided to install a toll gate at the entrance to the canyons.[47] According to Clem Segundo, a local Cahuilla man, the toll gate was put in the canyon

> so as to hold our people right here. ...We had to do that to make a living out of it, to hold our people here, otherwise if we didn't do that our people would go off to work and our land would be idle and they would say our people were lazy.[48]

The Cahuilla planned to handle the toll gate entirely by themselves, providing their own patrolmen and funding them with the income from the tolls.[49] Although dubious and somewhat opposed to this expression of Cahuilla tribal entrepreneurship ("the Indians," Superintendent Ellis complained, "are very secretive and jealous that the privilege of handling their own affairs may be interfered with"), the MIA acceded to the tribes' wishes and collection of tolls began that year.[50]

The Superintendent's doubts were shared by the local business community in Palm Springs. While some business people approved this sign of industry on the part of the Cahuilla, others worried about the effect the tolls would have on the lucrative tourist trade. The decision of the Cahuilla to raise the toll rates, particularly on horseback riders traversing the reservation, at the start of the 1936 tourist season provoked immediate condemnation. "[W]hile it is not and never has been our desire to take from the Indians," Palm Springs business men and women claimed in a letter to Commissioner of Indian Affairs John F. Collier (1933-1945), "we do object to their constantly harassing our citizenry and levying tribute on our tourists and visitors, upon whose good will not only our own but the livelihood of these Indians depends." The solution, they insisted, was for the government to take "immediate control of the Indian situation, that the status of these Indians and their relations to us and our visitors be definitely established." As the local business

people saw it, the interests of 50 Cahuilla were impeding the expression of the wishes of the 3,500-plus population of Palm Springs.[51] While their highhandedness in their dealings with the Cahuilla over this and other issues is not easy to condone, and their anxiety from our perspective seems exaggerated, in context their fears and demands are understandable. Dependent on the tourist trade for their livelihood, they were suspicious of and hostile towards any changes in the ecoscape that might threaten that trade.

On January 1, 1937, pressured by the demands of the white business interests and the complaints of members of the Agua Caliente band who disapproved of the way the tribal committee had been handling their shared funds, MIA Superintendent John W. Dady seized control of all tribal affairs. Dady decided that the costs of Cahuilla-administered toll collection outweighed the benefits. MIA Special Agent Harold H. Quackenbush was installed in a government-owned building located on reservation land adjacent to the hot springs and authorized to manage the collection, deposit, and distribution of tribal income whose sources ranged from tolls to rentals of Cahuilla land. A strict accounting of tribal income was posted for all the tribe to see, periodic meetings were held to decide how the money would be spent, and monthly per capita disbursements were distributed to all members of the tribe. (The significance of these actions will be discussed in greater detail in the chapter on Agua Caliente.)

Cahuilla versus "Indian" Canyons

Throughout the 1920s and 1930s the Cahuilla wanted to exert control over their lives and finances, particularly in the matter of collecting and spending their income. A variety of sources of income, some legal, others not, were available to the Cahuilla, such as filming fees from motion picture companies using the canyons for scenery, and the collection of tolls from tourists wishing to visit the canyons. In the strictest sense, all but privately owned assets and improvements could be considered tribal property. In practice, income derived from sources on lands recognized as "belonging" to an individual were treated as

individual income, while monies derived from unassigned assets such as the canyons were treated as tribal funds.

Regardless of how broadly "tribal income" was defined, such monies were, given the status of the Cahuilla as wards of the state (despite having been granted citizenship in 1924), subject to the supervision of the BIA and its local branch, the MIA. Officially, such income was supposed to be turned over to the Agency Superintendent, who in turn deposited it in a Treasury account in the tribe's (or an individual's) name. When the tribe wished to spend this money, they were supposed to decide how it was to be spent by majority vote in an officially called meeting. Having then decided how to spend the money, they were to make formal request for the disbursement of the funds to the Superintendent, who in turn passed it on to the Commissioner of Indian Affairs in Washington, D.C. Should the CIA agree with the Superintendent that the proposed expenditure was a good use of tribal monies, authority was granted to make the expenditure, and passed on to the tribe, again through the Superintendent. Given this system's inevitable delays, presumption of Cahuilla incompetence, and power given to two men – the Superintendent and the CIA – it is not surprising that many Cahuilla withheld their income, tribal or otherwise, from the government. (Recent events concerning BIA mishandling of tribal monies have proven that such caution was warranted.) It was often simplest and quickest for the tribal committee to keep track of the funds themselves and distribute them as needed. However, this alternative approach was not without its own problems.

Not all band members approved of the way the tribal committee disbursed their collective income; following older patterns, the committee tended to direct the funds in directions which they saw fit, rather than calling meetings for the tribe to vote on proposed expenditures. This older method had the advantage of speed and efficiency, but, as the dissenting faction was quick to point out, it was also vulnerable to favoritism and self-advancement. The dissenters also resented how some individuals benefitted

disproportionatly from the use of tribal lands, such as those who ran businesses on the more valuable sections of the reservation. While the land was tribally owned, the income from such businesses remained in the hands of the individuals lucky enough to be permitted to operate there. For the unlucky, this situation was perceived as particularly unfair, especially since the favored were often friends or family of tribal committee members or even on the committee themselves.

Members of the "traditionalist" faction, such as Francisco Patencio and his relatives, tended to be those who held authority within the band through their long association with the local ecoscape. The dissenters, on the other hand, were typically those who had arrived late on the scene or had returned after a long absence; they lacked the traditional claims on the increasingly valuable territory surrounding the hot spring and adjoining the white business district of Palm Springs. This internal conflict and its effect on the local ecoscape will be examined in greater detail in the next chapter. For the moment, the important thing is to recognize that even within groups that occupied a similar place in the ecoscape and shared a similar cartography, there could be significant differences. Out of such differences come change.

The response of some of the dissenters was to file suit to force allotment of the valuable sections of the reservation, preferably to themselves. Others would turn to the Indian Agency, demanding that the Superintendent intervene to ensure equitable distribution of all tribal funds, including, if possible, the income of the wealthier individuals. This shall be examined in greater detail in the next chapter, "Agua Caliente."

As suggested by the legend of the man-palm Moul, the bonds linking the Cahuilla to the canyon ecoscape were strong. For the Cahuilla, the palm canyons were more than merely an source of income, although that was important. For earlier generations as well as later, the canyons helped the Cahuilla through hard times. They provided water and

sustenance, shade and housing, raw materials for tools and clothing. The value of the canyon ecosystems was recorded in Cahuilla oral histories as we have seen. Fire and palms had a long association in Cahuilla myth, history, and practice; one was inseparable from the other -- an attitude that initially convinced white lovers of the palm that the Cahuilla were unsuitable caretakers for the canyons that had cared for the Cahuilla for generations. As time passed and the Cahuilla adapted to the changing ecoscape, the essence of the canyon's value altered, though it did not necessarily diminish. The tolls charged to visitors wishing to explore the canyons in the winter months and the fees paid by movie companies to use the canyons in their films provided an economic cushion that helped the tribe survive the lean tourist season of summer much as the canyons' water and shade helped them endure the heat of earlier summers.

The Cahuilla cartography had undergone considerable transformation in the decades after the arrival of the railroad, the reservation, and the first white settlers in the 1870s. Once undisputed masters of lore about indigenous plants, animals, climatic phenomena, and the location of seeps, springs, and other resources, the Cahuilla found their mastery of their ecoscape weakening as the ecoscape changed. Despite their wealth of indigenous knowledge, their knowledge of the practices and assumptions of their new white neighbors was less reliable. Over several decades, through a process of trial and error, the Cahuilla endeavored to become masters of the new ecoscape as they had been of the old. As they became more adept in the ways of the newcomers, older knowledge and understandings became less relevant. In addition to learning and unlearning practical survival skills, the Cahuilla had to learn to understand and manipulate the relationships and perceptions of other groups. The greater experience with white ecoscapes gained by younger Cahuilla and those who had spent more time outside of Palm Springs hastened the adaptation of the Cahuilla as a group to the new ecoscape. However, it also put them on a collision course with older "traditionalists."

The Mission Indian Agency agreed with the dissenters that the "traditionalists" were unsatisfactory caretakers of tribal interests. As trustee for the Cahuilla, it was legally obliged to ensure that the maximum benefit was derived from their resources and distributed in a manner that benefited the tribe as a whole. According to MIA Superintendents in the 1920s and 1930s, the Cahuilla were not competent to shoulder this obligation themselves. The Cahuilla saw things differently. Informal business arrangements were the norm on the reservation, as both Cahuilla and their white partners were unwilling to go through the rigorous and time-consuming process by which a potential business transaction with the Cahuilla was approved by the Superintendent and by the BIA in Washington, D.C. On a smaller or more remote reservation, such informal arrangements would likely have been condoned by the Agent -- as, indeed, they had in the past when Agua Caliente was such a reservation. In the context of a booming resort community, the ability of the Agent to turn a blind, if somewhat disapproving, eye was severely compromised.

Responsibility for the reservation, at least according to white observers, devolved ultimately onto the Agency, not the Cahuilla. Even as the Cahuilla were pressing for greater autonomy, the business interests of Palm Springs and their white clients were beseiging the Bureau with complaints and requests concerning the proper use of reservation land. The Agency's assumption of Cahuilla incompetence made it unlikely if not impossible that the Cahuilla would be allowed to run things themselves, yet at the same time the desire of the Cahuilla to handle their own affairs hampered the MIA's ability to address reservation problems effectively. In the case of the palm canyons, relative Cahuilla disinterest (compared to their concerns with issues elsewhere on the reservation) enabled the Agency to devise its own plans for handling matters, but even that was contested.

