**120**

The draft of an Executive order is herewith respectfully submitted.

Very respfy &c
S. A. Galpin
Acty Comr

(Thompson)

Dept Interior
Office Indian Affs
May 12, 1876

Hon Secretary Interior.

Sir:

I have the honor to enclose herewith copies of papers transmitted to this office by U.S. Agent E. A. Howard in regard to horses stolen from certain chiefs of the Brule Sioux nation by white men. It will be observed from the statements of the military officers at Sidney Barracks that some of the guilty parties are at Sidney, and others on the French Platte, and that they can be apprehended and the property recovered.

The 1st Article of the Treaty of 1868 with these Indians provides that if any wrong is committed by a white person upon the person or property of the Indians, the United States will, upon proof made to the Agent and forwarded to the Commissioner of Indian Affairs, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained." Sections 2154 and 2155 of the Act of June 30th 1834, also relates to cases of this character, the arrest of the offender, the penalty for the offense &c

I have therefore respectfully to recommend that the papers be referred to the Department of Justice with a view to the arrest and punishment of the guilty parties

Very respfy &c
S. A. Galpin
Acty Comr

(Thompson)

Dept Interior
Office Indian Affs
May 13th, 1876

Hon Secretary Interior

Sir

Referring to the communication of the Hon. H. P. Wilson, dated the 3rd instant, of which I am in receipt by your reference for report, making inquiry in relation to the action taken by this Department in pursuance of the provisions

ACC-HRA000219

# TAB 27

Reproduced at the National Archives

REFER IN REPLY TO THE FOLLOWING:

# DEPARTMENT OF THE INTERIOR,

## OFFICE OF INDIAN AFFAIRS,

### WASHINGTON.

San Jose, Calif., Jan 3, 1907.

Hon. Commissioner of Indian Affairs,
        Washington,  D.  C.

Sir:-

I have the honor to make the report asked for in your letter of Nov. 10, 1906, Land 96989-1906 in respect to certain lands withdrawn from entry on account of the Mission Indians which have not as yet been added to the reservations, and will specify those that, in my opinion should be formally added to the various reservations by Congress. I have been unable to report earlier owing to the time required in getting the data for a proper report. There are thirty four Indian reservations in Southern California. As to some of these I already had fairly complete data and as to others no changes were proposed. Still it took more than 2,000 miles of travel to visit these absolutely necessary for me to see. To get proper data from the Land Office and personally inspect the proposed additions and to secure other information necessary, required considerable time even if the Campo situation and other duties had not made further demands upon my time.

29 Palms.

The land patented as the 29 Palms reservation is the N. W. 1/4 Sec. 4, T. 1 S. R. 9 E., S. B. M.. The land actually occupied is the

NARA DC
RG 75
Central Classified Files, 1907-39
California Special
Box 9
F: Calif. Special 80665 - 1908 -310 [2 of 2]

ACC-HRA000874

Reproduced at the National Archives

(2. rnd. Commr. Res. Add.)

S. W. 1/4 Sec. 33, T. 1▮. 9 E. ., S. B. M. The latter description was reserved for the use of the Mission Indians by executive order dated Dec. 23, 1901. As this quarter section contains about all the land of value and especially the water, I recommend that it be added to the reservation. See my letter upon this subject dated Dec. 10, 1906.

### Inyaha.

My letter of Nov. 5, 1906 contains as complete a statement of the situation asxfxxxxs I have been able to make. The original Inyaha consisted of the N. E. 1/4 of Sec. 35 , T. 13 S. R. 3 E., S. B. M. Later Aug. 6, 1892, the S. 1/2 of the S. E. 1/4 and the N. W. 1/4 of the S. E. 1/4 of Sec 26, same township was added, but whether by executive order or by act of Congress the Land Office records at Los Angeles do not show. In a letter dated Feb. 19, 1906, to the Indian Office I recommended that there be added the N. 1/2 of the N. W. 1/4 and the S. E. 1/4 of the N. W. Sec. 35 the W. 1/2 of the N. E. 1/4 Sec. 26 and the W. 1/2 Sec. 26 be also added to the reservation. All but the last have, I understand, been withdrawn from entry. There is some arable land , some pasture and considerable wood upon the land mentioned and I would recommend the addition of the said land to the Inyaha reservation.

### Santa Rosa.

The Indians of the Santa Rosa band have never had a reservation set apart for them. The land has recently been surveyed, I understand, although not as yet published. As nearly as I can get at it they occupy land in section 33, T. 7. S. R. 5 E., S. B. M. The entire township is included it      San Jacinto Forest Reserve and th       be obstacles to

ACC-HRA000875

Reproduced at the National Archives

... Ind. Commr. Res. Add.)

the setting aside of land for these Indians, I would recommend that if

possible, the lands which these people have occupied from time immemorial

be in some manner secured to them.

### Capitan Grande.

The lands patented to the Capitan Grande band of Indians are Sec. 10,

11. 14, 15, 22, the W. 1/2 27, Sec. 28, 33, the S. 1/2 34 and Sec 35,

T. 14 S. R. 2 E., the N. 1/2 of Secs. 1 and 2 and Secs. 3 and 4, T. 15 S.,

R. 2 E., Secs. 31 and 32, T. 14 S. R. 3 E. and Secs 5 and 6 T. 15 S. R 3 E.

Since that time they have been reserved from entry pending investigation

etc., Secs. 23, 26 and 25, T. 14 S. R. 2 E., Secs 5, 6 and 10 T. 15 S.

R. 2 E. I see no advantage to the Indians in adding sections 5 and 6

T. 15 R. 2 E. Sec ten of same township is nearly worthless but the South

Fork of the San Diego river runs through it and it may be the scene of a

water struggle if not added. I would there fore recommend that the N.1/2

of Sec 10 be added and also the S. 1/2 Sec. 2 for the same reason, to

prevent future trouble over the water in the stream. The S. E. 1/4 of the

S. E. 1/4 of Sec. 21, T. 14 S. R. 2 E. was filed upon in 1887 by one

Frederick S. Anderton, pre-emption 2545, dated Nov. 23, that year.The

Land Office records at Los Angeles do not show that final proof was ever

made or that a final patent ever issued. There are no filings upon the

rest of the section. If the filing of Anderton is outlawed as it appears

to be I recommend that the entire section be added to the reservation.

The south east corner of the section is on the east side of the San Diego

River, not far from the Capitan Grande school house. There are several

acres of bottom land and the apparent possession of this tract by outsiders

ACC-HRA000876

Reproduced at the National Archives

4. Ind. Commr. Res. Add.)

has been a matter of disquietude to the Indians and it which should be removed.

I also recommend the addition of sections 23, 25 and 26 to the reservation

as recommended by several special agents at various times past.  There

is some pasturage and some wood which the Indians may as well have as any

one else.  I would also recommend the addition of the E. 1/2 of Sec. 27

and the N. 1/2 of Sec. 34.  They are not good for much . About the only

thing they can be used for would be for some white man to start a saloon

on. Rather than have the land in the possession of outside parties, who

would be expect to be bought out by the government at a high figure I

think it better to put the land into the reservation.  The situation in

townships 14 and 15 south range three East is somewhat different.  There

is a fine stream in each of the creeks known as King Creek and Conejos

Creek, in the rights to which the Indians have no protection. There is

also a considerable tract of arable land on sections 4, 7 and 8 which the

Indians will soon need.  They are cultivating some of it now.  This land

and all which will protect the water rights of the Indians should be added

to the reservation.  Some land has already passed into private ownership

and I consider the need of taking action to be great.  Sections 4, 7, 8

and the N.W. 1/4 of the S. W. 1/4 and the S. W. 1/4 of the N. W. 1/4 of

Sec. 9., T. 15 S. R 3 E. and the W. 1/2 Sec 28, the E. 1/2 of the S. E.

1/4 Sec. 28, and the N. 1/2 of the N. E. 1/4 Sec. 28, T. 14 S. R. 3 E.

should be added to the reservation. *lut Sw¼ Sec 33. S½ SE¼, the NE¼ SE¼,*
*SE¼ NE¼ + N½ NE¼ Sec 33. T. 14 & R3E*

### Agua Caliente or Palm Springs.

The sections originally reserved by executive order were Secs. 4, 6,

8, 10, 12, 14, 18, 20, 22, 24, 26, 28, 30, 32, and 34, T. 4. S. R. 4 E.

ACC-HRA000877

Reproduced at the National Archives

(5.Ind. Commr. Res. Add.)

and Sec. 2 in T. 5. S. R. 4 E.  The Sections Patented are Secs. 12, 14,
22, 24, 26, and 34, T. 4 S. R. 4 E. Some of these sections were restored
to entry and some entries were made on Sec. 10. These have recently been
cancelled and I recommend the addition of this section to the reservation.
Should the government ever attempt to do anything with the water at the
head of Chino Canyon on Sec. 6 Sec 10 will be about the only place it can
be used.  The Indians will probably not need it for some time but they
want the land and the present is the most favorable time to give it to
them.  Section 6 is the subject of a letter addressed by me to the Hon.
Commissioner of Indian Affairs, dated Dec. 10, 1906. I would renew the
recommendation there made that Sec. 6 be added to the reservation. It is
the only pasture land the Indians have and they want this section.  Most
of the land and water are upon Sec. 7, which is owned by the Southern
Pacific R. R. Co.  I suggested that perhaps the Railroad company might be
willing to exchange this Sec. 6 for section 22, T. 3 S. R. 4 E, upon which
the railroad buildings and other property at Palm Springs Station are
located, and to which the Company has no title.  If this should be done
section 7 should also be added to the reservation.I have seen nothing
further in T. 4. S. R. 4 E. that I can recommend for addition, except that
should the purchase of Sec. 35 be made as has been recommended by Chief
Irrigation Engineer Code and myself, this section should also be added.
This deal also includes Sec. 3 in T. 5. S. R. 4. E. Sec. 2 in this township
was not included in the patent. I think it should be added as it has quite
an area of good land and the Indians want the land.  They have lived upon
it within a few years, though I found none there on my recent visit. Sec.

Reproduced at the National Archives

(6.Ind.Commr.Res.Add.)

10 also should be added as it controls the water from Murray Canyon. This is not a large stream but any water in that country is a subject for bitter controversies and the best way to prevent any more such as the one which has lasted for so long with Barney, is to appropriate the wwhole subject of probable controversy. Sec. 11 of this township was at one time patented to the So. Pacofic R. R. Co., but it has been reconveyed to the United States. There is some arable land and it is the most natural place to use the water from Murray Canyon, or part of it and I think it should be added to the reservation.

### Martinez.

The desert reservations consist of certain even numbered sections, which I believe have not as yet been patented. There is no opportunity to add any land to the reservations as the whole country has proved to be in an artesian belt of the first class. Land without water is now $50.00 per acre. It would be very expensive and does not seem to be necessary to increase any of these reservations. Some years ago, I understand, the State relinquished sections 16 and 36, T.7 S. R. 8 E to the United States. They have been and now are occupied by the Indians. Upon Sec. 16 are three artesian wells and the Government school house. I would suggest that these Sections 16 and 36 be included in the patent when issued, and that if any Congressional action be necessary, the same be recommended at this time.

### Chimehuevi Valley.

The rights of the Indians of the Chimehuevi valley on the Colorado river below the Needles is the subject of my letter to the Indian Office

Reproduced at the National Archives

( 7.Ind.Commr.Res.Add.)

dated Dec. 27, 1906 These Indians regard their present location as their place of origin. I believe there is no question but they have occupied this land since primeval times. I do not know why the land has not been reserved before this, but the place is a remote one in the desert and they were probably overlooked, as a good many other Indians in California have been. I would therefore recommend that their valley be added to the Colorado River reservation or that whatever action is appropriate be taken The land to be so set aside should be, I think, T. 4 N. R. 25 E., T. 4 N. R. 26 E.,T. 5. N. R. 25 E., 6. N. 25 E.  the E. 1/2 of T. 5.N. R. 24 E. Sections 25, 26, 35 and 36 of T. 6 N. R. 24 E and  possibly a right of way for an irrigating ditch through T. 7 N. R. 24 E. The townships above mentioned are all fractional but 5 N 24 E and some of them are very small. All have not been surveyed.

### Pachanga.

There is considerable government land adjoining the Pachanga reservation but the most of it is absolutely worthless, as far as any one can see. The spring from which the Indians get their water and the water of which we expect to pipe down onto the reservation is situated upon government land. There are several springs all of which seem to be on Sec 25, T. 8. S. R. 2 W.I think this section should be added to the reservation. There would probably be no objection on the part of anyone if Secs. 30 and 31, T. 8 S. R. 2 1 W. should be added as has, I understand, been proposed. But I do not see any especial benefit.

### Saboba or San Jacinto.

Fractional section 5, (consisting of Lots 1, 2, 3, ~~4 and 5~~) T. 5 S. R. 1 E. and Lots 1, 2, 3, 4, and 5 and the N. E. 1/4 of N. E. 1/4 of Sec. 29 and all of Sec. 31, T. 4 S. R. 1 E., have by some misunderstanding been

ACC-HRA000880

Reproduced at the National Archives

' 8. ...d. Commr. Res. Add.)

patented to the Southern Pacific R. R. Co., as part of its land grant.
The land is not of great value, but it has been occupied by the Indians
since before the Southern Pacific Company was organized and probably for
hundreds of years before that. Part of the land has Indian houses on it
and has been for years under cultivation by the Indians.  The Indians will
naturally think that if they can be deprived of these descriptions they
can be deprived of all the land they have.  I do not think any one can
ever explain to the Indians how or why they should be deprived of this
land.  If there is any possible way I trust these sections may be added
to the reservation.

                    Campo.

    The land patented to the Campo Indians consists of the E. 1/2 of the
N. E. 1/4 Sec. 4, the W. 1/2 of the N. W. 1/4, the S. E. 1/4 of the N.
W. 1/4, the S. W. 1/4 of the N. E. 1/4, and the N. W. 1/4 of the S. W.
1/4 of Sec. 3, T. 18 S. R. 5 E. S. B. M.  The Indian graveyard, most of
the Indian houses and a large part of their arable land, all that can be
irrigated from the spring are upon the N. E. 1/4 of the N. W. 1/4 Sec. 3.
Why it was not included in the original grant I do not know.  It should
certainly be added to the reservation now.  I think it would be well
also to add the N. E. 1/4 of the S. E. 1/4 and the W. 1/2 of the N. E.
1/4 of Sec. 4, xxxxxxxx/xxxxxx T. 18 S. R. 5 E. and the S. 1/2 of the
S. E. 1/4 of Sec. 33 and the S. 1/2 of the S. W. 1/4 of Sec. 34, T. 17 S.
R. 5 E.  These descriptions of land have no value to speak of, except for
grazing a few cattle.  I think it advisable to interpose a little barren

Reproduced at the National Archives

( 9. Ind. Commr. Res. Add.)

land between the Indians and their neighbors. Most of the troubles of the Campo Indians have arisen from their white neighbors crowding over the lines. It would have been better, in my opinion, if the Commission had placed the reservations boundaries wide enough to protect the Indians, in the first instance. J. A. Warren, immediately adjoining the reservation in section 3, has been occupying for years a piece of the reservation equal to 40% of its arable land.    Such things could not occur if a zone of safety be allowed around the land occupied by the Indians, large enough to allow for mistaken boundaries, and defective surveys.    For the protection of the Indians I therefore recommend that these descriptions be added to the Campo reservation.

Laguna.

The land patented to the Laguna Indians is the N. W. 1/4 of Sec. 33 T. 14 S. R. 5 E. S. B. M.  Since then the S. W. 1/4 of the S. W. 1/4 Sec 28 and the N. 1/2 of the S. W 1/4  of Sec.33 have been reserved by executive order.  There are Indians on both tracts. The land is of very good quality, better than on any of the other reservations. I recommend that the descriptions mentioned above and also the S. E. 1/4 of the S. W. 1/4 of Sec. 28 be formally added to the reservation. The N. 1/2 of the S. 1/2 of Sec. 28 has been filed on as a homestead and also  the S. E. 1/4 of the S. W. 1/4  Sec. 33 and also certain land in Sec. 4, T. 15 S. R. 5 E. kxx  It would seem that if this land is valuable enough for white men to homestead it is valuable enough for the Indians .  I would therefor recommend that the homestead entries be cancelled and the land added to the Laguna reservation if authority for such procedure exists.

ACC-HRA000882

Reproduced at the National Archives

(10. Ind. Commr. Res. Add.)

Cuyapipe.

The land patented to the Cuyapipe Indians is the E. 1/4 of Sec. 19, the W. 1/2 of Sec. 20, the W. 1/2 of the S. E. 1/4 Sec. 20, the N. W. 1/4, the W. 1/2 of the N. E. 1/4, the N. E. 1/4 of the N. E. 1/4 and the N. W. 1/4 of the S. E. 1/4, Sec. 29, T. 15 S. R. 6 E. S. B. M. Since then there has been reserved by executive order the N. W. 1/4 ~~of the~~ ~~S. W. 1/4~~ and the W. 1/2 of the N. E. 1/4 Sec. 19 and the S. 1/2 of the S. E. 1/4 Sec. 29 and at a later date the N. W. 1/4 of Sec. 33. These so reserved by executive order are all occupied by the Indians and should be added to the reservation. I think that there should also be added a protective belt. The reservation is very barren on the side of a very rocky steep mountain. On sections 17 and 18 part way up the mountain is a mesa which should raise grain. The rest of the newly proposed addition is of value only as grazing land, and I do not consider it of high quality for that. But the need for protection from the variations of lines caused by fraudulent and careless surveys is the same here as at Campo. I there-fore recommend the land described above for addition to the reservation and also the following:- the S. 1/2 of Secs. 17 and 18; the N. E. 1/4 and E. 1/2 of the S. E. 1/4, Sec. 20; the S. W. 1/4 and the W. 1/2 of the S. E. 1/4 Sec. 19 all of Secs. 21, 28 and 30, the S. W. 1/4 Sec. 29, the N. 1/2 Sec. 32, the E. 1/2 and the E. 1/2 of the S. W. 1/4 and the S. W. 1/4 of the SW 1/4 of Sec 33.

La Posta.

The land patented to the La Posta Indians is the S. 1/2 of the S. E.

ACC-HRA000883

Reproduced at the National Archives

(11.Ind. Commr. Res. Add.)

1/4 and the S. E. 1/4 of the S. W. 1/4 Sec. 31, T. 16 S. R. 6 E., S. B. M., and the N. 1/2 of the N. E. 1/4 and the N. E. 1/4 of the N. W. 1/4 Sec. 6, T. 17 S. R. 6 E.. Subsequently there was reserved by executive order the S. 1/2 of the N. 1/2 Sec. 5 and the S. 1/2 of the N. E. 1/4 and the S. E. 1/4 of the N. W. 1/4 Sec. 6, T. 17 S. R. 6. E. and the S. 1/2 of the S. E. 1/4 and the N. W. 1/4 of the S. E. 1/4 Sec. 24 and the N. 1/2 of the N. E. 1/4 Sec. 25, T. 16 N. R. 5 E.  Upon the last named tract there were three Indian families when the land was suspended from entry twelve years ago.  There are none now and have been none for years.  I see no reason for retaining the land. It does not fit in with any scheme for improving the condition of the Indians and I recommend that the said land, described as the S. 1/2 of the S. E. 1/4 and the N. W. 1/4 of the S. E. 1/4 Sec. 24 and the N. 1/2 of the N. E. 1/4 Sec. 25 be restored to the public domain.  The particular tract patented to the Indians as the La Posta reservation is a very barren pile of granite rocks. The Indians were at that time and have been ever since located upon the S. 1/2 of the N. 1/2 of Sections 5 and 6, T. 17 S. R. 6 E.  This land should certainly be added to the reservation.  The best land in the neighborhood lies in the south half of section 30 and the N. 1/2 of the N. W. 1/4, the S. W. 1/4 of the N. W. 1/4 and the N. W. 1/4 of the S. W. 1/4 of Sec. 31, T. 16 S. R. 6 E. , which land has now been patented to private owners.  This seems to me to again illustrate the advisability of having a buffer strip of land around the reservation to take up the vagaries and worse of the various surveys in this country and to protect the Indians from boundary

ACC-HRA000884

Reproduced at the National Archives

(12. Ind. Commr. Res. Add.)

troubles with whosoever may take up the land adjoining them. I therefore recommend the addition to the La Posta reservation of the following land; the N. E. 1/4 of the S. W. 1/4; the s. W. 1/4 of the S. W. 1/4; the S. E. 1/4 of the N. W. 1/4 ; the N. 1/2 of S. E. 1/4 and the N. E. 1/4 ▓▓▓ of Sec 31 and all of sections 32 and 33, T. 16 S. R. 6 E and the W. 1/2 of the N. W. 1/4 and the S. 1/2 of Sec. 6; the N. 1/4 and the S. 1/2 of Sec. 5 and all of section 4, T. 17 S. R. 6 E. If this land is so added the reservation as enlarged will join on to the enlarged Manzanita and the new reservation which may be created to the south.

### Manzanita.

The land patented to the Manzanita Indians is the whole of section 26, T. 16 S. R. 6 E, S. B. M. The Indians had occupied this section but had been disposed by one Peter Mc Cain under a homestead patent for the S. W. 1/4 of section 23 same township. When the land was given the Indians they were mostly on the N. E. 1/4 of Sec. 35 and a few were on the E. 1/4 of Sec 25. , which tracts have been suspended from entry for some years by executive order. Mc Cain seems to be in possession through an error of the surveyor who ran the lines when he took up the land and not from any deliberate effort to occupy reservation land. He is using about 210 acres of land of fair quality, the possession of which by the Indians would be a great help in making them self sustaining. The field notes for T. 16 S. R. 6 E. were not on file at the county seat nor could they be obtained at Washington. Mc Cain's surveyor, not being able to get the field notes of this township, took those of the township immediately east, naturally supposing that the section lines of the two townships would

Reproduced at the National Archives

(13. Ind. Commr. Res. Add.)

coincide.  Actually they are half a mile apart and the surveyor therefore located Mc Cain half a mile too far south and the land to which Mc Cain holds a patent is a worthless rocky hill.  Within the last month the missing field notes have been found in the land office in Los Angeles and Deputy U. S. Surveyor Couts informs me that there is practically no doubt but Mc Cain is on the reservation.  A proper margin of land around the Indians would have prevented this whole affair and I therefore recommend that such a strip be now added to this reservation.  As far as Mc Cain is concerned, it is something like locking the stable a little late, but it is not too late to save troubles of the kind with other men.  I would therefore recommend the addition of the W. 1/2 of Sec. 24 and 25 and all of Secs. 22, 23, 27, 34 and 35, T. 16 S. R. 6 E.  I think it would be wise to pay Mc Cain a fair price for his improvements and would have tried to buy him out when there recently, but he was absent in the Imperial country for an indefinite period.  I hope to take up the matter with him on my next visit to Campo.  The matter of additions to the five Campo reservations will be mentioned and further explained in connection with the proposed purchases of land for the Campo Indians, in a report upon the same, which I expect to send in within a few days.

I would therefore summarize my recommendations as follows.

There should be added to

Twenty nine Palms,- S. W. 1/4 Sec. 33, T. 1 N. R. 9 E., S. B. M.

Inyaha,- N. 1/2 of the N. W. 1/4 and S. E. 1/4 of the N. W. 1/4 Sec. 35; the W. 1/2 Sec. 26 and the W. 1/2 of the N. E. 1/4 Sec. 26 and

Reproduced at the National Archives

(14. Ind. Commr. Res. Add.)

if the same has not been already added, the S. 1/2 of the S. E. 1/4 and the N.W. 1/4 of the S. E. 1/4 Sec. 26, all in T. 13 S. R. 3 E. S. B. M.

Santa Rosa.- E. 1/2 Sec. 32, all of Sec. 33 and the W. 1/2 of Sec. 34, T. 7 S. R. 5 E. S. B. M.

Capitan Grande,- Secs. 21, 23, 25, 26, the E. 1/2 of Sec. 27 and the N. 1/2 of Sec. 34, T. 14 S. R. 2 E. S. B. M; the N. 1/2 Sec 10 and the S. 1/2 of Secs. 1 and 2, T. 15 S. R. 2 E; the W. 1/2 Sec. 28, the N. 1/2 of the N. E. 1/4 and the E. 1/2 of the S. E. 1/4 Sec. 28, the S. W. 1/4 Sec. 33, the S. 1/2 of the S. E. 1/4, the N. E. 1/4of the S. E. 1/4 the S. E. 1/4 of the N. E. 1/4 and the N. 1/2 of the N. E. 1/4 Sec 33, all of T. 14 S. R. 3 E.; the whole of Secs. 4,,7 and 8 and the S. W. 1/4 of the N. W. 1/4 and the N. W. 1/4 of the S. W 1/4 of Sec. 9, all T. 15 S. R. 3 E. S. B. M.

Agua Caliente or Palm Springs.- Secs. 6, 7 if the same be ex- changed with the S. P. R. R.,Sec. 10, T. 4. S. R. 4. E. and Secs. 2, 10 and 11, T. 5. S. R. 4. E. S. B. M.

Martinez.- Secs. 16 and 36, T. 7. S. R. 8 E. S. B. M. if the same have not been added already.

Chimehuevi Valley,- Fractional townships4. N. R. 25 E., T. 4 N. R 26 E., T. 5 N. 25 E. , 6. N. 25 E, the E. 1/2 of T. 5 N. R. 24 E., and Secs. 25, 26, 35 and 36 T. 6 N. R. 24 E. S. B. M.

Saboba or San Jacinto.- Fractional Sec 5, T. 5 S. R. 1 E. and Lots 1, 2, 3, 4, and 5, and the N. E. 1/4 of Sec. 29 and all of Sec. 31, T. 4 S. R. 1 E., S. B. M.

ACC-HRA000887

Reproduced at the National Archives

(15. Ind. Commr. Res. Add.)

Campo.- The N. E. 1/4 of the N. W. 1/4 of Sec. 3; the N. E. 1/4 of the S. W. 1/4, the W. 1/2 of the N. E. 1/4 Sec. 4, T. 18 S. R. 5 E., and the S. 1/2 of the S. E. 1/4 of Sec. 33 and the S. 1/2 of the S. W. 1/4 Sec. 34, T. 17 S. R. 5 E. S. B. M.

Laguna.- The S. 1/2 of the S. W. 1/4 Sec. 28 and the N. 1/2 of the S. W. 1/4 Sec. 33, T. 14 S. R. 5 E. S. B. M.

Cuyapipe.- The S. 1/2 of Secs. 17 and 18, all of Sec. 19, excepting the E. 1/4 already in the reservation, the E. 1/4 of Sec. 20, the W. 1/2 of the N. E. 1/4 Sec. 20, all of Secs. 21, 28, and 30; the S. W. 1/4 Sec. 29, the S. 1/2 of the S. E. 1/4 Sec. 29, the N. 1/2 Sec. 32, the N. 1/2 Sec. 33, the S. E. 1/4, the E. 1/2 of the S. W. 1/4 and the S. W. 1/4 of the S. W. 1/4 Sec. 33,T. 15 S. R. 6 E. S. B. M.

La Posta.- The S. W. 1/4 of the S. W. 1/4, the N. E. 1/4 of the S. W. 1/4, the S. E. 1/4 of the N. W. 1/4, the N. 1/2 of the S. E. 1/4, and the N. E. 1/4, all of Sec. 31 and all of Secs. 32 and 33, T. 16 S. R. 6 E., and all of Secs. 4 and 5 and the S. 3/4 and the N. W. 1/4 of the N. W. 1/4 of Sec. 6, T. 17 S. R. 6 E. S. B. M.

Manzanita.- Sec. 22, Sec. 23 (should Mc Cain convey the S. W. 1/4 to the U. S. ), the W. 1/2 Sec. 24, the W. 1/2 Sec. 25, and all of Secs. 27, 34, and 35, T. 16 S. R. 6 E. S. B. M.

The Becker extension, as recommended in letter of Jan. 4, 1907, subject to the approval of the Hon. Commissioner of Indian Affairs,- Secs. 1, 2, 3, 10, the N. 1/2 of Sec. 11, the W. 1/2 of the S. W. 1/4, the N. 1/2 of the S. E. 1/4, and the S. E. 1/4 of the S. E. 1/4 Sec. 11, all of Sec. 12 and the N. 1/2 Sec. 13, the N. 1/2 Sec. 14, excepting the N. W.

Reproduced at the National Archives

(16. Ind. Commr. Res. Add.)

1/4 of the N. E. 1/4, Secs. 15, 21, the N. 3/4  and the S. E. 1/4 of the
S. E. 1/4 Sec. 22, the E. 1/2 Sec. 20, Sec. 27 (excepting the N. W. 1/4 of
the N. E. 1/4; the E. 1/4 and the W. 1/2  of Sec. 28; the E. 1/2 Sec. 29;
the N. E. 1/4 and the W. 1/2 of the S. E. 1/4 Sec. 32; the N. W. 1/4 and
the W. 1/2 of the E. 1/2 of Sec. 33; the N. 1/2 and the N. W. 1/4 of the
S. E. 1/4 and the N. E. 1/4 of the S. W. 1/4 Sec. 34; all in T. 17 S. R. 6
E., the E. 1/2 of Secs. 5, 8 and 17 and all of Secs. 3, 4, 9, 10, 15 and
16, (school section) the E. 1/2 of fractional Sec. 20 and fractional Sec.
21, all in T. 18 S. R. 6 E., S. B. M.

I would suggest that the above named descriptions of land be reserved
from entry, such as are not already suspended, pending such action as
Congress may see fit to take.

I would also suggest that authority be conferred upon the Secretary of the
or such official as Congress may see fit to appoint, to cancel any home-
stead entry  covering land needed for addition to any of the proposed
reservations, upon payment of a reasonable sum for any improvements the
homesteader may have upon the land.  The Smiley Commission was given such
authority, or its equivalent and it was of great advantage in setting
aside land for the Indians in Southern California.

I enclose herewith eight maps showing the proposed additions to the
reservations mentioned in this letter, and beg leave also to refer to
a map of the country east of Campo which accompanies my report upon the
proposed purchase of land for the Campo Indians.

Very respectfully,

C. E. Kelsey
Special Agent for the California Indians.

( Enclosures )

ACC-HRA000889

OFFICE OF
Indian Affairs
Rec. JAN 18 **1907**

5457

Indian Office,
FEB 4
Incl. Nov.

**1907**

San Jose Calif
Jan 4, 1907.

C. E. Kelsey
Spl Agt for the Cal. Ind.

Report upon proposed
additions to certain indian
reservations in California.

8 W.

To Secy with draft of proposed
bill 1/29/07 934
478

To Secy Jan 31/07
935/469

To Ch. O. 8/12/07 994

ACC-HRA000890

TAB 28



DEPARTMENT OF THE INTERIOR

WASHINGTON.

February 2, 1907.

The Commissioner of

The General Land Office.

Sir:

I transmit herewith, a copy of a communication from the Acting Commissioner of Indian Affairs, dated the 31st ultimo, transmitting descriptions of certain lands in California, which he recommends be withdrawn from all form of settlement and entry, pending action by Congress authorizing the addition of the lands described to the various Mission Indian Reservations.

In view of the recommendation of the Indian Office, I have to direct that the lands referred to be withdrawn from all form of settlement or entry until further notice, also that the local land officers of the districts in which the said lands are located, be advised of such withdrawal.

In this connection you are advised that the Department on the 31st ultimo forwarded to Congress, with favorable recommendation, the draft of a bill to authorize the addition of certain lands to the Mission Indian Reservations.

Very respectfully,

Secretary.

REFER IN REPLY TO THE FOLLOWING:

Land
5457-1907.

# DEPARTMENT OF THE INTERIOR,
## OFFICE OF INDIAN AFFAIRS,
### WASHINGTON.

January 31, 1907.

The Honorable,

The Secretary of the Interior.

Sir:

Referring to Office letter of January 28, transmitting
reports of Special Agent C. E. Kelsey on the condition of the
Mission Indian Reservations in California, and the draft of
a proposed bill for the betterment of their condition, I
have now the honor to transmit herewith certain descriptions
of land which he recommends be withdrawn from all form of
settlement and entry pending action by Congress whereby they
might be added to the several reservations.

The proposed additions are as follows:

Twenty-nine Palms.-  The SW/4 of Sec. 33, T. 1 N., R. 9 E.,
S.B.M.

Inyaha.- The N/2 of NW/4 and SE/4 of NW/4, Sec. 35;
the W/2 of Sec. 26 and the W/2 of NE/4, Sec. 26, and if the
same has not been already added, the S/2 of SE/4 and the NW/4
of SE/4, Sec. 26, all in T. 13 S., R. 3 E., S.B.M.

Santa Rosa.- The E/2 of Sec. 32, all of Sec. 33, and the
W/2 of Sec. 34, T. 7 S., R. 5 E., S.B.M.

ACC0022714

-2-

Capitan Grande.- Secs. 21, 23, 25, 26, the E/2 of Sec. 27 and the N/2 of Sec. 34, T. 14 S., R. 2 E., S.B.M.; the N/2 of Sec. 10 and the S/2 of Secs. 1 and 2, T. 15 S., R. 2 E.; the W/2 of Sec. 28, the N/2 of the NE/4 and the E/2 of SE/4, Sec. 28, the SW/4 Sec. 33, the S/2 of SE/4, the NE/4 of SE/4, the SE/4 of NE/4, and the N/2 of NE/4, Sec. 34, all of T. 14 S., R. 3 E.; the whole of Secs. 4, 7, and 8, and the SW/4 of NW/4 and the NW/4 of SW/4 of Sec. 9, all T. 15 S., R. 3 E., S.B. M.

Agua Caliente or Palm Springs.- Secs. 6, 7 if the same be exchanged with the S. P. R. R., Sec. 10, T. 4 S., R. 4 E., and Secs. 2, 10 and 11, T. 5 S., R. 4 E., S.B.M.

Martinez.- Secs. 16 and 36, T. 7 S., R. 8 E., S.B.M., if the same have not been added already.

Chimahuevi Valley.- Fractional townships 4 N., R. 25 E., T. 4 N., R. 26 E., T. 5 N., 25 E., 6 N., 25 E., the E/2 of T. 5 N., R. 24 E., and Secs. 25, 26, 35 and 36, T. 6 N., R. 24 E., S.B.M.

Saboba or San Jacinto.- Fractional Sec. 5, T. 5 S., R. 1 E., and Lots 1, 2, 3, 4, and 5, and the NE/4 of Sec. 20, and all of Sec. 31, T. 4 S., R. 1 E., S.B.M.

Cahuya.- The NE/4 of NW/4 of Sec. 3; the NE/4 of SW/4, the W/2 of NW/4 Sec. 4, T. 18 S., R. 5 E., and the S/2 of SW/4 of

ACC0022715

-3-

of Sec. 35, and the S/2 of SW/4 Sect 34, T. 17 S., R. 5 W., S.B.M.

Laguna.- The S/2 of SW/4 Sec. 28, and the N/2 of SW/4 Sec. 33, T. 14 S., R. 5 E., S.B.M.

Cuyapipe.- The S/2 of Secs. 17 and 18, all of Sec. 19, excepting the E/2 of NE/4 and the E/2 of SE/4 already in the reservation, the E/2 of NE/4 and the E/2 of SE/4, Sec. 20, the W/2 of NE/4 Sec. 20, all of Secs. 21, 28, and 30; the SW/4 of Sec. 29, the S/2 of SE/4 Sec. 29, the N/2 Sec. 32, the N/2 Sec. 33, the SE/4, the W/2 of SW/4, and the SW/4 of SW/4 Sec. 33, T. 15 S., R. 6 E., S.B.M.

La Posta.- The SW/4 of SW/4, the NE/4 of SW/4, the SE/4 of NW/4, the N/2 of SE/4, and the NE/4, all of Sec. 31, and all of Secs. 32 and 33, T. 16 S., R. 6 E., and all of Secs. 4 and 5, and the SW/4, the SE/4, the S/2 of NW/4, the S/2 of NE/4, and the NW/4 of NW/4 of Sec. 6, T. 17 S., R. 6 E., S.B.M.

Manzanita.- Sec. 22, Sec. 23 (should McCain convey the SW/4 to the United States), the W/2 Sec. 24, the W/2 Sec. 25, and all of Secs. 27, 34 and 35, T. 16 S., R. 6 E., S.B.M.

Campo.- Secs. 1, 2, 3, 10, the N/2 of Sec. 11, the W/2 of SW/4, the N/2 of SE/4, and the SE/4 of SE/4 Sec. 11; all of Sec. 12, and the N/2 Sec. 13, the N/2 Sec. 14, excepting the NW/4 of NE/4, Secs. 15, 21, the NW/4, the NE/4, the N/2 of

ACC0022716

-4-

SW/4, the N/2 of SE/4, and the SE/4 of SE/4, Sec. 22, the E/2
Sec. 26, Sec. 27 (excepting the NW/4 of NW/4) the E/2 of
NE/4, the E/2 of SE/4, and the W/2 Sec. 28; the E/2 Sec. 29;
the NE/4 and the W/2 of SE/4 Sec. 32; the NW/4 and the W/2
of E/2 Sec. 33; the N/2 and the NW/4 of SE/4 and the NE/4
of SW/4 Sec. 34; all in T. 17 S., R. 6 E., the E/2 of Secs.
5, 8, and 17, and all of Secs. 3, 4, 9, 10, 15 and 16 (school
section), the E/2 of fractional Sec. 20 and fractional Sec.
21, all in T. 18 S., R. 6 E., S.B.M.

I have the honor to recommend that the Commissioner of
the General Land Office be instructed to note the withdrawal
of these lands from all forms of settlement and entry, and
directed to advise the officers of the local land offices
for the districts in which the lands are situated, of such
withdrawal.

                                    Very respectfully,

                                    (Sd) C. J. Marrable

AGF.PM.                                   Acting Commissioner.

TAB 29

**Annual report of the Commissioner of Indian Affairs to the Secretary of the Interior.**

United States.
Washington, U.S. Govt. print. off.

http://hdl.handle.net/2027/mdp.39015034627896



**Public Domain, Google-digitized**

http://www.hathitrust.org/access_use#pd-google

This work is in the Public Domain, meaning that it is not subject to copyright. Users are free to copy, use, and redistribute the work in part or in whole. It is possible that heirs or the estate of the authors of individual portions of the work, such as illustrations, assert copyrights over these portions. Depending on the nature of subsequent use that is made, additional rights may need to be obtained independently of anything we can address. The digital images and OCR of this work were produced by Google, Inc. (indicated by a watermark on each page in the PageTurner). Google requests that the images and OCR not be re-hosted, redistributed or used commercially. The images are provided for educational, scholarly, non-commercial purposes.

Generated for guest (Library of Congress) on 2013-08-20 19:48 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-002





LIBRARY OF THE
UNIVERSITY OF MICHIGAN



THE GIFT OF

Dept. of Interior

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-003



Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-004

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-005

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-006

CO

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-007

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

# REPORT OF THE

# COMMISSIONER OF INDIAN AFFAIRS

### TO THE SECRETARY OF THE INTERIOR

## 1907



WASHINGTON : GOVERNMENT PRINTING OFFICE : 1907

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-008







THE GIFT OF

Dept. of Interior

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

CVWD 563-009

E
93
.U54 8

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-010

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-011

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-012

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF MICHIGAN

CVWD 563-013

# CONTENTS.

|  | Page. |
|---|---|
| A session's legislation | 7 |
| Coordination between Government bureaus | 8 |
| Improvements in office methods | 9 |
| Stopping one source of waste | 11 |
| Field administration | 12 |
| Thumb-print signatures | 14 |
| Obtaining employment for Indians | 15 |
|     The Southwest | 15 |
|     Blackfeet Reservation | 17 |
|     Rosebud and Pine Ridge reservations | 18 |
|     Work for Indian women | 19 |
|     Commercial agent for the Sioux | 20 |
| A wasteful school system | 21 |
| Liquor traffic in the Indian country | 30 |
| Settlement of claims against Indians | 36 |
| Education | 36 |
|     Government schools | 36 |
|     Public schools | 41 |
|     Mission schools | 42 |
|     Sectarian contract schools | 45 |
|         Osage | 46 |
|         Menominee | 46 |
|         Summary | 46 |
|         Renewal of contracts for 1908 | 47 |
|     Attendance of pupils | 48 |
|     Appropriations | 49 |
|     The school site at San Ildefonso pueblo | 50 |
|     Institutes | 50 |
| Indian exhibit at the Jamestown Exposition | 51 |
| Employees | 52 |
| Appropriations | 53 |
| Irrigation | 54 |
|     Work of the year | 55 |
|     Blackfeet | 56 |
|     Crow | 56 |
|     Flathead | 56 |
|     Fort Hall | 56 |
|     Klamath | 56 |
|     Mission | 57 |
|     Pima | 57 |
|     Shoshoni | 58 |
|     Tongue River | 58 |
|     Uintah | 58 |
|     Zuni pueblo | 58 |

3

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google   200370   Original from UNIVERSITY OF MICHIGAN

CVWD 563-014

4                               CONTENTS.

|                                                              | Page. |
|--------------------------------------------------------------|-------|
| Allotments and patents                                       | 58    |
| On reservations                                              | 59    |
| Columbia (Moses agreement)                                   | 59    |
| Crow                                                         | 60    |
| Flathead                                                     | 60    |
| Fort Berthold                                                | 60    |
| Jicarilla                                                    | 60    |
| Klamath                                                      | 61    |
| Makah                                                        | 61    |
| Oto                                                          | 61    |
| Osage                                                        | 61    |
| Pyramid Lake                                                 | 61    |
| Quinaielt                                                    | 61    |
| Sac and Fox in Kansas                                        | 61    |
| Shoshoni                                                     | 62    |
| The Sioux                                                    | 62    |
| Spokan                                                       | 63    |
| Turtle Mountain                                              | 63    |
| Uintah                                                       | 64    |
| Walker River                                                 | 64    |
| White Earth                                                  | 64    |
| Nonreservation allotments                                    | 65    |
| Allotments to mixed bloods                                   | 65    |
| Carson Sink                                                  | 66    |
| Where allotments are being made                              | 66    |
| The Burke law                                                | 67    |
| Dower in Indian allotments                                   | 69    |
| Court jurisdiction of allotments                             | 69    |
| Timber and minerals on reservations                          | 70    |
| Logging on reservations                                      | 71    |
| Flathead Reservation                                         | 71    |
| La Pointe Agency                                             | 72    |
| Red Cliff                                                    | 72    |
| Fond du Lac                                                  | 73    |
| Grand Portage                                                | 73    |
| Leech Lake Reservation                                       | 73    |
| Menominee Reservation                                        | 74    |
| Leasing of Indian lands                                      | 74    |
| Sales of Indian lands                                        | 76    |
| Eastern Cherokee lands                                       | 78    |
| Puyallup lands                                               | 78    |
| Railroads across Indian lands                                | 79    |
| Outside of Oklahoma and Indian Territory                     | 79    |
| Arizona and California                                       | 79    |
| Belcher Mountain                                             | 79    |
| Big Bend Transit                                             | 80    |
| Chicago, Milwaukee and St. Paul                              | 80    |
| Chicago and Northwestern                                     | 80    |
| Gila Valley, Globe and Northern                              | 80    |
| Grays Harbor and Puget Sound                                 | 80    |
| Great Northern                                               | 80    |
| Idaho and Northwestern                                       | 81    |
| Lake Creek and Coeur d'Alene                                 | 81    |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Case 5:13-cv-00883-JGB-SP    Document 85-20   Filed 10/21/14   Page 42 of 212   Page ID
#:4058

CONTENTS. 5

Page.

Railroads across Indian lands—Continued.
   Outside of Oklahoma and Indian Territory—Continued.
      Lake Superior and Southeastern _____ 81
      Minneapolis, St. Paul and Sault Ste. Marie _____ 81
      Missouri River _____ 81
      North Coast_____ 81
      Northern Pacific_____ 81
      Parker Transportation _____ 82
      Oregon and Washington_____ 82
      Oregon Electric_____ 82
   In Oklahoma and Indian Territory_____ 82
Indian lands set apart to missionary societies and churches___ 84
The upheaval at Oraibi_____ 84
Navaho prisoners_____ 91
Indians in California _____ 92
The Lemhi Indians _____ 94
The Five Civilized Tribes_____ 95
   Education _____ 95
   Mineral leases_____ 98
   Deposits in banks_____ 99
   Leasing and sale of lands_____ 100
   Incorporating tribes_____ 100
   Collection of revenues_____ 103
   Town sites _____ 104
   Public roads_____ 104
   Placing allottees in possession of their allotments_____ 105
   Alienation of allotments _____ 105
   Protection of full bloods_____ 106
   Intermarried Cherokees _____ 107
   Choctaw-Chickasaw freedmen _____ 109
   Closing of the tribal rolls_____ 112
Lands of Sac and Fox Indians in Iowa_____ 113
L'Anse and Ontonagon timber lands_____ 114
White Earth allotments and the residence question_____ 115
Sale of Kiowa pasture and wood reserves_____ 117
Kiowa town sites_____ 117
The Osage Reservation_____ 119
   Allotments _____ 119
      Fraudulent enrollment_____ 119
      First selections_____ 120
      Second selections—"The wheel plan"_____ 120
      Surveys _____ 121
   Town sites _____ 121
   Oil and gas leases_____ 123
Sioux pony claims_____ 124
Lower Brulé Reservation _____ 124
Absentee Utes _____ 125
Paiutes_____ 131
Mineral entries on Colville Reservation_____ 132
Yakima Reservation boundary_____ 132



CVWD 563-016

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-017

# REPORT

OF THE

# COMMISSIONER OF INDIAN AFFAIRS.

Office of Indian Affairs,
*Washington, D. C., September 30, 1907.*

Sir: I have the honor to submit herewith the seventy-sixth annual report of the Office of Indian Affairs.

## A SESSION'S LEGISLATION.

The Fifty-ninth Congress ended, as it began, with a most striking array of important permanent legislation respecting Indian interests. A quick survey of the last session's work shows statutes providing for the payment, out of an Indian allottee's share of his tribal fund, of taxes on his allotment, where the restrictions on alienation have been removed and such payment will save his home from attachment; permitting white children to attend Indian schools under similar conditions to those surrounding the attendance of Indian children at white schools; putting the sale of the allotment of any noncompetent Indian under the control of the Secretary of the Interior, and the use of the proceeds by the Commissioner of Indian Affairs for the benefit of the allottee or his heirs; furnishing a means for giving to any competent Indian, on his application, his pro rata share of the funds of his tribe, and authorizing the Secretary to apply part or all of the share of a blind, crippled or helpless Indian to the relief of his necessities; to quiet title to allotments on the Jicarilla Reservation and sell its timber; to open a further part of the Rosebud Reservation; to dispose advantageously of the desert lands of the Southern Ute Indians; liberalizing the law for the allotment of the Indians on the Bad River Reservation; opening a way out of the difficulty hitherto attending the irrigation of the Pima lands; beginning a system of irrigation on the Fort Hall Reservation; taking further steps for winding up the affairs of the Five Civilized Tribes; distributing remnants of funds among a number of Indian tribes and wiping their accounts off the books of the Treasury; removing restrictions from the allotments of all adult mixed bloods of the White Earth Reservation; permitting the Fort Belknap Indians to

7

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-018

8        REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

lease their lands for ten years for the culture of sugar beets and other crops in rotation; to allot the Blackfeet Indians and open their surplus lands to settlement; giving the Standing Rock allottees each a piece of timber land; evening up the allotments of the Fort Berthold Indians; permitting the allotment of lands to the Sioux married women hitherto unprovided for; paying the Indians of the Colville Reservation for their lands already opened to settlement; and for a number of other noteworthy purposes.

### COORDINATION BETWEEN GOVERNMENT BUREAUS.

It has always seemed to me one of the misfortunes of the great multiplicity and diversity of parts in our Federal governmental machine that there has been so marked a tendency toward a reduced rather than an increased coordination between the various administrative branches and organs. The Government maintains, for example, a great architectural establishment in connection with the Treasury Department, and yet the Indian Service has its own architectural organization and has been in the habit for many years of having its work inspected by persons temporarily appointed for the purpose, sometimes with good and sometimes with less good effect. I have endeavored to correct the tendency to which I have referred, as far as this Office is concerned, in such matters as the superintendence of construction, where I have, through the courtesy of the Supervising Architect of the Treasury, been enabled to obtain expert service by making use of men trained under him who happened to be temporarily unemployed. This arrangement is not always practicable but it seems so desirable on general principles, and its results have thus far proved so excellent, that I am trying to make more and more use of it as opportunity offers.

With steam engineering I am making a similar effort to avail myself of the best technical knowledge in the well-equipped bureaus of the Navy Department and the Revenue Marine. In the reform of our medical supply department I have had occasion to draw, and with advantage, upon the experience of the Surgeon-General's offices in the Army and Navy and the Marine-Hospital Service. The Indian Office has its own corps of timber and logging experts in the field; but as the Indian country is only part of our vast Commonwealth, and some of the problems arising in the timbered sections of it are such as concern indirectly, if not directly, large masses of our white population as well, I am trying to avail myself of the cooperation of the Forest Service of the Department of Agriculture, so as at least to have the plans of our Service harmonize with the plans of the Forest Service as far as can be, and I find the spirit of cooperation very fully reciprocated.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-019

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 46 of 212   Page ID #:4062

A still larger field for increased coordination is to be found in the irrigation work which is going on now all over the West. Within the last ten years this subject has taken such strides in public interest as to astonish even those who are the most enthusiastic advocates of the artificial reclamation of our deserts. Irrigation has come to play so large a part in the agriculture of the West that it is almost impossible to separate the two ideas; and tracts of Indian country which were turned into reservations a long time before there was any general knowledge of irrigation, and were then supposed to be comparatively valueless except for grazing or mining, are now proving to be well adapted to general agriculture, even including some of its more delicate forms, if water can be put upon the soil. The Indian Service has its own irrigation corps and system; but here again, as in matters affecting timber lands, the problems to be worked out on Indian reservations are often so closely allied with problems involving large areas of country opened to white settlement as to make the union of the Indian irrigation projects and the white irrigation projects really essential to the success of both. As far as possible, therefore, I am endeavoring to establish cooperative relations with the Reclamation Service. To that end, as described at length elsewhere, I am turning over to the Reclamation Service those projects under my jurisdiction which involve a possible conflict between the interests of the Indians and those of white settlers in the neighborhood of Indian reservations, and in return the Reclamation Service has authorized the consultation of its expert engineers by the irrigation engineers of the Indian Service.

Again, the Congress has responded during the last year, in some measure, to a plan I have had in view of enabling Indians, under certain conditions which used to be considered fatal, to obtain the benefits of some of the great reclamation projects designed primarily for whites, but actually including Indian lands in their broadest scope. By thus, in field after field, reversing the tendency toward differentiation, and starting a movement toward a closer unification of the Government's great developing forces, we can hope possibly to see in another generation a more perfect organization of our national public enterprises, and a great deal less of the economic waste which has so long prevailed, through two or three bureaus tramping practically over the same ground and maintaining separate sets of machinery for accomplishing a single purpose.

### IMPROVEMENTS IN OFFICE METHODS.

When I entered upon the administration of my present office I found in operation there, intrenched by long usage, a system of authorizing expenditures in the open market which seemed to me to offer an unusually promising field for improvement. Under Depart-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google      Original from UNIVERSITY OF MICHIGAN

CVWD 563-020

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

10    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

ment rules specific authority had to be obtained from the Secretary
of the Interior for every purchase of any kind or amount. This
routine necessitated the writing of at least four letters for each au-
thority granted. First, the agent or superintendent gave a detailed
statement of just what was wanted, with its price, purpose, and
necessity; second, the Office transmitted this to the Department, re-
peating in substance what the agent had said and recommending
that the authority be granted; third, the Department answered, re-
peating for the most part the language used by the Office; and,
fourth, the Office in turn notified the agent that authority had been
granted, again using the language of the agent's original request.
It was found, on examination, that more than 4,000 of the requests
for authority which came in each year were for expenditures of less
than $500; and, of this 4,000, three-fifths were for sums less than
$100, and two-fifths for less than $50 each. So few of the requests
were ever denied by the Department that sending them over for ap-
proval amounted to little more than mere formality. Accordingly it
was recommended, on March 11, 1905, that power to authorize ex-
penditures in open market, not exceeding $500 in value at any one
time, be delegated to the Commissioner of Indian Affairs.

The Department recognized at once the cumbersomeness of the ex-
isting system and admitted its power to delegate the desired au-
thority, but was not ready to approve so sweeping a change. How-
ever, to afford some relief, on April 1, 1905, authority was delegated
to the Commissioner to make and authorize expenditures in the open
market not exceeding $100 at any one time, with the understanding
that all requests for expenditures should be carefully scrutinized and
all authority limited to the actual necessities of the Service.

The results of two years of trial of this plan proved so satisfactory
that the Department on March 9, 1907, extended the authority so as
to make it cover amounts up to $500, as I had originally recom-
mended.

As work on open market expenditures increases at the rate of 10
per cent each year, it could hardly have been disposed of by the lim-
ited clerical force of the Office without the relief given by these two
authorities.

Another change which will cut off considerable work both in this
Office and the Treasury is connected with payments for supplies.
Hitherto supplies purchased annually by contract for delivery at the
several agencies and schools—such as beef, oats, corn, hay, ice, eggs,
vegetables, wood, etc.—have been paid for on papers issued by the
respective agents and superintendents. Therefore, after delivery of
his goods, a contractor must wait for his money until the papers
issued for them had reached Washington, been examined by the In-
dian Office and allowed by the Treasury and a draft returned to him.

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP    Document 85-20    Filed 10/21/14    Page 48 of 212    Page ID #:4064

When the point of delivery was in the far West such a roundabout routine consumed so much time that it tended to discourage bidders and thus lessen competition.

This slow and awkward method has all been changed. Beginning with the current fiscal year money is sent to agents and superintendents who are disbursing officers, and they pay these contract accounts instead of sending them to Washington for settlement. They are heavily bonded, generally by surety companies, the method of accounting is very rigid, and they are required to file with their accounts the same evidence which was furnished when the claims were forwarded here; so that, in effect, the Office is now simply saving the former waste of going twice over the same ground, and the persons who furnish supplies to the Government receive their pay so promptly that they can afford to offer better prices.

Still another endeavor to bring about more businesslike conditions has concerned itself with the time of making per capita payments to Indians. Many payments are made at such seasons as seriously to interfere with the best interests of the Indians. For example, at one agency the Indians leave their homes in the middle of the planting season and absent themselves for several days in order to draw an annuity of a few dollars; at another they receive their money in the part of the year when they need it least, and, with their usual improvidence, it is gone before severe weather begins. In some places a payment should be made just before planting season, so as to enable the planters to buy seed, while in others the Indians would suffer in the winter unless they received a fall payment. The agreement with the Devil's Lake Sioux, approved April 27, 1904, provided for an annual payment during the month of June; but the Indians petitioned that it be changed to April, because a June payment was too late for the purchase of seeds and too early to help them in harvesting. The date of payment was changed to April by the current Indian appropriation act. Similar changes now under consideration will doubtless be made from time to time. Not more than two payments will be made annually unless more are required by treaty stipulations.

### STOPPING ONE SOURCE OF WASTE.

As you are aware, I have been making for the last three years rather extended tours of the Indian country, aiming as far as possible to visit agencies and schools which have never been visited by a Commissioner before, and which rarely get a visit from anyone representing directly the Washington administration. Among other valuable fruits of these visitations has been the opportunity to observe what stocks of unused but usable material are on hand in the several store-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google    Original from UNIVERSITY OF MICHIGAN

CVWD 563-022

12    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

houses, not capable of being applied to local needs and yet too good for condemnation.  Here and there at other places I find serious lacks in equipment.  A year ago I made a systematic effort to obtain accurate statistics as to both lacks and oversupplies, which would enable me very often to avoid the expense of a purchase to meet some deficiency, by simply transferring material from one place where it is not wanted to another place where it is.

A single instance will illustrate what I have had in mind.  At a certain pueblo in New Mexico I discovered Indians plowing with oxen but using no yoke properly so called.  The beam of the plow was attached to a cross-timber which was lashed to the horns of the oxen, an arrangement not only cruel in a way but wasteful of the strength of the oxen as draft animals, as it brought all the strain upon organs which were not adapted by nature for that purpose.  At another agency I found ox yokes gathering dust in a storehouse because the use of oxen in that part of the country had gone out entirely many years ago and horses had been substituted.  An order for the transfer of a few yokes from the place where they were lying idle and occupying space that could be turned to better account, to the place where the lack of yokes was pitifully obvious, involved merely the freight transportation and accomplished the double good.  In like manner, clothing of sizes which would not fit anyone in the local contingent have been moved to places where these sizes were needed, and the cost of additional material thus saved; and the same plan has been applied to hardware, medical supplies and appliances, etc.

When I first started upon this economic campaign I found my efforts technically hampered by the wording of the one law on which I might have depended for my authority to make the desired transfers.  But as soon as I explained the difficulty to the Indian Affairs Committees of the Congress last winter they responded by incorporating into the then pending Indian appropriation bill a clause granting me the powers needed, and I have been making good use of these ever since.

### FIELD ADMINISTRATION.

Early in the history of the administration of Indian affairs the Western country was divided into large areas of territory, each in charge of a superintendent, under whom there were agents of particular reservations.  Superintendents reported to the Commissioner of Indian Affairs and agents to the superintendents.  The crudity of the telegraph and railroad systems in those days, the warlike attitude of the Indians and their tribal solidarity were the reasons for this complex system.  As the country became settled, with better

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-023

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 50 of 212   Page ID #:4066

transportation facilities reaching into the Indian country and more complete and rapid communication between the Office in Washington and its field representatives, superintendencies were abolished and agents came into immediate official contact with the Indian Office. Then began the breaking up of reservations into smaller territorial areas, each under a separate agent with a large corps of employees under his control. That condition continued until the last few years, when the disintegration of the tribes by the allotment of their lands and the education of their children began, and, instead of entire tribes being dealt with as units, the individual Indians were substituted for the groups.

This change of plan means increased work for the clerical force of the Office, but more satisfactory progress for the Indian. The Congress has wisely and effectively promoted the programme by enacting legislation, already discussed in my last report, enabling the Department to give to any competent Indian his pro rata share of his tribal fund and a patent in fee to his land if he wishes them, to sell a noncompetent Indian's land for his benefit if it is obvious that the money will do him more good, and to dole out to an Indian who is physically helpless such part of his pro rata share of his tribal fund as may be required to provide for his necessities.

As a final step in the disintegration of the old system, I have inaugurated the policy of doing away with every agency possible and placing the affairs of small groups of Indians in charge of a bonded day-school teacher or farmer, who reports direct to this Office without the intervention of his former superior, the agent. I am thus able to come into direct official contact with the man who personally meets the Indians in their everyday life and can report on their condition and requirements from intimate knowledge. This will more and more individualize the Indians and give them a home counselor who is himself the representative of the Washington Government. Their business matters, it is needless to say, are more expeditiously and intelligently acted upon than through the former roundabout mechanism.

To cite a recent example, there was until lately consolidated under an agent at San Jacinto, in southern California, a number of widely scattered bands of Mission Indians, living on small reservations. Five day schools are conducted at the homes of as many bands. Under the practice formerly prevailing the bonded officer at San Jacinto relied principally for his reports to this Office on the statements of a day school teacher or farmer who was near the Indians, as it was only rarely, of course, that he was able to visit his charges in person. This agency I have broken up into five groups, each in charge of the day school teacher nearest the Indians. The teacher in each case gives bond and in all particulars assumes the responsi-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-024

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 51 of 212   Page ID #:4067

bilities of the former agent, except that he has control of a smaller number of Indians, whom one man can handle effectively, living actually among them as he does. The same plan has been carried out at other places, but San Jacinto has been chosen to illustrate the new policy for the purposes of this report because it presents the most strictly typical conditions.

I may add that in course of time the Indian day schools are expected to merge into the local common school system, and then the solution of the so-called "Indian problem," as far as these particular Indians are concerned, will be complete, for they will have been absorbed into the general body politic and become like all other Americans, except as to origin and ancestry.

### THUMB-PRINT SIGNATURES.

Beginning in 1905, I adopted the practice of requiring, as evidence of the authenticity of written agreements with Indians, the thumb prints of the signers in addition to their signatures. It has worked so well that it will be continued as a regular feature in all negotiations of importance. For example, the agreement concluded on January 21, 1907, by Inspector James McLaughlin with the Indians of the Rosebud Reservation in South Dakota for the opening to settlement and entry of a part of that reservation bore, in addition to the signature or mark of each consenting Indian, the imprint of his right thumb. Where the thumb impressions are made with care there is so much individuality in the whorls of the different thumbs that it is seldom that more than a casual inspection is necessary to discern their distinguishing characteristics.

The adoption of this system may prove invaluable where questions of identity arise, and if it can be extended to allotting operations, and it proves practicable to obtain the thumb print of each Indian opposite his name and the description of the land allotted to him, the liability of giving double allotments will be reduced to a minimum.

Quite apart from its purely material aspect as a means of preventing error and confusion, moreover, the practice has another and not less important consideration to commend it in its influence on the Indian himself. When an illiterate Indian who is called upon to sign a document sees a clerk make a cross with a pen and put some writing around it, and finds that his only share in the operation is to step up and touch with his finger tips the end of the penholder as a sign that the mark is his, he naturally attaches very little significance to it. Instances are of not infrequent occurrence where the moral weight of evidence goes to show that an Indian has signed a certain paper, but the Indian stoutly denies having signed it and falls back upon the testimony of others who are ready to swear to an alibi or to

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF MICHIGAN

CVWD 563-025

declare that they were present with him and that he refused to touch the pen.

In such a case the officers in charge of the business are greatly puzzled to know whom to believe. The Indian, who by no means lacks natural shrewdness, can not easily be convinced that a cross made by another man on a piece of paper, in even the drawing of which he has himself taken no part, is his act in any binding sense. But it is easy to see, in every gathering where Indians are called upon to impress their thumb prints opposite their written names, that they understand that here is something which commits them, and that there is no escape from the effect of a mark actually made by them and capable of comparison with another mark similarly made at a later date. An eminent jurist once said of the oath administered in law courts to litigants and witnesses, that it is not designed so much to call the attention of the Deity to the act of his creature as it is to call the attention of the creature to the fact that there is a Deity who will judge him. So with the thumb print, the mere possibility of its use as a means of identification by officers of the Government in disputed cases is not more important, after all, than the reminder it conveys to the Indian that he is taking upon himself certain obligations which he can not lightly throw off.

To Inspector McLaughlin belongs the credit of having made the first experiments with thumb-print signatures. He was selected for that purpose because of his knowledge of the Indian character and the assurance that he would impress the solemnity of such attestations upon the Indians in a dignified way. Now that he has demonstrated the wisdom of the idea, I hope to have other inspecting officers extend its application till it becomes substantially universal, or till the percentage of Indians who can read and write becomes equal to the corresponding proportion among our white population.

### OBTAINING EMPLOYMENT FOR INDIANS.

The employment bureau, in charge of Charles E. Dagenett, which was established in 1905 to assist Indians to procure work outside their reservations, has met with continued success.

### THE SOUTHWEST.

Employment has been obtained for Indians on ranches, farms and railroads and at any other occupation for which they were qualified. Such steady employment as wage-earners and contact with the world outside of a reservation not only bring to the Indians money returns for their labor, but also develop self-reliance and a capacity for looking after their own individual and family interests. It is Mr. Dagenett's wise policy to exercise no direct supervision over Indians who can manage their own affairs and find employment for

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-026

16    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

themselves, even if sometimes less favorable results are obtained, for the best thing for them is to pick up experience as independent workers and thus acquire the faculty of initiative. In such cases he merely visits the Indians occasionally to inquire as to their welfare and the conditions of their employment.

While every encouragement has been given to those who were willing to go out as individuals on their own responsibility, employment has been procured also for Indians in gangs or groups, mainly on irrigation projects and railroad construction, and the demand for Indian laborers has far exceeded the supply.

Records as to the number of Indians employed and the amount of their earnings have been kept only where the group of Indian laborers was large enough to justify the employer in incurring the expense of providing some one to have special charge of them.

The work of controlling the inflow of the Colorado River to the Salton Sea was undertaken in July, 1906, with Mexican and other labor; but by the 1st of August the company was glad to make arrangements to employ Indian labor, as in that climate no other certain supply could be procured or kept. This work continued through the year and furnished employment to not less than 1,100 Indians, mostly Pimas and Papagos, the force ranging from 207 in August, 1906, to 667 in March, 1907. Their pay was $1.92½ per day of ten hours for ordinary labor, and $2, or even $2.25, for those showing any skill. Their commissary deductions were small, as they received their wages in money every week and usually paid cash for whatever they bought. The Indians had their families with them, could board themselves at a low cost, were given free transportation both ways for themselves and families, and suffered no hospital deductions. From August, 1906, through May, 1907, their gross earnings amounted to $115,784.44, and after deducting the small commissary charges, etc., the net remainder was $107,404.54. In October, as the work at the Salton Sea intake apparently neared completion, work was found for the Indians on the Government dam at Yuma. But a break in the Salton Sea levee again created an urgent demand for all available Indian laborers, and, as the wages there were better and the general conditions more satisfactory, the Indians preferred to remain. Therefore only about 100 went to work at the Government dam. Their gross earnings from October 27 to December 26 amounted to $3,325. Their work, as a rule, was satisfactory, and many more were wanted than could be furnished.

From 50 to 125 Indians also worked about four months as laborers and teamsters on the Colorado River near Yuma, receiving $1.75 and $2 a day.

On the Roosevelt dam north of Phoenix, Ariz., Indians have been constantly engaged in road work under an Indian foreman, and a few

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

have been employed as mechanics and on the cement work. The number has averaged 60, and the wages have ranged from $1.90 to $2.50 a day.

On the St. Mary's Canal on the Blackfeet Reservation in Montana from 100 to 225 Indians worked with their teams for several months. They were paid $1.25 and $2 a day as mere laborers and $3.50 and $5 a day for man and team.

Companies of Indians, mainly Hopis, Mohaves, Navahos, and Pueblos, varying from 48 in April to 210 in July, were kept at work on the Santa Fe railroad until February 12, when their services were discontinued on account of retrenchment by the railroad company. They were employed mostly in gangs, doing repair work and ballasting on the lines west of Albuquerque. From April, 1906, through February, 1907, their gross earnings were $25,101.61, of which they saved more than 72 per cent.

In the beet fields 404 Indians were employed last year during the thinning season and 62 during the fall harvesting. For the thinning season this year 604 were employed, 493 being schoolboys and 111 coming from the Hopi, Navaho, Pueblo, and Apache reservations. Their gross earnings amounted to $28,000, from which $6,000 was paid for transportation and $6,000 for board and clothing and advances in cash, and the remaining $16,000 was paid to the Indians in money when they started home, or was sent to the school superintendent in trust for the schoolboys. Probably 100 or more Indians will be wanted for the fall work. The beet work around Rocky Ford, Colo., this season has been very satisfactory both to the Indians and the beet growers, the Indians being well pleased with their earnings and their treatment.

The sheep industry of the Southwest also has afforded employment to many Indians. They are considered by sheep growers desirable hands, and the wages paid them have doubled in the last two years, being now about $30 per month and board. Lumbering offers much employment for the northern Pueblos, and the growing cantaloupe industries around Mesa, Ariz., are this year making large use of Indian labor. Mr. Dagenett reports that in the Southwest generally work for the Indians is plentiful, wages are high, and the outlook is encouraging.

### BLACKFEET RESERVATION.

I said in my last report that the hold gained by our employment bureau in the Southwest would make the extension of similar work to other parts of the country almost a matter of course. Last winter was unusually severe in Montana, and the Blackfeet Indians lost many cattle. As their reservation is not adapted to agriculture, the

22849—08——2

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google        Original from UNIVERSITY OF MICHIGAN

loss of the stock has impoverished some of the industrious and worthy members of the tribe. Mr. Dagenett was directed to investigate conditions on the reservation and to try to alleviate the reported distress by procuring work for the Indians. He reported that the mixed bloods—about three-eighths of the tribe—were able generally to take care of themselves, but that the full bloods as a rule had little knowledge of ranch or farm work, were unwilling to stay a reasonable length of time in one place or to work where they could not be in parties, were very apt to quit on little or no provocation and regardless of the interests of the employer, and were addicted to the use of intoxicants. Naturally the ranchers hesitated to employ them.

On the reservation oats and wheat might be raised if the Indians would take up the matter persistently, but they are disinclined to such new work from which the returns are not immediate. Stock raising has been generally successful, although the severe winters are a serious drawback. There is considerable lumber hauling not far from the reservation, but the amount which the Indians can earn with their small teams is discouraging. The only employment for which they seem to be fit is such work as ditch and railway construction, where they do the same thing every day and no particular skill is required. The agent, Captain Dare, at one time forbade the employment of outsiders on the reservation and insisted that all the work be given to Indians; but he had to rescind the order, as the necessary work could not be accomplished by the labor of Indians only, owing to their ignorance, indifference, and childishness.

The present distress among these people is not a mere temporary misfortune, but the outcome of conditions which must be reckoned with. Sooner or later the Indians must work, and the sooner they get at it the better. Some one was needed to devote his entire time to obtaining employment for the Blackfeet Indians, and Mr. Dagenett was authorized to employ an assistant on their reservation to work under his direction. Little has yet been accomplished, but Mr. Dagenett has had some correspondence with lumber companies in the neighborhood and finds that they are willing to employ these Indians, if the Indians will work and know how to do anything.

### ROSEBUD AND PINE RIDGE RESERVATIONS.

The Rosebud and Pine Ridge agencies in South Dakota were also visited last July by Mr. Dagenett. At Rosebud he found that very little had been done in the way of outside employment, while nearly all the Indians were drawing rations, even the able-bodied. Stock raising is an important industry, but the full-blood Indians have few cattle and depend on rations and the work provided artificially for them on the reservation. Such perfunctory employment has not given wholly satisfactory results. Those who could become self-sup-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google      Original from UNIVERSITY OF MICHIGAN

porting by utilizing the agricultural possibilities of their allotments to supplement revenues from their stock, need more than anything else to be encouraged in the development of those allotments; but they must also have opportunities for outside work, and any knowledge thus gained they can put to use in improving their own homes. These Indians would doubtless make good workmen if properly handled, although few of them are experienced at any kind of labor, except, perhaps, as horsemen in handling stock.  They need to be placed in good agricultural districts, and an effort will be made to send them to the beet fields around Greeley, Colo.  The representatives of the beet growers there have assured Mr. Dagenett of their willingness to cooperate with him, and this is an exceptionally good agricultural region, which will afford employment for a large number of Indian laborers if they prove satisfactory.

The matter of obtaining outside employment for the Pine Ridge Sioux has been well handled by the agent, Mr. Brennan.  Early last spring he dropped from the ration roll 1,600 Indians who were able-bodied and let them support themselves by work on the railroads, ranches, etc.; and a year or so ago he dropped 800 from the ration roll permanently as they were sufficiently advanced to care for themselves. A considerable number of the Pine Ridge Indians are working as section men and freight handlers and as construction laborers on the railroads near the reservation.  In such work Mr. Dagenett will cooperate with Agent Brennan in every way possible.

### WORK FOR INDIAN WOMEN.

On the Rosebud Reservation in South Dakota we are making an experiment in furnishing employment to girls and women.  Girls who return home after attendance at either reservation or nonreservation schools find little occupation for minds or hands unless they drift back into the old life or marry Indians who have ambition and enterprise.  On the recommendation of the day-school inspector for the Rosebud Reservation, arrangements have been made to employ educated girls as assistants to the housekeepers of the day schools, and for that purpose the expenditure of $3,000 has been authorized. This will help some of the girls over the roughest part of the inevitable readjustment which comes when they exchange school life for Indian home surroundings.

Furthermore, on the recommendation of the agent, an attempt is being made whereby Indian women of the Rosebud Reservation can be employed under proper management to manufacture garments of various kinds, to be sold to traders and others.  He has been allowed $2,000 with which to make the venture, and he believes that the enterprise will eventually become self-supporting.

As this work began last July, it is still too early to look for results.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

20      REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

## COMMERCIAL AGENT FOR THE SIOUX.

From several of the Sioux reservations complaints have come that the Indians who had had no commercial training were discouraged because of their inability to market advantageously the products of their farms. Here was an opportunity to give timely assistance, and so I decided to try the experiment of having another agent furnished by the Government who should bring products and markets together, just as Mr. Dagenett had brought laborers and employers together.

In December, 1906, the position of commercial agent for the Sioux was established and Henry J. Phillips, then superintendent of the Indian school at Chamberlain, S. Dak., was transferred to the new position. He had had many years of experience with the Indians and was especially interested in this feature of civilization among the Sioux. During the last six months he has spent some time on every Sioux reservation except Standing Rock in North Dakota.

He found that the Indians of the Yankton and Sisseton reservations were doing well enough without aid. They had farms and would have considerable surplus crops besides food products for their own use, and were capable of marketing their crops and transacting their business. On the other hand, few allottees in the Rosebud, Crow Creek, Lower Brulé, Pine Ridge, and Cheyenne River reservations were found to be living on their allotments or making any serious efforts to cultivate them. By visits at their homes and by conferences with the Indians in council, Mr. Phillips has endeavored to induce them to go upon their allotments and raise crops for market; but he reports the immediate outlook not very promising, since this season on most of the reservations nothing but a little garden truck has been planted. Moreover, many of the allotments are such that an experienced white farmer would find it difficult to cultivate them with any profit. Most of the allottees seemed anxious to better their condition; but if they are to become self-supporting as farmers, these Indians must have land which will produce crops, as well as be encouraged to till it and be assisted in procuring a market for whatever they produce. For myself, I hold very radical views on this whole subject. I do not believe that these Indians as a rule will ever make a success of farming, no matter what particular branch they pursue, or no matter how much they are assisted at the outset. I consider the policy of trying to make every Indian into a farmer whether he will or no, which has come down to me through so many years of failure, all wrong in conception and therefore impracticable in execution. But so many good persons still cling to the old notion, that I am stretching every resource at my command to give it the most favorable experiment possible.

Among the obstacles which stand in the way of their becoming self-supporting by farming and stock raising, Mr. Phillips includes

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-031

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 58 of 212   Page ID
#:4074

the day school, because the Indian allotments are widely scattered and often far from the school, and so an Indian can not live on his distant allotment and at the same time keep his children in the school.   Another is the ration system.   On one or two reservations many of the Indians have been dropped from the ration roll, yet on others most of them, including even the able-bodied, receive their customary dole, and naturally are not anxious for work of any kind. Still another drawback is the system of providing artificial work for the Indians on the reservations, for which they are paid by the day a certain sum in lieu of rations.   Mr. Phillips reckons with the fact that even the Indians who have allotments of fairly good farming land are destitute of the faculty of initiative, are unfamiliar with the best methods of work, and as a rule lack the necessary things with which to begin it, and some means of livelihood must be provided while they are improving their land.   This, he thinks, might be accomplished by paying them for certain work of a permanent and beneficial nature done by them on their own allotments, being careful to keep in view the fact that no such nursing process can be continued indefinitely, and giving only such assistance as will make it possible for the allottee to support himself from the products of his allotment.   Mr. Phillips anticipates no trouble in procuring markets presently, in the near-by cities, for anything the Indians may have to sell.

### A WASTEFUL SCHOOL SYSTEM.

To the attentive reader of my reports for the last two years it must have been plain that their argument pointed toward a marked change in the Indian educational establishment, always in the direction of greater simplicity and a more logical fitness to the end for which it was designed.   Such a change must be almost as slow in its complete accomplishment as the upbuilding of the structure whose plans are to be modified.   No one hand can bring it all about; the official term, the powers and the resources of no one commissioner are extensive enough to do more than set the machinery in motion and point out to his successors, the Congress, and the public the reasons for his course, trusting that such an appeal to the national common sense will bear fruit in the continuation at least of the general features of his policy.

I entered office with a purpose, which I have kept steadily in view, to enlarge the system of day-school instruction as opposed to the increase of the boarding schools, and among the boarding schools the preference of those on the reservations to those at a distance.   The subject has been so fully discussed that no elaborate rehearsal of the argument is called for here.   Briefly stated, it pivots on the question whether we are to carry civilization to the Indian or carry the Indian to civilization, and the former seems to me infinitely the wiser plan.



Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-032

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 59 of 212   Page ID #:4075

To plant our schools among the Indians means to bring the older members of the race within the sphere of influence of which every school is a center.   This certainly must be the basis of any practical effort to uplift a whole people.   For its demonstration we do not have to look beyond the border line of our experience with Caucasian communities, where it is obvious that the effect upon the character as well as the intelligence of any neighborhood of having abundant school facilities close at hand is by no means confined to the generation actually under the teachers' daily care.

Though the day-school system is the ideal mechanism for the uplifting of the Indians, we can not yet wholly dispense with boarding schools, because so many tribes still continue the nomadic or seminomadic habits which would require the continual moving of the day schools from place to place in order to keep near a sufficient number of families for their support.   In other cases a tribe which has had its lands allotted to its members individually has become so scattered over a large area that the distances the pupils would have to come and go would be prohibitive of their regular daily attendance at any school or schools, no matter how carefully located with regard to the convenience of the greatest number of possible patrons.   In such instances the difficulties of the situation are reduced to a minimum by a resort to the reservation boarding school, where the children are within easy enough reach of their parents to enable the latter to see them at rather frequent intervals.

But boarding schools, conducted on the basis on which the Government conducts those established for the benefit of the Indians, are an anomaly in our American scheme of popular instruction.   They furnish gratuitously not only tuition—the prime object of their existence—but food, clothing, and permanent shelter during the whole period of a pupil's attendance.   In plain English, they are simply educational almshouses, with the unfortunate feature, from the point of view of our ostensible purpose of cultivating a spirit of independence in the Indians, that the charitable phase is obtrusively pushed forward as an attraction instead of wearing the stamp which makes the almshouse wholesomely repugnant to Caucasian sentiment. This tends steadily to foster in the Indian an ignoble willingness to accept unearned privileges; nay, more, from learning to accept them he presently comes, by a perfectly natural evolutionary process, to demand them as rights and to heap demand upon demand.   The result is that in certain parts of the West the only conception his white neighbors entertain of an Indian is that of a beggar as aggressive as he is shameless.

Was ever a worse wrong perpetrated upon a weaker by a stronger race?   If so, history has failed to record it.   Scores of books have been written within the last generation assailing our white civiliza-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-033

tion for its disregard of the rights of the Indian, seeking their illustrations in the unjustifiable wars opened upon him; in the frauds practiced upon him by unscrupulous traders, contractors, and Government functionaries; in the absorption of his lands, a few thousand acres at a time, at prices which look small indeed beside the valuations at which the same lands have been held since white enterprise has developed them; and yet the authors of these works have been so hypnotized by their abhorrence of such merely physical iniquities that they have overlooked entirely the vastly greater moral damage wrought upon the same victim under the guise of a benevolent desire to civilize him—at long range.  As if self-reliance were not at the very foundation of our own civilization !  The evils of war, of graft, big and little, of business frauds and all other forms of bad faith are capable of remedy in the same monetary terms in which we measure and remedy evils among our own race; but what compensation can we offer him for undermining his character, and doing it by a method so insidious and unfair ?

Unhappily our generation can not go back and make over from the start the conditions which have come down to us by inheritance.  We can, however, do the next best thing, and avoid extending or perpetuating the errors for which we are not responsible, and we can improve every available opportunity for reducing their burden. Just as we have undertaken to free the Indian from the shackles which the reservation system has imposed upon his manhood, so we should recognize it as a duty to free him from the un-American and pauperizing influences which still invest his path to civilization through the schools.  The rudiments of an education, such as can be given his children in the little day school, should remain within their reach, just as they are within the reach of the white children who must be neighbors and competitors of the Indian children in their joint struggle for a livelihood.  Indeed, this being a reciprocal obligation—the right of the child, red or white, to enough instruction to enable him to hold his own as a citizen, and the right of the Government to demand that every person who handles a ballot shall have his intelligence trained to the point that reading, writing, and simple ciphering will train it—I believe in compelling the Indian parent, whether he wishes to or not, to give his offspring this advantage. My interpretation of the duty laid upon me by the statute in this regard has carried me even to the use of physical force and arms in the few instances where reasoning and persuasion failed and the Indians have defied the Government.

For a little while still, as I have said, the reservation boarding schools must stay for lack of something adequate to take their places; but as fast as one of these can be replaced with day schools the

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

change should be made, and I am pleased to have been able, in my short term of office, to give this movement its start.  For the continuance of our 25 nonreservation schools there is no longer any excuse.  We spend on these now nearly $2,000,000 a year, which is taken bodily out of the United States Treasury and is, in my judgment, for the most part a mere robbery of the taxladen Peter to pay the non-taxladen Paul and train him in false, undemocratic, and demoralizing ideas.  The same money, spent for the same number of years on expanding and strengthening the Indians' home schools, would have accomplished a hundredfold more good, unaccompanied by any of the harmful effects upon the character of the race.

But how shall we get rid of the nonreservation schools?  Close them to-morrow, hang out the auctioneer's flag, and appoint a receiver to wind up their business?  That is not necessary.  Revolutions accomplished in a night by drastic methods are rarely so complete or so lasting as those for which more time and thought are taken, and which are left to work themselves out after their momentum is once established.  At the last session of Congress the proposal was seriously made to abolish one or two of these supernumerary schools. I had no hand in giving it the form it took, but I was glad to see the idea coming to the front, as a sign that our lawmakers were of their own accord beginning to consider the subject.  Nothing came of the movement, beyond a brief agitation and a frank exchange of views in the committee rooms; but even this was significant that we had at last come within sight of a turning in the long lane of well-meant folly.  I sincerely hope that this little stir will be renewed in the next Congress and will spread.  The nonreservation schools can be, and ought to be, dropped off one by one or two by two, so as to produce the least practicable disturbance of conditions, but the beginning of their gradual dissolution ought to be no longer deferred.

If not summarily closed and dismantled, like an abandoned army post, how are they to be disposed of?

First of all, the " Indian " element in their composition should be wiped out completely.  Where else does the United States Government maintain special race lines in education?  Does it support free boarding schools for negroes, or for Filipinos, or for the Mexicans who came in under the treaty of Guadalupe Hidalgo, or for any other group of stranger people whom it has taken, wholly or in part, under its protection?  If not, then why for Indians?  In local schemes of popular education, it has pleased certain communities to separate the races according to what seems the best interests of the social vicinage; but for the Government of the United States to do so is quite another proposition.  Everywhere I am striving to erase those lines

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-035

which still rule off the Indian as a separate and distinct civic entity. Ethnically he will always remain an Indian, with an Indian color, Indian traits of mind, Indian ancestral traditions and the like; and I see nothing to deplore in that—indeed, much that is gratifying, for he has abundant reason for all his pride of race.   But as a citizen of our Republic, and an equal sharer with his fellows of every blood in the privileges and responsibilities of their common citizenship, he is not an Indian but an American; and I should be glad to see every mark expunged which tends to keep alive in his mind any civil distinctions to confuse his sense of allegiance.

This proposed obliteration of the exclusively Indian character of the schools can be accomplished by throwing them open to pupils of all races alike.   But the maintenance of institutions of the higher learning, looking to no special end for the national profit, does not seem to me a legitimate function of the United States Government.   I should therefore do one of two things with each school: Either (1) open it to youth of all races as a training school for Government servants of some particular class—as, for instance, for the enlisted men of the Army or for the observers' corps of the Weather Bureau—or (2) sell or give it to the State or the county where it stands.   Such tentative inquiries as I have been able to make have convinced me that a number of communities would welcome gladly such a gift, even if a few conditions were attached.   For example, it seems to me that the Congress could afford to say to a State: " Here is a school plant of some value, in good order.   It has industrial shops, a small farm, school rooms, dormitories which can either be kept for their original purpose or made over for some other.   It was built and equipped as a training school for Indians.   We will make you a gift outright of the whole establishment if you will agree to continue it as an industrial school, and put a proviso into its charter that for the next ensuing ninety-nine years any Indian who wishes an education there may have his tuition free, no matter what you are charging pupils of other races."

Such an arrangement, if adopted and carried into execution, would leave with the ambitious young Indian about enough advantage over the other students at the institution to satisfy the sentimental demands of the situation, without, on the one hand, putting the State to the expense of supplying him with food, clothes or lodging, or, on the other hand, continuing his subjection to the pauperizing and degrading influence of his present gratuities.   Moreover, it is the rule now in operation at Dartmouth College in New Hampshire. That institution, I believe, started its career as an Indian school, and to this day no charge for tuition is levied upon any Indian who

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

26    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

matriculates there.   Both principle and precedent seem to me to harmonize with sound reason.

The only argument with even a color of merit that I have ever heard advanced in favor of the perpetuation of the nonreservation school system was propounded to me this summer by a good woman who has done much benevolent work among our Indian tribes.   After admitting that there was no logical defense for the system under present conditions, she added: " But I shall be sorry to see these schools disappear, for they offer the only chance the children on my reservation have for seeing the outside world."   When I inquired how much of the real outside world a child saw while mewed up within the compound of a school run under the strict institutional discipline necessary in one of these large schools, she admitted that it was little; " Still," she persisted, " they do learn a great deal when they are sent from the school into the homes and farms of the neighborhood, under the ' outing system.' "   I was obliged to remind her that this was actually an argument against the schools, as the " outing " system was so called because it took the children out of a school in order to teach them something they could never learn inside of it. Moreover, as I have explained in earlier reports, I am building up an outing system on a vastly bigger, broader, and more practical basis than was ever known before, and extending it to the schools in the reservations as well as those outside.   The actual employment of the young people, at wages measured by the honest market value of their labor instead of by the artificial standards of philanthropy, will give them a much clearer and more useful view of life than any outing system devised as a part of a school curriculum.   It also has the virtue of serving as a test of character under the very conditions which will confront them when they leave schools of all sorts behind them and join in the universal struggle for a livelihood.

An objection to all boarding schools for Indian children, whether on or off the reservations, is that the pupil grows up amid surroundings which he will never see duplicated in his own home.   Steam heating, electric lighting, mechanical devices for doing everything—these cultivate in him a contempt for the homely things which must make up his environment as a poor settler in a frontier country.   His ideas of the relations of things are distorted; for his mind is not developed enough to enable him to sift and assort his observations and distinguish between essentials and nonessentials, between the comforts which are within his reach and the luxuries which are beyond his legitimate aspirations.   Nay, the cost of maintaining one of these establishments with its army of employees will hardly be appreciated

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 64 of 212   Page ID #:4080

till the inquirer runs his eye over the roster of an average nonreservation school and finds there, under regular salary:

| | |
|---|---|
| 1 superintendent. | 1 engineer. |
| 1 clerk. | 1 assistant engineer. |
| 1 assistant clerk. | 1 physician. |
| 5 teachers. | 1 dairyman. |
| 1 matron. | 1 baker. |
| 2 assistant matrons. | 1 cook. |
| 1 housekeeper. | 1 assistant cook. |
| 1 nurse. | 1 carpenter. |
| 1 seamstress. | 1 blacksmith. |
| 1 laundress. | 1 shoe and harness maker. |
| 1 farmer. | 1 tailor and band leader. |
| 1 teacher of agriculture. | 1 laborer. |

To maintain such a salary list, exclusive of the superintendent's share, and to buy the food and the clothes and the fuel and the hundred other necessaries of this big-scale housekeeping, the Government pays $167 a year for each pupil taken care of. Besides that, it pays by separate appropriations the superintendent's salary, which in this instance is only $1,700, and the cost of transporting the pupils from and to their homes, and sundry additions to the plant like an additional well, or a new boiler house, or a more modern steam engine, $4,000 to $10,000 for "general repairs and improvements," and the like, bringing the total charge up to nearer $200 per pupil. The next school on whose statistics my eye falls has a $2,500 superintendent and 60 employees, including among them, in addition to the classes represented in the list already given, a treasurer of the outing system, a stenographer separate from the clerk and assistant clerks, a disciplinarian, a kindergartner, a music teacher, a stewardess, a superintendent of industries, a hospital cook, a gardener, a wagon-maker, a mason, a painter, a printer, and an assistant printer and librarian. The cost of this school to the Government, pooling all the appropriations, would reach about $250 per pupil. Yet these figures are what remain after we have, in this Office, trimmed down, with what looks like a merciless hand, the estimates turned in by the superintendents in their zeal. And I could cite other cases with larger figures still. The Congress itself does not realize what it is spending uselessly.

Contrast such an exhibit with that presented by the day school, where we have a simple building and a simple equipment and employ only a teacher and a housekeeper; or if the school outgrows the dimensions within which these two persons can do all the necessary work, we employ more teachers. The cost per pupil ranges from about $36 a year to $67, according to the number enrolled in a single school. A safe average for the whole day school system would be $50 per pupil, or from one-fourth to one-fifth what we are spending on each

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-038

28        REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

pupil in the boarding schools. In other words, we can give school privileges to four or five young Indians for what one costs us at a boarding school; or, to make a more sweeping calculation, we are spending to-day at least twice as much as could be be profitably spent to give our whole Indian school population the facilities they actually need, even keeping in mind the need of a few boarding schools still, and this in spite of the fact that at the larger part of our day schools we provide a hot noonday lunch for the little people and help out the parents in clothing them suitably for attendance. No taxpayer would begrudge the expenses, in itself considered, if it really accomplished any lasting good; but when the influence of the existing system in one direction is nullified or possibly reversed in another, the resultant shows that what started as a well-meant extravagance has degenerated into a pernicious waste.

Although, as some of my incidental tests have discovered, public sentiment at large is ready for the application of common-sense principles to the Indian educational scheme, it must not be assumed that any disturbance of a well-rooted abuse can be accomplished without some trouble. The resistant force of error long persisted in is great.

For example, the Government's original investment in the non-reservation schools would, if footed up, represent some $3,000,000. There are not a few prudent economists who would put forward the amount of this fixed capital as an argument for continuing to spend an equal sum every two years on current expense account for something we do not need.

Again, there will come to the front the persons, either public men or prominent private citizens, who have procured the establishment of the nonreservation schools in or near their home towns, expecting that these institutions would stand forever as monuments to the authors of their being and as show places to attract visitors. The townspeople in many cases will doubtless object to any movement on the part of the Government calculated to alter the character, reduce the prestige, or imperil the local profitableness of their particular Indian school. "Abandon all the rest, if you must," they will plead, "but spare ours."

Yet again, there will come opposition from an element in the community who are public-spirited in a general way but uninformed as to details and not much interested in them; who believe, as a fundamental tenet in the creed of good citizenship, in "education," without having considered the real meaning of the term; who, visiting a public institution of any sort, found their judgment of its merits on the neatness of the lawns and the cleanliness of the buildings, the orderly way in which the inmates march to and from their meals or recite formulas in concert in the assembly hall. They

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 66 of 212   Page ID
#:4082

regard the well-dressed and well-fed Indian child who can reel off the
list of Presidents, or draw a map in colors, as " civilized," without
asking a further question as to what becomes of him after quitting
school for good.

Finally, perhaps, an undercurrent of hostility will be felt, though
for obvious reasons it will not show itself on the surface at once,
which a keen discernment can trace to its origin within the ranks of
the Indian Service itself. Its motive force is a fear lurking in the
breasts of a certain class of employees, lest the dissolution of the
nonreservation schools will mean the loss of their " jobs." I wish,
however, to record here my belief that this factor will be the least
potent of all we shall have to reckon with; for it is a fact that the
members of the great rank and file of the Service are as true men and
women, and as loyal subordinates, as can be found anywhere in the
public employ. The timid ones at this juncture will be those who
are conscious of their own lack of conspicuous merit or those who
have been so long running in a rut that the prospect of being jarred
out of it appalls them.

To meet these several criticisms in their order I would ask the
privilege of saying:

(1) Because the Government has built up a system which changed
conditions have rendered no longer effective for good, there is no rea-
son why it should continue pouring out its money in the same interest
when it can put this money to better use elsewhere. That is poor
economy, and worse progress.

(2) The town in which an Indian school is situated may still have
an institution of which it can afford to be proud, and the first pro-
jector of the Indian school may have just as firm and lasting a monu-
ment, if the school is made over to the local authorities and main-
tained still for educational purposes, but not exclusively for one race.

(3) The public-spirited citizen who believes education to be at the
bottom of all advancement in a country like ours ought surely to wel-
come the broadening of the scope of a school, and if the same money
now spent on putting an " institutional " brand on the children of our
red brethren—the greatest lovers of free life and haters of " institu-
tionalism " to be found anywhere in the world—is diverted so as to
fit a good many more of these children to pursue intelligently the only
livelihood open to them, it seems to me that it is bound to bring a big-
ger harvest of genuine civilization.

(4) There is no cause for alarm among workers in the Indian field
because our Service may be shorn of an outer fringe no longer of any
practical utility to the cause for which it exists. If it would be right
to continue a useless appendage because it means a pay roll for a few
more employees, it would be right to keep the Indians in ignorance
and economic bondage indefinitely because the complete solution of

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-040

the problem will mean the abolishment of the Office of Indian Affairs and the entire establishment dependent on it. But, passing from the moral point of view to the narrow one of personal interest, all the men and women who are doing good work will continue to be needed for a longer time to come than they will generally need their places or their pay. The concentration of the work means simply that, as workers drop out of the ranks through death or voluntary preference for other occupations, the vacancies they leave will by degrees go unfilled, and the equilibrium between the amount that is still to be done and the number who are to do it be thus maintained.

I may here, in concluding my remarks on this subject, expand my suggestion in an earlier paragraph that the nonreservation schools might better be abandoned by degrees than at one swoop, by adding that this gradual process would insure the survival for a number of years of a certain few of the schools which are still doing work of a value entitling them to special consideration. I have in mind one such in the interior of the country and one in the heart of the South- west, and one or two on the Pacific coast. For instance, at one of these is maintained an excellent business course, where ambitious young Indians can learn stenography, typewriting, bookkeeping, and other arts fitting them for clerical positions in which they not seldom excel; at another the boys of a mechanical bent—and of these there are a good many—learn enough about boilers and engines and the like to enable them to get work in the railroad roundhouses and the ma- chine shops which the rapid development of the West is bringing in its train; at another, great stress is laid upon the training of the girls for domestic employment in homes where the quality of the service counts for more than its quantity. Moreover, a few of these schools afford educational facilities to Indians so scattered as to put local groupings quite out of the question, yet tributary to commu- nities which either rule untaxed Indians entirely out of the com- mon schools or give them a kind of reception more discouraging than flat exclusion.

Is it too much to hope that the views here set forth may have your approval and be presented to the Congress in due season with a favorable recommendation, as outlining the positive policy of the Department?

### LIQUOR TRAFFIC IN THE INDIAN COUNTRY.

The hope expressed in my last report that the sale of intoxicating liquors to Indians would be greatly diminished by the employment of special officers out of the fund appropriated for the suppression of the liquor traffic (34 Stat. L., 328) has been realized beyond all expectation.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

The most important field of operations has been in the Indian Territory and Oklahoma, for which exclusively the Congress had set apart $15,000 of the total appropriation of $25,000. To this field Special Officer William E. Johnson was assigned. He was selected for appointment because he had already proved not only his capacity for the sort of work to be demanded of him, but his absolute contempt for danger in the performance of a difficult task. He entered upon duty in the Indian Territory early in August, 1906, and soon discovered that one of the most serious obstacles in his way was the congested condition of business in the courts. Owing to the rapid development of the Territory, the volume of this business had far outstripped the machinery provided for disposing of it. On the dockets of the United States courts in the four districts of the Indian Territory there were approximately 6,000 criminal cases pending besides an equal multitude of civil cases, and, with only eight judges to handle everything, the end was far to seek.

Most of the railway companies had rules forbidding the shipment of intoxicating liquors into the Territory; but such rules, owing to the fierce competition between the roads, had fallen into general disuse. A great quantity of spirituous liquors was coming in by express without hindrance, except as individual United States marshals and their deputies made occasional seizures, and these sporadic checks accomplished little of permanent value.

Brewers outside of the Territory also were openly shipping in low-grade beers under various aliases, such as Uno, Ino, Longhorn, Mistletoe, Non Tox, Shorthorn, Pablo, Statehood, Waukesha, Reveille, Hiawatha, Tin Top, etc. These would contain at first less than 2 per cent of alcohol; but after a market for them had been established, the percentage would generally be raised to about that of full-strength beer. The outside wholesalers, moreover, had a trick of shipping in large quantities of whisky concealed in their shipments of low-grade beers; and the retail dealers inside of the Territory would use the innocent-appearing beers as a cloak under which to conduct, in one way and another, a lively traffic in whisky.

Most of the "joints" at which the low-grade beers were sold were connected with gambling houses and other resorts of vice. The marshals and district attorneys had made several attempts to cope with this evil, usually with temporary success; but as these attempts were not made in all the districts simultaneously, and the congested condition of the courts prevented their handling in an effective manner such cases as they had, a joint keeper would be able to secure a foothold in one district, and use that as a base for reaching into all the other districts.

At the time of Mr. Johnson's arrival, the low-grade beer joints were in operation substantially without hindrance in nearly every part of the Territory, and 353 of them were paying special taxes to

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from UNIVERSITY OF MICHIGAN

32     REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

the revenue establishment as "retail dealers in malt liquors." The beers they were selling were largely full-strength beers.

Believing that the railways and these beer joints were the chief factors in the problem before him, Mr. Johnson addressed his attention directly to them. Though nearly every train brought in whisky, the express companies and railways generally denied the right of officers to search their cars. Mr. Johnson insisted on his right to search for evidence where a crime had been committed, and in cases where a warrant was demanded he offered to procure one, but warned agents everywhere that, if he were put to this trouble and found the whisky, he would immediately arrest them on the charge of introducing liquor. By degrees the objections were withdrawn, and thus his right of search became recognized, and by parity of reasoning the right of deputy marshals also. The increased seizures of whisky resulted in putting a considerable check upon such shipments.

The next attack was upon the traffic in low-grade beers. Mr. Johnson procured samples of every brand of these drinks which were sold in the Indian Territory, and submitted them to a chemist for analysis to ascertain the percentage of alcohol and whether malt was used in their production, and to a bacteriologist for examination to ascertain whether they were fermented products. The experts who passed judgment on the beers were men of the highest professional standing in Oklahoma, whose testimony was not only safe in itself, but bound to be satisfactory to the public at large. Their investigations showed that some of the samples contained but little less alcohol than straight beer, that all were malt products, and that all were fermented.

Mr. Johnson submitted the reports of the scientists to the four United States attorneys in the Indian Territory, each of whom gave him a written opinion that the introduction of the disguised beers into the Territory, and their sale there, were prohibited by the act of 1895. He then held conferences in St. Louis, Chicago, and Kansas City with the general superintendents of all express companies and the general traffic managers of all of the railways doing business in the Indian Territory, who, without exception, issued general orders to their agents to refuse further shipments of the brewery products mentioned, if destined for points in the Territory, and also to exercise great watchfulness against liquor concealed in packages of other freight. These sweeping orders had the effect of closing up substantially every one of the low-grade beer joints in the Territory. Attempts at smuggling were made here and there, but with little success.

A few months later, however, a scheme was devised to have these low-grade beers shipped clear through the Territory to some point in an adjoining State and have the freight paid all the way through,

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google        Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 70 of 212   Page ID
#:4086

and then replevin the shipment in some local court when the car had reached the desired point in the Territory.  Inasmuch as such shipments constituted interstate traffic, they could not be interfered with until after they had come into possession of the purchaser; and thus a considerable number of the old joints have recently reopened in the western, southern, and northern districts.  In the central district, where the United States attorney's office was able to lend particularly effective aid, the joints have been kept closed; and even in the other districts his unceasing campaign of harassment has resulted in keeping the beer down to a very low alcoholic standard.

The sincere cooperation of the railways and express companies in enforcing the law stimulated the ingenuity of the smugglers, who devised schemes for bringing in liquor concealed in gripsacks and trunks, checked as baggage, and for transporting it overland in wagons.  By stationing deputy marshals and Indian police at strategic points, however, it has been possible to seize trunks and hand bags containing whisky in transit on the trains, and a discouraging blow has thus been dealt to traffic of this character.

Here again, the Congress came promptly to the aid of the Office in its work of enforcing the law.  Section 2140 of the Revised Statutes confers upon Indian agents, subagents, superintendents, and commanders of military posts on Indian reservations, certain powers of search and seizure in liquor cases, and also empowers such officers to seize and sell, under libel proceedings, teams, wagons, boats, goods, and peltries which are used by persons in transporting liquors into the Indian Territory.  The current Indian appropriation act (34 Stat. L., 1017) carried the matter one step further, providing that—

* * * the powers conferred by section twenty-one hundred and forty of the Revised Statutes upon Indian agents and subagents, and commanding officers of military posts are hereby conferred upon the special agent of the Indian Bureau for the suppression of the liquor traffic among Indians and in the Indian country and duly authorized deputies working under his supervision.

Availing himself of this authority, Mr. Johnson has seized 32 horses, 13 wagons, 13 sets of double harness, and 5 saddles, which have brought at public sale $482.  During the eleven months ended on June 30, he and his deputies have made 902 separate seizures, and destroyed intoxicating liquors in the following quantities:

| | | |
|---|---|---:|
| Alcohol | gallons | 269 |
| Choctaw beer | do | 247 |
| Spiked cider | do | 3,329 |
| Intoxicating bitters | bottles | 3,286 |
| Beer | pints | 4,637 |
| Wine | do | 286 |
| Low-grade beer | do | 25,949 |
| Whisky | do | 28,559 |
| Brandy and liqueurs | do | 175 |

22849—08——3


Digitized by Google        Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

CVWD 563-044

34        REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

And these statistics, be it understood, do not include any of the seizures made by deputy marshals, or the considerable number of shipments, information of which came to our special officer so that he could intercept them by long-distance telephone communications to local authorities.

It has been Mr. Johnson's uniform practice to cooperate with the United States marshals and their deputies on the theory that he was sent to the Territory to assist rather than to instruct other Federal officers stationed there. Hence he and his deputies have always turned over their prisoners to the nearest deputy marshal immediately after arrest. During the eleven months of his service, he and his deputies have made, or directly caused to be made, 491 arrests in whisky cases that have resulted in grand jury indictments, though in a considerable number of instances the indictment was procured first and the arrest followed. This list is exclusive of arrests in cases where the United States commissioner failed to bind the prisoner over to the grand jury, as well as of many arrests made by deputy marshals on information furnished by him.

Owing to the fact that nearly all the gamblers in the Indian Territory also traffic in whisky or are active abettors of whisky peddling, Mr. Johnson has had occasion to make war upon these people, and his raids have resulted in the conviction of 52 gamblers and the destruction of 49 gambling houses and the collection of nearly $1,500 in fines. The value of the gambling paraphernalia captured has been estimated at some $12,000. Arrests in other cases incidental to his work but not exclusively for traffic in intoxicants have been more or less frequent, and include 7 for the high crime of murder.

These results have not been attained without hardship and peril. Two of Mr. Johnson's men and one posse man have been killed in skirmishes with boot-leggers, and 10 violators of the liquor laws have met a like fate. Mr. Johnson has had several narrow escapes himself, and during a good part of the time has worked in the face of a reward of $3,000 offered by outlaws for his assassination. His courage and devotion to duty deserve the highest praise. I know of no more efficient officer in the Indian Service; and indeed I may safely give him the credit of turning what used to be a rather dreary farce into an actual accomplishment in the enforcement of the acts of Congress forbidding the liquor traffic in the Indian Territory.

In July, 1906, Jesse E. Flanders, who had been an efficient clerk in our agency service and had shown what seemed to me a rather notable detective instinct, was assigned to duty as a special officer in Arizona and New Mexico, and was later sent into Colorado and Nevada. He has visited most of the reservations in these States and Territories, and has effected the conviction of a number of violators of the laws,

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 72 of 212   Page ID
#:4088

and several suspects whom he has arrested are now under indictment and awaiting trial.

John W. Green, formerly an officer of the Philippine Constabulary, was appointed one of our special officers on the 1st of January, 1907, entered upon duty early in that month, and has operated during the remainder of the fiscal year in Washington and Idaho. The conditions in these States, particularly among the Yakima Indians, were deplorable. Having been allotted, the Indians had come within the decision of the Supreme Court in the Heff case, and the county authorities were unwilling to put the taxpayers to any expense in enforcing the laws of the State against the sale of liquor to Indians. At North Yakima 22 saloons were open to Indians, and at other places they had no difficulty in obtaining all the liquor they wished. Mr. Green reports that he visited every liquor dealer in North Yakima and called several meetings, and on February 6 succeeded in getting all of them to sign an agreement not to sell or otherwise dispose of liquor to Indians or to anyone known as a peddler to Indians. On June 30 he reported that he had recently received letters from North Yakima saying that an Indian could scarcely buy a glass of lemonade there, so well were the saloon men keeping their agreement. He also appealed to the county and city authorities at this and other places, and induced them to pass ordinances imposing a fine and revocation of license on any person who should be found guilty of selling liquor to Indians or to Indian liquor peddlers. He seems to have taken the only means available to stop the traffic thereabout with allotted Indians, and to have stirred up a public sentiment which I think will go as far as anything can toward accomplishing the desired result.

In Idaho he has operated along the same lines with considerable success. The case of George Dick (referred to in my last annual report) is still pending in the Supreme Court, and will probably be disposed of during the October term of that court. It is hoped that the decision will be such as to permit a vigorous enforcement of the liquor laws of the United States among the Nez Perce Indians, as contemplated in the agreement with them.

The current Indian appropriation act makes another appropriation of $25,000 for the suppression of the liquor traffic. An additional special officer has been appointed and assigned to duty in Nebraska, and by the time this report goes into print I am in hope of having still another at work in the Southwest.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google        Original from
UNIVERSITY OF MICHIGAN

CVWD 563-046

36      REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

### SETTLEMENT OF CLAIMS AGAINST INDIANS.

The unusual amount of money which has lately come into the possession of Indians through sales of their inherited lands has occasioned great activity in the business of presenting claims against the Indians, many of them absolutely fraudulent.

Particularly aggravated cases arose among the Winnebago in Nebraska, and, after an unsuccessful attempt to have the claims satisfactorily adjusted by an inspector, with the approval of this Office the Indian debtors employed J. A. Singhaus of Tekamah, Nebr., to effect settlements for them. Contracts with him were filed in this Office, which provided that he should be allowed from the amount saved to the Indians 10 per cent for fees and 1 per cent for expenses. The 123 claims filed in the Office aggregated $54,763.68. A reduction of $29,842.06 was obtained by the attorney, and his commission and expenses amounted to $2,686.30, being a net saving to the Indians of 49.6 per cent of the original amount of the claims. On palpably fraudulent claims, which could be thrown out without examination, no commission was given. The Indians have employed Mr. Singhaus to procure settlement of other claims which have not yet been filed.

Settlements have been effected at other agencies, but without the employment of an attorney by the Indians. A special agent who investigated claims against Indians in Oklahoma and Kansas settled them at an average reduction of 50 cents on the dollar, and, it is believed, without causing any loss to honest creditors. In fact, after some of these settlements had been effected it was learned that the Indians had paid dollar for dollar for value received, and that the 50 per cent or thereabouts saved to them represented padded accounts and transactions which would not bear strict investigation.

The Office is trying through its field force to exercise a strict supervision over the expenditures made by the Indians from their trust funds, and many Indians have put their money into the building of homes and the purchase of farming implements. The total proceeds from inherited land sales up to June 30, 1907, amounted to $5,680,820, and they will probably be greater each year as the value of reservation lands increases.

### EDUCATION.

### GOVERNMENT SCHOOLS.

Twenty-five nonreservation schools were maintained during the year, to which will be added Wahpeton, S. Dak., which will be opened during the fiscal year 1908. This school, which was authorized in 1904, is the only nonreservation school established in the last five years. The aggregate enrollment in these schools for the year was

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-047

9,485, with an attendance of 8,495, an increase in each, respectively, of 206 and 110.   Detailed statistics are given in this table:

*Location, date of opening, attendance, etc., of nonreservation schools during the fiscal year ended June 30, 1907.*

| Location of schools. | Date of opening. | Number of employees.[a] | Capacity. | Enrollment. | Average attendance. |
|---|---|---|---|---|---|
| Carlisle, Pa | Nov.  1,1879 | 82 | [b]1,200 | 1,034 | 958 |
| Chemawa, Oreg. (Salem) | Feb. 25,1880 | 42 | 600 | 545 | 489 |
| Chilocco, Okla | Jan. 25,1884 | 73 | 700 | 886 | 703 |
| Genoa, Nebr | Feb. 20,1884 | 30 | 330 | 320 | 303 |
| Albuquerque, N. Mex | Aug.  —,1884 | 30 | 300 | 322 | 275 |
| Lawrence, Kans. (Haskell Institute) | Sept.  1,1884 | 69 | 750 | 840 | 764 |
| Grand Junction, Colo | —  —,1886 | 24 | 200 | 262 | 229 |
| Santa Fe, N. Mex | Oct.  —,1890 | 34 | 300 | 335 | 323 |
| Fort Mohave, Ariz | Dec.  —,1890 | 21 | 200 | 210 | 198 |
| Carson, Nev | do | 25 | 250 | 283 | 260 |
| Pierre, S. Dak | Feb.  —,1891 | 17 | 180 | 158 | 148 |
| Phoenix, Ariz | Sept.  —,1891 | 62 | 700 | 769 | 704 |
| Fort Lewis, Colo | Mar.  —,1892 | 25 | 200 | 242 | 192 |
| Fort Shaw, Mont | Dec. 27,1892 | 31 | 335 | 347 | 321 |
| Flandreau, S. Dak. (Riggs Institute) | Mar.  7,1893 | 38 | 375 | 421 | 392 |
| Pipestone, Minn | Feb.  1,1893 | 22 | 225 | 226 | 212 |
| Mount Pleasant, Mich | Jan.  3,1893 | 34 | 330 | 350 | 341 |
| Tomah, Wis | Jan. 17,1893 | 28 | 275 | 255 | 229 |
| Wittenberg, Wis | [c]Aug. 24,1895 | 14 | 120 | 130 | 120 |
| Greenville, Cal | [c]Sept. 25,1895 | 10 | 90 | 97 | 85 |
| Morris, Minn | Apr.  3,1897 | 21 | 160 | 168 | 162 |
| Chamberlain, S. Dak | Mar.  —,1898 | 23 | 200 | 247 | 215 |
| Fort Bidwell, Cal | Apr.  4,1898 | 10 | 100 | 79 | 65 |
| Rapid City, S. Dak | Sept.  1,1898 | 27 | 250 | 272 | 247 |
| Riverside, Cal | July  1,1902 | 50 | 500 | 687 | 560 |
| Total | | 842 | 8,870 | 9,485 | 8,495 |

[a] Excluding those receiving less than $100 per annum.
[b] 1,500 with outing pupils.
[c] Previously a contract school.

Ninety-one boarding schools were conducted on Indian reservations, an increase of one over the last previous year.   The day schools at Green Bay Agency, Wis., and at San Juan, Navaho Reservation, N. Mex., were merged into boarding schools.   The Omaha Boarding School, Nebraska, was converted into a day school, in order to take up the excess pupils in the public schools of the reservation.

The boarding schools had a total enrollment of 11,019, an increase of 12, and an average attendance of 9,520, a decrease of 128.   Data as to their location, organization, etc., are given in the following table:

*Location, date of opening, capacity, and average attendance of Government reservation boarding schools during the fiscal year ended June 30, 1907.*

| Location. | Date of opening. | Capacity. | Enrollment. | Average attendance. |
|---|---|---|---|---|
| **Arizona:** | | | | |
| Colorado River | May  1,1879 | 100 | 114 | 110 |
| Keams Canon (Moqui) | —,1887 | 160 | 250 | 191 |
| Western Navaho | July  1,1889 | 80 | 91 | 84 |
| Navaho | Dec. 25,1881 | 220 | 247 | 233 |
| Pima | Sept.  —,1881 | 250 | 237 | 208 |
| Fort Apache | Feb.  —,1894 | 150 | 159 | 155 |
| Rice Station | Dec.  3,1900 | 216 | 216 | |
| Havasupai | July  1,1900 | 55 | 53 | |
| Truxton Canyon | Apr.  1,1901 | 125 | 101 | |
| **California:** | | | | |
| Fort Yuma | Apr.  —,1884 | 180 | 110 | |
| Hoopa Valley | Jan. 21,1893 | 146 | 174 | |
| Round Valley | Aug. 15,1881 | 125 | 116 | |
| **Colorado:** | | | | |
| Southern Ute | Nov. 19,1902 | | 95 | |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-048

38      REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Location, date of opening, capacity, and average attendance of Government reservation boarding schools, etc.—Continued.*

| Location. | Date of opening. | Capacity. | Enrollment. | Average attendance. |
|---|---|---|---|---|
| Idaho: | | | | |
| Fort Hall | — —, 1874 | 115 | 152 | 147 |
| Fort Lapwai | Sept. —, 1886 | 150 | 131 | 105 |
| Lemhi | Sept. —, 1885 | 75 | 66 | 60 |
| Indian Territory: | | | | |
| Seneca (Quapaw) | June —, 1872 | 130 | 163 | 122 |
| Iowa: | | | | |
| Sac and Fox | Oct. —, 1898 | 80 | 68 | 62 |
| Kansas: | | | | |
| Kickapoo | Oct. —, 1871 | 70 | 79 | 74 |
| Potawatomi | — —, 1873 | 80 | 62 | 56 |
| Minnesota: | | | | |
| White Earth | — —, 1871 | 134 | 159 | 125 |
| Pine Point | Mar. —, 1892 | 75 | 91 | 76 |
| Wild Rice River | ....do ..... | 65 | 86 | 72 |
| Bena | Jan. 1, 1901 | 40 | 67 | 57 |
| Cass Lake | Jan. —, 1901 | 50 | 56 | 50 |
| Cross Lake | ....do ..... | 50 | 65 | 50 |
| Leech Lake | Nov. —, 1867 | 60 | 110 | 90 |
| Red Lake | Nov. —, 1877 | 80 | 116 | 91 |
| Vermilion Lake | Oct. —, 1899 | 150 | 61 | 49 |
| Montana: | | | | |
| Blackfeet | Jan. —, 1883 | 75 | 88 | 77 |
| Crow | Oct. —, 1884 | 150 | 109 | 92 |
| Pryor Creek | Feb. —, 1903 | 50 | 52 | 49 |
| Flathead | Feb. 4, 1901 | 36 | 51 | 45 |
| Fort Belknap | Aug. —, 1891 | 120 | 183 | 117 |
| Fort Peck | Aug. —, 1881 | 200 | 159 | 181 |
| Tongue River | Sept. 1, 1904 | 75 | 83 | 64 |
| Nebraska: | | | | |
| Winnebago | Sept. 15, 1901 | 90 | 83 | 74 |
| Santee | Apr. —, 1874 | 80 | 92 | 75 |
| Nevada: | | | | |
| Nevada | Nov. —, 1882 | 60 | 65 | 58 |
| Western Shoshoni | Feb. 11, 1893 | 80 | 80 | 73 |
| New Mexico: | | | | |
| Mescalero | Apr. —, 1884 | 130 | 112 | 104 |
| Tohatchi (Little Water) | July 1, 1899 | 125 | 109 | 95 |
| San Juan | *a*Feb. 24, 1907 | 100 | 107 | 75 |
| Jicarilla | Oct. 19, 1903 | 125 | 134 | 115 |
| Zuñi | Nov. —, 1896 | 60 | 100 | 76 |
| North Carolina: | | | | |
| Cherokee | Jan. 1, 1893 | 170 | 190 | 141 |
| North Dakota: | | | | |
| Fort Totten | — —, 1874 | 350 | 387 | 295 |
| Fort Berthold | Apr. 2, 1900 | 107 | 117 | 105 |
| Standing Rock (Agency) | May —, 1877 | 186 | 175 | 154 |
| Standing Rock (Martin Kenel) | — —, 1878 | 100 | 128 | 114 |
| Standing Rock (Grand River) | Nov. 20, 1893 | 140 | 139 | 124 |
| Oklahoma: | | | | |
| Shawnee | M y —, 1872 | 100 | 150 | 121 |
| Arapaho | De . —, 1873 | 150 | 107 | 101 |
| Cheyenne | — —, 1879 | 140 | 121 | 117 |
| Cantonment | May 1, 1899 | 80 | 98 | 61 |
| Red Moon | Feb. —, 1898 | 70 | 34 | 32 |
| Fort Sill | Aug. —, 1893 | 180 | 175 | 168 |
| Rainy Mountain | Sept. —, 1893 | 124 | 143 | 135 |
| Riverside | Sept. —, 1871 | 150 | 153 | 142 |
| Kaw | Dec. —, 1869 | 44 | 42 | 39 |
| Osage | Feb. —, 1874 | 180 | 144 | 137 |
| Pawnee | — —, 1865 | 120 | 110 | 105 |
| Ponca | Jan. —, 1883 | 100 | 106 | 104 |
| Oto | *b*Sept. 19, 1904 | 85 | 74 | 58 |
| Sac and Fox | Jan. —, 1868 | 100 | 76 | 68 |
| Seger | Jan. 11, 1893 | 150 | 113 | 107 |
| Oregon: | | | | |
| Grande Ronde | Apr. 1, 1874 | 90 | 58 | 50 |
| Klamath | Feb. —, 1874 | 110 | 122 | 108 |
| Yainax | Nov. —, 1882 | 80 | 76 | 60 |
| Siletz | Oct. —, 1873 | 84 | 62 | 55 |
| Umatilla | Jan. —, 1883 | 100 | 104 | 88 |
| Warm Springs | Nov. —, 1897 | 150 | 109 | 91 |
| South Dakota: | | | | |
| Cheyenne River | Apr. —, 1893 | 144 | 180 | 166 |
| Crow Creek | — —, 1874 | 120 | 107 | 99 |
| Springfield | Aug. 1, 1895 | 60 | 69 | 57 |
| Lower Brulé | Oct. —, 1881 | 130 | 59 | 53 |
| Pine Ridge | Dec. —, 1883 | 210 | 226 | 209 |

*a* Conducted as a day school last year.
*b* School burned Sept. 10, 1902; reopened Sept. 19, 1904.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-049

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.    39

*Location, date of opening, capacity, and average attendance of Government reservation boarding schools, etc.—Continued.*

| Location. | Date of opening. | Capacity. | Enrollment. | Average attendance. |
|---|---|---|---|---|
| **South Dakota—Continued.** | | | | |
| Sisseton | —— —,1873 | 100 | 94 | 78 |
| Rosebud | Sept. —,1897 | 168 | 157 | 137 |
| Yankton | Feb. —,1882 | 120 | 107 | 88 |
| **Utah:** | | | | |
| Uintah | Jan. —,1881 | 67 | 84 | 72 |
| Panguitch | Oct. 2,1900 | 30 | 36 | 30 |
| **Washington:** | | | | |
| Colville | July 1,1899 | 200 | 138 | 71 |
| Puyallup | Oct. —,1873 | 175 | 173 | 125 |
| Tulalip | aJan. 23,1905 | 134 | 157 | 141 |
| Yakima | —— —,1860 | 150 | 130 | 102 |
| **Wisconsin:** | | | | |
| Green Bay | b—— —,1876 | 75 | 104 | 82 |
| Oneida | Mar. 27,1893 | 200 | 204 | 197 |
| La Pointe (Lac du Flambeau) | July 6,1895 | 250 | 213 | 201 |
| Hayward | Sept. 1,1901 | 215 | 228 | 212 |
| **Wyoming:** | | | | |
| Shoshoni | Apr. —,1879 | 180 | 193 | 177 |
| Total | | 10,985 | 11,019 | 9,520 |

a Burned Jan. 29, 1902; reopened Jan. 23, 1905.
b Burned Jan. 18, 1905; opened as day school Feb. 9, 1905; conducted as a day school last year.

One hundred and sixty-three day schools were actually in operation during the year, as against 146 in the year before. As two of the day schools in 1906, Green Bay and San Juan, were temporary day schools pending the completion of the boarding-school buildings, the total shows a gratifying increase in these important schools of 19, and none were abandoned during the year. The new schools are, 4 on the Colville Reservation, Wash.; 1 on Flathead and 3 on Fort Peck, Mont.; 1 on Fort Apache, Ariz.; 1 on Rosebud, S. Dak.; 1 each on Fort Totten and Standing Rock, N. Dak.; 1 on Warm Springs, Oreg.; 2 on White Earth, and 1 on Nett Lake, Minn.; 1 on Omaha, Nebr.; 1 on Zuñi, N. Mex., and 1 at Navajo Springs, Colo. A number of new plants are now under consideration. The distribution and statistics of day schools are shown in the following table:

*Location, capacity, enrollment, and average attendance of Government day schools during the fiscal year ended June 30, 1907.*

| Location. | Capacity. | Enrollment. | Average attendance. |
|---|---|---|---|
| **Arizona:** | | | |
| Camp McDowell | 40 | 18 | 13 |
| **Fort Apache—** | | | |
| Cibicu | 45 | 50 | 44 |
| Canyon | 40 | 41 | 38 |
| **Moqui—** | | | |
| Oraibi | 156 | 147 | 114 |
| Polacco | 61 | 54 | 49 |
| Second Mesa | 100 | 118 | 105 |
| **Pima—** | | | |
| Blackwater | 36 | 33 | 20 |
| Casa Blanca | 40 | 37 | 28 |
| Gila Crossing | 46 | 36 | 28 |
| Lehi | 40 | 19 | 17 |
| Maricopa | 40 | 25 | 24 |
| Salt River | 30 | 33 | 25 |


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-050

*Location, capacity, enrollment, and average attendance of Government day schools during the fiscal year ended June 30, 1907—Continued.*

| Location. | Capacity. | Enroll-ment. | Average attend-ance. |
|---|---|---|---|
| Arizona—Continued. | | | |
| San Carlos— | | | |
| San Carlos | 100 | 42 | 37 |
| Western Navaho— | | | |
| Moencopi | 29 | 38 | 34 |
| California: | | | |
| Big Pine | 30 | 25 | 19 |
| Bishop | 50 | 28 | 15 |
| Independence | 30 | 23 | 15 |
| Manchester | 20 | 18 | 10 |
| San Jacinto— | | | |
| Coahuilla | 25 | 24 | 15 |
| Martinez | 26 | 28 | 22 |
| Potrero | 30 | 21 | 13 |
| Soboba | 34 | 17 | 13 |
| Tule River | 17 | 80 | 15 |
| Pala— | | | |
| Pala | 30 | 35 | 25 |
| La Jolla | 30 | 13 | 8 |
| Pechanga | 26 | 27 | 24 |
| Rincon | 26 | 20 | 15 |
| Mesa Grande— | | | |
| Mesa Grande | 20 | 20 | 12 |
| Capitan Grande | 27 | 9 | 8 |
| Volcan | 30 | 19 | 15 |
| Ukiah | 20 | 14 | 8 |
| Colorado: | | | |
| Navaho Springs | 20 | 20 | 17 |
| Kansas: | | | |
| Great Nemaha | 40 | 28 | 18 |
| Sac and Fox | 42 | 32 | 17 |
| Michigan: | | | |
| Bay Mills | 32 | 35 | 21 |
| Minnesota: | | | |
| Birch Cooley | 36 | 22 | 15 |
| White Earth— | | | |
| Beaulieu | 30 | 24 | 20 |
| Buffalo River | 30 | 22 | 13 |
| Pembina | 40 | 32 | 18 |
| Porterville | 30 | 38 | 22 |
| White Earth | 40 | 51 | 22 |
| Attending Leech Lake Boarding School (day pupils) | | 16 | 12 |
| Nett Lake | 25 | 37 | 21 |
| Montana: | | | |
| Blackfeet— | | | |
| Cut Finger | 30 | 23 | 13 |
| Willow Creek | 28 | 13 | 6 |
| Flathead | 30 | 35 | 18 |
| Fort Peck (4 schools) | 120 | 117 | 91 |
| Tongue River | 32 | 33 | 22 |
| Nebraska: | | | |
| Omaha | 60 | 22 | 11 |
| Nevada: | | | |
| Moapa River | 30 | 14 | 9 |
| Walker River | 32 | 29 | 18 |
| Fort McDermitt | 65 | 65 | 56 |
| New Mexico: | | | |
| Pueblo— | | | |
| Acomita | 32 | 60 | 28 |
| Isleta | 32 | 61 | 38 |
| Laguna | 36 | 43 | 36 |
| McCarty's | 25 | 23 | 15 |
| Mixeta | 20 | 21 | 18 |
| Paguate | 40 | 44 | 30 |
| Paraje | 32 | 23 | 19 |
| San Felipe | 50 | 46 | 41 |
| Seama | 40 | 25 | 20 |
| Cochiti | 26 | 27 | 19 |
| Jemez | 36 | 43 | 33 |
| Nambe | 20 | 26 | 16 |
| Picuris | 16 | 21 | 17 |
| Santa Clara | 30 | 45 | 29 |
| San Ildefonso | 21 | 29 | 24 |
| San Juan | 40 | 58 | 48 |
| Sia | 30 | 29 | 25 |
| Taos | 32 | 77 | 50 |
| Zuni | 30 | 40 | 26 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google      Original from UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 78 of 212   Page ID #:4094

*Location, capacity, enrollment, and average attendance of Government day schools during the fiscal year ended June 30, 1907—Continued.*

| Location. | Capacity. | Enroll-ment. | Average attend-ance. |
|---|---|---|---|
| **North Dakota:** | | | |
| Fort Berthold (3 schools)........................... | 182 | 97 | 73 |
| Fort Totten (4 schools)............................. | 140 | 197 | 94 |
| Standing Rock (6 schools).......................... | 178 | 162 | 126 |
| **Oregon:** | | | |
| Warm Springs— | | | |
| Simnasho........................................ | 30 | 28 | 18 |
| **South Dakota:** | | | |
| Cheyenne River (4 schools)........................ | 95 | 88 | 74 |
| Pine Ridge (30 schools) .......................... | 1,050 | 722 | 564 |
| Rosebud (21 schools) ............................. | 590 | 482 | 382 |
| **Washington:** | | | |
| Colville (4 schools)............................... | 129 | 194 | 124 |
| Neah Bay ........................................ | 70 | 63 | 41 |
| Quileute.......................................... | 42 | 68 | 58 |
| Tulalip— | | | |
| Swinomish...................................... | 60 | 43 | 31 |
| Port Madison................................... | 30 | 37 | 26 |
| Puyallup— | | | |
| Chehalis........................................ | 40 | 12 | 8 |
| Jamestown ..................................... | 24 | 18 | 8 |
| Port Gamble.................................... | 26 | 27 | 14 |
| Toholah (Quinaielt)............................ | 32 | 22 | 12 |
| Skokomish...................................... | 40 | 28 | 13 |
| **Wisconsin:** | | | |
| Stockbridge ...................................... | 40 | 32 | 12 |
| Oneida .......................................... | 40 | 35 | 10 |
| La Pointe (5 schools)............................. | 298 | 252 | 161 |
| **Wyoming:** | | | |
| Shoshone— | | | |
| Arapaho subissue station....................... | 30 | 17 | 13 |
| Total ...................................... | 5,770 | 5,130 | 3,670 |

## PUBLIC SCHOOLS.

Wherever the doors of the district schools are opened by the State authorities to Indian children the opportunity is seized to give them the advantage of education in the same classes and under the same methods prevailing for white children.   A multitude of young Indians are taken into the common schools without charge; but as a special inducement to the State authorities to foster the coeducation of Indians and whites, where other satisfactory arrangements can not be made, a contract is made for payment of a stipulated sum, usually equal to that allowed for white children, for the average attendance of the Indians.   Contracts were made with 12 district schools for 123 Indian pupils, which is nearly twice as many as were made the previous year, and gave an increase of 56 in the number contracted for.   The number of pupils enrolled was 128, an increase of 34, but there was an average attendance of only 58, an increase of just 8 for the year.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-052

42        REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

The following table exhibits the condition of these contracts:

*Public schools in which Indian pupils were placed under contract with the
Indian Bureau during the fiscal year ended June 30, 1907.*

| State. | School district. | County. | Contract number of pupils. | Number of months in session. | Enrollment. | Average attendance. |
|---|---|---|---|---|---|---|
| Nebraska ............... | No. 20 ............... | Cuming ...... | 8 | 9 | 10 | 8— |
| | No. 36 ............... | Knox......... | 15 | 9 | 14 | 8— |
| | No. 1 ............... | Thurston ..... | 19 | 9 | 12 | 4+ |
| | No. 10 ............... | ....do...... | 8 | 7 | 6 | 4— |
| | No. 17 ............... | ....do...... | 12 | 9 | 16 | 5— |
| | No. 17 ............... | ....do...... | 12 | 10 | 28 | 11+ |
| | No. 18 ............... | ....do...... | 5 | 9 | 5 | 2+ |
| | No. 21 ............... | ....do...... | 10 | 9 | 11 | 4— |
| | No. 22 ............... | ....do...... | 10 | 7 | 6 | 1+ |
| | No. 23 ............... | ....do...... | 8 | ............ | a 4 | a2 |
| South Dakota ........... | Yankton Agency. | Charles Mix .. | 6 | 6 | 6 | 2+ |
| | Independent ..... | Stanley....... | 10 | 9 | 10 | 7+ |
| Total............... | | | 123 | ............ | 128 | 58 |

a Estimated; no reports received from this school.

Unfortunately, Indian parents, though often appreciating in a
measure the advantages of coeducation with the whites, are prone to
listen and yield to the trifling objections of their children against
prompt and continuous attendance.   On the other hand, the teachers
are not so diligent as they ought to be in hunting up delinquents.
The following statistics, covering a series of years, will show how
desultory the attendance of Indian pupils has been at these district
schools:

*Number of district public schools, number of pupils contracted for, enrollment,
and average attendance from 1891 to 1907.*

| Year. | Number of schools. | Contract number of pupils. | Enrollment. | Average attendance. | Ratio of average attendance to enrollment. |
|---|---|---|---|---|---|
| | | | | | Per cent. |
| 1891............................................. | 8 | 91 | 7 | 4 | 57+ |
| 1892............................................. | 14 | 212 | 190 | 106 | 56— |
| 1893............................................. | 16 | 268 | 212 | 123 | 58+ |
| 1894............................................. | 27 | 259 | 204 | 101 | 50— |
| 1895............................................. | 36 | 487 | 319 | 192 | 60+ |
| 1896............................................. | 45 | 558 | 413 | 294 | 71+ |
| 1897............................................. | 38 | 384 | 315 | 195 | 62— |
| 1898............................................. | 31 | 340 | 314 | 177 | 57— |
| 1899............................................. | 36 | 359 | 326 | 167 | 51+ |
| 1900............................................. | 22 | 175 | 246 | 118 | 48 |
| 1901............................................. | 19 | 121 | 257 | 131 | 51— |
| 1902............................................. | 16 | 110 | 189 | 98 | 52— |
| 1903............................................. | 12 | 99 | 164 | 81 | 49+ |
| 1904............................................. | 7 | 61 | 97 | 57 | 59— |
| 1905............................................. | 6 | 56 | 84 | 51 | 60+ |
| 1906............................................. | 6 | 67 | 94 | 50 | 53+ |
| 1907............................................. | 12 | 123 | 128 | 58 | 45+ |

## MISSION SCHOOLS.

Most of the Christian bodies of the United States not only have
been zealous in spreading their work among the Indians by mission-
aries, but have supplemented their missions with many schools for

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google                    Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 80 of 212   Page ID #:4096

the children. There are 53 boarding schools—an increase of 3—and 5 day schools reporting to this Office. Their capacity is 5,747, and they have an enrollment of 4,307 and an average attendance of 3,692, an increase, respectively, of 571 and 599. The contract schools are not included in these totals.

The mission schools are under the following auspices: Roman Catholic, 34; Presbyterian, 5; Protestant Episcopal, 6; Congregational, 2; Lutheran, 2; and Evangelical Lutheran, Christian Reformed, Methodist, Baptist, Reformed Presbyterian, and Seventh Day Adventist, each 1; 3 others are undenominational.

The location, etc., of the mission schools and also of the schools under contract are shown in this table:

*Location, capacity, enrollment, and average attendance of mission schools during the fiscal year ended June 30, 1907.*

| Location. | Supported by— | Capacity. | Enrollment. | Average attendance. |
|---|---|---|---|---|
| *Boarding schools:* | | | | |
| Arizona: | | | | |
| Tucson | Presbyterian Church | 150 | 156 | 149 |
| St. Michael's | Catholic Church | 150 | 117 | 97 |
| Pima— | | | | |
| St. John's | do | 175 | 163 | 156 |
| Navaho Extension— | | | | |
| Tolchaco (Navaho Mission) | Independent Mission | 10 | 8 | 8 |
| California: | | | | |
| Banning (St. Boniface) | Catholic Church | 150 | 121 | 100 |
| San Diego (St. Anthony) | do | 120 | 97 | 80 |
| Idaho: | | | | |
| Cœur d'Alene— | | | | |
| De Smet | do | 150 | 95 | 91 |
| Slickpoo (St. Joseph) | do | 70 | 56 | 18 |
| Indian Territory: | | | | |
| Quapaw— | | | | |
| St. Mary's | do | 120 | 40 | 34 |
| Michigan: | | | | |
| Baraga | do | 120 | 24 | 20 |
| Harbor Springs (Holy Childhood). | do | 200 | 110 | 105 |
| Minnesota: | | | | |
| White Earth— | | | | |
| St. Benedict's | do | 150 | 101 | 98 |
| Red Lake— | | | | |
| St. Mary's | do | 100 | 85 | 64 |
| Montana: | | | | |
| Blackfeet— | | | | |
| Holy Family | do | 135 | 87 | 70 |
| Flathead— | | | | |
| St. Ignatius | do | 350 | 205 | 156 |
| Crow— | | | | |
| St. Xavier's | do | 120 | 62 | 54 |
| Fort Belknap— | | | | |
| St. Paul's | do | 90 | 77 | 69 |
| St. Peter | do | 100 | 53 | 50 |
| Fort Peck— | | | | |
| Wolf Point | Presbyterian Church | 30 | 27 | 24 |
| Tongue River— | | | | |
| St. Labre's | Catholic Church | 65 | 52 | 45 |
| Nebraska: | | | | |
| Santee— | | | | |
| Normal Training | Congregational Church | 125 | 111 | 94 |
| New Mexico: | | | | |
| Bernalillo | Catholic Church | 115 | 78 | 75 |
| Santa Fe— | | | | |
| St. Catherine's | Methodist Episcopal Church | 160 | 168 | 161 |
| Farmington (Navajo Mission) | do | 18 | 18 | 15 |
| Jewett (Presbyterian Mission) | Presbyterian Church | 30 | 17 | 14 |
| Gallup (Rehoboth) | Christian Reformed Church | 30 | 24 | 22 |
| North Dakota: | | | | |
| Devils Lake— | | | | |
| Turtle Mountain (St. Mary's) | Catholic Church | 140 | 149 | 123 |
| Standing Rock— | | | | |
| St. Elizabeth's | Episcopal Church | 50 | 55 | 50 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

CVWD 563-054

**44**    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Location, capacity, enrollment, and average attendance of mission schools during the fiscal year ended June 30, 1907—Continued.*

| Location. | Supported by— | Capacity. | Enrollment. | Average attendance. |
|---|---|---|---|---|
| *Boarding schools.* | | | | |
| Oklahoma: | | | | |
| Kiowa— | | | | |
| Cache Creek ............. | Reformed Presbyterian Church .. | 50 | 55 | 52 |
| Mary Gregory.............. | Presbyterian Church.......... | 60 | 23 | 20 |
| Methvin ............... | Methodist Church South ......... | 80 | 44 | 33 |
| St. Patrick's ............. | Catholic Church ............. | 100 | 82 | 76 |
| Shawnee— | | | | |
| Sacred Heart (St. Benedict's) | ....do ...................... | 60 | 39 | 35 |
| Sacred Heart (St. Mary's)... | ....do ...................... | 75 | 62 | 56 |
| Oregon: | | | | |
| Umatilla— | | | | |
| Kate Drexel ................ | ....do ...................... | 150 | 101 | 87 |
| Pennsylvania: | | | | |
| Philadelphia (Lincoln Institution.) | Independent Mission ......... | 100 | 32 | 24 |
| South Dakota: | | | | |
| Cheyenne River— | | | | |
| Oahe ................... | Congregational Church......... | 50 | 22 | 19 |
| Crow Creek— | | | | |
| Immaculate Conception .... | Catholic Church............. | 75 | 56 | 53 |
| Pine Ridge— | | | | |
| Holy Rosary ................. | ....do ...................... | 250 | 202 | 190 |
| Rosebud— | | | | |
| St. Francis ............... | ....do ...................... | 270 | 218 | 197 |
| St. Mary's.................. | Episcopal Church ............. | 60 | 55 | 49 |
| Sisseton— | | | | |
| Goodwill Mission ........... | Presbyterian Church .......... | 100 | 77 | 58 |
| Utah: | | | | |
| Aneth (Navaho Mission)........ | Independent Mission ........... | 20 | 5 | 5 |
| Washington: | | | | |
| Colville— | | | | |
| St. Francis Regis............ | Catholic Church............. | 90 | 66 | 58 |
| St. Mary's.................. | ....do ...................... | 100 | 73 | 50 |
| Puyallup— | | | | |
| St. George's............... | ....do ...................... | 90 | 62 | 50 |
| Wisconsin: | | | | |
| Eland (Bethany Mission)....... | Evangelical Lutheran Church ... | 50 | 32 | 28 |
| Red Springs (Emanuel Mission). | Lutheran Church............... | 34 | 24 | 7 |
| La Pointe— | | | | |
| Bayfield ................ | Catholic Church............. | 75 | 63 | 49 |
| Odanah ................ | ....do...................... | 125 | 104 | 96 |
| Green Bay— | | | | |
| Menominee (Zoar Mission) . | Lutheran Church............... | 30 | 12 | 5 |
| Wyoming: | | | | |
| Shoshoni— | | | | |
| St. Stephen's................ | Catholic Church............. | 130 | 108 | 90 |
| Shoshoni Mission ........... | Episcopal Church ............. | 20 | 17 | 14 |
| Total...................... | | 5,467 | 3,990 | 3,443 |
| *Day schools.* | | | | |
| Arizona: | | | | |
| Pima— | | | | |
| St. John's *a*................ | Catholic Church............. | .......... | 53 | 49 |
| San Xavier's ............... | ....do ...................... | 125 | 124 | 99 |
| Indian Territory: | | | | |
| Quapaw— | | | | |
| St. Mary's *b*.............. | ....do ...................... | .......... | 6 | 6 |
| Montana: | | | | |
| Fort Peck— | | | | |
| Wolf Point *c*............. | Presbyterian Church.......... | 15 | 13 | 10 |
| Crow— | | | | |
| Lodge Grass............... | Baptist Home Missionary Society. | 50 | 34 | 32 |
| Nebraska: | | | | |
| Santee— | | | | |
| Normal Training *d* ........ | Congregational Church......... | 25 | 8 | 5 |
| Oklahoma: | | | | |
| Etna (Whirlwind Mission)...... | Episcopal Church ............. | 25 | 27 | 24 |
| Wisconsin: | | | | |
| Green Bay— | | | | |
| Red Springs (Emanuel Mission). *e* | Lutheran Church ............. | .......... | 17 | |
| Oneida— | | | | |
| Adventist Mission ........... | Seventh Day Adventist.......... | 20 | 16 | 5 |
| Episcopal Mission............ | Episcopal Church ............. | 20 | 19 | 12 |
| Total...................... | | 280 | 317 | 249 |

*a* Attend St. John's Boarding School.
*b* Attend St. Mary's Boarding School.
*c* Attend Wolf Point Boarding School.
*d* Attend Santee Normal Training School.
*e* Attend Red Springs Boarding School.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 82 of 212   Page ID
#:4098

*Location, capacity, enrollment, and average attendance of mission schools during
the fiscal year ended June 30, 1907—Continued.*

| Location. | Supported by— | Capacity. | Enroll-ment. | Average attend-ance. |
|---|---|---|---|---|
| *Contract boarding schools.* | | | | |
| Oklahoma: | | | | |
| Osage— | | | | |
| St. John's...................... | Contract and Catholic Church ... | 150 | 36 | 34 |
| St. Louis........................ | ...do........................ | 125 | 92 | 80 |
| Wisconsin: | | | | |
| Green Bay— | | | | |
| Menominee (St. Joseph's)....... | ...do........................ | 200 | 190 | 162 |
| Total.......................... | | 475 | 318 | 276 |
| Virginia: | | | | |
| Hampton (Normal and Agricul-tural Institute). | Contract and independent ....... | 150 | 106 | 91 |

### SECTARIAN CONTRACT SCHOOLS.

On June 12, 1906, the Bureau of Catholic Indian Missions re-
quested contracts for its schools during the fiscal year 1907, as
follows:

| Name of school. | Agency. | Number of pupils. | Rate per capita. |
|---|---|---|---|
| St. Louis............................ | Osage............................ | 75 | $125 |
| St. John's........................... | ...do............................ | 65 | 125 |
| St. Joseph's......................... | Menominee (Green Bay)............ | 150 | 108 |
| St. Francis.......................... | Rosebud.......................... | 250 | 108 |
| Holy Rosary......................... | Pine Ridge....................... | 200 | 108 |
| Immaculate Conception............... | Crow Creek (Lower Brulé, Yankton).. | 65 | 108 |
| St. Labre's.......................... | Tongue River ..................... | 60 | 108 |
| St. Mary's .......................... | Quapaw .......................... | 20 | 50 |

The President directed the use of treaty funds for contracts only
during the fiscal year 1906, "unless there is authorization by Con-
gress or some determination by the courts;" and as the Congress
did not so authorize and the courts did not so determine, contracts
for the fiscal year ended June 30, 1907, were made only for the St.
John's and St. Louis mission schools on the Osage Reservation and
for St. Joseph's Industrial School on the Menominee Reservation.

On May 11, 1906, a bill in equity was filed in the supreme court
of the District of Columbia, by Reuben Quickbear and others, Rose-
bud Sioux, asking that the Department be enjoined from the use of
the trust and treaty funds of the tribe in making a contract with
the Bureau of Catholic Indian Missions for the education, etc., of
Indian children in the St. Francis Mission School.  The obvious
purpose of the suit was to test the legality of the proposed use of
these funds.   The case was heard by the court and on April 15, 1907,
the following decree was rendered by Hon. Ashley M. Gould, justice,
etc.:

Ordered, adjudged, and decreed as follows: That an injunction issue against
all of the defendants, and their present successors in office, in the case of such

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

CVWD 563-056

46      REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

of the said defendants as are no longer in office, perpetually restraining them from paying or authorizing the payment of, either by themselves or by any of their subordinate officers or agents whatever, any moneys of the Sioux treaty fund, referred to in the said bill and answer, appropriated for the uses of the Sioux tribe of Indians, to the Bureau of Catholic Indian Missions, at Washington, D. C., for the support, education, or maintenance of any Indian pupils of the said Sioux tribe at the St. Francis Mission Boarding School, on the Rosebud Reservation, in the State of South Dakota, as provided in the contract referred to in the said bill and answer; and that the defendants be further restrained from drawing, countersigning, and paying any warrants in favor of the said Bureau of Catholic Indian Missions for the purpose aforesaid, payable out of the said Sioux treaty fund; and

It is further ordered, adjudged, and decreed: That so much of the prayer of the said bill as asks that an injunction issue against the defendants restraining them from paying or authorizing the payment of any of the interest of the Sioux trust fund to the said Bureau of Catholic Indian Missions under the said contract be refused; and

It is further ordered and adjudged that each party pay the respective costs by each incurred.

The complainants and defendants both entered an appeal to the court of appeals, and the case was heard on May 21, 1907, but the court adjourned without rendering an opinion.

*Osage.*—The contracts for the fiscal year 1907 were made with the Bureau of Catholic Indian Missions for 75 children in the St. Louis Boarding School and for 65 children in the St. John's Boarding School, on the request of the Osage tribal council.

*Menominee.*—On September 4, 1906, a petition was sent to the superintendent in charge of the Menominee Indians for an expression of the desire of these Indians that a contract be made with the Bureau of Catholic Indian Missions for 150 children in St. Joseph's Industrial School during the fiscal year 1907.

In order to prevent frequent requests for signatures, the Bureau of Catholic Indian Missions wished that the petition presented to the Menominee Indians be so worded that it would express the desire, on the part of those who signed, that a contract be made for the fiscal year 1907 and each year for four successive years thereafter. The first petition was withdrawn on September 10, 1906, and a new one substituted conveying the request of the bureau. This petition was returned on January 12, 1907, with a sufficient number of shares represented thereon to entitle the applicant to a contract for the number of pupils and at the rate asked for, and one was executed in accordance with the terms of the petition.

*Summary.*—The following table summarizes the contracts executed for the education of Indian children in mission schools for the fiscal year 1907:

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-057

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 84 of 212   Page ID #:4100

*Pupils contracted for and average attendance in contract schools during year ended June 30, 1907.*

| Name of school. | Tribe. | Number of pupils. | Rate per capita. | Total amount. | Average attendance. | Claims settled. |
|---|---|---|---|---|---|---|
| St. Joseph's Industrial............ | Menominee... | 150 | $108 | $16,200 | 103+ | $11,085.11 |
| St. Louis........................ | Osage........ | 75 | 125 | 9,375 | 75 | 9,375.00 |
| St. John's....................... | ...do ....... | 65 | 125 | 8,125 | 33+ | 4,151.82 |
| Total...................... | | 290 | .......... | 33,700 | 211+ | 24,611.93 |

*Renewal of contracts for 1908.*—On June 28, 1907, the Bureau of Catholic Indian Missions asked that contracts be granted it, payable out of Indian tribal funds, for the care and education of Indian pupils during the fiscal year ending June 30, 1908, at the following-named schools: St. John's Boarding School, Osage Agency, Okla., for 65 pupils, at $125 per capita per annum; St. Louis Boarding School, Osage Agency, Okla., for 75 pupils, at $125 per capita per annum; St. Joseph's Industrial School, Green Bay Agency, Wis., for 150 pupils, at $108 per capita per annum.

Again, on June 28, 1907, the director of the Bureau of Catholic Indian Missions filed the following request:

In case the court of appeals of the United States shall decide that both trust and treaty funds of the Indians may be used for the education of Indian children in mission schools, I beg to ask that this letter be regarded as the formal application of this bureau for contracts, payable from such funds, for the care and education of Indian pupils during the fiscal year ending June 30, 1908, at the following-named schools: Immaculate Conception Mission, Crow Creek Agency, S. Dak., 65 pupils, at $108 per capita per annum; Holy Rosary Mission, Pine Ridge Agency, S. Dak., 200 pupils, at $108 per capita per annum; St. Francis Mission, Rosebud Agency, S. Dak., 250 pupils, at $108 per capita per annum; St. Labre's Mission, Northern Cheyenne Agency, Mont., 60 pupils, at $108 per capita per annum; St. Mary's Boarding, Quapaw Reservation, Ind. T., 20 pupils, at $108 per capita per annum.

The Bureau was informed that should the court of appeals decide that these funds are applicable for the purpose named the Office would give the application proper consideration.

In pursuance of instructions to the superintendent in charge of the Menominees, opportunity was given the Indians who had not heretofore signed the five-year petition to append their names, and on June 29, 1907, the superintendent filed a supplemental petition, on which, with the original petition, the total number of shares represented was sufficient to grant a contract for the number of pupils and at the rate asked for. The contract has therefore been executed.

The application of the Bureau of Catholic Indian Missions for contracts for the education of Osage Indians in the St. Louis and St. John's mission schools on the Osage Reservation for the fiscal year

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-058

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 85 of 212   Page ID #:4101

1908 was forwarded to the United States Indian agent at Osage Agency, Okla., on August 12, 1907, for consideration by the Osage tribal council. The council on August 19, 1907, recommended that the request of the Bureau be granted, and contracts have been duly made in accordance with the application.

### ATTENDANCE OF PUPILS.

Condensed statistics of the general condition of attendance, enrollment, etc., at all Indian and public schools are shown in the following table:

*Enrollment and average attendance of Indian schools, 1906 and 1907, showing increase in 1907 and number of schools.*

| Kind of school. | Enrollment. | | Increase (+) or decrease (—). | Average attendance. | | Increase (+) or decrease (—). | Number of schools, 1907. |
|---|---|---|---|---|---|---|---|
| | 1906. | 1907. | | 1906. | 1907. | | |
| **Government schools:** | | | | | | | |
| Nonreservation boarding | 9,279 | 9,485 | +206 | 8,385 | 8,495 | +110 | 25 |
| Reservation boarding | 11,007 | 11,019 | + 12 | 9,648 | 9,520 | −128 | 91 |
| Day | 4,476 | 5,130 | +654 | 3,342 | 3,670 | +328 | 163 |
| Total | 24,762 | 25,634 | +872 | 21,375 | 21,685 | +310 | 279 |
| **Mission schools:** | | | | | | | |
| Boarding | 3,396 | 3,990 | +594 | 2,841 | 3,443 | +602 | 53 |
| Day | 340 | 317 | − 23 | 252 | 249 | − 3 | 5 |
| Total | 3,736 | 4,307 | +571 | 3,093 | 3,692 | +599 | 58 |
| **Contract schools:** | | | | | | | |
| Boarding | 972 | 318 | −654 | 874 | 276 | −598 | 3 |
| Hampton | 115 | 106 | − 9 | 100 | 91 | − 9 | 1 |
| Public | 94 | 128 | + 34 | 50 | 58 | + 8 | 12 |
| Aggregate | 29,679 | 30,493 | +814 | 25,492 | 25,802 | +310 | a 341 |

a Twelve public schools in which Indian pupils were taught not enumerated here.

Statistical information concerning pupils in the schools of New York is omitted, as these institutions are under the sole control of the State authorities.

The number of schools conducted by the Government in the fiscal year 1907 was 279, an increase of 18 over last year. The total enrollment was 25,634, an increase of 872; the average attendance was 21,685, an increase of 310. The nonreservation boarding schools increased their attendance by 110 pupils and the day schools by 328, while the reservation boarding schools decreased theirs by 128.

Eight contract schools were reported last year, but only 3 this year; hence, the average attendance of this class of schools was decreased by 598 pupils, accounted for in the mission schools to which they were transferred. Public schools cared for 8 additional pupils.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-059

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 86 of 212   Page ID #:4102

A summary of Indian schools and attendance for the last thirty-one years is given in the following table:

*Number of Indian schools and average attendance from 1877 to 1907.[a]*

| Year. | Boarding schools. | | Day schools.[b] | | Totals. | |
|---|---|---|---|---|---|---|
| | Number. | Average attendance | Number. | Average attendance | Number. | Average attendance |
| 1877 | 48 | ............ | 102 | ............ | 150 | 3,598 |
| 1878 | 49 | ............ | 119 | ............ | 168 | 4,142 |
| 1879 | 52 | ............ | 107 | ............ | 159 | 4,448 |
| 1880 | 60 | ............ | 109 | ............ | 169 | 4,651 |
| 1881 | 68 | ............ | 106 | ............ | 174 | 4,976 |
| 1882 | 71 | 3,077 | 76 | 1,637 | 147 | 4,714 |
| 1883 | 80 | 3,793 | 88 | 1,893 | 168 | 5,686 |
| 1884 | 87 | 4,723 | 98 | 2,237 | 185 | 6,960 |
| 1885 | 114 | 6,201 | 86 | 1,942 | 200 | 8,143 |
| 1886 | 115 | 7,260 | 99 | 2,370 | 214 | 9,630 |
| 1887 | 117 | 8,020 | 110 | 2,500 | 227 | 10,620 |
| 1888 | 126 | 8,705 | 107 | 2,715 | 233 | 11,420 |
| 1889 | 136 | 9,146 | 103 | 2,406 | 239 | 11,552 |
| 1890 | 140 | 9,865 | 106 | 2,367 | 246 | 12,232 |
| 1891 | 146 | 11,425 | 110 | 2,163 | 256 | 13,588 |
| 1892 | 149 | 12,422 | 126 | 2,745 | 275 | 15,167 |
| 1893 | 156 | 13,635 | 119 | 2,668 | 275 | 16,303 |
| 1894 | 157 | 14,457 | 115 | 2,639 | 272 | 17,220 |
| 1895 | 157 | 15,061 | 125 | 3,127 | 282 | 18,188 |
| 1896 | 156 | 15,683 | 140 | 3,579 | 296 | 19,262 |
| 1897 | 145 | 15,026 | 143 | 3,650 | 288 | 18,676 |
| 1898 | 148 | 16,112 | 149 | 3,536 | 297 | 19,648 |
| 1899 | 149 | 16,891 | 147 | 3,631 | 296 | 20,522 |
| 1900 | 153 | 17,708 | 154 | 3,860 | 307 | 21,568 |
| 1901 | 161 | 19,464 | 143 | 3,613 | 304 | 23,077 |
| 1902 | 163 | 20,576 | 136 | 3,544 | 299 | 24,120 |
| 1903 | 162 | 20,772 | 144 | 3,610 | 306 | 24,382 |
| 1904 | 162 | 21,582 | 141 | 3,522 | 303 | 25,104 |
| 1905 | 167 | 21,812 | 145 | 3,643 | 312 | 25,455 |
| 1906 | 169 | 21,848 | 149 | 3,644 | 318 | 25,492 |
| 1907 | 173 | 21,825 | 168 | 3,977 | 341 | 25,802 |

[a] Some of the figures in this table as printed prior to 1896 were taken from reports of the superintendent of Indian schools.  As revised they are all taken from the reports of the Commissioner of Indian Affairs.  Prior to 1882 the figures include the New York schools.

[b] Indian children attending public schools are included in the average attendance, but the schools are not included in the number of schools.

## APPROPRIATIONS.

The direct appropriations made by Congress for educational purposes among the Indians for the last thirty-one years are tabulated as follows:

*Appropriations made by the Government since 1876 for Indian schools.*

| Year. | Appropriation. | Per cent increase. | Year. | Appropriation. | Per cent increase. |
|---|---|---|---|---|---|
| 1877 | $20,000 | ............ | 1893 | $2,315,612 | 1.04 |
| 1878 | 30,000 | 50.00 | 1894 | 2,243,497 | [a]3.50 |
| 1879 | 60,000 | 100.00 | 1895 | 2,060,695 | [a]8.87 |
| 1880 | 75,000 | 25.00 | 1896 | 2,056,515 | [a]2.00 |
| 1881 | 75,000 | ............ | 1897 | 2,517,265 | 22.45 |
| 1882 | 135,000 | 80.00 | 1898 | 2,631,771 | 4.56 |
| 1883 | 487,200 | 260.00 | 1899 | 2,638,390 | .25 |
| 1884 | 675,200 | 38.00 | 1900 | 2,936,080 | 11.28 |
| 1885 | 992,800 | 47.00 | 1901 | 3,080,367 | 4.91 |
| 1886 | 1,100,065 | 10.00 | 1902 | 3,244,250 | 5.32 |
| 1887 | 1,211,415 | 10.00 | 1903 | 3,531,250 | 8.84 |
| 1888 | 1,179,916 | [a]2.60 | 1904 | 3,522,950 | [a].28 |
| 1889 | 1,348,015 | 14.00 | 1905 | 3,880,740 | 10.15 |
| 1890 | 1,364,568 | 1.00 | 1906 | 3,777,100 | [a]2.67 |
| 1891 | 1,842,770 | 35.00 | 1907 | 3,925,880 | 3.93+ |
| 1892 | 2,291,650 | 24.30 | 1908 | 4,039,995 | 2.90+ |

[a] Decrease.



Digitized by Google    Original from    UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-060

### SAN ILDEFONSO PUEBLO.

On the 29th of December, 1904, C. J. Crandall, superintendent of the Santa Fe School, forwarded to this Office a deed, dated December 22, 1904, from the officers of the pueblo of San Ildefonso, in New Mexico, in their corporate capacity, conveying to the United States for $50 1 acre of land therein described for a site for an Indian school. This deed was returned to him on April 7, 1905, for an abstract of title from the proper court of record, showing the title of the conveyors to the land. No such abstract was received; but on July 17, 1905, the Acting Attorney-General submitted a letter from the United States attorney for the district of New Mexico, relating to a proposed sale and conveyance to the United States, by the " constituted authority " of the San Ildefonso pueblo, of 2 acres of land within the pueblo for a school site. The Acting Attorney-General doubted whether a deed from such " constituted authority " would pass a valid title and advised a resort to condemnation proceedings, as suggested by the district attorney. On November 7, 1905, the Office expressed its opinion that the trouble and expense incident to condemnation would be too great to justify the Government in entering proceedings for that purpose.

Afterward this matter received my closer personal attention. A visit to the spot satisfied me that some action ought to be taken to obtain a site for a school in that pueblo, and that condemnation proceedings seemed to hold forth the best means of procuring one. I therefore made a supplemental report to the Department on June 8, recommending that the Attorney-General be requested to issue the necessary instructions to the district attorney for New Mexico to confer with Superintendent Crandall as to the site, and institute condemnation proceedings at once.

On December 18, 1906, the superintendent reported that condemnation proceedings had been instituted in the court of the first judicial district at Santa Fe; that the judge had rendered an order approving the report of the commissioners appointed by the court to condemn the school site, and that the United States would come into full possession on the payment of the $10 awarded by the commissioners. The $10 was paid and $5 each was paid to the three commissioners for one day's service.

A contract was let last April for the construction on this site of two adobe buildings—one containing a schoolroom and industrial room for 30 pupils and the other a five-room dwelling for the teachers.

### INSTITUTES.

Under the authority of the Department, local Indian school service institutes were held during the last fiscal year at the Standing Rock

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-061

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 88 of 212   Page ID
#:4104

Agency, N. Dak., and the Rosebud Agency and Pine Ridge Agency,
S. Dak.  The general institute was held at Los Angeles, Cal., July 2
to 12, and employees were enabled to attend also the sessions of the
annual convention of the National Educational Association, which
met there July 8 to 12.  Owing to the fact that many of the schools
are situated in isolated parts of the country, employees do not, as a
rule, have the privilege of attending educational meetings conducted
for public school teachers; and the bringing together of those engaged
in Indian school work is considered of great importance, in order that
they may compare notes and discuss and adopt the most practical
methods in giving the young Indians such instruction as will help
them to become self-supporting.

All the institutes were well attended, and unusual interest was
shown throughout the sessions.  Demonstration lessons with classes
of Indian pupils were presented by teachers in the Service who had
made special preparation, for the purpose of showing other teachers
how class room and industrial instruction should be correlated and
adapted to local conditions and the particular needs of individual
tribes.

An interesting feature of the Los Angeles institute was an exhibit
of native Indian art, prepared by Miss Angel De Cora, a Winne-
bago, and art instructor at the Carlisle School, Pennsylvania.  All
of it attracted marked attention, but especially the specimens illus-
trating aboriginal ideals in decoration.  Owing to the fact that the
schools had been called upon for material for the Indian department
at the Jamestown Exposition no general request was sent out for
material for this institute, but there was a small though creditable
exhibit of class-room papers, art needlework, basketry, pottery, etc.,
which enabled employees in attendance to compare methods and work
of the several schools represented, and to obtain suggestions that can
not but help them in their respective lines of work.

### INDIAN EXHIBIT AT THE JAMESTOWN EXPOSITION.

The exhibit of the Indian Bureau at the Jamestown Exposition
differs little from its predecessors at other expositions.  It is mainly
an Indian school exhibit showing, by articles manufactured by In-
dian pupils in school shops and by class-room papers, the course of
instruction given in Government schools and the ability of the In-
dians to assimilate it.

The furnishings—carved desk, chairs, table, settee, bookcase and
andirons—were made by Indian youth, as were the contents of the
cases, embracing specimens of plain sewing, dressmaking, millinery,
lace and embroidery, uniform suits well tailored, shoes, harness,

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from
UNIVERSITY OF MICHIGAN

CVWD 563-062

blacksmith tools and horseshoes, a miniature hay baler, and a model wagon, a cupboard, and other examples of woodworking.

Decoration and color are given by Navaho blankets, rush matting, pottery made by the Pueblo Indians in New Mexico and the Catawba Indians in South Carolina, and implements and ornaments used by various tribes. The frieze, from Miss De Cora's art department at Carlisle, was designed and made by Indian pupils, as was also a rug of oriental weave. Other examples of applied Indian design on picture frames, pillow covers, etc., were furnished by them. The principal setting for the exhibit is a fine collection of photographs of Indians and Indian life which were lent by Mr. E. S. Curtis, of Seattle, Wash. They were selected from a large historical series which he is making of all the Indian tribes in order to furnish a complete pictorial history of the North American Indians.

A more technical historical touch is given by John Smith's map of Virginia, beside which is another map showing the present location in tide-water Virginia of the 700 mixed blood descendants of the Indians of the Powhatan stock. Almost the only other Indians who retain any part of the territory in which the early settlers of the seventeenth century found them are the Catawbas, the Cherokees in North Carolina, and the Six Nations in New York. They are represented in the exhibit by pottery, baskets, etc., and especially by a model, one-twentieth size, of an Iroquois bark council lodge.

In contrast with this lodge is a model of a two-room frame house with porch, such as many Indians now occupy, made by a full blood Absentee Shawnee.

The Government schools represented in the exhibit are: Chemawa, Chilocco, Carson, Crow Creek, Cheyenne, Crow, Cantonment, Cheyenne River, Carlisle, Flathead, Fort Peck, Fort Shaw, Genoa, Haskell, Klamath, Lac du Flambeau, Lemhi, Mission, Morris, Neah Bay, Navaho, Poplar River, Phoenix, Ponca, Quilieute, Riverside, Shawnee, Santa Fe, Swinomish, Seneca, Siletz, Tomah, and Wittenberg. Small school exhibits also were obtained from six of the public schools for Indians in New York, the only State which provides systematically for the education of its Indian youth. The Indian department of Hampton Normal Institute is also represented.

The Carlisle school has nothing at Jamestown to illustrate its extensive equipment for teaching the trades, as its carefully prepared exhibit was wrongly delivered on the exposition grounds and no trace of it has been found; however, restitution has been made for the cash value of the lost articles.

### EMPLOYEES.

There are connected with the Indian field establishment about 5,500 employees engaged in some capacity in the campaign of civilization

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

directed from this Office.  A little less than half the number are directly connected with the educational branch.  The remainder deal more particularly with the adult Indians, their homes, their tribal relations, their lands, and their rights under the law.  Substantially the entire corps is in the classified service, and appointments to it are made by selection from eligible lists prepared by the Civil Service Commission..  Of the inelasticity of the system as applied to the Indian field, I spoke in my last report; but now, as then, the Commission holds itself always ready to study sympathetically the difficulties of the Office in this respect, and endeavors so to adjust its rules as to procure qualified candidates.  About half the persons selected and notified decline appointment, usually on account of the inadequacy of the salaries the Office is able to pay under present appropriations, when viewed in the light of the everywhere increased cost of living and the scale of pay in private business for similar kinds of work.

This is unfortunate, because it means a tendency toward a lower standard for entrance into the Indian Service and our inability to retain long the best material we get.  The danger is particularly noticeable in the mechanical departments of the schools and agencies, where the low Government salaries attract, as a rule, a cheaper, and therefore in the end more expensive, class of workmen.  The mechanical engineering branch is particularly a sufferer, as the Office has hundreds of thousands of dollars invested in heating, lighting, pumping, and irrigation plants.  The remedy must be either a great reduction of the school and agency systems, or an increase of appropriations which will insure to the Government competent employees by offering them salaries equal to those paid by private concerns.

## APPROPRIATIONS.

The combined appropriations for the Indian Service contained in the appropriation act for the current fiscal year make a total of $10,123,188.05.  The aggregate of the appropriations for the fiscal year 1907 was $9,428,983.35.  The objects of the appropriations for these two years are shown in the following table:

*Appropriations in the Indian appropriation acts for the fiscal years 1907 and 1908.*

|  | 1907. | 1908. |
|---|---|---|
| Current and contingent expenses | $889,800.00 | $917,800.00 |
| Fulfilling treaty stipulations | 2,450,930.43 | 2,412,278.16 |
| Miscellaneous supports (gratuities) | 576,000.00 | 565,500.00 |
| Incidental expenses | 70,000.00 | 74,000.00 |
| Support of schools | 3,924,630.00 | 4,039,995.00 |
| Miscellaneous | 1,413,664.55 | 2,113,614.89 |
| Total | 9,325,024.98 | 10,123,188.05 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-064

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

54   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

Appropriations were also made by other acts, as follows:

|  | 1907. | 1908. |
|---|---|---|
| Current and contingent expenses | $23,668.78 | ............ |
| Fulfilling treaty stipulations | 46.47 | ............ |
| Miscellaneous | 80,243.17 | $182,028.58 |
| Total | 103,958.37 | 182,028.58 |

Adding these two together, we have the total appropriations for the two years.

*Total appropriations for the Indian service for the fiscal years 1907 and 1908.*

|  | 1907. | 1908. |
|---|---|---|
| Current and contingent expenses | $913,468.73 | $917,800.00 |
| Fulfilling treaty stipulations | 2,450,976.90 | 2,412,278.16 |
| Miscellaneous supports | 576,000.00 | 565,500.00 |
| Incidental expenses | 70,000.00 | 74,000.00 |
| Support of schools | 3,924,630.00 | 4,039,995.00 |
| Miscellaneous | 1,493,907.72 | 2,295,643.47 |
| Total | 9,428,983.35 | 10,305,216.63 |

The excess of 1908 over 1907 is $876,233.28, and is accounted for as follows:

Excess of 1908 over 1907:
    Current and contingent expenses......... $4,331.27
    Incidental expenses............ 4,000.00
    Support of schools............ 115,365.00
    Miscellaneous............ 801,735.75
                                                    $925,432.02
Excess of 1907 over 1908:
    Fulfilling treaty stipulations............ 38,698.74
    Miscellaneous supports............ 10,500.00
                                                    49,198.74

    Net increase for 1908............ 876,233.28

The principal items of this increase are support of schools, $115,365, as will appear from the table, $515,000 appropriated in fulfillment of agreements with Indians—$440,000 for the Indians of the Blackfeet Reservation, Mont., and $75,000 for the Indians of the Wind River Reservation, Wyo.—and $180,000 for certain lands of the Rosebud Reservation, S. Dak., carried under "Miscellaneous" in the table.

### IRRIGATION.

As I have already said, a plan has been made for the closest cooperation between the Reclamation Service and this Office in the conduct of irrigation projects under the jurisdiction of this Office.  The plan was approved by the Department on April 9, 1907.  It contemplates, among other things, that all broad questions of policy shall be determined in advance, annually or quarterly, by the Director of the Rec-



Digitized by Google        Original from UNIVERSITY OF MICHIGAN

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.     55

lamation Service and the Commissioner of Indian Affairs and approved by the Secretary of the Interior.   The localities where irrigation work is required and the conditions to be met as regards future allotments of lands, treaty obligations, and fiscal relations, are to be indicated by the Commissioner of Indian Affairs; the character and general location of the construction work are to be recommended by the Director of the Reclamation Service.

The chief engineer of the Indian Service is to report directly to the Secretary of the Interior in all matters of policy affecting the welfare of the Indians, sending a duplicate copy of his report to the Director of the Reclamation Service, from whom, in turn, he will receive instructions as to engineering details.   Headquarters of the Indian irrigation service have been established in Los Angeles, Cal., and placed in charge of Supt. Charles R. Olberg, under the supervision of the chief engineer.   This arrangement is expected to insure more elaborate supervision of important work, and, by bringing all the irrigation work of the Government into coordination, to effect eventually large economies of effort and expenditure.   The system of cost-keeping in use by the Reclamation Service is now applied as far as practicable to the work of Indian irrigation, Chief Engineer Code having adopted it on July 1, 1907.

### WORK OF THE YEAR.

The sum of $152,000 from the appropriation for " Irrigation, Indian reservations," was available for expenditure during the fiscal year 1907, and most of it was apportioned to the following reservations:

| | |
|---|---:|
| Zuni, N. Mex | $85,296.54 |
| Pala, Cal | 12,004.30 |
| Crow, Mont | 10,271.35 |
| Navaho and Moqui, Ariz. and N. Mex | 7,334.30 |
| Walker River, Nev | 7,132.46 |
| Tongue River, Mont | 2,817.17 |
| Pueblo, N. Mex | 3,422.74 |
| | 128,278.86 |

About one-half of the remainder has been expended mainly in repairs and maintenance of ditches and reservoirs on other reservations; and some additional tribal moneys and funds specially appropriated have also been used.   Of the total above given, $3,435.81 was not expended but was returned to the credit of the appropriation, though too late for use elsewhere; also, $6,000 authorized to be expended for the purchase of the " Barney pipe line," referred to hereafter, was decided by the Auditor, after the close of the fiscal year, to be unavailable for that purpose and hence was not expended.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-066

*Blackfeet.*—The act of March 1, 1907 (34 Stat. L., 1035) provides for allotting the Blackfeet Reservation in Montana and opening the surplus lands to settlement, and appropriates $300,000 toward constructing irrigation systems for the allotted lands. Engineer W. B. Hill has been making investigations of feasible canal projects on the reservation, in connection with Cyrus C. Babb, the local engineer of the Reclamation Service, but no report has been received.

*Crow.*—The work of constructing additional laterals and otherwise completing the irrigation system on the Crow Reservation in Montana has progressed steadily during the year.

*Flathead.*—On April 26, 1907, the Director of the Reclamation Service was asked to make a preliminary investigation on the Flathead Reservation in Montana to enable me to recommend the legislation needed for an adequate system of irrigation for the Indians to be allotted and for the lands to be disposed of under act of April 23, 1904 (33 Stat. L., 302). No report has yet been received from him.

*Fort Hall.*—The current Indian appropriation act (34 Stat. L., 1024) authorizes the Secretary of the Interior to acquire by purchase or condemnation all the lands in twelve townships in Idaho east of the Fort Hall Reservation which he shall deem necessary for constructing a reservoir for storing water to irrigate lands on the Fort Hall Reservation and those ceded by the Fort Hall Indians, and also whatever lands, rights, and property he may consider necessary to the success of such project. Supt. John J. Granville has been in charge of the preliminary work since early in March, and expects to complete all the surveys by winter, when the plans and final estimates can be worked up and passed upon by the engineers of the Indian and Reclamation services. Several complaints, however, have arisen which indicate that further legislation may be required, or possibly the whole project of the Blackfoot reservoir may have to be abandoned.

*Klamath.*—The surveys and estimates for the Modoc Point project on the Klamath Reservation in Oregon have been finished. The agreement with the Indians, ratified by the act of June 21, 1906 (34 Stat. L., 367), provides that about $130,000 of the amount appropriated in payment of the lands excluded from the reservation by an erroneous survey may be used by the Secretary of the Interior for irrigation, but that Indians whose allotments will not be benefited by such irrigation shall not bear any of its expense, but shall receive an equivalent in value in stock cattle or other articles. As only about one-tenth of the allottees would be benefited by the Modoc Point project, and the estimated cost approximates $150,000, its construction with the funds provided by the agreement is entirely out of the question, and a further appropriation by Congress seems to be the only recourse if the work is to be seriously undertaken.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 94 of 212   Page ID #:4110

*Mission Indians.*—Some $12,000 was expended during the year in the construction of a new ditch on the Pala Reservation, in California, to replace the one destroyed by floods, as mentioned in my last report.

On November 7, 1906, Chief Engineer Code reported that the holdings of B. B. Barney should belong to the Agua Caliente Indians and thus put an end to bickerings and disputes which are inevitable where members of two races are jointly interested in the same water supply. Special Agent Kelsey had recommended the same thing; and on December 17 the Department authorized the purchase of Mr. Barney's property for $6,000, to be taken from the $100,000 appropriated for the purchase of lands and water rights for Indians in California. A deed conveying the water rights, pipe line, lands, and other property was approved by the Attorney-General on July 5, 1907, and the transfer has been made. A further sum of some $7,600 from this appropriation has been expended to increase the water supply on the Pauma, Cahuilla, Cabezon, San Augustin, Mission and Pechanga reservations.

*Pima.*—On January 23, 1907, Chief Engineer Code reported that after the submission of the joint report of Special Agent Granville and himself, dated April 25, 1906—referred to in my last report—he had learned of new developments in the Salt River Valley reclamation project which would insure a large amount of surplus power. A plan was accordingly arranged whereby this Bureau was to sign an agreement with the Water-Users' Association of the Salt River Valley for power for pumping water on 10,000 acres of land on the Pima reservation, in Arizona, the power to be delivered at the north boundary of the reservation; the extension of the line to the various pumping plants on the reservation, and the construction work, were to be done by the engineers of the Reclamation Service and paid for from the funds available for the irrigation of Pima lands; and the Indians were to be required to pay the same construction and maintenance charges for power delivered to the reservation line as were assessed generally against the lands of the Salt River project.

In pursuance thereof, an item was inserted in the current Indian appropriation act (34 Stat. L., 1022), providing—

> That the Secretary of the Interior may, in his discretion, use such part of the three hundred thousand dollars heretofore appropriated for an irrigation system for the Pima Indians in the payment of such Indians' proportionate part of the construction of the Salt River project, and such funds may be transferred to the reclamation fund, to be expended by that Service in accordance with its rules and regulations; the Indians to receive a credit upon the reclamation charge assessed against their lands under the Salt River project for the amount so transferred.

An agreement signed by the president and the secretary of the Salt River Valley Water Users' Association, to include the lands of

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

CVWD 563-068

58    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

the Pima Indians within the area to be irrigated under the Salt River project, was executed by the Department on June 3, 1907, and $100,000 has been transferred to the reclamation fund out of the amount appropriated for the Pima irrigation system.

*Shoshoni.*—Though work on the Shoshoni Reservation in Wyoming has made considerable progress, not so much has been accomplished as was hoped, because of the impossibility of maintaining a constant laboring force for any considerable time. During the fiscal year 1907, $76,811.05 was expended, mainly on the Coolidge ditch and its lateral systems. On the 1st of July, 1907. $115,500 became available for continuing the work, the Congress having appropriated the balance of the $150,000 provided in the agreement with the Indians ($25,000) and the further sum of $75,000 by the current Indian appropriation act (34 Stat. L., 1052), and $15,500 being on hand from the appropriation of the previous fiscal year. The work is going on as rapidly as circumstances will permit.

*Tongue River.*—Some preliminary work has been done on the Tongue River Reservation in Montana, under the supervision of Inspector W. B. Hill. The current Indian appropriation act (34 Stat. L., 1035) contains a special appropriation of $40,000 for an irrigation system on this reservation, and it is intended to push the construction as rapidly as possible.

*Uintah.*—The work of constructing the several systems of irrigation on the Uintah Reservation in Utah has progressed favorably during the year, with the expenditure of $120,672.32 of the amount appropriated by the act of June 21, 1906 (34 Stat. L., 375). In view of the necessity of using the water in order to hold its appropriation under the laws of Utah, the acting agent was instructed last February to make every possible effort to lease all allotted land which could be irrigated, wherever the allottees were making no use of it. Very favorable terms were offered, and by advertising and press notices wide publicity was given to the fact that these lands could be leased. Many letters of inquiry have been received, but only twenty-six leases have been effected.

*Zuñi Pueblo.*—More than $85,000 was expended during the year on the Zuñi dam in New Mexico. It is now nearly finished, and work on the canal will soon begin. Owing to unusual floods, scarcity of labor and difficulty of access, the cost has far exceeded the original estimates; but the dam is a fine example of engineering skill, and the results will doubtless justify the expense if the Indians avail themselves of the benefits so liberally provided for them by the Government.

### ALLOTMENTS AND PATENTS.

Allotment work among Indians has been pushed as rapidly as possible since the date of my last report.


Digitized by Google          Original from
                             UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

CVWD 563-069

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS. 59

## ON RESERVATIONS.

During last year patents were issued and delivered to Indians, classified by reservations, as follows:

| | | | |
|---|---|---|---|
| Pine Ridge, S. Dak | 816 | Walker River, Nev | 490 |
| Lummi, Wash | 9 | Yakima, Wash | 653 |
| Crow, Mont | 82 | Columbia (Moses agreement), | |
| Swinomish, Wash | 1 | Wash | 33 |
| Kiowa, Okla | 511 | Shoshoni (ceded lands), Wyo | 368 |
| Skokomish, Wash | 31 | | |
| Oto and Missouria, Okla | 369 | Total | 3,363 |

The allotments approved during the year, but for which patents have not yet issued, were:

| | | | |
|---|---|---|---|
| Kiowa, Okla | 513 | La Pointe, Wis | 11 |
| Oto and Missouria, Okla | 121 | Crow, Mont | 1,981 |
| Pine Ridge, S. Dak | 1,463 | Devils Lake, N. Dak | |
| Standing Rock, S. Dak | 868 | Sac and Fox, Kans. and Nebr | 37 |
| Shoshoni, Wyo | 1,781 | Crow Creek, S. Dak | 2 |
| Rosebud, S. Dak | 252 | White Earth, Minn | 3,158 |
| Yankton, S. Dak | 2 | Turtle Mountain, N. Dak | 326 |
| Quinaielt, Wash | 119 | | |
| Yakima, Wash | 4 | Total | 10,643 |
| Lac du Flambeau, Wis | 5 | | |

The condition of the work in the field is as follows:

*Columbia (Moses agreement).*—Under what is known as the "Moses agreement," confirmed by the act of July 4, 1884 (23 Stat. L., 79), 37 original and 3 supplemental allotments were made to the Columbia Indians in Washington. Nos. 30 and 34, in favor of Snain chucks and Paul, respectively, were relinquished by the allottees, and the allotments canceled; No. 37, in favor of John Salla Salla, was restored to the public domain by Executive Order of January 19, 1895; and Nos. 33, 35, and 36 in favor of Ko mo dal kiah, Que lock us som, and Se cum ka nal lux, respectively, are unsurveyed, but the Commissioner of the General Land Office has directed the surveyor-general for Washington to close the public surveys on these allotments and segregate them from the public lands.

Patents for the remaining allotments, as "replatted and lotted" by the surveyor-general of Washington under instructions from the Commissioner of the General Land Office, were sent on May 13, 1907, to Inspector Tinker for delivery to the allottees or their heirs, the heirs to be ascertained according to the laws of the State of Washington.

The "Moses agreement act" of March 8, 1906 (34 Stat. L., 55), provides among other things that the allottees, or heirs of deceased allottees, may sell and convey all the lands covered by any patent, except 80 acres, under regulations to be prescribed by the Secretary of the Interior, all such conveyances to be subject to his approval to convey title. The inspector was instructed to visit and appraise each lot separately and to report all the facts, so that the Department

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-070

60    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

might be able to determine the method of sale which will bring the
largest return to the Indians.  Only a preliminary report has been
received from him.

*Crow.*—My last annual report showed that allotments to the Crow
Indians in Montana were practically completed.  The result of the
field work has been submitted to the Department and approved, with
the exception of a few allottees on Schedule A.  Their allotments have
been held up because of the inability of the Office to secure the sur-
vey of the lands in accordance with an adjustment made by a special
agent of this Office and one from the General Land Office.  Moreover,
further action has been suspended to allow settlers who, by error,
were permitted to enter lands belonging to Indians, an opportunity
to appeal from the order of cancellation issued by the General Land
Office.  It is believed that the cases can be closed within the next two
months.

*Flathead.*—The field work on the Flathead Reservation in Montana
has progressed very rapidly.  Of the 2,170 persons known to be en-
titled to allotment 1,573 had their selections scheduled on July 27,
1907, and the work was proceeding at the rate of about 75 selections
a week, which indicates that the field work will be completed by the
middle of October.

The surveys of the reservation have not been finished, but a special
examiner from the General Land Office has been on the ground for
some time with instructions to extend the surveys over such unsur-
veyed parts of the reservation as contain lands valuable for timber
or other purposes.  This work will doubtless be finished soon after
the completion of the field work of making the allotments.  It is
hoped that the commission to appraise the lands can begin work
before the end of October.

*Fort Berthold.*—Allotments were made in 1895 to the Indians of
the Fort Berthold Reservation in North Dakota under the act of
March 3, 1891 (26 Stat. L., 989–1032), for which patents were issued
and delivered to the parties entitled.

The act of March 1, 1907 (34 Stat. L., 1042), authorizes the Secre-
tary of the Interior to—

cause an allotment of 80 acres to be made from the lands of the Fort Berthold
Reservation, including lands to be restored, to each member of the several tribes
belonging on and occupying it now living and to whom no allotment has hereto-
fore been made, and where any allotment of less than 80 acres has heretofore
been made, the allottee, if now living, shall be allowed to take an additional
allotment which, with the land already allotted, shall not exceed 80 acres.

To make these additional allotments a special agent was appointed
on April 30, 1907, and he is now at work in the field.

*Jicarilla.*—The act of March 4, 1907 (34 Stat. L., 1413), author-
ized the cancellation of allotments heretofore made on the Jicarilla

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 98 of 212   Page ID #:4114

Reservation in New Mexico, the reallotment of the lands, and the sale of the timber, the proceeds from which are to be used for the advancement of the Indians.   An allotting agent has been at work there since June readjusting allotments heretofore made.

*Klamath.*—An allotting agent has been designated to make allotments to the children of the Klamath Indians in Oregon as provided in the act of May 27, 1902 (32 Stat. L., 260), and instructions were forwarded to him on September 3, 1907.

*Makah.*—On April 16, 1907, the President appointed William M. Peterson special allotting agent to allot the agricultural lands of the Makah Reservation, in Washington, under the act of February 8, 1887 (24 Stat. L., 388), as amended by the act of February 28, 1891 (26 Stat. L., 794). He was instructed on April 24 to allot to each Indian belonging on the reservation 10 acres of agricultural land, and to reserve the necessary tracts for school and other purposes, including such lands adjoining the town site of Neah Bay as might be needed hereafter for town-site purposes.

*Oto.*—The Oto Reservation, in Oklahoma, has been divided among the members of the tribe entitled to land under the act of April 21, 1904 (33 Stat. L., 217). The only unallotted land is 640 acres reserved for the use of the tribe in common, and 720 acres reserved for administrative, church, school and other public uses.

*Osage.*—Allotments on the Osage Reservation are referred to on page 119.

*Pyramid Lake.*—A complete census has been made of all Indians who belong to the Pyramid Lake Reservation, in Idaho, or are entitled to receive allotments thereon. This is preparatory to a compliance with section 26 of the act of April 21, 1904 (33 Stat. L., 225), which provides that 5 acres of irrigable land shall be allotted to each Indian belonging on the reservation, and that any lands in the reservation made irrigable by work prosecuted under the reclamation act of June 17, 1902 (32 Stat. L., 388), may be "reclaimed, utilized, and disposed of" by the Secretary of the Interior as though they were a part of the public domain.

*Quinaielt.*—The allotting of the Indians on the Quinaielt Reservation, in Washington, has been attended with more difficulties than elsewhere. The total number entitled by the latest computation will probably not exceed 400; on July 20, 1907, 366 selections had been scheduled, of which 119 have been approved, and the allotting agent has designated November 1 as the date when he will be able to complete his work. It will then be necessary to consider what shall be done with the surplus lands and their timber.

*Sac and Fox in Kansas.*—The remnant of the lands of the Sac and Fox of Missouri who live in Kansas has been allotted to the children

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-072

of former allottees in accordance with the act of June 21, 1906 (34 Stat. L., 349), and another reservation thus eliminated.

*Shoshoni.*—On April 29, 1907, the Department approved schedules of allotments to the Shoshoni and ·Arapaho Indians on the Shoshoni Reservation in Wyoming, which had been made under the treaty con-·cluded July 3, 1868 (15 Stat. L., 637), and the amended general allotment act. The Shoshoni schedule showed 116,340.68 acres on surveyed lands and approximately 1,603.20 acres on unsurveyed or partly surveyed lands. The Arapaho schedule showed 71,216.28 acres on surveyed lands and approximately 2,980.98 acres on land unsur-·veyed or partly surveyed or on the unmeandered parts of the Big Wind and the Big Popo Agie rivers. Only allotments on surveyed lands were approved.

The Department has given instructions to have the south bank of Big Wind River and the north bank of the Popo Agie River mean-·dered, and certain fractional townships surveyed. When this is done the allotments on the diminished reservation will be finished.

*The Sioux.*—The act of March 1, 1907 (34 Stat. L., 1048), author-·ized the allotment of lands to children of the Sioux tribes in the Dakotas, and to the married women of the Cheyenne River, Lower Brulé, and Standing Rock reservations who had not already been provided for. A special allotting agent has been appointed to make allotments to children on the Lower Brulé, Crow Creek, and Stand-·ing Rock reservations and to the married women of the Cheyenne River Reservation. He began work on the Lower Brulé Reserva-·tion early in June and his reports show satisfactory progress. The exact number of allotments to be made is not known, but it is believed that this work will be closed at the end of the current fiscal year.

The work begun by the special allotting agent on the Standing Rock Reservation in June, 1906, has advanced most satisfactorily because the Indians there have shown a greater interest in receiving allotments than any other Sioux. Often as many as 15 or 20 Indians have followed the surveyors in the field, urging that the lands which they had selected be the next to be surveyed. A little additional help was given Agent Gunderson so that he might be able to accom-·modate the Indians who showed such interest in the work. The total number of allotments to be made is approximately 3,500. At the rate it is now going forward, the field work is likely to be completed about the close of the present year.

The Pine Ridge Sioux have been assigned their lands under the act of March 2, 1889 (25 Stat. L., 888). The provision for allotments to children and married women has materially increased the work, which bids fair, at the present rate, to continue four or five years more. The number of Indians entitled to allotment exceeds 6,700, and probably not more than 3,000 have yet had their selections

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google      Original from UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 100 of 212   Page ID #:4116

scheduled. Much more rapid progress could be made if funds were available to employ enough persons to do the work. In view of the importance of speedily giving these people their lands in severalty and preparing for the restoration of the surplus lands to the public domain, it seems that it would be economical and profitable to allow the Office money to increase the allotting force enough to close the work within the next two years, possibly during the next year.

The act of March 2, 1907 (34 Stat. L., 1230), authorized the sale or other disposal of all that part of the surplus or unallotted lands in the Rosebud Reservation, in South Dakota, lying south of the Big White River and east of range 25 west of the sixth principal meridian. It also provided that before opening the lands the Secretary of the Interior might permit any Indian who had an allotment within the Rosebud Reservation to relinquish such allotment and to receive in lieu thereof an allotment anywhere within said reservation, and that he should also allot 160 acres of land to each child of Indian parentage, living at the time of the passage of the act but still without an allotment, whose father or mother " is or was, in case of death," a duly enrolled member of the Sioux tribe of Indians belonging on the Rosebud Reservation.

John H. Scriven, who has been appointed to make the allotments, entered upon his duties on May 13, 1907, and expects to finish them in about a year.

*Spokan.*—Allotments are being made to the Indians on the Spokan Reservation, in Washington, by Special Allotting Agent Clair Hunt, under authority of joint resolution of June 19,1902 (32 Stat. L., 744). Under the act of June 21, 1906 (34 Stat. L., 377), he was directed to reserve for town-site and terminal purposes not exceeding 360 acres at or near the junction of the Columbia and Spokane rivers. On December 26 he reported the reservation of lots 7, 8, 9, 10, 11, the E. ½ of the NW. ¼ and the NW. ¼ of the NE. ¼ of sec. 30, T. 28 N., R. 36 E., Willamette meridian, aggregating 293.65 acres.

*Turtle Mountain.*—The work of allotting the Turtle Mountain Chippewa Reservation in North Dakota under the act of April 21, 1904 (33 Stat. L., 194), has been concluded, and the 275 quarter sections comprising the reservation have been divided among 326 Indians, heads of families. In addition, about 650 locations have been made on the public domain, under the same act, to members of the Turtle Mountain band of Chippewas, thus providing for approximately 1,000 Indians.

According to the census of 1905, there were 2,362 enrolled members of the Turtle Mountain band. Some few additions were recommended by E. A. Allen, special agent, who enrolled the Indians entitled to maintain tribal relations with this band, and some names have been stricken from the roll. Accepting the total enrollment as 2,370 in

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-074

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 101 of 212   Page ID #:4117

round numbers, there remain approximately 1,370 Indians for whom no provision has been made, nearly all of them wives or children of reservation allottees. If these Indians are to secure lands it must be from the public domain in North Dakota and Montana. But protests have been made against their taking up so much of the public domain in these States, because the lands will remain untaxable as long as they are held in trust by the Government. The Office therefore intends to ask the Congress at its next session to appropriate a sufficient sum of money to pay to these 1,370 Indians an adequate amount in lieu of the lands to which they are entitled.

*Uintah.*—My last report dwelt at some length on the condition of allotments on the Uintah Reservation in Utah, because it presented such an illustration of the unwisdom of doing in haste work that demands deliberation. I have had to keep an allotting force on the ground the greater part of the year, endeavoring to straighten out the difficulties arising from the fact that the act of Congress providing for the opening limited our time so that we had no chance to survey the lands before making the allotments. The field work of the survey, when finished, was found to be faulty. The lands were assigned by regular subdivisions as far as practicable, but the changes in the surveys and plats will make it necessary to cancel a very large percentage of the allotments and to issue new certificates or trust patents showing the lands which the Indians are actually to receive.

*Walker River.*—There have been made to the Indians of the Walker River Reservation in Nevada 491 allotments, and patents for all except six, which are on unsurveyed land, were sent on May 15, 1907, to the superintendent of the Carson School for delivery. Besides the allotments, which cover a total of 9,783.25 acres, there were set aside for agency and school 80 acres; for cemetery 40; for the Methodist Episcopal Church 160; for grazing 37,390.29; and for timber 3,356.62 acres. By Presidential proclamation of September 26, 1906, all the remaining lands were opened to settlement on October 29 and made subject to disposal under existing law.

*White Earth.*—The Chippewa Commission, when it disbanded in 1900, had not completed the allotments on the White Earth Reservation in Minnesota under the act of January 14, 1889 (25 Stat. L., 642), and since then the superintendent in charge has taken up the work. The chief difficulty in the way of accomplishing it is the unwillingness of the Mille Lac, Sandy Lake, and White Oak Point bands to remove to White Earth, or their indifference. Though every reasonable appeal has been made to them, those who have come have straggled into the reservation only a few at a time, and many still hold off.

On June 5, 1907, Superintendent Michelet submitted a schedule of 505 allotments made to the members of the various bands of Indians entitled under the act of 1889, embracing an approximate

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-075

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 102 of 212   Page ID #:4118

area of 40,152 acres, and also a schedule of 2,796 allotments made to the members of the several bands of Indians on the White Earth Reservation under the act of April 28, 1904 (33 Stat. L., 539), embracing an approximate area of 223,790 acres.  With the exception of 143 allotments which have been canceled or are still pending, the schedules were approved on September 13 and have been entered on the tract books of the Office, and the Commissioner of the General Land Office has been directed to cause patents to issue accordingly.

### NONRESERVATION ALLOTMENTS.

On April 22, 1907, the Department revoked its order of February 21, 1903, which suspended all allotments made to nonreservation Indians under the fourth section of the general allotment act of February 8, 1887 (24 Stat. L., 388), as amended ·by the act of February 28, 1891 (26 Stat. L., 794), and the Commissioner of the General Land Office was directed to issue trust patents on all approved allotments against which no specific charges had been filed.  The order of suspension had directed that an investigation of all unapproved allotments be made jointly by this Office and the General Land Office; but neither office has had a field force available to do the work. Meanwhile, delay in the settlement of the question of allowing or canceling the suspended allotments was rendering the allottees insecure in their homes, as they were in doubt whether or not to continue to occupy and cultivate the land on which they had settled.  The revocation of the order was therefore recommended, because it was believed that less harm would result from the patenting of the approved allotments than from continuing their suspension.

Since the date of my last report 925 fourth-section allotments have been approved and 106 trust patents issued.

*Allotments to mixed bloods.*—The decision laid down in the case of Ulin *v.* Colby (24 L. D., 311), which held, in effect, that Indians other than full bloods are not entitled to allotments under the fourth section of the general-allotment act, has worked a great injustice to many mixed-blood Indians.  It tended to nullify the purpose of that act, which was to break up tribal relations and place the individual members of the tribe in a position of self-support and self-dependence with the individual instead of the tribe as the unit. Many mixed-blood Indians are as truly Indian in character and habits as the full bloods themselves.  Since, under the act of June 7, 1897 (30 Stat. L., 90), they were entitled to the benefits of tribal relations by virtue of their mother's membership in the tribe, to hold that, because of their white ancestry, they should be denied the benefits of the fourth section of the general-allotment act was to punish them for seeking a living independently of their tribe.  The Office

22849—08——5

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

CVWD 563-076

has been of the opinion that the duty which the Government owes these people is not interrupted by an infusion of white blood; therefore, on its recommendation, the Department directed on May 8, 1907, that the ruling followed in the decision of Ulin *v.* Corby be thereafter disregarded, and that—

one who is recognized by the laws and usages of an Indian tribe as a member thereof, or who is entitled to be so recognized, must be held qualified to take an allotment out of the public lands under the fourth section of the act of February 8, 1887, as amended by the act of February 28, 1891.

*Carson Sink.*—In my last report I outlined the plan which had been worked out to bring the allotted lands of the Pah Ute Indians in Carson Sink, Nevada, within a reclamation project. The plan was to extend the Truckee-Carson irrigation project over all existing allotments; to cancel existing allotments and dispose of the lands covered by them, except 7¼ sections, under the homestead laws; to reallot these 7¼ sections to the Indians in 10-acre tracts with perpetual water rights; and out of the proceeds of the other lands to repay to the reclamation fund the cost of reclaiming the Indian lands.

During the fall of 1906 Special Allotting Agent Casson procured the relinquishments of 17 patented and 83 unpatented allotments. On April 19, 1907, in accordance with Office recommendation, the Commissioner of the General Land Office was directed to cancel all the patented allotments which had been relinquished and all but two of the unpatented allotments embraced within the Truckee-Carson project, and to withdraw the lands covered by them, except the 7¼ sections, under the second form of withdrawal authorized by the act of June 17, 1902 (32 Stat. L., 388). The reserved sections were to be reallotted to the Indians in 10-acre tracts. On the same date the Director of the Reclamation Service was instructed to carry out that part of the plan dependent on his office.

It is now necessary to procure authority to cancel the unrelinquished patents and to obtain an appropriation for an advance of funds to defray the cost of reclaiming the lands reserved for reallotment. On December 1, 1906, I submitted to the Department a draft of an item of legislation which would carry the plan into effect, but it failed to become a law. I regard this as a matter of so great importance that I shall again submit a draft of legislation for recommendation to the Congress at its next session, embracing the necessary provisions to afford relief to the Indians and enable the Reclamation Service to complete its project.

*Where allotments are being made.*—Special Alloting Agent George A. Keepers reported for the month ending June 30, 1907, that up to that date he had made 275 allotments on the public domain in New Mexico.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google        Original from
                           UNIVERSITY OF MICHIGAN

CVWD 563-077

The resignation of William E. Casson on December 29, 1906, was accepted and Howard G. Bartlett, of Rome, N. Y., was commissioned to fill the vacancy. Agent Bartlett has been assigned to make allotments to Indians on the public domain in California and Arizona in the neighborhood of Needles.

There is a great deal of work to be done in making and adjusting fourth-section allotments in Oregon, Idaho, and Washington. In Washington the Northern Pacific Railway Company has relinquished its right to certain lands within its grant in townships 33 and 34, range 44 east, because those lands have long been in the occupancy of certain Kalispel Indians. The tentative allotments made by Special Allotting Agent John K. Rankin August 20, 1897, to the Kootenai Indians ought to be followed up and the lands allotted under the fourth section of the general allotment act.

Owing to the rapidity with which the public land available for allotment to Indians is being appropriated, this work should be prosecuted without the interruptions which have been so frequent during the last three or four years, so that the Indians on the public domain may be provided with homes before all suitable and available lands have passed into the possession of white settlers.

### THE BURKE LAW.

I devoted considerable space in my last report to a consideration of the act of May 8, 1906 (34 Stat. L., 182), commonly known as "the Burke law." One of its important provisions was the authority conferred on the Secretary of the Interior to issue patents in fee simple to allottees whenever he was satisfied that they were competent to care for their own affairs.

Under this act 881 applications have been received, and the number of cases acted on favorably up to September 1 is as follows:

| | | | |
|---|---|---|---|
| Klamath River, Cal | 2 | Ponca, Okla | 3 |
| Southern Ute, Colo | 1 | Kiowa, Okla | 12 |
| Nez Percé, Idaho | 18 | Grande Ronde, Oreg | 87 |
| Iowa, Kans | 1 | Siletz, Oreg | 25 |
| Potawatomi, Kans | 4 | Umatilla, Oreg | 39 |
| Kickapoo, Kans | 2 | Crow Creek, S. Dak | 2 |
| Sac and Fox, Kans. and Nebr | 5 | Sisseton, S. Dak | 31 |
| Santee and Ponca, Nebr | 30 | Lower Brulé, S. Dak | 2 |
| Omaha, Nebr | 24 | Rosebud, S. Dak | 34 |
| Winnebago, Nebr | 10 | Yankton, S. Dak | 57 |
| Leech Lake, Minn | 7 | Colville, Wash | 1 |
| White Earth, Minn | 16 | Seger, Okla | 1 |
| Cheyenne and Arapaho, Okla | 15 | Yakima, Wash | 5 |
| Sac and Fox, Okla | 14 | Quapaw, Ind. T | 1 |
| Citizen Potawatomi and Absentee | | La Pointe, Wis | 7 |
| Shawnee, Okla | 118 | Oneida, Wis | 171 |
| Kickapoo, Okla | 1 | | |
| Oto, Okla | 7 | Total | 753 |



Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

68      REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

The total number of patents issued to date is 477.  It is less than the number of applications which have had favorable action, because time is required for the preparation of the patents by the General Land Office after their issue has been directed.

The effort to carry out the intent of the Burke law has caused much labor, but the results on the whole are very satisfactory.  The chief difficulty is to ascertain the capacity of applicants.  Each agent or superintendent has his individual point of view, which, no matter how sincerely he may strive to carry out the spirit of the law, colors his reports and recommendations.  A good many allottees have appealed from the pro forma decisions of the Office, which has then ordered a special investigation, with results usually favorable to the appellants.

Some curious reasons have been advanced in support of conclusions for or against the capacity of an allottee.  In one case the agent laid considerable stress on the fact that the Indian wore short hair. Others make the educational test paramount.  The Office always holds that there is no one standard by which every person can be judged, but that probably the safest test is the industry and thrift of the applicant.  If an Indian has supported himself by his own exertions, whatever calling he may have followed, it is reasonable to suppose that he has acquired enough knowledge of money values and opportunities to justify the Government in trusting him with his own land.

On the whole, this provision of the Burke law is becoming better understood, and its effects are believed to be most beneficial.  Doubtless mistakes have been made, and will continue to be made, here and there, in its execution, but most of these will be found to have grown out of misinformation received by the Office from other sources than its own agents.  The average citizen is not likely to deny a request for his signature to a petition merely because he is not well enough acquainted with the facts; it is easier to sign than to refuse, especially when one can give no affirmative reason for refusing, and in this way the Office is sometimes misled.

The Burke law specifically withheld from the Secretary of the Interior authority to issue patents in fee to allottees in the Indian Territory.  The Congress doubtless intended to except only the members of the Five Civilized Tribes in that Territory from the scope of the act; but the effect of the law is to exclude from its benefits the Indians of the Quapaw Agency, the only agency in the Territory besides that for the Five Civilized Tribes.  As most of the Indians attached to the Quapaw Agency are thoroughly competent to manage their own affairs, and ought no longer to be held in such property bondage, it is hoped that the Congress at its next session will amend the wording of the Burke law so as to make plain its real purpose with regard to the Indian Territory.


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-079

## DOWER IN INDIAN ALLOTMENTS.

In my report for 1905 it was argued that under the laws of Oregon the widow of a deceased allottee would be entitled to dower: The question had come up in connection with allotments on the Umatilla Reservation. This opinion is sustained by a recent decree of the circuit court of the United States for the district of Oregon in the case of Sarah Wheeler, formerly Sarah Winslow, plaintiff, *v.* Annie Pettite and the United States, trustee, defendants.

The complainant, an Indian woman, brought this suit to determine her right as the lawful widow of Henry Winslow to dower in lands on the Grande Ronde Reservation, in Oregon, allotted to Winslow, a full-blood Indian, under the general allotment act of February 8, 1887.  She married him in 1881, and they had two daughters, both of whom are now living.  In 1890 Winslow, without being separated or divorced from Sarah, took another Indian named Annie as his wife, and they had one son.  When Winslow died, in 1896, he left Annie and this son in possession of the allotment.  Annie afterwards married a man named Pettite, with whom she is now living.

The court said that one of the main purposes of the general allotment act was to furnish a permanent home ultimately for the families of deceased Indians, that this indicated a purpose to secure the widow by some permanent right in the home of a deceased head of a family, and that dower was suited to this purpose.  Thereupon it was decided that the complainant was entitled to a dower right in the allotment of her deceased husband, Henry Winslow.  If no appeal is taken, the court will be asked to set off the dower to the widow.

## COURT JURISDICTION OF ALLOTMENTS.

In a case decided by the Supreme Court of the United States on February 25, 1907, it was held that State courts are without jurisdiction over lands allotted to Indians.  The case was of William McKay (substituted for Mary Kalyton) et al., plaintiff in error, *v.* Agnes Kalyton, by Louise Kalyton, her guardian ad litem, and the suit was begun in the circuit court of Umatilla County, Oreg., and involved an allotment made under the Umatilla act of March 3, 1885 (23 Stat. L., 340).

Briefly, the course of the argument was: That the case of the United States *v.* Rickert (188 U. S., 432–435) settled that the United States retained such control over allotments as would cause allotted lands to inure during the trust period for the sole use and benefit of allottees; that in the Smith case (194 U. S., 408) it was observed that prior to the passage of the act of August 15, 1894 (28 Stat. L., 286), " the sole authority for settling disputes concerning allotments resided in the Secretary of the Interior," and consequently contro-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

versies necessarily involving a determination of the title and incidentally of the right of possession of Indian allotments during the trust period were not primarily cognizable by any court, either State or Federal; that the act of 1894, which delegated to the courts of the United States the power to determine such questions, can not be construed as having conferred upon the State courts the authority to pass upon Federal questions over which, prior to the act of 1894, no court had any authority; that the purpose of the act of 1894 to continue exclusive Federal control over the subject was manifested by its command that a judgment or decree rendered in any such controversy should be certified by the court to the Secretary of the Interior; that by this provision, as pointed out in the Smith case, the United States consented to submit its interest in the trust estate and the future control of its conduct concerning it to the decrees of the courts of the United States, a power which such courts alone could exercise; that subsequent legislation confirmed this policy, as, by the amendments to the act of 1894, approved February 6, 1901 (31 Stat. L., 760), it is expressly required that in suits authorized to be brought in the circuit courts of the United States respecting allotments of Indian lands "the parties thereto shall be the claimant as plaintiff and the United States as party defendant;" and that nothing could more clearly demonstrate the conception of Congress that the United States continued as trustee to have an active interest in the proper disposition of allotted Indian lands and the necessity of its being made a party to controversies concerning allotments.

Therefore the Supreme Court held that the State court was without jurisdiction to entertain the controversy, and the suggestion that the controversy involved the mere possession and not the title to the allotted land was without merit, since, under the legislation of the Congress, the right of possession was dependent upon the existence of an equitable title in the claimant to the ownership of the allotted lands.

### TIMBER AND MINERALS ON RESERVATIONS.

Much of the timber on Indian reservations, especially in the Southwest, is overripe, and in dying effects a loss to the Indians of millions of dollars every year. It has been demonstrated that a systematic cleaning up, including the cutting of matured and diseased trees, improves the forest at large, eliminates to a great extent the danger of forest fires, and allows the grass and young trees to grow. The matured merchantable timber within the reservations of both classes—treaty and Executive order—ought to be cut and sold for the benefit of the Indians, and the proceeds used, under the direction of the Secretary of the Interior, for their benefit in purchasing stock or farming implements. If this were done the Indians would realize that their

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 108 of 212   Page ID
#:4124

timber is of value and that it is to their direct interest to protect the forests from fires.

The disposal of the timber would best be by a method like that followed by the Forest Service in selling timber on forest reserves; and the Office would have no objection to the Forest Service taking charge of the sale of timber on Indian reservations. There is no general law under which timber can be sold, except the dead timber standing or fallen which may be disposed of under the act of February 16, 1889 (25 Stat. L., 673), but experience has demonstrated that it is practically impossible to keep lumbermen, when operating under this act, from cutting green timber.

It is the purpose of the Office, with your approval, to request the Congress at the coming session to enact legislation applicable to all Indian reservations, whether allotted or unallotted, authorizing the sale of the timber under such regulations and restrictions as may be imposed by the Department.

Much of the land within some of the Indian reservations is supposed to be underlaid with minerals, and under the act of February 28, 1891 (26 Stat. L., 794), mineral leases may be made for a term not exceeding ten years. I do not see any reason why such mineral resources should not be developed, but the period to which leases are now confined is not long enough to justify persons or corporations in investing large sums of money in the undertaking, especially where the precious metals are concerned; and it is a part of my legislative programme to ask the Congress to fix longer periods for mineral leases. From this source the Indians ought to derive a good revenue not only through the medium of royalties, but by the increased opportunity for employment at gainful labor; and at the same time the development of the country in which they are living will not be longer retarded.

### LOGGING ON INDIAN RESERVATIONS.

During the year logging operations have been conducted on Indian reservations as follows:

### FLATHEAD RESERVATION.

An account of the blown-down timber within the Flathead Reservation in Montana, which was about to be advertised for public sale, was given in my last report. On November 10, 1906, the Department accepted the joint bid of Ed Donlan and W. B. Russell, of Missoula, Mont., for the timber in the Evaro-Jocko district and the bid of the John O'Brien Lumber Company, of Somers, Mont., for part of the timber in what is known as the Post Creek district. The remaining

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-082

timber in the Post Creek district has not been sold, and no bids were received for the timber on the Camas Prairie-Dayton Creek district. The agent has been asked for a recommendation as to the disposition to be made of this unsold timber.

## LA POINTE AGENCY.

Allottees on Indian reservations in Wisconsin under the jurisdiction of the La Pointe Agency are permitted to dispose of the timber on their allotments under the treaty of September 30, 1854 (10 Stat. L., 1109).   J. H. Cushway & Co., of Ludington, Mich., are the authorized timber contractors on the Lac du Flambeau Reservation; Justus S. Stearns, of Ludington, Mich., on the Bad River Reservation, and Signor, Crisler & Co., of Rice Lake, Wis., and Frederick L. Gilbert, of Duluth, Minn., on the Red Cliff Reservation.   During the last fiscal year timber contracts with allottees have been approved as follows:

| | |
|---|---|
| Bad River Reservation | 8 |
| Red Cliff Reservation | 1 |
| Lac Courte Oreille Reservation | 56 |
| Lac du Flambeau Reservation | 14 |
| Total | 79 |

The money accruing from the sale of timber on allotted lands is deposited in certain selected banks, which are required to give bonds for the faithful accounting for the funds deposited with them and the payment of the agreed rate of interest.   The agent has instructions not to allow deposits to exceed the aggregate amount of bonds furnished by a bank.   The deposits with each bank and the aggregate amount of bonds furnished by each at the close of the fiscal year were:

*Deposits in banks.*

| | Deposits. | Bonds. |
|---|---|---|
| City National Bank of Duluth, Minn | $128,384.56 | $135,000 |
| First National Bank of Bayfield, Wis | 64,126.88 | 60,000 |
| Northern National Bank of Ashland, Wis | 255,490.70 | 260,000 |
| First National Bank of Hudson, Wis | 168,715.52 | 175,000 |
| Ashland National Bank of Ashland, Wis | 238,969.00 | 260,000 |
| Total | 855,686.66 | 890,000 |

In July the agent was directed to reduce the deposits in the Bayfield bank to $60,000 or call on the bank for an additional bond.   He withdrew the surplus deposits.

*Red Cliff.*—The sale of timber by allottees on the Red Cliff Reservation is made under the joint resolution of Congress of February 20, 1895 (28 Stat. L., 970), as well as by the treaty of 1854.   By Department regulations of July 29, 1897, Mr. Gilbert, the authorized contractor, was required, among other things, to establish a sawmill on the reservation.   On May 17, 1905, the mill was burned.



Digitized by Google     Original from UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

CVWD 563-083

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 110 of 212   Page ID #:4126

On January 3, 1907, after considerable correspondence, the Department authorized Mr. Gilbert to rebuild the mill and gave him ten years' additional time for removing the timber, while he, in turn, relinquished his right under his bid in 1897 to take the cedar.

On Agent Campbell's recommendation, the Department granted authority on June 13 for the allottees to sell their cedar. August 15 was the date set for opening bids for the cedar, but no bids were received.

*Fond du Lac.*—On June 8, 1905, the Department approved regulations to govern the cutting and sale of timber on allotted lands on the Fond du Lac Reservation, in Minnesota, in accordance with the act of April 21, 1904 (33 Stat. L., 189). Notice of the willingness of the Government to permit allottees to dispose of their timber was published in several of the leading newspapers throughout the Northwest, but the bids received were all rejected as too low. On Department authority of December 15, 1906, the notice was republished and bids were opened by the agent on January 26, 1907. Martin Brothers, of Duluth, Minn., were found to be the highest and best bidders and their proposition was accepted. They have not begun active timber operations, but their bond has been approved and it is assumed that they will carry on the work during the coming logging season.

*Grand Portage.*—Under the act of February 12, 1901 (32 Stat. L., 785), the Department approved regulations dated October 2, 1901, authorizing allottees of the Grand Portage Reservation, in Minnesota, to sell the standing or fallen timber on their allotments, except the pine. These regulations were extended from time to time and operations were satisfactorily conducted. On recommendation of the agent, the Department on June 13, 1907, authorized the publication of notices in newspapers in Minnesota and Wisconsin that the allottees would be allowed to dispose of their pine also. Regulations to govern its cutting and sale were approved under the act of April 21, 1904, and bids for the purchase of the pine opened on August 16 are now under consideration.

### LEECH LAKE RESERVATION.

No timber contracts covering allotted lands under the jurisdiction of the Leech Lake Agency, in Minnesota, have been approved since December 22, 1905. Prior to that several were approved and during the last fiscal year $60,255.45 was collected for timber sold under those contracts. In addition, $1,427.88 was collected from R. H. King for trespass, and $400.61 from the Northland Pine Company—a charge of 25 cents per thousand feet above the contract price for the timber cut last year, because the company was found to be paying that amount for timber on adjoining ceded lands.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-084

**74**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

### MENOMINEE RESERVATION.

Reference was made in my last report to the act of June 28, 1906 (34 Stat. L., 547), which authorized the cutting and sale of the dead-and-down timber in what is known as the "blown down district" on the Menominee Reservation, in Wisconsin. Modified regulations governing logging operations under the act were promulgated on April 8, 1907, and John W. Goodfellow was appointed superintendent of logging. The locations of three mill sites have been approved, and contracts for the cutting of the timber are under consideration.

During the logging season of 1906–7 the Menominees cut and banked 17,500,000 feet of green and dead-and-down pine and hemlock saw logs under the act of June 12, 1890 (26 Stat. L., 146). The logs were sold under sealed bids to the Paine Lumber Company, Limited, for $325,700, or at the rate of $18.61+ per thousand feet, the highest price ever obtained for the Menominee timber.

### LEASING OF INDIAN LANDS.

I have planned to make an experiment of giving to progressive Indians greater freedom in the management of their allotments, so that while their lands are held in trust they may better qualify themselves to transact their own business and thus be prepared to take full charge of their affairs at the expiration of the trust period. Steps have been taken to ascertain at several agencies the names of Indians presumtively capable of managing or leasing their lands and collecting the rentals without departmental supervision, and also the names of parents who may safely be permitted to manage or lease the lands of their children now in school; and the Department has approved my recommendation that 30 Indians of the Crow Creek Agency, in South Dakota, 33 of the Southern Ute Agency, in Colorado, and 70 of the Shoshoni Agency in Wyoming, be permitted to try their hands at managing their allotments as indicated.

The terms for which allotted lands may be leased were mentioned in the last annual report. Grazing leases for more than one year and farming leases for more than two years provide for placing some substantial improvements on the premises or for breaking new land.

National banks have been selected as depositories for funds arising from leasing lands of minor orphans and for all individual Indian moneys which are not already provided for where the amounts are large enough to justify the banks in giving bonds to guarantee their safety.

The following list includes leases approved between August 15, 1906, and August 15, 1907:

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS. 75

*Leases of allotted lands.*

| Location. | No. of leases. | Purpose. |
|---|---|---|
| Cheyenne and Arapaho, Oklahoma | 1,049 | Farming and grazing. |
|  | 2 | Business. |
| Cantonment, Oklahoma | 184 | Farming and grazing. |
|  | 2 | Business. |
| Seger, Oklahoma | 185 | Farming and grazing. |
|  | 2 | Business. |
|  | 1 | Residence. |
| Carson, Nevada | 2 | Business. |
| Colville, Washingto | 3 | Farming and grazing. |
|  | 1 | Business. |
| Crow, Montana | 2 | Farming. |
| Fort Totten, North Dakota | 18 | Do. |
| Kaw, Oklahoma | 290 | Farming and grazing, |
| Kickapoo, Sac and Fox and Iowa, Kansas: |  |  |
| Kickapoo | 118 | Do. |
| Sac and Fox | 33 | Do. |
| Iowa | 31 | Do. |
| Kiowa, Oklahoma: |  |  |
| Kiowa | 203 | Do. |
|  | 2 | Business. |
| Comanche | 253 | Farming and grazing. |
|  | 3 | Business. |
| Apache | 32 | Farming and grazing. |
|  | 1 | Residence. |
| Caddo | 128 | Farming and grazing. |
|  | 1 | Business. |
| Wichita | 79 | Farming and grazing. |
| Klamath, Oregon | 416 | Grazing. |
| Nez Percé, Idaho | 373 | Farming and grazing, |
|  | 20 | Business. |
| Omaha, Nebraska | 525 | Farming and grazing, |
| Oneida, Wisconsin | 1 | Farming. |
| Oto, Oklahoma | 330 | Farming and grazing, |
| Pawnee, Oklahoma | 307 | Do. |
| Ponca and Tonkawa, Oklahoma: |  |  |
| Ponca | 817 | Do. |
|  | 4 | Business. |
| Tonkawa | 18 | Farming and grazing, |
| Potawatomi, Kansas | 257 | Do. |
| Round Valley, California | 21 | Farming. |
| Sac and Fox and Iowa, Oklahoma: |  |  |
| Sac and Fox | 221 | Farming and grazing, |
| Iowa | 21 | Do. |
| Santee and Ponca, Nebraska: |  |  |
| Santee | 135 | Do. |
| Ponca | 48 | Do. |
| Shawnee, Potawatomi, and Kickapoo, Oklahoma: |  |  |
| Absentee Shawnee | 107 | Do. |
| Potawatomi | 21 | Do. |
| Kickapoo | 35 | Do. |
| Shoshoni, Wyoming | 18 | Farming. |
| Siletz, Oregon | 2 | Farming and grazing. |
| Sisseton, South Dakota | 195 | Do. |
| Southern Ute, Colorado | 4 | Farming. |
| Uintah and Ouray, Utah | 25 | Do. |
| Umatilla, Oregon | 324 | Do. |
| Winnebago, Nebraska | 637 | Farming and grazing. |
| Yakima, Washington | 138 | Farming. |
|  | 1 | Business. |
| Yankton, South Dakota | 385 | Farming and grazing. |
| Total | 8,031 |  |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-086

The following table gives the leases for the occupancy of tribal lands which have been approved since September 30, 1906:

*Leases of tribal lands.*

| Reservation. | Number of leases. | Nature of land. | Term. | Number of acres. | Rate per acre. | Rental per annum. |
|---|---|---|---|---|---|---|
| Cheyenne River.. | 1 | Grazing ............. | 5 years.. | 291,840.00 | ................. | $13,132.80 |
| Chilocco ......... | 11 | Agricultural....... | 3 years.. | 1,680.00 | ................. | (a) |
| Fort Peck ........ | 1 | Farming .......... | 5 years.. | 1,160.00 | ................. | 1,000.00 |
| Lemhi ........... | 1 | ....do ............ | 7 months | .......... | ................. | 200.00 |
| Omaha........... | 21 | Farming and graz-<br>ing. | 1 year .. | 1,786.74 | ................. | 2,026.15 |
| Osage .......... | 59 | Grazing ............. | ....do .. | 502,450.00 | $0.10  to $0.71 | 186,137.71 |
| Standing Rock... | 4 | ....do ............. | 5 years.. | 857,120.00 | .036 to   .045 | $2,420.48 |
| Winnebago ...... | 8 | Farming and graz-<br>ing. | 1 year .. | 350.46 | .40  to   2.06 | 449.03 |
| Total....... | 106 | ................... | ......... | 1,656,336.20 | ........ ....... | 235,366.17 |

ᵃ One-third of a crop raised.

Since the date of the last annual report permits for grazing stock on tribal lands have been approved as follows:

*Grazing permits.*

| Reservation. | Number of permits. | Term. | Number head of stock. | Rate per head. | Tax. |
|---|---|---|---|---|---|
| Blackfeet............................ | 10 | 1 year ................... | ᵃ17 | $2.00 | $34.00 |
| | | | 8,362 | 1.50 | 12,543.00 |
| Crow ............................... | 4 | ....do ............... | 5,700 | 1.00 | 5,700.00 |
| Colville............................ | 16 | ....do ............... | 5,054 | 1.50 | 7,581.00 |
| Colorado River ..................... | 1 | ....do ............... | 95 | 1.00 | 95.00 |
| Cœur d'Alène ...................... | 3 | 5 months and 1 year.. | ᵇ1,000 | .20 | 200.00 |
| | | | 332 | 1.50 | 498.00 |
| Flathead ........................... | 4 | 1 year ............... | 1,543 | 1.00 | 1,543.00 |
| Fort Apache........................ | 16 | 6 months and 1 year.. | ᵇ9,000 | .20 | 1,800.00 |
| | | | 700 | .50 | 350.00 |
| | | | 2,530 | 1.00 | 2,530.00 |
| Fort Belknap....................... | 5 | 1 year ............... | ᵃ32 | 2.00 | 64.00 |
| | | | 1,500 | 1.00 | 1,500.00 |
| Fort Berthold ...................... | 8 | ....do ............... | ᵃ30 | 2.00 | 60.00 |
| | | | 1,951 | 1.50 | 2,926.50 |
| Fort Lewis......................... | 4 | 6 months ............. | 855 | .50 | 427.50 |
| Fort Peck ......................... | 10 | 1 year ............... | ᵃ20 | 1.50 | 30.00 |
| | | | 1,525 | 1.00 | 1,525.00 |
| Lower Brulé........................ | 9 | ....do ............... | 4,725 | 1.50 | 7,087.50 |
| Mescalero ......................... | 14 | ....do ............... | ᶜ260 | .25 | 65.00 |
| | | | ᵇ7,416 | .25 | 1,854.00 |
| | | | 198 | 2.00 | 396.00 |
| | | | 1,855 | 1.50 | 2,782.50 |
| | | | 1,784 | 1.25 | 2,230.00 |
| Tongue River ...................... | 1 | ....do ............... | 1,500 | 1.50 | 2,250.00 |
| Rosebud ........................... | 4 | ....do ............... | 1,503 | 1.50 | 2,254.50 |
| San Carlos ......................... | 2 | ....do ............... | 15,879 | 1.00 | 15,879.00 |
| Truxton Canyon .................... | 9 | ....do ............... | 1,070 | 1.00 | 1,070.00 |
| Uintah ............................ | 1 | ....do ............... | ᵇ5,000 | .20 | 1,000.00 |
| Warm Springs ...................... | 7 | ....do ............... | 173 | 2.00 | 346.00 |
| Western Shoshone................... | 1 | ....do ............... | 400 | 1.00 | 400.00 |
| Yakima ............................ | 27 | 1 year, 6, 2, and 1<br>months. | ᵇ32,158 | .20 | 6,431.60 |
| | | | ᵈ12,159 | .08 | 972.72 |
| | | | 245 | 1.50 | 367.50 |
| | | | 1,637 | .75 | 1,227.75 |
| | | | 505 | .50 | 252.50 |
| | | | 200 | .25 | 50.00 |
| Total ............................ | 196 | ................... | ........... | .......... | $5,823.57 |

ᵃ Horses.          ᵇ Sheep.          ᶜ Goats.          ᵈ Lambs.

**SALES OF INDIAN LANDS.**

Following is a detailed statement of sales of inherited Indian lands which have been made during the last fiscal year. On the whole

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

the average price per acre is less than that obtained during the
year immediately preceding, possibly because of the large sales at
Rosebud Agency, S. Dak., where the price is low owing to the poor
character of the land; but except in Idaho, Kansas, and South
Dakota the average price received has exceeded that for the fiscal
year 1906.

*Sales of inherited lands for fiscal year ended June 30, 1907.*

| Location of land. | Number of tracts. | Number of acres. | Total proceeds. | Average price per acre. |
|---|---|---|---|---|
| Idaho: Nez Percé | 6 | 423.55 | $10,505.00 | $24.80 |
| Indian Territory: Quapaw | 7 | 380.00 | 5,599.00 | 14.73 |
| Kansas: | | | | |
| Kickapoo | 4 | 270.00 | 4,815.00 | 17.83 |
| Potawatomi | 11 | 673.00 | 13,778.00 | 20.47 |
| Total | 15 | 943.00 | 18,593.00 | 19.72 |
| Minnesota: | | | | |
| Leech Lake | 10 | 637.15 | 10,137.50 | 15.91 |
| White Earth | 3 | 320.00 | 4,205.00 | 13.14 |
| Total | 13 | 957.15 | 14,342.50 | 14.98 |
| Montana: Crow | 15 | 1,480.00 | 36,191.00 | 24.45 |
| Nebraska: | | | | |
| Omaha | 28 | 1,928.25 | 67,627.50 | 35.07 |
| Santee | 14 | 1,472.41 | 14,919.25 | 10.13 |
| Winnebago | 7 | 470.48 | 12,612.81 | 26.81 |
| Total | 49 | 3,871.14 | 95,159.56 | 24.58 |
| South Dakota: | | | | |
| Crow Creek | 20 | 2,588.08 | 13,924.14 | 5.48 |
| Lower Brulé | 29 | 6,309.83 | 26,255.24 | 4.16 |
| Rosebud | 213 | 47,236.71 | 286,903.82 | 6.07 |
| Sisseton | 15 | 1,681.95 | 30,159.00 | 17.96 |
| Yankton | 157 | 13,200.37 | 272,499.21 | 20.64 |
| Total | 434 | 71,016.94 | 629,741.41 | 8.87 |
| Washington: | | | | |
| Colville | 8 | 588.85 | 7,362.00 | 12.50 |
| Yakima | 39 | 3,158.16 | 114,801.52 | 36.33 |
| Total | 47 | 3,747.01 | 122,163.52 | 32.60 |
| Wisconsin: | | | | |
| La Pointe | 7 | 361.25 | 3,683.55 | 10.20 |
| Oneida | 15 | 840.40 | 16,664.10 | 19.83 |
| Total | 22 | 1,201.65 | 20,347.65 | 16.93 |
| North Dakota: Devils Lake | 48 | 3,253.61 | 33,944.10 | 10.43 |
| Oklahoma: | | | | |
| Cantonment | 13 | 2,065.10 | 23,224.57 | 11.25 |
| Cheyenne and Arapaho | 20 | 3,103.30 | 32,757.00 | 10.55 |
| Kaw | 6 | 1,040.86 | 9,940.00 | 9.55 |
| Kiowa | 30 | 4,480.17 | 81,744.62 | 18.25 |
| Oto | 3 | 387.77 | 8,565.00 | 22.09 |
| Pawnee | 8 | 1,012.35 | 18,885.00 | 18.65 |
| Ponca | 9 | 825.09 | 21,633.25 | 26.22 |
| Seger | 6 | 951.64 | 11,106.20 | 11.67 |
| Shawnee | 6 | 469.93 | 13,383.00 | 28.48 |
| Total | 101 | 14,336.21 | 221,238.64 | 15.43 |
| Oregon: | | | | |
| Grande Ronde | 17 | 1,638.05 | 7,042.50 | 4.30 |
| Siletz | 40 | 2,670.94 | 21,151.46 | 7.90 |
| Umatilla | 6 | 440.00 | 12,774.00 | 29.03 |
| Total | 63 | 4,748.99 | 40,967.96 | 8.63 |
| Grand total | 820 | 106,359.25 | 1,248,793.34 | 11.74 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-088

78   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

Under acts of August 15, 1894 (28 Stat. L., 295); May 31, 1900 (31 Stat. L., 247); June 10, 1896 (29 Stat. L., 343); and June 7, 1897 (30 Stat. L., 72), and under treaty stipulations, there have occurred during the fiscal year 1907 the following—

*Sales of Indian lands not inherited.*

| Tribe. | Deeds. | Acres. | Considera-tion. | Average price. |
|---|---|---|---|---|
| Shawnee | 2 | 54.40 | $1,700.00 | $31.25 |
| Absentee Shawnee | 13 | 1,097.29 | 14,187.27 | 12.92 |
| Peoria | 13 | 937.34 | 13,996.00 | 14.93 |
| Miami | 2 | 120.00 | 750.00 | 6.25 |
| Citizen Potawatomi | 38 | 2,953.10 | 42,296.74 | 14.36 |
| Chippewas, L'Anse, etc | 83 | 6,627.00 | 49,157.00 | 7.28 |
| Chippewas, Saginaw, etc | 1 | 40.00 | 1,425.00 | 35.625 |
| Miscellaneous | 13 | 1,474.25 | 2,989.00 | 19.73 |
| Total | 165 | 13,303.38 | 126,501.01 | 9.50 |

This schedule does not include a number of deeds in which the consideration is only nominal, such as transfers between members of the same family for "$1, love and affection," quitclaims, etc., nor does it include the sale of certain lands of the North Carolina Cherokees and the Puyallup Indians mentioned below.

### SALE OF EASTERN CHEROKEE LANDS.

By deed dated October 4, 1906, the Council of the Eastern Band of Cherokee Indians in North Carolina sold to Messrs. Wirt C. Ward and Elihu Hutton 33,000 acres of land in Swain County, N. C., "on the waters of the Ravens Fork of Ocona Lufty River," known as the "Love Speculation tract;" also an adjoining tract of 2,000 acres. The consideration for the 35,000 acres—$245,000, or $7 an acre—was made payable, $5,000 in cash on the acceptance of the offer and the execution of a deed for the lands in fee simple, $19,500 in sixty days from the date of deed, and the remainder in nine equal annual payments of $24,500 each, all deferred payments to bear interest from their date at 5 per cent payable annually, and to be evidenced by notes of Wirt C. Ward and Elihu Hutton, secured by a deed of trust or mortgage on the land, executed by them to the Eastern Band of Cherokee Indians or to such trustee of the band as it might appoint. This deed was approved by the Department on December 12, 1906, and plans were adopted to govern the superintendent in charge in handling the money received in payment of the notes.

### SALE OF PUYALLUP LANDS.

Since my last report the Office has collected for the Indians of the Puyallup Reservation in Washington $27,595.94 deferred payments on sales of allotted lands, $15,119.82 deferred payments on sales of Indian addition lots, $45,932 for railway right of way over certain lots in the Indian addition to the city of Tacoma and damages to

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 116 of 212   Page ID #:4132

land adjacent, and $20,400 for the sale of tracts Nos. 4, 5, 20, and 21 not needed for school purposes whose sale was authorized by the act of June 21, 1906.  (34 Stat. L., 377.)

On July 1, 1907, the superintendent in charge of the Puyallup School was authorized to accept a bid of $30,000 for tract No. 2 in the Indian addition, although it was below the appraised value.  Tract No. 22, containing 1.29 acres and appraised at $7,740, was also offered for sale, but no report has yet been received as to its disposal.

## RAILROADS ACROSS INDIAN LANDS.

Railroad construction across Indian reservations is now particularly noticeable in the Northwest, where the industrial development has made necessary both the extension of all railroad systems and the building of new roads.  Several important lines have been completed or are in course of construction through Indian lands.  All grants of rights of way to railroad companies through Indian reservations, except in Oklahoma and Indian Territory, are made according to the act of March 2, 1899 (30 Stat. L., 990).

### RAILROADS OUTSIDE OF OKLAHOMA AND INDIAN TERRITORY.

There follows a summary of railroad construction affecting Indian lands outside of Oklahoma and Indian Territory for the year ended June 30, 1907:

*Arizona and California.*—This company is engaged in the construction of a railroad through the Colorado River Reservation in Arizona.  Its right of way was approved May 12, 1906, but during the last year the company has filed a map showing amended location of its line covering a distance of 16.964 miles, which was approved on November 24, 1906.  Damages for right of way in the sum of $205.63 have been collected.  The company applied for additional station grounds, alleging that under the act of March 2, 1899, it can not obtain a large enough area to meet its requirements, and it has requested permission in the nature of a license to occupy 27.57 acres until legislation can be had under which it can secure title to the land.

*Belcher Mountain.*—The maps of this company showing the location of its line through the south half of the Colville Reservation in Washington were filed in this Office in 1906.  It appeared that the proposed line was not only parallel, but was on, and crossed and recrossed, the right of way approved to the Spokane and British Columbia Railway Company.  That company was allowed sixty days in which to show cause why a right of way should not be approved to the Belcher Mountain Railway Company, and the latter was allowed sixty days in which to show that the public interest required the construction of its road.  Both companies filed responses, but as it did not appear that there was a public necessity for the construction of

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-090

80        REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

the Belcher Mountain Railway through the southern part of the Colville Reservation, its maps were disapproved on July 23, 1907.

The amended maps of its line crossing allotments in what was formerly the northern part of the Colville Reservation were approved on October 4, 1906, and damages have been collected.

*Big Bend Transit.*—This company filed maps which were approved on March 9, 1907, covering a proposed extension across the Spokane Reservation in Washington from a town site situated at "The Narrows," on the Spokane River, the southern boundary of the reservation.

*Chicago, Milwaukee and St. Paul.*—Maps of definite location showing a right of way through the Standing Rock Reservation in North and South Dakota were approved on November 5 and 28, 1906. Damages in the sum of $13,332.80 have been assessed and paid. Maps showing the location of nine station grounds were approved on May 27, 1907; assessment of damages is now being made. The entire line through the reservation, including a section of 20 miles approved on April 30, 1906, is 47.9 miles long.

On January 31, 1907, there was approved a map of location of right of way, 734.3 feet in length, across the Puyallup Reservation in Washington. Damages in the sum of $10,226 were assessed and collected for the benefit of the Indians in interest.

Maps of definite location of a right of way for 29.1 miles across the Coeur d'Alène Reservation in Idaho were approved on March 19 and June 4, 1907. Permission was granted for the immediate construction of this part of the road on the deposit by the company of a sum large enough to cover all damages which could reasonably be assessed.

*Chicago and Northwestern.*—A line 30.77 miles long is now under construction across Indian lands of the Rosebud Reservation in South Dakota. Maps of definite location were approved on August 11, 1906, and damages in the sum of $1,911 have been assessed and accepted.

*Gila Valley, Globe and Northern.*—Maps of definite location were approved on July 18, 1906, showing a right of way through the San Carlos Reservation in Arizona on which damages in the sum of $1,789.20 have been collected.

*Grays Harbor and Puget Sound.*—A petition to survey a right of way through the Quinaielt Reservation in Washington was approved on January 9, 1907.

*Great Northern.*—The Dakota and Great Northern Railway Company, a subsidiary company of the Great Northern, is constructing a line extending 75 miles across the Devils Lake Reservation in North Dakota. Maps of definite location of the right of way were approved on August 11 and 13, 1906. Damages in the sum of $3,066.30 were collected and have been paid to the allottees entitled.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.        81

The Washington and Great Northern Railway Company, also subsidiary to the Great Northern, was granted a right of way through the north half of the Colville Reservation in Washington, for which maps were approved on March 7, 1907. Assessment of damages is now in progress.

*Idaho and Northwestern.*—This company, which proposes to build a line extending north and south through the Coeur d'Alène Reservation in Idaho, was granted permission on February 15, 1906, to survey its line. Maps of definite location showing a part of its right of way 22.43 miles long were approved on December 22, 1906. The assessment of damages for this part is now going on.

*Lake Creek and Coeur d'Alène.*—Authority was granted to this company, which is subsidiary to the Oregon Railway and Navigation Company, to make a survey through the Coeur d'Alène Reservation in Idaho for a line to be used as a cut-off, extending from a point south of Lake Coeur d'Alène through the reservation in a northwesterly direction to a junction with the main line of the Oregon Railway and Navigation Company in Washington. Maps of definite location covering 12.36 miles of its line were approved on June 13, 1907. Damages are now being assessed.

*Lake Superior and Southeastern.*—Damages in the sum of $1,148.70, covering its right of way through the Lac Courte Oreille Reservation in Wisconsin have been collected from this company.

*Minneapolis, St. Paul and Sault Ste. Marie.*—This company was authorized, on August 11, 1906, to make a survey through the Fort Berthold Reservation in North Dakota, and maps of definite location showing a right of way 5.007 miles long were approved on February 13, 1907. This is known as the "Drake extension."

*Missouri River.*—Application to make surveys through the Standing Rock and Fort Berthold reservations in North Dakota was approved on August 15 and October 5, 1906, respectively. Maps of definite location showing a right of way for 39.21 miles through the Standing Rock Reservation were approved on October 31 and November 28, 1906, and for 29.43 miles through the Fort Berthold Reservation on March 7, 1907. Damages for these rights of way are now being assessed.

*North Coast.*—This company was authorized, on June 28, 1906, to make a survey through the Yakima Reservation in Washington, and its maps of definite location were approved on August 11, 1906.

*Northern Pacific.*—The Western Dakota Railroad, forming part of the Northern Pacific system, was authorized on August 15, 1906, to survey a line through the Standing Rock Reservation in South Dakota, and on October 5, 1906, it was authorized to survey a right of way through the Fort Berthold Reservation in North Dakota. Maps showing definite location have not been filed.

22849—08——6


Digitized by Google        Original from UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 119 of 212   Page ID #:4135

*Parker Transportation.*—On May 20, 1907, approval was given to the application of this company to survey a right of way for a short line from its boat landing on the Colorado River, at Parker, Ariz., through the Colorado River Reservation to connect with the Arizona and California Railway on the reservation.

*Oregon and Washington.*—This company, on August 11, 1906, was authorized to construct a line through the Puyallup Reservation in Washington. Maps of definite location were approved on October 10, 1906, and March 27, 1907. The line extends 0.037 mile through the school lands of the reservation, which are extremely valuable, and damages in the sum of $45,932 have been assessed and collected.

*Oregon Electric.*—This company has a right of way for 0.63 of a mile through the lands of the Salem School, in Oregon, for which maps of definite location were approved on September 5, 1906. Damages have been collected in the sum of $621.25.

### RAILROADS IN OKLAHOMA AND INDIAN TERRITORY.

All grants of right of way and grounds for railroad purposes in Oklahoma and Indian Territory are made in accordance with the act of February 28, 1902 (32 Stat. L., 43). The maps are not subject to the approval of the Secretary of the Interior and are merely filed in this Office, the rights being acquired by proceedings in the United States courts in those Territories. Following is a list of maps filed during the last fiscal year covering rights of way and lands:

*Railroad maps filed.*

| Name of company. | Right of way. | | Additional grounds. | |
|---|---|---|---|---|
| | Miles. | Acres. | Miles. | Acres. |
| Atchison, Topeka and Santa Fe Railroad: | | | | |
| Additional grounds at Wynnewood, Ind. T | | | | 0.598 |
| Additional grounds in sec. 20, T. 6 S., R. 2 E | | | | 1.93 |
| Additional grounds at Davis, Ind. T | | | | 11.82 |
| Additional grounds in sec. 6, T. 3 N., R. 1 E | | | | 6.2 |
| Additional grounds near Paoli, Ind. T | | | | 4.6 |
| Change of line near Red River | | | 0.5 | |
| Revision of line | | | 2.47 | |
| Blackwell, Enid and Southwestern Railroad: | | | | |
| Additional grounds in T. 5 N., R. 14 W | | | | 10.97 |
| Chicago, Rock Island and Pacific Railroad: | | | | |
| Grounds near Chickasha | | | | .84 |
| Grounds near Seminole, Ind. T | | | | 18.76 |
| Grounds near Lehigh, Ind. T | | | | 8.3 |
| Spurs to Dupont Powder Co | | | .62 | |
| Additional grounds in secs. 32 and 5, Ts. 2 and 3 S., R. 14 W | | | | 13.75 |
| Additional grounds in secs. 8 and 17, T. 4 S., R. 14 W | | | | 13.75 |
| Additional right of way | 21.1 | | | |
| Spur to McAlester Coal Co | | | | 1.634 |
| Additional grounds, secs. 12 and 1, T. 5 S., R. 8 W | | | | 39.99 |
| McAlester Coal Co.'s spur | | | | .58 |
| China Plant spur | | | .37 | 1.14 |
| Additional grounds, Elreno, Ind. T | | | | 21.28 |
| Spur to Degnan and McConnel Coal Co | | | .40 | |
| Choctaw, Newcastle and Western Railroad: | | | | |
| Additional right of way | 2.17 | | | |
| Choctaw Railway and Light Co.: | | | | |
| Amended location | | | .5 | |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-093

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS. **83**

*Railroad maps filed*—Continued.

| Name of company. | Right of way. | | Additional grounds. | |
|---|---|---|---|---|
| | Miles. | Acres. | Miles. | Acres. |
| Kansas City Southern Railway: | | | | |
| Station grounds near Spiro, Ind. T | | | | 0.1 |
| Lawton, Wichita Falls and Northwestern: | | | | |
| Right of way through Osage Nation | 30.7 | | | |
| Manufacturers Belt Line Railway: | | | | |
| Right of way near Tulsa, Ind. T | 7.67 | | | |
| Midland Valley Railway Co.: | | | | |
| Jenks and Glen Pool Branch | | | | 6.28 |
| Additional grounds at Glen Pool | | | | 2.96 |
| Additional grounds at Jenks | | | | 3.9 |
| Additional grounds at Glen Pool | | | | 9.18 |
| Missouri, Kansas and Texas Railway: | | | | |
| Station grounds at Durant | | | | .42 |
| Additional right of way, Tyrola, Ind. T | 1.51 | | | |
| Additional grounds, Wilburton Division | | | | 5.25 |
| McAlester-Edwards Coal Co.'s spur | | | 3.76 | |
| Additional right of way, Springtown to Atoka | | 88 | | |
| Limestone Gap revision | | | | 86.6 |
| Dewey Cement Co.'s spur | | | | 1.2 |
| Buck extension | | | | 61.71 |
| Crowder revision | | | | 20 |
| Reid-Adamson & Sons' spur | | | | 20.6 |
| Mekko revision | | | | 82.7 |
| Do | | | | 77.7 |
| Stringtown revision | | | | 100.1 |
| Crowder revision | | | | 1,519.5 |
| Dewey Cement Co.'s spur | | | | 15.38 |
| Gaines Creek extension | | | | 61.12 |
| National Zinc Co.'s spur | | | | .5 |
| Muskogee and Texas Railway: | | | | |
| Station ground in sec. 11, T. 10 N., R. 19 E | | | | 40 |
| Missouri, Oklahoma and Gulf Railway Co.: | | | | |
| Amended location of right of way | 25 | | | |
| Sand spur | | | | 20 |
| Oklahoma City and Western Railway Co.: | | | | |
| Station grounds near Cache, Ind. T | | | | 22.3 |
| Do | | | | 2.58 |
| Additional grounds, T. 2 N., R. 14 W | | | | 5.73 |
| Oklahoma Central Railway Co.: | | | | |
| Relocation of line | 5.254 | | | |
| Do | 10 | | | |
| Do | 7.888 | | | |
| Do | 3.35 | | | |
| Additional right of way at Purcell, Ind. T | 1.1 | | | |
| Additional right of way at Chickasha, Ind. T | 1.5 | | | |
| Do | 1.5 | | | |
| Do | 2.58 | | | |
| Additional station grounds at Purcell | | | | 2.78 |
| Additional station grounds at Rochdale | | | | 2.76 |
| Oklahoma City, Henryetta and St. Louis Railway: | | | | |
| Right of way, Henryetta to Okema | 21.31 | | | |
| Pueblo, Oklahoma and New Orleans Railway: | | | | |
| Right of way in Oklahoma | 52.77 | | | |
| Do | 16.15 | | | |
| Do | 14.26 | | | |
| Do | 26.10 | | | |
| Do | 24.7 | | | |
| St. Louis and San Francisco Railroad Co.: | | | | |
| Additional grounds near Kiefer, Ind. T | | | | .33 |
| Right of way to strip, pits near Dawson, Ind. T | 4 | | | |
| Additional grounds south of Platter, Ind. T | | | | .83 |
| Additional grounds near Ada | | | | 1.274 |
| Additional grounds in sec. 4, T. 2 N., R. 5 E | | | | .25 |
| Spur to Kiefer, Ind T | | | 3 | |
| Additional station grounds, in T. 17 N., R. 12 E | | | | 3.4 |
| Additional station grounds in sec. 4, T. 3 S., R. 5 E | | | | .33 |
| Shawnee Central Railroad: | | | | |
| Right of way through Indian Territory | 25.98 | | | |
| Washita Valley Interurban Electric Railroad: | | | | |
| Right of way through Indian Territory | 25 | | | |
| Do | 30 | | | |
| Do | 21 | | | |
| Weleetka-Shawnee Railroad: | | | | |
| Right of way through Indian Territory | 51.57 | | | |
| Wichita Falls and Northwestern Railroad: | | | | |
| Right of way through Oklahoma | 26.94 | | | |
| Do | 27.1 | | | |
| Total | 488.202 | 88 | 13.564 | 2,321.582 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-094

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 121 of 212   Page ID #:4137

## INDIAN LANDS SET APART TO MISSIONARY·SOCIETIES AND CHURCHES.

Tracts of reservation lands set apart between August 15, 1906, and July 1, 1907, for the use of societies and churches carrying on educational and missionary work among the Indians are:

*Reservation lands set apart for societies and churches.*

| Church or society. | Date. | Acres. | Location. |
|---|---|---|---|
| Roman Catholic | July 17, 1906 | 20 | Pine Ridge Reservation, S. Dak. |
| Mission to Navahos (Interdenominational). | Aug. 28, 1906 | 80 | Navaho Extension Reservation, Ariz |
| Roman Catholic | Oct. 26, 1906 | 3.78 | Lac du Flambeau Reservation, Wis. |
| Methodist Mission Church | Dec. 14, 1906 | 1 | Blackfeet Reservation, Mont. |
| Mennonite Church | Jan. 22, 1907 | 1 | Western Navaho Reservation, Ariz. |
| Home Mission Board, Southern Baptist Convention. | Mar. 23, 1907 | 13.25 | Pawnee Agency Site, Okla. |
| Presbyterian Board of Home Missions. | Apr. 5, 1907 | .7 | Camp McDowell Reservation, Ariz. |
| M. E. Mission Society of Southern California. | .....do....... | 4 | Yuma Reservation, Cal. |
| Roman Catholic | May 8, 1907 | 160 | Pine Ridge Reservation, S. Dak. |
| General Conference of Mennonites of North America. | June 8, 1907 | 1 | Northern Cheyenne Reservation, Mont. |

## THE UPHEAVAL AT ORAIBI.

The troubles between the two factions known as the "friendlies" and the "hostiles" in the Hopi pueblo of Oraibi in Arizona were not settled at the time my last report was made. Their differences, political and religious, had culminated in the forcible but bloodless eviction of the local hostile party, and their sympathetic visitors from Shimopovi, by the friendlies, in the early days of September, 1906.

Though no arms, and so little unnecessary violence, were used in the final act of this little drama, one or two hostiles were slightly hurt in the scuffle. For them, and a few others who fell ill later, a temporary hospital was established in one of the Indian houses on the mesa. Every effort was made, also, to reduce the conditions in the hostile camp to the normal state of comfort known to these Indians, by allowing any who wished to return to their old dwellings and bring away such provisions and other belongings as they needed. The site chosen for the camp was remote enough from the pueblo to avert any immediate danger of further physical conflict between the factions.

Authority was granted to the superintendent in charge for the temporary employment of 25 Navaho police should their services be necessary. Pending the arrival of a representative of the Office, the superintendent was directed to ascertain how many of the hostiles would be willing to cut loose from the leadership of the chief agitators and return to the mesa or to some point nearby under pledge no longer to resist the authority of the Government; to warn the friendlies not to molest the hostiles who behaved peaceably; to reopen

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-095

the day school at Oraibi as soon as practicable, and to see that all children living in or near the pueblo were placed in school, the parents having the privilege of choice as between the day school, the boarding school at Keams Canon, and any others open to Hopi children.

Meanwhile, on my personal knowledge of the nature and attitude of the Hopis obtained during ten years' acquaintance with them in their own country, confirmed or modified by consultation with a number of other persons on the ground who were familiar with the Hopis and cognizant of the facts in the Oraibi affair, I formulated a programme to be pursued, with such minor changes in detail as current developments might render expedient. This programme was discussed with the President and the Secretary of the Interior, and carried into effect with their approval. Its chief features may be set forth seriatim thus:

(1) That the Shimopovi intruders, who appear to have stirred up all the latest trouble, who never had any rights in the Oraibi pueblo, and who by abusing them have forfeited even the privileges of courtesy, be ordered to return to their own pueblo instantly;

(2) That the Oraibi hostiles, except the chief agitators Yu ke o ma and Ta wa hong ni wa, be permitted to return for the winter to Oraibi, on their pledge of peaceable conduct, and a like pledge to be exacted from the friendlies that they shall be kindly treated; this to be understood as only a temporary arrangement to prevent suffering during the approaching winter, as the rest of the programme will be worked out by the Government before spring;

(3) That Yu ke o ma and Ta wa hong ni wa be allowed to take their personal effects from Oraibi, including the season's crops, and to give these to their families for subsistence; but themselves to be notified that, as disturbers and inciters of their people to resistance of the Government, they must leave the Hopi country at once; their refusal, or their return after removal, to be punished by imprisonment at hard labor;

(4) That the ringleaders in the riots at Shimopovi early in the last school year be removed under arrest and confined in a military prison at hard labor, for such terms, in no case less than one year, as their respective offenses seem to justify;

(5) That in announcing to Yu ke o ma the decree of the Government in his case he be reminded that I reasoned earnestly with him last summer at the night council on the Oraibi plaza, and tried in a friendly way to show him the folly of his course, and that his only response was an insolent defiance; and that, in now turning for help to the same Government which he has always scoffed at, derided, and urged his people to resist, he is playing the part of a coward instead of a manly foe;

(6) That any other persons besides the two hostile chief agitators already mentioned by name, and the ringleaders in the Shimopovi riots, who may, on later investigation by the Indian Office, be convicted of habitual trouble-making, be imprisoned or banished;

(7) That Ta wa quap te wa, the chief of the friendly faction, be allowed to retain his priestly orders, but be deposed from his political chiefship until he has fitted himself, by acquiring enough knowledge of English to be able to speak and understand fairly the language of the Government of our country and the laws, for the instruction and guidance of the people he aspires to rule; and

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

that for this purpose he be given his choice between a local school and a non-reservation school;

(8) That the whole Oraibi populace be notified that the Government intends to have their children sent to school somewhere, just as all white communities are required by their governments to send their children to school somewhere, till they have learned enough to take care of themselves properly and to start them on the road to citizenship; that they be given a free choice between sending their children to the day school or sending them to Keams Canon; and that when they have decided this point, their decision be duly attested and themselves compelled to hold to it in good faith, so that the children shall not be continually shifting about;

(9) That like notice be given, and the same option extended, at Shimopovi;

(10) That at both villages the parents who refuse to send their children to the day school be considered to have elected in favor of Keams Canon; but that the officer to whom is assigned the task of obtaining their decisions be not anyone connected regularly with Keams Canon School, as this whole business must be kept free from even the suspicion of unfairness or needless duress—the only compulsory feature of it anywhere being the demand that every child shall be given some schooling one place or another;

(11) That especial pains be taken to make all the Indians understand that the Government has reached the limit of its patience with the old way of handling such matters, and that hereafter the Indians must conduct themselves reasonably like white people, or be treated as white people are treated who are forever quarreling and fighting among themselves;

(12) That until normal conditions are restored and in the opinion of the Government it will be safe to let the Indians control once more their own domestic affairs, the pueblo of Oraibi be governed by a commission consisting of the teacher in charge of the day school, who shall preside, the old judge who represents the friendly faction in the local Indian court, and a judge chosen from the hostile faction by the superintendent or inspecting officer who may be in charge of the reservation at the time this programme goes into operation;

(13) That regular troops be sent to Oraibi to preserve order while the foregoing arrangements are in progress, and to make arrests as indicated here or as directed by the superintendent or inspecting officer in charge;

(14) That immediate steps be taken, by administrative measures under existing laws or by procuring new legislation if that be necessary, looking toward the early allotment of land in severalty to the Hopis.

At the time of the troubles all our inspecting officers were engaged in other important work from which they could not be withdrawn without serious prejudice to the interests involved; but the services of Supervisor Reuben Perry became free about the middle of October, and he was detailed to execute the policy outlined above. In the meantime the teachers, field matron and other employees in the Oraibi district had sought by argument and kindly persuasion to bring the hostiles to an appreciation of their situation and the injury they were doing themselves by holding out against the Government. These efforts availed nothing, for when the supervisor arrived he found the Indians in the same unyielding attitude. By orders from the War Department, Troops H and K of the Fifth Cavalry, under command of Capt. Lucius R. Holbrook and Lieutenant Lewis, were

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-097

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 124 of 212   Page ID #:4140

placed at the service of the Office and reached the village on October 27. The next morning all the male Indians were assembled at the schoolhouse to hear what Washington had to say and to accept or reject the proposals offered. As far as the hostiles were concerned, the result confirmed the wisdom of having troops at hand. Although Mr. Perry patiently and laboriously set before them the benevolent purposes of the Government and the absence of any intention on its part to interfere with the religion of the Indians or their customs except where these came into collision with the law of the land, they remained, to a man, stubbornly resistant.

Yu ke o ma and Ta wa hong ni wa, indeed, renewed and persisted in a demand, which they had made from the beginning of the troubles, that the friendly chief should be beheaded and they and their followers returned by force to Oraibi. It was obvious, as I had foreseen in making up my programme, that no impression could be made upon the great mass of their followers as long as they remained where their advice could be heard and heeded. They were therefore publicly deposed from their usurped authority and at once arrested, together with 27 of the most conspicuous mischief-makers—including 12 Shimopovis—placed under guard, and taken to Keams Canon. There their cases were individually considered, and, according to the flagrancy of their respective misconduct, they received, with 12 exceptions, sentences to confinement at hard labor for terms ranging from one to three years. The exceptions were 1 aged man, who was regarded as too infirm for such punishment, and 11 at the other extreme of life who were, on account of their youth and apparently to their own great relief, ordered to go to school instead of to prison. They expressed a preference for Carlisle, and were accordingly sent there, in care of Lieutenant Lewis, as soon as the necessary arrangements could be made. After Yu ke o ma and Ta wa hong ni wa had had a brief taste of the punishment decreed for their colleagues, they were set free with a warning not to return to their old haunts. I am in hope that before the others—who have since been transferred to Fort Huachuca—are released and return, the tribe as a whole will have so far advanced in appreciation of the authority of the Government, if not of its good purposes toward them, that ignorant agitation and blind subservience to senseless leadership will have become less the settled rule among them.

Indeed, it was plain, from the hour of the removal of the ring-leaders in disturbance, that a part of the spell they had exercised over the rest had been broken; for at a later meeting, under encouragement of the supervisor to be more like men and think and act for themselves, 25 hostiles forsook the recalcitrant band and signed an agreement to obey the law of the land, let their children go to school, and live in peace with their neighbors. Thereupon they were sent

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-098

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

88    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

back to Oraibi under a guaranty of right treatment by the friendlies in occupation there. Of the rest, 53 renewed their declaration of hostility to the Government and were placed under arrest; and upon these, and 20 more who were arrested the next day, a sentence of ninety days at hard labor on the roads of the reservation was imposed.

Immediately after the arrests the children were gathered in, those whose parents consented being placed in a local day school, and 117 others sent to Keams Canyon. They not only did not shed any tears, but seemed much pleased to go. This was most gratifying; since, but for the sake of these little ones and the responsibility, both moral and legal, resting upon me to see that they should have their chance in life as our own children have theirs, I should not have deemed it worth while to attempt anything more at this time than to put a quietus upon the quarrel between their elders. The simplest humanity, however, demanded such intervention as I made in the children's behalf, where their parents were so utterly devoid of foresight or reason with regard to their fundamental interests.

With the removal of the long-sentence prisoners from Keams Canyon to Fort Wingate, we were able to dispense with the services of the troops on the reservation. And I wish, before closing this chapter of a unique story, to record thus publicly, as I have already in my formal official correspondence, my appreciation of the fine handling of their work by the military contingent. The sympathetic yet discreet counsels of the commanding officer, Captain Holbrook, and the admirable discipline of the men, contributed in the largest measure to the successful issue of a very delicate and difficult undertaking.

At the outset of this whole complicated business it was assumed that the hostiles evicted from Oraibi would build another village somewhere; and my purpose was not only to let them choose its site for themselves but to lend them such encouragement and aid as I could consistently with the other plans in hand. In addition, I was going to give the new village a day school of its own, if the Indians would make use of it in good faith, either under compulsion or otherwise. Or, in case later the two factions could be brought to tolerate each other as neighbors and settle down in peace together in the old pueblo, it was my wish to help them improve the place, and I should have increased the capacity of the present day school to the point of accommodating all the children. Other projects for their welfare were under consideration, one of them being a hospital to be erected by private munificence and run on a cooperative plan.

But all these matters had to be pushed aside to make way for the immediate needs of the hour and the still difficult disposition of the Indians. The women and children were provided with temporary

CVWD 563-099

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 126 of 212   Page ID #:4142

but comfortable quarters for the winter at their camp at Hotevilla. The 25 men who had renounced their active hostility were kept busy during the fall with their crops; and the group who were working out their ninety days' sentence on the roads could not, for obvious reasons, have their occupation changed to village building among their relatives and friends. By the expiration of their term it was time to fall to upon the preparation of the new season's crops. Just before their release 6 of their number agreed to the Government's terms and were permitted to take their children with them and go back to Oraibi, where the little ones could attend the day school. The children of the others were not allowed to go home for vacation, as it would have been practically impossible to recover them if they had once been out of the Government's custody while the parents continued actively hostile. I may add that during their period of enforced labor the prisoners, among other things, built 15 miles of new road out of Keams canyon in the direction of Holbrook, which shortened the distance to the agency several miles and added greatly to the safety of travel. I went over it myself last summer and was greatly impressed by its workmanlike appearance. While they were still thus employed, I submitted to them a proposition which had been laid before me for their further employment in the beet fields at Rocky Ford, Colo., but they refused to consider it, notwithstanding the pecuniary profit which such a contract would have brought them. Acceptance, of course, would have meant an absence of some months, a dreaded association with new and strange people, their adoption to some extent of the white man's habits and their subjection to his laws.

With the release of the prisoners, the superintendent recommended that some one representing the Government be stationed at Hotevilla. He was therefore authorized to employ a policeman, and one of the now loyal hostiles was appointed to the position and appears to be doing his duty creditably. I went to the hostile "camp," so called, while I was at Oraibi in May last, and was pleased with what I saw. It deserves its designation as a camp, as distinguished from a new pueblo, only because the houses are separate and more or less scattered, instead of being built against or on top of each other like the cumulative chambers of a wasp's nest. It is a more wholesome and generally better arrangement, and I entertain some hope that this style of building will presently supplant the old style in the preference of the people. Although rather more roughly put together than the pueblo houses, the new dwellings appear pretty comfortable, and their inhabitants as contented as could reasonably be expected under existing conditions.

I have devoted so much space to the conduct and fate of the hostiles that I seem almost in danger of overlooking what has occurred in the

CVWD 563-100

friendly faction.   While Yu ke o ma was spitting defiance at the Government and calling for the head of his victorious foeman, the latter was proving his greater intelligence and worldly wisdom by accepting the inevitable with as good grace as the rather trying imposition upon himself would permit.   The idea of going to school at the age of thirty-odd years was not attractive, naturally, to Ta wa quap te wa; but he promptly set his followers an example of confidence in the Government, merely asking the privilege of taking his wife and family with him and retaining his Indian costume and long hair. This request I granted the instant it was submitted to me, although, as far as I am aware, the concession was unique in the annals of our school service.   Frank Se wen imp te wa, the prospective governor of the Moencopi Hopis, who had got himself involved in the turmoil at Oraibi although it was none of his business, was granted a similar privilege, and both men chose the training school at Riverside, Cal., for their alma mater.   It required some overhauling of the local arrangements and some revision of the rules to accommodate this oddly assorted party; but Superintendent Hall showed no symptoms of panic at the prospect of the innovation, and, as usual, proved himself equal to the emergency.   Quarters were prepared, and in a little while the visiting public were treated to the unusual spectacle of two Indian chiefs and their entire families gathered in an institution of learning to prepare them for treading together the road to civilization.

The wisdom of sending these families to school was confirmed at once.   Within a few days after his arrival at Riverside, Ta wa quap te wa voluntarily presented himself to be shorn of his braids, and asked for a hat and a uniform like those which the other pupils wore. About twenty of the friendly children had been sent by their parents to Riverside with the chief; and a few weeks ago I gave the superintendent authority to let him return to Oraibi as a recruiting agent for the school.   How well he is getting on with his studies is evidenced by the fact that he can write letters home; and when I was at the school in June he sought me out and exchanged a few sentences of conversation with me in very intelligible English.   During the summer vacation he has found employment on one of the fruit farms near Riverside at first-class wages; and the last I heard of him he was inquiring the price of a second-hand bicycle, having in mind the saving of time he could accomplish by riding to and from his work every day.   And this is the Indian whom I described in my last year's report as shadowing me down the mesa trail after my starlight council with the hostiles of the pueblo, and holding a midnight conference with me at my quarters, with the necessary aid of an interpreter!

Yet Ta wa quap te wa's path has not been wholly thornless, even since he adopted the new order so completely.   After reaching Riverside he of course continued to feel an interest in home affairs; it

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 128 of 212   Page ID #:4144

presently came to light that he had delegated his brother to act as chief during his absence, and, probably because of appeals from his representative, had sought to direct matters in the village by correspondence. Now this was not according to my programme. The government of Oraibi I had placed in the hands of a commission, and it seems that the actions of the friendly judge who was serving on this commission did not always please some of the friendly faction. Investigation proved, however, that the very reasons they assigned for urging his removal were the best ones in the world for keeping him in office. It was thought wise, therefore, for the supervisor to take a representative from Oraibi to Riverside to talk things over with Ta wa quap te wa. This stroke of diplomacy did the business. The conference soon reached an understanding as to the status of the governing body, and the interference of the school-going chief came to an end.

In concluding this bit of history I would say that Supervisor Perry, who dealt with the trying crisis at Oraibi as my representative and straightened out the tangles on the civil side of it, was in constant and close communication with me all the time by wire. He was cautioned throughout against any measures which would bring unnecessary hardship upon the poor, benighted creatures with whom we had to deal; to keep the situation always firmly in hand but never to force it; to induce submission rather than reduce the Indians to it; to repeat to the hostiles, whenever occasion offered, my message that the Government was their best friend, was trying to help and not to hurt them, and had no vengeful feeling for anything that was past, but would welcome them as cordially as the friendlies to its care when they got ready to come; to exact from the friendlies just and fair treatment of the hostiles, and to make everyone understand that the Government took no sides in the local quarrels over religious matters, but that Washington's platform was simply peace, education, and conformity to law. These instructions Mr. Perry appears to have carried out in both letter and spirit.

### NAVAHO PRISONERS.

In my last report I gave an account of the suppression of a disturbance among the Navaho Indians by the arrest of seven men involved in an insurrectionary attempt, and their imprisonment at hard labor on Alcatraz Island in San Francisco Harbor. After a few months' confinement there I felt some fear that the dampness of the climate, to which they were wholly unaccustomed, might affect their health, and had them transferred to Fort Huachucha, in Arizona.

On October 12, 1906, the one-year sentences of Winslow, Tsosa Begay, and Ush Tilly, with commutation for good behavior, expired

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google        Original from UNIVERSITY OF MICHIGAN

CVWD 563-102

Case 5:13-cv-00883-JGB-SP Document 85-20 Filed 10/21/14 Page 129 of 212 Page ID #:4145

and they were returned to the Navaho Reservation. In June, 1907, the two-year terms of the other four—Denet, Lakai, Cladhy, and Tolghin—allowing for commutation, expired, and they were accordingly delivered at the agency by the War Department.

For the care and transportation of these prisoners the War Department has submitted vouchers in the sum of $2,375.12, and the claims have been forwarded to the Auditor for payment.

## INDIANS IN CALIFORNIA.

My last report referred to the investigation of conditions among the Indians in northern California undertaken by C. E. Kelsey, formerly secretary of the Northern California Indian Association. His services were secured as special agent to carry out the provisions of the act of June 21, 1906 (34 Stat. L., 333), which appropriated $100,000 for the purchase of lands, water rights, etc., for the Indians of California; and during the fiscal year just ended the following expenditures in southern California have been authorized: At San Manuel, the purchase of two small tracts aggregating 13 acres for $2,125; at Las Coyotes, the purchase of 160 acres in the San Ysido Canyon for $800; at Campo, the purchase of about 1,200 acres from J. A. Becker, L. A. Dyball, and the heirs of Horace G. Smith, at a cost of $14,500; at Pachanga, the purchase of 235 acres for $6,650 and the expenditure of $2.500 for piping water; at Pauma, the purchase of $400 worth of cement and tools for the Indians to use in finishing a reservoir begun by themselves; at Coachella or Cabazon, $1,200 for pumping plant and wells; at St. Augustin, $1,150 for the same purpose; at Morongo, $500 for testing the water supply; and at Cahuilla, $600 for improving the water system.

This makes a total expenditure authorized in southern California of $30,425.

By direction of the Department certain tracts of Government land adjoining Palm Springs, Twenty-nine Palms, Inyaha, Capitan Grande (including that part called Conejos), Laguna, Cuyapipe, Campo proper, La Posta, and Manzanita reservations have been withdrawn from all forms of settlement and entry, for the use of the Indians of these reservations. It is purposed to issue patents for these lands under the current Indian appropriation act (34 Stat. L., 1016) in the name of the band inhabiting the reservation to which the lands will be annexed.

There is still under consideration the purchase of a tract for the San Pascual Indians, estimated to cost between $3,000 and $5,000. Other work planned involves the settlement of the claim of Peter McCain, an occupant of Indian land on the Manzanita Reservation, who owns improvements there valued at $2,000 to $2,500; the fenc-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-103

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 130 of 212   Page ID #:4146

ing of the lands purchased for the Campo Indians, at an expense of about $4,000; the construction of a reservoir and irrigation ditches, with the necessary laterals to irrigate the Campo Reservation, to cost approximately $20,000; and the fencing of the Mesa Grande or Santa Ysabel No 2 Reservation, Santa Ysabel No. 3, and that part of the Las Coyotes Reservation which adjoins the Warner's ranch grant.

In northern California the following purchases have been authorized: For the use of the Cortina band, 480 acres at $4,800; for a band of Indians in Yolo County, 74.16 acres for $2,000; at Blue Lake, Humboldt County, for $1,500, a tract of about 27 acres, to furnish homes for some ten families; at Trinidad, Humboldt County, about 60 acres for $1,200, though, owing to a defective title, this tract may be rejected in favor of another 60 acres; at Pollasky, 140 acres for $1,575 for the use of the Millerton band of Indians.

At Colusa the purchase for $3,800 of a part of the rancheria near Packer, for the use of the Indians residing there, has been considered. The title to this land has twice passed through the probate court in the city and county of San Francisco, but the county court records were destroyed in the fire of 1906, and as the probate proceedings are not of record in Colusa County, evidences of title are difficult to procure. An abstract of title is now before a title insurance company, and, if approved by them, the purchase will be made.

The purchase from William Westbrook, for $7,200, of a tract of 163.86 acres for the Smith River Indians has been decided on. It borders three-quarters of a mile on the ocean and 1,200 feet on Smith River, and is desired by the Indians because of its convenience to a supply of sea food and its nearness to the fisheries in which the Indians find employment.

The Indians in the neighborhood of Etna have been living on lands which are a part of the Central Pacific Railroad Company's grant. The company offered them to the Government for the use of the Indians at the rate of $5 per acre, and the purchase was authorized at $2,208.

The Hopland band, numbering 120 persons, was without lands, and 630 acres are to be purchased for them in the McDowell Valley for $5,750.

The band of Indians called by the various names of Guenoc, Loconomi and Middleton, has from time immemorial resided on what is known as the Guenoc ranch. The part they occupy having recently been purchased by a land company for speculative purposes, land is to be purchased for them elsewhere at $2,000.

The cost of the ten tracts in northern California whose purchase has actually been authorized will aggregate $32,033. Other purchases in prospect are 75 acres for the Rumsey band and 92 acres for the Upper Lake band.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-104

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 131 of 212   Page ID #:4147

The following Indians also are reported as being in need of land: Crescent City, Del Norte County; Loleta, Bucksport and Mad River in Humboldt County; Cahto, Sherwood, De Haven, Westport, Fort Bragg, Noyo and Potter Valley in Mendocino County; Stewarts Point, Dry Creek, Cloverdale, Sebastopol and Bolinas in Sonoma County; Lakeport and Sulphur Bank, in Lake County; Paskenta, Tehama County; Elk Creek and Grindstone Creek, in Glenn County; Stony Ford, in Colusa County; Ione, Richey and Jackson Valley in Amador County; Lemoore, in Kings County; Laton and Sanger, in Fresno County; Mariposa, in Mariposa County; Groveland, Cherokee and Tuolumne in Tuolumne County; Murphy's Sheep Ranch, in Calaveras County; Nashville, in Eldorado County, and possibly some others.

Of the appropriation of $100,000 there has thus been authorized an expenditure of $62,458, exclusive of the salary and traveling expenses of Agent Kelsey, leaving not more than $30,000, in round numbers, available for further operations. The Office has been authorized to continue Mr. Kelsey's services for so much of the fiscal year ending June 30, 1908, as they may be needed. In all probability the entire year will be needed to complete his work in hand and to perfect the adjustment of the desert and timber allotments made to Indians under the fourth section of the general allotment act of February 8, 1887 (24 Stat. L., 388), another duty which will be assigned him.

It will be seen from this review that the current appropriation will be wholly inadequate; and to place the Indians of this State in a position whereby they may become self-supporting a further appropriation of at least $50,000 should be made by the next Congress.

### THE LEMHI INDIANS.

In the latter part of last April a party of 8 Indians removed from the Lemhi to the Fort Hall Reservation in Idaho. A second party of 30 went soon after, and other companies followed, until all the Lemhi Indians had been removed. Their farm machinery and cattle were shipped by rail from Red Rock, Mont., to Ross Fork, Idaho, and are now on the Fort Hall Reservation. Arrangements had already been made for the reception and settlement at Fort Hall of the Lemhi Indians, and their long-mooted removal was finally accomplished with little difficulty.

Tendoy, the old chief of the Lemhi Indians in Idaho, died on May 9, 1907. In the early days he rendered valuable service to white settlers, protecting them from marauding bands of Indians who were passing through the country, especially during the Nez Percé war, when, owing directly to his influence, the Nez Percé did not molest any white person in the Lemhi Valley.


Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-105

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 132 of 212   Page ID #:4148

Grateful settlers have subscribed about $200 toward the erection of a suitable monument to mark the burial place of Chief Tendoy, and have asked to have the NE. $\frac{1}{4}$ of SW. $\frac{1}{4}$, sec. 28, T. 19 N., R. 24 E., which contains a number of other Indian graves, set apart and withheld from entry. This tract of land is a hill which can not be reached with water, and is not fit for agricultural purposes. The Lemhi Indians heartily join in the wish of the white people, and steps have been taken by the Office to have this land withdrawn from entry and set apart for the desired purpose when the surveys shall have been finished.

### THE FIVE CIVILIZED TRIBES.

No change has been made in the management of the affairs of the Five Civilized Tribes during the year. Mr. Tams Bixby, who succeeded the Commission to the Five Civilized Tribes as sole commissioner, continued in charge until June 30, 1907, when he resigned, and J. George Wright, who for nine years had been inspector for the Indian Territory, was appointed commissioner, combining the duties of his new office with those of the inspectorship.

### EDUCATION.

By an act of Congress approved April 26, 1906 (34 Stat. L., 137), the Secretary of the Interior assumed control and direction of the schools among the Five Civilized Tribes.

The direct charge of these institutions rests in, and the work is administered through, John D. Benedict, superintendent of schools in Indian Territory, assisted by four United States supervisors. The Creek, Cherokee, Choctaw and Chickasaw nations are represented by tribal supervisors, who act in conjunction with the United States supervisors. School matters in the Seminole Nation are administered through the supervisor for the Creek Nation.

The amount of money available for school purposes in the several nations is as follows:

| | |
|---|---:|
| Cherokee Nation | $120, 476. 45 |
| Creek Nation | 83, 143. 62 |
| Choctaw Nation | 124, 967. 35 |
| Chickasaw Nation | 145, 471. 89 |
| Seminole Nation | 23, 788. 00 |
| Total tribal fund | 497, 847. 31 |

In the Indian appropriation act of June 21, 1906 (34 Stat. L., 340), the Congress allowed $150,000 for maintaining, strengthening and enlarging the tribal schools, and made provision for the attendance of children of parents of other than Indian blood therein, and the establishment of new schools under the control of the Department of the Interior.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google      Original from
UNIVERSITY OF MICHIGAN

CVWD 563-106

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

96     REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

This appropriation, supplemented by a part of the tribal funds
and by surplus court fees, was used in the establishment of 1,000
day schools, to which citizen and noncitizen children were admitted
on equal terms.  The schools had an enrollment of about 13,500
Indian pupils, 45,000 white, and 8,600 negro.  Although there is no
compulsory school law in the Territory and parents frequently do
not appreciate the necessity of compelling attendance, the number
enrolled is indicative of the wisdom of the Congress in providing
for those who are deprived of the ordinary public schools.  Nearly
all these one thousand rural schoolhouses have been built by popular
subscription.  Superintendent Benedict says:

> Immediate statehood will not affect educational conditions in the rural por-
> tions of this Territory, for the reason that nearly all of the farm lands are
> still owned by Indians and are not taxable.  The State can not remove restric-
> tions, nor can it maintain rural schools except by local taxation.  It will
> therefore be highly necessary that Congress continue its annual appropriation
> in support of these country schools until the farm lands become subject to taxa-
> tion.  As the country is rapidly filling up with white tenant farmers, this
> appropriation should be gradually increased to meet the ever-increasing demand
> for more schools.

Speaking generally, the academies and boarding schools have been
crowded to overflowing.  Great improvement has been made in the
curriculums by the introduction of industrial training and the rudi-
ments of agriculture.  The "summer normals" established by the
superintendent have been of immense benefit to the teachers of the
Territory and have enabled him to obtain a corps of very efficient
instructors.

The following tables give statistical information concerning schools
in the several nations:

*Tribal schools.*

| Name of school. | Enroll-ment. | Average attend-ance. | Time at school. | | Annual cost. | Average cost per pupil. |
|---|---|---|---|---|---|---|
| | | | *m.* | *d.* | | |
| *Cherokee schools.* | | | | | | |
| Male Seminary | 128 | 108 | 9 | 0 | $14,438.07 | $133.69 |
| Female Seminary | 180 | 152 | 9 | 0 | 19,565.33 | 128.70 |
| Orphan Asylum | 75 | 67 | 12 | 0 | 10,761.73 | 160.62 |
| Colored High School | 50 | 43 | 9 | 0 | 5,014.18 | 116.61 |
| 157 primary combined day schools *a* | *b* 9,687 | | | | 47,254.16 | |
| Total | 10,128 | 370 | | | 97,031.47 | |
| *Creek schools.* | | | | | | |
| Eufaula High School | 91 | 64 | 9 | 0 | 8,599.40 | 134.05 |
| Wetumka Boarding | 109 | 77 | 9 | 0 | 8,587.68 | 111.53 |
| Wealaka Boarding | 53 | 39 | 9 | 0 | 5,369.49 | 137.69 |
| Euchee Boarding | 87 | 70 | 9 | 0 | 7,673.24 | 109.62 |
| Coweta | 45 | 37 | 9 | 0 | 4,517.55 | 122.09 |
| Creek Orphan Home | 70 | 51 | 9 | 0 | 7,151.15 | 140.22 |
| Nuyaka | 109 | 71 | 9 | 0 | 5,599.81 | 78.76 |
| Tullahassee Boarding | 97 | 69 | 9 | 0 | 7,306.81 | 105.89 |
| Pecan Creek Boarding | 54 | 44 | 9 | 0 | 3,664.21 | 85.56 |
| Colored Orphan Home | 39 | 31 | 9 | 0 | 3,574.64 | 115.32 |
| 22 primary combined day schools *c* | *d* 1,524 | | | | 6,260.01 | |
| Total | 2,278 | 553 | | | 68,303.97 | |

*a* 21 are negro schools.
*b* 4,447 are white pupils and 1,279 are negro pupils.
*c* 3 are negro schools.
*d* 1,125 are white pupils and 225 are negro pupils.


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-107

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS. 97

### Tribal schools—Continued.

| Name of school. | Enrollment. | Average attendance. | Time at school. m. d. | Annual cost. | Average cost per pupil. |
|---|---|---|---|---|---|
| *Choctaw schools.* | | | | | |
| Jones Academy | 133 | 108 | 9 0 | $18,022.49 | $166.87 |
| Armstrong Academy | 115 | 95 | 9 0 | 16,154.29 | 170.05 |
| Tuskahoma Academy | 120 | 105 | 9 0 | 17,920.72 | 164.96 |
| Wheelock Academy | 110 | 108 | 9 0 | 18,982.69 | 155.17 |
| Murrow Indian Orphan Home | 82 | 78 | 9 0 | 8,468.64 | 108.57 |
| Durant | 90 | 71 | 9 0 | 5,724.61 | 80.63 |
| Big Lick | 31 | 20 | 6 0 | 840.02 | 42.00 |
| Chishoktak | 40 | 28 | 9 0 | 1,767.98 | 63.14 |
| Goodland | 80 | 54 | 8 0 | 3,050.82 | 57.98 |
| International School for the Blind and Deaf | 4 | 3 | 12 0 | 823.37 | 274.46 |
| 60 combined primary day schools a | 3,485 | ......... | ......... | 17,949.64 | ......... |
| Total | 4,290 | 665 | ......... | 106,085.27 | ......... |
| *Chickasaw schools.* | | | | | |
| Bloomfield Seminary | 43 | 24 | 6 15 | 5,305.19 | 221.05 |
| Harley Academy | 68 | 35 | 8 0 | 6,530.90 | 186.59 |
| Collins Institute | 56 | 33 | 8 15 | 6,067.27 | 183.85 |
| Rock Academy | 43 | 24 | 7 15 | 5,231.30 | 217.98 |
| Chickasaw Orphan Home | 72 | 51 | 8 0 | 10,124.91 | 198.22 |
| Stonewall | 29 | 22 | 9 0 | 2,316.31 | 105.29 |
| Selvidge Business College | 22 | 16 | 8 0 | 1,612.31 | 100.77 |
| Hargrove | 74 | 55 | 9 0 | 5,906.48 | 107.39 |
| St. Agnes Academy | 28 | 21 | 9 0 | 2,187.66 | 104.17 |
| Tonkawa Preparatory | 2 | 2 | 5 0 | 98.60 | 49.30 |
| St. Elizabeth's Convent | 20 | 18 | 8 0 | 1,652.95 | 91.28 |
| El Meta Bond | 7 | 5 | 9 0 | 558.79 | 111.76 |
| 69 day schools | 4,777 | ......... | ......... | 19,925.84 | ......... |
| Total | 5,241 | 306 | ......... | 67,518.51 | ......... |
| *Seminole schools.* | | | | | |
| Mekusukey | 110 | 78 | 8 0 | 8,643.48 | 110.81 |
| Emahaka | 102 | 77 | 7 0 | 7,980.92 | 103.77 |
| 4 day schools | 327 | ......... | ......... | 1,149.00 | ......... |
| Total | 539 | 155 | ......... | 17,782.40 | ......... |

a 2,497 are white pupils.

### Private and denominational school statistics.

| School. | Location. | President or principal. | When established. | Enrollment. White. | Enrollment. Indian. | Enrollment. Total. |
|---|---|---|---|---|---|---|
| Cherokee Academy | Tahlequah | W. J. Pack | 1885 | 105 | 57 | 162 |
| Cumberland | Cumberland | W. S. Graves | 1887 | 110 | 6 | 116 |
| Dwight Mission Industrial | Marble City | F. J. Schaub | 1820 | 35 | 60 | 95 |
| Hargrove College | Ardmore | J. M. Gross | 1895 | 132 | 87 | 219 |
| Indian University | Bacone | W. C. Farmer | 1880 | 92 | 63 | 155 |
| Indianola College | Wynnewood | F. J. Stowe | 1902 | 66 | 43 | 109 |
| Lutheran Mission | Oaks | N. L. Neilsen | 1902 | 26 | 38 | 64 |
| Spaulding College | Muskogee | T. F. Brewer | 1887 | 182 | .......... | 182 |
| St. Elizabeth's Institute | Purcell | M. Patricia | 1889 | 71 | 71 | 142 |
| Sacred Heart | Vinita | C. Van Hulse | 1897 | 94 | 138 | 232 |
| Total | | | | 913 | 563 | 1,476 |

### Support of schools from special funds.

| Name of fund. | Number of day schools. | Enrollment. Indian. | Enrollment. White. | Cost. |
|---|---|---|---|---|
| Indian schools, Five Civilized Tribes | a 486 | 5,160 | 26,298 | $134,069.89 |
| Indian schools, Five Civilized Tribes, surplus court fees | b 197 | 710 | 11,634 | 49,132.41 |

a 71 are negro schools, with an enrollment of 3,107.
b 28 are negro schools, with an enrollment of 810.

22849—08——7

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

CVWD 563-108

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 135 of 212   Page ID #:4151

### MINERAL LEASES.

A list of approved leases and a résumé of the amendments to the regulations governing Creek and Cherokee mineral leases were given in my last report.  The regulations were further revised on June 11, 1907.  Three important modifications are:

Instead of the requirement that a lessee show $5,000 cash on hand for the development of each lease, or $40,000 for the maximum acreage, 4,800 acres, a lessee is required to be vouched for, on his application for a lease, by two officers of separate national banks, or by one national-bank officer and the manager of an oil well supply company, or by "some other commercial enterprise with which the applicant has had extensive business relations;" but the Department reserves the right to make further inquiry at any time as to his standing and business ability.

On a gas well that tests in twenty-four hours 3,000,000 cubic feet or less the royalty is $150 per annum, and, where the capacity exceeds that, $50 additional per annum for each 1,000,000 cubic feet or fraction thereof; and except in emergencies, which in no case shall consume more than ten days, a lessee is not allowed to utilize more than 75 per cent of the capacity of a gas well.

The required forms of leases are now printed by the Government and are sold by the United States Indian agent at $1 per set, so that now it is not necessary to examine the leases as to substance, but only to see that the blank spaces are properly filled.

Up to the close of the last fiscal year 14,584 mineral leases, nearly all oil and gas, had been filed with the Union Agency, of which 9,575 have been forwarded for departmental consideration and 5,009 are pending at the agency; 14,423 covered oil and gas, 118 coal and asphalt, and the other 43 miscellaneous minerals; 4,886 leases, covering about 663,000 acres, have been approved.

Prior to the passage of the act of April 26, 1906 (34 Stat. L., 137), the Department had no jurisdiction of the approval of mineral leases in the Choctaw and Chickasaw nations; but under that act the Department is required to approve all mineral leases entered into by full-blood citizens of those nations and also of the Seminole Nation.  Previously, mineral leases in the Seminole Nation could be made with the tribal government with the consent of the allottee and the approval of the Department, one half of the royalty to be paid to the tribal government until its expiration and the other half to the allottee.  The tribal government of the Seminole Nation has not yet been extinguished, and the question as to whether it is entitled to one-half the royalty accruing from minerals extracted from land allotted to citizens of less than full blood is pending before the Department.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-109

The current Indian appropriation act (34 Stat. L., 1026) provides that—

> the filing heretofore or hereafter of any lease in the office of the United States Indian agent, Union Agency, Muskogee, Indian Territory, shall be deemed constructive notice.

Prior to this legislation there had been some doubt as to whether such filing was constructive notice.

The oil fields of the Creek and Cherokee nations were rapidly developed during the year, and the production has materially increased. There has not been much development in the Choctaw, Chickasaw, and Seminole nations, but the prospecting there indicates the ultimate discovery of new fields which will result in many thousands of acres of land being developed for oil and gas purposes. Approximately 21,717,000 barrels of oil were produced in the Indian Territory during the last fiscal year, and it is estimated that on the 30th of June 18,000,000 barrels were stored in tanks in the Creek and Cherokee nations.

Many Indians who have allotments in the productive fields receive each month royalties in very large amounts, many from $300 to $400 per month, several more than $2,000, and one more than $3,000 per month. In addition to the royalties, lessees offer large bonuses for leases on tracts within the developed oil fields, the largest cash bonus being $43,000, paid for a lease on 20 acres within what is known as the Glenn Pool; a bonus of $25,000, in addition to a royalty of 12½ per cent, was paid for a 160-acre lease on the allotment, also in the Glenn Pool, of Ernest Clayton, a deceased Creek citizen.

### DEPOSITS IN BANKS.

The money accruing from the sale of Creek allotted lands and the royalties arising from lands of minors and incompetents is deposited at interest in selected banks, which are required to give bond, in a sum equal to the amount of the deposits, for the payment of the deposits and the agreed rate of interest. The amounts deposited during the year and the balances on hand at the close of the last fiscal year, as reported by the Indian agent, are as follows:

*Deposits in banks.*

| Name of bank. | Location. | Deposited during year. | Balance on hand. |
|---|---|---|---|
| Bartlesville National Bank | Bartlesville | $13,886.74 | $48,969.10 |
| The First National Bank | do | 37,687.56 | 24,938.49 |
| The American National Bank | do | 14,398.82 | 9,280.11 |
| The First National Bank | Tulsa | 48,227.73 | 47,565.97 |
| The Commercial National Bank | Muskogee | 23,646.50 | 14,249.78 |
| The First National Bank | do | 44,594.71 | 39,799.50 |
| Do | Tahlequah | 26,522.20 | 22,298.97 |
| Do | Vinita | 32,516.27 | 23,535.35 |
| Do | Nowata | 22,832.60 | 23,939.23 |
| The Nowata National Bank | do | 28,548.42 | 24,947.53 |
| Total | | 287,311.55 | 279,524.03 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

### LEASING AND SALE OF LANDS.

Since the promulgation of the regulations of July 10, 1903, 867 tracts of land in the Creek Nation have been sold, with the approval of the Department, aggregating 73,379.42 acres, which brought $1,153,748.39, a little more than $15.72 per acre.

No change has been made in the law with reference to the sale of Choctaw and Chickasaw coal and asphalt lands; but in accordance with the act of June 21, 1906 (34 Stat. L., 325), the Department is having the lands explored with a view to determining their mineral resources and values; for which the act authorizes the expenditure of not exceeding $50,000 of any funds of the Choctaw and Chickasaw nations in the Treasury.

No surplus lands in any of the nations have been offered for sale. No such action can be taken until allotments have been made to all of the citizens of the nation to which the surplus belongs.

### INCORPORATING TRIBES.

In my last report I devoted a short passage to the consideration of a plan I had in mind for administering the estates of any Indian tribe who owned property of enough value to make it worth while, by incorporating the tribe as a joint stock company, with such safeguards in the act of incorporation as would protect the individual shareholders from their own improvidence and the company as a whole from a careless directorate. When the concrete problem of the disposal of the mineral-bearing lands of the Choctaws and Chickasaws became acute during the last session of Congress, the Hon. Moses E. Clapp, Senator from Minnesota and chairman of the Senate Committee on Indian Affairs, introduced this bill (S. 8286) :

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there is hereby created a corporation, to be known as the Choctaw-Chickasaw Coal, Oil and Asphalt Land Company, the purpose of which is to take title to, manage, and dispose of the coal, oil, and asphalt lands and deposits in the Choctaw and Chickasaw nations for the use and benefit of the persons whose names shall appear on the citizenship rolls of the Choctaw and Chickasaw nations finally approved by the Secretary of the Interior, and who are, under existing law, entitled to share in the distribution of the funds arising from the sale of the lands and deposits segregated by written order of the Secretary of the Interior, on March twenty-fourth, nineteen hundred and three, by virtue of and in accordance with the provisions of section fifty-eight of the act of Congress approved on July first, nineteen hundred and two (Thirty-second Statutes at Large, page six hundred and forty-one), and of any other lands or deposits in the Choctaw and Chickasaw nations that may have been segregated in like manner by order of the Secretary of the Interior or by act of Congress or added by direction of any act of Congress to any existing coal or asphalt lease theretofore made in accordance with law and in the royalties, rents, and profits accruing therefrom.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 138 of 212   Page ID
#:4154

SEC. 2. That the permanent officers of the corporation shall be: The President
of the United States, ex officio president; the Secretary of the Interior, ex
officio treasurer and transfer agent, and the Commissioner of Indian Affairs, ex
officio secretary; and these officers, together with the Secretary of the Treasury
and the Secretary of Commerce and Labor, shall be ex officio directors of the
corporation, and they and two persons elected by the stockholders of the corpo-
ration, one of whom shall be a Choctaw and the other a Chickasaw by blood,
shall constitute the board of directors thereof; and until such time as the
citizenship rolls of the Choctaws and Chickasaws have been completed and
finally approved by the Secretary of the Interior said directors shall be elected
by the persons whose names appear on the approved partial rolls, and their
terms of office shall expire ninety days from the date on which the final rolls
are approved. Should any ex officio director be unable, for any reason, to
attend a meeting of the directors or perform any of the duties required of him
by this act, he shall authorize some person connected with the Government of
the United States to represent him, such authority to be in writing and to be
made a part of the permanent records of the corporation; and the acts of the
person so authorized shall be held to be the acts of the ex officio director repre-
sented. The term of office of the members of the board of directors elected by
the stockholders shall be four years, and until their successors are elected and
qualified; and the ex officio members of the board of directors shall not be
entitled to pay for their services, nor shall there be any liability on the part
of the directors, ex officio or others, for the debts of the corporation.

SEC. 3. That the principal office of the corporation shall be the office of the
Secretary of the Interior, in the city of Washington, District of Columbia, and
the principal chief of the Choctaw Nation and the governor of the Chickasaw
Nation are hereby authorized, with the approval of the Secretary of the Interior,
for and on behalf of the citizens of the Choctaw and Chickasaw nations, respec-
tively, to convey to the corporation legal title to said segregated coal and asphalt
lands and deposits; and if the principal chief of the Choctaw Nation and the
governor of the Chickasaw Nation, or either, fail, refuse, or neglect to convey
to the corporation title to the property, as provided herein, the Secretary of the
Interior may, with the approval of the President of the United States, convey
to the corporation title to the segregated lands and deposits, and either convey-
ance, made and approved as herein provided, shall vest full legal title to the
segregated lands and deposits, and all right, title, interest, and equity of the
Choctaw and Chickasaw nations and the citizens thereof in and to the lands
and deposits, in the corporation, in trust, for the purposes set forth in this act.

SEC. 4. That the corporation shall have authority to explore for, mine, pro-
duce, purchase, sell, and transport coal and asphalt, both crude and refined; to
prospect for, extract, refine, and transport oil; to lease, for the mining of coal and
asphalt, and the extraction of oil, any of the deposits in or under the segregated
lands, and to lease or sell and convey the surface of any of them, whether within
the limits of incorporated or unincorporated town sites or otherwise, in tracts
not exceeding one hundred and sixty acres to any one purchaser, on such terms
and conditions as the board of directors may determine; to collect all royalties,
rents, and profits arising from any of the segregated lands heretofore leased for
coal and asphalt mining purposes and from any deposits in or under them
hereafter leased, and all rents and profits derived from the surface of any of
the segregated lands that may be leased for agricultural, grazing, or other pur-
poses; to borrow money; to purchase, own, sell, and convey real estate; to
mortgage property; to purchase mortgages, bonds, and stocks; to issue bonds
of the corporation; to sue and be sued; to adopt by-laws not inconsistent here-
with, and to do and perform any and all other acts necessary or incident to
carrying into effect the purposes of this act. The surface of the land shall be

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-112

leased and sold subject to the right of future lessees of coal, asphalt, and oil deposits to remove the coal, asphalt, and oil in or under the land without being accountable to the owner of the surface because of subsidence of the surface or other damage incident to removing coal, asphalt, or oil, or operating coke ovens. A majority of the board of directors shall constitute a quorum and shall have authority to transact the business of the corporation.

SEC. 5. That this act shall be in effect for not exceeding twenty-five years from the date of the approval hereof, unless extended by Congress; and the capital stock of the corporation shall be in an amount to be fixed by the board of directors, divided into such number of shares as will enable the board of directors to issue to each citizen of the Choctaw and Chickasaw nations, in the Indian Territory, whose name shall appear on the citizenship rolls finally approved by the Secretary of the Interior, a certificate for his per capita share of the capital stock of the corporation. It shall be unlawful for a citizen owner to sell, transfer, or assign any interest or use in his stock, directly or indirectly, or to encumber it in any way, without the written consent and approval of the Secretary of the Interior, as transfer agent of the corporation, indorsed thereon.

SEC. 6. That the capital stock of the corporation and the segregated coal and asphalt lands and coal, asphalt, and oil deposits shall not be subject to taxation by any State, Territorial, district, county, municipal, or other government while the title to the stock remains in the Indians, and the title to the coal and asphalt lands and coal, asphalt, and oil deposits remains in the corporation, except that the stock in the corporation shall be subject to taxation for school purposes only, by the proper officials of the county or counties in which the lands and deposits are situate, at the same rate and on the same conditions as personal property of citizens in such county or counties is taxed; and the tax thus levied shall be a charge against the income of the corporation and be paid by the board of directors therefrom. After all expenses of managing the corporation have been paid and such amount reserved as surplus as the board of directors may deem proper, the income of the corporation shall be distributed, in the form of dividends, to the holders of stock in the corporation, at such times as the board of directors may direct.

SEC. 7. That the first meeting of the ex officio directors of the corporation shall be held at such time as the President of the United States may direct, but not later than sixty days from the date of the approval of this act.

SEC. 8. That Congress shall have power to continue the provisions of this act beyond the period of twenty-five years; and if at the expiration of twenty-five years from the date of the approval hereof the provisions of the act have not been continued by Congress the affairs of corporation shall be wound up by the board of directors and the property distributed by them in accordance with the interests of the respective stockholders.

SEC. 9. That the right to at any and all times amend, modify, or repeal this act is hereby reserved by Congress.

SEC. 10. That all acts and parts of acts inconsistent with this act are hereby repealed.

This bill embodies in all respects my incorporation plan as applied to these particular tribes. In the House, almost simultaneously, the Hon. James S. Sherman, Representative from New York and chairman of the House Committee on Indian Affairs, introduced a bill containing substantially the same provisions, but constituting the officers of the corporation as follows:

The Secretary of the Interior, ex officio president; the Commissioner of Indian Affairs, ex officio secretary and treasurer and transfer agent; * * *


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

CVWD 563-113

together with three directors, appointed by and to serve during the pleasure of the President of the United States, * * * and two persons elected by the stockholders of the corporation, one of whom shall be a Choctaw and the other a Chickasaw by blood.

The shortness of the session and the temporary provision made for the administration of the affairs of the Five Civilized Tribes prevented the Congress from giving any particular consideration to either measure; but I am in hope that at the coming session it may be taken up seriously and examined and compared on its own merits with the various other projects mooted for making at once the most prudent and the most profitable disposal of the income-producing property of the Choctaws and Chickasaws.

### COLLECTION OF REVENUES.

By law it is made the duty of the Government to collect the taxes and royalties belonging to the several tribes, and the responsibility of making such collection devolves upon the United States Indian agent. During the fiscal year just ended he reports the handling of funds as follows:

RECEIPTS.

Choctaw and Chickasaw nations:

| | | |
|---|--:|--:|
| Coal royalty | $237,385.03 | |
| Asphalt royalty | 2,814.20 | |
| Condemnation town lots | 287.45 | |
| Condemnation of lands for railway purposes | 7,411.71 | |
| Sale of seized timber | 132.90 | |
| Quarterly payment right of way St. Louis and Santa Fe Rwy. Co | 3,000.00 | |
| Rent of jail at Tishomingo | 150.00 | |
| Sale of seized furs | 7.65 | |
| Grazing fee | 12,064.50 | |
| Town lots | 389,589.61 | |
| Individual Indian moneys, oil and gas | 32.84 | |
| | | $652,875.89 |
| Choctaw cattle tax | | 9.60 |

Cherokee Nation:

| | | |
|---|--:|--:|
| Oil and gas royalty (individual) | 568,835.34 | |
| Coal royalty (individual) | 2,176.48 | |
| Limestone and shale royalty (individual) | 2,060.00 | |
| Oil-lease bonus (individual) | 811.00 | |
| School revenue (board of teachers and pupils) | 9,050.21 | |
| Taxes on pipe lines | 233.85 | |
| Improvements former orphan asylum lands | 80.00 | |
| Sale of property, Cherokee Orphan Asylum | 419.35 | |
| Sale of estray stock | 228.48 | |
| Stone and ballast | 332.76 | |
| Ferry charters | 140.00 | |
| Grazing fee | 365.90 | |
| Town-lot payments | 146,582.23 | |
| | | 731,315.60 |


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

CVWD 563-114

**104**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

Creek Nation:

| | | |
|---|---|---|
| Oil and gas royalty (individual) | $181, 256. 93 | |
| Coal royalty (individual) | 12, 921. 56 | |
| Clay and shale royalty (individual) | 300. 00 | |
| Oil-lease bonus (individual) | 7, 095. 00 | |
| Taxes on pipe lines | 34. 76 | |
| Occupation tax | 133. 13 | |
| Grazing fee | 12, 802. 65 | |
| Town-lot payments | 22, 701. 96 | |
| | | $237, 245. 99 |

Miscellaneous:

| | | |
|---|---|---|
| Sale of town-site maps | 210. 80 | |
| Overpayments, advanced royalty, Creek and Cherokee | 10, 291. 48 | |
| Total moneys actually collected by Indian agent | 1, 631, 949. 86 | |
| Amount received by agent to cover disallowances | 247. 67 | |
| Received by Treasury warrants on requisition | 1, 379, 852. 73 | |
| | 3, 012, 049. 76 | |
| Balance "individual Indian moneys" carried over from previous fiscal year | 47, 902. 86 | |
| Balance "overpayments, advance royalty, Creek and Cherokee," carried over from previous fiscal year | 348. 90 | |
| Total | 3, 060, 296. 02 | |

The amount actually disbursed by him was $1,989,127.09 leaving
a balance of $1,071,168.93, which was on deposit with the subtreasury
at St. Louis, Mo., or in the United States Treasury.

The total amount collected as royalty on coal and asphalt in the
Choctaw and Chickasaw nations, from June 28, 1898, to June 30,
1907, was $1,975,972.61.

### TOWN SITES.

Town-site work is substantially finished, there being but few sup-
plemental schedules to be approved in cases where the lots were in
contest and could not be scheduled to the parties entitled. Several
small towns, however, have sprung into existence on the segregated
coal and asphalt lands, and it is the purpose of the Office to attempt
to obtain legislation during the coming session of the Congress which
will authorize the sale of the surface of the land to actual occupants.
If authorized, this will not involve much work or any considerable
expense.

### PUBLIC ROADS.

The Creek and Cherokee agreements declare that public highways
shall be established on all section lines, and during last year the
agent received 196 petitions asking that obstructions be removed from
section lines. The cost of establishing roads has been small, and
many allottees have waived claims for damages.

Public highways in the Choctaw, Chickasaw and Seminole nations
are established along section lines in accordance with the act of April

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-115

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 142 of 212   Page ID
#:4158

26, 1906 (34 Stat. L., 145).  The agent reports that he received during the year 812 petitions from persons residing in these nations, and that 1,582 miles of road have been established and ordered opened.  As a general rule, tenants and others residing in the different nations have cooperated with the Government in carrying out the law.

### PLACING ALLOTTEES IN POSSESSION OF THEIR ALLOTMENTS.

Under the agreements with the Five Civilized Tribes it is the duty of the agent, on the issuance of an allotment certificate, to place the allottee in possession and to remove from the land all persons objectionable to him.  The agent reports that there has been a material decrease in the number of complaints during the last year.  The number of written complaints received was 1,002, to which should be added 216 carried over from last year;  2,077 other complaints were disposed of without formal hearing, and 875 formal cases were heard and adjusted.

The agent experienced some difficulty in placing Cherokee allottees in possession of lands formerly held by freedmen who had been denied citizenship.  Every obstacle was placed in his way and suits were brought to enjoin him from removing the intruders.  Judge Joseph A. Gill, of the northern district of the Indian Territory, issued a temporary injunction, but after a hearing the injunction was dissolved.  It is estimated that some 2,000 persons who applied for enrollment as Cherokee freedmen are occupying lands allotted to enrolled citizens, and they will have to be ejected.

### ALIENATION OF ALLOTMENTS.

By the act of April 21, 1904 (33 Stat. L., 204), all restrictions were removed from the alienation of lands allotted to citizens of the Five Civilized Tribes who are not of Indian blood, except homesteads and the lands of minors, and authority was granted to the Secretary of the Interior to use his judgment as to removing restrictions on the alienation of the surplus allotments of adult Indians.  The following table shows the record up to June 30, 1907:

*Approved applications for removal of restrictions on alienation of allotments.*

| Nation. | Number of applications. | Acreage. | Estimated value. |
|---|---|---|---|
| Choctaw | 1,450 | 189,149.76 | $4,817,098.24 |
| Chickasaw | 537 | 62,299.46 | 1,888,368.00 |
| Cherokee | 2,787 | 178,267.11 | 6,206,146.00 |
| Creek | 516 | 58,012.14 | 2,095,066.00 |
| Seminole | 12 | 1,069.00 | 34,775.00 |
| Total | 5,302 | 488,787.47 | 15,041,453.24 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-116

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 143 of 212   Page ID #:4159

In addition to the foregoing the Department has authorized the alienation of tracts of land for town sites in accordance with applications made under the act of March 3, 1903 (32 Stat. L., 996), as follows:

*Lands alienated for town sites.*

| Nation. | Number of applications. | Acreage. | Estimated value. |
|---|---|---|---|
| Choctaw | 24 | 1,893.66 | $144,069.08 |
| Chickasaw | 9 | 614.00 | 38,744.35 |
| Cherokee | 24 | 991.64 | 77,199.43 |
| Creek | 65 | 3,729.00 | 288,618.35 |
| Total | 122 | 7,228.30 | 548,631.21 |

Under the same act and under the act of June 21, 1906 (34 Stat. L., 339), allottees have been authorized to sell all or parts of their allotments in lots and blocks for town-site purposes, as follows:

*Allotted lands alienated for town sites.*

| Nation. | Number of applications. | Acreage. | Estimated value. |
|---|---|---|---|
| Choctaw | 13 | 1,084.17 | $341,748.25 |
| Chickasaw | 3 | 225.85 | 60,523.75 |
| Cherokee | 39 | 1,274.95 | 348,559.50 |
| Creek | 53 | 2,790.10 | 721,361.50 |
| Total | 108 | 5,375.07 | 1,472,193.00 |

Adult Creek allottees, with the consent of the Secretary of the Interior, have the right under section 16 of the act of July 30, 1902 (32 Stat. L., 500), to sell the lands allotted to them, exclusive of their homesteads, and the following sales have been made:

| | |
|---|---|
| Number of tracts | 867 |
| Number of acres | 73,379.42 |
| Appraised value | $806,965.68 |
| Amount for which sold | $1,153,748.39 |

## PROTECTION OF FULL BLOODS.

It came to my knowledge that many full-blood Indians of the Indian Territory were giving deeds covering their surplus lands and were receiving in return very much less than their reasonable value. Therefore on March 4 I issued a circular letter addressed to "Every full-blood Indian citizen" of the Five Civilized Tribes, and had 25,000 copies of it distributed. The letter was printed on one side of the sheet in English and on the reverse side in the languages of the five tribes respectively. The full bloods were told that in winding up their affairs and distributing the property of the respective nations among their citizens the Government was doing everything in its

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



CVWD 563-117

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 144 of 212   Page ID #:4160

power to save for them the property which was rightfully theirs; they were warned that they were in great danger of losing their lands because educated persons were preparing to take advantage of their ignorance of the law and thereby obtain possession of their allotments; and I advised them not to sign any paper of any kind, if it was presented by a person other than a Government officer, without first consulting the nearest representative of the Government in whom they had confidence. I quoted from the act of April 26, 1906 (34 Stat. L., 144), the clause—

● Every deed executed before, or for the making of which a contract or agreement was entered into before, the removal of restrictions * * * is hereby declared void;

and told them that any paper affecting their allotments, which had been signed before the restrictions on the alienation of the land were removed, was of doubtful validity, and that they should pay no heed to anyone who pretended that he had an agreement with them for conveying their lands, for whoever had taken wrongful advantage of their ignorance well knew what the law was, and consequently had no cause for complaint if by disregarding it he lost money.

On the same date I addressed a circular letter to all agents, teachers, inspecting officers and other persons in the Government service stationed among the Five Civilized Tribes, notifying them that their future standing with this Office would depend upon the heartiness of their cooperation in protecting the full-blood Indians from robbery of their homes and lands. Agent Kelsey was instructed to have 1,000 mimeograph copies of the circular made and to send one, with several copies of the letter to the full bloods, to every Government official in the Indian Territory.

### INTERMARRIED CHEROKEES.

The act of June 28, 1898 (30 Stat. L., 495), provides that the Commission to the Five Civilized Tribes shall make rolls of the different tribes, enrolling, among others, " such intermarried white persons as may be entitled to citizenship under Cherokee laws." Early in 1903 a controversy arose as to the right of white persons intermarried with Cherokees to participate in the distribution of the tribal estate, and on February 24, 1903, the Department referred the subject to the Court of Claims for findings and opinion, in accordance with section 2 of the act of March 3, 1883 (32 Stat. L., 485).

Before any action was taken the act of March 3, 1905 (33 Stat. L., 1048), became law, which authorized the Court of Claims to render final judgment in the case and provided that either party feeling aggrieved by its judgment should have the right to appeal

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

CVWD 563-118

to the Supreme Court of the United States. On May 15, 1905 (40 Ct. of Cls., 411), the court rendered the following decision:

> That such white persons residing in the Cherokee Nation as became Cherokee citizens under Cherokee laws by intermarriage with Cherokees by blood prior to the 1st day of November, 1875, are equally interested in and have equal per capita rights with Cherokee Indians by blood in the lands constituting the public domain of the Cherokee Nation, and are entitled to be enrolled for that purpose, but such intermarried whites acquired no rights and have no interest or share in any funds belonging to the Cherokee Nation except where such funds were derived by lease, sale, or otherwise from the lands of the Cherokee Nation conveyed to it by the United States by the patent of December, 1838; that the rights and privileges of those white citizens who intermarried with Cherokee citizens subsequent to the 1st day of November, 1875, do not extend to the right of soil or interest in any of the vested funds of the Cherokee Nation, and such intermarried persons are not entitled to share in the allotment of the lands or in the distribution of any of the funds belonging to said nation, and are not entitled to be enrolled for such purpose; that those white persons who intermarried with Delaware or Shawnee citizens of the Cherokee Nation either prior or subsequent to November 1, 1875, and those who intermarried with Cherokees by blood and subsequently being left a widow or widower by the death of the Cherokee wife or husband, intermarried with persons not of Cherokee blood, and those white men who having married Cherokee women and subsequently abandoned their Cherokee wives have no part or share in the Cherokee property, and are not entitled to participate in the allotment of the lands or in the distribution of the funds of the Cherokee Nation or people, and are not entitled to be enrolled for such purpose.

On appeal, the Supreme Court of the United States on November 5, 1906, affirmed the decision of the Court of Claims. Afterward bills were introduced in the House and Senate providing for the enrollment of such white persons as prior to December 16, 1895, were intermarried with Cherokees, Shawnees or Delawares by blood, in accordance with the laws of the Cherokee Nation, and declaring that they should have the same status as other citizens of the tribe, but should first pay into the Treasury of the United States for the benefit of the Cherokee Nation $325 each, and should avail themselves of the privilege of enrollment within six months from the approval of the act. On January 4 the Office reported on Senate bill S. 6122, one of those referred to, and opposed the proposed legislation because it was doubtful whether there was enough Cherokee land to give an allotment to each person entitled to enrollment exclusive of the intermarried whites.

Believing that they were entitled to intermarried citizenship and that they had a right to share in the distribution of the Cherokee estate, many intermarried whites had made improvements on Cherokee lands in good faith, and the question arose as to whether they should be protected in the value of their improvements. The subject was brought to my attention by the President, and I expressed the opinion that intermarried whites not entitled to enrollment, who had

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 146 of 212   Page ID #:4162

in good faith prior to December 16, 1895, made permanent and valuable improvements on Cherokee lands, should be allowed a reasonable time within which to dispose of them to citizens of the nation who were entitled to select allotments, and at a valuation to be fixed by some officer of the Government. I submitted a draft of a bill to carry this into effect, which became a law on March 2, 1907. (34 Stat. L., 1220.) Intermarried whites were allowed until May 2, 1907, to dispose of their improvements, and the Commissioner to the Five Civilized Tribes was selected as the officer to fix the valuation at which they should be allowed to sell them to enrolled Cherokees. Most of them sold their improvements, and, on the whole, it is considered that the action taken by the Congress was equitable and just.

### CHOCTAW-CHICKASAW FREEDMEN.

Article 3 of the treaty of April 28, 1866 (14 Stat. L., 769), authorizes the Choctaw and Chickasaw nations to adopt their freedmen, and provides that, when the land is allotted, the freedmen and their decendants shall be given " forty acres each of land of said nations, on the same terms as the Choctaws and Chickasaws." On October 26, 1883, the principal chief approved an act of the national council of the Choctaw Nation adopting the freedmen, which was held by the Department to be a substantial compliance with the act of May 17, 1882 (22 Stat. L., 73), and the treaty of 1866.

On January 10, 1873, the Chickasaw legislature likewise passed an act adopting the freedmen of that nation in accordance with the treaty. The act was forwarded to the President, who laid it before the Speaker of the House of Representatives on February 10, 1873. It was referred to the Committee on Freedmen Affairs, but no further action was taken on the subject until August 15, 1894, when the Congress passed an act (28 Stat. L., 286) approving the Chickasaw act of 1873 which adopted the freedmen. Meanwhile, on October 22, 1885, the Chickasaw legislature had repealed that act.

The right of the freedmen to share in Choctaw and Chickasaw lands without compensation to the nations was afterwards passed on by the Court of Claims and the Supreme Court of the United States, which were given jurisdiction of the case by the Choctaw-Chickasaw supplemental agreement. The Supreme Court declared that under the supplemental agreement, " and not independent thereof," the Chickasaw freedmen were entitled to land of the value of 40 acres of the average allottable land, and that the Choctaw and Chickasaw nations were entitled to compensation from the United States for such land in accordance with the agreement. (See 193 U. S., 115.)

Many persons enrolled as Choctaw and Chickasaw freedmen have taken the position, through their attorneys, that those who were in

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-120

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 147 of 212   Page ID #:4163

part of Choctaw or Chickasaw Indian blood were entitled to enrollment and to share in the estate of the nations as Indians by blood. A person enrolled as a Choctaw or Chickasaw freedman receives land of only the value of 40 acres of the average allottable land and does not share in the funds of the tribes; while one enrolled as a citizen by blood is given an allotment of the value of 320 acres of the average allottable land of the two nations and will have his share of the tribal funds. In the case of Joe and Dillard Perry, who are of Chickasaw Indian and freedman blood, it had been held by the assistant attorney-general for the Interior Department that if they made application for enrollment as Chickasaw citizens by blood within the time prescribed by law they were entitled to enrollment as such. Their names had been placed on the Chickasaw freedman roll; but when it was shown that their applications had been properly made their names were transferred to the blood roll of the nation. Afterward, in accordance with the opinion of the Attorney-General of February 19, 1907, their names were retransferred to the freedman roll. Apparently taking this case as a precedent, the attorneys representing the Choctaw and Chickasaw freedmen procured the introduction into the Congress of a bill directing the Secretary to transfer from the freedman rolls to the blood rolls the name of any person of Indian blood on either the mother's or the father's side, as shown by the tribal rolls, the records of the Commission to the Five Civilized Tribes, or those in the Department. It was provided, however, that no original application for enrollment could be made, but that only those enrolled or who had applications pending for enrollment as Choctaw and Chickasaw freedmen should be entitled to the benefits of the proposed legislation. Office report of January 3 on the bill said, in substance, that whatever rights the freedmen had were based on the treaty of 1866 and subsequent action by the Congress and the tribal authorities; that it had always been the understanding of the Office that persons whose mothers were freedwomen were recognized by the tribes as belonging to the freedmen, regardless of the quantum of Indian blood; that during slavery a child followed the status of the mother, a child born of a free mother being free and one born of a slave mother being a slave; that it was the universal custom among the white people of this country to regard as a negro any person known to be in part of negro blood irrespective of the degree of such blood; that the Choctaw and Chickasaw nations had been fairly generous to their former slaves and their descendants by allowing them to participate to a limited extent in the allotment of land— something which former white slave owners had not done; and that for nearly half a century the freedmen had been allowed to occupy and cultivate lands belonging to the tribes without rental. The legislation was not enacted.



CVWD 563-121

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 148 of 212   Page ID #:4164

Early in February, 1907, Bishop W. B. Derrick and others, in behalf of the Choctaw and Chickasaw freedmen, filed with the President a memorial and a draft of a proposed bill to authorize suit to be brought in the Court of Claims, by the freedmen or their attorneys of record, against the Choctaw and Chickasaw nations and the Government, to determine their right in the lands of the Choctaw and Chickasaw nations with right of appeal to the Supreme Court by either party. The delegation asked that, if the President could not recommend the proposed legislation, the subject be referred to the Attorney-General for opinion. This was done, and the Attorney-General, on February 27, after discussing the subject at length, said:

> To hold that descendants of Indians and negroes who were always recognized by the tribal authorities as freedmen, and never as citizens, are entitled, simply because of their Indian blood, to be placed upon the rolls of citizens, would be entirely inconsistent with the previous action of the Government in this matter and in complete disregard of the rolls, customs, and usages of the tribes. There would be no end to the claims that could be made if everyone who had some Choctaw or Chickasaw blood was to be deemed a ' descendant," within the meaning of the treaty of 1830, without regard to tribal recognition and enrollment or to the legitimacy of his " descent."

> \* \* \* \* \* \* \*

> The Government has been for more than ten years engaged in the work of allotment of Indian lands and enrollment of Indian citizens among the Five Civilized Tribes; it has given every class of claimants to these privileges every reasonable opportunity to assert their claims, and to thus overturn its whole system and policy at the very last moment to let in these claimants would be, in my opinion, both inexpedient and unjust. I advise that you do not recommend legislation referring such claims to the Court of Claims or otherwise recognize them.

On April 13, 1907, certain attorneys, on behalf of Bettie Ligon and about 2,000 others who have been enrolled as freedmen but are in part of Indian blood, filed a complaint in equity in the United States court for the southern district of the Indian Territory against the chief executives of the Choctaw and Chickasaw nations and the Secretary of the Interior, with a view to securing a decree of the court declaring them entitled to an equal undivided interest with all persons in the grant resulting to the Choctaw and Chickasaw nations from the treaty of 1830, for which patent was issued March 23, 1842. The attorneys representing the nations and the Secretary demurred, on the ground, among others, that the court did not have jurisdiction. On May 18, 1907, Hon. Hosea Townsend, judge for the southern district, sustained the demurrer and dismissed the bill for want of jurisdiction. The case was taken to the court of appeals for the Indian Territory, but, as no two judges were able to agree as to the nature of the decree which should be rendered, the judgment of the lower court stood. The case is now pending, on appeal, in the United States circuit court for the eighth circuit.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-122

**112**    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

### CLOSING OF THE TRIBAL ROLLS.

The rolls of the several tribes were closed on March 4, 1907, and the Department is now without jurisdiction to consider the right of any person to tribal enrollment. The following table shows the

*Enrollment of the Five Civilized Tribes.*

| Nation. | Full bloods. | Part bloods. | Inter-married. | Freedmen. | Total. |
|---|---|---|---|---|---|
| Choctaw | 8,319 | 10,717 | 1,585 | 5,994 | 26,615 |
| Chickasaw | 1,538 | 4,146 | 635 | 4,670 | 10,989 |
| Creek | 6,812 | 5,083 | ............ | 6,807 | 18,702 |
| Cherokee | 6,601 | *a* 29,986 | 286 | 4,925 | 41,798 |
| Seminole | 1,399 | 739 | ............ | 986 | 3,124 |
| Total | 24,669 | 50,671 | 2,506 | 23,382 | 101,228 |

*a* Includes 197 registered Delawares.

The work of enrollment has continued for nearly fourteen years, and the completion of the rolls is decisive, as far as the Department is concerned, as to the number of persons entitled to share in the land and other property of the Five Civilized Tribes.

However, a number of names were stricken from the approved rolls in accordance with the opinion of the Attorney-General of February 19, 1907; and among others John E. Goldsby, an inter-married Chickasaw, and Ida and George A. Allison, Cherokees by blood, filed suits in the supreme court of the district of Columbia asking that a writ of mandamus be issued to compel the Secretary of the Interior to restore their names to the rolls. The court held that even if the Secretary had power to strike a name from the rolls—which was not decided—he had no right to do so without first giving the applicant opportunity to be heard; and it was ordered that mandamus issue directing the restoration of the three names to the approved rolls. An appeal has been taken by the Government to the court of appeals for the District of Columbia.

On June 14 the Department directed that, until the final determination of these suits, no action be taken looking to the cancellation of any selection in allotment which W. C. Thompson may have made, and on August 6, 1907, ordered—

that *all* persons struck from approved rolls be given the benefit of letter of June 14, 1907, in case of William C. Thompson and others.

It is probable that the litigation growing out of the striking of names from the approved rolls will delay to some extent the completion of the allotment work in the Five Civilized Tribes, but not very long.

Much yet remains to be done in winding up the business of the Five Civilized Tribes, but nothing can be accomplished looking to the disposal of the surplus tribal lands until allotments shall have

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 150 of 212   Page ID #:4166

been made to all citizens of the tribes. The Commissioner to the Five Civilized Tribes estimates that under favorable circumstances the allotments should be finished by July 1, 1909. After that the surplus lands of each tribe will be sold, and the proceeds as well as other tribal funds will be distributed among the citizens of the respective nations. When each citizen shall have received his proportionate share of the property of his tribe, the affairs of the Five Civilized Tribes will be brought to a finality.

### LANDS OF SAC AND FOX INDIANS IN IOWA.

In the report of this Office for 1898 attention was called to the anomalous condition of titles to the lands occupied by the Sac and Fox Indians in Iowa and to action recently taken by the State legislature (see chapter 110, Iowa Session Laws, 1896) and the United States Congress by act of June 10, 1896 (29 Stat. L., 331), for the purpose of securing a just recognition of the rights of the Indians.

At different times since 1857 the Sac and Fox Indians have purchased with their own funds sundry tracts of land in Tama County, Iowa, for which trust deeds have been executed, some in the name of the governor of the State and some in the name of the United States Indian agent. One for 80 acres was executed on July 13, 1857, in the name of Governor Grimes, in trust for certain Indians instead of for the tribe. The agent reported on November 12, 1896, that he was convinced that this deed was erroneously made to the Indians named, since in making the purchase they were undoubtedly acting for the tribe. He was thereupon instructed to call a general council and have the Indians execute in duplicate the proper paper authorizing him to expend out of their interest money a sum large enough to cover the expense of settling the title to this land under the laws of Iowa, which he had estimated would not exceed $125. A council was duly called, but the Indians would take no action, asserting that the land had been bought by the chiefs for the entire tribe and with the funds of the entire tribe. Here the matter rested, and no action was taken by this Office to secure a deed to the lands held in trust for the tribe by the governor, the intention being that when he should execute such a deed he should convey also the 80 acres which he held in trust for individual Indians instead of the tribe.

On February 16, 1898, the Office submitted to the Department a history of the Sac and Fox lands in Iowa, and recommended that the Department of Justice be requested to bring suit for quieting title in the tribe to the 80-acre tract. By letter from the Attorney-General dated March 10, 1898, the Office was advised that the United States attorney for the northern district of Iowa had been directed to consult

22849—08——8



Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from UNIVERSITY OF MICHIGAN

CVWD 563-124

**114     REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.**

with the agent and to enter suit for change of title; but no action appears to have been taken in the matter.

The uncertainty regarding the legal status of the Indians and the jurisdiction of their lands has resulted in frequent trespassing by neighboring whites and consequent friction between them and the Indians; and on June 25, 1907, the Office again brought the subject to the attention of the Department with a view to bringing about a formal transfer of the legal title held by the governor in trust, and the trusteeship of the lands of the Indians, to the Secretary of the Interior and his successors in office, as directed by the legislation of 1896.  On July 26, 1907, the governor was requested to execute the necessary deed or deeds; the Department of Justice was asked to instruct the United States attorney for the northern district of Iowa to bring suit to quiet title in the Sac and Fox tribe to the lands deeded in 1857 to Governor Grimes, and the superintendent of the Sac and Fox school was directed to execute deeds of conveyance in all cases where he is trustee, formally transferring the lands and the trusteeship thereof to the Secretary of the Interior, and to cooperate fully with the officers of the Department of Justice and the State of Iowa.

### L'ANSE AND ONTONAGON TIMBER LANDS.

Two years ago I referred in my report to the suspension of action, at my instance, on nearly 200 deeds executed by members of the L'Anse and Ontonagon bands of Chippewa Indians, in Michigan, covering timber lands.  An appraisement of these lands during the summer of 1905, by J. R. Farr, superintendent of logging in the Indian Service, showed that the lands were worth from three to four times the amounts for which the deeds were executed; and on this representation of the facts the President, on November 7, 1905, disapproved all the conveyances.  The grantees' in the deeds then offered to pay the difference between the sums named in the deeds and the appraisal and asked for an opportunity to submit proof of goods furnished and money paid on account of the original purchase prices.  This was granted.  After a delay of several months they submitted sundry receipts for money and unitemized bills purporting to be for goods delivered; but since the Indians denied that goods in the quantities indicated by the bills had been delivered to them, and declared that many of the money receipts did not represent actual payments or were greatly in excess of the amounts paid, I insisted upon more satisfactory proof from the grantees.  It was not furnished; and the Department being convinced that none of the evidence submitted constituted satisfactory proof of payment, all was rejected.

The purchasers under the disapproved deeds were notified that unless they deposited, within thirty days, the amount of the appraise-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google          Original from
                             UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 152 of 212   Page ID #:4168

ment made by Mr. Farr, the lands would immediately thereafter be offered for sale to the highest bidder. In every instance the deposit was made within the time fixed. One purchaser paid in $63,110, although he had claimed to have paid to the Indians in goods or money the entire purchase price—$18,000—for the tracts deeded to him. These matters will be closed up as fast as certain defects in the original conveyances are cured.

### WHITE EARTH ALLOTMENTS AND THE RESIDENCE QUESTION

The act of April 28, 1904 (33 Stat. L., 539), grants an additional allotment of 80 acres—

to each Chippewa Indian now legally residing upon the White Earth Reservation * * * and to those Indians who may remove to said reservation who are entitled to take an allotment under article seven of the treaty of April eighteen, eighteen hundred and sixty-seven.

A question arose as to whether the wife of Robert Morrison, a Mississippi Chippewa woman, was entitled to hold an additional allotment on the reservation and at the same time reside off the reservation. Refusing to express an opinion on the case submitted, because the facts were not sufficiently clear, the assistant attorney-general for the Department said, on June 21, 1906:

As a conclusion of law, however, my opinion is, from the legislation involved, that the authority to make allotments contained in the act of 1904 is restricted to those Chippewa Indians who were legally residing upon the White Earth Reservation at the date of the passage of the act and to those who may remove to and take up their residence on said reservation; and that the same rule is equally applicable and should prevail in respect to those claiming the benefits of the first proviso to said act.

Following this opinion, though very much against its own preferences, the Office instructed the superintendent in charge of the White Earth Agency that under the law actual residence on the reservation would be necessary in order to hold the additional allotment. Later the ruling was so far modified as to exempt from its provisions all persons in Government employ, the wives and children of employees at Indian agencies, all persons absent from the reservation attending school, including adults, and persons under any form of judicial restraint.

Notwithstanding these modifications the ruling occasioned much dissatisfaction among the Indians. For instance, one who had an allotment under the act of January 14, 1889 (25 Stat. L., 642), was an Episcopal clergyman in charge of a church in the southern part of the State; actual residence on the reservation necessitated leaving his parish. Another was a member of an engineering corps connected with the Great Northern Railway Company, with headquar-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-126

**116**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

ters at Seattle, Wash.; he likewise must abandon lucrative employment to take up his permanent residence on the reservation. Still another was a music teacher residing off the reservation. Many more were similarly affected by the ruling. They were recognized members of the tribe, had formerly resided on the reservation, and had received their original allotments under the act of January 14, 1889. To require continued residence on the reservation in order to obtain and hold the additional allotment meant the sacrifice of their business opportunities off the reservation and their return to conditions from which they had had the good sense and the resolution to seek escape, and from which the Office is always urging Indians to cut themselves free.

On February 14, 1907, Senator Clapp wrote to the Office that the interpretation given the law was opposed to the settled policy of the Government to encourage Indians to take up their residence among white people, and that the ruling was not founded on legal authority. He maintained that the act provided for allotments, first, to Indians who were legally residing on the reservation at the date of the passage of the act, and, second, to those who might afterwards remove to the reservation and who in other respects were entitled to allotments, but that nothing in the act required either class to remain permanently on the reservation, especially in view of the well-settled policy of the Government in dealing with Indians who are capable of self-support outside of reservation limits.

Accepting this interpretation of the law, coming from such a source and being consistent with the broad common-sense aspect of the situation, the Office, as soon as practicable, annulled its former instructions to Superintendent Michelet, and on April 27, 1907, instructed him as follows:

1. All persons who were lawfully residing on the reservation at the date of the passage of the act, and who come within its purview as defined in your general instructions on the subject, are entitled to allotments under the provisions of said act. There is nothing in the act which requires them to remain on the reservation.

2. All persons who are otherwise entitled to allotments under your general instructions who were not residing on the reservation at the time of the passage of the act, but who afterwards removed thereto, are entitled to allotments under its provisions. There is likewise nothing in the act which requires this class of persons to remain on the reservation.

3. Persons attending school off the reservation, whether adults or minors, will be regarded as having a residence on the reservation.

4. All persons who are otherwise entitled under your general instructions who are absent from the reservation in the employ of the Government, persons under any form of judicial restraint, the insane, idiotic, and others not capable of forming an intent, are to be regarded as having a residence on the reservation.

The superintendent was directed to give the widest publicity to the modified instructions.


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-127

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.   117

## SALE OF KIOWA PASTURE AND WOOD RESERVES.

The act of June 5, 1906, directed the opening to settlement of the 480,000 acres of grazing land and the 25,000 acres of wood land which had been reserved to be used in common by the Kiowa, Comanche and Apache Indians in Oklahoma.

The lands were to be opened to settlement by proclamation of the President and disposed of under sealed bids or at public auction, at the discretion of the Secretary of the Interior, to the highest bidder, under the provisions of the homestead laws of the United States and regulations adopted by the Secretary of the Interior. Before the opening, allotments were to be made to Indian children born since June 6, 1900, and, by the act of June 28, 1906 (34 Stat. L., 550), certain lessees were to be given the privilege of purchasing the tracts which they had leased.

By Presidential proclamation of September 19, 1906, 2,531 tracts in these reservations were offered for sale under sealed bids. Under the regulations prescribed by the Department bids were to be received at the local land office at Lawton, Okla., between December 3 and December 8, 1906, but it became necessary to extend the time to December 15.

A total of 7,621 sealed envelopes containing bids were received, the bidders making offers on from one to 1,820 separate tracts—an average of 30 to 35 bids from each bidder and an aggregate of nearly a quarter of a million separate bids. Of the 396,139.88 acres scheduled for sale, 175.16 acres were withdrawn after being scheduled; on 6,337.34 acres no bids were received; 638.20 acres were not awarded because the bids appeared to be too low; and 8,198.05 acres could not be awarded because the only bidders on these lands had received other awards. The remaining 380,790.69 acres were sold for $4,015,785.25, an average of $10.54 per acre, or $1,686.40 per quarter section.

### KIOWA TOWN SITES.

The act of March 20, 1906 (34 Stat. L., 80), provides for the establishment of town sites on the Kiowa, Comanche and Apache pasture lands. Under its provisions six town sites have been selected and surveyed into lots and blocks, and the lots have been offered for sale at public auction to the highest bidder. The sites were chosen with reference to water supply and drainage and to placing the towns a reasonable distance apart. Five of the town sites are in the " Big Pasture," in the southern part of the former Kiowa, Comanche and Apache Reservation, and one is in the northwest part of Pasture No. 4. The designation, location, and acreage of these town sites and the lots sold are as follows:


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

CVWD 563-128

118    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

Randlett, containing 400 acres, is on the south half of section 28 and the east half of the southeast quarter of section 29, township 4 south, range 12 west. It was surveyed into 112 blocks, and appraised at $29,699. The sale began on May 13, all the lots being sold at the first offering; they brought $68,754.

Eschiti, containing 320 acres, is on the north half of section 3, township 4 south, range 14 west. It was surveyed into 77 blocks and appraised at $15,222. The sale began on May 23, all the lots being sold at the original sale, realizing $50,907.

Quanah, containing 320 acres, is on the south half of the northwest quarter, the southwest quarter, and the west half of the southeast quarter of section 36, township 3 south, range 16 west. It was surveyed into 74 blocks and appraised at $12,549. The sale began on June 3. There remained unsold 513 lots, appraised at $4,728. The lots sold realized $10,252.

Isadore, containing 320 acres, is on the south half of the northeast quarter, the south half of the northwest quarter, the north half of the southwest quarter, and the north half of the southeast quarter of section 24, township 2 south, range 16 west. It was surveyed into 77 blocks and appraised at $10,195. The sale began on June 13. There remained unsold 544 lots, appraised at $3,781. The lots sold realized $7,937.

Ahpeatone, containing 320 acres, is on the west half of section 34, township 2 south, range 13 west. It was surveyed into 77 blocks and appraised at $12,541. The sale began on June 23, and 851 of the lots, appraised at $7,973, remained unsold. The lots sold realized $5,751.

Koonkazachey, containing 160 acres, is on the south half and the south half of the north half of the northwest quarter and the north half of the north half of the southwest quarter of section 13, township 5 north, range 19 west. It was surveyed into 42 blocks and appraised at $4,152. The sale began on July 5, and 502 of the lots, appraised at $3,728, remained unsold. The lots sold realized $449.

The prices obtained at all these sales are believed to represent the full value of the land.

In selecting the names for the towns I kept in view the preservation of certain historic associations with the period of civic transition through which the region had passed. Randlett was named in honor of Col. James F. Randlett, the United States Indian agent who for so many years and in so unselfish a manner protected the Indians of this agency from the spoilers who beset them; Isadore, in honor of Father Isadore, the good priest who has been so practical a worker in the missionary field among this group of Indians, and the other four towns to perpetuate the names of four of the most notable Indians who took part in the activities connected with the opening of the great Kiowa reserve.


Digitized by Google          Original from UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 156 of 212   Page ID #:4172

## THE OSAGE RESERVATION.

Reference was made in my last annual report to the more important provisions of the act of June 28, 1906 (34 Stat. L., 539), which authorized an equal division of the tribal lands and funds of the Osage Indians among the members of the tribe.

### ALLOTMENTS.

The reservation contains an area of 1,470,057 acres. On the basis of an enrollment of 2,250 members of the tribe this will furnish about 650 acres to each one. The trust funds of the tribe amount to some $9,000,000. There will, therefore, be set aside about $4,000 to each Indian. About half the land is classed as agricultural, the remaining being rough pasture. The reservation is rich in mineral deposits of oil, gas, lead, zinc and coal, but there has been little development of these resources except oil and gas.

During the fiscal year just closed the allotting commission which was organized August 14, 1906, has been actively engaged in carrying out the provisions of the act. The roll of the tribe as certified to the commission by the agent on July 6, 1907, showed a membership of 2,230. Of this number 926 are classed as full bloods and 1,304 as mixed bloods. For many years the property interests of the Osages have been so large as to induce white men to marry into the tribe. This accounts, in part, for the large percentage of mixed bloods. Many of them are practically white, with the keen business instincts of the white man, and through industry and enterprise they have come into possession of the greater part of the improved land of the reservation. On the other hand, the nonprogressive full bloods, as a rule, have been content to live in camps and villages in the south-central and southwestern part of the reservation, where they have banded together with the evident purpose of continuing tribal customs and communal property. Because of the problems presented by the difference in intelligence and enterprise of the two classes, and because the full bloods demanded protection from the schemes of the mixed bloods, it has been difficult for the commission to carry out the provisions of the act and at the same time mete out equal justice to both sides.

*Fraudulent enrollment.*—The act provided that the principal chief should within three months file with the Secretary of the Interior a list of the names which the tribe claimed were placed on the roll by fraud, and that the Secretary of the Interior should investigate the placing of these names on the roll and have power to drop from the roll the names of persons and their descendants found to have been placed thereon by fraud. The principal chief prepared a list of 244 persons, principally grouped in the following families: Clem, Javine,

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-130

Perrier, Fronkier, Herridge, Holloway, Labadie, Omaha, Lyman, Lombard, Brown, and Appleby.   These cases were heard by the commission, the evidence and record in each one being submitted to this Office.   Later the Osage council, by resolution, admitted that it was unable to obtain newly discovered evidence against 70 of the persons objected to, and that 7 others had been objected to by inadvertence.  The Javine, Perrier, Holloway, Labadie, Lombard and Brown cases have been decided in favor of the contestees.   The others are pending decision by the Assistant Attorney-General for the Department.

*First selections.*—Each member of the Osage tribe has a right to make three selections of 160 acres each and to designate which one shall constitute his "homestead."  Prior to the passage of the act 1,350 "first selections" or "homestead selections" had been made by the Indians under instructions from this Office to the United States Indian agent, and these were confirmed by the act.  Between June 28 and September 28, 1906, 500 additional first selections were filed, and since then the agent has filed 380 more, thus completing first selections by all persons on the roll up to July 6, 1907.

*Second selections, "The wheel plan."*—The chairman of the Osage allotting commission reported, on September 4, 1906, that there was likely to be much difficulty in determining the order of the second and third selections, and afterwards suggested that all the names be placed in a wheel and drawn out singly, each member to make his selection in the order in which his name was drawn; that is, the person whose name was drawn out first to have the right to make the first selection, and so on.  It was finally determined to adopt this plan, with some modifications.  It was approved by the Department on November 7, and two days later the allotting commission was given definite instructions as to carrying it into execution.  As the first selections were not then completed, and as many contests were pending, the Indians had ample opportunity to discuss the plan before its enforcement.  Some opposition to it developed, especially among the full bloods, but March 11, 1907, was set by the commission as the date for the drawing to take place.  In the meantime, on February 11, Harry Kohpay, interpreter for the Osage Indians, submitted to the Office a number of reasons why the "wheel plan," as it came to be designated by the Indians, should not be employed in making the second selections; he accompanied his letter with six petitions signed by members of the tribe, indorsing the method used in making the first selections and protesting against the wheel plan.  These papers were submitted to the Department for decision, particularly as to whether the plan proposed was clearly within the provisions of the Osage allotment act.  The question was referred to the Assistant Attorney-General, who on March 2 rendered an opinion, concurred in by the Department on the same date, that the so-called wheel plan, to be employed in making the second and third selections,

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google          Original from
                             UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 158 of 212   Page ID #:4174

was within the authority of the act, if that method should be deemed best in all respects for carrying out the provisions of the act.

The opposition of the Indians to this method made it expedient to postpone the drawing to a later date so that the plan could be explained to them, and an inspector was sent to the reservation who held several councils to talk it over with the various bands. By these conferences much of the opposition was overcome; but the inspector reported on May 25 that there was no unanimity of feeling in favor of the plan. Following his recommendation it was modified somewhat, and on June 3 instructions were sent to the allotting commission that the names of all members of the tribe who were entitled to allotments should be written on separate cards and placed in a wheel, to be known as the "name wheel;" that numbers from 1 to the highest number on the roll should be written on cards and placed in another wheel, to be known as the "number wheel;" that on Monday, July 8, at 9 o'clock, the drawing for the order of choosing the selections should begin; that both sets of cards should be thoroughly mixed by frequent revolutions of the wheels; and that a blindfolded person should be stationed at each wheel who should simultaneously draw from the respective wheels a name and a number—the number on the card from the "number wheel" indicating the order of selection of the person named on the card drawn from the "name wheel."

General notice was given by the commission of the time and place of the drawing, which occurred at the opera house in Pawhuska on July 8 and 9. Many of the mixed bloods were present, but the full bloods, as usual, manifested but little interest in the matter. The chairman of the commission reported on July 11 that the drawing had occurred without unusual interruptions, most of those present being apparently satisfied. The first 50 selections were filed on August 5, it being arranged that 50 selections should be filed each day until all were made. The work is now in progress and will be completed about November 15.

*Surveys.*—On June 10, 1907, Inspector McLaughlin reported the necessity for reestablishing the lost and obliterated survey corners on the reservation. The original surveys had been made in 1871–72, under what is known as the J. C. Darling contract, and a careful examination showed that within the cultivated part of the reservation scarcely any of the original corners were in place, while not more than 20 per cent could be found elsewhere. On June 26 the Office directed the allotting commission to instruct its corps of surveyors to relocate the missing survey corners in accordance with the printed instructions of the General Land Office on the subject.

### TOWN SITES.

My last report referred to the establishment, under the act of March 3, 1905 (33 Stats., 1061), of five town sites within the Osage Reserva-

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-132

122    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

tion, in Oklahoma.  The following table shows the sales of lots in each town site up to and including July 23, 1907:

*Sales of lots in town sites.*

Pawhuska town site:

| | | |
|---|---|---|
| Sale value lots, first sale | $206,810.50 | |
| Added by doubling appraisement | 7,550.00 | |
| School lots at appraised value | 560.00 | |
| Double deposit on lot 9, block 101 | 31.25 | |
| Received from first sale | | $209,625.51 |
| Unredeemed deeds | | 5,326.24 |
| Sale value, second sale | 3,884.00 | |
| Received on deposits, second sale | | 997.50 |
| Due on second sale | | 2,886.50 |
| | 218,835.75 | 218,835.75 |

Foraker town site:

| | | |
|---|---|---|
| Sale value, first sale | 42,486.00 | |
| Received from first sale | | 41,080.50 |
| Unredeemed lots | | 1,405.50 |
| Sale value, second sale | 622.00 | |
| Deposits on second sale | | 155.50 |
| Due on second sale | | 466.50 |
| | 43,108.00 | 43,108.00 |

Bigheart town site:

| | | |
|---|---|---|
| Sale value, first sale | 35,486.00 | |
| Received from first sale | | 35,099.00 |
| Unredeemed lots, first sale | | 387.00 |
| Sale value, second sale | 509.00 | |
| Deposits on second sale | | 127.25 |
| Due on second sale | | 381.75 |
| | 35,995.00 | 35,995.00 |

Hominy town site:

| | | |
|---|---|---|
| Sale value, first sale | 40,064.00 | |
| Received from first sale | | 39,887.75 |
| Unredeemed lots, first sale | | 176.25 |
| Appraised value, 94 unsold lots | 4,062.00 | |
| Value of lots yet to be sold | | 4,062.00 |
| | 44,126.00 | 44,126.00 |

Fairfax town site:

| | | |
|---|---|---|
| Sale value, first sale | 41,008.00 | |
| Received from first sale | | 40,888.00 |
| Unredeemed lots, first sale | | 120.00 |
| Appraised value, 123 unsold lots | 3,955.00 | |
| Value of lots yet to be sold | | 3,955.00 |
| | 44,963.00 | 44,963.00 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Recapitulation:

| | | |
|---|---:|---:|
| Total sale value, first sale | $366,414.50 | |
| Doubling value lots in Pawhuska | 7,550.00 | |
| Double deposit on lot 1, block 101, Pawhuska | 31.25 | |
| Sale value lots in Pawhuska, Foraker, and Big-heart, second sale | 5,015.00 | |
| Appraised value, unsold lots | 8,017.00 | |
| Receipts from first sale | | $366,580.76 |
| Unredeemed lots, first sale | | 7,414.99 |
| Receipts from second sale | | 1,280.25 |
| Due on second sale | | 3,734.75 |
| Value of unsold lots | | 8,017.00 |
| | 387,027.75 | 387,027.75 |

Additional sales were reported on August 16, of 94 lots in Hominy, reappraised value $4,112, sale value $4,345, and 122 lots in Fairfax, appraised value $3,930, sale value $6,543.50.

## OIL AND GAS LEASES.

The act of March 3, 1905 (33 Stat. L., 1061), extended for another ten years the lease for the mining and production of petroleum and natural gas which was granted to Edwin B. Foster on March 16, 1896, by the Osage Nation and covered the entire Osage Reservation in Oklahoma.  This lease was approved by the Department on April 8, 1896, and by various mesne assignments, approved by the Department on January 7, 1903, had become the property of the Indian Territory Illuminating Oil Company.  The extension covered subleases also in the following terms:

Which lease and all subleases thereof duly executed on or before December 31, 1904, or executed after that date based upon contracts made prior thereto and which have been or shall be approved by the Secretary of the Interior, to the extent of 680,000 acres in the aggregate, are hereby extended for the period of ten years from March 16, 1906, with all the conditions of said original lease except that from and after the 16th day of March, 1906, the royalty to be paid on gas shall be $100 per annum on each gas well, instead of $50 as now provided in said lease, and except that the President of the United States shall determine the amount of royalty to be paid for oil.

During the last fiscal year the Department has approved, on the recommendation of this Office, a number of subleases and assignments of subleases for the mining and production of oil and gas within the 680,000 acres.  Among the transfers were two subleases and 34 assignments in favor of Theodore N. Barnsdall, of Pittsburg, Pa., by which he secured control of approximately 300,000 acres.  Active operations in the mining of oil and gas have been carried on under these subleases and assignments, and the approximate production of oil from the lands covered thereby was reported last June to be about 2,500 barrels per day.


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

124   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

The Department has recently approved the transfer of the greater part of T. N. Barnsdall's holdings to the Barnsdall Oil Company, a corporation organized under the laws of the State of Delaware. This company has an authorized capital of $10,000,000, and announces its purpose to increase largely the production of oil from the lands under its control.

During the calendar year 1906 5,172,394.48 barrels of oil were run from the Osage Reservation to the Prairie Oil and Gas Company; 44,313.12 barrels were run to the Uncle Sam Oil Company; and 2,398.98 barrels were used as fuel by the different operators on the reservation in the development of their properties, making a total of 5,219,106.58 barrels of oil produced on the Osage Reservation during that year. Up to December 31, 1906, a total of 1,080 wells had been drilled, 716 of them classed as oil wells, 66 as gas wells, and 298 as dry wells.

Under the act extending the Foster lease, the royalty to be paid to the Osage Indians on gas is $100 per annum for each gas well in operation. On the recommendation of this Office the royalty to be paid on oil was increased from one-tenth to one-eighth of all the oil produced.

### SIOUX PONY CLAIMS.

My last report gave an account of the claims of Indians of the Pine Ridge and Rosebud reservations in South Dakota, dating from 1876 and 1878, for stock taken by the United States for military expediency, and for stock stolen by white men. On the recommendation of this Office, the Department has refused to consider any contracts made with attorneys for the prosecution of such claims, owing to the long time which has elapsed since the stock is alleged to have been taken and the difficulty experienced in trying to get satisfactory evidence on which to base recommendations for payment.

### LOWER BRULÉ RESERVATION.

The work of appraising the lands in South Dakota ceded by the Lower Brulé Indians under the agreement ratified by the act of April 21, 1906 (34 Stat. L., 124), referred to in my last report, has been finished, and the tract ceded is now ready for opening to settlement and entry as provided in the act. The schedule shows the following classification:

First class, 20,930.89 acres, at $2.50 per acre_____ $52,327.225
Second class, 14,031.14 acres, at $2.25 per acre_____ 31,570.065
Third class, 11,038.25 acres, at $1.75 per acre_____ 19,316.9475
Fourth class, 9,283.49 acres, at $1.25 per acre_____ 11,604.3625

     Total, 55,283.77 acres_____ 114,818.60



Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-135

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 162 of 212   Page ID #:4178

The lands of the first and second classes are comparatively level, but those of the third and fourth classes range from rough to very rough, and there is more or less gumbo in all.

This appraisement was approved by the Department on March 13, 1907.

### THE ABSENTEE UTES.

During the summer of 1906 a band of about 200 nonprogressive Utes—mostly members of the White River band—left their allotments and homes on the Uintah Reservation, Utah, to go to the Pine Ridge Reservation, S. Dak., there to enjoy an unrestricted communal life.

Capt. C. G. Hall, acting United States Indian agent of the Uintah and Ouray Agency, Utah, in a report dated July 12, 1906, on the question of retaining troops at Fort Duchesne, said that the band of malcontent Indians had been considerably decreased in strength by the departure from the reservation of probably 200 members; that their dissatisfaction with the Government was the result of the changes which had recently been brought about through allotments having been made to them and their surplus lands thrown open to public settlement; that since the opening of the reservation they had been able to secure all the intoxicating liquor they wanted; and that as a result several Indians had been killed and the lives of settlers threatened by drunken Indians, all of which aggravated the situation.

The agent at Pine Ridge telegraphed the Office on July 24, 1906, that a part of the band of Absentee Utes had reached that reservation and had been ordered to leave, and that 50 others had been noticed near Casper, Wyo., on July 10.  In response the agent was instructed to ascertain fully their purpose in going to Pine Ridge, and to tell them that they could acquire no rights there; that they could not be allowed to interfere with the Sioux Indians of that agency; and that they might, by reason of their absence, lose their rights on the Uintah Reservation.

Capt. C. G. Hall, U. S. Army, the acting agent in charge of the Utes, reporting on August 11, 1906, in response to an inquiry from the Office, said that there were in the party of Absentees about 120 men, 73 women, and 8 children; that they were then near Casper, Wyo., but purposed going into the Dakotas and would probably camp at Wounded Knee for two weeks.  He added that they had committed no depredations or unlawful acts, and recommended that Inspector McLaughlin be appointed to assist him in inducing the Indians to return.  About ten days later he telegraphed that nearly all the Absentees were then at a point about 10 miles west of Douglas, Wyo.; that he had held a council with them and urged them to return home,

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google            Original from
UNIVERSITY OF MICHIGAN

CVWD 563-136

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 163 of 212   Page ID #:4179

but that they were obdurate and insisted upon going into the Rosebud Indian country.

He was urged to impress upon the Indians the futility of proceeding on their journey and the desire of the Office that they return to their home and allotments.

On August 24, 1906, he wired that the Absentees were absolutely immovable in their intention to continue their journey; that they were preparing to move eastward, either to the Rosebud Reservation or the Black Hills; that as allottees, and therefore citizens, they insisted on their freedom to go where they pleased, and that though they had not yet committed depredations they would be forced to do so when their present supplies were exhausted.

On August 25, 1906, Hon. B. B. Brooks, governor of Wyoming, telegraphed that about 300 Utes, who had been camped along Flat River, near Douglas, Wyo., for several weeks were then heading across the country toward Little Water, that the settlers would not permit trespassing, and that he feared serious trouble. He asked this Department to remove the band from Wyoming. Captain Hall was at once instructed by telegraph that if he were absolutely certain of his inability to induce the Indians to abandon their intention, he should warn them that if they persisted in disregarding the wishes of the Office they would have to take the responsibility for anything which might happen to them; that he should explain, also, that the citizenship to which they attributed their independence had its burdens as well as its privileges, and that as citizens they were liable to punishment by local authorities for any unlawful acts they might commit.

Two days later the governor of Wyoming was advised of the action of the Office, which expressed its attitude thus:

As long as they [the Indians] are peaceable and do not threaten hostility it does not seem that the Federal Government would be justified in interfering with them. Moral suasion has been used with little apparent effect in inducing them to return to their homes, and it would therefore seem at present that the case is one for the local authorities rather than for this Department.

In a letter to the Department dated September 17, the governor again set forth the serious aspect of the matter, saying that neither the county nor the State authorities were able to cope with the situation, and urging the necessity for Federal action.

The next day Hon. F. W. Mondell, Representative from Wyoming, wrote the Office that reports had been received of many small thefts and depredations committed by the Utes; that their presence was a constant source of irritation and menace to the settlers, and that serious trouble was expected if they were not soon removed from Wyoming. The Department answered that Inspector James McLaughlin had been directed to proceed immediately to Casper and hold a conference with the Indians in the hope of persuading them to

CVWD 563-137

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 164 of 212   Page ID
#:4180

return to their homes without the use of troops; that the Department
had communicated all the facts to the President and recommended,
should the mission of the inspector fail, that troops be used to remove
the Indians if it could be done lawfully; and that——

> The Office seriously doubts that United States troops could legally be used for
> the purpose of apprehending and returning such Indians or for the purpose of
> preventing them from peaceably leaving their homes, and has always insisted in
> such cases on the State's paramount authority, and that the use of troops should
> not be resorted to, if at all, until every effort has been made by the State
> authorities to meet the requirements of the situation.

On October 8, 1906, Inspector McLaughlin telegraphed the Office
from Newcastle, Wyo., that he had just returned from the Ute camp;
that the leader of the absentees refused to return home; that he (the
inspector) had succeeded in getting 45 of the Indians to accompany
him to Utah; that some of those who did not return would go to the
Pine Ridge Agency, and about 100 of the more aggressive would
continue northwest to the Big Horn Mountains, where they thought
of settling; that no trouble need be apprehended from them if they
were not interfered with; but that they were sullen and would doubt-
less resist if forced to return while in that mood.

Forty-five of the absentees were accordingly provided with trans-
portation to their homes.

The John Morton Sheep Company telegraphed to the Department
on October 11 that the Utes camped 15 miles from Gillette were rob-
bing sheep camps and killing cattle and game; that the people of the
settlements were becoming aroused, and that serious trouble was
feared.

The governor of Wyoming wired the Department on October 14
that nearly all the Indians were then camped at Gillette, Wyo.; that
they were drinking, insulting and stealing, and had defied the local
police. He requested prompt action in order to avert serious trouble
between the absentees and the settlers.

The Department telegraphed to the governor the next day, inquir-
ing whether he requested the Government to send United States
troops into Wyoming to preserve order and arrest and remove the
Indians. On receipt of an affirmative response the President directed
that the matter be turned over to the War Department, and on
October 18 the Office furnished Capt. S. A. Cloman, of the General
Staff of the Army, a brief memorandum about the trouble.

On October 19 the Secretary of War telegraphed to the major-
general commanding the northern division:

> It having been represented to the President that a band of Ute Indians have
> entered the State of Wyoming, and have there committed a series of depreda-
> tions against the property and rights of its citizens; and a formal application
> for protection having been submitted in their behalf by the governor of Wy-
> oming, the legislature of that State not being in session, and it being impossible

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

CVWD 563-138

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

**128**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

to convene it; the President directs that Major-General Greely, commanding northern division, be instructed to cause a suitable force of cavalry to proceed to the scene of disturbance and command the intruders to return to their homes. It is the President's desire that they be firmly but tactfully dealt with and that a violent course be avoided unless their defiance of the authority of the United States continues and it becomes necessary, for that reason, to compel them to desist from their unlawful conduct and return to the lands which have been allotted to their use in the Uintah Reservation, Utah.

The Indian agent at Crow Agency reported on October 20 that the Absentee Utes were camped about 40 miles north of Gillette, Wyo., on the Little Powder River; that they had purchased subsistence supplies at Gillette, Wyo., but had made no hostile demonstrations, and were heading apparently for the Crow or the Northern Cheyenne Reservation in Montana.

The War Department ordered that troops proceed to the Indian camp and intercept a part of the band reported to be heading toward the Crow Reservation.

Major-General Greely telegraphed the War Department on October 24:

Captains Johnson and Pacton, Tenth Cavalry, striking Ute trail on the 22d, reached their camp on Spring Creek and Little Powder, 40 miles from Gillette, where a council was held with Chief Appah's band on the morning of the 23d. It would appear that the band camped with Appah consisted of about 300, with few women and children in sight and about 150 fighting men. They are fully armed, have their belts full of ammunition, and from 300 to 400 good ponies, 10,000 pounds of flour, purchased in Gillette, and a large amount of venison. Their transportation is mostly travois, with a few old wagons. While sullen and uncommunicative with reference to subject of return to Uintah Reservation, yet they expressed themselves on their grievances. They claim that they have harmed no one and expressed an intention of conducting themselves peacefully and lawfully. In this connection I have been unable to ascertain any illegal acts by them except the killing of game. They delayed moving to hold council with Johnson and Pacton, but declined to remain where they were pending further councils. At noon on the 23d the entire band moved down the Little Powder, with announced intention of proceeding to Cherry Creek, in Black Hills, but in Captain Johnson's opinion they are headed for Montana. Johnson states that they will certainly not return to the reservation unless compelled by decidedly superior forces, and is further of the opinion that they will resist any small force, in which opinion Major Grierson joins. Under these conditions, in order to avoid bloodshed, I have ordered Colonel Rogers and six troops, Sixth Cavalry, to take the field with Belle Fourche as the base. He has been instructed to intercept Appah's band and compel them to return with him to Fort Meade, where the entire band of Indians will be held as prisoners, awaiting instructions from the War Department as to their disposal. Rogers has been instructed to deal tactfully with them and avoid recourse to force save as a last extremity, but his orders are positive to bring the entire band into Fort Meade. Major Grierson has been ordered to follow the Utes with two troops—his only force, the two other troops being snowbound near Crawford. Major Grierson is directed to avoid any resort to arms, as his force is inferior to the reported fighting strength of the Utes, but he will keep in contact with them and keep these headquarters advised of their movements. Should they proceed



Digitized by Google          Original from
                             UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP  Document 85-20  Filed 10/21/14  Page 166 of 212  Page ID #:4182

toward Cheyenne Reservation, it will become necessary to put the remainder of Fort Robinson garrison in the field, operating from some suitable point on the Burlington Railroad near Sheridan as a base. In this contingency the Keough command, which has been kept ready for the field, may be called into play. The character of the country, the great distances, and the unusually early advent of winter storms will necessarily entail hardships, and of course the expenses of operations must be considerable. Although the original orders to cause the return of the Utes to their reservation were based on the formal call of the governor of Wyoming, yet it is assumed that military operations are to continue, even though the Indians enter South Dakota or Montana and even though they carry out their announced intention of lawful and peaceful procedure.

Under the excellent orders of the War Department, troops were directed from various posts to converge on the Indian camp, so that on the last day of October they were in a position to prevent the Utes from going into Montana and giving their pursuers a long chase. The purpose of employing so large a military force was to overawe them and persuade them to return quietly to their homes as the alternative of being disarmed and compelled to do so. On November 2 the major-general commanding telegraphed that the officer in command of the troops in the field reported that the Indians had arranged for a conference and that, should they surrender, they would be concentrated temporarily at Fort McKenzie pending further instructions from the War Department as to their future disposal.

On November 5 the United States Indian agent at Crow Agency reported that the rumors that the Utes had burned ranch buildings, shot and killed a prominent citizen, raided the cattle of the settlers, etc., were all sent out to the press by unreliable persons and were found to be absolutely false; and that the object of such reports was to try to create a feeling against the Utes and thereby arouse the citizens to take action against them.

At their conference with the military authorities the Utes were promised that their complaints would be given a full hearing and that a delegation of their chiefs would be allowed to come to this city for the purpose of personally presenting their grievances to the President, the Secretary of the Interior and the Commissioner of Indian Affairs. With this assurance the Indians accompanied the troops peaceably to Fort Meade, S. Dak., starting on November 6.

In the early part of March it was suggested by the Indian agent at Pine Ridge that it might be a good plan to disarm the absentee Utes, as reports had reached the Sioux that they were restless and in a threatening mood. Investigation proved that the reports were false, the Indians having conducted themselves in an exemplary manner; and in response to the recommendation of the commandant in charge, they were not disarmed.

22849—08——9



After the Indians had gone peaceably to Fort Meade, S. Dak., several misinformed friends of the Indians wrote the Office protesting against the action taken and intimating that the Indians were starving, half clad, and ill sheltered. To one typical correspondent of that sort I wrote, under date of November 7, pointing out a few of his more glaring errors of fact, and adding:

Someone has misled you also, evidently, on the subject of the lands in the Uintah Reservation. The very best in the entire reservation were set apart for the Indians, as well as a large grazing common and a good area of coal and timber lands for purposes of a fuel supply. The soil of the allotted land has been examined by experts and pronounced to be highly fertile if properly irrigated. The Department has taken pains to lay out a very complete and elaborate scheme of irrigation, and in the face of serious difficulties obtained from Congress an appropriation for beginning the execution of the plan, with as much of a promise as the Congress can hold out as to the action of others, that the appropriation would be continued up to $600,000, the estimated gross cost of the entire undertaking. Owing to the hurried way in which the allotments had to be made in order to comply with the law, it was of the first importance that the Indians who had received allotments should be on the spot to take possession of them as fast as they could be staked or fenced or otherwise distinguished, and that they should begin the work of their improvement, so as to get all the advantage possible of the laws of the State of Utah affecting water rights.

The other bands on the reservation with the White Rivers have behaved very well in that regard, trusting to the Government to provide for them as well as was practicable. The White Rivers from the first have been very sullen and ugly, and have simply demanded that no white civilization should come anywhere near them. A delegation visited this city about eighteen months ago, and I took them, at their request, to see the President and the Secretary of the Interior after they had heard what I had to say to them; and both the President and the Secretary, without any previous consultation with me, told them almost in the same words what I had told them as to the future of their people. The White Rivers alone of all the Utes on the reservation have kept alive the agitation against white civilization. Their exodus this summer had been prepared for by a process of accumulation of money and other material for a year or more—the sort of accumulation which, if it had been directed into a more sensible channel, would have done a great deal for their welfare and put them beyond the probability, almost the possibility, of serious need. The agent followed them into Wyoming, explaining to them the impracticability of their plan of going off to live among the Sioux, as the Sioux owned their own country, and it would be as far out of the question for the Utes to take away the Sioux lands to live on as it would be for the Sioux to come to Utah and take away the Ute lands. What these Indians demand is a big hunting ground—not farming country. They do not wish to farm and do not care to have settled homes; but their appeal to the President last spring, and to the soldiers since, has been for a game country which they could inhabit and where the white man would leave them alone.

To my mind, the action of the military authorities has been humane to the last degree. I do not know when I have ever seen a more creditable exhibition of American intelligence and genuine kindness of heart than on the part of the officers who had charge of the expedition against these Indians and of the authorities at the War Department who directed the movements in general. It

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google


Digitized by Google        Original from
UNIVERSITY OF MICHIGAN

CVWD 563-141

was obvious from the beginning that no hostile purpose animated the military authorities; that they recognized the peaceful errand on which the Utes had set out; and that their purpose simply to impress the Indians with the total futility of longer resistance to the will of the Government and to bring them back without the firing of a shot or the shedding of a drop of blood. Even the wish not to disarm the Indians unless they showed some purpose of misusing their hunting weapons showed tact and consideration. No military assistance would have been called upon in the matter but for the fact that the governor of Wyoming communicated to the President his inability to cope with the situation through the local civil authorities; and the same action, I assume, was taken there that would have been taken in the case of a large body of ignorant and armed white men traveling through the same country and disregarding the game laws and other local police provisions. Whatever credit, however, attached to the military management in this matter belongs with the War Department, as the Department of the Interior became merely an interested spectator after the military authorities had been directed by the President to take charge of the business.

Early in March Capt. Carter P. Johnson, of the Tenth Cavalry, came to Washington for the purpose of arranging for some permanent disposition of the Indians. His plan was to lease a sufficient body of land from one of the Sioux tribes and settle them on it. At the time of his visit Special Indian Agent Downs, in charge of the Cheyenne River Agency, was here. At a conference in which the President joined, it was decided to find homes for the Absentee Utes on the Cheyenne River Reservation in pasture No. 2, on which the pending lease was due to expire on June 1. At a general council held on April 15 the Cheyenne River Indians consented to lease the four northwestern townships of pasture No. 2, containing ample wood and water, to the Utes for five years from July 1, at an annual rental of 4½ cents per acre. These terms were accepted by the Utes, who voted that their rent might be paid from their annuity funds. The lease was executed, and approved on May 20, and on June 11 the commandant at Fort Meade reported that the last remnant of the Utes had left for the Cheyenne River Reservation. There the Absentee band has remained ever since.

### PAIUTES.

The Indian appropriation act of June 21, 1906 (34 Stat. L., 325, 376), appropriated $15,500 for the "San Juan Pah Ute Indians" and the "Kaibab Indians" in Utah. An investigation of their condition by Inspector Chubbuck last year developed the fact that it would be difficult to determine just what Indians would be entitled to receive the benefits of this fund, and accordingly by the current Indian appropriation act (34 Stat. L., 1049) the money was reappropriated and made available for the use of the "Piute Indians in southern Utah and northern Arizona."

They have lately been visited by Inspector Churchill, and on August 30, 1907, he recommended the establishment of a day school for

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

150 Shivwits Indians residing in the southwest corner of Utah near St. Georges. They have about 70 acres of tillable land with adjacent lands suitable for pasturage. A group of about 80 Paiutes he found near what is known as Moccasin Ranch, in Arizona, some 18 miles south of Kanab, Utah, where they have a fenced pasture of several thousand acres, and some 10 or 15 acres of tillable land watered by a spring on Moccasin Ranch of whose full flow the Indians own one-third. He recommended that a competent engineer be directed to measure the flow of the spring and stake out a pipe line and reservoir site; that there be purchased for the Indians from 50 to 100 2-year-old heifers with a suitable number of bulls, and from 50 to 100 high-grade coarse-wool bucks; and that a strip of land immediately north of the Utah-Arizona State line and adjoining the Navaho Reservation, about 35 miles north and south and 75 miles east and west, be withdrawn for the use of the Indians from all form of settlement and entry. These recommendations will soon be carried into effect.

Another group of the San Juan Paiutes live in the canyons along the Colorado and San Juan rivers in Utah just north of the Arizona line about 300 miles from Panguitch. Other scattered groups were found in Grass or Rabbit Valley in central Utah, a few families at Kanosh, and a few families, known as Pahranagats, in eastern Nevada. The inspector reported them as not needing assistance, and, in fact, as declining to acept anything from the Government.

### MINERAL ENTRIES ON COLVILLE RESERVATION.

At the request of this Office an investigation of mineral entries on the Colville Reservation, in Washington, has been made by representatives of the General Land Office, and in a number of cases the locators have been directed to show cause why their locations should not be canceled as being nonmineral. In many other cases where patents have issued, the Department of Justice has been requested to institute suits for vacating them. Most of these locations are reported to have been made in order to secure title to lands valuable for agricultural or town-site purposes.

As the survey of the Colville Reservation has not been finished, allotment of lands on the south half of the reservation is not yet possible.

### YAKIMA RESERVATION BOUNDARY.

On February 27, 1906, the General Land Office approved surveying contract No. 632, providing, among other things, for the survey of the boundaries of the Yakima Reservation, in Washington, by straight lines running from the headwaters of the South Fork of Atanum River to Spencer Point, thence to Conical Hump, thence to Grayback



Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from UNIVERSITY OF MICHIGAN

CVWD 563-143

Peak, and finally to the fifty-first mile corner on the old boundary line.

The Yakima Indians filed a protest against the location of the new boundary line because it eliminated 64,000 acres of land on the west and north of the boundary, then being demarked, which they claimed as part of the reservation. The Office reported to the Department on July 30 and August 16, 1906, that under the instructions issued in connection with contract No. 632, the surveys were made without reference to the claims of the Indians, and it was recommended that the surveyors be instructed to follow the boundary line of the reservation according to the wording of the treaty of June 9, 1855 (12 Stat. L., 951). This recommendation was approved by the Department August 24, 1906, and supplemental instructions were issued by the Commissioner of the General Land Office directing that the line be run on the ridge from the headwaters of the south fork of the Atanum River, around the headwaters of the Klickitat River by Spencer Point to Goat Rock, thence along the summit of the Cascade Mountains to Conical Hump, and thence by the blazed trees to Grayback Peak, this line following the treaty boundaries of the reservation as claimed by the Indians. The report of E. C. Barnard, of the Geological Survey, of his examination of this part of the boundary line (see H. Doc. 621, 56th Cong., 1st sess.), gives this as the true boundary of the reservation as originally intended. He considers the important clause in the treaty to be that which makes the summit of the Cascade Mountains form a part of the western boundary.

In a suit in equity now before the circuit court for the State of Washington, instituted by the United States of America, complainant, against the Northern Pacific Railway Company and the Mercantile Trust Company, defendants, for the purpose of canceling certain patents erroneously issued to the Northern Pacific Railway Company and the Northern Pacific Railroad Company within the Yakima Reservation, it was essential to the Government's success to fix some definite boundary, and the assistant attorney-general for the Department adopted the boundary recognized in the act of December 21, 1904 (33 Stat. L., 595), which is substantially the line run by contract No. 632. It is hoped that the court will take judicial notice of the boundary as fixed by treaty. If it does not do so, when this suit has been finally determined the question will have to be considered of the rights of the Indians to the lands lying between the straight-line boundary run under surveying contract No. 632 and that along the summit of the mountains, for which the Indians contend.

Very respectfully, your obedient servant,

FRANCIS E. LEUPP, *Commissioner.*

The SECRETARY OF THE INTERIOR.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# APPENDIX.

### REPORT OF THE SUPERINTENDENT OF INDIAN SCHOOLS.

DEPARTMENT OF THE INTERIOR,
OFFICE OF SUPERINTENDENT OF INDIAN SCHOOLS,
*Washington, D. C., September 25, 1907.*

SIR: I have the honor to submit herewith the twenty-fifth annual report of the Superintendent of Indian Schools. As in preceding years, the greater part of the time I have spent in the field visiting and inspecting schools, and detailed reports on their condition, defects, and requirements, have been submitted to you from time to time.

Through correspondence and circulars of instruction, and by personal directions when in the field, we have endeavored to conduct the educational work along the lines you have outlined, and to increase thereby the efficiency of the schools. Efforts have been made to obtain a closer correlation of the class-room and industrial work by giving individual assistance to teachers and through demonstration lessons presented at the various institutes. Teachers have been encouraged to study the conditions on the reservations and the individual characteristics of their pupils, and to use this knowledge in their efforts to adapt the instruction to meet the requirements of local conditions and the practical needs of pupils.

As you are aware, many teachers entering the Service have the mistaken idea that their efforts should be directed toward transforming the Indian child into something else, instead of developing him along natural lines, and do not seem to realize that the methods suited to white children must be materially modified in instructing Indian children. In view of this it has frequently been found necessary to spend considerable time at a school in order to assist teachers inexperienced in the work to adapt their courses of instruction to meet the needs of the particular tribe of Indians they are teaching and to prepare sample lessons for their guidance. While the plan of assisting individual teachers requires much time and labor, the efforts put forth are showing good results.

### EMPLOYEES' CONFERENCES.

In compliance with the instructions contained in a circular letter sent to the field, most of the schools have established employees' round-table conferences. These meetings are held at stated periods, usually weekly or biweekly, at which difficulties encountered in the

134


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

CVWD 563-145

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 172 of 212   Page ID #:4188

several departments of the school are discussed, and ways and means to overcome them are considered. The good results of these conferences are noticeable at many of the schools. They are especially helpful in securing a closer correlation of the class-room and industrial instruction, and it is hoped that all the schools will conduct them during the current year.

## SCHOOL COMMENCEMENTS.

A large number of schools arranged their commencement programmes in accordance with the suggestions contained in a circular letter issued by your direction, and in all instances they proved interesting and instructive. The public heartily approved of the exercises, which were more practical and less theoretical than formerly, and which brought out the actual acquirements of pupils and exemplified the methods of instruction, especially industrial.

## SANITATION.

Sanitary conditions at most of the schools visited have been much improved in recent years. There can be little doubt that many of the children enter school with inherited tendencies to disease, particularly to tuberculosis, and special efforts have been made to prevent its development in pupils thus predisposed. The strongest hope in combating this deadly disease, however, lies in instructing the school children in the precautions to be observed, and employees have been urged to give this subject special attention.

## TEACHING ENGLISH.

Teaching the Indian child to speak English is naturally the first step in his training, and efforts have been made to give him a working knowledge of the language in the shortest practicable time. We have found that many teachers do not give sufficient drill work; that they fail to understand that often the Indian child does not readily comprehend what he is being taught, and in his recitations is merely repeating from memory. To overcome this teachers have been urged to adapt their methods to suit the peculiar characteristics of the pupil; to teach objectively, and always to begin the teaching of English with the use of illustrations and objects familiar to the child. Endeavor also has been made to have the teachers require much oral work in recitations, and to stimulate responsiveness in the child. Studying the child and suiting the training to fit each case has proved beneficial to both teacher and pupils, and has given the former increased interest in the work and the latter greater self-reliance. There has been a marked improvement in many schools in the facility and rapidity with which the children learn to speak English.

## INDUSTRIAL TRAINING AND HOUSEHOLD ECONOMY.

Endeavor has been made to carry out your policy of giving industrial training and household economy a foremost place in Indian education, and it has been our constant aim while visiting schools to impress upon superintendents and employees the importance of having all instruction practical.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-146

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 173 of 212   Page ID #:4189

It is generally recognized that knowing how to cook is one of the main acquirements which the Indian girl must have if she would become a good housekeeper, and we are trying to have cooking thoroughly taught, so that each girl, before leaving school, will be fully qualified to prepare meals intelligently and economically for a small family, to keep accounts, and to take complete charge of the work of a small home. In view of the fact that the cook's time is largely taken up in preparing meals for the school table, the girls can acquire little knowledge of family cooking merely by assisting in the preparation of food on a large scale, and we have endeavored to have the theory of cooking taught in the class room, as is now done in many of the city and rural schools for white children. To this end an outline course was prepared and, with your approval, included in the curriculum at the beginning of the last school year. The course provides a series of detailed directions and sample graded lessons, in which the theory of cooking is correlated with language, number work, composition, etc. Some of the teachers have taken this up in earnest, and it is hoped that better results will be obtained than hitherto in this important branch of any girl's training.

### AGRICULTURAL INSTRUCTION.

The constant aim of all agricultural instruction has been to enable pupils to obtain practical results by simple means, at the same time giving them sufficient acquaintance with the principles of agriculture to enable them to understand the reasons for the various farming operations. To accomplish this we have endeavored to have the children take up the study of seeds in the class room during the winter—the teacher conducting experiments and illustrating the processes of germination—and in the spring to have them, under the supervision of the class-room teacher, do the actual work of laying out the garden plots, preparing the soil, planting, tending the growing plants, and harvesting the crop. Almost every school where suitable land can be had has adopted the system of having individual gardens for the smaller pupils. This has given excellent results and has increased decidedly the interest in farm work generally. The girls as well as the boys are given instruction in gardening. The average farmer's wife usually has to superintend, if not do, a great deal of her own gardening, and it is essential that Indian girls be taught how to do such work.

We have endeavored to have teachers adapt the instruction to local conditions, and in sections where stock raising is the principal industry they have been urged to give special attention to this subject, and, after instruction in the class room, to take the pupils to the barn or pasture, where the farmer or dairyman will give instruction in the management and care of stock, including the raising of calves, and will point out the distinguishing characteristics of different breeds of cattle—those best for beef and those best for the dairy.

During the last two years superintendents have been urged to do more extensive work in the dairy, and we are glad to report that some of the schools are giving special attention to it. Matrons and housekeepers also have been requested to have the girls as well as the boys learn to milk, and especially to have the girls taught the

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 174 of 212   Page ID #:4190

care of milk, to make good butter and cheese, and to keep the utensils of the dairy in a sanitary condition.   In a few of the schools this work has been taken up by the class-room teachers and correlated with language, numbers, etc., and it is hoped that another year a much larger number will do so.

### DAY SCHOOLS.

Most of the day schools have continued their record for good work during the past year.  As I believe you deem the civilizing and elevating influence of these schools upon the older Indians to be a most important part of their usefulness, we have urged teachers and housekeepers to follow the instructions of the Office and make it a part of their duties to visit regularly the homes of their pupils and instruct the parents in proper modes of living—keeping their huts or tepees neat and habitable, how to prepare and cook their food, how to sew, etc.  Each year the influence of these schools becomes more apparent, and on every reservation where they have been established the good effects upon the adult Indians can plainly be seen.  The child, on going to his home at night, carries with him, consciously or unconsciously, the civilizing atmosphere of the school.  The lessons of cleanliness and neatness especially are not lost.  The love of home and the warm reciprocal affection existing between parents and children are among the strongest characteristics of the Indian nature.  It is not strange, therefore, that the mother is frequently unwilling to be parted from her children for the time necessary to cover a term at a boarding school, but she usually makes little objection to their attending the day school, knowing that they will come home to her each evening.  By bringing civilization to the door of the Indian, instead of attempting to take him to civilization, family ties are maintained, while the industries and habits of civilization are given an early start; and your policy of extending the day school system wherever practicable can not but result in great good to the Indian.

### INSTITUTES.

A great deal of attention has been given to the supervision of institute work, which has been carried on for a number of years, in order to bring the Indian workers together and get before them methods of instruction which are particularly adapted to the teaching of Indian children.  In compliance with your directions, institutes were held as follows: Standing Rock Agency, N. Dak.; Rosebud Agency and Pine Ridge Agency, S. Dak.; and the general institute, or department of Indian education, at Los Angeles, Cal., in connection with the annual convention of the National Educational Association.

All of the institutes were well attended, and employees manifested greater interest in the proceedings than heretofore.  Demonstration lessons were presented to emphasize methods of instruction which it is hoped will secure a closer correlation of the literary and industrial instruction, and thus will give to pupils a training that will better fit them for the work in which they will most probably engage after leaving school.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-148

138   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

In view of the fact that the schools had been called upon for material for the Indian exhibit at the Jamestown Exposition, no general request was made for material for the Los Angeles institute; but there was a small exhibit of class-room papers, sewing, art needle-work, baskets, pottery, etc., which proved interesting and instructive to the teachers in attendance.   An exhibit of native Indian art, prepared under the supervision of Miss Angel De Cora, attracted special attention.

### RÉSUMÉ.

The progress made during the year, while not especially striking in any particular direction, has been steady and substantial in nearly all branches of the educational work.   The teachers are realizing more and more each year the importance of adapting the instruction to local conditions and immediate needs of pupils, and more practical methods of teaching now prevail in most of the schools than hitherto; however, we feel that much remains to be done to bring the work up to the desired standard of efficiency.

There is urgent need for the employment of additional domestic science instructors, who can devote their entire time to teaching the girls family cooking.   Better facilities for this work should be provided at a number of schools, but they need not be extensive, as better results will be obtained with the equipment usually found in the dining room and kitchen of a small home.

The Indians are fast becoming factors in industrial pursuits, especially in those sections of the country where you have established employment bureaus.   Large numbers of school boys have, as you are aware, also found profitable employment during the year, and it is believed that this number will increase rapidly as employees become more familiar with the practical educational policy you have adopted.

In conclusion, permit me to express my appreciation of the strong support you have always given me in my work.

Very respectfully, your obedient servant,

ESTELLE REEL,
*Superintendent of Indian Schools.*

The COMMISSIONER OF INDIAN AFFAIRS.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF MICHIGAN

## TRUST FUNDS AND TRUST LANDS.

The following statements show the transactions in the Indian trust funds and trust lands during the year ended October 31, 1907:

*Funds held in trust by the Government in lieu of investment.*

| Tribe and fund. | Date of acts, resolutions, or treaties. | Statutes at Large. Volume. | Statutes at Large. Page. | Amount in the United States Treasury. | Annual interest at 4 and 5 per cent. |
|---|---|---|---|---|---|
| Apache, Kiowa, and Comanche fund | June 6,1900 | 31 | 678 | $1,500,600.00 | $75,030.00 |
| | Mar. 3,1901 | 31 | 1062 | | |
| Apache, Kiowa, and Comanche 4 per cent fund | Mar. 20,1906 | 34 | 80 | 846,886.78 | 33,875.47 |
| Blackfeet Reservation 4 per cent fund | June 10,1896 | 29 | 354 | 273,909.50 | 10,956.38 |
| Cherokee asylum fund | Apr. 1,1880 | 21 | 70 | 51,334.47 | 2,566.72 |
| Cherokee orphan fund | ...do... | 21 | 70 | 344,148.27 | 17,207.41 |
| Cherokee national fund | ...do... | 21 | 70 | 656,937.74 | 32,846.88 |
| Cherokee school fund | ...do... | 21 | 70 | 495,403.89 | 24,770.19 |
| Cheyenne and Arapahoe in Oklahoma fund | Mar. 31,1891 | 26 | 1,024 | 1,000,000.00 | 50,000.00 |
| Chickasaw national fund | Apr. 1,1880 | 21 | 70 | 428,971.61 | 21,448.58 |
| | Jan. 14,1889 | 25 | 642 | | |
| Chippewa in Minnesota fund a | Feb. 26,1896 | 29 | 17 | 5,047,411.44 | 252,370.57 |
| | June 27,1902 | 32 | 400 | | |
| Choctaw 3 per cent fund | Mar. 1,1907 | 34 | 1,027 | 390,257.02 | 11,707.73 |
| Choctaw orphan fund | Apr. 1,1880 | 21 | 70 | 39,710.69 | 1,985.53 |
| Choctaw school fund | ...do... | 21 | 70 | 49,472.70 | 2,473.63 |
| Creek general fund | Apr. 1,1880 | 21 | 70 | 2,472,930.95 | 123,646.55 |
| | May 27,1902 | 32 | 249 | | |
| Crow b | Aug. 27,1892 | | | 6,614.95 | 330.70 |
| Crow Creek 4 per cent fund | Mar. 2,1895 | 28 | 888 | 88,909.53 | 3,556.38 |
| Fort Hall Reservation 4 per cent fund | June 6,1900 | 31 | 672 | 89,663.50 | 3,586.54 |
| Iowa fund | Apr. 1,1880 | 21 | 70 | 93,543.89 | 4,677.16 |
| Kickapoo general fund | ...do... | 21 | 70 | 90,044.03 | 4,502.20 |
| Kickapoo in Oklahoma fund | June 10,1896 | 29 | 328 | 10,231.76 | 511.58 |
| Klamath fund | June 21,1906 | 34 | 367 | 350,000.00 | 17,500.00 |
| Menominee fund | Apr 1,1880 | 21 | 70 | 153,039.38 | 7,651.96 |
| Menominee log fund | June 12,1890 | 26 | 146 | 2,315,691.48 | 115,784.57 |
| Nez Perce of Idaho fund | Aug. 15,1894 | 28 | 331 | 2,951.13 | 147.55 |
| Omaha fund | Apr. 1,1880 | 21 | 70 | 340,774.73 | 17,038.73 |
| | July 15,1870 | 16 | 36 | | |
| Osage fund | May 9,1872 | 17 | 91 | 8,383,033.34 | 419,151.66 |
| | June 16,1880 | 21 | 292 | | |
| | Aug. 19,1890 | 26 | 344 | | |
| Osage school fund | Apr. 1,1880 | 21 | 70 | 119,911.53 | 5,995.57 |
| Otoe and Missouri fund | Aug. 15,1876 | 19 | 208 | 348,955.97 | 17,447.79 |
| Pawnee fund | Apr. 12,1876 | 19 | 28 | 399,939.47 | 19,996.98 |
| Ponca fund | Mar. 3,1881 | 41 | 422 | 70,000.00 | 3,500.00 |
| Pottawatomie education fund | Apr. 1,1880 | 21 | 70 | 76,993.93 | 3,849.70 |
| Pottawatomie general fund | ...do... | 21 | 70 | 89,618.57 | 4,480.92 |
| Pottawatomie mills fund | ...do... | 21 | 70 | 17,482.07 | 874.10 |
| Puyallup 4 per cent school fund | Mar. 3,1893 | 23 | 633 | 208,482.75 | 8,339.31 |
| Round Valley general fund | Oct. 1,1890 | 26 | 658 | 9,489.73 | |
| Sac and Fox of the Mississippi | Oct. 2,1837 | 7 | 541 | 200,000.00 | 10,000.00 |
| | Oct. 11,1842 | 7 | 596 | 800,000.00 | 40,000.00 |
| Sac and Fox of the Mississippi fund | Apr. 1,1880 | 21 | 70 | 12,164.96 | 40,000.00 |
| Sac and Fox of the Mississippi in Oklahoma fund | Feb. 13,1891 | 26 | 749 | 207,588.99 | 10,379.44 |
| Sac and Fox of the Mississippi in Iowa fund | June 10,1896 | 29 | 331 | 38,603.93 | 1,930.20 |
| Seminole general fund | Apr. 1,1880 | 21 | 70 | 1,000,000.00 | 50,000.00 |
| Seminole school fund | July 1,1898 | 30 | 568 | 500,000.00 | 25,000.00 |
| Seminole | Aug. 7,1856 | 11 | 702 | 500,000.00 | 25,000.00 |
| | Mar. 21,1866 | 14 | 757 | 70,000.00 | 3,750.00 |
| Seneca of New York | June 27,1846 | 9 | 35 | 118,050.00 | 5,902.50 |
| Seneca, Tonawanda band | Apr. 1,1880 | 21 | 70 | 86,950.00 | 4,347.54 |
| Shoshone and Bannock fund | July 3,1882 | 22 | 149 | 3,716.83 | 185.84 |
| Siletz general fund | Aug. 15,1894 | 28 | 324 | 20,569.35 | 1,025.46 |
| Sioux fund | Mar. 2,1889 | 25 | 895 | 2,789,797.88 | 139,489.89 |
| Sisseton and Wahpeton fund | Mar. 3,1891 | 26 | 989 | 611,145.47 | 30,557.27 |
| Stockbridge consolidated fund | Feb. 6,1881 | 16 | 405 | 71,118.08 | 3,555.90 |
| Umatilla general fund | Aug. 5,1882 | 22 | 177 | 272,604.77 | 13,630.23 |
| Umatilla school fund | ...do... | 22 | 177 | 36,740.27 | 1,837.01 |
| Ute 5 per cent fund | Apr. 29,1874 | 18 | 41 | 500,000.00 | 25,000.00 |
| Ute 4 per cent fund | June 15,1880 | 21 | 204 | 1,250,000.00 | 50,000.00 |
| Uintah and White River Ute band | Apr. 1,1880 | 21 | 70 | 19,173.93 | 958.69 |
| Winnebago | Nov. 1,1837 | 7 | 546 | 804,909.17 | 20,245.45 |
| | July 15,1870 | 16 | 335 | 78,340.41 | 3,917.02 |
| Yankton Sioux fund | Aug. 15,1894 | 28 | 319 | 480,008.00 | 24,000.00 |
| Total | | | | 37,334,768.34 | 2,030,245.50 |

a Not available for tribal purposes.  b Annual report, 1892, p. 748.

139

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-150

140   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Changes in funds held by the Government in lieu of investment.*

### DECREASE.

| | |
|---|---:|
| Chickasaw national fund | $264,090.18 |
| Crow fund | 10,222.92 |
| Crow Creek 4 per cent fund | 545.20 |
| Fort Hall Reservation 4 per cent fund | 39,176.00 |
| Iowa fund | 38,479.98 |
| Iowa (treaty) | 57,500.00 |
| Kickapoo (treaty) | 64,865.28 |
| Kickapoo in Oklahoma fund | 23,212.06 |
| L'Anse and Vieux d'Sert fund | 20,000.00 |
| Nez Perce in Idaho fund | 1,006.12 |
| Omaha fund | 32,361.79 |
| Osage (treaty) | 69,120.00 |
| Otoe and Missouria fund | 156,191.56 |
| Pawnee fund | 61.68 |
| Pottawotomie (treaty) | 230,064.20 |
| Siletz general fund | 2,191.94 |
| Sioux fund | 165,880.52 |
| Sisseton and Wahpeton fund | 174,309.15 |
| Stockbridge consolidated fund | 4,870.52 |
| Sac and Fox of the Missouri | 100,400.00 |
| Total | 1,454,549.10 |

### INCREASE.

| | |
|---|---:|
| Apache, Kiowa, and Comanche 4 per cent fund | 846,886.78 |
| Cherokee national fund | 11.38 |
| Cherokee school fund | 5,032.22 |
| Choctaw 3 per cent fund | 390,257.92 |
| Chippewa in Minnesota fund | 951,207.52 |
| Menominee log fund | 200,400.00 |
| Osage fund | 9,374.80 |
| Puyallup 4 per cent school fund | 19,979.27 |
| Round Valley general fund | 3,449.70 |
| Sac and Fox of the Mississippi in Oklahoma fund | 6,303.47 |
| Shoshone and Bannock fund | 100.00 |
| Umatilla general fund | 3,307.41 |
| Uintah and White River Ute fund | 56.00 |
| Total | 2,436,366.47 |
| Net increase | 981,817.37 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-151

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.   141

*Receipts and disbursements on account of Indian lands since November 1, 1906.*

| Appropriations. | Date of acts or treaties. | Statutes at Large. Vol. | Statutes at Large. Page. | On hand Nov. 1, 1906. | Received. | Disbursed. | On hand Nov. 1, 1907. |
|---|---|---|---|---|---|---|---|
| Proceeds of— | | | | | | | |
| Apache, Kiowa, and Comanche lands | Mar. 20, 1906 | 34 | 80 | | $834,401.13 | $7,544.35 | $846,856.78 |
| Absentee Shawnee school lands | June 6, 1900 | 34 | 213 | $10,669.00 | | 1,694.82 | 8,965.18 |
| Blackfeet Reservation, Mont | June 25, 1906 | 34 | 325 | | 65,000.00 | | 65,000.00 |
| Colville Reservation, Wash | Mar. 3, 1903 | 32 | 1001 | 61,653.70 | 120,579.38 | 424.88 | 181,608.26 |
| Crow ceded lands | Mar. 1, 1907 | 34 | 1035 | 48,103.70 | 75,742.21 | 39,678.23 | 84,167.68 |
| Devils Lake Reservation, N. Dak | May 27, 1902 | 32 | 63 | 75,356.82 | 89,166.98 | 74,938.00 | 87,585.80 |
| Flathead Reservation, Mont | July 1, 1898 | 30 | 566 | 100,000.00 | | | 100,000.00 |
| Klamath River Reservation, Oreg | Apr. 27, 1904 | 33 | 352 | 24,882.52 | | | 24,882.52 |
| Grande Ronde Reservation, Oreg | Apr. 23, 1904 | 33 | 319 | 708.83 | 12,595.89 | 7,000.00 | 6,305.00 |
| Lower Brulé Reservation, S. Dak | June 17, 1892 | 27 | 52 | 5,000.00 | | | 5,000.00 |
| Rosebud Reservation, S. Dak | Apr. 28, 1904 | 33 | 569 | 441,001.27 | 412,296.25 | 340,141.83 | 513,155.69 |
| Rosebud Reservation, S. Dak, act Mar. 4, 1907 | Apr. 21, 1906 | 34 | 124 | | 165,000.00 | | 165,000.00 |
| Red Lake Reservation, Minn | Apr. 23, 1904 | 33 | 258 | 326,864.76 | 132,838.51 | 76,166.84 | 459,655.43 |
| Sioux reservations in Minnesota and Dakota | Feb. 20, 1904 | 33 | 1259 | 135,058.71 | 420.00 | | 14,678.71 |
| Sioux allotted lands | Mar. 2, 1907 | 34 | 50 | | 670.00 | | 670.00 |
| Southern Ute Reservation | Feb. 20, 1904 | 33 | 818 | 71,058.66 | 37,590.02 | 5,353.85 | 103,274.83 |
| Sulphur Springs Reservation | Mar. 3, 1905 | 33 | 78 | | | | |
| Choctaw Nation | Feb. 20, 1895 | 28 | 678 | 19,190.55 | | | 19,190.55 |
| Chickasaw Nation | July 1, 1902 | 32 | 655 | 6,396.85 | | | 6,396.85 |
| Uintah and White River Ute Reservation | May 24, 1888 | 25 | 157 | 19,117.93 | 190.00 | 44.00 | 19,173.93 |
| Uintah and White River Ute lands | May 27, 1902 | 32 | 263 | 9,760.00 | 84,894.33 | | 64,464.33 |
| Wichita ceded lands | Mar. 2, 1895 | 28 | 1009 | 78,755.58 | 88,000.00 | 68,396.74 | 100,358.84 |
| Wind River Reservation, Wyo | Mar. 3, 1905 | 33 | 294 | 6,400.00 | 61,036.68 | 6,331.59 | 61,673.09 |
| Timber cemetery site, La Pointe, Chippewas, Wis | Mar. 3, 1905 | 33 | 1016 | | 3,447.37 | | 3,447.37 |
| Fulfilling treaties with Omahas, proceeds of lands | Aug. 10, 1872 | 17 | 391 | 375,128.52 | 6,577.02 | 28,938.81 | 340,774.73 |
| Winnebagoes, proceeds of lands | Feb. 21, 1863 | 12 | 341 | 18,294.61 | 405.00 | | 18,699.61 |
| Otoe and Missouri, proceeds of lands | Aug. 15, 1876 | 19 | 208 | 505,147.53 | | 166,191.06 | 348,955.87 |
| Pawnee, proceeds of lands | Apr. 10, 1876 | 19 | 28 | 490,101.15 | 4,560.00 | 61.68 | 394,939.47 |
| Umatilla, proceeds of lands | Aug. 5, 1882 | 22 | 177 | 396,092.63 | | 1,282.59 | 394,810.04 |
| Chippewa, Turtle Mountain band | Apr. 21, 1904 | 33 | 194 | 758,000.00 | | 117,980.00 | 640,980.00 |
| Osage, proceeds of land | Sept. 20, 1865; July 15, 1870 | 14; 16 | 687; 362 | 8,373,658.54 | 9,520.16 | 445.36 | 8,383,033.34 |
| Payment to Indians of Colville Reservation for lands | Mar. 1, 1907 | 34 | 1056 | | 300,000.00 | | 300,000.00 |
| Total | | | | 12,051,625.92 | 2,514,761.93 | 941,160.23 | 13,625,217.62 |

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

142   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Incomes of the various Indian tribes from all sources for the fiscal year ended June 30, 1907.*

| Tribe. | Interest on trust fund. | Treaty and agreement obligations. | Gratuities. | Indian moneys, proceeds of labor, and miscellaneous. | Total. |
|---|---|---|---|---|---|
| Apache, Kiowa, Comanche, Wichitas, and affiliated bands | | | $25,000.00 | | $25,000.00 |
| Apache, Kiowa, and Comanche | $75,031.85 | | | $32,132.70 | 197,164.55 |
| Cheyenne and Arapaho | 50,000.00 | | 35,000.00 | 4,225.21 | 89,225.21 |
| Cheyenne River Sioux | | | | 109,702.08 | 109,702.08 |
| Cherokee | 77,835.88 | | | 299,879.51 | 377,715.39 |
| Chippewa of the Mississippi (White Earth) | | $4,000.00 | | 2,982.51 | 6,982.51 |
| Chippewa of Minnesota | 190,232.55 | 240,000.00 | | | 430,232.55 |
| Chickasaw | 35,761.49 | | | 211,482.74 | 247,244.14 |
| Chippewa of Red Lake | | | | 92,666.18 | 92,666.18 |
| Chippewa of Lake Superior | | | 7,000.00 | 9,887.37 | 16,887.37 |
| Chippewa, Turtle Mountain band | | | 13,000.00 | | 13,000.00 |
| Choctaw | 4,459.08 | 30,032.89 | | 634,270.42 | 668,762.39 |
| Coeur d'Alene | | 11,500.00 | | 2,534.00 | 14,034.00 |
| Colville | | | | 8,108.40 | 8,108.40 |
| Creek | 123,646.54 | | | 129,402.76 | 253,019.30 |
| Crow Creek Sioux | 3,587.54 | | | 6,900.00 | 10,487.54 |
| Crow | 1,190.38 | 36,000.00 | 8,000.00 | 34,270.45 | 79,460.83 |
| D'Wamish and other allied tribes in Washington | | | 5,000.00 | | 5,000.00 |
| Fort Hall Indians | 6,000.00 | 6,000.00 | 20,000.00 | 79.39 | 32,079.39 |
| Indians in Arizona and New Mexico | | | 225,000.00 | | 225,000.00 |
| Indians in Blackfeet Agency | 10,956.38 | 150,000.00 | | 43,461.00 | 204,417.38 |
| Indians of Flathead Agency | | | 9,000.00 | 1,703.62 | 10,703.62 |
| Indians of Fort Apache Agency | | | | 8,257.31 | 8,257.31 |
| Indians of Fort Belsnap Reservation | | | 20,000.00 | 7,880.83 | 27,880.83 |
| Indians of Fort Berthold Agency | | | 20,000.00 | 11,779.05 | 31,779.05 |
| Indians of Fort Peck Agency | | | 50,000.00 | 13,738.25 | 63,738.25 |
| Indians of Klamath Agency | 9,229.50 | | 5,000.00 | 1,784.50 | 16,014.00 |
| Indians of Lemhi Agency | | | 10,000.00 | | 10,000.00 |
| Indians of San Carlos Agency | | | | 28,072.64 | 28,072.64 |
| Iowa | 6,612.93 | 17,875.00 | | | 24,487.93 |
| Kansas | | | 1,500.00 | | 1,500.00 |
| Kickapoo (Kansas) | 4,502.20 | 3,243.26 | | | 7,745.46 |
| Kickapoo (Oklahoma) | 1,575.54 | | 2,000.00 | | 3,575.54 |
| Lower Brule Sioux | | | | 8,839.13 | 8,839.13 |
| Makah | | | 2,000.00 | | 2,000.00 |
| Mescaleros | | | | 9,190.14 | 9,190.14 |
| Menominee | 109,362.95 | | | 4,699.80 | 114,062.75 |
| Mission Indians in California | | | 5,000.00 | | 5,000.00 |
| Molels | | 3,000.00 | | | 3,000.00 |
| Nez Perce Indians in Idaho | | | | 2,295.83 | 2,295.83 |
| Nez Perce, Joseph band | | | 1,000.00 | | 1,000.00 |
| Northern Cheyennes and Arapahoes | | 99,000.00 | | | 99,000.00 |
| Northern Indians in California | | | 10,000.00 | | 10,000.00 |
| Omaha | 18,715.24 | | | 1,107.06 | 19,822.30 |
| Osages | 421,598.59 | 3,456.00 | | 923,522.07 | 1,351,577.66 |
| Otoe and Missouria | 30,096.23 | | | 10,148.80 | 40,245.03 |
| Pawnee | 20,000.06 | 47,100.00 | | | 67,100.06 |
| Pima | | | 40,000.00 | | 40,000.00 |
| Pine Ridge Sioux | | | | 662.00 | 662.00 |
| Ponca | 3,500.00 | | 9,000.00 | 780.94 | 13,280.94 |
| Pottawatomie | 9,204.72 | | | | 9,204.72 |
| Quapaw | | 1,500.00 | | 511.25 | 2,011.25 |
| Quinaielt and Quileute | | | 1,000.00 | | 1,000.00 |
| Rosebud Sioux | | | | 27,652.80 | 27,652.80 |
| Sac and Fox of the Mississippi | 12,628.73 | 51,000.00 | | | 63,628.73 |
| Sac and Fox of the Mississippi in Iowa | 1,930.20 | | | | 1,930.20 |
| Sac and Fox of Missouri | 333.22 | 65,070.00 | | | 65,403.22 |
| Seminole (Indian Territory) | 75,000.00 | 28,500.00 | | | 103,500.00 |
| Seneca, Tonawanda band | 4,347.50 | | | | 4,347.50 |
| Seneca, New York | | 11,982.50 | | 6,793.97 | 18,696.47 |
| Shoshones and Arapahoes in Wyoming | | | | 3,878.48 | 3,878.48 |
| Shoshones and Bannocks | | 11,000.00 | | | 11,000.00 |
| Shoshones in Wyoming | | | 12,000.00 | 3,878.46 | 15,878.46 |
| Sioux of Standing Rock | | | | 40,068.34 | 40,068.34 |
| Sioux, Yankton | | 45,000.00 | | | 45,000.00 |
| Sioux of Devils Lake | | | 5,000.00 | | 5,000.00 |
| Sioux of different tribes | 144,430.97 | 922,000.00 | | | 1,066,430.97 |
| Sioux, Sisseton and Wahpeton | 40,672.06 | | | | 40,672.06 |
| Six Nations of New York | | 4,500.00 | | | 4,500.00 |
| Spokane | | 2,000.00 | | | 2,000.00 |
| Stockbridge | 3,799.42 | | | | 3,799.42 |
| Tongue River Indians | | | | 198.87 | 198.87 |
| Tule River | | | | 3,587.25 | 3,587.25 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.   **143**

*Incomes of the various Indian tribes from all sources for the fiscal year ended June 30, 1907—Continued.*

| Tribe. | Interest on trust fund. | Treaty and agreement obligations. | Gratuities. | Indian moneys, proceeds of labor, and miscellaneous. | Total. |
|---|---|---|---|---|---|
| Ute, confederated bands of | $75,000.00 | $53,710.00 | | | $128,740.00 |
| Uintah | 897.38 | | | $1,204.90 | 2,102.28 |
| Walla Walla, Cayuse, and Umatilla | 15,313.42 | | $3,000.00 | | 18,313.42 |
| Warm Spring Indians, Oregon | | | 4,000.00 | 1,132.00 | 5,132.00 |
| Western Shoshone Indians, Nevada | | | 8,000.00 | 1,011.33 | 9,011.33 |
| Winnebagoes | | 44,162.47 | | 905.48 | 45,067.95 |
| Yakima and other tribes | | | 5,000.00 | 13,089.17 | 18,089.17 |
| San Juan Pah-Utes | | | 5,000.00 | | 5,000.00 |
| Kaibabs | | | 10,500.00 | | 10,500.00 |
| Total | 1,590,453.46 | 1,891,582.12 | 576,000.00 | 2,760,338.99 | 6,818,374.57 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-154

**144**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

Present liabilities of the United States to Indian tribes under treaty stipulations.

| Names of treaties. | Description of annuities, etc. | Number of installments yet unappropriated, explanations, etc. | Statutes. | Annual amount needed to meet stipulations indefinite as to time.[a] | Amount of annual liabilities of a permanent character. | Amount held in trust by the United States at 5 per cent.[b] |
|---|---|---|---|---|---|---|
| Choctaw | Permanent annuities | Article 2, treaty of Nov. 16, 1805; article 13, treaty of Oct. 18, 1820, $600; article 2, treaty of Jan. 20, 1825, $6,000, treaty of Jan. 20, 1825. | 7, p. 99; 11, p. 614; 7, p. 213; 7, p. 235. | | $9,000.00 | |
| Do | Provisions for smiths, etc. | Article 6, treaty of Oct. 18, 1820; article 9, treaty of Jan. 20, 1825. | 7, p. 212; 7, p. 236; 7, p. 614. | | 920.00 | |
| Coeur d'Alène | Employees as per eleventh article of the agreement of Mar. 26, 1887, ratified by act of Mar. 3, 1891. | | 26, p. 1027. | $3,500.00 | | |
| Indians of Fort Hall Agency | Twenty installments of annuity of $6,000 e | Expended by direction of the Secretary of the Interior; 1 installment due | 25, p. 687. | 3,500.00 | | |
| Molel | Pay of teacher to manual-labor school and subsistence of pupils, etc. | Treaty of Dec. 21, 1855. | 12, p. 982. | 3,000.00 | | |
| Northern Cheyenne and Arapaho | Subsistence and civilization, per agreement of Feb. 28, 1877. | Estimated. | 19, p. 256. | 90,000.00 | 30,000.00 | |
| Do | Pay of 2 teachers, 2 carpenters, 2 farmers, miller, blacksmith, engineer, and physician. | ...do... | 15, p. 658. | 9,000.00 | | |
| Pawnee | Annuity in cash. | Treaty of Sept. 24, 1857. | 11, p. 729. | | | |
| Do | Support of two manual-labor schools and pay of teachers | ...do... | 11, p. 729. | 10,000.00 | | |
| Do | For iron and steel and other necessary articles for shops, and pay of 2 blacksmiths, one of whom is to let in and gun smith, and compensation of 2 strikers and apprentices. | For iron and steel, $500. | 11, p. 729. | 500.00 | | |
| Do | Pay of physician... | Estimated. | 12, p. 720. | 1,200.00 | | |
| Pottawatomie | Permanent annuity in money. | Aug. 3, 1795. | 7, p. 51. | | 357.80 | $7,156.00 |
| Do | ...do... | Sept. 30, 1809. | 7, p. 114. | | 178.80 | 3,578.00 |
| Do | ...do... | Oct. 2, 1818. | 7, p. 185. | | 894.50 | 17,890.00 |
| Do | ...do... | Sept. 20, 1828. | 7, p. 317. | | 715.60 | 14,311.00 |
| Do | Permanent annuities. | Oct. 16, 1826; Sept. 20, 1828; July 29, 1829. | 7, p. 320; 7, p. 318; 7, p. 321. | | 5,724.77 | 114,495.46 |
| Do | Permanent provision for 3 blacksmiths and assistants, iron and steel. | July 29, 1829. | 7, p. 320. | | 1,008.99 | 20,179.80 |
| Do | Permanent provision for furnishing salt. | July 29, 1829. | 7, p. 320. | | 50.00 | 1,000.80 |
| Do | Permanent provision for payment of money in lieu of tobacco, iron, and steel. | Sept. 20, 1828; June 5 and 17, 1846. | 7, p. 318; 9, p. 855. | | 107.34 | 2,146.00 |
| Quapaw | For education, smith, farmer, and smith shop during the pleasure of the President. | $1,000 for education; $500 for smith, etc. | 7, p. 425. | 1,500.00 | | |
| Sac and Fox of Mississippi | Permanent annuity | Treaty of Nov. 3, 1804. | 7, p. 85. | | 1,000.00 | 20,000.00 |
| Do | Interest on $200,000, at 5 per cent | Treaty of Oct. 21, 1837. | 7, p. 541. | | 10,000.00 | 200,000.00 |
| Do | Interest on $800,000, at 5 per cent | Treaty of Oct. 21, 1842. | 7, p. 596. | | 40,000.00 | 800,000.00 |

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-155

| Tribe | Object | Reference | Page | Amount (interest/annuity) | Amount | Amount (principal) |
|---|---|---|---|---|---|---|
| Sac and Fox of Missouri | For support of school | Treaty of Mar. 6, 1861 | 12, p. 1172 | 200.00 | | |
| Seminole | Interest on $500,000, eighth article of treaty of Aug. 7, 1856 | $25,000 annual annuity | 11, p. 702 | | 25,000.00 | 500,000.00 |
| Do | Interest on $70,000, at 5 per cent | Support of schools, etc. | 14, p. 702 | | 3,500.00 | 70,000.00 |
| Senecas of New York | Permanent annuities | Feb. 19, 1831 | 9, p. 462 | | 6,000.00 | 6,000.00 |
| Do | Interest on $75,000, at 5 per cent | Act of June 27, 1846 | 9, p. 35 | | 3,750.00 | 75,000.00 |
| Do | Interest on $43,050, transferred from the Ontario Bank to the United States Treasury | do | 9, p. 35 | | 2,152.50 | 43,050.00 |
| Shoshones and Bannocks: | | | | | | |
| Shoshoni | For pay of physicians, carpenter, teacher, engineer, farmer, and blacksmith | Estimated | 15, p. 676 | 5,000.00 | | |
| Do | Blacksmith, and for iron and steel for shops | do | 15, p. 676 | 1,000.00 | | |
| Bannock | Pay of physician, carpenter, miller, teacher, engineer, farmer, and blacksmith | do | 15, p. 676 | 5,000.00 | | |
| Six Nations of New York | Permanent annuities in clothing, etc | Treaty of Nov. 11, 1794 | 7, p. 46 | | 4,500.00 | 90,000.00 |
| Sioux of different tribes, including Santee Sioux of Nebraska. | Blacksmith, and for iron and steel | Estimated | 15, p. 633 | 1,600.00 | | |
| Do | Physician, 5 teachers, carpenter, miller, engineer, farmer, and blacksmith | do | 15, p. 638 | 10,400.00 | | |
| Do | Purchase of rations, etc., as per article 5, agreement of Sept. 26, 1876 | do | 19, p. 256 | 500,000.00 | | |
| Do | Interest on $2,789,797.88, at 5 per cent, section 17, act of Mar. 2, 1889 | do | 25, p. 895 | | 139,489.89 | 2,789,797.88 |
| Tabequache, Moache, Capote, Wiminuche, Yampa, Grand River, and Uintah bands of Ute. | For iron and steel and necessary tools for blacksmith shop | Estimated | 15, p. 627 | 220.00 | | |
| Do | Two carpenters, 2 millers, 2 farmers, 2 blacksmiths, and 2 teachers | do | 15, p. 622 | 8,520.00 | | |
| Do | Annual amount to be expended under the direction of the Secretary of the Interior, in supplying said Indians with beef, mutton, wheat, flour, beans, etc. | do | 15, p. 622 | 30,000.00 | | |
| Winnebago | Interest on $804,909.17, at 5 per cent per annum | Nov. 1, 1837, and Senate amendment July 17, 1862 | 7, p. 546; 12, p. 628 | | 40,245.45 | 804,909.17 |
| Do | Interest on $78,340.41, at 5 per cent per annum, to be expended under the direction of the Secretary of the Interior | July 15, 1870 | 16, p. 335 | | 3,917.02 | 78,340.41 |
| Yankton tribe of Sioux | Twenty installments of $15,000 each, fourth series, to be paid to them or expended for their benefit.d / One installment of $15,000 due | | 11, p. 744 | | | |
| | | | | 680,640.00 | 329,112.76 | 5,771,855.46 |

a These amounts are now allowed, but are liable to be discontinued.
b This covers both amounts held in trust at 5 per cent and amounts which, if invested at 5 per cent, would produce permanent annuities.
c Aggregate of future appropriation required, $6,000.
d Aggregate of future appropriation required, $30,000.

22849—08——10

**146**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Schedule showing each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| ARIZONA. | *Acres.* | |
| Camp McDowell............... (Under Phoenix School.) Tribe: Mohave Apache. | 24,971 | Executive order, Sept. 15, 1903; act of Apr. 21, 1904, vol. 33, p. 211.  (See An Rep. 1905, p. 98.) |
| Colorado River *............. (Under Colorado River School.) Tribes: Chemehuevi, Kawia, Cocopa, *d* Mohave. | *b c* 240,640 | Act of Mar. 3, 1865, vol. 13, p. 559; Executive orders, Nov. 22, 1873, Nov. 16, 1874, and May 15, 1876.  (See sec. 25, Indian appropriation act, approved Apr. 21, 1904, vol. 33, p. 224.) |
| Fort Apache................ (Under Fort Apache School.) Tribes: Chilion, Chiricahua, Coyotero, Mimbreño, and Mogollon Apache. | *b* 1,681,920 | Executive orders, Nov. 9, 1871, July 21, 1874, Apr. 27, 1876, Jan. 26 and Mar. 31, 1877; act of Feb. 20, 1893, vol. 27, p. 469; agreement made Feb. 25, 1896, approved by act of June 10, 1896, vol. 29, p. 358.  (See act of June 7, 1897, vol. 30, p. 64.) |
| Gila Bend................... (Under Pima School.) Tribe: Papago. | *c* 22,391 | Executive order, Dec. 12, 1882. |
| Gila River.................. (Under Pima School.) Tribes: Maricopa and Pima. | 357,120 | Act of Feb. 28, 1859, vol. 11, p. 401; Executive orders, Aug. 31 1876, Jan. 10, 1879, June 14, 1879, May 5, 1882, and Nov. 15, 1883. |
| Havasupai (Supai).......... (Under Havasupai School.) Tribe: Havasupai. | *b* 38,400 | Executive orders, June 8 and Nov. 23, 1880, and Mar. 31, 1882. |
| Hopi (Moqui)............... (Under Moqui School.) Tribe: Hopi (Moqui). | 2,472,320 | Executive order, Dec. 16, 1882. |
| Navaho *e*.................. (Under Moqui, Navaho, Western Navaho, and San Juan schools and farmer on Extension.) Tribe: Navaho. | 9,503,763 | Treaty of June 1, 1868, vol. 15, p. 667, and Executive orders, Oct. 29, 1878, Jan. 6, 1880, two of May 17, 1884, and Nov. 19, 1892.  1,769,600 acres in Arizona and 967,680 acres in Utah were added to this reservation by Executive order of May 17, 1884, and 46,080 acres in New Mexico restored to public domain, but again reserved by Executive orders, Apr. 24, 1886, Jan. 8, 1900, and Nov. 14, 1901.  Executive orders of Mar. 10, 1905, and May 15, 1905, 61,523 acres added to reservation. |
| Papago..................... (Under Papago farmer.) Tribe: Papago. | *c* 27,566 | Executive order, July 1, 1874, and act of Aug. 5, 1882, vol. 22, p. 299.  41,622.65 acres allotted to 291 Indians, and 14 acres reserved for school site, the residue, 27,566 acres, unallotted.  (See letter book 208, p. 408.) |
| Salt River................. (Under Pima School.) Tribes: Maricopa and Pima. | *f* 46,720 | Executive orders, June 14, 1879, and Sept. 15, 1903.  (See Senate Doc. 90, 58th Cong., 2d sess.) |
| San Carlos................. (Under San Carlos Agency.) Tribes: Arivaipa, Chilion, Chiricahua, Coyotero, Mimbreño, Mogollon, Mohave, Pinal, San Carlos, Tonto, and Yuma Apache. | *b* 1,834,240 | Executive orders, Nov. 9, 1871, Dec. 14, 1872, Aug. 5, 1873, July 21, 1874, Apr. 27, 1876, Oct. 30, 1876, Jan. 26 and Mar. 31, 1877; act of Feb. 20, 1893, vol. 27, p. 469; agreement made Feb. 25, 1896, approved by act of June 10, 1896, vol. 29, p. 358.  (For fuller text see Misc. Indian Doc., vol. 49, p. 159.)  (See act of June 7, 1897, vol. 30, p. 64; act of Mar. 2, 1901, vol. 31, p. 952.) |
| Walapai.................... (Under Truxton Cañon School.) Tribe: Walapai. | 730,880 | Executive order, Jan. 4, 1883. |
| Total.................. | 16,980,931 | |
| CALIFORNIA. | | |
| Digger..................... (Under a farmer.) Tribe: Digger. | 330 | Act of Mar. 3, 1893 (27 Stats., 612), provides for purchase of 330 acres: not allotted. |
| Hupa Valley............... (Under Hupa Valley School.) Tribes: Hunsatung, Hupa, Klamath River, Miskut, Redwood, Saiaz, Sermalton, and Tishtanatan. | *b f* 99,051 | Act of Apr. 8, 1864, vol. 13, p. 39; Executive orders, June 23, 1876, and Oct. 16, 1891.  There have been allotted to 639 Indians 29,143.38 acres, reserved to 3 villages 68.74 acres, and opened to settlement under act of June 17, 1892 (27 Stats., p. 52), 15,096.11 acres of land (formerly Klamath River Reservation).  Letter books 263, p. 96; 382, p. 480; 383, p. 170. |

*a* Partly in California.
*b* Out boundaries surveyed.
*c* Surveyed.
*d* Not on reservation.
*e* Partly in New Mexico.
*f* Partly surveyed.


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

CVWD 563-157

Case 5:13-cv-00883-JGB-SP Document 85-20 Filed 10/21/14 Page 184 of 212 Page ID #:4200

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment*—Continued.

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| **CALIFORNIA**—continued. | *Acres.* | |
| **Mission** (28 reserves) (Under Pala, Mesa Verde, and San Jacinto schools.) Tribes: Clear Lake, Concow, Kawia, San Luis Rey, Serranos, and Temecula. | 184,216 | Executive orders, Jan. 31, 1870, Dec. 27, 1875, May 15, 1876, May 3, Aug. 25, Sept. 29, 1877, Jan. 17, 1880, Mar. 2, Mar. 9, 1881, June 27, July 24, 1882, Feb. 5, June 19, 1883, Jan. 25, Mar. 22, 1886, Jan. 29, Mar. 14, 1887, and May 6, 1889. 270.24 acres allotted to 17 Indians and for church and cemetery purposes on Sycuan Reserve (letter book 303, p. 297), and 119.99 acres allotted to 15 Indians on Pala Reserve (letter book 303, p. 57), 1,299.47 acres allotted to 85 Temecula Indians, 2.70 acres reserved for school purposes (letter book 351, p. 312). Proclamations of President of Apr. 16, 1901, vol. 32, p. 1970, and May 29, 1902, vol. 32, p. 2005; act of Feb. 11, 1903, vol. 32, p. 822. Warner's ranch of 3,353 acres purchased. (See Authority 7971; also letter book 580, p. 113. Deed recorded in Misc. Record book No. 5, p. 193.) Area subject to change by additions under act of June 21, 1906 (34 Stat., 325–333, and act of Mar. 1, 1907 (34 Stats., 1015–1022). |
| **Round Valley** (Under Round Valley School.) Tribes: Clear Lake, Concow, Little Lake, Nomelaki, Pit River, Potter Valley, Redwood, Wailaki, and Yuki. | a 32,282 | Acts of Apr. 8, 1864, vol. 13, p. 39, and Mar. 3, 1873, vol. 17, p. 634: Executive orders, Mar. 30, 1870, Apr. 8, 1873, May 18, 1875, and July 26, 1876: act of Oct. 1, 1890, vol. 26, p. 658. 5,408.72 acres allotted to 619 Indians, 180 acres reserved for school purposes, 3 acres for mission, 10.43 acres for cemetery, 177.13 acres for agency purposes: the residue, 32,282 acres, unallotted and unreserved. (Letter books 298, p. 17, and 395, p. 260.) (See act of Feb. 8, 1905, providing for a reduction of area of reservation, vol. 33, p. 706.) |
| **Tule River** (Under San Jacinto School.) Tribes: Kawia, c Kings River, Moache, Tehon, Tule, and Wichumni. c | b 48,551 | Executive orders, Jan. 9 and Oct. 3, 1873, and Aug. 3, 1878. |
| **Yuma** (Under Fort Yuma School.) Tribe: Yuma-Apache. | a 45,889 | Executive order, Jan. 9, 1884: agreement, Dec. 4, 1893, ratified by act of Aug. 15, 1894, vol. 28, p. 332. (See sec. 25 Indian appropriation act, approved Apr. 21, 1904, vol. 33, p. 224.) |
| Total d | 410,319 | |
| **COLORADO.** | | |
| **Ute** d (Under Fort Lewis and Southern Ute schools.) Tribe: Capote, Moache, and Wiminuche Ute. | 483,750 | Treaties of Oct. 7, 1863, vol. 13, p. 673, and Mar. 2, 1868, vol. 15, p. 619, act of Apr. 29, 1874, vol. 18, p. 36: Executive orders, Nov. 22, 1875, Aug. 17, 1876, Feb. 7, 1879, and Aug. 4, 1882, and act of Congress approved June 15, 1880, vol. 21, p. 199, and July 28, 1882, vol. 22, p. 178, May 14, 1884, vol. 23, p. 22, Aug. 15, 1894, vol. 28, p. 337, Feb. 20, 1895, vol. 28, p. 677. 65,450.33 acres allotted to 332 Indians and 360 acres reserved for use of Government (letter book 321, p. 80); also 7,360.32 acres allotted to 39 Indians (letter book 331, p. 395). 523,079 acres opened to settlement by President's proclamation dated Apr. 13, 1899. The residue, 483,750 acres, retained as a reservation for the Wiminuche Utes. |
| Total | 483,750 | |
| **IDAHO.** | | |
| **Cœur d'Alène** (Under superintendent.) Tribes: Cœur d'Alène, Kutenai, a Pend d'Oreille, c and Spokan. c | b c 404,480 | Executive orders, June 14, 1867, and Nov. 8, 1873: agreements made Mar. 26, 1887, and Sept. 9, 1889, and confirmed in Indian appropriation act approved Mar. 3, 1891, vol. 26, pp. 1026, 1029. Agreement, Feb. 7, 1894, ratified by act of Aug. 15, 1894, vol. 28, p. 322. |
| **Fort Hall** (Under Fort Hall School.) Tribes: Bannock and Shoshoni. | b c 447,940 | Treaty of July 3, 1868, vol. 15, p. 673: Executive orders June 14, 1867, and July 30, 1869: agreement with Indians made July 18, 1881, and approved by Congress July 3, 1882, vol. 22, p. 148; acts of Sept. 1, 1888, vol. 25, p. 452, Feb. 23, 1889, vol. 25, p. 687, and Mar. 3, 1891, vol. 26, p. 1011. Agreement made Feb. 5, 1898, ratified by act of June 6, 1900, vol. 31, p. 672, ceding 416,060 acres, of which 6,172.44 acres have been allotted to 90 Indians (see L. B. 527, p. 478); remainder of ceded tract opened to settlement June 17, 1902 (President's proclamation of May 7, 1902, vol. 32, p. 1997), act of Mar. 30, 1904, vol. 33, p. 153. |

a Surveyed.
b Outboundaries surveyed.
c Not on reservation.

d Partly in New Mexico.
e Partly surveyed

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

CVWD 563-158

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 185 of 212   Page ID #:4201

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| IDAHO—continued. | *Acres.* | |
| Lapwai................. (Under Fort Lapwai School.) Tribe: Nez Percé. | .......... | Treaty of June 9, 1863, vol. 14, p. 647; agreement of May 27, 1887, ratified by act of Sept. 1, 1888, vol. 25, p. 452; agreement, May 1, 1893, ratified by act of Aug. 15, 1894, vol. 28, p. 326.  180,370.09 acres allotted to 1,895 Indians, 2,170.47 acres reserved for agency, school, mission, and cemetery purposes, and 32,020 acres of timber land reserved for the tribe; the remainder restored to public settlement. (President's proclamation, Nov. 8, 1895, vol. 29, p. 873.) |
| Lemhi................. (Under custodian.) | *b* 64,000 | Unratified treaty of Sept. 24, 1868, and Executive order Feb. 12, 1875; agreement of May 14, 1880, ratified by act of Feb. 23, 1889, vol. 25, p. 687.  See 34 Stat. L., 335, and agreement executed Dec. 28, 1905, approved by President Jan. 27, 1906. |
| Total................. | 916,420 | |
| INDIAN TERRITORY. | | |
| Cherokee................. (Under Union Agency.) Tribe: Cherokee. | *a* 877,229 | Treaties of Feb. 14, 1833, vol. 7, p. 414, Dec. 29, 1835, vol. 7, p. 478, and July 19, 1866, vol. 14, p. 799; agreement of Dec. 19, 1891, ratified by tenth section of act of Mar. 3, 1893, vol. 27, p. 640; agreement ratified by act of July 1, 1902, vol. 32, p. 716.   Lands now in process of allotment. |
| Chickasaw................. (Under Union Agency.) Tribe: Chickasaw. | *a c* 1,690,964 | Treaty of June 22, 1855, vol. 11, p. 611; agreement of Apr. 23, 1897, ratified by act of June 28, 1898, vol. 30, p. 505; act of July 1, 1902, vol. 32, p. 641, ratifying agreement of Mar. 21, 1902; act of Apr. 21, 1904, vol. 33, p. 209; act of Apr. 28, 1904, vol. 33, p. 544.   Lands now in process of allotment. |
| Choctaw................. (Under Union Agency.) Tribe: Choctaw. | *c* 3,505,766 | Treaty of June 22, 1855, vol. 11, p. 611.   Same as Chickasaw. |
| Creek................. (Under Union Agency.) Tribe: Creek. | 626,044 | Treaties of Feb. 14, 1833, vol. 7, p. 417, and June 14, 1866 vol. 14, p. 785, and deficiency appropriation act of Aug. 5, 1882, vol. 22, p. 265.   (See Annual Report, 1882, p. LIV.)  Agreement of Jan. 19, 1889, ratified by act of Mar. 1, 1889, vol. 25, p. 757; President's proclamation Mar. 23, 1889, vol. 26, p. 1544; agreement of Sept. 27, 1897, ratified by act of June 28, 1898, vol. 30, p. 514; agreement of Mar. 8, 1900, ratified by act of Mar. 1, 1901, vol. 31, p. 861; President's proclamation of June 25, 1901, vol. 32, p. 1971; agreement of Feb. —, 1902, ratified by act of June 30, 1902, vol. 32, p. 500; President's proclamation of Aug. 8, 1902, vol. 32, p. 2021.   (See act of May 27, 1902, vol. 32, p. 258; act of Apr. 21, 1904, vol. 33, p. 204.)   Lands now in process of allotment. |
| Modoc................. (Under Seneca School.) Tribe: Modoc. | .......... | Agreement with Eastern Shawnees made June 23, 1874 (see Annual Report, 1882, p. 271), and confirmed in Indian appropriation act approved Mar. 3, 1875, vol. 18, p. 447.  Lands all allotted—3,976 acres allotted to 68 Indians, 8 acres reserved for church and cemetery purposes, 2 acres for school, and 24 acres for timber.   (Letter book 220, p. 102.) |
| Ottawa................. (Under Seneca School.) Tribe: Ottawa of Blanchards Fork and Roche de Bœuf. | *a* 1,587 | Treaty of Feb. 23, 1867, vol. 15, p. 513; 12,714.80 acres were allotted to 157 Indians; 557.95 acres were authorized to be sold by act of Mar. 3, 1891 (vol. 26, p. 989).   The residue, 1,587.25 acres, unallotted (letter book 229, p. 115). |
| Peoria................. (Under Seneca School.) Tribes: Kaskaskia, Miami, Peoria, Piankashaw, and Wea. | .......... | Treaty of Feb. 23, 1867, vol. 15, p. 513.   43,450 acres allotted to 218 Indians.   The residue, 6,313.27 acres, sold under act of May 27, 1902 (32 Stats., 245). |
| Quapaw................. (Under Seneca School.) Tribe: Quapaw. | .......... | Treaties of May 13, 1833, vol. 7, p. 424, and of Feb. 23, 1867, vol. 15, p. 513.   56,245.21 acres allotted to 247 Indians, 400 acres reserved for school and 40 acres for church purposes (letter book 335, p. 326).   Agreement of Mar. 23, 1893, ratified in Indian appropriation act approved Mar. 2, 1895, vol. 28, p. 907.   Agreement of Jan. 2, 1899, ratified in Indian appropriation act approved Mar. 3, 1901, vol. 31, p. 1067.   Act of Mar. 3, 1903, vol. 32, p. 997. |

*a* Surveyed.
*b* Outboundaries surveyed.
*c* The reestablishment of the true meridian, by the resurvey of the ninety-eighth meridian west will increase the area of the Choctaw and Chickasaw lands by 55,755.65 acres, or 87 square miles.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google


Digitized by Google        Original from
UNIVERSITY OF MICHIGAN

CVWD 563-159

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 186 of 212   Page ID #:4202

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment*—Continued.

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| **INDIAN TERRITORY**—cont'd. | *Acres.* | |
| Seminole.................... (Under Union Agency.) Tribe: Seminole. | *a* 21,374 | Treaty of Mar. 21, 1866, vol. 14, p. 755. (See Creek agreement, Feb. 14, 1881, Annual Report, 1882, p. LIV, and deficiency act of Aug. 5, 1882, vol. 22, p. 265.) Agreement of Mar. 16, 1889. · (See Indian appropriation act approved Mar. 2, 1889.) Agreement recorded in treaty book, vol. 3, p. 35. Agreement made Dec. 16, 1897, ratified by act of July 1, 1898, vol. 30, p. 567. Agreement of Oct. 7, 1899 ratified by act of June 2, 1900, vol. 31, p. 250. |
| Seneca..................... (Under Seneca School.) Tribe: Seneca. | ............. | Treaties of Feb. 28, 1831, vol. 7, p. 348; of Dec. 29, 1832, vol. 7, p. 411, and of Feb. 23, 1867, vol. 15, p. 513. 25,821.55 acres allotted to 302 Indians; 104.22 acres reserved for Government, church, and school purposes. Agreement of Dec. 2, 1901, ratified by act of May 27, 1902, vol. 32, p. 262. |
| Shawnee.................... (Under Seneca School.) Tribes: Seneca and Eastern Shawnee. | ............. | Treaties of July 20, 1831, vol. 7, p. 351; of Dec. 29, 1832, vol. 7, p. 411; of Feb. 23, 1867, vol. 15, p. 513, and agreement with Modocs, made June 23, 1874 (see Annual Report, 1882, p. 271), confirmed by Congress in Indian appropriation act approved Mar. 3, 1875, vol. 18, p. 447. 10,484.81 acres allotted to 84 Indians; 86 acres reserved for agency purposes (letter books 208, p. 266, and 233, p. 207); the residue, 2,543 acres, sold (agreement of Dec. 2, 1901, ratified by act of May 27, 1902, vol. 32, p. 262). |
| Wyandot.................... (Under Seneca School.) Tribe: Wyandot. | *a* 535 | Treaty of Feb. 23, 1867, vol. 15, p. 513. 20,695.54 acres allotted to 241 Indians, 16 acres to churches, etc., leaving 534.72 acres unallotted (letter book 228, p. 332). |
| Total................ | 6,723,499 | |
| **IOWA.** | | |
| Sauk and Fox............... (Under Sauk and Fox School.) Tribes: P o t a w a t o m i, Saux and Fox of the Mississippi, and Winnebago. | 2,965 | By purchase. (See act of Mar. 2, 1867, vol. 14, p. 507.) Deeds 1857, 1865, 1867, 1868, 1869, 1876, 1880, 1882, 1883, 1888, June, July, and Oct. 1892-1896 (see act of Feb. 13, 1891, vol. 26, p. 749). (See Annual Reports, 1891, p. 681; 1896, p. 81.) |
| Total................ | 2,965 | |
| **KANSAS.** | | |
| Chippewa and Munsee.......... (U n d e r  P o t a w a t o m i School.) Tribes: Chippewa and Munsee. | ............. | Treaty of July 16, 1859, vol. 12, p. 1105. 4,195.31 acres allotted to 100 Indians; the residue, 200 acres, allotted for missionary and school purposes. Patents issued to allottees; balance of allotments sold and proceeds paid to heirs (See ninth section.) Act of June 7, 1897, vol. 30, p. 92. |
| Iowa *b* ................... (Under Kickapoo School.) Tribe: Iowa. | ............. | Treaties of May 17, 1854, vol. 10, p. 1069, and of Mar. 6, 1861, vol. 12, p. 1171. 11,768.77 acres of land allotted to 143 Indians; 162 acres reserved for school and cemetery purposes (letter book 266, p. 86). |
| Kickapoo.................... (Under Kickapoo School.) Tribe: Kickapoo. | 398 | Treaty of June 28, 1862, vol. 13, p. 623. 18,619 acres allotted to 233 Indians; 120 acres reserved for church and school; the residue, 398.87 acres, unallotted (letter books 304 p. 480, and 772, p. 54). Acts of Feb. 28, 1899, vol. 30, p. 909, and Mar. 3, 1903, vol. 32, p. 1007. |
| Potawatomi.................. (Under P o t a w a t o m i School.) Tribe: Prairie band of Potawatomi. | *c* 500 | Treaties of June 5, 1846, vol. 9, p. 853; of Nov. 15, 1861 vol. 12, p. 1191; treaty of relinquishment, Feb. 27, 1867, vol. 15, p. 531. 76,536.36 acres allotted to 811 Indians; 319 acres reserved for school and agency, and 1 acre for church; the residue, 500.62 acres, unallotted (letter book 238, p. 228; 259, p. 437; 303, p. 301; 685, p. 202, and 825, p. 167). Acts of Feb. 28, 1899, vol. 30, p. 909, and Mar. 3, 1903 vol. 32, p. 1007. |
| Sauk and Fox *b* ........... (Under Kickapoo School.) Tribe: Sauk and Fox of the Missouri. | 24 | Treaties of May 18, 1854, vol. 10, p. 1074, and of Mar. 6, 1861, vol. 12, p. 1171; acts of June 10, 1872, vol. 17, p. 391, and Aug. 15, 1876, vol. 19, p. 208. 2,843.97 acres in Kansas 4,194.33 acres in Nebraska, aggregating 7,038.30 acres, allotted to 84 Indians, and underact June 21, 1906 (34 Stats., 324-349) 960.91 acres were allotted to 37 Indians, leaving 24.03 acres unallotted (letter books 233, p. 361; 383, p. 37 and 512, p. 110). |
| Total................ | 922 | |

*a* Outboundaries surveyed.        *c* Surveyed.
*b* In Kansas and Nebraska.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT / https://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google        Original from UNIVERSITY OF MICHIGAN

CVWD 563-160

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 187 of 212   Page ID #:4203

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| **MICHIGAN.** | *Acres.* | |
| Isabella a ................... (Under special agent.) Tribe: Chippewa of Saginaw, Swan Creek, and Black River. | 2,373 | Executive order, May 14, 1855; treaties of Aug. 2, 1855, vol. 11, p. 633, and of Oct. 18, 1864, vol. 14, p. 657. 96,213 acres allotted to 1,834 Indians. |
| L'Anse ................... (Under special agent.) Tribe: L'Anse and Vieux Désert bands of Chippewa of Lake Superior. | b 1,029 | Treaty of Sept. 30, 1854, vol. 10, p. 1109. 51,453 acres allotted to 645 Indians; the residue, 1,029 acres, unallotted. |
| Ontonagon ................... (Under special agent.) Tribe: Ontonagon band of Chippewa of Lake Superior. | ........... | Sixth clause, second article, treaty of Sept. 30, 1854, vol. 10, p. 1109; Executive order, Sept. 25, 1855. 2,561.35 acres allotted to 36 Indians. |
| Total ................... | 3,402 | |
| **MINNESOTA.** | | |
| Bois Fort ................... (Under La Pointe Agency.) Tribe: Bois Fort Chippewa. | ........... | Treaty of Apr. 7, 1866, vol. 14, p. 765; act of Jan. 14, 1889, vol. 25, p. 642. (See H. R. Ex. Doc. No. 247, 51st Cong., 1st sess., p. 63.) 55,211.79 acres allotted to 603 Indians and 434.63 acres reserved for agency, etc., purposes. (L. B. 359, 382); residue, 51,863 acres, to be opened to public settlement. |
| Deer Creek ................... (Under La Pointe Agency.) Tribe: Bois Fort Chippewa. | ........... | Executive order, June 30, 1883; act of Jan. 14, 1889, vol. 25, p. 642. (See H. R. Ex. Doc. No. 247, 51st Cong. 1st sess., p. 63.) 295.55 acres allotted to 4 Indians; residue, 22,744 acres, to be opened to public settlement. (Executive order of Dec. 21, 1858.) |
| Fond du Lac ................... (Under La Pointe Agency.) Tribe: Fond du Lac band of Chippewa of Lake Superior. | ........... | Treaty of Sept. 30, 1854, vol. 10, p. 1109; act of May 26, 1872, vol. 17, p. 190. 23,283.61 acres allotted to 351 Indians; act of Jan. 14, 1889, vol. 25, p. 642. (See H. R. Ex. Doc. No. 247, 51st Cong., 1st sess., p. 60.) The residue, 76,837 acres, restored to settlement. Agreement of Nov. 21, 1889. (See act of Jan. 14, 1889, vol 25, p. 642.) |
| Grand Portage (Pigeon River). b (Under La Pointe Agency.) Tribe: Grand Portage band of Chippewa of Lake Superior. | ........... | Treaty of Sept. 30, 1854, vol. 10, p. 1109; act of Jan. 14, 1889, vol. 25, p. 642. (See H. R. Ex. Doc. No. 247, 51st Cong., 1st sess., p. 59.) 24,191.31 acres allotted to 304 Indians; 208.24 acres reserved for agency and wood purposes; residue, 16,041.97 acres, to be opened to public settlement. |
| Leech Lake b ................... (Under Leech Lake Agency.) Tribes: Cass Lake, Pillager, and Lake Winibigoshish bands of Chippewa. | ........... | Treaty of Feb. 22, 1855, vol. 10, p. 1165; Executive orders, Nov. 4, 1873, and May 26, 1874; act of Jan 14, 1889, vol. 25, p. 642. (See H. R. Ex. Doc. No. 247, 51st Cong., 1st sess., p. 49.) 37,683.06 acres allotted to 536 Indians and 321.60 acres reserved for agency and school purposes; 1,381.21 acres allotted to 17 Cass Lake Indians; residue, 55,054 acres, to be opened to public settlement. (Act of June 27, 1902, vol. 32, p. 402.) |
| Mdewakanton ................... Tribe: Mdewakanton Sioux. | ........... | By purchase. (See acts of July 4, 1884, Mar. 3, 1885, May 15, 1886, June 29, 1888, Mar. 2, 1889, and Aug. 19, 1890.) 339.70 acres deeded to 47 Indians; 12,242.76 acres allotted to 88 Indians and held in trust by the United States, 8.90 acres reserved for school. (See Annual Report, 1891, pp. 111 and 179, and Sched. approved Nov. 21, 1904.) |
| Mille Lac ................... (Under White Earth School.) Tribe: Mille Lac and Snake River band of Chippewa. | c 61,014 | Treaties of Feb. 22, 1855, vol. 10, p. 1165, and article 12, of May 7, 1864, vol. 13, pp. 693, 695; act of Jan. 14, 1889, vol. 25, p. 642. (See H. R. Ex. Doc. No. 247, 51st Cong., 1st sess., p. 45.) Joint resolution (No. 5), Dec. 19, 1893, vol. 28, p. 576, and joint resolution (No. 40) approved May 27, 1898, vol. 30, p. 745. |
| Red Lake ................... (Under Red Lake School.) Tribe: Red Lake and Pembina bands of Chippewa. | 543,528 | Treaty of Oct. 2, 1863, vol. 13, p. 667; act of Jan. 14, 1889, vol. 25, p. 642. (See agreement July 8, 1889, H. R. Ex. Doc. No. 247, 51st Cong., 1st sess., pp. 27 and 32), and Executive order, Nov. 21, 1892. Act of Mar. 3, 1903. vol. 32, p. 1009, and act of Feb. 20, 1904, ratifying agreement made Mar. 10, 1902, vol. 33, p. 46, for sale of 256,152 acres. Act of Feb. 8, 1905, vol. 33, p. 708, granting 320 acres as a right of way for the Minneapolis, Red Lake and Manitoba Rwy. Co. |

a Agency abolished June 30, 1889.
b Surveyed.
c These lands have been ceded by the Indians to the Government, but are not yet open to sale or settlement.  See pp. XXXVIII and XLIII of Annual Report, 1890.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-161

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 188 of 212   Page ID #:4204

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment*—Continued.

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| **MINNESOTA**—continued. | *Acres.* | |
| Vermillion Lake ............. (Under La Pointe Agency.) Tribe: Bois Fort Chippewa. | a 1,080 | Executive order, Dec. 20, 1881, act of Jan. 14, 1889, vol. 25, p. 642. |
| White Earth .................. (Under White Earth School.) Tribes: Chippewa of the Mississippi; Pembina, and Pillager Chippewa. | 97,512 | Treaty of Mar. 19, 1867, vol. 16, p. 719.  Executive orders, Mar. 18, 1879, and July 13, 1883; act of Jan. 14, 1889, vol. 25, p. 642.  (See agreement July 29, 1889, H. R. Ex. Doc. No. 247, 51st Cong., 1st sess., pp. 34 and 36.)  Act of Apr. 28, 1904, vol. 33, p. 539.  362,593.15 acres allotted to 4,272 Indians and 1,899.61 acres reserved for agency, school, and religious purposes.  Under act of Apr. 28, 1904 (33 Stat., 539), 204,530.90 acres were allotted to 2,657 Mississippi and Otter Tail Pillager Chippewa, and under act of Jan. 14, 1889 (25 Stat., 642), 39,022.91 acres were allotted to 501 White Earth Chippewa, leaving unallotted and unreserved, 97,512.19 acres.  Lands now in process of allotment. |
| White Oak Point and Chippewa. (Under Leech Lake Agency.) Tribes: Lake Winnibigoshish and Pillager bands of Chippewa and White Oak Point band of Mississippi Chippewa. | .......... | Treaties of Feb. 22, 1855, vol. 10, p. 1165, and of Mar. 19, 1867, vol. 16, p. 719; Executive orders, Oct. 29, 1873, and May 26, 1874; act of Jan. 14, 1889, vol. 25, p. 742.  (See H. R. Ex. Doc. No. 247, 51st Cong., 1st sess., pp. 42, 49.)  14,389.73 acres allotted to 180 Lake Winnibigoshish Indians; the residue, 112,663.01 acres, of Lake Winnibigoshish Reserve to be opened to public settlement; 38,090.22 acres allotted to 479 Chippewa Indians (L. B. 359, p. 340).  Residue, 154,855 acres, restored to public domain. |
| Total .................. | 703,134 | |
| **MONTANA.** | | |
| Blackfeet .................... (Under Blackfeet Agency.) Tribes: Blackfeet, Blood, and Piegan. | 959,644 | Treaty of Oct. 17, 1855, vol. 11, p. 657; unratified treaties of July 18, 1866, and of July 13 and 15 and Sept. 1, 1868; Executive orders, July 5, 1873, and Aug. 19, 1874; act of Apr. 15, 1874, vol. 18, p. 28; Executive orders, Apr. 13, 1875, and July 13, 1880, and agreement made Feb. 11, 1887, approved by Congress May 1, 1888, vol. 25, p. 129; agreement made Sept. 26, 1895, approved by act of June 10, 1896, vol. 29, p. 353; act of Feb. 27, 1905, confirming grant of 356.11 acres of land and 120 acres of unsurveyed land.  (See vol. 33, p. 816.)  Lands now in process of allotment. |
| Crow ........................ (Under Crow Agency.) Tribes: Mountain and River Crow. | ab 1,844,182 | Treaty of May 7, 1868, vol. 15, p. 649; agreement made June 12, 1880, and approved by Congress Apr. 11, 1882, vol. 22, p. 42, and agreement made Aug. 22, 1881, approved by Congress July 10, 1882, vol. 22, p. 157; Executive orders, Oct. 20, 1875, Mar. 8, 1876, Dec. 7, 1886; agreement made Dec. 8, 1890; ratified and confirmed in Indian appropriation act approved Mar. 3, 1891, vol. 26, pp. 1039–1040; agreement made Aug. 27, 1892.  (See Annual Report, 1892, p. 748; also President's proclamation, Oct. 15, 1892, vol. 27, p. 1034.)  Act of Apr. 27, 1904, vol. 33, p. 352, to amend and ratify agreement of Aug. 14, 1899.  Under act Feb. 8, 1887 (24 Stat., 388), and act Feb. 28, 1891 (26 Stat., 794), and Executive order, June 8, 1901 (modifying Executive order of Mar. 25, 1901), 447,914.90 acres have been allotted to 2,272 Indians, and 1,822.61 acres reserved for administration, church, and cemetery purposes, leaving unallotted and unreserved 1,844,182.49 acres, and 14,711.96 acres on ceded part have been allotted to 81 Indians.  (See L. B., 743, p. 50; 852, p. 160, and 956, p. 416.) |
| Fort Belknap ................ (Under Fort Belknap School.) Tribes: Grosventre and Assiniboin. | 497,600 | Treaty of Oct. 17, 1855, vol. 11, p. 657; unratified treaties of July 18, 1866, and of July 13 and 15 and Sept. 1, 1868; Executive orders, July 5, 1873, and Aug. 19, 1874; act of Apr. 15, 1874, vol. 18, p. 28; Executive orders, Apr. 13, 1875, and July 13, 1880, and agreement made Jan. 21, 1887, approved by Congress May 1, 1888, vol. 25, p. 124; agreement made Oct. 9, 1895, approved by act of June 10, 1896, vol. 29, p. 350. |
| Fort Peck .................... (Under Fort Peck School.) Tribes: Assiniboin, Brulé, Santee, Teton, Hunkpapa, and Yanktonai Sioux. | 1,776,000 | Treaty of Oct. 17, 1855, vol. 11, p. 657; unratified treaties of July 18, 1866, and of July 13 and 15 and of Sept. 1, 1868; Executive orders, July 5, 1873, and Aug. 19, 1874; act of Apr. 15, 1874, vol. 18, p. 28; Executive orders, Apr. 13, 1875, and July 13, 1880; and agreement made Dec. 28, 1886, approved by Congress May 1, 1888, vol. 25, p. 113. |
| Jocko ........................ (Under Flathead Agency.) Tribes: Bitter Root, Carlos band, Flathead, Kutenai, Lower Kalispel, and Pend d'Oreille. | a 1,433,600 | Treaty of July 16, 1855, vol. 12, p. 975; act of Apr. 23, 1904, vol. 33, p. 302.  Lands now in process of allotment. |

a Outboundaries surveyed.                b Partly surveyed.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

CVWD 563-162

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

**152**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| MONTANA—continued. | *Acres.* | |
| Northern Cheyenne.......... (Under Tongue River School.) Tribe: Northern Cheyenne. | a 489,500 | Executive orders, Nov. 26, 1884, and Mar. 19, 1900; act of Mar. 3, 1903, vol. 32, p. 1000. |
| Total.................. | 7,000,526 | |
| NEBRASKA. | | |
| Niobrara................... (Under Santee School.) Tribe: Santee Sioux. | | Act of Mar. 3, 1863, vol. 12, p. 819, 4th paragraph, art. 6; treaty of Apr. 29, 1868, vol. 15, p. 637; Executive orders, Feb. 27, July 20, 1866, Nov. 16, 1867, Aug. 31, 1869, Dec. 31, 1873, and Feb. 9, 1885.  32,875.75 acres selected as homesteads, 38,908.01 acres selected as allotments, and 1,130.70 acres selected for agency, school, and mission purposes; unratified agreement of Oct. 17, 1882.  (For modification see sundry civil appropriation act approved Mar. 3, 1883, vol. 22, p. 624.  For text see misc. Indian doc., vol. 14, p. 305.)  Act of Apr. 30, 1888, vol. 25, p. 94, not accepted. |
| Omaha..................... (Under Omaha School.) Tribe: Omaha. | b 12,421 | Treaty of Mar. 16, 1854, vol. 10, p. 1043; selection by Indians with President's approval, May 11, 1855; treaty of Mar. 6, 1865, vol. 14, p. 667; acts of June 10, 1872, vol. 17, p. 391, and of June 22, 1874, vol. 18, p. 170; deed to Winnebago Indians dated July 31, 1874; act of Aug. 7, 1882, vol. 22, p. 341, act of Mar. 3, 1893 (27 Stats., p. 612); 129,470 acres allotted to 1,577 Indians; the residue, 12,421 acres, unallotted. |
| Ponca..................... (Under Santee School.) Tribe: Ponca. | | Treaty of Mar. 12, 1858, vol. 12, p. 997, and supplemental treaty, Mar. 10, 1865, vol. 14, p. 675; act of Mar. 2, 1889, sec. 13, vol. 25, p. 892.  27,202.08 acres allotted to 167 Indians; 160 acres reserved and occupied by agency and school buildings.  (See letter book 205, p. 339; also President's proclamation, Oct. 23, 1890, vol. 26, p. 1559.) |
| Sioux (additional).......... (Under Pine Ridge Agency.) Tribe: Oglala Sioux. | 640 | Executive order, Jan. 24, 1882. |
| Winnebago................. (Under Winnebago School.) Tribe: Winnebago. | b 1,711 | Act of Feb. 21, 1863, vol. 12, p. 658; treaty of Mar. 8, 1865, vol. 14, p. 671; act of June 22, 1874, vol. 18, p. 170; deed from Omaha Indians, dated July 31, 1874.  (See vol. 6, Indian deeds, p. 215.)  106,040.82 acres allotted to 1,200 Indians; 480 acres reserved for agency, etc.; the residue, 1,710.80 acres, unallotted. |
| Total.................. | 14,772 | |
| NEVADA. | | |
| Duck Valley c............... (Under Western Shoshoni School.) Tribes: Paiute and Western Shoshoni. | d 312,320 | Executive orders, Apr. 16, 1877, and May 4, 1886. |
| Moapa River............... (Under Moapa farmer.) Tribes: Chemehuevi, Kaibab, Pawipit, Pai-Ute and Shiwwits. | d 1,000 | Executive orders, Mar. 12, 1873, and Feb. 12, 1874; act of Mar. 13, 1875, vol. 18, p. 445, selection approved by Secretary of the Interior, July 3, 1875; Executive order of July 31, 1903. |
| Pyramid Lake.............. (Under Nevada School.) Tribe: Paiute. | d 322,000 | Executive order, Mar. 23, 1874.  (See sec. 26, Indian appropriation act, approved Apr. 20, 1904, vol. 33, p. 225.) |
| Walker River.............. (Under Carson School.) Tribe: Paiute. | | Executive order, Mar. 19, 1874; joint resolution of June 19, 1902, vol. 32, p. 744; act of May 27, 1902 (32 Stat., pp. 245-260); act of Mar. 3, 1903, vol. 32, pp. 982-997; act of June 21, 1906, vol. 34, p. 325; proclamation of President, Sept. 26, 1906, opening ceded part to settlement.  It contains 268,005.84 acres, leaving in diminished reserve 50,809.16 acres.  Allotted to 492 Indians, 9,783.25 acres; reserved for agency and school, 80 acres; reserved for cemetery, 40 acres; reserved for grazing, 37,390.29 acres; reserved for timber, 3,355.62 acres; reserved for church purposes, 160 acres.  (L. B. 885, p. 187.)  Subject to disposition under President's proclamation, 208,005.84 acres. |
| Total.................. | 635,320 | |

a Partly surveyed.     b Surveyed.     c Partly in Idaho.     d Outboundaries surveyed.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-163

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 190 of 212   Page ID #:4206

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment*—Continued.

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| **NEW MEXICO.** | *Acres.* | |
| Jicarilla Apache.................. (Under Jicarilla School.) Tribe: Jicarilla Apache. | a 286,400 | Executive orders, Mar. 25, 1874, July 18, 1876, Sept. 21, 1880, May 15, 1884, and Feb. 11, 1887.   129,313.35 acres allotted to 845 Indians, and 280.44 acres reserved for mission, school, and agency purposes.  (L. B. 335, p. 323.)  The residue, 286,400 acres, unallotted.  Lands now in process of allotment. |
| Mescalero Apache............... (Under Mescalero School.) Tribes:  Mescalero and Mimbreño Apache. | b 474,240 | Executive orders, May 29, 1873, Feb. 2, 1874, Oct. 20, 1875, May 19, 1882, and Mar. 24, 1883. |
| Pueblo: (Under Santa Fe and Albuquerque schools.) Tribe: Pueblo— | | |
| Jemez................. | b 17,510 | |
| Acoma................. | b 95,792 | |
| San Juan............. | b 17,545 | |
| Picuris.............. | b 17,461 | |
| San Felipe........... | b 34,767 | |
| Pecos................ | b 18,763 | Confirmed by United States patents in 1864, under old Spanish grants; acts of Dec. 22, 1858, vol. 11, p. 374, and June 21, 1860, vol. 12, p. 71.  (See General Land Office Report for 1876, p. 242, and for 1880, p. 658.)  See Executive orders of June 13 and September 4, 1902, setting apart additional lands for San Felipe and Nambe Pueblos, and Executive order of July 29, 1905, setting apart additional lands for Santa Clara Pueblo. |
| Cochiti.............. | b 24,256 | |
| Santo Domingo........ | b 74,743 | |
| Taos................. | b 17,361 | |
| Santa Clara.......... | b 49,369 | |
| Tesuque.............. | b 17,471 | |
| St. Ildefonso........ | b 17,293 | |
| Pojoaque............. | b 13,520 | |
| Sia.................. | b 17,515 | |
| Sandia............... | b 24,187 | |
| Isleta............... | b 110,080 | |
| Nambe................ | b 13,586 | |
| Laguna............... | b 125,225 | |
| Santa Ana............ | b 17,361 | |
| Zuñi..................... (Under Zuñi School.) Tribe: Zuñi Pueblo: | b 215,040 | Executive orders, Mar. 16, 1877, May 1, 1883, and Mar. 3, 1885.  (Area of original Spanish grant, 17,581.25 acres.) |
| Total.................. | 1,699,485 | |
| **NEW YORK.** | | |
| Allegany................... (Under New York Agency.) Tribes:  Onondaga and Seneca. | c 30,469 | Treaties of Sept. 15, 1797, vol. 7, p. 601, and of May 20, 1842, vol. 7, p. 587. |
| Cattaraugus............... (Under New York Agency.) Tribes:  Cayuga, Onondaga, and Seneca. | c 21,680 | Treaties of Sept. 15, 1797, vol. 7, p. 601, June 30, 1802, vol. 7, p. 70, and of May 20, 1842, vol. 7, p. 587.  (See annual report, 1877, p. 164.) |
| Oil Spring............... (Under New York Agency.) Tribe: Seneca. | c 640 | By arrangement with the State of New York.  (See annual report, 1877, p. 166.)  Seneca agreement of Jan. 3, 1893, ratified by act of Feb. 20, 1893, vol. 27, p. 470; act of June 7, 1897, vol. 30, p. 89. |
| Oneida................... (Under New York Agency.) Tribe: Oneida. | c 350 | Treaty of Nov. 11, 1794, vol. 7, p. 44. and arrangement with the State of New York.  (See annual report, 1877, p. 168.) |
| Onondaga................. (Under New York Agency.) Tribes: Oneida, Onondaga, and St. Regis. | 6,100 | Do. |
| St. Regis................ (Under New York Agency.) Tribe: St. Regis. | 14,640 | Treaty of May 13, 1796, vol. 7, p. 55.  (See annual report, 1877, p. 168.)  They hold about 24,250 acres in Canada. |
| Tonawanda................ (Under New York Agency.) Tribes: Cayuga and Tonawanda bands of Seneca. | a 7,549 | Treaties of Sept. 15, 1797, vol. 7, p. 601, and Nov. 5, 1857, vol. 12, p. 991; purchased by the Indians and held in trust by the comptroller of New York; deed dated Feb. 14, 1862  (See also annual report, 1877, p. 165.) |
| Tuscarora................ (Under New York Agency.) Tribes: Onondaga and Tuscarora. | 6,249 | Treaty of Jan. 15, 1838, vol. 7, p. 551, and arrangement (grant and purchase) between the Indians and the Holland Land Co.  (See annual report, 1877, p. 167.) |
| Total.................. | 87,677 | |

a Surveyed.          b Outboundaries surveyed.          c Partly surveyed.

Generated for guest (Library of Congress) on 2013-08-20 19:49 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from UNIVERSITY OF MICHIGAN

CVWD 563-164

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 191 of 212   Page ID #:4207

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment*—Continued.

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| | *Acres.* | |
| NORTH CAROLINA. | | Held by deed to Indians under decision of United States circuit court for western district of North Carolina, entered at November term, 1874, confirming the award of Rufus Barringer and others, dated Oct. 23, 1874, and acts of Aug. 14, 1876, vol. 19, p. 139, and Aug. 23, 1894, vol. 28, p. 441, and deeds to Indians from Johnston and others, dated Oct. 9, 1876, and Aug. 14, 1880. (See also H. R. Ex. Docs. No.196, 47th Cong., 1st sess., and No. 128, 53d Cong., 2d sess.) Now held in fee by Indians, who are incorporated. Act of Mar. 3, 1903, vol. 32, p. 1000. (See opinions of Asst. Atty. Gen., Mar. 14, 1894, and Feb. 3, 1904. 35,000 acres of the 98,211 acres sold. Deeds dated Oct. 4, 1906; approved Dec. 12, 1906.) |
| Qualla boundary and other lands. (Under Eastern Cherokee School.) Tribe: Eastern band of Cherokee. | *a* 48,000 *a* 15,211 | |
| Total................ | 63,211 | |
| NORTH DAKOTA. | | |
| Devils Lake................. (Under Fort Totten School.) Tribes: Assiniboin, Cuthead, Santee, Sisseton, Yankton, and Wahpeton Sioux. | 92,144 | Treaty of Feb. 19, 1867, vol. 15, p. 505, agreement Sept. 20, 1872; confirmed in Indian appropriation act approved June 22 1874, vol. 18, p. 167. (See pp. 328–357, Comp. Indian Laws.) 135,824.53 acres allotted to 1,193 Indians; 727.83 acres reserved for church, and 193.61 acres reserved for Government purposes. Act of Apr. 27, 1904, vol. 33, p. 319, to amend and ratify agreement made Nov. 2, 1901. President's proclamation of June 2, 1904, vol. 33, p. 2368. |
| Fort Berthold............. (Under Fort Berthold School.) Tribes: Arikara, Grosventre, and Mandan. | 884,780 | Unratified agreement of Sept. 17, 1851, and July 27, 1866 (see p. 322, Comp. Indian Laws); Executive orders, Apr. 12, 1870, July 13, 1880, and June 17, 1892; agreement Dec. 14, 1886, ratified by act of Mar. 3, 1891, vol. 26, p. 1032. (See Pres. proc. May 20, 1891, vol. 27, p. 979.) 80,340 acres allotted to 940 Indians (see letter book 445, p. 311); the residue, 884,780 acres, unallotted. Lands now in process of allotment. |
| Standing Rock............. (Under Standing Rock Agency.) Tribes: Blackfeet, Hunkpapa, Upper and Lower Yanktonai Sioux. | *b* 2,378,458 | Treaty of Apr. 29, 1868, vol. 15, p. 635, and Executive orders Jan. 11–Mar. 16, 1875, and Nov. 28, 1876. Agreement ratified by act of Feb. 28, 1877, vol. 19, p. 254, and Executive orders Aug. 9, 1879, and Mar. 20, 1884 (1,520,640 acres in South Dakota); unratified agreement of Oct. 17, 1882. (For modification see sundry civil appropriation act approved Mar. 3, 1883, vol. 22, p. 624; for text see Misc. Indian Doc., vol. 14, p. 305.) Act of Congress of Apr. 30, 1888, vol. 25, p. 94, not accepted. Act of Congress, Mar. 2, 1890, vol. 25, p. 888. President's proclamation of Feb. 10, 1890, vol. 26, p. 1554. Under act of Mar. 2, 1899 (25 Stats., 884), and authority of the President of Sept. 26, 1905, 868 Indians were allotted 294,181.51 acres, leaving unallotted 2,378,458.49 acres. Lands now in process of allotment. |
| Turtle Mountain............. (Under Fort Totten School.) Tribe: Pembina Chippewa. | ............ | Executive orders, Dec. 21, 1882, Mar. 29 and June 3, 1884, Agreement made Oct. 2, 1892, amended by Indian appropriation act approved and ratified Apr. 21, 1904, vol. 33, p. 194. 45,894 acres allotted to 326 Indians, and 186 acres reserved for church and school purposes under the abovenamed act. |
| Total................. | 3,355,382 | |
| OKLAHOMA. | | |
| Cheyenne and Arapaho...... (Under Cheyenne and Arapaho, Cantonment and Seger schools.) Tribes: Southern Arapaho, and Northern and Southern Cheyenne. | ............ | Executive order, Aug. 10, 1869; unratified agreement with Wichita, Caddo, and others, Oct. 19, 1872. (See annual report, 1872, p. 101.) Executive orders of Apr. 18, 1882, and Jan. 17, 1883, relative to Fort Supply military reserve (relinquished for disposal under act of Congress of July 5, 1894, by authority of Executive order of Nov. 5, 1894, see General Land Office report, 1899, p. 150). Executive order of July 17, 1883, relative to Fort Reno military reserve. Agreement made October, 1890, and ratified and confirmed in Indian appropriation act approved Mar. 3, 1891, vol. 26, pp. 1022–1026. 529,682.06 acres allotted to 3,294 Indians; 231,828.55 acres for Oklahoma school lands; 32,343.93 acres reserved for military, agency, mission, etc., purposes; the residue, 3,500,562.05 acres, opened to settlement. (See Pres. proc. Apr. 12, 1892, vol. 27, p. 1018.) Executive order, July 12, 1895. President's proclamation of Aug. 12, 1903, vol. 33, p. 2317. |

*a* Outboundaries surveyed.          *b* Partly surveyed.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from UNIVERSITY OF MICHIGAN

CVWD 563-165

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 192 of 212   Page ID #:4208

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| OKLAHOMA—continued. | *Acres.* | |
| Iowa.......... (Under Sauk and Fox School.) Tribes: Iowa and Tonkawa. | | Executive order, Aug. 15, 1883; agreement May 20, 1890, ratified by act of Feb. 13, 1891, vol. 26, p. 753. 8,685.50 acres allotted to 109 Indians; 20 acres held in common for church, school, etc.; the residue opened to settlement. Proclamation of President Sept. 18, 1891, vol. 27, p. 989. (See annual report, 1891, p. 677, and letter book 222, p. 364.) |
| Kansa.......... (Under Kaw School.) Tribe: Kansa or Kaw. | | Act of June 5, 1872, vol. 17, p. 228; 260 acres reserved for cemetery, school, and town site. Remainder, 99,877 acres, allotted to 247 Indians; act of July 1, 1902, vol. 32, p. 636, ratifying agreement, not dated. |
| Kickapoo.......... (Under Shawnee School.) Tribe: Mexican Kickapoo. | | Executive order, Aug. 15, 1883; agreement June 21, 1891; ratified by act of Mar. 3, 1893, vol. 27, p. 557. 22,529.15 acres allotted to 283 Indians; 479.72 acres reserved for mission, agency, and school purposes; residue opened to settlement by proclamation of the President May 18, 1895, vol. 29, p. 868; act of Mar. 3, 1903, vol. 32, p. 1001. |
| Kiowa and Comanche.......... (Under Kiowa Agency.) Tribes: Apache, Comanche, Delaware, and Kiowa. | | Treaty of Oct. 21, 1867, vol. 15, pp. 581 and 589; agreement made Oct. 6, 1892; ratified by act of June 6, 1900, vol. 31, p. 676, ceding 2,488,893 acres, of which 443,338 acres have been allotted to 2,759 Indians; 11,972 acres reserved for agency, school, religious, and other purposes. The residue, 2,033,583 acres, opened to settlement (letter books 486, p. 440; 488, p. 478). President's proclamations of July 4, 1901, vol. 32, p. 1975; June 23, 1902, vol. 32, p. 2007; Sept. 4, 1902, vol. 32, p. 2026, and Mar. 29, 1904, vol. 33, p. 2340. Of the 480,000 acres grazing land set apart under act of June 6, 1900, 1,841.92 acres were reserved for town sites under act Mar. 20, 1906 (34 Stat. L., 801), 82,059.52 acres were allotted to 513 Indians under act June 5, 1906 (34 Stat. L., 213), and 480 acres allotted to 3 Indians under act June 5, as amended by act Mar. 7, 1907 (34 Stat. L., 1018). The remaining 395,618.56 acres were turned over to the General Land Office for disposition under acts of June 5 and June 28, 1906, and proclamation of Sept. 19, 1906. The General Land Office reports the sale and entry of 344,094.17 acres under act of June 5, and of 21,830.24 acres under act of June 28, 1906. |
| Oakland.......... (Under Ponca School.) Tribes: Tonkawa and Lipan. | | Act of May 27, 1878, vol. 20, p. 84 (see annual report for 1882, p. LXIII. (See deed dated June 14, 1883, from Cherokee, vol. 6, Indian Deeds, p. 476.) (See deed from Nez Percé, May 22, 1885, vol. 6, Indian Deeds, p. 504.) 11,2/3.79 acres allotted to 73 Indians; 160.50 acres reserved for Government and school purposes. The residue, 79,276.60 acres, opened to settlement (letter book 257, p. 240). Agreement made Oct. 21, 1891, ratified by Indian appropriation act approved Mar. 3, 1893, vol. 27, p. 644. (For text, see annual report, 1893, p. 524.) |
| Osage.......... (Under Osage Agency.) Tribes: Great and Little Osage. | a 1,470,058 | Article 16, Cherokee treaty of July 19, 1866, vol. 14, p. 804; order of Secretary of the Interior, Mar. 27, 1871; act of June 5, 1872, vol. 17, p. 228. (See deed dated June 14, 1883, from Cherokee, vol. 6, Indian Deeds, p. 482.) Lands now in process of allotment. |
| Oto.......... (Under Oto School.) Tribe: Oto and Missouri. | | Act of Mar. 3, 1881, vol. 21, p. 381; order of the Secretary of the Interior, June 25, 1881. (See deed dated June 14, 1883, from Cherokee, vol. 6, Indian Deeds, p. 479.) Under acts of Feb. 8, 1887 (24 Stat., 388), Feb. 28, 1891 (26 Stats., 794), and Apr. 21, 1904 (33 Stat., 189), 127,711.22 acres were allotted to 514 Indians (885 allotments—see L. B. 929, p. 326) 720 acres were reserved for agency, school, church, and cemetery purposes, and 640 acres set aside for tribal uses. |
| Pawnee.......... (Under Pawnee School.) Tribe: Pawnee. | | Act of Apr. 10, 1876, vol. 19, p. 29. (Of this 230,014 acres are Cherokee and 53,006 acres are Creek lands. See deed dated June 14, 1883, from Cherokee, vol. 6, Indian Deeds, p. 470.) 112,850.84 acres allotted to 821 Indians; 840 acres were reserved for school, agency, and cemetery purposes; the residue, 169,320 acres, opened to settlement (letter books 261, p. 388, and 263, p. 5). Agreement made Nov. 23, 1892, ratified by act of Mar. 3, 1893, vol. 27, p. 644. (For text see annual report, 1893, p. 526.) |
| Ponca.......... (Under Ponca School.) Tribe: Ponca. | 320 | Acts of Aug. 15, 1876, vol. 19, p. 192; Mar. 3, 1877, vol. 19, p. 287; May 27, 1878, vol. 20, p. 76, and Mar. 3, 1881, vol. 21, p. 422. (See deed dated June 14, 1883, from Cherokee, vol. 6, Indian Deeds, p. 473.) There has been allotted to 784 Indians 101,050.75 acres, and reserved for agency, school, mission, and cemetery purposes 323.56 acres, leaving unallotted and unreserved 320 acres (letter books 302, p. 311, and 813, p. 401). Indian appropriation act, approved Apr. 21, 1904, vol. 33, p.217. |

a Surveyed.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

CVWD 563-166

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 193 of 212   Page ID #:4209

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| OKLAHOMA—continued. | *Acres.* | |
| Potawatomi............ (Under Shawnee School.) Tribes: Absentee Shawnee and Potawatomi. | ............ | Treaty of Feb. 27, 1867, vol. 15, p. 531; act of May 23, 1872, vol. 17, p. 159. (222,716 acres are Creek ceded lands; 365,851 acres are Seminole lands.) Agreements with citizen Potawatomi June 25 and Absentee Shawnees June 26, 1890; ratified and confirmed in the Indian appropriation act of Mar. 3, 1891, vol. 26, pp. 1016–1021. 215,679.42 acres allotted to 1,489 Potawatomi, and 70,791.47 acres allotted to 563 Absentee Shawnees, and 510.63 acres reserved for Government purposes; the residue opened to settlement by the President's proclamation of Sept. 18, 1891, vol. 27, p. 989. (See letter book 222, pp. 442, 444, and annual report for 1891, p. 677.) |
| Sauk and Fox........... (Under Sauk and Fox School.) Tribes: Ottawa, Sauk and Fox of the Mississippi. | ............ | Treaty of Feb. 18, 1867, vol. 15, p. 495; agreement June 12, 1890; ratified by act of Feb. 13, 1891, vol. 26, p. 749. 87,683.64 acres allotted to 548 Indians, and 800 acres reserved for school and agency purposes; the residue opened to settlement by the President's proclamation Sept. 18, 1891, vol. 27, p. 989. (See letter book 222, p. 169, and annual report for 1891, p. 677.) |
| Wichita................. (Under Kiowa Agency.) Tribes: Ioni, Caddo, Comanche, Delaware, Towakoni, Waco, and Wichita. | *a* 1,511,576 | (See treaty of July 4, 1866, with Delawares, art. 4, vol. 14, p. 794.) Unratified agreement, Oct. 19, 1872. (See annual report, 1872, p. 101.) Agreement made June 4, 1891, ratified by act of Mar. 2, 1895, vol. 28, p. 895. 152,991 acres allotted to 965 Indians; 4,151 acres reserved for agency, school, religious, and other purposes. The residue, 586,468 acres, opened to settlement (letter book 490, p. 90). President's proclamation of July 4, 1901, vol. 32, p. 1975. Unceeded Chickasaw and Choctaw leased lands west of the North Fork of the Red River. Act of May 4, 1896, vol. 29, p. 113. President's proclamation, Mar. 16, 1896, vol. 29, p. 878. |
| Total............... | 2,981,954 | |
| OREGON. | | |
| Grande Ronde........... (Under Grande Ronde School.) Tribes: Kalapuya, Clackamas, Cow Creek, Lakmiut, Mary's River, Molala, Nestucca, Rogue River, Santiam, Shasta, Tumwater, Umpqua, Wapato, and Yamhill. | ............ | Treaties of Jan. 22, 1855, vol. 10, p. 1143, and of Dec. 21, 1855, vol. 12, p. 982; Executive order June 30, 1857. 440 acres reserved for Government use and 33,148 acres allotted to 269 Indians. (See letter book 210, p. 328.) Act of Apr. 28, 1904, vol. 33, p. 567, amending and ratifying agreement of June 27, 1901. |
| Klamath................ (Under Klamath School.) Tribes: Klamath, Modoc, Paiute, Pit River, Walpape, and Yahuskin band of Snake (Shoshoni). | *b* 872,186 | Treaty of Oct. 14, 1864, vol. 16, p. 707. 177,719.62 acres allotted to 1,174 Indians; 6,094.77 acres reserved for agency, school, and church purposes. (See letter book 441, p. 314.) The residue, 872,186 acres, unallotted and unreserved. Act of May 27, 1902, vol. 32, p. 260; Indian appropriation act approved Apr. 21, 1904, vol. 33, p. 202; act of Mar. 3, 1905, vol. 33, p. 1033. Lands now in process of allotment. |
| Siletz................... (Under Siletz School.) Tribes: Alsea, Coquille, Kusan, Kwatami, Rogue River, Skoton, Shasta, Salmtkea, Siuslaw, Tututni, Umpqua, and thirteen others. | 3,200 | Unratified treaty, Aug. 11, 1855; Executive orders Nov. 9, 1855, and Dec. 21, 1865, and act of Mar. 3, 1875, vol. 18, p. 446. Agreement Oct. 31, 1892, ratified by act of Aug. 15, 1894, vol. 28, p. 323. 47,716.34 acres allotted to 551 Indians. Residue, 177,563.66 acres (except 5 sections), ceded to United States. (See letter book 281, p. 358.) President's proclamation May 16, 1895, vol. 29, p. 866. Acts of May 31 1900, vol. 31, p. 233, and Mar. 3, 1901, vol. 31, p. 1085. |
| Umatilla............... (Under Umatilla School.) Tribes: Cayuse, Umatilla, and Wallawalla. | *a* 79,820 | Treaty of June 9, 1855, vol. 12, p. 945, and act of Aug. 5, 1882, vol. 22, p. 297; Mar. 3, 1885, vol. 23, p. 340, and sec. 8 of act of Oct. 17, 1888, vol. 25, p. 559. (See orders Secretary of Interior, Dec. 4, 1888, (annual report, 1891, p. 682.) 76,933.90 acres allotted to 893 Indians, 980 acres reserved for school and mission purposes. (See letter book 255, p. 132.) Act of July 1, 1902, vol. 32, p. 730. |
| Warm Springs.......... (Under Warm Springs School). Tribes: Des Chutes, John Day, Paiute, Tenino, Warm Springs, and Wasco. | *a* 322,108 | Treaty of June 25, 1855, vol. 12, p. 963. 140,096.45 acres allotted to 960 Indians, and 1,195 acres reserved for church, school, and agency purposes. The residue, 322,108 acres unallotted and unreserved (letter book 334, p. 295) |
| Total............... | 1,277,314 | |

*a* Surveyed.          *b* Outboundaries surveyed.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-167

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 194 of 212   Page ID #:4210

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| **SOUTH DAKOTA.** | *Acres.* | |
| Crow Creek and Old Winnebago. (Under Crow Creek Agency.) Tribes: Lower Yanktonai, Lower Brulé, Miniconjou, and Two Kettle Sioux. | a 111,711 | Order of Department, July 1, 1863 (see annual report, 1863, p. 318); treaty of Apr. 29, 1868, vol. 15, p. 635, and Executive order, Feb. 27, 1885 (see President's proclamation of Apr. 17, 1885 annulling Executive order of Feb. 27, 1885; annual report, 1885, p. LI); act of Mar. 2, 1889, vol. 25, p. 888; President's proclamation, Feb. 10, 1890, vol. 26, p. 1554. There has been allotted to 842 Indians 172,733.81 acres, and reserved for agency, school, and religious purposes 1,076.90 acres, leaving a residue of 111,711 acres (letter books 302, p. 443; 372, p. 485; 373, p. 347). Lands are now in process of allotment. |
| Lake Traverse. (Under Sisseton Agency.) Tribes: Sisseton a n d Wahpeton Sioux. | .............. | Treaty of Feb. 19, 1867, vol. 15, p. 505; agreement, Sept. 20, 1872; confirmed in Indian appropriation act approved June 22, 1874, vol. 18, p. 167. (See pp. 328–337, Comp. Indian Laws.) Agreement, Dec. 12, 1889, ratified by act of Mar. 3, 1891, vol. 26, pp. 1035–1038. 309,904.92 acres allotted to 1,539 Indians, 32,840.25 acres reserved for school purposes, 1,347.01 acres for church and agency purposes; the residue, 574,678.40 acres, opened to settlement. (See President's proclamation Apr. 11, 1892, vol. 27, p. 1017.) |
| Cheyenne River. (Under Cheyenne River Agency.) Tribes: Blackfeet, Miniconjou, Sans Arcs, and Two Kettle Sioux. | 2,547,208 | Treaty of Apr. 29, 1868, vol. 15, p. 635, and Executive orders, Jan. 11, Mar. 16, and May 20, 1875, and Nov. 28, 1876; agreement ratified by act of Feb. 28, 1877, vol. 19, p. 254, and Executive orders Aug. 9, 1879, and Mar. 20, 1884. Unratified agreement of Oct. 17, 1882. (For modification see sundry civil appropriation act approved Mar. 3, 1883, vol. 22, p. 624; for text see Misc. Indian Docs., vol. 14, p. 305.) Act of Apr. 30, 1888, vol. 25, p. 94, not accepted. Act of Mar. 2, 1889, vol. 25, p. 888. President's proclamation of Feb. 10, 1890, vol. 26, p. 1554. (See act of Feb. 10, 1896, vol. 29, p. 10.) President's proclamations of Feb. 7, 1903, vol. 32, p. 2035, and Mar. 30, 1904, vol. 33, p. 2340. 320,631.05 acres have been allotted to 934 Indians, leaving unallotted 2,547,208.95 acres. (See L. B. 828, p. 321.) |
| Lower Brulé. (Under Lower Brulé Agency.) Tribes: Lower Brulé and Lower Y a n k t o n a l Sioux. | b c 199,730 | Treaty of Apr. 29, 1868, vol. 15, p. 635, and Executive orders Jan. 11, Mar. 16, and May 20, 1875, and Nov. 28, 1876; agreement ratified by act of Feb. 28, 1877, vol. 19, p. 254, and Executive orders, Aug. 9, 1879, and Mar. 20, 1884. Unratified agreement of Oct. 17, 1882. (For modification see sundry civil appropriation act approved Mar. 3, 1883, vol. 22, p. 624; for text see Misc. Indian Docs., vol. 14, p. 305.) Act of Apr. 30, 1888, vol. 25, p. 94, not accepted. Act of Mar. 2, 1889, vol. 25, p. 888. President's proclamation of Feb. 10, 1890, vol. 26, p. 1554. (See act of Feb. 10, 1896, vol. 29, p. 10.) Agreement made Mar. 1, 1898, ratified by act of Mar. 3, 1899, vol. 30, p. 1362, ceding 120,000 acres to the United States. 151,856 acres allotted to 555 Indians, and 964.06 acres reserved for agency, school, and religious purposes, leaving unallotted and unreserved 199,729.94 acres. (See letter book 498, p. 336.) (See act. Apr. 21, 1906, 34 Stats., 124, and President's proclamation of Aug. 12, 1907.) |
| Pine Ridge. (Under Pine Ridge Agency.) Tribes: Brulé S i o u x, N o r t h e r n Cheyenne, and Oglala Sioux. | b c 2,672,056 | Treaty of Apr. 29, 1868, vol. 15, p. 635, and Executive orders, Jan. 11, Mar. 16, and May 20, 1875, and Nov. 28, 1876; agreement ratified by act of Feb. 28, 1877, vol. 19, p. 254, and Executive orders, Aug. 9, 1879, and Mar. 20, 1884. (Tract, 32,000 acres, set apart by Executive order of Jan. 24, 1882, is situated in Nebraska.) Unratified agreement of Oct. 17, 1882. (For modification see sundry civil appropriation act approved Mar. 3, 1883, vol. 22, p. 624; for text see Misc. Indian Docs., vol. 14, p. 305.) Act of Apr. 30, 1888, vol. 25, p. 94, not accepted. Act of Mar. 2, 1889, vol. 25, p. 888. President's proclamation of Feb. 10, 1890, vol. 26, p. 1554. (See act of Feb. 10, 1896, vol. 29, p. 10.) Executive orders of Jan. 25, 1904, restoring lands in Nebraska to public domain, and Feb. 20, 1904, restoring one section for school purposes. 109,538.28 acres have been allotted to 312 Indians and 9,007.47 acres have been reserved for school and church purposes. (See L. B. 821, p. 698.) Under act Mar. 2, 1889 (25 Stats., 888), and authority of President July 29, 1904, 1,775 Indians have been allotted 601,689.04 acres, and 11,167.38 acres have been reserved for agency, school, and church purposes, leaving unallotted and unreserved 2,542,343.58 acres. Lands are still in process of allotment. |

a Surveyed.     b Outboundaries surveyed.     c Partly surveyed.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

CVWD 563-168

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 195 of 212   Page ID #:4211

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| SOUTH DAKOTA—continued. | *Acres.* | |
| Rosebud. (Under Rosebud Agency.) Tribes: Loafer, Miniconjou, Northern Oglala, Two Kettle, Upper Brulé, and Wahzhazhe Sioux. | *a b* 1,524,210 | Treaty of Apr. 29, 1868, vol. 15, p. 635, and Executive orders, Jan. 11, Mar. 16, and May 20, 1875, and Executive orders, Nov. 28, 1876; agreement ratified by act of Feb. 28, 1877, vol. 19, p. 254, and Executive orders, Aug. 9, 1897, and Mar. 20, 1884. Unratified agreement of Oct. 17, 1882. (For modification see sundry civil appropriation act approved Mar. 3, 1883, vol. 22, p. 624; for text see Misc. Indian Docs., vol. 14, p. 305.) Act of Apr. 30, 1888, vol. 25, p. 94, not accepted. Act of Mar. 2, 1889, vol. 25, p. 888. President's proclamation of Feb. 10, 1890, vol. 26, p. 1554. (See act of Feb. 10, 1896, vol. 29, p. 10.) 1,258,558.35 acres allotted to 4,914 Sioux Indians (L. B. 392,450 and 560, pp. 242, 271, and 110; 599, p. 396, and 926, p. 397). 416,000 acres opened to settlement; 29,392.01 reserved for Government purposes, churches, cemeteries, etc. The residue, 1,524,200.64 acres, unallotted and unreserved. Lands now in process of allotment. Agreement made Mar. 10, 1898, ratified by act of Mar. 3, 1899, vol. 30, p. 1364. Act of Apr. 23, 1904, vol. 33, p. 254, ratifying agreement made Sept. 14, 1901. President's proclamation of May 16, 1904, vol. 33, p. 2354. |
| Yankton. (Under Yankton Agency.) Tribe: Yankton Sioux. | | Treaty of Apr. 19, 1858, vol. 11, p. 744. 268,567.72 acres allotted to 2,649 Indians, and 1,252.80 acres reserved for agency, church, and school purposes. (See letter book 207, p. 1.) Agreement Dec. 31, 1892, ratified by act of Aug. 15, 1894, vol. 28, p. 314. The residue open to settlement. (See President's proclamation May 16, 1895, vol. 29, p. 865.) |
| Total | 7,054,915 | |
| UTAH. | | |
| Uinta Valley. (Under Uinta and Ouray Agency.) Tribes: Goshute, Pavant, Uinta, Yampa, Grand River Uncompahgre, and White River Ute. | *a b* 179,194 | Executive orders, Oct. 3, 1861; act of June 18, 1878, 20 Stats., 165; acts of May 5, 1864, vol. 13, p. 63. and May 24, 1888, vol. 25, p. 157; joint resolution of June 19, 1902, vol. 32, p. 744; act of Mar. 3, 1903, vol. 32, p. 997; Indian appropriation act, approved Apr. 21, 1904, vol. 33, p. 207; President's proclamations of July 14, 1905, setting aside 1,010,000 acres as a forest reserve, 2,100 acres as town sites, 1,004,285 acres opened to homestead entry, 2,140 acres in mining claims; 103,265.35 acres allotted to 1,283 Indians (see letter book 777, p. 392), and 60,160 acres under reclamation, the residue, 179,194.65 acres, unallotted and unreserved. |
| Uncompahgre. (Under Uinta and Ouray Agency.) Tribe: Tabequache Ute. | | Executive order, Jan. 5, 1882. (See act of June 15, 1880, ratifying the agreement of Mar. 6, 1880, vol. 21, p. 199.) 12,540 acres allotted to 83 Indians, remainder of reservation restored to public domain, act of June 7, 1897, vol. 30, p. 62 (Letter book 403, p. 115.) Joint resolution of June 19, 1902, vol. 32, p. 744. |
| Total | 179,194 | |
| WASHINGTON. | | |
| Chehalis. (Under Puyallup School.) Tribes: Chinook (Tsinuk), Clatsop, and Chehalis. | | Order of the Secretary of the Interior, July 8, 1864; Executive order, Oct. 1, 1886. 471 acres set aside for school purposes. The residue, 3,753.63 acres, restored to the public domain for Indian homestead entry. 36 Indians made homestead selections, covering all the land. (See L. B. 152, p. 201, and 153, p. 45.) |
| Columbia. (Under Colville Agency.) Tribe: Columbia (Moses band). | | Executive orders, Apr. 19, 1879, Mar. 6, 1880, and Feb. 23, 1883. (See Indian appropriation act of July 4, 1884, vol. 23, p. 79.) Agreement made July 7, 1883, ratified by act of July 4, 1884, vol. 23, p. 79. Executive order, May 1, 1886. Executive order of Mar. 9, 1894; Department orders of Apr. 11, 1894, and Apr. 20, 1894, and Executive order of Jan. 19, 1895. 25,172.30 acres allotted to 40 Indians (see Executive order of May 21, 1886, and act of March 8, 1906, 34 Stats., 55). |
| Colville. (Under Colville Agency.) Tribes: Cœur d'Aléne, Colville, Kalispel, Okinagan, Lake, Methow, Nespelim, Pend d'Oreille, Sanpoil, and Spokan. | *a* 1,300,000 | Executive orders, Apr. 9 and July 2, 1872; agreement made July 7, 1883, ratified by act of July 4, 1884, vol. 23, p. 79. Act of July 1, 1892, vol. 27, p. 62. (See acts of Feb. 20, 1896, vol. 29, p. 9, and July 1, 1898, vol. 30, p. 593.) 50,000.30 acres in north half allotted to 648 Indians (see letter book 428, p. 100); remainder of north half, estimated at 1,449,268 acres, to be opened to settlement Oct. 10, 1900 (see proclamation of the President, dated Apr. 10, 1900, 31 Stats., p. 1963). The residue, 1,300,000 acres (estimated), unallotted. Act of Feb. 7, 1903, vol. 32, p. 803. |

*a* Partly surveyed.    *b* Outboundaries surveyed.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from UNIVERSITY OF MICHIGAN

CVWD 563-169

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 196 of 212   Page ID #:4212

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| WASHINGTON—continued. | *Acres.* | |
| Hoh River............... (Under Neah Bay School.) Tribe: Hoh. | 640 | Executive order, Sept. 11, 1893. |
| Lummi................... (Under Tulalip School.) Tribes: Dwamish, Etak-mur, Lummi, Snoho-mish, Sukwamish, and Swiwamish. | a 598 | Treaty of Point Elliott, Jan. 22, 1855, vol. 12, p. 927  Executive order, Nov. 22, 1873.  Allotted, 11,634 acres to 85 Indians; reserved for Government school, 80 acres; unallotted and unreserved, 598 acres. |
| Makah................... (Under Neah Bay School.) Tribes: Makah and Qui-leute. | b 23,040 | Treaty of Neah Bay, Jan. 31, 1855, vol. 12, p. 939; Executive orders, Oct. 26, 1872, Jan. 2 and Oct. 21, 1873.  Lands now in process of allotment, except timber lands. |
| Muckleshoot............. (Under Tulalip School.) Tribe: Muckleshoot. | 169 | Executive orders, Jan. 20, 1857, and Apr. 9, 1874.  39 Indians have been allotted 3,191.97 acres. |
| Nisqualli............... (Under Puyallup School.) Tribes: Muckleshoot, Nisqualli, Puyallup, Skwawksamish, Stali-akoom, and five others. | ............ | Treaty of Medicine Creek, Dec. 26, 1854, vol. 10, p. 1132; Executive order, Jan. 20, 1857. Land all allotted.  4,718 acres to 30 Indians. |
| Osette.................. (Under Neah Bay School.) Tribe: Osette. | 640 | Executive order, Apr. 12, 1893. |
| Port Madison............ (Under Tulalip School.) Tribes: Dwamish, Etak-mur, Lummi, Snoho-mish, Sukwamish, and Swiwamish. | 1,375 | Treaty of Point Elliott, Jan. 22, 1855, vol. 12, p. 927; order of the Secretary of the Interior, Oct. 21, 1864.  5,909.48 acres allotted to 39 Indians; the residue, 1,375 acres, unallotted. |
| Puyallup................ (Under Puyallup School.) Tribes: Muckleshoot, Nisqualli, Puyallup, Skwawksamish, Stali-akoom, and five others. | ............ | Treaty of Medicine Creek, Dec. 22, 1854, vol. 10, p. 1132; Executive orders, Jan. 20, 1857, and Sept. 6, 1873.  17,463 acres allotted to 169 Indians.  Agreement made Nov. 21, 1876, ratified by act of  Feb. 20, 1893, vol. 27, p. 464.  (For text see annual report 1893, p. 518.)  The residue, 599 acres, laid out as an addition to the city of Tacoma, has been sold, with the exception of 39.79 acres reserved for school, and 19.43 acres for church and cemetery purposes, under acts of Mar. 3, 1893 (27 Stats., 612), June 7, 1897 (30 Stats., 62), and act of June 21, 1906 (34 Stats., 377). |
| Quileute................ (Under Neah Bay School.) Tribe: Quileute. | b 837 | Executive order, Feb. 19, 1889. |
| Quinaielt............... (Under Puyallup School.) Tribes: Quaitso and Quin-aielt. | a 214,441 | Treaties of Olympia, July 1, 1855, and Jan. 25, 1856, vol. 12, p. 971.  Executive order, Nov. 4, 1873.  Under acts of Feb. 8, 1887 (24 Stats., 388), and Feb. 28, 1891 (26 Stats., 794), 119 Indians have been allotted 9,558.84 acres, leaving unallotted 214,441.16 acres now in process of allotment. |
| Shoalwater.............. (Under Puyallup School.) Tribes: Shoalwater and Chehalis. | a 335 | Executive order, Sept. 22, 1866. |
| Skokomish............... (Under Puyallup School.) Tribes: Clallam, Skoko-mish and Twana. | ............ | Treaty of Point No Point, Jan. 26, 1855, vol. 12, p. 633; Executive order, Feb. 25, 1874.  Allotted in treaty reserve, 4,990 acres; residue, none.  (See L. B., 895, p. 268.)  Allotted in Executive order, addition, known as the Fisher addition, 814 acres; residue, none.  (L. B., 895, p. 285.)  62 allotments. |
| Snohomish or Tulalip...... (Under Tulalip School.) Tribes: Dwamish, Etak-mur, Lummi, Snoho-mish, Sukwamish, and Swiwamish. | a 8,930 | Treaty of Point Elliott, Jan. 22, 1855, vol. 12, p. 927; Executive order, Dec. 23, 1873.  13,560 acres allotted to 94 Indians; the residue, 8,930 acres, unallotted. |
| Spokan.................. (Under Colville Agency.) Tribe: Spokan. | 153,600 | Executive order, Jan. 18, 1881.  Agreement made Mar. 18, 1887, ratified by Indian appropriation act approved July 13, 1892, vol. 27, p. 139.  (For text see annual report 1892, p. 743.)  Joint resolution of Congress of June 19, 1902, vol. 32, p. 744.  Lands now in process of allotment. |
| Squaxon Island (Klahche-min). (Under Puyallup School.) Tribes: Nisqualli, Puyal-lup, Skwawksmamish, Staliakoom, and five others. | ............ | Treaty of Medicine Creek, Dec. 26, 1854, vol. 10, p. 1132; land all allotted, 1,494.15 acres, to 23 Indians. |

a Surveyed.                 b Outboundaries surveyed.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

CVWD 563-170

**160**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| WASHINGTON—continued. | *Acres.* | |
| Swinomish (Perrys Island)... (Under Tulalip School.) Tribes: Dwamish, Etakmur, Lummi, Snohomish, Sukwamish, and Swiwamish. | .......... | Treaty of Point Elliott, Jan. 22, 1855, vol. 12, p. 927; Executive order, Sept. 9, 1873. Allotted, 7,172 acres to 71 Indians reserved for school, 89.80 acres; unallotted, 0.35 acre. |
| Yakima............. (Under Yakima School.) Tribes: Klikitat, Paloos, Topnish, Wasco, and Yakima. | *a* 837,754 | Treaty of Walla Walla, June 9, 1855, vol. 12, p. 951. Agreement made Jan. 13, 1885, ratified by Indian appropriation act approved Mar. 3, 1893, vol. 27, p. 631. (For text see Misc. Indian Docs., vol. 41, p. 227; see also annual report 1893, pp. 520–521, and Senate Ex. Docs. No. 21, 49th Cong., 1st sess., and No. 45, 50th Cong., 1st sess.) Executive order, Nov. 28, 1892. Agreement, Jan. 8, 1894, ratified by act of Aug. 15, 1894, vol. 28, p. 320. 255,066.03 acres allotted to 2,823 Indians, and 1,020.24 acres reserved for agency, church, and school purposes. (See letter books 354, p. 419; 416, p. 263, and 879, p. 243.) The residue, 543,916.13 acres, held in common. Act of Dec. 21, 1904, recognizing claim of Indians to 293,837 acres additional land, vol. 33, p. 595. |
| Total................... | 2,542,359 | |
| WISCONSIN. | | |
| Lac Courte Oreille............ (Under La Pointe Agency.*c*) Tribe: Lac Court Oreille band of Chippewa of Lake Superior. | *b* 20,096 | Treaty of Sept. 30, 1854, vol. 10, p. 1109; lands withdrawn by General Land Office, Nov. 22, 1860, Apr. 4, 1865. (See report by Secretary of the Interior, Mar. 1, 1873.) Act of May 26, 1872, vol. 17, p. 190. 57,746 acres allotted to 1,003 Indians; the residue, 20,096 acres, unallotted. Act of Feb. 3, 1903, vol. 32, p. 795. |
| Lac du Flambeau............. (Under La Pointe Agency.) Tribe: Lac du Flambeau band of Chippewa of Lake Superior. | 26,153 | Treaty of Sept. 30, 1854, vol. 10, p. 1109, lands selected by Indians. (See report of Superintendent Thompson, Nov. 14, 1863, and report to Secretary of the Interior, June 22, 1866.) Department order of June 26, 1866. Act of May 29, 1872, vol. 17, p. 190. 43,558 acres allotted to 520 Indians; act of Feb. 3, 1903 (32 Stats., 795), 120 Indians were allotted 7,512.40 acres, leaving unallotted 26,153.40 acres. |
| La Pointe (Bad River)....... (Under La Pointe Agency.) Tribe: La Pointe band of Chippewa of Lake Superior. | 46,613 | Treaty of Sept. 30, 1854, vol. 10, p. 1109. 368.91 acres patented under art. 10; 195.71 acres fishing ground. 76,256.92 acres allotted to 959 Indians. (See letter to General Land Office, Sept. 17, 1856, and letter book 381, p. 49.) Under acts of Feb. 11, 1901 (31 Stats., 766), and Mar. 2, 1907 (34 Stats., 1217), 880 acres were allotted to 11 Indians, leaving unallotted and unreserved, 46,613.68 acres. |
| Red Cliff................ (Under La Pointe Agency.) Tribe: La Pointe band (Buffalo Chief) of Chippewa of Lake Superior. | .......... | Treaty of Sept. 30, 1854, vol. 10, p. 1109; Executive order, Feb. 21, 1856. See Indian Office letters of Sept. 3, 1858, and May 25, 1863, and General Land Office letter of May 27, 1863. (See Executive orders. See report of Superintendent Thompson, May 7, 1863. Lands withdrawn by General Land Office, May 8 and June 3, 1863.) 2,535.91 acres allotted to 35 Indians under treaty; of the residue 11,506.90 acres were allotted to 169 Indians under joint resolution of Feb. 20, 1895, vol. 28, p. 970, and 40.10 acres were reserved for school purposes. |
| Menominee............. (Under Green Bay School.) Tribe: Menominee. | *d* 231,680 | Treaties of Oct. 18, 1848, vol. 9, p. 952; of May 12, 1854 vol. 10 p. 1064, and Feb. 11, 1856, vol. 11, p. 679. |
| Oneida................ (Under Oneida School.) Tribe: Oneida. | .......... | Treaty of Feb. 3, 1838, vol. 7, p. 566. 65,402.13 acres allotted to 1,501 Indians. Remainder, 84.08 acres, reserved for school purposes. |
| Stockbridge............. (Under Green Bay School.) Tribes: Stockbridge and Munsee. | *b* 11,803 | Treaties of Nov. 24, 1848, vol. 9, p. 955; Feb. 5, 1856, vol. 11, p. 663, and of Feb. 11, 1856, vol. 11, p. 679; act of Feb. 6, 1871, vol. 16, p. 404. (For area, see act of June 22, 1874, vol 18, p. 174.) |
| Total................... | 336,345 | |

*a* Partly surveyed.     *c* Reservations in Minnesota are also under La Pointe Agency.
*b* Surveyed.            *d* Outboundaries surveyed

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google     Original from UNIVERSITY OF MICHIGAN

CVWD 563-171

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 198 of 212   Page ID #:4214

*Schedule of each Indian reservation, under what agency or school, tribes occupying or belonging to it, area not allotted nor specially reserved, and authority for its establishment—Continued.*

| Name of reservation and tribe. | Area. | Date of treaty, law, or other authority establishing reserve. |
|---|---|---|
| WYOMING. | *Acres.* | |
| Wind River......................... (Under Shoshoni Agency.) Tribes: Northern Arapaho and Eastern band of Shoshoni. | a 95,307 | Treaty of July 3, 1868, vol. 15, p. 673; acts of June 22, 1874, vol. 18, p. 166, and Dec. 15, 1874, vol. 18, p. 291; Executive order, May 21, 1887. Agreement made Apr. 21, 1896, amended and accepted by act of June 7, 1896 (vol. 30, p. 93); amendment accepted by Indians July 10, 1897. (See 2926–97 and letter book 359, p. 468.) Act of Mar. 3, 1905, ratifying and amending agreement with Indians of Apr. 21, 1904. See vol. 33, p. 1016. President's proclamation, June 2, 1906, opening ceded part to settlement. It contains 1,472,844.15 acres, leaving in diminished reservation 282,115.85 acres; allotted therein to 358 Indians, 31,010.49 acres. (See letter book 866, p. 157.) Reserved for Mail Camp, 120 acres; reserved for Mail Camp Park, 40 acres; reserved for bridge purposes, 40 acres. Subject to disposition under President's proclamation, 1,438,632.66 acres. 92.44 acres reserved by Secretary to complete allotments to Indians on ceded part. Of the diminished reserve, 185,016.65 acres were allotted to 1,781 Indians, and 1,792.05 acres were reserved for agency, school, church, cemetery purposes, under acts of Feb. 8, 1887 (24 Stats., 388), as amended by act of Feb. 28, 1891 (26 Stat., 794) and treaty of July 3, 1868 (15 Stat., 673), leaving unallotted and unreserved 95,307.15 acres. |
| Total.................... | 95,307 | |
| Grand total............. | 53,549,103 | |

*a* Partly surveyed.

22849—08——11

162     REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Statistics of Indian schools during*

| School. | Supported by— | Capacity. Boarding. | Capacity. Day. |
|---|---|---|---|
| ARIZONA. | | | |
| Colorado River: | | | |
| Colorado River boarding | Government | 100 | |
| Fort Mohave, nonreservation boarding | do | 200 | |
| Moqui: | | | |
| Moqui (Hopi) boarding | do | 160 | |
| Oraibi day | do | | 156 |
| Polacco day | do | | 61 |
| Second Mesa day | do | | 100 |
| Western Navaho: | | | |
| Western Navaho boarding | do | 80 | |
| Moencopi day | do | | 29 |
| Walapai: | | | |
| Truxton Canyon boarding | do | 125 | |
| Havasupai boarding | do | 55 | |
| Navaho: | | | |
| Navaho boarding | do | 220 | |
| Tohatchi boarding a | do | 125 | |
| St. Michael's Mission boarding | Catholic Church | 150 | |
| Navaho Extension: Tolchaco (Navaho Mission boarding) | Independent Mission | 10 | |
| Phoenix, nonreservation boarding | Government | 700 | |
| Camp McDowell, day | do | | 40 |
| Fort Apache: | | | |
| Fort Apache boarding | do | 150 | |
| Cibicu day | do | | 45 |
| Canyon day | do | | 40 |
| Pimas: | | | |
| Pima boarding | do | 250 | |
| Blackwater day | do | | 36 |
| Casa Blanca day | do | | 40 |
| Gila Crossing day | do | | 46 |
| Lehi day | do | | 40 |
| Maricopa day | do | | 40 |
| Salt River day | do | | 30 |
| St. John's Mission boarding and day | Catholic Church | 175 | |
| San Xavier: | | | |
| Field service | Government | | |
| San Xavier Mission day | Catholic Church | | 125 |
| Tucson, mission boarding | Presbyterian Church | 130 | |
| San Carlos: San Carlos day | Government | | 100 |
| Rice Station boarding | do | 216 | |
| CALIFORNIA. | | | |
| Fort Yuma: Fort Yuma boarding | Government | 180 | |
| Hoopa Valley: Hoopa Valley boarding | do | 146 | |
| Round Valley: Round Valley boarding | do | 125 | |
| Greenville, nonreservation boarding | do | 90 | |
| Fort Bidwell, nonreservation boarding | do | 100 | |
| Riverside (Sherman Institute), nonreservation boarding | do | 500 | |
| Pala: | | | |
| Pala day | Government | | 30 |
| La Jolla day | do | | 30 |
| Pechanga day | do | | 26 |
| Rincon day | do | | 26 |
| Superintendent for these schools | do | | |
| Mesa Grande: | | | |
| Mesa Grande day | do | | 20 |
| Capitan Grande day | do | | 27 |
| Volcan (Santa Ysabel) day | do | | 30 |
| Superintendent for these schools | do | | |
| San Jacinto: | | | |
| Cahuilla day | Government | | 25 |
| Martinez day | do | | 20 |
| Potrero day | do | | 30 |
| Soboba day | do | | 34 |
| Tule River day | do | | 17 |
| Superintendent for these schools | do | | |
| Big Pine day | do | | 30 |
| Bishop day | do | | 50 |
| Independence day | do | | 30 |
| Manchester day | do | | 20 |
| Ukiah day | do | | 20 |
| San Diego, St. Anthony's Mission boarding | Catholic Church | 120 | |
| Banning, St. Boniface's Mission boarding | do | 150 | |

a Situated at Tohatchi, N. Mex.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-173

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.　163

*the fiscal year ended June 30, 1907.*

| Male | Female | Indian | White | Boarding (Enrollment) | Day (Enrollment) | Boarding (Avg att.) | Day (Avg att.) | Months in session | Cost to Government | Value of subsistence raised by school | Cost to other parties | Indians in public schools not under Government contract |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 6 | 1 | 10 | 114 | .... | 110 | .... | 10 | $15,944.77 | | | |
| 10 | 11 | 3 | 18 | 210 | .... | 198 | .... | 10 | 30,833.85 | $2,208.27 | | |
| 11 | 8 | 6 | 13 | 250 | .... | 191 | .... | 10 | 29,478.65 | | | |
| 3 | 6 | 3 | 6 | .... | 147 | .... | 114 | 10 | 5,123.80 | 7.60 | | |
| 2 | 2 | 2 | 2 | .... | 54 | .... | 49 | 9 | 1,942.33 | | | |
| 2 | 4 | 3 | 3 | .... | 118 | .... | 105 | 10 | 3,924.66 | | | |
| 7 | 5 | 2 | 10 | 91 | .... | 84 | .... | 10 | 15,890.37 | 3,970.52 | | |
| .... | 2 | 1 | 1 | .... | 38 | .... | 34 | 10 | 1,089.09 | | | |
| 5 | 7 | 1 | 11 | 101 | .... | 94 | .... | 10 | 15,674.45 | 580.30 | | |
| 3 | 2 | .. | 5 | 53 | .... | 48 | .... | 10 | 5,220.28 | | | |
| 9 | 14 | 7 | 16 | 247 | .... | 233 | .... | 10 | 34,824.04 | 264.21 | | |
| 8 | 7 | 1 | 11 | 109 | .... | 95 | .... | 10 | 15,079.97 | 108.00 | | |
| 3 | 12 | 3 | 12 | 117 | .... | 97 | .... | 10 | | | $13,425.58 | |
| .. | 3 | .. | 3 | 8 | .... | 8 | .... | 6 | | | 1,000.00 | |
| 30 | 32 | 12 | 50 | 760 | .... | 704 | .... | 10 | 111,495.42 | 5,390.83 | | |
| ... | 2 | 1 | 1 | .... | 18 | .... | 13 | 10 | 835.00 | | | |
| 7 | 9 | 5 | 11 | 159 | .... | 155 | .... | 10 | 21,636.19 | 1,069.79 | | |
| 1 | 1 | .. | 2 | .... | 50 | .... | 44 | 10 | 2,735.32 | | | |
| 1 | 1 | .. | 2 | .... | 41 | .... | 38 | 7 | 1,534.88 | | | |
| 14 | 14 | 9 | 19 | 237 | .... | 208 | .... | 10 | 44,687.11 | 4,611.80 | | |
| 1 | 1 | .. | 2 | .... | 33 | .... | 20 | 10 | 1,246.74 | | | |
| .. | 2 | 2 | .. | .... | 37 | .... | 28 | 10 | 1,061.34 | | | |
| 1 | 1 | .. | 2 | .... | 36 | .... | 28 | 10 | 1,246.74 | | | |
| 1 | 1 | .. | 2 | .... | 19 | .... | 17 | 10 | 1,246.74 | | | |
| 1 | 1 | .. | 2 | .... | 25 | .... | 24 | 10 | 1,246.74 | | | |
| 1 | 1 | 1 | 1 | .... | 33 | .... | 25 | 10 | 1,241.94 | | | |
| 2 | 6 | 2 | 6 | 163 | .... | 156 | .... | 9 | | | 5,517.96 | |
| .. | 1 | .. | 1 | .... | .... | .... | .... | .. | 300.00 | | | |
| 1 | 3 | 1 | 3 | .... | 124 | .... | 99 | 8 | | | 1,200.00 | |
| 4 | 12 | 4 | 12 | 156 | .... | 149 | .... | 10 | | | 20,000.00 | |
| 1 | 2 | .. | 3 | .... | 42 | .... | 37 | 10 | 1,877.09 | | | |
| 8 | 11 | 4 | 15 | 216 | .... | 192 | .... | 10 | 25,603.37 | 1,401.00 | | |
| 8 | 7 | 4 | 11 | 110 | .... | 102 | .... | 10 | 17,443.34 | 608.24 | | |
| 5 | 9 | 4 | 10 | 174 | .... | 141 | .... | 10 | 19,031.02 | 2,881.80 | | |
| 5 | 8 | 4 | 9 | 116 | .... | 106 | .... | 10 | 16,387.17 | 3,196.34 | | 14 |
| 3 | 7 | 2 | 8 | 97 | .... | 85 | .... | 10 | 12,197.04 | 132.15 | | |
| 5 | 5 | 2 | 8 | 79 | .... | 65 | .... | 10 | 14,907.75 | 1,685.61 | | 1 |
| 25 | 25 | 11 | 39 | 687 | .... | 560 | .... | 10 | 77,493.34 | 5,249.56 | | |
| | | | | | | | | | | | | 4 |
| .... | 2 | 1 | 1 | .... | 35 | .... | 25 | 10 | 2,306.77 | 32.00 | | |
| 1 | 1 | .. | 2 | .... | 13 | .... | 8 | 10 | 1,161.46 | | | |
| 1 | 1 | .. | 2 | .... | 27 | .... | 24 | 10 | 1,491.48 | | | |
| 1 | 1 | 2 | .. | .... | 20 | .... | 15 | 10 | 1,268.21 | | | |
| 1 | .. | .. | 1 | .... | .... | .... | .... | .. | 942.47 | | | |
| 1 | 1 | .. | 2 | .... | 20 | .... | 12 | 10 | 1,229.19 | | | |
| 1 | 1 | .. | 2 | .... | 9 | .... | 8 | 10 | 1,047.89 | | | |
| .. | 2 | .. | 2 | .... | 19 | .... | 15 | 10 | 1,247.53 | | | |
| 1 | .. | .. | 1 | .... | .... | .... | .... | .. | 834.32 | | | |
| | | | | | | | | | | | | 10 |
| 1 | 1 | 1 | 2 | .... | 24 | .... | 15 | 10 | 1,295.17 | | | |
| 1 | 1 | .. | 2 | .... | 28 | .... | 22 | 10 | 1,400.80 | | | |
| 1 | 1 | .. | 2 | .... | 21 | .... | 13 | 10 | 1,318.22 | | | |
| 1 | 1 | .. | 2 | .... | 17 | .... | 13 | 10 | 1,317.70 | | | |
| 1 | 1 | .. | 2 | .... | 30 | .... | 15 | 10 | 1,304.71 | | | |
| 1 | .. | .. | 1 | .... | .... | .... | .... | .. | 1,400.00 | | | |
| .... | 2 | .. | 2 | .... | 25 | .... | 19 | 10 | 1,263.72 | | | |
| 1 | 1 | .. | 2 | .... | 28 | .... | 15 | 10 | 1,250.32 | | | |
| .... | 1 | .. | 1 | .... | 23 | .... | 15 | 10 | 780.04 | | | |
| .... | 1 | .. | 1 | .... | 18 | .... | 10 | 9 | 540.00 | | | |
| .... | 1 | .. | 1 | .... | 14 | .... | 8 | 10 | 600.00 | | | |
| 2 | 6 | .. | 8 | 97 | .... | 80 | .... | 10 | | | 7,236.00 | |
| 4 | 7 | 2 | 9 | 121 | .... | 100 | .... | 10 | | | 10,500.00 | |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

CVWD 563-174

**164**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Statistics of Indian schools during the*

| School. | Supported by— | Capacity. Boarding. | Capacity. Day. |
|---|---|---|---|
| **COLORADO.** | | | |
| Grand Junction, nonreservation boarding | Government | 200 | |
| Fort Lewis, nonreservation boarding | do | 200 | |
| Southern Ute: Southern Ute boarding | do | 50 | |
| Navaho Springs day | do | | 20 |
| **IDAHO.** | | | |
| Fort Hall: Fort Hall boarding | Government | 115 | |
| Lemhi: Lemhi boarding | do | 75 | |
| Nez Percé | | | |
| Fort Lapwai boarding | do | 150 | |
| Slickpoo, St. Joseph's Mission boarding | Catholic Church | 70 | |
| Coeur d'Alène: | | | |
| Field service | Government | | |
| De Smet Mission boarding | Catholic Church | 150 | |
| **INDIAN TERRITORY.** | | | |
| Quapaw | | | |
| Seneca boarding | Government | 130 | |
| St. Mary's Mission boarding | Catholic Church | 120 | |
| **IOWA.** | | | |
| Sac and Fox: Sac and Fox boarding | Government | 80 | |
| **KANSAS.** | | | |
| Potawatomi: Potawatomi boarding | Government | 80 | |
| Kickapoo | | | |
| Kickapoo boarding | do | 70 | |
| Great Nemaha day | do | | 40 |
| Sac and Fox day | do | | 42 |
| Lawrence (Haskell Institute), nonreservation boarding | do | 750 | |
| **MICHIGAN.** | | | |
| Mount Pleasant, nonreservation boarding | Government | 330 | |
| Bay Mills day | do | | 32 |
| Baraga, Chippewa Mission boarding | Catholic Church | 120 | |
| Harbor Springs, Holy Childhood Mission boarding | do | 200 | |
| **MINNESOTA.** | | | |
| Morris, nonreservation boarding | Government | 160 | |
| Pipestone, nonreservation boarding | do | 225 | |
| Birch Cooley day | do | | 36 |
| White Earth: | | | |
| White Earth boarding | do | 134 | |
| Wild Rice River day | do | 65 | |
| Pine Point boarding | do | 75 | |
| White Earth day | do | | 40 |
| Pembina day | do | | 40 |
| Porterville day | do | | 30 |
| Buffalo River day | do | | 30 |
| Beaulieu day | do | | 30 |
| St. Benedict's Orphan Mission boarding | Catholic Church | 150 | |
| Leech Lake: | | | |
| Leech Lake boarding | Government | 60 | |
| Bena boarding | do | 40 | |
| Cass Lake boarding | do | 50 | |
| Field service for these schools | do | | |
| Red Lake: | | | |
| Red Lake boarding | do | 80 | |
| Cross Lake boarding | do | 50 | |
| St. Mary's Mission boarding | Catholic Church | 100 | |
| Vermilion Lake boarding | Government | 150 | |
| Nett Lake day | do | | 25 |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.   165

*fiscal year ended June 30, 1907—Continued.*

| Male | Female | Indian | White | Boarding | Day | Boarding | Day | Months in session. | Cost to Government. | Value of subsistence raised by school. | Cost to other parties. | Indians in public schools not under Government contract. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 14 | 2 | 22 | 262 | .... | 229 | .... | 12 | $30,880.34 | $1,123.35 | .... | |
| 14 | 11 | 9 | 16 | 242 | .... | 192 | .... | 12 | 29,233.50 | 379.10 | .... | |
| 3 | 6 | .... | 9 | 75 | .... | 69 | .... | 10 | 11,421.03 | 311.00 | .... | |
| 1 | 1 | .... | 2 | .... | 20 | .... | 17 | 10 | 1,711.00 | .... | .... | |
| | | | | | | | | | | | | |
| 6 | 7 | 1 | 12 | 152 | .... | 147 | .... | 10 | 21,640.67 | 900.70 | .... | •10 |
| 2 | 7 | 3 | 6 | 66 | .... | 60 | .... | 7 | 6,757.14 | 808.14 | .... | 20 |
| 6 | 8 | .... | 14 | 131 | .... | 105 | .... | 9 | 15,211.46 | 784.70 | .... | |
| 7 | 14 | .... | 21 | 56 | .... | 18 | .... | 10 | .... | .... | $1,700.00 | |
| 1 | .... | .... | 1 | .... | .... | .... | .... | .... | 600.00 | .... | .... | |
| 13 | 10 | .... | 23 | 95 | .... | 91 | .... | 10 | .... | .... | 11,450.00 | |
| | | | | | | | | | | | | 317 |
| 6 | 10 | 5 | 11 | 163 | .... | 122 | .... | 10 | 18,367.44 | 1,196.85 | .... | |
| .... | 5 | .... | 5 | 40 | 6 | 34 | 6 | 10 | .... | .... | 2,000.00 | |
| 4 | 7 | .... | 11 | 68 | .... | 62 | .... | 10 | 9,725.73 | 1,127.65 | .... | |
| 2 | 7 | 3 | 6 | 62 | .... | 56 | .... | 10 | 10,368.32 | 135.20 | .... | 7 |
| 6 | 6 | 1 | 11 | 79 | .... | 74 | .... | 10 | 11,285.72 | 108.61 | .... | 18 |
| 1 | .... | .... | 1 | .... | 28 | .... | 18 | 10 | 653.75 | .... | .... | |
| 1 | .... | .... | 1 | .... | 32 | .... | 17 | 10 | 640.97 | .... | .... | |
| 36 | 33 | 10 | 59 | 840 | .... | 764 | .... | 10 | 131,667.60 | 13,499.58 | .... | |
| 17 | 17 | 13 | 21 | 350 | .... | 341 | .... | 10 | 48,999.08 | 6,106.50 | .... | |
| 1 | 1 | .... | 2 | .... | 35 | .... | 21 | 10 | 1,254.71 | .... | .... | |
| 1 | 10 | .... | 11 | 24 | .... | 20 | .... | 10 | .... | .... | 10,000.00 | ..t.. |
| 5 | 10 | .... | 15 | 110 | .... | 105 | .... | 10 | .... | .... | 6,850.00 | |
| 9 | 12 | 3 | 18 | 168 | .... | 162 | .... | 10 | 26,543.72 | 1,707.00 | .... | 1 |
| 11 | 11 | 9 | 13 | 226 | .... | 212 | .... | 10 | 40,279.07 | 3,178.36 | .... | |
| 1 | 1 | .... | 2 | .... | 22 | .... | 15 | 10 | 1,020.74 | 9.50 | .... | |
| 10 | 7 | 6 | 11 | 159 | .... | 125 | .... | 10 | 25,110.54 | 1,022.79 | .... | |
| 2 | 9 | 7 | 4 | 86 | .... | 72 | .... | 10 | 11,800.96 | 7.50 | .... | |
| 3 | 7 | 7 | 3 | 91 | .... | 76 | .... | 10 | 9,990.51 | 307.60 | .... | |
| 1 | .... | .... | 1 | .... | 51 | .... | 22 | 10 | 668.00 | .... | .... | |
| 1 | 1 | .... | 2 | .... | 32 | .... | 18 | 9 | 1,602.66 | .... | .... | |
| 1 | 1 | .... | 2 | .... | 38 | .... | 22 | 10 | 1,564.05 | 37.30 | .... | |
| 1 | 1 | .... | 2 | .... | 22 | .... | 13 | 5 | 726.89 | .... | .... | |
| .... | 1 | .... | 2 | .... | 24 | .... | 20 | 4 | 364.93 | .... | .... | |
| 3 | 7 | 1 | 9 | 101 | .... | 98 | .... | 10 | .... | .... | 7,832.42 | |
| 6 | 6 | 4 | 8 | 110 | 16 | 90 | 12 | 10 | 16,100.55 | 463.68 | .... | |
| 2 | 5 | 6 | 1 | 67 | .... | 57 | .... | 10 | 8,298.59 | 357.06 | .... | |
| 2 | 5 | 6 | 1 | 56 | .... | 50 | .... | 10 | 6,193.45 | 199.95 | .... | |
| 1 | .... | 1 | .... | .... | .... | .... | .... | 10 | 1,200.00 | .... | .... | |
| 4 | 7 | 2 | 9 | 116 | .... | 91 | .... | 10 | 15,518.79 | 271.65 | .... | |
| 3 | 5 | 6 | 2 | 65 | .... | 59 | .... | 10 | 7,996.04 | 201.75 | .... | |
| 3 | 5 | 1 | 7 | 85 | .... | 64 | .... | 10 | .... | .... | 4,440.00 | |
| 5 | 5 | 1 | 9 | 61 | .... | 49 | .... | 12 | 14,196.50 | 192.99 | .... | |
| .... | 1 | .... | 1 | .... | 37 | .... | 21 | 8 | 451.33 | .... | .... | |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

**166**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Statistics of Indian schools during the*

| School. | Supported by— | Capacity. Boarding. | Day. |
|---|---|---|---|
| **MONTANA.** | | | |
| Fort Shaw, nonreservation boarding | Government | 335 | |
| Blackfeet: | | | |
| Blackfeet boarding | ...do | 75 | |
| Cut Finger day | ...do | | 30 |
| Willow Creek day | ...do | | 28 |
| Holy Family Mission boarding | Catholic Church | 135 | |
| Crow: | | | |
| Crow boarding | Government | 150 | |
| Pryor Creek boarding | ...do | 50 | |
| Lodge Grass day | Baptist Home Missionary Society. | | 50 |
| St. Xavier's Mission boarding | Catholic Church | 120 | |
| Flathead: | | | |
| Flathead boarding | Government | 36 | |
| Flathead day | ...do | | 30 |
| St. Ignatius Mission boarding | Catholic Church | 350 | |
| Fort Belknap: | | | |
| Fort Belknap boarding | Government | 120 | |
| St. Paul's Mission boarding | Catholic Church | 90 | |
| St. Peter's Mission boarding | ...do | 100 | |
| Fort Peck: | | | |
| Fort Peck boarding | Government | 200 | |
| No. 1 day | ...do | | 30 |
| No. 2 day | ...do | | 30 |
| No. 3 day | ...do | | 30 |
| No. 4 day | ...do | | 30 |
| Wolf Point Mission boarding and day | Presbyterian Church | 30 | 15 |
| Tongue River: | | | |
| Tongue River boarding | Government | 75 | |
| Tongue River day | ...do | | 32 |
| St. Labre's Mission boarding | Catholic Church | 65 | |
| **NEBRASKA.** | | | |
| Omaha: Omaha day | Government | | 60 |
| Winnebago: Winnebago boarding | ...do | 90 | |
| Santee: | | | |
| Santee boarding | Government | 80 | |
| Santee Normal Training Mission boarding | Congregational Church | 125 | 25 |
| Genoa, nonreservation boarding | Government | 330 | |
| Thurston County: | | | |
| Public day, district No. 1 | Contract | | |
| Public day, district No. 10 | ...do | | |
| Public day, district No. 14 | ...do | | |
| Public day, district No. 17 | ...do | | |
| Public day, district No. 18 | ...do | | |
| Public day, district No. 21 | ...do | | |
| Public day, district No. 22 | ...do | | |
| Public day, district No. 23 | ...do | | |
| Cuming County: Public day, district No. 20 | ...do | | |
| Knox County: Public day, district No. 36 | ...do | | |
| **NEVADA.** | | | |
| Nevada boarding | Government | 60 | |
| Carson, nonreservation boarding | ...do | 250 | |
| Walker River: Walker River day | ...do | | 32 |
| Fort McDermitt day | ...do | | 65 |
| Moapa River: Moapa River day | ...do | | 30 |
| Western Shoshone: Western Shoshone boarding | ...do | 80 | |
| **NEW MEXICO.** | | | |
| Mescalero: Mescalero boarding | Government | 130 | |
| San Juan: San Juan boarding | ...do | 100 | |
| Jewett: Presbyterian Mission boarding | Presbyterian Church | 30 | |
| Farmington, Navaho Mission boarding | Methodist Episcopal Church. | 18 | |
| Gallup, Rehoboth Mission boarding | Christian Reformed Church | 30 | |
| Albuquerque, nonreservation boarding | Government | 300 | |

*a* Estimated; no reports received from this school.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

*fiscal year ended June 30, 1907—Continued.*

| Employees | | | | Enrollment | | Average attendance | | Months in session | Cost to Government | Value of subsistence raised by school | Cost to other parties | Indians in public schools not under Government contract |
| Sex | | Race | | | | | | | | | | |
| Male | Female | Indian | White | Boarding | Day | Boarding | Day | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 17 | 7 | 24 | 347 | | 321 | | 10 | $47,676.45 | $1,911.60 | | |
| 4 | 6 | 3 | 7 | 88 | | 77 | | 10 | 14,961.93 | | | |
| 1 | 1 | | 2 | | 23 | | 13 | 10 | 1,254.90 | | | |
| 1 | 1 | | 2 | | 13 | | 6 | 8 | 843.68 | | | |
| 12 | 7 | 2 | 17 | 87 | | 70 | | 10 | | | $6,500.00 | |
| 4 | 12 | 7 | 9 | 109 | | 92 | | 10 | 15,815.05 | 1,812.85 | | 20 |
| 2 | 5 | 1 | 6 | 52 | | 49 | | 10 | 9,026.40 | 641.63 | | |
| | 2 | 1 | 1 | | 34 | | 32 | 10 | | | 700.00 | |
| 10 | 6 | | 16 | 62 | | 54 | | 10 | | | 1,200.00 | |
| 2 | 3 | 3 | 2 | 51 | | 45 | | 10 | 5,042.23 | 206.42 | | 8 |
| 1 | 1 | | 2 | | 35 | | 18 | 10 | 1,165.36 | | | |
| 20 | 28 | 2 | 46 | 205 | | 156 | | 10 | | | 27,860.20 | |
| 5 | 9 | 4 | 10 | 153 | | 117 | | 10 | 16,008.15 | 342.75 | | 7 |
| 12 | 6 | 1 | 17 | 77 | | 69 | | 10 | | | 10,300.00 | |
| 5 | 9 | | 14 | 53 | | 50 | | 10 | | | 12,000.00 | |
| 6 | 10 | 4 | 12 | 159 | | 131 | | 10 | 20,720.13 | 1,373.68 | | 20 |
| 1 | 1 | | 2 | | 36 | | 28 | 10 | 2,252.94 | 122.71 | | |
| 1 | 1 | 1 | 1 | | 28 | | 23 | 7 | 1,210.27 | | | |
| 1 | 1 | | 2 | | 27 | | 20 | 5 | 1,672.85 | | | |
| 1 | 1 | | 2 | | 26 | | 20 | 2 | 494.61 | | | |
| 1 | 3 | ● | 4 | 27 | 13 | | 24 | 9 | | | 3,177.10 | |
| 5 | 7 | 4 | 8 | 83 | | 64 | | 10 | 15,284.01 | 827.52 | | |
| 1 | 1 | | 2 | | 33 | | 22 | 10 | 1,663.49 | | | |
| 2 | 6 | 1 | 7 | 52 | | 45 | | 10 | | | 4,500.00 | |
| 2 | | | 2 | | 22 | | 11 | 10 | 1,897.38 | | | 80 |
| 3 | 7 | 1 | 9 | 83 | | 74 | | 10 | 13,462.93 | 256.80 | | 25 |
| | | | | | | | | | | | | 89 |
| 4 | 6 | 3 | 7 | 92 | | 75 | | 10 | 10,948.22 | 401.25 | | |
| 6 | 12 | 2 | 16 | 111 | 8 | 94 | 5 | 9 | | | 10,470.00 | |
| 15 | 15 | 3 | 27 | 320 | | 303 | | 10 | 60,412.84 | 6,906.26 | | |
| | | | | | 12 | | 4+ | 9 | 79.30 | | | |
| | | | | | 6 | | 4— | 7 | 48.10 | | | |
| | | | | | 16 | | 5— | 9 | 85.70 | | | |
| | | | | | 28 | | 11+ | 10 | 330.24 | | | |
| | | | | | 5 | | 2+ | 9 | 21.65 | | | |
| | | | | | 11 | | 4— | 5 | 67.80 | | | |
| | | | | | 6 | | 1+ | 7 | 26.90 | | | |
| | | | | | a 4 | | a 2 | | | | | |
| | | | | | 10 | | 8— | 9 | 94.40 | | | |
| | | | | | 14 | | 8— | 9 | 223.32 | | | |
| 3 | 5 | 2 | 6 | 65 | | 58 | | 10 | 11,568.71 | 132.60 | | |
| 11 | 14 | 3 | 22 | 283 | | 260 | | 10 | 38,020.65 | 4,345.39 | | |
| 1 | 1 | | 2 | | 29 | | 18 | 10 | 1,665.91 | | | 1 |
| 1 | 2 | | 3 | | 65 | | 56 | 10 | 2,331.95 | 6.50 | | |
| 1 | 2 | 1 | 2 | | 14 | | 9 | 10 | 1,767.24 | | | |
| 2 | 7 | 1 | 8 | 80 | | 73 | | 10 | 11,575.38 | 307.60 | | |
| 2 | 9 | 1 | 10 | 112 | | 104 | | 10 | 16,230.43 | 269.17 | | |
| 3 | 7 | 1 | 9 | 107 | | 75 | | 5 | 9,232.22 | 57.84 | | |
| 1 | 3 | | 4 | 17 | | 14 | | 8 | | | 3,100.00 | |
| 2 | 3 | 1 | 4 | 18 | | 15 | | 9 | | | 2,578.00 | |
| 1 | 4 | | 5 | 24 | | 22 | | 11 | | | 4,000.00 | |
| 16 | 14 | 10 | 20 | 322 | | 275 | | 10 | 47,353.06 | 544.61 | | |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-178

**168**    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Statistics of Indian schools during the*

| School. | Supported by— | Capacity. | |
| --- | --- | --- | --- |
| | | Boarding. | Day. |
| NEW MEXICO—continued. | | | |
| Pueblo schools under Albuquerque superintendent: | | | |
| Acomita day | Government, | | 32 |
| Isleta day | do | | 32 |
| Laguna day | do | | 36 |
| McCarty's day | do | | 25 |
| Miseta day | do | | 20 |
| Pahuate day | do | | 40 |
| Paraje day | do | | 32 |
| San Felipe day | do | | 50 |
| Seama day | do | | 40 |
| Santa Fe, nonreservation boarding | do | 300 | |
| Pueblo schools under Santa Fe superintendent: | | | |
| Cochite day | do | | 26 |
| Jemez day | do | | 36 |
| Nambe day | do | | 20 |
| Picuris day | do | | 16 |
| Santa Clara day | do | | 30 |
| San Ildefonso day | do | | 21 |
| San Juan day | do | | 40 |
| Sia day | do | | 30 |
| Taos day | do | | 32 |
| Clerk for these schools | do | | |
| Jicarilla boarding | do | 125 | |
| Bernalillo, Mission boarding | Catholic Church | 115 | |
| Santa Fe, St. Catherine's Mission boarding | do | 160 | |
| Zuni boarding | Government | 60 | |
| Zuni day | do | | 30 |
| NORTH CAROLINA. | | | |
| Eastern Cherokee | | | |
| Cherokee boarding | Government | 170 | |
| NORTH DAKOTA. | | | |
| Devils Lake: | | | |
| Fort Totten boarding | Government | 350 | |
| Fort Totten day No. 1 | do | | 30 |
| Fort Totten day No. 2 | do | | 30 |
| Fort Totten day No. 3 | do | | 30 |
| Fort Totten day No. 4 | do | | 50 |
| Turtle Mountain, St. Mary's Mission boarding | Catholic Church | 140 | |
| Standing Rock: | | | |
| Standing Rock boarding | Government | 136 | |
| Agricultural boarding (Martin Kenel) | do | 100 | |
| Grand River boarding | do | 140 | |
| Cannon Ball day | do | | 40 |
| Bullhead day | do | | 50 |
| Porcupine day | do | | 40 |
| No. 1 day | do | | 20 |
| No. 2 day | do | | 26 |
| Little Oak Creek day | do | | 22 |
| Field service for these schools | do | | |
| St. Elizabeth's Mission boarding | Episcopal Church | 50 | |
| Day school inspector | Government | | |
| Fort Berthold: | | | |
| Fort Berthold boarding | do | 107 | |
| No. 1 day | do | | 40 |
| No. 2 day | do | | 50 |
| No. 3 day | do | | 42 |
| OKLAHOMA. | | | |
| Cheyenne and Arapaho: | | | |
| Arapaho boarding | Government | 150 | |
| Cheyenne boarding | do | 140 | |
| Superintendent for these schools | do | | |
| Cantonment, boarding | do | 80 | |
| Seger boarding | do | 150 | |
| Red Moon boarding | do | 70 | |
| Chilocco, nonreservation boarding | do | 700 | |
| Kiowa | do | | |
| Fort Sill boarding | do | 180 | |
| Rainy Mountain boarding | do | 124 | |
| Riverside boarding | do | 150 | |
| Carpenter for these schools | do | | |

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

*fiscal year ended June 30, 1907—Continued.*

| Employees | | | | Enrollment | | Average attendance | | Months in session | Cost to Government | Value of subsistence raised by school | Cost to other parties | Indians in public schools not under Government contract |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Male | Female | Indian | White | Boarding | Day | Boarding | Day | | | | | |
| | 2 | | 2 | | 60 | | 28 | 10 | $1,669.29 | | | |
| | 2 | 1 | 1 | | 61 | | 38 | 10 | 1,302.25 | | | |
| | 2 | 1 | 1 | | 43 | | 36 | 10 | 1,533.05 | | | |
| | 1 | | 1 | | 23 | | 15 | 10 | 1,132.33 | | | |
| | 2 | | 2 | | 21 | | 18 | 10 | 1,357.72 | | | |
| | 2 | 1 | 1 | | 44 | | 30 | 10 | 1,634.03 | | | |
| | 2 | 1 | 1 | | 23 | | 19 | 10 | 1,436.43 | | | |
| | 1 | | 2 | | 46 | | 41 | 10 | 1,426.48 | | | |
| 1 | 2 | 1 | 1 | | 25 | | 20 | 10 | 1,408.39 | | | |
| 16 | 18 | 15 | 19 | 335 | | | 323 | 10 | 56,277.43 | $5,546.31 | | |
| | 2 | 1 | 1 | | 27 | | 19 | 10 | 1,285.33 | | | |
| | 2 | | 1 | | 43 | | 33 | 10 | 1,802.75 | | | |
| 1 | 2 | | 3 | | 26 | | 16 | 10 | 1,228.00 | | | |
| | 2 | 1 | 1 | | 21 | | 17 | 10 | 1,133.91 | | | |
| | 2 | | 2 | | 45 | | 29 | 10 | 1,410.27 | | | |
| | 2 | | 2 | | 29 | | 24 | 10 | 1,409.71 | | | |
| | 2 | 1 | 2 | | 58 | | 48 | 10 | 1,969.62 | | | |
| | 2 | | 2 | | 29 | | 23 | 10 | 1,498.83 | | | |
| | 2 | | 2 | | 77 | | 50 | 10 | 1,718.86 | | | |
| 1 | | | 1 | | | | | | 800.00 | | | |
| 8 | 8 | 4 | 12 | 134 | | | 115 | 10 | 17,774.51 | 600.80 | | |
| 1 | 8 | | 9 | 78 | | | 75 | 12 | | | $6,500.00 | |
| 4 | 14 | 3 | 15 | 168 | | | 161 | 10 | | | 16,000.00 | |
| 5 | 7 | 1 | 11 | 100 | | | 76 | 9 | 25,368.85 | | | |
| | 3 | 1 | 2 | | 40 | | 26 | | 2,551.38 | | | |
| 9 | 8 | 6 | 11 | 190 | | | 141 | 10 | 17,632.41 | 383.63 | | 20 |
| 15 | 23 | 5 | 33 | 387 | | | 295 | 10 | 59,079.95 | 4,262.68 | | |
| 1 | 1 | | 2 | | 48 | | 21 | 10 | 1,380.30 | | | |
| 1 | 1 | | 2 | | 48 | | 24 | 10 | 1,611.26 | | | |
| 1 | 1 | | 2 | | 52 | | 25 | 6 | 934.86 | | | |
| 1 | 1 | 1 | 1 | | 49 | | 24 | 10 | 1,526.41 | | | |
| 1 | 12 | | 9 | 149 | | | 123 | 10 | | | 10,260.00 | |
| 6 | 12 | 4 | 14 | 175 | | | 154 | 10 | 24,536.33 | 1,059.52 | | |
| 5 | 11 | 7 | 9 | 128 | | | 114 | 10 | 19,280.70 | 2,859.34 | | |
| 7 | 7 | 2 | 12 | 139 | | | 124 | 10 | 18,516.06 | 509.15 | | |
| 2 | 2 | 3 | 1 | | 47 | | 35 | 10 | 2,491.64 | 23.00 | | |
| | 2 | | 2 | | 29 | | 23 | 10 | 1,424.07 | 42.00 | | |
| | 2 | 1 | 2 | | 26 | | 19 | 10 | 1,486.77 | 18.15 | | |
| | 2 | | 2 | | 16 | | 14 | 10 | 1,282.22 | 22.00 | | |
| | 1 | | 2 | | 22 | | 17 | 10 | 1,419.07 | 34.00 | | |
| 1 | 6 | 5 | 2 | | 22 | | 18 | 7 | 1,027.35 | | | |
| 3 | 7 | | 8 | 55 | | | 50 | 10 | 3,000.00 | | | |
| 1 | | | 1 | | | | | | 878.55 | | 5,400.00 | |
| 5 | 6 | 1 | 10 | 117 | | | 105 | 10 | 14,017.22 | 214.25 | | |
| 1 | 1 | | 2 | | 29 | | 22 | 10 | 1,222.99 | 3.00 | | |
| 1 | 1 | | 2 | | 31 | | 18 | 10 | 1,243.51 | 39.00 | | |
| 1 | 1 | 1 | 1 | | 37 | | 33 | 10 | 1,565.29 | | | |
| 9 | 9 | 3 | 11 | 107 | | | 101 | 10 | 16,929.72 | 4,646.06 | | |
| 6 | 9 | 4 | 11 | 121 | | | 117 | 10 | 25,284.17 | 1,348.78 | | |
| 1 | | | 1 | | | | | | 1,500.00 | | | |
| 8 | | 3 | 9 | 98 | | | 61 | 10 | 12,128.21 | 1,265.39 | | |
| 5 | 8 | 3 | 10 | 113 | | | 107 | 10 | 16,625.61 | 2,022.76 | | |
| 3 | 4 | 3 | 4 | 34 | | | 32 | 10 | 5,412.76 | 1,402.08 | | |
| 42 | 31 | 34 | 39 | 886 | | | 703 | 12 | 104,699.09 | 12,916.89 | | 30 |
| 6 | 12 | 5 | 13 | 175 | | | 168 | 10 | 23,630.56 | 777.60 | | |
| 5 | 9 | 2 | 12 | 143 | | | 155 | 10 | 19,737.69 | 592.05 | | |
| 6 | 8 | 3 | 11 | 153 | | | 142 | 10 | 19,993.86 | 655.96 | | |
| 1 | | | 1 | | | | | | 600.00 | | | |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

CVWD 563-180

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 207 of 212   Page ID
#:4223

*Statistics of Indian schools during the*

| School. | Supported by— | Capacity. Boarding. | Day. |
|---|---|---|---|
| **OKLAHOMA—continued.** | | | |
| Kiowa—Continued. | | | |
| Cache Creek Mission boarding | Reformed Presbyterian Church. | 50 | |
| Mary Gregory Mission boarding | Presbyterian Church | 60 | |
| Methvin Mission boarding | Methodist Church South | 80 | |
| St. Patrick's Mission boarding | Catholic Church | 100 | |
| Osage | | | |
| Osage boarding | Government | 180 | |
| St. John's Mission boarding | Catholic Church and Government contract. | 150 | |
| St. Louis Mission boarding | do | 125 | |
| Kaw: Kaw boarding | Government | 44 | |
| Ponca: Ponca boarding | do | 100 | |
| Pawnee: Pawnee boarding | do | 120 | |
| Oto: Oto boarding | do | 85 | |
| Sac and Fox: Sac and Fox boarding | do | 100 | |
| Shawnee | | | |
| Shawnee boarding | do | 100 | |
| St. Mary's Academy (Mission) | Catholic Church | 75 | |
| St. Benedict's Academy (Mission) | do | 60 | |
| Etna, Whirlwind Mission day | Episcopal Church | | 25 |
| **OREGON.** | | | |
| Grande Ronde: Grande Ronde boarding | Government | 90 | |
| Klamath: | | | |
| Klamath boarding | do | 110 | |
| Yainax boarding | do | 80 | |
| Superintendent for these schools | do | | |
| Clerk for these schools | do | | |
| Siletz: Siletz boarding | do | 84 | |
| Umatilla: | | | |
| Umatilla boarding | do | 100 | |
| Kate Drexel Mission boarding | Catholic Church | 150 | |
| Warm Springs: | | | |
| Warm Springs boarding | Government | 150 | |
| Simnasho day | do | | 30 |
| Chemawa, Salem nonreservation boarding | do | 600 | |
| **PENNSYLVANIA.** | | | |
| Carlisle, nonreservation boarding | Government | 1,200 | |
| Philadelphia, Lincoln Institution | Philanthropy | 100 | |
| **SOUTH DAKOTA.** | | | |
| Crow Creek | | | |
| Crow Creek boarding | Government | 120 | |
| Field Service | do | | |
| Immaculate Conception Mission boarding | Catholic Church | 75 | |
| Cheyenne River: | | | |
| Cheyenne River boarding | Government | 144 | |
| No. 1 day | do | | 25 |
| No. 5 day | do | | 20 |
| No. 7 day | do | | 22 |
| No. 8 day | do | | 28 |
| Field service and physician for these schools | do | | |
| Oahe, Mission boarding | Congregational Church | 50 | |
| Lower Brulé | | | |
| Lower Brulé boarding | Government | 130 | |
| Field service | do | | |
| Pine Ridge | | | |
| Pine Ridge boarding | Government | 210 | |
| Holy Rosary Mission boarding | Catholic Church | 250 | |
| No. 1 day | Government | | 35 |
| No. 3 day | do | | 35 |
| No. 4 day | do | | 35 |
| No. 6 day | do | | 35 |
| No. 7 day | do | | 35 |
| No. 8 day | do | | 35 |
| No. 9 day | do | | 35 |
| No. 10 day | do | | 35 |
| No. 11 day | do | | 35 |
| No. 12 day | do | | 35 |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-181

*fiscal year ended June 30, 1907—Continued.*

| Employees. | | | | Enrollment | | Average attendance. | | Months in session. | Cost to Government. | Value of subsistence raised by school. | Cost to other parties. | Indians in public schools not under Government contract. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sex. | | Race. | | | | | | | | | | |
| Male. | Female. | White. | Indian. | Boarding. | Day. | Boarding. | Day. | | | | | |
| 4 | 7 | 1 | 10 | 55 | | 52 | | 8 | | | $8,419.27 | |
| 2 | 5 | | 7 | 23 | | 20 | | 8 | | | 6,100.00 | |
| 1 | 6 | 1 | 6 | 44 | | 33 | | 9 | | | 4,165.00 | |
| 8 | 4 | | 12 | 82 | | 76 | | 10 | | | 8,000.00 | |
| | | | | | | | | | | | | 137 |
| 10 | 15 | 6 | 19 | 144 | | 137 | | 10 | $51,217.95 | $165.49 | | |
| 3 | 7 | | 10 | 36 | | 34 | | 10 | 4,151.82 | | | |
| | 11 | | 11 | 92 | | 80 | | 10 | 9,375.00 | | | |
| 1 | 6 | 2 | 5 | 42 | | 39 | | 6 | 5,260.62 | 1,006.28 | | 36 |
| 4 | 8 | 2 | 10 | 106 | | 104 | | 10 | 14,846.29 | 1,785.34 | | 4 |
| 6 | 7 | 2 | 11 | 110 | | 105 | | 10 | 14,694.35 | 828.46 | | 12 |
| 5 | 6 | | 11 | 74 | | 58 | | 10 | 13,973.21 | 1,254.50 | | 30 |
| 5 | 6 | | 11 | 76 | | 68 | | 10 | 12,287.06 | 1,247.89 | | 43 |
| | | | | | | | | | | | | 50 |
| 7 | 8 | 6 | 9 | 150 | | 121 | | 10 | 15,813.79 | 175.00 | | |
| 1 | 6 | | 7 | 62 | | 56 | | 10 | | | 4,320.00 | |
| 2 | 6 | | 8 | 39 | | 35 | | 10 | | | 3,000.00 | |
| 1 | 2 | | 3 | | 27 | | 24 | 7 | | | 600.00 | |
| 3 | 5 | 2 | 6 | 58 | | 50 | | 10 | 9,452.10 | 1,403.35 | | 20 |
| 8 | 6 | 3 | 11 | 122 | | 108 | | 10 | 16,593.24 | 2,208.46 | | |
| 4 | 7 | 3 | 8 | 76 | | 60 | | 10 | 16,498.00 | 1,184.60 | | |
| 1 | | | 1 | | | | | | 1,500.00 | | | |
| 1 | | | 1 | | | | | | 818.18 | | | |
| 3 | 4 | 4 | 3 | 62 | | 55 | | 10 | 8,645.71 | 908.41 | | 2 |
| 6 | 6 | 3 | 9 | 104 | | 88 | | 10 | 12,038.34 | 419.30 | | |
| 5 | | | 12 | 101 | | 87 | | 10 | | | 8,000.00 | |
| 7 | 6 | 3 | 10 | 109 | | 91 | | 10 | 15,678.04 | 2,096.10 | | |
| 1 | 1 | | 2 | | 23 | | 18 | 7 | 729.43 | | | |
| 21 | 21 | 8 | 34 | 545 | | 489 | | 10 | 83,483.69 | 9,940.50 | | |
| 44 | 38 | 18 | 64 | 1,034 | | 958 | | 12 | 151,779.64 | 6,476.38 | | |
| 1 | 9 | | 10 | 32 | | 24 | | 12 | | | 6,000.00 | |
| | | | | | | | | | | | | 11 |
| 4 | 8 | 1 | 11 | 107 | | 99 | | 10 | 15,410.09 | 1,913.14 | | |
| 1 | | | 1 | | | | | | 600.00 | | | |
| 5 | 8 | | 13 | 56 | | 53 | | 10 | | | 7,653.98 | |
| 7 | 9 | 6 | 10 | 180 | | 166 | | 10 | 25,284.17 | 1,348.78 | | |
| 1 | 1 | | 2 | | 13 | | 11 | 7 | 970.45 | | | |
| 1 | 1 | | 2 | | 21 | | 16 | 10 | 1,434.48 | | | |
| 1 | 1 | | 2 | | 22 | | 18 | 10 | 1,448.25 | | | |
| 1 | 1 | | 2 | | 32 | | 29 | 10 | 1,613.05 | | | |
| 1 | 3 | | 4 | | | | | | 3,100.00 | | | |
| . | 3 | | 3 | 22 | | 19 | | 9 | | | 1,500.00 | 3 |
| 2 | 5 | 2 | 5 | 59 | | 53 | | 10 | 9,240.40 | 347.23 | | |
| . | 1 | | 1 | | | | | | 600.00 | | | 25 |
| 11 | 11 | 8 | 14 | 226 | | 209 | | 10 | 34,626.93 | 1,856.23 | | |
| 12 | 19 | 1 | 30 | 202 | | 190 | | 10 | | | 20,000.00 | |
| 1 | | | 1 | | 27 | | 23 | 10 | 906.66 | | | |
| 1 | 1 | | 2 | | 26 | | 17 | 10 | 1,318.30 | 52.95 | | |
| 1 | 1 | | 2 | | 22 | | 17 | 10 | 1,412.43 | 17.30 | | |
| 1 | 1 | | 2 | | 35 | | 31 | 10 | 1,381.99 | 51.50 | | |
| 1 | 1 | | 2 | | 31 | | 27 | 10 | 1,346.80 | 24.50 | | |
| 1 | 1 | 1 | 2 | | 28 | | 24 | 10 | 1,338.18 | 50.50 | | |
| 1 | 1 | | 2 | | 18 | | 13 | 10 | 1,247.51 | 28.47 | | |
| 1 | 1 | | 2 | | 26 | | 20 | 10 | 1,351.08 | 54.90 | | |
| 1 | 1 | | 2 | | 27 | | 23 | 10 | 1,400.18 | 37.35 | | |
| 1 | 1 | | 2 | | 17 | | 14 | 10 | 1,236.75 | 3.50 | | |
| 1 | 1 | | 2 | | 14 | | 12 | 10 | 1,110.39 | 64.17 | | |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-182

Case 5:13-cv-00883-JGB-SP   Document 85-20   Filed 10/21/14   Page 209 of 212   Page ID #:4225

*Statistics of Indian schools during the*

| School | Supported by— | Capacity. | |
|--------|---------------|:---------:|:---:|
| | | Boarding. | Day. |
| **SOUTH DAKOTA—continued.** | | | |
| Pine Ridge—Continued. | | | |
| No. 13 day | Government | | 35 |
| No. 14 day | ...do | | 35 |
| No. 15 day | ...do | | 35 |
| No. 16 day | ...do | | 35 |
| No. 17 day | ...do | | 35 |
| No. 18 day | ...do | | 35 |
| No. 19 day | ...do | | 35 |
| No. 20 day | ...do | | 35 |
| No. 21 day | ...do | | 35 |
| No. 22 day | ...do | | 35 |
| No. 23 day | ...do | | 35 |
| No. 24 day | ...do | | 35 |
| No. 25 day | ...do | | 35 |
| No. 26 day | ...do | | 35 |
| No. 27 day | ...do | | 35 |
| No. 28 day | ...do | | 35 |
| No. 29 day | ...do | | 35 |
| No. 30 day | ...do | | 35 |
| No. 31 day | ...do | | 35 |
| Field service for these schools | ...do | | ..... |
| Rosebud: | | | |
| Rosebud boarding | ...do | 168 | ..... |
| St. Francis Mission boarding | Catholic Church | 270 | ..... |
| St. Mary's Mission boarding | Episcopal Church | 60 | ..... |
| Black Pipe day | Government | | 25 |
| Bull Creek day | ...do | | 30 |
| Butte Creek day | ...do | | 30 |
| Corn Creek day | ...do | | 30 |
| Cut Meat Creek day | ...do | | 30 |
| He Dog's Camp day | ...do | | 30 |
| Ironwood Creek day | ...do | | 30 |
| Little Crow's Camp day | ...do | | 28 |
| Little White River day | ...do | | 23 |
| Lower Cut Meat Creek day | ...do | | 28 |
| Milk's Camp day | ...do | | 30 |
| Oak Creek day | ...do | | 30 |
| Pine Creek day | ...do | | 25 |
| Red Leaf's Camp day | ...do | | 22 |
| Ring Thunder Camp day | ...do | | 25 |
| Rosebud day | ...do | | 30 |
| Spring Creek day | ...do | | 29 |
| Upper Cut Meat day | ...do | | 30 |
| Upper Pine Creek day | ...do | | 27 |
| White Thunder Creek day | ...do | | 27 |
| Whirlwind Soldier's Camp day | ...do | | 30 |
| Field service for these schools | ...do | | ..... |
| Sisseton: | | | |
| Sisseton boarding | ...do | 100 | ..... |
| Goodwill Mission boarding | Presbyterian Church | 100 | ..... |
| Yankton: Yankton boarding | Government | 120 | ..... |
| Flandreau (Riggs Institute) nonreservation boarding | ...do | 375 | ..... |
| Pierre, nonreservation boarding | ...do | 180 | ..... |
| Chamberlain, nonreservation boarding | ...do | 200 | ..... |
| Rapid City, nonreservation boarding | ...do | 250 | ..... |
| Stanley County: public day, independent district | Contract | | ..... |
| Charles Mix County: public day, Yankton district | ...do | | ..... |
| Springfield, boarding | Government | 60 | ..... |
| **UTAH.** | | | |
| Uintah and Ouray, Uintah boarding | Government | 67 | ..... |
| Orton, Panguitch boarding | ...do | 50 | ..... |
| Aneth, Navaho Mission boarding | Independent Mission | 20 | ..... |
| **VIRGINIA.** | | | |
| Hampton, Normal and Agricultural Institute | Special appropriation—contract and philanthropy. | 150 | ..... |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-183

*fiscal year ended June 30, 1907—Continued.*

| Male | Female | Indian | White | Boarding (enr.) | Day (enr.) | Boarding (att.) | Day (att.) | Months in session | Cost to Government | Value of subsistence raised by school | Cost to other parties | Indians in public schools not under Government contract |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | 2 | 17 | | 12 | | 10 | $1,196.20 | $31.00 | | |
| 1 | 1 | | 2 | 30 | | 23 | | 10 | 1,334.21 | 10.95 | | |
| 1 | 1 | | 2 | 23 | | 15 | | 10 | 1,325.82 | 40.80 | | |
| 1 | 1 | | 2 | 34 | | 24 | | 10 | 1,512.37 | 56.90 | | |
| 1 | 1 | | 2 | 18 | | 14 | | 10 | 1,272.12 | 79.75 | | |
| 1 | 1 | | 2 | 23 | | 18 | | 10 | 1,373.30 | 39.65 | | |
| 1 | 1 | | 2 | 15 | | 10 | | 10 | 1,341.93 | 69.40 | | |
| 1 | 1 | | 2 | 26 | | 18 | | 10 | 1,163.30 | 21.00 | | |
| 1 | 1 | 2 | | 36 | | 24 | | 10 | 1,370.97 | 6.90 | | |
| 1 | 1 | | 2 | 27 | | 22 | | 10 | 1,372.04 | 28.00 | | |
| 1 | 1 | | 2 | 20 | | 14 | | 10 | 1,274.74 | 43.50 | | |
| 1 | 1 | | 2 | 33 | | 24 | | 10 | 1,517.25 | 50.02 | | |
| 1 | 1 | | 2 | 29 | | 26 | | 10 | 1,378.09 | 59.00 | | |
| 1 | 1 | | 2 | 19 | | 13 | | 10 | 1,265.16 | 18.00 | | |
| 1 | 1 | 2 | | 26 | | 21 | | 10 | 1,492.95 | 49.75 | | |
| 1 | 1 | | 2 | 25 | | 20 | | 10 | 1,270.01 | 20.40 | | |
| 1 | 1 | | 2 | 20 | | 16 | | 10 | 1,221.17 | 47.13 | | |
| 1 | 1 | 1 | 2 | 13 | | 9 | | 10 | 996.81 | 183.50 | | |
| 1 | 1 | | 2 | 15 | | 10 | | 10 | 1,188.99 | 11.60 | | |
| 4 | | 1 | 3 | | | | | | 3,143.61 | | | |
| 11 | 9 | 4 | 16 | 157 | | 137 | | 10 | 31,959.13 | | | |
| 9 | 17 | | 26 | 218 | | 197 | | 10 | | | $24,000.00 | |
| 2 | 5 | | 7 | 55 | | 49 | | | | | 5,400.00 | |
| 1 | 1 | | 2 | | 21 | | 16 | 9 | 1,491.67 | 100.00 | | |
| 1 | 1 | | 2 | | 21 | | 14 | 9 | 1,471.45 | 100.00 | | |
| 1 | 1 | | 2 | | 15 | | 13 | 9 | 1,374.78 | | | |
| 1 | 1 | | 2 | | 36 | | 27 | 9 | 1,888.82 | 40.00 | | |
| 1 | 1 | | 2 | | 39 | | 30 | 9 | 1,976.07 | 150.00 | | |
| 1 | 1 | | 2 | | 27 | | 23 | 9 | 1,747.43 | 50.00 | | |
| 1 | 1 | | 2 | | 23 | | 20 | 9 | 1,616.04 | 100.00 | | |
| 1 | 1 | | 2 | | 21 | | 18 | 9 | 1,463.15 | 50.00 | | |
| 1 | 1 | | 2 | | 10 | | 8 | 9 | 1,207.60 | | | |
| | 2 | 1 | 1 | | 16 | | 13 | 9 | 1,306.10 | 75.00 | | |
| 1 | 1 | | 2 | | 22 | | 18 | 9 | 1,883.40 | 100.00 | | |
| 1 | 1 | | 2 | | 22 | | 17 | 9 | 1,569.38 | 100.00 | | |
| 1 | 1 | | 2 | | 23 | | 18 | 9 | 1,539.45 | 50.00 | | |
| 1 | 1 | | 2 | | 23 | | 19 | 9 | 1,533.30 | 50.00 | | |
| 1 | 1 | | 2 | | 12 | | 10 | 9 | 1,317.21 | 40.00 | | |
| | 1 | | 1 | | 16 | | 10 | 9 | 785.96 | | | |
| 1 | 1 | | 2 | | 34 | | 27 | 9 | 1,880.69 | | | |
| 1 | 1 | | 2 | | 50 | | 45 | 9 | 2,202.40 | 150.00 | | |
| | 2 | 1 | 1 | | 12 | | 9 | 9 | 1,085.14 | | | |
| 1 | 1 | | 2 | | 14 | | 12 | 9 | 1,351.33 | 50.00 | | |
| 1 | 1 | | 2 | | 25 | | 15 | 9 | 1,528.48 | 50.00 | | |
| 3 | 4 | | 7 | | | | | | 4,697.25 | | | 15 |
| 7 | 6 | 2 | 11 | 94 | | 73 | | 10 | 15,261.59 | 1,016.44 | | |
| 6 | 9 | 3 | 12 | 77 | | 58 | | 9 | | | 12,631.00 | |
| 8 | 7 | 2 | 16 | 107 | | 88 | | 10 | 14,442.74 | 2,182.51 | | 74 |
| 18 | 20 | 11 | 27 | 421 | | 392 | | 10 | 63,068.06 | 6,375.19 | | 8 |
| 9 | 8 | | 17 | 158 | | 148 | | 10 | 25,897.09 | 2,512.73 | | |
| 11 | 12 | 5 | 18 | 247 | | 215 | | 10 | 31,235.70 | 858.83 | | |
| 12 | 15 | 7 | 20 | 272 | | 247 | | 10 | 39,001.62 | 3,801.95 | | |
| | | | | | 10 | | 7+ | 9 | 186.67 | | | |
| | | | | | 6 | | 2+ | 6 | 24.18 | | | |
| 2 | 6 | 2 | 6 | 69 | | 57 | | 10 | 7,544.97 | 488.37 | | |
| 4 | 7 | 2 | 9 | 84 | | 72 | | 10 | 13,858.60 | 934.56 | | |
| 4 | 5 | 3 | 6 | 36 | | 30 | | 10 | 5,379.48 | 1,368.77 | | 2 |
| 1 | 2 | | 3 | 5 | | 5 | | 7 | | | (a) | |
| 10 | 13 | 1 | 22 | 106 | | 91 | | 12 | 15,115.60 | | | |

a **Not** reported.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

**174**   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Statistics of Indian schools during the*

| School. | Supported by— | Capacity. Boarding. | Capacity. Day. |
|---|---|---|---|
| **WASHINGTON.** | | | |
| Colville: | | | |
| Colville boarding (Fort Spokane) | Government | 200 | |
| No. 1 day | do | | 30 |
| No. 2 day | do | | 32 |
| No. 3 day | do | | 36 |
| No. 4 day | do | | 31 |
| St. Francis Regis Mission boarding | Catholic Church | 90 | |
| St. Mary's Mission boarding | do | 100 | |
| Field service | Government | | |
| Neah Bay: | | | |
| Neah Bay day | Government | | 70 |
| Quileute day | do | | 42 |
| Puyallup: | | | |
| Puyallup boarding | Government | 175 | |
| Chehalis day | do | | 40 |
| Jamestown day | do | | 24 |
| Fort Gamble day | do | | 26 |
| Skokomish day | do | | 40 |
| Toholah day (Quinaielt) | do | | 32 |
| St. George's Mission boarding | Catholic Church | 90 | |
| Tulalip: | | | |
| Tulalip boarding | Government | 134 | |
| Port Madison day | do | | 30 |
| Swinomish day | do | | 60 |
| Yakima: | | | |
| Yakima boarding | Government | 150 | |
| **WISCONSIN.** | | | |
| Green Bay: | | | |
| Green Bay boarding (Menominee) | Government | 75 | |
| Stockbridge day | do | | 40 |
| St. Joseph's Mission boarding | Catholic Church and Government contract. | 200 | |
| Zoar Mission boarding | Lutheran Church | 30 | |
| Red Springs Mission boarding | do | 34 | |
| Oneida: | | | |
| Oneida boarding | Government | 200 | |
| Oneida day | do | | 40 |
| Adventist Mission day | Seventh Day Adventist Church. | | 20 |
| Episcopal Mission day | Episcopal Church | | 20 |
| La Pointe: | | | |
| Lac du Flambeau boarding | Government | 250 | |
| Lac Courte Oreille day | do | | 63 |
| Fond du Lac day | do | | 30 |
| Grand Portage day | do | | 30 |
| Odanah day | do | | 125 |
| Red Cliff day | do | | 50 |
| Clerk for these schools | do | | |
| Bayfield Mission boarding | Catholic Church | 75 | |
| St. Mary's Mission boarding | do | 125 | |
| Hayward, boarding | Government | 215 | |
| Wittenberg, nonreservation boarding | do | 120 | |
| Eland, Bethany Mission boarding | Evangelical Lutheran Church. | 50 | |
| Tomah, nonreservation boarding | Government | 275 | |
| **WYOMING.** | | | |
| Shoshoni: | | | |
| Shoshoni boarding | Government | 180 | |
| St. Stephen's Mission boarding | Catholic Church | 130 | |
| Shoshoni Mission boarding | Episcopal Church | 20 | |
| Arapaho Subissue Station day | Government | | 30 |

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

CVWD 563-185

fiscal year ended June 30, 1907—Continued.

| Male. | Female. | Indian. | White. | Boarding. | Day. | Boarding. | Day. | Months in session. | Cost to Government. | Value of subsistence raised by school. | Cost to other parties. | Indians in public schools not under Government contract. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | 40 |
| 6 | 10 | .... | 16 | 138 | ...... | 71 | ...... | 10 | $14,213.89 | $1,682.13 | .............. | |
| .... | 2 | .... | 2 | ...... | 36 | ...... | 20 | 10 | 958.58 | .............. | .............. | |
| 1 | 1 | .... | 2 | ...... | 54 | ...... | 33 | 4 | 382.71 | .............. | .............. | |
| 1 | 1 | .... | 2 | ...... | 60 | ...... | 41 | 8 | 940.67 | .............. | .............. | |
| 1 | 1 | .... | 2 | ...... | 44 | ...... | 30 | 5 | 476.10 | .............. | .............. | |
| 6 | 6 | .... | 12 | 66 | ...... | 58 | ...... | 10 | .............. | .............. | $7,575.00 | |
| 6 | 1 | .... | 7 | 73 | ...... | 50 | ...... | 10 | .............. | .............. | $3,000.00 | |
| 1 | .... | .... | 1 | ...... | ...... | ...... | ...... | .... | 1,200.00 | .............. | .............. | |
| | | | | | | | | | | | | 21 |
| 3 | 1 | 1 | 3 | ...... | 63 | ...... | 41 | 10 | 2,622.99 | .............. | .............. | |
| 2 | 1 | 1 | 2 | ...... | 68 | ...... | 58 | 10 | 1,409.75 | .............. | .............. | |
| | | | | | | | | | | | | 26 |
| 8 | 9 | 2 | 15 | 173 | ...... | 125 | .... | 10 | 21,211.95 | 582.50 | .............. | |
| 1 | .... | .... | 1 | ...... | 12 | ...... | 8 | 9 | 761.50 | .............. | .............. | |
| 1 | .... | 1 | .... | ...... | 18 | ...... | 8 | 10 | 772.55 | .............. | .............. | |
| 1 | 1 | .... | 2 | ...... | 27 | ...... | 14 | 10 | 967.85 | .............. | .............. | |
| 1 | .... | 1 | .... | ...... | 28 | ...... | 13 | 10 | 774.45 | .............. | .............. | |
| 1 | 1 | .... | 2 | ...... | 22 | ...... | 12 | 10 | 1,086.50 | .............. | .............. | |
| 5 | 6 | .... | 11 | 62 | ...... | 50 | ...... | 10 | .............. | .............. | 5,731.79 | |
| | | | | | | | | | | | | 19 |
| 7 | 8 | 3 | 12 | 157 | ...... | 141 | ...... | 10 | 21,328.90 | 1,208.40 | .............. | |
| 1 | 1 | .... | 2 | ...... | 37 | ...... | 26 | 10 | 1,206.60 | 15.27 | .............. | |
| 1 | 1 | .... | 2 | ...... | 43 | ...... | 31 | 10 | 1,297.97 | 20.94 | .............. | |
| | | | | | | | | | | | | 80 |
| 6 | 7 | 5 | 8 | 130 | ...... | 102 | ...... | 9 | 17,068.07 | 1,692.19 | .............. | |
| 7 | 7 | 7 | 7 | 104 | ...... | 82 | ...... | 10 | 14,025.11 | 2,574.10 | .............. | |
| 1 | 1 | .... | 2 | ...... | 32 | ...... | 12 | 9 | 907.39 | .............. | .............. | |
| 10 | 9 | .... | 19 | 190 | ...... | 162 | ...... | 10 | 11,085.11 | .............. | 1,914.89 | |
| 1 | 2 | .... | 3 | 12 | ...... | 5 | ...... | 10 | .............. | .............. | 1,500.00 | |
| 1 | 2 | 1 | 2 | 24 | 17 | 7 | 7 | 10 | .............. | .............. | 1,130.00 | |
| | | | | | | | | | | | | 10 |
| 8 | 13 | 9 | 12 | 204 | ...... | 197 | ...... | 10 | 24,041.78 | 939.05 | .............. | |
| .... | 1 | .... | 1 | ...... | 35 | ...... | 10 | 6 | 383.00 | .............. | .............. | |
| 1 | .... | .... | 1 | ...... | 16 | ...... | 5 | 6 | .............. | .............. | (a) | |
| .... | 1 | 1 | .... | ...... | 19 | ...... | 12 | 8 | .............. | .............. | 400.00 | |
| 7 | 10 | 7 | 10 | 213 | ...... | 201 | ...... | 10 | 30,027.84 | 2,833.39 | .............. | |
| .... | 2 | .... | 2 | ...... | 58 | ...... | 33 | 10 | 1,245.66 | .............. | .............. | |
| 1 | 1 | .... | 2 | ...... | 20 | ...... | 8 | 10 | 1,004.26 | .............. | .............. | |
| 1 | 1 | .... | 2 | ...... | 15 | ...... | 9 | 10 | 1,034.73 | .............. | .............. | |
| .... | 2 | .... | 2 | ...... | 113 | ...... | 81 | 10 | 1,533.36 | .............. | .............. | |
| .... | 2 | .... | 2 | ...... | 46 | ...... | 30 | 10 | 1,112.50 | .............. | .............. | |
| .... | 1 | .... | 1 | ...... | ...... | ...... | ...... | 10 | 840.00 | .............. | .............. | |
| .... | 7 | .... | 7 | 63 | ...... | 49 | ...... | 10 | .............. | .............. | 4,000.00 | |
| 1 | 15 | .... | 16 | 104 | ...... | 96 | ...... | 10 | .............. | .............. | 11,232.35 | |
| 10 | 11 | 7 | 14 | 223 | ...... | 212 | ...... | 10 | 29,819.45 | 1,305.10 | .............. | |
| 5 | 9 | .... | 9 | 130 | ...... | 120 | ...... | 10 | 19,366.42 | 1,529.50 | .............. | |
| 3 | 3 | .... | 6 | 32 | ...... | 28 | ...... | 9 | .............. | .............. | 4,800.00 | 10 |
| 11 | 17 | 10 | 18 | 255 | ...... | 229 | ...... | 10 | 43,696.87 | 4,721.34 | .............. | |
| | | | | | | | | | | | | 10 |
| 7 | 6 | 2 | 11 | 193 | ...... | 177 | ...... | 10 | 24,950.65 | 4,156.17 | .............. | |
| 8 | 8 | 2 | 14 | 108 | ...... | 90 | ...... | 12 | .............. | .............. | 12,000.00 | |
| 3 | 2 | 1 | 4 | 17 | ...... | 14 | ...... | 8 | .............. | .............. | 3,324.09 | |
| 1 | 1 | .... | 2 | ...... | 17 | ...... | 13 | 1 | 118.00 | .............. | .............. | |

a Not reported.