Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 1 of 149   Page ID #:4229

RECAPITULATION.

| Kind of school. | Number | Capacity. | Enroll-ment. | Average attend-ance. | Number of em-ployees. | Cost to Gov-ernment. |
|---|---|---|---|---|---|---|
| **Government:** | | | | | | |
| Nonreservation boarding........ | 25 | 8,870 | 9,485 | 8,495 | 842 | $1,366,499.32 |
| Reservation boarding........... | 91 | 10,935 | 11,019 | 9,520 | 1,208 | 1,566,203.01 |
| Day........................... | 163 | 5,770 | 5,130 | 3,670 | 335 | 221,307.93 |
| Field service................. | | | | | 38 | 28,554.88 |
| Total.................... | 279 | 25,575 | 25,634 | 21,685 | a 2,423 | 3,182,565.14 |
| **Mission:** | | | | | | |
| Boarding..................... | 53 | 5,467 | 3,990 | 3,443 | 621 | ............. |
| Day.......................... | 5 | 280 | 317 | 249 | 11 | ............. |
| Total.................... | 58 | 5,747 | 4,307 | 3,692 | 632 | ............. |
| **Contract:** | | | | | | |
| Boarding..................... | 3 | 475 | 318 | 276 | 40 | 24,611.93 |
| Hampton...................... | 1 | 150 | 106 | 91 | 23 | 15,115.60 |
| Public....................... | 12 | ...... | 128 | 58 | ...... | 1,188.26 |
| Aggregate................. | b 341 | 31,947 | 30,493 | 25,802 | 3,118 | 3,223,480.93 |
| Boarding schools................. | 173 | 25,897 | 24,918 | 21,825 | 2,734 | $2,972,429.86 |
| Day schools..................... | 168 | 6,050 | 5,575 | 3,977 | 346 | 222,496.19 |

a Not including 7 supervisors, but including employees receiving $100 and more per annum.
b Not including 12 public schools.

OTHER SCHOOL STATISTICS.

| | |
|---|---|
| Number of Indians attending public schools ........................ | 1,390 |
| Number of employees in Government schools ......................... | a 2,423 |
| Male............................................................ | 1,070 |
| Female.......................................................... | 1,353 |
| Indian.......................................................... | 572 |
| White........................................................... | 1,853 |
| Number of employees in mission and contract schools................ | 695 |
| Male............................................................ | 247 |
| Female.......................................................... | 448 |
| Indian.......................................................... | 45 |
| White........................................................... | 650 |
| Cost of maintaining schools: | |
| To Government................................................... | $3,223,480.93 |
| To other parties............................................... | $404,085.23 |
| Value of subsistence raised by schools......................... | $211,420.22 |

a Not including 7 supervisors.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-187

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

# POPULATION OF INDIANS.

**Arizona:**

| | |
|---|---|
| Colorado River School— | |
| Mohave | 482 |
| Chemehuevi in Cheme- | |
| huevi Valley | a 55 |
| Fort Apache School— | |
| White Mountain Apache | 2,083 |
| Fort Mohave School— | |
| Mohave | 827 |
| Chemehuevi | 89 |
| Havasupai School— | |
| Havasupai | 172 |
| Moqui School— | |
| Hopi (Moqui) | 2,000 |
| Navaho | 2,000 |
| Navaho School— | |
| Navaho | 12,000 |
| Under farmer, Navaho Ex- | |
| tension— | |
| Navaho | 450 |
| Phoenix School— | |
| Mohave Apache at Camp | |
| McDowell | 181 |
| Mohave Apache on Up- | |
| per Verde Valley and | |
| Beaver Creek | 400 |
| Tonto Apache at Camp | |
| McDowell | 4 |
| Yuma Apache at Camp | |
| McDowell | 7 |
| Pima School— | |
| Maricopa | 383 |
| Papago | 2,058 |
| Pima | 4,037 |
| Under farmer, San Xavier— | |
| Papago on reserve (al- | |
| lottees) | a 523 |
| Papago in villages in | |
| Pima County | a 2,225 |
| San Carlos Agency— | |
| San Carlos Apache | 1,022 |
| Mohave Apache | 74 |
| Tonto Apache | 548 |
| Coyotero Apache | 545 |
| Yuma Apache | 2 |
| Truxton Canyon School— | |
| Walapai | 525 |
| Western Navaho School— | |
| Hopi (Moqui) | 135 |
| Navaho | 6,000 |
| Paiute | 25 |

**California:**

| | |
|---|---|
| Under farmer— | |
| Digger | 37 |
| Fort Bidwell School— | |
| Paiute | 200 |
| Pit River (Achomawi) | 500 |
| Fort Yuma School— | |
| Yuma | 645 |

**California—Continued.**

| | |
|---|---|
| Hoopa Valley School— | |
| Hupa | 424 |
| Lower Klamath | b 745 |
| Mesa Grande School— | |
| Mission Indians at— | |
| Capitan Grande | 111 |
| Inaja | 40 |
| Los Coyotes | 120 |
| Mesa Grande | 184 |
| Syquan | 30 |
| Volcan | 156 |
| Pala School— | |
| Mission Indians at— | |
| Pechanga | 171 |
| Pala | 255 |
| Pauma | 62 |
| Rincon | 126 |
| La Jolla, La Piche and | |
| Potrero | 198 |
| Cuyapipe | 41 |
| Campo | 18 |
| La Posta and Laguna | 24 |
| Manzanita | 57 |
| Round Valley School— | |
| Concow | 177 |
| Little Lake and Red- | |
| wood | 116 |
| Nomelaki and Pit River | |
| (Achomawi) | 79 |
| Yuki and Wailaki | 248 |
| San Jacinto School— | |
| Mission | 1,009 |
| Tule River | 154 |
| Not under an agent— | |
| Wichumni, Kawia, Pit | |
| River (Achomawi), and | |
| others | c 13,061 |

**Colorado:**

| | |
|---|---|
| Fort Lewis School— | |
| Wiminuche Ute | 453 |
| Southern Ute School— | |
| Capote and Moache Ute | 354 |

**Florida:**

| | |
|---|---|
| Not under an agent— | |
| Seminole | d 358 |

**Idaho:**

| | |
|---|---|
| Cœur d'Alène Reserve— | |
| Cœur d'Alène | 506 |
| Spokan | 95 |
| Fort Hall School— | |
| Bannock and Shoshoni | 1,308 |
| Bannock, Sheepeater, | |
| and Shoshoni trans- | |
| ferred from Lemhi | |
| Agency | 474 |
| Not under an agent | e 200 |
| Fort Lapwai School— | |
| Nez Percé | 1,473 |

a From report, 1906.
b From report, 1905.
c From report of Special Agent, Mar. 21, 1906; 1,306 are on forest reserves.

d From U. S. Census, 1900.
e From report of 1902.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-188

**178**  REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Population of Indians*—Continued.

Indian Territory:
Seneca School—

| | |
|---|---|
| Eastern Shawnee | 107 |
| Miami | 130 |
| Modoc | 51 |
| Ottawa | 211 |
| Peoria | 207 |
| Quapaw | 290 |
| Seneca | 390 |
| Wyandot | 379 |

Union Agency—

| | |
|---|---|
| Chickasaw, by blood | 5,684 |
| Chickasaw, by intermarriage | 635 |
| Chickasaw, freedmen | 4,670 |
| Choctaw, by blood | 19,036 |
| Choctaw, by intermarriage | 1,585 |
| Choctaw, freedmen | 5,994 |
| Creek, by blood | 11,895 |
| Creek, freedmen | 6,807 |
| Cherokee, by blood | 36,390 |
| Cherokee, by intermarriage | 286 |
| Cherokee, freedmen | 4,925 |
| Cherokee, Delawares (registered) | 197 |
| Seminole, by blood | 2,138 |
| Seminole, freedmen | 986 |

Iowa:
Sac and Fox School—

| | |
|---|---|
| Sauk and Fox of Mississippi | 345 |

Kansas:
Kickapoo School—

| | |
|---|---|
| Iowa | 253 |
| Kickapoo | 188 |
| Sauk and Fox of Missouri | 86 |

Potawatomi School—

| | |
|---|---|
| Munsee (or Christian) and Chippewa | a 92 |
| Prairie Band Potawatomi | 655 |

Michigan:
Under physician—

| | |
|---|---|
| L'Anse, Vieux Désert, and Ontonagan Chippewa | b 1,043 |

Not under an agent—

| | |
|---|---|
| Scattered Chippewa and Ottawa | c 5,587 |
| Potawatomi of Huron | d 78 |

Minnesota:
Leech Lake Agency—
Mississippi Chippewa—

| | |
|---|---|
| Mille Lac | 11 |
| White Oak Point | 471 |

Pillager Chippewa—

| | |
|---|---|
| Cass and Winnebagoshish | 457 |
| Leech Lake | 826 |

Red Lake School—Red Lake

| | |
|---|---|
| and Pembina Chippewa | 1,324 |

Vermilion Lake School—

| | |
|---|---|
| Chippewa (Boise Forte) | 650 |

Minnesota—Continued.
White Earth School—
Fond du Lac Chippewa

| | |
|---|---|
| (removal) | 110 |

Mississippi Chippewa—

| | |
|---|---|
| Gull Lake | 353 |
| Mille Lac (removal) | 724 |
| Mille Lac (nonremoval) | 545 |
| White Oak Point (removal) | 226 |
| White Earth | 1,847 |
| Pembina Chippewa | 342 |

Pillager Chippewa—

| | |
|---|---|
| Cass and Winnebagoshish | 60 |
| Otter Tail | 732 |
| Leech Lake (removal) | 288 |

Not under an agent—
Mdewakanton Sioux—

| | |
|---|---|
| Birch Cooley | e 150 |
| Elsewhere | f 779 |

Montana:

| | |
|---|---|
| Blackfeet Agency—Piegan | 2,086 |
| Crow Agency—Crow | 1,787 |

Flathead Agency—

| | |
|---|---|
| Kalispel | 202 |
| Kutenai | 573 |
| Flathead | 623 |
| Spokan | 135 |
| Pend d'Oreille | 633 |
| Other tribes who have rights | 55 |

Fort Belknap School—

| | |
|---|---|
| Assiniboin | 656 |
| Gros Ventre | 553 |

Fort Peck School—

| | |
|---|---|
| Assiniboin | 561 |
| Yankton Sioux | 1,145 |

Tongue River School—

| | |
|---|---|
| Northern Cheyenne | 1,450 |

Nebraska:

| | |
|---|---|
| Omaha School—Omaha | 1,246 |

Santee School—

| | |
|---|---|
| Ponca | 267 |
| Santee Sioux | 1,107 |

Winnebago School—

| | |
|---|---|
| Winnebago | 1,065 |

Nevada:

| | |
|---|---|
| Carson School—Paiute of Walker River Reserve | 469 |
| Under industrial teacher— Paiute of Moapa Reserve | 119 |

Nevada School—

| | |
|---|---|
| Paiute of Pyramid Lake | 590 |

Western Shoshoni School—

| | |
|---|---|
| Paiute | 250 |
| Shoshoni | 238 |
| Not under an agency | c 3,701 |

New Mexico:
Albuquerque School—

| | |
|---|---|
| Navaho | 176 |
| Pueblo | 4,045 |

a From report, 1900.  c From U. S. census, 1900.  e From report, 1901.
b From pay roll, 1906.  d From pay roll, 1888.  f From report, 1899.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-189

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.    **179**

*Population of Indians*—Continued.

| | |
|---|---:|
| **New Mexico**—Continued. | |
| Jicarilla School— | |
| Jicarilla Apache | 776 |
| Mescalero School— | |
| Mescalero Apache | 466 |
| San Juan School— | |
| Navaho | a 8,000 |
| Santa Fe School— | |
| Pueblo | 3,419 |
| Zuñi School— | |
| Pueblo of Zuñi | 1,682 |
| **New York:** | |
| New York Agency— | |
| Cayuga | 181 |
| Oneida | 284 |
| Onondaga | 544 |
| Seneca | 2,736 |
| St. Regis | 1,321 |
| Tuscarora | 353 |
| **North Carolina:** | |
| Cherokee School— | |
| Eastern Cherokee | 1,550 |
| **North Dakota:** | |
| Fort Berthold School— | |
| Arikara | 389 |
| Grosventre | 468 |
| Mandan | 263 |
| Fort Totten School— | |
| Sisseton, Wahpeton, and Cut-Head Sioux (known as Devils Lake Sioux). | 986 |
| Turtle Mountain Chippewa. | 2,420 |
| Standing Rock Agency— | |
| Sioux | 3,393 |
| **Oklahoma:** | |
| Cantonment School— | |
| Arapaho | 248 |
| Cheyenne | 529 |
| Cheyenne and Arapaho School— | |
| Arapaho | 502 |
| Cheyenne | 774 |
| Seger Colony School— | |
| Arapaho | 136 |
| Cheyenne | 598 |
| Kaw School— | |
| Kansa (Kaw) | 196 |
| Kiowa, etc., Agency— | |
| Apache | 159 |
| Caddo | 555 |
| Comanche | 1,440 |
| Kiowa | 1,235 |
| Wichita | 441 |
| Osage Agency— | |
| Osage | 2,156 |
| Oto School— | |
| Oto and Missouri | 390 |
| Pawnee School— | |
| Pawnee | 644 |
| Ponca School— | |
| Ponca | 578 |
| Tonkawa | 49 |
| Sac and Fox School— | |
| Iowa | 86 |
| Sac and Fox of Mississippi | 522 |

| | |
|---|---:|
| **Oklahoma**—Continued. | |
| Shawnee School— | |
| Absentee Shawnee | 590 |
| Citizen Potawatomi | 1,720 |
| Mexican Kickapoo | 290 |
| Under War Department— | |
| Apache at Fort Sill | b 298 |
| **Oregon:** | |
| Grande Ronde School— | |
| Clackamas | 18 |
| Lackmiut | 13 |
| Marysville | 11 |
| Rogue River | 14 |
| Santiam | 18 |
| Shasta | 12 |
| Umpqua | 46 |
| Wapato | 10 |
| Yamhill | 7 |
| Klamath School— | |
| Klamath | 665 |
| Modoc | 220 |
| Paiute | 108 |
| Pit River (Achomawi) | 58 |
| Siletz School— | |
| Siletz (confederated) | 448 |
| Umatilla School— | |
| Cayuse | c 405 |
| Umatilla | c 207 |
| Walla Walla | c 579 |
| Warm Springs School— | |
| Warm Springs (confederated) Wasco, Tenino, and Paiute | 773 |
| Allottees permanently absent from reservation | c 79 |
| **South Dakota:** | |
| Cheyenne River Agency— | |
| Blackfeet, Miniconjou, Sans Arcs, and Two Kettle Sioux. | 2,540 |
| Crow Creek Agency— | |
| Lower Yanktonai Sioux | 1,028 |
| Riggs Institute— | |
| Flandreau Sioux | 275 |
| Lower Brulé Agency— | |
| Lower Brulé Sioux | 485 |
| Pine Ridge Agency— | |
| Oglala Sioux | 6,688 |
| Rosebud Agency— | |
| Brulé Sioux | 5,011 |
| Sisseton Agency— | |
| Sisseton and Wahpeton Sioux | 1,942 |
| Yankton Agency— | |
| Yankton Sioux | 1,716 |
| **Utah:** | |
| Panguitch School— | |
| Kanab Kaibab | 83 |
| Shivwits Paiute | 140 |
| Uinta and Ouray Agency— | |
| Uinta Ute | 432 |
| Uncompahgre Ute | 524 |
| White River Ute | 305 |
| Not under an agency— | |
| Paiute | d 370 |

a A mere estimate.    b From report 1898.    c From report 1906.    d From report 1905.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-190

180   REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

*Population of Indians*—Continued.

Washington:
  Colville Agency—
    Columbia (Moses' band).. 324
    Colville.................... 334
    Kalispel................... 98
    Lake...................... 268
    Nez Percé (Joseph's band) 90
    Nespelim.................. 206
    Okinagan.................. 348
    Sanpoil.................... 152
    Upper Spokan............. 238
    Lower Spokan............. 301
    Wenatchi................. 93
  Neah Bay School—
    Hoh....................... 54
    Makah..................... 410
    Ozette.................... 28
    Quileute.................. 241
  Puyallup School—
    Chehalis.................. 146
    Georgetown............... 125
    Humptulip................ 24
    Nisqualli................. 146
    Puyallup.................. 479
    Quaitso (Queet-see)....... 55
    Quinaielt................. 141
    Sklallam.................. 327
    Skokomish................ 192
    Squaxon Island........... 98
  Tulalip School—
    Lummi.................... 414
    Muckleshoot.............. 155
    Suquamish or Port Madison.. 174
    Skagit and Swinomish.... 273
    Tulalip (remnants of many tribes and bands)....... 402
  Yakima School—
    Yakima, Klikitat, and Wisham (consolidated as confederated Yakima).. 2,002
  Not under an agent—
    Nooksak ................. *a* 200

Wisconsin:
  Green Bay School—
    Menominee.............. 1,375
    Stockbridge and Munsee.. 558
  La Pointe Agency—
    Chippewa at—
      Bad River................ 1,179
      Fond du Lac.............. 916
      Grande Portage.......... 343
      Lac Courte Oreille........ 1,201
      Lac du Flambeau........ 793
      Red Cliff................ 454
      Rice Lake................ 195
  Oneida School—Oneida........ 2,163
  Wittenberg School—
    Winnebago .............. 1,268
Wyoming:
  Shoshoni School—
    Arapaho.................. 888
    Shoshoni................. 813

Miscellaneous:
  Miami in Indiana........... *b* 243
  Oldtown Indians in Maine.... *c* 410
  Catawba in South Carolina.... *d* 60
  Alabama, Muskogee, and Cushatta in Texas............ *b* 470

*Summary.*

Population of Five Civilized Tribes including freedmen and intermarried whites.......... 101,228
Population exclusive of Five Civilized Tribes ............. 197,244

  Total Indian population, exclusive of Alaska.......... 298,472

*a* From Report 1903.
*b* From U. S. Census, 1900.
*c* From Report 1898.
*d* Live near Columbia and are intermarried with Cherokees.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

# INDEX.

**A.**

| | Page. |
|---|---|
| Absentee Shawnee. *See* Shawnee. | |
| Achomawi | 177, 179 |
| Agencies, breaking up of large | 13 |
| Agriculture, teaching in schools | 136 |
| Alabama | 180 |
| Allotments— | |
|   Dower rights | 69 |
|   Leased | 75 |
|   Nonreservation— | |
|     Mixed bloods entitled to | 65 |
|     Work resumed | 65, 66 |
|   Number made during year | 59 |
|   Osage "wheel plan" of selecting | 120 |
|   Placing allottees in possession | 105 |
|   Pyramid Lake | 61 |
|   Removal of restrictions on alienation | 105 |
|   Residence on, at White Earth | 115 |
|   State courts without jurisdiction over | 69 |
|   *See also* Patents. | |
| Apache | 139, 140, 141, 146, 153, 155, 177, 179 |
| Appropriations— | |
|   Indian Service | 53 |
|   Schools | 49 |
| Arapaho— | |
|   Northern, allotments | 62 |
|   Statistics | 142, 144, 154, 161, 179, 180 |
| Areas of reservations | 146 |
| Arikara | 154, 179 |
| Assiniboin | 151, 178 |
| Art, native, Indian | 51, 52, 138 |

**B.**

| | |
|---|---|
| Banks, deposits in | 99 |
| Bannock | 139, 142, 145, 147, 177 |
| Beetfields, Indian labor in | 17, 19 |
| Blackfeet— | |
|   Irrigation | 56 |
|   Labor conditions | 17 |
|   Statistics | 139, 151, 178 |
| Burke law | 67 |

**C.**

| | |
|---|---|
| Caddo | 156, 179 |
| California, lands for Indians in | 92 |
| Carson Sink, allotments | 66 |
| Catawba | 180 |
| Cayuga | 153, 178 |
| Cayuse | 143, 156, 180 |
| Chehalis | 158, 159, 179 |
| Chemehuevi | 146, 177 |
| Cherokee— | |
|   Rights of intermarried | 107 |
|   Statistics | 139, 142, 148, 178 |
|   *See also* Five Civilized Tribes. | |
| Cheyenne | 139, 142, 144, 152, 154, 179 |
| Chickasaw— | |
|   And Choctaw, bills to incorporate | 100, 102 |
|   Freedmen, rights of | 109 |
|   Statistics | 139, 142, 148, 178 |
|   *See also* Five Civilized Tribes. | |
| Chief, death of Teudoy | 94 |

| | Page. |
|---|---|
| Chippewa— | |
|   Allotments | 64 |
|   L'Anse and Ontonagon | 114 |
|   Logging | 72, 73 |
|   Statistics | 139, 142, 149, 150, 151, 178, 180 |
|   *See also* Turtle Mountain and White Earth. | |
| Choctaw— | |
|   And Chickasaw, bill to incorporate | 100, 102 |
|   Freedmen, rights of | 109 |
|   Statistics | 139, 142, 144, 148, 178 |
|   *See also* Five Civilized Tribes. | |
| Civil-service appointments declined | 53 |
| Clackamas | 156, 179 |
| Claims— | |
|   Fraudulent, against Indians | 36 |
|   Sioux pony, consideration refused | 124 |
| Coeur d'Alene | 142, 144, 147, 177 |
| Columbia Indians— | |
|   Allotments | 59 |
|   Statistics | 158, 180 |
| Colville— | |
|   Mineral entries on reservation | 132 |
|   Statistics | 142, 158, 180 |
| Comanche | 155, 156, 179 |
| Commencement exercises | 135 |
| Commercial agent for the Sioux | 20 |
| Concow | 147, 177 |
| Contract accounts, payments by agents | 10 |
| Cooking— | |
|   Better equipment for teaching needed | 138 |
|   Classes in | 136 |
| Coordination between Government Bureaus | 8 |
| Courts, State, without jurisdiction over allotments | 70 |
| Creek | 139, 142, 178 |
| Crow— | |
|   Allotments | 60 |
|   Irrigation | 56 |
|   Statistics | 139, 142, 151, 178 |
| Cushatta | 180 |

**D.**

| | |
|---|---|
| Deposits in banks | 99 |
| Delawares | 178 |
| Digger Indians | 146, 177 |

**E.**

| | |
|---|---|
| Eastern Cherokee— | |
|   Sales of lands | 78 |
|   Statistics | 154, 179 |
| Eastern Shawnee | 178 |
| Employees— | |
|   School— | |
|     Race, sex, number | 163, 176 |
|     Round table conferences | 134 |
|     Under civil service | 53 |
| Employment for Indians | 15 |
|   Artificial work a drawback | 21 |
|   For Indian women | 19 |

181

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

182                                    INDEX.

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

| | Page. |
|---|---|
| English, method of teaching | 135 |
| Exposition, Jamestown, Indian exhibit | 51 |

**F.**

| | |
|---|---|
| Five Civilized Tribes— | |
| Allotments | 105, 112 |
| Closing of rolls | 112 |
| Collection of revenues | 103 |
| Mineral leases | 98 |
| Protection of full-bloods | 106 |
| Roads | 104 |
| Schools | 96 |
| Town sites | 104, 106 |
| Flathead— | |
| Allotments | 60 |
| Irrigation | 56 |
| Logging | 71 |
| Statistics | 142, 151, 178 |
| Fond du Lac reservation, logging | 73 |
| Fort Berthold reservation, allotments | 60 |
| Fort Hall reservation— | |
| Irrigation | 56 |
| Removal Indians from Lemhi | 94 |
| Freedmen, Choctaw and Chickasaw | 109 |
| Full-blood Indians, protection of | 107 |
| Funds, Indian— | |
| Annually due Indians | 144 |
| Held in trust | 139, 144 |

**G.**

| | |
|---|---|
| Georgetown Indians | 180 |
| Grand Portage reservation, logging | 73 |
| Grazing permits | 76 |
| Grosventre | 151, 154, 178, 179 |

**H.**

| | |
|---|---|
| Havasupai | 146, 177 |
| Hoh | 159, 180 |
| Hopi (Moqui) | |
| Statistics | 146, 177 |
| Upheaval at Oraibi | 84 |
| Humptulip | 180 |
| Hupa | 146, 177 |

**I.**

| | |
|---|---|
| Incomes of Indian tribes | 142 |
| Incorporating tribes | 100 |
| Indian Territory, railroads in | 82 |
| See also Five Civilized Tribes. | |
| Institutes, school | 50, 137 |
| Iowa | 139, 142, 149, 155, 178, 179 |
| Irrigation— | |
| Cooperation with Reclamation Survey | 9, 54 |
| Expenditures on | 55 |
| Tongue River | 58 |

**J.**

| | |
|---|---|
| Jamestown Exposition, Indian exhibit | 51 |
| Jicarilla Apache— | |
| Allotments | 60 |
| Statistics | 153, 179 |
| Jocko reservation, area | 151 |
| Joseph's band. See Nez Percé. | |

**K.**

| | |
|---|---|
| Kalhab | 143, 179 |
| Kalispel | 151, 158, 178, 180 |
| Kansa (Kaw) | 142, 155, 179 |
| Kawia | 147, 177 |
| Keams Canyon school, Hopi sent to | 85, 88 |
| Kickapoo | 139, 149, 155, 178, 179 |
| Kiowa— | |
| Sale pasture and wood reserves | 117 |
| Statistics | 155, 179 |
| Town sites | 117 |
| Klamath— | |
| Allotment | 61 |
| Irrigation | 56 |
| Statistics | 139, 156, 177, 179 |
| Klikitat | 160, 180 |
| Kutenai | 147, 151, 178 |

**L.**

| | Page. |
|---|---|
| Labor, Indian | 15 |
| Lackmlut | 156, 179 |
| Lake Indians | 158, 180 |
| Lands, Indian— | |
| Five Civilized Tribes, sale | 100 |
| Receipts and disbursements | 141 |
| Sale of | 76 |
| L'Anse and Ontonagon Chippewa frauds in purchases of timber | 114 |
| See also Chippewa/ | |
| La Pointe Agency, logging | 72 |
| Leases— | |
| Five Civilized Tribes | 98, 100 |
| List of approved | 75, 76 |
| Mineral | 71 |
| Osage, oil and gas | 123 |
| Permitting Indians to manage their own | 74 |
| Leech Lake Reservation, logging | 73 |
| Legislation, important, of last session of Congress | 7 |
| Lemhi Indians, removal to Fort Hall | 94 |
| Liabilities of United States to Indians | 144 |
| Liquor, sale of, to Indians | 30 |
| Agreement among saloon keepers to suppress | 35 |
| Appropriation for suppression | 30, 35 |
| Suppression in Indian Territory | 31 |
| Little Lake Indians | 147, 177 |
| Logging— | |
| Cooperation with Forestry Bureau | 8 |
| Operations on Indian reservations | 71 |
| Lower Brulé Reservation, appraisal of lands | 124 |
| Lummi | 159, 180 |

**M.**

| | |
|---|---|
| Makah— | |
| Allotments | 61 |
| Statistics | 142, 159, 180 |
| Mandan | 154, 179 |
| Maricopa | 146, 177 |
| Marysville Indians | 156, 179 |
| Menominee— | |
| Logging | 74 |
| Statistics | 139, 142, 160, 180 |
| Mexican Kickapoo | 155, 179 |
| Miami | 178, 180 |
| Mineral— | |
| Entries, on Colville Reservation | 132 |
| Leases, Five Civilized Tribes | 98 |
| On Indian reservations, disposal | 70 |
| Missionary societies, Indian lands assigned to | 84 |
| Mission Indians— | |
| Irrigation | 57 |
| Placed under several bonded officers | 13 |
| Purchase and improvement of lands | 92 |
| Statistics | 142, 147, 177 |
| Missions among Indians. | |
| See Schools, mission. | |
| Missouria | 139, 142, 155, 179 |
| Modoc | 148, 156, 178, 179 |
| Mohave | 146, 177 |
| Molel | 142, 156 |
| Moqui. See Hopi. | |
| Moses' band. See Columbia. | |
| Muckleshoot | 159, 180 |
| Munsee | 149, 160, 178, 179 |
| Muskogee | 180 |

**N.**

| | |
|---|---|
| Navaho— | |
| Release of prisoners | 91 |
| Statistics | 146, 177, 179 |
| Nespelim | 158, 180 |
| Nez Percé | 139, 142, 148, 177, 180 |
| Nisqualli | 159, 180 |
| Nomelaki | 147, 177 |
| Nooksak | 180 |
| Northern Cheyenne | 142, 152, 178 |

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-193

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

**O.**

|  | Page. |
|---|---|
| Office methods, improvement in | 9 |
| Oil— | |
| And gas leases by Osages | 123 |
| Choctaw and Chickasaw company proposed | 100 |
| Leases, Five Civilized Tribes | 99 |
| Okinagan | 158, 180 |
| Oklahoma, railroads across Indian lands in | 82 |
| Oldtown Indians | 180 |
| Omaha | 139, 142, 152, 178 |
| Oneida | 153, 160, 179, 180 |
| Onondaga | 153, 179 |
| Open market expenditures, authority delegated Commissioner | 10 |
| Oraibi pueblo, disturbances | 84 |
| Osage— | |
| Allotments | 119 |
| Frauds in enrollment | 119 |
| Oil and gas leases | 123 |
| Statistics | 139, 142, 155, 179 |
| Town sites | 121 |
| Surveys | 121 |
| Oto— | |
| Allotments | 61 |
| Statistics | 139, 142, 155, 179 |
| Ottawa | 148, 178 |
| Ozette | 159, 180 |

**P.**

| | |
|---|---|
| Paiute— | |
| Allotments | 64, 66 |
| Assistance given | 131 |
| Statistics | 143, 152, 156, 177, 178, 179 |
| Papago | 146, 177 |
| Patents— | |
| Given competent Indians | 13 |
| Issued allottees under "Burke law" | 67 |
| Tests of capacity of applicants for | 68 |
| Pawnee | 139, 142, 144, 155, 179 |
| Payments, time of making | 11 |
| Pend d'Oreille | 147, 151, 158, 178 |
| Peoria | 148, 178 |
| Piegan | 151, 178 |
| *See also* Blackfeet. | |
| Pima— | |
| Irrigation | 57 |
| Statistics | 142, 146, 177 |
| Pine Ridge Reservation, employment found for Indians | 19 |
| Pit River Indians | 147, 156, 177, 179 |
| Ponca | 139, 142, 152, 155, 178, 179 |
| Population of Indians | 176, 180 |
| Port Madison Indians | 159, 180 |
| Potawatomi | 139, 142, 144, 149, 156, 178, 179 |
| Pueblo— | |
| San Ildefonso school site | 50 |
| Statistics | 153, 179 |
| Puyallup— | |
| Sales of land | 78 |
| Statistics | 139, 159, 180 |
| Pyramid Lake Reservation, allotments | 61 |

**Q.**

| | |
|---|---|
| Quaitso (Queetsee) | 159, 180 |
| Quapaw | 142, 144, 148, 178 |
| Quileute | 142, 159, 180 |
| Quinaielt— | |
| Allotments | 61 |
| Statistics | 142, 159, 180 |

**R.**

| | |
|---|---|
| Railroads across Indian lands | 79 |
| Rations— | |
| Indians dropped from roll | 19 |
| Indians still draw | 21 |
| Reclamation Service, cooperation with | 9, 53 |
| Red Cliff Reservation, logging | 72 |
| Redwood Indians | 146, 147, 177 |

|  | Page. |
|---|---|
| Reservations, areas and authority for | 146 |
| Roads, Five Civilized Tribes | 104 |
| Rogue River Indians | 156, 179 |
| Rosebud Reservation, finding employment for Indians | 18 |

**S.**

| | |
|---|---|
| Sac and Fox— | |
| Lands in Iowa | 113 |
| Of Missouri, allotments | 61 |
| Statistics | 139, 142, 144, 145, 149, 156, 178, 179 |
| St. Regis Indians | 153, 179 |
| Sales of Indian lands | 78 |
| Salton Sea, Indian labor at | 16 |
| San Ildefonso pueblo, school site | 50 |
| Sanitary conditions in schools | 135 |
| Sanpoil | 158, 180 |
| Santiam | 156, 179 |
| Schools— | |
| Appropriations | 49 |
| Attendance | 48, 49, 163, 176 |
| A wasteful system | 21 |
| Boarding, attendance | 37 |
| Are educational almshouses | 23 |
| Capacity | 162, 176 |
| Commencement exercises | 135 |
| Contract— | |
| Injunction against use of tribal funds | 45 |
| Pupils and rates allowed | 47 |
| Cost | 163, 176 |
| Day— | |
| An obstacle to farming | 21 |
| Attendance | 39 |
| Economy of | 27 |
| Should be substituted for boarding | 23 |
| Value of | 137 |
| Employees'. *See* Employees. | |
| Five Civilized Tribes | 95 |
| Institutes | 50, 137 |
| Mission— | |
| Attendance and location | 43 |
| Employees in | 163, 176 |
| Five Civilized Tribes | 97 |
| Nonreservation— | |
| Attendance | 37 |
| Discontinuance of | 24 |
| Expense of | 26 |
| Public— | |
| Indians in, under contract | 41 |
| Indians in, not under contract | 163, 176 |
| Report of superintendent | 134 |
| Site, San Ildefonso pueblo | 50 |
| Statistics | 162 |
| Value subsistence raised by | 163, 176 |
| Seminole | 139, 142, 145, 149, 178 |
| Seneca | 139, 142, 145, 149, 153, 178, 179 |
| Shasta Indians | 156, 179 |
| Shawnee | 149, 179 |
| Sheepeater | 177 |
| Shivwits Indians | 132, 152 |
| Population | 179 |
| Shoshoni— | |
| Allotments | 62 |
| Irrigation | 58 |
| Statistics | 139, 142, 143, 145, 147, 152, 161, 177, 178, 180 |
| Signatures, thumb print | 14 |
| Siletz | 139, 156, 179 |
| Sioux— | |
| Allotments | 62 |
| Commercial agent for | 20 |
| Pony claims, consideration refused | 124 |
| Statistics | 139, 142, 145, 150, 151, 152, 154, 157, 178, 179 |
| Sisseton Sioux | 139, 142, 154, 157, 179 |
| Skagit | 180 |
| Skilllam | 159, 180 |
| Skokomish | 159, 180 |
| Spokan— | |
| Allotments | 63 |
| Statistics | 142, 147, 158, 159, 177, 178, 180 |



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 9 of 149   Page ID #:4237

|                                              | Page. |
| -------------------------------------------- | ----- |
| Squaxon Island Indians                       | 159, 180 |
| Stockbridge                                  | 139, 142, 160, 180 |
| Superintendent of Indian schools, report     | 134 |
| Suquamish                                     | 159, 180 |
| Supplies, disposition of surplus stock        | 11 |
| Swinomish                                     | 159, 160, 180 |

**T.**

|                                              | Page. |
| -------------------------------------------- | ----- |
| Tenday, chief, death                         | 94 |
| Tenino                                       | 156, 179 |
| Thumb-print signatures                       | 15 |
| Timber, Indian: |  |
|   Disposal of                      | 70 |
|   L'Anse and Ontonagon             | 114 |
| Tongue River Reservation, irrigation         | 58 |
| Tonkawa                                      | 155, 179 |
| Town sites: |  |
|   Five Civilized Tribes            | 104 |
|   Kiowa                            | 117 |
|   Osage                            | 121 |
| Trust funds and lands                        | 139 |
| Tulalip                                      | 180 |
| Tule River                                   | 142, 147, 177 |
| Turtle Mountain Chippewa: |  |
|   Allotments                       | 63 |
|   Statistics                       | 142, 154, 179 |
| Tuscarora                                    | 153, 179 |

**U.**

|                                              | Page. |
| -------------------------------------------- | ----- |
| Uintah Reservation: |  |
|   Allotments                       | 64 |
|   Irrigation                       | 58 |
| Umatilla                                     | 139, 143, 156, 179 |
| Umpqua                                       | 156, 179 |

| Utes:                                        | Page. |
| -------------------------------------------- | ----- |
|   Allotments                       | 64 |
|   Desert their reservation         | 125 |
|   Settle down at Cheyenne River    | 131 |
|   Statistics                       | 139, 143, 145, 147, 158, 177, 179 |

**W.**

|                                              | Page. |
| -------------------------------------------- | ----- |
| Walla Walla                                  | 156, 179 |
| Wapato                                       | 156, 179 |
| Warm Springs                                 | 143, 156, 179 |
| Wasco                                        | 156, 179 |
| Wenatchi                                     | 180 |
| Wichita                                      | 156, 179 |
| Wichumni                                     | 147, 177 |
| Wailaki                                      | 147, 177 |
| Walapai                                      | 146, 177 |
| Walker River Reservation, allotments         | 64 |
| Waste: |  |
|   Existing school system           | 21 |
|   Stopping one source              | 11 |
| White Earth Reservation: |  |
|   Allotments                       | 64 |
|   Residence on allotments          | 115 |
| Winnebago                                    | 139, 143, 145, 152, 178, 180 |
| Wisham                                       | 180 |
| Wyandot                                      | 149, 178 |

**Y.**

|                                              | Page. |
| -------------------------------------------- | ----- |
| Yakima: |  |
|   Boundary line                    | 132 |
|   Statistics                       | 143, 160, 180 |
| Yamhill Indians                              | 156, 179 |
| Yuki                                         | 147, 177 |
| Yuma                                         | 147, 177 |

**Z.**

|                                              | Page. |
| -------------------------------------------- | ----- |
| Zuñi Pueblo, irrigation                      | 53, 58 |

O

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-195



Page.
64
125
131
139,
, 179

, 179
, 179
, 179
179
180
179
177
177
177
64

21
11

64
115
180
80
78

32
80
70
77
77

58

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-196



Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-197

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-198

DO NOT CIRCULATE

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-199

UNIV. OF MICH.

