STEVEN B. ABBOTT (SBN 125270)
sabbott@redwineandsherrill.com
GERALD D. SHOAF (SBN 41084)
gshoaf@redwineandhserrill.com
JULIANNA K. TILLQUIST (SBN 180552)
jtillquist@redwineandsherrill.com
REDWINE AND SHERRILL
ATTORNEYS AT LAW
1950 MARKET STREET
RIVERSIDE, CA 92501
PHONE (951) 684-2520
FACSIMILE (951) 684-9583

Attorneys for Defendants,
COACHELLA VALLEY WATER
DISTRICT, FRANZ DE KLOTZ, ED PACK,
JOHN POWELL, JR., PETER NELSON,
and DEBI LIVESAY, in their official
capacities as members of the Board of
Directors of the COACHELLA VALLEY
WATER DISTRICT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS, | ) ED CV 13-00883 JGB-(SPx) ) Action Filed May 14, 2013 ) |
| Plaintiff, vs. | ) DECLARATION OF GERALD D. ) SHOAF IN SUPPORT OF CVWD'S ) OPPOSITION TO MOTIONS FOR |
| COACHELLA VALLEY WATER DISTRICT, et al. | ) SUMMARY JUDGMENT BY AGUA ) CALIENTE BAND OF CAHUILLA ) INDIANS AND BY THE UNITED |
| Defendants. | ) STATES OF AMERICA ) |
| UNITED STATES OF AMERICA | ) Hearing:  February 9, 2015 ) Time:      9:00 a.m. |
| Plaintiff-in-Intervention | )            Courtroom 1 |

1

I, Gerald D. Shoaf, declare as follows:

1.      I am a member of the State Bar of California and am admitted to practice before this court.  I am a partner in Redwine and Sherrill, counsel of record for defendants COACHELLA VALLEY WATER DISTRICT and FRANZ DE KLOTZ, ED PACK, JOHN POWELL, JR., PETER NELSON and DEBI LIVESAY, in their Official Capacities as Members of the Board of Directors of the Coachella Valley Water District, (hereafter collectively "CVWD").  I make this declaration in support of CVWD's Opposition to Motions for Summary Judgment, or in the alternative, for Partial Summary Judgment.  I have personally worked on this case and am familiar with all matters related to Phase 1 discovery.  I have personal knowledge of all matters stated herein.

2.      Attached as Exhibit 51 (numbered consecutively following the Exhibits to my original Declaration in Support of CVWD's Motion for Summary Judgment) is a true and correct copy of the RESPONSES TO REQUESTS FOR ADMISSION OF DEFENDANT CVWD TO PLAINTIFF AGUA CALIENTE BAND OF CAHUILLA INDIANS (SET NO. 1), Request No. 19 to Request No. 21.

3.      Attached as Exhibit 52 is a true and correct copy of the article "Indian Reservation Water Rights" by Richard B. Collins in the October 1986 issue of the Journal AWWA at pages 48-54.

4.      Attached as Exhibit 53 is a true and correct copy of the "FINDINGS OF FACT, CONCLUSIONS OF LAW AND INTERLOCUTORY JUDGMENT

NUMBER 41 CONCERNING THE RIGHTS TO THE USE OF WATERS OF

SANTA MARGARITA RIVER STREAM SYSTEM HELD IN TRUST BY THE

U.S.A. IN CONNECTION WITH THE RAMONA, CAHUILLA AND

PECHANGA INDIAN RESERVATIONS" (Referred to as "Interlocutory Judgment

Number 41") in United States of America v. Fallbrook Public Utility District, 1247-

SD-C entered November 8, 1962.

5.      Attached as Exhibit 54 is a true and correct copy of Memorandum of Points

and Authorities in Support of Defendant's Motion for Summary Judgment or Partial

Summary Judgment (Doc. #63-2) in Preckwinkle v. Coachella Valley Water

District, EDCV05-626 VAP (SGLx) filed March 31, 2008.

6.      Attached as Exhibit 55 is a true and correct copy of Memorandum of Points

and Authorities of Defendant Coachella Valley Water District in Opposition to

Plaintiffs' Motion for Partial Summary Judgment as to First, Fifth, and Seventh

Claims only (Doc. 69) in Preckwinkle v. Coachella Valley Water District, EDCV05-

626 VAP (SGLx) filed April 21, 2008.

7.      Attached as Exhibit 56 is a true and correct copy of Reply Memorandum of

Points and Authorities to Opposition to Motion for Summary Judgment or Partial

Summary Judgment by Coachella Valley Water District (Doc. 90) in Preckwinkle v.

Coachella Valley Water District, EDCV05-626 VAP (SGLx) filed May 12, 2008.

1    I declare under penalty of perjury of the laws of the United States that the

2  foregoing is true and correct.  Executed on November *19*, 2014 at Riverside,

3  California.

4

5

6    Gerald D. Shoaf

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 51**

1   DAVID J. MASUTANI (SBN 172305)
2   **ALVARADOSMITH, APC**
    633 W. Fifth Street, Suite 1100
3   Los Angeles, CA  90071
    Telephone:  (213) 229-2400
4   Facsimile:  (213) 229-2499
5   dmatsutani@kmwlaw.com
    Attorneys for Plaintiff
6   AGUA CALIENTE BAND OF
7   CAHUILLA INDIANS

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  AGUA CALIENTE BAND OF            Case No. 5:13-cv-00883-JGB (SPx)
12  CAHUILLA INDIANS,                Judge: Hon. Jesus G. Bernal
                Plaintiff,
13                                   RESPONSES TO REQUESTS FOR
         v.                          ADMISSION OF DEFENDANT CVWD
14  COACHELLA VALLEY WATER           TO PLAINTIFF AGUA CALIENTE
    DISTRICT, et al.,                BAND OF CAHUILLA INDIANS (SET
15              Defendants.          NO.1)
16
17                                   Action filed:  May 14, 2013
18
19  PROPOUNDING PARTY:      DEFENDANT CVWD
20  RESPONDING PARTY:       PLAINTIFF AGUA CALIENTE BAND OF
21                          CAHUILLA INDIANS
22  SET NO.:                ONE
23
24
25
26
27
28
                                              OYGAR'S INTERROGATORIES
                                              5:13-cv-00883-JGB (SPx)
Gibson, Dunn &
Crutcher LLP    US2008 5510433 2

the extent that it misstates the location of the hot spring, which is located under the Spa Hotel and not the Agua Caliente Spa Resort Casino.

Subject to and without waiving the foregoing objections, the Tribe states that it has made reasonable inquiries and is unable to admit or deny the Request because the term "hydrologically distinct" is ambiguous.

REQUEST NO. 19:

Please admit that groundwater where YOU claim groundwater rights does not contribute to the surface flows of Andreas Creek.

RESPONSE:

The Tribe objects to this Request on the grounds that it exceeds the scope of Phase I discovery and is irrelevant to the existence of the Tribe's federally reserved or aboriginal rights to groundwater.

Subject to and without waiving the foregoing objections, the Tribe admits this Request.

REQUEST NO. 20:

Please admit that groundwater where YOU claim groundwater rights does not contribute to the surface flows of Tahquitz Creek.

RESPONSE:

The Tribe objects to this Request on the grounds that it exceeds the scope of Phase I discovery and is irrelevant to the existence of the Tribe's federally reserved or aboriginal rights to groundwater.

Subject to and without waiving the foregoing objections, the Tribe admits this Request.

ADMISSION NO. 21:

Please admit that groundwater where YOU claim groundwater rights does not contribute to the surface flows of Chino Creek.

RESPONSE:

The Tribe objects to this Request on the grounds that it exceeds the scope of Phase I discovery and is irrelevant to the existence of the Tribe's federally reserved or aboriginal rights to groundwater.

Subject to and without waiving the foregoing objections, this Request is admitted.

ADMISSION NO. 22:

Please admit that the TRIBE approved the settlement of its claim for loss of aboriginal rights and received compensation in the Indian Claims Commission proceeding captioned *Thompson v. United States*, 8 Ind.Cls.Com. 1; 13 Ind.Cls.Com. 543.

RESPONSE:

Denied.

Dated: April 28, 2014

KILPATRICK TOWNSEND
& STOCKTON LLP

By: _____
CATHERINE F. MUNSON
Attorneys for Plaintiff Agua
Caliente Band of Cahuilla
Indians

OYGAR'S INTERROGATORIES
5:13-cv-00883-JGB (SPx)

11

Gibson, Dunn &
Crutcher LLP

US2008 5510433 2

51-000008

**EXHIBIT 52**



# Indian Reservation Water Rights

*Richard B. Collins*

Indian tribes have uncertain claims to sizable water rights in the western states. State and federal officials are seeking to convert these rights to fixed entitlements in order to make clear to other users the amount of water legally available in various water systems. Two important questions are whether the tribes can find ways to put their rights to use and whether they can sell or lease their rights for use by others.

In legal theory, Indian reservation water rights are based on federal statutes and treaties. But meaningful definition is rarely found in the statute books. Early relations with the Indian nations were conducted by treaty and by broad agreements and statutes lacking specificity. As frequently happens in our system of government, application of politically determined generalities to particular subjects has been left to the courts.

## Origin of reservation rights

The Supreme Court settled on the modern definition of Indian reservation water rights in its 1963 decision in *Arizona* v. *California*.[1] Arizona brought suit to divide ownership of the waters of the lower Colorado River among Arizona, California, Nevada, and the United States and among the many local and private interests that claimed water under each sovereign authority. The United States, as trustee, successfully claimed water for five Indian reservations along the river—the Chemehuevi, Cocopah, Yuma, Colorado River, and Fort Mohave. It also obtained water rights for other federal reservations—two wildlife refuges, a national recreation area, and a national forest. The Supreme Court rejected the states'

constitutional challenges to the power of the federal government to reserve water for Indian reservations. The states had argued that federal power was restricted by states' rights. (Most of the federal reservations in the case were made after the states in the case had achieved statehood, although some reservations on the Arizona side of the river were made before Arizona became a state.) The Court upheld federal authority over navigable waters, such as the lower Colorado River, under the commerce clause of the Constitution.[2] As to nonnavigable waters, the Court has sustained federal power under the property clause.[3]

The Supreme Court had decided long before, in 1832, that the Constitution gave the federal government, rather than the states, primary control over Indian affairs,[4] so the 1963 decision applying that principle to water rights was not unexpected. Thus, federal recognition of Indian water rights is not limited by the Constitution; rights depend on interpreting federal statutes, treaties, and judicial opinions. The issue is not what Congress can do but what it has done.

**Water rights by implication.** The federal government can reserve water rights for reservations by saying so in a statute or treaty, but this has seldom occurred. In most instances, federal law has simply



ILLUSTRATION BY DIANE MANAGAN

set aside an Indian reservation or other federal land reservation without saying anything about water rights. Often there were indications that Congress knew that a reservation would require water to achieve the purposes for which the land was set aside, but no direct provision for water was made.

A straightforward approach for the Supreme Court would have been to construe congressional silence strictly and recognize no reservation water rights by implication. But instead the Court adopted the rule that whenever water is necessary to carry out the purposes of a federal land reservation, a water reservation will be implied.[3]

This rule is based on the Supreme Court's decision in a famous 1908 case, *Winters* v. *United States*.[5] Indeed, Indian reservation water rights are often called "*Winters* rights." Although *Winters* is familiar to many readers, reviewing its facts and background is basic to an understanding of reservation water rights.

In 1888, the Fort Belknap Indian Reservation was set aside in Montana Territory for the Gros Ventre and Assiniboine tribes; it was carved out of a larger Indian reservation that had been recognized earlier.[6] The Milk River was its northern boundary and major natural water source. After Montana became a

state, non-Indian settlers began to divert the river above the reservation, and the federal Indian Service used tribal funds to divert the river on the reservation for agricultural and domestic use by the Indians.

A drought occurred in 1905, and upstream users took all the water before it reached the reservation. Showing political courage that it has often lacked in Indian matters, the federal government resolved to act. The US attorney went into federal court seeking a court order to protect existing Indian water uses. He sued 21 upstream irrigators who were thought to have begun their diversions after the Indian Service had started to



federal law was the Supreme Court's development of protective rules to try to do justice to Indian tribes. The Court recognized the power of the US government under the Constitution to impose its will on Indian tribes. But the Court was aware that this power was largely unchecked by political control. The Indians could not vote, and Congress was often beholden to their deadliest enemies. This power ran counter to the basic tenet of representative democracy, consent of the governed. To assuage the harshness of congressional power, the Court required that Congress use its power over Indians openly and plainly. In other words, the Court sustained the power of Congress to pass laws to the Indians' detriment but required that it

*Indian rights are not lost because of nonuse, and the Indians are entitled to enough water for their reasonable needs.*

do so very clearly. Otherwise, the Court would construe the laws in favor of the Indians.

This principle takes several forms in the Supreme Court's opinions. Indian treaties are construed as the Indians understood them and in light of the language barrier, "not according to the technical meaning of [their] words to learned lawyers . . . ."[9] Ambiguities in treaties and statutes are construed in the Indians' favor, and uncertainties are read in favor of retained tribal self-

irrigate the reservation. The theory was that the Indians had the superior water right because Indian Service diversions had begun first. This was based on the western state water law principle that prior users' (senior) rights are superior to later users' (junior) rights.

But the 21 defendants claimed that they had been the first to divert. Rather than sort out who had actually diverted first, US District Judge William H. Hunt held for the Indians on the theory that when the Fort Belknap Reservation was set aside in 1888 and before, there was implicitly reserved to the tribes enough water to meet the Indians' reasonable needs. Because 1888 was prior to all non-Indian uses, the Indians had the superior water right. The Supreme Court upheld Judge Hunt.[7]

**Nineteenth-century background.** The Supreme Court's willingness to recognize an implied water right in *Winters* rested on three themes in nineteenth-century federal law. One was the practice of making treaties with the Indian nations. International treaties are often worded broadly and vaguely, since they rest on

delicate negotiations conducted across political and language barriers.

But the Indian nations were within US boundaries. Did Indian tribes have the same legal status as foreign nations? The Court decided they did not.[8] Did that mean Indian treaties should have less respect than international treaties or that the Indian tribes were not nations in any sense? No, treaties did recognize tribes as nations, and Indian treaties were of equal dignity with international treaties. The Court reasoned that "treaty" and "nation" are "words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well-understood meaning. We have applied them to the Indians, as we have applied them to the other nations of the earth. They are applied to all in the same sense."[1]

The Fort Belknap Indian Reservation involved in *Winters* had been set aside under a treaty modified by agreements ratified by federal statutes. Given that the sparse wording the Court was accustomed to in Indian treaties and agreements. By 1908, it was routine to interpret the language broadly to carry out its basic purposes, rather than to pick it apart as if it were a real estate contract.

A second theme of nineteenth-century

government as opposed to competing state or federal authority.[10]

This principle is sometimes misunderstood. It is meant for truly uncertain cases and to protect the reasonable expectations of the Indians. It does not confer unexpected benefits on the tribes. To understand fully the Court's sense of the principle, it is important to compare a large number of court opinions. One case, read in isolation, can be misleading.

The *Winters* case was a significant occasion to apply this principle. Fort Belknap had been set aside as an Indian reservation with no mention of water. But the land was so arid that without water rights, it was not capable of sustaining the tribes. The question was, when the tribes ceded all of their land except the reservation, did they give up all rights to water? The Court decided they had not.

The third theme from nineteenth-century federal law that was reflected in *Winters* directly concerned irrigation for agriculture. From 1854, the federal government pursued a concerted policy to persuade, and sometimes to compel, Indian people to become agriculturalists like their white neighbors.[10] When applied to arid places like Fort Belknap, this scheme plainly required water rights for irrigation, stock watering, hydroelectric power, and domestic use. There were many indications that federal officials knew this. Most important, the government spent some of the trust money it had paid the Indians for their ceded lands to build water projects on reservations. But the question of water rights was politically too sensitive to try to resolve. As water projects were built, water was simply taken without any attempt to secure a legal right to do so.

Fort Belknap was typical. In an 1895 agreement with the tribes, the United States purchased a large part of the land of the 1888 reservation. When Congress ratified the agreement in 1896, it expressly authorized spending the proceeds to build irrigation projects on the reservation, but nothing was said or done about water rights.[11]

Those who read the *Winters* opinion without considering these antecedent events and legal rules are sometimes surprised that eight justices of a conservative Supreme Court favored the Indians' claim. Yet read in light of its history, *Winters* was not a dramatic departure from precedent.

### Extent of Indian reservation water rights

**Defining the quantity of water reserved.** The *Winters* rule rests on several crucial points. Indian reservation water rights are reserved when the land is reserved, even if no actual use of water has yet occurred. They are superior to state law water rights established later, even though state-granted rights are based on

actual uses. Indian rights are not lost because of nonuse, and the Indians are entitled to enough water for their reasonable needs. Each of these rules differentiates reservation rights from western state water rights, which are defined by water actually diverted and put to a beneficial use. These differences generate conflicts, but the Court continues to follow *Winters*, and many problems in its application have been worked out.[10]

Present controversy is about the amount of water reserved. The *Winters* decision said the Indians are entitled to enough water for their reasonable needs. This vague standard was sufficient for that case because the lawsuit was filed

*Tribes lack capital, and the federal government has stopped subsidizing new water development projects.*

only to protect existing Indian uses, and these were modest. There was no need to determine what rights to additional water the Indians might have.

Later court cases were filed for quite a different purpose: to decide the total water rights of all users on a stream system. *Arizona* v. *California* was a major example. The challenge was to convert the open-ended standard of the Indians' reasonable needs into a measurable current entitlement.

The task has two parts: first, decide the kinds of water uses that define Indian reservation water rights; then establish a measure for each use.

The Supreme Court's general definition states that water is reserved for the purposes for which reservations were set aside. *Winters* awarded water for irrigation, stock watering, and domestic use. Other decisions have sustained water rights for Indian fisheries and for hydroelectric power.[12] These rulings were based on the notion that the general purpose of Indian reservations is to serve as a homeland for the tribes' residence and economic self-support by means of the Indians' existing water uses and by agriculture.

What if tribes claim water for other uses—mining, industry, recreation? There is nothing in the Supreme Court's legal theory that categorically confines Indian reservation water rights to agricultural or fishing uses. But the theory is based on an implication about federal purposes at the time a reservation was set aside. Read broadly, this would include any future water use that assists tribes in economic self-support. Yet the courts are unlikely to interpret it this

way because competing water users in a watershed would have no way to anticipate many kinds of uses.

The standard will probably measure tribal rights by uses reasonably foreseeable at the time a reservation was set aside. This measure could be augmented by new rights asserted by actual uses that began later, but these uses would not enjoy the senior priority of reservation water rights. Reservation water rights will be measured principally by needs to maintain pre-existing Indian activities, such as fisheries, and by needs for the agricultural purpose of federal policy.

Some uses by which Indian reservation water rights are measured involve modest amounts of water that do not generate significant controversy. The two uses that do matter are irrigation and fisheries, and most legal battles are about irrigation rights. By definition, these rights exist in arid places where irrigation is necessary. It is necessary for other farmers too, so there are politically powerful interests competing with those of the Indians.

The basic practical point is that the most significant modern question about Indian reservation water rights is how to measure the tribal right to water needed for irrigated agriculture. Because needs grow as Indian populations grow, and because needs change with changing irrigation technology and changing economic conditions, the standard of the *Winters* decision varies over time. It therefore impedes water use planning by other users on a watershed.

The Supreme Court confronted this dilemma in *Arizona* v. *California* and decided that the Indian irrigation right should be fixed at the amount of water needed to irrigate all reservation land that was suitable for irrigation, based on the technology and economic conditions at the time of the lawsuit. Called the practicably irrigable acreage standard, this decision represented a compromise between the competing values of fairness to the Indians and the certainty of allocation desired by non-Indian competitors. The tribes were awarded a generous measure of their needs—essentially the maximum amount they could claim under the reasonable needs test, whether a particular tribe would ever actually need that much or not. In return, the entitlement was fixed permanently to enhance planning and investment decisions by other users. The Court has rejected Indian efforts to increase their allocations based on facts discovered after a court's final judgment.[13]

**Calculating the quantity reserved.** Since *Arizona* v. *California* was decided in 1963, of course, water rights claimants, and government officials have struggled to apply the decision. Lawsuits to quantify water rights are complicated



in any case because every user on a watershed is potentially affected by the activities of every other user. A fair and just determination of water rights requires that each user have notice of court proceedings and a chance to assert claims. As a result, some court cases involve thousands of parties.

The difficulties do not end when all interested persons have had notice and are properly represented in court. Proving conventional water rights is moderately difficult because of the great fluctuations in water supply over time and because of uncertainties about amounts and characteristics of water in the ground. Proving Indian reservation water rights is even more difficult. To the limited extent that water is already in use (as it was in the *Winters* case), the matter is easy. Water actually in use is almost certainly reasonably needed. But very little Indian farmland is actually irrigated. Indian reservation water rights are mostly theoretical rights to water not yet put to use.

To measure these rights requires expert evidence of hypothetical irrigation plans. First, the total amount of reservation land capable of growing crops is surveyed, and soil samples are taken. Then engineers design hypothetical water delivery systems that could irrigate as much of that surveyed land as can be irrigated at reasonable cost in light of the expected income from the land.[11] The Indians' opponents challenge every proof.

There are enough variables in determining practicably irrigable acreage to produce enormous swings in the outcome of the measure. One important factor is the price of capital that would be used to build a hypothetical irrigation system, i.e., the discount rate. Inflation has generated serious disagreements about discount rates among experts,[15] and the tradition in the western United States has been for the government to provide capital free or at generously subsidized

interest rates.[16] Should these subsidies be considered in measuring Indian reservation water rights?

Another difficult variable is the water duty used to measure reservation rights. This is the amount of water applied to a field to produce a particular crop. In the western United States, water duty measures have traditionally been generous, but increasing competition for water has led to state government efforts to try to reduce waste and to conserve water.[17] By which standard should Indian water rights be determined—the profligate tradition or the new thrift?

**Groundwater rights.** The important court cases about Indian reservation

> *What is lacking is legal authority to sell or lease Indian reservation water rights apart from a land lease.*

water rights involved surface waters. Some decisions have protected Indian rights to surface waters against interference by groundwater pumping, but few cases directly address the question of Indian reservation rights to groundwater. Actual uses of groundwater exist on many Indian reservations, but most uses are limited in quantity and have not generated legal contests. The massive use of groundwater for the Black Mesa Mine on the Navajo Reservation has no competing claimant to raise a challenge.

When an Indian reservation needs groundwater for irrigation or other uses, the reservation water right theory ought to apply,[18] but the theory will require adjustment because of the nature of groundwater. When a groundwater source is located only under Indian land, the Indians will have all rights to the

resource. When the source is shared among surface owners, a more flexible accommodation of rights than the absolute priority of surface water rights is necessary. If a senior owner had an absolute right to the virgin water table and pump pressure of an aquifer, no one else could use the source. State law systems have come up with several practical answers to this dilemma, and it is probable that one of them will be applied to Indian groundwater rights.

### Putting Indian reservation water rights to use

Indian tribes with water rights for fisheries are using their water. Their principal concern is protecting rights from destruction or diversion by other users. Most disputes are in the Pacific Northwest, although the effort to save Pyramid Lake in Nevada has gained well-deserved attention in the press. The case is a good example of politics over economics. A magnificent fishing and recreation lake has been sacrificed for marginal alfalfa fields watered by federal subsidies, simply because the lake is owned by Indians with little political power.[19]

In many water-scarce areas, Indian irrigation rights are at issue, and most of these rights are unused and unquantified. Their uncertain extent has differing effects on competing non-Indian users. Some users benefit because Indian rights, like other water rights in the western states, do not preclude junior owners from using water unless the holder of senior rights is actually taking it.[20] While Indian entitlements are not in use, the water is available to junior owners in a position to use it. Others who require new investments to use water are deterred by Indian rights because the uncertainty inhibits raising and applying capital to expensive projects that need a fixed, reliable supply.

