SAM HIRSCH
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

F. PATRICK BARRY, Senior Trial Attorney
patrick.barry@usdoj.gov
DARON T. CARREIRO, Trial Attorney
daron.carreiro@usdoj.gov
YOSEF M. NEGOSE, Trial Attorney
yosef.negose@usdoj.gov
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
Phone:      (202) 305-0269
Facsimile:   (202) 305-0725
Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS,<br><br>Plaintiff,<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor, | CASE NO.<br>5:13-cv-00883-JGB-SP<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT, CVWD'S PHASE I MOTION FOR SUMMARY JUDGMENT** |

v.

COACHELLA VALLEY WATER
DISTRICT, et al.,

       Defendants.

BEFORE:  Judge Jesus G. Bernal
DATE:     February 9, 2015
DEPT:     Courtroom 1
TIME:     9:00 a.m.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................iii

I. INTRODUCTION ........................................................................................ 1

II. SUMMARY OF ARGUMENT ..................................................................... 1

   ARGUMENT .................................................................................................. 3

    A.  CVWD Conflates Quantification with Whether the United States
       Reserved Water to Sustain the Tribe's Homeland ..................................... 3

    B.  CVWD Incorrectly Relies Upon, Misstates, and Misapplies California
       Law by Conflating Quantification Issues with the Phase I Issues
       Presently Currently Before the Court........................................................ 5

    C.  The Tribe's Federal Reserved Water Rights for the Agua Caliente
       Reservation May Be Enforced in the Aquifer Underlying the Tribe's
       Reservation ............................................................................................... 9

    D.  Defendants' Argument that an 1851 Act of Congress Extinguished the
       Tribe's Aboriginal Title Should be Rejected........................................... 10

       1.  The 1851 Act Did Not Extinguish the Tribe's Aboriginal Right .. 11

       2.  Barker Does Not Apply................................................................. 14

       3.  Defendants' 1851 Act Arguments Do Not Bar the Availability of a
          Pre-Reservation Priority Date ...................................................... 16

# TABLE OF AUTHORITIES

**Federal Cases**

*Arizona v. California*, 373 U.S. 546 (1963) .........................................................*passim*

*Arizona v. California*, 376 U.S. 340 (1964) ...................................................... 3

*Barker v. Harvey,* 181 U.S. 481 (1901) ............................................................ 14, 15

*Broder v. Natoma Water & Mining Co.*, 101 U.S. 274 (1879) ............................... 6

*California v. United States*, 438 U.S. 645 (1978) .......................................... 5, 6

*California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142
(1935) ......................................................................................................... 6

*Cappaert v. United States*, 426 U.S. 128 (1976) ............................................*passim*

*Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) ............*passim*

*Cramer v. United States*, 261 U.S. 219 (1923) ........................................... 18

*John v. U.S.*, 720 F.3d 1214 (9th Cir. 2013) ................................................ 10

*Johnson v. M' Intosh*, 21 U.S. (8 Wheat.) 543 (1823) ................................... 12

*Jones v. Meehan*, 175 U.S. 1 (1899) ............................................................ 12

*Minnesota v. Mille Lacs of Chippewa Indians*, 526 U.S. 172 (1999) .................. 12

*Mitchel v. United States*, 34 U.S. 711 (1835) ............................................... 13

*Raleigh & Co. v. Reid*, 80 U.S. 269 (1872) .................................................. 13

*Summa Corp. v. California* ex rel *State Lands Comm'n*, 466 U.S. 198 (1984)....... 15

*United States v. New Mexico*, 438 U.S. 696 (1978) ......................................*passim*

*United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983) ............................... 3, 10

*United States v. Ahtanum Irr. Dist.*, 236 F.2d 321 (9th Cir. 1956) .........................

