SAM HIRSCH
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

F. PATRICK BARRY, Senior Trial Attorney
patrick.barry@usdoj.gov
DARON T. CARREIRO, Trial Attorney
daron.carreiro@usdoj.gov
YOSEF M. NEGOSE, Trial Attorney
yosef.negose@usdoj.gov
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
Phone:       (202) 305-0269
Facsimile:   (202) 305-0725
Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS, | CASE NO. 5:13-cv-00883-JGB-SP |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT, DWA'S PHASE I MOTION FOR SUMMARY JUDGMENT** |
| and | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Intervenor, | |

1    v.

2    COACHELLA VALLEY WATER
3    DISTRICT, et al.,                BEFORE:    Judge Jesus G. Bernal
                                      DATE:      February 9, 2015
4                 Defendants.         DEPT:      Courtroom 1
                                      TIME:      9:00 a.m.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................ii

I.  INTRODUCTION ................................................................................1

II.  SUMMARY OF ARGUMENT ...........................................................1

III.  ARGUMENT ......................................................................................5

    A.  The Power to Reserve Water is not Subject to Debate ............................5

    B.  Federal Reserved Rights are Defined by Federal, not State, Law............6

    C.  DWA Misconstrues and Misapplies Federal Case Law .........................10

    D.  Whether the Tribe is Currently Producing Groundwater from Its Reservation is Neither Relevant nor Material to the to the Reservation of Water .......................................................................................................12

    E.  DWA's Reference to Historical Documents is Neither Relevant nor Material to Whether Water was Reserved Water for the Agua Caliente Reservation ...........................................................................................13

    F.  The State of California Did Not – And Could Not – Adjudicate the United States' Reserved Water Rights Claims in 1938 ...........................17

    G.  The Character of the Agua Caliente Reservation Does Not Weigh Against an Implied Reserved Water Right..............................................18

    H.  DWA's Argument Regarding Allottees and Lessees Is Irrelevant .........19

    I.  Defendants' Argument that an 1851 Act of Congress Extinguished the Tribe's Aboriginal Title Should be Rejected ...........................................21

        1.  The 1851 Act Did not Extinguish the Tribe's Aboriginal Right ...22

        2.  Barker Does Not Apply.................................................................24

        3.   Defendants' 1851 Act Arguments Do Not Bar the Availability of a Pre-Reservation Priority Date .........................................................26

CONCLUSION.......................................................................................29

i

# TABLE OF AUTHORITIES

**Federal Cases**

*Arizona v. California*, 373 U.S. 546 (1963) ......................................................*passim*

*Barker v. Harvey,* 181 U.S. 481 (1901) ..........................................................24, 25

*Cappaert v. United States*, 426 U.S. 128 (1976) .............................................*passim*

*Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) .............*passim*

*Cramer v. United States*, 261 U.S. 219 (1923) ......................................................28

*John v. United States*, 720 F.3d 1214 (9th Cir. 2013) .................................5, 12, 17

*Raleigh & Co. v. Reid*, 80 U.S. 269 (1872) ............................................................23

*Summa Corp. v. California*, 466 U.S. 198 (1984) ..................................................25

*United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983).....................................*passim*

*United States v. Ahtanum Irr. Dist.*, 236 F.2d 321 (9th Cir. 1956) ....................4, 18

*United States v. Cappaert*, 508 F.2d 313 (9th Cir. 1974).......................................12

*United States v. McIntire*, 101 F.2d 650 (9th Cir. 1939) ........................................18

*United States v. New Mexico*, 438 U.S. 696 (1978) .........................................*passim*

*United States v. Powers*, 305 U.S. 527 (1939)……………………………….....20

*United States v. Santa Fe Pacific R.R. Co.*, 314 U.S. 339 (1941)..........................22

*United States v. Title Ins. & Trust*, 265 U.S. 472 (1924) .......................................25

*United States v. Walker River Irrigation District*, 104 F.2d 334 (9th 1939) ....26, 27

*Winters v. United States*, 207 U.S. 564, 28 S. Ct. 207, 52 L. Ed. 340 (1908) .*passim*

**State Cases**

*City of Barstow v. Mojave Water Agency*, 5 P.3d 853 (Cal. 2000) .........................4

*In re Water of Hallett Creek Stream Sys.*, 44 Cal. 3d 448, 749 P.2d 324 (1988)..8, 9

**Federal Statutes**

1850 Act.....................................................................................................................23

*An Act to Ascertain and Settle the Land Claims in the State of California*, 9 Stat.
        631 (1851)..................................................................................................22, 23

*An Act to Provide for the Survey of the Public Lands in California*, 10 Stat. 244
        (1853).................................................................................................................27

*General Allotment Act*, 25 U.S.C. § 381, et seq. ...................................................19

*Mission Indian Relief Act of 1891*, 26 Stat. 712 (1891) ...................................20, 24

**State Codes**

2014 Cal. Legis. Serv. 346 (S.B. 1168) (West), *to be codified at*
   Cal. Water Code § 10720.3(d)..............................................................................9

iii

**UNITED STATES' OPPOSITION TO DEFENDANT DESERT WATER
AGENCY'S PHASE I MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

On October 21, 2014, the Desert Water Agency ("DWA") filed its Motion for

Summary Judgment, stating that DWA is entitled to judgment "as a matter of law"

that the Tribe and the United States, do "not have a reserved water right in

groundwater."  Dkt. 84 at 2; Dkt. 84-1 at 1.  DWA seeks dismissal of the United

States' Complaint in Intervention.  The United States responds below.

