1   RODERICK E. WALSTON (Bar No. 32675)
    roderick.walston@bbklaw.com
2   STEVEN G. MARTIN (Bar No. 263394)
    steven.martin@bbklaw.com
3   BEST BEST & KRIEGER LLP
    2001 N. Main Street, Suite 390
4   Walnut Creek, California 94596
    Telephone: (925) 977-3300
5   Facsimile: (925) 977-1870

6   ARTHUR L. LITTLEWORTH (Bar No. 22041)
    arthur.littleworth@bbklaw.com
7   PIERO C. DALLARDA (Bar No. 181497)
    piero.dallarda@bbklaw.com
8   BEST BEST & KRIEGER LLP
    3390 University Avenue, Fifth Floor
9   P.O. Box 1028
    Riverside, California 92502
10  Telephone:  (951) 686-1450
    Facsimile:  (951) 686-3083
11
    Attorneys for Defendant
12  DESERT WATER AGENCY

13                  UNITED STATES DISTRICT COURT

14                 CENTRAL DISTRICT OF CALIFORNIA

15                       EASTERN DIVISION

16
    AGUA CALIENTE BAND OF            Case No. 5:13-cv-00883-JGB (SPx)
17  CAHUILLA INDIANS,                Judge:    Hon. Jesus G. Bernal

18            Plaintiff,             DEFENDANT DESERT WATER
                                     AGENCY'S REQUEST FOR JUDICIAL
19      v.                           NOTICE

20  COACHELLA VALLEY WATER           [Filed with:
    DISTRICT, et al.,                1.     Opposition to Motion for Summary
21                                   Judgment of Agua Caliente Band of
            Defendants.              Cahuilla Indians
22                                   2.     Declaration of Steven G. Martin
                                     3.     Desert water Agency's Appendix of
23                                   Citied Document in Support of Opposition
                                     to Motion for Summary Judgment of Agua
24                                   Caliente Band of Mission Indians]

25                                   Date:      February 9, 2015
                                     Time:      9:00 a.m.
26                                   Dept.:     Courtroom 1

27                                   Action Filed:   May 14, 2014
                                     Trial Date:     Feb. 3, 2015
28

01358.00008\9445070.1

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2OO1 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

## REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rules of Evidence 201(b) and 201(c), defendant Desert Water Agency ("DWA") requests that the court take judicial notice of the following documents, which are submitted in support of DWA's Opposition to the Motion for Summary Judgment by the Agua Caliente Band of Cahuilla Indians ("Tribe").  The number of each document below correlates to the exhibit number of the document as it appears in DWA's opposition brief.

1.     Excerpt from OFFICE OF ATTORNEY GENERAL, STATE OF WASHINGTON, AN INTRODUCTION TO WASHINGTON WATER LAW (January 2000), *available at* https://fortress.wa.gov/ecy/publications/publications/0011012.pdf.

The Declaration of Steven G. Martin, filed concurrently herewith, provides authentication of the documents.

Federal Rule of Evidence 201(b) authorizes this Court to take judicial notice of statues, cases, pleadings and legislative history because they are matters that are "not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Civ. P. 201(b).

Specifically, courts may take judicial notice of documents from public governmental agencies and the statutes, laws and cases stated within the document. *See Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953); *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008) ("[j]udicial notice is appropriate for records and reports of administrative bodies."); *Oregon Natural Desert Ass'n v. Bureau of Land Management*, 531 F.3d 1114,

1133-1134 n. 14 (9th Cir. 2008) (taking judicial notice of Bureau of Land Management's Planning Handbook); *Veliz v. Cintas Corp.*, 2009 U.S. Dist. LEXIS 36328, at * 11 n.3 (N.D. Cal. Apr. 23, 2009) (taking judicial notice of Department of Labor Wage & Hour Field Operations Handbook); *Lamar v. Micou,* 114 U.S. 218, 223 (1885) ("the law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice"); *Schultz v Tecumseh Products*, 310 F.2d 426, 433 (6th Cir. 1962) ("courts are required to take judicial notice of the statute and case law of each of the states"); *Continental Technical Services, Inc. v. Rockwell Int'l Corp.,* 927 F.2d 1198, 1199 (11th Cir. 1991) ("federal courts take judicial notice of the laws of every state in the Union").

Dated: December 5, 2014                                BEST BEST & KRIEGER LLP

By: */s/ Roderick E. Walston*

RODERICK E. WALSTON
ARTHUR L. LITTLEWORTH
GENE TANAKA
PIERO C. DALLARDA
STEVEN G. MARTIN

Attorneys for Defendant
DESERT WATER AGENCY

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2OO1 N. MAIN STREET, SUITE 39O
WALNUT CREEK, CA  94596

1   RODERICK E. WALSTON (Bar No. 32675)
    roderick.walston@bbklaw.com
2   STEVEN G. MARTIN (Bar No. 263394)
    steven.martin@bbklaw.com
3   BEST BEST & KRIEGER LLP
    2001 N. Main Street, Suite 390
4   Walnut Creek, California 94596
    Telephone: (925) 977-3300
5   Facsimile: (925) 977-1870

6   ARTHUR L. LITTLEWORTH (Bar No. 22041)
    arthur.littleworth@bbklaw.com
7   PIERO C. DALLARDA (Bar No. 181497)
    piero.dallarda@bbklaw.com
8   BEST BEST & KRIEGER LLP
    3390 University Avenue, Fifth Floor
9   P.O. Box 1028
    Riverside, California 92502
10  Telephone: (951) 686-1450
    Facsimile: (951) 686-3083

11
    Attorneys for Defendant
12  DESERT WATER AGENCY

13              UNITED STATES DISTRICT COURT

14             CENTRAL DISTRICT OF CALIFORNIA

15                    EASTERN DIVISION

16  AGUA CALIENTE BAND OF              Case No. 5:13-cv-00883-JGB (SPx)
    CAHUILLA INDIANS,                  Judge:   Hon. Jesus G. Bernal
17
              Plaintiff,               DECLARATION OF STEVEN G.
18                                     MARTIN IN SUPPORT OF
         v.                            DEFENDANT DESERT WATER
19                                     AGENCY'S REQUEST FOR JUDICIAL
    COACHELLA VALLEY WATER             NOTICE
20  DISTRICT, et al.,
                                       [Filed with:
21            Defendants.              1.    Opposition to Motion for Summary
                                       Judgment of Agua Caliente Band of
22                                     Cahuilla Indians
                                       2.    Request for Judicial Notice
23                                     3.    Desert Water Agency's Appendix of
                                       Cited Documents in Support of Opp. to
24                                     MSJ of Agua Caliente Band of Mission
                                       Indians]
25
                                       Date:     February 9, 2015
26                                     Time:     9:00 a.m.
                                       Crtrm.:   1
27
                                       Action Filed:   May 14, 2013
28                                     Trial Date:     Feb. 3, 2015

01358.00008\9445126.1

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

## DECLARATION OF STEVEN G. MARTIN

I, STEVEN G. MARTIN, declare as follows:

1.      I am an attorney with the law firm of Best Best & Krieger LLP, counsel for Defendant Desert Water Agency. I have personal knowledge of the matters set forth herein, and if called upon to do so, could and would competently testify to the contents of this declaration.

2.      Attached as Exhibit "1" to the Desert Water Agency's Request for Judicial Notice filed concurrently with this declaration supporting DWA's Opposition to the Motion for Summary Judgment filed by the Agua Caliente Band of Cahuilla Indians is a true and correct copy of an excerpt from OFFICE OF ATTORNEY GENERAL, STATE OF WASHINGTON, AN INTRODUCTION TO WASHINGTON WATER LAW (January 2000), *available at* https://fortress.wa.gov/ecy/publications/publications/0011012.pdf, discussing the groundwater laws in the State of Washington, which I downloaded on December 3, 2014, from the State of Washington's Department of Ecology's website at https://fortress.wa.gov/ecy/publications/publications/0011012.pdf.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on December 4, 2014, at San Diego, California.

Steven G. Martin

01358.00008 9445126 1                                         - 1 -

EXHIBIT 1

# *An Introduction To Washington Water Law*



## Office of Attorney General

### January 2000

**Christine O. Gregoire**
*Attorney General*

**James K. Pharris**
*Senior Assistant Attorney General*

**P. Thomas McDonald**
*Special Assistant Attorney General*

Copyright © January 2000 by Washington State Office of Attorney General

All rights reserved including the right of reproduction in whole or in part in any form. For permission, write to Washington State Office of Attorney General.

