# TAB II-1

CLASSIC REPRINT SERIES

# REPORT ON THE CONDITION AND NEEDS OF THE MISSION INDIANS OF CALIFORNIA, 1883



by

## Abbot Kinney



Forgotten Books

ACC0017334



# Report on the Condition and Needs of the Mission Indians of California

*by*

**Abbot Kinney**

Published by Forgotten Books 2013

Originally published 1883

PIBN 1000472474

www.ForgottenBooks.org

Copyright © 2013 Forgotten Books

ACC0017335



# eBook Terms & Conditions

## www.forgottenbooks.org

## 1. This eBook* may be

a. Copied for personal and educational use.

b. Printed for personal and educational use.

## 2. This eBook* may <u>NOT</u> be

a. Distributed in any form.

b Sold individually or as part of a package.

c. Modified in any way.

d. Reversed-engineered.



This eBook* and all its content including images are
Copyright © 2014 FB &c Ltd - All rights reserved.
Forgotten Books is a registered trademark of FB &c Ltd.

**FB &c Ltd**, Dalton House, 60 Windsor Avenue, London SW19 2RR
Company number 08720141. Registered in England and Wales.

*'eBook' refers to this PDF and any of its content including pages and images in either electronic or printed form.

ACC0017336

The paperback edition of
this book can be purchased from



Over 1,000,000 eBooks
are available to read at



ACC0017337



# 484,473 eBooks
are available to read at



www.ForgottenBooks.org

---

# Alchemy

*"In changing the base metals into gold and silver by the projection of the Stone, it follows (by an accelerated process) the method of nature, and therefore is natural."*

**The New Pearl of Great Price,** by Peter Bonus, 1338 AD

## www.ForgottenBooks.org/Alchemy

ACC0017338



# Free App Download







Enjoy

## 484,473 Books

wherever you go

# www.ForgottenBooks.org/apps



ACC0017339

# REPORT

## ON

# THE CONDITION AND NEEDS

### OF THE

# MISSION INDIANS OF CALIFORNIA,

#### MADE BY

## SPECIAL AGENTS

# HELEN JACKSON AND ABBOT KINNEY,

#### TO THE

## COMMISSIONER OF INDIAN AFFAIRS.

* * * ◆ * * *

### WASHINGTON:
#### GOVERNMENT PRINTING OFFICE.
### 1883.

5690 M I

ACC0017340

US 10297.55

1864, Feb. 12.
Gift o.
Prof. Asa Gray,
of Cambridge.

ACC0017341

# REPORT

ON

## THE CONDITION AND NEEDS OF THE MISSION INDIANS.

———

COLORADO SPRINGS, COLO.,
*July* 13, 1883.

SIR: In compliance with our instructions bearing dates November 28, 1882, and January 12, 1883, we have the honor to submit to you the following report on the subject of the Mission Indians in Southern California.

The term "Mission Indians" dates back over one hundred years, to the time of the Franciscan missions in California. It then included all Indians who lived in the mission establishments, or were under the care of the Franciscan fathers. Very naturally the term has continued to be applied to the descendants of those Indians. In the classification of the Indian Bureau, however, it is now used in a somewhat restricted sense, embracing only those Indians living in the three southernmost counties of California, and known as Serranos, Cahuillas, San Luisenos, and Dieguinos; the last two names having evidently come from the names of the southernmost two missions, San Luis Rey and San Diego. A census taken in 1880, of these bands, gives their number as follows:

| | |
|---|---:|
| Serranos | 381 |
| Cahuillas | 675 |
| San Luisenos | 1,120 |
| Dieguinos | 731 |
| Total | 2,907 |

This estimate probably falls considerably short of the real numbers, as there are no doubt in hiding, so to speak, in remote and inaccessible spots, many individuals, families, or even villages, that have never been counted. These Indians are living for the most part in small and isolated villages; some on reservations set apart for them by Executive order; some on Government land not reserved, and some upon lands included within the boundaries of confirmed Mexican grants.

Considerable numbers of these Indians are also to be found on the outskirts of white settlements, as at Riverside, San Bernardino, or in the colonies in the San Gabriel Valley, where they live like gypsies in brush huts, here to-day, gone to-morrow, eking out a miserable existence by days' works, the wages of which are too often spent for whisky in the village saloons. Travelers in Southern California, who have formed their impressions of the Mission Indians from these wretched wayside creatures, would be greatly surprised at the sight of some of the Indian villages in the mountain valleys, where, freer from the contaminating influence of the white race, are industrious, peaceable communities, cultivating ground, keeping stock, carrying on their own simple manufactures of pottery, mats, baskets, &c., and making their liv-

ACC0017342

ing—a very poor living, it is true, but they are independent and self-respecting in it, and ask nothing at the hands of the United States Government now, except that it will protect them in the ownership of their lands, lands which, in many instances, have been in continuous occupation and cultivation by their ancestors for over one hundred years.

From tract after tract of such lands they have been driven out, year by year, by the white settlers of the country, until they can retreat no farther: some of their villages being literally in the last tillable spot on the desert's edge or in mountain fastnesses. Yet there are in Southern California to-day many fertile valleys, which only thirty years ago were like garden spots with these same Indians' wheat fields, orchards, and vineyards. Now, there is left in these valleys no trace of the Indians' occupation, except the ruins of their adobe houses; in some instances these houses, still standing, are occupied by the robber whites who drove them out. The responsibility for this wrong rests, perhaps, equally divided between the United States Government, which permitted lands thus occupied by peaceful agricultural communities to be put "in market," and the white men who were not restrained either by humanity or by a sense of justice, from "filing" homestead claims on lands which had been fenced, irrigated, tilled, and lived on by Indians for many generations. The Government cannot justify this neglect on the plea of ignorance. Repeatedly, in the course of the last thirty years, both the regular agents in charge of the Mission Indians and special agents sent out to investigate their condition have made to the Indian Bureau full reports setting forth these facts.

In 1873 one of these special agents, giving an account of the San Pasquale Indians, mentioned the fact that a white man had just pre-empted the land on which the greater part of the village was situated. He had paid the price of the land to the register of the district land ffice, and was daily expecting his patent from Washington. "He owned," the agent says, "that it was hard to wrest from these well-disposed and industrious creatures the homes they had built up; but," said he, "if I had not done it, somebody else would; for all agree that the Indian has no right to public lands." This San Pasquale village was a regularly organized Indian pueblo, formed by about one hundred neophytes of the San Luis Rey Mission, under and in accordance with the provisions of the secularization act in 1834. The record of its founding is preserved in the Mexican archives at San Francisco. These Indians had herds of cattle, horses, and sheep; they raised grains, and had orchards and vineyards. The whole valley in which this village lay was at one time set off by Executive order as a reservation, but by the efforts of designing men the order was speedily revoked, and no sooner had this been done than the process of dispossessing the Indians began. There is now, on the site of that old Indian pueblo, a white settlement numbering 35 voters. The Indians are all gone; some to other villages, some living near by in cañons and nooks in the hills, from which, on the occasional visits of the priest, they gather and hold services in the half ruined adobe chapel built by them in the days of their prosperity.

This story of the San Pasquale Indians is only a fair showing of the experiences of the Mission Indians during the past fifty years. Almost without exception they have been submissive and peaceable through it all, and have retreated again and again to new refuges. In a few instances there have been slight insurrections among them, and threatenings of retaliation, but in the main their history has been one of almost incredible long suffering and patience under wrongs.

In 1851 one of the San Luiseno bands, the Aqua Caliente Indians, in

ACC0017343

the north part of San Diego County, made an attack on the house of a white settler, and there was for a time great fear of a general uprising of all the Indians in the country. It is probable that this was instigated by the Mexicans, and that there was a concerted plan for driving the Americans out of the country. The outbreak was easily quelled however, four of the chiefs were tried by court-martial and shot by order of General Heintzelman, and in January of the following year a treaty was made with the San Luiseno and Dieguino Indians, setting off for them large tracts of land. This treaty was made by a United States commissioner, Dr. Wozencraft and Lieutenant Hamilton, representing the Army, and Col. J. J. Warner, the settler whose house had been attacked. The greater part of the lands which were by this treaty assigned to the Indians are now within the boundaries of grants confirmed and patented since that time; but there are many Indian villages still remaining on them, and all Indians living on such lands are supposed to be there solely on the tolerance and at the mercy of the owners of said ranches, and to be liable to ejectment by law. Whether this be so or not is a point which it would seem to be wise to test before the courts. It is certain that in the case of all these Mission Indians the rights involved are quite different from and superior to the mere "occupancy" right of the wild and uncivilized Indian.

At the time of the surrender of California to the United States these Mission Indians had been for over seventy years the subjects, first of the Spanish Government, secondly of the Mexican. They came under the jurisdiction of the United States by treaty provisions, the treaty of Guadalupe Hidalgo, between the United States and Mexico, in 1848. At this time they were so far civilized that they had become the chief dependence of the Mexican and white settlers for all service indoors and out. In the admirable report upon these Indians made to the Interior Department in 1853, by the Hon. B. D. Wilson, of Los Angeles, are the following statements:

These same Indians had built all the houses in the country, planted all the fields and vineyards. Under the Missions there were masons, carpenters, plasterers, soap-makers, tanners, shoemakers, blacksmiths, millers, bakers, cooks, brick-makers, carters and cart-makers, weavers and spinners, saddlers, shepherds, agriculturalists, horticulturalists, vineros, vaqueros, in a word, they filled all the laborious occupations known to civilized society.

The intentions of the Mexican Government toward these Indians were wise and humane. At this distance of time, and in face of the melancholy facts of the Indians' subsequent history, it is painful to go over the details of the plans devised one short half century ago for their benefit. In 1830, there were in the twenty-one missions in California, some 20,000 or 30,000 Indians living comfortable and industrious lives under the control of the Franciscan fathers. The Spanish colonization plan had, from the outset, contemplated the turning of these mission establishments into pueblos as soon as the Indians should have become sufficiently civilized to make this feasible. The Mexican Government, carrying out the same general plan, issued in 1833 an act, called the secularization act, decreeing that this change should be made. This act provided that the Indians should have assigned to them cattle, horses, and sheep from the mission herds; also, lands for cultivation. One article of Governor Figueroa's regulations for the carrying out of the secularization act provided that there should be given to every head of a family, and to all above twenty-one years of age, though they had no family, a lot of land not exceeding 400 varas square, nor less than 100. There was also to be given to them in com-

ACC0017344

mon, enough land for pasturing and watering their cattle.  Another article provided that one-half the cattle of each mission school should be divided among the Indians of that mission in a proportionable and equitable manner; also one-half of the chattels, instruments, seeds, &c. Restrictions were to be placed on the disposition of this property.  The Indians were forbidden "to sell, burden, or alienate under any pretext the lands given them.  Neither can they sell the cattle."  The Commissioners charged with the carrying out of these provisions were ordered to "explain all the arrangements to the Indians with suavity and patience;" to tell them that the lands and property will be divided among them so that each one may "work, maintain, and govern himself" without dependence on any one."  It was also provided that the rancherias (villages) situated at a distance from the missions, and containing over twenty-five families, might, if they chose, form separate pueblos, and the distribution of lands and property to them should take place in the same manner provided for those living near the missions.

These provisions were in no case faithfully carried out.  The administration of the Missions' vast estates and property was too great a temptation for human nature, especially in a time of revolution and misrule. The history of the thirteen years between the passing of the secularization act and the conquest of California is a record of shameful fraud and pillage, of which the Indians were the most hapless victims.  Instead of being permitted each one to work, maintain, and govern himself without dependence on any one as they had been promised, their rights to their plats of land were in the majority of cases ignored; they were forced to labor on the mission lands like slaves; in many instances they were hired out in gangs to cruel masters.  From these cruelties and oppressions they fled by hundreds, returning to their old wilderness homes.  Those who remained in the neighborhood of the pueblos became constantly more and more demoralized and were subjected to every form of outrage.  By a decree of the Los Angeles aqumiento, about the time of our taking possession of California, all Indians found without passes, either from the alcalde of the pueblos in which they lived, or from their "masters, [significant phrase] were to be treated as horse thieves and enemies."  At this time there were, according to Mr. Wilson's report, whole streets in Los Angeles where every other house was a grog-shop for Indians; and every Saturday night the town was filled with Indians in every stage of intoxication.  Those who were helpless and insensible were carried to the jail, locked up, and on Monday morning bound out to the highest bidders at the jail gates.  "The Indian has a quick sense of justice," says Mr. Wilson; "he can never see why he is sold out to service for an indefinite period for intemperance, while the white man goes unpunished for the same thing, and the very richest and best men, to his eye, are such as tempt him to drink, and sometimes will pay him for his labor in no other way."  Even the sober and industrious and best skilled among them could earn but little; it having become a custom to pay an Indian only half the wages of a white man.

From this brief and necessarily fragmentary sketch of the position and state of the Mission Indians under the Mexican Government, at the time of the surrender of California to the United States, it will be seen that our Government received by the treaty of Guadalupe Hidalgo a legacy of a singularly helpless race in a singularly anomalous position.  It would have been very difficult, even at the outset, to devise practicable methods of dealing justly with these people, and preserving to them their rights.  But with every year of our neglect the difficulties have increased and the wrongs have been multiplied, until now it is,

ACC0017345

humanly speaking, impossible to render to them full measure of justice. All that is left in our power is to make them some atonement. Fortunately for them, their numbers have greatly diminished. Suffering, hunger, disease, and vice have cut down more than half of their numbers in the last thirty years; but the remnant is worth saving. Setting aside all question of their claim as a matter of atonement for injustice done, they are deserving of help on their own merits. No one can visit their settlements, such as Aqua Caliente, Saboba, Cahuilla Valley, Santa Ysabel, without having a sentiment of respect and profound sympathy for men who, friendless, poor, without protection from the law, have still continued to work, planting, fencing, irrigating, building houses on lands from which long experience has taught them that the white man can drive them off any day he chooses. That drunkenness, gambling, and other immoralities are sadly prevalent among them, cannot be denied; but the only wonder is that so many remain honest and virtuous under conditions which make practically null and void for them, most of the motives which keep white men honest and virtuous.

Having thus given as brief a presentation as possible of the general situation and nature of these Indians, we will proceed to state what, to the best of our judgment, are the steps which ought to be taken by the United States Government in their behalf. The descriptions of the most important villages we visited, and the detailed accounts of circumstances and situations on which our suggestions are based, are given for convenience of reference in separate exhibits.

1st. The first and most essential step, without which there is no possibility of protecting these Indians or doing anything intelligently for them, is the determining, resurveying, rounding out, and distinctly marking, their reservations already existing. The only way of having this done accurately and honestly, is to have it done by a surveyor who is under the orders and constant supervision of an intelligent and honest commissioner; not by an independent surveyor who runs or "floats" reservation lines where he and his friends or interested parties choose, instead of where the purpose of the United States Government, looking to the Indians' interests, had intended. There have been too many surveys of Indian reservations in Southern California of this sort. (See Exhibits C, H, I, J, L.) All the reservations made in 1876, and that comprises nearly all now existing, were laid off by guess, by the surveyor in San Diego, on an imperfect county map. These sections, thus guessed at by the surveyor, were reported by the Commissioner to the Interior Department, set aside by Executive order, and ordered to be surveyed. When the actual survey came to be made, it was discovered that in the majority of cases the Indian villages intended to be provided for were outside the reservation lines, and that the greater part of the lands set apart were wholly worthless. The plats of these reservations are in the surveyor-general's office at San Francisco. On each of them was marked by the surveyor an additional line in color, showing what tracts ought to be added to take in the Indian villages and fields. So far as we could learn, no action was taken in regard to these proposed additions.

The reservation lines, when thus defined, should be marked plainly and conspicuously by monuments and stakes, leaving no room for doubt. A plat of each reservation should then be given to the Indians living on it. It was pathetic, in our visits to village after village, to hear the Indians' request reiterated for this thing—" a paper to show to the white men where their lands were." Every fragment of writing they had ever received, which could by any possibility bear on their title to their

ACC0017346

lands, they had carefully preserved old tattered orders from Army officers thirty years back, orders from justices of the peace, &c., all worthless of course, but brought forward with touching earnestness to show us. In no single instance had the reservation lines ever been pointed out to them. One band, the Sequan Indians, who had never seen any agent, said they had been told that they were on a reservation, but they did not know if it were true or not. They had been obliged to give up keeping stock, because they could not find any place where the whites would let them pasture cattle. (See Exhibit J.)

There are some settlements of Indians on Government lands not set off as reservations, in some instances not surveyed. These tracts should all be surveyed, their boundaries marked, and the lands withdrawn from market to be permanently set aside for the Indians' use. We use the term "rounding out" in regard to these reservations chiefly on account of the complication which results from their being in some cases within the limit of railroad grants, and made subsequent to those grants. Some are actually within the limits of the Southern Pacific Railroad grant; others will be within the limits of the Texas Pacific grant, should that be confirmed. The odd sections thus belonging to the railroads should be secured to the Indians. There are also a few claims to lands within reservation boundaries, which are legal on account of their having been made before the reservations were set off. These should be extinguished. (See Exhibit O.)

2d. All white settlers now on reservations should be removed. For the last four years stray settlers have been going in upon reservation tracts. This is owing to the lack of boundary definitions and marks as aforesaid, also to the failure of the surveys to locate the reservations so as to take in all the ground actually occupied by Indian villages. Thus, in many instances, the Indians' fields and settlements have been wrested from them and they in their turn have not known where they could or could not go. There is not a single reservation of any size which is free from white settlers. It would seem that agents in charge of these Indians should have been authoritatively instructed in no case to allow squatters to settle on lands known to be within reservation lines, whether they were occupied by Indians or not. (See Exhibits H, I, O.)

The amount of land set off in Indian reservations in Southern California appears by the record to be very large, but the proportion of it which is really available is very small. San Diego County itself is four-fifths desert and mountain, and it is no exaggeration to say that the proportion of desert and mountain in the reservation is even larger than this. By thus resurveying, rounding out, and freeing from white settlers the present reservations, adding to them all Government lands now actually in occupation by Indians, there will be, according to the best of our judgment, nearly land enough for the accommodation of all the Mission Indians except those whose settlements are on grants.

3d. In regard to this latter class, *i. e.*, those whose villages are now within the boundaries of confirmed grants, the Government has to choose between two courses of action: either to remove them and make other provision for them, or to uphold and defend their right to remain where they are. In support of the latter course we believe a strong case could be made out, and we have secured from one of the ablest firms in Southern California a written legal opinion on this point. (See Exhibit A.) It seems clear that this contest should be made by the Government itself. It is impossible for these poverty-stricken and ignorant people to undertake on their own account and at their own expense the legal settlement of this matter. It would be foolish to

ACC0017347

advise it; inhuman to expect it. A test case could be made which would settle the question for all. (See Exhibit B.) In case the decision be favorable to the Indians remaining, the ranch owners should then be called on to mark off the boundaries of the Indians' lands according to the California State law covering such cases. (See Exhibit R.) Whether the lands thus reverting to the Indians could properly be considered as Government lands or not, would be a question to be determined. Probably the surest way of securing them for the Indians' permanent use would be to consider them as such and have them defined as reservations by act of Congress.

4th. And this brings us to our fourth recommendation, which is, that all these Indians' reservations, those already set off by Executive order, and all new ones made for them, whether of Government lands now in their occupation, or of lands which may be hereafter by legal process reclaimed for them from the grant lands on which they are now living, be patented to the several bands occupying them; the United States to hold the patent in trust for the period of twenty-five years; at the expiration of that time the United States to convey the same by patent to said Indians, as has been done for the Omaha Indians. The insecurity of reservations made merely by Executive order is apparent, and is already sadly illustrated in Southern California by the history of the San Pasquale Reservation, that of Aqua Caliente and others. The insecurity of reservations set apart by act of Congress is only a degree less. The moment it becomes the interest and purpose of white men in any section of the country to have such reservation tracts restored to the public domain, the question of its being done is only a question of influence and time. It is sure to be done. The future of these industrious, peaceable, agricultural communities ought not to be left a single day longer than is necessary, dependent on such chances; chances which are always against and never for Indians' interests in the matter of holding lands. The best way and time of allotting these Indians' lands to them in severalty must be left to the decision of the Government, a provision being incorporated in their patent to provide for such allotments from time to time as may seem desirable, and agents and commissioners being instructed to keep the advantages of this system constantly before the Indians' minds. Some of them are fit for it now, and earnestly desire it, but the majority are not ready for it. The communal system, on which those now living in villages use their lands, satisfies them, and is apparently administered without difficulty. It is precisely the same system as that on which the pueblo lands were cultivated by the early Spanish settlers in Southern California. They agree among themselves to respect each other's right of occupancy; a man's right to a field this year depending on his having cultivated it last year, and so on. It seems not to occur to these Indians that land is a thing to be quarreled over.

In the village of Aqua Caliente, one of the most intelligent of the young men was so anxious to show us his fields that we went with him a little distance outside the village limits to see them. He had some eight acres in grain, vine, and fruit trees. Pointing first in one direction, then in another, he indicated the places where his ground joined other men's ground. There was no line of demarcation whatever, except it chanced to be a difference of crops. We said to him, "Alessandro, how do you know which is your land and which is theirs?" He seemed perplexed, and replied, "This was my mother's land. We have always had it." "But," we persisted, "suppose one of these other men should want more land and should take a piece of yours?" "He

ACC0017348

couldn't," was all the reply we could get from Alessandro, and it was plain that he was greatly puzzled by the suggestion of the possibility of neighbors trespassing on each other's cultivated fields.

5th. We recommend the establishment of more schools. At least two more are immediately needed, one at the Rincon, and one at Santa Ysabel. (See Exhibits G. L.) As the reservations are gradually cleared, defined and assured for the Indians' occupancy, hundreds of Indians who are now roving from place to place, without fixed homes, will undoubtedly settle down in the villages and more schools will be needed. It is to be hoped also, that some of the smaller bands will unite with the larger ones for the sake of the advantages of the school, and other advantages of a larger community. The isolated situation of many of the smaller settlements is now an insuperable difficulty in the way of providing education for all the children. These Indians are all keenly alive to the value of education. In every village that we visited we were urged to ask the Government to give them a school. In one they insisted upon ranging the children all in rows, that we might see for ourselves that there were children enough to justify the establishing of a school.

In this connection we would suggest that if a boarding and industrial school, similar to those at Hampton and Carlisle, could be established in Southern California, it would be of inestimable value and would provide opportunities for many children who, owing to the the isolation of their homes, could not be reached in any other way.

We would further suggest that, in our judgment, only women teachers should be employed in these isolated Indian villages. There is a great laxity of morals among these Indians, and in the wild regions where their villages lie, the unwritten law of public sentiment, which in more civilized communities does so much to keep men virtuous, hardly exists. Therefore the post of teacher in these schools is one full of temptations and danger to a man. (See Exhibit M.) Moreover, women have more courage and self-denying missionary spirit, sufficient to undertake such a life, and have an invaluable influence outside their school-rooms. They go familiarly into the homes, and are really educating the parents as well as the children in a way which is not within the power of any man, however earnest and devoted he may be.

We would also suggest that great good might be accomplished among these Indians by some form of itinerary religious and educational labor among them. In the list of assignments of Indian agencies to different religious denominations, as given in the report of the Indian Bureau for 1882, the Mission Agency is assigned to the Evangelical Lutheran; but we could not learn that this denomination had done any work among them. So far as the Mission Indians have any religion at all they are Catholics. In many of the villages are adobe chapels, built in the time of the missions, where are still preserved many relics of the mission days, such as saints' images, holy-water kettles, &c. In these chapels on the occasions of the priest's visits the Indians gather in great numbers, women sometimes walking two days' journey, bringing their babies on their backs to have them baptized. There are also in several of the villages old Indians, formerly trained at the missions, who officiate with Catholic rites at funerals, and on Sundays repeat parts of the mass. As these Indians are now situated in isolated settlements so far apart, and so remote from civilized centres, the only practicable method of reaching them all would be by some form of itinerary labor. A fervent religious and practical teacher who should spend his time in going from village to village, remaining in each a few

ACC0017349

days or weeks, as the case might be, would sow seed which would not cease to grow during the intervals of his absence. If he were a man of sound common sense and knowledge of laws of life, fitted to instruct the Indians in matters of hygiene, cleanliness, ventilation, &c., and in a few of the simple mechanical arts, as well as in the doctrines of religion and morality, he would do more for the real good of these people at present than can be accomplished by schools.

6th. The suggestion of the value of itinerary labor among the Indians leads to our next recommendation, which we consider of great importance, viz, that it should be made the duty of any Government agent in charge of the Mission Indians to make a round of inspection at least twice a year, visiting each village or settlement however small. In no other way can anything like a proper supervision of these Indians' interests be attained. This proof of the Government's intention to keep a sharp eye on all that might occur in relation to the Indians would have a salutary moral effect, not only on the Indians, but on the white settlers in their neighborhood. It would also afford the means of dealing with comparative promptitude with the difficulties and troubles continually arising. As it is now, it is not to be wondered at that the Indians feel themselves unprotected and neglected, and the white settlers feel themselves safe in trespassing on Indians' property or persons. In some of the villages, where pre-emption claims have been located within the last four years, no agent has ever been. It is safe to say, that had an agent been on the ground each year, with the proper authority to take efficient measures, much of the present suffering and confusion would have been prevented. In the case, for instance, of the Los Coyotes village, filed on a few months ago (see Exhibit F), there was no reason why those lands should not have been set apart for the Indians long ago, had their situation been understood; so in the San Ysidro case, and others. The whole situation of an agent in regard to the Mission Indians is totally different from that of ordinary agency on a reservation. The duties of an Indian agent on a reservation may be onerous, but they are in a sense simple. His Indians are all together, within comparatively narrow limits, and, so to speak, under his hand, and dependent largely on the Government. The Mission Indians, on the contrary, are scattered in isolated settlements thirty, forty, a hundred miles away from the agency headquarters, many of them in regions difficult of access. Moreover, the Indians are in the main self-supporting and independent. Protection or oversight worth anything to them can only be given by a systematic method of frequent visitation.

What is true in this respect of the agent's work is, if possible, still truer of the physician's. If there is to be an agency physician for the Mission Indians at all, he should be a young, strong, energetic man, who is both able and willing to make at least four circuits a year through the villages, and who will hold himself bound to go when called in all cases of epidemics, serious illness, or accidents occurring among Indians within one day's journey of the agency headquarters. Whatever salary it is necessary to pay to secure such service as this should be paid, or else the office of agency physician to the Mission Indians should be abolished. Anything less than this is a farce and a fraud.

7th. We recommend that there be secured the appointment of a lawyer, or a law firm in Los Angeles, to act as special United States attorney in all cases affecting the interests of these Indians. They have been so long without any protection from the law that outrages and depredations upon them have become the practice in all white communities near which they live. Indians' stock is seized, corraled

ACC0017350

held for fines, sometimes shot, even on the Indians' own reservations or in the public domain. In seasons of dearth roving stockmen and shepherds drive their herds and flocks into Indians' grain fields, destroying their subsistence for a whole year. Lands occupied by Indians or by Indian villages are filed on for homestead entry precisely as if they were vacant lands. This has been more than once done without the Indians receiving any warning until the sheriff arrived with the writ for their ejectment. The Indians' own lives are in continual danger, it being a safe thing to shoot an Indian at any time when only Indian witnesses are present. (See Exhibits C, E.) It is plain that all such cases as these should be promptly dealt with by equal means. One of the greatest difficulties in the position of the Mission Indians' agent is, that in all such cases he is powerless to act except through the, at best, slow and hitherto unsatisfactory channel of reporting to the Interior Department. He is in the embarrassing position of a guardian of wards with property and property rights, for the defense of which he is unable to call in prompt legal assistance. In instances in which the Indians themselves have endeavored to get redress through the courts, they have in the majority of cases, to the shame of the Southern California bar be it spoken, been egregiously cheated. They are as helpless as children in the hands of dishonest, unscrupulous men. We believe that the mere fact of there being such a United States legal authority near at hand to act for the Indians, would in a short time, after a few effective illustrations of its power, do away with the greater proportion of the troubles demanding legal interference.

