and also to determine their right to the water and the lands. We fear, if the claims of these various parties are pressed to a hearing in the various courts, the result will be very _disastrous_ to the Indians as affecting their rights to both water and land. We, then, were confronted by all these conflicting interests which left the Indians and the whites in that neighborhood all in a state of great uncertainty. To state the situation briefly, we found the Indians the acknowledged holders of lands they did not want or work, and the whites insisted upon rights to lands that are absolutely essential to the Indians, if a reservation is to be established there. The problem was, how, by means of the lands not wanted to obtain the title to lands that were wanted, freed from all claims, and at the same time relieve the government of threatened and actual litigation by the evicted parties.

Believing that we could make such an arrangement, but having some doubt of our authority, we, on the 16th of March, asked for instructions. Upon the receipt of your telegram and letter of instructions of April 1, 1891, (Exhibit Page 6) "to go ahead" we have spent much time and anxiety to bring about a settlement of all these conflicting interests. The result is, that we have a written offer from C. O. Barker who holds a power of attorney from W. S. Hatheway, C.

54.

F. Jost and Margaret Jost, Richard Gird and John G. North, author-
izing him so to do, of a release of their several interests, and
an exchange of their lands on the following basis:

The said Hathaway to relinquish all his claim to lands in
Township two (2) South, Range one (1) East, and in Township two
(2) South, Range two (2) East, S. B. M., and all water rights of
every kind, and all claims for damages by reason of eviction or
otherwise; said Hathaway to receive a patent therefor to the North
half (1/2) of Section fourteen (14) in Township three (3) South,
Range one (1) East, S. B. M.

Said C. F. Jost and Margaret Jost offer to exchange all their
interest in and to lands and water rights of every sort and nature
in Townships two (2) South, Range one (1) and two (2) East, S. B.
M., and all claims for damages, because of eviction or otherwise,
the said Jost and Jost to receive in exchange therefor a patent to
the West half (1/2) Section six (6), Township three (3) South,
Range one (1) East, S. B. M.

Said Richard Gird and John G. North offer to relinquish all
their right in and to Sections one (1), two (2), three (3), ten
(10), eleven (11), twelve (12), thirteen (13), fourteen (14),
fifteen (15), twenty-two (22), twenty-three (23), twenty-four (24),
twenty-five (25), twenty-six (26), twenty-seven (27), thirty-four

55.

(34), thirty-five (35), and thirty-six (36), in Township two (2) South, Range one (1) East, S. B. M.; and Sections six (6), seven (7), eighteen (18), nineteen (19), thirty (30) and thirty-one (31) in Township two (2) South, Range two (2) East, S. B. M.; and to any and all damages growing out of eviction or otherwise. Said Gird and North to receive in exchange therefor patents to and for the South half (1/2) Section eight (8), Northwest quarter (1/4) Section eight (8), East half (1/2) of Northeast quarter (1/4) of Section eight (8), the Northeast quarter (1/4) Section ten (10), the Southeast quarter (1/4) of the Northwest quarter (1/4) Section ten (10), East half (1/2) of the Southeast quarter (1/4) Section ten (10), the Northwest quarter (1/4) of the Southeast quarter (1/4) Section ten (10), Section eighteen (18), and the North half (1/2) Section; twenty (20); all in Township three (3) South, Range one (1) East, S. B. M.; as will appear more in detail in a written proposition signed the said Barker, and acknowledged November 11, 1891, transmitted herewith and marked Exhibit L. Said proposition will hold good only until the first day of January, 1892.

We also, at an early date, opened negotiations with the officers of the Southern Pacific Railway Company, with a view of affecting an exchange with them. The outlook at first was very for-

56.

ACC0017463

bidding, and legal difficulties presented themselves to the offi-
cers of the Railroad Company.   We were obliged to make several
visits to San Francisco in the course of the negotiations.
We finally have a proposition from them to release their right
in and to the following lands, viz:

Section thirteen (13), East half (1/2) of Section fifteen
(15), Sections twenty-three (23) and twenty-five (25), East half
(1/2) of Section twenty-seven (27), and Section thirty-five (35);
all in Township two (2) South, Range one (1) East, S. B. M.
Also, all of Section thirty-one (31) in Township two (2) South,
Range two (2) East, S. B. M.; they to receive in exchange therefor
patents to the following lands:

All of Section eighteen (18) except North-west quarter (1/4)
of North-west quarter (1/4); Sections twenty (20) and thirty-two
(32) in Township two (2) South, Range one (1) East, S. B. M.;
South-east quarter (1/4) Section twenty (20), Section thirty-two
(32) in township two (2) South, Range two (2) East, S. B. M.
Also, North-east quarter (1/4) and South-half (1/2) of South-west
quarter (1/4) of Section four (4); the North-west quarter (1/4)
of South-east quarter (1/4) nfxŞmzkinn and South half (1/2) of
South-east quarter (1/4) of Section six (6); in Township three (3)
South, Range one (1) East, S. B. M.   South-west quarter (1/4)

37.

ACC0017464

Section eighteen (18), Northwest quarter (1/4) Section twenty (20)
Northwest quarter (1/4) Section twenty-two (22), South half (1/2)
Section twenty-eight (28),; in Township three (3) South, Range two
(2), East, S. B. M.   A copy of the said agreement is transmitted
herewith, marked Exhibit G.

Wellwood Murray and Eliza E. Murray are the owners of the
North half (1/2) of Section one (1/3), Township three (3) South,
Range one (1) East, S. B. M. (less ten acres near the North-west
corner thereof, which is owned by Mrs. Toutain.)   This land is
needed in the proposed reservation; it is near the present
Indian village, and could readily be placed under water.   The
Murrays are willing to exchange it for the East half (1/2) of
Section ten (10) in Township four (4) South, Range four (4) East,
S. B. M. (Agua Caliente), as will be seen by their proposition
transmitted herewith marked Exhibit H.   The land on Section ten
(10) is not needed.   The Murrays supposed they had made an ar-
rangement with Mrs. Toutain, by which she would deed to them her
ten acres, so that they could offer to exchange half Section for
half Section; but as she,   though consenting orally, has declined
to sign any papers, they propose to pay over one hundred dollars
to the Indian Department, to enable it to obtain Mrs. Toutain's

58.

ACC0017465

claim to the ten acres, which she will probably be glad to sell, when she finds that the reservation will be established any way. She will have no water, and no way of getting any, on her ten acres.    She is a woman who has given the Indians and the Indian Agent much trouble; but we think it exceedingly desirable that the exchange be made with the Murrays.

The right of way for the irrigating ditch on Section ten (10) Township four (4) South, Range four (4) East, S. B. M., should be reserved in the patent.

As will be observed, to bring about these various exchanges requires a larger area of land surrendered than we get for the Indians in return; but, in making the exchange, we avoid the delays and hazards of litigation.    We secure the release of large claims for damages growing out of unlawful evictions, and secure to the reservation exceedingly valuable water rights.    This Commission, if it was dealing with reference to property owned by its members as individuals, would not hesitate for a moment in making these exchanges, and we urge that the exchanges be made as herein indicated, and that they be made at once; for it will be observed that Mr. Barker's proposition holds good only until January 1st, 1892, and we have reason to think that some of the parties who have given him a power of attorney would not be sorry if the settlement,

59.

on the basis herein named, was not affected.

6. The Bear Valley Irrigation Company is constructing a pipe li to carry water across the Reservation.

They do not obtain any water upon the Reservation, or effect its sources of supply. To look after this line, it will be neces sary for them to construct a wagon road the whole length of the Canon. This will be an advantage to the Indians, as they can use it as a wood road, and to get to their lands in the upper part of the Canon. Their proposition, embracing both this and the Agua Caliente Reservation, is sent herewith.

We recommend its acceptance, except as to their proposition for power stations, and if those are granted, it should be but for two, one on the East line and one near the west line of the Reser vation, on worthless lands, and with rigid restrictions as to who should be permitted to stay at those stations.

This is the place of all others where an intelligent system of irrigation ought to be planed and adopted. If rightly managed an abundant supply of the best of water can be had the year round. We understand from Agent Rust, that he has to the credit of these Indians upwards of three thousand dollars, the proceeds of the use of land not needed by the Indians that might be made available for this purpose. We urge that a plan be proposed early; it will

60.

ACC0017467

help in the matter of allotments, which ought to be made soon.

We most earnestly urge upon the Department that a competent water engineer familiar with the methods of irrigation in California, be employed at an early date to plan a system of irrigation for this Reservation. This Reservation is destined to be the best in California. The land lies well for irrigation. Take the Reservation as a whole, and there is equal difference in the altitude of the arable and irrigable land. The upper Cienegas can be used for the higher lands, while the lower lands can be placed under water from the lower souce of supply. The cost of making a plan would not be large and the work can be done by the Indians.

As will be observed by a communication transmitted herewith and marked Exhibit K, from the Board of Church Extension of the American Moravian Church, that society has erected on five acres of land on the Reservation, a church building and parsonage, and the pastor of the church has put out a considerable orchard and vineyard; the improvements made have cost about thirteen hundred dollars. So far as we can observe, the work of the church, the missionary and his family among the Indians is educational and wholesome, and we recommend that the request made by the society,

61.

ACC0017468

through Bishop Bochman, be granted and they be given the use, for
the purposes mentioned, of the following lands, viz:

Beginning at the South-west corner of the North-east quarter
(1/4) of Section thirty-six (36); thence North forty (40) rods;
thence East twenty (20) rods; thence South forty (40);rods; thence
West twenty (20) rods to the place of beginning; all in Township
two (2) South, Range one (1) East, S. B. M., with the necessary
supply of water for domestic and irrigation purposes.

We therefore recommend that the following described lands
be set aside for the use of the Mission Indians now on the lands
and for those to be hereafter placed thereon, which we estimate at
about two hundred altogether.   Said Reservation should be called
Morongo, viz:

Sections ten (10), twelve (12), thirteen (13), fourteen (14),
East half (1/2) of Sections fifteen (15), twenty-two (22), Sections
Twenty-three (23), twenty-four (24), twenty-five (25), twenty-six
(26), East half (1/2) Section twenty-seven (27), North-west quarter
(1/4) and East half (1/2) Section thirty-four (34), Sections thirty-
five (35) and thirty-six (36), all in Township two (2) South,
Range one (1) East, S. B. M.; also, the north half (1/2) of Section
one (1) except ten (10) acres in the North-west corner thereof,
and the North half (1/2) of Section two (2), all in Township three

62.

ACC0017469

(3) South, Range one (1) East, S. B. M.; also, Sections eighteen (18), Thirty (30) and thirty-one (31) in Township two (2) South, Range two (2) East, S. B. M.; also, Section six (6) in Township three (3) South, Range two (2) East, S. B. M. "

We also recommend that all the lands not herein mentioned as retained for a reservation or for the purposes of making the exchanges herein indicated, which are in the reservation as now established called Morongo, be restored to the public domain.

ACC0017470

This is an exceedingly valuable property.   There is a good school here,-- a church also is supported.   The Indians have good houses and many improvements.   They are ready in many cases for individuals allotments.   The longer the allotment is delayed the more complicated the situation will become on account of the improvements that will be made by progressive Indians who will not want to surrender any of their holdings.

## SANTA YSABEL.

We recommend that a reservation be established called Santa Ysabel embracing the following lands, viz:

The South half (1/2) of Section twenty-one (21), Sections twenty-five (25), twenty-six (26) and twenty-seven (27), and the East half (1/2) and the North-west quarter (1/4), of Section twenty-eight (28), all in Township eleven (11) South, Range two (2) East, S. B. M.; also Sections twenty-seven (27), twenty-eight (28), thirty-four (34), and thirty-five (35), and fractional Sections twenty-five (25), twenty-six (26), twenty-nine (29), thirty (30), thirty-two (32) and thirty-three (33) in Township eleven (11) South, Range three (3) East, S. B. M.; also Sections one (1), two (2) and twelve (12) and fractional Sections three (3), four (4),

84.

ACC0017471

ten (10), eleven (11), thirteen (13) and fourteen (14), all in Township twelve (12) South, Range three (3) East, S. B. M.; also Sections ten (10), fourteen (14) and fifteen (15), fractional Section thirteen (13), and the West half, the West half (1/2) of the North-east quarter (1/4), the South-west quarter (1/4) of the North-east quarter (1/4), and the South-west quarter (1/4) of the South-east quarter (1/4) of Section three (3), all in Township twelve (12) South, Range two (2) East, S. B. M.

