-3-

Company with directions to make the map as per instructions contained in said office letter, and that as soon as completed he would forward the same to this office. The records of this office do not show that the map in question has ever been received here.

That under date of December 28, 1892, the Secretary of the Company transmitted a copy of a resolution adopted by the Company December 28, 1892, formally withdrawing the said proposition of December 1, 1891, on the alleged ground that no reply thereto had been received from this office; that on January 13, 1893, Mr. Frank D. Lewis, Special Attorney for the Mission Indians stated that for some weeks he had heard rumors to the effect that the Bear Valley Irrigation Company claimed to have incurred no liability in regard to supplying water to the Indians of the Agua Caliente reservation, but that as he had no copy of the offer of the company to the Mission Commission he was unable to form an accurate opinion in the matter until the day before the date of his letter, when he received from Mr. Albert K. Smiley, who was Chairman of said Commission, a copy of the report and exhibits, together with a copy of a resolution adopted by the Company withdrawing its offer; that he did not know whether the action of the Secretary of the Interior and of the President in approving the recommendation

CTRL002768
ACC-HRA000731

-4-

of the Commission that the offer of said Company be accepted was
sufficient acceptance to complete the contract or not, but he was
inclined to the opinion that it was not sufficient and he there-
fore requested information as to what action the Department had
taken in the matter.

That by letter of February 11, 1898 Mr. Lewis was advised as
to the status of the case and told that it did not appear that the
failure of the enterprise was owing to any negligence on the part
of this office, but that it _did_ appear that nothing further could
be done in the matter of acceptance of the proposition until the
company filed the said map of definite location; that this office
was not disposed to regard the matter as closed simply upon the
withdrawal by the Company of its proposition as aforesaid, nor
could this office do anything further with the knowledge before
it.

That Mr. Lewis was therefore requested to make such investi-
gation as may be necessary to enable him to report to what extent,
if any, the Bear Valley Irrigation Company had proceeded with its
operations on or through either the Morongo or Agua Caliente
reservation.

CTRL002769

ACC-HRA000732

-5-

That in his (Estudillo's) letter of October 31, 1893, he
asked to be informed as to what relations they have with, or what
share they own in the water of the Toquitch ditch, and as to the
interest of the Bear Valley Water Co., in said ditch, as he found
the ditch partly cemented and containing a good flow of water,
while the Indians were getting the small end of it.

That office reply thereto dated November 20, 1893, enclosed
for his information a copy of the said letter of February 11,
1893, to Special Attorney Lewis, showing the status of the right
of way matter at that date and informed him that this office had
received no further information in the matter; that he was therefore
told that proper steps should be taken by him to see that none of
the water to which the Indians on the several reservations were
justly entitled, shall be diverted from them.

That it is an indisputable fact that neither the Bear Valley
Irrigation Co., the Palm Valley Water Co., (they being one and the
same concern, I understand) nor Mr. McCallum has acquired any
rights, benefits or privileges in or to any streams lying wholly
within or running through the Agua Caliente or any other Indian
reservation by virtue of any contract with this Department; that
the said companies and Mr. McCallum have only such rights in

CTRL002770
ACC-HRA000733

-6-

streams running through an Indian reservation as are conferred upon them by State and United States Statutes and no more, and such rights as are conferred must be exercised wholly outside of the limits of an Indian reservation, they having no right whatever to go upon such reservations, for any purpose, without the consent of the Department of the Interior.

That Sections 2339 and 2340 (U.S. Revised Statutes) and Section 8 of the Mission Indian Act(26 Stats., 712) make certain provisions relative to irrigation rights (said sections fully quoted in letter); that a patent for the Agua Caliente reservation had not yet been issued and that as above stated, no authority had been granted for any water privileges thereon except to B.B. Barney.

That it seemed to be evident from the statement of facts made to this office that the water companies mentioned, and McCallum, had unlawfully diverted water from the Indians on the Agua Caliente reservation, and thereby damaged them; that to what extent this unlawful diversion had been made, this office was, from the information before it, unable to determine; that the Statutes of California have some bearing upon the question and should be con-

CTRL002771
ACC-HRA000734

-7-

sulted before taking further steps looking to the redress of whatever wrong had been done; that it was assumed that he, the Agent, had carried out the directions contained in telegram of July 17th, aforesaid, and taken steps to restore the water improperly diverted by these people; that in giving such directions much had to be left to his knowledge of the facts of the case, of the State laws relative thereto, and to his good judgment and discretion.

The Agent was further informed that a copy of said letter would be furnished Special Attorney Lewis, with whom he should confer for the purpose of ascertaining the full legal rights of the Indians in the premises, and with the further view and purpose of instituting proceedings against McCallum or any other guilty parties, and that it was therefore expected that he would restore the water to the Indians as fully and completely as the law would permit him to do.

A copy of the said letter of July 20, 1894, of which the foregoing is a rather full abstract, was accordingly sent to Mr. Lewis with necessary instructions.

By letter of August 20th, 1894, Agent Estudillo reported that upon proceeding to the Agua Caliente reservation he found

CTRL002772

ACC-HRA000735

-8-

matters in very bad condition as to the water supply of the Indians, and that he had then under way an agreement with McCallum that would be submitted for approval at as early a date as possible, by which the Indians would receive not less than 80 inches perpetual flow of water delivered on the reservation and that this would irrigate all the land that the Indians will ever cultivate.

By letter of November 6, 1894, the Agent was informed that the agreement referred to had not yet been received, notwithstanding the lapse of sufficient time, and he was directed to make full report of his action in the matter.

In a report on Mission Agency matters dated October 22, 1894, Special Agent Shelby stated that the Palm Valley Water Co., had not lived up to its agreement to furnish water to Indians; that it had appropriated the Toquitch water which was the only palatable water the Indians had; that the Toquitch spring located in the Toquitch Canon, on the reservation, would answer all the purposes of the Indians at any season of the year if it was confined and not allowed to be lost through the rock; that he saw but one solution of this difficulty and that was to have the Indians build a reservoir some three-fourths of a mile from the springs, the government to furnish cement for the reservoir and piping to conduct water from spring to reservoir, and the Indians to build ditches

CTRL002773

ACC-HRA000736

-9-

from reservoir to their lands; that this water could then be placed
in the hands of the Indian Agent who could make an exchange with
the white people for so much of their water for irrigating pur-
poses, if they desired any of the Toquitch water for drinking.  The
Special Agent further stated that J.G. McCallum, the President of
the Palm Valley Water Co., is an Ex-Indian Agent (Mission) is a
lawyer, and is a difficult man for the local officials to deal
with.

By letters of February 28, 1895, Special Attorney Lewis and
Agent Estudillo were again directed to take some decisive action
in this matter and they were advised that the plan recommended by
Special Agent Shelby did not commend itself to the good judgment
of this office, as then informed.

I am now in receipt of a report dated June 18th by Special
Attorney Lewis in which he shows conclusively that a trespass has
been committed by the said McCallum, that the Indians have been
greatly damaged thereby, and though he had made every effort,
McCallum will not agree to any fair and reasonable proposition
looking to a supply of water for the Indians; that McCallum
proposes, in consideration of the surrender to the Company of all
the rights of the government to water and rights of way which the

CTRL002774
ACC-HRA000737

-10-

company require for their canals and ditches over the reservation
lands, the Company will supply the Indians in section 14 with a
flow of 30 miners inches so long as that quantity may flow from
the west canon, and all the water of that canon when the flow may
fall below 30 miners inches; the Palm Valley Co., reserving the
right to substitute for one half of the water so to be supplied
to the Indians a like quantity from its White Water supply, and
the company agreeing to guarantee a reasonable supply of water at
all times for domestic purposes.  This proposition was evidently
unsatisfactory to Mr. Lewis, who further states that the present
condition of affairs is that the Palm Valley water company is the
only body with which the United States can at this time make any
arrangement looking to the betterment of the Indians' condition,
and all that the said company will do is to grant to the United
States, in consideration of a grant to it, of all the rights and
privileges which it now holds (though as a trespasser only) a
supply of water smaller in extent than the United States would
have if it ejected the company from the reservation and took
possession of its works and canal; that such action would re-
quire, however, the building of a ditch or the laying of a pipe
from a point on Section 22 where the canal now is to the Indian

CTRL002775
ACC-HRA000738

-11-

village on section 14, as the present ditch is probably the
property of the Palm Valley Water Company, and where it crosses
the private lands on Section 15 could not be taken by the govern-
ment, as it is probably not the original ditch; that should this
summary action be taken and the Palm Valley Water Co., dispossessed
and its diverting works and canal taken possession of, even then
the Indians would get only an uncertain supply not to be depended
on during the summer months of an ordinary year, and during a dry
season no supply whatever from June 1st to October or November.

Mr. Lewis states that there is one other source of supply
for water for this reservation and that is, Chino Canon on Sections
4,5, and 6, of Township 4 south, range 4 east. S.B.M: that there
is a continuous flow of about 80 inches of water in the stream
flowing down this canon which could be piped to section 14 at an
expense of about $5,000; that this would give an unfailing supply
and an independent one to the Indians; that it is probable that if
the Palm Valley Water Co., be ejected from its holdings on the
reservation lands the value of the west canon water and the rights
of way across sections 22 and 28 would be so apparent that a
reasonable and advantageous arrangement for a permanent supply
could be made; that should this course be deemed advisable the

CTRL002776
ACC-HRA000739

-12-

question of whether the ejectment should be made by the Agent
(and the military if necessary) or through an action at law is a
matter for Department consideration.

Mr. Lewis encloses a plat showing the location of the several
points referred to in his report.

The present Agua Caliente reservation, shown by the red
lines on the enclosed map, was selected for the Indians residing
thereon, by the late Mission Indian Commission under the pro-
visions of the Act of January 12, 1891 (26 Stats., 712) and the
selection was approved by the President and by the Secretary of the
Interior December 29, 1891.

Section 14 and the east half of southeast quarter and the
northeast quarter of section 22 were set aside for the use of said
Indians by Executive Order dated May 15, 1876, and by Executive
Order dated September 29, 1877, all the even numbered sections
in township 4 south, range 4 east, township 4 south, range 5 east
and township 5 south, range 4 east, excepting sections 16 and 36,
and any tracts the title to which had passed out of the United
States, were reserved for the Mission Indians.

Section 8 of said Act of 1891, provides:

CTRL002777
ACC-HRA000740

-13-

"That previous to the issuance of a patent for any reservation as provided in section three of this act the Secretary of the Interior may authorize any citizen of the United States, firm, or corporation to construct a flume, ditch, canal, pipe, or other appliances for the conveyance of water over, across, or through such reservation for agricultural, manufacturing, or other purposes, upon condition that the Indians owning or occupying such reservation or reservations shall, at all times during such ownership or occupation, be supplied with sufficient quantity of water for irrigating and domestic purposes upon such terms as shall be prescribed in writing by the Secretary of the Interior, and upon such other terms as he may prescribe, and may grant a right of way for rail or other roads through such reservation: Provided, That any individual, firm, or corporation desiring such privilege shall first give bond to the United States, in such sum as may be required by the Secretary of the Interior, with good and sufficient sureties, for the performance of such conditions and stipulations as said Secretary may require as a condition precedent to the granting of such authority. x.x.x.x.Subsequent to the issuance of any tribal patent, or of any individual trust patent as provided in section five of this act, any citizens of the United States, firm, or corporation may contract with the tribe, band, or individual for whose use and benefit any lands are held in trust by the United States, for the right to construct a flume, ditch, canal, pipe, or other appliances for the conveyance of water over, across, or through such lands, which contract shall not be valid unless approved by the Secretary of the Interior under such conditions as he may see fit to impose."

The foregoing presents, substantially, the facts of the case as shown by the records of this office;and, after giving the question careful consideration in all its bearings, I am clearly of the opinion that the said Palm Valley Water Company is a trespasser on the Agua Caliente reservation, that serious damage to the Indians results therefrom, that the trespassers have been

CTRL002778
ACC-HRA000741

-14-

temporized with too long, and that they should be summarily
ejected.

The question presented by Mr. Lewis is, whether the ejectment
should be made by the Agent (and the military if necessary) or by
an action at law.

In view of the fact, as shown by the reports of the Mission
Commission and Special Attorney Lewis, that the Indians would be
better off under a fair and reasonable contract with the Company
than they would be without such an arrangement, it is thought that
the most practical step would be to first have the Agent eject
the Company from the reservation and take possession of its plant.
This demonstration of authority on the part of the Government will
probably have the effect of bringing Mr. McCallum to a realizing
sense of the advantages his company is enjoying on the reserva-
tion and cause him to act less defiantly and arbitrarily. Such
action will probably compel him to either make reasonable con-
cessions or stay off the reservation and lose their plant alto-
gether.

Mr. McCallum or the Company could be ejected now by an action
at law under Section 2118, Revised Statutes, which prescribes a
penalty of $1000 in such cases.

CTRL002779
ACC-HRA000742

-16-

Under Section 2149 (Id)-

"The Commissioner of Indian Affairs is authorized and required, with the approval of the Secretary of the Interior, to remove from any tribal reservation any person being therein without authority of law, or whose presence within the reservation may, in the judgment of the Commissioner, be detrimental to the peace and welfare of the Indians; and may employ for the purpose such force as may be necessary to enable the Agent to effect the removal of such person".

Section 2148 provides that "If any person who has been re-

"moved from the Indian country shall thereafter at any time re-

"turn or be found within the Indian country, he shall be liable to

"a penalty of one thousand dollars".

I believe that it would be better to first eject this company

from the reservation and if it shall subsequently return thereto

without making satisfactory arrangements for furnishing the

Indians with water, action should then be taken under said Section

2148.

I have, therefore, the honor to state that this office will,

with the approval of the Department, direct the U.S. Indian Agent

Mission Agency to give the said Palm Valley Water Company through

the proper officers and agents, notice to remove from the Agua

Caliente reservation within ten days after receipt of notice and

to surrender to the Agent all the property and plant of said

CTRL002780

ACC-HRA000743

-16-

company now located on said reservation, and in the event of the failure of any member, agent or employe of said Company to so remove, to take immediate steps to forcibly remove them by Indian police, and to take full possession and control of the property of the company lying within the limits of the reservation.

It may be added that McCallum has heretofore given these Indians trouble by denying them access to their cemetery, and that a disposition has been manifested by many persons in and about the several Mission reservations to ignore the rights of the Indians whenever it suits their purposes to do so.  The Mission Indians are meek, inoffensive people, and they should not be imposed upon.

The return of Special Attorney Lewis' report to the files of this office is requested.

     Very respectfully,
      Your obedient servant,

           Commissioner.

