CATHERINE F. MUNSON (D.C. Bar No. 985717, admitted *pro hac vice*)
CMunson@kilpatricktownsend.com
MARK REEVES (GA Bar No. 141847, admitted *pro hac vice*)
MReeves@kilpatricktownsend.com
KILPATRICK TOWNSEND & STOCKTON, LLP
607 14th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 508-5800; Fax:  (202) 508-5858

STEVEN C. MOORE (CO Bar No. 9863, admitted *pro hac vice*)
Smoore@narf.org
HEATHER WHITEMAN RUNS HIM (NM Bar No. 15671, admitted *pro hac vice*)
HeatherW@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Tel:  (303) 447-8760; Fax:  (303) 443-7776

DAVID J. MASUTANI (CA Bar No. 172305)
DMasutani@alvaradosmith.com
ALVARADOSMITH, APC
633 W. Fifth Street, Suite 1100
Los Angeles, CA 90071
Tel:  (213) 229-2400; Fax:  (213) 229-2499

Attorneys for Plaintiff
Agua Caliente Band of Cahuilla Indians

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS,<br><br>Plaintiffs,<br><br>v.<br><br>COACHELLA VALLEY WATER DISTRICT, et al.<br><br>Defendants. | Case No.:    ED CV 13-00883-JGB-SPX<br>Judge:       Jesus G. Bernal<br><br>**AGUA CALIENTE BAND OF CAHUILLA INDIANS' BRIEF IN OPPOSITION TO DESERT WATER AGENCY'S MOTION FOR SUMMARY JUDGMENT ON PHASE I ISSUES**<br><br>Trial Date:    February 3, 2015<br>Action Filed:   May 14, 2013 |

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

US2008 6158957 2

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................iii

FACTUAL BACKGROUND....................................................................2

SUMMARY OF ARGUMENT ................................................................5

ARGUMENT & ANALYSIS ...................................................................6

I.      Agua Caliente has a federally reserved right to groundwater. ........................6

      A.      DWA mischaracterizes or misconstrues controlling case law..............7

            1.      DWA mischaracterizes the standard for finding Winters rights. ....................................................................................7

            2.      DWA mischaracterizes New Mexico. ........................................8

            3.      DWA misconstrues Cappaert. ...................................................10

      B.      State law does not limit, obviate, or replace Agua Caliente's federally reserved rights........................................................................12

            1.      A correlative, overlying right under state law is not a valid substitute and does not obviate the need for Agua Caliente's federally reserved right. ...........................................................13

            2.      DWA's claims that recognition of Agua Caliente's federally reserved right would undermine state regulatory schemes and lead to "legal confusion" are unfounded and inconsistent with controlling law. ...............................................................16

      C.      Groundwater is necessary to fulfill the purposes of the Agua Caliente Reservation. ...........................................................................19

            1.      The primary purposes of the Agua Caliente Reservation include the provision of a permanent homeland and agricultural base for Agua Caliente, both of which require water........................................................................................20

            2.      DWA's selling groundwater to Agua Caliente does not obviate Agua Caliente's federally reserved right to that water........................................................................................22

            3.      Agua Caliente's federally reserved right to water is not based on or determined by its use of water at any particular time in history. ...........................................................................23

            4.      Any state law water rights that Agua Caliente may have received from the Whitewater River adjudication do not supersede or replace Agua Caliente's federally reserved rights. ...........................................................................................25

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

i

**AGUA CALIENTE'S BRIEF IN OPP. TO DWA'S MSJ ON PHASE I ISSUES**

D.   Allottees and lessees on the Agua Caliente Reservation have federally reserved rights that are derivative of Agua Caliente's. .......27

II.   Agua Caliente has an aboriginal right to groundwater...................................28

A.   There is no conflict between the Agua Caliente's aboriginal rights and a reserved right to water. ..............................................................28

B.   *Barker* and its progeny do not bar all aboriginal claims by California Indians and are distinguishable from this case. .................29

CONCLUSION ......................................................................................................30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S BRIEF IN OPP. TO DWA'S MSJ ON PHASE I ISSUES**

# TABLE OF AUTHORITIES

Page

**Cases**

*Arizona v. California,*
   373 U.S. 546 (1963) ..................................................................................passim

*Barker v. Harvey,*
   181 U.S. 481 (1901) ..........................................................................................29

*Cal. Water Serv. Co. v. Edward Sidebotham & Son,*
   224 Cal. App. 2d 715 (1964) ...........................................................................14

*Cappaert v. United States*, 426 U.S. 128 (1976) ...................................................passim

*City of Barstow v. Mohave Water Agency,*
   5 P.3d 853 (Cal. 2000) ...............................................................................14, 15

*Colorado River Water Conservation Dist. v. United States,*
   424 U.S. 800 (1976) ..........................................................................................26

*Colville Confederated Tribes v. Walton,*
   647 F.2d 42 (9th Cir. 1984) .......................................................................passim

*Colville Confederated Tribes v. Walton,*
   752 F.2d 397 (9th Cir. 1985) ....................................................................12, 13

*Confederated Salish & Kootenai Tribes of the Flathead Reservation v. Stults,*
   59 P.3d 1093 (Mont. 2002) ......................................................................12, 29

*Fed. Power Comm'n v. Oregon,*
   349 U.S. 435 (1955) ..........................................................................................18

*Gila River Pima-Maricopa Indian Cmty. v. United States,*
   494 F.2d 1386 (Ct. Cl. 1974) ...........................................................12, 17, 29

*In re Water in the Gila River Sys.,*
   989 P.2d 739 (Ariz. 1999)........................................................................passim

*In re Water of Hallett Creek Stream Sys.,*
   44 Cal. 3d 448 (1988)..........................................................................................8

*Katz v. Wilkinshaw,*
   141 Cal. 116 (1903)...........................................................................................14

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
   521 F.3d 1097 (9th Cir. 2008)..........................................................................15

*Montana v. Confederated Salish & Kootenai Tribes,*
   712 P.2d 754 (Mont. 1985) .....................................................................13, 24

*New Mexico v. Aamodt,*
   618 F. Supp. 993 (D.N.M. 1985) .....................................................................29

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

iii

*Pyramid Lake Paiute Tribe v. Ricci*,
  245 P.3d 1145 (Nev. 2010) ...................................................................27

*Soboba Band of Mission Indians v. United States*,
  37 Ind. Cl. Comm. 326 (1976) .............................................................12

*Summa Corp. v. California ex rel. State Lands Comm'n*,
  466 U.S. 198 (1984) ...............................................................................30

*Tweedy v. Tex. Co.*,
  286 F. Supp. 383 (D. Mont. 1968) .......................................................12

*U.S. v. Santa Fe Pacific Railroad Co.*,
  314 U.S. 339 (1941) ...............................................................................29

*United States v. Adair*,
  723 F.2d 1394 (9th Cir. 1984) .......................................................passim

*United States v. Cappaert*,
  508 F.2d 313 (9th Cir. 1974) .................................................................11

*United States v. New Mexico*,
  438 U.S. 696 (1978) ..........................................................................passim

*United States v. Shoshone Tribe of Indians*,
  304 U.S. 111 (1938) ...............................................................................29

*United States v. Washington*,
  384 F. Supp. 312 (W.D. Wash. 1974) ..................................................24

*United States v. Washington*,
  No. 01-ccv-47, 2005 WL 1244797 (W.D. Wash. May 20, 2005) ...............10, 12, 13

*United States v. Washington*,
  No. 2:01-cv-00047 (W.D. Wash. Feb. 24, 2003)..................................25

*Winters v. United States*,
  207 U.S. 564 (1908) ..........................................................................passim

**Statutes**

2014 Cal. Legis. Serv. Ch. 346 (S.B. 1168) (West) ...........................9, 17, 18

43 U.S.C. § 666.......................................................................................26

Cal. Water Code § 10720.3(d) ...........................................................9, 17, 18

California Land Claims Act of 1851, 9 Stat. 631 ..................................5

Mission Indians Relief Act of 1891 (MIRA), 26 Stat. 712 ...............3

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S BRIEF IN OPP. TO DWA'S MSJ ON PHASE I ISSUES**

Before the Court are the parties' cross-motions for summary judgment in Phase 1 of this case, which, by court-approved stipulation of the parties, "address[es] the threshold issues of whether the [Agua Caliente Band of Cahuilla Indians] has rights groundwater pursuant to the federal *Winters* doctrine and/or aboriginal rights to groundwater." Doc. 49, ¶ 4. As set forth in Agua Caliente's principal brief in support of its motion for summary judgment, Doc. 85-1, and below, settled federal legal doctrines and precedents establish that Agua Caliente has a federally reserved right to sufficient groundwater to accomplish the primary purposes of the Agua Caliente Reservation, which include the creation of a permanent homeland and agricultural base for Agua Caliente. Agua Caliente also has an aboriginal right to groundwater in the area of its Reservation based on Agua Caliente's use and occupation of that area since time immemorial.

