This amended order replaces Document Number 115, and reflects solely formatting alterations.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 13–883–JGB** | Date | March 24, 2015 |
|---|---|---|---|
| Title | *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water District et al.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order GRANTING IN PART and DENYING IN PART Plaintiffs' and Defendants' motions for partial summary judgment

"It is probable that no problem of the Southwest section of the Nation is more critical than that of scarcity of water." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 804 (1976).

The Agua Caliente Band of Cahuilla Indians ("Agua Caliente" or "Tribe") claims to have lived in the Coachella valley, which sits just to the east of the San Jacinto mountains in southern California, since before California was admitted as a State in 1850. The Coachella valley forms part of the Sonoran desert, where water is scarce. The Agua Caliente sued the Coachella Valley Water District ("CVWD") and the Desert Water Agency ("DWA"),[1] seeking, among other things, a declaration that their federal reserved water rights, which arise under the doctrine of Winters v. United States, 207 U.S. 564 (1908), extend to groundwater. The parties, plus the United States as Plaintiff-intervenor, all filed motions for partial summary judgment. (Doc. Nos. 82, 83, 84, 85.) After considering all the papers, the exhibits submitted with them, and the parties' arguments at the March 16, 2015 hearing, the Court concludes the Tribe's federal reserved water rights may include groundwater, but the Tribe's aboriginal right of occupancy was extinguished long ago, so the Tribe has no derivative right to groundwater on that basis.

---

[1] The Court refers to CVWD and DWA collectively as "Defendants."

## I. BACKGROUND

### A. Factual allegations

The Agua Caliente have lived in the Coachella valley since before American or European settlers arrived in what is now southern California, and the Tribe has used both surface water and groundwater resources there for "cultural, domestic and agricultural subsistence purposes." (Compl. ¶ 4.) Those uses included "stock watering and agricultural irrigation," and the Tribe raised "abundant crops of corn, barley and vegetables" in the 1850s. (Compl. ¶ 14–15.) President Ulysses S. Grant established the Tribe's reservation in an Executive Order issued May 15, 1876, and the reservation was expanded by President Rutherford B. Hayes on September 29, 1877. (Id. ¶5.) The United States, pursuant to statute, holds the lands of the reservation in trust for the tribe. (Id.) The Agua Caliente claim the "establishment of the Reservation pursuant to federal law impliedly reserved to the Tribe and its members the right to surface water and groundwater sufficient to accomplish the purposes of the reservation, including establishing a homeland for the Tribe and its members." (Id. ¶ 6.) In the Tribe's view, those reserved rights "are the most senior" in the region, and, accordingly, the Agua Caliente may prevent CVWD and DWA from adversely affecting the quantity and quality of their water. (Id. ¶¶ 7, 8.)

Defendants are creatures of California statutes, or individuals sued in their official capacities who control or manage the CVWD or DWA. The CVWD is a county water district, and is responsible for developing groundwater wells in the Coachella valley and extracting groundwater. (Compl. ¶ 10.) The DWA is an "independent special district" created to provide water to the city of Palm Springs and areas that surround it by developing groundwater wells and extracting groundwater. (Id. ¶ 12.) Throughout the twentieth century, Californians displaced the Agua Caliente from the Coachella valley, and fueled agricultural expansion in the desert through the increased use of groundwater for commercial irrigation. (Compl. ¶¶ 23–24.)

The Tribe's pleading further states the groundwater underlying the Coachella valley is in a continual state of "overdraft," which means the outflows from the aquifer exceed the inflows. (Compl ¶ 33.) The CVWD tries to recharge the Coachella valley's groundwater by importing water from the Colorado River, but the Tribe alleges that water is of inferior quality. (Compl. ¶ 47.)

The complaint finally alleges the "Tribe and its members have established a homeland in the Coachella valley, including housing, schools, government offices, and cultural and commercial enterprises," for which the Tribe relies upon its reserved groundwater resources. (Compl. ¶ 51.) The Agua Caliente seek relief in this case to "satisfy the present and future needs of the Tribe and its members" and to protect the Tribe's reserved water rights from overdraft and degradation. (Compl. ¶¶ 52–54.)[2]

---

[2] The United States' complaint in intervention asserts claims materially similar to the Tribe's complaint regarding the claim for a declaration of federally reserved water rights. It does not, however, assert a claim regarding aboriginal water rights.

B.     **Procedural history**

The Agua Caliente filed this action for declaratory and injunctive relief against both defendants in May 2013.  (Doc. No. 1.)  In June 2014 the Court granted the United States' motion to intervene as a Plaintiff in its capacity as trustee for the Tribe's reservation.  (Doc. Nos. 62, 70.)

