1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MATTHEW T. KLINE (Bar No. 211640)
mkline@omm.com
DANIEL R. SUVOR (Bar No. 265674)
dsuvor@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Defendants Coachella Valley Water District, and G. Patrick O'Dowd, Ed Pack, John Powell, Jr., Peter Nelson and Castulo R. Estrada, sued in their official capacity as members of the Board of Directors*

(Additional counsel identified on next page)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

AGUA CALIENTE BAND OF
CAHUILLA INDIANS,

           Plaintiff,

and

UNITED STATES OF AMERICA,
           Plaintiff-Intervenor,

      v.

COACHELLA VALLEY WATER
DISTRICT, et al.,

           Defendants.

Case No. 5:13-cv-00883-JGB (SPx)

Judge:    Hon. Jesus G. Bernal

**DEFENDANT COACHELLA VALLEY WATER DISTRICT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON PHASE 2 ISSUES; MEMORANDUM OF POINTS AND AUTHORITIES**

Filed concurrently with:

1.  Statement of Undisputed Facts
2.  Request for Judicial Notice
3.  Declaration of Steve Bigley
4.  Declaration of Expert Graham E. Fogg
5.  Declaration of Expert Richard Howitt
6.  Declaration of Daniel R. Suvor
7.  Proposed Order

Dept.:           Courtroom 1
Action Filed:    May 14, 2013
Phase 2 Hearing:  January 22, 2018

STEVEN B. ABBOTT (Bar No. 125270)
sabbott@redwineandsherrill.com
GERALD D. SHOAF (Bar No. 41084)
gshoaf@redwineandsherrill.com
REDWINE AND SHERRILL, LLP
3890 11th Street, Ste. 207
Riverside, CA 92501-3577
Telephone:  (951) 684-2520
Facsimile: (951) 684-5491

BARTON THOMPSON, JR. (Bar No. 72927)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025-7019
Telephone: (650) 473-2600
Facsimile: (650) 473-2601

ANTON METLITSKY (*pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

WALTER DELLINGER (*pro hac vice*)
BRADLEY N. GARCIA(*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

*Attorneys for Defendants Coachella
Valley Water District, and G. Patrick
O'Dowd, Ed Pack, John Powell, Jr.,
Peter Nelson and Castulo R. Estrada,
sued in their official capacity as
members of the Board of Directors*

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on January 22, 2017, at 9 a.m. or as soon thereafter as the matter may be heard in Courtroom 1 of the above-entitled court located at 3420 Twelfth Street, Riverside, California, Defendants COACHELLA VALLEY WATER DISTRICT and G. PATRICK O'DOWD, ED PACK, JOHN POWELL, JR., PETER NELSON, and CASTULO R. ESTRADA, in their Official Capacities as Members of the Board of Directors of the Coachella Valley Water District—hereafter collectively referred to as "CVWD")[1]—will and do hereby move the Court, by and through their counsel of record, under Fed. R. Civ. P. Rule 56, for partial summary judgment declaring:

1. On the first Question Presented in this Phase 2 of the case—*i.e.*, the **quantification standard of Agua Caliente's federal reserved water right—**the question of which standard applies is not justiciable because the Tribe lacks standing and the issue is not ripe for review.  If the Court reaches the merits of this first question, then it should hold the appropriate standard to quantify the Tribe's right proceeds in three steps:

   a. *Step One*, the Court should calculate the "allocable groundwater" available here by determining the natural, sustainable yield of the Indio Subbasin *minus* the State-recognized correlative rights of all overlying owners whose rights predate the Tribe's *Winters* rights;

   b. *Step Two*, the Court should decide how much of this groundwater the Tribe needs to meet the "primary" agricultural purpose of the

---

[1] This Motion and accompanying briefing refer to: (1) defendant Coachella Valley Water District as "CVWD"; (2) defendant Desert Water Agency as "DWA"; (3) CVWD and DWA as "the Water Agencies"; (4) plaintiff Agua Caliente Band of Cahuilla Indians as "Agua Caliente" or "the Tribe"; (5) practicably irrigable acreage as "PIA"; (6) acre-feet as "af"; (7) State Water Project as "SWP"; (8) Metropolitan Water District of Southern California as "MWD"; (9) Central Arizona Project as "CAP"; and (10) Clean Water Act as "CWA".  Unless noted, all emphases are added, and all internal citations and quotations are omitted.

Reservation under a modified version of the Supreme Court's "practicably irrigable acreage" ("PIA") standard that accounts for the Tribe's resort economy by multiplying the Reservation acreage that is practicably irrigable and likely to be developed for some economically viable purpose by the amount of water reasonably needed for the type of commercial or residential use to which the land is most likely to be placed; and

c. *Step Three,* the Court should determine the Tribe's existing state-law water rights and subtract them from the amount to which it would otherwise be entitled under the first two steps (if state rights exceed this amount, federal law does not entitle the Tribe to anything more).

2. On Question 2—*i.e.*, whether the Tribe owns the **groundwater storage space**[2] below its Reservation—that question is also not justiciable because the Tribe lacks standing and the question is not ripe for review. If the Court reaches the merits of that question, then it should hold that the groundwater storage space is a public resource available to all and is not subject to the Tribe's claims of private ownership.

3. On Question 3—*i.e.*, the **quality component of the Tribe's federal reserved water right**—the Court should hold that California nuisance law, not a unique *Winters* element, governs any challenge to the quality of Colorado River water that CVWD uses to recharge the aquifer and sustainably manage groundwater for the entire Valley's benefit, including the Tribe's.

---

[2] In the parties' original stipulation, this second question was phrased in terms of the ownership of "pore space." The Tribe, however, has advised the parties and the Court that it is seeking a declaration that it owns "the void or open subterranean spaces that are not filled by solid material; the empty space between rocks, sand, and other solid soil *where water can be stored.*" Dkt. 192 at 3. To clarify the subject of the Tribe's claim, CVWD therefore uses the term "groundwater storage space" rather than the broader term "pore space."

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

1    This Motion is based on this Notice and the briefing and pleadings filed

2    herewith, including the accompanying the Memorandum of Points and Authorities,

3    CVWD's Statement of Undisputed Facts ("SUF"), the Declaration of Steve Bigley

4    and exhibits thereto ("Bigley Decl."), the Declaration of Expert Graham E. Fogg

5    and the exhibit thereto ("Fogg Decl."), the Declaration of Expert Richard Howitt

6    and the exhibit thereto ("Howitt Decl."), the Declaration of Daniel R. Suvor and the

7    exhibits thereto ("Suvor Decl."), CVWD's Request for Judicial Notice and the

8    exhibits thereto ("RJN"), and CVWD's Proposed Order.  This Motion is also based

9    on the pleadings and papers on file herein; the further briefing that CVWD will

10    submit on these cross-motions for summary judgement (including reply briefing);

11    and other argument and evidence as may be received at the hearing of the motion.

12    This Motion is made following the conference of counsel under L.R. 7-3,

13    which took place over several discussions, including on October 10, 2017.

14

15    Dated:  October 20, 2017                    Respectfully Submitted,

16                                                                /s/ Barton Thompson, Jr.
                                                                   BARTON THOMPSON, JR.
17                                                                MATT KLINE
                                                                   ANTON METLITSKY
18                                                                DANIEL SUVOR
                                                                   O'MELVENY & MYERS LLP
19

20
                                                                *Attorney for Defendants Coachella Valley*
21                                                              *Water District, and G. Patrick O'Dowd,*
                                                                *Ed Pack, John Powell, Jr., Peter Nelson*
22                                                              *and Castulo R. Estrada, sued in their*
                                                                *official capacity as members of the Board*
23                                                              *of Directors (collectively, "CVWD")*

24

25

26

27

28

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

    A.    Coachella Valley ......................................................................... 3

    B.    The Valley's Limited Local Water Supplies ............................... 4

    C.    Water Uses in the Coachella Valley Outstrip Local Supplies .............. 4

    D.    CVWD's Programs to Ensure Sufficient Water for the Valley ............ 5

        1.    CVWD's Conservation and Recycling Programs ..................... 5

        2.    Importation of Colorado River Water ...................................... 6

        3.    Groundwater Recharge ............................................................ 7

    E.    The Importance of the Colorado River to Groundwater Recharge ....... 8

    F.    The Agua Caliente Tribe's Water Rights and Uses ................... 8

PROCEDURAL HISTORY ................................................................................... 10

ARGUMENT ......................................................................................................... 11

I.    The Requests to Quantify the Tribe's Implied Water Right and Determine Ownership of Groundwater Storage Space Are Not Justiciable ............................................................................................. 11

    A.    The Quantification Request Is Not Justiciable .......................... 11

    B.    The Tribe's Ownership Claim Is Not Justiciable ...................... 13

II.    The Proper Quantification Standard Is a Modified PIA Standard. ........ 14

    A.    Step 1:  The Tribe's *Winters* Rights Cannot Exceed Its Share of the Subbasin's Natural Sustainable Yield ............................ 14

    B.    Step 2:  The Court Should Adopt a Modified PIA Standard ............... 16

    C.    Step 3:  The Tribe Is Not Entitled to Any Additional Water If Its Existing State-Law Water Rights Satisfy Its Needs ............ 20

III.    The Tribe Does Not Own Groundwater Storage Space ......................... 21

    A.    State Courts Have Universally Held That Groundwater Storage Space Is a Common Area Not Capable of Private Ownership ............ 21

    B.    The Court Should Incorporate State Law in Deciding the Character of the Groundwater Storage Space .............................. 23

    C.    The Court Should Follow the Logic of State Law Even if It Formulates Its Own Federal Rule ............................................. 25

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

**TABLE OF CONTENTS**
**(continued)**

Page

D.    There Is No Precedent for Holding That Indian Tribes Own the Groundwater Storage Space Underlying their Reservations ...............26

IV.   A *Winters* Right Does Not Have a Unique Water Quality Component.........27

A.    Both the Federal and State Governments Carefully Regulate the Quality of Colorado Water River Water.............................................28

B.    The Tribe's Water Quality Claim Must Be Resolved Under California Nuisance Law Rather Than a Special Federal Rule. ..........29

C.    No Court Has Ever Extended the Reserved Rights Doctrine to Incorporate a Unique Cause of Action for Water Quality..................33

CONCLUSION.......................................................................................34

# TABLE OF AUTHORITIES

**Page**

CASES

*Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water
Dist.,*
849 F.3d 1262 (9th Cir. 2017) ..................................................*passim*

*Andrus v. Charlestone Stone Prods.,*
436 U.S. 604 (1978) ..........................................................................27

*Arizona v. California,*
373 U.S. 546 (1963) ..................................................................17, 20

*Baker v. Ore-Ida Foods, Inc.,*
513 P.2d 627 (Idado 1973) ............................................................15

