1   CATHERINE F. MUNSON (D.C. Bar No. 985717, admitted *pro hac vice*)
    CMunson@kilpatricktownsend.com
2   MARK REEVES (D.C. Bar No. 1030782, admitted *pro hac vice*)
    MReeves@kilpatricktownsend.com
3   KILPATRICK TOWNSEND & STOCKTON, LLP
    607 14th Street, N.W., Suite 900
4   Washington, D.C. 20005
    Tel:  (202) 508-5800; Fax:  (202) 508-5858
5
    STEVEN C. MOORE (CO Bar No. 9863, admitted *pro hac vice*)
6   Smoore@narf.org
    HEATHER WHITEMAN RUNS HIM (NM Bar No. 15671, admitted *pro hac vice*)
7   HeatherW@narf.org
    NATIVE AMERICAN RIGHTS FUND
8   1506 Broadway
    Boulder, CO 80302
9   Tel:  (303) 447-8760; Fax:  (303) 443-7776

10  JOHN TABINACA PLATA (CA Bar No. 303076)
    jplata@aguacaliente.net
11  AGUA CALIENTE BAND OF CAHUILLA INDIANS
    5401 Dinah Shore Drive
12  Palm Springs, CA 92264
    Tel: (760) 699-6837; Fax: (760) 699-6963
13

14  Attorneys for Plaintiff
    Agua Caliente Band of Cahuilla Indians

15              **UNITED STATES DISTRICT COURT**

16       **CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

| | |
|---|---|
| 17 AGUA CALIENTE BAND OF | Case No.:   ED CV 13-00883-JGB-SPX |
| 18 CAHUILLA INDIANS, | Judge:   Jesus G. Bernal |
| 19            Plaintiffs, | **AGUA CALIENTE BAND OF** |
| 20 | **CAHUILLA INDIANS'** |
| v. | **MEMORANDUM OF POINTS AND** |
| 21 | **AUTHORITIES IN SUPPORT OF** |
| 22 COACHELLA VALLEY WATER | **MOTION FOR SUMMARY** |
| DISTRICT, et al. | **JUDGMENT ON PHASE II ISSUES** |
| 23 | |
| 24            Defendants. | Hearing Date:   January 22, 2018 |
| | Time:   9:00 A.M. |
| 25 | Courtroom:   1 |
| 26 | |
| 27 | Action Filed:   May 14, 2013 |
| 28 | |

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................iii

BACKGROUND .............................................................................................1

I.   Procedural History ...............................................................................1

II.   Law of the Case ...................................................................................1

III.  Factual Background .............................................................................2

ARGUMENT & ANALYSIS ..............................................................................4

I.   Agua Caliente's Federal Reserved Water Right Should be Quantified in the Amount Necessary to Irrigate All of the Irrigable Acreage Set Aside for the Tribe by the United States and to Meet the Reservation's Homeland Needs.................................................................5

    A.   The United States Established the Agua Caliente Reservation to Serve as a Permanent Home for the Agua Caliente People and to Support the Establishment of an Agrarian Economy in the Coachella Valley Desert. .............................................6

    B.   When Agricultural Pursuits are One of the Purposes of a Reservation, the Amount of Water Reserved for that Purpose is Appropriately Quantified Based on the Irrigable Acreage Reserved. .......................................................................8

    C.   The PIA Standard is Based on the Irrigability of the Lands that the United States Reserved for Agua Caliente, and the Amount of Water Reserved is not Reduced Based on Subsequent Land or Water Use..............................................10

        1.   Indian tribes can use PIA-based water rights for any lawful purpose. ..........................................................11

        2.   The PIA standard measures a federal reserved water right based on the irrigable acreage set aside for the tribe regardless of subsequent land use or development. ...12

    D.   The Homeland Purpose of the Agua Caliente Reservation Supports the Quantification of Additional Water Rights to the Extent Necessary to Satisfy that Purpose. ......................................13

II.  Agua Caliente's Federal Reserved Water Right Includes a Quality Component. ........................................................................................14

    A.   The Rationale of the Winters Doctrine Applies Equally to Water Quality and Quantity.....................................................15

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

i

A.    The United States' Property Interest in Reserved Water May not be Destroyed Via Degradation...................................................17

B.    Agua Caliente's Right to Water Quality is Consistent with California Law. ...................................................18

III.    **Agua Caliente Owns the Subterranean Pore Space Underlying its Reservation.**...................................................19

**CONCLUSION** ...................................................20

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

1
2

# <u>TABLE OF AUTHORITIES</u>

3
4

**Cases**

5
6

*Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*,
    849 F.3d 1262 (9th Cir. 2017).................................................................................passim

*Arizona v. California*,
    373 U.S. 546 (1963)...............................................................................................passim

*Arizona v. California*,
    439 U.S. 419 (1979).......................................................................................................11

*Cappaert v. United States*,
    426 U.S. 128 (1976).........................................................................................................5

*Colville Confederated Tribes v. Walton*,
    647 F.2d 42 (9th Cir. 1981)......................................................................................passim

*Crow Tribe of Indians v. Peters*,
    835 F. Supp. 2d 985 (D. Mont. 2011)...........................................................................19

*Crum v. Mt. Shasta Power Corp.*,
    4 P.2d 564 (Cal. Ct. App. 1931)....................................................................................19

*Dep't of Transp. v. Goike*,
    560 N.W.2d 365 (Mich. Ct. App. 1996) ........................................................................20

*Emeny v. United States*,
    412 F.2d 1319 (Ct. Cl. 1969) .........................................................................................20

*Hopi Tribe v. United States*,
    782 F.3d 663 (Fed. Cir. 2015)........................................................................................16

*Hunt v. United States*,
    278 U.S. 96 (1928).........................................................................................................18

*Kittitas Reclamation Dist. v. Sunnyside Valley Irr. Dist.*,
    763 F.2d 1032 (9th Cir. 1985)........................................................................................17

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976)..................................................................................................17, 18

*Montana v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*,
    712 P.2d 754 (Mont. 1985) ..........................................................................................6, 9

*Mosser v. Denbury Res., Inc.*,
    898 N.W.2d 406 (N.D. 2017)..........................................................................................20

*Oklahoma v. Tyson Foods, Inc.*,
    258 F.R.D. 472 (N.D. Okla. 2010)..................................................................................16

