RODERICK E. WALSTON (Bar No. 32675)
roderick.walston@bbklaw.com
ARTHUR L. LITTLEWORTH (Bar No. 22041)
arthur.littleworth@bbklaw.com
MICHAEL T. RIDDELL (Bar No. 72373)
michael.riddell@bbklaw.com
WENDY WANG (Bar No. 228923)
wendy.wang@bbklaw.com
MILES KRIEGER (Bar No. 309797)
miles.krieger@bbklaw.com

BEST BEST & KRIEGER LLP
2001 N. Main Street, Suite 390
Walnut Creek, California 94596
Telephone: (925) 977-3300
Facsimile: (925) 977-1870

Attorneys for Defendants Desert Water Agency, et al.
and Patricia G. Oygar, Thomas Kieley, III, James
Cioffi, Craig A. Ewing and Joseph K. Stuart, sued in
their official capacity as members of the Board of
Directors

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS,<br><br>Plaintiff,<br><br>v.<br><br>COACHELLA VALLEY WATER DISTRICT, et al., and DESERT WATER AGENCY, et al.,<br><br>Defendants. | Case No. 5:13-cv-00883-JGB (SPx)<br>Judge:    Hon. Jesus G. Bernal<br><br>**DEFENDANT DESERT WATER AGENCY'S OPPOSITION TO PLAINTIFF'S AND INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT**<br><br>[Filed concurrently with:<br><br>1. Supplemental Request for Judicial Notice<br>2. Supplemental Declaration of Miles Krieger<br><br>Hearing Date:    January 22, 2018<br>Time:    9:00 a.m.<br>Ctrm:    1<br><br>Action Filed: May 14, 2013 |
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>COACHELLA VALLEY WATER DISTRICT, et al., and DESERT WATER AGENCY, et al.,<br><br>Defendants. | |

1

**TABLE OF CONTENTS**

2

3                                                                                        **Page**

I.    THE HOMELAND STANDARD RATHER THAN THE
      "PRACTICABLY IRRIGABLE ACREAGE" STANDARD APPLIES
      IN QUANTIFYING THE TRIBE'S RESERVED RIGHT IN
      GROUNDWATER ............................................................................1

      A.    The Homeland Standard Applies in Quantifying the Tribe's
            Reserved Right in Groundwater ........................................................1

      B.    The Homeland Standard Requires Consideration of Various
            Factors, Including the Unique Circumstances of the Tribe's
            Reservation ...................................................................................3

      C.    The "Practicably Irrigable Acreage" Standard Does Not Apply
            in Quantifying the Tribe's Reserved Right .........................................6

      D.    Even Where Applicable, the "Practicably Irrigable Acreage"
            Standard Does Not Provide for the Reservation of a Separate
            Quantity of Water in Addition to the Quantity of Water
            Reserved Under the Homeland Standard ...........................................11

      E.    The Homeland Standard Does Not Include Groundwater for
            Commercial Uses. ........................................................................13

II.   THE TRIBE'S RESERVED RIGHT DOES NOT INCLUDE A
      WATER QUALITY COMPONENT, AND IN ANY EVENT THE
      TRIBE'S WATER QUALITY CLAIM MUST BE DISMISSED. ...............16

      A.    The Tribe's Reserved Right Does Not Include a Water Quality
            Component ...................................................................................16

      B.    Under the Property Clause of the Constitution, the United States
            and the Tribe Have a Theoretical Right, in the Abstract, to
            Prevent Water Quality Degradation of the United States'
            Property, Including the Tribe's Reservation Here. ............................20

      C.    Since the Tribe Has Not Alleged That the Alleged Water
            Quality Degradation Causes the Tribe to Suffer a Concrete and
            Particularized Injury, the Tribe Does Not Have Article III
            Standing to Maintain Its Water Quality Claim .................................23

      D.    Since the Tribe Has Not Alleged That the Alleged Water
            Quality Degradation Is Preventing Fulfillment of the Primary
            Reservation Purposes, the Tribe's Water Quality Claim Should
            Be Dismissed ...............................................................................25

      E.    The Tribe Has a Remedy Under California Law to Protect Water
            Quality on Its Reservation, Which Further Demonstrates that the
            Tribe's Reserved Right Does Not Include a Water Quality
            Component. ..................................................................................26

III.  THE TRIBE DOES NOT OWN THE STORAGE SPACE OF THE
      GROUNDWATER BASIN. ..............................................................27

      A.    The Cases Cited by the Tribe Do Not Support Its Ownership
            Claim ..........................................................................................27

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

**TABLE OF CONTENTS**
**(continued)**

**Page**

    B.    The United States Apparently Does Not Support the Tribe's
Ownership Claim. ................................................................31

CONCLUSION .................................................................................32

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

## TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Adjudication of All Rights to Use Water in Gila River System and
Source*
  201 Ariz. 307, 35 P.3d 68 (2001) ........................................................................4

*Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water
Dist., et al.*
  849 F.3d 1262 (9th Cir. 2017) ......................................................................2, 7

*Andrus v. Charleston Stone Products Co.*
  436 U.S. 604 (1978) .........................................................................................29

*Arizona v. California* ("*Arizona I*")
  373 U.S. 546 (1963) ...................................................................................*passim*

*Arizona v. California* ("*Arizona II*")
  460 U.S. 605 (1983) ................................................................................8, 9, 10

*Board of County Commissioners v. Park County Sportsmen's Ranch*
  45 P.3d 693 (Colo. 2002) ................................................................................29

*California Oregon Power Co. v. Beaver Portland Cement Co.*
  295 U.S. 142 (1935) .........................................................................................21

*Cappaert v. United States*
  426 U.S. 128 (1976) ....................................................................................6, 16

*Central & West Basin Water Replenishment Dist. v. Southern
California Water Co.*
  109 Cal.App.4th 891, 135 Cal.Rptr.2d 486 (2003) ........................................29

*Chance v. BP Chemical, Inc.*
  670 N.E.2d 985 (Ohio 1996) ..........................................................................29

*Colville Confederated Tribes v. Walton*
  647 F.2d 42 (9th Cir. 1981) ......................................................................*passim*

**TABLE OF AUTHORITIES**
(continued)

Page

*Crow Tribe v. Peters*
   835 F.Supp.2d 985 (D. Mont. 2011) ........................................................29, 30

*Dep't of Transp. v. Goike*
   560 N.W.2d 365 (Mich. Ct. App. 1996).................................................28, 29

*Emeny v. United States*
   412 F.2d 1319 (Ct. Cl. 1969) .................................................................28, 29

*Haggar Co. v. Helvering*
   308 U.S. 389 (1940).......................................................................................10

*Henslee v. Union Planters Nat'l Bank & Trust Co.*
   335 U.S. 595 (1949) ......................................................................................20

*Hopi Tribe v. United States*
   782 F.3d 663 (Fed. Cir. 2015)...............................................................17, 18, 19

*Horne v. Flores*
   557 U.S. 433 (2009).......................................................................................23

*Hunt v. United States*
   278 U.S. 96 (1928).........................................................................................21

*Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*
   763 F.2d 1032 (9th Cir. 1985).......................................................................19

*Kleppe v. New Mexico*
   426 U.S. 529 (1976).......................................................................................21

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992).......................................................................................23

*Mosser v. Denbury Res., Inc.*
   898 N.W.2d 406 (N.D. 2017)......................................................................28, 29

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*
   538 U.S. 803 (1990).......................................................................................24

*Pasadena v. Alhambra*
   33 Cal.2d 908, 930-931, 207 P.2d 17 (1949)...............................................26

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

**TABLE OF AUTHORITIES**
(continued)

Page

*Phoenix Water Co. v. Fletcher*
   23 Cal. 481, 1863 WL 730 (1863)...........................................................18, 26

*Starrh & Starrh Cotton Growers v. Aera Energy*
   LLC, 153 Cal.App.4th 583, 63 Cal.Rptr.3d 165 (2007)..............................28, 29

*Summers v. Earth Island Inst.*
   555 U.S. 488 (2009).......................................................................................23

*Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist.*
   3 Cal.2d 489, 533-535.....................................................................................26

*United States v. 43.42 Acres of Land*
   520 F.Supp. 1042 (W.D. La. 1981)................................................................28

*United States v. Adair*
   723 F.2d 1394 (9th Cir. 1983)................................................................6, 7, 12

*United States v. American Trucking Assns., Inc.*
   310 U.S. 534 (1940).......................................................................................10

*United States v. Anderson*
   591 F.Supp. 1 (E.D. Wash. 1982), *aff'd in part, rev'd in part*, 736
   F.2d 1358 (9th Cir. 1984). Tribe Mem. 16-17 .......................................17, 19, 25

*United States v. Gila Valley Irrigation Dist.*
   920 F.Supp. 1444 (D. Ariz. 1996)..................................................17, 18, 19, 25

*United States v. New Mexico*
   438 U.S. 696 (1978)...................................................................................*passim*

