MATTHEW T. KLINE (Bar No. 211640)
mkline@omm.com
DANIEL R. SUVOR (Bar No. 265674)
dsuvor@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Defendants Coachella
Valley Water District, and G. Patrick
O'Dowd, Ed Pack, John Powell, Jr.,
Peter Nelson and Castulo R. Estrada,
sued in their official capacity as members
of the Board of Directors*

(Additional counsel identified on next
page)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

AGUA CALIENTE BAND OF
CAHUILLA INDIANS,

          Plaintiff,

and

UNITED STATES OF AMERICA,
          Plaintiff-Intervenor,

      v.

COACHELLA VALLEY WATER
DISTRICT, et al.,

          Defendants.

Case No. 5:13-cv-00883-JGB (SPx)

Judge:   Hon. Jesus G. Bernal

**DEFENDANT COACHELLA
VALLEY WATER DISTRICT'S
OPPOSITION TO PLAINTIFFS'
PHASE 2 SUMMARY JUDGMENT
MOTIONS**

Filed concurrently with:

1. Statement of Genuine Disputes of
   Material Facts and Undisputed Facts
   in Opposition ("OSUF")
2. Evidentiary Objections
3. Declaration of Expert Graham E. Fogg
4. Declaration of Expert Richard Howitt

Dept.:        Courtroom 1
Action Filed:   May 14, 2013
Phase 2 Hearing:   January 22, 2018

STEVEN B. ABBOTT (Bar No. 125270)
sabbott@redwineandsherrill.com
GERALD D. SHOAF (Bar No. 41084)
gshoaf@redwineandserrill.com
REDWINE AND SHERRILL, LLP
3890 11th Street, Ste. 207
Riverside, CA 92501-3577
Telephone:  (951) 684-2520
Facsimile: (951) 684-5491

BARTON THOMPSON, JR. (Bar No. 72927)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025-7019
Telephone: (650) 473-2600
Facsimile: (650) 473-2601

ANTON METLITSKY (*pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

WALTER DELLINGER (*pro hac vice*)
BRADLEY N. GARCIA (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

*Attorneys for Defendants Coachella
Valley Water District, and G. Patrick
O'Dowd, Ed Pack, John Powell, Jr.,
Peter Nelson and Castulo R. Estrada,
sued in their official capacity as
members of the Board of Directors*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

FACTUAL BACKGROUND .................................................................. 4

   A.   The Tribe Engaged In Small-Scale Agriculture Prior To The Reservation's Creation ........................................................... 4

   B.   The United States Established The Reservation To Allow The Tribes To Sustain Their Agrarian Way Of Life And Provide For Their "Just Requirements" ....................................................... 5

   C.   The United States Understood That Much Of The Land In The Reservation Was Not Developable, And That Water Was Scarce ...... 6

   D.   The Checkboard Reservation Evidences The United States' Intent To Create An Interrelated Economy ................................. 7

   E.   The Water Agencies' Recharge Efforts Are Essential To The Valley's Economy, And The Tribe ........................................... 8

ARGUMENT ......................................................................................... 9

I.   The Quantification Request Should Be Dismissed, And Alternatively The Tribe's and United States' Proposed Standards Should Be Rejected ........................................................................................ 9

   A.   The Quantification Issue Is Not Justiciable ............................. 9

   B.   The Tribe's and United States' Proposed Quantification Standards Are Incorrect ....................................................... 9

      1.   The Tribe's Proposed Standard Is Incorrect ................. 10

         a.   There Is No Support for the Tribe's Dual Standard ........................................................ 10

         b.   The PIA Standard Is Inappropriate and Unworkable in this Case ................................... 14

      2.   The United States' Proposed Standard Is Unworkable and Improperly Bypasses the Primary Purpose Test ....................................................... 16

      3.   The Tribe's and United States' Proposed Standards Ignore Important Limitations and Constraints .............. 17

II.   The Tribe Is Not Entitled To A Declaration That It Owns Groundwater Storage Space Underlying The Reservation ................................. 20

   A.   The Storage Space Ownership Claim Is Not Justiciable ................... 20

   B.   No Case Supports The Tribe's Claim To Ownership of Groundwater Storage Space ..................................................... 21

   C.   The Court Should Apply The Uniform State Law Treating Groundwater Storage Space As A Public Resource ......................... 24

III.   A *Winters* Right Does Not Have a Unique Water Quality Component ........ 29

   A.   California Nuisance Law Provides The Appropriate Rule Of Decision For The Tribe's Water Quality Claim ....................... 30

CVWD'S OPPOSITION TO
PHASE 2 SUMMARY JUDGMENT.
NO. 5:13-CV-00883-JGB (SPx)

## TABLE OF CONTENTS
### (continued)

**Page**

B.    The Tribe's And U.S.'s Remaining Arguments Are Mistaken .......... 32

    1.    No Court Has Ever Created A Special *Winters* Water Quality Right ........................................ 32

    2.    California Water Law Does Not Protect Water Rights From Immaterial Degradation ........................... 33

    3.    CWD Does Not Dispute This Court's Authority To Protect The Tribe's Water Right From Degradation ................................................ 34

CONCLUSION ...................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*,
  849 F.3d 1262 (9th Cir. 2017) ........................................................*passim*

*Andrus v. Charlestone Stone Prods.*,
  436 U.S. 604 (1978) ....................................................................24

*Baker v. Ore-Ida Foods, Inc.*,
  513 P.2d 627 (Idaho 1973) .........................................................18

*Bender v. Williamsport Area Sch. Dist.*,
  475 U.S. 534, 541 (1986) ...........................................................21

*Brown v. Spilman*,
  155 U.S. 665 (1895) ....................................................................23

*California v. Superior Court*,
  78 Cal. App. 4th 1019 (2000) ....................................................23

*Cappaert v. United States*,
  426 U.S. 128 (1976) ..........................................................1, 10, 18

*Cent. & W. Basin Replenishment Dist., v. S. Cal. Water Co.*,
  109 Cal. App. 4th 891 (2003) ........................................23, 25, 26

*Chance v. BP Chems., Inc.*,
  670 N.E.2d 985 (Ohio 1996) ......................................................24

*City of Blue Springs v. Cent. Dev. Ass'n*,
  831 S.W.2d 655 (Mo. Ct. App. 1992) .........................................23

*City of Milwaukee v. Illinois & Michigan*,
  451 U.S. 304 (1981) ....................................................................31

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..............................................................20, 21

*Colville Confederated Tribe v. Walton*,
  460 F. Supp. 1320 (E.D. Wash. 1978) ..................................11, 19

*Colville Confederated Tribes v. Walton*,
  647 F.2d 42 (9th Cir. 1981) ..............................................10, 11, 19

*Crum v. Mt. Shasta Power Corp.*,
  117 Cal. App. 586 (1931) ...........................................................33

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Davis v. Agua Sierra Res., L.L.C.*,
    203 P.3d 506 (Ariz. 2009) .................................................................23

4

*Department of Transportation v. Goike*,
    560 N.W.2d 365 (Mich. Ct. App. 1996)............................................26

5

6

*Doherty v. Oregon Water Res. Dir.*,
    783 P.2d 519 (Or. 1989).....................................................................18

7

8

*Ellis v. Loftus Iron Co.*,
    (1874) L. R. 10 C. P. 10 (U.K.) .........................................................28

9

10

*Emeny v. United States*,
    412 F.2d 1319 (Ct. Cl. 1969).............................................................26

11

*Hanson v. McCue*,
    42 Cal. 303 (1871) .............................................................................18

12

13

*Herrin v. Sutherland*,
    241 P. 328 (Mont. 1925)....................................................................28

14

15

*Hopi Tribe v. United States*,
    782 F.3d 662 (Fed. Cir. 2015) ...........................................................32

16

17

*Hudson v. West*,
    306 P.2d 807 (Cal. 1957)....................................................................34

18

*In re Application U-2*,
    413 N.W.2d 290 (Neb. 1987) .....................................................25, 28

19

20

*In re Gen. Adjudication of All Rights to Use Water in Gila River Sys.
    & Source*,
    35 P.3d 68 (Ariz. 2001) ..............................................................*passim*

21

22

*In re General Adjudication of the Big Horn River System*,
    753 P.2d 76 (Wyo. 1988) ............................................................*passim*

23

24

*In re Park Cty. Sportsmen's Ranch*,
    45 P.3d 693 (Colo. 2002) ............................................................*passim*

25

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992); ......................................................................9, 20

26

27

*Mardan Corp. v. C.G.C. Music, Ltd.*,
    804 F.2d 1454 (9th Cir. 1986)................................................24, 25, 27

28

CVWD'S OPPOSITION TO
PHASE 2 SUMMARY JUDGMENT.
NO. 5:13-CV-00883-JGB (SPx)

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*Martinson v. Hughey,*
4
199 Cal. App. 3d 318 (1988) ................................................................. 29

5

*Meridian, Ltd. v. San Francisco,*
90 P.2d 537 (Cal. 1939) ........................................................................ 34

6

*Mosser v. Denbury Res., Inc.,*
7
898 N.W.2d 406 (N.D. 2017) ...................................................... 25, 26, 27

8

*Navajo Nation v. United States,*
501 F.3d 1327 (Fed. Cir. 2007), *rev'd and remanded on other*
9
*grounds,* 556 U.S. 287 (2009) ............................................................. 22

10

*Niles Sand & Gravel Co. v. Alameda County Water Dist.,*
11
37 Cal. App. 3d 924 (1974) .................................................................. 25

12

*Northern Pacific R. Co. v. Soderberg,*
188 U.S. 526 (1903) .............................................................................. 24

13

*Oklahoma v. Tyson Foods, Inc.,*
14
258 F.R.D. 472 (N.D. Okla. 2009) ....................................................... 33

15

*Orr v. Bank of Am., NT & SA,*
16
285 F.3d 764 (9th Cir. 2002) ............................................................... 13

17

*Pasadena v. Alhambra,*
33 Cal. 2d 908 (Cal. 1949) ................................................................... 18

18

*Penobscot Nation v. Mills,*
19
861 F.3d 324 (1st Cir. 2017) .................................................................. 9

20

*Phoenix Water Co. v. Fletcher,*
21
23 Cal. 481 (1863) .......................................................................... 33, 34

22

*Public Serv. Comm'n v. Wycoff Co.,*
344 U.S. 237 (1952) ............................................................................... 9

23

*Pueblo of Santa Ana v. United States,*
24
214 F.3d 1338 (Fed. Cir. 2000) ........................................................... 22

25

*Starrh & Starrh Cotton Growers v. Aera Energy LLC,*
26
153 Cal. App. 4th 583 (2007) ............................................................... 26

