CATHERINE F. MUNSON (D.C. Bar No. 985717, admitted *pro hac vice*)
CMunson@kilpatricktownsend.com
MARK REEVES (D.C. Bar No. 1030782, admitted *pro hac vice*)
MReeves@kilpatricktownsend.com
KILPATRICK TOWNSEND & STOCKTON, LLP
607 14th Street, N.W., Suite 900
Washington, D.C. 20005
Tel:  (202) 508-5800; Fax:  (202) 508-5858

STEVEN C. MOORE (CO Bar No. 9863, admitted *pro hac vice*)
Smoore@narf.org
HEATHER WHITEMAN RUNS HIM (NM Bar No. 15671, admitted *pro hac vice*)
HeatherW@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Tel:  (303) 447-8760; Fax:  (303) 443-7776

JOHN TABINACA PLATA (CA Bar No. 303076)
jplata@aguacaliente.net
AGUA CALIENTE BAND OF CAHUILLA INDIANS
5401 Dinah Shore Drive
Palm Springs, CA 92264
Tel: (760) 699-6837; Fax: (760) 699-6963

Attorneys for Plaintiff
Agua Caliente Band of Cahuilla Indians

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS,<br><br>                    Plaintiffs,<br><br>v.<br><br>COACHELLA VALLEY WATER DISTRICT, et al.<br><br>                    Defendants. | Case No.:    ED CV 13-00883-JGB-SPX<br>Judge:        Jesus G. Bernal<br><br>**AGUA CALIENTE BAND OF CAHUILLA INDIANS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE 2 ISSUES**<br><br>Hearing Date:    January 22, 2018<br>Time:            9:00 A.M.<br>Courtroom:        1<br><br>Action Filed:    May 14, 2013 |

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................................iii

**ARGUMENT & ANALYSIS** ...........................................................................................2

I.  **Agua Caliente has legal and prudential standing to bring all claims asserted in its Complaint.**..........................................................................................2

    A.  Agua Caliente has standing to seek the declaration and quantification of its federal reserved water right and the injunction of further interference with that right.................................................3

    B.  Agua Caliente has standing to litigate its pore space and water quality claims. ...........................................................................8

II.  **The water districts' proposed quantification standards are inconsistent with binding precedent and would improperly limit Agua Caliente's federal reserved water right.**....................................................9

    A.  PIA is the established federal standard for quantifying agriculture-based reserved rights, notwithstanding the water districts' criticisms. ...........................................................................10

    B.  The quantification standards and "factors" proposed by the water districts would impose unlawful limitations on Agua Caliente's federal reserved right.................................................12

        1.  *Pre-Reservation water rights are not before the Court and do not limit the scope or existence of Agua Caliente's federal reserved right.*................................................12

        2.  *Questions pertaining to safe yield are not properly before the Court.* ...............................................................14

        3.  *State law controls neither the existence nor the scope of Agua Caliente's federal reserved water right, and putative state law rights do not limit the federal right at issue here.*......15

        4.  *Equitable considerations such as "sensitivity" to junior right holders and off-reservation water users are not part of the quantification standard.*....................................................18

        5.  *The PIA standard was devised to meet the minimal need of a federal reservation's agricultural purpose.*.............................19

        6.  *The additional "factors" that DWA would graft into the quantification standard are irrelevant and improper.* .............20

        7.  *CVWD's proposal to effectively conduct two quantification analyses is unprecedented and unreasonable.* ..........................22

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

III.    **Federal reserved water rights include a water quality component.**........24

    A.    Federal law governs federal reserved water rights. ............................24

    B.    A choice of law inquiry under *Kimbell Foods* is inappropriate
           where a federal rule has already been adopted in a prior case............26

    C.    Application of California nuisance law would frustrate and impair
           the United States' sovereign interest in its reserved water right.........28

IV.    Agua Caliente has an ownership interest in pore space under federal law...30

    A.    The Court cannot adopt state law because there is an existing
           federal rule of decision.........................................................................31

    B.    Even if no federal rule existed, the Court should not adopt state
           law. .........................................................................................................33

**CONCLUSION** ........................................................................................................37

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

1
2

# <u>TABLE OF AUTHORITIES</u>

3

**Cases**

4
5

*Adamson v. Black Rock Power & Irrig. Co.*,
   12 F.2d 437 (9th Cir. 1926).................................................................................3

6
7

*Agua Caliente Band of Cahuilla Indians v. CVWD*,
   849 F.3d 1262 (9th Cir. 2017)....................................................................passim

8
9

*Arizona v. California*,
   373 U.S. 546 (1963)....................................................................................passim

10
11

*Arizona v. California*,
   O.T. 1960, Orig. p. 266 (Dec. 5, 1960).......................................................passim

12

*Avista Corp, Inc. v. Sanders County*,
   405 Fed. App'x 225 (9th Cir. 2010) .........................................................4, 9

13
14

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964)..................................................................................26

15
16

*Cappaert v. United States*,
   426 U.S. 128 (1976)..............................................................................passim

17
18

*Cent. & W. Basin Water Replenishment Dist. v. S. Cal. Water Co.*,
   109 Cal. App. 4th 891 (2003) ................................................................35

19
20

*Cent. Pines Land Co. v. United States*,
   274 F.3d 881  (5th Cir. 2001)...............................................................26

21
22

*Chance v. B.P. Chemicals., Inc.*,
   670 N.E.2d 985 (Ohio 1996)................................................................36

23
24

*City of Santa Maria v. Adam*,
   211 Cal. App. 4th 266 (2012) .............................................................14

25

*Clearfield Trust Co. v. United States*,
   318 U.S. 363 (1943).............................................................................26

26
27

*Colville Confederated Tribes v. Walton*,
   752 F.2d 397 (9th Cir. 1985)........................................................passim

28

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

*Confederated Salish & Kootenai Tribes v. Clinch,*
  992 P.2d 244 (Mont. 1999) .......................................................................... 6

*Eric L. Garner, et al., Institutional Reforms in California Groundwater Law,*
  25 Pac. L.J. 1021 (2004) ............................................................................ 17

*Haehlen v. Wilson,*
  54 P.2d 62 (Cal. App. 1936) ....................................................................... 29

*Hi-Desert Cnty. Water Dist. v. Blue Skies Country Club, Inc.,*
  23 Cal. App. 4th 1723 (1994) ..................................................................... 14

*Hopi Tribe v. United States,*
  782 F.3d 662 (Fed. Cir. 2015)...................................................................... 27

*In re Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source,*
  35 P.3d 68 (Ariz. 2001)..................................................................... 10, 23, 25

*In re Water of Hallett Creek Stream Sys.,*
  749 P.2d 324 (Cal. 1988) ......................................................................... 8, 16

*Lussier v. San Lorenzo Valley Water Dist.,*
  206 Cal. App. 3d 92, 253 Cal. Rptr. 470 (Ct. App. 1988)...................... 28

*MedImmune, Inc. v. Genetech, Inc.,*
  549 U.S. 118 (2007) ...................................................................................... 3

*Parravano v. Babbitt,*
  70 F.3d 539 (9th Cir. 1995)......................................................................... 32

*Pershing Park Villas Homeowners Ass'n v. United P. Ins. Co.,*
  219 F.3d 895 (9th Cir. 2000)......................................................................... 7

*Pon v. Wittman,*
  81 P. 984 (Cal. 1905) .................................................................................. 29

*San Diego Gas & Electric Co. v. Superior Court,*
  13 Cal. 4th 893, 55 Cal. Rptr. 2d 724, 920 P.2d 669 (1996) ................... 29

*Sierra Club v. Andrus,*
  487 F. Supp. 443 (D.D.C. 1980) ................................................................ 13

*Starrh & Starrh Cotton Growers v. Area Energy, LLC,*
  153 Cal. App. 4th 583 (2007) ..................................................................... 35

KILPATRICK TOWNSEND & STOCKTON
607 14ᵗʰ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

*Sycuan Band of Mission Indians v. Roache*,
    54 F.3d 535 (9th Cir. 1994)........................................................................7

*United States v. Adair*,
    723 F.2d 1394 (9th Cir. 1984)...........................................................passim

*United States v. Anderson*,
    591 F. Supp. 1 (E.D. Wash. 1982),
    *aff'd in part, rev'd in part,* 736 F.2d 1358 (9th Cir. 1984)..................27, 28

*United States v. California*,
    332 U.S. 19 (1947).........................................................................3, 4, 9, 33

*United States v. Gila Valley Irrigation District,*
    920 F. Supp. 1444 (D. Ariz. 1996)..............................................27, 28, 29

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011)...............................................................................26

*United States v. Kagama*,
    118 U.S. 375 (1886)................................................................................36

*United States v. Kennedy,*
    738 F.2d 584 (3d Cir. 1984).............................................................26, 31

*United States v. Kimbell Foods*,
    440 U.S. 715 (1979)..........................................................................passim

*United States v. Lewis Cnty.*,
    175 F.3d 671 (9th Cir. 1999),
    *cert. denied* 528 U.S. 1018 (1999)........................................................34

*United States v. Little Lake Misere Land Co., Inc.*,
    412 U.S. 580 (1973)................................................................................26

*United States v. New Mexico*,
    438 U.S. 696 (1978).........................................................................passim

*United States v. Shoshone Tribe of the Wind River Reservation in Wyoming*,
    304 U.S. 111 (1938)...........................................................................31, 32

*United States v. Washington*,
    375 F. Supp. 2d 1050 (W.D. Wash. 2005),
    *vacated pursuant to settlement by* 2007 WL 4190400 (W.D. Wash.  Nov. 20, 2007)..................................................................................11, 12, 23

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET , STE 900
WASHINGTON, DC 20005-2018

v

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

*Utah Power & Light Co. v. United States*,
   243 U.S. 389 (1917) ................................................................................. 33

*Utah v. United States*,
   528 F.3d 712 (10th Cir. 2008) ............................................................. 4, 9

*Wilson v. Omaha Indian Tribe*,
   442 U.S. 653 (U.S. 1979) ........................................................... 29, 31, 34

*Winters v. United States,*
   207 U.S. 564 (1908) ......................................................................... passim

*Yunis v. United States*,
   118 F. Supp. 2d 1024 (C.D. Cal. 2000) .................................................. 34

**Statutes**

80 Fed. Reg. 37054 .................................................................................... 28

80 Fed. Reg. 37099 .................................................................................... 28

**Other Authorities**

25 U.S.C. § 177 ......................................................................................... 33

25 U.S.C. § 2701 ....................................................................................... 36

25 U.S.C. § 4301 ....................................................................................... 36

33 U.S. § 1251 ........................................................................................... 28

47 Cal. Jur. 3d Nuisances § 8.................................................................... 29

A.R.S. §§ 45-801 ...................................................................................... 37

Cal. Water Code § 10720.3........................................................................ 25

