1   MATT KLINE (Bar No. 211640)
    mkline@omm.com
2   DANIEL R. SUVOR (Bar No. 265674)
    dsuvor@omm.com
3   HEATHER WELLES (Bar No. 302256)
    hwelles@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 8th Floor
5   Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
6   Facsimile: (310) 246-6779

7   *Attorneys for Defendants Coachella*
    *Valley Water District, and G. Patrick*
8   *O'Dowd, Ed Pack, John Powell, Jr.,*
    *Peter Nelson and Castulo R. Estrada,*
9   *sued in their official capacity as members*
    *of the Board of Directors*
10
    (Additional counsel identified on next
11  page)

12              **UNITED STATES DISTRICT COURT**
13            **CENTRAL DISTRICT OF CALIFORNIA**
                   **EASTERN DIVISION**
14

15  AGUA CALIENTE BAND OF          Case No. 5:13-cv-00883-JGB (SPx)
    CAHUILLA INDIANS,              Judge:   Hon. Jesus G. Bernal

16            Plaintiff,           **CVWD'S SUPPLEMENTAL BRIEF**
    and                            **ON JUSTICIABILITY OF PHASE 2**
17                                 **CLAIMS (PURSUANT TO COURT'S**
    UNITED STATES OF AMERICA,      **ORDER, DKT. NO. 267)**
18            Plaintiff-Intervenor,
                                    Filed concurrently with:
19
    v.                               1. Request for Judicial Notice
20                                    2. [Proposed] Order
    COACHELLA VALLEY WATER
21  DISTRICT, et al.,               Dept.:        Courtroom 1
                                    Action Filed: May 14, 2013
22            Defendants.          Hearing:      Not set

23

24

25

26

27

28
                                       CVWD SUPP. BR. RE: STANDING
                                       CASE NO. 5:13-CV-00883-JGB

STEVEN B. ABBOTT
(Bar No. 125270)
sabbott@redwineandsherrill.com
GERALD D. SHOAF
(Bar No. 41084)
gshoaf@redwineandhserrill.com
REDWINE AND SHERRILL, LLP
3890 11th Street, Ste. 207
Riverside, CA 92501-3577
Telephone:  (951) 684-2520
Facsimile: (951) 684-5491

BARTON THOMPSON, JR.
(Bar No. 72927)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025-7019
Telephone: (650) 473-2600
Facsimile: (650) 473-2601

ANTON METLITSKY
(*pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

WALTER DELLINGER
(*pro hac vice*)
BRADLEY N. GARCIA
(*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

*Attorneys for Defendants Coachella
Valley Water District, and G. Patrick
O'Dowd, Ed Pack, John Powell, Jr.,
Peter Nelson and Castulo R.
Estrada, sued in their official
capacity as members of the Board of
Directors*

# TABLE OF CONTENTS

**Page**

I.    Introduction ........................................................................................... 1

II.   The Tribe Lacks Standing To Raise Each Phase 2 Issue. ...................... 3

    A.    The Tribe's Storage Space Claim Is Easily Dismissed, As The
        Tribe Has Identified No Concrete Injury Or Ripe Controversy. .......... 4

    B.    The Tribe Has Offered Nothing To Justify A Long, Costly
        Quantification Proceeding. ...................................................... 5

    C.    The Tribe Has Shown No Injury Based On Water Quality. ............... 10

        1.    *Page's Withdrawal Of His Arsenic Opinions Means The
              Record Now Contains Only Evidence That Recharge
              Operations Reduce Arsenic.* ...................................... 10

        2.    *The Tribe Has Provided No Evidence Of Harm Caused
              By TDS.* ................................................................ 10

III.  The Tribe's Withdrawal Of Page's Declarations Does Not Negate His
    Admissions At His Deposition. ................................................................ 12

IV.   Conclusion ........................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arizona v. California,*
    373 U.S. 546 (1963) ..................................................................................6

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ..................................................................................12

*Far Out Prods., Inc. v. Oskar,*
    247 F.3d 986 (9th Cir. 2001) ..................................................................13

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
    624 F.3d 1083 (9th Cir. 2010) ................................................................12

*Liebsack v. United States,*
    731 F.3d 850 (9th Cir. 2013) ..................................................................13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................3, 10, 12

*Navajo Nation v. Dep't of Interior,*
    876 F.3d 1144 (9th Cir. 2017) ..................................................................7

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ..................................................................4

*United States v. Villalta,*
    662 F.2d 1205 (5th Cir. 1981) ................................................................13

*Valley Forge Christian College v. Ams. United for Separation of*
    *Church & State,*
    454 U.S. 464 (1982) ................................................................................12

## Other Authorities

Fed. R. Evid. 601, advisory committee's note ...........................................13

