RODERICK E. WALSTON, Bar No. 32675
roderick.walson@bbklaw.com
ARTHUR L. LITTLEWORTH, Bar No. 22041
arthur.littleworth@bbklaw.com
PIERO C. DALLARDA, Bar No. 181497
piero.dallarda@bbklaw.com
MICHAEL T. RIDDELL, Bar No. 72373
michael.riddell@bbklaw.com
HOLLAND P. STEWART, Bar No. 317028
holland.stewart@bbklaw.com
Best Best & Krieger LLP
3390 University Avenue, 5th Floor
P.O. Box 1028
Riverside, CA 92502
Telephone: (951) 686-1450
Facsimile: (951) 686-3083

Attorneys for Defendant
DESERT WATER AGENCY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS,<br><br>Plaintiff,<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>COACHELLA VALLEY WATER DISTRICT, et al.,<br><br>Defendants. | Case No. 5:13-cv-00883-JGB(SPx)<br><br>Judge: Hon. Jesus G. Bernal<br><br>DESERT WATER AGENCY'S SUPPLEMENTAL BRIEF ON JUSTICIABILITY OF PHASE 2 CLAIMS (PURSUANT TO COURT'S ORDER, DKT. NO. 267)<br><br>Dept.: Courtroom 1<br>Hearing: Not Set<br><br>Action Filed: May 14, 2013 |

## TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................1

II. TRIBAL EXPERT'S FAILURE TO SUPPORT TRIBE'S STANDING .................................................................................................3

III. THE TRIBE'S WATER QUALITY CLAIM ....................................................5
   A. Failure to Demonstrate Concrete and Particularized Injury ...................5
   B. State Drinking Quality Standards............................................................6

IV. THE TRIBE'S QUANTIFICATION CLAIM ...................................................8

V. THE TRIBE'S PORE SPACE OWNERSHIP CLAIM ..................................10
   A. Land Subsidence.....................................................................................10
   B. Non-Interference With Tribe's Use of Pore Space ..............................11

VI. THE TRIBE IS RESPONSIBLE FOR ITS OWN FAILED STRATEGY......................................................................................................11

VII. CONCLUSION...................................................................................................13

LAW OFFICES OF
BEST BEST & KRIEGER LLP
3390 UNIVERSITY AVENUE, 5TH FLOOR
P.O. BOX 1028
RIVERSIDE, CA 92502

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Ernst & Young v. Depositors Econ. Prot. Corp.*
   45 F.3d 530 (1st Cir. 1995).................................................................................9

*Horne v. Flores*
   557 U.S. 433 (2009).............................................................................................3

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992).......................................................................................3, 10

*Summers v. Earth Island Inst.*
   555 U.S. 488 (2009).............................................................................................3

*Thomas v. Anchorage Equal Rights Comm'n*
   220 F.3d 1134 (9th Cir. 2000) (en banc) .............................................................3

**Federal Statutes**

Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.*, 300g-1 *et seq.* .................................................................................................................................6

**State Statutes**

Health & Safety Code §§ 116275(c), (d)....................................................................6

**Regulations**

22 C.C.R. § 64449..............................................................................................7, 8, 9

40 C.F.R. § 143.1........................................................................................................6

## I. INTRODUCTION

This supplemental brief addresses the question of whether the Agua Caliente Band of Cahuilla Indians (the "Tribe") has standing to pursue its Phase 2 summary judgment claims against Desert Water Agency ("DWA") and Coachella Valley Water District ("CVWD") (together, the "Water Agencies"). At the Tribe's request, the Court allowed the Tribe to introduce new evidence on the issue of standing in the form of supplemental declarations from its expert, Oliver Page. The Court also allowed CVWD and DWA to depose Mr. Page. Docket ("Dkt.") 266, 267. Mr. Page's testimony at his deposition not only failed to support the Tribe's standing arguments, it demonstrated that the Tribe has no standing.

