1  CATHERINE F. MUNSON (D.C. Bar No. 985717, admitted *pro hac vice*)
   CMunson@kilpatricktownsend.com
2  MARK REEVES (D.C. Bar No. 1030782, admitted *pro hac vice*)
   MReeves@kilpatricktownsend.com
3  KILPATRICK TOWNSEND & STOCKTON, LLP
   607 14th Street, N.W., Suite 900
4  Washington, D.C. 20005
   Tel:  (202) 508-5800; Fax: (202) 508-5858
5
6  Attorneys for Plaintiff
   Agua Caliente Band of Cahuilla Indians
7  (Additional counsel identified on next page)

8              **UNITED STATES DISTRICT COURT**
9     **CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

| | |
|---|---|
| 10  AGUA CALIENTE BAND OF<br>CAHUILLA INDIANS, | Case No.:  ED CV 13-00883-JGB-SPX |
| 11              Plaintiff, | Judge:      Hon. Jesus G. Bernal |
| 12  and | **AGUA CALIENTE BAND OF** |
| 13  UNITED STATES OF AMERICA, | **CAHUILLA INDIANS' RESPONSE**<br>**TO CVWD'S SUPPLEMENTAL**<br>**BRIEF ON STANDING** |
| 14              Plaintiff-Intervenor, | |
| 15  v. | Filed concurrently with: |
| 16  COACHELLA VALLEY WATER<br>DISTRICT, et al. | 1.  Declaration of Mark H. Reeves<br>2.  Declaration of Robyn Krueger |
| 17 | 3.  Declaration of Rahsaan Tilford |
| 18              Defendants. | 4.  Plaintiff's Application for Leave to<br>File Under Seal |
| 19 | 5.  Request for Judicial Notice<br>6.  Evidentiary Objections |
| 20 | |
| 21 | Hearing Date:      TBD |
| 22 | Time:              TBD<br>Courtroom:        1 |
| 23 | Action Filed:      May 14, 2013 |

STEVEN C. MOORE (CO Bar No. 9863, admitted *pro hac vice*)
Smoore@narf.org
HEATHER WHITEMAN RUNS HIM (NM Bar No. 15671, admitted *pro hac vice*)
HeatherW@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Tel:  (303) 447-8760; Fax: (303) 443-7776

JOHN TABINACA PLATA (CA Bar No. 303076)
jplata@aguacaliente.net
AGUA CALIENTE BAND OF CAHUILLA INDIANS
5401 Dinah Shore Drive
Palm Springs, CA 92264
Tel: (760) 699-6837 Fax: (760) 699-6963

Attorneys for Plaintiff
Agua Caliente Band of Cahuilla Indians

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ii

I.    Agua Caliente has standing to quantify its federal reserved water right. ....... 1

    A.    *CVWD misconstrues what Agua Caliente must show to demonstrate standing to quantify its federal reserved water right.* ...... 1

    B.    *Agua Caliente's injury arises from the uncertainty surrounding the scope, character, and extent of its federal reserved water right.* ......... 3

    C.    *Even under CVWD's mischaracterized standard, evidence shows that Agua Caliente has suffered and faces harm as a result of the water districts' actions.* ........................................................................ 5

II.    Agua Caliente has standing to litigate its water quality claim. ...................... 8

III.    Agua Caliente has standing to proceed with its pore space claim. ............... 13

IV.    CVWD grossly mischaracterizes the situation involving Mr. Page............. 14

i

# TABLE OF AUTHORITIES

**Cases**

*Agua Caliente Band of Cahuilla Indians v. CVWD*,
    849 F.3d 1262 (9th Cir. 2017)......................................................................2, 4

*Arizona v. California*,
    373 U.S. 546 (1963) .....................................................................................1, 2

*Avista Corp. v. Sanders Cnty.*,
    405 Fed. App'x 225 (9th Cir. 2010) ..............................................................4

*Cent. Delta Water Agency v. United States*,
    306 F.3d 938 (9th Cir. 2002).........................................................................9

*Colville Confederated Tribes v. Walton*,
    647 F.2d 42 (9th Cir. 1981)........................................................................4, 5

*Confederated Salish & Kootenai Tribes v. Clinch*,
    992 P.2d 244 (Mont. 1999) ...........................................................................4

*Ecological Rights Found. v. Pac. Lumber Co.*,
    230 F.3d 1141 (9th Cir. 2000).......................................................................9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
    528 U.S. 167 (2000) ...............................................................................7, 8, 9

*Halet v. Wend Inv. Co.*,
    672 F.2d 1305 (9th Cir. 1982).......................................................................7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................6, 9

*Navajo Nation v. Dep't of the Interior*,
    876 F.3d 1144 (9th Cir. 2017).......................................................................1

*Nevada v. United States*,
    463 U.S. 110 (1983) ......................................................................................3

