| | |
|---|---|
| 1 | MATT KLINE (Bar No. 211640) |
|   | mkline@omm.com |
| 2 | DANIEL R. SUVOR (Bar No. 265674) |
|   | dsuvor@omm.com |
| 3 | HEATHER WELLES (Bar No. 302256) |
|   | hwelles@omm.com |
| 4 | O'MELVENY & MYERS LLP |
|   | 1999 Avenue of the Stars, 8th Floor |
| 5 | Los Angeles, CA 90067-6035 |
|   | Telephone: (310) 553-6700 |
| 6 | Facsimile: (310) 246-6779 |

*Attorneys for Defendants Coachella Valley Water District, and G. Patrick O'Dowd, Ed Pack, John Powell, Jr., Peter Nelson and Castulo R. Estrada, sued in their official capacity as members of the Board of Directors*

(Additional counsel identified on next page)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS, | Case No. 5:13-cv-00883-JGB (SPx) |
|  | Judge:   Hon. Jesus G. Bernal |
| Plaintiff, | |
| and | **CVWD'S SUPPLEMENTAL REPLY BRIEF ON JUSTICIABILITY OF PHASE 2 CLAIMS (PURSUANT TO COURT'S ORDER, DKT. NO. 267)** |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Intervenor, | |
|  | **ORAL ARGUMENT REQUESTED** |
| v. | |
|  | Filed concurrently with: |
| COACHELLA VALLEY WATER DISTRICT, et al., | 1. Evidentiary Objections |
|  | 2. Response to Evidentiary Objections |
| Defendants. | |
|  | Dept.:           Courtroom 1 |
|  | Action Filed:   May 14, 2013 |
|  | Hearing:        Not set |

STEVEN B. ABBOTT
(Bar No. 125270)
sabbott@redwineandsherrill.com
GERALD D. SHOAF
(Bar No. 41084)
gshoaf@redwineandhserrill.com
REDWINE AND SHERRILL, LLP
3890 11th Street, Ste. 207
Riverside, CA 92501-3577
Telephone:  (951) 684-2520
Facsimile: (951) 684-5491

BARTON THOMPSON, JR.
(Bar No. 72927)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025-7019
Telephone: (650) 473-2600
Facsimile: (650) 473-2601

ANTON METLITSKY
(*pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

WALTER DELLINGER
(*pro hac vice*)
BRADLEY N. GARCIA
(*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

*Attorneys for Defendants Coachella Valley Water District, and G. Patrick O'Dowd, Ed Pack, John Powell, Jr., Peter Nelson and Castulo R. Estrada, sued in their official capacity as members of the Board of Directors*

**TABLE OF CONTENTS**

**Page**

I.  The Tribe Lacks Standing to Raise Each Phase 2 Issue ................................... 2

    A.  The Tribe's Storage Space Claim Must Be Dismissed. .......................... 2

    B.  The Tribe Lacks Standing To Quantify Its Reserved Right. ................. 4

    C.  The Tribe Lacks Standing to Pursue Its Water Quality Claim. ............. 8

# TABLE OF AUTHORITIES
Page(s)

**Cases**

*Arizona v. California*,
  373 U.S. 546 (1963) ............................................................................................... 8

*Avista Corp. v. Sanders Cty.*,
  405 F. App'x 225 (9th Cir. 2010) ........................................................................... 4

*Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011) ............................................................................................... 7

*Collins v. Wayne Corp.*,
  621 F.2d 777 (5th Cir. 1980) ................................................................................. 3

*Crow Creek Sioux Tribe v. United States*,
  900 F.3d 1350 (Fed. Cir. 2018) ................................................................... 1, 2, 4, 5

*Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*,
  753 F.3d 862 (9th Cir. 2014) ................................................................................. 6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
  528 U.S. 167 (2000) ............................................................................................. 10

*Gest v. Bradbury*,
  443 F.3d 1177 (9th Cir. 2006) ............................................................................... 6

