UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 13-00883 JGB (SPx)** | Date | April 19, 2019 |
|---|---|---|---|
| Title | ***Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water District, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) GRANTING-IN-PART Defendants' Motions for Summary Judgment (Dkt. Nos. 200, 202); (2) DENYING-IN-PART Plaintiff's Motion for Summary Judgment (Dkt. No. 203); (3) DENYING Plaintiff Intervenor's Motion for Summary Judgment (Dkt. No. 204); and (4) DENYING Plaintiff's Motion to Exclude (Dkt. No. 222) (IN CHAMBERS)**

The Agua Caliente Band of Cahuilla Indians (the "Tribe") has lived in the Coachella Valley since before California was admitted as a state in 1850. The Coachella Valley lies just to the east of the San Jacinto mountains in Southern California. The Tribe sued the Coachella Valley Water District ("CVWD") and the Desert Water Agency ("DWA") (collectively, "Defendants"). ("Complaint," Dkt. No. 1.) The parties, as well as the United States as Plaintiff-intervenor, all filed motions for partial summary judgment. (Dkt. Nos. 200, 202, 203, 204.) After considering all papers, the exhibits submitted therein, and the parties' arguments at the April 26, 2018 hearing and February 25, 2019 hearing, the Court finds the Tribe has standing to pursue the declaratory relief it seeks in its pore space claim but does not have standing to pursue its quantification and quality claims.

## I.    BACKGROUND

In May 2013, the Tribe filed this action for declaratory and injunctive relief against Defendants. (Complaint.) In June 2014, the Court granted the United States' motion to intervene as a plaintiff in its capacity as trustee for the Tribe's reservation. (Dkt. Nos. 62, 70.)

In December 2013, the parties stipulated to trifurcate this action.  (Dkt. No. 49.)  Phase I addressed "whether the Tribe has a reserved right and an aboriginal right to groundwater."  Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water District, et al., 849 F.3d 1262, 1267 (9th Cir. 2017).  Phase II seeks to resolve (1) whether the Tribe owns the pore space underlying its reservation; (2) whether there is a water quality component to the Tribe's federal reserved water right; and (3) the appropriate legal standard to quantify the Tribe's reserved water right.  (See Dkt. No. 121; Dkt. No. 193.)  If necessary, in Phase III, the Court will undertake the fact-intensive tasks of quantifying the Tribe's rights to groundwater and pore space, and crafting appropriate injunctive relief.  (Dkt. No. 116 at 3.)   The Court also determined that should it find the right to groundwater includes a water quality component, Phase III will address the identification of the water quality standard.  (Dkt. No. 121 at 1 n.1.)

All parties separately filed motions for summary judgment as to Phase I.  The Court granted partial summary judgment to the Tribe and United States on the claim that the government impliedly reserved appurtenant water sources—including underlying groundwater—when it created the Tribe's reservation, and granted partial summary judgment to Defendants regarding the Tribe's aboriginal title claims.  (Dkt. No. 116 at 14-15.)  Defendants brought an interlocutory appeal of the Court's grant of partial summary judgment in favor of the Tribe and the United States.  (Dkt. No. 123.)  The Ninth Circuit affirmed the Court's judgment.  Agua Caliente, 849 F.3d at 1265.  The United States Supreme Court then denied certiorari.  Coachella Valley Water Dist. v. Agua Caliente Band of Cahuilla Indians, 138 S. Ct. 468 (2017); Desert Water Agency v. Agua Caliente Band of Cahuilla Indians, 138 S. Ct. 469 (2017).

As in Phase I, all four parties separately filed motions for summary judgment as to Phase II.  (Dkt. Nos. 200, 202, 203, 204.)  The parties moved for summary judgment on (1) whether the Tribe beneficially owns pore space underlying the Reservation; (2) whether the Tribe's groundwater rights include a water quality component; and (3) the legal standard for quantifying the Tribe's reserved water rights.  The United States, however, only moved for summary judgment on the issues of (1) the legal standard for quantification; and (2) whether the reserved right to groundwater includes a quality component.

CVWD also filed a request for judicial notice (Dkt. No. 201) as did the Tribe (Dkt. No. 210) and DWA (Dkt. Nos. 202-6, 207-1).  With its motion for summary judgment and memorandum of points and authorities (Dkt. No. 200), CVWD submitted the following:

- Statement of undisputed facts ("SUF," Dkt. No. 200-1);
- Declaration of Steve Bigley with Exhibits 1-6 (Dkt. No. 200-2);
- Declaration of Expert Graham E. Fogg with Exhibit A (Dkt. No. 200-3);
- Declaration of Expert Richard Howitt with Exhibit A (Dkt. No. 200-4);
- Declaration of Daniel R. Suvor with Exhibits 1-3 (Dkt. No. 200-5); and
- Request for judicial notice (Dkt. No. 201).

DWA included the following with its motion for summary judgment (Dkt. No. 202) and memorandum of points and authorities (Dkt. No. 202-1):

- Statement of undisputed facts ("SUF," Dkt. No. 202-2);
- Declaration of Mark Krause (Dkt. No. 202-3);
- Declaration of Martin Krieger (Dkt. No. 202-4);
- Declaration of Miles Krieger (Dkt. No. 202-5); and
- Request for judicial notice (Dkt. No. 202-6).

With its motion for summary judgment (Dkt. No. 203) and memorandum of points and authorities (Dkt. No. 203-1), the Tribe submitted an appendix (Dkt. No. 203-2).[1] The United States also filed a motion for summary judgment and memorandum of points and authorities (Dkt. No. 204), although it did not attach any supporting documents.

On November 20, 2017, all four parties filed oppositions to the opposing parties' motions for summary judgment.  (See Dkt. No. 207 ("DWA's Opposition"); Dkt. No. 208 ("CVWD's Opposition"); Dkt. No. 209 ("Tribe's Opposition"); Dkt. No. 211 ("United States' Opposition").)  DWA attached a supplemental request for judicial notice (Dkt. No. 207-1) and a supplemental declaration of Miles Krieger (Dkt. No. 207-2).  CVWD attached a statement of genuine disputes of material facts and undisputed facts in opposition ("OSUF," Dkt. No. 208-1), evidentiary objections (Dkt. No. 208-2), declaration of Graham E. Fogg with Exhibit A (Dkt. No. 208-3), and declaration of Richard Howitt with Exhibit A (Dkt. No. 208-4).  The Tribe attached DWA's supplemental brief to the Supreme Court (Dkt. No. 209-1); CVWD's supplemental brief to the Supreme Court (Dkt. No. 209-2), response to CVWD's statement of undisputed facts ("OSUF," Dkt. No. 209-3), response to DWA's statement of undisputed facts ("OSUF," Dkt. No. 209-4), evidentiary objections to CVWD's statement of uncontroverted facts (Dkt. No. 209-5), evidentiary objections to DWA's statement of undisputed facts (Dkt. No. 209-6), and a declaration of Margaret Park (Dkt. No. 209-7).  The Tribe also filed a request for judicial notice. (Dkt. No. 210.)  The United States attached a statement of genuine disputes of material fact and legal objections (Dkt. No. 211-1), in which it adopted the Tribe's responses, as well as a declaration of Brandon Anderson to which the United States attached a Notice to Show Cause dated January 22, 2015.  (Dkt. No. 211-2).  On December 8, 2017, CVWD filed a notice of errata to the Expert Report of Graham Fogg (Dkt. No. 215) to which it attached Fogg's Declaration and Exhibit A (Dkt. Nos. 215-1, 215-2, 215-3).

On December 11, 2017, the parties filed their respective replies.  (See Dkt. No. 216 ("DWA's Reply"); Dkt. No. 219 ("CVWD's Reply"); Dkt. No. 217 ("Tribe's Reply"); Dkt.

