CATHERINE F. MUNSON (D.C. Bar No. 985717) (admitted *pro hac vice*)
KEITH M. HARPER (D.C. Bar No. 451956) (*pro hac vice* motion pending)
MARK H. REEVES (D.C. Bar No. 1030782) (admitted *pro hac vice*)
Kilpatrick Townsend & Stockton LLP
607 14th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 508-5800
Fax: (202) 505-5858

STEVEN C. MOORE (CO Bar No. 9863) (admitted *pro hac vice*)
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
Telephone: (303) 447-8760
Fax: (303) 443-7776

JOHN TABINACA PLATA (CA Bar No. 303076)
jplata@aguacaliente.net
AGUA CALIENTE BAND OF CAHUILLA INDIANS
5401 Dinah Shore Drive
Palm Springs, CA 92264
Tel: (760) 699-6837; Fax: (760) 699-6963

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS,<br><br>Plaintiff,<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor<br><br>v.<br><br>COACHELLA VALLEY WATER DISTRICT, et al.<br><br>Defendants. | CASE NO.: ED CV 13-00883-JGB-SPX<br>Judge:       Jesus G. Bernal<br>Courtroom: 1<br><br>**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Hearing Date:<br>Time:<br>Action Filed:      May 14, 2013 |

Comes now the Agua Caliente Band of Cahuilla Indians ("Tribe") and shows as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362 because the Tribe is a federally recognized Indian tribe and its claims arise under the Constitution, laws, and treaties of the United States.

2.      Venue in this Court is appropriate under 28 U.S.C. § 1391(b) because the land and underlying water at issue, as well as the Defendants, are located within the Central District of California.

## NATURE OF THE ACTION

3.      This is an action to have this Court judicially recognize, declare, quantify and decree to the Tribe its prior and paramount reserved right to sufficient water underlying the Coachella Valley as is necessary to fulfill the aboriginal rights of the Tribe and its members as well as the present and future homeland purposes of the Tribe's Reservation; recognize, declare, and quantify the Tribe's beneficial ownership of the volume of pore space underlying the Tribe's Reservation; and to enjoin Defendants from injuring the Tribe and its members by overdrafting the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer and degrading the groundwater quality or otherwise infringing upon the Tribe's paramount reserved water and pore space rights.

## DESCRIPTION OF THE ISSUE

4.      The Cahuilla Indians, ancestors of the present day Tribe and its members, have lived in the Coachella Valley since time immemorial, and have aboriginal rights to the surface water and groundwater resources of the Valley, which they have developed and relied on for millennia for traditional cultural, domestic and agricultural subsistence purposes.

5.      The Tribe's Reservation ("Reservation" or "Agua Caliente Reservation") was established on May 15, 1876 by the Executive Order of President Ulysses S.

Grant from lands in the Coachella Valley which the Cahuilla Indians used and occupied since time immemorial. The Reservation was subsequently expanded through the Executive Order of President Rutherford B. Hayes of September 29, 1877 and other administrative acts. In 1896, the Secretary of the Interior started issuing patents to the Tribe declaring that the United States would hold the lands of the Reservation in trust for the Tribe as authorized by the Mission Indian Relief Act of January 12, 1891 (26 Stat. 712). Today, the Reservation exceeds 31,396 acres of land, all located within the aboriginal territory of the Tribe.

6.     The establishment of the Reservation pursuant to federal law impliedly reserved to the Tribe and its members the right to surface water and groundwater sufficient to accomplish the purposes of the Reservation, including establishing a homeland for the Tribe and its members. These orders and acts acknowledged and confirmed the Tribe's preexisting rights to surface water and groundwater.

7.     Under established principles of federal law, the surface and groundwater rights of the Tribe are the most senior in the Coachella Valley, predating all water rights decreed, or otherwise claimed under state law.

8.     Defendants' development of the groundwater resources of the Coachella Valley has adversely affected the quantity and quality of the groundwater underlying the Coachella Valley and in particular the Agua Caliente Reservation, and thus has injured and infringes upon the senior reserved rights of the Tribe, and the use and enjoyment of said rights by the Tribe and its members. This suit seeks to declare the existence of the Tribe's rights as the senior reserved rights in the Valley under federal law, to quantify said rights, and to enjoin Defendants from injuring the Tribe and its members, or otherwise infringing upon their senior water rights. The suit also seeks a declaration of the Tribe's  beneficial ownership of a defined amount of subterranean pore space—defined for purposes of this lawsuit as the void or open subterranean spaces that are not filled by solid material or the empty space between rocks, sand, and other solid soil where water can be stored—in the aquifer underlying the

Coachella Valley and injunctive relief protecting the pore space from degradation or diminishment by Defendants.

## **PARTIES**

9.     Plaintiff Agua Caliente Band of Cahuilla Indians is a federally recognized Indian Tribe, which presently operates under a Constitution and by-laws approved by the Commissioner of Indian Affairs on April 18, 1957, as amended.