What the federal government was slowly but reluctantly realizing was that its role in the ecoscape had shifted. Once a key part of the evolving pattern due to its stores of

knowledge and capital, the BIA found itself increasingly on the periphery. Both Cahuilla and white residents were developing reservoirs of knowledge and capital even as the Agency's local resources were diminishing. The MIA was responsible for the protection of the palm canyons, but lacked the resources and skills to handle the enormous crowds of visitors that visited them, and was unwilling to let the Cahuilla take over. In the various letters produced by local Indian Agents on the subject, their frustration with being caught between the demands of the public for both access and protection, and the limits imposed by lack of money and manpower and experience is clear. It is not surprising that the Mission Indian Agency was among the champions of the bill setting aside the canyons as a National Monument; responsibility for this bureaucratic headache would then be transferred to the better equipped and more experienced National Park Service. This desire also reflected the MIA's growing awareness of its increasing superfluity in the Palm Springs ecoscape. Yet the local habit of looking to the authority of the federal government lingered during the 1920s and 1930s.

Agency employees' perception of, and responses to, the events surrounding the canyons were informed by their cartographies, as those of the Cahuilla and the local whites were by theirs. Of all the groups, the federal government had the largest hand in the initial shaping of the new ecoscape. From the outset, when it decided to subsidize railroads by granting railroad companies odd-numbered Sections to sell and then allocated the even-numbered Sections in the Palm Springs area to the Agua Caliente Indian Reservation, the federal government had placed its imprint on the ecoscape of Palm Springs.

Unlike the Cahuilla, and later white residents, the government operated from a position of unfamiliarity and remoteness. Indian Agents cycled in and out of office, as did their distant superiors in Washington, D.C. Indeed, it was not until the 1930s that a permanent Agency staff was assigned to, and resided in, the community of Palm Springs.

Balanced against this distance and unfamiliarity was the power of a system designed to enhance the collection of knowledge and its employment, and an authority that derived from an apparent objectivity in contentious local affairs. Despite significant differences in the personalities and individual knowledge and interests of the Indian Agents, their approaches to events in Palm Springs were shaped by a shared system of protocol and precedent. This system offered a methodical, if slow, way to understand the unfamiliar. In the context of a rapidly evolving ecoscape reliance on this system ultimately proved a handicap. Federal agents reluctantly discovered that the knowledge it conferred was not a match for that provided by daily experience. Although the government had played a crucial role in setting up the broad framework of the new ecoscape, it was the Cahuilla and white residents who filled in the finer, more subtle connections within that framework. As local participants in the ecoscape's creation grew more sure of their roles within it, government intervention became less a necessity than a crutch.

Concern about both the community and local economy informed the actions taken by Palm Springs business interests, particularly as represented by the hotel industry and the Chamber of Commerce. Deriving considerable benefit from the proximity of the reservation, they also found its contiguity with the city frustrating. The Cahuilla (and their working class renters on Section 14 of the reservation) provided valuable labor for the resorts and the other local residents. Cahuilla relics were important tourist attractions, as were the Cahuilla themselves. Fiestas, dances, and the like provided entertainment; "Indian" legends and history provided fodder for white versions of local color, such as the Desert Plays. By the 1930s, the canyons were known internationally, drawing thousands to see their famous palms; the fact that camping overnight in the canyons was forbidden meant that these visitors had to rely upon the village for their housing and other needs. However, the reservation and the Cahuilla were not under the control of these interests. Although dependent upon the cooperation of the Indian Office, its Agents, and the

Cahuilla themselves, Palm Springs business men and women did not accept the actions of that Agency and its wards passively .

Although unable to directly control the operation of the reservation, the business community did endeavor to insure that at least their complaints would be heard and dealt with efficiently. They were not reluctant to exert their influence in Congress and in the community to nudge reservation management in their direction, or to ensure cooperation from the Cahuilla on areas of mutual concern. As noted, the Cahuilla as a group provided labor and a market for the community, as did the lower-class whites and Hispanics to whom they rented. The Cahuilla were considered picturesque, and thus valuable as a tourist attraction. But several of the Cahuilla were shrewd businesspeople in their own right, running campgrounds, managing stores, acting as landlords, and so on. As such they were competitors, and in some ways they enjoyed what the white business interests viewed as unfair advantages, such as freedom from state tax laws and the ability to call in the federal government on their behalf. The Cahuilla as a group could theoretically influence the growth of the village by granting rights of way across the reservation for development -- or by withholding them. They could, also in theory, raise the toll rates for the canyons and thus discourage visitation by non-Cahuilla, or even bar outside access entirely. Although some of these potential threats never manifested, either because the Cahuilla themselves would be hurt by them, or because the MIA intervened on behalf of white business interests, those interests remained cognizant of the latent power of the Cahuilla to interfere with the smooth operation of village and business in Palm Springs.

Initially handicapped by both the lack of indigenous knowledge such as the Cahuilla possessed, and of a system for acquiring such knowledge, such as that used by the government, the local residents of Palm Springs struggled in the early decades of the settlement. The unfamiliarity of the ecoscape and the difficulty of learning about it systematically meant that knowledge was acquired, often painfully, through trial and

error. As a result, by the 1920s and 1930s, the villagers had a knowledge of the new ecoscape that rivaled that of the Cahuilla (for whom the altered ecoscape was almost as new), and surpassed that of the government, at least in terms of personal, intimate knowledge. Unfortunately, this local knowledge did not guarantee that its possessors could make the best use of it. If Cahuilla practices and beliefs were denied the authority that came from belonging to the white community, those of the villagers came up short compared to the sheer weight of long experience that accrued to the Cahuillan cartography. Relative to the government, the villagers were far and away more familiar with the day-to-day dynamics of life in the Palm Springs ecoscape; yet they lacked the power to make decisions regarding the reservation (a significant portion of that ecoscape, on all levels) and even decisions focusing on the areas they did control were affected by the federal presence (or lack thereof). The white residents of Palm Springs, then, found themselves balked in their exercise of local authority, just as their knowledge and familiarity with the local ecoscape increased.

The general population of visitors who were the lifeblood of the resort community were less interested in these machinations. Like most vacationers, today as well as then, they were interested in fun, relaxation, and freedom from the demands of their everyday lives. They wished to be entertained with colorful fiestas and dances, to explore mysterious Indian ruins and to rest in the shade of ancient palm trees. They wanted the assurance that these treats would be waiting for them. Thus the two main concerns of tourists were protection and access. However, these two interests were often at odds, as was the case for visitors wishing to camp overnight in the palm canyons while demanding that the canyons be protected from fire and vandalism. The very numbers of these visitors formed a two-edged sword. The community depended heavily on their patronage for its economic survival, but the crowds in the canyons threatened those areas' fragile ecosystems

and famed beauties. Their presence increased competition between white residents and the Cahuilla, and placed additional pressure on the federal government.[52]

The general public shared with the government the handicaps of distance and lack of day-to-day familiarity, and that of relative lack of power with the villagers. In their often naive enthusiasm about the region, they demonstrated by contrast the extent to which the white residents of Palm Springs had become integrated into the local ecoscape. (Local newspapers such as *The Desert Sun* often seemed torn between celebrating the tourism that was becoming the lifeblood of the community, and expressing annoyance with the clumsy ignorance of actual tourists.) The visitors who came to Palm Springs had less at stake than either locals or the federal government. Although many were return visitors, coming year after year, they made their homes and livings elsewhere, and could endure -- or even embrace -- their lack of responsibility for the running of things which weighed down the other groups. Automobile tourists, in particular, hoped to experience life free from the cares of everyday obligations.[53] Yet the visitors, as a group, did not lack influence. If only through sheer numbers, they were a force to be reckoned with in the doings of the village. This power was offset by their relative ignorance. This combination posed a danger to the more knowledgeable parties in Palm Springs; the visitors could exert (often inadvertently) considerable force in matters about which they knew little or nothing, sometimes for the worse. On the other hand, their lack of knowledge enabled the local interests to sway the visitors to their side through apparent superiority of knowledge. Both dangerous and valuable, the general public who visited Palm Springs in the winter season could not be safely ignored by any of the three groups with a greater investment in the evolution of the local ecoscape.

By the 1930s, the Cahuilla and the white villagers had established places for themselves in their shared ecoscape. The full potential of these positions was not yet realized, largely in part due to the continued involvement of the federal government in

local affairs. The Cahuilla were learning how to negotiate successfully with their white neighbors, and how to reconcile older beliefs and practices with the limits and possibilities of the changed ecoscape. White villagers were feeling more comfortable in their understanding of what had become their home, yet were still learning that this ecoscape was one in they had to share authority with the Cahuilla. Yet unsure in these roles, both groups continued to rely on the aid of the Indian Office in resolving local disputes. The controversy over the canyons and the challenges posed by the tourism boom revealed that this method was no longer adequate. But it would take a troubled government take-over of Cahuilla affairs in the 1930s to convince all three groups that it was time for local residents, white and Cahuilla to stand on their own two feet. This take-over, and its immediate outcome, will be addressed in the next chapter, which deals with the hot spring Agua Caliente.

Notes

1 Lowell John Bean and Katherine Siva Saubel. *Temalpakh (From the Earth): Cahuilla Indian Knowledge and Usage of Plants.* (Banning, California: Malki Museum Press, 1972), p. 148, on Qawa'siktem; Lowell John Bean, with Sylvia Brakke Vane, and Jackson Young, *The Cahuilla Landscape: The Santa Rosa and San Jacinto Mountains.* (Menlo Park, Calif.: Ballena Press, 1991), pp. 15-20; see also pgs. 39, 49, 76, and elsewhere on springs.

2 David Prescott Barrows, *Ethno-Botany of the Coahuilla Indians.* (Banning, California: Malki Museum Press, 1977), p. 38.

3 Lowell John Bean, *Mukat's People: The Cahuilla Indians of Southern California.* (1972; Berkeley and Los Angeles: University of California Press, 1974), pp. 44-45; Bean and Saubel. *Temalpakh (From the Earth)*, pp. 145-49 on palm uses; Francisco Patencio, *Stories and Legends of the Palm Springs Indians.* (Los Angeles: Times-Mirror, 1943), p. 101, on the creation and use of the palms that came from a man.