NOV 18 1909

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-200

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-201



UNIVERSITY OF MICHIGAN

3 9015 03462 7896

Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT / http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

CVWD 563-202



Generated for guest (Library of Congress) on 2013-08-20 19:50 GMT  /  http://hdl.handle.net/2027/mdp.39015034627896
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# TAB 30

Reproduced from the Unclassified / Declassified Holdings of the National Archives

REFER IN REPLY TO THE FOLLOWING:

**DEPARTMENT OF THE INTERIOR,**

Field Work.
Authority.
102939.

**OFFICE OF INDIAN AFFAIRS,**

31606-1907
35174-1907
36758-1907

**WASHINGTON.**          May 9, 1907.

Subject: Purchase of
land and water rights,
Agua Caliente.

The Honorable,

The Secretary of the Interior.

Sir:

On December 17, 1907, the Secretary granted authority
for the purchase of certain lands in the vicinity of the Agua
Caliente Reservation, in California, and other property from B.
B. Barney for the use of any Indians the Department may hereafter
deem proper to place on the lands, as recommended by Chief Engi-
neer Code, at a cost of $6,000.

On January 3, 1907, Superintendent Wright was informed
of the authority and instructed to call on the United States
Attorney to assist him in procuring from Mr. Barney an abstract of
title and a deed for the lands, to be forwarded to this Office for
consideration.

On March 25, Mr. Wright forwarded a deed from Burleigh
B. Barney and wife to the lands in question (SE/4 of Sec. 3, T.
5 S., R. 4 E., and Sec. 35, T. 4 S., R. 4 E.), with an abstract
of title prepared by the Riverside Title Trust Company, and a
letter from Oscar Lawlor, U. S. Attorney for the Southern District
of California. Subsequently Mr. Barney forwarded, through Mr.

ACC-HRA000930

Reproduced from the Unclassified / Declassified Holdings of the National Archives

-2-

Code, a warranty deed executed by himself and wife conveying the
lands mentioned, together with the water rights and other property
appurtenant thereto in detail.

Mr. Code, who was present in the city at the time these
were received, suggested that action be deferred until he could
personally ascertain whether the land was properly described,
some doubt having been cast on this by Inspector Chubbuck.

The Office is now in receipt, by Department reference,
of a telegram from Mr. Code, dated May 7, in which he recommends
that payment for Barney holdings, Agua Caliente Reservation, be
made as soon as possible.

The District Attorney in his letter of March 20th
advised that a deed be accepted from Mrs. Elizabeth W. Barney
(correct name Caroline M.), joined in by her husband, Burleigh
B. Barney, for Sec. 35, and said that the title to the SE/4 of
Sec. 3 was vested in B. B. Barney, free of incumbrance.

The deed presented is a joint one covering both tracts,
executed by Burleigh B. Barney and Caroline M. Barney.  It would
seem to convey the entire interests of both parties in each tract.

The deed presented by Mr. Barney through Mr. Code and
accompanying papers are forwarded herewith for submission to the
Attorney General for his written opinion as to the validity of the
title.

Very respectfully,

Acting Commissioner.

JFA-D

ACC-HRA000931

TAB 31

46 P 621/2

## WARRANTY DEED

BURLEIGH B. BARNEY ET UX.
TO
THE UNITED STATES OF AMERICA

THIS INDENTURE, made the 22nd day of March, in the year of our Lord, nineteen hundred and seven, between BURLEIGH B. BARNEY and CAROLINE M. BARNEY, my wife, the parties of the first part, and THE UNITED STATES OF AMERICA, the party of the second part.

WITNESSETH: That the said parties of the first part, for and in consideration of the sum of six thousand dollars, gold coin of the United States of America, to them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, do by these presents grant, bargain and sell, convey and confirm, unto the said party of the second part, and to their heirs and assigns forever, all the certain lots, pieces or parcels of land situate, lying and being in the County of Riverside, and State of California, and bounded and particularly described as follows, to-wit:

First, a half interest in the waters of Andreas Canyon; Second: One pipe line 8 inches in diameter made of steel, approximately 6600 feet in length No. 14 Birmingham Gauge; Third: S.E. ¼ of section 3, township 5 S. range 4 east, S. B. Meridian; Fourth: Section 35, township 4 south, range 4 east, 640 acres of land S. B. Meridian; Fifth: Improvements on Section 35, consisting of 4 small cottages (frame) and one barn, some little fencing, outhouses, etc.; Sixth: Several hundred feet of service pipe with 6 hydrants for supplying cottages and garden with water.

TOGETHER with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof.

TO HAVE AND TO HOLD, the same to the said United States of America, their heirs and assigns forever, and the said first party do hereby covenant with the said United States of America, and their legal representatives, that the said real estate is free from all encumbrances, and that they will and their heirs, executors and administrators shall warrant and defend the same to the United States of America, ___ heirs and assigns forever, against the just and lawful claims and demands of all persons whomsoever.

IN WITNESS WHEREOF, the said parties of the first part have hereunto set their hand _ and seal _, the day and year first above written.

Burleigh B. Barney    (Seal)
Caroline M. Barney    (Seal)

copy of this deed in
ardam Office File No. 13884 - 1948 - California - 313 (Part 2)
70953-07-311

ACC0022727

- 2 -

Signed, sealed and delivered )
in the presence of Grace S. Paige, )
Margaret Condon. )

State of California )
County of ___ ___ ) ss

On this 6th day of April, in the year nineteen hundred and seven, before me, Margaret Condon, a Notary Public in and for said County, residing therein, duly commissioned and sworn, personally appeared Rutleigh B. Barney and Caroline M. Barney, known to me to be the persons whose names are subscribed to the within instrument, and acknowledged to me that they executed the same.

WITNESS my hand and official seal.

Margaret Condon, Notary Public
in and for said Riverside,
County of Riverside, State
of California

(NOTARIAL SEAL)

38174 ( Indian Office )        60685 ( Indian Office )
      ( Apr. 11 ) 1907                ( Jul. 8 ) 1907
      ( Incl. No. 1 )                ( Incl. No. 2 )

( Office of Auditor )          ( Office of Indian Affairs,)
( for Interior Dept. )         ( Received )                83008
( Jul. 11, 1907 )              ( Dec. 11, 1908 )
( Indian Division )            ( File _____ )

Received for record Dec. 30, 1908, at 17 min. past 9 o'clock A.M. at request of C. E. Kelsey. Copied in book No. 276 of Deeds, page 96 et seq., records of Riverside County, California.

Fees, $2.30

I. S. Logan, Recorder.

CERTIFIED CORRECT

Douglas Clark
Land Officer

ACC0022728

- 20 -

# Warranty Deed

**This Indenture,** made this 22nd day of — March in the year of our Lord nineteen hundred and Seven

**Between** Denleigh J. Barney and his Wife Caroline M Barney the parties part of the first part,

**And** the United States of America the party of the second part.

**Witnesseth:** That the said parties of the first part, for and in consideration of the sum of Six Thousand DOLLARS, gold coin of the United States of America, to them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, do by these presents grant, bargain and sell, convey and confirm unto the said party of the second part, and to heirs and assigns forever, all the certain lots, pieces, or parcels of land situate, lying and being in the County of Riverside and State of California and bounded and particularly described as follows, to-wit:



Section Thirty five Township 4 South Range 4 East San bernardino Meridian also South East (1/4) Quarter Section (3) Three Township (5) Five South Range 4 East San bernardino Meridian

**Together** with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof.

**To Have and to Hold,** the same to the said United States of America heirs and assigns forever, and the said first parties do hereby covenant with the said United States of America, and their legal representatives that the said real estate is free from all encumbrances, and that they will and their heirs, executors and administrators shall WARRANT AND DEFEND the same to the said United States of America heirs and assigns forever, against the just and lawful claims and demands of all

ACC0022729

*STATE OF CALIFORNIA,*
*County of Riverside*  } *ss*

On this 5th day of *April* in the year nineteen hundred and *Seven* before me *Margart London* a Notary Public in and for said County, residing therein, duly commissioned and sworn, personally appeared *Burleigh B. Barney and his wife Caroline M. Barney*

known to me to be the persons whose names *are* subscribed to the within instrument and acknowledged to me that *they* executed the same.

**Witness** my hand and official seal.

*Margart London*

Notary Public in and for said *Riverside* County of *Riverside* State of California

DATED

19

Co

**No.**

**Deed**
**Warranty**

305758

ACC0022730

TAB 32

795378
98375-22. I.O.

4—1040-R

# The United States of America,

## To all to whom these presents shall come, Greeting:

WHEREAS, There has been deposited in the General Land Office an Order of the Secretary of the Interior directing that a patent issue to the Agua Caliente or Palm Springs Band of Mission Indians, under the provisions of the Act of Congress of January 12, 1891 (26 Stat. 712), as amended by the Act of March 1, 1907 (34 Stat., 1015), for the north half of Section eleven in Township five south of Range four east of the San Bernardino Meridian, California, containing three hundred twenty acres:

NOW KNOW YE, That the UNITED STATES OF AMERICA, in consideration of the premises, and in accordance with the provisions of the third Section of the said Act of Congress, approved January twelfth, eighteen hundred and ninety-one, hereby declares, that it does and will hold the said Tract of land selected as aforesaid (subject to all the restrictions and conditions contained in the said Act of Congress of January 12, 1891), for the period of twenty-five years in trust for the sole use and benefit of the said Agua Caliente or Palm Springs Band of Mission Indians, according to the laws of California, and at the expiration of the said period the United States will convey the same or the remaining portion not patented to individuals, by patent to the said Agua Caliente or Palm Springs Band of Mission Indians, as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever; provided, that when patents are issued under the fifth Section of said Act of January twelfth, eighteen hundred and ninety-one, in favor of individual Indians for lands covered by this patent, they will override (to the extent of the lands covered thereby) this patent and will separate the individual allotment from the lands held in common; and there is reserved from the lands hereby held in trust for said Agua Caliente or Palm Springs Band of Mission Indians, a right of way thereon for ditches or canals constructed by the authority of the United States.

IN TESTIMONY WHEREOF, I, Warren G. Harding, President of the United States of America, have caused these letters to be made Patent, and the Seal of the General Land Office to be hereunto affixed.

GIVEN under my hand, at the City of Washington, the TWENTY-NINTH day of MARCH in the year of our Lord one thousand nine hundred and TWENTY-THREE and of the Independence of the United States the one hundred and FORTY-SEVENTH.

(SEAL)

By the President: Warren G Harding.

By Viola G. Pugh , Secretary.

M. P. LeRoy

ACC0017375

231

The United States of America.

To all to whom these Presents shall come, Greeting:

Whereas it is provided by an Act of Congress entitled "An Act for the relief of the Mission Indians in the State of California," approved January Twelfth Anno Domini one thousand eight hundred and ninety one (26. Stats. 712) that the Secretary of the Interior shall appoint three disinterested persons as Commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the the State of California upon reservations which shall be secured to them.

"Section 2." That it shall be the duty of said Commissioners to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include as far as practicable the land and villages which have been in the actual occupation and possession of said Indians and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the Secretary of the Interior."

"Section 3." That the Commissioners upon the completion of their duties shall report the result to the Secretary of the Interior, who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the Commissioner and approved by him in favor of each band or village of Indians occupying any such reservation, which patent shall be of the legal effect and declare that the United States does and will hold the land thus patented subject to the provisions of Section 4 of this Act, for the period of Twenty five years in trust, for the sole use and benefit of the band or village to which it is reserved, and that at the expiration of said period the United States will convey the same by

— 11 —

ACC0022719

232

remaining portion not previously patented in severalty, by patent to said band or village discharged of said trust and free of all charges or incumbrances whatsoever.

And whereas it appears by a letter dated October twenty six eighteen hundred and ninety six from the Commissioner of Indian Affairs, and an other dated October twenty eight, eighteen hundred and ninety five from the Secretary of the Interior that a selection has been made by the Commissioners appointed and acting under said Act of Congress of January twelfth eighteen hundred and ninety one for the Agua Caliente Band or Village of Mission Indians covering sections twelve, fourteen, twenty two, twenty four, twenty six and thirty four of Township four South of Range four East of the San Bernardino Meridian in the State of California, containing three thousand eight hundred and forty four acres and eighty hundredths of an acre.

Now Know Ye, That the United States of America in consideration of the premises and in accordance with the provisions of the third section of the said Act of Congress approved January twelfth eighteen hundred and ninety one, hereby declares that it does and will hold the said tracts of land selected as aforesaid (subject to all the restrictions and conditions contained in the said Act of Congress of January 12, 1891) for the period of twenty-five years in trust for the sole use and benefit of the said Agua Caliente Band or Village of Mission Indians according to the laws of California and at the expiration of said period the United States will convey the same, or the remaining portion not patented to individuals, by patent to said Agua Caliente Band or Village of Mission Indians as aforesaid in fee simple discharged of said trust and free of all charges or incumbrances whatsoever. Provided that when patents are issued under the fifth section of said Act of January twelfth eighteen hundred and ninety-one in favor of individual Indians for lands covered by this patent they

—12—

233

will over side ( to the extent of the land covered thereby of this patent, and will separate the individual allotment from the lands left in common; and there is reserved from the lands hereby held in trust for said Agua Caliente Band or Village of Mission Indians, a right of way hereon, for ditches or canals, constructed by the authority of the United States.

In testimony whereof, I, Grover Cleveland, President of the United States of America have caused these Letters to be made Patent and the Seal of the General Land Office to be hereunto affixed.



Given under my hand at the city of Washington this fourteenth day of May in the Year of our Lord one thousand eight hundred and ninety-six and of the Independence of the United States the one hundred and twentieth.

By the President Grover Cleveland

By M McKean, Secretary

L. Q. C. Lamar
Recorder of the General Land Office.

Recorded Vol. 21 pp. 231 to 233 inclusive

ACC0022721

4-207o
(May 1954)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
WASHINGTON 25, D. C.

MAR 1 2 1958

I hereby certify that ~~the attached~~ copy of patent is a true and lite~~ral certi~~fication from the record which is in ~~custody~~ in this office.

IN TEST~~IMONY WHERE~~OF I have hereunto sub-scribed my name and caused the seal of this office to be affixed, at the city of Washington, on the day and year above written.

........................................
Certifying Officer

ACC0022722

*The United States of America*

*To all to Whom, these presents shall come Greeting:*

Whereas, It is provided by an Act of Congress entitled "An Act for the relief of the Mission Indians in the State of California approved, January twelfth, Anno Domini one thousand eight hundred and ninety-one, (26 Stats. 712) that the Secretary of the Interior shall appoint three disinterested persons as commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the State of California upon reservations which shall be secured to them,

"Section, 2" That it shall be the duty of said Commissioners to select a reservation, for each band or village of the Mission Indians residing within said State, which reservation shall include as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians and which shall be sufficient in extent to meet their just requirements which selection shall be valid when approved by the Secretary of the Interior!

"Section 3" That the Commissioners upon the completion of their duties shall report the results to the Secretary of the Interior, who if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the Commissioners and approved by him in favor of each band or village of

— 15 —

ACC0022723

477

Indians occupying any such reservation which patent shall be of the legal effect and declare that the United States does and will hold the land thus patented subject to the provisions of Section 4 of this act, for the period of twenty-five years in trust for the sole use and benefit of the band or village to which it is issued and that at the expiration of said period the United States will convey the same or the remaining portion not previously patented in severalty by patent to said band or village discharged of said trust and free of all charges or incumbrances whatsoever."

And whereas it appears by a letter dated May eighth, nineteen hundred and six, from the Commissioner of Indian affairs, and an order dated May fourteenth, nineteen hundred and six from the Secretary of the Interior, that a selection has been made by the Commissioners appointed and acting under said act of Congress of January twelfth eighteen hundred and ninety one for the Agua Caliente Band or Village of Mission Indians covering Section two in Township five South of Range four East of San Bernardino Meridian in California containing six hundred and thirty-eight acres and fifty-six hundredths of an acre.

Now Know Ye, That the United States of America in consideration of the premises and in accordance with the provisions of the third section of the said act of Congress approved January twelfth eighteen hundred and ninety-one hereinbefore

—16—

478

clause, that it does and will hold the said tracts of land selected as aforesaid (subject to the restrictions and conditions contained in the said Act of Congress of January 12, 1891) for the period of twenty-five years in trust for the sole use and benefit of the said Agua Caliente Band or Village of Mission Indians according to the laws of California and at the expiration of said period the United States will convey the same or the remaining portion not patented to individuals by patent to said Agua Caliente Band or Village of Mission Indians as aforesaid in fee simple, discharged of said trust and free of all charge or incumbrance whatsoever— Provided that when patents are issued under the fifth section of said act of January twelfth, eighteen hundred and ninety-one in favor of individual Indians for lands covered by this patent they will over ride (to the extent of the land covered thereby), this patent and will separate the individuals allotment from the lands left in common, and there is reserved from the lands hereby granted held in trust for said Agua Caliente Band or Village of Mission Indians, a right of way thereon for ditches or canals constructed by the authority of the United States.

In testimony whereof I, Theodore Roosevelt President of the United States of America have caused these letters to be made patent, and the Seal of the General Land Office to be hereunto affixed.

ACC0022725

179

Seal

Given under my hand
at the City of Washington
the twenty-ninth day of
October, in the year of
our Lord one thousand
nine hundred and six
and of the Independence
of the United States the
One hundred and thirty
first.

By the President, T. Roosevelt

By F. M. McKean Secretary

C. H. Brush
    Recorder of the General Land Office.

AGO0022726

90494-10 I.O.
94001-10

4—1040-R.

# The United States of America,

## To all to whom these presents shall come, Greeting:

WHEREAS, THERE HAS BEEN DEPOSITED IN THE GENERAL LAND OFFICE AN ORDER OF THE SECRETARY OF THE INTERIOR DIRECTING THAT A PATENT ISSUE TO THE AGUA CALIENTE BAND OR VILLAGE OF INDIANS, UNDER THE PROVISIONS OF THE ACT OF CONGRESS OF JANUARY 12, 1891 —26 STATUTE, 712—, AS AMENDED BY THE ACT OF MARCH 1, 1907 —34 STAT., 1015—, FOR THE SECTIONS TWO, FOUR, SIX, EIGHT, EIGHTEEN, TWENTY, TWENTY-EIGHT, THIRTY, AND THIRTY-TWO AND THE WEST HALF OF SECTION TEN IN TOWNSHIP FOUR SOUTH AND THE SECTIONS FOUR, SIX, EIGHT, TWELVE, FOURTEEN, EIGHTEEN, TWENTY, TWENTY-TWO, TWENTY-FOUR, TWENTY-SIX, TWENTY-EIGHT, THIRTY, THIRTY-TWO, AND THIRTY-FOUR IN TOWNSHIP FIVE SOUTH ALL IN RANGE FOUR EAST AND THE SECTIONS TWO, FOUR, SIX, EIGHT, TEN, TWELVE, FOURTEEN, EIGHTEEN, TWENTY, TWENTY-TWO, TWENTY-FOUR, TWENTY-SIX, TWENTY-EIGHT, THIRTY, THIRTY-TWO, AND THIRTY-FOUR IN TOWNSHIP FOUR SOUTH OF RANGE FIVE EAST OF THE SAN BERNARDINO MERIDIAN, CALIFORNIA, CONTAINING TWENTY-FIVE THOUSAND TWENTY AND THIRTY-FOUR HUNDREDTHS ACRES.

NOW KNOW YE, THAT THE UNITED STATES OF AMERICA, IN CONSIDERATION OF THE PREMISES, AND IN ACCORDANCE WITH THE PROVISIONS OF THE THIRD SECTION OF THE SAID ACT OF CONGRESS, APPROVED JANUARY TWELFTH, EIGHTEEN HUNDRED AND NINETY-ONE, HEREBY DECLARES, THAT IT DOES AND WILL HOLD THE SAID TRACTS OF LAND SELECTED AS AFORESAID —SUBJECT TO ALL THE RESTRICTIONS AND CONDITIONS CONTAINED IN THE SAID ACT OF CONGRESS OF JANUARY 12, 1891—, FOR THE PERIOD OF TWENTY-FIVE YEARS IN TRUST FOR THE SOLE USE AND BENEFIT OF THE SAID AGUA CALIENTE BAND OR VILLAGE OF INDIANS, ACCORDING TO THE LAWS OF CALIFORNIA, AND AT THE EXPIRATION OF THE SAID PERIOD THE UNITED STATES WILL CONVEY THE SAME OR THE REMAINING PORTION NOT PATENTED TO INDIVIDUALS, BY PATENT TO THE SAID AGUA CALIENTE BAND OR VILLAGE OF INDIANS, AS AFORESAID, IN FEE, DISCHARGED OF SAID TRUST AND FREE OF ALL CHARGE OR INCUMBRANCE WHATSOEVER; PROVIDED, THAT WHEN PATENTS ARE ISSUED UNDER THE FIFTH SECTION OF SAID ACT OF JANUARY TWELFTH, EIGHTEEN HUNDRED AND NINETY-ONE IN FAVOR OF INDIVIDUAL INDIANS FOR LANDS COVERED BY THIS PATENT THEY WILL OVERRIDE —TO THE EXTENT OF THE LANDS COVERED THEREBY— THIS PATENT AND WILL SEPARATE THE INDIVIDUAL ALLOTMENT FROM THE LANDS HELD IN COMMON;  AND THERE IS RESERVED FROM THE LANDS HEREBY HELD IN TRUST FOR SAID AGUA CALIENTE BAND OR VILLAGE OF INDIANS, A RIGHT OF WAY THEREON FOR DITCHES OR CANALS CONSTRUCTED BY THE AUTHORITY OF THE UNITED STATES.

IN TESTIMONY WHEREOF, I,         WILLIAM H. TAFT,

President of the United States of America, have caused these letters to be made

Patent, and the seal of the General Land Office to be hereunto affixed.

GIVEN under my hand, at the City of Washington, the      **FIFTH**

(SEAL)        day of       **JANUARY**        in the year of our Lord one thousand

nine hundred and        **ELEVEN**        and of the independence of the

United States the one hundred and

**THIRTY-FIFTH.**

By the President:

By                                            Wm H Taft

                      N. P. LeRoy

                      H. V. Jlampard

                                            Secretary.

                      Recorder of the General Land Office.

RECORD OF PATENTS, Patent Number      **168071**

ACC0022731

TAB 33





**Making every drop count since 1918**

# Coachella Valley Water District
## 2010-11 Annual Review

Inside:

2010 was a good year for groundwater replenishment.
*Page 2*

District offers new landscape and toilet rebate programs.
*Pages 4-5*

Water Quality Report details valley's drinking water.
*Pages 6-9*

Coachella Canal's distribution system expanded to alleviate demand on the aquifer.
*Page 15*

CVWD 151-001

## Board of Directors

**Peter Nelson**
President, Division 4

**John Powell, Jr.**
Vice president, Division 3

**Franz De Klotz**
Director, Division 1

**Patricia "Corky" Larson**
Director, Division 2

**Debi Livesay**
Director, Division 5

## Senior Administration

**Steve Robbins**
General Manager-Chief Engineer

**Jim Barrett**
Assistant General Manager

**Julia Fernandez**
Board Secretary

## Directors

**Raul Aguirre**
Director of Service

**Heather Engel**
Director of Communication & Legislation

**Dan Farris**
Director of Operations

**Kay Godbey**
Director of Finance

**Mark Johnson**
Director of Engineering

**Heidi Keeran**
Director of Human Resources

**Javier Miranda**
Director of Trades & Support

## Contact Us

**Payment Address**
P.O. Box 5000
Coachella, CA 92236

**Correspondence Address**
P.O. Box 1058
Coachella, CA 92236

**Offices**
75-515 & 75-525 Hovley Lane East
Palm Desert
85-995 Avenue 52
Coachella

**Main switchboard**
(760) 398-2651

**Job hot line**
(760) 398-2661 ext. 2103

**Weather hot line**
(760) 398-7211

**Fax** (760) 398-3711

**Web sites** www.cvwd.org
www.waterfun4kids.org

**Established in 1918**, the Coachella Valley Water District is a government agency run by a five-member Board of Directors, elected at-large to represent the five divisions within CVWD's service area. The directors serve four-year terms.

**Board meetings are open to the public** and generally held on the second and fourth Tuesday of each month at 9 a.m. in Forbes Auditorium, at CVWD's Coachella office. Call the district or visit online to confirm actual dates, times and location.

**The Water Quality Report** on pages 6-9 is mailed to all bill payers and registered voters within the district's domestic water boundary, in accordance with state law. The 2010-11 Annual Review costs approximately 50 cents per issue to print and mail.



Printed on 30% recycled paper

Cover Photo: When rain and snow melt pour out of the San Bernardino mountains, it awakens the Whitewater River. The river water is sometimes mixed with imported water (as seen here) and as much of the water as possible is diverted into CVWD replenishment ponds to help supplement the aquifer. The remainder flows down the Whitewater River Stormwater Channel, built along the river's natural path. Because the river is often dry, local residents sometimes forget it exists and are reminded only when the river disrupts traffic where roads are built inside the river bed/channel.

CVWD 151-002

To Coachella Valley Water District customers:

CVWD is responsible for ensuring quality drinking water is delivered to your home 24 hours a day. But our commitment to meeting the various water-related needs of the Coachella Valley doesn't end there. We also import water for irrigation and groundwater replenishment, collect and treat wastewater, deliver recycled water and manage the regional flood stormwater system.

Thanks to above-average rainfall and full reservoirs across the state, Gov. Jerry Brown this spring declared the end of the state's three-year drought. While this was welcome news, it should not be used as an excuse to return to wasteful water use. In the Coachella Valley, we rely on the vast aquifer and, unfortunately, that aquifer remains in a state of overdraft regardless of drought status. Overdraft occurs when we use more water from the aquifer than is returned by natural and artificial means, such as rain and imported water.

As a responsible steward of the valley's groundwater resources, the district imports water from the Colorado River and the State Water Project for agricultural and golf course irrigation and to replenish the aquifer. Increased use of imported water is among the future goals outlined in the district's Water Management Plan, the draft update of which was released at the end of 2010 and is available to review online at www.cvwd.org.

The long-term planning document identifies a range of actions needed to eliminate overdraft of the aquifer while maintaining the quality of life in the valley. Other objectives include expanding groundwater replenishment efforts and increasing the use of recycled water for irrigating golf courses.

The plan also outlines water conservation goals for all types of water users, including agriculture, golf, homes and businesses. Water use by homes and businesses decreased in 2010, in part due to tiered rates and increased awareness about the need to change wasteful water practices. We have not yet met the state's mandate of reducing water use by 20 percent by the year 2020, but are well on our way.

In these difficult economic times, CVWD has taken a number of steps to reduce costs and keep rates among the lowest in the state. At the time this publication was printed, the Board of Directors had not yet approved the 2011-12 fiscal year budget. However, the budget proposal reflected increased power and fuel costs coupled with reduced revenue and some reserve funds remaining depleted.

Reduced spending, including across-the-board departmental cuts and another year of postponing maintenance projects, helped create a budget that anticipates no increases for sewer and domestic water rates and minimal increases for canal water rates.

Despite budget challenges, I assure you we will strive to provide the highest quality service to all our customers in all these water-related areas.

Sincerely,

Steve Robbins,
General Manager-Chief Engineer

CVWD 151-003

## Groundwater facts

The Coachella Valley is blessed with a natural groundwater basin. In the early days of the valley, the aquifer was so full you needed only to dig a shallow hole to find water.

Today, our aquifer is in a state of overdraft, meaning more water is used each year than can be replaced by natural or artificial means.

The district is protecting its imported water supply to eliminate overdraft by expanding its replenishment program.

**345,136 af** — Amount of groundwater used in the Coachella Valley in 2010

**298,941 af** — Amount of imported water replenished by CVWD and DWA in 2010

**62,700 af** — Average annual amount of water naturally replenished by rain and snow melt

**2.26 million af** — Water replenished by CVWD and DWA since 1973

**5.5 million af** — Estimated cumulative overdraft

**39 million af** — Estimated capacity of Coachella Valley's groundwater basin

*af = acre-feet; 1 acre-foot equals 325,851 gallons*



*Page 2*

# Groundwater replenishment program has successful year

In 2010, the Coachella Valley Water District and Desert Water Agency jointly replenished almost as much imported water into the aquifer than was taken out by area residents and businesses, helping to close the gap on the overdrafted aquifer.

Imported water supplies reached near-record breaking levels in 2010, with nearly 300,000 acre-feet put into the groundwater basin. That is enough water to meet the annual needs of approximately 300,000 homes and businesses.

When you add the estimated average of 62,700 acre-feet of natural groundwater replenishment through captured rain and snow melt, the total replenished amount was greater than what was taken out. That was the first time the amount replenished exceeded the amount taken out since 1986.

CVWD and DWA are State Water Project contractors. Combined, the two agencies are the third largest contractor in the state. In 2010, the agencies replenished approximately 228,000 acre-feet of water into the Whitewater Replenishment Facility near Windy Point and more than 33,000 acre-feet into the Mission Creek spreading basins.

In addition, CVWD operates the Thomas E. Levy Groundwater Replenishment Facility in south La Quinta and the Martinez Canyon Pilot Facility in Oasis. In 2010, more than 37,400 acre-feet of water was replenished at these two facilities combined.

All of CVWD's drinking water comes from the groundwater basin, with an estimated capacity in excess of 39 million acre-feet. Overdraft of the aquifer can have serious consequences, including increased pumping costs, land subsidence and water quality issues. Imported water is used to replenish the basins to ensure adequate water supplies and maintenance of groundwater levels.

While it is critical that we import water to replenish the aquifer, it is an expensive undertaking. CVWD and DWA's imported water costs are $76 million per year.

Groundwater replenishment programs are partially funded by the Replenishment Assessment Charge, commonly called the RAC, which is paid by all large water users with private wells that pump more than 25 acre-feet of groundwater per year, including CVWD.

Groundwater replenishment is just one way in which the district is working to protect the aquifer. In addition, the district looks for means to provide alternative water sources to non-potable users, such as recycled water for golf courses.

| Year | Natural replenishment average | Artificial replenishment actual | Total replenishment | Valleywide pumped * | Difference |
|------|------|------|------|------|------|
| 2010 | 62,700 | 298,941 | 361,641 | 345,136 | 16,505 |
| 2009 | 62,700 | 82,849 | 145,549 | 373,869 | (228,320) |
| 2008 | 62,700 | 15,984 | 78,684 | 395,207 | (316,523) |
| 2007 | 62,700 | 22,795 | 85,495 | 396,331 | (310,836) |
| 2006 | 62,700 | 121,508 | 184,208 | 349,990 | (165,782) |
| 2005 | 62,700 | 195,020 | 257,720 | 395,920 | (138,200) |
| 2004 | 62,700 | 22,258 | 84,958 | 388,275 | (303,317) |
| 2003 | 62,700 | 2,614 | 65,314 | 412,846 | (347,532) |
| 2002 | 62,700 | 40,528 | 103,228 | 389,566 | (286,338) |
| 2001 | 62,700 | 4,279 | 66,979 | 382,766 | (315,787) |
| **Average** | 62,700 | 80,678 | 143,378 | 382,991 | (239,613) |

* Excludes private well pumpers of less than 25 acre-feet annually.

All numbers in acre-feet. An acre-foot of water is equal to 325,851 gallons, or enough water to cover one acre of land one foot deep.



The Whitewater River and Coachella Valley stormwater channels convey flood waters from rain and snow melt safely through the valley to the Salton Sea. Concrete lining, sometimes hidden underneath golf courses, landscaping or earthen material, helps prevent erosion and protect adjacent properties.

# Stormwater channels keep flows away from homes

With the general scarcity of rain in the Coachella Valley, it might be easy to think that flooding is something desert residents don't need to worry about.

"People don't realize that huge storms do happen," said Dan Charlton, engineering manager.

When heavy rains occur, the alluvial fans surrounding the valley convey stormwater down into populated areas. Historically, such storms have been catastrophic, causing millions of dollars in property damage.

The regional stormwater system developed by the water district relies on a main channel and several smaller channels to safely convey water away from homes and businesses for 49 miles from Whitewater to the Salton Sea.

From Windy Point to about Washington Street, the main channel is called the Whitewater River Stormwater Channel because it is the naturally occurring Whitewater River riverbed. At about Washington Street, the riverbed officially turns into the Coachella Valley Stormwater Channel. Built separately, they form one cohesive channel fed by 15 smaller tributary channels that collect rapidly moving flood water as it pours from the adjacent mountains onto the valley floor.

Many of these smaller facilities were built in the 1970s in cooperation with area cities. The length of all regional flood protection facilities is 134 miles.

This year, progress continued with the ongoing work to line the stormwater channel with concrete.

"It helps convey the water downstream and helps prevent lateral erosion, protecting adjacent properties from inundation," Charlton said.

Along several areas of the channel, the lining is covered with grass, earthen material or other landscaping, hiding the lining while allowing it to provide protection.

Recent work has involved lining a 4,000 foot-long section of the channel from Industrial Way to Avenue 54 in the city of Coachella.

The $2.5 million project required dewatering the channel, which is the process of removing water from the soil. This can be difficult in the east valley, where the groundwater table is only 8-10 feet below the surface.

The project also required locating and recording a high-pressure gas line and building access ramps and storm drain outlets.

## Did you know?

The 49-mile stormwater channel that conveys rain and snow melt through the valley to the Salton Sea is called the Whitewater River Stormwater Channel to the west of Washington Street and the Coachella Valley Stormwater Channel to the east.

This main channel was built to withstand a Standard Project Flood, or approximately 82,000 cubic feet per second of water flow. This is greater than a 100-Year Flood.

Some development, such as roads and golf courses, is built within stormwater protection facilities. However, the main purpose of each facility is to convey water.

Residents need to be cautious when crossing stormwater channels both during and prior to a storm because deep, flowing water can appear suddenly.

CVWD 151-005

## Water use by the numbers

**60 gallons** — Water an average person uses inside the home each day

**1,370 gallons in the summer; 550 gallons in the winter** — Water an average Coachella Valley homeowner uses on outside irrigation each day

**200-800 gallons per day** — Water saved by fixing a leaky toilet

**12 gallons** — Water saved by reducing shower time from 10 to 5 minutes



This free, 12-page booklet will guide you to finding hidden and wasteful leaks inside and outside your home.



At 160 pages, *Lush & Efficient Landscape Gardening in the Coachella Valley* is packed with photos and information on hundreds of desert-friendly plants and trees. Cost is $15 and includes an interactive CD-ROM.

Order either publication using the postcard inside this *Annual Review.*

# Landscape rebate program expands districtwide

Thousands of square-feet of landscaping have been converted from turf to desert-friendly gardens with help from the Coachella Valley Water District.

"The desert landscaping that is drip-irrigated uses 50 percent to 70 percent less water than grass. That's very significant," said Dave Koller, conservation coordinator for the district. "The conversion can pay itself off over the years."

Koller points out that 70 to 80 percent of residential water is used outdoors. He said the water district's introduction of tiered rates helped to raise awareness about conservation, even though the rates were set up so that homeowners could meet their water budget and still have turf.

The conversion projects were fueled in part this year by rebate programs developed by the district in partnership with the cities of Palm Desert and La Quinta. The agencies jointly contributed more than $200,000 in Water Wise Landscape Rebates to participating residents and businesses.

One rebate program paid eligible CVWD customers to remove turf and replace it with lush and efficient landscaping. Eligible homeowner associations and businesses could qualify for rebates to replace grass on parkways adjacent to city streets.

A second program offered to residents and businesses provided rebates for those wanting to replace older, inefficient spray nozzles with water-saving smart nozzles.

The district is now offering a rebate program to all CVWD customers, even if there is no matching funds from the city in which you live. For qualifying participants, the district will pay $1 for each square foot of grass replaced and $2.50 for each new generation sprinkler nozzle installed.