Those who favor quantifying Indian rights, particularly public officials, have

initiated lawsuits and negotiations x entitlements. Major proceedings are under way in Arizona, Montana, Idaho, New Mexico, Colorado, and Wyoming. Because of their complexity, these cases will require many years in court except when the parties come to settlements. But one way or another, Indian reservation water rights will be quantified by court decree or federal statute.

What happens after that? Because reservations are afflicted with poverty, tribes want to find productive uses for their water, but there are complex obstacles to development. Tribes lack capital, and the federal government has stopped subsidizing new water development projects. Also, access to private capital markets is impeded, principally by limits on water rights transfers.

Quantifications of Indian irrigation rights are based on agricultural uses that are often not the best uses of water in the modern economy. Non-Indian agricultural water rights are being converted to municipal and industrial uses throughout the West, despite the sunk costs, inertia, and emotional attachment represented by established farms. Undeveloped Indian water rights lack these impediments and would readily be shifted to higher uses, and municipal and industrial water systems would be willing buyers of an assured supply. But under existing law, tribal reservation water rights may not be sold or leased for use off tribal land.

**Limits on transfers of tribal water rights.** Indian tribal land, which defines tribal reservation water rights, cannot be sold without permission from Congress.[21] This precludes the most common way in which non-Indian water rights are sold, in conjunction with the land on which the water is used. Non-Indian water rights can also be bought and sold apart from the land. This is not the case with Indian water rights; they cannot be sold apart from tribal lands.

There are ways to transfer Indian water rights short of outright sale. Congress has given general authority in federal statutes for Indian tribes to lease their land, including long-term leases.[22] When tribal land is leased for farming, it is accepted practice to include the right to use part of the reservation's water right to irrigate the land.[10]

Moreover, some courts have approved the right of Indian tribes to apply their water rights that are defined by irrigation to other, nonagricultural uses on their own land.[23] By leasing tribal land, tenants can use the water for other purposes. For example, Indian land leased for housing can apply tribal irrigation water rights to serve the needs of the development.

There is similar authority for tribes to sell mineral rights in their land.[24] (According to legal tradition, a sale of

minerals with the right to use the land for their removal is a "mining lease" or "oil and gas lease.") Thus when tribes lease land for oil extraction, their lessees can use reservation water rights for secondary oil recovery or like purposes. A major example of this kind of use is the coal slurry pipeline from the Black Mesa Mine on the Navajo Reservation to the power plant at Mojave, Nev. The pipeline uses reservation groundwater.

What is lacking is legal authority to sell or lease Indian reservation water rights apart from a land lease. (By contrast, the right to sell or lease within a local water basin is routine under western state water law.) Authority to transfer water would be beneficial to tribes and to other users who would like to buy a reliable water supply. The optimum statute would allow leasing for periods

long enough to allow amortization of investments at commercially reasonable rates, possibly with rights to renew at redetermined prices. This would assure Indian tribes of a steady and fair return.

Serious opposition to any law of this kind can be expected from two quarters. One is from holders of junior water rights who currently benefit from the Indians' inability to put their water rights to use. They would have to pay for what is now a free good.

The other barrier is from the familiar political forces that impede many kinds of transfers of state water rights. In basic theory, water rights in the western states are freely marketable. In practice, there are many limitations. Some are inherent, such as the complex information and transaction costs of water rights transfers. Many are legal.[25]



**Surface Water and Federal Lands in the American West**

■ Federal Indian reservations

■ Federal public lands (national parks, forests, and wildlife refuges)

ADAPTED FROM A MAP PREPARED BY THE AMERICAN INDIAN RESOURCES INSTITUTE

One legal obstacle is the determination of every western state to prohibit private water exports. Although federal law limits the states' right to forbid exports,[26] the political desire to do so is strong. If a bill to allow tribes to lease or sell water rights is introduced in Congress, an effort to except from it any interstate water transfer is predictable.

A related barrier is various intrastate limits on transfers between major water basins. States will be reluctant to allow Indian tribes to avoid these limitations without state approval.

A third obstacle in western state water law is the great protection given to other water users who might be affected by a transfer of water rights. A water rights seller can transfer only an amount that will not harm other users. Because other users rely on that part of the return flow from the seller's water right that is not actually consumed by the seller's use, the seller can transfer only the amount consumed. This protection, which some observers think is excessive, impedes many transfers.[27]

Unused Indian water rights present a peculiar version of the problem of protecting junior users. If an Indian right were in use, some junior water rights holders would enjoy that part of the water not actually consumed by Indian use, the part that would return to the system. This return flow is a hypothetical amount rather than an empirically measurable one, and this may complicate transfers.

There is an exception to the rule that Indian water rights cannot be sold or leased for off-reservation use. In southern Arizona, the city of Tucson, the Papago (Tohono O'odham) Indian Tribe, and other users share the same groundwater supply. They negotiated a settlement of their competing ownership claims, and the agreement was enacted by Congress as a statute. A section of this law explicitly allows the tribe to sell or lease the rights confirmed to it under the statute.[28] This provision was sought not only by the tribe but by other users, such as the city; they wanted assured access to the supply at market prices.[29] A second, prospective exception is part of a proposed agreement between the Fort Peck tribes and the state of Montana.[30] It has not yet received necessary approval by the state courts, and it may require approval by Congress.

The Papago statute was an easy case. Since the unused Indian right was to groundwater, there were no junior users relying on return flow to protect. Interstate and interbasin transfers were not a practical threat. Allowing the sale of surface rights will be harder politically. The Fort Peck agreement is also a relatively easy case politically. It would allow sale of surface water from the Missouri River, which is not overappro-

transfers by subjecting tribal transfers to valid limits imposed by state law.

## Conclusion

Indian reservation water rights are a frequent topic of concern in the West, and state and federal officials have embarked on a determined effort to quantify Indian rights. As rights are quantified, attention will shift to their use. Lack of capital and changes in the best uses of water are significant barriers to tribal development on reservations. The alternative of sale or lease is blocked by federal law. Congress should enact a remedy by authorizing Indian tribes to lease their water rights.

## References

1. *US Repts.*, 373:546 (1963).
2. *US Const.*, art. I, sec. 8, cl. 3.
3. Cappaert v. United States. *US Repts.*, 426:128, 138 (1976).
4. Worcester v. Georgia. *US Repts.*, 31:515, 559 (1832).
5. *US Repts.*, 208:564 (1908).
6. Act of May 1, 1888, ch. 213. *US Statutes at Large*, 25:113 (1888).
7. HUNDLEY, N.C. JR. The "Winters" Decision and Indian Water Rights: A Mystery Reexamined. *Western Historical Quarterly*, 13:17 (1982).
8. Cherokee Nation v. Georgia. *US Repts.*, 30:1 (1831).
9. Jones v. Meehan. *US Repts.*, 175:1, 11 (1899).
10. *Felix S. Cohen's Handbook of Federal Indian Law* (R. Strickland et al, editors); at pp. 221–225, 575–604, 613. Michie Bobbs-Merrill, Charlottesville, Va. (1982).
11. Act of June 10, 1896, ch. 398, sec. 8. *US Statutes at Large*, 29:321, 350 (1896).
12. United States v. Adair. *Federal Reporter 2d*, 723:1394, 1412–1414 (9th Cir. 1983) (fishing, hunting, gathering), *cert. denied*, 104 S.Ct. 3536 (1984). United States v. Walker River Irr. Dist. *Federal Reporter, 2d*, 104:334, 340 (9th Cir. 1939) (power).
13. Arizona v. California. *US Repts.*, 460:605 (1983).
14. BURNESS, H.S. ET AL. The "New" Arizona v. California; Practicably Irrigable Acreage and Economic Feasibility. *Nat. Resources Jour.*, 22:517 (1982).
15. BURNESS, H.S. ET AL. Practicably Irrigable Acreage and Economic Feasibility: The Role of Time, Ethics, and Discounting. *Nat. Resources Jour.*, 23:289 (1983).
16. SAX, J.L. Selling Reclamation Water Rights: A Case Study in Federal Subsidy Policy. *Mich. Law Review*, 64:13 (1965).
17. SHUPE, S.J. Waste in Western Water Law: A Blueprint for Change. *Ore. Law Review*, 61:483 (1982).
18. MEYERS, C.J. Federal Groundwater Rights: A Note on Cappaert v. United States. *Land & Water Law Review*, 13:377 (1978).
19. United States v. Truckee-Carson Irr. Dist. *Federal Reporter 2d*, 649:1286, 1289-95 (9th Cir. 1981), *aff'd in part, rev'd in part sub nom.*

20. United States v. Ahtanum Irr. Dist. *Fed. Reptr. 2d*, 236:321, 335, 340 (9th Cir. 1956), *cert. denied*, 352 U.S. 988 (1957).
21. *US Code*, title 25, sec. 177 (1982).
22. *U.S. Code*, title 25, sec. 415 (1982).
23. COLLINS, R.B. Indian Allotment Water Rights. *Land & Water Law Review*, 20:421, 429 n. 33 (1985).
24. *US Code*, title 25, secs. 396a–401 (1982).
25. CLYDE, S.E. Legal and Institutional Barriers to Transfers and Reallocation of Water Resources. *S. Dak. Law Review*, 29:232 (1984).
26. Sporhase v. Nebraska. *US Repts.*, 458:941 (1982).
27. MEYERS, C.J. & POSNER, R.A. Market Transfers of Water Rights: Toward an Improved Market in Water Resources. *National Water Commission Legal Study No. 4* (1971).
28. Southern Arizona Water Rights Settlement Act of 1982, Pub. L. No. 97-293, sec. 306(c). *US Statutes at Large*, 96:1274 (1982).
29. House of Representatives Rept. 97-855, 97th Cong., 2d Sess. (1982).
30. State of Montana/Assiniboine and Sioux Tribes of Fort Peck Indian Reservation Compact, art. III, *ratified* in S.B. 467, ch. 735, 49th Leg. 1985 Mont. Laws.

Nevada v. United States, 463 U.S. 110 (1983).



**About the author:** *Richard B. Collins is associate professor of law at the University of Colorado, Campus Box 401, Boulder, CO 80309. Before joining the CU faculty in 1982, he spent 15 years in private law practice, representing American Indians and tribes. He received his BA from Yale University (New Haven, Conn.) and his LLB from Harvard Law School (Cambridge, Mass.). His articles have appeared in* Land & Water Law Review, University of Colorado Law Review, University of Washington Law Review, *and the* American Bar Association Journal.



# EXHIBIT 53



FILED

NOV 6 - 1962

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

LODGED

NOV.- 1 1962

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

ENTERED

NOV 8 - 1962

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT, et al.,<br><br>Defendants. | No. 1247-SD-C<br><br>FINDINGS OF FACT, CONCLUSIONS OF LAW AND INTERLOCUTORY JUDGMENT NO. 41 CONCERNING THE RIGHTS TO THE USE OF WATERS OF SANTA MARGARITA RIVER STREAM SYSTEM HELD IN TRUST BY THE U.S.A. IN CONNECTION WITH THE RAMONA, CAHUILLA AND PECHANGA INDIAN RESERVATIONS. |

FINDINGS OF FACT

RAMONA INDIAN RESERVATION

1.

The Ramona Indian Reservation was established by Executive Order dated December 29, 1891, and is situated in Riverside County, State of California and comprised of lands described as follows:

North Half of the Southwest Quarter (N½ of SW¼), Southeast Quarter of the Southwest Quarter (SE¼ of SW¼), and the South Half of the Southeast Quarter (S½ of SE¼) of Section Thirty-two (32); the Southwest Quarter of the Southwest Quarter (SW¼ of SW¼) of Section Thirty-three (33) all in Township Six (6) South, Range Three (3) East, San Bernardino Base & Meridian.

3249

7

1  Northwest Quarter of the Northwest Quarter (NW¼ of NW¼)
   of Section Four (4); Northeast Quarter of the Northeast
2  Quarter (NE¼ of NE¼) of Section Five (5); all in
   Township Seven (7) South, Range Three (3) East,
3  San Bernardino Base & Meridian.

4                              2.

5       The Ramona Indian Reservation is located in the most

6  northeasterly portion of the Santa Margarita River watershed

7  and in fact the Santa Margarita River watershed line traverses

8  the Ramona Indian Reservation roughly on a line extending

9  diagonally from the southwest to the northeast across the

10 North Half (N½) of the Southwest Quarter (SW¼) of Section 32,

11 Township 6 South, Range 3 East, S.B.B.M.

12                             3.

13      The lands of the Ramona Indian Reservation within

14 the Santa Margarita River watershed are as follows:  Those lands

15 within the North Half (N½) of the Southwest Quarter (SW¼) of

16 Section Thirty-two (32) lying south and west of the watershed

17 line as above described; the Southeast Quarter of the Southwest

18 Quarter (SE¼ of SW¼) of Section Thirty-two (32); Southwest

19 Quarter of the Southwest Quarter (SW¼ of SW¼) of Section Thirty-

20 three (33), all in Township 6 South, Range 3 East, S.B.B.M.;

21 Northwest Quarter of the Northwest Quarter (NW¼ of NW¼),

22 Section 4; Northeast Quarter of Northeast Quarter (NE¼ of NE¼)

23 of Section 5, all in Township 7 South, Range 3 East, S.B.B.M.

24                             4.

25      The Ramona Indian Reservation consists of approxi-

26 mately 560 acres of which approximately 321 acres lie within

27 the Santa Margarita River watershed.

28                             5.

29      Within the Santa Margarita River watershed there are

30 approximately 104 acres of irrigable land within the Ramona

31 Indian Reservation.

                          -2-

3250

6.

At the present time no Indians reside on the Ramona
Indian Reservation, but Indians of the Cahuilla Indian Reserva-
tion are using said lands for stock raising purposes.

7.

All the lands of the Ramona Indian Reservation within
the watershed of the Santa Margarita River with the exception
of the area of basement complex in the Southwest Quarter of
Section 33, Township 6 South, Range 3 East, overlie the shallow
aquifer of the Anza Ground Water Basin as discussed more fully
in Findings of Fact, Conclusions of Law and Interlocutory Judg-
ment No. 33.  All ground waters contained in the older alluvial
deposits on the Ramona Indian Reservation within the Santa Mar-
garita River watershed are a part of the shallow aquifer of the
Anza Ground Water Basin, and do in fact add to, contribute to
and support the Santa Margarita River stream system.

8.

All ground waters contained within the deposits of
basement complex in the Southwest Quarter (SW¼) of Section 33
Township 6 South, Range 3 East and within the Ramona Reserva-
tion are vagrant, local, percolating waters, not a part of the
Santa Margarita River stream system, and said ground waters do
not add to, contribute to nor support the Santa Margarita River
or any tributary thereto.

9.

There is a spring situated in the Northwest Quarter
(NW¼) of the Northwest Quarter (NW¼) of Section 4, Township 7
South, Range 3 East.

10.

Climate in the Ramona Indian Reservation is semi-arid,
with warm to hot, dry summers and generally moist winters.

-3-

3251

9

1    Rainfall usually occurs duing the period from November 1 to

2    April 1.  Freezing temperatures or below freezing temperatures

3    may be expected during that period.

4                                    11.

5          The amount of surface waters which flow over and

6    upon the Ramona Indian Reservation within the Santa Margarita

7    River watershed is extremely limited in that such surface

8    waters only exist during or immediately after periods of

9    substantial rainfall.

10                                   12.

11         The United States of America when it established

12   said Ramona Indian Reservation on December 29, 1891, intended

13   to reserve rights to the use of the waters of the Santa Mar-

14   garita River stream system which under natural conditions

15   would be physically available on the Ramona Reservation, in-

16   cluding rights to the use of ground waters, sufficient for

17   the present or future needs of the Indians residing thereon.

18         There is no issue presently presented which requires

19   this Court to make findings of fact, conclusions of law or

20   interlocutory judgment provisions concerned with the amount

21   of water required for the Indians' use, the rights of any

22   future assignees or successors in interest to said lands, and

23   other related factors.  As this Court will keep continuing

24   jurisdiction of this cause, this Court can, if the occasion

25   should arise in the future, make such findings and judgment

26   provisions as may then be required on these issues.

27   CAHUILLA INDIAN RESERVATION

28                                   13.

29         The Cahuilla Indian Reservation was established

30   pursuant to Executive Order dated December 27, 1875, and is

31   situated in Riverside County, State of California, and

                                    -4-

                                                         3252.

                                                         10

comprised of the following described lands:

    Section Twenty-five (25), Section Twenty-six (26), Section Twenty-seven (27), Section Twenty-eight (28), Section Thirty-three (33), Section Thirty-four (34), Section Thirty-five (35) and Section Thirty-six (36), all in Township Seven (7) South, Range Two (2) East, SBBM;

    Section Twenty-six (26), Section Twenty-seven (27), Section Twenty-eight (28), Section Twenty-nine (29), Section Thirty (30), Section Thirty-one (31), Section Thirty-two (32), Section Thirty-three (33), Section Thirty-four (34) and Section Thirty-five (35), all in Township 7 South, Range Three (3) East, SBBM;

    Section One (1), Section Two (2), Section Three (3) and Section Four (4) all in Township Eight (8) South, Range Two (2) East, SBBM;

    Section Two (2), Section Three (3), Section Four (4), Section Five (5), Section Six (6), all in Township Eight (8) South, Range Three (3) East, SBBM.

In addition to the above-described lands there was added to the Cahuilla Indian Reservation by Executive Order dated March 14, 1887, the following lands:

Section 23, Township 7 South, Range 2 East.

On December 29, 1891, by Executive Order there was likewise added to the Cahuilla Indian Reservation the South Half ($S\frac{1}{2}$) of Section 14, Township 7 South, Range 2 East.

On or about January 25, 1927, the North Half ($N\frac{1}{2}$) of Lot 3, in Section 8, Township 8 South, Range 3 East, S.B.B.M. was acquired by the Secretary of Interior by deed, and added to the Cahuilla Indian Reservation. Said deed is recorded in Book 703 of Deeds, page 133, Riverside County, California.

14.

By Findings of Fact, Conclusions of Law and Inter-locutory Judgment No. 33 the nature and extent of the shallow and deep aquifers of the Anza Ground Water Basin have been determined. Said Anza Ground Water Basin consists of the younger and older alluvial deposits within Anza Valley upstream from a line which is drawn on U. S. Exhibit 278 in Section 29,

-5-

3253

//

1   Township 7 South, Range 3 East. The surface extent of said
2   younger and older alluvial deposits which comprise the Anza
3   Ground Water Basin is depicted on said U. S. Exhibit 278
4   incorporated herein by reference.
5           As determined in Findings of Fact, Conclusions of
6   Law and Interlocutory Judgment No. 33 the ground waters con-
7   tained within the shallow aquifer of the Anza Ground Water
8   Basin are percolating waters and add to, contribute to and
9   support theSanta Margarita River stream system.  To the
10  extent that any lands of the Cahuilla Indian Reservation con-
11  sist of the younger or older alluvial deposits of the shallow
12  aquifer of the Anza Ground Water Basin as determined in
13  Findings of Fact, Conclusions of Law and Interlocutory Judg-
14  ment No. 33 said lands are a part of the shallow aquifer of
15  the Anza Ground Water Basin.
16                          16.
17          Those lands of the Cahuilla Indian Reservation which
18  overlie the deep aquifer of the Anza Ground Water Basin as
19  determined in Findings of Fact, Conclusions of Law and Inter-
20  locutory Judgment No. 33 do in fact contain ground waters which
21  are a part of the deep aquifer of the Anza Ground Water Basin.
22  Said lands of the Cahuilla Indian Reservation which do in
23  fact overlie the deep aquifer of the Anza Ground Water Basin
24  are located in the Northeast Quarter of Section 28, and the
25  West One-Half (W½) of the Northwest Quarter (NW¼) of Section 27,
26  Township 7 South, Range 3 East, S.B.B.M. and are depicted on
27  U. S. Exhibit 278.
28                          17.
29          All ground waters contained within the deep aquifer
30  of the Anza Ground Water Basin and within the Cahuilla Indian
31  Reservation are not a part of the Santa Margarita River stream

-6-

3254

12

1  system nor do said ground waters add to, contribute to or

2  support the Santa Margarita River or any tributary thereto.

3                          18.

4        Cahuilla Creek does flow over lands which comprise

5  a portion of the Cahuilla Indian Reservation and there is a

6  perennial flow of Cahuilla Creek in the Southwest Quarter

7  (SW¼) of Sections 23 and 27, Township 7 South, Range 2 East.

8  All surface waters of Cahuilla Creek and its tributaries within

9  the Cahuilla Reservation are a part of the Santa Margarita

10 River stream system.

11                         19.

12       There are a total of 18,292 acres in the Cahuilla

13 Indian Reservation of which 17,312 acres are within the

14 watershed of the Santa Margarita River.  Of these, 12,998 acres

15 are under present conditions irrigable.

16                         20.

17       At present the waters contained upon or within the

18 lands which comprise the Cahuilla Indian Reservation are

19 primarily used for limited domestic use and livestock purposes.

20 There are at the present time approximately 94 Indians in

21 the Cahuilla Tribe of which 32 are now residing on the Cahuilla

22 Indian Reservation.

23                         21.

24       There is situated in the Southwest Quarter of the

25 Southwest Quarter (SW¼ of SW¼) of Section 14, Township 7

26 South, Range 3 East, sixteen (16) acres which overlie the

27 Cahuilla Ground Water Basin and which have been irrigated with

28 waters from a spring situated slightly north and east of the

29 irrigated land.

30                         22.

31       There are within the Cahuilla Indian Reservation in

-7-

3255

13

1  the North Half of the Northwest Quarter (N½ of NW¼) of

2  Section 26, Township 7 South, Range 2 East, thirty-five

3  (35) acres of land which have been irrigated.  The waters

4  for this irrigation come from a spring located slightly north

5  and east of the irrigated lands and both the lands irrigated

6  and the spring are located in the Cahuilla Ground Water Basin

7  as said basin is defined in Findings of Fact, Conclusions of

8  Law and Interlocutory Judgment No. 33.

9                          23.

10          In the East Half of the Northeast Quarter (E½ of NE¼)

11  of Section 6, Township 8 South, Range 3 East, within the

12  Cahuilla Indian Reservation approximately 20 acres of lands

13  have been irrigated with waters from a spring situated near

14  the West Quarter corner of Section 5 Township 8 South, Range 3

15  East

16                          24.

17          Climate in the Cahuilla Indian Reservation is similar

18  to that which exists in the Ramona Indian Reservation, and ex-

19  cept where springs or perennial flow of surface waters exist

20  as found hereinabove, surface water is apparent only during or

21  immediately after periods of rainfall.

22                          25.

23          That a portion of the lands which comprise the

24  Cahuilla Indian Reservation overlie the Cahuilla Ground Water

25  Basin as said basin has been determined in Findings of Fact,

26  Conclusions of Law and Interlocutory Judgment No. 33; said

27  ground water basin and said Indian Reservation are depicted

28  on U. S. Exhibit 278 incorporated herein by reference.  All

29  ground waters contained within the lands of the Cahuilla

30  Indian Reservation which are a part of the Cahuilla Ground

31  Water Basin add to, contribute to and support the Santa Mar-

garita River stream system.

                          -8-

3256

14

26.

The United States of America, when it created the Cahuilla Indian Reservation by Executive Orders dated December 27, 1875, March 14, 1887, and December 29, 1891, intended to reserve rights to the use of the waters of the Santa Margarita River stream system which under natural conditions would be physically available on the Indian Reservation, including rights to the use of the ground waters, sufficient for the present or future needs of the Indians residing thereon. There is no issue presently presented which requires this Court to make findings of fact, conclusions of law or judgment provisions concerning the amount of water required for the Indians' use on said lands or the rights of any future assignees or successors in interest to said lands. As this Court will keep continuing jurisdiction of this cause, this Court can, if the occasion should arise in the future, make such findings of fact, conclusions of law and interlocutory judgment provisions as may be required on those issues.

PECHANGA INDIAN RESERVATION

27.

In the Executive Orders and related documents establishing the Pechanga Indian Reservation, the reservation is sometimes referred to as the Temecula Indian Reservation and the Indians residing thereon referred to as the Temecula Indian Mission Band.

28.