*United States v. Rio Grande Dam & Irrigation Co.* 174 U.S. 690 (1899) .............. 6

*United States v. Title Ins. & Trust*, 265 U.S. 472 (1924) ............................... 15

*United States v. Walker Irrigation Dist.*, 104 F.2d 334 (9th Cir. 1939) ............... 6, 16

*Winters v. United States*, 207 U.S. 564, 28 S. Ct. 207, 52 L. Ed. 340 (1908) .*passim*

**State Cases**

*City of Barstow v. Mojave Water Agency*, 5 P.3d 853 (Cal. 2000) .................. 8

*In re All Rights to Use Water in the Big Horn River Sys.*, 753 P.2d 76
(Wyo. 1988).................................................................................................. 5

*In re General Adjudication of All rights to Use Water in the Gila River Sys. &*
*Source*, 35 P.3d68 (Ariz. 2001) ................................................................ 5, 8

*In re Water of Hallett Creek Stream Sys.*, 749 P.2d 324 (Cal. 1988)....................7, 8

*Mimbres Valley Irrigation Co. v. Salopek*, 564 P.2d 615 (N.M. 1977) ...................4

*State ex rel Greely v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 712 P.2d 754 (Mont. 1985) ............................................................5

**Federal Statutes**

*An Act to Ascertain and Settle the Land Claims in the State of California*, 9 Stat. 631 (1851)...............................................................................12, 13, 17

*An Act to Provide for the Survey of the Public Lands in California*, 10 Stat. 244 (1853)...................................................................................................17

*Mission Indian Relief Act of 1891*, 26 Stat. 712 (1891) .........................................14

*Reclamation Act of 1902*, 43 U.S.C. §§ 371, 383 (1902) ........................................5

**State Codes**

2014 Cal. Legis. Serv. 346 (S.B. 1168 (West), *to be codified at* Cal. Water Code § 10720.3(d).................................................................6

**Other Authorities**

Executive Order, May 15, 1876..................................................................................18

Executive Order, September 29, 1877 ........................................................................18

**UNITED STATES' OPPOSITION TO DEFENDANT, COACHELLA VALLEY WATER DISTRICT'S PHASE I MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

On October 21, 2014, the Coachella Valley Water District ("CVWD") filed its Motion for Summary Judgment claiming entitlement to judgment as a matter of law on the grounds that the Agua Caliente "Reservation does not have water rights to groundwater." Dkt. 84-1 at 1, 8.  CVWD seeks dismissal of the United States' Complaint in Intervention, Dkt. 71.  As set forth below, the Court should deny CVWD's Motion for Summary Judgment.

## II.     SUMMARY OF ARGUMENT

Long settled Supreme Court precedent recognizes that the United States holds  federal reserved water rights on behalf of tribes based on federal set aside of lands for tribes, as well as a tribe's retention of all rights not clearly ceded. See, e.g., *Arizona v. California,* 373 U.S. 546, 598-601 (1963); *Winters v. United States,* 207 U.S. 564, 575–78 (1908). Federal reserved water rights also arise when the United States sets aside federal lands for other, non-Indian federal purposes. See e.g., *United States v. New Mexico*, 438 U.S. 696, 699 (1978).  Whether such water rights are reserved presents an issue of federal law that is distinct from the

1

issue of the quantity of the water reserved.[1]

Per the parties' stipulation, to which CVWD agreed and to which the United States consented upon grant of its motion to Intervene, the legal effect of establishing the Agua Caliente Reservation is presently at issue. See Revised Joint 26(f) Conference Report and Case Management Proposal at 10. (Explaining that Phase I will be resolved on "cross-motions for partial summary judgment addressing the *core legal issues* of whether the Tribe has rights to groundwater, both in the form of aboriginal rights and pursuant to the federal *Winters* doctrine.") (emphasis added).  Quantification, on the other hand, requires a fact-intensive inquiry as to the amount of water necessary to effectuate the purpose of a given reservation—in this case, the amount of water necessary to sustain a permanent homeland that will satisfy "the future as well as the present needs" of the Agua Caliente Band of Cahuilla Indians ("Tribe"). See *Arizona,* 373 U.S. at 600. This question is unfit for resolution via cross-motions for partial summary judgment,[2] and is reserved for Phase III. *Id.* ("Phase III of the case will involve quantification of the Tribe's rights to groundwater . . . ."). CVWD's Phase I Motion for Summary

---

[1] *See, e.g., Colville Confederated Tribes v. Walton*, 647 F.2d 42, 46-7 (9th Cir. 1981) ("*Walton*") (Recognizing the power to reserve water for federal purposes as a separate question from the amount of water reserved.)  *See also United States v. New Mexico,* 438 U.S. 696, 699 (1978) (The power to reserve water for land is separate from the question of the amount of water which has been reserved).