## II.    SUMMARY OF ARGUMENT.

The Supreme Court has long recognized that the United States holds federal

reserved water rights on behalf of tribes based on federal set aside of lands for

tribes, as well as a tribe's retention of all rights not clearly ceded.  *Winters v.*

*United States,* 207 U.S. 564, 577 (1908).  A similar reservation of water occurs

when the United States sets aside other federal lands.  *United States v. New*

*Mexico*, 438 U.S. 696, 699 (1978).   Whether the United States has reserved such

water rights is a federal law issue distinct from the issue of the quantity of water

reserved.  *See New Mexico*, 438 U.S. at 699 (the power to reserve water "does not

answer the question of the amount of water which has been reserved or the

purposes for which the water may be used").  The former question – the legal

effect of federal reservation of tribal land – is presently at issue, per the parties'

1

1  stipulation.  The latter question – the quantification of the reserved right – by

2  stipulation is to be briefed at phase III and, therefore, is not now before the Court.

3
4       DWA, in spite of the briefing schedule to which it agreed, devotes more than

5  ten pages of its response brief to the question of quantification.  In so doing, DWA

6  spins out a flawed and unsupported argument that federal law governing the

7
8  *quantification* of a reserved water right in the non-Indian context – specifically the

9  issue of deference to state water law – applies to and is a limiting factor in

10  determining whether the United States *reserved federal water rights* when it

11  established the Agua Caliente Reservation.  This mistake is fatal to DWA's

12  Motion.

13
14       DWA also argues, based on state law, that groundwater is not "necessary"

15  for the purpose of the Tribe's reservation.  According to this argument, because the

16  Tribe, as an overlying landowner under state law, "has an equal and correlative

17
18  right to use groundwater under California law in common with other overlying

19  landowners," DWA Br. at 7, there was no federal reservation of water.  This

20  argument is wrong, first because it runs counter to clear and longstanding Supreme

21
22  Court precedent; and second because it is founded on an erroneous interpretation

23  of *New Mexico*, a case that did not even address the issues of Indian reserved water

24  rights.

25
26
27
28

2

The federal power to set aside land for an Indian tribe is based upon the Indian affairs authority in United States Constitution, treaties and federal law governing the United States' relationship and authority over Indian affairs.  The intent to reserve water when setting aside lands for an Indian tribe is implied because water is necessary to fulfill the purpose of establishing an Indian homeland. *See Arizona v. California*, 373 U.S. 546, 597 (1963) ("*Arizona I*") ("under our view, the Indian claims here are governed by the statues and Executive Orders creating the reservations").  The existence of either contrary or compatible state law is irrelevant to the question of the reservation of tribal water rights. *Id.*  Here, the Reservation was established by Executive Order to provide a home for Indians.  In an arid environment, such as the Coachella Valley, a reservation of water is required to make the reservation a viable homeland.

Moreover, DWA's argument that state law supplants the need for a federal reserved right ignores the fact that a federal reserved water right is, regardless of state law, not defeasible or subject to state condemnation, and is protected where threatened.  *Cappaert v. United States*, 426 U.S. 128, 143 (1976) ("Thus, since the implied-reservation-of-water-rights is based on the necessity of water for the purpose of the federal reservation, we hold that the United States can protect its water from subsequent diversion, whether the diversion is of surface or groundwater.").  Under DWA's construction, the Tribe would be forced to share

3

groundwater under California's correlative rights doctrine, as one of many overliers whose right can be constantly diminished. *See City of Barstow v. Mojave Wat. Agency*, 5 P.3d 853, 863 (Cal. 2000). Diminishing the Tribe's water right in this manner would threaten the federal purpose for which its Reservation was created. A reserved water right cannot be defeated by state law. *Cappaert*, 426 U.S. at 147.

Finally, DWA asserts, incorrectly, that any rights reserved by the United States were lost because California adjudicated those rights in 1938 in "In the Matter of the Determination of the Relative Rights, Based Upon Prior Appropriation, of the Various Claimants to the Waters of the Whitewater River, and Its Tributaries, In San Bernardino and Riverside Counties, California, Civ. No. 18035" (the "Whitewater Adjudication"). That argument fails both because the United States had not waived its sovereign immunity to such an adjudication and because the state court lacked authority over federal rights. *See United States v. Ahtanum Irrigation District,* 236 F.2d 321, 328 (9th Cir. 1956) ("It is too clear to require exposition that the state water right decree could have no effect upon the rights of the United States."). Moreover, DWA incorrectly assumes that the United States consented to the State's purported authority to adjudicate federal water rights. In fact, the United States expressly denied the state's jurisdiction and authority "to enter any order or make any determination affecting, or to in any way

4

affect, the said rights of the United States in or to the waters of Whitewater River." United States' Suggestion (Dkt. 84-7) at 18.

For these reasons, and those described below, DWA's Motion should be denied.