For future updates, write to Solicitor General Team, Washington State Office of Attorney General.

Published by Washington State Office of Attorney General, 1125 Washington Street SE, PO Box 40100, Olympia Washington 98504-0100

wro

## AUTHORS

James K. Pharris graduated from Harvard Law School in 1973 and joined the Washington State Attorney General's Office in the same year. From 1973 to 1988, he was assigned to the Legal Fiscal Division (of which he was the Chief after 1982), where he was legal counsel to the State Auditor, the Office of Financial Management, the Legislative Budget Committee, and several related agencies. From 1988 to 1993, he was the chief of the Ecology Division, where he served as chief counsel to the Department of Ecology. Since 1993, he has been assigned to the Solicitor General Team, where his assignments include the preparation of ballot titles for initiatives and referenda, the writing and editing of Attorney General Opinions, and serving as an officewide resource in several subject areas, particularly in the area of appellate practice.

Tom McDonald graduated from Seattle University Law School in 1984. From 1984 to 1986 he was in private practice with Law & Knous in Denver, Colorado. From 1986 to 1989, he served on the staff of the Washington State Senate, working with the Agriculture Committee and as counsel to the Joint Select Committee on Water Policy. From 1989 to 1990, he worked for the Colorado Attorney General's Office on federal water law issues. From 1990 to 1999, he was employed by the Washington State Attorney General in the Ecology Division, where he was the section chief for water programs and lead counsel on water resource issues. In November 1999, he joined the Olympia office of Perkins Coie, where he continues to specialize in water issues. Since 1998, he has been an adjunct professor at Seattle University, where he teaches a course in Water Law, and he is a frequent speaker at conferences and seminars on the subject.

## ACKNOWLEDGEMENTS

This paper is the result of a cooperative effort involving dozens of people. **Professor Gregory Hicks** of the University of Washington Law School and **Professor Amy Kelley** of Gonzaga University Law School read the drafts and contributed hundreds of ideas and suggested edits; in addition, they gave valuable time to meeting with the authors and contributing additional thoughts in several dozen telephone calls.

**Elizabeth Rosan**, Law Clerk in the Attorney General's office and student at Lewis & Clark Law School, assisted greatly in the preparation of this paper, both through her research efforts and by preparing the initials drafts of several portions. Her excellent research skills and writing ability greatly facilitated the project.

The Water Resources Group in the Attorney General's Office, an informal staff group which meets monthly to share information on water law issues, helped in the paper from its very conception. They helped prepare the initial outline, drafted some chapters and portions of other chapters, and offered organizational and drafting ideas at key points in the production. Many thanks to **Lilia Lopez**, **Matthew Love** (now with the U.S. Justice Department), and **Maryanne McGovern**.

Thanks also to the Ecology Division of the Attorney General's Office, which, above all, absorbed extra workload so the paper could be completed. Senior Counsel **Deborah Mull** and Assistant Attorney General **Joan Marchioro** helped with extensive editing and re-writing of some portions.

The Management Team and the Executive Team in the Attorney General's Office kept the project on track and provided valuable suggestions on organization and approach at several key points in the writing project. Very special thanks are due to Attorney General **Christine Gregoire**, who first conceived the idea of summarizing water law in a staff-written paper, and who steered the project to a successful conclusion, offering the authors her characteristic clarity of vision as well as the energy and the time to get the job done.

Finally, the authors owe an enormous debt to those who provided technical assistance in getting the paper completed – especially to **Wendy R. Otto**, legal secretary in the Solicitor General Division, and to **Dominique Starnes** and **Wanda James** of the Ecology Division. All were willing to put in long hours of computer work on a project larger than any of us had ever attempted. Thanks also to the staff of the Attorney General Print Shop, which, as usual, cheerfully processed the printing of the paper with an uncomfortably short turnaround time.

# *TABLE OF CONTENTS*

SUMMARY ................................................................................1

INTRODUCTION AND PRELIMINARY NOTE ..............................23

## PART I

## THE HISTORICAL DEVELOPMENT OF WASHINGTON WATER LAW

**I.    The Principle Of Common Ownership Of Water**

    A.    Water Not Subject To Ordinary
        Private Ownership Concepts....................................................I:1

    B.    Water Subject To Usufructuary
        Right To Capture And Use .....................................................I:2

    C.    Water Declared To Be A Public
        Resource; Subject To Management
        And Police Power Regulation Of State....................................I:5

**II.   The Development Of Water Law In Washington**

    A.    Territorial And Early Statehood Legislation..........................II:1

    B.    The Initial Choice Of Washington Courts:
        The Riparian Doctrine...........................................................II:2

*Water Law Treatise*

C.    The Emergence Of The Prior Appropriation
      Doctrine As The Dominant Law In Washington .................II:11

D.    Judicial Efforts At Reconciling The Riparian
      And Prior Appropriation Doctrines .....................................II:18

      1.    *Doan Creek* ............................................................II:18

      2.    *Weitensteiner v. Engdahl* ...........................................II:19

      3.    *Brown v. Chase* .....................................................II:20

      4.    The *Stranger Creek* Case ...........................................II:24

      5.    *Department Of Ecology v. Abbott* ...............................II:26

E.    Federal Response To State Allocation
      And Regulation Of Water .....................................................II:28

**PART II**

**FUNDAMENTALS OF WASHINGTON WATER LAW**

**III.  The Nature And Elements Of A Water Right In Washington**

A.    Prior Appropriation Law ....................................................... III:1

B.    The Element Of Intent  ......................................................... III:3

C.    Reasonable Diligence........................................................... III:7

D.    Beneficial Use Of The Water; The Issue Of Waste ........... III:10

      1.    The Leading Case:  *In re Marshall Lake* .................. III:11

      2.    Beneficial Use Definition ......................................... III:13

ii

*Table Of Contents*

3.  Water Duty ................................................................. III:13

4.  Waste ........................................................................ III:14

5.  Reasonable Efficiency Standard Rejected ................ III:18

6.  Beneficial Use Adopted In Statute ........................... III:21

E.  Priority Date / The Relation Back Doctrine ...................... III:24

1.  The Priority Date Of The Water Right ..................... III:24

2.  The Relation Back Doctrine ...................................... III:27

F.  Appurtenancy ................................................................... III:32

**IV.  The Water Codes:  Surface Water**

A.  Pre-1917 Codes ................................................................ IV:1

B.  The 1917 Water Code ....................................................... IV:3

1.  The Adjudication Process ......................................... IV:5

2.  The Permit Application Process ................................ IV:14

(a)  Introduction ................................................... IV:14

(b)  The Permit Application ................................... IV:16

(c)  Standards For Review Of
     Permit Application .......................................... IV:19

(d)  Beneficial Use Criteria ................................... IV:21

(e)  Protection Of Existing Water
     Rights Criteria ............................................... IV:24

(f)  Water Quality Considerations ......................... IV:30

(g)  Water Availability Criteria ............................. IV:35

(h)  Public Interest Criteria .................................. IV:39

(i)  Permit Conditions .......................................... IV:41

(j)  Temporary And Preliminary Permits .............. IV:44

*Water Law Treatise*

**V.   The Water Codes:  Ground Water**

    A.   Basic Ground Water Hydrology ..............................................V:1

    B.   Common Law Principles Of Ground Water ..........................V:4

    C.   The 1945 Ground Water Code ...............................................V:7

        1.   Defining Ground Waters To Supplement The 1917 Surface Water Code ................................................................V:7

        2.   Permit System:  Extending The 1917 Code's Permit System To Ground Water .........................................................V:9

        3.   The Ground Water Code And Pre-1945 Common Law Ground Water Rights ..........................V:16

        4.   Exemptions Under The Ground Water Permit System ...................................................V:20

        5.   Artificially Stored Ground Waters ...............................V:24

        6.   Changes To Ground Water Rights ..............................V:26

        7.   Priority Enforcement Between Ground Water, Surface Water, And Instream Flow Rights ..........................................V:28