The question of the rights of Indians living on grant lands to remain there will, if the Department decides to test it by law, involve some litigation, as it will no doubt be contested by the ranch owners; but this point once settled and the Indians secured in the ownership of their lands, a very few years will see the end of any special need of litigation in their behalf. We recommend in this connection and for this office the firm of Brunson & Wells, of Los Angeles. We have obtained from this firm a clear and admirable opinion on these Indians' right to their present homes (see Exhibit A), and we know them to be of high standing at the bar and to have a humane sympathy for Indians.

8th. We recommend that there should be a judicious distribution of agricultural implements among these Indians. No village should be omitted. Wagons, harness, plows, spades, and hoes are greatly needed. It is surprising to see what some of these villages have accomplished with next to no implements. In the Santa Ysabel village the Indians had three hundred acres in wheat; there were but three old broken plows in the village, no harness, and no wagon. (See Exhibit G.) There is at present much, and not unfounded, sore feeling in some of the villages which have thus far received no help of this kind, while others of the villages have been supplied with all that was needed.

9th. There should always be provided for the Mission Indians' agency a small fund for the purchase of food and clothing for the very old and sick in times of especial destitution. The Mission Indians as a class do not beg. They are proud spirited, and choose to earn their living. They will endure a great deal before they will ask for help. But in seasons of drought or when their little crops have, for any cause, failed, there is sometimes great distress in the villages. Last winter the Cahuillas, in the Cahuilla Valley (see Exhibit C), were for many weeks without sufficient food. The teacher of their school repeatedly begged them to let her write to the agent for help, but they refused. At last one night the captain and two of the headmen came to her room and

ACR0017351

said she might write. They could no longer subdue the hunger. She wrote the letter; the next morning at daylight the Indians were at her door again. They had reconsidered it, they said, and they would not beg. They would rather starve, and they would not permit her to send the letter.

10th. The second and third special points on which we were instructed to report to the Department were, whether there still remains in Southern California any Government land suitable for an Indian reservation, and if not, in case lands must be bought for that purpose, what lands can be most advantageously purchased. There is no Government land remaining in Southern California in blocks of any size suitable for either white or Indian occupancy. The reason that the isolated little settlements of Indians are being now so infringed upon and seized, even at the desert's edge and in stony fastnesses of mountains, is that all the good lands, i. e., lands with water or upon which water can be developed, are taken up.

We recommend two purchases of land; one positively, the other contingently. The first is the Pauma ranch, now owned by Bishop Mora, of Los Angeles. (See Exhibit P.) This ranch lying as it does between the Rincon and Pala Reservations on the north and south, and adjoining the La Jolla Reservation, affords an admirable opportunity to consolidate a large block of land for Indian occupancy. It is now, in our opinion, a desirable tract. While it is largely hilly and mountainous, there is considerable good sheep and cattle pasturing on it and a fair amount of bottom land for cultivation along the river. The price asked for it is, as lands are now selling in Southern California, low. If the already existing reservations are cleared of whites, unified, and made ready for Indian occupancy, and the Government lands now in actual occupation by Indians be assured to them, the addition of this Pauma ranch will be, in our opinion, all that will be required to make comfortable provision for all the Indians, except those living within the boundaries of confirmed grants.

Should the Department decide to remove all these and provide them with new homes, we recommend the purchase of the Santa Ysabel ranch. (See Exhibit Q.) The purchase of this ranch for an Indian reservation was recommended to the Government some years ago, but it was rejected on account of the excessive price asked for it. It is now offered to the Government for $95,000. During the past ten years the value of lands in Southern California, has in many places quadrupled; in some it is worth more than twenty times what it was then. We have no hesitation in saying that it is not now possible to buy an equally suitable tract for any less money. The ranch contains 17,719.40 acres; is within the rain belt of San Diego County, is well watered, and, although it is largely mountainous, has good pasture, some meadow land, and some oak timber. It is, moreover, in the region to which the greater proportion of these Indians are warmly attached and in the vicinity of which most of them are now living. One large Indian village is on the ranch. (See Exhibit G.) Father Ubach, the Catholic priest of San Diego, who has known these Indians for seventeen years, says of it, "it is the only tract to which human power can force these Indians to remove." We recommend this purchase only as a last resort in the event of the Department's being compelled to provide new homes for all the Indians now living within the boundaries of confirmed grants.

In conclusion, we would make the suggestion that there are several small bands of Mission Indians north of the boundaries of the so-called Mission Indians' agency, for whom it would seem to be the duty of the

ACC0017352

Government to care as well as for those already enumerated. One of these is the San Carlos Indians, living near the old San Carlos Mission at Monterey. There are nearly one hundred of these, and they are living on lands which were given to them before the secularization act in 1834. These lands are close to the boundaries of the ranch San Francisquito of Monterey. These boundaries have been three times extended, each time taking in a few more acres of the Indians' lands, until now they have only ten or twelve acres left. There are also some very destitute Indians living in the neighborhood of the San Antonio Mission, some sixty miles south of Monterey, and of San Miguel, forty miles farther south, and of Santa Juez near Santa Barbara. These Indians should not be overlooked in arrangements made for the final establishing of the Mission Indians in Southern California.

Hoping that these recommendations may be approved by the Department, we are,

Very respectfully, yours,

HELEN JACKSON.
ABBOT KINNEY.

Hon. H. PRICE,
*Commissioner of Indian Affairs.*

---

### INDEX OF EXHIBITS.

|   |   | Page |
|---|---|------|
| A. | Legal brief of Brunson and Wells | 14 |
| B. | Saboba | 17 |
| C. | Cahuilla Reservation | 18 |
| D. | Warner's Ranch Indians | 20 |
| E. | San Ysidros | 22 |
| F. | Los Coyotes | 23 |
| G. | Santa Ysabel | 24 |
| H. | Mesa Grande | 25 |
| I. | Capitan Grande | 26 |
| J. | Sequan | 28 |
| K. | The Conejos | 28 |
| L. | Pala and neighborhood, including Rincon, Pauma, and La Jolla | 29 |
| M. | Pachanga | 30 |
| N. | The Desert Indians | 31 |
| O. | San Gorgonio Reservation | 32 |
| P. | Pauma Ranch and the proposal for its sale to the United States Government | 34 |
| Q. | Proposition for sale of Santa Ysabel Ranch to the United States Government | 35 |
| R. | Copy of California State law for the government and protection of Indians | 35 |

---

## EXHIBIT A.

LOS ANGELES, CAL., *May* 12, 1883.

SIR: In response to your verbal request asking our opinion as to the following questions, viz:

1st. Have civilized Indians and those who are engaged in agriculture or labor of any kind, and also those who are known as Pueblos or Rancheros Indians in California, a right to occupy and possess lands which they and their predecessors had continuously occupied, possessed, and enjoyed while said lands were under the jurisdiction of the Mexican Government, up to and at the date of the ratification of the treaty Guadalupe Hidalgo between the United States and the Mexican Republic, March, 1848, notwithstanding that said lands so occupied and enjoyed by the Indians aforesaid had been while they were so occupying and possessing the same, by the proper Spanish and Mexican authorities before the ratification of said treaty granted to certain Spanish and Mexi-

ACC0017353

can citizens, and since the acquisition by the United States of the territory embracing said lands so granted been by the United States confirmed, surveyed, and patented to the grantees or their legal representatives ?

2d. Has the United States Government the right to condemn lands within the State of California for the purpose of giving Indians homes thereon ?

We have the honor to submit the following as our reply and answer to the above interrogatories. Before and at the date of the treaty of Guadalupe Hidalgo, all the territory now known as California was a part of and under the jurisdiction of the Mexican Republic. We do not regard it as necessary in order to answer the questions propounded to give a history of the land laws of Spain and Mexico, nor the method of acquiring land prior to August 18, 1824.

On August 18, 1824, the Mexican Congress enacted a general colonization law prescribing the mode of granting lands throughout the Mexican territory. This law was limited and defined by a series of regulations ordained by the Mexican Government, November 21, 1828. By these laws and regulations, which have ever since continued in force, the governors of Territories were authorized to grant with certain specified exceptions vacant land. By the fundamental laws of 1824, the regulations of 1824, and the regulations of the departmental legislature consistent therewith, all Mexican grants in California have been determined. and by this have been determined the validity of every grant of land in California. (Lesse and Vallejo *vs.* Clark, 3 Cal., 17.) The limitations, as well as the fundamental laws mentioned, provided that in making grants or distribution of land (such as are now known as Mexican grants)—

1st. It must be vacant land, and if occupied by Indians, then without prejudice to them.

2d. That such land as would be granted to the damage and injury of the Indians should be returned to the rightful owners.

The Mexican Government reserved from private grant all lands occupied and possessed by the Indians. Great care was taken to make strict reservation of such land, and by law no valid grant of land occupied or possessed by Indians could be made so as to dispossess them. When California was ceded to the United States the rights of property of its citizens remained unchanged. By the law of nations those rights were sacred and inviolable, and the obligations passed to the new government to protect and maintain them. The term property, as applied to lands, embraces all titles, legal or equitable, perfect or imperfect. (Teschemacher *vs.* Thompson, 18 Cal., 12.) The United States never had, and does not now possess, any power under or by virtue of said treaty whereby it could or can confer upon a citizen holding and claiming property granted by the Mexican Government other or different property rights than those conferred by such Government, and such as were possessed, enjoyed, and held by him while under the jurisdiction of such Government. It cannot abridge or enlarge the right to enjoy and to possess property held by virtue of Mexican law at the date of said treaty, nor can it deprive persons of any right to property which belonged to them at the date of said treaty.

A mere grant of land by the Mexican governor without compliance by the grantee with the further requisitions of the Mexican law forms but an inchoate title, and the land passed to the United States, which hold it subject to the trust imposed by the treaty and the equities of the grantee. *The execution of the trust is a political power.* (Lesse *vs.* Clark, 3 Cal., 17.)

By the fundamental laws of 1824, the regulation of 1828, and the regulation of the departmental legislature, one condition was that in making private grants of lands the lands granted must be vacant lands. Lands occupied by and in possession of Indians were not such vacant lands, for by the same laws and regulations it was provided that such grants must be without prejudice or damage to the Indians, and that such land granted to the damage and injury of the Indians should be returned to the rightful owners. (New Code, law 9, title 12, book 4.)

The Mexican authorities recognized the rights of Indians to hold, enjoy, and possess lands, and there are of record a number of grants made by the Mexican authorities to Indians. They not only had the right to receive grants of land under the Mexican laws, but also to convey the lands so granted. (United States *vs.* Sinnol, Hoffman's Reports, 110.)

It will be observed that at the date when private grants of land were made with some regard for law, the limitation and conditions required by law to be observed were inserted in such grants, viz: L. C., No. 342–6, S. D., 398; L. C., No. 254–219, S. D., 228–407; L. C., No. 740–372, N. D. 208; L. C., No. 326–359, N. D. 389; Hoffman's Report land cases, pp. 35 *et seq.*; surveyor-general's letter, dated San Francisco, March 14, 1883, and addressed to Mrs. Wm. S. Jackson.

The Indians and their descendants, who occupied and now occupy lands within the grants above named, as well as grants containing claims of a similar character, are in our opinion possessed and seized of the lands which were and have been and now are in their possession, and they can hold the same against persons claiming the same by virtue

AC0017354

of a United States patent, issued upon a confirmed Mexican grant. This leaves to be answered the following question: Can the Indians hold lands for which a United States patent has issued conditioned as set out in the first question, provided no conditions or limitations are contained or expressed in the grant? This is a question beset and surrounded by many difficulties, nor do we deem it necessary to do more than refer to restrictions and limitations contained in the laws of Mexico concerning private grants of lands upon which Indians were residing, lands which were occupied by them. It is certain that if such lands were granted by a Mexican official and the authorities omitted to recite the conditions and limitations required by law, and reserve from the operation of such grant such lands as the law conditioned could not be conveyed by such grant, such a grant would and could not take it out of the operation of the law. It could not defeat the rights of those whose rights attached by reason of law. If the officers of the Mexican Government to whom was confided the trust exceeded their authority as regulated by the solemnities and formalities of the law, the courts are bound to take notice of it and cannot shield those claiming under such title from the necessary consequence of ignorance, carelessness, or arbitrary assumption of power. (Lease & Vallejo *vs.* Clarke, 3 Cal., 17).

It is now necessary to inquire how far and to what extent will the issuance to the grantee of the United States patent change or modify this rule. We shall not discuss, as we do not deem it necessary, the decision of the United States Supreme Court that "a United States patent cannot be attached collaterally, but may be by a direct proceeding," as we did not regard these decisions as in any way affecting the question submitted and now before us.

In 1851, March 3, Congress passed an act entitled "An act to ascertain and settle the private land claims in the State of California." By said statute it was enacted "that it shall be the duty of the commission herein provided for to ascertain and report to the Secretary of the Interior the tenure by which the Mission lands are held, and those held by civilized Indians, and those who are engaged in agriculture or labor of any *kind*, and also those which are *occupied* and cultivated by Pueblos or Rancheros Indians. (U. S. Statutes at Large, vol. 9, p. 634, sec. 16, Little & Brown's ed.) We have no means of ascertaining whether such a report was made, or if made, its contents. We have no doubt the commission did their duty and complied with the law, and that their report will be found on file in the Department of the Interior. This report, if in our hands, would greatly aid us in reaching a correct conclusion. By the same act it is further provided that the patent of the United States issued to parties holding Mexican grants are conclusive between the United States and the said claimants only, and shall not affect the interest of that person. (*Ib.*, p. 634). If the report of the commission established the fact that the Indians were residing upon and occupying lands within the boundaries of claimed grants, which grants have no conditions or limitation inserted therein, that they claimed such lands by virtue of the laws of Mexico, this evidence, with such other evidence as we understand can be furnished, is in our opinion enough to establish under the law, as we regard it, a right in the Indians to hold and occupy such lands against the confirmee or patentee. If, however, no such report has been made, we are of the opinion if conclusive evidence can be furnished proving that these Indians were in possession of these lands at the time these grants were made by the Mexican authorities, that they continued in possession, and were in possession at the date of the treaty, and have since continued in possession, the law will entitle them to hold such land against all persons claiming under the patent.

We answer the second question propounded as follows :

By the fifth amendment to the Constitution of the United States it is provided : * * * "Nor shall private property be taken for public use without just compensation." Would the taking of lands belonging to citizens for the purpose of giving the same to Indians be such a public use as is contemplated by the Constitution? We are of the opinion it would not. (Walther *vs.* Warner, 25 Mo., 277 ; Board of Education *vs.* Hockman, 48 Mo., 243 ; Buffalo and New York Railroad Company *vs.* Brannan, 9 N. Y., 100 ; Bradley *vs.* New York, &c., Railroad Company, 21 Conn., 294 ; Fisher *vs.* Horicon Iron Work, &c., Company, 10 Wis., 354 ; New Orleans and Railroad Company *vs.* Railroad Company, 53 Ala., 211 ; Conn *vs.* Horrigan, 2 Allen, 159 ; Chambers *vs.* Sattuler, 40 Cal., 497 ; Railroad Company *vs.* City of Stockton, 41 Cal., 149 ; Channel Company *vs.* Railroad Company, 51 Cal., 269 ; Gilmer *vs.* Lime Point, 18 Cal., 229 ; Conn *vs.* Tewksbury, 11 Metcalf, 55 ; Manufacturing Company *vs.* Head, 56 N. H., 386 ; Olmstead *vs.* Camp, 33 Conn., 532 ; Buckman *vs.* Saratoga Railroad Company, 3 Paige Ch., 45 ; Memphis Freight Company *vs.* Memphis, 4 Cold., 419 ; Enfield Toll Bridge Company *vs.* Hartford Railroad Company, 17 Conn., 42.)

We are, very respectfully,

BRUNSON & WELLS,
*Attorneys at Law.*

ABBOT KINNEY, Esq., *Los Angeles, Cal.*

ACC0017355

# EXHIBIT B.

### SABOBA.

Saboba is the name of a village of Indians of the Serrano tribe, one hundred and fifty-seven in number, living in the San Jacinto Valley, at the base of the San Jacinto Mountains, in San Diego County. The village is within the boundaries of a Mexican grant, patented to the heirs of J. Estudillo, January 17, 1880. The greater part of the grant has been sold to a company which, in dividing up its lands, allotted the tract where the Saboba village lies to one M. R. Byrnes, of San Bernardino, who proposes to eject the Indians unless the United States Government will buy his whole tract of 700 acres at an exorbitant price. The Saboba village occupies about 200 acres, the best part of Mr. Byrnes's tract. The Indians have lived in the place for over a hundred years. They have adobe houses, fenced fields and orchards, and irrigating ditches. There is in the village a never-failing spring, with a flow of about 25 miner's inches. It is claimed by the Indians that the first surveys did not take in their village. This is probably true; the resurveying of grants and "floating" their lines so as to take in lands newly discovered to be of value, and leave out others discovered to be worthless, being a common practice in California. In a country where water is gold, such a spring as these Saboba Indians owned could not long escape notice or be left long in the undisturbed possession of Indians. These Indians support themselves now, and have always done so, by farming, and by going out in organized bands as sheep-shearers and vintagers. They are industrious and peaceable, and make in good seasons a fairly comfortable living. They formerly kept stock, but since the new occupancy, allotting and fencing of the valley, have been obliged to give it up. There is a Government school in this village, numbering from thirty to forty pupils, who have made remarkable progress in their studies. The school is taught by a Pennsylvania lady, formerly a teacher of the freedmen. Her gentleness and refinement have excited an influence all through the village, and her self-denying labors among the people in times of sickness and suffering have been the work of a missionary rather than of a teacher. The following letters were written by two of the children in this school, both under fourteen years of age. They were written without the teacher's knowledge or aid, and brought to her with the request that she would send them. The handwritings are clear and good:

*To the President of the United States:*

Mr. PRESIDENT—DEAR SIR: I wish to write a letter for you, and I will try to tell you some things. The white people call San Jacinto rancho their land, and I don't want them to do it. We think it is ours, for God gave it to us first. Now I think you will tell me what is right, for you have been so good to us, giving us a school and helping us. Will you not come to San Jacinto some time to see us, the school, and the people of Saboba village? Many of the people are sick, and some have died. We are so poor that we have not enough good food for the sick, and sometimes I am afraid that we are all going to die. Will you please tell what is good about our ranches, and come soon to see us.
Your friend,

RAMON CAVAVI.

Mrs. JACKSON:

MY DEAR FRIEND: I wish to write you a letter about the American people that want to drive us away from our own village of Saboba. I don't know what they can be about. I don't know why they do so. My teacher told me she was very sorry about the town, and then my teacher said, I think they will find a good place for you if you have to go; but I do hope they will not drive you away. Then it will be very good for all the people of Saboba. It is a very good town for the people. They have all the work done on their gardens, and they are very sorry about the work that is done. My work is very nicely done also. The people are making one big fence to keep the cows and the horses off their garden.
Your true friend,

ANTONIO LEON.

These Saboba Indians are greatly dispirited and disheartened at the prospect of being driven out of their homes, and feel that the Government ought to protect them. The captain of the village, a very sensible and clear-headed man, said, "If the Government says we must go, we must; but we would rather die right here than move." The right of these Indians to the tract they have so long occupied and cultivated is beyond question. That this right could be successfully maintained in the courts is the opinion of the law firm of Brunson & Wells, whose admirable paper covering all cases of this kind is given herewith. (See exhibit.)

We found 3 miles from this village on Government land a narrow canon called Indian Canon, in which half a dozen Indian families were living. The canon is but 5 or 6 miles long and very narrow; but it has a small, never-failing brook in it, and some good bottom land, on which the Indians had excellent wheat crops growing. The sides of it are moderately well wooded. It was surprising that so desirable a nook had been overlooked or omitted by the surveyors of the San Jacinto Ranch. We wrote to the Depart-

5690 M I——2

ACC0017356

ment immediately recommending its being set aside for Indians' use.  In another beautiful cañon, also with a never-failing stream running through it, we found living the old chief, Victoriano, nearly one hundred years old.  The spot was an oasis of green, oak and willow trees, a wheat field, and apricot orchard and vineyard, the latter planted by Victoriano's father.  This place has been given by Victoriano to his grandson, who we were told is taking steps to secure it to himself under the Indian homestead act.

## Exhibit C.

### THE CAHUILLA RESERVATION.

The Cahuilla Valley is about 40 miles from Saboba, high up among the peaks and spurs of the San Jacinto Mountains; a wild, barren, inaccessible spot.  The Cahuilla village, situated here, was one of the most interesting that we visited, and the Indians seemed a clear-headed, more individual and independent people than any other we saw. This is partly due to their native qualities, the tribe having been originally one of the most warlike and powerful in the country, as is indicated by their name, which signifies "master."  The isolation of this village has also tended to keep these Indians self-respecting and independent.  There is no white settlement within 10 miles, there being comparatively little to tempt white men into these mountain-fastnesses.  The population of the village numbers from one hundred and fifty to two hundred.  The houses are of adobe, thatched with reeds; three of the houses have shingled roofs, and one has the luxury of a floor.  These Indians make the greater part of their living by stock-raising.  They also send out a sheep-shearing band each year.  They have sixteen fields, large and small, under cultivation, and said they would have had many more except for the lack of plows, there being but one plow for the whole village.  They raise wheat, barley, corn, squashes, and watermelons.  Sometimes the frost kills the corn, and occasionally the grasshoppers descend on the valley, but aside from these accidents their crops do well.  All through the village were to be seen their curious outdoor granaries— huge baskets made of twisted and woven twigs and set up on poles.  The women were neatly dressed, the children especially so, and the faces of all, men, women, and children, had an animation and look of intellectual keenness very uncommon among the Southern California Indians.  On the outskirts of the village is a never-failing hot spring. In this water the Indians, old and young, are said to be continually bathing.  It was the Indians' impression that the lines of their reservation ran directly through the center of this hot spring.  They had been told so by some white men, but they know nothing certainly.  The lines had never been shown to them.  On subsequent examination at the surveyor-general's office in San Francisco we discovered that this spring and the village itself are entirely outside the reservation lines; also that another Indian settlement called Duasno, a few miles distant, and intended to have been included in the reservation, is outside the lines.  The Cahuilla Reservation stands recorded as containing 26 sections of land; so far as we could judge of the region, it seemed to us a generous estimate to say that there might be possibly 500 acres of cultivatable land in it.  In good years there would be considerable pasturage on the sides of the mountains; but far the greater part of the tract is absolutely worthless, being bare and stony mountains.  The Cahuillas, however, are satisfied with it.  They love the country and would not exchange it for fertile valleys below.  They said that they would be perfectly contented if the Government would only mark their land off for them, and set up boundaries so that they could know where they might keep their own stock and keep the white men's stock out. All they asked for in addition to this was some harnesses, wagons, and agricultural implements, especially plows.  Of these last the captain reiterated, and was not satisfied till he saw the figures written down, that ten was the smallest number that would be sufficient for the village.

A few rods from the hot spring there stood a good adobe house, shut up, unoccupied. The history of this house is worth telling, as an illustration of the sort of troubles to which Indians in these remote regions, unprotected by the Government, and unable to protect themselves, are exposed.  Some eight years ago the Cahuillas rented a tract of their land as pasture to two Mexicans named Machado.  These Machados, by permission of the Indians, built this adobe house, and lived in it when looking after their stock. At the expiration of the lease the house was to be the property of the Indians.  When the Machados left they said to the Cahuilla captain, "Here is your house."  The next year another man named Thomas rented a pasture tract from the Indians and also rented this house, paying for the use of it for two years six bulls, and putting into it a man named Cushman, who was his overseer.  At the end of the two years Thomas said to the

**19**

Cahuillas, "Here is your house; I now take my cattle away." But the man Cushman refused to move out of the house; said it was on railroad land which he had bought of the railroad company. In spite of the Indians' remonstrances he lived on there for three or four years. Finally he died. After his death his old employer, Thomas, who had once rented this very house from the Indians, came forward, claimed it as his own, and has now sold it to a man named Parks. Through all this time the Indians committed no violence on the trespassers. They journeyed to Los Angeles to find out from the railroad company whether Cushman owned the land as he said, and were told that he did not. They laid the matter before their agent, but he was unable to do anything about it. It would seem of the greatest importance in the case of this reservation, and of all others similarly placed, that the odd section claimed or owned by the railroad companies should be secured and added to the permanent reservation. Much further trouble will in this way be saved.

An incident which had occurred on the boundaries of the Cahuilla Reservation a few weeks before our arrival there is of importance as an illustration of the need of some legal protection for the Indians in Southern California. A Cahuilla Indian named Juan Diego had built for himself a house and cultivated a small patch of ground on a high mountain ledge a few miles north of the village. Here he lived alone with his wife and baby. He had been for some years what the Indians call a "locoed" Indian, being at times crazy; never dangerous, but yet certainly insane for longer or shorter periods. His condition was known to the agent, who told us that he had feared he would be obliged to shut Juan up if he did not get better. It was also well known throughout the neighboring country, as we found on repeated inquiry. Everybody knew that Juan Diego was 'locoed." (This expression comes from the effect a weed of that name has upon horses, making them wild and unmanageable.) Juan Diego had been off to find work at sheep-shearing. He came home at night riding a strange horse. His wife exclaimed, "Why, whose horse is that?" Juan looked at the horse, and replied confusedly, "Where is my horse, then?" The woman, much frightened, said, "You must take that horse right back; they will say you stole it." Juan replied that he would as soon as he had rested; threw himself down and fell asleep. From this sleep he was awakened by the barking of the dogs, and ran out of the house to see what it meant. The woman followed, and was the only witness of what then occurred. A white man, named Temple, the owner of the horse which Juan had ridden home, rode up, and on seeing Juan poured out a volley of oaths, leveled his gun and shot him dead. After Juan had fallen on the ground Temple rode closer and fired three more shots in the body, one in the forehead, one in the cheek, and one in the wrist, the woman looking on. He then took his horse, which was standing tied in front of the house, and rode away. The woman, with her baby on her back, ran to the Cahuilla village and told what had happened. This was in the night. At dawn the Indians went over to the place, brought the murdered man's body to the village, and buried it. The excitement was intense. The teacher, in giving us an account of the affair, said that for a few days she feared she would be obliged to close her school and leave the village. The murderer went to the nearest justice of the peace and gave himself up, saying that he had in self-defense shot an Indian. He swore that the Indian ran towards him with a knife. A jury of twelve men was summoned, who visited the spot, listened to Temple's story, pronounced him guiltless, and the judge so decided. The woman's testimony was not taken. It would have been worthless if it had been, so far as influencing that jury's minds was concerned. Her statement was positive that Juan had no knife, nor weapon of any kind; sprang up from his sleep and ran out hastily to see what had happened, and was shot almost as soon as he had crossed the threshold of the door. The district attorney in San Diego, on being informed by us of the facts in the case, reluctantly admitted that there would be no use whatever in bringing a white man to trial for murder of an Indian under such circumstances, with only Indian testimony to convict him. This was corroborated, and the general animus of public feeling vividly illustrated to us by a conversation we had later with one of the jurors in the case, a fine, open-hearted, manly young fellow, far superior in education and social standing to the average Southern California ranchman. He not only justified Temple's killing the Indian, but said he would have done the same thing himself. "I don't care whether the Indian had a knife or not," he said; "that didn't cut any figure at all the way I looked at it. Any man that'd take a horse of mine and ride him up that mountain trail I'd shoot him whenever I found him. Stockmen have just got to protect themselves in this country." The fact that Juan had left his own horse, a well-known one, in the corral from which he had taken Temple's; that he had ridden the straight trail to his own door, and left the horse tied in front of it, thus making it certain that he would be tracked and caught, weighed nothing in this young man's mind. The utmost concession that he would make was finally to say, "Well, I'll agree that Temple was to blame for firin' into him after he was dead. That was mean, I'll allow."