There is much worthless mountain land on this Reservation, but the line can not be run over these mountains without great expense.   These Indians have some cattle, and a considerable part of thier industry is grazing.   They have an abundant supply of water and of arable land, not only for their own needs, but also for perhaps fifty Indians more, if it shall be necessary to put them there.   We believe it will become necessary to make homes for Indians who are now scattered about in the mountains and valley without homes and also for Indians who may be dispossessed by litigation, pending or threatened, and for these reasons we recommend that this reservation be set apart not only for the Indians now on it, but also for such Mission Indians as it may be advisable to put there hereafter.

66.

ACC0017472

We think it would be wise to have a water engineer plan a system of ditches for irrigation purposes.   The Indians could do the work.   Some of the Indians on the Santa Ysabel Ranch have already been driven off, others are threatened with litigation. This would natually be the place for them to go if they are required to get new homes.

A settler by the name of C. Paine has settled on this Reservation.  We recommend that the Agent be instructed to get him off.   _fu 3.86 2/02_

## MISSION.

As to the reservation now existing called Mission, we have to report that there are no Indians living on these lands, and none have lived there for some years.   We have tried to find Indians to go on there and have failed .'

We, therefore, recommend that the following lands comprising this reservation be restored to the public domain, viz:

Sections twelve (12), thirteen (13) and fourteen (14) in Township two (2) South, Range three (3) East, S. B. M.

66.

ACC0017473

## CABEZON.

Your Commissioners have to state as to the present Reservation on the desert near Indio called Village, that there are no Indians on the Reservation as now established as is shown by a careful survey, to-wit:-

On Sections nineteen (19) in Township five (5) South, Range eight (8) East, and Section twenty-four (24) in Township five (5) South, Range seven East, S. B. M.  The Indians are all on Section Thirty-two (32) in Township five (5) SOuth, Range eight (8) East, S. B. M.

The Station of the Southern Pacific Railroad Company is on Section twenty-four (24) in Township five (5) South, Range seven (7) East, S. B. M.

There are about sixty Indians on Section thrity-two (32) in Township five (5) South, Range eight (8) East and they have a number of houses; there is a good deal of mesquite on Section thirty-two (32) and also on Section thirty (30) in Township five (5) South, Range eight (8) East, S. B. M., and we recommend that a reservation be established containing the following lands:

67.

ACC0017474

Sections thirty (30) and thirty-two (32) in Township five (5?) South, Range eight (8) East, S. B. M.; and that the same be called Cabezon.

There are no Indians whatever at Section six (6) in Township seven (7) South, Range nine (9) East, S. B. M., known as Cabezon, and the land is not available for any settlement by them.

The station of the Southern Pacific Railroad Company, known as Walters, is on this section. The land is of no use except for the purpose for which it is now used. We therefore recommend that Section twenty-four (24) in Township five (5) South, Range seven (7) East, and Section nineteen (19) in Township five (5) South, Range eight (8) East, and Section six (6) in Township seven (7) South, Range nine (9) East, S. B. M., be restored to the public domain.

In addition to the reservation which have been set apart for these Indians, and the parcels of land within the boundaries of confirmed grants, the Indians' right to which the Commissioners have asserted, and attempted to locate and defind; quite a number of Indians have been advised to take homesteads under the provisions of the Fourth Section of the Allotment Act.

68.

ACC0017475

In a number of cases in order to locate them we caused surveys to be made and Mr. Lewis, Special Counsel for the Indians has promised to take the proper steps to secure the lands they desire in this manner.   We deemed this much better than to multiply the number of reservations.

The lands selected by this Commission will not exceed in area the amount prescribed by the Act of Congress creating this Commission.   The aggregate of the lands retained is much smaller than in the reservations as now established.   We have proceeded on the theory that the Southern Pacific Company would soon be, if not already, entitled to the odd sections within the railroad limit.   This would reduce the acreage very largely.   We also have thrown out worthless desert and mountain lands thinking it unwise to give the Indians the appearance of holding a disproportionate quantity of lands.   We have, however, retained, sufficient lands for their reasonable needs.   With their rights permanently settled we hope the condition of the Mission Indians will materially improve.

*Rec page 73 -*

12.

69.

HERITAGE ROOM ARCHIVES
K SMILEY LIBRARY
125 W. VINE
REDLANDS, CA 92373

ACC0017476

## SAN LUIS REY.

Near the old San Luis Rey Mission are some forty Indians, the
only ones left in the immediate vicinity of this once most flour-
ishing mission.

They are one private land which has been patented, though
there was testimony that the Indains were on it long before it
was entered by the white man to whom it was patented.   These Ind-
ians are needed as laborers in the immediate neighborhood.   They
have, during all the years this has been held by this white man,
cultivated their fields, and are in comfortable homes.   They ut-
terly refuse to consider the question of removing to some other
place, and, unless ejected by the Sheriff, will remain where they
are, and if thus ejected they can find homes on one of the reser-
vations set apart for those who may be evicted from their present
homes.

The Commissioners find themselves unable to do more than make
this provision and ask that Mr. Lewis, special attorney for the
Indians be instructed to protect them in what are, at least, their
equitable rights.

70.

ACC0017477

## IANDIANS ON PRIVATE GRANTS.

Your Commissioners have caused the holdings on Warner's Ranc
at Santa Ysabel Ranch and also at Santa Felipe to be surveyed.

The Indians desire to remain where they are;  we have been
unable to arrange a settlement with the  ranch owners.

We recommend that Mr. F. D. Lewis, Special Counsel of the
Indians, be instructed to defend the rights of the Indians in
case legal steps are taken to remove them, and also to recover
the rights of those wrongfully removed from the Santa Ysabel Ranc

As to the Indians named on a list furnished us by the the
Indian Department as being near Pomona, Riverside, San Diego and
San Bernardino; we have to say that they must have been at these
villages temporarily engaged in digging ditches for the purposes
of irrigation, employed by improvement companies..

There are but few of them at these place now and we have mad
provision for the Indians mentioned in said list, on the reserva-
tion herein recommended by us, to which reservations they belong.

71.

ACC0017478

The Commissioners desire to gratefully acknowledge the uniform courtesy shown, the facilities offered, and the services rendered them in the prosecution of their work, by the Register of the United States Land Land Office, Col. Seamans, and his subordinates at Los Angeles; and to bear testimony to the faithfulne with which E. L. Dorn, the surveyor, who has down must of the work required, has discharged his duties. He has been a safe repository of such knowledge as he has gained, and a confidential and wise adviser in the prosecution of our work. The same may b said of R. N. Vail, who surveyed the San Jacinto and Coahuilla Reservations.

We desire also to speak of the courtesy of Indian Agent Rust and the late physician Dr. Ferreber in giving us such information as they could; also of the efficient service rendered to us by the Special Counsel of the Mission Indians, Mr. Frank D. Lewis. He has rendered us very substantial aid. He is a friend of the Indians and has their confidence. We have seen much of him and regard the legal interests of the Indians safe in his hands as he possesses integrity as well as ability.

An appropriation from Congress should be obtained to remunerate him after the present appropriation has expired or before exhausted.

13

ACC0017479

We may be pardoned in suggesting that, by reason of an industry and frugality we have done the work assigned us, and have kept within the very moderate appropriation made by Congress to do this work.

Some details are yet undone, and for that reason we do not now ask to be discharged, but the great bulk of our work is done, and as soon as the details have been worked out, we shall ask to be permanently discharged.

All of which is respectfully submitted.

*Albert K. Smiley.*

*Joseph B. Moore.*

*Charles C. Painter*

*This report transmitted under*
*date of DEC 7 - 1891 - See #24477-1891-*
*For copy to Secy see h13-227-369.*

ACC0017480

Exhibit A.

Map of San Diego Flume Company's Flume Line through Capitan Grande

Reservation.

7 4

ACC0017481

Exhibit B.

San Diego, Cal., November 21st, 1891

Prof. C. C. Painter,

Secretary Mission Indian Commissioners.

Dear Sir:-

In accordance with the request of your commission-
ers, as well as that the Secretary of the Interior may be fully
advised in the matter, we have had prepared, and herewith transmit
to you, a plat and tracing of the flume extending through the "El
Capitan" Indian Reservation, of San Diego County, California, which
said map also shows the location of the principal reservoir of this
Company, the point of diversion of water on the San Diego River,
as well as other important data.

We also herewith transmit a copy of an agreement
executed on the 16th day of January, 1888, by and between Joseph
W. Preston, United States Indian Agent, and the San Diego Flume
Company, by the terms of which an attempt was made, on the part
of Mr. Preston, to convey to the Flume Company a right of way over,
through and upon this reservation, for the consideration named in
said agreement.

This agreement, as the present officials understand,
was made with a view of obtaining a ratification of the same by
the Secretary of the Interior, assuming that he had such power,

1.

ACC0017482

otherwise a ratification by Act of Congress.

The officials of the Company then in charge of the matter, in

form us that the exactions made By Mr. Preston were considered

heavy and burdensome, but the necessities of this city and the

surrounding country were such that they felt justified in con-

ceding the point in order to hasten the construction of the plant.

The City's supply of water is obtained from this Company, and

during the summer months the water is conducted from the Cuyamaca

Reservoir, distant some sixty miles.   The great distance from

which it is necessary to convey this water, and during the summer

months the supply being obtained from an artificial reservoir of

limited capacity, makes it necessary to supply water to consumers

under rules and regulations with reference to taking and using the

same, and rigid with reference to wastage.

We make the foregoing observations in order that your Commis-

ion and the Secretary of the Interior may be fully advised of the

necessity to us of terms and provisions which will protect this

Company from wastage of water, as well as the necessity of having

it taken under and in accordance with rules and regulations gov-

erning their consumers,   And in order to better acquaint you with

what we exact from others to whom we sell water, we enclose here-

2

ACC0017483

with a form of contract adopted by this Company.

Section 3 of the law under which your commission was appointed provides for the granting of rights of way to corporations for the construction of flumes, ditches, etc., for the conveyance of water, over, across or through Indian Reservations  "Upon conditio that the Indians owning or occupying such reservation . . . shall at all times, during such ownership or occupation, be supplied wit sufficient quantity of water for irrigating purposes and domestic purposes, upon such terms as such shall be prescribed in writing by the Secretary of the Interior, and upon such other terms as he may prescribe."

The Board of Directors of this Company, at a meeting just held, authorize the undersigned, as President, to express to you the willingness of this Company to comply with said provision.

We do not, however, feel that any money consideration should be exacted from the Company, and in furnishing water as required by said section we are anxious that the contract which the Secretary may have prepared, should take into consideration our position and incorporate therein such provisions as will protect our interest as well as the wards of the nation.

We assume that this matter will be arranged by correspondence instituted between this Company, and the Interior Department, and

3.

77

HERITAGE ROOM ARCHIVES
K SMILEY LIBRARY
125 W. VINE
REDLANDS, CA

ACC0017484

trust that your Hon. Commission, having discussed this matter with the Officials of this Company, and traversed the country covered by our flume property, and viewed the same, will further advise the said department in the premises.

We remain,

Very respectfully yours,

The San Diego Flume Company,

(SEAL)

By J. W. Sefton
President.

Attest:

L. F. Doolittle

Secretary.

4.

78

ACC0017485

Exhibit C.

Redlands, Cal. Dec. 1, 1891.

Albert K. Smiley,

J. B. More, and

C. C. Painter, Esqs.,

Board of Commissioners to locate reservation for Mission Indians of California.

Gentlemen:-- The Bear Valley Irrigation Company has made water filings upon the Whitewater River, Mission Creek and other streams located in Townships 1 North and 1 and 2 South, in Ranges 1, 2 and 3 East, S. B. B. & M., for the purpose of utilizing the water of said streams, which have heretofore run to waste, on lands in Townships 2, 3 and 4 South, Ranges 2, 3 and 4 West, S. B. M. The waters of these streams are to be utilized by means of tunnels, canals, ditches and reservoirs, and in taking the same to the place of intended use it will be necessary to pass through a portion of the Reservation set apart to the Mission Indians near Banning, California. Our Company desires a right of way for its pipe lines, ditches and canals through said Indian Reservation,

1.

ACC0017486

of a width, say from 50 to 100 feet with stations in the more
mountainous part of say 300 feet wide by 1000 feet long to erect
buildings and machinery upon, to utilize the water power of said
pipe lines, ditches and canals, and transmit the same by electric-
al wires for manufacturing and other uses at Banning, Redlands ,
Alessandro and elsewhere, as the development of the country may re
quire, with the right of way for ingress and egress thereto.