(Holland)

 P.

CTRL002781

ACC-HRA000744

# TAB II-8

# ANNUAL REPORTS

⊂/

OF THE

# DEPARTMENT OF THE INTERIOR

FOR THE

FISCAL YEAR ENDED JUNE 30, 1897.

REPORT OF THE

· COMMISSIONER OF INDIAN AFFAIRS.

WISCONSIN
HISTORICAL
SOCIETY

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1897.

ACC-HRA000769

Details consist of about thirty boys and are changed monthly. They work one-half of each day. Details are graded and pupils advanced from one grade to another, as shown in course of work above.

Carpenter shop.—While a reasonable amount of work has been done, I can not report much progress for the boys. although the brightest were placed on the detail.

Bake shop.—In charge of an Indian baker, whose work is quite satisfactory.

Sanitary.—During the winter the children were troubled with severe colds. None of these terminated fatally. One death occurred, caused by tuberculosis. A sewerage system would make the sanitary condition of the school first class.

Religious.—All the pupils attend Sunday school each Sunday at 10 a. m. Many also attend the services held by the missionary. A Christian Endeavor each Sunday evening is largely attended by the pupils.

Very respectfully,

R. S. GRAHAM, *Superintendent.*

The SUPERINTENDENT OF INDIAN SCHOOLS.

---

REPORT OF THE MISSION-TULE RIVER CONSOLIDATED AGENCY.

SAN JACINTO, CAL., *August, 1897.*

SIR: I have the honor to submit this my annual report of the affairs of this agency, together with the required statistics and such other information as I am able to collect.

The inclosed census reports show a population of 3,848 Indians, distributed over the thirty-two reservations of this agency, which are scattered over an immense section of country; in fact, the agency embraces all of southern California.

I find the Indians generally industrious, quiet, and inoffensive, ready to work when work is to be had by them, and advancing in the art of civilized pursuits as rapidly as can be expected. Their farms are in fair condition, considering the disadvantages they are laboring under. The want of water for irrigation is probably the most serious drawback they have to contend with, nearly every reservation of the agency being in the same condition to some extent. This has been brought about by the white settlers diverting the waters of streams and otherwise using the flow of springs and water supplies that fed the streams from which the Indians obtained their supply of water. I see no way to adjust this matter without a long and tedious lawsuit, covering many cases and affecting many old and well-established water rights.

The Indians are interested in stock raising to a greater extent than any other pursuit, their lands being in most cases short of a supply of water for farming. This could be overcome in some instances, but not in all, or on all reservations.

At Soboba.—The industrial garden established there last year has proven a decided success. The Indians are interested in the work, and seem to take that interest which is commendable.

At Cahuilla.—The Indians are interested in stock raising for the reason that their reservation is better adapted to that industry than anything else. They could grow very fine apples, cherries, and such fruits had they the water to irrigate them. The irrigation of this reservation could be accomplished at not an unreasonable expenditure.

At Capitan Grande.—The Indians are especially obedient, kind, and progressive. Their lands have been allotted to them, with which they are perfectly satisfied. Their children attend school regularly; are bright, intelligent, and apt scholars.

At Mesa Grande.—The condition of the Indians is somewhat improved over their standing of last year. The day-school teacher has exercised her good offices with them, and, I am informed, has done a great deal of good.

At Pechanga.—The Indians are contented, but in a deplorable condition for want of water. They are actually short of sufficient water to drink. Their sanitary condition is bad, and the matter of their progress and civilization is seriously crippled.

At Yuma.—The capricious Colorado River has caused sad havoc by its untimely overflow. I have relieved the immediate necessities of the Indians, as authorized. The reservation is sadly in need of a physician and farmer, without which they are rapidly drifting away from civilized pursuits of their ancestors.

At Potrero.—The best of feeling exists. The Indians are kind, obedient, and very industrious. Their crops have not been good, however, though their stock is in fair shape.

I am informed that many reservations forming this agency are erroneously located, among which I find by the records of this office are Laguna, Campo, La Posta, Inaja, Manzanita, and Twenty nine Palms, and I may add that the Martinez Village of Indians is not situated on the Torres Reservation. Special Agent Patton has recently surveyed Laguna and Campo, and I think he also surveyed

ACC-HRA000770

118        REPORTS OF AGENTS IN CALIFORNIA.

La Posta, Inaja, and Manzanita. His reports will, however, show this event, if it has been done. He is now surveying the Twenty-nine Palms Reservation, after which he will make a locating survey of the Martinez Indian village, on the Torres Reservation.

**At Morongo.**—The water supply is short, owing to natural causes in part and to needed repairs of the rock ditch, which under authority given will have my immediate attention. The Indians are thrifty as can be expected, are well advanced in civilized pursuits, and are industrious, good people.

**At Agua Caliente (Warner's Ranch).**—The same old suit is going on for the ownership of the property; I have great hopes of the Indians' final success. I shall give them all the aid I possibly can; my short time in office, however, has not enabled me to be of much service so far to them.

**San Luis Rey and San Philipe.**—Villages being located on patented lands are beyond my aid. The Indians are undergoing a process of slow but sure eviction from their homes.

**Agua Caliente No. 2 (Palm Springs).**—The water troubles of this place have been in part settled. The difficulty is not entirely adjusted, however, as Mr. McCallum, the president of the company, has died, thus leaving matters in an unfinished condition.

**At Torres Reservation.**—The Indians are in need of water at several of the villages, chiefly among which are the villages of Torres and Martinez. The well at the Martinez school, I have not had time to examine. I can not say much of its condition at present, further than its flow is totally inadequate; I shall report upon this matter as time may permit.

**At Santa Ynez.**—I am informed that the Indians are doing quite well under the new order of things. They are satisfied that their homes are secured to them for all time to come; therefore they are contented and happy.

**At Twenty-nine Palms.**—I find that little can be said in favor of the reservation. The Indians are destitute and without a chance to advance in the line of civilization. The facts are, that they have neither land nor water with which to accomplish any good results. Special Agent Patton is now surveying the reservation. It is to be hoped that he will find a better condition of things than was found by the preliminary survey made last winter.

**Allotments.**—In the matter of allotments nothing has been done this year of which I am sufficiently informed to make a report; but I am satisfied from what I have seen that all of the reservations should be patented and allotted at the earliest date possible, and those that can not be patented should have their outside boundary lines surveyed and so designated by monuments that anyone could know the exterior lines of the reservation.

**The day schools** I find in a thrifty condition. What repairs may be necessary, as well as the needs of the schools, I will make the subject of future reports.

I herewith submit a tabulated statement showing the names of the teachers, their compensation, the location of the schools, number of days' attendance at each school, the average number of pupils enrolled during the year, and the average attendance:

| Names of teachers. | Compensation per month. | Location of school. | Number of days attendance. | Average number of pupils enrolled during the year. | Average attendance. |
|---|---|---|---|---|---|
| | | | | | Per cent. |
| W. H. Winship | $72.00 | Tule River | 2,849 | 20 | 13.90 |
| Sarah E. Morris | 72.00 | Potrero | 4,306 | 26 | 20.84 |
| Charles E. Burton | 72.00 | Soboba | 4,806 | 32 | 26.94 |
| N. J. Sulsberry | 72.00 | Cahuilla | 4,123 | 24 | 19.57 |
| Bella Dean | 72.00 | Pechanga | 3,829 | 22 | 18 |
| J. H. Babbitt | 72.00 | Agua Caliente | 2,571 | 18 | 13.55 |
| Mary C. B. Watkins | 72.00 | Mesa Grande | 3,162 | 21 | 14.35 |
| Flora Golsh | 72.00 | La Jolla | 3,928 | 30 | 19.72 |
| Ora M. Salmons | 72.00 | Rincon | 5,424 | 31 | 26 |
| E. F. Thomas | 72.00 | Capitan Grande | 4,930 | 24 | 22.75 |
| James M. Gates | 72.00 | Martinez | 2,630 | 16 | 12.70 |

## REPORTS OF AGENTS IN CALIFORNIA.

The following tabulated statement shows the names of the reservations (or villages), their population by sexes, the population under 18 years of age and their sexes, the population of children of school age by sexes, the number speaking English, and the number of dwellings of all classes used by the Indians:

| Reservations. | Population. | | | Population under 18 years. | | | Population of school age. | | Number speaking English. | Number of dwellings. | Tribes. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male. | Female. | Total. | Male. | Female. | Total. | Male. | Female. | | | |
| Agua Caliente No. 2 | 41 | 31 | 72 | 11 | 8 | 19 | 7 | 5 | 40 | 15 | C. |
| Augustine | 23 | 20 | 43 | 9 | 5 | 14 | 7 | 4 | 25 | 9 | C. |
| Cahuilla | 89 | 99 | 188 | 35 | 39 | 74 | 30 | 13 | 150 | 52 | C. |
| Capitan Grande | 68 | 70 | 138 | 31 | 34 | 65 | 20 | 16 | 95 | 38 | D. |
| Campo | 11 | 10 | 21 | 1 | 3 | 4 | 1 | 1 | 9 | 4 | D. |
| Cuyapepa | 19 | 20 | 39 | 9 | 10 | 19 | 7 | 7 | 20 | 8 | D. |
| Cabazon | 22 | 20 | 42 | 4 | 6 | 10 | 1 | 5 | 15 | 7 | C. |
| Inaja | 15 | 17 | 32 | 5 | 5 | 10 | 3 | 2 | 20 | 6 | C. |
| Los Cayotes | 74 | 52 | 126 | 31 | 21 | 52 | 23 | 17 | 70 | 25 | D. |
| Mesa Grande | 85 | 73 | 158 | 30 | 26 | 56 | 20 | 15 | 100 | 35 | D. |
| Morongo | 165 | 134 | 299 | 68 | 55 | 123 | 37 | 38 | 200 | 55 | S. |
| Potrero | 117 | 138 | 255 | 46 | 53 | 99 | 39 | 43 | 200 | 55 | S. L. |
| Pala | 19 | 24 | 43 | 10 | 7 | 17 | 4 | 3 | 25 | 10 | S. L. |
| Pauma | 22 | 24 | 46 | 4 | 2 | 6 | 4 | 2 | 25 | 10 | S. L. |
| Rincon | 72 | 87 | 159 | 45 | 51 | 96 | 38 | 42 | 85 | 25 | S. L. |
| Soboba | 87 | 87 | 174 | 26 | 30 | 56 | 19 | 23 | 100 | 40 | S. |
| Syquan | 19 | 18 | 37 | 5 | 5 | 10 | 4 | 3 | 20 | 15 | D. |
| Santa Ysabel | 37 | 38 | 75 | 9 | 17 | 26 | 5 | 16 | 55 | 15 | D. |
| San Manuel | 22 | 16 | 38 | 6 | 4 | 10 | 6 | 4 | 18 | 9 | S. |
| Santa Rosa | 25 | 30 | 55 | 7 | 17 | 24 | 6 | 12 | 15 | 13 | C. |
| Santa Ynez | 30 | 36 | 66 | 10 | 15 | 25 | 13 | 10 | 45 | 13 | S. Y. |
| Temecula | 88 | 87 | 175 | 39 | 34 | 73 | 26 | 25 | 120 | 40 | S. |
| Torris | 178 | 142 | 320 | 70 | 46 | 116 | 37 | 34 | 150 | 70 | C. |
| Twenty-nine Palms | 15 | 12 | 27 | 5 | 4 | 9 | 5 | 4 | 95 | 6 | C. |
| Agua Caliente | 67 | 82 | 149 | 33 | 36 | 69 | 24 | 18 | 95 | 45 | C. P. |
| Port La Cruz | 7 | 3 | 10 | | | | | | | | S. L. |
| Puerta Ygnoria | 32 | 19 | 51 | 9 | 7 | 16 | 9 | 7 | 22 | 12 | S. L. |
| San Luis Rey | 25 | 25 | 50 | 9 | 4 | 13 | 8 | 2 | 20 | 10 | S. L. |
| San Felipe | 43 | 35 | 78 | 18 | 15 | 39 | 15 | 14 | 35 | 15 | D. |
| Tule River | 83 | 92 | 175 | 34 | 48 | 82 | 23 | 32 | 110 | 35 | T. R. |
| Yuma | 409 | 298 | 707 | 158 | 97 | 247 | 158 | 97 | 300 | | Y. |
| Total | 2,009 | 1,839 | 3,848 | 777 | 704 | 1,473 | 596 | 514 | 2,190 | 688 | |

The sanitary condition of the reservations has improved, generally speaking, of which the report of the physician, C. C. Wainwright, will treat more particularly. It is as follows:

The medical treatment of the Indians on the Mission-Tule Consolidated Agency is a very difficult task from the fact that the reservations that constitute this agency are small and scattered over a very large area of territory. Every climatic condition imaginable almost is found where these Indians live. In July and August the extremes are found on the Colorado desert, when the temperature runs up to 130° in the shade at Torres Reservation, and in December and January in the Los Coyotes Mountains, at the San Ygnacio village; the other extreme is found with the thermometer down to zero. La grippe, consumption, scrofula, idiopathic anæmia, diseases of the heart and its appendixes, venera, and pneumonia prey upon these people. Their manner of living, viz, many sleeping in houses without ventilation, perhaps a consumptive among half a dozen sleeping in the same room, uncleanliness, poor and insufficient food, and their immorality more than all else, render them easy victims to the above list of diseases. Then the people are very superstitious, especially the older ones; yet it ramifies and modifies the conditions of all of them in some degree.

Mission Indians, as a rule, have no individuality, no self-assertion; they do not rise above circumstances; they do not have the power to extricate themselves from the smallest difficulties; any impediment in their way brings them to a dead stop. All this, taken as a whole, and many other things unnecessary to mention in this report, make the physician's work very difficult, consistent with good service. These are some of the conditions that confront the physician at this agency.

To reach the most people, to go right into their homes, lift them up firmly out of their degradation, break up their superstitions, supplant the "medicine man," get them to use intelligent medicines, teach the benefits of virtue, hold your influence over them for civilization, is good service, and more easily said than done. It takes years of constant care, vigilance, and consistency to accomplish this work, for Indians have good memories, and, with all their frailties, judge people very correctly, and any violation of the rules of veracity circumscribes the usefulness of any field worker.

To reach the most people, I teach domestic medicines to the teachers, matrons, and the Indians themselves. The teachers and matrons are apt scholars, and do well in acute cases and in some cases of emergency. I supply them with remedies, so that no Indian that falls sick near a teacher or matron but has an intelligent effort made to relieve his suffering, and in many cases life has been saved in this manner.