Defendant Desert Water Agency (DWA), in addition to opposing Agua Caliente's motion for Phase 1 summary judgment, has filed its own motion for summary judgment. DWA argues that the federally reserved rights doctrine is inapplicable to groundwater and that even if that were not the case, California law would preempt or supersede any federally reserved right to groundwater that Agua Caliente might have. Both arguments fail, however, as the reserved rights doctrine does apply to groundwater and it is this federal doctrine that preempts state water law, not the other way around. DWA also contends that Agua Caliente has failed to submit evidence sufficient to sustain its claim of an aboriginal right to groundwater and that any such right has been extinguished by operation of federal law. Again, both of DWA's arguments are without merit. Agua Caliente has submitted evidence of its use and occupation of the land constituting its current reservation since time immemorial, evidence sufficient to establish an aboriginal right to groundwater that has never been validly extinguished. DWA, on the other hand, proffered no evidence to refute Agua Caliente's evidence of aboriginal use and occupancy. Accordingly, DWA's motion for summary judgment should be denied.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

1

# FACTUAL BACKGROUND[1]

The key facts for Phase 1 of this case are largely undisputed. The Agua Caliente people have resided in the present-day Coachella Valley since time immemorial. *See, e.g.*, Doc. 85-4 at ¶¶ 24 & 27. Throughout their history, they have relied upon and made use of the Valley's water resources for various purposes to ensure their survival in an arid, desert climate. Doc. 85-4 at ¶¶ 15-26.

In 1876 and 1877, Presidents Grant and Hayes issued executive orders setting aside the bulk of the lands constituting the present-day Agua Caliente Reservation. *See* Executive Order of May 15, 1876 (1876 Executive Order) (Doc. 85-4, Tab 1); Executive Order of Sept. 29, 1877 (1877 Executive Order) (Doc. 85-4, Tab 1); Doc. 84-1 at 1-2. President Grant's 1876 order reserved land "for permanent use and occupancy" by Agua Caliente, and President Hayes' 1877 order expressly provided that the land was reserved "for Indian purposes." *See* Executive Orders, Doc. 85-4, Tab 1.

The lands set aside as the Agua Caliente Reservation in 1876-1877 have served continuously as the Tribe's Reservation since those dates, with additional parcels being added from time to time. *See* Doc. 85-4 at ¶¶ 30-36. The United States has issued trust patents to Agua Caliente and its members for the lands reserved by Presidents Grant and Hayes and for other, later additions to the Reservation. *Id.* at ¶¶ 67-68.

Agua Caliente and DWA appear to be in agreement on this broad overview of the relevant history of the Agua Caliente people and the establishment of the Agua Caliente Reservation. These agreed-upon facts, standing alone, establish Agua Caliente's federally reserved rights to groundwater as a matter of law.

---

[1] Agua Caliente adopts and incorporates by reference the factual background section of its brief in support of its motion for summary judgment. To avoid unnecessary duplication of that material, Agua Caliente here highlights only important areas of agreement or disagreement with the alleged facts in DWA's principal brief.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

There are, however, a number of factual allegations and inferences in DWA's brief that Agua Caliente disputes, both as to their accuracy and their relevance. The bulk of these disputes are addressed in Agua Caliente's response to DWA's Statement of Undisputed Facts (Doc. 84-2) and need not be addressed here; this discussion will be limited largely to the alleged facts set forth in DWA's "Statement of the Case" (Doc. 84-1 at 1-6).

DWA's Statement of the Case includes a lengthy discussion of the Mission Indians Relief Act of 1891 (MIRA), 26 Stat. 712, and the Smiley Commission Report prepared after MIRA's enactment. Doc. 84-1 at 3-4. To the extent that DWA intends to imply that MIRA, the Smiley Commission Report, or any other legislative or executive actions disestablished the Agua Caliente Reservation established by the 1876 and 1877 Executive Orders, it is incorrect. *See* Agua Caliente Statement of Genuine Disputes of Material Fact (CVWD) at ¶¶ 11-12 & 17-20. The land set aside for Agua Caliente in those Executive Orders has remained a part of the Agua Caliente Reservation since their issuance and is the subject of trust patents issued to Agua Caliente and its members. *See id.*

DWA's Statement of the Case also discusses the Riverside County Superior Court's 1938 adjudication of state law rights to surface waters of the Whitewater River and its tributaries. Doc. 84-1 at 5-6. DWA incorrectly alleges that the Riverside County court "adjudicated the right of the United States to divert and use Whitewater River water for the Tribe's reservation." *Id.* at 5. While the Riverside County court did allocate a state law surface water right to the United States for use on the Agua Caliente Reservation, it did not adjudicate the United States' federal water rights and lacked any authority to do so. *See infra*, Part I.C.4. Any implication that the state law Whitewater adjudication and decree effects this case or Agua Caliente's federally reserved rights is unfounded.

DWA erroneously implies that groundwater is not necessary to the Reservation because Agua Caliente currently does not produce groundwater from wells within it.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

Doc. 84-1 at 21. In fact, groundwater accounts for the overwhelming majority of water consumed on the Reservation. *See* Doc. 85-4 at ¶¶ 15-27. In response to interrogatories propounded by Agua Caliente, DWA indicated that groundwater made up 75%-85% of the water that it provided to customers within the Agua Caliente Reservation for the years 2011-2013, and Defendant CVWD indicated that "[a]ll (100%) water delivered by CVWD to domestic water service customers on the Reservation is groundwater." *See* CVWD Resp. to Agua Caliente Interrogatory (CVWD Int. Resp.) No. 13 at p. 3-4, Plaintiff's Evidentiary Notebook Submitted in Support of Agua Caliente's Opposition to Defendants' Motions for Summary Judgment on Phase I Issues (AC Opp. Notebook), Tab II-17; DWA Resp. to Agua Caliente Interrogatory (DWA Int. Resp.) No. 13 at p. 3, AC Opp. Notebook, Tab II-18. The Defendants' records demonstrate that they deliver well in excess of 10,000 acre feet of <u>groundwater</u> to the Agua Caliente Reservation on an annual basis, and these figures do not account for the thousands of acre-feet of additional groundwater produced by on-Reservation pumpers. *See* CVWD Int. Resp. 12 at 3, AC Opp. Notebook, Tab II-17; DWA Int. Resp. 12 at 2, AC Opp. Notebook, Tab II-18; CVWD documents regarding water production and consumption, AC Opp. Notebook, Tabs II-15 & II-16.

The absolute necessity of groundwater to the Reservation is further underscored by the fact that surface water supplies to the Agua Caliente Reservation have always been and always will be intermittent and unreliable as a practical matter. *See, e.g.*, 1907 Kelsey Report, Doc. 84-5, Ex. 7, at 5-6; Doc. 82-1 at 6 (quoting the 1891 Smiley Commission Report for the proposition that the water coming from "Toquitz [sic] Canyon … fails for two or three months, nearly every year, and cannot be depended upon"). Around the time of the Reservation's establishment, federal Indian agents knew not only that there was "very little running water" on the surface, but also that there was "water …so near the surface that it can be easily developed." *See* J.G.

1  Stanley, "Report on the Conditions and Needs of the Mission Indians of Southern

2  California" (July 13, 1883) at p. 32, AC Opp. Notebook, Tab II-1.

3  **SUMMARY OF ARGUMENT**

4      While DWA makes a number of interrelated arguments in support of its motion

5  for summary judgment, they all can be reduced to a handful of erroneous core

6  contentions: (1) that California state law replaces or renders unnecessary any federally

7  reserved right to groundwater; (2) that federally reserved rights do not apply to

8  groundwater generally or in the particular context of the Agua Caliente Reservation;

9  and (3) that Agua Caliente's aboriginal rights, if any, were extinguished by the

10  California Land Claims Act of 1851, 9 Stat. 631 (the 1851 Act). Because each of these

11  contentions is without merit, the Court should deny DWA's motion.