The parties stipulated to trifurcate this action into three phases.  (Doc. No. 49.)  Phase I seeks to resolve the primarily legal questions regarding the existence of (1) the Agua Caliente's federal reserved rights to groundwater under the Winters doctrine, and (2) the Tribe's aboriginal rights to groundwater.  Phase II, contingent to a certain extent on Phase I's resolution, will address (1) the ownership of certain "pore space" beneath the reservation; (2) the legal question of whether a right to a quantity of groundwater encompasses a right to water of a certain quality; and (3) some of the equitable defenses asserted by the CVWD and DWA.  If necessary, in Phase III the Court will undertake the fact-intensive tasks of quantifying the Agua Caliente's rights to groundwater and pore space, and crafting appropriate injunctive relief.

All four parties have filed motions for summary judgment.  The Tribe's motion, (Doc. No. 85), argues federal law recognizes the Tribe's reserved right to groundwater, and that it also holds aboriginal title to land in the Coachella valley to which groundwater rights attach.  The United States' motion, (Doc. No. 83), echoes the Tribe's Winters rights argument and emphasizes the supremacy of federal water rights over those created by state law, but does not claim tribal aboriginal title on the Agua Caliente's behalf.

CVWD maintains in its motion that (1) Congress extinguished any aboriginal groundwater rights, and (2) Winters rights impliedly reserved for the Tribe do not extend to groundwater, and even if they extend to groundwater, the purposes of the Agua Caliente's reservation will not "entirely fail" without a reserved right to groundwater.  (Doc. No. 82.)  DWA's motion, (Doc. No. 84), largely parallels that of CVWD; it contends the Tribe has no federal reserved right in groundwater, and the Tribe's aboriginal water rights claim was extinguished by statute long ago.

## II.     LEGAL STANDARD

A court shall grant a motion for summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  Summary judgment is appropriate if "under the governing law, there can be but one reasonable conclusion as to the verdict."  Anderson, 477 U.S. at 250.  Courts consider cross-motions for summary judgment independently of one another, each on their own merits, in light of all the evidence attached to both motions.  Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," Anderson, 477 U.S. at 248; Scott v. Harris, 550 U.S. 372, 380 (2007), and the underlying substantive law identifies which facts are material. Id. In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party. Scott, 550 U.S. at 380.

### III. FACTS

The facts relevant to Phase I issues, taken from the parties' statements of undisputed facts and requests for judicial notice, are not in dispute. Preceding the creation of the Agua Caliente's reservation, various government officials reported that they intended the reservation to "meet the present and future wants of these Indians, by giving them the exclusive and free possession of these lands [on which] they will be encouraged to build comfortable houses, improve their acres, and surround themselves with home comforts." (E.g., Doc. No. 92–1 ¶ 47.) A "Mission Indian Agent" corresponded that his department's purpose was to "secure the Mission Indians with permanent homes, with land and water enough, that each one who will go upon a reservation may have to cultivate a piece of ground as large as he may desire." (Doc. No. 92–1 ¶ 58; see also id. ¶¶ 39–59.)

A series of seven Executive Orders, issued pursuant to statutory authority and dated from 1865–1881, created what is now the Agua Caliente's reservation, although the first two reserved the bulk of the land. (See Doc. No. 92–1 ¶ 30.) All the Orders are very short. President Grant stated in the first Order that the land described was "withdrawn from sale and set apart as reservations for the permanent use and occupancy of the Mission Indians in southern California." (Id. ¶ 31.) The subsequent reservations either incorporate the general statement of purpose contained in the first, or simply state the reservation should be used for "Indian purposes." (See id. ¶¶ 32–36.)

The groundwater basin which underlies the reservation extends beneath the entire Coachella valley, and the aquifer is in a state of overdraft. (Doc. No. 92–1 ¶ 69.) The groundwater does not "add to, contribute to or support" any surface stream from which the Tribe diverts water or is otherwise relevant to this litigation (e.g., the Tahquitz, Andreas, or Chino Creeks). (Doc. No. 96–1 ¶ 1.) Neither the Tribe nor its allottees produce groundwater, rather, they purchase their water from DWA or CVWD. (Doc. No. 98–9 ¶¶ 1–2, 19.) Some non-Indian lessees who occupy reservation territory do produce groundwater for their use—specifically to water golf courses. (Doc. No. 98–9 ¶ 20.)

In 1938, the California Superior Court for Riverside County entered a decree governing the rights to the water in the Whitewater river system. (Doc. No. 84–5 Ex. 1.) The United States participated in that adjudication via a "Suggestion," (Doc. No. 84–7 Ex. 8), and received a right to divert some surface water from the Tahquitz and Andreas creeks for the Tribe's use (Doc. No. 84–5 Ex. 1 at 61–62). The United States, however, specifically stated in its Suggestion that it was not "submitting the rights of the United States . . . to the jurisdiction of the Department of Public Works of the State of California" and also that the court lacked "jurisdiction of the water rights of the United States." (Doc. No. 84–7 Ex. 8 at 46.)