*Bd. of Cnty. Comm'rs of Cnty. of Park v. Park Cty. Sportsmen's
Ranch, LLP,*
45 P.3d 693 (Colo. 2002) .................................................21, 22, 25

*Board of Comm'rs of Jackson County v. United States,*
308 U.S. 343 (1939) ..........................................................................24

*Cappaert v. United States,*
426 U.S. 128 (1976) ..................................................................*passim*

*Cent. & W. Basin Replenishment Dist. v. S. Cal. Water Co.,*
109 Cal. App. 4th 891 (2003) ..........................................22, 23, 30

*City of Los Angeles v. City of Glendale,*
142 P.2d 289 (Cal. 1943) ..............................................................22

*City of Los Angeles v. City of San Fernando,*
537 P.2d 1250 (Cal. 1975) ............................................................22

*City of Milwaukee v. Illinois and Michigan,*
451 U.S. 304 (1981) ................................................................23, 30, 31

*Clapper v. Amnesty Int'l USA,*
133 S. Ct. 1138 (2013) ....................................................................12

*Colville Confederated Tribes v. Walton,*
752 F.2d 397 (9th Cir. 1985) ........................................................14

**TABLE OF AUTHORITIES**
(continued)

Page

*Colorado River Water Conserv. Dist. v. United States*
    424 U.S. 800 (1976) ....................................................................... 31

*Doherty v. Oregon Water Resources Dir.,*
    783 P.2d 519 (Or. 1989) ............................................................... 15

*Hanson v. McCue,*
    42 Cal. 303 (1871) ......................................................................... 15

*Hopi Tribe v. United States,*
    782 F.3d 662 (Fed. Cir. 2015) ..................................................... 34

*Illinois v. City of Milwaukee,*
    406 U.S. 91 (1972) .................................................................. 30, 31

*In re Application U-2,*
    413 N.W.2d 290 (Neb. 1987) ................................................. 22, 26

*In re Gen. Adjudication of All Rights to Use Water in the Big Horn
    River Sys.,*
    753 P.2d 76 (Wyo. 1988) ....................................................... 18, 19

*In re Gila River,*
    201 Ariz. 307 (2001) ..................................................................... 18

*Katz v. Walkinshaw,*
    74 P. 766 (Cal. 1903) ................................................................... 15

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................ 11, 12

*Mardan Corp v. C.G.C. Music, Ltd.,*
    804 F.2d 1454 (9th Cir. 1986) ................................................ 23, 31

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ...................................................................... 11

*Missouri v. Illinois,*
    200 U.S. 496 (1906) ................................................................ 30, 31

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Nat'l Audubon Soc'y v. Dep't of Water,*
    869 F.2d 1196 (9th Cir. 1988) ........................................................................ 32

*New York v. New Jersey,*
    256 U.S. 296 (1921) ...................................................................................... 30

*Newhall Land & Farming Co. v. Super. Ct.,*
    23 Cal. Rptr. 2d 377 (Ct. App. 1993) ............................................................ 30

*North Dakota v. Minnesota,*
    263 U.S. 365 (1923) ................................................................................ 30, 31

*Northern Pacific R. Co. v. Soderberg,*
    188 U.S. 526 (1903) ...................................................................................... 27

*Orange County Water District v. Sabic Innovative Plastics US, LLC,*
    14 Cal. App. 5th 343 (2017) ......................................................................... 30

*Pasadena v. Alhambra,*
    33 Cal. 2d 908 (Cal. 1949) ..................................................................... 14, 15

*Potomac Steam Boat Co. v. Upper Potomac Steam Boat Co.,*
    109 U.S. 672 (1884) ...................................................................................... 24

*Public Serv. Comm'n v. Wycoff Co.,*
    344 U.S. 237 (1952) ...................................................................................... 12

*S.W. Sand & Gravel, Inc. v. Cent. Ariz. Water Conservation Dist.,*
    212 P.3d 1 (Ariz. Ct. App. 2008) ............................................................. 22, 23

*San Diego Cnty. Gun Rights Comm.v. Reno,*
    98 F.3d 1121 (9th Cir. 1996) ........................................................................ 13

*San Diego Gas & Elec. Co. v. Super. Ct.,*
    920 P.2d 669 (Cal. 1996) .............................................................................. 30

*Tehachapi-Cummings County Water Dist. v. Armstrong,*
    49 Cal. App. 3d 992 (Cal. App. 1975) ..................................................*passim*

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) .......................................................... 12, 13, 14

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Adair*,
  723 F.2d 1394 (9th Cir. 1983) ...........................................................................17

*United States v. Anderson*,
  591 F. Supp. 1 (E.D. Wash. 1982) ......................................................33

*United States v. Anderson*,
  6 Indian L. Rep. F-129 (E.D. Wash. 1979) ......................................33

*United States v. Braren*,
  338 F.3d 971 (9th Cir. 2003) .............................................................13

*United States v. Gila Irrigation District*,
  920 F. Supp. 1444 (D. Ariz. 1996) ...................................................33

*United States v. Gila Valley Irrigation Dist.*,
  804 F. Supp. 1, 7 (D. Ariz. 1992),
  *vacated in part*, 31 F.3d 1428 (9th Cir. 1994)...................................33

*United States v. Kimbell Foods, Inc.*,
  440 U.S. 715 (1979) ...............................................................*passim*

*United States v. Little Lake Misere Land Co., Inc.*,
  412 U.S. 580 (1973) ....................................................................23, 31

*United States v. New Mexico*,
  438 U.S. 696 (1978) ...............................................................*passim*

*United States v. Shoshone*,
  304 U.S. 111 (1938) ....................................................................26, 27

*W. Maricopa Combine, Inc. v. Ariz. Dep't of Water Res.*,
  26 P.3d 1171 (Ariz. Ct. App. 2001) ............................................22, 23

*Washington v. Washington State Comm. Passenger Fishing Vessel*
  *Ass'n*,
  443 U.S. 658 (1979) ...........................................................................19

*Wilson v. Omaha Indian Tribe*,
  442 U.S. 653 (1979) ....................................................................24, 25, 32

vi

# TABLE OF AUTHORITIES
### (continued)

Page

STATUTES

1980 Ariz. Sess. Laws, 4th Spec. Sess, 1339 .................................................. 15

33 U.S.C. § 303(c) ....................................................................................... 28, 29

42 U.S.C. § 300g-1(b)(1)(A) ............................................................................ 29

Cal. Civ. Code § 3479 ...................................................................................... 30

Cal. Code Regs. tit. 22, § 64449(a) .................................................................. 29

Cal. Water Code § 10720 ................................................................................. 15

Cal. Water Code § 10727.2(b)(1) ....................................................................... 4

Cal. Water Code § 10780 ................................................................................. 29

Cal. Water Code § 13050(f) .............................................................................. 29

Cal. Water Code §13240 ................................................................................... 29

Colorado River Basin Salinity Control Act of 1974, Pub. L. No. 93-
320, 88 Stat. 266 ......................................................................................... 29

Act of Oct. 30, 1984, Pub. L. No. 98-569, 98 Stat. 2933 ........................... 29

Federal Agriculture Improvement and Reform Act of 1996 § 334, Pub.
L. No. 104-127, 110 Stat. 888, 996-1002 ................................................... 29

OTHER AUTHORITIES

Andrew Mergen & Sylvia Liu, *Misplaced Sensitivity: the Draft
Opinions in* Wyoming v. United States, 68 U. Colo. L. Rev. 683
(1997) .................................................................................................... 18, 19

Cohen's Handbook of Federal Indian Law (2012) .................................. 27

Jennele Morris O'Hair, *The Federal Reserved Rights Doctrine and
Practicably Irrigable Acreage: Past, Present, and Future*,
10 BYU J. Pub. L. 263 (1996) .................................................................. 18

Restatement (Second) of Torts (1979) ................................................ 30

# TABLE OF AUTHORITIES
## (continued)

**Page**

Thomas W. Merrill, *Trespass, Nuisance, and the Costs of Determining Property Rights*, 14 J. Legal Stud. (1985).............................................................31

# INTRODUCTION

Phase 2 raises three questions critical to the future of both the Coachella Valley and effective groundwater management throughout the United States: (1) What standards govern quantification of the Agua Caliente Tribe's *Winters* groundwater right?  (2) Does the Tribe own the groundwater storage space deep below its Reservation, or is the space a common resource open to all?  (3) Does the Tribe's *Winters* groundwater right include a unique water-quality "component," or does state common law govern water-quality claims?

How much groundwater the Tribe can claim beyond the water that it already receives from CVWD and DWA and can pump pursuant to its state-law correlative groundwater right will determine whether the Water Agencies can continue to meet the needs of the many millions of Valley residents and visitors.  The Valley's economy is entirely dependent on imported water.  The average natural inflow to the Indio Subbasin from precipitation, streams, and flow between groundwater basins (*i.e.*, without importing water into the Valley), is roughly 52,000 acre-feet of water.  SUF ¶ 18.[3]  To meet the Valley's growing demand for water, the Water Agencies have imported Colorado River water to the Valley since 1949.  SUF ¶ 31. This year, the Water Agencies expect to import 645,000 af—nearly half of which is dedicated to groundwater recharge.  SUF ¶ 78.  Reallocating water in the Coachella Valley is a zero-sum game.  *E.g.*, Howitt Decl. Ex. A at 5-8.  Any additional water awarded to the Tribe in this case will force a gallon-for-gallon reduction in the water available to other users in the Valley.

Answers to the questions of groundwater storage space and water quality will affect whether and how the water agencies can continue the groundwater recharge operations that are meeting the water needs of the Valley and are soon set to eliminate years of groundwater overdraft.  Like many areas of the Southwest, the

---

[3] An acre-foot ("af") is equivalent to 325,851 gallons of water and provides roughly enough water to meet the domestic needs of one home annually.

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

Valley imports Colorado River water to recharge its aquifer.  Either exclusive ownership of groundwater storage capacity by overlying landowners, or novel rights against changes to existing groundwater quality would doom such recharge operations not only in the Valley but also in multiple other Southwest regions.

As discussed below, there is no legal support for this result, and judgment should be granted for CVWD on each of the three question presented in Phase 2 of this case.  To begin, the Tribe does not even have standing to press two of the Phase 2 questions presented (Questions 1 and 2), which are not ripe for current review in any event.  If the Court reaches these questions, however, it should hold:

- On Question 1, that quantification of the Tribe's water rights will require three steps.  *First*, the Court must determine how much groundwater is even available to allocate to the Tribe.  The Tribe's rights cannot exceed the natural, sustainable yield of the Indio Subbasin, *less* existing state groundwater rights of others that predate the Reservation.  *Second*, the Court must decide how much of this groundwater the Tribe needs to meet the "primary" agricultural purpose of the Reservation—the font of its asserted *Winters* right.  Here, the Court should follow the Supreme Court's "practicably irrigable acreage" ("PIA") standard, adjusted to account for the fact that the Tribe now operates a resort economy, not an agrarian one.  *Third,* the Court must examine whether the Tribe's existing state-law water rights already provide it with the water to which it would otherwise be entitled under the first two steps.  While the Court can adopt these governing rules now, their application is highly fact-intensive, as noted in CVWD's accompanying expert declarations, and the Court should reserve final adjudication of these questions for the Phase 3 trial.