*Phoenix Water Co. v. Fletcher*,

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON
PHASE II ISSUES

23 Cal. 481 (1863).................................................................................18

*PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*,
    511 U.S. 700 (1994).........................................................................16

*Puyallup Indian Tribe v. Port of Tacoma*,
    717 F.2d 1251 (9th Cir. 1983)............................................................6

*Starrh & Starrh Cotton Growers v. Aera Energy, LLC*,
    153 Cal. App. 4th 583 (2007) ...........................................................20

*Thomas v. Bible*,
    983 F.2d 152 (9th Cir. 1993) (*cert denied* 508 U.S. 951 (1993) ...............2

*Town of Antioch v. Williams Irr. Dist.*,
    205 P. 688 (1922)............................................................................18

*United States v. 43.42 Acres of Land*,
    520 F. Supp. 1042 (W.D. La. 1981).....................................................20

*United States v. Adair*,
    723 F.2d 1394 (9th Cir. 1984).......................................................passim

*United States v. Ahtanum Irrigation Dist.*,
    236 F.2d 321 (9th Cir. 1956)..............................................................5

*United States v. Alexander*,
    106 F.3d 874 (9th Cir. 1997)..............................................................1

*United States v. Anderson*,
    591 F. Supp. 1 (E.D. Wash. 1982) *aff'd in part, rev'd in part,* 736 F.2d 1358 (9th Cir. 1984)........................................................................................17

*United States v. Gila Valley Irrigation District*,
    920 F. Supp. 1444  (D. Ariz. 1996)....................................................16

*United States v. New Mexico*,
    438 U.S. 696 (1978) .........................................................................8

*United States v. Shoshone Tribe of the Wind River Reservation in Wyo.*,
    304 U.S. 111 (1938)....................................................................19, 20

*United States v. Walker River Irr. Dist.*,
    104 F.2d 334 (9th Cir. 1939).............................................................17

*United States v. Wash. Dep't of Ecology*,
    375 F. Supp. 2d 1050 (W.D. Wash. 2005)....................................9, 11, 14

*Wilson v. Omaha Indian Tribe*,
    442 U.S. 653 (1979) .......................................................................19

*Winters v. United States*,
    207 U.S. 564 (1908)...................................................................passim

*Wright v. Best*,
    121 P.2d 702 (Cal. 1942) .................................................................18

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES

## Statutes

Mont. Code Ann. § 82-11-180(3) ..................................................................19

N.D. Cent. Code § 47-31-03 .......................................................................19

Wyo. Stat. Ann. § 34-1-152(a) ...................................................................19

## Other Authorities

*Cohen's Handbook of Federal Indian Law* § 19.03[5][b] (Nell Jessup Newton ed., 2012)..........................................................................................9, 11, 16

Property Clause of the United States Constitution, Art. IV, Sec. 3, Cl. 2 ..................17

Report of Special Master Elbert P. Tuttle, *Arizona v. California*, O.T. 1981 (Feb. 22, 1982)...........................................................................12

Report of Special Master Simon H. Rifkind, *Arizona v. California*, O.T. 1960 (Dec. 5 1960) (Rifkind) ..........................................................passim

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

Pursuant to this Court's September 6, 2017 Order (Doc. 193), Plaintiff Agua Caliente Band of Cahuilla Indians (Agua Caliente) hereby moves the Court to determine that: (1) Agua Caliente's federal reserved water right will be quantified as the full amount of water necessary to irrigate all practicably irrigable acreage set aside for Agua Caliente by the United States and to accomplish the Reservation's homeland purpose; (2) Agua Caliente's federal reserved water right includes a water quality component, to be determined in Phase 3 of this case, in addition to a quantity component; and (3) Agua Caliente is the beneficial owner of subterranean pore space underlying its Reservation, the amount of which will be quantified in Phase 3.

## BACKGROUND

### I.    Procedural History

Agua Caliente filed suit in 2013 seeking declarations that it has a federal reserved right to a certain quantity and quality of water and that it owns the pore space underlying its reservation as well as associated injunctive relief. *See* Complaint (Doc. 1). After stipulating to trifurcate the case, the parties filed Phase 1 cross-motions for summary judgment addressing, *inter alia*, whether Agua Caliente has a federal reserved right to groundwater underlying the Agua Caliente Reservation. This Court ruled that Agua Caliente does have a federal reserved right to such groundwater, *see* March 24, 2015 Order (Doc. 116) (Phase 1 SJ Order), and the Ninth Circuit affirmed. *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262 (9th Cir. 2017). The defendant water districts have filed a petition for *certiorari* seeking Supreme Court review of the Ninth Circuit's decision. This Court ordered the parties to proceed with Phase 2 briefing while the cert petition is pending. *See* Doc. 193.

### II.    Law of the Case

The law of the case doctrine generally precludes a court from "'reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.'" *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (quoting *Thomas*

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES

*v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993) (*cert denied* 508 U.S. 951 (1993))). The doctrine applies to several issues in this case, including that "the United States intended to reserve water when it established a home for [] Agua Caliente" and that "the Agua Caliente Reservation carried with it an implied right to use water from the Coachella Valley aquifer." *Agua Caliente*, 849 F.3d at 1272-73.

It is also law of the case that "[t]he general purpose [of an Indian reservation], *to provide a home for the Indians*, is a broad one and must be liberally construed" and that "the underlying purpose" of the Agua Caliente Reservation is "to establish a home and support an agrarian society." *Id.* at 1270 (internal quotation omitted, emphasis in original). "Put differently, the primary purpose underlying the establishment of the reservation was to create a home for the Tribe." *Id.*

## III.   Factual Background

The United States established the Agua Caliente Reservation by executive orders in 1876 and 1877 following a prolonged effort by the United States to provide for the Indians of Southern California in the face of increasing encroachment and depredation by white settlers. Tribe's Statement of Undisputed Facts, Phase 1, Doc. 85-4, SF 38, Tab 1, p. 24-25; Doc 85-4, SF 38, Tab 2, p. 71.[1] In the decades leading to the establishment of the Reservation, federal officials described conditions of the Cahuilla Indians resulting from white encroachment as "deplorable," "sadly neglected" and "almost entirely destitute of the means of subsistence." Doc. 85-4, SF 38, Tab 1, p. 24; Doc. 85-4, SF 81, Tab 3, p. 148.