*United States v. Rio Grande Dam & Irrigation Co.*
   174 U.S. 690 (1899).......................................................................................21

*United States v. Shoshone Tribe*
   304 U.S. 111 (1938)..................................................................................27, 28

*United States v. Walker River Irrigation Dist.*
   104 F.2d 334 (1939).......................................................................................21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

**TABLE OF AUTHORITIES**
(continued)

Page

*Utah Power & Light Co.*
    243 U.S. 389 (1917)..................................................................21

*Washington v. Washington State Fishing Fishing Vessel Ass'n*
    443 U.S. 658 (1979)..................................................2, 7, 14, 15

*Wilson v. Omaha Indian Tribe*
    442 U.S. 653 (1979)..............................................................29, 30

*Wright v. Best*
    19 Cal.2d 368, 121 P.2d 702 (Cal. 1942) ..........................26

**Constitutional Provisions**

U.S. Const., Article 3 ....................................................23, 24, 25

U.S. Const., Article 4, § 3, cl. 2 .............................................20

**Other Authorities**

Report of Special Master, *Arizona I* is available at:
    http://lawcollections.colorado.edu/allfile/201635.pdf.......................9

Report of Special Master, *Arizona II* is available at:
    http://lawcollections.colorado.edu/allfile/201518.pdf.......................9

**DEFENDANT DESERT WATER AGENCY'S OPPOSITION TO PLAINTIFF'S AND INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT**

This memorandum of points and authorities by Desert Water Agency ("DWA") responds to the motions for summary judgment of plaintiff Agua Caliente Band of Cahuilla Indians ("Tribe") and intervenor United States. DWA will address the Tribe's and the United States' arguments in their motions in the order in which they were presented, namely (1) the quantification standard, (2) the water quality component issue, and (2) the Tribe's claimed ownership of the pore space of the groundwater basin.[1]

**I.    THE HOMELAND STANDARD RATHER THAN THE "PRACTICABLY IRRIGABLE ACREAGE" STANDARD APPLIES IN QUANTIFYING THE TRIBE'S RESERVED RIGHT IN GROUNDWATER.**

**A.    The Homeland Standard Applies in Quantifying the Tribe's Reserved Right in Groundwater.**

The United States argues that the "homeland" standard applies in quantifying the Tribe's reserved right in groundwater, U.S. Mem. 8, and that the homeland standard requires consideration of the documents and circumstances surrounding the reservation's creation, the history of the Indians, and the Indians' needs to maintain themselves under changed circumstances. *Id.* at 10.

DWA agrees that the homeland standard applies in quantifying the Tribe's reserved right in groundwater, as DWA has argued in its own motion. DWA Mem. 22-24. DWA also agrees that the homeland standard requires consideration of the

---

[1] As used in this memorandum, "MSJ" refers to a party's motion for summary judgment; "Mem." to a party's supporting memorandum of points and authorities; "CVWD" to the Coachella Valley Water District; and "Water Agencies" to both DWA and CVWD.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2OO I N. MAIN STREET, SUITE 39O
WALNUT CREEK, CA  94596

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

1  elements described by the United States, such as the historical documents and other
2  circumstances surrounding the reservation's creation.  *Id.*

3  The Supreme Court—applying the equivalent of a homeland standard—has
4  held that the quantity of water reserved for Indian reservations is that necessary to
5  "make the reservation livable" and to "satisfy the future as well as the present needs
6  of Indian Reservations." *Arizona v. California*, 373 U.S. 546, 600 (1963) ("*Arizona
7  I*").  The Ninth Circuit, following *Arizona I*, has held that the purpose of Indian
8  reservations is to establish a "home" for the Indians, and that the homeland standard
9  requires consideration of the historical documents and circumstances surrounding
10  creation of the reservation, the history of the Indians, and the Indians' need "to
11  maintain themselves under changed circumstances." *Colville Confederated Tribes
12  v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981).  In an analogous case, the Supreme
13  Court interpreted a treaty allocating fishing rights as reserving sufficient water for
14  Indians to provide them with a "livelihood—that is to say, a moderate living."
15  *Washington v. Washington State Fishing Fishing Vessel Ass'n*, 443 U.S. 658, 686
16  (1979).  The Ninth Circuit in the interlocutory appeal of the instant case stated that
17  a purpose of the Tribe's reservation was to establish a "home" for the Tribe.  *Agua
18  Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist., et al.,* 849 F.3d
19  1262, 1270 (9th Cir. 2017).

20  In sum, the Supreme Court and Ninth Circuit have held that a "home" or
21  "homeland" standard applies in quantifying reserved rights for Indian tribes,
22  including the Tribe in this case, and that this standard requires a sufficient quantity
23  of water to make the reservation "livable" and satisfy "the future as well as the
24  present needs" of the Indians, *Arizona I*, 373 U.S. at 600; to enable the Indians to
25  make a "moderate living," *Washington Fishing Vessels*, 443 U.S. at 686; and to
26  enable the Indians to "maintain themselves under changed circumstances," *Walton*,
27  647 F.2d at 47.

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

**B.** **The Homeland Standard Requires Consideration of Various Factors, Including the Unique Circumstances of the Tribe's Reservation.**

The United States argues that various factors must be considered in applying the homeland standard, namely the Indians' needs for "food cultivation, drinking, bathing, washing, cooking, sewer and other municipal purposes, commerce, religious practices, industry, and other forms of development." U.S. Mem. 8. DWA agrees that most of the factors cited by the United States should be considered in quantifying the Tribe's reserved right in groundwater.

DWA disagrees, however, that the purposes of "commerce," "industry" and "other forms of development" should be considered, because these were not the primary purposes—and, at best, were only the secondary purposes—for which the Tribe's reservation was created. The Smiley Commission, established by the Secretary of the Interior to investigate the Tribe's needs, issued a report in 1891 stating that the Tribe used water for "irrigation" and "domestic use." Smiley Comm'n Rep., at 33 (DWA RJN, Exh. 2). The Smiley Commission Report made no mention of the Tribe's use or need for water for commercial or industrial development. Thus, the primary purposes of the Tribe's reservation, according to the Smiley Commission Report, were agricultural and domestic uses, but not commercial or industrial uses. The Supreme Court has held that federal water rights are reserved only for primary reservation purposes and not secondary purposes, and that federal reservations must acquire their water rights for "secondary" uses under state law, in the same manner as public and private appropriators. *United States v. New Mexico*, 438 U.S. 696, 702 (1978). Since commercial and industrial uses were not the primary purposes for which the Tribe's reservation was created, and at most were secondary uses, commercial and industrial uses cannot be considered in quantifying the Tribe's reserved right under the homeland standard. Although the Tribe's reservation needs have changed, in

that the Tribe no longer uses water for agricultural purposes, DWA SUF 18, the quantity of the Tribe's reserved right cannot be expanded to encompass commercial and industrial uses that were not the primary purposes of the Tribe's reservation.[2]

In addition to the factors described above, the homeland standard also requires consideration of the unique circumstances of the Tribe's reservation, because these unique circumstances directly relate to the Tribe's modern homeland needs. These unique circumstances were described in DWA's motion for summary judgment, DWA Mem. 25-30, and include the following circumstances, among others:

- The Tribe has a relatively small membership, consisting of only 440 members, unlike the relatively large Indian tribes whose rights were quantified in *Walton* and *Arizona I*. Since the Tribe has a relatively small membership, only a relatively small amount of groundwater is necessary to meet the Tribe's modern needs. DWA Mem. 25-26.

- The Tribe has a correlative right to use groundwater under California law to meet its reservation needs. The quantity of water otherwise encompassed within the Tribe's reserved right should be reduced by the amount of water encompassed within its correlative right. *Id.* at 26-27.

- The Tribe has a decreed right to use Whitewater River surface water for its reservation needs. The quantity of water otherwise encompassed within its

---

[2] The United States also argues this Court should consider the factors described by the Arizona Supreme Court in *In re Adjudication of All Rights to Use Water in Gila River System and Source,* 201 Ariz. 307, 318-320, 35 P.3d 68 (2001), namely "culture, geography; economics; past water uses; and population trends," U.S. Mem. 11, and also that this Court should consider "the Tribe's culture and cultural water uses," "evidence of Coachella Valley's topography, geography, and water and other natural resources." *Id.* at 12. These factors appear to be variations of the factors described by the United States and discussed in the text above, and—to the extent they are not—the factors are not related to primary reservation purposes and thus cannot appropriately be considered under the homeland standard.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

reserved right should be reduced the quantity of water encompassed within its decreed right. *Id.* at 27-28.

- The Tribe does not pump, or attempt to pump, groundwater to meet its current needs, and instead purchases water from the Water Agencies. The Tribe does not currently rely on groundwater pumping to support its reservation needs. *Id.* at 28-29.