27

*State ex rel. Martinez v. Lewis,*
861 P.2d 235 (N.M. Ct. App. 1993) ............................................... 12, 14

28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Tehachapi-Cummings County Water Dist. v. Armstrong,*
    49 Cal. App. 3d 992 (1975) .......................................................... 18, 19

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ........................................................... 9

*Town of Antioch v. Williams Irr. Dist.,*
    188 Cal. 451 (1922) .......................................................................... 34

*United States v. 43.42 Acres of Land,*
    520 F. Supp. 1042 (W.D. La. 1981) .................................................. 26

*United States v. Adair,*
    723 F.2d 1394 (9th Cir. 1983) .......................................................... 10

*United States v. Anderson,*
    736 F.2d 1358 (9th Cir. 1984) .......................................................... 19

*United States v. Causby,*
    328 U.S. 256 (1946) .......................................................................... 28

*United States v. Gila Valley Irrigation Dist.,*
    920 F. Supp. 1444 (D. Ariz. 1996) ................................................... 32

*United States v. Hays,*
    515 U.S. 737 (1995) .......................................................................... 21

*United States v. Hicks,*
    50 F. App'x 867 (9th Cir. 2002) ....................................................... 22

*United States v. Kimbell Foods, Inc.,*
    440 U.S. 715 (1979) ...................................................................*passim*

*United States v. Klamath & Moadoc Tribes,*
    304 U.S. 119 (1938) .......................................................................... 22

*United States v. McKinnon,*
    281 F. Supp. 2d 1146 (N.D. Cal. 2003) ............................................ 22

*United States v. New Mexico,*
    438 U.S. 696 (1978) ...................................................................*passim*

*United States v. Shoshone,*
    304 U.S. 111 (1938) ..................................................................... 22, 23

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Washington,*
  375 F. Supp. 2d 1050 (W.D. Wash. 2005) ............................................... 11, 12, 17

*W. Maricopa Combine, Inc. v. Arizona Dep't of Water Res.,*
  26 P.3d 1171 (Ariz. Ct. App. 2001) ............................................................ 25, 29

*Winters v. United States,*
  207 U.S. 564 (1908) ........................................................................................ *passim*

*Wright v. Best,*
  121 P.2d 702 (Cal. 1942) ........................................................................................ 33

**STATUTES**

Arizona Groundwater Management Act of 1980, 1980 Ariz. Sess.
  Laws, 4th Spec. Sess. 1339 ..................................................................................... 18

Mont. Code Ann. § 82-11-180(3) ............................................................................ 26

N.D. Cent. Code § 47-31-08 ................................................................................... 26

Sustainable Groundwater Management Act of 2014, §§ 10720-10737.8 ............... 18

Wyo. Stat. Ann. § 34-1-152(a) ................................................................................ 26

**OTHER AUTHORITIES**

Andrew Mergen & Sylvia Liu,
  *Misplaced Sensitivity: the Draft Opinions in* Wyoming v. United
  States, 68 U. Colo. L. Rev. 683 (1997) ................................................................. 15

Cohen's Handbook of Federal Indian Law (2012) ............................................. 22, 23

Owen M. Lopez,
  *Upstairs/Downstairs: Conflicts Between Surface and Mineral
  Owners,* 26 Rocky Mtn. Min. L. Inst. 995 (1980) ................................................ 24

Report of Special Master Elbert P. Tuttle, *Arizona v. California,*
  O.T. 1981 (Feb. 22, 1982) ..................................................................................... 11

Report of Special Master Simon H. Rifkind, *Arizona v. California,*
  O.T. 1960 (Dec. 5, 1960) ....................................................................................... 12

Summers Oil and Gas (3d ed. 2006) ................................................................. 23, 24

**RULES**

Fed. R. Civ. P. 56 ................................................................................................... 13

### INTRODUCTION[1]

The parties' cross motions for Phase II summary judgment offer the Court clearly contrasting choices.  The Tribe (and to a lesser extent the United States) stakes out extreme positions on each of the issues, relying on few and often no relevant precedents, and showing zero regard for the practical consequences those positions would have for the Coachella Valley and effective groundwater management throughout much of the United States.  CVWD, by contrast, urges the Court to use settled, practical, and widely-applied standards that offer the Tribe all the water, and all the protection for that water, it can reasonably claim to require.

First, the Tribe proposes an overbroad quantification standard.  The Tribe argues that it is entitled to water for not just the practically irrigable acreage on the reservation, but *all* of the reservation lands, including those described as "dreary wastes of Colorado Desert land" and "rocky, pathless mountain lands" in accounts contemporaneous with the Reservation's creation.  OSUF ¶ 20.  The United States never contemplated the Tribe would develop such lands, nor would it have reserved water for that purpose.  The factual assertions the Tribe makes to support its contrary argument distort and contravene the historical record.

The Tribe's proposal suffers from several other legal errors as well.  In seeking to maximize its water award, the Tribe ignores the Supreme Court's mandate limiting the reservation's water right to its "minimal need." *Cappaert v. United States*, 426 U.S. 128, 141 (1976).  And the Tribe ignores precedents and logic mandating that reserved rights must be subject to various limiting factors, including the safe yield of the basin, the economic feasibility of agricultural development, pre-existing rights under state law, and the Tribe's own undisputed entitlements under state law to ground and surface water.  For its part, the United States does not propose any quantification "standard" at all, but simply offers a

---

[1] Unless otherwise indicated, all defined terms have the same meaning given to them in CVWD's Phase 2 Motion for Partial Summary Judgment. *See* Dkt. 200.

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

non-exhaustive list of evidentiary categories that it posits "may be relevant" to the quantification issue.  Dkt. 204 at 11.  That submission does nothing to advance the issues in Phase 2.

Second, the Tribe seeks a never-before-recognized right to private ownership of the groundwater storage space underlying its reservation, *i.e.*, a right to exclusive ownership of particular parts of the interconnected aquifer deep below the Earth's surface.  That novel right would be profoundly impractical.  As many courts have recognized, and as CVWD's experts have detailed, water moves and makes private ownership of storage space anathema to workable groundwater management.  Every case the Tribe cites pertains to minerals such as natural gas or oil, *not* groundwater storage.  Tellingly, the United States has never joined the Tribe's ownership claim.

In response, CVWD does not argue that the Tribe has *no* rights to store water underground.  Instead, under the uniform state-law approach, groundwater storage space is a public resource, and the Tribe has the same reasonable right to store appropriated surface waters in the aquifer as anyone else.  Because there is no existing federal common law addressing ownership of groundwater storage spaces, and because the uniform state approach accommodates any legitimate federal interest, the Court should adopt state law as the rule of decision.

Third, the Tribe seeks a never-before-recognized right to prevent *any* degradation of the quality of its water, *even if* the water would still be suitable for the reservation's purposes.  That novel right would set the stage for an injunction barring the Water Agencies' importation and recharge of Colorado River water— water that is absolutely essential to the Valley's economy, as well as the Tribe's, and that is used every day by tens of millions in the Valley and Southwest United States.  No case has ever held that there is a unique federal common law of water quality springing from *Winters v. United States*, 207 U.S. 564 (1908), much less that such law guarantees federal lands completely pristine water.

2

1      Again, CVWD does not stake out the opposite extreme and argue that the

2    Tribe has *no* legal protection against degradation of its reserved water right.  To the

3    contrary, CVWD argues that under widely applied common law nuisance rules, the

4    Tribe's reserved water is protected from any material and unreasonable degradation

5    that would render it unsuitable to the purposes of the reservation.  That widely-used

6    state law should again be adopted as the federal rule of decision.  Indeed, unless the

7    Tribe maintains its remarkable and unprecedented position that the *Winters*

8    doctrine—which is designed only to ensure tribes are granted enough water to meet

9    their reservation's primary purposes—guarantees pristine water quality *regardless*

10    of the Tribe's actual needs, then it should have no objection to the Court adopting

11    California nuisance law as the rule of decision.

12      The Court, however, should not even reach the quantification or groundwater

13    storage space issues, because the Tribe lacks standing to raise them.  The Tribe

14    cannot demonstrate any actual or imminent injury requiring a quantification of its

15    federal reserved water right.  The Tribe already has significant rights to pump

16    groundwater, but does not exercise them.  Even if there were jurisdiction over the

17    quantification request, the Court should dismiss it on prudential ripeness grounds.

18    Although the parties disagree over the specific contours of the Tribe's right, the

19    disagreement is necessarily abstract and unfocused.

20      The Tribe also lacks any injury related to the underground storage space

21    issue.  The Tribe confirms that conclusion in its brief, declaring that it will

22    dramatically reveal "how the water districts have interfered with or otherwise

23    violated" the Tribe's "ownership rights, as well as the appropriate relief to address

24    such violations, . . . in Phase 3."  Dkt. 203-1 at 20.  The Tribe, however, must

25    demonstrate its injury with specific facts and evidence by the time it moves for

26    summary judgment.  The Tribe's wait-and-see approach also warrants dismissal on

27    prudential ripeness grounds.  The Tribe asks for a declaration of "ownership"

28    without articulating what rights of ownership it seeks.  Without any sense of why

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

this issue is being litigated, the parties, and this Court, cannot address it properly.

## FACTUAL BACKGROUND

As detailed further below, the Tribe has violated this Court's procedural rules by failing to submit a statement of undisputed material facts along with its brief, which is rife with factual assertions. That error alone requires denial of the Tribe's motion to the extent it relies on improper factual assertions. *Infra* at 13 n.3.

Despite the Tribe's procedural violation, CVWD submits the following background to (1) clarify the record in response to the Tribe's assertions about the historical record and the purposes of the Reservation, and (2) briefly explain again the importance of the Water Agencies' efforts to recharge the aquifer. CVWD refers the Court to the factual detail in its Phase II Motion for Partial Summary Judgment, which exhaustively discusses all material facts relevant to the Phase II issues and the drastic practical implications of the positions the United States, and especially the Tribe, urge this Court to adopt. *See* Dkt. 200 at 3-11.

### A.    The Tribe Engaged In Small-Scale Agriculture Prior To The Reservation's Creation

Before the United States acquired California from Mexico in 1848, the Tribe, like many bands of Mission Indians throughout the Valley, had established small agrarian communities. *See* OSUF ¶ 6. Agents from the U.S. Office of Indian Affairs visited the tribes several times in the mid to late 19th century, issuing a series of reports addressing how the government could help them. *See* OSUF ¶ 7. These reports present a uniform picture of agrarian tribes who wanted nothing more than "protection in [their] lands and homes."  OSUF ¶¶ 8-9 ("The desire of all these Indians…is to be let alone in possession of what they now occupy.").