**Rules**

2 *Waters and Water Rights*
   21-15 to -16 (Amy K. Kelley ed., 3d ed. 2017) ..................................... 14

Erwin Chemerinsky,
   FEDERAL JURISDICTION (6th ed. 2012) ..................................................... 26

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET , STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

Felix S. Cohen et al.,
*Cohen's Handbook of Federal Indian Law* § 19.03[9] (Nell Jessup Newton
ed., 2012) ........................................................................................................27, 33

Reid Chambers,
*Reflections on the Changes in Indian Law, Federal Indian Policies and
Conditions on Indian Reservations since the Late 1960s*, 46 Ariz. St. L. J.
729, 766 (2014) .............................................................................................5

## Constitutional Provisions

United States Const., Art. I, § 8 ..........................................................................36

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

As they have done throughout this litigation, the water districts in their Phase 2 dispositive motions rely upon inapplicable state law concepts and uncertain state law rights in an effort to improperly limit or eliminate Agua Caliente's paramount federal property rights. They also once again disregard this Court's delineation of the Phase 2 issues in an effort to broaden or limit the scope of each question before the Court as best suits them. These efforts have no more merit now than they have previously. Agua Caliente's lawsuit seeks the declaration, quantification, and enforcement of federal rights that are not subject to state law—federal rights that the water districts have actively infringed and imperiled for decades. And Phase 2 of this lawsuit is limited in scope to the three purely legal issues once agreed upon by the parties and reaffirmed by this Court's September 6, 2017 order: (1) the appropriate legal standard for quantifying the Agua Caliente Reservation's federal reserved water right; (2) whether there is a water quality component to the federal reserved water right; and (3) whether Agua Caliente owns the pore space underlying its Reservation. *See* Doc. 193.

The water districts now contend, however, for the first time, that Agua Caliente lacks standing to litigate the Phase 2 issues. Agua Caliente unquestionably has both constitutional and prudential standing to bring its claims, all of which involve legitimate, concrete disputes between diametrically opposed parties and seek to address substantial, ongoing harm that the water districts have inflicted on Agua Caliente.

The water districts' arguments on the merits, specifically on the three Phase 2 issues, are unavailing. Their proposed standards for quantifying Agua Caliente's federal reserved water right have no support in federal law, are impractical, and rely heavily on irrelevant state law doctrines. Moreover, the water districts' standards repeatedly seek to incorporate improper limiting factors into the quantification standard by importing fact-intensive questions pertaining to the use and priority of the Reservation's federal reserved water right—questions that are properly considered in Phase 3 of this case, if at all.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

The water districts' water quality and pore space arguments fare no better. They ask this Court to disregard established federal law in favor of state law rules that would frustrate the United States' intent in establishing the Agua Caliente Reservation and limit or destroy sovereign federal rights held by the United States in trust for the Tribe. The Court cannot do so, nor should it.

## ARGUMENT & ANALYSIS

I.    **Agua Caliente has legal and prudential standing to bring all claims asserted in its Complaint.**

Although this case was filed more than four years ago, has been litigated, at great cost of party and judicial resources, through multiple rounds of briefing and argument and an appeal to the Ninth Circuit, and both defendants admitted this Court's subject matter jurisdiction in their answers, *see* Doc. 39 ¶ 1 and Doc. 40 ¶ 1, CVWD now asserts, for the first time, that Agua Caliente lacks constitutional and prudential standing to seek quantification of its federal reserved water right and a declaration and quantification of its pore space ownership. *See* CVWD's Memorandum in Support of Motion for Partial Summary Judgment on Phase 2 Issues (CVWD Br.) at 11-13 (Doc. 200).[1]

DWA disavows CVWD's challenge to Agua Caliente's standing to quantify its federal reserved water right.[2] It contends instead that Agua Caliente lacks standing to assert its water quality claim and may lack standing to litigate its ownership of pore space. *See* DWA Memorandum in Support of Motion for Summary Judgment (Phase 2) (DWA Br.) at 1-2 & 20 (Doc. 202-1). None of these arguments challenging standing has merit.

---

[1] Pin citations are to the native page numbers at the bottom of each document.

[2] DWA, in a supplemental brief filed in connection with its pending cert petition before the Supreme Court, appears to agree that Agua Caliente has standing at least to litigate the existence and quantification of its federal reserved right to groundwater. DWA Supp. Br. at 1-2 (attached as Ex. A). DWA takes a more nuanced position, both in its Phase 2 brief and in its supplemental brief to the Supreme Court, regarding the justiciability of Agua Caliente's pore space claim. *See id.* at 2; DWA Br. at 1.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

**A.    Agua Caliente has standing to seek the declaration and quantification of its federal reserved water right and the injunction of further interference with that right.**

To establish standing, Agua Caliente must "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007). This standard is easily met with respect to Agua Caliente's claim for quantification of its federal reserved water right.

CVWD, having spent years doggedly denying the existence of the federal reserved water right that Agua Caliente claims, cannot credibly deny the existence of a substantial controversy between parties having adverse legal interests. Instead, it contends that Agua Caliente's claim fails to meet Article III's immediacy requirement and does not identify any "certainly impending" injury. CVWD Br. at 11-12. This is so, CVWD asserts, because Agua Caliente has not shown an imminent intent to pump groundwater or any interference with such pumping by CVWD. *Id.* at 12. Finally, CVWD asserts that Agua Caliente lacks standing because its alleged injury would not be redressed by a ruling from this Court. CVWD's assertions are erroneous.

Agua Caliente unquestionably satisfies Article III's immediacy and injury requirements. Agua Caliente has a federal reserved water right—a federal property right—in a certain, yet to be determined amount of groundwater appurtenant to the Agua Caliente Reservation. *See, e.g.*, *Agua Caliente Band of Cahuilla Indians v. CVWD*, 849 F.3d 1262, 1273 (9th Cir. 2017); *Adamson v. Black Rock Power & Irrig. Co.*, 12 F.2d 437, 438 (9th Cir. 1926) ("That a water right is real property is well settled."). CVWD and DWA dispute the existence of that right and claim that they are entitled to pump the groundwater in which Agua Caliente and the United States claim a property interest. "Such concrete conflicts as these constitute a controversy in the classic legal sense, and are the very kind of differences which can only be settled by agreement, arbitration, force, or judicial action." *United States v. California*, 332 U.S. 19, 25 (1947); *see also Avista Corp, Inc. v. Sanders County*, 405 Fed. App'x 225, 226-

KILPATRICK TOWNSEND & STOCKTON
607 14ᵗʰ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

27 (9th Cir. 2010) (holding that an asserted economic interest in a disputed property right establishes Article III standing); *Utah v. United States*, 528 F.3d 712, 721 (10th Cir. 2008) (standing requirements are satisfied by "competing claims" to a property right). What is more, the defendants have damaged and, in essence, appropriated the property that is subject to Agua Caliente's federal reserved right by overdrafting the aquifer in a cumulative amount well in excess of five million acre-feet (AF) of water. *Agua Caliente*, 849 F.3d at 1266. This ongoing injury to Agua Caliente's property interest further establishes the Tribe's standing. *California*, 332 U.S. at 22 (affirming standing to declare the United States' rights in property claimed by the State of California and to enjoin California's further unpermitted use of that property).

Agua Caliente's planned use of its property right is completely irrelevant. The existence, *vel non*, of the federal property right does not turn on whether the water districts approve of the Tribe's water use. And CVWD identifies no case, and Agua Caliente is aware of none, holding that an Indian tribe's alleged lack of concrete plans to make a particular, immediate use of its federal reserved water right deprives it of standing to seek the declaration and quantification of that right or an injunction of interference with it. On the contrary, it is well settled that tribes do <u>not</u> need to make full use of their federal reserved water rights in order to have them quantified. *United States v. Adair*, 723 F.2d 1394, 1416 (9th Cir. 1984) ("[T]he full measure of [a federal reserved water] right need not be exercised immediately."). In *Arizona v. California*, for example, the Supreme Court quantified federal reserved rights well in excess of the water being used by the relevant Indian tribes and explicitly rejected the contention "that the quantity of water reserved should be measured by the Indians' reasonably foreseeable needs." 373 U.S. 546, 600 (1963). In fact, *Arizona* decreed water rights totaling 905,496 AF per year to five tribes for 135,636 practicably irrigable acres despite

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

the fact that the tribes were actually irrigating less than 36,000 acres at the time.[3] *Arizona*'s quantification is irreconcilable with CVWD's assertion that there is no Article III standing to seek quantification of a federal reserved water right in the absence of a demonstrated, concrete plan to imminently put the right to use. Moreover, it is undisputed that the Agua Caliente Reservation is currently using well in excess of 10,000 AF of groundwater annually—*i.e.*, that Agua Caliente is purchasing at least some of the groundwater subject to its federal reserved right from the water districts.[4] *Agua Caliente*, 849 F.3d at 1267 ("[G]roundwater supplied by the water agencies remains the main source of water for all types of consumption on the reservation throughout the year.").

CVWD's assertion that Agua Caliente has failed to identify even a threatened injury is strange indeed. The defendants have overdrafted the aquifer underlying the Agua Caliente Reservation, reducing the amount and quality of groundwater available to meet the Reservation's needs as well as the cost of accessing the remaining water. *See id.* at 1266; Statement of Undisputed Facts in Support of Agua Caliente's Consolidated Phase 2 Response Brief, filed contemporaneously herewith, ¶¶ 1-5 (SUF). And, through their spreading of untreated Colorado River water to partially ameliorate the overdraft that they have caused, the defendants are increasing the salinity of the native groundwater in which Agua Caliente has a federal reserved right. *See id.* ¶¶ 7-10. The defendants also continue to exclude Agua Caliente from meaningful, substantive participation in groundwater management decisions that directly affect its federal reserved right. *See id.* ¶ 11. Agua Caliente's injury is not speculative in the least—it is an indisputable fact and matter of record. *See* June 5, 2017 Order at 6 (Doc.

---

[3] Reid Chambers, *Reflections on the Changes in Indian Law, Federal Indian Policies and Conditions on Indian Reservations since the Late 1960s*, 46 Ariz. St. L. J. 729, 766 (2014). )

[4] *See* Doc. 97 at 3-6 (citing discovery responses indicating the amount of water that the defendants provide to the Agua Caliente Reservation by the defendants and the percentage of that supply—100% in CVWD's case and 75-85% for DWA—that consists of groundwater).

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

180) ("[T]he Tribe has made a strong showing in support of its assertion that it will suffer irreparable harm if the case is stayed any longer … [and] has provided ample evidence of the water agencies' overdrafting of the aquifer and impairment of the Tribe's crucial water resource.").