Report of Special Master S. Rifkind, *Arizona v. California*, O.T. 1960
    (Dec. 5, 1960) ..........................................................................................6

1    **I.    Introduction**

2         Given the case-ending admissions that the Tribe's consultant and expert gave

3    at his recent deposition—which are fatal to the Tribe's efforts to prove Article III

4    standing on any of its three Phase 2 claims—it is no surprise that the Tribe chose

5    for the past year not to introduce any evidence of asserted injury and argue the law

6    instead.  The realities are that no such injury has occurred, and that none of the

7    Tribe's Phase 2 claims is justiciable.  This long-running case must come to an end.

8         To reset the stage, more than a year ago, the Water Agencies informed the

9    Tribe that they would move for summary judgment on the basis that the Tribe

10   lacked standing to pursue any its Phase 2 claims (pore space, water quantification,

11   or water quality).  Through multiple rounds of summary judgment briefing, the

12   Tribe failed to submit evidence to show that its claims arose out of any cognizable

13   harm.  The Tribe finally sought to provide such evidence in May 2018, after the

14   Court held its hearing on the standing question.  The evidence came in the form of

15   declarations from the Tribe's long-time consultant Oliver Page.  The Court allowed

16   that supplementation (over the Water Agencies' objections), on the condition that

17   the Agencies could conduct limited discovery and depose Page.  Dkt. 266, 267.

18        The Agencies deposed Page on October 4, 2018.  On cross, Page admitted

19   that he is not an expert on key issues covered by his declarations, despite the

20   Tribe's assurances otherwise.  Page also withdrew or conceded away the core of

21   each of his other opinions and confirmed the Tribe has suffered no concrete injury.

22   These binding admissions were compelled, in part, by the scores of reliance

23   documents that the Court had ordered Page to produce over the Tribe's objection.

24        On the Tribe's <u>pore-space</u> claim, Page asserted in his declarations (which he

25   admitted the Tribe's lawyers ghostwrote and he only took a few hours to review)

26   that the Water Agencies were causing subsidence in the Valley and a breakdown of

27   clays in the aquifer.  But when cross-examined, Page could point to no permanent

28   subsidence on the Tribe's lands, and he disavowed his clay-breakdown opinion.

1    After a year of litigating this issue (at great cost to ratepayers), the Tribe utterly has
2    failed to show any injury to its pore space interest (assuming it even owns one).
3        On <u>quantification</u>, Page made similar admissions.  He confirmed the Tribe
4    has always had adequate water for any of its development needs; he conceded away
5    the Tribe's claim that the Agencies were "overdrafting" the aquifer under tribal
6    land; he confirmed that the Tribe's lawyers had "cherry picked" the data in drafting
7    his declaration to argue otherwise; and he confirmed that water levels on the Tribe's
8    lands have been rising since well before the Tribe filed suit and up through today.
9    Page, like the Tribe for the past year, failed to identify any cognizable injury on the
10   water quantification claim—much less one that would require the Court and
11   hundreds of rights holders to have a water-rights quantification trial of the sort that
12   would be required here.  Indeed, Page could not dispute that the Tribe's other paid
13   consultants affirmed that long-term overdraft basin-wide will be resolved by 2021.
14       On the <u>water quality</u> claim, Page withdrew his opinion that Colorado River
15   water was somehow adding unsafe arsenic to the aquifer.  He conceded that opinion
16   was based on a glaring data-transcription error.  He further conceded that he knows
17   of no harm to the Tribe based on any other constituent (including the salinity
18   measure TDS on which the Tribe has focused), and that Colorado River water is
19   perfectly usable for domestic and irrigation purposes.  When examined concerning
20   the few cherry-picked wells where the Tribe's lawyers said TDS had contaminated
21   the Tribe's lands, Page confirmed again and again that others sources of TDS could
22   have easily been the cause and he could not attribute the readings to the Agencies.
23       One reason for these stunning admissions is that the Tribe's counsel made the
24   classic error of writing Page's opinions themselves and not having Page verify or
25   substantiate the asserted conclusions.  Indeed, Page admitted he played *no role at*
26   *all* in drafting his declarations and instead spent at most a few hours reviewing
27   them.  The Tribe, moreover, did not have Page check any of the declarations'
28   claims *against the underlying data* in his files, even after errors were noticed.

- 2 -

On the undisputed record before the Court—which includes the evidence the Agencies submitted with their original briefs, and Page's devastating admissions—only one result is possible. The Court should hold that the Tribe has failed to carry its burden at the Rule 56 stage to produce competent evidence demonstrating that each of its three Phase 2 claims is justiciable. The Court should grant the Water Agencies summary judgment and enter final judgment in the case.