Three days before his scheduled deposition, Mr. Page and the Tribe's counsel filed an errata declaration withdrawing his opinion to eliminate testimony regarding the levels of arsenic in the replenishment water imported by the Water Agencies. At his deposition, Mr. Page unequivocally testified that (1) he had done little work on the case (maybe five hours); (2) the declarations originally submitted in this case were prepared by counsel for the Tribe with very little, if any, input from him; (3) the little work performed by his office on the declarations was based on unreliable and misleading data from the Tribe and data that was cherry picked by the Tribe's counsel; (4) he is not an expert in subsidence or pore space; and, (5) despite working for the Tribe for many years, Mr. Page has no knowledge of any injury ever suffered by the Tribe as a result of water imported by the Water Agencies or any other of their groundwater management activities. The case should end here. But now the Tribe is attempting another ploy.

Faced with the devastating Page deposition testimony, which is the only evidence the Tribe has presented to this Court to support standing, the Tribe now disclaims Mr. Page's declarations and attacks his deposition testimony on grounds that he is allegedly incompetent. This is a dubious assertion. At his deposition, Mr. Page simply told the truth under oath and anyone in his place would have testified

similarly. The Tribe has no other evidence to offer in support of its claim that it has standing. Indeed, based on the uncontroverted record before the Court, the water imported by the Water Agencies is (1) consumed throughout the southwestern U.S., including California, Nevada and Arizona; and, (2) accepted as drinking water by both federal and state authorities. The Tribe has shown no evidence that the Tribe has been unable to use the water for any purpose on the reservation.[1]

As to water availability or quantity, and despite the many chances the Court has provided the Tribe, the Tribe has not been able to produce any evidence that it lacks the water needed to develop the reservation for its intended purposes. Mr. Page testified that the Tribe has had no problems obtaining water for its casinos, golf courses, hotels, crops, or any other financial endeavor. Indeed, the Tribe's specific plan for development of the reservation and its own Environmental Impact Statement indicate that the Water Agencies supply the Tribe with all the water it needs. Dkt. 277-3, Exh. 1 at 147:24-149:16.[2] The Tribe's enormous financial success in the development of the reservation provides ample evidence that it has had access to all the water it needs. Dkt. 200-4, Exh. A at 13-14.

Article III of the United States Constitution requires the Tribe to demonstrate standing by showing "specific facts" indicating that it has suffered an "injury in fact"—that is, a "concrete and particularized" injury that is "actual or imminent"—and that the injury is "caused" by the defendant's conduct and will be "redressed"

---

[1] As set forth in more detail below, the only evidence previously offered by the Tribe to that effect were readings from the Desert Princess well. See Dkt. 243-2, ¶¶38-55. But that data is highly unreliable because equipment at the well constantly malfunctions and the well is under the influence of many other sources of contamination, including maintenance activities from the overlying golf course and nearby storm water channels. See Dkt. 277-3, Exh. 1 at 74:5-77:24 (Mr. Page did not consider tribal report identifying alternative sources of TDS); id. at 51:18-53:3 (admitting that "[y]ou would think" turf fungicide detected in Desert Princess sampling came from the golf course surface); id. at 103:25-104:12 (Desert Princess well data shows broken equipment). Furthermore, even the Tribe's unreliable data confirms that the water extracted from that well still complies with the applicable drinking water standards for TDS.

[2] Docket 277-3 Exh. 1 refers to the transcript of Mr. Page's deposition. The Water Agencies also lodged a DVD of Mr. Page's deposition at Dkt. 277-3, Exh. 2.

LAW OFFICES OF
BEST BEST & KRIEGER LLP
3390 UNIVERSITY AVENUE, 5TH FLOOR
P.O. BOX 1028
RIVERSIDE, CA 92502

01358.00008\31602864.1

2

DWA'S SUPPLEMENTAL BRIEF ON JUSTICIABILITY OF PHASE 2 CLAIMS
5:13-CV-00883-JGB

by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992); *see Horne v. Flores*, 557 U.S. 433, 445 (2009); *Summers v. Earth Island Inst.*, 555 U.S. 488, 403 (2009). Even if the Tribe has been injured, it must also present evidence that there is a real, ripe dispute that must be resolved by this Court, not just a potential disagreement about something that could happen in the future. *See, e.g., Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc). The deposition testimony of its own expert witness confirms that the Tribe has failed to present "specific facts" showing that the Water Agencies have caused the Tribe to suffer a concrete and particularized injury on its Phase 2 claims and that the Tribe has standing to maintain the claims, or that there is any ripe controversy at issue.