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005).........................................................................9

*United States v. Adair*,
    723 F.2d 1394 (9th Cir. 1984).......................................................................2

*United States v. Ahtanum Irr. Dist.*,
   124 F. Supp. 818 (E.D. Wash. 1954) ........................................................................... 3

*United States v. Ahtanum Irr. Dist.*,
   236 F.2d 321 (9th Cir. 1956) .................................................................................... 2, 3

*United States v. California*,
   332 U.S. 19 (1947) ..................................................................................................... 4

*United States v. Walker River Irr. Dist.*,
   2012 WL 1424178 (D. Nev. April 23, 2012) ............................................................. 3

**Other Authorities**

Report of Special Master S. Rifkind, *Arizona v. California*, O.T. 1960 (Rifkind) ........ 2

**AGUA CALIENTE BAND OF CAHUILLA INDIANS' RESPONSE TO CVWD'S SUPPLEMENTAL BRIEF**

Agua Caliente plainly has standing to have its federal reserved water right quantified, to seek redress of the districts' degradation of the water subject to that right, and to litigate the disputed status of its sovereign and proprietary rights in the pore space underlying its Reservation. Having standing to litigate those claims, Agua Caliente must have standing to obtain rulings on the interlocutory, precursor legal issues now before the Court. CVWD can argue inapplicable standards and ignore relevant evidence, choosing instead to recount—often in misleading or embellished fashion—testimony that Agua Caliente has disclaimed, but its attacks cannot defeat Agua Caliente's right to have this Court determine its rights in and control over its federally reserved property.

## I.    Agua Caliente has standing to quantify its federal reserved water right.

*A.    CVWD misconstrues what Agua Caliente must show to demonstrate standing to quantify its federal reserved water right.*

CVWD's argument that Agua Caliente lacks standing to seek quantification of its federal reserved water right misses the mark because it mischaracterizes the relevant injury.[1] CVWD asserts, incorrectly, that Agua Caliente cannot pursue quantification because (1) it allegedly has not shown that it has a concrete need or plan to use its federal reserved water right and (2) the water districts have not interfered with its ability to access the water reserved for it. Doc. 281 at 5 (all pin cites to ECF pages). Tellingly, however, CVWD cannot cite a single reserved rights case where the court required such a showing to proceed with quantifying a *Winters* right. On the contrary, it relies on cases that either quantify rights absent such a showing, *see Arizona v. California*, 373 U.S. 546, 599-601 (1963), or do not involve quantification of *Winters* rights at all. *See Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144 (9th Cir. 2017) (dismissing breach of fiduciary duty claims against the United States based on an alleged failure to protect unquantified *Winters* rights, but not involving any claim for quantification).

---

[1] To be clear, the quantification claim is not before the Court in Phase 2. Instead, by stipulation of the parties and its own order, the Court is merely identifying the legal standard that it will apply to quantify the right in Phase 3.

CVWD's failure to cite case law supporting its position is easily explained: courts quantifying *Winters* rights have not required tribes to demonstrate their use of or plans for using the right or to show that opposing parties are preventing them from accessing water for current needs.[2] On the contrary, case law universally recognizes that federal reserved water rights are not tied to or contingent upon any contemporary use or showing of need, but instead are forward-looking rights intended to satisfy future needs. *See Arizona*, 373 U.S. at 600 (1963); *Agua Caliente Band of Cahuilla Indians v. CVWD*, 849 F.3d 1262, 1272 (9th Cir. 2017); *United States v. Adair*, 723 F.2d 1394, 1416 (9th Cir. 1984); *United States v. Ahtanum Irr. Dist.*, 236 F.2d 321, 326 (9th Cir. 1956). Accordingly, courts quantify such rights without a showing of then-current reservation needs or uses or interference with a present effort to use water. *See Arizona*, 373 U.S. at 600-01; Report of Special Master S. Rifkind, *Arizona v. California*, O.T. 1960 (Rifkind), at 86 & 350 (quantifying 11,340 acre-feet of water for the Chemehuevi Reservation, which had no irrigation or Indian residents); *Ahtanum*, 236 F.2d at 327.

CVWD's insinuation that the Supreme Court required a showing of unmet need to quantify rights in *Arizona* is incorrect. Doc. 281 at 6. In the passage cited by CVWD, Master Rifkind declined to use the Supreme Court's original jurisdiction to equitably apportion as-then uncontested rights between states. Rifkind at 318. The cited discussion has no relevance to the quantification of actively disputed *Winters* rights. *See Arizona*, 337 U.S. at 597 (distinguishing *Winters* rights from interstate rights subject to equitable apportionment). And Master Rifkind did, in fact, quantify unused *Winters* rights. *See, e.g.*, Rifkind at 86 & 350.