*Navajo Nation v. Dep't of Interior*,
  876 F.3d 1144 (9th Cir. 2017) ............................................................................... 1

*New England Power Generators Ass'n v. FERC*,
  707 F.3d 364 (D.C. Cir. 2013) ............................................................................ 3, 8

*Patent Category Corp. v. Target Corp.*,
  No. CV 06-7311, 2008 WL 11336468 (C.D. Cal. July 17, 2008) ...................... 10

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ................................................................................. *passim*

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................................... 1

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Thomas v. Anchorage Equal Rights Comm'n*,
  220 F.3d 1134 (9th Cir. 2000) (en banc) .................................................................. 3

*United States v. Adair*,
  478 F. Supp. 336 (D. Or. 1979) ............................................................................... 8

*United States v. Adair*,
  723 F.2d 1394 (9th Cir. 1983) ................................................................................. 8

*United States v. Ahtanum Irr. Dist.*,
  236 F.2d 321 (9th Cir. 1956) ................................................................................... 8

*Whitmore v Arkansas*,
  495 U.S. 149 (1990) ................................................................................................ 4

Injury-in-fact is "a hard floor of Article III jurisdiction," *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); indeed, "no principle is more fundamental," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). This is no less true in cases involving Indian water rights than in any other. *See Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1356 (Fed. Cir. 2018) (dismissing reserved water rights suit for lack of injury); *Navajo Nation v. Dep't of Interior*, 876 F.3d 1144, 1160 (9th Cir. 2017) (same). Yet after months of briefing and now three rounds of belated evidentiary submissions, the Tribe has still failed to meet *its* burden to show injury that would justify proceeding further here. This case therefore must end.

The Court held its standing hearing over six months ago. In response to the Court's questions, the Tribe was completely unable to explain how, if at all, it was injured. *See* Dkt. 241 at 47:3-48:6. To salvage its case, the Tribe asked to submit the declaration of Oliver Page, who it claimed could carry its standing burden. The Court "grudgingly" agreed, but allowed discovery and briefing on the competency and relevance of Page's testimony. Dkt. 263 at 12:20-13:2; *see also* Dkt. 267. At his deposition, Page conceded the Tribe *has suffered no injury from the Agencies' activities*, and the Tribe unsurprisingly has now abandoned any reliance on Page.

The Tribe now seeks to introduce thousands of pages of unauthenticated documents into the closed record and to rehash old arguments based on decades-old case law having nothing to do with Article III. No matter how many times the Tribe belatedly seeks to recast its case, one essential fact remains: The Tribe has suffered no concrete, particularized injury and thus lacks standing to pursue this case further. The Court should grant summary judgment for the Agencies.[1]

---

[1] Tellingly, the Tribe does not press for summary judgment in *its favor* in its final briefs—instead suggesting that there are disputed issues of fact, and the Court can sort out everything in Phase 3. In support, the Tribe can cite only its own conclusory rhetoric and untimely, inadmissible evidence. None supports the Tribe's arguments, and its own experts' admissions refute them. If the Court considers any of this untimely evidence (and it should not do so), CVWD should be allowed 15 pages of briefing to address it and the chance to depose the Tribe's declarants.

## I. The Tribe Lacks Standing to Raise Each Phase 2 Issue

To establish standing, the Tribe has the burden to show an injury in fact that is "concrete and particularized," "actual or imminent." *Crow Creek*, 900 F.3d at 1355. The Tribe, however, has utterly failed in this burden for every claim it raises. The Tribe's expert witness, Mr. Page, repeatedly admitted the Tribe has suffered no injury as a result of the Agencies' actions, and the Agencies' own experts and percipient witnesses confirm this fact. Nothing is limiting the Tribe's ability to pump groundwater and store water underground; drinking water, moreover, is the same high quality as consumed by millions of users across the Southwest.