---

[1] CVWD objects and argues the Court should not consider any of the factual assertions in the Tribe's motion for summary judgment because the Tribe failed to provide a separate statement of undisputed facts, as required under Local Rule 56-1 and the Court's Standing Order.  (Dkt. No. 208-1 at 1.)  CVWD also points out that the Tribe relies on the statement of facts submitted with its Phase I motion for summary judgment.  (Id.)  The Court relies only on the statements of fact, accompanied by a request for judicial notice, the Tribe submitted in opposition to Defendants' motions for summary judgment.  Thus, this objection is OVERRULED as moot.

No. 218 ("United States' Reply").)  DWA's Reply included a notice of errata (Dkt. No. 216-1) and DWA's response to the Tribe's statement of undisputed facts (Dkt. No. 216-2).  The Tribe's Reply included a response to CVWD's statement of undisputed facts in opposition (Dkt. No. 217-1) and evidentiary objections to CVWD's statement of undisputed facts in opposition (Dkt. No. 217-2).  The United States also attached to its Reply a statement and legal objections (Dkt. No. 218-1), in which it adopted the Tribe's responses.  CVWD attached to its Reply its statement of genuine disputes of material facts and undisputed facts in reply (Dkt. No. 219-1), response to the Tribe's evidentiary objections (Dkt. No. 219-2), and a supplemental declaration of Steve Bigley (Dkt. No. 219-3).

The Tribe filed a motion to exclude the declarations, reports, exhibits, and statements of fact relying thereon of expert witnesses Howitt, Fogg, and Bigley.  ("Motion to Exclude," Dkt. No. 222.)[2]  The United States filed a notice of joinder on December 22, 2017.  (Dkt. No. 223.) CVWD opposed the Motion to Exclude.  (Dkt. No. 224.)  CVWD also filed a response to the Tribe's evidentiary objections.  (Dkt. No. 225.)  The Tribe filed a reply on January 8, 2018.  (Dkt. No. 228.)  The Metropolitan Water District of Southern California filed an amicus curiae brief in support of Defendants' motions for summary judgment.  (Dkt. No. 231-1.)

The Court concluded it best to decide the issues in segments.  On April 26, 2018, the Court heard oral argument concerning (1) justiciability with respect to all issues; and (2) whether the Tribe's groundwater rights include a water quality component.  (Dkt. No. 238.)

On August 1, 2018, the Court granted the Tribe's motion to supplement the evidence with the declaration of Oliver Page.  (Dkt. No. 266.)  The same day, the Court ordered that Defendants may depose Page and obtain records of the documents on which he relied in reaching the conclusions in his declaration.  (Dkt. No. 267.)  The Tribe was allowed this same limited discovery with respect to one of Defendants' standing experts.  (Id.)  The Court ordered supplemental briefing following this limited discovery.  (Id.)

CVWD and DWA filed supplemental briefs on the justiciability of the Tribe's claims. (See Dkt. No. 281 ("CVWD Suppl. Br."); Dkt. No. 287 ("DWA Suppl. Br.").)  CVWD's supplemental brief included a request for judicial notice.  (Dkt. No. 282.)  On November 11, 2018, the United States filed a statement position which was not contemplated in the Court's order permitting limited supplemental briefing and for which the United States did not obtain leave.  (Dkt. No. 286.)[3]  On November 14, 2018, the Tribe responded to CVWD's supplemental brief.  (Dkt. No. 289 ("Tribe's Suppl. CVWD Opp'n).)  The Tribe's opposition to CVWD's

---

[2] The Court finds it unnecessary at this time to address the Motion to Exclude.  The Court does not find any facts supported by the expert reports relevant to determine whether the Tribe's claims are justiciable or whether there is a water quality component to the Tribe's federal reserved water.  Thus, the Court DENIES the Motion to Exclude as MOOT.

[3] CVWD objected to this filing and requests that it be stricken.  (Dkt. No. 300.)  The Court acknowledges that the United States was not invited to submit any supplemental briefing. (See Dkt. No. 241 at 57:5-6; Dkt. No. 267.)  However, the Court declines to strike this filing.

supplemental brief included a map (Dkt. No. 289-1), the declaration of Rahsaan Tilford which attached a memorandum of understanding between the Tribe and the Mission Springs Water District (Dkt. No. 289-2), the declaration of Mark Reeves which attached four exhibits, including the deposition transcript and exhibits of Defendants' expert Graham Fogg (Dkt. Nos. 289-3 through 289-15), evidentiary objections (Dkt. Nos. 289-16), the declaration of Robyn Krueger (Dkt. Nos. 290), sealed exhibits A through J (Dkt. Nos. 291), the declaration of Catherine Munson (Dkt. No. 296), and a request for judicial notice (Dkt. No. 294). On November 16, 2018, the Tribe responded to DWA's supplemental brief. (Dkt. No. 298 ("Tribe's Suppl. DWA Opp'n").) The Tribe's opposition to DWA's supplemental brief attached evidentiary objections. (Dkt. No. 298-1.)

On November 21, 2018, DWA and CVWD filed their supplemental replies. (Dkt. No. 301 ("DWA Suppl. Reply"); Dkt. No. 302 ("CVWD Suppl. Reply").) CVWD attached to its supplemental reply a response to the Tribe's evidentiary objections. (Dkt. No. 302-2.) CVWD also filed evidentiary objections to the Tribe's supplemental opposition and opposed the Tribe's request for judicial notice. (Dkt. No. 302-1.) DWA joined CVWD's objections, responses to the Tribe's objections, and opposition to the Tribe's request for judicial notice. (Dkt. No. 303.) The Tribe responded to Defendants' evidentiary objections and opposition to their request for judicial notice. (Dkt. No. 304.) The Court held a hearing on February 25, 2019.[4]

## II.    REQUESTS FOR JUDICIAL NOTICE

CVWD requests the Court take judicial notice of the following documents: (1) Public Law 85-801, 72 Stat 968: An Act to provide for the construction of an irrigation distribution system and drainage works for restricted Indian lands within the Coachella Valley County Water District in Riverside County, California, and for other purposes; (2) Public Law 94-271, 90 Stat. 373 § 1 (1976): An Act to provide for the division of assets between the Twenty-Nine Palms Bank and the Cabazon Band of Mission Indians, California, including certain funds in the United States Treasury, and for other purposes; (3) An Act to incorporate the Texas Pacific Railroad, and to aid in the Construction of its Road, and for other purposes, c15, Stat. 573, 576 (1871); (4) Executive Orders of May 1876 and September 29, 1877; (5) Act to Provide for the better organization of Indian Affairs in California, 13 Stat. 39, 40 (1864); (6) excerpts from report of Mission Indians Commission ("Smiley Commission") (Dec. 7, 1891); (7) excerpts from report of U.S. Special Agent D.A. Dryden (June 30, 1875); (8) Suggestion of the United States in the Matter of the Determination of Relative Rights, Based upon Prior Appropriation, of the Various Claimants to the Waters of the White Water River and Its Tributaries, in San Bernardino and Riverside Counties, California (June 26, 1924); (9) Judgment, In the Matter of the Determination of the Relative Rights, Based upon Prior Appropriation, of the Various Claimants to the Waters of the White Water River and Its Tributaries, in San Bernardino and Riverside Counties,

---

[4] On February 26, 2019, CVWD lodged the slide presentation it used at the February 25, 2019 hearing. (Dkt. No. 309.) The Tribe and the United States objected to the lodging. (Dkt. No. 316.) Because the Court does not rely on these slides, the objection is OVERRULED.

California (Dec. 9, 1938); and (10) U.S. Bureau of Reclamation, Colorado River Basin Water Supply and Demand Study.  (Dkt. No. 201.)