10.     Defendant, the Coachella Valley Water District ("CVWD"), is a county water district formed in 1918 and organized pursuant to the California Water Code. CVWD's purported service area covers approximately 1,000 square miles from the San Gorgonio Pass to the Salton Sea, mostly within the Coachella Valley in Riverside County, California. CVWD has developed more than 100 groundwater wells in its service area, and extracts in excess of 100,000 acre feet of groundwater annually from the Upper Whitewater sub-basin of the Coachella Valley Groundwater Basin. CVWD utilizes pore space under the Agua Caliente Reservation to store imported Colorado River water based on its claim that the pore space underlying the Reservation is subject to a public servitude allowing its use by CVWD. CVWD is not an arm of the State of California.

11.     Defendants John Powell, Jr., Peter Nelson, G. Patrick O'Dowd, Anthony Bianco, and Castulo R. Estrada are members of the Board of Directors of Defendant CVWD and, as such, are charged with establishing CVWD policy and directing CVWD activities, including the pumping and extraction of groundwater underlying the Coachella Valley and the use of pore storage space in the aquifer underlying the Coachella Valley in a manner that interferes with the Tribe's federally reserved rights. They are sued solely in their official capacities as directors of CVWD.

12.     Defendant, the Desert Water Agency ("DWA") is an independent special district created by a special act of the California State Legislature in 1961. DWA provides water services to Palm Springs, outlying county areas, Desert Hot Springs and part of Cathedral City. DWA has developed approximately 29 wells and extracts

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

approximately 43,000 acre feet of water annually from the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley. DWA utilizes pore space under the Agua Caliente Reservation to store imported Colorado River water based on its claim that all pore space underlying the Reservation is a public resource available for use by DWA. DWA is not an arm of the State of California.

13.    Defendants Patricia G. Oygar, Kristin Bloomer, James Cioffi, Craig A. Ewing, and Joseph K. Stuart are members of the Board of Directors of Defendant DWA and, as such, are charged with establishing DWA policy and directing DWA activities, including the pumping and extraction of groundwater underlying the Coachella Valley and the use of pore storage space in the aquifer underlying the Coachella Valley in a manner that interferes with the Tribe's federally reserved rights. They are sued solely in their official capacities as directors of DWA.

## FACTS

**A.    The History of the Cahuilla People and the Agua Caliente Band in the Coachella Valley, and the Legacy of Incoming Settlers Squandering the Land and Water Resources of the Valley**

14.    The Cahuilla people, from whom the Agua Caliente Band members are descendant, have resided in the Coachella Valley for millennia.  Prior to the arrival of non-Indians to the region and up until the Tribe's settlement on the Agua Caliente Reservation, the Tribe had an established civilization that had sustainably depended on water from the Valley's canyons, springs and aquifer for, among other things, domestic, stock watering and agricultural irrigation purposes.

15.    The Cahuilla had good success with producing a range of grain, vegetable and fruit crops, irrigating with water drawn from the Whitewater River and its tributaries. Pacific Railroad employees investigating possible railroad routes in the early 1850s described the Cahuilla Indians in the northwestern part of the Valley raising abundant crops of corn, barley and vegetables in the vicinity of their villages.

16.     Later reports by federal Indian agents in the Valley in the mid-1890s confirmed these substantial agricultural activities, as well as the presence of an elaborate system of irrigation ditches and dams developing the water from the Chino, Tahquitz and Andreas Canyons, three streams having their source on the eastern slope of the San Jacinto Mountains.  According to a number of accounts, this included a more than one mile long irrigation conveyance ditch from Tahquitz Canyon constructed around 1830.  There are undated, preserved rock-lined ditches, reservoirs, and dams in Andreas Canyon north of Andreas Creek.  Hand-dug walk-in wells as deep as thirty feet were features of Cahuilla settlements in the northern half of the Valley.

17.     In 1876, by Executive Order of President Grant, the Agua Caliente Band of Cahuilla Indians Reservation was established in the Valley on lands aboriginally occupied by the Tribe and its members. In 1877, President Hayes issued another Executive Order reserving significant additional lands for the Tribe. In 1896, the Secretary of the Interior started issuing patents to the Tribe declaring that the United States would hold the lands of the Reservation in trust for the Tribe as authorized by the Mission Indian Relief Act of January 12, 1891 (26 Stat. 712). Then in February 1907, Departmental Orders added additional lands.  As of today, the Reservation totals more than 31,396 acres of land.

18.     The Reservation was established to, among other things, enable the Tribe and its members to continue to prosper and maintain a homeland. Agriculture was one of the primary purposes for which the Reservation was established. Because the Valley is situated in the southern California desert, sufficient water is essential to the life and prosperity of the Tribe and its members.