4 David Prescott Barrows, *Ethno-Botany of the Coahuilla Indians.* (Banning, California: Malki Museum Press, 1977), p. 61.

5 Bean and Saubel. *Temalpakh (From the Earth)*, p. 149, on the use of fire to control pests; Bean, *Mukat's People*, on the dangers of wildfire and the uses of fire to control (and roast) insects, fertilize the soil, and herd rabbits; and Cultural Systems Research, Inc., *Archaeological, Ethnographic, and Ethnohistoric Investigations at Tahquitz Canyon, Palm Springs, California.* (Cultural Systems Research, Inc. 823 Valparaiso Ave., Menlo Park, CA 94025: November 1995), p. V-209, footnote 156. Hereafter referred to as the Tahquitz Report, this study includes an excellent chronology of the interactions between the Agua Caliente band of Cahuilla Indians and the Agents of the Indian Service and local Palm Springs whites.

J[ames] Smeaton Chase described the fire-making process in *California Desert Trails, with Illustrations from Photographs by the Author and an Appendix of Plants. Also Hints on Desert Travelling.* (Boston and New York: Houghton Mifflin Company, 1919), p. 73, as did Walter Lindley, M. D. in "Indio -- a Palm Forest in the Desert" in Stephen Bowers, *A Remarkable Valley and an Interesting Tribe of Indians*, (San Buenaventura, Calif., 1888), cited in the Tahquitz Report. See also Stephen J. Pyne, *Fire in America: A Cultural History of Wildland and Rural Fire*, (Princeton: Princeton University Press, 1982), for a discussion of the ways the Indian or rural use of fire came under censure by federal authorities.

---

6 Patencio, *Stories and Legends*, p. 69.

7 Bean and Saubel. *Temalpakh (From the Earth)*, pp. 145-149, on palm uses; Patencio, *Stories and Legends*, p. 101, on the creation and use of the palms that came from a man; William Duncan Strong, *Aboriginal Society in Southern California*. (Berkeley: UC Press, 1929; Morongo Indian Reservation, Banning, Calif.: Malki Museum Press, 1972), p. 141 on the sacrifice of the palm. The spelling given here of the palm woman was that used by Edward S. Curtis in *The North American Indian* (Norwood, Mass., 1926), pg. 120, cited in *Temalpakh*; that of the man who became a palm is the form used by Bean and Saubel. Strong offers the alternate spelling *Ninmaiwit*, and Patencio *Moul*.

8 Alejo Patencio, "Palm Springs Cahuilla Creation Myth," translated by Jolian Norte, after mourning ceremony at Palm Springs February 1925, as recorded by Strong in *Aboriginal Society in Southern California*, p. 130-143; for note regarding palm see pp. 140-141.

9 Patencio, *Stories and Legends*, p. 19

10 Chase, *California Desert Trails*, p. 73.

11 Patencio, *Stories and Legends*, p. 101.

12 Patencio, *Stories and Legends*, p. 101.

13 William P. Blake, *Report of a Geological Reconnaissance in California: Made in Connection with the Expedition to Survey Routes in California, to Connect with the Surveys of Routes for a Railroad from the Mississippi River to the Pacific Ocean, under the Command of Lieut. R. S. Williamson, Corps Top. Eng'rs, in 1853*. (New York: H. Baillière, 1858), p. 95.

14 Advertising booklet for the hotel "Established 1886 by Welwood Murray, Elizabeth Murray, Proprietors. " [c. 1900]. Charles Francis Saunders, *Under the Sky in California*. (1913, 1919; New York: Robert M. McBride and Co., 1926), p. 35; *Palm Springs Health Resort: The Oasis of the Desert*.

15 Sally Presley, *Facts and Legends: The Village of Palm Springs*. (Palm Springs: Celebrity Publishers, 1996), p. 10.

16 J[ames] Smeaton Chase, *Our Araby: Palm Springs and the Garden of the Sun. Illustrated from Photographs by the Author: with a Descriptive list of Desert Plants, etc. and Hints to Desert Motorists: also A New Map of the Region by the U. S. Geological Survey*. (Pasadena, Cal.: Star-News Publishing Company, 1920); *Our Araby: Palm Springs and the Garden of the Sun. New Edition, Revised and Enlarged*. (New York: J. J. Little & Ives Company, 1923).

17 Welwood Murray, *Palm Springs: An Attractive Winter Resort for Tourists and Invalids*. [c. 1910]; *Palm Springs: Health Resort: The Oasis of the Desert*, [c. 1900]; Palm Springs Chamber of Commerce. *Map of Palm Springs, California, "America's Desert Resort."* [c. 1920]; *Palm Springs, California: California's Most Picturesque Oasis*. (January 1929); *Riverside County: It's* [sic]*Hotels and Resorts*, [c. 1920]; Hugh Evans and Company, *Palm Springs: The Oasis of Delight*. [c. 1920s]; William Mason and James Carling, *Where Shall We Go? A Guide to the Desert*. (Los Angeles: Wolfer Printing Co., 1939), p. 49.

18 A brief drive around the downtown of Palm Springs will quickly convince one of the validity of this claim; the Agua Caliente Cultural Information Center shares the attention of tourists with stores selling Navajo rugs, Hopi kachina dolls, and T-shirts illustrated with Southwestern sand-paintings. There are even some buildings purporting to be of Indian design, such as "pueblos" made out of cement painted pink.

19 Tahquitz Report, p. v-247. See also *Palm Springs, California*, (1929), a brochure put out by the four major resorts and hotels, The Desert Inn, the Oasis, El Mirador and Deep Well Guest Ranch. This publication includes a photograph of the Desert Play (p. 15), to which the Cahuilla were given free admission (see C[harles] L. Ellis to Garnet Holme, September 14, 1922). The actors depicted in the picture are obviously whites, appearing in loincloths and bad wigs.

20 *The Sands of Time*. (Palm Springs, The Desert Inn, c. 1930), p. 15.

21 Don Admiral, *Desert of the Palms*. (El Centro, Calif.: The Desert Magazine, 1938), pp. 22, 24.

22 *The Desert Sun*. X.38 (April 23 to April 30, 1937), p. 1.

23 George Wharton James, *Traveler's Hand Book to Southern California*. (Pasadena, Calif.: 1904), p. 292.

24 Hugh Evans and Company. *Palm Springs: The Oasis of Delight*. [c. 1920s]

25 Anne Farrar Hyde, *An American Vision: Far Western Landscape and National Culture, 1820-1920*, (New York: New York University Press, 1990), p. 7.

26 Hyde, *An American Vision*. The history of the Palm Springs ecoscape suggests that we need to think about that which Hyde's (and others') account does not -- that is, how native peoples viewed their own familiar ecoscapes and how they coped with the changes made to them. The answers to such questions are not readily apparent in *An American Vision*, for the simple reason that Hyde is more concerned with white images of the West and of its native peoples, than with how indigenous groups themselves understood local ecoscapes.

---

27 George Wharton James, *Traveler's Hand Book to Southern California.* (Pasadena, Calif.: 1904), p. 292.

28 C[harles] L. Ellis to Commissioner of Indian Affairs. July 23, 1929; C[harles] L. Ellis to Commissioner of Indian Affairs. June 12, 1930. See also "National Park Notes," *Sierra Club Bulletin* (January 1922): 212-18; "National Park Notes," *Sierra Club Bulletin* 11.3: 320-26; and Frederic Taber Cooper, *Rider's California: A Guide-Book for Travelers with 28 Maps and Plans,* (New York: The Macmillan Company, 1925), pp. 619-20.

29 C[harles] L. Ellis to Commissioner of Indian Affairs. June 12, 1930; C[harles] L. Ellis to Commissioner of Indian Affairs. September 3, 1932.

30 C[harles] L. Ellis to John B. Fisher, Business Manager for Cecil B. DeMille. March 8, 1923. For this and other camping correspondence see RG 75, Records of the Mission Indian Agency, Central Classified Files 1920-1953, Box 18, File 115, "Hunting and Fishing on Indian Reservations in California."

31 C[harles] L. Ellis to Elwood Llyod. March 8, 1923; C[harles] L. Ellis to John B. Fisher, Business Manager for Cecil B. DeMille. March 8, 1923; C[harles] L. Ellis to E. B. Meritt, Assistant Commissioner. March 8, 1923; William J. Maloney to C[harles] L. Ellis. April 26, 1923. See also The Tahquitz Report.

32 C[harles] L. Ellis to E. B. Meritt, Assistant Commissioner. March 8, 1923.

34 Permit issued by the Indian Business Committee (Albert S. Patencio, Ramon Manuel, Frank Patencio, and Amado Miguel) to the Ben Wilson Film Producing Company. January 26, 1923; memorandum. March 1923; C[harles] L. Ellis to J. H. Lasky. March 31, 1923; John B. Fisher to C[harles] L. Ellis. April 5, 1923; H. C. Updegraf to "Charles Allis." August 27, 1923; C[harles] L. Ellis to H. C. Updegraf, August 28, 1923; memorandum, November 7, 1923.

35 Elizabeth Green to C[harles] L. Ellis. March 3, 1923; C[harles] L. Ellis to John B. Fisher. March 8, 1923; C[harles] L. Ellis to E. B. Meritt. March 8, 1923.

36 Stephen J. Pyne, *Fire in America: A Cultural History of Wildland and Rural Fire,* (Princeton: Princeton University Press, 1982).

37 Charles Francis Saunders, *Under the Sky in California.* Illustrated from Photographs mainly by C. F. and E. H. Saunders. (1913, 1919, 1926; New York: Robert M. McBride & Co., 1926).