Individual homeowners can qualify for rebates adding up to $1,000. The rebates can add up to $5,000 for a large landscape project, such as those managed by HOAs.

Those who converted landscaping during the recent rebate programs had to meet certain conditions. In return, they received professional assistance from RGA

### Toilet rebates

Starting July 1, the district will offer a new program to help customers reduce their indoor water use by providing up to $100 for replacing an old toilet with a newer, more efficient one.

**Program details:**

• All district customers are eligible, with a limit of one toilet replacement per household.

• Old toilets must be manufactured prior to 1992 and consume more than 3 gallons per flush.

• The customer is responsible for installing the new toilet and must provide the district with a sales receipt and deliver the old toilet, which will be recycled.

• The $10,000 annual program will fund replacement of up to 60 toilets per year.

Visit www.cvwd.org for details.

Landscape Architects of Palm Desert, smart technology suppliers and CVWD expert staff.

"We wanted to give people as much information as we could about what it would take to create a desert landscape," Koller said.

The district is currently conducting a study of 60 properties that converted landscaping, comparing their water use to that of similar neighborhood homes that retained their turf front lawns. So far, the ongoing analysis indicates that those who converted their landscaping are using approximately 30 percent less water than the neighbor homes, a similar statistic to that found by a landmark five-year Las Vegas study.

The study shows that in La Quinta alone, participating homeowners collectively saved a total of more than 15 million gallons of water from 2008 to 2010 because of landscape conversions.

CVWD 151-006



Lake Mirage Racquet Club started making changes to save water and energy a couple years ago. Board members say the long-term savings far exceed the initial investment. Among the changes was the removal of approximately 1,000 square feet of turf, especially from along curbs and walkways.

# Homeowner associations reducing water use with landscape conversions and irrigation projects

Colorful lush and efficient landscapes have become a valleywide trend among homeowner associations that are now paying more attention to water usage and making changes to become more water-efficient.

HOAs are also getting smarter about proper irrigation techniques and how to communicate with their landscape professionals to understand and set common water conservation goals.

Lake Mirage, a 26-year-old country club located in Rancho Mirage recently made significant upgrades in order to save water, energy and money. The upgrades included fixing all pool leaks, which resulted in saving nearly 18,000 gallons of water each month, and installing new energy efficient pool and spa pumps.

Lake Mirage also worked closely with its landscape contractor for irrigation and landscaping recommendations. Approximately 1,000 square feet of turf was removed from Lake Mirage's curb side and replaced with desert-friendly landscaping, decomposed granite, large boulders and cobblestones.

In addition, 19 smart controllers were installed through CVWD's Large Landscape Smart Controller Rebate Program, resulting in even more water savings. In addition to rebate and incentive programs, CVWD offers workshops and free efficiency evaluations for homeowner associations with specific suggestions tailored to the association.

"It is encouraging to see more and more HOAs taking the initiative to become better water managers. By reducing water waste and better managing water usage, we are collectively making a difference in the Coachella Valley's future groundwater supply," said David Koller, CVWD conservation coordinator.

Another homeowner association that recently made changes is the Palm Desert Resorter. The association converted a tract with 40 double-unit homes to desert landscaping.

Turf was also removed from curb sides, back patios, several walk-ways in between homes, and the pool area. It was replaced with desert-friendly plants, a drip irrigation system and decomposed granite. The HOA has eliminated water run-off on its streets and sidewalks and cut its water consumption in half.

Additionally, more than 10 years ago the water-conscious community installed its very own weather station that measures outdoor temperature, wind, rain and humidity. The weather station helps the Resorter to irrigate its landscaping more accurately, improving overall efficiency. Such systems are getting more and more popular with HOAs.

### Did you know?

CVWD's Water Management staff will provide a free evaluation of your homeowner association's irrigation and landscaping, including specific suggestions to increase your efficiency and reduce water bills. Call (760) 398-2651.

CVWD 151-007

## Does CVWD fluoridate the drinking water?

CVWD does not add fluoride to the water. However, fluoride is a naturally occurring element found in local groundwater.

## Do I need a water softener?

No. CVWD tap water meets all drinking water standards and does not need to be conditioned or filtered.  CVWD does not prohibit the use of water softeners, but district ordinance does prohibit the discharge of excess salt down the drain.

Discharged salt can harm the groundwater and may require additional treatment, which would increase future costs of providing sewer and water services. If you choose to soften your water, please check with your local water conditioning expert or the Pacific Water Quality Association to avoid installing a system that discharges excess salt down the drain.

## For more detailed information:

To receive a summary of the district's source water assessments, or for additional water quality data or clarification, call the district's Water Quality Section at (760) 398-2651. Complete copies of source water assessments may be viewed at the Coachella Valley Water District, 85-995 Avenue 52, Coachella, CA 92236.

Este informe contiene información muy importante sobre su agua potable. Tradúzcalo ó hable con alguien que lo entienda bien. También puede llamar al distrito de agua al número de teléfono (760) 398-2651.

*Page 6*

# 2011 Domestic Water Quality Report



Local students tour the CVWD Water Quality Laboratory to learn about water quality issues and testing procedures.

Coachella Valley Water District is committed to delivering high quality drinking water that meets stringent government standards. This annual report documents that the water served to all CVWD water users (obtained from wells drilled into the Coachella Valley's vast groundwater basin) meets state and federal drinking water quality standards.

The district is tasked with ensuring that CVWD drinking water meets these standards. Highly trained employees monitor the water systems and collect drinking water samples that are tested at the district's state-certified laboratory. A few specialized tests are performed by other certified laboratories. In addition to the detected constituents listed in the table on pages 8-9, CVWD's Water Quality staff monitors for more than 100 other regulated and unregulated chemicals.

CVWD is governed by a locally elected, five-member board of directors who normally meet in public session at 9 a.m., on the second and fourth Tuesdays of each month at the district's Coachella office at Avenue 52 & Highway 111.

### The following report is written and provided in accordance with California Department of Public Health requirements:

While all of CVWD's domestic water supply meets state and federal standards, drinking water supplied to some service areas does contain low levels of naturally occurring arsenic. The arsenic standard balances the current understanding of arsenic's possible health effects against the costs of removing arsenic from drinking water. The U.S. Environmental Protection Agency continues to research the health effects of low levels of arsenic, which is a mineral known to cause cancer in humans at high concentrations and is linked to other health effects such as skin damage and circulatory problems. All drinking water delivered by CVWD last year complies with the 10 ug/L MCL.

Radon is a naturally occurring, radioactive gas — a by-product of uranium — that originates underground but is found in the air. Radon moves from the ground into homes primarily through cracks and holes in their foundations. While most radon enters the home through soil, radon from tap water typically is less than two percent of the radon in indoor air.

The U.S Environmental Protection Agency (USEPA) has determined that breathing radon gas increases an individual's chances of developing lung cancer, and has proposed a maximum contaminant level of 300 picoCuries per liter (pCi/L) for radon in drinking water. This proposed standard is far less than the 4,000 pCi/L in water that is equivalent to

the radon level found in outdoor air. The radon level in district wells ranges from none detected to 460 pCi/L, significantly lower than that found in the air you breathe.

Nitrate in drinking water at levels above 45 milligrams per liter (mg/L) is a health risk for infants younger than six months old. High nitrate levels in drinking water can interfere with the capacity of the infant's blood to carry oxygen, resulting in serious illness; symptoms include shortness of breath and blueness of skin. Nitrate levels above 45 mg/L may also affect the ability of the blood to carry oxygen in other individuals, such as pregnant women and those with certain enzyme deficiencies. If you are caring for an infant, or you are pregnant, you should ask for advice from your health care provider.

Nitrate levels in district wells ranges from no detection to 40 mg/L, which is below the maximum containment level.

If present, elevated levels of lead can cause serious health problems, especially for pregnant women and young children. Lead in drinking water is primarily from materials and components associated with service lines and home plumbing.

Coachella Valley Water District is responsible for providing high quality drinking water, but cannot control the variety of materials used in plumbing components. When your water has been sitting for several hours, you can minimize the potential for lead exposure by flushing your tap for 30 seconds before using water for drinking or cooking.  You can capture this flushed water in a container and use it for watering plants. If you are concerned about lead in your water, you may wish to have your water tested. Information on lead in drinking water, testing methods, and steps you can take to minimize exposure is available from the Safe Drinking Water Hotline or at http://www.epa.gov/safewater/lead.

As noted, all drinking water served by CVWD comes from wells. The California Department of Public Health requires water agencies to state, however, "the sources of drinking water (both tap water and bottled water) include rivers, lakes, streams, ponds, reservoirs, springs and wells. As water travels over the surface of the land or through the ground, it dissolves naturally occurring minerals and, in some cases, radioactive material, and can pick up substances resulting from the presence of animals or from human activity."

"Contaminants that may be present in source water include:

"• Microbial contaminants, such as viruses and bacteria, that may come from sewage treatment plants, septic systems, agricultural livestock operations and wildlife.

"• Inorganic contaminants, such as salts and metals, that can be naturally occurring or result from urban stormwater runoff, industrial or domestic wastewater discharges, oil and gas production, mining or farming.

"• Pesticides and herbicides that may come from a variety of sources such as agriculture, urban stormwater runoff and residential uses.

"• Organic chemical contaminants, including synthetic and volatile organic chemicals, that are by-products of industrial processes and petroleum production, and can also come from gas stations, urban stormwater run off and septic systems.

"• Radioactive contaminants that can be naturally occurring or be the result of oil and gas production and mining activities.

"In order to ensure that tap water is safe to drink, USEPA and the state Department of Public Health (Department) prescribe regulations that limit the amount of certain contaminants in water provided by public water systems."

Department regulations also establish limits for contaminants in bottled water that must provide the same protection for public health. "Drinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants. The presence of contaminants does not necessarily indicate that water poses a health risk. More information about contaminants and potential health effects can be obtained by calling the USEPA's Safe Drinking Water Hotline (1-800-426-4791) or the National Safe Council Radon Hotline (1-800-SOS-RADON)."

Drinking Water Source Water Assessments:

The district has conducted source water assessments that provide information about the vulnerability of district wells to contamination. In 2002, CVWD completed a comprehensive source water assessment that evaluated all groundwater wells supplying the district's six public water systems. An assessment is performed on each new well added to CVWD's system. Groundwater from these district wells are considered vulnerable to activities associated with urban and agricultural uses.

Urban land uses include the following activities: known contaminant plumes, dry cleaners, underground storage tanks, septic systems, automobile gas stations (including historic), automobile repair shops, historic waste dumps/landfills, illegal/unauthorized dumping, sewer collection systems and utility stations' maintenance areas.

Agricultural land uses include the following activities: irrigation/agricultural wells, irrigated crops, pesticide/fertilizer/petroleum and transfer areas. The following activities have been associated with detected contaminants: known contaminant plumes, dry cleaners and irrigated crops.

Drinking water supplied by CVWD's wells to our communities complies with state and federal drinking water quality standards.

---

"Some people may be more vulnerable to contaminants in drinking water than the general population. Immuno-compromised persons such as persons with cancer undergoing chemotherapy, persons who have undergone organ transplants, people with HIV/AIDS or other immune system disorders, some elderly, and infants can be particularly at risk from infections.  These people should seek advice about drinking water from their health care providers.

USEPA/Centers for Disease Control (CDC) guidelines on appropriate means to lessen the risk of infection by Cryptosporidium and other microbial contaminants are available from the **Safe Drinking Water Hotline 1-800-426-4791 or www.epa.gov/safewater.**"

—California Department of Public Health

CVWD 151-009

## Definitions & Abbreviations

**AL or Regulatory Action Level** — The concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water system must follow.

**MCL or Maximum Contaminant Level** — The highest level of a contaminant that is allowed in drinking water. Primary MCLs are set as close to public health goals or maximum contaminant level goals as economically and technologically feasible. Secondary MCLs are set to protect the odor, taste and appearance of drinking water.

**MCLG or Maximum Contaminant Level Goal** — Level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs are set by the U.S. Environmental Protection Agency.

**mg/L** — Milligrams per liter (parts per million). One mg/L is equivalent to 1 second in 11.6 days.

**MRDL or Maximum Residual Disinfectant Level** — The highest level of a disinfectant allowed in drinking water. There is convincing evidence that addition of a disinfectant is necessary for control of microbial contaminants.

**MRDLG or Maximum Residual Disinfectant Level Goal** — The level of a drinking water disinfectant below which there is no known or expected risk to health. MRDLGs do not reflect the benefits of the use of disinfectants to control microbial contaminants.

**N/A** — Not applicable. The government has not set a Public Health Goal, Maximum Contaminant Level Goal or Maximum Contaminant Level for this substance.

**ND** — None detected

**NL or Notification Level** — Health based advisory level established by the California Department of Public Health for chemicals in drinking water that lack maximum containment levels (MLCs) as stated by CDPH.

**NTU** — Nephelometric turbidity units (measurement of suspended material)

**pCi/L** — picoCuries per liter. For uranium, one pCi/L is equivalent to one second in 21.1 years.

**PDWS or Primary Drinking Water Standard** — MCLs and MRDLs for contaminants that affect health along with their monitoring and reporting requirements, and water treatment requirement.

**PHG or Public Health Goal** — Level of a contaminant in drinking water below which there is no known or expected risk to health. Public Health Goals are set by the California Environmental Protection Agency.

**Secondary Drinking Water Standard** — Based on aesthetics, these secondary maximum contaminant levels have monitoring and reporting requirements specified in regulations.

**ug/L** — Micrograms per liter (parts per billion). One ug/L is equivalent to 1 second in 31.7 years.

**uS/cm** — Microsiemens per centimeter

*Page 8*

# CVWD 2011 Domestic Water Quality Su

(Covering the reporting period January - December 2010)

CVWD analyzed more than 15,000 water samples last year to ensure that your drinking water meets the state and federal standards. Every year, the district is required to analyze a select number of these samples for more than 100 regulated and unregulated substances.

This table lists those substances that were detected in the district's five service areas. Gray boxes indicate no substance was detected or existing data is no longer reportable. The data on the chart, which summarizes results of the most recent monitoring completed between 2002 and 2010, shows

that CVWD cont

To read this t
the column, cor
Health Goal, Ma
For example,
area, you would

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| **Detected parameter, units** | **PHG or (MCLG)** | **Primary or (secondary) MCL** | **Cove Communities** [1] **Range (Average)** |
| Aluminum, ug/L | 600 | 1,000 (200) | ND-140 (ND) |
| Arsenic, ug/L | 0.004 | 10 | ND-5.7 (ND) |
| Boron, mg/L [2] | N/A | NL=1.0 | |
| Chloride, mg/L | N/A | (500, 600) [8] | 6.5-115 (16) |
| Chlorine (as $Cl_2$), mg/L [3] | MRDLG 4 | MRDL 4.0 | ND-1.4 (0.3) |
| Chromium, ug/L | (100) | 50 | ND-22 (ND) |
| Chromium VI, ug/L [2] | N/A | N/A | 2.4-18 (8.4) |
| Copper, mg/L [4] [homes tested/ sites exceeding AL] | 0.3 | AL=1.3 | 0.12 [53/ 0] |
| Copper, mg/L | N/A | (1.0) | ND-0.2 (ND) |
| Fluoride, mg/L | 1 | 2.0 | 0.1-1.0 (0.6) |
| Gross alpha particle activity, pCi/L | (0) | 15 | ND-11 (3.6) |
| Hardness (as $CaCO_3$), mg/L | N/A | N/A | 23-300 (120) |
| Haloacetic acids, ug/L [3] | N/A | 60 | |
| Iron, ug/L | N/A | (300) | ND-230 (ND) |
| Foaming Agents (MBAS), mg/L | N/A | (0.5) | ND-0.09 (ND) |
| Nitrate (as NO3), mg/L | 45 | 45 | ND-40 (7.0) |
| pH, units | N/A | N/A | 7.3-8.4 (7.8) |
| Sodium, mg/L | N/A | N/A | 17-86 (28) |
| Specific conductance, uS/cm | N/A | (1,600, 2,200) [8] | 240-920 (380) |
| Sulfate, mg/L | N/A | (500, 600) [8] | 13-190 (40) |
| Tetrachloroethylene (PCE), ug/L | 0.06 | 5 | ND-0.6 (ND) |
| Total Coliform bacteria, positive samples/month | (0) | more than 5% [5] or more than 1 [6] | ND-1% (ND) |
| Total dissolved solids, mg/L | N/A | (1,000, 1,500) [8] | 150-550 (230) |
| Total trihalomethanes, ug/L [3] | N/A | 80 | 1.8-3.6 (4.0) |
| Turbidity, NTU | N/A | (5) | ND-2.6 (ND) |
| Uranium, pCi/L | 0.43 | 20 | ND-12 (4.5) |
| Vanadium, ug/L [2] | N/A | NL=50 | 6.2-39 (15) |

**Footnotes:** (1) Includes the communities of Rancho Mirage, Thousand Palms, Palm Desert, Indian Wells, La Quinta and portions of Bermuda Dunes, Cathedral City, Indio and Riverside County.

(2) Unregulated contaminants are those for which EPA and the California Department of Public Health have not established drinking water standards. The purpose of unregulated contaminant monitoring is to assist both regulatory agencies in determining the occurrence of unregulated contaminants in drinking water and whether

future regulation is
(3) The reported av
(4) Reported value
(5) Systems that co

## ummary

inues to deliver drinking water that meets state and federal water quality standards.

able: First, determine in which service area you live (columns 4-8). Then move down mparing the detection level of each chemical or other contaminant with the Public ximum Contaminant Level Goal and Maximum Contaminant Level (columns 2-3).

if you live in La Quinta and want to know the level of fluoride detected in your service look down the Cove Communities column and stop at the fluoride row. The average

fluoride level in that service area is 0.6 mg/L with the range of results varying between 0.1 mg/L and 1.0 mg/L.

Compare these values to the Maximum Contaminant Level in Column 3. Fluoride levels in this water comply with the Maximum Contaminant Level of 2.0 [mg/L]. The range can show a level above the Maximum Contaminant Level and still comply with the drinking water standard when compliance is based on average levels found in each water source.

| 5<br>Indio Hills, Sky Valley & areas around Desert Hot Springs<br>Range (Average) | 6<br>Mecca, Bombay Beach, North Shore & Hot Mineral Spa<br>Range (Average) | 7<br>Desert Shores, Salton Sea Beach & Salton City<br>Range (Average) | 8<br>Thermal, Valerie Jean & Oasis<br>Range (Average) | 9<br><br><br>Major Source(s) |
|---|---|---|---|---|
| | | | | Erosion of natural deposits |
| | ND-30 (3.7)[7] | | ND-5.1 (ND) | Erosion of natural deposits |
| | | 0.3-0.4 (0.4) | | Erosion of natural deposits |
| 13-25 (18) | 40-55 (46) | 230-350 (280) | 20-43 (28) | Leaching from natural deposits |
| 0.1-0.7 (0.3) | ND-1.3 (0.3) | ND-1.1 (0.4) | ND-0.3 (0.2) | Result of drinking water chlorination |
| 15-19 (17) | | | ND-24 (12) | Erosion of natural deposits |
| 9.1-19 (15) | | | ND-21 (10) | Erosion of natural deposits |
| 0.14 [21/ 0] | | 0.11 [23/ 0] | | Internal corrosion of household plumbing |
| | | | | Erosion of natural deposits |
| 0.4-0.8 (0.6) | 0.9-1.2 (1.0) | 0.7-1.6 (1.2) | 0.6-0.9 (0.7) | Erosion of natural deposits |
| 3.5-14 (7.5) | ND-3.0 (ND) | ND-3.9 (ND) | ND-4.2 (ND) | Erosion of natural deposits |
| 120-200 (170) | 15-17 (16) | 200-290 (240) | 11-57 (35) | Erosion of natural deposits |
| 1.4 | | | | By-product of drinking water chlorination |
| | | | | Leaching from natural deposits |
| | | | | Municipal and industrial waste discharges |
| ND-5.0 (3.6) | | 4.7-6.6 (5.3) | ND-3.0 (ND) | Leaching of fertilizer, animal waste, natural deposits |
| 7.6-8.0 (7.8) | 6.9-8.7(8.0) | 7.6-8.0 (7.8) | 7.0-7.8 (7.5) | Physical characteristic |
| 58-86 (69) | 46-53 (48) | 220-260 (230) | 42-45 (44) | Erosion of natural deposits |
| 570-820 (680) | 270-290 (280) | 1,500-2,000 (1,700) | 240-340 (290) | Substances that form ions when in water |
| 150-220 (170) | ND-1.9 (0.6) | 200-280 (250) | 1.4-43 (22) | Leaching from natural deposits |
| | | | | Discharge from dry cleaners and auto shops |
| | | | | Naturally present in the environment |
| 360-540 (440) | 140-170 (150) | 850-1,200 (1,000) | 130-210 (180) | Leaching from natural deposits |
| 12 | 0.8 | 7.1 | 5.0 | By-product of drinking water chlorination |
| | ND-0.2 (ND) | ND-0.6 (0.2) | ND-0.3 (0.2) | Leaching from natural deposits |
| 5.4-11 (7.5) | 2.0 | 2.4-4.2 (3.0) | 2.6-5.0 (3.8) | Erosion of natural deposits |
| 8.9-26 (15) | | 5.8-24 (17) | ND-29 (14) | Erosion of natural deposits |

s warranted.

verage represents the highest running annual average based on distribution system monitoring.

s are 90th percentile levels for samples collected from faucets in water user homes.

ollect 40 or more samples per month.

(6) Systems that collect less than 40 samples per month.

(7) Although an individual sample may exceed the MCL, compliance is based on a running annual average. The average reported is the highest running annual average for distributed water.

(8) Values listed are the upper and short-term consumer acceptance contaminant levels.

CVWD 151-011

## Keep medications out of the water system

Everything CVWD customers flush down their toilets and rinse down drains travels to a wastewater treatment plant and, in some cases, is reclaimed and sent to golf courses for irrigation use. Not all compounds and drugs are removed from this treatment process and trace amounts can still be detected.

While there is no evidence that trace amounts from medications pose a risk to human health, it's prudent to control what we put into the wastewater system. Limiting what you put down the drain is the easiest way to start!

## What you can do to help

Throw medicines in the trash after grinding them up and mixing with an undesirable substance, such as coffee grounds or kitty litter, so they are unrecognizable to children or anyone intentionally searching your trash.

## Keep fats, oils and greases out of your pipes

Improperly disposed fats, oils and greases are a common cause of sewer overflows and backups both in the home and throughout the sewer system.

Additionally, they cause expensive damage to CVWD's wastewater reclamation facilities.

## What you can do to help

• Never put grease down sink drains or garbage disposals.

• Scrape hardened grease into the trash can for proper disposal.

CVWD's new trunk sewer line installation is approximately 6.5 miles long. The line will allow for the connection of future and existing homes and businesses.

# Sewer projects assist Thermal

CVWD has continued to focus this year on improving wastewater collection and treatment infrastructure in the east valley, to accommodate future development.

Construction is underway on the Avenue 62 Trunk Sewer Project, which will provide gravity sewer service. The work involves installing 34,300 feet of 33-inch and 42-inch diameter gravity sewer pipeline.

"The Avenue 62 trunk sewer is definitely a project that will help the east valley," said Mark Johnson, director of engineering.

"The project will intercept sewage from sub-regional sewer pipelines and eliminate several district sewage lift stations."

Using gravity instead of pumping to move wastewater is more energy-efficient and cost-effective. The project is scheduled for completion at the end of this year.

Another large project in Thermal is the Polk Street Sewer Project which consists of a gravity sewer line along Polk Street from Avenue 56 (Airport Boulevard) to Avenue 62. This will improve sewer service to the Thermal area and tie it in to the Avenue 62 Trunk Sewer. The Polk Street Sewer Project is scheduled to be completed this fall.

CVWD also is seeking grant funding from the U.S. Department of Agriculture Rural Development to provide sewer collection facilities to serve the existing and proposed expansion of three communities made up of mobile home parks: Mountain View Estates, St. Anthony, and Pierce Street Community.

The proposed facilities will replace failing and aging on-site sewer systems currently being used by the mobile home parks.

CVWD 151-012

# Domestic projects expand service area

CVWD domestic water engineers teamed up with Riverside County this year on several projects in the east valley that improved infrastructure in areas traditionally lacking those resources. These projects will improve drinking water service to existing and future district customers.

## Thermal

CVWD worked with the county Economic Development Agency (EDA) to provide water and sewer to the new Thermal Sheriff's station, a 77,000-square-foot facility that will serve the eastern Coachella Valley, and the new Thermal Fire Station, a 8,900 square-foot facility that replaces one built in the 1950s.

EDA paid for most of the water and sewer work, with the district contributing additional funds to upsize the sewer work to account for projected growth in the area. The work for both the fire and sheriff's stations came to about $12.4 million, with EDA responsible for about $10.9 million of that cost.

CVWD also worked in conjunction with the county EDA when it was implementing a series of street improvements in Thermal. CVWD went in ahead of that work, replacing some water mains and relocating them away from sidewalks and curbs so that they would be under the streets instead, making them more accessible for future maintenance.

## Mecca

CVWD worked with the Riverside County Department of Transportation on a street revitalization project for the community of Mecca, relocating water mains that otherwise would end up under the sidewalk and gutter improvement areas.

## Salton City

A new $1.7 million reservoir under construction in Salton City will provide additional storage capacity for daily, emergency and fire flow demands.

The reservoir is a 2.5 million gallon, steel welded tank. By adding the reservoir to the system, the district will be able to remove an existing 1 million gallon tank from service for inspection and repair, without disrupting service to area customers.





(Above) In spring 2011, work was underway to install a 50,000 foot waterline adjacent to Polk Street in Thermal to provide drinking water to the new sheriff's station and fire station.

(Left) Construction is currently underway of a 2.5 million gallon domestic reservoir in Salton City. Construction on the $1.7 million project began in January 2011 and is expected to be completed in August.

CVWD 151-013

## Paying your bill

### Online
### with a credit card

Customers can now view bills and pay them online using a credit card. Visit the Manage My Account section of the website at www.cvwd.org/service/payment.php.

### Automatic
### electronic payment

The district also offers the convenience of having your monthly payment automatically deducted from your checking account. Simply complete an Automatic Payment Service Form, available at either office or on our website at www.cvwd.org/service/payment.php.

### In person

Drop boxes are available at offices in Palm Desert (75-525 Hovley Lane East) and Coachella (85-995 Avenue 52). The Palm Desert drop box is open 24 hours a day.

### By mail

Mailed payments should be sent to P.O. Box 5000, Coachella, CA 92236. For more information, contact customer service at (760) 391-9600.

# Rate Summary

As of August 1, 2010 [1]

### Domestic Water Base Rate

| Area of service | Monthly charge per 100 cubic feet | Monthly charge 3/4" meter |
|---|---|---|
| Rate Area 1 — Majority of the district, except areas noted below | $1.12 | $7.00 |
| Rate Area 2 — Includes Sky Valley & Indio Hills | $1.35 | $7.50 |
| Rate Area 3 — Includes east Salton Sea areas of North Shore and Bombay Beach | $1.64 | $7.50 |
| Rate Area 4 — Includes Salton City, Desert Beach and Desert Shores | $1.42 | $7.50 |
| Rate Area 5 — Areas outside boundaries of the district, but served by the improvement district | $1.69 | $17.50 |

### Tiers

| | | |
|---|---|---|
| Tier 1: Excellent | 90% Base Rate | |
| Tier 2: Efficient | Base Rate | Customers pay the tier rate for all water used within that tier. |
| Tier 3: Inefficient | Base Rate x 1.5 | |
| Tier 4: Wasteful | Base Rate x 2 | |
| Tier 5: Excessive | Base Rate x 4 | |

### Residential Sanitation

| Area of service | Monthly charge per dwelling unit |
|---|---|
| Service Area 80 (includes ID 53, 54, 57, the cities of Palm Desert, Cathedral City, Rancho Mirage and City of Indian Wells) | $24.50 |
| Service Area 81 (includes area along I-10 from Thousand Palms to Indio) | $27.65 |
| Service Area 41 (bounded generally by Jackson, Calhoun and Avenues 52 and 56) | $28.05 |
| La Quinta, PGA West and Mecca | $29.05 |
| Bombay Beach | $31.85 |
| North Shore Beach | $32.40 |

### Irrigation Water

| User category | Charge per acre-foot |
|---|---|
| Agriculture | $24.95 |
| Golf courses & other non-agriculture | $33.20 |
| Groundwater recharge | $91.58 |
| Construction | $140.00 |
| Quagga mussel mitigation surcharge | $5.75 |
| Gate charge, per day | $11.50 |

[1] This table represents water rates for the 2010-11 fiscal year. At the time this publication was printed, the water district's Board of Directors had not yet approved the 2011-2012 rate structure, pending a public meeting. For confirmation of the most up-to-date rates, call CVWD at (760) 398-2651 or visit www.cvwd.org/service/rates.php.

CVWD 151-014

# Comparative Condensed Balance Sheet

| Assets | June 30, 2010 | June 30, 2009 [1] |
|---|---:|---:|
| Current assets: | | |
| Cash and investments | $201,555,763 | $194,118,289 |
| Accounts receivable, inventory, prepaid expenses & other | 43,268,761 | 36,444,243 |
| | **244,824,524** | **230,562,532** |
| Property, plant & equipment: | | |
| Land, facilities & equipment | 1,307,973,903 | 1,272,190,757 |
| All-American Canal & distribution system (participating equity) | 34,874,505 | 34,874,505 |
| State Water Project (participating equity) | 152,688,182 | 138,452,930 |
| Construction work in progress | 13,120,345 | 11,618,928 |
| Accumulated amortization & depreciation | (441,714,265) | (402,276,506) |
| | **1,066,942,670** | **1,054,860,614** |
| Assets restricted for development & other purposes | **153,476,898** | **125,404,271** |
| **Total Assets** | **$1,465,244,092** | **$1,410,827,417** |
| **Liabilities & Equity** | | |
| Current liabilities: | | |
| Accounts payable | $6,647,504 | $8,447,522 |
| Customer advances & deposits | 3,766,733 | 4,970,700 |
| Accrued salaries, interest, deferral & other expenses | 7,632,454 | 4,915,244 |
| | **18,046,691** | **18,333,466** |
| Long-term liabilities: | | |
| State Water Project & other | 5,405,191 | 4,054,970 |
| Bonds payable & certificates of participation | 9,965,000 | 12,250,000 |
| | **15,370,191** | **16,304,970** |
| Total liabilities | **33,416,882** | **34,638,436** |
| [2] Taxpayers' equity in assets | **1,431,827,210** | **1,376,188,981** |
| **Total Liabilities & Equity** | **$1,465,244,092** | **$1,410,827,417** |

[1] Adjustments were made to the 2009 Balance Sheet in the 2010 audited financial statements. Those adjustments are reflected here.

[2] Includes the taxpayers' equity in canal and irrigation distribution facilities, wells and reservoirs, treatment plants and stormwater facilities. This value includes facilities paid for by others and donated to the district. The value has been reduced by any outstanding debt (liabilities).

[3] Represents the consolidation of the General and Fleet Funds into the Enterprise Funds for Generally Accepted Accounting Principals reporting purposes.

[4] The district utilized reserves for a variety of capital projects primarily related to maintaining and increasing levels of drinking water, including bringing non-potable water to the central valley for irrigation purposes and establishing a groundwater recharge facility in the east valley.

# Condensed Statement of Revenues & Expenses

Fiscal year ended June 30, 2010

| | Canal water | Domestic | Sanitation | Stormwater | Recharge | Other [3] | Total |
|---|---:|---:|---:|---:|---:|---:|---:|
| **Revenues** | | | | | | | |
| Water sales | $10,042,162 | $68,433,204 | $695,157 | $0 | $0 | $0 | $79,170,523 |
| Service charges | 1,079,279 | 1,126,558 | 33,147,614 | 0 | 18,151,571 | 0 | 53,505,022 |
| Availability charges | 814,443 | 593,545 | 106,481 | 0 | 0 | 0 | 1,514,469 |
| Taxes | 1,974,927 | 223,300 | 2,460,973 | 14,106,823 | 35,195,201 | 10,151,195 | 64,112,419 |
| Interest | 341,318 | 852,518 | 2,104,771 | 983,683 | 856,259 | 1,378,878 | 6,517,427 |
| Other revenues | 3,594,026 | (4,383,954) | 1,296,926 | 459,526 | 84,380 | 3,143,798 | 4,194,702 |
| **Total** | **$17,846,155** | **$66,845,171** | **$39,811,922** | **$15,550,032** | **$54,287,411** | **$14,673,871** | **$209,014,562** |
| **Expenses** | | | | | | | |
| Operation & maintenance | $11,339,564 | $49,899,454 | $23,689,242 | $5,691,064 | $40,019,162 | ($1,727,040) | $128,911,446 |
| General & administration | 2,248,052 | 9,672,796 | 3,655,828 | 876,861 | 0 | (4,190,840) | 12,262,697 |
| Other | (4,464,869) | 7,455,114 | 1,609,268 | 1,591,745 | 201,532 | (1,249,897) | 5,142,893 |
| Depreciation | 807,292 | 13,593,705 | 10,526,981 | 2,338,012 | 415,576 | 11,077,416 | 38,758,982 |
| Reserves | 7,916,116 | [4] (13,775,898) | 330,603 | 5,052,350 | 13,651,141 | 10,764,232 | 23,938,544 |
| **Total** | **$17,846,155** | **$66,845,171** | **$39,811,922** | **$15,550,032** | **$54,287,411** | **$14,673,871** | **$209,014,562** |

*Page 13*

## California agriculture by the numbers

**81,500** — Number of farms and ranches in California

**25.3 million** — Acres of farmland in California

**7.5 million** — Acres of irrigated farmland in California

**312 acres** — Average size of California farm

**418 acres** — Average size of U.S. farm

**400** — Number of farm commodities grown in California

**41%** — Amount of California's total water supply that goes toward agriculture

**50%** — Amount of Coachella Valley's total water supply that goes toward agriculture. Primary supply is Colorado River water, brought to the valley via the 122-mile Coachella Canal

**30%** — Amount of California's farms producing more than $100,000 in products

*Source: California Farm Water Coalition, www.farmwater.org*



# 2010 Crop Report

(Covering the reporting period January - December 2010)

Crop production on Coachella Valley land irrigated with Colorado River water

| Crop | Acreage | Yield in tons | Value per acre | Total value |
|---|---|---|---|---|
| **Fruit** | **25,548** | **176,119** | **$11,079** | **$283,039,337** |
| Dates | 8,503 | 28,655 | $5,800 | $49,317,400 |
| Figs | 126 | 529 | $7,493 | $944,118 |
| Grapes (table) | 8,387 | 53,006 | $12,141 | $101,826,567 |
| Grapefruit | 989 | 12,536 | $4,917 | $4,862,913 |
| Lemons & limes | 4,191 | 64,139 | $8,934 | $37,442,394 |
| Mangos | 134 | 11,122 | $7,404 | $992,136 |
| Olives | 88 | 365 | $7,404 | $651,552 |
| Oranges & tangerines | 2,769 | 2,431 | $29,712 | $82,272,528 |
| Peaches | 43 | 155 | $5,527 | $237,661 |
| Strawberries | 318 | 3,180 | $14,126 | $4,492,068 |
| **Vegetables** | **26,024** | **452,412** | **$9,005** | **$234,345,504** |
| Asparagus | 10 | 120 | $5,700 | $57,000 |
| Beans | 1,071 | 6,105 | $7,410 | $7,936,110 |
| Broccoli | 1,240 | 7,440 | $4,200 | $5,208,000 |
| Cabbage | 40 | 546 | $4,450 | $178,000 |
| Carrots | 1,879 | 90,192 | $6,432 | $12,085,728 |
| Cauliflower | 1,284 | 10,786 | $6,979 | $8,961,036 |
| Celery | 391 | 13,646 | $14,253 | $5,572,923 |
| Corn (sweet) | 3,105 | 1,244 | $4,069 | $12,634,245 |
| Cucumbers | 40 | 480 | $5,760 | $230,400 |
| Greens (kale, etc.) | 2,603 | 33,839 | $8,580 | $22,333,740 |
| Lettuce | 3,449 | 71,739 | $8,857 | $37,304,384 |
| Melons | 734 | 24,956 | $10,816 | $6,688,208 |
| Onions (dry) | 211 | 1,113 | $1,346 | $284,006 |
| Other vegetables[1] | 3,505 | 43,942 | $8,841 | $30,987,705 |
| Peppers | 5,037 | 89,792 | $15,930 | $80,239,410 |
| Potatoes | 1,109 | 7,236 | $1,543 | $1,711,187 |
| Squash | 191 | 1,146 | $4,842 | $924,822 |
| Tomatoes | 125 | 2,225 | $14,464 | $1,808,000 |
| **Forage** | **2,763** | **22,933** | **$488** | **$1,347,069** |
| Alfalfa hay | 580 | 4,930 | $935 | $542,300 |
| Sudan grass | 1,075 | 5,438 | $627 | $674,025 |
| Irrigated pasture[2] | 1,108 | 12,520 | $118 | $130,744 |
| **Nursery** | **1,415** | **—** | **$23,763** | **$33,624,645** |
| **Fish Farms** | **162** | **470** | **$16,820** | **$2,724,840** |
| **Golf Courses** | **5,299** | **459,817** | **$9,847** | **$52,179,253** |
| **Polo Fields** | **484** | **42,007** | **$9,847** | **$4,765,948** |
| **Turf Grass** | **903** | **78,387** | **$9,847** | **$8,891,841** |
| **Total** | **62,744**[3] | | **$9,896** | **$620,918,437** |

All financial figures are rounded off to the nearest dollar. Crop categories are as established by the Bureau of Reclamation.