The Pechanga Indian Reservation was established by an Executive Order, dated June 27, 1882. The lands which presently comprise that Reservation are situated in Riverside County, State of California, described as follows:

Section Twenty-six (26), Section Twenty-seven (27) except for the Northwest Quarter of the Northwest Quarter (NW¼ of NW¼) Section Thirty-Four (34)

-9-

3257

15

1    except for Lot 16, Section Thirty-five (35), Lot 7
     and Southeast Quarter of the Southwest Quarter
2    (SE¼ of SW¼) of Section Twenty-eight (28), all in
     Township Eight (8) South, Range Two (2) West, SBBM.

3

4                         29.

5      There was added to the Pechanga Indian Reservation:

6    Section Twenty-five (25), Township Eight (8) South,
     Range Two (2) West, SBBM.

7

8 by Executive Order dated January 9, 1907, of the Secretary of

9 the Interior.

10                        30.

11      In addition to the lands comprising the Pechanga Indian

12 Reservation as above described, there was added on August 29,

13 1893, to that Reservation by an unnumbered Patent:

14    The North Half of the Northwest Quarter (N½ of NW¼),
     Southeast of the Northwest Quarter (SE¼ of NW¼),
15    Northwest Quarter of the Northeast Quarter (NW¼ of
     NE¼) of Section Thirty-six (36), Township Eight (8)
16    South, Range Two (2) West, SBBM.

17      There was likewise added to the Pechanga Indian

18 Reservation

19    Southwest Quarter of the Northeast Quarter (SW¼ of NE¼),
     East Half of the Northeast Quarter (E½ of NE¼), South
20    Half (S½) of Section Thirty-six (36), Township Eight (8)
     South, Range Two (2) West, SBBM,

21

22 by a patent dated May 25, 1931.

23      Also added to the Pechanga Indian Reservation is the

24 so-called Kelsey Tract, Lot E of the Little Temecula Grant, by

25 a deed dated March 11, 1907.

26                        31.

27 Pechanga Creek

28      Pechanga Creek is an intermittent stream which rises

29 in the Cleveland National Forest, Section 30, Township 8 South,

30 Range 1 West, SBBM. It proceeds in a generally northwesterly

31 direction, entering the Pechanga Indian Reservation in the

-10-

3258

16

1   Northeast Quarter (NE¼) of Section 25, Township 8 South,

2   Range 2 West SBBM., and leaves the Reservation near the North-

3   west corner of the Southeast Quarter of the Southwest Quarter

4   (SE¼ of SW¼) of Section 28, Township 8 South, Range 2 West,

5   SBBM.  Continuing its general course as above described, the

6   stream proceeds across lands in private ownership for a dis-

7   tance of approximately one-half (1/2) mile where it enters

8   the so-called Kelsey Tract, described as Lot E of the Little

9   Temecula Rancho, which is part of the Pechanga Reservation.

10  Proceeding across that tract of Reservation Land, the stream

11  continues its course to the point where it enters Temecula

12  Creek approximately one (1) mile east from where the stream

13  last mentioned joins Murrieta Creek to form the Santa Mar-

14  garita River   Said Pechanga Creek is a tributary to Temecula

15  Creek one of the two principal tributaries of the Santa Mar-

16  garita River.  Pechanga Creek is intermittent and flows only

17  during and immediately after periods of rainfall.

18  Murrieta-Temecula Ground Water Area

19       The exterior boundaries of the Murrieta-Temecula

20  Ground Water Area was established by the Findings of Fact,

21  Conclusions of Law and Interlocutory Judgment No. 30, entered

22  the 8th day of March, 1962.

23                          33.

24       The following described lands situated within the

25  Pechanga Indian Reservation are part of the Murrieta-Temecula

26  Ground Water Area and those lands have been found to overlie

27  ground waters within that area:

28       All of Section Twenty-six (26) all of Section Thirty-
         five (35), North Half of the South Half (N½ of S½),
29       North Half (N½) of Section Thirty-four (34), all of
         Section Twenty-seven (27), within Pechanga Indian
30       Reservation, all of Section Twenty-eight (28) within
         Pechanga Indian Reservation, and Lot E of Little
31       Temecula Rancho within Pechanga Indian Reservation.

                          -11-

3259

17

34.

Geology of Murrieta-Temecula Ground
Water Area Within Pechanga Indian
Reservation

The lands within the Pechanga Indian Reservation above described which are part of the Murrieta-Temecula Ground Water Area are comprised of older continental alluvium and conform generally to the description of the ground water area which is more fully described in the Findings of Fact, Conclusions of Law and Interlocutory Judgment No. 30 and entered March 8, 1962. In the general area through which Pechanga Creek has its course, the older continental alluvium is overlain with a thin layer of younger alluvium. The younger alluvium is the erosion from and redistribution of the older alluvium as well as erosion from the surrounding basement complex.

35.

There is a complex of faults through the Pechanga Indian Reservation intersecting and traversing the alluvial fill above described. Result of that faulting has been to control in some but undetermined degree the movement of the ground water within the Reservation. Generally, however, it is found that those ground waters are moving towards the mouth of Temecula Canyon through which flows the Santa Margarita River.

36.

Ground waters, if any, found in the basement complex or weathered basement complex within the Pechanga Indian Reservation are vagrant, local and percolating, not a part of the Santa Margarita River streamsystem. Said deposits of basement complex or weathered basement complex are depicted on U. S. Exhibit 15L.

-12-

3260

18

37.

Climate, Crops, Duty of Water,
Irrigable Acreage Within Pechanga
Indian Reservation

Climate in the Pechanga Indian Reservation is semi-arid, with warm to hot, dry summers, and cool and generally moist winters. Rainfall usually occurs during the period from the first of November to the first of April. There are occasional rain showers during the irrigation season which is roughly from April to October. As a consequence, the period of the greatest demand for water is the period of shortest supply, whereas the period of greatest supply occurs when the demands are very slight. The irrigable portions of the Pechanga Indian Reservation are subject to frost damage.

38.

There are a total of 3787 acres of land in the Pechanga Indian Reservation within Santa Margarita River water-shed. Of these 3787 acres, 1694 acres are irrigable. Of these 1694 acres, 559 are Class VI lands which are not suitable for cultivation but because of their other characteristics are suitable for irrigated but non-cultivated crops.

39.

At the present time, the waters contained in the Pechanga Indian Reservation are used largely for stock raising and domestic purposes and the extent of the water use is negligible in that there are at the present time only approximately six (6) Indians residing on the Reservation. The Pechanga Indian Tribe consists of 194 Indians.

40.

The United States of America when it withdrew the Indian Lands above described to form the Pechanga Indian Reservation, intended to reserve rights to the use of the

-13-

3261

17.

1 waters of the Santa Margarita River stream system which under
2 natural conditions would be physically available on the
3 Indian Reservation, including rights to the use of ground
4 waters sufficient for the present or future needs of the
5 Indians residing thereon.  There is no issue presently pre-
6 sented which requires this Court to make findings of fact,
7 conclusions of law and interlocutory judgment provisions
8 concerned with the amount of water required for the Indians'
9 use or the rights of any future assignees or successors in
10 interest to said lands.  As this Court will keep continuing
11 jurisdiction of this cause this Court can, if the occasion
12 should arise in the future, make such findings of fact,
13 conclusions of law and interlocutory judgment provisions as
14 may be required on those issues.

15                                    41.

16 Water Duty

17          Under present conditions and generally on the
18 Ramona, Cahuilla and Pechanga Indian Reservations and through-
19 out this area a reasonable water duty for crops is as follows:

20                                    Irrigation Requirements
21                                    Acre-Feet Per Acre Per Year

22 Row Crops                                4.00
   Irrigated Pasture                        3.83
23 Alfalfa                                  3.00
   Deciduous Fruit                          1.07
24 Small Grains                             1.75
   Avocados                                 2.35
25 Citrus                                   1.86

26          To the irrigation requirements shown above, there
27 should be added 10% for delivery losses.  That type of loss occurs
28 between the point of supply and the point of use.

29          This Court finds that the above set forth general
30 water duty requirements and all findings herein concerned with
31 irrigable acreage are supported by the evidence in this case.

                                    -14-

                                              3262

                                                20

1 However, in this case there was no issue of apportionment
2 presented and such findings concerning water duty and
3 irrigable acreage as set forth in these findings shall be
4 prima facie evidence as to these facts in any future pro-
5 ceedings wherein the question of water duty or irrigable
6 acreage is relevant. As used herein, prima facie evidence
7 shall mean that which suffices for the proof of a particular
8 fact until contradicted or overcome by other evidence.

9                                        42.

10        That no use of any surface waters which flow over
11 and upon any of the lands within the Santa Margarita River
12 watershed and within the Ramona, Cahuilla and Pechanga
13 Indian Reservations has been open, notorious or adverse,
14 and there are no prescriptive rights to the use of any
15 waters of the Santa Margarita River stream system on any
16 lands which comprise said Indian Reservations

17                                        43.

18        That no appropriative rights exist to the use of
19 the waters of the Santa Margarita River stream system or
20 waters which add to and support said Santa Margarita River
21 stream system on any of the lands which comprise the Ramona,
22 Cahuilla and Pechanga Indian Reservations.

23                                        44.

24        That except as expressly provided hereinabove there
25 are no rights to the use of the waters of the Santa Margarita
26 River and its tributaries or waters which add to and support
27 said River and its tributaries owned or held by the United
28 States of America in trust for the Indians or in trust as to
29 said Indian Reservations
30  - - -
31  - - -

-15-

3263

2 /

1          CONCLUSIONS OF LAW

2     RAMONA INDIAN RESERVATION

3                              1.

4          The United States of America when it established the

5     Ramona Indian Reservation intended to reserve, and did reserve,

6     rights to the use of the waters of the Santa Margarita River

7     stream system which under natural conditions would be available

8     on the Ramona Indian Reservation, including rights to the use

9     of ground waters, sufficient for the present and future needs

10    of the Indians residing thereon with a priority date of

11    December 29, 1891.

12                             2.

13         All lands of the Ramona Indian Reservation within the

14    watershed of the Santa Margarita River with the exception of an

15    area of basement complex in the Southwest Quarter (SW¼) of

16    Section 33, Township 6 South, Range 3 East, overlie the

17    shallow aquifer of the Anza Ground Water Basin and the ground

18    waters contained within said lands add to, contribute to and

19    support the Santa Margarita River stream system.

20                             3.

21         All ground waters contained within the deposits of

22    basement complex in the Southwest Quarter (SW¼) of Section 33,

23    Township 6 South, Range 3 East, and within the Ramona Indian

24    Reservation are vagrant, local, percolating waters not a part

25    of the Santa Margarita River stream system and said ground

26    waters do not add to, contribute to nor support the Santa

27    Margarita River or any tributary thereto.

28    CAHUILLA INDIAN RESERVATION

29                             4.

30         The United States of America intended to reserve, and

31    did reserve, rights to the use of the waters of the Santa

                             -16-

                                                3264

                                                22

1  Margarita River stream system which under natural conditions
2  would be physically available on the Cahuilla Indian Reserva-
3  tion including rights to the use of the ground waters, suf-
4  ficient for the present and future needs of the Indians re-
5  siding thereon with priority dates of December 27, 1875, for
6  lands transferred by the Executive Order of that date;
7  Marh 14, 1887, for lands transferred by Executive Order of that
8  date; December 29, 1891, for lands transferred by Executive
9  Order of that date

10                                5.

11       Ground waters contained within the lands of Cahuilla
12  Indian Reservation and within the younger or older alluvial
13  deposits which are a part of the shallow aquifer of the Anza
14  Ground Water Basin are percolating waters and add to, contribute
15  to and support the Santa Margarita River stream system.

16                                6.

17       Ground waters contained within the deep aquifer of the
18  Anza Ground Water Basin in the Northeast Quarter (NE$\frac{1}{4}$) of
19  Section 28, and the West One-half (W$\frac{1}{2}$) of the Northwest Quarter
20  (NW$\frac{1}{4}$) of Section 27, Township 7 South, Range 3 East, and within
21  the Cahuilla Indian Reservation, are a part of the deep aquifer
22  of the Anza Ground Water Basin, and said ground waters do not
23  add to, support nor contribute to the Santa Margarita River
24  stream system.

25                                7.

26       Ground waters contained within the lands of the
27  Cahuilla Indian Reservation which were determined to be a
28  part of the Cahuilla Ground Water Basin in Findings of Fact,
29  Conclusions of Law and Interlocutory Judgment No. 33 add to,
30  support and contribute to the Santa Margarita River stream.
31  system.

-17-

3265

23

1  PECHANGA INDIAN RESERVATION

2                                    8.

3       United States of America intended to reserve and did

4  reserve rights to the use of the waters of the Santa Margarita

5  River stream system which under natural conditions would be

6  available on the Pechanga Indian Reservation including rights

7  to the use of ground waters sufficient for the present and

8  future needs of the Indians residing thereon with priority

9  dates of June 27, 1882, for those lands established by Execu-

10  tive Order of that date; January 9, 1907 for those lands

11  transferred by the Executive Order of that date; August 29,

12  1893 for those lands added to the reservation by Patent on

13  that date; May 25, 1931, for those lands added to the reserva-

14  tion by Patent of that date.

15                                   9.

16       That those lands specifically described in Findings

17  of Fact No. 33 are within the Murrieta-Temecula Ground Water

18  Area as said ground water area has been determined in Findings

19  of Fact, Conclusions of Law and Interlocutory Judgment No. 30,

20  and ground waters contained therein, add to, contribute to

21  and support the Santa Margarita River stream system.

22                                   10.

23       That all surface waters which flow over and upon any

24  of the lands within the Santa Margarita River watershed and

25  which are a part of the Ramona, Cahuilla and Pechange Indian

26  Reservations are a part of the Santa Margarita River stream

27  system

28                                   11.

29       That there are no prescriptive rights to the use of

30  the waters of the Santa Margarita River and its tributaries or to

31  - - -

                                   -18-

                                                              3266

1   the use of the waters which add to and support said River and

2   its tributaries owned or held in trust by the United States

3   for the Indians' use or in trust as to said Indian Reservations.

4                             12.

5       That there are no appropriative rights to the use of

6   the waters of the Santa Margarita River and its tributaries or

7   to the use of the waters which add to and support said River and

8   its tributaries owned or held in trust by the United States of

9   America for the Indians' use or in trust as to said Reservations.

10                             13.

11       That except as provided in Findings of Fact 12, 26,

12   and 40 herein, there are no rights to the use of the Santa Mar-

13   garita River or its tributaries or waters which add to and sup-

14   port said River and its tributaries owned by the United States

15   in trust for the Indians' use or in trust for use upon the

16   said Indian Reservations.

17               INTERLOCUTORY JUDGMENT

18                      1.

19       IT IS ORDERED, ADJUDGED AND DECREED that the United

20   States of America when it established the Ramona Indian Reserva-

21   tion intended to reserve and did reserve rights to the use of

22   the waters of the Santa Margarita River stream system which

23   under natural conditions would be physically available on the

24   Ramona Reservation, including rights to the use of ground waters,

25   sufficient for the present and future needs of the Indians re-

26   siding thereon with a priority date of December 29, 1891.

27                      2.

28       IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all

29   lands of the Ramona Indian Reservation within the watershed

30   of the Santa Margarita River with the exception of the area

31   of basement complex in the Southwest Quarter ($SW\frac{1}{4}$)

-19-

3267

25

53-000036

1   of Section 33, Township 6 South, Range 3 East, which is de-
2   picted on U. S. Exhibit 278 incorporated herein by reference,
3   overlie the shallow aquifer of the Anza Ground Water Basin
4   as determined in Findings of Fact, Conclusions of Law and
5   Interlocutory Judgment No. 33, and the ground waters con-
6   tained therein add to, contribute to and support the Santa
7   Margarita River stream system.

8   CAHUILLA INDIAN RESERVATION

9                               3.

10      IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the
11  United States of America intended to reserve and did reserve
12  rights to the use of the waters of the Santa Margarita River
13  which under natural conditions would be physically available
14  on the Cahuilla Indian Reservation, including rights to the
15  use of ground waters, sufficient for the present and future
16  needs of the Indians residing thereon with priority dates of
17  December 27, 1875, for lands transferred by the Executive
18  Order of that date; March 14, 1887, for lands transferred by
19  the Executive Order of that date; December 29, 1891 for lands
20  transferred by the Executive Order of that date.

21                              4.

22      IT IS FURTHER ORDERED, ADJUDGED AND DECREED that
23  ground waters contained within the lands of the Cahuilla
24  Indian Reservation and within the younger or older alluvial
25  deposits which are a part of the shallow aquifer of the Anza
26  Ground Water Area are percolating waters and add to, contribute
27  to and support the Santa Margarita River stream system.

28                              5.

29      IT IS FURTHER ORDERED, ADJUDGED AND DECREED that
30  ground waters contained within the deep aquifer of the Anza
31  Ground Water Basin, in the Northeast Quarter (NE$\frac{1}{4}$) of

-20-

3268

25

1   Section 28 and the West One-half (W½) of the Northwest
2   Quarter (NW¼) of Section 27, Township 7 South, Range 3
3   East, and within the Cahuilla Indian Reservation, are a
4   part of the deep aquifer of the Anza Ground Water Basin and
5   said ground waters do not add to, support nor contribute to
6   the Santa Margarita River stream system.

                            6.

7   
8          IT IS FURTHER ORDERED, ADJUDGED AND DECREED that
9   ground waters contained within the lands of the Cahuilla
10  Indian Reservation which are a part of the Cahuilla Ground
11  Water Basin add to, contribute to and support the Santa Mar-
12  garita River stream system.

13  PECHANGA INDIAN RESERVATION

14                          7.

15         IT IS FURTHER ORDERED, ADJUDGED AND DECREED that
16  the United States of America intended to reserve, and did re-
17  serve, rights to the use of the waters of the Santa Margarita
18  River stream system which under natural conditions would be
19  physically available on the Pechanga Indian Reservation,
20  including rights to the use of ground waters sufficient for
21  the present and future needs of the Indians residing thereon
22  with priority dates of June 27, 1882, for those lands
23  established by the Executive Order of that date; January 9,
24  1907 for those lands transferred by the Executive Order of
25  that date; August 29, 1893 for those lands added to the
26  Reservation by Patent on that date; and May 25, 1931, for
27  those lands added to the Reservation by Patent of that date.
28                          8.
29         IT IS FURTHER ORDERED, ADJUDGED AND DECREED that
30  those lands specifically described in Findings of Fact No.33
31  are within the Murrieta-Temecula Ground Water Area as said

                            -21-

3269

27

1   ground water area has been determined in Findings of Fact,

2   Conclusions of Law and Interlocutory Judgment No. 30.

3                                    9.

4          IT IS FURTHER ORDERED, ADJUDGED AND DECREED That

5   all surface waters which flow over and upon any of the lands

6   within the Santa Margarita River watershed and which are a

7   part of the Ramona, Cahuilla and Pechanga Indian Reservations

8   are a part of the Santa Margarita River stream system.

9                                   10

10         IT IS FURTHER ORDERED, ADJUDGED AND DECREED that

11  the use of any waters, surface or ground, by the Indians on

12  the Ramona, Cahuilla and Pechanga Reservations is subject to

13  the continuing jurisdiction of this Court.

14                                   11.

15         IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all

16  ground waters contained within deposits of basement complex

17  or weathered basement complex and within the Santa Margarita

18  River watershed and within the Ramona, Cahuilla and Pechanga

19  Indian Reservations as said deposits are depicted on U. S. Ex-

20  hibit 278 and U. S. Exhibit 15L are vagrant, local, percola-

21  ting waters not a part of the Santa Margarita River or any

22  tributary thereto.  It is further ordered, adjudged and

23  decreed that the rights of the United States of America as

24  the owner in trust of said lands are forever quieted against

25  all parties claiming rights to the waters of the Santa Mar-

26  garita River and/or its tributaries.  It is further  ordered,

27  adjudged and decreed that the United States of America as

28  owner in trust of said lands is forever restrained from

29  asserting rights in or to the waters of the Santa Margarita

30  River or its tributaries concerning said lands excepting

31  rights to surface waters which flow over and upon said lands.

                                   -22-

                                                            3270

                                                               28

12.

2      IT IS FURTHER ORDERED, ADJUDGED AND DECREED that

3  there are no prescriptive rights owned by the United States of

4  America in trust for the Indians or Indian lands to the use

5  of the waters of the Santa Margarita River or its tributaries

6  or waters which add to and support said River and its tri-

7  butaries.

8                          13.

9      IT IS FURTHER ORDERED, ADJUDGED AND DECREED that

10  there are no appropriative rights owned by the United States

11  of America in trust for the Indians or Indian lands to the

12  use of the waters of the Santa Margarita River or its tri-

13  butaries or waters which add to and support said River and

14  its tributaries

15                          14.

16     IT IS FURTHER ORDERED, ADJUDGED AND DECREED that

17  except as expressly provided in Paragraphs 1, 4 and 7 of

18  this Interlocutory Judgment there are no rights to the use

19  of the waters of the Santa Margarita River and its tribu-

20  taries or to the waters which add to and support said River

21  and its tributaries owned by the United States of America

22  in trust for the Indians or Indian lands on the Ramona,

23  Cahuilla and Pechanga Reservations.

24                          15.

25     IT IS FURTHER ORDERED, ADJUDGED AND DECREED that

26  based upon the decision of the United States Court of Appeal

27  Ninth Circuit, California v. United States, 235 Fed.2d 647

28  that this is not a final decree but is interlocutory in

29  nature and by reason of the order by this Court that all

30  parties are adverse one to the other, thus dispensing with

31  cross pleadings, all parties to this proceeding may object to

-23-

3271

29

1   these findings of fact, conclusions of law and interlocutory

2   judgments and will be given full opportunity upon due notice

3   to interpose their objections to these findings of fact,

4   conclusions of law and interlocutory judgments prior to the

5   entry of final judgment in this case.

6                              16

7        IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there

8   is no issue presently presented which requires this Court to

9   make findings of fact, conclusions of law or interlocutory

10  judgment provisions concerned with the amount of water required

11  for the Indians use, the rights of any future assignees or

12  successors in interest to said lands, and other related factors.

13  Jurisdiction is reserved by this Court to make such findings of

14  fact, conclusions of law and judgment provisions in the future

15  should the need occur.

16                             17

17       IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this

18  Interlocutory Judgment is not appealable, is not final and

19  shall not be operative until made a part of the final judgment

20  in this case, and this Court expressly reserves jurisdiction

21  to modify or vacate it either upon its own motion or upon

22  motion of any party to this proceeding until such time as

23  final judgment in this cause is entered.