[2] Until quantification has been litigated—in Phase III—CVWD's representations as to the Tribe's water needs are, and will remain premature.

2

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

Judgment ("Motion") filed on October 21, 2014, misses this distinction and conflates quantification with the matters presently before the Court.  CVWD's Motion also conflates state and federal law, while misstating the state and federal law it applies. For these reasons, the United States requests denial of CVWD's Motion and that the Court grant Summary Judgment on behalf of the United States.

## **ARGUMENT**

### A. CVWD Conflates Quantification Analysis with Analysis as to Whether Water was Reserved to Sustain the Tribe's Homeland.

Much of CVWD's Motion relies on the United States Supreme Court's decision in *United States v. New Mexico*, 438 U.S. 696 (1978). See, e.g. Dkt. 82-1 at 21-23. But *New Mexico* does not apply to the issues before the Court in Phase I, and likely, does not apply to this case at all.[3] *New Mexico* addressed quantification of the United States' federal reserved water right under the final decree entered in *Arizona v. California*, 376 U.S. 340, 350 (1964), which carried into effect the Court's prior opinion, 373 U.S. 546 (1963), and established, unequivocally, "*that the United States had reserved water rights in 'quantities reasonably necessary to fulfill the purposes of the Gila National Forest.'" Mimbres Val. Irr. Co. v. Salopek*,

---

[3] See *United States v. Adair*, 723 F.2d 1394, 1409 n.13 (9th Cir. 1983) ("While the purpose for which the federal government reserves other types of lands may be strictly construed, *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1979) (national forest), the purposes of Indian reservations are necessarily entitled to broader interpretation if the goal of Indian self-sufficiency is to be attained.").

3

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

564 P.2d 615, 616-17 (N.M. 1977) (emphasis added), *aff'd sub nom. United States v. New Mexico*, 438 U.S. 696 (1978). Thus, when the matter reached the Supreme Court, the issue of whether water had been reserved for the Gila National Forest was already decided.  In an effort to delimit the scope of the reserved right acknowledged by the *Arizona* decree, the Court below, in *Mimbres*, had analyzed (1) the purposes for which the Gila National Forest was originally established; and (2) whether those purposes necessarily required an implied reservation of water. *Id.* It was this *quantification* effort that the Supreme Court addressed and affirmed in *New Mexico*. The Court did not, as CVWD suggests, articulate or apply a test to determine whether water had been reserved in the first instance.[4]

Moreover, even as to quantification, there is strong indication that *New

_____

[4]  *Compare Mimbres,* 564 P.2d at 616-17 ("The final decree entered in Arizona v. California concludes that the United States had reserved water rights in 'quantities reasonably necessary to fulfill the purposes of the Gila National Forest.' Applying the Cappaert Rule, we must now determine for what purpose the Gila National Forest was originally established and whether those purposes necessarily require an implied reservation of water.") (footnote omitted) *with* Dkt. 82-1 at 22 ("[t]hus, application of the reserved rights doctrine, requires an identification and analysis of (1) the primary purposes of the reservation, and (2) a determination that the purposes of the reservation would 'entirely fail' without the water that is the subject of the reserved rights request."). See also *New Mexico,* 438 U.S. at 698 (describing the issue before the Court as what *quantity* of water, if any, the United States reserved out of the Rio Mimbres when it set aside the Gila National Forest in 1899); COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, 19.03[5][a] at 1220-1221 (Nell Jessup Newton ed., 2012)("Indian water rights are *quantified* according to the purposes that those water rights are intended to fulfil.")(emphasis added).