## III.   ARGUMENT

### A. The Power to Reserve Waters is not Subject to Debate.

Pursuant to the *Winters*' Doctrine, the establishment of a reservation implicitly reserves sufficient water to accomplish the purposes of the reservation. *See John v. United States*, 720 F.3d 1214, 1225 (9th Cir. 2013) ("Since 1908, the courts have also recognized that a federal reservation of land carries with it the right to use water necessary to serve the purposes of federal reservations."), *cert. denied,* 134 S. Ct. 1759 (2014). This doctrine applies with equal force to reservations established by Executive Order. *Arizona I*, 373 U.S. at 598 ("We can give but short shrift at this late date to the argument that the reservations either of land or water are invalid because they were originally set apart by the Executive.").

In *Walton*, an implied reservation of water for irrigation and for hunting and fishing was found, based upon "a one-paragraph Executive Order that stated only that the land would be 'set apart as a reservation for said Indians.'" *United States v. Adair*, 723 F.2d 1394, 1410 (9th Cir. 1984). Simply put, "Congress intended to deal fairly with the Indians by reserving waters without which their lands would be

5

useless."  *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 47 (9th Cir. 1981), citing *Arizona I*, 373 U.S. at 600.

Accordingly, the two Executive Orders withdrawing and reserving land for the Agua Caliente Tribe demonstrate that the Executive Branch implicitly reserved sufficient water to meet the purposes for which the Reservation was established. *John,* 720 F.3d at 1225.

**B. Federal Reserved Rights are Defined by Federal, not State, Law.**

DWA's argument, based on a misinterpretation of *United States v. New Mexico*, that "Congress' deference to state water law must be taken into account in determining whether a federal reserved water right 'impliedly' exists," DWA Br. at 13, is baseless.  But DWA carries the canard further by suggesting such deference defeats the reserved right because under state law a reserved right is no longer "necessary" to accomplish the reservation's purpose.  *Id.* at 18.

Long ago, the Supreme Court declared – and has not retreated from – the rule that federal reserved water rights claims "are governed by the statutes and Executive Orders creating the reservations" and are not subject to state law. *Arizona I,* 373 U.S. at 597.  "The Supreme Court decisions in *New Mexico* and *Cappaert* establish beyond any doubt that the *Winters* doctrine is a source of rights . . . . The Court in those cases found no need to look for a state law basis for the rights it upheld.  Rather, a careful reading of the cases confirms that the water

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

rights recognized were defined by federal not state, law." *Adair*, 723 F.2d at 1411 n.19 (citations omitted). *Adair* found that the federal right may include claims that are not recognized by state law. *Id.* ("water rights of the type reserved for the Klamath Tribe are not generally recognized under state prior appropriations law is not controlling as federal law provides an unequivocal source of such rights").

DWA's theory is not only wrong, but would also have significant adverse implications for the Tribe. Unlike a federal reserved right, a state-law correlative right, can be regulated, diminished or even lost by competition from non-Indian overliers. Under DWA's theory, the Tribe's "state water right" would be subject to the vagaries of state regulation. Through regulation and competition the purpose of the reservation, to provide the Tribe with a permanent home, would be in jeopardy.

DWA incorrectly assumes that the availability of water under state law has bearing on the determination of whether a federal reserved water right is implied. What matters is whether water is necessary to fulfill the purposes for which a reservation was established. If it is, water is impliedly reserved, under federal law. The issue then is not whether the state allows the Tribe to use water, but whether, at the time the  reservation was established, water is necessary to fulfill the purposes for which the reservation was created. *New Mexico,* 438 U.S. at 702.  In *Winters*, the Court reasoned that water must have been reserved for the Fort Belknap Reservation because without water, the arid land on which the reservation

7

was located would be practically useless to the Indians.  *Winters*, 207 U.S. at 576.

The same is true in this case: the Reservation was established to provide a home

for Indians in an arid environment, the Coachella Valley.  Given the obvious need

for water to effect the purpose of the Reservation, "the power of the Government to

reserve the waters and exempt them from appropriation under the state laws is not

denied, and could not be."  *Id.* at 577.

DWA's argument that state law nullifies the federal intent to reserve

has already been considered by the California Supreme Court.  *In Re Hallett*

*Creek*, although not a case involving the federal reserved water rights of an

Indian tribe, examined  how state law intersected with federal law water

rights.  The case concerned the adjudication of the waters of Hallett Creek in

California.  The United States Forest Service claimed two rights to water:

(1) a reserved water right for the primary purposes of a reservation; and (2) a

riparian water right under state law for the reservation's secondary

purposes.[1]  After finding, as a matter of law, that when the reservation of

land for a specific purpose impliedly reserves sufficient water to accomplish

the "primary" purposes of the reservation, the Court recognized that the

Forest Service may also claim riparian rights under state law to accomplish

---

[1]  An overlying right for groundwater is analogous to that of the riparian owner in
a surface stream.  It is based upon the ownership of the land and is appurtenant
thereto.  *City of Barstow*, 5 P.3d at 863.

8

any secondary purposes of the reservation. *Id.* at 334, 336. Thus, under *Hallett Creek,* state law does not defeat the federal right, but may supplement that right, where appropriate, to fulfill the secondary purposes of the reservation. Although federally reserved water rights for tribes are not exactly the same as those for other federal lands, the general premise that state law cannot supplant reserved water rights applies here. At most, state law would only supplement the Tribe's federal reserved water rights.