**VI.  Loss Of Water Rights**

    A.   Statutory Forfeiture And Abandonment .............................. VI:1

        1.   Statutory Forfeiture ..................................................... VI:3

        2.   Abandonment ............................................................... VI:9

    B.   Other Theories By Which Water Rights May Be Lost .................................................................... VI:12

        1.   Prescription ............................................................. VI:12

        2.   Estoppel And Laches ............................................... VI:13

    C.   Water Right Claims And Registration Act ........................ VI:15

*Release 01/00*

*Table Of Contents*

**VII.  Transfer And Change Of Water Rights**

    A.    Introduction And History ..................................................VII:1

    B.    Legal Framework For Transfers ........................................VII:2

          1.    Determining The Validity Of The Right ...................VII:3

          2.    Analyzing Injury To Other Rights .............................VII:6

          3.    Considerations Of The Public Interest ......................VII:7

          4.    Transfer Of Exempt Wells ......................................VII:10

          5.    Transferring Water Rights Through Condemnation ...........................................................VII:11

          6.    Transferring Water Rights Through Interties ................................................................VII:15

          7.    Water Conservancy Boards.....................................VII:17

**PART III**

**OTHER LAWS AFFECTING WASHINGTON WATER RIGHTS**

**VIII.  Federal Reserved Water Rights:  Indian Reservations And Federal Lands**

    A.    Introduction....................................................................VIII:1

    B.    Basic Federal Reserved Rights Law: The *Winters* Doctrine .....................................................VIII:2

    C.    *Winters* Explained And Implemented: Subsequent Developments In The Law ..........................VIII:6

          1.    Priority Date Of Federal Reservation ....................VIII:6

*Water Law Treatise*

2. Quantity Of Reserved Right –
Calculation, Issues of Beneficial Use,
Due Diligence ......................................................... VIII:7

3. Appurtenancy Issues ............................................... VIII:12

4. Ground Water Issues ............................................... VIII:12

5. Changes In Use And Transfer Of
Reserved Water Rights ........................................... VIII:13

D. The Regulation And Adjudication Of
Federal Reserved Water Rights .................................... VIII:14

1. Regulatory Jurisdiction ......................................... VIII:14

2. Adjudicatory Jurisdiction ....................................... VIII:17

E. Non-Indian Federal Reserved Rights ............................... VIII:19

F. Conclusions ......................................................... VIII:20

IX. **Public Water Supply Law**

A. Introduction ....................................................... IX:1

B. Background ......................................................... IX:1

C. General Regulatory Requirements ................................... IX:2

1. The Regulatory Agencies Involved ............................. IX:2

2. Systems Subject To Regulation ................................. IX:3

3. Public Water System Construction,
Expansion, Improvement ........................................ IX:4

4. Source Development ............................................ IX:7

5. Water Quality And Source Protection .......................... IX:8

6. Operation And Maintenance .................................... IX:12

7. Operating Permits ............................................. IX:12

*Release 01/00*

*Table Of Contents*

8.    Planning ................................................................ IX:15

    (a)    Individual Water System Planning ................. IX:15

    (b)    Coordinated Water System Planning ............... IX:16

    (c)    Satellite System Management Agencies .......... IX:23

9.    Water Use Efficiency ............................................... IX:25

    (a)    Conservation ..................................................... IX:26

    (b)    Reclaimed Water Use ....................................... IX:27

D.    Other Agency Authority In Relation To The Public Water System Regulations ....................................... IX:29

**X.    Endangered Species Act**

A.    Section 4 – Listing Decisions, Critical Habitat Designation, 4(d) Rules, And Recovery Plans ...................... X:4

    1.    Listing Decision ................................................. X:4

    2.    Critical Habitat Designation .......................... X:6

    3.    4(d) Rules ........................................................ X:10

    4.    Recovery Plans .............................................. X:11

B.    Section 7 – Interagency Cooperation ................................... X:14

C.    Section 9 – Prohibited Acts ................................................. X:21

D.    Section 10 – Habitat Conservation Plans ........................... X:27

E.    Section 11 – Enforcement .................................................. X:29

F.    What Is Supreme? – State Water Rights v. ESA ................. X:30

**TABLE OF AUTHORITIES**

**INDEX**

*Release 01/00*

*The Water Codes:  Ground Water*

# V.

# THE WATER CODES:  GROUND WATER

## A.    BASIC GROUND WATER HYDROLOGY

Ground water is subterranean or underground water that occupies the voids within granular geologic materials or cracks in solid rock.  The exact relationship between ground water and the underground structures where it is found is not fully understood.  Nevertheless, basic scientific principles help describe the relationship of movement and exchange between surface and ground waters.  The complex nature of surface and ground water interactions has shaped the law of ground water in Washington.

The principle of hydraulic continuity refers to the hydraulic connection and dynamic interactions between ground water and surface water.  An aquifer is in hydraulic continuity with lakes, streams, rivers, or other surface-water bodies whenever it is discharging into surface waters and contributing to instream flows, or being recharged by surface waters.  Recharge areas are those where the force of gravity causes precipitation (rain or snowmelt) to infiltrate into surface soils and percolate down to the water table.  Discharge areas are those where ground water flows into streams or lakes, something that can occur only where the water table is higher than the stream or lake bottoms, or, less commonly, where underground water is under sufficient pressure to seep upward into stream or lake bottoms.

*Release 01/00*

*Water Law Treatise*

Where hydraulic continuity occurs, surface and ground water cannot be considered separate sources; withdrawal from one will affect the other. The magnitude and timing of the effects of water extraction at one location on water availability at other locations is dependent upon the degree of hydraulic continuity.

The hydrogeologic principle of Darcy's Law governs the dynamic interactions between ground and surface water. Darcy's Law explains that when an aquifer is hydraulically connected to a stream, the flow into or out of the stream is proportional to the difference between the stream stage elevation and the water table elevation. This interaction in turn explains the effects of well extraction on surface and instream waters.

Pumping from wells affects ground water in three fundamental ways: it lowers ground water pressures and heads; it reduces ground water storage; and it changes the rates of ground water recharge and discharge. As water moves from an aquifer into a well, a cone of depression forms, spreading outward from the well until it encounters a hydraulic boundary, such as surface water. A well in turn reduces stream flow, through the concept of "capture", by lowering the aquifer water table to a level that reduces or prevents ground water from recharging the stream.

Generally, the effect of a pumping well on a regional, hydraulically continuous flow system is not observable during short pumping tests. The connection however is apparent over the long term as the New Mexico Supreme Court has acknowledged.

> "The relationships derived from Darcy's law show that the effects of ground-water withdrawals on a nearby stream arise gradually and that if the well is some distance from the stream many years elapse before the effects of the

*Release 01/00*

*The Water Codes: Ground Water*

> withdrawal are fully reflected in the stream-flows. The
> relationships show, however, that ultimately the annual
> stream-flow is reduced by an amount equal to the annual
> ground-water appropriation. The relationships also show that
> once a ground-water appropriation is made, and continued for
> a period of time, the effects on surface water flows are not
> terminated at the time that the ground-water appropriation is
> terminated but continue, gradually diminishing, for many
> years after the ground-water appropriation is ended."

*City of Albuquerque v. Reynolds*, 71 N.M. 428, 439-40, 379 P.2d 73
(1963) (quoting state engineer); *see also* Gregory A. Hicks, *Protecting
And Promoting Wildlife Habitat On State And Private Land In Washing-
ton's Arid Interior*, 4 Hastings Envtl. L.J. 13, 35-37 (1997) (explaining
how regional ground water pumping in the Swanson Lakes Wildlife Area
of Washington has diminished surface water supplies, causing the actual
disappearance of creeks, ponds, lakes, wet marshes, and meadows).

A recent study provided significant insights regarding the varied
and complex responses to ground water pumpage that may occur in
hydrogeologic environments. David S. Morgan & Joseph L. Jones, U.S.
Geological Survey Open-File Report 95-470, *Numerical Model Analysis
Of The Effects Of Ground-Water Withdrawals On Discharge To Streams
And Springs In Small Basins Typical Of The Puget Sound Lowland,
Washington* 73 (1996). The study generated a three-dimensional computer
model that illustrated how the hydraulic effects of pumping one well can
propagate throughout a moderately large ground water basin and reach
some of the surface water boundaries. The model also calculated that a
hypothetical well pumped at several hundred gallons per minute, a rate
common for a municipal or irrigation well, would reduce heads,
stream flow, and spring discharge over areas of many square miles,

irrespective of whether pumping occurred from the unconfined or underlying confined aquifers.