The account of our visit to the Cahuilla Reservation would be incomplete without a

ACC0017358

## 20

brief description of the school there. It numbers from forty to fifty scholars, and is taught by a widow who, with her little daughter ten years of age, lives in one small room built on at the end of the school-house. Part of the room is curtained off into a recess holding bed, washstand, and bureau. The rest of the room is a sitting-room, kitchen, store-room, and barely holds the cooking stove, table, and chairs. Here alone, with her little daughter, in a village of near two hundred Indians, 10 miles from any white man's home, this brave woman has lived more than a year, doing a work of which the hours spent in the school-room are the smallest part. The Indians come to her with every perplexity and trouble; call on her for nursing when they are ill; for food when they are destitute. If she would allow it her little room could always be crowded with women, and men also, eager to watch and learn. The Cahuillas have good brains, are keen, quick, and persevering. The progress that these children have made in the comparatively short time since their school was opened was far beyond that ordinarily made by white children in the same length of time. Children who two years ago did not know a letter, read intelligently in the second and third readers, spelled promptly and with remarkable accuracy, and wrote clear and legible hands, their copy-books being absolutely free from blots or erasures; some of the older pupils went creditably through a mental arithmetic examination, in which the questions were by no means easy to follow. They sang songs in fair tune and time and with great spirit, evidently enjoying this part of the exercises more than all the rest. We had carried to them a parcel of illustrated story books, very kindly contributed by some of the leading publishers in New York and Boston, and the expression of the rows of bright dark eyes as the teacher held up book after book was long to be remembered. The strain on the nervous system of teachers in such positions as this can hardly be estimated by ordinary standards. The absolute isolation, the ceaseless demand, the lack, not only of the comforts, but of many of the necessities of life, all mount up into a burden which it would seem no woman could long endure. Last winter there was a snow-storm in the Cahuilla Valley lasting two days and nights. A fierce wind drove the dry snow in at every crevice of the poorly-built adobe house, like sand in a sand-storm. The first day of the storm the school had to be closed early in the day, as the snow fell so fast on books and slates nothing could be done. The last night of the storm the teacher and her little girl spent the entire night in shoveling snow out of the room. They would pile it in a blanket, open the door, empty the blanket, and then resume shoveling. They worked hard all night to keep pace with the storm. When the snowing stopped the school-room was drifted full and for many days after was wet and damp. It would seem as if the school term in such places as this ought not to be over eight months in the year. The salaries, however, should not be reduced, for they are barely living salaries now, every necessary of life being procured at a great disadvantage in these wild regions. One of these teachers told us she had been obliged to give an Indian $1 to ride to the nearest store and bring her one dollar's worth of sugar. It was the opinion of the Cahuilla teacher (a teacher of experience at the East before her marriage) that the Indians would accomplish more in eight months than in the nine. The strain upon them also is too great—of the unwonted confinement and continuous brain work. Should this change be made the vacation should be so arranged as to be taken at the sheep-shearing season, at which times all the schools are much broken up by the absence of the elder boys.

•
———

## Exhibit D.

### THE WARNER'S RANCH INDIANS.

The tract known as Warner's Ranch lies in the northern part of San Diego County, about 40 miles from the Cahuilla Valley. It contains two grants, the San José del Valle and the Valle de San José; the first containing between 26,000 and 27,000 acres, confirmed to J. J. Warner, patented January 16, 1880; the second, containing between 17,000 and 18,000 acres, confirmed to one Portilla, patented January 10, 1880. The whole property is now in the possession of Governor Downey, of Los Angeles. There are said to be several conflicting claims yet unsettled. The ranch is now used as a sheep and stock ranch, and is of great value. It is a beautiful region, well watered and wooded. There are within its boundaries five Indian villages, of San Luisenos and Diegmons: Aqua Caliente, Puerta de la Cruz, Puerta de San José, San José, and Mataguay. The last four are very small, but Aqua Caliente has long been the most flourishing and influential village in the country. It was formerly set apart as a reservation, but the executive order was canceled January 17, 1880, immediately after the patenting of the San José del Valle ranch, within the boundaries of which it was then claimed that the village lay, although to the best information we could get the first three surveys of that ranch did not

ACC0017359

take the village in. The aged captain of the Aqua Caliente Indians still preserves a paper giving a memorandum of the setting off of this reservation of about 1,120 acres for this people. It was by executive order, 1875. He also treasures several other equally worthless papers—a certificate from a San Diego judge that the Indians are entitled to their lands; a memorandum of a promise from General Kearney, who assured them that in consideration of their friendliness and assistance to him they should retain their homes without molestation, "although the whole State should fill with white men." It is not to be wondered at that these Aqua Caliente Indians find it difficult to-day to put any faith in white men's promises.

It will be seen from the above brief statement of the situation that they have an exceedingly strong claim on the Government for protection in their right to their lands. Since the restoration of their village and fields "to the public domain," the patenting of the ranches and their sale to Governor Downey, the Indians have been in constant anxiety and terror. Governor Downey has been considerate and humane in his course toward them, and toward all the Indians on his estate. And his superintendent also is friendly in his treatment of them, permitting them all the liberty he can consistently with his duty to the ranch. He finds their labor invaluable at sheep-shearing time, and is able throughout the year to give them occasional employment. But the Indians know very well that according to the usual course of things in San Diego County they are liable any day to be ejected by process of law; and it is astonishing that under the circumstances they have so persevered in their industries of one sort and another. They have a good number of fields under cultivation. They also make saddle mats and hats out of fibrous plants; the women make baskets and lace. It is said to be the most industrious village in the county; the old captain dealing severely with any Indian found idle. They have also a small revenue from the hot springs, from which the village takes its name. These bubble up in a succession of curious stone basins in the heart of the village. They are much resorted to in summer by rheumatic and other patients, who rent the Indians' little adobe houses and pay them a small tax for the use of the waters. The Indians themselves at these times move into bush huts in a valley or cañon some two miles above the village, where their chief cultivated fields lie. They were very earnest to know from us if we would advise their planting more of this ground. They said they would have planted it all except that they were afraid of being driven away. This upper valley and these planting fields were said to be on Government land; but on examination of the surveyor's plats in the Los Angeles land office, we could find no field notes to indicate their location. These Indians have in use another valley called Lost Valley, some fifteen miles from their village high up in the mountains, and reached only by one very steep trail. Here they keep their stock, being no longer able to pasture it below. They were touchingly anxious to have us write down the numbers of cattle, horses, sheep each man had and report to Washington that the President might see how they were all trying to work. There are probably from one hundred and twenty-five to one hundred and fifty head of cattle owned in the village, about fifty horses, and one hundred sheep.

There is here a Government school, taught by a young German lady of excellent education and much enthusiasm in her work. At great cost and risk she has carried her piano up into these wilds, and finds it an invaluable assistance in training and influencing her pupils. It was a scene not to be forgotten, when after their exercises in reading arithmetic, &c., in all of which they showed a really wonderful proficiency, the children crowded into the teacher's little room and sang their songs to the piano accompaniment, played by her with spirit and feeling. "My country, 'tis of thee, sweet land of liberty," was the song they seemed to like best; all unaware how little applicable to their own situation were its strains of exultant joy and freedom. In this one tiny room adjoining the school-room this young lady lives, sleeps, prepares her own food, frequently having a "cooking class" of Indian women, whom she is teaching to make soups, bread, &c., and to do fine washing. It is impossible to put too much appreciative sympathy on these women teachers in Indian schools in Southern California. Their situation and their work are unique in isolation and difficulty.

The other Indian villages on Warner's ranch do not demand separate description, consisting of not more than half a dozen houses each and numbering only from fifteen to thirty Indians. Each village, however, has its own captain, and its cultivated fields, orchards, &c., to which the Indians are profoundly attached, and from which it would be very hard to induce them to move, spite of their poverty, and the difficulty of making a living, as they are now placed.

During our stay at Warner's ranch, the captain of the San José village had an experience which will illustrate the helplessness of these Indian farmers in Southern California. He had on a piece of Government land, a short distance from his village, a fenced wheat field of some fifty acres; it was his chief dependence for his year's support. Going away one day, he left his aged father in charge at home; the old man wandered away,

ACC0017360

22

and during his absence one of the roving sheep herders, of whom the country is full, broke down the fence, turned in his flock, and when Domingo came home at night the whole field was eaten close to the ground. Hearing of our being at the superintendent's house Domingo came over to ask if we could help him in the matter. The quiet, matter-of-course way in which he told the story was more impressive than any loudness of complaint would have been. He said very simply, "What can I do for food this winter?" Mr. Kinney rode over to the village, saw the field, and after some trouble found the herder, who, much frightened, said he did it by his master's orders. This master, an Italian, lived some 20 miles away, the nearest justice of the peace, 16 miles. On seeing the justice we found that nothing could be done in the way of securing damages from the sheep owner, until two white men, residents of the county should inspect the premises and estimate the damages. Domingo rode 16 miles in the night in a fierce storm of sleet and rain, with letters from us to white men on the ranch, asking them to do this. He was back again at daylight with a note from one of them, saying that he could not induce a man to go with him. Finally, the justice, at our request, hired two men at days' wages to go and inspect the Indian's field. They estimated the damages at about one-tenth of the real amount, and thus we were obliged to leave the matter. We afterwards received a letter from the Italian stating that he had settled with Domingo, but not mentioning the sum paid. It was plain that except for our taking hold of the affair the Indian would never have recovered a cent. This is by no means an exceptional instance.

----

## Exhibit E.

### THE SAN YSIDRO INDIANS.

In the San Ysidro Cañon, about 8 miles from Warner's ranch, has been living from time immemorial a band of San Luiseno Indians, numbering from fifty to seventy-five, and called by the name of their canon. We first saw the captain of these Indians in Los Angeles, in the office of the United States court commissioner, Mr. H. T. Lee, of whose kindness and humane sympathy in dealing with all Indian matters which come under his notice it is not out of place here to make grateful mention. This Captain Pablo, with two of his headmen, had walked a three days' journey to Los Angeles to see if he could get any help in the matter of lands which had been wrested from his people. His story was a pitiful one. Some six years ago a white man named Chatham Helm had come in at the head of their canon, three miles above the site of their village, taken up a homestead claim there, cutting off the greater part of their water supply and taking some of their cultivated fields, and leaving them restricted room for their stock. Since that time they had been growing poorer and poorer, but had managed to live by cultivating lands below the village near the mouth of the canon, where there was anothe small stream. But now a new squatter had appeared below them and filed on all the remaining lands, including the site of the village itself. The man Helm, above them, had patented his lands, built a good house, and was keeping considerable stock. The Indians could have no water except what he permitted to come down the canon. Three years ago one of their number had been shot dead by Helm who was set free on the usual plea of self defense. Since then the Indians had been in continual terror. The new squatter had threatened them with the same fate if they came near his inclosures. Between these two squatters the Indian village was completely hemmed in and cut off and starvation stared them in the face. In fact, in the course of the last winter one little girl had actually died for want of food. Their countenances corroborated the tale. They were gaunt with hunger and full of despair. It would exceed the limits of this paper to give a full report of the interview with these Indians. It will not soon be forgotten by any one taking part in it—the solemn tones in which the Indians replied to the interpreter's questions, the intent and imploring gaze with which they studied all our faces and listened to all the words unintelligible to them in which we spoke with one another.

It was finally decided to forward to the Interior Department the affidavits of these Indians, setting forth the manner in which they had been robbed of their lands, and requesting that Cloos's entry be held for cancellation, and that Helm's patent be reopened. It was found, on looking the matter up in Washington, that several years ago this cañon had been withdrawn from market with a view to having it set off as a reservation for the Indians living in it, but the matter had slipped everybody's mind. On visiting the San Ysidro Cañon ourselves a few weeks later, we found that Cloos, taking time by the forelock, had sold out his homestead claim, his house, and what he was pleased to

ACC0017361

call his "improvements," for $600 to a poor old widow, Mrs. Pamela Hagar by name. We found Mrs. Hagar, with her son, on the ground, preparing to go into the bee business. She appeared very little surprised at hearing that the claim she had bought was a questionable one, remarking : "Well, I mistrusted something was wrong ; Cloos seemed in such a hurry to get his money." This woman appeared nearly as helpless as the Indians themselves. The deed she had taken from Cloos was not acknowledged ; she had not got it recorded ; her name was misspelled in it ; and the enumeration of the sections, &c., in it did not agree with the list in the land office certificate. She begged us to ask the Government to refund to her the sum she had paid to Cloos, and signed by her mark a paper saying she would accept it. It is a small sum, and as the poor old woman made the transaction in good faith, knowing nothing about the Indians' presence on the place, it would seem not unreasonable that she should be paid. The next morning Cloos himself appeared on the scene, very angry and resentful. He said he had "a perfect right to file on that land"; that "Indians were not citizens" and "had no right to public lands," and that "the stockmen of San Diego County were not going to stand the Indians' killing their stock much longer"; that "the Government ought to put the Indians all together somewhere and take care of them," and that "there'd be a big fight with Indians in San Diego County before long, we might rest assured of that"; and much more of the same sort, which would not be worth repeating, except that it is a good illustration of the animus of the greater portion of Southern California ranchmen towards Indians. A few days after this we were gladdened by the news from Washington that Cloos's filing was held for cancellation, and that the Attorney-General had ordered proceedings to be begun in San Francisco for the vacating of Chatham Helm's patent. A few instances of such promptitude as this would change the whole status of the South California Indians, giving courage to them, and, what is still more important, making it clear to the perception of white men that the Indians' rights are no longer to be disregarded as they have been.

---

## Exhibit F.

### THE LOS COYOTES.

Five miles up from the head of the San Ysidro Cañon, to be reached only by a steep and narrow trail, lies a small valley on the desert side of the mountains. It is little more than a pocket on a ledge. From its rim one looks down directly into the desert. Few white men have ever penetrated to it, and the Indians occupying it have been hitherto safe, by reason of the poverty and inaccessibility of their home. No agent has ever visited them ; they have supported themselves by keeping stock and cultivating their few acres of land. There are not more than 80 acres all told in the valley. About three weeks before our arrival at Warner's ranch a man named Jim Fane, a comrade of Helm, who had usurped the San Ysidro Canon, having, no doubt, learned through Helm of the existence of the Los Coyotes Valley, appeared in the village and offered the Indians $200 for their place. They refused to sell, upon which he told them that he had filed on the land, should stay in any event, and proceeded to cut down trees and build a corral. It seems a marvelous forbearance on the part of a community numbering twenty-six able-bodied men and twenty-one women not to take any forcible measures to repel such an intruder as this. But the South California Indians have learned by long experience that in any contest with white men they are sure to be found in the wrong. Not an Indian laid violent hands on Fane. He seems to have gone about as safely in the heart of this Indian village, which he was avowedly making ready to steal, as if he had been in an empty wilderness. Mr. Kinney found him there, hard at work, his belt full of cartridges and pistols. He was a rough fellow, at first disposed to be defiant and blustering, but on being informed of the Department's action in the case of Cloos's filing, he took a milder tone, and signed a paper saying that he would take $75 for his "improvements." Later in the day, after consulting with his friend Helm, he withdrew the paper and announced his determination to stay in the valley. On inquiry at the land office at Los Angeles we found that his filing had been returned to him for correction of errors. We were therefore in time to secure the stopping of all further proceedings on his part through the land office. Nothing, however, but authorized and authoritative action on the part of the agent representing the Interior Department will stop his proceedings on the ground. Just before leaving California we received an urgent letter from the Los Coyotes' captain, saying that Fane was still there—still cutting down their trees and building corrals.

The Indians of this band are robust, active, and finely made, more nearly in the native health and strength of the race than any other band in the country. The large

ACC0017362

24

proportion of children also bore testimony to their healthful condition, there being thirty-five children to twenty-one women and twenty-six men. The captain had the lists of his people kept by three lines of notches on a stick, a new notch being made for each birth and crossed out for each death. They could count only up to five. Everything beyond that was "many." Their houses were good, built of hewn pine timber with thatched roofs made from some tough fibrous plant, probably the yucca. Each house had a thatched bower in front of it and stood in a fenced inclosure. These Indians raise beans, pumpkins, wheat, barley, and corn. They have twenty-five head of cattle and more horses. They say they have lived in this valley always and never desire to leave it. The only things they asked for were a harness, chain, coulter, and five plows. They have now one plow.

This village is one of the best illustrations of our remarks on the need of itinerary labor among the Mission Indians. Here is a village of eighty-four souls living in a mountain fastness which they so love they would rather die than leave it, but where the ordinary agencies and influences of civilization will never reach, no matter how thickly settled the regions below may come. A fervent religious and practical teacher spending a few weeks each year among these Indians might sow seed that would never cease growing during the intervals of his absence.

----

## Exhibit G.

### THE SANTA YSABEL RANCH.

The Santa Ysabel ranch is adjoining to Warner's ranch. It is a well wooded, well watered, beautiful country, much broken by steep and stony mountains. The original grant of this ranch was confirmed March 17, 1858, to one Jose Ortego and the heirs of Edward Stokes. The patent was issued May 14, 1872. It is now owned by a Captain Wilco c, who has thus far not only left undisturbed the Indian village within the b oundaries of his estate, but has endeavored to protect the Indians by allowing to the ranch lessee a rebate of $200 yearly on the rent on account of the Indians' occupancy. There is in the original grant of this ranch the following clause: "The grantees will leave free and undisturbed the agricultural lands which the Indians of San Diego are actually occupying."

We found on arriving at the Santa Ysabel village that an intelligent young Indian living there had recently been elected as general over the Dieguino Indians in the neighborhood. He showed to us his papers and begged us to wait till he could have all his captains gathered to meet us. Eight villages he reported as being under his control, Santa Ysabel, Mesa Grande, Mesa Chiquita, San Jose, Mataguay, La Puerta, Laguna, and Anaha. He was full of interest and inquiry and enthusiasm about his people. "I want know American way," he said in his broken English. "I want make all my people like American people. How I find out American laws? When white men lose cow, lose pig, they come here with pistol and say we must find or give up man that stole. How we know? Is that American law? We all alone out here. We got nobody show us. Heap things I want ask about. I make all my people work. We can't work like American people ; we ain't got work with; we ain't got wagon, harness ; three old broked plows for all these people. What we want, some man right here to go to. While you here white man very good; when you go away trouble same as before."

There are one hundred and seventy-one Indians in this village. They are very poor. Many of their houses are of tule or brush, their clothes were scanty and ragged, some of the older men wearing but a single garment. That they had not been idle their big wheat field proved; between three and four hundred acres fenced and the wheat well up. "How do you divide the crops?" we asked. "Every man knows his own piece," was the reply. They sell all of this wheat that they can spare to a storekeeper some three miles away. Having no wagon they draw the wheat there on a sort of sledge or wood triangle, about four feet long, with slats across it. A rope is tied to the apex of this, then fastened to the horn of a saddle on a horse ridden by a man, who steers the sledge as best he may. The Indians brought this sledge to show us, to prove how sorely they needed wagons. They also made the women bring out all the children and arrange them in rows, to show that they had enough for a school, repeating over and over that they had many more, but they were all out digging wild roots and vegetables. "If there was not great many them, my people die hungry," said the general; "them most what we got eat." It is a sore grievance to these Santa Ysabel Indians that the Aqua Caliente Indians, only twenty miles away, have received from the Government a school, plows, wagons, &c., while nothing whatever has been done for them. "Them Aqua Caliente Indians got everything," said the general; "got hot springs too; make money on them hot springs; my people got no chance make money."

ACC0017363

On the second day of our stay in this region we saw four of the young general's captains, those of Puerta San Felipe, San José, Anaha, and Laguna. In Puerta San Felipe are sixty-four people. This village is on a confirmed grant, the "Valle de San Felipe," confirmed to Felipe Castillo. The ranch is now leased to a Frenchman, who is taking away the water from the Indian village, and tells the captain that the whole village belongs to him, and that if anybody so much as hunts a rabbit on the place he will put him in prison. These people are in great destitution and trouble, being deprived of most of their previous means of support. The Anaha captain reported fifty-three people in his village. White men had come in and fenced up land on both sides of him. "When he plants his wheat and grain the white men run their hogs into the fields"; and "when the white men find anything dead they come to him to make him tell everything about it, and he has not got anything to tell." The San José captain had a similar story. The Laguna captain was a tall, swarthy, well-to-do-looking Indian, so unlike all the rest that we wondered what there could have been in his life to produce such a difference. He said nobody troubled him. He had good land, plenty of water, raised grain and vegetables, everything he wanted except watermelons. His village contained eleven persons; was to be reached only by a steep trail, the last four miles. We expressed our pleasure at finding one Indian captain and village that were in no trouble and wanted for nothing. He smiled mysteriously, as we afterward recalled, and reiterated that nobody troubled him. The mystery was explained later, when we discovered accidentally in San Diego that this Laguna village had not escaped, as we supposed, the inroads of white men, and that the only reason that the Laguna Indians were not in trouble was that they had peaceably surrendered half their lands to a white man, who was living amicably among them under a sort of contract or lease.

## Exhibit H.

### MESA GRANDE.

Mesa Grande lies high up above the Santa Ysabel village and 15 miles west of it. The tract adjoins the Santa Ysabel ranch, and is, as its name indicates, a large table land. There was set off here in 1876 a large reservation, intended to include the Mesa Grande Indian village, and also a smaller one of Mesa Chilquita; but, as usual, the villages were outside of the lines, and the lands reserved were chiefly worthless. One of the settlers in the neighborhood told us he would not take the whole reservation as a gift and pay the taxes on it. The situation of the Indians here is exceedingly unfortunate and growing more and more so daily. The good Mesa Grande lands, which they once owned and occupied, and which should have been secured to them, have been fast taken up by whites, the Indians driven off, and, as the young general said, "all bunched up till they haven't got any room." Both the Mesa Chilquita and Mesa Grande plateaus are now well under cultivation by whites, who have good houses and large tracts fenced in.

They have built a good school-house, which we chanced to pass at the hour of recess, and noting Indian faces among the children, stopped to inquire about them. There were, out of twenty-seven scholars, fifteen Indians or half-breeds, some of them, the children of Indians who had taken up homesteads. We asked the teacher what was the relative brightness of the Indian and white children. Supposing that we shared the usual prejudice against Indians, the teacher answered in a judiciously deprecating tone, "Well, really there isn't so much difference between them as you would suppose." "In favor of which race?" we asked. Thus suddenly enlightened as to our animus in the matter, the teacher changed his tone, and said he found the Indian children full as bright as the whites; in fact, the brightest scholar he had was a half-breed girl.

On the census list taken of Indians in 1880 Mesa Grande and Mesa Chilquita are reported as having, the first, one hundred and three Indians, the second, twenty-three. There are probably not so many now, the Mesa Chilquita tract being almost wholly in possession of the whites. The Mesa Grande village has a beautiful site on a small stream, in a sort of hill basin, surrounded by higher hills. The houses are chiefly adobe, and there is on one of the slopes a neat little adobe chapel, with a shingled roof nearly done, of which the Indians were very proud. There were many fields of grain and a few fruit orchards. The women gathered around our carriage in eager groups, insisting on shaking hands, and holding up their little children to shake hands also. They have but once seen an agent of the Government, and any evidence of real interest in them and their welfare touches them deeply.

ACC0017364

## 26

The condition of the Indians in this district is too full of complications and troubles to be written out here in detail. A verbatim copy of a few of our notes taken on the spot will give a good picture of the situation.

Chrysanto, an Indian, put off his farm two months ago by white man named Jim Angel, with certificate of homestead from Los Angeles land office. Antonio Douro, another, put off in same way from his farm near school-house. He had built good wooden house; the white man took that and half his land. He was plowing when the white man came and said "get out! I have bought this land." They have been to the agent. They have been ten times, till they are tired to go. Another American named Hardy ran an Indian off his farm, built a house on it, then he sold it to Johnson and Johnson took a little more land and Johnson sold it to Stone, and he took still more. They used to be well fixed, had plenty of stock, and hundreds of horses. Now they are all penned up, and have had to pay such fines they have got poor. Whites take their horses and cattle and corral them and make them pay 25 cents, 50 cents to get them out. "Is that American law?" they asked: "and if it is law for Indians' horses is it not same for white men's horses?" But one Indian shut up some of the white men's horses that came on his land, and the constable came and took them all away and made the Indian pay money. The Americans so thick now they want all the Indians away, so to make them go they keep accusing them of stealing.

This is a small tithe of what we were told. It was pitiful to see the hope die out of the Indians' faces as they laid grievance after grievance before us, and we were obliged to tell them we could do nothing, except to "tell the Government." On our way back to Santa Ysabel we were waylaid by several Indians, some of them very aged, each with the same story of having been driven off or being in imminent danger of being driven off his lands.

On the following day we had a long interview with one of the white settlers of Mesa Grande, and learned some particulars as to a combination into which the Mesa Grande whites had entered to protect themselves against cattle and horse thieves. The young Indian general was present at this interview. His boots were toeless; he wore an old gingham shirt and ragged waistcoat, but his bearing was full of dignity. According to the white man's story, this combination was not a vigilance committee at all. It was called "The Protective League of Mesa Grande," and had no special reference to Indians in any way. According to the Indian general's story it was a vigilance committee, and all the Indians knew very well that their lives were in danger from it. The white man protested against this and reiterated his former statements. To our inquiry why, if the league were for the mutual protection of all cattle owners in the region, the captains of the Indian villages were not invited to join it, he replied that he himself would have been in favor of that, but that to the average white settler in the region such a suggestion would be like a red rag to a bull. That he himself, however, was a warm friend to the Indians. "How long you been friend to Indians?" asked the boy-general with quiet sarcasm. We afterwards learned by inquiry of one of the most influential citizens of a neighboring town, that this protective league was in fact nothing more or less than a vigilance committee, and that it meant short shrift to Indians; but being betrayed by one of its members it had come to an untimely end, to the great relief of all law-abiding people in the vicinity. He also added that the greater part of the cattle and horse stealing in the region was done by Mexicans and whites, not by Indians.

Whether it is possible for the Government to put these Mesa Grande Indians into a position to protect themselves, and have anything like a fair chance to make their living in their present situation, is a question; but that it ought to be done, if possible, is beyond question. It is grievous to think that this fine tract of land so long owned and occupied by these Indians, and in good faith intended by the Government to be set aside for their use, has thus passed into other hands. Even if the reservation tract, some three hundred acres, has been by fraudulent representations restored to the public domain, and now occupied by a man named Clelland, who has taken steps to patent it, the tract by proper investigation and action could probably be reclaimed for the Indians' use.