Our Company also desires to utilize the water rising a in a nd
flowing out of the San Jacinto Mountains to the Eastward in the
vicinity of the Aqua Caliente Indian Reservation for irrigating
lands in that vicinity and elsewhere.  We have made water filings
upon all the streams and canons in the vicinity of Aqua Caliente
subject to the vested rights of the Indians and others, and proceed
ing to develope all of the afroe mentioned water filings.

It is also probable that we shall desire to erect a telephone
line along our canal and pipe line which runs through the Indian
Reservation near Banning.  To the end that our developments of
the country may not be retarded a nd may not conflict with the
rights of the Indians, we make you the following proposition:

In consideration of the right of way through the Reservation
near Banning for pipe lines, ditches and canals, and right of way
for ingress and egress thereto, as hereinbefore set forth, and on

2.

ACC0017487

or about the line delineated upon a map which we will send to you
in a few days, and the right to our Company, so far as the rights
of the Indians are concerned, to use the waters of the streams and
canons herein before mentioned, we will construct or cause to be
constructed a wagon road up the Protrero Canon for the joint use
of the Company and its employees, and such of the Indians as
desire to travel the same. // We will furnish or cause to be furn-
ished to the Indians at or near the North-west corner of Section
14, in Township 4, South, Range 5 East, S. B. M. on or before
February 1st, 1892, from time to time as may be required by the
Indians, sufficient water irrigate one hundred and sixty acres of
land in said Section 14, on a basis of one inch to six acres of
land, measured at the point delivered under a 4 inch pressure,
providing the same is desired by the Indians at said point to irri-
gate said land or a portion thereof; and whenever said Indians have
under cultivation and requiring irrigation one hundred sixty acres
of land, this Company will furnish from time to time as they may
need the same, enough water to irrigate an additional 160 acres of
land in said Section on the same basis. Said water supply to
be continuous aslong as the said Indians need the same for irri-
gation purposes.    This Company will also furnish from that

3.

certain creek known as the Andreas Creek, at the banks thereof,
so far as the supply of water in said creek will permit, suffici
water to irrigate 100 acresof land on a basis one inch to six
acres, to such Indians as may dsire to and actually use the same
on any portion of Section 34, S. W. 1/4 of S W 1/4 of Section 35,
Township 4 South, Range 4 East, or the N W 1/4 of the N W 1/4 of
Section 2, or the N E 1/4 ofthe N E 1/4 Section 3, Township 5
South, Range 5 East, S. P. M., it being understood that the water
above mentionedis not to be furnished unless the Indians settled
on said Reservation shall require the same for irrigating their

  lands, and that such Indians as may be settled down said Reser-
vation shall at all times have such water as may be necessary for
domestic purposes, the same to be taken by them at their own
expense from the canals and ditches owned by thisCompany or by the
Palm Valley Water Company.   It being understood that the Indians
shall have a first lien upon all the sources of water supply to
which they now have any rights, for the supply of water hereby
agreed to be furnished to them.

  It is also understood that our Company and the Palm Valley
Water Company shall have a right of way across such parts and
portions of the Indian Reservation at Aqua Caliente asmay be neces-

4.

ACC0017489

sary to irrigate any of the lands cultivated in that vicinity by white residents who may be settled there now or may hereafter settle there.

Very respectfully yours,

BEAR VALLEY IRRIGATION COMPANY,

By Henry L. Williams,
Vice-president,

(CORPORATE SEAL)

And Fred. E. Hotchkiss,
Secretary.

ACC0017490

Copy

Exhibit D.

Redlands, California, Nov. 30th, 1891.

The Hon. U. S. Indian Commissioners,

Dr. Sirs:

Understanding that it is desired by you that in the forma
tion of the Reservation about to be made at Banning the north half
of section one in township three south and range one east in S. B.
meridian is required-  We offer to exchange this parcel of land
(less ten acres already deed near the north-west corner) being
three hundred and ten acres- for the east half of section ten
in township four south and four east in San Bernardino meridain-
and situate near Aqua Caliente No. 2 Reservation in San Diego
County California-- and to enable the Commissioners to make this
                                                    we agree
exchange and to possibly secure the remaining ten acres to pay
the sum of one hundred dollars to the Commissioners on demand
or to the Secretary of the Interior-- for T. M. Parsons
being duly authorized--

                         Welwood Murray,

                         Eliz E. Murray.

84

ACC0017491

Exhibit E.


Commissioners Smiley, Moore and Painter.


To the Commissioners of Indians U. S. Mission Indians

Dr Sirs:

We are desirous of a renewal of the existing lease of the Agua Caliente Hot Springs - situate at Palm Springs, California on the same terms as now, excepting that the rental be one hundred dollars yearly, and that the grounds or enclosure be one acre, to be entirely for ornamental and useful purposes relating to the springs and its environments and that the lease be extended to ten years - this being essential to make the necessary improvements and to an adequate advertising of the place. The present lease expires June 5th, 1892.-

Welwood Murray

Eliza E. Murray.

85

ACC0017492

Exhibit F.

Contract with owner of Pauma Ranch. relative to the claims of the
Indians.

86

ACC0017493

# EXHIBIT G.

COPY OF RESOLUTION adopted by the Board of Direc-
tors of the SOUTHERN PACIFIC RAILROAD COMPANY (of
California), on the 17th day of November, A. D.
1891.

WHEREAS, by an Act of Congress of the United States
of America, approved January 12th, 1891, entitled "An Act for the
relief of the Mission Indians in the State of California," it was
enacted that it should be the duty of the Commissioners appointed
under the provisions of said Act, to select a reservation for each
band or village of the Mission Indians residing within said State,
sufficient in extent to meet their just requirements, which selec-
tions should be valid when approved by the President and Secretary
of the Interior.

AND WHEREAS, in and by said Act it was further en-
acted that, in case any land should be selected under said Act, to
which any railroad company was or should thereafter be entitled to
receive a patent, such railroad company should, upon releasing all
claim and title thereto, and on the approval of the President and
Secretary of the Interior, be allowed to select an equal quantity

ACC0017494

of other land of like value in lieu thereof, at such place as the
Secretary of the Interior should determine.

AND WHEREAS, the Commissioners appointed under the
provisions of said Act have, by virtue of the power and authority
thereby vested in them, selected the following described lands, to
which this Company is or will hereafter be entitled to receive a
patent, to-wit:-

All of Section Thirteen (13), the East One-half (1/2)
of Section Fifteen (15), all of Sections Twenty-three (23) and
Twenty-five (25), the East One-half (1/2) of Section Twenty-seven
(27), and all of Section Thirty-five (35) in Township Two (2) South,
Range One (1) East, San Bernardino Meridian; also, all of Section
thirty-one (31) in Township Two (2) South, Range Two (2) East, San
Bernardino Meridian; said lands containing an area of three thou-
sand eight hundred and forty (3840) acres.

AND WHEREAS, this Company is willing to release all
claim and title to the said lands upon being allowed to select an
equal quantity of other land of like value in lieu of the lands
selected by the said Commissioners as aforesaid, to-wit, upon be-
ing allowed to select the following described lands, to-wit:-

All of Section Eighteen (18) (except the Northwest
One-quarter (1/4) of the North west one-quarter (1/4), and all of

2

ACC0017495

Section Twenty- (20) and Thirty-two (32) in Township Two, (2- South,
Range One (1) East, San Bernardino Meridian; also, the Southeast
One-quarter (1/4) of Section Twenty (20), and all of Section Thirty
two (32) in Township Two (2) South, Range Two (2) East, San Bernar-
dino Meridian; also, the Northeast One-quarter (1/4) and the South
One-half (1/2) of the Southwest One-quarter (b/4) of Section Four
(4), the Northwest  One-quarter (1/4) of the Southeast One-quarter
(1/4), and the South One-half (1/2) of the Southeast One-quarter
(1/4) of Section Six (6), in Township Three (3) South, Range One
(1) East, San Bernardino Meridian; also, the Southwest One-quarter
(1/4) of Section Eighteen (18), the Northwest One-quarter (1/4) of
Section Twenty (20), the Northwest One-quarter (1/4) of Section
Twenty-two (22), and the South One-half (1/2) of Section Twenty-
eight (28), in Township Three (3) South, Range Two (2) East, San
Bernardino Meridian; said lands containing an area of Three Thous-
and eight hundred and forty (3840) acres.

NOW, BE IT RESOLVED: That, on the approval of the
President and Secretary of the Interior of such lieu selection by
this Company, the President and Secretary of this Company be, and
they are hereby authorized and empowered to release, on behalf of
this Company, all claim, right, title and interest in and to the
lands selected by the said Commissioners as aforesaid, and to make

3
89

and execute in the name and on behalf of this Company and as its act and deed, and under its corporate seal such release of said lands selected by the said Commissioners as aforesaid, in such form as may be required by the said Commissioners and by the President and Secretary of the Interior.

---

I, J. L. Willcutt, Secretary of the Southern Pacif Railroad Company (of California) do hereby certify that the foregoing is a full, true and correct copy of a Res olution adopted at a regular meeting of the Board of Directors of said Company held at the office of the sai Company, in the City and County of San Francisco, State of California, on Tuesday, the 17th day of November, A. D., 1891.

IN WITNESS WHEREOF, I have hereunto affixed my nam and the corporate seal of said Company, the 21st day of November, A. D. 1891.

(S E A L).            (Signed) J. L. Willcutt,

Secretary Southern Pacific

Railroad Company

4.



ACC0017497

*kopy*

Exhibit H.

Palm Springs, San Diego Co., Cal.

Prof Chas. C. Painter

Secy U.S. Ind. Commissioners

Dear Sir:    In the matter of the projected exchange of land, and your desire that the land be clear of the ten acre incumbrance, we have to report that Mrs. M. succeeded in securing the promise of Mrs. Tutain- on our paying her $100.00, to remove from the premises, until the deed is signed, however, we can not place much credence on the promise.    To effect this (as Mrs. T. stated she would be in San B. to-morrow to see you ) we have written to hxx Mr. Parsons to get her acknowledgment and pay her- but to make sure that she has given no mortgage on the land.    He is directed to report progress to you.

Very Respectfully Yours

Welwood Murray.

ACC0017498

Exhibit 1.

Map showing proposed reservations for Mission Indians.

92

ACC0017499

Exhibit K.

Bethlehem, Pa. Febr. 12, 1891.

To the Board of Commissioners on apportionment

of Indian Lands;

Dear Sirs:--

In behalf of the Society for Propagating the Gospel among the Heathen," I beg leave herwith to represent to you that said Society is carrying on school and mission work at Potraro, San Bernardino Co. Calif., on five (5) acres of land, assigned to the Society for this purpose, through the National Women's Indian Association;- that we have just completed the improvements require & that our missionary, Rev. W. H. Weinland, is now in a position to carry on the work among the Indians advantageously.   Hence we respectfully petition your body to make the grant of said five acres of land a permanent thing, by giving to our Society a deed for the same, gratuitously, if possible, or for such a reasonable price as you may deem just and fair.

Respectfully yours

H. T. Bachman Epis. Fr.
President of the S. P. G.

Exhibit L.

I, C. O. Barker, acting under and in persuance of a power of
attorney duly executed, by Walter S. Hatheway on the third day of
March 1891 do hereby agree to deliver to the United States or its
authorized representatives a full and complete relinquishment to
all the rights, title and interest of said W. S. Hatheway to any
and all land or lands lying within the townships known and des-
cribed as Townships 2 South, Ranges One and 2 East San Bernardino
Meridian and more especially to that portion locally known as the
Hatheway Canon, and I further agree to furnish to the United States
or its authorized representatives a full and complete relinquish-
ment of all the rights, title and interest in and to any and all
of the water in said Hatheway Canon and any and all water, either
from creek, stream, spring or cieniga rising upon or flowing throu
or over any of the above described land; and I further agree to
furnish a full and complete relinquishment of any and all claims
that the said W. S. Hatheway may have either in law or equity
against the United States, or any agent thereof for having been
evicted from certain unsurveyed lands to-wit  the unsurveyed
portion of Twonship 2 South, Range one East, S. B. M. ascertaine

1.

ACC0017501

by private survey to be Section 27, or for any damage that the said

Hatheway may have suffered by reason of the destruction of his

improvements and the loss of the use of the land, for and in con-

sideration of a good and sufficient patent, without cost to said

Hatheway, for the land known and described as the North 1/2 of

Section 14 Township 3 South, Range 1 East, S. B. M. and acting

in persuance of an agreement entered into on the 5th day of Agust

1889 between C. F. Jost and Margaret Jost, his wife, parties of

the first part, and C. O. Barker, party of the second part.