The Indians learn slowly, and every year I can see they advance, inasmuch as the "medicine man" has less and less influence over the tribes, and many of them have quit altogether their incantations and adopted some other mode of making a living.

ACC-HRA000772

120                    REPORTS OF AGENTS IN CALIFORNIA.

To reach the most people, in addition, I never go on a reservation unless I see and talk to all
the members of the tribe. In this manner I collect vital statistics, the only correct way and a
very important part of the service.
Through the past winter and spring we have had a scourge of la grippe throughout the agency
and very distressing in its results, as many Indians are not able to work when the chance offers
itself, consequently much suffering ensued from scarcity of subsistence. Measles have also been
epidemic on some of the reservations, resulting in a large mortality among the small children,
caused by the poor shelter offered by the Indian huts.
Before closing this paper I desire to call the attention of the Department to an inhuman cus-
tom among the Mission Indians which is very distressing to myself. It is the way the Indians
treat their old and infirm. After an old man or woman becomes so aged and decrepit that he
or she is not able to forage or work, they place them apart under a brush hut and keep them
supplied with only water until they die from sheer exhaustion.

- The following tabulated statement shows the number of cases treated, the births,
and deaths for the fiscal year 1897:

| Month. | Patients treated during fiscal year 1896. | Patients treated during fiscal year 1897. | Decrease. | Increase. | Born. | Died. |
|---|---|---|---|---|---|---|
| July, 1896 | 222 | 205 | 17 | | 15 | 5 |
| August, 1896 | 102 | 163 | | 61 | 13 | 4 |
| September, 1896 | 148 | 244 | | 96 | 12 | 10 |
| October, 1896 | 204 | 175 | 29 | | 15 | 5 |
| November, 1896 | 297 | 160 | 137 | | 9 | 5 |
| December, 1896 | 526 | 171 | 355 | | 14 | 7 |
| January, 1897 | 435 | 336 | 109 | | 13 | 9 |
| February, 1897 | 288 | 328 | | 40 | 8 | 11 |
| March, 1897 | 161 | 290 | | 129 | 10 | 7 |
| April, 1897 | 307 | 332 | | 25 | 13 | 9 |
| May, 1897 | 454 | 212 | 242 | | 9 | 7 |
| June, 1897 | 342 | 217 | 125 | | 6 | 6 |
| Total | 3,586 | 2,923 | 1,014 | 351 | 137 | 85 |

The police service I find is efficient. The men composing the force are trust-
worthy, good men, worthy of the trusts they have in hand.
In conclusion, I must thank the Department for its able support.
In submitting this, my first annual report, I beg to state that my tenure of office
has been of such brief duration that I must of necessity depend largely for my
information of the various reservations and the compilation of statistics upon my
efficient clerk, Mr. N. Davenport.
        Very respectfully,
                                                L. A. WRIGHT,
                                            United States Indian Agent.
The COMMISSIONER OF INDIAN AFFAIRS.


                REPORT OF ROUND VALLEY AGENCY.

                                ROUND VALLEY AGENCY,
                            Covelo, Cal., August 18, 1897.
SIR: I have the honor to submit the following as the annual report of the Round
Valley Agency for the fiscal year ending June 30, 1897. The agency, having been
abolished by act of Congress, has been under the control of the superintendent of
the Round Valley Indian school since November 4, 1896, at which date I received
for the property and assumed control of it, relieving First Lieut. Thomas Connolly,
First Infantry, U. S. A., who was at that time acting agent.

| Tribe. | Population. | Males over 18 years. | Females over 18 years. | School children between 6 and 18 years. |
|---|---|---|---|---|
| Concow | 162 | 58 | 49 | 31 |
| Little Lake and Redwood | 136 | 41 | 52 | 23 |
| Ukie and Wylackie | 283 | 94 | 111 | 41 |
| Pitt River and Nomelackie | 63 | 17 | 18 | 14 |
| Total | 644 | 210 | 330 | 109 |

        Population this year _____ 644
        Population last year _____ 634

            Increase for this year _____ 10

ACC-HRA000773

# TAB II-9



RG 48 RECORDS OF THE DEPT.
OF THE INTERIOR

Indian Division

1897—7155

Letters Received.
1861 - 1907

1897
6710 - 7400

Entry 653

Box No. 290

CTRL002786

ACC-HRA000781



CTRL002787

ACC-HRA000782



## E. V. BROOKSHIRE,

### Attorney and Counsellor at Law.

ROOMS 1 AND 2, FIRST FLOOR,

No. 506 E ST. N. W.

Washington, D. C., Sept. 31, 1897

To the Honorable, The Secretary of the Interior

    Washington, D.C.

Sir:-

    I am in receipt of a communication from Messrs Hatch, Miller & Brown, attorneys at law, Los Angeles, California, who represent certain settlers upon lands embraced in, Tp.4 S., Range 4 East

                                     Tp.4 S., Range 5 East

                                     Tp.5 S., Range 4 East.

San Bernardino base and meridian, California, excepting Sections Twelve (12), Fourteen (14), Twenty-two (22), Twenty-four (24), Twenty-six (26) and Thirty-four (34) in Tp. 4, S. Range 4, East, and Section Two (2), Tp. 5, S. Range 4, East.

    It appears that these lands were by executive order of October 1st, 1877, withdrawn for the Agua Caliente Mission Indians; and it further appears that the lands have never been and are not now inhabited by the Indians, but for a long time have been settled upon by white settlers who supposed the lands were open to settle- ment and entry.   The lands are in the desert and not susceptable to cultivation without irrigation, and they have been partially re-claimed by white settlers by means of irrigation ditches.

    It further appears that other lands have subsequently been set apart and are now occupied by these Indians, who number

CTRL002788

ACC-HRA000783

SUBJECT:

# E. V. BROOKSHIRE,

## Attorney and Counsellor at Law,

ROOMS 1 AND 2, FIRST FLOOR.

No. 508 E ST. N. W.

OFFICE HOURS: 9 A. M. 10 3 P. M.

Washington, D. C.,

all told, about 50 people.

Messrs Hatch, Miller & Brown on behalf of their clients request that those lands above described, may be restored to settlement and entry and I have the honor to concur in their request.

There has been considerable correspondence on this subject from the Register and Receiver of the Los Angeles Land Office and from Hon. Stephen M. White, U.S. Senator, and I have the honor to refer to the letter of May 20, 1896 ( E. 55,707--1896 J.B.S.) from the Honorable Commissioner of the Land Office to the Honorable Stephen M. White.

I have the honor to request that the matter may be investigated, if convenient, by a special agent of your Department, in order that the exact situation may be presented for executive action.

Very respectfully,

E. V. Brookshire

CTRL002789

ACC-HRA000784



7155

Acting Comm'r Indian Affairs,

October 8, 1897,

Relative to restoration of
certain tracts of Mission Indian
lands in California.

CTRL002790

ACC-HRA000785

Refer in reply to the following:

Land
    41182-1897

3/8

## Department of the Interior.

### OFFICE OF INDIAN AFFAIRS.

WASHINGTON, October 8, 1897.

The Honorable

    The Secretary of the Interior.

Sir:

    I am in receipt, by your reference for report, of a letter
dated September 30, from Mr. E.V.Brookshire of this city, requesting
that certain tracts of land in California now under reservation for
the Agua Caliente band of Mission Indians be restored to the public
domain and opened to settlement.

    I have the honor to report that prior to 1891, scattered
tracts of land were reserved for the several bands or villages of
Mission Indians in California.  Under the act of Congress approved
January 12, 1891 (26 Stats., 712) a commission was appointed to select
reservations for the several bands of Mission Indians.  This com-
mission selected for the Agua Caliente band Sections 12, 14, 22, 24,
26 and 34, Township 4 south, range 4 east S.B.M.  Also Section 2,
township 5 south range 4 east.  These tracts did not include all
the tracts which were then under reservation for said band of In-
dians by virtue of Executive Order dated September 29, 1877.

CTRL002791

ACC-HRA000786

-2-

The reservations selected by the commission for several other bands of these Indians did not include all that were at the time and have since been in a state of reservation by Executive Order.

By office letter of December 19,1891, transmitting the report of the said commission, it was recommended "that no lands in the reservations as at present existing be restored to the public domain until the several reservations shall have been patented as contemplated by the act".

The reason for such recommendation was based upon the apprehension that mistakes,to the damage of the Indians, might have been made by the commission in its selections, and that by holding the lands already under reservation until the final completion of the work, such mistakes might be the more easily rectified.

And further, that the recommendation of the commission involved three extensive exchanges of land with the Southern Pacific Railroad Company for the even numbered sections claimed by it on the Morongo San Jacinto and Torres reservations.

The foregoing recommendation was approved by the President and by the Secretary of the Interior,December 29,1891, and subsequent developments have proved the wisdom of making it, it being found that in several cases the commission reserved for the Indians

CTRL002792
ACC-HRA000787

-3-

tracts the title to which had passed out of the United States, but neglected to reserve tracts that were in the actual use and occupancy of the Indians.  Furthermore, the exchange of lands with the Southern Pacific Railroad Company has not yet been consummated.

Patents have not yet issued for all of these reservations and the reason for delaying the restoration of the lands at present under reservation still exists, though there is no material objection so far as I know to the President's said order of December 29, 1891, being so modified in a particular case as to except a certain tract of land where the exigencies of the case render such action advisable.

I do not know whether there is such exigency in the case presented by Mr. Brookshire as will warrant an exception being made therein.

Very respectfully,
Your obedient servant,

Acting Commissioner.

Holland.  (H)

CTRL002793

ACC-HRA000788

# TAB II-10

reduced at the National Archives

19628   OFFICE OF
Indian Affairs
REC.  MAR 2   1906

INTERIOR DEPARTMENT

March 2, 1906

---oOo---

Refers, for report, Inspector
Levi Chubbuck's report on
agreement between B. B. Barney
and the Agua Caliente Indians
regarding water right in  Andreas
Cañon.

---oOo---

Wrapper

Inc.

To Sect Mar. 10/06  840 / 300

NARA DC
RG 75
Central Classified Files, 1907-39
California Special
Box 9
F: Calif. Special 70953-1907-311



S-2 / 30

ACC-HRA000790

Reproduced at the National Archives

In reply to:

## Department of the Interior,
### INDIAN SCHOOL SERVICE,
#### OFFICE OF SUPERINTENDENT.

*Los Angeles, Cal*
*August 28, 1900.*

*Hon. Commissioner of Indian Affairs,*
*Washington, D.C.*

*Sir:*
*The enclosed copy of B.B.*
*Barney's Contract, referred to*
*in my report of August 23 on*
*the Palm Springs water question*
*as an Enclosure, was inadvertently*
*omitted, and I have the honor to suggest*
*that it be filed therewith.*
*Very respectfully*
*W.H. Holland*
*Supervisor*

NARA DC
RG 75
Central Classified Files, 1907-39
California Special
Box 9

ACC-HRA000791

43306   OFFICE OF
Indian Affairs
Rec SEP 4   **1900**

31

M. F. Holland
Supervisor
Los Angeles Cal
Aug 28. 1900

_____

Inc contract of B.B.
Barney in connection
with Palm Springs
Water question

_____

46/128

ACC-HRA000792

Reproduced at the National Archives

FRANK D. LEWIS
ATTORNEY AT LAW
ROOMS 23 AND 24
EVANS BLOCK

RIVERSIDE, CAL., December 18 1893

Francisco Estudillo Esq.
      United States Indian Agent,
         Colton California.

Dear Sir:-
            I inclose herewith to you the copy of the Barney Right of

Way Terms.    I think the document is a trifle lax in its terms

but at the same time I have no doubt that it is sufficient to pre-

serve the Indian water claims and to give them the supply of water

that it was intended by the Mission Indian Commission they should

have.   There certainly is a possibility for discussion as to the

point of delivery of the Indian Supply and that matter should be

carefully looked after when Barney lays his pipe.    DEC 19 1893
                                                     DEC 19 1893

                        Yours truly,

ACC-HRA000793

Reproduced at the National Archives

(Copy)

Terms upon which right of way will be granted to B.B. Barney, of Riverside, California, for a pipe line, flume, or ditch, through the Agua Caliente Indian Reservation in California, under the provisions of the eighth section of the Act of Congress approved January 12th, 1891, (26 Stats., 714)


1.    In consideration of the grant of such right of way (not exceeding 20 feet in width) to said B.B. Barney, his heirs, or assigns, with all the usual rights of land and water and of ingress, egress, and regress, for the purpose of constructing, operating, and maintaining an irrigating pipe line, flume, or canal, with the necessary works appurtenant thereto, through section 2, in township 5 south of range 4, east, S.B.M., in said Agua Caliente Reservation, along the line as indicated on a map filed in the office of Indian Affairs by said B.B. Barney, April 25, 1893, and stamped "15697 Indian Office Inclos. No. 1-1893", the said B.B. Barney, his heirs, ~~devisees~~, or assigns, shall deliver for the use of the Indians living on or cultivating lands on the said section 2, and also on section 34, township 4 south of range 4 east, S.B.M., from the waters of Andreas Creek at the banks thereof, or at the point where said pipe line, flume, or canal shall cross the west line of the above mentioned section 2, sufficient water to irrigate one hundred acres of land, or such a portion thereof as the Indians may have under cultivation in the aforesaid sections 2 and 34, on the basis of one

Reproduced at the National Archives

-2-

inch of water continuous flow, measured under a four inch
pressure, to six acres of land; provided, however, that in
case the flow of water in the Andreas Creek should at any time
be less than thirty-three and one-third miners inches, measur-
ed under a four inch pressure, then, and while such flow of
water remains, and is less than thirty-three and one-third
miners inches, and for no longer, the obligation to furnish a
maximum quantity of sixteen and two thirds inches of water
shall be deemed to be waived, and in lieu thereof the said
Barney, his heirs or assigns, shall in lieu thereof furnish
upon the same terms, at the same place, and for the same uses,
one half of the total quantity of such diminished flow.

2.    The delivery of water as stipulated in the preceding
paragraph shall continue so long as the Indians shall reside
upon said reservation, and as to any lands within said reser-
vation, that may hereafter be allotted to or held in trust
for any Indian, so long as said lands shall be so held in
trust, unless said flume or canal shall sooner be abandoned
by said Barney, his heirs, or assigns.

                              Riverside, California.

                                        1898.

    I hereby accept and agree to the foregoing terms and
conditions.

ACC-HRA000795

43306  Indian Office,  1900

MISSION TULE RIVER  CO.
Colton Col.
FRANCISCO ESTUDILLO
U.S. IND... CO.