12      As a matter of law, when the United States established the Agua Caliente

13  Reservation, it impliedly reserved enough water to satisfy the Reservation's primary

14  purposes, including providing a permanent homeland and agricultural base for Agua

15  Caliente. *See, e.g.*, *Winters v. United States*, 207 U.S. 564 (1908). This is known as

16  the *Winters* doctrine. The federally reserved water rights recognized under the *Winters*

17  doctrine are federal rights that preempt state law and state law rights. Accordingly,

18  federally reserved rights cannot be limited, replaced, or rendered unnecessary by state

19  laws.

20      As many courts have held, that reservation of water created a federal right that

21  is not subject to state law or limited to any particular source or type of water. The key

22  question for courts to address in determining the existence of a federally reserved

23  *Winters* right is whether water is necessary to establish the primary purposes of the

24  federal reservation in question. If so, the existence of the right is established and only

25  its quantification remains. The source or type of water available and required to satisfy

26  the right is not determinative. Here, there can be no doubt that some amount of water

27  is necessary to achieve the federal purposes of creating a permanent homeland and

28  agricultural base for Agua Caliente in the arid, desert lands of the Coachella Valley.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

Accordingly, the existence of Agua Caliente's federally reserved water right is indisputable, and DWA's motion for summary judgment on that issue should be denied out of hand.

Additionally, Agua Caliente's occupation and use of the lands constituting and surrounding its present day Reservation – as well as the water available on and under those lands – since time immemorial gives Agua Caliente a federal common law aboriginal right to groundwater. This record is replete with factual information supporting this right, and the right has never been legitimately extinguished, notwithstanding DWA's arguments to the contrary. DWA's motion for summary judgment on this issue should be denied as well.

## ARGUMENT & ANALYSIS

### I.     Agua Caliente has a federally reserved right to groundwater.

Agua Caliente has a federally reserved right to groundwater pursuant to the doctrine set forth by the United States Supreme Court in *Winters v. United States*, 207 U.S. 564 (1908). *See* Doc. 85-1 at 5-18. The *Winters* doctrine provides that when the United States established the Agua Caliente Reservation, it impliedly reserved the right to sufficient water to satisfy the Reservation's primary purposes. *Id.* at 6-9. This reserved right is a fully vested, federal right that is not subject to limitation or replacement by state law or any state law rights, and it is intended to provide for Agua Caliente's contemporaneous and future needs. *Id.* at 9-12. Furthermore, this federally reserved right attaches to any source of water available to the Reservation, regardless of whether that source of water was in use at the time of the Reservation's establishment. *Id.* at 13-16. For all of these reasons, Agua Caliente is entitled as a matter of law to summary judgment declaring the existence of a federally reserved right to groundwater sufficient to satisfy the primary homeland and agricultural purposes of the Agua Caliente Reservation. *Id.* at 16-18.

DWA opposes Agua Caliente's motion for summary judgment and has moved for summary judgment itself seeking a declaration that Agua Caliente does <u>not</u> have a

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

6

federally reserved right to groundwater. *See* Doc. 84-1. DWA's arguments in support of its motion are flawed and unfounded.

## A.    DWA mischaracterizes or misconstrues controlling case law.

Before discussing DWA's various contentions, it is necessary to correct a number of mischaracterizations of foundational case law in the opening section of DWA's legal argument. The *Winters* doctrine provides that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purposes of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976); *see also Arizona v. California*, 373 U.S. 546, 600 (1963); *Winters*, 207 U.S. at 576-577; *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 46 (9th Cir. 1984) (*Walton I*). In the course of reaffirming the *Winters* doctrine's continued vitality in *United States v. New Mexico*, the Supreme Court clarified that the United States impliedly reserved water rights to the extent necessary to satisfy a reservation's primary purposes; water rights useful for a reservation's secondary purposes are not reserved, and must be acquired under state law. *New Mexico*, 438 U.S. 696, 702 (1978); *see also United States v. Adair*, 723 F.2d 1394, 1408-09 (9th Cir. 1984); *Walton I*, 647 F.2d at 47. This much, at least, DWA correctly recites. It then proceeds, however, to mischaracterize or overstate a number of critically important federal decisions.

### 1.    DWA mischaracterizes the standard for finding Winters rights.

DWA first attempts to improperly restrict the *Winters* doctrine in ways that no court has ever done. Carefully selecting single words and short phrases from various cases, DWA fabricates a test pursuant to which federally reserved water rights can exist on Indian reservations "only if the right is 'essential to the life of the Indian people' and necessary to prevent the reservation from being 'practically valueless.'" Doc. 84-1 at 11 (internal citations omitted). This is a substantially more onerous standard than the one set forth by the Ninth Circuit, which has explained that "[a]n

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

implied reservation of water for an Indian reservation will be found where it is necessary to fulfill the purposes of the reservation." *Walton I*, 647 F.2d at 46. Indeed, it does not appear that any court has ever applied DWA's statement of the *Winters* standard in assessing the existence of federally reserved water rights. This Court should not be the first.

2. *DWA mischaracterizes New Mexico.*

After delineating its distorted take on the *Winters* standard, DWA proceeds to expound on its interpretation of the Supreme Court's *New Mexico* decision. To DWA, the key teachings of *New Mexico* are "that Congress' deference to state water law must be taken into account in determining whether a federal reserved water right 'impliedly' exists, and that a reserved right impliedly exists only if 'necessary' to serve the 'primary' purpose of the reservation and prevent this purpose from being 'entirely defeated.'" Doc. 84-1 at 13. One of these purported teachings is entirely incorrect, and the other is an exaggeration.

The notion that congressional deference to state water law is critical to the determination of federally reserved water rights, particularly on an Indian reservation, is simply incorrect. Federal and state courts have consistently recognized that the *Winters* doctrine is an exception to any general policy of deference to state water law and that state law cannot limit or restrict federally reserved water rights. The Supreme Court has flatly held that "determination of reserved water rights is not governed by state law but derives from the federal purpose of the reservation" and that "[f]ederal water rights are not dependent upon state law or state procedures …." *Cappaert*, 426 U.S. at 145; *see also New Mexico*, 438 U.S. at 715 (affirming that the *Winters* doctrine "is an exception to Congress' explicit deference to state water law in other areas"). The Supreme Court of California likewise has affirmed that the *Winters* doctrine "constitutes an exception to the plenary authority which the states otherwise enjoy over the nonnavigable waters within their borders." *In re Water of Hallett Creek Stream Sys.*, 44 Cal. 3d 448, 457 (1988); *see also id.* at 455 n.3 ("Since the federal

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

8

government's reserved right is based on the property and supremacy clauses of the United States Constitution, the states may not deprive the federal government of the use of such water."). Other state supreme courts have echoed *Hallett Creek*'s concession. *See, e.g.*, *In re Water in the Gila River Sys.*, 989 P.2d 739, 747 (Ariz. 1999) (*en banc*) ("[T]he Supreme Court has defined the reserved rights doctrine as an exception to Congress's deference to state water law." (citing *New Mexico*, 438 U.S. at 714)).

Indeed, the fact that federally reserved groundwater rights preempt state law is so well settled that is has been codified in California. A recently enacted state statute provides that "federally reserved water rights to groundwater shall be respected in full. In case of conflict between federal and state law … federal law shall prevail." *See* 2014 Cal. Legis. Serv. Ch. 346 (S.B. 1168) (West), *to be codified at* Cal. Water Code § 10720.3(d). The provision goes on to recognize that its acknowledgement of state law deference to federally reserved groundwater rights "is declaratory of existing law." *Id.* The claim that federally reserved water rights must defer to state water law should be rejected out of hand.