## IV. DISCUSSION

Phase I of this case addresses, by stipulation of the parties, (1) whether the Tribe's federal reserved water rights include groundwater resources, and (2) whether the Tribe may assert aboriginal title to groundwater underlying its reservation. The Court addresses the issues in turn.

### A. United States v. Winters and federal reserved water rights

#### 1. The law of federal reserved water rights

For over a century, the Supreme Court has held that when the United States "withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation."[3] Cappaert v. United States, 426 U.S. 128, 138 (1976) (citing U.S. Const. art. I, § 8; U.S. Const. art. IV, § 3); see also Winters v. United States, 207 U.S. 564 (1908); John v. United States, 720 F.3d 1214; 1225–26 (9th Cir. 2013); Colville Confederated Tribes v. Walton, 647 F.2d 42 (9th Cir. 1981); Felix S. Cohen et al., Cohen's Handbook of Federal Indian Law § 19.03 (2012 ed.) ("Cohen's Handbook"); 1 Waters and Water Rights § 37.02 (Amy K. Kelley ed., 3d ed. 2015). Impliedly reserved water rights "vest[ ] on the date of the reservation and [are] superior to the rights of future appropriators." Id. Winters rights arise under federal law, and are thus an exception to the normal rule that assigns water resources regulation to the states. United States v. New Mexico, 438 U.S. 696, 701–02 (1978); Cappaert, 426 U.S. at 145; Cohen's Handbook § 19.03[1].

The amount of water impliedly reserved under the Winters doctrine presents a tougher question than whether or not the government reserved water at all. See Walton, 647 F.2d at 48. Arizona v. California, 373 U.S. 546 (1963), provides the analytical starting point for a quantification of an Indian tribe's Winters rights. In Arizona, an original proceeding, the Supreme Court agreed with the special master's conclusion that "water was intended to satisfy the future as well as the present needs of the Indian Reservations and . . . that enough water was reserved to irrigate all the practicably irrigable acreage on the reservation." 373 U.S. at 600. Following Arizona, the Court explained the federal government only reserves "that amount of water necessary to fulfill the purpose of the reservation, no more." Cappaert, 426 U.S. at 141. And in a subsequent case it drew a distinction between a reservation's primary purpose, for

---

[3] Generally, the phrase "public domain" refers to "the land owned by the [federal] Government, mostly in the West, that was available for sale, entry, and settlement under the homestead laws, or other disposition under the general body of land laws." Hagen v. Utah, 510 U.S. 399, 412 (1994). The government reserves land, literally setting aside "parcels of land belonging to the United States . . . for various purposes, including Indian settlement, bird preservation, and military installations, when it appear[s] that the public interest would be served by withdrawing or reserving parts of the public domain." Id. (internal citations and quotation marks omitted).

which water is impliedly reserved under Winters, and secondary uses, for which it is not. New Mexico, 438 U.S. at 702.

The Ninth Circuit applies New Mexico's primary use–secondary use distinction to guide the implied reserved water rights analysis involving Indian tribes and reservations, although not necessarily to control it. See United States v. Adair, 723 F.2d 1394, 1408–09 (9th Cir. 1983) (citing New Mexico, 438 U.S. at 702); Walton, 647 F.2d at 47 (writing in the process of quantifying a tribe's Winters rights: "[w]e apply the New Mexico test here").[4] The Ninth Circuit has further explained the "general" purpose of an Indian reservation, and thus the purpose for which the federal government impliedly reserves water rights, is to "provide a home for the Indians, [which] is a broad one and must be liberally construed." Walton, 647 F.2d at 47 & n.9 ("The rule of liberal construction should apply to reservations created by Executive Order. See [Arizona, 373 U.S. at 598]. Congress envisioned agricultural pursuits as only a first step in the 'civilizing' process."); United States v. Ahtanum Irrigation Dist., 236 F.2d 321, 326 (9th Cir. 1956) ("It is obvious that the quantum is not measured by the use being made at the time the treaty was made. The reservation was not merely for present but for future use."). To identify an Indian reservation's purposes, the Ninth Circuit considers "the [reservation's formative] document and circumstances surrounding its creation, and the history of the Indians for whom it was created," as well as the tribe's "need to maintain themselves under changed circumstances." Walton, 647 F.2d at 47 (citing United States v. Winans, 198 U.S. 371, 381 (1905)); accord United States v. Washington, 375 F. Supp. 2d 1050, 1064 (W.D. Wash. 2005), vacated pursuant to settlement, Lummi Indian Nation v. Washington, No. C01–0047Z, 2007 WL 4190400 (W.D. Wash. Nov. 20, 2007).