- Question 2, the pore space—or "groundwater storage space"—question, *supra* n.2, is more simple to answer, assuming it is ripe for review.  This storage space is a *common resource* available to all and is not subject to

the Tribe's claims of private ownership.  Existing law and basic principles of hydrology compel this conclusion.

- On Question 3, California nuisance law—and not a unique *Winters* water-quality right of the sort the Tribe posits—governs any challenge the Tribe might make in Phase 3 to the quality of Colorado River water that CVWD uses to recharge the aquifer and sustainably manage groundwater for the benefit of the entire Valley, including the Tribe.

## FACTUAL BACKGROUND

### A.    Coachella Valley

Coachella Valley is highly arid, with an average annual rainfall of just four inches on the valley floor.  SUF ¶ 1.  The Valley is nevertheless home to a year-round population of 376,000 people, with an additional 13 million seasonal residents and visitors annually.  The Valley supports farms that produce over $730 million in annual revenues and a tourism economy that generates $6 billion in 2015.  SUF ¶¶ 2-5.  The Valley is also home to five Indian tribes, including the Agua Caliente.  SUF ¶ 6.  The Tribe and the greater Coachella Valley economy are interdependent.  The current value of the Tribe's assets is directly linked to the imported water supplies that have sustained economic growth in the Valley over the last several decades.  *E.g.*, Howitt Decl. Ex. A at 16.

Upon California's entry into the United States, the federal government owned virtually all the land that now constitutes the Coachella Valley.  In 1871, Congress granted most of the odd-numbered sections of land in the Coachella Valley to the Southern Pacific Railroad.  SUF ¶ 7.  Congress anticipated that the railroad would raise money, and simultaneously encourage settlement in the Coachella Valley, by selling this land to local settlers.  SUF ¶ 8.

Five years later, President Ulysses S. Grant reserved many of the even-numbered sections of land "for the permanent use and occupancy of the Mission Indians in southern California," including the Tribe.  SUF ¶ 9.  A year later,

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

President Rutherford B. Hayes reserved additional even-numbered sections for "Indian purposes." During the same period, various executive orders also reserved land for three other reservations. SUF ¶ 11. The United States thus made its intent clear that local tribes and non-Indian settlers would share the Coachella Valley.

## B.    The Valley's Limited Local Water Supplies

The Valley enjoys limited native water supplies. The Whitewater River is the Valley's only significant source of surface water, and it provided less than a one-third of its long-term average 12,000 af of water in 2016. SUF ¶¶ 12-14.[4]

The Valley's low annual rainfall and snowmelt is not nearly enough to replenish what is pumped from the Indio Subbasin, the subbasin beneath most tribal lands. The natural "sustainable yield" of the Indio Subbasin (*i.e.*, the natural inflow into the subbasin minus the outflow) averages roughly 26,300 af per annum. SUF ¶¶ 16-17. Unless water is imported into the Valley to augment the natural sustainable yield, this is the most water that can be taken out of the subbasin without "overdrafting" the aquifer.

Both the Water Agencies and the Tribe agree that sustainable groundwater management, rather than overdrafting, should be the long-term goal and practice in the Valley.[5] To avoid overdraft and ensure minimum standards for effective groundwater management, California in 2014 enacted the Sustainable Groundwater Management Act, which requires local regions to manage groundwater sustainably no later than 2040. Cal. Water Code § 10727.2(b)(1). CVWD expects to beat this deadline by nearly two decades and eliminate local overdraft by 2022. SUF ¶ 23.

## C.    Water Uses in the Coachella Valley Outstrip Local Supplies

The population and economy of the Valley have long outgrown the native water supply. Valley residents and businesses use more than 400,000 af of water a

---

[4] CVWD holds the junior appropriative right in the Whitewater River, which authorizes diversion to underground storage.

[5] Indeed, the Tribe seeks an injunction preventing overdrafting of the aquifer. *See* Dkt. 1 ("Compl.") ¶ 74.

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

year (compared to the natural sustainable yield of roughly 26,300 af).  SUF ¶ 19.  In 2016, CVWD and DWA jointly provided approximately 108,251 af of drinking water to domestic residents, commercial facilities, and resort developments in the Valley, and CVWD provided 342,000 af to local farms for irrigation.  SUF ¶¶ 21, 79.  The Tribe has played an integral role in the Valley's economic development as well, constructing casinos, subdivisions, and resorts on its Reservation, and the Tribe benefits economically from the health of the local economy.  SUF ¶ 20.

Without the efforts of the Water Agencies to reduce pumping in the Valley and recharge the aquifer with Colorado River water, the amount of overdraft would be enormous.  *E.g.*, Fogg Decl., Ex. A at 6.  As explained in the next section, however, the Water Agencies' efforts to meet the Valley's water needs without overdraft have been successful.  *Id.* at 26.

### D.    CVWD's Programs to Ensure Sufficient Water for the Valley

In 2002, CVWD adopted a comprehensive Urban Water Management Plan to ensure continued water supplies meet the Valley's growing population.  It estimates that it will meet the goal of eliminating the Valley's overdraft by 2022.  SUF ¶¶ 22-23.  CVWD uses three principal tactics to meet the Valley's needs sustainably:

### 1.    CVWD's Conservation and Recycling Programs

CVWD takes aggressive steps to conserve water.  For example, it uses "tiered-pricing" that charges more per unit of water as consumption increases; it imposes special conservation measures on new real-estate developments; it continually educates Valley residents in water-efficient landscaping techniques; it works with local farmers to ensure reasonable use of irrigation water; and it educates over 21,000 children a year, about water conservation.  SUF ¶ 24-29, 76-77.  The results are tangible.  Water-efficient methods such as drip irrigation, for example, save the Valley substantial water and help address overdraft.

CVWD also has encouraged the use of recycled water in the Valley since 1965.  SUF ¶ 27.  Since 2010, CVWD has required golf courses with access to

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

recycled water or imported Colorado River water to use those sources to meet a minimum of 80% of their irrigation demand.  SUF ¶ 28.  Today, the Water Agencies provide more than 14,000 af of recycled water each year for golf course and greenbelt irrigation from four wastewater treatment facilities.  SUF ¶ 29.

## 2.    Importation of Colorado River Water

Conservation and recycling alone cannot bring the Valley's water needs into balance.  CVWD thus imports Colorado River water, which is the Valley's sole economically affordable source of imported water.  SUF ¶ 80.  CVWD first contracted with the United States for Colorado River water in 1934.  SUF ¶ 81.  The Coachella Canal, which brings that water into the Valley, was completed in 1949, and CVWD has since then supplied this water to agricultural users in the West and East portions of the Valley.  SUF ¶ 31.

As the Valley continued to grow, CVWD recognized that it needed to import additional water.  In the 1960s, CVWD began purchasing water from the State Water Project ("SWP"), which exports water from the Sacramento River system for delivery to Southern California's coastal plain.  SUF ¶ 32.  Unfortunately, the SWP does not reach to the Coachella Valley, and an extension is not presently feasible, as it could cost more than $800 million dollars.  SUF ¶ 33.  CVWD therefore provides its SWP entitlement to the Metropolitan Water District of Southern California ("MWD").  In return, MWD provides CVWD with a share of its Colorado River water.  SUF ¶ 34.

Colorado River water is widely used in the Southwest and is well within established consumer standards.  SUF ¶ 30, 36.  While marginally saltier than some water in the basin (though less so than some native groundwater), SUF ¶ 35, there is no practical way to desalinate the water before use.  SUF ¶ 37.  For example, a desalination plant to meet the Valley's needs would have to handle more water than the largest desalination plant in the world—the Ras Al Khair Desalination Plant in Saudi Arabia—which cost more than $7 billion to construct, and uses as much

1   power as half the Coachella Valley per year.  SUF ¶¶ 38-40.  CVWD also would

2   need to dispose of brine while maintaining the protected environmental

3   conservation areas surrounding it.  SUF ¶ 40.  Because Colorado River salinity

4   levels are all within all applicable standards, these billions of dollars in

5   expenditures would not materially benefit the community.  SUF ¶ 36.

6   Supplementing Valley groundwater from the Colorado River has increased

7   groundwater levels while lowering energy costs.  *E.g.*, Fogg Decl. Ex. A at 33.

8               **3.    Groundwater Recharge**

9        CVWD recharges the Indio Subbasin in two ways.  First, it uses Colorado

10   River water to recharge the subbasin directly.  Second, some of the water CVWD

11   supplies to its customers for irrigation percolates down into and recharges the

12   groundwater aquifer.  SUF ¶ 41.  Starting in 1973, CVWD has directly recharged

13   the West Indio Subbasin through a 700-acre, state-of-the-art replenishment facility

14   in the northern end of the Valley, accessible to the Colorado River Aqueduct.  SUF

15   ¶ 42.  (At some point in this case, we submit that the Court should take a site visit

16   to this facility.)  Since inception, CVWD's Whitewater recharge facility has

17   recharged more than 3.3 million af of water.  SUF ¶ 42.  In 2009, CVWD opened

18   another recharge facility to service the East Indio Subbasin.  SUF ¶ 43.

19        CVWD's recharge program is crucial to the effective management of the

20   Valley's water.  The recharge program ultimately will eliminate groundwater

21   overdraft by increasing the sustainable yield of the aquifer.  Indeed, the recharge

22   program already has reversed the impact of overdraft in many areas, with overdraft

23   expected to be eliminated by 2022.  SUF ¶ 23.

24        In years when MWD allows the Water Agencies to import more water into

25   the basin than local users consume, CVWD stores that surface water in the subbasin

26   through its recharge operations for future use.  SUF ¶ 45.  This avoids the need to

27   build expensive surface reservoirs to store this water.  SUF ¶ 45.  CVWD's

28   recharge program also allows many water users in the Valley who are not linked to

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

1   the Water Agencies' systems—including many lessees of Reservation lands—to

2   meet their water needs by pumping groundwater.  If CVWD did not recharge the

3   subbasin, these users could not get water without the construction of expensive new

4   distribution systems.  SUF ¶ 83.