---

[1] Each of the documents the Tribe cites in the factual background were included in the Tribe's Statement of Undisputed Facts in the Phase 1 briefing and are undisputed by the water districts and not subject to evidentiary objections. All pin cites to previous pleadings are to the page number of the .pdf filed with the Court rather than to the page number appearing at the bottom of the pages. Consistent with the Court's Standing Order, the Tribe has prepared an accompanying tabbed appendix with the selection of documents for the Court.

KILPATRICK TOWNSEND & STOCKTON
607 14th STREET , STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES

The United States' purpose in reserving land for Agua Caliente was to create a permanent home where "they would soon become self-sustaining." Doc 85-4, SF 73, Tab 4, p. 104. Agricultural practices had sustained Agua Caliente for generations, and the United States intended for the Tribe to eventually transition to a more intensive Euroamerican style of agriculture that required access to sufficient land and water resources. *See infra*.

Special Agent John Ames observed in 1874, when addressing the need for the United States to reserve land for Agua Caliente, that:

> Water is an absolutely indispensable requisite for an Indian settlement, large or small. It would be worse than folly to attempt to locate them on land destitute of water, and that in sufficient quantity for the purposes of irrigation . . . .

Doc. 85-4, SF 39-43, Tab 5, p. 20.

In 1875, Indian Agent D.A. Dryden envisioned the Agua Caliente Reservation serving as a permanent homeland where Agua Caliente would engage in agricultural practices. He described the Reservation as one that would "meet the present and future wants of these Indians, by giving them exclusive and free possession of these lands . . . [t]hey will be encouraged to build comfortable houses, improve their acres, and surround themselves with home comforts." Doc. 85-4, SF 44-47, Tab 1, p. 25.

Following the issuance of the 1876 executive order setting aside 880 acres of lands recommended by Agent Dryden, however, it became immediately apparent that the lands were insufficient to serve as a permanent and agricultural homeland for the Tribe. Doc. 85-4, SF 52-55, Tab 6. Dryden maintained that Congress must appropriate additional funds for the purpose of "securing a large tract of land as a reservation for these people." Doc. 85-4, SF 51-55, Tab 6, p. 36. One year later, Commissioner Smith wrote to newly appointed agent J.E. Colburn, explaining that the Indians needed "to be put in secure possession of lands suitable for cultivation." Doc. 85-4, SF 57, Tab 7, p.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

3

48. Smith instructed Colburn to make "strenuous efforts" to reserve "every available foot of vacant arable land" for the "permanent occupation" of the Tribe. *Id.*

In response, Agent Colburn issued a report indicating that he believed it was the federal government's intention to put the Tribe "permanently in possession of lands which they may cultivate as their own." Doc. 85-4, SF 58-59, Tab 8, p. 53. Colburn explained that his "first purpose" was to "secure the Mission Indians permanent homes, with land and water enough, that each one who will go upon a reservation may have to cultivate a piece of ground as large as he may desire." Doc. 85-4, SF 58-59, Tab 8, p. 55. Approximately one month later, President Hayes issued the 1877 Executive Order setting aside much of the land Agent Colburn had identified and expanding the Reservation to more than 30,000 acres. Doc. 85-4, SF 60-66, Tab 9. These historical records, and others, led the Ninth Circuit to hold that the purpose of the Agua Caliente Reservation was "to establish a home and a support an agrarian society." *Agua Caliente*, 849 F.3d at 1270.

## ARGUMENT & ANALYSIS

This phase of the case addresses three legal questions: (1) the appropriate standard(s) for quantifying the amount of water that the United States impliedly reserved for Agua Caliente; (2) whether there is a quality component to Agua Caliente's federal reserved water right; and (3) whether Agua Caliente owns the pore space underlying its Reservation. *See* Doc. 193 at 1. Pursuant to the Court's Order and the parties' stipulation, Agua Caliente's brief is limited to those three narrow, legal issues. Additional issues pertaining to the quantification, use, or implications of the legal rights at issue are deferred to Phase 3 and not addressed herein.

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**I.    Agua Caliente's Federal Reserved Water Right Should be Quantified in the Amount Necessary to Irrigate All of the Irrigable Acreage Set Aside for the Tribe by the United States and to Meet the Reservation's Homeland Needs.**

The Ninth Circuit having held that the United States reserved groundwater for Agua Caliente when it established the Agua Caliente Reservation, *Agua Caliente*, 849 F.3d at 1272-73, this Court must now confront "[t]he more difficult question concern[ing] the amount of water reserved." *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981). The first step in addressing this question, as stipulated by the parties and ordered by the Court, is to determine the legal standards that this Court will use to quantify Agua Caliente's federal reserved water right.

A handful of settled legal principles inform the selection of the appropriate quantification standards. When the United States establishes an Indian reservation, it immediately "acquires a water right vesting on the date the reservation was created." *Walton*, 647 F.2d at 46 (citing *Cappaert v. United States*, 426 U.S. 128, 138 (1976)); *see also Arizona v. California*, 373 U.S. 546, 600 (1963). The amount of water reserved is the amount "necessary to accomplish the purpose of the reservation," and a reservation may have more than one purpose for which water is reserved. *Agua Caliente*, 849 F.3d at 1268; *see United States v. Adair*, 723 F.2d 1394, 1409-10 (9th Cir. 1984) (citing *Cappaert*, 426 U.S. at 141); *Walton*, 647 F.2d at 47-48. The reserved right is not limited to the amount of water used by the reservation at any point in time, but instead is "intended to satisfy the future as well as the present needs" of the reservation. *Arizona*, 373 U.S. at 600; *see also Adair*, 732 F.2d at 1408-09; *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 326-27 (9th Cir. 1956). Accordingly, the right must be quantified in a way that ensures the availability of water for the continued development and eventual full use of the reserved land.

These principles, as explained in detail below, support the adoption of two quantification standards for Agua Caliente's federal reserved water right. First, to

accomplish the Reservation's agricultural purpose, water should be quantified based on the practicably irrigable acreage (PIA) standard adopted by the Supreme Court in *Arizona v. California*. Second, to accomplish the Reservation's homeland purpose, the reserved right also should include enough water to accommodate the use and occupation of any land within the Reservation that is not practicably irrigable.