- The Tribe's reservation is part of a checkerboard, in which tribal lands are interspersed with non-tribal lands. The groundwater underlying the Tribe's reservation also underlies the lands of other overlying landowners. The Tribe's groundwater pumping will have an impact on the rights of other groundwater users. *Id.* at 29.

- Most of the Tribe's reservation lands have been allotted (57.6%) or are owned by non-Indians (29.4%), and only a relatively small portion of the reservation lands (12.7%) are unallotted trust lands. Since the amount of unallotted trust lands is relatively small, the Tribe's water needs for the trust lands are relatively small. *Id.* at 29-30.

- Although the Tribe has only 440 members, DWA SUF 20, more than 26,000 people reside on the Tribe's reservation. Suvor Dec. (Doc. 200-5, Exh. 2), at 15. Thus, most of the people who reside on the Tribe's reservation are non-Indians, or at least non-members of the Tribe.

Additionally, the Supreme Court in *New Mexico* held that the quantification of reserved rights must take into account the impacts on other users of water and Congress' policy of deference to state water law. Specifically, the Court stated that "federal reserved water rights will frequently require a gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators," and "[t]his reality … must be weighed in determining what, if any, water" is reserved. *New Mexico*, 438 U.S. at 705. The Court stated that it has upheld reserved rights only after it has "carefully examined both the asserted water right

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated," *id*. at 700, and that this "careful examination is required both because the reservation is implied rather than expressed, and because of the history of congressional intent in the field of federal-state jurisdiction with respect to allocation of water." *Id*. at 701-702; DWA Mem. 31-32.

In addition, the Supreme Court has held that a federal reserved water right includes only the amount of water necessary to satisfy the "minimal need" of the reservation. *Cappaert v. United States*, 426 U.S. 128, 141 (1976); *New Mexico*, 438 U.S. at 700 n. 4; DWA Mem. 32.

The Tribe argues that the limitations of the reserved rights doctrine described in *New Mexico* do not apply to Indian reservations. Tribe Mem. 8. In fact, the Ninth Circuit in *Walton* directly applied *New Mexico*'s limitations in quantifying the Indian tribe's reserved rights in that case. *Walton*, 647 F.2d at 47 ("We apply the New Mexico test here."). In *Adair*, the Ninth Circuit stated that *New Mexico* and *Cappaert*, "while not directly applicable to *Winters* doctrine rights on Indian reservations," "establish several useful guidelines." *Adair*, 723 F.2d at 1408. *Adair* then applied *New Mexico*'s limitations in concluding that the Indian tribe in that case had a reserved right. *Id*. at 1409-1410. Since *Walton* and *Adair* applied *New Mexico*'s limitations in establishing and quantifying the reserved rights of Indian tribes in those cases, *New Mexico*'s limitations apply in quantifying the Tribe's reserved right here.

## C.  The "Practicably Irrigable Acreage" Standard Does Not Apply in Quantifying the Tribe's Reserved Right.

The Tribe argues that the "practicably irrigable acreage" ("PIA") standard applies in quantifying the Tribe's reserved right in groundwater. Tribe Mem. 5-6, 13-14. In support of its argument, the Tribe cites the Supreme Court's decision in *Arizona I* and the Ninth Circuit's decisions in *Walton* and *Adair*, which applied the

1    PIA standard in quantifying the reserved rights of the Indian tribes in those cases.

2    *Arizona I*, 373 U.S. at 600; *Walton*, 647 F.2d at 47-48; *Adair*, 723 F.2d at 1415-

3    1416; Tribe Mem. 9.

4         Contrary to the Tribe's argument, the PIA standard does not apply in

5    quantifying the Tribe's reserved right in groundwater.  Although the Tribe's

6    reservation was created to enable the Tribe to maintain itself as an "agrarian

7    society," as the Ninth Circuit stated in the interlocutory appeal in this case, *Agua*

8    *Caliente*, 489 U.S. at 1270, the Tribe no longer uses water for agricultural purposes.

9    DWA SUF 18; CVWD SUF 60; DWA Mem. 23.  Therefore, the PIA standard is

10   anachronistic as applied in quantifying the Tribe's reserved right in groundwater.

11   There is no reasonable nexus between the Tribe's modern needs—which require

12   sufficient water to make the reservation "livable" for the Tribe's 440 members and

13   provide them with a "moderate living," *Arizona I*, 373 U.S. at 373 ("livable");

14   *Washington Fishing Vessel*, 443 U.S. at 686 ("moderate living")—and the

15   potentially large amount of practicably irrigable acreage on the Tribe's reservation,

16   a reservation that according to the Tribe has over 31,000 acres.  DWA Mem. 23-24,

17   25-26.  The fact that the Tribe no longer uses water for agricultural purposes

18   distinguishes this case from the Supreme Court's decision in *Arizona I* and the

19   Ninth Circuit's decisions in *Walton* and *Adair*, because the Indian tribes in those

20   cases were using water for agricultural purposes when their reserved rights were

21   quantified, and the PIA standard provided a reasonable methodology for measuring

22   the amount of water necessary to meet the tribes' modern needs.  Here, the Tribe—

23   unlike tribes in *Arizona I*, *Walton* and *Adair*—does not use water for agricultural

24   purposes.  Thus, the PIA standard does not provide a reasonable methodology for

25   measuring the amount of groundwater necessary to meet the Tribe's modern needs,

26   and the PIA standard does not apply.

27        In *Arizona I*, the Supreme Court, in applying the PIA standard, stated that the

28   quantity of reserved water is that needed to satisfy "the *future* as well as the *present*

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

needs of the Indian Reservations." *Arizona I*, 373 U.S. at 600 (emphases added). The Court made no mention of any basis for quantifying the reserved water based on the reservation's *past* uses, such as past agricultural uses that are no longer extant. *Arizona I* thus indicated that the quantity of reserved water looks to the Indians' present and future needs, not their past needs that may no longer apply.

Indeed, the Agua Caliente Tribe's water needs for agricultural uses were relatively small even when its reservation was created by the 1870s executive orders. According to the Smiley Commission Report, about 70 members of the Tribe resided on the reservation, nearly all of them in section 14, in Township 4S, Range 4E. Smiley Comm'n Rep., at 31-32 (DWA RJN, Exh. 2). Section 14 was fed with water from two streams, Tahquitz Creek and Andreas Creek. *Id.* at 32. The Tribe "depended largely on water coming from" Tahquitz Creek, and also "had a supply of water coming from" Andreas Creek. *Id.* The long-term (1948-2009) annual flow from Tahquitz Creek was 3,566 acre feet, and the long-term annual flow from Andreas Creek was 2,047 acre feet. Bigley Dec. (Doc. 200-2, Exh. 2), at 53. Although the Tribe from 1909 to 1919 constructed a ditch and pipeline to divert water from Tahquitz Creek to irrigate 150 acres, the Tribe as of 1924 had irrigated only about 40 acres. CVWD SUF 64-65. Although the Tribe during the same period constructed a dam and pipeline to divert water from Andreas Creek to irrigate 210 acres, the Tribe as of 1924 had irrigated only 70 acres. CVWD SUF 62-63. Today, the Tribe no longer even uses water for agricultural purposes. DWA SUF 18. Thus, the Tribe's water uses for agriculture were relatively small even when its reservation was created by the 1870s executive orders. The Tribe is attempting through the PIA standard to leverage its former meager agricultural uses into a very large reserved right to use groundwater in the Coachella Valley for any purpose.

The Tribe argues that the PIA standard is supported by the reports of Special Masters Simon Rifkind and Elbert Tuttle in *Arizona I* and *Arizona v. California*,

460 U.S. 605 (1983) ("*Arizona II*"), respectively, which applied the PIA standard in quantifying the reserved rights of the Colorado River Indian tribes in those cases. Tribe Mem. 8-9, 12-13. Special Master Rifkind applied the PIA standard because he determined it would be "impossible" to otherwise predict the "future needs of the Indians," and the amount of the practicably irrigable acreage on the reservation provided a reasonable methodology for predicting the Indians' present and future needs. Report of Special Master, *Arizona I*, at 262.[3] The amount of practicably irrigable acreage on the Tribe's reservation in this case, however, does not provide a reasonable methodology for predicting the Tribe's present and future needs, because the Tribe does not use groundwater to irrigate its reservation lands. DWA SUF 18. Special Master Tuttle—although applying the PIA standard—stated that "[n]o standard was definitive for all cases," Report of Special Master, at 89, *Arizona II*, and that *Arizona I* "did not necessarily adopt this [PIA] standard as the universal measure of Indian reserved water rights." *Id.* at 90.[4] Thus, Special Master Tuttle indicated that the PIA standard may not be appropriate for quantifying reserved rights of Indian tribes in all cases, such as cases where, as here, the Indians no longer use water for agricultural purposes.