Agent Colburn described the various tribes' agricultural communities in his August 15, 1877 report. The Tribe seizes on an out-of-context fragment of this report to suggest that Agent Colburn's "first purpose" was to secure for each tribe member "a piece of ground *as large as he may desire*." Dkt. 203-1 at 4 (emphasis

added).  Colburn, in fact, emphasized that the tribes' desire was "to be let alone in possession of what they now occupy," and the existing farming plots were typically "one acre to four or five," with a field greater than five acres being "rarely found." OSUF ¶¶ 9-10.  As Colburn further recognized, the "natural supply of water" limited the size of the villages and settlements "scattered through a large tract of otherwise desert country."  OSUF ¶ 11.

This limited view of the purpose of reserving land—to sustain the tribes' agrarian way of life—comports with instructions Colburn received from Commissioner Smith.  Smith explained that "so long as these Indians have been in possession of lands they have supported themselves in comparative comfort"; hence, "the only assistance which they require is to be protected from encroachment and injustice on the part of the white settlers, and to be put in secure possession of lands suitable for cultivation."  OSUF ¶ 12.  Similarly, Agent Dryden wrote in 1875:  "What these people want and what they ought to have is just enough tillable land for their gardens and range for their stock."  OSUF ¶¶ 13-14; *see id.* ("They never urged their claims upon the attention of the Government until recently, when it has become evident to them that they will soon be deprived of everything they had though their own unless the Government interfere to prevent it.").

**B.    The United States Established The Reservation To Allow The Tribes To Sustain Their Agrarian Way Of Life And Provide For Their "Just Requirements"**

The United States anticipated that the Tribe would use the Reservation to sustain its domestic and agricultural way of life, encouraging tribe members "to build comfortable houses, improve their acres, and surround themselves with home comforts." *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, *("CVWD")* 849 F.3d 1262, 1265 (9th Cir. 2017); *see* Dkt. 85-19 (tab 18), at 24 (Dryden Report from June 30, 1875) ("The one pressing want of these people now is land, on which they can cultivate their gardens.").

The timing of the two executive orders setting aside the core of the

5

Reservation lands reflects that the United States intended simply to allow the tribes to maintain "the comparative comforts" they had traditionally enjoyed.  The first order, from President Grant in May 1876, came less than a year after Agent Dryden reported that the tribes want "just enough tillable land for their gardens and range for their stock."  OSUF ¶¶ 13, 15.  The second, from President Hayes in 1877, followed just one month after Agent Colburn wrote that the tribes "desire above all else to be left in possession of [their] little villages."  OSUF ¶¶ 16-17.

Congressional action further illustrates this purpose.  In 1891, Congress enacted legislation to provide relief for the Mission Indians.  *See* OSUF ¶ 18.  The Act formed a three-person commission, known as the Smiley Commission, and directed it to select reservation lands that were "as far as practicable … lands and villages [that] have been in possession of said Indians, and [that] shall be sufficient in extent to meet their just requirements."  OSUF ¶ 19.  Instead of following the typical blueprint of dislocating tribes onto a reservation, the Act acknowledged that the tribes were already settled and farming.  *See id.*  As a series of agents had previously reported, these tribes needed only clearly defined property to allow them to live in the "comparative comfort" that they had achieved through small-scale farming and other pursuits.  *See* OSUF ¶ 12.

### C.    The United States Understood That Much Of The Land In The Reservation Was Not Developable, And That Water Was Scarce

The United States understood that both the unusable nature of much of the Reservation, and the scarcity of water in the area, would limit the potential for the Tribe to develop the Reservation.  First, as the Smiley Commission reported in 1891, much of the Reservation consisted of "dreary wastes of Colorado Desert Lands" and "rocky, pathless mountain lands."  OSUF ¶ 20.  Indeed, the vast majority of the Reservation is located in rocky, mountainous terrain that the Tribe could not develop for irrigated agriculture.  *See* OSUF ¶ 21; Howitt Supp. Decl. (filed herewith), Ex. A at 7-8.  Nothing in the historical record remotely suggests

1    that the United States intended the Tribe to develop those lands.

2         Second, even as to the Reservation's farmable land, the Smiley Commission

3    reported that "there is much more arable land in this Reservation than the Indians

4    need, and more than they can supply with water, without which it has little value."

5    OSUF ¶ 22.  Contemporaneous accounts underscore that the United States did not

6    expect the Tribe to use much of its arable land, in large part because of the limited

7    supply of water.  Agent Colburn noted in 1877 that tribal villages were "scattered

8    through a large tract of otherwise desert country" and that village populations were

9    limited by the "natural supply of water."  OSUF ¶ 23.  The Tribe used a previously

10    constructed irrigation ditch, and additional water works built with the assistance of

11    the United States, to sustain itself with the "natural supply of water."  OSUF ¶ 24.

12        Indeed, the United States could not have foreseen the Valley's modern

13    development at all.  The Valley's soaring economy has been made possible only by

14    the Water Agencies' extraordinary effort to import Colorado River water,

15    augmenting the "natural supply of water" that Agent Colburn saw as a limiting

16    factor.  *See* OSUF ¶ 23.  Without this augmented supply, much of the Reservation

17    would remain of "little value" because, as the Smiley Commission reported, there is

18    more "arable land" in the Reservation than "the Indians need, and more than they

19    can supply with water."  *See* OSUF ¶ 22; *see also* Howitt Supp. Decl., Ex. A at 8-9

20    (noting that the natural level of groundwater recharge would not support current

21    economic activities in the Coachella Valley).

22        **D.    The Checkboard Reservation Evidences The United States' Intent
            To Create An Interrelated Economy**

23

24        In 1871, five years before the set-aside of any Reservation lands, Congress

25    granted most of the odd-numbered sections in the Coachella Valley to the Southern

26    Pacific Railroad.  *See* OSUF ¶ 25.  Congress expected the railroad to sell this land

27    to local settlers, simultaneously raising money and encouraging settlement in the

28    Valley.  *See* OSUF ¶ 26.  The United States understood that local tribes and non-

Indian settlers would share the Coachella Valley when it set aside the first of the Reservation lands five years later, creating a checkerboard. *See* OSUF ¶ 15.

In keeping with that vision, the Tribe's economic activities have grown with the Valley. *See* Howitt Supp. Decl., Ex. A at 6-7. As detailed in CVWD's motion, much of the once-arable Reservation land has been allotted and sold or leased to non-Indians for commercial development, and the 440-member Tribe runs numerous businesses. Dkt. 200 at 8-9. Richard Howitt, a resource economist, estimates that per capita income from the Tribe's various economic activities exceeds $200,000 per year, compared to per capita income in the greater Coachella Valley of less than $30,000. *See id.*; Howitt Supp. Decl., Ex. A at 7-8; OSUF ¶ 29.

The Tribe's real estate and other business ventures are part of the integrated give-and-take of the Valley's resort economy. *See* Howitt Supp. Decl., Ex. A at 8. The Tribe's businesses provide economic opportunities for Valley residents, while other Valley businesses enhance the value of the Tribe's endeavors. *See* OSUF ¶ 27. Without the water agencies' recharge efforts, none of this economic activity would have been possible. *See* OSUF ¶ 28.

### E.    The Water Agencies' Recharge Efforts Are Essential To The Valley's Economy, And The Tribe

As detailed at length in CVWD's opening motion, without CVWD's continued recharge efforts, the Valley's thriving economy would quickly exhaust the aquifer. The Valley's water usage (over 400,000 af per year) dwarfs the Valley's native groundwater supplies (26,300 af per year). *See* Dkt. 200 at 4-5; OSUF ¶¶ 1-2. CVWD has taken numerous, complex steps to ensure the Valley receives sufficient water. *See* Dkt. 200 at 5-8. Most pertinent here, CVWD (like authorities in many other regions) imports large amounts of Colorado River water every year, which it uses to replenish the aquifer through two recharge facilities. *See* Dkt. 200 at 6-7; OSUF ¶ 3. CVWD uses the aquifer to store water for the benefit of all Valley residents, including the Tribe. *See* Dkt. 200 at 7-8; OSUF ¶ 4.

1

**ARGUMENT**

2

**I.    The Quantification Request Should Be Dismissed, And Alternatively The
Tribe's and United States' Proposed Standards Should Be Rejected**

3

4

    **A.    The Quantification Issue Is Not Justiciable**

5

As CVWD demonstrates in its motion for summary judgment, the Court must

6

dismiss the Tribe's quantification request for lack of standing. *See* Dkt. 200 at 11-

7

13. The Tribe cannot demonstrate any "actual or imminent" injury from the lack of

8

a quantification of its reserved water right because it does not pump groundwater,

9

even though it is already indisputably permitted to pump significant amounts of

10

water under state law. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992);

11

*see Penobscot Nation v. Mills*, 861 F.3d 324, 336-38 (1st Cir. 2017) (no standing to

12

determine Indian fishing right). There is no "imminent" need to know the outer

13

bounds of the Tribe's water rights when it is not exercising its current rights.

14

The Court should also dismiss the quantification claim under prudential

15

ripeness doctrine. There can be no assurance that a "concrete controversy will

16

develop" here, *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 245 (1952), as

17

compared to the "abstract disagreement" presently before the Court, *Thomas v.*

18

*Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).

19

There is simply no reason to believe that the Tribe will ever seek to withdraw more

20

than the amount of water all agree it is entitled to under state law. The Tribe's

21

request for quantification thus now lacks "specific factual context" and delaying

22

adjudication will not harm the parties. *Id.* at 1141; *see also Penobscot Nation,* 861

23

F.3d at 338-39 (holding that tribal fishing claim was not ripe for determination).

24

    **B.    The Tribe's and United States' Proposed Quantification Standards
Are Incorrect**

25

26

The Court should dismiss the Tribe's quantification request for the reasons

27

just discussed. If the Court reaches the merits of the quantification issue, however,

28

the Court should reject the Tribe and U.S. proposals.

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

### 1.    The Tribe's Proposed Standard Is Incorrect

As CVWD explains in its motion for summary judgment, quantification of federal reserved rights requires "sensitivity to [the] impact upon those who have obtained water rights under state law and to Congress' general policy of deference to state water law." *United States v. New Mexico*, 438 U.S. 696, 718 (1978) (Powell, J., dissenting in part). The Supreme Court therefore has held that courts must limit *Winters* awards to "only that amount of water necessary to fulfill the purpose of the reservation, no more," and tailor relief to a reservation's "minimal need." *Cappaert*, 426 U.S. at 140-41. As the Ninth Circuit emphasized in its opinion, moreover, water is "implicitly reserved for primary purposes," not secondary purposes. *CVWD*, 849 F.3d at 1270; *see also New Mexico*, 438 U.S. at 700-01; *United States v. Adair*, 723 F.2d 1394, 1409 (9th Cir. 1983).