In a supplemental brief filed with the Supreme Court after its Phase 2 dispositive motion, CVWD concedes that Agua Caliente "claims an immediate, ongoing injury from CVWD's continued withdrawal of groundwater from the aquifer" and explicitly disclaims any assertion that Agua Caliente lacks standing to enjoin CVWD's pumping of groundwater in violation of Agua Caliente's federal reserved right, yet it still disputes Agua Caliente's standing to quantify its water right. CVWD Supp. Br. at 3 (attached as Ex. B). This parsing of Agua Caliente's claim makes no sense. Quantification of the water right goes hand-in-glove with its declaration and is absolutely indispensable to the appropriate tailoring of the injunctive relief that CVWD concedes Agua Caliente has standing to seek. CVWD offers no explanation for why this Court would have jurisdiction to declare a right's existence but not the authority to quantify that right, nor does it suggest how the Court should go about enjoining interference with an unquantified, unknown right. *See, e.g.*, *Confederated Salish & Kootenai Tribes v. Clinch*, 992 P.2d 244, 249-50 (Mont. 1999) (enjoining the state from issuing groundwater use permits until tribal federal reserved rights were quantified because, absent quantification, it was impossible to ensure that the permitted water uses did not infringe the reserved rights). Unless CVWD concedes that the existence of *any* federal reservation of groundwater for Agua Caliente justifies the complete injunction of CVWD's groundwater pumping, its standing argument falls apart.[5] Agua Caliente has standing to seek quantification of its federal reserved water right in the same way and

---

[5] A mere injunction of overdraft without a concomitant quantification would not protect Agua Caliente's right or prevent the water districts from infringing it. For example, if Agua Caliente elected to store a portion of its reserved water in the aquifer to partially remediate the water districts' longstanding overdraft, CVWD's extraction of that water would not necessarily put the aquifer in further overdraft, but it would impermissibly interfere with Agua Caliente's use of its federal reserved right.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

for the same reasons that it had standing to seek a declaration of that right and will have standing to enjoin CVWD from interfering with it. These are three inextricably connected steps towards a remedy for the injury alleged by Agua Caliente.

CVWD's other standing arguments are even more easily dismissed. Its claim that this Court cannot redress Agua Caliente's injury in the absence of other overlying landowners is both improperly asserted and incorrect. It is improperly asserted because the parties have agreed that arguments regarding the necessity, *vel non*, of other defendants are reserved for Phase 3, and Rule 19 issues are not included in the three questions that this Court directed the parties to brief in Phase 2. *See* Stipulation to Trifurcate the Case ¶ 11 (Doc. 49); Doc. 193 at 1. It is incorrect because Agua Caliente alleges that the water districts are interfering with its rights and seeks to enjoin them, as the primary pumpers and rechargers of groundwater in the area, from doing so. This Court's entry of the requested declaratory and injunctive relief will redress the injuries asserted by Agua Caliente. And even if the Court eventually determines the presence of additional defendants is necessary, Agua Caliente (and the United States, as plaintiff-in-intervention) will have the option of joining those defendants at that time. The absence of additional defendants at this stage, when all Rule 19 issues have been deferred by agreement of the parties, in no way defeats Agua Caliente's standing.

CVWD's argument that Agua Caliente lacks prudential standing is weaker still. First, prudential standing arguments, unlike their constitutional counterparts, are subject to waiver. *See, e.g.*, *Pershing Park Villas Homeowners Ass'n v. United P. Ins. Co.*, 219 F.3d 895, 899 (9th Cir. 2000); *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 538 (9th Cir. 1994). CVWD has waived any challenge to Agua Caliente's prudential standing to litigate the declaration and quantification if its rights by failing to raise the issue during the previous four-plus years of litigation.

Beyond waiver, CVWD's argument that Agua Caliente's claim lacks prudential ripeness because the Tribe has not (1) adjudicated its state law water rights or (2) shown that it needs or plans to use groundwater is nonsense. Agua Caliente asserts a senior and

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

paramount federal water right that is not at all dependent on the existence or extent of the Tribe's state law water rights. *See Agua Caliente*, 849 F.3d at 1272; *see also United States v. New Mexico*, 438 U.S. 696, 702 (1978) (indicating that the United States can acquire and hold water rights under state law wholly apart from its federal reserved rights); *In re Water of Hallett Creek Stream Sys.*, 749 P.2d 324, 330 (Cal. 1988) (confirming that the United States could use state law water rights in addition to its federal reserved rights for a national forest). Agua Caliente need not quantify a junior, irrelevant state law right in order to pursue the quantification of its federal right, and CVWD cites no case to support its novel theory. In any case, as discussed above, the Agua Caliente Reservation's current use of and need for groundwater is well-established. Agua Caliente has both constitutional and prudential standing to seek a declaration and quantification of its federal reserved water right.

**B.    Agua Caliente has standing to litigate its pore space and water quality claims.**

The challenges to Agua Caliente's standing to litigate its water quality and pore space claims are similarly flawed and require little additional analysis. Like the Tribe's federal reserved water right claim, the pore space ownership claim asserts a paramount federal property interest and seeks to enjoin the water districts from using that property in any way that conflicts with the Tribe's rights. *See* Doc. 1. The water districts deny the existence of Agua Caliente's federal property right in pore space, asserting that the pore space is instead a publicly owned resource. *See* CVWD Ph. 2 Br. at 13; DWA Ph. 2 Br. at 1-2. By virtue of their recharge programs, which have recharged nearly 3 million AF of imported water into the aquifer since 1973, the water districts are easily the largest users of pore space in the Coachella Valley. *See* AC Resp. to CVWD SUF 42 (filed contemporaneously herewith). As such, there is a present, concrete dispute over the existence and extent of Agua Caliente's asserted federal property right, and Agua Caliente has standing to bring a claim for declaration of that right and eventually for its

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

quantification and protection. *See, e.g.*, *California*, 332 U.S. at 24-26; *Avista Corp*, 405 Fed. App'x at 226-27; *Utah*, 528 F.3d at 721.

DWA's claim that Agua Caliente has failed to allege a concrete injury to establish standing for its water quality claim is also erroneous. As this Court has recognized, Agua Caliente has not only alleged, but has presented "ample evidence of the water agencies' … impairment of the Tribe's crucial water resource … and the resulting continued degradation of such rights." Doc. 180 at 6. And because CVWD and DWA are far and away the predominant users of imported water for groundwater recharge, enjoining them from using untreated Colorado River water to further degrade and displace the native groundwater certainly will redress, or at least prevent the continued worsening of, Agua Caliente's injury. DWA is entitled to assert—in Phase 3—that it has not violated applicable water quality standards or caused any injury to Agua Caliente's water quality right. But it cannot credibly say that Agua Caliente has failed to assert an injury sufficient to establish standing for its water quality claim.[6]

## II.    The water districts' proposed quantification standards are inconsistent with binding precedent and would improperly limit Agua Caliente's federal reserved water right.

As set forth in Agua Caliente's principal Phase 2 brief and held by the Ninth Circuit, the quantification of a federal reserved water right is based on the purposes for which the United States established the reservation. *See* Doc. 203-1 at 6; *Agua Caliente*, 849 F.3d at 1269-70 (holding that water is reserved for purposes "directly associated with the reservation of land"). The United States established the Agua Caliente Reservation to serve as a permanent home where the Agua Caliente people could live and establish an agrarian society. *See* Doc. 203-1 at 6-8; *Agua Caliente*, 849 F.3d at 1270.  Accordingly, the Reservation's federal reserved water right should be quantified as the amount of water necessary (1) to irrigate all practicably irrigable land reserved

---

[6] CVWD has conceded that Agua Caliente asserts an immediate and ongoing injury in connection with its water quality claim. Ex. B at 2.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

for Agua Caliente and (2) to support the occupation and use of any reserved land that is not practicably irrigable. Federal courts repeatedly have held that the practicably irrigable acreage (PIA) standard is the correct way to quantify the agricultural water rights of a federal Indian reservation like Agua Caliente's, with the reservation of additional water recognized where necessary to accommodate additional, non-agricultural reservation purposes. *See* Doc. 203-1 at 8-14.

The water districts dispute the PIA standard's applicability, with each arguing for different—and mutually inconsistent—quantification standards that are not grounded in federal law. DWA argues for its version of a "homeland" standard that is, in essence, a much more restrictive version of the homeland standard adopted by the Supreme Court of Arizona in the Gila River adjudication. *See In re Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source,* 35 P.3d 68 (Ariz. 2001). CVWD has attempted to reinvent the wheel by fabricating an entirely new standard, one that combines aspects of the PIA standard with various limitations derived from state law and equitable doctrines. Neither standard is consistent with Supreme Court precedent or the law of this Circuit, and neither should be adopted by this Court.

### A.    PIA is the established federal standard for quantifying agriculture-based reserved rights, notwithstanding the water districts' criticisms.

Despite its firm foundation in Supreme Court and Ninth Circuit case law, both water districts urge this Court to reject the PIA standard. DWA concedes that PIA "generally applies in quantifying reserved rights for Indian reservations created primarily for agricultural purposes," but argues that the standard is "anachronistic" and inappropriate here because Agua Caliente does not use significant water for agricultural purposes. DWA Br. at 23-24. CVWD levels a similar criticism, arguing that (1) it makes little sense to quantify the Agua Caliente's right based on an agricultural standard when the Tribe has transitioned from farming to a modern "resort economy" and (2) the PIA standard fails to adequately consider junior, state law water rights. CVWD Br. at 16-17.

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

While it is true that Agua Caliente's current economy is not based predominantly on agriculture, controlling precedent mandates that PIA is still the appropriate standard for quantifying the amount of water reserved for agricultural purposes of a federal Indian reservation. It is well settled that water is reserved based on the purposes for which a reservation is established. *See Cappaert v. United States*, 426 U.S. 128, 145 (1976) ("[D]etermination of reserved water rights … derives from the federal purpose of the reservation."); *Walton*, 647 F.2d at 48 ("[T]he purposes for which the reservation was created govern[] the quantification of reserved water."); *see also Agua Caliente*, 849 F.3d at 1269 ("The federal purpose for which land was reserved is the driving force behind the reserved rights doctrine."); Report of Special Master Simon H. Rifkind, *Arizona v. California*, O.T. 1960, Orig. p. 266 (Dec. 5, 1960) (Rifkind).