Now, after Page has been deposed, the Tribe asks the Court to withdraw his declarations and treat his deposition admissions as unreliable. This final effort to stave off summary judgment should be rejected. The Tribe offers no competent evidence—*none*—that any answer Page gave was affected by his condition. The Federal Rules, moreover, do not permit the blanket exclusion of testimony the Tribe seeks. In any event, the Court can review the DVD copy of Page's deposition and see for itself that he clearly, calmly, and without difficulty gave all the answers in question. Neither Page nor the Tribe ever asked for a break during the deposition. To the contrary, in the days before the deposition, the Tribe's counsel had Page submit a third declaration and affirmed he would *not be withdrawing any of his opinions*, save for the glaring arsenic error.

Page was the Tribe's last chance to show injury. Even if the Court disregards all of his testimony—the declarations the Tribe has withdrawn, and the deposition it seeks to impeach—all that means is that the Tribe is left again with no evidence to substantiate its alleged harms. Either way, the Agencies are entitled to judgment.

## II.    The Tribe Lacks Standing To Raise Each Phase 2 Issue.

As set forth in prior briefing, at summary judgment the Tribe must submit evidence showing, "through specific facts," that (1) it has suffered an injury in fact that is both "concrete and particularized" and "actual or imminent"; (2) the injury is traceable to the Agencies' conduct; and (3) it is "likely" that a favorable decision would redress the supposed injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 562-63 (1992). The Tribe must also show there is a ripe controversy that will cause

actual hardship if not resolved by the Court. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc).[1]  The Tribe's misadventures with Page confirm that it has failed to satisfy these obligations.

### A.    The Tribe's Storage Space Claim Is Easily Dismissed, As The Tribe Has Identified No Concrete Injury Or Ripe Controversy.

The Tribe lacks standing to raise its storage space claim because it has adduced no evidence showing that the Water Agencies are interfering in any way with its purported rights, and the claim is not ripe because the Tribe has not even explained in any comprehensible fashion why it seeks to litigate this claim or what rights of ownership it wants the Court to declare it has. *See* Dkt. 219 at 3-4.

The *only* evidence the Tribe has ever offered that even purports to establish standing to raise this claim is the discredited and abandoned Page declarations. Page originally opined that the Water Agencies' activities were damaging the Tribe's supposed pore space by causing subsidence near the Tribe's reservation, *see* Dkt. 248-1 at 16, but when cross-examined, Page admitted that he is not qualified to testify about subsidence *at all*, Dkt. 277-3, Ex. 1 at 165:25-166:5:

Q. "Okay.  So you're not an expert in subsidence."

A. "No."[2]

The only subsidence the Tribe's lawyers had Page identify in his declarations was a negligible reading from a U.S. Geological Survey report based on decade-old data, which showed perhaps a few millimeters of decline on a tiny corner of the reservation—a meaningless amount when undertaking a groundwater storage project or other development project. *See id.* at 163:3-165:16.  Unsurprisingly,

---

[1] Unless otherwise noted, all internal quotation marks, alterations, citations, and objections are omitted; and all emphases are added.

[2] *See id.* at 150:23-151:18, 156:7-158:20, 165:17-24 (Page admitting he is "not an expert in permanent versus temporary subsidence," and "not familiar with" related literature).  The Agencies lodged a DVD of Page's deposition with the Court, Dkt. 277-3, Ex. 2, and ask to play excerpts of the testimony for the Court at any final hearing on these matters.

Page, at his deposition, could identify no damage that had occurred on tribal land, no development opportunities that had been affected, and no water storage projects that would be impacted by this supposed subsidence. *Id.* at 162:12-163:2. Page never disputed Dr. Graham Fogg's conclusion that, if it exists, this one-millimeter subsidence is unlikely to be permanent. Dkt. 247-1, Ex. A at 19-20. Indeed, the Tribe never provided any evidence of conditions on the ground now or at the time it filed suit. The record therefore contains no competent evidence that any subsidence is affecting the Tribe's land, much less that the Tribe has suffered a related injury.

The only other evidence that purportedly supported the Tribe's pore space claim was the suggestion in the now-abandoned Page declaration that introduction of Colorado River water "likely" caused breakdown of clays in the aquifer that "potentially" affected the pore space. Dkt. 243-2 ¶ 56. As the Agencies showed before, such speculative claims do not establish Article III injury. *See, e.g.*, Dkt. 248-1 at 20-21. In any event, at his deposition Page disavowed this theory, confirming that he was not offering *any* opinions on the breakdown of clays. Dkt. 277-3, Ex. 1 at 167:25-168:2. Thus, the only record evidence is Fogg's testimony—documented with data—that recharging with Colorado River water produces *no risk* for breakdown of clays (unlike recharging with State Water Project water, which Tribe would have the Agencies do at a cost of more than a billion dollars). *See* Dkt. 247-1, Ex. A at 36; Dkt. 200-2 ¶ 24.