## II. TRIBAL EXPERT'S FAILURE TO SUPPORT TRIBE'S STANDING

In its motion to submit additional evidence, the Tribe argued that its expert, Mr. Page, would present evidence supporting the Tribe's standing to maintain its Phase 2 claims by showing that the Water Agencies are decreasing quantity and quality of water underlying the Tribe's reservation and damaging and reducing the pore space. *See* Dkt. 243-1 at 9438. The Tribe claimed that Mr. Page's evidence would thus satisfy the Tribe's burden to present specific facts supporting its standing. *Id.* at 9437-9438. However, just the opposite is true. Mr. Page's testimony does not support the Tribe's argument that it has standing, and instead supports the Water Agencies' contention that the Tribe has not suffered concrete harm and does *not* have standing. Understandably, the Tribe now seeks to distance itself from Mr. Page's testimony by stating in its Application for Leave to File Under Seal that it does not intend to rely on his declarations and deposition testimony. Dkt. 271 at 2. Nonetheless, Mr. Page's deposition testimony is part of the record before this Court and the Tribe has offered no other evidence to support its claim to standing.

Mr. Page admitted at his deposition that the Tribe's lawyers had drafted his declarations, that he spent only a few hours in reviewing and editing them, and that he never checked the data that purportedly underlie them. Dkt. 277-3, Exh. 1 at 19:9-13, 27:9-13, 116:18-21. He stated that the Tribe's lawyers had, in effect, "cherry-picked" the data. *Id.* at 94:9-13. Most importantly, he acknowledged that the Tribe had not suffered any injury at all as to any of the Tribe's claims—the Tribe's overdraft claim, *id.* at 109:5-112:21, the Tribe's water quality claim, *id.* at 144:19-147:23, and the Tribe's pore space ownership claim, *id.* at 162:12-165:16.

To provide some specific examples of how Mr. Page's testimony failed to support the Tribe's justiciability argument:

- At his deposition, Mr. Page conceded that the "trend" in groundwater levels on the reservation has been "upward measurements," Dkt. 277-3, 109:3-4, and that groundwater levels were rising when the Tribe filed its action in 2013. *Id.* at 99:2-103:20.
- Mr. Page conceded at his deposition that he was unfamiliar with other sources of recharge water in the West Whitewater Subbasin—the part of the groundwater basin where the Tribe's reservation is located-- and that he did not know what effect they may have on TDS. *Id.* at 277-3, 53:16-58:8.
- Mr. Page acknowledged at his deposition that many other sources of water might affect water quality in the Tribe's Desert Princess well and that he had never investigated any of those sources. *Id.* at 51:18-53:3, 58:5-23, 61:12-62:4, 67:7-73:10. Mr. Page stated he was unfamiliar with documents showing that the Tribe had identified sources of surface contamination near the well, which is the primary well discussed in his water quality opinion. *Id.* at 58:5-8, 67:7-72:12.
- Mr. Page acknowledged at his deposition that any rise in TDS levels at Well "MW-3," a monitoring well near the Tribe's casino, was not attributable to Colorado River water. *Id.* at 143:25-144:3.

- Mr. Page admitted that his original opinion that the Water Agencies' recharge efforts were increasing arsenic levels under the reservation was erroneous, and he withdrew that portion of his opinion. Dkt. 270-1, ¶ 16; Dkt. 277-3, Exh. 1 at 20:2-7.
- Mr. Page abandoned his original opinion that the chemistry of Colorado River water was causing the "likely" breakdown of clays in the aquifer, "potentially" reducing pore space. Dkt. 243-2 ¶56; Dkt. 277-3, Exh. 1 at 167:25-168:2.