---

[2] As pointed out in prior briefing, Agua Caliente and its members <u>do</u> use groundwater. Nearly all water used on the Reservation is groundwater, and numerous Agua Caliente members and lessees pump groundwater directly from Reservation trust land. Doc. 246-1 at 4, ¶ 7; *see* Doc. 97 at 8 n.3. Moreover, Agua Caliente itself pumped groundwater shortly before filing this lawsuit, and it recently announced a partnership with Mission Springs Water District to explore further development and use of the Tribe's reserved groundwater. Doc. 246-1 at 3, ¶ 6; Declaration of Rahsaan Tilford Ex. 1.

2

The Ninth Circuit's holding in *Ahtanum* also forecloses CVWD's argument. There, the district court initially adopted a position similar to that urged by the districts here, dismissing claims for quantification of *Winters* rights on the grounds that the United States "did not plead, claim or prove possession by use[] and beneficial application of any defined water right on any allotment" or that "any of the Indians has been ousted from the possession and use of the flow." *United States v. Ahtanum Irr. Dist.*, 124 F. Supp. 818, 837, 839 (E.D. Wash. 1954); *see id.* at 827-29, 839-40. The Ninth Circuit rejected this theory completely. *Ahtanum*, 236 F.2d at 340 ("With this we disagree."). The United States did not, and was not required to, show defendants' interference with the Indians' property or beneficial use thereof to establish a *Winters* claim. *Id.* Its demonstration of title and the Indians' "aggregate needs" sufficed. *Id.*; *see also id.* at 327 (finding it "plain … that the paramount right of the Indians to the waters of Ahtanum Creek was not limited to the use of the Indians at any given date"); *id.* at 339-40. CVWD's theory of the case would require Agua Caliente to prove more to survive summary judgment on an interlocutory legal question in Phase 2 than it will need to prove to prevail on the merits in Phase 3 under *Ahtanum*. That is not the law, and Agua Caliente simply is not required to demonstrate current use/interference with use of water in order to establish standing for this Court to resolve the issue before it.

B.    *Agua Caliente's injury arises from the uncertainty surrounding the scope, character, and extent of its federal reserved water right.*

Correctly identifying the injury establishing Agua Caliente's standing requires correctly understanding the nature of Agua Caliente's claim. A suit to quantify a federal reserved water right is in effect a quiet title action. *See, e.g.*, *Nevada v. United States*, 463 U.S. 110, 143 (1983); *Ahtanum*, 236 F.2d at 339 ("The suit, like other proceedings designed to procure an adjudication of water rights, was in its purpose and effect one to quiet title to realty."); *United States v. Walker River Irr. Dist.*, 2012 WL 1424178 **4-5 (D. Nev. April 23, 2012). In a quiet title action, injury arises not from damage to or interference with use of property, but rather from the uncertainty of a party's rights in—

and, in the case of an Indian tribe's *Winters* rights, sovereignty over—the property in question. *See, e.g.*, *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 53 (9th Cir. 1981) ("Regulation of water on a reservation is … an important sovereign power.").

Here, Agua Caliente claims proprietary and sovereign interests in water reserved for it by the United States and, as discussed below, the pore space underlying the Agua Caliente Reservation. The districts dispute the existence, extent, and nature of those rights, casting a cloud of uncertainty over Agua Caliente's ability to exercise them. *See, e.g.*, Doc. 202-1 at 32-39 (asserting various limitations on Agua Caliente's *Winters* rights); Doc 208 at 26-28 (questioning the priority of and asserting limitations on Agua Caliente's *Winters* rights). The parties further dispute Agua Caliente's right to store reserved water—a non-consumptive use—and the districts' asserted right to use water reserved for the Tribe. *Compare Confederated Salish & Kootenai Tribes v. Clinch*, 992 P.2d 244, 247-50 (Mont. 1999) (enjoining issuance of permits to use water potentially subject to unquantified *Winters* rights) *with* Doc. 219 at 22 n.9 (arguing that Agua Caliente cannot store reserved water for future use or prevent the districts from using it). These disputes and the resulting uncertainty, all of which will be redressed by this Court's quantification of Agua Caliente's *Winters* right and issuance of appropriate injunctive relief, establish a concrete, justiciable controversy under Article III. *See, e.g.*, *United States v. California*, 332 U.S. 19, 24-25 (1947) (finding standing to adjudicate a dispute over "who owns, or has paramount rights in," certain property and holding that "[s]uch concrete conflicts as these constitute a controversy in the classic legal sense"); *Avista Corp. v. Sanders Cnty.*, 405 Fed. App'x 225, 226 (9th Cir. 2010) (holding that a party whose rights and obligations with respect to property could be affected by who held title had injury arising out of uncertainty, and thus had standing to quiet title).