Lacking any evidence of injury, the Tribe seeks to cloud the analysis with random snippets from more than 1700 pages of new documents—without leave of Court, into a closed summary judgment record, on the improper basis of judicial notice, and through declarants whom the Agencies cannot examine. Worse still, the Tribe forces the Agencies to respond to this disorganized mess in a week—further defying due process and the Court's numerous orders not to lard the record with new filings. Dkt. 241 at 57:5-6, 57:10-13; Dkt. 266 at 6; Dkt. 267. As explained in CVWD's evidentiary objections, the Court should disregard all of this evidence. That said, if the Court works through the giant new stack, it will see the Tribe cites nothing to change the conclusion that there is no injury and thus no standing.

### A. The Tribe's Storage Space Claim Must Be Dismissed.

The Tribe's storage space claim (which even the U.S. chose not to join, Dkt. 218 at 12) is not justiciable for two distinct reasons. First, the Tribe lacks standing because it has not shown the Agencies are interfering with its purported storage space rights or otherwise causing any injury in fact. Second, there is no ripe controversy because the Tribe has never explained in any comprehensible fashion what rights it wants the Court to bestow. Dkt. 281 at 4; Dkt. 219 at 3-4.

Reflecting the weakness of the Tribe's pore space claim, it buries its response at the end of its brief. Even then, the Tribe never addresses the ripeness issue. This

is fatal. Resolving a legal question with profound practical consequences, such as whether a tribe has exclusive rights in underground storage space—without even understanding *what rights* it seeks—is precisely the sort of "abstract disagreement" that the Article III ripeness rule guards against. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).

On standing, the Tribe fares no better. Confronted by evidence that nothing stands in the way of the Tribe storing water, the Tribe is reduced to arguing that a dated study, supported by no current evidence, showing the *potential* existence of *one millimeter* of *temporary* <u>surface</u> subsidence on a few acres at a corner of its reservation establishes injury in fact. Dkt. 189 at 14. There is no evidence, however, that such subsidence ever caused any change in the deep, subsurface pore space that is the subject of the Tribe's claim. To the contrary, Page admitted the Tribe is capable of using that storage space and has incurred no subsidence-related costs—no harm to physical property, no inability to store water, and no other damage. *E.g.*, Dkt. 277-3 at 162:12-163:2. Although the Tribe disavows Page and tries improperly to impeach his testimony through lawyer argument, Dkt. 272, it cannot contest the reliability or binding nature of these claim-ending admissions.[2]

As a final fallback, the Tribe argues that its pore-space claim is analogous to a quiet-title action, and that mere "uncertainty" over its "title" poses an injury. Dkt. 289 at 13, 3-4. But "[i]t would be a strange thing indeed if uncertainty were a sufficiently certain harm to constitute an injury in fact." *New England Power*

---

[2] Indeed, the Tribe now concedes that Page's admissions are properly before the Court, noting the Agencies are "free to use" his deposition admissions and that they "undermin[e] [the Tribe's] … case." Dkt. 289 at 14; *Collins v. Wayne Corp.*, 621 F.2d 777, 782 (5th Cir. 1980) (expert admission is party admission). The Tribe asks what it could have done differently when days before his deposition it had doubts about Page. The easy answer: call the Agencies, withdraw Page, and save the *ratepayer money* spent on Page's and Fogg's depositions and these briefs.

The Tribe accuses the Agencies of saying Page's condition is "invent[ed]." Dkt. 298 at 9. Not so. The Agencies asked the Court to review his videotaped testimony itself, and they can provide the Court expert testimony that Page's "mild" condition did not bar Page from testifying. None of Page's doctor notes dispute this.

*Generators Ass'n v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013).  If the Tribe were right, plaintiffs would have standing to bring any and all disputes before federal courts because all disputes raise a cloud of doubt.  To establish standing, the Tribe must show that the uncertainty has led to a "concrete and particularized" injury that is "actual or imminent, not conjectural." *Spokeo*, 136 S. Ct. at 1548; *see Avista Corp. v. Sanders Cty.,* 405 F. App'x 225, 226 (9th Cir. 2010) (company "adversely affected economically" had standing to raise a quiet-title claim).