The Tribe seeks judicial notice of the following documents: (1) Desert Water Agency (2016) PWS #3310005. Public Water System Statistics. Calendar Year 2016. Department of Water Resources; (2) Coachella Valley Water District (2016) PWS #3310001. Public Water System Statistics. Calendar Year 2016. Department of Water Resources; (3) Excerpt from Coachella Valley Investigation Bulletin No. 108, published by the California Department of Water Resources (July 1964): (4) Excerpts from the United States Department of the Interior Geological Survey, Analog Model Study of the Ground-Water Basin of the Upper Coachella Valley, California (1974); (5) Excerpts from Coachella Valley Water District (2017) Engineer's Report on Water Supply and Replenishment Assessment 2017-2018; (6) Excerpts from Coachella Valley 2015 Urban Water Management Plan, Final Report, July 1, 2016; (7) Excerpts from 2014 Status Report for the 2010 Coachella Valley Water Management Plan Update; (8) Excerpt from Metropolitan Water District of Southern California (2016) Annual Report; (9) Excerpt from Metropolitan Water District of Southern California (2015) Annual Report; (10) Excerpt from U.S. Geological Survey, Predicted Water-Level and Water-Quality Effects of Artificial Recharge in the Upper Coachella Valley, California, Using a Finite-Element Digital Model (April 1978); (11) Excerpts from 2017 Review of Water Quality Standards for Salinity Colorado River System, Prepared by Colorado River Basin Salinity Control Forum (October 2017); (12) Excerpt from Final Environmental Impact Report on Utilizing Colorado River Water to Recharge Upper Coachella Valley Groundwater Basins (June 13, 1973); (13) Excerpt A Publication G-4.  National Oceanographic Data Center, Summary of Temperature-Salinity Characteristics of the Persian Gulf General Series; (14) Map, United States Department of Agriculture CDL2016 Area of Interest; (15) Excerpts from Report, Coachella Valley Water Management Plan Update (January 2012); (16) Excerpts from Coachella Valley Groundwater Management Plan for the Coachella Valley Planning Area of the West Colorado River Basin, prepared for Coachella Valley County Water District and Desert Water Agency (April 1979); (17) Excerpts from the Coachella Valley Groundwater Basin Salt and Nutrient Management Plan (June 2015); and (18) Excerpts from the Desert Water Agency 2015 Urban Water Management Plan (June 2016).

DWA requests the Court take judicial notice of the following documents: (1) An Act for the Relief of the Mission Indians in the State of California, 26 Stat. 712-714, 51st Congress, Sess. II (Jan. 12, 1891); (2) A Report of Mission Indians Commission ("Smiley Report") (Dec. 7, 1891); (3) Decree, In the Matter of the Determination of the Relative Rights, Based Upon Prior Appropriation, of the Various Claimants to the Waters of Whitewater River and Its Tributaries, In San Bernardino and Riverside Counties, California, No. 18035, Superior Court for Riverside County (Dec. 9, 1938) ("Whitewater River Decree"); (4) An Intergovernmental Agreement between the Arizona Water Banking Authority and Gila River Indian Community, dated June 16, 2015 ("Gila River Agreement"); (5) A right-of-way amended grant decision from the Department of Interior, Bureau of Land Management ("BLM") to CVWD; (6) A right-of-way agreement between BLM, United States Fish and Wildlife Service, and CVWD; (7) "Suggestion of the United States," Before the Division of Water Rights, Department of Public Works, State of California, In the Matter of the Determination of the Relative Rights, Based Upon Prior

Appropriation, of the Various Claimants to the Waters of Whitewater River and Its Tributaries, in San Bernardino and Riverside Counties, California (June 26, 1924).  (Dkt. Nos. 202-6; 207-1.)[5]

Pursuant to Federal Rule of Evidence 201, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d).  "A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

The Court finds the documents submitted by CVWD and the Tribe to be the appropriate subject of judicial notice and takes notice of those documents.  "Courts may take judicial notice of some public records, including the 'records and reports of administrative bodies.'"  United States v. Ritchie, 342 F.3d 903, 909 (9th Cir. 2003) (quoting Interstate Nat. Gas Co. v. S. Cal. Gas Co., 209 F.2d 380, 385 (9th Cir. 1953)); see also 26 C.F.R. § 1.162-29 (defining, for the purpose of the statute ("Influencing legislation") administrative bodies as including water districts).  "The Court's authority includes taking judicial notice of government reports." Villanueva v. Biter, No. 1:11-cv-01050-AWI-SAB (PC), 2017 WL 6040326, at *3 (E.D. Cal. Dec. 6, 2017) (citation omitted).

The Court also finds the documents submitted by DWA to be the appropriate subject of judicial notice.  The Court can take judicial notice of public records not subject to reasonable dispute, including statutes, and thus takes notice of the Mission Indians Relief Act of 1891.  See Rocky Mountain Farmers Union v. Goldstene, 719 F. Supp. 2d 1170, 1184, 1186 (E.D. Cal. 2010) (citation omitted).  The Court also takes judicial notice of the Whitewater River Decree for the existence of the document.  See U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (taking judicial notice of proceedings in state court because that proceeding had a direct relation to the issue at hand).  Lastly, the Court takes judicial notice of the remainder of the documents submitted by DWA because they are public agency records not subject to reasonable dispute.

---

[5] In support of its supplemental brief, CVWD attached a request for judicial notice for its 2010 Water Management Plan Update.  (Dkt. No. 282.)  In support of its supplemental opposition, the Tribe requests judicial notice for 19 additional documents.  (Dkt. No. 294.)  The Court granted only a limited scope through which the parties were permitted to supplement the record.  The Court permitted the Tribe to submit the Page Declaration.  (Dkt. 266.)  In response, the Court allowed Defendants to depose Page and obtain the documents on which he relied.  (Dkt. 267.)  The Court allowed the Tribe mirroring, limited discovery as to one of Defendants' standing experts.  (Id.)  The Local Rules require parties to submit the evidence upon which they rely in their moving papers, oppositions, and replies.  See L.R. 7-5, 7-9, 7-10.  These documents should have been filed with the initial briefing on these motions but were not submitted.  They will not be considered now, as they exceed the limited scope of the Court's orders permitting the parties to supplement the record.  CVWD's supplemental request for judicial notice (Dkt. No. 282) and the Tribe's supplemental request for judicial notice (Dkt. No. 294) are DENIED.

### III.   FACTS

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.[6]  They are "admitted to exist without controversy" for purposes of the motions for summary judgment presently before the Court.  See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

In 1876, President Ulysses S. Grant issued a presidential executive order, later expanded in 1877 by presidential executive order, setting aside lands for the reservation. (CVWD OSUF ¶¶ 15-16.)  Five Indian tribes, including the Agua Caliente Band of Cahuilla Indians, inhabit the Coachella Valley.  (CVWD OSUF ¶ 31; CVWD SUF ¶ 6.)   The Tribe's lands are interspersed with nontribal lands, creating a checkerboard pattern.  (DWA SUF ¶ 3.)  As a result of the checkerboard pattern, the aquifer underlying the Tribe's reservation ("Reservation") also underlies the lands of other overlying landowners.  (DWA SUF ¶ 4.)  The groundwater in the aquifer underlying tribal and nontribal lands is commingled; no physical barrier prevents water stored in the nontribal portion of the aquifer from migrating to the tribal portion.  (DWA SUF ¶ 7.)

The Tribe utilizes water supplied by CVWD and DWA.  (Suvor Decl., Exh. 1 at 6.)  In 2016, CVWD's and DWA's public water systems covering the Reservation served a total population of 340,000 people.  (Agua Caliente RJN, Exhs. 1 & 2.)  Today, the Tribe does not pump groundwater from its Reservation.  (DWA SUF ¶ 21; CVWD SUF ¶ 73.)  The Tribe currently does not use water for agricultural purposes to any significant degree.  (DWA SUF ¶ 18.)