19.     Non-Indian settlers moved into the Coachella Valley and began developing the water resources of the Valley. There is a history of settlers squandering land and water to the detriment of the Cahuilla people. The increase in non-Indian settlement of the region in the 1870s saw a correspondent problem with trespass and

mis-appropriation of land and water from the Tribe and its members.  By the 1870s, non-Indian settlers in the northern Coachella Valley, in particular, were claiming any plot of land that had a supply of water—the very lands that had been settled and occupied by Cahuilla people for centuries. Indian Special Agents at the time complained of the injustice, but little if anything was done to protect the Cahuilla people and their lands and resources.

20.    As a result, the Tribe was impoverished, its numbers declined, and its agricultural way of life was severely compromised. An Indian Agent in the Coachella Valley wrote in 1894 that most of the Cahuilla land and water had been confiscated by non-Indian "land grabbers," forcing many of the Indian men of working age to move away to labor for ranchers 50 to 60 miles distant. The old men and women were described by the agent as remaining home "in a condition of wretchedness, by reason of destitution, as I had never seen….I found them lying on the ground in their huts, their shoulders and sides being callous from constant contact with the hard earth. They had nothing to eat but a sort of bean, which grows in the desert, and which is pulverized by a mortar and moisturized with water….The site was pitiful in the extreme."

21.    Circa 1910, the United States Indian Irrigation Service ("IIS") initiated the semblance of a systematic effort to provide the Tribe with water resource development and management assistance in support of the Tribe's irrigation as well as household and other water needs. The IIS did ultimately construct some very limited new delivery facilities and rehabilitate existing facilities on behalf of the Tribe. The Tribe's allocated share of water was inadequate, however, and, even then, the Tribe frequently received less water than promised or the water it did receive was of extremely poor quality.  In the end, what IIS-driven successes there were proved too little, too late.

22.    By this time, over 40 years after the Reservation's establishment, the Tribe was so far forcibly and effectively displaced from engaging in its own irrigation

activities, and non-Indian settlement and uses of  water in the area were so significant, the IIS's efforts largely failed and were ultimately abandoned.

23.    Non-Indian settlers dominated the agricultural economy of the Valley in the first decades of the 20th Century.  This domination became even more pronounced in the mid-1930s with the additional development of the region's groundwater resources through the advent of efficient electric pumps. Significant levels of groundwater pumping in the Coachella Valley began in earnest during the 1940s just after World War II, concurrent with rapid regional population growth.  Between 1940 and 1950 the population of Riverside County grew by over 60 percent.

24.    Once under irrigation, the Coachella Valley became far more productive. The advent of improved water resource impoundment and irrigation system technologies led to rapid increase in regional irrigation development.  Irrigation of the region's desert soils allowed for increased grain yields and, most importantly, the production of superior quality feed crops such as alfalfa hay and higher valued permanent crops, particularly citrus that benefit greatly from irrigation in terms of yield and quality.

**B.**    **The California State Court Adjudication of Surface Water Rights in the Whitewater River**

25.    The Whitewater River and its tributaries rise on the south and east slopes of the San Gorgonio Mountains, in the southwestern part of San Bernardino County, at an altitude of about 11,000 feet, and in times of extreme flood flows in a general southeasterly direction for a distance of about sixty-five miles, traversing the central part of Riverside County, and emptying into the Salton Sea.

26.    In 1922, the Division of Water of the California Department of Public Works commenced a general stream adjudication of surface flow the Whitewater River System to determine the quantity of water that appropriators would be allowed to use. The adjudication began by collecting hydrological data on the Whitewater River system including water usage data.  Engineers from the Division of Water

examined water flow levels, irrigable acres, appropriation amounts, and myriad other factors in the watershed. *Report on Water Supply and Use of Water from Whitewater River Stream System* (November 1923) ("Whitewater Report").

27. The Whitewater Report listed the United States as an appropriator for the Agua Caliente Reservation from two Whitewater River tributaries—Andreas Creek and Tahquitz Creek.

28. In response to the Adjudication's commencement on June 26, 1924, the United States filed a "Suggestion" on behalf of the Tribe contesting the state court's jurisdiction to determine the reserved water rights of the Tribe under federal law. Notwithstanding the lack of jurisdiction, the United States in the Suggestion asserted the Tribe's interests in the water resources of the Whitewater River System, in particular Andreas and Tahquitz Creeks. *Suggestion of the United States, In The Matter of the Determination of the Relative Rights, Based Upon Prior Appropriation, of the Various Claimants to the Water of White Water River and its Tributaries, in San Bernardino and Riverside Counties, California*, (June 26, 1924) ("Suggestion").

29. A brief "Historical Uses" section was also included in the Suggestion. Therein, the United States noted that while no records were kept of very early use of the water from Tahquitz Creek by Indians, "it is known that these lands were irrigated by them as early as 1835 and practically continuously since that time to the year 1914." *Id.* at 16. Regarding Andreas Creek, the United States in the Suggestion stated that while records of early use were not available, the "water of Andreas Creek was used upon these lands by the Indians in a very early day." *Id.* at 14.