38 John W. Dady to D. E. Murphy. June 20, 1940.

39 Senate Committee on Indian Affairs. *Palm Springs Band of Mission Indians Hearing before the Committee on Indian Affairs, 1936-1937, Seventy-Fifth Congress, First*

---

*Session, on S. 1424, a Bill to Repeal that Provision in the Act of March 2, 1927 (39 Stat. L. 976), Directing the Making of Allotments to Indians of the Mission Indian Reservations, Calif., and S. 2589, a Bill to Authorize the Sale of Part of the Lands Belonging to the Palm Springs or Agua Caliente Band of Mission Indians, and for Other Purposes,* (Washington, D. C.: Government Printing Office, 1937).

40 Bean, *Mukat's People.*

41 E[dward] L. Dorn to H[oratio] N[elson] Rust, U. S. Indian Agent. December 29, 1892; W[illia]m Collier, Special Attorney for the Mission Indians, and L. A. Wright, Indian Agent, to Commissioner of Indian Affairs. May 10, 1900; B. F. Allen, Forest Superintendent, to Commissioner of the General Land Office. June 29, 1900; Grant I. Taggart, Supervisor, General Land Office, to B. F. Allen, Superintendent, General Land Office. July 1, 1900.

42 C[harles] L. Ellis to Commissioner of Indian Affairs. September 3, 1932.

43 C[harles] L. Ellis to Elizabeth Green. March 14, 1923. This favoring of tribal control over individual control stands in opposition to national and regional trends; in some ways it prefigures the later era of national Indian policy under John Collier.

44 C[harles] L. Ellis to A. C. [Arno B.] Cammerer, Acting Director, National Park Service. March 8, 1923; Arno B. Cammerer, Acting Director of the National Park Service, to C[harles] L. Ellis. March 15, 1923; C[harles] L. Ellis to Arno B. Cammerer. March 23, 1923. The Agency's awareness of its own inexperience is noted in the Tahquitz Report.

45 Budget requests came to consume much of the Superintendent's correspondence to the Office in Washington, D.C. Allotments for the care of the canyons, it seemed, were never adequate. Initially, the horse cost roughly 60¢/day to feed, or about $225 a year, the fire guard $375 a year. C[harles] L. Ellis to Commissioner of Indian Affairs. July 6, 1925; July 14, 1926. This salary was later raised to $1020 per annum, minus $120 for quarters, fuel, and light. C[harles] L. Ellis to Commissioner of Indian Affairs. May 15, 1926; December 13, 1926; June 21, 1927. Additional men were hired on weekends and holidays for $4 a day, or in situations that required clean-up and repair, such as fire or flood. C[harles] L. Ellis to Commissioner of Indian Affairs. February 2, 1926; April 25, 1927; July 1, 1927. Three men held the position of Fire Guard during the period under examination here - William P. Maloney, Arthur Harrold, and Santa Cruz Siva, an Indian. See also C[harles] L. Ellis to Commissioner of Indian Affairs. January 3, 1929, February 28, 1929; July 13, 1931; July 21, 1932; John W. Dady to Commissioner of Indian Affairs. July 27, 1933; March 1, 1934; July 25, 1934; March 16, 1937; May 19, 1932.

46 C[harles] L. Ellis to Commissioner of Indian Affairs. March 9, 1928.

---

47 C[harles] L. Ellis to Commissioner of Indian Affairs. June 12, July 14, and July 30, 1930.

48 Clemente Segundo, "Statement of Clem Segundo" in Senate Committee on Indian Affairs. *Palm Springs Band of Mission Indians Hearing before the Committee on Indian Affairs, 1936-1937, Seventy-Fifth Congress, First Session, on S. 1424, a Bill to Repeal that Provision in the Act of March 2, 1927 (39 Stat. L. 976), Directing the Making of Allotments to Indians of the Mission Indian Reservations, Calif., and S. 2589, a Bill to Authorize the Sale of Part of the Lands Belonging to the Palm Springs or Agua Caliente Band of Mission Indians, and for Other Purposes.* (Washington, D. C.: Government Printing Office, 1937), p. 31. It should be noted that Segundo's comment not only explains the monetary value of a toll gate; it also shows that wage labor was not considered "real" work for Native Americans. Those not engaged in settled (preferably agricultural) labor were thus construed as "lazy."

49 C[harles] L. Ellis to Commissioner of Indian Affairs. September 10, 1930.

50 C[harles] L. Ellis to Commissioner of Indian Affairs. June 26, 1930.

51 Earl Coffman et al [Earl Coffman, Indian Affairs Committee; Frank H. Bennet, president of the Palm Springs Chamber of Commerce; Francis F. Crocker, president of the Junior Palm Springs Chamber of Commerce; Charles F. Morrison, president of the Palm Springs Property Owners Association; Harold Hicks, president of the Palm Springs Realty Board; Henry Hoagland, president of the Desert Riders; Warren B. Pinney, chairman of the Palm Springs Sanitary board; George B. Roberson, president of the Palm Springs Police Protection District; and Alvah F. Hicks of the Palm Springs Fire Commission] to John F. Collier, November 5, 1936, in Senate Committee on Indian Affairs, *Palm Springs Band of Mission Indians Hearing before the Committee on Indian Affairs, 1936-1937, Seventy-Fifth Congress, First Session, on S. 1424, and S. 2589.* (Washington, D. C.: Government Printing Office, 1937), pp. 54-55; The Tahquitz Report. On the ratio of Cahuilla to white tenants on Indian land (2,000) and residents of Palm Springs (1500, swelling to 8000 in winter), see R. A. Floyd, Project Manager, to Charles W. Petit, Assistant Regional Conservator. October 18, 1938.

52 See Warren James Belasco, *Americans on the Road.* (Cambridge, Mass.: The MIT Press, 1979) for a discussion of the ways in which automobility and tourism intersected.

53 Belasco, *Americans on the Road.*

## Chapter 6

## Agua Caliente

To effectively view the final distinctive feature of the Palm Valley ecoscape -- the Agua Caliente hot spring -- one must travel in time as well as in space; rapid change in subsequent years has obscured the visibility of this spring, although not its importance. Coming across the baking desert flats from the south, or along the wind-blown edge of Mount San Jacinto from the north, weary travelers once felt their hearts leap at a most welcome sight. Surrounded by vegetation, water gurgled up from the earth, its strange sounds accompanied by the drone of dragonflies and other insects. The spring's hot water has its origins deep within the fault zones of the region; earthquakes have shifted its opening from time to time, but never managed to seal it off completely. At the center of the spring, the "boil," water reaching over 100°F welled up through a fine granular sand, producing a bubbling reminiscent, as one observer put it, of "mush boiling in a pot." The force of this bore of water was enough to keep a strong man afloat, no matter how hard he tried to sink. Adjacent to the hot spring was a smaller, cooler spring. Both offered a reliable flow of faintly sulphurous yet drinkable water. This potability, along with the water's alleged medicinal values, ensured that these springs became the focus of human attention.[1]

Each group -- Cahuilla, white settlers, and agents of the Mission Indian Agency -- valued the spring Agua Caliente (hot water in Spanish), but for different reasons. The Cahuilla had a long association with the spring -- which they called Sec He (boiling water) in reference to its heated waters long before it came to be known as Agua Caliente. For generations they used it and its neighboring spring for healing, spiritual assistance, and bathing. From the 1870s on it also became a source of income; this development, in conjunction with larger changes in the local ecoscape, led to dissent not only between Cahuilla and whites, but within the band as well. White settlers and tourists valued the spring as a place to bathe for health and sport. Local hoteliers capitalized on this,

featuring the spring in their advertisements. Dependent on outside income for their livelihood, white businesses sought to control and rationalize the region's attractive physical resources, including the hot spring. This put them on a collision course with the Cahuilla, who wished to maintain their own hold on the springs, located on reservation land. The federal government, primarily in the form of the Bureau of Indian Affairs's local branch, the Mission Indian Agency, found itself caught between the various local factions in the period from about 1888 to the mid-1930s. On the one hand, its obligation to see to its Cahuilla wards' welfare encouraged it to promote the springs as a source of tribal income. On the other, pressure from the white community and its own assumptions about Cahuilla competence prompted it to favor white management of the springs. In the 1930s matters came to a head, as internal tribal dissension combined with white demands to provoke a complete Agency take-over of tribal affairs. In the aftermath of this seizure, as the decade drew to a close, the steam from the hot springs cleared, revealing the mature patterns of the Palm Valley ecoscape.

**A "Most Wonderful, and Most Valuable, Spring"**

The Cahuilla were the earliest known people to use the springs. According to one of their histories, a Cahuilla head man named Tutomeet created the hot spring around the time when the Cahuilla came to the Coachella Valley through San Gorgonio Pass. Tutomeet, being "tired and sick and lame" from his long journey, took up his staff and struck the ground with it.

> He twisted it around, and caused the water of a spring to come out... He named it *Sec he*, meaning boiling water, which is up to the earth and on the earth, which is to be for ever, never to dry up, never to go away, but to be there for ever and always for the sick. ...Then he went into the water and cured himself and his people also.[2]

The Cahuilla who remained formed a close, though respectful, relationship with this healing spring. Its boiling water and the strange noises that emanated from its depths

suggested the presence of spirit beings hiding within. These spirits had to be placated with prayers and offerings lest would-be bathers fall victim to their potentially fatal caprices. The reputed powers of the mineral waters, however, drew the people despite the risk.[3]

Bathing was a central part of Cahuilla culture, a practice which might at first seem incongruous for a desert society. Yet the Cahuilla habitually located their permanent camps near water sources, and springs and pools seem to have been especially prized. As anthropologist Lowell Bean has argued, bathing was important for hygiene and played a role in Cahuilla beliefs and practices.[4] According to Cahuilla elder Francisco Patencio, the early people learned proper behavior from the moon woman Menyil, who

> took the young people to a place of water, and taught them to dance and run and jump and wrestle and play games; different for the boys, and different for the girls. She taught them songs and foot-racing; taught the girls and women to rise and bathe in the pool before the men got up. Then, just as the sun came up, she taught them to shake out their hair backward and forward, to thoroughly untangle it, and then as the sun shone on it, it would never turn grey, nor get blossoms (split ends) at the ends. She taught them how to laugh and play and be merry.[5]

Even after she fled to the sky to escape the advances of the creator Mukat, the people honored their beloved teacher by bathing whenever the new moon appeared.