[1]Other vegetables include artichokes, eggplant, okra, radishes and spices

[2]Yield is in animal units per month (AUM)

[3]Includes double cropping

CVWD 151-016

# Expansion project alleviates groundwater demand

CVWD completed a significant project this year that connected four water customers to the irrigation distribution system, allowing them to irrigate their land with Colorado River water, rather than pumping groundwater from the aquifer.

As a result of the Irrigation System Expansion Project, 3,840 acre-feet per year of water will not need to be pumped from the aquifer, which is in a state of overdraft. This accomplishment is in line with the district's goal of finding ways to reduce demand on the aquifer.

"As part of the Water Management Plan, we have identified a need to convert people from groundwater to canal water," said Dan Charlton, engineering manager.

"Meanwhile farmers are doing their own cost-benefit analysis. With increased costs associated with pumping groundwater, it's getting easier to convert these people."

The $2.5 million project connected Ocean Mist Farms, Artesian Acres, Sunrise Marsh and CalSun Gold (Castro family trust) to canal water.

An assessment district was formed and bonds were sold to allow the landowners to pay off their costs over time. For the landowners, together representing 753 acres of land, the



In April 2010, the water district and property owners celebrated the completion of the Irrigation System Expansion Project, which provides Colorado River water to four property owners who previously relied on groundwater.

conversion allows them to avoid the costs of pumping groundwater. This includes the power required for the pumping and the maintenance and depreciation of the wells.

In addition, the large groundwater users in that area pay a Replenishment Assessment Charge (RAC) to the district that partially funds the district's costs to replenish the aquifer with imported water.

The landowners now will pay the canal water rate which includes an added surcharge for quagga mussel control.

The project benefits the eastern Coachella Valley because it helps reduce demand on the aquifer and provides additional customers for the district's imported water.

# Golf courses explore alternative water sources

An increasing number of Coachella Valley golf courses will be using recycled water and Colorado River water to maintain their landscaping, thanks to the availability of these water sources from the Mid-Valley Pipeline Project.

This is one of the key ways that the district is working to reduce demand on the aquifer, which is in a state of overdraft. Overdraft has serious consequences, including increased pumping costs for all water users, land subsidence and increased groundwater salinity.

Although the recent economic downturn slowed the pace of the project, CVWD is working with the Indian Wells Golf Resort and the Berger Foundation's Classic Club to connect them to the pipeline.

Future plans call for at least four golf courses along the pipeline to get canal water directly from it. In addition, at least 10 other courses can be hooked up for the mix of recycled and canal water with future connection work. These additions would reduce groundwater pumping by another 15,700 acre-feet per year.

The district has a goal to complete the construction of the remaining phases of the project by 2020. That would provide up to 37,000 acre-feet per year of canal water and 15,000 acre-feet of recycled waste water to golf courses in the West Valley and reduce groundwater overdraft by at least 25 percent.

The first phase of the pipeline project, completed in 2009, brought Colorado River water from the Coachella Canal in Indio to the district's Water Reclamation Plant 10. The blend of recycled and canal water currently is delivered to eight golf courses and five other users. If these users reach 90 percent of their irrigation needs with non-potable water, 2,700 acre-feet per year of groundwater pumping will be eliminated.

The pipeline has been especially effective because it brings the option of source substitution to the middle part of the valley that has seen the greatest growth.

"The Mid-Valley Pipeline targets the area where groundwater demand is the highest," said Patti Reyes, planning and special programs manager for the district.

Increasingly the district is finding that large irrigators like golf courses want to use recycled water.

"We know the customers understand the need for this," Reyes said.

*Page 15*

## Responding to a boil order notice:

### Bottled water

In the unlikely event that CVWD's water system is compromised, you could be advised to not use tap water. Your first choice for replacing tap water for drinking and cooking should be bottled water. Everyone should include in their emergency supply kit a 7-day supply of bottled water (at least 1 gallon of water per person per day, plus extra water for pets). You can purchase commercially bottled water or store your own.

### Boiled water

If you don't have bottled water, you should use boiled tap water. Boiling water will kill most types of disease-causing organisms. If the water is unusually cloudy, murky or colored, filter it first through a clean cloth or allow it to settle and draw off the clear water for boiling. Then, bring to a rolling boil and leave for one minute.

### Bleached water

If you are unable to boil water, your next best choice is to disinfect it with household bleach. Bleach will kill some (but not all) types of disease-causing organisms.

If the water is unusually cloudy, murky or colored, filter it first through a clean cloth or allow it to settle and draw off the clear water for disinfection.

Then, add 1/8 teaspoon (or 8 drops) of regular, unscented liquid household bleach for each gallon of water, stir well and let it stand for 30 minutes before using. Store disinfected water in clean containers with covers.

**Never use** scented, powdered or swimming pool bleach. These products may contain dangerous amounts of chemicals not intended for consumption. A faint chlorine smell is normal.

# Emergency Preparedness & Drinking Water

In the event of a natural disaster, such as an earthquake or severe flooding, Coachella Valley Water District's water delivery system could be compromised and you could be advised to not use tap water for any purpose or to boil the water before using it for drinking and cooking. Remove this page and store it with your emergency preparedness supplies so that you will have the information available to help guide you during such an emergency.

## How do I know if my tap water can be used for drinking and cooking?

In the event of a disaster, CVWD may issue a boil water notice as a precautionary measure if water quality is in doubt. CVWD will inspect and test the water system. If the test results are unacceptable, a boil water notice will be issued and remain in place until the problem is located and solved, and the water system tests are acceptable. Notification will be made through the media or direct contact and door hangers. CVWD's web site (www.cvwd.org) and posted fliers in public places may also be used.

## Is boiled tap water always safe to use?

It is possible that following a natural disaster, you will be notified that the tap water will need to be boiled before use for drinking and cooking. However, it is possible for tap water to be contaminated with a chemical that is not safe to consume even after boiling and may even be a risk during bathing. In this unlikely event, you will receive specific notification to not use the tap water for any purpose.

Your first choice for replacing tap water for drinking and cooking should be bottled water. Everyone should include in their emergency supply kit a 7-day supply of bottled water (at least 1 gallon of water per person per day, plus extra water for pets). Your next best choice is to disinfect the tap water with household bleach (see instructions in the column to the left).

## Can I use the water inside my water heater?

While bottled water is preferred, the water in your water heater can be used for drinking and cooking, provided that the water heater remains upright and you turn off the main water valve to your home immediately after the disaster occurs. To access this water, turn off the heating element and open the drain faucet at the bottom of the water heater. To start the water flowing, close the water intake valve at the top of the tank and open a hot water faucet in the home.

When CVWD announces that you can resume normal use of your tap water, don't forget to refill the water heater before turning on the heating element.

## Turn off sprinklers

A disaster may result in reduced water pressure and limited water supply, caused by leaks in the distribution system or by wells temporarily out of service. If this happens, it will be important to restrict water use to drinking, cooking and other emergency purposes, such as fire suppression.

Please turn off your irrigation sprinklers so you aren't wasting what may be a limited supply on non-essential uses.

CVWD 151-018

# By the Numbers

(Covering the reporting period January - December 2010)

**Coachella Valley Water District** is a local government agency formed in 1918 by the registered voters within the district.

**Governing board:** Five directors, representing five divisions and elected at-large to four-year terms.

**Fields of service:** Domestic water supply, treatment and distribution; wastewater collection and treatment; recycled water distribution; regional stormwater/flood protection; irrigation water importation and distribution; irrigation drainage collection; groundwater management and promotion of water conservation

**Property valuation:** Property within CVWD boundaries had a total combined assessed value in 2010 of $54,432,958,000 as fixed by Riverside and Imperial County assessors and state officials. This figure is used to determine property tax funding for the district.

## General Information

| | |
|---|---|
| Employees | 497 |
| Total service area | 639,857 acres |

## Domestic Water

**Service information**

| | |
|---|---|
| Population served | 286,192 |
| Active accounts | 107,997 |
| Average daily demand | 94 mgd |
| Total water delivered | 105,001 af |

**System information**

| | |
|---|---|
| Active wells | 102 |
| Total well capacity | 244 mgd |
| Distribution reservoirs | 58 |
| Storage capacity | 132 mg |
| Distribution piping system | 1,978 miles |

## Canal Water

**Service information**

| | |
|---|---|
| Total irrigable acres | 78,530 |
| Active accounts | 1,120 |
| Total water delivered | 251,249 af |
| Average daily demand | 688 af |
| Maximum daily demand | 1,207 af |

**System information**

| | |
|---|---|
| Reservoirs | 2 |
| Storage capacity | 1,301 af |
| Distribution system | 485 miles |
| Pumping plants | 17 |
| Length of canal | 122 miles |

## Agricultural Drainage

| | |
|---|---|
| Total on-farm drains | 2,298 miles |
| Acreage with farm drains | 37,425 |
| District open drains | 21 miles |
| District pipe drains | 166 miles |

## Wastewater

**Service information**

| | |
|---|---|
| Population served | 266,823 |
| Active accounts | 100,688 |
| Average daily flow | 17.1 mgd |

**System information**

| | |
|---|---|
| Wastewater reclamation plants | 6 |
| Total daily plant capacity | 33.5 mgd |
| Collection piping system | 1,083 miles |

## Recycled Water

**Service information**

| | |
|---|---|
| Active accounts | 16 |
| Average daily flow | 8.7 mgd |

**System information**

| | |
|---|---|
| Wastewater reclamation plants producing recycled water | 3 |
| Total daily capacity | 18 mgd |
| Distribution piping system | 15 miles |

## Groundwater Management
(In cooperation with Desert Water Agency)

| | |
|---|---|
| Recharge facilities | 4 |
| Recharge from imported water | 298,941 af |
| Imported supply since 1973 | 2,562,640 af |

## Stormwater Protection

**Service area** 381,479 acres

**System information**

| | |
|---|---|
| Number of stormwater channels | 16 |
| Length of Whitewater River/ Coachella Stormwater Channel | 49 miles |
| Length of all regional flood protection facilities | 134 miles |

**af** = acre-feet. An acre-foot of water is equal to 325,851 gallons, or enough water to cover one acre of land one foot deep.

**mgd** = million gallons per day.





**Coachella Valley Water District**
P.O. Box 1058
Coachella, CA 92236

Presort Standard
U.S. POSTAGE
PAID
Permit No. 20
Coachella, CA 92236

# Irrigation Guide

If you don't have a self-adjusting irrigation timer, use this guide to determine the approximate amount of water your landscaping needs each month. Individual watering times will vary due to soil and other conditions.

Gradually reduce the amount of water to find an adequate amount for your situation without being wasteful.

**January**
Water-efficient shrubs
.7 gal./day ◆ 2 days/week

Grass spray system
4 min./day ◆ 7 days/week

**March**
Water-efficient shrubs
.9 gal./day ◆ 4 days/week

Grass spray system
9 min./day ◆ 7 days/week

**May**
Water-efficient shrubs
.9 gal./day ◆ 6 days/week

Grass spray system
15 min./day ◆ 7 days/week

**July**
Water-efficient shrubs
.9 gal./day ◆ 7 days/week

Grass spray system
16 min./day ◆ 7 days/week

**September**
Water-efficient shrubs
1 gal./day ◆ 5 days/week

Grass spray system
12 min./day ◆ 7 days/week

**November**
Water-efficient shrubs
.7 gal./day ◆ 3 days/week

Grass spray system
5 min./day ◆ 7 days/week

When there's measurable rain, turn your sprinkler system off and keep it off until the surface of the ground has dried !

CVWD 151-020

TAB 34

# HANDBOOK
of the
## INDIANS OF CALIFORNIA

ACC-HRA002765

# HANDBOOK

### OF THE

# INDIANS OF CALIFORNIA

### BY

## A. L. KROEBER



## CALIFORNIA BOOK COMPANY, Ltd.
### BERKELEY, CALIFORNIA

ACC-HRA002766

Lithographed in the United States of America, August, 1953, by permission of the
Chief of the Bureau of American Ethnology, Smithsonian Institution.

ACC-HRA002767

Dedicated

**to**

Weitchpec Frank, Robert Spott, Ralph Moore, Peter Christman, Feliz Calac, Jack Jones, and perhaps two hundred other original Californians who contributed information, including many of earlier generation whose births antedated the year 1833 "when the stars fell."

ACC-HRA002768

# FOREWORD

This edition is a photolithographic facsimile of the "Handbook of the Indians of California" published in 1925 as Bulletin 78 of the Bureau of American Ethnology of the Smithsonian Institution. The title page has been altered to conform to the publisher, place and date of reissue, and this preface and the dedication have been inserted; otherwise nothing has been changed.

Although several thousand copies of the handbook were produced by the government printer in 1925, the edition was exhausted within a few years, and the work became a scarce and increasingly costly collector's item in the used book market. Chief Matthew W. Stirling of the Bureau of American Ethnology graciously gave his consent to republication under nongovernmental auspices, an accommodation which is acknowledged with thanks.

I am grateful also to the California Book Company for undertaking the reissue, which will serve to fill the want for a comprehensive work on the California Indians that continues to be felt alike by laymen and by anthropologists, as well as by students, librarians, and those interested in the topography, antiquities, aborigines, and history of California.

A. L. Kroeber

University of California
June 24, 1953

ACC-HRA002769

# PREFACE.

This book is the outcome of 17 years of acquaintance and occupation with the Indians of California; intermittent, it is true, but with these people remaining throughout the first subject of the writer's study. Although it may seem otherwise, it attempts to be a history.

It is not a history in the usual sense of a record of events. The vast bulk of even the significant happenings in the lives of uncivilized tribes are irrecoverable. For the past century our knowledge is slight; previous to that there is complete obscurity. Nor do the careers of savages afford many incidents of sufficient intrinsic importance to make their chronicling worth while.

The book is a history in that it tries to reconstruct and present the scheme within which these people in ancient and more recent times lived their lives. It is concerned with their civilization—at all events the appearance they presented on discovery, and whenever possible an unraveling, from such indications as analysis and comparison now and then afford, of the changes and growth of their culture. There being no written documents, the element of time enters infinitely less than in works which it is customary to designate historical. In the stead of time, the geographical factor looms large. It is not that this dimension is necessarily more important in savage life than that of chronology; but it is a hundred times more readily operated in, and is on the whole the most available means through which some glimpses of time perspective are attainable.

It is for this reason that after long deliberation I have constituted the bulk of the book a series of tribal descriptions. A broader typical treatment of phases of native culture seems theoretically more desirable, especially in the case of a remote and unimportant people. But such a treatment would have led to an unfortunate dilemma. The local variations are so numerous that their consideration would have smothered the systematic presentation of general points of view. On the other hand, the elimination of this detail would have left the presentation as an abstraction, too largely dependent upon the subjective attitudes of the author, and sterile in the sense of lacking the color and life in which, after all, the characteristics of civilizations are manifest.

v

ACC-HRA002770

I have, therefore, proceeded on the plan of picturing as concretely as I might the customs of each of some 50 little nations, adding discussions and comparisons of broader scope wherever the knowledge in hand made such procedure seem profitable. This brings it about that the more general conclusions appear strewn at random through the course of several hundred pages, and to some this will seem unfortunate. I have attempted to meet the difficulty in two ways— first, by a few chapters which are wholly summary and comparative, and which will be found at the end of the work; second, by a carefully prepared subject index, which not only brings together all the references to each phase of culture but often enumerates its principal aspects or elements.

After some hesitation I have omitted all directly historical treatment in the ordinary sense; that is, accounts of the relations of the natives with the whites and of the events befalling them after such contact was established. It is not that this subject is unimportant or uninteresting, but that I am not in position to treat it adequately. It is also a matter that has comparatively slight relation to the aboriginal civilization. It presupposes, indeed, some understanding of that civilization; but it requires also a thorough knowledge of the local history as well as of the institutions of the superior race. It involves prolonged study and acquaintance with Spanish and mission archives, with Government documents, with early California events and pioneer conditions. In all these things many others are more proficient than I can hope to become; and it has seemed that I might better contribute to the future writing of such a history by concentrating effort in the field to which training and predilection have led me, and endeavoring to render the California Indian, as such, a more familiar object to the future historian of his political and economic relations with ourselves. I have, therefore, considered the effect of contacts only in special cases; as when necessary to form an estimate of an ancient vanished culture through the medium of its modern and modified representative.

In the matter of population, too, the effect of Caucasian contact can not wholly be slighted, since all statistics date from a late period. The disintegration of native numbers and native culture have proceeded hand in hand, but in very different ratios according to locality. The determination of populational strength before the arrival of the whites is, on the other hand, of considerable significance toward the understanding of Indian culture, on account of the close relations which are manifest between type of culture and density of population.

It has also appeared most profitable to attempt as little formal separation as possible of the data acquired by ethnological and

ACC-HRA002771

archeological investigations. I have indeed added a chapter on pre-history, in the nature of a summary and compilation of miscellanea. In the main, however, a detailed survey of the prehistory of California on the basis of its archeology would be a catalogue of sites known to have been inhabited, a list of excavations performed, and a description of objects found. As yet there is little sequence of development traceable in these ancient remains. The objects discovered in any region are very similar to those used by recent Indians. A strictly archeological treatment leaves the greater part of the culture with which it is concerned entirely untouched, and is likely to have undue recourse to pure speculation in its interpretations. In an area of such unusual stability, ethnological data must accordingly be made use of constantly. This being true, a single treatment seems called for. Data from the recent and surviving Indians being on the whole very much fuller, the only practical procedure has been to incorporate the specifically archeological material in accounts that are prevailingly of an ethnological character.

The physical type of the natives is another topic that has been slighted. In this case the reason is its essential aloofness from the main thread of the work. It is a truism that physical type and culture have only the slightest, if any, relation in human history; and one of the earliest maxims impressed on the student of anthropology, although still one of the most frequently violated, is the fallacy of inferring from one to the other. A compact review and analysis of all that is known on the physical anthropology of the natives of California would be exceedingly useful in itself, but would add little to the serviceability of this book. Moreover, it can be better executed by other hands.

As regards the province of speech, I feel no such hesitation of competence, but here again the subject matter is an essentially distinct one, besides being of a nature which generally impresses as technical. The relation of language to civilization is undoubtedly closer than that of head form or skin color, but it is far from intimate. I have therefore considered speech only in so far as the accumulating knowledge of the languages of California has led to their classification on a genetic or historical basis and thus contributes to the insight of the origin, movements, and relationship of the several nations.

One cultural activity of the profoundest emotional import I have regretfully felt compelled to refrain from considering—music. There is no question that any attempt at a well-rounded description of the culture of a people which omits music from its consideration is imperfect. But in the present case the difficulties were enormous. Primitive music is so thoroughly different from our own as to be practi-

ACC-HRA002772

cally unintelligible except on long acquaintance. It has been analyzed only imperfectly and usually is even transcribed but inadequately. There is no work which seriously attacks the music of the California Indians. A chapter on this fascinating subject would therefore have had to be either so superficial as to be worthless or so long and detailed as to become disproportionate.

A considerable part of the information gathered in this book has never been printed before. Some of this is my own. The remainder has been unhesitatingly put at my disposal by the present and former members of the department of anthropology of the University of California: Dr. P. E. Goddard, Dr. E. Sapir, Dr. S. A. Barrett, Mr. N. C. Nelson, Dr. T. T. Waterman, Mr. E. W. Gifford, Mr. L. L. Loud, Prof. R. B. Dixon, Dr. J. Alden Mason, and the late Dr. Philip Mills Jones. In fact, the present work would have been impossible without the research which has been conducted for the university since 1901, as a result of the foundation of the department of anthropology by the late Mrs. Phoebe Apperson Hearst. In a large sense, therefore, this book expresses the results of the work of the University of California far more than the labors of one individual. It has merely fallen to my lot to combine and present the knowledge which has accumulated through the efforts of the group of whom I am one.

Mr. F. W. Hodge, ethnologist in charge of the Bureau of American Ethnology, and Mr. J. P. Harrington, now also of the Bureau, have put further data at my disposal. Personally I wish to express to Mr. Hodge my genuine sense of obligation for the opportunity to carry through the undertaking. Without his encouragement and constant readiness to cooperate it is likely that a work of the scope of the present book would not have been undertaken by any one for many years to come.

I am at the more pains to make these acknowledgments because this is my only opportunity. It has appeared necessary to omit references to the sources and authorities for my statements. This is an unusual procedure in a work that pretends to scholarship, but there were many reasons urging its adoption. Had authorities been cited at all, it would have been desirable to cite them at every opportunity. To the nonprofessional reader such an accumulation of references to sources would have been unserviceable and generally distracting. The anthropologist or historian has an offhand acquaintance with the bulk of the published literature and its detailed citation would in most cases aid him but little. Moreover, the abundant use made of manuscript data would leave serious vacancies in any list of references to particular passages. Intending students are the only ones, it has seemed, who may now and then be seriously inclined

ACC-HRA002773

Case 5:13-cv-00883-JGB-SP Document 85-21 Filed 10/21/14 Page 68 of 149 Page ID #:4296

to deplore the lack of citations to the original sources; but their needs, I am convinced, will on the whole be better served by the bibliography which has been appended. This bibliography makes less pretense to completeness than to being an aid to discrimination. With this feature in mind, I have ventured to add brief appraisals to the titles of many of the works there listed.

If it is remembered that at least nine-tenths of the printed information on the Indians of California, certainly in quantity of facts, perhaps also in number of pages, is contained in three sets of periodical publications—those of the University of California in American Archaeology and Ethnology, the Bulletin of the American Museum of Natural History, and the publications of the Federal Government, particularly those of the Bureau of American Ethnology and the National Museum under the auspices of the Smithsonian Institution—together with a small group of books not exceeding 8 or 10 in number, it becomes apparent that the problem of authorities and bibliography for the subject dealt with in this work is in the main a simple one.

I should not close without expressing my sincere appreciation of my one predecessor in this field, the late Stephen Powers, well known for his classic " Tribes of California," one of the most remarkable reports ever printed by any government. Powers was a journalist by profession and it is true that his ethnology is often of the crudest. Probably the majority of his statements are inaccurate, many are misleading, and a very fair proportion are without any foundation or positively erroneous. He possessed, however, an astoundingly quick and vivid sympathy, a power of observation as keen as it was untrained, and an invariably spirited gift of portrayal that rises at times into the realm of the sheerly fascinating. Anthropologically his great service lies in the fact that with all the looseness of his data and method he was able to a greater degree than anyone before or after him to seize and fix the salient qualities of the mentality of the people he described. The ethnologist may therefore by turns writhe and smile as he fingers Powers's pages, but for the broad outlines of the culture of the California Indian, for its values with all their high lights and shadows, he can still do no better than consult the book. With all its flimsy texture and slovenly edges, it will always remain the best introduction to the subject. It is a gratification to remember that there was once a time when an unendowed periodical published in California felt able to command the support of its public by including among its offerings almost the whole of a work of this merit. The "Tribes of California " was first issued in the Overland Monthly of San Francisco.

ACC-HRA002774

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 69 of 149   Page ID #:4297

### POSTSCRIPT.

New information on the Indians of California has of course become available during the five years since this manuscript was written. To incorporate even a summary of this would have meant the alteration as well as the addition of numerous passages—an unfeasible procedure. I have therefore only corrected errors, and here and there added footnotes indicating the range or significance of the recent acquisitions to knowledge, and their sources. These notes will serve to guide the reader to the literature that is gradually filling the gaps in the world's knowledge of the tribes in question. Only the bibliography has been brought as fully as possible up to date.

The chapters on the Yurok, Yuki, Yokuts, and Mohave consist almost wholly of previously unpublished data collected by myself. The chapters on the Karok, Wiyot, Kato, Huchnom, Coast Yuki, Pomo, Yahi, Wintun, Maidu, Costanoans, and Serrano combine similar data in greater or less amount with materials from published sources. The chapter on the Miwok embodies a considerable block of unpublished data put at my disposal by E. W. Gifford. The section of the chapter on Prehistory dealing with cultural stratification in the San Francisco Bay shell mounds is based on unpublished preliminary computations by N. C. Nelson.

Certain parts of the present volume have been utilized, with the approval of the Bureau and with changes of greater or less moment, in other publications. Chapter 53 forms the basis of an article, "Yuman Tribes on the Lower Colorado," in volume 16 of the University of California Publications in American Archaeology and Ethnology; chapters 54–56, of "Elements of Culture in Native California," in volume 13; and chapter 59, "California Culture Provinces," in volume 17 of the same series.

A. L. KROEBER.

BERKELEY, CALIF., *February 1, 1923.*

ACC-HRA002775

# CONTENTS.

| Chapter. | Page. |
|---|---|
| 1. The Yurok: land and civilization | 1 |
| 2. The Yurok: law and custom | 20 |
| 3. The Yurok: religion | 53 |
| 4. The Yurok: arts | 76 |
| 5. The Karok | 98 |
| 6. The Chimariko and Wiyot | 109 |
| 7. Athabascans: the Tolowa | 121 |
| 8. Athabascans: the Hupa, Chilula, and Whilkut | 128 |
| 9. Athabascans: southern groups | 142 |
| 10. The Yuki: ethnic geography | 159 |
| 11. The Yuki: culture | 169 |
| 12. The Yuki: religion | 182 |
| 13. The Huchnom and Coast Yuki | 202 |
| 14. The Wappo | 217 |
| 15. The Pomo: geography and politics | 222 |
| 16. The Pomo: civilization | 240 |
| 17. The Pomo: religion | 258 |
| 18. The Coast and Lake Miwok | 272 |
| 19. The Shastan group | 279 |
| 20. The Shasta | 285 |
| 21. The Achomawi and Atsugewi | 305 |
| 22. The Modoc | 318 |
| 23. The Yana and Yahi | 336 |
| 24. The Penutian Family | 347 |
| 25. The Wintun: geography and culture | 351 |
| 26. The Wintun: Kuksu cult | 364 |
| 27. The Maidu: land and society | 391 |
| 28. The Maidu: arts and implements | 405 |
| 29. The Maidu: religion and knowledge | 422 |
| 30. The Miwok | 442 |
| 31. The Costanoans | 462 |
| 32. The Yokuts: geography | 474 |
| 33. The Yokuts: social institutions | 492 |
| 34. The Yokuts: cults | 502 |
| 35. The Yokuts: the concrete basis of life | 519 |
| 36. The Esselen and Salinans | 544 |
| 37. The Chumash | 550 |
| 38. The Washo | 569 |
| 39. The Shoshonean stock | 574 |
| 40. The Paiute, Mono, and Koso | 581 |
| 41. The Chemehuevi | 593 |
| 42. The Kawaiisu and Tübatulabal | 601 |

xi

ACC-HRA002776

XII                                    CONTENTS

Chapter.                                                                           Page.
43. Serrano divisions_____ 611
44. The Gabrielino _____ 620
45. The Juaneño _____ 636
46. The Luiseño: elements of civilization_____ 648
47. The Luiseño: organization of civilization_____ 668
48. The Cupeño and Cahuilla_____ 689
49. The Diegueño and Kamia_____ 709
50. The Mohave: concrete life_____ 726
51. The Mohave: dream life_____ 754
52. The Yuma_____ 781
53. Other Yuman tribes_____ 796
54. Arts of life_____ 804
55. Society_____ 830
56. Religion and knowledge_____ 851
57. Population_____ 880
58. Place names_____ 892
59. Culture provinces _____ 898
60. Prehistory_____ 919
Appendix: Pronunciation of native words_____ 940
Bibliography _____ 943
Classification of titles by subject_____ 967
Classified subject index_____ 969
General index_____ 973

LIST OF TABLES.

 1. Principal dances and ceremonies of the Kuksu system of the cen-
       tral tribes_____ 378
 2. Principal spirit impersonations in the Kuksu system of the cen-
       tral tribes_____ 379
 3. Maidu spirit impersonations_____ 433
 4. Sequence of Maidu dances and ceremonies_____ 435
 5. Northern Maidu calendar_____ 438
 6. California shell bead money measures_____ 565
 7. Elements of religion in southern California_____ 713
 8. Yuman song cycles_____ 786
 9. The adolescence ceremony for girls_____ 864
10. Ritual numbers and methods of numeration_____ 876
11. Indian population of California, 1770 and 1910_____ 883
12. Source of some California place names of Indian origin_____ 895
13. Coast cultures of northern California, Oregon, and Washington_____ 905
14. Percentage composition of California shell mounds_____ 923
15. Molluskan proportions (by weight) in shell mounds_____ 924
16. Percentages of total artifacts constituted by certain implements
       according to depth in shell mounds_____ 929
17. Percentages of classes of artifacts according to locality of shell
       mounds_____ 932

ACC-HRA002777

# ILLUSTRATIONS.

### PLATES.

|  |  | Page. |
|---|---|---|
| 1. | Map: Indians of California, by stocks and tribes | In pocket. |
| 2. | Yurok treasures: obsidian blades | 26 |
| 3. | Hupa Deerskin dance; Yurok making boat | 26 |
| 4. | Yurok fishing for salmon in Klamath River | 70 |
| 5. | Mouth of the Klamath; canoe shooting rapids | 70 |
| 6. | Fishing at fall of Klamath; altar | 70 |
| 7. | Karok fishing from scaffold | 70 |
| 8. | Karok deer head decoy | 78 |
| 9. | Yurok house fronts and interior | 78 |
| 10. | Karok house; Yurok sweat house interior | 78 |
| 11. | Yurok town and graves; Hupa measuring money | 78 |
| 12. | Karok sacred houses; Yurok carved door | 80 |
| 13. | Chilula sweat house; Yurok canoe | 80 |
| 14. | Hupa woman leaching acorns; Karok sweat house | 80 |
| 15. | Yurok purse, box, and boat ornament | 80 |
| 16. | Yurok pestle, arrow straightener, knife, grease dish | 90 |
| 17. | Yurok acorn gruel stirrers | 90 |
| 18. | Karok in armor and shooting | 90 |
| 19. | Yurok stool, adzes, and mauls | 90 |
| 20. | Yurok carved spoons of elk antler | 94 |
| 21. | Karok man | 94 |
| 22. | The Karok center of the world | 108 |
| 23. | Wiyot baskets | 108 |
| 24. | Lassik basketry | 144 |
| 25. | North central Californian types: Pomo, Wintun, Modoc, Huchnom | 144 |
| 26. | Map: Yukian divisions | 160 |
| 27. | Map: Settlements of the Wappo and Lake Miwok | 172 |
| 28. | Yuki types | 172 |
| 29. | Seed beaters | 172 |
| 30. | Wooden smoking pipes | 172 |
| 31. | Central and northern California types: Salinan, Yana, Hupa | 172 |
| 32. | Sierra Nevada types: Miwok, Yokuts, Mono, Washo | 172 |
| 33. | Pomo fish traps | 172 |
| 34. | Map: Southern part of the territory of the Wintun | 354 |
| 35. | Cradles | 354 |
| 36. | Map: The Pomo and their subdivisions | 356 |
| 37. | Map: Territory and villages of the Maidu and Miwok | 446 |
| 38. | Miwok acorn granary | 446 |
| 39. | Cradles | 446 |

XIII

XIV                           ILLUSTRATIONS

|                                                                                 | Page. |
|---------------------------------------------------------------------------------|-------|
| 40. Cradles                                                                     | 446   |
| 41. Cord-wrapped leg remains                                                    | 508   |
| 42. Feather dance skirts                                                        | 508   |
| 43. Flutes                                                                      | 508   |
| 44. Mortar hopper; acorn gruel stirrers; bull roarers                           | 508   |
| 45. Miwok mortars in bedrock; Yokuts mortar of oak                              | 524   |
| 46. Cahuilla house; Yokuts booth for snaring pigeons                            | 524   |
| 47. Map: The southern and central Yokuts                                        | 526   |
| 48. Map: Habitat of the Chumash and Alliklik                                    | 526   |
| 49. Arrow straighteners                                                         | 530   |
| 50. Yokuts basketry                                                             | 530   |
| 51. Yokuts pottery                                                              | 530   |
| 52. Chumash basketry                                                            | 560   |
| 53. Chumash cap and asphalted water baskets                                     | 560   |
| 54. Chumash burden and storage baskets; Mohave beadwork                         | 560   |
| 55. Head net; baskets from various tribes                                       | 560   |
| 56. Mohave house interior; Koso sweat house                                     | 590   |
| 57. Map: Native sites in part of southern California                            | In pocket. |
| 58. Quill headbands                                                             | 590   |
| 59. Patwin headband; Mohave fish scoop; Chemehuevi basket                       | 596   |
| 60. Hupa pounding acorns; Cahuilla granary; Serrano sweat house                 | 596   |
| 61. Diegueño dancer; Pomo woman parching caterpillars                           | 664   |
| 62. Cahuilla sandal and painted jar                                             | 664   |
| 63. Pliable bag, Buena Vista Lake                                               | 728   |
| 64. Mohave types                                                                | 728   |
| 65. Mohave types                                                                | 728   |
| 66. Metates and grinding slabs                                                  | 728   |
| 67. Mohave farm tools; Pomo rattles; Yurok, Pomo, Modoc paddles                 | 740   |
| 68. Mohave pottery bowls                                                        | 740   |
| 69. Mohave cremation                                                            | 740   |
| 70. Yurok woman and old men                                                     | 740   |
| 71. Hupa woman and men                                                          | 808   |
| 72. Head net and rolled hair; cotton blanket                                    | 808   |
| 73. Baskets and caps from various tribes                                        | 808   |
| 74. Map: Ritual cults of California                                             | 808   |
| 75. Yuki baskets                                                                | 822   |
| 76. Miwok coiled baskets                                                        | 822   |
| 77. Karok using fire drill; Patwin Hesi dancers                                 | 822   |
| 78. Yahi shooting and drilling fire                                             | 822   |
| 79. Hupa double-ball shinny                                                     | 848   |
| 80. Miwok feather cape                                                          | 848   |
| 81. Skull from Buena Vista Lake region                                          | 934   |
| 82. Petroglyphs from the Sierra Nevada                                          | 934   |
| 83. The Painted Rock of Carrizo Plains                                          | 938   |

TEXT FIGURES.

|                                                                                 |     |
|---------------------------------------------------------------------------------|-----|
| 1. Yurok towns and territory                                                    | 9   |
| 2. Yurok town of Weitspus and associated settlements                            | 12  |
| 3. Blanket of two deerskins, painted. Hupa                                      | 77  |
| 4. Yurok house ladder                                                           | 79  |
| 5. End plank of Yurok sweat house, with exit hole                               | 80  |
| 6. Plan of sleeping places in Yurok sweat house                                 | 82  |
| 7. Yurok net weights                                                            | 86  |

ACC-HRA002779

ILLUSTRATIONS                                                     **XV**

| | | Page. |
|---|---|---|
| 8. | Chimariko land, towns, and neighbors | 110 |
| 9. | Wiyot and Yurok in relation to the Algonkin family | 113 |
| 10. | Wiyot towns and territory | 114 |
| 11. | Wiyot shaman's outfit | 118 |
| 12. | Plan of Hupa town of Takimitlding | 129 |
| 13. | Chilula land and towns | 139 |
| 14. | Sinkyone ring-and-pin game of salmon vertebræ | 147 |
| 15. | Acorn buzzer toys: Sinkyone, Pomo, Miwok | 148 |
| 16. | Wailaki charm | 153 |
| 17. | Distribution of the Hokan family in California | 223 |
| 18. | Family tree of Pomo dialects | 227 |
| 19. | Pomo dance house | 242 |
| 20. | Sections of headbands of yellow-hammer quills | 267 |
| 21. | Central Californian dance headdresses | 268 |
| 22. | Coast Miwok territory and settlements | 274 |
| 23. | Plan of Shasta house | 288 |
| 24. | Cross section of Shasta house | 289 |
| 25. | Achomawi large house, skeleton plan | 312 |
| 26. | Atsugewi cradle | 317 |
| 27. | Klamath-Modoc two-horned muller | 324 |
| 28. | Klamath-Modoc fishhooks | 326 |
| 29. | Klamath-Modoc pipe bowls | 333 |
| 30. | Yana territory, northern part | 338 |
| 31. | Yahi deer decoy, stuffed | 342 |
| 32. | Map sketched and explained by Ishi, the last Yahi | 344 |
| 33. | Penutian languages and degree and direction of dialectic variation | 348 |
| 34. | Penutian dialects in relation to drainage system | 350 |
| 35. | Patwin dance house | 387 |
| 36. | Maidu settlements in American Valley | 397 |
| 37. | Central Californian cocoon rattles | 420 |
| 38. | Yokuts loop stirrer and Miwok paddle | 446 |
| 39. | Miwok dance or assembly house | 447 |
| 40. | The Miwok village of Upüsüni | 448 |
| 41. | Acorn tops, Pomo and Miwok | 449 |
| 42. | Costanoan dialect areas and approximate sites of some settlements | 465 |
| 43. | Yokuts topography, distribution, and neighbors | 486 |
| 44. | Yokuts dance headdress of magpie and crow feathers | 508 |
| 45. | Women's tattoo | 520 |
| 46. | Women's and men's tattoo | 521 |
| 47. | Yokuts basket designs | 533 |
| 48. | Cradle types of central and southern California | 535 |
| 49. | Salinan and Esselen territory and settlements | 548 |
| 50. | Uto-Aztecan family | 576 |
| 51. | Shoshonean branches, divisions, and dialect groups in California | 578 |
| 52. | Clustering of Shoshonean divisions in California | 579 |
| 53. | Carrying net.  Koso of Death Valley | 591 |
| 54. | Chemehuevi dice of filled shells | 598 |
| 55. | "Boomerang" rabbit killers of southern California | 632 |
| 56. | Southern California ground paintings | 663 |
| 57. | Cahuilla seed beater | 695 |
| 58. | Cahuilla pestles | 697 |
| 59. | Cahuilla carrying net | 698 |
| 60. | Face paints: Mohave men | 730 |

ACC-HRA002780

XVI                                    ILLUSTRATIONS

|  |  | Page. |
|---|---|---|
| 61. | Face paints: Mohave women | 732 |
| 62. | Face paints: Mohave women | 733 |
| 63. | Plan of Mohave earth house | 734 |
| 64. | Mohave bowl and ladle | 738 |
| 65. | Mohave pottery bowl | 739 |
| 66. | Mohave fire drill | 739 |
| 67. | Bone awls: Pomo, Maidu, Yokuts, Yuki, Miwok | 806 |
| 68. | The Californian snowshoe | 807 |
| 69. | Exogamy and totemism in California | 835 |
| 70. | Cremation and earth burial in California | 842 |
| 71. | Ghost dance movements in California | 871 |
| 72. | Decrease of native population from 1770 to 1910 | 887 |
| 73. | Subculture areas on the Pacific coast of the United States | 903 |
| 74. | Major culture areas and centers of development within California | 916 |
| 75. | Prehistoric sites about San Diego Bay | 920 |
| 76. | Prehistoric sites on Santa Rosa Island | 921 |
| 77. | Prehistoric sites on Santa Cruz Island | 922 |
| 78. | Distribution of petrographs | 937 |

ACC-HRA002781

# MUSEUM NUMBERS OF OBJECTS ILLUSTRATED.

Unless otherwise mentioned, objects shown in the plates and text figures are in the University of California Museum of Anthropology and their numbers bear the prefix " 1–."  If there is no designation of specimens by letters on plate or figure, the numbers refer to specimens as shown in order from left to right, or top to bottom, or both.