24       Dated:

25            *11.8.62*

26

27

28                              *James M. Carter*
                                JUDGE

29

30

31

                              -24-


                                                 3272

                                                  70


                      53-000041

**EXHIBIT 54**

54-000042

1   Steven B. Abbott, State Bar No. 125270
    email: sabbott@redwineandsherrill.com
2   Gerald D. Shoaf, State Bar No. 41084
    email: gshoaf@redwineandsherrill.com
3   Harry C. Carpelan, State Bar No. 102239
    email: hcarpelan@redwineandsherrill.com
4   REDWINE AND SHERRILL
    1950 Market Street
5   Riverside, California 92501-1720
    Telephone No.: (951) 684-2520
6   Facsimile No.: (951) 684-9583

7   Attorneys for Defendant,
    COACHELLA VALLEY WATER DISTRICT

8

9              UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

11

| | |
|---|---|
| 12   BOBBIE RAY PRECKWINKLE, an individual; STEPHEN RICE, an individual; CHAD SIVA, an individual, | ) Case No. EDCV05-626 VAP (SGLx) |
| 13 | ) |
| 14                    Plaintiffs, | ) Honorable Virginia A. Phillips |
| 15          v. | ) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT |
| 16   COACHELLA VALLEY WATER DISTRICT, a public agency, | ) |
| 17 | ) |
| 18                   Defendants. | ) HEARING: 6/2/08 TIME: 10:00 A.M. COURTROOM: 2 TRIAL: 12/2/08 |
| 19 | ) |

20

21

22

23

24

25

26

27

28

EDCV05-626 VAP (SGLx)

## TABLE OF CONTENTS

Page

I.   INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III. CVWD MAY LEVY REPLENISHMENT ASSESSMENTS ON
     A NON-INDIAN LESSEE OF ALLOTTED LAND . . . . . . . . . . . . . . . . . . . 5

     A.   State Law Authorizes CVWD to Levy Replenishment
          Assessments on Groundwater Producers . . . . . . . . . . . . . . . . . . . 5

     B.   The Exercise of Taxing Jurisdiction by Levying a Replenishment
          Assessment on a Non-Indian Lessee Does not Violate
          Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.   The Levy of Replenishment Assessments Does
               Not Regulate Water Rights . . . . . . . . . . . . . . . . . . . . . . . . . 9

          2.   There is No Interference with Plaintiffs' Ability
               To Lease Their Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          3.   The Replenishment Assessments Are Not an
               Encumbrance on Trust Property . . . . . . . . . . . . . . . . . . . . . 10

          4.   The Balance of Interests is in Favor of CVWD . . . . . . . . . . . . 11

IV.  THE INDIVIDUAL CLAIMS ARE WITHOUT MERIT . . . . . . . . . . . . . . 13

     A.   Common Allegations That Are Not True . . . . . . . . . . . . . . . . . . . 13

     B.   CVWD Is Entitled to Judgment on the First Claim . . . . . . . . . . . . . 14

     C.   The Second Claim for Trespass Fails as Plaintiffs
          Are Not in Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     D.   The Fourth Claim Fails as CVWD Did Not Convert
          Any Property of Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     E.   There Is No Infringement of a Federal Constitutional or
          Statutory Right to Support a Claim under 42 USC
          Section 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     F.   CVWD is Entitled to Judgment on the Sixth Claim . . . . . . . . . . . . . 16

     G.   Declaratory Relief Should Not be Granted . . . . . . . . . . . . . . . . . . 17

V.   ANY DAMAGES ARE LIMITED BY THE APPLICABLE
     CLAIMS REQUIREMENTS AND STATUTES OF
     LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

54-000044

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A.    Claims Arising Under State Law - Six Months or One
      Year Prior to Presentation of the Claim . . . . . . . . . . . . . . . . . . . . . . . 18

B.    Federal Law Claims - Two Years Prior to Filing Suit,
      if at All . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**EDCV05-626 VAP (SGLx)**

ii

MEMO OF PTS AND AUTHS IN SUPPORT OF CVWD MSJ

TABLE OF AUTHORITIES

Page

**Federal Cases**

*Agua Caliente Band of Mission Indians, v. County of Riverside,*
442 F.2d 1184 (9th Cir. 1971) ................. 11, 12, 17

*Arizona Department of Revenue v. Blaze Construction Company, Inc.,*
526 U.S. 32, 119 S.Ct. 957, 143 L.Ed.2d 27 (1999) .................. 12

*Carey v. Piphus*
435 US 247, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978) ................. 16

*Colville Confederate Tribes v. Walton,*
647 F.2d 42 (9th Cir. 1981) ...................... 9

*Cotton Petroleum Corporation v. New Mexico,*
490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989) ............... 12

*Fort Mojave Tribe v. County of San Bernardino,*
543 F.2d 1253 (9th Cir. 1976) ................. 11, 12, 17

*Graham v. Connor*
490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed 2d 443 (1989) .............. 15

*Knox v. Davis*
260 F. 3d 1009 (9th Cir. 2001) ...................... 19

*Maine v. Thiboutot,*
448 U.S. 1, 100 S. Ct. 2502, 65 L. Ed.2d 555 (1980) ................. 15

*Maricopa and Phoenix Railroad Company v. Arizona Territory,*
156 U.S. 347, 15 S.Ct. 391, 39 L.Ed.447 (1895) .................... 12

*McClanahan v. Arizona State Tax Comm'n.*
411 U.S. 164, [93 S.Ct. 1257], 36 L.Ed 2d 129 (1973) .............. 8, 9

*Mescalero Apache Tribe v. Jones,*
411 U.S. 145, [93 S.Ct. 1267, 36 L.Ed 2d 114] (1973) .............. 9

*Moe v. Confederated Salish and Kootenai Tribe of the Flathead Reservation et al.,*
425 U.S. 463, 96 S.CT. 1634, 48 L.Ed.2d 96 (1976) .............. 8, 9, 12

*Oklahoma Tax Commission v. Texas Company,*
336 U.S. 342, 69 S.Ct. 561, 93 L.Ed 721 (1949) .................. 11

*Sumner Peck Ranch v. Bureau of Reclamation,*
823 F. Supp 715 (E. D. Cal. 1993) .................... 18

**EDCV05-626 VAP (SGLx)**

iii

MEMO OF PTS AND AUTHS IN SUPPORT OF CVWD MSJ

54-000046

*Thomas v. Gay,*
    169 U.S. 264, [18 S.Ct. 340, 42 L.Ed 740] (1898) . . . . . . . . . . . . . . . . . . . 9, 13

*Truscott v. Hurlbut Land & Cattle Company,*
    73 F. 60 (1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. McGowan,*
    302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938) . . . . . . . . . . . . . . . . . . . . 12

*Utah  Northern Railway v. Fisher,*
    116 U.S. 347, 15 S.Ct. 391, 39 L.Ed. 447 (1895) . . . . . . . . . . . . . . . . . . . . 12

*Wagoner v. Evans,*
    170 U.S. 588, 18 S.Ct. 730, 42 L.Ed. 398 (1905) . . . . . . . . . . . . . . . . . . . . 12

*Warren Trading Post Co. v. Arizona Tax Comm'n,*
    380 U. S. 685, 85 S. Ct. 1242, 14 L. Ed. 2d 165 (1965) . . . . . . . . . . . . . . . . . 9

*Washington v. Confederated Tribes of the Colville Indian Reservation et al.,*
    447 U.S. 134, 100 S.Ct. 2069, 6 LEd.2d 10 (1980) . . . . . . . . . . . . . . . . . . . 12

*White Mountain Apache Tribe v. Bracker,*
    448 U.S. 136, 100 S. Ct. 2578, 65, 69 L.Ed. 2d 665 (1980) . . . . . . . . . . . . . . .
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 9, 11, 12

*Williams v. Lee,*
    358 U. S. 217, 79 S. Ct. 269, 3 L. Ed. 2d  651 (1959) . . . . . . . . . . . . . . . . . . 9

*Wilson v. Garcia,*
    471 U. S. 261, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985) . . . . . . . . . . . . . . . 19

### State Cases

*Abbott v. City of Los Angeles*
    50 Cal. 2d 438, 326 P.2d 484 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Amador Valley Investors v. City of Livermore,*
    43 Cal. App. 3d 483, 117 Cal. Rptr. 749, (1973) . . . . . . . . . . . . . . . . . . . . . 18

*Bennett v. Hibernia Bank*
    47 Cal. 2d 540, 305 P. 2d 201, (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Border Business Park, Inc. v. City of San Diego,*
    142 Cal. App. 4th 1538, n. 20, 49 Cal. Rptr. 3d 259  (2006) . . . . . . . . . . . . 18

*City of Barstow v. Mojave Water Agency,*
    23 Cal.4th 1224, 99 Cal.Rptr.2d 294 (2000) . . . . . . . . . . . . . . . . . . . . . . 7

*City of Los Angeles v. City of San Fernando*
    (1975) 14 Cal.3d 199, 123 Cal.Rptr. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*City of Los Angeles v. City of San Fernando,*
14 Cal.3d 199, 123 Cal.Rptr. 1 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gale v. McDaniel*
72 Cal. 334 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Graner v. Hogsett*
1948) 84 Cal.App.2d 657, 191 P.2d 497 . . . . . . . . . . . . . . . . . . . . . . . . 15

*Munger v Moore*
11 Cal. App. 3d 1, 89 Cal. Rptr. 323 (1970.) . . . . . . . . . . . . . . . . . . . . 15

*Pasadena v. Alhambra*
(1949) 33 Cal.2d 908, 207 P.2d 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Smith v. Cap Concrete,*
133 Cal. App. 3d 769, 184 Cal. Rptr. 308 (1983) . . . . . . . . . . . . . . . . 14

*State of California v. Superior Court (Bodde),*
32 Cal.4th 1234, 13 Cal. Rptr. 3d 534 (2004) . . . . . . . . . . . . . . . . . . 18

*Utility Audit Co. v. City of Los Angeles,*
112 Cal App. 4th 950, 5 Cal Rptr. 3d 520, (2003) . . . . . . . . . . . . . . . 18

*Vuich v. Smith*
(1934) 140 Cal. App. 453, 35 P. 2d 365 . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Waters of Hallett Creek Stream System,*
44 Cal.3d 448, 243 Cal.Rptr. 448 (1988) . . . . . . . . . . . . . . . . . . . . . . 7

**Statutes**

California Code of Civil Procedure Section 335.1 . . . . . . . . . . . . . . . . . 19

California Government Code § 905 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Government Code § 910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Government Code § 911.2(a) . . . . . . . . . . . . . . . . . . . . . . . . 18

California Government Code §945.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Water Code §§ 1200 et seq., 1375 (d) . . . . . . . . . . . . . . . . . 3

California Water Code § 30000 et seq. . . . . . . . . . . . . . . . . . . . . . . . . 2,3

California Water Code § 31630 et seq . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

California Water Code § 31630.5, subd.(e) . . . . . . . . . . . . . . . . . . . . . . 5

California Water Code § 31630.5, subd.(f) . . . . . . . . . . . . . . . . . . . . . . 6

California Water Code § 31631  . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

California Water Code § 31631.5  . . . . . . . . . . . . . . . . . . . . . . . . . . 16

California Water Code § 31632  . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 16

California Water Code § 31632.5  . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

California Water Code § 31633.5  . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

California Water Code § 31634  . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

California Water Code § 31638  . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

California Water Code § 31638.5  . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

25 U. S. C. Section 348  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

25 U.S.C. Section 956  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

25 U.S.C. Section 956 (a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

28 U.S.C. Section 1187  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1360  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19

42 U.S.C. 1983  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 19

**Other Texts**

5 Witkin *Summary of California Law* (10th Ed.) Torts § 699, p. 1023 . . . . . . . . . . . 15

12 Witkin, *Summary of California Law* (10th Ed.) Real Property § 372, p. 436  . . . 14

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant COACHELLA VALLEY WATER DISTRICT ("CVWD") respectfully submits this memorandum of points and authorities in support of its motion for summary judgment, or in the alternative, for partial summary judgment against Plaintiffs BOBBIE RAY PRECKWINKLE and STEPHEN RICE (collectively "Plaintiffs")[1].

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT.

Plaintiffs commenced this action on July 11, 2005 (Doc. #1), and filed a Second Amended Complaint ("SAC") on April 4, 2006. (Doc. # 22.) The Court granted CVWD's motion to dismiss the Third Claim for inverse condemnation. (Doc. # 32.) The six surviving claims remaining claims are for: (1) interference with a federal right, (2) trespass, (4) conversion, (5) violation of constitutional rights (Commerce Clause and Property Clause, due process) under 42 U.S.C. 1983, (6) unlawful taxation, in violation of the above federal statutes pertaining to allotted lands and (7) declaratory relief.

At root and branch this case is a jurisdictional dispute regarding the proper role of state taxing authority over non-Indian activity on non-Indian owned leaseholds of Indian allotted lands. The law has long recognized the exercise of lawful tripartite jurisdiction by federal, tribal, and state authorities in Indian country, including reservations and allotted lands. As will be discussed more fully below, the Supreme Court in *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145, 100 S. Ct. 2578, 69 L.Ed. 2d 665 (1980) has prescribed a *specific* test regarding the proper exercise of state authority over *non-Indian activity* on Indian lands. CVWD contends that the levy of this groundwater replenishment assessment meets this test and that it may therefore appropriately levy the assessment on a non-Indian producer of ground water leasing land on a long term basis from Indian allottees.

This conclusion disposes completely of Plaintiffs' first, fourth, fifth, sixth and

_____

[1] Plaintif Chad Siva is deceased, and probate proceedings are pending to appoint an executor with authority to perform the settlement agreement previously signed by Mr. Siva and CVWD. The motion is not directed at Mr. Siva's claims.

1  seventh claims.  As explained below, several of those claims also suffer from other

2  deficiencies which entitle CVWD to judgment. Plaintiffs' second claim for trespass fails

3  completely as they are not in current possession of the lands they have leased to the

4  country club, and cannot thus establish an essential element for trespass.

5       Alternatively, assuming a claim does survive  this motion, various statutes limit

6  the period for which any damages may be recovered on the state law claims (Second and

7  Fourth Claims) and for the federal claims (the First, Fifth and Sixth Claims).

8  **II.   FACTUAL BACKGROUND**

9       The facts and supporting evidence are set forth in greater detail in the Proposed

10  Statement of Uncontroverted Facts and Conclusions of Law submitted concurrently, to

11  which the Court's attention is directed.  This summary is drawn from that proposed

12  statement.

13       Plaintiffs are the Indian owners of two parcels of allotted lands of the Agua

14  Caliente Indian Reservation which are still in trust status.

15       CVWD is a public agency governed by an elected board of directors under the

16  County Water District Law (Cal. Wat. Code § 30000 et seq.)  Among its services,

17  CVWD provides domestic water service drawn from groundwater supplies and conducts

18  ground water recharge operations using waters appropriated from the Whitewater River

19  and imported from the Colorado River.

20       The Coachella Valley lies primarily in Riverside County, extending from the San

21  Gorgonio Pass to the Salton Sea and forms part of the Lower Colorado Desert.  Annual

22  rainfall averages three inches.  The Whitewater River flows along the axis of the valley.

23  Beneath the valley floor is a large groundwater basin which serves as a common water

24  supply source for the valley.  The Allotted lands overlie this groundwater basin.

25       President Grant created the Agua Caliente Indian Reservation by executive orders

26  in 1875 and 1876.  In 1877, the odd-numbered sections of land in the region were

27  granted to the Southern Pacific railroad.  In 1877, the reservation was expanded by

28  executive order to include the lands that form plaintiffs' allotments. Because only even-

EDCV05-626 VAP (SGLx)

MEMO OF PTS AND AUTHS IN SUPPORT OF CVWD MSJ

1    numbered sections were available for reservation, the Agua Caliente Indian reservation

2    has a "checkerboard" pattern, with private lands and reservation lands in alternating

3    sections.        In 1918, CVWD was formed to protect the water resources of the region.

4    CVWD is a public agency governed by an elected board of directors under the County

5    Water District Law (Cal. Water Code § 30000 et seq.)  CVWD initiated a statutory

6    stream adjudication of the Whitewater River and also obtained an appropriative water

7    right to all remaining waters in the river, which it diverts to replenish the groundwater

8    basin at recharge ponds constructed adjacent to the Whitewater River at the upper end

9    of the valley, west of Palm Springs.

10        The allotments of plaintiffs were aggregated with others, and leased under a

11    Master Lease Agreement in 1969 for development of the lands as a golf course and

12    residential units.  The current lessee is Mission Hills County Club, a non-Indian entity,

13    which operates three wells on the allotted lands to irrigate the golf course and the

14    landscaped areas of the residential developments. *These wells were not constructed by,*

15    *and are not owned or operated by, CVWD.  The wells are not connected with CVWD's*

16    *domestic water system.  CVWD does not control when the wells are operated, how much*

17    *water is extracted by the wells, or what uses are made of the water extracted.  CVWD*

18    *has never used any of the water extracted by the wells.*

19        In California, one cannot initiate an appropriation from a surface stream without

20    first obtaining a permit from the State Water Resources Control Board and the Board

21    may not issue a permit unless it finds there is water available for appropriation. (Water

22    Code §§ 1200 et seq., 1375 (d).) There is no comparable system governing the

23    production of groundwater.  Anyone can drill a well and begin to pump. This can lead

24    to a situation where the aggregate production exceeds the long-term aggregate recharge,

25    a condition known as overdraft, which if not addressed can lead to undesirable effects,

26    including land subsidence, declining water levels and increased energy costs,

27    degradation of water quality and destruction of the basin as dewatered soils collapse and

28    compact.

1    Early in the Twentieth Century, the Coachella Valley groundwater basin went into

2  a state of overdraft. In the lower region of the valley, the importation of irrigation water

3  from the Colorado River through the Coachella Canal beginning in 1949 partially

4  mitigated the overdraft in that region, but did nothing to prevent the continuing decline

5  of water levels in the Upper Coachella Valley.

6    The people of the Coachella Valley decided to address the overdraft issue in the

7  Upper Coachella Valley in a different manner than the traditional approach of engaging

8  in expensive and protracted litigation to adjudicate the groundwater basin and limit

9  extractions to the safe-yield of the basin in accordance with the relative priority of water

10  rights. (See, *Pasadena v. Alhambra* (1949) 33 Cal.2d 908, 207 P.2d 17, and *City of Los

11  Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 123 Cal.Rptr. 1, for an example

12  of how protracted and complicated such adjudications can become.) They decided a

13  better way was to import additional water to recharge the groundwater basin, thereby

14  satisfying all water demands on the basin, financing the expense of such imported water

15  by replenishment assessments levied on each producer of groundwater.

16    In the 1960's, CVWD and Desert Water Agency entered into contracts with the

17  California Department of Water Resources to purchase water developed by the State

18  Water Project. Because the California Aqueduct does not extend to the Coachella

19  Valley, CVWD and DWA exchanged their State Water Project supply for an equal

20  volume of Colorado River water from delivered from the Metropolitan Water District's

21  Colorado River aqueduct. The water is delivered into the Whitewater River and then

22  diverted into CVWD's Whitewater Spreading Facilities, which were enlarged in 1972,

23  and again in 1984, for this purpose. The recharge water percolates into the groundwater

24  basin where it migrates down the valley. The area benefitted by these replenishment

25  activities includes the allotted lands. Replenishment operations with Colorado River

26  water began in 1973, and CVWD began levying replenishment assessments in the area

27  of benefit in 1980. Since 1973, CVWD has recharged nearly 2 million acre-feet of water

28  at the Whitewater Spreading Facilities.

1   To finance its recharge operations, including the very significant expense of
2   purchasing imported State Water Project water each year, CVWD levies water
3   replenishment assessments, at a uniform rate for each acre-foot pumped. The
4   replenishment assessment is levied on all producers of ground water, which may include
5   lessees who produce ground water. (Cal. Water Code § 31634, 31630.5, subd.(e).) The
6   area of benefit in which production is subject to assessment is established by the
7   CVWD's Board of Directors based upon an annual engineering survey and report. (Cal.
8   Water Code § 31631-31632.) The assessments are the personal obligation of the
9   producer, and if not paid, are collected by legal action against the producer in court.
10  (Cal. Water Code § 31638.) The assessments are not secured by liens upon any property
11  or water right.

12  **III. CVWD MAY LEVY REPLENISHMENT ASSESSMENTS ON A NON-**
13  **INDIAN LESSEE OF ALLOTTED LAND.**

14  A common premise underlying all of plaintiffs' remaining claims is that CVWD
15  is without legal authority to levy replenishment assessments on plaintiffs' lessee for the
16  water extracted by the lessee from the three wells on the allotted lands. Therefore,
17  CVWD will address this issue first, at length, and then address residual issues in
18  individual claims later in the brief. CVWD is authorized by state law to levy and collect
19  replenishment assessments from the lessee and this action violates no federal law.

20  **A.   State Law Authorizes CVWD to Levy Replenishment Assessments on**
21  **Groundwater Producers**

22  CVWD is authorized by state law to levy a ground water replenishment
23  assessment on producers of ground water in the Coachella Valley for the purpose of
24  replenishing groundwater supplies within the District with imported water and "in lieu"
25  programs that replace ground water use with use of Colorado River water or reclaimed
26  water. (Cal. Water Code Sections 31630 *et seq.*)

27  The replenishment assessment is levied on the producers of ground water, which
28  may include lessees who produce ground water. (Cal. Water Code 31634, 31630.5,

EDCV05-626 VAP (SGLx)

1  subd.(e).)

2     The area of benefit in which production is subject to assessment is established by

3  the CVWD's board of directors based upon an annual engineering survey and report.

4  (Cal. Water Code 31631-31632.)

5     The amount of the assessment cannot exceed the amount required to fund

6  specified charges. (Cal. Water Code 31633.) The assessment is at a uniform rate per

7  acre-foot of production in each area of benefit. (Cal. Water Code 31632.5)   The

8  assessment is non-discriminatory; all producers, including public entities and the District

9  itself, must pay the assessment except for minimal producers who produce less than 25

10  acre-feet per year. (Cal. Water Code 31630.5, subds. (e,f), 31633.5-31634.)

11     Each producer subject to the levy of the assessment is required to have a water

12  measuring device affixed to the water-producing facility that can measure and register

13  the accumulated amount of water produced, and the producer may enter into an

14  agreement with CVWD by which the District will install, maintain, own and read the

15  meter. (Cal. Water Code 31638.5).

16     Pursuant to this authority CVWD has levied replenishment assessments on

17  plaintiffs' lessee for groundwater produced by plaintiffs' lessee since 1980. CVWD has

18  always sent the notices of assessment to the lessee, who as the producer is liable for the

19  assessment. CVWD has never attempted to collect the assessments from plaintiffs, and

20  plaintiffs have never paid any of these assessments.

21     Significantly, there is no provision for replenishment assessments to become a lien

22  upon the land, either the non-Indian owned leasehold or underlying Indian allotment, or

23  upon the water produced by the wells. The assessments are a *personal obligation* of the

24  non-Indian producer, and if not paid, are collected by the District through legal action

25  against the producer in any court having jurisdiction. (Cal. Water Code § 31638). The

26  incidence, or legal obligation, to pay the assessment is squarely on the non-Indian water

27  producer.

28     There are two other things of significance to note.   First, the character or

1  ownership of the water rights under which the water is produced is irrelevant to the

2  assessment process.  It matters not whether a producer is producing water under an

3  asserted reserved water right, an overlying right, an appropriative water right, or is

4  exercising a right to recapture imported water, or under any water right at all[2]. Nor does

5  it matter what the relative priority of the water right being exercised is. The entire

6  purpose of the replenishment assessment program is to provide sufficient supplies of

7  water so all demands can be satisfied, regardless of the character or priority of the water

8  rights.

9       Second, the statutory scheme under which CVWD operates does not authorize the

10  District to regulate the amount of groundwater a producer can pump, nor does it

11  authorize CVWD to regulate the uses to which the pumped water may be applied.  It is

12  not a regulatory to scheme to preserve the groundwater basin by limiting the amount of

13  water extracted; it is a system to finance the importation of water to satisfy all demands

14  so no one has to limit production. The Indian allottees and their non-Indian lessee, and

15  all others continue to enjoy the use of water in the groundwater basin under whatever

16  water rights they may have.

17  **B.    The Exercise of Taxing Jurisdiction by Levying a Replenishment**

18  **Assessment on a Non-Indian Lessee Does Not Violate Federal Law.**

19       The United States Supreme Court has prescribed a test to govern the exercise of

20  state jurisdiction over non-Indian activities and interests on Indian lands.  In *White*

21  *Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S. Ct. 2578, 65 L. Ed. 2d 665,

22  (1980) a non-Indian logging enterprise challenged imposition of a motor carrier license

23  tax assessed on the carrier's gross receipts, and a use fuel tax based on diesel fuel used

24

25       [2] For an explanation of the various categories of water rights, see *In re Waters*
*of Hallett Creek Stream System,* 44 Cal.3d 448, 457-458, 243 Cal.Rptr. 448 (1988)
26  (reserved water rights), *City of Barstow v. Mojave Water Agency,* 23 Cal.4th 1224,
27  1240-1241, 99 Cal.Rptr.2d 294 (2000) (overlying, appropriative, and prescriptive
28  rights); *City of Los Angeles v. City of San Fernando,* 14 Cal.3d 199, 255-262, 123
Cal.Rptr. 1 (1975) (recapture rights).