4

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

*Mexico* has little bearing on Indian reserved water rights.  See, e.g., *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source (Gila River V)*, 35 P.3d 68, 76-77 (Ariz. 2001) ("[W]e believe the significant differences between Indian and non-Indian reservations preclude application of the [*New Mexico*] test to the former."); *In re All Rights to Use Water in the Big Horn River System*, 753 P.2d 76, 100 (Wyo. 1988), *aff'd sub nom. Wyoming v. United States*, 492 U.S. 406, (1989), *abrogated on other grounds by Vaughn v. State*, 962 P.2d 149 (Wyo. 1998); *State ex rel. Greely v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 712 P.2d 754, 767 (Mont. 1985) (citing *New Mexico*, and distinguishing its analysis—a quantification analysis—from the quantification analysis applicable to the special case of Indian reserved rights: "Unlike Indian reserved rights, which include water for future needs and changes in use, federal reserved rights are quantified on the basis of the original, primary purposes of the reservation. Water for secondary purposes is not factored into the quantification.").  Accordingly, CVWD's reliance on *New Mexico* is inappropriate.

**B. CVWD Improperly Relies Upon, Misstates and Misapplies California Law in Conflating Quantification with the Phase I Issues Presently Before the Court.**

CVWD mistakenly relies on *California v. United States*, 438 U.S. 645 (1978)—a case that addressed  § 8 of the Reclamation Act of 1902 (43 U.S.C.A. §§

5

371, 383)—for the proposition that "the general rule is that state water law should control disputes over water resources, and the federal government will proceed to acquire water rights under state law." Dkt. 82-1 at 14.[5] The Supreme Court, in *California v. U.S.,* noted that this general rule does not apply to federally reserved water rights "so far at least as may be necessary for the beneficial uses of the government property". 438 U.S. at 662. In reaching this conclusion, the Court relied on *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690 (1899), the same case that the *Winters* Court relied upon in articulating the specific proposition that "the power of the government to reserve the waters and exempt them from appropriation under the state laws" could not be denied. *Winters*, 207 U.S. at 577 (1908).  The Supreme Court has continually affirmed the *Winters* Doctrine and CVWD's contention that "any analysis of the water rights issues here should begin with California Law", Dkt. 82-1 at 16, is entirely without merit. Even California law explicitly acknowledges the primacy of federal reserved

---

[5] CVWD also relies on *Broder v. Natoma Water & Mining Co.*, 101 U.S. 274 (1879)—a case that predates the *Winters* Doctrine by decades, and *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935)—a case that addressed private rights in the waters of non-navigable streams on the public domain. These cases did not hold that that the government may not reserve unappropriated water necessary to effectuate the purposes of federally reserved land. The federal government's power to do so is beyond debate. *United States v. Walker River Irr. Dist.*, 104 F.2d 334, 336 (9th Cir. 1939).

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

groundwater rights. See 2014 Cal. Legis. Serv. Ch. 346 (S.B. 1168) (West), *to be codified at* Cal. Water Code § 10720.3(d).

Moreover, CVWD misstates and misapplies the California law it cites by conflating quantification with the Phase I issues presently before the Court. Specifically, CVWD cites *In Re: Water of Hallett Creek Stream System*, 749 P.2d 324 (Cal. 1988) ("*In Re Hallett Creek*") for the proposition that the availability of state-based water rights to serve federal purposes eliminates  the need for federal reserved water rights to serve the same. See Dkt. 82-1 at 16-17.  As an initial matter, this proposition concerns quantification of rights, which is a matter reserved for Phase III. More fundamentally, however, this proposition is unsupported by *In Re Hallett Creek*, as well as contrary to federal law.

*In Re Hallett Creek* did not consider federal Indian reserved water rights, but the reserved water rights of the Plumas National Forest. The California Supreme Court addressed the interplay between state-law based water rights and federal reserved water rights, through the lens of the primary-secondary purpose distinction outlined in *New Mexico*, supra, 438 U.S. 696. At issue were United States Forest Service claims to *two* kinds of rights: (1) a "reserved" water right under federal law for "primary" National Forest purposes, defined as firefighting and roadwatering; and (2) riparian water rights under California law for "secondary" national forest uses, described by the United States as "wildlife

7

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

enhancement." *In Re Hallett Creek*, 749 P.2d at 324-26. As to the former, the Court explained:

> Under the federal "reserved rights" doctrine …, when the United States 'reserves' land from the public domain for purposes such as a national forest, it implicitly reserves the use of water sufficient to accomplish the "primary" purposes of the reservation, subject to whatever rights may have vested while the lands were in the public domain.