Finally, DWA's position, already suspect under *Hallett Creek*, is expressly rejected by California law:

> In the adjudication of rights to the use of groundwater, and in the management of a groundwater basin or subbasin by a groundwater sustainability agency or by the [State Water Resources Control Board], federally reserved water rights to groundwater shall be respected in full. In case of conflict between federal and state law in that adjudication or management, federal law shall prevail. . . .
> *This subdivision is declaratory of existing law.*

2014 Cal. Legis. Serv. Ch. 346 (S.B. 1168) (West), *to be codified at* Cal. Water Code § 10720.3(d) (emphasis added). The State's express recognition of federal reserved water rights to groundwater, and their supremacy when a conflict arises with state law, defeats DWA's contention that such rights will "impair California's system of groundwater regulation" and cause "harmful

9

and disruptive effects in the administration of groundwater resources in California."  DWA Br. at 20.

**C.     DWA Misconstrues and Misapplies Federal Case Law.**

DWA relies on *New Mexico* under the mistaken impressions that the Court "held that Congress' general deference to state water law must be taken into account in determining whether a federal reserved water right 'impliedly' exists . . .." DWA Br. at 13. Instead, *New Mexico* states that notwithstanding Congress' deference to state law in many areas it "did not intend thereby to relinquish its authority to reserve unappropriated water in the future for use on appurtenant lands withdrawn from the public domain for specific federal purposes."  438 U.S. at 698. Thus "even in the face of Congress' express deference to state water law in other areas," *id.* at 702, the Court had no difficulty finding intent to reserve necessary water for the land it had set apart.

DWA's reliance on *New Mexico* is misplaced because that case deals with the *quantification* of a reserved right – not the question of whether water was impliedly reserved.  Accordingly, the Court in *New Mexico* recognized at the outset that the "question posed in this case – what is the quantity of water . . . reserved . . . – is a question of implied intent and not power."  *Id.* at 698.  Stated another way, "Congress' power to reserve water for land . . . does not answer the question of the amount of water which has been reserved or the purposes for which

10

the water may be used." *Id* at 699.[2] Similarly, in *Walton*, the Court quickly confirmed the power to reserve water for the Colville Reservation, but stated that "the more difficult question concerns the amount of water reserved." 647 F.2d at 47. As noted in *Arizona I*, the question of the implied intent to reserve water for a specific purpose is a matter of fact and law. 373 U.S. at 596 ("The Master found both as a matter fact and law that when the United States created these reservation or added to them, it reserved not only land but also the use of enough water . . . to irrigate the irrigable portions of the reserved lands."). How much water, and the specific purposes of the reservation informing that quantification, are fact-intensive inquiries unfit for resolution via cross-motions for partial summary judgment. *Walton,* 647 F.2d at 47 ("To identify the purposes for which the Colville Reservation was created, we consider the document and circumstances surrounding

---

[2] *New Mexico,* unlike this case, addressed federally reserved water rights related to National Forests, not those of an Indian reservation. In this context, the Court distinguished between the "specific purposes" of national forests and secondary uses of such forests, concluding that reserved water rights exist only for the former. 438 U.S. at 702, 707-09. For secondary uses, "there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator." *Id.* at 702. The Ninth Circuit has since held that the primary/secondary purpose distinction set forth in *New Mexico* does not directly apply to Indian reservations. *United States v. Adair*, 723 F.2d 1394, 1408 (9th Cir. 1983) (non-Indian federal reservation reserved water rights, *New Mexico* and *Cappaert*, while providing guidance, are "not directly applicable to federal reserved rights on Indian reservations").

11

its creation, and the history of the Indians for whom it was created."); *Adair*, 723 F.2d at 1409 ("Resolution of the [primary purpose of the reservation] depends on an analysis of the intent of the parties to the 1864 Klamath Treaty as reflected in its text and surrounding circumstances.").

DWA's confusion regarding these principles underscores the futility of its position on summary judgment. The reserved right, as we have pointed out, is not based upon whether the body of water is navigable, *Arizona I,* 373 U.S. 546, 597 (1963), or non-navigable, *Winters v. United States*, 207 U.S. 564 (1908), or whether the source is surface or underground water, *United States v. Cappaert*, 508 F.2d 313, 317 (9th Cir. 1974); *see also John*, 720 F.3d 1214, 1230 (9th Cir. 2013) ("the Supreme Court has recognized that federal water rights may reach sources of water that are separated from, but 'physically interrelated as integral parts of the hydraulic cycle' with, the bodies of water physically located on reserved land") (quoting *Cappaert*, 426 U.S. at 133). The right is based upon the United States' constitutional power to reserve land and water for federal purposes and is not subject to, or modified by, state law.

**D. Whether the Tribe is Currently Producing Groundwater from Its Reservation is Neither Relevant nor Material to the Reservation of Water.**

DWA contends that because the Tribe does not currently produce groundwater, but instead purchases it from DWA, a federal reserved right to

12

groundwater is not necessary to accomplish the reservation purpose of providing the Tribe a homeland.  Once again, DWA is incorrect.  Whether water (surface or groundwater) was impliedly reserved when the Agua Caliente Reservation was established is not controlled by the Tribe's use of the water in 2014.  Rather, as discussed above, a reserved water right for an Indian tribe vests no later than the date a reservation was established, and the quantity of the water needed to fulfill the purpose of that reservation is a question that does not need to be addressed at this time.  Contrary to water rights based in state law, federal reserved rights are not subject to forfeiture or abandonment and relate to what is needed to fulfill both the Tribe's present and future needs, and not by initial appropriation or even current "beneficial use" of water.  *Arizona I*, 373 U.S. at 598, 600-01, 605 (1963); *Walton*, 647 F.2d at 47.