In sum, successful management of water resources, based on established scientific relationships, depends on the consideration of water uses in a geographic context sufficiently broad to account for the attenuated and sometimes far-reaching effects of ground water withdrawal. Such a system-wide approach will help provide a comprehensive accounting and better understanding of water resources.

## B.   *COMMON LAW PRINCIPLES OF GROUND WATER*

For the first half of this century, no statutory law in Washington existed to regulate ground water rights. Consequently the law of ground water appropriation developed independently of law of surface water. Washington's judicial decisions initially defined the right to use subterranean waters in two leading cases, *Patrick v. Smith*, 75 Wash. 407, 134 P. 1076 (1913), and *Evans v. City of Seattle*, 182 Wash. 450, 47 P.2d 984 (1935). Rather than following English case law that granted the owner of land absolute title to everything underneath his land, these cases adhered to the common law distinction between "underground streams" and "percolating waters".

Underground streams were deemed to have permanent, well-known and defined subterranean channels and were governed by the same appropriation rules as applied to surface streams and lakes. William Goldfarb, *Water Law* 5 (1984) (citing R.E. Clark, *Classes Of Water And Character Of Water Rights in 7 Waters And Water Rights* § I at 300 (1978)). Percolating waters, on the other hand, included subterranean waters without a definite channel that were subject to a

*The Water Codes: Ground Water*

concept, which the Court somewhat inappropriately labeled "correlative rights". *Patrick*, 75 Wash. at 414-415; *Evans*, 182 Wash. at 457-459. All underground waters, however, were presumed to be "percolating" and the burden of showing otherwise was made almost impossible. *Evans*, 182 Wash. at 453 (clear and convincing proof required); *Wilkening v. Washington*, 54 Wash. 2d 692, 344 P.2d 204 (1959). Failure to understand the complicated nature of ground water resources led to these unscientific categories not based on hydrologic principles.

The appropriation rules that emerged from *Patrick* and *Evans* included the following:

(1) A person who interferes with the reasonable use of percolating waters by a landowner is liable for damages unless the draining off of the water is necessary in connection with a "reasonable use" of the interferor's own property.[1]

(2) If, in connection with the reasonable use of his own property, a landowner interferes with the reasonable use of "percolating waters" by another owner, no damages are recoverable.

These principles do not, in fact, represent a "correlative rights" approach as the courts claim; rather, they involve a combined reasonable use and correlative rights doctrine. *See* VII *Washington Real Property Deskbook*, § 117.7 at 117-22 (3d ed. 1996). In a strict correlative rights jurisdiction, there are shared interests in a common res that limit each user to her fair share. *See Restatement (Second) of Torts* 858 (1979). The

---

[1] Under this rule, the withdrawal of "percolating waters" by a landowner for commercial purposes to the exclusion of another's use would appear to involve an unreasonable use of the taker's property. *Evans*, 182 Wash. at 459.

*Release 01/00*

doctrine of "reasonable use", on the other hand, allows an owner to take all the water she needs, regardless of impact on her neighbor, if the owner's withdrawal is required for a reasonable use of her land. *See, e.g.,* *Wisconsin v. Michels Pipeline Constr., Inc.*, 63 Wis. 2d 278, 217 N.W.2d 339 (1974). The doctrine of reasonable use thus allows a landowner to interfere with (or even destroy) a neighbor's water use so long as the landowner is making a reasonable use of her own property. Indeed, in the *Evans* case, recovery was denied even though the City of Seattle (treated as an ordinary landowner) had totally dried up plaintiff's springs (used for domestic supply) by draining percolating underground waters from the city's own gravel pit.

Subsequently, however, the Court created an exception to the reasonable use doctrine of the *Evans* case, applicable where damage was caused as a result of a public improvement project. *See also United States v. Alexander*, 148 U.S. 186, 13 S. Ct. 529, 37 L. Ed. 415 (1893) (holding that plaintiff could recover for the loss of water from his well since the government was exercising eminent domain powers and could not raise the immunity defense of an ordinary landowner). Thus, in *Washington v. Ponten*, 77 Wash. 2d 463, 463 P.2d 150 (1969), liability was imposed on the state for draining nearby domestic wells in connection with an excavation for a freeway. The Court concluded that because the state was pursuing rights obtained by eminent domain and was using property in a way no private owner would, it should not be considered an "ordinary landowner" making beneficial use of its property as under the *Evans* decision. In *Bjorvatn v. Pacific Mechanical Construction, Inc.*, 77 Wash. 2d 563, 464 P.2d 432 (1970), the Court reached a similar conclusion

where "Seattle Metro" caused subsidence of adjacent property by draining
water in connection with constructing a sewer.

## C.   *THE 1945 GROUND WATER CODE*

### 1.   *Defining Ground Waters To Supplement the 1917 Surface Water Code*

In 1945, the Legislature enacted a comprehensive ground
water code to regulate and control allocation of public ground water.
1945 Wash. Laws ch. 263 (now codified in Wash. Rev. Code 90.44).  In
defining the term "ground waters", the Legislature initially adopted
common law language of the Washington courts:

> All bodies of water that exist beneath the land
> surface and that there saturate the interstices of rocks or
> other materials – that is, the waters of underground streams
> or channels, artesian basins, underground reservoirs, lakes
> or basins, whose existence or whose boundaries may be
> reasonably established or ascertained – are defined for the
> purpose of this act as "ground waters."

1945 Wash. Laws ch. 263, § 3.

Given the code's unclear language, judicial decisions in
Washington did not take into account the impact of the 1945 Legislature's
enactment of the state's ground water code and continued to distinguish
between underground and percolating waters until 1979.  *Peterson v.
Department of Ecology,* 92 Wash. 2d 306, 596 P.2d 285 (1979).   In
*Peterson*, the Court held that from the effective date of the Act of 1945,
rights in the use of ground water arise only by permit, and the decision to
issue a permit is a discretionary act.  *Id.*  The delay in judicial recognition
in the scope and affect of the Ground Water Act was apparently the result
of confusion over whether the code was intended to apply to "percolating"

waters.   In   *Ponten*, for example, Justice Neill, in dissent, opined that "percolating waters" were not "ground water" as defined in the ground water code. *Ponten*, 77 Wash. 2d at 477-78.

In 1973 then, the Legislature clarified any doubt as to statutory coverage by amending the definition of "ground waters".   1973 Wash. Laws ch. 94, § 2.   This amended definition, as set forth in Wash. Rev. Code 90.44.035, now reads, in pertinent part, as follows:

> "ground waters" means all waters that exist beneath the land surface or beneath the bed of any stream, lake or reservoir, or other body of surface water within the boundaries of this state, whatever may be the geological formation or structure in which such water stands or flows, percolates or otherwise moves.   there is a recognized distinction between natural ground water and artificially stored ground water.

Wash. Rev. Code 90.44.035(3).

The purpose of assigning such a broad definition to ground water was to "reaffirm the intent of the legislature that 'ground waters,' . . . means all waters within the state existing beneath the land surface, and to remove any possible ambiguity which may exist as a result of the dissenting opinion in [*Washington*] *v. Ponten*, 77 [Wash.] 2d 463 (1969)".[2] 1973 Wash. Laws ch. 94, § 1.   Accordingly, if water is located underground it is unambiguously classified as ground water for purposes of the 1945 Ground Water Code.

---

[2]  Note that this definition explicitly included percolating waters.

## 2.   *Permit System: Extending The 1917 Code's Permit System To Ground Water*

By enacting the ground water code, the Legislature adopted a new and substantially different approach to the protection of ground water rights.  Essentially, the Legislature rejected both the correlative rights and the reasonable use doctrines and extended the prior appropriation principles of the surface water code to ground waters.[3]  Wash. Rev. Code 90.44.020; *see* The Emergence Of The Prior Appropriation Doctrine As The Dominant Law In Washington *supra* ch. II, section C.  "This chapter . . . is enacted for the purpose of extending the application of such surface water statutes to the appropriation and beneficial use of ground waters within the state." Wash. Rev. Code 90.44.020.