---

## EXHIBIT I.

### CAPITAN GRANDE.

Capitan Grande is the name of the cañon through which the San Diego River comes down from the Cuyumaca Mountains, where it takes its rise. The canon is thirty-five miles from the city of San Diego; is fifteen miles long, and has narrow bottom lands along the river, in some places widening out into good meadows. It is in parts beautifully wooded and full of luxuriant growths of shrubs and vines and flowering plants. In 1853 a band of Dieguino Indians were, by the order of Lieutenant Magruder, moved from San Diego to this cañon (see paper No. 1, appended hereto). These Indians have continued ever since to live there, although latterly they have been so much pressed upon by white settlers that their numbers have been reduced. A large reservation, showing on the

ACC0017365

record nineteen full sections, was set off here, in 1876, for these Indians. It is nearly all on the bare sides of the mountain walls of the cañon. As usual, the village site was not taken in by the lines. Therefore white settlers have come in and the Indians been driven away. We were informed that a petition was in circulation for the restoration to the public domain of a part of this reservation. We could not succeed in finding a copy of this petition; but it goes without saying that any such petition means the taking away from the Indians the few remaining bits of good land in their possession. There are now only about sixty Indians left in this cañon. Sixteen years ago there were from one hundred and fifty to two hundred—a flourishing community with large herds of cattle and horses and good cultivated fields. It is not too late for the Government to reclaim the greater part of this cañon for its rightful owners' use. The appended affidavits, which we forwarded to Washington, will show the grounds on which we earnestly recommended such a course.

### PAPER No. 1.

Copy of Colonel Magruder's order locating the Indians in Capitan Grande.

MISSION SAN DIEGO, *February* 1, 1883.

Permission is hereby given to Patricio and Leandro, alcalde and captain, to cultivate and live at the place called Capitan Grande, about four leagues to the south and east of Santa Ysabel, as it is with extreme difficulty that these Indians can gain a subsistence on the lands near the mission in consequence of the want of sufficient water for irrigation. It is understood that this spot, called, as above, Capitan Grande, is a part of the public domain. All persons are hereby warned against disturbing or interfering with the said Indians, or their people, in the occupation or cultivation of said lands. Any complaints in reference to said cultivation or to the right of occupancy must be laid before the commanding officer of this post, in the absence of the Indian agent for this part of the country.

(Signed by Colonel Magruder.)

### PAPER No. 2.

Copy of affidavit of the captain of Capitan Grande Indians and one of his head men.

STATE OF CALIFORNIA,
 *County of San Diego :*

In the application of Daniel C. Isham, James Meade, Mary A. Taylor, and Charles Hensley.

Ignacio Curo and Marcellino, being duly sworn by me through an interpreter, and the words being interpreted to each and every one of them, each for himself deposes and says:

"I am an Indian belonging to that portion of the Dieguino Indians under the captainship of Ignacio Curo, and residing in the rancheria of Capitan Grande, being also a part and portion of the Indian people known as Mission Indians; our said rancheria was located at Capitan Grande, where we all now reside in A. D. 1853, by an order issued by Colonel Magruder, of the United States Army, located at the post of San Diego on February 1 of said year, 1853. That since that time we and our families have resided on and possessed said lands. That said lands are included in township 14 south, range 2 east, of San Bernardino meridian in San Diego County, State of California.

That affiants are informed and believe that Daniel C. Isham, James Meade, Mary A. Taylor, and Charles Hensley have each of them filed in the land office of Los Angeles their application for preemption or homestead of lands included in the lands heretofore possessed by affiants, and now occupied by the rancheria of affiants as a home for themselves and families. That said affiants and their tribe have constantly occupied and partly cultivated the land so claimed by said Isham, Meade, Taylor, and Hensley since the year 1853. That they nor their tribe have ever signed any writing yielding possession or abandoning their rights to said lands; but that said parties heretofore mentioned are attempting by deceit, fraud, and violence to obtain said lands from affiants and the Government of the United States. Affiants therefore pray that the land officers of the United States Government will protect them in their right and stay all proceedings on the part of said claimants until the matter is thoroughly investigated and the rights of the respective parties adjudicated.

           IGNACIO CURO, his + mark.
           MARCELLINO, his + mark.

Witness: M. A. LUCE.

### PAPER No. 3.

Copy of affidavit of Anthony D. Ubach, in regard to Capitan Grande Indians, and in the matter of the application of Daniel Isham, James Meade, Mary A. Taylor, and Charles Hensley.

Anthony D. Ubach, being first duly sworn, on oath deposes and says: I am now, and have been continuously for the last seventeen years, Catholic pastor at San Diego, and have frequently made official visitations to the various Indian villages or rancherias in said county; that I have frequently during said time visited the Capitan Grande Rancheria, on the San Diego River, in said county of San Diego; that when I first visited said rancheria, some seventeen years ago, the Indians belonging to the rancheria cultivated the valley below the falls on the San Diego River and herded and kept their stock as far up as said falls; that I know the place now occupied and claimed by the above-named applicants and each of them, and also the place occupied and claimed by Dr. D. W. Strong; that from the time I first visited said rancheria until the lands were occupied by the aforesaid white men said lands were occupied, cultivated, and used by the Indians of Capitan Grande Rancheria as a part of their rancheria; that upon one occasion I acted as interpreter for Capitan Ignacio Curo in a negotiation between said Capitan Ignacio and D. W. Strong, and that said Strong at that time rented from said Ignacio a portion of the rancheria lands for bee pasture; I also know that Capt. A. P. Knowles and A. S. Grant also rented the lands from the Indians of the rancheria when they first located there.

           ANTHONY D. UBACH.

SAN DIEGO, *State of California.*

ACC0017366

## 28

Copy of the deposition of J. S. Manasse in the matter of the Capitan Grande Indians and the application of Daniel Isham, James Meade, Mary A. Taylor, and Charles Hensley.

STATE OF CALIFORNIA,
*San Diego County:*

J. S. Manasse, being first duly sworn, on oath deposes and says: I am now, and have been continuously since the year 1853, a resident of said county of San Diego; that I have known these certain premises on the San Diego River, said county, known as the Capitan Grande Rancheria, since the year 1856; that at that time and for many years thereafter the Indians belonging to said Capitan Grande Rancheria occupied and cultivated their fields as far up as the falls on the San Diego River; that the premises now occupied by the above-named applicants were so occupied and cultivated by the Indians belonging to said rancheria during the time aforesaid; I know that about one year ago Capt. A. P. Knowles paid rent to Ignacio Curo for a portion of the land now claimed by the above-named applicant, Charles Hensley; also that when I first knew of the rancheria and for many years thereafter the Indians of that rancheria owned and kept there a considerable number of cattle, horses, and sheep.

J. S. MANASSE.

The lands above referred to as claimed by Dr. D. W. Strong were patented by him September 15, 1882. They include all the lands formerly cultivated by the Indians and used for stock pasturage at the head of the cañon. When, at the expiration of his first year's lease of the tract for bee pasturage, the Indians asked if he wished to renew the lease he informed them that he should stay and file on the land. His lines are as follows: N. E. ¼ of N. E. ¼, S. ½ of N. E. ¼, and N. W. ¼ of S. E. ¼, Sec. 2, T. 14 S., R. 2 E., S. B. M., Home. No. 969.

Charles Hensley's homestead entry is as follows: No. 986, March 29, 1882. S. ½ of N. W. ¼ and W. ½ of S. W. ¼, Sec. 22, T. 14 S., R. 2 E., S. B. M. This is on the original site of the Indian village, and Hensley is living in Capitan Ignacio Curo's house, for which, after being informed that he had to leave it at any rate and might as well get a little money for it, Ignacio took a small sum of money.

James Meade's entry, which included Mary Taylor's interest, is as follows: No. 987, March 29, 1882. N. ½ of N. W. ¼ and N. ½ of N. E. ¼, Sec. 22, T. 14 S., R. 2 E., S. B. M. Captain Knowles's lines we did not ascertain. He claims and in one way or another occupies several tracts in the cañon.

---

## EXHIBIT J.

### THE SEQUAN INDIANS.

The Sequa Indians are a small band of Dieguino Indians living in a rift of the hills on one side of the Sweetwater Canon, about twenty miles from San Diego. There are less than fifty of them all told. They are badly off, having for the last ten years been more and more encroached on by white settlers, until now they can keep no cattle, and have little cultivable land left. There is a small reservation of one section set off for them, but the lines were never pointed out to them, and they said to us they did not know whether it were true that they had a reservation or not. They had heard also that there was an agent for the Indians, but they did not know whether that were true or not. As nearly as we could determine, this village is within the reservation lines; and if it is, some of the fields which have been recently taken away from the Indians by the whites must be also. They had the usual bundle of tattered "papers" to show, some of which were so old they were hardly legible. One of them was a certificate from a justice of the peace in San Diego, setting forth that this justice, by virtue of power in him vested by the California State law, did

permit hereby all these Indians to occupy peaceably and without disturbance all the certain land and premises heretofore occupied and held by these Indians aforesaid, including all their right and title to all other necessary privileges thereto belonging, mainly the water necessary for the irrigation of their lands.

These Indians are much dispirited and demoralized, and wretchedly poor. Probably the best thing for them would be, in case the Capitan Grande Cañon is cleared of whites and assured to the Indians, to remove there and join the Capitan Grande band.

---

## EXHIBIT K.

### THE CONEJOS.

The Conejos are of the Dieguino tribe. Their village is said to be partly on the Capitan Grande Reservation. One man familiar with the region told us that the reservation line ran through the center of the Conejos village. The village is reached only by a nine-

ACC0007367

miles horseback trail, and we did not visit it. The captain came to San Diego to see us, and we also learned many particulars of the village from an intelligent ranchwoman who has spent eleven summers in its vicinity. There are thirty-two men, twenty-six women, and twenty-two children in the band. They have good fields of wheat, and raise corn, squashes, and beans; yet there is not a plow in the village. The captain is very strenuous in his efforts to make all his Indians work. When strange Indians come to the village to visit they also are set to work. No one is allowed to remain longer than three days without lending a hand at the village labor. They are a strong and robust band. They say they have always lived in their present place. The captain asked for plows, harnesses, and "all things to work with," also for some clothes for his very old men and women. He also begged to be "told all the things he ought to know;" said no agent had ever visited them, and "no one ever told them anything."

In many of their perplexities they are in the habit of consulting Mrs. Gregory, and she often mounts her horse and rides nine miles to be present at one of their councils. Not long ago one of their number, a very young Indian, having stabbed a white man living near Julian, was arrested, put in jail, and in imminent danger of being lynched by the Julian mob. They were finally persuaded, however, to give him up to his tribe to be tried and punished by them. Mrs. Gregory was sent for to be present at the trial. The facts in the case were, that the Irishman had attempted to take the young Indian's wife by force. The husband interfering, the Irishman, who was drunk, fired at him, upon which the Indian drew his knife and stabbed the Irishman. Mrs. Gregory found the young Indian tied up in the snow, a circle of Indians sitting around him. Recounting the facts, the captain said to Mrs. Gregory, "Now, what do you think I ought to do?" "Would you think he deserved punishment if it were an Indian he had stabbed under the same circumstances?" asked Mrs. Gregory. "Certainly not," was the reply, "we should say he did just right." "I think so too," said Mrs. Gregory; "the Irishman deserved to be killed." But the captain said the white people would be angry with him if no punishment were inflicted on the young man; so they whipped him and banished him from the rancheria for one year. Mrs. Gregory said that during the eleven years that they had kept their cattle ranch in the neighborhood of this village, but one cow had ever been stolen by the Indians; and in that instance the Indians themselves assisted in tracking the thief, and punished him severely.

---

## EXHIBIT L.

### PALA AND ITS NEIGHBORHOOD.

In the days of the prosperity of the San Luis Rey Mission, Pala was one of its chief appanages. It lies an easy day's journey from San Luis Rey, in the valley of the San Luis Rey River. It has also a little stream of its own, the Pala Creek. It is a beautiful spot, surrounded by high hills, with wooded spars, and green bits of meadow here and there. The ruins of the old mission buildings are still standing, and services are held several times a year in the dilapidated chapel. It has always been a favorite spot with the San Luis Rey Indians, some five or six hundred of whom are living in the region. The chief settlements are Pala, Pauma, Apeche, La Jolla, and Rincon. At Pala, La Jolla, and Rincon are reservations. Of the Pala Reservation some tracts have been restored to the public domain, to be patented to whites. The remainder of this reservation, so far as we could learn its location, contains very little good land, the greater part of it being in the wash of the creek. The Rincon Reservation is better, being at the head of the valley, directly on the river, walled in to the south by high mountains. It is, as its name signifies, in a corner. Here is a village of nearly two hundred Indians; their fields are fenced, well irrigated, and under good cultivation in grains and vegetables. They have stock—cattle, horses, and sheep. As we drove into the village, an Indian boy was on hand with his hoe to instantly repair the break in the embankment of the ditches across which we were obliged to drive. These Indians have been reported to us as being antagonistic and troublesome, having refused to have a Government school established there. Upon inquiry of them we found that the latter fact was true. They said they wanted a title to their lands, and till they had that they did not wish to accept anything from the Government; that the agent had promised it to them again and again, but that they had now lost faith in ever getting it. The Captain said: "The commissioners come one day and tell us we own the lands and fields; the next day comes somebody and measures, and then we are out of our houses and fields, and have to live like dogs." On the outskirts of this village is living a half-breed, Andrew Scott, who claims some of the Indians' fields and cuts off part of their water supply. He is reported as selling whisky to them, and in this and other ways doing them great harm. It is not improbable that he would be found to be within the reservation lines.

ACC0017368

Between the Rincon and Pala lies the Pauma village. It is on the Pauma ranch, the purchase of which for Indian occupancy we have recommended to the Government. This ranch is now rented, and the Indians are much interfered with by the lessee, who is naturally reluctant to lose the profit off a single acre of the land. There is in the original grant of the Pauma ranch the following clause: "They shall have free the arable lands now occupied by the Indians who are established thereon, as also the lands they may need for their small quantity of live stock."

The La Jolla region we were unable to visit. The Indian village is said to be outside the reservation lines. There is a claim against this tract, and the La Jolla captain told us that the parties representing it had said to him that they were coming in with sheep next year, and would drive all the Indians out. Upon inquiry at the surveyor-general's office in San Francisco in regard to the La Jolla tract, we learned that there is a record on file in the archives of that department purporting to show that there was a grant made in favor of the Indians of San Luis Rey, Pablo, and Jose Apis, for a tract of land named La Jolla, in the immediate vicinity of the Valle de San José, dated November 7, 1845, signed by Pio Pico; deposited in the archives January 31, 1878. From Mr. Chauncey M. Hayes, a resident of San Luis Rey, the agent of the Pauma ranch, we received the following letter on the subject of La Jolla:

La Jolla was granted November 7, 1845, by the Mexican Government to José and Pablo Apis Indians, Expediente No. 242, and is recorded in the surveyor-general's office, in book No. 4, p. 17. It was not presented to the land commissioner in 1853, and remained without any action being taken. Col. Cave J. Couts, now deceased, bought the interest of the grantees, and a contract was afterwards made between Judge E. D. Sawyer, of San Francisco, and himself to secure its approval by a special act of Congress. About three years ago an act was passed approving the grant for about 8,848 acres, reserving therefrom all lands then occupied. If this included Indians there would not be much of La Jolla left.

It is evident that this is a claim which should be closely investigated. The probabilities are that it would not bear such investigation. In Pala some of the Indians had been ejected from their homes under circumstances of great cruelty and injustice; affidavits setting forth the facts in their case were forwarded by us to Washington (see Paper No. 1, appended hereto). It is to be hoped that the Indians can be reinstated in their homes. If the Pauma ranch be purchased for Indian occupancy, as we recommend, it will, with the present reservation tracts of the Rincon, Pala, and La Jolla, make a sizable block of land, where the Indians will be comparatively free from white intrusion, and where they will have a good chance to support themselves by agriculture and stock raising.

PAPER No. 1, appended to Exhibit L.

Affidavit of the claims of Arthur Golsh, Gaetano Golsh, and others, to a certain piece of land in township of Pala.

Patricio Soberano and Felipe Joqua, being duly sworn by me through an interpreter, and the words hereof being interpreted to each and every one of them, each for himself deposes and says; I am an Indian belonging to that portion of the San Luisenos Indians under the captainship of Jose Antonio Sal, and belonging in the rancheria of Pala. I have occupied the land in question ever since my childhood, together with Geromino Lugo and Luis Ardillo, our wives and families numbering in all twenty-nine persons. I have resided on the land in question continuously until December, 1882. About five years ago one Arthur Golsh rented of Luis Ardillo a portion of said land for three months at a rental of $5 per month. After this, said Golsh claimed the property of Ardillo and of the three other Indians; ordered them to leave; used threats; on one occasion aimed a pistol at Patricio Soberano. He then proceeded to file on the land, and obtained a patent for the land while these Indians were still residing upon it. The said Indians had upon the said land four houses, one of which is adobe, various inclosed fields, and a long ditch for bringing irrigation water to the said lands. In spite of the threats of Arthur Golsh and others, we continued to occupy the lands until December, 1882, when we were informed by Agent S. S. Lawson that if we did not leave voluntarily we would be put off by the sheriff.

Said affiants therefore pray that said land be returned to the said Indians by the United States Government.

Signed by Patricio Soberano and Felipe Joqua in presence of the justice of the peace, in Pala.

---

# EXHIBIT M.

## THE PACHANGA INDIANS.

This little band of Indians is worthy of a special mention. They are San Luisenos, and formerly lived in the Temecula Valley, where they had good adobe houses and a large tract of land under cultivation. The ruins of these houses are still standing there, also their walled graveyard full of graves. There had been a settlement of Indians in thi

ACC0017369

Temecula Valley from time immemorial, and at the time of the secularization of the missions many of the neophytes of San Luis Rey returned thither to their old home. At the time of the outbreak of the Aqua Caliente Indians, in 1851, these Temecula Indians refused to join in it and moved their families and stock to Los Angeles for protection. Pablo, their chief at that time, was a man of some education, could read and write, and possessed large herds of cattle and horses. This Temecula Valley was a part of the tract given to the San Luisenos and Dieguinos by the treaty of January 3, 1853, referred to in the body of this report. (See page —.) In 1873 a decree of ejectment against these Indians was obtained in the San Franciso courts without the Indians' knowledge. The San Diego Union of September 23, 1875, says on the subject:

For forty years these Indians have been recognized as the most thrifty and industrious Indians in all California. For more than twenty years past these Indians have been yearly told by the United States commissioners and agents, both special and general, as well as by their legal counsel, that they could remain on these lands. Now, without any previous knowledge by them of any proceedings in court, they are ordered to leave their lands and homes. The order of ejectment has been served on them by the sheriff of San Diego County. He is not only commanded to remove these Indians, but to take of their property whatever may be required to pay the costs incurred in the suit.

Comment on the extracts would be superfluous. There is not often so much of history condensed in the same number of newspaper paragraphs. A portion of these Temecula Indians, wishing to remain as near their old homes and the graves of their dead as possible, went over in the Pachanga canon, only three miles distant. It was a barren, dry spot ; but the Indians sunk a well, built new houses, and went to work again. In the spring of 1882, when we first visited the place, there was a considerable amount of land in wheat and barley, and a little fencing had been done. In July, 1882, the tract was set off by Executive order as a reservation for these Indians. In the following May we visited the valley again. Our first thought on entering it was, would that all persons who still hold to the belief that Indians will not work could see this valley. It would be hardly an extreme statement to say that the valley was one continuous field of grain. At least four times the amount of the previous year had been planted. Corrals had been built, fruit orchards started; one man had even so far followed white men's example as to fence in his orchard a piece of the road which passed his place. The whole expression of the place had changed ; so great a stimulus had there been to the Indians in even the slight additional sense of security given by the Executive order setting off their valley as a reservation. And, strangely enough, as if nature herself had conspired at once to help and to avenge these Indians in the Temecula Valley from which they had been driven out, the white men's grain crops were thin, poor, hardly worth cutting ; while the Indians' fields were waving high and green—altogether the best wheat and barley we had seen in the county. It is fortunate that this little nook of cultivable land was set aside as a reservation. Had it not been it would have been "filed on" before now by the whites in the region, who already look with envy and chagrin on the crops the Indian exiles have wrested from land nobody thought worth taking up.

A Government school has been opened here within the past year, and the scholars have made good progress. We found, however, much unpleasant feeling among the Indians in regard to the teacher of this school, owing to his having a few years before driven off four Indian families from their lands at Pala, and patented the lands to himself. There were also other rumors seriously affecting his moral character which led us to make the suggestion in regard to the employment of female teachers in these Indian schools. (See report recommendation.) As one of the Indians forcibly said, to set such men as this over schools was like setting the wolf to take care of the lambs.

These Pachanga Indians had, before the setting aside of their tract as a reservation, taken steps towards the securing of their cañon, and the dividing it among themselves under the provisions of the Indian homestead act. They were counseled to this, and assisted in it by Richard Eagan, of San Juan Capistrano, well known as a good friend of the Indians. They have expressed themselves as deeply regretting that they were persuaded to abandon this plan and have the tract set off as a reservation. They were told that they could in this way get their individual titles just as securely and without cost. Finding that they have no individual titles, and cannot get them, they are greatly disappointed. It would seem wise to allow them as soon as possible to carry out their original intention. They are quite ready and fit for it.

---

## Exhibit N.

### THE DESERT INDIANS.

The Indians known as the Desert Indians are chiefly of the Cahuilla tribe, and are all under the control of an aged chief named Cabezon, who is said to have more power and influence than any Indian now living in California. These Indians' settlements are lit-

ACC0017370

## 32

erally in the desert ; some of them being in that depressed basin, many feet below sea level, which all travelers over the Southern Pacific Railroad will recollect. There is in this desert one reservation, called Aqua Caliente, of about 60,000 acres. From the best information that we can get this is all barren desert land, with only one spring in it. These Desert Indians are wretchedly poor, and need help perhaps more than any others in Southern California. We were unable to visit these Indians personally, but were so fortunate as to induce Capt. J. G. Stanley, a former Indian agent for the Mission Indians and a warm friend of theirs, to go out in our stead and report to us on their condition. His report is herewith given :

Mrs. H. H. JACKSON :

MADAM : In compliance with your request I proceeded to the Cabezon Valley and have endeavored, as far as was possible with the limited time at my command, to ascertain the present condition and actual necessities of these Indians that still inhabit that portion of the Colorado Basin known as the Cabezon Valley, that being also the name of the head chief, who, from the best information that can be obtained, is not less than ninety and probably one hundred years old, and who still has great influence with all the Indians in that region. I found it impracticable to visit all the rancherias, and accordingly sent out runners and called a council of all the Indians of all the villages to be held at a point on the railroad known as Walter's Station, that being the most central point. The next day there were present in council about one hundred Indians, including the captains of all the rancherias and the old chief Cabezon. Having been special agent under the old superintendent system, and well acquainted with the Indians, I was received by them with the greatest cordiality. I read and interpreted your letter to Cabezon, and also explained that you were not able to visit them in person on account of ill health. The Indians, through their spokesman or interpreter, then stated their cause of complaint. First, that Mr. Lawson had never visited their villages nor taken any interest in their welfare ; that he had allowed his interpreter, Juan Morengo, to take the advantage of them ; that Juan Morengo had made a contract for them with a man in San Bernardino to cut wood on land claimed by the Indians for the railroad company, he taking the lion's share on the profits, and agreeing to pay them every Saturday in money ; that Juan Morengo took some $200 belonging to the Indians and appropriated it to his own use ; that the contractor did not pay as agreed, but wished the Indians to take poor flour and other articles at a great price. There may be some exaggeration of the causes of complaint, but it is evident that no one has looked after the rights of these Indians. The Indians have stopped cutting the wood, and they say the contractor tells them he will send others to cut wood if they will not do it. If I understand rightly this is Government land, and no one has a right to cut the timber. It is true, it is mesquite timber, and they profess to cut only the dry trees, but the mesquite is invaluable to the Indians. It not only makes their fires, but its fruit supplies them with a large amount of subsistence. The mesquite bean is used green and dry, and at the present time is their principle article of food. Moreover, without the mesquite tree the valley would be an absolute desert. The wood (the dead trees) could be made a source of employment and profitable revenue to the Indians if cut with proper regulations, but the present mode is destruction to the timber and benefits but few of the Indians. I have extended my remarks on this subject, as I think it very important. If the wood is to be cut the Indians should be supplied with wagons and harness that they may do all the work of delivering the wood and get the profit of their labor. I would suggest that it is very important that a tract of country be segregated and set apart for these Indians. There is a vast amount of desert land in their country, but there are spots in it that have been occupied by them for hundreds of years where wheat, corn, melons, and other farm products can be grown. There is very little running water, but water is so near the surface that it can be easily developed. The Indians appear to know nothing of any lands being set apart for them, but claim the whole territory they have always occupied. I think that to avoid complications something should be done for these Indians immediately to protect their interests. At present there are eight villages or rancherias, each with its own captain, but all recognizing old Cabezon as head chief. I ascertained from each captain the number belonging to his village and I found the aggregate to be 560 souls. These Indians are not what are called Christianized Indians. They never belonged to the missions and have never been received into any church. They believe in spirits and witchcraft. While I was among them I was told by a white man that the Indians intended to kill one of their number because he had bewitched a man and made him sick. I asked the interpreter about it. He acknowledged that it to be true, but said they only intended to frighten him so that he would let the man alone. I told him it would be wrong to kill the Indian, and he said they would not do it. They are very anxious to have schools established amongst them, and are willing to all live in one village if a suitable place can be selected. I shall offer as my opinion that immediate steps should be taken to set apart lands for these Indians, that they be permitted to cut wood for sale only on the public lands in Cabezon Valley, that no one be permitted to cut any green timber in the valley, that two strong wagons and harness for twelve horses be furnished (or loaned) to the Indians for the purpose of hauling wood only, that lumber be furnished to make sheds for said wagons and harness. The Indians have horses of their own.

All of which is respectfully submitted.