I further agree to deliver to the United States a full and com-

plete relinquishment of all right, title, interest or claim of

the said C. F. Jost and Margaret Jost, his wife, to any and all

lands lying within townships 2 South, Range 1 and 2 East, S. B. M.

and to any right, title or interest to any and all of the water

either from creek, stream, spring or othr water source, rising on

or flowing through or over any of the land in the above described

township-- and of any and all claims for damages that the said

C. F. Jost and Margaret Jost may have either in law or equity

against the United States or any of its Agents for eviction from

any portion of the above described lands, or for any loss by

reason of the destruction of their improvements or the loss of the

2.

use of any portion of the above described lands.    For and in Consideration of a patent for the West 1/2 of Section 6 Tp 3 South Range 1 East S. B. M. to be issued by the U. S. to said C. F. Jost and Margarett Jost.

And acting under and in persuance of a power of attorney executed on the 5th day of September 1889 by Richard Gird and John G. North I do hereby further agree to furnish a full and complete relinquishment to all the right, title and interest of the said Richard Gird and John G. North to any and all lands lying in what is locally known as the Hatheway Canon in Twonships 2 S one and 2 E, S. B. M. including sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35 and 36 in Tp 2 S. R. one E. and Sections 6, 7, 18, 19, 30, and 31 in Tp. 2 S. R. two E, S. B. and to all the rifght, title and interest of said Richard Gird and John G. North to any andall water from any creek, stream, spring, cienega or other source whatsoever, rising on or flowing through or over any of the above mentioned lands and of any and all claims against the United States or any ofits agents for damages for eviction from any portion of the hereinbefore describedlands, or for the damage to or destruction of improvements and loss of use of land.

3.

96

ACC0017503

For and in consideration of a patent or patents to be issued
to the said Richard Gird and John G. North for the South 1/2
of Section 8, N W 1/4 of Section 8, the E 1/2 of N E 1/4 of Section
8, the N E 1/4 of Section 10, the S E 1/4 of N W 1/4 of Section
10, the E 1/2 of S E 1/4 of Section 10, the N W 1/4 of the S E
1/4 of Section 10, all of Section 18, and the N 1/2 of Section 20,
all in Township 3 South, Range 1 East, S. B. M.  And for the
further consideration that the Morongo Reservation shall be con-
fined to Sections 13, 14, 23, 24, 25, 26, 35 and 36 and the E 1/2
of Sections 15, 22, 27 and 34 in Tp 2 S R 1 E S. B. M. and section
31, in Tp 2 S. R. 2 E, Section 6, in Tp 3 South Range 2 East, and
the N 1/2 of Sections 1 and 2 in Tp 3 S R 1 E, S. B. M.

And I do further agree that the United States or its authorized
representatives shall have the option of accepting this offer at
any time prior to the 1st day of January 1892.

C. O. Barker.

For a valuable consideration I hereby consent that Secs. 10,
12, West 1,2,22, West 1/2 Sec 34, all in Town two (2) S.R one (1)
East, S. B. M. & Sections eighteen (18) & thrity (30) in Town two
(2) S R two (2) East S. B. M. may be included in the Morongo

HERITAGE ROOM ARCHIVES
K SMILEY LIBRARY
125 W. VINE
REDLANDS, CA 92373

4.
97

ACC0017504

State of California, )

County of San Bernardino )

On this eleventh day of Nov. in the year one thousand eight hundred and ninety-one, before me, D. W. Herlihy a Notary Public in and for said County, residing therein duly commissioned and sworn, personally appeared C. O. Barker known to me to be the person described in, whose name is subscribed to and who executed the within instrument, and he acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year in this Certificate first above written.

D. W. Herlihy,

(SEAL)
Notary Public

This acknowledgment covers changes in contract in five different instances in regard to boundaries of said land.

5.

ACC0017505

EXECUTIVE MANSION.

December 29 ª 1891

The report of the Mission Indian Commission, appoint-

ed under the act of January 12, 1891 (26 Stat., 712), is hereby

approved, except so much thereof as relates to the purchase of

lands from and exchange of lands with private individuals,

which is also approved subject to the condition that Congress

shall authorize the same.

All of the lands mentioned in said report,

are hereby withdrawn from settlement and entry until

patents shall have issued for said selected reservations, and

ACC0017506

30

until the recommendations of said Commission shall be fully

executed,and,by the proclamation of the President of the

United States,the lands or any part thereof shall be restored

to the public domain.

*Benj Harrison*

*Department of the Interior*
*Washington. D.C.*
*December 29 th*

*Under the act of Congress and as*
*above provided, approved*

*John W. Noble*
*Secretary*

16

100

ACC0017507

TAB II-4

Reproduced at the National Archives



46165        (189)

SC31

NARA DC
RG 75
PI·163/E 102
Special Cases 1821-1907
Bx 19

Reproduced at the National Archives

DEPARTMENT OF THE INTERIOR,

OFFICE OF INDIAN AFFAIRS,

WASHINGTON, D. C., *January 31, 1891.*

A. K. SMILEY, Esq., *Redlands, California.*
JOSEPH B. MORSE, Esq., *Lapeer, Michigan.*
Prof. C. C. PAINTER, *Washington, D. C.*

GENTLEMEN:

The act "for the relief of the Mission Indians in the State of California," approved January 12, 1891, provides, in part, as follows:

"That immediately after the passage of this act the Secretary of the Interior shall appoint three disinterested persons as commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the State of California, upon reservations which shall be secured to them as hereinafter provided.

"SEC. 2. That it shall be the duty of said commissioners to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the President and the Secretary of the Interior. They shall also appraise the value of the improvements belonging to any person to whom valid existing rights have attached under the public land laws of the United States, or to the assignee of such person, where such improvements are situated within the limits of any reservation selected and defined by said commissioners subject in each case to the approval of the Secretary of the Interior. In cases where the Indians are in occupation of lands within the limits of confirmed private grants, the commissioners shall determine and define the boundaries of such lands, and shall ascertain whether there are vacant public lands in the vicinity to which they may be removed. And the said commission is hereby authorized to employ a competent surveyor and the necessary assistants.

"SEC. 3. That the commissioners, upon the completion of their duties, shall report the result to the Secretary of the Interior."   *   *   *

The Secretary of the Interior having appointed you commissioners to discharge the duties imposed by said act, the following instructions are issued for your guidance in the performance of your important work.

As you are doubtless aware, these Indians received their name—Mission Indians—from their relation to the early Catholic missions on the Pacific coast, the first of which was established in 1769.

The original idea on which these missions were maintained seems to have been that so soon as the Indians should be brought, as converts of the church, into a condition for self-support, the lands which they were occupying and cultivating should be allotted as their own. Owing to the docility of the Indians and the profit of the system, it was continued up to the date of the secularization act of 1833, without recognition of the individual rights of the Indians. (See annual report of this office for 1875, pp. 9 and 10.)

CVWD 497-002

This act was passed for the ostensible purpose of carrying out the design of the missions. The result, however, seems to have been the division of the lands among a few influential Spanish and Mexican families (see report of Commissioner Wetmore, p. 4). It is to be observed, however, that by the fundamental laws of the Mexican Republic of 1824, the regulation of 1828, and the regulation of the departmental legislature, one condition was that in making private grants of lands, the lands granted must be vacant lands, and another that such grants must be without prejudice or damage to the Indians. Under the treaty of Guadaloupe Hidalgo, the rights of these Indians as existing previously to the acquisition of California by the United States, were guaranteed. The State of California also at an early day (April 22, 1850), enacted that persons and proprietors of lands on which the Indians were residing should permit such Indians to peaceably reside on such lands unmolested, and that the white person or proprietor might apply to have a sufficient amount of land for the necessary wants of such Indians, including their village, set off for such Indians.

It does not appear, however, that the Indians have ever availed themselves of this provision.

Southern California escaped the effects of the gold fever, and the tide of emigration did not turn in that direction until about the Fall of 1867.

In the annual report of this office for the year 1875 (p. 10) the effect of the emigration which set in during the year 1867 upon the Indians, is referred to as follows:

"Gradually, however, for the past eight years, Southern California has been filling up by emigration; Spanish and Mexican grants have been "determined" in such a way as to cover choice tracts wherever found; large ranches have been cut up and the desirable portions of public domain pre-empted, and thus all available agricultural lands have been seized or occupied by individual owners, who, in conformity to law, have become possessed of the lands on which the remnants of a few thousand Mission Indians are making their homes in San Diego and San Bernardino counties. So long as the pre-emptors and purchasers did not require their lands for use or sale, the Indians were allowed to remain undisturbed and in blissful ignorance of the fact that the place they called home had by law passed to the ownership of another. Of late, under the increasing demands for these lands, writs of ejectment are being procured by which the Indians are forcibly dispossessed and turned adrift in poverty and wretchedness."

January 31, 1870, on the representation of Lieutenant A. P. Greene, acting agent, indorsed by Superintendent B. C. Whitney, six townships were set apart for the permanent homes of these Indians and withdrawn from public sale.

The Commissioner of Indian Affairs in his report for 1875 (p. 11), states that "the setting apart of these reservations received the most strenuous, united, and persistent opposition of the citizens and press of California. The proceeding was represented as an enormous swindle upon the Government and a hardship and outrage upon the Indians, and numerous petitions and remonstrances, signed by leading citizens, were forwarded to the President; and the Indians themselves, for whose benefit alone the reservations had been created, were induced to ask not to be sent thither but to be "let alone" upon the lands they were then occupying, and which they were left to believe would remain permanently their homes.

In accordance with this demand of public opinion in California, Commissioner Parker suggested to the Department the propriety of restoring the Pala and San Pasqual reserves to the public domain, which was accordingly done by executive order of February 17, 1871, and this last opportunity of furnishing these Indians with homes by substituting public lands in California for those in the title to which the Government had failed to protect them was lost.

This appears to have been the first attempt to establish a reservation or reservations for these Indians. As shown above, the reservation was abolished in a little over a year.

In 1873, John G. Ames was appointed a special agent to inquire into the condition and necessities of the Mission Indians, and submitted his report October 28, 1873 (copy herewith).

In 1874, Charles A. Wetmore was appointed a special agent to proceed to southern California and make a thorough inquiry into all the facts and circumstances affecting these Indians and to devise some plan whereby favorable legislation could be had for their relief. He submitted his report January 9, 1875 (copy herewith).

The only result of these investigations appears to have been the establishment, by executive order of December 27, 1875, of nine reservations.

In 1876 and subsequent years additional reservations were established.

July 13, 1883, Mrs. Helen Jackson and Abbot Kinney, Esq., special agents, made an exhaustive report upon the condition and needs of the Mission Indians, their recommendations being the basis of the act of January 12, 1891.

Regarding the reservations, they say—

"All the reservations made in 1876, and that comprises nearly all now existing, were laid off by guess by the surveyor in San Diego on an imperfect county map. These sections thus guessed at by the surveyor were reported by the Commissioner to the Interior Department, set aside by executive order, and ordered to be surveyed. When the actual survey came to be made, it was discovered that in a majority of cases the Indian villages intended to be provided for were outside the reservation lines, and that the greater part of the lands set apart were wholly worthless. The plats of these reservations are in the Surveyor-General's office at San Francisco; on each of them was marked by the surveyor an additional line in color, showing what tracts ought to be added to take in the Indian villages and fields."

There are now twenty reservations for these Indians, as shown by the accompanying map.

According to the report of Agent Rust, of May 9, 1890, there are thirty-seven separate villages of Mission Indians, six (524 Indians) being on lands owned by private parties; eight (615 Indians) on patented grants, and three (115 Indians) on Government lands; one village (48 Indians)

being partly on private and partly on Government ...s; according to Agent Rust the number of Indians on reservations is 1,841; total 3,143.

Under the second section of the act it is your duty to select a reservation for each band or village of Mission Indians, "which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians and which shall be sufficient in extent to meet their just requirements."

In the case of each of the existing reservations, you will ascertain whether the reservation as described in the executive order creating it (and as modified by subsequent orders) contains all the land to which the band is entitled under the above provision, and in the event that such is not the case, you will submit a description of the reservation as it should be made. Such description should be made according to the public surveys if possible, and so that the lines can readily be established upon the ground from the description given. In case the existing reservation contains lands not needed or occupied by the Indians, and not available for the removal of other Indians thereto, a reduced reservation should be reported. Where a village or band is located upon public lands a reservation, complying as far as practicable with the requirements of the second section, should be selected and properly described.

Your attention is called to the following clause in the second section of the act:

"In cases where the Indians are in occupation of lands within the limits of confirmed private grants, the commissioners shall determine and define the boundaries of such lands, and shall ascertain whether there are vacant public lands in the vicinity to which they may be removed."