Contract of
B.O. Barney
Right of way over
Agua Caliente Reservation
at or near Palm Springs

Reproduced at the National Archives

ACC-HRA000796

Reproduced at the National Archives

43034

Los Angeles,Cal.,Aug.23rd,1900.

Hon.Commissioner of Indian Affairs,

Washington,D.C.

Sir:-

In compliance with Office directions of June 30th last(Land),I pro-
ceeded to the Palm Springs Indian reservation for the purpose of trying
to secure water for the Indians,and have the honor to submit the follow-
ing report on my findings:

All of the Palm Springs band,numbering 11 families,40 persons in all,
now live on the west half of section 14,township 4,south,range 4,east.
They have a few fruit trees,grape vines and small corn and melon patch-
es,and evidently work them to the best advantage. The scattered patches o
of land under cultivation do not exceed 20 acres altogether.The labors
of the Indians are greatly handicapped by lack of water.The principal
supply at present is the overflow from the hot spring,which is leased to
Dr.Murray and located near the west line of section 14,as shown by accom-
panying plat. The other source of supply is a lateral ditch which taps
the Whitewater ditch at a point about 400 yards west  of the hotel in
section 15. This supply is very meagre and uncertain. Getting out at
4.30 in the morning I saw about 3 or 4 inches of water in  this ditch
running to the Indians,and,seeing the ditch at the same point about two
hours later,found even that small quantity had been shut off.
The same quantity apparently was turned in to them late in the evening.

(Enclos/)

ACC-HRA000797

Reproduced at the National Archives

2.

Upon inquiry I was informed that the Indians do not always get this much
as the Palm Valley Water Company's Canjero (ditch operator) understands
his business well enough to turn in somewater to them when official vis-
itors appear.   *Dec 1981 – 1901*

The Whitewater ditch, at the point where it enters section 15,was car-
rying,during my visit,about 20 inches of water ,and is intended to sup-
ply the wants of settlers in sections 10,15,23 and 25. There were,until
this summer,15 families living on these sections,all of whom but   3
or 4 lived on section 15,and the undertaking of the Water Company was
to furnish water for about 600 acres for them. There are now 5 families
living on their ranches,the others having apparently *abandoned* theirs after see-
ing their orchards die for want of water. One fine orchard that I saw
dying was Mr.McCallum's,the President of the Water Company,and his
house apparently abandoned.No water is allowed to anyone for alfalfa,and
only a little for orchards,the balance being required for domestic use.
McCallum's ranch,it should be noted,is on the SW quarter of the SE quar-
ter of 15,and has been kept alive by the water that McCallum senior,who
has recently died,had stolen from Toquitch Canon and conveyed by a flume
paralleling the old Indian ditch.

The next point visited was the Toquitch Canon,which I found to be as
dry as anything can be,at and above the point of diversion of the ancient
Indian ditch,which is shown by red line running from the centre of Ses-
tion 22 to 14. About one mile up this very rough and rocky canon a little

ACC-HRA000798

Reproduced at the National Archives

43034

3.

Water now trickles over a precipice and sinks into a small sand patch where it is lost. At seasons of the year when water is least needed, the Toquitch Canon is said to be a torrent, and supplies more water than the Indian ditch and McCallum's abandoned flume can carry.   *1988 s - 1901*

One proposition suggested was to pipe this water to the Indians, a distance of about 3 miles. The water from this canon is clear and pure and much superior for domestic use to the dirty looking fluid of Whitewater ditch. It was the Toquitch water that the office ordered shut offf from McCallum in 1894-95. This water furnished the domestic supply for the whites and had the office orders been enforced Mc Callum could have been brought to terms as contemplated by office letters of July 20,1894 fo Agent Estudillo and Frank D.Lewis, and of February 23,1895 to Lewis. Another letter of which I have some recollection but which cannot be found in the Agency files, directed the Agent to give McCallum 10 days notice and then proceed to break up his headgate and flume.

It is estimated that the cost of piping from this canon to section 14 would be, for 5 inch Asphalt Paper pipe, in Los Angeles, $2,534. Freight to Palm Springs, carload rates, $181; total, $2,715-plus the cost of a Superintendent and Indian labor in laying pipe, upon which I can give no reliable figures. From what I have seen and heard of the Asphalt pipe it is very durable and much cheaper than iron. The *price* list enclosed *(Enclos. 2),* is for small lots; on 3 to 5 mile propositions there is 25 per cent.off. It comes in seven foot lengths and 5 inch pipe weighs 4 2-3 pounds per foot. A 5 inch pipe with about 3 per cent fall will carry about 50 inches of water, and as the fall from from Toquitch to section 14 will not average over 3 per cent, a

ACC-HRA000799

Reproduced at the National Archives

4.

5 inch pipe would be necessary to give an adequate supply. For the purpose of comparison I give the price on wrought iron screw pipe, quoted in Los Angeles today:

4 inch, 40 cents per foot. Weight ,10 1-2 lbs. per foot.

5   "   52   "   "   "   "        14 1-2   "   "   "

### Iron riveted pipe.

4 inch, No.16,21 cents per foot. Weight,3 1-4 lbs.

4   "   "  14,24   "   "   "   "      4 1-4   "

5   "   "  16,27   "   "   "   "      4        "

5   "   "  14,29   "   "   "   "      5        ".

This pipe would be too frail for use in the rocky canon where heavy washes occur.

The next point examined was Andreas Canon in section 3, township 5 south, range 4,E, where B.B.Barney takes the water into his pipe line under a contract supposed to have been made in December 1893. Here an excellent stream of water was found flowing at least 100 inches and all going to waste. Barney's 8 or 10 inch pipe line runs less than half this water to a place called " The Garden of Eden", in the north half of section 35-4 S. 4 E., where it is soon lost in the sand. The Garden of Eden, which was abandoned about as soon as the building was erected and a fence built around it, is a desert ranch, covering hardly 10 acres, with town lots staked out all around it, and is about the most foolish scheme that a man could embark in. The place shows no evidence of having been occupied for several years, and

Reproduced at the National Archives

5.

probably never will be again.

Barney's contract is a sweeping one,under which he gets everything for nothing-that is if the enclosed draft purporting to be a copy of the contract is,in fact,a true copy.The contract as executed I have not been able to see.In the draft I can find no valid consideration.It says,in substance, " You give me all your water and I will give you back,either from my pipe or at the banks of the stream where you are now taking it out into the ditch that you made many years ago,as I see fit,one inch of water to every six acres of land that you cultivate."One inch of water to that sandy soil would do about as much good as a tub full,so far as I can learn,Barney never and, did furnish any water to the old indian,Andreas,who had a ranche in section 34 and abandoned it after Barney began operations.Mr.Barney is now bank-rupt. Though this contract could,it is believed,be abrogated for wantof consideration,such action is not necessary for two reasons:First,Barney has forfeited his right to the water under the California laws by five years non user.Second,even were he using the water,he could claim and continue to use only such quantity as is necessary for the proper cultivation of his land,and no more. As stated above,his pipe will carry probably half of the water that is now flowing in Andreas Canon and there is certainly enough left for the Indians.To make this water available however,the Indians must either move down to section 34 ,township 4,south,and section 2,5 south,or have it piped to them on section 14 at a cost for the pipe alone of $3,801. Freight,$271.46;total,$4,072.46,plus labor.To do this with wrought iron

ACC-HRA000801

Reproduced at the National Archives

6.

pipe the cost would be for pipe-23,760 feet at 52 cents ,$12,355.20;

freight,244,520 lbs at 24 1-2 cents,$499.Total $12,854 plus labor.

Adverting to Barney's contract,it would appear from its terms that the
Indians were to get water from his pipe that would otherwise be in acces-
sible to them-that is,if Mr.Barney chose to let them have it from his pipe
rather than from the banks of the stream where they had been getting it.
This would of course be a valuable consideration and the office probably
took that view of it.After being on the ground however I can state with-
out fear of contradiction that it would have been no advantage or benefit
whatever to the Indians to have had water  delivered to them at the point
where the pipe line crosses the west line of section 2,and,by such delivery
have the supply to their ditch stopped.

Furthermore,Barney,according to the statements of the Indians,never gave
them a drop of water from his pipe,and when they began taking it into their
old ditch again,directly from the stream,he posted a notice prohibiting
such taking,and the notice was taken down by Agent Wright.

The next and last point examined was the Cienaga,located in China Can-
on-NE quarter of section 7. Here was found a small stream of water that
flows through Chino Canonfrom a westerly direction into the Cienaga and
there sinks,together with the water of two or three other little springs.
To get to this water the interests of the Southern Pacific railroad com-
pany would have to be acquired,and the water piped to the Indians  at a
cost for the pipe and freight of about $2700. In addition,a great amount of

Reproduced at the National Archives

7.

ditching would have to be done in and about the Cienaga to get the water collected at one point from which to pipe.

This Cienaga is a green spot of probably seven acres that was long the abode of an Indian named Chino,who was the father of my guide on this expedition. There was plenty of evidence to be seen of Indian occupancy, but the poor Indian was evicted by a white man as soon as section 7 passed to the railroad company. The interests of said white man,whose name I have not been able to learn,were acquired by one H.F.Wheaton who has fenced the trail at the entrance to the Cienaga for the exclusion of Indian ponies that had been grazing there.

Wheaton does not reside on or cultivate this tract nor does he use the water in any way. To get at the water one must go upon the said tract of land. If it can be acquired by exchange,or purchase at a reasonable fig-ure,it would give the Indians some good land and an uncertain supply of water for other portions of their reservation.I say an uncertain supply because I was in formed by the Captain of the Morongo village who said he once lived there, that it sometimes goes dry in summer. By rounding up and piping the water to the nearest point on the Whitewater ditch,about three mile distant,arrangment could be made with McCallum for its conveyance to section 14 by his ditch.

The enclosed letter,just received from Jerome Madden,Land Agent of the Southern Pacific Co.,shows that all of said section 7 is railroad land, *(Enclos.)* and that Wheaton is holding it under his application to purchase,filed February 13,1892. Just what rights he has acquired thereunder I will

ACC-HRA000803

Reproduced at the National Archives

43034

8.

learn from a personal interview with Mr.Madden when I reach San Francisco, and advise the office further.

I have shown the difficulty and probable cost of getting water from To-quitch,Andreas Canon and the Cienaga,and this leaves the Whitewater ditch as the last for discussion. To this ditch and water the Indians can es-tablish no legal right. An idea that was predominant with me during the whole investigation was to bring McCallum to terms and get water from him without cost to the Government. To do this I thought of shutting off his ditch where it enters government land and found myself against an obsta-cle. By reference to the plat it will be seen that the ditch enters town-ship 4 south,4 east at section 3,which is railroad land;it then passes through the east 1-2 of 10 which was deeded to Dr.Murray;thence through the east 1-2 of 15 which was acquired by whites from the railroad ;thence between 14 and 22,keeping exactly in the middle of the road as I saw by personal examination,to section 23 which is railroad land partly settled by whites;it then strikes Indian land at the NE corner of the SE 1-4 of 22,below which point only one ranch,in section 25,is supplied. To shut McCallum off at the point where he enters Indian land would not hurt him any,and,furthermore,he could easily straighten his ditch so as to avoid going into Indian land at all. I then looked up in the Land Office here the status of section 34,township 3,south,4 east,with the view to stop-ping him there. It was found that this tract is public domain,and that he could not be stopped there because of the provisions of Section 2339 U.S.Revised Statutes.

ACC-HRA000804

Reproduced at the National Archives

43034

9.

There is not enough water now in McCallum's ditch to divide equally between the whites and the Indians as the quantity of each would be too small to do either much good. My plan was,therefore,to get a division of timefor all of the water,giving it to Indians and whites every alternate 24 hours.

Mr.William Collier,the Special Attorney for the Mission Indians,whom I saw at Riverside,joined me in a conference with U.S.Attorney Flint at the latter's office in Los Angeles on the 14th inst.,and after fully satisfying ourselves that the Indians had no legal right in the Whitewater ditch we concluded to call in McCallum and by pretending that we were under orders to do something to his material damage,get him to agree to a division of time on the water. We found that McCallum knew as much about his rights and our powers in the premises as we did,and he calmly told us that the only way we could get water from him,in addition to what he was giving gratuitously,was by purchase,and that he had not a drop to sell. As we had given him no intimation as to what we proposed to do in the event of his failure to agree to our proposition,further than the direct statement to him that he was a trespasser on Indian land,he informrd us that we could take any action we thought best. As the only action we could take would be to shut off his ditch where it enters section 22,as above stated,we did not deem it wise to tell him so. He very graciously informed us that he would quitclaim the Company's right's in the Cienaga to us and permit us to run a pipe from the Cienaga to the Company's ditch.

ACC-HRA000805

Reproduced at the National Archives

10.

The Company has no rights in the Cienaga worth anything, else they would not be ceded; but the permission to connect a pipe line with the ditch would be of material value to the Government in the event of taking water from the Cienaga. All the property of the Company is mortgaged and it is in a bad way. The white users are all stockholders and not purchasers at so much per inch.

I have given pretty fully the conditions existing on and about the reservation at this time. It should be added that while the Indians and whites alike are suffering for water and fighting for every drop, they have more this summer than either the last or the one before. This is admitted by all and the fact is verified by the records of the Weather Bureau. I did not then see the several water sources referred to above at their worst, and hopes are entertained by all that next summer will see them with even more water.

Coming down to what is best to be done to secure more water for the Indians, involves consideration of a difficult problem. The Palm Valley Water Company (McCallum) must be eliminated as a source upon which we can enforce demands. The time to have done this was in 1894 and '95, when they were unlawfully appropriating the Toquitch water for domestic purposes, and when the Company, had the office orders been enforced, could have been dealt with to advantage. With the Company's ditch eliminated, we are left with three propositions:-

(1). Moving one half the Indians to the two lower sections of their reservation where there is ample good land and letting them use their old ditch

ACC-HRA000806

Reproduced at the National Archives

11.

from Andreas Canon,regardless of Barney's contractor,piping the water from said Canon to the east half of section 14,a distance of 4 1-2 miles,at a cost of about $4,500.

(2). Piping the water from an uncertain flow up the Toquitch Canon from a point about 1 1-2 miles west of the point from which the old ditch runs,the last named point being about the centre of section 22. This would require about 3 miles of 5 inch pipe at a cost of about $2700. It should be stated here that the reason why the Indians do not live on section 22,near the water,is because it is a rocky waste without an acre of arable land.

(3). Piping from the Cienaga,the uncertainties and difficulties of which I have shown above.