DWA's claim that federally reserved water rights may be found only where "'necessary' to serve the 'primary' purpose of the reservation and prevent this purpose from being 'entirely defeated,'" Doc. 84-1 at 13, while not entirely fabricated, nevertheless constitutes an overly restrictive reading of *New Mexico*. *New Mexico* held that federally reserved rights are limited to the amount of water necessary to accomplish the primary purposes of a federal reservation and that water is not reserved to satisfy a reservation's secondary purposes. *See New Mexico*, 438 U.S. at 702. It did not, however, limit reservations to a single "primary purpose," as DWA implies. *See Adair*, 723 F.2d at 1410 ("Neither *Cappaert* nor *New Mexico* requires us to … identify a single essential purpose that the parties to the 1864 Treaty intended the Klamath Reservation to serve."); *Walton I*, 647 F.2d at 47-48 (applying *New Mexico* to identify multiple primary purposes for a reservation). Nor did the *New*

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

9

*Mexico* Court further restrict its holding by requiring a finding that the primary purpose of the federal reservation would be "entirely defeated" in the absence of a federally reserved right. That phrase is not included in the Court's holding, *see New Mexico*, 438 U.S. at 702, and cases applying *New Mexico* do not use it. *See, e.g.*, *Adair*, 723 F.2d at 1408-09; *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981) (*Walton I*); *United States v. Washington*, No. 01-ccv-47, 2005 WL 1244797, at *3 (W.D. Wash. May 20, 2005).

DWA's overly strict reading of *New Mexico* is inappropriate in any context, but it is particularly improper where the federal reservation in question is an Indian reservation. *New Mexico* involved the assessment of a reserved water right for a national forest, and it interpreted a statute that expressly identified and limited the purpose of such reservations. *See New Mexico*, 438 U.S. at 706-707, 709. In that particular context, a strict reading of the purposes of a federal reservation might be appropriate. It is well settled, however, that the purposes of an Indian reservation are <u>not</u> to be strictly construed, but instead must be broadly construed in favor of Indian interests. *See Adair*, 723 F.2d at 1408 n.13 ("While the purpose for which the federal government reserves other lands may be strictly construed … the purposes of Indian reservations are necessarily entitled to broader interpretation …." (internal quotation & citation omitted)); *Walton I*, 647 F.2d at 47 ("The general purpose [of Indian reservations], to provide a home for the Indians, is a broad one and must be liberally construed."). Of course, as discussed below, this is largely an academic discussion at this stage of the litigation, as a detailed analysis of the Agua Caliente Reservation's primary purposes goes to quantification of Agua Caliente's federally reserved water right rather than its existence. *See Walton I*, 647 F.2d at 47-48 ("[T]he purposes for which the reservation was created govern[] the quantification of the water.").

3.    *DWA misconstrues Cappaert.*

Finally, DWA briefly turns its attention to the Supreme Court's decision in *Cappaert*. The *Cappaert* litigation raised the question of whether the United States

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

could invoke reserved water rights associated with Devil's Hole, a subterranean pool within the Death Valley National Monument that served as home for the endangered pupfish, to prevent surrounding landowners from pumping groundwater from their wells. *United States v. Cappaert*, 508 F.2d 313, 315-318 (9th Cir. 1974), *aff'd at* 426 U.S. 128. The United States argued that groundwater pumping by nearby landowners lowered the level of Devil's Hole, threatening its pupfish population. The Ninth Circuit, finding that the purpose for the reservation of Devil's Hole was to protect pupfish, applied *Winters* to hold that the United States "implicitly reserved enough groundwater to assure [their] preservation" and that it could invoke its reserved rights to enjoin other landowners from pumping groundwater in amounts that adversely affected the pupfish. *Id.* at 318-322.

The Supreme Court affirmed the Ninth Circuit's decision. While it found that Devil's Hole was properly characterized as surface water rather than ground water, it did not find the distinction legally significant. As the Court explained, "since the implied-reservation-of-water-rights doctrine is based on the necessity of water for the purpose of the federal reservation, … the United States can protect its water from subsequent diversion, whether the diversion is of surface water or groundwater." *Cappaert,* 426 U.S. at 143. While DWA correctly quotes *Cappaert* as stating that "'[n]o cases of this Court have applied the doctrine of implied reservation of water rights to groundwater,'" Doc. 84-1 at 14 (quoting *Cappaert*, 426 U.S. at 142), it misconstrues the Supreme Court's decision as suggesting that the *Winters* doctrine is inapplicable to groundwater. At most, the Supreme Court's decision is neutral on that question and does not disturb the Ninth Circuit's explicit holding that the United States can indeed reserve groundwater. The more appropriate reading of the Supreme Court's decision, however, is that it supports the application of the *Winters* doctrine to groundwater, as it would make little sense to hold that the United States reserves necessary surface water and can restrict other, overlying landowners from using

groundwater in order to protect its reserved rights, but it cannot reserve rights to groundwater itself.[2] *See, e.g.*, *Gila River*, 989 P.2d at 747.

**B.    State law does not limit, obviate, or replace Agua Caliente's federally reserved rights.**

DWA offers a number of state law-based arguments in support of its position that Agua Caliente lacks a federally reserved right to groundwater. These arguments share a common flaw: they fail to account for or properly credit the fact that Agua Caliente's *Winters* rights are federal rights that are not controlled by or subject to state law. It is a fundamental premise of American jurisprudence that federal law and rights preempt and take precedence over their state counterparts. *See* U.S. Const. art. VI, cl. 2. It naturally follows that federally reserved water rights are superior to state water rights, and an inferior state right cannot displace or substitute for the stronger federal right. *See, e.g.*, *Cappaert*, 426 U.S. at 145; *Colville Confederated Tribes v. Walton*, 752 F.2d 397, 400 (9th Cir. 1985 (*Walton II*); *United States v. Adair*, 723 F.2d at 1411 n.19 (9th Cir. 1984); *Gila River*, 989 P.2d at 747-748. Nevertheless, Agua Caliente will briefly respond to each of DWA's various arguments for relying on state law to limit or replace the Tribe's federally reserved rights.

---

[2] As several courts have recognized, the "significant question for the purpose of the reserved rights doctrine is not whether the water runs above or below the ground but whether it is necessary to accomplish the purpose of the reservation." *In re Water of the Gila River Sys.*, 989 P.2d 739, 747 (Ariz. 1999) (*en banc*). *See also Washington*, 2005 WL 1244797, at *3; *Tweedy v. Tex. Co.*, 286 F. Supp. 383, 385 (D. Mont. 1968) ("[T]he same implications which led the Supreme Court to hold that surface waters had been reserved would apply to underground waters as well."); *Soboba Band of Mission Indians v. United States*, 37 Ind. Cl. Comm. 326, 487 (1976); *Confederated Salish & Kootenai Tribes of the Flathead Reservation v. Stults*, 59 P.3d 1093, 1098 (Mont. 2002).

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

1. *A correlative, overlying right under state law is not a valid substitute and does not obviate the need for Agua Caliente's federally reserved right.*

First, DWA argues that Agua Caliente does not have a federally reserved right to groundwater because it has a correlative state law right to access groundwater as an overlying landowner. Doc. 84-1 at 15-19. This state law right, DWA contends, means that the "federal reserved right is not 'necessary' to accomplish the primary reservation purpose and prevent this purpose from being 'entirely defeated.'" *Id.* at 18 (quoting *New Mexico*, 438 U.S. at 700, 702). This argument misses the mark entirely.

As explained *supra*, Agua Caliente's federally reserved right is superior to and preempts any state law rights. The superiority of Agua Caliente's federally reserved water right over any correlative right that it might have as an overlying landowner under state law has significant practical implications. *Winters* rights, unlike state law water rights, "arise without regard to equities that may favor competing water users" – *i.e.*, they are not subject to equitable reduction or limitation to support inferior, state law rights. *Walton II*, 752 F.2d at 405. *See also Cappaert*, 426 U.S. at 138-139; *Winters*, 207 U.S. at 569-570. Reserved rights also are not measured or limited by the amount of water used by the right holder at any particular point in time; rather, the right to all water necessary to support the present and future needs of a federal reservation is fully reserved and vested at the time of a reservation's establishment. *See Cappaert*, 426 U.S. at 138; *Arizona*, 373 U.S. at 600; *Washington*, 2005 WL 1244797, at *3 ("The water right vests on the date that the reservation is created, not when the water is put to use or at some later time." (citing *Arizona*, 373 U.S. at 600). Finally, reserved rights cannot be lost, reduced, or otherwise limited as a result of nonuse. *See, e.g.*, *Walton II*, 752 F.2d at 404 (rejecting the contention that *Winters* rights could be lost through nonuse); *Montana v. Confederated Salish & Kootenai Tribes*, 712 P.2d 754, 762, 765 (Mont. 1985) ("Reserved water rights are established by references to the purpose of the reservation rather than to actual, present use of the water. … Most reservations have used only a fraction of their reserved water.").