Cases addressing Winters rights proceed in two distinct analytical steps. Courts first examine the existence of reserved rights—usually a straightforward inquiry. Then comes quantification, which addresses the scope of the government's implication. See, e.g., New Mexico, 438 U.S. at 698, 718 (first restating Winters rule, then deciding Congress intended to reserve water from the Rio Mimbres "only where necessary to preserve the timber or to secure favorable water flows for private and public uses under state law"); Cappaert, 426 U.S. at 138–46 (addressing whether the government reserved water in connection with the addition of Devil's Hole to the Death Valley National Monument, and then ruling that distant groundwater pumping could be enjoined to protect the federal reservation); Walton, 647 F.2d at 47 ("We hold that water was reserved when the . . . [r]eservation was created. . . . The more difficult question

---

[4] The Court recognizes that the primary use–secondary use distinction may be best suited to contexts where a "primary purpose" of a reservation is more clearly announced, such as federal reservations created pursuant to statute as in New Mexico. See Cohen's Handbook § 19.03[4] ("The significant differences between Indian reservations and federal reserved lands indicate that the [primary–secondary] distinction should not apply."). Notwithstanding the practical difficulty of identifying a tribe's reservation's primary purpose, the Court must follow Ninth Circuit case law, which explains that New Mexico, "while not directly applicable to Winters doctrine rights on Indian reservations," at a minimum "establish[es] several useful guidelines." Adair, 723 F.2d at 1409.

concerns the amount of water reserved."). The upshot of this well-established framework, especially in light of the parties' agreement to split this case into three phases, is that the Court addresses here only the existence of the Tribe's Winters rights; quantification comes later.

### 2. The federal government impliedly reserved water for the Tribe's reservation

When Presidents Grant and Hayes withdrew portions of the Coachella valley from the public domain by Executive Order to create the Agua Caliente's reservation, they also reserved, by implication, the right to appurtenant water in the amount necessary "to fulfill the purposes of the reservation." Cf. Walton, 647 F.2d at 46–47. No case interpreting Winters draws a principled distinction between surface water physically located on a reservation and other appurtenant water sources. See, e.g., Cappaert, 426 U.S. at 143; see also Cohen's Handbook § 19.03[2][a] ("Reserved rights presumably attach to all water sources—groundwater, streams, lakes, and springs—that arise on, border, traverse, underlie, or are encompassed within Indian reservations."). Instead, the relevant legal constraints under Winters and its progeny are whether (1) the reserved water is necessary to fulfill the purposes of the reservation and (2) the reserved water is appurtenant to the reserved land. Walton, 647 F.2d at 46.

#### a. The reservation's purpose

The documents contemporaneous with the creation of the Agua Caliente's reservation are vague, which is not surprising because they're approximately 150 years old. But those documents do admit that the reservation intended to provide the Tribe with a home, and intended to do so with some measure of permanence. Walton guides the interpretation of the Agua Caliente's reservation's purpose. In Walton, like in this case, the President created the reservation by terse Executive Order in the era following the Civil War, 647 F.2d at 47 n.8, and the Ninth Circuit cautioned: "[t]he specific purposes of an Indian reservation, however, were often unarticulated. The general purpose, to provide a home for the Indians, is a broad one and must be liberally construed." Id. at 47. The court there held the tribe's reserved rights extended to agricultural uses as well as the "development and maintenance of replacement fishing grounds" due to the economic and religious importance of fishing to the tribe. Id. at 48.

Accordingly, the Court must both construe the general purposes of the Tribe's reservation broadly, and take account that Winters rights anticipate increased or novel future uses. See also Ahtanum Irrigation Dist., 236 F.2d at 326. Applying those tenets, the Court can safely state that the reservation implied at least some water use; but exactly how much is not a question presented by Phase I of this case.

#### b. Groundwater is appurtenant to the Tribe's reservation

Any attempt to limit appurtenant water sources to surface water fails as a matter of law and logic. For example, California law recognizes that groundwater rights are inextricably linked to the overlying land. See City of Barstow v. Mojave Water Agency, 23 Cal. 4th 1224, 1240 (2000) ("An overlying right, analogous to that of a riparian owner in a surface stream, is the right of the owner of the land to take water from the ground underneath for use on his land

within the basin or watershed; the right is based on ownership of the land and is appurtenant thereto.") (internal quotation marks omitted). And federal law, at least by implication, treats surface water and groundwater similarly. See Cappaert, 426 U.S. at 143 (holding the United States can "protect its water from subsequent diversion, whether the diversion is of surface water or groundwater"). Taken together, these authorities suggest that groundwater provides an appurtenant water source, in the Winters sense.