5       **E.    The Importance of the Colorado River to Groundwater Recharge**

6           Faced with limited water supplies, many regions of the West, including

7   Southern California, Arizona, Nevada, and New Mexico, have found groundwater

8   recharge to be crucial to their ability to meet local water needs and avoid

9   groundwater overdraft.  *E.g.*, Fogg Decl. Ex. A at 16-17.  These recharge programs

10  often use Colorado River water.  All of Arizona's recharge operations, for example,

11  use Colorado River water from the Central Arizona Project ("CAP").  *Id.* at 15.

12  Many of the recharge operations in Southern California use combinations of

13  Colorado River water and water from the State Water Project.  SUF ¶ 82.  Nevada's

14  Las Vegas recharge operation—one of the largest aquifer storage and recovery

15  system in the world—also uses Colorado River that it treats for bacteria but not salt

16  before injecting it into the groundwater basin.  SUF ¶ 48.

17          Native American tribes in Arizona also use Colorado River water to recharge

18  local groundwater aquifers.  In Arizona, entities that recharge groundwater aquifers

19  generate credits that they can sell to others wishing to pump from the aquifer.  SUF

20  ¶ 49.  Native American tribes have recharged significant volumes of CAP water as

21  part of this program, and at least one, the Gila River Indian Community, actively

22  markets the credits that it has thereby generated.  SUF ¶¶ 50-51.  The total yearly

23  amount recharged by Arizona tribes has increased from 17,000 af in 2009 to an

24  average of 227,000 af from 2011 through 2013.  In 2013, Arizona tribes held over

25  550,000 af of credits under the Arizona groundwater recharge programs.  SUF ¶ 51.

26      **F.    The Agua Caliente Tribe's Water Rights and Uses**

27          The Aqua Caliente Tribe's economic activities have grown with the Valley.

28  More than half of the 31,396-acre Reservation (59%) consists of allotted lands—

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

much of which is leased to non-Indians for development as subdivisions, golf courses, and resorts.  SUF ¶¶ 52-55.  Consequently, 20,000 people live on the Agua Caliente Reservation, but there are only some 440 members of the Tribe.  SUF ¶ 56. The Tribe itself runs multiple business ventures, including two casinos, two golf courses, and the Indian Canyons and Tahquitz Canyon recreational areas.  SUF ¶ 20.  Even a partial accounting of the Tribe's revenue shows that it is in excess of $1.4 million per Tribe member per year.  Per capita income in the greater Coachella Valley is $28,945.  *See* Howitt Decl. Ex. A at 14.

The United States anticipated that the Tribe would use the Reservation for domestic and agricultural purposes.  Creation of the Reservation, the United States hoped, would encourage the tribe "to build comfortable houses, improve their acres, and surround themselves with home comforts."  *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist*., *("CVWD")* 849 F.3d 1262, 1265 (9th Cir. 2017); *see* Dkt. 85-19 (tab 18), at 24 (Dryden Report from June 30, 1875) ("The one pressing want of these people now is land, on which they can cultivate their gardens.").  Nothing in the historical record suggests that the Tribe relied on ether surface water or groundwater for fishing, hunting, or other purposes.  SUF ¶ 60. Only about 70 members of the Tribe lived on the Reservation when it was formed, and no one anticipated that the Valley would evolve into the tourist mecca that it has become.  SUF ¶ 58.

Between 1909 and 1919, the Tribe, with assistance from the United States, constructed waterworks to divert surface flows to meet the Tribe's agricultural needs.  SUF ¶ 61.  The Tribe, for example, built a dam and pipeline across Andreas Creek that allowed for the irrigation of 210 acres of sandy soil with 1890 af of water.  SUF ¶ 62.  By 1924, however, only 70.2 acres of this land was under irrigation.  SUF ¶ 63.  The Tribe also constructed a ditch and pipeline to divert waters from Tahquitz Creek, with capacity to irrigate 150 acres of sandy soil with 1350 af of water; by 1924, only 40 acres were under irrigation.  SUF ¶¶ 64–65.

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

1    The Tribe holds two types of water rights under California law.  First, it

2  holds a correlative right to pump an unspecified amount of water as the owner of

3  land overlying the Indio Subbasin.  *See Tehachapi-Cummings County Water Dist.*

4  *v. Armstrong*, 49 Cal. App. 3d 992, 1001 (Cal. App. 1975).  Second, the United

5  States on behalf of the Tribe holds surface water rights under the California

6  Superior Court's 1938 Whitewater River Decree that allocates the water of that

7  river system.  SUF ¶ 69-70.  The rights allocated to the United States on behalf of

8  the Tribe closely tracks the amount of water that the United States had "suggested"

9  the Tribe needed to divert for irrigation on its lands.  SUF ¶ 69-70.

10    The Tribe currently does not engage in any farming operations on the

11  Reservation.  SUF ¶ 71.  The Tribe purchases the water that it needs for its

12  domestic and commercial operations from CVWD and DWA.  SUF ¶ 72.  The

13  Tribe itself does not pump any groundwater.  Some of the lessees of allotted lands

14  on the Reservation, however, pump groundwater for irrigation of golf courses and

15  landscaped areas.  SUF ¶¶ 74-75.  The Tribe claims to have engaged in limited

16  groundwater recharge operations using its Whitewater River rights.  SUF ¶ 73.

17                              **PROCEDURAL HISTORY**

18    The Tribe filed this suit against the Water Agencies in 2013, and the United

19  States intervened as trustee for the Tribe and individual allottees.  The parties

20  agreed to trifurcate the case.  In Phase 1, this Court held that *Winters* applies to all

21  water appurtenant to a federal reservation, including groundwater.  The Ninth

22  Circuit affirmed.  *CVWD*, 849 F.3d 1262.  In doing so, the Ninth Circuit confirmed

23  that under *United States v. New Mexico,* 438 U.S. 696, 701-702 (1978), water is

24  impliedly reserved only for the "primary purposes" of a reservation, not the

25  "secondary purposes."  *CVWD*, 849 F.3d at 1269.  The Ninth Circuit further held

26  that the "underlying purpose" of the Agua Caliente Reservation was to "establish a

27  home and support an agrarian society."  *Id*. at 1270.  The Water Districts have

28  petitioned for certiorari, and that petition is pending.

10

Currently before the Court are three Phase 2 questions concerning the appropriate quantification standard, ownership of groundwater storage space, and whether *Winters* rights carry a unique water-quality component.

## ARGUMENT

### I. The Requests to Quantify the Tribe's Implied Water Right and Determine Ownership of Groundwater Storage Space Are Not Justiciable

The Tribe and United States lack standing to seek a quantification, and the Tribe lacks standing to raise its storage-space claim. The Court, moreover, should dismiss both claims under prudential ripeness doctrine. Both issues appear to be purely hypothetical, without a case or controversy to ground their resolution. CVWD has asked the Tribe and United States repeatedly for more information about their claims in order to determine whether there is an actual dispute, without success. Absent such information, CVWD must guess at the issues' relevance— presenting exactly the problem that standing and ripeness are meant to prevent.

### A. The Quantification Request Is Not Justiciable

To establish Article III standing, the Tribe must submit evidence showing, "through specific facts," that (1) it has suffered an injury in fact that is both "concrete and particularized" and "actual or imminent;" (2) the injury is traceable to CVWD's conduct; and (3) it is "likely" that a favorable decision would redress the supposed injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 562 (1992); *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007) (same standard applies to declaratory judgment action).

The Tribe lacks standing to seek a declaration of the quantity of groundwater to which it is entitled because it has provided no basis to believe that it *will ever actually pump groundwater*, much less that there is an "imminent" dispute over the quantity the Tribe *could pump*. It is undisputed that the Tribe is entitled to both groundwater and surface water under state law, and yet it does not even attempt to

11

1    exercise its state right.  The fact that the Tribe's right (if any) to additional

2    groundwater has not been quantified simply does not injure the Tribe in any way.

3         Moreover, the Tribe fails to satisfy the requirement that a "threatened injury

4    must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l*

5    *USA*, 133 S. Ct. 1138, 1147 (2013).  It is too "speculative" that the Tribe will start

6    pumping groundwater "imminently," much less that the Tribe would pump so much

7    water that CVWD would somehow object. *Id.*  There is, in short, no basis to

8    conclude that the Tribe has an "imminent" need to know the outer bounds of its

9    water rights when it is not even exercising the state rights it already has.

10        The Tribe cannot meet the other standing requirements either.  Whatever

11   injury the Tribe might claim with respect to a quantification of its reserved right

12   could not possibly trace back to CVWD—CVWD has never interfered with any

13   efforts by the Tribe to produce groundwater, and any suggestion that CVWD would

14   do so in the future is pure guesswork.  Likewise, this Court could not redress even a

15   credible claim of injury because the Tribe has not joined in this action other

16   overlying landowners, each of whom can currently pump groundwater.  This Court

17   cannot bind those other landowners to a judgment, and the Tribe could not enforce

18   the judgment against them.  The Court should therefore dismiss the Tribe's water

19   quantification claim. *See Lujan*, 504 U.S. at 568 (failure to join agencies prevented

20   court from redressing alleged injuries).

21        Even if the Tribe could demonstrate standing, the Court should dismiss the

22   quantification question under prudential ripeness doctrine.  By ensuring that a

23   "concrete controversy will develop," *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S.

24   237, 245 (1952), ripeness doctrine prevents courts "from entangling themselves in

25   abstract disagreements," *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d

26   1134, 1138 (9th Cir. 2000) (en banc).

27        A claim is unfit for judicial resolution, and therefore unripe, when it (1) lacks

28   "specific factual context" and (2) delaying adjudication will not impose hardship on

12

the parties. *Id.* at 1141.  Both elements are present here.  First, there is no reason to think a concrete controversy will develop.  The Tribe has never bothered to adjudicate its correlative water rights under California law, leaving the Court in the dark as to whether the Tribe needs any additional water.  Nor is there any evidence that the Tribe currently needs groundwater or has plans to use it in the future, much less for what purpose the Tribe intends to use it.  The Tribe simply has offered no factual basis for the Court to adjudicate the Tribe's quantification claim.

Second, and for all the reasons shown above, there is no harm to withholding adjudication.  There is no pressing or practical reason why the Tribe currently needs to know the quantity of its reserved water right.  *See San Diego Cnty. Gun Rights Comm.v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996); *United States v. Braren*, 338 F.3d 971, 976 (9th Cir. 2003) (dispute over tribal water rights unfit for judicial review because facts undeveloped and a "declaration of water rights from a federal court today would provide no relief in any event").

## B.   The Tribe's Ownership Claim Is Not Justiciable

The Court also lacks jurisdiction over the Tribe's claim that it owns the groundwater storage space under the Reservation.  That issue does not relate to any "actual or imminent" injury.  The Tribe seeks a "declaration that it has a prior and paramount ownership interest in sufficient pore space . . . to store its Federally reserved right to groundwater for all present and future purposes."  Compl. ¶ 66.  But the Tribe is currently engaged in only a small recharge effort with its rights from the Whitewater River Adjudication, and neither of the Water Agencies has ever objected to those efforts.  SUF ¶ 73.