### A. The United States Established the Agua Caliente Reservation to Serve as a Permanent Home for the Agua Caliente People and to Support the Establishment of an Agrarian Economy in the Coachella Valley Desert.

"The federal purpose for which land was reserved is the driving force behind the reserved rights doctrine." *Agua Caliente*, 849 F.3d at 1269; *see also Walton*, 647 F.2d at 48 ("[T]he purposes for which the reservation was created govern[] the quantification of reserved water ...."). Accordingly, to determine the proper standard for quantifying Agua Caliente's federal reserved water right, it is first necessary to identify the purposes of the Agua Caliente Reservation.

To determine the purposes of an Indian reservation, courts look to (1) "the document and circumstances surrounding its creation"; (2) "the history of the Indians for whom it was created"; and (3) the need of the Indians "to maintain themselves under changed circumstances." *Walton*, 647 F.2d at 47. At the same time, courts are mindful that "[t]he specific purposes of an Indian reservation ... were often unarticulated," and "[t]he general purpose, to provide a home for the Indians, is a broad one and must be liberally construed." *Id.* To the extent that there are any doubts or uncertainties as to the Reservation's purposes, the Indian canons of construction established and applied in *Winters v. United States*, 207 U.S. 564, 576-77 (1908), require that they be resolved, and that the executive orders be construed liberally, in favor of Agua Caliente. *See Montana v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 712 P.2d 754, 762-63 (Mont. 1985) (citing numerous federal cases); *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251, 1257 n.6 (9th Cir. 1983); *see also Walton*, 647 F.2d

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

at 47 n.9 ("The rule of liberal construction should apply to reservations created by Executive Order.").

The Ninth Circuit has recognized that the purposes of the Agua Caliente Reservation are "to establish a home *and* support an agrarian society." *Agua Caliente*, 849 F.3d at 1270 (emphasis added). These purposes are well supported by the historical record. The executive orders establishing the Agua Caliente Reservation provide that it was set aside in 1876 "'for the permanent use and occupancy'" of the Agua Caliente people, with additional lands added the next year "'for Indian purposes.'" *See* Phase 1 SJ Order at 4 (quoting executive orders); *see also Adair*, 723 F.2d (noting that the Ninth Circuit previously ascertained agrarian homeland and fishing purposes for an Indian reservation based on a similarly terse, "one-paragraph Executive Order") (citing *Walton*, 647 F.2d at 47 n.8). Correspondence among federal officials contemporaneous to the establishment of the Reservation repeatedly mentions the United States' desire to establish a place where the Indians would "'be encouraged to build comfortable houses [and] improve their acres'" and where each one would have "'land and water enough … to cultivate a piece of ground as large as he may desire.'" Doc. 85-4, SF 44-47, Tab 8, p. 55. Special Agent Ames stressed that "[i]t would be worse than folly to attempt to locate [Agua Caliente and other Mission Indians] on land destitute of water, and that in sufficient quantity for purposes of irrigation …." Doc. 85-4, SF 39-43, Tab 5, p. 20. And Commissioner of Indian Affairs John Smith instructed the local Indian agent to make "strenuous efforts … at the earliest possible date" to identify for reservation "every available foot of vacant arable land." Doc. 85-4, SF 51-55, Tab 7, p. 49. The entire historical record surrounding the creation of the Agua Caliente Reservation shows that the United States intended to set aside sufficient arable land and water resources to provide a permanent homeland where the Agua Caliente people could not only live self-sufficiently, but also establish an agrarian based economy. *See generally* Factual Background, *supra*. The Tribe's federal reserved water right should be quantified based on those purposes.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

1   While the water districts likely will continue to assert that Agua Caliente's federal
2   reserved water right is limited by the Supreme Court's distinction between primary and
3   secondary reservation purposes in *United States v. New Mexico*, 438 U.S. 696 (1978),
4   and its concomitant declaration that water is reserved only to the extent necessary to
5   accomplish the former, that distinction is irrelevant here. *New Mexico*, while providing
6   "useful guidelines," is "not directly applicable to *Winters* doctrine rights on Indian
7   reservations." *Adair*, 723 F.2d at 1408-09. As discussed *supra*, the "primary purposes"
8   of Indian reservations established more than a century ago often were not well
9   articulated, and the law requires that the purposes of Indian reservations, unlike those
10   of other federal reservations, be broadly and liberally construed. *See, e.g.*, *Walton*, 647
11   F.2d at 47. Moreover, even if *New Mexico*'s primary/secondary distinction applied with
12   full force, it would not affect the result. The Ninth Circuit has already determined, and
13   the historical record confirms, that the dual primary purposes of the Agua Caliente
14   Reservation are "to establish a home and support for an agrarian society." *Agua
15   Caliente*, 849 F.3d at 1270. That determination is law of the case. *See supra* at 1-2.
16   Agua Caliente therefore has a federal reserved right to the amount of water necessary
17   to accomplish those purposes.

**B.    When Agricultural Pursuits are One of the Purposes of a Reservation, the Amount of Water Reserved for that Purpose is Appropriately Quantified Based on the Irrigable Acreage Reserved.**

20   In *Arizona v. California*, the Supreme Court established PIA as the presumptive
21   standard for quantifying the federal reserved water rights needed to satisfy an Indian
22   reservation's agrarian purpose. *See Arizona*, 373 U.S. at 600-01 Phase 1 SJ Order at 5.
23   In an extensive report in that case, Special Master Simon Rifkind reasoned that only by
24   immediately "reserving sufficient water to irrigate all of the practicably irrigable lands
25   in a Reservation … could the United States ensure that the Reservation lands would be
26   usable when needed to support an Indian economy." Report of Special Master Simon

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

H. Rifkind, *Arizona v. California*, O.T. 1960, Orig. pp. 262 (Dec. 5 1960) (Rifkind).[2] The Supreme Court agreed, adopting Master Rifkind's findings that "water was intended to satisfy the future as well as the present needs of the Indian Reservations and … that enough water was reserved to irrigate all the practicably irrigable acreage on the reservations" and holding that PIA was "the only feasible and fair way" to quantify the water reserved to accomplish the agricultural purpose of the reservations at issue. *Arizona*, 373 U.S. at 600-01. *Arizona* instructs that where, as here, the United States establishes an Indian reservation with an agrarian purpose, the amount of water reserved for that purpose is measured by PIA.