The PIA standard, if applied in quantifying the Tribe's reserved right, may lead to irrational and absurd results. Under the PIA standard, the Tribe—a

---

[3] Special Master Rifkind concluded that the PIA standard would provide sufficient water "to satisfy the future expanding agricultural and related water needs of each Indian Reservation." Report of Special Master, *Arizona I*, at 260. The Colorado River Indian Tribe's expansive need for water for present and future agricultural uses in *Arizona I* is vastly different from the Tribe's claimed need for quantification under the PIA standard, in light of the Tribe's meager agricultural uses when its reservation was created and its subsequent cessation of agricultural uses. *See* pages 8-9, *supra*. Special Master Rifkind's report in *Arizona I* is available at: http://lawcollections.colorado.edu/allfile/201635.pdf.

[4] Special Master Tuttle's report in *Arizona II* is available at: http://lawcollections.colorado.edu/allfile/201518.pdf.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

relatively small Indian tribe that originally had only 70 members and now has only 440 members, DWA Mem. 25—would potentially have the right to a very large quantity of groundwater, because the Tribe's reservation is very large; according to the Tribe's complaint, the reservation consists of more than 31,000 acres. *Id.* at 26. Thus, the amount of groundwater encompassed under the PIA standard may far exceed the amount necessary to meet the Tribe's modern homeland needs. The PIA standard might potentially allow the Tribe to use so much groundwater that other groundwater users in the Coachella Valley would be unable to exercise their own rights to use groundwater. DWA Mem. 31-32. Indeed, the PIA standard under the Tribe's argument may allow the Tribe to use so much groundwater that the safe yield of the basin would be jeopardized. DWA Mem. 26. In construing statutes, the courts are required to avoid constructions that lead to "absurd results." *United States v. American Trucking Assns., Inc.,* 310 U.S. 534, 543 (1940); *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940). In construing the Tribe's reserved right, this Court should avoid a construction that might lead to absurd results under the PIA standard.

Notably, the United States does not support the Tribe's argument that the PIA standard applies in quantifying the Tribe's reserved right in groundwater. The United States asserts that "PIA is not the 'universal measure of Indian Reserved water rights,'" quoting Special Master Tuttle's report in *Arizona II*, and asserts that "PIA does not capture the nuance necessary to ensure that all Indian reservations in America serve the homeland needs of their resident tribes." U.S. Mem. 9. Thus, the United States argues that the PIA standard does not apply in quantifying the Tribe's reserved right, and that under the *Arizona* decisions this Court's task is to "fairly and feasibly account for Agua Caliente's present and future water use needs." *Id.* at 10. DWA agrees that this Court should "fairly and feasibly" provide for the Tribe's present and future needs, and believes that the factors described earlier, including those related to the unique circumstances of the Tribe's

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

reservation, provide for a fair and feasible quantification of the Tribe's present and future needs.  *See* pages 4-5, *supra*.  Since the Tribe's lands were reserved by the United States rather than by the Tribe, the United States' failure to support the Tribe's PIA argument further undermines the Tribe's argument that the PIA standard applies.

**D.    Even Where Applicable, the "Practicably Irrigable Acreage" Standard Does Not Provide for the Reservation of a Separate Quantity of Water in Addition to the Quantity of Water Reserved Under the Homeland Standard.**

The Tribe argues not only that the PIA standard applies in quantifying its reserved right in groundwater, but also that the PIA standard provides for the reservation of a separate quantity of groundwater in addition to the quantity reserved under a homeland standard.  Tribe Mem. 5-6, 13-14.  Under the Tribe's argument, the Tribe would be entitled to a specific quantity of groundwater under the homeland standard, and a separate and additional quantity of groundwater under the PIA standard.

Contrary to the Tribe's argument, the PIA standard—even where applicable—does not provide for the reservation of separate quantities of water under the homeland standard and the PIA standard.  Rather, the homeland standard is the *general* standard that applies in quantifying reserved rights for Indian reservations, and the PIA standard is the *specific* standard that applies under the homeland standard in cases of Indian tribes that use water for agricultural purposes.  In *Arizona I*, the Supreme Court adopted the Special Master's conclusions that the quantity of the reserved water was that necessary to "satisfy the future as well as the present needs of the Indian Reservations," and that this amount was that necessary "to irrigate all the practicably irrigable acreage on the reservations."  *Arizona I*, 373 U.S. at 600.  In other words, the Supreme Court held that the standard for determining the "future as well as the present needs" of the Indians—that is, the

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

homeland standard—is measured by the amount of water necessary to irrigate the "practicably irrigable acreage" of the reservation. Thus, *Arizona I* did not reserve separate quantities of water under the homeland standard and the PIA standard. Rather, *Arizona I* reserved a quantity of water under the homeland standard that was measured by the PIA standard.

In arguing that the homeland standard and the PIA standard provide for the reservation of separate quantities of water, the Tribe cites the Ninth Circuit's decisions in *Walton* and *Adair*, which held that the reserved rights for the Indian tribes in those cases included separate quantities of water for agricultural purposes and for fishing purposes. Tribe Mem. 13-14. The Tribe's argument is misplaced for several reasons.

First, *Walton* itself contradicts the Tribe's argument that separate quantities of water are reserved under the homeland standard and the PIA standard. *Walton* stated that the "general purpose" of the Colville Indian Tribe's reservation was to provide a "home" for the tribe, *Walton*, 647 F.2d 47, and that the "specific purposes" were "often unarticulated," *id*., but that "one purpose" of establishing the homeland was to enable the Indians "to maintain their agrarian society," *id*., and "one purpose" was to preserve the Indians' "access to fishing grounds." *Id*. at 48. Thus, *Walton* distinguished between the "general" homeland purpose and the specific agricultural and fishing purposes, indicating that the general homeland purpose includes, where applicable, specific agricultural and fishing purposes.

Second, water uses for agriculture and for fishing, as in *Walton*, are entirely different kinds of uses, because water used for agriculture does not include water used for fishing, and *vice versa*. Thus, it may be appropriate, as in *Walton*, to reserve separate quantities of water for agriculture and fishing, where agriculture and fishing both relate to the Indians' modern needs. But since the general homeland purpose includes specific agricultural and fishing purposes, where the latter are applicable, there is no basis for providing for the reservation of separate

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

quantities of water for the general homeland purpose, on the one hand, and specific agricultural and/or fishing purposes, on the other.

Third, since the Tribe does not use groundwater for either agricultural purposes, DWA SUF 18, or fishing purposes, CVWD SUF 60, there is no basis for reserving separate quantities of water for either such purpose here in any event.

As noted earlier, the United States does not support the Tribe's argument that the PIA standard applies in quantifying the Tribe's reserved right in groundwater. *See* page 11, *supra*. *A fortiori*, the United States presumably does not support the Tribe's argument that the Tribe's reserved right includes separate quantities of water under both the homeland standard and the PIA standard, which further demonstrates that the homeland standard and the PIA standard do not provide for reservations of separate quantities of groundwater.

**E.    The Homeland Standard Does Not Include Groundwater for Commercial Uses.**

The Tribe argues that its reserved right include groundwater for commercial uses, and that the quantification of the Tribe's reserved right should include a quantity of groundwater for commercial uses.  Tribe Mem. 10-13.

Contrary to the Tribe's argument, the Tribe's reserved right does not include commercial uses, and the quantification of its reserved right does not include a quantification for commercial uses, because commercial purposes are not the primary purposes for which the Tribe's reservation was created.  As noted earlier, the Smiley Commission that investigated the Tribe's needs concluded that the Tribe used water for "irrigation" and "domestic use," but made no mention of any use or need of water for commercial uses.  Smiley Comm'n Rep., at 33 (DWA RJN, Exh. 2); *see* page 3, *supra*.  Thus, the Tribe's primary reservation purposes were agricultural and domestic purposes, but not commercial purposes.  The Supreme Court in *New Mexico* held that federal water rights are reserved only for primary reservation purposes, not secondary purposes.  *New Mexico*, 438 U.S. at 702.  Since

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

commercial purposes were not the primary purposes for which the Tribe's reservation was created, and at most were only secondary purposes, the Tribe's reserved right does not include groundwater for commercial purposes under *New Mexico*. *See* pages 3-4, *supra*. Notably, Special Master Rifkind, in his report in *Arizona I*, declined to provide an allocation of water for non-agricultural water uses such as "industry," because "other uses, such as industry, … were not contemplated at the time the Reservations were created." Report of Special Master, *Arizona I*, at 265.

The Tribe makes two arguments in support of its contention that its reserved right in groundwater includes commercial uses. First, the Tribe argues that its reserved right includes the right to use water for "any lawful purpose," and that commercial uses are a "lawful purpose." Tribe Mem. 11. Assuming *arguendo* that the Tribe has the right to use its reserved water for "any lawful purpose," this means only that the Tribe may have the right to use its reserved right in groundwater—*once it is quantified*—for commercial uses, but does not mean that the quantity of the Tribe's reserved right can be expanded to include commercial uses that were not part of the primary reservation purposes for which the Tribe's reservation was created. The quantity of the Tribe's reserved right is that necessary to maintain a homeland, that is, the amount necessary to make the reservation "livable," *Arizona I*, 373 U.S. at 599, and to provide the Tribe's members with a "moderate living," *Washington Fishing Vessel*, 443 U.S. at 686. The homeland standard does not include groundwater for commercial purposes, because commercial purposes were not the primary purposes—and at most were only secondary purposes—for which the Tribe's reservation was created.