The Tribe ignores those governing precedents, and instead advocates for a capacious dual standard, under which the Tribe would receive water to irrigate all practicably irrigable acreage *plus* water "to accommodate the use and occupation of any [non-irrigable] land within the Reservation." Dkt. 203-1 at 5-6. According to the Tribe, the net result would be a standard allowing for the "eventual full use of the reserved land" without any limitation whatsoever. *Id.* at 5. That approach fails.

#### a.    There Is No Support for the Tribe's Dual Standard

According to the Ninth Circuit, there was one "underlying purpose" of the Reservation: "to establish a home and support an agrarian society." *CVWD*, 849 F.3d at 1270. "Put differently, the primary purpose underlying the establishment of the reservation was to create a home for the Tribe." *Id.* The Tribe tries to divide this single purpose into two—an agricultural purpose and a "homeland" purpose— and claim a separate water right for each. Ninth Circuit precedent is to the contrary.

In *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981), for example, the Ninth Circuit held that one purpose of the Colville Reservation was to "provide a homeland for the Indians to maintain their agrarian society." As

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

1    a result, "sufficient water was reserved to permit irrigation of all practicably

2    irrigable acreage on the reservation." *Id.* at 48.  The Colville Reservation did not

3    receive a separate reserved right for a "homeland" purpose.  *See also Colville*

4    *Confederated Tribe v. Walton*, 460 F. Supp. 1320, 1330 (E.D. Wash. 1978) ("The

5    Colville Reservation was set aside as a homeland for the Indians; therefore the

6    reservation of water sufficient to raise crops and provide food must be implied.").

7         Indian tribes have sometimes argued that the purpose of their reservations

8    entitles them not only to PIA water but also to water for tribal domestic use.

9    Courts, however, have generally concluded that the PIA standard is sufficient to

10   cover both agricultural and domestic needs or have added a small percentage for

11   domestic use.  *See, e.g.,* Report of Special Master Elbert P. Tuttle, *Arizona v.*

12   *California*, O.T. 1981, at 101-02 (Feb. 22, 1982) (adding one percent to agricultural

13   consumptive use to cover "domestic and stock watering purposes"); *Walton,* 647

14   F.2d at 47-48 (no additional domestic water awarded); *In re General Adjudication*

15   *of the Big Horn River System*, 753 P.2d 76, 99 (Wyo. 1988) ("*Big Horn*") (also

16   holding that PIA water subsumes any water needed for municipal or commercial

17   use).

18        One court permitted the Lummi Indian Nation to prove an additional amount

19   for its tribal members' domestic use, but only because the portion of the tribe's

20   reservation suitable for agriculture was "relatively small" and therefore unlikely to

21   justify sufficient PIA water to cover domestic needs.  *United States v. Washington*,

22   375 F. Supp. 2d 1050, 1063 (W.D. Wash. 2005), *vacated pursuant to settlement sub*

23   *nom. Lummi Indian Nation v. Washington*, 2007 WL 4190400 (W.D. Wash. Nov.

24   20, 2007), *aff'd sub nom. Lummi Nation v. Dawson*, 328 F. App'x 462 (9th Cir.

25   2009).  Notably, the court rejected the Lummi Indian Nation's far broader request

26   for water sufficient for "all domestic, agricultural, community, commercial, and

27   industrial purposes" to which it could put its reservation, 375 F. Supp. at 1062,

28   which mirrored the Tribe's request here for PIA water *and* "enough water to

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

accommodate the use and occupation of any land within the Reservation that is not practicably irrigable." Dkt. 203-1 at 6. The *Washington* court objected that the claim would result in "the quantification of a water right for a broad and almost unlimited range of activities." 375 F. Supp. at 1062. Such a claim "conflicts with clear Ninth Circuit precedent" and "must fail as a matter of law." *Id.* at 1065. "Because water rights stemming from a reservation of public land are implied only where 'without the water the purposes of the reservation would be entirely defeated,'" the court found that the tribe was not entitled to any water for purposes beyond agricultural and domestic use. *Id.* at 1066 (*quoting New Mexico*, 438 U.S. at 700); *see also* Report of Special Master Simon H. Rifkind, *Arizona v. California*, O.T. 1960 (Dec. 5, 1960) (rejecting water for industrial and other uses because they were not contemplated purposes at the time the reservations were created).

The historical record in this case similarly forecloses the Tribe's claim that it is entitled to water sufficient to develop the *entire* Reservation.[2] As explained *supra* at 4-8, the historical record makes clear that the government never anticipated that the Tribe would develop the entire Reservation, and that the government therefore did not intend to reserve water for lands that were clearly not developable at the time of the Reservation's creation. As the Smiley Commission reported, the acreage reserved was disproportionate to the Tribe's 70-member size, with much of the acreage consisting of "dreary wastes of Colorado Desert Lands" and "rocky, pathless mountain lands." OSUF ¶ 20. Even as to farmable land, the Smiley

---

[2] The historical record of the Reservation's creation is consistent with other reservations granted water under the PIA standard, but not a broader "homeland" standard, due to their primarily agricultural purposes. In *Big Horn*, for example, the Wyoming Supreme Court upheld a lower court ruling that the purpose of the Wind River reservation was primarily agricultural, even though it was apparent that the agricultural economy began to fail within twenty years of its creation. *See Big Horn*, 753 P.2d at 98 (Wyo. 1988). Similarly, the New Mexico Court of Appeals found no error in the application of the PIA standard to Apache reservations located in mountainous terrain, even though it left the tribe with little water due to the economic impracticality of irrigating mountainous reservation lands. *See State ex rel. Martinez v. Lewis*, 861 P.2d 235, 251 (N.M. Ct. App. 1993).

Commission documented that "there is much more arable land in this Reservation than the Indians need, and more than they can supply with water, without which it has little value."   OSUF ¶ 22; *see also supra* at 6-7.

The Tribe attempts to support its contentions with a few cherry-picked and out-of-context quotes from the historical record.[3]  The Tribe twice cites the snippet from Colburn's report stating in the abstract that the Department's purpose was to reserve enough land and water for each Tribe member to cultivate "a piece of ground as large as he may desire."  Dkt. 203-1 at 4.  But Colburn himself observed more specifically that the Tribe desired only to preserve its *existing* villages and farms, which rarely exceeded even a five acre plot.  OSUF ¶ 10.

Moreover, even this cherry-picked statement, when read in light of the well-understood situation on the ground, makes clear that Colburn meant only irrigable farm land.  As the Smiley Commission explained, much of the Reservation was "rocky, pathless mountain lands," and the Reservation contained "more arable land … than the Indians need [or] can supply with water."  OSUF ¶ 22.  *Winters* rights are fundamentally based on the government's "implied intent" in reserving federal land, *New Mexico*, 438 U.S. at 698, and it would be absurd to assume that the government reserved water for the Tribe to develop these "dreary wastes" and

---

[3] As detailed in CVWD's Evidentiary Objections (filed herewith), the Tribe's factual arguments must be rejected at the threshold, because it failed to comply with basic procedural rules requiring parties to file a Statement of Undisputed Facts with any summary judgment filing.  *See* L.R. 56-1; Standing Order at 6 ("The moving party's brief shall be accompanied by a Statement of Undisputed Facts."); *see Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 775 (9th Cir. 2002) (failure to provide pin cites in statement of facts "alone warrants exclusion of the evidence").  That failure has made it difficult for CVWD to respond to the various factual assertions on which the Tribe relies, though CVWD has attempted to do so in as clear a fashion as possible for the Court's benefit.  The Tribe argues that its *Phase 1* statement of facts still applies, *and* that CVWD waived its right to dispute them. Dkt. 203-1 at 2 n.1.  But CVWD is not bound by its decision not to dispute certain facts in Phase 1. As the Advisory Committee notes to Rule 56 explain, the Rule protects "a party's ability to accept a fact for purposes of the motion only . . . without running the risk that the fact will be taken as established . . . for other purposes."  Fed. R. Civ. P. 56 advisory committee's note.

"rocky, pathless mountain lands."  OSUF ¶ 20.

b.    *The PIA Standard Is Inappropriate and Unworkable in this Case*

The Ninth Circuit has used a PIA standard to quantify reserved rights in cases involving reservations with purposes similar to that of the Agua Caliente Reservation.  As discussed in CVWD's motion for summary judgment, however, the traditional PIA standard is both inappropriate and unworkable in this case without modification.  Dkt. 200 at 19-20.  The Tribe has not engaged in agriculture for the last fifty years—and for good reason.  Given the local tourist economy, the use of Reservation lands for agriculture is simply not economic.  Howitt Supp. Decl., Ex. A at 6 ("a tribal economy based on tourism is, without question, the highest and best use of the land and water resources on the reservation").

Attempting to apply the traditional PIA standard in this case therefore would make no sense.  Indeed, the PIA standard would argue against giving the Tribe any reserved right water at all.  Under well-established legal standards, land is practicably irrigable only where the likely financial returns of irrigation would outweigh the cost of the irrigation project.  *See, e.g.*, *Big Horn,* 753 P.2d at 101; *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source*, 35 P.3d 68, 78 (Ariz. 2001) ("*Gila V*").  Given the valuable non-agricultural uses of the Reservation, however, the cost of dedicating land to agricultural use would far outweigh any financial returns from the agriculture—even if it were technically possible to develop a viable agricultural operation in the middle of a major urban area.  While the Tribe might argue that alternative uses should be ignored, the opportunity cost of not being able to use land for other purposes is an essential element of basic cost-benefit analyses.  *See* Howitt Supp. Decl., Ex. A at 6.[4]

As the Arizona Supreme Court has explained, moreover, the PIA standard

---

[4] The Tribe, moreover, has the burden of proving that land is practicably irrigable. *See Lewis*, 861 P.2d at 245-246.

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

1 suffers from a variety of flaws.  First, as just noted, it can potentially lead to

2 "inequitable treatment of tribes based solely on geographical location."  *Gila V*, 35

3 P.3d at 78.  Second, it "pretends" that tribes are farmers even in situations where

4 that makes no sense—as this case again demonstrates.  *Id.*  Finally, it "potentially

5 frustrates the requirement that federally reserved water rights be tailored to minimal

6 need" by awarding water to irrigate arable land even if that is more than necessary

7 to fulfill the Reservation's need.  *Id.* at 79.  This case again illustrates the point.

8 The Tribe's current use of its arable land for tourist purposes not only brings the

9 Tribe more revenue, but also uses far less water per acre than irrigated agriculture.

10 *See* Howitt Supp. Decl., Ex. A at 8-9.  Application of the traditional PIA standard to

11 such land therefore would give the Tribe far more water than it needs in order to

12 utilize such land for its best use.  *See Gila V*, 35 P.3d at 80 ("any development plan

13 should consider natural resources (including potential water uses), so that the water

14 actually granted will be put to its best use on the reservation.").