Courts have recognized that water quantified based on the PIA standard might not and need not be used for agricultural pursuits, but that does not alter the standard for quantifying the right. *See Walton*, 647 F.2d at 47-49; Rifkind at 266. Indeed, the Ninth Circuit has explicitly held that water is quantified based on the purpose for which it was reserved even where "subsequent acts mak[e] the historically intended use of the water unnecessary." *Walton*, 647 F.2d at 48; *see also Adair*, 723 F.2d at 1415 n.24. In short, even if it were true, as the water districts assert, that other standards might dovetail more neatly with the present-day use of water on the Agua Caliente Reservation, the law simply does not require a nexus between a reservation's current water use and the standard used to quantify the reservation's federal reserved water right.[7] *See United States v. Washington*, 375 F. Supp. 2d 1050, 1065 (W.D. Wash. 2005), *vacated pursuant to settlement by* 2007 WL 4190400 (W.D. Wash. Nov. 20, 2007), ("[N]o federal court has ever found an impliedly reserved water right by looking

---

[7] As Master Rifkind explained, one of the benefits of the PIA standard is that it "preserve[s] the full extent of the water rights created by the United States and … establish[es] water rights of fixed magnitude and priority so as to provide certainty for both the United States and non-Indian users." Rifkind at 265. Under this standard, the current use of water at any given time may change, but the purpose of the Reservation is constant and provides a concrete basis for quantifying the federal reserved water right.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

first to the modern day activities of the Indian nation. … Although compelling in analysis and result, [the homeland standard] is contrary to Ninth Circuit precedent."). The United States established the Agua Caliente Reservation, in part, to encourage farming, and it reserved water for that purpose; looking to modern water use on the Reservation to quantify the amount of water reserved for that purpose is inherently a *non sequitur*. That is why the binding precedent of this Circuit provides that the use of the PIA standard to quantify the agriculture-based portion of a federal reserved right is "well settled." *Adair*, 723 F.2d at 1415; *see also Washington*, 375 F. Supp. 2d at 1065.

**B.    The quantification standards and "factors" proposed by the water districts would impose unlawful limitations on Agua Caliente's federal reserved right.**

Both water districts seek to impose numerous conditions and limitations on the quantification of Agua Caliente's federal reserved water right. Many of these conditions are not properly at issue in Phase 2, and none of them find support in federal law. Accordingly, even if the standard for quantification of the Reservation's right was an open question in this Circuit, those proposed by the water districts would still be inappropriate.

1.    *Pre-Reservation water rights are not before the Court and do not limit the scope or existence of Agua Caliente's federal reserved right.*

Before it even begins discussing its proposed quantification standard, CVWD seeks to limit the scope of Agua Caliente's right by arguing that any quantification must account for water rights that existed before the establishment of the Agua Caliente Reservation. Any such rights, to the extent that they even exist, go to the priority and use of Agua Caliente's federal reserved right rather than its existence, are incredibly fact-bound, and should be addressed in Phase 3, if at all.

Putative water rights that allegedly pre-existed the Agua Caliente Reservation have nothing to do with the quantification of Agua Caliente's federal reserved right. While federal reserved water rights are indeed "subordinate to pre-existing water

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

rights," CVWD Br. at 16, the potential existence of such rights does not limit the amount of water necessary to meet a reservation's needs.[8] The reserved right, in whatever quantity is necessary to meet the reservation's needs, is simply junior—subordinate, in CVWD's words—to any preexisting vested and perfected right. If an extant groundwater right senior to Agua Caliente's is someday quantified, Agua Caliente's right will be junior in priority to such a right, but not per se reduced by it.[9] *See, e.g.*, *Sierra Club v. Andrus*, 487 F. Supp. 443, 451 (D.D.C. 1980) ("Any prior appropriator, who perfected its rights according to applicable state law, holds rights senior to the federal right."). Stated differently, any pre-existing water rights may affect Agua Caliente's ability to use its full federal reserved right, but they do not affect the scope or existence of that right.[10]

Even if preexisting rights did limit the scope of federal reserved rights, the current existence of any right senior to Agua Caliente's is dubious and not presently before the Court. When the United States establishes a reservation, it impliedly reserves "previously unappropriated waters … necessary to accomplish the purposes for which the reservation was created." *Cappaert*, 426 U.S. at 139; *see United States v. New Mexico*, 438 U.S. 696, 698 (1978) (Congress retains the "authority to reserve unappropriated water … for use on appurtenant lands withdrawn from the public domain for specific federal purposes."). While the owners of other lands overlying the relevant sub-basins of the aquifer may have had an inchoate, unexercised, and unperfected right under state law to use groundwater prior to the establishment of the

---

[8] As discussed in Agua Caliente's principal brief and throughout the relevant case law, the needs of the reservation set the standard for determining the amount of water reserved. *See, e.g.*, *Walton*, 647 F.2d at 48 ("[T]he purposes for which the reservation was created govern[] the quantification of reserved water."); Rifkind at 266.

[9] If the water districts contend that they hold rights senior or equal in priority to Agua Caliente's federal reserved right, they are free to present evidence to that effect in response to Agua Caliente's Phase 3 claim for injunctive relief.

[10] DWA appears to agree with Agua Caliente on the relevance of any water rights associated with pre-Reservation railroad land grants. While it also refers to such rights in its brief, it concedes that they would "relate[] more to the priority than the quantity of the Tribe's reserved right …." DWA Br. at 30.

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

Agua Caliente Reservation, there is no evidence that they had actually done so.[11] The groundwater thus remained unappropriated and available for reservation by the United States. *See id.* Additionally, California law provides that overlying landowners' groundwater rights can be lost to prescription if unexercised for five years in an overdrafted basin. *See, e.g., City of Santa Maria v. Adam*, 211 Cal. App. 4th 266, 279, 299-300 (2012); *Hi-Desert Cnty. Water Dist. v. Blue Skies Country Club, Inc.*, 23 Cal. App. 4th 1723, 1732 (1994); 2 *Waters and Water Rights* 21-15 to -16 (Amy K. Kelley ed., 3d ed. 2017) (characterizing loss of a California state law overlying right to prescriptive users as "fairly easy"). Given the longstanding overdraft of the basin at issue here, it is probable that any overlying state law rights that might have been associated with pre-reservation land grants are long since lost—likely to the water districts as prescriptive groundwater pumpers in this unadjudicated basin.

Of course, these are extremely fact-intensive questions, and Agua Caliente makes no pretense of litigating them here, where the Court has limited its inquiry to the appropriate legal standard for quantifying the Reservation's federal reserved water right. The Tribe merely raises these points to underscore that any hypothetical *ex ante* limitation of Agua Caliente's federal reserved right based on the supposed existence of other rights that are not presently before the court is not a proper Phase 2 issue.

       2.     *Questions pertaining to safe yield are not properly before the Court.*

Both water districts contend that the quantification standard for Agua Caliente's reserved right must factor in the safe yield of the aquifer. Putting aside the irony of the defendants' sudden concern over "serious problems" raised by the "long-term overdraft of critically threatened groundwater aquifers," CVWD Br. at 15, and the risks of "depletion, or even destruction of the groundwater resource" if any overdraft is permitted, DWA Br. at 26, safe yield is not a part of the quantification standard that the Court is currently addressing. A federal reserved water right is quantified based on the

---

[11] In fact, CVWD has argued that pumping "meaningful amounts of groundwater … was *not even possible at that time*." CVWD Cert. Pet. 32 (emphasis in original).

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

amount of water necessary to accomplish the purposes of the reservation. *See Walton*, 647 F.2d at 48; Rifkind at 266; *see also Agua Caliente*, 849 F.3d at 1269. While practical considerations such as safe yield ultimately may affect the reservation's ability to access the full amount of water reserved for it, they do not factor into the quantification of the right.

The Ninth Circuit directly addressed this issue in *Colville Confederated Tribes v. Walton*, 752 F.2d 397 (9th Cir. 1985), where it reversed a district court ruling limiting the federal reserved water right for a tribal fishery based on the amount of available water. *Id.* at 404-05. Emphasizing that the quantification of a federal reserved water right is governed by the purposes of the reservation, the Ninth Circuit explicitly instructed the district court to quantify the right in the full amount necessary to sustain the tribal fishery. *Id.* at 405. If insufficient water existed to fully supply the tribe's fishery right and other rights with equal priority in a given year, then the rights of equal priority would share the available water pro rata. *Id.* Under *Walton*, safe yield and other questions of water availability relate only to the *use* of a federal reserved right, not its scope or existence. They are not part of the quantification standard.

> 3. *State law controls neither the existence nor the scope of Agua Caliente's federal reserved water right, and putative state law rights do not limit the federal right at issue here.*

Both water districts cite state water law and rights in support of their self-serving and unworkable proposed limitations on Agua Caliente's federal reserved right, as they have done throughout this litigation. They assert that the quantification standard must preemptively limit the Reservation's federal right based on the putative existence of both (1) state law overlying rights and (2) state decreed surface water rights. DWA Br. at 26-28; CVWD Br. at 20-21. The defendants' state law-based arguments are easily rejected; indeed, they already have been rejected by the Ninth Circuit.

"Federal water rights are not dependent upon state law or state procedures …." *Cappaert*, 426 U.S. at 145; *see also Agua Caliente*, 849 F.3d at 1272 ("[S]tate water

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

rights are preempted by federal reserved rights. … Thus, state water entitlements do not affect our analysis with respect to the creation of the Tribe's federally reserved water right."); *Adair*, 723 F.2d at 1411 n.19 (explaining that federal reserved water rights are "defined by federal, not state, law"). Federal reserved water rights are superior to state law water rights in many ways. *See* Doc. 97 at 11-13. Accordingly, no court has ever held that a federal reservation's reserved water rights are subject to obviation or reduction based on the alleged existence of additional water rights under state law.

The Ninth Circuit has already rejected the water districts' contention that water is reserved only where other sources of water are insufficient to meet a reservation's needs. *Agua Caliente*, 849 F.3d at 1269 & 1272. The panel explained that because federal reserved rights preempt state law rights, the existence of the latter does not affect the analysis of the former. *Id.* at 1272. The California Supreme Court has reached the same conclusion, holding that when the United States has a federal reserved water right to accomplish the primary purposes of a reservation, additional water available pursuant to state law can be used to accomplish the reservation's secondary purposes—not to reduce its federal reserved right. *See In re Water of Hallett Creek Stream Sys.*, 749 P.2d 324, 329 (Cal. 1988) (holding that the United States can, "*in addition to its sovereign prerogatives*, exercise the common law rights of an ordinary proprietor under state law" (emphasis added)); *see also New Mexico*, 438 U.S. at 702 (providing that the United States reserves water for the primary purposes of a reservation and then, to the extent that it seeks *additional* water, "would acquire water in the same manner as any other public or private appropriator" (emphasis added)).