The Agencies are entitled to summary judgment on this first Phase 2 claim.

**B.    The Tribe Has Offered Nothing To Justify A Long, Costly Quantification Proceeding.**

The Tribe lacks standing to seek a quantification of its reserved rights because it has *no need or plan to use those rights*. Even at this late date, the Tribe has never suggested that it has any intention of pumping any groundwater or that it has been prevented from doing so. Nor has it suggested that it lacks water needed to develop or use its reservation for its intended purposes. *See* Dkt. 219 at 13-15.

Page's deposition only confirmed this.  Page never suggested the Tribe has any intention of pumping groundwater, much less in amounts that would exceed its existing state law rights.  Page also could identify no time when the Tribe:

- was unable to obtain all of the water it wanted from CVWD and DWA;
- was unable to water golf courses or landscaping;
- was unable to grow crops;
- was unable to supply its hotels with water; or
- had to turn down a single development opportunity due to water concerns.

Dkt. 277-3, Ex. 1 at 109:5-112:21.  Page's testimony was based on years of working for the Tribe as a paid consultant, and on his status as the expert designated to help the Tribe show evidence of an injury here.  *See* Dkt. 243-1 at 6.

The Tribe offers no other evidence that there is any unmet need for water that demands resolution by court order.  To the contrary, it is undisputed that the Tribe has always had access to all of the groundwater it has ever needed to develop its reservation.  *See* Dkt. 200-4, Ex. A at 13-14.  Indeed, the evidence before the Court shows that the Tribe has successfully built casinos, golf courses, and other business ventures that have produced tens millions of dollars in annual income.  *See id.* at 12-14; Dkt. 209-3 at 23; *see also* Dkt. 277-3, Ex. 1 at 147:24-149:16.

Because reserved water rights, like all water rights, convey only an interest in actually using water to fulfill the purposes of the right, the Tribe's failure to show an unmet need is fatal to its claim.  *See* Dkt. 219 at 14 n.9.  The Court is left with a situation just like that in *Arizona v. California*, 373 U.S. 546 (1963), where the Supreme Court left water rights unquantified because there was "no indication that" enjoyment of the plaintiff's rights was "in immediate danger."  Report of Special Master S. Rifkind, *Arizona v. California*, O.T. 1960, at 318-19 (Dec. 5, 1960).

The Tribe's last gasp argument to avoid this obvious outcome is that the Agencies are "overdrafting" the aquifer under its land.  Dkt. 209 at 5.  But the Tribe *still* has never explained how any purported overdraft has actually interfered with

1  its ability to use water to develop its reservation.  The mere fact that others may use

2  a water source in which the Tribe also has a right does not show standing if there is

3  no actual injury, as "speculation or subjective apprehension about future harm does

4  not support standing." *Navajo Nation v. Dep't of Interior*, 876 F.3d 1144, 1162-63

5  (9th Cir. 2017) (no standing based on potential third-party reliance on unquantified

6  reserved water rights in the absence of a concrete impact to tribal claimant).

7       This failure alone is enough to grant the Agencies summary judgment.  But

8  there is more.  The first abandoned Page declaration was supposed to establish the

9  need for a water quantification proceeding by suggesting an urgent shortfall of

10  water in the system.  The Tribe's lawyers wrote for Page that groundwater levels

11  declined at "nearly every well on the Agua Caliente Reservation" between 2000

12  and 2013 and 2000 and 2017.  Dkt. 243-2 ¶¶ 5(c), 17-18.  However, as *Page stated*

13  at his deposition, this method of randomly comparing dates like "2000" and "2017"

14  is "how you cherry pick" data.  Dkt. 277-3, Ex. 1 at 94:3-13.  When confronted

15  with a report from other consultants who work for the Tribe, who concluded in

16  2014 that there had been no overdraft in the system for the past 10 years and that

17  any overdraft in the basin as a whole (beyond the reservation) would be resolved by

18  2021, Page confirmed that these experts did not "pick[] two random dates like 2000

19  and . . . 2017 and compar[e] those" results.  *Id*. at 88:13-20, 94:3-19.  Using such

20  random points of comparison was not a valid method, as he confirmed:

21       Q: "That is how you cherry pick[,] right[,] you pick two random dates and
22          you say let's compare those two dates [and] see if [it] has gone up or see
             if it has gone down right?"
23       A: "Yes."

24  *Id*. at 94:9-13.  And Fogg agreed that the method employed by the Tribe's counsel

25  in the now-disavowed Page declaration was unsound.  Dkt. 247-1, Ex. A at 11-13.