Mr. Page has not presented any credible evidence supporting the Tribe's argument that it has standing to maintain its Phase 2 claims.

### III. THE TRIBE'S WATER QUALITY CLAIM

#### A. Failure to Demonstrate Concrete and Particularized Injury

The Tribe, through Mr. Page or otherwise, has not offered any evidence that its alleged reserved right has been injured as a result of any activities by the Water Agencies. There is no evidence of any activity or function that the Tribe has been unable to perform, any harm to the Tribe's property or other interests, or any financial, pecuniary or economic loss incurred by the Tribe as a result of the imported water. There is no evidence before the Court to suggest that the imported water has in any way limited the ability of the Tribe—one of the wealthiest tribes in the nation—to achieve its high level of prosperity.

Notably, Mr. Page acknowledged during his deposition that he was unaware of any injury sustained by the Tribe as a result of the imported Colorado River water. He stated that he was unaware of any physical injury to the Tribe or the reservation, of any guest refusing to patronize the Tribe's hotels, of any golf courses having been harmed, of any crops or machinery having been damaged, or that the Tribe has not been able to pursue development projects. Dkt. 277-3, Exh. 1 at 144:19-145:16. He acknowledged that the imported water has not prevented

fulfillment of any reservation purposes. *Id.* at 148:10-12. He further acknowledged that people in California and other western states use imported Colorado River water for domestic and irrigation uses. *Id.* at 145:18-146:7. He also acknowledged that neither the State of California nor the federal government, nor any other governmental entity, has ceased to use Colorado River water because of its TDS content. *Id.* at 146:9-147:1. Indeed, millions of people in California and other western states use imported Colorado River for drinking and other beneficial uses, and imported Colorado River water provides the sustenance for the economies of many western states.

The Tribe has offered no evidence indicating that it has suffered any concrete injury. Thus, the Tribe has not met its burden of showing specific facts to demonstrate that it has standing to maintain its water quality claim.

### B. State Drinking Quality Standards

Apart from the fact that the Tribe has failed to show specific facts that the imported water has caused it to suffer a concrete injury, and that Mr. Page has conceded that the Tribe has not suffered such an injury, the imported water fully complies with federal and state drinking water standards. This further demonstrates that the Tribe has not suffered concrete harm and does not have standing.

California has enacted a statute—the Pure and Safe Drinking Water Act, Cal. Health & Saf. Code (H&S Code) §§ 116270 *et seq.*—that establishes safe drinking water standards in California.[3] The statute authorizes the state to adopt a "maximum contaminant level" ("MCL") for any substance in water delivered by a public water system. H&S Code §§ 116275(c), (d). The state may adopt a "primary" MCL for any substance that affects the public health, and a "secondary"

---

[3] The California statute implements the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.*, 300g-1 *et seq.*, which establishes standards for safe drinking water that are not federally enforceable but are recommended guidelines for the states. 40 C.F.R. § 143.1.

MCL for any substance that—although not harmful to the public health—may affect the aesthetic quality of the water. The state has not adopted a primary MCL for TDS, but has adopted a secondary MCL for TDS. 22 C.C.R. § 64449. The secondary MCL for TDS consists of a range: 500 mg/l (milligrams per liter) is a recommended level as a matter of consumer preference if reasonable, 1,000 mg/l is the upper recommended level, and even 1,500 mg/l is acceptable on a short term basis. *Id.* Water that does not exceed these MCL limits is "permissible." *Id.* at § 116275(f). In short, in the judgment of the State of California, water that does not exceed 1,000 mg/l, and even 1,500 mg/l in the short term, is "permissible" and safe to drink. As Mr. Johnson stated in his declaration, "[t]he State has set 500 mg/l for TDS as a recommended guide, but it is not a public health requirement for water suppliers." Dkt. 246-2, at 9550 (¶ 3). So even if there was evidence that any specific well on the Tribe's reservation had TDS levels over 500 mg/l (which there is not, as the Tribe has abandoned Mr. Page's faulty opinions on that point), and if there were evidence that such levels were actually affecting drinking water (which, again, there is not), the Tribe still would not have shown that the water would be inappropriate for domestic or other uses.