As the Ninth Circuit has instructed, the proper resolution of uncertainty arising from unquantified *Winters* rights "is found in quantifying" them. *Walton*, 647 F.2d at 48; *see also Agua Caliente*, 849 F.3d at 1272 (anticipating that this Court would conduct "a full analysis specifying the scope of the water reserved"). By quantifying its federal

4

reserved water right, Agua Caliente seeks to settle disputes and remove uncertainties regarding the existence, extent, nature, and scope of its sovereign and property interests. It unquestionably has standing to do so.

**C.**    *Even under CVWD's mischaracterized standard, evidence shows that Agua Caliente has suffered and faces harm as a result of the water districts' actions.*

Even under CVWD's misguided premise that Agua Caliente must show a threat to or interference with its ability to use its reserved water in order to establish standing, Agua Caliente has, without the benefit of full discovery, put forth evidence sufficient to survive the districts' motions for summary judgment. The districts' undisputed and long-standing overdraft of the aquifer has caused water levels under the Reservation to decline precipitously, and the districts claim no intent to restore groundwater levels to pre-overdraft conditions.[3] These undisputed facts suffice to establish injury.

As CVWD has publicly stated, overdraft and declining groundwater levels have "serious consequences;" "the immediate and direct effect is increased groundwater pumping costs." Doc. 282 at 102. Agua Caliente felt this effect when it pumped water for its golf course as recently as 2012, and its members' lessees feel it now when they pump reserved groundwater for use on the Reservation.[4] *See supra* n.2. Moreover, based on the most recent data available and the testimony of CVWD's expert, Dr. Graham Fogg, water levels under parts of the Agua Caliente Reservation continue to decline and did so as recently as the last year. *See infra*. This evinces an ongoing infringement of Agua Caliente's ability to access groundwater that the United States reserved for the Reservation's present and future use.

---

[3] While the districts are not the Valley's only groundwater pumpers, they indisputably pump the vast majority of the water in the basin. *See* Docs. 225-2 & 225-3. To the extent they claim that other pumpers must be joined in this lawsuit for Agua Caliente to obtain complete relief, *see* Doc. 281 at 12, they raise a Rule 19 issue that the parties agreed to defer until Phase 3 of this case. *See* Doc. 49, ¶ 11.

[4] Agua Caliente's allottee members are entitled to a ratable share of the Reservation's federal reserved water right. *See Walton*, 647 F.2d at 51.

In an attempt to evade the reality of significant cumulative overdraft and groundwater level declines, CVWD accuses Agua Caliente of "cherry-picking" limited time periods that support the Tribe's claims. Doc. 281 at 11. Of course, such accusations can be lodged against any incomplete data set. The only way to fully avoid "cherry-picking" is to start from the beginning. The districts' own expert calculates that from 1936 (roughly the onset of modern groundwater pumping) to 2013 (the year Agua Caliente filed this lawsuit), overdraft reduced the amount of groundwater stored beneath Agua Caliente Reservation trust lands by between 80,892 and 146,130 acre-feet (AF). *See* Phase 1 Rebuttal Report of Robert Krieger[5] (K&S Report) at 6-7.[6] For this same period, the districts' expert found that groundwater levels declined beneath 29 of the 36 sections of land within the Reservation. *Id.*, Table 3. These findings are consistent with the districts' public reports. For example, near the time that Agua Caliente filed this suit—which is the relevant time for assessing standing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570, n.5 (1992)—CVWD estimated overdraft for the Upper Whitewater River Subbasin between 1936 and 2011 to be 735,974 AF and noted that groundwater levels in West Valley, where the Reservation is located, had "decreased substantially." Agua Caliente Request for Judicial Notice (RJN) B-77; Doc. 282 at 22. DWA recently estimated the cumulative overdraft of the West Whitewater River Sub-basin as 628,000 AF, RJN C-101, roughly the same amount estimated by the K&S Report. K&S Report, Table 1. And earlier this year, DWA estimated cumulative overdraft of 624,000 AF. RJN D-170.

---

[5] Krieger & Stewart has provided engineering services to DWA for at least 45 years, including preparing or supervising the preparation of the studies and ensuing reports for establishing replenishment assessments and other DWA water charges. Doc. 246-1 at 2, ¶ 3. CVWD also disclosed Robert Krieger, the author of the K&S Report, as its Phase 1 testifying expert. *See* Declaration of Mark H. Reeves, filed herewith, Ex. B.

[6] The K&S Report appears as Exhibit 11 to the deposition transcript of CVWD's expert, Dr. Fogg, and separately in Ex. C to the Reeves Declaration. Pin cites are to the original page numbers in the K&S Report.