The Tribe provides no such evidence.  The record is bereft of any proof it has been stymied or harmed because of uncertainty over whether it owns pore space.[3]

### B. The Tribe Lacks Standing To Quantify Its Reserved Right.

On quantification, the Tribe again fails to show a concrete actual or imminent injury.  *Crow Creek,* 900 F.3d at 1355.  The Tribe is free to pump groundwater, as it always has been, and admits it currently uses groundwater.  Dkt. 289 at 2 n.2.  Neither Agency has ever objected to that, and the Agencies provide the Tribe with all other water it needs to use and develop its land.  *See* Dkt. 209-3 at 32-33; Dkt. 246-1 ¶ 5.  Where, as here, there is no evidence that the amount of water "available for the Tribe's use is insufficient to fulfill the purposes of the Reservation or will be insufficient in the future," the Tribe "has failed to allege injury in fact, as necessary to demonstrate standing." *Crow Creek*, 900 F.3d at 1356.

While the Tribe and Water Agencies *might* someday disagree over the Tribe's right to pump groundwater (*if* the Tribe starts overpumping, and *if* there is insufficient water for all Valley users), such remote *speculation* is insufficient under Article III.  "A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v Arkansas*, 495 U.S. 149, 158 (1990).  *If* such a situation

---

[3] In its response to DWA, the Tribe argues for the first time—citing no evidence, let alone admissible evidence—that it has standing because it "would like to store or bank groundwater," but cannot.  Dkt. 298 at 5.  Again, no one is preventing the Tribe from storing or banking new water, and there is not a shred of evidence to the contrary.  Page, the Tribe's long-time agent and putative expert, admitted that the Tribe was *not* being injured in this way.  Dkt. 277-3, Ex. 1 at 162:16-19.

1  occurs in the future, the Tribe can then seek to pursue quantification. But the mere
2  risk of a future dispute does not justify embarking on a complex, resource-intensive
3  proceeding today. Page, the Tribe's other expert (Meridian), and the Agencies'
4  witnesses all agree that the Tribe has all the water it needs. Dkt. 277-3, Ex. 1 at
5  109:5-112:21; 200-2 ¶¶ 33, 54; 200-4, Ex. A at 13-14; 246-1 ¶ 5.

6  The Federal Circuit's recent decision in *Crow Creek* confirms why the Tribe
7  lacks standing. In *Crow Creek*, a tribe sued the federal government for a "taking"
8  and mismanagement of water in the Missouri River, in which the tribe had *Winters*
9  rights. Noting that the United States distributed water from the Missouri River to
10 other users, the tribe argued that "any [government] action affecting the waters of
11 the Missouri River constitutes an injury," because the government "took and used
12 the Tribe's water and water rights." 900 F.3d at 1357. But as the court explained,
13 "the Tribe appears to misunderstand what its water rights entail." *Id.* "[W]ater
14 rights are usufructary in nature—meaning that the property right consists not so
15 much of the fluid itself as the advantage of its use—the Tribe has no right to any
16 particular molecules of water, either on the Reservation or up- or downstream …."
17 *Id.* The Tribe's *Winters* rights give it "the right to use sufficient water to fulfill the
18 purposes of the Reservation." *Id.* Thus, the Tribe "simply *cannot be injured by*
19 *government action that does not affect the Tribe's ability to use sufficient water to*
20 *fulfill the purposes of the Reservation.*" *Id.* (italics added). Since (as here) there
21 was no such evidence, the Federal Circuit dismissed the action for lack of standing.