 Portions of the aquifer underlying the Coachella Valley are in overdraft.  (Agua Caliente RJN, Exh. 15 at ES-4.)  Overdraft in an aquifer is correlated with a lowering of the water table.[7]  (Id.)  Groundwater becomes more expensive to pump as the water table lowers.  (Id.)  Continued overdraft of a basin can result in "substantial and possibly irreversible gradation" of groundwater quality.  (Id.)  Continued overdraft can also cause land subsidence, which can damage infrastructure and reduces storage space in the aquifer.  (Id.)  DWA and CVWD have spread imported Colorado River water to recharge the aquifer.  (Agua Caliente RJN, Exh. 15 at ES-3.)

---

[6] The Court considers the parties' objections where necessary.  All other objections are OVERRULED.  "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself . . . ."  Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Thus, these objections are redundant and need not be considered separately.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").

[7] Merriam-Webster defines a water table as "the upper limit of the portion of the ground wholly saturated with water."  See Meriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/water%20table (last visited Feb. 14, 2019).

Water imported by DWA is mixed with native groundwater.  (DWA SUF ¶ 27.)  This dilutes concentrations of total dissolved solids ("TDS") in the imported water.  (Id.)

## IV.   LEGAL STANDARD

### A.  Standing

"Constitutional standing concerns whether the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy' to which the federal judicial power may extend under Article III, § 2."  Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co., 219 F.3d 895 (9th Cir. 2000).  "[T]he irreducible constitutional minimum of standing" is comprised of three elements: (1) an injury-in-fact; (2) a causal connection between the injury and challenged conduct such that the injury is "fairly traceable" to the challenged action; and (3) it must be "likely," not merely "speculative" that the injury can be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).  The injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  Id. at 560.  "The party invoking federal jurisdiction bears the burden of establishing these elements."  Id. at 561.

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).  Thus, the "standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of Government was unconstitutional."  Id. (quoting Raines v. Byrd, 521 U.S. 811, 819 (1997)).  Importantly, when there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650–51 (2017).

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  National Wildlife Federation, supra, 497 U.S., at 889, 110 S.Ct., at 3189.  In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."  Gladstone, supra, 441 U.S., at 115, n. 31, 99 S. Ct., at 1616, n. 31.

Lujan, 504 U.S. at 561.

### B.  Ripeness

A dispute is ripe when it presents concrete legal issues in actual cases.  Colwell v. HHS, 558 F.3d 1112, 1123 (9th Cir. 2009).  "Ripeness and standing are closely related because they

originate from the same Article III limitation." <u>Montana Envtl. Info. Ctr. v. Stone-Manning</u>, 766 F.3d 1184, 1188 (9th Cir. 2014) (citing <u>Susan B. Anthony List v. Driehaus</u>, 134 S. Ct. 2334, 2341 n.5 (2014)). In fact, "in many cases, ripeness coincides squarely with standing's injury in fact prong." <u>Thomas v. Anchorage Equal Rights Comm'n</u>, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing. . . . Indeed, because the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline.")

CVWD's ripeness argument is not based in constitutional ripeness, but prudential ripeness. "The ripeness inquiry contains both a constitutional and a prudential component. The constitutional component focuses on whether there is sufficient injury, and thus is closely tied to the standing requirement [citation omitted]; the prudential component, on the other hand, focuses on whether there is an adequate record upon which to base effective review." <u>Portman v. Cty. of Santa Clara</u>, 995 F.2d 898, 902-03 (9th Cir. 1993) (citation omitted). Whether a dispute is ripe depends on "the fitness of the issues for judicial decision" and "the hardship to the parties" of withholding review. <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 149 (1967), <u>overruled on other grounds by</u> <u>Califano v. Sanders</u>, 430 U.S. 99, 105 (1977).

## C. Summary Judgment

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. <u>Celotex</u>, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322; <u>Anderson</u>, 477 U.S. at 252. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d at 387 (citing <u>Anderson</u>, 477 U.S. at 252).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson</u>, 477 U.S. at 248. When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. <u>Barlow v. Ground</u>, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## V.    DISCUSSION

### A.  Justiciability of the Tribe's Claims

#### 1.   Quantification

CVWD claims Plaintiffs' quantification claims are not justiciable: (1) the Tribe and the United States lack standing to seek quantification, and (2) the claim is not ripe under the prudential ripeness doctrine.  (Dkt. No. 200 at 11.)  DWA also argues the Tribe cannot establish standing.[8]  (Dkt. No. 202-1 at 28-29.)  The Court agrees that the Tribe lacks standing to seek quantification of its federally reserved water right.

Defendants contend the Tribe provides no basis to believe it will ever pump groundwater; thus, there is no injury.  (Dkt. Nos. 200 at 11-12; 202-1 at 28-29.)  In their supplemental briefing, Defendants reiterate their argument that the Tribe offers no evidence that it intends to pump any groundwater or that the Tribe faces immediate concerns regarding water quantity and its ability to develop or use the reservation.  (Dkt. Nos. 281 at 5-9; 287 at 8-10.)  Further, Defendants maintain Plaintiff cannot show the requisite causation because Defendants have not interfered with any efforts of the Tribe to produce groundwater.  (Dkt. Nos. 200 at 12; 202-1 at 28-29.)  DWA further argues Defendants have never prevented or even discouraged the Tribe from producing groundwater underlying the reservation.  (Dkt. No. 287 at 8-9.)  Lastly, Defendants contend the Tribe cannot establish redressability.  (Dkt. No. 200 at 12; 202-1 at 28-29.)  CVWD argues that because the Tribe has failed to join in this action other overlying landowners, the Court cannot bind those landowners to a judgment or enforce a judgment against them.  (Id.)

The Tribe notes in its Opposition that it purchases at least some of the groundwater subject to its federal reserved right from Defendants.  (Dkt. No. 209 at 5.)  The Tribe argues whether or not it pumps groundwater is immaterial.  (Id. at 4.)  Moreover, the Tribe claims injury: Defendants have overdrafted the aquifer, thus reducing the quantity and quality of groundwater available to meet the Tribe's needs and impacting the cost to access the remaining water.  (Id. at 5.)  The Tribe also contends it satisfies Article III's immediacy and injury requirements because it has a federal reserved water right in the groundwater in an undetermined amount.  (Id. at 3.)  It claims Defendants' contention that they can pump groundwater in which the Tribe and United States claim a property interest in and of itself constitutes a controversy.

---

[8] In its Opposition, DWA states it "does not challenge the Tribe's standing to seek quantification; rather, DWA acknowledges that the Tribe has standing to assert that it has a reserved right in groundwater, which includes quantification of the right."  (Dkt. No. 216 at 14 n.8.)  However, in its motion for summary judgment, under the section discussing quantification, DWA states the Tribe lacks standing to seek quantification because it does not pump groundwater.  (Dkt. No. 202-1 at 28-29 ("The Tribe's failure to pump or attempt to pump groundwater also demonstrates that the Water Agencies have not 'caused' the Tribe to suffer a 'concrete and particularized' injury that would be 'redressed' by a favorable decision, and thus the Tribe lacks Article III standing to pursue its claim against the Water Agencies.").)

(Id.)  "Quantification of the water right goes hand-in-glove with [the] declaration [of the right to the water] and is absolutely indispensable to the appropriate tailoring of the injunctive relief[.]" (Id. at 6.)   In its supplemental briefing, the Tribe analogizes its reserved right to a quiet title action and asserts injury in the form of uncertainty surrounding the "scope, character, and extent" of the reserved right.  (Dkt. No. 289 at 3-4.)  The Tribe's supplemental briefing reiterates its position that overdraft of the aquifer is sufficient evidence of the Tribe's current and impending injury.  (Id. at 5-8.)