30. In 1938, the Superior Court of the State of California, Riverside County, entered a Judgment in the Whitewater Adjudication. The 1938 Judgment listed the United States of America as the appropriator, on behalf of the Agua Caliente Indian Reservation, of surface water from both Andreas and Tahquitz Creeks. With respect to Andreas Creek, the U.S. was given a priority date for the appropriation of January 1, 1893, and securing the use of 6.0 cfs of water throughout the entire year, as requested

in the Suggestion. Regarding Tahquitz Creek, the U.S. was entitled to 4.8 cfs of water also available throughout the entire year, with a priority date of April 26, 1884. *In the Matter of The Determination of the Relative Rights, Based Upon Prior Appropriation, if the Various Claimants to the Waters of Whitewater River, its Tributaries, in San Bernardino & Riverside Counties, CA*, Civ. No. 18035 at 2-3 (California Superior Court, September 9, 1938) ("1938 Judgment") at 65-66.

31.    The United States' Suggestion also made reference to the Tribe's entitlement under federal law to a large additional quantity of groundwater for irrigation, domestic, and stock-watering purposes, also referencing that the United States had developed wells, pumps, canals and conduits for the purpose of delivering groundwater for those purposes. Suggestion at pp. 17-18, Paragraph X. The court did not act on these large groundwater claims, due to the Division of Water of the California Department of Public Works' opinion that it lacked jurisdiction under the terms of applicable state law. Whitewater Report at 3-4.

32.    The surface rights decreed in the name of the United States in trust for the Tribe, from Andreas and Tahquitz Creeks amount to approximately 8,000 acre feet per year. The Tribe actively uses these surface water rights to replenish the groundwater underlying its Reservation lands. Defendants use this water and other water in the aquifer owned by the Tribe under federal law without compensation to the Tribe.

**C.    The Recent History and Present State of Groundwater Usage and Supply**

33.    Outflows from the Coachella Valley Groundwater Basin aquifer have generally exceeded inflows for decades, a condition known as "overdraft." As admitted by CVWD, the continued overdraft of the aquifer by Defendants has resulted in a substantial cumulative net loss the amount of groundwater stored in the aquifer, including the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin. *See, e.g.*, Coachella Valley Water Management Plan Update Draft Report (December 2010) ("2010 Draft Report") at 4-7 – 4-8.

34.     As admitted by CVWD, between the years of 2000 and 2009, natural recharge of the Coachella Valley Groundwater Basin aquifer by Defendants, including both natural inflows and returns from use, averaged approximately 280,000 acre feet per year according to estimates published by CVWD.  *See* 2010 Draft Report at 4-11.

35.     In addition to this natural recharge, imported water from the Colorado River has been used to artificially recharge the Coachella Valley Groundwater Basin aquifer.  CVWD has indicated that during the years 2000-2009, artificial recharge via imported Colorado River water averaged an additional 51,000 acre feet per year.  *See id.*

36.     CVWD has stated that from 2000-2009, the average total inflows to the Coachella Valley Groundwater Basin aquifer were approximately 331,000 acre feet per year.  *See id.*

37.     Published CVWD figures indicate that groundwater pumping from the Coachella Valley Groundwater Basin aquifer averaged approximately 398,000 acre feet per year from 2000-2009.  *See id.*  An additional total of approximately 52,000 acre feet per year were lost to evapotranspiration and subsurface outflow to the Salton Sea.  *See id.*

38.     CVWD statistics indicate that the total average annual outflows from the Coachella Valley Groundwater Basin aquifer from 2000-2009 were approximately 441,000 acre feet per year.  *Id.*

39.     CVWD's published figures indicate that the average annual net loss of stored water, or overdraft, of the Coachella Valley Groundwater Basin aquifer from 2000-2009 was approximately 110,000 acre feet per year.  *See id.; id.* at 7-20.

40.     CVWD recently estimated, in an expert report that it filed in this case, that the annual natural groundwater recharge to the West Whitewater Area of Benefit, which underlies the majority of the Agua Caliente Reservation, is approximately 40,000 AF. *See* Doc. 200-4, Page.ID 7499.

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

41.    DWA recently estimated the annual natural groundwater recharge (natural inflows less natural outflow) of the West Whitewater River Management Area, which includes most of the Agua Caliente Reservation, to be approximately 30,500 AF. Engineer's Report Groundwater Replenishment and Assessment Program for the West Whitewater River Subbasin, Mission Creek Subbasin, and Garnet Hill Subbasin Areas of Benefit, Desert Water Agency 2019/2020 (May 2019) (2019 DWA Replenishment Report) at III-1.

42.    As of 2019, existing annual production of groundwater in the West (or Upper) Whitewater River Subbasin, also known as the Indio Subbasin, which underlies the majority of the Agua Caliente Reservation, is in excess of the annual natural groundwater recharge, meaning there is no excess groundwater in the aquifer.