Generations after Menyil's flight, the Cahuilla who lived at the eastern base of Mount San Jacinto were still bathing in the springs. On November 15, 1853, the railroad survey expedition led by Lieutenant R. S. Williamson passed through the area, and halted at the springs for water and rest. According to geographer William S. Blake, who accompanied the party, the weary men "saw a green spot in the distance, and soon came to two large springs of water rising in the bare plain, not far from the foot of the mountain." Here a number of Cahuilla were bathing and preparing a meal.[6]

For these and later government employees, the hot springs were less a spiritual place than a useful natural resource to be measured, explained, and exploited in the most

efficient matter. Not only did Blake observe the centrality of the springs in the Cahuilla activities, he also carefully catalogued the springs' characteristics. "One of these springs is warm," he noted,

> and forms a pool nearly thirty feet in diameter, and three to four feet deep. The cold spring is not quite so large, and is only ten feet distant from the other. The water stands at the same level in each, and probably commingles, so that, on the side adjoining the warm spring, there is but little difference in the temperature, one being 120° and the other 82°F. A constant odor of sulphuretted hydrogen rises from the water, and pails painted with white lead were turned black by it.[7]

Later observers added to the data collected about the springs; they dissected, numbered, classified and rated the springs according to precise scientific cartographies. In 1915 Gerald A. Waring of the USGS cited the findings of an earlier study in his report on the springs of California. The springs at the base of Mount San Jacinto were sampled and the samples analyzed; a breakdown of salinity, alkalinity, constituent elements, and temperature was generated.[8] In 1923 John S. Brown, also of the USGS, expanded on his predecessors' findings, adding a comment about the historical and contemporary role of the springs in the local ecoscape:

> The spring, really one spring despite the plural name, is about a block east of the present main road, so that travelers rarely see it. It yields a small flow of tepid water that has a noticeable sulphurous odor and is reputed to have medicinal virtues. The Indians, who own it, conduct a bathhouse... and also use the water for irrigation.... The spring water is seldom used for drinking, although the spring constituted a valuable watering place in former days. The water of the spring bubbles up in an area about 60 feet in diameter covered with rushes and grasses and forms a pool that is partly covered by the bathhouse. The flow is perhaps 10 gallons a minute. Analysis No. 38... indicates a water of low mineral content for the region. The hydrogen sulphide, which had all disappeared before analysis, makes the water poor for drinking, although judged by other constituents, it would be considered good. The chief mineral constituent is alkali carbonate. The water undoubtedly rises under pressure, but the condition creating this pressure at a point

> so high on the border of Coachella Valley is obscure. It may possibly be due to a local approach of the buried crystalline rocks to the surface and impounding of a reservoir of ground water near the surface or the water may rise along a fault place at the east side of San Jacinto Mountain.[9]

Such descriptions supported an agenda of efficient exploitation based on the assessment of concrete physical data. Visiting the springs in 1888, U.S. Indian Agent Joseph W. Preston (1887-1888) noted that this "most wonderful, and most valuable, spring," which he valued at $150,000, could produce "millions" in revenue *if handled properly*.[10] Viewed only as a component of the local ecosystem, the springs seemed manageable and ready to be harnessed for use. But they existed in a local web of both cartographies and ecosystem, and directing their role within this local ecoscape would prove a more formidable task.

White settlers, tourists and business people, meanwhile, cared little for the spiritual aspects of the springs perceived by the Cahuilla, and generally disregarded the scientific measurements taken by federal observers. Instead they emphasized the fun of bathing in the playful, capricious spring and the health benefits that this brought. Cahuilla associations with the spring and government data were employed primarily in an effort to make the spring seem exotic, timeless, and "proven" to improve health.

The springs, especially Agua Caliente, were valuable assets to a would-be sanitarium and resort. Advertisements for the region touted it as being "famous all over the southern part of the State as being the location of the Agua Caliente Springs, whose waters are an absolute specific for rheumatism and a host of other diseases."[11] Dr. Welwood Murray, a local resident and the region's first hotelier, was one of the spring's most vigorous boosters. "Not the least of the attractions at Palm Springs," he proclaimed in several advertisments,

> is the wonderful mineral hot sand springs, possessing medicinal virtues of the highest order.... Rheumatism, kidney and skin diseases yield quickly to regular bathing in these waters... Another mineral spring for drinking purposes has proved highly beneficial as an aperient, diuretic and tonic.[12]

Many visitors to the hotel built in 1886 by Murray and his wife Elizabeth Erskine Murray found the lure of the springs irresistible. Some came for their health. Such bathers, already drawn by the promises of the "sanitary" desert air, sought out the springs for their medicinal virtues. According to another advertisement, placed by the Murrays in the Redlands *Citrograph*,

> The mineral hot spring is phenomenal, and the only one of its kind known. From profound depths is constantly welling up a clear stream of hot mineral water accompanied by pure quicksand of about 100 degrees F., and containing magnesium, sodium, chlorine, iron, sulphur and free carbonic acid gas. Its curative effects are well-known and are a specific for kidney, rheumatic, skin and blood diseases. Another mineral spring for drinking has proved highly beneficial as an aperient, diuretic and tonic. Those afflicted with nervous prostration or debilitated from over work, find here quiet rest and speedy cure.[13]

Other visitors were simply tempted by the fun of sporting in a pool of hot buoyant quicksand. After the land auction held by the Palm Valley Land Company in 1887, which incidentally brought crowds of bidders to stay at the Murrays' hotel, "The spring received much attention, and, until long after midnight, parties of hilarious bathers could be seen sporting in the limpid waters and vainly endeavoring to sink themselves in the 'bottomless pit.'"[14]

The buoyancy experienced by bathers in the spring received special attention from the sporting crowd. Observer Edmund Mitchell, writing in *Sunset Magazine* around the turn of the century, described Agua Caliente as

> a cauldron of bubbling sand, into which the body sinks chest deep, as into a soft warm poultice of the finest and cleanest emery powder. Here, in a bath of one hundred degrees Fahrenheit, one is gently massaged by the divine nurse, Nature. There is no bottom to be touched, but to sink is impossible -- even to dip one inch deeper than the equilibrium established by the laws of flotation in such an element as mingled sand and hot water rising from the bowels of the earth, requires the strength of a Sandow exerted downward with the help of a massive fixed cross-

> beam of timber. If you are inclined to the making of experiments, drop in your watch -- a gold repeater by preference -- and it will instantly be engulfed and forever disappear.[15]

This gleeful delight in the playfulness of the spring proved a persistent theme in white experiences with Agua Caliente. Writer George Wharton James, a not infrequent visitor to nearby Chino Canyon, where he had a small dwelling, was the most eloquent of the region's boosters. In 1904, he first introduced his readers to the "wonder spring, which, though bottomless and bubbling up gently and noiselessly, refused to allow any bather to sink lower than his shoulders"[16] with a citation from George Hamlin Fitch, editor of the *San Francisco Chronicle*:

> This spring is unparalleled on the coast, and perhaps in the world. Through a central shaft, of the dimensions of an ordinary well, the hot water and sand rise, sometimes spurting high in air like a geyser, but usually bubbling over the surface. The water spreads around in a circular pool about six feet by ten, to a general depth of three or four inches. The bottom is hard sand until one reaches the shaft. Then the bather sinks with a swift motion that makes his heart leap. The warm, liquid sand closes in around the body, and one goes down to the armpits. Then with a mighty recoil the limbs are thrown out and the pool once more becomes placid.[17]

In 1906 James published his renowned book *Wonders of the Colorado Desert*, which described his rambles in and musings on the Coachella Valley and its immediate surroundings. Here he again wrote of the spring, providing an expanded version of Fitch's description, which noted that the "wonderfully exhilarating" effect of the hot water caused one to come "out of the bath feeling as though he had taken several glasses of champagne." James noted the capriciousness of the spring, recounting his own embarrassing leap into the main shaft, which had invisibly and momentarily closed; he ended up standing knee-deep in sandy mud in front of his much-amused friends. Of those friends, he had written, "I had excited their curiosity to the highest pitch," and it seems that his

writing and that of other boosters had a similar effect on their readers.[18] Tourists seeking to enjoy the palms and the springs would become the lifeblood of the region by the 1920s.

One obstacle stood in the way of this idyllic enjoyment of the springs, as the hoteliers saw it: the Cahuilla. To a degree the Cahuilla were prized as labor and as an advertising gimmick. Edmund Mitchell described the springs as "the hot healing waters of the Indians, famed hundreds of years ago for hundreds of miles around."[19] An advertisement from the 1910s or 1920s similarly noted how "for ages agone, the aborigines crossed the burning desert to find in these same hot springs the healing agencies that exist in them, unexhausted, today..."[20] Yet when these "aboriginees" stepped outside of such roles, they were perceived as a problem. Not only was their management of the bathhouse considered below par, but their very presence at the springs when bathing was considered disruptive to white bathers.

Sometime between 1853 and 1871 the Cahuilla had erected a bathhouse over the springs. This they kept locked, save for their own use and that of an occasional white visitor whom they charged 10¢ for the privilege.[21] Initially this was not a problem, as the numbers of visitors prior to 1884 were few. In 1886, Doctor Welwood Murray and his wife Elizabeth Erskine Murray moved to the area and constructed a hotel across the street from the hot spring. Their arrival heralded the beginning of several decades of wrangling over the springs.