PLATES.

2: 1542, 1327.

3: armor, in Daggett collection.

15: 2259, 1952, 1866.

16: 1682, 2181, 1538, 1084.

17: 1647, 1618, 2198, 1563, 1679, 1892.

19, a–e: 2841, 1073, 937 (Hupa), 1629, 1195.

20: 2069, 1943, 1236, 1099, 2219, 1239, 1240, 1237.

23, a–c: 9415, 9394, 11626.

24, a–d: 2541, 2530, 2547, 2534.

29: 10529, 19441, 4102, 401.

30, a–g: 2760, 2766, 9169, 10800 and 3960, 10358, 2673, 3902.

33, a–c: 2581, 2587, 2603.

35: 9461, 16573, 2307.

38: 10500.

39–40, a–o: 10259, 13841, 10057, 10235, 10216, 10055, 10731, 10830, 10780, 10817, 2327, 10944, 10730, 3087, 17336.

41: 12–1752.

42, a–c: 1399, 9165, 9579.

43, a, 9247, 9240; b, 10435, 10434; c, 10227; d, 2410, 103, 2671, 13977, 2714; e, 1779.

44, a–f: 20978, 14475, 16555, 4035, 9208, 2679.

45: 10715.

49, a–f: 19677, 19742, 14057, 11043, 14477, 4367.

50: 10832, 10910, 3951, 4011, 10390, 10899.

51: 14077, 10823, 10889, 14075, 14074, 14076.

52: American Museum of Natural History 50.1–2150, 50–539 (Chumash attribution probable).

53: 14497, 14503, 14502, 14998, 14999.

54: 14495, 14496.

55: a, 14524; b, 4344, 13828; c, 10972; d, 20964; e, 20926; f, Shoemaker collection, 3, 49.

58: 14565, 9580, 10039, 10040.

59: 14540, 4377, 4357.

62: 11067, 11095.

63: 14570.

66: 4301, 14071, 12971.

67, a–i: 1754, 1720, 13866, 153, 1413, 1703, 12401, 11235, 1704.

68: 1713, 13783, 13775, 13774, 4321.

72: 14577, 14595.

73: a, 10956; b, 11125; c, 11057; d, 11130, 11111; e, 1600, 1509, 1601; f, 1663.

75: 11960, 12008, 11963.

76: 9920, 10120, 10351.

80: 10038.

81: 12–1734.

3625°—25——2

# XVIII    MUSEUM NUMBERS OF OBJECTS ILLUSTRATED

## TEXT FIGURES.

3: 872.

4: 9572.

5: 9380.

7: 1688r, 1908, 1933, 1923, 1688g.

11: 11622a, 11620, 9416, 11621.

14: 2266.

15: 2267, 10600, 10137.

16: 4383.

20: 2803, 525, 645, 2948.

21: 772, 13466, 17, 10043, 10047.

26: 2311.

27: 4540.

28: 12763.

29: 12382, 12580, 14137.

31: 19564.

37: 10747, 2324, 15b, 509, 2818, 10004, 2835.

38: 10126, 10466.

41: 10603, 10135.

44: 1398.

53: 14567.

54: 10971.

55: 14493, 9215, 1753.

57: 10979, 11107.

58: 11121.

59: 10997.

65: 1722.

66: 13851.

67: 2773, 7457, 10439, 10802, 14087, 12017, 10125, 10228.

ACC-HRA002783

CHAPTER 48.

## THE CUPEÑO AND CAHUILLA.

THE CUPEÑO: Tribal relations, 689; social organization, 690; religion, 691. THE CAHUILLA: History and habitat, 692; plant foods, 694; mortar and metate, 696; basketry, 698; pottery, 702; houses, 703; weapons, 704; various utensils, 704; society, 705; religion, 707.

### THE CUPEÑO.

#### TRIBAL RELATIONS.

The Cupeño are one of the smallest distinct groups in California. They state that they possessed only two permanent villages: Kupa— whence their Spanish name—near the famous hot springs of Warner's ranch, usually called merely Agua Caliente, a designation that has also been applied to the tribe; and Wilakal, in Luiseño Wolak, at San Ysidro. The Diegueño call the two sites Hakupin and Ephi. The entire territory controlled by the inhabitants of these two settlements is a mountainous district on the headwaters of the San Luis Rey, not over 10 miles by 5 in extent—a sort of Doris in an Indian Greece.

The Cupeño appear to have no name for themselves, other than Kupa-ngakitom, "Kupa-people," and perhaps Wilaka-ngakitom. Their language they call Panahil. The Diegueño call them Hekwach, which is a generic Yuman designation for the Cahuilla. The Cupeño name the Serrano Tamankamyam, the Cahuilla Tamikochem, the Diegueño Kichamkochem, the Luiseño Kawikochem, perhaps all of them terms based on the cardinal directions.

The hot springs seem to have drawn the residence of various Indians for two or three generations, and some years ago the Cupeño were removed, with several other settlements, to Pala. Indian censuses, being more frequently based on location than on exact tribal discrimination, have therefore either ignored the Cupeño or exaggerated their strength. In 1910 there were not far from 200. Anciently, 500 must be set as their maximum.

It is above all their speech that warrants a separate recognition of the Cupeño. This is of the Luiseño-Cahuilla branch of Shoshonean, but more than a mere dialect of either of these tongues. Luiseño and Cahuilla have many words in common which in Cupeño are quite

689

different. When Cupeño agrees with one and differs from the other, the resemblance is more frequently with Cahuilla. In accord with this fact is the Diegueño name of the tribe, which classes it with the Cahuilla. So small a body of people as the Cupeño could not, however, have developed so distinctive an idiom while in their recent intimate juxtaposition to two larger groups of the same origin. A former period of isolation, or of special contact with aliens, is indicated. We must infer, accordingly, that the Cupeño detached themselves from the still somewhat undifferentiated Luiseño-Cahuilla group at some former time, moved to their present abode, and later were overtaken by their more numerous kinsmen; or, that they represent a southerly advance guard which was crowded back into intimacy with its congeners by an expansion of the Diegueño. In either event, relations with the Diegueño appear to have been an important factor in Cupeño tribal history.

### SOCIAL ORGANIZATION.

The Cupeño scheme of society is less disintegrated than the Luiseño, but appears also to have been modified in the past century. Its present form is this:

| Moieties. | Clans. | Ceremonial groups. |
|---|---|---|
| 1. *Istam* ("Coyotes") | 1. *Nauwilot* ("body louse") | "Party" 1. |
| | 2. *Changalangalish* | |
| | 3. *Kauval* | |
| | 4. *Po-tama-toligish* ("his tooth black") | "Party" 2. |
| 2. *Tuktum* ("Wild cats") | 5. *Aulingawish, Auliat* ("blood ——") | |
| | 6. *Sivimoat* | "Party" 3. |
| | 7. *Djutnika* | |

The totem of the moiety is called *wala*, "great-great-grandparent," but there is no belief in descent from the totem animal. A sort of good-natured opposition is recognized between the moieties, whose members frequently taunt each other with being unsteady and slow witted, respectively. Mourning ceremonies are made by moieties, but the complementary moiety always participates. Throughout California the contact of the moiety scheme with religion was largely on the side of mourning rites. There is an association here which is undoubtedly of historical significance.

The nature of the "clans" is less clear. As there were several, and the Cupeño had only two villages, they can scarcely have been local bodies. Their appellations also do not seem to be based on place

ACC-HRA002785

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 80 of 149   Page ID #:4308

names. They are used as outright family names by the modern Indians; but this can hardly be old practice. The functions of the clans are said to have been chiefly religious. In recent years, as some of them dwindled in numbers, their members ceased their own ceremonies and affiliated themselves with other clans, most of the Cupeño say: in this way the "parties" became established. Others regard the "clans" as only synonymous designations of the religious "party" units. At any rate, the Cupeño designate both clan and party by the latter term in speaking English, and call them both *nout* in their own language. This word also means chief, and is found, as *nota* and *net*, among the Luiseño and Cahuilla. Each clan had its chief, it is said, and there were neither village nor moiety chiefs. At present there is a chief for each "party," besides a tribal political head chosen at the instigation of the whites. Each *nout* had a *paha* or ceremonial director, as among the Luiseño and Serrano; also a *kutvovosh*, who seems to have served as his speaker, messenger, fire tender, and assistant.

### RELIGION.

The Cupeño call the toloache initiation *manit paninil*, "Jimson weed drinking." The director of this holds his post through inheritance, it is said, and is also known as *nout*. The *morahash* whirling dance was called *pukavihat*. The girls' adolescence rite, *aulinil* or *ilunika*, included the usual "roasting," and a ring dance in which the people were grouped by moieties. This ceremony is described as made by the girl's clan, but the statement may refer rather to her patrilinear kinsmen, who would generally constitute at least a considerable portion of a clan. *Piniwahat* is the singing of maledictions against "clan" enemies.

The mourning ceremonies are the *pisatuil, süshomnil,* and *nangawil*, apparently corresponding to the Luiseño *tuvish, chuchamish,* and *tauchanish*. The moieties constantly function in these. Each rite is made by the moiety to which the dead person belonged, and the other is invited. In all of them the guests sing during the early part of the night, the rite makers after midnight. In both the *süshomnil* and *nangawil* property is thrown away as well as burned, and this is seized and kept by members of the opposite moiety. The materials for the figures in the *nangawil* are prepared by the mourning moiety, and then assembled—for pay—by the invited one. This ceremony is said to last three days. The eagle killing ceremony is also in the hands of one moiety at a time, with the other present as guests. This organization by moieties must give the Cupeño mourning ceremonies a different color from those of the nonmoiety Luiseño, which in other respects they appear to resemble closely.

ACC-HRA002786

Case 5:13-cv-00883-JGB-SP  Document 85-21  Filed 10/21/14  Page 81 of 149  Page ID #:4309

Cupeño mythology is closest to that of the Cahuilla, it would seem, and even perhaps more closely related to that of the Serrano than to that of the adjacent Luiseño. Tumayowit ("earth") and Mukat were the first deities and the creators or progenitors of everything in it. They led mankind southward to their approximate present seats. Either identified or associated with these two gods were Coyote and Wild Cat, who emerged from the halves of a primeval bag hanging in space. Mankind was already in existence, but in mud and darkness. Tumayowit and Mukat disagreed. The former wished death to be and finally descended to a lower world. Mukat caused people to quarrel, and was finally poisoned, by the wish of men, through Frog eating his voidings. Coyote was sent away on a pretext, but returned and seized Mukat's heart from the funeral pyre. The Cupeño were exterminated by their neighbors, only one baby boy, Hübüyak, escaping with his Diegueño mother. As he grew up, he rejoined his kinsmen of Coyote moiety and Kauval clan who had remained at Saboba (in historic Luiseño territory), returned to Kupa. slaughtered the destroyers of his people, and settled there with two Luiseño wives, to become the progenitor of the Cupeño of today. The Wild Cat moiety came to Kupa later.

Mukat is obviously the equivalent of Wiyot, but Tumayowit, the earth mother, appears here, as among the Cahuilla, as a man, if there is no error. This part of the myth suggests the Diegueño and Yuman belief in two first hostile brother gods.

## The Cahuilla.

### HISTORY AND HABITAT.

The Cahuilla, with 750 souls, are to-day one of the important tribes of California. Originally they may have numbered 2,500. They are Catholic and speak Spanish; but, although generally included among the Mission Indians, they were only to a slight extent brought under mission control in the first third of the nineteenth century. The western division may have been partially affiliated with the submission at San Bernardino, and those from the vicinity of Cahuilla Valley, or some of them, appear to have been within the sphere of San Luis Rey or its station at Pala. After secularization, many of the Cahuilla entered into relations with the Spaniards on the grants in the fertile portion of southern California, either as seasonal visitors or more permanent peons. This brought them in some numbers into Serrano and Gabrielino territory and has led to the attribution of part of the habitat of the former people to the Cahuilla by some authorities. Of late years this westward movement from the desert and mountains has slackened. The Government has developed water

ACC-HRA002787

and protected Indian rights, and the Cahuilla live regularly in their old homes—an instance of the enduring attachment of the California nations to their ancestral soil. There are fewer reservations than there once were villages; but they are rather fairly distributed through the same regions.

The name Cahuilla is in universal use, but its origin is obscure. Reid, our principal authority on the Gabrielino, says that the word means "masters"; but this has not been confirmed. Indians of all tribes regard the designation as of Spanish origin. The Yuman group about Ensenada Bay in Baja California, who are practically one people with the Diegueño, have sometimes been called Cahuillas; but whatever basis of local or official usage this appellation may have, it is unfortunate, since speech proves the Bajeños to have no connection at all with the American Cahuilla. There is also a Yokuts Kawia tribe, on Kaweah River, whose name, however, seems to be a coincidence. The Yokuts say Kā'wia or Gā'wia, while Cahuilla is of course Kawi'a. This is its universal pronunciation. The spellings Coahuilla and Coahuila, although the more frequent and established in government usage, are therefore erroneous; they would be pronounced Kwawia or Kwawila. The latter seems a mere confusion with the name of the Mexican State of Coahuila.

The Cahuilla are called Yuhikt-om or Kwimkuch-um ("easterners") by the Luiseño, Tamikoch-em by the Cupeño, Kitanemun-um by the Serrano proper, Kwitanem-um by the Chemehuevi, Hakwicha by the Mohave, and a dialectic equivalent of Hakwicha by the other Yuman groups that know them.

Cahuilla territory is somewhat irregular, but may be defined as the inland basin between the San Bernardino Range and the range extending southward from Mount San Jacinto; with a few spillings over into the headwaters of coast drainage. There are three natural topographical divisions.

The first comprises San Gorgonio Pass, lying nestled between the giant peaks of Mounts San Bernardino, San Gorgonio, and San Jacinto, all over 10,000 feet high. With this belongs Palms Springs Canyon, and the westward draining San Timoteo Canyon.[1] The elevation of the inhabited sites is between 1,500 and 2,500 feet. Serrano and Luiseño adjoin. The natives of this district, who are here

[1] This is in error. San Gorgonio Pass and San Timoteo Canyon were in Serrano possession, as set forth in the footnote appended to the section on·the Serrano. Palm Springs Canyon thus remains as the focus of this Cahuilla group, and their boundary should be run northward or northeastward from Mount San Jacinto instead of forming the westward arm shown in Plates 1 and 57. The hill near White Water probably marked their limit against the Serrano and not against the Desert Cahuilla. The Serrano do not reckon the Palm Springs division as Cahuillas. They are said to call them Wanupiapayum and Tüpamukiyam; which, however, appear also as names of Serrano local groups.

ACC-HRA002788

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 83 of 149   Page ID #:4311

designated as the Western or Pass Cahuilla, speak a somewhat different though intelligible dialect to the remainder of the group. Their range extended to Kawishmu, a hill a little east of White Water.

Southeastward is the Colorado Desert, partly below sea level, and forming an old arm of the Gulf of California. The southern end of this totally arid valley, occasionally watered by overflows from the great Colorado into New River—which looks on the map like an affluent but is really a spillway flowing in opposite direction from the main stream—was in the possession of the Kamia or other Yuman groups. The northern end, down to about Salton Sea, was Cahuilla. Most of this district is exceedingly fertile under irrigation, and has been partly reclaimed. In native times it appeared most forbiddingly desert. But its tremendous depression brought the ground waters near the surface, so that in many localities mesquite trees throve and the Cahuilla obtained water in comparatively shallow wells. The people here are the Kitanemun-um of the Serrano, our Desert Cahuilla.

The third division lived in the mountains south of San Jacinto Peak, chiefly in fairly watered canyons well up the less favored side of the range, overlooking the inland desert, as at Santa Rosa, Los Coyotes, and San Ygnacio. At one point these people were across the divide, in Pacific Ocean drainage. This is the district centering in the patch now known as " Coahuila Reservation "—though it harbors only a small minority of the entire group—on the head of the Santa Margarita. The elevation of these habitats is from 3,000 to 4,000 feet. The speech is said to be distinguishable from that of the desert; but the difference is insignificant, and the desert and mountain divisions might be grouped together.

Plate 57 shows a few important sites in part of tne habitat of the Cahuilla. Other place names are: Kavinish, Indian Wells; Pal tewat, Indio; Pal seta, Cabezon; Temalwahish, La Mesa; Sokut Menyil, Martinez; Lawilvan or Sivel, Alamo; Tova, Agua Dulce; Wewutnowhu, Santa Rosa. San Ygnacio is both Pachawal and Sapela. Most of these seem to be old names of specific villages, but now refer to tracts or reservations. Other sites are mentioned in the list of clans under " Society " below.

## PLANT FOODS.

The principal supplies of food drawn from plants by the Cahuilla are rather accurately known, and while somewhat more varied than usual owing to the range of the group from low desert to high and fairly watered mountains, may be considered typical of the Indians of the southern part of the State.

Oaks, of course, require reasonable precipitation and moderate elevation, so that they are available in quantities to only a part of the Cahuilla; but the

ACC-HRA002789

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 84 of 149   Page ID #:4312

acorns were utilized wherever obtainable and treated as by the other Californians. *Quercus lobata* was the species that the Cahuilla had most frequently accessible to them.

In the sunken desert, where the roots of the mesquite can in many places penetrate to ground water, the fruit of this tree was the staple food. Both the bean or honey and the screw mesquite (*Prosopis juliflora* and *pubescens*) were employed, the whole fruits being ground in wooden mortars. The former variety was the more important; the latter is sweeter.

Agaves and yuccas were less vital to the Cahuilla than to the mountain tribes of western Arizona and probably the Chemehuevi and Koso, but were made use of in the same way. The thick, short, succulent, sweet stalks were roasted in stone-lined and covered pits. The waxy flowers as well as the fruits of some species were eaten cooked.

Nearly every variety of cactus was made use of. Most generally the fruit was consumed, but the fleshy stalks or leaves of some species helped out when diet became scant, and sometimes buds or seeds are edible.

The native palm bears clusters of a small fruit which was not neglected.

Nearly every conifer, from pine to juniper, had its seeds eaten. The most important variety is the Nevada nut pine, *Pinus monophylla*, seeds of which were harvested by the Cahuilla in the same manner as by the Koso, the cones being roasted to extract the nuts.

Many plants furnished what is usually known by its Mexican name pinole—the Aztec original *pinolli* is significant of the wide distribution of the food habit—that is, seed flour. The most important kind was chia, *Salvia columbariae*, Cahuilla *pasal*. Other sages and a variety of plants were also made use of: *Atriplex lentiformis*, *Artemisia tridentata*, *Sisimbrium canescens*, *Lasthenia glabrata*, *Chenopodium fremontii*. These were all gathered with the seed beater (Fig. 57), parched or roasted with coals



FIG.   57. — Cahuilla   seed beater.

shaken in a basket or pottery tray, and ground. The meal was eaten dry, boiled, or baked into heavy doughy cakes, according to species.

California is nowhere a berry country. The Cahuilla have available several varieties which are rather of the nature of small fruits. In some of these the seeds are perhaps of more food value than the flesh. Thus, in the wild plum, *Prunus*, Cahuilla *chamish*, Mexican *yslay*, the kernel of the pit is crushed, leached, and boiled like acorn flour. Manzanita, *Arctostaphylos*, is treated similarly. The berries of the elder, *Sambucus mexicana*, and of sumac, *Rhus trilobata*, are also dried. The influence of acorn-seed processes in the use of these food materials is evident. The arid to subarid climate of California produces fruits whose paucity of juicy pulp allows them to be made into meal; but a people unaccustomed to grinding would hardly have applied the process to varieties consumable otherwise.

Root parts of plants are of little service to the Cahuilla, whose dry habitat allows but a sparse growth of the lily-like bulb plants that are important farther north in the State. Flowers, on the other hand, are often thick and sappy.

ACC-HRA002790

Case 5:13-cv-00883-JGB-SP Document 85-21 Filed 10/21/14 Page 85 of 149 Page ID #:4313

Those of species of yucca, agave, sumac, and ocatilla (*Fouquiera spinosa*) are boiled, either fresh or after drying.

Altogether, more than 60 varieties of plants are known to have served the Cahuilla as food in one form or another, and the whole number may have been twice as great. It is obvious that a non-farming people living in a country of little game and limited fertility would be likely to leave no source of wild plant food idle which lay within their capacity to utilize. The value of ethnobotanical studies lies in a comprehension of the processes followed, and a determination of the manner in which these have positively and negatively affected methods of securing food. It is clear that a few well-developed processes were applied to the limits of applicability, rather than that the best possible method was independently devised for each product of nature. Thus grinding and drying stand out among the Cahuilla; the seed beater is more important than the digging stick. The true significance of the processes, of course, is clear only with the totality of the botanical environment in view. For this reason the plants and parts not utilized are as important to an interpretative understanding as those made use of; but on this side little information has been recorded.

### MORTAR AND METATE.

The Cahuilla do not neatly square their metates, as the Mohave do, but use an irregularly rectangular or oval slab. Most specimens have only part of their surfaces worn, obviously by a circular motion. The rub stone sometimes is only a bowlder ground flat. Another form is dressed into an oval, and rather thin. This type could also be used for rotary grinding. In general, the implement is of the California type, as described in the chapters on the Maidu and Luiseño, and is more properly designated "grinding slab" than "metate."

But there are many "manos" that are as evenly squared as a brick, and even longer and narrower. These can be utilized only with a back and forth motion. Some metates, too, show that they have been rubbed with such a stone. Now the Cahuilla of to-day often grind wheat; and it is therefore a question whether this southwestern type of metate was frequent among them anciently, or whether its use has been stimulated by contact with Mexicans. The settlers from Mexico must have brought many metates of lava with them, or manufactured them after their arrival. Apparently the utensil was in daily service in every poorer Spanish Californian household for several generations; and from this source it penetrated, in its standard Mexican form with three legs, to the Indians. Occasional examples are still in use in Indian hands in central as well as southern California. Fragments have even been discovered in the surface layers of the San

ACC-HRA002791

Francisco Bay shell mounds and in graves on the Santa Barbara coast.

The southern California mortar is a block of stone hollowed out, when new, some 2 or 3 inches, but gradually wearing deeper. The hopper is by no means always employed. If present, it is always attached with asphalt or gum. Neither of the two central and northern types of mortar is known—the bedrock hole and the slab with loose, superposed hopper.

The pestle, as in central California, is frequently only a long cobble, sometimes slightly dressed at the grinding end or along one side (Fig. 58, *b*).

For mesquite beans and perhaps other foods, the desert Cahuilla use a deep wooden mortar sunk into the ground. This has its counterpart on the Colorado River; but the Cahuilla form appears to average a more extended section of log and deeper hole. A pestle of unusual



Fig. 58.—Cahuilla stone pestles for wooden (*a*) and for stone (*b*) mortar.

length, often 2 feet, is necessitated. To prevent undue weight, this must be made slender; and in turn, dressing is involved (Fig. 58, *a*). The pestle for the wooden mortar is therefore quite different from the much more roughly shaped form used on stone.

It is doubtful if the Cahuilla-Mohave wooden mortar is connected with that of the valley Wintun and Yokuts. One is used for mesquite, the other for acorns. The former has a deep, pointed pit; the other contains a broad bowl-shaped basin, in the center of which is a small shallow excavation in which all the actual pounding is done. The southern mortar of wood is perhaps a device to meet some particular quality of the mesquite bean; that of central California is clearly a substitute for a more general form in stone.

Somewhere in acornless southeastern California, probably from the Chemehuevi to the Eastern Mono, and in parts of Nevada, a very large and deep cone-shaped mortar of stone occurs, worked with a long and sharp but thick pestle of extraordinary weight. This seems to be connected with the wooden mortar of southern California.

ACC-HRA002792

**698**       BUREAU OF AMERICAN ETHNOLOGY       [BULL. 78

The mountain Cahuilla, as well as the Luiseño and Diegueño, who have acorns but no mesquite, have not been observed to possess wooden mortars; and no pestle of wood has been reported from California except from the Mohave.

### BASKETRY.

Cahuilla basketry is that of all the " Mission Indians " of southern California. Chumash ware alone was somewhat different, though clearly of the same type. It is a rather heavy but regular basketry, coiled on bundles of *Epicampes* grass stems, the wrapping being either sumac splints or *Juncus* rush. The varying shades of the latter produce a mottled effect, which is pleasing to most civilized people, though it is not certain that the natives sought it equally. But they obviously appreciated the lustrous texture of the rush,



FIG. 59.—Cahuilla carrying net.   (Cf. Fig. 53.)

which, as used for the groundwork, is normally buff in color, while red or brown lengths of stem serve for designs, and even olive and distinctly yellow shades can be obtained. Only black was produced by dyeing. The prevailing pattern arrangement is one of encircling bands.

The forms are as standardized and nearly as few as the materials. They are nearly flat plates; shallow flaring bowls; a large deeper basket; a small receptacle with slightly constricted mouth, the equivalent of the Chumash-Yokuts-Chemehuevi " bottle-neck," but without trace of a shoulder; and the woman's cap.

The large basket serves for storage and carriage. It differs fundamentally from the carrying basket of all central and northern California. It is close coiled instead of open twined; is flat bottomed instead of an inverted cone; and broader than deep. It is obviously not a form that originated for transport, but a receptacle or pot put

ACC-HRA002793

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 88 of 149   Page ID #:4316

secondarily to burden use. The explanation is found in the carrying net, which renders the precise shape of the contained basket of little moment.

The net has the form of a small hammock with a mesh of from 3 to 5 inches, the ends being gathered on heavy loops, which are joined by an adjustable rope passing across the cap-protected forehead (Fig. 59). Similar nets are found in central California to as far north as the Pomo without an accompanying alteration of the carrying basket from its conical form. The inference is that the central Californians employed the net only occasionally, the southern Shoshoneans regularly. All that is actually known of the use of the implement corroborates this conclusion. The net must therefore be regarded as of southern origin. It is a localized device: the adjacent Southwest reverts to the basket or employs the carrying frame; the Shoshonean Plateau appears to use the Californian cone basket.

It may be added that the Pomo carrying net has the headband woven in, so that the capacity can not be altered—a fact which indicates that it is designed only for certain specific usages.

The large, coiled, fairly deep storage and transport basket of the south may therefore be regarded as probably an original cooking vessel, and is certainly a form which elsewhere is used for cooking. It is not so used by the Cahuilla to-day, as indeed is not to be expected of a pottery making people. The history of the vessel can hardly be understood in full without more precise knowledge of the baskets in which the inland Gabrielino—who made no pots and were too remote from steatite to use it generally—did their cooking.

The same vessel undoubtedly served formerly, as it does to-day, for a general receptacle; but that it was not primarily a store basket is suggested by two circumstances. The first is that the ancient Chumash possessed a taller, larger, and distinctly bellied basket, similar to that of northwestern California in form, but coiled instead of twined. This was indubitably made for storing only. The second fact is that the Cahuilla (Pl. 60), the Mohave, and apparently the Luiseño also, make an outdoor granary. This is not set vertically and worked into posts, as among the Sierra tribes, but laid flat on the ground, on a rock, or on a scaffold. It is made of long stalks of wormwood, *Artemisia*, among the Cahuilla, or arrow weed, *Pluchea*, with the Mohave, and put together in bundles much on the plan of a bird's nest, without textile process. The Mohave and desert Cahuilla form is up to 6 feet in diameter, generally low, and without bottom. This type is mostly used to hold mesquite. The mountain Cahuilla make a smaller but taller form with bottom for their acorns. The entire device is obviously one that is serviceable only in an arid climate: there is no thatch or provision for cover except horizontally

ACC-HRA002794

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 89 of 149   Page ID #:4317

laid stalks that would not turn rain. This granary, together with the opportunities afforded by rock crevices in a dry country, make a true storage basket unnecessary in most of southern California. The large " mission " basket would be convenient to contain as much food as might be wanted about the house; it was not intended to hold provisions for the winter, nor was it serviceable for the purpose.

The small and more or less globular basket of the Cahuilla and their neighbors was no doubt sometimes useful as a deposit for awls and other little things; it must also have served particularly as a gift and as an offering in the mourning anniversary.

The basketry cap of southern California has the shape of a fairly tall frustum. Except for material and texture, it is identical with the Yokuts and Koso cap. This southern coiled form appears to have only a remote historical connection with the overlay-twined cap of northernmost California, which is low and more or less convex in profile, and whose range, toward the south at least, is exactly coterminous with that of the basket art that does not know coiling. The northern cap is worn habitually; southern women don theirs when they carry a load. The intervening tribes, such as Maidu, Miwok, and Pomo, use no headwear. A third type is represented in California among the Chemehuevi, and appears to be representative of the Shoshonean Plateau. This is diagonally twined, peaked, and sometimes has the design painted on. It seems that this form links the northern and southern California types geographically, rendering the distribution of the object continuous over an arc of territory. This arc and the Pacific Ocean inclose the north central Californian capless area. A distribution of this kind makes it obvious that it is a specific reason, and not mere failure of diffusion, that has kept the central Californians from use of the cap; and establishes some possibility that they once wore it and subsequently abandoned the custom.

The Great Basin type of cap is found among Cahuilla and Diegueño beside the coiled form. Both are shown in Plate 73, *d*.

The mortar hopper of the Cahuilla and other southerners is started on a hoop. Here is a truly interrupted distribution. The north twines its hopper, the south coils, the middle area dispenses with the article.

Uniformity of technique, material, pattern, and even fineness of finish of all coiled ware, irrespective of the nature of the basket, is almost absolute among the Cahuilla and their neighbors, and is one of the most marked traits of their art.

The commonest twined basket of southern California is a small or moderate sized openwork vessel of *Juncus* stems, used both as a receptacle and, after lining with leaves or similar material, for

ACC-HRA002795

Case 5:13-cv-00883-JGB-SP Document 85-21 Filed 10/21/14 Page 90 of 149 Page ID #:4318

leaching. The weave is essentially simple twining, with considerable doubling and zigzagging of warp. The introduction of these variants seems random, the only apparent purpose being to keep the interstices approximately equal in area. No attention is paid to uniformity of mesh or to an even surface. The result is a basket that seems deliberately crude and unworkmanlike.

The seed beater has become a frame rather than a basket with the Cahuilla. It is nothing but a bundle of three, six, or a dozen sticks, wrapped together at one end to form a handle, and more or less spread fanwise at the other end over a hoop. A single crosspiece may bisect the circle and give stiffness, but is not always introduced. Modern pieces have the fan and hoop very roughly lashed together with cord, rag strips, or wire. As no old specimens have been preserved, this imperfect workmanship may possibly be ascribable to modern degeneracy. But the analogous crudeness of the openwork basket, as contrasted with the full maintenance of careful finish in all coiled ware to the present time, suggests that the Cahuilla beater was always made hastily and imperfectly. This is the more likely because on the one hand it is scarcely a true basket and on the other reaches its southernmost known range in southern California. The concept has become feeble, its execution half-hearted. (Fig. 57.)

The only other twined vessel known to have been made in the region of " mission " basketry is the pitched or asphalted water jug with constricted neck, and the occurrence of this is doubtful for the Cahuilla. The Chemehuevi and Kawaiisu manufacture a coated jug in diagonal twining and with pointed or round bottom, a type belonging to the Shoshonean Plateau and the western part of the Southwest. The Chumash made a bellied bottle that would stand up, and used simple twining. The Gabrielino, who also had no pottery, may have had the same type; the preserved description of their water vessel unfortunately is not clear. The Chumash and Chemehuevi forms probably met in the Serrano region, although here also exact knowledge fails. For Cahuilla, Luiseño, and Diegueño there is only a single and vague reference; and as these peoples made pottery, the occurrence of the basketry water bottle among them must be considered somewhat doubtful, and was probably at most occasional.

The southern California basket art thus reveals these traits. Twining is remarkably undeveloped. Types that are twined elsewhere in the State are either lacking in the south, replaced by coiled substitutes, or amazingly crude. The center of the art rests in coiling to a much higher degree than elsewhere. The coiled ware is connected with that of central California, especially of the San Joaquin Valley, but is reduced to a single weil-maintained manner universally ap-

ACC-HRA002796

plied. The occurrence of pottery among the Cahuilla, Luiseño, and Diegueño has unquestionably contributed to this condition of their basketry. As soon as neighboring regions without pottery are entered, such as the Santa Barbara Channel or Tehachapi Mountain district, the rigid restriction to a single style ceases, and twining flourishes beside coiling.

## POTTERY.

The pottery made by the Cahuilla, Luiseño, and Diegueño, which did not extend to the Gabrielino but probably to the Serrano, apparently had its immediate origin in the lower Colorado Valley, from which it continues also in the opposite direction to the Seri. It is a coiled and smoothed unslipped ware, made of clay that burns red, with tempering of crushed rock; very thin walled, light, but fragile and porous. Patterns are linear, solid areas being confined chiefly to fillings in of the favorite acute angle; and are painted on in yellow ocher, which fires to a somewhat deeper red than the clay. The Cahuilla and Luiseño more frequently omit designs, but when they add them, do so in typical Mohave style, which is suggestive of tattoo and face-paint patterns; but they employ a red substance in place of yellow ocher. Black designs occur (Pl. 62), and though rare are of interest because unknown to the Mohave. They are said to have been produced with black mineral; the surface is more highly polished and the lines finer. The forms of vessels seem to have been less numerous than with the Mohave; at least, spoons, plates, and oval platters have not been found. The moderns occasionally make specialties, like jars with three or four mouths, which do not occur among the Mohave, where the art remained vigorous in purely native condition until recently; but these may be fanciful inventions under American stimulus. Something similar has occurred among the Yuma, whose old pottery seems to have nearly disappeared before crude and bastard forms made as curiosities.