EDCV05-626 VAP (SGLx)

7

1   within the State of Arizona.   In the face of heavy federal regulation and tribal
2   involvement in the Tribe's timbering interests the Court held that the state tax was
3   preempted by federal law. In reaching its decision, the Supreme Court recognized that
4   "there is no rigid rule by which to resolve the question whether a particular state law
5   may be applied to an Indian reservation or to tribal members." 448 U.S. at 141.   The
6   Court recognized that state jurisdiction over Indian reservations and its members could
7   be barred by the preemption of federal laws, or "it may unlawfully infringe on the right
8   of reservation Indians to make their own laws and be ruled by them." 448 U.S. at 143.
9   The Court recognized that "more difficult questions arise where, as here, a State asserts
10  authority over the conduct of non-Indians engaging in activity on the reservation." 448
11  U.S. 144. The Court set forth a different test than those enunciated above, stating, 448
12  U.S. at 144-145:

13          "When on-reservation conduct involving only Indians is at
14          issue, state law is generally inapplicable, for the State's
15          regulatory interest is likely to be minimal and the federal
16          interest in encouraging tribal self-government is at its
17          strongest. See *Moe v. Salish & Kootenai Tribes*, supra, at 480-
18          481; *McClanahan v. Arizona State Tax Comm'n.* 411 U.S.
19          164, 173, [93 S.Ct. 1257], 36 L.Ed 2d 129 (1973). More
20          difficult questions arise where, as here, a State asserts
21          authority over the conduct of non-Indian engaging in activity
22          on the reservation. In such cases we have examined the
23          language of the relevant federal treaties and statutes in terms
24          of both the broad policies that underlie them and the notions
25          of sovereignty that have developed from historical traditions
26          of tribal independence. This inquiry is not dependent on
27          mechanical or absolute conceptions of state, federal, and tribal
28          interests at stake, an inquiry designed to determine whether,

1   in the specific context, the exercise of state authority would

2   violate federal law. Compare *Warren Trading Post Co. v.*

3   *Arizona Tax Comm'n*, supra [380 U. S. 685, 85 S. Ct. 1242,

4   14 L. Ed. 2d 165 (1965)], and *Williams v. Lee*, supra [358 U.

5   S. 217, 79 S. Ct. 269, 3 L. Ed. 2d 651 (1959)] , with *Moe v.*

6   *Salish & Kootenai Tribes,* supra, and *Thomas v. Gay*, 169 U.S.

7   264, [18 S.Ct. 340, 42 L.Ed 740] (1898). Cf. *McClanahan v.*

8   *Arizona State Tax Comm'n*, 411 U.S. at 171; *Mescalero*

9   *Apache Tribe v. Jones*, 411 U.S. 145 at 148, [93 S.Ct. 1267,

10   36 L.Ed 2d 114] (1973)."

11   Unlike the circumstances surrounding the *Bracker* case, the above inquiry, when

12   applied to the undisputed facts of this case, leads to the conclusion that CVWD's

13   exercise of jurisdiction to levy the assessment does not violate any federal statue or

14   policy.

**1.  The Levy of Replenishment Assessments Does Not Regulate Water Rights.**

16   There is no interference with the exercise of whatever water rights may be

17   appurtenant to leased allotted lands. This is not a water rights case. CVWD has never

18   denied to Plaintiffs or their lessee the right to pump groundwater or the right to use it on

19   the leased allotted land. There is no restriction on the amount of water that may be

20   pumped or the uses to which it may be applied.

21   Assessing a non-Indian lessee's production of ground water during the term of the

22   lease cannot be characterized as regulation of any Indian reserved ground water right

23   because no restriction is imposed on the exercise of any water rights of any kind. ~~Unlike~~

24   *Colville Confederate Tribes v. Walton,* 647 F.2d 42 (9th Cir. 1981), state law here is not

25   attempting to regulate whether water can be produced, how much can be produced,

26   where it can be used, for what purposes it can be used, or what priority whatever water

27   rights the water may be produced under may enjoy relative to other rights.  It is simply

28   raising revenue in a non-discriminatory manner to fund a program aimed at providing

EDCV05-626 VAP (SGLx)

54-000058                                MEMO OF PTS AND AUTHS IN SUPPORT OF CVWD MSJ

1   imported water to supply whatever demands on placed on the groundwater basin under
2   whatever claimed water right the producer is producing the water.

3   **2.   There is No Interference with Plaintiffs' Ability to Lease Their Lands.**

4   There is no interference with Plaintiffs' ability to lease their lands for commercial
5   development or to receive the agreed rent under the lease.

6   The lease here reveals that it is a lease to develop and operate a golf course
7   enterprise (Master Lease, Article 4.) The lease provided that the Indian lessors would
8   receive a percentage of the annual gross receipts of the business enterprise. (Master
9   Lease, Article 4.) By sinking and operating wells, and producing water to irrigate the
10  course, Mission Hills Country Club has become a successful and profitable enterprise
11  throughout the years, thus fulfilling to goals of the lease. Application of the assessment
12  does not in anyway put the Indian allottees at a market disadvantage in the leasing of
13  their lands. The payment of the assessment by the non-Indian lessee is merely a cost of
14  doing business, *a cost born by all others similarly situated throughout the Coachella*
15  *Valley.*

16  Because the rent is calculated based on gross receipts, the assessment does not
17  reduce in any way  rent paid to plaintiffs. However, should the lessee elect to pass
18  on the assessment  to its customers as a business expense, the gross revenues would be
19  increased which would in turn *increase* the amount of rent paid to the Indian lessors.

20  **3.   The Replenishment Assessments Are Not an Encumbrance on Trust**
21  **Property.**

22  As noted above, the replenishment assessments are a personal obligation of the
23  lessee and are not secured by a lien on the allotted lands or any water rights.   The
24  assessments do not reduce is any way the rent payable under the lease, as it is a gross
25  proceeds lease and therefore are not a tax on income from the leasing of the alloted trust
26  lands.

27  Taxes and assessments on lessees of allotted land that are not liens upon the land
28  do not violate provisions of federal law prohibiting the encumbrance of allotted lands,

EDCV05-626 VAP (SGLx)

1   and they do not violate the provisions of Public Law 280 (28 U.S.C. Section 1187)[3] that

2   qualify the grant of civil jurisdiction made to California in that statute. *Agua Caliente*

3   *Band of Mission Indians, v. County of Riverside,* 442 F.2d 1184, 1187 (9th Cir. 1971);

4   *Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253, 1256-1257 (9th Cir.

5   1976).

6       **4.   The Balance of Interests is in Favor of CVWD.**

7           As shown above, there collection of replenishment assessments from the lessee does

8   not violate federal law nor burden any federal or tribal policy. Even if any burden were

9   discernible, however, the balance of interests tips heavily in favor of CVWD. CVWD's

10  assessment is not intended to be a general revenue producing tax. It is tailored to provide

11  revenues to protect a common resource shared by Indian and non-Indian alike. Because

12  collective pumping of the groundwater basin by all producers has exceeded the supplies

13  of native water creating a condition of overdraft, CVWD obtains additional water

14  supplies which are delivered into the Whitewater River and then diverted into the

15  CVWD's recharge basins.  While plaintiffs argue that the assessment is somehow less

16  applicable than a general revenue tax, such a distinction is not apparent in the cases

17  dealing with the taxation of Indian and non Indian interests. Indeed, to the extent that the

18  assessment supports a specific replenishment program from which allotted lands benefit,

19  rather than general revenues,  the *White Mountain* balance tips in CVWD's favor, not

20  the allottees.

21          The assessments are not secured by liens upon any property or water right.  It has

22  long been settled that taxes and assessments levied on lessees of Indian tribal and

23  allotted lands that do not become liens upon the land are not prohibited by federal law.

24  Whatever immunity from taxation Indian owners of trust lands possess does not extend

25  to the lessees of the land. (*Oklahoma Tax Commission v. Texas Company,* 336 U.S. 342,

26

27      [3] *Agua Caliente Band of Mission* Indians addressed the anti-encumbrance

28  provisions of 25 U. S. C. Section 348, which are comparable to the provisions of 25 U.S.C. Section 956 cited in the complaint as applicable to plaintiffs' allotted lands.

1   69 S.Ct. 561, 93 L.Ed 721 (1949) (upholding state gross production taxes and excise

2   taxes on petroleum produced from leases on allotted and restricted Indian lands); *Agua*

3   *Caliente Band of Mission Indians, supra*, 442 F.2d at 1186 (9th Cir. 1971) (upholding

4   possessory interest tax on lessee) and *Fort Mojave Tribe, supra*, 543 F.2d 1253 (same).[4]

5   There is no federal policy which is intended to franchise any immunity from state

6   taxation to non-Indian lessees absent the kind of comprehensive federal regulatory

7   scheme involved in *Bracker*. This case is far more similar to *Moe v. Confederate Salish*

8   *and Kootenai Tribes of the Flathead Reservation et al.*, 425 U.S. 463, 96 S.Ct. 1634, 48

9   L.Ed.2d 96 (1976). In that case the Supreme Court held that a state sales tax on

10  cigarettes, the incidence of which fell on the non-Indian buyer, was required to be

11  collected and paid by a lessee of Indian land, despite the fact that the vendor was an

12  Indian and a tribal member. The Court quoted *United States v. McGowan*, 302 U.S. 535,

13  539, 58 S.Ct. 286, 82 L.Ed. 410 (1938): "Enactments of the Federal Government passed

14

15  [4] There are many, many cases where the courts have upheld state and local taxation
    of non-Indians on Indian land. *See, e.g. Arizona Department of Revenue v. Blaze*

16  *Construction Company, Inc.*, 526 U.S. 32,119 S.Ct. 957, 143 L.Ed.2d 27

17  (1999)(upheld state imposed transaction privilege tax on non-Indian corporation
    doing business on reservation for United States); *Cotton Petroleum Corporation v.*

18  *New Mexico*, 490 U.S. 163 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989)(state and tribe

19  could impose severance taxes on on-reservation oil and gas production by a non-
    Indian lessee); *Washington v. Confederated Tribes of the Colville Indian Reservation*

20  *et al.*, 447 U.S. 134, 100 S.Ct. 2069, 6 LEd.2d 10 (1980)(state could impose an

21  excise tax on reservation purchases of cigarettes by nonmember Indians and non
    Indians despite coexistent tribal taxes); *Utah Northern Railway v. Fisher*, 116 U.S.

22  347, 15 S.Ct. 391, 39 L.Ed. 447 (1895)(upheld territorial and county taxes on land,

23  right of way and property owned by railroad located within the Fort Hill Indian
    Reservation); *Maricopa and Phoenix Railroad Company v. Arizona Territory*, 156

24  U.S. 347, 15 S.Ct. 391, 39 L.Ed.447 (1895)(upheld county property taxes on right of

25  way, track and rolling stock owned by railroad within the Gila River Indian
    Reservation); *Truscott v. Hurlbut Land & Cattle Company*, 73 F. 60 (1896); *Thomas*

26  *v. Gay*, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898)(upheld county taxes on

27  cattle grazing on non-Indian leaseholds within Oklahoma Indian Reservation);
    *Wagoner v. Evans*, 170 U.S. 588, 18 S.Ct. 730, 42 L.Ed. 398 (1905)(county taxation

28  of non-Indian owned cattle on Indian reservation).

EDCV05-626 VAP (SGLx)

54-000061                        MEMO OF PTS AND AUTHS IN SUPPORT OF CVWD MSJ

1   to protect and guard its Indian wards only affect the operation, within the colony, of such
2   state laws as conflict with the federal enactments." 425 U.S. at 483.

3        Plaintiff's case is based on suppositions, that if the assessment against the tenant
4   were not paid, it could become a lien on the property. Plaintiffs here are not producers
5   (extractors) of groundwater and have not had the assessment levied upon them. The
6   replenishment assessment is under the Water Code only a personal obligation of the
7   producer, and cannot be enforced as a lien on the allotted lands. This is a hypothetical
8   case where none of the assumptions necessary to make it an actual triable case or
9   controversy have occurred; the plaintiffs have not been assessed, much less had any lien
10  placed by the District on their property.

11  **IV.  THE INDIVIDUAL CLAIMS ARE WITHOUT MERIT**

12       **A.    Common Allegations That Are Not True.**

13       Before the Court can evaluate the individual claims that are pleaded, it is necessary
14  to pierce through the untrue allegations that were incorporated by reference in multiple
15  claims. One pierced, the dispute narrows to a challenge to validity of the replenishment
16  assessments levied on country club, and nothing else.

17       In SAC ¶ 11, incorporated by reference in all claims, Plaintiffs make allegations
18  regarding wells on their allotted land and allege "that CVWD has either in part operated,
19  drilled and/or participated in the removal of the water from the Allotted Land"

20       In SAC ¶ 21 of the first claim, incorporated in all later claims, they allege CVWD
21  participated in the operation of the wells.

22       In SAC ¶ 22 of the first claim, incorporated in all later claims, they imply that
23  CVWD is charging a fee to Plaintiffs.

24       In SAC ¶ 27 of the second claim, incorporated in all later claims, plaintiffs allege
25  CVWD facilitated the installation of the wells.

26       In SAC ¶ 31 of the dismissed third claim, incorporated in all later claims, plaintiffs
27  allege CVWD installed wells, and also that CVWD collected money from plaintiffs.

28       None of these allegations are true. The true facts are:

EDCV05-626 VAP (SGLx)

1  – The District neither drilled nor operated any of the three wells at issue, State Well Nos.
2  04S05E26D01S, 04S05E26H01S and 04S05E26K01S, and has never used any of the
3  water produced from those wells. (Uncontroverted Facts 27, 28, and 29.)

4  – The District has never charged plaintiffs, nor have plaintiffs ever paid
5  replenishment assessments to the District. (Stipulated Facts 19 and 20.)

6  **B.   CVWD Is Entitled to Judgment on the First Claim.**

7  Stripped of the untrue allegations, this claim is a pure challenge to the levy of
8  replenishment assessments on the country club, and as explained in Part III above, these
9  assessments are valid.  The motion for summary judgment should be granted as to the
10  First Claim.

11  **C.   The Second Claim for Trespass Fails as Plaintiffs Are Not in Possession.**

12  Plaintiffs' second claim is for trespass.  Plaintiffs are *lessors* of a long term lease of
13  property at Mission Hills Country Club. (Stipulated Uncontroverted Fact 7.) Plaintiffs,
14  therefore, are *not* in exclusive  present  possession of their allotted lands. Plaintiffs
15  therefore have no right to sue for trespass, as the proper plaintiff if there were any
16  problem would be the tenant in actual possession (*Smith v. Cap Concrete*, 133 Cal. App.
17  3d 769 at 774, footnote 4, 184 Cal. Rptr. 308 (1983), cited in 12 Witkin, *Summary of*
18  *California Law* (10th Ed.) Real Property § 372, p. 436.)  Lacking an essential element,
19  the trespass claims fails and CVWD is entitled to judgment on the second claim[5].

20  **D.   The Fourth Claim Fails as CVWD Did Not Convert Any Property of**
21  **Plaintiffs.**

22  The fourth claim for conversion, rests on SAC ¶ 39, where plaintiffs allege "By
23  charging and collecting fees from the master tenant for the removal and replenishment
24  of water, District has converted plaintiff's property for its own use."

25  District is not charging  *plaintiffs* for pumping; it levies the assessment on their
26  *lessee* based upon the *lessee's*  production, an activity by a non-Indian on Indian land.
27  (Stipulated Facts 19, 20,  23 ,and 24)

28

---

[5]CVWD also pleaded this as its Thirteenth Affirmative Defense in its answer. (Doc. # 33.)

5 Witkin *Summary of California Law* (10th Ed.) Torts § 699, p. 1023, notes that "Conversion is the wrongful exercise of dominion over *personal property* of another." (Emphasis added.) Only personalty, and not real property can be the subject of conversion. Allegations of real property ownership are irrelevant to a cause of action for conversion. *Graner v. Hogsett* (1948) 84 Cal.App.2d 657, 662, 191 P.2d 497, citing *Vuich v. Smith* (1934) 140 Cal. App. 453, 35 P. 2d 365, stated "such an action will not lie for the conversion of real estate." "It is generally acknowledged that conversion is a tort that may be committed only with relation to personal property and not real property." *Munger v Moore* 11 Cal. App. 3d 1, at 7, 89 Cal. Rptr. 323 (1970).

The plaintiffs do not have any personal ownership interest in the funds used by their tenant to make payments to the District. They have parted with no property. Under California law, CVWD is entitled to the funds. (Cal. Water Code, § 31630: "The Coachella Valley Water District shall have the power to levy and collect water replenishment assessments....") The claim for conversion fails on the facts, and CVWD is entitled to judgment on the fourth claim.

**E.    There Is No Infringement of a Federal Constitutional or Statutory Right to Support a Claim under 42 U.S.C. Section 1983.**

The fifth claim alleges that the payment of the replenishment fees by the *tenant* is actionable under 42 U.S.C. § 1983 as violations to *plaintiffs*' rights under the Property Clause and Commerce Clause of the United States Constitution (Paragraph 46) and that the plaintiffs' due process rights were violated (Paragraph 48.)

42 U.S.C. section 1983 does not create new rights; it merely creates a remedy for infringement of federal rights elsewhere established in the Constitution or statute. (*Graham v. Connor* 490 U.S. 386, 393-394,109 S. Ct. 1865, 104 L. Ed 2d 443 (1989) – section 1983 does not create new rights and instead is a remedy for violation of federal rights elsewhere established in law; *Maine v. Thiboutot*, 448 U.S. 1, 4-8, 100 S. Ct. 2502, 65 L. Ed.2d 555 (1980) – section 1983 does not create new rights, but only a remedy for deprivation of federal constitutional or statutory rights.)

1    The Commerce clause and Property clause serve as the constitutional basis for the

2    federal government to regulate matters relating to Indians.  As explained in Part III,

3    above, the levy of replenishment assessments on plaintiffs' lessee does not violate any

4    federal law or policy relating to Indian allotted lands, and thus there is no basis for an

5    action founded on those asserted rights.

6        Nor has there been any deprivation of due process.  California law provides for

7    notice and hearing before assessments are levied, with notice being published in the

8    newspaper and mailed to all producers – in this case, the country club. (Cal. Water Code

9    §§ 31631.5, 31632.)  To recover for a violation of procedural due process, plaintiffs must

10   show actual injury. (*Carey v. Piphus* 435 US 247, 264, 98 S. Ct. 1042, 55 L. Ed. 2d 252

11   (1978).)  This they cannot do.  No assessments have been levied upon plaintiffs or liened

12   upon their property.  The assessments do not reduce the rent they receive. They have

13   parted with no property.  There is no basis for a claim under section 1983.  This claims

14   fails on both facts and law and CVWD is entitled to judgment on the fifth claim.

15       **F.  CVWD is Entitled to Judgment on the Sixth Claim.**

16       The sixth claim reprises the first claim, again alleging "unlawful taxation" contrary

17   to 25 U.S.C. § 956 (a), which forbids any attachment or levy being applicable against

18   an equalization allotment, and 28 U.S.C. § 1360 for the proposition that it is unlawful

19   to impose any tax or levy on Indian land without written approval by the Secretary of

20   the Interior. *Plaintiffs never received or paid an assessment (Stipulated Facts 19, 20.)*

21   *No assessment, much less an attachment or levy, has been made by the District upon*

22   *any property belonging to plaintiffs.* (Stipulated Facts 23 and 24)

23       Plaintiffs Preckwinkle and Rice have not produced (extracted) any groundwater

24   from State Well Nos. 04S05E26D01S, 04S05E26H01S and 04S05E26K01S, contrary

25   to the allegations of paragraph 22 (Uncontroverted Fact 26.) Plaintiffs Preckwinkle and

26   Rice have never been charged any replenishment assessments nor paid any

27   replenishment assessments to Defendant District, contrary to the allegations of

28   paragraph 22 (Stipulated Facts 19 and 20.) *Payments by the tenant are not payments*

EDCV05-626 VAP (SGLx)

54-00065

MEMO OF PTS AND AUTHS IN SUPPORT OF CVWD MSJ

1   *by the plaintiffs.*

2       28 USC § 1360(b) does not forbid taxing or assessing the activities by a non-Indian

3   lessee on Indian property. (*Agua Caliente Band of Mission Indians v. County of*

4   *Riverside,* 442 F.2d 1184, 1186 (9th Cir. 1971) and *Fort Mojave Tribe v. County of San*

5   *Bernardino,* 543 F.2d 1253 (9th Cir. 1976).))

6       Whatever tax immunity plaintiffs may enjoy in the land and any water rights that

7   may be appurtenant to their allotments, that immunity does not extend to the tenant

8   (*Agua Caliente,* 442 F.2d at 1187: "The general rule that tax exemptions are not granted

9   by implication is applicable to taxing acts affecting Indians as it is to all others.") The

10   tax immunity that plaintiffs enjoy with respect to their allotments (and any water rights

11   attached to them) is personal to them and not transferable to a non-Indian lessee. It is

12   thus not a property right that can be conveyed or leased. Therefore the levy of the

13   assessments on the lessee does not "diminish," "reduce," or otherwise infringe or invade

14   any right of plaintiffs.

15       The court should grant the motion for summary judgment as to the Sixth claim.

16   **G. Declaratory Relief Should Not Be Granted.**

17       In their Seventh Claim, Plaintiffs seeks a declaration that the District may not assess

18   or charge fees to plaintiffs or their tenant (¶55), and in the prayer, clause 4, plaintiff

19   seeks a declaration that the plaintiffs can charge their tenant for producing water on the

20   property.

21       There is no necessity for this court to order that the District cannot charge

22   assessments against the plaintiffs. Plaintiffs have never produced (extracted) an ounce

23   of water from their property and have never been subject to the assessments for

24   imported water (Stipulated Facts 19, 20, 23, 24.) As to the assessments against the

25   tenant, CVWD may levy the assessment on the tenant, as explained in Part III, above.

26       As to the request that the court declare plaintiffs rights <u>vis a vis</u> their tenant, this is

27   not really a dispute with CVWD. CVWD has no stake in this argument between the

28   plaintiffs and their tenant and it would be inappropriate for the Court to make such a

EDCV05-626 VAP (SGLx)

17

MEMO OF PTS AND AUTHS IN SUPPORT OF CVWD MSJ

1    declaration without the tenant being present as a party to be heard in this matter. The

2    Court is requested to grant the motion for summary judgment as to the Seventh Claim.

3    **V.  ANY DAMAGES ARE LIMITED BY THE APPLICABLE CLAIMS**

4    **REQUIREMENTS AND STATUTES OF LIMITATION.**

5        Assuming arguendo that the First, Second, Fourth, Fifth or Sixth Claims survive

6    this motion for summary judgment, the court should grant partial summary judgment

7    limiting the period for which damages, if any, may be recovered for those claims.

8        **A. Claims Arising Under State Law - Six Months or One Year Prior to**

9    **Presentation of the Claim.**

10       As a general rule, California law requires a person seeking monetary damages from

11   a local public entity, such as CVWD, to first present a claim before filing suit.  (Cal.

12   Govt. Code §§ 905, 910, 945.4.)  This is an essential element of a claim that must be

13   pleaded and proved.  (*State of California v. Superior Court (Bodde)*, 32 Cal.4th

14   1234,1239-1245, 13 Cal. Rptr. 3d 534 (2004).)  Claims for personal injury or personal

15   property damage must be presented within six months of accrual and all others must be

16   presented within one year. (Cal. Govt. Code § 911.2(a).)  Delayed discovery does not

17   toll the accrual date for either trespass, (*Gale v. McDaniel* 72 Cal. 334, at 335  (1887)),

18   or conversion (*Bennett v. Hibernia Bank* 47 Cal. 2d 540, at 561, 305 P. 2d 201, (1956).)

19

20       Plaintiffs allege they presented a claim on December 23, 2004.  This limits them to

21   going back only six months on claims for injury to personalty (conversion) and one year

22   for injury to real property (trespass) and they cannot recover damages for earlier periods.

23   *(See,  Abbott v. City of Los Angeles* 50 Cal. 2d 438, at 464, 326 P.2d 484 (1958);

24   *Amador Valley Investors v. City of Livermore*, 43 Cal. App. 3d 483, 489-490,117 Cal.