*Id.* at 325-26, n. 3. As to state-based riparian rights, the court recognized that the Forest Service may claim such water as is necessary to effectuate secondary forest uses under the state's riparian scheme.[6] *Id.* Thus, *In Re Hallett Creek* held

---

[6] Under California law, an overlying right, "analogous to that of the riparian owner in a surface stream, is the owner's right to take water from the ground underneath for use on his land within the basin or watershed; it is based on the ownership of the land and is appurtenant thereto." *City of Barstow v. Mojave Water Agency*, 23 Cal. 4th 1224, 1240-41, 5 P.3d 853 (Cal. 2000) (citation and quotation marks omitted). Such a right is insecure, and is inadequate to maintain a permanent homeland. As more overliers use the finite pool of water, there is less water available to any particular user over time.  See *id.* 1241. Moreover, California Courts may limit one exercising an overlying right to its present and prospective reasonable beneficial uses, as prescribed by the California Constitution, Article X, Section 2. *Id.; Cf. In re Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 201 Ariz. 307, 311, 35 P.3d 68, 72 (Ariz. 2001) (a federally reserved water right is preemptive. Its creation is not dependent on beneficial use, and it retains priority despite non-use.).

8

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

that state law may supplement a federal reserved water right, where appropriate, to fulfill the secondary uses of a national forest.

Even ignoring the distinctions between a National Forest and the permanent homeland of a sovereign Indian tribe, as well as the distinctions between Phase III quantification and the Phase I issues presently before the Court, *In Re Hallett Creek* does not support CVWD's suggestion that California's groundwater laws supplant the power to sustain the Agua Caliente Reservation by exempting waters from appropriation under state law. See Dkt. 82-1 at 16-17. The authority of the United States to reserve water for tribes, and the authority of tribes to retain those rights not ceded cannot be denied. *Winters*, 207 U.S. at 577. To the extent that CVWD argues the contrary, CVWD is mistaken.

**C. The Tribe's Federal Reserved Water Rights for the Agua Caliente Reservation May Be Enforced in the Aquifer Underlying the Reservation.**

CVWD does not dispute that the Agua Caliente Reservation was established as a permanent homeland for the Tribe. *See* Dkt. 82-1 at 5. As to such a homeland, "[r]egulation of water… is critical to the lifestyle of its residents and the development of its resources." *Walton*, 647 F.2d at 52. It "is an important sovereign power" because, "[e]specially in arid . . . regions of the West" (areas like the Coachella Valley), "water is the lifeblood of the community." *Id.*

The reservation of such water—the "lifeblood of the community"–does not

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

depend on its navigability, see *Arizona*, 373 U.S. at 600-601, non-navigability, see *Winters,* 207 U.S. at 577, or location above or below ground.[7]  It inheres in the reservation of land for federal purposes requiring water, and its ambit, "has no physical location separate and distinct from the waters on which the right can be enforced." *John v. United States*, 720 F.3d 1214, 1231 (9th Cir. 2013), *cert denied Alaska v. Jewell*, 134 S. Ct. 1759 (2014).  Here, the aquifer underlying the Tribe's homeland contains "lifeblood"—necessary water—in an amount to be quantified in Phase III of this litigation. CVWD's arguments that the Tribe does not need this water, or that it was not reserved,[8] *see* Dkt 82-1 at 24, are without merit.

### D. Defendants Argument that an 1851 Act of Congress Extinguished the Tribe's Aboriginal Title Should be Rejected.

---

[7]Although CVWD notes that "the Supreme Court has never extended the doctrine of reserved water rights to groundwater," Dkt. 82-1 at 2, CVWD fails to mention that courts in the Ninth Circuit, and elsewhere in the arid West, overwhelmingly have. See Dkt. 83 at 7-12 (citing nine federal court cases and two state court cases).

[8] In *Arizona v. California,* Arizona, like CVWD, argued that "there is a lack of evidence showing that the United States in establishing the reservations intended to reserve water for them." 373 at 598. The Court rejected Arizona's argument. *Id.* There, as here, that the reservation set aside arid land for the Tribe sufficed to establish the intent to reserve sufficient water to permanently sustain the Tribe. *See also Adair*, 723 F.2d 1394, 1410 (9th Cir. 1984) (acknowledging reservation of water based upon "a one-paragraph Executive Order that stated only that the land would be 'set apart as a reservation for said Indians.'"); *Arizona*, 373 U.S. at 600 ("The Court in *Winters* concluded that the Government, when it created that Indian Reservation, intended to deal fairly with the Indians by reserving for them the waters without which their lands would have been useless.").