**E.  DWA's Reference to Historical Documents is Neither Relevant nor Material to Whether Water was Reserved Water for the Agua Caliente Reservation.**

Drawing from federal law applicable to the quantification of a reserved water right, DWA asserts that the historical record in this case does not support a reservation of groundwater for the Agua Caliente Reservation.  DWA Br. at 22-24.  According to *Walton*:

> To identify the purposes for which the Colville Reservation was
> created, we consider the document and circumstances surrounding its
> creation, and the history of the Indians for whom it was created.  We
> also consider their need to maintain themselves under changed
> circumstances.

647 F.2d at 47 (footnote and citations omitted).  The quote however, does not address whether water was reserved for the Colville Reservation, but rather how to quantify the amount of water reserved.  *Id.*  In both *Walton* and *Arizona I*, the respective courts concluded that the Executive Orders establishing the reservations were sufficient evidence that water was implicitly reserved when the reservations were created.  *Walton,* 647 F.2d at 47 and *Arizona I*, 373 U.S. at 598-99.

By its own admission, however, DWA does not rely on the 1876 and 1877 Executive Orders that established the Agua Caliente Reservation.  Instead, DWA cites to documents created between 14 and 30 years *after the fact.*  Moreover, DWA relies on these after-the-fact documents not as evidence of the underlying intent, but as anecdotal evidence that fifteen years after the creation of the reservation the Tribe was not using groundwater.  DWA's conclusion, which is not supported by law, is that these documents limit the purposes of the reservation and, thus, the reserved water right.

The argument has been rejected by both the Supreme Court and the Ninth Circuit.  In *Arizona I*, Arizona made a similar claim – contending that "the quantity of water reserved should be measured by the Indians' 'reasonably foreseeable needs.'" 373 U.S. at 600-01.  The Court refused to apply this standard because it required the Court to "guess" how "many Indians there will be and what their future needs will be." *Id.* at 601.  The Court concluded that the only standard employed for quantification must account for the "future as well as the present needs of the Indian Reservations." *Id.* at 600.  In contrast, DWA argues that this Court should only decree what the Tribe was using in 1891 – regardless of the weight of federal case law declaring that federal rights, once reserved, are not lost or modified.  If DWA's theory prevailed, tribes would be at a continuous disadvantage because "Indians were not in a position, either economically or in terms of their development of farming skills, to compete with non-Indians for water rights." *Walton,* 647 F.2d at 46.  Once the water is reserved, it makes no difference whether the tribe was able to develop that resource – in this case, groundwater – because the right, and the purposes for which it can be used, are not measured by what the tribe has put to use and, likewise, is not lost by failure to develop.  A reservation of water for an Indian tribe is "intended to satisfy the future as well as the present needs of the Indian Reservations." *Arizona I*, 373 U.S.

15

at 600.  Thus, even in the context of quantification, development of a water sources at the time of reservation is not relevant.

Finally, the *contemporaneous* record that surrounds the creation of the Agua Caliente Reservation is what matters, and it clearly demonstrates that the "purpose" of the Agua Caliente Reservation was to provide the Tribe with a permanent home with water sufficient to meet the Tribe's present and future needs. In August 1877, for example, Indian Agent John Colburn wrote to the Commissioner of Indian Affairs pleading for additional lands for the Agua Caliente, among others.  Dkt. 85-19, Tab 23 at 53 ("Tab 23").  Describing the need for these lands, Colburn uses "permanent home" or "reservation" as a purpose for the Agua Caliente Reservation in four separate paragraphs.  The correspondence specifically states that the "first purpose of the Department [of Interior] is now to secure the Mission Indians permanent homes, with land and water enough, that each one who will go upon a reservation may have to cultivate a piece of ground as large as he may desire."  Tab 23 at 55.  Approximately forty-five days later, President Hayes signed the Executive Order withdrawing lands "from sale and settlement, and set apart as a reservation for Indian purposes" for the Agua Caliente Tribe.  Dkt. 85-5 at Tab 1.

This evidence demonstrates that water was integral to and necessary for the success of the Reservation; therefore, the executive orders setting aside lands for

the Reservation implicitly reserved sufficient water to meet the Tribe's present and future needs.  The fact that groundwater was not mentioned fourteen or thirty years later is not relevant because the federal reserved water right includes "all the bodies of water on which the United States' reserved rights could at some point be enforced – *i.e.*, those waters that are or may become necessary to fulfill the primary purposes of the federal reservation at issue."  *John*, 720 F.3d at 1231.

**F. The State of California Did Not – And Could Not – Adjudicate the United States' Reserved Water Rights Claims in 1938.**

DWA contends that in 1938 the State of California adjudicated and decreed the "United States' rights on behalf of the Tribe."  DWA Br. at 24.  This award, DWA asserts, "provided the United States with all water necessary to satisfy the primary reservation purpose."  *Id.* at 25.  Even assuming that DWA has standing to make this argument, it is specious.  The United States at that time expressly stated that it was "not submitting the rights or claims of the United States to the jurisdiction of the Department of Public Works of the State of California . . . or at all . . .."  Suggestion of the United States ("Suggestion") at 1 (Dkt. 84-7 at ECF 29 of 86). 1.  Indeed, the United States vigorously argued that the "neither said Department [of Public Works of the State of California], or Division [of Water Rights] has jurisdiction of the water rights of the United States and is without jurisdiction to enter any order or make any determination affecting  . . . the said rights of the

17

United States in or to the waters of Whitewater River . . . ." *Id.* at 18 (Dkt. 84-7 at ECF 46 of 86).