By expressly extending the prior appropriation doctrine to ground water, the Legislature also extended the notion of public ownership to such water.[4]  Wash. Rev. Code 90.44.040 thus provides:

> Subject to existing rights, *all natural ground waters* of the state as defined in [Wash. Rev. Code] 90.44.035,

---

[3]  The doctrine of prior appropriation for surface streams and lakes on the public domain has been recognized since statehood.  *Tenem Ditch Co.* v. *Thorpe*, 1 Wash. 566, 20 P. 588 (1889).  The doctrine of riparian rights was recognized at the same time.  *Benton v. Johncox*, 17 Wash. 277, 49 P. 495 (1897); *see* The Emergence Of The Prior Appropriation Doctrine As The Dominant Law In Washington *supra* ch. II, section C.

[4]   Extending the prior appropriation system to ground water has been constitutionally challenged as a taking of property without due process of law.  *See* A. Dan Tarlock, *Law Of Water Rights And Resources* 6.03[2] (1988).  The Washington Supreme Court held that the permit requirement to withdrawal public ground water is a reasonable exercise of the state's police power and that Ecology's decision not to issue a ground water permit did not constitute unconstitutional taking of property.  *See Peterson*.  Similarly, the New Mexico Supreme Court held that a statute declaring ground water a public resource subject to beneficial use was not an unconstitutional taking of property without due process.  *New Mexico v. Dority*, 55 N.M. 12, 225 P.2d 1007 (1950).

> also *all artificial ground waters that have been abandoned or forfeited*, are hereby declared to be *public ground waters* and to belong to the public and *to be subject to appropriation for beneficial use* under the terms of this chapter and not otherwise.

(Emphasis added.)

In defining the management of this public resource, the Legislature made the acquisition of rights dependent on compliance with an exclusive permit system.[5]   Wash. Rev. Code 90.44.050, .055, .060.   The permit system was absolute as of June 6, 1945, as provided in Wash. Rev. Code 90.44.050:

> After June 6, 1945, no withdrawal of public ground waters of the state shall be begun, nor shall any well or other works for such withdrawal be constructed, unless an application to appropriate such waters has been made to the department and a permit has been granted by it as herein provided[.]

Enumerated uses of relatively minor amounts, however, are exempted from the permit requirement.   Wash. Rev. Code 90.44.050; *see* Exemptions Under The Ground Water Permit System *infra* ch. V, section C.4.  Also exempt from obtaining a permit is the distribution and use of reclaimed water, or effluent, generated from a wastewater treatment facility.  Wash. Rev. Code 90.46.120.  Affirming the Legislature's intent, the Washington Supreme Court held that ground water is a publicly owned resource that requires a permit for withdrawal, except in limited circumstances defined by regulation or other applicable laws.  *Jensen v.*

---

[5]   The ground water code establishes substantive limitations for the use and regulation of the state's finite resource. AGO 1984 No. 19, at 10.

*Department of Ecology,* 102 Wash. 2d 109, 113, 685 P.2d 1068 (1984);
*Hillis v. Department of Ecology,* 131 Wash. 2d 373, 932 P.2d 139 (1997).
Moreover, the Court has held the code's permit requirement a reasonable
exercise of police power, such that a denial of a permit does not
constitute an unconstitutional taking. *Peterson,* 92 Wash. 2d at 316.

The procedures for processing a ground water application were
similar to those provided for when obtaining surface water right permits
under Wash. Rev. Code 90.03.250 through 90.03.340.[6]  Wash. Rev. Code
90.44.060 provides, in pertinent part:

> Applications for permits for appropriation of
> underground water shall be made in the same form and
> manner provided in [Wash. Rev. Code] 90.03.250 through
> 90.03.340, as amended, the provisions of which sections
> are hereby extended to govern and to apply to ground
> water, or ground water right certificates and to all permits
> that shall be issued pursuant to such applications, and the
> rights to the withdrawal of ground water acquired thereby
> shall be governed by [Wash. Rev. Code] 90.03.250 through
> 90.03.340[.]

For a full discussion of the requirements to obtain a surface water right
which would be applicable for acquisition of ground water rights, see The
Water Codes: Surface Water, chapter IV above.  In addition to these
requirements, ground water rights are limited by a concept of feasibility
and ·reasonableness in light of the characteristics of the aquifer being
tapped.  Wash. Rev. Code 90.44.070 provides, in part:

---

[6]  In light of the United States Supreme Court's ruling that ground water is an
article in interstate commerce and that laws forbidding the export of water across state
boundaries are presumed to be unconstitutional, states now have less latitude to manage
interstate ground water resources.  *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941,
102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982).

> No permit shall be granted for the development or withdrawal of public ground waters beyond the capacity of the underground bed or formation in the given basin, district, or locality to yield such water within *a reasonable or feasible pumping lift* in case of pumping developments, or within a reasonable or feasible reduction of pressure in the case of artesian developments.

(Emphasis added.)

Not surprisingly, Washington cases prior to the 1970s did not explicitly address the question of the extent of protection afforded to well owners based on reasonable pumping levels. The purpose of the code's limitation is to protect the capacity of ground water bodies by prohibiting methods and rates of extraction harmful to efficient use of the aquifer. In contrast to surface water appropriations, a senior appropriator is not "absolutely protected in either his historic water level or his historic means of diversion". *Baker v. Ore-Ida Foods, Inc.*, 95 Idaho 575, 584, 513 P.2d 627 (1973). Accordingly, some senior appropriators may have to modify their diversionary works in order to promote economic growth and development. In ground water appropriation suits the issues general involve a right to a given pressure level rather than a simple right to an amount of water.

While the ground water code recognizes the priority system, it only protects ground water appropriators to the extent they have reached or below reasonable ground water pumping levels. *See Warner Valley Stock Co. v. Lynch*, 215 Or. 523, 336 P.2d 884 (1959); *Montana ex rel. Crowley v. Gallatin Cy. Dist. Ct.*, 108 Mont. 89, 88 P.2d 23 (1939). Analogous procedures have been adopted to protect ground water development in

*Release 01/00*

other appropriation doctrine states.  *See Fundingsland v. Colorado Ground Water Comm'n*, 171 Colo. 487, 468 P.2d 835 (1970); *Baker*.

The principle of "safe sustaining yield" in the code further protects vested ground water rights against later appropriations.

> As between appropriators of public ground water, the prior appropriator shall as against subsequent appropriators from the same ground water body be entitled to the preferred use of such ground water to the extent of his appropriation and beneficial use, and *shall enjoy the right to* have any withdrawals by a subsequent appropriator of ground water limited to *an amount that will maintain and provide a safe sustaining yield* in the amount of the prior appropriation.

Wash. Rev. Code 90.44.130 (emphasis added).  The policy behind this limitation is to prohibit overdraft or "mining" of ground water resources – that is where the depletion of an aquifer occurs at a rate faster than the natural rate of recharge.  For a discussion on ground water mining, see *Fundingsland*.

In 1985, the Legislature enacted a ground water management program to address issues of overdrafting and mining and to promote "the protection of water quality, assurance of quantity, and efficient management of water resources to meet future needs".  Wash. Rev. Code 90.44.400(1).  Regulations promulgated by Ecology as a result of this act further explain that the intent of this program is "to forge a partnership between a diversity of local, state, tribal and federal interests in cooperatively protecting the state's ground water resources".  Wash. Admin. Code 173-100-010.  The program calls for Ecology to

V:13

designate ground water areas or sub-areas, or separate depth zones within
such areas or sub-areas through rulemaking.[7]  Each area designated must
enclose all or any part of a distinct body of public ground water.
Following the designation of sub-areas, areas, and zones, Ecology then
establishes the priorities of right to withdrawal water for each ground
water area separately.  The priority date of a certificate of a vested ground
water right relates back to "the date of filing of the original application for
a withdrawal with the department, or the date or approximate date of the
earliest beneficial use of water".  Wash. Rev. Code 90.44.130.  Once
ground water management programs are adopted, Ecology and Social &
Health Services and affected local governments shall use the programs as
guiding documents "when reviewing and considering approval of all
studies, plans, and facilities that may utilize or impact the implementation
of the program".  Wash. Rev. Code 90.44.430.

In order to prevent overdraft, Ecology also may designate ground
water areas or sub-areas and separate depth zones within an area or sub-
area and accordingly establish priority of rights to withdraw public ground
water.  Wash. Rev. Code 90.44.130.