J. G. STANLEY.

---

## EXHIBIT O.

### THE SAN GORGONIO RESERVATION.

This is the only reservation of any size or value in Southern California. It lies in the San Gorgonio Pass, between the San Bernardino and San Jacinto Mountains. The Southern Pacific Railroad passes throughout it. It is a large tract, including a considerable proportion of three townships. It is an exposed situation, open to the desert winds, and very hot in summer. A small white settlement, called Banning, lies in this district. Most of the titles to these settlements are said to have been acquired before the reserva-

ACC0017371

tion was set off.   We received from the settlers in Banning the following letter:

To Mrs. JACKSON and Mr. KINNEY, *Commissioners, &c.:*

At a public meeting of all the residents on the lands reserved for Indian purposes, held at Banning, in San Gorgonio Pass, San Bernardino County, California, it was resolved that a delegation from our inhabitants be appointed to proceed to San Bernardino and lay before the commissioners a statement of the existing status of the lands reserved for Indian pruposes as affecting the citizens resident on those Townships known as 2 and 3, S., R. 1 E. and 2 S., R. 2 E., in San Bernardino meridian.   Believing that it is of the utmost importance that you should become conversant with facts affecting the condition and future well-being of the Indians whom it is designed to place upon these lands, we respectfully request a hearing.   Among those facts as affecting the residents directly, and more remotely the Indians. are the following:

There is in San Gorgonio Township, of which these lands are a part, a population of two hundred and fifty souls.   In Township 3 S., R. 1 E., is the village of Banning, which is the business centre of the surrounding country, and has an immediately surrounding population numbering fifty souls.   It has post and express offices, railroad depot, district school, church organization, general merchandise store, the flume of the San Gorgonio Fluming Company, two magistrates; and during the last year there was sold or shipped from this place alone fully 20,000 bushels of wheat and barley, over 200 hundred tons of baled hay, a large amount of honey, butter, eggs, poultry, live stock, &c., besides 200 cords of wood.   Although more than half of the area of this township is in the mountains and uninhabited; from the remaining portion which is surveyed land, there is at this time fully 1,200 acres in grain, and the value of the improved property is over $50,000, exclusive of railroad property.   Vested interests have been acquired to all the water available for irrigation under the code of laws existing in this State.   Wells have repeatedly been dug without success in this township.   United States patents to lands were granted in this township long anterior to the Executive order reserving the lands for Indian purposes, and since then the population has not increased.   No Indian has, within the memory of man, resided in this township.   There are not over two entire sections of land in the entire area left available for cultivation, and on these without abundance of water no one could possibly succeed in earning a livelihood.   One of these sections was occupied and was abandoned, the attempt to raise a cereal crop having failed.   The extreme aridity of the climate renders the successful growth of cereals problematical, even when summer fallowing is pursued, and the amount of human casualty possessed by the average Indian does not usually embrace the period of two years.   To intersperse Indians between white settlers who own the railroad land or odd sections and the remaining portions of the Government sections, where a "no fence" law exists, as here, would not be conducive to the well-being of the Indians, and would result in a depreciation of our property alike needless and disastrous.   In township 2 S., R. 2 E., there are not over eighty acres available, that in Weaver Creek cañon, where the water was acquired and utilized before the Executive order and the legal right well established.   In township 2 S., R. 1 E., settlements were made many years before the issue of the order of reservation, especially on odd-numbered sections or railroad lands as then supposed to be, and these bona fide settlers have acquired claims in equity to their improvements.   On one ranch in this township, that of Messrs. Smith & Stewart, who have cultivated and improved the mesa or bench lands, there was produced several thousand sacks of grain, but this involved such an outlay of capital and knowledge, beside experience in grain growing such as Indians do not possess.   In this township, embracing the three mentioned, there are upward of forty voters, and these unanimously and respectfully ask you to grant us a hearing when we can reply to any interrogatories you may be pleased to make.   If you will kindly name the time when to you convenient, the undersigned will at once wait upon you.

W. K. DUNLAP,
BEN. W. SMITH,
S. Z. MILLARD.
WELWOOD MURRAY,
GEO. C. EGAN,
D. A. SCOTT,
G. SCOTT.

There is upon this San Gorgonio Reservation a considerable amount of tillable land. There are also on it several small but good water-rights.   One of these springs, with the adjacent land, is occupied by an Indian village called the Potrero, numbering about sixty souls; an industrious little community, with a good amount of land fenced and under cultivation.   These Indians are in great trouble on account of their stock, the approaches to their stock ranges having been by degrees all fenced off by white settlers, leaving the Indians no where they can run their cattle without risk of being corralled and kept till fines are paid for their release.   All the other springs except this one are held by white settlers, who, with one exception, we were informed, have all come on within the past five years.   They claim, however, to have bought the rights of former settlers.   One of the largest blocks of this reservation lies upon the San Bernardino Mountain, and is a fair stock range.   It is now used for this purpose by a man named Hyler.   The next largest available block of land on the reservation is now under tillage by the dry system by the firm of Smith & Stewart.   There is also a bee ranch on the reservation, belonging to Herron & Wilson.   One of the springs and the land adjacent are held by a man named Jost.   He is on unsurveyed land, but claims that by private survey he has ascertained that he is on an odd-numbered section, and has made application to the railroad for the same.   He requested us to submit to the Department his estimate of the value of his improvements.   It is appended to this exhibit.   It seems plain from the above facts, and from the letter of the Banning gentleman, that a considerable number of Indians could be advantageously placed on this reservation if the whites were removed.   It would be necessary to acquire whatever titles there may be to tracts included in the reservation; also to develop the water by the construction of reservoirs, &c., probably to purchase some small water-rights.   Estimating roughly, we would say by an expenditure of from $30,000 to $40,000 this reservation could be rounded out and put into readiness for Indians.   It ought to be most emphatically stated and

5690 M I——3

ACC0017372

distinctly understood, that without some such preparation as this in the matter of water-rights and channels the Indians cannot be put there. It is hardly possible for one unfamiliar with the Southern California country to fully understand how necessary this is. Without irrigation the greater portion of the land is worthless, and all arrangements for developing, economizing, and distributing water are costly. This is an objection to the San Gorgonio Reservation. There are two others. The Indians for the most part have an exceeding dislike to the region, and will never go there voluntarily; perhaps only by force. The alternative of railroad sections with the sections of the reservations will surely lead to troubles in the future between the white settlers and the Indians. These are serious objections; but it is the only large block of land the Government has left available for the purpose of Indian occupancy.

### PAPER No. 1, APPENDED TO EXHIBIT O.

#### Claim of C. F. Jost and wife for improvements in San Gorgonio Reservation, Banning, San Bernardino County.

Settled on section 25, township 2 S., R. 1 E., S. B. M., San Bernardino County, in May, 1875. Bought out other white settlers. Hold railroad permission to settle on land; of date, November, 1875.

#### IMPROVEMENTS.

| | |
|---|---:|
| House | $300 00 |
| Barn | 150 00 |
| Milk house | 50 00 |
| Meat house | 50 00 |
| Granary | 50 09 |
| Potato house and cellar | 50 09 |
| Chicken house | 20 00 |
| Two board flumes | 50 00 |
| Two water dams | 20 00 |
| Honey house | 10 00 |
| Wire fencing | 300 00 |
| Other fencing | 200 00 |
| One hundred and seventy fruit trees (mostly bearing this year) | 400 00 |
| Breaking up sod land and draining land | 200 00 |
| Amount paid to first white settler for claim (no improvements) | 250 00 |
| | 2,100 00 |

On the 1st of June I will have $50 worth of seed potatoes in the ground, and labor, $100. It is necessary to plow the ground three times to properly prepare it for potatoes. This crop in December of the same year is worth $500 to $600 in the markets. Have about seventy stands of bees, worth, say, $300, which if I am moved will be a dead loss.

---

## EXHIBIT P.

### THE PAUMA RANCH.

The Pauma ranch lies on the San Luis Rey River, between the Rincon and Pala Reservations. It contains three leagues of land, largely upland and mesa, good for pasturage and dry farming. It can be irrigated by bringing water from the San Luis Rey River. There is some timber on it; also some bottom lands along the river and along the Pauma Creek. The ranch is the property of Bishop Mora, who made to us the following proposition for its sale.

For the sum of $31,000 in gold coin of the United States of North America I am disposed to sell to the Government of the United States, for the benefit of the Mission Indians, the ranch called "Pauma Ranch, in the county of San Diego," containing 3 leagues of land, more or less, reserving to myself and to my assignees: 1st, 2 acres of land whereon the present Indian chapel stands; 2d, 320 acres on one half-section on the south side of the public road leading to Pala, whereon the frame house stands formerly belonging to Joaquin Amat. Terms, cash on delivery of deed of sale. This offer is made with the proviso that the transaction is to be concluded on or before the 31st day of October o f the present year.

Santa Ynez, Santa Barbara County, May 14, 1883.

FRANCIS MORA,
*Bishop of Monterey and Los Angeles.*

Upon being informed by us that this condition of time of sale would make it impossible for us to secure these lands for the Indians, the bishop in the following note waived that condition:

SAN LUIS OBISPO, *May* 21, 1883.

Mrs. WILLIAM S. JACKSON:

DEAR MRS. JACKSON: Your favor of the 17th instant has been received. I feel heartily thankful for the interest you take in behalf of our Indians, and do with pleasure waive the condition as regards to the time, and will let the offer stand until the proposed bill has been voted on by Congress;

ACC0017373

35

provided, however, that the purchase can be brought to a close during spring or summer of the
year 1884, and subject to one year's lease, which will conclude December 31, 1884, because I must try
*pendente transactions* to get enough to pay taxes.
Hoping you will reach home in good health,
Yours, affectionately,

FRANCIS MORA,
*Bishop of Monterey and Los Angeles.*

It should be distinctly understood that Bishop Mora in making this offer, and gener-
ously allowing it to stand open for so long a time, is influenced by a warm desire for the
welfare of the Indians.

---

## EXHIBIT Q.

*Proposition for the sale of the Santa Ysabel ranch to the United States Government.*

LOS ANGELES, *Cal., May* 19, 1883.

Mrs. HELEN HUNT JACKSON and ABBOT KINNEY, Esq.,
*Special Commissioners to the Mission Indians:*

Should the U. S. Government wish to purchase the Santa Ysabel rancho, in San Diego
County, California, containing 4 leagues of land, or about 18,000 acres, we will sell said
rancho for the sum of ninety-five thousand dollars ($95,000), gold coin.
Respectfully,

HARTSHORNE & WILCOX,
By E. F. SPENCE, *Agent.*

---

## EXHIBIT R.

AN ACT for the government and protection of Indians, passed by the California State legislature
April 22, 1850.

SECTION 1. Justices of the peace shall have jurisdiction in all cases of complaints by,
for, or against Indians in their respective townships in this State.

SEC. 2. Persons and proprietors of lands on which Indians are residing shall permit
such Indians peaceably to reside on such lands unmolested in the pursuit of their usual
avocations for the maintenance of themselves and their families; provided the white
person or proprietor in possession of such lands may apply to a justice of the peace in
the township where the Indians reside to set off to such Indians a certain amount of
land, and on such application the justice shall set off a sufficient amount of land for the
necessary wants of such Indians, including the site of their village or residence if they so
prefer it, and in no case shall such selection be made to the prejudice of such Indians;
nor shall they be forced to abandon their homes or villages where they have resided for
a number of years; and either party feeling themselves aggrieved can appeal to the
county court from the decision of the justice, and then, when divided, a record shall be
made of the lands so set off in the court so dividing them; and the Indians shall be
permitted to remain thereon until otherwise provided for.

This act has never been repealed, nor, so far as we could learn, complied with in a
single instance. To-day it would be held as of no value in the California courts.

ACC0017374

# TAB II-2

Reproduced at the National Archives

9299

DEPARTMENT OF THE INTERIOR, INDIAN DIV. RECEIVED DEC 21 1891

Act. Commr. of Ind. Affairs.

Dec. 19, 1891.

Submits report of Mission
Indian Commission, with recom-
mendations.

Enc

*Report of asst Atty
Genl.   Dec 29/91.*

*Lettter to I.O. ackg maln
+ encly a a Gopmion
        Dec 30/91*

*See 9312-92*

ACC-HRA000645

Reproduced at the National Archives

Before reply to the following:

Land
44447-1891

# Department of the Interior,

## OFFICE OF INDIAN AFFAIRS,

Washington, December 19, 1891.

To the Honorable

    The Secretary of the Interior.

Sir:

    Under date of December 7, 1891, Mr. F. D. Lewis, Clerk of

the Mission Indian Commission, transmitted to this Office the

report of said Commission addressed to the Secretary of the In-

terior through the Commissioner of Indian Affairs.

    This Commission was appointed under the provisions of

the Act of January 12, 1891 (26 Stats., 712), and consisted of

A. K. Smiley, Joseph B. Moore and Prof. C. C. Painter.

Instructions were given the Commissioners under date of January

31, 1891, which instructions were approved by you February 4,

1891, copy enclosed.

    The second section of the Act provides as follows:

    "That it shall be the duty of said commissioners to select a
reservation for each band or village of the Mission Indians re-
siding within said State, which reservation shall include, as far
as practicable, the lands and villages which have been in the
actual occupation and possession of said Indians, and which shall
be sufficient in extent to meet their just requirements, which
selection shall be valid when approved by the President and the
Secretary of the Interior.    They shall also appraise the value
of the improvements belonging to any person to whom valid existing
rights have attached under the public land laws of the United
States, or to the assignee of such person, where such improvements
are situated within the limits of any reservation selected and
defined by said commissioners, subject in each case to the approv-
al of the Secretary of the Interior.    In cases where the Indians
are in occupation of lands within the limits of confirmed private

ACC-HRA000646

Reproduced at the National Archives

2

grants, the commissioners shall determine and define the boundaries of such lands, and shall ascertain whether there are vacant public lands in the vicinity to which they may be removed.  And the said commission is hereby authorized to employ a competent surveyor and the necessary assistants."

The third section provides that the commissioners, upon the completion of their duties, shall report the result to the Secretary of the Interior, who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the Commission and approved by him, in favor of each band or village of Indians occupying any such reservation.

The commissioners recommend that there be set apart for the Mission Indians of California twenty-six (26) reservations which will be referred to and described separately hereafter.

1.   SAN MANUEL.

The Commission recommends the following described reservation for the Indians living thereon on the 12th of March, 1891, viz:

Section twenty (20), and that part of Section thirty (30) bounded on the north and east by the section lines and on the south-west by the flume, being a triangular shaped piece of land containing about fifteen (15) acres, - all in Township one (1) north of Range three (3) west.  For a more detailed statement the Commission refers to its report of March 12, 1891.

In that report the commissioners state that the village

ACC-HRA000647

Reproduced at the National Archives

3

consists of eight families and about 40 persons, situated upon the south-west quarter (SW¼) of Section twenty (20), Township one (1) north of Range three (3) west.   This said section is unsurveyed, very broken and mostly mountainous.   The Indians are living in quite comfortable adobe houses, having a spring of water and a small orchard of grape vines and fruit trees.   They have been in the occupancy of these lands about thirty years.

In the spring of 1888, one John Smithline, ignoring the rights of the Indians, took forcible possession of the north-west quarter (NW¼), burning their fences and corral and a brush house and threatened to shoot them if they returned.   In the spring of 1890, Smithline, while apparently in the sole possession of the north-west quarter (NW¼) sold his claim to one Paul Wiese, who is a young and ignorant German.   He claims that he supposed Smithline had the right to sell to him; that he paid him $150 in cash, and that he has spent fully as much more in improving the house, building a barn and developing the water on the land.

The commissioners report that there is perhaps not to exceed 25 or 30 acres of arable land on the entire section, with some timber and considerable pasture.   The Commission caused the section to be surveyed and recommended that it be set aside as a reservation.   Wiese has agreed to give up, without trouble, the possession of the land occupied by him.   The Commission recommend-

ACC-HRA000648

Reproduced at the National Archives

ed that he be paid the sum of $200, at which they appraise his improvements.   The Commission also recommended that there be reserved in the patent the right of way across the land for an irrigating ditch which is constructed across the south end of the section, with the right to enter and make repairs, the Indians to have the right to use water from said ditch for domestic purposes as is now done by them.   The Commission also recommends that the triangular piece of land referred to, be included in the reservation.

In a communication dated June 2, 1891, the Commissioner of the General Land Office reports that the tract referred to, embracing 11.58 acres, being lot one (1) of Section thirty (30), was selected by the State May 26, 1885, as school land in lieu of deficiency in fractional township eighteen (18) south, Range seven (7) east.   This said selection has not been approved, but as it appears to be free from objection, will doubtless be included in the next clear list submitted for approval.

In view of this statement I have the honor to recommend that the selection of Section 20 be approved and also the selection of the 11.58 acres if the claim of the State can be satisfied with other land.

2.     TWENTY-NINE PALMS.

Described as follows:

The south-west quarter (SW$\frac{1}{4}$) of Section thirty-three (33) in Township one (1) north of Range nine (9) east, S.B.M.,

ACC-HRA000649

Reproduced at the National Archives

5

and the north-west quarter (NW¼) of Section four (4), Township one (1) south, Range nine (9) east, S.B.M.

The commissioners report that there are three families living on these lands, having three houses and some cultivated fields, the head man being Chimihueava Mike; that they have plenty of water and that there is sufficient tillable land for their needs.

It is recommended that this selection be approved.

3.  RAMONA.

Described as follows:

The south-west quarter (SW¼) of the south-east quarter (SE¼) of Section thirty (30), the west half (W½) of the north-east quarter (NE¼), the south-east quarter (SE¼) of the north-east quarter (NE¼) and the north-east quarter (NE¼) of the south-east quarter (SE¼) of Section thirty-one (31), the north half (N½) of the south-west quarter (SW¼), the south-east quarter (SE¼) of the south-west quarter (SW¼), and the south half (S½) of the south-east quarter (SE¼) of Section thirty-two (32), and the south-west quarter (SW¼) of the south-west quarter (SW¼) of Section thirty-three (33), - all in Township six (6) south of Range three (3) east, S.B.M.

Also the north-west quarter (NW¼) of the north-west

ACC-HRA000650

Reproduced at the National Archives

6

quarter (NW$\frac{1}{4}$) of Section four (4), and the north-east quarter

(NE$\frac{1}{4}$) of the north-east quarter (NE$\frac{1}{4}$) of Section five (5), all

in Township seven (7) south of Range three (3) east.

Three families are situated on these lands which are valuable

grazing lands with a good supply of water.

I recommend that the selection be approved.

4.   PALA.

Described as follows:

The south half (S$\frac{1}{2}$) of the north-east quarter (NE$\frac{1}{4}$) of

Section thirty-three (33), the north-west quarter (NW$\frac{1}{4}$) of the

north-west quarter (NW$\frac{1}{4}$), and the north-east quarter (NE$\frac{1}{4}$) of the

north-east quarter (NE$\frac{1}{4}$) of Section thirty-four (34), all in

Township nine (9) south of Range two (2) west.

The land is nearly all arable land and has been occu-

pied by the Indians for a long time.   They have comfortable

houses, are not willing to leave, and there are no other Govern-

ment lands in the vicinity that the commissioners could recommend

be set apart for their use, or they would have made the reserva-

tion larger.   They think the land ought to be allotted, and that

those Indians for whom there is no land, should be induced to go

to some other reservation.   There are about 60 Indians.   Forty

acres of the one hundred and sixty included in this reservation

is a detached tract. I recommend the approval of this selection.

ACC-HRA000651

Reproduced at the National Archives

7

5.   RINCON.

The village of Rincon comprises about 150 Indians. There is a very good school there and the children are making commendable progress.   The commissioners recommend that the following lands be set aside as a reservation to be called Rincon: Fractional Section twenty-six (26) and Section thirty-five (35) of Township ten (10) south of Range one (1) west, and Sections two and three in Township eleven (11) south, Range one (1) west.

The commissioners report that nearly all these lands are arable and well watered; that some of the Indians are farming successfully, and that they think it would be wise to allot to individuals the land on the reservation.

It is recommended that this selection be approved.

(This reservation is designated on the diagram as San Luis Rey.)

6.   Cahuilla.

The commissioners recommend that this reservation remain as at present with the addition of the south half ($S\frac{1}{2}$) of Section fourteen (14), Township seven (7) south of Range two (2) east, on which an Indian has a house and cultivated field. With this addition the reservation is described as follows: The south half ($S\frac{1}{2}$) of Section fourteen (14), Sections twenty-three (23), twenty-five (25), twenty-six (26), twenty-seven (27),

ACC-HRA000652

Reproduced at the National Archives

8

twenty-eight (28), thirty-three (33), thirty-four (34), thirty-five (35) and thirty-six (36) in Township seven (7) south of Range two (2) east; Sections twenty-six (26), twenty-seven (27), twenty-eight (28), twenty-nine (29), thirty (30), thirty-one (31), thirty-two (32), thirty-three (33), thirty-four (34), and thirty-five (35), in Township seven (7) south of Range three (3) east; Sections one (1), two (2), three (3), and four (4) in Township eight (8) south of Range two (2) east, and Sections two (2), three (3), four (4), five (5), and six (6) in Township eight (8) south of Range three (3) east.

There are about 250 Indians on this reservation.

It is recommended that the selection be approved.


7.   POTRERO.

The commissioners recommend that there be set aside for the use of the Mission Indians in the villages of La Piche, La Jolla, and for such other Mission Indians as it may be expedient to place thereon, the following described lands, to be called Potrero:

Fractional Sections seventeen (17), nineteen (19), twenty (20), twenty-one (21), twenty-two (22), twenty-seven (27), twenty-eight (28), and twenty-nine (29), and Sections twenty-three (23), twenty-five (25), twenty-six (26), thirty (30), thirty-one (31), thirty-two (32), thirty-three (33), thirty-four

ACC-HRA000653

Reproduced at the National Archives

9

(34) and thirty-five (35) in Township ten (10) south, Range one (1) east.

It is recommended that the selection be approved.

8.   MESA GRANDE.

Described as follows:

The east half (E$\frac{1}{2}$) of the south-east quarter (SE$\frac{1}{4}$) of Section eight (8), and the south-west quarter (SW$\frac{1}{4}$) of the south-west quarter (SW$\frac{1}{4}$) of Section nine (9), Township twelve (12) south, of Range two (2) east.

There are three families of Indians on these       120 acres who do not wish to remove to a larger reservation.

It is recommended that the selection be approved.

9.   INAJA.

There are now two reservations known as Inaja containing 160 acres and the Cosmit containing 80 acres.  The commissioners report that the latter reservation is located north of the rancheria of the Indians on thoroughly worthless land, and that the land they had been cultivating and their homes were taken by a white man.   There have been no Indians on the reservation at Cosmit since it was set apart, because no one can live thereon.

At Inaja, under Captain Jose Delores, there are thirty

ACC-HRA000654

Reproduced at the National Archives

10

Indians who have some 70 acres of arable land with water for about one-half of that amount.  About 40 acres is good grazing land and the rest is high pine land.

The commissioners recommend that the old reservation at Cosmit be restored to the public domain, and that the reservation of Inaja embrace the following described lands: the north-east quarter (NE$\frac{1}{4}$) of Section 35, the south-half (S$\frac{1}{2}$) of the south-east quarter (SE$\frac{1}{4}$) and the north-east quarter of the south-east quarter (SE$\frac{1}{4}$) of Section twenty-six (26), Township thirteen (13) south of Range three (3) east.

It is recommended that this selection be approved.

10.   LA POSTA.

There are 35 Indians on this rancheria who have not more than 30 or 40 acres of second-rate land, with sufficient water.   The commissioners recommend the addition of certain tracts to the rancheria occupied by them, the whole to be known as the reservation of La Posta, described as follows: the south-east quarter (SE$\frac{1}{4}$) of the south-west quarter (SW$\frac{1}{4}$) and the south half (S$\frac{1}{2}$) of the south-east quarter (SE$\frac{1}{4}$) of Section thirty-one (31), Township sixteen (16) south, Range six (6) east, and the north half (N$\frac{1}{2}$) of the north-east quarter (NE$\frac{1}{4}$) and the north-east quarter (NE$\frac{1}{4}$) of the north-west quarter (NW$\frac{1}{4}$) of Section six (6), Township seventeen (17) south, Range six (6)

ACC-HRA000655

Reproduced at the National Archives

11

east.

This recommendation is approved.

11.   MANZANITA.

The commissioners state that there are some 40
Indians on the north half (N½) of the north-west quarter (NW¼)
of Section twenty-six (26), Township sixteen (16) south, Range
six (6) east; that there is very little land and of a very poor
quality, and that there is none that can be added to what is now
occupied by them.   They are the poorest of all the Indians visit-
ed for whom the Commission attempted to provide.   They recommend
that Section twenty-six (26) of Township sixteen (16) south,
Range six (6) east, be patented to the Indians for security,
and state that it is for a part of these Indians that a larger
amount of land has been reserved at Capitan Grande than would
have been otherwise reserved, to which it is hoped they may be
induced to remove.

This recommendation is approved.

12.   LAGUNA.

The commissioners recommend that the north-west
quarter (NW¼) of Section thirty-three (33) in Township fourteen
(14) south, Range five (5) east, be patented to the village con-
sisting of four houses and as many families under Captain Valen-

ACC-HRA000656

Reproduced at the National Archives

tine.   They state that there is a sufficient quantity of arable land, a considerable portion of which is under cultivation.

It is recommended that this selection be approved.


13.   CAMPO.

In Township eighteen (18) south, Range five (5) east there is a rancheria comprising eight houses and 47 Indians who have water and some good land.   The Commission recommends the addition of such land as they were able to find, the reservation to comprise the following described tracts: the east half (E$\frac{1}{2}$) of the north-east quarter (NE$\frac{1}{4}$) of Section four (4), the west half (W$\frac{1}{2}$) of the north-west quarter (NW$\frac{1}{4}$), the south-east quarter (SE$\frac{1}{4}$) of the north-west quarter (NW$\frac{1}{4}$), the south-west quarter (SW$\frac{1}{4}$) of the north-east quarter (NE$\frac{1}{4}$) and the north-west quarter (NW$\frac{1}{4}$) of the south-west quarter (SW$\frac{1}{4}$) of Section three (3), all in Township eighteen (18) south, Range five (5) east.

It is recommended that this selection be approved.


14.   TEMECULA.

The Commission recommends that this reservation, as created by Executive order, comprise Sections twenty-six (26), twenty-seven (27), twenty-eight (28), thirty-four (34) and thirty-five (35) in Township eight (8) south, Range two (2) west, and

Reproduced at the National Archives

13

be confirmed as a permanent reservation, as the Indians are un-
willing to remove.    The commissioners also state that the little
water they have has its rise on Section thirty-six (36), 160
acres of which ought to be added to the reservation.    The former
Agency clerk and physician, Dr. Ferrabee, purchased this land
from the State, that it might be held for this purpose, and is
willing to sell it to the Government for what it cost him, and
they recommend that it be purchased and added to the reservation.
This land is described as follows: the north half (N$\frac{1}{2}$) of the
north-west quarter (NW$\frac{1}{4}$), the south-east quarter (SE$\frac{1}{4}$) of the
north-west quarter (NW$\frac{1}{4}$), and the south-west quarter (SW$\frac{1}{4}$) of
the north-east quarter (NE$\frac{1}{4}$) of Section thirty-six (36), Town-
ship eight (8) south of Range two (2) west.    The commissioners
think that the purchase can be made for a sum not to exceed
four hundred dollars ($400.)    There are about 160 Indians, being
the remnant of those who were ejected from the Temecula Valley
some years ago.

The recommendation of the Commission as to the selection
of the old reservation is approved.    The addition of the land
owned by Dr. Ferrabee is a matter that will require Congressional
action.

15.    CUYAPIPE, OR LONG CANON.

The commissioners report that the Cuyapipe village

ACC-HRA000658

Reproduced at the National Archives

14

consists of some twenty houses, a small church and about 74 Indians; that there is quite a stream of water flowing through the narrow canon on the sides of which the village is located, which is constantly cutting away the small amount of land that can be cultivated, and that the Indians are very poor and cannot be otherwise so long as they remain there. It is hoped that they can be induced to remove to Capitan Grande. They recommend that the following described land be given them for a reservation: the east half (E$\frac{1}{2}$) of the north-east quarter (NE$\frac{1}{4}$) and the east half (E$\frac{1}{2}$) of the south-east quarter (SE$\frac{1}{4}$) of Section nineteen (19), the west half (W$\frac{1}{2}$) of Section twenty (20), the west half (W$\frac{1}{2}$) of the south-east quarter (SE$\frac{1}{4}$) of Section twenty (20), the north-west quarter (NW$\frac{1}{4}$) of Section twenty-nine (29), the west half (W$\frac{1}{2}$) and the north-east quarter (NE$\frac{1}{4}$) of the north-east quarter (NE$\frac{1}{4}$) of Section twenty-nine (29), and the north-west quarter (NW$\frac{1}{4}$) of the south-east quarter (SE$\frac{1}{4}$) of Section twenty-nine (29), all in Township fifteen (15) south of Range six (6) east.

Their recommendation is approved.