You will examine the title to all such lands and ascertain to what extent, if any, the rights of the Indians are guaranteed or protected in the original grant or conveyance. If the Indians are willing to remove to another reservation, where they can be accommodated, such removal will be advisable, as they can then be given allotments and valid titles, which can not be done as to lands in which they have only the right of occupancy. If they are unwilling to remove, or if there are no lands available upon which to locate them, the boundaries of the lands occupied should be accurately defined as required by the act. The same course should be pursued as to private lands other than confirmed grants.

You are authorized to employ a competent surveyor and the necessary assistants to define the boundaries of the selected tracts, and to determine the legal subdivisions upon which Indians are located. Care should be taken to secure the services of a thoroughly honest, reliable, and competent surveyor.

The act requires you to appraise the value of the improvements belonging to any person to whom existing valid rights have attached under the public land laws of the United States or to the assignee of such persons, where such improvements are situated within the limits of any reservation selected and defined by you. Such appraisement is subject to the approval of the Secretary.

In order to acquire existing valid rights settlement must have been made on surveyed public land before it was set aside for Indian purposes. It is understood that in some cases settlement and improvement were made on unsurveyed lands before the reservation was created. In these cases the settlers are recognized as having equitable rights only. Therefore, where improvements of settlers are located within existing or selected reservations, it should be ascertained whether such improvements were made before the land was appropriated for Indian purposes, whether it was vacant land—that is, not occupied by Indians at the date of settlement—and whether it was surveyed or unsurveyed. The nature and extent of the improvements should be shown and their value carefully estimated in detail.

Where settlers are upon lands not needed for the Indians it will doubtless be advisable to exclude such lands from the reservation as defined by you. Where valid rights have attached and the lands are needed for the Indians, the value of the lands as well as of the improvements should be given.

Care should be taken that all tracts to which valid rights have attached are accurately described. For your information I inclose copies of office reports of October 11, 1886, and March 9, 1887, relative to certain alleged trespassers whose removal from the Mission reservations was directed by office letter of March 16, 1887 (copy also inclosed).

The third section provides—

"That in case any land shall be selected under this act to which any railroad company is or shall hereafter be entitled to receive a patent, such railroad company shall upon releasing all claim and title thereto, and on the approval of the President and the Secretary of the Interior, be allowed to select an equal quantity of other land of like value in lieu thereof, at such place as the Secretary of the Interior shall determine."

Under the act of March 3, 1871 (16 Stats., 573), the Southern Pacific Railroad Company was granted the odd sections within twenty miles on each side of its road. Some of the existing reservations, and other lands occupied by the Indians fall within this grant. In some cases the lands have not yet been subdivided and the rights of the company have not yet attached, but as soon as the surveys are extended over the lands the title of the company will doubtless be complete.

If odd sections are retained or selected within the limits of the grant for reservation purposes, you will, if practicable, confer with the proper officers of the company with the view of ascertaining whether they will release the company's claim as contemplated by the act. Should the officers indicate that the company will decline to release its claim the reservations should be so defined as to exclude the odd sections within

6

the grant as far as possible. It is not apprehended, however, that there will be any difficulty in dealing with the company, as it has always manifested a desire to treat the Indians fairly, and can no doubt select other lands equally valuable.

You will observe that the eighth section of the act confers upon the Secretary of the Interior power to authorize the construction of ditches and other appliances for irrigating purposes through the reservations.

You will report whether any such appliances have been constructed through or across any of the reservations selected, and make such suggestions and recommendations regarding the subject of irrigation in any of the selected reservations as your observations may seem to require.

It is desired that you give as full a description as possible of the character of the land in each reservation, with the respective quantities of arable, grazing, and other lands. Your opinion as to the willingness of the Indians to take allotments as provided in the act, and the advisability of making such allotments based upon your observation during the progress of your work is requested.

The object of the act of January 12, 1891, is to secure the determination and adjustment of the rights of the Mission Indians as regards their lands, and also of the rights and claims of settlers in conflict therewith. I need not remind you that the accomplishment of that result depends in great measure upon your efforts, and I am confident that you will exercise all possible care and patience in the investigation in order that a satisfactory and final settlement of the troubles which have so long beset these Indians may be had.

You will each be allowed compensation at the rate of $8 per diem while actually engaged in the work required of you, in addition to your actual and necessary traveling expenses—your salaries to commence on the day you take the oath of office and enter upon your duties.

Mr. Painter has been designated as disbursing officer of the commission and will be required to give bond in the penal sum of $5,000. When he shall have filed his bond as disbursing officer, special instructions will be given him for his guidance in preparing and rendering his accounts in order that they may conform strictly to the regulations of the Department governing such matters. You are authorized to visit the local land officers and the office of the Surveyor-General of the State of California, if found necessary, in order to obtain information as to the status of lands, etc.

Upon the completion of your labors you will submit a full and detailed report thereof to this office.

Very respectfully,

T. J. MORGAN,
*Commissioner.*

Approved February 4, 1891.
JOHN W. NOBLE,
*Secretary.*

CVWD 497-005

DEPARTMENT OF THE INTERIOR,

WASHINGTON.   December 30, 1891.

The Commissioner of Indian Affairs.

Sir:

I return herewith the report of the Mission Commission and accompanying papers received with your communication of 19th instant.

By the order of the President of the 29th instant attached to said report, you will see that the same is approved except so much thereof as relates to the purchase of lands from and exchange of lands with private individuals which is also approved subject to the condition that Congress shall authorize the same and that all the lands mentioned in said report are withdrawn from settlement and entry until patents shall have issued for said selected  reservations and until the recommendations of said Commission shall be fully executed and by the proclamation of the President the lands or any part thereof shall be restored to the public domain.

The above action has this day been communicated to Mr. Painter by telegraph, with directions to advise the Commission and parties interested.

I also enclose herewith a communication of 29th instant from the Honorable Assistant Attorney General for this Department

CVWD 497-006

to whom the report was referred, and have to direct that a draught

of a bill be prepared authorizing the Secretary of the Interior

to purchase or exchange the lands as recommended.

You will also please prepare a list of the lands men-

tioned in said report of the Commission which are to be withdrawn

by the order of the President for file in the General Land Office.

Very respectfully,

9299 Ind. Div. '91.

21 enclosures.

Secretary.

CVWD 497-007

Reproduced at the National Archives

9299-'91.
Lnd.Div.

*L.R.S.*

## DEPARTMENT OF THE INTERIOR,
### Office of the Assistant Attorney-General.
#### WASHINGTON,

*Dec 29/1891*

The Honorable

The Secretary of the Interior.

*Indian Office
file no. 46165
1891*

Sir:

I have the honor to acknowledge the receipt, by

your verbal reference, of a communication from the Acting

Commissioner of Indian Affairs submitting the report of the

Mission Indian Commission, duly appointed under the provisions

of the act of Congress approved January 15, 1891 (26 Stats.,

712), entitled "An act for the relief of the Mission Indians

in California."   By the first section of said act the Secre-

tary of the Interior is required to appoint three commission-

ers to arrange a just and satisfactory settlement of the

Mission Indians residing in the State of California, "upon

reservations which shall be secured to them as hereinafter

provided."   Section two provides:

"That it shall be the duty of said commission to
select a reservation for each band or village of the Mission
Indians residing within said State, which reservation shall in
clude, as far as practicable, the lands and villages which
have been in the actual occupation and possession of said
Indians, and which shall be sufficient in extent to meet their

CVWD 497-008

2

just requirements, which selection shall be valid when approv-
ed by the President and Secretary of the Interior.  They
shall also appraise the value of the improvements belonging
to any person to whom valid existing rights have attached
under the public land laws of the United States, or to the
assignee of such person, where such improvements are situated
within  the limits of any reservation selected and defined
by said commissioners subject in each case to the approval
of the Secretary of the Interior.   In cases where the Indians
are in occupation of lands within the limits of confirmed
private grants, the commissioners shall determine and define
the boundaries of such lands, and shall ascertain whether
there are vacant public lands in the vicinity to which they
may be removed.   And the said commission is hereby authorized
to employ a competent surveyor and the necessary assistants."

It is provided by section three that said commission
when it has completed its labors, shall make report thereof
to the Secretary of the Interior, and if there be no objection
he shall cause a patent to issue for each of the reservations
approved by him, in favor of each band or village of Indians
occupying such reservation, with a proviso, however, -

"That no patent shall embrace any tract or tracts to which
existing valid rights have attached in favor of any person
under any of the United States laws providing  for the dis-
position of the public domain, unless such person shall
acquiesce in and accept the appraisal provided for in the
preceding section in all respects, and shall thereafter, upon
demand and payment of said appraised value, execute a release
of all title and claim thereto;  and a separate patent, in
similar form, may be issued for any such tract or tracts at
any time thereafter.   Any such person shall be permitted to
exercise the same right to take land under the public land

CVWD 497-009

Reproduced at the National Archives

3

laws of the United States as though he had not made settlement on the lands embraced in said reservation."   2. "That in case any land shall be selected under this act to which any railroad company is or shall hereafter be entitled to receive a patent, such railroad company shall, upon releasing all claim and title thereto, and on the approval of the President and Secretary of the Interior, be allowed to select an equal quantity of other land of like value in lieu thereof at such place as the Secretary of the Interior may determine";  and 3, that the trust patents shall be placed in the custody of the Interior Department and copies thereof shall be filed with the proper Indian agent and be open to public inspection.

Sections four and five make provision for allotments of land in severalty to the Indians residing upon any of said reservations, and the issuance of trust patents therefor.

Section six provides:

"That in cases where the lands occupied by any band or village of Indians are wholly or in part within the limits of any confirmed private grant or grants, it shall be the duty of the Attorney-General of the United States, upon request of the Secretary of the Interior, through special counsel or otherwise, to defend such Indians in the rights secured to them in the original grants from the Mexican Government, and in an act for the government and protection of the Indians passed by the legislature of the State of California April twenty-second, eighteen hundred and fifty, or to bring any suit, in the name of the United States, in the Circuit Court of the United States for California, that may be found necessary for the full protection of the legal or equitable rights of any Indian or tribe of Indians in any of such lands."

The California act above referred to makes it the duty of justices of the peace in said State to set off a

CVWD 497-010

4

sufficient amount of land for the necessary wants of the Indians residing upon lands owned by white persons, upon the application of such owners.

The Senate Committee on Indian Affairs, in 1885, reported that "This act has never been repealed, nor, so far as we could learn, complied with in a single instance. To-day, it would be held of no value in the California courts." (See Sen.Rep't No.1522, 48th Cong.,2d Sess., p.150.)

The Commission, in said report, recommends that twenty-six reservations, particularly describing each by name, be set apart in said State for the use of said Mission In-dians.   The Acting Commissioner of Indian Affairs recommends, generally, the approval of the selections of reservations as made by said Commission, and, in addition thereto, that "lot one of section 30" selected as school land in lieu of de-ficiency in fractional town 18 south range 7 east, embracing 11.58 acres, be set apart if the claim of the State can be satisfied with other land, the list containing said lot not yet having been approved to the State.

The fourteenth reservation, named "Temecula", the Commission recommends should be set apart by executive order,

CVWD 497-011

Reproduced at the National Archives

5

and that a part of section 36 in town 8 south range 2 west
should be purchased from the State's vendee at a price not to
exceed $400.    The Acting Commissioner approves of the selec-
tion of the reservation by the Commission, but says that the
question of the purchase of section 36 "will require con-
gressional action."

The Commission states that the eighteenth reserva-
tion, named "San Jacinto", contains some odd-numbered sections
within the granted limits of the Southern Pacific Railroad
Company, and it recommends that the Company be allowed to
select other lands in lieu thereof, subject to the approval
of the Secretary of the Interior.    This recommendation re-
ceives the approval of the Acting Commissioner.

The Commission also recommends that the reservation
named "Agua Caliente" be diminished to include certain sec-
tions named, and that the surplus land be restored to the
public domain, "except the east half of section ten, which
they recommend be exchanged with Dr. Murray and wife."    The
proposed selection is approved by the Acting Commissioner.

It appears that within the limits of the reserva-
tion named "Los Coyotes" there are several patented claims,

Reproduced at the National Archives

6

and among them the claims of J. J. Warren and Harmon T. Helm, which the Commission recommends be "extinguished by purchase or otherwise, because it would be of great benefit to the Indians." The Commission states that said claims were entered and patented before the reservation was set apart by executive order, but long subsequently to the time when the lands were in the possession of the Indians. The Acting Commissioner states that under the provision of said section three, which prohibits the patenting of any tract as a reservation to which existing valid rights have attached, it will require an appropriation by Congress to pay the appraised value, should the owners be willing to dispose of their claims.