A fact that should also be borne in mind in considering any proposition involving any considerable cost ,is the rapidly decreasing number of Indians. Nine years ago they were said to be 70.They are now reduced to 40-young and old. That they have been much neglected by the Government and abused by white neighbors is a fact that cannot be refuted. A statement that one old fellow made to me in council was as true as it was touching.He said"Washington sent people here lots of times for many years gone to get water for us. They come and we show them all around and we tell them all we know and they go away and we get less water all the time".

In view of all the facts and conditions as I have seen them,the submission of a recommendation ,as I am directed to do,is a difficult matter.The best that I can do is to recommend either the removal of the Indians-or a part

Reproduced at the National Archives

43034

12.

of them—to section 34 township 4 S,4 E,and section 2,township 5 S,4 E;or, pipe the water to them on section 14 from Andreas Canon. It could never reach that point by ditch because of rapid evaporation and percolation. If money is to be spent in piping it had better be done from the source that promises the most lasting supply,even though it should be a little more distant and cost more.

I have endeavored to give as full information as possible respecting the other sources of supply,for the use of the office in the event of my recommendation not being approved.

Very respectfully,

Supervisor.

ACC-HRA000808

43034   OFFICE OF
        Indian Affairs
        Rec      1        1900

Los Angeles, Cal.

August 23, 1900

No. 31

M. A. E. Wellans
Supervisor

Reports on Palm
Spring Water matter

< 3 Enclo >

File

1/126                    70x

ACC-HRA000809

# TAB II-11

# ANNUAL REPORTS

*c/*      OF THE

# DEPARTMENT OF THE INTERIOR

FOR THE

## FISCAL YEAR ENDED JUNE 30, 1902.

## INDIAN AFFAIRS.

PART I.

REPORT OF THE COMMISSIONER,

AND

APPENDIXES.

WISCONSIN
HISTORICAL
SOCIETY

WASHINGTON:

GOVERNMENT PRINTING OFFICE.

1903.

ACC-HRA000820

174      REPORTS CONCERNING INDIANS IN CALIFORNIA.

There are 2 church buildings and 3 missionaries at the agency. If it is true that it is possible to have too much of a good thing, I would say that this field is too small for 2 churches, the Indian population of the entire Hupa Reservation being only 413. One denomination might move its mission down on the Klamath River, where the need is much greater, but each has a nice start, and neither desires to give up. Equal privileges are extended to Miss Chase and her assistant, Mis-McGraw, Presbyterians, and to Rev. Mr. Clark, Episcopalian. Although there is lack of cordial cooperation, harmony prevails, and all seem to be earnest and cons scientious. The Sunday school is under my control, the missionaries and some of the Government employees each teaching a class. In the morning each pupil is allowed to attend the church of their choice; in the evening a song service is held, which is attended by all the older pupils.

The court of Indian offenses has done much to help maintain order and improve morality on the reservation. The guardhouse has been completed, and is used when necessary. Most of the trouble on the reservation is caused by whisky.

The police force has been equipped with revolvers and is becoming more efficient, the addition of a captain to the force making it much easier to secure good men. I believe there will be fewer runaways from the school this year than last, although this is one of the unfortunate schools where the runaway habit prevails.

Road making and repairing is done by all the able-bodied Indians of the reservation, who put in from three to fifteen days each on the roads, depending on the amount of use they make of them. The four districts are each in charge of a supervisor, who directs the work and keeps a record of the time. As no salaries can be paid, it is not very easy to get good men to take charge of the road districts.

Farming and gardening are the principal industries on the reservation. About a dozen of the Indians do more or less stock raising, one of them having been awarded the contract for furnishing beef during the coming fiscal year. Most of the Indians own hogs, chickens, cattle, horses, or mules. They haul freight for the Government, employees, and trader. Several of them work during part of the year for the salmon canneries, lumber and shingle mills, and on sheep and cattle ranches. Some mining is done by Indians, and at certain seasons of the year a great many engage in fishing for eels and salmon, which are smoked and dried for winter use. The gathering of acorns, from which the highly prized soup and porridge is made, is engaged in by the older and less progressive Indians.

The women carry on the art of basket making with such skill as to make the Hupa basket almost world famous, the cap, shaped like a shallow bowl, with odd patterns woven in with stems of maiden-hair fern, cedar root, and grasses, being in especially great demand. I have encouraged the industry as much as possible, and the baskets now command such good prices that basket making is coming back to its old-time popularity, when baskets were a necessity for cooking and domestic purposes. Many of the old-time baskets can not be replaced at any price.

Nearly all of the employees of both agency and school have worked together pleasantly and harmoniously, and much credit is due them for faithful and conscientious work.

The school was in charge of Supervisor Conser, now special agent, for some time before my arrival, and Supervisor Holland visited it in November. I am indebted to both of them for many valuable suggestions and good advice, which I have tried to follow during the year.

Sincere thanks are due to your office for the hearty support given and courtesy shown, as well as for the valuable suggestions made.

Very respectfully,                                FRANK KYSELKA,
                            *Superintendent and Special Disbursing Agent.*

The COMMISSIONER OF INDIAN AFFAIRS.

REPORT OF AGENT FOR MISSION TULE RIVER AGENCY.

SAN JACINTO, CAL., *September 20, 1902.*

SIR: In accordance with custom and in compliance with your instructions, I have the honor to submit this my fifth annual report of the Mission Tule River Consolidated Agency, being for the fiscal year ending June 30, 1902, together with the revised census rolls and the usual statistics.

ACC-HRA000821

**Location.**—The official location and headquarters for the Mission Agency is at San Jacinto, Cal.; post and telegraph offices the same.

**Population.**—Unusual care has been exercised to obtain a correct census and the required statistics. The corrected census shows the following to be the aggregate population of the several reservations situated within this agency:

| | |
|---|---:|
| Total population (males, 1,521; females, 1,304) | 2,825 |
| Males over 18 | 953 |
| Females over 14 | 848 |
| Males under 18 | 568 |
| Females under 18 | 456 |
| Between 6 and 16 (males, 340; females, 269) | 609 |
| Births during the year | 77 |
| Deaths during the year | 116 |
| Formal marriages during the year | 20 |

The following tabulated statement shows the names of the reservations (or villages), number of acres, population, distance from agency, and character of land. Substantially this same table was printed in the report of this agency for the fiscal year 1901, but as it gives much information in a concise form, it is again submitted, with some changes.

| Name of reservation. | Number of acres. | Popula-tion. | Distance from agency. | General character of land. |
|---|---|---|---|---|
| | | | *Miles.* | |
| Agua Caliente, No. 2 (Palm Springs). | 3,844 | 29 | 50 | Desert land; subject to intense heat; little water for irrigation. Patent issued. |
| Augustine | 615 | | 75 | Desert; no water. Patent issued. |
| Torres (Alimo Bonito, Agua Dulce, Martinez, and Torres village). | 19,200 | 213 | 75 | Desert; subject to intense heat in summer; for lack of water, no farming; artesian water could be obtained in abundance; land would then be productive. Not patented. |
| Cahuilla | 18,240 | 159 | 35 | Mountain valley; stock land; little water. Not patented. |
| Capitan Grande | 10,253 | 118 | 130 | Portion good; very little water. Patent issued. |
| Campo | 280 | 18 | 170 | Poor land; no water. Patent issued. |
| Cuyapipa | 880 | 36 | 125 | Do. |
| Cabazon | 640 | 28 | 27 | Desert; produces nothing; no water. Patent issued. |
| Inyaha (Annhuae) | 280 | 42 | 100 | Small amount of poor land. Patent issued. |
| Los Coyotes (San Ignacio and San Ysedro villages). | 22,640 | 100 | 85 | Mountainous; very little farming land. Not patented. |
| Morongo | 38,600 | 288 | 25 | Fair land, with water. Not patented. |
| Mesa Grande | 120 | | 75 | Small amount of farming land; little water; portion good; stock land. Patent issued. |
| Pala | 160 | 76 | 40 | Good land; water. Allotted. |
| Pauma | 250 | 63 | 50 | Portion good land, with water. Not patented. |
| Potrero (La Jolla, La Piche). | 8,329.12 | 226 | 75 | Portion good; water on part. Allotted. |
| Rincon | 2,552.81 | 149 | 65 | Sandy; portion good, with water. Patented and allotted. |
| Syquan | 640 | 42 | 110 | Small quantity agricultural land. Patent issued and allotted. |
| Santa Ysabel | 29,844.96 | 284 | 80 | Mountainous; stock land; no water. Patented. |
| San Felipe | | 76 | 85 | Lost land by legal decision. |
| San Jacinto | 2,960 | 136 | 6 | Mostly poor; very little water. Not patented. |
| San Manuel | 640 | 38 | 55 | Worthless; dry hills. Patent issued. |
| Santa Rosa | | 54 | | Unsurveyed; as yet unsettled, but final adjustment will be satisfactory to Indians. Not patented. |
| Santa Ynez | | 60 | 240 | |
| Tule River | 45,000 | 143 | 450 | Good reservation; small amount farming land. |
| La Posta | 238.88 | | 170 | Poor land; no water. Not patented. |
| Manzanita | 640 | | 170 | |
| Temecula | 3,360 | 193 | 35 | Almost worthless for lack of water. Patent issued. |
| Twenty-mile Palms | 160.21 | 36 | 190 | Desert. Patent issued. |
| Agua Caliente, No. 1, Mataguay, Puerta La Cruz, San Jose. | | | | All located on Warner's ranch, and lost to the Indians by decision of the United States Supreme Court. |

ACC-HRA000822

176    REPORTS CONCERNING INDIANS IN CALIFORNIA.

**General conditions.**—In a general way I am confident that some improvement in the condition of the Indians is being made from year to year. They are not (save in a few instances) provided with suitable land, with water for irrigation; hence they can not make an independent and comfortable living by tilling the soil. At least 75 per cent of the Mission Indians support themselves and families by labor for white people in civilized pursuits. To my certain knowledge many Indians travel over 100 miles in search of work, taking their families, including their children, with them; this interferes with the attendance of many of the day schools.

Southern California has had five successive years of severe drought, and in consequence many industrious white men have been compelled to abandon their homes and seek a more favored locality. We can not expect Indians to be successful in farming where white men, with their superior knowledge and judgment, have failed. The crops such as Indians generally plant—viz, wheat, barley, corn, beans, melons, etc.—must have surface irrigation and are decided failures without it.

Under these adverse conditions, through all the serious drought, the Mission Indians have done remarkably well; they have shown conclusively that they are not beggars, not lazy, but faithful laborers. Upon their own land they would have starved, consequently they have sought labor in irrigated districts already spoken of; this is a mutual benefit for the employer and the Indians. This gypsy-like method of Indian employment does not tend to the best standard of citizenship, for the home is neglected, but it shows that when the improvements now under way for the betterment of their condition are completed the Indians will make good use of the facilities given them.

Rations are furnished only to the aged, sick, and destitute.

**Sanitary.**—On June 30, 1901, the position of physician at this agency was abolished. I believe this was a step in the right direction. The many reservations of the agency are so scattered and separated as to make it impracticable for one physician to give prompt and efficient treatment to the Indians in his charge. Local physicians have been employed in emergency cases where the Indians were too poor to pay for the medical attention themselves. The agent issues medicines at the agency office and on trips among the Indians, and a supply of simple medicines is furnished to all the day schools for distribution among the Indians. This plan is more economical and satisfactory than the employment of a regular agency physician.

I have succeeded in having two or three sick Indians admitted to the county hospital for care and treatment.

**Day schools.**—We have had a fairly successful school year; there has been a slight decrease in the attendance, due, as already stated, to the Indians leaving their homes in search of employment.

Owing to the intense heat on the desert, the Martinez Day School was closed on the 13th of June. I believe it would be good policy to hold only a nine months' session at this school. The thermometer frequently indicates 115° to 118° in the shade in June, and neither teacher nor pupils can do good work in such heat.

We have 11 day schools, all held in buildings belonging to the Government. The buildings all need repainting and some slight repairs at some of the schools. The water supply is inadequate and needs attention. I will make special reports upon these matters.

I herewith submit a tabulated statement showing the names of the teachers, their compensation, the location of the day schools, the average number of pupils enrolled during the year, and the average attendance during the fiscal year 1902. This table shows a slight decrease in attendance compared with that of the fiscal year 1901, due to the fact that many Indians are away from home with their families a portion of the year in search of work.

| Teacher. | Compensation per month. | Location of school. | Average number pupils enrolled during year. | Average attendance. |
|---|---|---|---|---|
| Nelson Carr | $72 | Tule River | 20 | 14 |
| Sarah E. Gilman | 72 | Potrero | 18 | 11 |
| Charles J. Goodrich | 72 | Martinez | 17 | 13 |
| Edwin Minor | 72 | Soboba | 21 | 14 |
| Belle Dean | 72 | Pechanga | 34 | 17 |
| Stephen Waggoner | 72 | Cahuilla | 15 | 10 |
| J. H. Babbitt | 72 | Agua Caliente | 18 | 14 |
| Mary C. B. Watkins | 72 | Mesa Grande | 18 | 12 |
| Will H. Stanley | 72 | La Jolla | 22 | 17 |
| Ora M. Salmons | 72 | Rincon | 30 | 24 |
| Leonidas Swain | 72 | Capitan Grande | 10 | 8 |

ACC-HRA000823

REPORTS CONCERNING INDIANS IN CALIFORNIA.    **177**

**Warner's ranch Indians.**—The unfortunate decision against the Warner's ranch Indians continues to be the event of paramount interest this year as well as last. I am informed, also, that judgment has been taken against the San Felipe Indians and that they, too, are homeless. These cases have excited unusual interest and sympathy all over the country. The earnest and active measures taken by the Indian department for the relief of these unfortunate people meets with the universal approval of all. Even the Indians, in their undemonstrative manner, say they "feel very sad to lose their homes, but only half sad, because the Government is going to help them."

In December, 1901, Inspector McLaughlin, in company with myself, examined carefully the various pieces of property offered for sale to the Government for relocating the Warner's ranch Indians. Of all the property offered up to that time, the Monserrate ranch, in San Diego County, was superior, and the inspector recommended its purchase. There was, however, one very essential feature lacking in this property, more noticeable to Californians, where "water is king," than to an Eastern person, who is not fully familiar with our methods of irrigation. For successful farming in southern California water in abundance for irrigation is indispensable. The Monserrate property possesses but a small supply of gravity water; therefore, when this property was selected there was so much protest against its purchase that the Government finally appointed a special committee to select suitable lands for the "Warner's ranch and other Indians."