Correlative, overlying rights under California law provide none of these protections. By definition, they lack any priority date, and as DWA concedes, they are subject to limitation to accommodate water use by other overlying landowners. *See City of Barstow v. Mohave Water Agency*, 5 P.3d 853, 863 (Cal. 2000) (citing *Cal. Water Serv. Co. v. Edward Sidebotham & Son*, 224 Cal. App. 2d 715, 725-726 (1964)); *Katz v. Wilkinshaw*, 141 Cal. 116, 146 (1903) ("Disputes between overlying landowners, concerning water for use on the land, to which they have an equal right … are to be settled by giving to each a fair and just proportion."); *see also* Doc. 84-1 at 16. Significantly, and contrary to DWA's contention, state law correlative rights may be lost if unused. *See City of Barstow*, 5 P.3d at 863, 868 (citing various cases addressing adverse possession of overlying rights under state law). And as one court has sagely recognized in rejecting the exact argument put forward by DWA here, a "theoretically equal right to pump groundwater, in contrast to a *reserved* right, would not protect a federal reservation from a total future depletion of its underlying aquifer by off-reservation pumpers." *Gila River,* 989 P.2d at 748 (rejecting the contention that a correlative, overlying right to pump groundwater under state law obviated the need to recognize an Indian reservation's federally reserved right to groundwater).

This last concern is particularly relevant here because the aquifer underlying the Agua Caliente Reservation has suffered from prolonged overdraft and a significant cumulative reduction in stored water. *See* Doc. 85-4 at ¶¶ 69-72; Doc. 85-1 at 4-5. *Gila River* presented the same factual scenario, as "Arizona had consumed far more groundwater than nature [could] replenish." *Gila River*, 989 P.2d at 748. The Arizona Supreme Court held that state law that "provides all overlying landowners an equal right to pump as much groundwater as they can put to reasonable use upon their land" does not "adequately serve to protect federal rights." *Id.* at 747-748. Citing the Supreme Court precedent of *Winters* and *Arizona*, the Arizona Court explained that this state law-based argument "overlooks that federal reserved water rights are by nature a preserve intended to 'continue through the years'" and "'to satisfy the future

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

as well as the present needs of the Indian Reservations.'" *Id.* at 748 (quoting *Arizona*, 373 U.S. at 600). Here, as in *Gila River*, the continued overdraft of the aquifer underscores that correlative overlying rights are not an adequate substitute for Agua Caliente's superior, federally reserved *Winters* right.

DWA's argument attempts to replace federally reserved water rights with inferior state law rights in all cases where a federal reservation has access to water pursuant state law.[3] There is absolutely no precedent or justification for such an outcome. *See, e.g.*, *Winters*, 207 U.S. at 573 (upholding federally reserved rights in the Milk River despite the presence of other bodies of water on the Fort Belknap Reservation that Indians could have used). Federal reservations in California may enjoy overlying rights, but any such rights are in addition to, rather than in lieu of, the federally reserved *Winters* right. *See Hallett Creek*, 44 Cal. 3d at 455-458 (affirming that the United States held a federally reserved right to water necessary to satisfy the principle purposes of a federal reservation and could also claim a state law riparian right to use water for the reservation's secondary purposes). DWA's contrary contention is unfounded.

The same is true of DWA's strained contention, tucked away at the end of its discussion of state law correlative rights, that Agua Caliente's *Winters* claim fails because Agua Caliente did not use particular phrasing in its complaint. *See* Doc. 84-1 at 18-19. Federal law requires only notice pleading; a "complaint need not contain detailed factual allegations," and it needs only to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (internal punctuation & citation omitted). Agua Caliente's Complaint, like that of the United States, goes well beyond Rule 8's minimal pleading requirements. It gives the Defendants ample notice of the

---

[3] The overlying right recognized under California law is analogous to a riparian right. *See City of Barstow*, 5 P.3d at 863.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

issues in the case and the factual bases for Agua Caliente's claims, and it provides a more than plausible case for Agua Caliente's entitlement to the requested relief.

2. *DWA's claims that recognition of Agua Caliente's federally reserved right would undermine state regulatory schemes and lead to "legal confusion" are unfounded and inconsistent with controlling law.*

DWA offers two additional, equally unavailing arguments in support of its contention that Agua Caliente's alleged state law right to groundwater preempts the Tribe's federally reserved right. First, it contends that Agua Caliente cannot have a federally reserved right to groundwater because such a right would "impair California's system of groundwater regulation by exempting the Tribe from requirements that apply to all other users of groundwater in California." Doc. 84-1 at 19. DWA goes on to decry how Agua Caliente's supposed "sweeping, open-ended tribal water right would … exempt[] the Tribe from principles of equal sharing and correlative rights that apply in California, and would jeopardize the rights of other groundwater users …." *Id.* at 20. While DWA is correct that Agua Caliente's federally reserved right is not subject to state laws or regulation, it is absolutely wrong in believing that this fact defeats or negates the right's existence.

As set forth above, federal law and federally reserved rights are superior to and preempt their state law counterparts, not the other way around. And while there may be some chance that the declaration and quantification of Agua Caliente's federally reserved right could limit groundwater use by those with inferior rights, that is no reason for disregarding the senior, superior right. The Ninth Circuit has addressed this exact issue in the context of Indian reserved water rights, explaining that:

> We recognize that open-ended water rights are a growing source of conflict and uncertainty in the West. Until their extent is determined, state-created water rights cannot be relied on by property owners. … Resolution of the problem

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

1    is found in quantifying reserved water rights, not in limiting

2    their use.

3  *Walton I*, 647 F.2d at 48. The Supreme Court of Arizona similarly held that "[t]o

4  solve the conflict and uncertainty that reserved rights engender, we must quantify

5  them, for we may not ignore them." *Gila River*, 989 P.2d at 750. The United States

6  Supreme Court has made similar statements, explaining that it does not "analyze the

7  [*Winters*] doctrine in terms of a balancing test" between the interests of reserved right

8  holders and the holders of lesser rights. *Cappaert*, 426 U.S. at 138 (affirming the

9  injunction of off-reservation groundwater pumping to protect a superior, federally

10 reserved water right); *Winters*, 207 U.S. at 570 (recognizing an Indian reservation's

11 reserved right despite the fact that "thousands of people" off the reservation relied the

12 same water and would be "greatly and irreparably damaged" by recognition of the

13 reserved right (internal punctuation omitted)).

14    In seeking the declaration and quantification of its federally reserved right,

15 Agua Caliente is following the course of action directed by the Ninth Circuit in

16 *Walton I*. By contrast, in contesting the existence of Agua Caliente's right based on its

17 effect on other right holders, DWA is revisiting an argument that the Ninth Circuit

18 expressly rejected.[4] Agua Caliente's reserved right poses no more threat to state law

19 and regulation or to inferior right holders than the reserved rights recognized in

20 *Winters*, *Cappaert*, *Arizona*, *Walton I*, *Gila River*, and any number of other cases.[5]

21 _____

22 [4] DWA's argument is also inconsistent with California statutory law, which, as noted

23 *supra*, expressly provides that that "federally reserved water rights to groundwater

24 shall be respected in full. In case of conflict between federal and state law … federal

    law shall prevail." *See* 2014 Cal. Legis. Serv. Ch. 346 (S.B. 1168) (West), *to be*

25 *codified at* Cal. Water Code § 10720.3(d).