With one exception, every court to address the issue agrees that Winters rights encompass groundwater resources, as well as surface water, appurtenant to reserved land. See, e.g., Washington, No. C01–0047Z, slip op. at 8 (W.D. Wash. Feb. 24, 2003) ("Thus, as a matter of law the Court concludes that the reserved water rights doctrine extends to groundwater even if groundwater is not connected to surface water."); Tweedy v. Texas Co., 286 F. Supp. 383, 385 (D. Mont. 1968) ("The Winters case dealt only with the surface water, but the same implications which led the Supreme Court to hold that surface waters had been reserved would apply to underground waters as well. The land was arid—water would make it more useful, and whether the waters were found on the surface of the land or under it should make no difference."); In re Gila River Sys. & Source, 989 P.2d 739, 747 (Ariz. 1999) ("The significant question for the purpose of the reserved rights doctrine is not whether the water runs above or below the ground but whether it is necessary to accomplish the purpose of the reservation."); Confederated Salish & Kootenai Tribes v. Stults, 59 P.3d 1093, 1099 (Mont. 2002) ("We see no reason to limit the scope of our prior holdings by excluding groundwater from the Tribes' federally reserved water rights in this case."). But see In re Big Horn River Sys., 753 P.2d 76, 99–100 (Wyo. 1988), aff'd by an equally divided court, Wyoming v. United States, 492 U.S. 406 (1989).[5]

Appurtenance, as that term is used by the Winters doctrine, must provide some legal limitation to impliedly reserved water rights; but persuasive authority suggests that limit should not be drawn between surface and groundwater sources. Cf. Cappaert, 426 U.S. at 142–43 (emphasizing the relation between surface water and groundwater in the hydrologic cycle). The federal government intended to reserve water for the Tribe's use on its reservation. Rights to the groundwater underlying the reservation are appurtenant to the reservation itself. Accordingly, the Court concludes the federal government impliedly reserved groundwater, as well as surface water, for the Agua Caliente when it created the reservation. Whether groundwater resources are necessary to fulfill the reservation's purpose, however, is a question that must be addressed in a later phase of this litigation.

---

[5] The Wyoming Supreme Court admitted that "[t]he logic which supports a reservation of surface water to fulfill the purpose of the reservation also supports reservation of groundwater," but nevertheless ruled against the extension of Winters rights because "not a single case applying the reserved water doctrine to groundwater is cited to us." 753 P.2d at 99. The weight of authority on the issue has shifted.

### 3. Defendants' arguments are largely irrelevant to Phase I issues

The parties agreed to address two discrete questions in Phase I of this case. The first, and the one relevant to much of Defendants' written submissions, asks for clarification of the Tribe's <u>Winters</u> rights—namely whether they could extend to groundwater underlying the reservation. DWA and CVWD have argued extensively in their briefing that any <u>Winters</u> rights possessed by the Agua Caliente do not extend to groundwater. Their contentions, however, mainly talk past whether <u>Winters</u> rights include groundwater, and focus on the quantum of the Tribe's entitlement.

Defendants' arguments largely take two forms. First, Defendants contend that principles of federalism and comity counsel against an extension of <u>Winters</u> rights to California groundwater resources. Second, Defendants claim the Tribe is able to function adequately under California's groundwater allocation framework without resort to <u>Winters</u> rights, so an asserted right beyond their current allotment is not necessary to prevent the reservation's purpose from being entirely defeated.[6] Neither argument withstands scrutiny.

It is neither novel nor controversial that <u>Winters</u> rights derive from federal law, and thus displace state law when in conflict. <u>E.g.</u>, <u>Cappaert</u>, 426 U.S. at 138–39. The case law specifically holds that the <u>Winters</u> doctrine does not entail a "balancing test" of competing interests to determine the existence or scope of reserved rights. <u>Id.</u> Moreover, the California legislature acknowledges the supremacy of federal water rights, and acquiesces in their priority. <u>See</u> Cal. Water Code § 10720.3 ("[I]n the management of a groundwater basin or subbasin by a groundwater sustainability agency or by the board, <u>federally reserved rights to groundwater shall be respected in full</u>. In case of conflict between federal and state law in that . . . management, federal law shall prevail.") (emphasis added). Therefore, Defendants' arguments regarding federal-state relations run counter to both federal and state law.

Defendants' additional arguments hinge on an unduly restrictive reading of <u>United States v. New Mexico</u>, and a misapprehension of that case's subsequent application by the Ninth Circuit to cases which involve tribal rights. In the <u>New Mexico</u> case, the Supreme Court addressed the scope of reserved rights in the Rio Mimbres's water connected to the government's creation of the Gila National Forest. 438 U.S. at 697–98. Congress established that Forest, among many others, pursuant to the Organic Administration Act of 1897, which intended the

---

[6] Although greatly simplified by the Court, this argument makes up a large portion of DWA's substantive briefing. For example, DWA argues (1) the Tribe has a correlative right to groundwater under California law, which, like all other groundwater users is subject to a state constitutional standard of reasonable use, so the Tribe may access those resources without a declaration of <u>Winters</u> rights just like any other overlying landowner; (2) the Tribe has not drilled wells on its property, so groundwater is not necessary for the reservation; and (3) the United States only requested a certain amount of surface water in the 1938 state court adjudication of the Whitewater system, so that amount is adequate to satisfy the needs of the reservation.