As shown below, groundwater storage space is a public resource under California law, and the Tribe therefore enjoys reasonable rights of storage in the groundwater aquifer.  The Tribe has not alleged any other use to which it is currently putting the groundwater storage space, nor has it alleged that CVWD's recharge operations are interfering the Tribe's present or immediate future uses.

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

The Tribe has no "concrete plan," or even any plan at all, that would appear to bring its claims to the groundwater storage space into conflict with CVWD's interests. *Thomas*, 220 F.3d at 1139.[6]

Unable to point to any specific controversy between the parties, the Tribe seeks a purely advisory opinion on the "ownership" of the groundwater storage space. The point of the ripeness doctrine is to keep courts out of such abstract disagreements.

## II.    The Proper Quantification Standard Is a Modified PIA Standard.

The first question before the Court in Phase 2—assuming arguendo the Court finds the Tribe has standing to present it and it is a ripe question—is the standard by which to quantify the Tribe's *Winters* groundwater right. CVWD explains below, in detail, the three steps the Court should follow under governing law. As noted here and the accompanying expert reports, this quantification process is highly fact bound—and turns on hydrologic, historic, economic, and other real-world factors— so in deciding on this legal test, the Court should be aware that, as it applies the test in Phase 3, it may wish to revisit these issues, given the benefit of more context.

### A.    Step 1: The Tribe's *Winters* Rights Cannot Exceed Its Share of the Subbasin's Natural Sustainable Yield

The first question that the Court must address in quantifying the Tribe's *Winters* right is how much groundwater is even available to allocate. *See Colville Confederated Tribes v. Walton*, 752 F.2d 397, 405 (9th Cir. 1985) (holding tribe must share proportional burden of water reduction with holders of concomitantly created water rights); *Pasadena v. Alhambra*, 33 Cal. 2d 908, 931 (Cal. 1949) (enjoining all groundwater users from pumping beyond aquifer's "safe yield"). Any quantification must protect groundwater rights preexisting the Reservation,

---

[6] Early in its Complaint, the Tribe alleges in passing that the Water Agencies are using the groundwater storage space underlying its reservation without paying compensation. Compl. ¶¶ 10, 12. However, the Tribe does not request compensation in either its causes of action or prayer for relief.

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

1  and, to avoid overdraft, must also be limited to the natural sustainable yield.  *See id.*

2        Groundwater overdraft, as noted earlier, raises serious problems ranging

3  from dropping groundwater levels to surface subsidence.  *E.g.*, Fogg Decl., Ex. A at

4  10.  As a result, virtually all of the western states, including California, have

5  adopted laws seeking to prevent the long-term overdraft of critically threatened

6  groundwater aquifers.[7]  Recognizing the threat that continued overdraft presents,

7  the Tribe itself seeks (unnecessarily) to enjoin the Water Agencies from

8  overdrafting the aquifer.  *Supra* n.5.  An aquifer, however, is an integrated body

9  that belongs to the public, rather than any single user.  *E.g.*, Fogg Decl., Ex. A at

10  17-18.  It is therefore critically important that the same rules apply to everyone.

11  The Tribe cannot legitimately argue that the Water Agencies be enjoined from

12  overdrafting the aquifer, while the Tribe be allowed to do so.

13        The Tribe also must share the natural sustainable yield with landowners

14  whose title traces back to the Southern Pacific Railroad's grants under the Texas

15  Pacific Railroad Act, 16 Stat. 573, 576 (1871).  Congress' grants to the railroad

16  predate the Tribe's rights by five years.  The United States plainly did not intend in

17  establishing the Reservation to deny water to the lands of the railroad.  For one

18  thing, Congress intended that the railroad would sell the land to local settlers.

19  Moreover, the railroad's land enjoyed groundwater rights under California state

20  law.  At the time of the 1871 grant to the railroad, California courts held that

21  landowners were entitled to use water underlying their land.  *See Hanson v. McCue*,

22  42 Cal. 303 (1871).[8]

23

24        [7] *See, e.g.,* Sustainable Groundwater Management Act of 2014, Cal. Water Code
§§ 10720 - 10737.8; Arizona Groundwater Management Act of 1980, 1980 Ariz.
25  Sess. Laws, 4th Spec. Sess, 1339; *Doherty v. Oregon Water Resources Dir.*, 783
P.2d 519 (Or. 1989); *Baker v. Ore-Ida Foods, Inc.*, 513 P.2d 627 (Idaho 1973).
26        [8] The California Supreme Court subsequently held that each overlying owner's
27  groundwater rights are subject to the "correlative rights" of other overlying owners.
*Katz v. Walkinshaw*, 74 P. 766 (Cal. 1903).  As a result, overlying owners must
28  equitably share the limited recharge of a groundwater aquifer.  *See id. at* 772-73.

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

Landowners, moreover, do not lose their groundwater rights from non-use. Like tribal owners of *Winters* rights, overlying owners in California are entitled to make use of their groundwater rights, even if they have not used them in the past. *See, e.g., Tehachapi-Cummings County Water Dist. v. Armstrong*, 49 Cal. App. 3d 992, 1001 (Cal. App. 1975).

*Winters* rights have always been subordinate to pre-existing water rights, *e.g.*, *Cappaert v. United States,* 426 U.S. 128, 138 (1976) (*Winters* rights are superior only to those of "future appropriators"), and there is no basis to favor the Tribe's right over the prior-existing rights of the railroad and its successors in interest.

For these reasons, the Tribe's *Winters* right cannot exceed (1) the natural, sustainable yield of the Indio Subbasin, *minus* (2) the state-recognized correlative rights of all overlying owners who trace their ownership to the Southern Pacific Railroad—the "allocable water" from the aquifer.  Determining the amount of "allocable water" would be the work of Phase 3, based on percipient and expert witness testimony and the hydrological record presented to the Court.

## B.    Step 2:  The Court Should Adopt a Modified PIA Standard

In determining how much of the "allocable water" to award the Tribe, the Court should use a modified PIA standard that reflects the Supreme Court's prior endorsement of the PIA standard while recognizing that the Tribe now operates a resort economy, not an agrarian economy.  Quantifying federal reserved water rights is a delicate task, requiring "sensitivity to [the] impact upon those who have obtained water rights under state law and to Congress' general policy of deference to state water law."  *New Mexico*, 438 U.S. at 718 (Powell, J., dissenting in part). Accordingly, the Supreme Court has held that *Winters* entitles the federal reservation to "only that amount of water necessary to fulfill the purpose of the reservation, no more," and that relief must be tailored to "minimal need." *Cappaert*,

---

This added constraint, however, did not deprive overlying owners of the basic right to groundwater that they had always enjoyed.

426 U.S. at 140-41; *see New Mexico*, 438 U.S. at 700-01 (*Winters* protects primary but not secondary reservation purposes); *CVWD*, 849 F.3d at 1270 (confirming that the "primary-secondary use distinction" applies to Indian tribes). These strict limitations are necessary because "federal reserved water rights will frequently require a gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators." *New Mexico*, 438 U.S. at 705.

Here, those strict minimal-need limitations call for a quantification standard that embraces the Reservation's historical, agrarian purposes, without ignoring the present-day reality that the Tribe stopped trying to farm decades ago. *E.g.*, Howitt Decl. Ex. A at 8. The Tribe is now a key participant in the Valley's lucrative resort economy—an interconnected web of goods and services that a rapid shift in water usage would entirely disrupt due to the Valley's scarce water resources. *Id.* at 13. The Court therefore should award the Tribe as much of the allocable water as the Tribe needs to support a resort economy (rather than an agricultural one) on the practicably irrigable acres likely to be developed on the Reservation. This approach retains the typical PIA standard used to quantify *Winters* rights for agriculture tribes, without turning a blind eye to the Tribe's current land developments, needs, and other Valley residents.

The Ninth Circuit has held that the primary purpose of the Reservation is agrarian. *See CVWD,* 849 F.3d at 1270. When quantifying *Winters* rights associated with agrarian reservations, courts have started out with the PIA standard, which the Supreme Court first adopted in *Arizona v. California*. 373 U.S. 546, 601 (1963).[9] Under this standard, courts first determine the total irrigable acreage on the reservation and then multiply by the "water duty," *i.e.* the amount of water

---

[9] The executive orders creating the reservation provide no support for any additional water for non-agrarian purposes. Cases providing additional water for purposes such as hunting and fishing have typically relied either on historical use of water for the purposes or special treaty language. *See, e.g., United States v. Adair*, 723 F.2d 1394, 1409-17 (9th Cir. 1983).

1  reasonably necessary to produce the maximum number of crops ordinarily grown

2  on a given tract of land.  *See, e.g.*, *Walton*, 752 F.2d at 403-04.

3      As this Court has recognized, however, *Arizona* is only the "analytical

4  starting point" for quantification.  *CVWD*, 2015 WL 13309103, at *4.  Courts have

5  modified the PIA standard to ensure that the tribe's minimal needs are met without

6  overly burdening other water users.  *See In re Gen. Adjudication of All Rights to

7  Use Water in the Big Horn River Sys.*, 753 P.2d 76, 112 (Wyo. 1988), *aff'd sub

8  nom. Wyoming v. United States*, 492 U.S. 406 (1989).  In the words of the Arizona

9  Supreme Court, the PIA standard, unless modified, "potentially frustrates the

10 requirement that federally reserved water rights be tailored to minimal need" by

11 awarding "an overabundance of water" instead of the water necessary for the

12 reservation to fulfill its purpose.  *In re Gila River*, 201 Ariz. 307, 318 (2001).

13     Although the U.S. Supreme Court has never addressed the question, there is

14 good reason to believe that it would also modify the PIA standard if failing to do so

15 would give a tribe more water than it needs, or would unduly encroach on other

16 water users.  The Court was poised to hold just that in *Wyoming*, the Court's first

17 opportunity after *Arizona* to explain how to quantify *Winters* rights.  In that case,

18 the majority of the Court had voted to place significant restrictions on the use of the

19 PIA standard.  Justice O'Connor even drafted an opinion so holding before having

20 to recuse herself.[10]

21     Justice O'Connor's recusal resulted in an equally divided Court and no

22 opinion.  Although not precedent, the O'Connor draft highlights the deficiencies

23 that insensitive application of the PIA standard can yield.  In particular, the draft

24 opinion emphasized that the focus should be on the tribe's "realistic needs," rather

26 [10] *See* Jennele Morris O'Hair, *The Federal Reserved Rights Doctrine and
Practicably Irrigable Acreage:  Past, Present, and Future*, 10 BYU J. Pub. L. 263,
27 289-291 (1996); Andrew Mergen & Sylvia Liu, *Misplaced Sensitivity: the Draft
Opinions in* Wyoming v. United States, 68 U. Colo. L. Rev. 683 (1997) (attaching
28 Justice O'Connor's draft opinion as an appendix).