Post-*Arizona* case law from lower courts reinforces that PIA, while not the sole and exclusive means of quantifying reserved water rights for all purposes on all Indian reservations, is the settled and correct standard for quantifying water rights reserved for an agricultural purpose. *See Adair*, 723 F.2d at 1415-16 ("The scope of Indian irrigation rights is well settled. It is a right to sufficient water to irrigate all the practicably irrigable acreage on the reservation." (internal quotation omitted)); *Walton*, 647 F.2d at 47-48 (holding that "one purpose for creating this reservation was to provide a homeland for the Indians to maintain their agrarian society" and adopting the PIA standard to quantify the water reserved for that purpose); *Montana*, 712 P.2d at 764; *see also United States v. Wash. Dep't of Ecology*, 375 F. Supp. 2d 1050, 1066 (W.D. Wash. 2005) (*Wash. Ecology*) (vacated pursuant to settlement by 2007 WL 4190400 (W.D. Wash. Nov. 20, 2007)); *Cohen's Handbook of Federal Indian Law* § 19.03[5][b] (Nell Jessup Newton ed., 2012) (*Cohen*). In keeping with this precedent and with the rationale of the *Winters* doctrine, the federal reserved water right for the agrarian purpose of the Agua Caliente Reservation should be quantified in the amount necessary to irrigate all practicably irrigable acreage set aside for the Tribe.

---

[2] The Rifkind Report is available online at:
http://lawcollections.colorado.edu/allfile/201635.pdf

**AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

### C. The PIA Standard is Based on the Irrigability of the Lands that the United States Reserved for Agua Caliente, and the Amount of Water Reserved is not Reduced Based on Subsequent Land or Water Use.

Given the narrow scope of the issue at hand in Phase 2, the Court may wish to limit its holding to a declaration that it will apply the PIA standard to quantify the amount of water reserved for the Reservation's agricultural purpose, leaving the contours and details of that standard and its application to this case to be fleshed out in Phase 3. In light of arguments previously raised by the water districts, however, Agua Caliente believes that further clarification of certain legal aspects of the PIA standard may provide helpful guidance as the parties either engage in settlement discussions or proceed to Phase 3 of the case.

In their affirmative defenses to Agua Caliente's Complaint, both water districts assert that Agua Caliente's water rights do not "extend" to commercial properties and developments on the Agua Caliente Reservation served by the water districts. *See* CVWD 4th Aff. Def. (Doc. 39) at 14; DWA 4th Aff. Def. (Doc. 40) at 11-12. While the water districts have not yet had the opportunity to elaborate on the rationale underlying their assertion, it potentially implicates—and conflicts with—two important aspects of the PIA standard. The first is that while the PIA standard quantifies federal reserved water rights based on a reservation's agricultural purpose, it in no way restricts the uses to which a tribe can put its reserved water. The second is that a federal reserved water right is measured by the irrigable acreage set aside by the United States, which, because of post-reservation development, may not equal the irrigable acreage currently found on the Reservation. Because these are purely legal aspects of the standard that govern how it applies to the Tribe's federal reserved right, Agua Caliente submits that these issues are appropriately before the Court and subject to resolution in Phase 2.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

### 1. Indian tribes can use PIA-based water rights for any lawful purpose.

To the extent that the water districts contend that the PIA standard restricts the use of a federal reserved water right to agricultural pursuits, their argument is flatly inconsistent with binding precedent. The Ninth Circuit has held that "the use of reserved water is not limited to fulfilling the original purposes of the reservation ...." *Walton*, 647 F.2d at 49; *see id.* at 48 ("When the Tribe has a vested property right in reserved water, it may use it in any lawful manner."); *see also Arizona v. California*, 439 U.S. 419, 422 (1979) (stating that the quantification of water rights based on irrigation needs "shall not constitute a restriction on the usage" of those rights); *Wash. Ecology*, 375 F. Supp. 2d at 1070 ("[T]he water may be used for any purpose, including domestic, commercial, and industrial purposes."); Rifkind at 266 ("[T]he decree [of a federal reserved water right] establishes a property right which the United States may utilize or dispose of for the benefit of the Indians in any lawful manner."); *Cohen* § 19.03[6]. Accordingly, where the highest and best or simply the preferred use of reserved land is non-agricultural, a tribe is free to use a federal reserved water right quantified based on an agricultural use standard for non-agricultural purposes. *See Arizona*, 439 U.S. at 422; *Walton*, 647 F.2d at 48 (holding that a tribe retains its federal reserved water right even when "subsequent acts mak[e] the historically intended use of the water unnecessary"). This rule "is consistent with the general purpose for the creation of an Indian reservation providing a homeland for the survival and growth of the Indians and their way of life." *Id.* at 49; *see also id.* at 47 & n.9 ("Congress envisioned agricultural pursuits as only a first step in the 'civilizing' process."); Phase 1 SJ Order at 10. Using the PIA standard to quantify Agua Caliente's federal reserved right does not preclude use of that water on commercially developed properties within the Reservation.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14ᵗʰ STREET, STE 900
WASHINGTON, DC 20005-2018

### 2. The PIA standard measures a federal reserved water right based on the irrigable acreage set aside for the tribe regardless of subsequent land use or development.

To the extent that the water districts assert that Agua Caliente cannot have a federal reserved water right for developed properties because such lands ostensibly are no longer practicably irrigable, they again miss the mark. As discussed *supra*, a federal reserved water right is fully vested from the moment the United States establishes a reservation, *see supra* at 4, and it is settled law that "[t]he magnitude of the water rights created by the United States is measured by the amount of irrigable land set aside …." Rifkind at 262. The PIA standard is intended to "preserve the full extent of the water rights created by the United States" when it established the reservation in question. *Id.* at 265. The federal reserved water right is (1) fully vested at the time of a reservation's establishment, (2) based on the amount of irrigable land contained within the reservation, (3) intended to be preserved to its full extent, and, as discussed *supra*, (4) cannot be lost if the purpose for which it was quantified becomes obsolete; it follows that the right is not reduced where some portion of the arable, practicably irrigable land originally reserved for a tribe is developed for other uses.