Second, the Tribe argues that the PIA standard applies in quantifying its reserved right and that its reserved right cannot be "reduced based on subsequent land or water use," Tribe Mem. 10, or based on "subsequent land use of development," *id.* at 12. Thus, the Tribe argues that it has the right to a very large

quantity of groundwater under the PIA standard, and that the large quantity of groundwater reserved under the PIA standard cannot be subsequently "reduced" because the Tribe no longer uses water for agricultural purposes.  The premise of the Tribe's argument—that it has the right to a very large quantity of groundwater under the PIA standard—is misplaced, because, as we have argued, the PIA standard does not apply in quantifying the Tribe's reserved right in groundwater.  *See* pages 7-11, *supra*.  Rather, the homeland standard applies in quantifying the Tribe's reserved right, and the homeland standard requires sufficient water to make the reservation "livable," *Arizona I*, 373 U.S. at 599, and to provide the Tribe's members with a "moderate living," *Washington Fishing Vessel*, 443 U.S. at 686.  Thus, the quantity of the Tribe's reserved right is not "reduced" and the Tribe does not suffer "punishment" because it no longer uses water for agricultural purposes, as the Tribe argues.  Tribe Mem. 10.  Rather, the homeland standard provides the Tribe with sufficient water to meet its present and future needs.  DWA Mem. 22-24.

Even though the Tribe's reserved right in groundwater does not include commercial uses, the Tribe conducts various commercial activities on its reservation, principally in operating tourist destinations and casinos, as a result of which the Tribe has a high level of prosperity; the Tribe's annual revenue is $658,014.397, and the annual revenue per tribal member is $1,495,510.  Howitt Dec. (Doc. 200-4, Exh. A), at 13.  The Tribe's high level of prosperity through these commercial activities differentiates the Tribe from the Indian tribes whose reserved rights were upheld in *Arizona I*, *Walton* and *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983), where the tribes depended on agriculture, and in *Walton* and *Adair* a fishery as well, for their livelihood.  *Arizona I*, 373 U.S. at 599 (citing territorial delegate's statement that "[i]rrigating canals are essential to the prosperity of these Indians"); *Walton*, 647 F.2d at 47-48 (describing reservation purposes of maintaining "agrarian society" and "access to fishing grounds"); *id.* at 45 (stating that "[s]almon and trout were traditional foods for the Colville Indians, .

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

1  . . but irrigation use [by non-Indians] depleted the water flow during spawning

2  season"); *Adair*, 723 F.2d at 1410.

3      More importantly, since these commercial activities are not primary

4  reservation purposes and at most are only secondary purposes, the Tribe's reserved

5  right in groundwater does not include a separate quantity of groundwater for these

6  commercial uses.  As the Supreme Court held in *New Mexico*, federal water rights

7  are reserved only for primary reservation purposes and not secondary purposes.

8  *New Mexico*, 438 U.S. at 702.  Rather than exercising a federal reserved water right

9  to serve these commercial purposes, the Tribe instead obtains water for the

10  commercial purposes from the Water Agencies under California law.  DWA SUF 6,

11  22; CVWD SUF 55, 75.  This further demonstrates that the economic success and

12  prosperity of the Tribe's reservation is not dependent on a reserved water right for

13  commercial uses.

14  **II.   THE TRIBE'S RESERVED RIGHT DOES NOT INCLUDE A WATER**
   **QUALITY COMPONENT, AND IN ANY EVENT THE TRIBE'S**
15  **WATER QUALITY CLAIM MUST BE DISMISSED.**

16
      **A.   The Tribe's Reserved Right Does Not Include a Water Quality**
17          **Component.**

18

19      The Tribe and the United States argue that the *Winters* doctrine applies to

20  both water quantity and water quality, because a federal reserved water right may

21  be impaired either by depletion of water quantity or degradation of water quality.

22  Tribe Mem. 15-16, 17; U.S. Mem. 14.  Therefore, they contend, the Tribe's

23  reserved right in groundwater includes a water quality  component.  *Id*.

24      As DWA argued in its MSJ, the Tribe's reserved right does not include a

25  water quality component.  DWA Mem. 17-18.  The Supreme Court and Ninth

26  Circuit have held that reserved rights apply to water quantity, but have not held that

27  reserved rights apply to water quality.  *See, e.g., Cappaert,* 426 U.S. at 141; *New*

28  *Mexico*, 438 U.S. at 705; *Arizona I*, 373 U.S. at 600; *Walton,* 647 F.2d at 47; DWA

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

1  Mem. 17-18.  The Supreme Court has always measured the United States' reserved

2  rights in terms of water quantity, such as the practicably irrigable acreage of the

3  reservation, *Arizona I*, 373 U.S. at 600, and has never measured such rights in terms

4  of water quality.  Therefore, the Tribe's reserved right does not include a water

5  quality component.[5]

6       The cases cited by the Tribe and the United States do not support their

7  contention that the Tribe's reserved right includes a water quality component.

8  Tribe Mem. 16-17; U.S. Mem. 16-17.  The principal cases cited are *United States v.*

9  *Gila Valley Irrigation Dist.*, 920 F.Supp. 1444 (D. Ariz. 1996), *Hopi Tribe v.*

10  *United States*, 782 F.3d 663 (Fed. Cir. 2015), and *United States v. Anderson*, 591

11  F.Supp. 1 (E.D. Wash. 1982), *aff'd in part, rev'd in part*, 736 F.2d 1358 (9th Cir.

12  1984).  Tribe Mem. 16-17.  These decisions do not support the Tribe's and the

13  United States' water quality claim.

14       In *Gila Valley*, the district court held that under the Globe Equity Consent

15  Decree, the Apache Indian tribe had the right to seek an injunction preventing

16  farming practices that caused increased salinity in the Gila River and thus impaired

17  the tribe's ability to grow salt-sensitive crops on its reservation.  *Gila Valley*, 920

18  F.Supp. at 1448, 1454.  Specifically, the court held that the tribe had the right to

19  water of minimum salt levels under the consent decree because of the "unlikelihood

20  of successful commercial cultivation of salt-sensitive and moderately salt-sensitive

21  crops using Gila River water at its current levels of quality." *Id.* at 1454.  In

22  interpreting the tribe's rights under the consent decree, the court applied the

23  principles of the western states' water laws, namely the principle that "a prior

24  ─────────────

25  [5] DWA contends that—even if *arguendo* the Tribe's reserved right includes a water
   quality component—the Water Agencies' importation of Colorado River water does

26  not violate the water quality component, because the imported water meets federal
   and state water quality standards, and also because the imported water in some

27  respects improves rather than degrades water quality.  DWA Mem. 20 n. 6.  These
   issues, if still extant, will be addressed in Phase 3.

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

appropriator of water is entitled to protection, including injunctive relief, against material degradation of the quality of the water by junior appropriators upstream." *Id*. at 1448, *citing, e.g., Phoenix Water Co. v. Fletcher*, 23 Cal. 481, 487, 1863 WL 730 (1863). In short, the court, first, interpreted the tribe's rights under a consent decree that does not apply here, and second, interpreted the tribe's rights based on principles of state law rather than federal law. Thus, *Gila Valley* provides no support for the Tribe's and the United States' argument that the Tribe's reserved right—which is not based on a consent decree, and is based on federal law rather than state law—includes a water quality component.