15       For all of these reasons, there have been increasing calls to either modify the

16 PIA standard to accurately reflect reality or abandon the standard entirely.  As

17 noted in CVWD's motion for summary judgment, for example, Justice O'Connor

18 has suggested, in a draft opinion that was never adopted because she ultimately

19 recused herself from the case, that the PIA analysis should exclude any

20 undeveloped acreage unless there is a "*reasonable likelihood* that future irrigation

21 projects, necessary to enable lands which have never been irrigated to obtain water,

22 will *actually* be built."  Andrew Mergen & Sylvia Liu, *Misplaced Sensitivity: the

23 Draft Opinions in* Wyoming v. United States, 68 U. Colo. L. Rev. 683, 738 (1997)

24 (attaching Justice O'Connor's draft opinion as an appendix); *see also* Dkt. 200 at 18

25 n.10.  The importance of such a "practical assessment" flows from the need to

26 quantify reserved rights with "[s]ensitivity to the impact on prior appropriators."

27 Mergen & Liu, *supra*, at 738.  The Arizona Supreme Court has gone further and

28 called for abandoning the PIA approach.  *Gila V*, 35 P.3d at 80.  The Arizona court

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

1  also has emphasized that any proposed projects used to quantify a reserved right

2  "should be scrutinized to insure that they are practical and economical." *Id.*

3       In its motion for summary judgment, CVWD suggests a modified PIA

4  approach that (1) reflects both the Reservation's original agrarian purpose and its

5  current tourist economy, (2) provides the Court with a clear and administrable

6  standard, (3) meets the Tribe's "minimal need," and (4) is "sensitive" to other water

7  users.  Dkt. 200 at 19-20.  Under that standard, the Court would determine what

8  "practicably irrigable" land is likely to be developed for *some* economically viable

9  use.  The Court would then multiply that acreage by the amount of water reasonably

10 needed for the type of commercial or residential use to which the land is most likely

11 to be placed (taking into account good conservation practices).

12           **2.**      **The United States' Proposed Standard Is Unworkable and**

13                      **Improperly Bypasses the Primary Purpose Test**

14      The United States appears to agree that the traditional PIA approach is

15 inappropriate in this case, arguing that PIA is not sufficiently nuanced and "not the

16 'universal measure of Indian Reserved water rights.'"  Dkt. 204 at 10.  Rather than

17 suggesting a modified PIA approach consistent with the Supreme Court's and Ninth

18 Circuit's guidance, however, the United States suggests the Court should consider

19 an unlimited range of evidence and then decide what to do.  *Id.* at 8-13.  As the

20 United States concedes, its proposal is just a list of evidentiary categories that "may

21 be relevant" to quantification, as if Rule of Evidence 402 offers the operative test.

22 *See id.* at 11.  Worse, the list does not even purport to be complete.  *Id.*  Under the

23 U.S. approach, apparently, the parties would throw everything in but the kitchen

24 sink—except, as discussed below, anything that would favor CVWD or DWA—

25 and the Court would then conjure a number out of the ingredients.  That approach is

26 not only completely lawless, but would do nothing to focus the parties as they move

27 to Phase 3, and therefore totally defeat the purpose of Phase 2 summary judgment.

28      The United States' approach also ignores the Ninth Circuit's admonition in

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

this case that the *New Mexico* primary purpose test governs the quantification of the Tribe's reserved rights. *CVWD*, 849 F.3d at 1270. Tellingly, the United States does not even cite *New Mexico* once in its brief. Rather than focusing on the water needed to meet the Reservation's primary purpose, the United States suggests that the Court should look to any factor relevant to "the fluid and expansive needs" of the Tribe, including commerce and industry. Dkt. 204 at 8. As the district court in *Washington* explained in rejecting a similar argument, this approach "does away with determining the purpose and begs the question of what water was reserved to make the homeland 'livable.'" *Washington,* 375 F. Supp. 2d at 1065. Federal reserved water rights are "limited in nature" and require "a primary purpose determination based on the intent of the federal government *at the time the reservation was established*." *Id.* (emphasis added).

The United States borrows much of its suggested approach from the Arizona Supreme Court's opinion in *Gila V.* Unlike the United States, however, the *Gila V* court provided guidance on how to weigh and apply the varied evidence (and also limited what evidence should be considered). Indeed, *Gila V* emphasized that a reserved water right should be "tailored to a reservation's 'minimal need.'" 35 P.3d at 80. And as the state supreme court noted, a focus on *minimal need* is critical to ensuring that reserved rights are quantified with "sensitivity toward existing state water users." *Id.* at 81. The Agua Caliente Tribe's current level of economic development, however, is already "more than sufficient to maintain the well-being of the existing and future members of the Tribe." Howitt Supp. Decl., Ex. A at 6.[5]

### 3. The Tribe's and United States' Proposed Standards Ignore Important Limitations and Constraints

Not only are the Tribe's and United States' proposed standards fatally flawed, but they also ignore important limitations and restrictions that the Court

---

[5] According to the Arizona Supreme Court, present and projected population levels are a "necessary element in quantifying water rights" to a Tribe's "minimal need." *Gila V*, 35 P.3d at 80.

1    should incorporate into its quantification of the Tribe's reserved rights.

2    First, the Tribe and the United States fail to account for the fact that the

3    Coachella Valley groundwater basin has a limited safe yield that caps the amount of

4    water the Tribe can properly withdraw.  *See Pasadena v. Alhambra*, 33 Cal. 2d 908,

5    931 (Cal. 1949) (enjoining all groundwater users from pumping beyond aquifer's

6    "safe yield").  This commonsense limitation ensures that the Basin remains a viable

7    source of water for future generations in keeping with the many states, including

8    California, that have adopted laws limiting the amount of water users can draw

9    from an aquifer.[6]  An aquifer is an integrated body that belongs to the public, and

10   permitting unsustainable overdraft in one area can have drastic consequences for

11   others, including dropping groundwater levels and surface subsidence.  *See* Dkt.

12   200-3 at 10, 17-18; *infra* at 27-29.

13   Second, the Tribe and the United States ignore the Tribe's obligation to share

14   the aquifer with landowners whose titles predate and are senior to the Reservation's

15   formation.  *See* Dkt. 200 at 15-16.  Congress granted most of the odd-numbered lots

16   in the Valley to the Southern Pacific Railroad *before* President Grant set aside the

17   first of the Reservation lands, in the hopes that the railroad would sell this land to

18   local settlers.  OSUF ¶¶ 25-26.  State law entitled those landowners to use the water

19   underlying their land, *Hanson v. McCue*, 42 Cal. 303 (1871), and protects that right

20   even if the landowners never used it, *see Tehachapi-Cummings County Water Dist.

21   v. Armstrong*, 49 Cal. App. 3d 992, 1001 (1975).  The Tribe's *Winters* rights are

22   subordinate to these pre-existing water rights.  *See Cappaert*, 426 U.S. at 138.

23   Third, the Tribe and the United States ignore that existing entitlements

24   already satisfy all or some of the Tribe's requirements.  As the Ninth Circuit

25   observed, the Court must "conduct a thorough *New Mexico* analysis with respect to

26

27   _____

[6] *See, e.g.,* Sustainable Groundwater Management Act of 2014, Cal. Water Code §§ 10720-10737.8; Arizona Groundwater Management Act of 1980, 1980 Ariz. Sess. Laws, 4th Spec. Sess, 1339; *Doherty v. Oregon Water Res. Dir.*, 783 P.2d 519 (Or. 1989); *Baker v. Ore-Ida Foods, Inc.*, 513 P.2d 627 (Idaho 1973).

28

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

whether the Tribe needs access to groundwater" in considering the "scope" of the Tribe's reserved right. *CVWD*, 849 F.3d at 1272. Under California law, the Tribe has the right to withdraw all of the groundwater "that [it] can beneficially put to use on [its] land," subject only to the aquifer's "safe yield" and the claims of other overlying landowners. *Tehachapi-Cummings*, 122 Cal. Rptr. at 924. The Tribe also has surface water rights sufficient "for all purposes" that the United States obtained on the Tribe's behalf in the Whitewater River Adjudication. OSUF ¶ 30. To the degree that the Tribe's state rights already meet its needs, reserved water is not "necessary to accomplish the purpose" of the Reservation. *CVWD*, 849 F.3d at 1268; *see New Mexico*, 438 U.S. at 701. To avoid the Tribe getting twice as much water as it needs, the Tribe's existing state rights must be subtracted in quantifying the Tribe's reserved rights. *See Walton*, 460 F. Supp. at 1330 (not awarding a reserved right for a tract of land with plentiful water from another waterway).

Finally, the Tribe and the United States are entitled only to the water needed to fulfill the purposes of the Reservation on those lands retained by the United States in trust for the Tribe or allottees. Only 12.7% of the original Reservation remains unallotted trust lands. Dkt. 202-1 at 29. The remaining reservation lands have been allotted and either remain in the hands of Indian allottees (57.6% of the Reservation) or are now owned by non-Indians (12.7%). *Id.* Non-Indian owners are not entitled to any reserved water except to the degree they have diligently and continuously put the Tribe's rights to use upon acquiring the lands. *See Walton*, 649 F.2d at 51; *United States v. Anderson*, 736 F.2d 1358, 1362 (9th Cir. 1984).

In summary, the Tribe and U.S. proposed water quantification approaches are one-sided, contrary to law, and should be rejected.[7]

---

[7] As CVWD noted, the Court may wish to revisit some of these issues once it has greater factual context, given the fact-bound nature of quantification. *See* Dkt. 200 at 2, 14. The Tribe argues, for example, how it can use its reserved rights, *see* Dkt. 203-1 at 11, even though this is not a Phase 2 issue. That issue raises various difficult questions, including whether the Tribe can market its water and use water on non-overlying land, and should not be addressed until a later phase.

## II.    The Tribe Is Not Entitled To A Declaration That It Owns Groundwater Storage Space Underlying The Reservation

The Tribe dedicates just two of its 21 pages to argue that it has a novel right of ownership to the groundwater storage space that lies deep beneath its patchwork lands.  As a threshold matter, the Tribe's own motion confirms that it lacks standing to raise this claim.  And even if the Court reaches the merits of the Tribe's claim—which the United States tellingly does not join—the Court should reject it.[8]

### A.    The Storage Space Ownership Claim Is Not Justiciable

The Tribe asserts it is entitled to a declaration that it is the "beneficial owner" of the groundwater storage space.  Dkt. 203-1 at 19.  To have standing to seek such a declaration in federal court, however, the Tribe must show that the declaration will address an "actual or imminent" injury.  *Lujan*, 504 U.S. at 560, 564.  And at the summary judgment stage, the Tribe must provide "specific facts" showing how it is injured by the Water Agencies' actions.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013).