The water districts' proposed limitation of the Reservation's federal reserved water right based on state law is practically unworkable in addition to being legally unsupported. The scope of Agua Caliente's putative state law correlative right to groundwater necessarily varies depending on other overlying landowners' use of the

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

resource.[12] *See, e.g.*, *Eric L. Garner, et al.*, *Institutional Reforms in California Groundwater Law*, 25 Pac. L.J. 1021, 1023-29 (2004) (explaining that the correlative rights doctrine limits all overlying landowners to a proportional share the aquifer's safe yield in an overdrafted basin). And the Tribe's state decreed surface water right is an unreliable paper right that provides an uncertain amount of water from season to season and year to year.[13] If the quantum of Agua Caliente's reserved right depended on the Tribe's ability to access water under its state law rights, this Court would need to retain jurisdiction to ascertain the amount of water available under state law each year and to annually reset the Reservation's federal reserved right accordingly. Unsurprisingly, no court has ever done this for a federal reserved right—a right that vests one time, at the establishment of the reservation, and is by law superior to other, subsequently established rights. *See* Rifkind at 265 (explaining that one benefit of the PIA standard is the establishment of "water rights of fixed magnitude and priority so as to provide certainty for both the United States and non-Indian users"); *see also Walton*, 647 F.2d at 48 (quantifying federal reserved rights in order to resolve—not perpetuate—the problems caused by "open-ended water rights").

There simply is no basis in law or logic to contend that potential access to water under state law dispossesses an Indian tribe of a superior federal reserved water right or limits that right. That remains so regardless of how often the water districts reassert this argument in hopes for a different outcome.

---

[12] As noted *supra*, even the existence of the state law overlying rights asserted by the water districts is uncertain.

[13] The Ninth Circuit noted it that "surface water is virtually nonexistent in the valley for the majority of the year," *Agua Caliente*, 849 F.3d at 1266, and CVWD asserts in its Statement of Undisputed Facts that the runoff of the Whitewater River—"the Valley's only significant source of surface water"—"measured only 31% of the long-term average of 12,000 af" per year in 2016. Doc. 200-1 ¶¶ 12-14.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

17

4.    *Equitable considerations such as "sensitivity" to junior right holders and off-reservation water users are not part of the quantification standard.*

Both water districts erroneously contend that the legal standard for quantifying Agua Caliente's federal reserved water right requires consideration of junior, state law rights and competing, off-reservation water uses. DWA Br. at 31-32; CVWD Br. at 16-20. In support of this supposed "sensitivity" requirement—which amounts to balancing of the equities under another name—both water districts quote Justice Powell's *dissenting* opinion in *New Mexico*. *See* DWA Br. at 3132; CVWD Br. at 16. Of course, dissenting opinions are not binding precedent on this Court.

Actual, binding precedent forecloses modification or abandonment of the PIA standard based on equitable considerations such as the "sensitivity" considerations urged by the defendants. The Supreme Court has spoken directly to this issue, holding that "balancing the equities is not the test" for determining federal reserved water rights. *Cappaert*, 426 U.S. at 139 n.4. The Ninth Circuit has done likewise, holding that "[w]here reserved rights are properly implied, they arise without regard to equities that may favor competing water users." *Walton*, 752 F.2d at 405 (citing *Cappert*, 426 U.S. at 138-39). And this Court, in *this case*, has expressly rejected the assertion that equities allegedly favoring competing water users are relevant to the determination of a federal reserved water right. *See* Doc. 150 at 6 (citing *Cappaert* and *Walton*). While it is true that recognition of a federal reserved water right potentially can result in a "gallon-for-gallon reduction in the amount of water available" for other, non-reservation uses, that concern is addressed through the reserved rights doctrine's limiting the quantity of water reserved to the amount necessary to accomplish the purposes of the reservation in question. *New Mexico*, 438 U.S. at 705; *see id.* at 700-01 (indicating that the requisite "careful examination" is accomplished through this limitation). The law does not impose—indeed, it explicitly rejects—any additional limitation of a federal reserved right based on equitable considerations or "sensitivity" to junior right holders.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

18

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

5.    *The PIA standard was devised to meet the minimal need of a federal reservation's agricultural purpose.*

Both water districts assert that the Court must incorporate into the quantification standard a limitation that ensures the Reservation does not receive "an overabundance of water." CVWD Br. at 18; *see also* DWA Br. at 32. It is true that the quantification of a federal reserved right must be tailored to provide the amount of water necessary to accomplish the purposes of the reservation in question and no more. *See, e.g.*, *New Mexico*, 438 U.S. at 700 (noting that the Supreme Court has incorporated that limitation "each time" it has applied the reserved rights doctrine); *Cappaert*, 426 U.S. at 141 (reciting the same limitation); *Adair*, 723 F.2d at 1409 & 1416 (restating the limitation and then applying the PIA standard). That requirement is not an additional stricture on the PIA standard or an additional factor to be considered when PIA is assessed, however. Rather, it is inherently a part of the PIA standard. Stated differently, it is settled law that application of the PIA standard to quantify a federal reserved right for agricultural purposes provides the amount of water needed for that purpose and no more.

This conclusion is obvious from even a cursory review of Master Rifkind's report, which was adopted in relevant part by the Supreme Court in *Arizona*. Master Rifkind considered and rejected various quantification standards and methodologies en route to concluding that PIA offers the only workable way to ensure enough water to meet the current and future needs of a federal Indian reservation's agricultural purpose. *See* Rifkind at 260-66. Non-Indian parties, notably including the State of Arizona, objected to the PIA standard on the grounds that it afforded too much water to Indian reservations. *See Arizona*, 373 U.S. at 600-01. The Supreme Court disagreed, explicitly affirming Master Rifkind's PIA standard as "the only feasible and fair way by which reserved water for the reservations can be measured." *a* at 601. Fifteen years later, the Supreme Court cited *Arizona* as an example of its efforts to ensure that federal reserved rights are quantified only in "that amount of water necessary to fulfill the purpose of

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

the reservation, no more." *New Mexico*, 438 U.S. at 700. The Supreme Court having twice affirmed PIA as a way of ensuring that federal reserved rights are quantified in the appropriate amount, the water districts' cannot credibly argue that some additional limitation should be imposed on the standard to avoid giving an Indian reservation "too much water."

Despite the controlling precedent of *Arizona* and *New Mexico*, CVWD argues that "there is good reason to believe" that the Supreme Court might modify the PIA standard if given the opportunity to do so. CVWD Br. at 18. In support of this argument, CVWD cites an unpublished draft opinion prepared by former Supreme Court Justice O'Connor prior to her recusal in a case involving quantification of water rights in Wyoming's Big Horn River system. *See id.* at 18-19. In essence, CVWD argues that an unadopted draft opinion prepared by a later recused and now-retired Justice nearly thirty years ago indicates how the Supreme Court would rule today and authorizes this Court to ignore the rule of *Arizona*. Of course, Justice O'Connor's draft opinion does neither of those things. *Arizona* held that the PIA standard is appropriately tailored to meet the agricultural water needs of a federal Indian reservation with that purpose, and it remains the law of the land. Any assertion that it provides an "overabundance" of water can be rejected out of hand.

> 6.    *The additional "factors" that DWA would graft into the quantification standard are irrelevant and improper.*

DWA identifies a handful of additional factors that it believes this Court must consider in adopting a quantification standard. These include (1) the size of Agua Caliente's membership; (2) that Agua Caliente does not currently pump a substantial amount of groundwater; (3) that the Tribe's lands are interspersed with non-reservation lands such that recognition of the Reservation's federal reserved right to groundwater will affect adjacent, non-Indian water users; (4) that a portion of the Agua Caliente Reservation is owned in fee by non-Indians; and (5) that the majority of the Reservation is allotted and many allottees lease their lands to non-Indians for commercial or

KILPATRICK TOWNSEND & STOCKTON
607 14ᵗʰ STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

residential use. *See* DWA Br. at 25-26, 28-30, & 32. None of these assertions are relevant to the legal question before the Court—*i.e.*, the proper legal standard for quantifying the Agua Caliente Reservation's federal reserved water right.

DWA's shotgun assertions require only brief responses:

(1) The PIA standard is based on the amount of irrigable land reserved, and tribal membership is irrelevant. The Supreme Court explicitly rejected such a limitation in *Arizona*, explaining that "[h]ow many Indians there will be and what their future needs will be can only be guessed" and holding that "the only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage." 373 U.S. at 601. This makes sense, as it is reasonable to conclude that the United States reserved the amount of land that it found necessary to provide a viable, permanent agrarian home for the Agua Caliente people.

(2) The Ninth Circuit, relying on well-established precedent, has already determined that Agua Caliente's current or historic pumping of groundwater does not affect its federal reserved right. *Agua Caliente*, 849 F.3d at 1272 (rejecting the water districts' assertion that the Tribe's alleged lack of groundwater production obviates its federal reserved right); *see also Adair*, 723 F.2d at 1416 (federal reserved rights exist regardless of whether they are fully used); *Walton*, 647 F.2d at 51 (federal reserved water rights are not lost by non-use). Moreover, it is undisputed as a factual matter that the Agua Caliente Reservation is currently using in excess of 10,000 AF of groundwater a year.

(3) The potential effects of a federal reserved right on the holders of junior water rights are irrelevant to the existence and quantification of the reserved right. *See, e.g.*, *Cappaert*, 426 U.S. at 139 n.4; *Walton*, 752 F.2d at 405 ("Where reserved rights are properly implied, they arise without regard to equities that may favor competing water users."); Doc. 150 at 6 ("[T]his Court will follow binding Ninth Circuit and Supreme Court precedent and find that the equitable doctrine of balancing of the equities is not applicable in this case." (citing *Cappaert* and *Walton*)).

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

21

(4) The existence of fee-owned and allotted lands within the Reservation is irrelevant to the quantification standard; the reserved right is quantified based on the purpose of the reservation, with individual allottees and even non-Indian fee landowners potentially entitled to a prorated share of the reserved right—based on a fact-intensive inquiry to be taken up in Phase 3, if at all. *See Walton*, 752 F.2d at 400-05.

(5) Current land use by allottees within the Reservation is likewise irrelevant; the reserved right is quantified based on the purposes of a reservation and can be used for any lawful purpose. *Walton*, 647 F.2d at 48-49; Rifkind at 265-66. DWA's additional factors are inconsistent with settled law and irrelevant to this Court's delineation of the legal standard for quantifying Agua Caliente's federal reserved water right.

### 7. *CVWD's proposal to effectively conduct two quantification analyses is unprecedented and unreasonable.*

CVWD's "modified-PIA" approach, in addition to the flaws identified above, needlessly adds additional complexity and cost to an already complex inquiry by effectively requiring two quantifications analyses. As CVWD explains it, its standard would first require a full PIA analysis to "determin[e] what Reservation acreage is practicably irrigable" and then a second, homeland-style analysis to assess what practicably irrigable land is "likely to be developed for *some* economically viable purpose." CVWD Br. at 19 (emphasis in original). CVWD attempts to justify this concocted, unreasonable standard as one that takes into account the original, agrarian purpose of the Agua Caliente Reservation while also taking into account the realities of its modern land use. In reality, it is a thinly veiled attempt to give CVWD two opportunities to limit Agua Caliente's federal reserved right.