26       Yet the Tribe has doubled down on this unreliable approach in its briefing,

27  telling the Court that "[m]onitoring wells show that water levels near the Tribe's

28  casino, which is not near the Recharge Facility, have decreased the last ten years."

Dkt. 250 at 8.  But when confronted with the Tribe's own water-level data for 11 different wells, Page acknowledged that the data showed an *upward* trend in the years both before and after the Tribe filed this suit at nine of the 11 wells, including the *very casino monitoring wells* referenced in the Tribe's briefs.  Dkt. 277-3, Ex. 1 at 99:2-103:20, 108:25-109:4 & Depo. Ex. 27.  Page confirmed that while there might be some possible overdraft in other parts of the basin, *that was not the case on tribal lands*.  *See* Dkt. 277-3, Ex. 1 at 107:5-12, 108:7-109:4 (overdraft opinion was based on "the entire basin," and there have been "upward measurements" on the reservation).  All that matters at summary judgment is the Tribe's lands, as it needs to prove concrete injury to its holdings.  Page's admissions refuting any such claim of injury are consistent with the other record evidence—*i.e.*, that groundwater levels on the reservation have been "generally stable for at least the last 10 years."  Dkt. 246-1 ¶ 11; Dkt. 247-1, Ex. A at 13-14 (showing increasing water levels on tribal lands).  Put simply, there is no imminent need to quantify the Tribe's rights.

The Tribe suggests that the basin is "trend[ing] toward increasing overdraft," and the Court must intervene.  *E.g.*, Dkt. 243-2 ¶ 10.  Cross-examination yet again demonstrated that the opposite is true.  Page confirmed that the Tribe's paid, expert consultants concluded that: (1) water supplies in the basin are sufficient to meet the Tribe's demands; (2) there was no overdraft in the basin after 2004; and (3) under the Agencies' management plans, basin-wide overdraft will be eliminated by 2021.  *See* Dkt. 277-3, Ex. 1 at 90:10-91:7 & Depo. Ex. 26 at 5.15.1-8 to 5.15.1-9.  (The Tribe sought to bury these admissions by not providing such reports to the Agencies, the Court, or Page.  *See* Dkt. 277-3, Ex. 1 at 89:14-24.)

The Tribe also cannot counter the basic fact that the many water users in the basin—other than the Agencies—pump significant amounts of groundwater and would not be bound by an order restricting the Agencies' pumping.  *See* Dkt. 200 at 12.  The only way to limit these users in Phase 3 would be a years-long, multi-million-dollar adjudication that would require Coachella Valley rights holders—

CVWD SUPP. BR. RE: STANDING
CASE NO. 5:13-CV-00883-JGB

hundreds, if not thousands of parties—to raise their groundwater claims before the Court, or risk losing them forever. Article III requires the Tribe to adduce competent evidence of injury and redressability to show that such a proceeding is necessary. The Tribe has come nowhere close to making that showing.

All that is left is the Agencies' undisputed evidence negating standing—*e.g.*:

- Testimony that the Agencies have recharged hundreds of thousands of acre feet of water more than they have withdrawn since 2010, when CVWD updated its water management plan. Dkt. 219-3 ¶ 6. (Fogg testified that the current planning regime is the appropriate time period for analyzing the Agencies' water-supply management, which Page never disputed. *See* Dkt. 247-1, Ex. A at 15.)
- Evidence that the Agencies acted aggressively to ensure that the Valley has adequate future water supply, with rights to import more than 600,000 acre-feet of water annually. Dkt. 219-3 ¶ 10; Dkt. 200-2 ¶ 23, 28.
- Testimony that the Agencies successfully encouraged conservation over the past decade, reducing groundwater pumping. Dkt. 200-2 ¶¶ 46, 47.
- Evidence that, when measured over a 10-year average time period, the Agencies have resolved overdraft in the basin. Dkt. 215-2, Ex. A at 27-28.
- And the *Tribe's own expert reports* stating that the Tribe has all of the water necessary to pursue development and there was no overdraft in the years prior to this suit. Dkt. 247-1, Ex. A at 8; Dkt. 277-3, Ex. 1 at 90:10-91:7 & Depo. Ex. 26 at 5.15.1-8 to 5.15.1-9.