Instead, the evidence before the Court is that the "average TDS level of the drinking water delivered by DWA is 370 mg/l, well below even the secondary standard and the recommended guide." Dkt. 246-2, at 9550 (¶ 3). DWA has not received any complaints from its customers, including the Tribe, that the water delivered by DWA is not suitable for an intended use or does not taste good. *Id.* DWA has never had to shut down production from its wells because of water quality concerns associated with TDS or other substances in the imported water. *Id.* And, as acknowledged by the record, including Mr. Page's deposition testimony, the Tribe has never been harmed as a result of water quality. The Tribe has offered nothing to counter any of this.

The signature well from the now abandoned Page declarations is the Desert Princess well, a golf course irrigation well that, according to Mr. Page, showed TDS levels in the range of 500 mg/l to 600 mg/l. Even if the Tribe had not abandoned this evidence, these TDS levels are, of course, still far below the 1,000 mg/l level that is the "permissible" limit of the state drinking water goals. Moreover, Mr. Page and the Tribe itself have acknowledged that the water quality readings from the Desert Princess well are unreliable for many reasons. The well equipment is unreliable and hardly functions. *See* Dkt. 277-3, Exh. 1 at 103:25-104:12. The Tribe even acknowledges that the "well data we have been using over the years was known to be very inaccurate." Dkt. 277, Exh. 1 at 113:24-114:13 (citing Exh.28). Furthermore, the well is under the influence of several factors that affect water quality readings for TDS, including the maintenance activities of the overlying golf course operated by the Tribe's lessee, the nearby storm water channels under the cone of influence of the well, and multiple other factors. *See id.* at 34:21-35:2, 37:3-7, 54:4-55:9, 57:22-58:8, 63:11-19, 67:20-81:17. None of this has anything to do with the Water Agencies' recharge activities. As Mr. Page acknowledged, any of these factors could have affected TDS readings. *See id.* at 38:10-40:6, 58:16-20, 77:18-24.

IV. **THE TRIBE'S QUANTIFICATION CLAIM**

DWA's expert, Mr. Scriven, stated that the Tribe has never pumped groundwater from its reservation, or indicated an intention to do so, except for a limited past situation in which the Tribe briefly pumped groundwater for a golf course. Dkt. 246-1, at 9544-46 (¶¶6-10). Any groundwater pumping on the Tribe's reservation has been performed by lessees who have never expressed any concern about groundwater levels or water quality. *Id.* The Tribe has never indicated any plans to develop its own source of water supply and instead relies on the Water Agencies to provide water. *Id.* The Water Agencies have never prevented or

discouraged the Tribe from producing groundwater underlying its reservation. *Id.* Perhaps more importantly, the Water Agencies do not know if they would ever oppose any plan the Tribe would come up with in the future. So there is no ripe dispute for the Court to resolve. "Federal courts cannot—and should not—spend their scarce resources in what amounts to shadow boxing." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 537 (1st Cir. 1995) (even a primarily legal dispute is not ripe when it "depends upon future events that may never come to pass, or that may not occur in the form forecasted").

Mr. Page acknowledged at his deposition that the Tribe has not suffered any harm as a result of any alleged overdraft. He agreed that any alleged overdraft has not prevented the Tribe from watering golf courses, supplying water to hotels on the reservation, pursuing development projects, pumping groundwater for its needs, banking groundwater, growing crops, watering lawns and gardens, or obtaining water from the Water Agencies. Dkt. 277-3, Exh. 1 at 109:5-112:15. Indeed, he acknowledged that there have been "upward measurements" of water on the Tribe's reservation, *id.* at 109:3-4, which flatly contradicts his claim that groundwater levels on the Tribe's reservation are declining as a result of overdraft.

DWA has offered evidence that groundwater levels underlying the Tribe's reservation have been generally stable for the last ten years, Dkt. 246-1, at 9546 (¶10), and that the reservation has greater quantities of underlying groundwater than it would have had in the absence of DWA's and CVWD's groundwater management program, including DWA's and CVWD's importation of Colorado River water. *Id.* So groundwater levels are going up, not down as the Tribe would have the Court believe. More importantly, however, the Tribe has offered no evidence that it has been prevented from exercising its reserved right or that insufficient water has been made available to it.