The districts do not plan to restore groundwater levels to what they were when the United States established the Agua Caliente Reservation. *See* Fogg Transcript, Reeves Decl. Ex. D (Fogg), 84:13-17. Rather, they speculate that they will "resolve" ongoing, additional overdraft sometime in the future, hopefully by 2022, and that resolution will be "based on the 1990 baseline." *See* RJN S-679. In other words, the districts simply plan to normalize existing overdraft. Fogg 85:11-14 (explaining that existing lower groundwater levels "can be" "the new normal").

By arguing that they will "resolve" ongoing overdraft of the aquifer in the future instead of addressing past, existing overdraft, the districts essentially assert that Agua Caliente will not suffer further harm. This argument implicates mootness rather than standing. A case becomes moot only "if it is absolutely clear that: (1) there is no reasonable expectation that the alleged violation will recur; and (2) interim relief or events have completely eradicated the effects of the violation." *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1308 (9th Cir. 1982). The "heavy burden" of "persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 708 (2000), and the districts cannot meet it.

Dr. Fogg's testimony shows that groundwater levels have declined under the Reservation over many different time periods, including the most recent years. He agreed that data for nearly all of the wells the Tribe monitors showed groundwater level declines from 2000 to 2013 and from 2000 to 2017. Fogg 27:9-22. He also testified that while a hydrograph of a well supposedly in the vicinity of the Reservation shows some increases in groundwater on the Reservation, it also shows groundwater level declines on the Reservation for the ten-year period from 2006 to 2016. *Id.* 50:19 – 51:16 & Ex. 1, Fig. 1.3. Importantly, a more recent version of this CVWD hydrograph shows more widespread groundwater level declines on the Reservation for the last ten years. Fogg 52:20 – 53:3 & Ex. 3 at PAGE0035197. In other words, the trend is worsening. This same well shows a decline in groundwater levels from 2016 to 2017, the most recent

7

data available. Fogg 53:25 – 54:8. The districts' claim that their conduct is no longer injuring Agua Caliente and that the Tribe is misleadingly "cherry-picking" data is nonsense belied by their own expert's sworn testimony and CVWD's own reports.[7]

Finally, while Dr. Fogg claims in his report that "the Districts' proposed water management plan is expected to substantially mitigate the above overdraft effects," Doc. 247-1 at 15, he admitted on cross-examination that he actually understands very little about the workings of the plans and "that was not really part of my work on this." Fogg 89:21-22. Based on this testimony, Dr. Fogg cannot credibly attest to the efficacy of the districts' plans to resolve overdraft, plans which are uncertain at best and come nowhere close to meeting the burden required by *Laidlaw*. DWA's latest public report paints a more accurate picture, admitting that:

> The Coachella Valley Groundwater Basin (and its subbasins) is in an overdraft condition and will most likely remain so, even with the importation and exchange of available SWP water, until a higher proportion of the maximum SWP Table A allocations becomes available. With maximum Table A allocations, recharge in the WWR and MC Management Areas would offset the current annual overdraft, although overdraft in future years is virtually unpredictable, due to the difficulty of projecting long-term growth and reliability of SWP supplies.

RJN D-209. In short, historic overdraft is undisputed and will not be addressed, and reliable predictions about the districts' ability even to limit future overdraft are impossible. Under these facts, Agua Caliente has standing to quantify its federal reserved water rights even under the inaccurate standard urged by the districts.

## II.    Agua Caliente has standing to litigate its water quality claim.

As in the case of Agua Caliente's quantification claim, CVWD overstates and mischaracterizes the evidentiary showing necessary at this stage. And once again,

---

[7] After initially claiming that a map in CVWD's SPEIR showed that groundwater levels would improve from 2009 to 2045 under Agua Caliente lands, Dr. Fogg admitted on cross-examination that this same map showed groundwater level declines (in red) for this same period under other Reservation lands. Fogg 56:13 – 58:17 & Ex. 7, Fig. 8-3.

contrary to CVWD's claims, the evidence more than suffices to make the showing actually required—a point that CVWD conceded as recently as its Phase 2 reply brief. *See* Doc. 219 at 21 ("Plaintiffs have standing … to raise water quality claims."). Now, however, CVWD contends that Agua Caliente has shown no "cognizable injury related to groundwater TDS levels," and thus has no standing. Doc. 281 at 14, 16 n.4. CVWD errs in several ways.

CVWD's first misstep is presuming what injuries are "cognizable." This disregards the issue before the Court in Phase 2—*i.e.*, "whether the Tribe's groundwater rights include a water quality component." Doc. 121 at 1. If *Winters* rights do include a water quality component, "the identification of the water quality standard and the quantification of the water quality will be addressed in Phase III." *Id.* at 1 n.1. At this juncture, where the applicable quality standard remains undetermined and reserved for a future phase of the case, the standing inquiry can require no more than for Agua Caliente to demonstrate declines in water quality that are traceable to the districts and redressable by this Court. As discussed below, it has done so.