22 Absent any evidence that it has insufficient water to fulfill any reservation
23 purposes, the Tribe contends that it has standing to seek a quantification because
24 overdraft has left water tables lower than in the basin's natural state. Dkt. 289 at 5.
25 Again, however, the Tribe presents no evidence that these conditions have injured
26 it. The Tribe for the first time asserts that it "felt th[e] effect" of higher pumping
27 costs "when it pumped water for its golf course" in 2012, but provides absolutely
28 no evidence to support that claim, much less the expert analysis that would be

required to establish differential costs. Dkt. 289 at 5. The only evidence in the record is Page's binding and direct admission that the Tribe never informed him of "a single time that they've had to spend more money to pump water over the last 17 years because of overdraft." Dkt. 277-3, Ex. 1 at 112:13-18.

The Tribe's evidence, moreover, focuses on past overdraft, not current conditions. But the Tribe seeks quantification as a "necessary precursor to its claim for injunctive relief" limiting the Agencies' pumping. Dkt. 217 at 6. Overdraft is only relevant to these claims if the Agencies were causing overdraft when the Tribe filed this suit: "*it is not the presence or absence of a past injury* that determines Article III standing to seek injunctive relief; *it is the imminent prospect of future injury*." *Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 868 (9th Cir. 2014) (italics added); *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (Plaintiffs "seek[ing] declaratory and injunctive relief . . . must demonstrate that they are realistically threatened by" future harm).

There is no evidence, however, of any current or recent overdraft under the Tribe's reservation. Page admitted when confronted with well readings on tribal land that he had no evidence that there was any overdraft under the Tribe's land, now or in the future. Dkt. 277-3, Ex. 1 at 105:24-25, 108:19-109:4.

Instead of addressing the recent era, the Tribe spends pages arguing that overdraft occurred over the last 80 years. *See* Dkt. 289 at 6-7. The Tribe's *own experts* say there is no current overdraft or "imminent prospect of future injury": "[d]uring the last ten-year period [2004-2014], *there has been no overdraft*" and "[w]ater levels have increased in . . . the Palm Springs area." Dkt. 277-3, Ex. 1 at 90:25-5; Page Dep. Ex. 26 at 5.15.1-9. The Tribe has no response to this admission and provides no competent evidence to counter it. Instead, the Tribe falsely claims that Dr. Fogg's testimony shows groundwater levels declining over the last ten years. Dkt. 289 at 7. Dr. Fogg, however, testified that the Tribe's efforts to show a decline were "biased" and did not reflect "the greater context" or account for

"natural hydrologic fluctuation." Dkt. 247-1, Ex. A at 10-14; Dkt. 289-3, Ex. D at 28:22-29:1, 51:18. He never suggested that any overdraft was occurring, and if the Court has any question on this score, CVWD is happy to produce him to testify.

Nor has the Tribe shown that overdraft will likely occur in the future. CVWD proffered unrebutted testimony showing that it has ample water supplies with which to replenish the basin and has taken numerous steps to limit groundwater pumping and promote conservation. *See* Dkt. 200-2, 219-3. There is no overdraft at present, nor is there projected to be through at least 2045. Dkt. 247-1, Ex. A at 23. The Tribe has presented no evidence whatsoever to the contrary. Page admitted he could not dispute the projections, and the Tribe's other experts (Meridian) endorsed them. Dkt. 277-3, Ex. 1 at 88:13-96:21.

To establish standing, moreover, the Tribe must also show that any injury is "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S. Ct. at 1547. The Tribe therefore must show that the Agencies contributed to any recent overdraft. Yet the only evidence shows that, since CVWD adopted its 2010 water management plan (well before the Tribe filed suit), the Agencies replenished more water than they produced. *See* Dkt. 219 at 2-3; Dkt. 219-3 ¶ 6. Far from overdrafting the basin, the Agencies have actively improved it. If there is any overdraft, it is due to the other pumpers in the Valley, including the Tribe's golf course lessees, who are engaged in significant pumping. *See* Dkt. 255-2, 255-3.