### a.  Effect of Non-Use on Standing Inquiry

The Court notes that although non-use does not destroy the Tribe's federally reserved water right, it affects whether the Tribe has standing to adjudicate the scope, extent, and character of that right.  The Ninth Circuit holds that "the Indian allottee does not lose by non-use the right to a share of reserved water.  This characteristic is not applicable to the right acquired by a non-Indian purchaser."  Colville Confederated Tribes v. Walton, 647 F.2d 42, 51 (9th Cir. 1981).  Additionally, the reserved right extends to the Tribe's future needs.  See U.S. v. Ahtanum Irr. Dist., 236 F.2d 321, 326 (9th Cir. 1956) ("It is obvious that the quantum is not measured by the use being made at the time the treaty reservation was made.  The reservation was not merely for present but for future use.");  U.S. v. Adair, 726 F.2d 1394, 1416 (9th Cir. 1983) ("the full measure of this right need not be exercised immediately.  As with rights reserved to the Tribe, water may be used by Indian allottees for present and future irrigation needs.").  The Ninth Circuit reiterated that the Tribe's "rights are not lost through non-use," but instead "are flexible and can change over time."  Agua Caliente, 849 F.3d at 1272 (citing Colville, 647 F.2d at 47-48, 51).  Thus, the Tribe does not lose its reserved right to the groundwater simply because it does not currently pump it.

However, the fact that the Tribe does not lose its reserved right by non-use does not mean the Tribe automatically has standing to adjudicate the scope of that right.  The Court finds the use needs of the Tribe—current and future—critical to an inquiry concerning actual or imminent injury to the reserved right.

First, the Court considers the nature of the Tribe's reserved right.  For standing purposes, the Tribe must show an invasion to its legally protected interest.  See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (citing Lujan, 504 U.S. at 560).  Under the Supreme Court's decision in Winters v. United States, 207 U.S. 564, the creation of an Indian Reservation contains a right to water "to the extent needed to accomplish the purpose of the reservation."  Cappaert v. United States, 426 U.S. 128, 138 (1976).  This right is referred to as a "Winters right."  The Supreme Court holds this Winters right "reserves only that amount of water necessary to fulfill the purpose of the reservation, no more."  Id. (citing Arizona v. California, 373 U.S. 546, 600-01 (1963) (emphasis added)).  In this case, the Ninth Circuit acknowledged limitations on a Winters right and noted that a Winters right "only reserves water to the extent it is necessary to accomplish the purpose of the reservation[.]"  Agua Caliente, 849 F.3d at 1268.  Thus, the interest protected through a Winters right is the Tribe's need for water.  This is inherently tethered to the Tribe's use or future use of water.

**CIVIL MINUTES—GENERAL**

The Federal Circuit, considering a similar issue, reached the same conclusion. See Crow Creek Sioux Tribe v. United States, 900 F.3d 1350 (Fed. Cir. 2018). The tribe in Crow Creek argued any action affecting the water source at issue constitutes an injury to its Winters right, even if the action does not affect the tribe's ability to draw sufficient water to fulfill the purposes of the reservation. Id. at 1357. The Federal Circuit rejected this argument, noting that a Winters right only entitled a tribe to enough water to fulfill the purposes of its reservation, not more. Id. It elaborated that that the tribe's property right was usufructuary in nature in that the tribe did not own particular molecules of water but the advantage of its use. Id. (citation omitted). The Federal Circuit held that the tribe cannot be injured by "action that does not affect [its] ability to use sufficient water to fulfill the purposes of the [r]eservation." Id. This Court agrees with the Federal Circuit's analysis and finds that the Tribe must provide evidence of injury to its ability to use sufficient water to fulfill the purposes of the reservation.

Second, the Tribe argues courts may quantify a Winters right without requiring the Tribe to show current need, plans for using their right, or interference with access to water for current needs. (Dkt. No. 289 at 2.) However, the cases on which the Tribe relies do not address standing and do not excuse the Tribe from providing evidence of injury—either current or imminent. Furthermore, the cases on which the Tribe relies address hostile, competing uses between the tribes and their opposing parties. The tribe in U.S. v. Ahtanum, 236 F.2d 321, 324-25, 340 (9th Cir. 1956), sought to divert water from a stream when there would not be enough water available to satisfy the needs of both the tribe and its opposing parties. The tribe in U.S. v. Adair, 723 F.2d 1394 (9th Cir. 1983), sought to protect water for fishing and hunting against competing irrigation use that precluded a proper balance of open water for the tribe's hunting and fishing uses. See U.S. v. Adair, 478 F. Supp. 336. 339-340 (D. Or. 1979). Finally, in Arizona v. California, 373 U.S. 546, 595 (1963), the Supreme Court adopted its Special Master's recommendation and declined to quantify Winters rights for some tribes. The Special Master concluded quantification was unnecessary in some instances because there was no "indication that such enjoyment [of the use of tributary inflow] is in immediate danger of being interfered with." Report of Special Master Rifkind, Arizona v. California, O.T. 1960, at 318 -19 (Dec. 5, 1960). The special master found that the project at issue "cannot be considered an immediate threat to the continuation of present tributary inflow into the mainstream" and that "no existing mainstream project has been refused water[.]" Id. at 319-20. The Arizona Court adopted these findings, implicitly finding no "immediate danger" to justify quantification. Furthermore, although the Arizona Court acknowledged a Winters right protects future needs, it disagreed with the Special Master's decision to determine other related claims, concluding that "[s]hould a dispute over title arise because of some future refusal by the Secretary to deliver water to either area, the dispute can be settled at that time." Arizona, 373 U.S. 600-01. Thus, these cases do not support the proposition that the existence of a Winters right creates standing without evidence of actual or imminent injury to that right.

Finally, the Court is unpersuaded by the Tribe's assertion that this action is akin to a quiet title action, rendering "uncertainty" sufficient injury for standing purposes. The Tribe may be correct in its assertion that adjudicating a Winters right is in purpose and effect like a

quiet title action because it requires a court to determine the extent of the parties' rights with respect to a particular water source.  See Nevada v. U.S., 463 U.S. 110, 143 (1983); Ahtanum, 236 F.2d at 339.  However, the Tribe provides no citation for its contention that "uncertainty" concerning the scope of its rights satisfies Article III's injury-in-fact requirement such that this Court may excuse the Tribe from offering evidence that it is currently or imminently unable to use sufficient water to fulfill the purposes of the reservation.[9]

For these reasons, the Court finds that to satisfy the injury-in-fact requirement for standing to quantify its Winters right, the Tribe must provide evidence that Defendants' actions actually or imminently harm the Tribe's ability to use sufficient water to fulfill the purposes of the reservation.

### b.  Injury to Winters Right

Next, the Court examines whether the Tribe offers evidence of injury to its Winters right. In other words, the Court looks for evidence that the Tribe is unable, or may imminently become unable, to use sufficient water to fulfill the purposes of the reservation.

The Ninth Circuit has explained the purposes of the Executive Orders establishing the reservation.  In 1876, President Grant "ordered certain lands 'withdrawn from sale and set apart as reservations for the permanent use and occupancy of the Mission Indians of southern California.'"  Agua Caliente, 849 F.3d at 1265 (quoting Exec. Order of May 15, 1876).  President Rutherford B. Hayes' 1877 Order reserved additional lands for "'Indian purposes.'"  Id. (quoting Exec. Order of Sept. 29, 1877).  Prior to these orders, the government issued detailed reports from Indian Agents, recognizing "the urgent need to reserve land for Indian use in an attempt to encourage tribal members to 'build comfortable houses, improve their acres, and surround themselves with home comforts.'"  Id. (quoting Comm'r of Indian Aff., Ann. Rep. 224 (1875)).  The Ninth Circuit concluded its historical account: "In short, the United States sought to protect the Tribe and 'secure the Mission Indians permanent homes, with land and water enough.'"  Id. at 1265-66 (quoting Comm'r of Indian Aff., Ann. Rep. 37 (1877)).