43.    Continued overdraft of the Coachella Valley Groundwater Basin aquifer, including the Upper Whitewater and Garnet Hill sub-basins, has led to and is likely to lead to a further decline in groundwater levels in parts of the Coachella Valley Groundwater Basin, subsidence, and adverse effects on groundwater quality and storage volume within the Coachella Groundwater Basin.

44.    CVWD admits that it pumps in excess of 100,000 acre feet of water from the Coachella Valley Groundwater Basin each year, and it has projected that its groundwater pumping will increase substantially in future years. *See, e.g., id*. at 4-8; Coachella Valley Water District 2009-10 Annual Review ("2010 Review") at 17; Coachella Valley Water District Urban Water Management Plan Final Report (December 2005) ("2005 Report") at 3-11.

45.    According to CVWD's records, CVWD has produced at least 170,000 AF of groundwater from wells located on the Agua Caliente Reservation since 1987, with annual production amounts ranging between approximately 1,532 AF and 9,705 AF. Since 2013, CVWD has produced 29,788 AF of groundwater from wells located on the Reservation, and continues to pump groundwater from wells located on the Reservation, without the Tribe's authorization. After the Tribe filed this lawsuit,

CVWD ceased publishing, and otherwise making available including in response to California Public Records Act requests, reports showing how much water is pumped by individual pumpers in the Coachella Valley, including on the Agua Caliente Reservation.

46.    CVWD's historical and ongoing extraction of groundwater from the Coachella Valley Groundwater Basin, including the Upper Whitewater and Garnet Hill sub-basins, has contributed to the Basin's overdraft condition.

47.    DWA pumps approximately 43,000 acre feet of water from the Coachella Valley Groundwater Basin each year.    *See* DWA Website, available at http://www.dwa.org/index.php?option=com_content&view=article&id+49Itemid=37, last accessed on May 7, 2013.

48.    Since 1987, according to DWA's records, DWA has produced at least 643,250 AF of groundwater from wells located on the Agua Caliente Reservation, with annual production amounts ranging from approximately 4,265 AF to 23,686 AF. Since 2013, DWA has produced 61,640 AF of water from wells located on the Reservation, and continues to pump groundwater from wells located on the Reservation, without the Tribe's authorization.

49.    DWA's historical and ongoing extraction of groundwater from the Coachella Valley Groundwater Basin has contributed to the Basin's overdraft condition.

50.    Since 1973, CVWD and DWA have been using imported water from the Colorado River to "recharge" the Coachella Valley Groundwater Basin aquifer in an attempt to partially offset the damaging effects of the aquifer's overdraft condition. *See, e.g.*, 2005 Report at 1-8.

51.    Despite these efforts, the net amount of water stored in the Coachella Valley Groundwater Basin aquifer, including the Upper Whitewater and Garnet Hill sub-basins, continues to decline, resulting in the continuation and worsening of the overdraft condition and while the Defendants claim to have slowed or arrested

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

ongoing overdraft through their recharge program, they concede that their recharge efforts will not reduce or diminish cumulative overdraft, *see* 2019 DWA Replenishment Report at II-29, nor will they address associated ill effects of that long term cumulative overdraft, including irreversible subsidence, decreases in groundwater quality, declining groundwater levels and increased water extraction costs.

52.    The most up-to-date available estimates, published by DWA, indicate that the historic cumulative net overdraft—which takes into account the amount of imported water artificially recharged by the Defendants—totals 538,000 AF in the West Whitewater River Management Area and 109,000 AF in the Mission Creek Management Area. *See id.* These figures include all-time record artificial recharge in 2017 resulting from record-level precipitation the preceding winter. *See id.* at II-32 and Ex. 1. These figures also include more than 235,000 AF of so-called "advanced delivery" water that is stored in the aquifer for Metropolitan Water District (MWD), *see id.* at Ex. 6, and is subject to recall by MWD on demand.

53.    This cumulative overdraft has resulted in a lowered groundwater table in the basin, including under the Agua Caliente Reservation. Lowering of the groundwater table increases the costs of producing groundwater by necessitating deeper wells, more powerful pumps, and higher energy costs for increased pump lifts. These cost increases are directly harmful to those who produce groundwater on the Reservation.

54.    The Tribe has produced groundwater on the Reservation in the past for its own use. The Tribe is resuming groundwater production on the Reservation. It is currently installing wells in both of Defendants' service areas that the Tribe anticipates will produce groundwater no later than January, 2020, likely sooner. The groundwater levels at both of these wells are lower than they would be but for Defendants' overdraft of the aquifer. As a result, the cost to the Tribe for pumping

groundwater at these wells will be higher to due to higher pump lifts. Deeper wells increase energy costs as well.

55.    The Tribe is taking additional affirmative, concrete steps, for additional groundwater production in the immediate future. The Tribe has invested in additional opportunities and is in negotiations to produce additional groundwater on the Reservation. The Tribe intends to fully develop and use its groundwater rights. Because of Defendants' over use of groundwater in the aquifer has caused groundwater levels under the Reservation to lower, the Tribe's cost to produce groundwater from all of its wells will be higher than it would be if the aquifer were at its natural, pre-Reservation level.