**A "Great Nuisance to the People"?**

The initial Cahuilla monopoly on the bathhouse, and their creation of a pond outside "in which water and muck [were] permitted to stand... [forming] a great nuisance to the people at the hotel," convinced Indian Agent Agent Joseph W. Preston (1887-summer of 1888) that Cahuilla handling of the springs left much to be desired. Taking advantage of this, the Murrays pressed for permission to lease the springs from the government. Preston

agreed that this was a good idea, and even proposed constructing a second bathhouse so that whites and Cahuilla could bathe separately.[22]

On May 30, 1889, Elizabeth Murray signed the first lease for the use of the springs. This lease required the Murrays to make improvements to the site, including a separate bathing compartment for the Cahuilla, and to pay an annual rental of $150. In exchange for this income, and the improvements, the Cahuilla agreed to curtail their use of the springs, though they did "reserve the right to bathe in the boil or spring spout at any time in the morning until 7 o'clock, and exclusively between the hours of 12M and 1 o'clock P. M." This lease would run for three years, expiring in 1892.[23] During this time the Murrays made the most of their opportunity. As we have seen, they advertised the healing virtues of the hot and cold springs in regional papers, and set about planting some 22 varieties of trees and adding other ornamental plants to the hotel grounds.[24]

Although the situation seemed stable, tensions were bubbling below the surface, waiting to erupt, geyser-like, at the first opportunity. Although the Cahuilla were getting an income from the Murray's lease, it was at the considerable price of their independence. They were barred from bathing in the spring for the large part of the day, and the rental monies passed not into their hands, but into those of the Indian Agent. Although presumably it was then available for tribal use, any requests to that effect had to pass through several layers of government approval before the Cahuilla saw any sign of these funds -- if their expenditure was approved at all. When Elizabeth Murray's lease expired in 1892, the Cahuilla saw this as an opportunity to regain control of the bathhouse. When Indian Agent Horatio Nelson Rust (1889-1893) rejected their suit -- he supported the Murrays' request for renewal -- they rallied behind other contenders for the lease. They specifically favored Mrs. Ella Chambers Brooks and her friend Richard D. W. Lee, who promised to offer a more equitable arrangment.[25]

Agent Rust recommended including land around the springs in the lease, increasing the lease to ten years and decreasing the yearly payment to $100. These amendments, he felt, would enable and encourage the Murrays to plant "trees and ornamental plants" and to build a "commodious bath house." The Cahuilla would thus get a dependable income for the next ten years, and access to the spring "at proper hours, free of charge." Hopefully, Rust added, Dr. and Mrs. Murray would take care of the "dirty frog pond" that surrounded the spring as well.[26]

Charles C. Painter, an Indian advocate and member of the Mission Indian Commission, concurred with Agent Rust's assessment. He noted that "The probabilities are that the Southern Pacific Railroad will move its road and bring it nearer to the spring. If so, this ought to be a place of very great resort, because the spring is of very great value." Although he had some concerns about the need to protect Cahuilla interests, Painter concluded that

> If it can be done in such a way as to be a source of income to the Indians, and at the same time provide that this spring be utilized to its fullest extent for the purpose which the Creator undoubtedly had in view when he created it, then I think [the spring and land immediately surrounding it] might be set apart as a park.[27]

The Cahuilla and their allies, however, felt that they could protect their own interests, and challenged these efforts to extend the Murrays' lease.

On March 8, 1892, Captain José Rafael and the adult male members of the band signed a protest against renewal of the lease. Noting that the improvements specified in the original lease had not been made, "nor a proper consideration shown the Indians" they "strenuously protest[ed]" granting a lease to either Elizabeth Murray or her husband. Instead, they proposed, a 20-year lease should be granted to Ella Chambers Brooks, a local resident.[28] Mrs. Brooks herself added, in her own letter, that the Murrays had not made "adequate improvements per terms of contract." She then put in her own bid to lease the

springs and "an acre of ground... to permit of good building and some improvements in ornamental shrubbery" for a term of 20 years.[29]

The Murrays and their defenders responded vigorously to this challenge. John Hamilton Gilmour, a journalist visiting the area, believed that Rust and Welwood Murray were in cahoots to gain control of the spring, but felt that Brooks was a poor alternative. The Murrays, he argued, were better suited to hold the lease, being the owners of the only hotel in the area. "Should the lease of the spring be granted Mrs. Brooks," Gilmour explained, "an incalculable harm would be done Palm Springs. The spring attracts to this place many visitors and it can only be run to advantage by the people who own the hotel." Moreover, ownership of the hotel provided the necessary capital to manage the spring, the income from the baths being in itself insufficient. Elizabeth Murray, Gilmour noted, "has already paid net $600 for the lease of that spring and has not made $200 out of it," and asked, "Now when a hotel keeper cannot with all their custom make the spring profitable how can a private person."[30]

Gilmour felt that the petition (which, along with a second Cahuilla petition, is apparently in the handwriting of Brooks' friend and supporter Richard D. W. Lee) was not an accurate representation of Cahuilla feelings on the matter.[31] And Rust dismissed Cahuilla concerns as little more than an expression of a typical "village quarrel." "[W]hile I have no very kindly feelings towards Murray," Rust concluded, "The springs cannot be utilized by any once else to advantage... I feel sure he should have a lease with proper requirements."[32]

It was up to a more neutral outsider to weigh the competing arguments. In July, Indian Inspector Arthur W. Tinker paid a visit to the region. After weighing the options, Tinker decided in the Murrays' favor. To Tinker, Brooks' ideas "seemed to be in a rather crude, visionary, and vague state." She had, he observed, "only a small one story house, and could not accommodate more than two or three guests." The Murrays, on the other

hand, were equipped with "a comfortable hotel with two or three cottages." The bathhouse they had built, "while not expensive, nor handsome, has answered very well, and is much better than none." [33]

Concerning the Cahuilla proposal to handle the bathhouse themselves Inspector Tinker was dismissive. Not only would the income thus received be far less than the rental monies offered by the Murrays, but, Tinker felt, "the amount would not in all probability be divided fairly, as the Captain would get the greater proportion of the money received from the baths."[34] (He was not far wrong, as it turned out.)

Moreover, the very presence of the Cahuilla themselves was considered detrimental to the bathhouse trade. Arguing that their hours should be limited, perhaps from 5 to 7 a.m and 12 noon to 2 p.m., Tinker argued that "they should not [sic] be allowed to bathe only at these times, and not allowed -- as they do now at times -- to annoy the guests and visitors who wish to bathe." "The Indians," he claimed,

> have had all, and more than all the time allowed them by the terms of the lease to bathe; they have had the same rights, and used any part of the bath house or pool they have wished, and have on many occasions annoyed the lady guests and invalids, by insisting upon bathing, when they were taking their baths, at hours not allowed the Indians by the terms of the contract [of 1889].[35]

Tinker foresaw trouble in the future unless additional steps were to be taken. "This small community is divided into factions," he observed, "and are quarrelling among themselves about almost everything, and when all other subjects fail they quarrel about who should have a lease of this spring." Tinker recommended that the spring be set apart from any land to be allotted to individual Cahuilla in the future. Better yet, he thought, the government should arrange for it to be sold or leased for not less than a duration of ten years. "I am of the opinion," he concluded, "that in the future this spring will cause the Department a great deal of trouble and annoyance, and this is why I recommend it be sold or leased..." His words would prove more prophetic than he knew.[36]

While the government slowly moved towards completing the renewal of the lease, Mrs. Murray fretted about the already considerable delay in granting her renewal, and pressed the Agency to finish the process. Not only were her "invalids" deprived of the health-giving mineral waters, but real problems were developing as a result of negligence. The bathhouse, she wrote, "is falling into ruins, the pond is neglected and all environments filthy, full of water bugs, & tules, and soon neither invalid or Indian will be able to use it."[37] Mrs. Murray also wrote to Albert K. Smiley of the Mission Indian Committee, complaining that "we are not able to give baths and consequently will loose [sic] the season which you know is a short one." She considered the Cahuilla to be partly to blame, noting that "since Captain Joe has had the key he took from us the end of June the place is in such a delapedated [sic] & dirty condition that no white person can use it."[38]

One can therefore imagine the Murrays' relief when an agreement for the new lease was finally drawn up and signed by Elizabeth Murray and Captain Rafael on December 10, 1892. The Cahuilla agreed again to limit their bathing, which was to be free of charge, to the hours between 5 and 7 a.m. and between noon and 2 p.m. The Murrays, in turn, agreed "to construct within three years a new bath house, a new swimming pool; to erect a fence around both the Spring and pool; to level the grounds; to keep the premises neat and clean; and not to divert the water from its present course." The lease was to run for ten years, at $100 per annum, and included not only the hot spring but also a 276 foot by 789 foot rectangle of land around it.[39]

One can sense the pride felt by Indian Agent Rust in getting the agreement signed. A couple of days later he wrote to the Commissioner that he had met with the Cahuilla (despite his conviction that they didn't need to be a party to the lease at all) and that twelve of the fourteen male voters of the band had approved the lease, the remaining two being too old to attend. Approval, he was sure, was the result of the band receiving but $5 in income from the baths after being given the key on June 30. "I am confident all

understood," he added, "as I had a good interpreter and several could speak English."[40] Yet Agent Rust tempered this optimism with caution. Noting that Captain Rafael had requested a copy of the agreement, he wrote that he expected to be "misrepresented" on the matter in the future.[41] This proved to be the case, though, as it turned out, it was not the Cahuilla who were doing or had done the misrepresentation.

The lease was but a week old when Richard D. W. Lee wrote to Secretary of the Interior John W. Noble, complaining that Rust had coerced or tricked the Cahuilla into approving the new lease. Rust had, he wrote, held the meeting at an unreasonably late hour:

> when the night had well advanced, the indians say at midnight he went to the captain's house and had him go or send for the members of his settlement. They roused from their beds and half asleep came to the captain where they were presented with a paper to sign.