The introduction of this art from the Colorado River to the desert and the coast is not altogether recent, as the presence of sherds in the upper layers of an ancient site at La Jolla proves. The apparent absence of pottery from the lower deposits can not yet be stressed, because examination has been too far from exhaustive to make negative conclusions dependable. On the other hand, it can not be doubted that the art came to the coast from the east at no very remote period.

That the ultimate source of the pottery industry of the entire region is from the Southwest proper is also certain. But again, hasty conclusions must be avoided. Nothing like the Mohave-Luiseño ware

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 92 of 149   Page ID #:4320

has been found in any ancient or recent Pueblo culture; an area wholly or nearly without pottery separates the Colorado River from the westerly edge of the district of Pueblo architecture; and from the river to the coast there are no traces of any other form of the art.

The ware most nearly resembling that of southern California seems to be a red pottery with one-colored pattern found up the Gila and at least as far into Sonora as the Papago country. This similarity, together with the modern Seri one, points to Sonora rather than the Pueblos as the specific source of the southern California art.

### HOUSES.

The Cahuilla house is thatched. Its original form has not been satisfactorily determined. At present it is rectangular and set on forked posts. There is a distinct ridge and considerable slope to the roof. The walls may be plastered with mud or adobe. This type of dwelling has unquestionably been influenced by the Mexican *jacal* or the American house; but to what degree is uncertain. On the desert larger and more nearly square houses with nearly flat roof and without sharp corners may be seen which somewhat suggest the Mohave house minus its covering of sand. These are probably more nearly aboriginal. The mud coating of the walls of the pitched-roof houses is certainly not native. The Mohave follow the same practice, but it is positively known to be recent with them.

In the mountains a type survived until recently which lacks walls. Two, four, or six posts are set up rather close together and connected across their crotched tops by short logs. From these, poles are then radiated to the ground, and some sort of thatch bound on. Such a dwelling suggests a reduction of the Miwok semisubterranean house or assembly chamber, but is probably more immediately connected with the Luiseño and Mohave houses; a covering of earth could be easily added or omitted. Stumps in abandoned settlements at the edge of the desert conform to this structural plan. But the question remains whether this type of house was built by all the Cahuilla or restricted to those in a certain topography; and further, whether it represents the standard house, or a form used in summer or for temporary purposes.

Uncertainty also surrounds the sweat house. The Serrano and Pass Cahuilla made this chamber. For the Mountain Cahuilla the sweat house has not been mentioned; but they may have had it. For the Desert Cahuilla the case is more doubtful. The next tribes to the east, those of the Colorado River, do not know the sweat house.[2]

---

[2] A recent study of the Cahuilla by L. Hooper (see bibliography) leaves the use of sweat houses and earth-covered houses somewhat obscure, but establishes the existence of sweat houses.

ACC-HRA002798

The sweat house of the Pass region is oval and small, about 12 by 8 feet, and of a man's height in the middle (Pl. 60). The only opening is the door on ground level. Inside from this is the fire-place, and beyond, two center posts, connected by a transverse beam. From this poles run down to the edge of the rather shallow excava-tion. The whole is then laid with brush and earth. The structure is too small for dancing or assemblies: all through southern Cali-fornia the sweat house is used only for sweating.

This sweat house agrees closely in plan with the old type of Cahuilla dwelling that has been discussed.

The ramada or shade is of the usual type: a roof of foliage on posts. In the desert it forms a sort of porch in front of the door, and is frequently surrounded in whole or part by a windbreak—both devices known also to the Mohave.

The brush inclosure for ceremonial purposes has not been reported from the Cahuilla, but may have been made by them.

### WEAPONS.

The Cahuilla bow is that of all southern California—long, narrow, thick, and unbacked. It is made of mesquite, inferior specimens of willow, or palm-leaf stem; in the mountains probably of other ma-terials. The arrow is of two kinds: cane with a wooden foreshaft, as among the Chemehuevi and Yokuts, or a single sharpened stem of *Artemisia*, without head, the Mohave type. The grooved straightener and polisher of steatite, which was heated, occurs throughout the south, and has already been mentioned as the regular accompaniment of the cane or reed arrow.

The thrusting war club with thick cylindrical head was used by the Cahuilla. This is a form found from the Pueblos to the Gabrie-lino.

The curved flat rabbit-killing stick of southwestern type was known to all the southern Californians (Fig. 55).

### VARIOUS UTENSILS.

The Cahuilla cradle was a ladderlike frame like that of the Mohave and Diegueño. The relation of this generic southern Cali-fornia type to the other forms found in California has been discussed in the section dealing with the Yokuts. Whether the Cahuilla used a hooplike wickerwork hood of splints such as the Mohave attach to their frames is not recorded, but seems likely. (Pl. 39, *b*.)

ACC-HRA002799

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 94 of 149   Page ID #:4322

The hammock-shaped carrying net (Fig. 59) is often suspended in the house to hold a sleeping baby. This may be an aboriginal custom, but there is no certainty on the point.

The desert habitat of most of the Cahuilla is probably responsible for their nonuse of the two commonest Californian string materials, *Apocynum* and *Asclepias*. Instead they employ the leaf fibers of the mescal, *Agave deserti*, and the bark of the reed, *Phragmites communis*. The latter plant is called *wish*, but this word in Luiseño denotes *Apocynum cannabinum*.

The mealing brush of soaproot fibers, *Chlorogalum pomeridianum*, is also replaced by one of agave among the Cahuilla.

The straight flute has four holes usually set roughly in two pairs by rule of thumb or eye, and therefore productive of arbitrary intervals rendering the instrument unsuited for accompaniment to the voice.

For strung shell money the Cahuilla are known to have used the *Olivella* type of thin, curving disks, but the more massive currency of clam must also have reached them.

### SOCIETY.

The social organization of the Cahuilla has been less broken and altered in the past century than that of the Luiseño, and may therefore afford a truer picture of the society of the latter people than their own present institutions. At the same time the information about the Cahuilla is not wholly clear. As among the Serrano, the moieties stand out definitely, the "clans" are less certain.

The Cahuilla moieties are patrilinear, totemic, and exogamous. They are called *Istam*, after *isil*, the coyote, and *Tuktum*, after the wild cat, *tukut; -am, -um*, is the plural ending. Endogamy occurs now and then, as among the Miwok; it may or may not have been tolerated in native days.

The "clans" are very numerous, small, and associated with localities or named after places. All clan members insist on their direct kinship and descent in the male line from a comparatively recent ancestor. No recorded clan names and village names agree. Two or more clans might inhabit one village. The members of a single clan sometimes live in different villages, and the Cahuilla do not seem to regard this condition as a modern innovation. All this leaves it doubtful whether the clans are bodies of the kind usually implied by this term, or only families of actual blood kindred named after a spot with which they are or once were associated. Their moiety affiliations prove nothing in this matter, since under patrilinear moieties either patrilinear clans or patrilinear families must automatically form part of the moieties.

ACC-HRA002800

Case 5:13-cv-00883-JGB-SP Document 85-21 Filed 10/21/14 Page 95 of 149 Page ID #:4323

The recorded Cahuilla clans are nearly all from the desert division:

### Coyote moiety.

*Sawala-kiktum.* Formerly with the Wild Cat *Nanha-yum* and *Ayelmukut* and Coyote *Ikoni-kiktum* in the village of Ekwawinet at La Mesa, 2 miles south of Coachella. Now at Torros Reservation.

*Ikoni-kiktum.* See last.

*Taukat-im.* Southwest of Coachella.

*Wora'i-kiktum.* At Indio.

*Sewakil.* South of Indio.

*Masuvich-um.* On Martinez Reservation. The name is said to refer to a sandy place.

*Wiit-am,* "grasshoppers." On Martinez Reservation.

*Mumlait-im.* On Martinez Reservation.

*Wansau-wum.* On Martinez Reservation. Named from *wanyish,* stream, because once flooded out.

*Iviat-um.* At Agua Dulce.

*Sasalma-yum.* At Agua Dulce.

*Kaunakal-kiktum.* At Agua Dulce. This group is said once to have lived at a place where *kaunakal* shrubs grew.

*Kauvistamila-kiktum.* At Agua Dulce.

*A'atsat-um,* "good ones." Formerly at Indian Wells.

*Wanisiwau-yam.* At Mecca.

*Tevi-nga-kiktum.* At Alamo.

*Wiyist-am.* At San Ysidro.

*Havinawich-um.* At Palm Springs.

*Amna'avich-um,* "large ones." Northwest of Palm Springs.

*Hunavati-kiktum.* Southeast of Banning. Perhaps Serrano.

### Wild Cat moiety.

*Palkausinakela,* "seepage from a spring." Figtree John, west of Salton Sea.

*Panatka-kiktum.* Now at Thermal; came from west of there.

*Tui-kiktum.* Southeast of Thermal.

*Isil-sivayauvich-um.* South of Coachella.

*Wanki-nga-kiktum.* South of Coachella.

*Nanha-yum, Tel-kiktum,* and *Ayelmukut.* At La Mesa, south of Coachella.

*Panasa-kiktum.* Southeast of Coachella.

*Wansinga-tamyangahuch-um.* Northeast of Coachella.

*Walpunidi-kiktum.* At Alamo.

*Palpunivikt-um.* At Alamo.

*Tamula-kiktum.* Near Alamo.

*Tamolanich-im.* At Agua Dulce.

*Awal-im,* "dogs," a nickname. At Martinez.

*Autaat-em.* West or southwest of Coachella; now at Martinez.

*Waricht-em—warish,* mesquite. At Indian Wells; now at Thermal and Mecca.

*Kauvis-paumiyawich-em,* "living in the rocks at Kauwis," *i. e.* at Palm Springs. Now at Mecca.

*Kauwis-i-kiktum,* "living at Kauwis." Perhaps one group with the last. Now at Palm Springs and Coachella.

*Kilyi-nga-kiktum.* On Mission Creek. Perhaps Serrano.

ACC-HRA002801

*Iswet-um,* "wolves," a nickname; in Spanish, Lobos, used in the form Lugo, as a modern family name. On Cahuilla Reservation. This is the only mountain Cahuilla clan recorded, and is so prominent on its reservation as to give the impression that *Iswetum* may have been a synonym for all the people of the district. The wolf is not an inhabitant of southern California.

*Wakwai-kiktum.* Formerly near Warner's ranch, that is, neighbors of the Cupeño. Now at Wakwi or Maulim on Torros Reservation.

The ending *-kiktum* on many of these names is from the stem *ki,* "live" or "house."

The Cahuilla word for "clan" is *tahelo,* which is probably from the stem *tah, atah,* "person," occurring in several Shoshonean languages of southern California.

The chief, *net,* and his assistant or ceremonial director, *paha,* held office in the clan, it is said.

The totemism of the moieties extends to ritual and myth. Images for the *nukil* or mourning anniversary are made by each moiety for the other. Temayowit and Mukat, the first gods, born in the Milky Way, are thought to have been companions of Coyote and Wild Cat, respectively. The moon is a woman of Coyote moiety, made by Temayowit, the sun a Wild Cat man who went to the sky.

Their possession of names and affiliation with the moieties render it probable that the enumerated groups of the Cahuilla approached the nature of clans. But the relation of the clans to the local or political units, to the moieties, to blood families, and to chieftainship and religious groups is far from clear for any of the southern California Shoshoneans.

### RELIGION.

Considering the importance of the Cahuilla, their strength in survivors, and the interest attaching both on account of their varied environment and their position midway between the Gabrielino and the Mohave ceremonial foci, regrettably little is known of their religion.

Their creation myth seems to have been of Serrano type, but with the deities named as among the Cupeño.

The mourning anniversary was called *Nukil* or *Hemnukuwin.* Images were used.

The same may be said of the adolescence rite, *Aulolil* or *Pemiwoluniwom,* in which the girl was "roasted."

Whether the Chungichnish religion reached the Cahuilla of the pass is not certain. It probably obtained some foothold among those of the mountains. It did not exist in the desert. The Cahuilla there do not know Chungischnish, drink no toloache publicly, make no sand paintings, and hold no eagle ceremony. According to the Mohave, they sing several cycles analogous to their own song series.

ACC-HRA002802

Case 5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 97 of 149   Page ID #:4325

There may be some forced native equating in this statement, but there is probably at least some basis of fact. The desert Cahuilla knew the toloache plant and admit that they drank it, but apparently only as occasional individuals intent on wealth or some other special aspect of fortune. This is very nearly the Mohave attitude toward the drug.[3]

On the whole, therefore, it would seem that the Cahuilla possessed the basic and generalized elements of southern California religion; lacked—at least in their most characteristic habitat—its developed Chungichnish form; and had come instead under a certain degree of Mohave or Colorado River influence. This influence is likely to have been indirect, since there is practically no mention of outright communications between the Cahuilla and the Mohave.

---

[3] L. Hooper, The Cahuilla Indians (see bibliography), gives, among other new data, an account of a Jimson-weed initiation which appears to refer to the Pass division.

ACC-HRA002803



ACC-HRA002804



NATIVE SITES IN PART OF SOUTHERN CALIFORNIA

ACC-HRA002805

# TAB 35

# REPORT

OF THE

# COMMISSIONER OF INDIAN AFFAIRS,

MADE TO THE

## SECRETARY OF THE INTERIOR,

FOR

## THE YEAR 1869.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1870.

ACC-HRA000113

No. 32.

INDIAN AGENCY,
*Tulle River, Cal., September* 9, 1869.

SIR: In conformity with paragraph 3 of circular dated Department of the Interior, Office Indian Affairs, June, 1869, I have the honor to submit a report of the condition of the Indians under my charge since August 7, 1869.

Sanitary condition good. A few cases of fever and ague and intermittent fevers have occurred since taking charge. Generally their health is good. No births or deaths have occurred.

I learn that several tribes, viz: the Kowsis, Yowkies, Wachamnis, Monos, and Tejons are roaming at large through this section of country. As they never have been compelled to live on the reservation, they imagine that they have no right here, and they prefer living away from here, as they obtain work from farmers, stock owners, &c. The Manache Indians, who formerly lived here, have nearly all left and are living somewhere in the vicinity of Owens River. Those had left previous to my taking charge; cause supposed to be, in consequence of the number of deaths among them caused by measles during last year.

The Tule Indians, of whom there are present two hundred and seventeen and absent in the mountains, gathering acorns and hunting, one hundred and twenty, are a very industrious people. The majority of them understand farming, but it is against their will that they do any work on the place, as they consider that government should allow them to cultivate for themselves. They wish to remain here and are very much afraid of being moved away.

I respectfully recommend the purchase of this place and a division made among them of the lands; also the erection of suitable buildings for agent and employés.

Since August 7 have had Indians employed making adobes, of which they have made six thousand five hundred; commenced laying stone foundations for temporary quarters for employés September 1.

Average force of Indians employed per day twenty-five. Under the superintendence of the carpenter and blacksmith (employés) they have worked admirably.

A school-house and teacher are very much needed, and several have asked me for the same. I find that some of them know the alphabet perfectly well.

To place the agent's house in a comfortable and safe condition, and to complete employés' quarters, the sum of three hundred and fifty dollars will be required.

Very respectfully, sir, your obedient servant,
JOHN H. PURCELL,
*First Lieut. United States Army, Indian Agent.*

Hon. E. S. PARKER,
*Commissioner of Indian Affairs.*

------

No. 33.

LOS ANGELES, CAL., *September* 30, 1869.

SIR: I have the honor to submit the following report of the condition of the Indians under my charge:

I have been acting as special agent for the Mission and Coahuila

13 I A

ACC-HRA000114

194    REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS.

Indians five years, and during that time have forwarded to the Commissioner of Indian Affairs at Washington detailed reports of the condition and wants of the Indians of Southern California, showing the number and locality of each tribe, recommending the establishment of a reservation to which the Indians could be taken as they became crowded out of their homes by the white settlers.

I presume that one reason why nothing has been done for these Indians is, they have been peaceable and caused the government no trouble, and consequently have been almost entirely neglected.

I now beg leave to submit the following report of the present condition of the Mission and Coahuila Indians of Southern California:

The Mission Indians are the remnant of those Indians who were christianized by the Catholic priests who founded the missions in California, and by them were brought into a state of semi-civilization. The Indians were the principal workers in erecting those extensive piles of buildings which, though now in ruins, attest the energy and perseverance of the founders.

The Indians were also taught to work and cultivate the soil, and extensive tracts of land were cultivated by the priests with Indian labor, and the proceeds dealt out to them in regular rations. Upon the secularization of the missions by the Mexican (Spanish) government, the Indians connected with them were turned loose to shift for themselves. Many of them, no doubt, returned to their wild state, but a large portion of them established themselves in small villages or "rancherias" in different parts of Los Angeles, San Diego, and San Bernardino Counties, and maintained themselves by cultivating a little corn or wheat where small patches of irrigable land could be found, and by working as servants on the ranches or in the vineyards. Many of the Mission Indians are living on lands belonging to individuals, and have no claim to the ground they occupy should the owners see fit to demand possession. Others are located on public land where they have been all their lives, but the rapid influx of settlers is fast crowding them out, and they will soon be homeless.

The San Diego Mission Indians number from fifteen hundred to two thousand, old and young, and are nearly all within the county of San Diego. The San Louis Mission Indians are nearly all to be found in Los Angeles County, and number about six hundred men, women, and children. Nearly all these Indians could be gradually brought into a reservation, and in a very short time would become self-sustaining.

The Coahuilas speak a different language, and although partially civilized are distinct from the Mission Indians. A few of them are christianized, but the largest portion retain all their old superstition. They have strong faith in their "medicine men" and a great veneration for the raven and coyote.

They inhabit principally a tract of country about eighty miles east from San Bernardino, and known as the Cabeson Valley, and their villages are on or near the road leading to La Paz, on the Colorado River. The name of the head chief is Cabeson, (or big head.) He is an old man, and the interpreter Martin is really the head-man. There are thirteen villages, each having a captain; but I have found that the captains have very little authority. The country they inhabit is nearly all a desert. There are a few springs, near which the Indians cultivate a little corn, wheat, and barley, but the quantity raised is very limited, and the Indians live principally by what they can obtain from those who travel through their country, and upon the wild seeds and roots they are able to collect.

ACC-HRA000115

Another branch of this tribe, numbering about four hundred, occupy a tract of country lying in the mountains, about forty miles southeast from San Bernardino, and known as the Coahuila Valley. Their head chief is Manuel Largo. His principal residence is at Agua Caliente, (warm springs.) He has five villages under his authority. They live principally upon wild seeds, which they gather in the mountains, and a few of them cultivate a little corn and have a few horses and cattle. Many of the young men and women visit the towns and settlements, and obtain employment as house servants, or work on the ranches or in the vineyards.

I am satisfied if they were gathered into a reservation and put under the direction of a competent person, they would soon become self-sustaining.

I had the honor of accompanying the present superintendent of Indian affairs, General J. B. McIntosh, on his late tour of inspection of the condition of the Mission Indians of Southern California, and I hope, through his representations, to see a reservation established for the Mission and Coahuila Indians at a very early day.

I have the honor to be, very respectfully, your obedient servant,
. J. Q. A. STANLEY,
*Special Agent for Mission Indians.*

Hon. E. S. PARKER,
*Commissioner of Indian Affairs.*

---

No. 34.

OFFICE OF INDIAN AFFAIRS,
*San Francisco, Cal., August* 1, 1869.

SIR : I have the honor to report to the department that in pursuance of an act of Congress passed July 27, 1868, authorizing the abandonment of the Smith River Indian farm, in Del Norte County, and the removal of the Indians and government property to Hoopa Valley Indian reservation in Klamath County, (or to Round Valley, as might be deemed most advisable,) I proceeded to Smith River last November, for the purpose of taking some preliminary steps toward the accomplishment of that object.

In undertaking a task so important in its results and so expensive in its execution, I labored under many embarrassments, and felt that the exigencies of the service required that I should take some responsibilities without waiting for more specific instructions or further legislation. I had asked for an appropriation of five thousand dollars to defray the ordinary expenses of removal, without being able at that time to anticipate any extra expense for the capture of runaway Indians.

Congress had appropriated three thousand five hundred dollars only.

On my arrival at Smith River I learned from the agent, Henry Orman, jr., that about one hundred and fifty of the Indians at that place had become alarmed at the prospect of removal, and had escaped into Humboldt County. Others had attempted to leave the agency, and had been captured and brought back—forty at one time, and several smaller bands at other times.

Winter was approaching, and the time for plowing and seeding at Hoopa reservation close at hand.

We needed at that place all the Smith River teams and the best

ACC-HRA000116

# TAB 36



The Federal Indian Policy in California, 1846–1860
Author(s): William H. Ellison
Source: *The Mississippi Valley Historical Review*, Vol. 9, No. 1 (Jun., 1922), pp. 37–67
Published by: Organization of American Historians
Stable URL: http://www.jstor.org/stable/1886099
Accessed: 10-08-2014 22:02 UTC

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content
in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship.
For more information about JSTOR, please contact support@jstor.org.

*Organization of American Historians* is collaborating with JSTOR to digitize, preserve and extend access to *The Mississippi
Valley Historical Review.*

http://www.jstor.org

ACC-HRA002148

## THE FEDERAL INDIAN POLICY IN CALIFORNIA,
### 1846-1860

Indian affairs have had a large place in the history of the United States. From the organization of our government almost to the present time the Indian question has involved us in grave political, economic, and moral issues, has necessitated the expenditure of vast sums of money, and has exercised a far-reaching influence upon the character and development of American civilization.

From the first the United States was forced to deal with the Indian question because of the hostility of the Indians and the irresistible pressure against the Indian frontier by whites in search of free land or wealth. The making of treaties with the Indians, by which they were granted the right to occupy certain regions and white persons were prohibited from entrance into these areas, the establishment of trading houses among the tribes, and the introduction among them of ''the implements and the practice of husbandry, and the household arts'' were some of the methods by which the government tried to make adjustment between the Indians and whites. The United States must be credited with a degree of sincerity in its efforts to deal with the Indian problem in the early years of our history. Some persons even believed, as did Jefferson for a time, that the efforts put forth by the government would tend to civilize the Indians and prepare them to share in the benefits and duties of civil government.

Because of the friction resulting from the eagerness of individuals and states to secure the lands occupied by Indians many persons came to feel, soon after 1800, that the only way to deal with the situation was to separate the Indians and the whites by persuading the Indians to exchange the lands occupied by them for lands somewhere in the west. This plan was first officially suggested by Jefferson, was later stated with more definiteness by Monroe, and was carried out under Jackson and

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002149

his successor. This "removal policy" had by 1840 resulted in the erection of an Indian frontier extending from the Red river and Texas to the Great lakes. Many believed that beyond this frontier the United States would not expand.[1]

The new Indian policy had just been put into effect, with the completion of the Indian frontier, when the line of division was broken as a result of the annexation of Texas, the settlement of the Oregon question, the westward migration of the Mormons and the addition of an immense area to the United States by the treaty of Guadalupe Hidalgo. Through these events the United States became responsible for a large additional Indian population, and Indian treaties were broken by large numbers of people crossing the Indian country on their way to the new lands.

The acquisition of what is now California and subsequent events in the new region, especially the discovery of gold in 1848, added greatly to the burdens and the confusion of federal Indian administration. Changes in the general Indian policy also resulted. The large number of Indians in California, their low stage of development, and their history under Spain and Mexico had much to do with the character of the problems to be faced and the policy to be followed. A brief sketch of the Indian policy of Spain and Mexico in California is therefore in order.

The natives of California when found by Europeans were among the least developed of the Indians in America. There was no agriculture in all their territory. Some hunting and considerable fishing were carried on, but the food of the natives for the most part consisted of acorns, seeds, grasses, roots, and berries. The natives of the northwestern part of the region and those along the Santa Barbara channel were slightly more advanced than those in other parts of the territory, but everywhere there was an almost total lack of anything savoring of culture.

[1] In making this adjustment with the Indians the United States was guided by the principles upon which civilized nations had for a long time based their treatment of uncivilized peoples. These principles were restated and reënforced by decisions of the supreme court, which, while recognizing the Indian tribes as in a sense states with which formal treaties were to be made, regarded the governments of civilized states as having sovereignty over lands and peoples within their jurisdiction. For a full discussion of this subject see Worcester *v.* Georgia, 7 *Peters,* 517-518; Johnson and Graham's lessee *v.* McIntosh, 8 *Wheaton,* 572-583; Cherokee nation *v.* State of Georgia, 5 *Peters,* 1-2; United States *v.* Rogers, 4 *Howard,* 570-572.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002150

There was also no tribal organization as it existed in other parts of the continent.   The native groups, of which there were many, were defined and held together by language and by the topography of the country more than by any political or social bonds.[2]

The Spaniards began in 1769 the task of civilizing these unpromising natives of California, numbering, it is variously estimated, from 150,000 to 260,000 before the arrival of the whites.[3] In this year the mission of San Diego, the first white settlement within the present limits of California, was founded.   This was followed by twenty other Franciscan missions founded between San Diego and the northern shore of San Francisco by 1823.

For a period of fifty years the missions were from certain standpoints a great success.   There were times when they had in their care as many as 21,000 natives, who were taught the rudiments of Christianity, and some of the arts of industry and agriculture.   Large numbers of horses, cattle, and sheep were raised at the missions.   The yield of grain was said to have reached a total of 180,000 bushels in 1821.   Many buildings were constructed by the labor of the Indians.   The natives, though unacquainted with the arts and unaccustomed to labor before the missionaries came, did practically all of the manufacturing, weaving, tanning, leather work, milling, soap-making, building, and other work of the industries.

The secularization of the missions, provided for under a *reglamento provisional* passed on August 2, 1834, and practically carried into effect by 1839, undid the work of the faithful missionaries and scattered their protégés.   Many of the Indians, unable to readjust themselves to their old way of living, died as a result. Others went into the natives' haunts, whence, joining with the wild Indians, they would come back, frequently with great success, to raid and to steal.   Since they were acquainted with the

[2] Much information on the Indians of California is contained in the *Handbook of American Indians, north of Mexico* (Bureau of American ethnology, *Bulletin* no. 30, edited by Frederick M. Hodge — Washington, 1907-1910), Hubert H. Bancroft, *Native races* (San Francisco, 1883), vols. 1, 3, 4, Stephen Powers, *Tribes of California* (Washington, 1877), and *University of California publications in American archæology and ethnology* (Berkeley, 1903-1917).

[3] See A. L. Kroeber, "California, Indians of," in *Handbook of American Indians*, part 1, p. 190; C. Hart Merriam, "The Indian population of California," in *American anthropologist* (new series), 7: 594-606.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002151

country, the missions, and the ranches, they found it easy to drive off horses and cattle into the mountains. These raids, which resulted in much conflict between the Indians and the whites, continued up to and beyond the date of the American occupation.

The occupation of California by the United States on July 7, 1846, had important consequences for the history of Indian affairs in the United States. Indirectly, as has already been noted, it had much to do with breaking the established Indian frontier; and directly, it added to the burdens of Indian administration another Indian problem. This problem was one of rather large proportions and of some difficulty, for, in addition to the complications resulting from the character and previous history of the Indians in California, their number was still large at the beginning of American occupation, in spite of their great losses through pestilence and recent contact with the whites.[4]

There is no way to find out the exact number of Indians in California when the Americans took possession, but the best authorities now agree that it was large. When all available facts are considered it seems safe to say that in 1846 at least 100,000 or perhaps 125,000 Indians inhabited what is now California.[5]

The adjustment between this large body of Indians and the whites, whose numbers were to increase with great rapidity, was

[4] There were serious pestilences of smallpox in 1833, 1837, 1838, and 1844.

[5] Thomas B. King, in his *Report on California* (Washington, 1850), and Henry R. Schoolcraft, in *Information respecting the history, condition, and prospects of the Indian tribes of the United States* (Philadelphia, 1851-1857 — reprinted as *Archives of aboriginal knowledge*, Philadelphia, 1860-1868), have done much to perpetuate too low an estimate of the Indian population of the region by making use of figures given by writers who knew practically nothing about the matter. Statements of value in forming an estimate of the population are found in the following: *Handbook of American Indians* (Hodge ed.), part 1, p. 190; Merriam, "Indian population of California," in *American athropologist* (new series), 7:594-606; Hubert H. Bancroft, *History of California* (*History of the Pacific states of North America*, vols. 13-18 — San Francisco, 1884-1888), 3: 357-358, 4: 73, 648; Governor McDougall to President Fillmore, March 1, 1851, in *Senate executive documents*, 32 congress, 1 session, no. 1, part 1, p. 138; L. Lea from George W. Barbour, O. M. Wozencraft, and Redick McKee, March 5, 1851, from R. McKee, March 24, 1851, from Adam Johnston, January 30, 1852, from E. F. Beale, November 22, 1852, *ibid.*, 33 congress, special session, no. 4, pp. 62-63, 67-69, 242, 379; Beale to G. W. Manypenny, August 22, September 30, 1853, *ibid.*, 33 congress, 1 session, no. 1, part 1, pp. 467, 472; *Report of the commissioner of Indian affairs*, 1856, p. 246.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002152

not made without difficulty.   Here, as in practically every other
part of the United States where the whites took possession of
lands occupied by, or in proximity to, the Indians, the govern-
ment had a dual task.   On one hand, it had to guard the whites
who pressed in upon the territory against outrages by the In-
dians; on the other, it had to protect the Indians against the
rapacity and cruelty of the whites.

The intention to fulfill this task was evidenced in two proc-
lamations issued by the military authorities in California im-
mediately after the Americans took possession.   One of these
documents proclaimed that ''The California Battalion of Mount-
ed Riflemen will be kept in the service of the Territory, and
constantly on duty to prevent and punish the aggressions by the
Indians or any other persons upon the property of individuals
or the peace of the Territory.''   The other was a proclamation
in the district of San Francisco ordering the release of all In-
dians held to service against their wills, but providing that those
having chosen their own employers were to abide by their con-
tracts unless they should be given permission in writing to leave
or unless the magistrate should annul the contract.   By this
order also the Indians were prohibited from wandering about the
country in an idle and dissolute manner, and if so found they
were liable to arrest and punishment by labor on the public
works at the discretion of the magistrate.[6]   The proclamations
were an assertion of sovereignty by the United States over the
Indians and the territory occupied by them, and might be criti-
cized on purely sentimental grounds; but the policy indicated
was to prove a godsend to the whites and some protection to the
Indians themselves.

The Indians were a source of great annoyance to the early
white settlers in California because of their continued depreda-
tions, in which they drove off large numbers of horses and con-
stantly endangered the safety of persons in the settlements.
These marauding expeditions, which were the scourge of the

[6] The first of these documents was issued on August 7, 1846, by R. F. Stockton,
commander-in-chief of the military forces and governor of California.   See the
*California Star,* January 9, 16, 23, 1846.   The second was a public order of John
B. Montgomery, in military command of the district of San Francisco.   See *ibid.,*
February 20, March 6, 1847.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002153

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 112 of 149   P #:4340

whole country from Sonoma to San Diego, called the military forces into frequent service.[7]

In spite of these difficulties, General Kearny, who became governor of California on March 1, 1847, believed that conciliatory methods could be used effectively in dealing with the natives. Accordingly, he recommended that presents should be given the Indians as a means of maintaining peace.   In addition to adopting this measure, on April 7, 1847, by virtue of authority vested in him as military governor of the territory, he appointed John A. Sutter subagent for the Indians on and near the Sacramento and San Joaquin rivers; and on April 14 he appointed Mariano G. Vallejo to the same office for the Indians on the north side of the bay of San Francisco.   These agents were instructed to secure information concerning the Indians in their districts, to establish local regulations with the approval of the governor, and to regard themselves as protectors of the Indians.   Evidence is abundant that these agents and the military governor did much to see that justice was done the Indians and that peace was maintained.[8]

The efforts of the federal authorities to maintain peaceful relations in the country resulted in only partial success.   Depredations by the Indians continued, and the military force was

[7] Walter Colton, *Three years in California* (New York, 1854), 25, 29-31; *California Star*, March 13, 20, April 10, 17, 1847; unbound documents, manuscript archives of California, 1846-1850, in the Bancroft library, Berkeley, California, pp. 146-147, 168-169; the *Californian*, August 15, 1846, p. 4, August 22, 1846, p. 11, September 26, 1846, p. 37, December 26, 1846, p. 96.   The *Californian*, a weekly, was the first newspaper published at Monterey.   It continued publication from August 15, 1846, to May 6, 1847.   An abstract of the paper, which makes a large volume of manuscript, is in the Bancroft library, where it is listed as *Cal. MSS.* no. 72.

[8] Mariano G. Vallejo, Documentos para la historia de California, tomo 1, p. 23, tomo 12, p. 281, in the Bancroft library; Major Hardie to Vallejo, July 26, 1847, *ibid.*, tomo 12, p. 308; General Kearny to W. T. Marcy, April 28, 1847, in *Senate executive documents*, 31 congress, 1 session, no. 18, p. 275; *ibid.*, 175; Kearny to Vallejo, W. T. Sherman to J. D. Hunter, August 1, 1847, Governor Mason to Lieutenant Anderson, to John A. Sutter, August 16, 1847, to Vallejo and Sutter, August 19, 1847, to L. W. Boggs and Vallejo, November 11, 1847, H. W. Halleck to Vallejo, September 15, 1847, circular letter of Halleck, August 16, 1847, *ibid.*, 285, 332, 334-335, 356-359, 360-361, 370-371, 396; Sutter to Kearny, March 18, May 27, 1847, Mason from Captain Folsom, August 15, 1847, from Boggs and Vallejo, October 30, 1847, in unbound documents, manuscript archives of California, 1846-1850, pp. 86-87, 90, 124-126, 175; John A. Sutter, Personal reminiscences, 42, in the Bancroft library; Sutter to Mason, July 12, 1847, in *California Star*, July 24, 1847.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002154

inadequate for the situation.  The result was that Lieutenant
Sherman, through Alcalde Burton of San José, authorized
persons to shoot Indians caught stealing horses.  Likewise, a
general order went into effect on November 1, 1847, directing all
persons having Indians in their service to give every Indian
employed or hired a certificate to that effect.  Indians found
wandering about without such certificates were to be arrested
and punished as horse-thieves.  Wild Indians and Indians not
employed who wished to visit settlements for the purposes of
trade were required to secure passes from the Indian subagent
of the district.[9]  These measures, it will be seen, bear close
resemblance to the black codes of the south.  If they would seem
to make atrocities against the Indians possible and to be harsh
and discriminatory, it must be remembered that the character
and the conduct of the Indians gave some justification for the
methods used in dealing with them.

While the Indians brought much trouble upon themselves, the
evil of drunkenness among them was wholly the fault of the
whites.  An honest effort, which met with only partial success,
was made to remedy this evil.  A proclamation was issued on
November 29, 1847, making anyone who in any manner disposed
of liquor to Indians liable to severe punishment, and providing
that in cases of prosecution Indians were to be held competent
witnesses.  Alcaldes and Indian subagents were directed to
carry the provisions of the proclamation into effect.  Vigorous
action was demanded against all violators of the law and num-
bers of persons were prosecuted with rigor.[10]

Questions of property ownership involving the rights of In-
dians and others to lands were called to the attention of the
military authorities on various occasions during the years 1847
and 1848.  General Kearny and his successor, Governor Mason,
desired to maintain the *status quo* of the missions and the mis-
sion lands until proper legal tribunals should determine their

[9] Halleck to Vallejo, August 16, 1847, Lieutenant Sherman to John Burton,
September 6, 1847, in *Senate executive documents*, 31 congress, 1 session, no. 18, p.
358; *California Star*, September 18, 1847.