25   Rptr. 749, (1973); *Sumner Peck Ranch v. Bureau of Reclamation*, 823 F. Supp 715, 731

26   (E. D. Cal. 1993); *Utility Audit Co. v. City of Los Angeles*, 112 Cal App. 4th 950, at 960-

27   961, 5 Cal Rptr. 3d 520, (2003); *Border Business Park, Inc. v. City of San Diego*, 142

28   Cal. App. 4th 1538, at 1562, n. 20, 49 Cal. Rptr. 3d 259  (2006).)  Plaintiffs therefor

EDCV05-626 VAP (SGLx)

MEMO OF PTS AND AUTHS IN SUPPORT OF CVWD MSJ

1   cannot seek damages for trespass more than one year prior to December 23, 2004 or for

2   conversion for more than six months prior to December 23, 2004, and CVWD is entitled

3   to partial summary judgment barring damages before those dates.

4   **B. Federal Law Claims – Two Years Prior to Filing Suit, if at All.**

5        The applicable statute of limitation for the alleged violation of 42 U.S.C. Section

6   1983 is by reference to the state statute of limitations for personal injury, *Knox v. Davis*

7   260 F. 3d 1009, 1012-1013 (9th Cir. 2001); *Wilson v. Garcia* 471 U.S. 261, 279-280,

8   105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985.) Plaintiffs' complaint was filed July 11, 2005,

9   at which time the applicable personal injury statute of limitation was two years under

10  California Code of Civil Procedure Section 335.1[6]. Plaintiffs therefore cannot recover

11  damages for the period prior to two years before the complaint was filed July 11, 2005.

12  (Uncontroverted Fact 44.)

13       Both the first and sixth claims are based on the same allegations of violation of 25

14  U.S.C. § 956 (a) and 28 U.S.C. § 1360. These statutes do not provide for independent

15  cause of action for damages[7] and therefore no damages of any kind should be allowed.

16  It would appear then, that if any damages were to be recovered at all, it would have to

17  be under 42 U.S.C. § 1983, and thus subject to the same two year limit.

18  / / /

19  / / /

20  / / /

21

22

23

24

25

26

27  [6]CVWD pleaded this section in its Second, Fifth, Sixth and Seventh Affirmative Defenses in
its Answer (Doc. # 33.)

28  [7]25 U.S.C. §956(b) does create a damages claim against persons providing unauthorized
legal services. This would thus negate a damages claims for other violations of the section.

EDCV05-626 VAP (SGLx)

## VI.   CONCLUSION.

Summary judgment should be entered in favor of COACHELLA VALLEY WATER DISTRICT as to all remaining claims of plaintiffs PRECKWINKLE and RICE.

DATED: March 31, 2008                    Respectfully submitted,

REDWINE AND SHERRILL

By _____
Steven B. Abbott
email: sabbott@redwineandsherrill.com
Harry C. Carpelan
email: hcarpelan @redwineandsherrill.com
Attorneys for Defendant,
COACHELLA VALLEY WATER DISTRICT
1950 Market Street
Riverside, California 92501-1720
Telephone: (951) 684-2520
Facsimile: (951) 684-9538

54-000069

# EXHIBIT 55

55-000070

1  Steven B. Abbott, State Bar No. 125270
   email: sabbott@redwineandsherrill.com
2  Gerald D. Shoaf, State Bar No. 41084
   email: gshoaf@redwineandsherrill.com
3  Harry C. Carpelan, State Bar No. 102239
   email: hcarpelan@redwineandsherrill.com
4  REDWINE AND SHERRILL
   1950 Market Street
5  Riverside, California 92501-1720
   Telephone No.: (951) 684-2520
6  Facsimile No.: (951) 684-9583

7  Attorneys for Defendant,
   COACHELLA VALLEY WATER DISTRICT

8

9              UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

11

12  BOBBIE RAY PRECKWINKLE, an          )  Case No. EDCV05-626 VAP
    individual; STEVEN RICE, an         )                (SGLx)
13  individual; CHAD SIVA, an individual, )
                                        )  Honorable Virginia A. Phillips
14              Plaintiffs,             )
                                        )  MEMORANDUM OF POINTS
15        v.                           )  AND AUTHORITIES OF
                                        )  DEFENDANT COACHELLA
16  COACHELLA VALLEY WATER             )  VALLEY WATER DISTRICT IN
    DISTRICT, a public agency,          )  OPPOSITION TO PLAINTIFFS'
17                                      )  MOTION FOR PARTIAL
                Defendants.            )  SUMMARY JUDGMENT AS TO
18  _____     )  FIRST, FIFTH, AND SEVENTH
                                           CLAIMS ONLY

19                                         HEARING: 6/2/08
                                           TIME: 10:00 A.M.
20                                         COURTROOM : 2
                                           TRIAL: 12/2/08
21

22

23

24

25

26

27

28
                                   1        EDCV05-626 VAP (SGLx)

# TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  CVWD MAY LEVY REPLENISHMENT ASSESSMENTS ON THE NON-INDIAN LESSEE OF ALLOTTED LAND . . . . . . . . . . . . . . . 2

    A.   CVWD May Levy Replenishment Assessments on Groundwater Producers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   The Exercise of Taxing Jurisdiction by Levying a Replenishment Assessment on a Non-Indian Lessee Does Not Violate Federal Law. . . 4

        1.   The Levy of Replenishment Assessments Does Not Regulate Water Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.   The Replenishment Assessments Are Not an Encumbrance on Trust Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.   The Balance of Interests is in Favor of the District . . . . . . . . . 9

III. PLAINTIFFS' ASSERTED RESERVED RIGHTS ARGUMENT IS BASED ON FLAWED ASSUMPTIONS . . . . . . . . . . . . . . . . . . . . . 14

    A.   JURISDICTIONAL BARRIERS TO ASSERTION OF RESERVED WATER RIGHT TO GROUNDWATER. . . . . . . . . . . . . . . . . . . . 14

    B.   THE LESSEE IS PUMPING MORE THAN NEEDED TO IRRIGATE PLAINTIFFS' ALLOTTED LANDS. . . . . . . . . . . . . . . . . . . . . 16

IV.  NO ACTIONS TAKEN TOWARDS PLAINTIFFS, AND NO DAMAGES, PRECLUDES JUDGMENT ON THE FIFTH CLAIM . . . . . . . . . . . . . . 17

V.   PLAINTIFFS' IRRELEVANCIES NOT REFERENCED IN ANY UNCONTROVERTED FACT SHOULD BE DISREGARDED . . 17

    A.   Richard Freeman and Thomas Henslee . . . . . . . . . . . . . . . . 17

    B.   Bobbie Ray Preckwinkle . . . . . . . . . . . . . . . . . . . . . . . 18

    C.   Kim Snyder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i                      EDCV05-626 VAP (SGLx)

55-000072

TABLE OF AUTHORITIES
FEDERAL CASES

*Agua Caliente Band of Mission Indians v. County of Riverside,*
442 F.2d 1184 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Arizona Department of Arizona Department of Revenue v. Blaze Construction
Company, Inc.,* 526 U.S. 32,119 S.Ct. 957, 143 L.Ed.2d 27 (1999) . . . . . . . . . . . 13

*Arizona v. California,* 373 U.S. 546, 10 L. Ed. 2d 542, 83 S.Ct. 1468 (1963) . . . . 16

*Carey v. Piphus,* 435 U.S. 247,  98 S. Ct. 1042, 55 L. Ed. 2d. 252 (1978) . . . . . . . 17

*Colville Confederate Tribes v. Walton,* 647 F.2d 42 (9th Cir. 1981) . . . . . . . . . . 6, 10

*Cotton Petroleum Corporation v. New Mexico,* 490 U.S. 163, 109 S.Ct. 1698, 104
L.Ed.2d 209 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Dugan v. Rank,* 372 U.S. 609,  83 S. Ct. 999, 10 L. Ed. 2d 15 (1963) . . . . . . . . . . 16

*Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253 (9th Cir. 1976)  9, 13

*Federal Power Commission v. Oregon,* 349 U.S. 435, 75 S. Ct. 832,
99 L. Ed 1215, (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Maricopa and Phoenix Railroad Company v. Arizona Territory,*
156 U.S. 347, 15 S.Ct. 391, 39 L.Ed.447 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McClanahan  v. Arizona State Tax Comm'n.* 411 U.S. 164, 173,
93 S.Ct. 1257, 36 L. Ed 2d 129 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Minnesota v. United States* 305 U.S. 382, 59 S. Ct.292, 83 L. Ed. 235  (1939) . . . 15

*Moe v. Confederate Salish and Kootenai Tribes of the Flathead Reservation et al.,*
425 U.S. 463, 96 S.Ct. 1634, 48 L. Ed.2d 96 (1976) . . . . . . . . . . . . . . . . . . . . . 5, 13

*Oklahoma Tax Commission v. Texas Company,* 336 U.S. 342,
69 S.Ct. 561, 93 L. Ed 721 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Thomas v. Gay,* 169 U.S. 264, 18 S.Ct. 340, 42 L. Ed. 740 (1898) . . . . . . . . . . . . 13

*Truscott v. Hurlbut Land & Cattle Company,* 73 F. 60 (1896) . . . . . . . . . . . . . . . 13

*Utah  Northern Railway v. Fisher,* 116 U.S. 347, 15 S.Ct. 391,
39 L. Ed. 447 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ii                     EDCV05-626 VAP (SGLx)

*United States, et al. v. Anderson, et al.*, 736 F.2d 1358 (9th Cir. 1984) . . . . . . . . . . 10

*United States v. McGowan*, 302 U.S. 535, 539, 58 S.Ct. 286,

82 L. Ed. 410 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wagoner v. Evans*, 170 U.S. 588, 18 S.Ct. 730, 42 L. Ed. 398 (1905) . . . . . . . . . . 13

*Washington v. Confederated Tribes of the Colville Indian Reservation et al.*,

447 U.S. 134, 100 S.Ct. 2069, 6 L Ed.2d 10 (1980) . . . . . . . . . . . . . . . . . . . . . . . 13

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136,

100 S. Ct. 2578, 69 L. Ed 2d 665, (1980)  . . . . . . . . . . . . . . . . 4, 5, 7, 8, 10, 12, 13


STATE CASES

*City of Barstow v. Mojave Water Agency*, 23 Cal.4th 1224, 1240-1241, 99

Cal.Rptr.2d 294 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*City of Los Angeles v. City of San Fernando*, 14 Cal.3d 199, 255-262,

123 Cal.Rptr. 1 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Waters of Hallett Creek Stream System*, 44 Cal.3d 448, 457-458,

243 Cal.Rptr. 448 (1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3


FEDERAL STATUTES

28 U.S.C. Section 1187   (Public Law 280) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U. S. C. Section 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

43 U.S.C. § 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

25 CFR 162.103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STATE STATUTES

Cal. Water Code § 31630 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Water Code § 31630.5, subd.(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Water Code § 31630.5, subd.(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Water Code § 31631- 31632 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Water Code § 31632.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

iii                          EDCV05-626 VAP (SGLx)

Cal. Water Code § 31633 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Water Code § 31633.5-31634 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Cal. Water Code § 31634 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Water Code § 31638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Cal. Water Code § 31638.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv                    EDCV05-626 VAP (SGLx)

CVWD PTS AND AUTHS IN OPP TO PLAINTIFFS MSJ

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant, COACHELLA VALLEY WATER DISTRICT ("CVWD" or "District"), respectfully submits this opposition to Motion of Plaintiffs BOBBIE RAY PRECKWINKLE and STEVEN RICE for Partial Summary Judgment on their First, Fifth and Seventh Claims.

I

## SUMMARY OF ARGUMENT

The gist of plaintiffs' motion is that the District cannot levy a replenishment assessment on their lessee and that the levy of such assessments on plaintiffs lessee rises to the level of a federal case because it interferes with an asserted reserved water right. Plaintiffs are not entitled to partial summary judgment on those claims.

The levy of replenishment assessments on plaintiffs' lessee is authorized by state law and is not forbidden by federal law. It does not regulate any water rights at all, as no one is restricted in the amount of water that can be pumped or the purpose for which it can be used.

To the extent that plaintiffs' claim is based on an asserted reserved water right, partial summary judgment cannot be granted because such a water right has not been adjudicated, and cannot here be adjudicated. In any event, the production by the lessee has greatly exceeded the maximum possible amount of water that could be produced under any such right.

Plaintiffs' Fifth claim under 42 U. S. C. Section 1983 fails because they have not suffered any damage as a result of the levy of the replenishment assessments. Their rent under the lease was unaffected, and they did not pay the assessments.

1                                                         EDCV05-626 VAP (SGLx)

## II

## CVWD MAY LEVY REPLENISHMENT ASSESSMENTS ON THE NON-INDIAN LESSEE OF ALLOTTED LAND

A common premise underlying plaintiffs' claims is that CVWD is without legal authority to levy replenishment assessments on plaintiffs' lessee for the water extracted by the lessee from the three wells on the allotted lands. Therefore, CVWD will address this issue first, at length, and then address other issues later in the brief. CVWD is authorized by state law to levy and collect replenishment assessments from the lessee and this action violates no federal law.

### A.    CVWD May Levy Replenishment Assessments on Groundwater Producers

CVWD is authorized by state law to levy a groundwater replenishment assessment on producers of groundwater in the Coachella Valley for the purpose of replenishing groundwater supplies within the district with imported water and "in lieu" programs that replace ground water use with use of Colorado River water or reclaimed water. (Cal. Water Code Sections 31630 *et seq.*)

The replenishment assessment is levied on the producers of ground water, which may include lessees who produce groundwater. (Cal. Water Code Sections 31634, 31630.5, subd.(e).)

The area of benefit in which the production is subject to assessment is established by CVWD's board of directors based upon an annual engineering survey and report (Cal. Water Code 31631- 31632.)

The amount of the assessment cannot exceed the amount required to fund specified charges. (Cal. Water Code 31633.) The assessment is at a uniform rate per acre-foot of production in each area of benefit. (Cal. Water Code 31632.5) The assessment is non-discriminatory; all producers, including public entities and the District itself, must pay the assessment except for minimal producers who produce less than 25 acre-feet per year. (Cal. Water Code 31630.5, subds. (e,f),

2                                          EDCV05-626 VAP (SGLx)

31633.5-31634.)

Each producer subject to the levy of the assessment is required to have a water measuring device affixed to the water-producing facility that can measure and register the accumulated amount of water produced, and the producer may enter into an agreement with CVWD by which the District will install, maintain, own and read the meter. (Cal. Water Code 31638.5).

Pursuant to this authority CVWD has levied replenishment assessments on plaintiffs' lessee for groundwater produced by plaintiffs' lessee since 1980. CVWD has always sent the notices of assessment to the lessee, who as the producer is liable for the assessment. CVWD has never attempted to collect the assessments from plaintiffs, and plaintiffs have never paid any of the assessments.

Significantly, *there is no provision for replenishment assessments to become a lien upon the land*, either the non-Indian owned leasehold or underlying Indian allotment, or upon the water produced by the wells. The assessments are a *personal obligation* of the non-Indian producer, and if not paid, are collected by the District through legal action against the producer in any court having jurisdiction. (Cal. Water Code § 31638). The incidence, or legal obligation, to pay the assessment is squarely on the non-Indian water producer.

~~There are two other things of significance to note.~~ First, the character or ownership of the water rights under which the water is produced is irrelevant to the assessment process. It matters not whether a producer is producing water under an asserted reserved water right, an overlying right, an appropriative water right, or is exercising a right to recapture imported water, or under any water right at all.[1] Nor does it matter what the relative priority of the water right being

---

For an explanation of the various categories of water rights, see *In re Waters of Hallett Creek Stream System*, 44 Cal.3d 448, 457-458, 243 Cal.Rptr. 448 (1988) (reserved water rights), *City of Barstow v. Mojave Water Agency*, 23 Cal.4th 1224, 1240-1241, 99 Cal.Rptr.2d 294 (2000) (overlying, appropriative, and prescriptive

3

EDCV05-626 VAP (SGLx)

exercised is. The entire purpose of the replenishment assessment program is to provide sufficient supplies of water so all demands can be satisfied, regardless of the character or priority of the water rights.

Second, the statutory scheme under which CVWD operates does not authorize the District to regulate the amount of groundwater a producer can pump, nor does it authorize CVWD to regulate the uses to which the pumped water may be applied.  It is not a regulatory to scheme to preserve the groundwater basin by limiting the amount of water extracted; it is a system to finance the importation of water to satisfy all demands so no one has to limit production. The Indian allottees and their non-Indian lessee continue to enjoy the use of water underlying the allotments, whether that use is in the nature of a state water right or federal reserved water right.

**B.    The Exercise of Taxing Jurisdiction by Levying a Replenishment Assessment on a Non-Indian Lessee Does Not Violate Federal Law.**

The United States Supreme Court has prescribed a test to govern the exercise of state jurisdiction over non-Indian activities and interests on Indian lands.  In *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S. Ct. 2578, 69 L. Ed 2d 665, (1980) a non-Indian logging enterprise challenged imposition of a motor carrier license tax assessed on the carrier's gross receipts, and a use fuel tax based on diesel fuel used within the State of Arizona.  In the face of heavy federal regulation and tribal involvement in the Tribe's timbering interests the Court held that the state tax was preempted by federal law. In reaching its decision, the Supreme Court recognized that "there is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members." 448 U.S. at 141.  The Court recognized that state jurisdiction over Indian reservations and its members could be barred by

rights); *City of Los Angeles v. City of San Fernando*, 14 Cal.3d 199, 255-262, 123 Cal.Rptr. 1 (1975) (recapture rights).

4                    EDCV05-626 VAP (SGLx)

(a) the preemption of federal laws, or (b) "it may unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them." 448 U.S. at 143. The Court recognized that "more difficult questions arise where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." 448 U.S. 144. The Court set forth a different test than those enunciated above, stating, 448 U.S. at 144-145:

> "When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest. See *Moe v. Salish & Kootenai Tribes*,[425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) ]supra, at 480-481; *McClanahan v. Arizona State Tax Comm'n*, [411 U.S. 164, 173, [93 S.Ct. 1257], 36 L.Ed 2d 129 (1973). More difficult questions arise where, as here, a State asserts authority over the conduct of non-Indian engaging in activity on the reservation. In such cases we have examined the language of the relevant federal treaties and statutes  in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law."

Unlike the circumstances surrounding the *Bracker* case, the above inquiry, when applied to the facts of this case, tilts heavily in favor the conclusion that

CVWD PTS AND AUTHS IN OPP TO PLAINTIFFS MSJ

1   CVWD's exercise of jurisdiction to levy the assessment does not violate any
2   federal law.

3   **1. The Levy of Replenishment Assessments Does Not Regulate Water**
4   **Rights.**

5   There is no interference with the exercise of whatever water rights may bve
6   appurtenant to leased allotted lands. This is not a water rights case. CVWD has
7   never denied to plaintiffs or their lessees the right to pump groundwater or the
8   right to use it on the leased allotted land. There is no restriction on the amount of
9   water that may be pumped or the uses to which it may be applied.

10   Assessing a non-Indian lessee's production of ground water during the term of
11   the lease cannot be characterized as any form of regulation of an Indian reserved
12   ground water right. No restriction is imposed on the exercise of any water rights of
13   any kind. Unlike *Colville Confederate Tribes v. Walton*, 647 F.2d 42 (9th Cir.
14   1981), state law here is not attempting to regulate whether water can be produced,
15   how much can be produced, where it can be used, for what purposes it can be
16   used, or what priority whatever water rights the water may be produced under may
17   enjoy relative to other rights[2]. It is simply raising revenue in a non-discriminatory
18   manner to fund a program aimed at providing imported water to supply whatever
19   demands are placed on the groundwater basin under whatever claimed water right
20   the producer is producing the water.

21   CVWD has never denied Plaintiffs or its lessee the right to pump groundwater
22   or the right to use it on the allotted land. The levy of the assessment simply does
23   not interfere with, or violate, any federal statute or policy.

24   In fact and in law the imposition of the replenishment assessment on the non-

25   

26   [2]   There has not been an adjudication of groundwater rights in the basin, so the relative
27   priorities of groundwater users has not been definitively determined or quantified. See
28   Material Fact 32, Declaration of Steven Robbins, paragraph 8, page 3, lines 5-6.

1  Indian lessee groundwater producer is no different than the imposition of

2  leasehold interest taxes (or other property taxes) on non-Indian leaseholds (or

3  other property interests), which a long unbroken line of cases (cited in footnote 6)

4  have considered lawful under federal Indian law. In order to avoid this line of

5  cases squarely authorizing taxation of non-Indian owned interests in Indian land,

6  Plaintiffs argue that "to tax an asset by definition regulates and diminishes its

7  value"(Plaintiffs' Proposed Conclusion of law 16),[3] automatically assuming that

8  taxation is an economic damage to their rights. This court should not grant

9  summary judgement based on an automatic assumption of unproven damage.

10     If it were the governing rule that taxation equals damages, then the courts

11  would have never allowed taxation of non-Indian held interests because such

12  taxation would diminish and therefore "regulate" the rental or other value of the

13  Indian land. Plaintiffs cite *White Mountain Apache v. Bracker*, supra, 448 U. S.

14  136, for the proposition that taxes against a non-Indian can be preempted by

15  federal law. In *White Mountain*, however, there existed a comprehensive federal

16  and tribal scheme which was held to totally preempt the state power to tax a non-

17  Indian entity. There is no such scheme here.[4]

18  _____

19  [3]  Plaintiffs also argue that this is a "fee" rather than a "tax" and therefore the cases

20  allowing taxation do not apply. However, an examination of those cases, and their
underlying rationale, fail to make any distinction in federal law between a tax and fee.

21  Indeed, the fact that the assessment is not a general revenue tax merely designed to

22  fill government coffers cuts in CVWD's favor. As a fee, the assessment is narrowly
tailored to pay only for the proportional costs of replenishing the groundwater

23  resource, thus providing a direct benefit to Mission Hills Country Club by sustaining

24  a resource used by it and other groundwater users within the area of benefit. Such an
exaction, whether called a fee or tax, is far less a threat to any federal protective

25  scheme asserted in this case than more broadly based property taxes which have been

26  [4] held lawful in the cases cite by CVWD.

27  Plaintiffs cite 25 CFR 162.103 for the proposition that Indian leases do not convey

28  water rights unless the lease expressly incorporates such rights. What the regulation

7
EDCV05-626 VAP (SGLx)

## 2. The Replenishment Assessments Are Not an Encumbrance on Trust Property.

As noted above, the replenishment assessments are a personal obligation of the lessee and are not secured by a lien on the allotted lands or any water rights. The assessments do not reduce is any way the rent payable under the lease, as it is

expressly says is that Part 162 applies to land use agreements including: "(5)Leases of water rights associated with Indian land, except to the extent the use of such water rights is incorporated in a lease of the land itself;…" Notwithstanding the fact that this regulation was not in effect when the lease was entered into, the subject lease may well comply with this regulation by implicitly conveying the right of the lessee to develop the golf course by using groundwater. CVWD's assessment in no way conflicts, or otherwise interferes, with this regulation, limited to the lessee. Neither does this sole allusion to the methodology of leasing water constitute the kind of complete preemptive federal scheme envisioned in *White Mountain Apache Tribe v. Bracker.*

The lease reveals that it is a lease to develop and operate a golf course enterprise (Master Lease, Article 4, Material Fact No. 43.) At the inception of the lease no surface water was available outside the leased premises to irrigate such an enterprise. The lease provided that the Indian lessors would receive a percentage of the annual gross receipts of the business enterprise. (Master Lease, Article 4; Declaration of Jubin Merati, Ph. D., paragraph 11, Material Fact No. 44.) The enterprise could never have been undertaken unless the lease implicitly granted permission to the lessee to produce groundwater to develop the golfing enterprise. By sinking and operating wells, and producing water to irrigate the course, Mission Hills Country Club has become a successful and profitable enterprise throughout the years.