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

The priority dates for the Tribe's federal reserved water rights, along with their scope, elements, and quantification, are not the subject of this phase of the litigation.  Regardless, Defendants argue that an 1851 Congressional Act extinguished the Tribe's aboriginal title to water, precluding the Tribe from claiming a pre-reservation priority date.  The Court should defer consideration of the Tribe's priority date until Phase III or, if the Court reaches the issue in connection with aboriginal title, it should reject Defendants' argument.  The Congressional Act relied upon by Defendants, and the cases interpreting it, do not apply to the Tribe's water rights claims in this case.  Defendants' arguments are also inconsistent with the United States' contemporaneous treaty negotiations with the Tribe, and with subsequent action by Congress.  In particular, the cases cited by Defendants are distinguishable from the current case in all significant respects. But even if the Court were to accept Defendants' arguments as to the Tribe's aboriginal title to land, they would still be insufficient to bar the availability of a time immemorial priority or pre-reservation priority date for the Tribe's separate and distinct federal reserved water rights, which derive solely from United States law and the exercise of preemptive, federal power.

## 1. The 1851 Act Did Not Extinguish the Tribe's Aboriginal Right.

11

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

Defendants argue that Congress extinguished the Tribe's aboriginal title through legislation entitled An Act to Ascertain and Settle the Private Land Claims in the State of California, 9 Stat. 631 (March 3, 1851) ("1851 Act" or "Act").[9]  It is well established that the intent to extinguish aboriginal title must be clearly expressed on the face of a treaty or statute. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999);  *Jones v. Meehan*, 175 U.S. 1 (1899); *Johnson v. M'Intosh*, 21 U.S. 543 (1823).  The 1851 Act's first and only reference to Indians is in Section 16, which requires that the commission investigate and report the tenure of certain Indian lands, not that Indians present claims to the commission for consideration under Section 8.  9 Stat. at 634.  This is significant for two reasons: (1) it suggests Indian rights to land were to be considered apart from the patent proceedings described in Section 8; and (2) it underscores a lack of expressed intent in the Act to require Indians to present claims of aboriginal title to the commission.  By giving the commission definite powers and duties regarding Indians and their titles, the Act excludes from the commission's jurisdiction all other powers, including adjudication of such titles.

---

[9] Defendant CVWD omits the word "Private" from the title of the 1851 Act. CVWD Br. at 10.  This omitted term is significant, as the title of the Act, and its express language, limit the procedures of the Act to "private" land claims.

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

*See, e.g.*, *Raleigh & Co. v. Reid,* 80 U.S. 269, 270 (1871) ("When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.").

Defendants' 1851 Act argument also does not make sense chronologically, in light of the contemporaneously negotiated and executed treaty with the Tribe. On September 30, 1850 (six months prior to the 1851 Act), Congress appropriated $25,000 "[t]o enable the President to hold treaties with the various Indian tribes in the State of California." 9 Stat. 544, 558 (1850). One of those treaties was the Treaty of Temecula, executed by both the Tribe and the United States on January 5, 1852 (less than a year after the 1851 Act, and still within the two-year filing deadline under Section 13 of the 1851 Act), reserving lands that encompassed most of the Tribe's current reservation. Dkt. 85-21, Tab 38, pgs. 142-145; *see also* Dkt. 85-4 at SF 76-79. The United States Senate did not ratify the Treaty, although that fact was not disclosed to the Tribe or the public for some time. Dkt. 85-4 at SF 80-81. Thus, neither the federal government, the Tribe, nor private claimants thought that the Tribe's lands were subject to attack from private claimants seeking patents under the 1851 Act. Moreover the Tribe also had reason to believe that these lands were to be protected by the United States under the fully executed (yet eventually unratified) Treaty.