Moreover, it is beyond dispute that, regardless of any disclaimer, the State did not possess the requisite power to adjudicate the United States' reserved rights:

> It is too clear to require exposition that the state water right decree could have no effect upon the rights of the United States.  Rights reserved by treaties such as this are not subject to appropriation under state law, nor has the state power to dispose of them.

*Ahtanum*, 236 F.2d at 328; *see also United States v. McIntire*, 101 F.2d 650, 654 (9th Cir. 1939) (state water laws are not controlling on an Indian reservation); *Walton*, 647 F.2d at 53, n.17.

Accordingly, because the State of California did not have the power or authority and ultimately lacked jurisdiction to adjudicate the federal reserved water rights of the Agua Caliente Tribe in the Whitewater Adjudication, its decree purporting to adjudicate the Tribe's reserved water rights is, as a matter of law, neither applicable to nor controlling in this case.

**G. The Character of the Agua Caliente Reservation Does Not Weigh Against an Implied Reserved Water Right.**

DWA contends that because the lands reserved by the 1876 and 1877 executive orders comprise a "checkerboard pattern," in which tribal lands are

18

interspersed with non-tribal lands, there can be no implied intent to reserve groundwater.  DWA Br. at 26.  DWA relies upon *Walton*, as the sole authority for its position.  *Walton*, however, concerned a Tribe's authority to regulate non-Indian water use on the Colville Reservation, not whether water was reserved for the Tribe.  *Walton*, 647 F.2d at 51 ("Finally, we consider Walton's claim to water rights based on state water permits.").  Indeed, the court had already determined , based upon President Grant's one-paragraph Executive Order, that water had been reserved to meet the purposes of that reservation.  *Watlton,* 647 F.2d at 47.  Thus, the court's holding is limited to the "tribe's inherent power to regulate generally the conduct of non-members on land no longer owned by, or held in trust . . . ."  *Id.* at 52.  As a result, that aspect of *Walton* has no bearing on the reservation of water in the first instance.

**H. DWA's Argument Regarding Allottees and Lessees Is Irrelevant.**

DWA's remaining arguments discuss whether Allottees or lessees have reserved water rights.  Lessees – or non-Indians leasing tribal land – do not have a separate federal reserved water right, but may use a portion of the tribal reserved water (as the lease may allow) upon such lands.  Allottees (and accordingly, their lessees) derive their use of the reserved water right by statute.  Section 7 of the General Allotment Act, 25 U.S.C. § 381, *et seq.*, provides that in cases "where the use of water for irrigation is necessary to render the lands with any Indian

19

reservation available for agricultural purposes, the Secretary of the Interior is authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservations."  As a general proposition, the Supreme Court has interpreted Section 7 as securing water for allottees where necessary for irrigation.  *See Walton*, 647 F.2d at 50, citing *United States v. Powers*, 305 U.S. 527 (1939).  In any event, the relative rights of the allottees, their lessees and a tribe to share in federal reserved water rights are irrelevant to the existence of the right in the first instance.

More troubling, however, is that DWA posits that the Mission Indian Relief Act of 1891, 26 Stat. 712, 714 (1891), created the Agua Caliente Reservation in 1891.  DWA Br. at 31.  No authority exists to support this proposition  and DWA does not explain or argue why it is entitled to judgment on this question.

As the United States has demonstrated, the Agua Caliente Reservation was created in 1876 and expanded in 1877 and the establishment of the Reservation impliedly reserved sufficient water to meet the Reservation's purposes.  *See, e.g.*, *Arizona I*, 373 U.S. at 598 ("We can give but short shrift at this late date to the argument that the reservations either of land or water are invalid because they were originally set apart by the Executive.") (footnote omitted); *Adair*, 723 F.2d at 1410 ("President Grant established the Colville Reservation in a one-paragraph

Executive Order that stated only that the land would be 'set apart as a reservation for said Indians.") (footnote omitted).  DWA's passing comment – not a developed argument – does not address the establishment of the reservation in the 1870s or what water was reserved for the Tribe at that time.  Nor does DWA explain how, once the Reservation was established, the Mission Indian Relief Act purportedly extinguished the Executive Order reservation and supplanted that reservation with an 1891 reservation.  Having failed to assert this argument in its opening brief, DWA is barred from asserting it in its reply.

## I.  Defendants Argument that an 1851 Act of Congress Extinguished the Tribe's Aboriginal Title Should be Rejected.

The priority dates for the Tribe's water rights, along with their scope, elements, and quantification, are not the subject of this phase of the litigation. Regardless, Defendants argue that an 1851 Congressional Act extinguished the Tribe's aboriginal title to water, precluding the Tribe from claiming a pre-reservation priority date.  The Court should defer consideration of the Tribe's priority date until Phase III or, if the Court reaches the issue in connection with aboriginal title, it should reject Defendants' argument.  The Congressional Act relied upon by Defendants, and the cases interpreting it, do not apply to the Tribe's water rights claims in this case.  Defendants' arguments are also inconsistent with the United States' contemporaneous treaty negotiations with the Tribe, and with

21

subsequent action by Congress.  In particular, the cases cited by Defendants are distinguishable from the current case in all significant respects.  But even if the Court were to accept Defendants' arguments as to the Tribe's aboriginal title to land, they would still be insufficient to bar the availability of a time immemorial or pre-reservation priority date for the separate and distinct federal reserved water right, which derives solely from United States law and the exercise of preemptive, federal power.