When Wash. Rev. Code 90.44.070 and .130 are construed together,
they define the level of protection afforded to ground water rights and the
relationship between appropriators.  Simply put, the "safe sustaining
yield" principle of Wash. Rev. Code 90.44.130 is qualified by the

---

[7]  Ecology, local government, or ground water users, however, may initiate the
development of a ground water management program for each area or sub-area.  In fact,
the statute provides local government the option to assume "the lead agency role in
developing the ground water management program and in implementing the provisions of
[Wash. Rev. Code] 90.44.400 through 90.44.420".  Wash. Rev. Code 90.44.400(2).

"reasonable or feasible pump lift" concept of Wash. Rev. Code 90.44.070. Thus, the right of the prior appropriator has been interfered with if a new development prevents the prior appropriator from fully satisfying her well appropriation at or below the "reasonable or feasible pump lift" level for the aquifer in question.   Conversely, if the prior appropriator's well is shallow and the new development does not prevent her from withdrawing from a deeper level that is still within the "reasonable or feasible pump lift" standard, no interference with her right has occurred.   In this latter scenario, the "safe sustaining yield in the amount of the prior appropriation" is still available within the aquifer, but not within the capacity of the prior appropriator's well as constructed.   Her means of withdrawal are thus not protected until she reaches the "reasonable or feasible pump lift" well depth.   At that level and below, her ability to satisfy her appropriation at the well depth she has reached is part and parcel of her right.[8]

This interpretation harmonizes the correlative objectives of the code by promoting the full utilization of the public resource while at the same time protecting prior rights.   An interpretation that protected well depths absolutely, on the other hand, would limit ground water development to the level of the earliest and shallowest wells in an aquifer. Conversely, an interpretation which offered no such protection would make ground water development a mere "race to the bottom", rendering

---

[8]   Though no appellate cases interpret this state's ground water code on protection of works, this interpretation has been litigated and upheld in determinations of the Pollution Control Hearings Board.   *See, e.g., Shinn v. Department of Ecology,* PCHB Nos. 75-613, 75-648 to 75-652 (Jan. 29, 1975).

the protection of prior appropriations illusory.  *See Mathers v. Texaco, Inc.,* 77 N.M. 239, 421 P.2d 771 (1966).   In the end, the extent of protection provided by the Washington's ground water code depends upon a site-specific factual inquiry and technical analysis that takes into consideration both the geohydraulic characteristics of the aquifer and the state of pump and well construction technology.

### 3.    *The Ground Water Code And Pre-1945 Common Law Ground Water Rights*

While the 1945 Ground Water Code exempts "existing rights" from the appropriation procedure for acquiring rights, there is no indication that the Legislature intended to exclude ground water rights vested prior to 1945 from this comprehensive ground water rights system.[9]

Wash. Rev. Code 90.44.090, for example, provides for the issuance of water right certificates to "[a]ny person, firm or corporation claiming a vested right to withdraw public ground waters of the state by virtue of prior beneficial use of such water".[10]   To obtain such a

---

[9]  Wash. Rev. Code 90.44.040 does not elaborate on the term "existing rights". Compare Wash. Rev. Code 90.03.010 under the earlier surface water statutes, which goes to considerably greater length, stating in part:

> Nothing contained in this chapter shall be construed to lessen, enlarge, or modify the existing rights of any riparian owner, or any existing right acquired by appropriation, or otherwise.

Wash. Rev. Code 90.03.010.   For more discussion on how the 1917 Water Code addressed existing riparian rights, see *Department of Ecology v. Abbott*, 103 Wash. 2d 686, 692, 694 P.2d 1071 (1985).

[10]  An early Attorney General Opinion interpreting this provision advised that "*any* vested ground water right is entitled to a certificate at any time within three years after the effective date of chapter 122, Laws of 1947, which period may be extended two (2) additional years".  AGO 1951 No. 49-51-467, at 3 (emphasis added).

*The Water Codes: Ground Water*

certificate, however, a claimant had to submit a declaration within three years of 1945 stating the beneficial use made, the date of earliest beneficial use and continuity of use, the amount of water claimed, the land the water was applied to (if for irrigation) and a description of the well, other works, and the geologic formation. In response to such declarations, the state was to make findings in the same manner as to an original application to appropriate and to issue a water certificate if the findings "sustain the declaration". Interpreting this provision, the Attorney General's Office came to the "inescapable conclusion" that

> the legislature meant to define "existing rights" as having the same essential *attributes* as the rights which would be acquired under the code. The law recognized and preserved existing rights then being exercised, but it defined them in a way which eliminated their initial character under the correlative rights or reasonable use doctrines. In short, the legislature announced a rule of property defining all ground water rights in the State--old and new--and it provided at least three years for persons claiming existing rights to take steps to preserve them in accordance with the new definition of their attributes. It therefore follows that the legal regime for protection of works discernible from the Ground Water Code applies to pre-1945 as well as post-1945 ground water rights.

AGO 1984 No. 19, at 19 (emphasis in original).

Additionally, the code is unambiguous in requiring a permit to withdraw ground water pursuant to Wash. Rev. Code 90.44.050:

> After June 6, 1945, no withdrawal of public ground waters of the state shall be begun, nor shall any well or other works for such withdrawal be constructed, unless an application to appropriate such waters has been made to the department and a permit has been granted by it as herein provided[.]

*Release 01/00*

While this provision provides an enumerated list of exceptions to the permit requirement, "existing rights" are not mentioned. Following the rule of statutory construction, exemptions to a statute are narrowly construed to give maximum effect to the policy underlying the general rule. *See, e.g., City of Yakima v. International Ass'n of Fire Fighters Local 469,* 117 Wash. 2d 655, 818 P.2d 1076 (1991); *Washington v. Wanrow*, 88 Wash. 2d 221, 559 P.2d 548 (1977). A broad reading of the "exemption" language in Wash. Rev. Code 90.44.050 to include ground water rights exercised prior to 1945 would violate the rules of statutory construction and increase the size of the "exempt" sector of appropriated ground water. AGO 1984 No. 19.

In 1997, the Legislature re-opened the Water Rights Claims Registry in a final attempt to address the scattered and incomplete records for water rights established before the 1917 Surface Water Code and the 1945 Ground Water Code. Wash. Rev. Code 90.14.068 reads, in part:

> [A]ny person claiming under state law a right to withdraw and beneficially use ground water under a right that was established before the effective date of the ground water code established by chapter 263, Laws of 1945, shall register the claim with the department during the filing period unless the claim has been filed in the state water rights claims registry before July 27, 1997. A person who claims such a right and fails to register the claim as required is conclusively deemed to have waived and relinquished any right, title, or interest in the right.

Wash. Rev. Code 90.14.068(1).

This provision alone has not brought finality to the debate over unexercised common-law ground water rights. As for unexercised natural and artificial ground water within the state, however, the code clearly

*The Water Codes: Ground Water*

provides for the forfeiture and abandonment of such waters which in turn become public waters subject to appropriation.   Wash. Rev. Code 90.44.040; *Jensen*, 102 Wash. 2d at 114.

While no case law has held that common-law ground water rights were extinguished unless perfected by beneficial use, *Department of Ecology v. Abbott*, 103 Wash. 2d 686, 694 P.2d 1071 (1985), addressed a parallel issue under the surface water code:   "Whether unused riparian rights survived adoption of the use-oriented 1917 water code[.]"   *Abbott*, 103 Wash. 2d at 693.   The Washington Supreme Court held that all riparian rights not beneficially used by 1932, fifteen years after the enactment of the code, may be terminated. *Id.* at 695. The Court reasoned that the state's proposed fifteen year period was a constitutionally reasonable period of notice for riparian holders to comply with the new use requirements of the 1917 Water Code.  Thus, the reversion of unused riparian rights to the state was a valid exercise of police power and did not exact an unconstitutional taking without compensation. *Id.* at 697.

Applying this reasoning to resolve pre-code ground water rights, unused common-law ground water rights arguably terminated fifteen years after the enactment of the code in 1960 unless it can be shown that they were continuously applied to beneficial use.   Given the reasoning of *Abbott* and the deference accorded to Attorney General Opinions[11], the

---

[11]   An Attorney General Opinion is not controlling, but is entitled to considerable weight.   *See Everett Concrete Products, Inc. v. Department of Labor & Indus.*, 109 Wash. 2d 819, 828, 748 P.2d 1112 (1988); *Bellevue Fire Fighters Local 1604 v. City of Bellevue*, 100 Wash. 2d 748, 751 n.1, 675 P.2d 592 (1984).