16. SYCUAN.

The commissioners recommend that Section thirteen (13) in Township sixteen (16) south of Range one (1) east, be set aside as a reservation to be called Sycuan. The land is well watered and nearly all arable. It is surrounded by a set-

ACC-HRA000659

Reproduced at the National Archives

15

tled country and the Indians find constant employment at remuner-
ative prices.    There are about 50 Indians on the reservation.

Their recommendation is approved.

17.    CAPITAN GRANDE.

The commissioners recommend the following reserva-
tion to be called the Capitan Grande:    Sections ten (10), eleven
(11), fourteen (14), fifteen (15), twenty-two (22), the west half
(W½) of Section twenty-seven (27), Section twenty-eight (28),
Section thirty-three (33), the south half (S½) of Section thirty-
four (34), and Section thirty-five (35), all in Township fourteen
south of Range two (2) east; also Sections three (3) and four (4)
and the north half (N½) of Sections one (1) and two (2) in Town-
ship fifteen (15) south of Range two (2) east; Sections thirty-
one (31) and thirty-two (32) in Township fourteen (14) south of
Range three (3) east, and Sections five (5) and six (6) in Town-
ship fifteen (15) south of Range three (3) east.

They state that in their judgment about one-sixth of
these lands are cultivatable, and, that under arrangements they
have made with the San Diego Flume Company, will be well supplied
with water, except four sections on the east.    The reservation
includes sufficient land for the Indians now thereon and also for
fully 100 others who will need to find homes thereon.    They re-
commend that the reservation be patented not to those now on the

ACC-HRA000660

Reproduced at the National Archives

16

lands only, but also to those who shall hereafter find homes there.   They state that they do not find any claims upon the lands they have selected for the reservation, for improvements, that they think it necessary to extinguish.   Charles Hensley, A. P. Knowles, and perhaps others, have claims against the Government for eviction from the reservation, but if these claims have merit, some other department of the government should pass upon them.   The commissioners recommend that Sections twenty-three (23), twenty-five (25), twenty-six (26), the east half of Section twenty-seven (27), and the north half (N$\frac{1}{2}$) of Section thirty-four (34), Township fourteen (14) south of Range two (2) east, be restored to the public domain.

I recommend that the selection of the reservation be approved.

18.   SAN JACINTO.

The commissioners recommend that the following described tracts of land be set apart as a reservation to be called San Jacinto: the west half (W$\frac{1}{2}$), and the south half (S$\frac{1}{2}$) of the south east quarter (SE$\frac{1}{4}$) of Section twenty-eight (28), Section twenty-nine (29), the south half (S$\frac{1}{2}$) of the south-east quarter (SE$\frac{1}{4}$) of Section twenty (20), the north half (N$\frac{1}{2}$) of Section thirty-three (33), and all of Section thirty-two (32), except such lots in the south-west quarter (SW$\frac{1}{4}$) as belong to

ACC-HRA000661

Reproduced at the National Archives

that portion of the San Jacinto grant now in possession of the
Indians, - all in Township four (4) south of Range one (1) east.
Also Section two (2), the north half (N½) of Section three (3),
fractional Section four (4), and fractional part of the north-
east quarter (NE¼) of Section five (5), all in Township five (5)
south of Range one (1) east.

The commissioners state that the proposed reservation
contains the sections already granted to the Southern Pacific
Railroad Company, and recommend that the Company be allowed,
subject to approval of the Secretary of the Interior, to select
an equal amount of land elsewhere in lieu of this.  The Indians
number nearly 200.

The recommendations of the commissioners are approved.

19.  AGUA CALIENTE.

As now established this reservation contains
nearly 61,000 acres of land upon which are settled about 70
Indians.  The odd sections are claimed by the Railroad Company.
Many of the even sections are barren wastes of desert land and
many others are rugged, pathless, mountain lands.  Nearly all
the Indians are settled on Section fourteen (14), Township four
(4) south, Range four (4) east.  The commissioners recommend
that the following lands be set aside as a reservation to be
called Agua Caliente:  Sections twelve (12), fourteen (14),

ACC-HRA000662

Reproduced at the National Archives

18

twenty-two (22), twenty-four (24), twenty-six (26), and thirty-four (34), all in Township four (4) south of Range four (4) east; also Section two (2) in Township five (5) south of Range four (4) east.   They recommend that the other lands now included in the reservation as formerly set apart, except the east half (E$\frac{1}{2}$) of Section ten (10) which they recommend be exchanged with Dr. Murray and wife, - be restored to the public domain. They make other recommendations as to arrangements for water, and that Dr. Murray and wife be allowed to renew their lease of the hot spring used as a health resort, which can be considered hereafter.

It is recommended that the selection of the proposed reservation be approved.

20.   LOS COYOTES.

This reservation was set apart by Executive Order of May 6, 1889.   It consists of Section three (3) and fractional Section four (4) in Township eleven (11) south of Range four (4) east, and all of Township ten (10) south, Range four (4) east, "except so much of the same as is covered by the patents issued to J. J. Warren, January 16, 1880, and to Harmon T. Helm January 16, 1886."  Also all tracts the title to which had passed out of the United States or to which valid legal rights had attached. The Commission reports that the following tracts have been patented: the south half (S$\frac{1}{2}$) of the north-west quarter (NW$\frac{1}{4}$) and the south-west quarter (SW$\frac{1}{4}$) of the north-east quarter (NE$\frac{1}{4}$)

Reproduced at the National Archives

19

and the north-east quarter (NE$\frac{1}{4}$) of the south-west quarter (SW$\frac{1}{4}$) of Section twenty (20) which has been patented to Hiram Keyes.

Also, the west half (W$\frac{1}{2}$) of the south-west quarter (SW$\frac{1}{4}$) of Section twenty (20), and the south-east quarter (SE$\frac{1}{4}$) of the south-east quarter (SE$\frac{1}{4}$) of Section nineteen (19), and the north-east quarter (NE$\frac{1}{4}$) of the north-east quarter (NE$\frac{1}{4}$) of Section thirty (30) patented to Eugene Paumenberg.

Also, the north-west quarter (NW$\frac{1}{4}$) of the south-east quarter (SE$\frac{1}{4}$) and the fractional south-west quarter (SW$\frac{1}{4}$) of Section thirty (30) which is patented to one Helm.

Also the north half (N$\frac{1}{2}$) of the north-east quarter (NE$\frac{1}{4}$) of Section thirty-one (31), and the north half (N$\frac{1}{2}$) of the north-west quarter (NW$\frac{1}{4}$) of Section thirty-two (32), to Jacob Jora.

Also, the east half (E$\frac{1}{2}$) of the north-east quarter (NE$\frac{1}{4}$), and the south-west quarter (SW$\frac{1}{4}$) of the north-east quarter (NE$\frac{1}{4}$), and the north-west quarter (NW$\frac{1}{4}$) of the south-east quarter (SE$\frac{1}{4}$) of Section twenty-six (26) patented to Robert Fain.

Also, the east half (E$\frac{1}{2}$) of the south-west quarter (SW$\frac{1}{4}$), and the south-west quarter (SW$\frac{1}{4}$) of the south-west quarter (SW$\frac{1}{4}$), of Section twenty-six (26), and the north-west quarter (NW$\frac{1}{4}$) of the north-west quarter of Section thirty-five (35), patented to James Tally.

ACC-HRA000664

20

Also, the south-west quarter (SW¼) of the north-west quarter (NW¼) of Section thirty-five (35), and the south-east quarter (SE¼) of the north-east quarter (NE¼), and the north half of the south-east quarter (SE¼) of Section thirty-four (34), patented to Chat Helm.

Also, parts of Sections thirty-one (31), thirty-two (32), thirty-three (33), south of the boundary line of the Rancho San Jose del Valle.

The commissioners report that these entries were made before the reservation was set apart, but long subsequently to the time when the lands were in possession of the Indians.

Chatham Helm was the first white settler in the canon, and his claim was perfected.   His house stands in the narrowest part of the canon, and his claim separates the Indians below him from their pasturage lands above, as also from another Indian village on the eastern boundary of the township.   It is impossible for the Indians of San Ysidro to get their stock on to their pastures without passing through a gate placed within a few feet of Helm's house and kept closed.

The Commission believes that if the claims of Helm and Tally could be extinguished by purchase or otherwise, it would be a great advantage to these Indians, removing a serious obstacle in the way of their progress.   To do this would require about

Reproduced at the National Archives

Reproduced at the National Archives

21

$2,500.

There are about 150 Indians in the two villages of San
Ysidro and San Ignatio which are five or six miles apart.
The commissioners recommend the setting apart of the lands in-
cluded in the present reservation that are available, and the ex-
tinguishment of Helm's and Tally's rights.

I recommend that the selection of the reservation be
approved.

The third section of the Act of January 12, 1891, pro-
vides that no patent shall embrace any tract to which existing
valid rights have attached in favor of any person unless such
person shall accept the appraisement provided for in section two,
and upon demand and payment shall execute a release.
                    of Helms and Tally
The acquisition of the   claims will require an appropriation by
Congress.

21.   TORROS.

The Commission has grouped together a number of
villages or camps of desert Indians, numbering some 489 persons,
and recommends that a reservation to be called Torros be selected,
as follows:   Sections two (2) and twelve (12) in Township seven
(7) south, Range seven (7) east, S.B.M.; Sections seven (7),
eight (8), nine (9), ten (10), fourteen (14), fifteen (15),
twenty-two (22), twenty-three (23), twenty-four (24), twenty-five

ACC-HRA000666

Reproduced at the National Archives

(25), twenty-six (26), thirty-five (35), and thirty-six (36), in Township seven (7) south, Range eight (8) east, S.B.M.; Sections one (1), two (2), and twelve (12), in Township eight (8) south, Range eight (8) east, S.B.M.; Sections six (6), seven (7), eight (8), eighteen (18), nineteen (19), twenty (20), west half (W$\frac{1}{2}$) of twenty-eight (28), twenty-nine (29), thirty (30), east half (E$\frac{1}{2}$) of thirty-one (31), and Section thirty-two (32), Township eight (8) south, Range nine (9) east, S.B.M.; also the west half (W$\frac{1}{2}$) of Section four (4), Section five (5), east half (E$\frac{1}{2}$) of Section six (6), and Sections seven (7) and eight (8), west half (W$\frac{1}{2}$) of Section nine (9), Township nine (9) south, Range nine (9) east, S.B.M.

The land embraced in this description extends along the fringes of the desert and the foot hills which border it on the south-west.  It is desert land, with mesquite, and more or less of salt grass, and at the points indicated good springs, and it would be protected by mountains on one side and desert on the other, from the intrusion of whites.

The odd sections belong to the Southern Pacific Railroad Company, which has expressed its willingness to choose, subject to the approval of the Honorable Secretary of the Interior, other sections south of Banning in lieu of these.

Section thirty-six (36) Township seven (7) south, Range

Reproduced at the National Archives

eight (8) east, belongs to the State.  It has little value, but is necessary to the reservation.  The state should be allowed to select land in lieu therefor.

if

The Commissioners state that the Salton Lake rises over the desert, much of this land will be 200 feet under water, and that they have made provision at Morongo and Agua Caliente for this contingency.

It is recommended that the selection of this reservation be approved.  It is doubtful, however, whether lieu lands can be given the State for Section 36 without additional legislation.

22.   PAUMA.

On the private grant called "Pauma Ranch", there are three rancherias occupied by one, two, and twelve Indian families respectively - in all, about 80 Indians.

These rancherias have been occupied by Indians since before the treaty of Guadaloupe Hidalgo.  The commissioners state that the original grant excepted these holdings, according to the translation found in the records and accepted by the present owner , Bishop Francis Mora.  To determine his legal rights Bishop Mora has commenced suits against the Indians.

Acting under the clause of the Act which requires the commissioners to determine and define the boundaries of lands within private grants occupied by Indians, they caused the holdings

Reproduced at the National Archives

24

to be surveyed and entered into negotiations with Bishop Mora, as the result of which they secured a quitclaim deed from him to 250 acres of land, an interest in certain lands during the life of Francisco Maja and his wife, and water rights of all the Indians.

The extent of the holdings of these Indians has been a matter of dispute.  This deed admits the fee to the 250 acres to be in the United States and will enable it to convey the lands by patent to the Indians, as in the case of the other reservations

I recommend the acceptance of the deed and that the selection of this reservation be approved.       It is considered unnecessary to quote the description of the lands, which is quite lengthy.

The commissioners state that the Indians are bright, capable men, ready for allotments, which they recommend be made at once.

23.    AUGUSTINE.

Thirty-eight Indians are located on Section nineteen (19), Township six (6) south, Range eight (8) east.  The land is worthless, with no timber and very poor water, obtained by digging a well some ten feet deep.  The Indians are unwilling to remove, as they obtain work at the railroad station.  The section is within the railroad grant.  The Commission recommend

ACC-HRA000669

Reproduced at the National Archives

that the adjoining Section (18) be set apart for this damp, as the Indians can remove to it if they are ever called upon to vacate the one they are on.   Section eighteen (18) is better land.

It is recommended that this selection be approved.

### 24.   SANTA YSABEL.

The Commission recommend that a reservation called by the above name, be established embracing the following lands: The south half ($S\frac{1}{2}$) of Section twenty-one (21), Sections twenty-five (25), twenty-six (26), and twenty-seven (27), and the east half ($E\frac{1}{2}$) and the north-west quarter ($NW\frac{1}{4}$) of Section twenty-eight (28), all in Township eleven (11) south, Range two (2) east, S.B.M.; also Sections twenty-seven (27), twenty-eight (28), thirty-four (34), and thirty-five (35), and fractional Sections twenty-five (25), twenty-six (26), twenty-nine (29), thirty (30), thirty-two (32), and thirty-three (33), in Township eleven (11) south, Range three (3) east, S.B.M.; also Sections one (1), two (2), and twelve (12) and fractional Sections three (3), four (4), ten(10), eleven (11), thirteen (13) and fourteen (14), all in Township twelve (12) south, Range three (3) east, S.B.M.; also Sections ten (10), fourteen (14), and fifteen (15), fractional Section thirteen (13), and the west half, the west half ($W\frac{1}{2}$) of the north-east quarter ($NE\frac{1}{4}$), the south-west quarter ($SW\frac{1}{4}$) of the

Reproduced at the National Archives

north-east quarter (NE¼), and the south-west quarter (SW¼) of the south-east quarter (SE¼) of Section three (3), all in Township twelve (12) south, Range two (2) east, S. B. M.

The commissioners state that there is much worthless land, but that the line cannot be run over the mountains without great expense. The Indians on this reservation have some cattle and a considerable part of their industry is grazing. They have an abundant supply of water and of arable land, not only for their own needs, but for perhaps 50 more Indians, if it shall be necessary to put them there. They recommend that the reservation be set apart not only for the Indians now on it, but for such Mission Indians as it may be advisable to put there hereafter.
This recommendation is approved.

25. CABEZON.

The Commissioners recommend that this reservation embrace Sections thirty (30) and thirty-two (32) in Township five (5) south of Range eight (8) east, about 60 Indians being located on Section 32. There are no Indians on Sections nineteen (19), Township five (5) south of Range eight (8) east, twenty-four (24), Township five (5) south of Range seven (7) east, and Section six (6) in Township seven (7) south of Range nine (9) east, included in the present reservation of Cabezon, and two called "Village".
upon which no Indians are located
The commissioners recommend that these sections be restored to the public domain. The recommendation as to the se-

Reproduced at the National Archives

lection of this reservation is approved.

26.   MORONGO.

According to the report of the Commission this reservation, as at present constituted, embraces considerable worthless mountain land and much worthless waste and desert land. It also contains more agricultural land suitable for dry farming than is needed by the Indians.   The Southern Pacific Railroad runs through the reservation and the Company claims that it is entitled to the odd sections thereon.   The Indians, about 100 in number, are nearly all located in the village of Potrero at the mouth of a canon about five miles long and of considerable width.   The commissioners state that if all the land of and near this canon, and the small one adjacent called Hatheway's Canon, could be secured, it would make as desirable location for them as could be desired.   White men, however, have settled upon some of the railroad lands in the Canon and have filed on the water.

W. S. Hatheway settled on what, by private survey, is determined to be Section twenty-seven (27), Township two (2) south Range one (1) east, and developed considerable water on that Section and in the Canon further up.   He was ejected from the lands after he had spent, as he claims, about $1,500.

C. F. Jost and Margaret Jost settled on Section twenty-five (25) some years ago and made very valuable improvements.   They

ACC-HRA000672

Reproduced at the National Archives

were also ejected.    The land occupied by them is in the heart of
what the Commission thinks ought to be the reservation, and is es-
pecially valuable on account of the water that can be developed
on it.

Richard Gird and John G. North procured an interest some
years ago on Sections fifteen (15) and twenty-three (23), towards
the upper end of the Canon, upon which there are valuable cienegas
They also obtained rights to surplus water from Hatheway and the
Josts.    They also took steps which resulted in their getting
title to the east half (E$\frac{1}{2}$) of Section thirty-six (36) claimed to
be a school section, and on which are nearly all of the houses,
irrigating ditches and very considerable vineyards and orchards
of the Indians.    The commissioners report that the loss of this
Section would be an irreparable one to the Indians.    Gird and
North also built irrigating ditches in the upper end of the Canon
established a field of alfalfa, put out an orchard and spent
considerable sums of money.    They were also evicted and have
commenced suit to recover damages and to determine their right
to the water and lands.    The commissioners fear that if the
claims of these several parties are pressed to a hearing in the
various courts, the result will be very disastrous to the Indians
as affecting their right to both water and land.    They state
that they found the Indians the acknowledged holders of lands

Reproduced at the National Archives

they did not want nor work, and the whites insisting upon rights
to lands that are absolutely essential to the Indians, if a res-
ervation is established.

Believing that they could, by means of the lands not
wanted, obtain title to lands that were wanted, freed from all
claims, and at the same time relieve the Government of threatened
and actual litigation, but having some doubt of their authority,
they, on the 16th of March, 1891, asked this Office for instruc-
tions.  April 1st, 1891, this Office telegraphed them to "go
ahead", and on the same day advised them by letter that they had
ample authority to effect the change suggested, "that is, to give
up lands within the reservation not occupied or needed by the
Indians in order to secure within the reservation, free from in-
cumbrance, lands which are needed for the Indians."  As the re-
sult they have a written offer from C. O. Barker, attorney for
W. S. Hatheway, C. F. Jost, Margaret Jost, Richard Gird and John
G. North, to release their several interests, claims, and suits,
the several parties to receive in consideration and exchange
therefor, patents for certain other lands as described.
Under this arrangement, Hatheway is to receive a patent for
320 acres; the Josts for 320 acres and Gird and North for 1,840
acres.  This proposition, however, is not to remain open after
the first of January next.

ACC-HRA000674

Reproduced at the National Archives

The commissioners also secured the consent of the Southern Pacific Railroad Company to relinquish the odd sections desired for the permanent reservation, and to take an equal quantity of land in certain even sections within the present reservation, but which the Commission does not consider necessary to retain.   The resolution of the Company does not include Section eleven (11), Township two (2) south, Range one (1) east, which the Commission includes in the proposed reservation.

The commissioners also state that Wellwood Murray and Eliza E. Murray are the owners of the north half (N$\frac{1}{2}$) of Section one (1), Township three (3) south, Range one (1) east (except 10 acres owned by Mrs Tutain), and that this land is needed in the proposed reservation.   The Murrays are willing to exchange this land for the east half (E$\frac{1}{2}$) of Section ten (10) in Township four (4) south, Range four (4) east (in the present Agua Caliente reservation) which land is not needed for the Indians.

The commissioners report that to bring about these various changes requires a larger area of land surrendered than is recovered for the Indians in return, but that in making the exchange the delays and hazards of litigation are avoided. They secure the release of large claims for damages growing out of alleged unlawful evictions, and to the reservation exceedingly valuable water rights.   They say that if they were dealing with

ACC-HRA000675

Reproduced at the National Archives

31

reference to their own property they would not hesitate for a moment in making the proposed exchange.

So far as the exchange of railroad lands is concerned there appears to be ample authority, under the following clause of the third section of the Act:

"That in case any land shall be selected under this act to which any railroad company is or shall hereafter be entitled to receive a patent, such railroad company shall, upon releasing all claim and title thereto, and on the approval of the President and Secretary of the Interior, be allowed to select an equal quantity of other land of like value in lieu thereof, at such place as the Secretary of the Interior shall determine."

The townships in question have not been subdivided, and this Office has held that the grant to the Company does not attach until the odd sections have been determined by public official survey, and on this ground recommended the removal of Gird and North and the other persons referred to in the report of the Commission.  A decision of the district court in a timber trespass , however, takes the ground that the right of the Company has attached.  However this may be, the land in the odd section will unquestionably become the property (if it has not already) of the railroad company.  I think the change suggested should be approved.

The case is different, however, with regard to the proposed exchange of lands claimed by private parties.  The Act does not contain any authority for the exchange of such lands,

ACC-HRA000676

Reproduced at the National Archives

32

nor do I know of any authority of law by which patents can be
issued to these parties for the quantity of land which it is
proposed to give them.

Office letter of April 1, 1891, contemplated that the
Commission might release from reservation lands not needed for the
Indians upon which the parties in question could locate, but did
not contemplate the issuance of patents for such released lands,
except such as they might be entitled to under existing laws.

I do not understand that these parties have acquired
any valid rights as against the United States on the even sections
and such rights as they have on the odd sections have been ac-
quired from the railroad company. The Commission does not state
what these rights are, nor how acquired. It is very important,
however, that the claims of these parties should be removed if
possible.

In a communication dated December 15, 1891, Prof.
Painter of the Commission, states that he has already urged the
vital importance of having the approval of the President and
Secretary to the proposed exchange with these parties and the
railroad company before the expiration of the year, as Mr.
Barker's power of attorney expires on January 1st next, and some
of the parties would not be sorry to have the arrangement fail.
He states that he cannot overestimate the importance of the

ACC-HRA000677

Reproduced at the National Archives

33

proposed arrangement, as if it fails, the Indians will be in a
deplorable condition.   He suggests that the exchanges may be
ratified, and the sections to be given in exchange held under
reservation until the patents can be prepared for the several
parties, and so trouble and annoyance be prevented.

He also transmits a telegram from Mr. Smiley, one of the commis-
sioners, as follows:

"December 14, 1891.

Red Lands, Calif.

Prof. C. C. Painter,

Gt. Barrington, Mass.

Effort being made to give this State lieu lands for east
one-half of Sec. thirty-six, township two south range one east
S.B.B. and M.  said land was patented under survey of Henry Wash-
ington adopted Sept. 19 fifty-five which established three corners
of said section.   Am informed there is a party here who has ar-
ranged with an official in Department at Washington that will en-
able him to file at Los Angeles land office on the land to be
given to settlers as soon as President removes executive order
of reservation and before patents are issued to settlers under
agreement with Mission Indian commissioners.   See that parties
to whom we have promised lands are protected.   This is a vital
matter and needs prompt action.  See Secretary at once.

Gilbert K. Smiley."

The Act does not contain any authority for the exchange
of school sections, but it is possible that this authority may
exist under general law.

The proposed exchange and settlement of the status of
this reservation is very desirable and the arrangement should

Reproduced at the National Archives

34

be carried out if possible, although the rights of the parties may, to a certain extent, be questionable, and they are to receive more land with a good title than they are to surrender with a doubtful title.

It is also possible that the railroad company is to receive land in exchange for that for which they have already received compensation, but this is a small matter compared to the great advantage to be derived from a satisfactory settlement of the Mission Indian question. It should not be forgotten that by the proposed settlement, not only is sufficient land to be secured, but what is of more importance, an abundant water supply.

It is suggested that the object desired may be attained by formally accepting the proposition of Mr. Barker and the railroad company and then asking Congress to authorize the exchange of the private and school lands.

Some other matters are discussed in the report, which I have not here referred to in view of the importance of early action in regard to the Morongo reservation.

After the selections for reservations and the propositions above referred to shall have been passed upon by you, this Office, if you so desire, will submit a list of the several reservations, with particular descriptions thereof, after consultation with the General Land Office as to entries, &c., a form of

ACC-HRA000679

Reproduced at the National Archives

patent, etc., and will submit a report upon the other matters referred to.

It may also be necessary to obtain further information from the Commission as to the grantees to be named in the patents, etc.

It is recommended that no lands in the reservations as at present existing be restored to the public domain until the several reservations shall have been patented as contemplated by the Act.   Authority for such restoration is doubtless contained in the second section of the Act, which provides for the selection of reservations sufficient in extent for the just requirements of the Indians.

It is estimated that these 26 reservations, if constituted as recommended by the Commission, will embrace some 136,000 acres.   The reservations as at present constituted, contain according to the annual report of this year 182,315 acres.

The Commission recommends that the Tule River reservation be patented to the Indians now located thereon.   This reservation, containing some 43,000 acres, was formerly under an independent agency, but being so small, the agency was consolidated with the Mission Agency.   The Indians located on this reservation have not been classed as Mission Indians.   It is presumed that the Commission treated the reservation as one of the Mission res-

ACC-HRA000680

Reproduced at the National Archives

36

ervations from the fact of its being attached to the Mission

Agency.

The recommendation of the Commissioners is submitted

for your consideration.   The area of the reservation is not in-

cluded in the figures given above.

In his letter of December 15th, Prof. Painter regrets

that

would be very inconvenient for                    at that the importance

of this matter is so great that he will respond at once to a

telegram if deemed necessary.

Very respectfully,

Your obedient servant,

Allen (L)

Acting Commissioner.

ACC-HRA000681

# TAB II-3

and
Executive Order of December 29, 1891.   Box 42

# I N D E X

--0--

| Reservation | Page |
|---|---|
| San Manuel | 3 |
| Ramona | 4 |
| Pala | 5 |
| Rincon | 6 |
| Cahuilla | 7 |
| Potrero | 8 |
| Inaja | 10 |
| Cosmit | 10 |
| Mesa Grande | 10 |
| La Posta | 12 |
| Manzanita | 13 |
| La Cuna | 13 |
| Campo | 14 |
| Temecula | 15 |
| Cuyapipe | 16 |
| Sycuan | 18 |
| Capitan Grande | 18 |
| San Felipe | 21 |

| Reservation | Page |
|---|---|
| Tule River | 23 |
| San Pasqual | 24 |
| Santa Ynez | 26 |
| San Jacinto | 28 |
| Agua Caliente | 30 |
| Los Coyotes | 36 |
| Torros | 40 |
| Pauma | 44 |
| Augustine | 43 |
| Santa Rosa | 48 |
| Morongo | 51 |
| Santa Ysabel | 64 |
| Mission Creek | 66 |
| Cabazon | 67 |
| San Louis Rey | 70 |
| Private Grants | 71 |

HERITAGE ROOM ARCHIVES
A. K. SMILEY LIBRARY
125 W. VINE
REDLANDS, CA 92373

ACC0017406

U.S. INDIAN SER[VICE],

San Diego

May 26, 190[ ]

Commissioner Indian Affairs

Washington D.C.

Sir,

I have the honor to return
the report of Mission Indian Commissi[on]
for a filing in Office

Very Respectfully

[signature]

Spl Agt

ACC0017407

REPORT OF MISSION INDIAN COMMISSIONERS.