For the reservation named "Torros" the Commission selected among other tracts section 36, town 7 south range 8 east, S.B.M., and certain odd-numbered sections within the grant to said railroad company. The company has signified its willingness to select other lands in lieu of those within the reservation, and the Acting Commissioner expresses the opinion that the State should be allowed to select land in lieu of said section 36, but expresses a doubt whether this can be done without additional legislation.

CVWD 497-013

reproduced at the National Archives

7

It is stated by the Commission that on the private grant called "Pauma Ranch" there are three rancherias which have been occupied by Indians since prior to the treaty with Guadaloupe Hidalgo, and that the original grant excepted these Indian holdings.    The present owner has commenced suit to determine his rights and the Commission caused the Indian holdings to be surveyed, and entered into negotiations with the present owner, Bishop Mora, who made a quit-claim deed to 250 acres of land, also an interest in certain lands during the lifetime of one Maja     and his wife,"and water rights of all of the Indians."    The Acting Commissioner recommends the acceptance of the deed and the approval of the selection.

The Commission reports that the "Morongo" reserva- tion, as at present established, contains much waste land and more agricultural land than is necessary for the Indians; that the Southern Pacific Railroad runs through the reserva- tion, and the company claims the odd-numbered sections; that white men have settled upon some of the railroad lands, and have filed on the water in the canon, one of whom, W. S. Hathiway, settled upon a tract, shown by private survey

CVWD 497-014

8

to be in section 27, town 2 south range 1 east, and was
ejected therefrom after having expended, as he alleges,
about $1500;  that two others, C. F. Jost and Margaret Jost,
settled upon section 25 some years ago and made valuable im-
provements, and they were also ejected;  that Richard Gird
and John G. North acquired an interest several years ago on
sections 15 and 23, near the upper end of the canon, and ob-
tained rights of surplus water from said Hatheway and Josts;
that, in addition, said Gird and North procured title to the
east half of section 36, upon which are nearly all of the
houses, irrigating ditches, and a considerable portion of
the orchards and vineyards belonging to the Indians;  that
they also raised a field of alfalfa, and spent considerable
money in making irrigating ditches in the upper end of the
canon, and in setting out an orchard;  that these parties have
also been ejected from their claims and have commenced suit
to recover damages and to determine their right to the lands
and the water.   The Commission reports that, finding the
Indians in possession of lands they did not want, and the
whites claiming lands that were essential to the well being of

CVWD 497-015

9

the Indians if the reservation was to be established, and also desiring to relieve the government of litigation and secure title to the lands claimed by the whites for the reservation, they wrote to the Commissioner of Indian Affairs on March 16, 1891, for instructions, and on April 1, same year, received a telegram to "go ahead";  that subsequently they were advised by letter from the Indian Office  that they had ample authority "to give up lands within the reservation not occupied or needed by the Indians in order to secure within the reservation, free from incumbrance, lands which are needed for the Indians."    Thereupon the Commission secured a proposition in writing from the alleged attorney in fact of said Hatheway, Josts, Gird and North to release their several interests in and to the lands claimed by them and the water rights and all claims for damages on account of said evictions upon condition that they receive patents from the United States for other lands in lieu thereof, as follows:   Hatheway one half section, the Josts one half section, and Gird and North patents for 1840 acres, which proposition the United States is authorized to accept "at any time prior to the 1st day of January, 1892."

CVWD 497-016

Reproduced at the National Archives

10

The Commission further reports that in order to secure these various exchanges it will be necessary to surrender a larger area than will be secured for the Indians.

The Acting Commissioner expresses the opinion that there is ample authority in said act for the exchange of railroad lands, but the act does not contain any authority for the exchange of lands claimed by private parties, nor does he know of any law authorizing the issuance of patents to said parties as proposed by the Commission.  He also says that the written instructions of April 1, 1891, to the Commission did not contemplate the issuance of patents for lands released from the reservation "except such as they might be entitled to under existing laws;"  that "the act does not contain any authority for the exchange of school sections, but it is possible that this authority may exist under general laws," and he suggests that said proposition of said attorney in fact and the railroad company might be formally accepted and afterwards Congress could be asked to authorize the exchange of the private and school lands.

Reproduced at the National Archives

11

By your said reference I infer that you wish my
opinion whether the Executive Department is authorized to
accept said propositions for the exchange of lands and issue
patents therefor, and also whether any of the lands selected
for reservation purposes are subject to settlement and entry
prior to the issuance of patents for the same.

There can be no question, in my judgment, but that
there is ample authority under the provision of the third sec-
tion of said act for the exchange of lands with the railroad
company within the limits of said reservations, provided
such company is or may be entitled to a patent for the lands
claimed and releases its claim and title thereto.   But I am
unable to find any authority of law for an exchange of lands
with private parties and the issuance of patents therefor.
The duties of said Commission are expressly stated in the
second section of said act.

Besides selecting the necessary reservations for
said Indians, the Commission is specifically directed to
appraise the inprovements within the same belonging to any
person, or his assignee, who has acquired "valid existing
rights . . . under the public-land laws of the United

CVWD 497-018

12

States . . . subject to the approval of the Secretary

of the Interior," and also to define the boundaries of the

lands occupied by Indians within the limits of confirmed

private grants, and also to determine whether there are vacant

public lands near, to which the Indians can be removed.

It thus appears not only that there is no express

statutory authority for the exchange of lands claimed by

private parties within the limits of the reservations se-

lected by said Commission, but explicit instructions are

given in said act for the appraisal by said Commission of

the improvements of persons having "valid existing rights"

therein, subject, however, to the approval of the Secretary

of the Interior.

It is well settled, I think, that Congress alone

has the power of the disposal of the property of the United

States, and that the title to public land can pass only by

virtue of some law of Congress.   (Constitution of the United

States, Art.IV, Sec.3, Clause 2;  United States v. Gratiot,

14 Peters, 526;  United States v. Fitzgerald, 15 Peters,128.)

While the Executive Department cannot patent lands

from the public domain in exchange for those claimed by

private parties, unless expressly authorized so to do by law,

CVWD 497-019

13

yet the President may reserve from sale and set apart for
public uses tracts of land belonging to the United States.
In Grisar v.McDowell (16 Wall.,364-381), the Supreme Court
said:

> "from an early period in the history of the govern-
> ment, it has been the practice of the President to order from
> time to time, as the exigencies of the public service required
> parcels of land belonging to the United States to be reserved
> from sale and set apart for public uses."

And, in like manner, very many of the Indian reser-
vations have been set apart by executive order, sometimes by
the President, under his own hand, and occasionally by the
Secretary of the Interior, whose acts are presumed to be by
the direction of the President.   (Wilcox v. Jackson, 13
Peters, 498.)

From the papers referred, it is quite impossible
to determine what rights the parties represented by said
attorney in fact have to the lands proposed to be exchanged.
It is true that the Commission reports that Gird and North
procured "an interest some years ago on sections fifteen and
twenty-three   .   .   .   which were railroad lands," but
it does not appear when or to what extent said interest was
obtained.   Besides, their proposition of relinquishment of
their interest in the sections  described, does not state

Reproduced at the National Archives

Reproduced at the National Archives

14

the extent of their interest therein or how they acquired

any "valid existing rights" to the same.  Moreover, an exam-

ination of the lands proposed for exchange by the railroad

company shows that at least one section is the same as said

attorney in fact proposes to exchange, namely, section 31, town

2 south, range 2 east, S.B.M..

The special counsel for the Indians, Mr. Lewis, in a

letter dated December 7, 1891, concedes the right of the com-

pany to the lands claimed by it and urges the acceptance

of its proposition before January 1, 1892, so that the basis

for the several actions pending against "Preston and Morango"

and others expected, may be destroyed.

The right of said company is derived from the 23rd sec-

tion of the Act of Congress approved March 3, 1871 ( 16 Stat.,

573-579), which provides:

"That, for the purpose of connecting the Texas Pacific
railroad with the city of San Francisco, the Southern Paci-
fic Railroad Company of California is hereby authorized
(subject to the laws of California) to construct a line of
railroad from a point at or near Tehachapa Pass, by way of
Los Angeles, to the Texas Pacific railroad at or near the
Colorado river, with the same rights, grants, and privileges,
and subject to the same limitations, restrictions, and condi-

Reproduced at the National Archives

15

tions as were granted to said Southern Pacific Railroad
Railroad Company of California, by the act of July twenty-
seven, eighteen hundred and sixty-six: Provided, however,
That this section shall in no way affect or impair the
rights, present or prospective, of the Atlantic and Pacific
Railroad Company or any other railroad company."

Section 18 of the act of July 27, 1866 (14 Stat., 292-299)
authorizes the Southern Pacific Railroad Company to connect
with the Atlantic and Pacific Railroad and to have "similar
grants of land, subject to all the conditions and limita-
tions herein provided."  By section two of the granting act
it was agreed (inter alia) that "the United States shall
extinguish, as rapidly as may be consistent with the public
welfare of the Indians, and only by their voluntary cession,
the Indian title to all lands falling under the operation
of this act and acquired in the donation to the road named
in the act."  Section three grants to said company, --
"every alternate section of public land, not mineral, desig-
nated by odd numbers, to the amount of twenty alternate sec-
tions per mile on each side of said railroad line, as said
company may adopt, through the Territories of the United
States, and ten alternate sections of land per mile on each
side of said railroad whenever it passes through any State,
and whenever on the line thereof the United States have full

CVWD 497-022

16

title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is designated by a plat thereof filed in the office of the commissioner of the general land office."

If the Mission Indians were in actual occupancy of lands at the date of the definite location of said road, it is very doubtful if the company acquired any right of possession to the land, so long as it is so occupied.   And if there were any other claims under the land laws of the United which could be perfected, they would serve to except the land from the operation of the grant.  So, also, under the rulings of this Department, no person can acquire a settlement right by entering upon lands in the actual use or occupancy of Indians. This was expressly ruled in the case of the Mission Indians v. Walsh (12 L.D., 576), on review, 13 L.D., 269.

Hence, in order to determine whether the company has a legal right to the odd sections within the limits of its grant, and also within the limits of the reservation proposed to be selected, it should clearly appear that they were, in the language of the granting act, "free from pre-emption or other claims or rights" at the date of the act.   This is not shown by the report of the Commissioner; but as the special counsel of the Indians concedes the claim of the railroad to these lands, presumably he and the Commissioner are satisfied on that point.

CVWD 497-023

-17-

I am, however, clearly of the opinion, and so advise you, that there is no warrant of law authorizing the approval of said propositions for the exchange or purchase of lands, and issuing patents to private individuals as recommended; that under the provisions of the act of February 28, 1891 (26 Stat., 796), the State, if it has not disposed of the school sections, may select other lands in lieu thereof, and that the President may, if deemed necessary, withdraw the lands involved herein from settlement and entry until Congress shall grant the authority to purchase, exchange and issue the patents as proposed.

I see no objection to the approval of those reservations selected that are free from adverse claims.

Inasmuch, however, as additional legislation is necessary to authorize the Executive Department to purchase and exchange lands as recommended by said Commission, the Commissioner of Indian Affairs should be directed to prepare the draft of a Bill to be submitted by the President to Congress, authorizing the Secretary of the Interior to purchase or exchange the lands as recommended.

The papers submitted are herewith returned.

Very respectfully,

Assistant Attorney General.

CVWD 497-024

Reproduced at the National Archives

# LIST
## AND ESTIMATED
## AREA
## OF PROPOSED RESERVATIONS.

----- oo - oOo - oo -----

| NO. | NAMES. | AREA. |
|---|---|---|
| 1. | San Manuel. | 640 |
| 2. | Twenty-nine Palms. | 320 |
| 3. | Ramona. | 520 |
| 4. | Pala. | 160 |
| 5. | Rincon. | 2,560 |
| 6. | Cahuilla. | 18,240 |
| 7. | Potrero. | 10,880 |
| 8. | Mesa Grande. | 120 |
| 9. | Inaja. | 280 |
| 10. | La Posta. | 240 |
| 11. | Manzanita. | 640 |
| 12. | Laguna. | 160 |
| 13. | Campo. | 280 |
| 14. | Temecula. | 3,360 |
| 15. | Cuyapipe or Long Canon. | 1,120 |
| 16. | Sycuan. | 640 |
| 17. | Capitan Grande. | 10,560 |
| 18. | San Jacinto. | 3,680 |

CVWD 497-025

Reproduced at the National Archives

2

| NO. | NAMES. | AREA. |
|---|---|---|
| 19. | Agua Caliente. | 4,480 |
| 20. | Los Coyotes. | 23,640 |
| 21. | Torres. | 20,800 |
| 22. | Pauma. | 250 |
| 23. | Augustine. | 640 |
| 24. | Santa Ysabel. | 17,920 |
| 25. | Cabezon. | 1,280 |
| 26. | Morongo. | 12,160 |
| | Total, ...... | 135,570 |

CVWD 497-026

(Copy)

Banning, California,

March 16th, 1891.