This committee is composed of the following persons: Charles F. Lummis, Los Angeles, chairman; C. L. Partridge, Redlands, and R. C. Allen, San Diego. These gentlemen are all experienced Californians and no doubt will make the very best selection possible for the purpose. This commission, named above, in company with William Collier, special attorney for the Mission Indians, and Judge Egan, a civil engineer, have made a thorough canvas of all property offered for sale. Their report, I understand, is now in your hands. We all trust that a wise selection has been made, and no doubt this is the case.

I think that the Indians will offer but little resistance when the time finally comes for their removal.

**General remarks.**—The Santa Ynez land case will soon be settled in a very satisfactory way for the Indians. No allotments have been made during the year. For protection of the Indians some resurveys should be made as soon as possible to establish boundary lines; especially is this necessary at the Tule River and Santa Ysabel reservations.

I am pleased to receive notification that a clerk and additional farmer have been appointed for this agency.

In closing I desire to express my gratitude for courteous treatment and favors accorded me by your office. Much credit is also due the employees for their united efforts to make the work a success.

Respectfully submitted.

L. A. WRIGHT,
*United States Indian Agent.*

The COMMISSIONER OF INDIAN AFFAIRS.

## REPORT OF SCHOOL SUPERINTENDENT IN CHARGE OF ROUND VALLEY AGENCY.

COVELO, CAL., *August 20, 1902.*

SIR: I have the honor to submit the annual report of affairs at this agency and school for the fiscal year ending June 30, 1902.

The improvement in the general condition of the Indians of this reservation mentioned in my last report has continued during the fiscal year, and many improvements to their homes and allotments have been added. These Indians are nicely located, and with an average amount of industry and good management are in no danger of ever becoming dependent. The greatest obstacle to the progress of these Indians has been the liquor traffic, and as I now have that under safe control I feel greatly encouraged for their future.

**Industries.**—Farming and stock raising are the principal pursuits of these Indians. The crop this year is confined chiefly to hay, on account of the late spring rendering it impossible to sow for grain. Stock raising has also been very discouraging, many dying from blackleg. I obtained 2,000 doses of vaccine from the Agricultural Department, which were used with good result, very few dying after having been

9674—02——12

ACC-HRA000824

# TAB II-12

# ANNUAL REPORTS

OF THE

# DEPARTMENT OF THE INTERIOR

FOR THE

FISCAL YEAR ENDED JUNE 30, 1904.

## INDIAN AFFAIRS.

### PART I.

#### REPORT OF THE COMMISSIONER,

AND

APPENDIXES.

WISCONSIN
HISTORICAL
SOCIETY

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1905.

ACC-HRA000825

ing liquor to Indians. He was arrested and lodged in the county jail, and as promptly habeas corpused out. I then took the evidence before the grand jury, at San Francisco, and secured an indictment. He is yet at large, however, though a fugitive from justice, understanding that a return to the reservation will mean his arrest. We circulated a petition asking the board of supervisors to revoke the liquor license of two parties who were running disorderly houses in Covelo, and whom we were sure were selling liquor to Indians. Nothing definite has come of this as yet. The same parties are still in business, openly boasting that they will sell liquor to whomsoever they will.

Much good in the direction of securing sobriety has been accomplished through the efforts of Rev. Len Schillinger, who has been instrumental in the organization of a lodge of Good Templars among the Indians. This lodge has a membership of 30.

**Crimes.**—Some crimes have been committed, both on and off the reservation. Several Indians were sentenced in the justice court at Covelo to pay fines and to confinement in the county jail for disorderly conduct. One was sentenced to Folsom for three years for forgery, and an indictment was returned against another by the Federal grand jury for assault with intent to kill. He will be convicted if he does not plead guilty.

**School.**—The school has had a reasonably successful year. The attendance has been an even hundred. Most of the employees have been efficient, capable, industrious, and willing. In the main they have been loyal also. Good work has been performed in the schoolrooms, sewing room, laundry, kitchen, and particularly in the general housework department; also in the garden and on the farm. For more detailed reports I would most respectfully refer you to communications written by me at various times during the year directed to your Office and to a report made by Supervisor Dickson upon affairs at this agency mentioned in office letter, under date of March 25, 1904.

**Improvements.**—During the year we have painted all the buildings except the sides of the barn and the roof of the girls' building, and partially constructed a laundry and a commissary. Many other minor improvements might be noted, but it seems unnecessary.

**Official visitors.**—Only one official, Supervisor Dickson, has visited us during the year. His suggestions were timely and helpful, and we are indebted to him for much valuable assistance.

**Conclusion.**—In conclusion I desire to thank your Office for many past favors and to express the hope that a continuance of these will be merited.

Very respectfully,

HORACE J. JOHNSON,
*Superintendent and Special Disbursing Agent.*

The COMMISSIONER OF INDIAN AFFAIRS.

---

REPORT OF SCHOOL SUPERINTENDENT IN CHARGE OF MISSION AGENCY.

SAN JACINTO, CAL., *September 1, 1904.*

SIR: Agreeably to the requirements of the regulations, I have the honor to submit this, my first annual report as superintendent and disbursing agent of the San Jacinto training school, being also my seventh annual report in the Indian service, with the usual statistics.

**Division of the Mission Agency.**—On July 20, 1903, the honorable Secretary of the Interior directed that what was then known as the "Mission-Tule River Consolidated Agency" be divided into two sections; the southern portion, consisting of the Capitan Grande, Campo, Guaypipa, Inyaha, Los Coyotes, Mesa Grande, Pala, Pauma, Potrero, Rincon, Syquan, La Posta, Manzanita, and Temecula reservations, and all duties appertaining to the above-named reservations, be placed under charge and control of a bonded superintendent, to be located at Pala, Cal., and that all the duties appertaining to the northern division, consisting of the following-named reservations, Tule River, Palm Springs, Torres, Cabazon, Morongo, San Jacinto, San Manuel, Santa Rosa, Santa Ynez, Twenty-nine Palms, and Cahuilla, devolve upon myself as superintendent and disbursing officer, with official headquarters continued at San Jacinto, Cal.

On September 18 all public property belonging to the southern division was turned over to Mr. Charles E. Shell, who had been appointed superintendent and special disbursing agent of the Pala training school, and receipts therefor taken, as directed by your Office.

ACC-HRA000826

## 170    REPORTS CONCERNING INDIANS IN CALIFORNIA.

No doubt the division of the agency was a very wise move, as the field was entirely too large for any one man to give proper attention to the manifold duties that were constantly arising. Moreover, the reservations are so widely scattered that it was practically impossible for one agent to visit each section and devote sufficient time to ascertain the requirements of the Indians. Since the division of territory and the change in title from agent to superintendent, I have continued to discharge agent's duties for all of those reservations under my charge, as I consider the intent of the honorable Commissioner to devolve such duties upon me as superintendent. I feel that my work has been much more satisfactory and that much more permanent good has been effected on behalf of the Indians.

**Census statistics.**—The revised census rolls for 1904 show the following statistics:

| Reservation. | Total population. | Males. | Females. | Males over 18. | Females over 14. | Males under 18. | Females under 14. | Between 6 and 16. | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Total. | Males. | Females. |
| Cahuilla | 151 | 73 | 78 | 49 | 51 | 24 | 31 | 31 | 13 | 18 |
| Morongo | 286 | 155 | 131 | 83 | 84 | 72 | 54 | 75 | 40 | 35 |
| Palm Springs | 32 | 19 | 13 | 15 | 12 | 4 | 5 | 5 | 2 | 3 |
| Santa Ynez | 53 | 24 | 29 | 14 | 18 | 10 | 12 | 15 | 7 | 8 |
| Santa Rosa | 51 | 26 | 25 | 21 | 19 | 5 | 10 | 10 | 2 | 8 |
| San Manuel | 55 | 36 | 19 | 26 | 14 | 10 | 5 | 8 | 5 | 3 |
| San Jacinto | 144 | 75 | 69 | 54 | 53 | 21 | 24 | 33 | 15 | 18 |
| Tule River | 144 | 80 | 64 | 53 | 40 | 27 | 24 | 32 | 15 | 17 |
| Cabazon | 76 | 45 | 31 | 30 | 23 | 15 | 10 | 14 | 8 | 6 |
| Torres (including Alimo Bonita Agua Dulce, Martinez, Torres, and Walters villages) | 271 | 154 | 117 | 112 | 91 | 42 | 51 | 54 | 33 | 21 |
| Total | 1,263 | 687 | 576 | 457 | 405 | 230 | 226 | 277 | 140 | 137 |

**General conditions.**—All farming operations during the past year have been carried on under adverse conditions. We are experiencing the driest of all dry years and practically no crops of any kind have been raised in this vicinity. This is a double hardship upon the Indians who seek labor in civilized pursuits, for the failure of crops and fruits has reduced the demand for Indian labor and the lack of water for irrigation has prevented them from raising enough upon their places for subsistence. In view of these facts, and when we remember that these Indians receive no assistance whatever in the way of seeds supplied or other help, with the exception of a few tools and farming implements, we must conclude that they have done remarkably well.

Where irrigation is possible—as, for instance, on the desert at Morongo, Tule River, Santa Ynez, and on small portions of the San Jacinto Reservation—they have raised fair crops of cereals, beans, melons, some hay, and a small quantity of fruit. The desert Indians have done especially well in this line, and continue to use the water furnished them to most excellent advantage.

Some reservations are utterly worthless for agricultural purposes, the most notable of these being San Manuel, Santa Rosa, Cahuilla, and Palm Springs, because the land is poor and mountainous in some cases and on account of the utter lack of water. There is little hope of any improvement for the places mentioned above, as there is only water sufficient for domestic purposes and farming can not be successfully carried on without irrigation in this country. The question, then, of self-support for quite a portion of our Indians is a serious one, but they are quite industrious and manage to live some way; their wants being simple, they are easily provided for.

Drunkenness continues to be a very serious obstacle to the advancement and complete civilization of the Indian. A large part of their hard earnings is spent for alcoholic liquors; this keeps them debauched and very poor; they seem to care little but to satisfy this inordinate thirst. They are entirely lacking in thrift and think only of to-day. We have been especially vigilant during the past year in endeavoring to apprehend liquor sellers and have them properly punished. In some instances I have made it so extremely "hot" for some of these lawbreakers that they have discontinued business entirely. This is true of one Mike Griffin, who for years sold liquor near the Tule River Reservation. Several arrests and convictions have been made for these offenses, and I shall continue to make every effort to break up the nefarious traffic.

ACC-HRA000827

Our chief hope for bettering the condition of the Indians and making them self-supporting lies along the line of developing water, where this can be done. From past experience, I am certain that this idea will meet with your approval and I shall from time to time request your authority to make these improvements.

**Schools.**—There are five day schools and one Catholic mission school within my territory.

The Catholic boarding school, known as the St. Boniface mission school, is located near the Morongo Reservation and has an average attendance of about 75 pupils, gathered from the various reservations of southern California. The Rev. B. Florian Hahn, superintendent of this school, is a zealous worker and conducts a good school. The only criticism which might be offered is that pupils who are too young are enrolled; as they should be in the day schools.

The day school is a splendid factor in the civilization of the older Indians, as the teacher and housekeeper are frequently brought into contact with the parents as well as with the children, and it is only fair to presume that this intercourse has beneficial results.

The following table shows the location, name of teacher, compensation per month, and average attendance and enrollment during the year at the five day schools:

| Teacher. | Compensation per month. | Location. | Average enrollment. | Average attendance. |
|---|---|---|---|---|
| Will H. Stanley | $72.00 | Soboba | 18 | 15 |
| James B. Royce | 72.00 | Martinez | 20 | 17 |
| Sarah E. Gilman | 72.00 | Potrero | 25 | 15 |
| William J. Snowden | 72.00 | Tule River | 20 | 8 |
| Stephen Waggoner | 72.00 | Cahuilla | 2 | 2 |

The Soboba day school, on the San Jacinto Reservation, near the city of San Jacinto, is well conducted. The teacher and housekeeper are interested in their work. The grounds are well kept and in every way the school may be considered a success. Water is obtained from a well pumped by a windmill which answers for purposes of domestic use and irrigating the shrubbery and trees surrounding the school. There is also a good school garden in connection with this school in which the teacher takes a healthy interest. The building is old and will need some repairs.

The Cahuilla day school is situated 35 miles east of San Jacinto, in a mountainous region. The Indians are scattered over a large territory which makes it difficult to maintain a good school attendance, especially in the winter time. This school was closed October 1 of last year for lack of proper support and cooperation of the older Indians. They now regret that the school was closed and are exceedingly anxious to have it reopened. I have already requested your authority to do this and if it is granted every effort will be made to put the school on a good footing. The building is very poor and the water facilities are exceedingly primitive, what little is procured being brought from a small spring at some distance from the schoolhouse. We can not, therefore, have a school garden.

The Potrero day school, located on the Morongo Reservation, near Banning, and some 25 miles from agency headquarters, is an excellent school and fairly well attended. The buildings are in fair repair. The new water system is satisfactory and continues to furnish sufficient water for school use.

The Martinez day school is situated on the Colorado desert, 4 miles from the railroad and post-office and 75 miles from the agency. This is a prosperous school and shows an increased attendance over last year, and will, I feel sure, show a continued increase. During the year the school grounds were enlarged, some shade trees planted, and an effort made to do some school gardening. This was only partially successful because of the late start and the great heat of the desert. The buildings are of adobe and in a very poor state of repair. I was compelled during the year to put some iron rods into the walls to keep them from falling. There is but one living room for the teacher and family. I will, at an early date, ask your authority to make some repairs to this school plant.

There is an awakening among the desert Indians, due to the fact that they now have water and can prosecute their farming operations with some degree of success, and from now on this will undoubtedly be one of our best day schools. The water for school purposes is now obtained from one of the artesian wells.

The Tule River day school has not been so successful as I would have had it. This is due chiefly to the fact that the school is not properly located, being too far up the river to have the attendance of most of the children on the reservation. The

ACC-HRA000828

families living above the school building have but few children of school age; most of the families having school children live down the river 2 or 3 miles below the school and from that point 2 or 3 miles up the mountain. The pupils who live on the mountain, therefore, have to travel some 5 miles to reach the school, and those at the foot of the mountain some 2½ miles, crossing and recrossing the river. This is a large reservation and there are plenty of pupils to make the school a prosperous one. During the last month of the school year the teacher tried the experiment of holding the school in a ramada located near the center of the school population, some 3 miles from the present situation of the school building, and the average attendance increased from 6 in May to 22 in June, the month in which the experiment was tried, which shows quite conclusively that the building is improperly situated. The Indians inform me that they will gladly support the school when it is possible for them to do so.

During the year I installed a new water plant at this school, laying some 2,000 feet of inch pipe from the river to the school grounds. This furnishes an adequate supply of water for domestic purposes and also for irrigating a small school garden, some fruit trees, and a small berry patch.