26 [5] To the extent that DWA is concerned that Agua Caliente's federally reserved right to

27 groundwater is "open-ended," Doc. 84-1 at 19, it should welcome this action. As

    explained elsewhere herein, Agua Caliente's *Winters* rights were fully reserved and

28 vested in the amount necessary to meet Agua Caliente's current and future needs upon

    the establishment of the Reservation; they have not changed since that time, and they

KILPATRICK TOWNSEND & STOCKTON
607 14ᵗʰ STREET, STE 900
WASHINGTON, DC 20005-2018

DWA makes a similar – and equally invalid – argument that Agua Caliente's federally reserved water right should be disregarded because it would "create legal confusion" and impair California's ability "to fashion a water rights regime responsive to local needs." Doc. 84-1 at 26-28 (internal punctuation omitted). Again, DWA fails to explain how Agua Caliente's reserved right would impact state law and regulatory capabilities differently or create greater "legal confusion" than every other federally reserved right that has been recognized and quantified in the State of California. Nor does it cite a single case in which a court has declined to recognize a federally reserved water right based on these concerns. The one case that DWA does cite – *Walton I* – explicitly rejected efforts to limit an Indian tribe's federally reserved right based on these concerns, explaining that "[t]he Supreme Court has held that water use on a federal reservation is not subject to state regulation absent explicit federal recognition of state authority." *Walton I*, 647 F.2d at 52 (citing *Fed. Power Comm'n v. Oregon*, 349 U.S. 435 (1955)). *See also Gila River*, 989 P.2d at 747 ("[W]e may not withhold application of the reserved rights doctrine purely out of deference to state law."). Federally reserved water rights and state law water rights have managed to co-exist in numerous instances, and their ability to do so is expressly recognized by federal law as well as California case and statutory law. *See, e.g.*, *New Mexico*, 438 U.S. at 715-716; *Hallett Creek*, 44 Cal. 3d at 457-458; 2014 Cal. Legis. Serv. Ch. 346 (S.B. 1168) (West), *to be codified at* Cal. Water Code § 10720.3(d). DWA's claim that the co-existence of such right in this particular instance will somehow lead to debilitating "legal confusion" or complete frustration of state regulation (which would still apply in full force to all inferior, non-federally reserved rights to use the aquifer's groundwater) are wholly without merit and should be rejected out of hand.

are "open-ended" only in the sense that they have yet to be quantified by a court of competent jurisdiction. This action will remedy that problem.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

DWA also argues that the Court should disregard Agua Caliente's federally reserved right because the aquifer underlying the Agua Caliente Reservation extends under non-reservation lands such that upholding Agua Caliente's rights would have off-reservation effects. Doc 84-1 at 25-26. This is merely a repackaging of the same arguments dispensed above. Federally reserved water rights nearly always involve water sources that cross reservation boundaries, and they nearly always have effects that are felt off-reservation. *See, e.g.*, *Arizona*, 373 U.S. at 598-599 (holding that the United States reserved water from the Colorado River for Indian reservations); *Cappaert*, 426 U.S. at 143 n.7 (addressing the fact that off-reservation groundwater pumping would have to be limited to some degree to protect the federal reservation's rights); *Winters*, 207 U.S. at 569-570 (noting the significant off-reservation developments that relied on Milk River water that the Court held was federally reserved). *Walton I*, the case cited by DWA, does not remotely support the claim that federally reserved rights should be limited where they will have off-reservation effects or involve bodies of water that cross reservation boundaries. The language quoted by DWA is taken from the Ninth Circuit's lengthy discussion of why the general federal policy of deference to state water law is <u>not</u> applicable on federal reservations and to federally reserved rights. *See Walton I*, 647 F.2d at 52-54. The Court noted that the lack of off-reservation effects of its ruling and the intra-reservation nature of the water system at issue made it especially easy in that particularly case to disregard any claim that state law should apply to limit the federally reserved rights in question. *See id.* This provides no support for DWA's contention that the law disfavors recognizing federally reserved rights in water sources that cross reservation boundaries or that will have off-reservation effects.

## C. Groundwater is necessary to fulfill the purposes of the Agua Caliente Reservation.

In addition to its misguided arguments as to why state law should preempt Agua Caliente's federally reserved right to groundwater, DWA puts forward a number of

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

arguments contending that a federally reserved right cannot exist in this case because it is not necessary to accomplish the purposes of the Agua Caliente Reservation. Groundwater is absolutely necessary to accomplish the purposes of the Agua Caliente Reservation, however, and each of DWA's arguments to the contrary misses the mark.

> 1.    The primary purposes of the Agua Caliente Reservation include the provision of a permanent homeland and agricultural base for Agua Caliente, both of which require water.

As explained *supra*, the *Winters* doctrine provides that when the United States reserves land from the public domain, it also impliedly reserves water rights to the extent that they are necessary to accomplish the reservation's primary purposes. The historical record shows that the Agua Caliente Reservation was and is intended to provide a permanent homeland for a self-sufficient Agua Caliente people, a purpose that includes but is not limited to supporting agriculture. *See* Doc. 85-4, ¶¶ 30-66; Doc. 85-1 at 17-18; Doc. 82-1 at 23-24. This is entirely consistent with the language of the executive orders establishing the Reservation "for permanent use and occupancy" by Agua Caliente and for "Indian purposes." *See* Executive Orders (Doc. 85-4, Tab 1). While acknowledging that the "specific purposes of an Indian reservation … were often unarticulated," courts have inferred homeland, agricultural, and similar purposes for Indian reservations based on similar or even lesser evidence of federal intent. *Walton I*, 647 F.2d at 47. For example, the Ninth Circuit has interpreted an extremely general executive order as intending to reserve water "not only for the purpose of supporting Klamath agriculture, but also for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands." *Adair*, 723 F.2d at 1410. *See also Walton I*, 647 F.2d at 47-48 (looking to "the document and circumstances surrounding [the Colville Reservation's] creation, and the history of the Indians for whom it was created" to determine that its primary purposes included "to provide a homeland for the Indians to maintain their agrarian society" and "preservation of the tribe's access to fishing grounds").

20

Water is absolutely and indisputably necessary to permanently accomplish the homeland and agricultural purposes of the Agua Caliente Reservation. The Supreme Court has repeatedly and expressly inferred that the United States understood that water "would be essential to the life of the Indian people and to the animals they hunted and the crops they raised," particularly in hot, arid climates such as that of the Coachella Valley. *Arizona*, 373 U.S. at 599. *See also Winters*, 207 U.S. at 576-577. Groundwater in particular is necessary, as shown by the fact that the overwhelming majority of the water that the Defendants supply to their customers, including Agua Caliente and others on the Reservation, consists of groundwater. *See supra*, p. 4. The absolute necessity of groundwater is further demonstrated by the fact that surface water does not even flow year-round on the Reservation; without groundwater, there would be times when the Reservation had no access to water at all. *See id.* As the Arizona Supreme Court explained in the course of recognizing that federally reserved rights apply to groundwater:

> [S]ome reservations lack perennial streams and depend for present or future survival substantially or entirely upon pumping of underground water. We find it no more thinkable in the latter circumstance than in the former that the United States reserved land for habitation without reserving the water necessary to sustain life.

*Gila River*, 989 P.2d at 746. This is common sense – where water is necessary to satisfy the primary purpose of a federal reservation and only one appurtenant source of water is consistently or adequately available, the federally reserved right attaches to that source of water.

Because water – and specifically groundwater – is necessary to accomplish the primary federal purposes of the Agua Caliente Reservation, Agua Caliente has a federally reserved right to groundwater as a matter of law. The more difficult

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

21

1    questions pertaining to the quantification of this right are reserved for Phase 3 of the

2    case, and are not currently before the Court.

3        **2.**    *DWA's selling groundwater to Agua Caliente does not obviate Agua*

4                *Caliente's federally reserved right to that water.*

5        DWA further argues that groundwater cannot be necessary to accomplish the

6    purposes of the Reservation because Agua Caliente currently buys groundwater from

7    the Defendants rather than pumping it from the ground. Doc. 84-1 at 21-22; Doc. 84-2

8    ¶ 2 ("The Tribe purchases its water supplies from the defendant water agencies."). To

9    be clear, DWA does not contend that groundwater is not required to meet the

10   Reservation's needs – quite the contrary, it alleges that the defendants produce

11   groundwater from wells and then sell it to Agua Caliente to meet those needs. *Id.*

12   DWA thus acknowledges that Agua Caliente requires groundwater to sustain the

13   Reservation while simultaneously contending that the Reservation does not need

14   groundwater.