National Forests to "conserve water flows, and to furnish a continuous supply of timber for the people." Id. at 706. The Supreme Court held those two purposes the only ones for which the government impliedly reserved water, notwithstanding later-enacted statutes which promoted other uses of the Forest, like "outdoor recreation" or "wildlife and fish purposes." Id. at 714–15. The Court drew on the legislative history of the Multiple-Use Sustained-Yield Act of 1960 to hold the subsequently designated purposes were "secondary," meaning they were not "so crucial as to require a reservation of additional water." Id. at 715. As noted above, the Ninth Circuit has held the reasoning of New Mexico only "establishes useful guidelines" for tribal reservation cases, and courts should instead focus on the broader command that Winters rights encompass "only that amount of water necessary to fulfill the purpose of the reservation, no more." Adair, 723 F.2d at 1408–09.

In this case there are no subsequent enactments that impact the purposes of the Tribe's reservation, although to be sure the government augmented the reservation's territory over time. The reservation's purposes remain the same as when the government created the reservation—to provide the Agua Caliente with a permanent homeland. The Ninth Circuit has specifically emphasized such a purpose's elasticity; a tribal reservation's reason for being is not etched in stone, but shifts to meet future needs. See Walton, 647 F.2d at 47–48; Ahtanum Irrigation Dist., 236 F.2d at 326.

Despite Defendants' insistent reliance on New Mexico, that case's reasoning simply does not impact Phase I of this litigation.[7] Of course, delineating the reservation's purpose will ultimately dictate the breadth of the Tribe's Winters rights, but the Agua Caliente's reservation, at a minimum, provides the Tribe with a homeland for now and for the future, and Winters ensures a federal right to appurtenant water to realize that end.

Accordingly, the Tribe and the United States are entitled to partial summary judgment on the Phase I issue of whether the Tribe's federally reserved water rights encompass groundwater underlying the reservation.

---

[7] Defendants also argue that individual allottees and lessees of reservation land have no claim to reserved water rights because (1) the Tribe has no such right and (2) resort golf courses, of the kind maintained by some lessees, do not fit Defendants' conception of the Tribe's reservation's purpose. Contentions regarding the derivative rights of allottees and lessees fail for the same reasons their other arguments fail—they are simply not relevant to Phase I of this case. It is well-established that "Indian allottees have a right to use a portion of . . . reserved water." Adair, 723 F.2d at 1415. Additionally, "the full quantity of water available to the Indian allottee thus may be conveyed to the non-Indian purchaser," Walton, 647 F.2d at 51, which logic surely translates to lessees. Thus, for the same reasons Defendants other arguments fail, this one fails as well due to its derivative nature. To the extent Defendants wish to argue that resort golf courses, or any other use, does not fall within the class of permissible uses under the Winters doctrine, it may so argue in later phases of this case, which will deal with the scope of the implied reservation.

B.     **The Tribe's claim to an aboriginal groundwater right fails**

The Tribe's second claim in this lawsuit asserts an aboriginal right to use groundwater beneath the Coachella valley, with a priority date of time immemorial.[8] Simplified, the Agua Caliente's aboriginal rights argument proceeds thusly: federal law recognizes certain rights connected to original Indian occupancy; lands encompassed by the Treaty of Guadalupe Hidalgo[9] fall under the original occupancy doctrine; the Tribe has continually and exclusively occupied the Coachella valley, which was ceded as part of the Treaty of Guadalupe Hidalgo, since centuries before other settlers; so the Agua Caliente possess an aboriginal right to groundwater underlying its reservation. (Tribe's Mot. for Summ. J. at 18–23.) In opposition to the Tribe's aboriginal rights claim, Defendants point out that Congress, via an 1851 statute, required the presentation of land claims in California to a commission for validation, the Tribe did not assert such a claim, so the land the Tribe occupied in the Coachella valley reverted to the public domain. The Tribe's claim to an aboriginal occupancy right fails.