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

1    than some theoretical need divorced from reality. Mergen & Liu, *supra*, at 738. In

2    discussing whether to include unirrigated lands in the PIA analysis, Justice

3    O'Connor explained that "[s]ensitivity to the impact on prior appropriators"

4    requires a "'practical' assessment—a determination apart from theoretical

5    economic and engineering feasibility—of the *reasonable likelihood* that future

6    irrigation projects, necessary to enable lands which have never been irrigated to

7    obtain water, will *actually* be built." *Id.*

8        Because the Tribe is no longer engaged in agriculture, and there is no

9    evidence that it will return to an agrarian economy in the future, a strict

10   interpretation of the PIA standard might deny the Tribe virtually any federal water.

11   Future irrigation projects will not "actually be built," and the primary purpose of

12   the Reservation was not to develop casinos, resorts, and golf courses. *Cf.*

13   *Washington v. Washington State Comm. Passenger Fishing Vessel Ass'n*, 443 U.S.

14   658, 686 (1979) (analogizing from *Winters* line of cases, and holding that tribe's

15   fishing rights were limited to the amount necessary for tribe members to maintain

16   "a moderate living"). Absent the Water Agencies' Colorado River imports,

17   moreover, little of the Tribe's lands would ever have been developed for any

18   purpose. *E.g.*, Howitt Decl. Ex. A, at 7 (discussing the linkage between Colorado

19   River imports and the Tribe's development).

20       CVWD, however, believes that a modified-PIA approach would be fairer to

21   all parties. The Court would begin by determining what Reservation acreage is

22   practicably irrigable *and* likely to be developed for *some* economically viable

23   purpose. The Court would then multiply by the amount of water reasonably needed

24   for the type of commercial or residential use to which the land is most likely to be

25   placed.[11] Assuming sufficient allocable water (the Step 1 question), this would

26

27       [11] Recognizing the limited water available in the Valley, this water duty should
     reflect good conservation practices. *See Big Horn River System*, 753 P.2d at 112.

28

19

provide the Tribe with water for current and future acreage, but limit the Tribe to the water needed to develop the land for its most likely purpose.

As noted, prior opinions show that an appropriate quantification standard must (i) be administrable,[12] (ii) honor the reservation's primary purpose,[13] (iii) award enough water to satisfy the Tribe's "minimal need,"[14] and (iv) do so with "sensitivity" to other water users.[15]  The modified-PIA approach meets all of these criteria.  It (i) employs a readily administrable quantification standard, (ii) incorporates the Tribe's agrarian purpose, (iii) gives the Tribe more than enough water to satisfy its "minimal need," and (iv) does not disrupt the Valley's water distribution.

## C.   Step 3:  The Tribe Is Not Entitled to Any Additional Water If Its Existing State-Law Water Rights Satisfy Its Needs

Quantification finally must take into account the Tribe's state rights.  Because the *Winters* right entitles the Tribe only to the amount of water necessary to fulfill the primary purpose of the reservation, *see Cappaert*, 426 U.S. at 140-41, the Tribe is only entitled to additional water to the extent its state-law rights do not suffice to fulfill that primary purpose.  If state rights suffice, then federal law does not entitle the Tribe to anything more.  Once the Court has determined the amount of the allocable water that the Tribe should receive under the modified-PIA standard, the Court should subtract all water available to the Tribe under current state law.  *See Walton*, 647 F.2d at 49 (subtracting well-watered tract from PIA analysis).[16]  The Tribe already enjoys under California law the right to withdraw all of the groundwater "that [it] can beneficially put to use on [its] land," subject only to the aquifer's "safe yield" and the claims of other overlying landowners.

---

[12] *See Arizona*, 373 U.S. at 601 (emphasizing feasibility of standard).

[13] *See New Mexico*, 438 U.S. at 700-01 (1978); *CVWD*, 849 F.3d at 1270.

[14] *Cappaert,* 426 U.S. at 140-41.

[15] *New Mexico,* 438 U.S. at 718 (Powell, J., dissenting in part).

[16] The Court also should make clear that the Tribe cannot claim water for any acreage for which it already is receiving sufficient water from the Water Agencies.

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

1  *Tehachapi-Cummings*, 122 Cal. Rptr. 924.  On top of that right, the Tribe also has

2  *surface* water rights sufficient "for all purposes," including irrigation of lands for

3  present and future needs.  SUF ¶¶ 69-70.  Indeed, the Tribe's economic success

4  shows it already has sufficient water to support the well-being of its members.

5  Howitt Decl. Ex. A at 13.  Any additional water awarded to the Tribe could

6  decrease overall economic activity in the Valley, to the detriment of the Tribe and

7  all other residents, *id.*, so the law requires that this calculus be carefully conducted.

8  **III.    The Tribe Does Not Own Groundwater Storage Space**

9      The second question for Phase 2—again assuming the Court reaches it—is

10  whether the Tribe "owns" the groundwater storage space underlying the

11  Reservation.  The answer is no.  As shown below, groundwater storage space is a

12  common resource that is not subject to ownership by the Tribe or any other

13  overlying owner.  This is the law of all States to have addressed the question and is

14  the only workable legal rule in the arid West.

15  **A.    State Courts Have Universally Held That Groundwater Storage**

16  **Space Is a Common Area Not Capable of Private Ownership**

17      All state courts to consider the question have come to the same conclusion:

18  Groundwater storage space is a common resource, not capable of private ownership

19  by the Tribe or any other overlying owners.  As these courts have recognized, *infra*,

20  adopting any other rule would pose major limitations on groundwater recharge and

21  thus effective water management in the West.  Fogg Decl. Ex. A at 6-7, 20-22.

22  Groundwater aquifers constitute systems through which water flows, and it would

23  be impossible to store water in one part of an aquifer without impacting other areas.

24  *Id.*

25      The Colorado Supreme Court considered this issue when a group of

26  landowners sought to prevent the Sportsmen's Ranch, a fellow landowner, from

27  "occupy[ing] the space beneath the lands . . . to store water or other substances on

28  or below the surface of the lands," claiming it would constitute a trespass.  *Bd. of*

21

1    *Cnty. Comm'rs of Cnty. of Park v. Park Cty. Sportsmen's Ranch, LLP*, 45 P.3d 693,

2    696 (Colo. 2002).  The court concluded that "Colorado law does not recognize a

3    land ownership right by which the Landowners can claim control of the aquifers as

4    part of their bundle of sticks." *Id*. at 709.  Particularly relevant here, the court

5    rejected the landowners' assertion that "common-law principles entitle them to

6    control the storage space in the aquifers underneath the surface of their land." *Id.* at

7    701.  The court reasoned that allowing the overlying property owners to control

8    who may store water or to charge for easements "would disharmonize Colorado's

9    historical balance between water use rights and land ownership rights." *Id.* at 714.

10         California courts have followed the same logic.  Its Court of Appeal has held

11   that no individual owns the groundwater—one merely has the "right to take and use

12   the water." *Cent. & W. Basin Replenishment Dist.*, *v. S. Cal. Water Co*., 109 Cal.

13   App. 4th 891, 905 (2003).  Therefore, groundwater storage—the place where this

14   water is stored and recharged—is a public resource. *Id*. at 904-05; *see City of Los*

15   *Angeles v. City of Glendale*, 142 P.2d 289 (Cal. 1943) (upholding city's right to

16   store imported surface water for later use); *City of Los Angeles v. City of San*

17   *Fernando*, 537 P.2d 1250 (Cal. 1975) (confirming city was entitled to store water

18   for recharge and later recapture).  The court maintained that the right to store water

19   is not linked to the right to use or extract water, refusing to sanction an approach

20   that would allow a legal interest in one right to result in an interest in all "linked"

21   rights. *Cent. & W. Basin*, 109 Cal. App. 4th at 910.  Such a right would bestow

22   "adjacent property owners . . . more control over their neighbors than nuisance law

23   affords them." *Id*. at 910.  And allocating storage space on a pro rata basis, the

24   court concluded, "fail[ed] to ensure that the storage space will be used for the

25   public benefit." *Id.* at 912.

26         Other state courts have agreed. *E.g.*, *In re Application U-2*, 413 N.W.2d 290,

27   298 (Neb. 1987) (Nebraska groundwater is owned by the public, and "the only right

28   held by an overlying landowner is in the use of the ground water"); *W. Maricopa*

22

*Combine, Inc. v. Ariz. Dep't of Water Res.*, 26 P.3d 1171, 1175-76 (Ariz. Ct. App. 2001) (private landowners cannot challenge transportation and storage of water on surface or in underground storage facility); *S.W. Sand & Gravel*, *Inc. v. Cent. Ariz. Water Conservation Dist.*, 212 P.3d 1, 5 (Ariz. Ct. App. 2008) (same).

## B.   The Court Should Incorporate State Law in Deciding the Character of the Groundwater Storage Space

The state courts' universal rejection of private ownership of groundwater provides the appropriate rule of decision in this case.  Specifically, the Court should adopt California law in determining whether the Tribe can own groundwater storage space.  Although Indian property rights are ultimately defined by federal law, courts frequently incorporate state law rather than developing their own separate federal rule of decision.  *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979).  Federal courts develop federal common law rules only if "there exists a significant conflict between some federal policy or interest and the use of state law."  *City of Milwaukee v. Illinois and Michigan,* 451 U.S. 304, 313 (1981).  "If state law can be applied, there is no need for federal common law; if federal common law exists, it is because state law cannot be used."  *Id.* at 313 n.7; *see United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 595-96 (1973) (courts should adopt well-established state law standards in the absence of "specific aberrant or hostile state rules.").

The Supreme Court's *Kimbell Foods* opinion sets out a three-factor test for deciding whether to incorporate state law as the federal rule of decision: (1) does the issue "require a nationally uniform body of law"; (2) would the use of state law "frustrate specific objectives of the federal programs"; and (3) would use of federal law "disrupt commercial relationships predicated on state law."  *Mardan Corp v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1458 (9th Cir. 1986).

The Supreme Court has applied the *Kimbell Foods* test and specifically endorsed relying on substantive state law in the context of Indian property rights.