Agua Caliente is not aware of any case in which a court has reduced an Indian tribe's federally reserved water right as a result of—in effect, as a punishment for— non-agricultural development on the tribe's reservation. In fact, Special Master Elbert Tuttle explicitly rejected such an argument in his report in *Arizona v. California*. *See* Report of Special Master Elbert P. Tuttle, *Arizona v. California*, O.T. 1981, Orig. pp. 101-02 (Feb. 22, 1982) (Tuttle).[3] There, several states argued that the practicably irrigable acreage used to determine a tribe's federal reserved water rights should be reduced to account for reserved land featuring "permanent developments" "devoted to uses other than farming or services ancillary to farming." *Id.* Master Tuttle rejected this

---

[3] The Tuttle Report is available online at:
http://lawcollections.colorado.edu/allfile/201518.pdf

**AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

argument outright, saying that the states making it "failed to understand the point." *Id.* at 102. Indian tribes, Master Tuttle explained, "are not limited in the use of decreed water rights to agricultural purposes." *Id.* Rather, they are decreed a water right based on the amount of irrigable acres reserved for their benefit, and they may use the reserved water in any lawful manner. *See id.* That a tribe may have erected non-agricultural permanent improvements on a portion of the irrigable lands reserved for it did not, Master Tuttle determined, deprive the tribe of any portion of its federal reserved water right.

When the United States established reservations for Indians, it did not intend for them "to remain stagnant or die out." Rifkind at 260. Instead, it intended to ensure the availability of land and water necessary "for the survival *and growth* of the Indians …." *Walton*, 647 F.2d at 49 (emphasis added); *see Winters*, 207 U.S. at 577. Stated differently, "Congress envisioned agricultural pursuits as only a first step in the 'civilizing' process. This vision of progress implies a flexibility of purpose." *Id.* at 47 n.9. A rule that reduced Indians' federal reserved water rights in lockstep with any non-agricultural development on their reservation would encourage stagnation while inhibiting growth and flexibility. And it would be irreconcilable with the notion of a fully vested water right that reservation inhabitants can use "in any lawful manner" as their development progresses. *Walton*, 647 F.2d at 48. This Court should affirm that the PIA standard calls for quantification of Agua Caliente's federal reserved right based upon the arability of the land originally selected and reserved for Agua Caliente and that it is not subject to reduction based on subsequent land use or development.

**D.     The Homeland Purpose of the Agua Caliente Reservation Supports the Quantification of Additional Water Rights to the Extent Necessary to Satisfy that Purpose.**

The Ninth Circuit has clearly indicated that quantification of additional water above and beyond that provided by the PIA standard is appropriate when a reservation has additional purposes beyond agriculture. *See Adair*, 723 F.2d at 1409-10; *Walton*,

647 F.2d at 48; *see also Wash. Ecology*, 375 F. Supp. 2d at 1066-67 ("Under *Winters* and its progeny, water is impliedly reserved for the Tribe in sufficient quantities to make the Reservation livable, including those portions of the Reservation that are not suitable for agriculture."). In this case, this Court and the Ninth Circuit have determined, and the historical record shows, that the Agua Caliente Reservation was intended to serve both agricultural and homeland purposes. *Agua Caliente*, 849 F.3d at 1270. In addition to the quantification of a federal reserved right for irrigable lands based on the PIA standard, the Agua Caliente Reservation's homeland purpose merits the quantification of additional water rights necessary to accomplish that purpose. The homeland purpose requires, at an absolute minimum, a water right sufficient to meet the Reservation's present and future domestic needs—*i.e.*, the amount of water required for domestic use on all habitable, non-PIA acreage within the Reservation.

## II.    Agua Caliente's Federal Reserved Water Right Includes a Quality Component.

Phase 2 presents the narrow question of "whether there is a water quality component to Agua Caliente's federal reserved water right." Doc. 193 at 1.[4] Courts consistently hold that water quality is attendant to a tribe's federal reserved water right and thus is protected from impairment. These decisions rest on the logical, unremarkable premise that water quality must be protected to ensure that both the purposes of a tribe's reservation and the tribe's use of water can be sustained. Any rule that would reserve a quantity of water for tribes but allow outside actors to pollute that water without repercussion would be nonsensical. The protection of water quality also rests on the legal premise that that the United States' property interest in water, to which the Tribe is beneficiary, cannot be destroyed absent express congressional consent. Finally, though this is fundamentally a question of federal law, the protection of water

---

[4] This purely legal question requires no discovery. Related questions pertaining to (1) the applicable water quality standard and (2) whether and to what extent the water districts may be violating that standard are reserved for Phase 3.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

quality as a component of a water right is consistent with California's long-standing rule that a water user is entitled to water of "undeteriorated" quality. Agua Caliente's federal reserved water right includes a quality component.[5]

### A. The Rationale of the Winters Doctrine Applies Equally to Water Quality and Quantity.

The Ninth Circuit and other federal courts have consistently held that a federal reserved water right encompasses a water quality component. Decisions in these cases necessarily rest on two closely-related premises under the *Winters* doctrine: that (1) where an agreement between the United States and a tribe is silent as to reserved rights, the agreement must be construed in a manner that furthers the purpose of the reservation; and (2) a reserved right to use a certain quantity of water would be meaningless if the water's poor quality made it unusable. *See Winters*, 207 U.S. at 576–77.

Treaties and executive orders setting aside Indian reservations are generally silent as to water quality, just as they are water quantity. In *Winters*, however, the Supreme Court held that given a choice between two implications, "one of which would support the purpose of the [reservation] and the other impair or defeat it," courts should choose the former. *Id.* at 576 ("We realize that there is a conflict of implications, but that which makes for the retention of the waters is of greater force than that which makes for their cession."). Notably, the Court implied this reserved water right with awareness of the United States' intent to protect both water quantity and water quality. *Id.* (recounting

---

[5] That federal reserved rights have a water quality component is so logical that DWA previously conceded that Agua Caliente's *Winters* rights include at least some quality component. *See* Doc. 180 at 12-16 ("There is virtually no issue as between DWA, the Tribe and the United States concerning whether the Tribe's reserved right includes a water quality component …. DWA agrees that the Tribe's reserved right includes a water quality component in the abstract, under certain circumstances, for certain purposes, and subject to quantification ….").