In *Hopi Tribe*, the Hopi Indian tribe brought a damages action against the United States, claiming that the United States had a fiduciary obligation to provide safe drinking water on the tribe's reservation and that the United States had violated its fiduciary duty because the water on the tribe's reservation, including the groundwater, contained dangerous levels of arsenic. *Hopi Tribe*, 782 F.3d at 665. The Federal Circuit rejected the tribe's claim. The court held that the United States does not have a fiduciary duty to provide safe drinking water on an Indian reservation unless some source of law, such as a statute or executive order, imposes such a duty on the United States, and that no source of law imposes such a duty. *Id*. at 668-669. Notably, the Federal Circuit held that the statutes cited by the tribe, even construed "in light of the *Winters* doctrine" as the tribe argued they should be construed, did not establish such a fiduciary duty by the United States. *Id*. at 669. Since *Hopi Tribe* held that the United States does not have a fiduciary duty under the *Winters* doctrine to provide for water quality on Indian reserved lands, *Hopi Tribe* contradicts rather than supports the Tribe's and the United States' argument that the Tribe's reserved right includes a water quality component.[6]

---

[6] The Tribe asserts that *Hopi Tribe* held that the "*Winters* doctrine gives the United States 'the power to enjoin others from practices that reduce the quality of water feeding a reservation.'" Tribe Mem. 16. In fact, *Hopi Tribe* stated only that the

18

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

In *Anderson*, the district court held that the Spokane Indian Tribe had a reserved right under the *Winters* doctrine "to preserve fishing in the Chamokane Creek." *Anderson*, 591 F.Supp. at 5. The court then stated that "[t]he *quantity* of water needed to carry out the reserved fishing purposes is related to water temperature rather than simply minimum flow," and "[t]he *volume* of water needed to preserve fishing" was the "furiously debated" issue that the court then resolved. *Anderson*, 591 F.Supp. at 5 (emphases added). Thus, *Anderson* determined the "quantity" and "amount" of water necessary to fulfill the reservation purpose of fishing, and held that this quantity and amount is that necessary to meet a particular "temperature" for fish to survive. Since the court considered water *quality* only to the extent relevant in measuring water *quantity*, the decision does not support the Tribe's and the United States' argument that the Tribe's reserved right includes a water quality component where water quality is not used to measure water quantity.[7]

---

*Winters* doctrine "may" give the United States that power "[i]n some circumstances," and cited in support of the statement the district court's decision in *Gila Valley*. *Hopi Tribe*, 782 F.3d at 669. As noted above, *Gila Valley* interpreted the Indian tribe's rights under a consent decree that does not apply here, and interpreted the tribe's rights based on principles of state law rather than federal law. Thus, *Hopi Tribe* did not hold or suggest that the *Winters* doctrine applies to water quality.

[7] The Tribe cites the Ninth Circuit's decision in *Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, 763 F.2d 1032 (9th Cir. 1985), as indicating the interconnection between water quantity and water quality. Tribe Mem. 17. In *Kittitas*, the Ninth Circuit held that a reclamation project was required to release water from the reservoir because nests of salmon eggs were "threatened by low post-irrigation season water flows." *Kittitas*, 763 F.2d at 1033. Thus, the salmon eggs were threatened by reduced quantities of water, not by reduced water quality.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

In sum, there is no precedent that holds that a reserved water right includes a water quality component, and no basis for this Court to establish such a precedent.[8]

**B.     Under the Property Clause of the Constitution, the United States and the Tribe Have a Theoretical Right, in the Abstract, to Prevent Water Quality Degradation of the United States' Property, Including the Tribe's Reservation Here.**

The United States and the Tribe argue that—even assuming that the Tribe's reserved right does not include a water quality component—the United States and the Tribe have the right under the United States' property powers to prevent harm to federal property, including harm caused by degradation of water quality on federal reserved lands.  U.S. Mem. 14, 15-16; Tribe Mem. 17-18.  Thus, they argue, this Court can enjoin conduct that causes degradation of water quality on the Tribe's reservation, regardless of whether the Tribe's reserved right includes a water quality component.  *Id.*

Under the Property Clause of the Constitution, Congress has the power to make "all needful rules and regulations" respecting the United States' property.  U.S. Const., art. 4, § 3, cl. 2.  Although the states are traditionally responsible for regulating water rights and Congress traditionally defers to state water laws, the states' authority to regulate water rights is subject to the limitation, established in the Property Clause, that "in the absence of any specific authority from Congress, a

---

[8] The Tribe asserts that DWA "conceded"—"in the abstract, under certain circumstances and for certain purposes"—that the Tribe's reserved right includes a water quality component.  Tribe Mem. 15 n. 5.  DWA's highly qualified statement was simply a preliminary statement of its position that was submitted in order that the Court could determine the appropriate Phase 2 issues, and was not intended to represent DWA's considered legal position based on its further research and analysis, as that position is set forth in the text above.  And, even if DWA's position were inconsistent, one is reminded of Justice Frankfurter's comment that "[w]isdom too often never comes, and so one ought not to reject it because it comes late."  *Henslee v. Union Planters Nat'l Bank & Trust Co.,* 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

state could not by its legislation destroy the right of the United States as the owner of lands bordering on a stream to the continued flow, so far, at least, as might be necessary for the beneficial uses of the government property." *California Oregon Power Co. v. Beaver Portland Cement Co.,* 295 U.S. 142, 159 (1935); *see United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 703 (1899); *United States v. Walker River Irrigation Dist.*, 104 F.2d 334, 337 (1939).  Under its property powers, Congress has the power to control the "occupancy and use" of the lands of the United States, and to protect such lands "from trespass and injury." *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976); *Utah Power & Light Co.*, 243 U.S. 389, 405 (1917).  "[T]he power of the United States to thus protect its lands and property does not admit of doubt." *Hunt v. United States*, 278 U.S. 96, 100 (1928).

DWA agrees that the United States has the power under the Property Clause to protect federal property from harm, including harm caused by degradation of water quality on federal reserved lands.  And, where the United States has reserved lands for the occupancy and use of an Indian tribe, as the United States has done here, the Indian tribe as the occupier and user of the federal property would also have the right to protect the property from harm caused by degradation of water quality.  Thus, DWA agrees that the United States and the Tribe have a theoretical right, in the abstract, to seek injunctive relief to prevent harm to the Tribe's reservation caused by degradation of water quality, to the extent that the United States itself has not authorized the activity that causes the alleged harm.[9]  The United States' and the Tribe's right to seek such relief arises not because the Tribe's reserved right includes a water quality component, but because the United

---

[9] Here, the United States has authorized the Water Agencies' activity—that is, importation of Colorado River water—that the United States and the Tribe claim causes degradation of water quality on the Tribe's reservation.  DWA Mem. 12 n. 5, 21 n. 7.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

1    States has the right under the Property Clause, and the Tribe has the derivative

2    right, to protect the Tribe's reservation from harm caused by water quality

3    degradation.

4         The fact that the United States and the Tribe have the right under the federal

5    property power to protect water quality on the Tribe's reservation further

6    demonstrates that the Tribe's reserved right is not necessary to protect water quality

7    and thus does not include a water quality component.  In *New Mexico*, the Supreme

8    Court held that a federal water right is reserved only to the extent "necessary" to

9    fulfill primary reservation purposes.  *New Mexico*, 438 U.S. at 702.  The Tribe's

10   reserved right is not "necessary" to protect water quality—because the United

11   States' property powers provide adequate protection of water quality—and thus the

12   Tribe's reserved right does not include a water quality component for this

13   additional reason.

14        Although the United States and the Tribe have the theoretical right to seek

15   injunctive relief to prevent harm to the Tribe's reservation caused by water quality

16   degradation, their exercise of this theoretical right is subject to two major

17   limitations under the circumstances of this case.  First, the United States does not

18   claim authority under its property power to seek to prevent alleged water quality

19   degradation on the Tribe's reservation.  The United States' complaint in

20   intervention does not allege that the United States has the right under its property

21   power to prevent water quality degradation, and for that matter does not even allege

22   that the Tribe's reserved right includes a water quality component—and in fact does

23   not even mention water quality at all.  Doc. 62-1.[10]  Since the United States does

24   _____

25   [10] The United States asserts that DWA's answer to the United States' complaint in
     intervention did not address the issue of "whether the Court may protect Agua

26   Caliente's waters from degradation."  U.S. Mem. 8 n. 6.  The United States fails to

27   mention, however, that the United States' complaint in intervention (Doc. 62-1) did
     not mention the water quality issue, which is the reason that DWA did not mention

28   the issue in its answer to the United States' complaint in intervention.  In its

1  not pursue a water quality claim, the question is not whether the United States can

2  pursue such a claim, but whether the Tribe itself can pursue a water quality claim,

3  whatever the doctrinal basis of the claim.

4        Second, as DWA will argue in the next two subheadings, (1) the Tribe does

5  not have standing under Article III of the Constitution to assert an abstract and

6  hypothetical water quality claim, and has standing to assert a water quality claim

7  only by alleging and showing that the alleged degradation of water quality causes

8  the Tribe to suffer a concrete and particularized injury, and (2) assuming *arguendo*

9  that the Tribe's reserved right includes a water quality component, the water quality

10  component is relevant only to the extent that the alleged degradation of water

11  quality prevents fulfillment of the primary reservation purposes.  Since the Tribe

12  has not alleged that the alleged water quality degradation causes the Tribe to suffer

13  a concrete and particularized injury or prevents fulfillment of the primary

14  reservation purposes, the Tribe's water quality claim should be dismissed for the

15  Tribe's failure to make the necessary allegations to support its claim.

16      **C.**    **Since the Tribe Has Not Alleged That the Alleged Water Quality**

17                  **Degradation Causes the Tribe to Suffer a Concrete and**
                **Particularized Injury, the Tribe Does Not Have Article III**

18                  **Standing to Maintain Its Water Quality Claim.**

19        Under Article III of the Constitution, a plaintiff does not have standing to

20  maintain an action unless the plaintiff alleges and can demonstrate that the plaintiff

21  has suffered an "injury in fact"—that is, an injury that is "concrete and

22  particularized" and "actual or imminent," and not "conjectural" or "hypothetical"—

23  that is "traceable" to the defendant's conduct and will be "redressed" by a favorable

24  decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992); *see Horne*

25  *v. Flores*, 557 U.S. 433, 445 (2009); *Summers v. Earth Island Inst.*, 555 U.S. 488,

26  

27  answer to the Tribe's complaint, however, DWA asserted in its Fifth Affirmative
Defense that the Tribe's reserved right does not include a water quality component.