Yet the Tribe has never attempted to explain how the Water Agencies or anyone else is interfering with its supposed ownership of underground storage space, nor what benefit would accrue to it if it succeeds in securing a declaration. Rather than identify a "case or controversy" related to this claim, the Tribe's motion instead affirms the Tribe's continued obfuscation:  "A demonstration of how the water districts have interfered with or otherwise violated Agua Caliente's pore space ownership rights, as well as appropriate relief to address such violations," the Tribe promises, "will follow in Phase 3."  Dkt. 203-1 at 20.

---

[8] The United States notes only that it would oppose any argument claiming access to the Reservation lands or aiming to undercut the Tribe's reserved water right. Dkt. 204 at 3 n.1.  CVWD claims no right to access the surface of the Reservation trust lands—such as a right to use those lands as a recharge site to replenish the aquifer—and CVWD's position does not undercut the Tribe's reserved right. CVWD does not dispute that the Tribe has the right to store appropriated surface waters in the aquifer because it is a public resource.

1    That is not how federal courts work.  Every federal court has a "special
2    obligation to satisfy itself" of its own jurisdiction before addressing the merits of
3    any claim, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986), and
4    standing "is perhaps the most important of [the jurisdictional] doctrines," *United*
5    *States v. Hays*, 515 U.S. 737, 742 (1995).  The Tribe was accordingly required to
6    plead in its complaint facts showing how it is injured, and at summary judgment it
7    must have already developed such facts.  *Clapper*, 568 U.S. at 412.

8    The Tribe's failure to identify a concrete harm also support a dismissal under
9    prudential ripeness doctrine.  Its claim for ownership of the groundwater storage
10   space is not grounded in any specific controversy, and thus the Court's opinion on
11   this issue would be purely advisory and abstract.  Even if the Tribe finally reveals
12   the basis for its injury in further briefing, this is too late a stage of the litigation for
13   the Court or the Water Agencies to address its claims.[9]

14   ## B.   No Case Supports The Tribe's Claim To Ownership of
15   Groundwater Storage Space

16   CVWD does not dispute that federal law ultimately controls whether the
17   Tribe owns the groundwater storage space.  But, contrary to the Tribe's
18   representations, no federal (or state) court has held that ownership of land carries a
19   right to ownership of groundwater storage space underlying the land, and numerous
20   states have reached the contrary result.  The law has long distinguished between
21   ownership of underground storage space for groundwater and ownership of other
22   resources like oil or minerals, and every case the Tribe relies upon addresses only
23   the latter.  Relatedly, the Tribe does not attempt to explain how a system in which it
24   owns a portion of an interconnected groundwater storage system would actually

25

26   [9] CVWD tried to avoid this result.  For months, it sought (without success) focused
27   contention interrogatories and limited discovery on the Tribe's past and current uses
     of the groundwater storage space to make any dispute concrete.  *E.g.*, Dkt. 192 at 7
28   (Aug. 2017 Joint Status Report) (noting "Tribe's claims [on groundwater storage
     space are] very general, providing little guidance on … [its] specific contentions").

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

1   work, in light of the checkerboard pattern of the reservation lands, the natural

2   migration of water, and the dueling rights of other tribal landowners.

3       In the face of the Tribe's extreme and novel request, CVWD does not tack to

4   the opposite extreme.  Instead, CVWD urges the Court to rule that well-established

5   state law provides the federal rule of decision here.  State law already uniformly

6   holds that landowners share ownership of underground storage space as a public

7   resource.  That law protects whatever legitimate interest the Tribe may have (*e.g.*, it

8   allows the Tribe to store surface water in the groundwater basin), and any novel

9   rule granting paramount ownership of some specific area of the groundwater

10  storage space would be wildly disruptive and unworkable.  *See* Dkt. 200 at 21-27.

11      The Tribe stakes its claim to ownership of the groundwater storage space

12  underlying its reservation on *United States v. Shoshone*, 304 U.S. 111 (1938).  The

13  Tribe acknowledges that *Shoshone* addressed ownership of "timber and subsurface

14  mineral deposits," but asserts that the Court's "logic and holding" applies to the

15  groundwater storage space also.  Dkt. 203-1 at 19.  That claim is wrong.  *Shoshone*

16  held the tribe there owned timber and minerals because they were "constituent

17  elements of the land" that the United States had knowingly put in trust for the tribe.

18  304 U.S. at 116.  No court has held that *Shoshone*'s "constituent elements" include

19  any element beyond timber and minerals.  *See United States v. Hicks*, 50 F. App'x

20  867, 868 (9th Cir. 2002) (minerals); *Navajo Nation v. United States*, 501 F.3d 1327,

21  1341 (Fed. Cir. 2007) (same), *rev'd on other grounds*, 556 U.S. 287 (2009); *Pueblo*

22  *of Santa Ana v. United States*, 214 F.3d 1338, 1339 (Fed. Cir. 2000) (same); *United*

23  *States v. Klamath & Moadoc Tribes*, 304 U.S. 119 (1938) (timber); *United States v.*

24  *McKinnon*, 281 F. Supp. 2d 1146, 1149 (N.D. Cal. 2003) (timber & vegetation).

25      Indeed, numerous authorities demonstrate that *Shoshone*'s analysis *does not*

26  extend to groundwater storage space.  Cohen's Handbook of Federal Indian Law—

27  a treatise the Tribe cites repeatedly—says so explicitly:  the "exception to full

28  beneficial ownership" under *Shoshone* "is water."  Cohen's Handbook of Federal

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

Indian Law § 17.01 n.1 (2012).  In this instance at least, Cohen is right:  *Shoshone*'s directive on mineral rights cannot be applied to groundwater storage space.

The law has long recognized that fundamental differences between groundwater and minerals necessitate different legal treatment.  Minerals are treated as a private resource to own and exploit, while groundwater is a commons and not subject to private ownership.  *See Brown v. Spilman*, 155 U.S. 665, 670 (1895) (minerals belong to owners of the land); *California v. Superior Court*, 78 Cal. App. 4th 1019, 1023 (App. Ct. 2000) ("no private ownership of ground or flowing water").  Similarly, the storage of natural gas or petroleum is almost always a private undertaking for private profit.  *See* 1A Summers Oil and Gas § 8:4 (3d ed. 2006); *see also* Fogg Supp. Decl., Ex. A at 3.  Storage of groundwater, by contrast, is generally a public function, where the storing organization (like CVWD) is a public entity trying to promote the public interest.  *See Cent. & W. Basin Replenishment Dist., v. S. Cal. Water Co.*, 109 Cal. App. 4th 891, 904-05 (2003).  Subjecting storage space for *water* to private ownership simply does not follow from the fact that *minerals* are subject to private ownership.[10]

Indeed, courts addressing claims of private ownership over groundwater storage space have explicitly rejected reliance on cases involving mineral rights.  The Colorado Supreme Court has explained that the "mineral cases . . .  are *clearly distinguishable* from water cases."  *In re Park Cty. Sportsmen's Ranch*, 45 P.3d 693, 709 (Colo. 2002) (emphasis added).  And the Ohio Supreme Court has explained that groundwater disputes are "not analogous to . . . oil and gas cases, around which a special body of law has arisen based on special circumstances not

---

[10] Further illustrating the private nature of such rights, courts have allowed mineral estates to be severed from the land.  *See* 1A Summers, *supra*, § 8:1.  Groundwater, however, generally cannot be severed from surface ownership.  *See, e.g.*, *City of Blue Springs v. Cent. Dev. Ass'n*, 831 S.W.2d 655, 659 (Mo. Ct. App. 1992) ("[W]ater is not severable from the land through or under which it flows . . . . That distinction alone makes water different from cases dealing generally with minerals and their severance."); *see also Davis v. Agua Sierra Res., L.L.C.*, 203 P.3d 506, 512 (Ariz. 2009) (en banc) (groundwater interest is not severable).

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

present here." *Chance v. BP Chems., Inc.*, 670 N.E.2d 985, 991 (Ohio 1996); *see Andrus v. Charlestone Stone Prods.*, 436 U.S. 604, 611 (1978) (noting that "federal mining law surely was not intended to be a general real estate law").[11]  Even the U.S. Supreme Court has explained that numerous "legal conflicts . . . might arise" if water were treated similarly to a mineral.  *Andrus*, 436 U.S. at 615; *see also N. Pac. R. Co. v. Soderberg*, 188 U.S. 526, 530 (1903) (noting that defining a mineral as "any constituent of the earth's crust" would be "subversive"); 1 Summers, *supra*, § 3:6 ("analogies of oil and gas to . . . *subterranean waters* . . . are defective because the physical properties of oil and gas and the economic concerns of oil and gas production are different from the physical and economic attributes of the matters and substances with which they are compared").[12]

### C.    The Court Should Apply The Uniform State Law Treating Groundwater Storage Space As A Public Resource

In the absence of any governing federal law, CVWD urges the Court to adopt the uniform state law approach, followed by California, that groundwater storage space is a public resource and not subject to private ownership.  As noted, CVWD does not dispute that federal law governs the Tribe's ownership of groundwater storage space, but as the Ninth Circuit has explained, "that is only the initial step in the analysis.  The next step is to determine whether, although federal law governs, state law should be incorporated to provide the content of that federal law." *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457 (9th Cir. 1986).

As explained in CVWD's motion for summary judgment, groundwater storage space, like groundwater itself, is not capable of private ownership under

---

[11] *See also* Owen M. Lopez, *Upstairs/Downstairs: Conflicts Between Surface and Mineral Owners*, 26 Rocky Mtn. Min. L. Inst. 995, 1022 (1980) (fresh water "has generally been held not to be a mineral," including under the 1872 Mining Law and the Stock-Raising Homestead Act, which preserves "all the coal and other minerals in the lands so entered and patented" (citing *Andrus*, 436 U.S. 604)).

[12] Moreover, aquifer systems (including the basin here) generally lack well-defined boundaries that would substantially compartmentalize or limit lateral or vertical movement of the groundwater.  *See* Fogg Supp. Decl., Ex. A at 3.

California law.  Instead, "subsurface storage space is a public resource." *Cent. & W. Basin Replenishment Dist.*, 109 Cal. App. 4th at 905; *see also Niles Sand & Gravel Co. v. Alameda County Water Dist.*, 37 Cal. App. 3d 924 (1974) (rejecting inverse condemnation claim based on groundwater replenishment program).