The Supreme Court and the Ninth Circuit, as explained *supra*, both have held that water is reserved at the time of a reservation's establishment in the amount necessary to accomplish the purposes of the reservation and that the purpose of the reservation governs the quantification of the federal reserved right but not its use. *See Arizona*, 373 U.S. at 600-01; *Walton*, 647 F.2d at 47-49; Rifkind at 266. Those holdings call for

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

application of the PIA standard—with no further limitations or restrictions—to quantify the water reserved to accomplish the agrarian purpose of the Agua Caliente Reservation. *See, e.g.*, *Adair*, 723 F.2d at 1415-16. That is the law of this Circuit.

Alternatively, the Arizona Supreme Court has expressed misgivings about PIA, holding that reserved water rights should instead be quantified based on likely, economically viable uses of water on the reservation assessed as of the time of quantification—a homeland standard. *Gila River,* 35 P.3d at 77-81. The homeland standard hinges on whether a proposed use of water is "reasonably feasible." *Id.* at 81. It would not consider irrigability, for example, unless the proposed use for which a water right was to be quantified included an irrigation project. The *Gila River* homeland standard is not tied to the original purposes of the reservation, is not the law of this Circuit and has never, to Agua Caliente's knowledge, been adopted or applied by any federal court.[14] *See, e.g.*, *Washington*, 375 F. Supp. 2d at 1065 (rejecting *Gila River* as inconsistent with federal law).

While the Supreme Court and Ninth Circuit have adopted the PIA standard and the Arizona Supreme Court has applied a version of the homeland test, no court has ever held that it is necessary or appropriate to conduct a full PIA analysis to identify practicably irrigable lands, then conduct an additional homeland analysis to ascertain and quantify a water right based on economically viable, non-agricultural uses of only those lands identified as practicably irrigable. More to the point, the idea is unreasonable on its face. If PIA is the standard for quantifying the right, as it is in this Circuit where, as here, water was reserved for an agricultural purpose, then the current and future use of the water is irrelevant. *See Walton*, 647 F.2d at 48 ("[T]he purposes for which the reservation was created govern[] the quantification of reserved water, but not the use of such water."); Rifkind at 266. Conversely, if the right is to be quantified based on the amount of water needed for likely, economically viable, non-agricultural land uses,

---

[14] This also undermines DWA's proposed homeland standard, which is just a more restrictive and limited version of the standard adopted by the Arizona Supreme Court.

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

there is no logical reason to limit the water right to practicably irrigable acres or even to assess irrigability in the first instance. CVWD essentially asks this Court to reject the settled federal PIA standard except to the extent that it could be used to impose an additional, illogical and unworkable limitation on a homeland standard. The Court should not adopt this novel, ill-conceived approach.

## III.    Federal reserved water rights include a water quality component.

Settled legal principles, case law, and the rationale of *Winters* all indicate that water must be of a certain quality to meet the purposes of the reservation. In fact, DWA concedes that courts "*have held that Indian tribes have rights to water of a certain quality* … where lack of water quality was impairing the reservation purposes." DWA Br. at 19 (emphasis added).[15] With little authority to counter Agua Caliente's water quality claim, the water districts resurrect their previously rejected, Phase 1 argument that California law should supplant Agua Caliente's federal *Winters* rights. DWA Br. at 21; CVWD at 28. This argument has no more merit now than it did in Phase 1. Relying on well-settled Supreme Court precedent, the Ninth Circuit has uniformly applied federal law to protect water quality attendant to a federal reserved water right without reference to state law. Those decisions definitively establish the existence of a water quality component to Agua Caliente's reserved water right.

### A.    Federal law governs federal reserved water rights.

It is settled that federal law governs federal water rights, including the narrow Phase 2 question of whether *Winters* rights have a water quality component. In *New Mexico*, the Supreme Court explained that federal reserved water rights are an "*exception* to Congress' explicit deference to state water law in other areas." 438 U.S. at 715 (emphasis added). In *Cappaert* and *Arizona*, the Supreme Court rejected the application of state law principles to federal water rights, holding instead that federal

---

[15] Both defendants appear to agree that Agua Caliente has a right to protect the quality of its groundwater, but they contend that California law is the exclusive source of that right. CVWD Br. at 29-33; DWA Br. at 21. The parties' disagreement is thus quite narrow.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

law governs such rights. *Cappaert*, 426 U.S. at 145 ("[D]etermination of reserved water rights is not governed by state law but derives from the federal purpose of the reservation."); *Arizona*, 373 U.S. at 597 (rejecting the application of state law principles to tribal water rights because "the Indian claims here are governed by the statutes and Executive Orders establishing the reservations"). Even the recently-enacted California Sustainable Groundwater Management Act recognizes this principle, providing that "in the management of a groundwater basin or subbasin by a groundwater sustainability agency or by the board, federally reserved rights to groundwater shall be respected in full. In case of conflict between federal and state law … federal law shall prevail." Cal. Water Code § 10720.3 This Court relied upon Supreme Court precedent and the California Legislature's acknowledgement of the primacy of federal law in Phase 1 when rejecting arguments nearly identical arguments to those now being advanced by the water districts. Doc. 115 at 9 ("It is neither novel nor controversial that *Winters* rights derive from federal law, and thus displace state law when in conflict.") And the Ninth Circuit explicitly affirmed,  holding that federal reserved rights preempt conflicting state law. *Agua Caliente*, 849 F.3d at 1272 .

In the face of these definitive rulings, CVWD cites *United States v. Kimbell Foods*, 440 U.S. 715 (1979), and asks this Court to borrow state law as the federal rule of decision. CVWD Br. at 31. A similar argument was raised—and rejected by the Arizona Supreme Court—in the *Gila River* litigation. There, state parties argued that state law should provide the rule of decision for the Gila River Indian Community's claimed federal reserved right groundwater. Acknowledging that "the Supreme Court has defined the reserved rights doctrine as an exception to Congress's deference to state water law," the Arizona Court held that adoption of state law under a *Kimbell Foods* analysis would be improper. *In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 989 P.2d 739, 747-48 (Ariz. 1999).

The water districts' argument is further undermined by the Supreme Court's rule that state law should not be chosen as the federal rule where "[t]he duties imposed upon

the United States and the rights acquired by it" in a particular area of law "find their roots in the same federal sources." *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943); *see also United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 594 (1973) (denying application of Louisiana law in quiet title action involving federal land where application of state law would impair federal statutory program). Indeed, federal law is most applicable when "necessary to protect uniquely federal interests," including federal proprietary interests. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964); *Little Lake Misere*, 412 U.S. at 580, 595-97; Erwin Chemerinsky, FEDERAL JURISDICTION (6th ed. 2012) at 384, 388-91. The United States' "*sovereign* rights" in holding reserved water rights on behalf of Agua Caliente and its solemn trust responsibility to protect those rights counsels strongly against deference to state law in this context. *See* Dkt. 150 at 8 ("[T]he Government's federal property rights in holding the land in trust for an Indian tribe stems from its sovereign capacity, rather than proprietary interests." (emphasis added) (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 178 (2011))).

### B.    A choice of law inquiry under *Kimbell Foods* is inappropriate where a federal rule has already been adopted in a prior case.

A *Kimbell Foods* analysis is unnecessary and improper where, as here, a federal rule of decision already exists. For example, in *United States v. Kennedy*, the Third Circuit reversed a district court's application of state law to a conversion claim and rejected the *Kimbell Foods* analysis *en toto*. 738 F.2d 584, 586 n. 3 (3d Cir. 1984). Because a federal rule had already been adopted in a prior case, the court "was not acting in the absence of an existing federal rule" and therefore was "not at liberty to adopt state law as the measure of the federal rule." *Id.*; *see also Cent. Pines Land Co. v. United States*, 274 F.3d 881, 892 (5th Cir. 2001) (borrowing state law as federal rule of decision is inappropriate in cases involving strong federal interests of owners of mineral servitude on federal land).

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

As relevant to this case, the Ninth Circuit and district courts therein, including cases cited by DWA, have already applied federal law to protect water quality attendant to federally reserved water rights, and they have done so without regard to state law principles. In *Walton*, the Ninth Circuit found the "the right to water to establish and maintain the Omak Lake Fishery includes the right to sufficient water to permit natural spawning of the trout." 647 F.2d at 48. In *United States v. Anderson*, the court held that "under the *Winters* doctrine the Tribe has the reserved right to sufficient water to preserve fishing in the Chamokane Creek" and that the right included sufficient water to maintain water temperature, not just water flow, in the Creek in order to preserve fish habitat. 591 F. Supp. 1, 5 (E.D. Wash. 1982), *aff'd in part, rev'd in part*, 736 F.2d 1358 (9th Cir. 1984). And in *United States v. Gila Valley Irrigation District*, the court granted injunctive to relief in order to protect two tribes' agricultural water against upstream irrigators' contributions of salt to the water and to "restore the Apache Tribe water of sufficient quality to sustain commercial production of … crops." 920 F. Supp. 1444, 1453, 1455 (D. Ariz. 1996); *see also Hopi Tribe v. United States*, 782 F.3d 662, 669 (Fed. Cir. 2015) ("[I]n some circumstances, [the *Winters* right] may also give the United States the power to enjoin others from practices that reduce the quality of water feeding the reservation.") .

These decisions demonstrate judicial recognition of the inextricable bond between water quantity and water quality. Felix S. Cohen et al., *Cohen's Handbook of Federal Indian Law* § 19.03[9], at 1236 (Nell Jessup Newton ed., 2012) (*Cohen*) ("[I]t is difficult to draw a meaningful distinction between quantity and quality for the purposes of the *Winters* doctrine."). They further establish that whether federal reserved water rights include a water quality component is not a question of first impression. Because courts have already uniformly applied federal law to include quality aspects in federal reserved water rights, adoption of state law is inappropriate.

It is noteworthy that cases protecting water quality under the reserved rights doctrine conceivably could have borrowed water quality standards under state law or

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

the federal Clean Water Act to control water quality issues raised in those cases, *but they did not*. Instead these courts ordered the parties to maintain the water quality so as not to defeat the purpose of the reservation. *See Walton*, 647 F.2d at 48; *Anderson*, 591 F. Supp. at 5; *Gila Valley*, 920 F. Supp. at 1453, 1455. This rebuts CVWD's summary assertion that this Court need not recognize a water quality component to Agua Caliente's reserved water right because water quality is already regulated under the Clean Water Act, under multi-state management of the Colorado River, and under California's Porter-Cologne Quality Control Act.[16] CVWD Br. at 29. Whatever protection these laws might provide to the quality of Agua Caliente's reserved water is in addition to, rather than in lieu of, the federal reserved right's assurance of water that is, at a minimum, of sufficient quality to accomplish the purposes of the reservation.