On this record, the Agencies are entitled to summary judgment on this claim.[3]

---

[3] The Tribe's distortions of the record are not limited to Page. In its last reply brief arguing the Court must hear Page's testimony, the Tribe represented to the Court that CVWD's 2010 Water Management Plan "predicts that overdraft of the Basin will continue at the alarming rate of 90,000 AF per year through the year 2045." Dkt. 250 at 8. This claim completely misstates the cited document. The Tribe provided the Court only a snippet from the nearly 300-page report. *See* Dkt. 255-4. But even that snippet shows unambiguously that CVWD anticipated a potential overdraft under the *old plan*—which was, of course, replaced by the very

**C.    The Tribe Has Shown No Injury Based On Water Quality.**

The Tribe has similarly failed to demonstrate its standing to raise any water quality claim.  Page abandoned the opinions expressed in his declarations that the Water Agencies' importation of Colorado River Water was raising arsenic levels and conceded that he never identified any other water-quality injury to anyone in the Valley, much less the Tribe, resulting from the Agencies' actions.

1.    *Page's Withdrawal Of His Arsenic Opinions Means The Record Now Contains Only Evidence That Recharge Operations Reduce Arsenic.*

The first abandoned Page declaration stated that the Agencies' replenishment activities were increasing arsenic levels in the water under the Tribe's reservation.  Dkt. 243-2 ¶ 5(e).  After Fogg demonstrated that this conclusion was obviously flawed, Dkt. 247-1, Ex. A at 24-30, the Tribe's attorneys—not Page—re-reviewed the data and identified a fatal error.  Dkt. 277-3, Ex. 1 at 28:11-29:8.  The Tribe filed an amended declaration from Page withdrawing those opinions the day before his scheduled deposition.  Dkt. 270-1 ¶ 16; *see also* Dkt. 277-3, Ex. 1 at 20:2-7 (all arsenic opinions withdrawn).  The only record evidence related to arsenic is therefore Fogg's unrebutted conclusion that Colorado River recharge has *reduced* levels of arsenic that naturally occur in the basin—improving water quality.  *Supra*.

2.    *The Tribe Has Provided No Evidence Of Harm Caused By TDS.*

The Tribe likewise has no evidence that the Agencies' recharge of Colorado River Water is causing a cognizable injury related to groundwater TDS levels.

To begin, the statement in the first abandoned Page declaration that "high levels" of TDS "can" have certain impacts, Dkt. 243-2 ¶ 29, is and was inadequate to establish the "concrete," "particularized" injury to the Tribe necessary to establish Article III jurisdiction.  *Lujan*, 504 U.S. at 563-64.  And when pressed on

document the Tribe cites.  *Id.* at 4-10 (chart labeled "2045 *With 2002 WMP*").  Both the new plan and Dr. Fogg's supplemental declaration—both available to the Tribe when it filed its reply—show that CVWD projected a significant *positive* change in storage through 2045.  Dkt. 247-1, Ex. A at 23; CVWD RJN at 7-20 (Fig. 7-4).

CVWD SUPP. BR. RE: STANDING
CASE NO. 5:13-CV-00883-JGB

these speculative opinions, Page admitted on cross that he had *never identified*:

- any physical injury anyone on tribal lands has suffered due to TDS levels;

- any physical equipment that has been damaged or harmed;

- any guest who has refused to patronize the Tribe's businesses;

- any harm to the Tribe's golf courses or any damaged crops; or

- any use of water that the Tribe cannot pursue due to TDS levels.

Dkt. 277-3, Ex. 1 at 144:19-145:16.

Although the Tribe now disclaims any reliance on Page's opinions, it has pointed to no other evidence of such harms. When pressed at oral argument, the Tribe asserted that it "could not use the water as it stands under the aquifer . . . for domestic uses." Dkt. 241 at 47:16-20. That is nonsense. Many in the Coachella Valley rely on that very groundwater for domestic water supply. *See, e.g.*, Dkt. 210-6 at 6-9. And it is undisputed—as Page admits—that the Colorado River supplies water for drinking and agricultural purposes across the Southwest United States, and is widely accepted by regulatory authorities, including the federal government and the State of California, for domestic use. Dkt. 209-3 at 13; Dkt. 277-3, Ex. 1 at 145:18-146:15. The Tribe has never offered any evidence to support its lawyer's argument about use and has left uncontested the Agencies' evidence that the Tribe has never complained about the taste of water in the basin. Dkt. 246-2 ¶ 3; *see also* Dkt. 246-1 ¶ 10 (no tribal lessees have lodged complaints about groundwater quality).