The Tribe has not presented any specific facts showing that it would suffer a concrete and particularized injury if the Tribe's reserved right is not quantified in

this proceeding. At this juncture, the Tribe presents only a hypothetical claim for quantification, and not a claim based on an actual or threatened injury or any actual dispute as to how much water it could pump. To demonstrate standing, a plaintiff must show that it has suffered a concrete and particularized injury that is "actual or imminent" and not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560-561. Since the Tribe's quantification claim is hypothetical and not based on an actual or imminent injury, the Tribe does not have standing to obtain quantification of its right at this juncture.

## V. THE TRIBE'S PORE SPACE OWNERSHIP CLAIM

### A. Land Subsidence

The Tribe has argued that it has standing to bring its pore space claim because overdrafting has caused subsidence and thus loss of pore space. However, Mr. Page acknowledged at his deposition that he was unaware of the actual circumstances of any subsidence on the reservation and that any subsidence appears to be minor and inconsequential. He stated that he has not measured the amount of any subsidence, that it "doesn't appear to be a lot," and may be measured in millimeters. Dkt. 277-3, Exh. 1 at 150:12, 150:22, 163:15-16. He stated that he has not done any testing to determine whether the alleged subsidence is permanent or temporary and is unaware of the distinction between permanent and temporary subsidence. *Id.* at 150:23-151:2-4. He acknowledged that he is unaware of current conditions. *Id.* at 165:14-16. And, he acknowledged that he is not an expert on subsidence. *Id.* at 158:18-20, 166:3-5.

More importantly, Mr. Page acknowledged at his deposition that the Tribe has not suffered any concrete injury as a result of land subsidence. He stated that the alleged subsidence has not caused damage to the Tribe's lands, or impacted any tribal efforts to pump or bank groundwater, or prevented the Tribe from pursuing

development opportunities, or caused the Tribe to spend money remediating any subsidence. *Id.* at 162:12-163:1.

Dr. Fogg stated in his declaration that the U.S. Geologic Survey has concluded that any subsidence on the Tribe's lands is negligible because the underlying aquifer is mostly composed of coarse-grained sands and gravel, which are less prone to subsidence than fine-grained sediments, such as clay. Dkt. 247-1, at 9618, 9629. Dr. Fogg also stated that because of recharge activities, subsidence on the Tribe's lands is not expected to occur in the future. *Id.* at 9618.

Thus, the undisputed evidence shows that any land subsidence that may have occurred on the Tribe's reservation is negligible and not likely to recur, and, more importantly, has not caused the Tribe to suffer any concrete injury.

### B. Non-Interference With Tribe's Use of Pore Space

Contrary to the Tribe's claim that the Water Agencies are "interfering" with the Tribe's reserved right by "limit[ing]" the Tribe's ability to "fully use its pore space," Dkt. 209, at 8432, the Water Agencies have never interfered with the Tribe's right to use the pore space, and Mr. Page has not suggested otherwise. *See,* Dkt. 246-1, at 9544.

### VI. THE TRIBE IS RESPONSIBLE FOR ITS OWN FAILED STRATEGY

The Court has provided the Tribe with every opportunity to demonstrate that its Phase 2 claims are justiciable, and the Tribe has used up all of its markers. To keep its case alive, the Tribe has offered only inadmissible, unreliable testimony from its longtime consultant, whom, in a twist of events, the Tribe now seeks to disavow. The real reasons for the Tribe's sudden change of heart are that Mr. Page did virtually none of the work in preparing his declarations, has admitted that he is not an expert on one of the core issues in the case, and has withdrawn most of his previous opinions submitted to the Court. Although the Water Agencies agree that

Page's declarations are inadmissible, the Tribe has provided nothing to suggest that the Court can simply disregard Mr. Page's deposition testimony that the Tribe has suffered no injury, or his deposition testimony showing that the positions taken in his declarations were unsupportable.