Even if a broader question was before the Court, CVWD's insistence that the Tribe show that water quality has declined to the point of causing physical injury or becoming unusable, Doc. 281 at 15-16, would still overstate the test. At the summary judgment state, plaintiffs "need not establish that they in fact have standing, but only that there is a genuine question of material fact as to standing elements." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002). Moreover, the plaintiffs' evidence must be taken as true. *Lujan*, 504 U.S. at 561. And in cases alleging environmental injuries such as water quality degradation, plaintiffs have standing if they can show a connection to the area of concern, that their future life will be less enjoyable, including aesthetic satisfaction, and that they have or will suffer if the area in question becomes environmentally degraded. *Laidlaw*, 528 U.S. at 169; *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005). Agua Caliente, who has been

relying upon the groundwater in Coachella Valley for millennia, unquestionably has a connection to its federally reserved groundwater. The districts have degraded, and are continuing to degrade, this groundwater with no plans to stop.

Undisputed evidence, much of it published by the districts themselves, shows that the districts' recharge activities have contributed to increased total dissolved solids (TDS) in the groundwater underlying parts of the Agua Caliente Reservation and that those adverse effects will continue and worsen so long as the districts continue to recharge the aquifer with untreated Colorado River water. While the water quality standard applicable to *Winters* rights remains to be determined, California and the U.S. EPA have established a Secondary Maximum Contaminant Level (SMCL) for TDS at 500 mg/L. RJN N; MWD 4-3.[8] Higher TDS levels may cause a "great number of people to stop using water from their public water system." RJN N. Accordingly, responsible water managers strive to keep TDS levels below 500 mg/L.[9]

CVWD and DWA have recharged untreated Colorado River water at the Whitewater River Recharge Facility (the Facility) directly up-gradient from the Agua Caliente Reservation since 1973. Doc. 282 at 136; RJN K-541. The TDS of the recharge water ranges from 530 to 750 mg/L, averaging 636 mg/L since 1973—a level the United States Geological Survey (USGS) calls "significantly higher dissolved solid concentration (greater than 500 mg/L) than the native water (about 200 mg/L)." RJN K-544; Doc. 282 at 136. In 1992, using CVWD and DWA data, the USGS, in cooperation

---

[8] The Court has judicially noticed the online version of Metropolitan Water District's (MWD) 2016 Urban Water Management Plan. (Doc. 231, 233). References to that plan are to the page numbers of that online document, designated as "MWD ---."

[9] MWD, a public agency that serves over 19 million Californians, has a goal of TDS levels under 500 mg/L in delivered water. *See* Doc. 231 at 2; MWD 4-3. For MWD, "concern over salinity levels in the Colorado River has existed for many years" because "salinity can impact various water uses such as limiting groundwater and recycled water uses, reducing the lifespan of household appliances, and reducing crop yields." MWD 4-3, 4-4. An MWD analysis of the cost effect of higher TDS water concluded that every 100 mg/L of TDS cost consumers $95 million. *Id.* To meet its salinity standards, MWD mixes Colorado River water with lower TDS water supplies prior to delivery. *Id.* 4-2.

with the California Regional Water quality Control Board, published a report analyzing the recharge program's "effects on water quality." RJN, K-535-36. The USGS concluded that "[d]issolved-solids concentrations of ground water near the artificial-recharge area generally has increased as a result of the artificial recharge. (fig. 6)" RJN K-544, 546 (showing 4S4E-2B1 in Fig. 6). Publicly available reports and the districts' own data and analysis indicate that this has occurred in at least two supply wells within the Agua Caliente Reservation, referred to herein by their DWA identification numbers of Well 22 and Well 14.

Well 22,[10] a USGS/DWA active supply well on the Reservation, had TDS levels of 229 mg/L in 1973. RJN  K-608, G, H, I, P, M. By 1990, TDS levels had climbed to 402 mg/L. RJN K-608. The 1992 USGS report included Well 22 in a series of graphs showing wells with rising TDS levels caused by the districts' recharge activity. RJN K-544; 546 Figure 6 (4S/4E-2B1). Specifically, the USGS found that this Reservation well is down gradient from the artificial recharge and demonstrated a "water quality response" to the recharge. RJN K-570 (referring to 4S/4E-2B1). Based on data published on the State Water Board's website, the TDS levels at this well repeatedly have exceeded 500 mg/L since 2002, with the most recent tests in 2013 and 2016 showing 580 mg/L. RJN E, N. The K&S Report graphed the TDS at Well 22, illustrating the correlation between the amount of recharge water and the increasing groundwater TDS levels. Fogg Ex. 11, Figure 16; Doc. 198. It also addressed Well 14,[11] another water supply well on the Reservation. RJN A-46, M, P, Q, R. TDS levels in Well 14 were 296 mg/L in 1973, exceeded 500 mg/L in recent years, and were most recently measured at 450 mg/L. RJN K-610 (1973-1988); RJN O (1988-2016); K&S Report at 11, Figure 16 (showing exceedance of 500 mg/L).