Unable to show any injury here, the Tribe instead rehashes decades-old cases to suggest the right to quantification is automatic, without any injury. Not a single case cited by the Tribe for this startling proposition discusses standing; thus, they provide no guidance on this critical jurisdictional question. *E.g., Christian Sch. Tuition Org. v. Winn,* 563 U.S. 125, 144-45 (2011) ("[t]he Court would risk error if it relied on [jurisdictional] assumptions that have gone unstated and unexamined").

Moreover, the tribes in each cited case actively sought to use water over the *opposition of the defendants*—establishing the exact sort of injury *not* present here.

In *United States v. Ahtanum Irr. Dist.*, 236 F.2d 321, 325, 340 (9th Cir. 1956), the tribe sought to divert water from the stream at issue, and there was not enough water available to satisfy competing needs. In *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983), the Tribe sought to protect water for fishing and hunting against competing uses of local ranchers. *See United States v. Adair,* 478 F. Supp. 336, 340 (D. Or. 1979). And in *Arizona v. California*, the special master only quantified rights where doing so was necessary to permit the United States to manage the flow of the river. The Supreme Court expressly declined to resolve other related claims, concluding that "[s]hould a dispute over title arise because of some future refusal by the Secretary to deliver water . . . the dispute can be settled at that time." *Arizona v. California*, 373 U.S. 546, 601 (1963).[4]

    The Tribe also contends that its suit is analogous to a quiet title action, and that it suffers an injury just from the "uncertainty" over its "title" to the water. Dkt. 289 at 3-4. Again, "uncertainty" is not injury, *New England Power*, 707 F.3d at 369, without proof of "concrete and particularized" harm that is "actual" and not "conjectural," *Spokeo*, 136 S. Ct. at 1548. The record lacks any evidence that the Tribe has been unable to take any action or been harmed because of any uncertainty over the exact quantity of water to which it has a federal right. To the contrary, the Tribe's own experts and the Agency witnesses all confirmed the Tribe has all the water it needs to develop its land. *Supra* at 5; Dkt. 281 at 5-6.[5]

    **C.    The Tribe Lacks Standing to Pursue Its Water Quality Claim.**

    The Tribe has also demonstrated no injury in fact to support standing to raise any claim regarding the quality of its reserved water rights. The Tribe no longer

---

[4] While the Tribe suggests that *Arizona* dealt only with interstate water rights, *Arizona* addressed both interstate water rights and *Winters* rights, and the relevant passages explicitly involved whether to determine the Indian rights.

[5] Indeed, according to the Tribe's belated, improper recent submission, it has just entered into a deal with the Mission Springs Water District to "explore the potential" for "pooling their expertise and resources" for water delivery, Dkt. 289-2 ¶ 3—demonstrating that any "uncertainty" is not restricting the Tribe's ability to exploit its water resources.

argues any water quality concerns other than TDS levels.  And the Tribe has offered no evidence that it has suffered, or will imminently suffer, any injury of any kind.  Page conceded that the Tribe had not suffered any injury due to TDS; that the water has been suitable for every purpose the Tribe has ever wanted to use it; and that Colorado River water is a "valid source" of drinking and irrigation water.  Dkt. 277-3, Ex. 1 at 144:19-146:15.  The Tribe presents no evidence that it cannot use the water or that any tribal member has complained about water quality.  The Tribe's inability to show that importing Colorado River water has caused it a concrete injury is unsurprising—such water, as the Tribe does not dispute, is used *throughout the region for all purposes without complaint*.  See Dkt. 281 at 15.

The Tribe instead embarks on a pages-long effort to show that TDS levels in the aquifer have increased since the 1970s, and that the increase is due to the Agencies' recharge efforts—all supported by improper evidentiary submissions.  Dkt. 289 10-13.  The Tribe has the facts wrong, as explained below.  But even on the Tribe's own terms, such a showing is irrelevant.  As with the Tribe's quantification argument, the fundamental gap in the Tribe's theory is it offers no explanation of *how* increasing salinity has or will imminently injure it.  Indeed, Page admits knowing of no such concrete harm—to any crop, to any customer, to the Tribe's resort economy or otherwise.  Dkt. 277-3, Ex. 1 at 144:19-146:15.