The Tribe contends it offers evidence of ongoing injury to its property interest.  (Dkt. Nos. 209 at 4; 289 at 5-9.)  The aquifer is in a state of overdraft.  (Agua Caliente RJN, Exh. 15 at

---

[9] The Tribe asserts the Supreme Court "found standing to adjudicate a dispute 'over who owns, or has paramount rights in,' certain property and [held] that '[s]uch concrete conflicts as these constitute a controversy in the classic legal sense[.]'"  (Dkt. No. 289 at 4 (quoting U.S. v. California, 332 U.S. 19, 24-25 (1947)).)  The Tribe conveniently omits that the Supreme Court explained state and federal governments asserted conflicting claims as to who had a superior right to take oil and gas from under ocean land off the California coast, "much of which has already been, and more of which is about to be, taken by order under authority of the state."  U.S. v. California, 332 U.S. at 24-25.  Thus, the "controversy in the classic legal sense" contemplated a current and imminently threatened injury to the federal government's asserted right to the oil and gas California was already taking.

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

ES-4.)  "The demand for groundwater has annually exceeded the limited natural recharge of the groundwater basin.  The condition of a groundwater basin in which the outflows (demands) exceed the inflows (supplies) to the groundwater basin over the longer term is called 'overdraft.'" (Id.)  Overdraft in an aquifer is correlated with lowering of the water table. (Id.) As the water table gets lower, pumping of groundwater becomes more expensive. (Id.) Continued overdraft can result in land subsidence, which can damage infrastructure and reduce storage space in the aquifer. (Id.)  The water districts have imported Colorado River water to recharge the aquifer. (Id. at ES-3 to -4.)  This has partially offset the cumulative overdraft of the aquifer and the effects of overdraft. (Id.)  "Continued overdraft would eventually stifle the growth in the Valley, as it would not be possible to demonstrate that adequate water supplies exist to support growth." (Id. at ES-8.)  Although it is disputed whether Defendants are responsible for the overdraft, they are pumping water. (See Agua Caliente RJN, Exh. 18 at 3 ("DWA and CVWD groundwater extractions . . .").)  Defendant CVWD contends it is not overdrafting the aquifer, but even if it were, such overdraft would not interfere with the Tribe's reserved right because reserved water rights are tied to use, as discussed above. (Dkt. No. 219 at 14 n.9.)  In its response to CVWD's supplemental brief, the Tribe focuses on the existence of overdraft, both currently and cumulatively, as sufficient injury for standing purposes.[10] (Dkt. No. 289 at 5-9.)

The Court finds that an overdraft condition—whether currently or cumulatively over many years—is not enough to satisfy the Tribe's burden to provide evidence of injury related to its quantification claim.  As addressed above in Part V.A.1.a, the Tribe's legally protected interest is its ability to use sufficient water to fulfill the purposes of the reservation.  The Tribe asserts that water levels under the reservation continue to decline, which "evinces an ongoing infringement of [the Tribe's] ability to access groundwater," but provides no evidence connecting the declining water level with any of the Tribe's current or future use needs. (Dkt. No. 289 at 5.)  Without such an evidentiary connection to its use needs, the Tribe cannot establish a non-speculative actual or imminent injury to its Winters right.  The Tribe notes that from 2009 through 2012 it pumped water to irrigate a golf course, producing a total of 3,391 acre-feet of groundwater. (Dkt. No. 246-1 ¶ 6.)  But in 2012 the Tribe ceased pumping that groundwater. (Id.)  Additionally, the Tribe does not provide evidence that from 2009 through 2012 it was unable to access sufficient water.  Thus, the Tribe's evidence may reflect injury to the water table, but it does not reflect injury to the Tribe's Winters right.

The only assertions concerning the Tribe's ability to use sufficient water resulting from overdraft conditions are either unsupported in the record or inadmissible.  First, the Tribe notes that one effect of declining groundwater levels is increased pumping costs.  The Tribe asserts that "it felt this effect" when it pumped water for a golf course in 2012 and that its members' lessees "feel it now when they pump reserved groundwater for use on the Reservation." (Dkt. No. 289 at 5.)  These assertions lack any citation to the record.  Second, the Tribe's response to CVWD's supplemental brief asserts that it recently announced a partnership with Mission

---

[10] The Tribe relies heavily on 19 additional documents for which it requests judicial notice.  The Court denied these requests and will not consider them here. See supra Part II n.4.

Springs Water District to explore further development and use of reserved groundwater. (Dkt. No. 289 at 2 (citing Dkt. No. 289-2, Ex. 1).) Defendants object to the cited evidence as an improper, late-filed submission that exceeds the scope of the limited nature in which the parties were permitted to supplement the record. (Dkt. No. 302-1 at 9.) As addressed above, the Court only permitted, in addition to the Page Declaration, the deposition of Page and one of Defendants' experts with production of the documents on which those experts relied. (Dkt. Nos. 266, 267.) This submission exceeds the limited supplementation the Court allowed, and the Tribe did not move to further supplement the record. Accordingly, the Court SUSTAINS Defendants' objection. The Court also notes that even if it were to consider the Tribe's memorandum of understanding with the Mission Springs Water District, the agreement's purpose is to "explore the potential for creating a long-term plan for the development, beneficial use and conservation of their water resources[.]" (Dkt. No. 289-2, Ex. 1 at 2.) The agreement merely endeavors to explore the feasibility of such a partnership. (Id.) Thus, the agreement is not evidence that the Tribe will pump water or that the Tribe may pump water in quantities risking conflict with the Defendants. Accordingly, there is no evidence that the Tribe will not be able to access sufficient water to fulfill any particular purpose, much less the purposes of the reservation.

Thus, the Tribe does not present evidence it is currently unable to use sufficient water to fulfill the purposes of the reservation nor does it present evidence that its need for water will increase in the future such that its use will conflict with Defendants' use. Thus, the Tribe has not provided any evidence of actual or imminent injury such that it has standing for this Court to adjudicate its quantification claim. Because the Court finds the Tribe lacks standing to pursue its quantification claim, the Court will not consider CVWD's redressability and ripeness arguments. Accordingly, the Court GRANTS Defendants' Motions as to the Tribe's quantification claim.

## 2. Quality

DWA argues the Tribe does not have standing to litigate its water quality claim. (Dkt. No. 202-1 at 20.) CVWD did not initially contend this claim should be dismissed for lack of Article III standing.[11] (See Dkt. Nos. 200 at 11-14.; 219 at 9-13, 21 ("Plaintiffs have standing . . . to raise water quality claims.").) However, in its supplemental brief, CVWD contests the

---

[11] In CVWD's petition for certiorari to the Supreme Court, it stated:

> CVWD does not argue, and has never argued, that the Tribe lacks standing to press this claim [(regarding water quality)], or that the claim should otherwise be dismissed on justifiability grounds. Nor could it: CVWD is currently replenishing the aquifer with Colorado River water—indeed, CVWD has explained that it cannot sustainably manage the aquifer without Colorado River water—and the Tribe asserts an immediate and ongoing injury to its alleged reserved right.

(See Dkt. No. 209-2, Ex. B at 2.)