56.    On August 6, 2019, Agua Caliente enacted an ordinance to establish the Agua Caliente Water Authority, a tribal government charged to "protect, manage, and regulate the Tribe's Groundwater, and to promote the public health, safety, welfare, and economic security of the Tribe, Tribal Members, Tribal Entities, and the Reservation Community." Agua Caliente Water Authority Ordinance (AC Water Ord.), Ch. 1 § I.C.[1] The Water Authority is directed and authorized to, "among other things, administer well permits, monitor and manage groundwater levels and groundwater quality, and administer the imposition of groundwater production fees on producers of the Tribe's Groundwater." *Id.*, Ch. 1 § I.B.10.

57.    To begin restoration of the aquifer and offset the increased costs of on-Reservation groundwater production and other ill effects resulting from the Defendants' overdraft of the aquifer, the Tribe intends to put a portion of the federal reserved water right decreed in this litigation to use by storing it to replenish the aquifer under the Reservation. To that end, on September 24, 2019, the Tribal Council adopted a resolution directing the Agua Caliente Water Authority to ensure that 20,000 AF of the groundwater reserved for the Agua Caliente Reservation by the

---

[1] The Water Ordinance and related resolutions are found on the Tribe's website: http://www.aguacaliente.org/content/Agua%20Caliente%20Water%20Authority/

United States is stored annually in the aquifer to alleviate depletion resulting from the Defendants' overuse. The Tribe's efforts, which will be implemented through the Tribe's permitting process, will be frustrated if the Defendants are allowed to continue to extract groundwater on the Reservation that the Tribe stores in an effort to reduce the effects of long standing cumulative overdraft. Moreover, the Tribe is unable to ascertain the amount of federal reserved groundwater available for storage absent a quantification of its federal reserved water right.

58.     The Tribe estimates its federally reserved groundwater right to be at least 60,000 AF per year. The Tribe intends to fully develop and use its groundwater rights.

59.     The Tribal Council seated the Water Authority Board on October 8, 2019. *See* Resolution 45-19. Pursuant to Ch. 2, § II.H of the AC Water Ord., the Water Authority is now preparing a report that will, *inter alia*, recommend water production fees to be applied to the production of the Tribe's groundwater on the Reservation, including by the Defendants. This report will be completed by November 4, 2019.

60.     Lessees of allotted land on the Reservation currently pump groundwater. Defendants regulate and unlawfully burden the Tribe's groundwater right by charge all non-*de minimis* pumpers of groundwater on the Reservation a replenishment assessment based on how much water the groundwater pumpers produce.

61.     On September 30, 2019, DWA sent the Tribe a statement claiming that the Tribe owes over $200,000 in fees for replenishment assessments that DWA levied on the Tribe when the Tribe pumped groundwater on the Reservation from 2009 to 2012. The Tribe anticipates that DWA will continue to assess this fee on the Tribe when it resumes pumping groundwater.

62.     Furthermore, the quality of the imported Colorado River water used for groundwater recharge is inferior to that of the local groundwater. In particular, the Colorado River water has a higher level of total dissolved solids (TDS) than the local groundwater. This has resulted in further degradation of groundwater quality and

increasing salinity levels within the Coachella Valley Groundwater Basin aquifer, including the Upper Whitewater and Garnet Hill sub-basins, particularly in the vicinity of the recharge facilities in the northern portion of the Coachella Valley which are in close proximity to land owned by the Tribe and its members.

63.     Population and development in the Coachella Valley have increased in recent decades and are projected to continue increasing well into the future, resulting in a projected increase in water usage and demand.

64.     Additionally, the potential effects of climate change are predicted to decrease naturally occurring inflows into the Coachella Valley Groundwater Basin, including the Upper White water and Garnet Hill sub-basins, aquifer and threaten the availability of imported water, resulting in increased extraction of groundwater within the Basin and a corresponding exacerbation of the existing overdraft condition.

65.     Neither CVWD nor DWA have succeeded in devising a plan to reverse the aquifer's cumulative overdraft condition while meeting current or anticipated future demands for groundwater within the Coachella Valley. Known comprehensive water planning efforts, and proposed ranges of alternatives, do not adequately address the current and future groundwater quantity and quality problems besetting the Coachella Valley.

66.     The Tribe and its members have established a homeland in the Coachella Valley, including housing, schools, government offices, and cultural and commercial enterprises. The Tribe and its members rely on the groundwater resource to satisfy domestic, cultural, commercial, and other homeland purposes.

67.     The increasing groundwater TDS and salinity levels, subsidence, and decreasing groundwater storage capacity present an immediate and ongoing threat of serious and irreversible injuries to the Tribe and its members.