Moreover, he continued, the Cahuilla were under the impression that they had been ordered to sign by "that omnipotent power, 'the government of Washington.'" They did not understand or believe that they had a choice in the matter.[42]

The subsequent protest of the Cahuilla of the inclusion of five acres of land in the springs lease suggests that Lee's accusations -- though undoubtedly self-interested -- were at least partly true. John Morongo, the Indian Chief of Police who had served as the interpreter at the December 7th meeting, concurred in a written statement that no mention had been made about including the land in the hot springs lease at that time (or any other, as far as Morongo knew).[43] The land in question, Captain Rafael informed the Commissioner, was

> a five-acre tract of land upon which there are now about 150 grape-vines, six fig-trees and five peach-trees, besides one-half an acre of alfalfa -- the annual income or return from which is worth to my people from fifty to seventy-five dollars.

> These fig-trees are old and very large and are very prolific bearers; the grape vines yield about two tons of grapes a year.

Rafael further added that, "We knew nothing about the proposition to rent land with the spring or we would not have consented to it -- especially the proposition to rent the particular land upon which the above mentioned improvements are located."[44]

When the news slowly filtered back to Rust (it is a measure of the Agents' general removal from the area in the 1880s and 1890s that they usually learned of local matters through the Office in Washington, rather than directly from local sources) he defended his actions. He explained that he did not mention the five acres' inclusion in the lease at the meeting because "I did not suppose it was necessary to consult the Indians with reference to a Government Reservation," and because correspondence from the Office had given him the impression that the inclusion of such a reserve in the lease had already been approved. Rust suggested that the Cahuilla claims about the parcel's value were overblown. He enclosed a map showing the location of the plantings in question and wrote that

> One Pedro Chino claims the five acres upon which is a small piece of Alfalfa, Seven good fig trees, about 150 grapevines which their starved animals have eaten so close as to render them almost valueless, and two old worthless seedlings [sic] peach trees.

Such worthless land, claimed by a single person, he argued, would be more than compensated for by the lease monies and later allotments the Cahuilla would receive.[45] Such specious protests, Rust implied, were the result of collaboration between Brooks and Cahuilla Will Pablo and Pedro Chino, rather than expressive of a real concern on the part of the Cahuilla as a group. Moreover, he claimed, the Cahuilla in general were possessed of an "animus" against the Murrays:

> knowing that Dr. Murray prized the young cottonwoods, growing along the north side of the spring, for their shade, [the Cahuilla] have within one week cut down about one half of these, and I think would have cut them all had Mr. Dorn, Surveyor, not been camped there. I have forbidden them from cutting more, but they

will do as Will Pablo directs them in spite of me. I regret that the shade trees needed so much should have been thus wantonly destroyed.[46]

Animus not withstanding, it seems probable that the trees were removed in an effort to make the land less desirable to the Murrays, and thus less likely to be included in the lease. Indeed, on the same day that Captain Rafael sent his protest about the inclusion of land in the lease, he signed his acceptance of Mrs. Murray's lease of the spring itself.[47]

Frustrated with the continued delay and the "constant bathing of Indians in the boil of the spring" (which annoyed his guests), Welwood Murray told Rust that he was willing to compromise on the acreage included in the lease. He suggested that a minimum of two acres would be acceptable, and begged "please let it be done."[48] The animosity between the Murrays and Ella Brooks remained unresolved, and the Cahuilla placed another padlock on the bathhouse door (supposedly given to them by Brooks), inspiring Dr. Murray to complain that the responsible parties ought to be arrested and "The refractory and mutinous captain shd. [should] be deposed at once."[49]

The questionable circumstances under which the original lease was signed, these on-going protests and the Murrays' willingness to forgo their claim to the land if they could retain access to the spring itself all prompted the Office to rewrite the lease. On March 9, 1893, Agent Rust informed the Office that Elizabeth Murray had accepted the new lease with the five-acre clause struck out; he sent on the paperwork for approval, though not without additional grumbles about the persistent enmity between himself and the Cahuilla.[50]

Probably as a result of this confusion and the on-going antagonism between Rust, the Cahuilla and the Murrays, the new lease was not approved until July 19, 1893.[51] This delay, coupled with the inevitable delays imposed by distance and the bureaucratic process, meant that the Murrays did not regain their leasehold on the spring until August 1, 1893, a full eight months after the original lease date. This situation prompted the new Indian Agent, Francisco Estudillo (1893-1897), to suggest that part of that year's rental

payment be refunded, although the Cahuilla had been expecting $100 from the Murrays.[52] This "missing" income perhaps explains why the Captain again locked the bathhouse. It was not until October that Agent Estudillo was able to report that the Murrays were at last able to "place things to rights" and that the Cahuilla were looking forward to using their rental monies to fence in their cemetery.[53] The twin problems of Cahuilla assertions of independence and their interference in white settlers' attempts to use the springs themselves seemed to be solved. White visitors would get to bathe undisturbed by the Cahuilla. The Murrays would be able to entice visitors with visions of ancient healing springs. The BIA would not have to take direct responsibility for managing this valuable resource on behalf of its Cahuilla wards. And again, the Cahuilla would receive a needed income -- but paid for it with their independence.

The decade that followed was relatively uneventful, though colored by desperation brought by the drought that lasted until 1905. Visitors grew few and far between, despite efforts by Welwood Murray and others to "boost" the springs in a brief flurry of articles that appeared in the summer and fall of 1898 in *Sunset Magazine* and other periodicals. The writers to a man waxed rhapsodic about the "curative properties" of the hot spring and the "dry asceptic air of the desert." For the visitor who was so lured by these endorsements, the contrast between their version of Palm Valley and the reality must have been striking; none of the articles gave any indication of the desperate straits in which the small community found itself.[54]

Earlier in the year the Murrays had plaintively written to the latest Indian Agent, L. A. Wright, for a reduction of their rental to $50 per year, noting that "in no single year has the revenue from the spring exceeded the sum of twenty-five doll[ar]s" and that "during this period of depression and anxiety" they found themselves unable to pay the usual amount.[55] Wright, who passed their message on to the Commissioner, recommended that the reduction be approved.[56] Apparently this request was not granted, for when

Wright visited the area again in July, he reported giving $100 from the rental monies to the Cahuilla, noting that "their crops are poor and they very much needed the money paid them" due to restrictions on their water supply caused partly by the drought and partly, as has been noted before, by the selfish parsimony of the Palm Valley Water Company.[57]

If nothing else, the drought succeeded in driving away any fly-by-nights who might have been interested in the region or its hot spring. When Elizabeth Murray's lease came up for renewal in 1903, only the Murrays, the government, and the Cahuilla seemed interested. The Murrays' relative lack of competitors, however, did not guarantee renewal. Trouble could be seen brewing in a letter Cahuilla Lee Arenas wrote for Pedro Chino in June of 1902. In it Chino complained that "Money from the rental of the bath-house was to be paid as of old in January. At any rate it was understood from the officials that the cash was in the hands of the Agent, and would be paid to them in March. That needed cash is still withheld."[58]

Even as the drought had decreased the Murrays' income, it had increased the need of the Cahuilla for the same, and made all sources of water precious. When the water from Tahquitz had ceased, they had relied on "the water from the hot springs... for irrigation" thus reverting to the practices of an earlier period, when "All the water [they] had to drink... was from the hot sulphur spring, to drink or to irrigate with."[59] These factors no doubt influenced the band's interest in the possibility of constructing a reservoir, and their decision to oppose renewal. The reservoir, it was believed, would help conserve scarce water; regaining control of the bathhouse would hopefully ensure that any income it brought would go directly into Cahuilla hands.[60]

The eve of the lease's expiration found Dr. Murray in a defensive frame of mind. The band's proposals he felt were unnecessary, but not entirely incompatible with the Murrays' continued rental of the spring. "As they have always had every drop of water," he explained,

and as any reservoir constructed, from the level nature of the ground, could but conserve about a head of something less than one foot of water, the backing of even this water would not injure the utilisation [sic] of the bath, nor detract from its volume or use in irrigation in any way.

Murray feared that his business, located across the street from the spring, would suffer if the Cahuilla resumed control. "Without some care," he warned, "the place and spring will revert to the wretched hog wallow it was when we first took hold of it. A vile smelling nuisance, harboring and breeding mosquitoes..." He further believed that the Cahuilla proposals were the result of "influences" that wished "to destroy our mutual amity."[61]

In May of 1903, "The question of the Hot Springs remain[ed] unsettled." Murray reiterated his earlier arguments about the "unsatisfactory and futile" reservoir plan and reminded the Agency that when the Cahuilla "had these baths, no one could bathe there from vermin and unsanitary conditions." He worried that his decision to leave "all the buildings and fences intact" would further prejudice the Murrays' case, since "nothing would please the Captain more than to be idle and draw for himself the money for bathing."[62] These protests notwithstanding, the lease was not renewed and control over the bathhouse reverted to the Cahuilla.

It is not entirely clear why renewal was denied; in any case, Cahuilla management of the bathhouse lasted less than six years. Soon it seemed as if they had merely traded one set of frustrations for another; the band quickly found themselves divided over the handling of the bathhouse revenues. One faction desired that the funds be distributed equally among the individual members of the band. The other, headed by Captain Marcus Belardo, wished to use the income on behalf of the whole tribe. In particular, Belardo's supporters intended to use the monies to improve the bathhouse, which had begun to slowly fall into disrepair. As they held the key to the bathhouse, and therefore controlled access to its income, this faction held a tenuous ascendancy in the band.[63]

Moreover, not only was the band divided on the distribution of the bathhouse monies; it turned out that no one was sure where the money was or how much it constituted. Earlier efforts by Agent Wright to remedy the situation by transferring control over the bathhouse from Captain Belardo's faction to the other had come to naught. Instead, it served to reinforce the division between the two groups. When Special Inspector Levi Chubbuck of the Indian Irrigation Service visited the area in May, 1906, he attempted to untangle this mess. Chubbuck narrowed the missing amount down to $116, and deduced that it was being held by absent members Willie Marcus and "Pico" who had kept the records and received the money. This money, Chubbuck decreed, would be distributed among the members when Marcus and Pico returned. Meanwhile, the money received while Sal Santiago had held the keys (about $50 over a two-month period) was used for repairs to the bathhouse.[64]

Such disputes ensured that Cahuilla supervision of the hot spring and bathhouse would prove short-lived. By 1909 Indian Agent Clara D. True had taken "the management and collecting for the spring out of [Cahuilla] hands" and, given the absence of viable alternatives, set Agency Farmer Adrian I. Maxwell to collecting the 25¢ fee from the bathers.[65] (Welwood Murray was not in any condition to offer assistance; the Murrays' hotel had closed in 1909, and he was preoccupied with challenges to his claims on the cold spring and with his wife's worsening health.[66]) The Cahuilla, lacking any alternative, reluctantly accepted the situation, and tried to use the Agency's renewed interest to improve conditions on the reservation; the next decade saw the construction of a new bathhouse and other similar projects. Their patience was eventually rewarded; by the 1930s control of the bathhouse was back in Cahuilla hands.