[10] Vallejo, Documentos para la historia de California, tomo 12, pp. 319, 324;
*Senate executive documents*, 31 congress, 1 session, no. 18, p. 413; Mason to Colonel
Stevenson, to I. Callaghan, June 11, 1848, to W. R. Longley, June 16, 17, 1848,
Halleck to P. C. Carrillo, July 20, 1848, *ibid.*, 539-542, 547-548.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002155

5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 114 of 149   P
#:4342

ownership and the rights of Indians in relation to them.   It was
held by the authorities that the law of secularization gave the
Indians lands for their own use, but that they could not in any
way dispose of the lands and that all sales of mission property
made by them were void.   The question of the right of Indians
to own and to sell or lease lands outside the missions was dis-
posed of by Mason with a statement to Sutter and Marshall,
who sought a sanction for the lease of lands from Indians on the
American fork of the Sacramento river, that the United States
did not recognize the right of Indians to sell or lease the lands on
which they resided.[11]

With peace secured between Mexico and the United States,
steps were taken toward some permanent and general policy for
the administration of Indian affairs in the new territory.   On
July 17, 1848, congress asked for a report as to the number of
Indians in Oregon, California, and New Mexico.   On November
30 the commissioner of Indian affairs reported that the acquisi-
tion of California and New Mexico had increased the number of
Indians in the United States and that this would require the
appointment of additional agents for the proper management of
affairs of the department; and on December 5 the president in
his message to congress recommended the appointment of a suit-
able number of Indian agents for the territory.[12]

On April 3, 1849, George W. Crawford, secretary of war, noti-
fied General Persifer F. Smith, commanding the Pacific division
of the army, that the proper officers for the management of In-
dian affairs in California had been appointed and would repair
with convenient dispatch to the scene of their labors.   On the
same day the secretary of state gave instructions to Thomas
Butler King, who had been appointed by the president to study
conditions in California and to secure information concerning

[11] *Californian*, March 27, 1847, p. 169; *Senate executive documents*, 31 congress,
1 session, no. 18, p. 430; Mason to J. M. Bonilla, November 30, 1847, to the command-
ing officer at San Francisco, February 5, 1848, Halleck to Colonel Stevenson, July
25, 1848, *ibid.*, 413-414, 448, 552-555.   In this letter Halleck gives a summary of all
the decrees in his possession relating to the missions of California since their
secularization.   For Governor Mason's letter to J. A. Sutter on the right of Indians
to own or to lease land see *ibid.*, 466.

[12] *House executive documents*, 30 congress, 2 session, no. 76, pp. 1-5, 11-12; *ibid.*,
no. 1, pp. 407-408.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002156

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 115 of 149   P
#:4343

the natives there.   The commissioner of Indian affairs gave a
commission on April 7 to John S. Wilson as Indian agent at
"Salt Lake, California," and on April 14 to Adam Johnston as
Indian subagent on the Sacramento and San Joaquin rivers.  On
July 15 William Carey Jones was sent to California under in-
structions from the secretary of state and the secretary of the
interior.   He was directed specifically to study land titles, but
as part of his duties he was to make inquiry into the nature of
Indian rights as existing under the Spanish and Mexican gov-
ernments, to indicate from authoritative data the difference
between the privileges enjoyed by the wandering tribes and
those enjoyed by the tribes who had made actual settlements,
and to report their general form, extent, and locality, together
with the manner in which such rights had been recognized.[13]

   While these officials were preparing to take up their respective
duties in California, changes which had an important bearing on
the Indian question were taking place in that region with great
rapidity.   Gold had been discovered in the previous year, and
in 1849 tens of thousands of people poured into the country.
Indians were crowded from their accustomed haunts, hostilities
were frequent, and the military problem became a serious one
because soldiers deserted to go to the mines.   Governor Riley
made the best distribution of troops that seemed possible, but
he was not able to prevent injustice to the Indians, retaliation on
their part, and consequent bitter feelings.[14]

   [13] *Senate executive documents*, 31 congress, 1 session, no. 1, part 1, p. 157;
William C. Jones, *Report on the subject of land titles in California* (Washington,
1850), 3; John M. Clayton to T. B. King, April 3, 1849, W. Medill to John Wilson,
April 7, 1849, to Adam Johnston, April 14, 1849, in *Senate executive documents*, 31
congress, 1 session, no. 18, pp. 9-11, 97-98, 409-410.  On November 17, John A. Sutter
was notified of his appointment as Indian subagent on the Sacramento river.  Adam
Johnston was directed to give his services to the valley of the San Joaquin.  See
*Senate executive documents*, 33 congress, special session, no. 4, p. 4.  Sutter appears
to have been receptive at first, but he evidently changed his mind, for on May 23,
1850, he declined the appointment and Johnston took over the duties of his district.
*Ibid.*, 115.

   [14] The correspondence concerning these occurrences and developments is so volumi-
nous that it is impracticable to give the references here.

   The attitude of the people of California toward the Indians, which grew in part
out of the hostilities between natives and immigrants as the immigrants crowded
the Indians from their sources of food supply, should be noted in this place.
The convention which drew up the constitution for California after a long debate

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002157

46                    *William H. Ellison*                    M. V. H. R.

The men who were appointed to various offices in California
reached the field and took up their work in the summer and fall
of 1849.[15]   William Carey Jones examined the question of land
titles and made his report under date of April 10, 1850.   The
only part of his report having direct bearing on this study is the
section dealing with the nature of Indian rights to the soil under
the Spanish and Mexican governments.   He found that "In the
wild or wandering tribes, the Spanish law does not recognize
any title whatever to the soil."   But with respect to other In-
dians he learned that it was a principle laid down in the Spanish
colonial laws that the Indians should have a right to as much
land as they needed for their habitations, for tillage, and for the
pasturage of their flocks.[16]

The report of Thomas Butler King, dated March 22, 1850, was
communicated to congress by the president on March 26.   While
King devoted a portion of his space to Indian affairs, the report
had no great importance for Indian administration.   Little that
he said regarding Indians was based on first-hand information,
and the figures given have no reliability whatever.   King did
observe correctly that the number of Indians had greatly de-
clined since earlier days.   Remains in all the valleys of the
Sierra Nevada and along the foothills of that range gave indica-
tions that at no remote period there must have been a numerous
population where none existed at the time of his investigation.

and much shifting of position by various delegates denied to Indians the right to
vote, but a proviso was added to the effect that nothing in the law should be con-
strued to prevent the legislature by a two-thirds vote from admitting Indians or
their descendants to the right of suffrage. *Report of the debates in the convention
of California on the formation of the state constitution in September and October,
1849* (edited by J. Ross Browne—Washington, 1850), 7, 61-74, 305-308, 458, appendix,
iv.   The first legislature of the state passed an act for the government and protection
of the Indians which provided that "in no case shall a white man be convicted of any
offense upon the testimony of an Indian, or Indians," which made the Indians
subject to many forms of punishment for petty offenses, which recognized their
possessory rights to lands but provided for their dispossession by an easy process,
and which created for certain Indians under age a wardship that made possible
something akin to slavery. *Statutes of California*, first session, pp. 408-410.   See
also *Journals of the California legislature*, first session, pp. 3, 224, 257, 333-334, 337,
366-367, 369, 384, 575, 1284.

   [15] Nothing further need be said concerning John Wilson, for by the settlement
of the eastern boundary of California along the ridge of the Sierra Nevada his
agency was excluded from California.

   [16] Jones, *Report on land titles in California*, 32-34.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002158

Many of the Indians seen by him were of the lowest grade of
human beings, with little inclination to work or to improve their
condition.   They had never pretended to hold any interest in the
soil, nor had they been regarded by the Spaniards or by the
American immigrants as possessing any.   It was King's opin-
ion, and this may have influenced to some extent the policy of
the administration, that it might be possible to collect the
Indians together and to teach them in some degree the arts of
civilization.[17]

Adam Johnston, whose services in the Indian affairs of Cali-
fornia were of more importance than those of any other person
of the period, began his active work in the spring of 1850.   The
results of his observations were set forth in several reports
made to the Indian department.   By September 16 he had visit-
ed many tribes of Indians and had noted their low stage of de-
velopment.   That they were declining in numbers seemed to
him apparent on every hand.   The fact that they were being
crowded out of their old homes by the rapid incoming of the im-
migrants, and thus were being deprived of their accustomed
food supply, led him to recommend that at various points depots
should be established for the distribution of supplies.[18]

The suggestion of King, referred to above, that the arts of
civilization might be taught to the Indians if they were collected
together, seems to have been the first official suggestion for the
concentration of the California Indians.   Adam Johnston be-
lieved that supplies ought to be systematically distributed to the
Indians to compensate them for their losses.   The military offi-
cials evidently had similar ideas, for, in a report to the war
department, General Riley recommended that as far as practica-
ble the Indians of California should be concentrated in districts
over which the United States should have exclusive jurisdic-
tion.[19]

Partly as a result of definite suggestions from the civil and
military officials in California and partly because of a desire to
act for the best interests of both Indians and whites, but with
little understanding of the situation in that remote region, con-

[17] *House executive documents*, 31 congress, 1 session, no. 59, pp. 1, 2, 6-8.

[18] Johnston to O. Brown, March 1, July 6, September 6, 1850, in *Senate executive
documents*, 33 congress, special session, no. 4, pp. 37, 41-43, 45.

[19] *Senate executive documents*, 31 congress, 1 session, no. 52, pp. 56-57.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002159

gress passed, and the president approved on September 28, 1850,
"An act to authorize the appointment of Indian agents in Cali-
fornia." On September 30 a measure became law appropriat-
ing $25,000 to enable the president to make treaties with the
various Indian tribes in California.[20]

Redick McKee of Virginia, George W. Barbour of Kentucky,
and O. M. Wozencraft of Louisiana were appointed as Indian
agents, or commissioners, under the laws passed by congress;
and as early as possible they set out for the field of their labors.
Dr. Wozencraft reached San Francisco on December 27, Colonel
McKee on December 29, and Colonel Barbour on January 8.
The commissioners decided to act collectively for a time, thougn
their instructions permitted them to work separately, and John
McKee, son of Redick McKee, was chosen secretary of their
body.

On January 14 the agents went to the capital at San Jose to
consult with the governor and to secure information from the
members of the legislature about Indian troubles in their re-
spective districts. They found the governor and the legislature
much concerned by reports of Indian depredations in various
parts of the state. As a result of the excitement a bill was
passed by the legislature authorizing a loan not to exceed five
hundred thousand dollars to be used in case of war to repel
invasions or to suppress insurrections. Another act provided
for the payment of liberal salaries to officers and soldiers who
had previously aided in putting down uprisings. Still another
authorized the governor to call out troops to defend the frontier
and provided liberally for their compensation. It was expected
that the state would be reimbursed by the federal government
for all expenditures called for under these acts.[21] These mili-

[20] *Statutes at large and treaties of the United States of America, from December
1, 1845, to March 3, 1851* (Boston, 1851), 519, 544-559.

[21] *Senate executive documents*, 31 congress, 2 session, no. 1, part 1, pp. 28-29,
41-42; *ibid.*, 33 congress, special session, no. 4, pp. 46-48. When the agents were
about ready to set out for California it was discovered that by some oversight no
appropriation had been made to pay their salaries. But provision had been made
for paying three commissioners for services in behalf of the Indians of California.
To avoid delay it was decided to appoint the same persons commissioners who had
been nominated and confirmed as agents. These commissioners made report immedi-
ately on their arrival in California. See *ibid.*, 53-54. The attention of the depart-

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002160

tary provisions would have been none too great if the governor's statement that there were one hundred thousand warriors in the state had been true.

Early in February the commissioners set out for the Indian country in the San Joaquin valley. They were accompanied by a military escort of the United States army under the command of Captain E. D. Keyes. The company went to Stockton, then up the San Joaquin valley to the Mariposa river. After much effort, six tribes of Indians were assembled at the commissioners' camp, where on March 19 the first treaty was arranged for the United States with the Indian tribes.

By the treaty the jurisdiction of the United States over the Indians and over lands occupied by them was jointly recognized, provisions and beef cattle were promised in abundance to the Indians, and it was agreed that all cases of dispute between Indians and white men were to be adjudicated by the civil authorities. The Indians in agreeing to the treaty provisions relinquished all title to lands claimed by them. In return for such relinquishment a large tract of land between the Merced and Tuolumne rivers was set apart for their exclusive occupancy. As soon as the treaty had been concluded the Indians left for the reservation under the charge of Redick McKee and Adam Johnston.[22]

The commissioners now proceeded south. By April 14 they had established themselves at Camp Barbour on the upper San Joaquin river and were successfully persuading many Indians

ment was called to the high cost of living in California with the hope that congress might be induced to raise the commissioners' salaries.

Some reports of Indian troubles were well authenticated. See *Message of the governor*, January 7, 1851, in *Journals of the California legislature*, second session, 793-796; also see *ibid.*, 40, 51, 59-60, 68, 72, 563-565, 878-879, 941-944, 946, 1368. The various acts passed are in *Statutes of California*, 1851, pp. 402-403, 489-491, 520-521.

[22] Lea from R. McKee, February 11, 1851, from Barbour, McKee, and Wozencraft, February 17, March 25, 1851, in *Senate executive documents*, 33 congress, special session, no. 4, pp. 54-58, 69-71; *Message of the president of the United States communicating eighteen treaties made with Indians in California, 32 congress, 1 session* (Washington, 1905), 44-47. This document was published under order of the senate in executive session, January 19, 1905. The injunction of secrecy was not removed from these treaties and other documents belonging with them until the day before, January 18. This document will be referred to in what follows as *California treaties*, 1851-1852.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002161

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 120 of 149   P
#:4348

to meet with them there.  On April 29 a formal treaty was made
with sixteen tribes, or bands.  Promises were given in the treaty
to supply the Indians with food and equipment, and a large
tract of land was set apart as another reservation.

The agents evidently relied much on a full stomach as a guar-
antee of peace, for they stated that experience had taught that
the best way to keep the Indians in California quiet was to give
them plenty of food.  In order to supply this necessity, the
commissioners considered themselves under compulsion to make
liberal promises under the head of ''subsistence.''  The depart-
ment was advised that this course must be pursued throughout
the state for, according to the commissioners' view, ''it is
*cheaper* to feed the whole flock for a *year* than to *fight* them for
a week.'' [23]

Adam Johnston did not entertain the same feelings of op-
timism concerning the effects of treaty-making as did the other
officials; he believed that Indian depredations would continue
in spite of the treaties.  He knew of many whites, too, who,
having lost property or friends at the hands of the natives,
had declared their intention of shooting them on sight, whether
treaties were made or not, and he thought the establishment
of a line of military posts along the valley of the San Joaquin,
with an Indian agent at each one, would be the most effective
means of meeting the problem. [24]

The original instructions of the commissioners permitted
each to adopt a separate course of action.  On their arrival in

[23] *Journal of the United States Indian commissioners for California,* April 12, 15,
19, 23, 25, 26, 28, 29, in *Senate executive documents,* 33 congress, special session,
no. 4, pp. 90-97.  For a period the commissioners kept a chronological record of their
activities.  This will be referred to as *Journal of the commissioners.*  For the treaties
see *California treaties,* 1851-1852, pp. 47-49.  On May 1 the commissioners reported
their movements and acts to the Indian department.  It was stated that 600 or 700
Indians were residing in the reserve between the Tuolumne and the Merced rivers.
It was expected that this number would be increased to 1000 or 1200 when the
*monas* or wild Indians should come in.  At the second reservation 711 Indians were
counted.  It was reported that these would probably increase to 2000 or more.  The
commissioners optimistically asserted that the two treaties had broken the confidence
of the hostile tribes in their ability to contend with the whites.  McKee, Barbour,
and Wozencraft to Lea, May 1, 1851, in *Senate executive documents,* 31 congress,
1 session, no. 1, p. 486.

[24] Johnston to Lea, March 3, April 11, June 24, 1851, *ibid.,* 33 congress, special
session, no. 4, pp. 63-67, 72-74, 105.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002162

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 121 of 149   P #:4349

California, because of their slight knowledge of the country and of their problem, they had deemed it wise to act as a joint board for a time. It was later decided, however, to divide the country among them, and on May 1 the division was made. In the drawing of lots for districts "the northern district, or that portion of the State north of 40° or 41° of latitude, until it reaches the headwaters of the Sacramento, fell to McKee. The middle district, extending from San Joaquin on the south to the head-waters of the Sacramento, and east of the coast range to the eastern boundary of the State, fell to O. M. Wozencraft. The southern district, extending from the San Joaquin south and west, and east to the state boundary, fell to G. W. Barbour."

With the division arranged, on May 3 Wozencraft, McKee, and John McKee left Camp Barbour for San Francisco. On their arrival in that city they were disappointed at finding no remittance of funds as expected. Their disappointment was increased when they read in a paper that Lea's estimate of money needed for their purposes had been cut from $75,000 to $25,000 by congress, a procedure which McKee characterized as an egregious blunder, the result of which would be to handicap him and his colleagues greatly in their undertaking.[25]

Barbour entered upon the duties of his district in the south as soon as the division of territory was made. As rapidly as possible he brought Indian tribes together and made treaties with them similar to the two already made. In each case a large tract or tracts of land were set apart as Indian reservations. On May 13 a treaty was made on King's river with twelve tribes or bands of Indians; on May 30 one was arranged with seven tribes on the Kaweah river; on June 3 another was made with four tribes on Paint creek; and on June 10 another was concluded with eleven bands at Tejon Pass.[26]

From Tejon Pass Barbour went on to Los Angeles, but he was disappointed to find on his arrival that no money was contained in the letter which awaited him from McKee. Because of his

[25] *Journal of the commissioners,* April 19, 30, and May 1, 1851, in *Senate executive documents,* 33 congress, special session, no. 4, pp. 91-92, 97-98; R. McKee to Barbour, May 13, 1851, *ibid.,* 81.

[26] Barbour to Lea, May 14, July 28, 1851, *ibid.,* 81, 122-123; *California treaties,* 1851-1852, pp. 10-16, 19-21.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002163

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 122 of 149   P #:4350

lack of funds and of the great difficulty of crossing the desert, he gave up his plan to go to the Colorado river, and dispensed with practically all of his military escort. He then made arrangements to visit and treat with some tribes below Los Angeles, but before he started south news reached him of a threatened outbreak of Indians in the Tulare valley and thither he went instead in the last part of June. By inducing the trespassing miners to leave the reservations, by holding friendly talks with the Indians, and by making assurances to them that the beef promised would soon be supplied, he secured a fair degree of satisfaction among the natives.[27]

From the Tulare valley Barbour went on to San Francisco. On his arrival there on July 28 he found a letter from the department advising him that only $25,000 had been appropriated for the Indian work in California and that as soon as this sum was expended the commissioners were to confine themselves solely to their duties as agents. Since he had been unable to make his intended trip to the Indians below Los Angeles because no funds were available for it, and since things were moving along harmoniously in the valley under Johnston, Barbour decided to go to Washington and to visit his family in Tennessee. Accordingly on October 4 he left San Francisco for the trip east.[28]

[27] Barbour to E. D. Keyes, June 17, 1851, to Lea, July 28, 1851, in *Senate executive documents*, 33 congress, special session, no. 4, pp. 125-126, 128.

Great supplies of beef were promised to the Indians in connection with every treaty made. On May 28 when the treaty was being arranged at Camp Keyes, Barbour completed a contract with John C. Frémont to supply the beef promised to the Indians in the southern part of the state. This contract was without authorization from Washington, and Frémont understood that it was subject to the approval or rejection of the authorities there. Frémont proceeded to supply the beef cattle according to the contract. By Barbour's instruction some of the cattle were delivered to the different Indian tribes and some 1900 to Barbour on the San Joaquin river. Barbour turned these over to Adam Johnston. At the request of Frémont, Barbour drew drafts on the secretary of the interior for $183,825 when he received the cattle. See Barbour's report to Lea (not dated), received at the Indian office February 2, 1852, in *Senate executive documents*, 33 congress, special session, no. 4, pp. 258-259; Frémont to Barbour, May 19, 1851, Barbour to Frémont, May 28, 1851, Johnston's receipt for cattle, August 28, 1851, *ibid.*, 267-268; Hayes collection, Indians, vol. 2, no. 4, in the Bancroft library. This last is a collection of scrapbooks containing both printed and manuscript materials, but made up chiefly of newspaper clippings.

[28] Report of Barbour to Lea, February 2, 1852, in *Senate executive documents*, 33 congress, special session, no. 4, p. 260.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002164

5:13-cv-00883-JGB-SP  Document 85-21  Filed 10/21/14  Page 123 of 149  P #:4351

It has already been stated that Johnston did not consider the making of treaties an effective method of dealing with the California Indians. Nevertheless, it became necessary for him as Indian subagent to coöperate in making some of the treaties and to assume responsibility for certain reservations after the treaties had been made. The greater part of his services were given to the southern, or Barbour's district, although some of his time was spent north of this region. Johnston's work resulted in the accumulation of large claims against the United States, for he took upon himself the responsibility of furnishing greater supplies of beef than were stipulated in the treaties. The delivery of the beef was placed in the hands of traders whom he licensed for the respective reservations. Furthermore, he employed a physician, Dr. W. M. Ryer, to visit the Indians and vaccinate them, relying upon the government to pay in the future for Dr. Ryer's time and skill.[29]

Johnston did commendable work for the Indians and made valuable reports to the department; but by reason of his subordination when the commissioners entered upon their duties in California, he became dissatisfied. By the end of the summer of 1851 his position had grown almost intolerable to him. He was unable to get help from the military authorities in forcing unlicensed traders and other intruders from the reservations, friction developed between him and Wozencraft, and he was left without funds to carry on his work. The result of all this was that he not only failed to report regularly to the Indian department, but carried on the business of his agency in a desultory manner. As a consequence he was relieved of the office, notice of his dismissal being sent to him by Lea under date of January 9, 1852.[30]

Wozencraft, who with McKee arrived in San Francisco on May 8, began immediately to make preparations for a journey into the central district. Before his arrangements were completed he was advised by McKee, as the disbursing officer, that, in view of the very limited appropriation made by congress,

[29] Report of Johnston, June 24, 1851, in *Senate executive documents*, 33 congress, special session, no. 4, pp. 104-105.

[30] Johnston to General Hitchcock, August 4, 1851, to the commissioner of Indian affairs, October 8, 1851, to A. H. H. Stuart, December 4, 1851, to Lea, February 25, 1852, Wozencraft to Lea, December 1, 1851, Lea to Johnston, January 9, 1852, *ibid.*, 24, 196, 200, 229, 233-234, 293.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002165

54                    *William H. Ellison*            M. V. H. R.

it would be inexpedient for the commissioners personally to
incur any large financial responsibility or by their actions to
implicate the Indian department until congress should provide
adequate funds.[31]

Wozencraft left San Francisco for the Indian country on May
24.  As rapidly as possible he made treaties with many tribes
of Indians and, like the other agents, set apart large reserva-
tions for them.  His first treaty was made on May 28 with six
tribes of Indians who met at Dent and Vantine's ferry on the
Stanislaus river; the next was concluded with ten tribes at Camp
Union on the Yuba river; another was made on August 1 with
nine tribes of Indians near Bidwell's ranch on Chico creek;
five tribes entered into a treaty at Reading's ranch on August
16; eight tribes made a treaty at Camp Colus on September 2;
and four tribes on the Consumnes river entered into a treaty on
September 18.  After the treaties were made, an addition of
some twelve tribes was made to the reservation near Chico.
Wozencraft expected, according to his statement, which partook
of his characteristic exaggeration, that eventually as many as
75,000 or 80,000 Indians would be included in the provisions of
the six treaties.  While traveling and making these compacts,
the agent was piling up heavy claims against the United States,
for the estimate of the amount required to fulfill the stipulations
contained in the several treaties reached the sum of $346,138.[32]

In addition to those in the central district, two reservations
were set apart by Wozencraft for Indians in southern California.
When Colonel Barbour left for the east, he asked Wozencraft to
take charge of his district in his absence.  During the months of
November and December reports reached Wozencraft of Indian
trouble in the south, and in particular among those tribes whom
Barbour had failed to visit below Los Angeles.  With a military
escort, therefore, Wozencraft left on December 8 for the scene
of the trouble.  The Indians were found in a warlike attitude,
but quiet and confidence were soon restored.  On January 5 a
treaty was made with three of these tribes and two days later

[31] R. McKee to Wozencraft, May 13, 1851, Wozencraft to Lea, May 14, 1851,
in *Senate executive documents,* 33 congress, special session, no. 4, pp. 80, 83-84.

[32] R. McKee to Lea, May 29, 1851, Wozencraft to Lea, May 28, September 30,
October 14, 1851, statement of O. M. Wozencraft, *ibid.,* 84, 86, 133, 187-190; *Cali-
fornia treaties,* 1851-1852, pp. 22-37.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002166

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 125 of 149   P #:4353

one was concluded with the Diegan Indians. The territory set apart for the use of these tribes embraced a large area.[33]

Redick McKee's journey into the northern district was delayed until August 11, because funds failed to arrive from Washington. He was able to start when he did because Collector King advanced him $5,000 on a draft against the department. His escort on the expedition was a company of dragoons under Major W. W. Wessels. The party proceeded north by way of the Russian river country, Humboldt river on the coast, Klamath river valley, and Scott's valley, where the journey ended.

With various tribes of Indians McKee made treaties of the same general character as those negotiated by Barbour and Wozencraft. The first one was made with eight tribes at a camp near Clear lake on August 20, and another, with four more tribes in the same general region on August 22. On October 6 a treaty was arranged on the South fork of the Trinity river with the lower Klamath, upper Klamath, and Trinity nations. On November 4, after locating a reservation site in Scott's valley — though with great difficulty because of the objections of the settlers — McKee concluded a treaty with three nations who resided severally in twenty-four, nineteen and seven *rancherias* or villages.[34]

On December 29, the day after his return to San Francisco, McKee made a report to Washington on his activities in the north. Now, as at other times, he indicated a desire to make a temporary return to Washington, but the department did not

[33] Wozencraft to Lea, December 1, 3, 1851, undated, received at Indian office February 18, 1852, in *Senate executive documents,* 33 congress, special session, no. 4, pp. 229-230, 285-287; Wozencraft, Statement on Indian affairs, pp. 8-13, manuscript in the Bancroft library; *California treaties,* 1851-1852, pp. 38-43. Wozencraft's work practically ended with the making of these treaties. At this time and later he was involved in controversy with McKee. He also became involved in differences with the Indian department, especially after the appointment of a superintendent of Indian affairs for California.

[34] John McKee, *Minutes,* in *Senate executive documents,* 33 congress, special session, no. 4, pp. 134, 141-142, 144-145, 161-162, 170-177. A daily record of the trip north was kept by John McKee, son of Redick McKee and secretary of the commissioners. R. McKee to T. B. King, T. B. King to R. McKee, July 11, 1851, *ibid.,* 118-120; George Gibbs, "Journal of the expedition of Colonel Redick McKee, United States Indian agent, through north-western California," in Schoolcraft, *Indian tribes of the United States,* 3: 106-112, 166-173; *California treaties,* 1851-1852, pp. 52-53, 59-60, 65-67.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002167

consider that the public interest would be promoted by his
presence at the capital and virtually ordered him to remain in
California.[35]

The services of McKee from this time to the end of his rela-
tions with the department in the early part of 1853 were less
expensive to the government than those formerly rendered,
but they were likewise of slight practical value. Some of the
time he spent with little success in defending the treaties before
the legislature and in the press, but the greater part he spent in
controversies with the military authorities over the way in
which meat had been furnished to the Indians on the expedition
north, with Governor Bigler and members of the legislature
over the blame for difficulties between Indians and whites in
the northern part of the state, and with Superintendent Beale
over the question of their relative authority.[36]

The chief work of Barbour, Wozencraft, and McKee had been
the negotiating of treaties with the Indians of California. In

[35] R. McKee to Lea, December 29, 1851, January 15, 31, 1852, Lea to R. McKee,
February 4, 1852, John McKee, *Minutes*, in *Senate executive documents*, 33 congress,
special session, no. 4, pp. 25, 178-180, 235-236, 239, 248-249.

[36] The dispute with the military authorities grew out of the charges made against
McKee by army officers, who alleged that supplies were furnished to the Indians in
a careless and criminal way. The business connection of John McKee with those
who furnished the supplies complicated the matter. From the evidence in the case
it appears that John McKee's relation to the sale of the beef was injudicious, but not
criminal; that McKee's general plan for handling the supply matter was unwise;
that General Estelle of the state militia, who sold most of the beef to the govern-
ment, was not guilty of wrong doing; and that General Hitchcock of the United
States army had a desire for orderliness in methods, and was a jealous military man
with an ear for gossip. For material bearing on this dispute, see *House executive
documents*, 34 congress, 3 session, no. 76, pp. 67-68; *Senate executive documents*, 33
congress, special session, no. 4, pp. 24-25, 27, 298-299, 300-308, 347-355.

The controversy between McKee and the state officials resulted from reports of
hostilities in the northern part of the state. McKee charged that the whites were
to blame, and the governor and members of the legislature supported the other side.
United States military forces were finally provided for that region. *Ibid.*, 310-326,
353, 364; *Journal of the senate of California*, 1852, pp. 304, 703-708, 710-711,
721-723; O. C. Coy, The settlement of the Humboldt bay region, 163, manuscript in
the Bancroft library.

The difficulty with Beale which ended McKee's services in California was caused
by McKee's disappointment that Beale and not himself was appointed superintendent
of Indian affairs in California. McKee proved a problem for Beale, and his services
came to an end as a result of insubordination and the controversy in which they
became involved. See *Senate executive documents*, 33 congress, special session, no. 4,
pp. 33, 308, 324, 364-366, 372-373, 381-389.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002168

all, 18 treaties were made by them, affecting 139 tribes or bands. It is not possible to state with accuracy the number of Indians included in these tribes, but it is safe to say that there were not fewer than 25,000. Only a fraction of this number, however, was ever taken to the reservations. The reservations set apart for the Indians included a total of 11,700 square miles, or 7,488,000 acres of land.[37] This vast space is equal to the combined areas of Massachusetts, Connecticut, Delaware, and Rhode Island, or to about that of the present counties of Fresno, Alameda, Sacramento, and San Diego in California, or to seven and one-half per cent of the total area of the state.

The government of the United States had authorized the commissioners to make treaties with the Indians of California, and had appropriated $50,000 for their use in doing so. This they consumed as they had a right to do. In addition they let contracts for supplies and incurred other expenses which amounted to nearly one million dollars. As to the latter points, it is difficult to say to what extent they were justified in their action. Certainly they had no authorization to commit the government in the way they did, but they defended their action on the ground that it was necessary under the circumstances.

To make these treaties effective their ratification in Washington was necessary. The sentiment in California with reference to the treaties, divided from the first, grew increasingly hostile as time went on. The main objection was to giving the Indians such large areas of valuable land. The subject of the treaties was taken up early in the session of the legislature of 1852, where intense opposition was manifested. The assembly passed resolutions condemning them and asking for their rejection by the United States senate. The senate voiced its opposition in much hostile discussion and by a section in a memorial on the subject of the public domain of California.

By February 18, 1852, when the last of the treaties had been received in Washington, officials of the interior department were aware that violent opposition had developed against the treaties in California and that the California delegation in congress was solidly against them. L. Lea, the commissioner of Indian

[37] This statement is made after a careful calculation based on the description of the reservations contained in *California treaties*, 1851-1852.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002169

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 128 of 149   P
#:4356

affairs, and Edward F. Beale, the newly appointed superintend-
ent of Indian affairs for California, were in favor of their rati-
fication. Secretary Stuart, in submitting the treaties, together
with a mass of documents, to the president on May 22, was non-
committal.

The eighteen treaties were submitted to the senate by the
president on June 1. On June 7 the president's message ac-
companying them was read in the senate and, with the treaties
and accompanying documents, was referred to the committee
on Indian affairs. The treaties were next considered in secret
session of the senate, and all were rejected by that body. While
the reasons for the action of the senate do not appear in the
records, it is quite certain that the main causes for the defeat
of the treaties were the methods of the commissioners in piling
up immense claims against the United States, and the violent
opposition to the treaties in California because they removed
such large areas of land from public and private use. Senator
Weller of California at a later time said: "Public policy de-
manded that these treaties should be rejected." [38]

The treaties had been rejected, but they left a disagreeable
aftermath. The question of the disposition of the claims against
the United States growing out of the work of the commissioners
came up in congress as early as March 26, 1852, when an amend-
ment to the deficiency bill was proposed appropriating $520,000
toward their liquidation, but no action was taken at this time.
The next step was on April 6, when the senate called upon the
department of the interior for information on the subject. In
return, a statement of claims amounting to nearly $800,000 was
received. The question came up several times during the re-
mainder of the session, but still nothing was done.[39]

Most of the claims were never paid because of prejudice
against them and evidence of fraud in many cases. One of the
claims allowed was that of John C. Frémont for $183,825. A
bill providing for the payment of this claim, with interest from

[38] *California treaties*, 1851-1852, pp. 1-8; *Congressional globe*, 32 congress, 1 ses-
sion, part 3, pp. 2103, 2172.

[39] *Ibid.*, 880-890, 2104; *ibid.*, 33 congress, 1 session, part 2, p. 1335, part 3, pp.
2103-2110; Lea to W. R. Graham, April 13, 1852, W. A. Graham to W. R. King,
April 14, 1852, in *Senate executive documents*, 32 congress, 1 session, no. 61, pp. 1-3.
See also many miscellaneous documents, *ibid.*, pp. 2-26.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002170

5:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 129 of 149   P
#:4357

June 1, 1851, was approved by the president on July 29, 1854.
A claim of Wozencraft for the reimbursement of $7,000 ex-
pended by him in the course of his duties was paid in July,
1856.   In 1860 Samuel J. Hensley was paid $96,375 for beef
furnished to the Indians.   The payment of other claims, although
discussed from time to time, was never made.   The whole ques-
tion was finally disposed of in 1871 without further adjust-
ment.[40]

On March 3, 1852, an act creating a California Indian super-
intendency became a law.   On the day following Edward F.
Beale was appointed to the newly created office.   Appropria-
tions were made to meet the expenses of the superintendency
and an additional appropriation of $100,000 was made for the
purpose of preserving peace with the Indians who had been
dispossessed of their lands, until arrangements could be made
for their future settlement.[41]

On September 16 Beale reported his arrival in San Francisco,
and he at once made a tour into one part of his field.   From
what he saw and heard he became convinced that some definite
Indian policy was immediately necessary for California.   On
October 29 he reported to the department that he was maturing
a plan which was "recommended alike by its practicability,
humanity, and economy," which he would be prepared to de-
velop fully after his proposed visit to the south.   In brief, the
basis of what he would propose was outlined as follows:

> In the first place I propose a system of "military posts" to be
> established on reservations, for the convenience and protection of the

[40] Edward F. Beale investigated some of the claims and found that much fraud
had been practiced.  See *Senate executive documents,* 33 congress, special session,
no. 4, pp. 368-370; 32 congress, 2 session, no. 57, pp. 1-5.

For action on the claims of Frémont, Wozencraft, and others, see *United States
statutes,* 33 congress, 1 session, *Private acts,* 80; *ibid.,* 34 congress, 1 session, *Private
acts,* 31; *ibid.,* 36 congress, 1 session, *Private acts,* 15; *Congressional globe,* 34
congress, 1 session, part 2, pp. 1369, 1461, 1575; *ibid.,* 36 congress, 1 session, part
2, pp. 1001, 1277, 1503, 1524, 1557, 1575, 1832, part 3, p. 2607; *Senate reports,* 36
congress, 1 session, no. 111, pp. 1-5; *House reports,* 35 congress, 1 session, no. 133,
pp. 1-2; *Report of the commissioner on Indian affairs,* 1857, pp. 10-11; *ibid.,* 1871,
pp. 17-18, 153-154.

[41] Lea to Beale, August 2, 1852, in *Senate executive documents,* 33 congress,
special session, no. 4, p. 38; *United States statutes,* 32 congress, 1 session, pp. 2-3,
18, 55.  The appropriation for the expenses of the superintendency was only about
one-fourth of what Beale requested.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002171

*William H. Ellison*        M. V. H. R.

Indians; these reservations to be regarded as military reservations. The Indians to be invited to assemble within these reserves.

A system of discipline and instruction to be adopted by the agent who is to live at the post.

Each reservation to contain a military establishment.

The expenses of the troops to be borne by the surplus of Indian labor.

The reservations to be made with a view to a change in location, where increase of white population may make it necessary.[42]

A little later Beale set forth the plan in greater detail. In this elaboration he made it clear that he proposed to care for the Indians somewhat after the manner of the missions, without the religious emphasis of those institutions, and that he expected success to attend his plan because a similar method had been successful in the Spanish days. He estimated the number of Indians in California at from 75,000 to 100,000, and thought an appropriation of $500,000 should be made to begin the new system. General Hitchcock expressed himself officially as heartily in favor of the plan and asserted that the choice of the government lay between accepting Beale's plan or giving the Indians over to rapid extermination or expulsion from the state.[43]

Soon after sending his proposal to the Indian department Beale set out on a trip south. He began preparations for putting his plan into operation, in case approval were given it by the Indian office, by selecting as a location for some of the Indians a tract of land between the San Joaquin and Fresno rivers. No treaty was made with the Indians who were asked to go upon it, nor was a reservation set apart in the usual sense. It was his purpose to ask that the land be set aside as a government reservation to be held by the Indians by a simple agreement, so that the Indians might be removed at the government's pleasure.[44]

While the government at Washington was groping blindly

[42] Beale to Lea, September 16, October 29, 1852, in *Senate executive documents,* 33 congress, special session, no. 4, pp. 36, 374.

[43] Beale to Lea, November 22, 1852, *ibid.,* 378-380; General Hitchcock to Colonel Cooper, November 29, 1852, *ibid.,* 32 congress, 2 session, no. 57, pp. 16-18.