The unilateral interpretation presented in the plaintiffs' request for this court to decide the meaning of the lease in the absence of the tenant runs contrary to the doctrines of considering the reasonable expectations of the parties, from construing ambiguities against the drafter of the lease, (here the BIA for the lessors), the failure to expressly exclude the use of attendant water rights from the terms of the lease, and by inference, the implied use of resources to accomplish the necessary and intended development of the property as a golf course. It can be asserted that the Master Lease impliedly granted the tenant the right to extract groundwater. Certainly, under the other material terms of the lease, the tenant is responsible for all taxes and assessments (Material Fact 41.) Such expenditures, in excess of all rents, are to borne only by the tenant (Material Fact 40), who could argue that having paid all assessments, it has acted within its rights under the lease.

8                    EDCV05-626 VAP (SGLx)

1   a gross receipts lease and therefore not a tax on income from the leasing of the
2   allotted trust lands.
3       Taxes and assessments on lessees of allotted land that are not liens upon the
4   land do not violate provisions of federal law prohibiting the encumbrance of
5   allotted lands, and they do not violate the provisions of Public Law 280 (28 U.S.C.
6   Section 1187) that qualify the grant of civil jurisdiction made to California in that
7   statute. *Agua Caliente Band of Mission Indians*, 442 F.2d 1184, at 1187 (9th Cir.
8   1971);*Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d 1253 at 1256-
9   1257(9th Cir. 1976)
10      Plaintiffs here are not producers (extractors) of groundwater and have not had
11  the assessment fee levied upon them. The replenishment assessment under the
12  Water Code is only a personal obligation of the producer, and cannot be enforced
13  as a lien on the allotted lands. Under the express terms of the Master Lease,
14  Article 19,  the lessee is responsible for and "shall pay all taxes, assessments,"
15  levied during the term of the lease, and is required to prevent any lien against the
16  property. (Material Fact Nos. 40, 41  and 42.)  This is a hypothetical case where
17  none of the assumptions necessary to make it an actual triable case or controversy
18  have occurred; the plaintiffs have not been assessed (Material Fact Nos. 30, 48),
19  much less had any lien placed  on their property by the District.

**3. The Balance of Interests  is in Favor of the District**

20
21      Plaintiffs also assert (P.1, Memorandum of Points and Authorities) that
22  defendant is attempting to unlawfully interfere with Plaintiffs' reserved rights by
23  "regulating" the water table. Plaintiffs cite *Federal Power Commission v. Oregon*,
24  349 U.S. 435, 75 S. Ct. 832, 99 L. Ed 1215, (1955) for the proposition that, absent
25  explicit federal recognition, state regulation over reservation use of water is not
26  permitted. In this regard the taxation cases cited above demonstrate that this
27  federal rule against state *regulation* of reserved waters does not extend to *state*
28  *taxation* of non-Indian *activity* or interests, or, even, state regulation of non-Indian

9                                    EDCV05-626 VAP (SGLx)

water use on reservations. *United States, et al. v. Anderson, et al.*, 736 F.2d 1358 (9th Cir. 1984) is not to the contrary.  Using the particularized inquiry test enunciated in *White Mountain*, the Ninth Circuit upheld regulatory authority over non-Indian use of surplus waters Chamokane Basin water *within* the Spokane reservation. The court found the exercise of state authority did <u>not</u> impinge on any tribal or federal interests which rose to the violation of federal law. *Anderson*, supra, 736 F.2d 1364-1365.

Here, CVWD asserts only authority to impose a discreet assessment on the production of groundwater on an activity by a corporation, a non-Indian with a leasehold of allotted land. Indeed, CVWD's assessment rests much lighter than the state scheme in *Anderson* which acted to regulate the quantity and use of surplus waters on the reservation. CVWD's assessment works no such regulation and does not impinge in any significant way on the manner and use of the subject groundwater, under whatever claim of rights. Indeed, the Ninth Circuit in *Anderson* concluded , 736 F. 2d at p.1365 that:

> [n]o federal preemption of state regulation has occurred.
> No federal statute or regulatory scheme expressly or
> impliedly governs water use by non-Indians on the
> Spokane Reservation. Second, the balance of interest
> weighs most heavily in favor of the state.

The balance of interests weighs heavily in favor of preserving and increasing the groundwater basin's resources by importing additional supplies, as expressly authorized by the California Legislature.

Plaintiffs cite *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) for the proposition that state regulation of water use on reserved land is forbidden  under *Federal Power Commission v. Oregon*, 349 U.S. 435, 75 S. Ct. 382, 99 L. Ed. 1215 (1955).  This says too much too easily. CVWD does not

10                               EDCV05-626 VAP (SGLx)

1  regulate the production of groundwater on the subject leasehold. The assessment
2  scheme does not regulate where, when, or how either the Indian lessor, or even the
3  non-Indian lessee, elects to produce and use water. Its sole purpose is to assess a
4  fee or tax based on the amount of water produced to protect the shared
5  underground resource from depletion, a condition which harms the entire basin.
6  Preserving, without regulating usage of, the water table of the aquifer is not the
7  same as regulating water used by Indians or non-Indians on Indian land. The
8  purpose of the assessment is not to discourage groundwater production or the
9  manner of its use. The assessment is to *replenish* the groundwater *to preserve its*
10 *viability* for *all* producers. Plaintiffs' tenant produces groundwater without
11 restrictions by the District, and plaintiffs benefit from the golf course's receipts.
12      Application of the assessment does not in anyway put the Indian allottees at
13 a market disadvantage in the leasing of their lands. The Indian lessor-allottees
14 receive full value for use of their water by the lessee through the rental revenue
15 from the lease.[5] Thus, payment of the assessment by the non-Indian lessee is

16

17 _____

   [5]    Plaintiffs have alleged that the assessment is an interference (at best), and a
18 taking (at worst), of a federal reserved water right protected from interference or
   taking by federal law. This is simply not the case as a matter of law with respect to
19 the water produced and used by the non-Indian lessee. When an Indian is in
   possession of his or her allotment, the allotment is in trust, the fee or legal title is
20 owned by the United States, and the beneficial interest, including the right to
   possession and use of appurtenant rights such as water, is held by the allottee.
21 However, when the Indian leases his trust allotment he conveys the possessory estate
   and appurtenant rights such as water, to another, in this case, the non-Indian lessee.
22 This is why the Secretary of Interior must approve each lease of allotted land. The
   possessory estate is exchanged for contract rights under the lease, including the right
23 to prescribed rent which are now the corpus of the trust which is why rents are paid
24 to the Bureau of Indian Affairs and paid into a trust account entitled an "Individual
   Indian Money Account." The leasehold (and similar interests such as rights-of-way)
25 is not in trust, which is why so many courts have held that States may levy a
26 possessory interest tax on such interests when held by non-Indians. The plaintiffs
27 continues to receive the full rent due under the lease, which is their trust property.

28                                    11                EDCV05-626 VAP (SGLx)

merely a cost of doing business, *a cost born by all others similarly situated throughout the Coachella Valley*. Since the rent is calculated based on gross receipts, the assessment does not affect plaintiffs rent, and therefore causes no economic detriment to them.(Material Fact 44.) However, should the lessee elect to pass on the assessment  to its customers as a business expense gross revenues would be increased which would ***increase***  rent to the Indian lessors. Thus, no violation of federal law or burden on federal policy or tribal sovereignty is discernible by application of CVWD's assessment.

CVWD's assessment is not intended to be a general revenue producing tax. It is tailored to provide revenues to protect a common resource shared by Indian and non-Indian alike. Because collective pumping of the groundwater basin by all producers has exceeded the supplies of native water creating a condition of overdraft, CVWD obtains additional water supplies which are delivered into the Whitewater River and then diverted into the CVWD's recharge basins. While plaintiffs argue that the assessment is somehow less applicable than a general revenue tax, such a distinction is not apparent in the cases dealing with the taxation of Indian and non Indian interests. Indeed, to the extent that the assessment supports a specific replenishment program from which allottees directly benefit, rather than general revenues,  the *White Mountain* balance tips in CVWD's favor, not the allottees.

The assessments are not secured by liens upon any property or water right. It has long been settled that taxes and assessments levied on lessees of Indian tribal and allotted lands that do not become liens upon the land are not prohibited by federal law.  Whatever immunity from taxation Indian owners of trust lands possess does not extend to the lessees of the land. (*Oklahoma Tax Commission v. Texas Company,* 336 U.S. 342, 69 S.Ct. 561, 93 L. Ed 721 (1949) (upholding state gross production taxes and excise taxes on petroleum produced from leases on allotted and restricted Indian lands); *Agua Caliente Band of Mission Indians v.*

12      EDCV05-626 VAP (SGLx)

*County of Riverside,* 442 F.2d 1184, 1186 (9th Cir. 1971) (upholding possessory interest tax on lessee) and *Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253 (9th Cir. 1976 (same).[6]

There is no federal policy which is intended to franchise any immunity from state taxation to non-Indian lessees absent the kind of comprehensive federal regulatory scheme involved in *Bracker.* This case is far more similar to *Moe v. Confederate Salish and Kootenai Tribes of the Flathead Reservation et al.,* 425 U.S. 463, 96 S.Ct. 1634, 48 L. Ed.2d 96 (1976). In that case the Supreme Court held that a state sales tax on cigarettes, the incidence of which fell on the non-Indian buyer, was required to be collected and paid by a lessee of Indian land, despite the fact that the vendor was an Indian and a tribal member.  The Court quoted *United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 82 L. Ed. 410 (1938): "Enactments of the Federal Government passed to protect and guard its

---

[6] There are many, many cases where the courts have upheld state and local taxation of non-Indians on Indian land. See, e.g. *Arizona Department of Revenue v. Blaze Construction Company, Inc.,* 526 U.S. 32,119 S.Ct. 957, 143 L.Ed.2d 27 (1999)(upheld state imposed transaction privilege tax on non-Indian corporation doing business on reservation for United States); *Cotton Petroleum Corporation v. New Mexico,* 490 U.S. 163 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989)(state and tribe could impose severance taxes on on-reservation oil and gas production by a non-Indian lessee); *Washington v. Confederated Tribes of the Colville Indian Reservation et al.,* 447 U.S. 134, 100 S.Ct. 2069, 6 L. Ed.2d 10 (1980)(state could impose an excise tax on reservation purchases of cigarettes by nonmember Indians and non Indians despite coexistent tribal taxes); *Utah Northern Railway v. Fisher,* 116 U.S. 347, 15 S.Ct. 391, 39 L.Ed. 447 (1895)(upheld territorial and county taxes on land, right of way and property owned by railroad located within the Fort Hill Indian Reservation); *Maricopa and Phoenix Railroad Company v. Arizona Territory,* 156 U.S. 347, 15 S.Ct. 391, 39 L.Ed.447 (1895)(upheld county property taxes on right of way, track and rolling stock owned by railroad within the Gila River Indian Reservation); *Truscott v. Hurlbut Land & Cattle Company,* 73 F. 60 (1896); *Thomas v. Gay,* 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898)(upheld county taxes on cattle grazing on non-Indian leaseholds within Oklahoma Indian Reservation); *Wagoner v. Evans,* 170 U.S. 588, 18 S.Ct. 730, 42 L.Ed. 398 (1905)(county taxation of non-Indian owned cattle on Indian reservation).

13                                    EDCV05-626 VAP (SGLx)

Indian wards only affect the operation, within the colony, of such state laws as conflict with the federal enactments." 425 U.S. at 483.

III

## PLAINTIFFS' ASSERTED RESERVED RIGHTS ARGUMENT
## IS BASED ON FLAWED ASSUMPTIONS

Also underlying plaintiffs' claim is an assertion that their allotted lands enjoy a reserved water right to make beneficial use of the groundwater underlying the property, and from this they argue that the character of such a right carries with it an immunity from a replenishment assessment being levied upon their lessee for producing water under such a right. There are several problems with this argument.

First, as noted above, the replenishment assessments do not prohibit anyone from producing water under any kind of water right.

Second, no such right has been adjudicated to plaintiffs' allotted lands and cannot here be adjudicated in the absence of the United States.

Third, the amount of water being produced from the wells exceeds the amount needed to irrigate plaintiff's allotted lands – thus exceeding any possible measure of any purported reserved water right.

### A.   JURISDICTIONAL BARRIERS TO ASSERTION OF RESERVED WATER RIGHT TO GROUNDWATER.

Before Plaintiffs can demonstrate such unlawful interference or regulation, they must first necessarily establish the existence of such a reserved groundwater right, which has to date neither been adjudicated nor quantified. Plaintiffs' lawsuit is, therefore, premature and simply not ripe for litigation. Furthermore, this Court lacks jurisdiction to adjudicate such a right since the United States is not a party to this action.

Under federal law, the United States is the owner of the reservation and its appurtenant water rights, which it holds in trust for the Tribe and the allottees

14        EDCV05-626 VAP (SGLx)

therein. (*Minnesota v. United States* 305 U.S. 382, 386-388, 59 S. Ct.292, 83 L. Ed. 235 (1939.) The United State as trustee is therefore a necessary and indispensable party. (*Id.*) The United States, however, is not a party to this action. Nor can it be joined because Congress has not waived the sovereign immunity of the United States to allow it to be joined to this type of case, involving a claim to water rights for only a handful of properties overlying a groundwater basin.

Congress has provided only a limited waiver to allow the joinder of the Untied States to water rights cases under the McCarren Amendment, 43 U. S. C. § 666[7]. Under that amendment, the United States *only* consents to be a party with respect to general stream or basin adjudications.

This case is <u>not</u> such a basinwide adjudication of water rights, and the United States has declined and <u>not</u> consented to be a party, and this Court therefore lacks the power to adjudicate Plaintiffs' putative reserved water right. The waiver given by subsection (a)(1) of the McCarren Amendment is limited to general stream and basin adjudications in which all the water rights will be adjudicated; it does not permit joining the United States in a lawsuit where only

---

[7] The McCarren Amendment , 43 U.S.C. § 666, provides in pertinent part: "Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty , and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: <u>Provided</u> That no judgment  for costs shall be entered against the United States in any such suit."

15                    EDCV05-626 VAP (SGLx)

the rights of plaintiffs and the United States will be adjudicated. *Dugan v. Rank,* 372 U.S. 609, 618, 83 S. Ct. 999, 10 L. Ed. 2d 15 (1963).

Plaintiffs cannot in this case, where there has been no adjudication of groundwater rights in the basin, (Material Fact 32) in the absence of the United States as a party (Material Fact 31), pursue claims of a reserved water right.

## B.  THE LESSEE IS PUMPING MORE THAN NEEDED TO IRRIGATE PLAINTIFFS' ALLOTTED LANDS.

In *Arizona v. California,* 373 U.S. 546, 600-601, 10 L. Ed. 2d 542, 83 S.Ct. 1468 (1963), the Court limited the reserved water right for a reservation to the amount needed to irrigate the practicably irrigable acreage of the reservation.  It is not an unlimited right.

As a factual matter, more water is being produced by the lessee from the wells at issue than is needed to irrigate plaintiffs' allotted land, whether it be for the actual use as a golf course or for the hypothetical use of irrigated agriculture. Defendant's disclosed expert, agricultural engineer Joseph M. Lord, Jr., sets forth in his declaration his analysis, for both the 40 acre Rice parcel and the 240 acre Preckwinkle parcel , that the amount of groundwater actually pumped from State Well Nos.04S05E26D01S,  04S05E26H01S and  04S05E26K01S exceeds the amount necessary to irrigate either parcel  as a golf course, or for any of the varieties of crops examined (Material Facts 35 and 36.) Lord further opines (Material Facts 37 and 38) that  the groundwater extracted from the State Well on each allotment has been and is still being used for purposes other than to irrigate said  parcels.  The water so produced exceeds any maximum measure of a reserved water right, and because  plaintiffs rest their argument solely on a claim of interference with a reserved water right, the claim must fail.

There are also triable issues as to whether the natural recharge of the basin, coupled with apparent claims of prior vested overlying right on the private lands granted to the railroad, can satisfy that generous measure of reserved water rights.

16  EDCV05-626 VAP (SGLx)

See Material Facts 57-60, based on the analysis set forth in the Declaration of Steven Robbins, General Manager and Chief Engineer of the District.

## IV

## NO ACTIONS TAKEN TOWARDS PLAINTIFFS,  AND NO DAMAGES, PRECLUDES JUDGMENT ON THE FIFTH CLAIM

No assessments have been levied upon plaintiffs, much less liened on their property. (Defendant's Material Facts 30, 48.) Action taken towards the tenant is not action taken against the plaintiffs. Additionally, plaintiffs have suffered no monetary damages.  (Defendant's Material Fact 44.) *Carey v. Piphus*, 435 U.S. 247, 264, 98 S. Ct. 1042, 55 L. Ed. 2d. 252 (1978) requires actual damages for any recovery.

Plaintiffs have not proven the replenishment assessments are unlawful as applied to the tenant.  There is no liability under the Fifth Claim, and surely  the court cannot grant summary judgment to plaintiffs based on an assumption of law as plaintiffs request (Plaintiffs' Proposed Conclusion of Law 16) without any evidence of damages presented in plaintiffs' proposed Uncontroverted Facts.

## V

## PLAINTIFFS' IRRELEVANCIES NOT REFERENCED IN ANY UNCONTROVERTED FACT  SHOULD BE DISREGARDED

### A. Richard Freeman and Thomas Henslee

The declarations of plaintiffs' counsel  Richard Freeman and the tenant's former general counsel, Thomas Henslee, have been provided by plaintiffs in support of the motion for partial summary judgment, but are not cited as establishing any part of any proposed controverted fact. The declarations are inadmissible, as hearsay (Freeman) and improperly verified and speculative (Henslee), but their inclusion without any reference to the pleadings asserted to be proved makes them simply irrelevant, except as the proof of the historical beginnings of this action, in seeking further funds for plaintiffs, rather than redress

17                    EDCV05-626 VAP (SGLx)

of any wrong to plaintiffs committed by the District.

**B. Bobbie Ray Preckwinkle**

The lengthy declaration by plaintiff Preckwinkle regarding his speculation about the meaning of signs on the Country Club's wells similarly is not referenced to any point necessary to prove the elements of plaintiffs' claims for relief. Out of caution, despite the irrelevancy to the pleadings herein, in addition to the objections to the speculations in said declaration, the court is provided the Declaration of Steven B. Bigley (Defendant's Material Facts 45 and 46) regarding the nature and purpose of the District's well monitoring program, the data from which is used in preparing the annual statutory Engineer's reports necessary to maintain the groundwater replenishment program.

Regardless of Plaintiff Preckwinkle's speculation as to whether the District constructed or operates the wells, the parties have stipulated that the wells were all constructed by other entities  before the replenishment assessments began in 1980 (Stipulated  Facts 10, 11, and 12, presented as Material Facts 23, 24 and 25), and it is uncontradicted by competent evidence that the District did not construct operate or maintain them (Defendant's Material Facts 49, 50, and 51.) Uninformed speculation on matters not serious enough to qualify as Uncontroverted Facts for consideration by the court is no basis to grant summary judgment.

**C. Kim Snyder**

The  declaration of Kim Snyder essentially argues that the BIA should never have approved the ambiguous Master Lease it in fact approved in 1969. That is irrelevant to any issue raised in this case as to the District. The Snyder declaration does present evidence, the basis for Defendant's Material Fact 33, that any lease between the plaintiffs and their tenant is subject to appraisal and the approval of the BIA, proving that the conjecture regarding a separate sale of water rights is pure speculation. Snyder's interpretation of the contract  is objectionable, as interpretation is within the province of the court. There is a conflict between the

18                               EDCV05-626 VAP (SGLx)

potential reasonable expectations of the parties to the contract. Although the tenant is not a party before the court (Material Fact 33), defendant has asserted the conflicting possibility that the groundwater pumping rights, since they are not excluded specifically, and are necessary for the contemplated development of the golf course, were impliedly provided to the tenant in the Master Lease (Material Fact 43.)

## VI

## CONCLUSION

There are numerous material facts in dispute; preventing the court from granting plaintiffs' motion in favor of plaintiffs as to any claim. Plaintiffs have not proven adjudicated, quantified reserved groundwater rights and cannot do so in this case. The amount of water historically pumped from the wells on their allotments exceeds any such possible reserved right for irrigation of the allotments. Plaintiffs assume damages, and have presented no proof of action towards them by the District or actual damages, negating liability on the Fifth Claim. Plaintiffs seek this court's interpretation of the terms of the lease in regards to an absent party, the tenant, essentially seeking an advisory opinion. Plaintiffs' motion for partial summary judgment should be denied as to the First, Fifth and Seventh Claims.

DATED: April 21, 2008                Respectfully submitted,


By:   S/Steven b. Abbott
         Steven B. Abbott
email: sabbott@redwineandsherrill.com
Gerald D. Shoaf
email: gshoaf@redwineandsherrill.com
Harry C. Carpelan
email: hcarpelan @redwineandsherrill.com
REDWINE AND SHERRILL
Attorneys for Defendant,
COACHELLA VALLEY WATER DISTRICT
1950 Market Street
Riverside, California 92501-1720
Telephone No.: (951) 684-2520

19                      EDCV05-626 VAP (SGLx)

**EXHIBIT 56**

56-000095

1   Steven B. Abbott, State Bar No. 125270
    email: sabbott@redwineandsherrill.com
2   Gerald D. Shoaf, State Bar No. 41084
    email: gshoaf@redwineandsherrill.com
3   Harry C. Carpelan, State Bar No. 102239
    email: hcarpelan@redwineandsherrill.com
4   REDWINE AND SHERRILL
    1950 Market Street
5   Riverside, California 92501-1720
    Telephone No.: (951) 684-2520
6   Facsimile No.: (951) 684-9583

7   Attorneys for Defendant,
    COACHELLA VALLEY WATER DISTRICT

8

9                    UNITED STATES DISTRICT COURT

          CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

10

11  BOBBIE RAY PRECKWINKLE, an        )Case No. EDCV05-626 VAP
    individual; STEVEN RICE, an       )              (SGLx)
    individual; CHAD SIVA, an individual, )
12                                     )Honorable Virginia A. Phillips
                                       )
13           Plaintiffs,              )REPLY MEMORANDUM OF
                                       )POINTS AND AUTHORITIES TO
14        v.                          )OPPOSITION TO MOTION FOR
                                       )SUMMARY JUDGMENT OR
15  COACHELLA VALLEY WATER             )PARTIAL SUMMARY JUDGMENT
    DISTRICT, a public agency,        )BY COACHELLA VALLEY WATER
16                                     )DISTRICT
             Defendants.              )
17  _____  )

18                                     HEARING: 6/2/08
                                       TIME: 10:00 A.M.
19                                     COURTROOM: 2
                                       TRIAL: 12/2/08
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     There are no Triable Issues of Material Fact . . . . . . . . . . . . . . . . . . . . . . . .   1

II.    CVWD's Replenishment Assessments on Plaintiffs' Non-Indian
       Lessee's Activities are Valid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

III.   Plaintiffs Cannot Sue for Trespass . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

IV.    Plaintiffs Have no Conversion Claim . . . . . . . . . . . . . . . . . . . . . . . . . .   10

V.     No Damage Supports the Fifth Claim . . . . . . . . . . . . . . . . . . . . . . . . . .   10

VI.    Relief Cannot be Granted Under the Seventh Claim . . . . . . . . . . . . . . . .   11

VII.   The Applicable Limitations Period for the Federal Claims . . . . . . . . . . .   11

VIII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

56-000097

# TABLE OF AUTHORITIES

**Federal Cases**

*Canatella v. Van De Kamp,*

486 F. 3d 1128 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

*Carey v. Piphus,*

435 U.S. 247, 264, 98 S. Ct. 1042, 55 L.Ed2d 252 (1978)  . . . . . . . . . . . 11

*County of Oneida, New York  v. Oneida Indian Nation of New York State,*

470 U. S. 226, 105 S. Ct. 1245, 84 L. Ed. 2d 169 (1985) . . . . . . . . . . . . . *12*

*Dugan v. Rank,*

372 U.S. 609, 618, 83 S. Ct. 999, 10 L. Ed. 2d 15 (1963) . . . . . . . . . . . . . 5

*Gilmour v. Gates, McDonald and Co.,*

382 F. 2d 1312 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jones v. Blanas,*

393 F. 3d 918 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Minnesota v. United States*

305 U.S. 382, 59 S. Ct.292, 83 L. Ed. 235  (1939) . . . . . . . . . . . . . . . . . . 5

*Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation,*

425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976)  . . . . . . . . . . . . . . . . 8

*White Mountain Apache Tribe v. Bracker,*

448 U.S. 136, 100 S.Ct. 2578, 69 L.Ed. 665 (1980) . . . . . . . . . . . . . . . 6, 7

*Yakima v. Confederated Tribes,*

502 U.S. 251, 112 U. S. 683, 116 L. Ed. 2d 687 (1991)  . . . . . . . . . . . . . . 6

**State Cases**

*Korea Supply Co. v. Lockheed Martin Corp.,*

29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29 (2003) . . . . . . . . . . . . . . . . . . . . . . . *10*

*Lightner Mining Co. v. Lane,*

161 Cal. 689, 120 P. 771 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Munger  v. Moore*

11 Cal. App. 3d 1, 89 Cal. Rptr. 323 (1970) . . . . . . . . . . . . . . . . . . . . . . 10

**Federal Statutes**

42 U. S. C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

43 U. S. C. § 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**State Statutes**

California Water Code § 31630.5(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

California Water Code §3162.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

iii

56-000099

## I.  THERE ARE NO TRIABLE ISSUES OF MATERIAL FACT.

Plaintiffs' opposition fails to present evidence that creates a genuine issue of material fact that would prevent the granting of the motion as to any claim in the Second Amended Complaint. The opposition instead consists of irrelevant facts, semantic games, and strained legal arguments. No evidence is presented to contradict the essential facts that entitle CVWD to judgment. Plaintiffs' Response to CVWD's Proposed Statement of Uncontroverted Facts does not actually controvert any of those facts.  As explained in detail below, it either presents meritless legal argument or irrelevant facts.