Extinguishment of aboriginal title would also be inconsistent with the Mission Indian Relief Act of 1891, which Congress passed 40 years later. Section

13

6 of the Mission Indian Relief Act authorized the Attorney General "in cases where the lands occupied by any band or village of Indians are now wholly or in part within the limits of any confirmed private grant or grans . . . to defend such Indians in the rights secured to them in the original grants from the Mexican Government." 26 Stat. 712, 713.  Section 6 authorizes "any suit . . . that may be found necessary to the full protection of the legal or equitable rights of any Indian or tribe of Indians in any such lands."  *Id.* If, as Defendants claim, aboriginal title derived from Mexican law and was extinguished by the 1851 Act, no rights would remain for the Attorney General to defend and protect, and Congress would not have included this authorization in the Mission Indian Relief Act.

### 2.  *Barker* Does Not Apply

Defendants seek to rely on *Barker v. Harvey*, 181 U.S. 481 (1901), and its progeny to argue that the Tribe lacks an aboriginal right to water.   But these cases are distinguishable.  *Barker* involved a dispute over lands claimed under a Mexican land grant confirmed in a United States patent issued to a private claimant under the Act.  The Indians[10] challenging the patent did so decades after the federal patent proceedings in which the title from the Mexican land grant was confirmed. The Court ruled that, under the 1851 Act, the Indians were required to have

---

[10] The Indians in *Barker* are described as "Agua Caliente," but they are not associated with the current Tribe.  Dkt. 82-1 at 11-12.

14

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

presented their claim to the lands at issue in the patent proceeding and, by failing

to do so, had abandoned their claim.  *Id.* at 491-92.[11] When pared to its facts,

*Barker* holds only that in the face of a competing, federally confirmed Mexican

land grant, a party challenging the patent was required to have done so in the same

federal patent proceedings conducted under the Act.[12]

Here, the Tribe's case is distinguishable because (1) the Tribe's lands were

never part of a Mexican land grant; (2) the Tribe's claims to its lands were never in

dispute,[13] because no competing claim to the Tribe's lands was ever presented, and

no patent proceeding was ever conducted requiring the Tribe's participation; (3)

the Tribe's lands remained reserved from settlement following the 1851 Act; and

---

[11] Moreover, the Indians challenging the patent did not actually occupy the land at issue. 181 U.S. at 498 ("the land had been for two years vacant and abandoned").

[12] The other cases relied upon by Defendants are factually similar to *Barker*, include similar holdings, and likewise are distinguishable.  *See Summa Corp. v. California ex rel. State Lands Comm'n*, 466 US 198 (1984) (barring State of California's claim for a public trust easement over land that was part of a Mexican land grant and where grantees had their titles confirmed in federal patent proceedings under the 1851 Act); *United States v. Title Ins. & Trust*, 265 U.S. 472 (1924) (upholding Mexican land grant for full title to land, confirmed in subsequent federal patent proceedings under the 1851 Act, against a subsequent tribal challenge not addressed during the patent proceedings).

[13] As described above, by 1852, the Tribe and the United States had negotiated and executed the Treaty of Temecula (Dkt. 85-21, Tab 38, pgs. 142-145) reserving lands that encompassed most of the Tribe's current reservation.  Dkt. 85-4 at SF 76-79.

15

(4) the Tribe's water right and priority date do not derive from Spanish or Mexican law. Moreover, Defendants cite no authority for the proposition that *Barker* and its progeny should be extended to water, independent of land ownership and the aboriginal title to land at issue in the other cases.

### 3. Defendants' 1851 Act Arguments Do Not Bar the Availability of a Pre-Reservation Priority Date.

Even if *Barker* and its progeny could be interpreted to hold that the 1851 Act extinguished the Tribe's aboriginal title to land, they are still insufficient to bar the availability of a time immemorial priority date for the Tribe's separate and distinct federal reserved water right, which derives solely from United States law and the exercise of preemptive, federal power.