### 1.  The 1851 Act Did Not Extinguish the Tribe's Aboriginal Right

Defendants argue that Congress extinguished the Tribe's aboriginal title through legislation entitled An Act to Ascertain and Settle the Private Land Claims in the State of California, 9 Stat. 631 (March 3, 1851) ("1851 Act" or "Act").[3]  It is well established that the intent to extinguish aboriginal title must be plain and unambiguous clearly expressed on the face of a treaty or statute.  *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 346 (1941). The 1851 Act's first and only reference to Indians is in Section 16, which requires that the commission investigate and report the tenure of certain Indian lands, not that Indians present claims to the commission for consideration under Section 8.  9 Stat. at 634.  This is

---

[3] Defendant CVWD omits the word "Private" from the title of the 1851 Act. CVWD Br. at 10.  This omitted term is significant, as the title of the Act, and its express language, limit the procedures of the Act to "private" land claims.

22

significant for two reasons: (1) it suggests Indian rights to land were to be considered apart from the patent proceedings described in Section 8; and (2) it underscores a lack of expressed intent in the Act to require Indians to present claims of aboriginal title to the commission.  By giving the commission definite powers and duties regarding Indians and their titles, the Act excludes from the commission's jurisdiction all other powers, including adjudication of such titles. *See, e.g.*, *Raleigh & Co. v. Reid,* 80 U.S. 269, 270 (1871) ("When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.").

Defendants' 1851 Act argument also does not make sense chronologically, in light of the contemporaneously negotiated and executed treaty with the Tribe. On September 30, 1850 (six months prior to the 1851 Act), Congress appropriated $25,000 "[t]o enable the President to hold treaties with the various Indian tribes in the State of California."  9 Stat. 544, 558 (1850).   One of those treaties was the Treaty of Temecula, executed by both the Tribe and the United States on January 5, 1852 (less than a year after the 1851 Act, and still within the two-year filing deadline under Section 13 of the 1851 Act), reserving lands that encompassed most of the Tribe's current reservation.  Dkt. 85-21, Tab 38, pgs. 142-145; *see also* Dkt. 85-4 at SF 76-79.  The United States Senate later failed to ratify the Treaty, although that fact was not disclosed to the Tribe or the public for some time.  Dkt. 85-4 at SF 80-81.  Thus, neither the federal government, the Tribe, nor private

23

claimants thought the Tribe's lands were subject to  attack under the 1851 Act.
Moreover, the Tribe also had legitimate reason to believe that these lands were to
be protected by the United States under the executed (yet unratified) Treaty.

Extinguishment of aboriginal title would also be inconsistent with the
Mission Indian Relief Act of 1891, which Congress passed 40 years later.  Section
6 of the Mission Indian Relief Act authorized the Attorney General "in cases where
the lands occupied by any band or village of Indians are now wholly or in part
within the limits of any confirmed private grant or grants . . . to defend such
Indians in the rights secured to them in the original grants from the Mexican
Government." 26 Stat. 712, 713.  Section 6 authorizes "any suit . . . that may be
found necessary to the full protection of the legal or equitable rights of any Indian
or tribe of Indians in any such lands." *Id.* If, as Defendants claim, aboriginal title
derived from Mexican law and was extinguished by the 1851 Act, no rights would
remain for the Attorney General to defend and protect, and Congress would not
have included this authorization in the Mission Indian Relief Act.

## 2. *Barker* Does Not Apply

Defendants seek to rely on *Barker v. Harvey*, 181 U.S. 481 (1901), and its
progeny to argue that the Tribe lacks an aboriginal right to water.   But these cases
are distinguishable.  *Barker* involved a dispute over lands claimed under a Mexican
land grant confirmed in a United States patent issued to a private claimant under

24

the Act. The Indians[4] challenging the patent did so decades after the federal patent proceedings in which the title from the Mexican land grant was confirmed. The Court ruled that, under the 1851 Act, the Indians were required to have presented their claim to the lands at issue in the patent proceeding and, by failing to do so, had abandoned their claim. *Id.* at 491-92.[5] When pared to its facts, *Barker* holds only that in the face of a competing, federally confirmed Mexican land grant, a party challenging the patent was required to have done so in the same federal patent proceedings conducted under the Act.[6]

Here, the Tribe's case is distinguishable because (1) the Tribe's lands were never part of a Mexican land grant; (2) the Tribe's claims to its lands were never in

---

[4] The Indians in *Barker* are described as "Agua Caliente," but they are not associated with the current Tribe. Dkt. 82-1 at 11-12.

[5] Moreover, the Indians challenging the patent did not actually occupy the land at issue. 181 U.S. at 498 ("the land had been for two years vacant and abandoned").