*Release 01/00*

code most likely now governs all ground water rights thus rendering the case law as stated in *Patrick*, *Evans*, and *Ponten* obsolete.[12]

## 4.    *Exemptions Under The Ground Water Permit System*

While the general rule is that ground water cannot be withdrawn from any aquifer without a permit issued by Ecology, the Legislature provided for four major classes of exemptions under the ground water right permit system: (1) stock watering  purposes; (2) the watering of a lawn or of a noncommercial garden not exceeding one-half in area; (3) single or group domestic uses in an amount not exceeding five thousand gallons a day; and (4) an industrial purpose in an amount not exceeding five thousand gallons a day.   Wash. Rev. Code 90.44.050. Persons qualifying under such exemptions withdrawing water "regularly used beneficially, shall be entitled to a right equal to that established by a permit issued under the provisions of this chapter".  *Id.*  While these small withdrawals are exempt from procedural requirements to obtain water right permits, they are not exempt from other substantive provisions in the ground water code.  Specifically, such exemptions must comply with the beneficial use requirement, are supplemental to surface water rights, and are subject to the priority system. Wash. Rev. Code 90.44.040, .020, .060.

Recognizing that in some circumstances small withdrawals might affect the water system, the Legislature authorized Ecology to "require the person or agency making any such small withdrawal to furnish

---

[12]   The enactment of 1973 Wash. Laws ch. 94 explicitly reaffirming the code's comprehensive coverage, underscores this point.

*The Water Codes: Ground Water*

information as to the means for and the quantity of that withdrawal". Wash. Rev. Code 90.44.050.  The proviso is evidence that the Legislature tried to be careful to avoid letting the exemptions swallow the rule, by balancing the policies behind the exemptions with the state's need for information to operate the water system and resolve disputes.

While the amount of water withdrawn from exempt wells remains difficult to quantify, it is clear that the cumulative impact will affect ground water supply.  *See* Robert N. Caldwell, *Six-Packs For Subdivisions: The Cumulative Effects Of Washington's Domestic Well Exemption*, 28 Envtl. L. 1099, 1108-20 (1998).  A recent Attorney General Opinion addressed the cumulative impacts presented by exempt wells and concluded that:

- Where a single housing development requires greater than 5000 gallons per day, regardless of the number of wells drilled, the project is considered a single withdrawal of ground water and is not exempt from the permit requirements of  Wash. Rev. Code 90.44 and 90.03.

- The statutory exemption does not authorize "intertie" or interconnection of exempt wells to create a public water system[13]; the intertie statute could be applied if the exempt withdrawals applied

---

[13]  Intertie law only applies to public water systems and must have an existing water right permit or certificate.  Wash. Rev. Code 90.03.383(2)(a); 70.119A.020(4). Since exempt withdrawals do not have permits or certificates and cannot be subject to a water right claim, they cannot qualify under the intertie law.  Under the 1997 Consolidation Act, however, "the holder of a valid right to withdraw public ground waters may consolidate that right with a ground water right exempt from the permit requirement under [Wash. Rev. Code] 90.44.050, without affecting the priority of either of the water rights being consolidated".  Wash. Rev. Code 90.44.105 (1997 Wash. Laws ch. 446, § 1).

V:21

for a permit, or were consolidated (pursuant to 1997 Wash. Laws ch. 446) with another water right with a permit or certificate.

- Ecology must review applications for water right permits, even applications for uses of water that are otherwise exempt under Wash. Rev. Code 90.44.050. The following criteria used in water right decisions are defined in Wash. Rev. Code 90.03.290: "if it shall find that there is water available for appropriation for a beneficial use, and the appropriation thereof as proposed in the application will not impair existing rights or be detrimental to the public welfare".

- There is no statutory or other lawful basis for issuing a water rights certificate to the holder of a water right based on an exempt ground water withdrawal, unless either (a) the owner of the right applies for and receives a permit or (b) the exempt right is first consolidated with a right covered by a permit or certificate.

AGO 1997 No. 6.

Washington law does not allow the owner of an exempt well to transfer or change the withdrawal of water to a different location or for a different purpose, such as changing the use of the water from domestic-home use to industrial; an exempt withdrawal is strictly limited to the land to which the water was applied unless (a) the owner of the rights applies for and receives a permit or (b) the exempt right is first consolidated with a right covered by a permit or certificate.[14] *Id.*

---

[14] A change in the location or purpose of use of an "exempt" withdrawal would be meaningless because Ecology could not prevent its continued use after the change is processed.

*The Water Codes: Ground Water*

Under the rules of statutory construction, the "exemption" language should be narrowly construed. *Id.* at 5-7. If the Legislature had included the drilling of multiple exempt wells within the code's exemptions, it "would undercut the unity and integrity of the state's water system and could increase the complexity of any litigation or other dispute about the water in question". *Id.* at 7.

The Opinion, however, did not address whether the well exemption would apply to a new subdivision proposal connected to an older land development. *See Hillis,* 131 Wash. 2d at 377-78. As stated above though, if a "project" requires greater than 5000 gallons of water per day, a permit is required. While the Opinion did not define the scope of a "project", it did refer to case law developed under SEPA and to legislative intent to conclude that the impact of a proposal as a whole should be considered in determining whether the domestic withdrawal exemption was appropriate in a given case, and that a project that was unified in purpose should not be broken down into separate components, for instance, considering each well constituting a separate project. AGO 1997 No. 6, at 7. The Opinion also recognized that it was responding to a specific fact pattern, and if the facts varied, "such as withdrawals independently made by different persons, or a series of separate withdrawals occurring over a long period of time, the answer might well be different". *Id.* at 7 n.7. The agency letter also provided guidance on how the agencies intended to work with the local governments on resolving the water needs for developments that were currently or were intending to use the exemption of water.

*Release 01/00*

## 5.   *Artificially Stored Ground Waters*

The ground water code's permit system applies not only to natural ground waters but also to all artificial ground waters.  The code defines artificially stored ground water as:

> [W]ater that is made available in underground storage artificially, either intentionally, or incidentally to irrigation and that otherwise would have been dissipated by natural waste.

Wash. Rev. Code 90.44.035(5).

Artificially stored ground water generally occurs as natural seepage from irrigation.  *Jensen*, 102 Wash. 2d at 113.  It is water that otherwise would return to the natural water system and be available for further use by a junior appropriator or a new appropriation.  However, the designation of it as artificially stored water allows it to be protected for use by the original appropriator, similar to the common law doctrine of recapture.  *Id.*; *Department of Ecology v. U.S. Bureau of Reclamation* (*U.S. Bureau*), 118 Wash. 2d 761, 827 P.2d 275 (1992).   Unless abandoned or forfeited, artificially stored ground water is not public water.  *See* Wash. Rev. Code 90.44.040.   Moreover, artificially stored ground water does not lose its identity and become public ground water when it commingles with naturally occurring ground water.  *Jensen*, 102 Wash. 2d at 115; *see also Ide v. United States*, 263 U.S. 497, 506, 44 S. Ct. 182, 68 L. Ed. 407 (1924).

To claim ownership of artificially stored waters located within a designated area, sub-area, or zone pursuant to Wash. Rev. Code 90.44.130, any person, firm, or corporation must file a certified declaration within 90 days after the designation of the ground water area

*The Water Codes: Ground Water*

with Ecology. *Id.* In case the claimant fails to file within the ninety-day period, the claimant may request a "reasonable extension of time" not to exceed two additional years. Upon a showing of good cause, Ecology may only grant such an extension. Ecology may "accept or reject" such declarations, however, they do not convey any right to withdraw public ground waters. Claimants who have filed declarations of ownership of artificially stored ground waters must obtain permits to appropriate public ground waters following the same procedures used for all other ground water applications. Wash. Rev. Code 90.44.130.

For claimants declaring ownership of artificially stored ground water subsequent to the designation of the ground water area, sub-area, or zone, the statute provides a three-year filing period following the "earliest artificial storage". The Legislature provided the same extension procedures for these claimants.

There is growing interest to "intentionally" create artificially stored ground water through well injection programs. This allows users, like municipal supplies, to store winter stream flows in the ground water aquifer and withdraw this water in the summer months. The reclaimed Water Use Act of 1992, as amended in 1997, recognizes the opportunity to intentionally recharge ground water with reclaimed water (treated effluent). Wash. Rev. Code 90.46. One primary issue is whether the water injected in the ground can be available as surplus water in the aquifer in the future when the "stored" water will be withdrawn. The geohydrology of the system may be a factor as aquifers tend to equalize from the new infusion of water, possibly resulting in no net surplus of water.

V:25

*Water Law Treatise*

## 6.    *Changes To Ground Water Rights*

Transfers and changes to ground water rights are governed by the general provisions of Wash. Rev. Code 90.03.380, and, more specifically, by the provisions of the ground water code, Wash. Rev. Code 90.44.100. *See* Transfer And Change Of  Water Rights *infra* ch. VII.   Under Wash. Rev. Code 90.44.100(1), the holder of a ground water permit or certificate may amend or change the method of withdrawal or the manner or place of use of water without losing the priority of the right. Such changes provide flexibility for ground water permit holders, but "do not alter the original project or the quantity of water needed". *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wash. 2d 118, 131, 969 P.2d 458 (1999)

There are a number of conditions for the granting of a ground water amendment.  Ecology must determine, pursuant to Wash. Rev. Code 90.03.380, that water is available for beneficial use and that the proposed appropriation will not impair existing rights or be detrimental to the public welfare.  *R.D. Merrill Co.*, 137 Wash. 2d at 131-32.  Unlike Wash. Rev. Code 90.03.380, the ground water code specifically requires the same analysis for a change to a ground water right as for issuing a new water right.  This implicates the full analysis in Wash. Rev. Code 90.03.290 and 90.54.  *See* The Water Codes: Surface Water *infra* ch. IV, section B.  In essence, the ground water code treats applications for ground water changes procedurally the same as original applications for ground water rights.  *R.D. Merrill Co.*, 137 Wash. 2d at 131-32.

In contrast to Wash. Rev. Code 90.03.380, which requires beneficial use of water before Ecology may approve a change in surface

*Release 01/00*

water use, Wash. Rev. Code 90.44.100 allows amendments as to manner
and place of use, and point of withdrawal to ground water permits and
certificates regardless of whether or not the water has already been applied
to beneficial use. *R.D. Merrill Co.*, 137 Wash. 2d at 129 (holding that a
transfer of an inchoate and unperfected ground water right was
permissible); *Okanogan Wilderness League, Inc. v. Town of Twisp*,
133 Wash. 2d 769, 777-79, 947 P.2d 732 (1997) (construing Wash. Rev.
Code 90.03.380 to limit the transfer of surface water rights only where
water has been applied to beneficial use, thereby confirming an
appropriator's right to change or transfer water only when the right has
been perfected into a vested property interest through the beneficial use of
that water). In *R.D. Merrill Co.*, the Court explained that "[b]y expressly
allowing amendment of a *permit*, [Wash. Rev. Code] 90.44.100 plainly
contemplates that an unperfected water right may be involved. It follows
that water may not actually have been beneficially used." *R.D. Merrill
Co.*, 137 Wash. 2d at 130 (emphasis in original). The Washington
Supreme Court reasoned that for changes of place of use, points of
withdrawal, or manner of use, ground water is treated differently from
surface water because:

> A holder of an appropriative right to withdraw ground
> water may sink a well in the location stated in the permit
> application, but discover it provides no water. Another
> location on the property is found which is likely to provide
> ample water to satisfy the appropriative right.

*Id.* at 131.

The Court specifically rejected the argument that the purpose of
use could also be changed for permits. *Id.* The purpose of use can only be

changed for quantities of water that have already been applied to
beneficial use, consistent with Wash. Rev. Code 90.03.080, and the
restrictions on speculation. *Id.* at 131-32. Before the 1997 amendment,
Wash. Rev. Code 90.44.100 required an amendment application for the
construction of additional or replacement wells at the same location *or* a
new location. The statute now provides that no application is needed
when constructing replacement or new additional wells at the original
location.[15] Wash. Rev. Code 90.44.100(2)(c). However, replacement or
new wells at the same location must still comply with conditions pursuant
to Wash. Rev. Code 90.03.280. *See* Wash. Rev. Code 90.03.290
(incorporated by reference in Wash. Rev. Code 90.44 under Wash. Rev.
Code 90.44.060).

### 7. *Priority Enforcement Between Ground Water, Surface Water, And Instream Flow Rights*

In contrast to the early common law cases, the Legislature
recognized the hydraulic connection and thus potential conflict between
ground and surface waters under the 1945 Ground Water Code.
Foreseeing priority enforcement problems between surface and ground
waters, the Legislature prioritized surface water rights as superior to
subsequent ground water "to the extent that any underground water is part
of or tributary to the source of any surface stream or lake, or that the
withdrawal of ground water may affect the flow of any spring, water
course, lake, or other body of surface water". Wash. Rev. Code

---

[15] The original location is "the area described as the point of withdrawal in the
original public notice published for the application for the water right for the well".
Wash. Rev. Code 90.44.100(4).

90.44.030.   Interpreting this provision in *Rettkowski*, the Washington Supreme Court found that Wash. Rev. Code 90.44.030 emphasized "the potential connections between ground water and surface water, and makes evident the Legislature's intent that ground water rights be considered a part of the overall water appropriation scheme, subject to the paramount rule of 'first in time, first in right.'"   *Rettkowski v. Department of Ecology*, 122 Wash. 2d 219, 226 n.1, 858 P.2d 232 (1993).

Under the Water Resources Act of 1971, the Legislature directed Ecology to administer water allocation and use programs in a manner that gave "[f]ull recognition . . . to the natural interrelationships of surface and ground waters." Wash. Rev. Code 90.54.020(9).  To ensure the protection of these connected waters, the Legislature provided for base flows[16] in all perennial rivers and streams as a baseline for future allocation of ground water.   Wash. Rev. Code 90.54.020(3)(a); *see also* Wash. Rev. Code 90.22.010.  This standard, in turn, would help protect fish, wildlife, scenic, aesthetic and other important environmental and navigational values. Under limited circumstances, however, ground water withdrawals in conflict with instream base flows may be authorized "where it is clear that

---

[16]   While the statute does not define base flows, Ecology has provided a definition: "[i]n a hydrologic sense, the term base flow normally refers to flow sustained in a stream during extended periods without precipitation or, that component of streamflow primarily derived from ground water effluent."   State Water Program, *Western Washington Instream Resources Protection Program:  An Overview* 3.

*Water Law Treatise*

overriding considerations of the public interest will be served". Wash. Rev. Code 90.54.020(3)(a). Similarly, Ecology has authority to condition all surface water allocations to preserve minimum instream flows established by regulation for each river basin. Wash. Rev. Code 90.03.247.

In *Hubbard v. Department of Ecology*, 86 Wash. App. 119, 936 P.2d 27 (1997), the court of appeals ruled that the connection between ground water and surface water may exist even when the point of withdrawal of the ground water is several miles removed from the affected stream. Even though the effect of the proposed pumping on the flow of the river would be minimal, the court upheld Ecology's decision to restrict ground water withdrawal in order to protect instream flows in the Okanogan River given the "significant hydraulic continuity" between the aquifer and river. The court stated: "Any effect on the river during the period it is below the minimum instream flow level conflicts with existing senior rights (such as the minimum flow level itself) and may be reasonably considered detrimental to the public interest." *Hubbard*, 86 Wash. App. at 125. In another case, the Pollution Control Hearing Board reached a similar result finding that hydraulic continuity is established "if the evidence demonstrates that *any* of the water from the ground at the place, and depth, in question would otherwise have

*The Water Codes: Ground Water*

contributed to a particular surface water". *In re Appeals from Water Rights Decisions of the Dep't of Ecology*, PCHB No. 96-8, at 23 (July 16, 1996)[17] (emphasis in original); *see Jones v. Department of Ecology*, PCHB No. 94-63-66 (1995); *Summers v. Department of Ecology*, PCHB No. 91-42 (1992); *Plakos v. Department of Ecology*, PCHB No. 87-38 (1988).

---

[17] This ruling is currently on appeal before the Washington Supreme Court.

*Release 01/00*