To the Honorable,

The Secretary of the Interior,                                    34993

Through the Commissioner of Indian Affairs:--

The undersigned Mission Indian Commissioners most respectfully report as follows:

As soon after their appointment as possible, all the members of the Commission went to California and proceeded to make themselves as familiar with the condition of the Indians and their reservations as possible.   To do this they were compelled to travel over many miles of mountain roads and to have many surveys made. We have found a great many difficulties in the way of a satisfactory solution of the questions submitted to us: white men, in many instances, had encroached upon the Indian lands-- especially upon those within the lines of Spanish grants, the Southern Pacific Railroad Company claimed to own the odd sections of land within the reservations near the line of its railroad, settlers had moved on to these railroad lands and made improvements and developed water rights.     of them had been ejected by the military and had   suits against the government or against the officers    .   We have attempted to adjust al

ACC0017408

differences, and in some cases have succeeded, as will appear more in detail in our recommendations in regard to individual reservations.

It is our judgment that if our recommendations are adopted it will result in a reasonably comfortable and adequate home for every Mission Indian who cares to avail himself of the provisions made for him on these reservations.

At those reservations where we think it wise to allot the lands at an early date in severalty, we have so recommended.  As to the reservations where we do not so recommend, we did not think it best as yet to allot the lands to individuals.

In Southern California the water supply is an important matter.  Its use can be greatly economized by the adoption of method and system in the laying out and the construction of the reservoirs and irrigating ditches.

The Indians are good ditchers and have great skill in the building of irrigating ditches, but they do not possess the technical knowledge that will enable them to plan a system of irrigation that shall provide for an economical use of water by so many families as will need it on some of the reservations proposed by us, and so we recommend that there be employed a competent water engineer to plan systems of irrigation for them in such localities as will mention more in detail hereafter.

ACC0017409

After pursuing the work of the Commission for about eight weeks, Messrs. Smiley and Moore were compelled to go East and were granted leave of absence for that purpose.   Mr. Painter has remained in California continuously causing surveys to be made and getting such information in detail as he could get.   Mr. Moore returned in October and Mr. Smiley early in November, and all the members of the Commission since their return have spent all their time in the work of the Commission.   We recommend that there be set apart for the Mission Indians of California, the following reservations:

## SAN MANUEL.

We recommend that there be set aside for the Indians living on the land March 12th, 1891, the following lands for a reservation to be called San Manuel, viz:

Section twenty (20); also that part of Section thirty (30) bounded on the North and on the East by the section line and on the South-west by the flume; it being a triangular shaped piece of land containing about fifteen acres: All in Township one (1) North, Range three (3) West, S. B. M.

(For a more detailed statement of this proposed reservation, see our report of March 12th, 1891).

3.

ACC0017410

## TWENTY-NINE PALMS.

This Commission recommends that there be established a reservation known as the Twenty-nine Palms, to consist of the following lands, viz:

The South-west quarter of Section thirty-three (33) in Township one (1) North, Range Nine (9) East, S. B. M.; and also the North-west quarter of Section four (4) in Township one (1) South, Range nine (9) East, S. B. M.

There are three families here having three houses and some cultivated fields: the head man is Chimehueva Mike. They have plenty of water and can be very comfortable here. There is sufficient tillable land for their needs; the balance of the land in the proposed reservation is valuable grazing land.

The Indians were in possession of these lands as shown by the field notes as long ago as in 1852.

## RAMONA.

We recommend that the following lands be set aside as a reservation to be called Ramona, viz: The South-west quarter of the South-east quarter (1/4) and the South-east quarter (1/4) of the South-west quarter (1/4) of Section thirty (30); the West one-half (1/2) of the North-east quarter (1/4) and the South-east quarter (1/4) of the North-east quarter (1/4), and the North-east quarter

ACC0017411

(1/4) of the South-east quarter (1/4) of Section Thirty-one (31);
the North half (1/2) of South-west quarter (1/4) and the South-
east quarter (1/4) of the South-west quarter (1/4) and the South
half (1/2) of South-east quarter (1/4), Section thirty-two (32 );
and the South-west quarter (1/4) of the South-west quarter (1/4),
Section thirty-three (33); all in Township six (6) South Range
Three (3) East, S. B. M.; also the North-west quarter (1/4) of the
North-west quarter (1/4) of Section four (4), and the North-east
quarter (1/4) of the North-east quarter (1/4) of Section five (5);
all in Township seven (7) South, Range three (3) East, S. B. M.

There are three families comfortably situated on these lands
which are valuable as grazing lands; they have a good water supply.

## PALA.

This Commission recommends that the following lands be set
aside as a reservation to be known as Pala, viz: The South half
(1/2) of the North-east quarter (1/4) of Section thrity-three (33);
the North-west quarter (1/4) of the North-west quarter (1/4) of
Section thirty-four (34), and the North-east quarter (1/4) of the
North-east quarter (1/4) of Section thirty-four (34); all in Town-
ship nine (9) South, Range two (2) West, S. B. M.

This land is nearly all arable land and has been occupied by
the Indians for a long time.   They have on these lands quite com-

5.

ACC0017412

fortable houses.    The Indians are not willing to leave and there
are no other government lands in this vicinity that we can recom-
mend to be set apart for their use or we should be glad to have
the reservation larger.

We think the lands at Pala ought to be alloted, and the sur-
plus Indians for whom there is not land, induced to go to some of
the other reservations.

There are about sixty Indians here.

## RINCON.

The village of Rincon comprises about one hundred and fifty
Indians.    There is a very good school here and the children are
making commendable progress.

We recommend that there be set aside the following lands as a
reservation to be called Rincon, viz: Fractional Section twenty-
six (26) and Section thirty-five (35) in Township ten (10) South,
Range one (1) West, S. B. M., and Sections two (2) and three (3)
in Township eleven (11) South, Range one (1) West, S. B. M.

Nearly all these lands are arable and well watered.    Some
of the Indians are farming successfully and we think it would be
wise to allot to indviduals the lands on this reservation.    In
our judgment the lands allotted should not be in regular shapes
but should be allotted with reference to getting a supply of water,

6.

ACC0017413

and with reference to the buildings and improvements already made.

## CAHUILLA.

We recommend that the Cahuilla Indian Reservation remain as it is with the addition of the South half (1/2) of Section fourteen (14) in Township seven (7) South, Range two (2) East, S. B. M. We suggest this addition because an Indian has a house and cultivated field upon this land and needs it for a home.

The lands we recommend for this reservation are as follows: The South half (1/2) of Section fourteen (14), Sections twenty-three (23), twenty-five (25), twenty-six (26), twenty-seven (27), twenty-eight (28), thirty-three (33), thirty-four (34), thirty-five (35), and thirty-six (36) in Township seven (7) South, Range two (2) East, S. B. M.; Sections twenty-six (26), twenty-seven (27), twenty-eight (28), twenty-nine (29), thirty (30), thirty-one (31), thirty-two (32), thirty-three (33), thirty-four (34) and thirty-five (35) in Township seven (7) South, Range three (3) East, S. B. M.; Sections one (1), two (2), three (3) and four (4) in Township eight (8) South, Range two (2) East, S. B. M.; Sections two (2), three (3), four (4), five (5) and six (6) in Township eight (8) South, Range three (3) East, S. B. M.

This band of Indians have quite comfortable houses and are largely engaged in stock raising. There is a school on this

7.

ACC0017414

reservation which is quite well attended. Many of the men are independent and ambitious and we think would manage their lands in a capable way, if they were individual owners. On account of the fact that so large a part of their industry is stock raising, it would not be practicable to allot their grazing lands, but we believe it would be good policy to allot some of the agricultural lands, of which there is a sufficiency for that purpose, to the more intelligent and industrious heads of families. When not needed in the work upon the reservation, the men are in the habit of going outside to work. Their services are in demand and they earn considerable sums of money. When the Indians are all at home, there are about two hundred and fifty people on this reservation.

## POTRERO.

This Commission suggests that in their judgment it is not advisable to create separate reservations for La Jolla and La Piche villages, though there have been some indications of a desire, on the part of the Indian Department, to have it done. There are about forty Indians in the village of La Piche; there are about one hundred and forty in the village of La Jolla. It is difficult to tell where one village ends and the other begins The children from both villages attend the same school. It is not desirable or practical to maintain more than one school.

8.

ACC0017415

There is already jealousy between the people of the two villages. Room should be made on this reservation for Mission Indians who are inadequately provided for at other places. Many of the Indians are now ready for individual allotment. To attempt to establish two reservations will increase the jealousy of these Indians and greatly complicate the allotment of lands and the providing for worthy Mission Indians who need homes here. We therefore recommend that there be set aside, for the use of the Mission Indians in the villages of La Piche and La Jolla, and for such other Mission Indinas as it may be expedient to place upon said reservation, the following described land to be called the Potrero; viz., fractional Sections seventeen (17), nineteen (19), twenty (20), twenty-one (21), twenty-two (22), twenty-seven (27), twenty-eight (28) and twenty-nine (29), and Sections twenty-three (23), twenty-five (25), twenty-six (26), thirty (30), thirty-one (31), thirty-two (32), thirty-three (33), thirty-four (34) and thirty-five (35), in Township ten (10) South, Range one (1) East, S. B. M.

There are many evidences of prosperity and thrift upon the part of these people, and they have an opportunity here to make for themselves most excellent homes. They have an abundance of water, and also of arable land, for their reasonable needs, and also for a considerable addition to their numbers. There is also much good grazing land. The reservation, upon nearly all sides,

9.

ACC0017416

runs back to and takes in considerable mountain land worthless for

any purpose except to prevent encroachments by others upon it.

## MESA GRANDE.

We recommend that the following lands be set apart as a reser

vation to be called Mesa Grande, viz: The East half (1/2) of the

South-east quarter (1/4) of Section eight (8), and the South-west

quarter (1/4) of the South-west quarter (1/4) of Section nine (9)

in Township twelve (12) South, Range two (2) East, S. B. M.

There are three families of Indians on these lands who do not

wish to move to a larger reservation.


## INAJA.

Two reservations contiguously situated in Township thirteen

(13) South, Range three (3), S. B. M., to-wit, the North-east

quarter (1/4) of Section thirty-five (35), and the North one-half

(1/2) of the North-east quarter (1/4) of Section twenty-five (25),

known respectively as Inaja and Cosmit, were set apart by executiv

order dated December 27th, 1875.   The Indians for whom the latter

was intended had their Rancheria on the South one-half (1/2) of th

North-east quarter (1/4), and had fine water and excellent land.

Through what the Commssion believes to be a cruel fruad, the

10.

ACC0017417

Reservation was located North of their Rancheria on utterly worthless land, and the land they had been cultivating, and their homes, were taken by a white man.

There have been no Indians on the reservation of Cosmit since it was set apart, because no one could live upon it.   At Inaja, under Captain Jose Dolores, there are thirty Indians who have some seventy acres of arable land, with water for about one-half of that amount.   About forty acres of the remainder is good grazing land, and the rest, fifty acres, is high pine land.

These Indians were greatly disappointed that we could not restore to them their old fields and water at Cosmit, but will be satisfied with such additions as we are able to make, to-wit, the South one-half (1/2) of the South-east quarter (1/4) and the North-east quarter (1/4) of the South-east quarter (1/4) of Section twenty-six (26), Township thriteen (13) South, Range three (3), East, S. B. M.   The Commission recommends, therefore, that the Reservation of Inaja embrace the North-east quarter (/4) of Section thirty-five (35); and the South one-half (1/2) of the South-east quarter (1/4), and the North-east quarter (1/4) of the South-east quarter (1/4), of Section twenty-six (26), Township thirteen (13) South, Range three (3) East, S. B. M.; and that the reservation of Cosmit, i. e., the North one-half (1/2) of the North-east quarter (1/4) of Section twenty-five (25), be restore to the public domain.

11.

ACC0017418

## LA POSTA.

The La Posta Rancheria is on the South-east one-fourth (1/4) of the South-west one-fourth (1/4), and the South one-half (1/2) of the South-east one-fourth (1/4), of Section thirty-one (31), Township sixteen (16) South, Range six (6) East, S. B. M.   There are thirty-five Indians here, who have not more than thirty or forty acres of second rate land, with sufficient water.   They are poor, and there is little hope for them where they now live. The Commission recommends that, in addition to the land above described, the following be added: The North one-half (1/2) of the North-east one-fourth (1/4), and the North-east one-fourth (1/4) of the North-west one-fourth (1/4) of Section six (6), Township seventeen (17) South, Range six (6) East, S. B. M., so that the La Posta Reservation will embrace the following descriptions of land: The South-east quarter (1/4) of the South-west quarter (1/4), and the South half (1/2) of the South-east quarter (1/4) of Section thirty-one (31), Township sixteen (16) South, Range six (6) East, S. B. M.; and the North half (1/2) of the North-east quarter (1/4), and the north-east quarter (1/4) of the North-west quarter (1/4) of Section six (6), Township seventeen (17) South, Range six (6) East, S. B. M.

12.

ACC0017419

## MANZANITA.

In Township sixteen (16) South, Range six (6) East, S. B. M.,
on the North half (1/2) of the North-west quarter (1/4) of Section
twenty-six (26), is the Rancheria called Manzanita, where there
are some forty Indians.    There is very little land, and this of a
very poor quality, and there is none that can be added to that
now occupied by them.

These are the very poorest Indians of all visited, or for
whom the Commission have attempted to provide.

It is recommended that this Section be patented to them for
security, but it is in part of these that a larger amount of land
has been reserved at Capitan Grande than would other have been
reserved, to which they, it is hoped, may be induced to remove
when convinced that they can secure homes there.

## LAGUNA.

On Section thirty-three (33) of Township fourteen (14) South,
Range five (5) East, is an old Rancheria called Laguna, consisting
of four houses and as many families, under Captain Valentine.
There is a sufficiency of arable land, a considerable portion of

13.

ACC0017420

which is under cultivation.    There are also two large springs from which most of the land under cultivation can be irrigated.

The Commission recommends that the North-west quarter (1/4) of this Section be patented to this village, as a permanent reservation.

## CAMPO.

In Township eighteen (18) South, Range five (5) East, S. B. M., is a Rancheria comprising eight houses and forty-seven Indians. They have water and some good land and there is demand for work in the neighborhood.    They were located on the South-east one quarter (1/4) of the North-west one quarter (1/4) and on the South-west one quarter (1/4) of the North-east one quarter (1/4) of Section three (3).

The Commission has made some additions such as they were able to make and recommend that the reservation of Campo be created and comprise the following described land:

The East half (1/2) of the North-east one quarter (1/4) of Section four (4); the West half (1/2) of the North-west quarter (1/4); the South-east quarter (1/4) of the North-west quarter (1/4); the South-west quarter (1/4) of the North-east quarter (1/4); and the North-west quarter (1/4) of the South-west quarter (1/4) of

14.

ACC0017421

Section three (3), Township eighteen (18) South, Range five (5) East, S. B. M.

## TEMECULA.

This reservation, as created by executive order, comprised Sections twenty-six (26), twenty-seven (27), twenty-eight (28), thirty-four (34) and thirty-five (35), in Township eight (8) South, Range two (2) West, S. B. M. Owing to an almost entire lack of water, the land is suitable only for dry farming, and can be utilized alone for such grains as barley and wheat, which are made by the winter rains.

The Indians, being unwilling to remove, the Commission recommends the setting apart of these Sections as a permanent Reservation for them, believing that, with such crops as they will be able to raise, and the wages they can earn as laborers on the adjoining ranches, they can make a comfortable living.  The little water they have has its rise on Section thirty-six, one hundred and sixty acres of which ought to be added to the selections the Commission has made.  The former Agency Clerk and Physician, Dr. Ferrebee, purchased this land from the State, that it might be held for this purpose, and is willing to sell it to the government

15.

ACC0017422

for what it cost him, *including taxes and interest,* and the Commission recommends that it be purchased and added to the Reservation.

This land is described as follows:

The north half (1/2) of the North-west quarter (1/4); the South-east quarter (1/4) of the North-west quarter (1/4); and the South-west quarter (1/4) of the North-east quarter (1/4) of Section thirty-six (36), Township eight (8) South, Range two (2) West, S. B. M.  This purchase can be made, we believe, for a sum not exceeding ~~Four~~ *Five* Hundred Dollars.

There are, at this place, about one hundred and sixty Indians, being a remnant of those who were ejected from the Temecula Valley some years ago.

The Commission recommends that the government pipe the water from the above mentioned quarter sections to the school-house, and to a central point of the village, under the supervision of the Indian Agent, at an estimated cost of Two Thousand Dollars.

## CUYAPIPE, or LONG CAÑON.

The Cuyapipe Indian Village, consisting of some twenty houses, and a small church, and about seventy-four Indians, fifty men and women and twenty-four children, stands on the North-east quarter (1/4) of the North-east quarter (1/4) of Section nineteen (19),

16.

Township fifteen (15) South, Range six (6) East, S. B. M. There is quite a stream of water, being the North fork of the Tia Juana flowing through the narrow cañon on the sides of which the village is located, which is constantly cutting away the small amount of land that can be cultivated. They are very poor, and cannot be otherwise so long as they remain here, and it is hoped that they may be induced, when convinced that they can secure better land, with an assured title, to remove to Capitan Grande.

For the present we recommend that the following described land may be given them for a Reservation: The East half (1/2) of the North-east quarter (1/4) and the East one-half (1/2) of the South-east quarter (1/4) of Section nineteen (19); the West half (1/2) of Section twenty (20), the West half (1/2) of the South-east quarter (1/4) of Section twenty (20); the North-west quarter (1/4) of Section twenty-nine (29); the West half (1/2) and the North-east quarter (1/4) of the North-east quarter (1/4) of Section twenty-nine (29); and the North-west quarter (1/4) of the South-east quarter (1/4) of Section twenty-nine (29).

There is no available land contained in this description, except along the creek, but, in the absence of a survey, which would cost many times more than the land is worth, it is necessary to give a margin along the mountains sides to make certain that

17.

ACC0017424

this land is included.

## SYCUAN.

We recommend that the following lands be set aside as a reservation, to be called Sycuan.

Section thirteen (13) in Township sixteen (16) South, Range one (1) East, S. B. M.

This land is well watered, and nearly all arable. It is surrounded by a settled country, and the Indians who care to work can get constant employment at remunerative prices. There are on the Reservation about fifty Indians.

## CAPITAN GRANDE.

We recommend that there be set aside the following lands as a Reservation, to be called the Capitan Grande, viz: Sections ten (10), eleven (11), fourteen (14), fifteen (15), twenty-two (22), the West half (1/2) of Section twenty-seven (27), twenty-eight (28), thirty-three (33); South half (1/2) Section thirty-four (34), and Section thirty-five (35); all in Township fourteen (14) South, Range two (2) East, S. B. M. Also, Section three (3) and four (4), and the North half (1/2) of Sections one (1) and two (2),

18.

ACC0017425

in Township Fifteen (15) South, Range Two (2) East, S.B.M.   Also,

Sections thirty-one (31) and thirty-two (32) in Township fourteen

(14) South, Range three (3) East, S. B. M.   Also, Sections five

(5) and six (6) in Township fifteen (15) South, Range three (3)

East, S. B. M.

In our judgment, about one-sixth of these lands are cultivat-

able lands, and under an arrangements we have made with the San

Diego Flume Company, which we shall mention later, will be well

supplied with water, except the East four Sections.   The rest of

the lands are chiefly grazing lands, though there are some worth-

less mountain lands.   There is not only sufficient land for the

Indians now on the Reservation, but also for fully one hundred

others who will need to find homes here.

We recommend that the reservation be set apart, not to those

now on the land simply, but also to those who shall hereafter find

homes there.   This Reservation will make ideal homes for Indians.

It is one of the localities where individuals are intelligent and

good workers, and some individual allotments ought to be made soon.

The San Diego Flume Company has its diverting dam on this

Reservation.   Its flume also goes nearly the whole length of it,

as will be seen by a tracing transmitted herewith and marked

Exhibit A.

12.

The San Diego River runs through the Reservation, but for a good part of the year is dry, so that it would not furnish a permanent supply of water for irrigating purposes.   At the dry season of the year the irrigating Company turns water into the stream from their Reservoir, and then by means of the diverting dam, turns the water into the flume from the river, assuring a permanent supply.   They have also constructed a good road through the Reservation, and for the right of way for the flume, diverting dam and road, propose to furnish the Indians now on and that may be put on, the Reservation hereafter who are under their flume what water they may need for domestic and irrigating purposes, under reasonable regulations, as will be seen by their proposition transmitted herewith and marked Exhibit B.   We think the construction of this flume is of benefit to this Reservation.   At one time the Flume Company attempted to make, with Indian Agent Preston, an agreement, by which they were to pay $1300 in money, as well as to furnish the water.   That occurred in boom times, and under great stress.   We do not think the money consideration ought to be asked of them.   We do not find any claims upon the lands we have herein selected as a reservation, for improvements, that we think it necessary to extinguish.   Charles Hensley, A. P. Knowles and perhaps others, have claims against the government for eviction

20.

from the Reservation.   If these claims have merit, some other department of the government should pass upon them.

We recommend that Sections twenty-three (23), twenty-five (25), twenty-six (26), and the East half (1/2) of Section twenty-seven (27), and the North half (1/2) of Section thirty-four (34), in Township fourteen (14) South, Range two (2) East, S. B. M., be restored to the public domain.   About one-half of the lands we so recommend to be restored are worthless mountain lands; the others have some value as grazing and agricultural lands but we have retained sufficient lands for the reasonable needs, not only of the Indians now there, numbering about one hundred and fifty, but also of fully one hundred more.

The lands we recommend to be thrown out include the lands upon which are the claims of Captain Arthur F. Head, Jacob P. Keener and Robert Alford.   *Heads land, in lieu for 9, T15 SR 2 E, restored by Ex order of Apl 16, 1901*

## SAN FELIPE RANCH.

This lies to the East of Warner's Ranch, near the desert, in Township twelve (12) and thirteen (13) South, Ranges four (4) and five (5) East, S. B. M.   Formally, there were two quite large Rancherias within the grant, and it has been claimed by the owners

21.

ACC0017428

and tacitly admitted by the friends of the Indians, and various officials in charge of them, that they came on to the grant subsequent to the time it was made.   Acting on this assumption, the owners ejected the Indians from one of these Rancherias some years since, and demolished their houses.

Those in the other Rancheria have held on to their homes, and in part to the lands they have been using, and there are now on the Grant about one dozen houses and seventy Indians.   They are attached to their homes, and for the present utterly refuse to consider the question of removal to some other place.

The Commission had testimony which led it to believe, that these Indians were on the land long before the grant was made, and that, had the owners of the grant resorted to the courts for a writ of ejectment, the Indians would not have been removed.

We therefore can only report the situation, and ask that if an attempt is made to eject them, Mr. Lewis, United States Counsel for the Mission Indians, be instructed to protect their rights; and, in case of failure, to maintain their rights in the courts, they be given a home at Capitan Grande, Agua Caliente, or Morongo, where, in view of such contingencies, we have set apart a surplus of lands above the needs of those now living on these proposed Reservations.

ACC0017429

The lands now occupied by these Indians are insufficient for their use, but serve to furnish them gardens and orchards, while the men earn the chief support for their families elsewhere.

## TULE RIVER.

The Tule River Reservation, as the Commission found it, embraces about forty-three thousand acres, of which not more than two hundred are tillable. There are on it nearly two hundred Indians, who have some three hundred head of cattle, one hundred and fifty head of horses and mules, and a few sheep and hogs. The range for stock would support from four thousand to five thousand head.

The government farmer in charge of these Indians, an intelligent and capable man, says he can take care of some sixty or seventy more Indians. There are on the ranch of General Beale in Kern County, about sixty miles from this Reservation, some eighty Indians living in a Canon containing four hundred acres of land. These Indians paid General Beale a nominal rent for this land, and are needed as laborers on the ranch. They have lived here since 1876, and have been paying a rent since 1880.

General Beale says that, so long as he or his son, Truxton Beale, has this property, the Indians shall never be disturbed.

ACC0017430

He makes provision for the old and infirm.   These Indians are anxious for homes,- for land of their own, but as we could find none in this vicinity, we only recommend that the Tule River Reservation as it stands, shall be patented to the Indians now on it, and such others, now on Beale's Ranch, as may choose to remove to it.

As you already have a description of this Reservation, we deem it unnecessary to burden our report with a repetition of it.

## SAN PASQUAL.

On the San Pasqual Mountains, in Township eleven (11) South, Range one (1) West, S. B. M., are some nine or ten families of Indians, living on public land.   These were cruelly and wrongfully driven from the San Pasqual Valley a few years since; their land there, though granted to them by the Mexican Government, having been patented by the United States, to white men.

The difficulties attending an attempt to unsettle the lands thus held, are so great the Commission hesitates to recommend an effort to restore these people to their rights; a surveyor was therefore instructed to find on what descriptions of land they are living, and it accords both with the views of the Commissioners and the wishes of the Indians, that these should be entered as

24.

ACC0017431

Homesteads, under the special provisions of the Homestead Law for Indians.   The Township has not been officially surveyed, but the survey made for the Commission by E. L. DOrn, a careful and competent surveyor, locates them on the East half (1/2) of Section twenty-one (21), the South half (1/2) of Section fifteen (15), Section twenty-two (22), the West half (1/2) and the West half (1/2) of the east half (1/2) of Section twenty-seven (27), the East half (1/2) of the South-east quarter (1/4) anixixime of Section twenty-eight (28), and the North-west quarter (1/4) of Section twenty-three (23); all in Township eleven (11) South, Range one (1) West, S. B. M.

The Commission recommends that until such time as these lands have been officially surveyed, they be held in reserve for these Indians, and then the opportunity be given for them to enter homesteads.

There is a sufficiency of arable land for their support, with very little water, but the character of the soil is such that fairly good crops of corn and other grains are made without irrigation.   These Indians seem to be fairly industrious, and, under the circumstances, hopefully progressive.

25.

ACC0017432

# THE SANTA YNEZ INDIANS.

"Within the limits of the College Grant, in Santa Barbara County, in the Canada de la Cota, is an Indian village composed of some fifteen familes.   These date their possession of the lands they occupy from about 1835, they removing to this place immediately after the Secularization Act, which emancipated them from the control of the Padres.

Grants of land were made to several Neophytes by Governor Michel Toreno, all within the College Grant, previous to its execution, which were excepted by its provisions.   Two of these were within the bounds of the present village.   These grants were duly executed, and should have been noted in the Mexican record, but are not to be found so recorded.

There are abundant evidences of a long occupancy of this canon, by a much larger number of Indians, and their title to their land by adverse possession might easily be maintained, were it not that the owners of the College Grant present a duly executed written acknowledgement on the part of the Indians that their occupancy was not adverse.

As against this instrument, the declaration of the Indians, that they never paid a cent, nor did they know that they had signed such an acknowledgement of their position as tenants, there would

23.

ACC0017433

be difficulty in maintaining their otherwise unquestionable title by adverse occupancy, whatever opinion we might have as to the worldly wisdom of the Bishop who procured this acknowledgment.

The present owners of the grant, while maintaining that the Indians had no legal rights which they will recognize, emphatically declare that they will protect and maintain, to the fullest extent their equitable rights.   They declare these Indians shall never be disturbed in their occupancy and use of the lands on which they now live, if they persist in their wish to stay where they are; or they will, preferably, deed to the Secretary of the Interior, in trust for them, five acres of good land, to each family; pipe to it a sufficiency of water for agricultural and domestic purposes, and build for each family a comfortable two-room frame house.

This, in the estimation of the Commission, would be better for the Indians than the possessions they now hold, even if made secure to them by a perfect title.

The unwillingness of the Indians to leave their present homes embarrasses this proposition at present.

The Commission, having no power either to set apart the lands now occupied or to compel the Indians to accept the offer made by the Company, feel that they have discharged their duty in the prem-

27.

HERITAGE ROOM ARCHIVES
A K SMILEY LIBRARY
125 W. VINE
REDLANDS, CA 92373

ACC0017434

ises when they recommend, as they do, that the special attorney for the Mission Indians be instructed to take immediate steps to perfect the arrangement proposed by the Company, fearing a change in its control might jeopardize the liberal offer now made.

## SAN JACINTO RESERVATION

Near to and adjoining the Town of San Jacinto, is a tract of land containing seven hundred and forty-five (745) acres within the boundaries of a confirmed grant on which is the Indian village of Saboba. A suit was brought against these Indians a few years since, for the purpose of ejecting them from this grant. The case of the Indians was ably represented by Shirley C. Ward, at that time United States special counsel for the Mission Indians, and on an appeal from the Superior Court of the County, the Supreme Court of California, reversed the decision and affirmed the possessory right of these Indians to this land.

Immediately adjoining this tract lies the San Jacinto Reservation, as set apart by an executive order, dated June 19th, 1883. A portion of this was, by executive order, restored to the public domain, for the purpose of allowing certain Indians to homestead it, which has been done.

23.

ACC0017435

After a careful survey of the land for the purpose of locating
the holdings of the Indians living on the Reservation, and a like
careful consideration of the facts, real and probable, the Commiss-
ion has decided to recommend that the following described lands
be set apart as a permanent reservation for these Indians:

The North-west quarter (1/4); the West half (1/2) of the
South-west quarter (1/4), and the South half (1/2) of the South-
east quarter (1/4) of Section twenty-eight (28); Section twenty-
nine (29); the South half (1/2) of the South-east quarter (1/4)
of Section twenty (20); the North half (1/2) of Section thirty-
three (33); and all of Section thirty-two (32), except such lots
in the South-west quarter (1/4) as belong to that portion of the
grant now in possession of the Indians; all in Township four (4)
South, Range one (1) East. ✗ Also Section two (2); the South half
(1/2) of Section three (3); also, fractional part of the North-
east quarter (1/4) of Section five (5); all in Township five (5)
South, Range one (1) East, S. B. M. ✗

It will be observed that the proposed Reservation contains
Sections already granted to the Southern Pacific Railroad Company.

In accord with the provisions of the act creating this Com-
mission, and in harmony with an agreement made with the Directors

ACC0017436

of that Company, we recommend that the Company be allowed, subject to the approval of the Honorble Secretary of the Interior, to select an equal amount of land elsewhere in lieu of this.

We have retained Section twenty-nine (29), Township four (4) South, Range one (1) East, because some Indians have settled in a Canon, where there is a spring, on the western part of it. We include the South-east quarter of Section twenty (20) in the same Township, for the same reason, the Indians there having water and an old vineyard and orchard.

The chief settlement on this Reservation is on Section two (2), and the part of Section three (3), in Township five (5) South, Range one (1) East, S. B. M., along Indian Creek.

The water of this Creek has been partly filed upon, but the Indians have a prescriptive right to a part of it.   The surplus above the amount thus appropriated could be conducted on to Section thirty-two (32), Township four (4), Range one (1), which, with water, could be made most valuable.

There is also a stream flowing down across the western part of Section twenty-eight (28), and the western part of Section thirty-three (33), and the southern border of thirty-two (32),

36.

ACC0017437

in township four (4) South, Range one (1) East, S. B. M.
This water fails during the latter part of the summer, but it is
believed that a permanent flow could be secured by development,
and easily conducted into Section thirty-two (32), on which,
chiefly, in the future, these Indians must depend.

The San Jacinto River, during the past spring, washed away
some fifty to seventy-five acres of the land on the grant, and
the prospect is that a very large share of the seven hundred and
forty-five (745) acres on this grant will disappear.

These Indians, of whom there are nearly two hundred, are
quite advanced, and if the government will aid them in the develop-
ment of their water, as this Commission respectfully recommends
it shall due, it is believed that will utilise for pasturage and
cultivation the valuable part of their Reservation.

## AGUA CALIENTE.

As now established, this Reservation embraces nearly sixty-
one thousand (61,000) acres of land, upon which are settled about
seventy Indians.    It is such disproportions between Indians and
acres that has given rise to much of the adverse criticism of Cal-
ifornia newspapers against the Reservation system.

ACC0017438

The odd sections are claimed by the railroad company, many of the even sections are dreary wastes of Colorado Desert Lands, and many others are rocky, pathless mountain lands. Nearly all of the Indians are settled on Section fourteen (14) in Township four (4) South, Range four (4) East, S. B. M. This is excellent land, and if it had an abundant permanent water supply, no better land could be found in Southern California, for a home. The hot spring is near the west line of this Section, and is used not only for bathing purposes, but the overflow is used for irrigation. The quantity of water, however, is small, and the Indians have depended largely upon water coming from Toquitch Canyon. Fifty years ago, they built a ditch to bring water from the source for their lands. This supply fails for two or three months, nearly every year, and cannot be depended upon. The Indians, too, have had much trouble with white men, who have a settlement on Section fifteen (15).

There are some Indians on Section thirty-four (34), who are on good land. They had a supply of water, coming from Andreas Cañon, but some of it has been diverted by white men, of whom the Indians bitterly complain. We have recently made an arrangement, subject to the approval of the Secretary of the Interior,

ACC0017439

with the Bear Valley Irrigation Company, a very responsible company by which, for the right of way over the Reservation, and for the rights of these Indians to water in Andreas Cañon, they agree to provide for the Indians on Section two (2), Township five (5) South, Range four (4) East, and on Section thirty-four (34), Township four (4) South, Range four (4) East, S. B. M., sufficient water to irrigate one hundred acres upon the basis of one inch to six acres, and water for domestic use. They also agree, for the right of way across the Reservation, and for the surplus waters in Toquitch Canyon, to furnish, on the North line of Section fourteen (14), Township four (4) South, Range four (4) east, S. B. M., sufficient water for the domestic use of all the Indians now, or that may hereafter be, upon the Reservation. They also agree to furnish sufficient water to irrigate one hundred and sixty acres of land, upon the basis of one inch to six acres, and that when one hundred and sixty acres is under irrigation by the Indians, to furnish them sufficient water for another one hundred and sixty acres, upon the basis of one inch to six acres. This will be a permanent supply and a better supply than the Indians have ever had or could have if left to themselves. The proposition of this Company is transmitted herewith and marked Exhibit C; and we recommend its approval.

33.

There is much more arable land in this Reservation than the Indians need,,and more than they can supply with water, without which it has little value.  Dr. W. Murray and wife have a piece of land,-- nearly all the North half (1/2) of Section one (1), Township three (3) South, Range one (1) East, S. B. M.-- that we want to make part of the Morongo Reservation.  They are willing to exchange it for the East half (1/2) of Section ten (10), Township four (4) South, Range four (4) East, S. B. M., in this Reservation, and we recommend this exchange.  His proposition will be found accompaning this report and marked Exhibit D.  We most earnestly recommend this exchange, but would have the right of way across section ten (10), now in use by the water company, reserved or secured.

We recommend that the following lands be set aside as a Reservation, to be called Agua Caliente, viz: "Section twelve (12), fourteen (14), twenty-two (22), twenty-four (24), twenty-six (26) and thirty-four (34), all in Township four (4) South, Range four (4) East, S. B. M.  Also, Section two (2), in Township five (5) South, Range four (4) East, S. B. M."

We also recommend that all the other lands now in this Reservation as formerly set apart by executive order (except the East half (1/2) of ten (10) which recommend be exchanged with Dr. Murra

34.

ACC0017441

and wife) be restored to the public domain.

As we have before suggested, there is a valuable hot spring on Section fourteen (14), in Township four (4) South, Range four (4) East.   Just across the street, Dr. Murray and wife have a small hotel that is used as a health resort.   This is seven miles across the dreary desert from a small station on the Southern Pacific Railroad, called Seven Palms.   There are no people living there but the station employees; it is about twenty or twenty-five miles to Banning, the first village of any importance.   Dr. Murray and wife have had a three years lease of this spring, for which they have paid $500.   The Indians are allowed to bathe at reasonable hours.   We do not believe the Murrays have realized one-half the rent they have paid from the baths.   They desire to renew their lease at one hundred dollars a year, when it expires. Their proposition is transmitted herewith and marked Exhibit E. The whites, as well as the Indians, ought to have such benefit as may come to them from the use of these waters.   We recommend that the proposition of the Murrays be accepted, under suitable rules and regulations, that will secure to the Indians, as well as the whites, bathing facilities.

The reservation, as recommended by us, will accomodate at least one hundred Indians more than are now there.   Some of the

35.

ACC0017442

desert Indians must, and all may be compelled to move, if the Salto Sea should rise. In this contingency, this is the place for them and we recommend that it be set apart, not only for those on the Reservation, but for those hereafter to come. Many of the Indian on the Reservation are ready for allotment. We are inclined to think, however, that the allotment ought to be delayed until the question of possible removal may have been determined. As we have before suggested the allotments ought to respect the improvements and the occupancy of Indians, as now made, as far as possible.

The water plan as we have arranged it, is simple; but some plan ought to be adopted at once, as it will make the future work much easier.

## LOS COYOTES.

The Reservation of <u>Los Coyotes</u> was set apart by Executive Order.

It consists of Section three (3) and fractional Section four (4), in Township eleven (11) South, Range four (4) East, S. B. M.; and all of township ten (10) South, Range four (4) East, S. B. M.,

36

ACC0017443

except the following described lands: the South half (1/2) of the north-west quarter (1/4) and the South-west quarter (1/4) and the North-east quarter (1/4) and the North-east quarter (1/4) of the South-west quarter (1/4) of Section tenty (20); which has been patented to Hiram Keyes.   Also, the West half (1/2) of the South-west quarter (1/4) of Section twenty (20), and the South-east quarter (1/4) of the South-east quarter (1/4) of Section nineteen (19), and the North-east quarter (1/4) of the North-east quarter (1/4) Section thirty (30), patented to Eugene Paumenberg. Also, the North-west quarter (1/4) of South-east quarter (1/4), and the fractional South-west quarter (1/4) Section thirty (30), which is patented to one Helm.   Also, the North half (1/2) of North-east quarter (1/4), Section thirty-one (31), and the North half (1/2) of North-west quarter (1/4) Section thirty-two (32), to Jacob Jora.   Also, the East half (1/2) of the North-east quarter (1/4), and the South-west quarter (1/4) of the North-east quarter (1/4), and the North-west quarter (1/4) of the South-east quarter (1/4), Section twenty-six (26), patented to Robert Fain. Also, the East half (1/2) of South-west quarter (1/4), and the South-west quarter (1/4) of South-west quarter (1/4), andxxkxx Section twenty -six (26), and the North-west quarter (1/4) of

37.

North-west quarter (1/4), Section thirty-five (35), patented to
James Tally.   Also, the South-west quarter (1/4) of the North-
west quarter (1/4) Section thirty-five (35), and the South-east
quarter (1/4) of North-east quarter (1/4), and the North half
(1/2) of South-east quarter (/4), Section thirty-four (34),
patented to Chat Helm.   Also, parts of Sections thirty-one (31)
thirty-two (32), thirty-three (33), South of the Boundaryline of
the Rancho San Jose del Valle.   ┼

These entries were made before the Reservation was set apart,
but long subsequent to the time when the lands were in possession
of the Indians, and the injustice and cruel wrongs inflicted upon
them, and the annoyances to which they are still subjected by one
especially of the settlers, give good cause to the Indians for
bitter complaint.   Chatham Helm was the first white settler in
this Canon, and unfortunately his filings were allowed, and his
claim perfected.

His house stands in the narrowest part of the Canon, and his
claim separates the Indians below him at San Ysidro from their
pasturage lands above, as also from the Indian village of San
Ignatio, on the eastern boundary of the township.   It is impossi-
ble for the Indians of San Ysidro to get their stock on to their

38.

ACC0017445

pastures without passing through a gate placed within a few feet of Helm's house, and kept closed.   This he will not suffer them to do.   He has been a great annoyance to the Indians, also, in regard to their use of water.   The survey the Commission caused to be made discovered the fact that he was claiming a forty acre piece belonging to the Indians, recovering which they are enabled to put the entrance to their ditch some distance further up, giving them some relief in the matter of irrigation.

The Commission believes that if the claims of Helm and Tally could be extinguished by purchase or otherwise, it would be a great advantage to these Indians, removing an obstacle to the best use of their land, and a serious obstacle in the way of their progress. To do this would require about ~~four~~ *two* thousand ~~five hundred dollars~~: five hundred for Helm's place, and two thousand for Tally's.

There are in all about one hundred and fifty Indians in the two villages, which are five or six miles apart.   They have sufficient good arable land for their agricultural needs which, with their grazing lands, if made accessible, would give them ample support.

There is no school at either village, and few of the children go from home to school.

38.

ACC0017446

The Commission recommends the setting apart, permanently, for them the above described lands, and deems the extinguishment of Helm's and Tally's claim as of great importance to the Indians. The holdings of the other settlers do not block up the canon as do those of these two men, more especially that of Helm.

If, for any reason, it is not deemed advisable to buy out these men, the Commissioners ask that Mr. Lewis be instructed to abate the nuisance Helm maintains by keeping his bees as a guard against free passage along the road, and as an obstacle to the free use, by the Indians, of their land.

## TORROS.

On Section two (2), Township seven (7) South, Range seven (7) East, S. B. M. is the Torros Reservation, containing one section of very good land, with water to irrigate during most of the year thirty or forty acres, and which it is believed could be so far developed as to suffice for a much larger acreage.   There is here a thrifty Indian village of seventy persons.   They have fifty head of stock.

From this point to Section eight (8), in Township nine (9) South, Range nine (9) East, specifically on Sections nine (9),

40.

ACC0017447

fifteen (15) and thirty-five (35) in Township seven (7) South, Range eight (8), and on Sections nineteen (19) and thirty-two (32) in Township eight (8) South, Range nine (9) East, there are in all including those at Torros, two hundred and seventy-nine Indians. On Sections nine (9) and fifteen (15), Township seven (7) South, Range eight (8) East, are the two villages of Matinas, containing one hundred and twenty-five Indians. They have some water, plenty of mesquite which furnishes food and fuel, and grazing for some stock. On Section thirty-five (35), in the same Township, is Captain Bill's camp of fifty-three Indians; the camp is called Alamo Bonita. There is some good land, but the water is little is quantity and of a very poor quality. On Section twelve (12), Township eight (8) South, Range eight (8) East, is fine salt grass and good pasturage; on Sections eighteen (18), nineteen (19) and thirty-two (32), Township eight (8) South, Range nine (9) East, are very fine springs of good water, and on the last named section a fine old fig orchard of seventy-five trees. Here are raised fine melons, squash, corn, etc., etc., and the Indians belong here, numbering thirty-one, have stock, and opportunity to raise large herds. On Section eight (8), Township nine (9) South, Range Nine (9) East, S. B. M., are springs and good grazing.

41.

HERITAGE ROOM ARCHIVES
K SMILEY LIBRARY
125 W. VINE
REDLANDS, CA 92373

ACC0017448

If the Salton Lake does not resume its old bed in this desert, these Indians can have, if the recommendations of the Commission be approved, a home which few white men will covet, but which the Indians claim and desire, and on which they can maintain themselves in comfort.   There are, in these various desert villages, about seventy children of school age, who are receiving no attention from the government,   these Indians never, in fact, having been visited by any official of the Indian Bureau, prior to our visit, as it is claimed by them.

The Commission recommends that the Reservation of Torros be as follows:

Sections two (2) and twelve (12) in Township seven (7) South, Range seven (7) East, S. B. M.; Sections seven (7), eight (8), nine (9), ten (10), fourteen (14), fifteen (15), twenty-two (22), twenty-three (23), twenty-four (24), twenty-five (25), twenty-six (26), thirty-five (35) and thirty-six (36), in Township seven (7) South, Range eight (8) East, S. B. M.; Sections one (1), two (2), and twelve (12), in Township eight (8) South, Range eight (8) East, S. B. M.; Sections six (6), seven (7), eight (8), eighteen (18), nineteen (19), twenty (20), West half (1/2) of twenty-eight (28), twenty-nine (29), thirty (30), East half (1/2) of thirty-one (31),

42.

and Section thirty-two (32), Township eight (8) South, Range nine (9), East, S. B. M.; also, the West half (1/2) of Section four (4) Section five (5), East half (1/2) of Section six (6), and Sections seven (7) and eight (8), West half (1/2) of Section nine (9), Township nine (9) South, Range nine (9) East, S. B. M.

The land embraced in this description extents along the fringes of the desert and the foot hills which border it on the Southwest.   It is desert land, with Mesquite, and more or less of salt grass, and at the points indicated good springs, and it would be protected by mountains on one side and desert on the other, from the instrusion of whites.

The odd Sections belong to the Southern Pacific Railroad Company, which has expressed its willingness to choose, subject to the approval of the Honorable Sectretary of the Interior, other sections South of Banning in lieu of these.

Section thirty-six (36) Township seven (7) South, Range eight (8), East, belongs to the State.   It has little value, but is necessary to the Reservation.   The State should be allowed to select lieu land therefor.

The Commission has bourne in mind the fact that if the Salton Lake does rise over this desert, much of this land will be two

43.

ACC0017450

hundred feet under water, and so have made provision at Morongo and Agua Caliente, for this contingency.

## PAUMA.

On what is now called the Pauma Ranch there is one rancheria occupied by one Indian family, one occupied by two Indian families and one occupied by about twelve Indian families, numbering in all, about eighty Indians.   These Rancherias have been occupied by Indians since before the treaty Guadalupe Hidalgo.   The extent of the occupancy is disputed.   The original grant excepted these holdings, according to the translation found in the records and accepted by the present owner, Bishop Francis Mora of Los Angeles. The excepted lands were those occupied by Indians when the grant was made.   To determine his legal rights, and to get the Indians off lands occupied by them, Bishop Mora had commenced suits against them, in which suits Mr. Lewis, as Special Assistant United States Attorney for Mission Indians, appeared as their attorney.   While we think the suits must fail in part, it is probable the Indians are now occupying more lands than can be shown to have been in the possession of Mission Indians at the time of the making of the Grant.

44.

9

ACC0017451

Acting under the act creating this Commission, requiring us to define the boundaries of lands held by the Indians within a confirmed private grant, we have caused these holdings to be surveyed.   We also entered into negotiations with Bishop Mora, and it is agreed between us, that the occupancy of the lands within said grant, by the Indians, is of two hundred and fifty (250) acres, a detailed description of which is contained in a contract which is also a quit-claim deed made between the said Bishop Mora and your Commissioners, herewith transmitted and marked Exhibit F.

Bishop Mora by this instrument grants to the United States an interest in certain lands during the life of Francisco Maja and his wife, also water rights for all of said Indians.

For the details of the agreement see contract made between the Bishop and your Commissioners transmitted herewith.   As it seems to be agreed, that while the possessory rights to these excepted lands are in the Indians, the fee is in the United States.

We recommend that the lands described in said contract, be set aside as a reservation to be called Pauma; and it is particularly described as follows, to-wit:-

Beginning at a point from which corner number two of the official survey of the Pauma Rancho bears North sixty-three degrees and thirty minutes East (63o 30'), and one hundred eighty-three

45.

ACC0017452

and fifty-nine one-hundredths (183-59/100) chains distant; thence
South one degree (1°) East, thirty-one and forty-two one-hundredths
(31-42/100) chains to Station two (2); thence North seventy de-
grees (70°) East, twenty-nine and thirty-five one-hundredths
(29-35/100) chains to Station three (3); thence North eighty-six
degrees and thirty minutes (86° 30') East, twenty-seven and forty-
two one-hundredths (27-42/100) chains to Station four (4); thence
North forty-eight and one-half degrees (48-1/2°) East, seven and
fifty-six one-hundredths (7-56/100) chains to Station five (5);
thence North sixty-nine degrees (69°) East, fifteen and twenty-
three one-hundredths (15-23/100) chains to Station six (6); thence
North forty-five and one-half degrees (45-1/2°) West, fifty-three
and twenty-eight one-hundredths (53-28/100) chains to Station seven
(7); thence South forty degrees (40°) West, thirty-four and
eighty-five one-hundredths (34-85/100) chains to Station eight (8);
thence South eighty-five degrees (85°) West, fifteen and ninety-
seven hundredths (15-97/100) chains to the point of beginning;
containing two hundred and twenty-five (225) acres.

Beginning at a point from which the corner to Section twenty-
two (22), twenty-three (23), twenty-six (26) and twenty-seven (27),
of Township ten (10) South, Range No. one (1) West, of the San

46.

Bernardino Meridian, bears South fifty-one degrees (51°) West, and one hundred and seventy-two (172) chains distant from station No. one (1); thence South forty-five degrees (45°) West, twelve and one-half (12-1/2) chains to Station two (2); thence South forty-five degrees (45°) East, ten (10) chains to Station three (3); thence North forty-five degrees (45°) East, twelve and one-half (12-1/2) chains to Station four (4); thence North forty-five degrees (45°) West, ten (10) chains to the place of beginning; containing twelve and one-half (12-1/2) acres.

Beginning at a point from which Station No. one (1) of the survey last above mentioned bears North eleven degrees and thirty minutes (11° 30') West, thirty-one and forty-one one-hundredths (31-41/100) chains distant; thence West ten (10) chains to Station two (2); thence South forty-five degrees (45°) West, seventeen and fifty-six one-hundredths (17-56/100) chains to Station three (3); thence East ten (10) chains to Station four (4); thence North forty-five degrees (45°) East, seventeen and fifty-six one-hundredths (17-56/100) chains to the point of beginning; containing twelve and one-half (12-1/2) acres of land.

All in the County of San Diego.

The Indians on these lands are bright, capable men, ready for individual allotment, which we recommend be made at once.

47.

ACC0017454

The land is all arable, and either has been or can be, put under water.

## AUGUSTINE.

On Section nineteen (19), of Township six (6) South, Range eight (8) East, S. B. M., is the camp of Augustine, where live in bush and tule houses thirty-eight Indians.   The Rancheria is on the East half (1/2) of the Section.   The land is worthless, with no timber, and very poor water, obtained by digging a well some ten feet deep.

The Indians are unwilling to remove, as they have some work at the railroad Station.   This is a Railroad Section.   The Commission have decided to recommend that the adjoining section eighteen (18), be set apart for this camp to which they can go if they are ever called upon to vacate the one they are on, it being much better land.

## SANTA ROSA.

There are fifty-nine Indians living in a Rancheria of about twelve houses, on unsurveyed, and practically unsurveyable land,

48.

in San Diego County, under Santa Rosa Mountain.   They have water with but little land to irrigate; there is some pine timber, but no way of getting it to market.   They have grazing for a few cattle, and are able to raise some corn and potatoes.   The member of the Commission who visited them had a ride over a hard trail of some thirty miles in from, and back into, the Hemet Valley. He had occasion to know that they live fairly well, and seemed to be satisfied with themselves and their location and are at present unwilling to leave this isolated and almost barren Canon for another place.   About three to four miles in an easterly direction, near the desert, there are two other families living about a mile apart; at the most westerly of these places lives Manuel Tonte, who has a small spring, and a reservoir, from which he irrigates a little land on which he has a vineyard and some grain.   Easterly from here, distant nearly one mile, Nicholas Winche, who has eight children, two of them grown, lives.   He has a little water, and a few acres of arable land.   Both of these wish to have these lands set apart to them, as do also the Indians at the principal Rancheria, under Captain Ponce Leon.

As a health resort, provided no food was required, this would seem to be an ideal place; and devoted lovers of magnificent scene-

49.

ACC0017456

ry could here gratify their tastes, but for those who seek opportunities to build homes the prospect will not be encouraging. There were gathered here at the time of the Commissioner's visit, a large number of Indians who sought a safe retreat from the waters rising on the desert below and as refuge from such dangers the place has much to commend it.

It is the opinion of the Commissioners that these Indians should be induced to remove to some one of the reservations on which they recommend that a surplus of land be retained for those who, like these, can never make a support where they are; and it is the opinion of the "Father" who ministers to them spiritually, that he can persuade them to remove to Capitan Grande, when assured that they can have a home there, and access to school for their twenty to twenty-five children.

As this land has never been surveyed, this location can not be described with absolute certainty, and as it would cost many times what the country is worth to survey it, it will probably not be done, and since the pine of these unsurveyed mountains will always be worth more in their relation to climate than as lumber, it is respectfully suggested that the unsurveyed townships lying between the Coahuilla Valley and the Colorado desert remain as they are for the protection of the pine, and that a reservation for

50.

ACC0017457

these Indians be set apart according to a description which will be added as supplementary to this report, which has not as yet been received from the surveyor send to mark it out by metes and bounds, according to instructions given him by the Commission.

## MORONGO.

(filed with 2598/08)

The Reservation near Banning, called Morongo, has given this Commission much trouble.

The Reservation, as now constituted, embraces considerable worthless mountain land, and also much worthless wash and desert land.     It also has in its borders now, more agricultural land suitable for dry farming, such as growing barley, than is needed by the Indians.     Indeed, because the Indians neither occupied nor worked some of these agricultural lands, the Indian Agent has thought it wise to lease a portion thereof, the proceeds have been devoted by him, as we understand it, for the benefit of the Indians.

The Southern Pacific Railroad runs through this Reservation. Its officers claim that by virtue of law it is entitled to the odd sections of land within this Reservation.     There are about one hundred Indians on the Reservation.   Nearly all at their

51.

village called Potrero.    This is at the mouth of a canon about five miles long and of considerable breadth.    There is a nice stream of water flowing from two cienegas, one of which is a little ways up the canon, and the other at nearly its head. If all the land of and near this canon, and the small one adjacent called Hatheway's canon, could be secured to the Indians, it would make as desirable location for them as their most earnest friend could wish.

Unfortunately for the Indians, white have seen how valuable the land, with the water, is, and have settled upon some of the railroad lands in the canon, and have filed on the water,. W. S. Hatheway settled on what, by private survey, is determined to be Section twenty-seven (27) in Township two (2) South, Range one (1) East, S. B. M., and developed considerable water on that section and in the canon farther up.  He was ejected from these lands after he had spent about, as he claims,  fifteen hundred dollars.    He also insists that his ejectment was unlawful, as he was on railroad lands, and that he has a claim against the govern-ment.    C. F. Jost, and Margaret Jost, his wife, settled on Sectio twenty-five (25) some years ago, and made very valuable improve-ments, having good buildings, a good orchard, and having developed

52.

by means of ditches, a large supply of water.  They were also ejected, they claim, unlawfully, and bring a larger claim against the government for damages.  The land occupied by them is right in the heart of what we think ought to be Indian reservation, and is especially valuable because of the water that can be developed upon it.  Richard Gird and John G. North, appreciating the great value of the water in Hatheway's canon and the canon above the Potrero, procured an interest some years ago on Sections fifteen (15) and twenty-three (23), which are toward the upper end of the canon, upon which there are valuable cienegas and which were railroad lands.  They also obtained rights to surplus water from Hathaway and from the Josts.  They also took steps which resulted in their getting title to East half (1/2) Section thirty-six, (36), they claiming it was a school section to which they could get title. Nearly all of the houses, irrigating ditches and very considerable vineyards and orchards of the Indians are on this section. To lose Section thirty-six (36) would be an irreparable loss to this village.  Gird and North also built irrigating ditches in the upper end of the canon, established a field of alfalfa, and put out an orchard, and spent considerable sums of money. They, too, were evicted; claiming their eviction was unlawfully, and their losses great, they have commenced suit to recover damages

53.

ACC0017460