Hon. Jno. W. Noble,

Through the Indian Department,

Washington, D.C.

Dear Sir:

The Mission Indians commissioners find themselves
confronted at this point with the following situation:

On that portion of the reservation where most of the In-
dians are living, and in a canyon above the Indian village
called Protrero white men have settled on the odd sections
claiming the right to do so upon the theory that they are R.R.
lands and that though unsurveyed, that as of course title
must ultimately go to the Southern Pacific R.R. Co., and from
it to them they have developed more or less important water
rights, to water that is absolutely essential for the use of
the Indians. The most important of these claims are those of
Gird and North and one Jorist. The Banning Water and Im-
provement Co., through its President Mr. Barker has got op-
tions on these claims, and desires to trade them for some even
sections of desirable barley land within the reservation which

CVWD 497-027

Reproduced at the National Archives

-2-

have never been used by the Indians, and upon which it is
doubtful if they could ever live because of the entire absence
of even water enough for domestic use. The scheme of Mr.
Barker if carried out—by a relinquishment from the R.R. Co.,
as well—would put the reservation all together and would
supply it with an adequate amount of water for all purposes
including irrigation. While the commission do not think the
proposition as made is sufficiently fair to the Indians to
warrant its adoption, they do think it desirable to make an
arrangement somewhat upon the general lines indicated by the
Barker scheme. The commission however doubt their authority
under the law to exchange lands, even though not used by the
Indians, and never likely to be, for these claims and lands
that are desirable to the Indians. If the commission has
this authority, subject to the approval of the President and
Secretary, to go on, and compromise and exchange, they have
no doubt of their ability to so arrange the Banning reserva-
tion as to make a permanent and satisfactory settlement ,
subject of course, to the expectation that the R.R. Co., will
relinquish its right to the odd sections in lieu of other
lands.

These commissioners ask for full and explicit instructions

CVWD 497-028

Reproduced at the National Archives

-3-

as to their powers with reference to the Banning reservation.

Time is so important that if the Secretary thinks we have the right to go on with the negotiation we wish he would telegraph us to "go ahead at Benning" and let written instructions follow at once.

Respectfully yours,

Albert K. Smiley )  Mission

Chas. C. Painter )  Indians

J.B. Morse . )  Commissioners.

CVWD 497-029

Reproduced at the National Archives

1  City and County of San Bernardino, State

2  of California, March 14th, 1891.

3  I, C. N. Damron, as the Attorney of Paul Wiese make this

4  statement. I am satisfied from my personal knowledge, that

5  Paul Wiese purchased the claim of John A. Smithline in good

6  faith to make a home, and that said Wiese at the time he made

7  the purchase did not know of any trouble between Smithline

8  and the Indians. I heard Wiese and Smithline talk the busines

9  over about the 28th or 29th of March, 1890, just after Wiese

10 got deed from Smithline hereto attached. Nothing was said

11 about trouble with the Indians. I also hereto attach affi-

12 davit of Smithline that was delivered to Wiese when he got

13 deed from Smithline, showing that Smithline had claim to the

14 land made under Possessory Land Claim Act of this State,

15 passed April 20th, 1852, which can be found in Compiled Laws

16 of California 1850-53, page 896. This law is in force, and

17 applies to any public lands in this state in maintaining and

18 defending possessory actions. I understand that this law is

19 to protect actual settlers, and further my understanding is

20 that the actual settler on Government land has the first

21 right after the Government has made a survey; but believing

22 as I do that the land in question is so situated, being ad-

23 joining to where the Indians live, and that it is convenient

24 and suitable for them as a home, and believing that it is

25 right for them to have a home, I have advised Mr. Paul Wiese,

26 a poor, hard working young German man to quit claim to said

27 Indians said land, and to turn over the same to them, together

28 with all the improvements thereon, and his barley crop, feel-

CVWD 497-030

Reproduced at the National Archives

1   ing certain that the Government of the United States will do

2   right by him, and give him a just allowance.

3       I further state that Paul Wiese, in my opinion, has

4   acted in good faith in this whole transaction, and that he

5   is a young man of only ordinary intelligence.

6

7   *C. W. Damron*

8   *Attorney for Paul*

9   *Wiese*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CVWD 497-031

Reproduced at the National Archives

No. 1.

Possessory Land Claim:

State of California

County of San Bernardino

J. A. Smithline on oath says that he is a native born citizen of the United States of America over the age of Twenty one years, namely of the age of Thirty one years, and that he claims certain public lands in this State, and that the lands claimed by him are within the County of San Bernardino State of California and described as follows, Commencing at a point two miles due North from certain Springs known as Harlem Springs and which said point is marked by a monument of stone about three feet in hight, thence due East one half mile to a monument and stake, which mark the South East corner of Affiants said land, thence due North one half mile to a stake and monument, and which mark the North East corner of affiants lands, thence due West one half mile to a stake and monument, and which mark the North West corner of Affiants said lands, thence due South one half mile to the place of beginning, and that his said lines do not Embrace more than one hundred and sixty acres of land. Affiant further says that he has taken no other claim under "An act prescribing the mode of maintaining and defending possessory actions on Public Lands in this

Reproduced at the National Archives

State "Passed April 20th 1852" and that he
was make this claim under said act,
and that to the best of his knowledge and
belief the said described lands are
not claimed under any existing title

　　　　　　　J. A. Smithline

Subscribed and sworn
to before me April
27st AD 1888.
　　　　Elmer E Rowell
　　　　　Notary Public

CVWD 497-033

Reproduced at the National Archives



9299

Act. Commr. of Ind. Affairs.

Dec. 19, 1891.

Submits report of Mission
Indian Commission, with recom
mendations.

Enc

Report of Asst Atty
Genl.      Dec 29/91.

Leldut J.C. actg maln
& encls A.A.G. opinion
        Dec 30/91

See 9312-92

CVWD 497-034

# TAB II-5

Reproduced at the National Archives



41471

**OFFICE OF**
**Indian Affairs,**
**Rec'd NOV 8**   **1893**

Case 31

MISSION TULE RIVER "CONS" AGENCY.
Colton, Cal.   OCT 31 1893
FRANCISCO ESTUDILLO,
U. S. INDIAN AGENT.

Report of 2d Visit to
Palm Spring —
And settlement of Difficulties
of Cemetery &
Explains protection of water ditches
Asking for information relative to the
Fortwith ditch. reporting Indians
Wishes in relation to the 100$
Received as Rent of the Springs

Ensd Nov, 20/93
113 268/452

Noted

28/162

ACC-HRA000702

Reproduced at the National Archives

41471

# United States Indian Service,

### MISSION TULE RIVER "CONS." AGENCY.

Colton, Calif. OCT 31 1893, 189

Hon. Commissioner of Indian Affairs

### Washington,

### D. C.

Sir

I have the honor to report
that my 2d trip to Palm Springs was more
successful than my 1st.

I find upon person examination, that at the point
upon the Andreas Ditch (which conveys the water from the Andreas
Cañon) where the water was diverted by the Garden
Of Eden Co. That the Co take all the water at this Point Out
of the ditch by Flume. returning a portion to the old creek
bed below the Andreas ditch, where it is of little practical
use to the Indians. and of no value whatsoever to the Co.
That this Garden Of Eden Co have not farmed to exceed 8
acres of land at the Garden of Eden or elsewhere, though
they are monopolising all of the water, to the great
harm, and damage of the Indians—who during
the spring. and summer have not sufficient water
to save their crops — Mr Barney has not yet signed
the contract for the right of way for a pipe line

ACC-HRA000703

Reproduced at the National Archives

41471

2

2. Hon Com.

Over the reservation at Palmit. though he has twice
agreed to come and do so — I shall use my best efforts
to protect these Indians in their rights —

I take the liberty to ask what relation the
Indians have with, or what share do they own in the
water of the Tocwetch ditch. and what interest
does the Bear Valley Water Co. have or own. —
I find this ditch partly cemented containing a good
flow of water but in this as in other cases the
Indians get the small end of it —

I have settled the dispute over the Old Indian
Cemetery amicably to all parties.

The Indians are quite willing to select another site
for their burrying ground. provided they can
fence in. and retain the present grounds without
intrusion from the whites. to this Mr McCallum
agrees perfectly. I have therefore with them selected
another site quite suitable. and pleasant to all parties

I held a consultation with the Indians in reference to
the 100$ Rental in my hands for the Palm Springs. —
they desired. as much of it spent as will properly

ACC-HRA000704

Reproduced at the National Archives

3 Steen Caw

fence their Old Cemetery - The agree ment now is, that I shall purchase sufficient lumber, and pay freigh on Same to Walters to fence in 55 x 65 feet which covers all the graves of Indians and lime to white wash same. that the Indians will do the hauling from Walters to Palm Springs And build and white wash the fence at their Own expense - Than the remainder of the Money viz 100$ shall be spent in addition to the appropriation under Authority 36888 for the benefit of the Water for the reservation -

Respectfully submitted

Francisco Estudillo

U S Indian agt

ACC-HRA000705

TAB II-6

Reproduced at the National Archives



OFFICE OF
Indian Affairs
26355   Rec'd JUN 26   1895

31

CASE NO.

Frank D. Lewis.
Riverside. Cal.
        June 18. 1895.

Reply to letter of
Feb. 23. 1895. rel. to
the water trouble on
the Agua Caliente
Res.

    Line

To Dept July 3. 95.
L.B. 309 - 384

32/83

Holland

INDIAN OFFICE
28120   Inclos. No.   1   1895

5947

Reproduced at the National Archives

FRANK D. LEWIS
ATTORNEY AT LAW
ROOMS 23 AND 24
EVANS BLOCK

26355

RIVERSIDE, CAL., June 18th, 189 5

The Commissioner of Indian Affairs,

        Washington, D. C.

Sir:-

        Referring to Indian Office letter dated February 23, 1895
Land 7730 - 1895, relative to water trouble on the Agua Caliente
reservation, I have to state that I have delayed replying to this
letter for the reason that I have been negotiating with the Palm
Valley Water Company through J. G. McCallum, its president, and the
Palm Valley Land Company, a San Francisco corporation and a stock-
holder in the Palm Valley Water Company, in the hope that I might
arrange a settlement of the conflicting interests that would be
beneficial to the Indians and acceptable to the Interior Depart-
ment.

        The Department records will show that the Mission Indian Com-
mission submitted a proposition from the Bear Valley Irrigation
Company, which the Commission reported to be a very responsible
company, whereby in consideration of the grant to the Bear Valley
Irrigation Company of various rights of way and the surplus waters
of various streams and canons it proposed to furnish the Indians on
the Agua Caliente reservation with water for the irrigation of 160
acres of land at the rate of one inch to six acres, and when this
160 acres was under irrigation to furnish a similar supply for  an

ACC-HRA000716

Reproduced at the National Archives

2.

additional 160 acres.

At the time of making this proposition the Bear Valley Irrigation Company was interested in Palm Valley and the waters thereof as the holder under contract of purchase of the stock in the Palm Valley Water Company now owned by J. G. McCallum. As this stock amounted to more than a majority of the stock of the corporation it was within the power of the Bear Valley Irrigation Company at that time to have brought about the execution of a contract on that basis. The Bear Valley Irrigation Company was at the time of its negotiation with the Mission Indian Commission on the verge of insolvency, and is now totally bankrupt -- all of its assets having been sold for debt over a year ago. Its holdings of stock in the Palm Valley Water Company have reverted to McCallum, who is now president holding a controlling interest in the stock.

From the foregoing it will be seen that no arrangement or agreement has been made by or for the United States that has any binding force whatever relative to a supply of water for the Agua Caliente Indians.

As to the situation at the Agua Caliente reservation I have to say: that there is incontrovertible evidence to be had to the effect that, prior to the creation of the executive order reservation and to the first claim of the white men either to land or water in this vicinity, the Indians had appropriated and were using water from the West Canon and had built a ditch to carry the water

ACC-HRA000717

Reproduced at the National Archives

3.

to their lands and they did carry the waters of West Canon through this ditch from a point on Section 22, T. 4 S., R. 4 E., S. B. M., where the water was diverted from its natural course across a portion of said Section 22 and Section 15 to their lands in Section 14 and 15; but as to what extent their appropriation went the testimony is very conflicting and to a large extent dependence must be placed on Indian testimony which is very indefinite and at best only relative.

The waters of West Canon form one of the principal streams flowing down the East side of the San Jacinto mountain and rise somewhere near its summit on the unsurveyed lands, which may or may not be a part of the lands set apart for an Indian reservation by Executive Order.

The stream flows from the top of the San Jacinto mountain through alternate even and odd numbered sections which belong respectively to the United States as Indian reservation and to the Southern Pacific Railroad by grant from the United States (which grant antedates the Executive Order creating the reservation), until it debouches on Section 22 heretofore mentioned, at which point it was diverted by the Indians and carried in their ditch to their lands.

To the extent of their appropriation, that is, to the extent of the quantity of water so diverted and appropriated to beneficial uses, the Indians as individuals, and independent of the rights and

ACC-HRA000718

Reproduced at the National Archives

4.

benefits inuring to them from the Executive Order creating the res-
ervation, but under the provisions of the Act o f Congress of July
26, 1866, perfected a valid and vested right to the waters of the
West Canon even as against the United States.   This appropriation,
as far as I can ascertain and upon my judgment from a careful con-
sideration of all the evidence I have been able to obtain, did not
exceed at any time a flow of 30 miner's inches of water.

The stream flowing down the West Canon is an uncertain one,
carrying a large supply of water during the winter and spring when
there is snow on the mountain, but running entirely dry during the
summer months of an ordinary season.   It cannot be relied upon to
furnish the Indians with a permanent and unfailing supply of water
for the irrigation of perennial plants and trees, though in almost
any season it will supply water for ordinary crops which mature in
this valley before the stream dries up.

After the issuance of the Executive Order creating the Agua
Caliente reservation the predecessors of the Palm Valley Water Com-
pany, acting under the provisions of the California statutes, which
they pretended to believe or did believe applied to the lands held
by the United States as Indian reservation, appropriated all of the
waters of the West Canon and, taking possession of the Indians'
ditch, enlarged and improved the same and constructed diverting
head-works on the Indian reservation on Section 22, 4 S., 4 E., S.
B. M.   They carried the waters on to and across Section 15, and

ACC-HRA000719

Reproduced at the National Archives

5.

26355

turned what surplus they had onto the reservation Section 14, where
the Indian village now is.

After the Palm Valley Water Company had been incorporated and
had succeeded to the interests it now claims it constructed a can-
al and took water from a point on the White Water river several
miles north of the North line of the reservation to the centre of
Section 15, hereinbefore referred to, crossing the reservation Sec-
tion 10 and the railroad Section 3 of Township 4 S., R. 4 E., S. B.
M.   This reservation Section 10, in accordance with recommendation
of the Mission Indian Commission, has since been patented to Well-
wood Murray.   It was from this supply that the Bear Valley Irri-
gation Company proposed to supply the Indians with water; but there
is no legal ground upon which the United States or the Indians can
claim any right or interest in the water so diverted from the White
Water river and carried by the Palm Valley Water Company's canal to
the lands in Section 15 and in the vicinity thereof.   Whatever
right the United States or the Indians have must be dependent on
the flow of water in and from the West Canon.   This supply, as I
have said before, is an uncertain and fluctuating one.

If the Palm Valley Water Company and its predecessors, in tak-
ing possession of the Indians' ditch and in going upon the reserva-
tion for the purpose of diverting the water of a stream flowing
thereon, were merely trespassers and by their action secured no
permanent rights, either in the shape of water appropriations or

Reproduced at the National Archives

6.

rights of way for the head-works or diverting works for their sys-
tem and for their canal where it crosses the reservation, then the
United States has the right to eject the Plam Valley Water Company
by process of law, if advisable, and to take possession of all the
head-works and ditches of the company which are located upon the
reservation sections, and to utilize the waters of West Canon in
such manner as may be deemed advisable, subject only to the rights
of individual Indians whose appropriations were made and whose
rights became vested under the provisions of the Act of Congress of
July 26, 1866, prior to the issuance of the Executive Order creat-
ing the reservation.

The question as to whether the Palm Valley Water Company and
its predecessors were trespassers or not depends upon the inter-
pretation given to the Executive Order creating the reservation as
to its effect upon the rights granted to appropriators of waters
and rights of way on the lands within the public domain by the Act
of Congress of July 26, 1866.

I think that the meaning of the Act is to grant certain rights
and privileges on the public mineral lands of the United States as
well as to confirm water rights and rights of way acquired in con-
formity with local customs and usages.  It has been repeatedly
held that the rights and privileges granted by this statute rela-
tive to acquiring rights over the mineral lands of the United
States do not apply to the lands held under reservation for Govern-

Reproduced at the National Archives

7.

mental uses, and there is clearly no reason why the same principle

should not apply in regard to the rights and privileges confirmed

and provided for in the 9th section of this Act, water rights and

rights of way over the public lands.    See Sec. 2339 R. S. U. S.,

and Jennison vs. Kirk, 98 U. S. 453, construing and interpreting

the same.

I cannot see, therefore, that State or local laws or customs

will cut any figure in this matter, and I am fully convinced that

by the appropriation and user of the Palm Valley Water Company and

its predecessors, where the acts of diversion and appropriation

have been committed upon an Indian reservation, no rights have been

acquired as against the United States, and I therefore see no rea-

son why the company cannot be ejected from the reservation and de-

prived of all the waters of West Canon.

As to the advisability of this course:

The West Canon is not a stream which can be depended on for a

supply of water for the Indians under any method of user heretofore

adopted.    If the scheme of damming some portion of the Canon,

thereby creating a reservoir in which to impound the surplus waters

during the winter and spring months for use when the ordinary flow

of the stream has ceased, is a feasible and practicable one and

within the bounds of reason with regard to the expenditores requir-

ed to accomplish such a result, it can only be ascertained through

the careful examination and report of some thoroughly informed and

ACC-HRA000722

Reproduced at the National Archives

8.

competent civil engineer.

I have, therefore, endeavored to secure some settlement by contract with the Palm Valley Water Company, or through or under it, by which a supply of water can be secured for the lands of this reservation that will be permanent and lasting throughout the summer and fall months as well as in the winter and spring.

I have had a proposition from the Palm Valley Water Company, obtained as the result of eight or ten protracted interviews with the president thereof, to the effect that, in consideration for the surrender to the company of all the rights of the Government to water and rights of way which the company require for their canals and lateral ditches over the reservation lands, the Palm Valley Water Company will supply the Indians on Section 14 with a flow of 30 miner's inches of water so long as that amount may flow from the West Canon, and all the water of that canon when the flow may fall below 30 miner's inches; the Palm Valley Water Company reserving the right to substitute for 1/2 of the quantity of water so to be supplied to the Indians a like quantity from its White Water supply; and the Palm Valley Water Company agreeing to guarantee a reasonable supply of water at all times for domestic uses.

This is the best proposition that I have been able to obtain, though I have made many different propositions looking to the furnishing by the Palm Valley Water Company of a graduated supply, taking anywhere from one-half of the flow of West Canon down to

ACC-HRA000723

Reproduced at the National Archives

9.

26355

fifty miner's inches for the winter and spring months and a smaller amount each month as the stream dries up and the water becomes scarce, though the minimum supply to be at least ten miner's inches. This proposition was refused by Mr. McCallum, who said he thought an arrangement could be made whereby the Indians might become stockholders in the Palm Valley Water Company on the basis of their being given stock to represent water for about 30 acres of land.

For several months I was negotiating with the representative of the Palm Valley Land Company, which holds about one-thousand shares of the stock of the Palm Valley Water Company. We were trying to arrange a contract whereby the Palm Valley Land Company was to place stock to represent 20 miner's inches of water in the hands of a trustee, with sufficient guarantees for the payment of all charges and assessments, in trust for the Palm Valley or Agua Caliente Indians, in consideration for the grant to the Palm Valley Land Company by the United States of all rights to water in West Canon and for certain rights of way across the reservation.

This proposed contract failed to receive the approval of the Board of Directors of the Palm Valley Land Company and negotiations were discontinued.

The present condition of affairs consequently is that the Palm Valley Water Company is the only body with which the United States can at this time make any arrangement looking to the betterment of the

ACC-HRA000724

Reproduced at the National Archives

10.

26355

condition of the Indians and all that the Palm Valley Water Compa-
ny will do is to grant to the United States, in consideration of a
grant to it of all the rights and privileges which it now holds
(though as a trespasser only), a supply of water smaller in extent
than the Unuted States would have if it ejected the company from
the reservation and took possession of its works and canal.

Such action would require, however, the building of a ditch or
the laying of a pipe from a point on Section 22 where the canal now
is to the Indian village on Section 14, as the present ditch is
probably the property of the Palm Valley Water Company and where it
crosses the private lands on Section 15 could not be taken by the
Government, as it is probably not the original Indian ditch.
Should this summary action be taken and the Palm Valley Water Com-
pany dispossessed and its diverting works and canal taken possess-
ion of, even then the Indians would get only an uncertain supply
not to be depended on during the summer months of an ordinary year,
and during a dry season no supply whatever from June 1st to Novem-
ber, or possibly October.   Such a supply precludes the possibili-
ty of raising other than annual crops.

There is one other source of supply for water for this reser-
vation and that is, Chino Canon on Sections 4, 5 and 6 of T. 4 S.,
R. 4 E., S. B. M.   There is a continuous flow of about 30 inches
of water in the stream flowing down this canon which could be piped
to Section 14 at an expense of about $5000.00.   This would give

ACC-HRA000725

Reproduced at the National Archives

11.

an unfailing supply and an independent one to the Indians.

It is probable that if the Palm Valley Water Company was ejected from its holdings on the reservation lands the value of the water of West Canon and the rights of way across Sections 22 and 26 would be so apparent that a reasonable and advantageous arrangement for a permanent supply could be made.

Should this course be deemed advisable the question of whether the ejectment should be made by the Agent (and the military if necessary) or through an action at law is a matter for Department consideration.

I enclose herewith a plat showing the location of the different points referred to herein.

Very respectfully,

Frank D. Lewis

Special U. S. Att'y for Mission Indians.

ACC-HRA000726

TAB II-7



CTRL002764

ACC-HRA000727

DEPT. OF THE INTERIOR
RECEIVED
1895
INDIAN DIV.

Commr. Ind. Affrs.
July 3, 1895.

----

Recommends removal of Palm
Valley Water Co., and
J.G. McCallum from the Agua
Caliente Indian Reservation.

----

Letter to J.O. rutzluchy

July 8/95

CTRL002765
ACC-HRA000728

Refer in reply to the following:

Land,
26355-1895.

# Department of the Interior,

## OFFICE OF INDIAN AFFAIRS.

WASHINGTON, July 3, 1895.

The Honorable

The Secretary of the Interior.

Sir:

Under date of July 16, 1894, the late Professor C.C. Painter transmitted communications dated June 30, 1894, from Mr. Welwood Murray and Rev. Wm. R. Henderson, Banning, California, showing that the crops of the Indians of the Agua Caliente reservation were dying and that the Indians were suffering from the want of pure water for domestic purposes as the result of the unlawful diversion of waters of the reservation by one J.G. McCallum, representing the Palm Valley Water Company; that the said McCallum had not only appropriated the water but had also converted to the use of the company a ditch made by the Indians over 50 years ago and that if something was not done soon the Indians' crops would not only perish but disease would be liable to break out amongst them.

This office therefore sent the following telegram, July 17th, to U.S. Indian Agent Estudillo:

CTRL002766
ACC-HRA000729

-2-

"Take effective steps at once to restore water to Indians diverted by McCallum or any Company.  No privileges have been granted on Agua Caliente, except to Barney for pipe line. Letter to-morrow".

By letter of July 20th, the facts of the case, as far as known to this office, were fully stated to Agent Estudillo. He was informed that no water privileges had been granted on Agua Caliente except to Barney; that no contract or agreement had been made with the Bear Valley Irrigation Co., or with the Palm Valley Water Co., by the Indians or by the government, and that any one claiming rights to the waters of the reservation by virtue of such contract or agreement, as McCallum seemed to be doing, must be stopped.

That the late Mission Commission's report showed (Exhibit "C") that the Bear Valley Irrigation Co., had submitted a proposition dated December 1, 1891, looking to the acquirement of certain privileges in and about the Agua Caliente reservation; that as a necessary preliminary to such business, the said company was called upon by office letter of June 11, 1892, to submit a map showing the location of the several lines, stations, &c., through and on the reservations referred to in the said proposition; that to this the Secretary of the Company replied under date of June 22, 1892, that the matter had been referred to the Engineer of the

CTRL002767

ACC-HRA000730