All day school buildings need painting.

**The Desert Indians.**—Running parallel with a spur of the Sierrra Madre Mountain for a distance of 15 miles lies the Torres Reservation, most of which is on an avers age of 200 feet below the level of the sea, having once been the bed of an arm of the ocean and in its natural state about as unpromising and forbidding looking a place as one could imagine. This and the region round about is known as the Colorado Desert and through all the ages has produced nothing that we are aware of but mesquite beans, which until recent years was the principal article of subsistence for the Indian tribes who occupied this territory unmolested.

Even so short a time as twelve years ago the commission whose duty it was to select lands for the homeless Mission Indians in reporting upon this Torres Reservation, stated as follows: "If the Salton Lake does not resume its old bed upon this desert, these Indians can have, if the recommendation of the commission be approved, a home which few white men will covet."

Now, what a transformation! This desert waste is being reclaimed as fast as brain and brawn can do it, and the magic touch of water has done it all. Some one discovered that this vast region was underlaid with an abundance of artesian water and hundreds of wells have been sunk. The soil is excellent and well watered, produces immense crops of melons, early vegetables, fruit, and hay, and these crops mature here at least two months earlier than elsewhere. Lands have increased in value from practically nothing to $100 per acre. All this being true, the Indians have for once been fortunate, as they may now rise superior to the circumstances that compelled them to make a home in this waste and have an equal chance with their white brothers.

While it was said that the land was so poor that "few white men would covet it," it has been shown that a large portion of the Torres Reservation is excellent for agricultural purposes. The artesian water furnished the Indians last year has been of incalculable value to these people. There was no trouble, as was at first feared, to induce these Indians to move upon the irrigable lands. They were quick to see the chances and opportunities offered, and the chief difficulty now lies in making something like an equitable allotment of the land.

In my opinion this land should be allotted at the earliest possible date. It should be surveyed into small tracts so that roads and ditches may be regularly laid out with reference to the adjoining lines of the various holdings of the Indians. The longer this is delayed the harder it will be to put it into execution, as many of the Indians are now claiming much more land than we can possibly give them.

I wish also to urge the necessity of sinking more wells, for the supply of water furnished is insufficient for the requirements of the Indians. The Cabazon Reservation, which has but two wells, should have at least from four to six more. The Twenty-nine Palms Indians were permitted to remove to this reservation, as they lived at a remote desert point, with no prospects in view, and it would be well to permit them to remain permanently at Cabazon, where they may, if more water be furnished, make comfortable homes. I finished three reservoirs and there remain eight yet to be completed.

**Tule River boundary line.**—In compliance with your authority and instructions I caused a resurvey to be made of a portion of the boundary line of the Tule River Reservation. This survey was made because several white men are claiming large portions of splendid timber land within the lines of the reservation. These parties claim to have patents to this land, and had begun cutting some of the timber, making it into posts and shakes and hauling it away.

Before beginning the resurvey I was especially particular to obtain from the

ACC-HRA000829

surveyor-general for California the very latest field notes and plats as a guide in retracing this line, and every effort was made to secure correct data before the work was actually begun, because many persons were of the opinion that the reservation line had never been run as claimed, while others had it mislocated; and persons who had obtained deeds to the land were so insistent that they were right and that the land claimed by them was outside the reservation that I took every precaution to be as fully informed as possible.

The latest survey of official record was made by William Minto in 1873, and the surveyor-general stated that all subsequent surveys closed onto the line made by Minto in 1873. We had but little difficulty in reestablishing the line run by Minto in 1873. We retraced the whole northern boundary line, the line in dispute, and found every one but two of the thirty-four corners or survey stations exactly as given in the field notes. Witness trees, posts, and witness stones were all well marked and intact with the exception of two unimportant corners. These the surveyor was able to locate by the witness trees.

The greatest public interest is centered in this contest, for the result of our survey would make it appear that extensive misrepresentations or frauds have been perpetrated by some one to gain possession of this splendid timber land, really the most valuable portion of the reservation. The Tule River Reservation comprises some 47,000 acres and was made a reservation by Executive order of January 9, 1873. This is a matter of the very greatest importance and has been made the subject of a special report by me and will, no doubt, receive your early consideration.

This resurvey has also definitely settled another dispute between the Indians and one Luther Anderson, on the southern boundary of the reservation. No part of the land claimed by Anderson is on the reservation and this fact was evident to the Indians, who accepted the situation.

**Sanitary.**—We have had no epidemics among our Indians during the past year. There was a smallpox scare, but it amounted to nothing. By your permission I had as many of the Indians vaccinated as would submit to the operation.

The plan of employing local physicians to treat emergency cases and Indians who are unable to pay for their own medical attention works well. In connection with this service I prepare simple remedies for the use of the schools and Indians throughout my territory. In compliance with your instructions I examined the pupils at the St. Boniface and St. Anthony's mission schools, and with a few slight exceptions found all of the pupils in good physical condition and the buildings in good order, cleanly, and well kept.

**General remarks and recommendations.**—I desire to call your attention to the fact that there are several hundred Indians located within my jurisdiction along the mountain foothills of Kern, Fresno, Tulare, and Kings counties. These people have not been considered wards of the Government and I have never given them any special attention. No lands have been reserved for them and they are living upon very small patches of poor land, either public or private land, where they remain by sufferance of the owners. Sooner or later these people will require attention.

My experiences and observations among the Indians during the past year convince me that a home for the aged, infirm, destitute, and helpless Indians of southern California is almost indispensable. I wish now to reiterate that part of my report for 1903 which has reference to this subject, as follows:

Throughout this agency on every reservation there are aged, infirm, indigent Indians. They are a helpless lot. Practically all of the expenditures for rations and medical bills that you have permitted have been for this class of people. The Indian people think a great deal of their families, yet it is a notorious fact that they are negligent of their old folks. They put them in a shack to live alone, and they frequently suffer for the necessaries of life—that is, sufficient food and comfortable bedding; and who can tell what bodily suffering they endure in silence? Many of the cases are pitiful to behold. In my opinion it would be an act of humanity, and would have the indorsement of all the people of southern California, if some retreat or home could be provided where this class of Indians could be assembled and comfortably housed and fed and decently clothed, and in cases of sickness have their medical wants supplied.

I am informed that the buildings known as the Perris Indian School are soon to be vacated and in my opinion this property could be converted into such a retreat or home for the Indians as I have spoken of and I earnestly recommend that this be done.

During the year we were visited by Inspector Chubbuck and Supervisor Dickson and greatly appreciated the counsel and suggestions given by them.

I desire to express my thanks to the Office for the assistance given and courtesies shown myself and the employees during the last year.

Respectfully submitted.

L. A. WRIGHT,
*Superintendent and Special Disbursing Agent.*

The COMMISSIONER OF INDIAN AFFAIRS.

ACC-HRA000830

# TAB II-13

# EXHIBIT 41

Shoaf-Ex41-001

April 24, 1924.

Dr. Samuel Blair
Inspector
Department of the Interior.

Dear Dr. Blair:

Agua Caliente, Cabezon, Augustine, Torres, and Martinez Indian Reservations are all located in that portion of the Colorado Desert known as the Coachella Valley, and while Agua Caliente is situated at the foot of Mt. San J_____ 25 miles from the other four, it has some points in c_____ them, and in studying its water resources the demands o_____ reservations below must also be considered.

The lower Coachella Valley fr_____ _o _____ entirely dependent upon artesian water for _____ only source of this artesian water is from t_____ and its tributaries which rise on the sides _____ nardino and San Jacinto. No underground _____ from the south because all of that section o_____ been filled in with fine silt brought down by _____ River, making a formation that is impervious _____ of water. The Coachella Valley has been de_____ past 25 years, since the time that the first _____ were sunk. At that time, all wells yield_____ of water by artesian flow, and pumping wa_____ the development of the valley has progress_____ water has increased to such an extent that _____ more water is being pumped out from the unde_____ than is received from the streams above_____

In order to protect its inter_____ _____lla Valley has been organized as the Coachella V_____ _____ District, and has been making investi___tions _____ years to see what should be done to ins_____ for the farmers, and the Indian Service_____ with them, as we have felt that the inter_____ in that section are identical with those o_____

RG 75, Mission
Envelope with 45742-24-150

Case 5:13-cv-00883-JGB-SP Document 89-44 Filed 02/05/14 Page 67 of 79 Page ID #5163

As far as can be learned from the data at hand,
it appears that the average annual flow into these underground
reservoirs, after deducting the amount of water lost by evap-
oration and transpiration in irrigating the lands around Ban-
ning, on the Morongo Indian Reservation, and other places in
the upper part of the valley, is approximately 54,000 acre
feet.   At the present time, there are approximately 12,900
acres of land under cultivation in the lower valley, requiring
at least 5 acre feet per annum, or 64,000 acre feet in all,
which is at least 10,000 more than is being received.   This
is further evidenced by the fact that the water plane is fall-
ing a little bit every year, and wells, in which formerly.
flowed an abundance of water, have either ceased entirely to
flow, or must be pumped to furnish enough water for irrigation.
Fourteen years ago, the Indian Service maintained two pumping.
plants in this region, one on the Cabezon Reservation, and
the other on the Augustine.   At the present time, there is, a
second pumping plant on the Cabezon, two at Torres, and one at
Martines, in addition to the two original ones, and the Indians
are asking for more.

Two years ago, these Indian lands were allotted
into approximately 250 40-acre tracts, but most of the Indians
have refused to accept their allotments until the government
puts down wells and operates pumping plants on each of these
tracts.   Since it would cost approximately $5,000 to sink a
well and build a pumping plant, the total cost of irrigating
this land would be in the neighborhood of three-quarters of a
million dollars, and the cost of clearing it to put it in good
condition for irrigation would be another half million.   The
water requirements would be 50,000 acre feet per annum, so the
valley would be using more than twice the water which it is now
receiving or can expect to receive at any time until the All-
American Canal is built.   Therefore, unless there is immediate
prospect of the building of this canal, it is useless to con-
sider the development of any of these large allotments, and
the only program which the Irrigation Office of the Indian Ser-
vice has in mind is the development of the present wells as
far as it appears to be feasible to do so.

In order to protect the present cultivated land,
the Coachella Valley County Water District has placed a blanket
filing on the surplus water of all the creeks tributary to the
Whitewater River, and an adjudication of the water rights of this
valley is being made by the State Division of Water Rights, and
final proofs of all waters claimed are to be filed by July 1, 1924.

Shoaf-Ex41-003

Dr. Samuel Blair

Page 5.

cop̄y

**AGUA CALIENTE**  The Agua Caliente Reservation contains 31,200 acres, nearly all of which is unsuitable for agricultural purposes, either because it is located on the rocky slopes of the mountains or because the soil is almost pure sand.  It is located east of Mt. San Jacinto, which is 10,000 feet high, and is protected by it from the prevailing westerly winds, which makes it an ideal location as a winter and health resort.  It is, therefore, likely that the region around Palm Springs will never be devoted to agriculture, but will become one of the principal resorts in Southern California.

**TAHQUITZ CREEK**  A small band of Agua Caliente Indians have lived in this neighborhood since time immemorial, and the records of the Indian Office show that about 1853, they constructed the ditch from Tahquitz Cañon to their lands lying on the present location of the town of Palm Springs, and also to what is now Section 14, a part of the reservation, and that, when the white people first came to this country, the Indians allowed them to use the water from this ditch, until finally the early settlers attempted to appropriate all of the water for their own use.  About 1895, the Palm Valley Land and Water Company diverted water from the Whitewater River, about five miles to the northwest, and proposed to the Indian Service that if the Indians would relinquish all rights to water in Tahquitz Cañon, the Company would grant them 27 inches of water, 24 of which was to come from Whitewater River, and 3 inches from Tahquitz Creek.  This contract was recommended, but never was signed; but, on the supposition that it would be approved by the Department, the Indians built a ditch about a quarter mile in length, to connect with the Whitewater Ditch, and evidently used water at times for about two years, when the president of the Company, Mr. McCallum, died, and the company all but went out of existence, and failing to deliver water, the Indians resumed the care of the ditch and the use of water from Tahquitz Creek.

      In 1910, when the Irrigation Service was starting the project on this reservation, the old water rights of both the Indians and the whites were investigated, and a contract was drawn up and signed by the Secretary of the Interior, which gave to the Indians the first 40 inches of water in Tahquitz Creek, the whites the next 40, and all above 80 inches was to be divided, two-thirds to the Indians, and one-third to the white people. The ditch was rebuilt, and lined with stone and concrete to prevent seepage losses, and now has a capacity of approximately 375 inches, or 7½ second feet, and the water has been divided between

Shoaf-Ex41-004

Dr. Samuel Blair                                    Page 4.

the Indians and the whites on the basis of this contrast ever
since, although it is possible that at times the measurements
have not been made with the greatest degree of accuracy, and
some have questioned for this reason whether or not the Indians
have received all the water to which they are entitled.

During the last few months, some of the Indians have
been referring frequently to the old contract, which grants
them 27 inches from the Whitewater Ditch, but they were ig-
norant of the fact that this contract never was approved, and
that since it was based entirely upon the relinquishment of all
right to water in Tahquits Creek, the signing of the above con-
tract, in February, 1911, dividing the waters of Tahquits Creek,
would have rendered the earlier contract null and void.

Tahquits Creek, like all other desert streams, is sub-
ject to extreme fluctuation, and while there is more than enough
water for all parties during the spring, the flow so small
during the summer and fall that the Indians, who are not the
best of farmers, have not found it advisable to attempt to cul-
tivate more than 150 acres, and a large part of this is devoted
to pasture for their horses.

ANDREAS CREEK    A second source of water supply for the In-
dians is in Andreas Canon, four miles
south of Tahquits, which the Indians used to a large extent
before the advent of the white people. In the latter
part of the '90's, some of the railroad land in the mouth
of Andreas Canon was purchased by the Bannounced and a con-
tract was made with the Indian Agent, allowing the desert
a small amount of water from the creek. A few years later
it was found that the ranch had practically deprived the In-
dians of all water from this source, and had secured enough
rights so that it was practically impossible to return the
water which the Indians had formerly used.

However, upon finding a flaw in the title of the
land, the Indian Agent was able to force the owner of the
ranch to sign a compromise contract, and later, in 1907, the
Indian Service purchased the ranch with all its water rights,
thus giving to the Indians without question the full flow
of this creek. Since that time, a distributing system has
been built to carry this water two and a half miles to the
north, for the purpose of irrigating about 250 acres of land,
which might be classed as agricultural. However, on account
of its distance from the town of Palm Springs, the Indians
have been very slow about putting it under cultivation, and
they have also found that what was considered some of the
better land contains so much hardpan that the crops have been
failures after the first two or three years.

Shoaf-Ex41-005

Dr. Samuel Blair                                                Page 5.

The Department of Agriculture has established an experimental station on 10 acres of land in Section 54, and their experience has been that the soil is too deficient in humus to make it of value for dates until several years have been spent in fertilizing it. It is, therefore, hardly likely that the Indians will ever make a great amount of use of the water from this creek.

WATER DEVELOPMENT      There has been considerable agitation about developing more water for these Indians, which can be done in three different ways.

1st.   Water can be filed upon in Murray and Palm Canons, and carried to the Indian lands at considerable expense. Neither one of these canons furnishes very much water, and at the time that the water would be most needed, which would be during the summer and early fall, the increased flow would be so small that it would not warrant the expense of the pipe line to carry it to the Indian lands.
Considering the scarcity of water in the lower Coachella Valley, it would be far better to allow these creeks to remain unappropriated so that they may add their quota to the underground waters below.
Chino Creek cannot be considered, as its water is all filed upon, and is used for municipal purposes in Palm Springs.

2nd.   Reservoirs.

Tahquitz Canon, being close to Palm Springs, and being cut from solid rock, is the one that appeals to the most people as being the ideal location for a dam. The dam sites on this creek are almost ideal, since there is everywhere solid rock for the walls, and practically no excavation for the foundation would be necessary, and there are probably few streams in the United States which have more dam sites per mile than Tahquitz Canon.  The canon falls 7,000 feet in seven miles, giving it an average grade of 1 foot in 5, and an average dam 100 feet high would back the water only 500 feet, and the canon is so narrow that such a reservoir would contain approximately only 40 acre feet, and a flow of one second foot would fill it in 20 days.   Many small dams could be built throughout the length of the canon, but the expense, in proportion to the amount of water conserved, would be so large as to make it prohibitive.

Andreas Canon is not nearly as steep, so that a dam of corresponding height would conserve much more water.   At the same time, the dam sites are not as favorable and the dam itself would cost more.   Therefore, neither of these canons, or in fact, any of the canons in this neighborhood can be considered as feasible types for storage reservoirs.

Shoaf-Ex41-006

Dr. Samuel Blair                                            Page 4.

### 3rd.    Wells.

There always has been more or less talk of sinking
wells in this valley, due to the fact that many of the promoters
have seen the results obtained from wells on the other side of
the mountains, and also in the Coachella Valley, but they have
not taken into account the fact that the lands close to the
foot of the mountains lie on a much steeper slope, and have a
much smaller underground reservoir above them than the lands
below.

Wells sunk in this neighborhood might yield sufficient
water for a short time each year, but would go dry about the
time that the water would be most needed. One well has been
sunk about three miles to the east and water has been found at
a depth of 110 feet. This has led other enthusiasts to put
down wells in this neighborhood, but we have yet to learn that
enough water can be developed from them to make the agricul-
tural development of this land possible. It must always be
borne in mind that as we leave the protection of Mt. San Jac-
into, going eastward, the chances of finding well water in-
crease, as the prevailing desert winds also increase, so that
the land becomes less and less adaptable to irrigation.

In the lower Coachella Valley the wells penetrate
what is now an underground reservoir, where the depth of water
sand penetrated is very large, amounting often to 100 to 300
feet. In the neighborhood of Palm Springs, the wells will
penetrate the underground stream which is feeding this reser-
voir below, and the depth of sand would be very much less,
though the Indian Service has no record of the strata pene-
trated by any of the existing wells. It therefore stands
to reason that no well in this neighborhood would yield very
much water, and the first well which was completed in 1921
and evidently has been used as an inducement to others to
sink wells—is not surrounded by any amount of cultivated land.
Considering the large amount of promotion going on in this part
of the state at the present time, in connection with the usual
tactics of land promoters, this lack of cultivated land around
this pioneer well should be kept in mind before proceeding with
any program for developing the wells to irrigate lands which
are scarcely suitable for cultivation, always bearing in mind
that the water is needed and can be put to better use on the
land below.

ALLOTMENTS    It is well to bear in mind that these Indians are
not farmers by nature, and that since Palm Springs
has been growing so rapidly during the past few years, they have
been slowly abandoning their farms, to work in the village, and
as the village grows in population and work becomes more and
more abundant, it is inevitable that they will farm even less
land than they do at the present time.

Shoaf-Ex41-007

Dr. Samuel Blair

Page 7.

It is said that the W½ of Sec. 10 and a portion of Sec. 22, (T4S, R4E) could both be sold at high prices for subdivision into town lots. Sec. 10 is so situated on the debris cone of Tahchevah Canon, that it is useless to the Indians, and Sec. 22, lying at the mouth of Tahquitz Canon, is so thickly covered with granite boulders that only about two acres in the SE corner, and perhaps a small tract in the NE corner, could be considered of any value. If this section, or a portion of it, could be sold at the high price, which its nearness to Palm Springs would warrant, without sacrificing in any way the water rights to Tahquitz Canon, the sale should by all means be made. The proceeds of the sale could be devoted very profitably to building a new pipe line along the north boundary to Sec. 22, so that the Indians could obtain their water for irrigation without having it pass through the town, where it would be subject to theft and contamination. The water could be divided at the beginning of this new pipe line, so that the whites' share would flow automatically to them through the old ditch, and the Indians would get theirs through the new. At the same time, a domestic pipe line could be built, which would take water from the creek above all sources of contamination, and carry it direct to the Indians' homes.

*traded*

The land in Sec. 14 has been divided into tracts of about two acres each, but the Indians have refused to accept them, since they are reluctant to change the present land lines with no apparent improvement. Since the main use of this section is going to be to form a home for these Indians and to give them small tracts of land for gardens, it might be that the Indians would prefer that a small part of the section adjacent to the western boundary be divided into village lots, of which not more than fifteen or twenty would be required, and the remainder of the section, or of the SW¼ of the section, be subdivided into new allotments for farming purposes only.

*allotment*

With such an arrangement, it would be feasible to give the Indians an ideal domestic water supply, and there would be sufficient money left to build them modern homes, or at least homes which would embody modern sanitary principles, and yet be simple enough in style and construction to be suitable to the Indian needs in a region that is subject to such high temperatures as Palm Springs.

*andreas*

For the present, the land under the pipe line from Andreas Canon should be considered as agricultural land, and the Indians should be given an opportunity to cultivate it if they so choose. But, at the present time, it looks as though the ultimate destiny of the Andreas Creek water would be for municipal purposes in and around the town of Palm Springs, and the Indians will be much better off if allowed to sell or lease this land which is so poorly adapted to agriculture, and so very

Shoaf-Ex41-008

Dr. Samuel Blair                                                    Page 6.

desirable for resort purposes.    The disposition of this land
might be postponed for some time, not only to give the Indians
an opportunity to better adjust themselves to changing condi-
tions, but to obtain a better price than could be done if so
much land were placed on the market at once.

        While such a change from the old scheme of allotment
is extremely radical, it probably would work out ultimately to
the better advantage of the Indians, and would give them a bet-
ter opportunity to become an essential part of the community
than could be done if they lived in primitive style on little
used allotments, so situated as to hinder the growth of the
community; and, if given better homes and the opportunity to
decide on the general principles along which the lands are di-
vided, the foundation would be taken out from under much of
the criticism of the Department.

                                        Very respectfully,

                                        Supervising Engineer

                                        by
                                            H. K. PALMER
                                            Engineer.

HKP/mvb.

Shoaf-Ex41-009

# TAB II-14

STATE OF CALIFORNIA
DEPARTMENT OF PUBLIC WORKS
DIVISION OF WATER RIGHTS
H. A. KLUEGEL, Chief of Division

# WHITEWATER RIVER ADJUDICATION PROCEEDINGS

# REPORT ON

# Water Supply and Use of Water

## FROM

## Whitewater River Stream System

### San Bernardino and Riverside Counties

### CALIFORNIA

By GORDON ZANDER
Hydraulic Engineer

SACRAMENTO, CALIFORNIA
NOVEMBER, 1923

ACC0000056
LHR0005529
ACC-HRA001032

Vol. 62

U. S. Indian Irrigation Service

STATE OF CALIFORNIA

DEPARTMENT OF PUBLIC WORKS

DIVISION OF WATER RIGHTS

WHITEWATER RIVER ADJUDICATION PROCEEDINGS

REPORT

on

WATER SUPPLY AND USE OF WATER

From

WHITEWATER RIVER STREAM SYSTEM

SAN BERNARDINO AND RIVERSIDE COUNTIES

CALIFORNIA

Submitted as Evidence

November 15, 1923

Submitted by Gordon Zander, Hydraulic Engineer

Approved November 15, 1923.

Chief of Division

ACC0000057

LHR0005530

ACC-HRA001033

U. S. Indian Irrigation Service
311 FEDERAL BUILDING
Los Angeles, California

TABLE OF CONTENTS

|  | Page |
|---|---|
| LETTER OF TRANSMITTAL | |
| Hydraulic Engineer to Chief of Division of Water Rights | |
| INTRODUCTION | 1 |
| GENERAL DESCRIPTION OF WATERSHED | 4 |
| CLIMATE | 8 |
| SOILS | 11 |
| CROPS | 11 |
| RUN-OFF RECORDS | 12 |
| RECORDS OF COACHELLA VALLEY COUNTY WATER DISTRICT | 12 |
| Whitewater River | 12 |
| Snow Creek and Falls Creek | 14 |
| Tahquitz Creek | 15 |
| Andreas Creek | 16 |
| Palm Canyon and Murray Creeks | 17 |
| Millard Canyon Creek | 17 |
| RECORDS OF CONSOLIDATED RESERVOIR AND POWER COMPANY | 17 |
| RECORDS OF SOUTHERN SIERRAS POWER COMPANY | 18 |
| Snow Creek | 18 |
| Falls Creek | 19 |
| RECORDS OF UNITED STATES GEOLOGICAL SURVEY | 19 |
| Whitewater River | 20 |
| Snow Creek | 20 |
| RECORDS SECURED BY DIVISION OF WATER RIGHTS | 20 |
| San Gorgonio River | 20 |
| Hathaway Creek | 20 |

ACC0000058
LHR0005531
ACC-HRA001034

TABLE OF CONTENTS (Cont.)

RUN-OFF RECORDS:                                                          Page

    RECORDS SECURED BY DIVISION OF WATER RIGHTS (Cont.)

        Potrero Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 21
        Millard Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 22
        Lion Canyon Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- 22
        Stubby Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 22
        Cottonwood Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- 23
        Whitewater River -- -- -- -- -- -- -- -- -- -- -- -- -- -- 23
        Mission Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 24
        Cienega Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 25
        Big Morongo Creek -- -- -- -- -- -- -- -- -- -- -- -- -- 25
        Little Morongo Creek -- -- -- -- -- -- -- -- -- -- -- -- 26
        Dry Morongo Creek -- -- -- -- -- -- -- -- -- -- -- -- -- 26
        Thousand Palms Canyon Creek -- -- -- -- -- -- -- -- -- 26
        Cabazon Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 27
        Unnamed Stream about One Thousand Feet west of Cabazon
        Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 27
        Jensen's Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 27
        Snow Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 27
        Falls Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 28
        Chino Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 28
        Tahquitz Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 29
        Andreas Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 30
        Murray Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 31
        Palm Canyon Creek -- -- -- -- -- -- -- -- -- -- -- -- -- 31

USE OF WATER -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 32

    UPPER VALLEY -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 32

        Whitewater River -- -- -- -- -- -- -- -- -- -- -- -- -- -- 33
        San Gorgonio River -- -- -- -- -- -- -- -- -- -- -- -- -- 39
        Banning Overflow Drain -- -- -- -- -- -- -- -- -- -- -- 42
        Kathway Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 43
        Potrero Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 45
        Millard Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 45
        Lion Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 47
        Stubby Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 47
        Cottonwood Creek -- -- -- -- -- -- -- -- -- -- -- -- -- 49
        Mission Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 49
        Cienega Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 50
        Big Morongo Creek -- -- -- -- -- -- -- -- -- -- -- -- -- 50
        Little Morongo Creek -- -- -- -- -- -- -- -- -- -- -- -- 52
        Dry Morongo Creek -- -- -- -- -- -- -- -- -- -- -- -- -- 52
        Thousand Palms Canyon -- -- -- -- -- -- -- -- -- -- -- 53
        Cabazon Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 53
        Unnamed Creek about One Thousand Feet west of Cabazon
        Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 54
        Jensen's Creek -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- 54

ACC0000059
LHR0005532
ACC-HRA001035

USE OF WATER

UPPER VALLEY (cont.)

    Snow Creek and Falls Creek — — — — — — — — — — — — — — — — — — — — — — .
    Chino Creek — — — — — — — — — — — — — — — — — — — — — — — — — — — — —
    Tahquitz Creek — — — — — — — — — — — — — — — — — — — — — — — — — — —
    Andreas Creek — — — — — — — — — — — — — — — — — — — — — — — — — —
    Murray Creek — — — — — — — — — — — — — — — — — — — — — — — — — — —
    Palm Canyon Creek — — — — — — — — — — — — — — — — — — — — — — — —
    Springs — — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

LOWER VALLEY — — — — — — — — — — — — — — — — — — — — — — — — — — —

DIVERSION MEASUREMENTS — — — — — — — — — — — — — — — — — — — — — —

    UPPER VALLEY — — — — — — — — — — — — — — — — — — — — — — — — — — —

    Diversions 1, 2 and 3 — — — — — — — — — — — — — — — — — — — — — —
    Diversion 4 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 5 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversions 6, 7, 8, 9 and 10 — — — — — — — — — — — — — — — — — — .
    Diversion 11 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 12 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 13 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 14 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 15 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversions 16, 17 and 18 — — — — — — — — — — — — — — — — — — — —
    Diversion 19 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 20 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 21 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 22 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversions 23, 24, 25 and 26 — — — — — — — — — — — — — — — — — —
    Diversion 27 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 28 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 29 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversions 30 and 31 — — — — — — — — — — — — — — — — — — — — —
    Diversions 32 and 33 — — — — — — — — — — — — — — — — — — — — —
    Diversion 34 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 35 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 36 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 37 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 38 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 39 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 40 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversions 41, 42 and 43 — — — — — — — — — — — — — — — — — — — —
    DIVERSION 44 — — — — — — — — — — — — — — — — — — — — — — — — — —
    Diversion 45 — — — — — — — — — — — — — — — — — — — — — — — — — —

ACC0000060
LHR0005533

ACC-HRA001036