15       Of course, DWA cites no law for the proposition that it can defeat a federally

16   reserved water right by taking water subject to that right and then selling that water to

17   the lawful right holder. It does cite *Winters*, where the Supreme Court held that off-

18   reservation parties who were using water that was subject to a reserved right were

19   acting unlawfully and affirmed an injunction of their conduct. *See Winters*, 207 U.S.at

20   564. It also cites *Walton I*, which reached substantially the same result. *Walton I*, 647

21   F.2d at 53 ("To the extent Walton's use of water exceeds his rights and interferes with

22   the rights of the tribe, it will be enjoined."). It is inconceivable that *Winters* and

23   *Walton I* would have been decided differently had the non-Indian parties offered to

24   sell the tribes' reserved water to them instead of keeping it for their own use. DWA's

25   argument that its willingness to sell to Agua Caliente water that is subject to the

26   Tribe's reserved right somehow negates the existence of that right is absurd.

27

28

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

3. *Agua Caliente's federally reserved right to water is not based on or determined by its use of water at any particular time in history.*

DWA next argues that a reserved right to groundwater cannot be necessary to accomplish the purposes of the Agua Caliente Reservation because the "historical documents surrounding the creation of the Tribe's reservation … make no mention of any tribal extraction and use of groundwater." Doc. 84-1 at 23.[6] This means, according to DWA, that Agua Caliente has no federally reserved right to groundwater.

This argument is rife with flaws. As an initial matter, *Winters* rights are <u>implied</u> rights. By definition, no express statement is required to find an implied right. *See, e.g.*, *Cappaert*, 426 U.S. at 138 ("This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, *by implication*, reserves appurtenant water …." (emphasis added)); *Walton I*, 647 F.2d at 46 ("An implied reservation of water for an Indian reservation will be found where it is necessary to fulfill the purposes of the reservation.").

DWA's argument also relies on a mischaracterization of the nature of federally reserved water rights. It in essence contends that Agua Caliente cannot have a federally reserved right to any water other than the water that it was using when the United States established the Agua Caliente Reservation. This is not the law, however,

---

[6] In an effort to support its contention, DWA briefly discusses a handful of historical documents dating from 1891-1907 mentioning the use of surface water by Agua Caliente. *See* Doc. 84-1 at 24. But Presidents Grant and Hayes established the Agua Caliente Reservation by executive orders in 1876-77, well before the time period discussed in those documents. *See* Executive Orders, Doc. 85-4, Tab 1. While Agua Caliente's use and sources of water at the time of the Reservation's establishment are irrelevant as a matter of law for reasons set forth in the text, DWA strains credulity by contending that documents produced 25-40 years later constitute conclusive evidence of what water sources Agua Caliente was using at the time of the Reservation's establishment. If anything, the historical record demonstrates the known precariousness of surface water supplies available on and around the Reservation, particularly in times of drought. *See supra*, p. 4.

as the water rights created by the *Winters* doctrine are in no way limited to the quantity or source of water in use at the time of a reservation's establishment. This has been clear since the doctrine's inception, as *Winters* itself involved reserved rights in a water source that the Indians of the Fort Belknap Reservation did not begin using until years after their Reservation was established. *Winters*, 207 U.S. at 565-566.

Federally reserved water rights are not intended merely to allow tribes to maintain their lifestyle as of the date of their reservation's establishment, frozen in time with no regard to future changes in ways and standards of living, technology, or population. Rather, they are set aside in an amount necessary to satisfy a tribe's current and future needs, and they allow for changes and growth in tribal water use over time. *See Arizona*, 373 U.S. at 600; *Winters*, 207 U.S. at 565-566; *Walton I*, 647 F.2d at 47 ("[W]ater was reserved to meet future as well as present needs …."); *Confederated Salish*, 712 P.2d at 762 ("Reserved water rights are established by reference to the purposes of the reservation rather than to actual, present use of water."); *see also, e.g.*, *United States v. Washington*, 384 F. Supp. 312, 402 & 407 (W.D. Wash. 1974) (holding that "tribes may utilize improvements in traditional fishing techniques, methods and gear" to exercise treaty fishing rights "[j]ust as non-Indians may continue to take advantage of improvements in fishing techniques").[7] The Ninth Circuit spoke directly to this point in *Walton I*, where it explained that the federal government's vision in establishing Indian reservations "implies a flexibility of purpose" and that determining the purpose of an Indian reservation requires consideration of Indians' "need to maintain themselves under changed

---

[7] While the federal intent to reserve water for present as well as future tribal needs is settled as a matter of law, it is borne out by the facts in this case as well, as the historical record around the time of the establishment of the Agua Caliente Reservation is replete with instances of federal officials looking at how water use and agricultural production on the Reservation eventually might expand. *See* Doc. 85-1 at 2-4; Doc. 85-4 at ¶¶ 39-66.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

circumstances." *Walton I*, 647 F.2d at 47 & n.9; *see also United States v. Washington*, No. 2:01-cv-00047, slip op. at 10 (W.D. Wash. Feb. 24, 2003) (holding that "the Court is not bound by the historical use of groundwater by the Lummi at the time" of their reservation's establishment).

If the *Winters* doctrine only reserved rights to water that a tribe was already using prior to the establishment of its reservation, as DWA speciously contends, then it would be largely pointless. Accordingly, any discussion of the source or amount of water in use at the time of the Reservation's establishment is irrelevant to the question before the Court.

Finally, DWA's argument relies on the erroneous premise that Agua Caliente cannot have a federally reserved right to groundwater unless the use of groundwater was a primary purpose of the Reservation. This misunderstands the *Winters* doctrine. Judicially recognized primary purposes of federal reservations include things like providing a permanent homeland for Indian tribes, preserving endangered species, or promoting timber production. *See, e.g.*, *New Mexico*, 438 U.S. at 718; *Cappaert*, 426 U.S. at 141; *Adair*, 723 F.2d at 1410; *Walton I*, 647 F.2d at 47-48. Water is required to accomplish all of these purposes, but water use as such is not a primary purpose and the law does not require that it be one. This case is no different; the use of groundwater, per se, is not a primary purpose of the Agua Caliente Reservation, but groundwater is required to accomplish the Reservation's primary purposes.

> **4.**    *Any state law water rights that Agua Caliente may have received from the Whitewater River adjudication do not supersede or replace Agua Caliente's federally reserved rights.*

DWA's final argument is based on a decades old adjudication of state law water rights in the Whitewater River system by the California Department of Public Works (DPW) and the Superior Court of Riverside County. *See* Doc. 84-1 at 24-25. DWA contends that the United States' submission to DPW of a "Suggestion" claiming the right to divert certain amounts of surface water on behalf of Agua Caliente and the

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

1    Riverside County court's subsequent recognition of that right under state law satisfied

2    the full extent of Agua Caliente's federally reserved water rights once and for all. This

3    argument fails for several reasons.

4         First, the Whitewater adjudication involved state law water rights. As explained

5    *supra*, state law rights cannot replace or obviate federally reserved rights. The

6    Whitewater adjudication provides additional evidence of why this is so, as the state

7    law rights that it decreed are subject to limitations that are not applicable to federally

8    reserved rights. *See In re Whitewater River*, Doc. 84-5 at 65-66 (limiting the rights

9    decreed for Agua Caliente "to beneficial use for the purposes herein described," which

10   consisted of "domestic, stock watering, power development and irrigation purposes").

11   Second, but relatedly, neither DPW nor the Riverside County Court had jurisdiction

12   over the United States or any federally reserved rights. *See Suggestion*, Doc. 84-7 at

13   29 (stating that the United States was "appearing solely for the purpose of this

14   Suggestion only and not submitting the rights or claims of the United States to the

15   jurisdiction of the Department of Public Works").[8] So even if state law rights could

16   substitute for federally reserved rights, the Whitewater River adjudication would not

17   be binding on the United States or dispositive of its water rights.

18        Third, the United States made no claim that the water identified in its

19   Suggestion would satisfy the full extent of its reserved rights. *See generally id.* On the

20   contrary, it expressly stated that the water addressed in its Suggestion would be used

21   to irrigate specific lands making up a very small portion of the Agua Caliente

22   Reservation. *See id.* at 40-44. Fourth, in accordance with a stipulation by the parties,

23   the Whitewater River adjudication excluded groundwater rights. *See* DPW Engineer's

24   Report at 3-4 (Nov. 15, 1925), AC Opp. Notebook, Tab II-14 ("[T]his office could not

25

26   [8] State courts lacked jurisdiction to adjudicate federal reserved water rights prior to the
27   1952 passage of the McCarran Amendment, and even now they have such jurisdiction
     only in comprehensive water right adjudications. *See* 43 U.S.C. § 666; *Colorado River*
28   *Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

undertake a complete adjudication of both the surface and underground water rights of the stream system because of our limited jurisdiction over underground waters."). DWA tacitly recognizes this fact by arguing that groundwater rights in the Coachella Valley remain unadjudicated and subject to the California correlative rights doctrine.

The Supreme Court of Nevada's decision in *Pyramid Lake Paiute Tribe v. Ricci*, 245 P.3d 1145 (Nev. 2010), which DWA relies upon, is distinguishable from this case on almost all of the above bases. There, the court held that a tribe did not have additional water rights beyond those decreed as the "full 'implied reservation of water' rights that were due" to the tribe's reservation in a federal adjudication initiated by the United States in a court of competent jurisdiction. *Id.* at 1148 (internal quotation omitted). The Whitewater River adjudication was not initiated by the United States, was not in a court of competent jurisdiction, and did not seek a declaration of the full federally reserved rights of the Agua Caliente Reservation. As a result, the Whitewater adjudication and *Pyramid Lake* are equally irrelevant to this litigation. DWA's reliance on *Pyramid Lake* – and its argument generally – has no merit.

### D. Allottees and lessees on the Agua Caliente Reservation have federally reserved rights that are derivative of Agua Caliente's.

DWA closes its attack on Agua Caliente's federally reserved right to groundwater by contending that allottees and lessees on the Agua Caliente Reservation lack federally reserved rights. *See* Doc. 84-1 at 28-32. DWA is correct, as a matter of law, that Agua Caliente allottees' federally reserved rights are derivative of Agua Caliente's rights. *Id.* at 29. DWA contends that allottees therefore lack any reserved rights to groundwater as a matter of course, since Agua Caliente supposedly lacks such rights. DWA's contention as to Agua Caliente's reserved rights is wrong for a variety of reasons, as described elsewhere herein. Agua Caliente does have federally reserved rights to groundwater, and Agua Caliente allottees have derivative rights to use Agua Caliente's reserved rights to the extent provided by federal law.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

DWA makes the same argument with respect to lessees of Reservation lands – *i.e.*, that their rights to water are derivative of those of Agua Caliente or Agua Caliente allottees, who themselves have no federally reserved rights. While the rights of lessees are not before the Court, it is clear for the reasons stated above that Agua Caliente and its allottees do have reserved rights.

DWA also argues that even if reserved rights exist within the Reservation, they cannot be used for the production of water for commercial golf courses. This is incorrect, and represents merely another effort by DWA to freeze Agua Caliente in time circa 1890. Agua Caliente has a federally reserved right to groundwater in the amount necessary to provide for the current and future needs of its Reservation "under changed circumstances." *See, e.g.*, *Walton I*, 647 F.2d at 47. As the Ninth Circuit has explained, "[w]hen the Tribe has a vested property right in reserved water, it may use it in any lawful manner. … [P]ermitting the Indians to determine how to use water is consistent with the general purpose for the creation of an Indian reservation …." *Id.* at 48-49. Agua Caliente has a fully vested, federally reserved right to the amount of water necessary to permanently accomplish the present and future primary purposes of its Reservation. Once that right is quantified, as it will be in this litigation, Agua Caliente can make any lawful use of its reserved water. DWA has no authority to limit Agua Caliente's lawful use of its water.

## II.   Agua Caliente has an aboriginal right to groundwater.

### A.   There is no conflict between the Agua Caliente's aboriginal rights and a reserved right to water.

DWA asserts that Agua Caliente's claimed aboriginal right to groundwater is inconsistent with its reserved right to groundwater. Doc. 84-1 at 33. DWA cites no precedent to support this theory, referring only to *Cappaert* and *New Mexico* for a general discussion of the nature of reserved rights.[9] Those cases, however, do not hold

---

[9] Defendants also cite to *United States v. Adair*, 723 F.2d 1394, 1413-1415 (9th Cir. 1983) in a footnote, and deeply mischaracterize the rights upheld in that case. While

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

that aboriginal rights are inconsistent with reserved rights, as they did not involve aboriginal rights at all.

An aboriginal right is not inconsistent with a reserved right. *See, e.g., United States v. Shoshone Tribe of Indians*, 304 U.S. 111 (1938). Indeed, tribal reserved rights often include and preserve the continuation of aboriginal water uses necessary to ensure that the purpose of a reservation can be met. *See Gila River Pima-Maricopa Indian Cmty. v. United States*, 494 F.2d 1386, 1390 (Ct. Cl. 1974) ("There is no Procrustean rule that the creation of a reservation rigidly stamps out aboriginal rights."). Aboriginal rights differ from reserved rights in at least one important way, as they predate the establishment of reservations and generally have a priority date of time immemorial. *See Adair*, 723 F.2d at 1414 (where there is no indication of U.S. intent to diminish aboriginal holdings, those rights are reserved by treaty with a priority date of time immemorial); *New Mexico v. Aamodt*, 618 F. Supp. 993, 1009 (D.N.M. 1985) (recognizing certain Pueblo water rights to appurtenant surface and ground water with a time immemorial priority date); *Confederated Salish*, 712 P.2d at 767 ("Where the existence of a preexisting tribal use is confirmed by treaty, the courts characterize the priority date as "time immemorial." (internal citations omitted.))

**B.    *Barker* and its progeny do not bar all aboriginal claims by California Indians and are distinguishable from this case.**

DWA contends that *Barker v. Harvey*, 181 U.S. 481 (1901), and subsequent cases "hold *any* claims by California Indian Tribes, including *the Mission Indians*" for occupancy rights were extinguished by the claims procedure set out in the 1851 Act.

---

Defendants state that "an 1864 Treaty granted the … Tribe … an aboriginal water right", aboriginal rights are not established by treaties. Treaties may recognize such rights, but they absolutely do not depend on a treaty for their existence. *U.S. v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339, 347 (1941). Nor are aboriginal rights limited to supporting hunting and fishing, or limited from uses such as appropriations to divert and use water.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

Doc. 84-1 at 34-35 (emphasis added). This overstates the holdings of those cases and is an inaccurate generalization of the claims and histories of a widely diverse group of tribes. *Barker* and other cases that DWA cites are factually distinguishable because they involved claims that originated in Mexican law, and involved rights to land subject to Mexican grants. Doc. 85-1 at 26-29. Defendants' reliance on *Summa Corp. v. California ex rel. State Lands Comm'n*, 466 U.S. 198 (1984), is also misplaced, as that case involved a question of rights to lands for which patents were issued through the Land Commission process, and the failure of the State to assert its claims in that forum.[10] *Id.* at 204-205.

## CONCLUSION

Agua Caliente has a federally reserved right to groundwater. Such water is necessary to fulfill the primary purposes of the Agua Caliente Reservation, and it cannot be limited or replaced by state law or any alleged state law water rights. DWA's motion for summary judgment on the reserved rights claim, which erroneously relies on state law and inaccurate characterizations of controlling federal law, should be denied as a matter of law. Agua Caliente also has an aboriginal right to groundwater based on its use and occupation of the current day Coachella Valley since time immemorial. That right has never been legitimately extinguished, and DWA's motion for summary judgment on Agua Caliente's aboriginal rights claim should be denied as well.

---

[10] Even if the 1851 Act had extinguished Agua Caliente's aboriginal title – a point that the Tribe vehemently disputes – Agua Caliente subsequently reestablished that title after 1853 by virtue of its continuous use and occupancy of lands and water resources that were a part of the public domain until they were set aside as the Agua Caliente Reservation in the 1870s. *See* Doc. 85-1 at 29.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

DATED: December 5, 2014.

By: _____ /s/ Catherine Munson

CATHERINE MUNSON
(D.C. Bar No. 985717, admitted *pro hac vice*)
MARK H. REEVES
(GA Bar No. 141847, admitted *pro hac vice*)
**KILPATRICK TOWNSEND & STOCKTON LLP**

STEVEN C. MOORE
(CO Bar No. 9863, admitted *pro hac vice*)
HEATHER WHITEMAN RUNS HIM
(NM Bar No. 15671, admitted *pro hac vice*)
**NATIVE AMERICAN RIGHTS FUND**

*Attorneys for Plaintiff*
*Agua Caliente Band of Cahuilla Indians*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018