Federal law recognizes a tribe's property right arising out of original territorial occupancy. See United States ex rel. Chunie v. Ringrose, 788 F.2d 638, 641–42 (9th Cir. 1986) ("Indian's aboriginal title derives from their presence on the land before the arrival of white settlers.") (citing Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 279 (1955)); see also Cohen's Handbook § 15.04[3] ("A tribe with original Indian title may bring a federal common law action to enforce ownership rights."). Aboriginal property rights which arise under federal law are not "ownership rights," but rather are "right[s] of occupancy granted by the conquering sovereign . . . [and are] therefore necessarily a creature of the conquering sovereign's law." Id. at 642.[10] Chief Justice Marshall, in Johnson v. M'Intosh, 21 U.S. 543 (1823), laid down the rule that "the conquering government acquires the exclusive right to extinguish Indian title." Chunie, 788 F.2d at 642. Any such divestment of original Indian title is purely a matter of Congressional prerogative. United States v. Santa Fe Pac. R. Co., 314 U.S. 339, 347 (1941). And although the Supreme Court has noted extinguishment could be accomplished by "treaty . . . sword . . . exercise of complete dominion adverse to the right of occupancy, or otherwise," id., a federal

---

[8] The United States' complaint in intervention did not press such a claim and neither did its motion for summary judgment on Phase I issues. The United States' opposition to Defendants' motion for summary judgment, however, argues in favor of such an aboriginal right.

[9] The Treaty of Guadalupe Hidalgo, signed by the United States and Mexico in 1848, ended the Mexican–American War. See Summa Corp. v. California, 466 U.S. 198, 202 (1984). Under the terms of the Treaty, Mexico ceded much of what is now considered the American Southwest to the United States, including the territory that would later become the states of California, Nevada, and Utah, and parts of Arizona, New Mexico, Colorado, and Wyoming.

[10] Like the Ninth Circuit has done past cases, in the absence of any argument that "the Spanish or Mexican law of aboriginal title differs from our own, [the Court] will assume that it does not." Chunie, 788 F.2d at 642.

statute embodies a more typical legislative divestment.  See id. at 347–48 (discussing in depth the effects of various statutes on competing land claims).

The United States ratified the Treaty of Guadalupe Hidalgo in 1948.  California was admitted as a state in 1850.  Shortly after California's admission, in order to "protect property rights of former Mexican citizens in the newly-acquired territory and to settle land claims, Congress passed the Act of March 3, 1851, ch.41, 9 Stat. 631," ("Act of 1851").  Chunie, 788 F.2d at 644.  Three of the Act of 1851's numerous provisions impact this case: section 8 instituted a land claims process for people claiming property rights in California; section 13 imposes a two-year time limit for presenting land claims; and section 16 imposed a "duty [on] the commissioners herein provided for to ascertain and report . . . the tenure by which the mission lands are held, and those held by civilized Indians."  See Barker v. Harvey, 181 U.S. 481, 483–85 (1901).[11]

Federal courts construe sections 8 and 13 broadly; together they bar Indians who failed to assert original occupancy claims within the statutory two-year window from relying on such a right in future disputes:

> [The Supreme Court], after observing . . . the United States was bound to respect the rights of private property in the ceded territory, said there could be no doubt of the power of the United States, consistently with such obligation, to provide reasonable means for determining the validity of all titles within the ceded territory, to require all claims to lands therein to be presented for examination, and to declare that all not presented should be regarded as abandoned.  The Court further said the purpose of the act of 1851 was to give repose to titles as well as to fulfill treaty obligations, and that it not only permitted, but required, all claims to be presented to the commission, and barred all from future assertion which were not presented within the 2 years.

United States v. Title Ins. & Trust Co., 265 U.S. 472, 483 (1924); see also Summa Corp. v. California ex rel. State Lands Comm'n, 466 U.S. 198, 208 (1984) (explaining that the Title Insurance case "applied [the Court's] decision in Barker to hold that because the Indians failed to assert their interest within the timespan established by the 1851 Act, their claimed right of occupancy was barred"); Santa Fe, 314 U.S. at 351 (discussing Barker and Title Insurance, and noting "the Act of 1851 was interpreted as containing machinery for extinguishment of claims, including those based on Indian right of occupancy").  The Supreme Court has held repeatedly that, despite the Act of 1851's text, the "land confirmation proceedings were intended to be all-

---

[11] The Act of 1851's Section 8 states: "[t]hat each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government shall present the same to the said commissioners . . . ."  Barker, 181 U.S. at 483.  Section 13 holds: "[t]hat all lands, the claims to which have been finally rejected . . . and all lands the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held and considered as part of the public domain of the United States."  Id. at 484.

encompassing" and a failure to assert aboriginal title within the terms of the statute would preclude subsequent claims to land. Chunie, 788 F.2d at 646 ("Given the line of Supreme Court decisions recognizing the extensive reach of the Act of 1851 . . . the Chumash, claiming a right of occupancy based on aboriginal title, lost all rights in the land when they failed to present a claim to the commissioners.").

In this case, the Tribe alleges they have occupied the Coachella valley since time immemorial. Within the framework established by Barker and Chunie, that means they held an aboriginal right of occupancy under Mexican law, and then a right of occupancy under United States law following the Treaty of Guadalupe Hidalgo. The Tribe admits that no claim was filed on its behalf as part of the claims process under the Act of 1851, (Doc. No. 82–3 Ex. 1–10), so like the Indians in all other cases interpreting the Act of 1851, the Agua Caliente's aboriginal claim was effectively extinguished after the two-year claims window closed, and its territory subsumed within the public domain.

Citing Cramer v. United States, 261 U.S. 219 (1923), the Tribe argues alternatively that even if the Act of 1851 extinguished its aboriginal title, the Tribe re-established such a right by continuous occupancy from 1853 until the creation of its reservation in 1876.[12] (Tribe's Mot. for Summ. J. at 23.) But even if the Tribe did reclaim a title of original occupancy in the 23 years between the time its claim was extinguished and the creation of its reservation, the reservation effectively re-extinguished that right. Reservation, recall, means the United States withdraws land which it then "set[s] apart for public uses." Hagen, 510 U.S. at 966. Aboriginal rights are based on "actual, exclusive, and continuous use and occupancy 'for a long time' of the claimed area," Native Vill. of Eyak v. Blank, 688 F.3d 619, 622 (9th Cir. 2012). Accordingly, an aboriginal right of occupancy is fundamentally incompatible with federal ownership.

The Act of 1851 extinguished the Tribe's aboriginal occupancy right, and even if the Tribe re-established such a right it was not continuous and exclusive and continuous once the United States created the Agua Caliente's reservation. Accordingly, the Tribe cannot assert an original occupancy right, and Defendants are entitled to summary judgment on this issue.

C.  **Interlocutory appeal under 28 U.S.C. 1292(b)**

Usually litigants may only appeal final judgments of district courts. See 28 U.S.C. § 1291. Section 1292, however, confers appellate jurisdiction over a limited class of interlocutory decisions by district courts, including decisions which involve "a controlling question of law as to which there is substantial ground for difference of opinion and that an

---

[12] One point of clarification is in order: the Tribe's asserted right to groundwater based on aboriginal title must actually connect to its claim for aboriginal title. That is, no such freestanding aboriginal rights to natural resources exist, all derive from a right to occupancy. See United States v. Shoshone Tribe, 304 U.S. 111, 116–17 (1938) ("To that end the United States granted and assured to the tribe peaceable and unqualified possession of the land in perpetuity. Minerals and standing timber are constituent elements of the land itself.").

immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. 1292(b); see also Couch v. Telescope, Inc., 611 F.3d 629, 632–33 (9th Cir. 2010).

Whether Winters rights extend to groundwater, in light of California's correlative rights legal framework for groundwater allocation, effectively controls the outcome of this case. The scope of this litigation would, at the very least, shrink dramatically if the issue resolves the other way, thus "advanc[ing] the ultimate termination" of the case. Substantial ground for difference of opinion exists on the legal question—state supreme courts are split on the issue and no federal court of appeals has passed on it. See Couch, F.3d at 633.[13] Additionally, the Supreme Court's decision in Cappaert specifically avoided deciding the issue, it chose instead to construe distant groundwater as surface water. In this case it is undisputed that the groundwater at issue is not hydrologically connected to the reservation's surface water, so it sits uncomfortably outside Cappaert's explicit holding. And although not one of § 1292(b)'s factors, it's worth noting this decision may be unreviewable as a practical matter due to the likelihood of settlement as the case progresses. Cf. United States ex rel. Lummi Indian Nation v. Washington, No. C01–0047Z, 2007 WL 4190400, at *1 (W.D. Wash. Nov. 20, 2007).

In accordance with § 1292(b), the Court certifies this Order for interlocutory appeal, should the parties seek review.

## V. CONCLUSION

The Court has attempted to address the parties' arguments within the framework set out by their own agreement, which was approved by the Court. The conclusions made in this Order should be read with an eye toward the larger picture of this litigation.

Based on the foregoing discussion of the legal issues presented by Phase I of this case, the Court (1) GRANTS partial summary judgment to the Agua Caliente and the United States on the claim that the government impliedly reserved appurtenant water sources—including underlying groundwater—when it created the Tribe's reservation; and (2) GRANTS partial

---

[13] The Ninth Circuit recently explained:

> To determine if a "substantial ground for difference of opinion" exists under § 1292(b), courts must examine to what extent controlling law is unclear. Courts traditionally will find that a substantial ground for difference of opinion exists where "the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point . . . or if novel and difficult questions of first impression are presented."

Couch, 611 F.3d at 633.

summary judgment to Defendants regarding the Tribe's aboriginal title claims because the Land Claims Act of 1851, as interpreted by the Supreme Court, effectively extinguished any such right.

**IT IS SO ORDERED.**