In *Wilson v. Omaha Indian Tribe*, 442 U.S. 653 (1979), the Court held that Nebraska law regarding accretion and avulsion of riverbanks provided the right rule to adjudicate a dispute over tribal ownership of riparian land.  Acknowledging that "the Indians' right to the property depends on federal law," *id.* at 670, the Court nonetheless held that, under *Kimbell Foods*, applying state law was appropriate. The Court saw no specific need for a uniform body of federal law "as long as the applicable [state] standard is applied[] evenhandedly to particular disputes." *Id.* at 673.  "[E]quitable application of state law" would raise "little likelihood of injury to federal trust responsibilities [and] tribal possessory interests," providing "[a]dequate means . . . to insure fair treatment" of those interests. *Id.* at 673-74. And the Court recognized that "States have substantial interest in having their own law resolve controversies" involving property, and that borrowing state law would protect "the reasonable expectations of . . . private landowners" and "avoid arriving at one answer to . . . [a] dispute[] involving Indians on one side and possibly quite different answers with respect to neighboring land where non-Indians are the disputants." *Id.* at 674; *see Board of Comm'rs of Jackson County v. United States*, 308 U.S. 343, 352 (1939) (adopting state law as rule of decision in Indian rights case); *cf. Potomac Steam Boat Co. v. Upper Potomac Steam Boat Co.*, 109 U.S. 672, 682 (1884) (adopting general state-law approach to federal riparian water rights applicable in the District of Columbia).

The three *Kimbell Foods* factors all support relying on state law governing groundwater storage space.  As to the first factor, state law is already uniform, so there is no need to supplant that law with a different uniform federal rule.  With regard to the second, use of state law here would do nothing to frustrate any interest the Tribe has in storing water underground; indeed, it specifically protects that interest by cementing the universal understanding that groundwater storage— especially in the arid West—is a public resource.  As to the third factor, given the number of existing groundwater recharge operations in the West and the importance

24

of those operations to providing a public water supply in arid regions, establishing a contradictory federal rule has strong potential to interfere drastically with existing commercial relationships.  *See Omaha Indian Tribe*, 442 U.S. at 674.

### C.   The Court Should Follow the Logic of State Law Even if It Formulates Its Own Federal Rule

Moreover, even if the Court concludes that it should develop a uniform federal rule to address the question of the ownership of groundwater storage space underlying reservations, the Court should follow the uniform state-law rule rejecting ownership of groundwater storage space.  Any other rule would pose major limitations for groundwater recharge and storage.  As the Colorado Supreme Court recognized, "a common law rule that permits private ownership would . . . inject[] nearly unfathomable factual issues into the exercise of water use rights." *Park Cty. Sportsmen's Ranch*, 45 P.3d at 715.  And, as the Nebraska Supreme Court explained, private ownership in storage space overlooks fundamental hydrologic truth that *water moves*:  "It is completely unrealistic to pretend the water which accumulates under Tri-County's laterals and canals will remain in storage precisely under the lands which Tri-County has been authorized to service with irrigation waters.  The water, of necessity, will move into the entire natural storage field, following the laws of nature."  *In re Application U-2*, 413 N.W.2d at 296.

CVWD's expert reports underscore why any other rule is unworkable.  A groundwater basin is an integrated system in which the actions of pumping and recharge can have far-reaching consequences, but for which it is typically difficult to isolate one individual's effects from another.  Fogg Decl. Ex. A at 6-7, 20-22.  In this case, moreover, there are over 100 allotments (or individual parcels carved out of tribal lands) overlying the groundwater basin, all in patchwork pattern and four other overlying Tribes.  *Id*. at 33; Howitt Decl. Ex. A at 9; SUF ¶¶ 6-9.

As a result, any rule that gave an overlying Tribe or tribal owner the right to object to groundwater recharge if any of the groundwater seeped under its property

25

could force CVWD, or anyone else wishing to recharge groundwater including the Tribe, to negotiate with scores of individuals and entities for permission.  Any breakdown in negotiations would prevent valuable recharge efforts.  Such a rule, moreover, would raise immense proof issues, not to mention invite endless disputes and litigation.  Fogg Decl. Ex. A at 17-22.

Groundwater moves slowly and recharge of water in one spot can take years or decades to reach distant portions of the aquifer. *Id.* at 17-22.  When groundwater is recharged in one area, however, it can raise the water table in another portion of the aquifer even before any of the water reaches that portion. *Id.*  Under the Tribe's asserted rule, courts would face major challenges of determining whether water recharged in one area had actually moved under someone else's property. *Id.*

The reality is that all landowners and water users in the Valley, including the Tribe, benefit from the common ownership rule. *Id*. at 20-22.  If the court adopted a different approach, the Tribe itself could be liable to other tribes or, if the Court's ruling led California to change its legal approach, to other overlying owners, if the Tribe chose to store groundwater.

## D.  There Is No Precedent for Holding That Indian Tribes Own the Groundwater Storage Space Underlying their Reservations

The Tribe contends that *United States v. Shoshone*, 304 U.S. 111 (1938), supports its claim of groundwater storage space ownership.  It does not.  *Shoshone* considered whether the Shoshone Tribe owned timber and minerals on their Reservation under an 1868 treaty with the United States.  The Court concluded that the Shoshones did because such resources are "constituent elements of the land itself" that the United States knowingly and intentionally entrusted to the tribe. *Id.* at 116-17.  That is, ownership of timber and minerals *always* follows land ownership, so it did for the Shoshones as well.

As shown above, courts do not hold that property owners have exclusive ownership of underground storage space.  And no court has ever extended

26

*Shoshone* to water.  In fact, it is generally understood that the "*exception* to full beneficial ownership" under *Shoshone* "is water."  Cohen's Handbook of Federal Indian Law § 17.01 n.1 (2012).  In the tribal context, federal courts also have differentiated rights to minerals from rights to water and water-related resources. *See Andrus v. Charlestone Stone Prods.*, 436 U.S. 604, 615 (1978) ("One can readily imagine the legal conflicts that might arise from these differing approaches if ordinary water were treated as a federally cognizable 'mineral.'"); *Northern Pacific R. Co. v. Soderberg*, 188 U.S. 526, 530 (1903) (noting that defining a mineral as "any constituent of the earth's crust" would be "subversive").

This conclusion is confirmed by the *Shoshone* Court's reliance on the likely intent of the parties.  *See* 304 U.S. at 116-17.  When the treaty there was signed, the parties knew the land "contain[ed] valuable mineral deposits—gold, oil, coal, and gypsum" and "included more than 400,000 acres of timber."  *Id.* at 114.  Because the parties signed the treaty "with knowledge that there were mineral deposits and standing timber in the reservation," the Court concluded that the parties must have intended that the Tribe would own these resources.  *Id.* at 117.  Here, in contrast, neither the Tribe nor the United States would have contemplated that the executive orders creating the Reservation would have bestowed on the Tribe future rights to underground storage space.  Not surprisingly, there is no mention of groundwater storage space in the executive orders or other contemporaneous records.  Indeed, the Tribe relied on surface water after its creation.  SUF ¶ 62-65, 67.

In short, the Tribe's unprecedented claim that it owns the groundwater storage space under its land should be rejected, assuming the Court reaches it.

## IV.   A *Winters* Right Does Not Have a Unique Water Quality Component

The final question in Phase 2 is whether the Tribe's *Winters* rights include a water-quality component that would support its cause of action against storage of Colorado River water in the groundwater basins underlying the Tribe's Reservation. The Tribe seeks both a declaration and injunction that would prevent the Water

1  Agencies from recharging the aquifer with "imported water of a quality that is
2  inferior to the pre-existing groundwater in the aquifer."  Compl. ¶¶ 65, 74.  If
3  recognized, the Tribe's claim would prevent CVWD from solving the current
4  overdraft challenge in the Valley by importing and recharging Colorado River
5  water—water that has proven acceptable to tens of millions of people.

6      Notably, the United States does not join in the Tribe's water-quality claim.
7  And no precedent supports the Tribe's position that *Winters* rights include a unique
8  water-quality component.  Indeed, the right that the Tribe seeks is entirely
9  unnecessary because state nuisance law already fully protects *Winters* rights, like
10  all water rights, from substantial and unreasonable water-quality degradation.

11     Thus, this Court should grant CVWD partial summary judgment that
12  (i) *Winters* does not create a unique cause of action entitling a federal reservation to
13  water of a certain quality, and (ii) the Tribe's water quality claim should be
14  resolved in Phase 3 by applying California nuisance law.

## A.    Both the Federal and State Governments Carefully Regulate the Quality of Colorado Water River Water

17     The Colorado River constitutes a major water supply source for California,
18  Arizona, Colorado, Nevada, New Mexico, Utah, and Wyoming (the "Basin
19  States"), as well as Mexico.  It provides water to nearly 40 million people, irrigates
20  nearly 5.5 million acres of land, and provides water for at least 22 federally
21  recognized Indian tribes, 11 National Parks, seven National Wildlife Refuges, and
22  four National Recreation Areas.  SUF ¶ 30.  The federal government, state
23  governments, irrigation districts, public water agencies, and private citizens manage
24  and regulate its waters through a complex system.

25     The United States and the basin states regulate the salinity of the Colorado
26  River pursuant to the Clean Water Act ("CWA").  The Basin States complete a
27  required review of existing water quality standards for the river every three years,
28  *see* 33 U.S.C. § 303(c), and hold public meetings and develop standards governing

28

the basin through the Colorado River Salinity Control Forum.  Congress has passed a number of statutes specifically addressing Colorado River water quality as part of this massive, multi-state management and governance process.  *See* Colorado River Basin Salinity Control Act of 1974, Pub. L. No. 93-320, 88 Stat. 266; Act of Oct. 30, 1984, Pub. L. No. 98-569, 98 Stat. 2933; Federal Agriculture Improvement and Reform Act of 1996 § 334, Pub. L. No. 104-127, 110 Stat. 888, 996-1002.  In addition, the Safe Drinking Water Act requires CVWD to deliver the Tribe clean drinking water, *see* 42 U.S.C. § 300g-1(b)(1)(A), and California directly regulates the amount of salt allowed in that water, Cal. Code Regs. tit. 22, § 64449(a).

State law also regulates the quality of groundwater.  California's Porter-Cologne Water Quality Control Act requires regional water-quality control boards to develop water quality objectives and control plans to "protect[] against quality degradation" and ensure protection of beneficial uses, including domestic and agricultural use, in groundwater basins across the State.  Cal. Water Code §§ 13050(f), 13240, 13242.  Under the State's water-quality control plan for the Colorado River Basin and the State Water Resources Control Board's recycled water policy, CVWD must manage salts and nutrients to ensure that Basin water protects municipal, industrial, and agricultural uses.  Resolution No. 2009-011; 2015 Salt & Nutrient Plan at 2-5.  California also ensures the collection of accurate and thorough quality data through its Groundwater Ambient Monitoring and Assessment Program.  *See* Cal. Water Code §§ 10780-10782.3.

The Tribe does not allege that the Colorado River water CVWD uses to recharge the aquifer violates any of these standards.

### B.      The Tribe's Water Quality Claim Must Be Resolved Under California Nuisance Law Rather Than a Special Federal Rule.

No court has ever recognized a special federal water quality standard associated with a *Winters* right.  Assuming that the wide array of federal and state regulatory regimes already governing Colorado River water and the Basin fail to

29

ensure that the Tribe has access to groundwater of an adequate quality to meet its needs, this Court should not create such a standard here, but should instead hold that California nuisance law governs the Tribe's claim.

The Tribe's water quality claim sounds in nuisance, seeking (a) a declaration that CVWD's management of the Basin interferes with the Tribe's "ability to use and enjoy" its reserved groundwater rights, and (b) an injunction that prohibits the recharge program as a means to prohibit that interference. *See* Compl. ¶¶ 65, 70-71, 74, Prayer for Relief ¶¶ 5, 9.  California provides a readily available nuisance cause of action that would entitle the Tribe to relief if it could show that (1) CVWD's activity "interfere[s] with the [Tribe's] use and enjoyment of [its] property," that is, water necessary for the purposes of the reservation; (2) the invasion of that interest was unreasonable; and (3) the invasion was substantial. *San Diego Gas & Elec. Co. v. Super. Ct.*, 920 P.2d 669, 696 (Cal. 1996) (citing Restatement (Second) of Torts (1979)); Cal. Civil Code §§ 3479, 3481

California courts have recognized that nuisance law provides the proper framework for adjudicating water pollution claims.  For example, in the recent case of *Orange County Water District v. Sabic Innovative Plastics US, LLC*, 14 Cal. App. 5th 343, 401 (2017), the Court of Appeal held that "a claim of private nuisance" was an appropriate mechanism for addressing quality claims based on appropriative groundwater rights.  *See also Cent. & W. Basin Replenishment Dist.*, 135 Cal. Rptr. 2d at 500 (suggesting that nuisance law is the proper standard for interference with groundwater rights); *Newhall Land & Farming Co. v. Super. Ct.*, 23 Cal. Rptr. 2d 377, 381 (Ct. App. 1993) (analyzing groundwater contamination nuisance claims).

Federal courts agree:  "When it comes to water pollution th[e] Court has spoken in terms of 'a public nuisance.'"  *Illinois v. City of Milwaukee*, 406 U.S. 91, 106 (1972) (quoting *New York v. New Jersey*, 256 U.S. 296, 313 (1921)); *see City of Milwaukee v. Illinois*, 451 U.S. 304, 310 (1981); *North Dakota v. Minnesota*, 263

30

U.S. 365, 374 (1923); *Missouri v. Illinois*, 200 U.S. 496, 520-21 (1906).

The Tribe's *Winters* right is federal, but as explained earlier, the Supreme Court has held that federal courts should turn to federal causes of action only if "there exists a significant conflict between some federal policy or interest and the use of state law." *City of Milwaukee,* 451 U.S. at 313; *Mardan*, 804 F.2d at 1458. To determine whether a federal rule of decision is necessary, the Court applies the *Kimbell Foods* test. *Supra* at 23-24. Under that test, there is no basis to establish a distinct rule separate from the protections already afforded by state nuisance law.

*First*, there is no need for a uniform federal rule because California follows the generally accepted Restatement-based rules for nuisance actions. *See Kimbell Foods*, 440 U.S. at 728-29. Reliance on state law is particularly appropriate here, because the relevant cause of action is so historically grounded and therefore well-rooted in common doctrine. *See, e.g.*, Thomas W. Merrill, *Trespass, Nuisance, and the Costs of Determining Property Rights*, 14 J. Legal Stud. 13, 17 (1985) (noting that the Restatement's nuisance standard "is widely followed by American courts").

*Second*, state law would not frustrate any federal objective. For one thing, there is nothing about reserved rights generally that would argue against adopting a state-law rule of decision to enforce them. Indeed, the Supreme Court has made clear that such rights must be narrowly construed, "curtailing" state rights "only to the extent necessary to preserve" the uses for which the water was reserved, *Cappaert*, 426 U.S. at 141. *See Colo. River Water Conser. Dist. v. United States*, 424 U.S. 800, 812 (1976) ("Indian interests may be satisfactorily protected under regimes of state law.").

Nor is there anything about California nuisance law in particular that would interfere with the federal interests protected by federal reserved rights. California state nuisance law is neither "aberrant" nor hostile to the interests of the Tribe or the United States; rather, it provides the Tribe with protection against groundwater contamination under a widely recognized common law standard. *Cf. Little Lake*,

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

412 U.S. at 597-603.  In fact, the protection provided by California nuisance law—protection from degradation that interferes with the legitimate needs and purposes of the reservation—mirrors the federal reserved rights doctrine's focus on ensuring access to water that is "necessary to fulfill the very purposes for which a federal reservation was created."  *New Mexico*, 438 U.S. at 702.  Thus, as in *Omaha Indian Tribe*, 442 U.S. at 673, utilizing state law raises "little likelihood of injury to federal trust responsibilities [and] tribal possessory interests."  *See Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1204 (9th Cir. 1988) ("no conflict between" federal interests in clean air and "the use of California's common law of nuisance").

*Third*, applying a federal rule different from the California rule would significantly disrupt existing relationships.  *See Omaha Indian Tribe*, 442 U.S. at 674; *Kimbell Foods*, 440 U.S. at 740.  Groundwater recharge operations are growing in scale and importance across the West.  Fogg Decl., Ex A at 16-17.  Because such operations almost inevitably alter natural groundwater conditions by utilizing alternative sources, imposing a new federal rule (as opposed to the existing state rules in place) could derail such operations in basins providing tribal water, as well as other land-use activities affecting water quality.  If tribal rights are held to one standard and all other users are held to another, "one answer" to water quality claims could arise "in disputes involving Indians," while "quite different answers" could arise "where non-Indians are the disputants," *Omaha Indian Tribe*, 442 U.S. at 674—a result that this Court, under the *Kimbell Foods* test, must try to avoid.  When it comes to Colorado River water especially, imposing a distinct *Winters* right that might limit the ability to store that water underground could both eliminate a necessary water-supply source for millions of people and significantly complicate an already complex, interstate management system governing one of the most heavily utilized freshwater resources in the world.  SUF ¶ 30.

There is, in other words, no basis whatever to create a federal water quality standard distinct from the applicable California law of nuisance, which fully

32

protects the Tribe's ability to protect itself from water pollution, and does not conflict with federal objectives or policies in any respect.

### C.   No Court Has Ever Extended the Reserved Rights Doctrine to Incorporate a Unique Cause of Action for Water Quality.

It is no surprise, then, that no court has held that the *Winters* doctrine incorporates a unique cause of action to enforce water-quality claims separate from state nuisance law.  In *United States v. Gila Irrigation District*, 920 F. Supp. 1444 (D. Ariz. 1996), the court concluded that the San Carlos Apache Tribe was entitled to an injunction because upper-basin farming had degraded the quality of Gila River water and "the effect . . . on the Apache Tribe's efforts to revitalize their agriculture [was] of a magnitude warranting some form of injunctive relief." *Id.* at 1454.  But *Gila* was not based on an implied federal reserved right—rather, the court was construing a 1935 consent decree specifically granting the Apache "a right . . . to the 'natural flow'" of the Gila River.  *Id.* at 1448; *see United States v. Gila Valley Irrigation Dist.*, 804 F. Supp. 1, 7 (D. Ariz. 1992), *vacated in part*, 31 F.3d 1428 (9th Cir. 1994) (determining whether "return flows" from irrigation violated the Indians' right to "natural flow" as specified by the decree).  The court did not suggest that the reserved rights doctrine itself provided a remedy.

In *United States v. Anderson*, 591 F. Supp. 1 (E.D. Wash. 1982), *rev'd in part*, 736 F.2d 1358 (9th Cir. 1984), the court similarly did not suggest that *Winters* rights include a unique cause of action for water pollution.  There, the question was the amount of water needed to "preserve fishing" in a particular creek.  *Id.* at 5. The court concluded that the tribe's rights extended to sufficient water to ensure water cool enough to support salmon.  The court did not consider whether there was a separate reserved right to protection against contamination.[17]

---

[17] In a previous opinion, *United States v. Anderson*, 6 Indian L. Rep. F-129, F-129-30 (E.D. Wash. 1979), the court made clear that it addressed only "three issues: first, the validity of the Tribe's claim to a reserved water right for the purpose asserted; second, the *quantity of water* which is sufficient to fulfill that purpose; and

Finally, in *Hopi Tribe v. United States*, 782 F.3d 662, 669 (Fed. Cir. 2015), the Federal Circuit stated in dictum that the United States "may" have the "power to enjoin others from practices that reduce the quality of water feeding" a reservation. The court did not explain whether the basis would be nuisance or some other cause of action and cited only *Gila*, which, as noted above, did not rest on *Winters*.

In sum, this Court should not be the first to recognize a special federal rule applicable to reserved-right water quality claims. The Tribe's complaint presents a claim for relief sounding in nuisance to address its water quality concerns. The Court should resolve that claim, using California nuisance law, in Phase 3.

## CONCLUSION

The Court should grant partial summary judgement in CVWD's favor and dismiss the Tribe's quantification and water quality claims for lack of jurisdiction. In the alternative to dismissing these claims for lack of jurisdiction, the Court should (i) adopt the modified PIA quantification standard described above; and (ii) hold that the Tribe has no ownership right in groundwater storage space. On the third question presented in Phase 2, the Court should hold that California nuisance law applies to the Tribe's water quality claim.

Respectfully submitted this 20th day of October 2017.

Dated: October 20, 2017          /s/ Barton Thompson, Jr.
                                 BARTON THOMPSON, JR.
                                 MATT KLINE
                                 ANTON METLITSKY
                                 DANIEL R. SUVOR
                                 O'MELVENY & MYERS LLP

---

third, the priority date of the reserved right." The court did not purport to address a separate claim to water quality.

CVWD'S PHASE 2 NOTICE OF
MOTION AND MEM. OF P. & A.
NO. 5:13-CV-00883-JGB (SPx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: October 20, 2017

/s/ Steven B. Abbott
STEVEN B. ABBOTT
GERALD D. SHOAF
REDWINE AND SHERRILL, LLP

*Attorneys for CVWD*

35

1

## **Certification in Compliance with Local Rule 5-4.3.4**

2       I hereby certify that, pursuant to Local Rule 5-4.3.4, I have obtained the

3  authorization from the above signatories to file the above-referenced document, and

4  that the above signatories concur in the filing's content.

5

6   Dated:  October 20, 2017          /s/ Barton Thompson, Jr.

                                      BARTON THOMPSON, JR.

7                                     O'MELVENY & MYERS LLP

8
9                                   *Attorney for Defendants Coachella Valley*
*Water District, and G. Patrick O'Dowd, Ed*
10                                 *Pack, John Powell, Jr., Peter Nelson and*
*Castulo R. Estrada, sued in their official*
11                                 *capacity as members of the Board of*
*Directors*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1