KILPATRICK TOWNSEND & STOCKTON
607 14ᵗʰ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

1  the United States' allegation that "undeteriorated water" was "essential" to the

2  advancement of tribal communities).

3      *Winters* is also based on the premise that the United States "intended to deal fairly

4  with the Indians by reserving for them the waters without which their lands would have

5  been useless." *Arizona*, 373 U.S. at 600. In this respect, water quality is every bit as

6  critical as water quantity—a deficit of either can render a reservation useless. As the

7  leading Indian law treatise observed, "it is difficult to draw a meaningful distinction

8  between quantity and quality of water for purposes of the *Winters* doctrine." *Cohen* §

9  19.03[8](c)(9); *see PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S.

10  700, 719 (1994) (holding, in the context of a Clean Water Act challenge, that "[i]n many

11  cases, water quantity is closely related to water quality").

12      A federal court directly addressed the interplay of water quality and the *Winters*

13  doctrine in *United States v. Gila Valley Irrigation District*, 920 F. Supp. 1444 (D. Ariz.

14  1996). At issue was the San Carlos Apache Tribe's right to the "natural flow" of the

15  stream to support historic agricultural activities on its reservation. In particular, the

16  court considered the "two interrelated aspects to the water quality issue … flow rate and

17  contamination"—reduced flows due to upstream diversion of water from the Gila River

18  and increased levels of salt contamination in irrigation return flows feeding the

19  reservation. *Id.* at 1449. After finding that the salinity of the return irrigation flows

20  reaching the San Carlos Reservation prevented the successful cultivation of crops,

21  thereby undermining the success of the tribe's commercial agriculture, *id.* at 1454, the

22  court granted injunctive relief "to restore [to] the Apache Tribe water of sufficient

23  quality to sustain commercial production of the sorts of crops they grew." *Id.* at 1454-

24  55. *See also Hopi Tribe v. United States*, 782 F.3d 663, 669 (Fed. Cir. 2015) (noting

25  that *Winters* doctrine gives the United States "the power to enjoin others from practices

26  that reduce the quality of water feeding [a] reservation"); *Oklahoma v. Tyson Foods,*

27  *Inc.*, 258 F.R.D. 472, 477 (N.D. Okla. 2010) (holding that the Cherokee Nation was an

28  indispensable party to state's lawsuit against defendant poultry corporation alleging

KILPATRICK TOWNSEND & STOCKTON
607 14ᵗʰ STREET, STE 900
WASHINGTON, DC 20005-2018

16

1  extensive pollution of waters in which Cherokee Nation held unadjudicated water
2  rights).

3      Quantity and quality also are inextricably connected in instances where a tribe's
4  reserved right includes sufficient water to provide critical habitat for wildlife. In *Walton*,
5  the Ninth Circuit held that the tribe's water right necessarily "includes the right to
6  sufficient water to permit natural spawning of the trout" in Omak Lake. 647 F.2d at 48.
7  Likewise, in *United States v. Anderson*, the district court held that the quality of water
8  necessary to preserve the Spokane Tribe's fishing in the Chamokane Creek Basin "is
9  related to temperature rather than to simply minimum flow" and awarded sufficient
10 water to maintain temperature of 68 degrees or less. 591 F. Supp. 1, 5-6 (E.D. Wash.
11 1982) *aff'd in part, rev'd in part,* 736 F.2d 1358 (9th Cir. 1984)*; see also Kittitas*
12 *Reclamation Dist. v. Sunnyside Valley Irr. Dist.*, 763 F.2d 1032 (9th Cir. 1985)
13 (ordering the release of reservoir water necessary to preserve salmon nests). These
14 decisions show that both reserved water quantity and quality are protected in order to
15 accomplish the purposes of a federal reservation. The same rule applies to the federally
16 reserved groundwater that "remains the main source of water for all types of
17 consumption on the [Agua Caliente] reservation." *Agua Caliente*, 849 F.3d at 1267.

18     **A.    The United States' Property Interest in Reserved Water May not be**
19            **Destroyed Via Degradation.**

20     The principle that *Winters* rights have a water quality component is firmly
21 supported by the enduring rule that, absent an express act of Congress, the United
22 States' property interests may not be destroyed. *United States v. Walker River Irr. Dist.*,
23 104 F.2d 334, 338-339 (9th Cir. 1939) ("[I]n the absence of a specific authority from
24 Congress, a state cannot destroy the right of the United States" to its property "so far at
25 least as may be necessary for the beneficial uses of the government property."").
26 Congress's power under the Property Clause of the United States Constitution, Art. IV,
27 Sec. 3, Cl. 2, "is without limitations" and includes the right to protect its interests in
28 land from "injury." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976). Based on this

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON
PHASE II ISSUES

rule, courts have protected the United States' interest in numerous aspects of its property right. *See, e.g.*, *Hunt v. United States*, 278 U.S. 96, 99 (1928) (enjoining interference with the Secretary of Agriculture's directive to exterminate excess deer in a national forest, noting that "the power of the United States to thus protect its lands and property does not admit of doubt"); *Kleppe*, 426 U.S. at 529 (enjoining capture of wild burros on federal land as prohibited under the Wild Free-Roaming Horses and Burros Act).

Here, the United States reserved water underlying the Agua Caliente Reservation for the benefit of Agua Caliente. The United States retains a property interest in the water that it reserved—a property interest that can be adversely affected to the point of being lost, as a practical matter, if the quality of the reserved water is degraded. Therefore, the United States' interest in undiminished water quality on behalf of the Tribe requires protection under federal law.

## B. Agua Caliente's Right to Water Quality is Consistent with California Law.

While it is both an established principle and the law of this case that federal law governs federal reserved water rights, *see, e.g.*, *Agua Caliente*, 849 F.3d at 1272, Agua Caliente's claim that its right includes a water quality component also is fully consistent with state water law. It is noteworthy that California law has long recognized that a water user is entitled to water which is undiminished in quantity and undeteriorated in quality. *Phoenix Water Co. v. Fletcher*, 23 Cal. 481, 488 (1863). Anything that "render[s] the water less wholesome than when in its ordinary state" so as to impair its priority and usefulness constitutes an "invasion" of water rights. *Id.* at 25-26; *see also Wright v. Best*, 121 P.2d 702, 709 (Cal. 1942) (holding that a prior appropriator was entitled to water "preserved in its natural state of purity" and that "any use which corrupts the water so as to essentially impair its usefulness . . . is an invasion of his rights"); *Town of Antioch v. Williams Irr. Dist.*, 205 P. 688, 689 (1922). The right to "unimpaired water quality" also extends to owners of riparian water rights. *Crum v. Mt.*

KILPATRICK TOWNSEND & STOCKTON

607 14ᵗʰ STREET, STE 900

WASHINGTON, DC 20005-2018

*Shasta Power Corp.*, 4 P.2d 564, 570 (Cal. Ct. App. 1931). The notion that a water right includes the right to water of a certain quality is wholly unremarkable.

## III. Agua Caliente Owns the Subterranean Pore Space Underlying its Reservation.

Agua Caliente is entitled to a declaration that it is the beneficial owner of the pore space, defined as the void or open subterranean spaces that are not filled by solid material or the empty space between rocks, sand, and other solid soil where water can be stored, underlying the Agua Caliente Reservation. The lands at issue in this case are held in trust by the United States for the benefit of Agua Caliente and its members. *Agua Caliente*, 849 F.3d at 1265. Ownership of the pore space, like any other question pertaining to property rights in Indian lands held in trust by the United States, is thus controlled by federal law. *See, e.g.*, *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 670 (1979) ("[W]here the Government has never parted with title and its interest in the property continues, the Indians' right to the property depends on federal law."); *Crow Tribe of Indians v. Peters*, 835 F. Supp. 2d 985, 989-90 (D. Mont. 2011) ("[B]ecause the United States holds title to the minerals for the benefit of the Crow Tribe, federal law controls.").

Federal law provides that Indian tribes are the beneficial owners of all "constituent elements of the land" comprising their reservations. *United States v. Shoshone Tribe of the Wind River Reservation in Wyo.*, 304 U.S. 111, 116 (1938). While *Shoshone* dealt directly with ownership of timber and subsurface mineral deposits, its logic and holding apply with full force to the pore space—another constituent element of the land. Agua Caliente owns the space between the particles of soil comprising its Reservation just as it owns the soil itself.

Surface estate ownership of the underlying pore space or other subterranean storage space is widely accepted. Several states have statutes to that effect, and a body of analogous case law lends further support. *See, e.g.*, Wyo. Stat. Ann. § 34-1-152(a); N.D. Cent. Code § 47-31-03; Mont. Code Ann. § 82-11-180(3); *see also Mosser v.*

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES

*Denbury Res., Inc.*, 898 N.W.2d 406 (N.D. 2017) (interpreting the state's pore space ownership statutes); *Dep't of Transp. v. Goike*, 560 N.W.2d 365 (Mich. Ct. App. 1996) (subterranean storage space vacated by the removal of minerals belongs to the surface landowner); *Emeny v. United States*, 412 F.2d 1319 (Ct. Cl. 1969) (holding that the surface landowner also owned "geological structures beneath the surface, including any such structure that might be suitable for … underground storage"); *United States v. 43.42 Acres of Land*, 520 F. Supp. 1042, 1045 (W.D. La. 1981) (reciting the "general rule" that landowners own vacated space left beneath their lands by the removal of minerals).

Even California law, which the water districts presumably will argue precludes a ruling in favor of Agua Caliente on this issue, has recognized that the owner of the surface estate has a compensable property interest in the underlying pore space, holding that "[c]ausing subsurface migration of … wastewater into a mineral estate (groundwater pore space) of another without that landowner's consent is a trespass." *Starrh & Starrh Cotton Growers v. Aera Energy, LLC*, 153 Cal. App. 4th 583, 592 (2007). While state law does not control, it is fully consistent with the notion embedded in federal law that Agua Caliente, as the beneficial owner of lands reserved and held in trust for it by the United States, owns the pore space that is a "constituent element[] of the land." *Shoshone*, 304 U.S. at 116.

Pursuant to the Court's September 2017 order and the prior stipulation of the parties, Phase 2 of the case addresses only Agua Caliente's ownership, *vel non*, of the pore space. A demonstration of how the water districts have interfered with or otherwise violated Agua Caliente's pore space ownership rights, as well as the appropriate relief to address such violations, will follow in Phase 3.

## CONCLUSION

It is settled law that the United States "intended to deal fairly with the Indians" when it established reservations for them. *Arizona*, 373 U.S. at 600; *see also Walton*, 647 F.2d at 47. Fair dealing, in this context, includes and requires the reservation of

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES

sufficient groundwater to accomplish the agrarian and homeland purposes of the Agua Caliente Reservation. This Court can ensure such fair dealing by (1) using the PIA standard to quantify the amount of water reserved for the Reservation's agrarian purpose and (2) decreeing an additional reservation of water necessary to make any non-practicably irrigable lands within the Reservation useful and livable as a homeland.

This Court can further ensure fair dealing with the Agua Caliente Indians by recognizing that a reservation of a certain quantity of water is useless and cannot help accomplish the purposes of the Agua Caliente Reservation unless the reserved water is of a certain quality, and that Agua Caliente's federal reserved water right accordingly includes a water quality component. Finally, this Court should hold that the United States' reservation of land for Agua Caliente included every constituent element of the land reserved, including the subterranean pore space, and that Agua Caliente is the beneficial owner of such space underlying its Reservation as a matter of federal law.

DATED: October 20, 2017.     By:   /s/ Catherine Munson

CATHERINE MUNSON
(D.C. Bar No. 985717, admitted *pro hac vice*)
MARK H. REEVES
(DC Bar No. 1030782, admitted *pro hac vice*)
**KILPATRICK TOWNSEND & STOCKTON LLP**

STEVEN C. MOORE
(CO Bar No. 9863, admitted *pro hac vice*)
HEATHER WHITEMAN RUNS HIM
(NM Bar No. 15671, admitted *pro hac vice*)
**NATIVE AMERICAN RIGHTS FUND**

JOHN TABINACA PLATA (CA Bar No. 303076)
jplata@aguacaliente.net
**AGUA CALIENTE BAND OF CAHUILLA INDIANS**

*Attorneys for Plaintiff*
*Agua Caliente Band of Cahuilla Indians*

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PHASE II ISSUES**