28  DWA's Answer to Complaint, at 11 (Doc. 40).

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

493 (2009); *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (1990).  Therefore, the Tribe does not have Article III standing to pursue its water quality claim—whether its claim is based on the United States' property powers or the Tribe's reserved right—unless the Tribe alleges and can show that the Water Agencies' importation of Colorado River water is causing the Tribe to suffer a "concrete and particularized" injury that is "traceable" to the Water Agencies' conduct and will be "redressed" by a favorable decision.

The Tribe has not made the necessary allegations to demonstrate that the Tribe has Article III standing to maintain its water quality claim against the Water Agencies, because the Tribe has not alleged that the Water Agencies' importation of Colorado River water causes the Tribe to suffer any injury that would be considered "concrete and particularized."  Although the Tribe alleges that the imported water contains "higher levels" of total dissolved solids ("TDS") than the native groundwater, Tribe's Complaint, at 13 ¶ 47 (Doc. 1), the Tribe has not alleged that the higher TDS levels are causing any concrete and particularized injury to its reservation.  The effects of the higher TDS levels on the Tribe's reservation might be entirely benign rather than harmful, and the Tribe has not alleged that the effects are harmful rather than benign.  The Tribe has not alleged, for example, that the higher TDS levels exceed water quality standards or drinking quality standards established under federal and state statutes and regulations; if the higher TDS levels do not exceed federal and state water quality standards and drinking quality standards, the water is presumptively safe to drink and there would be no basis for the Tribe to claim that the higher TDS levels are causing any concrete and particularized injury to the Tribe or its reservation.  Nor has the Tribe alleged that the water is not suitable for the agricultural and/or commercial uses for which the Tribe seeks to quantify its reserved right.  Therefore, the Tribe has not made the necessary allegations to establish that it has Article III standing to maintain its water quality claim, and the claim should be dismissed.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

Since the issue of whether the Tribe has Article III standing goes to this Court's jurisdiction to hear the Tribe's water quality claim, this Court is required to decide the Article III standing issue before it addresses the merits of the Tribe's claim, including the Tribe's claim that its reserved right includes a water quality component.

**D.     Since the Tribe Has Not Alleged That the Alleged Water Quality Degradation Is Preventing Fulfillment of the Primary Reservation Purposes, the Tribe's Water Quality Claim Should Be Dismissed.**

Assuming *arguendo* that the Tribe's reserved right includes a water quality component, the water quality component is included in its reserved right only to the extent that a particular level of water quality is necessary to fulfill the primary purposes of the Tribe's reservation, as DWA has argued.  DWA Mem. 19.  In *New Mexico*, the Supreme Court held that a reserved water right includes only the water "necessary" to fulfill the primary reservation purposes.  *New Mexico*, 438 U.S. at 702.  Thus, if a particular level of water quality is not "necessary" to fulfill the primary reservation purposes, a reserved water right does not include a water quality component under *New Mexico*.  The cases cited by the Tribe and the United States that have upheld the rights of Indian tribes to water quality in other contexts have upheld such rights because degradation of water quality was causing actual and concrete harm to the tribe's reservation purposes.  *Gila Valley*, 920 F.Supp. at 1454 (holding that farming practices were causing increased salinity and thus harming Indian tribe's right under consent decree to grow salt-sensitive crops on its reservation); *Anderson*, 591 F.Supp. at 5 (holding that depletion of flows were affecting temperature of water and thus harming fishery resource on which the Indian tribe depended).

Here, the Tribe has not alleged that the importation of water containing higher TDS levels impairs or otherwise prevents fulfillment of the reservation purposes in any way.  As mentioned above, the effects of the higher TDS levels

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA  94596

may be entirely benign rather than harmful, and the Tribe has not alleged that the effects are harmful rather than benign. Since the Tribe has not alleged that the higher TDS levels are preventing fulfillment of the primary reservation purposes, the Tribe's water quality should be dismissed for this additional reason.

### E. The Tribe Has a Remedy Under California Law to Protect Water Quality on Its Reservation, Which Further Demonstrates that the Tribe's Reserved Right Does Not Include a Water Quality Component.

The Tribe argues that its right to protect water quality on its reservation is consistent with California law, which, according to the Tribe, holds that "a water user is entitled to water which is undiminished in quantity and undeteriorated in quality." Tribe Mem. 18, citing *Phoenix Water Co. v. Fletcher*, 23 Cal. 481, 488 (1863), and *Wright v. Best*, 19 Cal.2d 368, 378-379, 121 P.2d 702 (Cal. 1942). In fact, *Phoenix Water* and *Wright* held that a plaintiff is entitled to seek injunctive relief only for a *material* degradation of water quality, and not for degradation of water quality regardless of how minor or immaterial. *Phoenix Water*, 23 Cal. at 488 ("material injury"); *Wright*, 19 Cal.2d at 378 ("material deterioration of the quality of the stream"). As DWA has argued, water users who have rights to use water under California law have the right to seek injunctive relief to prevent others from substantially harming their water rights. *Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist*., 3 Cal.2d 489, 533-535, 45 P.2d 972 (1935); *Pasadena v. Alhambra*, 33 Cal.2d 908, 930-931, 207 P.2d 17 (1949); DWA Mem. 21.

Since the Tribe's water quality claim is consistent with California law, the Tribe has a remedy under California law to protect water quality on its reservation from unreasonable impairment. The Tribe's remedy under California law to protect the reservation's water quality further demonstrates that the Tribe's reserved right does not include a water quality component, as DWA has argued. DWA Mem. 21. In *New Mexico*, the Supreme Court held that a reserved right includes only the

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

water "necessary" to fulfill primary reservation purposes. *New Mexico*, 438 U.S. at 702. Since the Tribe has a remedy under California law to protect water quality on its reservation, the inclusion of a water quality component as part of the Tribe's reserved right is not "necessary" to fulfill the primary reservation purposes, and therefore is not included in the Tribe's reserved right under *New Mexico*.

## III.    THE TRIBE DOES NOT OWN THE STORAGE SPACE OF THE GROUNDWATER BASIN.

In its complaint, the Tribe makes several allegations that it "owns" the "pore space," or the storage space, of the groundwater basin underlying its reservation. Complaint, at 4 (¶ 10), 5 (¶ 12), 15 (¶ 55), 16-17 (¶ 66), 18 (¶ 75) (Doc. 1).[11]  In its memorandum of points and authorities in support of its MSJ, however, the Tribe provides only a scant discussion of the issue, slightly more than a page.  Tribe Mem. 19-20.  The Tribe's scant discussion of the issue hardly provides a basis for this Court to establish a significant precedent of federal law that no court has ever established, namely that Indian tribes own the storage space of groundwater basins underlying their reservations and are entitled to compensation from those who utilize the basins to store and extract groundwater.

As we explain, the cases cited by the Tribe do not support its ownership claim, and the United States—by not addressing or even mentioning the claim— appears not to support the claim.

### A.    The Cases Cited by the Tribe Do Not Support Its Ownership Claim.

The Tribe argues that the Supreme Court in *United States v. Shoshone Tribe*, 304 U.S. 111 (1938), established the principle that "[f]ederal law provides that

---

[11] As DWA has noted, the term "storage space" rather than "pore space" is the appropriate term that applies to the Tribe's ownership claim, because "storage space" refers to the portion of a groundwater basin where groundwater is found, and "pore space" refers to the subsurface area where minerals are found.  DWA Mem. 2.  Accordingly, this memorandum will use the term "storage space."

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

1    Indian tribes are the beneficial owners of all 'constituent elements of the land'

2    comprising their reservations," which include groundwater.  Tribe Mem. 19.

3    *Shoshone Tribe* established no such principle.  *Shoshone Tribe* held that the Indian

4    tribe in that case owned the timber and minerals located on the tribe's reservation

5    under an 1868 treaty that does not apply here.  DWA Mem. 15-16.  The treaty

6    reserved a large swath of lands in several states for the tribe's exclusive use and

7    occupancy, and it was reasonable to conclude that the treaty granted to the tribe the

8    ownership of the timber and minerals on the lands.  *Id*.  *Shoshone Tribe* did not

9    hold or suggest that under federal law Indian tribes own the storage space of

10   groundwater basins underlying their lands.  No such issue was raised in *Shoshone*

11   *Tribe*.  *Shoshone Tribe* did not even involve groundwater.  Thus, *Shoshone Tribe*

12   does not support the Tribe's ownership claim in the storage space of the basin.

13       The Tribe cites several decisions that hold that overlying landowners have an

14   ownership interest in subsurface minerals located beneath their lands, and argues

15   that the decisions support the Tribe's claimed ownership of the "pore space" of the

16   groundwater basin here.  Tribe Mem. 19-20.  The cited decisions are *Mosser v.*

17   *Denbury Res., Inc.*, 898 N.W.2d 406 (N.D. 2017), *Dep't of Transp. v. Goike*, 560

18   N.W.2d 365 (Mich. Ct. App. 1996), *Emeny v. United States*, 412 F.2d 1319 (Ct. Cl.

19   1969), and *United States v. 43.42 Acres of Land*, 520 F.Supp. 1042, 1045 (W.D. La.

20   1981).  The Tribe also argues that California law itself recognizes that the owner of

21   the surface estate has a compensable property interest in the underlying "pore

22   space," citing the California Court of Appeal's decision in *Starrh & Starrh Cotton*

23   *Growers v. Aera Energy,* LLC, 153 Cal.App.4th 583, 592, 63 Cal.Rptr.3d 165

24   (2007), which also involved subsurface minerals.  Tribe Mem. 20.

25       The above decisions cited by the Tribe—*Mosser*, *Goike, Emeny, 43.42 Acres*

26   and *Starrh*—do not support the Tribe's ownership claim of the storage space of the

27   groundwater basin, because the decisions addressed rights in subsurface minerals

28   and the laws applicable to subsurface minerals are entirely different from the laws

1  applicable to groundwater.  As DWA has explained, the laws applicable to

2  groundwater, unlike the laws applicable to subsurface minerals, provide that an

3  overlying landowner has a "usufructuary" right in groundwater—that is, the right of

4  use—but does not own the groundwater itself, or the storage space where the

5  groundwater is found.  DWA Mem. 3, 4-9, 13-15.  In *Andrus v. Charlestone Stone

6  Products Co.*, 436 U.S. 604, 614-615 (1978), the Supreme Court squarely held that

7  groundwater is not considered a "mineral" for purposes of federal laws regulating

8  mining of minerals.  Thus, the cases cited by the Tribe, which establish rights in

9  subsurface minerals, do not support the Tribe's claim that it owns the storage space

10  of the groundwater basin.

11      Further, the decisions cited by the Tribe—*Mosser*, *Goike*, *Emeny, 43.42

12  Acres* and *Starrh*—involved the application of state law rather than federal law as

13  applied to subsurface minerals.  Since the cited decisions applied state law rather

14  than federal law, they do not support the Tribe's claim that it owns the storage

15  space under federal law.  Under state law, a groundwater basin is considered a

16  public resource that may be used by those who have rights to store and extract

17  groundwater, and is not "owned" by those who have such rights.  *E.g., Central &

18  West Basin Water Replenishment Dist. v. Southern California Water Co.,* 109

19  Cal.App.4th 891, 904-905, 135 Cal.Rptr.2d 486 (2003); *Board of County

20  Commissioners v. Park County Sportsmen's Ranch*, 45 P.3d 693, 700-701 (Colo.

21  2002); *Chance v. BP Chemical, Inc.*, 670 N.E.2d 985, 992 (Ohio 1996); DWA

22  Mem. 4-9, 17.  As DWA has argued, this Court should adopt, or "borrow," the

23  principle of state law that provides that a groundwater basin is a public resource,

24  because this principle of state law does not conflict with federal law and no federal

25  interest supports a different result.  DWA Mem. 9-10.

26      The Tribe cites two other decisions—*Wilson v. Omaha Indian Tribe*, 442

27  U.S. 653 (1979), and *Crow Tribe v. Peters*, 835 F.Supp.2d 985 (D. Mont. 2011)—

28  that the Tribe argues support the principle that an Indian tribe's ownership of "pore

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596

1  space" involves "property rights" of Indians, and that Indians' property rights are

2  governed by federal law.  Tribe Mem. 19.  In *Wilson*, the Supreme Court held that

3  whether an Indian tribe owned a tract of land that had moved through either

4  avulsion or accretion because of a change in the river was governed by federal law,

5  but the Court adopted, or "borrowed," the state law that determines whether the

6  movement of the land had been caused by avulsion or accretion.  *Wilson*, 442 U.S.

7  at 989-992.  *Wilson* supports DWA's argument that federal law should adopt, or

8  "borrow," the principle of state law holding that a groundwater basin is a public

9  resource.  DWA Mem. 9-10.  *Wilson* did not suggest that Indian tribes own the

10  storage space of groundwater basins, and had nothing to do with groundwater.  In

11  *Crow Tribe*, the district court, following *Wilson*, held that federal law applies in

12  determining whether an Indian tribe owned subsurface minerals located beneath its

13  reservation.  *Crow Tribe*, 835 F.Supp.2d at 989-990.  As indicated above, the laws

14  governing subsurface minerals are entirely different from the laws governing

15  groundwater, including the storage space of the groundwater.  DWA Mem. 13-14.

16  Thus, *Crow Tribe* is inapposite here.

17       The unique circumstances of the Tribe's reservation further demonstrate that

18  the groundwater basin in this case is a public resource and is not owned by the

19  Tribe.  DWA Mem. 10-12.  The Tribe's reservation is part of a checkerboard, in

20  which tribal lands are interspersed with non-tribal lands.  *Id*.  Under the Tribe's

21  ownership theory, the Tribe would "own" the portion of the groundwater basin

22  underlying its lands on the checkerboard, but the other parts of the basin that

23  underlie immediately adjacent lands on the checkerboard would be a public

24  resource available to those who have rights to store and extract groundwater.  *Id*.  It

25  would be difficult if not virtually impossible to effectively administer a

26  groundwater basin that is partly owned by the Tribe and partly owned by the public.

27  *Id*.  The practical difficulties of administering such a groundwater basin further

28

1  demonstrate that the basin should be considered a public resource available for use

2  by those who have rights to store and extract groundwater.

3       In sum, the Tribe's claimed ownership of the storage space of the

4  groundwater basin is not supported by precedent, logic or policy, which may

5  explain why the Tribe devotes only scant attention to its ownership claim.

6       **B.    The United States Apparently Does Not Support the Tribe's**

7       **Ownership Claim.**

8       In its memorandum of points and authorities in support of its MSJ, the United

9  States does not argue that the Tribe owns the storage space of the aquifer, and does

10  not even mention the issue.  In light of the United States' silence concerning the

11  Tribe's ownership claim, it is fair to say that the United States does not support the

12  claim, even though it does not overtly oppose the claim.

13       The United States' silence concerning the Tribe's ownership claim may

14  reflect the United States' tacit acknowledgement that a groundwater basin is a

15  public resource available to those who have the right to store and extract

16  groundwater and is not owned by those who have such rights, as DWA has argued.

17  DWA Mem. 4-9.  The United States' silence may also reflect the United States'

18  understanding that the City of Los Angeles stores water from the Owens Valley and

19  Mono Lake basin in the San Fernando basin, DWA Mem. 7; that the Metropolitan

20  Water District of Southern California ("MWD") has numerous underground storage

21  projects, including the Upper Coachella Groundwater Storage Program, DWA

22  Mem. 8; that Arizona provides for underground storage of Colorado River water,

23  DWA Mem. 8 n. 4; DWA's Request for Judicial Notice ("RJN") (Doc. 202-6), Exh.

24  4; CVWD SUF 49-51; and that Las Vegas operates one of the largest underground

25  storage projects with Colorado River water that is treated for bacteria but not salt.

26  CVWD SUF 48.

27

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2OO1 N. MAIN STREET, SUITE 39O
WALNUT CREEK, CA  9459G

1    The United States' silence may also reflect the United States'

2    acknowledgement that it has participated in underground storage projects.  For

3    example, the United States has approved the exchange agreement between MWD,

4    DWA and CVWD that provides for importation of Colorado River water into the

5    Coachella Valley groundwater basin.  DWA Mem. 12 n. 5; Bigley Dec. (Doc. 200-

6    2), at 8.  Also, the Whitewater River groundwater replenishment program was

7    constructed pursuant to a grant from the U.S. Bureau of Land Management

8    ("BLM"), DWA RJN, Exh. 5; DWA SUF 25, and pursuant to an agreement dated

9    June 11, 1984, between the BLM, the U.S. Fish and Wildlife Service, and CVWD.

10    DWA RJN, Exh. 6; DWA SUF 26.  Since the United States has participated in and

11    supported underground storage projects in other contexts, it is understandable why

12    the United States may not support the Tribe's claim that it owns the storage space

13    of the groundwater basin here.

## CONCLUSION

The motions for summary judgment of the Agua Caliente Band of Cahuilla
Indians and the United States should be denied.


Respectfully submitted,


 _/S/Roderick Walston_
Roderick E. Walston
Arthur L. Littleworth
Wendy Y. Wang
Miles Krieger
Attorneys for Desert Water Agency

LAW OFFICES OF
BEST BEST & KRIEGER LLP
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CA 94596