The Supreme Court and the Ninth Circuit have held that state water law may supply the rule of decision in disputes over federal water rights and Indian property rights.  *See* Dkt. 200 at 23-25 (citing cases).  Under *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979), the determination whether to incorporate California law focuses on (1) whether the issue requires a "nationally uniform body of" federal law; (2) whether state law would "frustrate specific objectives of the federal programs"; and (3) whether "application of a federal rule would disrupt commercial relationships predicated on state law." *Mardan*, 804 F.2d at 1458-59.

1. Here, state law provides a "national uniform body" of law, eliminating any need for federal law to fill the gap.  All courts that have considered whether groundwater storage space is privately owned have agreed with the California courts that storage space is a public resource incapable of private ownership.  *E.g., Park Cty. Sportsmen's Ranch,* 45 P.3d at 696 (rejecting common-law ownership of "the storage space in aquifers underneath the surface of their land[]"); *accord W. Maricopa Combine, Inc. v. Arizona Dep't of Water Res*., 26 P.3d 1171, 1175-76 (Ariz. Ct. App. 2001); *In re Application U-2*, 413 N.W.2d 290, 298 (Neb. 1987).

The Tribe contends, contrary to the foregoing authorities, that the proposition that ownership of groundwater storage space follows land ownership is "widely accepted."  Dkt. 203-1 at 19-20.  But the Tribe fails to cite a single case that arises in the context of groundwater storage.  Instead, the Tribe relies on cases addressing the fundamentally different issue of underground storage of oil, natural gas, and petroleum injection water.  For all the reasons given *supra* at 23-24, the authorities are entirely inapposite.  *See Mosser v. Denbury Res., Inc*., 898 N.W.2d 406, 413 (N.D. 2017) (claim for damages under North Dakota Oil and Gas Production

CVWD STATEMENT OF GENUINE DISPUTES & UNDISPUTED FACTS IN OPPOSITION CASE NO. 5:13-CV-00883-JGB

1  Damage Compensation law for disposal of saltwater produced from petroleum

2  wells in underground reservoir); *Department of Transportation v. Goike*, 560

3  N.W.2d 365, 365 (Mich. Ct. App. 1996) (dispute between owners of mineral and

4  surface estates over ownership of a reservoir's storage space "once it has been

5  evacuated of the minerals and gas"); *Emeny v. United States*, 412 F.2d 1319, 1320

6  (Ct. Cl. 1969) ("storage of helium-gas mixtures and pure helium produced

7  elsewhere" in a subterranean geological structure); *United States v. 43.42 Acres of*

8  *Land*, 520 F. Supp. 1042, 1045 (W.D. La. 1981) (discussing surface owners' rights

9  to a *man-made* underground oil storage space).

10  The only California decision the Tribe cites dealt with pollution from "oil

11  production activities," not ownership of groundwater storage space. *See Starrh &*

12  *Starrh Cotton Growers v. Aera Energy LLC*, 153 Cal. App. 4th 583, 588 (2007).

13  *Starrh* involved a trespass resulting from the migration of petroleum wastewater

14  into groundwater underlying the plaintiff's property. *See id.* at 588 (suit filed

15  because "produced water has migrated into the aquifer underlying Starrh's property,

16  reducing the quality of the subsurface water"). While the court describes the

17  trespass as involving the "subsurface migration of oil field wastewater into a

18  mineral estate (groundwater pore space) of another," *id.* at 592, the court never

19  suggested that overlying owners have an exclusive right to groundwater storage

20  space. As already noted, California law is clear that "subsurface storage space is a

21  public resource." *Cent. & W. Basin Replenishment Dist.*, 109 Cal. App. 4th at 905.

22  The Tribe also claims that three state statutes bolster its ownership claim.

23  The statutes are again off base. The purpose of each was to address underground

24  injection of *carbon dioxide* and, in particular, whether mineral or surface-right

25  owners control the storage. *See* Wyo. Stat. Ann. § 34-1-152(a) (Wyoming Pore

26  Space and $CO_2$ Property Rights Statute); N.D. Cent. Code § 47-31-08 (enacted in

27  2009 in conjunction with provisions for carbon dioxide underground storage, *see*

28  *Mosser,* 898 N.W.2d at 412); Mont. Code Ann. § 82-11-180(3) (dealing with

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

carbon-dioxide injection wells).  Although the statutes talk generally in terms of pore space, none even remotely addresses groundwater storage space, and no court or administrative agency has ever applied them to groundwater storage.  In its effort to justify its unprecedented claim, the Tribe once again ignores basic differences in subsurface resources and relies on remote, irrelevant provisions.

2.  The second *Kimbell Foods* factor likewise favors employing the uniform state rule.  The Tribe has not articulated any reason why it should be granted paramount ownership of the groundwater storage space, but to the extent there is a federal interest in play it is, at most, simply to ensure that the Tribe is able to store surface water underground and recapture it.  Under state law treating groundwater storage space as a public resource, the Tribe can do so.  *See* Dkt. 200 at 21-24.

3.  Finally, it is difficult to overstate the extent to which granting the Tribe exclusive ownership of some portion of the groundwater storage space "would disrupt commercial relationships predicated on state law."  *Mardan*, 804 F.2d at 1458.  The ability to store water underground "maximize[s] the beneficial use of all of the state's waters."  *Park Cty. Sportsmen's Ranch,* 45 P.3d at 705 n.18 (noting that underground storage reduces evaporation of water in storage, permits storage for emergencies, raises the water table, and can reduce the energy and costs required for pumping).  It also improves both access to, and distribution of, water.  Storing water in the basin allows users (including lessees on reservation lands) to pump water directly.  In turn, the water agencies do not need to construct a costly waterworks system to transport the water throughout the Valley.  It is critical that this form of transportation be a commons and not be subject to private control.  As the Colorado Supreme Court recognized, a common law rule that permits private ownership would "inject[] nearly unfathomable factual issues into the exercise of water use rights."  *Id.* at 715.  Among other things, trespass claims would arise every single day.  "It is completely unrealistic to pretend the water which accumulates [underground] will remain in storage precisely under the lands which

CVWD STATEMENT OF GENUINE DISPUTES
& UNDISPUTED FACTS IN OPPOSITION
CASE NO. 5:13-CV-00883-JGB

1    Tri-County has been authorized to service with irrigation waters.  The water, of

2    necessity, will move into the entire natural storage field, following the laws of

3    nature." *In re Application U-2*, 413 N.W.2d at 296.

4            This case is especially illustrative.  The groundwater basin here is integrated,

5    and there are over 100 different allotments apart from the tribal lands that overly it,

6    all in a checkerboard pattern.  *See* Dkt. 200 at 25; Howitt Supp. Decl., Ex. A at 7-8.

7    There are also four other overlying Indian reservations.  OSUF ¶ 31.  In arguing for

8    ownership rights, the Tribe neglects to explain how those rights could possibly be

9    workable given the patchwork pattern of its reservation lands, how to measure the

10   water's natural underground movement, how to isolate the effects from one user's

11   recharge or pumping, or how to resolve the ownership rights of any other federal

12   landowner, namely the four other tribes whose reservations overlie the basin.[13]

13           Courts have weighed such practical realities not only in this context, but in

14   other property rights disputes as well.  Before the invention of the airplane, for

15   example, courts commonly found that any encroachment into the physical air space

16   of another landowner was a violation of property rights.  *E.g.*, *Herrin v. Sutherland*,

17   241 P. 328, 331 (Mont. 1925) (landowner committed a trespass by firing shotgun

18   over property of neighbor); *Ellis v. Loftus Iron Co*., (1874) L. R. 10 C. P. 10 (U.K.)

19   (finding that a trespass occurred when a horse reached its head over a common

20   fence).  But the prevalence of air travel required courts to adjust to a different

21   reality of private air space ownership.  *See United States v. Causby*, 328 U.S. 256,

22   261 (1946) ("[c]ommon sense revolts at the idea" that "every transcontinental flight

23   would subject the operator to countless trespass suits").  Here, granting private

24

25   [13]  Instead, the Tribe oversimplifies the nature of its ownership, claiming it owns
     the space between the soil as it owns the soil itself.  Dkt. 203-1 at 19.  The term
26   "soil," however, refers to the material comprising the upper three to six feet of the
     earth.  *See* Fogg Supp. Decl., Ex. A at 4.  Aquifer systems extend well below the
27   soil associated with an individual owners' land.  It is a major misconception to
     consider the deeper subsurface within which the aquifer system resides to be merely
28   soil or extensions of soil.  *See id.*

ownership over any portion of an interconnected aquifer invites a trespass claim any time anyone recharges water anywhere in the aquifer, because that water will naturally spread through the aquifer and cross any number of surface property lines. Any notion of private ownership of portions of underground aquifers simply "has no place in the modern world." *Park Cty. Sportsmen's Ranch*, 45 P.3d at 701.

Water systems in the West use not only groundwater aquifers, but also surface waterways as natural means of conveyance.  The law therefore treats rivers as commons too and does not permit property owners to claim exclusive rights over natural channels as they pass across their lands or to demand payment for the channel's use as a means of conveying water.  *E.g., Martinson v. Hughey*, 199 Cal. App. 3d 318, 327 (1988) ("The right to use a natural channel as a temporary conduit or as a drain for artificial flow has been frequently upheld."); *Park Cty. Sportsmen's Ranch*, 45 P.3d at 709-710 (appropriators have the right to "conduct their appropriated water through the natural channel across the landowner's property without interference"); *W. Maricopa Combine*, 26 P.3d at 1176 ("allowing the movement of water 'of another' through natural watercourses, has long been an integral part of Arizona water law").  Treatment of groundwater storage space as a commons is thus not an idiosyncratic rule, but a part of a broader effort to ensure effective management of water resources.  Privatization of groundwater storage capacity would not only undermine groundwater replenishment efforts throughout the West, but call into question the long-standing principle that rivers are common means of conveyance, wreaking even further havoc on western water management.

In sum, if the Court reaches this claim, it should rule that the Tribe has no claim to private ownership to any underground groundwater storage space—though it may utilize that space, along with others, as a public resource.  The Court should not invent a new, contrary federal rule to resolve the Tribe's abstract, unripe claim.

### III.    A *Winters* Right Does Not Have a Unique Water Quality Component

The final Phase 2 issue is whether the Tribe's *Winters* rights contain a unique

1  water-quality component.  The Tribe and U.S. motions on this issue primarily assail

2  a position no one is taking, arguing that leaving the Tribe's reserved water right

3  with *no protection* from degradation would be improper.  *See, e.g.*, Dkt. 203-1 at 14

4  (arguing that allowing "outside actors to pollute [the Tribe's] water without

5  repercussion would be nonsensical").  CVWD does not dispute that proposition.

6  Nor does CVWD dispute that federal law governs the question of what protection

7  of water quality the Tribe's reserved right receives.  What CVWD *does* dispute is

8  the Tribe's contention that federal law provides *Winters* rights special protection

9  from *any* degradation in quality, even if such degradation has *no* impact on any use

10  to which the Tribe intends to put the water.  *E.g.*, Compl. ¶¶ 65, 74; Dkt. 203-1 at

11  18 (seeking right to "undiminished water quality").  That extreme position—the

12  necessary next step in the Tribe's unfounded effort to enjoin the Water Agencies

13  from recharging the aquifer with Colorado River water, which is heavily regulated

14  by federal and state law, used daily by millions of people, and absolutely essential

15  to sustaining the Valley's economy, *see* Dkt. 200 at 28-29—finds no support in any

16  federal or state decision, and must be rejected.  Instead, as set forth in CVWD's

17  motion for summary judgment, the Court should rule that while federal law protects

18  water quality, the rule of decision here is California's law of nuisance, which

19  follows the Restatement's well-defined and widely used cause of action to prevent

20  substantial and unreasonable interference with the use and enjoyment of water, and

21  accordingly protects the federal interest in ensuring the Tribe can use water to

22  further the reservation's primary purposes.  Dkt. 200 at 29-31.

23    **A.    California Nuisance Law Provides The Appropriate Rule Of
          Decision For The Tribe's Water Quality Claim**
24

25    The *Kimbell Foods* analysis—which the Tribe and U.S. ignore—again

26  requires this Court to utilize existing state law as the rule of decision.  First, there is

27  no need for a novel, uniform federal water quality rule, because the Restatement

28  test California follows is already widely used.  *See* Dkt. 200 at 31.

Second, the Tribe's and United States' own briefs confirm that applying California's law of nuisance would not frustrate the federal interests at stake. A separate federal common law rule need only be recognized if "there exists a significant conflict between some federal policy or interest and the use of state law." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 313 (1981). State nuisance law, however, is entirely consistent with the federal interest here.

As CVWD has explained, the federal interest here is to ensure the Reservation's access to water that is "necessary to fulfill the very purposes for which a federal reservation was created." *New Mexico*, 438 U.S. at 702; Dkt. 200 at 31-32. Both the United States and the Tribe construe the federal interest similarly. According to the United States, the federal concern is that degradation "can frustrate or even eliminate the Tribe's ability to use water." Dkt. 204 at 15. And the Tribe states that "water quality must be protected to ensure that both the purposes of a tribe's reservation and the tribe's use of water can be sustained." Dkt. 203-1 at 14; *see id.* at 16 (quality right is as important as quantity because "a deficit of either can render a reservation *useless*" (emphasis added)); *id.* at 17 (quality is protected "in order to accomplish the purposes of a federal reservation"). That is, even the Tribe and United States articulate the federal interest here as ensuring that the Tribe can *use* the water in connection with the reservation's purposes. The California law of nuisance provides just that protection. *See* Dkt. 200 at 30. It is the Tribe's request for a novel, heightened right to entirely pristine water which diverges from, and goes far beyond, the federal interests protected by *Winters*, and which should be rejected for that reason alone.

As to the third factor, it is beyond dispute that creating the Tribe's requested federal rule under which *any* degradation of water quality can be enjoined would be devastating to existing commercial relationships. Indeed, the Tribe seeks to enjoin the water agencies' importation of Colorado River water, which is essential to the Valley's economy and its many inhabitants. *Supra* at 8; Dkt. 200 at 3-8. It is no

exaggeration to say that the Valley's growth has depended in large part on commercial entities understanding that development will be supported by sustainable management of water resources—which depends entirely on CVWD's ability to recharge the aquifer with Colorado River water, Dkt. 200 at 3-8.

## B.    The Tribe's And U.S.'s Remaining Arguments Are Mistaken

Nothing in the Tribe or U.S. briefs offers a reason to reject California's law of nuisance as the rule of decision.

### 1.    No Court Has Ever Created A Special *Winters* Water Quality Right

The Tribe asserts that courts "have consistently held that a federal reserved water right encompasses a water quality component." Dkt. 203-1 at 15.  The Tribe is wrong.  No court has ever held that *Winters* itself creates a unique body of federal water quality law, and there is no need to create one now.

The primary case the Tribe relies upon *did not even involve a* Winters *right*. *Gila Valley* instead enforced a 1935 consent decree granting the San Carlos Apache Tribe the right to the "natural flow" of the Gila River.  *United States v. Gila Valley Irrigation Dist.*, 920 F. Supp. 1444, 1448 (D. Ariz. 1996).  Further, the court granted injunctive relief because degradation of the "natural flow" had rendered the water at issue of such low quality that it "prevent[ed] the successful cultivation of" a variety of crops the tribe grew, *id.* at 1454, not on an abstract showing that the quality of the River water was degraded in some immaterial respect.  That is consistent with how California's law of nuisance would operate.

The Tribe also cites *Hopi Tribe v. United States*, 782 F.3d 662 (Fed. Cir. 2015), which did not address a water quality issue at all but said only in dictum that *Winters* "may also give the United States the power to enjoin others from practices that reduce the quality of water feeding the reservation."  *Id.* at 669.  In fact, CVWD does not necessarily disagree with that general statement—the *Winters* doctrine is why this Court must engage in a *Kimbell Foods* analysis to identify the

1    appropriate rule of decision, and under the California law of nuisance the Court

2    could enjoin practices that degrade the quality of water in certain circumstances.

3          The Tribe's final purported water-quality citation does not address the

4    appropriate legal protections for the quality of federally reserved water at all, but

5    holds only that a tribe had an interest—and therefore should be joined—in a suit

6    challenging a poultry company's extensive pollution of a water source in which the

7    tribe had a "viable legal claim" to *Winters* rights.  *Oklahoma v. Tyson Foods, Inc.*,

8    258 F.R.D. 472, 477-78 (N.D. Okla. 2009).  The Tribe also cites a series of cases

9    (Dkt. 203-1 at 17) which even by the Tribe's own description address the provision

10   of "sufficient water" to meet various purposes, and in fact none of those cases

11   addresses whether and what type of water quality protection *Winters* might provide.

12   **2.      California Water Law Does Not Protect Water Rights From Immaterial Degradation**

13

14         The Tribe also argues in conclusory fashion that California law recognizes a

15   right to water which is "undeteriorated in quality," suggesting that state law offers

16   protection of natural water quality unrelated to whether water remains suitable to

17   the uses to which it is put.  Dkt. 203-1 at 18.  The Tribe again misconstrues the

18   cases.  *Wright v. Best*, 121 P.2d 702 (Cal. 1942), in fact holds that water right

19   holders can enjoin activities that cause "material deterioration" which "corrupts the

20   water so as to essentially impair its usefulness for the purposes to which he

21   originally devoted it."  *Id.* at 709.  Another case plaintiffs quote out of context for

22   the proposition that rights holders are entitled to water "unimpaired in quality"

23   actually adopts a rule requiring a showing of "some real, material and substantial

24   damage" before enjoining water use, and holds in that case that the plaintiff was not

25   entitled to relief because "[t]here was adequate water . . . *for all purposes* for which

26   the plaintiff desired it."  *Crum v. Mt. Shasta Power Corp.*, 117 Cal. App. 586, 602

27   (1931) (emphasis added); *see also Phoenix Water Co. v. Fletcher*, 23 Cal. 481, 482

28   (1863) (junior appropriator may not "destroy its utility for" senior appropriator by

injecting sawdust and bark into water); *id.* at 487 ("prior appropriator is clearly entitled to protection against acts which materially diminish the quantity of water to which he is entitled, or deteriorate its quality, *for the uses to which he wishes to apply it*" (emphasis added)); *see also Town of Antioch v. Williams Irr. Dist.*, 188 Cal. 451, 460-61 (1922) (rights-holder able to enjoin material degradation of quality interfering with use, if relief will not result in extreme waste for other users). Numerous other California cases make clear that the law protects water quality only to the extent it results in substantial and unreasonable interference with the beneficial uses for which that water is used.[14]

### 3. CVWD Does Not Dispute This Court's Authority To Protect The Tribe's Water Right From Degradation

The sum and substance of the United States' water quality argument is that under *Winters* no party can injure federal property without authority from Congress, and that this Court has authority to protect the federal reserved right it has decreed. Dkt. 204 at 14-15. CVWD does not dispute that assertion in principle. But the specific question here is whether there is a need for a novel federal rule to offer that protection, or whether state nuisance law suffices. The United States does not echo the Tribe's erroneous argument that courts have articulated a unique federal water quality standard arising out of *Winters* itself, and it offers no reason why the California law of nuisance should not apply as the rule of decision on this claim.

The Court should therefore rule that the source of law governing the Tribe's water quality claim is the California law of nuisance, *not* the novel, extreme federal rule the Tribe asks the Court to craft.

---

[14] *E.g.*, *Hudson v. West*, 306 P.2d 807, 818 (Cal. 1957) (riparian rights holders are entitled to natural flow "without unreasonable detention or substantial diminution in quantity or quality"); *Meridian, Ltd. v. San Francisco*, 90 P.2d 537, 550 (Cal. 1939) (riparian right to water "of suitable quality" without "substantial impairment").

1

## CONCLUSION

2       The Tribe's and United States' motions for Phase II summary judgment

3  should be denied, and CVWD's cross motion should be granted.

4    Dated: November 20, 2017        */s/ Barton Thompson, Jr.*
5                                    MATTHEW KLINE
                                     BARTON THOMPSON, JR.
6                                    ANTON METLITSKY
                                     DANIEL R. SUVOR
7                                    BRADLEY N. GARCIA
8                                    O'MELVENY & MYERS, LLP

9
     Dated: November 20, 2017        */s/ Steven B. Abbott*
10                                   STEVEN B. ABBOTT
                                     GERALD D. SHOAF
11                                   REDWINE AND SHERRILL, LLP

12                                   *Attorneys for CVWD*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>Certification in Compliance with Local Rule 5-4.3.4</u>**

2       I hereby certify that, pursuant to Local Rule 5-4.3.4, I have obtained the

3 authorization from the above signatories to file the above-referenced document, and

4 that the above signatories concur in the filing's content.

5

6  Dated:  November 20, 2017       */s/ Barton Thompson, Jr.*

7                       BARTON THOMPSON, JR.
                          O'MELVENY & MYERS, LLP

8

9                       *Attorney for CVWD*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CCVWD'S OPPOSITION TO
PHASE 2 SUMMARY JUDGMENT.
NO. 5:13-CV-00883-JGB (SPx)