## C.    Application of California nuisance law would frustrate and impair the United States' sovereign interest in its reserved water right.

Even if a *Kimbell Foods* analysis were appropriate, this Court still should not adopt state law because doing so would frustrate or impair federal interests. *Kimbell Foods*, 440 U.S. at 728-729 (identifying federal interests as a key consideration in deciding whether to borrow from state law). The water districts propose California nuisance law as the remedy for the degradation of Coachella Valley groundwater— including that reserved for the Agua Caliente Reservation.[17] A nuisance is generally defined under California law as a "substantial and unreasonable invasion of one's interest in the free use and enjoyment of one's property." *Lussier v. San Lorenzo Valley Water Dist.*, 206 Cal. App. 3d 92, 100, 253 Cal. Rptr. 470, 473 (Ct. App. 1988). This state law significantly conflicts with federal law and interests for at least three reasons.

---

[16] Moreover, the United States does not regulate groundwater under the Clean Water Act, 33 U.S. § 1251. *See* 80 Fed. Reg. 37054, 37099 (June 29, 2015).

[17] Notably, CVWD would limit Agua Caliente's remedies to nuisance alone. As DWA acknowledges, however, "a water user has the right to obtain injunctive relief and damages against any person who causes harm to the user's water rights." DWA Br. at 21.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

First, for a nuisance to constitute an actionable "unreasonable invasion," "the gravity of the harm outweighs the social utility of the defendant's conduct." *San Diego Gas & Electric Co. v. Superior Court*, 13 Cal. 4th 893, 55 Cal. Rptr. 2d 724, 920 P.2d 669 (1996); 47 Cal. Jur. 3d Nuisances § 8 (collecting cases). Applying nuisance law to Agua Caliente's water quality claim would thus insert a balancing of the equities test despite the Supreme Court's explicit rejection of such a test in the context of federal reserved water rights. *See, e.g.*, *Cappaert*, 426 U.S. at 139 n.4 (1976) ("[B]alancing of the equities is not the test…."); *Winters*, 207 U.S. at 577 (rejecting the consideration of the utility of upstream non-Indian irrigation on the Milk River); Dkt. 150 at 6 (holding that "the equitable doctrine of balancing of the equities is not applicable in this case").[18]

Second, California law offers unclean hands as a defense to a nuisance claim. *See Pon v. Wittman*, 81 P. 984, 988 (Cal. 1905). This Court has already specifically repudiated the water districts' unclean hands defense, explaining that reserved water rights are not governed by state law, but instead are derived from the federal purpose of the reservation. Dkt. 150 at 7-9.

Third, California nuisance law provides a "lawful purpose" defense whereby defendants may avoid liability if they use their land for a lawful purpose and exercise ordinary care. *Haehlen v. Wilson*, 54 P.2d 62, 64 (Cal. App. 1936). This defense is directly contrary to *Winters* and its progeny. The putative lawfulness of conduct by off-reservation water users in *Winters*, *Cappaert*, and *Gila Valley* did not prevent the courts in those cases from enjoining the infringement of federal reserved water rights. Consideration of the lawfulness of the water districts' pumping as a possible defense to Agua Caliente's claim thus conflicts with the federal reserved water rights doctrine.

Given the defenses available under California nuisance law, applying that law to any aspect of a federal reserved water right would necessarily diminish and weaken that

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

---

[18] For the same reason and based on the same authority, any disruption to existing relationships is irrelevant because federal reserved water law rejects consideration, much less comparison of the utility of competing water users regardless of their "importance." CVWD Br. at 32 (citing *Wilson v. Omaha Indian Tribe*, 442 U.S. at 674).

right and interfere with the federal government's overriding interest in preserving its sovereign property interest therein. *Winters* does not countenance such casual defeat of these federal interests. *Winters*, 207 U.S. at 577 ("It would be extreme [*sic*] to believe that within a year Congress destroyed the reservation and … took from them the means of continuing their old habits, yet did not leave them the power to change to new ones."). The adoption of state law therefore would be improper even under a *Kimbell Foods* analysis.

## IV.    Agua Caliente has an ownership interest in pore space under federal law.

Based on the water districts' arguments, the need to further clarify the nature of Agua Caliente's pore space ownership claim is apparent. Agua Caliente recognizes the hydrologic reality that water flows through subterranean pore space without regard to surface property boundaries. It does not claim an unqualified right to exclude water introduced into the aquifer by the water districts from moving, by natural means, into pore space directly underlying the Reservation. Nor does it seek any monetary compensation from the water districts in this lawsuit. Rather, Agua Caliente seeks a declaration that it has a federal property right in a certain amount of pore space—the amount underlying its Reservation—and, in Phase 3, an injunction preventing the water districts from interfering with that federal property right. Examples of the types of interference that Agua Caliente would seek to enjoin include any conduct that: (1) limits Agua Caliente's ability to fully use its pore space to store and recover its own water or water that the Tribe might store for others pursuant to commercial groundwater banking agreements; or (2) decreases or damages the pore space, such as overdrafting of the aquifer to the point of causing land subsidence (*see* SUF ¶ 6) or the introduction of pollutants and contaminants that adversely affect the Tribe's ability to use or market its resource. Whether such conduct is taking place now is a fact-intensive, Phase 3 issue, as is the precise tailoring of any necessary injunctive relief, including how to properly account for the fungibility of pore space resources and the unavoidable migration of stored water. Assuming, for the reasons set forth above, that Agua Caliente has standing

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

30

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

to litigate its claimed federal property right to pore space, the only question currently before this Court is whether that right exists.

Under governing federal law, the reservation of land for an Indian tribe necessarily includes pore space within that land. *See* Doc. 203-1 at 19-20. And, contrary to the water districts' assertions, there can be no question that federal law controls this issue. The United States established the Agua Caliente Reservation by reserving lands from the public domain, and it presently holds the relevant lands in trust for the benefit of Agua Caliente and its members. *See Agua Caliente*, 849 F.3d at 1265. "In these circumstances, where the Government has never parted with title and its interest in the property continues, the Indians' right to the property depends on federal law, wholly apart from the application of state law principles …." *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 671 (U.S. 1979) (internal quotation omitted). Of course, as the water districts point out, *Wilson* went on to hold that even where federal law controls, it may be appropriate, under certain circumstances, to adopt state law as the federal rule of decision. *See id.* at 672 (citing *Kimbell Foods*, 440 U.S. at 727-28). Those circumstances do not exist here, however, where there is an established federal rule of decision and state law is unsettled and potentially in conflict with federal interests.

## A.    The Court cannot adopt state law because there is an existing federal rule of decision.

As discussed *supra*, *Kimbell Foods* allows the adoption of state law as the federal rule of decision only where no federal rule exists. *See Kennedy*, 738 F.2d at 586 n.3. Here, a federal rule is already in place: reservations of land for Indian tribes include every "constituent element[] of the land." *United States v. Shoshone Tribe of the Wind River Reservation in Wyoming*, 304 U.S. 111, 116 (1938). As explained in Agua Caliente's principal Phase 2 brief, subterranean pore space is a constituent element of the land, so existing federal law provides that it is part of the estate reserved for Agua Caliente. *See* Doc. 203-1 at 19-20.

1    The water districts offer several unpersuasive arguments for why the clear rule
2    of *Shoshone* should not apply to pore space. They contend, *inter alia*, that *Shoshone*
3    applies only to minerals and does not extend to water, CVWD Br. at 26-27 & DWA Br.
4    at 13-15, that federal reserved rights do not include storage space because water rights
5    are usufructory, DWA Br. at 3, and that *Shoshone* is inapposite because it involved
6    treaty rights, *id.* at 15-16. These contentions are easily refuted.

7    While it is true that *Shoshone* refers to constituent elements of the land rather
8    than to water and that water rights are generally usufructory, neither fact has any
9    relevance to Agua Caliente's pore space claim, which involves a property right in land,
10   not water.[19] If the pore space claim were part and parcel of Agua Caliente's federal
11   reserved water right, then there would be no question that federal law controlled and
12   displaced state law. *See supra* at 15-16 (citing numerous cases affirming that federal
13   law governs federal reserved water rights and does not defer to state law). Because Agua
14   Caliente's pore space claim involves a property interest in land—the very land that
15   constitutes the Tribe's Reservation—it makes no difference whether *Shoshone* extends
16   to water or that water rights are usufructory. Similarly, the fact that *Shoshone* involved
17   treaty rights is irrelevant because it is firmly settled that treaty reservations and
18   executive order reservations like Agua Caliente's enjoy equal status under federal law.
19   *See, e.g.*, *Arizona*, 373 U.S. at 598 ("We can give but short shrift at this late date to the
20   argument that reservations of land or water are invalid because they were originally set
21   apart by the Executive."); *Parravano v. Babbitt*, 70 F.3d 539, 545 (9th Cir. 1995) ("We
22   have long held that when it comes to protecting tribal rights against non-federal
23   interests, it makes no difference whether those rights derive from treaty, statute or
24   executive order …." (citing several cases)). The water districts' efforts to distinguish
25   *Shoshone* are unavailing, and this Court should follow the established federal rule by

26
27
28

---

[19] DWA explicitly acknowledges this fact, DWA Br. at 2, yet still argues as though the pore space claim were a water claim.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

holding that Agua Caliente beneficially owns the pore space that is a constituent element of its reservation.

Agua Caliente's beneficial ownership of pore space draws further support from the settled rule that the United States cannot be divested of a property interest without express congressional approval. *See, e.g.*, *Utah Power & Light Co. v. United States*, 243 U.S. 389, 404 (1917) ("[T]he power of Congress is exclusive, and … only through its exercise in some form can rights in lands belonging to the United States be acquired."); *see also California*, 332 U.S. at 39-40. It is likewise settled, as a matter of federal statutory law, that any putative transfer of a property interest in Indian lands held in trust by the Unites States is invalid absent congressional authorization. *See* 25 U.S.C. § 177; *Cohen* § 15.06[5]. The water districts identify no congressional authorization for a transfer of the property interest in the pore space underlying the Agua Caliente Reservation from the United States to the general public.[20] Such a transfer cannot be effectuated by state law or state judicial decisions—the only authority cited by the water districts for the putative public ownership of the resource. *See* CVWD Br. at 22; DWA Br. at 4-5. Yet that is precisely what would result from applying state law to recognize public ownership of the pore space underlying the Agua Caliente Reservation. Existing federal law bars this result, and thus bars the adoption of state law to decide this claim.

## B. Even if no federal rule existed, the Court should not adopt state law.

Assuming, counterfactually, that there was no extant federal rule of decision, adoption of state law would still be inappropriate here. When considering the adoption of state law, *Kimbell Foods* instructs courts to consider (1) the need for a nationally uniform body of law; (2) whether application of state law would frustrate federal objectives; and (3) the extent to which application of a federal rule would disrupt commercial relationships based on state law. *Kimbell Foods*, 440 U.S. at 728-29.

---

[20] As noted *supra*, the United States established the Agua Caliente Reservation by reserving lands from the public domain. Federal title to the land constituting the Reservation is thus unbroken, and any interest therein necessarily resides in the United States, in trust for the Tribe, absent a valid conveyance.

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

There is unquestionably a need for uniformity in determining the scope of federal property rights in land held in trust by the United States for Indians, particularly where, as here, state law would result in dispossession of a federal property right. When the proprietary interests of the federal government are at stake, "the most relevant consideration is the gravity of the federal interest which the Ninth Circuit has found in a similar circumstance, necessitates the application of federal law." *Yunis v. United States*, 118 F. Supp. 2d 1024, 1034 (C.D. Cal. 2000) (citing *United States v. Lewis Cnty.*, 175 F.3d 671, 677 (9th Cir. 1999), *cert. denied* 528 U.S. 1018 (1999)). This is not a case like *Wilson*, where gradual shifting of the course of a river marking a reservation's boundary created a dispute over whether certain property was within the reservation. *See Wilson*, 442 U.S. at 658-59. Here, the United States unquestionably holds title to the pore space containing land in trust for the benefit of Agua Caliente and its members, it has always held title to the land, and the water districts ask this Court to adopt state law to strip the United States of an element of its property right. Nor is the state law here neutral, as in *Wilson*, such that in some cases it will operate to the benefit of the United States/Indian tribes and other times to their detriment. *See id.* at 673 ("On some occasions, Indian tribes may lose some land because of the application of a particular state rule of accretion and avulsion, but it is as likely on other occasions that the tribe will stand to gain."). Here, state law rules can never add to federal property rights; the only change that they could affect is the diminution of a sovereign federal property right in reserved lands. The United States has a compelling interest in uniformity of its property rights as well as in maintaining its full property interests free of one-sided interference from or diminution by state law.

The water districts contend, erroneously, that the federal need for uniformity is irrelevant here because state law is completely uniform in holding that pore space is a public resource in which overlying landowners have no property rights. CVWD Br. at 21-24; DWA Br. at 4-10. This is not true even in California. One decision of the California Court of Appeals, heavily relied upon by both water districts, holds that a

34

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

state constitutional amendment and statutes declaring that state water resources must be available for all of the state's residents and developed for the public benefit also apply to pore space. *See Cent. & W. Basin Water Replenishment Dist. v. S. Cal. Water Co.*, 109 Cal. App. 4th 891, 904-05 (2003) (*C&W Basin*). Because of its reliance on state water law, the relevance of this holding is dubious—it is well settled that state water law does not control federal reserved rights, and Agua Caliente claims pore space as an interest in land, not as derivative of its water right. But even if *C&W Basin* is presumed relevant, another, more recent California appellate decision holds that a landowner has an actionable claim against a defendant who allows contaminated water to infiltrate the groundwater pore space under the owner's land. *Starrh & Starrh Cotton Growers v. Area Energy, LLC*, 153 Cal. App. 4th 583, 592 (2007) (holding that allowing contaminated water to migrate into the "groundwater porespace[] of another without that landowner's consent is a trespass under California law"). The notion that California law views pore space as a purely public resource in which overlying landowners have no property interest—the argument espoused by the water districts—is flatly inconsistent with recognition of landowners' right to sue for trespass into the pore space underlying their land—a right consistent with the one asserted by Agua Caliente under federal law.

DWA's efforts to distinguish *Starrh* on the grounds that it supposedly involved mineral rights rather than groundwater pore space is wholly unavailing. DWA Br. at 2. *Starrh* explicitly states that the invaded property interest is in "groundwater porespace." 153 Cal. App. 4th at 592. If anything, *Starrh*'s description of "groundwater porespace" as a mineral estate, *id.*, severely undercuts both water districts' arguments that pore space and mineral rights are wholly distinct as a matter of law. *See* DWA Br. at 2; CVWD Br. at 26-27.

Nor is state law uniform outside of California. Agua Caliente's principal brief identifies several states that have recognized the surface landowner's property interest in pore space by statue or case law. *See* AC Br. at 19-20. The water districts identify

several cases that they claim reached the opposite result.[21] *See* DWA Br. at 4-9; CVWD Br. at 21-23. Regardless of their merits, and contrary to the water districts' claims, these decisions unquestionably establish a lack of uniformity in state law. Because uniformity is desirable in this context, this Court should not adopt state law.

Application of state law in this case also would frustrate federal objectives. Major goals of federal Indian policy include encouraging tribal self-sufficiency, self-governance, and economic development. *See, e.g.*, 25 U.S.C. §§ 2701 & 4301 (stating federal policy and obligations toward Indian tribes). Adopting a body of law that would allow states to remove tribal lands, or any constituent element thereof, from tribal control by declaring them to be a public resource plainly would frustrate these federal objectives. In this specific case, declining to recognize Agua Caliente's pore space ownership would deprive the Tribe of an economic development opportunity and infringe its territorial sovereignty, both of which are directly contrary to statutorily delineated federal policies. Such frustration of federal policy would be intolerable in any case, but it would be particularly so in the context of federal-Indian relations, where the federal government's exclusive role is constitutionally enshrined and its special obligations are well settled. *See, e.g.*, United States Const., Art. I, § 8; *United States v. Kagama*, 118 U.S. 375, 384 (1886) (describing the "duty" and "power" of the United States to protect Indian communities from states, which are "often their deadliest enemies").

Finally, adoption of a federal rule recognizing a tribal property right in pore space underlying Indian reservations would not unduly disrupt state-law based commercial relationships. While CVWD asserts that the declaration of Agua Caliente's ownership

---

[21] At least one of those cases actually supports Agua Caliente's position. In *Chance v. B.P. Chemicals., Inc.*, 670 N.E.2d 985 (Ohio 1996), the Ohio Supreme Court rejected a chemical refiner's argument that its subsurface injection of byproducts was permissible because the injectate mixed with "native brine" that constituted a public water resource rather than property of the surface landowner. *Id.* at 25. Without addressing the ownership of the "native brine," the court held that landowners "have a property interest in the rock into which the injectate is placed, albeit potentially a limited one …." *Id.*

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

interest in pore space "has strong potential to interfere drastically" with existing groundwater recharge operations in the West, it provides no evidence of why that would be the case, nor is there any reason to so assume. It is certainly possible for groundwater storage operations to accommodate allocation of groundwater storage space and similar limitations on unfettered groundwater storage. For instance, Arizona, whose groundwater storage and banking programs are alluded to in CVWD's Statement of Undisputed Facts (Doc. 200-1 ¶¶ 49-51), allocates groundwater storage space by allowing storage of water at state-authorized facilities only pursuant to permits. *See generally* A.R.S. §§ 45-801, *et seq.* This limitation has not prevented the state from developing an advanced commercial market for groundwater storage and associated credits. *See* Doc. 200-1 ¶ 49. There is no apparent reason why recognizing the federal property interest asserted by Agua Caliente—the right to use the amount of pore space underlying its reservation for groundwater storage and to enjoin interference with or infringement of that right—would be any more disruptive than a state permitting regime that allocates storage space among certain facilities and water users.[22] Accordingly, this Court need not adopt state law as the rule of decision in this case to avoid interference with existing commercial relationships. Even in the absence of an existing federal rule of decision, *Kimbell Foods* would not support adoption of state law.

## CONCLUSION

The water districts have offered no persuasive reason for the Court to accept their positions on any of the three legal issues presented in Phase 2. Their proposed quantification standards disregard and contradict settled federal law providing that water is reserved at the time of a reservation's establishment in the full amount necessary to accomplish the reservation's intended purposes. Their arguments against the existence of a water quality component for federal reserved water rights disregard numerous cases and basic logic indicating that water quantity and quality cannot be

---

[22] To the extent that such concerns persist, they could be addressed through the appropriate tailoring of injunctive relief in Phase 3.

**AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES**

KILPATRICK TOWNSEND & STOCKTON
607 14ᵀᴴ STREET, STE 900
WASHINGTON, DC 20005-2018

1  meaningfully separated in this context. And their efforts to deny the existence of a

2  federal property right in pore space—a component part of the very land reserved for

3  Agua Caliente—misconstrue both the nature of the right asserted by the Tribe and the

4  state of existing law. The Court should deny the water districts' motions and grant Agua

5  Caliente's motion for the reasons set forth in its principle brief.[23]

6

7  DATED: November 20, 2017.        By:   /s/ Catherine Munson

8  CATHERINE MUNSON
   (D.C. Bar No. 985717, admitted *pro hac vice*)

9  MARK H. REEVES
   (DC Bar No. 1030782, admitted *pro hac vice*)

10 **KILPATRICK TOWNSEND & STOCKTON LLP**

11 STEVEN C. MOORE

12 (CO Bar No. 9863, admitted *pro hac vice*)
   HEATHER WHITEMAN RUNS HIM

13 (NM Bar No. 15671, admitted *pro hac vice*)
   **NATIVE AMERICAN RIGHTS FUND**

14

15 JOHN TABINACA PLATA (CA Bar No. 303076)
   jplata@aguacaliente.net

16 **AGUA CALIENTE BAND OF CAHUILLA INDIANS**

17

18 *Attorneys for Plaintiff*
   *Agua Caliente Band of Cahuilla Indians*

19

20 [23]    Despite this Court's order limiting Phase 2 issues to three legal questions and
21 rejecting requests for additional discovery as unnecessary, *see* Doc. 193, CVWD
   submitted hundreds of pages of putative expert reports, declarations, and other factual
22 materials with its Phase 2 Motion for Summary Judgment. These submissions grossly
   violate the spirit of this Court's order, which plainly envisioned Phase 2 as a time for
23 clarifying legal issues to inform the fact-intensive Phase 3 analysis rather than as a time
24 to entertain protracted factual analysis and argument. In addition to being improperly
   proffered, the overwhelming majority of these materials are simply irrelevant to the
25 three narrow questions on which the Court ordered briefing. Agua Caliente respectfully
26 requests that the Court disregard these materials, which constitute yet another attempt
   to redefine the scope of Phase 2 in derogation of the orders of this Court and stipulation
27 of the parties.
28

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, STE 900
WASHINGTON, DC 20005-2018

AGUA CALIENTE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PHASE II ISSUES