The sum and substance of the Tribe's evidence is therefore that the Agencies' recharge efforts may have marginally increased a measure of salinity in the water that has not affected its usability for any purpose. The Tribe, moreover, has no response to the Agencies' unrebutted evidence that these recharge efforts have *improved* other water quality measures—such as reducing arsenic—that unlike TDS levels are actually related to human health. *See* Dkt. 247-1, Ex. A at 26-30; Dkt. 246-2 ¶ 9. As for the Tribe's dire claims about a few wells being polluted, Page

CVWD SUPP. BR. RE: STANDING
CASE NO. 5:13-CV-00883-JGB

conceded he cannot opine that the Water Agencies' recharge efforts actually caused any specific TDS measurement.  *See* Dkt. 277-3, Ex. 1 at 58:16-20, 77:18-24, 141:7-144:3.  Other nearby developments—including golf courses, housing developments, storm channels, and overwatering of lawns and pools—are all obvious culprits, as documented in Page's own files.  *See id.* at 34:21-35:2, 37:3-7, 54:4-55:9, 57:22-58:8, 63:11-19, 67:20-81:17.  In addition, as Page's company documented, the Tribe's well data has been a sporadic mess and the key well it cites in its briefing has been broken for years.  *See id.* at 114:7-117:9.

In sum, the Tribe fails to show any "cognizable interest" "directly affected" by increased TDS levels; thus, it lacks standing.  *Lujan*, 504 U.S. at 560.  To the extent the Tribe has an abstract desire for lower TDS levels untethered to specific harms suffered "as a consequence of" the Agencies' actions, that desire does not amount to an Article III injury.  *Valley Forge Christian College v. Ams. United for Separation of Church & State*, 454 U.S. 464, 485-86 (1982).  The Court permitted the Tribe one last chance, through Page, to try to adduce evidence of injury.  That effort failed, and the Agencies are entitled to summary judgment.[4]

## III.    The Tribe's Withdrawal Of Page's Declarations Does Not Negate His Admissions At His Deposition.

The Tribe has never explained what legal theory would support a conclusion that Page's deposition testimony is so unreliable that it should be disregarded or

---

[4] As CVWD previously showed, the Tribe's supposed injuries based on arsenic or perchlorate are not properly before the Court because they were not mentioned in the Tribe's complaint.  *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088-89 (9th Cir. 2010).  Furthermore, even if the Tribe had not abandoned Page's declarations, they were insufficient to establish injury because it is undisputed that "continued recharge of Colorado River water *will likely lead to a reduction in perchlorate concentrations* in groundwater beneath tribal lands." Dkt. 247-1, Ex. A at 32.  In any event, conditions that may have resulted from the Agencies' past actions cannot form the basis for the prospective injunctive and related declaratory relief the Tribe seeks in this lawsuit.  *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-05 (1983).

1    discounted at all.  Fundamentally, basic capacity issues are governed by Federal
2    Rule of Evidence 601, even for experts.  *See Liebsack v. United States*, 731 F.3d
3    850, 856-57 (9th Cir. 2013).  All that is required under that rule is that a witness is
4    "capable of communicating relevant material and understands that he has an
5    obligation to do so." *United States v. Villalta*, 662 F.2d 1205, 1206 (5th Cir. 1981).
6    Very "few witnesses are disqualified" under Rule 601—instead, one must assess
7    the credibility of specific responses.  Fed. R. Evid. 601, advisory committee's note.

8         The Tribe therefore *at most* raises a general issue of credibility, which does
9    not "foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,
10   997 (9th Cir. 2001).  The scant evidence the Tribe has provided, moreover, includes
11   no opinion that Page could not competently sit for a deposition on October 4, 2018,
12   or any reason to question any specific admission that Page made.  *See* Dkt. 271, 273.
13   As the videotaped record of the deposition makes plain, *see* Dkt. 277-3, Ex. 2, Page
14   answered questions throughout October 4 ably and without confusion.

15        Although the Tribe's legal position is inchoate, what is clear is that the Tribe
16   launched an attack on the credibility of its own witness only *after* he made his
17   damaging admissions.  The Tribe's attorneys never gave the Agencies or the Court
18   any warning that Page's testimony could not be trusted.  Just the opposite.  On
19   October 1, they had him submit yet another new declaration to the Court, Dkt. 270-
20   1, and assured CVWD and DWA that he was not withdrawing any opinions and
21   would testify, Dkt. 277-2 ¶ 5 & Ex. 1.  CVWD went to the expense of preparing
22   Fogg (its rebuttal expert for Page) for Fogg's deposition and then defending it, and
23   then prepared for and took Page's deposition. *Id.* ¶¶ 3, 7-9; Dkt. 277-3 ¶¶ 3, 7.
24   DWA did much of the same work.  Dkt. 277-2 ¶¶ 8-9, 23.  At no point before or
25   during Page's deposition did Page or the Tribe make any claim that Page was not
26   well.  To the contrary, he said he could "[s]tay here all day" when asked if he
27   needed a break, and he confirmed that when he testified he remained his company's
28   Chief Financial Officer.  Dkt. 277-3, Ex. 1 at 23:3-5, 112:23-113:6.

CVWD SUPP. BR. RE: STANDING
CASE NO. 5:13-CV-00883-JGB

The following week—and after its tactical gamble of deposing Fogg and keeping Page in the case failed—the Tribe's counsel claimed that they developed concerns about Page while *preparing him for his deposition two weeks earlier*. Dkt. 277-3 ¶ 4. Yet as the Tribe admitted, it never informed DWA or CVWD of those concerns. *Id.* ¶ 5; Dkt. 277-2 ¶¶ 6, 9. Rather, its counsel took Fogg's deposition and presented Page for his deposition without any objection, and even had Page submit to the Court an amended declaration—at a time when they now say they believed him to be unreliable. *See* Dkt. 277-2 ¶ 9; Dkt. 270-1; Dkt. 277-3, Ex. 1 at 17:1-18:5. It was not until after Page made his truthful, devastating admissions that the Tribe claimed he was incompetent. And even then, counsel had him sign his deposition without objection, Dkt. 277-2 ¶ 16, and neither Page nor any competent witness has testified that a single line of the testimony he gave was untrue or unreliable. *See* Dkt. 271, 272, 273 & Exs. A-J. Instead, what we have now is the Tribe's lawyer quoting hearsay from websites, offering improper opinion testimony, and making legal arguments in the form of a declaration. *See* Dkt. 277 at 8.

At some point, these games must come to an end. The Tribe waited almost a year to introduce Page, and did so months after the parties briefed summary judgment. *See* Dkt. 243. When the Agencies challenged his qualifications and the data underlying his opinions, the Tribe called these objections "frivolous" and tried to shield relevant documents from discovery and keep Page from being deposed. Dkt. 249 at 6; *see* Dkt. 247-2 ¶¶ 7-8 (Tribe opposed deposition); Dkt. 262 at 10-11 (opposing thorough document discovery). As a result of Page's injection into the case in May, the Water Agencies (and their ratepayers) have spent tens of thousands of dollars briefing and conducting discovery, only to find that Page's declarations were written not by him, but by the lawyers—with zero review by him of any underlying data. Dkt. 277-3, Ex. 1 at 18:6-19:13, 22:20-23:2.

Now that these improper tactics have been exposed, the Tribe seeks to compound the prejudice to the Agencies and their constituents by abandoning Page,

1  wishing away his admissions, and refusing the Agencies any ability to test (through

2  discovery) the asserted findings on which the Tribe's new reliability arguments are

3  based.  The parties and the Court have been down this road before: when the Tribe

4  refused to offer Page or his documents up for discovery, cross-examination exposed

5  that Page's asserted opinions were not his own, that data had been cherry-picked,

6  and that the analysis of the Tribe's counsel was erroneous and flawed.

7       The Court should rely on Page's admissions to grant the Agencies summary

8  judgment.  The Tribe has adduced no competent evidence to challenge any line of

9  testimony that Page gave.

10      If the Court has any doubt about the reliability questions now injected into

11  the case by the Tribe, the Agencies should be permitted to depose witnesses with

12  relevant testimony about Page's condition and submit expert testimony of its own.

13  Due process demands such discovery in this multi-million dollar dispute—in which

14  the Tribe seeks sea-changing relief like barring all Colorado River water recharge

15  (a central tenet of good water management across the Southwestern United States).

16      Given the Tribe's highly prejudicial and unusual decision to disclaim Page's

17  declarations—after forcing significant discovery costs to test them—the Court

18  should consider cost-shifting in connection with discovery the past several months.

19  **IV.    Conclusion**

20      In any event, summary judgment should be granted in the Agencies' favor on

21  the Tribe's three remaining Phase 2 claims.  The claims are not justiciable.  The

22  Agencies request oral argument at which to fully and finally ventilate these issues.

23  Dated: November 7, 2018          */s/ Barton Thompson, Jr.*
                                    O'MELVENY & MYERS LLP
24

25  Dated: November 7, 2018          */s/ Steven Abbott*
                                    REDWINE AND SHERRILL, LLP
26

27                                   *Attorneys for the CVWD Defendants*

28

1

## **<u>Certification in Compliance with Local Rule 5-4.3.4</u>**

2      I hereby certify that, pursuant to Local Rule 5-4.3.4, I have obtained the

3  authorization from the above signatories to file the above-referenced document, and

4  that the above signatories concur in the filing's content.

5

6  Dated:  November 7, 2018          */s/ Barton Thompson, Jr.*
                                     BARTON THOMPSON, JR.
7                                    O'MELVENY & MYERS LLP

8                                    *Attorney for CVWD*

9  OMM_US:76502950

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CVWD SUPP. BR. RE: STANDING
CASE NO. 5:13-CV-00883-JGB