The Tribe previously asserted that Mr. Page "is competent to testify" on the basis that he has been its consultant for decades and has significant knowledge regarding the Tribe's purported injuries. Dkt. 243-1 at 6; Dkt. 249 at 6. At his deposition, which is available to the Court on DVD (Dkt. 277-3, Exh. 2), Mr. Page responded to questions with no sign of confusion, including questions regarding his background, the process of preparing his declarations, and his working relationship with the Tribe. See, Dkt. 277-3, Exh. 1 at 13:7-25:19. He never asked to stop the deposition. In fact, when CVWD's counsel suggested breaking for lunch and asked if that was okay with Mr. Page, he responded that he could "[s]tay here all day." *Id.* at 112:23-113:6. Furthermore, the Tribe's counsel expressed no concern to the Water Agencies about Mr. Page's capacity or ability to answer questions before the deposition, off the record during any break, on the record when returning from break, or at any other time that day. See *id.* at 117;17-23 (returning from break); Dkt. 277-2 ¶¶6, 9; Dkt. 277-3 ¶5. Counsel apparently expressed no concern to Mr. Page about his performance. See *id.* at 73:20-25; 117:24-118:2 (Page did not discuss his testimony with lawyers during breaks).

The timeline of events suggests that the Tribe decided to discredit Mr. Page only after he offered testimony that the Tribe's attorneys did not like. Indeed, the Tribe submitted and filed with the Court an amended declaration signed by Mr. Page the Friday before Mr. Page's deposition and there was no mention of lack of capacity then. See Dkt. 270. The Tribe's counsel met in person with Mr. Page days before his deposition and there was no mention of a lack of capacity. See Dkt. 277-3, Exh. 1 at 14:7-22. Mr. Page revised, corrected and signed an errata sheet on October 22, 2018. See Dkt. 277-2 ¶ 16 & Exh. 3. Moreover, Mr. Page has been the

Tribe's consultant for many years, so the Tribe had every opportunity to investigate and evaluate his competence before proffering him as a testifying expert. *See* Dkt. 243-1 at 6 ("Mr. Page has been working with Agua Caliente since the 1990s . . . ."). Instead, after walking away from a deposition in which its expert was impeached by irrefutable documents, and in which its expert truthfully admitted that the Tribe had suffered no injury, the Tribe decided to sacrifice its own expert witness, and now tries to discredit his testimony.

The Tribe's tactics are unfairly prejudicial to the Water Agencies, which opposed the Tribe's submission of additional testimony from Mr. Page and then spent significant resources preparing for and conducting his deposition, and in drafting these supplemental briefs. *See* Dkt. 277-2 ¶ 23; Dkt. 277-3 ¶ 7. It would be more than appropriate for the Court to order the Tribe to cover the Water Agencies' costs of responding to the Tribe's motion to supplement the record and all subsequent related proceedings. But most importantly, the Water Agencies request the Court's determination that based upon the evidence presented, the Tribe lacks standing to proceed any further in this case.

## VII. CONCLUSION

This Court should dismiss the Agua Caliente Tribe's Phase 2 claims on the ground that the Tribe does not have standing to maintain the claims.

Dated: November 9, 2018

Respectfully submitted,
BEST BEST & KRIEGER LLP

By: /s/ Piero C. Dallarda
Roderick E. Walston
Arthur L. Littleworth
Piero C. Dallarda
Michael T. Riddell
Holland P. Stewart
Attorneys for Defendant
Desert Water Agency

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2018, by using the CM/ECF system, I electronically filed with the Clerk of the Court for the United States District Court, Central District of California – Eastern Division, the following document:

DESERT WATER AGENCY'S SUPPLEMENTAL BRIEF ON JUSTICIABILITY OF PHASE 2 CLAIMS (PURSUANT TO COURT'S ORDER, DKT. NO. 267)

All registered CM/ECF users in this case will be served by the CM/ECF system.

Dated: November 9, 2018   /s/Cheryl Seaman
                         CHERYL SEAMAN