---

[10] This well has several identifying numbers, including State Well No. T4S/R4E-2B1S, DWA Well 22, PS Code 3310005-024, USGS 3351221116320801. *See* RJN A-46, N-647, G, H, J, I, P.
[11] This well's identifying numbers include State Well No. 4S/4E-26A1, DWA Well 14; PS Code 310005-017, USGS 334756116314001. *See* RJN A-46, N-647, Q, R.

The K&S Report confirmed that increasing TDS levels in wells down gradient from the Facility, like Wells 14 and 22, have "an apparent correlation to replenishment water." K&S Report at 11. The only wells considered and excluded from this conclusion are two, including one on the Reservation, "located farther away from the Whitewater River Channel." *Id.* Krieger reasoned that "the replenishment water is likely migrating away from the spreading grounds horizontally at relatively shallow depths, generally following the path of least resistance defined by the downstream course of the Whitewater River Channel." *Id.*[12] Agua Caliente has repeatedly cited Well 22 as one influenced by recharge, *see* Reeves Dec., Ex. A, Doc. 243-2 (Ex. 6), and neither district has disputed the USGS's conclusion that TDS increases at this well are the result of artificial recharge, nor have they disputed their own experts' conclusion that recharge is causing the TDS increases at Well 14.

These effects of artificial recharge are undisputed and unsurprising. They were predicted when recharge efforts began in the 1970s, Fogg 60:18-23, and they were predicted as recently as 2010 when CVWD issued its WMP Subsequent Program Environmental Impact Report (SPEIR) explaining that its "groundwater model estimates, as under the 2002 Plan, water quality changes from recharge with Colorado River water would affect the groundwater supply … of the Agua Caliente tribe." RJN F-328; Fogg Ex. 7. These effects, according to CVWD's SPEIR, are going to increase in the future. RJN F-328-29; Fogg Ex. 7. ("Agua Caliente tribal wells would also be affected by the recharge, reflected in salinity gradually increasing over time to a level approaching that of the Colorado River."). They are "significant and not mitigable." RJN F-327; Fogg, Ex. 7. The SPEIR even includes a map showing how a plume of degraded water has moved and is predicted to continue moving under the Agua Caliente

---

[12] Krieger also opined that "active pumping of the wells located in the path of the replenished groundwater draws the shallow, replenished water deeper into the pumping zone of the aquifer in the vicinity of the wells." *Id.*

Reservation over time—an outcome that Dr. Fogg admitted at his deposition is likely. *See* Ex. A, attached hereto; RJN F-331; Fogg 62:14-17 & Ex. 7.

Indeed, before Agua Caliente filed this lawsuit, CVWD was publicly forthcoming about the effects of its recharge project, admitting that "Colorado River water delivered to the Coachella Valley contains more than one ton of salt in every acre-foot of water delivered," Doc. 282 at 193, and that "imported water brings about 350,000 tons of salt into the basin each year." Doc. 282 at 226, 250. It further acknowledged that artificial recharge caused increased TDS levels in the aquifer. Doc. 282 at 136, 250 ("Over time, this will lead to a gradual degradation of water quality in the basin."). These are the facts, and no amount of litigation-targeted obfuscation by the districts can change them.

This evidence of Agua Caliente's standing is particularly compelling in light of the relatively low bar for demonstrating injury at this stage and for this type of claim. As explained in earlier briefing, plaintiffs alleging environmental harms such as water quality degradation are not required to delay their claims until a resource is despoiled or irreparably harmed. *See* Doc. 250 at 8-9 (citing case law). This is because injuries to the environment, if allowed to proceed unchecked, are often irreversible. *See id.* Here, Agua Caliente has identified a concrete injury to its critical natural resource, and that injury is fairly traceable to the districts' conduct and remediable by order of this Court. Agua Caliente has standing to bring its water quality claim, which necessarily includes standing to litigate the narrow, threshold legal question currently before the Court.

**III.    Agua Caliente has standing to proceed with its pore space claim.**

Like its claim for quantification of its federal reserved water right, Agua Caliente's pore space claim asks this Court to quiet Agua Caliente's title to property reserved for it by the United States and, in the process, to remove clouds and uncertainties surrounding the existence, nature, and scope of the Tribe's sovereign and proprietary interests. The districts unquestionably dispute Agua Caliente's ownership of and sovereignty over the Reservation's pore space; indeed, they assert that they have rights in that property that equal or surpass the Tribe's. *See, e.g.*, Doc. 140 at 8 (asserting

that the Reservation is "burdened with a public servitude for storage and transmission of recharge water"); Doc. 39 at 21; 208 at 33-34 (claiming that state law makes the pore space under the Reservation a "public resource" available for use by the districts).

In any event, the existence of subsidence on the Reservation is undisputed. Doc. 281 at 8; Doc. 255-5. CVWD merely argues that the injury is *de minimis* and "likely" impermanent. Doc. 281. Yet in 2012, CVWD candidly admitted the devastating impacts of subsidence, even subsidence that is "difficult to detect," and conceded that "compaction of fine-grained sediments is permanent" and results in "a permanent loss of groundwater storage capacity." Doc. 282-229-30. This evidence, which supports Agua Caliente's pore space claim and must be taken as true at this stage, *see Lujan*, 504 U.S. at 561, further establishes Agua Caliente's standing.

## IV. CVWD grossly mischaracterizes the situation involving Mr. Page. [13]

CVWD devotes much of its brief to trumpeting what it characterizes as "case-ending" concessions from the deposition testimony of Oliver Page. Doc. 281 at 5. Agua Caliente has disclaimed reliance on Mr. Page's Phase 2 testimony, not, as CVWD baldly asserts, because it regrets a "tactical gamble" or is attempting to "wish[] away his admissions," *id.* at 17-18, but because it has serious doubts about the testimony's reliability for reasons set forth in recently filed sealed documents and in the Declaration of Catherine Munson filed herewith. Agua Caliente has not argued that Mr. Page is incompetent under FRE 601 or attempted to exclude his testimony, and CVWD is free to use that testimony if it believes it appropriate to do so.[14] CVWD is not free, however, to misstate that testimony or to groundlessly impugn opposing counsel.

Mr. Page did not, as CVWD wrongly states, testify that he "played *no role at all*" in drafting his declarations. *Id.* at 6 (emphasis in original). He testified that counsel

---

[13]To avoid unnecessary duplication, Agua Caliente will provide a more detailed response to the districts' similar arguments about Mr. Page in its response to DWA's supplemental brief. But some of CVWD's assertions require immediate correction.

[14] CVWD did insist that Mr. Page was neither qualified nor competent to offer reliable expert testimony in this case <u>before</u> his medical diagnosis. *See* Doc. 247 18-27.

14

assembled drafts of his declarations "based on the information, a lot of it taken directly from our technical report[s] we prepared," that portions were "put in" by his associate, and that he then reviewed and edited the drafts. Doc. 277-3, Ex.1, 18:6-22 & 29:18 – 30. To characterize that testimony as an "admi[ssion]" that Mr. Page played "*no role at all*" in preparing his declarations is flatly misleading.

Worse yet is CVWD's cynical effort to take advantage of Mr. Page's emergent medical condition to cast unfounded aspersions at opposing counsel. The sealed documents, which were shared with defense counsel, and the declarations of Agua Caliente's counsel show that Mr. Page first sought treatment for his condition only days before his deposition and did not disclose his concerns to counsel or receive a diagnosis until after the deposition. *See generally* Munson Declaration. At that point, the Tribe's counsel promptly fulfilled their ethical duty to disclose their concerns about Mr. Page to opposing counsel, undermining their own case, and agreed to seek and share medical documentation of his condition. *Id.* Yet CVWD apparently would have the Court believe that this was an elaborate conspiracy executed by the Tribe's counsel in coordination with Mr. Page and his well respected treating physician, part of a "tactical gamble" to hedge against potentially harmful testimony from a reputable witness whose testimony the Tribe took great effort to place before the Court. That is a baseless fantasy. The facts are that: (1) Mr. Page has an emergent medical condition that, *inter alia*, limits his present ability to provide reliable expert opinion testimony in this case; (2) the timing of the discovery of that condition and its disclosure to counsel were extremely unfortunate with respect to this litigation; and (3) the prejudice that having to disclaim Mr. Page's testimony has caused for Agua Caliente is far greater than any ostensible prejudice suffered by the districts, who rely on his testimony extensively and argue that it is dispositive of the case in their favor. The notion that this was contemplated or intended by the Tribe or its counsel is as ridiculous as it is unsupported and callous.

Dated:  November 14, 2018          By: */s/ Catherine F. Munson*

Catherine F. Munson
(D.C. Bar No. 985717, admitted *pro hac vice*)
Mark H. Reeves
(D.C. Bar No. 1030782, admitted *pro hac vice*)
**Kilpatrick Townsend & Stockton LLP**

Steven C. Moore
(CO Bar No. 9863, admitted *pro hac vice*)
Heather Whiteman Runs Him
(NM Bar No. 15671, admitted *pro hac vice*)
**Native American Rights Fund**

John Tabinaca Plata (CA Bar No. 303076)
jplata@aguacaliente.net
**Agua Caliente Band of Cahuilla Indians**

*Attorneys for Plaintiff*
*Agua Caliente Band of Cahuilla Indians*

16