The Tribe attempts to evade its burden of proof by watering down Article III in two ways.  *First*, it argues that it need only show "declines in water quality that are traceable to the districts."  Dkt. 289 at 9.  Not so.  The Tribe must also provide evidence that such "declines in water quality" have *caused the Tribe to suffer an injury* that is not "conjectural." *Spokeo*, 136 S. Ct. at 1548.  The charitable version of the Tribe's argument is that Agency recharge activities might someday cause TDS levels to reach some unspecified point that will injure it, Dkt. 281, at 11—the very definition of a "conjectural" harm.  *Second*, the Tribe asserts it need not show concrete injury to itself, but rather need only show "a connection to the area of

concern" or that its "future life will be less enjoyable, including aesthetic satisfaction." Dkt. 289 at 9. But as the Tribe's own authority makes clear, the focus "is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000). Thus, to the extent the Tribe argues that it is enough to show some harm *to the water*, Dkt. 289 at 13, that argument is plainly wrong—as *Laidlaw* establishes.

If the argument is instead that the Tribe's aesthetic satisfaction is threatened when water becomes saltier, the argument is unsupported by any facts and refuted by common sense. There is no evidence that any individual in the region, much less a Tribal member, has ever noticed any change in the salinity of the water, and no evidence that any change can be seen, tasted, smelled, or has caused harm. By contrast, the plaintiff in *Laidlaw* provided affidavits showing that the defendant's discharge of mercury into a river "directly affected [its members] recreational, aesthetic, and economic interests," including by causing them to refrain from swimming or fishing. 528 U.S. at 182-84. The Tribe has made no such showing.

Even if the Court concludes that merely showing some change in TDS levels attributable to the Agencies is sufficient, the Tribe's new evidence is still infirm. Although the Tribe attempts to rely on judicial notice to argue that recharge activities have caused certain TDS levels at two DWA wells, Page admitted that numerous other sources of TDS are present in the basin and could have affected such wells. *See* Dkt. 277-3, Ex. 1 at 58:16-20, 77:18-24, 141:7-144:3. To allow the Tribe to suggest otherwise—based on evidence dumped in the record a year too late, and not questioned via cross-examination—would be grossly unfair.[6]

The Court should dismiss the remaining claims and enter final judgment.

---

[6] This is especially the case in light of the Tribe's having ghostwritten Page's reports in contravention of Rule 26 and misrepresented his qualifications. Dkt. 281 at 14; Dkt. 288 at 2; *Patent Category Corp. v. Target Corp.*, No. CV 06-7311, 2008 WL 11336468, at *2-3 (C.D. Cal. July 17, 2008). Only cross-examination of Page—to which the Tribe objected—exposed that the Tribe's claims were plainly refuted by record data. The Tribe cannot be allowed to escape such scrutiny here.

| | | |
|---|---|---|
| Dated: November 21, 2018 | | */s/ Barton Thompson, Jr.* <br> O'MELVENY & MYERS LLP |
| Dated: November 21, 2018 | | */s/ Steven B. Abbott* <br> REDWINE AND SHERRILL, LLP |

*Attorneys for the CVWD Defendants*

## Certification in Compliance with Local Rule 5-4.3.4

I hereby certify that, pursuant to Local Rule 5-4.3.4, I have obtained the authorization from the above signatories to file the above-referenced document, and that the above signatories concur in the filing's content.

Dated: November 21, 2018

*/s/ Barton Thompson, Jr.*
BARTON THOMPSON, JR.
O'MELVENY & MYERS LLP

*Attorney for CVWD*

OMM_US:76540640

- 12 -

CVWD SUPP. REPLY BR.
CASE NO. 5:13-CV-00883-JGB