Tribe's standing to assert its water quality claim. (Dkt. No. 281 at 10.) DWA maintains, "[s]ince
the Tribe has not alleged that the higher TDS levels of the imported water are adversely affecting
the purposes of the Tribe's reservation or otherwise adversely affecting its water rights in any
concrete way, the Tribe has failed to make the necessary allegations to establish that it has Article
III standing to pursue its water quality claim." (Id. at 20.) Further, in its Reply, DWA argues
the Tribe has failed to allege any kind of "'concrete and particularized' injury that is 'actual or
imminent.'" (DWA Reply at 11.) DWA offers these arguments again in its supplemental brief.
(Dkt. No. 287 at 5-6.) In its supplemental brief, CVWD similarly argues the Tribe has not
provided evidence of injury caused by TDS levels attributable to recharge from Colorado River.
(Dkt. No. 281 at 10-12.)

The Tribe points to the Court's previous order (Dkt. No. 180) finding the Tribe "made a
strong showing in support of its assertion that it will suffer irreparable harm if the case is stayed
any longer . . . The Tribe asserts that . . . the water agencies have . . . damaged the water quality
of the aquifer by pumping lower quality Colorado River water." (Dkt. No. 180 at 6.) The Court
notes, however, that the record has grown substantially since Phase II began and that there has
been substantial standing-related discovery. In its response to CVWD's supplemental brief, the
Tribe contends that because Phase III determines the water quality standard, it must only provide
evidence of "declines in water quality that are traceable to [Defendants] and redressable by this
Court." (Dkt. No. 289 at 9.) The Tribe contends it has fulfilled this burden.[12] (Id.)

The Tribe must provide evidence of an invasion to a legally protected interest. See
Spokeo, 136 S. Ct. at 1548 (2016) (citing Lujan, 504 U.S. at 560). The Tribe argues its Winters
right contains a water quality component. (Dkt. No. 203 at 14-19.) Thus, assuming the Winters
right contains a water quality component, the Tribe must provide evidence that recharging the
water table with Colorado River water actually or imminently impairs the Tribe's ability to use
water of a sufficient quality to fulfill the purposes of the reservation. See supra Part V.A.1.a.

The Court briefly summarizes the admissible, relevant evidence the Tribe offers. The
Tribe offers evidence that "[c]ontinued decline of groundwater levels could result in a substantial
and possibly irreversible degradation of water quality in the groundwater basin due to the
intrusion of lower quality, high TDS water applied at the surface for irrigation and reduced drain
flows carrying the salts out of the basin." (Agua Caliente RJN Ex. 15, at ES-84.) The
Metropolitan Water District's (MWD) 2016 Urban Water Management Plan indicates MWD
has a goal of keeping TDS levels under 500 mg/L in the water it delivers and mixes Colorado
River water with lower TDS water supplies. (Dkt. No. 231 at 4-3.)[13] The Tribe's wells will be

---

[12] The Tribe relies heavily on 19 additional documents for which it requests judicial
notice. The Court denied these requests and does not consider them here. See supra Part II n.4.

[13] Defendants object to the Tribe's use of the MWD Plan for the following reasons: (1) the
Tribe tries to rely on analysis and substantive facts in the MWD Plan without demonstrating the
facts are not reasonably subject to dispute; (2) the Tribe asks the Court to take judicial notice of
the its interpretive gloss on proffered facts; (3) the Tribe improperly supplements the record; (4)

affected by recharge "reflected in salinity levels gradually increasing over time to a level approaching that of the Colorado River." (Dkt. No. 289-9 at 131 of 133.)[14]

This evidence, however, does not indicate that the Tribe cannot use the water to fulfill the purposes of the reservation. Like with its quantification claim, the Tribe focuses on changes to the water but does not provide evidence that these changes preclude the Tribe, either currently or imminently, from being able to use its reserved water for any purpose. The Tribe contends that in cases alleging environmental injuries, plaintiffs have standing if they show a connection to the area of concern; that their future life will be less enjoyable, which includes aesthetic satisfaction; and that they will suffer if the area in question becomes degraded. (Dkt. No. 289 at 9 (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 169 (2000), Ecological Rights Found. V. Pac. Lumber Co., 230 F.3d 1141, 1149 (9th Cir. 2000); Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 860 (9th Cir. 2005)).) However, the possibility of asserting aesthetic harm does not change the fact that "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." Laidlaw, 528 U.S. at 181. To satisfy this requirement, an environmental plaintiff must establish that "they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Id. (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)). Here, the Tribe offers evidence that its water will have higher TDS levels, but fails to provide admissible evidence of any injury to the Tribe or its Winters right. Thus, the Tribe only offers evidence of injury to the water, not injury to the Tribe.

---

the Tribe offers data susceptible to varying interpretation with reasonable dispute as to what it establishes; and (5) the Tribe offers government reports to establish ultimate facts that are properly the basis of expert testimony. (Dkt. No. 302-1 at 15-17, 18-20.) The Court previously granted judicial notice of this document. (Dkt. No. 233.) As such, it is properly before the Court and Defendants' third ground for objection is meritless. However, Defendants are correct that the Court may not use the MWD Plan to take judicial notice of its interpretation of data or the Tribe's interpretation of the MWD Plan. Similarly, the Court may not take judicial notice of analysis or substantive facts subject to reasonable dispute. For example, the Court cannot find the following contention is beyond reasonable dispute: "High levels of salinity can impact various water uses such as limiting groundwater and recycled water uses, reducing the lifespan of household appliances, and reducing crop yields." (Dkt. No. 231 at 4-3.) These cited facts, although appearing in a public record, are not clearly beyond reasonable dispute, and their inclusion in a public record does not elevate them to such a status. Accordingly, the Court SUSTAINS-IN-PART Defendants' objections. The Court limits its use of the MWD Plan to those facts not subject to reasonable dispute.

[14] Defendants object to the Tribe's use of judicial notice exhibits in the paragraph accompanying this citation to Exhibit 7 to the Fogg Deposition. (Dkt. No. 302-1 at 30-34.) The Court does not rely on these documents and Defendants' objections do not discuss Exhibit 7.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

Because the Tribe fails to provide evidence of harm, actual or imminent, to the its ability to use water of a sufficient quality to fulfill the purposes of the reservation, the Tribe lacks standing for its water quality claim.  The Court GRANTS Defendants' Motion as to this claim.

### 3.  Pore Space

Defendants contend the Tribe does not have standing to assert its claim for ownership over the pore space.[15] (Dkt. No. 208 at 21; Dkt. No. 216 at 15.)  They argue the Tribe lacks standing because it does not seek any monetary compensation.  (Dkt. Nos. 216 at 15, 219 at 3.)  DWA maintains the water agencies do not interfere with the Tribe's right to store water in the pore space and the importation of Colorado River water does not interfere with the claimed ownership of the pore space.  (Id. at 16.)

CVWD argues the Tribe cannot show any actual or imminent injury.  (Dkt. No. 200 at 13; Dkt. No. 208 at 21.)  Presently, the Tribe engages in a small recharge effort, to which neither of the water agencies have interfered or objected.  (Dkt. No. 200 at 13.)  Further, CVWD argues "The Tribe has no 'concrete plan,' or even any plan at all, that would appear to bring its claims to the groundwater storage space into conflict with CVWD's interests."  (Id. at 14 (citation omitted).)  CVWD also claims the Tribes pore space claim is not ripe for review because it does not articulate "why it is claiming ownership of the groundwater storage space, or even what it means by ownership."  (Dkt. No. 219 at 4 (internal quotation marks omitted).)

The Tribe contends there is "a present, concrete dispute over the existence and extent of Agua Caliente's asserted federal property right, and Agua Caliente has standing to bring a claim for declaration of that right and eventually for its quantification and protection."  (Dkt. No. 209 at 8-9.)

In U.S. v. California, the Supreme Court wrote:

[H]ere there is a claim by the United States, admitted by California, that California has invaded the title or paramount right asserted by the United States to a large area of land and that California has converted to its own use oil which was extracted from that land. [citation omitted.]  This alone would sufficiently establish the kind of concrete, actual conflict of which we have jurisdiction under Article III.  The justiciability of this controversy rests therefore on conflicting

---

[15] Defendants use the term "storage space" instead of "pore space."  (See Dkt. Nos. 200 at 2 n.2, 202-1 at 2.)  CVWD explains the Tribe is seeking a declaration that it owns "'the void or open subterranean spaces that are not filled by solid material; the empty space between the rocks, sand, and other solid soil where water can be stored.'"  (Dkt. No. 200 at 2 n.2 (quoting Dkt. No. 192 at 3).)  CVWD thus uses the term "groundwater storage space" and not the broader term "pore space."  (Id.)  The Court elects to use the term pore space, as it is consistent with the language used throughout the litigation.  The Court adopts the Tribe's definition of pore space articulated above.  (See Dkt. No. 192 at 3.)

claims of alleged invasions of interests in property and on conflicting claims of governmental powers to authorize its use.

332 U.S. 19, 25 (1947), supplemented sub nom., 332 U.S. 804 (per curiam).  In California, there were conflicting claims to ownership, albeit not regarding pore space.  Id. at 24-25.  Here, Phase II seeks to resolve whether the Tribe owns pore space underlying its Reservation.  (Dkt. No. 121 at 1; Dkt. No. 193 at 1.)  CVWD contends "groundwater storage space is a common resource that is not subject to ownership by the Tribe or any other overlying owner."  (Dkt. No. 200 at 21.)  Thus, the Tribe presumably claims the water districts have invaded the title asserted by the Tribe to the storage space.  As in California, this is sufficient to create a concrete conflict as to whether the Tribe owns an interest in the pore space underlying its reservation.  But it is insufficient to create a conflict allowing this Court to determine the scope of that alleged ownership interest.

The Court's analysis concerning the Tribe's quantification claim also applies to the pore space claim.  It has already been established that the Tribe has a federally reserved water right.  Agua Caliente, 849 F.3d at 1265.  However, as addressed above, the Tribe lacks standing to quantify that right because it failed to provide evidence of actual or imminent injury to the Tribe's ability to exercise the reserved right.  See Part V.A.1.  In other words, after declaring the Tribe owns a federally reserved water right, the Court found the Tribe lacked standing to seek its desired injunctive relief.

Here, the Tribe seeks both: (1) a declaration that it has an "ownership interest in sufficient pore space . . . to store its federally reserved right to groundwater for all present and future purposes"; and (2) and injunction preventing Defendants from infringing on that "ownership interest in sufficient pore space . . . to store its federally reserved right to groundwater for all present and future purposes."  (Compl. ¶¶ 66, 76.)[16]  As addressed above, this action is sufficiently analogous to U.S. v. California, 332 U.S. 19, and the Court finds the Tribe has standing to seek a declaration that it has an ownership interest in sufficient pore space to store its federally reserved water.  However, like with the quantification claim, the Tribe presents no evidence of any actual or imminent threat to its ability to store water of any quantity—much less its ability to store an amount necessary to fulfill the purposes of the reservation.  Thus, the Tribe presents no evidence of actual or imminent injury to its ownership

---

[16] The Court notes that in its Phase II briefing, the Tribe contends it owns the pore space underlying its reservation because it is a "constituent element" of the surface estate the Tribe owns.  (See Dkt. Nos. 203-1 at 19-20; 217 at 2, 18; 298 at 4-5.)  This directly conflicts with the Tribe's Complaint, which asserts the ownership interest is in "sufficient pore space in the Groundwater Basin aquifer underlying the Coachella Valley and the Tribe's reservation to store its federally reserved right to groundwater for all present and future purposes."  (Compl. ¶¶ 66, 76.)  All paragraphs of the Complaint address the pore space interest in terms of use connected to the Tribe's asserted federally reserved right—not as subterranean, constituent elements of land ownership.  (See id. ¶¶ 8, 10-13, 55, 66, 71, 76.)  Thus, the Tribe's argument that it owns the pore space underlying its reservation as a constituent element of its surface estate is not properly before this Court.

interest in sufficient pore space to store its federally reserved water.  Accordingly, the Tribe lacks standing to seek its requested injunctive relief concerning pore space.

## B.  Pore Space Ownership

Due to the Court's ruling in Part V.A, the Tribe's sole remaining claim concerns pore space.  The Court defers to Phase III the narrow issue of whether the Tribe owns sufficient pore space to store its federally reserved water right.  For the reasons addressed in Part V.A.3, Phase III will not determine whether to enjoin Defendants' from infringing on this right—if it exists—because the Tribe did not provide evidence that it faced any actual or imminent injury to its alleged ownership of sufficient storage space.

## C.  The United States

The United States contends it has a sovereign right to define federal property rights, to enforce the executive orders creating the Tribe's reservation, and to enforce the <u>Winters</u> doctrine. (Dkt. No. 286 at 3.)  The United State asserts these rights stem from the government's right to apply to the courts for assistance in the exercise of its powers and discharge of its duties, its duty to enforce federal law, and the judiciary's power to hear cases in which the United States is a party. (<u>Id.</u> at 2 (citations omitted).)  The United States further asserts it has power to litigate to protect and enforce federal rights and aid in executing federal policies. (<u>Id.</u> (citing <u>Cramer v. United States</u>, 261 U.S. 219, 223 (1923).)  The United States maintains it has standing to pursue this action to protect the Tribe's federal reserved water right, which it holds for the benefit of the Tribe. (Dkt. No. 211.)  These assertions concerning the government's ability to protect federal rights and access federal courts may be correct.  However, none of these principles stand for the proposition that the United States may be relieved of its Article III burden to provide evidence of harm to the Tribe's federally reserved right.  Like the Tribe, the United States fails to provide such evidence.  Accordingly, the United States lacks standing to assert its quantification and quality claims for the same reasons the Tribe lacks standing as to those claims.[17]

## VI.    COST-SHIFTING

As addressed above, the Court granted the Tribe's motion to supplement the record with the declaration of Oliver Page, permitted limited additional discovery which included Page's deposition, and ordered supplemental briefing. (Dkt. Nos. 266, 267.)  After Page's deposition, counsel for the Tribe informed Defendants and the Court that the Tribe would not be relying on Page's Phase II declarations and believed his deposition testimony may be unreliable due to a recently discovered medical condition. (Dkt. No. 271 at 2-3.)  Defendants accuse the Tribe of gamesmanship and contend the Tribe seeks to impeach its own witness only because he made damaging admissions in his deposition testimony. (Dkt. Nos. 281 at 13-14; 287 at 12.)  Defendants request that the Court consider requiring the Tribe to pay Defendants' costs in responding to the motion to supplement and all subsequent related proceedings. (<u>Id.</u>)  The Court

---

[17] The United States does not raise any claims concerning pore space.  (<u>See</u> Dkt. No. 71.)

is not persuaded that the Tribe engaged in the gamesmanship of which they are accused and declines to consider cost-shifting in relation to any motions associated with Phase II.

## VII.   CONCLUSION

For the reasons above, the Court GRANTS-IN-PART Defendants' Motions for Summary Judgment as to the Tribe's quantification and quality claims because the Tribe currently lacks standing as to those claims.  The Court DENIES-IN-PART the Tribe's Motion for Summary Judgment.  The Court DENIES the United States' Motion for Summary Judgment.  The Court defers judgment as to the other issues raised in the motions.

**IT IS SO ORDERED.**