68.     Groundwater underlying the Reservation is in limited supply and is needed to satisfy the present and future needs of the Tribe and its members. The Defendants' withdrawal and use of the groundwater in the Upper Whitewater and

Garnet Hill sub-basins of the Coachella Valley Groundwater Basins adversely injures and affects the ability of the Tribe and its members to exercise its federal reserved right to the withdrawal, use and enjoyment of that groundwater.

69.     The groundwater underlying the Valley in the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin is the primary source of fresh water within the Reservation, and it has experienced intrusion of salt and other pollutants as a direct result of excessive pumping and reinjection without sufficient treatment activities of the Defendants. Degradation of the Valley's groundwater quality adversely injures and affects the ability of the Tribe and its members to exercise its federal reserved right to the withdrawal, use and enjoyment of that groundwater.

70.     Pore space is a constituent element of the land reserved for Agua Caliente by the United States in the 1876 and 1877 Executive Orders.

71.     The Tribe has proprietary interests in the land comprising its Reservation, including in the pore space that it beneficially owns.

72.     The Defendants' assertion of jurisdiction and/or a public servitude over the pore space underlying the Agua Caliente Reservation casts a cloud over the existence, scope, and extent of the Tribe's property right.

73.     The Tribe has sovereign interests in and powers over its Reservation, including its federally reserved water rights and in the pore space that is a constituent element of the land beneficially owned by the Tribe and its members. The Defendants' actions identified herein undermine and infringe upon the Tribe's sovereign authority over its Reservation.

74.     Similarly, the Defendants' assertion of jurisdiction over and an unfettered right to use for their benefit the pore space reserved for Agua Caliente is an affront to the Tribe's sovereignty over its Reservation territory.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief)

75.     The Tribe repeats, realleges and incorporates by reference herein the allegations in paragraphs 1 through 74.

76.     The Tribe and its members have used the land and the natural resources of the Coachella Valley, including its surface water and groundwater resources, since time immemorial and possess aboriginal title to said land and resources that predates the formation of the United States.

77.     By virtue of its aboriginal title to the lands and resources of the Coachella Valley, the Tribe is entitled to a declaration that its aboriginal rights to groundwater from the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin exist in an amount sufficient to meet the aboriginal uses of the Tribe and its members.

78.     The Tribe is entitled to a declaration that its rights to groundwater have a priority date of time immemorial, and that its rights are the senior, prior and paramount water right to Defendants' state law based water rights.

79.     The Tribe is entitled to a declaration that Defendants' past and continued overdraft of the Upper Whitewater and Garnet Hill Sub-basins of the Coachella Valley Groundwater Basin aquifer necessarily and impermissibly interferes with the Tribe's aboriginal groundwater rights and its ability to use and enjoy those rights.

80.     The Tribe and its members have used the land and the natural resources of the Coachella Valley, including its surface water and groundwater resources, since time immemorial. The Executive Orders of 1876 and 1877, as well as other administrative actions, reserved for the Tribe the land comprising the current Agua Caliente Reservation and its resources and constituent elements, including pore space, and impliedly reserved to the Tribe and its members the right to water sufficient to accomplish the homeland purposes of the Reservation. The implied reservation of the right to water applies to groundwater as well as surface water.

81.     The Tribe is entitled to a declaration that it possesses groundwater rights from the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley

Groundwater Basin aquifer in sufficient quantities to foster, promote, and fulfill the homeland purposes for which the lands of the Tribe's Reservation were set aside for the Tribe and its members, both for all present and future purposes.

82.     The Tribe is entitled to a declaration that its rights to groundwater from the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin have a priority date of time immemorial and no later than the Executive Orders of 1876-1877, and that its rights are the senior, prior and paramount water right in the Coachella Valley to Defendants' state law based water rights.

83.     The Tribe is entitled to a declaration that Defendants' continued overdraft of the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer necessarily and impermissibly interferes with the Tribe's reserved federal groundwater rights and its ability to use and enjoy those rights.

84.     The Tribe is entitled to a declaration that recharge of the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer with imported water of a quality that is inferior to the pre-existing groundwater in the aquifer degrades groundwater quality within the Coachella Valley and that such degradation of groundwater quality necessarily and impermissibly interferes with the Tribe's federal reserved groundwater rights and its ability to use and enjoy those rights.

85.     The Tribe is entitled to a declaration that it has a prior and paramount ownership interest in the volume of pore space underlying the Tribe's Reservation and a declaration of the volume of pore space so owned.

## SECOND CLAIM FOR RELIEF

### (Injunctive Relief)

86.     The Tribe repeats and realleges and incorporates by reference herein the allegations in paragraphs 1 through 85.

87.     In furtherance of the Tribe's request for Declaratory Relief, the Tribe also seeks permanent injunctive relief to protect its federal reserved groundwater and pore space rights.

88.     CVWD and DWA pump water unrestrained from the groundwater Upper Whitewater and Garnet Hill sub-basins underlying the Coachella Valley and the Tribe's Reservation. Withdrawal of groundwater by the Defendants from the aquifer underlying the Coachella Valley, and the Tribe's Reservation, has harmed and continues to cause irreparable harm to the Tribe and its members, by infringing upon the ability of the Tribe and its members to effectively utilize their federally reserved and protected right to that groundwater, including but not limited to storing reserved water to partially offset the lingering ill effects of long standing cumulative overdraft.

89.     The pollution of the groundwater in the aquifer due to the reinjection of low quality Colorado River water has infringed and continues to infringe upon the ability of Tribe and its members to exercise effectively their federally reserved and protected right to that groundwater thereby causing and continuing to cause irreparable harm to the Tribe and its members.

90.     The increasing groundwater TDS and salinity levels, subsidence and decreasing groundwater storage capacity associated with the continuing overdraft of the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer and the injection of inferior quality imported water into the aquifer present an immediate and ongoing irreparable harm to the Tribe, its members and the public.

91.     The Tribe seeks a permanent injunction enjoining the Defendants from withdrawing groundwater Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin underlying the Coachella Valley and the Tribe's Reservation in conflict with the rights of the Tribe and its members as declared and decreed by this Court.

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

92.    The Tribe seeks a permanent injunction enjoining the continuing overdraft of the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer by Defendants.

93.    The Tribe seeks a permanent injunction enjoining the recharge of the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer with imported water of a quality that is inferior to the pre-existing groundwater in the aquifer without first treating the water.

94.    The Tribe seeks a permanent injunction enjoining Defendants from infringing upon the Tribe's sovereign and proprietary interests in pore space or interfering with the Tribe's ability to use those rights.

95.    The equities and public interest weigh in favor of the Tribe's requests for injunctive relief.

**WHEREFORE**, the Tribe prays and demands an order from this Court that:

1.    Declares that the Executive Orders of 1876 and 1877 and other federal actions impliedly reserved the right to the groundwater underlying the Reservation in an amount sufficient to foster, promote, and fulfill the purposes for which the lands of the Reservation are set aside for the Tribe and its members;

2.    Further declares that the Tribe has aboriginal rights to groundwater from the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin in the Coachella Valley in an amount sufficient to meet and provide for the aboriginal uses of the Tribe and its members;

3.    Further declares that the priority date of the Tribe's groundwater rights from Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin is time immemorial, or at the very latest that the priority date of the Tribe's rights is no later than the Executive Orders of 1876, and 1877;

4.    Further declares that Defendants' overdraft of the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer necessarily

and impermissibly interferes with the Tribe's groundwater rights and its ability to use and enjoy those rights;

5.     Further declares that the intentional introduction into the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer of imported water that is untreated and of lower quality than the pre-existing groundwater, and the resultant degradation of groundwater quality in and underneath the Coachella Valley, constitutes an impermissible interference with the Tribe's groundwater rights and its ability to use and enjoy those rights;

6.     Further declares that the Tribe is the beneficial owner of the volume of pore space underlying, and forming a constituent element of, the lands reserved for the Tribe by the United States;

7.     Quantifies the Tribe's rights to groundwater from the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin underlying the Coachella Valley in an amount necessary and sufficient to satisfy, foster, and promote the homeland purposes of the Tribe's Reservation;

8.     Quiets the Tribe's title to pore space and quantifies the volume of pore space beneficially owned by the Tribe;

9.     Enjoins Defendants from withdrawing groundwater from the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin underlying the Coachella Valley and the Tribe's Reservation in conflict with the rights of the Tribe and its members as declared and decreed by this Court;

10.    Enjoins the Defendants from overdrafting the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin aquifer;

11.    Enjoins the Defendants from producing groundwater on the Reservation without authorization and from producing groundwater used by the Tribe to replenish the aquifer and partially offset the lingering harmful effects of long standing cumulative overdraft;

12.     Enjoins the Defendants from injecting into the Upper Whitewater and Garnet Hill sub-basins of the Coachella Valley Groundwater Basin water of a quality that is inferior to the pre-existing groundwater in the aquifer without first treating the water;

13.     Enjoins the Defendants from using pore space underlying the Coachella Valley and the Tribe's Reservation in conflict with the rights of the Tribe and its members as declared and decreed by this Court;

14.     Awards such other and further relief as may be deemed just and proper;

15.     Awards attorney's fees and costs; and

16.     Retains this Court's jurisdiction for purposes of enforcement of its decree.


Dated:  October 21, 2019          By_____/s/ *Catherine F. Munson*_____

Catherine F. Munson
Keith M. Harper
Mark H. Reeves
KILPATRICK TOWNSEND & STOCKTON LLP
Steven C. Moore
NATIVE AMERICAN RIGHTS FUND
John Tabinaca Plata
AGUA CALIENTE BAND OF CAHUILLA INDIANS
Attorneys for *Plaintiff*
Agua Caliente Band Of Cahuilla Indians

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**