**Coming to a Boil**

The 1920s and 1930s saw both Palm Springs and the Agua Caliente Indian Reservation undergo rapid expansion and growth. Wealthy tourists flocked to the resort

even in the midst of Depression, seeking the sunshine and the fabulous oasis depicted in film and tour books. Such visitors were openly coveted by Palm Springs business interests; in glossy advertising brochures local businesses touted "The Oasis of Delight" and produced maps of "America's Desert Resort."[67] Most of these mentioned the hot spring and bathhouse as one of the notable attractions of the area. Yet this very success brought with it increased conflict between the Cahuilla and the white residents of Palm Springs. Efforts on the part of the Palm Springs Chamber of Commerce to boost tourism in the region often involved areas of the reservation, and the Cahuilla were not always eager to cooperate.

When it seemed in the interest of the Cahuilla to work with the Chamber of Commerce, projects that involved both the village and the reservation proceeded smoothly. In 1933, for example, the Chamber of Commerce, the government, and the Cahuilla collaborated on a road improvement project in front of the bathhouse. The Chamber offered to contribute $1200 and provide materials and labor if the government agreed to match their funds. MIA Superintendent John W. Dady (1933-?) approved this plan, noting that the road was "a detriment both to the town and to the Indian village" in its current condition, and that "there has been much criticism from visitors of whom there are thousands during the year as the town is a nationally known winter resort." An additional incentive was that the Cahuilla would "be given all the work they can and will perform at local laborer wages on the Reservation side and on the town side of the road also."[68] The following year the band approached Superintendent Dady about improving the bathhouse and various reservation water systems; they wanted to use $400 of the monies derived from the airport lease of part of Section 14 by the Palm Springs Chamber of Commerce. Dady gave his approval, and the request was apparently granted.[69] In both of these cases, Cahuilla interests aligned with those of the government and the Chamber of Commerce, with the result that each project was undertaken and completed without major complications.

Such projects demonstrated that, although this period was marked by internal Cahuilla disputes, they did not deter the band from acting in unison when their joint interests were threatened. Regardless of their position on other matters or on the handling of tribal monies, all agreed on several points relative to the bathhouse and spring: The bathhouse and hot spring should remain tribal property; the spring should be protected; the bathhouse was an important source of revenue, and efforts should be made to protect and enhance that revenue. Generally speaking, the business interests of Palm Springs and the Indian Office concurred, at least on the latter two points.

Yet other contemporary issues demonstrated that a willingness to cooperate was not the same as consensus. Impatient to increase the number of visitors to the region, in the mid-1920s the Palm Springs Chamber of Commerce had promoted the construction of an airport nearby. Rising land values made it difficult to contemplate siting it on private land; the relatively unused reservation land beckoned. The possibility of renting some of Section 14 for the airport was broached in the spring of 1928, with perhaps predictable results.[70] Initially, rumor had it that "a half section was involved and included the bath house and springs quarter, if not the spring." Though reassured on this count -- only the NE $^{1}/_{4}$ was being considered, not the part of Section 14 that contained the hot springs and surrounds -- the Cahuilla remained sceptical. (As well they might be, given that proposals to rent or sell the bathhouse and springs had historically appeared at fairly regular intervals.)[71]

Among other things, the airport proposal reopened earlier disputes about the handling of income from tribally-held resources such as the bathhouse and spring, and now the airport. Questions about the distribution of bathhouse income, raised in the 1900s, had never really been settled. As the authors of the Tahquitz Report have suggested, what was at stake was a shift from a more traditional, tribal mode of distribution (where the dispensation of the money was at the discretion of tribal leaders) to one more in keeping with the entrepreneurial spirit that characterized white Palm Springs. Members of the

band who had clout in the traditional tribal structure, not unexpectedly, tended to favor the former mode. Members who had moved to the Agua Caliente reservation later (and thus lacked traditional influence in the region) or who had a higher individual stake in businesses that were functionally personal but technically tribal (such as a campground located on unallotted reservation land) tended toward the latter.[72] The dispute over the airport highlighted this division within the band, and kept these smouldering resentments alive.[73]

Factions within the band primarily disagreed on the matter of distribution (rather than collection) of tribal funds, including bathhouse income. (Given that the bathhouse was estimated to have brought in $2,500 during the 1929-1930 season, it is not hard to understand why the matter was of such interest.[74]) Frustrated with the grip the older members of the tribe seemed to have on tribal power and income, some Indians belonging to the newer faction came to feel that government control might be preferable if it meant that the income collected would be distributed on an equal per capita basis. It should also be noted that the tribal membership of several people belonging to this entrepreneurial faction was in dispute by the other members of the band, and the dissenters were thus also bidding for federal recognition of their claims to membership. Lee Arenas, Richard Joe Arenas, Pedro Chino, Pico Manuel, Ramon Manuel, Willie Marcus, Frank Moro, Della Nicholson, Louyse Orends, Albert Patencio, Augusta Patencio, Celia Patencio, Flora Patencio, Francisco Patencio, Joe Patencio, Moreno Patencio, Virginia Patencio, Baristo Sal, Miguel Saturnino, Clemente P. Segundo, Mrs. Mandy Segundo, and Tillie P. Welmas (in other words, members of the original families who had settled around the springs) were considered tribal members and were generally satisfied with the existing leadership; later arrivals, some of whom were half-Indian, or had married non-Indians, were not: Juana Rodriguez Hatchitt, Roy Lugo, Ramalda Taylor, Lena Lugo Taylor Welmas, Genevieve Pierce St. Marie, Carrie Pierce Casero, Annie Pierce, and Marcus Pete. (A few, like the

Andreas family, had claims to other parts of the reservation, but kept aloof from most of these disputes.)[75]

In the mid-1930s, the internal dispute among band members came to a head. The faction dissatisfied with the traditional handling of tribal income attempted a new tactic. Allying themselves with attorney Thomas L. Sloan, they sued for the completion of tentative land allotments made in the 1920s. By so doing they hoped to remove their lucrative individual businesses from possible usurpation as tribal property: some also hoped to gain access to the more valuable parts of the reservation that were denied them so long as those assets remained under tribal control. While some observers claimed that it was the wealthiest Cahuilla who were opposed to allotment and to per capita disbursement of funds, this is not entirely accurate. For example, Marcus Pete, one of the pro-allotment faction, maintained cabins and tent camps on part of the reservation and seems to have derived a reasonable income from them.[76]

The dissenters' suit had repercussions beyond the tribe itself, for it challenged the authority of the Department of the Interior to grant or not grant allotments, and so in 1935, 1936, and 1937, the issue of allotments was explored by the United States Congress in a series of hearings on Senate bill 1424, "A Bill to Repeal that Provision in the Act of March 2, 1917 (39 Stat. L. 976), Directing the Making of Allotments to Indians of the Mission Indian Reservations, California."[77] The hearings also considered Senate bill 2589, "A Bill to Authorize the Sale of Part of the Lands Belonging to the Palm Springs or Agua Caliente Band of Mission Indians, and for Other Purposes." In the course of gathering testimony on these bills, the taut lines of dissent and dependence binding Cahuilla, Palm Springs business interests, and the federal government were revealed.

Palm Springs business interests, represented by the members of the Palm Springs Chamber of Commerce, favored government control of the reservation and hot springs. It was unlikely that a private management arrangement like that made with the Murrays

would be implemented again; there were too many competing interests involved. Moreover, "Indian incompetence" was no longer a sufficient justification for government intervention; Cahuilla management had become problematic in much more disturbing ways. The Agua Caliente Cahuilla by the mid-1930s had gained sufficient local power that they could -- and often did -- impede the execution of what the Chamber of Commerce felt were Palm Springs' essential plans for progress.

In May, 1935, for example, the Chamber undertook a project for improving the town's sewer system. All appeared to be going smoothly, until it became apparent the following February that the new line would pass close to the bathhouse and hot spring. Fearing that the necessary excavations might threaten the spring, the Cahuilla immediately protested to the Superintendent, who promised to investigate.[78] Not reassured, the Cahuilla maintained their own vigil on the proceedings. As the *Desert Sun*, Palm Springs' local paper, noted,

> Investigators employed by the local Indians [watched] the digging of the sewer past the Agua Caliente bath house very carefully ...to make sure that the 20-foot ditch does not cross the hot water vein and shut off the supply of the health-giving liquid from the bath house on the reservation.[79]

Although no hot water was uncovered, and the sewer was successfully completed, the band's watchdogs reminded Palm Springs that, like it or not, any plans for the community's growth had to take the reservation and the Cahuilla into account.[80]

Proximity to the reservation was one problem, but a greater one for local interests was the Cahuilla themselves. In the 1920s and even more so in the 1930s, the business interests felt themselves threatened by the growing economic savvy of the Cahuilla. At the start of the 1936 tourist season the Cahuilla decided to raise the fees for using the bathhouse, visiting the palm canyons, and riding horses across the reservation.[81] The reaction of the Palm Springs business community was immediate and negative. "[W]hile it is not and has never been our desire to take from the Indians," they claimed in a letter sent