[44] Beale to Lea, December 14, 1852, *ibid.,* 33 congress, special session, no. 4, pp. 390-392.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002172

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 131 of 149   P
#:4359

for some wise Indian policy for California, Beale's earlier sug-
gestions were received.   In response to an order of December
3, Beale went to Washington, where he reported the distress-
ing conditions of the natives of California and the need for
prompt action in their behalf on the part of congress.   He
presented with vigor his plan for small reservations where the
Indians could be protected and taught to work.   He proposed
that the Indians should be persuaded to go on the reservations
by simple agreement between them and the government, but
that no treaties should be made.[45]   The result was that congress
gave authorization for the creation of five military reservations
in California not to exceed 25,000 acres each, and appropriated
$250,000 to defray the expenses of maintaining the Indians in
California and removing them to the reservations.   On April
13 Beale was ordered to return to California by the most ex-
peditious route, in order to put the new plan into operation.[46]

Immediately after his arrival in Los Angeles on August 22,
Beale began the execution of his plan by going to Tejon Pass,
where a conference was held with some Indians and the pur-
poses of the government concerning them were explained.   He
also conferred with some army officers, who had traveled much
in the state, as to the best place for a reservation.   The result
of their discussion was a decision by Beale to locate a reserva-
tion in the Tejon region.[47]

As Beale passed on down the valley, still working on the plan
for his first reservation, he visited the experimental farm which
he had located the previous year on the San Joaquin river.
He expressed himself as satisfied with the results.   He found
that the wild Indians that had been placed upon it had been able

[45] Lea to Beale, December 3, 1852, in *Senate executive documents*, 33 congress,
special session, no. 4, p. 33.   On his arrival in Washington Beale showed by abundant
evidence the sad condition of the California Indians.   He presented the fact of their
unfair and cruel treatment by the whites, who in numerous instances perpetrated
atrocities upon them, and exploited and enslaved them.   *Ibid.*, 32 congress, 2 session,
no. 57, pp. 8-16.

[46] *Congressional globe*, 32 congress, 2 session, pp. 1085-1086; *United States
statutes*, 32 congress, 2 session, p. 38; R. McClelland to Beale, April 13, 1853, in
*Senate executive documents*, 33 congress, 1 session, no. 1, part 1, pp. 464-466.

[47] Gwin H. Heap, *Central route to the Pacific from the valley of the Mississippi
to California* (Philadelphia, 1854), 10-11, 110-118; *Daily Alta California*, September
22, 1853; Beale to Manypenny, September 30, 1853, in *Senate executive documents*,
33 congress, 1 session, no. 1, part 1, pp. 469-470; *ibid.*, 478-479.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002173

to support themselves. He believed that their success would be a means of inducing other Indians to settle on a reservation. The reservation Indians had learned to plow, to reap, to build corrals, and to tend gardens, and Beale was enthusiastic.[48]

A problem now presented itself in connection with the establishment of a reservation at Tejon because part of the land desired was covered by a Spanish land grant, and the law under which Beale was working gave no authority for the purchase of lands for Indian purposes. Beale asked the opinion of the California congressional delegation as to the wisdom of proceeding. Being advised that he should make such conditional arrangements, subject to the approval of congress, as he considered indispensable to the successful operation of the law, he went ahead with his plan, even though the commissioner of Indian affairs advised postponement of the enterprise until there should be further legislation on the part of congress.[49]

The Tejon reservation started out well. By February, 1854, the Indians gathered there had under cultivation some 2,500 acres of land. Later in the year a company of men who paid a visit to the reservation reported 3,265 acres of land under cultivation, and more than 400 Indians working in the fields. The visitors wrote of what they had seen as a remarkable achievement. Their statements were concurred in by the editor of the *Pacific*, and were corroborated by the testimony of Captain P. E. Connor, who said that he saw on the reservation a great grain crop valued at a large sum, and Indians working at their various occupations with utmost cheerfulness.[50]

[48] Beale to Manypenny, September 30, 1853, H. B. Edwards to Beale, September 20, 1853, *ibid.*, pp. 471-474. Beale's enthusiasm over accomplishments and prospects was shared by others. The editor of the *Daily Alta California*, September 22, 1853, commended the plan of putting the Indians on reservations where they could learn to support themselves. Then he said: ''Five years after the first settlement is made and put into successful operation the Indian affairs of California will cease to be an item of expense to the General or State Government; all hostilities will be over; the whites will be entirely free from annoyance by the Indians; the Indians will be transformed from a state of semi-barbarism, indolence, mental imbecility, and moral debasement, to a condition of civilization, Christianity, industry, virtue, frugality, social and domestic happiness and public usefulness.''

[49] Beale to W. M. Gwin and M. S. Latham, September 27, 1853, to Lea, September 30, 1853, Manypenny to Beale, November 18, 1853, in *Senate executive documents*, 33 congress, 1 session, no. 1, part 1, pp. 470-471, 474-476, 480-481.

[50] Beale to Manypenny, February 8, 1854, in *Report to the commissioner of Indian*

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002174

:13-cv-00883-JGB-SP   Document 85-21   Filed 10/21/14   Page 133 of 149   P #:4361

But further progress of the reservation system under Beale was rudely checked by reason of political developments and his own neglect properly to attend to certain business matters. During the early part of 1854 political opposition to Beale began to manifest itself, and some of his friends feared that congress would refuse to appropriate the money needed for further expansion of the system.[51]   Unfortunately Beale had neglected to use care and promptness in dealing with the department to such an extent that a large part of the appropriation of $250,000 remained unaccounted for in the spring of 1854. This neglect proved disastrous to him when the question of providing for the future of Indian administration in California came before congress.

It was on May 1, 1854, while the question of the amount to be appropriated for Indian affairs in California was under consideration in congress, that Beale's accounts were reported in arrears to the extent of nearly $250,000. The result was that when the measure providing for funds for Indian service in California was passed, the appropriation for the development of the reservation system was cut down to $125,000 and the number of reservations which might be created was reduced from five to three. Until just before the final passage of the bill, a provision was attached estopping Beale from drawing any portion of the amount appropriated until he had accounted for the former appropriation, but this was withdrawn before the final action on the measure, because Beale was removed from office while congress was taking action and another person was appointed in his place.[52]

Beale's successor was Thomas J. Henley, an able man and a

*affairs*, 1854, pp. 298-299; *Los Angeles Star*, June 17, 24, 1854; *Stockton Republican*, in Hayes collection, Indians, vol. 2, nos. 124, 129, 144; *Pacific*, June 30, 1854.

[51] *Los Angeles Star*, June 17, 24, 1854, in Hayes collection, Indians, vol. 2, nos. 124, 129; T. H. Benton to Beale, April 3, 1854, in Stephen Bonsal, *Edward Fitzgerald Beale* (New York and London, 1912), 186-187.

[52] *Congressional globe*, 33 congress, 1 session, part 2, pp. 1027, 1028, 1041-1051, part 3, pp. 1895, 1945, 1983; *United States statutes*, 33 congress, 1 session, p. 332. It should be said that a thorough investigation of Beale's accounts was made. A report on the subject by the comptroller to the secretary of the treasury, April 9, 1885, completely vindicated Beale and partially restored him to public confidence. See J. M. Broadhead to James Guthrie, April 9, 1855, in *Senate executive documents*, 34 congress, 3 session, no. 69, pp. 1-7; Hayes collection, Indians, vol. 2, no. 153.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002175

64          *William H. Ellison*          M. V. H. R.

successful politician.  He received his instructions under date
of June 2, 1854, and entered upon his official duties on July 15.
He went first to Tejon, where he took possession and began
supervision of the public property located there.  While it
seemed to him that Beale had somewhat overstated the degree
of prosperity at Tejon, things were in most respects as repre-
sented.  Henley was convinced by what he saw that the military
reservation system furnished the only wise method of dealing
with the Indians, and he planned to develop the establishment at
Tejon along the lines on which it had been begun.  He spent
more than a month at this place getting things in order for
development under his assistants who were left in charge.

From Tejon Henley went north over the emigrant road, ex-
amining the country and studying the Indians as he proceeded.
From the San Joaquin valley he continued farther north, in-
tending to spend the remainder of the year among the hundreds
of small tribes of Indians in that section.  Before the end of
September he had established Nome Lacke reservation in Colusa
county, which was to become one of the most permanent and
useful of all the reservations.  A site for a military post was
selected on the reserve, a subagent was put in charge, and the
natives began to assemble at once and to prepare winter quar-
ters.[53]

The reports of Henley to the department, full of details of
the work at Tejon and Nome Lacke, were optimistic concerning
the progress and promise of the reservation system.  Indeed,
it was made to appear that the organization and development
were so satisfactory at Tejon that there would be little necessity
for expenditures there after the year 1854-1855.  While im-
pressing the department with the progress of affairs, Henley
recommended the modification of the law under which he was
working so as to permit the making of five reservations instead
of three, and asked for an appropriation of $200,000 for the
two additional establishments.  His request was granted.  The
law was modified in accordance with his wishes as to the num-

[53] T. J. Henley to Manypenny, August 28, 1854, in *Report of the commissioner of
Indian affairs*, 1854, pp. 300-307; *Senate executive documents*, 34 congress, 3 session,
no. 69, p. 1; *Weekly Placer Times and Transcript*, September 30, 1854; E. D.
Keyes to E. D. Townsend, December 12, 1854, in *House executive documents*, 34
congress, 3 session, no. 76, pp. 88-89.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002176

ber of reservations, and an appropriation of $150,000 was made for removing and supporting the Indians on the two additional reservations. With this added appropriation, the total sum provided for Indian affairs in California for the year 1855-1856 was $360,300.[54]

Up to September, 1856, there had been established four permanent reservations. These were Tejon, Nome Lacke, Klamath on the Klamath river, and the Mendocino on the shores of the Pacific. In addition, temporary reserves or farms had been established on the Fresno and King's rivers, and at Nome Cult valley in the coast range of mountains. Henley's report indicated a flourishing state of affairs at practically all locations; but, unfortunately for his credibility, his glowing accounts of progress were contradicted by the reports of army officers to whom General Mackall addressed an inquiry in August, 1856. These reports indicate that Henley grossly exaggerated the prosperity and development of the reserves, and that they were improperly managed.[55]

Although differences of opinion had developed in California with reference to the success of the Indian administration, the federal government continued for two years more to make large appropriations for the maintenance and development of the system of military reservations, relying upon the accuracy of the reports of Henley and his agents. But in 1858, just at the time when Henley was gathering from his agents their statements of progress,[56] Godard Bailey was given instructions as a special agent to visit the reservations. He was instructed to acquaint himself with their history and actual conditions, in order that he might furnish the Indian office with the data

[54] Manypenny to R. McClelland, November 25, 1854, in *Report of the commissioner of Indian affairs*, 1854, pp. 15-16; Henley to Manypenny, December 18, 1854, in *Senate executive documents*, 33 congress, 2 session, no. 42, pp. 3-4; *United States statutes*, 33 congress, 2 session, pp. 698-699.

[55] Henley to Manypenny, September 4, 1856, in *Report of the commissioner of Indian affairs*, 1856, pp. 236-239, 245; J. Edwards to W. W. Mackall, August 24, 1856, B. L. Beall to W. W. Mackall, September 29, 1856, L. Loeser to W. W. Mackall, October 28, 1856, John E. Wool to L. Thomas, November 3, 1856, in *House executive documents*, 34 congress, 3 session, no. 76, pp. 138-141.

[56] *Congressional globe*, 34 congress, 3 session, pp. 529, 532, appendix, p. 408, 35 congress, 1 session, appendix p. 572; *United States statutes*, 34 congress, 3 session, p. 183, 35 congress, 1 session, p. 330.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002177

upon which to base an intelligent opinion upon the practical working system, and upon its value as applied to the Indians of the state.

Bailey visited several of the reserves, and in his report he discussed in some detail the conditions in each one. His communication, which in no sense took the form of an attack upon Henley or his agents, stated that the plan devised by Beale for collecting the Indians on farms and thereon supporting them by their own labor had proved a lamentable failure. He said:

> At present the reservations are simply government alms-houses, where an inconsiderable number of Indians are insufficiently fed and scantily clothed, at an expense wholly disproportionate to the benefits conferred. There is nothing in the system, as now practiced, looking to the permanent improvement of the Indian, or tending in any way to his moral, intellectual, or social elevation, the only attempts at anything of the sort that fell under my observation seeming to be rather the result of individual effort than to spring from the system itself.[57]

When the California Indian question came before congress in 1859, no move was made to abolish the reservations, but the appropriation for the removal and subsistence of Indians was cut down to $50,000 and that for incidental expenses of the superintendency, to $7,500. With the reduced appropriation James Y. McDuffie, the successor of Henley as superintendent, undertook to continue the system of Beale. His reports indicated that all the reservations with the exception of Klamath were in a dilapidated condition. Under these conditions, the commissioner of Indian affairs recommended the repeal of all laws authorizing the appointment of a superintendent and agents in California, the abandonment of the system in use, and the substitution of some other plan.

The scheme proposed by him was the division of the state into two districts, with a superintending agent in each, a supervisor to lead and direct the Indians in their labors, and only such mechanics and laborers as might be necessary to keep tools in repair. The Indians in the southern part of the state who worked on lands should have these furnished them. Reserva-

---

[57] G. Bailey to C. E. Mix, November 4, 1858, in *Report of the commissioner of Indian affairs*, pp. 298-305.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002178

tions might be provided for the dispossessed Indians of the valleys, but the Indians who should settle on them were to be taught that they were not to be fed and clothed at government expense.[58]  Based on these suggestions, after much discussion, a bill providing a new method of administering Indian affairs in California became a law on June 19, 1860.[59]

Under this law the secretary of the interior divided the state into a northern and a southern district.  The northern district included all that part of California north of the southern boundary of the counties of Marin, Sonoma, Solano, Sacramento, and El Dorado, to the eastern boundary of the state; the southern district included all the rest of the state.  Two superintending agents were appointed, and a modified, less expensive, but no more effective system of administration for dealing with the natives was instituted.[60]  It consisted of placing the Indians on small reservations to which they were to go by simple agreement and not by treaty.  This policy of small reservations, begun in California in 1853, was rapidly extended over the west.  California thus made a distinct contribution to our Indian policy.

WILLIAM H. ELLISON

OREGON AGRICULTURAL COLLEGE
    CORVALLIS

[58] *Congressional globe,* 35 congress, 2 session, part 1, pp. 694, 734-735; *United State statutes,* 35 congress, 2 session, p. 400; A. B. Greenwood to J. Thomson, November 26, 1859, in *Report of the commissioner on Indian affairs,* 1859, pp. 23-24.

[59] *Congressional globe,* 36 congress, 1 session, part 3, pp. 2368-2369, part 4, p. 2904; *United States statutes,* 36 congress, 1 session, p. 57.

[60] A. B. Greenwood to J. Thompson, November 30, 1860, in *Report of the commissioner of Indian affairs,* 1860, pp. 20-21.

Between 1850 and 1859 the United States expended a total of $1,737,493 on Indian affairs in California.  In addition to this amount spent in Indian administration, $924,259.65 had been appropriated to reimburse California for expenses incurred in Indian wars.  There was yet some $600,000 in bonds of the state outstanding for which the state expected to be recompensed.  These figures do not include the expenses incurred by the United States army in policing the Indian country and in suppressing Indian uprisings.

This content downloaded from 216.14.230.78 on Sun, 10 Aug 2014 22:02:49 UTC
All use subject to JSTOR Terms and Conditions

ACC-HRA002179

TAB 37

US Department Of The Interior

# Indian Affairs

Contact Us

HOME | WHO WE ARE | WHAT WE DO | NEWS | CALENDAR OF EVENTS | DOCUMENT LIBRARY | HOW DO I...

HOME ‣ WHO WE ARE ‣ REGIONAL OFFICES ‣ PACIFIC ‣ WHO WE ARE

## WHO WE ARE

To begin to discuss why and how the Pacific Regional Office is unique you must first review some of the history of California and California Tribes.  While the history of the Federal-Indian relationship in California shares some common characteristics with that of Native people elsewhere in the United States, it is different in many aspects.  It includes the unprecedented magnitude of non-native migration into California after the discovery of gold in 1848, nine days before the signing of the Treaty of Guadalupe Hidalgo; the Senate's refusal to ratify the 18 treaties negotiated with California tribes during 1851-52; and the lawless nature of California's settlement after the Treaty of Guadalupe Hidalgo, including State sanctioned efforts to "exterminate" the indigenous population.

Under pressure from the California Congressional delegation, the United States Senate not only refused to sign the 18 treaties that had been negotiated, but they also took extraordinary steps to place the treaties under seal.  Between the un-ratified treaties and the Land Claims Act of 1851, most California Indians became homeless.

Major shifts in federal Indian policy at the national level during the late 19th century exacerbated the Indian problems in California.  Passage of the General Allotment Act in 1887 opened part of the limited lands in California to non-Indian settlement.  In 1905 the public was finally advised of the 18 unratified treaties.   Citizens sympathetic to the economic and physical distress of California Indians encouraged Congress to pass legislation to acquire isolated parcels of land for homeless California Indians.  Between 1906 and 1910 a series of appropriations were passed that provided funds to purchase small tracts of land in central and northern California for landless Indians of those areas.  The land acquisitions resulted in what has been referred to as the Rancheria System in California.

In 1934, with the passage of the Indian Reorganization Act (IRA), the reconstituting of tribal governments included the BIA's supervision of elections among California tribes, including most of the Rancheria groups.  Although many tribes accepted the provisions of the IRA, few California tribes benefited economically from the IRA because of the continuing inequities in funding of Federal Indian programs.

Beginning in 1944, forces within the BIA began to propose partial liquidation of the Rancheria system. Even the limited efforts to address the needs of California Indians at the turn of the century and again through passage of the IRA were halted by the federal government when it adopted the policy of

termination.  California became a primary target of this policy when Congress slated forty–one (41), California Rancherias for termination pursuant to the Rancheria Act of 1958.

During the past quarter century, judicial decisions and settlements have restored 27 of the 38 Rancherias that were terminated under the original Rancheria Act.  Additional tribes have since then been restored as a result of Acts of Congress

This brief history only begins to explain why the Pacific Regional Office is unique.  California tribes today continue to develop their tribal infrastructure as a result of not having the same opportunities that have been provided to other native groups throughout the Country.  California has a large number of aboriginal native populations who are not currently recognized by the United States which presents it's own list of problems.

### CHOOSE A CATEGORY

– – Click To Change Category – –

## REGIONS



Click the map to view our regions and their office contact information and the tribes served by that region

RETURN TO THE PACIFIC REGION HOME PAGE

NORTHERN CALIFORNIA AGENCY

CENTRAL CALIFORNIA AGENCY

SOUTHERN CALIFORNIA AGENCY

PALM SPRINGS AGENCY

TRIBES

# IndianAffairs.gov

Site Map  |  Accessibility  |  Contact Us  |  Feedback  |  Notices  |  Disclaimer  |  Privacy  |  Home
FOIA  |  No Fear Act Data  |  E–Gov  |  USA.gov  |  USAJobs.gov  |  DOI.gov

This is an Official Web Site.
Last Updated 10/20/14 2:19 PM

http://www.bia.gov/WhoWeAre/RegionalOffices/Pacific/WeAre/[10/20/2014 7:02:30 PM]

TAB 38

| 70TH CONGRESS | SENATE | DOCUMENT |
|---|---|---|
| 1st Session | | No. 53 |

# INDIAN AFFAIRS

---

# LAWS AND TREATIES

---

## VOL. IV
### (LAWS)
#### COMPILED TO MARCH 4, 1927

---

COMPILED, ANNOTATED, AND EDITED

BY

## CHARLES J. KAPPLER, LL. M.
#### OF THE BAR OF THE DISTRICT
#### OF COLUMBIA



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1929

ACC-HRA000026

In testimony whereof, the parties have hereunto signed their names and affixed their seals, this fourth day of November, anno Domini eighteen hundred and fifty-one.

REDICK McKEE,
*United States Indian Agent.* [SEAL.]

For and in behalf of the O-de-i-lah tribe or band from the Upper Klamath river:

| | |
|---|---|
| I-SHACK, his x mark. | [SEAL.] |
| E-EH-NE-QUA, his x mark. | [SEAL.] |
| PI-O-KUKE, his x mark. | [SEAL.] |
| SA-NAK-A-HA, his x mark. | [SEAL.] |

For and in behalf of the I-ka-ruck tribe or band in Shasta valley:

| | |
|---|---|
| TSO-HOR-GIT-SKO, his mark. | [SEAL.] |
| CHE-LE-NA-TUK, his x mark. | [SEAL.] |

For and in behalf of the Ko-se-tah tribe or band in Shasta valley:

| | |
|---|---|
| ADA-WAR-HOW-IK, his x mark. | [SEAL.] |
| QUAP-SOW-A-HA, his x mark. | [SEAL.] |

For and in behalf of the Ida-kar-i-waka-ha tribe or band in Shasta valley:

| | |
|---|---|
| A-LAT-SE-WAK-A-NA, his x mark. | [SEAL.] |
| IDA-KAR-I-WAK-A-HA, his x mark. | [SEAL.] |

For and in behalf of the Wat-sa-he-wa tribe or band in Scott's valley:

| | |
|---|---|
| AR-RATS-A-CHO-I-CA, his x mark. | [SEAL.] |

For and in behalf of E-eh tribe or band in Scott's valley:

| | |
|---|---|
| AN-NA-NIK-A-HOK, his x mark. | [SEAL.] |
| SUN-RISE, his x mark. | [SEAL.] |

Signed, sealed and delivered, after being fully explained, in presence of—

JOHN McKEE, *Secretary.*
GEORGE GIBBS, } *Interpreters.*
LINDLEY ABEL, }
W. T. SMITH.
F. H. McKINNEY.
C. McDERMIT.
SAMUEL FLEMING.
WALTER McDONALD.
C. FULTON.
WM. H. BURGESS.
EDWARD HICKS.
WILLIAM DAIN.
LIRY SWAN.
GEO. W. TAIT.

---

## TREATY WITH THE SAN LOUIS REY, ETC., 1852.

TREATY MADE AND CONCLUDED AT THE VILLAGE OF TEMECULA, STATE OF CALIFORNIA, JANUARY 5, 1852, BETWEEN THE UNITED STATES INDIAN AGENT, O. M. WOZENCRAFT, AND THE CHIEFS, CAPTAINS AND HEAD MEN OF THE SAN LOUIS REY, KAH-WE-AS, AND THE CO-COM-CAH-RAS TRIBES OF INDIANS.

A treaty of peace and friendship made and concluded at the village of Teme-

January 5, 1852.

Unratified.

cula, California, between the United States Indian Agent, O. M. Wozencraft, of the one part, and the captains and head men of the following nations, viz: The nation of San Louis Rey Indians, the Kah-wé-as, and the tribe of Co-cóm-cah-ras.

ARTICLE 1. The several nations above mentioned do acknowledge the United States to be the sole and absolute sovereign of all the soil and territory ceded to them by a treaty of peace made between them and the republic of Mexico.

ART. 2. The said nations of Indians acknowledge themselves, jointly and severally, under the exclusive jurisdiction, authority and protection of the United States, and hereby bind themselves hereafter to refrain from the commission of all acts of hostility and aggression towards the government or citizens thereof, and to

ACC-HRA000027

live on terms of peace and friendship among themselves, and with all other Indian tribes which are now or may come under the protection of the United States; and furthermore bind themselves to conform to and be governed by the laws and regulations of the Indian bureau, made and provided therefor by the Congress of the United States.

ART. 3. To promote the settlement and improvement of said nations, it is hereby stipulated and agreed that the following district of country in the State of California shall be and is hereby set apart forever, for the sole use and occupancy of the aforesaid nations of Indians, still reserving to the government of the United States all minerals found thereon, to wit: commencing at the southwest corner of the San Jacinto grant, and running along the southern and eastern line of the same to the San Gorgonio grant; thence running along the southern and eastern line of the same to the northeastern corner thereof; thence due east to the eastern base of the Sierra Nevada mountain; thence on a southerly straight line in the general direction of the base of said mountain to a point due east of the northeastern corner of the grant of San Jose del Valle; thence due west to said corner; thence along the northeastern line of the same to the northwestern corner; thence on a direct line to the southern corner of the grant of Temecula; thence running around said grant, including it, by west, north and east, to its northeastern corner, and from thence on a straight line to the place of beginning. To have and to hold the said district of country for the sole use and occupancy of said Indian nations forever: *Provided*, That there is reserved to the government of the United States the right of way over any portion of said territory, and the right to establish and maintain any military post or posts, public buildings, school-houses, houses for agents, teachers, and school purposes, and such others as they may deem necessary for its uses or the protection of the Indians. The said nations and their tribes, and each of them, hereby engage that they will never claim any other lands within the boundaries of the United States, nor ever disturb the people of the United States in the free use and enjoyment thereof.

ART. 4. To aid the said nations of Indians in their subsistence while removing to and making their settlement upon the said reservation, the United States will furnish them, free of all charge, with two thousand five hundred head of beef-cattle to average in weight five hundred pounds, three hundred and fifty sacks of flour of one hundred pounds each, within the term of two years from the date of this treaty.

ART. 5. As early as convenient after the ratification of this treaty by the President and Senate, in consideration of the premises, and with a sincere desire to encourage said nations in acquiring the arts and habits of civilized life, the United States will also furnish them with the following articles, (to be divided among them by the agent according to their respective numbers and wants,) during each of the two years succeeding the said ratification, viz: one pair strong pantaloons and one red flannel shirt for each man and boy; one linsey gown for each woman and girl; seven thousand yards calico, seventeen hundred yards of brown sheeting, seventy pounds Scotch thread, four dozen pairs of scissors, fourteen dozen thimbles, five thousand needles, one two and a half point Mackinaw blanket for each man and woman over fifteen years of age; seven thousand pounds of iron and six thousand pounds of steel; and in like manner in the first year for the permanent use of said tribes, and as their joint property, viz: one hundred and thirty brood-mares and seven stallions, six hundred young cows, thirty-six bulls, twenty yoke of working oxen with yokes and chains, twenty work mules or horses, forty-two ploughs, assorted sizes, three hundred and forty corn hoes, one hundred and forty spades, and twenty grindstones. Of the stock enumerated above, and the product thereof, no part or portion shall be killed, exchanged, sold, or otherwise parted with, without the consent and direction of the agent.

ART. 6. The United States will also employ and settle among said nations, at or near their towns or settlements, one practical farmer, who shall superintend all agricultural operations, with two assistants, men of practical knowledge and industrious habits; one carpenter, one wheelwright, one blacksmith, one principal school-teacher, and as many assistant teachers as the President may deem proper to instruct said nations in reading, writing, &c., and in the domestic arts upon the manual labor system; all the above named workmen and teachers to be maintained and paid

ACC-HRA000028

by the United States for the period of five years, and as long thereafter as the President shall deem advisable.   The United States will also erect suitable schoolhouses, shops and dwellings for the accommodation of the school-teachers, mechanics, agriculturists and assistants above specified, and for the protection of the public property.

In testimony whereof, the parties have hereunto signed their names and affixed their seals, this fifth day of January, in the year of our Lord one thousand eight hundred and fifty-two.

O. M. WOZENCRAFT,   [SEAL.]
*United States Indian Agent.*

For and in behalf of the San Louis Rey Indians:

PEDRO, (Ka-wa-wish) of the Mission, his x mark.                          [SEAL.]
CISTO, (Go-no-nish) of Las Flores, his x mark.                           [SEAL.]
BICENTE, (Poo-clow) of Buena Vista, his x mark.                          [SEAL.]
PABLINO, (Coo-hac-ish) of Pala, his x mark.                              [SEAL.]
FRANCISCO, (Pah-hoo-vole) of Pauna, his x mark.                          [SEAL.]
JOSE, (Cah-lac) of El Potrero, his x mark.                               [SEAL.]
CALISTRO, (Chah-cwal-ish) of Yah-peet-cha, his x mark                    [SEAL.]
SANTIAGO, (Yu-loke) of La Joya, his x mark.                              [SEAL.]
PEDRO, (Pal-e-gish) of La Puerta, his x mark.                            [SEAL.]
BRUNO, (Cwah-si-cat) of Puerta Cruz, his x mark.                         [SEAL.]
YSIDRO, (To-sho-vwul) of Tovin, his x mark.                              [SEAL.]
CERVANTES, (Ca-hal) of Ahuanga, his x mark.                              [SEAL.]
LAURIANO, (Cah-par-ah-pish) of Temecula, his x mark.                     [SEAL.]
JOSE NOCA, (Chan-gah-lang-ish) of Agua Caliente, his x mark.            [SEAL.]
JOSE YGNACIO, (Tesh-mah-ken-ma-wish) of San Ysidro, his x mark.        [SEAL.]

For and in behalf of the Kah-wé-as nation of Indians:

JUAN ANTONIO, (Coos-woot-na) chief, his x mark.                          [SEAL.]
LEONARDO, (Parlewit) of the people of Razon, his x mark.                 [SEAL.]

For and in behalf of the people of Too-va:

FRANCISCO JAVIEL, (——) of Tierra Seca, his x mark.                      [SEAL.]
JOSE, (Coos-pa-om-nu-it) of Pah-nuc-say, the country of Cabezon,
    his x mark.   [SEAL.]
JUAN, (Kah-we-a) of Pal-se-wish, his x mark.                             [SEAL.]
GINIO, (——) of Wah-ne-pe-ah-pa, his x mark.                            [SEAL.]
YLARIO, (Sahtoo) of Wah-kigh-na, his x mark.                             [SEAL.]
TEODORO, (Chu-cal) alcalde of Juan Antonio and of Cah-be-nish,
    or Palma Seca, his x mark.   [SEAL.]
YGNACIO, (Chin-gal) of the people of Toro of Pal-kay-witch-ish, or
    Agua Corta, his x mark.   [SEAL.]
JUAN BAUTISTA, (Sah-at) of Pow-ky, his x mark.                           [SEAL.]
GERONIMO, (——) of Co-ro-vang-ang, his x mark.                          [SEAL.]
VICTORIANO, (Kwe-vish) of Sow-wah-wah, his x mark.                       [SEAL.]

For and in behalf of the people or tribe of Cocom-cah-ras, alias Serranos:

EHETERIO, (——) of Maronga, his x mark.                                 [SEAL.]

Signed, sealed and delivered, after being fully explained, in the presence of—

    J. J. WARNER,
    G. WILLIAMS,
    L. D. VINSONHALER,
    R. SACKETT,
    J. HAMILTON, *Secretary.*

ADDENDA.—In case the government of the United States and the actual proprietor of the Temecula grant cannot agree upon its purchase, the said government agrees to add some other portion of territory of equal extent to the above described Indian grant.

O. M. WOZENCRAFT,
*United States Indian Agent.*

J. J. WARNER,
L. D. VINSONHALER,   } *Witnesses.*
G. WILLIAMS,
R. SACKETT,

TAB 39

| 4TH CONGRESS, | HOUSE OF REPRESENTATIVES. | EX. DOC. |
| 3d Session. | | No. 76. |

## INDIAN AFFAIRS ON THE PACIFIC.

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES,

TRANSMITTING

*Report in regard to Indian affairs on the Pacific.*

FEBRUARY 16, 1857.—Ordered to be printed.

*To the House of Representatives:*

In compliance with a resolution of the House of Representatives of the 19th ultimo, requesting me " to furnish to the House all correspondence and documents, not incompatible with the public interest, relating to Indian affairs in the department of the Pacific—those of the Interior as well as those of the War Department," I transmit accompanying report and documents from the Secretary of War.

FRANKLIN PIERCE.

WASHINGTON, *February* 14, 1857.

WAR DEPARTMENT,
*Washington, February* 14, 1857.

SIR: I have the honor to submit, herewith, the following papers, required by the resolution of the House of Representatives of the 19th of January, " that the President be requested to furnish to this House all correspondence and documents, not incompatible with the public interest, relating to Indian affairs in the department of the Pacific—those of the Interior as well as those of the War Department."

I. Reports on the numbers, characteristics, localities, &c., &c., of the Indians in the department of the Pacific.

II. Indian affairs in California.

III. Indian affairs in Oregon and Washington Territories.

In conformity with your directions, a copy of the resolution was transmitted to the Secretary of the Interior.

I have the honor to be, very respectfully, your obedient servant,

JEFF'N DAVIS,
*Secretary of War.*

The PRESIDENT OF THE UNITED STATES.

ACC-HRA000054

that the Indians are peaceably inclined, and if properly treated by the whites would remain quiet.

On the 1st instant, Messrs. Jennings, Campbell, and Wallace, (of the peace party,) from Tulare county, called on the commanding officer at Fort Miller, and informed him that the difficulty was about a single cow, which the Indians had stolen. They stated that war was unnecessary, and that at a meeting held by them two-thirds of the settlers were opposed to attacking the Indians, but were in favor of demanding the aggressors of the chiefs. The others (the war party) insisted upon attacking the Indians collectively, and accordingly organized a company and gave pursuit, the result of which has been made public. We have yet to learn that the Indians in Tulare county have struck a blow against the whites, save in their own defence ; and the general is of opinion that the regular force now in the southeastern part of the State is sufficient to protect the settlers from Indian aggressions, provided the frequent murders and aggressions on the part of the whites against the Indian tribes are checked before the latter are driven to a combination and general war against the former. The general desires that you will say to his excellency the governor, that it will afford him great pleasure to co-operate with him, and that he will do all in his power to protect the citizens of the State, and to preserve peace with the Indians.

I am, sir, very respectfully, your obedient servant,

D. R. JONES,
*A. A. General.*

Hon. WM. D. KIBBE,
*Quartermaster and Adj't Gen. of California.*
*Sacramento City, California.*

———

MISSION OF SAN DIEGO, CALIFORNIA,
*April* 29, 1856.

SIR : In obedience to your instruction of April 21, I proceeded to the rancho of San Jacinto, in the vicinity of San Gorgonia. On my arrival there I sent for Juan Antonio, the principal captain of the Carvilla Indians, from whom I learned that the Indians were all quiet, having at present no serious difficulty with the whites ; but the whites were encroaching upon the lands now occupied by the Indians. He complained that the commissioners had promised to send him farming utensils, and told him to live on this land, where he would not be disturbed, neither of which promises had been fulfilled. He says that the Indians living around him have raised small crops this year, but the greater portion of the tribe were almost entirely destitute of the means of subsistence, owing to the failure of their crops.

I ascertained from other sources that the whites were in the habit of taking the gardens or other lands from the Indians without paying them either for crops or improvements, and, on the other hand, the Indians, being without food, steal the cattle of the whites, who

**124**          INDIAN AFFAIRS ON THE PACIFIC.

threaten to burn the houses and drive the Indians off, unless the government should take steps very soon either to remove the Indians or prevent further depredations ; these courses, you will readily perceive, must lead to a troublesome and expensive war.

At the request of Juan Antonio, I promised to notify him several days previous to the departure of the next expedition, in order that he may assemble his captains to hear what was said. I feel satisfied that this chief will do all in his power to preserve peace and keep the Indians quiet, which, however, cannot be a great while, under present circumstances ; and I am of the opinion that it would be cheaper to issue beef to these Indians than to fight them, at all events, until some superintendent of Indian affairs is appointed who will attend to the duties pertaining to his office.

I was informed that a Mr. Spitler, an American, living near Juan Antonio, is the only man who has endeavored to prevent trouble ; and that he has not only been very efficient in settling all disputes, but has fed and protected the Indians as far as lay in his power ; this I believe to be true, as Juan Antonio appeared to have confidence in him. He is an old soldier, and was severely wounded at the battle of San Pasquale ; I would, therefore, respectfully suggest that something be done to remunerate him for his trouble, as he is a very poor man, and scarcely able to assist the Indians.

I would further suggest that measures be adopted to mark the boundaries of the Indian lands, and that the whites be prevented from encroaching further.

I enclose herewith a letter from Mr. Rains, the sub-agent at Temecula, from which you will perceive that the San Louis Indians are also in destitute condition, and will therefore be compelled to steal cattle, in order to prevent starving ; also, the great danger of an outbreak, should the threats of the whites be carried out.

For many years these Indians have been in the habit of cultivating their fields without fencing, but at present, the cattle of the whites overrun and destroy their crops, and they have no means of redress.

The foregoing facts will, I think, show the absolute necessity of adopting, at an early day, some means for protecting the Indians from the whites, and to prevent the former from stealing the cattle of the latter.

I am, sir, very respectfully, your obedient servant,
WILLIAM A. WINDER,
*First Lieutenant Third Artillery.*

Captain H. S. BURTON,
*U. S. A., Commanding Mission San Diego.*

------

WAR DEPARTMENT,
*Washington, October* 18, 1856.

SIR : I have the honor to transmit herewith, for the information of the Department of the Interior, the copy of a letter from General John E. Wool, enclosing Captain H. S. Burton's report of his visit to

ACC-HRA000056