Uncontroverted Fact 23: Language from an earlier proposed stipulated fact was mistakenly used by defense counsel; the difference is not important, and semantic only. The District has never sent replenishment assessments to the plaintiffs, only to their tenants. See Uncontroverted Facts 19 and 20, Stipulated Statement of Uncontroverted Facts in Support of Cross-Motions for Summary Judgment. No evidence is presented to create a triable issue of fact.

Uncontroverted Fact 26:  Plaintiffs present a strained legal argument that they are the actual producers of the groundwater, without providing any actual evidence to that they engaged in an act of "production" as that term is defined in Water Code section 31630.5 (d) or were assessed by CVWD for any production.  Plaintiffs admit that "Plaintiffs did not physically operate the wells, ...." The assessments notices are sent to the producer based upon production by the producer.  That part of the statute is clear and unequivocal. The producer was Mission Hills County Club and that was to whom the assessments were sent. (Robbins Declaration ¶ 19[1].) The ownership of

---

[1] As to the objectionable speculation in plaintiff Preckwinkle's declaration that the CVWD may have been extracting groundwater from the wells on his and plaintiff Rice's properties, it should be noted that plaintiffs have *not* disputed Defendant's Uncontroverted Facts 27, 28 and 29, which establish that: [27] State Well Nos. 04S05E26D01S, 04S05E26H01S and 04S05E26K01S were not constructed by, and are not owned or operated by CVWD, and the wells are not connected with CVWD's

the wells is irrelevant to the assessment process, as is the character of the water right, if any, under which the water is extracted.   The cited portions of Mr. Robbins deposition regarding the assessment process confirm that CVWD's process fully comports with the statutory scheme and focuses the assessments on production by a producer.

Uncontroverted Fact 30:  Plaintiffs do not dispute or offer any evidence to controvert.  The statute unequivocally states that the "board may by resolution levy a replenishment assessment upon *all* water production . . ." (Water Code 31632.5, emphasis added.)

Uncontroverted Fact 32:  Plaintiffs' response to this fact consists solely of legal arguments regarding possession of the wells and the ownership of water rights. All that Defendant's Uncontroverted Fact 32 seeks to establish is that under the applicable statute, the replenishment assessments are the personal obligation of the *producer*, and are not secured by any liens on property or water rights. Nothing in the plaintiffs' page long response creates any triable issue as to this fact or even suggests that the assessments sent to the country club were anything other than the personal obligation of the country club to pay.

Uncontroverted Fact 33:  Plaintiffs' opposition resorts to a dictionary for semantic gamesmanship.  The sentence cannot be reasonably read the way plaintiffs wish when read in the context of the entire paragraph. Plaintiffs present no evidence to support any finding that the District recovers all or more than all the costs it incurs to benefit the groundwater basin's producers.

Uncontroverted Fact 35: Mr. Robbins in his declaration testified that water is

_____

domestic water system; [28] CVWD does not control when State Well Nos. 04S05E26D01S, 04S05E26H01S and 04S05E26K01S are operated, how much water is extracted by the wells, or what uses are made of the water extracted; and [29] The District has never used any of the water produced from State Well Nos. 04S05E26D01S, 04S05E26H01S and 04S05E26K01S.

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

available at some depth.  The Engineer's Report and Mr. Robbins Declaration show that the water level is higher because of the artificial recharge activity than it would have been without, showing that there is a benefit to the property.  Plaintiffs offer no evidence to show that this higher water level did not occur. And they offer no evidence to show that their allotted lands are not within the geographic limits of the area determined by the board to be the "area of benefit," a determination supported by the substantial evidence of the Engineer's Report.

Uncontroverted Fact 36: The absence of objection is not disputed by any evidence.  The lack of notice to BIA does not create a triable issue as to this fact.

Uncontroverted Fact 37:  Plaintiffs do not indicate that they dispute and cite no evidence.

Uncontroverted Fact 38: Plaintiffs return to the legal argument raised in response to Uncontroverted Fact 26, that they are the producers.  CWD incorporates here its prior response. It should be noted, however, that all that Uncontroverted Fact 38 seeks to establish is that, since 1980, the District has levied the assessments on the lessees producing the groundwater from the wells on plaintiffs' property. Nothing in the opposition establishes that the plaintiffs rather than the tenants operated the wells or received the assessment notices.

Uncontroverted Fact 39:  Plaintiffs' response to this fact is again the argument that they are the producers, as argued in opposition to Uncontroverted Facts 26 and 38.  CVWD incorporates here its prior response.

Plaintiffs have presented no evidence that they performed any act that constitutes production of groundwater within the meaning of California Water Code 31630.5 (d). (Uncontroverted Fact 41.)  Plaintiffs assert, without any evidentiary support, that the "charge is imposed at the 'head' of the Indian wells." The evidence is that the charge is assessed only on production (extraction) of groundwater by a producer. Having never operated the wells, plaintiffs cannot be producers under the statute.

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

56-000102

3

Uncontroverted Fact 40: Plaintiffs' response thereto simply cites the opposition presented to Uncontroverted Fact 39; however, Fact 40 merely notes the 2007 Engineer's Report makes a reference to the tenant, Mission Hills Country Club as a producer and plaintiffs do not appear to dispute that the statement is made in the report.

Uncontroverted Fact 41: Plaintiffs do not offer any evidence to dispute.

Uncontroverted Fact 42:  Plaintiffs do not offer any evidence to dispute.

Uncontroverted Fact 43: Defendant simply set forth as Fact 43 the relevant language establishing the gross receipts nature of the master lease, which prevents the tenant from reducing the rent paid to the plaintiffs by the amount cost of the replenishment assessments. Plaintiffs' opposition never refutes a single word of Uncontroverted Fact 43. No citation to any expert economist declaration is provided to establish any proof of economic damage to the plaintiff. Instead the opposition simply asserts speculation and irrelevancies; the actual formula used to calculate the rent prevents any impact on the plaintiffs from the replenishment assessments. The broad assertion without reference to evidence is made that the "expenses paid by Plaintiffs' tenant have a significant impact on Plaintiffs." The evidence of the Master Lease is to the contrary, since gross receipts are the basis for the additional rents.

References to potential amendment of the lease, and what *may* occur (page 9, line 27), are objectionable as speculation. Likewise, anticipation of what the tenant *may* do in the future in a hypothetical situation  (page 10, lines 6-10) is merely speculation and argument of counsel, not admissible evidence. The final argument on page 10, line 11, that the District is suggesting that the Plaintiffs can set any price for their water and obtain it from the tenant, has nothing to do with Uncontroverted Fact 43, which merely cites the terms of the lease and notes how the gross receipts formula prevents the tenant from passing on the cost of the replenishment assessments to the plaintiffs.

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

56-000103

## II.     CVWD'S REPLENISHMENT ASSESSMENTS ON PLAINTIFFS' NON-INDIAN LESSEE'S ACTIVITIES ARE VALID.

In their opposition brief, Plaintiffs again argue that CVWD's replenishment assessment violates federal law by "interfering" with their claimed federal reserved ~~water right~~[2]. Even assuming the existence of any such water rights[3], CVWD's assessment is levied, not on Plaintiffs or their water rights, but on the *activity* of a non-Indian lessee producing groundwater in pursuit of its own business interests. CVWD is not interfering with anyone's use of any water rights. Neither is CVWD attempting in any way to regulate the manner, use, time, or amount of water used on the allotments. ~~Neither is CVWD assessing or burdening the rent paid the lessee to the~~

---

[2] The issue of reserved water rights cannot be adjudicated here in the absence of the United States. ~~Under federal law, the United States is the owner of the reservation~~ and its appurtenant water rights, which it holds in trust for the Tribe and the allottees therein. (*Minnesota v. United States* 305 U.S. 382, 386-388, 59 S. Ct.292, 83 L. Ed. 235 (1939.) The United State as trustee is therefore a necessary and indispensable party. (*Id.*) The United States, however, is not a party to this action. Nor can it be joined because Congress has provided only a limited waiver to allow the joinder of the United States to water rights cases under the McCarren Amendment, 43 U. S. C. § 666.  Under that amendment, the United States *only* consents to be a party with respect to general stream or basin adjudications.

This case is *not* such a basinwide adjudication of water rights, and the United States has *not* consented to be a party, and this Court therefore lacks the power to adjudicate Plaintiffs' putative reserved water right. The waiver given by subsection (a)(1) of the McCarren Amendment is limited to general stream and basin adjudications in which all the water rights will be adjudicated; it does not permit joining the U.S. in a lawsuit where only the rights of plaintiffs and the United States will be adjudicated.  *Dugan v. Rank*, 372 U.S. 609, 618, 83 S. Ct. 999, 10 L. Ed. 2d 15 (1963).

[3] Plaintiffs have not presented any evidence to establish that such a right has been decreed for their allotted lands, the amount of water that can annually produced under such a water right, or that production by the lessee has been or will continue to be within the limits of such a water right. Without any of this, there is a complete failure of proof as to any injury to the asserted right.  Plaintiffs assume, without any basis in evidence, that the all production by the lessee would occur under a asserted reserved water right.  Assumptions are not evidence.

1   lessor. In short, CVWD is not interfering in any way with any protected rights or

2   assets which are held in trust by the United States for the benefit of the allottees.

3   Plaintiffs argue further that the assessment is a "fee" rather than a "tax."

4   Plaintiffs make such an argument in an obvious attempt to avoid the long line of

5   federal cases recognizing state authority to impose various property taxes on non-

6   Indian owned interests in Indian lands. However, none of the tax cases cite by CVWD

7   are dependent on the distinction (semantic or otherwise) propounded by Plaintiffs.

8   Taxes (or for that matter, fees) levied against Indian property interests which have

9   been conveyed to, and vested in, non-Indians in perpetuity (such as rights-of-way) or

10   for a term of years (such as leaseholds) are subject to state taxing jurisdiction as long

11   as the legal obligation is on the non-Indian owner. As demonstrated previously by

12   CVWD, this is precisely the case with respect to the replenishment assessment.

13   Plaintiffs cite *Yakima v. Confederated Tribes*, 502 U.S. 251, 112 U. S. 683, 116

14   L. Ed. 2d 687 (1991) to the effect that states are prohibited by federal law from taxing

15   reservation lands and reservation Indians. (Plaintiff's Opp. p. 9) CVWD does not

16   contest this point but again asserts that it is neither taxing nor assessing Indians or

17   Indian lands. As set forth more fully at footnote 5 of CVWD's opposition brief (Doc.

18   # 69, p.11), the leasehold is *not* in trust and the activity of producing groundwater by

19   a non-Indian lessee, is outside the ambit of any federal protective scheme. Plaintiffs'

20   property has never been assessed and plaintiffs have never received any assessment

21   and CVWD has never asserted plaintiffs are liable for the replenishment assessment.

22   There is no dispute, however, that the lessee is liable for paying the assessment and

23   the burden and benefits derived from the assessment fall directly on Mission Hill

24   Country Club, Inc., the non-Indian lessee.

25   Plaintiffs contend that the assessment violates "an entire body of law" intended

26   to insulate Indian water rights from state assessment or taxation. As demonstrated in

27   its opening and opposition memoranda of law, CVWD's assessment by law is on a

28   non-Indian lessee producing the groundwater, and is not tax on water rights. Plaintiffs

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

56-000105

1   argue further that *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct.

2   2578, 69 L.Ed. 665 (1980) supports its position, arguing that if the Supreme Court

3   prohibited state fuel use and license taxes on a non-Indian logging company, the law

4   must also prohibit an assessment on a non-Indian producing groundwater on a non-

5   Indian owned leasehold on allotted land.   Plaintiffs' reliance on *White Mountain*

6   *Apache Tribe v. Bracker, supra*, is misplaced. More specifically, plaintiffs fail in their

7   attempt to analogize the BIA leasing regulations in this case to the comprehensive

8   federal and tribal statutory and regulatory scheme governing timber operations and

9   sales on Indian reservations involved in the *White Mountain* case. The cases are not

10   analogous.

11      First, the federal regulations involved in *White Mountain* were indeed

12   comprehensive. The Court found that the BIA "exercises literally daily supervision

13   over the harvesting and management of tribal timber [by Pinetop]." It must be

14   underscored that the *White Mountain* test (enunciated at 448 U.S. at 144-145) requires

15   a "*particularized*" (emphasis added) inquiry into federal, state and tribal interests to

16   determine if "*in a specific context*, the exercise of state authority would violate federal

17   law."(emphasis added) In this case, that inquiry reveals no such comprehensive federal

18   or even tribal regulatory scheme governing the use of water on allotments or

19   leaseholds of allotted land, unlike the harvesting and sale of timber on Indian land by

20   a non-Indian company. Further, in *White Mountain* the Court could find "no

21   discernible regulatory function or service performed by the State that would justify the

22   assessment of taxes on Bureau and tribal roads within the reservation." 448 U.S. at

23   148-149. In this case, of course, revenues derived from the assessment directly benefit

24   the Plaintiffs and their lessee by replenishing the water table underlying the allotments

25   and leasehold. Second, even assuming some degree of federal regulation over the

26   leasing of water rights, Plaintiffs have failed to provide a specific citation to which

27   regulation CVWD's assessment purports to violate. *Most importantly, such*

28   *regulations no more preempt state authority to impose assessments over non-Indian*

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

*production of groundwater, than the leasing regulations as whole preempt taxation of non-Indian leaseholds.*

Plaintiffs argue that the assessment interferes with the ability of the Indians to realize the highest and best use of their property. However, since all other off reservation lessees similarly situated must also pay the assessment, the assessment simply fails to interfere with or diminish the ability of the Indian allottees to receive fair value in the leasing of their lands, or prevent those lands from being leased for the highest and best use. Indeed, the assessment, in the long term, assures that such lands will have a supply of water sufficient to meet the land's highest and best uses.

Plaintiffs attempt to distinguish *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) by arguing that if the assessment is lawful, Plaintiffs bear the burden of the assessment though it is levied on the lessee, while in *Moe,* the non-Indian cigarette purchaser, rather than the Indian vendor, bears the burden of the tax. The contention lacks merit. In this case, as CVWD has said repeatedly, the groundwater producer (the lessee) is legally liable for the assessment, not the Indian lessor. In both *Moe* and this case the non-Indian is responsible for payment of the tax and bears its burden.

Further, since the lease provides for rental payments computed by a percentage of the lessee's gross (rather than net) proceeds, the lessee must bear the cost of the assessment with no diminishment of rent to the lessor. Indeed, immunizing the lessee from the assessment would franchise the immunity to non-Indian lessees on Indian lands, which puts them at an unfair competitive advantage to other off reservation lessee groundwater producers similarly situated. In *Moe* the Supreme Court refused to recognize any federal law or policy which would put even an Indian vendor of cigarettes to non-Indians at a competitive advantage, particularly if it would foster misdemeanor avoidance of the state tax by non-Indian purchasers. 425 U.S. at 482.

Finally, Plaintiffs argue that federal law prohibits CVWD's assessment because it is a regulation of Indian real property. As set forth in detail above and in previous

1    memoranda: (a) CVWD's groundwater assessment does not regulate the Indian

2    lessors' allotments or the non-Indian lessee leasehold in any way; (b) it is not a "land

3    use" regulation competing with the Tribe's authority to so regulate; and (c) the

4    purpose of the assessment is to provide revenues for the replenishment of the

5    groundwater aquifer, not "regulate" the groundwater table, much less that small

6    portion underlying Plaintiffs' allotments. Plaintiffs are trying to fit a regulatory square

7    peg into a taxing round hole. It will simply not fit.

## III.    PLAINTIFFS CANNOT SUE FOR TRESPASS.

9    Plaintiffs have not and cannot prove any trespass by the District, since plaintiffs

10    have contracted to give up the actual possession of their allotments to their tenant. The

11    California Supreme Court noted in *Lightner Mining Co. v. Lane*, 161 Cal. 689, at 694,

12    120 P. 771 (1911): "It is a well settled proposition that the proper party plaintiff in an

13    action for trespass to real property is the person in actual possession." Plaintiffs'

14    allegations of trespass therefore depend on proof of actual possession and a right to

15    exclusive possession of their leased allotments. All proof is to the contrary: the

16    property is leased to a tenant under a long term Master Lease to create and maintain

17    a golf course and country club thereon (Uncontroverted Fact 7) and District employees

18    enter "the leased allotted land" (Uncontroverted Fact 21); the same tenant has

19    occupied the land since 1993 (Uncontroverted Fact 25.)

20    No trespass can be asserted for the pumping of the groundwater as plaintiffs did

21    not present any evidence in opposition to Uncontroverted Facts 27, 28, and 29, which

22    establish the District did not construct the wells on plaintiffs' properties and does not

23    operate the wells or use the water obtained from the wells. Inadmissible speculation

24    and alleged confusion about the operation of the wells by the plaintiffs does not rise

25    to a material triable genuine issue as to trespass, since the plaintiffs gave actual

26    possession to their tenant.

27    / / / /

28

Plaintiffs did not plead waste. "A plaintiff may not amend her complaint through arguments in a brief opposing summary judgment." *Gilmour v. Gates, McDonald and Co.*, 382 F. 2d 1312, 1315 (11th Cir. 2004.)

## IV.    PLAINTIFFS HAVE NO CONVERSION CLAIM.

Plaintiffs have never paid an assessment to the District (Uncontroverted Fact 20.) Plaintiff's tenant has paid all assessments (Uncontroverted Fact 24.) Plaintiffs' personal property was not used to pay the assessments, as the plaintiffs do not own every dollar in their tenant's possession, but are merely entitled to payments under the lease.[4] "It is generally acknowledged that conversion is a tort that may be committed only with relation to personal property and not real property." *Munger v. Moore* 11 Cal. App. 3d 1, at 7, 89 Cal. Rptr. 323 (1970.) There is no genuine issue of material fact, and the motion for summary judgment must be granted as to the plaintiffs' Fourth claim for conversion.

## V.    NO DAMAGE SUPPORTS THE FIFTH CLAIM.

The assessments have never been paid by the plaintiffs (Uncontroverted Fact 20.) The assessments have only been levied against the tenant (Uncontroverted Facts 23, 24, 26,  38 and 39.) Under the gross receipts formula for rental payments to the plaintiffs in the Master Lease there has been no damage to the plaintiffs. Plaintiffs

---

[4] In their opposition points and authorities, plaintiffs argue that recovery by plaintiffs of sums paid by the tenant to the District would somehow be restitutionary in nature, and assert that they may file an amended complaint to seek such relief. The California Supreme Court however, has stated that such relief does not lie in these circumstances, noting in *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, at 1149, 131 Cal. Rptr. 2d 29 (2003): "The remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants. First, it is clear that plaintiff is not seeking the return of money or property that was once in its possession. KSC has not given any money to Lockheed Martin; instead it was from the Republic of Korea that Lockheed Martin received its profits. Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff."

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

56-000109

1   have presented no proof of actual damages, without which they cannot recover for a

2   violation of procedural due process, the wrong alleged in the Fifth Claim. (*Carey v.*

3   *Piphus* 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed2d 252 (1978).)

4   **VI.   RELIEF CANNOT BE GRANTED UNDER THE SEVENTH CLAIM**

5         No declaratory relief can be granted adjudicating the plaintiffs' alleged

6   reserved groundwater rights due again to the inability of this court to quantify any

7   reserved groundwater rights in the absence of the United States as a necessary and

8   indispensable party. (See fn. 2, *ante*.)

9         Similarly, any demand for declaratory findings as to the duties of the tenant to

10   the plaintiffs under the Master Lease must be determined in another forum, where the

11   tenant has an opportunity to participate. The court should grant summary judgment to

12   the Defendant as to the Seventh claim in its entirety.

13   **VII.   THE APPLICABLE LIMITATIONS PERIOD FOR THE FEDERAL**

14          **CLAIMS.**

15         Plaintiffs' opposition is limited to argument regarding only the First, Fifth and

16   Sixth claims, the federal claims. Plaintiffs presented no legal argument to contest the

17   applicability of the separate one year and six month claims presentation periods of

18   limitation to the state law based claims, the Second claim for trespass and the Fourth

19   Claim for conversion, respectively.

20         As to the Fifth claim for violation of constitutional rights under 42

21   U.S.C. § 1983, recent case law holds that any damages beyond two years are barred

22   by the statute of limitations; see *Jones v. Blanas*, 393 F. 3d 918, 927 (9th Cir. 2004)

23   and *Canatella v. Van De Kamp*, 486 F. 3d 1128,1132-1133 (9th Cir. 2007.) Plaintiffs

24   cite no case law exempting Native American allottees from that rule.

25         As to the First and Sixth claims, plaintiffs argue that federal law governing

26   statutes of limitations for rights asserted in litigation by the United States or by a tribe

27   apply[5]. Neither the United States nor the Agua Caliente Band of Cahuilla Indians are

28   [5]If the Court concludes that longer statute does apply, partial summary judgment as to
      that longer period should be granted, as the facts are undisputed, and CVWD did

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

parties herein, and Defendant submits the plaintiffs' allegations regarding violation of their individual rights not to have assessments levied upon their lessee are more closely akin to such an individualized Section 1983 action than to challenge by a tribe to the conveyance of tribal land contrary to the Non-intercourse Act of 1793 asserted in *County of Oneida, New York v. Oneida Indian Nation of New York State,* 470 U.S. 226, 105 S. Ct. 1245, 84 L. Ed. 2d 169 (1985). The plaintiffs here are asserting their individual rights regarding their leased allotted lands, and neither their tribe is nor the United States is a party herein.

**VIII. CONCLUSION.**

This case is not at the pleading stage where claims can survive upon loosely pleaded allegations. Instead it is at the summary judgment stage where the law is applied to facts established by admissible evidence. The undisputed facts entitle CVWD to judgment on all remaining claims in this case and CVWD's motion for summary judgment should therefor be granted.

Respectfully submitted,

DATED: May 12, 2008         By: /s/ Steven B. Abbott
                            Steven B. Abbott
                            email: sabbott@redwineandsherrill.com
                            REDWINE AND SHERRILL
                            Attorneys for Defendant,
                            COACHELLA VALLEY WATER DISTRICT
                            1950 Market Street
                            Riverside, California 92501-1720
                            Telephone No.: (951) 684-2520

plead that section in its second through seventh affirmative defenses.

EDCV05-626 VAP (SGLx)
REPLY MEMO POINTS AND AUTHS
OPP TO CVWD MSJ

56-000111