For example, in *United States v. Walker River Irrigation District*, 104 F.2d 334 (9th Cir.1939), the Ninth Circuit ruled that the Walker River Indian Reservation was entitled to an November 29, 1859 priority date – even though the Executive Order setting apart the lands was not issued until 1874 – based upon the acts of Executive Branch department heads initiating the establishment of the reservation, including a November 29, 1859 letter from the Commissioner of Indian Affairs "suggesting the propriety and necessity of reserving these tracts for Indian use." *Id.* at 338.  There is similar support here for the Tribe's pre-reservation priority date.  *See* Ames Report (Tab 17) at 1-2, 14 (Dkt. 85-19 at p. 6-

16

7 of 73, and 19 of 73) (pre-Reservation correspondence from the Acting Secretary of the Interior, Commissioner of Indian Affairs, and Special Agent recommending the establishment of a reservation for certain Mission Indians, including the Tribe, as well as "prompt steps . . . to secure lands for their occupancy" and recommending "that the Government lands upon which these Indians are now living be reserved for their use"); Dryden Report (Tab 18) at 224 (Dkt. 85-19 at 25 of 73) (pre-Reservation recommendation to the Commissioner of Indian Affairs that "the principal Indian settlements, be selected and set apart for exclusive Indian occupation"); Dryden Letter (Tab 19) (Dkt. 85-19 at 29 of 73) (recommending "possible lands . . . to be withdrawn from entry by Executive Order"). In fact, in an ultimate act of the Executive, the United States actually negotiated and executed the Treaty of Temecula with the Tribe in 1852, reserving lands that encompassed most of the Tribe's current reservation.

Even if the 1851 Act were applicable, the failure to submit an 1851 Act claim for land would result only in the land becoming "considered as part of the public domain." 9 Stat. at 633. But in 1853, at the close of the two-year period for the presentation of land claims under the 1851 Act, Congress passed another statute opening public lands in California to settlement. 10 Stat. 244, 246-47 ("1853 Act"). The 1853 Act expressly did not authorize any settlement of public land "in the occupation or possession of any Indian tribe." *Id.* In other words,

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

even prior to the Executive Orders of 1876 and 1877, the Tribe's lands remained reserved from settlement, without any dispute or competing private land grant. The Tribe occupied the lands in question continuously until the United States expressly reserved them for the Tribe's "permanent occupancy" by executive orders in 1876 and 1877. Historical documents demonstrate that the lands reserved for the Tribe under the Executive Orders were chosen specifically because they were the lands the Tribe had occupied. Ames Report (Tab 17) at 14 (Dkt. 85-19 at 19 of 73) (recommending "that the Government lands upon which these Indians are now living be reserved for their use"); Dryden Report (Tab 18) at 224 (Dkt. 85-19 at 25 of 73) (recommending that "the principal Indian settlements, be selected and set apart for exclusive Indian occupation"). Accordingly, by at least March 3, 1853, the Tribe had an undisputed right of occupancy. *See Cramer v. United States*, 261 U.S. 219, 231 (1923) (holding that the 1851 Act "plainly has no application" for the following three reasons: "[t]he Indians here concerned do not belong to any of the classes described therein and their claims were in no way derived from the Spanish or Mexican governments. Moreover, it does not appear that these Indians were occupying the lands in question when the act was passed."). This right may form the basis of a pre-reservation priority date, but again, the determination of the scope, elements, and quantification of the water rights are for a later phase of this litigation.

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP

Dated: December 5, 2014          Respectfully submitted,


                                 SAM HIRSCH
                                 Acting Assistant Attorney General
                                 Environment & Natural Resources Division
                                 United States Department of Justice

                                     /s/  F. Patrick Barry
                                 F. PATRICK BARRY, Senior Trial Attorney
                                 DARON T. CARREIRO, Trial Attorney
                                 YOSEF M. NEGOSE, Trial Attorney
                                 Indian Resources Section
                                 Environment and Natural Resources Division
                                 United States Department of Justice
                                 P.O. Box 7611
                                 Ben Franklin Station
                                 Washington, DC 20044
                                 Phone:       (202) 305-0269
                                 Facsimile:   (202) 305-0725
                                 patrick.barry@usdoj.gov
                                 daron.carreiro@usdoj.gov
                                 yosef.negose@usdoj.gov

                                 Attorneys for Plaintiff-Intervenor
                                 UNITED STATES OF AMERICA

19

United States' Opp. to CVWD's
Phase I Motion for Summary Judgment
Case No. 5:13-cv-0883-JGB-SP