[6] The other cases relied upon by Defendants are similar to *Barker*, and likewise are distinguishable. *See Summa Corp. v. California*, 466 U.S. 198 (1984) (barring State of California's claim for a public trust easement over land that was part of a Mexican land grant and where grantees had their titles confirmed in federal patent proceedings under the 1851 Act); *United States v. Title Ins. & Trust*, 265 U.S. 472 (1924) (upholding Mexican land grant for full title to land, confirmed in subsequent federal patent proceedings under the 1851 Act, against a subsequent tribal challenge not addressed during the patent proceedings).

25

dispute,[7] because no competing claim to the Tribe's lands was ever presented, and no patent proceeding was ever conducted requiring the Tribe's participation; (3) the Tribe's lands remained reserved from settlement following the 1851 Act; and (4) the Tribe's water right and priority date do not derive from Spanish or Mexican law. Moreover, Defendants cite no authority for the proposition that *Barker* and its progeny should be extended to water, independent of land ownership and the aboriginal title to land at issue in the other cases.

### 3.  Defendants' 1851 Act Arguments Do Not Bar the Availability of a Pre-Reservation Priority Date

Even if *Barker* and its progeny could be interpreted to hold that the 1851 Act extinguished the Tribe's aboriginal title to land, they are still insufficient to bar the availability of a time immemorial priority date for the Tribe's separate and distinct federal reserved water right, which derives solely from United States law and the exercise of preemptive, federal power.

For example, in *United States v. Walker River Irrigation District*, 104 F.2d 334 (9th 1939), the Ninth Circuit ruled that the Walker River Indian Reservation was entitled to an November 29, 1859 priority date – even though the Executive

---

[7] As described above, by 1852, the Tribe and the United States had negotiated and executed the Treaty of Temecula (Dkt. 85-21, Tab 38, pgs. 142-145) reserving lands that encompassed most of the Tribe's current reservation.  Dkt. 85-4 at SF 76-79.

26

Order setting apart the lands was not issued until 1874 – based upon the acts of Executive Branch department heads initiating the establishment of the reservation, including a November 29, 1859 letter from the Commissioner of Indian Affairs "suggesting the propriety and necessity of reserving these tracts for Indian use." *Id.* at 338.  There is similar support here for the Tribe's pre-reservation priority date.[8]  In fact, in an ultimate act of the executive, the United States actually negotiated and executed the Treaty of Temecula with the Tribe in 1852, reserving lands that encompassed most of the Tribe's current reservation.

Even if the 1851 Act were applicable, the failure to submit an 1851 Act claim for land would result only in the land becoming "considered as part of the public domain."  9 Stat. at 633.  But in 1853, at the close of the two-year period for the presentation of land claims under the 1851 Act, Congress passed another statute opening public lands in California to settlement.  10 Stat. 244, 246-47 ("1853 Act").  The 1853 Act expressly did not authorize any settlement of public land "in the occupation or possession of any Indian tribe."  *Id.*  In other words,

---

[8] *See, e.g.*, Ames Report (Tab 17) at 1-2, 14 (Dkt. 85-19 at p. 6-7 of 73, and 19 of 73) (recommending the establishment of a reservation for certain Mission Indians, including the Tribe, as well as "prompt steps . . . to secure lands for their occupancy" and recommending "that the Government lands upon which these Indians are now living be reserved for their use"); Dryden Report (Tab 18) at 224 (Dkt. 85-19 at 25 of 73) (pre-Reservation recommendation to the Commissioner of Indian Affairs that "the principal Indian settlements, be selected and set apart for exclusive Indian occupation").

even prior to the Executive Orders of 1876 and 1877, the Tribe's lands remained reserved from settlement, without any dispute or competing private land grant. The Tribe occupied the lands in question continuously until the United States expressly reserved them for the Tribe's "permanent occupancy" by executive orders in 1876 and 1877.  Historical documents demonstrate that the lands reserved for the Tribe under the executive orders were chosen specifically because they were the lands the Tribe had occupied.[9]  Accordingly, by at least March 3, 1853, the Tribe had an undisputed right of occupancy. *See Cramer v. United States*, 261 U.S. 219, 231 (1923) (holding that the 1851 Act "plainly has no application" for the following three reasons: "[t]he Indians here concerned do not belong to any of the classes described therein and their claims were in no way derived from the Spanish or Mexican governments. Moreover, it does not appear that these Indians were occupying the lands in question when the act was passed.").  This right may form the basis of a pre-reservation priority date, but again, the determination of the scope, elements, and quantification of the water rights are for a later phase of this litigation.

---

[9] Ames Report (Tab 17) at 14 (Dkt. 85-19 at 19 of 73) (recommending "that the Government lands upon which these Indians are now living be reserved for their use"); Dryden Report (Tab 18) at 224 (Dkt. 85-19 at 25 of 73) (recommending that "the principal Indian settlements, be selected and set apart for exclusive Indian occupation").

28

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny DWA's Phase I Motion for Summary Judgment.

Dated: December 5, 2014          Respectfully submitted,

SAM HIRSCH
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

    /s/  F. Patrick Barry
F. PATRICK BARRY, Senior Trial Attorney
DARON T. CARREIRO, Trial Attorney
YOSEF M. NEGOSE, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
Phone:    (202) 305-0269
Facsimile:   (202) 305-0725
patrick.barry@usdoj.gov
daron.carreiro@usdoj.gov
yosef.negose@usdoj.gov

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA